**APPENDIX**

# INDEX TO APPENDIX

| Document | Filed Date | Docket Number | Page Number |
|---|---|---|---|
| Plaintiff's Motion for a Preliminary Injunction | 5/26/2021 | 2 | A-001 |
| Statement of Interest of the United States | 6/17/2021 | 42 | A-004 |
| First Amended Complaint | 7/16/2021 | 64 | A-026 |
| Memorandum Opinion and Order re Preliminary Injunction | 7/21/2021 | 67 | A-052 |
| West Virginia Secondary School Activities Commission's Motion for Summary Judgment | 4/21/2021 | 276 | A-067 |
| Defendants Harrison County Board of Education and Dora Stutler's Motion for Summary Judgment | 4/21/2021 | 278 | A-072 |
| Defendant's West Virginia State Board of Education and W. Clayton Burch's Motion for Summary Judgment | 4/21/2021 | 283 | A-079 |
| Defendant State of West Virginia's Motion for Summary Judgment | 4/21/2021 | 285 | A-086 |
| Defendant-Intervenor Motion for Summary Judgment | 4/21/2021 | 286 | A-089 |
| Plaintiff's Motion for Summary Judgment | 4/21/2021 | 289 | A-092 |
| Exhibit 2 (Declaration of B.P.J.) to the Declaration of Loree Stark | 4/21/2022 | 289-3 | A-096 |
| Plaintiff's Statement of Undisputed Material Facts | 4/21/2022 | 290 | A-102 |
| Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Exclude Testimony of Gregory A. Brown | 5/12/2021 | 316 | A-129 |
| Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Exclude Testimony of James M. Cantor | 5/12/2021 | 320 | A-160 |
| Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Exclude Testimony of Stephen B. Levine | 5/12/2021 | 324 | A-186 |
| Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Exclude Testimony of Chad T. Carlson | 5/12/2021 | 328 | A-214 |
| Plaintiff's Motion to Reconsider the Grant of Lainey Armistead's Permissive Intervention | 5/26/2022 | 353 | A-233 |

| Document | Filed Date | Docket Number | Page Number |
|---|---|---|---|
| Plaintiff's Memorandum of Law in Support of Motion Reconsider the Grant of Lainey Armistead's Permissive Intervention | 5/26/2022 | 354 | A-237 |
| Exhibit A (Order Granting Petition for Change of Name) to the Declaration of Tara L. Borelli | 6/22/2022 | 417-1 | A-255 |
| Memorandum Opinion and Order re Motion for Summary Judgment | 1/5/2023 | 512 | A-262 |
| Plaintiff's Motion for a Stay Pending Appeal of the January 5, 2023 Orders [Dkt. Nos. 512 and 513] | 1/20/2023 | 515 | A-285 |
| Declaration of B.P.J. | 1/20/2023 | 515-1 | A-303 |
| Declaration of Heather Jackson | 1/20/2023 | 515-2 | A-307 |
| Notice of Appeal | 1/23/2023 | 517 | A-312 |
| Defendants' Response to Plaintiff's Motion for a Stay Pending Appeal of the January 5, 2023 Orders | 1/27/2023 | 520 | A-314 |
| Memorandum Opinion and Order re Stay Pending Appeal | 2/7/2023 | 527 | A-336 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

*Defendants*.

Civil Action No.   2:21-cv-00316

Hon.

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff B.P.J., by and through her next friend and mother, Heather Jackson, moves this

Court, under Federal Rule of Civil Procedure 65, to preliminarily enjoin Defendants, as well as

their officers, employees, agents, attorneys, and any person who is in active concert or participation

with any Defendant or under any Defendant's supervision, direction, or control, from enforcing

any of the provisions of House Bill 3293 ("H.B. 3293"), codified at W. Va. Code § 18-2-25d,

against Plaintiff, and any other law, custom, or policy that precludes Plaintiff's participation on

girls' school sports teams in West Virginia.  A copy of H.B. 3293 is attached as Exhibit A to the

Declaration of Loree Stark which is filed simultaneous with this Motion.  Plaintiff also moves this

Court for an order waiving the requirement for bond or security.

This Motion is based on the memorandum of law in its support and the declarations filed

with it, as well as the Complaint. Plaintiff makes this motion on the ground that H.B. 3293 violates

Title IX of the Education Amendments of 1972, 42 U.S.C. § 1983, and the Equal Protection Clause

of the Fourteenth Amendment to the United States Constitution, as set out in the accompanying

memorandum of law in support of this Motion.

Dated: May 26, 2021

/s/ Loree Stark

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308-1210
Phone: (404) 897-1880
ccharles@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St., Suite 2300 Denver,
CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Statements of Visiting Attorneys
Forthcoming

Attorneys for Plaintiff

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                                    *Plaintiff*,

          v.

WEST VIRGINIA STATE BOARD OF      Civil Action No. 2:21-cv-00316
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA       Hon.
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,
                                    *Defendants*.

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 26th day of May, 2021, I electronically filed a true and exact copy of ***Plaintiff's Motion for a Preliminary Injunction*** with the Clerk of Court and all parties using the CM/ECF System. A copy of this motion will also be served to the Defendants with the Complaint.

                              */s/ Loree Stark*
                              West Virginia Bar No. 12936

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER   )
JACKSON, *Plaintiff*,                           )
                                          )
vs.                                   )   Case No. 2:21-cv-00316
                                          )
WEST VIRGINIA STATE BOARD OF         )
EDUCATION, HARRISON COUNTY BOARD  )
OF EDUCATION, WEST VIRGINIA          )
SECONDARY SCHOOL ACTIVITIES       )
COMMISSION, W. CLAYTON BURCH in his  )
official capacity as State Superintendent, and  )
DORA STUTLER in her official capacity as   )
Harrison County Superintendent, *Defendants*.  )

**STATEMENT OF INTEREST OF THE UNITED STATES**

The United States respectfully submits this Statement of Interest, under 28 U.S.C. § 517,[1]

to advise the Court of its view that Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment do not permit West

Virginia to categorically exclude transgender girls[2] from participating in single-sex sports

restricted to girls.

---

[1] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

[2] The term "transgender" describes a person whose gender identity differs from the person's sex assigned at birth. For example, a transgender girl is a person who identifies as a girl but whose sex assigned at birth was male. The term "cisgender" describes a person whose gender identity is the same as the person's sex assigned at birth. Given Plaintiff's age, the United States refers only to "girls" and "boys," but the analysis applies equally to women and men.

1

The United States has a significant interest in ensuring that all students, including students who are transgender, can participate in an educational environment free of unlawful discrimination and that the proper legal standards are applied to claims under Title IX and the Equal Protection Clause. The U.S. Department of Justice ("DOJ") and U.S. Department of Education enforce Title IX to protect students from sex discrimination in federally funded education programs and activities. This includes ensuring that recipients offer equal athletic opportunities to students regardless of their sex. DOJ is further charged with coordinating federal agencies' implementation and enforcement of Title IX. 28 C.F.R. Pt. 54; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); 28 C.F.R. 0.51. DOJ also has authority to investigate and resolve complaints that a school board is depriving students of equal protection based on sex (and other bases). 42 U.S.C. § 2000c-6.

Under the law challenged here, West Virginia (or the "State") prohibits girls who are transgender from participating on female "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education." W. Va. Code §§ 18-2-25d(c)(1)-(2) ("H.B. 3293"). The State claims that H.B. 3293 will protect athletic opportunities for girls. Neither the facts nor the law supports that assertion. To be sure, there remain significant barriers to providing full equity in athletics for female students.[3] But permitting participation by transgender girls, who make up "approximately one half of one percent" of the United States' population, is not one of them. *See Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020), *appeals docketed*, Nos. 20-35813, 20-35815 (9th Cir.

---

[3] Indeed, on the day Plaintiff filed this lawsuit, the United States filed an *amicus* brief in the Sixth Circuit to clarify the standards for assessing whether a school equitably meets its students' athletic interests and abilities, regardless of sex. *See* U.S. Br. as Amicus Curiae, *Balow v. Michigan State Univ.*, No. 21-1183 (6th Cir. May 26, 2021).

Sep. 17, 2020).  The United States submits this Statement of Interest to provide its view that Plaintiff's Title IX and Equal Protection Clause challenges are likely to succeed on the merits.

## BACKGROUND

The Governor of West Virginia signed H.B. 3293 into law on April 28, 2021, and it is set to go into effect on July 8, 2021.  The law mandates that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education . . . shall be expressly designated as [male, female, or coed] based on biological sex."  W. Va. Code § 18-2-25d(c)(1).  The law defines "biological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth."  *Id.* § 18-2-25d(b)(1).  It further defines "female" to mean "an individual whose biological sex determined at birth is female," with a corresponding definition for "male."[4]  *Id.* §§ 18-2-25d(b)(2)-(3).  The law prohibits girls who are transgender from participating on girls' sports teams, stating that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex"—where "male sex" is determined by sex assigned at birth—"where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* § 18-2-25d(c)(2).  There is no parallel provision for participation on boys' sports teams.  The law also creates a private cause of action for "[a]ny student aggrieved" by a violation, allowing for injunctive relief, damages, fees, and costs against a county board of education or state institution of higher education.  *Id.* § 18-2-25d(d)(1).  The Legislature's proffered justification is that "[c]lassification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex."  *Id.* § 18-2-25d(a)(5).  Specifically, "[b]iological males would displace females to a substantial extent if permitted to compete on teams

---

[4]  The United States does not concede the accuracy of these definitions.

3

designated for biological females." *Id.* § 18-2-25d(a)(3).

Plaintiff B.P.J is an 11-year-old girl who is transgender. She argues that Defendants' compliance with H.B. 3293 will bar her from participating in school athletics in violation of Title IX and the Equal Protection Clause. No. 1 at 2.[5] B.P.J. participated on an all-girls cheerleading team while in elementary school, and she wants to participate in girls' athletics as she enters middle school in the 2021-22 school year. No. 2-1 at 21-22. Specifically, B.P.J. wants to try out for Bridgeport Middle School's girls' cross-country and track teams. The middle school principal informed B.P.J.'s mother that her daughter may not participate on the girls' cross-country or track teams because of H.B. 3293. No. 2-1 at 23. B.P.J. does not seek to join the boys' cross-country and track teams because she is a girl and such participation would "devastate" B.P.J., "completely erase who she is," and undermine her social transition. No. 1 at 17; No. 2-1 at 23. Even if B.P.J. wanted to participate on the boys' team, the principal said it would be "confusing" for her to join the boys' teams because she looks like and presents as a girl. No. 2-1 at 23. In reality, then, H.B. 3293 will exclude B.P.J. entirely from the cross-country and track programs at her middle school. B.P.J. has moved for a preliminary injunction, arguing that Defendants' compliance with H.B. 3293 violates Title IX and the Equal Protection Clause. She requests this Court to enjoin West Virginia from enforcing H.B. 3293 and "any other law, custom, or policy that precludes B.P.J.'s participation on girls' school sports teams in West Virginia" and allow B.P.J. to participate on girls' sports teams consistent with her gender identity. No. 19 at 8.

## ARGUMENT

On a motion for a preliminary injunction, the court reviews: (1) the movant's likelihood

---

[5] "No.___ at ___" refers to the docket entry number and page number of documents filed in this case, using the Court's CM/ECF pagination.

of success on the merits; (2) the threat of irreparable harm to the movant absent an injunction; (3) the balance of hardships; and (4) the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). The United States believes that Plaintiff will likely succeed on the merits of her Title IX and equal protection claims and does not address the other factors.

A state law that limits or denies a particular class of people's ability to participate in public, federally funded educational programs and activities solely because their gender identity does not match their sex assigned at birth violates both Title IX and the Equal Protection Clause. H.B. 3293 does exactly this. H.B. 3293's prohibition applies to all transgender girls in public secondary and postsecondary education—regardless of a student's specific circumstances—and to no one else.[6]

H.B. 3293 violates Title IX by effectively prohibiting, solely on the basis of sex, a certain subset of students—girls who are transgender—from participating in athletic programs offered by recipients of federal financial assistance ("recipients"). On its face, H.B. 3293 restricts girls who are transgender from participating on girls' teams. But because forcing transgender girls to participate on boys' teams also causes discriminatory harm, H.B. 3293 affords them no opportunity to participate on single-sex sports teams at all.

H.B. 3293 also violates the Equal Protection Clause. Discriminatory treatment against transgender people is subject to heightened scrutiny because it constitutes both discrimination based on sex and discrimination against a quasi-suspect class. H.B. 3293 fails heightened scrutiny

---

[6] To be sure, West Virginia may not remedy the violation by extending its categorical ban to boys who are transgender. The Supreme Court has explained that federal nondiscrimination mandates protect individuals. By extending its discriminatory ban to boys, West Virginia would not avoid liability, but rather would double it. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) ("Nor is it a defense for an employer to say it discriminates against both men and women because of sex. . . . Instead of avoiding Title VII exposure, this employer doubles it.").

analysis because West Virginia cannot demonstrate that prohibiting a handful of transgender student athletes from playing on athletic teams consistent with their gender identity is substantially related to any important government interest. Thus, this Court should find a likelihood that Plaintiff will succeed on the merits of both her Title IX and Equal Protection Clause claims.

## I.    B.P.J. Is Likely To Prevail On Her Title IX Claim

B.P.J. is likely to prevail on her Title IX claim against Defendants. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's implementing regulations mandate that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 34 C.F.R. § 106.41(a); 28 C.F.R. § 54.450(a). Although the regulations allow recipients to operate or sponsor separate teams based on sex, the regulations do not define "sex" or address how students who are transgender should be assigned to such teams. 34 C.F.R. § 106.41(b); 28 C.F.R. § 54.450(b). The regulations do not require, or even suggest, that recipients assign students who are transgender to teams based on their sex assigned at birth, as H.B. 3293 requires.

This Court should reject any attempt by the State to argue that *the regulations* do not prohibit the assignment of students to teams based on sex assigned at birth, regardless of whether such a classification harms transgender students. When assigning students to single-sex sports teams, a recipient must still comply with the *statutory* prohibition against discrimination based on sex in Title IX itself. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) ("[T]he implementing regulation cannot override the statutory prohibition against

*discrimination* on the basis of sex."), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *petition for cert. filed*, No. 20-1163 (Feb. 19, 2021).  And the Supreme Court has recently clarified that discrimination against a person for being transgender *is* discrimination based on sex.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746-47 (2020); *see also Grimm*, 972 F.3d at 619.  Therefore, any interpretation of Title IX's regulations that requires gender identity discrimination would violate the statute's nondiscrimination mandate.  Because H.B. 3293 requires the Defendants to engage in precisely this type of sex discrimination that causes harm to B.P.J., the law violates Title IX.  A discriminatory state law is no defense to a Title IX violation.

    A.    *H.B. 3293 Requires Recipients To Discriminate In Violation Of Title IX*

    B.P.J. prevails on her Title IX claim by showing:  (1) she was excluded from an education program or activity on the basis of sex; (2) the educational institution in question is a recipient of federal financial assistance; and (3) the improper discrimination caused her harm.  *See Grimm*, 972 F.3d at 616 (citation omitted).  The United States believes she is likely to make this showing.

    There is no question that the school district that B.P.J. attends is a recipient of federal funds.  Nor can there be any doubt that B.P.J. will be excluded from a recipient's education program or activity:  Bridgeport Middle School's principal told B.P.J.'s mother that B.P.J. is ineligible for the girls' cross-country and track program.  *See* No. 2-1 at 23.  That is precisely the effect of H.B. 3293.  It excludes all girls who are transgender from participating in girls' athletics in public secondary and postsecondary schools.

    Any argument that B.P.J. has not been excluded because she could join the boys' team is untenable.  B.P.J. is a girl, not a boy.  She describes herself as a girl.  No. 2-1 at 31.  She lives and identifies as a girl in her daily life.  No. 2-1 at 20.  Her middle school principal acknowledged it would be "confusing" for B.P.J. to join the boys' teams given that she neither looks like, nor

presents herself as a boy.  No. 2-1 at 23.  As the Fourth Circuit has explained, for purposes of a discrimination analysis, B.P.J. is similarly situated to other girls.  *See Grimm*, 972 F.3d at 610, 618 ("Grimm was similarly situated to other boys, but was excluded from using the boys['] restroom facilities based on his sex-assigned-at-birth.").  Requiring her to join a boys' team would harm B.P.J. for the reasons discussed below.  In practice, Harrison County Schools' compliance with H.B. 3293 will exclude B.P.J. from all of her school's single-sex sports teams.

It is also clear that this exclusion is based on sex.  H.B. 3293 targets girls who are transgender.  In *Bostock*, the Supreme Court explained that "discrimination based on . . . transgender status necessarily entails discrimination based on sex."  *See* 140 S. Ct. at 1746-47.  Following *Bostock*, the Fourth Circuit held that Title IX prohibits discrimination against students because they are transgender.  *Grimm*, 972 F.3d at 616-17; *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *petition for reh'g en banc pending*, No. 18-13592 (11th Cir. Aug. 28, 2020).  In *Grimm*, the Fourth Circuit found that a school board policy violated Title IX because the school board:

> could not exclude Grimm from the boys['] bathrooms without referencing his 'biological gender' under the policy, which it has defined as the sex marker on his birth certificate.  Even if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions.

972 F.3d at 616.  So too here.  H.B. 3293 separates students onto athletic teams by their "sex determined at birth," W. Va. Code § 18-2-25d (b)(2)-(3), and it is impossible to enforce H.B. 3293 against B.P.J. without referencing her sex assigned at birth.

Finally, H.B. 3293 causes B.P.J. discriminatory harm.  To comply with H.B. 3293, B.P.J.'s school district must exclude her from girls' sports entirely, all the way through high school.  *See Gregor v. W. Va. Secondary Sch. Activities Comm'n*, 2020 WL 6292813, at *4 (S.D. W. Va. Oct.

27, 2020) (citations omitted) (acknowledging a person may be irreparably harmed if they cannot participate in a sport at all); No. 2-1 at 60 ("[I]t can be extremely harmful for transgender youth to be excluded from the team consistent with their gender identity.").[7]  B.P.J., unlike her cisgender peers, would miss the many benefits of interscholastic athletics, including skill-building, exercise, motivation, social ties, and increased confidence.  No. 2-1 at 46-47.  As many courts have recognized, this type of exclusion would cause a student like B.P.J. to experience stigma, isolation, and dignitary harm.  *See Grimm*, 972 F.3d at 597-601, 617-18 (bathroom policy made plaintiff feel "alienat[ed]" and "humiliate[ed]"); *Adams*, 968 F.3d at 1307 (bathroom policy made plaintiff feel "sorely 'alienated' and 'different' from other students because he is transgender"); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-47 (7th Cir. 2017) (exclusion from boys' restroom "stigmatized" transgender boy, causing him "significant psychological distress" including "depression and anxiety"), *cert. dismissed*, 138 S. Ct. 1260 (2018); *Dodds v. Dep't of Educ.,* 845 F.3d 217, 221-222 (6th Cir. 2016) (finding that exclusion from the girls' restrooms "had substantial and immediate adverse effects" on plaintiff's "daily life," "health," and "well-being").[8]

Requiring that B.P.J. participate on a boys' team would likewise cause her real and lasting harm.  Joining the boys' team would contravene B.P.J.'s medically-supervised social transition.  No. 2-1 at 20-21, 60.  It would "erase who she is" and "devastate her," causing mental and

---

[7]  If she attends a public college in West Virginia, B.P.J. also will be banned from women's intercollegiate sports.

[8]  Conversely, the mere presence of transgender students in sex-segregated spaces that align with their gender identity does not violate cisgender students' Title IX rights.  *See Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 (3d Cir. 2018) (restrooms and locker rooms), *cert. denied*, 139 S. Ct. 2636 (2019); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020) (restrooms, locker rooms, and showers).

emotional distress.  No. 2-1 at 23, 32-33.  Forcing her to run on the boys' team would "constitute harm under Title IX, as it 'invites more scrutiny and attention' from other students, 'very publicly branding all transgender students with a scarlet 'T'.'"  *Grimm*, 972 F.3d at 617-18 (quoting *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) (brackets omitted), *cert. denied*, 139 S. Ct. 2636 (2019)).  Being on a boys' team would make B.P.J. vulnerable to invasive questions, gossip, and ridicule for participating on the "wrong" team.  This "emotional and dignitary" harm is "legally cognizable under Title IX."  *See id.* at 618 (citing *Adams*, 968 F.3d at 1306-07, 1310-11).  On these facts, the United States believes B.P.J. is likely to prevail on the merits of her Title IX claim.

> **B.**  *Title IX Itself Provides Sufficient Protection Against H.B. 3293's Concern That Boys Will Displace Girls In Athletics*

In addition to requiring recipients to discriminate based on sex, the West Virginia Legislature's justification for H.B. 3293 ignores Title IX's existing protections in the athletics context.  The State seeks to justify the law on the theory that "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated.  Biological males would displace females to a substantial extent if permitted to compete on teams designated for biological females."  W. Va. Code § 18-2-25d(a)(3).[9]  As an initial matter, there are no facts to suggest that, in this case, allowing B.P.J. to participate in girls' sports will substantially displace other girls, or that any cisgender boy seeks a spot on a girls' team.  An overview of Title IX's regulations, which can be credited with creating hundreds of thousands of athletic opportunities for girls, demonstrates why H.B. 3293 is unnecessary.

---

[9]  H.B. 3293's definition of "biological males" wrongly conflates two distinct groups, cisgender boys and transgender girls.  The legislature's conflation of these groups is inappropriate given the Fourth Circuit's analysis of similarly situated students in *Grimm*.  972 F.3d at 610, 618 (finding that the plaintiff, a transgender boy, was "similarly situated to other boys").

Since 1975, Title IX's implementing regulations have required recipients to provide equal athletic opportunities for their students regardless of sex. 45 C.F.R. § 86.41(c) (subsequently codified at 34 C.F.R. § 106.41(a) and 28 C.F.R. § 54.450(a)). The regulations recognized that in order to expand opportunities for girls, as the underrepresented sex, recipients could offer sex-segregated sports teams. 45 C.F.R. § 86.41(b) (subsequently codified at 34 C.F.R. § 106.41(b); 28 C.F.R. § 540(b). B.P.J. does not challenge her school's ability to offer separate boys' and girls' sports teams. She simply challenges how her school and her state intend to assign her, as a transgender girl, to a single-sex team.

The regulations further require that a recipient's "selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c); 28 C.F.R. § 54.450(c). The regulation ensures that recipients provide athletic participation opportunities that effectively accommodate the interests and abilities of each sex, and protects against boys usurping girls' athletic participation opportunities. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856-57 (9th Cir. 2014). It does not preclude recipients from treating transgender students consistent with their gender identity. Nor can it. *See Grimm*, 972 F.3d at 618 ("[T]he implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex."). And as a factual matter, there is no discernible risk that transgender girls will somehow "displace" cisgender girls "to a substantial extent." W. Va. Code § 18-2-25d(a)(3); *see also Hecox*, 479 F. Supp. 3d at 977 ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

Moreover, under Title IX, recipients may both permit transgender girls to participate on girls' athletic teams *and* exclude cisgender boys from the girls' teams.  B.P.J. is a girl.  She has participated on an all-girls community cheerleading team for the last two years.  No. 2-1 at 21.  Her middle school principal acknowledged that it would be confusing to identify her any other way.  No. 2-1 at 23.  Consistent with Fourth Circuit precedent, B.P.J. is similarly situated to other girls.  *See Grimm*, 972 F.3d at 610.  An analogous claim by a cisgender boy to play on a girls' team rather than the corresponding boys' team would fail because:  (1) he lives and presents as a boy and therefore is not similarly situated to girls for purposes of permissibly sex-segregated activities; and (2) he experiences no cognizable "emotional and dignitary harm" from being excluded from the girls' team.  *Id.* at 618 (citing *Adams*, 968 F.3d at 1306-07, 1310-11).

At its core, Title IX is about ensuring equal educational opportunities to all students regardless of their sex.  Despite its claim of "promot[ing] equal athletic opportunities" for girls, W. Va. Code § 18-2-25d(a)(5), H.B. 3293 does the opposite.  It targets a vulnerable and historically marginalized subset of girls and prohibits them from participating in athletics.  It bars girls who are transgender from teams that are consistent with their gender identity—and effectively bars them from all single-sex sports teams at the secondary and postsecondary levels—without regard to any individual's specific circumstances and without any facts to suggest that there is a "problem" that requires solving in the first place.  H.B. 3293 does so despite the fact that Title IX already protects equal athletic opportunities for all students and H.B. 3293 does so in violation of Title IX's mandate to offer educational opportunities free of sex discrimination.

## II.     H.B. 3293 Cannot Survive Heightened Scrutiny Under The Equal Protection Clause

B.P.J. is also likely to succeed on the merits of her equal protection claim because H.B. 3293 discriminates based on sex and transgender status.  The Equal Protection Clause

12

prevents states from discriminating against individuals on the basis of sex and against people who are transgender absent an "exceedingly persuasive" justification. *Grimm*, 972 F.3d at 610-13. The State cannot demonstrate such a justification.

A.      *H.B. 3293 Is Subject To Heightened Scrutiny*

To determine whether a statute or policy warrants heightened scrutiny under the Equal Protection Clause, a court asks whether the classification at issue jeopardizes the exercise of a fundamental right or categorizes based on an inherently suspect characteristic. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citations omitted). Heightened scrutiny applies here for two separate reasons: H.B. 3293 discriminates based on sex and H.B. 3293 discriminates based on transgender status.

The Supreme Court has long held that classifications based on sex warrant heightened scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*) (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982)). H.B. 3293 singles out girls who are transgender, including B.P.J., for different treatment based on the sex they were assigned at birth. W. Va. Code § 18-2-25d(b)(1). The Fourth Circuit's controlling precedent holds that excluding transgender students from sex-segregated spaces that align with their gender identity is discrimination based on sex under the Equal Protection Clause. *Grimm*, 972 F.3d at 607-10. Other circuits agree. *See Adams*, 968 F.3d at 1296; *Whitaker By Whitaker*, 858 F.3d at 1051. Just as in *Grimm*, H.B. 3293 discriminates on the basis of sex: it treats B.P.J. differently from all other students with the same gender identity based solely on her sex assigned at birth. 972 F.3d at 608 (school district policy limiting bathroom access to "corresponding biological genders" or sex listed on birth certificate "creates sex-based classifications").

Fourth Circuit precedent also requires heightened scrutiny here because people who are

transgender are a quasi-suspect class. *Grimm*, 972 F.3d at 611–13. The Fourth Circuit observed, "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment." *Id.* at 610-11 (citation omitted). It does not matter that H.B. 3293 categorizes teams without explicitly referencing "transgender students": by categorizing teams based on that law's definition of "biological sex," girls who are transgender are the only group who cannot compete on sports teams that align with their gender identity. W. Va. Code § 18-2-25d(b). Because H.B. 3293 discriminates against a quasi-suspect class—girls who are transgender—this Court must apply heightened scrutiny. *Grimm*, 972 F.3d at 610.

> **B.    *H.B. 3293 Is Not Substantially Related To Achieving The State's Articulated Governmental Interest***

H.B. 3293 cannot survive the rigorous analysis that heightened scrutiny demands. To survive heightened scrutiny, the state must show the law "serves important governmental objectives" and the "discriminatory means employed are substantially related to the achievement of those objectives." *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724) (internal quotation marks omitted). "The burden of justification is demanding" and the justification must be "'exceedingly persuasive.'" *Id.* (quoting *Miss. Univ. for Women,* 458 U.S. at 724). The inquiry provides enhanced protection in circumstances where there is a greater danger that the legal classification results from either impermissible prejudice or stereotypes, *see, e.g.*, *Grimm*, 972 F.3d at 614–15, or "a bare . . . desire to harm a politically unpopular group," *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Moreover, when evaluating an articulated governmental interest, the "justification must be genuine, not hypothesized" and "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533; *see also Grimm*, 972 F.3d at 615 (holding that policy restricting access to restroom by

14

"biological sex" is "marked by misconception and prejudice" against transgender plaintiff) (citation omitted); *Adams*, 968 F.3d at 1297 (finding no substantial relationship between defendants' articulated justification and restroom policy where the concerns were hypothesized and treated transgender plaintiff unfavorably "simply because he defies gender stereotypes"). A classification does not withstand heightened scrutiny when "the alleged objective" differs from the "actual purpose" underlying the classification. *Miss. Univ. for Women,* 458 U.S. at 730.

The State proffers "promoting equal athletic opportunities for the female sex" as its governmental interest. W. Va. Code § 18-2-25d(a)(4). There is no doubt that promoting equal athletic opportunities is an important governmental interest. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011) (citing *Kelley v. Bd. of Tr., Univ. of Ill.*, 35 F.3d 265, 272 (7th Cir. 1994)). The State contends this law is necessary to "promote equal athletic opportunities for the female sex" because "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not . . . similarly situated" and "[b]iological males would displace females to a substantial extent if permitted to compete on teams designated for biological females." W. Va. Code § 18-2-25d(a)(3)-(5). But as explained above, Title IX already ensures that cisgender boys will not "displace [girls] to a substantial extent" and the State does not claim that cisgender boys have sought to do so. The truth is H.B. 3293 targets transgender girls. This Court should reject the State's proffered explanation as factually inaccurate, based on biases, and employing overbroad generalizations about transgender girls. Further casting doubt on the State's justification, H.B. 3293 hinders equal athletic opportunities for girls by creating an additional hurdle for participation.

First, the State's justification lacks a factual basis. H.B. 3293's text and legislative record make clear that the law was calculated to exclude girls who are transgender from girls' athletic

teams.  The State already allows schools to have "separate teams for members of each sex," and under existing state law, cisgender boys cannot join a girls' team except in limited circumstances. W. Va. Code R. § 127-2-3.8.[10]  When asked how H.B. 3293 would change this status quo, counsel for the bill explained that it "would affect those that changed their sex after birth."  No. 1-1 at 14. Other delegates, including bill sponsors, also made clear that the bill's focus was on transgender girls.  No. 1-1 at 21, 25.  So, when the State says, "biological males would displace females" in athletics, W. Va. Code § 18-2-25d(a)(3), and defines students by their sex assigned at birth, *id.* § 18-2-25d(b)(1), the State's objective is clear: to define transgender girls as "boys" and then to prevent them from participating on girls' athletics teams.  *See VMI*, 518 U.S. at 535-36 ("[B]enign justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." (internal quotation marks and citation omitted)).

Recently, an Idaho District Court found a similar law unconstitutional.  *See Hecox*, 479 F. Supp. 3d at 979.  The *Hecox* court rejected Idaho's claim that barring girls who are transgender from girls' athletic teams had any relationship to ensuring equality and opportunities for girls' athletics.  As was the case in *Hecox*, H.B. 3293's legislative record "reveals no history of transgender athletes ever competing in sports" in West Virginia and no evidence that female athletes have been displaced by transgender athletes in West Virginia.  *Id.* at 978.  The West

---

[10]  H.B. 3293's reliance on *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982), does not support the law's discriminatory means.  W. Va. Code § 18-2-25d(a)(3).  *Clark* did not address the participation of transgender athletes.  Instead, *Clark* upheld a school district's policy that cisgender boys could not play on a girls' volleyball team where "boys' overall opportunity is not inferior to girls'."  695 F.2d at 1131.  At issue here is a transgender girl who seeks to play on a girls' team.  *Clark* thus provides no support for the State's discriminatory purpose because, simply, transgender women "have not and could not 'displace' cisgender women in athletics 'to a substantial extent.'"  *Hecox*, 479 F. Supp. 3d. at 977 (quoting *Clark*, 695 F.3d at 1131).

Virginia Department of Education's Executive Director of Policy and Government Relations testified that the agency has received no complaints about transgender athletes. No. 1-1 at 14-15. One of the bill's sponsors, Delegate Ellington, stated that he knew of no complaints regarding transgender athletes in West Virginia, *see* No. 1-1 at 9, 19, much less that transgender girls are so numerous and skilled that they could "displace" other women and girls in sports.[11] Instead, he pointed to "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut." No. 1-1 at 21. The existence of two runners in another state fails to provide an "exceedingly persuasive justification" for H.B. 3293's categorical bar. *See Hecox*, 479 F. Supp. 3d. at 979 (citing *VMI*, 518 U.S. at 533). As in Idaho, the record here contains "no evidence to suggest a categorical bar against transgender female athlete's participation in sports is required in order to promote 'sex equality' or to 'protect athletic opportunities for females'" in West Virginia. *Id.* at 978-79 (citation omitted). The State can point to no valid evidence to justify H.B. 3293.

On the contrary, the State disregarded evidence that giving girls who are transgender the same athletic opportunities that all other girls enjoy has not displaced cisgender girls. The West Virginia Legislature had before it evidence that sixteen states successfully allow transgender students to participate in sports consistent with their gender identity. No. 25 at 38-39, 75. The National Collegiate Athletic Association ("NCAA") has allowed transgender students who meet certain conditions to participate in intercollegiate sports consistent with their gender identity for over ten years. *Id.*; *see also* NCAA, *NCAA Inclusion of Transgender Student-Athletes* (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf. Yet, girls and young women who are transgender have not displaced cisgender girls in those states or in college

---

[11] The bill's co-sponsors and the Governor of West Virginia also stated that they did not know of any girls who are transgender in West Virginia who competed on girls' teams, much less who dominated or displaced cisgender girls. No. 1 at 2, 14.

athletics.  The lack of "empirical evidence that transgender inclusion will hinder sex equality in sports or athletic opportunities" for girls shows that H.B. 3293's exclusion of transgender girls "has no relationship" to the law's objective.  *Hecox*, 479 F. Supp. 3d. at 979, 982.

Second, statements by H.B. 3293's sponsors show that a misunderstanding or fear of transgender girls, and in certain instances, outright anti-transgender bias, rather than an interest in promoting women's athletic opportunities, motivated this bill.  For example, Delegate Mazzochi said that she did not "want all this mixing and matching" of transgender and cisgender children in "locker rooms."  No. 1 at 12.  Delegate Bridges announced on Facebook he was co-sponsoring H.B. 3293, then "liked" comments to his post that advocated for physical violence against girls who are transgender, compared them to pigs, and called them by a pejorative term ("tranny").  Jordan Bridges, "Update: The bill passed out of committee." Facebook (Mar. 16, 2021), https://perma.cc/HA5C-VJ4N.[12]  He also made other anti-transgender comments, saying that "this country is going down hill [sic] fast" in response to a news article discussing transgender-inclusive business practices.  Jordan Bridges, "I swear my hand." Facebook (Oct. 23, 2019), https://perma.cc/8BHK-7V5Z.  The biases and moral disapproval articulated by the bill's sponsors are not justifiable reasons to legislate.  *See Lawrence v. Texas*, 539 U.S. 558, 577-78 (2003) (holding moral disapproval of same-sex sexual conduct was impermissible basis for legislation); *see also Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (finding in a race discrimination suit that "[t]he Constitution cannot control such prejudices but neither can it tolerate them.  Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").[13]

---

[12]  The archived and live Facebook pages are available via the permalink.  DOJ has retained permanent copies of these Facebook pages in the event that they are modified or deleted.

[13]  Intermediate scrutiny is the appropriate level of review in this case.  But even under rational basis review, H.B. 3293 would fail because bare dislike of an unpopular social group is never a

Third, even if this Court were to credit the State's purported objective of wanting to protect girls' athletic opportunities, H.B. 3293's categorical exclusion of transgender girls is not "substantially related" to that objective, as the equal protection caselaw requires. *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724) (internal quotation marks omitted). H.B. 3293's assumption that transgender girls, as a group, enjoy some inherent competitive advantage over their cisgender classmates ignores the facts of this case. Excluding B.P.J., who has not gone through puberty and is receiving puberty-delaying treatment, No. 2-1 at 21, 32, contributes nothing to ensuring competitive fairness. *See* No. 2-1 at 6-8. By sweeping so broadly, the State proved itself "less concerned with ensuring equality in athletics than [] with ensuring exclusion of transgender women athletes." *Hecox*, 479 F. Supp. 3d at 984.

Finally, H.B. 3293 may hinder rather than promote athletic opportunities for all girls. Though the law purports to bar only transgender girls from joining the girls' team, the practical effect is that *every* girl in West Virginia may be subject to having her eligibility for a single-sex team challenged merely because some other student claims the girl in question is not a "real" girl. This is likely to affect girls who do not adhere to sex stereotypes and who present as less stereotypically feminine. While intended to expose transgender girls, the consequences would be harmful for gender non-conforming cisgender girls as well. Indeed, two doctors testified that being the subject of such a challenge would be "psychologically devastating," "embarrassing, humiliating," "lead to the . . . person being ostracized," and increase her suicide risk. No. 25 at 97-98, 101. Thus, rather than protecting opportunities for girls, the law could reasonably chill

---

legitimate legislative motive. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446-47 (1985)*; Moreno*, 413 U.S. at 534. The State's prohibition of transgender girls from girls' teams is not rationally related to its stated interest of protecting girls' athletic opportunities. *See Cleburne,* 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

athletic participation by all girls who do not conform to sex stereotypes.

H.B. 3293 cannot survive heightened scrutiny. The State cannot point to any valid evidence that allowing transgender girls to participate on girls' sports teams endangers girls' athletic opportunities. Instead, the State legislated based on misconceptions and overbroad assumptions about transgender girls. It is illogical for the State to believe it can protect girls' athletic opportunities by barring girls from playing sports. The harm to B.P.J. is real and it will be lasting. The United States believes B.P.J. will succeed on the merits of her equal protection claim.

## CONCLUSION

Title IX and the U.S. Constitution bar Defendants from implementing the policy commanded by H.B. 3293. That policy does nothing to further the State's purported goal of protecting athletic opportunities for girls. At the same time, it violates the nondiscrimination mandates of Title IX and the Equal Protection Clause.

Respectfully submitted, this 17th day of June, 2021.

LISA G. JOHNSTON
Acting United States Attorney
Southern District of West Virginia


_____
FRED B. WESTFALL, JR.
W. Va. State Bar No. 3992
Assistant United States Attorney, Civil Chief
JENNIFER M. MANKINS
W. Va. State Bar No. 9959
Assistant United State Attorney
300 Virginia Street East, Room 4000
Charleston, WV 25301
Telephone: (304) 345-2200
Fax: (304) 347-5104
Fred.Westfall@usdoj.gov
Jennifer.Mankins@usdoj.gov


/s/ Emma Leheny_____
EMMA LEHENY
Principal Deputy General Counsel

VANESSA SANTOS
JESSICA WOLLAND
Attorneys
Office of the General Counsel
United States Department of Education

KRISTEN CLARKE
Assistant Attorney General

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS
Acting Deputy Assistant Attorney General
Civil Rights Division


_____
WHITNEY M. PELLEGRINO
Acting Chief
ARIA S. VAUGHAN
MICHELLE L. TUCKER
AMANDA K. DALLO
Trial Attorneys
United States Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
Telephone: (202) 598-9629
Aria.Vaughan@usdoj.gov
NY Bar No. 5044748


*Attorneys for the United States*


A-024

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Respectfully submitted,

ARIA S. VAUGHAN
Trial Attorney
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
Telephone: (202) 598-9629
Aria.Vaughan@usdoj.gov
NY Bar No. 5044748

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, PATRICK MORRISEY in his official capacity as Attorney General, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**FIRST AMENDED COMPLAINT** |

**INTRODUCTION**

1.      B.P.J. is an 11-year-old girl who will start middle school this fall.  While in elementary school, B.P.J. participated on a cheerleading team, where she enjoyed the camaraderie of practicing, playing, and competing alongside a team comprised entirely of girls.  This fall, B.P.J. wants to continue playing sports in middle school by participating on the girls' cross-country and track teams.  B.P.J. comes from a family of runners, and she is excited for her chance to try out and compete.

2.      But without this Court's intervention, B.P.J. will be denied that opportunity simply because she is transgender.  As part of a wave of similar legislation introduced across the country, West Virginia passed a new law in April 2021 that categorically bans B.P.J. and all other girls who are transgender in West Virginia from participating in school sports consistent with their

1

gender identity. The new statute, which was passed by the legislature as H.B. 3293, is codified at W. Va. Code § 18-2-25d ("H.B. 3293").[1]

3.    H.B. 3293 was prompted by unfounded stereotypes, false scientific claims, and baseless fear and misunderstanding of girls who are transgender. Proponents of H.B. 3293 made clear that its purpose is to exclude what they referred to as "transgenders"[2] from girls' sports teams. Yet, as H.B. 3293's sponsors and the Governor have acknowledged, there is no evidence of any "problem" caused by girls who are transgender participating on sports teams in West Virginia.

4.    By barring B.P.J. and other girls who are transgender from participating in school athletics, H.B. 3293 discriminates on the basis of sex and transgender status in violation of the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). If allowed to go into effect, H.B. 3293 will cause severe and entirely unnecessary harms and distress to B.P.J. and other girls who are transgender—an already vulnerable group of people subject to a history of discrimination that continues to this day.

5.    B.P.J. seeks declaratory and injunctive relief from this Court to allow her to experience the benefits of athletic participation consistent with her gender identity and without being singled out from other girls for different treatment simply because she is transgender.

## PARTIES

**Plaintiff**

6.    B.P.J. is an 11-year-old girl who lives in Harrison County, West Virginia. She will attend Bridgeport Middle School in the fall and intends to try out for the girls' cross-country and

---

[1] The enacted version of H.B. 3293 is attached as Exhibit A to the Declaration of Loree Stark ("Stark Declaration") that is filed contemporaneously with this Complaint.
[2] *See* Stark Declaration, Exhibit E (April 8, 2021 West Virginia Senate Hearing).

track teams.  The first week of tryouts begins on August 2, 2021.  B.P.J. brings this suit through her next friend and mother, Heather Jackson.

**Defendants**

7.      Defendant West Virginia State Board of Education ("State Board of Education"), located in Kanawha County, has a statutory duty to supervise the public-school system and is responsible for implementing education policies and programs in West Virginia.  W. Va. Const. art. XII, § 2; W. Va. Code § 18-2-5; *Jones v. W.Va. State Bd. of Educ.*, 218 W. Va. 52, 61 (2005). The State Board of Education's supervisory role, which includes extracurricular activities such as interscholastic athletics, has been delegated to "county boards of education and the West Virginia Secondary School Activities Commission."  *Jones*, 218 W. Va. at 61 (citing W. Va. Code § 18-2-25).

8.      Defendant West Virginia Secondary School Activities Commission ("School Activities Commission"), located in Wood County, controls, supervises, and regulates interscholastic athletics for secondary schools pursuant to the State Board of Education's power under West Virginia Code § 18-2-25.  Such powers may be limited and are supervised by the State Board of Education.  *Id.*  The School Activities Commission possesses rule-making authority under West Virginia Code § 18-2-25.  Upon information and belief, the School Activities Commission is the controlling authority for Bridgeport Middle School's athletic programs.[3]

9.      Defendant Harrison County Board of Education ("County Board of Education") is the governing body of Harrison County's public education system, which includes Bridgeport Middle School.  W. Va. Code § 18-5-1.  The County Board of Education exercises control,

---

[3] *See* School Activities Commission's Rules and Regulations Handbook, at V, https://www.wvssac.org/rules-and-regulations/ (listing Bridgeport Middle School as a "Member School").

supervision, and regulation over Bridgeport Middle School's interscholastic athletics unless and until it delegates such control, supervision, and regulation to the School Activities Commission. W. Va. Code § 18-5-13; W. Va. Code § 18-2-25.  On information and belief, the County Board of Education has delegated its control, supervision, and regulation of Bridgeport Middle School's interscholastic athletics to the School Activities Commission.

10.     Defendant State Superintendent W. Clayton Burch is the Chief Executive Officer of the State Board of Education.  Defendant Burch executes his official duties in Wood County. Defendant Burch oversees all public schools, county superintendents, and county boards of education in West Virginia.  W. Va. Code § 18-3-3.  He is sued in his official capacity.

11.     Defendant Superintendent Dora Stutler is the Chief Executive Officer of the County Board of Education.  Defendant Stutler executes her official duties in Harrison County.  Defendant Stutler is responsible for executing educational policies under the direction of the State Board of Education and the County Board of Education.  W. Va. Code § 18-4-10.  This includes interscholastic athletics.  She is sued in her official capacity.

12.     Defendant Patrick Morrisey is the Attorney General of the State of West Virginia, located at State Capitol Complex, Building 1, Room E-26, Charleston, West Virginia.  The Attorney General is the state officer in charge of enforcing all state laws in West Virginia, including H.B. 3293.  W. Va. Code Ann. § 5-3-2.  Defendant Morrisey is sued in his official capacity.  Defendant Morrisey moved to intervene on behalf of the State of West Virginia on June 17, 2021.  *See* ECF No. 40.  The motion was granted on June 18, 2021.  *See* ECF No. 44.

13.     Defendant State of West Virginia oversees and operates the West Virginia State Board of Education, which employs Superintendent W. Clayton Burch.  W. Va. Code § 18-2-1.

The State of West Virginia, by its Attorney General Defendant Morrisey, moved to intervene on June 17, 2021. *See* ECF No. 40. The motion was granted on June 18, 2021. *See* ECF No. 44.

## JURISDICTION AND VENUE

14.     This action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX.

15.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States, including laws providing for the protection of civil rights, and because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution.

16.     Venue is proper in the Charleston Division of the Southern District of West Virginia under 28 U.S.C. § 1391(b)(1) and (2) because Defendants the State Board of Education, the School Activities Commission, and Burch reside in this Division and District and because a substantial part of the events or omissions giving rise to the claims occurred in this Division and District.

17.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

18.     This Court has personal jurisdiction over Defendants because they are domiciled in West Virginia and because West Virginia is the location of their denial of Plaintiff's rights under the United States Constitution and the laws of the United States.

## FACTUAL ALLEGATIONS

**A.    Gender Identity and Gender Dysphoria.**

19.    Every individual's sex is multifaceted and comprised of many distinct biological characteristics, including, but not limited to, chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity.

20.    Everyone has a gender identity.  Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity.

21.    A person's gender identity is a fundamental component of their identity that is durable and deeply rooted.  It cannot be changed by social or medical intervention.

22.    When a child is born, a sex designation usually occurs at birth based on a visual assessment of the infant's external genitalia.  Most people are cisgender, meaning that their gender identity aligns with the sex they were assigned at birth.

23.    But not everyone's gender identity aligns with the sex they are assigned at birth. A transgender person is someone who has a gender identity that does not align with their sex assigned at birth.

24.    When a person experiences sustained and clinically significant distress caused by the incongruence between their gender identity and their sex-assigned at birth, they may be diagnosed with "gender dysphoria."  *See* American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V").

25.    Under the widely accepted standards of care developed by The Endocrine Society and the World Professional Association for Transgender Health, the only treatment for gender

dysphoria before puberty is "social transition." Preventing transgender youth from social transition can result in severe anxiety and depression, self-harm, and suicidality.

26.    Moreover, for transgender people of all ages (both pre- and post-puberty), being able to socially transition and live and express themselves consistent with their gender identity is critical to their health and well-being.

27.    As part of the medically necessary social transition, before transgender children reach puberty, they have the option to receive puberty-delaying medical treatment. The puberty-delaying treatment helps pre-pubertal transgender children live in alignment with their gender identity and treats the symptoms of gender dysphoria.

28.    Puberty-delaying treatment pauses endogenous puberty at whatever stage it is at when the treatment begins. This has the impact of limiting the influence of a person's endogenous hormones on their body. For example, a girl who is transgender who undergoes puberty-delaying treatment before her endogenous puberty begins will experience none of the impacts of testosterone that would be typical if she underwent her endogenous puberty.

29.    Because puberty-delaying treatment allows transgender youth to avoid going through their endogenous puberty, it helps mitigate gender dysphoria and prevents them from experiencing permanent physical changes that would otherwise accompany their endogenous puberty.

B.      **B.P.J.'s Gender, Medical Treatment, and Participation in Sports.**

30.      B.P.J. is a girl who is transgender, which means she is a girl who was assigned the sex of male at birth.  A recent picture of B.P.J. is included below:



31.      B.P.J. knew from a very young age that she is a girl.  By the time she was in the third grade, B.P.J. was living as a girl at home.  At the end of the school year, she informed her mother and father that she did not want to continue going to school "dressed as a boy" and that she wanted to go by the first name B. (a name commonly associated with girls).

32.      B.P.J.'s family supported (and continues to support) B.P.J. living authentically as the girl that she is.

33.      B.P.J. was diagnosed with gender dysphoria in 2019, and she began puberty-delaying treatment on June 15, 2020.  B.P.J. had been receiving this treatment for almost one year at the time West Virginia passed H.B. 3293.

8

A-033

34.     B.P.J. comes from a family of runners, and she plans to try out for the girls' cross-country and track teams at Bridgeport Middle School.  Team tryouts begin on August 2, 2021.

35.     At a young age, B.P.J.'s mother would run with B.P.J. through local parks, which contributed to B.P.J.'s love of running.  B.P.J. has wanted to run on a team since she was in kindergarten.  She has grown up watching her older brothers run on their school teams and her mother compete in organized races.

36.     B.P.J. also likes being on a team and playing sports with other girls.  When B.P.J. competed in cheerleading while in elementary school, she enjoyed the camaraderie of being on a team of girls with her friends and working together as a team to succeed.

37.     Now, just like any other middle school student, B.P.J. wants the chance to explore her athletic interests and try out for the teams that interest her.

### C.     Participation of B.P.J. and Other Transgender Youth in School-Sponsored Athletics.

38.     For children and young adults, school-sponsored athletics offer a range of benefits that they continue to experience throughout life.  For example, students who participate in high school sports are more likely to finish college and more likely to be actively engaged in planning for their future.  Athletics provide an opportunity to gain confidence, to develop important social, emotional, and coping skills, and to build social connections.  By contrast, when young people are excluded from participating in youth sports, or do not feel accepted or respected, they do not have the opportunity to reap these benefits.

39.     Girls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams.  The only way for a girl who is transgender to experience the benefits associated with sex-separated school

athletics—or to participate in school athletics at all—is for her to participate on the same teams as other girls.

40.     Girls who are transgender are also not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance.  There is scientific consensus that sex chromosomes and genitals alone—*i.e.*, independent of circulating testosterone—do not meaningfully affect athletic performance.  Rather, any population-level performance differences between cisgender boys and cisgender girls in athletic competition are due to circulating testosterone levels that typically diverge significantly starting at puberty.

41.     Girls who are transgender and who receive puberty-delaying treatment followed by gender-affirming hormone therapy never go through their endogenous puberty and thus do not experience physiological changes caused by testosterone.  They experience a hormonal puberty typical of cisgender girls and not cisgender boys.

42.     Girls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty.  The National Collegiate Athletic Association ("NCAA"), World Athletics, and the International Olympic Committee (the "Olympics") all allow women who are transgender to play in women's athletic events after suppressing their levels of testosterone for particular periods of time (*e.g.*, one year) and (for World Athletics or the Olympics) below a particular threshold.

### D.  H.B. 3293

#### 1.  H.B. 3293's Introduction, Debate, Amendment, and Enactment

43.  Before H.B. 3293 was enacted, a student's eligibility to participate in athletics at the secondary school level in West Virginia was governed by rules promulgated by the School Activities Commission, the executive body with expertise governing scholastic sports.  These rules provided separate teams for boys and girls.  W. Va. Admin. Code § 127-2-3 (3.8).

44.  Prior to H.B. 3293, West Virginia had no public or formal prohibition on the participation of transgender students in school sports.

45.  On March 18, 2021, H.B. 3293 was introduced in the West Virginia House by Delegate Caleb Hanna.  H.B. 3293 was part of a concerted, nationwide effort to target transgender youth for unequal treatment with state legislation.

46.  From the outset, and through the legislative process, proponents of H.B. 3293 made clear that H.B. 3293 was targeted at, and intended only to affect, girls who are transgender.

47.  For example, one of H.B. 3293's sponsors, Delegate Jordan Bridges, announced on Facebook on March 16, 2021 that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). Jordan Bridges, "Update: The bill passed out of committee." Facebook (Mar. 16, 2021), https://perma.cc/HA5C-VJ4N.  Delegate Bridges had previously made other anti-transgender comments, such as that "this country is going down hill [sic] fast" in response to a news article discussing transgender-inclusive business practices. Jordan Bridges, "I swear my hand." Facebook (Oct. 23, 2019), https://perma.cc/8BHK-7V5Z.

11

48.     The operative language of H.B. 3293 as introduced would have required students to provide copies of their birth certificates reflecting their "sex at time of birth" in order to be admitted to public school at any level in West Virginia. *See* W. Va. Leg. Originating H.B. 3293 (Mar. 16, 2021) § 18-2-5c.[4]  If a student were unable to provide a birth certificate that reflected their "sex at time of birth," the student would have been required to submit an affidavit as well as "[a] signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy." *Id.* § 18-2-5c(a)(2).

49.     The introduced version of H.B. 3293 further provided that, for purposes of participating in athletics at the secondary level, "[t]he sex identified in subsection (a) above shall be the pupil's sex for the purposes of participating in single-sex secondary school interscholastic athletic events under the control, supervision, and regulation of the West Virginia Secondary Schools Activities Commission." *Id.* § 18-2-5c(e).

50.     The introduced version of H.B. 3293 also would have required the School Activities Commission to "verify with each county board that each student participating in single-sex interscholastic events [at the secondary level] is participating according to the student's sex at the time of the student's birth." *Id.* § 18-2-25(f).

51.     On March 18, 2021, the West Virginia House Education Committee held a hearing on H.B. 3293.  When asked how H.B. 3293 would change the status quo in West Virginia—which already had sex separation in sports—counsel for H.B. 3293 replied that the bill "would affect

---

[4]   The introduced version of H.B. 3293 is available on the legislature's website: https://www.wvlegislature.gov/Bill_Status/bills_text.cfm?billdoc=HB3293%20ORG.htm&yr=2021&sesstype=RS&i=3293.

those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth.[5]

52.    During the hearing, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics.  Another witness testified that there had been no instances of girls who are transgender "dominating" sports in West Virginia.  In fact, during the hearing, there was no evidence provided that any girl who is transgender had ever played on a girls' athletic team in West Virginia.

53.    H.B. 3293 passed out of the Education Committee and was heard by the Judiciary Committee on March 18, 2021.  The Judiciary Committee amended H.B. 3293 to state that, for purposes of participating in athletics at the secondary level, if a birth certificate were not provided or did not indicate a student's sex assigned at birth, then a "signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted."  *See* W. Va. Leg. Amended H.B. 3293 (Mar. 18, 2021) § 18-2-5c.[6]

54.    As with the first hearing, testimony in the Judiciary Committee focused on students who are transgender.  Opponents of H.B. 3293 again drew attention to the fact that there had been no issues regarding transgender students participating in sports in West Virginia.  As one witness relayed:  while there is "no harm" being addressed by H.B. 3293, "there is harm perpetrated by it."[7]  Nevertheless, H.B. 3293 passed out of the Judiciary Committee, as amended, on March 18, 2021.

---

[5] *See* Stark Declaration, Exhibit B (March 18, 2021 West Virginia House of Delegates Education Committee).
[6] The Education Committee's amendment to H.B. 3293 is available here: https://www.wvlegislature.gov/Bill_Text_HTML/2021_SESSIONS/RS/bills/HB3293%20SUB.pdf.
[7] *See* Stark Declaration, Exhibit C (March 18, 2021 West Virginia House of Delegates Judiciary Committee).

13

55.     On March 23, 2021, the West Virginia Delegates debated H.B. 3293 on the House floor.  When asked at this hearing about the number of complaints that the School Activities Commission had received regarding transgender athletes in West Virginia, Delegate Joe Ellington ("Del. Ellington"), a sponsor of H.B. 3293, admitted that he did not know of any complaints in West Virginia.

56.     Again, during the House floor debate, the sponsors of H.B. 3293 made clear that H.B. 3293 is targeted at, and is intended to exclude, girls who are transgender.  Delegate Margitta Mazzochi, a co-sponsor of H.B. 3293, suggested that she did not "want all this mixing and matching" of "transgender children" with non-transgender children in "locker rooms."  Likewise, when closing the debate, Del. Ellington described the "issue" solved by H.B. 3293 as being "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut."[8]

57.     During the House floor debate, opponents of H.B. 3293 emphasized that H.B. 3293 was simply "creat[ing] problems where they don't exist."  Others emphasized the negative impact that H.B. 3293 would have on West Virginia's transgender population:  as one Delegate put it, "West Virginia, a place to live, work, raise a family if you choose, only if you're not transgender."[9]

58.     H.B. 3293 was passed out of the House without further amendment on March 25, 2021.

59.     On April 1, 2021, H.B. 3293 was heard in the Senate Education Committee.  The Education Committee amended the House version of the bill, including to make it a new section of the Code (§ 18-2-25d).  The Senate Education Committee's amendment removed the birth

---

[8] See Stark Declaration, Exhibit D (March 25, 2021 West Virginia House of Delegates).
[9] See Stark Declaration, Exhibit D (March 25, 2021 West Virginia House of Delegates).

certificate provisions and defined "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." § 18-2-25d(b)(1). The Senate Education Committee added a cause of action provision allowing "any student" "aggrieved" by a violation of H.B. 3293 to sue the respective county board of education. *Id.* at (d). In addition, whereas previous iterations of H.B. 3293 had encompassed only secondary school athletics, the Senate Education Committee expanded the breadth of H.B. 3293's scope to encompass collegiate athletics as well. *Id.* at (c)(1). This amended version of H.B. 3293 was passed out of the Senate Education Committee to the full Senate.

60. The Senate debated H.B. 3293 on April 8, 2021. During the debate, proponents of H.B. 3293 again made clear that H.B. 3293 was targeted towards and intended to affect only transgender youth. One senator who supported H.B. 3293 explicitly noted that "the bill" is "about transgenders." Another senator quoted from a letter which described the "trans movement" as "an attack upon womanhood."[10]

61. Opponents of H.B. 3293 noted that multiple groups of medical professionals, including the West Virginia Chapter of the American Academy of Pediatrics, opposed H.B. 3293, calling attention to statistics on suicide and self-harm among transgender youth.

62. H.B. 3293, as amended by the Senate Education Committee, passed the Senate floor on April 9, 2021.

63. On April 28, 2021, Governor Justice signed H.B. 3293 into law.

64. Governor Justice distanced himself from H.B. 3293 and identified no valid purposes for it. In an interview on April 30, Governor Justice was asked if he could provide "one example of a transgender child trying to get an unfair advantage." In response, Governor Justice

---

[10] *See* Stark Declaration, Exhibit E (April 8, 2021 West Virginia Senate Hearing).

replied: "No, I can't really tell you one."[11]  He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority.  It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids.  I mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills.  This is not a priority to me."

### 2.    H.B. 3293 As Enacted

65.    H.B. 3293 becomes effective on July 8, 2021.

66.    H.B. 3293 as enacted categorically excludes participation in school sports in West Virginia at the middle school, high school, and collegiate level by all girls who are transgender.  §§ 18-2-25d(a)-(c).

67.    It does so notwithstanding the statute's purported finding that "Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex."  § 18-2-25d(a)(4).

68.    Specifically, H.B. 3293 requires that all "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education, including a state institution that is a member of the National Collegiate Athletic Association (NCAA)" are "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex."  §§ 18-2-25d(b), (c).

69.    H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* at (c)(2).  There is no parallel provision for boys' teams.

---

[11] https://twitter.com/MSNBC/status/1388132937707802629.

70.     H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female *based solely on the individual's reproductive biology and genetics at birth*." *Id.* at (b)(1) (emphasis added).  Girls who are transgender necessarily cannot show that they are girls under this definition.

71.     H.B. 3293 also provides a cause of action for "[a]ny student" "aggrieved" by a violation of H.B. 3293 to sue for "injunctive relief and actual damages, as well as reasonable attorney's fee and court costs." *Id.* at (d).

72.     H.B. 3293 does not define (or set any limits on) what a "violation" under H.B. 3293 may be and delegates authority to other bodies to establish rules and regulations.

73.     H.B. 3293 thus exposes female athletes to the risk of having to subject themselves to sex-based challenges in order to participate on a school-sponsored girls' athletic team.  The medical history form that the School Activities Commission requires students wishing to participate in school athletics to complete does not refer to sex or gender, or require students to report their reproductive biology or genetics.  As a result, girls whose sex is disputed will be unable to rely on their regular sports exam to make the appropriate showing of "biological sex" under H.B. 3293 and thus may be subject to embarrassing, invasive, and/or costly exams to be allowed to play on the girls' team.  There is no parallel burden placed on boys.

### 3.     H.B. 3293 Excludes Girls Who Are Transgender Based on Their Transgender Status—Not Based on Purported Athletic Advantages

74.     H.B. 3293 excludes girls who are transgender from girls' sports teams based on their transgender status, not on any feature tied to a purported physiological athletic advantage.

75.     Specifically, H.B. 3293 requires that athletic teams be separated based solely on genetics and reproductive anatomy at birth.  W. Va. Code § 18-2-25d(b)(1).  H.B. 3293 precludes

consideration of circulating testosterone in determining "biological sex"—the only sex-related characteristic with any documented relationship to athletic ability.

76.     H.B. 3293 thus categorically bars *any* girl who is transgender from participating in girls' sports without considering factors that have any correlation with athletic ability.  Under H.B. 3293, even girls like B.P.J., who receive puberty-delaying treatment and never go through endogenous puberty, are prohibited from participating on girls' sports teams.

77.     By contrast, H.B. 3293 would allow a boy who is transgender to play on the girls' sports team, even if the boy had received hormone replacement therapy, including exogenous testosterone as part of his treatment for gender dysphoria.

**E.     H.B. 3293 Harms B.P.J. and Other Girls Who Are Transgender.**

78.     B.P.J. was angry and sad when she learned about H.B. 3293 and how it would impact her.  Although B.P.J. is a girl, under H.B. 3293's definition of "biological sex," B.P.J. will be excluded from joining a girls' sports team at school.  W. Va. Code 18-2-25d(b)(1).

79.     If H.B. 3293 is in effect at the start of the Fall 2021 athletic season, B.P.J. will not be able to participate in any activity involving "competitive skill."

80.     Upon information and belief, cross-country running, track, and presumably any other school-sponsored sport of interest to B.P.J. fit that descriptor.

81.     Indeed, on May 18, 2021, the Principal of Bridgeport Middle School—the school that B.P.J. will attend in fall 2021—informed B.P.J.'s mother that B.P.J. will not be permitted to join the girls' cross-country or track teams due to H.B. 3293.  The Principal further stated that if B.P.J. attempted to participate on the boys' team, it would be "confusing" for the cross-country coaches because B.P.J. looks and presents as female, like any other girl.  The Principal said he thus

18

would have to inform the coaches for both the girls' and boys' cross-country teams that B.P.J. is transgender.

82. The reality is that B.P.J. cannot—and does not want to—participate on the boys' team because she is a girl, not a cisgender boy. Doing so would be embarrassing and would undermine her medical treatment for gender dysphoria, which includes living and expressing herself as a girl in all aspects of her life. Forcing her onto a boys' team would undermine this core part of her identity and medical care.

83. Barring B.P.J. from participating in school sports prevents her from experiencing the motivation, challenge, camaraderie, and joy that sport has brought her in the past, as well as opportunity to be teammates with other girls participating in athletics.

84. West Virginia's attempt to force B.P.J. to compete on the boys' team also is a clear sign to her and others that West Virginia does not see or accept her as the girl that she is.

85. Excluding girls who are transgender from participating in athletics alongside their female peers increases shame and stigma and contributes to negative physical and emotional health outcomes for the girls who are transgender who are excluded.

86. H.B. 3293 also limits (or eliminates) the benefits of athletics for *all* girls. Exclusionary policies such as that embodied in H.B. 3293 discourage, rather than encourage, participation in athletics.

87. Moreover, because H.B. 3293 impacts girls and not boys, it puts all girls at risk of having their sex disputed.

## CLAIMS FOR RELIEF

### COUNT I
Violation of Title IX
20 U.S.C. § 1681, *et seq.*
Plaintiff against the State of West Virginia, the State Board of Education, the County Board of
Education, and the School Activities Commission

88.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

Plaintiff brings this Count against the State Board of Education, the County Board of Education,

the State of West Virginia, and the School Activities Commission.

89.     Title IX provides that "[n]o person in the United States shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

90.     The State of West Virginia, the State Board of Education, and the County Board of

Education all are, manage, operate, and/or have controlling authority for educational programs

receiving federal financial assistance.

91.     The School Activities Commission receives federal financial assistance directly

and/or indirectly through *inter alia* dues paid by its federal-fund-receiving members.

92.     Because secondary school athletics are of a unique nature that require cooperation

and a common administration between the various federal-fund-receiving members, these federal-

fund-receiving members have ceded controlling authority to the School Activities Commission

over secondary school athletics.

93.     The School Activities Commission's existence and purpose is merely a

consequence of the inherent need for a centralized body to manage, coordinate, schedule, or

otherwise administer secondary school sports in West Virginia.  It thus is a controlling authority

over a federally funded program, namely, athletic opportunities for federal-fund-receiving educational institutions in West Virginia.

94.     Under Title IX, discriminating against transgender students is discrimination "on the basis of sex."

95.     The statutory language of Title IX does not exempt athletic programs from the broad prohibition on discrimination.  The implementing regulations for Title IX permit sports teams to be separated by sex, but do not mandate such separation.

96.     Neither Title IX, nor its regulations, purport to define "sex" based on reproductive anatomy or genetics at birth.  These authorities also do not specify what constitutes separation of sex for purposes of athletic activities, should a school choose to separate certain sports teams by sex.

97.     H.B. 3293 discriminates against B.P.J. and other girls who are transgender by singling them out for different treatment from cisgender girls and—as a result—preventing them from accessing the benefits of participation in school athletics on an equal basis as other students, in violation of their rights under Title IX.

98.     H.B. 3293 also discriminates against B.P.J. and other girls as compared to boys. H.B. 3293 places girls, but not boys, at risk of having their "biological sex" challenged and accordingly being the focus of an action contending that they do not satisfy the law's definition of female "biological sex."   As a result, H.B. 3293 prevents girls from accessing the benefits of participation in school athletics on an equal basis vis-à-vis boys in violation of their rights under Title IX.

99.     B.P.J. is irreparably harmed by Defendants' illegal conduct in violation of Title IX.

**COUNT II**
Deprivation of Equal Protection
U.S. Const. Amend. XIV
Plaintiff against W. Clayton Burch, Dora Stutler, School Activities Commission, and Patrick
Morrisey

100.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.
Plaintiff brings this Count against Defendants State Superintendent W. Clayton Burch in his
official capacity, Harrison County Superintendent Dora Stutler in her official capacity, the School
Activities Commission, and Attorney General Patrick Morrisey in his official capacity.

101.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant
to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the
equal protection of the laws."  U.S. Const. amend. XIV, § 1.

102.    Defendants are all governmental actors acting under color of state law for purposes
of 42 U.S.C. § 1983 and the Fourteenth Amendment.

103.    Under the Equal Protection Clause, discrimination based both on sex and
transgender status is subject to heightened scrutiny and is therefore presumptively unconstitutional
absent a showing by the state that the discrimination is substantially related to an important state
interest.

104.    H.B. 3293 discriminates against girls who are transgender by singling them out for
different treatment from cisgender girls and—as a result—prevents them from accessing the
benefits of participation in school athletics on an equal basis as other students based both on sex
and transgender status.

22

105.    Excluding girls who are transgender form participating on girls' sports teams based solely on their "reproductive anatomy and genetics at birth" is not substantially related to any important state interest.

106.    West Virginia passed H.B. 3293 for the impermissible purpose of excluding all girls who are transgender from school athletics.  H.B. 3293's sweeping exclusion of girls who are transgender from participation in school athletics is so disconnected from H.B. 3293's purported justifications that it is impossible to credit them.

107.    H.B. 3293 is based on unfounded stereotypes, false scientific claims, and baseless fear and misunderstanding of girls who are transgender, which are insufficient to justify discriminatory treatment under any level of scrutiny.

108.    H.B. 3293 also discriminates against B.P.J. and other girls as compared to boys. H.B. 3293 places girls, but not boys, at risk of having their "biological sex" challenged and accordingly being the focus of an action contending that they do not satisfy the law's definition of female "biological sex."  As a result, H.B. 3293 prevents girls from accessing the benefits of participation in school athletics on an equal basis vis-à-vis boys in violation of their rights under the Equal Protection Clause.

109.    As a result, Defendants have violated the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

110.    B.P.J. is irreparably harmed by Defendants' illegal conduct in violation of the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment as follows:

A.      Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under Title IX;

B.      Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

C.      Preliminarily and permanently enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from enforcing H.B. 3293 or any other law, custom, or policy that precludes Plaintiff's participation on girls' school sports teams in West Virginia;

D.      Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

E.      Awarding Plaintiff nominal damages with respect to her Title IX claim and nominal damages with respect to her equal protection claim against the Schools Activities Commission;

F.      Awarding Plaintiff her costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

G.      Granting such other and further relief as the Court deems just and proper.

Dated: July 16, 2021

Respectfully submitted,

*/s/ Loree Stark*

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent, | Civil Action No.<br><br>Hon. |
| *Defendants*. | |

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 16th day of July 2021, I electronically filed a true and exact copy of ***Plaintiff's Amended Complaint*** with the Clerk of Court and all parties using the CM/ECF System.

*/s/ Loree Stark*
West Virginia Bar No. 12936

26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

               Plaintiffs,

v.                              CIVIL ACTION NO.   2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

               Defendants.

MEMORANDUM OPINION & ORDER

A fear of the unknown and discomfort with the unfamiliar have motivated many of the most malignant harms committed by our country's governments on their own citizens. Out of fear of those less like them, the powerful have made laws that restricted who could attend what schools, who could work certain jobs, who could marry whom, and even how people can practice their religions. Recognizing that classifying human beings in ways that officially sanction harm is antithetical to democracy, the states ratified the Fourteenth Amendment. It ensures that no state may "deny to any person within its jurisdiction the equal protection of the laws." Accordingly, the courts are most juberous of any law—state or federal—that treats groups of people differently.

The matter before me today is a motion to preliminarily enjoin a recently passed state law. Those standing in opposition to this law assert that it was enacted to incite fear and exclude certain persons rather than to address a legitimate government interest. At this point, I have been provided with scant evidence that this law addresses any problem at all, let alone an important problem. When the

government distinguishes between different groups of people, those distinctions must be supported by compelling reasons. Having determined that Plaintiff has a likelihood of success in demonstrating that this statute is unconstitutional as it applies to her and that it violates Title IX, Plaintiff's Motion for a Preliminary Injunction is **GRANTED**.

## I.    Plaintiff and Her Claims

B.P.J. is an eleven-year-old girl preparing to begin the sixth grade at a new school. Like many of her peers, B.P.J. intends to participate in school athletics. She hopes to join both the girls' cross country and track teams. However, B.P.J. was informed by her school that because of a new statute, she will no longer be permitted to join either team because she is a transgender girl.

For a definition of terms such as gender identity,[1] gender dysphoria,[2] cisgender,[3] etc., I refer to the meticulously researched and written opinion in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 594–597 (4th Cir. 2020). I adopt the definition of transgender used in that opinion. "'Transgender' is . . . 'used as an umbrella term to describe groups of people who transcend conventional expectations of gender identity or expression.'" *Grimm*, 972 at 596 (quoting *PFLAG, PFLAG National Glossary of Terms* (July 2019), http://pflag.org/glossary).

B.P.J. writes in depth about her history—revealing publicly what are inherently private details—to educate both the court and public. B.P.J. is a transgender girl who, while assigned the sex of male at birth, knew from a young age that she is a girl. [ECF No. 64, ¶ 31]. By the third grade, B.P.J. was living as a girl at

---

[1] One's "deeply felt, inherent sense" of one's gender. *Grimm*, 927 F.3d at 594.

[2] "[A] condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Grimm*, 927 F.3d at 594–95.

[3] A person whose gender identity aligns with her sex-assigned-at-birth. *Grimm*, 927 F.3d at 594.

home but dressing as a boy at school. *Id.* B.P.J. then asked to change her name to a name commonly associated with girls and began living as a girl in both public and private. *Id.* B.P.J. also joined her elementary school's all-girl cheerleading team. *Id.* at ¶ 36. B.P.J. practiced and competed with this team without incident.

B.P.J. was diagnosed with gender dysphoria in 2019. *Id.* at ¶ 33. She began puberty-delaying treatment on June 15, 2020, to treat that condition.[4] Plaintiff avers that this treatment, which prevents endogenous puberty and therefore any physiological changes caused by increased testosterone circulation, prevents her from developing any physiological advantage over other girl athletes.[5]

B.P.J., through her mother, filed this lawsuit against the West Virginia State Board of Education, the Harrison County Board of Education, the West Virginia Secondary Schools Activities Commission ("WVSSAC"), State Superintendent W. Clayton Burch, and Harrison County Superintendent Dora Stutler. The State of West Virginia moved to intervene, and that motion was granted. Plaintiff then amended her complaint, [ECF No. 64], naming both the State and Attorney General Patrick Morrisey as defendants.

In her complaint, B.P.J. alleges that Defendants Burch, Stutler, the WVSSAC, and Attorney General Morrisey deprived her of the equal protection guaranteed to her by the Fourteenth Amendment and that the State, the State Board of Education,

---

[4] "The medical treatment for gender dysphoria is to eliminate [] clinically significant distress by helping a transgender person live in alignment with their gender identity." [ECF No. 2-1, Adkins Decl., at 5]. For some transgender youth, the distress from gender dysphoria is addressed through puberty blocking treatment. *Id.* at 6. "Puberty blocking treatment allows transgender youth to avoid going through their endogenous puberty thereby avoiding the heightened gender dysphoria and permanent physical changes that puberty would cause." *Id.* The State cites to experts who question when social transition and puberty blocking treatment are appropriate for young people. *See,* [ECF No. 49, Ex. E]. But what is or should be the default treatment for transgender youth is not the question before the court.

[5] The NCAA and the International Olympic Committee, which both permit transgender women to compete as women in athletic events, require that the athletes suppress their testosterone for a certain period of time or that it be suppressed below a particular threshold.

the Harrison County Board of Education, and the WVSSAC have violated Title IX. [ECF No. 64, at 20–23]. B.P.J. seeks a declaratory judgment that Section 18-2-25d of the West Virginia Code violates Title IX and the Equal Protection Clause; an injunction preventing Defendants from enforcing the law against her; a waiver of the requirement of a surety bond for preliminary injunctive relief; nominal damages; and reasonable attorneys' fees.

The motion for a preliminary injunction that accompanies her complaint seeks relief only insofar as this law applies to her. That is, granting this motion will only prevent the State and other Defendants from enforcing Section 18-2-25d against B.P.J. Whether the law is facially unconstitutional is an issue raised in the Complaint and will be resolved at a later stage of litigation.

## II.    The Law

On March 18, 2021, ten delegates in the West Virginia House of Delegates introduced House Bill 3293, strategically referred to as the "Save Women's Sports Bill." West Virginia Governor Jim Justice signed the bill into law on April 28, 2021, and it was codified as West Virginia Code, Section 18-2-25d, entitled "Clarifying participation for sports events to be based on biological sex of the athlete at birth."

The statute begins by noting that "[t]here are inherent differences between biological males and biological females, and that these differences are cause for celebration, as determined by the Supreme Court of the United States in United States v. Virginia (1996)." § 18-2-25d(a)(1). The statute then provides a series of definitions, all at issue here:

> (1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

> (2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.
>
> (3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

§ 18-2-25d(b)(1)–(3).

Using these definitions, the gravamen of the statute requires that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education," "shall be expressly designated as one of the following based on biological sex: (A) Males, men, or boys; (B) Females, women, or girls; or (C) Coed or mixed." § 18-2-25d(c)(1). Once those teams are properly designated, the statute goes on to address who may participate on which teams. "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." § 18-2-25d(c)(1).

According to the statute's text, its definition of "biological sex" has nothing to do with gender identity. "Gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." § 18-2-25d(a)(4).

The State asserts that the objective of the statute is to provide equal athletic opportunities for female athletes and to protect the physical safety of female athletes when competing. [ECF No. 49, at 7]. Plaintiff argues that the State's assertion is a

façade concealing the true objective: to exclude transgender girls and women from participating in sports.

## III.  The Preliminary Injunction

The United States Supreme Court and the United States Court of Appeals for the Fourth Circuit have provided district courts with a precise analytical framework for determining whether to grant preliminary injunctive relief. First, B.P.J. must make a clear showing that she will likely succeed on the merits. Second, she must make a clear showing that she is likely to be irreparably harmed absent preliminary relief. Third, she must show that the balance of equities tips in her favor. Finally, B.P.J. must show that an injunction is in the public interest. All four requirements must be satisfied. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010).

### a.  Likelihood of Success on the Merits

As required by *Natural Resource Defense Counsel*, I must first determine if B.P.J. has demonstrated a clear likelihood of success on the merits of either her Equal Protection Claim or her Title IX Claim. I will address each in turn.

### i.  Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The first step in an equal protection analysis is to determine what level of scrutiny I must apply to Section 18-2-25d. The answer to this question turns on what

classifications are created by the law. Plaintiff argues that this law discriminates against transgender girls and only transgender girls because cisgender boys, cisgender girls, and transgender boys are all unaffected by the law's central tenet: non-cisgender girls may not participate on a girls' sports team. [ECF No. 19, at 19]. The State responded that this law does not treat transgender girls differently than other groups because this law is premised on "biological sex," and it treats all "biological males" similarly by prohibiting them from participating on girls' sports teams.

Essentially, the State contends that the Equal Protection Clause is not being violated because B.P.J. is being treated the same under this law as those she is similarly situated with: "biological males" as defined by West Virginia Code § 18-2-25d(b)(3). But this is misleading. Plaintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls. *Accord Grimm*, 972 F.3d at 610 ("The overwhelming thrust of everything in the record . . . is that Grimm was similarly situated to other boys"). Plaintiff has lived as a girl for years. She has competed on the all-girls cheerleading team at her school. She changed her name to a name more commonly associated with girls. And of the girls at her middle school, B.P.J. is the only girl who will be prevented from participating in school-sponsored athletics. Here, there is an inescapable conclusion that Section 18-2-25d discriminates on the basis of transgender status. *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) ("while the physiological differences the Defendants suggest support the categorical bar on transgender women's participation in women's sports may justify the Act, they do not overcome the inescapable conclusion that the Act discriminates on the basis of transgender status"). The question then is what level of scrutiny applies to classifications based on transgender status.

The Fourth Circuit answered that question in *Grimm*. *Stare decisis* requires that I apply intermediate, or heightened, scrutiny to laws that classify people according to transgender status. *Grimm* arrived at this conclusion from two different directions. First, *Grimm* finds that discrimination against transgender people is inherently based in sex, and therefore the level of scrutiny applicable to sex discrimination applies to transgender discrimination. 972 F.3d at 607. In the alternative, *Grimm* finds that transgender people are a quasi-suspect class and therefore entitled to intermediate scrutiny of laws that treat them differently than non-transgender people. *Id.*

To survive a review under intermediate scrutiny, the government must provide an "exceedingly persuasive justification" for the classification created by a law or policy. *Mississippi Univ. For Women v. Hogan*, 458 U.S. 718, 724 (1982). At a minimum, the government must show that "the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* A law discriminating against a quasi-suspect class "must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 648 (1975)).

"Under intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012) (citing *United States v. Chester,* 628 F.3d 673, 683 (4th Cir. 2010)). The party defending the statute must "present[] sufficient probative evidence in support of its stated rationale for

enacting a gender preference, i.e., . . . the evidence [must be] sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metropolitan Dade Cnty.*, 122 F.3d 895, 910 (11th Cir. 1997)); *Concrete Works of Colorado, Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) ("[T]he gender-based measures . . . [must be] based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" (quoting *Mississippi Univ. for Women*, 458 U.S. at 726)).

In this preliminary matter, my inquiry is constrained to whether this statute is unconstitutional *as applied* to B.P.J. An as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Educational Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc)). "It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328 (2006) (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

Here, the State's proffered objective for the statute is to provide equal athletic opportunities for female athletes and to protect female athletes while they participate in athletics. [ECF No. 49, at 7]. B.P.J. argues that I should reject this offered objective and instead find that the State's true objective is to exclude transgender women and girls from participating in state-sponsored athletics. While I need not do so, *Virginia*, 518 U.S. at 536, I will proceed as if the State's offered objective is genuine. Regardless, I find that this statute as applied to B.P.J. is not substantially related to providing equal athletic opportunities for girls.

As described at length in her memorandum in support of her motion for a preliminary injunction, B.P.J. has been living publicly as a girl for over a year at this point. As part of treating her gender dysphoria, B.P.J. has been on puberty delaying drugs for over a year. As a result, B.P.J. has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State.

B.P.J. has provided evidence that any physical advantages that men and boys enjoy are derived from higher concentrations of circulating testosterone. This is supported by both the NCAA policy[6] and the International Olympic Committee's policy[7] that permit transgender women to compete on teams that align with their gender identity so long as those athletes receive testosterone suppressing treatment. According to B.P.J.'s experts, "there is a medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes." [ECF No. 2-1, Safer Decl., at 6–7].

The Defendant cites to an expert who asserts that for transgender athletes who have undergone endogenous puberty, later suppression of testosterone does not eradicate all competitive advantage. [ECF No. 49, Ex. G]. Like Judge Nye in the District of Idaho, I find this opinion unpersuasive. *See Hecox v. Little*, 479 F. Supp. 3d 930, 980 (D. Idaho 2020). While that argument may be relevant to a facial challenge of the statute, it is irrelevant to this as-applied analysis. B.P.J. has not undergone endogenous puberty and will not so long as she remains on her prescribed

---

[6]    *NCAA Inclusion of Transgender Student-Athletes*, NCAA (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf
[7]    *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism*, Int'l Olympic Comm. (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf.

puberty blocking drugs. At this preliminary stage, B.P.J. has shown that she will not have any inherent physical advantage over the girls she would compete against on the girls' cross country and track teams.

Further, permitting B.P.J. to participate on the girls' teams would not take away athletic opportunities from other girls. Transgender people make up a small percentage of the population: 0.6% of the adult population generally, and 0.7% of thirteen- to seventeen-year-olds. Herman, Flores, Brown, et al., *Age of Individuals Who Identify as Transgender in the United States*, The Williams Institute (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf. The number of transgender people who wish to participate in school-sponsored athletics is even smaller. Insofar as I am aware, B.P.J. is the only transgender student at her school interested in school-sponsored athletics. Therefore, I cannot find that permitting B.P.J. to participate on the girls' cross country and track teams would significantly, if at all, prevent other girl athletes from participating.

Finally, as applied to B.P.J., this law cannot possibly protect the physical safety of other girl athletes. Cross country and track are not contact sports. The physical ability of one athlete does not put another in danger in the way it might in another sport like football or hockey.

As applied to B.P.J., Section 18-2-25d is not substantially related to protecting girls' opportunities in athletics or their physical safety when participating in athletics. I find that B.P.J. is likely to succeed on the merits of her equal protection claim.

### ii.  Title IX

Success on her Title IX claim would require B.P.J. to show "(1) that [she] was excluded from participation in an education program 'on the basis of sex'; (2) that the

educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616 (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)). There is no question that Defendants named in this case received federal funding or that the athletic programs run by Harrison County are part of an education program. Recognizing this, what remains to be determined is whether B.P.J has demonstrated that she will likely succeed in proving that she is being excluded on the basis of sex and that she was harmed by unlawful discrimination.

That B.P.J. is being excluded from school athletics on the basis of her sex is clear. Like the Fourth Circuit's decision in *Grimm*, I "have little difficulty holding" that Section 18-2-25d discriminates against her "on the basis of sex." *Grimm*, 972 F.3d at 616; *accord Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (holding that discrimination against a person for being transgender is discrimination "on the basis of sex" under Title VII). The law could not exclude B.P.J. from a girls' athletics team without referencing her "biological sex" as defined in the statute. Her sex "remains a but-for cause" of her exclusion under the law. *Grimm*, 972 F.3d at 616.

Again, as in *Grimm*, I also have little difficulty finding that B.P.J. is harmed by this law. All other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity. Under this law, B.P.J. would be the only girl at her school, as far as I am aware, that is forbidden from playing on a girls' team and must join the boys' team. Like the discriminatory policy in *Grimm*, this law both stigmatizes and isolates B.P.J.

The final question is whether the law unlawfully discriminates against B.P.J. In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (quoting *Bostock*, 140 S. Ct. at 1740). Here, as I have stated above, B.P.J. will be treated worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity. Considering all of this, I find that B.P.J. has demonstrated a likelihood of success on the merits for her Title IX claim.

### b. Irreparable Harm

When a party has shown a likelihood of a constitutional violation, the party has shown an irreparable harm. *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960). Forcing a girl to compete on the boys' team when there is a girls' team available would cause her unnecessary distress and stigma. In addition to the harm to B.P.J., requiring her to compete on the boys' team would also be confusing to coaches and teammates. And not only would B.P.J. be excluded from girls' sports completely; she would be excluded because of who she is: a transgender girl. Having found above that her exclusion is likely to be in violation of the Equal Protection Clause and Title IX, I find that B.P.J. has demonstrated that she will be irreparably harmed if this law were to take full effect.

### c. Balance of Equities and the Public Interest

Where, as here, the government is a party, the "balance of the equities" and "public interest" prongs of the preliminary injunction test merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating the balance of the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. It is always

in the public interest to uphold constitutional rights. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

It is clearly in the public interest to uphold B.P.J.'s constitutional right to not be treated any differently than her similarly situated peers because any harm to B.P.J.'s personal rights is a harm to the share of American rights that we all hold collectively. The right not to be discriminated against by the government belongs to all of us in equal measure. It is that communal and shared ownership of freedom that makes up the American ideal. The American ideal is one "that never has been yet— And yet must be—the land where *every* man is free." *Let America be America Again, Langston Hughes.*

Plaintiff B.P.J.'s Motion for a Preliminary Injunction is **GRANTED.**

## IV.    Bond Requirement

Plaintiff also seeks to waive the bond required by Federal Rule of Civil Procedure 65(c). "Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." *Hoecst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). This bond can even be waived entirely when the defendant would not suffer any harm from the injunction. *Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Sch.*, No. Civ. A. AW-05-1994, 2005 WL 1075634, at *12 (D. Md. May 5, 2005). I find that a bond is unnecessary and waive its requirement in this case.

## V.    Conclusion

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction [ECF No. 2] is **GRANTED.** While this case is pending, Defendants are enjoined from

enforcing Section 18-2-25d against B.P.J. She will be permitted to sign up for and participate in school athletics in the same way as her girl classmates.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:      July 21, 2021

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,
      Plaintiff,

v.                                    Civil Action No. 2:21-cv-00316
                                    Honorable Joseph R. Goodwin, Judge

WEST VIRGINIA STATE BOARD OF EDUCATION,
HARRISON COUNTY BOARD OF EDUCATION,
WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISION, W. CLAYTON BURCH
in his official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,
      Defendants,

And

LAINEY ARMISTEAD,
      Defendant-Intervenor.

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION'S
MOTION FOR SUMMARY JUDGMENT

**NOW COMES** Defendant West Virginia Secondary School Activities Commission ("WVSSAC"), by counsel, Roberta F. Green, Kimberly M. Bandy, Shannon M. Rogers and Shuman McCuskey Slicer PLLC, and, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, hereby respectfully submits this Motion for Summary Judgment on the claims asserted against the WVSSAC by Plaintiff, along with supporting memorandum of law seeking summary judgment in favor of the WVSSAC on any and all claims presented by Plaintiff against it.

Plaintiff has failed to present sufficient evidence to prove the claims presented against WVSSAC, specifically that the WVSSAC is a state actor who has the ability or authority to enforce H.B. 3293 and/or capable of violating her Title IX and Equal Protection Rights under the

Fourteenth Amendment. Further, the evidence presented through written discovery including admissions, depositions, and expert reports fails to establish any evidence that Plaintiff has been harmed by WVSSAC or that she would be harmed by WVSSAC if H.B. 3293 were upheld. Plaintiff's evidence asserted against the WVSSAC is wholly speculative and is not ripe for pre-enforcement adjudication. For these and other reasons more fully set forth in the accompanying memorandum of law, WVSSAC respectfully requests that this Court grant summary judgment in its favor on the claims advanced by Plaintiff, dismiss said claims with prejudice, and dismiss WVSSAC as a party to this action.  WVSSAC seeks any and all further relief deemed appropriate by the Court.

**WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION,
By Counsel.**

**/S/ *Roberta F. Green***

_____
Roberta F. Green (WVSB #6598)
Kimberly M. Bandy (WVSB #10081)
Shannon M. Rogers (WVSB # 13920)
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street East, Suite 200 (25301
Charleston, WV 25339
(304) 345-1400
(304) 343-1826 FAX
rgreen@shumanlaw.com
kbandy@shumanlaw.com
srogers@shumanlaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**B.P.J., by her next friend and mother,
HEATHER JACKSON,**
          **Plaintiff,**

**v.**                                          **Civil Action No. 2:21-cv-00316**
                                                **Honorable Joseph R. Goodwin, Judge**

**WEST VIRGINIA STATE BOARD OF EDUCATION,
HARRISON COUNTY BOARD OF EDUCATION,
WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISION, W. CLAYTON BURCH**
**in his official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,**
          **Defendants,**

**And**

**LAINEY ARMISTEAD,**
          **Defendant-Intervenor.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I, Roberta F. Green, have this day, the 21st day of April, 2022, served a true and exact copy of **"WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION'S MOTION FOR SUMMARY JUDGMENT"** with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| Loree Beth Stark | Kathleen R. Hartnett |
| Nicholas Ward | Julie Veroff |
| ACLU of WV FOUNDATION | COOLEY LLP |
| 1614 Kanawha Boulevard, East | 101 California St. – 5th Floor |
| Charleston, WV 25311 | San Francisco, CA 94111-5800 |
| lstark@acluwv.org | khartnett@cooley.com |
| nward@acluwv.org | jveroff@cooley.com |
| | |
| Katelyn Kang | Elizabeth Reinhardt |
| COOLEY LLP | COOLEY LLP |
| 55 Hudson Yards | 500 Boylston St., 14th Floor |
| New York, NY 10001-2157 | Boston, MA 02116-3736 |
| kkang@cooley.com | ereinhardt@cooley.com |

Andrew Barr
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO  80202-5686
abarr@cooley.com

Joshua Block
Chase Strangio
ACLU FOUNDATION
125 Broad Street
New York, NY  10004
jblock@aclu.org

Sruti Swaminathan
LAMBDA LEGAL
120 Wall St., 19th Floor
New York, NY 10005
sswaminathan@lambdalegal.org

Kelly C. Morgan
Michael W. Taylor
Kristen Vickers Hammond
BAILEY & WYANT, PLLC
500 Virginia St., East, Suite 600
Charleston, WV  25301
kmorgan@baileywyant.com
mtaylor@baileywyant.com
khammond@baileywyant.com

Douglas P. Buffington, II
Curtis R.A. Capehart
Jessica A. Lee
State Capitol Complex
Building 1, Room E-26
Charleston, WV  25305-0220
Curtis.R.A.Capehart@wvago.gov

Taylor Brown
American Civil Liberties Union
125 Broad St., 18th Floor
New York, NY 10004
tbrown@aclu.org

Avatara Smith-Carrington
LAMBDA LEGAL
3500 Oak Lawn Ave., Suite 500
Dallas, TX 75219
asmithcarrington@lambdalegal.org

Carl Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA  30030
ccharles@lambdalegal.org

Susan Llewellyn Deniker
Jeffrey M. Cropp
STEPTOE and JOHNSON, LLC
400 White Oaks Boulevard
Bridgeport, WV  26330
susan.deniker@steptoe-johnson.com
jeffrey.cropp@steptoe-johnson.com

Tara Borelli
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

David C. Tryon
West Virginia Atty. General's Office
1900 Kanawha Blvd., E.
Bldg. 1, Rm 26E
Charleston, WV  25305
David.C.Tryon@wvago.gov

Brandon S. Steele
Joshua D. Brown
Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Ste 100
Beckley, WV  25801
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs
Roger Greenwood Brooks
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
jscruggs@adflegal.org
rbrooks@adflegal.org

Timothy D. Ducar
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ  85260
tducar@azlawyers.com

Anthony E. Nortz
Kesner & Kesner
112 Capitol Street
Charleston, WV  25301
anortz@kesnerlaw.com

Aria S. Vaughan
U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
aria.vaughan@usdoj.gov

Christiana Holcomb
Rachel Csutoros
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
cholcomb@adflegal.org
rcsutoros@adflegal.org

Meredith Taylor Brown
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
tbrown@aclu.org

Michael W. Taylor
BAILEY & WYANT PLLC
500 Virginia St., E. – Suite 600
Charleston, WV 25301
mtaylor@baileywyant.com

Fred B. Westfall, Jr.
Jennifer M. Mankins
United States Attorney's Office
300 Virginia Street, East – Rm. 400
Charleston, WV 25301
fred.westfall@usdoj.gov
jennifer.mankins@usdoj.gov

*/S/ Roberta F. Green*

Roberta F. Green, Esquire (WVSB #6598)
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street E., Suite 200 (25301)
Charleston, West Virginia
Phone: (304) 345-1400
Facsimile: (304) 343-1826
*Counsel for Defendant WVSSAC*
rgreen@shumanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

                *Plaintiff*,

v.                              Civil Action No. 2:21-cv-00316
                              Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

                *Defendants*,

and

LAINEY ARMISTEAD,

                *Defendant-Intervenor*.

**DEFENDANTS HARRISON COUNTY BOARD OF EDUCATION
AND DORA STUTLER'S MOTION FOR SUMMARY JUDGMENT**

Defendants Harrison County Board of Education ("HCBOE") and County Superintendent Dora Stutler ("Stutler") (collectively the "County Board"), by counsel, move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The County Board has not caused any injury to Plaintiff B.P.J., and it is thus entitled to summary judgment. This conclusion is compelled for three reasons, all of which rely on undisputed facts and applicable law. These three reasons are set forth in greater detail in the County Board's supporting memorandum of law, which is contemporaneously being filed with this motion.

First, the County Board is required to comply with and enforce West Virginia law, including the state law ("the Act") that B.P.J. challenges in this civil action. Thus, B.P.J.'s claim is one against the State, not against the County Board. It is undisputed that, if B.P.J. has an actionable injury as she alleges, then her injury was inflicted by the State; the County Board undisputedly has no policy or custom of its own that has caused or will cause B.P.J. any harm, and it had no part in the creation or passage of the Act at issue. The County Board cannot be liable for any injury that it did not cause. Therefore, the HCBOE is entitled to summary judgment on the Title IX claim against it in Count I, and Stutler is entitled to summary judgment on the Equal Protection Clause claim against her, in her official capacity, in Count II.

Second, should the Court determine that Stutler, in her official capacity, is a proper defendant to Count II for purposes of an injunction, then she should be retained only in her capacity as a State official – not in her capacity as an official of the HCBOE. If Stutler ever enforces the Act at issue (in the event that the Court's injunction is lifted or modified), she will be acting solely as a State official, not as a HCBOE official, because she would be enforcing only a State law, not any policy or custom of the County Board. Any such enforcement would be mandated; Stutler has no discretion regarding whether to enforce the Act. Under these circumstances and this Court's clear precedent, any monetary award assessed against Stutler must be paid entirely by the State,

*not* by the County Board, because the State, not Stutler or the HCBOE, is solely responsible for the Act that B.P.J. claims harms her.

Finally, although the County Board undisputedly had no part in creating, developing, shaping, or passing the Act at issue, and it undisputedly has no policy or custom of its own that prevents B.P.J. from joining girls' teams based on transgender status, the County Board has been sued for damages, fees, and costs over the Act. Therefore, the County Board finds itself in the position of defending the Act, even though it did not create, support or pass the Act. As set forth in its supporting memorandum of law, a legal foundation clearly exists for finding that the Act is lawful under Title IX and that the Act does not violate the Equal Protection Clause.

There is evidence that biological males outperform biological females and that biological females are more prone to injury when participating in sports. Thus, permitting biological males to compete on teams designated for females may displace and injure biological female athletes. Title IX regulations permit sex-separated sports teams if selection for teams is based on competitive skill or if the sport is a contact sport, and it promotes equal athletic opportunity for members of both sexes. Thus, the Act does not violate Title IX. Similarly, the Act does not violate the Equal Protection Clause because the classification it makes is substantially related to its purposes of promoting fair competition and safety for biological female athletes.

Pursuant to Rule 7.1(a)(1) of the Local Rules of Civil Procedure of the United States District Court for the Southern District of West Virginia, copies of Exhibits 1 through 8, which are cited in the supporting memorandum of law, are attached to this motion.

WHEREFORE, for the reasons set forth herein and in the County Board's supporting memorandum of law, the HCBOE and Stutler respectfully request that the Court **GRANT** their Motion for Summary Judgment. The HCBOE is entitled to summary judgment on the sole claim against it, and it should be dismissed as a defendant. Stutler has not violated any

right of B.P.J.'s, and thus, she is also entitled to summary judgment.  If Stutler is retained as a defendant to Count II for purposes of an injunction, then she must be retained as an agent of the State, not of the HCBOE, and consequently, any damages or other monetary award, including any award for attorneys' fees and costs, that may be assessed against her must be paid by the State. Therefore, the HCBOE and Stutler are entitled to summary judgment on Counts I and II, as well as B.P.J.'s claim for monetary damages, including any award for attorneys' fees and costs, against them.  Thus, they respectfully request that the Court **GRANT** their motion.

Respectfully submitted this 21st day of April, 2022.

STEPTOE & JOHNSON PLLC
Of Counsel

/s/ Susan L. Deniker
Susan L. Deniker          (WV ID #7992)
Jeffrey M. Cropp          (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.                                                      Civil Action No. 2:21-cv-00316
                                                        Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

## **CERTIFICATE OF SERVICE**

I hereby certify that on 21st day of April, 2022, I electronically filed the foregoing

"Defendants Harrison County Board of Education and Dora Stutler's Motion for Summary

Judgment" with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to all counsel of record.

14558750

**Joshua A. Block, Esquire**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street 18th Floor
New York, NY 10004
*Counsel for Plaintiff*

**Loree Stark, Esquire**
**Nicholas P. Ward, Esquire**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA
1614 Kanawha Boulevard East
Charleston, WV  25311
*Counsel for Plaintiff*

**Avatara A. Smith-Carrington, Esquire**
LAMBDA LEGAL
3500 Oak Lawn Avenue Suite 500
Dallas, TX 75219
*Counsel for Plaintiff*

**Carl Solomon Charles, Esquire**
**Tara L. Borelli, Esquire**
LAMBDA LEGAL
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
*Counsel for Plaintiff*

**Sruti J. Swaminathan, Esquire**
LAMBDA LEGAL
120 Wall Street 19th Floor
New York, NY 10005
*Counsel for Plaintiff*

**Kathleen R. Hartnett, Esquire**
**Julie Veroff, Esquire**
**Zoë Helstrom, Esquire**
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
*Counsel for Plaintiff*

**Katelyn Kang, Esquire**
**Valeria M. Pelet del Toro, Esquire**
COOLEY LLP
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Elizabeth Reinhardt, Esquire**
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
*Counsel for Plaintiff*

**Andrew D. Barr, Esquire**
COOLEY LLP
1144 15th Street Suite 2300
Denver, CO 80202
*Counsel for Plaintiff*

**Roberta F. Green, Esquire**
**Kimberly M. Bandy, Esquire**
**Shannon M. Rogers, Esquire**
SHUMAN McCUSKEY & SLICER
PO Box 3953
Charleston, WV 25339-3953
*Counsel for Defendant WV Secondary
School Activities Commission*

14558750

**A-077**

**Kelly C. Morgan, Esquire**
**Kristen Vickers Hammond, Esquire**
**Michael W. Taylor, Esquire**
BAILEY & WYANT
PO Box 3710
Charleston, WV 25337-3710
*Counsel for Defendants WV State Board of*
*Education and W. Clayton Burch*

**Douglas P. Buffington, II, Esquire**
**Curtis R. Capehart, Esquire**
**David C. Tryon, Esquire**
WV ATTORNEY GENERAL'S
OFFICE
State Capitol Complex
Building 1, Room 26E
1900 Kanawha Boulevard East
Charleston, WV 25305-0220

*Counsel for Defendant The State of*
*West Virginia*

**Brandon Steele, Esquire**
**Joshua D. Brown, Esquire**
THE LAW OFFICES OF BRANDON S.
STEELE
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Jonathan Scruggs, Esquire**
**Roger G. Brooks, Esquire**
**Henry W. Frampton, IV, Esquire**
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Christina Holcomb, Esquire**
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Rachel Csutoros, Esquire**
**Tyson Langhofer, Esquire**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Travis Barham, Esquire**
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE
STE D-1100
Lawrenceville GA 30043
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Timothy D. Ducar, Esquire**
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

*/s/ Susan L. Deniker*

Susan L. Deniker        (WV ID #7992)
Jeffrey M. Cropp        (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

STEPTOE & JOHNSON PLLC
OF COUNSEL

*Counsel for Defendants Harrison County Board*
*of Education and Dora Stutler*

14558750

**A-078**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**B.P.J., by her next friend and mother, HEATHER JACKSON,**

    **Plaintiff,**

**v.**

**WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER, in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,**

    **Defendants,**

**and**

**LAINEY ARMISTEAD,**

    **Defendant-Intervenor.**

**Civil Action No. 2:21-cv-00316**
**Honorable Joseph R. Goodwin**

## DEFENDANTS WEST VIRGINIA STATE BOARD OF EDUCATION AND W. CLAYTON BURCH'S MOTION FOR SUMMARY JUDGMENT

**NOW COME** Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch, by and through counsel, Kelly C. Morgan, Michael W. Taylor, Kristen V. Hammond, and the law firm of Bailey & Wyant, P.L.L.C., and, pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, hereby move this Court for entry of an Order granting them summary judgment resulting in a dismissal from this action, with prejudice. In support of this Motion, these Defendants submit their contemporaneously filed Memorandum of Law in Support of their Motion for Summary Judgment, as well as the following exhibits:

(a)    Exhibit 1 – Deposition Transcript of WVBOE 30(b)(6) Representative Michele Blatt;

(b)    Exhibit 2 – Deposition Transcript of WVSSAC 30(b)(6) Representative Bernard Dolan and Ex. 6;

(c)    Exhibit 3 – Disability Rights S.C. v. McMaster, No. 21-2070, 2022 U.S. App. LEXIS 2292 (4th Cir. Jan. 25, 2022); and

(d)    Exhibit 4 – 2022 West Virginia Legislature House Joint Resolution 102.

**WHEREFORE**, based upon the foregoing and the reasons set forth in the contemporarily filed Memorandum of Law, Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch respectfully request that this Court enter an Order granting them summary judgment resulting in a dismissal from this action, with prejudice, and awarding them such other relief deemed necessary and appropriate.

Respectfully Submitted,

**DEFNDANTS WEST VIRGINIA STATE BOARD OF EDUCATION and W. CLAYTON BURCH**

**By Counsel,**

**/s/ Kelly C. Morgan**
**Kelly C. Morgan (WV Bar #9519)**
**Michael W. Taylor (WV Bar #11715)**
**Kristen V. Hammond (WV Bar #9727)**
**Bailey & Wyant, PLLC**
**500 Virginia Street, East, Suite 600**
**P.O. Box 3710**
**Charleston, WV 25337-3710**
**Telephone: 304.345.4222**
**Facsimile: 304.343.3133**
kmorgan@baileywyant.com
mtaylor@baileywyant.com
khammond@baileywyant.com

USCA4 Appeal: 23-1078 Doc: 34-2 Filed: 02/07/2023 Pg: 84 of 345

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

    Plaintiff,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,

    Defendants,

and

LAINEY ARMISTEAD,

    Defendant-Intervenor.

Civil Action No. 2:21-cv-00316
Honorable Joseph R. Goodwin

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on April 21, 2022, the foregoing **"Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch's Motion for Summary Judgment"** was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Loree Stark
Nicholas Ward
American Civil Liberties Union of West Virginia Foundation
405 Capitol St., Suite 507
P.O. Box 3952
Charleston, WV 25339-3952
lstark@acluwv.org
*Counsel for Plaintiff*

Avatara Smith-Carrington
Lambda Legal
3500 Oak Lawn Ave., Suite 500
Dallas, TX 75219
asmithcarrington@lambdalegal.org
*Counsel for Plaintiff*

Carl Charles
Tara Borelli
Lambda Legal
158 West Ponce De Leon Ave., Suite 105
Atlanta, GA 30030
ccharles@lambdalegal.org
*Counsel for Plaintiff*

Sruti Swaminathan
Lambda Legal
120 Wall St., 19th Floor
New York, NY 10005
sswaminathan@lambdalegal.org
*Counsel for Plaintiff*

Joshua Block
Chase Strangio
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
jblock@aclu.org
*Counsel for Plaintiff*

Kathleen Hartnett
Julie Veroff
Zoe Helstrom
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
khartnett@cooley.com
*Counsel for Plaintiff*

Elizabeth Reinhardt
Cooley LLP
500 Boylston St., 14th Floor
Boston, MA 02116
ereinhardt@cooley.com
*Counsel for Plaintiff*

2

Andrew Barr
Cooley LLP
1144 15th St., Suite 2300
Denver, CO 80202
abarr@cooley.com
*Counsel for Plaintiff*

Katelyn Kang
Cooley LLP
55 Hudson Yards
New York, NY 10001
kkang@cooley.com
*Counsel for Plaintiff*

Roberta F. Green
Kimberly M. Bandy
Shuman McCuskey & Slicer PLLC
P.O. Box 3953
Charleston, WV 25339-3953
rgreen@Shumanlaw.com
*Counsel for Defendant West Virginia Secondary School Activities Commission*

Susan L. Deniker
Jeffrey M. Cropp
Steptoe & Johnson PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
susan.deniker@steptoe-johnson.com
*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

Douglas P. Buffington, II
Curtis R. A. Capehart
David C. Tryon
Office of the West Virginia Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305-0220
Curtis.R.A.Capehart@wvago.gov
*Counsel for Defendant State of West Virginia Attorney*

Brandon S. Steele
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Dr., Suite 100
Beckley, WV 25801
bsteelelawoffice@gmail.com
*Counsel for Defendant-Intervenor Lainey Armistead*

3

Jonathan Scruggs
Henry W. Frampton
Alliance Defending Freedom
15100 N. 90th St.
Scottsdale, AZ 85260
jscruggs@adflegal.org
*Counsel for Defendant-Intervenor Lainey Armistead*

Christiana M. Holcomb
Alliance Defending Freedom
440 First St., NW, Suite 600
Washington DC 20001
cholcomb@adflegal.org
*Counsel for Defendant-Intervenor Lainey Armistead*

Timothy D. Ducar
Law Offices of Timothy D. Ducar
7430 E. Butherus Dr., Suite E
Scottsdale, AZ 85260
orders@azlawyers.com
*Counsel for Defendant-Intervenor Lainey Armistead*

Whitney M. Pellegrino
Aria S. Vaughan
Michelle L. Tucker
Amanda K. Dallo
United States Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
Aria.Vaughan@usdoj.gov
*Counsel for United States of America*

Fred B. Westfall, Jr.
Jennifer M. Mankins
United States Attorney's Office
300 Virginia Street East, Room 4000
Charleston, WV 25301
Fred.Westfall@usdoj.gov
*Counsel for United States of America*

**A-084**

/s/ Kelly C. Morgan
**Kelly C. Morgan (WV Bar #9519)**
**Kristen V. Hammond (WV Bar #9727)**
**Michael W. Taylor (WV Bar #11715)**
**Bailey & Wyant, PLLC**
**500 Virginia Street, East, Suite 600**
**P.O. Box 3710**
**Charleston, WV 25337-3710**
**Telephone: 304.345.4222**
**Facsimile: 304.343.3133**
**kmorgan@baileywyant.com**
**khammond@baileywyant.com**
**mtaylor@baileywyant.com**

A-085

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                    *Plaintiff*,

v.                                       Civil Action No. 2:21-cv-00316
                                       Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,

                    *Defendants*,

and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

## <u>DEFENDANT STATE OF WEST VIRGINIA'S<br>MOTION FOR SUMMARY JUDGMENT</u>

NOW COMES Defendant, State of West Virginia (the "State"), by counsel, and,

respectfully moves this Court for an order under Rule 56 of the Federal Rules of Civil Procedure

granting summary judgment, in the State's favor against the named Plaintiff.  As further explained

in the attached Memorandum in Support of this Motion the State of West Virginia is entitled to

summary judgment because "there is no genuine issue as to any material fact and the moving party

is entitled to a judgment as a matter of law."  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d

954, 958 (4th Cir. 1996) (citing Fed.R.Civ.P. 56(c)).

This Motion is made on the grounds specified in this Motion and the accompanying Memorandum of Law, the exhibits attached to the Memorandum of Law, all matters of which the Court may take judicial notice, and on such other and further oral or documentary evidence as may be presented to the Court at or before the hearing on this Motion.  The State of West Virginia is entitled to summary judgement on both of Plaintiff's causes of action.

Respectfully submitted,

By counsel,
PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: April 21, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B. P. J., by her next friend and mother,

HEATHER JACKSON,

     Plaintiff,


v.                                  CIVIL ACTION NO. 2:21-cv-00316

                                         Judge Joseph R. Goodwin

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST
VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION,
W. CLAYTON BURCH, in his official
Capacity as State Superintendent, DORA
STUTLER, in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA
BOARD OF EDUCATION, et al.,

     Defendants.


and LAINEY ARMISTEAD,

     Intervenor Defendant.

## CERTIFICATE OF SERVICE

     I hereby certify that, on this 21st day of April, I electronically filed the foregoing
"Defendant State of West Virginia's Motion for Summary Judgment" with the Clerk of Court
and all parties using the CM/ECF System.

                                   /s/ Curtis R. A. Capehart
                                   Curtis R. A. Capehart

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>Oral Argument Requested |

**DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT**

Defendant-Intervenor Lainey Armistead moves for summary judgment under Federal Rule of Civil Procedure 56 and requests that this Court enter judgment for Armistead and Defendants as to all of Plaintiff B.P.J.'s claims and terminate this case. In support of her motion, Armistead relies on the affidavits, admissions, depositions, and other documents included in the appendix to this motion in addition to her contemporaneously filed Memorandum of Law. Armistead requests oral argument to be heard at a time and date set by the Court under Local Rule of Civil Procedure 9.8. Armistead respectfully prays for this relief and for any further relief this Court may deem just and proper.

Respectfully submitted this 21st day of April, 2022.

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com

*/s/ Brandon S. Steele*

Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

*Visiting Attorneys*
*Attorneys for Defendant-Intervenor*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J, by her next friend and mother,
HEATHER JACKSON

*Plaintiff,*

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA

*Defendants,*

and

LAINEY ARMISTEAD

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

I, Brandon Steele, hereby certify that on April 21, 2022, I electronically filed a true and exact copy of ***Defendant-Intervenor's Motion for Summary Judgment*** with the Clerk of Court and all parties using the CM/ECF system.

/s/ *Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiff B.P.J., by her next friend and mother, Heather Jackson, respectfully moves this Court for summary judgment on her Equal Protection Clause claim and Title IX claim, seeking declaratory and permanent injunctive relief and nominal damages in the amount of $1.00.

Plaintiff's motion seeks a judgment as to liability on her claim that Defendants' enforcement of H.B. 3293, a law that categorically excludes Plaintiff B.P.J. and other women and girls who are transgender from women's and girls' sports, is in violation of the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendment of 1972, 20 U.S.C. §1681, *et seq.* Each named Defendant is a proper subject of injunctive relief because each

Defendant is obliged to enforce H.B. 3293 against B.P.J.  Plaintiff respectfully requests that this

Court issue a declaratory judgment finding that Defendants' enforcement of the categorical ban

violates Plaintiff's rights under the Equal Protection Clause and Title IX; permanently enjoin

Defendants, their agents, employees, successors, and all others acting in concert with them, from

enforcing the law against her; and award her nominal damages in the amount of $1.00.

Dated: April 21, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Respectfully submitted,
/s/ Loree Stark

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Andrew Barr*
Cooley LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Elizabeth Reinhardt*
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

               *Plaintiff*,

         v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

               *Defendants*,

        and

LAINEY ARMISTEAD,

               *Defendant-*
*Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

---

**CERTIFICATE OF SERVICE**

   I, Loree Stark, do hereby certify that on this 21st day of April, 2022, I electronically filed a true and exact copy of ***Plaintiff's Motion for Summary Judgment*** with the Clerk of Court and all parties using the CM/ECF System.

                              */s/ Loree Stark*
                              Loree Stark
                              West Virginia Bar No. 12936

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**DECLARATION OF B.P.J.**

I, B.P.J., pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2.      I am a girl who is also transgender.  I am 11 years old, and I am in the sixth grade at Bridgeport Middle School.  I have two older brothers, ages 14 and 20.  I live with my brothers; my mom, Heather; and my dad, Wesley in Lost Creek, West Virginia.

3.      Some of my favorite things to do include playing outside with our family's dogs, riding my bike, running with my friends and family, and jumping on the trampoline.  I am very

1

passionate about math and science and make straight As in school.  Also, I like to play videogames like Apex Legends, Minecraft, and Overwatch.  I also got an Oculus this year, and I love playing the Beat Saber game.

4.      I knew from when I was very little that I am a girl.  When I was younger, I remember always feeling like I wasn't in the right body and wanting to play in my mom's clothing.

5.      My mom has always been supportive of me, so it felt normal for me to talk to her about how I was feeling about being a girl and that I wanted to go by the name B.P.J.  While talking to my dad was a little bit harder in the beginning, he supported me in wanting to be referred to as B.P.J. and in the fact that I am a girl.

6.      During my fourth-grade year, I went to school dressed in clothes that girls wear, and teachers and staff were using my chosen name.  My mom and I met with my principal, teacher, and others at my school to make a plan for how my school could best support me as a girl.  I was happy with the plan we developed together, and I really felt supported by my classmates and by my school.

7.      One of the ways my parents supported me in being the girl that I am is that they took me to see a team of healthcare professionals who work with transgender people.  I was diagnosed with gender dysphoria in 2019.

8.      I am currently on puberty-delaying medication and have been for almost two years.

9.      In fourth grade, I joined a cheerleading team with other girls.  I first got into cheering because my mom encouraged me to try a sport.  Since I had spent time learning cheer

routines while in the stands at football games and my friends were also on the cheer team, I decided to pursue cheer.

10.     I really liked being a cheerleader.  It was fun.  I liked having the chance to be on a team with my friends and learning how to do all the cheers.  I never had any problems with the other girls on the team.

11.     During my first year on the cheer team, our team placed at a cheer competition for the first time ever.  It made me feel proud and good about myself to work hard and improve as a team.

12.     Heading into junior high school, I was excited to try out for the girls' cross-country and track teams.  Although I really enjoyed my time on the cheer team, I sometimes got "stage fright" and preferred to take up a new sport.

13.     Since I was young, I have always enjoyed running and everyone in my family runs.  My older brothers run cross-country, and my mom runs too.  Seeing my family run has motivated me to want to try out and participate.

14.     Last spring, my mom told me about a law called H.B. 3293 that prevents transgender girls like me from playing on girls' sports teams.  Knowing that I could not try out for the girls' cross-country and track teams just because I am a transgender girl was horrible and made me feel angry and sad.  It hurt to know that I would not be able to have the chance to run on the girls' team like my friends can because of who I am.

15.     I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team.

16.     Running with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls.  If I did not get to participate in cross-

3

country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team.

17.     In July 2021, I participated in training and conditioning before the August try-outs for the girls' cross-country team.  Participating in training and conditioning was a positive experience—I had fun getting to know the coaches and teammates, and challenging myself to run as well as I could.

18.     Following try-outs at the beginning of August, I learned that I made the girls' cross-country team.  My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team.  I made so many new friends and loved competing with and supporting my teammates.  We learned about teamwork, having a positive attitude, and how to have fun while being competitive.

19.     Since I was also interested in participating on the girls' track team, I looked forward to spring try-outs.

20.     In early March, I participated in two weeks of try-outs for the girls' track team and on March 11, 2022, I learned that I made the girls' track team.  I was ecstatic.

21.     Ultimately, I just want to have the opportunity to participate in school sports like any other girl.  Sports are an important part of my experience at school, and I was so happy to be able to have the chance to participate in cross-country and track this year with the other girls in my school.  I look forward to many more years of running with my peers.  It is so upsetting and hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender.

*  *  *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __04/19/2022__

_____
B.P.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>           *Plaintiff*,<br><br>    v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>           *Defendants*,<br><br>    and<br><br>LAINEY ARMISTEAD,<br><br>           *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |

## I.    B.P.J. Is A Girl Who Is Transgender.

1.    B.P.J. is an eleven-year-old girl who is also transgender. (Ex. 2[1] (Declaration of B.P.J.) ¶ 2; Ex. 12 (Deposition Transcript of B.P.J.) at 25:3-5, 25:11-14, 25:23-26:3; Ex. 13 (Deposition Transcript of Heather Jackson, Jan. 19) at 59:5-6; Ex. 15 (Deposition Transcript of Wesley Scott Pepper) at 46:16-20; Dkt. No. 252 (Stipulation of Uncontested Facts Agreed to by Harrison County Board of Education, County Superintendent Dora Stutler, and Plaintiff) ("County Stip.") ¶ 1; Dkt. No. 270 (Stipulation of Uncontested Facts Agreed to by West Virginia State Board of Education, State Superintendent W. Clayton

---

[1] "Ex." refers to an exhibit attached to the April 21, 2022, declaration of Loree Stark submitted in support of Plaintiff B.P.J.'s motion for summary judgment.

Burch, and Plaintiff) (WVBOE Stip.) ¶ 1; Dkt. No. 158 (WVSSAC's Answer to Plaintiff's First Amended Complaint ("WVSSAC Ans.") ¶¶ 1, 6, 30.) B.P.J. was designated male at birth and has a female gender identity. (Ex. 1-A (Declaration of Heather Jackson) at 1; Ex. 1-B at 2.)

2.      B.P.J. is fiercely protected by her mother, Heather Jackson; unconditionally loved by her father, Wesley Pepper; and has the support of her older brothers and grandparents. (Ex. 1 ¶¶ 4, 22–23; Ex. 2 ¶ 5; Ex. 15 at 165:21-166:1, 185:5-16.)

3.      When B.P.J. was in third grade, she socially transitioned at school to living and presenting in accordance with her identity as a girl. (Ex. 1 ¶ 11; Ex. 12 at 39:6-39:24.) "Social transition" means allowing a transgender child to live and be socially recognized in accordance with their gender identity. (Ex. 22 (Declaration and Expert Report of Deanna Adkins, M.D.) ¶ 27.)

4.      B.P.J.'s elementary school and middle school have both acknowledged and respect that B.P.J.'s gender identity is female. (Dkt. No. 252 (County Stip.) ¶ 1.)

5.      When B.P.J. was in elementary school, her school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Ex. 1-A at 1; Ex. 2 ¶ 6; Dkt. No. 252 (County Stip.) ¶ 1.)

6.      Under this plan, school staff were informed that B.P.J.'s authentic gender is female, and were instructed to refer to her with her female name and using female pronouns. (Ex. 1-A at 2–3.)

7.      Under the gender support plan, school staff were also informed on how to support B.P.J. if she faced problems from others at school because of her gender. (Ex. 1-A at 2–3.)

8.      B.P.J.'s middle school created a similar plan. (Ex. 1-B.)

9.    Like the elementary school plan, B.P.J.'s middle school gender support plan confirmed that B.P.J.'s parents are aware of and supportive of her gender identity and that B.P.J. "is comfortable with others knowing her gender identity and transition," and provided that "all teachers," students, and multiple administrators and county staff would be made aware of her gender identity. (Ex. 1-B at 2.)

10.    Under the elementary and middle school gender support plans, if anyone has questions about B.P.J.'s identity, teachers and staff should "[b]e open and honest" and respond, "[s]he is [B.P.J.]; and that makes her happy." (Ex. 1-A at 2; Ex. 1-B at 3.)

11.    B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Ex. 2 ¶ 6; Ex. 12 at 130:3-132:13.)

12.    In 2019, B.P.J. was diagnosed with gender dysphoria by Dr. Gerald Montano, a pediatrician at the University of Pittsburgh Medical Center Children's Hospital of Pittsburgh's Gender and Sexuality Development Program. (Ex. 1 ¶ 13; Ex. 2 ¶ 7; Ex. 20 (Deposition Transcript of Gerald Montano, D.O.) at 93:17-19; Ex. 5 (State of West Virginia's Response to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 6 (Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 7 (Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5.)

13.    On June 15, 2020, at the first signs of puberty—known as the "Tanner 2" stage of pubertal development—B.P.J. began receiving puberty delaying (or "blocking") treatment, in accordance with the Endocrine Society's clinical guidelines for treating gender dysphoria. (Ex. 1 ¶ 14.)

14.  B.P.J. has been on puberty delaying treatment for nearly two years. (Ex. 1 ¶ 14; Ex. 2 ¶ 8; Ex. 20 at 115:22-116:4; Ex. 19 (Deposition Transcript of Kacie Kidd, M.D.) at 89:22-90:18.)

15.  "Puberty blocking treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins." (Ex. 22 ¶ 30.)

16.  When administered to transgender girls at the beginning of the "Tanner 2" stage of sexual maturity, puberty-blocking medication prevents transgender girls from experiencing levels of circulating testosterone above what is typical for non-transgender girls and women. (Ex. 24 (Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 50; Ex. 25 (Rebuttal Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 17; Ex. 22 ¶ 31.)

17.  As a result of receiving puberty-delaying medication at the beginning of the "Tanner 2" stage of pubertal development, B.P.J. has not gone through her endogenous puberty and has not experienced the effects of testosterone that would be typical if she underwent her full endogenous puberty. (Ex. 22 ¶¶ 30–31; Ex. 19 at 119:22-120:15.) Specifically, she has never experienced levels of circulating testosterone above what is typical for non-transgender girls and women. (Ex. 24 ¶ 50; Ex. 25 ¶ 17; Ex. 22 ¶ 31.)

18.  If B.P.J. goes on to receive gender-affirming hormone therapy, she will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously and will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution, and secondary sex characteristics that are typically experienced by non-transgender girls who go through a typically female puberty. (Ex. 25 ¶ 17; Ex. 22 ¶ 43.)

## II.   B.P.J.'s Wishes To Participate In And Experience The Benefits Of School Sports.

19.   B.P.J. has always liked running and loves playing team sports. (Ex. 2 ¶¶ 3, 13; Ex. 12 at 65:2-4, 145:15-18, 67:21-68:6.)

20.   While in elementary school, she enjoyed participating in a recreational cheerleading team with other girls. (Ex. 1 ¶¶ 16–18; Ex. 2 ¶¶ 9–11; Ex. 12 at 72:21-72:22.)

21.   As someone who comes from a family of runners, B.P.J. also grew up running and watching her older brothers and mother run competitively and as part of a team. (Ex. 1 ¶ 20; Ex. 2 ¶ 13.)

22.   School-sponsored athletics offer a range of educational and social benefits for children and young adults, including camaraderie, cooperation, leadership, teamwork, watching out for fellow players, trust, physical fitness, perseverance, sportsmanship, and discipline. (Dkt. No. 78 (State of West Virginia's Answer to Plaintiff's First Amendment Complaint) ("State Ans.") ¶ 38; Dkt. No. 131 (Lainey Armistead's Answer to Plaintiff's First Amended Complaint) ("Armistead Ans.") ¶ 38; Dkt. No. 156 (West Virginia State Board of Education's Answer to Plaintiff's First Amendment Complaint) ("WVBOE Ans.") ¶ 38; Dkt. No. 157 (Harrison County Board of Education's Answer to Plaintiff's First Amendment Complaint) ("County Ans.") ¶ 38; Dkt. No. 158 (WVSSAC Ans.) ¶ 38; Ex. 27 (Expert Report and Declaration of Mary D. Fry, Ph.D.) ¶¶ 18, 37; Ex. 16 (Deposition Transcript of Harrison County Board of Education 30(b)(6) Designees) at 106:22-106:24, 222:9-17; Ex. 8 (West Virginia State Board of Education's Responses to Plaintiff's Second Set of Requests for Admission) Nos. 45–47; Ex. 17 (Deposition Transcript of WVSSAC 30(b)(6) Designee) at 113:8-11; Ex. 21 (Deposition of Lainey Armistead) at 156:17-25; Dkt. No. 95-1 (Declaration of Lainey Armistead) ¶ 27; Ex. 11 (Lainey Armistead's

Responses and Objections to Plaintiff's Second Set of Requests for Admission) Nos. 44–45.)

23.    The benefits from school athletics can contribute to greater success in college and throughout life. (Ex. 27 ¶¶ 18, 37.)

24.    These benefits exist regardless of whether a student wins or loses. (Ex. 5 No. 47; Ex. 6 No. 47; Ex. 8 No. 47; Ex. 9 (State Superintendent W. Clayton Burch's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 10 (WVSSAC's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 11 No. 47; Ex. 27 ¶ 35).

25.    These benefits are advanced when all athletes have the opportunity to play the sport they love. (Ex. 27 ¶ 18.)

26.    Encouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all participants. (Ex. 27 ¶¶ 28–30, 35.)

27.    Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized. (Ex. 27 ¶¶ 26, 34.)

28.    Excluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all participants. (Ex. 27 ¶¶ 37–41.)

29.    B.P.J. has experienced benefits from participating in cheerleading in the past and from participating in cross-country in the 2021-22 school year. (Ex. 1 ¶¶ 17–18, 28; Ex. 2 ¶¶ 10–11, 16–18.)

30.     B.P.J. hopes to continue to experience such benefits from playing on girls' teams in the future. (Ex. 2 ¶ 21.)

**III.    Prior To H.B. 3293, West Virginia Had A Longstanding Policy Of Sex Separation In School Sport And Did Not Categorically Bar Transgender Students From Participating.**

31.     Before it passed H.B. 3293, West Virginia had a general, longstanding, and unchallenged policy establishing separate school sports teams for boys and girls. *See* W. Va. Code R. § 127.

32.     Almost all sports in West Virginia at the public secondary school level are separated into boys' and girls' teams. (Ex. 17 109:24-110:4.) The exceptions are cheerleading, football, baseball, wrestling, and golf. (Ex. 10 Nos. 29–30; Ex. 17 at 109:24-110:4.)

33.     Cheer teams are always designated as "coed" or "mixed," whereas football, baseball, wrestling, and golf teams are boys' teams that permit girls to play if they so desire because no separate girls' teams exist, and so are considered "mixed . . . to respond to demand." (Ex. 17 at 104:2-105:6.)

34.     In practice, cheer "almost always has boy [and girl] members," but baseball and football are "very seldom" actually mixed. (Ex. 17 at 104:17-20.)

35.     There are no co-ed teams for cross-country or track at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)

36.     Under rules established by the West Virginia Secondary School Activities Commission ("WVSSAC")—which were already in existence when H.B. 3293 was enacted—cisgender boys are prohibited from playing on girls' teams at the public secondary school level. (Ex. 17 at 105:4-105:16; Ex. 39 (WVSSAC000148) at § 127-2-3.8; Ex. 7 Nos. 38–39; Ex. 8 Nos. 38–39; Ex. 10 Nos. 38–39; Ex. 11 Nos. 38–39.)

37.  By contrast, girls may choose to play on a boys' team if they wish to do so and no girls' team exists, as is the case with football, baseball, wrestling, and golf. (Ex. 17 104:2-105:6.)

38.  West Virginia did not have a law or policy prohibiting girls who are transgender from playing on girls' teams before it passed H.B. 3293.

39.  Before H.B. 3293, the WVSSAC Board of Directors had an internal policy that allowed students who are transgender to participate on teams consistent with their gender identity if the transgender student's school allowed them to participate, based on its considerations of whether that specific student's participation would impact "fair competition among high school teams." (Ex. 37 (WVSSAC000008).) Under the internal policy, if another school contested the transgender student's eligibility to play, then the Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (*Id.*)

40.  The WVSSAC received no complaints about this internal policy, and the WVSSAC is not aware of any instances of a transgender student attempting to participate under this policy. (Ex. 17 at 118:23-119:16.)

41.  Since 2011, the National College Athletics Association ("NCAA") has allowed women who are transgender to participate on women's teams after completing one year of testosterone suppression. (Ex. 24 ¶ 38.)

42.  In 2022, the NCAA announced that it had revised its policy to adopt a "sport-by-sport approach" that "calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors." (Ex. 24 ¶ 39.)

IV.   **H.B. 3293 Categorically Bans Transgender Girls And Women From Participating On Girls' And Women's Sports Teams.**

43.   On April 9, 2021, West Virginia passed H.B. 3293. W. Va. Code § 18-2-25d. H.B. 3293 went into effect 90 days later. *Id.*

44.   H.B. 3293 categorically bans all girls who are transgender from participating in school sports from middle school through college. W. Va. Code § 18-2-25d.

45.   H.B. 3293 requires that all public secondary school or college sports in West Virginia be "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex." W. Va. Code §§ 18-2-25d(b), (c).

46.   H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1).

47.   H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2). There is no parallel provision for boys' teams.

48.   The legislative findings for H.B. 3293 reject the notion of allowing students to play on sports teams consistent with their "gender identity," asserting that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(4).

49.   H.B. 3293's definition of "biological sex" categorically excludes B.P.J. and any other transgender girl from playing sports at the middle school, high school, and collegiate levels. (Ex. 5 Nos. 24 (admitting "that H.B. 3293 prohibits Plaintiff B.P.J. from participating on

9

girls' athletic teams at all public secondary schools located in West Virginia"), 36–37; Ex. 6 Nos. 36–37; Ex. 7 Nos. 20–22, 36–37; Ex. 8 Nos. 36–37; Ex. 9 Nos. 20–22, 36–37; Ex. 10 Nos. 36–37; Ex. 11 Nos. 36–37; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2; Ex. 16 at 100:21-101:4; Ex. 17 at 113:16-20; Ex. 28 (Deposition Transcript of Mary D. Fry, Ph.D.) 180:18-20 (Q. [from Attorney David Tryon] Well, right now the rule is HB-3293, which says that [a] transgender girl must participate on the boys['] team.).)

50.  H.B. 3293 does not prohibit a cisgender girl at any public secondary school in West Virginia from joining a girls' athletic team. (Ex. 5 Nos. 34–35; Ex. 6 Nos. 34–35; Ex. 7 Nos. 34–35; Ex. 8 Nos. 34–35; Ex. 9 Nos. 34–35; Ex. 10 Nos. 34–35; Ex. 11 Nos. 34–35; Ex. 16 at 100:2-101:4; Ex. 18 (Deposition Transcript of State Board of Education 30(b)(6) Designee) at 124:11-25, 125:3-19.)

51.  Melissa White, counsel for the House of Delegates Education Committee, referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill" (Ex. 40 (WVSBOE 000008).)

52.  Melissa White also described the bill as a "[t]ransgender originating bill" (Ex. 40 (WVSBOE000039)) and a "bill regarding transgender participation in sports" (Ex. 40 (WVSBOE000009).)

53.  During debates over the bill, when asked how H.B. 3293 would change the status quo in West Virginia, the counsel representing the bill replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth. (Ex. 35 (West Virginia House of Delegates Education Committee Testimony, Mar. 18, 2021) at 9.)

54.     A member of the West Virginia House of Delegates and Chairman of the Education Committee, Joe Ellington, described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to compete in state track and field meetings in Connecticut." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 3; Dkt. No 25 (Supplemental Declaration of Katelyn Kang) Ex. C at 37–38.)

55.     During the debate in the Senate, one senator, Michael J. Maroney, expressly noted that "the bill" is "about transgenders." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 2; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)

56.     Another senator, Rollan Roberts, shared a constituent letter stating that the "trans movement is an attack upon womanhood." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 3; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)

57.     On March 16, 2021, Delegate Jordan Bridges announced on Facebook that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). (Ex. 42 (Jordan Bridges, "Update: The bill passed out of committee," Facebook, https://perma.cc/HA5C-VJ4N (March 16, 2021)).)

58.     The sole justification for H.B. 3293 offered in the legislative text is "promot[ing] equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5). The law discusses

equal athletic opportunities only in terms of the "substantial" displacement of female athletes. *Id.* § 18-2-25d(a)(3)-(4).

59.    During the discovery period, the State identified additional rationalizations that it claims are advanced by H.B. 3293: (1) "[t]o [p]rotect [w]omen's [s]ports," (2) "[t]o follow Title IX," and (3) "[t]o protect women's safety in female athletic sports." (Ex. 4 (State of West Virginia's Responses to Plaintiff's First Set of Interrogatories) No. 6.)

60.    During a House committee hearing of the bill, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics. (Ex. 35 at 11.)

61.    The bill's sponsors also acknowledged that they were not aware of a single instance of a transgender athlete having ever competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from such participation. (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. B (West Virginia House of Delegates Education Committee, Mar. 18, 2021) at 1–2, Ex. C (West Virginia House of Delegates Judiciary Committee, Mar. 18, 2021) at 1, Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 1.)

62.    When Governor Justice was asked after signing the bill whether he could give "one example of a transgender child trying to get an unfair advantage," he responded, "No, I can't really tell you one." Ex. 43 (MSNBC on Twitter, https://twitter.com/MSNBC/status/1388132937707802629 [https://perma.cc/G8VM-QGYU] (April 30, 2021).) He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority. It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids. I

mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills. This is not a priority to me." (*Id.*)

63. Defendants were not aware of any transgender student athletes participating on an athletic team offered by a public secondary school in West Virginia when H.B. 3293 was passed. (Defendants' Responses to Plaintiff's Second Set of Requests for Admission Nos. 40–41.)

64. Defendants are not currently aware of a transgender student athlete other than B.P.J. participating on an athletic team offered by Bridgeport Middle School or any other public secondary school in West Virginia. (Ex. 5 Nos. 42–43; Ex. 6 Nos. 42–43; Ex. 7 Nos. 42–43; Ex. 8 Nos. 42–43; Ex. 9 Nos. 42–43; Ex. 10 Nos. 42–43; Ex. 11 Nos. 42–43; Ex. 17 at 119:13-16.)

65. WVSSAC has not received any complaints about transgender students participating in school sports in West Virginia. (Ex. 17 at 120:9-15.)

66. The West Virginia Department of Education's General Counsel described H.B. 3293 as "much ado about nothing." (Ex. 40 (WVSBOE000006).)

67. The West Virginia Department of Education did not support H.B. 3293 when it was passed. (Ex. 41 (WVSBOE000038).)

68. The State Board's 30(b)(6) witness testified that the Board had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in school sports, and that the Department of Education, State Board, and State Superintendent have never received any complaints regarding students who are transgender participating in school sports. (Ex. 18 at 67:3-10, 101:15-17, 102:12-13, 113:19-114:16, 125:24-126:2, 135:24-136:19).

69.  The West Virginia Department of Education and the State Superintendent still do not support H.B. 3293. (Dkt. No. 270 (WVBOE Stip.) ¶ 5.)

**V.  H.B. 3293's Exclusive Reliance On "Biological Sex" And Categorical Bar To The Participation Of Transgender Women And Girls Is A Stark Departure From The Inclusive Policies Of Major Sporting Associations.**

70.  H.B. 3293 classifies school sports teams "according to biological sex" and defines "biological sex" as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(a)(5), (b)(1).

71.  Scientists recognize that a person's sex encompasses different biological components, including sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and external genitalia, and other secondary sex characteristics, which are not always aligned in the same direction. (Ex. 25 ¶¶ 5–6 (and sources cited therein)); Ex. 23 (Exhibit 4 to Deposition Transcript of Deanna Adkins, M.D. (Hembree WC, et al. Endocrine Treatment of Gender Dysphoria/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab 2017; 102:3869-3903 ("Endocrine Society Guidelines 2017") at 3875)).)

72.  Although the precise biological causes of gender identity are unknown, gender identity itself has biological underpinnings, possibly as a result of variations in prenatal exposure to sex hormones, gene sequences, epigenetics, or a combination of factors. (Ex. 25 ¶ 6 (and sources cited therein); Ex. 23 (Endocrine Society Guidelines 2017 at 3874–75).)

73.  H.B. 3293's requirement that teams be separated "based solely on the individual's reproductive biology and genetics at birth" is a stark departure from the prior policy in West Virginia and is not the rule used by elite sporting organizations.

14

A-115

74.     The NCAA, World Athletics, and the International Olympic Committee ("IOC") all permit transgender girls and women to compete in women's sport events after suppressing their levels of testosterone for particular periods of time or below particular thresholds. (Dkt. No. 78 (State Ans.) ¶ 42; Dkt. No. 131 (Armistead Ans.) ¶ 42; Dkt. No. 156 (WVBOE Ans.) ¶ 42; Dkt. No. 157 (County Ans.) ¶ 42; Dkt. No. 158 (WVSSAC Ans.) ¶ 42; Ex. 24 ¶¶ 27–39.)

75.     The NCAA's policy is described above. *See supra* ¶¶ 41–42. The NCAA policy aims to "preserve[] opportunity for transgender-student athletes." (Ex. 45 (NCAA, *Board of Governors updates transgender participation policy* (Jan. 19, 2022), https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx).)

76.     Since 2011, World Athletics, the international governing body for track-and-field athletics, has required that women with elevated levels of circulating testosterone lower their levels of testosterone below a threshold amount in order to compete in elite international women's sports competitions. (Ex. 24 ¶ 27.)

77.     In 2019, World Athletics adopted regulations allowing women who are transgender to participate in elite international women's sports competitions if their total testosterone level in serum is beneath a particular threshold—5 nmol/L—for at least one year before competition. (Ex. 24 ¶ 29.)

78.     The IOC published formal eligibility rules for the participation of transgender women in 2003. Those rules required that transgender women athletes could compete in women's events only if they had genital surgery, a gonadectomy (*i.e.*, removal of the testes), and legal documentation of female sex. (Ex. 24 ¶ 31.)

79. In 2015, the IOC adopted new policies allowing women who are transgender to participate on women's teams if they demonstrated that their total testosterone level in serum was below 10 nmol/L for at least one year prior to competition. (Ex. 24 ¶ 33.)

80. In 2021, the IOC adopted a new "Framework on Fairness, Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations," which replaces the 2015 guidance. (Ex. 24 ¶ 34.)

81. Unlike the IOC's 2003 and 2015 policies, the IOC's 2021 framework does not attempt to adopt a single set of eligibility standards for the participation of transgender athletes that would apply universally to every IOC sport. Instead, the 2021 framework provides a set of governing principles for sporting bodies to follow when adopting eligibility rules for their particular sport. (Ex. 24 ¶ 35.)

82. Under the 2021 framework, "[n]o athlete should be precluded from competing or excluded from competition on the .exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.) "Until evidence . . . determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.)

83. The 2021 framework further provides that "[a]ny restrictions arising from eligibility criteria should be based on robust and peer reviewed research that: (a) demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes; (b) is largely based on data collected from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility criteria aim to regulate; and (c) demonstrates that such

disproportionate competitive advantage and/or unpreventable risk exists for the specific sport, discipline and event that the eligibility criteria aim to regulate." (Ex. 24 ¶ 37.)

84.     USA Swimming recently adopted a policy allowing girls and women who are transgender to apply to compete in elite events if they demonstrate that their "prior physical development . . . as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender [f]emale competitors" and they "demonstrate[] that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L . . . continuously for a period of at least thirty-six (36) months before the date of the Application." (Ex. 29 (Declaration of Gregory A. Brown, P.H.D., F.A.C.S.M.) ¶ 177.)

85.     A person's genetic makeup and internal and external reproductive anatomy are not useful indicators of athletic performance and have not been used in elite competition for decades. (Ex. 24 ¶ 49.)

86.     Some people with 46,XY chromosomes may have inactive testosterone receptors (a syndrome called "complete androgen insensitivity syndrome, CAIS") which means they do not respond to testosterone despite very high levels. (Ex. 24 ¶ 26(b).)

87.     Usually, people with CAIS have female gender identity and have external genitalia that are typically female. They do not develop the physical characteristics associated with typical male puberty. (Ex. 24 ¶ 26(b).)

88.     It has long been recognized that women with CAIS do not have an athletic advantage over other women simply by virtue of having XY chromosomes. (Ex. 24 ¶ 59.)

89.     There is a medical consensus that the largest known biological cause of average differences in athletic performance between non-transgender men as a group and non-transgender

women as a group is circulating testosterone beginning with puberty. (Ex. 24 ¶ 25; Ex. 25 ¶ 8; Ex. 29 ¶ 114 ("While boys exhibit some performance advantage even before puberty, it is both true and well known to common experience that the male advantage increases rapidly, and becomes much larger, as boys undergo puberty and become men.").)

90.    Before puberty, boys and girls typically have the same levels of circulating testosterone, and age-grade competitive sports records show only modest differences in athletic performance between non-transgender boys and non-transgender girls. (Ex. 24 ¶¶ 24–25; Ex. 26 (Exhibit 4 to Deposition Transcript of Joshua D. Safer (Handelsman 2018 ("Age-grade competitive sports records show minimal or no female disadvantage prior to puberty[.]"))); Ex. 26 ¶ 114 (describing differences as "modest").)

91.    There have been no studies purporting to establish that any modest differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are attributable to innate physiology as opposed to social factors. (Ex. 30 (Deposition Transcript of Gregory A. Brown) at 94:19-23; Ex. 25 ¶ 9.)

92.    H.B. 3293 does not provide for any consideration of circulating testosterone levels. W. Va. Code § 18-2-25d.

**VI.    H.B. 3293 Harms B.P.J.**

93.    Under H.B. 3293, B.P.J. is forbidden from playing on a girls' team at Bridgeport Middle School, or on a girls' athletic team at any public secondary school in West Virginia. (Ex. 5 Nos. 20-24; Ex. 6 Nos. 20-24; Ex. 7 Nos. 20-24; Ex. 8 Nos. 20-24; Ex. 9 Nos. 20-24; Ex. 10 Nos. 20-24; Ex. 11 Nos. 20-24; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2.)

94.     In May 2021, B.P.J.'s mother, Heather Jackson, met with B.P.J.'s new Principal at Bridgeport Middle School, David Mazza, regarding a gender support plan for B.P.J., which specified the ways the school would support B.P.J. as a girl. (Ex. 1 ¶ 23; Ex. 16 at 95:25-96:6).

95.     At that same meeting, Ms. Jackson informed Principal Mazza that B.P.J. wanted to participate on the girls' cross-country team. (Ex. 1 ¶ 24; Ex. 1-B at 5; Ex. 14 (Deposition Transcript of Heather Jackson (Jan. 20, 2022)) at 250:14-252:7; Ex. 16 at 220:2-16.) In response to Ms. Jackson's statement, Principal Mazza communicated to Ms. Jackson that B.P.J. would not be able to run on the girls' cross-country team because of H.B. 3293. (Ex. 1 ¶ 24; Ex. 12 at 129:21-130:2, 106:16-21, 107:3-11; Ex. 13 at 21:22-22:16; Ex. 14 at 250:8-251:12; Ex. 16 at 220:19-22; Dkt. No. 157 (County Ans.) ¶¶ 63–65.)

96.     B.P.J. "just want[s] the opportunity to participate in school sports like any other girl." (Ex. 2 ¶ 21.)

97.     Forcing B.P.J. to run on the boys' team would be stigmatizing, isolating, hurtful, and devastating for her. (Ex. 1 ¶¶ 30–31; Ex. 2 ¶¶ 14–16, 21.)

98.     According to B.P.J., "[Being a girl] means—it means everything." (Ex. 12 29:24-30:5.) "I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team." (Ex. 2 ¶ 15; *see also* Ex. 12 at 120:24-121:4.)

99.     According to B.P.J., "[r]unning with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls. If I did not get to participate in cross-country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team." (Ex. 2 ¶ 16.) "It is so upsetting and

hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender." (Ex. 2 ¶ 21.)

100.    According to B.P.J.'s mother, "[i]t is wrong and senseless to try to make [B.P.J.] participate on boys' teams when there are girls' teams available. Forcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl." (Ex. 1 ¶ 30.) "Forcing her to run with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (Ex. 1 ¶ 31.)

101.    B.P.J. does not have the option of running on a co-ed team, as there is no co-ed cross-country or track team at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)

102.    Preventing B.P.J. from playing sports with other girls will deprive B.P.J. of experiences of competition, friendship, and responsibility that come from participation in school sports. (Ex. 1 ¶¶ 28, 31; Ex. 2 ¶¶ 10–11, 14, 16–18.)

103.    It is hurtful and frustrating for B.P.J. to be denied the opportunity to play on girls' sports teams, and to be treated differently because she is transgender. (Ex. 2 ¶¶ 14, 21.)

104.    Allowing Defendants to enforce H.B. 3293 against B.P.J. would send a signal to B.P.J. that her state refuses to see her for the girl that she is. (Ex. 1 ¶ 31.)

**VII.    B.P.J.'s Lawsuit Challenges Her Exclusion From Girls' Sports Under H.B. 3293.**

105.    B.P.J. filed this lawsuit on May 26, 2021, arguing that H.B. 3293 as applied to her violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and the Equal Protection Clause of the United States Constitution. (Dkt. No. 1 (Complaint).)

106.    B.P.J.'s Title IX claim is pleaded against the State of West Virginia, the State Board of Education, the County Board of Education, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 20.)

107.    B.P.J.'s Equal Protection Clause claim is pleaded against State Superintendent W. Clayton Burch, County Superintendent Dora Stutler, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 22; Dkt. No. 127 (Order dismissing without prejudice B.P.J.'s equal protection claim against the Attorney General in his official capacity).)

108.    The Harrison County Board of Education is the governing body of Harrison County's public education system. W. Va. Code § 18-5-1. The County Superintendent is responsible for executing educational policies under the direction of the State Board and County Board, including interscholastic athletics. W. Va. Code § 18-4-10.

109.    "[A]bsent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J." (Dkt. No. 252 (County Stip.) at ¶¶ 3–4.) The County Board and County Superintendent's role in enforcing the law is "mandatory, not merely optional." (Dkt. No. 73 (Harrison County Board of Education's Memo in Support of Motion to Dismiss First Amended Complaint) at 2, 6; *see also* Ex. 16 at 44:15-45:12, 145:1-145:5.)

110.    "Absent an injunction by a court," the State Board and Superintendent Burch "would be compelled and required to follow H.B. 3293" and the State Board "would be compelled and required to promulgate rules implementing H.B. 3293." (Dkt. No. 270 (WVBOE Stip.) ¶¶ 3–4; *see also* Ex. 18 at 118:1-3.)

21

A-122

111. Without an injunction, the WVSSAC "cannot adopt or enforce any policy" allowing girls who are transgender to participate on girls' sports teams that "conflicts with state law." (Ex. 10 No. 50.)

112. The State Board is federally funded. (Dkt. No. 156 (WVBOE Ans.) ¶ 90; *see also* Ex. 18 at 39:19-40:3.)

113. The County Board is federally funded. (Dkt. No. 157 (County Ans.) ¶ 90; *see also* (Dkt. No. 252 (County Stip.) ¶ 8); Ex. 7 No. 66).)

114. The State Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code § 18-2-25; (Ex. 18 at 35:22-24.)

115. The County Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code §§ 18-2-25, 18-5-13; (Ex. 16 at 53:24-54:10.)

116. WVSSAC was given controlling authority over federally funded secondary school athletic programs by the State and County Boards. W. Va. Code § 18-2-25; (Ex. 39 (WVSSAC000133-38) (outlining the WVSSAC's powers over secondary schools and their athletics)).

117. WVSSAC member schools must follow WVSSAC's rules and regulations when "conducting interscholastic athletic[s]" (Ex. 39 (WVSSAC0000134)) and when determining whether a student is eligible to play secondary school sports. (Ex. 17 at 73:4-73:8.)

118.    WVSSAC's Board of Directors has "the power to decide all cases of eligibility of students and participants in interscholastic athletic[s]." (Ex. 39 (WVSSAC000138); *see also* Ex. 17 at 61:25-62:13.)

119.    WVSSAC's athletic handbook provides that it must comply with Title IX. (Ex. 38 (WVSSAC000017).)

**VIII.    This Court's Preliminary Injunction Allowed B.P.J. To Participate On Her School's Girls' Cross-Country And Track Teams, All Without Incident.**

120.    After this Court issued its preliminary injunction on July 21, 2021, B.P.J. was permitted to participate on Bridgeport Middle School's girls' cross-country team. (Ex. 5 No. 6; Ex. 6 No. 6; Ex. 7 No. 6; Ex. 8 No. 6; Ex. 9 No. 6; Ex. 10 No. 6; Ex. 11 No. 6.)

121.    B.P.J. participated in the Mountain Hollar MS Invitational meet and the Doddridge Invitational meet while she was on the cross-country team. (Ex. 1 ¶ 27.)

122.    In the Mountain Hollar Invitational, B.P.J. placed 51 out of 66 participants. (Ex. 1 ¶ 27; Ex. 33 (Mountain Hollar Invitational Stats).)

123.    In the Doddridge Invitational meet, B.P.J. placed 123 out of 150 participants. (Ex. 1 ¶ 27; Ex. 34 (Doddridge Invitational Stats, HCBOE_1167-HCBOE_1168).)

124.    According to B.P.J: "My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team. I made so many new friends and loved competing with and supporting my teammates. We learned about teamwork, having a positive attitude, and how to have fun while being competitive." (Ex. 2 ¶ 18.)

125.    In Spring 2022, B.P.J. tried out for, made, and began running on the girls' track team at Bridgeport Middle School. (Ex. 3 (Plaintiff's Second Set of Supplemental Responses and Objections to State of West Virginia's First Set of Interrogatories and Requests for Production) No. 9.)

126.   B.P.J. was "ecstatic" to learn she qualified for the track team and "look[s] forward to many more years of running with [her] peers." (Ex. 2 ¶¶ 20–21.)

127.   There were no complaints associated with B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team. (Dkt. No. 252 (County Stip.) ¶ 5; Ex. 5 No. 9; Ex. 6 No. 9; Ex. 7 No. 9; Ex. 8 No. 9; Ex. 9 No. 9; Ex. 10 No. 9; Ex. 11 No. 9.)

128.   No student was cut from or otherwise not permitted to participate on the cross-country team as a result of B.P.J.'s participation. (Dkt. No. 252 (County Stip.) ¶ 6.)

129.   Defendant-Intervenor could not identify "any specific fairness issue" related to B.P.J.'s participation in girls' cross-country at her middle school. (Ex. 21 at 143:14-20.)

130.   Defendant-Intervenor responded, "I don't know," when asked whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team." (Ex. 21 170:13-170:22.)

131.   Girls and women who are transgender have competed in a wide range of contact and collision sports in high school and college, including basketball, soccer, volleyball, softball, lacrosse, and women's tackle football, without any reported injuries to cisgender girls. (Ex. 31 (Declaration of Dr. Chad T. Carlson, M.D., F.A.C.S.M.) at 1; Ex. 32 (Deposition Transcript of Dr. Chad T. Carlson) at 124:6-125:4, 154:12-156:16.)

132.   There are significant variations in height, weight, and muscle mass within the population of cisgender girls, and within the population of cisgender boys, such that student athletes all the time play with or compete against students who are bigger, faster, and/or stronger than them, whether they are participating in single sex or co-ed teams. (Ex. 25 at 12 ¶ 27; Ex. 28 at 49:19-50:5, 51:18-22, 52:16-24, 189:13-19.)

133.    Any safety considerations attendant to differences in height, weight, and muscle mass are already addressed in West Virginia secondary schools through even-handed rules and the use of proper equipment. (Ex. 16 at 164:3-14, 228:14-22.)

134.    Any actual safety concerns attendant to girls who are transgender playing on girls' sports teams "can be addressed through even-handed rules instead of discriminating based on transgender status." (Ex. 25 at ¶ 4(d).)

135.    Defendant-Intervenor could not identify any safety concern resulting from B.P.J.'s participation on her middle school girls' cross-country team. (Ex. 21 at 139:25-140:4, "Q: . . . What is the safety concern for middle school cross-country and B.P.J. participating on the girls' team? . . . THE WITNESS: I don't know.")

136.    The State does not know of any middle school girl who was physically harmed by B.P.J.'s participation on the Bridgeport Middle School girls' cross-country team. (Ex. 5 No. 10.)

**IX.    Lainey Armistead Will Graduate West Virginia State University In May 2022.**

137.    Defendant-Intervenor Lainey Armistead will graduate from West Virginia State University in May 2022. (Ex. 22 at 67:21-25.)

Dated: April 21, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

26

A-127

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | Civil Action No. 2:21-cv-00316 |
| v. | Hon. Joseph R. Goodwin |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | **CERTIFICATE OF SERVICE** |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**CERTIFICATE OF SERVICE**

I, Loree Stark, do hereby certify that on this 21st day of April, 2022, I electronically filed a true and exact copy of the ***Statement of Undisputed Material Facts*** with the Clerk of Court and all parties using the CM/ECF System.

/s/ Loree Stark
Loree Stark
West Virginia Bar No. 12936

A-128

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                    *Plaintiff*,

        v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                    *Defendants*,

        and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION TO
EXCLUDE EXPERT TESTIMONY
OF GREGORY A. BROWN**

# TABLE OF CONTENTS

Page

INTRODUCTION AND BACKGROUND ..................................................... 1

LEGAL STANDARD.................................................................................. 4

    I.     Dr. Brown's Opinion Regarding the Definition of "Biological Sex" Should Be Excluded. ........................................................................................ 5

    II.    Dr. Brown's Opinions Regarding Prepubertal Children and the Alleged Athletic Advantages of Transgender Girls Who Receive Puberty-Delaying Medication Should Be Excluded. ........................................................... 8

          A.    Dr. Brown's Assertions Regarding Prepubertal Physiological Differences Are Not Reliable.................................................. 11

          B.    Dr. Brown's Assertions That Prepubertal Boys Have Athletic Advantages Due to Innate Physiology Are Unreliable. .......................... 14

          C.    Dr. Brown's Assumption That Prepubertal Transgender Girls Will Have the Same Physiology as Prepubertal Cisgender Boys Is Unreliable.................................................................................. 16

          D.    Dr. Brown's Assumption that Alleged Physiological Differences Before Puberty Will Persist After Puberty-Delaying Medication and Gender-Affirming Hormones Is Unreliable. ..................................... 17

    III.    Dr. Brown's Opinions Regarding the Inclusion of Transgender Women Who Suppress Testosterone After Endogenous Puberty Should Be Excluded. ............................................................................................. 20

CONCLUSION........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barber v. United Airlines, Inc.*,
    17 Fed. Appx. 433 (7th Cir. 2001) ........................................................... 13

*Bellitto v. Snipes*,
    302 F. Supp. 3d 1335 (S.D. Fla. 2017) ...................................................... 5

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ..................................................... 13

*Carnegie Mellon Univ. v. Hoffmann–LaRoche. Inc.*,
    55 F. Supp. 2d 1024 (N.D. Cal. 1999) ....................................................... 14

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ...................................................................... 6

*EEOC v. Freeman*,
    778 F.3d 463 (4th Cir. 2015) ...................................................................... 12

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ..................................................................................... 19

*In re Hanford Nuclear Reservation Litig.*,
    894 F. Supp. 1436 (E.D. Wash. 1995) ...................................................... 13

*Hecox v. Little*,
    No. 1:20-cv-00184-DCN (D. Idaho) ........................................................... 1

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
    790 F.3d 532 (4th Cir. 2015) ...................................................................... 4

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ...................................................................... 11

*Kopf v. Skyrm*,
    993 F.2d 374 (4th Cir. 1993) ...................................................................... 6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..................................................................................... 21

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    174 F. Supp. 3d 911 (D.S.C. 2016) ................................................ 3, 16, 1, 23

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502,*
892 F.3d 624 (4th Cir. 2018) ........................................................................2, 4, 11, 12, 20, 25

*Lust v. Merrell Dow Pharms., Inc.,*
89 F.3d 594 (9th Cir. 1996) ...................................................................................14

*Martinez v. Sakurai Graphic Sys. Corp.,*
No. 04 C 1274, 2007 WL 2570362 (N.D. Ill. Aug. 30, 2007).................................6

*McEwen v. Baltimore Washington Med. Ctr. Inc.,*
404 Fed.Appx. 789 (4th Cir. 2010)........................................................................16

*O'Conner v. Commonwealth Edison Co.,*
807 F. Supp. 1376 (C.D. Ill. 1992) ..........................................................................6

*Oglesby v. Gen. Motors Corp.,*
190 F.3d 244 (4th Cir. 1999) ..................................................................................19

*Rover Pipeline LLC v. Rover Tract No(s). WV-MA-ML-056.500-ROW & WV-MA-ML-056.500-ATWS,*
No. 5:18-CV-68, 2021 WL 3424270 (N.D.W. Va. Aug. 5, 2021) ...........................5

*Sardis v. Overhead Door Corp.,*
10 F.4th 268 (4th Cir. 2021) ...........................................................................4, 8, 19

*Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.,*
No. 3:20-CV-00201 (RNC) (D. Conn.) .....................................................................1

*In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.,*
26 F.Supp.3d 449 (E.D. Pa. 2014) ..........................................................................16

## Other Authorities

Fed. R. Civ. P. 56(c)(2)...............................................................................................4

Fed. R. Evid. 702 .................................................................................4, 5, 6, 22, 25

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of Gregory Brown, Ph.D., FACSM from consideration at summary judgment or trial.

## INTRODUCTION AND BACKGROUND

Plaintiff B.P.J. is an 11-year-old girl who is transgender. Because she is transgender, B.P.J. is categorically prohibited from participating with other girls on her middle school's cross-country or track and field teams as a result of H.B. 3293. B.P.J. brought this lawsuit to challenge this categorical exclusion as violating B.P.J.'s right to be free from discrimination under Title IX of the Education Amendments of 1972 and the Equal Protection Clause.

As part of their defense of H.B. 3293, Defendant the State of West Virginia and Defendant-Intervenor Lainey Armistead ("Intervenor") identified and disclosed an expert report from Gregory Brown, Ph.D., FACSM. According to Dr. Brown, girls and women who are transgender have an inherent athletic advantage over cisgender girls even when they receive puberty-delaying medication and gender-affirming hormones, and even when they reduce their levels of circulating testosterone after puberty. (*See generally* Dkt. No. 289-30 (Brown Rep.)) Dr. Brown has not been qualified by the court as an expert witness in any other litigation. He submitted an expert report in *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, No. 3:20-CV-00201 (RNC) (D. Conn.) before that case was dismissed, and he submitted declarations in support of a motion for preliminary injunction in *Soule* and in opposition to a motion for preliminary injunction in *Hecox v. Little*, No. 1:20-cv-00184-DCN (D. Idaho). (*See* Block Decl. Ex. A.)

As discussed below, Dr. Brown's report is an advocacy piece that is not grounded in reliable data and does not reflect the application of reliable principles and methods. Although Dr. Brown has expertise in discussing the physiological differences between cisgender men and women that relate to athletic performance, his report ventures far beyond his areas of expertise to

1

offer sweeping and speculative conclusions about the biological determinants of sex, the athletic performance of prepubertal children, and the impact of puberty-delaying medication and gender affirming hormones. While purporting to provide a review of the relevant literature, Dr. Brown misleadingly quotes excerpts from sources that suit his theories while ignoring other portions of the same articles that directly undermine his claims. These omissions are not small or isolated; they are multiple, egregious, and so significant that they present a fundamentally inaccurate description of the sources he purports to summarize. Such "[r]esult-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018).

To take just one example, Dr. Brown states in his report that a consensus statement "signed by more than 60 sports medicine experts from prestigious institutions around the world" supports his view that suppressing circulating levels of testosterone after puberty is insufficient to mitigate the alleged athletic advantages of transgender women. (Dkt. No. 289-30 (Brown Rep.) ¶ 167) (citing Hamilton, B. et al, Integrating transwomen and female athletes with differences of sex development (DSD) into elite competition: the FIMS 2021 consensus statement. Sports Med (2021).) Brown quotes the consensus statement for the proposition that "[t]ranswomen have the right to compete in sports. However, cisgender women have the right to compete in a protected category." (*Id.* at ¶ 12.) But Dr. Brown never discloses that the consensus statement prominently and repeatedly *rejects* the opinions he offers in this case. A summary of "Key Points" at the beginning of the consensus statement emphasizes that "[t]he use of testosterone concentration limits of 5 nmol/L in transwomen and DSD women athletes is a justifiable threshold based on the best available scientific evidence." (Block Decl. Ex. G (Hamilton 2021) at 1402.) When asked

2

during his deposition why he failed to disclose this critical information in his report, Dr. Brown stated, "I disagree with that key point," and explained that in deciding what portions of the article to mention in his report, "I cited the information that I agree with." (Dkt. No. 289-31 (Brown Dep. Tr.) 231:2-13.) That is virtually the same response given by one of the experts who was excluded from the *In re Lipitor* litigation when confronted with the fact that he had excluded important studies from his analysis. In that case, Dr. Quon testified, "I only wrote things that I believe. And I don't believe these studies." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 930–31 (D.S.C. 2016). Disagreement does not give Dr. Brown a license to omit contradictory findings from a study that he cites to, and these omissions underscore the unreliability of his report more broadly.

Dr. Brown's result-driven analysis reflects the fact that he is not a passive bystander in this case. Rather, Dr. Brown proactively sought out the opportunity to be involved in supporting exclusionary laws like H.B. 3293. Several years ago, after learning that Intervenor's counsel, the Alliance Defending Freedom ("ADF"), was attempting to exclude two transgender girls in Connecticut from competing on their high school girls' track-and-field team, Dr. Brown contacted ADF to volunteer his services. (Dkt. No. 289-31 (Brown Dep. Tr.) 35:22–36:7.) Dr. Brown had not previously engaged in similar solicitation for any other topic. (*Id.* at 36:15–37:13.) Since then, Dr. Brown has actively lobbied across the country for the passage of legislation categorically banning girls and women who are transgender from participating on girls' and women's athletic teams, often at the invitation of groups who oppose legal protections for transgender people. Dr. Brown testified in support of legislation in Ohio at the request of the Center for Christian Virtue, (Dkt. No. 289-31 (Brown Dep. Tr.) 32:17-18); in Texas at the request of Texas Values, (*id.* at

32:19-20); in North Carolina at the request of North Carolina Values, (*id.* at 32:22–33:1); and in Pennsylvania at the request of the Pennsylvania Family Alliance, (*id.* at 32:2-4.)

Because Dr. Brown's testimony is not "based on sufficient facts or data" and is not "the product of reliable principles and methods," his proffered opinions do not qualify under Federal Rule of Evidence 702 as admissible expert testimony. The court should exercise its "special gatekeeping obligation" and exclude his testimony from consideration at summary judgment or trial. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021).

## LEGAL STANDARD

Federal Rule of Evidence 702 "permits an expert to testify where the expert's 'scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,' so long as the expert's opinion is 'based on sufficient facts or data,' 'is the product of reliable principles and methods,' and the expert 'has reliably applied the principles and methods to the facts of the case.'" *In re Lipitor*, 892 F.3d at 631 (quoting Fed. R. Evid. 702). "Rule 702 thus imposes a special gatekeeping obligation on the trial judge to ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis*, 10 F.4th at 281 (internal quotation marks and citations omitted). If an expert's testimony is "alleged to be unreliable, then the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. While district courts have broad discretion in analyzing reliability, such discretion does not include the decision to abandon the gatekeeping function." *Id.* at 282 (internal quotation marks and citations omitted).

Rule 702 applies with full force when ruling on a motion for summary judgment even when the case is scheduled for bench trial. Summary judgment cannot be granted or denied based on evidentiary material that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790

4

F.3d 532, 538 (4th Cir. 2015). Thus, when evidence related to a material fact comes in the form of expert testimony, "the propriety of summary judgment hinges on whether [the] expert evidence is admissible before this Court" under Rule 702. *Rover Pipeline LLC v. Rover Tract No(s). WV-MA-ML-056.500-ROW & WV-MA-ML-056.500-ATWS*, No. 5:18-CV-68, 2021 WL 3424270, at *3 (N.D.W. Va. Aug. 5, 2021); *accord Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1347 (S.D. Fla. 2017).

**I.    Dr. Brown's Opinion Regarding the Definition of "Biological Sex" Should Be Excluded.**

One of the issues in this litigation is whether H.B. 3293's definition of "biological sex"—which the statute defines as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth"—reflects an accurate medical or scientific understanding of the term. W. Va. Code § 18-2-25d(b)(1). B.P.J. has submitted expert declarations from Dr. Joshua Safer, an endocrinologist who specializes in transgender medicine, and Dr. Deanna Adkins, a pediatric endocrinologist who specializes in the treatment of transgender adolescents and of children and adolescents with differences of sexual development ("DSD"). As experts in their fields, Dr. Safer and Dr. Adkins have explained that biological sex encompasses the sum of several different biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity, which itself has biological roots. (*See* Dkt. No. 289-25 (Safer Rep.) ¶ 48; Dkt. No. 289-26 (Safer Rebuttal) ¶¶ 5–7 (and sources cited therein); Dkt. No. 289-23 (Adkins Rep.) ¶ 41.) For these reasons, the Endocrine Society cautions that the term "biological sex" is "imprecise and should be avoided" in the context of discussing transgender people and people with DSDs. (Dkt. No. 289-23 (Adkins Rep. ¶ 41) (citing Block Decl. Ex. C (Hembree (2017)).

In Section I of his report, Dr. Brown purports to offer a contrary expert opinion regarding the definition of "biological sex," but Dr. Brown has no qualifications to offer an expert opinion

on this topic. And the opinions he does offer are cherry-picked, taking quotations out of context while ignoring other portions of the articles that directly contradict his assertions.

First, Dr. Brown lacks qualification to discuss the medical and scientific communities' understanding of sex's biological elements. An expert witness must possess requisite "knowledge, skill, experience, training, or education" that would assist a trier of fact. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, No. 04 C 1274, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007). "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Id.* "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994).

Dr. Brown is a professor of Exercise Science. He is not an endocrinologist or a geneticist. The opinion in his report regarding the biological basis of sex consists almost entirely of quotations from an Endocrine Society article. (*See* Block Decl. Ex. D (Bhargava et al. (2021)). Instead of relying on any expertise or experience of his own, Dr. Brown merely stitches together selected excerpts from the Bhargava 2021 article to discuss matters on which he has no independent expertise. Rule 702 requires more. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Moreover, although Dr. Brown's report addressed DSDs, (*see* Dkt. No. 289-30 (Brown Rep.) ¶ 4), Dr. Brown disclaimed at deposition that he was offering any expert testimony regarding the biological bases of sex for people with DSDs, including people with complete androgen insensitive syndrome ("CAIS"). (Dkt. No. 289-31 (Brown Dep. Tr.) at 44:15–49:11.) Dr. Brown stated that he "stand[s] by" a sentence in his report quoting Bhargava 2021 for the proposition that "[m]any DSDs are associated with genetic mutations that are now well known to endocrinologist and geneticists," which he said represented the "full extent of [his] expert testimony about DSDs." (*Id.* at 46:8–47:15.) But Dr. Brown could not answer whether CAIS is caused by a genetic mutation. (*Id.* at 47:16–48:3.) Dr. Brown also disclaimed any expertise on the athletic participation of women with CAIS generally. (*See id.* at 45:4-10 ("I have been retained as an expert witness in this matter primarily dealing with biological male and biological female and not as an expert on disorders or differences of sexual development. And so I would say I probably would not be the best person to offer a statement on where someone with CAIS should participate."))

Second, even if Dr. Brown were qualified to provide an expert opinion based on the Bhargava 2021 article, Dr. Brown does not employ any reliable methodology in forming his opinion that sex is determined at conception based on chromosomes. Dr. Brown simply plucks out isolated quotes from the Bhargava 2021 to paint a misleading picture that the article supports his pre-determined conclusions about chromosomes. In reality, the article directly undermines Dr. Brown's claims. The introduction of the article explains that "[s]ex differences are caused by 3 major factors—sex hormones, genes, and environment." (Block Decl. Ex. D (Bhargava 2021) at 220.) The article has a few subsections describing the role of chromosome kayrotypes, while cautioning that "karyotypic analysis may be misleading, as there are well-described 46,XX males" and " 46,XY females." (*Id.* at 221.) The article then explains how physical sexual differentiation

occurs when genes interact with hormones and environmental factors in utero and during puberty. (*See id.* at 222 (discussing "Sexual Differentiation Caused by Gonadal and Non-Gonadal Hormones); *id.* at 223 (discussing "Influence of Gonadal Steroid Hormones and Nongonadal Hormones in Brain Development"); *id.* at 225 ("Given that the critical and sensitive periods for sexual differentiation are defined by the production and response to gonadal steroids, it is not surprising that steroids are the primary drivers of developmental origins of sex differences in brain (and probably other tissues) and behavior."); *id.* at 227 (discussing "Hormonal Versus Sex Chromosome Effects" and explaining that "[s]ex differences are caused by 3 major factors—sex hormones, genes on sex chromosomes/autosomes, and environment").)

Dr. Brown also misrepresents what the Bhargava 2021 article says about the biological roots of gender identity.  Dr. Brown quotes Bhargava for the proposition that "a clear biological causative underpinning of gender identity remains to be demonstrated."  (Dkt. No. 289-30 (Brown Rep.) ¶ 4.)  But the article goes on to explain that, while the precise causative factor is unknown, "there is ample but incomplete evidence for biological substrates—neuroanatomic, genetic, and hormonal—for gender orientation."  (Block Decl. Ex. D (Bhargava 2021) at 227.)

Whether due to a lack of familiarity with the materials or as a result of deliberate cherry-picking, Dr. Brown's alleged expert opinion about the meaning of "biological sex" fundamentally misrepresents the article he purports to summarize and lacks "a reliable basis in the knowledge and experience of the relevant discipline."  *Sardis*, 10 F.4th at 282 (internal quotation marks and citations omitted).

## II. Dr. Brown's Opinions Regarding Prepubertal Children and the Alleged Athletic Advantages of Transgender Girls Who Receive Puberty-Delaying Medication Should Be Excluded.

The Court should also exclude Dr. Brown's opinions regarding alleged advantages of transgender girls who receive puberty-delaying medication.  There is a broad consensus in the

8

scientific literature that the primary biological basis for differences in athletic performance between men and women is the rise in circulating levels of testosterone beginning in endogenous male puberty. (*See* Dkt. No. 289-27 (Handelsmann 2018).)  The average differences in athletic performance between boys and girls before puberty are generally between 0 and 6% depending on the sport, and are routinely described as "minimal" or nonexistent.[1]  In light of this scientific consensus, it is widely acknowledged that transgender girls who never go through endogenous puberty as a result of puberty-delaying medication do not have any average athletic advantages compared with cisgender girls.[2]

Until his expert report in this case, Dr. Brown did not dispute this consensus.  In the expert declaration he submitted to this Court in opposition to Plaintiff's Motion for a Preliminary Injunction, Dr. Brown repeatedly acknowledged and accepted the scientific consensus that prepubertal boys do not have any meaningful athletic advantage over prepubertal girls, and that the physiological characteristics that create athletic advantages do not arise until circulating levels

---

[1] (*See, e.g.*, Dkt. No. 289-27 (Handelsman et al. 2018) ("Age-grade competitive sports records show minimal or no female disadvantage prior to puberty"); *id.* at fig.1 (showing average performance gaps of 6% or less for running, jumping, and swimming); Block Decl. Ex. I (Tønnessen 2015) at 1 (reporting that "[m]ale and female athletes perform almost equally in running and jumping events up to the age of 12" and calculating differences for 11-year-olds at less than 5%); *id.* Ex. N (Coleman 2020) at 95 (summarizing competitive swimming data showing that "pre-pubertal children of both sexes are competitive for the win in co-ed events, with females having some advantage in the six to eight-year-old age brackets").)

[2] (*See* Block Decl. Ex. J (World Rugby Guidelines) ("Transgender women who transitioned pre-puberty and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby."); *id.* Ex. Q (Briefing Book) at 8 ("Because the onset of male puberty—normally around ages 11–12 in boys—is the physical justification for separate sex sport, trans girls and women who have never experienced the onset of male puberty should be included without condition." (footnote omitted)).)

9

of testosterone rise during a typically male endogenous puberty.[3]  But after this Court granted Plaintiff's Motion for a Preliminary Injunction and highlighted the fact that B.P.J. is receiving puberty blocking medication, Dr. Brown dramatically shifted gears and developed a newfound expert opinion regarding the athletic performance of prepubertal youth, without any acknowledgment of his about-face or effort to explain his change in position.  In his most recent expert report, Dr. Brown revises his previous opinion that "men, and adolescent boys, perform better in almost all sports than women, and adolescent girls because of their inherent physiological advantages that develop during male puberty" and asserts for the first time that "men, adolescent boys, *and prepubertal male children* perform better in almost all sports than women, adolescent girls, and prepubertal."  (Dkt. No. 289-30 (Brown Rep.) at 4 (emphasis added).)  Dr. Brown then further speculates that these alleged advantages persist even after transgender girls and women receive puberty-delaying medication and gender affirming hormones.

As discussed below, Dr. Brown's newfound opinions should be excluded.  An "expert's testimony must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's

---

[3] (*See* Block Decl. Ex. A (Brown Hecox Rep.) ¶ 25 (describing "male athletic performances" before puberty as "being equal on average on those of age-matched females") (quoting Handelsmann 2018); ¶ 90 ("As with muscle, sex differences in bone are absent prior to puberty but then accrue progressively from the onset of male puberty due to the sex difference in exposure to adult male circulating testosterone concentrations.") (citing Handelsman 2018); ¶ 95 ("Before puberty, boys and girls hardly differ in height, muscle and bone mass."); ¶ 109 ("[S]ex differences in physical capacities (assessed as [maximal oxygen uptake] or isometric strength in the majority of cases) are negligible prior to the onset of puberty.") (citing Tønnessen 2015); ¶ 113 ("[B]efore puberty, boys and girls do not differ in height, muscle and bone mass.") (citing Gooren 114); ¶ 114 (explaining that "physical advantage in performance arises during early adolescence when male puberty commences after which men acquire larger muscle mass and greater strength, larger and stronger bones, higher circulating haemoglobin as well as mental and/or psychological differences."); ¶ 119 ("It is concluded that the gender divergence in athletic performance begins at the age of 12-13 years and reaches adult plateau in the late teenage years."))

opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (quotation marks omitted). Dr. Brown's proffered testimony about prepubertal children and puberty-delaying medication fails this reliability analysis at each step of the process. To support his newfound opinion, Dr. Brown engages in a result-oriented search for materials, while ignoring contrary information he found to be inconvenient, including contrary information he cited in previous reports but deleted from the one submitted in this case. Instead of acknowledging the peer-reviewed literature finding no significant differences in athletic performance, Dr. Brown relies on physical fitness tests of the general population and on raw data he personally downloaded from the internet without subjecting to peer review. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 71–109.) He then goes beyond that shaky foundation to engage in pure speculation that the alleged advantages he found will persist even when a transgender girl receives puberty blockers and then undergoes a typically female puberty through gender-affirming hormones. (*Id.* at ¶¶ 110–13.) Each of these missteps—whether alone or in combination—require that the testimony be excluded. *See In re Lipitor*, 892 F.3d at 637–38 ("[C]ourts must look to the entire process that produced an opinion to determine whether the expert's work satisfies *Daubert*'s fundamental command: that expert testimony be reliable and relevant.")

### A. Dr. Brown's Assertions Regarding Prepubertal Physiological Differences Are Not Reliable.

*First*, Dr. Brown attempts to show that "much data and multiple studies show that significant physiological differences" exist between prepubertal boys and prepubertal girls. (Dkt. No. 289-30 (Brown Rep.) ¶ 72.) But, as with his discussion of "biological sex," Dr. Brown uses selective quotations to present a fundamentally inaccurate description of the sources he purports to summarize. "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an

unreliable fashion." *In re Lipitor*, 892 F.3d at 634. "[J]ust as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes.'" *EEOC v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (Agee, J., concurring).

To justify his claims, Dr. Brown focuses on what he calls a "seminal work" by McManus and Armstrong, which states that there is a "small but detectable" difference in lean body mass "throughout childhood with about a 10% greater lean mass in boys than girls prior to puberty." (Dkt. No. 289-30 (Brown Rep.) ¶ 71 (quoting Block Decl. Ex. L (McManus 2011) 56:23-46)).) Plucking out that single fact, Dr. Brown ignores the article's remaining findings that there are no significant differences between prepubertal boys and girls across a range of characteristics relevant to athletic performance. (*See* Block Decl. Ex. L (McManus 2011) at 24 ("Prior to 11 years of age differences in average speed are minimal"); *id.* at 27 ("small sex difference in fat mass and percent body fat are evident from mid-childhood"); *id.* at 29 ("bone characteristics differ little between boys and girls prior to puberty"); *id.* at 32 ("There is little evidence that prior to puberty pulmonary structure or function limits oxygen uptake"); *id.* at 34 ("[N]o sex differences in arterial compliance have been noted in pre- and early- pubertal children").

Dr. Brown similarly misrepresents his other sources. Dr. Brown states that "[i]n a review of 22 peer reviewed publications on the topic, Staiano and Katzmarzyk (2012) conclude that girls have more T[otal]B[ody]F[at] than boys throughout childhood and adolescence." (Dkt. No. 289-30 (Brown Rep.) ¶ 73.) Dr. Brown thus gives the false impression that all 22 of the peer-reviewed publications demonstrated differences on total body fact. To the contrary, as Staiano and

Katzmarzyk's expressly note, "not all studies demonstrate sex differences in T[otal]B[ody]F[at] before puberty."[4]  (Block Decl. Ex. M (Staiano 2012).)

Instead of providing a reliable accounting of the alleged "significant physiological differences" between prepubertal boys and girls, Dr. Brown was "selective in his choice of supporting data, focusing only on those fragments of data which tend to lend credence to his theory." *In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. 1436, 1450 (E.D. Wash. 1995). Indeed, Dr. Brown admitted that he does not think the opinions he expressed in his expert report should be held to "the same standards of peer-reviewed article[s]" or "the same rigor as a peer-reviewed article."  (Dkt. No. 289-31 (Brown Dep.) 134:17-22, 135:15-17.)  According to Dr. Brown, "in a peer-reviewed article, you are not providing opinions; you are summarizing literature," and "the writing style is so phenomenally different." (*Id.* at 136:10-13, 137:16-17.)

But regardless of what writing style an expert uses, their opinion must still derive from a reliable application of scientific principles or methods.  Whether in the courtroom or in a peer-reviewed article, cherry-picking fails that test.  *See Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (rejecting expert who did not explain why he ignored certain data, accepted only testimony and data that suited his theory, and "cherry-picked" supporting facts); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert's testimony where expert "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his

---

[4] For example, "[a] multi-year longitudinal study of American boys and girls aged 8.1±1.6 years found similar TBF. There were no significant sex differences for TBF measured by bioelectrical resistance in a study of 4 boys and 12 girls aged 6.4±1.2 years in the US.41 A study of 129 African American and white 10–12-year-olds indicated no difference in TBF measured by DXA across sexes, though boys had a bimodal distribution of TBF whereas girls' TBF was skewed to higher values. Additionally, there were no sex differences in total abdominal fat measured by CT in 31 6–7-year-olds in the Netherlands."  (Block Decl. Ex. N (Staiano 2012) at 5.)

13

A-145

conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion."); *Carnegie Mellon Univ. v. Hoffmann–LaRoche. Inc.*, 55 F. Supp. 2d 1024, 1039 (N.D. Cal. 1999) ("The Ninth Circuit has upheld the exclusion of expert testimony where the expert selectively chose his support from the scientific landscape.") (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

### B.  Dr. Brown's Assertions That Prepubertal Boys Have Athletic Advantages Due to Innate Physiology Are Unreliable.

***Second***, Dr. Brown argues that the "small but detectable" differences in lean body mass sometimes found in prepubertal boys and girls creates an inherent biological athletic advantage for prepubertal boys in "almost all athletic events."  (Dkt. No. 289-30 (Brown Rep.) at 4, 56.)  Dr. Brown could not identify any studies that purport to calculate how much a 10% difference in lean body mass enhances athletic performance.  (Dkt. No. 289-31 (Brown Dep. Tr.) 89:4-6.)

Instead, to support his sweeping claim that prepubertal boys have an advantage in "almost all athletic events," Dr. Brown relies on population-based data from physical fitness tests, not studies of people who have chosen to participate in competitive athletics.  (Dkt. No. 289-30 (Brown Rep.) ¶¶ 75–100.)  Because these epidemiological studies do not compare athletes with athletes, there is no reliable basis for Dr. Brown to attribute those differences among the general population to innate biology instead of to social factors such as greater societal encouragement of athleticism in boys and greater opportunities for boys to play sports.  (Dkt. No. 289-26 (Safer Rebuttal) ¶ 9.)  Indeed, Dr. Brown conceded at deposition that he could not find a single study that purported to "quantify[] the effects of social causes" versus "physiological factors" on differences in athletic performance between prepubertal boys and girls.  (Dkt. No. 289-31 (Brown Dep. Tr.) 94:13-23.)

Beyond the physical fitness surveys, Dr. Brown also relies on a single year's worth of data about track-and-field competitions that he personally downloaded from the Athletic.net website.

(Dkt. No. 289-30 (Brown Rep.) App. 1.)  Dr. Brown has not attempted to publish this raw data or subject it to peer review.  (Dkt. No. 289-31 (Brown Dep. Tr.) 95:15-24.)  Unsurprisingly, the raw data has many anomalies: in many of the events, the average differences in performance reported by Dr. Brown are in the low single-digits for 7–8-year-olds, spike to double digits for 9–10-year-olds and then return to single-digits for 11-12-year-olds.  (Dkt. No. 289-30 (Brown Rep.) App. 1.)  Aside from these anomalous spikes, the majority of the average differences in performance reported by Dr. Brown are below 7% and often below 5%.  (*See id.*)  As noted above, extensive peer-reviewed literature characterizes difference at 6% or less as minimal or insignificant.[5]

While he relies on inapposite physical fitness surveys and his own collection of raw data, Dr. Brown simply ignores the extensive peer-reviewed studies of competitive age-grade sports that found minimal or no differences before prepubertal boys and girls, with the differences in performance for various sports all being 6% or less.[6]  Dr. Brown's omission is particularly glaring because Dr. Brown previously relied on those findings in an earlier draft of his own expert report,[7] and even continues to cite to portions of those studies in the latest version.[8]  "[F]ailing to

---

[5] *See supra* note 1.

[6] *See supra* note 1. Unlike the raw data Dr. Brown downloaded, the Tønnessen 2015 study examined the "100 all-time best male and female 60m, 800m, long jump and high jump athletes in each age category from 11 to 18" from a dataset going back to 1975.  (Block Decl. Ex. I (Tønnessen 2015).)  A study by Handelsmann (2017) examined four different sources of data: (1) the US Age Group Swimming time standards which lists the prevailing time standard for entry to the top level of all boys and girls events for individual years from 1981 to 2016; (2) the current world records for boys and girls between the ages of 5 and 19 years in running events from 50 m to 2 miles, and in high jump, pole vault, long jump, triple jump, and standing long jump.  (Block Decl. Ex. E (Handelsmann 2017).)

[7] *See supra* note 3.

[8] (*See* Dkt. No. 289-30 (Brown Rep.) ¶¶ 8, 12, 14–15, 18, 22, 29, 45–48, 50, 52, 54–55, 64, 66, 115–16, 120, 146, 156 (citing Handelsmann 2018); *id.* at ¶¶ 17, 22, 29, 64, 110 (citing Handelsmann 2017); *id.* at ¶¶ 22, 29, 59, 115 (citing Tønnessen 2015); *id.* at ¶ 8 (citing Coleman, D. L. et al., Re-affirming the value of the sports exception to Title IX's general non-discrimination rule. Duke J. of Gender and Law Policy 27(69):69-134 2020).)

15

adequately account for contrary evidence is not reliable or scientifically sound." *In re Lipitor*, 174 F. Supp. 3d 911, 932 (D.S.C. 2016); *see McEwen v. Baltimore Washington Med. Ctr. Inc.*, 404 Fed.Appx. 789, 791–92 (4th Cir. 2010) (upholding exclusion of expert testimony where experts "failed to meaningfully account for . . . literature at odds with their testimony"); *In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 26 F. Supp. 3d 449, 460–61 (E.D. Pa. 2014) ("The Court finds that the expert report . . . does selectively discuss studies most supportive of her conclusions . . . and fails to account adequately for contrary evidence, and that this methodology is not reliable or scientifically sound.").

### C.    Dr. Brown's Assumption That Prepubertal Transgender Girls Will Have the Same Physiology as Prepubertal Cisgender Boys Is Unreliable.

*Third*, Dr. Brown assumes without evidence that prepubertal transgender girls will tend to have the same average body composition and performance on physical fitness tests as prepubertal cisgender boys.  But, as Dr. Brown admits, he is not aware of any studies purporting to measure the athletic performance or physical fitness of transgender girls.  (Dkt. No. 289-31 (Brown Dep. Tr.) 99:8-11.)  Moreover, one of the sources Dr. Brown cites in support of his position specifically observed that even before receiving puberty-blocking medication, a cohort of transgender girls already had a percentage of body fat that was more similar to cisgender girls than to cisgender boys.[9]  Other articles cited by Dr. Brown also expressly caution that "hormone-naïve transwomen may not, on average, have the same athletic attributes as cisgender men" and state that "[t]he need to move beyond simple comparisons of cisgender men and women to assess the sporting

---

[9] (*See* Block Decl. Ex. O (Klaver 2018) at 251–60) (reporting that "[b]efore the start of GnRHa, . . . transwomen had a percentage of body fat closer to that of ciswomen (SDS = -0.9) than to that of cismen (SDS =1.6)" and explaining that "[t]he cause of the increased percentage of body fat and BMI in transwomen is unknown, but it can be postulated that psychological stress from gender dysphoria and an inactive lifestyle could have contributed") (footnote omitted).)

capabilities of transwomen is imperative." (Block Decl. Ex. F (Harper 2021) at 7.)[10] Despite purporting to base his opinions on these articles, (*see* Dkt. No. 289-30 (Brown Rep.) ¶ 8), Dr. Brown ignored these explicit limitations communicated by the articles' authors.

> **D.     Dr. Brown's Assumption that Alleged Physiological Differences Before Puberty Will Persist After Puberty-Delaying Medication and Gender-Affirming Hormones Is Unreliable.**

*Fourth*, Dr. Brown assumes that alleged advantages for transgender girls that he claims exist pre-puberty will persist after a transgender girl receives puberty-blocking medication followed by gender affirming hormones to stimulate a typically female puberty. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 110–13 & p. 56.) Dr. Brown has no independent qualifications or experience regarding endocrine treatments for transgender people. He has never conducted primary research involving transgender individuals, and to the best of his knowledge none of his subjects has been transgender. (Dkt. No. 289-31 (Brown Dep.) 55:21-22, 56:17-18.) He has never conducted a formal literature review or meta-analysis about treatment of transgender people. (*Id.* at 51:23–56:5.) His only knowledge has come from "[t]rying to keep up with the legislation in sports regarding the participation of transgender individuals and then on seeing the legislation, out of [his] own curiosity, looking to see what research was informing that legislation." (*Id.* at 56:6-12.)

Dr. Brown wrongly assumes that puberty-delaying medication followed by gender-affirming hormones will freeze in place any alleged advantages that exist before puberty. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 110–13 & p.56.) But a transgender woman who receives puberty-delaying medication followed by gender-affirming hormones does not have the physiology of a

---

[10] (*See also* Block Decl. Ex. G (Hamilton 2021) at 1407 (noting problematic nature of inferring that transwomen and cisgender males are the same); Block Decl. Ex. H (Hilton 2020) at 205 ("[T]ransgender women often have low baseline (pre-intervention) bone mineral density (BMD), attributed to low levels of physical activity, especially weight-bearing exercise, and low vitamin D levels."); *id.* at 208 (noting that "cohorts of transgender women often have slightly lower baseline measurements of muscle and strength than control males.").)

prepubertal boy. (*See* Dkt. No. 289-26 (Safer Rebuttal) ¶ 17.) Following administration of puberty blockers, transgender girls and women will have also received gender-affirming care to allow them to go through puberty consistent with their female gender identity. As a result of a typically female puberty, these transgender girls and women will develop many of the same physiological and anatomical characteristics of cisgender girls and women, including bone size (Dkt. No. 289-30 (Brown Rep.) ¶¶ 46–48), skeletal structure (*id.* at ¶ 49), and "distinctive aspects of the female pelvis geometry [that] cut against athletic performance" (*id.* at ¶ 50.)

Dr. Brown's only authority for his contrary claim is an article, the Klaver 2018 study, measuring the body composition of a cohort of transgender women who received puberty blocking medication at about age 13.5, approximately two years after puberty typically begins. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 112–13.)[11] That study reported its findings along three metrics: lean body mass, body fat, and waist-hip ratio. After receiving puberty-delaying medication and gender-affirming hormones, the transgender women in the Klaver 2018 study had a higher percentage of lean body mass than comparable cisgender women, the same amount of body fat as comparable cisgender women, and overall body compositions that were more similar to cisgender women than to cisgender men. (Block Decl. Ex. O (Klaver 2018) at 255–56.) Instead of reporting the entirety of the study's findings, Dr. Brown reported only the finding about lean body mass. He did not mention the other findings about body fat and overall body composition. When asked why he selectively quoted findings from Klaver 2018 to omit those findings that showed similarities between transgender women and cisgender women, Dr. Brown had no explanation; he testified

---

[11] As part of its discussion of puberty blockers, Dr. Brown's expert report also cites to a study by Tack et al. (*See* Brown Rep. ¶ 111 (citing Tack 2018).) But Dr. Brown admitted during his deposition that the subjects of study did not actually receive puberty blockers and were not prepubertal. (Dkt. No. 289-31 (Brown Dep. Tr.) 140:4-24, 149:3-5.)

that his discussion of the Klaver 2018 article "is not intended to be a summary of the article in its entirety." (Dkt. No. 289-31 (Brown Dep. Tr.) 157:23-24.)[12]

Even more fundamentally, Dr. Brown presents no data to support the assumption that the transgender women in the Klaver study he references have any athletic advantages compared with cisgender women. In other words, he offers no scientific basis to conclude that there is a connection between lean body mass and athletic advantage, either generally or in the context of particular sports. Indeed, he admits that he is not aware of *any* research whatever concerning the athletic performance of transgender women who have received puberty-delaying medication. (Dkt. No. 289-30 (Brown Rep.) ¶ 110.) "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[D]istrict courts must ensure that an expert's opinion is 'based on scientific, technical, or other specialized *knowledge* and not on belief or speculation.' And to the extent an expert makes inferences based on the facts presented to him, the court must ensure that those inferences were 'derived using scientific or other valid methods.'" *Sardis*, 10 F.4th at 281 (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citations omitted)).

---

[12] Moreover, even if Dr. Brown had accurately reported the findings of Klaver 2018 in their entirety, the transgender women in that study had already experienced approximately two years of endogenous puberty. Those women would not be representative of transgender girls who receive puberty blocking medication at the beginning of Tanner 2 in accordance with the Endocrine Society Guidelines. Dr. Brown admits in his report that the timing of when puberty blockers are administered is "outside [his] area of expertise," (Dkt. No. 289-30 (Brown Rep.) ¶ 110), but that lack of expertise did not dissuade him from offering an expert opinion based on the mistaken premise that puberty-delaying medication is administered between Tanner 2 and Tanner 3 or making broad statements about the impact of puberty-delaying medication.

*     *     *

In short, Dr. Brown's newfound opinions about the athletic advantages of transgender girls and women who never go through endogenous puberty as a result of puberty-delaying medication are built on cherry-picked surveys of the literature, raw data never subjected to peer review, a failure to discuss contrary studies on which Dr. Brown previously relied, and a long chain of speculation. Because such testimony "has a greater potential to mislead than to enlighten" it "should be excluded." *In re Lipitor*, 892 F.3d at 632.

## III.    Dr. Brown's Opinions Regarding the Inclusion of Transgender Women Who Suppress Testosterone After Endogenous Puberty Should Be Excluded.

In the final section of his expert report, Dr. Brown advances sweeping conclusions about the participation of transgender women who have suppressed circulating testosterone based on an extremely limited set of actual data. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 119–77.) There are only two studies that actually measure the athletic performance of transgender women after suppressing testosterone. (Dkt. No. 289-26 (Safer Rebuttal) ¶ 19.) The other studies measure discrete characteristics such as muscle size or grip strength. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 153–56.) When describing this small universe of data in a blog post for the Physiology Educators Community Practice Blog, Dr. Brown expressed appropriate caution about drawing strong conclusions from the limited data.  In his blog post, Dr. Brown warned:

> It is also important to note that the effects of male-to-female hormone treatment on important determinants of athletic performance remain largely unknown. Measurements of VO2max in transwomen using direct or indirect calorimetry are not available. Measurements of muscle strength in standard lifts (e.g., bench press, leg press, squat, deadlift, etc.) in transwomen are not available. Nor have there been evaluations of the effects of male-to-female hormone therapy on agility, flexibility, or reaction time. There has been no controlled research evaluating how male-to-female hormone treatment influences the adaptations to aerobic or resistance training. And there are only anecdotal reports of the competitive athletic performance of transwomen before and after using male-to-female hormone treatment.

20

(Block Decl. Ex. P (Brown GA).) Dr. Brown concluded that "[i]n the end, whether it is safe and fair to include transgender athletes and athletes with DSD in women's sports comes down a few facts that can be extrapolated, lots of opinions, and an interesting but complicated discussion." *Id.*

But Dr. Brown takes a different approach in his expert report, abandoning nuance and instead offering the sweeping and unequivocal opinions that including transgender women in athletics is irreconcilable with ensuring fairness and that the alleged differences in athletic performance justify an across-the-board rule prohibiting all transgender women from competing in all women's sports under all circumstances regardless of how much and how long they suppress their circulating levels of testosterone because the "policy goals" of "fairness, safety, and full transgender inclusion . . . are irreconcilable for many or most sports." (Dkt. No. 289-30 (Brown Rep.) at 57.) This striking difference between Dr. Brown's public writings and his expert report calls into question the reliability of Dr. Brown's expert testimony because it suggests that he "has not employed in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re Lipitor*, 174 F. Supp. 3d at 932 (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)) (internal quotation marks and brackets omitted).

Although he has no independent experience in crafting athletic policies, (Dkt. No. 289-31 (Brown Dep. Tr.) 110:4-7), Dr. Brown claims that the sweeping opinions in his expert report are supported by other "peer-reviewed analyses of the scientific literature" and "respected voices." (Dkt. No. 289-30 (Brown Rep.) ¶ 168.) But, as discussed below, Dr. Brown was forced to admit during his deposition that those peer-reviewed analyses and respected voices explicitly *reject* the appropriateness of a categorical ban on the participation of transgender women and girls on women's and girls' sports teams. (*See e.g.*, Dkt. No. 289-31 (Brown Dep. Tr.) 209:8-9.) Indeed, as discussed below, Dr. Brown openly admitted that, in summarizing those articles, he selectively

quoted only from portions of the articles that he agreed with, while ignoring other portions of the article in which the authors rejected the positions Dr. Brown was advocating. (*See* Dkt. No. 289-31 (Brown Dep. Tr.) 200:2-12; 209:8-9; 231:2-13.) "[W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." Rule 702 advisory committee notes.

For example, Dr. Brown relies on a Consensus Statement from the International Federation of Sports Medicine ("FIMS"). Dr. Brown notes that the FIMS Consensus Statement is "signed by more than 60 sports medicine experts from prestigious institutions around the world," (Dkt. No. 289-30 (Brown Rep.) ¶ 12) and quotes the article for the proposition that "[t]ranswomen have the right to compete in sports. However, cisgender women have the right to compete in a protected category[.]" (*Id.* at ¶ 167.) But Dr. Brown never discloses that the FIMS Consensus Statement prominently and repeatedly *rejects* the opinions he offers in this case. A summary of "Key Points" at the beginning of the FIMS Consensus Statement further emphasizes that "[t]he use of testosterone concentration limits of 5 nmol/L in transwomen and DSD women athletes is a justifiable threshold based on the best available scientific evidence." (Block Decl. Ex. G (Hamilton 2021) at 1402.) The official list of "consensus statements" further provide that "[u]se of serum testosterone concentrations as the primary biomarker to regulate the inclusion of athletes into male and female categories is currently the most justified solution as it is supported by the available scientific literature and should be implemented at the elite level, where there is an emphasis on performance enhancement." (*Id.* at 1409.) The FIMS consensus statement also argued against an across-the-board rule, explaining that "[a]s each sport can vary greatly in terms of physiological demands, we support the view held also by others stating that individual sport's governing bodies

should develop their own individual policies based on broader guidelines developed on the best available scientific evidence, determined experimentally from a variety of sources with a particular preference for studies on transwomen and DSD women athletes." (*Id.*)

When asked why he failed to disclose this critical information in his report, Dr. Brown stated, "I disagree with that key point," and explained that in deciding what portions of the article to mention, "I cited the information that I agree with." (Dkt. No. 289-31 (Brown Dep. Tr.) 231:2-13.) That is virtually the same response given by one of the experts who was excluded from the *In re Lipitor* litigation when confronted with the fact that he had excluded important studies from his analysis. In that case, Dr. Quon testified, "I only wrote things that I believe. And I don't believe these studies." *In re Lipitor*, 174 F. Supp. 3d at 930–31 (internal citations omitted). Again, these omissions further underscore the unreliability of Dr. Brown's report more broadly.

Dr. Brown engaged in similarly deceptive tactics when describing the views of Professor Dorianne Coleman and the Women's Sports Policy Working Group. Dr. Brown claimed that Dr. Coleman's 2020 article supported his views, but the Coleman 2020 article states that there should be "unconditional inclusion" of transgender girls on girls' sports teams in "high school intramural, junior varsity, and regular season play, where institutional goals are primarily related to health and fitness and to the development of social skills." (Block Decl. Ex. N (Coleman 2020) at 130.) Dr. Brown disagrees with that recommendation and therefore omitted it from his expert report. The Coleman 2020 article also advocates that transgender women should be allowed to participate in more competitive sports events if they suppress circulating testosterone. *Id*. When asked why he did not include that information, Dr. Brown stated in his deposition that the article "is kind of confusing on that" point, but he nevertheless cited the article in alleged support of his position. (Dkt. No. 289-31 (Brown Dep. Tr.) 209:8-9.)

Dr. Brown repeats the same pattern when claiming that a "briefing book" from Professor Coleman's organization, the Women's Sports Policy Working Group, supported Dr. Brown's views. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 169–70.) The "briefing book" proposes Title IX regulations that are similar to the positions advocated in the Coleman 2020 article. (*See* Block Decl. Ex. Q (Briefing Book).) The proposed regulations state that: "Because trans girls/women who have not begun male puberty do not have significant male sex-linked advantages, they shall be included in girls' and women's sports without conditions or limitations." (*Id.* at 12.) The proposed regulation further provides that "transgender girls who have experienced puberty and who have sufficiently mitigated their male sex-linked advantages—through surgery and/or gender affirming hormones consistent with the rules of their international federations—may participate in girls'/women's sport without additional conditions or limitations." (*Id.* at 12–13.) Dr. Brown ignores those recommendations while claiming Dr. Coleman's organization as one of the "respected voices" supporting his views.

Dr. Brown misrepresented his sources again in his discussion of the Hilton 2021 article, which specifically advocates against an across-the-board rule. (*See* Block Decl. Ex. H (Hilton 2021).) The article states that "it is clear that different sports differ vastly in terms of physiological determinants of success, which may create safety considerations and may alter the importance of retained performance advantages. Thus, we argue against universal guidelines for transgender athletes in sport and instead propose that each individual sports federation evaluate their own conditions for inclusivity, fairness and safety." (*Id.* at 211.) The article also specifically notes that given testosterone suppression's effects in endurance-based sports, "the balance between inclusion and fairness is likely closer to equilibrium in weight-bearing endurance-based sports compared with strength-based sports." (*Id.* at 209.) Dr. Brown does not mention these recommendations. At

24

his deposition, Dr. Brown testified incorrectly that the article supported a categorical across-the-board exclusion for all sports. (Dkt. No. 289-30 (Brown Dep. Tr.) 200:2-12.)

A 2021 article from Harper received the same treatment from Dr. Brown. Like the Hilton 2021 article, the Harper 2021 article distinguishes between endurance sports and strength sports and states that "sport-specific regulations for transwomen in endurance versus strength sports may be needed." (Block Decl. Ex. F (Harper 2021) at 8.) The Harper 2021 article also cautions that: "Whether transgender and cisgender women can engage in meaningful sport, even after gender-affirming hormone therapy, is a highly debated question. However, before this question can be answered with any certainty, the intricacies and complexity of factors that feed into the development of high-performance athletes warrant further investigation of attributes beyond those assessed herein." (*Id.*) While purporting to rely on Harper 2021, (*see* Brown Rep. ¶¶ 8, 12, 128, 143, 151, 164), Dr. Brown ignores these inconvenient portions of the article that directly undermine his opinion that an across-the-board ban on the participation of transgender women is justified by the current science.

A one-sided advocacy piece is neither helpful nor reliable for a finder of fact. With all of these articles, Dr. Brown purported to summarize the opinions of respected voices in the scientific community by in reality chose only to "cite[] the information that I agree with." (Dkt. No. 289-31 (Brown Dep. Tr.) 231:2-13.) Under Rule 702, such "[r]esult-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor*, 892 F.3d at 634.

## CONCLUSION

For the foregoing reasons, the Court should enter an order excluding the proffered expert testimony of Gregory Brown, Ph.D., FACSM from consideration at summary judgment or trial.

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org
tborelli@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully Submitted,
/s/ Loree Stark

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org
nward@acluwv.ord

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com
zhelstrom@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com
vpeletdeltoro@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

          *Plaintiff,*

      v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

          *Defendants*,

     and

LAINEY ARMISTEAD,

          *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed

a true and exact copy of the ***Memorandum in Support of Plaintiff's Motion to Exclude Expert***

***Testimony of Gregory A. Brown*** with the Clerk of Court and all parties using the CM/ECF System.

          */s/ Loree Stark*
          Loree Stark
          West Virginia Bar No. 12936

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                                *Plaintiff*,

            v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF        EDUCATION,        WEST        VIRGINIA
SECONDARY        SCHOOL        ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                                *Defendants*,

            and

LAINEY ARMISTEAD,

                                *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF JAMES M. CANTOR**

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE AND FACTUAL BACKGROUND ............................................ 1

LEGAL STANDARD ................................................................................................................... 3

ARGUMENT .................................................................................................................................. 5

A.  Dr. Cantor's Primary Opinions Have No Relevance To This Case Because
    They Address Issues Beyond The Scope Of The Dispute. ................................................. 6

B.  Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Transgender
    Adolescents In This Case. .................................................................................................... 7

    1.  Dr. Cantor Admits That He Is Not Qualified To Offer Opinions
        On H.B. 3293 Or Transgender Athletes. .................................................................. 10

C.  Dr. Cantor's Testimony Is Methodologically Unreliable And Unsupported
    By Science Or Medicine. ................................................................................................... 12

    1.  Dr. Cantor's Assertions That Transgender Adolescents Are Receiving
        "Affirmation On Demand" And That Adolescents Transition Due
        To The "Unrealistic Expectation That Transition Will Help Them Fit In"
        Are Unsupported. ...................................................................................................... 15

    2.  Dr. Cantor Testified That Transgender People Are One Of Three Things:
        Autogynephilic, Homosexual, Or Mistaken. ........................................................... 17

    3.  Dr. Cantor's Opinion That No Professional Organization Has Articulated A
        Meritorious Position Calling Into Question The Basis For The Act Directly
        Contradicts The Fourth Circuit's Holding In *Grimm*. ............................................. 18

    4.  Dr. Cantor Has Offered Harmful Opinions Related To Transgender
        People And Has Been Removed From Respectable Scientific Societies
        For Posting Disrespectful Material. .......................................................................... 19

D.  Dr. Cantor's Report, Opinions, And Testimony Lack Probative Value And Are Thus
    Inadmissible Under Federal Rule Of Evidence 403. ......................................................... 20

CONCLUSION ........................................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Belk, Inc. v. Meyer Corp., U.S.*,
 679 F.3d 146 (4th Cir. 2012) ...................................................................2, 3

*Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.*,
 85 F. App'x 964 (4th Cir. 2004) .....................................................................6

*Cooper v. Smith & Nephew, Inc.*,
 259 F.3d 194 (4th Cir. 2001) ....................................................................3, 13

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)......................................................................... *passim*

*Dunn v. Sandoz Pharms. Corp.*,
 275 F.Supp.2d 672 (M.D.N.C. 2003) ...........................................................12

*Edmo v. Corizon, Inc.*,
 935 F.3d 757 (9th Cir. 2019) ..........................................................................1

*Edwards v. Ethicon, Inc.*,
 No. 12 Civ. 09972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014).........................7

*Grimm v. Gloucester Cnty. Sch. Bd*,
 972 F.3d 586 (4th Cir. 2020) ........................................................... *passim*

*Hartke v. McKelway*,
 526 F.Supp. 97 (D.D.C. 1981)....................................................................8, 9

*Knight v. Boehringer Ingelheim Pharms., Inc.*,
 323 F. Supp. 3d 837 (S.D.W.Va. 2018)...........................................................6

*Kopf v. Skyrm*,
 993 F.2d 374 (4th Cir. 1993) ..........................................................................7

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999)........................................................................................4

*Lebron v. Sec'y of Fla. Dep't of Child. and Fams.*,
 772 F.3d 1352 (11th Cir. 2014) ......................................................................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod.
 Liab. Litig. (No II) MDL 2502*,
 892 F.3d 624 (4th Cir. 2018).........................................................................12

*Martinez v. Sakurai Graphic Sys. Corp., No. 04 C 1274*,
 2007 WL 2570362 (N.D. Ill. Aug. 30, 2007) ..................................................8

*Mod. Auto. Network, LLC v. E. All. Ins. Co.*,
    416 F. Supp. 3d 529 (M.D.N.C. 2019) ..................................................3, 8

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
    No. 17 Civ. 53, 2021 WL 736375 (M.D.N.C. Feb. 25, 2021) ............................4, 13

*O'Conner v. Commonwealth Edison Co.*,
    807 F.Supp. 1376 (C.D. Ill. 1992) ....................................................8

*Reliastar Life Ins. Co. v. Laschkewitsch*,
    No. 13 Civ. 210-BO, 2014 WL 1430729 (E.D.N.C. Apr. 14, 2014) ......................8

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ...................................................... *passim*

*SAS Inst., Inc. v. World Programming Ltd.*,
    125 F. Supp. 3d 579 (E.D.N.C. 2015)..............................................4, 13

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
    878 F.2d 791 (4th Cir. 1989) ........................................................3

*Wright v. United States*,
    280 F. Supp. 2d 472 (M.D.N.C. 2003) ...............................................7

**Statutes**

20 U.S.C. § 1681, et seq. ...............................................................1

W. Va. Code § 18-2-25d(a)(5) (2021) ...................................................6

**Other Authorities**

Federal Rule of Evidence 403 ...................................................2, 5, 20

Fed. Rule of Evidence 702 ..............................................................2, 3

Statement of Undisputed Material Facts ¶ 48, ECF No. 290 .............................6

Statement of Undisputed Material Facts ¶ 59, ECF No. 290 ............................11

## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

Plaintiff, a twelve-year-old girl who is transgender, challenges the legality of H.B. 3293, a law that categorically bars Plaintiff and any other female athletes who are transgender from participating on girls' and women's sports teams in West Virginia. B.P.J. contends that the law violates her rights under the Equal Protection Clause of the Fourteenth Amendment and discriminates against her based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

As part of their defense of H.B. 3293, Defendants identified and disclosed an expert report from Dr. James M. Cantor. Dr. Cantor disagrees with the views of the mainstream medical community and offers testimony that providing gender-affirming care to transgender youth, including permitting social transition for children and puberty-delaying medication and hormone therapy when indicated for adolescents, does not produce better mental health outcomes and is not the accepted standard of care. As discussed below, Dr. Cantor's testimony about the proper medical treatment for transgender youth is not relevant to the claims in this litigation, Dr. Cantor is an adult psychiatrist who is not qualified to present himself as an expert on transgender youth, and his speculative opinions have no grounding in reliable scientific principles and methods.

As the Fourth Circuit recognized in *Grimm*, the standards of care for treating gender dysphoria "[d]eveloped by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) . . . represent the consensus approach of the medical and mental health community." *Grimm v. Gloucester Cnty. Sch. Bd*, 972 F.3d 586, 595–96 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* 141 S. Ct. 2878 (2021). "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical

1

professional groups." *Id.*; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

Each of Dr. Cantor's proffered opinions is excludable for one or more of three reasons. First, Dr. Cantor's opinions are irrelevant because the opinions he offers about treatment for transgender youth fall outside the scope of the parties' dispute, which is simply whether a law can categorically bar transgender girls and women from girls' and women's sports teams in West Virginia. Second, Dr. Cantor is not qualified to offer opinions about the treatment of pre-pubertal transgender children or transgender adolescents as he does not work with and has not meaningfully studied this population. Third, Dr. Cantor's remaining opinions must be excluded because they are unreliable—they are not based on scientific methodology but rather untested hypotheses, pure speculation, and beliefs that lack any support besides Dr. Cantor's own *ipse dixit*. Because Dr. Cantor's opinions should be excluded pursuant to *Daubert* standards, and because any probative value offered by his testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, and undue delay under Federal Rule of Evidence 403, this Court must exclude them. Dr. Cantor's testimony is not "relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Dr. Cantor does not possess the "full range of experience and training" to provide expert testimony in this case. *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009)). And Dr. Cantor's testimony is not "the product of reliable principles and methods[.]" Fed. R. Evid. 702. Therefore, Dr. Cantor's proffered opinions do not qualify under Federal Rule of Evidence 702 as admissible expert testimony.

2

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of James Cantor, Ph.D. from consideration at summary judgment or trial as inadmissible under Federal Rule of Evidence 702.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert*, 509 U.S. at 597; *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.,* 848 F.3d 219, 230 (4th Cir. 2017)); *see* Fed. R. Evid. 702 advisory committee note to 2000 amendments (amendment "affirms the trial court's role as gatekeeper," and that "all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). The party offering the expert carries the burden of establishing the admissibility of testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

A trial court must also determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a trial court considers an expert's professional qualifications and "full range of experience and training[.]" *Belk, Inc.*, 679 F.3d 162. If the purported expert lacks the knowledge, skill, experience, training, or education on the issue for which the opinion is proffered, the trial court must exclude the expert. *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019), *aff'd*, 842 F. App'x 847 (4th Cir. 2021). Even if the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis,* 10 F.4th at 282 (quoting *Daubert*, 509 U.S. at 592). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id*. at 281 (quoting

*Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)) ("Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded.").

If the opinions offered by the expert are deemed relevant and the expert is qualified to offer testimony, a trial court will inquire if the opinion is based on a reliable foundation, which focuses on "the principles and methodology" employed by the expert to assess whether it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* at 281 (citations omitted). When evaluating whether an expert's methodology is reliable, a court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S. at 593–94. While trial courts have "broad latitude" to determine reliability, they must engage in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281 (quoting *Nease*, 848 F.3d at 229). When addressing an expert whose methodology is grounded in experience, courts use three factors: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015), *aff'd* 874 F.3d 370 (4th Cir. 2017); *see also Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 17 Civ. 53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021).

Finally, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it[,]" "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (emphasis added) (quoting Weinstein, Rule 702 of the Federal Rules of Evidence Is

Sound; It Should Not Be Amended, 138 F.R.D. 631 (1991).) "As such, 'the importance of [the] gatekeeping function cannot be overstated.'" *Sardis*, 10 F.4th at 283 (quoting *United States v. Barton,* 909 F.3d 1323, 1331 (11th Cir. 2018)).

## ARGUMENT

This is a discrimination case about the ability of girls and women who are transgender to participate on school-sponsored athletic teams. Although the fact that B.P.J. and many other girls and women who are transgender have had puberty-delaying medication or other endocrine care is relevant in responding to the State's argument that they have an athletic advantage rooted in physiology, Dr. Cantor does not purport to offer any testimony regarding these issues. And as this Court previously recognized in its decision issuing a preliminary injunction, "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Op.) at 3 n.4.)

On their face, Dr. Cantor's opinions are irrelevant to the purported justifications of H.B. 3293. Dr. Cantor's opinion that providing gender-affirming care to transgender youth does not produce better mental health outcomes and is not the accepted standard of care is not relevant to this Court's consideration of whether West Virginia can categorically ban transgender girls and women from girls' and women's sports teams. In fact, even if the testimony about gender-affirming care provided to adolescents were relevant, Dr. Cantor offers irrelevant testimony about the treatment of prepubertal children and the treatment of adults. With respect to prepubertal children, Dr. Cantor's testimony and report focus on irrelevant debates about "desistance" and about the appropriateness of social transition for transgender youth. When discussing transgender adults, his testimony focuses on irrelevant and inaccurate theories about paraphilias and other causes of "transgenderism."

5

Dr. Cantor's testimony should thus be excluded.

**A.    Dr. Cantor's Primary Opinions Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute.**

The "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is 'a precondition to admissibility.'" *Sardis*, 10 F.4th at 282 (quoting *Daubert*, 509 U.S. at 592). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id.* at 281 (quoting *Nease*, 848 F.3d at 232–33). "[I]t is axiomatic that 'expert testimony which does not relate to any issue in the case is not relevant [and] non-helpful.'" *Knight v. Boehringer Ingelheim Pharms.*, *Inc.*, 323 F. Supp. 3d 837, 846 (S.D.W. Va. 2018) (quoting *Edwards v. Ethicon, Inc.*, No. 12 Civ. 09972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014)). In order to be relevant, an opinion needs to "fit" with the facts at issue. *Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004).

Dr. Cantor's opinions are simply not relevant to any purported justification Defendants have offered for H.B. 3293, which focus on athletic opportunities and notions of protecting women in sports. *See, e.g.*, W. Va. Code § 18-2-25d(a)(5) (2021) (offering sole justification of "promot[ing] equal athletic opportunities for the female sex"); (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶ 48) (State's purported justifications are limited to "protect[ing]" women in sports and complying with Title IX). Indeed, Dr. Cantor disclaimed any intent to offer opinions about those issues. He is offering no opinion regarding the extent to which a person assigned male at birth purportedly has any athletic advantage, (Swaminathan Decl., Ex. B at 161:4-8); the extent to which transgender women or girls have any supposed athletic advantage, (*id.* at 223:3-10); or whether H.B. 3293 should apply to college athletics, (*id.* at 178:18-23.)

Instead, Dr. Cantor's opinions in this case focus on issues not relevant to this case: the standards of care for treatment of transgender youth.  For example, Dr. Cantor proposes to offer the opinion that "[a]ffirmation of a transgender identity in minors who suffer from early-onset or adolescent-onset gender dysphoria is not an accepted 'standard of care.'"  (Swaminathan Decl., Ex. A at 3 ¶ 8(e).)  But this opinion is unrelated to any interest proffered by the State.  (Pl's SUF ¶ 59.)  And as this Court already has recognized, "what is or should be the default treatment for transgender youth is not the question before the court."  (PI Op. at 3 n.4.)  Accordingly, Dr. Cantor's disagreement with the established standard of care in this Circuit—untethered to any governmental interest proffered by Defendants—does not "fit" with the facts at issue and has no relevance here.[1]

## B.  Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Transgender Adolescents In This Case.

To render expert testimony, the witness must possess the requisite "knowledge, skill, experience, training, or education" that would assist the trier of fact.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) ("A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education.").  If not qualified, the expert's testimony is unreliable.  *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 13 Civ. 10-BO,

---

[1] Dr. Cantor's other opinions about adults are even farther afield.  For example, Dr. Cantor opines on "adult-onset gender dysphoria" and mental health issues in transgender adults, which is completely irrelevant to the issue of whether a twelve-year-old transgender girl should be able to participate on the girls' cross-country team at her school.  (Swaminathan Decl., Ex. A at 12–14); *see, e.g.*, *Edwards v. Ethicon, Inc.*, No. 12 Civ. 09972, 2014 WL 3361923, at *15 (S.D.W. Va. July 8, 2014) (excluding expert opinion about complications future patients might experience as irrelevant to the plaintiff's claims).

2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014); *see, e.g., Mod. Auto. Network, LLC*, 416 F. Supp. 3d at 537 (affirming the district court's exclusion of an expert because they lacked experience relevant to the matters at issue); *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (holding expert witness was properly excluded who did not propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation).

Dr. Cantor is not qualified to offer his opinions regarding treatment protocols for transgender youth. "[A]n expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp., No. 04 C 1274*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *see also Lebron*, 772 F.3d at 1369. "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362 at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *see also, e.g., Hartke v. McKelway*, 526 F.Supp. 97, 100–101 (D.D.C. 1981), *aff'd*, 707 F.2d 1544 (D.C. Cir. 1983).

Dr. Cantor's primary area of expertise is the study of hypersexuality and paraphilias,[2] and nearly one hundred percent of his clinical practice focuses on adults. (Swaminathan Decl., Ex. B

---

[2] "The term 'paraphilia'…[m]ost broadly[] refers to the highly atypical sexual interest that dominate a person's life and interact with or prevent them from having an otherwise typical sexual life." (Swaminathan Decl., Ex. B at 139:20–25.)

at 140:5–141:24, 179:7-18.)  He has publicly stated that his "primary research opportunities have involved studying sex offenders, mostly pedophiles and persons with other atypical sexualities whose behaviors led them into the legal system." (Swaminathan Decl., Ex. E; Swaminathan Decl., Ex. B at 140:5–141:24.)

At his deposition, Dr. Cantor admitted that he is not an endocrinologist, has not personally diagnosed any child or adolescent with gender dysphoria, has never personally treated any child or adolescent for gender dysphoria, and does not provide psychotherapy counseling to children or adolescents with gender dysphoria.  (Swaminathan Decl., Ex. B at 179:1-14.)  None of Dr. Cantor's professional roles have involved significant contact—or in many cases, any contact—with children or adolescents.  During Dr. Cantor's fellowship at the Center for Addiction and Mental Health ("CAMH"), the average age of the patients he provided one-on-one therapy to was early 40s, the youngest being in their "late teens, early 20s." (*Id.* at 50:10-19.)  Approximately 80 percent of the patients that Dr. Cantor saw at CAMH had been adjudicated as sex offenders.  (*Id.* at 151:7-10.)  When Dr. Cantor assumed his next professional role at Queen Elizabeth Hospital in Montreal, he did not provide psychotherapy to children or adolescents—he "predominantly worked with adults who came in with depression and anxiety disorders[.]"  (*Id*. at 54:7-14.)  Subsequently, while completing his post-doctoral studies within the law and mental health program, Dr. Cantor did not work with children and adolescents with gender dysphoria.  (*Id*. at 61:4-8.)  Dr. Cantor then became Senior Scientist at CAMH, where even while supervising the work of his interns, Dr. Cantor testified that he never worked directly with children or adolescents with gender dysphoria.  (*Id.* at 68:22–69:2.)  His supervision of the CAMH interns never involved research around puberty-delaying treatment prescribed to transgender adolescents nor hormone therapy prescribed to transgender adults.  (*Id.* at 132:11-19.)  In fact, in Dr. Cantor's current private practice, he has only

9

treated "about six to eight patents ages 16 to 18," and was unable to identify whether these patients were transgender or had gender dysphoria.  (*Id*. at 179:15-18, 180:8-13.)

Dr. Cantor admitted at his deposition—as he must—that he has almost no experience researching and writing about or administering mental health treatment to transgender adolescents. Indeed, in the list of 64 articles he has authored or co-authored, only one even mentions transgender children ("The Recalled Childhood Gender Identity"), and Dr. Cantor was not a primary author of the article and did not himself carry out any portion of the study.  (Swaminathan Decl., Ex. B at 102:8-14.)

In sum, Dr. Cantor is not recognized as an expert in providing treatment to transgender children or adolescents, does not have the requisite qualifications to provide treatment to transgender children or adolescents, has never treated nor delivered any psychiatric care to transgender children or adolescents in his day-to-day practice, has never written about or researched the provision of care to transgender children and adolescents, and has extremely limited experience working with children and adolescents in any capacity.  (*Id*. at 179:4-14.)  For all these reasons, Dr. Cantor is not qualified under the *Daubert* standards to offer opinions on matters relating to the care of transgender children.

### 1.    Dr. Cantor Admits That He Is Not Qualified To Offer Opinions On H.B. 3293 Or Transgender Athletes.

Astonishingly, Dr. Cantor admitted that he is not providing any testimony relating to the three purported governmental interests that the State of West Virginia ("State") asserts are advanced by H.B. 3293: 1) to protect women's sports; 2) to follow Title IX; and 3) to protect women's safety in female athletic sports.  (Pl's SUF ¶ 59.)  When asked whether he is "offering an expert opinion with respect to whether H.B. 3293 serves the interest of protecting women's

sports," Dr. Cantor responded he "[hadn't] been asked that, no." (Swaminathan Decl., Ex. B at 178:3-6.) When asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of following Title IX," Dr. Cantor responded that he "[hadn't] been asked that, no." (Swaminathan Decl., Ex. B at 178:7-10.) When asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of protecting women's safety in female athletic sports," Dr. Cantor again responded that he "[had not] been asked that, no." (Swaminathan Decl., Ex. B at 178:11-14.) When asked whether he has "any opinions on whether H.B. 3293 should apply to college athletes," Dr. Cantor responded that he has "no opinion in any direction." (Swaminathan Decl., Ex. B at 178:18-20.)

                                        ***

    The opinions expressed by Dr. Cantor are insufficiently tied to the facts of this case so that they will aid a factfinder in determining whether a categorical ban on transgender girls and women participating on girl's and women's sports team is lawful, and should therefore be excluded as irrelevant.

11

A-174

C.    **Dr. Cantor's Testimony Is Methodologically Unreliable And Unsupported By Science Or Medicine.**

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281.  Dr. Cantor's opinions fall far short of the reliability standard.  Dr. Cantor's theory that "it remains entirely *plausible* that the psychotherapy [alone without] puberty blockers caused the improvements" in the mental health of transgender adolescents is pure speculation that has never been tested.  (Swaminathan Decl., Ex. A at ¶ 54 (emphasis added).)  But plausibility does not satisfy any standard for an expert opinion.  Such speculative opinions should be excluded, especially given this Circuit's holding that "proffered evidence that has a greater potential to mislead than to enlighten should be excluded."  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see also Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003) ("[S]peculation is unreliable evidence and is inadmissible").

Dr. Cantor asserts without any evidence whatsoever that his views are accepted and shared by the amorphous and unspecific "scientific community."  (Swaminathan Decl., Ex. B at 210:2-25.)  Dr. Cantor asserts that "several scores" of people, comprised of individuals he is "in regular contact with," agree with his opinions as to withholding social transition in prepubertal children with gender dysphoria.  (*Id.*)  He admitted that his communications with these individuals, primarily sex researchers and sex therapists (none of whom specialize in care of transgender patients), are his "primary source" of evidence for the assertion that "practitioners support withholding social transition in prepubertal patients with gender dysphoria."  (*Id.* at 211:4-15, 211:17-22.)  Dr. Cantor's opinions thus are not rooted in science—they are personal opinions he

12

has formed through communications with groups of individuals who he is in routine contact with, and who are not practitioners specializing in the treatment of children and adolescents with gender dysphoria.[3]

Furthermore, Dr. Cantor fails to address how his experience and communications with other "sexologists"—which he claims are sufficient foundation for his opinions—leads to the conclusions he draws in this case. *See*, *e.g*., *Cooper,* 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method."); *SAS Inst.*, 125 F. Supp. 3d at 589; *see also Nat'l Ass'n. for Rational Sexual Offense L.*, 2021 WL 736375, at *3 (excluding expert where offering party failed to establish how expert's "experience leads to his conclusions nor how those experiences have been reliably applied to the facts").

Another unreliable opinion presented by Dr. Cantor is that "the majority" of prepubertal children who experience gender dysphoria will cease to be transgender. (Swaminathan Decl., Ex. B at 191:11-24; 212:19-213:3 ("[R]esearch has unanimously shown that the majority of children with gender dysphoria desist – that is, cease to experience such dysphoria by or during puberty."). Dr. Cantor's only support for this concept is "11 studies listed on [his] blog." (Swaminathan Decl., Ex. B at 206:12–207:11.) Upon closer inspection, these sources are woefully inadequate to support his assertion. All of his sources suffer from the same malady: they purported to show desistance among children who were identified as having gender dysphoria under prior versions of the

---

[3] Even Defendants' other experts disagree with Dr. Cantor.  Dr. Cantor opposes allowing transgender children to live in accordance with their gender identity, (Swaminathan Decl., Ex. B at 210:2-25), but Defendants' proposed expert, Dr. Stephen Levine, "cooperate[s] with" social transition and even has supported "people who already had social transition . . . in the face of their parents' objection."  (Swaminathan Decl., Ex. H (Levine Dep.) at 141:7-11.)

American Psychiatric Association's Diagnostic and Statistical Manual ("DSM").  Those versions included a now-obsolete and overly broad diagnosis for "Gender Identity Disorder in Children," which differs in key ways from the current DSM-5 diagnostic criteria for "Gender Dysphoria in Children."  As another expert in this matter explained, the older Gender Identity Disorder diagnosis did not require a finding that the child had a gender identity different from the sex assigned at birth.  (Swaminathan Decl., Ex. D at 324:16–325:4.)  As a result, those older studies tended to mischaracterize gender-nonconforming children as transgender.  Such studies cannot be relied on to draw conclusions regarding "desistance" in prepubertal youth diagnosed with gender dysphoria.

Similarly, Dr. Cantor criticizes studies showing positive outcomes for transgender children who access puberty-delaying treatment as unreliable because there is "no method of separating how much of its result was due to psychotherapy versus due to medical intervention."  (*Id.* at 252:6-10.)  But this criticism is not meaningful: these studies nonetheless indicate that gender-affirming care leads to positive outcomes for transgender youth.  (*See e.g.*, Swaminathan Decl., Ex. B at 233:1-10, 229:16-22.)

Chief among Dr. Cantor's many unreliable opinions is his assertion that wide disagreement exists about the appropriate treatment for gender dysphoria and that the SOC are not accepted by his amorphous and unspecified "scientific community."  (Swaminathan Decl., Ex. A at ¶ 8(c).)  Contrary to Dr. Cantor's personal feelings, which were formed as discussed above through communications with "several scores" of people who do not specialize in care of transgender patients, there ***is broad consensus*** about the appropriate treatment for gender dysphoria.  All major medical associations endorse and follow the treatment protocols established by the WPATH in the SOC Version 7.  (Swaminathan Decl., Ex. E ¶ 27.)  This factual reality calls into serious question the reliability of this proffered opinion.

Additionally, Dr. Cantor's testimony directly contradicts the Fourth Circuit's recognition that "we now have modern accepted treatment protocols for gender dysphoria," which have been "[d]eveloped by the World Professional Association for Transgender Health (WPATH) . . . [and] represent the consensus approach of the medical and mental health community[.]"  *Grimm*, 972 F.3d at 595.  The Fourth Circuit recognizes these treatment protocols "as *the authoritative standards of care*," finding that "[t]here are no other competing, evidence-based standards . . . accepted by any nationally or internationally recognized medical professional groups."  *Id.* at 595–96 (emphasis added) (quoting *Edmo*, 935 F.3d at 769).

**1.      Dr. Cantor's Assertions That Transgender Adolescents Are Receiving "Affirmation On Demand" And That Adolescents Transition Due To The "Unrealistic Expectation That Transition Will Help Them Fit In" Are Unsupported.**

Dr. Cantor's most strikingly unreliable opinion is that "[b]ecause only a minority of gender dysphoric children persist in feeling gender dysphoric in the first place, 'transition-on-demand' . . . 'increases the probability of unnecessary transition and unnecessary medical risks.'" (Swaminathan Decl., Ex. B at 213:22–214:11.)  Again, in making this broad and unfounded assertion, Dr. Cantor relies only on "those 11 studies" on his blog.  (*Id.* at 215:17–217:19.)  Dr. Cantor has no experience in his own practice with persistence or desistence in children with gender dysphoria, and he does not offer any support for this proposition from practitioners who actually treat gender dysphoria in children.  (*Id.*)

When asked whether "any patient ever [came] to [him] asking for affirmation on demand," Dr. Cantor's response was "no."  (*Id.* at 181:11-13.)  When asked what his basis was for saying that providers are providing "affirmation on demand to children and adolescents with gender dysphoria," Dr. Cantor responded that his "only evidence" is from the following sources:

"Through several venues.  I get that information from parents, from people, you know, in society who e-mail me asking for help.  There's a large number of media reports of it happening through the world, U.S., Canada and Europe.  And there's now been – there are now several governmental entities, mostly in Europe, are now beginning more formal . . . investigations of it."  (*Id*. at 181:14-25; 184:5-10.)

When asked whether he had ever spoken to providers who claim to provide affirmation on demand to children and adolescents with gender dysphoria, his response was "no."  (*Id*. at 182:17-21.)  When asked whether any provider at CAMH (his former employer) provides affirmation on demand, his response was again "no."  *Id*. at 183:16-24.  In other words, Dr. Cantor was unable to identify a single instance of a provider providing affirmation on demand, and his "evidence" is woefully inadequate to support any conclusion that such practice is occurring.  Similarly, Dr. Cantor was unable to identify any scientific literature that demonstrates that providers are providing affirmation on demand to children and adolescents with gender dysphoria.  (*Id*. at 184:11-14.)

Another stark example of Dr. Cantor's opinions failing to meet methodological reliability is his assertion that "a child experiencing depression from social isolation might develop hope – and the unrealistic expectation – that transition will help them fit in, this time as and with the other sex."  (Swaminathan Decl., Ex. A at ¶ 69; Ex. B at 218:18–219:20.)  Dr. Cantor himself admitted at his deposition that this "hypothesis hasn't been . . . tested," and therefore has no probative value.  (Swaminathan Decl., Ex B at 219:15-20.)

None of Dr. Cantor's unsubstantiated hypotheses justify denying treatment to transgender adolescents, which is not at issue in this case regardless.

2.    **Dr. Cantor Testified That Transgender People Are One Of Three Things: Autogynephilic, Homosexual, Or Mistaken.**

The Fourth Circuit has held conclusively that "just like being cisgender, being transgender is natural and is not a choice." *Grimm*, 972 F.3d at 594.  The Fourth Circuit also acknowledges that "[b]eing transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Id.* (quotation marks omitted).  By contrast, Dr. Cantor egregiously espouses that only three factors can "motivate a person to want to live as the other sex." (Swaminathan Decl., Ex. B at 143:8-10.)  At his deposition, Dr. Cantor testified that "anyone who is transgender is transgender either due to autogynephilia,[4] homosexuality, or a mistake they've made as a . . . younger individual." (*Id.* at 145:7-15 ("[T]hat's the best summary we have of the – of the existing research").)  Dr. Cantor asserted that homosexuality "can motivate a person to feel gender dysphoric" and "be the source of the desire to change." (*Id.* at 143:20-144:1.)  In justifying his third theory, Dr. Cantor stated that young individuals "mistake the emotions that they're having to be gender dysphoria when they're actually motivated by something else, for example, a desire to not be associated with the sex that they would be biologically associated with." (*Id.* at 144:9-15.)  Dr. Cantor's testimony is not only in direct conflict with Fourth Circuit precedent, but is a harmful, outlier opinion in the scientific community.  Dr. Cantor does not believe that individuals can be transgender unless they fall into one of his three purported pathways.  His views, which pathologize transgender people in stark contradiction to the Fourth Circuit's recognition that being transgender is a normal variation in human development, are irrelevant, harmful, and unfit for use by the Court.

---

[4] Autogynephilia refers to an extreme outlier hypothesis that transgender people become transgender out of a sense of sexual arousal. (*Id.* at 142:3-8.)

17

3.    **Dr. Cantor's Opinion That No Professional Organization Has Articulated A Meritorious Position Calling Into Question The Basis For The Act Directly Contradicts The Fourth Circuit's Holding In** *Grimm***.**

Dr. Cantor spends a great deal of time in his report critiquing the statements of preeminent medical and behavioral health organizations that recognize the standard of care for treating gender dysphoria. (Swaminathan Decl., Ex. A at ¶¶ 107–39.) Dr. Cantor's critiques, however, are misleading, misconstrue the current standards of care, and flout Circuit law. As just one example, Dr. Cantor quotes selectively from the Endocrine Society's clinical guidelines to misleadingly suggest that the guidelines recommend "address[ing] mental health issues *before* embarking on transition," and that they do "not endorse any affirmation-only approach." (Swaminathan Decl., Ex. A at ¶ 119–20 (emphasis added).) But this is incorrect. In fact, the guidelines affirmatively *recommend* that adolescents with gender dysphoria receive medical treatment and endorse "gender-affirming" care throughout. (*See, e.g.*, Swaminathan Decl., Ex. F at 3871 §§ 2.1-2.5 (recommending treatment with puberty-delaying medication and hormones).)

Dr. Cantor is additionally unqualified to opine on these professional organizations as he lacks any involvement with them. He testified that he is not a member of WPATH, has never advised the WPATH in any capacity, has never been involved in developing the SOC, and could not recall the most recent version of the SOC. (Swaminathan Decl., Ex. B at 203:1–204:24.) Similarly, Dr. Cantor is not a member of the Endocrine Society, was not involved in the development of the Endocrine Society guidelines in 2009 or in 2017, is not aware of the scientific literature conducted by the Endocrine Society in developing the guidelines, and does not hold himself out as an expert in how the guidelines were developed. (*Id*. at 201:8–202:19.)

Dr. Cantor's attack on these professional organizations also defies this Circuit's recognition that they constitute the "*leading* medical, public health, and mental health organizations" regarding treatment for transgender adolescents. *Grimm*, 972 F.3d at 594 n.1 (emphasis added). *Grimm* relied heavily on the amici curiae brief submitted by many of the same organizations to explain the treatment protocols for transgender adolescents, citing these organizations as "our foremost medical, mental health, and public health organizations." *Id.* at 612; *see also id.* at 594–613 (citing the amici curiae brief nine times).

### 4. Dr. Cantor Has Offered Harmful Opinions Related To Transgender People And Has Been Removed From Respectable Scientific Societies For Posting Disrespectful Material.

Dr. Cantor is unfit to provide testimony in this case given his history of promulgating disturbing and offensive content about transgender people.[5] In Dr. Cantor's blogpost, Sexology Today, for example, Dr. Cantor suggests that transgender people are "atypical," and writes that "only very few trans kids still want to transition by the time they are adults. Instead, they generally turn out to be *regular* gay or lesbian folks." (Swaminathan Decl. Ex. G; Ex. B at 187:17–188:9 (testifying that "non-regular gay or lesbian folks" are people "with a paraphilia or with a fetish that makes the determination of their sexual orientation a bit moot"); Ex. B at 188:15–189:1 (testifying that "if a child's gender dysphoria were to persist and they continued to want to transition by the time they are adults," that would be "atypical") (emphasis added).)

---

[5] Dr. Cantor was a member of the Society for the Scientific Study of Sexuality, a group dedicated to "forward[ing] and promot[ing] the conduct and dissemination of sex research," for twenty-seven years. (Swaminathan Decl., Ex. A. at 96; Ex. B at 284:19-22; 287:11-13.) After his twenty-seven-year membership, Dr. Cantor was suspended and removed from the society's online forum after its Board determined that Dr. Cantor had violated one of its guidelines by posting "disrespectful" content relating to transgender people. (Swaminathan Decl., Ex. B. at 288:10-13 ("[T]hey told me what I said they deemed to be disrespectful"); 288:16-18 ("Q . . . [D]id what you say deal with issues relating to transgender people or gender dysphoric people? A. Yes."))

19

**D.      Dr. Cantor's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.**

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony.  Fed. R. Evid. 403.  As noted above, Dr. Cantor offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are irrelevant and unreliable.  Consideration of his testimony would waste time and create confusion.  The testimony would also result in prejudice, as the testimony seeks to sow confusion about the veracity of Plaintiffs' gender identity, gender dysphoria diagnosis, and other experiences—issues unrelated to whether transgender girls and women should be allowed to participate on girls' and women's sports teams in West Virginia.  Accordingly, Dr. Cantor's testimony fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

# CONCLUSION

WHEREFORE, based on the foregoing, Plaintiff respectfully request that this Court grant the instant motion and exclude all of Dr. Cantor's purported expert testimony because it is not admissible under *Daubert* and the Federal Rules of Evidence.

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Swaminathan*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
cSwaminathan@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com
*Visiting Attorneys
Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                              *Plaintiff*,

          v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                              *Defendants*,

          and

LAINEY ARMISTEAD,

                              *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true

and exact copy of *Plaintiff's Memorandum of Law in Support of Motion to Exclude the Expert*

*Testimony of James M. Cantor* with the Clerk of Court and all parties using the CM/ECF System.


                              */s/ Loree Stark*
                              Loree Stark
                              West Virginia Bar No. 12936

22

A-185

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | Civil Action No. 2:21-cv-00316 |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Hon. Joseph R. Goodwin |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN B. LEVINE**

**TABLE OF CONTENTS**

INTRODUCTION AND BACKGROUND ................................................................ 1

LEGAL STANDARD............................................................................................... 2

ARGUMENT ........................................................................................................... 4

    DR. LEVINE'S PRIMARY OPINIONS HAVE NO RELEVANCE TO THE
    CASE. ................................................................................................................. 5

        1.    Dr. Levine's Opinions About The Standards Of Care For Transgender
             Adolescents Are Irrelevant And Should Be Excluded.......................... 6

        2.    Dr. Levine Admitted That He Does Not Understand How His Testimony
             Is Being Used In This Case...................................................................... 7

    DR. LEVINE IS NOT QUALIFIED TO OFFER OPINIONS ABOUT THE MEANING
    OF "BIOLOGICAL SEX" OR TREATMENTS FOR PRE-PUBERTAL
    CHILDREN WITH GENDER DYSPHORIA............................................... 8

        1.    Dr. Levine Is Not Qualified To Offer Opinions About The Meaning Of
             "Biological Sex." ....................................................................................... 9

        2.    Dr. Levine Is Not Qualified To Offer Opinions About Treatment For Pre-
             Pubertal Children Or Adolescents. ..................................................... 12

    DR. LEVINE'S TESTIMONY IS METHODOLOGICALLY UNRELIABLE AND
    UNSUPPORTED BY SCIENCE OR MEDICINE......................................... 13

        1.    Dr. Levine Falsely Asserts That Providers Are Providing Rapid
             Affirmation Care To Transgender Adolescents................................. 14

        2.    Dr. Levine's Assertion That There Are Widely Varying Views About The
             Appropriate Treatment For Gender Dysphoria Is Simply Wrong. ..... 16

        3.    Dr. Levine's Opinion That Accessing Gender-Confirming Care Is
             Experimental And Unethical Is Unfounded........................................ 17

        4.    Dr. Levine's Opinions Directly Contradict The Fourth Circuit's Holding
             In *Grimm*............................................................................................ 20

        5.    Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And
             Are Thus Inadmissible Under Federal Rule Of Evidence 403. .......... 22

    CONCLUSION....................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belk, Inc. v. Meyer Corp., U.S.*,
    679 F.3d 146 (4th Cir. 2012) ....................................................................3

*Bourne v. E.I. DuPont de Nemours & Co.*,
    85 F. App'x 964 (4th Cir. 2004) ...............................................................5

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021) ................................................2, 17

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ..............................................................3, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 578 (1993) .....................................................................3, 4, 13, 23

*Dunn v. Sandoz Pharm. Corp.*,
    275 F. Supp. 2d 672 (M.D.N.C. 2003) .....................................................15

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ....................................................................10

*Edmo v. Idaho Department of Correction*,
    358 F. Supp. 3d 1103 (D. Idaho 2018) ......................................................2

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ...........................................13, 14, 20, 21

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ........................................................2

*Kadel v. North Carolina State Health Plan for Teachers and State Employees*,
    12 F.4th 422 (4th Cir. 2021) ...............................................................19, 21

*Knight v. Boehringer Ingelheim Pharm., Inc.*,
    323 F. Supp. 3d 837 (S.D. W.Va. 2018) ....................................................5

*Kopf v. Skyrm*,
    993 F.2d 374 (4th Cir. 1993) .................................................................7, 8

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ....................................................................................4

*Lebron v. Sec. of Fla. Dept. of Children and Families*,
    772 F.3d 1352 (11th Cir. 2014) .................................................................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
    892 F.3d 624 (4th Cir. 2018) ....................................................................15

*Martinez v. Sakurai Graphic Sys. Corp.*,

No. 04 Civ. 1274, 2007 WL 2570362 (N.D. Ill. Aug. 30, 2007) ...............................9

*Mod. Auto. Network, LLC v. E. All. Ins. Co.*,
416 F. Supp. 3d 529 (M.D.N.C. 2019) ...........................................................3, 8

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
No. 17 Civ. 53, 2021 WL 736375 (M.D.N.C. Feb. 25, 2021) ..............................4

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) .........................................................................7

*Norsworthy v. Beard*,
87 F. Supp. 3d 1164 (N.D. Cal. 2015) ..........................................................1, 2

*O'Conner v. Commonwealth Edison Co.*,
807 F. Supp. 1376 (C.D. Ill. 1992) ...................................................................9

*Reliastar Life Ins. Co. v. Laschkewitsch*,
No. 13 Civ. 210, 2014 WL 1430729 (E.D.N.C. Apr. 14, 2014) ..........................8

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ........................................................3, 4, 6, 13

*SAS Inst., Inc. v. World Programming Ltd.*,
125 F. Supp. 3d 579 (E.D.N.C. 2015) ...............................................................4

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) ...........................................................................3

*Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*,
197 F. Supp. 3d 837 (W.D.N.C. 2016) .............................................................6

*Wright v. United States*,
280 F. Supp. 2d 472 (M.D.N.C. 2003) ..............................................................8

**Statutes**

20 U.S.C. § 1681, et seq. ...................................................................................1

**Other Authorities**

Anthony N. Almazan & Alex S. Keuroghlian, *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, JAMA .................................18

Federal Rule of Evidence 403 ................................................................1, 4, 21, 22

Federal Rule of Evidence 702 ...................................................................1, 2, 3, 10

NIH 2015 and 2022 ................................................................................................10

## INTRODUCTION AND BACKGROUND

Plaintiff B.P.J., a twelve-year-old girl who is transgender, challenges the legality of H.B. 3293, a law that categorically bars Plaintiff and any other female athletes who are transgender from participating on girls' and women's sports teams in West Virginia. B.P.J. contends that the law violates her rights under the Equal Protection Clause of the Fourteenth Amendment and discriminates against her based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

As part of their defense of H.B. 3293, Defendants identified and disclosed an expert report from Dr. Stephen Levine to support the following contentions: (1) there is no consensus or agreed-upon standard of care to treat child or adolescent gender dysphoria; (2) transgender identity is not biologically based; and (3) affirming transgender youth and permitting them to transition are "experimental therapies that have not been shown to improve mental or physical health outcomes." (Swaminathan Decl., Ex. A at iv-v.) The opinions offered by Dr. Levine should be excluded for three reasons: (1) they are irrelevant to the legal questions in this case; (2) Dr. Levine is not qualified to offer this testimony regardless of its relevance; and (3) Dr. Levine's opinions are not based on sufficient facts or data or derived from sufficiently rigorous methodology as required under Federal Rule of Evidence 702. Dr. Levine's proffered opinions should also be excluded because when viewed in the context of Federal Rule of Evidence 403, any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.

This is not the first case in which Dr. Levine has sought to offer testimony about transgender people that is irrelevant, beyond his qualifications, or unreliable. In *Norsworthy v. Beard*, a case involving a transgender prisoner, "the Court g[ave] very little weight to the opinions

of Levine, whose report misrepresent[ed] the [applicable] Standards of Care; overwhelmingly relie[d] on generalizations about gender dysphoric prisoners, rather than an individualized assessment of Norsworthy; contain[ed] illogical inferences; and admittedly include[d] references to a fabricated anecdote." 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015).  This finding was echoed in *Edmo v. Idaho Department of Correction*, another district court case involving an incarcerated transgender individual.  358 F. Supp. 3d 1103, 1125–26 (D. Idaho 2018), *vacated in part on other grounds sub nom*, *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (finding that Dr. Levine "is an outlier in the field of gender dysphoria" and placing "virtually no weight" on his opinions).

Of particular relevance to this case, Dr. Levine's opinions were further diminished in *Hecox v. Little*, a case challenging a similarly unconstitutional ban on athletic participation of transgender girls and women.  479 F. Supp. 3d 930 (D. Idaho 2020).  There, the court dismissed Dr. Levine's opinion that "gender affirming policies are harmful to transgender individuals," and "accept[ed] Plaintiffs' evidence regarding the harm forcing transgender individuals to deny their gender identity can cause."  *Id.* at 977 n.33.  And just last year, another district court strongly discounted his proffered testimony by granting a preliminary injunction against a law banning access to gender-affirming medical care.  *See Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021).

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of Dr. Stephen B. Levine from consideration at summary judgment or trial as inadmissible under Federal Rule of Evidence 702.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable

foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 578, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); *see* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (amendment "affirms the trial court's role as gatekeeper," and that "all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). The party offering the expert carries the burden of establishing the admissibility of testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

A trial court must also determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a trial court considers an expert's professional qualifications and "full range of experience and training." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (cleaned up). If the purported expert lacks the knowledge, skill, experience, training, or education on the issue for which the opinion is proffered, the trial court must exclude the expert. *See, e.g.*, *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019), *aff'd*, 842 F. App'x 847 (4th Cir. 2021). Even if the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis*, 10 F.4th at 282 (cleaned up). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id.* at 281 ("Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded.").

If the opinions offered by the expert are deemed relevant and the expert is qualified to offer testimony, a trial court will inquire if the opinion is based on a reliable foundation, which focuses on "the principles and methodology" employed by the expert to assess whether it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* at 281,

3

290 (cleaned up).  When evaluating whether an expert's methodology is reliable, a court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id.*; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S. at 593–94.  While trial courts have "broad latitude" to determine reliability, they must engage in the gatekeeping process and not simply "delegate the issue to the jury."  *Sardis*, 10 F.4th at 281.  When addressing an expert whose methodology is grounded in experience, courts use three factors: "(1) how the expert's experience leads to the conclusion reached; (2) why that experience is a sufficient basis for the opinion; and (3) how that experience is reliably applied to the facts of the case."  *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015); *see also Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 17 Civ. 53, 2021 WL 736375, at \*3 (M.D.N.C. Feb. 25, 2021).

Finally, because "expert evidence can be both powerful and misleading because of the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595 (cleaned up).  As such, "the importance of [the] gatekeeping function cannot be overstated."  *Sardis*, 10 F.4th at 283 (cleaned up).

## ARGUMENT

On its face, Dr. Levine's testimony, which deals with the standards of care and protocols for treating gender dysphoria, is irrelevant to the purported justifications of H.B. 3293.  This case is about the ability of girls and women who are transgender to participate on school-sponsored

4

athletic teams in accordance with their gender identity. As this Court previously recognized in its preliminary injunction order, "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Op.) at 3 n.4.) This renders Dr. Levine's testimony irrelevant to the issues before this Court.

Additionally, even if Dr. Levine's opinions about the treatment of transgender children and adolescents were relevant, Dr. Levine would not be qualified to offer them. Dr. Levine is not a board-certified child and adolescent psychiatrist. (Swaminathan Decl., Ex. B at 83:12–84:3, 87:1-7.) As he previously testified, his nearly fifty-year practice has focused predominately on treating adult patients. (Swaminathan Decl., Ex. B at 79:9–79:11, 87:1–87:4, 87:11–87:13.) He is particularly unqualified to opine about the use of hormonal interventions to treat gender dysphoria as he is not an endocrinologist. (Swaminathan Decl., Ex. B at 81:18-23, 81:1–87:4.) Finally, Dr. Levine's testimony is methodologically unreliable and unsupported by science or medicine, and his opinions are outliers among the scientific community.

## DR. LEVINE'S PRIMARY OPINIONS HAVE NO RELEVANCE TO THE CASE.

"[I]t is axiomatic that expert testimony which does not relate to any issue in the case is not relevant and non-helpful." *Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 846 (S.D. W.Va. 2018) (quoting *Edwards v. Ethicon, Inc.*, No. 12 Civ. 9972, 2014 WL 3361923, at *2 (S.D.W.Va. July 8, 2014)). To be relevant, an opinion must "fit" with the facts at issue. *Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004). "The test for relevance, or fit, considers whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016) (cleaned up). The

5

"court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis*, 10 F.4th at 282 (cleaned up).

1.    **Dr. Levine's Opinions About The Standards Of Care For Transgender Adolescents Are Irrelevant And Should Be Excluded.**

This case is about whether a twelve-year-old transgender girl can participate on the girls' cross-country and track teams at her middle school, and whether the law at issue, H.B. 3293, violates her rights under the Equal Protection Clause and Title IX.  Defendants contend that H.B. 3293 is justified by a state interest in protecting women's sports, following Title IX, and protecting women's safety in female athletic sports.  (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶ 59.)  But Dr. Levine's testimony does not speak to any of those issues.  Rather, Dr. Levine's opinions on standards of care for transgender adolescents, and personal opinions on gender-affirming medical care, have been previously recognized as irrelevant by this Court.  When Defendants attempted to present the same testimony in opposition to B.P.J.'s motion for a preliminary injunction, this Court properly recognized that, "The State cites to experts who question when social transition and puberty blocking treatment are appropriate for young people. But what is or should be the default treatment for transgender youth is not the question before the court."  (PI Op. at 3 n.4.)  The Court's prior analysis is equally true today.  Dr. Levine's testimony is not relevant to this inquiry because it will not help the "trier of fact to understand the evidence or to determine a fact in issue"—namely whether H.B. 3293 is substantially related to West Virginia's asserted interests in protecting women's sports, following Title IX, and protecting women's safety in female athletic sports.  *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017); (Pl's SUF ¶ 59.).

2.      **Dr. Levine Admitted That He Does Not Understand How His Testimony Is Being Used In This Case.**

To assist the trier of fact, the expert providing testimony must understand the nature of the case and the testimony being provided.  *See Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).  Here, Dr. Levine has no understanding of the law being challenged and is not an expert with respect to issues pertaining to transgender athletes like Plaintiff B.P.J.  When asked whether he is familiar with the law that's being challenged in this case, H.B. 3293, Dr. Levine swiftly replied "no."  (Swaminathan Decl., Ex. B at 143:11-14.)  Dr. Levine admitted that he has no opinion as to whether B.P.J. should be permitted to play sports, (*id*. at 42:23–43:1), and testified that he is "not an expert . . . in matters of athletics and physiology," sports medicine, or athletic performance.  (Swaminathan Decl., Ex. B at 42:13–42:22, 81:24–82:3.)

When asked whether he understood that he is being paid as an expert by the Defendants in this case to submit testimony that will be used against the participation of transgender students in sports, Dr. Levine replied, "I don't think I fully understand that."  (*Id.* at 253:10-19.)  When asked whether he understood that his opinion in this case is being used to "support excluding an eleven-year-old transgender girl from a middle school track team that wants her to play on it," Dr. Levine said that he "already told" Plaintiff's counsel that he "[does not] know the details of this particular case."  (*Id*. at 249:1-9.)  When asked whether "allowing a transgender girl to participate on a girl[s] team, consist with her gender identity, is harmful to the transgender girl," Dr. Levine testified, "I don't think it would harm the child to the extent that it reinforces their current identity."  (*Id*. at 153:13–154:1.)

Dr. Levine was also "shocked" to hear that Defendants attached the declaration he provided in the *Tingley v. Ferguson et. al.*, (Washington, May 2021) case to their Preliminary Injunction

7

motion without his consent.  (*Id.* at 68:14–69:1.)  When asked whether he has "any objection to [his] declaration from one case being submitted in another case without [his] approval," he stated that, "personally, [he] does have an objection for people using [his] previous testimony" because he doesn't believe that it's "fair" to him given that "every case is somewhat different" and he feels that it is "[his] work product."  (*Id.*)

* * *

The opinions expressed by Dr. Levine are insufficiently tied to the facts of this case such that they would aid a factfinder, and should therefore be excluded as irrelevant.

### DR. LEVINE IS NOT QUALIFIED TO OFFER OPINIONS ABOUT THE MEANING OF "BIOLOGICAL SEX" OR TREATMENTS FOR PRE-PUBERTAL CHILDREN WITH GENDER DYSPHORIA.

To render expert testimony, the witness must possess the requisite "knowledge, skill, experience, training, or education" that would assist the trier of fact.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) ("A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education.").  If not qualified, the expert's testimony is unreliable.  *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 13 Civ. 210, 2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014); *see, e.g.*, *Mod. Auto. Network, LLC*, at 537 (affirming the district court's exclusion of an expert because they lacked experience relevant to the matters at issue); *Lebron v. Sec. of Fla. Dept. of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (holding expert witness was properly excluded who did not propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation).

8

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp*., No. 04 Civ. 1274, 2007 WL 2570362, at \*2 (N.D. Ill. Aug. 30, 2007). "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Id*. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994).

**1.      Dr. Levine Is Not Qualified To Offer Opinions About The Meaning Of "Biological Sex."**

In Section II of his report, Dr. Levine purports to offer an expert opinion regarding the definition of "biological sex," but Dr. Levine has no qualifications to offer an expert opinion on this topic, a fact he admitted at deposition. (Swaminathan Decl., Ex. B at 196:21–197:6.) Despite this lack of qualifications, Dr. Levine strings together what can best be described as cherry-picked generalizations from disconnected sources that take quotations out of context while ignoring other portions that clearly contradict his views.

First, Dr. Levine is not qualified to discuss the medical and scientific communities' understanding of the biological elements of sex. Dr. Levine is a psychiatrist with no experience treating pre-pubertal transgender children and no expertise relating to endocrinology or biology. The opinions in his report regarding the biological basis of sex consist of out-of-context quotations from an Endocrine Society article ("Bhargava 2021") and references to a National Institute of Health research notice ("NIH 2015") and an info-graph about how sex and gender affect disease

("NIH 2022"). (*See* Swaminathan Decl., Ex. C; Swaminathan Decl., Ex. A ¶¶ 19–27.) Instead of relying on any expertise or experience of his own, he merely stitches together selected excerpts from these unrelated sources to discuss matters on which he has no independent expertise. Rule 702 requires more. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Second, even if Dr. Levine were qualified to provide an expert opinion based on the NIH 2015 and 2022 sources or the Bhargava 2021 article, he does not employ any reliable methodology in forming his opinion that sex is clear, binary, and determined at conception based solely on chromosomes and reproductive capabilities. (Swaminathan Decl., Ex. A ¶ 20.) First, Dr Levine cites an infographic entitled "How Sex and Gender Influence Health and Disease," which has no publication date, and does not use the term "biological sex." Nor does this one-page document proport to provide a complete and scientifically accurate definition of sex, but rather identifies how health and disease risks affect "women" and "men" broadly, identifying risk variables tied to those categories that are biologically and socially constructed. (*See* Swaminathan Decl., Ex. D.) Dr. Levine's methodology is further unreliable when he attempts to construe an NIH research notice about including "sex as a biological variable in research" as support for his assertion that sex is only determined at birth based on chromosomes and reproductive capacity. (*See* Swaminathan Decl., Ex. E.) The notice contains no definition of sex all, in fact. Instead, and what Dr. Levine erroneously omits from his quotation is the notice's explanation of its background and purpose, which is to call attention to the disparity in biomedical research whereby "[m]ore often than not, basic and preclinical biomedical research has focused on male animals and cells. An over-reliance on male animals and cells may obscure understanding of key sex influences on health processes

and outcomes." *Id*. Dr. Levine's suggestion that a statement from the NIH that studies and data must account for sex as a biological variable to acknowledge differences in health and disease outcomes supports his unqualified opinion about the meaning of "biological sex" is methodologically unsound.

Dr. Levine also fundamentally misrepresents the Bhargava 2021 article by conflating its use of "gender" with "gender identity," even though the article makes clear distinctions between those terms: "Gender includes perception of the individual as male, female, or other, both by the individual and by society. *Gender identity* is a psychological concept that refers to an individual's self-perception." (Swaminathan Decl., Ex. C at 8.) Dr. Levine plucks out this isolated quote ("[s]ex often influences gender, but gender cannot influence sex") to paint a misleading picture that the article supports his pre-determined conclusions about sex, but the article directly undermines Dr. Levine's claims. (*Id*. at 10.) The introduction of the article explains that "[s]ex differences are caused by 3 major factors—sex hormones, genes, and environment." (*Id*. at 2.) And the article goes on to explain that, while the precise causative factor [of gender identity] is unknown, "there is ample but incomplete evidence for biological substrates—neuroanatomic, genetic, and hormonal—for gender orientation." (*Id*. at 9.)

Finally, Dr. Levine spends eight pages of his report offering the opinion that "transgender identity is not biologically based," again, without the qualifications to do so. (Swaminathan Decl., Ex. C ¶¶ 91–96.) But again, the veracity of B.P.J.'s identity as a transgender girl is not at issue in this case, and Dr. Levine's testimony should be excluded.

11

**2.      Dr. Levine Is Not Qualified To Offer Opinions About Treatment For Pre-Pubertal Children Or Adolescents.**

Dr. Levine indicated in his report that for almost fifty years, his "specialties have included psychological problems and conditions relating to individuals' sexuality and sexual relations, therapies for sexual problems, and the relationship between love, intimate relationships, and wider mental health." (Swaminathan Decl., Ex. C ¶ 2.)  Dr. Levine specializes in adult psychiatric care, not adolescent psychiatric care.  Dr. Levine's proffered report and deposition testimony *are* in alignment about the fact that he lacks any experience treating any prepubertal children with gender dysphoria.  (Swaminathan Decl., Ex. C ¶ 5.)  Dr. Levine testified at his deposition that over the course of his 48-year-career, he has only seen an estimated six prepubertal children, and of those six, he could not recall that he saw any of them more than *one* time.  (Swaminathan Decl., Ex. D at 87:1-7.)  Similarly, over the course of his career, Dr. Levine has only seen approximately fifty adolescent patients *total*, including both cisgender and transgender patients.  (*Id*. at 87:1–87:4, 87:11–87:13.)

Dr. Levine's research and literature similarly do not focus on issues pertaining to transgender adolescents.  Indeed, in the list of over 180 articles he has authored or co-authored, only two even mention transgender adolescents ("Ethical Concerns" and "The Psychiatrist's Role"), and only to echo Dr. Levine's personal views on their care, not to report any study he has completed.  (Swaminathan Decl., Ex. A ¶ 15-18.)  At his deposition, Dr. Levine testified that he rejects the medical community's widely accepted and authoritative guidance for transgender care.  Dr. Levine's outlier views on the World Professional Association for Transgender Health Standards of Care ("WPATH SOC") are in direct conflict with not only the "leading medical, public health and mental health organizations" but also with this Circuit's description of the

mainstream medical consensus. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 n.1 (4th Cir. 2020); see *also* 972 F.3d at 595 (noting that the WPATH SOC "represent the consensus approach of the medical and mental health community . . . and have been recognized by various courts, including this one, as the authoritative standards of care").

Dr. Levine is not recognized as an expert in providing treatment to transgender children by his private employer who by his own admission does not refer children to him as patients, nor by University Hospitals' LGBTQ and Gender Care Program, which he admitted did not consult with him in the forming of the clinic or in their ongoing work. (Swaminathan Decl., Ex. B at 113:19–114:4.) He does not write or research about providing treatment to transgender children, nor does he deliver any psychiatric care to them in his day-to-day practice. Dr. Levine is not qualified under the *Daubert* standard to offer opinions on matters relating to the standards of care of transgender children, and he cannot use his personal beliefs as evidence in this case.

\* \* \*

In sum, Dr. Levine's lack of experience with treating transgender children and adolescents, and unfamiliarity with the issues at hand warrant exclusion of his opinions regarding care for transgender adolescents.

### DR. LEVINE'S TESTIMONY IS METHODOLOGICALLY UNRELIABLE AND UNSUPPORTED BY SCIENCE OR MEDICINE.

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281. Here, Dr. Levine's opinions fail all indicia of reliability. Dr. Levine testified at his deposition that with respect to the treatment of adolescent gender dysphoria, there is a "lack of evidence, from [his] perspective, as to which approach is scientifically based." (Swaminathan Decl., Ex. B at 212:12-17.) This opinion is a clear outlier based on the Fourth

13

Circuit's detailed treatment of the medical consensus in this area. *Grimm*, 972 F.3d at 595–96. As this Court has already acknowledged, the proper medical treatment for transgender youth is not at issue in this case, but even if it were, Dr. Levine has previously admitted in testimony under oath that the WPATH SOC are widely accepted and that the care he provides patients for the treatment of gender dysphoria is generally aligned with the SOC. (Swaminathan Decl., Ex. I at 145:16-24; Ex O at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24–226:17; Ex. I at 103:11-19.) He testified, without providing any source beyond his own personal views, that in the WPATH SOC v7, "there was much less interest in the pathways to transgenderism and more interest in the treatment of transgenderism, and so it became too many advocates." (Swaminathan Decl., Ex. B at 225:25–226:3.) But beyond his own personal beliefs, Dr. Levine presents no evidence that the SOC are unreliable, or that there are any other scientific guidelines that practitioners should follow in providing gender affirming care to transgender adolescents. (Swaminathan Decl., Ex. A at 24–28.) Regardless, Dr. Levine's personal opinions about the standards of care and guidelines for transgender adolescent care should be excluded in the present case as they are not relevant, as this Court has stated, to the issue of whether transgender girls and women should be allowed to participate on girls' and women's sports teams in West Virginia.

**1.  Dr. Levine Falsely Asserts That Providers Are Providing Rapid Affirmation Care To Transgender Adolescents.**

In addition, some of Dr. Levine's opinions are misleading at best, or flat out false. For example, Dr. Levine testified at his deposition that "there is a practice of rapid affirmation [of gender dysphoria] happening in the United States." (Swaminathan Decl., Ex. B at 124:10-13.) Dr. Levine's only support for the notion that clinicians in the United States are performing "rapid affirmation care," a claim he also makes in his report, (Swaminathan Decl., Ex. A ¶ 50), is from

unidentified parents who have allegedly contacted him with complaints about their child's treatment.  (Swaminathan Decl., Ex. B at 120:6–123:20, 130:1-12 ("[I]t could be that parents that are having negative experiences are the ones that are seeking you out, correct? Yes . . . people come to see me because they think I have knowledge or attitude that is consistent with their position."); 128:14-15 ("parental reports that are consistent over time, to me, is good data").  Such plainly unreliable and speculative opinions should be excluded, especially given the Fourth Circuit's holding that "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018); *see also Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003) ("speculation is unreliable evidence and is inadmissible").

Dr. Levine claims his contact with "concerned parents" and providers at a local clinic who consulted him about "borderline personality kids," (Swaminathan Decl., Ex. B at 122:5-7, 126:1-7), is sufficient foundation for his opinion that rapid affirmation care is being provided.  But he fails to address how this purported contact leads to his conclusions and how such cherry-picked, anecdotal testimony is reliably applied to the facts here.  (Swaminathan Decl., Ex. B at 120:9–121:3, 125:16–127:2 ("Q . . . [O]ther than the people at the Cleveland Clinic, have you spoken to any other gender-affirming professionals about their practices? A . . . the answer to your question is no")); *see, e.g.*, *Cooper*, 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method").  Dr. Levine's testimony on this point should be excluded.

15

2.    **Dr. Levine's Assertion That There Are Widely Varying Views About The Appropriate Treatment For Gender Dysphoria Is Simply Wrong.**

Chief among Dr. Levine's many unreliable opinions is his assertion that wide disagreement exists about the appropriate treatment for gender dysphoria and that the SOC are not accepted by the scientific community.  (Swaminathan Decl., Ex. A ¶¶ 66–73.)  In addition to contravening the Fourth Circuit's recognition of a mainstream consensus about this care as explained above, this is objectively incorrect.  There ***is broad consensus*** about the appropriate treatment for gender dysphoria, as evidenced by the fact that all major medical associations, the largest health systems in the United States (Department of Veterans Affairs, Kaiser-Permanente, the Federal Bureau of Prisons), and most major health insurers endorse and follow the treatment protocols established by the WPATH in the SOC Version 7.  (Swaminathan Decl., Ex. G.)  Indeed, "[a] number of professional medical organizations have joined WPATH in recognizing that gender affirming care is medically necessary for transgender people."  (*Id.* at 361)  This includes, among others, the American Medical Association, American Psychiatric Association, American Psychological Association, American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, and the Endocrine Society.  (*Id.*)  Dr. Levine himself admitted at his deposition that he believes "medical certainty is a joke," (Swaminathan Decl., Ex. B at 75:11-12), and that he does not "actually believe that people like [him] ought to be recommending [care]."  (*Id.* at 117:13-19.)

This factual reality, combined with Dr. Levine's *own admissions* about his use of the WPATH treatment protocols, calls into serious question the reliability of this proffered opinion.  (Swaminathan Decl., Ex. B at 182:5-9, Ex. H at 112:16-21.)  Dr. Levine even admitted this in a prior deposition in December 2020, acknowledging that he continues to utilize the WPATH SOC

when writing letters to authorize hormones or surgery for someone with gender dysphoria. (Swaminathan Decl., Ex. P at 29:10-18; 37:2-13; 47:22–49:3; 103:11-19.)    At the *Claire* deposition, Dr. Levine confessed that he does not dispute that the WPATH SOC is widely accepted, but just maintains, without evidence, that they are "wrong," even though his clinical care continues to be consistent with these standards.  (*Id.* at 145:16-24.)  Dr. Levine fails to show how his experience leads to this conclusion, and his testimony is rendered unreliable.

### 3.    Dr. Levine's Opinion That Accessing Gender-Confirming Care Is Experimental And Unethical Is Unfounded.

Without any basis, Dr. Levine asserts that "hormonal interventions to treat gender dysphoria are experimental in nature and have not been shown to be safe, but rather put an individual at risk of a wide range of long-term and even life-long harms."  (Swaminathan Decl., Ex. A ¶ 18k1.)  Additionally, Dr. Levine claims that "the causes and treatment of gender dysphoria has low scientific quality."  (*Id.* ¶ 140.)  Dr. Levine's opinions are both inaccurate and unreliable. In fact, just last year, another federal district court drew the exact opposite conclusion of the testimony Dr. Levine submitted there when it enjoined Arkansas' state law seeking to ban gender-confirming treatment for minors.  *See Brandt*, 551 F. Supp. 3d 882.  In doing so, the *Brandt* court explicitly found that: (a) "Gender-affirming treatment is supported by medical evidence that has been subject to rigorous study;" and (b) "Every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."  *Id.* at 891.  Dr. Levine's testimony on the quality and nature of gender affirming care should be excluded.

Dr. Levine alleges that because transgender adults face increased vulnerability to negative life outcomes, providing any "'affirmative' treatment," particularly to adolescents, is experimental

and unethical.  (Swaminathan Decl., Ex. A ¶¶ 18i, 18kl, 154.)  This opinion cannot satisfy the reliability standard because Dr. Levine cherry-picks studies and misrepresents others, and because he has previously testified that he authorizes both hormone therapy and, where appropriate, surgical interventions for his own patients—*i.e.*, the very forms of care he suggests in his report are experimental and unethical.[1]

     Dr. Levine ignores studies contrary to his belief and omits recent studies demonstrating that medical treatments for transgender adolescents and adults have favorable outcomes across many measures.[2]  Additionally, in an effort to support his own view, Dr. Levine distorts studies

---

[1] (Swaminathan Decl., Ex. E at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: do you think because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").)

[2] Laura E. Kuper et al., Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy, 145 Pediatrics e20193006 (2020). doi: 10.1542/peds.2019-3006.; Polly Carmichael et al., Short-term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old People with Persistent Gender Dysphoria in the UK, 16 PLOS ONE e0243894 (2021). doi: 10.1371/journal.pone.0243894.; Valeria P. Bustos et al., Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence, 9 Plastic and Reconstructive Surgery Global Open e3477 (2021).doi: 10.1097/gox.0000000000003477;Anna I.R. van der Miesen et al., Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers, 66 Journal of Adolescent Health 699-704 (2020). doi: 10.1016/j.jadohealth.2019.12.018.; Rikke Simonsen et al., Sociodemographic Study of Danish Individuals Diagnosed with Transsexualism, 3 Sexual Medicine 109-117 (2015); Mohammad Hassan Murad et al., Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes, 72 Clinical Endocrinology 214-231 (2010); Anthony N. Almazan & Alex S.

beyond the authors' explicit intentions or design. In particular, a plethora of studies show that trans people experience pervasive stigma and discrimination, resulting in health disparities. Dr. Levine baselessly claims that receiving gender-confirming care *causes* those disparities and is therefore experimental, relying most heavily on two articles that expressly do not support this assertion. (Swaminathan Decl., Ex. A ¶ 155.) First, he relies on a study by Cecilia Dhejne, a scholar in the field who has publicly and specifically said that Dr. Levine's assertion is a mischaracterization of her work. (*Id*.) Her study directly states that it is not designed to "address whether [gender-affirming care] is an effective treatment or not," (*see* Swaminathan Decl, Ex. F at 2), yet that is exactly the purpose for which Dr. Levine attempts to use it. When confronted at deposition in *Kadel* about the inapplicability of Dr. Dhejne's work to his personal theory, Dr. Levine admitted that the study design created a serious limitation in drawing any conclusions about the efficacy of the care. (Swaminathan Decl., Ex. H at 156:7-11.) The second study (Simonsen 2015) that Dr. Levine misrepresents to support his claim that gender confirming care is experimental likewise cautioned that it should not be used to evaluate whether or not gender affirming care is beneficial. (Swaminathan Decl., Ex. A ¶ 155.) Despite this warning, Dr. Levine implies that the article demonstrates a causal relationship between receiving gender-confirming surgery and higher death rates. (*Id*.) But the Simonsen study itself states that "the present study design does not allow for determination of causal relations between HT (hormone therapy) and SRS (sex reassignment surgery) and somatic morbidity or mortality." (*See* Swaminathan Decl., Ex. G at 241–47.)

---

Keuroghlian, Association Between Gender-Affirming Surgeries and Mental Health Outcomes, JAMA Surgery (2021). doi: 10.1001/jamasurg.2021.0952.

19

Ultimately, Dr. Levine fails to cite any literature that supports his belief that gender confirming care is experimental and unethical.  Moreover, despite his arguments about gender confirming care in his expert report, Dr. Levine authorizes exactly this care for his patients who need it.  (Swaminathan Decl., Ex. H at 55:13-17; 56:2-5; 112:16-21; 176:8-16.)  When asked if he believes that because a study showed that some people committed suicide *no patient* should be able to access gender affirming surgery, Dr. Levine responded, "that would be illogical."  (*Id*. at 151:25–152:6.)  And when asked if all the concerns he has are justifications for denying medical interventions to all people with gender dysphoria, he responded, "I'm not advocating denying endocrine treatment or surgical treatment."  (*Id*. at 85:4-11.)

**4.     Dr. Levine's Opinions Directly Contradict The Fourth Circuit's Holding In *Grimm*.**

Dr. Levine's opinions contradict the clear medical consensus described in binding Fourth Circuit precedent.  Because the Fourth Circuit's precedent informs review of the issues, Dr. Levine's opinions do not help this Court.  The Fourth Circuit's detailed discussion of this consensus in the recently decided *Grimm v. Gloucester Cnty. Sch. Bd.* help demonstrate that Dr. Levine's opinions are unreliable.  His attempts to disparage the credibility of the WPATH and diminish the SOC as ideological and unscientific fail and are ironically contrary to his testimony about treatment he provides transgender patients in private practice, which follows the SOC.  (Swaminathan Decl., Ex. A ¶¶ 69–73.)  Additionally, his "opinion" is unreliable, as it directly contravenes the consensus described by the Fourth Circuit in *Grimm*:

> Fortunately, we now have modern accepted treatment protocols for gender dysphoria. Developed by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) (hereinafter "WPATH Standards of Care") represent the consensus approach of the medical and mental health community, Br. of Medical Amici 13, and have been recognized by various courts, including this one, as the authoritative standards of care, *see*

20

> *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *see also Edmo*, 935 F.3d at 769; *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *vacated sub nom. Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257 (11th Cir. 2020). There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Edmo*, 935 F.3d at 769 (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

*Grimm*, 972 F.3d at 595–96. Further irreconcilable with available data and the consensus of the medical community, Dr. Levine asserts that gender dysphoria is a psychiatric condition. (Swaminathan Decl., Ex. A ¶ 92.) The Fourth Circuit disagrees, holding that: "Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm*, 972 F.3d at 594 (internal quotations omitted); *see also Kadel v. N.C. State Health Plan for Tchr.s & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021).

As Judge Gregory observed in an appeal involving healthcare for transgender people, "just like being cisgender, being transgender is natural and is not a choice." *Kadel*, 12 F.4th at 427 (Gregory, J.) (quoting *Grimm*, 972 F.3d at 594). Dr. Levine testified, "[I]f I could put [young people that were experiencing gender dysphoria] on a pathway of being non-transgender, I would expect that the vast majority of them would end up to be homosexual in their orientation" and "cisgender." (Swaminathan Decl., Ex. B at 223:12-25.)[3] But the Fourth Circuit has found that "mental health practitioners' attempt[s] to convert transgender people's gender identity to conform with their sex assigned at birth . . . did not alleviate dysphoria, but rather caused shame and

---

[3] Dr. Levine further testified that "even though medical psychiatric knowledge does not know how to transform a person from a trans state to a cis state or a previous state, it doesn't mean that life doesn't transform people into detransitioned people." (*Id*. at 228:12–230:3.)

psychological pain." *Grimm*, 972 F.3d at 595.  Fourth Circuit precedent renders much of Dr. Levine's testimony unreliable.

5.    **Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.**

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony.  Fed. R. Evid. 403.  As noted above, Dr. Levine offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are unreliable and in direct conflict with Fourth Circuit precedent.  Consideration of his testimony would create confusion and result in prejudice, as the testimony seeks to challenge Plaintiffs' gender identity, gender dysphoria diagnosis, and the care that she and other transgender youth receive—all issues that are unrelated to whether the State of West Virginia can prevent B.P.J. from running on the girls' cross-country and track teams at her middle school based on her transgender status.  Accordingly, Dr. Levine's testimony fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

**CONCLUSION**

WHEREFORE, based on the foregoing, Plaintiff respectfully requests that this Court grant

the instant motion and exclude all of Dr. Levine's purported expert testimony because it is not

admissible under *Daubert* and the Federal Rules of Evidence.

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com
*Visiting Attorneys
Attorneys for Plaintiff*

23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>     *Plaintiff*,<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>     *Defendants*,<br><br>  and<br><br>LAINEY ARMISTEAD,<br><br>     *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

### CERTIFICATE OF SERVICE

  I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true and exact copy of *Plaintiff's Memorandum of Law in Support of Motion to Exclude the Expert Testimony of Stephen B. Levine* with the Clerk of Court and all parties using the CM/ECF System.

          */s/ Loree Stark*
          Loree Stark
          West Virginia Bar No. 12936

24

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Civil Action No. 2:21-cv-00316 Hon. Joseph R. Goodwin |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF CHAD T. CARLSON**

**TABLE OF CONTENTS**

<b>Page</b>

INTRODUCTION AND BACKGROUND ................................................................................. 1

LEGAL STANDARD....................................................................................................................... 3

ARGUMENT ...................................................................................................................................... 4

I.     DR. CARLSON'S OPINIONS REGARDING PREPUBERTAL CHILDREN
       AND TRANSGENDER GIRLS WHO RECEIVE PUBERTY-DELAYING
       MEDICATION SHOULD BE EXCLUDED. ................................................................. 4

II.    DR. CARLSON'S OPINION THAT THE EXISTING DATA SUPPORTS A
       CATEGORICAL BAN ON TRANSGENDER GIRLS AND WOMEN SHOULD
       BE EXCLUDED. .................................................................................................................. 8

CONCLUSION................................................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ...................................................................9, 12

*Bellitto v. Snipes*,
    302 F. Supp. 3d 1335 (S.D. Fla. 2017) .................................................................4

*CCM Rochester, Inc. v. Federated Invs., Inc.*,
    No. 14 Civ. 3600, 2016 WL 11617452 (S.D.N.Y. Aug. 31, 2016) ........................7

*Eberli v. Cirrus Design Corp.*,
    615 F. Supp. 2d 1357 (S.D. Fla. 2009) ...........................................................7, 12

*Hines v. Wyeth*,
    No. 04 Civ. 0690, 2011 WL 2680842 (S.D.W. Va. July 8, 2011).........................10

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
    790 F.3d 532 (4th Cir. 2015) ...............................................................................3

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
    892 F.3d 624 (4th Cir. 2018) ...............................................................................3

*Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.*,
    No. 06 Civ. 1164, 2010 WL 3907489 (N.D.N.Y. Sept. 30, 2010) .........................6

*Oglesby v. Gen. Motors Corp.*,
    190 F.3d 244 (4th Cir. 1999) .............................................................................13

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) .............................................................................10

*Rosen v. Ciba–Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996) ..................................................................................9

*Rover Pipeline LLC v. Rover Tract No(s). WV-MA-ML-056.500-ROW & WV-MA-ML-056.500-ATWS*,
    No. 18 Civ. 68, 2021 WL 3424270 (N.D.W. Va. Aug. 5, 2021)............................3

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) .............................................................................2, 3

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

**Statutes**

Title IX of the Education Amendments of 1972
    20 U.S.C. § 1681, et seq...........................................................................................1

**Other Authorities**

Fed. R. Civ. P. 56(c)(2)............................................................................................3

Federal Rule of Evidence
    702.................................................................................................... *passim*
    703...........................................................................................................6

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of Chad T. Carlson, M.D., FACSM from consideration at summary judgment or trial.

## INTRODUCTION AND BACKGROUND

Plaintiff B.P.J. is a 12-year-old girl who is transgender.  Because she is transgender, B.P.J. is categorically prohibited from participating with other girls on her middle school's cross-country or track and field teams as a result of H.B. 3293.  B.P.J. brought this lawsuit to challenge this categorical exclusion as violating B.P.J.'s right to be free from discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment.

As part of their defense of H.B. 3293, Defendants identified and disclosed an expert report from Chad T. Carlson, M.D., FACSM to support their contention that H.B. 3293 advances a governmental interest in protecting safety.  In his report, Dr. Carlson states that "[m]ales exhibit large average advantages in size, weight, and physical capacity over females—often falling far outside female ranges," and that "[f]ailure to preserve protected female-only categories in contact sports (broadly defined) will ultimately increase both the frequency and severity of injury suffered by female athletes who share playing space with these males."  (Dkt. No. 289-32 (Carlson Rep.) ¶ 11(c).)  Dr. Carlson further opines that "suppression of testosterone levels by males"—a term Dr. Carlson equates with transgender girls and women who have already begun puberty—will not fully reverse the effects of testosterone on skeletal size, strength, or muscle hypertrophy, leading to persistence of sex-based differences in power, speed, and force-generating capacity."  (*Id.* at ¶ 11(d).)  As detailed below, these assertions are beyond Dr. Carlson's expertise, are not based on sufficient facts or data, and are not derived from sufficiently rigorous methodology, and accordingly should be excluded.

1

Dr. Carlson is a sports medicine physician, with no professional expertise in endocrinology and no professional education or training regarding transgender people. (Dkt. No. 289-33 (Carlson Dep.) at 24:8-12, 72:6-23.) Before writing his expert declarations in this case, Dr. Carlson had never written any publications on the topic of transgender people. (*Id.* at 44:14-45:8.) To the best of his knowledge, Dr. Carlson does not know if he has even treated a transgender patient. (*Id.* at 69:16-18.)

Dr. Carlson is a current or former member of the Christian Medical & Dental Association, which provided Dr. Carlson's name to the Alliance Defending Freedom as a person who could provide an expert declaration on sports safety. (Dkt. No. 289-33 (Carlson Dep.) 30:23-31:7, 32:21-33:14.) Dr. Carlson provided the following description of the process he went through to create his first expert declaration as follows: "I met with one of the attorneys from Alliance Defending Freedom, I outlined with him what we thought might be an appropriate take on this paper, and then both of us did literature searches. I compiled what I thought was relevant for the paper." (Dkt. No. 289-33 (Carlson Dep.) 51:17-51:22.)

As discussed below, although Dr. Carlson may have expertise in the mechanics of sports injury and in sex-based differences between cisgender men and women, Dr. Carlson ventures far beyond that expertise when he attempts to extrapolate that information to transgender girls and women. Because Dr. Carlson's testimony regarding transgender girls and women is not "based on sufficient facts or data" and is not "the product of reliable principles and methods," his proffered opinions do not qualify under Federal Rule of Evidence 702 as admissible expert testimony. The Court should exercise its "special gatekeeping obligation" and exclude his testimony from consideration at summary judgment or trial. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021).

# LEGAL STANDARD

Federal Rule of Evidence 702 "permits an expert to testify where the expert's 'scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,' so long as the expert's opinion is 'based on sufficient facts or data,' 'is the product of reliable principles and methods,' and the expert 'has reliably applied the principles and methods to the facts of the case.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting Fed. R. Evid. 702). "Rule 702 thus imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis*, 10 F.4th at 281 (internal quotation marks and citations omitted). If an expert's testimony is "alleged to be unreliable, then the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. While district courts have broad discretion in analyzing reliability, such discretion does not include the decision to abandon the gatekeeping function." *Id.* at 282 (internal quotation marks and citations omitted).

Rule 702 applies with full force when ruling on a motion for summary judgment even when the case is scheduled for a bench trial. Summary judgment cannot be granted or denied based on evidentiary material that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015). Thus, when the evidence related to a material question of fact comes in the form of expert testimony, "the propriety of summary judgment hinges on whether [the] expert evidence is admissible before this Court" under Rule 702. *Rover Pipeline LLC v. Rover Tract No(s). WV-MA-ML-056.500-ROW & WV-MA-ML-056.500-ATWS*, No. 18 Civ. 68, 2021 WL 3424270, at *3 (N.D.W. Va. Aug. 5, 2021); *accord Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1347 (S.D. Fla. 2017).

3

**ARGUMENT**

**I.    Dr. Carlson's Opinions Regarding Prepubertal Children And Transgender Girls Who Receive Puberty-Delaying Medication Should Be Excluded.**

The Court should exclude Dr. Carlson's opinions regarding alleged safety implications of allowing transgender girls and women to participate on female sports teams if they have not gone through endogenous puberty as a result of puberty-delaying medication and gender-affirming hormones. As discussed below, Dr. Carlson's newfound views on this topic are based on his own independent expertise and simply parrot the unreliable opinions of one of Defendants' other proffered experts.

There is a broad consensus in the scientific literature that the primary biological basis for differences in athletic performance between men and women is the rise in circulating levels of testosterone beginning in endogenous male puberty. (Dkt. No. 289-25 (Safer Rep.) ¶ 25.) Accordingly, even the highly restrictive policy of World Rugby—which Dr. Carlson praises as "rooted in objective facts," "objective risks of harm," and "real, acknowledged, and documented physical differences"—provides that "[t]ransgender women who transitioned pre-puberty and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby (subject to confirmation of medical treatment and the timing thereof)." (Dkt. No. 49-8 (Ex. H - World Rugby guidelines).)

Prior to his expert report filed in support of the State's motion for summary judgment, Dr. Carlson did not dispute this consensus. At the preliminary injunction stage of this case, Dr. Carlson filed a declaration in support of the State's opposition to Plaintiff's Motion for a Preliminary Injunction, which he called a "White Paper . . . Concerning Injury Risks Associated With Transgender Participation in Female Athletics." (Dkt. No. 49-7.) In that declaration, Dr. Carlson explained that he was "offer[ing] information on his own professional opinion on the potential for

4

increased injury risk to females in sports when they compete against biologically male transgender athletes." (Dkt. No. 49-7 ¶ 8.) The full extent of Dr. Carlson's opinion on the topic focused exclusively on physiological differences that develop once circulating levels of testosterone rise during a typically male puberty. (*See* Dkt. No. 49-7 ¶ 18 ("Children don't play contact sports with adults and, as has already been discussed, after the onset of puberty, men and women compete in categories specific to their own biological sex."); *id.* ¶ 40 ("All of us are familiar with basic objective physiological differences between the sexes which become apparent after the onset of puberty and persist throughout adulthood."); *id.* ¶ 79 ("As a medical doctor, I will focus on those specific sex-based characteristics of males who have undergone normal sex-determined pubertal skeletal growth and maturation that are relevant to the safety of female athletes.").)

But after this Court granted Plaintiff's Motion for a Preliminary Injunction and highlighted the fact that B.P.J. is receiving puberty blocking medication, Dr. Carlson was asked by Defendants to "update" his report to address prepubertal youth. (Dkt. No. 289-33 (Carlson Dep.) at 99:14-19.) The expert report Dr. Carlson ultimately filed—unlike the declaration filed in opposition to the preliminary injunction—was edited to insert new references to alleged differences in prepubertal children that Dr. Carlson had not included in his original report. (Dkt. No. 289-32 (Carlson Rep.) ¶ 11(c) ("Even before puberty, males have a performance advantage over females in most athletic events."); *id.* at ¶ 16 ("Although most easily documented in athletes who have gone through puberty, these differences are not exclusively limited to post-pubescent athletes either."); *id.* at ¶ 17 ("In sum, a large and unbridgeable performance gap between the sexes is well-studied and equally well-documented, beginning in many cases before puberty."); *id.* at ¶ 25 (references "real, acknowledged, and documented physical differences between the sexes (in many cases before adolescence)"); *id.* at ¶ 42 ("All of us are familiar with basic objective physiological differences

5

between the sexes, *some of which exist in childhood*, and some of which become apparent after the onset of puberty, and persist throughout adulthood.") (emphasis added or reflect new language).)

Dr. Carlson's newfound views on the matter were not the product of independent expertise or rigorous, data-driven study. Rather, Dr. Carlson's report merely cites to the separate expert report filed by another one of Defendants' putative experts, Dr. Gregory Brown. "While an expert may rely upon another expert to form an opinion under Rule 703, an expert may not merely recite another expert's opinion as his own." *Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.*, No. 06 Civ. 1164, 2010 WL 3907489, at *27 (N.D.N.Y. Sept. 30, 2010). That is exactly what Dr. Carlson did here:

> I have reviewed the expert declaration of Gregory A. Brown, Ph.D., FACM of February 23, 2022, provided in this case, which includes evidence from a wide variety of sources, including population-based mass testing data, as well as age-stratified competition results, all of which support the idea that prepubertal males run faster, jump higher and farther, exhibit higher aerobic power output, and have greater upper body strength (evidenced by stronger hand grip and better performance with chin-ups or bent arm hang) than comparably aged females. This performance gap is well-documented in population-based physiologic testing data that exists in databases such as the Presidential Fitness Test, the Eurofit Fitness test, and additional mass testing data from the UK and Australia. Collectively, this data reveals that pre-pubertal males outperform comparably aged females in a wide array of athletic tests including but not limited to the countermovement jump test, drop jump test, change of direction test, long jump, timed sit-up test, the 10 X 5 meter shuttle run test, the 20 meter shuttle run test, curl-ups, pull-ups, push-ups, one mile run, standing broad jump, and bent arm hang test. Dr. Brown further references studies showing a significant difference in the body composition of males and females before puberty. In sum, a large and unbridgeable performance gap between the sexes is well-studied and equally well-documented, beginning in many cases before puberty.

(Dkt. No. 289-32 (Carlson Rep.) ¶ 17.) Although Dr. Carlson asserted at his deposition that he had done additional research through "PubMed" when "updating" his report, he could not recall any additional sources that he relied on during his deposition when asked. (*See* Dkt. No. 289-33 (Carlson Dep.) at 105:13-14, 105:25-106:4.) Because Dr. Carlson's proffered testimony "merely

regurgitate[s]" the findings of Dr. Brown, he has no independent basis to present those opinions as separate expert testimony. *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009).

Even if Dr. Carlson were permitted to parrot Dr. Brown's testimony as his own, Plaintiff has filed a separate motion to exclude Dr. Brown's testimony regarding prepubertal children because those opinions do not reflect a reliable application of scientific principles or methods. Dr. Brown's opinions are built on cherry-picked surveys of the literature, raw data never subjected to peer review, a failure to discuss contrary studies on which Dr. Brown previously relied, and a long chain of speculation. For all the same reasons why Dr. Brown's opinions on these issues are inadmissible under Rule 702, those opinions are also inadmissible when parroted by Dr. Carlson. "[T]heir opinions rise and fall together." *CCM Rochester, Inc. v. Federated Invs., Inc.*, No. 14 Civ. 3600, 2016 WL 11617452, at *7 (S.D.N.Y. Aug. 31, 2016).

Dr. Carlson engaged in even more speculation during his deposition when he purported to offer an additional expert opinion not found in his report or declaration on how these assertions regarding prepubertal youth were relevant to transgender girls and women who receive puberty-delaying medication followed by gender affirming hormones. Dr. Carlson did not previously address the topic of puberty-delaying medication in either his expert report or declaration. For that reason alone, Dr. Carlson's opinions regarding puberty-delaying medication must be excluded.

Even if Dr. Carlson's opinions regarding puberty-delaying medication had been timely disclosed, Dr. Carlson is not qualified to offer them. Dr. Carlson is not an endocrinologist, and at his deposition he repeatedly disclaimed any basis to offer an expert opinion on the physiological effects of puberty-delaying medication followed by gender-affirming hormones. (*See* Dkt. No. 289-33 (Carlson Dep.) at 75:8-10.) But Dr. Carlson nevertheless expressed at his deposition the

alleged expert opinion that "there is retained difference in lean body mass" in transgender girls and women who receive puberty-delaying medication when compared with cisgender girls and women.  (*Id.* at 116:17-24.)  Dr. Carlson's only basis for that assertion was an article from 2018 that he read for the first time when preparing for the deposition after his expert report had been submitted.  (Dkt. No. 289-33 (Carlson Dep.) 116:17-117:17, 146:10-25, 150:5-151:12.)

As discussed in Plaintiff's separate memorandum in support of the motion to exclude the expert testimony of Dr. Brown, the 2018 article by Klaver et al. involved a cohort of transgender women who already experienced approximately two years of endogenous puberty before receiving puberty-blocking medication and therefore are not representative of transgender girls who—like B.P.J.—receive puberty blocking medication at the beginning of the Tanner 2 stage of pubertal development in accordance with the Endocrine Society Guidelines.  Moreover, the Klaver 2018 study did not provide any data to support the assumption that the minor observed differences in percentage of lean body mass for the transgender women in the study actually translated into any athletic advantages compared with cisgender women.  For all the reasons that the Klaver 2018 article forms an insufficient basis for Dr. Brown's expert opinions, it forms an insufficient basis for Dr. Carlson's expert opinion as well.

## II.    Dr. Carlson's Opinion That The Existing Data Supports A Categorical Ban On Transgender Girls And Women Should Be Excluded.

The Court should also exclude Dr. Carlson's opinion that the current data on injury risk is sufficient to support a categorical ban on the participation of girls and women who are transgender in contact or collision sports teams with other girls and women.  "Under the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999) (quoting *Rosen v. Ciba-*

*Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996)) (alterations incorporated).  But in the conclusion of

his report, Dr. Carlson engages in precisely the sort of "unscientific speculation" that Rule 702

forbids:

> [I]t is my view as a medical doctor that policymakers have an important and
> pressing duty not to wait while avoidable injuries are inflicted on girls and women,
> but instead to proactively establish policies governing participation of biological
> males in female athletics that give proper and scientifically-based priority to safety
> in sport for these girls and women. Separating participants in contact sports based
> on biological sex preserves competitive equity, but also promotes the safety of
> female athletes by protecting them from predictable and preventable injury.
> Otherwise, the hard science that I have reviewed in this white paper leaves little
> doubt that eligibility policies based on ideology or gender identity rather than
> science, will, over time, result in increased, and more serious, injuries to girls and
> women who are forced to compete against biologically male transgender athletes.
> When basic science and physiology both predict increased injury, then leagues,
> policymakers, and legislators have a responsibility to act to protect girls and women
> before they get hurt.

(Dkt. No. 289-32 (Carlson Rep.) at 59-60.)  These sweeping policy assertions pertain to topics on

which Dr. Carlson admits he has no expertise and are based on speculative and inaccurate

assumptions about the physiological characteristics of girls and women who are transgender.

As an initial matter, although Dr. Carlson purports to offer policy recommendations in his

expert report, Dr. Carlson specifically and repeatedly disclaimed any expert basis for doing so

during his deposition.  Although Dr. Carlson asserted that the participation of transgender girls

and women created an increased quantum of risk, he repeatedly testified that he could not quantify

the degree of risk or compare it to the safety risks when cisgender girls compete other cisgender

girls who are larger-than-average or faster-than-average.  (Dkt. No. 289-33 (Carlson Dep.) at

122:22-24, 136:8-13.)  When asked whether he believed that quantifying the degree of risk is

relevant information when determining whether the risk justifies an exclusion of transgender girls,

Dr. Carlson responded "That's a policy issue. That's not my job. My job is just to say is there a

risk." (*Id.* at 129:9-10.)

Dr. Carlson also disclaimed an expert basis for offering policy recommendations on related matters. When asked whether the safety risk inherent in contact and collision sports was high enough to warrant eliminating contact and collision sports altogether, Dr. Carlson stated "that's a societal—that's not why I was retained for this. I was retained to speak to safety issues as exist in sport, not whether a sport ought to continue." (*Id.* at 195:22-25.) Similarly, when asked whether the participation of women with complete androgen insensitivity syndrome created safety risks that would justify their exclusion from girls' and women's sports teams, Dr. Carlson responded: "[M]y report speaks to safety issues and whether there are risks for (technical difficulty) faster individuals to participate in pools of athletes who don't share those same traits. It's not my job to create policy or decide which groups are more appropriate." (*Id.* at 25:17-22.)

Thus, by Dr. Carlson's own repeated admission, he has no expertise in providing recommendations on which population groups should and should not be excluded from participation based on alleged safety risks. His opinion "as a medical doctor" regarding the steps policy makers should take when addressing safety risks is "mere personal opinion and thus inadmissible." *Hines v. Wyeth*, No. 04 Civ. 0690, 2011 WL 2680842, at *5 (S.D.W. Va. July 8, 2011), *order clarified on reconsideration*, No. 04 Civ. 0690, 2011 WL 2730908 (S.D.W. Va. July 13, 2011); *accord Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) ("[P]ersonal opinion testimony is inadmissible as a matter of law under Rule 702.").

Moreover, even if he had a basis to offer an expert opinion, Dr. Carlson's recommendations are premised on uninformed speculation and guesswork. Dr. Carlson acknowledges that there are intra-sex differentiations among cisgender women in terms of size, speed, and strength that could lead to increased safety risks for other athletes. (Dkt. No. 289-32 (Carlson Rep.) ¶ 78.) If the presence of an athlete above a certain threshold height or body weight were to pose an

unacceptably heightened risk to safety in particular contact or collision sports, then there is no logical reason to exclude all transgender girls (even when they fall below that threshold) while allowing a potentially greater number of cisgender girls to participate (even when they fall above that threshold). Sporting organizations can provide generally applicable limitations on height or weight for all girls and women—whether transgender or cisgender—without using transgender status as an inaccurate proxy. (*See* Dkt. No. 289-26 (Safer Rebuttal) ¶ 27.)

To justify excluding transgender girls and women, but not cisgender girls and women, Dr. Carlson reasons that "within sex-specific pools, size differential is somewhat predictable and bounded, even considering outliers," but when people assigned male at birth participate on girls' and women's teams, "there is an increased possibility that a statistical outlier in terms of size, weight, speed, and strength—and potentially an extreme outlier—is now entering the [cisgender] female pool." (Dkt. No. 289-32 (Carlson Rep.) ¶ 78.) Yet Dr. Carlson provides no evidence that there actually is a greater statistical likelihood of cisgender athletes encountering a "statistical outlier" who is transgender than encountering a "statistical outlier" who is cisgender, and such a result is questionable in light of the small percentage of the population that is transgender and the smaller percentage of transgender students participating in team sports. Contrary to his uninformed speculation about the risks posed by transgender girls and women, Dr. Carlson acknowledges that some transgender girls and women "have indeed competed in a variety of girls' and women's contact sports," (*id.* at 59), and that he is not aware of any evidence that the participation of those transgender girls and women actually led to an increase in the rate or severity of injury for cisgender girls and women participating with them. (Dkt. No. 289-33 (Carlson Dep.) at 156:9-16.) "While scientific testimony need not be known to a certainty, *Daubert* does require that assertions be derived from 'scientific knowledge,'" which must be "more than subjective

belief or unsupported speculation." *Allison*, 184 F.3d at 1319 n.23.  But Dr. Carlson presents no data other than his own intuition.

Dr. Carlson also speculates that injuries will increase because the number of transgender participants "up till now have been small" and "recent studies have reported very large increases in the number of children and young people identifying as transgender compared to historical experience."  (Dkt. No. 289-32 (Carlson Rep.) at 59.)  But he admitted during his deposition that the source he cited for that proposition, a survey of high school students in Minnesota, reported the number of students who identified as transgender *or gender-nonconforming*, a term defined in the study as people who do "not follow stereotypical conventions of masculinity and femininity and who may or may not identify as transgender."  (Dkt. No. 289-33 (Carlson Dep.) at 215:14–216:5.)  The Minnesota study—in addition to being an unduly small sample size—does not show a "very large increase[] in the number of children and young people identifying as transgender," (Dkt. No. 289-32 (Carlson Rep.) at 63), nor does it have as its aim data collection or analysis about how many of those children might participate in school sports.

Dr. Carlson's speculations about epidemiology, and his mistaken use of an article that does not support his claims, do not qualify as "sufficient facts or data" or "reliable principles and methods" for presenting expert testimony under Rule 702.  To the contrary, Dr. Carlson's opinions represent "exactly the sort of unscientific speculation that *Daubert* was designed to exclude." *Eberli*, 615 F. Supp. 2d at 1365.  Dr. Carlson's statement that "policy makers have an important and pressing duty to act when" when "[f]aced with this rapid social change," (Dkt. No. 289-32 (Carlson Rep.) at 60), is simply the product of his own "belief or speculation," and not based on the "scientific, technical, or other specialized *knowledge*" that Rule 702 demands. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

12

A-229

**CONCLUSION**

For the foregoing reasons, the Court should enter an order excluding the proffered expert testimony of Chad T. Carlson, M.D., FACSM from consideration at summary judgment or trial.

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Swaminathan*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
cSwaminathan@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true and exact copy of ***Plaintiff's Memorandum of Law in Support of Motion To Exclude the Expert Testimony of Chad T. Carlson*** with the Clerk of Court and all parties using the CM/ECF System.

/s/ Loree Stark
Loree Stark
West Virginia Bar No. 12936

15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**PLAINTIFF'S MOTION TO RECONSIDER THE GRANT OF
LAINEY ARMISTEAD'S PERMISSIVE INTERVENTION**

Plaintiff, pursuant to Federal Rule of Civil Procedure 54(b), moves the Court to reconsider its order granting Lainey Armistead's permissive intervention. This motion is based upon the attached Memorandum of Law, Declaration of Valeria M. Pelet del Toro ("Pelet del Toro Decl."), as well as the pleadings, records, and papers on file with this Court.

Lainey Armistead's status as Defendant-Intervenor is no longer viable in this case because she no longer has a significantly protectable interest at stake, as she graduated from West Virginia State University in May 2022 and has no plans to play on a scholastic women's soccer team; she

1

has significantly burdened the discovery process and her continued presence in the case will cause

further inefficiency; and she has not made any legal arguments that are not already advanced by

other Defendants.

For these reasons, Plaintiff respectfully requests that the Court reconsider its order granting

Lainey Armistead's permissive intervention and revoke her status as Defendant-Intervenor.

Dated: May 26, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor

2

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

            *Plaintiff*,

    v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

            *Defendants*,

    and

LAINEY ARMISTEAD,

            *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

### CERTIFICATE OF SERVICE

    I, Loree Stark, do hereby certify that on this 26th day of May, 2022, I electronically filed a

true and exact copy of ***Plaintiff's Motion to Reconsider the Grant of Lainey Armistead's***

***Permissive Intervention*** with the Clerk of Court and all parties using the CM/ECF System.

                              */s/ Loree Stark*
                              Loree Stark
                              West Virginia Bar No. 12936

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Civil Action No. 2:21-cv-00316  Hon. Joseph R. Goodwin |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER THE GRANT OF LAINEY ARMISTEAD'S PERMISSIVE INTERVENTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND BACKGROUND ..................................................................... 1

LEGAL STANDARD .................................................................................................... 2

ARGUMENT .................................................................................................................. 4

    I.      Ms. Armistead No Longer Has A Significantly Protectable Interest At Stake And Does Not Provide A Unique Perspective. ........................................... 4

            A.      Ms. Armistead Graduated From WVSU In May 2022. ............................ 4

            B.      Ms. Armistead's Briefing Does Not Align With Her Personal Views Expressed At Her Deposition. ........................................................ 6

            C.      Reconsideration Is Warranted In Light Of These Developments. ............. 7

    II.     Ms. Armistead Significantly Burdened The Discovery Process And Keeping Her In This Case Will Continue To Add Undue Complications............ 8

    III.   Ms. Armistead Has Not Made Unique Arguments. ............................................ 11

CONCLUSION ............................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceptance Indem. Ins. Co v. Se. Forge, Inc.*,
   209 F.R.D. 697 (M.D. Ga. 2002) .............................................2

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
   326 F.3d 505 (4th Cir. 2003) ..................................................2

*Carlson v. Bos. Sci. Corp.*,
   856 F.3d 320 (4th Cir. 2017) ..................................................3

*City of Greensboro v. Guilford Cnty. Bd. of Elections*,
   No. 15 Civ. 559, 2015 WL 12752936 (M.D.N.C. Oct. 30, 2015) ........................................3, 4

*Grimm v. Gloucester County School Board*,
   972 F.3d 586 (4th Cir. 2020) ..................................................11, 12

*Illinois v. City of Chicago*,
   No. 17 Civ. 6260, 2018 WL 3920816 (N.D. Ill. Aug. 16, 2018) .............................................3

*Mallory v. Eyrich*,
   922 F.2d 1273 (6th Cir. 1991) ................................................2

*Mishewal Wappo Tribe of Alexander Valley v. Salazar*,
   No. 9 Civ. 2502, 2012 WL 4717814 (N.D. Cal. Sept. 28, 2012)......................................7, 8, 9

*Morgan v. McDonough*,
   726 F.2d 11 (1st Cir. 1984) ...................................................2

*Penn. Higher Edu. Assistance Agency v. Hoh*,
   No. 14 Civ. 748, 2016 WL 815287 (S.D. W.Va. Feb. 29, 2016) .............................................3

*Pinney v. Nokia, Inc.*,
   402 F.3d 430 (4th Cir. 2005) ..................................................3

*State v. City of Chicago*,
   912 F.3d 979 (7th Cir. 2019) ..................................................8

*Sutphin v. Ethicon, Inc.*,
   No. 14 Civ. 1379, 2020 WL 5269409 (S.D. W.Va. Sept. 3, 2020) .............................................3

*United States v. First Trust & Sav. Bank, Clarksville, Tenn.*,
   No. 77 Civ. 3296, 1977 WL 1265 (M.D. Tenn. Aug. 29, 1977) .............................................8

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**Other Authorities**

Federal Rule of Civil Procedure
    54(b) ................................................................................................................. 2, 3, 7
    59(e) ....................................................................................................................... 3

A-240

## INTRODUCTION AND BACKGROUND

Lainey Armistead's status as Defendant-Intervenor in this case is no longer appropriate. Ms. Armistead sought to intervene on the premise that, as a female athlete in West Virginia, she has a significant interest that could be affected by this litigation; that she would not burden or prejudice the proceedings; and that she would offer legal arguments different from those advanced by the named Defendants. (Dkt. No. 95 (Memo. ISO Mot. to Intervene).) This Court granted her motion, finding that "Ms. Armistead plans to defend H.B. 3293 as a member of the class of people for whom the law was written" and so "will add a perspective not represented by any of the current defendants"; that she "will not significantly add to the parties' discovery burdens"; and that she would make "several arguments . . . that will differ from those of the current defendants." (Dkt. No. 130 (Intervention Order) at 6.) Since the Court issued its order, however, changed circumstances have nullified the first consideration, and the realities of the case's litigation have disproved the second and third.

Critically, Ms. Armistead is no longer "a member of the class of people for whom the law was written." She graduated from West Virginia State University ("WVSU") in May 2022 and will soon move to Florida to attend law school, where she has no plans to play on a scholastic women's soccer team. (Dkt. No. 300 (Supp. Armistead Decl.) at 5 ¶¶ 5–7.) Even before this development, when she was still a West Virginia student athlete, her briefing barely made any mention of her personal perspective. In addition, Ms. Armistead's conduct during the discovery period prejudiced Plaintiff, and, despite her promise to do so, she has not offered the Court any legal arguments in support of H.B. 3293 that are not also advanced by Defendant State of West Virginia ("State").

1

Ms. Armistead suggests that because she "is already a party to this case," she is entitled to continue to participate in this action. (Dkt. No. 302 (Int. MSJ Opp.) at 25–26.) But intervention does not signify "absolute entitlement to continue as a party until termination of the suit." *Morgan v. McDonough*, 726 F.2d 11, 14 (1st Cir. 1984). Courts can and do revisit decisions granting intervention when circumstances change or predicted facts are not borne out. This Court should re-examine its order granting Ms. Armistead's permissive intervention and rescind her status as Defendant-Intervenor.

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment," and "a district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). That power includes the ability to reconsider orders granting intervention. *See, e.g.*, *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991) ("If the plaintiffs should seek reconsideration of the order granting intervention, the district court has authority to reexamine the question of intervention of right, hold whatever hearings it deems advisable, and redetermine the issue in light of its findings and conclusions.").[1]

---

[1] An order granting a motion to intervene is interlocutory in nature. *See Acceptance Indem. Ins. Co v. Se. Forge, Inc.*, 209 F.R.D. 697, 701 (M.D. Ga. 2002) (citation omitted).

2

The power to reconsider an interlocutory order "is committed to the discretion of the district court." *Penn. Higher Edu. Assistance Agency v. Hoh*, No. 14 Civ. 748, 2016 WL 815287, at *4 (S.D. W.Va. Feb. 29, 2016) (citing *Am. Canoe Ass'n*, 326 F.3d at 515). "[A] court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (cleaned up); *see also Sutphin v. Ethicon, Inc.*, No. 14 Civ. 1379, 2020 WL 5269409, at *1 (S.D. W.Va. Sept. 3, 2020) (Goodwin, J.) (similar); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 452 (4th Cir. 2005) (noting that "newly discovered (material) evidence" can support reconsideration). "Compared to motions to reconsider *final* judgments pursuant to Rule 59(e)[,] . . . Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light." *Carlson*, 856 F.3d at 325.

In the context of intervention, if an intervenor's "participation fails to produce expected benefits, causes unexpected delays or problems, unnecessarily expands the case, or otherwise interferes with or complicates resolution of the issues, the [c]ourt may re-examine its decision." *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15 Civ. 559, 2015 WL 12752936, at *1 n.1 (M.D.N.C. Oct. 30, 2015); *see also Illinois v. City of Chicago*, No. 17 Civ. 6260, 2018 WL 3920816, at *11 n.5 (N.D. Ill. Aug. 16, 2018) ("[I]f the assumptions about the future course of this litigation . . . should turn out to be radically incorrect, nothing in the rules or the case law . . . would prevent re-examination of the matter of intervention.").

Here, reconsideration is warranted "to account for new evidence," *Sutphin*, 2020 WL 5269409, at *1, as well as the resulting "problems" and the absence of "expected benefits" from

3

Ms. Armistead's participation, *City of Greensboro*, 2015 WL 12752936, at *1 n.1—namely, Ms. Armistead's graduation from WVSU and her imminent departure from West Virginia, the record of discovery complications created by Ms. Armistead's participation, and the fact that Ms. Armistead did not make arguments different from those of the named Defendants.

**ARGUMENT**

This Court should reconsider its order granting Ms. Armistead's status as Defendant-Intervenor for three reasons: (1) Ms. Armistead's recent graduation nullifies her asserted interests and claimed added value to this case; (2) Ms. Armistead's participation in this case as Defendant-Intervenor unduly complicated discovery and her continued participation in this proceeding will further consume court and party resources; and (3) Ms. Armistead has not presented the Court with distinct arguments in defense of H.B. 3293.

**I.      Ms. Armistead No Longer Has A Significantly Protectable Interest At Stake And Does Not Provide A Unique Perspective.**

**A.      Ms. Armistead Graduated From WVSU In May 2022.**

Ms. Armistead justified her request for intervention based on her status as a female athlete in West Virginia whose "ability to compete" would be affected by an injunction against H.B. 3293. (Dkt. No. 95 (Memo. ISO Mot. to Intervene) at 7; *see also id.* at 8 ("Armistead has a substantial legal interest in ensuring her equal opportunity to compete in collegiate athletics."); *id.* at 9 ("This litigation could eviscerate Armistead's ability to compete fairly and safely and to participate in a system designed to protect women."); *id.* at 10 ("Were the Sports Act facially invalidated, Armistead would be stripped of her legal protections under the Act.").) Consistent with those representations, this Court, in its Order allowing Ms. Armistead to permissively intervene, stated, "Ms. Armistead plans to defend H.B. 3293 as a member of the class of people for whom the law

4

A-244

was written. She will add a perspective not represented by any of the current defendants." (Dkt. No. 130 (Intervention Order) at 6.)

Facts have since changed. Ms. Armistead submitted an application to graduate from WVSU sometime before March 25, 2022 (*see* Dkt. No. 289-22 (Armistead Dep. Tr.) at 67:22-23) and graduated earlier this month (Dkt. No. 300 (Supp. Armistead Decl.) at 5 ¶ 5.) She will begin law school in Florida in August 2022. (*Id.* at 5 ¶ 6.) Ms. Armistead has no "inten[tion] to play soccer on the university's women's soccer team." (*Id.* at 5 ¶ 7.) Because she is no longer a student athlete in West Virginia, nor even an out-of-state student athlete who will compete against women's teams from West Virginia, Ms. Armistead has no protectable interest implicated by this litigation.

Ms. Armistead did not affirmatively alert Plaintiff of these facts, nor did she allow Plaintiff to discover these facts in a timely manner. She was evasive when answering questions about her graduation plans during her deposition,[2] even though she had already applied to out-of-state law

---

[2] (*See* Dkt. No. 289-22 (Armistead Dep. Tr.) at 50:23-24 ("I am not sure of my exact graduation plans yet."), 59:4-7 ("Because I am interested in possibly getting a Master's degree at [WVSU], and I still have three years of NCAA eligibility, which would mean I can continue playing in the fall."), 61:12-21 ("I'm not sure if I would be able to play soccer and do law school."), 62:17-24 ("Q. If you get into law school, are you going to try out for the team, or that's the end of soccer? . . . . THE WITNESS: I don't know."), 64:5-16 ("Q. Well, you've applied to three of them [law schools], and you're waiting to hear back, right? . . . . THE WITNESS: I want to play soccer at [WVSU]. BY [Plaintiff's counsel] MR. BARR: Q. But you couldn't do that if you were in law school; right? . . . . THE WITNESS: I could not do that if I was in law school, correct."), 66:21-25 ("Q. When do you expect that you'll know if you're going to graduate in May? . . . . THE WITNESS: I don't know. Hopefully before May."), 68:16-22 ("Q. Do you have any plans to withdraw the form you've already filed to graduate in two months? A. Filing the form doesn't automatically mean that I graduate. Q. I'm just asking if you have any plans to withdraw the form. A. I don't know what my plans are yet."), 69:1-2 ("Sitting here today, I am not sure what my future holds yet.").)

5

schools[3] and submitted an application to graduate from WVSU.[4] She only confirmed the facts of her graduation and plans to attend law school in Florida in a supplemental declaration accompanying her summary-judgment opposition brief (Dkt. No. 300 (Supp. Armistead Decl.) at 5 ¶¶ 5–6) following Plaintiff's identification of Ms. Armistead's graduation plans in Plaintiff's Statement of Undisputed Material Facts (Dkt. No. 290 (Pl.'s SUF) ¶ 137.)

In short, Ms. Armistead is not "a member of the class" H.B. 3293 purports to protect and will not offer that perspective to the Court. The Court should rescind her status as Defendant-Intervenor on this basis alone.

### B. Ms. Armistead's Briefing Does Not Align With Her Personal Views Expressed At Her Deposition.

Even when Ms. Armistead was a student athlete on a women's team in West Virginia, however, that personal perspective was lacking from her briefing in this case. Instead, her briefs largely focus on the views and experiences of *other* athletes. (*See, e.g.*, Dkt. No. 288 (Int. MSJ) at 1-4; Dkt. No. 302 (Int. MSJ Opp.) at 13, 20.)

The strident defense of H.B. 3293 and opposition to B.P.J.'s participation on her school's girls' cross-country and track teams advanced in Ms. Armistead's briefing also stands in stark contrast to some of the positions Ms. Armistead took in her deposition. Ms. Armistead testified in her deposition that she lacked familiarity with the basic facts of this case—she did not know that B.P.J. is a middle school student who ran on her school's girls' cross-country team (Dkt. No. 289-22 (Armistead Dep. Tr.) at 74:10-25); she did not know whether H.B. 3293 would prohibit B.P.J.

---

[3] (*Id.* at 60:10-14 ("Q. Have you applied to law school? A. Yes. Q. Where did you apply? A. I applied to [three law schools]."))

[4] (*Id.* at 67:22-25 ("Q. Did you file a form to graduate [from WVSU] in May? A. Yes. Q. When did you file that form? A. Sometime before the due date."))

from playing on her school's girls' cross-country team (*id.* at 80:2-25, 91:3-12); she did not know what would happen if she won this lawsuit (*id.* at 81:2-4); and she did not know "anything" about H.B. 3293, including any of its claimed objectives (*id.* at 86:22-24, 90:5-18). Ms. Armistead also testified that she was not sure whether B.P.J. should, in fact, be excluded from playing on her girls' sports teams. She stated that she did not know of any safety or fairness concern resulting from B.P.J.'s participation on her school's girls' cross-country team (*id.* at 139:25–140:4, 143:14–144:11), and that she did not know whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team" (*id.* at 170:18-22.).[5]

### C.    Reconsideration Is Warranted In Light Of These Developments.

Because this new evidence and the absence of expected benefits undercut Ms. Armistead's main argument for intervention and a key basis of this Court's decision to permit intervention, this Court should reconsider its prior order and revoke Ms. Armistead's status as Defendant-Intervenor. Doing so is consistent with the values of Federal Rule of Civil Procedure 54(b) and judicial practice. Federal courts can and do reconsider and revoke a party's status as intervenor in light of new facts or changed circumstances. For example, in *Mishewal Wappo Tribe of Alexander Valley v. Salazar*, the district court removed an intervenor's status when the intervenor could not maintain its asserted interests. No. 9 Civ. 2502, 2012 WL 4717814, at *6 (N.D. Cal. Sept. 28, 2012). There, the plaintiff Tribe made a land request to the Secretary of the Interior to take into trust public lands held by the Department of the Interior for the benefit of the Tribe. *Id.* at *1. Two Counties asked and were allowed to permissively intervene to protect their interests in the public lands. *Id.* at *3.

---

[5] Perhaps given this conflict between Ms. Armistead's personal perspective and the views being championed in her filings, the State has sought to downplay the notion that Ms. Armistead herself has a valuable perspective to offer in this case. (*See* Dkt. No. 330 (State Resp. Pl.'s SUF) at 10 (asserting that Ms. Armistead "has no reason to have a developed opinion on middle schoolers").)

As the case progressed, however, the Tribe amended its complaint to include only federal lands, which were not under the Counties' control. *Id.* at *4. The amended complaint rendered the Counties' interests "not viable" and "too remote" to sustain permissive intervention. *Id.* The *Mishewal* court reasoned that the Counties' interests "[we]re not claims that ha[d] much of anything in common with the actual issues." *Id.* at *6. *See also United States v. First Trust & Sav. Bank, Clarksville, Tenn.*, No. 77 Civ. 3296, 1977 WL 1265, at *2 (M.D. Tenn. Aug. 29, 1977) (rescinding a taxpayer's intervenor status following the discovery of new evidence that undermined the intervenor's interests).

As in these cases, subsequent developments in the litigation have undermined the reasoning driving prior decisions to permit Ms. Armistead's intervention. The purpose of granting Ms. Armistead's motion to intervene was to allow her to present her perspective as a West Virginia student athlete. Because she is no longer a West Virginia student athlete and she has not provided that perspective, the Court should reconsider its order granting intervention and revoke Ms. Armistead's status as intervenor.

## II.    Ms. Armistead Significantly Burdened The Discovery Process And Keeping Her In This Case Will Continue To Add Undue Complications.

In granting permissive intervention, this Court found "that allowing Ms. Armistead to intervene will not cause undue delay or prejudice" and would "not significantly add to the parties' discovery burdens." (Dkt. No. 130 (Intervention Order) at 6.) In addition to the changed circumstances rendering Ms. Armistead disconnected from the issues in this case, this Court should re-examine Ms. Armistead's status as intervenor because "the balance of interests [has] shift[ed]"—Plaintiff's "fears [of prejudice] are [now] substantiated." *State v. City of Chicago*, 912 F.3d 979, 988 (7th Cir. 2019); *see also Mishewal Wappo Tribe*, 2012 WL 4717814, at *6 (revoking

8

permissive intervention where the intervenors' "actions have significantly impacted the proceedings"); (Dkt. No. 99 (Pl.'s Opp. to Int. Mot. to Intervene) at 16–17 (describing concern that Ms. Armistead's intervention would "prolong and increase the burdens of discovery and motion practice") (quoting *Stuart v. Huff*, 706 F.3d 345, 350 (4th Cir. 2013)).

Since joining this lawsuit as Defendant-Intervenor, Ms. Armistead has issued burdensome and voluminous discovery requests. For example, whereas the other Defendants submitted only two requests for admission, Ms. Armistead sought admissions to *eighty-two* statements. Of those, almost fifty requests sought responses to hypothetical questions regarding the treatment of various endocrine conditions not at issue in this case and/or that had not yet been (and in many cases, have not been) the subject of expert testimony.[6] Her approach to interrogatories was similarly burdensome and undiscerning.

Ms. Armistead's involvement in the case has also significantly increased the amount of expert discovery. She supported four expert witnesses, all of which are unqualified, irrelevant, or both,[7] and she filed a motion to exclude the testimony of one of Plaintiff's experts that is duplicative of the State's motion to exclude the same expert.[8]

---

[6] (Pelet del Toro Decl., Ex. A ¶¶ 13–61.) Some of these hypothetical questions included: "[a]dmit that Histrelin is used to treat biological males with idiopathic short stature[]"; "[a]dmit there are high-school aged biological males who, because of hypogonadism, have circulating testosterone comparable to that of biological females of their same age[]"; and "[a]dmit that for purposes of participating on sex separated school athletic teams, high school male-identifying biological males who experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their same age are similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy." (*Id.* ¶¶ 11, 23, 44.)

[7] (Dkt. Nos. 316 (Brown *Daubert* Mot.), 320 (Cantor *Daubert* Mot.), 324 (Levine *Daubert* Mot.), 328 (Carlson *Daubert* Mot.).)

[8] (Dkt. Nos. 306 (State Mot. to Exclude Fry Expert Test.), 310 (Int. Mot. to Exclude Fry Expert Test.).)

Moreover, Ms. Armistead now seeks to rely on the irrelevant testimony from ten individuals she failed to timely disclose. (*See* Dkt. No. 288 (Int. MSJ) at 2–3.) Specifically, in support of her motion for summary judgment, Ms. Armistead offers declarations from out-of-state athletes, parents of out-of-state athletes, and former athletes, none of whom have any connection to B.P.J.'s challenge here. These ten individuals are from the list of at least *thirty-seven* individuals Ms. Armistead identified in "supplemental" disclosures provided to Plaintiff's counsel four months after Ms. Armistead's initial disclosures and three days after the deadline for written discovery had closed. Despite repeated requests from Plaintiff's counsel that she identify which witnesses she reasonably believed she might use to support her claims or defenses, Ms. Armistead refused to engage, leaving Plaintiff unable to depose these potential witnesses. (Dkt. Nos. 332-18 (Ltr. to Int. from Pl., Mar. 17, 2022), 332-19 (Email from Int. to Pl., Mar. 23, 2022).)

Finally, in a case where there are already four Defendants and four separate sets of defense counsel, Plaintiff has had to respond to separate (but often overlapping) discovery requests and sets of briefs. Had Ms. Armistead timely shared her plans to graduate from WVSU this spring, Plaintiff could have raised reconsideration with this Court before Ms. Armistead's submission of a motion for summary judgment and multiple motions to exclude expert testimony, potentially saving the parties and the Court significant time.

Ms. Armistead's continued participation in this case will continue to impose additional burdens without any corresponding benefit, including separate cross-examination if there is a trial, separate post-trial briefing, and separate appellate briefing at each stage of any subsequent appeal. The added complications and burdens created by Ms. Armistead's involvement in this litigation are further reason to reconsider the grant of permissive intervention.

## III.    Ms. Armistead Has Not Made Unique Arguments.

Finally, reconsideration of Ms. Armistead's intervention is warranted because she has not presented the Court with arguments that "differ from those of the current defendants." (Dkt. No. 130 (Intervention Order) at 6.) In her motion for intervention, Ms. Armistead represented that she would "advance litigation arguments different from and contrary to the State Defendants' arguments." (Dkt. No. 95 (Memo. ISO Mot. to Intervene) at 14.) But the reality is that Ms. Armistead and the State have been fully aligned in their defense of H.B. 3293 and pursuit of summary judgment.

Ms. Armistead identified five arguments that she would make that would differ from those made by the State: (1) "Title IX not only permits—but *requires*—separate sports teams for women and girls in contests of strength or speed"; (2) "gender identity is not a protected class" and *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), was wrongly decided; (3) "the State's interest in providing equal athletic opportunities for women justifies [H.B. 3293's] different treatment" based on "gender identity"; (4) B.P.J.'s requested relief would result in discrimination in violation of *Grimm*; and (5) "B.P.J. is asking the Court to replace biological sex with gender identity in the Sports Act." (Dkt. No. 95 (Memo. ISO Mot. to Intervene) at 14–15.) The State in fact makes the first, third, and fifth arguments. (*See* Dkt. No. 287 (State MSJ) at 22 ("Title IX *requires* some different treatment between the biological sexes."); *id.* at 13–17 (arguing that H.B. 3293's classification is substantially related to the State's interest in "ensuring equal opportunities for females in sports"); *id.* at 4 ("Plaintiff would base sports teams on gender identity."); *id.* at 7 ("Plaintiff's position that a student-athlete be permitted to participate on a team consistent with the athlete's gender identity rather than biological sex would be impossible given this array of gender identities.").) And Ms. Armistead has not made the second or fourth arguments. Instead, she—like

11

the State—has argued that "*Grimm* doesn't apply." (Dkt. No. 288 (Int. MSJ) at 18; *see also* Dkt. No. 287 (State MSJ) at 33 ("The holding of *Grimm* . . . does not apply here.").)

\* \* \*

In sum, Ms. Armistead no longer has personal interests at stake in this litigation and thus no longer has a personal perspective as someone supposedly protected by H.B. 3293 to offer the Court; her participation to date has complicated the proceedings and prejudiced Plaintiff and judicial economy; and she has not offered the Court the unique legal arguments promised in her intervention motion. Accordingly, this Court should grant Plaintiff's motion to reconsider and revoke Ms. Armistead's intervenor status.

## CONCLUSION

Plaintiff respectfully requests that this Court reconsider its order granting Lainey Armistead's permissive intervention and revoke her status as Defendant-Intervenor in this case.

Dated: May 26, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                              *Plaintiff*,

      v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                              *Defendants*,

      and

LAINEY ARMISTEAD,

                              *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 26th day of May, 2022, I electronically filed a true and exact copy of ***Plaintiff's Memorandum of Law in Support of Motion to Reconsider the Grant of Lainey Armistead's Permissive Intervention*** with the Clerk of Court and all parties using the CM/ECF System.

                            */s/ Loree Stark*
                            Loree Stark
                            West Virginia Bar No. 12936

14

# Exhibit A

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

RE:   CHANGE OF NAME OF
█████████████ P███-J█████

                                      Civil Action No. 22-P-104-1
                                      Judge Christopher J. McCarthy

Heather D. Jackson and
Wesley Scott Pepper, as parents

     Petitioners.

## ORDER GRANTING PETITION FOR CHANGE OF NAME

Pending before the Court is a Petition for Change of Name, filed by Heather Jackson and Wesley Pepper, as parents, legal guardians, and next of friends on behalf of their daughter, originally named █████████ P███-J████, a minor child. The Petitioner seeks the name change in order for her name to conform with her gender identity.

On May 2, 2022, the Petitioners filed the Petition for name change that is pending. The hearing was scheduled for June 1, 2022. On June 1, 2022, this Court held a hearing on the Petition following proper publication of notice as a Class-I legal advertisement. Present at said hearing were Petitioners Heather D. Jackson, Wesley Scott Pepper, and the Minor Child.

The Court now concludes that the Petition will be **GRANTED**.

## FINDINGS OF FACT

1. On May 2, 2022, Heather D. Jackson and Wesley Scott Pepper filed in Harrison County, West Virginia a Petition for Change of Name seeking to change their daughter's name from █████████████ P███-J█████ to B████████ ██████ P███-J██████.

Page **1** of **5**

A-256

2. ███████████████ P███-J███ has been a bona fide resident of Harrison County for all relevant periods of time.

3. Notice of the hearing on said Petition was published as a Class-I legal advertisement on May 18, 2022, in the Clarksburg Exponent Telegram, a newspaper of general circulation for Harrison County, West Virginia, at least 10 days prior to the June 1, 2022 hearing.

4. The name change is not being sought for any of the illegal purposes articulated in West Virginia Code § 48-25-101(a), and the Petitioners are not barred from seeking a name change based on the provisions of § 48-25-101(a) or § 48-25-103, as represented by the Petitioners in their properly verified Petition.[1]

5. No injury will be done to any person by reason of the name change.

6. Reasonable and proper cause exists for the name change.

---

[1] West Virginia Code § 48-25-101(a) states:

> (a) A person desiring a change of his or her own name, or that of his or her child, may apply to the circuit court or family court of the county in which he or she resides by a verified petition setting forth and affirming the following:
>
> (1) That he or she has been a bona fide resident of the county for at least one year prior to the filing of the petition or that he or she is a nonresident of the county who was born in the county, was married in the county and was previously a resident of the county for a period of at least fifteen years;
>
> (2) The cause for which the change of name is sought;
>
> (3) The new name desired;
>
> (4) The name change is not for purposes of avoiding debt or creditors;
>
> (5) The petitioner seeking the name change is not a registered sex offender pursuant to any state or federal law;
>
> (6) The name change sought is not for purposes of avoiding any state or federal law regarding identity;
>
> (7) The name change sought is not for any improper or illegal purpose;
>
> (8) The petitioner is not a convicted felon in any jurisdiction;
>
> (9) The name change sought is not for any purpose of evading detection, identification or arrest by any local, state or federal law-enforcement agency; and
>
> (10) Whether or not the petitioner desires to protect his or her identity for personal safety reasons.

Page **2** of **5**

A-257

7.  The name change is not sought for any fraudulent or evil intent on the part of the Petitioners.

8.  Petitioners testified at the hearing that their daughter wished to change her name to reflect her gender identity. The minor child also testified to this fact.

## **CONCLUSIONS OF LAW**

Pursuant to West Virginia Code § 48-25-103(a), a court may grant a name change after making certain findings regarding the facts and circumstances of a Petition:

> Upon the filing of the verified petition, and upon proof of the publication of the notice and of the matters set forth in the petition, and being satisfied that no injury will be done to any person by reason of the change, and upon a finding that all representations the applicant has affirmed pursuant to subsection (a), section one hundred one of this article are true and the applicant is not prohibited from obtaining a name change pursuant to this article, that reasonable and proper cause exists for changing the name of petitioner and that the change is not desired because of any fraudulent or evil intent on the part of the petitioner, the court or judge may order a change of name.

W. Va. Code § 48-25-103(a).

The Court is not permitted to grant a name change if certain other circumstances are present:

> (b) The court may not grant any change of name for any person convicted of any felony during the time that the person is incarcerated.

> (c) The court may not grant any change of name for any person required to register with the State Police pursuant to the provisions of article twelve, chapter fifteen of this code during the period that the person is required to register.

> (d) The court may not grant a change of name for persons convicted of first degree murder in violation of section one, article two, chapter sixty-

one of this code for a period of ten years after the person is discharged from imprisonment or is discharged from parole, whichever occurs later.

    (e) The court may not grant a change of name of any person convicted of violating any provision of section fourteen-a, article two, chapter sixty-one of this code for a period of ten years after the person is discharged from imprisonment or is discharged from parole, whichever occurs later.

W. Va. Code § 48-25-103(b)–(e).

    Further, when a name change involves a minor child, proof that the change is in the best interest of the child is necessary over and above what is required by the name change statute. W. Va. Code § 48-25-101 et seq.; Syl. Pt. 3, *In re Name Change of Jenna A.J.*, 231 W. Va. 159, 744 S.E. 2d 269 (2013) (internal citations omitted). Any name change involving a minor child may be made only upon clear, cogent, and convincing evidence that the change would significantly advance the best interests of the child. *Id.* at 231 W. Va. at 163, 744 S.E.2d at 273 (2013).

    The Court finds that it is the best interest of the minor child to change her name for several reasons. First, children who are allowed to have names conforming to their gender identity feel more accepted by the community as a whole. Second, changing the minor child's name to her gender identity ensures a safe and happy mental state by the child in conforming with her gender identity. Finally, this name change is supported by the parents. Both of whom know the mind of their child.

    The Court is satisfied that all the requirements of the above-quoted statutes have been met, and that the Petitioner is not barred from having the Petition granted by the same.

## ORDER

Therefore, based on its above-stated findings, the Court concludes that the instant Petition will be **GRANTED.**

It is hereby **ORDERED** that the name of ▮▮▮▮▮▮▮▮▮▮ P▮▮ -J▮▮ shall be changed to B▮▮▮▮▮▮ P▮▮ -J▮▮ by which name she shall hereafter be called.

It is **FURTHER ORDERED** that Petitioner shall immediately deliver a certified copy of this Order to the Office of the Clerk of the County Commission of Harrison County, West Virginia, the current county of his residence, and upon payment of any fees the clerk shall immediately record the same in a book to be kept for the purpose of name changes, and index the same under both the old and the new names. After this Order is filed in the Office of the Clerk of the County Commission, the new name of B▮▮▮▮▮▮ P▮▮ -J▮▮ is to be used in place of the Petitioner's former name.

It is **FURTHER ORDERED** that the Clerk of this Court shall send three (3) certified copies of this Order to the Petitioners, Heather D. Jackson and Wesley Scott Pepper, 12537 Buckhannon Pike, Lost Creek, WV 26385. This is a **FINAL ORDER**. The Clerk of this Court is **ORDERED** to remove this case from the Court's docket.

ENTER: _6/2/2022_

_____

The Hon. Christopher J. McCarthy, Chief Judge

Page **5** of **5**

**A-260**

STATE OF WEST VIRGINIA

COUNTY OF HARRISON, TO-WIT

I, Albert F. Marano, Clerk of the Fifteenth Judicial Circuit and the 18th Family

Court Circuit of Harrison County, West Virginia, hereby certify the foregoing

to be a true copy of the ORDER entered in the above styled action on the

_2nd_ day of _____June_____, 20_22_.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix the

Seal of the Court this _2nd_ day of _____June_____, 20_22_.

_____

Fifteenth Judicial Circuit & 18th

Family Court Circuit Clerk

Harrison County, West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

                Plaintiffs,

v.                                CIVIL ACTION NO.   2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

                Defendants.

MEMORANDUM OPINION AND ORDER

West Virginia passed a law that defines "girl" and "woman," for the purpose of
secondary school sports, as biologically female. Under the law, all biological males,
including those who identify as transgender girls, are ineligible for participation on
girls' sports teams. B.P.J., a transgender girl who wants to play girls' sports,
challenges the law. The question before the court is whether the legislature's chosen
definition of "girl" and "woman" in this context is constitutionally permissible. I find
that it is.

I.   **Relevant Facts**

    **A.  B.P.J.**

B.P.J. is an eleven-year-old transgender girl. This means that although B.P.J.'s
biological sex is male, she now identifies and lives as a girl. According to her First
Amended Complaint, B.P.J. began expressing her female gender identity when she

was three years old. [ECF No. 285-2]. By the end of third grade, B.P.J. expressed herself fully—both at home and otherwise—as a girl. In 2019, B.P.J. was diagnosed with gender dysphoria and, at the first signs of puberty, she began taking puberty blocking medications to treat that condition. [ECF No. 289-21]. As a result, B.P.J. has not undergone endogenous male puberty.

In 2021, as she prepared to enter middle school, B.P.J. expressed interest in trying out for the girls' cross-country and track teams. When her mother, Plaintiff Heather Jackson, asked the school to allow B.P.J. to participate on the girls' teams, the school initially informed her that whether B.P.J. would be permitted to play on the girls' teams depended on the outcome of House Bill ("H.B.") 3293, which was then pending in the West Virginia legislature. When the law passed, the school informed Ms. Jackson that B.P.J. would not be permitted to try out for the girls' teams.

## B. The "Save Women's Sports Bill"

H.B. 3293, entitled the "Save Women's Sports Bill," was introduced in the West Virginia House of Delegates on March 18, 2021. The bill passed and was codified as West Virginia Code Section 18-2-25d, entitled "Clarifying participation for sports events to be based on biological sex of the athlete at birth." The law, which was clearly carefully crafted with litigation such as this in mind, begins with the following legislative findings:

> (1) There are inherent differences between biological males and females, and that these differences are cause for celebration, as determined by the Supreme Court of the United States in *United States v. Virginia* (1996);

2

(2) These inherent differences are not a valid justification for sex-based classifications that make overbroad generalizations or perpetuate the legal, social, and economic inferiority of either sex. Rather, these inherent differences are a valid justification for sex-based classifications when they realistically reflect the fact that the sexes are not similarly situated in certain circumstances, as recognized by the Supreme Court of the United States in *Michael M. v. Sonoma County, Superior Court* (1981) and the Supreme Court of Appeals of West Virginia in *Israel v. Secondary Schools Act. Com'n* (1989);

(3) In the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated. Biological males would displace females to a substantial extent if permitted to compete on teams designated for biological females, as recognized in *Clark v. Ariz. Interscholastic Ass'n* (9th Cir. 1982);

(4) Although necessarily related, as concluded by the United States Supreme Court in *Bostock v. Clayton County* (2020), gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex; and

(5) Classifications of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex.

W. Va. Code § 18-2-25d(a)(1)–(5).

After making these findings, the law sets forth definitions of "biological sex," "female," and male" as follows:

(1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

3

(2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.

(3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

*Id.* § 18-2-25d(b)(1)–(3).

Finally, the law requires that each athletic team that is "sponsored by any public secondary school or a state institution of higher education" "be expressly designated as" either male, female, or coed, "based on biological sex." *Id.* § 18-2-25d(c). Teams that are designated "female" "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 18-2-25d(c)(2).

### C. Procedural History

On May 26, 2021, B.P.J., through her mother, filed this lawsuit against the West Virginia State Board of Education and its then-Superintendent W. Clayton Burch, the Harrison County Board of Education and its Superintendent Dora Stutler, and the West Virginia Secondary Schools Activities Commission ("WVSSAC"). The State of West Virginia moved to intervene, and that motion was granted. Plaintiff then amended her complaint, [ECF No. 64], naming the State of West Virginia and Attorney General Patrick Morrisey as defendants. Mr. Morrisey has since been dismissed as a party from this lawsuit.

In her amended complaint, B.P.J. alleges that Defendants Burch, Stutler, and the WVSSAC deprived her of the equal protection guaranteed to her by the

4

Fourteenth Amendment and that the State, the State Board of Education, the Harrison County Board of Education, and the WVSSAC have violated Title IX. B.P.J. seeks a declaratory judgment that Section 18-2-25d of the West Virginia Code violates Title IX and the Equal Protection Clause; an injunction preventing Defendants from enforcing the law against her; a waiver of the requirement of a surety bond for preliminary injunctive relief; nominal damages; and reasonable attorneys' fees.

B.P.J. initially requested a preliminary injunction to allow her to compete on the girls' track and cross-country teams during the pendency of this case. Finding that B.P.J. had a likelihood of success on the merits of her as-applied challenge to the law, I granted the preliminary injunction. All defendants moved to dismiss, and those motions were denied. Lainey Armistead, a cisgender[1] female college athlete then moved to intervene as a defendant and that motion was granted. All parties have now moved for summary judgment.

## II.   Legal Standard

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A).

---

[1] "Cisgender" means a person whose gender identity aligns with her biological sex. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

## III.    Analysis

B.P.J. alleges that H.B. 3293 violates the Constitution's Equal Protection Clause and Title IX. I will address each argument in turn. Before turning to the merits of those arguments, however, I find it important to address some preliminary matters.

### A.  The WVSSAC's Motion

The WVSSAC does not argue the merits of Plaintiff's Equal Protection or Title IX claims. Rather, the WVSSAC only argues that it is not a state actor and is therefore not subject to scrutiny under either the Equal Protection Clause or Title IX. I disagree. Defendant WVSSAC's motion [ECF No. 276] is **DENIED**.

A court may only apply equal protection scrutiny to state action. U.S. Const. amend. XIV, § 1, cl. 4.; *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 923–24 (1982). Likewise, only a party acting under the color of state law is subject to suit pursuant to 42 U.S.C. § 1983. Despite differing terms, the color-of-law requirement in a § 1983 claim and the state action requirement under the Fourteenth Amendment are synonymous and are analyzed the same way. *See Lugar*, 457 U.S. at 923–24; *United States v. Price*, 383 U.S. 787, 794 (1966).

"[T]he character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 931 (2001) (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995)). For example, an ostensibly

private actor can become a state actor when it is "controlled by an 'agency of the State,'" or "entwined with governmental policies[,]" or the government is "entwined in [its] management or control." *Pennsylvania v. Bd. of Dir. of City Trs. of Phila.*, 353 U.S. 230, 231 (1957); *Evans v. Newton*, 382 U.S. 296, 299 (1966). There is, however, no rigid test to determine when a challenged action becomes a state action. *Brentwood Acad.*, 531 U.S. at 295. No single fact nor set of conditions will definitively confer state action because there may be a better "countervailing reason against attributing activity to the government." *Id.* at 295–96. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Lugar*, 457 U.S. at 939 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 860 (1961); *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 116 (4th Cir. 2022) ("[T]he inquiry is highly fact-specific in nature.").

After considering its composition, rulemaking process, obligations under state law, and other rules for student eligibility, I find the WVSSAC is a state actor. Like in *Brentwood Acad.*, the WVSSAC's nominally private character "is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." 531 U.S. at 298. I find that the WVSSAC is a state actor for several reasons. Though county boards of education have the statutory authority to supervise and control interscholastic athletic events, they have delegated that authority to the WVSSAC. [ECF No. 285-1]. Every public secondary school in

West Virginia is a member of the WVSSAC, and the school principals sit on the WVSSAC's Board of Control to propose and vote on sports rules and regulations. *Id.* Any rule the WVSSAC passes is then subject to approval by the State Board of Education, and the State Board of Education requires that any coach who is not also a teacher be trained by the WVSSAC and certified by the State Board of Education. *Id.* And the WVSSAC Board of Directors—the entity that enforces the rules—includes representatives of the State Superintendent and the State Board of Education, among other governmental entities. *Id.*; 127 C.S.R. § 127-1-8.2. Here, it appears that the WVSSAC cannot exist without the state, and the state cannot manage statewide secondary school activities without the WVSSAC. The WVSSAC is pervasively entwined with the state.

The WVSSAC's motion for summary judgment [ECF No. 276] is therefore **DENIED**.

### B. Animus

In her Amended Complaint, B.P.J. alleges that H.B. 3293 was introduced in the legislature "as part of a concerted, nationwide effort to target transgender youth for unequal treatment." [ECF No. 64, ¶ 45]. B.P.J. alleges that the law was "targeted at, and intended only to affect, girls who are transgender." *Id.* ¶ 46. In support of these contentions, B.P.J. points to the actions of bill co-sponsor Delegate Jordan Bridges. According to the Amended Complaint, Delegate Bridges made a Facebook post announcing the introduction of the bill and then "'liked' comments on his post that advocated for physical violence against girls who are transgender, compared

8

girls who are transgender to pigs, and called girls who are transgender by a pejorative term." *Id.* ¶ 47. In her summary judgment motion, B.P.J. again points the court to the actions of Delegate Bridges and points to several instances where legislators made clear that the purpose of the bill was to address transgender participation in sports.

Notwithstanding these statements, B.P.J. does not argue that the law is unconstitutional under the Supreme Court's animus doctrine, and the record lacks sufficient legislative history to make such a finding. The record makes abundantly clear, however, that West Virginia had no "problem" with transgender students playing school sports and creating unfair competition or unsafe conditions. In fact, at the time it passed the law, West Virginia had no known instance of any transgender person playing school sports. While the legislature did take note of transgender students playing sports in other states, it is obvious to me that the statute is at best a solution to a potential, but not yet realized, "problem."

Even so, the law is only unconstitutional under the animus doctrine if the reason for its passage was the "bare desire" to harm transgender people. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). While the record before me does reveal that at least one legislator held or implicitly supported private bias against, or moral disapproval of, transgender individuals, it does not contain evidence of that type of animus more broadly throughout the state legislature. Therefore, I cannot find unconstitutional animus on the record before me.

## C. Other Matters

Next, before proceeding to the merits of the case, I find it important to briefly discuss what this case is *not*.

First, despite the politically charged nature of transgender acceptance in our culture today, this case is *not* one where the court needs to accept or approve B.P.J.'s existence as a transgender girl. B.P.J., like all transgender people, deserves respect and the ability to live free from judgment and hatred for simply being who she is. But for the state legislature, creating a "solution" in search of a problem, the courts would have no reason to consider eligibility rules for youth athletics. Nevertheless, I must do so now.

This is also *not* a case where B.P.J. challenges the entire structure of school sports. B.P.J. does not challenge, on a broad basis, sex-separation in sports. B.P.J. wants to play on a girls' team. And she admits that there are benefits associated with school athletics, "including when such athletics are provided in a sex-separated manner." [ECF No. 286-1, at 1445]. Ultimately, B.P.J.'s issue here is not with the state's offering of girls' sports and boys' sports. It is with the state's definitions of "girl" and "boy." The state has determined that for purposes of school sports, the definition of "girl" should be "biologically female," based on physical differences between the sexes. And the state argues that its definition is appropriate here because it is substantially related to an important government interest. B.P.J., for her part, seeks a legal declaration that a transgender girl is "female."

10

I will not get into the business of defining what it means to be a "girl" or "woman." The courts have no business creating such definitions, and I would be hard-pressed to find many other contexts where one's sex and gender are relevant legislative considerations. But I am forced to consider whether the state's chosen definition passes constitutional muster in this one discrete context.

### D. Equal Protection

Having addressed those matters, I now turn to the merits of B.P.J.'s claim that H.B. 3293 violates the Constitution's Equal Protection Clause.

### 1. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment provides that no state may deny any person within its jurisdiction "equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. In other words, "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Realistically, though, every law impacts people differently, and the Fourteenth Amendment does not prohibit that outcome. *Reed v. Reed*, 404 U.S. 71, 75 (1971). But the Equal Protection Clause does forbid a statute from placing people into different classes and treating them unequally for reasons "wholly unrelated to the objective of that statute." *Id.* at 75–76. Ultimately, if a law seeks to treat different groups of people differently, it must do so "upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.* at 76 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

In general, courts presume that a law is constitutional. Based on that presumption, courts may only overturn a law if the challenger can show that the law's classification is not rationally related to *any* government interest. *Moreno*, 413 U.S. at 533. This general review is known as rational basis review. However, the court's inquiry becomes more searching if the law disadvantages a group of people who have historically been discriminated against and whose identity has nothing to do with their ability to participate in society. Race-based laws, for example, are "immediately suspect" because "they threaten to stigmatize individuals by reason of their membership in a racial group." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Laws based on race, or other suspect classifications such as alienage and national origin, are subject to strict scrutiny and will only be upheld "upon an extraordinary justification." *Id.* at 643–44 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)). Under strict scrutiny, the law must be "narrowly tailored to serve a compelling governmental interest." *Cleburne*, 473 U.S. at 440.

In the middle of rational basis review and strict scrutiny lies intermediate scrutiny. Intermediate scrutiny applies to laws that discriminate on the basis of a quasi-suspect classification, like sex, *United States v. Virginia*, 518 U.S. 515, 533 (1996), and transgender status, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ("Engaging with the suspect class test, it is apparent that transgender persons constitute a quasi-suspect class."). Sex discrimination receives intermediate scrutiny because while states have historically used sex as a basis for invidious discrimination,

we recognize that there are some "real differences" between males and females that could legitimately form the basis for different treatment. *Virginia*, 518 U.S. at 533.

The Supreme Court has long "viewed with suspicion laws that rely on 'overbroad generalizations about the different talents, capacities, or preferences of males and females.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692 (2017) (quoting *Virginia*, 518 U.S. at 533). Therefore, laws that discriminate based on sex must be backed by an "exceedingly persuasive justification." *Virginia*, 518 U.S. at 513. That is to say, the law's proponents must show that it "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). Even if the law's objective is to protect the members of one sex, that "objective itself is illegitimate" if it relies on "fixed notions concerning [that sex's] roles and abilities." *Morales-Santana*, 137 S. Ct. at 1692.

The party defending the statute must "present[] sufficient probative evidence in support of its stated rationale for enacting a [sex] preference, i.e., . . . the evidence [must be] sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895, 910 (11th Cir. 1997)); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) ("[T]he gender-based measures . . . [must be] based on 'reasoned analysis rather than [on] the mechanical application of

traditional, often inaccurate, assumptions.'" (quoting *Miss. Univ. for Women*, 458 U.S. at 726)).

### 2. Discussion

There is no debate that intermediate scrutiny applies to the law at issue here— H.B. 3293 plainly separates student athletes based on sex. And even B.P.J. agrees that the state has an important interest in providing equal athletic opportunities for female students. [ECF No. 291, at 24]. As discussed earlier, B.P.J. does not challenge sex-separation in sports on a broad basis; she does not argue that teams should be separated based on some other factor or not separated at all. Rather, B.P.J. recognizes the benefits of sex-separated athletics and takes issue only with the state's definitions of "girl" and "woman" as based on biological sex.

B.P.J. argues that "H.B. 3293 excludes students from sports teams based on 'biological sex' and defines 'biological sex' solely in terms of 'reproductive biology and genetics at birth.'" *Id.* at 19. According to B.P.J., H.B. 3293 uses this "'ends-driven definition[] of "biological sex" to 'guarantee a particular outcome': Barring girls who are transgender from qualifying as girls for purposes of school sports and thereby categorically excluding them from girls' teams and therefore from school sports altogether." *Id.* (quoting *Grimm*, 972 F.3d at 626 (Wynn, J., concurring)). B.P.J. argues that this definition of "biological sex," and the related definitions of "girl" and "woman," are not substantially related to the government interest in providing equal athletic opportunities for females.

14

The State of West Virginia, the State Board defendants, the Harrison County defendants, and Intervenor Lainey Armistead all argue that the state's classification based on "biological sex" is substantially related to its important interest in providing equal athletic opportunities for females. The state points to a longstanding recognition in the courts that "'[p]hysical differences between men and women . . . are enduring' and render 'the two sexes . . . not fungible.'" [ECF No. 305, at 13–14 (quoting *Virginia*, 518 U.S. at 533)]. And the state argues that in order to preserve athletic opportunities for females, it is necessary to exclude biological males from female teams because males as a group have significant athletic advantage over females and thus the two groups are not similarly situated. [ECF No. 287, at 6–8].

The record does make clear that, in passing this law, the legislature intended to prevent transgender girls from playing on girls' sports teams. In making that decision, the legislature considered an instance in Connecticut where two transgender girls ran on the girls' track team and won at least one event. Cisgender girls there sued, claiming the state's policy allowing the transgender girls to play on girls' teams violated Title IX. *Id.* at 5. But acting to prevent transgender girls, along with all other biological males, from playing on girls' teams is not unconstitutional if the classification is substantially related to an important government interest. The state's interest in providing equal athletic opportunity to females is not at issue here, and B.P.J. does not argue that sex-separate sports in general are not substantially related to that interest. Rather, B.P.J. argues that she and other transgender girls

15

should be able to play on girls' teams despite their male sex, because their gender identity is "girl."

While sex and gender are related, they are not the same. *See e.g., PFLAG, PFLAG National Glossary of Terms* (June 2022), http://pflag.org/glossary (defining "biological sex" as the "anatomical, physiological, genetic, or physical attributes that determine if a person is male, female, or intersex . . . includ[ing] both primary and secondary sex characteristics, including genitalia, gonads, hormone levels, hormone receptors, chromosomes, and genes" and explaining that "[b]iological sex is often conflated or interchanged with gender, which is more societal than biological, and involves personal identity factors"). It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes. Gender, on the other hand, refers to "a set of socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate." *Id.* Gender identity, then, is "[a] person's deeply held core sense of self in relation to gender." *Id.* For most people, gender identity is in line with biological sex. *See Grimm*, 972 F.3d at 594. That is, most females identify as girls or women, and most males identify as boys or men. But gender is fluid. There are females who may prefer to dress in a style that is more typical of males (or vice versa), and there are males who may not enjoy what are considered typical male activities. These individuals may, however, still identify as the gender that aligns with their sex. Others may not. When one's gender identity is incongruent with their sex, that person is transgender. To be transgender, one must have a deeply held "consistent[], persistent[], and insistent[]"

conviction that their gender is, "on a binary, . . . opposite to their" biological sex. *Id.* I recognize that being transgender is natural and is not a choice. But one's sex is also natural, and it dictates physical characteristics that are relevant to athletics.

Whether a person has male or female sex chromosomes determines many of the physical characteristics relevant to athletic performance. Those with male chromosomes, regardless of their gender identity, naturally undergo male puberty, resulting in an increase in testosterone in the body. B.P.J. herself recognizes that "[t]here is a medical consensus that the largest known biological cause of average differences in athletic performance between [males and females] is circulating testosterone beginning with puberty." [ECF No. 291, at 28]. While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes. Given B.P.J.'s concession that circulating testosterone in males creates a biological difference in athletic performance, I do not see how I could find that the state's classification based on biological sex is not substantially related to its interest in providing equal athletic opportunities for females.

In parts of her briefing, B.P.J. asks me to find that specifically excluding transgender girls from the definition of "girl" in this context is unconstitutional because transgender girls can take puberty blockers or other hormone therapies to mitigate any athletic advantage over cisgender females. B.P.J., for example, is

biologically male, but she identifies as a girl. To express her gender identity, she goes by a traditionally feminine name, wears her hair long, uses female pronouns, and in all other respects lives as a girl. Before the first signs of puberty, B.P.J. made no other changes as a result of her transgender identity. But, once she started showing signs of male puberty, B.P.J. began taking puberty blocking medications, pausing the male puberty process. In that respect, B.P.J. argues that she has not gained the physical characteristics typical of males during and after puberty.

While this may be true for B.P.J., other transgender girls may not take those medications. They may not even come to realize or accept that they are transgender until after they have completed male puberty. Even if a transgender girl wanted to receive hormone therapy, she may have difficulty accessing those treatment options depending on her age and the state where she lives. And, as evidenced by the thousands of pages filed by the parties in this case, there is much debate over whether and to what extent hormone therapies after puberty can reduce a transgender girl's athletic advantage over cisgender girls. Additionally, of course, there is no requirement that a transgender person take any specific medications or undergo hormone therapy before or after puberty. A transgender person may choose to only transition socially, rather than medically. In other words, the social, medical, and physical transition of each transgender person is unique.

The fact is, however, that a transgender girl is biologically male and, barring medical intervention, would undergo male puberty like other biological males. And biological males generally outperform females athletically. The state is permitted to

18

legislate sports rules on this basis because sex, and the physical characteristics that flow from it, are substantially related to athletic performance and fairness in sports.

Could the state be more inclusive and adopt a different policy, as B.P.J. suggests, which would allow transgender individuals to play on the team with which they, as an individual, are most similarly situated at a given time? Of course. But it is not for the court to impose such a requirement here. Sex-based classifications fall under intermediate scrutiny and therefore do not have a "narrowly-tailored" requirement. As intervenor, Lainey Armistead, points out, "[s]ome boys run slower than the average girl . . . [and] [s]ome boys have circulating testosterone levels similar to the average girl because of medical conditions or medical interventions," but B.P.J. denies that the latter "would be similarly situated [to cisgender girls] for purposes of Title IX and the Equal Protection Clause," and does not argue that they should be allowed to play on girls' teams. [ECF No. 288, at 17 (citing ECF No. 286-1, at 1473)]. This is inconsistent with her argument that the availability of hormone therapies makes transgender girls similarly situated to cisgender girls. In fact, after reviewing all of the evidence in the record, including B.P.J.'s telling responses to requests for admission, it appears that B.P.J. really argues that transgender girls are similarly situated to cisgender girls for purposes of athletics at the moment they verbalize their transgender status, regardless of their hormone levels.

The legislature's definition of "girl" as being based on "biological sex" is substantially related to the important government interest of providing equal athletic

opportunities for females. B.P.J.'s motion for summary judgment on this basis is **DENIED**.

### E.  Title IX

Finally, I address B.P.J.'s claim that H.B. 3293 violates Title IX. B.P.J. brings this claim against the State of West Virginia, the State Board of Education, the County Board of Education, and the WVSSAC.

### 1.  Legal Standard

Title IX provides that "no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To succeed on a Title IX claim, a plaintiff must prove that she was (1) excluded from an educational program on the basis of sex; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that "improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616 (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)). "In the Title IX context, discrimination 'mean[s] treating [an] individual worse than others who are similarly situated.'" *Id.* at 618 (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020)). Title IX permits sex-separate athletic teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

2.  Discussion

B.P.J. argues that H.B. 3293 violates Title IX because it excludes transgender girls from participation on girls' sports teams. B.P.J. argues that this amounts to complete exclusion from school sports altogether, and that it is discrimination because she and other transgender girls are similarly situated to cisgender girls. [ECF No. 291, at 17]. The state responds that the law does not violate Title IX because it does not exclude B.P.J. from school athletics. "To the contrary, it simply designates on which team [she] shall play." [ECF No. 287, at 22]. And, the County Defendants argue that Title IX authorizes sex separation in sports in the same scenarios outlined in H.B. 3293—"where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2). All Defendants[2] argue that while it did not define the term, Title IX used "sex" in the biological sense because its purpose was to promote sex equality. Therefore, they argue that H.B. 3293 furthers, not violates, Title IX. I agree.

Title IX authorizes sex separate sports in the same manner as H.B. 3293, so long as overall athletic opportunities for each sex are equal. 34 C.F.R. § 106.41(b)–(c). As other courts that have considered Title IX have recognized, although the regulation "applies equally to boys as well as girls, it would require blinders to ignore that the motivation for the promulgation of the regulation" was to increase opportunities for women and girls in athletics. *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). There is no serious debate that Title IX's

---

[2] Excluding the WVSSAC.

endorsement of sex separation in sports refers to biological sex. Nevertheless, B.P.J. argues that transgender girls are similarly situated to cisgender girls, and therefore their exclusion from girls' teams is unlawful discrimination. But as I have already discussed, transgender girls are biologically male. Short of any medical intervention that will differ for each individual person, biological males are not similarly situated to biological females for purposes of athletics. And, despite her repeated argument to the contrary, transgender girls are not excluded from school sports entirely. They are permitted to try out for boys' teams, regardless of how they express their gender.

I do not find that H.B. 3293, which largely mirrors Title IX, violates Title IX. B.P.J.'s motion for summary judgment on this basis is **DENIED.**

## IV.    Conclusion

I have no doubt that H.B. 3293 aimed to politicize participation in school athletics for transgender students. Nevertheless, there is not a sufficient record of legislative animus. Considering the law under the intermediate scrutiny standard, I find that it is substantially related to an important government interest. B.P.J.'s motion for summary judgment is **DENIED**. Defendant WVSSAC's motion for summary judgment [ECF No. 276] is **DENIED**. The motions for summary judgment filed by the State of West Virginia [ECF No. 285], the Harrison County defendants [ECF No. 278], the State Board defendants [ECF No. 283], and Intervenor Lainey Armistead [ECF No. 286] are **GRANTED** to the extent they argue that H.B. 3293 is constitutional and complies with Title IX. The preliminary injunction is **DISSOLVED**. All other pending motions are **DENIED as moot.**

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:      January 5, 2023

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>   *Plaintiff*,<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>   *Defendants*,<br><br>  and<br><br>LAINEY ARMISTEAD,<br><br>   *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>RELIEF REQUESTED BY FEBRUARY 3, 2023 |

**PLAINTIFF'S MOTION FOR A STAY PENDING APPEAL OF**
**JANUARY 5, 2023 ORDERS [DKT. NOS. 512 AND 513]**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   BACKGROUND ............................................................................................. 1

    A.    H.B. 3293 And This Court's Injunction Allowing B.P.J. To Participate .............. 1

    B.    This Court's Rulings Against B.P.J. And The Need For A Stay Pending
          Appeal .......................................................................................................... 3

III.  LEGAL STANDARD ...................................................................................... 4

IV.   ARGUMENT ................................................................................................... 5

    A.    B.P.J.'s Substantial Merits Arguments Warrant A Stay Pending Appeal ............. 6

    B.    The Equities Strongly Favor A Stay Pending Appeal ......................................... 10

V.    CONCLUSION ................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.M. by E.M. v. Indianapolis Pub. Sch.*,
No. 1:22-cv-01075-JMS-DLP, 2022 WL 2951430 (S.D. Ind. July 26, 2022),
appeal dismissed, No. 22-2332 (7th Cir. Jan. 19, 2023)..........................................6

*Doe* v. *Wood Ctny. Bd*. of *Educ.*, 888 F. Supp. 2d 771, 778 (S.D. W. Va. 2012) ........................10

*Goldstein v. Miller*,
488 F. Supp. 156 (D. Md. 1980) ...............................................................5

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ...................................................... *passim*

*H.B. Rowe Co. v. Tippett*,
615 F.3d 233 (4th Cir. 2010) ...................................................................7

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho 2020), *appeal filed*, 20-35815
(9th Cir. Sept. 17, 2020)................................................................6, 7

*Krell v. Queen Anne's Cty.*,
No. CV JKB-18-0637, 2020 WL 416975 (D. Md. Jan. 27, 2020)...........................................6

*Long v. Robinson*,
432 F.3d 977 (4th Cir. 1970) ...................................................................4

*Nken v. Holder*,
556 U.S. 418 (2009).............................................................................4

*Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*,
No. 1:16CV534(JCC/IDD),
2016 WL 3346349 (E.D. Va. June 16, 2016) ...........................................5

*Peck v. Upshur Cnty. Bd. of Educ.*,
941 F. Supp. 1478 (S.D. W. Va. 1996)..................................................5

*Soule by Stanescu v. Conn. Ass'n of Schs., Inc. et al.*,
No. 21-1365-cv, 2022 WL 17724715 (2d Cir. Dec. 16, 2022).................................6

*Westfield Ins. Co. v. Mitchell*,
No. 2:12-cv-00585, 2013 WL 12166340 (S.D.W. Va. Feb. 7, 2013)........................4

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
No. 2:07-cv-00122, 2007 WL 9717802 (S.D. W. Va. Oct. 11, 2007)............................ *passim*

-i-

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 62(d) ...............................................................................................1, 4, 5

## I.    Introduction

Plaintiff B.P.J., a minor, by and through her next friend and mother, respectfully moves for a stay of this Court's order dissolving the as-applied preliminary injunction pending appeal of the Orders entered by this Court on January 5, 2023 (Dkt. Nos. 512 and 513 ("Orders"). *See* Fed. R. Civ. P. 62(d). This stay motion is about preserving the status quo for a 12-year-old girl who loves to run and whose participation on her girls' cross-country and track-and-field teams harms no one. A stay of the order dissolving the preliminary injunction pending appeal will allow B.P.J. to continue participating on those teams consistent with her gender identity, as she has—without incident—since this Court's preliminary injunction order was entered on July 21, 2021. Tryouts for spring track-and-field are to take place on February 27, 2023. Absent a stay pending appeal, B.P.J. will be barred from participation—a result that will severely and irreparably harm her and benefit absolutely no one. (*See* Dkt. No. 512 at 9 (explaining that the challenged "statute is at best a solution to a potential, but not yet realized, 'problem'").)

Plaintiff respectfully requests that this Court rule on this motion by February 3, 2023, so that Plaintiff may try out for spring track and, as necessary, seek relief from the Fourth Circuit Court of Appeals in order to do so. Although Plaintiff respectfully submits that a stay pending appeal should be granted in full, Plaintiff alternatively seeks a stay pending the Fourth Circuit's resolution of a stay motion.

Plaintiff was unable to confirm WVSSAC's position on the stay prior to filing. All other Defendants did not consent to the stay.

## II.    Background

### A.    H.B. 3293 And This Court's Injunction Allowing B.P.J. To Participate

On April 28, 2021, West Virginia enacted H.B. 3293, a law that categorically bans all transgender girls and women from participating on girls' and women's sports teams within the

1

state.  (Dkt. No. 290 (Pl's SUF) ¶¶ 43-44.)  As this Court has observed, this enactment was "at best a solution to a potential, but not yet realized, 'problem,'" (Dkt. No. 512 at 9) and was "aimed to politicize participation in school athletics for transgender students," (*id.* at 22).

On July 21, 2021, thirteen days after H.B. 3293 took effect, this Court granted then-11-year-old B.P.J., a narrow, as-applied preliminary injunction prohibiting Defendants from enforcing H.B. 3293 against B.P.J. and allowing B.P.J. to participate on the girls' cross-country and track teams at her middle school.  (Dkt. No. 67.)  In so ruling, this Court correctly observed that "B.P.J. has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State," (*id.* at 10), and that, "[a]s applied to B.P.J., [H.B. 3293] is not substantially related to protecting girls' opportunities in athletics or their physical safety when participating in athletics," (*id.* at 11).  This Court also explained that "[i]t is clearly in the public interest to uphold B.P.J.'s constitutional right to not be treated any differently than her similarly situated peers because any harm to B.P.J.'s personal rights is a harm to the share of American rights that we all hold collectively."  (*Id.* at 14.)

Pursuant to this Court's preliminary injunction order, B.P.J. has participated without incident on her middle school's girls' cross-country and track teams over the past year and a half.  (H. Jackson Decl. ¶ 10.)  B.P.J. describes those two years on the girls' teams as "the best of [her] life."  (B.P.J. Decl. ¶ 6.)  B.P.J.'s mother has "never seen [B.P.J.] happier" than when she "pick[s] her up from practices and take her to meets."  (H. Jackson Decl. ¶ 10.)  Not only are these sports a passion of B.P.J.'s, but being able to participate on a team has allowed her to make many friends, show sportsmanship towards her team and girls from other schools, and motivate herself and her teammates to try their hardest at practices and meets.  (*Id.* ¶ 6.)  B.P.J. is far from the most competitive member of her team—consistently finishing near the back of the pack—but is a team

player who loves to play sports, have fun with her friends, and try her best during practices and meets. (H. Jackson Decl. ¶ 10.)[1]

There have been no issues caused by B.P.J.'s participation on Bridgeport Middle School's girls' cross-country and track teams. (Dkt. No. 290 (Pl's SUF) ¶ 120, 127; H. Jackson Decl. ¶ 10.) Additionally, no student was physically harmed by B.P.J.'s participation. (Dkt. No. 290 (Pl's SUF) ¶¶ 127-128, 136.)

B.P.J. is now 12 years old and is in seventh grade at Bridgeport Middle School. In June of 2022, after several years of consulting with her team of medical professionals, B.P.J. was prescribed estradiol, an estrogen-based feminizing hormone therapy used to maintain testosterone levels in the typical female range in transgender girls and women. (H. Jackson Decl. ¶ 5.) B.P.J. is currently taking estradiol in conjunction with her puberty delaying treatment. (*Id*.) As a result, B.P.J. will not go through endogenous puberty and will instead develop physiological characteristics consistent with a typical female puberty. (*Id*.)

B.      **This Court's Rulings Against B.P.J. And The Need For A Stay Pending Appeal**

On January 5, 2023, this Court issued the Orders granting summary judgment to Defendants, dissolving the preliminary injunction, and dismissing the case. (Dkt. Nos. 512, 513.) When B.P.J.'s mother told B.P.J. about this Court's ruling, B.P.J. was devastated. (H. Jackson

---

[1] For example, in the Fall of 2022, B.P.J. participated in five meets as a part of her cross-country season, and her performance was consistent with that in previous seasons. (H. Jackson Decl. ¶ 8.) At the Charles Point Invitation, B.P.J. placed 54 out of 55 participants. (*Id*.) At the Mountain Holler Middle School Invitational, B.P.J. placed 43 out of 53 participants. (*Id*.) At the Taylor County Middle School Invitational, B.P.J. placed 38 out of 46 participants. (*Id*.) At the Elkins Middle School Invitational, B.P.J. placed 78 out of 80 participants. (*Id*.) At B.P.J.'s final race of the season, the Mid-Mountain 10 Conference Middle School Championships, B.P.J. finished 64 out of 65 participants. (*Id*.) During the spring track-and-field season in 2022, B.P.J. placed 36 out of 45 participants in the shotput at the Connect Bridgeport Middle School Invitational. (*Id*. at ¶ 7). At the Ritchie Middle School Pizza Box Invitational, B.P.J. placed 15 out of 25 participants in discus. (*Id*.) At the Harry Green Middle School Invitational, B.P.J. placed 57 out of 61 participants in shotput, and 35 out of 53 participants in discus. (*Id*.)

Decl. ¶ 11; B.P.J. Decl. ¶ 8.)  B.P.J. ran upstairs and "cried in [her] bed the whole night," as she "was terrified about not being able to continue doing the thing that she loves with her best friends." (H. Jackson Decl. ¶ 11; B.P.J. Decl. ¶ 8.)  B.P.J. was scared to go to school the next day and face the friends and teammates she has spent the last two years becoming close with and who she calls her "second family."  (B.P.J. Decl. ¶¶ 9-10.)  To her relief, her classmates were frustrated on her behalf, and told her that they think she should be able to continue playing on the girls' teams. (B.P.J. Decl. ¶ 9.)  B.P.J. is deeply upset that "West Virginia does not see [B.P.J.] for the girl that [she is] and won't let [her] run with [her] friends and be happy."  (B.P.J. Decl. ¶ 9.)

Tryouts for the spring track-and-field season at Bridgeport Middle School begin on February 27, 2023.  (H. Jackson Decl. ¶ 9.)  Unless the status quo is preserved prior to that date through a stay of this Court's dissolution of the preliminary injunction, B.P.J. will not be able to participate on girls' sports teams at school, including the track team at Bridgeport Middle School this Spring.  This will irreparably harm B.P.J.: preventing her from reaping the benefits of school sports on a team with other girls would stigmatize and isolate her as the only student unable to participate consistent with her gender identity, and would erase her from a crucial component of school and community life.  (H. Jackson Decl. ¶ 12.)

### III.   Legal Standard

Where, as here, a district court has issued orders "dissolv[ing] . . . an injunction," the court may "restore" such an injunction pending appeal by issuing a stay.  Fed. R. Civ. P. 62(d).  "To obtain a stay, a party must show '(1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay.'"  *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, No. 2:07-cv-00122, 2007 WL 9717802, at * 1 (S.D. W. Va. Oct. 11, 2007) (quoting *Long v. Robinson*, 432 F.3d 977, 979 (4th Cir. 1970));

4

*accord Westfield Ins. Co. v. Mitchell*, No. 2:12-cv-00585, 2013 WL 12166340, at *2 (S.D.W. Va. Feb. 7, 2013) (quoting, inter alia, *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)).

As this Court has explained, "a court need not 'harbor serious doubts concerning the correctness of its decision' in order to find that the party seeking a stay has a strong likelihood of success on appeal," because "[i]f that were the case, rule 62[d] relief would rarely be granted." *Musgrave*, 2007 WL 9717802, at *1 (quoting *Peck v. Upshur Cnty. Bd. of Educ.*, 941 F. Supp. 1478, 1481 (S.D. W. Va. 1996)). "Rather, '[w]hat is fairly contemplated is that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained.'" *Musgrave*, 2007 WL 9717802, at *1 (quoting, inter alia, *Goldstein v. Miller*, 488 F. Supp. 156, 172-173 (D. Md. 1980)). Thus, "[t]he upshot is that 'a court, when confronted with a case in which the other three factors strongly favor interim relief, may exercise its discretion to grant a stay if the movant has made a substantial case on the merits.'" *Musgrave*, 2007 WL 9717802, at *1 (quoting *Peck*, 941 F. Supp. at 1481); *accord Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC, No. 1:16CV534(JCC/IDD),* 2016 WL 3346349, at *5 (E.D. Va. June 16, 2016) (granting stay pending appeal because "Plaintiff raises a substantial case with several novel legal issues, the balance of equities weighs in favor of granting the stay, and the public interest lies in granting the stay").

## IV. Argument

This Court should grant a stay pending appeal to maintain the status quo for B.P.J. At a minimum, Plaintiff "has made a substantial case on the merits," *id.*, including in light of this Court's prior determination in its preliminary injunction ruling that B.P.J. was likely to succeed on the merits. All three remaining factors strongly favor a stay: B.P.J. will be irreparably harmed if the Orders are not stayed pending appeal; no one will be harmed if the Orders are stayed; and the public interest favors a stay preserving the status quo.

### A.    B.P.J.'s Substantial Merits Arguments Warrant A Stay Pending Appeal

Given that "other three factors strongly favor interim relief,", B.P.J. need only make a "substantial case on the merits" to justify a stay. *Musgrave*, 2007 WL 9717802, at *1; *accord Krell v. Queen Anne's Cty.*, No. CV JKB-18-0637, 2020 WL 416975, at *2 (D. Md. Jan. 27, 2020). B.P.J. has more than satisfied this standard:  not only does she have a substantial case on the merits, but she is likely to succeed on appeal.  Here, this Court initially concluded that B.P.J. was likely to succeed on the merits of both her Equal Protection Clause and Title IX claims.  (Dkt. No. 67 at 11, 13.)  Two other district courts have also held that similar categorical bans on transgender girls and women participating in female sports likely violated either the Equal Protection Clause or Title IX. *See Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) (Equal Protection Clause), *appeal filed*, 20-35815 (9th Cir. Sept. 17, 2020); *A.M. by E.M. v. Indianapolis Pub. Sch.*, No. 1:22-cv-01075-JMS-DLP, 2022 WL 2951430 (S.D. Ind. July 26, 2022) (Title IX), appeal dismissed, No. 22-2332 (7th Cir. Jan. 19, 2023); *see also Soule by Stanescu v. Conn. Ass'n of Schs., Inc. et al.*, No. 21-1365-cv, 2022 WL 17724715, at *8 (2d Cir. Dec. 16, 2022) (citing *Grimm*, among other cases, to state that "discrimination based on transgender status is generally prohibited under federal law," including Title IX).

B.P.J. acknowledges that this Court's Orders now reflect a different view of the merits.  But, as this Court's preliminary injunction order makes clear, there is at a minimum a substantial case that H.B. 3293 is both unconstitutional and in violation of Title IX, including under the Fourth Circuit's ruling in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-597 (4th Cir. 2020), which ruled in favor of a boy who is transgender who brought an as-applied challenge to a restroom policy based on "biological gender."  (Dkt. No. 67 at 2.) (relying on *Grimm*).  There is at least a substantial case that the Fourth Circuit applying *Grimm* will agree with this Court's analysis from the preliminary injunction stage.

6

When this Court concluded that B.P.J. was likely to succeed on her as-applied equal protection challenge, it faithfully applied controlling precedent, including *Grimm*. This Court recognized in its injunction order that H.B. 3293 "discriminates on the basis of transgender status." (Dkt. No. 67 at 7.); *accord Hecox*, 479 F. Supp. 3d at 975; (*see also* Dkt. No. 512 at 22 ("I have no doubt that H.B. 3293 aimed to politicize participation in school athletics for transgender students").) This Court then correctly determined that "Plaintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls," including because "Plaintiff has lived as a girl for years . . . She changed her name to a name more commonly associated with girls. And of the girls at her middle school, B.P.J. is the only girl who will be prevented from participating in school-sponsored athletics." (Dkt. No. 67 at 7.) And just as *Grimm* conducted an as-applied analysis as to whether the school's restroom policy satisfied heightened scrutiny as applied to Grimm in particular, so did this Court's preliminary injunction order, explaining that its "inquiry is constrained to whether this statute is unconstitutional as applied to B.P.J.," which must be determined "based on a developed factual record and the application of a statute to a specific person." (Dkt. No. 67 at 9.) As the Fourth Circuit has made clear in the equal protection context, regardless of whether a plaintiff can "mount a successful facial challenge, [a plaintiff] may nonetheless be able to demonstrate that the application or enforcement of a statute is unconstitutional" if "a court has 'the concrete facts necessary' to assess such an as-applied challenge." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 243 (4th Cir. 2010).

At summary judgment, however, this Court took a quite different approach—one akin to the reasoning of the *Grimm* dissent. *See Grimm*, 972 F. 3d at 628 (Niemeyer, J., dissenting) ("Grimm was born a biological female and identifies as a male, and therefore his circumstances are different from the circumstances of students who were born as biological males. For purposes

of restroom usage, he was not similarly situated to students who were born as biological males."). Among other things, this Court's summary judgment ruling analyzed the classification at issue as a distinction between boys and girls in general, not as specific discrimination based on transgender status, (Dkt. No. 512 at 14, 17.); determined that B.P.J. is similarly situated to a hypothetical cisgender boy with low circulating testosterone rather than the other girls on her team, (*id.* at 19); and failed to analyze B.P.J.'s as-applied claim by examining whether excluding B.P.J. in particular was substantially related to an important governmental interest in light of the fact that she has been receiving puberty-delaying medication and will not go through endogenous puberty because *other* girls who are transgender may not receive similar medical treatment (*id.* at 18). In each of these respects, this Court's summary judgement decision departed from the reasoning employed by the *Grimm* majority and employed reasoning more similar to the *Grimm* dissent.

Likewise, when this Court granted B.P.J.'s motion for a preliminary injunction, it faithfully applied *Grimm*'s Title IX holding. This Court stated that "as in *Grimm*, I also have little difficulty finding that B.P.J. is harmed by this law." (Dkt. No. 67 at 12.) "All other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity." *Id.* "Under this law, B.P.J. would be the only girl at her school, as far as I am aware, that is forbidden from playing on a girls' team and must join the boys' team. Like the discriminatory policy in Grimm, this law both stigmatizes and isolates B.P.J." *Id.* This Court also concluded that the harm to B.P.J. constituted unlawful "discrimination" because "B.P.J. will be treated worse than girls with whom she is similarly situated" since "she alone cannot join the team corresponding to her gender identity." *Id.* at 13.

By contrast, this Court's summary judgment decision rejected B.P.J.'s Title IX claim without mentioning *Grimm*. Instead, this Court stated that "despite her repeated argument to the contrary, transgender girls are not excluded from school sports entirely. They are permitted to try out for boys' teams, regardless of how they express their gender." (Dkt. No. 512 at 22.) But— like the rejected argument that Gavin Grimm could have used the girls' restrooms—the statement that B.P.J. can join a boys' team, "fails to 'meaningfully reckon with what it means for [B.P.J.] to be a transgender [girl].'" *Grimm*, 972 F.3d at 610 n.10. "[D]espite the [Defendants'] contention that there is no problem because [B.P.J.] could have" participated on boys' sports teams, "we must take a careful and practical look at the options [she] realistically faced." *Id.* at 624 (Wynn, J., concurring). "Forcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl" and would be "a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (Dkt. No. 290 (Pl's SUF) ¶ 100.) And in no case would such a theoretical option allow for equal and non-stigmatizing treatment. (*See* Dkt. No. 512 at 12.)

Finally, with respect to whether the harm to B.P.J. constituted unlawful "discrimination" in violation of Title IX, this Court's summary judgment ruling that B.P.J. is similarly situated to other people classified by H.B. 3293 as "biological males," (*id.* at 22), is contrary to *Grimm*'s holding that Gavin Grimm was similarly situated to students of the same gender identity. Moreover, here, as in *Grimm*, just because "the act of creating sex-separated [sports teams] in and of itself is not discriminatory," *Grimm*, 972 F.3d at 618, does not mean that prohibiting students from participating consistent with their gender identity is permitted by Title IX. (*See, e.g.*, Dkt. No. 42 (U.S. Statement of Interest) ("Although the [Title IX] regulations allow recipients to

operate or sponsor separate teams based on sex, the regulations do not define 'sex' or address how students who are transgender should be assigned to such teams."))

***

B.P.J. does not seek to reargue summary judgment. Rather, she respectfully submits that—regardless of whether the Court "harbor[s] serious doubts concerning the correctness of its decision"—she is likely to succeed on the merits on appeal, including under *Grimm*, and, at a minimum, presents "an admittedly difficult legal question" and "substantial case on the merits." *Musgrave*, 2007 WL 9717802, at *1 (internal quotation marks and citations omitted). Accordingly, she has satisfied the standard for a stay pending appeal, particularly given the great harm that B.P.J. will suffer pending an appeal absent a stay.

### B.    The Equities Strongly Favor A Stay Pending Appeal

The non-merits factors all strongly favor a stay pending appeal. B.P.J. "will experience [her] middle school years only once during [her] life," *Doe* v. *Wood Ctny. Bd. of Educ.*, 888 F. Supp. 2d 771, 778 (S.D. W. Va. 2012), and would be irreparably harmed if she is not permitted continue participating on her school's girls' cross-country and track teams. As this Court recognized in its order granting B.P.J. a preliminary injunction, there is "little difficulty finding that B.P.J. is harmed by this law" because "[l]ike the discriminatory policy in *Grimm*, this law both stigmatizes and isolates B.P.J." (Dkt. No. 67 at 12.) This Court also correctly recognized that "[f]orcing a girl to compete on the boys' team when there is a girls' team available would cause her unnecessary distress and stigma [and] would be confusing to coaches and teammates." *Id.* at 13. This Court ultimately found that B.P.J. "will be irreparably harmed if this law were to take full effect." *Id.* B.P.J. respectfully submits that conclusion is just as true today as it was in July 2021. Additional declarations from both B.P.J. and her mother strongly confirm this irrefutable point. (*See* H. Jackson Decl. ¶ 12; B.P.J. Decl. ¶ 9.)

10

In contrast, no harm will befall *anyone* if B.P.J. is permitted to participate in school sports consistent with her gender identity pending resolution of her appeal. *See, e.g.*, *Musgrave*, 2007 WL 9717802, at *2 (comparing "[w]hatever" injury to the defendant versus the harm to the plaintiff which "unquestionably constitutes irreparable injury" and concluding that the equities weighed in plaintiff's favor) (citation omitted). As this Court recognized in its Orders, it is "abundantly clear" that "West Virginia had no 'problem' with transgender students playing school sports and creating unfair competition or unsafe conditions," and thus "the statute is at best a solution to a potential, but not yet realized, 'problem.'" (Dkt. No. 512 at 9.) Indeed, while the preliminary injunction was in place, B.P.J.—the only person known to be impacted by this law—participated without incident on school-sponsored girls' cross-country and track teams alongside her classmates and friends for three seasons. (Dkt. No. 290 (Pl's SUF) ¶ 120, 127); H. Jackson Decl. ¶ 10.) No one was injured as a result of her participation; she did not "dominate" anything (but instead consistently finished at the back of the pack); and her teammates and coaches welcomed her participation on the team. (H. Jackson Decl. ¶ 7.)

Moreover, B.P.J.'s continued medical treatment only confirms this Court's finding in its preliminary order that "B.P.J. has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State." (Dkt. No. 67 at 10.) Not only has B.P.J. continued puberty blocking treatment, but as of June 2022, B.P.J. began taking estradiol, an estrogen-based feminizing hormone therapy used to maintain testosterone levels in the typical female range in transgender girls and women. (H.

11

Jackson Decl. ¶ 5.)  As a result, B.P.J. will not go through endogenous puberty and will instead develop physiological characteristics consistent with a typical female puberty.[2]  (*Id.*)

Finally, the public interest strongly favors B.P.J.'s ability to participate in girls' sports pending appeal.  As this Court explained in its preliminary injunction order, "[i]t is clearly in the public interest to uphold B.P.J.'s constitutional right to not be treated any differently than her similarly situated peers because any harm to B.P.J.'s personal rights is a harm to the share of American rights that we all hold collectively."  (Dkt. No. 67 at 14; *See also* Dkt. No. 512 at 10 "B.P.J., like all transgender people, deserves respect and the ability to live free from judgment and hatred for simply being who she is.")  The same is true today.

## V.    Conclusion

For the foregoing reasons and all others apparent to this Court, B.P.J. respectfully requests that this Court stay the Orders pending appeal.


Dated: January 20, 2023                    Respectfully Submitted,
                                           */s/ Nick Ward*

Joshua Block*                              Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION             Aubrey Sparks (Bar No. 13469)
FOUNDATION                                 AMERICAN CIVIL LIBERTIES UNION OF
125 Broad St.                              WEST VIRGINIA FOUNDATION
New York, NY 10004                         P.O. Box 3952
Phone: (212) 549-2569                      Charleston, WV 25339-3952
jblock@aclu.org                            Phone: (914) 393-4614
                                           nward@acluwv.org
Avatara Smith-Carrington*                  asparks@acluwv.org
LAMBDA LEGAL
1776 K Street, N.W., 8th Fl.               Kathleen Hartnett*
Washington, DC 20006-2304                  Julie Veroff*
Phone: (202) 804-6245                      Zoë Helstrom*
asmithcarrington@lambdalegal.org           COOLEY LLP

---

[2] Defendants have attempted to offer expert testimony arguing that transgender girls have a quantum of an athletic advantage even if they do not undergo endogenous puberty, but that testimony is subject to several pending *Daubert* challenges.  (*See, e.g.*, Dkt. Nos. 316 and 317.)

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org
tborelli@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com
zhelstrom@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

13

A-301

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

        *Plaintiff*,

        v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

        *Defendants*,

        and

LAINEY ARMISTEAD,

        *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

I, Nick Ward, do hereby certify that on this 20th day of January, 2023, I electronically

filed a true and exact copy of ***Plaintiff's Motion for a Stay*** with the Clerk of Court and all parties

using the CM/ECF System.

        */s/ Nick Ward*
        Nick Ward
        West Virginia Bar No. 13703

14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                               *Plaintiff*,

            v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                               *Defendants*,

           and

LAINEY ARMISTEAD,

                               *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## **DECLARATION OF B.P.J.**

I, B.P.J., pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2.       On April 19, 2022, I signed a declaration for my attorneys to submit to the court. When I signed the declaration, I was an 11-year-old girl in sixth grade at Bridgeport Middle School.

3.       I am now a 12-year-old girl, and I am currently in the seventh grade at Bridgeport Middle School.

1

4.      I knew from when I was very little that I am a girl.  I began receiving puberty-delaying medication in 2020 as part of my treatment for gender dysphoria, which I am still receiving.  The doctors gave me a Vantas implant, and I felt so happy that my body would reflect the girl that I am.  In June of 2022, after years of visits, my doctor told me that I was ready to begin an estrogen hormone therapy called Estradiol, and I have been taking that medication in addition to the puberty-delaying medication for the last seven months.

5.      Competing on a team with my friends on the girls' cross-country and track-and-field teams is a central part of my life and identity.  After my Fall cross-country season in 2021, I was very excited to try out for the girls' track-and-field team in the Spring of 2022.  My coach, Ms. Schoonmaker, encouraged me to try out some of the field events based on my running times from my cross-country season so that I could still join the track-and-field team and compete with my friends.  I ended up loving shotput and discus, and I made the team for those two events.  It was so much fun to cheer on my teammates who ran at the meets, and they would cheer me on when I competed in shotput and discus.  I then ran on the girls' cross-country team again in Fall 2022.  I am excited to try out for the girls' track-and-field team this spring and have been preparing to do so.  Tryouts begin on February 27, 2023.

6.      The past two years on Bridgeport Middle School's girls' cross-country and track-and-field teams have been the best of my life.  I love being on a team with my friends.  We have the best time during practices and at cross-country and track-and-field meets.  If I had not been able to join the cross-country or track-and-field teams these last few years, I would have missed out on challenging myself with all the amazing friends I made and the time we got to spend together.  My teammates support me even when I am not the fastest or best on the team.

7.      Every practice and meet is different.  I learn something new at each event, and I am happiest when I am trying my best and motivating my teammates to do their best.  When it rains and our trails become muddy, we have so much fun together being knee-deep in the mud and finishing our runs.  When I compete in meets, I always feel the support from my coach, my teammates, and my family to have fun and keep a positive attitude.  You get to push yourself, and the only way to lose is by not trying your hardest.  I love breathing in the fresh air and feeling proud when I work hard.  I feel so free and fully myself when I am out on the field.

8.      When my mom told me that the court had ruled against me and I would no longer be able to participate on the girls' team with my friends, I felt so angry and upset.  I ran upstairs to my room and cried in my bed the whole night.

9.      I was scared to go to school the next day and tell my friends and my teammates the bad news, but they were so supportive.  Even the kids I am not as close to at school told me they think it is unfair that this law prevents me from participating on the girls' team.  Running on the boys' team is not an option for me, but would be deeply upsetting, humiliating, and confusing because I am a girl.  I feel sad and frustrated that West Virginia does not see me for the girl that I am and won't let me play on a team with my friends and be happy.

10.     I don't want to stop doing the thing that I love and that is part of who I am.  Sports are everything to me and my cross-country and track-and-field teams have become my second family over the last two years.  Nothing makes me happier than being on a team with my friends and competing on behalf of my school.  I have many more years of cross-country and track-and-field left, and I just want the opportunity to participate in school sports like any other girl.

* * *

3

A-305

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on <u>January 20, 2023</u>

_B. P. J._
_____
B.P.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.                                                   Civil Action No. 2:21-cv-00316

WEST VIRGINIA STATE BOARD OF                         Hon. Joseph R. Goodwin
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

## DECLARATION OF HEATHER JACKSON

I, Heather Jackson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration of my own personal knowledge, and, if called as a witness,

I could and would testify competently to the matters stated herein.

2.      On April 19, 2022, I signed a declaration for my attorneys to submit to the court.

3.      I am 54 years old.  I am the mother of two sons, ages 21 and 14, and a 12-year-old

daughter.  I live in Lost Creek, West Virginia.

4.      My daughter's name is B.P.J.  B.P.J. has been on puberty delaying treatment since

2020, under the care of a multidisciplinary team of medical providers with expertise in treating

transgender adolescents.

1

A-307

5.      In June of 2022, under the care of Dr. Kacie Kidd and her team at the West Virginia University Department of Pediatrics, B.P.J. and I were told that B.P.J. was eligible to start hormone therapy.  B.P.J. had pure joy and radiance in her eyes when she realized her body could develop in a way that matches what her brain is telling her.  After we spoke as a family, and after we spoke in-depth with her medical and mental health providers, B.P.J. was prescribed estradiol, an estrogen-based hormone therapy, which she has been taking for the last seven months.  B.P.J. is very comfortable with her treatment plan and is so excited for her body to go through puberty in a way that matches who she is.

6.      For the past year and a half—thanks to the court's injunction order—participating on Bridgeport Middle School's girls' cross-country and track teams has meant everything to my daughter.  Having the opportunity to play on the girls' teams is important to B.P.J. because she feels her happiest when she is out on the field making friends and competing in one of her favorite sports.  She is a gracious teammate and an incredible motivator, and she always tries to have as much fun as possible!

7.      After running with her cross-country team in the Fall of 2021, B.P.J. was so excited for Spring track-and-field in 2022.  Although B.P.J. was not fast enough to make the track-and-field team in running events, her coach, Ms. Schoonmaker, encouraged her to try out for the field events, and B.P.J. focused on shotput and discus.  B.P.J. loved taking on a new challenge, was able to make the team, and participated in meets for those two field events.  At the Connect Bridgeport Middle School Invitational, B.P.J. placed 36 out of 45 participants in shotput, and 29 out of 29 participants in discus; at the Ritchie Middle School Pizza Box Invitational, B.P.J. placed 15 out of 25 participants in discus; and at the Harry Green Middle School Invitational, B.P.J. placed 57 out

A-308

of 61 participants in shotput, and 35 out of 53 participants in discus.  B.P.J.'s 2022 track-and-field meet records are attached hereto as Exhibit A.

8.      After participating on the cross-country and track-and-field teams for both seasons in the 2021-2022 school year, it was no surprise to me that B.P.J. carried this interest into her seventh-grade year, and tried out for, and made, the girls' cross-country team again in the Fall of 2022.  During this second cross-country season of hers, B.P.J. participated in several meets with her teammates.  At the Charles Point Invitation, B.P.J. placed 54 out of 55 participants; at the Mountain Holler Middle School Invitational, B.P.J. placed 43 out of 53 participants; at the Taylor County Middle School Invitational, B.P.J. placed 38 out of 46 participants; at the Elkins Middle School Invitational, B.P.J. placed 78 out of 80 participants; and at the Mid-Mountain 10 Conference Middle School Championships, B.P.J.'s final race of the season, B.P.J. finished 64 out of 65 participants.  B.P.J. did not participate in any additional meets after her final race due to a toe injury that she has since recovered from.  B.P.J.'s 2022 cross-country meet records are attached hereto as Exhibit B.

9.      B.P.J. has been excited about trying out for track again this spring and has been planning to do so.  Tryouts will take place on February 27, 2023.

10.     My daughter's love for participating in school sports is a precious thing.  B.P.J. loves all the friends she has made on the girls' cross-country and track teams, trying her best at every practice and meet, and being a team player.  In her two years of sports with Bridgeport Middle School, B.P.J. has not encountered any problems with any of her teammates or children from any other schools, and her coaches and teachers have been extremely supportive of her participation.  I have never seen my daughter happier than when I pick her up from practices and take her to meets.  Photos from B.P.J.'s 2022 cross-country season are attached as Exhibit C.

11.     This new year of 2023 has been incredibly difficult for B.P.J.  I watched my daughter run upstairs to her room in tears after I told her about the recent ruling against her and removing the injunction that allowed her to participate as the girl she is.  She was devastated and cried for the entire night and told me that she was terrified about not being able to continue doing the thing that she loves with her friends.  The next morning, B.P.J. told me that although she is very sad, she will never stop fighting for her right to play with her teammates and to be treated equally.

12.     Forcing B.P.J. to compete on the boys' cross-country or track-and-field teams would profoundly harm her, erase who she actually is, and make participating in the school sports that bring her so much joy impossible for her.  She cannot be the person she is and compete on the boys' team.

13.     My daughter is a twelve-year old girl who just wants the same opportunities as the other girls in her school.  By refusing to treat her as a girl and singling her out for different treatment than all the other girls, West Virginia sends a clear message that it refuses to see her, accept her, and respect her equally to others.  My daughter will be forever harmed if she is not able to compete alongside her teammates and friends as she has done so happily for the past year and a half.

* * *

4

A-310

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on <u>January 20, 2023</u>    _____
                                                    Heather Jackson

5

**A-311**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | Civil Action No. 2:21-cv-00316 |
| v. | Hon. Joseph R. Goodwin |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | NOTICE OF APPEAL |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

Notice is hereby given that B.P.J., by her next friend and mother, Heather Jackson, appeals to the United States Court of Appeals for the Fourth Circuit from the judgment order entered in this action on January 5, 2023.

Dated: January 23, 2023

Respectfully Submitted,
*/s/ Nick Ward*

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569

Nick Ward (Bar No. 13703)
Aubrey Sparks (Bar No. 13469)
AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952

A-312

jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
1776 K Street, N.W., 8th Fl.
Washington, DC 20006-2304
Phone: (202) 804-6245
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org
tborelli@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Phone: (914) 393-4614
nward@acluwv.org
asparks@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com
zhelstrom@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff,* | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Case No. 2:21-cv-00316   Hon. Joseph R. Goodwin |
| *Defendants,* | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor.* | |

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR A STAY PENDING APPEAL OF JANUARY 5, 2023 ORDERS

## TABLE OF CONTENTS

Table of Authorities ............................................................................iii

Introduction ........................................................................................ 1

Background ......................................................................................... 2

Legal Standard ................................................................................... 5

Argument ............................................................................................ 5

    I.  B.P.J. is not likely to prevail on the merits.................................. 5

        A.    B.P.J. must show a likelihood of success on the merits, not just a "substantial case." .......................................................... 6

        B.    B.P.J.'s argument is inherently contradictory and therefore cannot succeed on the merits. ............................................... 8

    II.  B.P.J. seeks to alter the status quo, not preserve it. .................... 11

    III. The equities—merged with the public interest—weigh against B.P.J. ....... 12

Conclusion ........................................................................................ 15

Certificate of Service........................................................................ 18

TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Kasper v. School Board of St. Johns County*,
 No. 18-13592, 2022 WL 18003879 (11th Cir. Dec. 30, 2022)................... 10, 13

*Andino v. Middleton*,
 141 S. Ct. 9 (2020) .............................................................. 11, 12, 15

*Brown v. Gilmore*,
 533 U.S. 1301 (2001) ................................................................... 2

*Bucklew v. Precythe*,
 139 S. Ct. 1112 (2019) ................................................................. 9

*Clark v. Arizona Interscholastic Association*,
 695 F.2d 1126 (9th Cir. 1982)........................................................ 9

*Clark v. Arizona Interscholastic Association*,
 886 F.2d 1191 (9th Cir. 1989)....................................................... 13

*Doe v. Wood County Board of Education*,
 888 F. Supp. 2d 771 (S.D.W. Va. 2012) ......................................... 13

*Does 1-5 v. Cooper*,
 No. 1:13-cv-711, 2016 WL 10587195 (M.D.N.C. Mar. 2, 2016) ....................... 7

*Goldstein v. Miller*,
 488 F. Supp. 156 (D. Md. 1980) .................................................... 6

*Gregor v. West Virginia Secondary School Activities Commission*,
 No. 2:20-cv-00654, 2020 WL 5997057 (S.D.W. Va. Oct. 9, 2020) ................... 14

*Grimm v. Gloucester County School Board*,
 972 F.3d 586 (4th Cir. 2020) ....................................................... 10

*Kadel v. Folwell*,
 No. 1:19-cv-272, 2022 WL 11166311 (M.D.N.C. Oct. 19, 2022)........................ 7

*Long v. Robinson*,
 432 F.2d 977 (1970) ................................................................ 6, 7

*Neese v. Becerra*,
 No. 2:21-cv-163, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022)..................... 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................... 5, 11

*Ohio Citizens for Responsible Energy, Inc. v. NRC,*
    479 U.S. 1312 (1986) ...................................................................... 11

*Ohio Valley Environmental Coalition, Inc. v. U.S. Army Corps of Engineers,*
    890 F. Supp. 2d 688 (S.D.W. Va. 2012) ....................................... 6, 7

*Peck v. Upshur County Board of Education,*
    941 F. Supp. 1478 (S.D. W. Va. 1996) ......................................... 6, 7

*Petrie v. Ill. High School Association,*
    394 N.E.2d 855 (1979) ..................................................................... 10

*Real Truth About Obama, Inc. v. Federal Election Commission,*
    575 F.3d 342 (4th Cir. 2009) ................................................... 5, 6, 14

*Real Truth About Obama, Inc. v. Federal Election Commission,*
    607 F.3d 355 (4th Cir. 2010) ............................................................ 5

*Real Truth About Obama, Inc. v. Federal Election Commission,*
    559 U.S. 1089 (2010) ........................................................................ 5

*Respect Maine PAC v. McKee,*
    562 U.S. 996 (2010) .......................................................................... 5

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) ............................................................................ 9

*Van Wagner v. Atlas Tri-State SPE, LLC,*
    No. 3:11-cv-75, 2011 WL 10621664 (N.D.W. Va. Nov. 1, 2011) ........................ 7

*West v. Radtke,*
    48 F.4th 836 (7th Cir. 2022) .......................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................... 5, 13

*Wise v. Circosta,*
    978 F.3d 93 (4th Cir. 2020) ............................................................ 12

## INTRODUCTION

This Court recently ruled in a comprehensive opinion that West Virginia Code § 18-2-25d ("Sports Act") is constitutionally sound and consistent with Title IX's goals of promoting educational opportunities for women and girls. Mem. Op. and Order (Op.) 22 (Doc. 512). In doing so, this Court recognized that this case is *not* about "B.P.J.'s existence as a transgender girl." Op. 10. Instead, this Court considered whether West Virginia may lawfully maintain sex-separated sports based on the Code's definition of "biological sex," which looks to "physical form" based on "reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1). And given that biology is the reason for separate men's and women's teams, it found the Sports Act to be lawful.

B.P.J. now asks this Court not for a stay but an ongoing injunction, suspending the Sports Act's application to B.P.J. pending appeal. B.P.J. 's Motion asserts that B.P.J. "is likely to succeed on the merits on appeal," that an injunction is necessary to preserve the status quo, and that the equities "strongly favor" an injunction because "no harm will befall anyone if B.P.J. is permitted to participate in school sports consistent with her gender identity." Pl.'s Mot. For a Stay Pending Appeal of Jan. 5, 2023 Orders (Mot. To Stay) 10–11 (Doc. 515).[1] These arguments, however, fail under the clearly applicable legal standard.

In starting with the merits, everyone—including B.P.J.—agrees that separate men's and women's teams exist to accommodate the average physiological differences between men and women. Still, B.P.J. argues that the state should designate athletic teams only according to gender identity even though gender identity does not affect a person's physiology. This argument cannot succeed. It is the biological classification and its effect on athletic performance – not gender identity – that motivates and

---

[1] This brief references page numbers according to a document's original pagination or bates stamp where it differs from the ECF stamp.

justifies the existence of girls' teams.

Far from preserving the status quo, B.P.J. seeks to upend it. B.P.J. is "seeking not merely a stay of [this Court's] judgment, but an injunction against the enforcement of a presumptively valid state statute." *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers). And Supreme Court and Fourth Circuit caselaw explicitly instruct that when a state acts to protect the health and welfare of its citizenry, it is the *state's* actions that set the status quo, not a federal court's intervention. This, too, dooms B.P.J.'s request since B.P.J. gets the relevant stay standard wrong.

Finally, the equities and public interest favor Defendants. West Virginia's statute separates males and females such that female competition is protected, allowing females who desire to compete in sports involving competitive skill or contact to compete fairly and safely against other biological females only. Thus, West Virginia Code § 18-5-25d helps keep biological females safe in contact sports and preserves a level playing field, whether in terms of where females finish in competition against each other or any other sports-related opportunity. Ultimately, this Court must – and did – consider the public's interest, not just the alleged harms to one individual. That public interest is manifest in the statute, which has passed constitutional muster. And it would now be inequitable to require Defendants to suspend application of the Sports Act against *only* B.P.J. while they are enforcing it against all others.

B.P.J.'s arguments cannot meet the heavy burden necessary for an injunction. This Court should deny the motion.

## BACKGROUND

In April 2021, West Virginia passed H.B. 3293, codified as West Virginia Code § 18-2-25d, which requires public schools to designate sports teams "based on

biological sex" and prevents biological male students from intruding into female sports, specifically competitive or contact sports. W. Va. Code § 18-2-25d(c)(1). Lawmakers passed the Sports Act to "promote equal athletic opportunities for the female sex" based on the "inherent differences" between the sexes, aware of occurrences of males competing against (and beating) female athletes in women's track events in other states. *Id*. at (a)(1)–(5); *see* Op. 9, 15.

Shortly before the Sports Act became effective, B.P.J. brought the present litigation. B.P.J. is a 12-year-old biological male who identifies as female. *See* Op. 1, 17–18; Mot. to Stay 3. B.P.J. takes hormones in conjunction with puberty blockers that will (according to B.P.J.) allow B.P.J. to "develop physiological characteristics consistent with a typical female puberty." Mot. to Stay 3. Not all biological males who identify as female elect to take medications to suppress their endogenous hormone production. Some "choose to only transition socially, rather than medically." Op. 18. "[T]he social, medical, and physical transition of each transgender person is unique." *Id*. And "there is much debate over whether and to what extent hormone therapies after puberty can reduce a transgender girl's athletic advantage over cisgender girls." *Id*.

In July 2021, this Court issued a preliminary injunction based on a preliminary and incomplete record, enjoining the Sports Act's application to B.P.J., and allowing B.P.J. to compete in girls' sports as this case proceeded. For three seasons, B.P.J. competed on the Bridgeport middle school's girls' cross-country and track and field teams.

For three seasons, B.P.J. also displaced female competitors. In doing so, B.P.J. sometimes placed near the bottom of the rankings, while in other competitions B.P.J. beat dozens of biological female competitors. And though it "may not seem like a big deal to some, placements matter to athletes." App. to Def.-Intervenor's Mot. for Summ. J. (App.) 61 (¶ 17) (Doc. 286-1); *see also id*. at 7 (¶¶ 40–43). For example,

during the 2022 cross country and track seasons, B.P.J. sometimes placed last or near the bottom of the rankings, while in other competitions B.P.J. beat dozens of competitors. At one track and field invitational, "B.P.J. placed 15 out of 25 participants in discus." Decl. of Heather Jackson ¶ 7 (Doc. 515-2). At another B.P.J. placed "35 out of 53 participants in discus." *Id.* At one cross-country invitational during the fall, "B.P.J. placed 43 out of 53 participants," and at another "B.P.J. placed 38 out of 46 participants." *Id.* ¶ 8.

On January 5, 2023, this Court granted summary judgment to most Defendants after it received a more complete record than at the preliminary-injunction stage.[2] Based on that complete record, including certain important concessions by B.P.J., this Court observed—as B.P.J. concedes—that average circulating testosterone levels give males a biological advantage in athletic performance over their female counterparts. Op. 17. These "inherent physical differences between the sexes" make "biological males [] not similarly situated to biological females for the purposes of athletics." *Id.* at 17, 22. The fact that an individual biological male—whether due to naturally low testosterone or medical interventions—may lack typical levels of circulating testosterone does not negate the State's substantial interest in advancing equitable athletic opportunities for females by designating sports teams according to sex. *Id.* at 17, 19. This Court concluded that the Sports Act is constitutional and consistent with Title IX, dissolved the preliminary injunction, and granted summary judgment. *Id.* at 19, 22.

B.P.J. now seeks an injunction pending appeal so that B.P.J. can try out for girls' spring track. Mot. to Stay 1.

---

[2] The West Virginia Secondary Schools Activities Commission's summary judgment motion was denied. Summary judgment was granted to the remaining Defendants and Defendant-Intervenor Lainey Armistead.

LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) allows courts to "restore, or grant an injunction" pending appeal. Injunctive relief is "an extraordinary remedy that may only be awarded upon *a clear showing* that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added), particularly when a party is "asking for an injunction against enforcement of a presumptively constitutional state legislative act." *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010). Indeed, this type of request "demands a significantly higher justification than a request for a stay." *Id.* (cleaned up)

A party seeking the injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of … relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "And all four requirements must be satisfied." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20), *vacated on other grounds*, 559 U.S. 1089 (2010).[3]

Here, the equities merge with the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("harm to the opposing party and weighing the public interest … factors merge when the Government is the opposing party"). And "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

ARGUMENT

**I.      B.P.J. is not likely to prevail on the merits.**

B.P.J.'s motion fails for at least three reasons—most plainly because B.P.J. is not likely to succeed on the merits of this case.

---

[3] In its subsequent opinion on remand, the Fourth Circuit reaffirmed the injunction standards discussed in the prior opinion. *Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355, 355 (4th Cir. 2010).

5
A-322

### A. B.P.J. must show a likelihood of success on the merits, not just a "substantial case."

To begin, B.P.J. incorrectly asserts that a plaintiff need only show a "substantial case on the merits" to obtain an injunction. Mot. to Stay 5–6. B.P.J. relies on a now-superseded standard that traces back to *Long v. Robinson*, 432 F.2d 977, 979 (1970). According to *Long* and its progeny, courts considering stays pending appeal may balance all the factors to see if the equities make up for a less-than-meritorious case. *See id.* at 981; *Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 890 F. Supp. 2d 688, 692 (S.D.W. Va. 2012) ("the factors are balanced, such that a stronger showing on some of these prongs can make up for a weaker showing on others"). Under this line of cases, a party needed to show only a "substantial case on the merits," or that they "raise difficult and serious questions," if the other three factors weigh in their favor. *Peck v. Upshur Cnty. Bd. of Educ.*, 941 F. Supp. 1478, 1481 (S.D. W. Va. 1996) (quoting *Goldstein v. Miller*, 488 F. Supp. 156, 172 (D. Md. 1980)). Indeed, these cases suggest that a party could obtain relief even if the "chance of prevailing … is only fifty percent or less" when the "balance of equities" weighs in their favor. *Goldstein*, 488 F. Supp. at 172.

But as the Fourth Circuit has explained, this standard "now stands in fatal tension with the Supreme Court's 2008 decision in *Winter*." *Real Truth,* 575 F.3d at 346. *Winter* repudiated the balancing approach that courts like the Fourth Circuit used to apply to preliminary injunction requests. *Id.* at 347. Now, "all four requirements must be satisfied." *Id.* at 346. Since preliminary injunctions are analogous to injunctions pending appeal, B.P.J. must "clearly demonstrate that [B.P.J.] will likely succeed on the merits," which is a "far stricter" standard than the one on which B.P.J. relies. *Id.* at 347 (explaining that "a grave or serious question for litigation" is insufficient for injunctive relief).

To be sure, district courts disagree on whether and to what extent *Real Truth* altered the standard for relief pending appeal because the case only considered preliminary injunctions. *See Kadel v. Folwell*, No. 1:19-cv-272, 2022 WL 11166311, at *2 (M.D.N.C. Oct. 19, 2022) (collecting cases); *Does 1-5 v. Cooper*, No. 1:13-cv-711, 2016 WL 10587195, at *1 (M.D.N.C. Mar. 2, 2016) ("the precise standard in the Fourth Circuit for issuing a stay pending appeal is somewhat unclear"). But *Real Truth* provides the better, more logically-consistent approach. The Fourth Circuit has always demanded a stronger showing to justify relief pending appeal than it has for preliminary injunctions. *Long*, 432 F.2d at 979; *Van Wagner v. Atlas Tri-State SPE, LLC*, No. 3:11-cv-75, 2011 WL 10621664, at *5 (N.D.W. Va. Nov. 1, 2011) ("[A]n applicant for a motion to stay will have more difficulty establishing the likelihood of success on the merits factor." (cleaned up)); *Peck*, 941 F. Supp. at 1481 (party seeking injunction pending appeal bears a "significantly heavier burden … than they assumed at the preliminary injunction stage").

That approach makes sense. A preliminary injunction asks for relief while the facts and arguments are still developing. After this Court has finally and dispositively considered the issues, it must be harder, not easier, to obtain the same relief. *Peck*, 941 F. Supp. at 1481 ("This heavier burden is, of course, due to the fact that the Court has issued a decision on the merits[.]"). And here, this Court has considered *all* the evidence and arguments at summary judgment.

Even if this court wishes to balance the factors, though, B.P.J. "must make *at least as strong* a showing on the first prong (likelihood of success)—and certainly not a lesser showing—as compared to a party moving for a preliminary injunction." *See Ohio Valley*, 890 F. Supp. 2d at 692 (concluding *Real Truth* "does not apply directly to stays" but is still relevant to the analysis). Thus, it's not enough to "merely show serious questions going to the merits" or a substantial case. *Id.* Instead, B.P.J. must show a likelihood of success on the merits during appeal.

**B. B.P.J.'s argument is inherently contradictory and therefore cannot succeed on the merits.**

In between B.P.J. and the relief that B.P.J. seeks lies a conundrum. The whole reason—indeed, the only constitutionally permissible reason—for designating sports teams by sex is to accommodate the average physiological differences between the sexes, which are rooted in biology. This gives biological females an opportunity to compete on equal footing. So how can it be illegal or unconstitutional, as B.P.J. argues, to separate sports teams based on biology?

This Court correctly recognized that B.P.J.'s argument is internally inconsistent. B.P.J. agrees that laws and policies designating athletic teams by sex are generally lawful because it would not be fair for (the vast majority of) biological males to participate in women's sports because of their (on average) physiological advantages. Yet B.P.J. simultaneously argues that a biology-based classification is unlawful. Indeed, B.P.J. contends that gender identity alone should control whether a person is eligible to participate in male sports or female sports, even though gender identity denotes nothing about a person's physical characteristics or relative athletic abilities. While B.P.J. makes arguments about the effects of puberty blockers and medical interventions, B.P.J. does not argue that biological males with naturally low testosterone levels, or those who lack athleticism, should be allowed to participate on women's sports teams. As this Court has recognized, B.P.J.'s positions are irreconcilable. Op. 19.

In short, B.P.J. advocates for a classification (gender identity) that has no connection to athletic performance. As this Court recognized, B.P.J.'s theory is that "transgender girls are similarly situated to cisgender girls for purposes of athletics at the moment they verbalize their transgender status, regardless of their hormone levels." Op. 19. B.P.J. further argues that the state's preferred classification (biology), which *is* an accurate proxy for average athletic performance, is invalid.

This cat's cradle of contradictions dooms B.P.J.'s case and, more acutely, this particular motion. If designating sports teams based on sex is valid because of the average physiological differences between males and females, it cannot be invalid because it demarcates based on biology. And a sex classification that is validly applied to males *because* they are biologically male must be valid when applied to B.P.J. *because* B.P.J. is biologically male. *See* Op. 18. B.P.J.'s claim may be "novel" and perhaps "difficult," Mot. to Stay 5, but this Court properly rejected it as facially illogical.

B.P.J. pivots on the equal-protection claim by attempting to manipulate the legal standard—arguing that this is an "as-applied" challenge that looks exclusively at how the law affects B.P.J. But "classifying a lawsuit as facial or as-applied ... does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). If B.P.J. were correct, and courts must decide "whether excluding B.P.J. in particular was substantially related to an important governmental interest," Mot. to Stay 8, every male with low testosterone or poor athletic skills could mount an as-applied challenge to the Sports Act.

This Court faithfully followed binding Supreme Court and Fourth Circuit precedent affirming that intermediate scrutiny does not require that a classification be "capable of achieving its ultimate objective in every instance." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001). Instead, courts look at the classification itself. B.P.J. fails to explain why B.P.J.'s rule doesn't apply to other males who desire (perhaps with good reason) to participate on women's sports teams. *See Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982) (rejecting male's challenge to women's-only volleyball team where school did not offer men's team); *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855 (1979) (same). To grant B.P.J.'s motion would be to effectively overrule these cases.

It follows that B.P.J.'s Title IX claim also fails. Title IX prohibits schools from treating an "individual worse than others who are similarly situated.'" *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) (citation omitted). But B.P.J.'s medical interventions do not make B.P.J. similarly situated to biological females in the context of athletics. Otherwise, males with low testosterone or other unique circumstances could make the same claim. And the fact that B.P.J. *must* take puberty blockers to (allegedly) achieve the physiology of a girl proves that gender identity alone does not make B.P.J. similarly situated to biological females either.

Biology also explains why *Grimm* does not control the outcome here. *Grimm* was based on privacy interests that are, according to *Grimm*, tied to a person's gender identity. But gender identity does not affect biology. Op. 22. And because sex-separated sports are based on physical competitiveness rather than privacy interests, a gender identity classification does not work in this context. That makes *Grimm* inapposite.

Furthermore, this Court's ruling on summary judgment is supported by a growing consensus that laws acknowledging biological differences in sports and other areas of life comply with equal protection and Title IX. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2022 WL 18003879, at *8 (11th Cir. Dec. 30, 2022) (finding bathrooms designated according to biological sex satisfied equal protection and Title IX); *West v. Radtke*, 48 F.4th 836, 852 (7th Cir. 2022) (explaining a "sex-based classification" exempting prisoner from "cross-sex strip searches" by transgender prison guard is lawful); *Neese v. Becerra*, No. 2:21-cv-163, 2022 WL 16902425, at *11 (N.D. Tex. Nov. 11, 2022) (federal government's "reinterpretation of Title IX … imperils the very opportunities for women Title IX was designed to promote and protect — categorically forcing biological women to compete against biological men").

B.P.J.'s merits argument is not sound, and therefore, B.P.J.'s request for an injunction pending appeal must fail.

## II.    B.P.J. seeks to alter the status quo, not preserve it.

B.P.J. purports to ask for a "stay pending appeal to maintain the status quo." Mot. to Stay 5. But what B.P.J. actually requests is that this Court "restore … an injunction," prohibiting the enforcement of a law duly enacted by West Virginia's democratically elected Legislature. Fed. R. of Civ. P. 62(d).

"An injunction and a stay have typically been understood to serve different purposes." *Nken*, 556 U.S. at 428. An injunction "is a means by which a court tells someone what to do or not to do." *Id*. Whereas "a stay operates upon the judicial proceeding itself … by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Id*. Though the two may share "some functional overlap," a stay generally "suspends judicial alteration of the status quo." *Id*. at 429 (cleaned up) (quoting *Ohio Citizens for Resp. Energy, Inc. v. NRC,* 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)). But a federal court injunction "grants judicial intervention," thereby altering the status quo. *Id*.

That is always the case when a federal court enjoins a duly enacted state law. The Supreme Court recently reaffirmed this principle when it reinstated a state election law that a lower court had enjoined during the Covid-19 pandemic. *Andino v. Middleton*, 141 S. Ct. 9 (2020). States have primary responsibility for protecting the health and safety of their citizens, particularly "in areas fraught with medical and scientific uncertainties" like this one. *Id.* at 10 (Kavanaugh, J., concurring) (citation omitted). "It follows that a State legislature's decision" in these areas "should not be subject to second-guessing by an 'unelected federal judiciary' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id*.

Put succinctly, *Andino* instructs that "it is the state's action—not any intervening federal court decision—that establishes the status quo." *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (en banc) (rejecting request to enjoin state election procedures). So, "even if reasonable minds can disagree on the merits, an injunction is still inappropriate here." *Id.* at 103.

## III.   The equities—merged with the public interest—weigh against B.P.J.

B.P.J. asserts that the remaining factors favor an injunction because (a) an injunction "harms no one," (b) without one B.P.J. cannot participate in sports, and (c) enjoining the law is necessary to respect B.P.J.'s identity. Mot. to Stay 1. For the reasons already explained, these factors make little difference. Moreover, B.P.J.'s arguments are wrong, and none of them favors an injunction in this case.

B.P.J.'s request would lead to more inequities. If this Court reinstates an injunction, what should schools say to the biological male whose gender identity switches "back and forth"? App. 1097 (121:3–6). Or how should schools handle a request from another biological male who identifies as female or a biological male who has some other unique circumstance that makes the girls' team a "better fit"? There is no limiting principle that would justify excluding other males who desire to participate on a girls' team. Rather than promoting the public interest, an exception would create more inequity. The public interest is better served by applying the law consistently to everyone.

Moreover, the Sports Act represents the state's considered judgment about the harms of allowing biological males to compete in women's sports. After legislators debated its pros and cons, they chose to protect fair play for biological females at all public schools (secondary and higher education), whether it was seasoned collegiate athletes like Lainey Armistead, or middle schoolers who are still developing their motor skills. In other words, West Virginia chose to protect biological females no

matter how prestigious or "important" the sporting event. It protects biological females competing in their middle school turkey trot, biological females who do not receive any accolades for their efforts, and even biological females competing for last place. Indeed, girls "who are only average high school athletes ... would fare even worse" than elite athletes if they were forced to compete against biological males. *Adams*, 2022 WL 18003879, at *21 (Lagoa, J., concurring).

Although B.P.J. disagrees with that judgment, B.P.J. wrongly asserts that the harm is one-sided. Importantly, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Consider the biological females who have already lost to B.P.J. in competitions. *See, e.g.*, Mot. to Stay, Ex. A (Doc. 515-3). The Motion to Stay focuses only on how the law affects one person (i.e. B.P.J.) and complains that it would "erase who she is." Mot. to Stay 9. But this Court should consider—indeed, must consider—the interest of every biological female athlete who desires to compete in female-only competition. "If males are permitted to displace females … even to the extent of one player … the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989). And biological females—no less than B.P.J.—"will experience their middle school years only once during their life." *Doe v. Wood Cnty. Bd. of Educ.*, 888 F. Supp. 2d 771, 778 (S.D.W. Va. 2012). Their lives, interests, and dignity matter, too.

Ironically, B.P.J. minimizes the importance of biological female-only competitions to downplay the effects of B.P.J.'s participation. But placing 16th instead of 15th directly impacts the girl who got bumped. "[It] may not seem like a big deal to some, but placements matter to athletes." App. 61 (¶ 17). They understand that losing is a part of every sport, but they still want to earn their spot "fair and square." *Id.* Also, no one can say how B.P.J.'s finishes will change with continued

participation on the girls' team; the fact that B.P.J.'s past performances were not top-tier results does not mean that, as B.P.J. becomes one of the older students on the team and grows and matures, those results could change markedly. This is frequently the case in middle school (and even high school) sports, when motivated young athletes grow, train, and mature: they become the higher finishers and strongest competitors. The fact that B.P.J. has not placed or won up to this point is no reason to prevent enforcement of a law duly enacted nearly two years ago and now adjudged constitutional. B.P.J.'s argument falls short of the "clear showing" necessary for relief. *Real Truth,* 575 F.3d at 346.

Indeed, even now there is an increasing amount of literature affirming that biological males—even those who take puberty blockers and supplement their hormones—will retain physiological advantages over biological females.[4] Despite B.P.J.'s repeated assertions that medical interventions allow B.P.J. to "develop [the] physiological characteristics" of a girl, Mot. to Stay 3, the evidence and peer-reviewed studies do not support this with anything approaching certainty.

Finally, while B.P.J. disclaims the possibility of competing on the boys' team, B.P.J. cannot ignore that sports teams are separated to accommodate the average physiological differences between the sexes, not diverse gender identities. As this Court itself noted, B.P.J. may participate on the boys' team, even if B.P.J. has no desire to do so. Op. 22; *see also Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No. 2:20-cv-00654, 2020 WL 5997057, at *3 (S.D.W. Va. Oct. 9, 2020). And unlike bathrooms, many women and girls throughout West Virginia and the country have long sought to compete on boys' teams because they desire a higher level of

---

[4] *See* Lidewij Sophia Boogers et al., *Transgender Girls Grow Tall: Adult Height Is Unaffected by GnRH Analogue and Estradiol Treatment*, 107 The Journal of Clinical Endocrinology & Metabolism no. 9 (Sept. 2022), https://doi.org/10.1210%2Fclinem%2Fdgac349.

competition. *See O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301 (1980). A girl competing on the boys' team need not be strange or uncomfortable because it is far from a unique occurrence.

Defendants acknowledge that this is a contentious issue fraught with emotions. But that is one more reason for this Court to defer to West Virginia's elected representatives. *See Andino*, 141 S. Ct. at 10 (Kavanaugh, J., concurring). B.P.J. may have a different view of how to balance the equities, but those public policy arguments are better made to West Virginia legislators than this Court.

CONCLUSION

This Court should deny Plaintiff's motion for stay pending appeal.

Respectfully submitted this 27th day of January, 2023.

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd. E,
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: curtis.r.a.capehart@wvago.gov

*Counsel for Defendant, STATE OF*
*WEST VIRGINIA*

 /s/ *Kelly C. Morgan*
 Kelly C. Morgan
 Michael W. Taylor
 Kristen Vickers Hammond
 BAILEY & WYANT
 P. O. Box 3710
 Charleston, WV 25337-3710
 Telephone: 304-345-4222
 Fax: 304-343-3133
 Email: kmorgan@baileywyant.com
 mtaylor@baileywyant.com
 khammond@baileywyant.com

*Attorneys for Defendants*
*West Virginia State Board of*
*Education and Clayton Burch*

/s/ *Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
Telephone: 304-253-1230
Fax: 304-255-1520
bsteelelawoffice@gmail.com

Jonathan Scruggs, AZ Bar No. 030505*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: 480-444-0020
Fax: 480- 444-0028
jscruggs@adflegal.org

Christiana Kiefer, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: 202-393-8690
Fax: 202-347-3622
ckiefer@adflegal.org

Johannes Widmalm-Delphonse, VA Bar
No. 96040*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: 571-707-4655
Fax: 571-707-4656
Email:
jwidmalmdelphonse@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
Telephone: 480-502-2119

*/s/Roberta F. Green*

Roberta F. Green
Kimberly M. Bandy
Shannon M. Rogers
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street East, Suite 200
25301
Charleston, WV 25339
(304) 345-1400
(304) 343-1826 FAX
rgreen@shumanlaw.com
kbandy@shumanlaw.com
srogers@shumanlaw.com

Shannon Marlowe Rogers
MILLER & AMOS
Suite 300
2 Hale Street
Charleston, WV 25301
Telephone: 757-635-8836
Email: srogers@shumanlaw.com

*Attorneys for Defendant*
*West Virginia Secondary School*
*Activities Commission*

Fax: 480) 452-0900
tducar@azlawyers.com

*\*Visiting Attorneys*

*Attorneys for Defendant-Intervenor*

*/s/ Susan L. Deniker*

Susan L. Deniker
Jeffrey Mark Cropp
STEPTOE & JOHNSON
400 White Oaks Boulevard
Bridgeport, WV 26330
Telephone: 304-624-8000
Fax: 304-624-8183
Email: susan.deniker@steptoe-
johnson.com
Jeffrey.Cropp@steptoe-johnson.com

*Attorneys for Defendants*
*Harrison County Board of Education*
*and Dora Stutler*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff,*

    v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA,

*Defendants,*

    v.

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Brandon Steele, hereby certify that on January 27, 2023, I electronically filed a true and exact copy of *Defendants' Response to Plaintiff's Motion for a Stay Pending Appeal of January 5, 2023 Orders* with the Clerk of Court and all parties using the CM/ECF system.

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
Telephone: 304-253-1230
Fax: 304-255-1520
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

                Plaintiffs,

v.                                CIVIL ACTION NO.  2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the court is Plaintiff's Motion for a Stay Pending Appeal. [ECF No. 515]. For the reasons stated herein, B.P.J.'s motion is **DENIED**.

### I.  Background

This case concerned the lawfulness of West Virginia's Save Women's Sports Act (the "Act"), a law passed by the West Virginia Legislature in April 2021. The Act classifies school athletic teams according to biological sex and prohibits biological males from participating on athletic teams designated for females. W. Va. Code § 18-2-25d(a)(5), (b), (c)(2). B.P.J., a transgender minor seeking to join her middle school's girls' cross country and track teams, filed a Complaint with this court, alleging that the Act violates the Equal Protection Clause of the Fourteenth Amendment and Title IX. [ECF No. 1]. On July 21, 2021, I granted B.P.J. a preliminary injunction enjoining enforcement of the Act against her. [ECF No. 67]. Thus, B.P.J. was able to compete on the girls' cross country and track teams during the pendency of this case.

The parties filed motions for summary judgment on April 21, 2022. [ECF Nos. 276, 278, 283, 285, 286, 289]. On January 5, 2023, I denied B.P.J.'s motion for summary judgment and granted summary judgment in favor of the State of West Virginia, the Harrison County defendants, the State Board defendants, and Intervenor Lainey Armistead (collectively, the "Defendants"). [ECF No. 512]. I also dissolved the preliminary injunction. *Id.*

On January 20, 2023, B.P.J. filed the instant motion requesting that the court stay its January 5, 2023 Order, dissolving the preliminary injunction, until her appeal is resolved. [ECF No. 515]. B.P.J. seeks this relief so that she can "continue participating on those [athletic] teams consistent with her gender identity." *Id.* at 5. Defendants jointly responded on January 27, 2023. [ECF No. 520]. B.P.J. replied on January 30, 2023. [ECF No. 521].

## II.    Legal Standard

Rule 62(d) of the Federal Rules of Civil Procedure permits the court to "restore" an injunction "[w]hile an appeal is pending from . . . final judgment that . . . dissolves . . . [the] injunction." When ruling on a motion to stay an order, the court considers the following four factors: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S.

2

770, 776 (1987)). "The first two factors . . . are the most critical," and a party seeking

a stay must demonstrate more than a mere possibility of success on the merits. *Id.* at

434.

## III.    Discussion

As the Defendants have acknowledged, this was a novel and difficult case. *See*

[ECF No. 520, at 13]. With respect to the instant motion, the second, third, and fourth

factors weigh heavily in favor of granting B.P.J.'s motion for a stay. B.P.J. is a twelve-

year-old transgender girl in middle school, often considered a memorable and pivotal

time in a child's life. For many children, the middle school experience is shaped

considerably by their participation on their school's athletic teams. B.P.J.'s

experience has been no different. [ECF No. 515-1, ¶¶ 5–6]. Moreover, as I expressed

in my previous Orders, not one child has been or is likely to be harmed by B.P.J.'s

continued participation on her middle school's cross country and track teams. [ECF

No. 67, at 11; ECF No. 512, at 9]. Both cross country and track are non-contact sports,

and B.P.J. often finishes near the end of the pack, [ECF Nos. 515-3, 515-4]. I am

unpersuaded, as Defendants have argued, that B.P.J. finishing ahead of a few other

children, who would have placed one spot higher without her participation,

constitutes a substantial injury. In the end, the only person truly injured by the

enforcement of the Act against her is B.P.J., who must now watch her teams compete

from the sidelines. It is in the public interest that all children who seek to participate

in athletics have a genuine opportunity to do so. Moreover, there is a public interest

in celebrating not only the unique differences of those who fit into society's binary world but also those who fall outside that box.

That said, a law is not deemed unconstitutional simply because it causes harm. When analyzing equal protection claims, courts apply different levels of scrutiny to different types of classifications. In this case, the court applied intermediate scrutiny to the Act because the Act "separates student athletes based on sex." [ECF No. 512, at 14]. This level of scrutiny applied to both B.P.J.'s facial and as-applied challenges. *See Oswald v. Ireland-Imhof*, 599 F. Supp. 3d 211, 218 (D.N.J. 2022) (applying the same level of scrutiny to the plaintiff's facial and as-applied challenges). To pass intermediate scrutiny, a law must be substantially related to an important governmental objective. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).

As I explained in my Order granting summary judgment to the Defendants, B.P.J. never challenged the well-accepted practice of separating sports by sex; rather, she only challenged the state's definitions of "male" and "female," which determine the athletic team an individual may participate on. [ECF No. 512, at 10]. To achieve sex-separated sports, however, the state needed to adopt some definition to determine eligibility for participation on either team. In this case, the state, claiming an interest in promoting equal athletic opportunities for females, drew the line at biological sex determined at birth. It is common knowledge that "sex, and the physical characteristics that flow from it," are linked "to athletic performance and fairness in sports." *Id.* at 19. Thus, separating athletic teams based on biology is substantially

4

related to the state's important interest in providing equal athletic opportunities to females, who would otherwise be displaced if required to compete with males. The Act, therefore, is not violative of the Equal Protection Clause.

As for Title IX, which authorizes sex-separate sports, "[t]here is no serious debate that [its] endorsement . . . refers to biological sex." *Id.* at 21–22. Like the alleged interest put forth by the state in this case, the goal of Title IX "was to increase opportunities for women and girls in athletics." *Id.* at 21 (citing *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993)). Thus, I could not, and still cannot, find that the Act, "which largely mirrors Title IX, violates Title IX." *Id.* at 22. As such, I am unpersuaded that B.P.J. is likely to succeed on her facial challenge of the Act on appeal.

Under the above analysis, the state is permitted to use biology as the sole criterion in separating school athletic teams. The legislature, of course, could have used less rigid definitions which would allow transgender individuals to play on the athletic team consistent with their gender identity. Indeed, more inclusive definitions might have even furthered the legislature's stated objective. "But it [was] not for the court to impose such a requirement here." *Id.* at 19. The question before the court was whether the Act survives intermediate scrutiny, and intermediate scrutiny does not require the tightest fit between means and ends for a law to withstand constitutional muster.

5

B.P.J.'s as-applied challenge asked the court to consider her gender in lieu of sex and to include her in the state's definition of "female." To do so, the court would have needed to assess B.P.J.'s individual characteristics, which is not appropriate under intermediate scrutiny. The court was required, instead, to consider whether excluding B.P.J. from teams designated as female—because she is biologically male and males consistently outperform females in athletics—is substantially related to the important government interest of providing equal athletic opportunities for females. The court answered that question in the affirmative: intermediate scrutiny permits the line drawing between "males" and "females" adopted here by the state in the context of sports, without individual consideration of occasional outliers. *Id.* The analysis must end there. Had the court looked any further and taken B.P.J.'s gender and sex characteristics into account, it would have been applying strict scrutiny's narrow tailoring requirement. *See id.* That analysis also would have been inconsistent with my decision to uphold the legislature's chosen definitions of "male" and "female" for the purpose of athletics. Accordingly, I cannot find that B.P.J. is likely to succeed on her as-applied challenge of the Act on appeal.

Because B.P.J. cannot satisfy the first prong of the test to obtain a stay, her motion is **DENIED**.

6

A-341

## IV.    Conclusion

For the foregoing reasons, B.P.J.'s Motion for a Stay Pending Appeal [ECF No. 515] is **DENIED**. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        February 7, 2023

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

7

**A-342**