No. 23-1078 (L) (2:21-cv-00316)

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

B.P.J., by her next friend and mother; HEATHER JACKSON,

*Plaintiff - Appellant,*

versus

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY
BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity
as State Superintendent; DORA STUTLER, in her official capacity as Harrison
County Superintendent,

*Defendants - Appellees,*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees.*

---

On Appeal from the United States District Court for the Southern District of West
Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

**BRIEF OF PLAINTIFF-APPELLANT B.P.J.,**
**BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON**

---

*Counsel for Plaintiff-Appellant listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant B.P.J.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1078    Caption: B.P.J. v. West Virginia State Board of Education, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

B.P.J., by her next friend and mother; HEATHER JACKSON
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kathleen R. Hartnett                Date:      3/27/2023

Counsel for: B.P.J.

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION..........................................................................1

ISSUES PRESENTED FOR REVIEW ..................................................................2

INTRODUCTION ................................................................................................3

STATEMENT OF THE CASE..............................................................................7

    I.    Factual Background..............................................................................7

        A.    B.P.J. Is A Middle School Girl Who Is Transgender. ..............7

        B.    B.P.J. Loves Sports And Wants The Chance To Play On Girls' Teams At School. ........................................................10

        C.    H.B. 3293's Transgender Exclusion. .....................................12

    II.    Procedural History...........................................................................17

SUMMARY OF THE ARGUMENT ....................................................................19

STANDARD OF REVIEW ................................................................................22

ARGUMENT ...................................................................................................22

    I.    H.B. 3293 Violates The Equal Protection Clause As Applied To B.P.J.............................................................................................23

        A.    H.B. 3293 Discriminates Based On Transgender Status. ........23

            1.    H.B. 3293 Facially Discriminates Based On Transgender Status By Explicitly Excluding Consideration of "Gender Identity."............................23

            2.    H.B. 3293's Only Function Is To Discriminate Against Transgender Girls.............................................26

            3.    The Stated Purpose Of H.B. 3293 Was To Discriminate Against Transgender Students. ................29

        B.    Heightened Equal Protection Scrutiny Applies Here and Requires Analysis by Reference to the Excluded Class Of Transgender Girls—Not Cisgender Boys. ...............................31

        C.    B.P.J.'s As-Applied Equal Protection Claim Requires An As-Applied Analysis. .........................................................33

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

D.  H.B. 3293's Categorical Exclusion Is Not Substantially Related To The State's Proffered Interests, As Applied To B.P.J. ...................................................................37

1.  Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Sports." ...........................................38

2.  Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Safety." ...........................................43

E.  H.B. 3293 Fails Any Level Of Scrutiny As Applied To B.P.J. ...................................................................45

II.  H.B. 3293 Violates Title IX As Applied to B.P.J. ...........................46

A.  H.B. 3293 Excludes B.P.J. On The Basis of Sex...................46

B.  Defendants Receive Federal Funds...........................................47

C.  H.B. 3293 Harms B.P.J. Through Unlawful Discrimination...................................................................48

D.  Excluding B.P.J. From Girls' Teams Is Not The Same As Excluding A Cisgender Boy From Girls' Teams. ...................53

E.  Title IX's Athletic Regulations Do Not Authorize Discrimination Against Transgender Students. .......................54

III.  The Court Should Instruct The District Court To Enter A Permanent Injunction. .......................................................................57

CONCLUSION .......................................................................................58

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.M. by E.M. v. Indianapolis Pub. Schs.*,
   No. 1:22-CV-01075-JMS-DLP, 2022 WL 2951430 (S.D. Ind. July
   26, 2022) ...................................................................................20

*Alive Church of the Nazarene, Inc. v. Prince William Cty., Va.*,
   59 F.4th 92 (4th Cir. 2023) ....................................................29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................22

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) .................................................22

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020)................................................27, 47, 48

*Burlington N. & Santa Fe Ry. v. White*,
   548 U.S. 53 (2006)..........................................................48, 53

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)................................................................35

*City of L.A., Cal. v. Patel*,
   576 U.S. 409 (2015)................................................................33

*Clark v. Arizona Interscholastic Association*,
   695 F.2d 1126 (9th Cir. 1982) ......................................38, 39, 40, 41

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
   80 F. Supp. 2d 729 (W.D. Mich. 2000) ...............................48

*Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 n.12
   (3d Cir. 2012) ...........................................................................8

*Gregor v. W. Va. Secondary Sch. Activities Comm'n*,
   No. 2:20-cv-00654, 2020 WL 5997057 (S.D.W. Va. Oct. 9, 2020) .................12

## TABLE OF AUTHORITIES
### (continued)

Page

*Grimm v. Gloucester Cnty. Sch. Bd.*,
400 F. Supp. 3d 444 (E.D. Va. 2019) ................................................28

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
822 F.3d 709 (4th Cir. 2016) .............................................................56

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ......................................................*passim*

*H.B. Rowe Co. v. Tippett*,
615 F.3d 233 (4th Cir. 2010) .............................................................44

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho 2020) .........................................*passim*

*J.E.B. v. Alabama ex rel. T. B.*,
511 U.S. 127 (1994)...................................................................36, 52

*Lawrence v. Texas*,
539 U.S. 558 (2003)...........................................................................53

*Lehr v. Robertson*,
463 U.S. 248 (1983)...........................................................................35

*Mercer v. Duke Univ.*,
401 F.3d 199, 207 (4th Cir. 2005) .....................................................46

*N.C. State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .............................................................28

*Oncale v. Sundowner Offshore Services, Inc.*,
523 U.S. 75 (1998)............................................................................53

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) ....................................21, 32, 46, 47

*Pers. Adm'r of Mass v. Feeney*,
442 U.S. 256 (1979)...................................................................29, 30

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ret. Comm. of DAK Americas LLC v. Brewer*,
  867 F.3d 471 (4th Cir. 2017) .............................................................22

*Romer v. Evans*,
  517 U.S. 620 (1996).........................................................................45

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
  484 F.3d 700 (2007).........................................................................8

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017)...........................................................................36

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973).........................................................................30

*United States v. Virginia*,
  518 U.S. 515 (1996)...................................................................*passim*

*United States v. Windsor*,
  570 U.S. 744 (2013).........................................................................26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977).........................................................................29

*White Coat Waste Project v. Greater Richmond Transit Co.*,
  35 F.4th 179 (4th Cir. 2022) ...........................................................35

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
  477 F.3d 1282 (11th Cir. 2007) .......................................................48

**Statutes**

20 U.S.C. § 1681 .................................................................................1

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

## TABLE OF AUTHORITIES
### (continued)

**Page**

42 U.S.C. § 1983 ...................................................................................1

W. Va. Code § 18-2-25 ....................................................................47, 48

W. Va. Code § 18-2-25d(a)(3) ...................................................37, 38, 50

W. Va. Code § 18-2-25d(a)(4) ........................................................24, 37

W. Va. Code § 18-2-25d(a)(5) ...............................................................37

W. Va. Code § 18-2-25d(b)(1) ...........................................4, 13, 24, 40

W. Va. Code § 18-2-25d(c)(1) ...............................................................13

**Other Authorities**

W. Va. Code St. R. § 127-2-3 (3.8) ......................................................12

34 C.F.R. § 106.33 .................................................................................55

34 C.F.R. § 106.41 .................................................................................46

34 C.F.R. § 106.41(a) .............................................................................55

34 C.F.R. § 106.41(b) .............................................................................55

34 C.F.R. § 106.41(c) .............................................................................55

Fed. R. Civ. P. 56(a) ..............................................................................22

Fed. R. Evid. 201(b) ................................................................................8

## STATEMENT OF JURISDICTION

This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*; the Equal Protection Clause of the United States Constitution; and 42 U.S.C. § 1983. The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction under 28 U.S.C. § 1291. This is an appeal from a final judgment. On January 5, 2023, the District Court denied summary judgment for Plaintiff-Appellant/Cross-Appellee B.P.J. and Defendant-Appellee/Cross-Appellant West Virginia Secondary School Activities Commission ("WVSSAC"), and granted summary judgment for Defendants-Appellees and Intervenor-Appellee. (JA4256.) B.P.J. filed a timely notice of appeal on January 23, 2023. (JA4289.) WVSSAC filed a notice of appeal on February 1, 2023. (JA4291.)

## ISSUES PRESENTED FOR REVIEW

1.     Does H.B. 3293's categorical ban on transgender girls playing on girls' school sports teams violate the Equal Protection Clause as applied to B.P.J.?

2.     Does H.B. 3293's categorical ban on transgender girls playing on girls' school sports teams violate Title IX as applied to B.P.J.?

**INTRODUCTION**

Plaintiff-Appellant B.P.J. is a 12-year-old girl from West Virginia who is transgender.[1] B.P.J. has known she is a girl for as long as she can remember. She has gone by the name B. and lived as a girl in all aspects of her life for years. Her elementary and middle schools created gender support plans to ensure she was fully recognized and supported as a girl at school, and the State of West Virginia amended her birth certificate to reflect her name as B. and her "sex" as "female." She receives puberty-delaying treatment as well as estrogen hormone therapy, ensuring that she has not and will not go through endogenous puberty. Like many kids her age, B.P.J. loves to run and play on sports teams with her friends. She relishes the peer relationships that team sports have allowed her to build and the personal satisfaction that comes from trying her best.

Two years ago, B.P.J. was preparing to start middle school and looking forward to trying out for the girls' cross-country team. But in April 2021, West Virginia enacted H.B. 3293, a law that categorically bars all transgender girls from playing on all school-sponsored girls' sports teams from middle school through college based solely on the fact that they were assigned a male sex at birth. The law was intentionally drafted in the most sweeping terms possible: its prohibition applies

---

[1] *See generally Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-97 (4th Cir. 2020) (providing background information and terminology related to people who are transgender).

to every school-sponsored sport at every level, including club and intramural activities; and it applies to every girl who is transgender, regardless of whether, like B.P.J., they have never gone through endogenous puberty and therefore have never experienced any of the physiological changes consistent with puberty typical of cisgender boys (and instead have circulating testosterone levels typical of cisgender girls).

H.B. 3293 did not create sex-separated school sports teams. West Virginia has long divided its school sports teams into girls' teams and boys' teams. Rather, H.B. 3293 newly required that sex separation be based exclusively on "reproductive biology and genetics at birth," W. Va. Code § 18-2-25d(b)(1), so as to exclude transgender girls from girls' teams. Legislators openly acknowledged that this was the purpose of the law, even as they also candidly admitted that they lacked any evidence that transgender girls had ever sought to play sports in West Virginia, let alone that their participation was harming anyone.

B.P.J. was devastated at the prospect of not being able to play on her middle school's sports teams just because she is transgender. She brought an as-applied challenge to the law so she could have the opportunity to play sports just like every other girl at her school. In July 2021, the District Court, applying this Court's precedents, including *Grimm*, agreed that B.P.J. was likely to succeed on her claims under Title IX and the Equal Protection Clause and entered a preliminary injunction

4

preventing H.B. 3293 from being enforced against B.P.J.—and only B.P.J. *See* Att'y. Gen. Morrisey Briefs Media Regarding Major Development in Transgender Sports Law Case at 1:53-2:05 (Mar. 9, 2023), https://vimeo.com/805689352 (conceding that the preliminary injunction is "very narrow").

Because of the preliminary injunction, B.P.J. has been able to participate on the girls' cross-country and track teams for three, going on four, seasons—all with the support of her family, school, coaches, and teammates. (JA0483; JA0900; JA0905; JA3108; JA4285-4286.) Despite regularly finishing near the back of the pack, B.P.J. has experienced the benefits of school sports: her mother has "never seen [B.P.J.] happier" than when she "pick[s] her up from practices and takes her to meets" (JA4286), and B.P.J. has considered the past two years "the best of [her] life." (JA4281; *see also* JA0900.)

In January 2023, the District Court abruptly reversed course, entering summary judgment against B.P.J. and dissolving the preliminary injunction just as B.P.J. was gearing up for spring track-and-field at her middle school. (JA4256.) The District Court ruled against B.P.J. without ever having held a hearing, without resolving any of the pending *Daubert* and *in limine* motions, and largely without reference to the voluminous record amassed during discovery. Its decision is replete with analytic errors and stands in direct conflict with *Grimm* and other controlling precedent. In particular, instead of analyzing H.B. 3293 as a law that discriminates

specifically against transgender girls and therefore focusing on whether the law's specific exclusion of transgender girls is valid, the District Court analyzed H.B. 3293 as a law that discriminates against both transgender girls and cisgender boys as an undifferentiated group, and asked more generally whether separating that entire group from girls' sports teams is valid. The District Court compounded its error by refusing to consider B.P.J.'s as-applied challenge even though *Grimm* itself conducted an as-applied analysis.

When B.P.J.'s mother told B.P.J. about the summary judgment ruling, B.P.J. was crushed. She ran upstairs and "cried in [her] bed the whole night," because she "was terrified about not being able to continue doing the thing that she loves with her best friends." (JA4282; JA4287.) B.P.J. requested a stay pending appeal from the District Court, which denied the request but nonetheless emphasized that "not one child has been or is likely to be harmed by B.P.J.'s continued participation on her middle school's cross country and track teams." (JA4298.) This Court then granted B.P.J. an injunction pending appeal and stayed the District Court's dissolution of the preliminary injunction. (ECF No. 50.) Defendants (save the County Board of Education and Superintendent Stutler) filed an emergency application with the Supreme Court, seeking vacatur of this Court's interim order. *See West Virginia v. B.P.J.*, No. 22A800 (U.S. Mar. 9, 2023). That application remains pending as of the time this brief was finalized.

6

H.B. 3293 violates both equal protection and Title IX as applied to B.P.J. This Court should reverse the District Court's deeply flawed summary decision, grant summary judgment to B.P.J., and remand with instructions to convert the preliminary injunction into a permanent one. Alternatively, the Court should vacate and remand for the District Court to evaluate B.P.J.'s as-applied claims under the proper standard.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    B.P.J. Is A Middle School Girl Who Is Transgender.

B.P.J. is a 12-year-old girl who lives in Harrison County, West Virginia, and attends Bridgeport Middle School. This is B.P.J. and her mother (and next friend), Heather Jackson:



Additional photos of B.P.J. are included at JA0894.

B.P.J. is transgender. Despite being assigned a male sex at birth, she has known from a very young age that she is a girl. She has been diagnosed with gender

dysphoria, and has lived as a girl in all aspects of her life for many years, with the full support of her family. Between third and fourth grade, B.P.J. socially transitioned to living as a girl at school. (JA0876-0877; JA0898; JA0966; JA3086-JA3087; JA4256-4257.)

B.P.J.'s elementary and middle schools have acknowledged that B.P.J. is a girl and support her. (JA0482; JA0883; JA0888; JA1056- JA1057; JA3086-JA3087.) Her elementary school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (JA0482; JA0883; JA0898; JA3086.) Under this plan, school staff members were informed that B.P.J. is female; were instructed to refer to her with her new name and female pronouns; and were given tools to support B.P.J. should she face problems at school because she is transgender. (JA0883; JA3086.) B.P.J.'s middle school created a similar plan, which provided that all teachers, students, and multiple administrators and county staff would be made aware of her gender identity. (JA0888; JA3087.)

The State of West Virginia, contrary to its position in this litigation, likewise has acknowledged that B.P.J. is a girl. In summer 2022, West Virginia amended her birth certificate to recognize her name as B. and "sex" as "female" (JA4647),[2] after

---

[2] This Court may take judicial notice of B.P.J.'s amended birth certificate as a public record. *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 n.12 (3d Cir. 2012) (taking judicial notice of amended birth certificates); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); Fed. R. Evid. 201(b).

a West Virginia court found that "conforming" her name "with her gender identity" would enable B.P.J. to "feel more accepted by the community as a whole" and enjoy "a safe and happy mental state." (JA4242.)

In June 2020, at the first signs of puberty—known as the "Tanner 2" stage of pubertal development—B.P.J. began receiving puberty-delaying (or "blocking") treatment, in accordance with clinical guidelines for treating gender dysphoria. (JA0877; JA4281.) Puberty-delaying treatment pauses endogenous puberty at whatever stage it is at when the treatment begins. (JA1742; JA3088.) When administered to transgender girls at the beginning of the "Tanner 2" stage, puberty-delaying medication prevents transgender girls from experiencing levels of circulating testosterone above what is typical for cisgender girls and women. (JA1742- JA1743; JA2104; JA2147; JA3088.)

In June 2022, B.P.J. was prescribed estradiol as gender-affirming hormone therapy. (JA3088; JA4281; JA4284-4285.) As a result, B.P.J. has not and will not go through endogenous puberty. (JA4257.) Instead, her levels of circulating testosterone will stay in a typical female range, and she will develop physiological characteristics consistent with a typical female hormonal puberty. (JA1743; JA2147; JA3088.)

**B.    B.P.J. Loves Sports And Wants The Chance To Play On Girls'
      Teams At School.**

Like many young people, B.P.J. loves sports and participating on teams.
School-sponsored athletics offer a range of benefits for children and young adults,
including creating camaraderie and teaching teamwork, which are advanced when
all athletes have the opportunity to play the sport they love. (JA0878; JA0898-0899;
JA0998; JA3089-3090.) In elementary school, for example, B.P.J. participated on a
recreational cheerleading team with other girls, an experience that helped her learn
about responsibility, trust, and teambuilding. (JA0059; JA0878; JA0898-0899;
JA0998; JA3089.)

B.P.J. has always especially liked running. (JA0878-0879; JA0898-0899;
JA3089; JA3107-3108; JA4281.) She grew up running and watching her older
brothers and mother run competitively and as part of a team. (JA0878-0879; JA0898;
JA3089.) B.P.J. hoped that when she began middle school, she would have a chance
to run on the girls' cross-country team that fall. (JA0060; JA0070.) But in April
2021, West Virginia enacted H.B. 3293 into law to prevent transgender girls from
playing on girls' sports teams. The next month, B.P.J. and her mother met with the
principal at Bridgeport Middle School to discuss the gender support plan for B.P.J.,
and the principal explained that B.P.J. would not be allowed to participate on the
girls' cross-country team because of H.B. 3293. (JA0879; JA1434-1435; JA3103;
JA4257.) "Knowing that [she] could not try out for the girls' cross-country and track

10

teams just because [she is] a transgender girl was horrible and made [B.P.J.] feel angry and sad." (JA0898.) As B.P.J. has explained: "I just want the opportunity to participate in school sports like any other girl." (JA3103-3104; JA4282.)

Because of the District Court's July 2021 as-applied preliminary injunction (detailed further below), B.P.J. was able to participate on the girls' cross-country and track-and-field teams at her middle school for three seasons over the last year-and-a-half. (JA0899; JA4285-4286.) She has played on these teams with the full support of her coaches and teammates (JA0899; JA4286.) B.P.J. regularly finishes near the back of the pack, and she was not fast enough to make the girls' running events in spring 2022, leading her to participate in girls' discus and shotput instead. (JA4285-4286 (collecting statistics of B.P.J.'s placement during events); JA0880; JA3107.) But regardless of how she places, B.P.J. loves to participate and try her best. (JA0899; JA4286.) Being on a team has allowed her to make many friends, show good sportsmanship towards her team and girls from other schools, and motivate herself and her teammates to push themselves at practices and meets. (JA0899; JA4281-4282.) If B.P.J. "had not been able to join the cross-country or track-and-field teams these last few years, [she] would have missed out on challenging [her]self with all the amazing friends [she] made and the time [they] got to spend together." (JA4281.)

This Court's stay order (ECF No. 50) allowed B.P.J. to again participate in discus and shot put when the Spring 2023 track-and-field season began in February 2023.

### C.    H.B. 3293's Transgender Exclusion.

Sex separation in school sports has long been the rule in West Virginia. (JA1443-1444; JA1448-1449; JA3091-3091; JA4214); W. Va. Code St. R. § 127-2-3 (3.8). Under this framework predating H.B. 3293, boys are prohibited from playing on girls' teams and girls are prohibited from playing on boys' teams if a girls' team is available (JA1443-1444; JA3091-3091); *Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No. 2:20-cv-00654, 2020 WL 5997057, at *3 (S.D.W. Va. Oct. 9, 2020) (unsuccessful challenge to West Virginia policy barring a girl from playing on her school's boys' soccer team). There are very few co-ed school sports in public secondary schools; both cross-country and track-and-field are sex-separated. (JA0920; JA1448-1449; JA3091.)

Before H.B. 3293, West Virginia did not prohibit transgender students from playing on sex-separated teams consistent with their gender identity. (JA1443-1444; JA1448-1449; JA3091-3091); W. Va. Code St. R. § 127. Rather, Defendant-Appellee/Cross-Appellant WVSSAC had a policy that allowed transgender students to participate on teams consistent with their gender identity if their school allowed them to participate. (JA3091; JA4214.) Under the policy, if another school contested

the transgender student's eligibility to play, then WVSSAC would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (JA3091; JA4214.) There are no known examples of this policy having been used, much less having been the source of any complaint. (JA1457-1458; JA3091.)

H.B. 3293 changed the status quo by requiring all public secondary school and college sports teams in West Virginia be "expressly designated" as either "males," "females," or "co-ed" based on "biological sex," and defined "[b]iological sex" based "solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1), (c)(1). Through its new definition of "biological sex," H.B. 3293 categorically bars all girls who are transgender from participating in school sports from middle school through college. Its prohibition applies to every school-sponsored sport at every level, including club and intramural activities, and to every girl who is transgender, regardless of whether they, like B.P.J., have never gone through endogenous puberty and therefore have circulating testosterone levels typical of cisgender girls.

H.B. 3293's requirement that teams be separated "based solely on the individual's reproductive biology and genetics at birth" is a stark departure not only from the prior policy in West Virginia but also from the standards of elite sporting organizations. Notably, no elite sporting organization prevents transgender girls and

13

women from participating if, like B.P.J., they have not gone through endogenous puberty. (JA2785; JA2797-2801; JA2805-2807.) That is because a person's sex chromosomes and reproductive anatomy alone are not useful indicators of athletic performance; indeed, they have not been used to determine participation in sex-separated elite sports for decades. (JA2096; JA3101.) Instead, medical consensus is that the largest known biological cause of average differences in athletic performance between cisgender men as a group and cisgender women as a group is their levels of circulating testosterone, which start to diverge between boys and girls beginning with puberty. (JA2096; JA2143-2144; JA2526-2527; A3101-3102.)[3] There was no evidence before the Legislature that transgender girls who receive puberty delaying treatment at the onset of puberty have average athletic performances as a group that are better than the average athletic performances of cisgender girls as a group. (JA2105-2106; JA2144-JA2145; JA2148; JA3102.)

H.B. 3293's stated purpose and only function was to overturn the WVSSAC's policy allowing participation by transgender students and, in its place, to install a regime that systematically excludes transgender girls from girls' teams. As the District Court found, "[t]he record . . . make[s] clear that, in passing the law, the

---

[3] For example, it has long been accepted—and Defendants do not dispute—that women with Complete Androgyn Insensitivity Syndrome ("CAIS") who have XY chromosomes but inactive testosterone receptors do not have an athletic advantage over other women simply by virtue of having XY chromosomes. (JA3101.)

14

legislature intended to prevent transgender girls from playing on girls' sports teams."
(JA4270.) The Chief Counsel of H.B. 3293's originating committee referred to H.B.
3293 as a "[t]ransgender participation in secondary schools bill," a "[t]ransgender
originating bill," and a "bill regarding transgender participation in sports." (JA3063;
JA3094.) When asked how H.B. 3293 would change the status quo in West Virginia,
counsel representing the bill replied that H.B. 3293 "would affect those that changed
their sex after birth." (JA3094; JA0085.) The Chairman of the originating committee
also described the "issue" that H.B. 3923 was designed to address as "two
transgender girls" who "were allowed to compete in state track and field meetings
in Connecticut." (JA0153-0154; JA3095.) And per a State Senator, "the bill" was
"about transgenders." (JA0214; JA3095.)

Legislators were also clear that H.B. 3293 was the product of fear and dislike
of transgender people. (JA4263-4264.) During the debate, one Senator favorably
shared a constituent letter stating that the "trans movement is an attack upon
womanhood." (JA0214; JA3095.) A House Delegate and co-sponsor of the bill
stated that she did not "want all this mixing and matching and whatever" of
transgender students with non-transgender students in "locker rooms." (JA0146.)
And another House Delegate who co-sponsored the bill "liked" online comments
(on his Facebook post announcing his co-sponsorship) that advocated for physical
violence against girls who are transgender, compared girls who are transgender to

15

pigs, and called girls who are transgender by a pejorative term. (JA3068; JA3095.)

The District Court also recognized that H.B. 3293 was a "'solution' in search of a problem." (JA4264.) The District Court found that "[t]he record makes abundantly clear . . . that West Virginia had no 'problem' with transgender students playing school sports and creating unfair competition or unsafe conditions. In fact, at the time it passed the law, West Virginia had no known instance of any transgender person playing school sports." (JA4264.) Indeed, H.B. 3293's sponsors acknowledged during the legislative debate that they were not aware of any transgender athlete having competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from that participation. (JA0052; JA0054; JA3096.) The West Virginia Department of Education also provided legislative testimony that it had never received any complaints about transgender students participating in school athletics (JA3096; JA0087) and its general counsel characterized the bill as "much ado about nothing" (JA3063; JA3067; JA3097.) After signing the bill, Governor Justice admitted that he could not identify even "one example of a transgender child trying to get an unfair advantage" and stated that the issue was not "a priority" for him, as "we only have 12 kids maybe in our state that are transgender-type kids." (JA3067; JA3096-3097.) To this day, Defendants are not aware of any transgender student who wishes to participate in public school sports in West Virginia other than B.P.J. (JA0012 (ECF No. 1);

JA0413; JA3097.)

## II.    Procedural History

B.P.J. filed suit in May 2021, alleging that H.B. 3293's categorical exclusion of transgender girls from girls' sports violated the Equal Protection Clause and Title IX as applied to her. (JA0012 (ECF No. 1); JA0415.) As defendants, she named the West Virginia Board of Education and State Superintendent W. Clayton Burch, the Harrison County Board of Education and County Superintendent Dora Stutler, and the WVSSAC. (JA0012 (ECF No. 1); JA413.) The State of West Virginia then intervened to defend the law. (JA0015 (ECF No. 44).)

In July 2021, the District Court preliminarily enjoined Defendants from enforcing H.B. 3293 against B.P.J., concluding in a well-reasoned opinion that B.P.J. was likely to succeed on both of her claims and that the equities favored injunctive relief. (JA0439-0453.) The District Court then denied motions to dismiss filed by all Defendants except the State (JA0457-0464), which did not move to dismiss.

The District Court also granted permissive intervention to Lainey Armistead, then a college student in West Virginia. Armistead claimed that H.B. 3293 protected her from potentially having to play collegiate soccer against hypothetical women who are transgender (JA0457; JA0465), but when she was asked during her deposition whether she had had any objection to B.P.J. participating on her middle school's girls' teams, Armistead stated "I don't know." (JA1730; JA3108.)

17

Armistead graduated in 2022 and now lives in Florida. (JA0036 (ECF No. 353).) In light of that development, B.P.J. filed a motion asking the District Court to reconsider and revoke its grant of permissive intervention (JA0036 (ECF No. 353)), which the District Court never ruled on.

After extensive discovery, largely propounded by Armistead, the parties filed cross-motions for summary judgment. (JA0031-0032 (ECF Nos. 276, 283, 285, 286, 289.) In support of her motion for summary judgment, B.P.J. submitted evidence and expert reports confirming that H.B. 3293 did not advance any proffered state interests, including as applied to transgender girls like B.P.J. who have never experienced endogenous puberty and thus have levels of circulating testosterone akin to those of cisgender girls. (JA1742-1743; JA2104; JA2147; JA3088.) In contrast, Defendants' experts failed to identify any studies—or even anecdotal reports—finding athletic advantages in transgender girls who, like B.P.J., have received puberty-delaying medication since the onset of puberty. (JA0034 (ECF Nos. 316, 320, 324); JA2665; JA2525-2526.)

In January 2023, the District Court, in an unexplained about-face, granted summary judgment against B.P.J. and dissolved the preliminary injunction. (JA4256.) In so doing, it relied on Armistead's arguments without ever having resolved B.P.J.'s motion to reconsider and revoke her permissive intervention. The District Court also rejected B.P.J.'s claims as a matter of law without discussing—

18

or ruling on the admissibility of—the voluminous expert evidence submitted by both sides, each of which submitted multiple *Daubert* motions and motions *in limine*. B.P.J. timely noticed her appeal. (JA4289.)

B.P.J. sought a stay pending appeal from the District Court, which was denied. This Court then granted B.P.J. an injunction pending appeal and stayed the District Court's order dissolving its preliminary injunction. (ECF No. 50.) Defendants (save the County Board of Education and Superintendent Stutler) filed an emergency application with the Supreme Court, seeking vacatur of this Court's interim order. *See West Virginia v. B.P.J.*, No. 22A800 (U.S. Mar. 9, 2023). The Supreme Court has not acted on the application as of the time this brief was finalized.

## SUMMARY OF THE ARGUMENT

H.B. 3293 categorically excludes transgender girls—a tiny percentage of the population—from playing on all girls' school sports teams in West Virginia from middle school through college. The summary judgment record establishes as a matter of law that H.B. 3293 violates the Equal Protection Clause and Title IX as applied to B.P.J., a 12-year-old middle school girl who has "consistently and persistently" identified as a girl for years, *Grimm*, 972 F.3d at 619, and has not gone through (and will never go through) endogenous puberty. The District Court's holding to the contrary is deeply flawed, and its reasoning directly conflicts with *Grimm* and other binding precedent. It is also at odds with the reasoning of every

19

other federal court to analyze similar categorical bans. *See Hecox v. Little*, 479 F. Supp. 3d 930, 988 (D. Idaho 2020) (issuing preliminary injunction based on equal protection), *appeal filed*, No. 20-35815 (9th Cir. Sept. 17, 2020); *A.M. by E.M. v. Indianapolis Pub. Schs.*, No. 1:22-CV-01075-JMS-DLP, 2022 WL 2951430, at *14 (S.D. Ind. July 26, 2022), *appeal dismissed*, No. 22-*2332* (7th Cir. Jan. 19, 2023) (issuing preliminary injunction based on Title IX).

By its plain text, operation, and purpose, H.B. 3293 discriminates against transgender girls relative to their cisgender peers, and therefore is subject to heightened scrutiny under the Equal Protection Clause. *Grimm*, 972 F.3d at 607-10. To survive heightened scrutiny review, the State must provide an "exceedingly persuasive justification" for the law, and bears the "entire[]" "demanding" burden of showing that the specific "discriminatory means employed are substantially related to the achievement of" its proffered interests. *United States v. Virginia* ("*VMI")*, 518 U.S. 515, 531, 533 (1996). The focus of that inquiry is on the persons against whom the law discriminates—here, transgender girls, and specifically B.P.J. *See id.* at 523-33. The District Court ran afoul of these precedents by failing to analyze H.B. 3293 as discrimination based on transgender status and by refusing to address the as-applied nature of B.P.J.'s claims. Instead, it analyzed H.B. 3293 as a law creating sex-separated sports teams, collapsed transgender girls and cisgender boys into a single group, and asked whether separating that entire group from

20

cisgender girls in sports is valid.

In attempting to satisfy heightened scrutiny, Defendants maintain that H.B. 3293 advances an interest in protecting cisgender girls from substantial displacement and physical harm, and Defendants seek to justify the law based on physiological characteristics that arise during male puberty. But Defendants have not satisfied their "demanding" burden under heightened scrutiny to justify the law's categorical ban on participation by transgender girls, let alone as applied to a girl like B.P.J., who has not undergone, and will never undergo, endogenous puberty and so has none of the characteristics Defendants maintain are of concern. H.B. 3293 therefore violates the Equal Protection Clause as applied to B.P.J.

Regarding B.P.J.'s as-applied Title IX claim, this Court's precedent makes clear that excluding transgender students from facilities and programs consistent with their gender identity constitutes unlawful discrimination because it treats transgender students worse than similarly situated students and harms them. *See Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 129 (4th Cir. 2022) (en banc); *Grimm*, 972 F.3d at 617. In reaching a contrary conclusion, the District Court once again failed to properly analyze H.B. 3293's discrimination based on transgender status and failed to consider any of the circumstances specific to B.P.J. Because H.B. 3293 excludes B.P.J. from girls' school sports teams based on her transgender status, thereby harming her and treating her worse than similarly situated peers, it violates

21

Title IX as applied to B.P.J.

This Court should reverse the District Court's summary judgment order, grant summary judgment to B.P.J., and order the District Court to convert the preliminary injunction into a permanent injunction. Alternatively, this Court should vacate and remand for the District Court to evaluate B.P.J.'s as-applied claims under the proper standard.

## STANDARD OF REVIEW

A district court's grant or denial of summary judgment is reviewed de novo. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

Based on the undisputed material facts, H.B. 3293 violates the Equal Protection Clause and Title IX as applied to B.P.J. Accordingly, summary judgment should be entered for B.P.J., and the statute permanently enjoined as applied to her.

## I.     H.B. 3293 Violates The Equal Protection Clause As Applied To B.P.J.

By its text, operation, and design, H.B. 3293 classifies and excludes students from school sports based on their transgender status. As applied to B.P.J., that discrimination fails heightened scrutiny—or any level or scrutiny. The District Court's systemic analytic errors caused it to enter summary judgment against B.P.J. on her equal protection claim. This Court should direct entry of summary judgment in favor of B.P.J.

### A.     H.B. 3293 Discriminates Based On Transgender Status.

"In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons." *Grimm*, 972 F.3d at 607. As the District Court correctly recognized in its preliminary injunction order (before inexplicably reversing itself at the summary judgment stage), the "conclusion that [H.B. 3293] discriminates on the basis of transgender status" is "inescapable." (JA0445.) The law's anti-transgender discrimination is clear from its text, function, and acknowledged purpose.

#### 1.     H.B. 3293 Facially Discriminates Based On Transgender Status By Explicitly Excluding Consideration of "Gender Identity."

H.B. 3293's anti-transgender discrimination is plain from the statutory text. The statute declares that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic

opportunities." W. Va. Code § 18-2-25d(a)(4). To accomplish the stated goal of excluding consideration of gender identity, H.B. 3293 constrains participation on a girls' team to those with a "biological sex" of female, and newly defines "biological sex" as limited "solely" to a person's "reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1). By definition, transgender people are people for whom "gender identity is separate and distinct" from their "reproductive biology and genetics at birth"; cisgender people are not encompassed or affected by H.B. 3293's distinction between the two.

Under this Court's precedent in *Grimm*, distinguishing between cisgender girls and transgender girls based on their sex assigned at birth discriminates based on transgender status. 972 F.3d at 608, 610. *Grimm* considered a school district policy stating that some students have "gender identity issues" and requiring students to use the restroom according to their "biological gender." *Id.* at 609. This Court explained that the policy—which would be enforced by "rely[ing] on the sex marker on the student's birth certificate," *id.* at 608— "privilege[d] sex-assigned-at-birth over" Grimm's male identity: "Grimm was similarly situated to other boys, but was excluded from using the boys['] restroom facilities based on his sex-assigned-at-birth." *Id.* at 610. This Court held that excluding Grimm on that basis constituted sex discrimination and discrimination based on transgender status. *Id.*

24

H.B. 3293's text operates just like the school district policy at issue in *Grimm*. Like the policy in *Grimm*, H.B. 3293 explicitly declares that its purpose is to distinguish between "gender identity" and "biological sex," a distinction that on its face is targeted at transgender students. Like the policy in *Grimm*, H.B. 3293 privileges sex assigned at birth over all other considerations and thereby separates transgender students from their similarly situated peers. Thus, the statute "on its face discriminates between cisgender athletes, who may compete on athletic teams consistent with their gender identity, and transgender [girls and] women athletes, who may not compete on athletic teams consistent with their gender identity." *Hecox*, 479 F. Supp. 3d at 975.

*Grimm* further refuted the school district's assertion—echoed by Defendants here—that grouping Grimm, a transgender boy, with cisgender girls did not discriminate against him "because Grimm's 'choice of gender identity did not cause biological changes in his body, and Grimm remain[ed] biologically female.'" 972 F.3d at 610 (quoting school district brief). As this Court explained, "the Board's framing" of transgender boys as equivalent to cisgender girls was the product of "bias," "misconceptions," and a fundamental misunderstanding of "what it means for [Grimm] to be a transgender boy." *Id.* at 610, 610 n.10. Namely, the school district was treating "gender identity [as] a choice," and "privileg[ing]" his sex assigned at birth "over Grimm's medically confirmed, persistent and consistent

gender identity" as a boy, even though "the overwhelming thrust of everything in the record" demonstrated "that Grimm was similarly situated to other boys." *Id.* at 610.

So too here. B.P.J. is a girl who is transgender, who has for years lived and been recognized as a girl in all aspects of her life. *See supra* at 10-12. Attempting to equate B.P.J. with a cisgender boy through a "biological sex" classification denies the reality of who she is and treats her differently from cisgender girls because of her transgender status.

### 2. H.B. 3293's Only Function Is To Discriminate Against Transgender Girls.

H.B. 3293's facial discrimination against transgender girls is also reflected in the statute's "operation in practice," *United States v. Windsor*, 570 U.S. 744, 771 (2013): to exclude girls who are transgender—and only girls who are transgender—from girls' sports teams.

Although the entire point of H.B. 3293 was to exclude transgender girls from girls' teams, Defendants have sought to deny that H.B. 3293 discriminates based on transgender status, claiming that it merely creates sex-separated sports teams. (*See, e.g.*, JA0032 (ECF No. 288 at 7-9).) But that argument ignores, among other things, that school sports *already* were sex-separated in West Virginia before H.B. 3293. *See supra* at 14-15. B.P.J. does not challenge sex separation in sports, nor would a judgment in her favor prevent West Virginia from continuing to maintain separate

girls' and boys' teams. *Cf. Grimm*, 972 F.3d at 618 ("Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself from the sex-separated restroom matching his gender identity."). B.P.J. simply wants to play on the girls' team like other girls.

What West Virginia lacked prior to H.B. 3293 was any law or policy prohibiting girls who are transgender from playing on girls' teams. Instead, prior to H.B. 3293, WVSSAC's policy *allowed* for transgender students to participate in school sports on a case-by-case basis. *See supra* at 15. Against that backdrop, H.B. 3293 *redefined* sex separation with a new classification to target transgender girls—and only transgender girls—for exclusion. By contrast, H.B. 3293 changes nothing for cisgender students. Cisgender girls were allowed to play on girls' teams (but not boys' teams) before H.B. 3293 and are still allowed to play on girls' teams (but not boys' teams) after H.B. 3293. Likewise, cisgender boys were prohibited from playing on girls' teams before H.B. 3293 and after H.B. 3293 was passed. That is because for cisgender students, the law's distinction between sex assigned at birth and gender identity is irrelevant. As the legislative counsel candidly acknowledged, the one and only group "affect[ed]" by H.B. 3293 is "those that changed their sex after birth." (JA3094); *cf. Bostock v. Clayton County*, 140 S. Ct. 1731, 1745 (2020) ("By discriminating against transgender persons, [H.B. 3293] unavoidably discriminates against persons with one sex identified at birth and another today.");

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (striking down voting provisions that were crafted "with almost surgical precision" to target Black voters).

Defendants maintain that H.B. 3293 does not discriminate against transgender girls like B.P.J. because it "treats all" people assigned a male sex at birth "*the same*, whether they identify as females *or* males," and "prohibits *all*" people assigned male sex at birth "from participating in female sports." (JA0031-0032 (ECF Nos. 281, 287, 288).) The District Court properly recognized that argument as "misleading" at the preliminary injunction stage. (JA0445.) And it is foreclosed by *Grimm*, where the school district unsuccessfully advanced the same position. *See* 972 F.3d at 608-10. By classifying students based on "biological gender," the school district's policy did not treat students "the same" and instead ensured that "[t]ransgender students [were] singled out, subjected to discriminatory treatment, and excluded from spaces where similarly situated students are permitted to go." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 457 (E.D. Va. 2019), *aff'd*, 972 F.3d 586 (4th Cir. 2020). Specifically, the policy

> shunt[ed] individuals like Grimm—who *may not* use the boys' bathrooms because of their 'biological gender,' and who *cannot* use the girls' bathrooms because of their gender identity—to a third category of bathroom altogether: the 'alternative appropriate private facilit[ies]' established in the policy for 'students with gender identity issues.'

972 F.3d at 620 (Wynn, J., concurring).

28

H.B. 3293 likewise singles out transgender girls for disfavored treatment, because they are barred from girls' teams because of their "reproductive biology and genetics at birth" and unable to play on boys' teams because of their gender identity. The function of the law is to "entirely eliminate[] their opportunity to participate in school sports." *Hecox*, 479 F. Supp. 3d at 977.

### 3.    The Stated Purpose Of H.B. 3293 Was To Discriminate Against Transgender Students.

H.B. 3293's facially discriminatory text is matched by an openly acknowledged discriminatory purpose. H.B. 3293 was passed "'because of,' not 'in spite of,' its adverse effects upon" girls who are transgender. *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979); *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (providing that "contemporary statements by members of the decisionmaking body" are relevant to assessing discriminatory purpose).

As the District Court agreed, "[t]he record . . . make[s] clear that, in passing this law, the legislature intended to prevent transgender girls from playing on girls' sports teams," (JA4270), and declared there was "no doubt that H.B. 3293 aimed to politicize participation in school athletics for transgender students." (JA4277); *cf. Alive Church of the Nazarene, Inc. v. Prince William Cty., Va.*, 59 F.4th 92, 104–05 (4th Cir. 2023) (explaining that in identifying discriminatory purpose, "a court can

consider contemporary statements by decisionmakers indicating bias" and "derisive comments made to lawmakers by members of the community").

Puzzlingly, however, the District Court still failed to analyze H.B. 3293 as a law that discriminates based on transgender status because the District Court concluded that the legislative history was insufficient to render the statute "unconstitutional under the Supreme Court's animus doctrine." (JA4264 (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973)).) But the existence of a discriminatory legislative purpose does not require a showing of animus or desire to harm. As long as a statute is passed "***at least in part*** 'because of,' not merely 'in spite of,' its adverse effects upon" girls who are transgender, *Feeney*, 442 U.S. at 279 (emphasis added), the statute must be analyzed as discriminating based on transgender status.

* * *

H.B. 3293 was not a mere effort to endorse long extant sex separation in sports, but was new discrimination based on transgender status. This is made clear, both independently and collectively, by: H.B. 3293's carefully crafted statutory definition of "biological sex," which operates to categorically exclude girls who are transgender from girls' sports teams; the status quo prior to H.B. 3293, which was that West Virginia already provided for sex separation in sport and for case-by-case inclusion of transgender girls in girls' sports; the reality that H.B. 3293 affects only

30

transgender girls and changes nothing for cisgender students; and H.B. 3293's legislative record, which "make[s] clear that, in passing this law, the legislature intended to prevent transgender girls from playing on girls' sports teams." (JA4270.)

### B. Heightened Equal Protection Scrutiny Applies Here and Requires Analysis by Reference to the Excluded Class Of Transgender Girls—Not Cisgender Boys.

Laws that discriminate against transgender people by treating transgender girls differently from cisgender girls—or treating transgender boys differently from cisgender boys—are subject to heightened scrutiny under the Equal Protection Clause for several reasons. *Grimm*, 972 F.3d at 607-10. That differential treatment between transgender girls and cisgender girls "necessarily rests on a sex classification," *id.* at 608; "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes," *id.*; and discriminates based on transgender status, which independently "constitute[s] at least a quasi-suspect" classification, *id.* at 610.

The District Court at summary judgment claimed to apply heightened scrutiny to B.P.J.'s equal protection claim, but it analyzed the wrong classification. Instead of applying heightened scrutiny to H.B. 3293's discrimination against transgender girls, the District Court misperceived H.B. 3293 to be a sex-based classification distinguishing between boys and girls generally. (JA4269.) Adopting Defendants' framing of the question— "whether it's appropriate to separate the typical male from

31

the typical female in sports" (JA0033 (ECF No. 302))—the District Court asked whether distinguishing between boys and girls based on their "reproductive biology and genetics at birth" was substantially related to an important governmental interest. (JA4269; JA4272.) And because the District Court concluded that separating students based on "reproductive biology and genetics at birth" is constitutionally valid with respect to *cisgender* students who constitute more than 99% of the population (JA0451), it concluded that separating *all* students—both cisgender and transgender—on this basis is substantially related to the asserted government interest in "providing equal athletic opportunities for females" to satisfy heightened scrutiny. (JA4272; JA4274-4275.)

This analytic frame, and the District Court's resulting conclusion, were error. The proper question under heightened scrutiny here—a question unasked by the District Court—is whether the challenged classification is constitutionally valid with respect to the excluded group: transgender girls. That is because heightened scrutiny's substantial-relationship inquiry focuses on the persons against whom the law discriminates. The court must "focus[] on the differential treatment for denial of opportunity for which relief is sought" and determine whether the specific "discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533 (internal quotation marks omitted); *accord Peltier*, 37 F.4th at 125 (explaining that "we must evaluate whether there is an

exceedingly persuasive justification for the *sex-based classification being challenged*"). In other words, "[t]he proper focus of the constitutional inquiry is the group from whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015).

Here, as explained, *see supra* I.A, H.B. 3293 was not enacted to distinguish between cisgender boys and cisgender girls—West Virginia law and policy already did that. H.B. 3293's sole function—evidenced by its text, operation, and acknowledged purpose—is to distinguish students based on transgender status and to exclude transgender girls from girls' sports. Because H.B. 3293 is targeted at the very small percentage of girls who are transgender, it receives heightened scrutiny on that basis. *See, e.g.*, *Grimm*, 972 F.3d at 613 (noting that transgender people "represent approximately 0.6% of the United States adult population"); *Hecox*, 479 F. Supp. 3d at 977 (similar). And it is *that* transgender exclusion—not the differential treatment of all girls compared to all boys—that must pass constitutional muster.

## C.    B.P.J.'s As-Applied Equal Protection Claim Requires An As-Applied Analysis.

Because B.P.J. challenges H.B. 3293 only as applied to her, the equal protection question presented by this case is narrower still—whether Defendants have established that categorically excluding B.P.J. from girls' school sports because of her transgender status is substantially related to an important government interest. Essential to this as-applied equal protection inquiry are the facts that B.P.J. is a 12-

year-old middle schooler who (1) has "consistently and persistently" identified as a girl for years, *Grimm*, 972 F.3d at 619, and (2) has never gone through endogenous puberty and so has never had levels of circulating testosterone akin to those of cisgender boys but instead has levels of circulating testosterone typical of cisgender girls, *see supra* at 12.

*Grimm* itself was an as-applied case. There, this Court considered whether the school district's restroom policy was "substantially related to the important objective of protecting student privacy . . . as applied to Grimm." 972 F.3d at 607. This Court concluded "that bodily privacy of cisgender boys using the boys restrooms did not increase when Grimm was banned from those restrooms" and "[t]herefore, the Board's policy was not substantially related to its purported goal," *id.* at 614.

Just as this Court did in *Grimm*, the District Court properly conducted an as-applied analysis at the preliminary-injunction stage. The District Court found that B.P.J. "has lived as a girl for years" (JA0445) and "has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State," (JA0448). Accordingly, the District Court held that, as applied to B.P.J., H.B. 3293 "is not substantially related to protecting girls' opportunities in athletics or their physical safety when participating in athletics." (JA0449.)

34

At summary judgment, however, the District Court refused to undertake the required as-applied analysis, and instead focused on hypothetical transgender girls generally, rather than B.P.J. specifically. The District Court explained that it would not take account of any of the facts of B.P.J.'s individual circumstances because they might differ from those of other transgender girls, noting that what "may be true for B.P.J." may not be true for "other transgender girls," and that "the social, medical, and physical transition of each transgender person is unique." (JA4263.)

Once again, that was error. *See Grimm*, 972 F.3d at 607, 609-10. Unlike a facial challenge, which "can be decided without regard to its impact on the plaintiff asserting the facial challenge," an "as-applied challenge is one which depends on the identity or circumstances of the plaintiff." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022) (internal quotation marks omitted). The Supreme Court has explained that such as-applied challenges are "the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (holding that discrimination based on disability was unconstitutional only as applied and thus declining to consider whether the challenged policy was facially invalid); *cf. Lehr v. Robertson*, 463 U.S. 248, 267 (1983) (explaining that laws allowing unmarried mothers—but not unmarried fathers—from vetoing a child's adoption are constitutional as applied to

fathers who never establish a substantial relationship with the child, but unconstitutional as applied to fathers who have established that relationship).

The District Court stated—without citing any authority for its position and without acknowledging that *Grimm* was an as-applied challenge—that it could not focus on facts specific to B.P.J. because doing so would be the equivalent of importing strict scrutiny's "narrowly-tailored" requirement into heightened scrutiny. (JA4274.) But the alternative to "narrow tailoring" is not "no tailoring." Under intermediate scrutiny, even when generalizations "have 'statistical support,' [the Supreme Court's] decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 582 U.S. 47, 64 n.13 (2017) (quoting *J.E.B. v. Alabama ex rel. T. B.*, 511 U.S. 127, 139 n.11 (1994)). Indeed, the fundamental role of heightened equal protection scrutiny is to ensure individuals have "equal opportunity to aspire, achieve, participate in and contribute to society based on their *individual* talents and capacities." *VMI*, 518 U.S. at 532 (emphasis added). Group-based generalizations about sex may not be used to "deny[] opportunit[ies]" to people "outside the average description." *Id*. at 550. Courts can—and indeed, must—consider plaintiff-specific facts in an as-applied challenge under intermediate scrutiny to determine whether a proffered justification is "exceedingly persuasive." *VMI*, 518 U.S. at 533.

36

### D.     H.B. 3293's Categorical Exclusion Is Not Substantially Related To The State's Proffered Interests, As Applied To B.P.J.

To survive heightened scrutiny, the government must provide an "exceedingly persuasive justification" for H.B. 3293's discriminatory classification. *VMI*, 518 U.S. at 531. "The burden of justification is demanding and [] rests entirely on the State"—*not* B.P.J. *Id.* at 533. Any asserted justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation," and the government "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

The sole justification offered for H.B. 3293 in the legislative text is "promot[ing] equal athletic opportunities for the female sex" by reference to avoiding the "substantial" displacement of female athletes. W. Va. Code § 18-2-25d(a)(3)-(5). During the discovery period and in its summary-judgment briefing, the State also proffered a *post hoc* rationalization: "protect[ing] women's safety in female athletic sports." (JA0903; JA3096.) *Post hoc* justifications proffered "in response to litigation" should not be credited. *VMI*, 518 U.S. at 533. But in any event, Defendants have not shown that categorically excluding B.P.J. from all girls' sports substantially advances either interest. (*See, e.g.*, JA1699-1700.)

### 1. Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Sports."

Defendants have not demonstrated an "exceedingly persuasive" connection between barring B.P.J. from girls' sports pursuant to a categorical exclusion of transgender girls and protecting against the substantial displacement of cisgender female athletes. *VMI*, 518 U.S. at 534. Rather, Defendants' arguments—and the District Court's summary-judgment reasoning (JA4270-4273)—all rest on the notion that, as a general matter, cisgender boys athletically outperform cisgender girls, and therefore, as a general matter, transgender girls athletically outperform cisgender girls. But Defendants have not met their burden to show that the latter is true. And they certainly have not made that showing with respect to transgender girls who—like B.P.J.—have never gone through and will not go through endogenous puberty.

In H.B. 3293 itself, the only legislative finding concerning substantial displacement provides that "[b]iological males would displace biological females to a substantial extent if permitted to compete on [girls'] teams . . ., as recognized in *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982)." W. Va. Code § 18-2-25d(a)(3) (full case citation added). But *Clark* had nothing to do with transgender student athletes and its logic does not support their categorical exclusion. *Clark* concerned a policy preventing cisgender boys from playing volleyball on the girls' team in a school district that did not sponsor a boys'

38

volleyball team but provided "overall [athletic] opportunit[ies]" to boys that were "not inferior" to those provided to girls. 695 F.2d at 1131-32. There, the parties *stipulated* that boys would "on average be potentially better volleyball players than girls," thus creating an "undue advantage." *Id.* at 1127, 1131. Based on those stipulated facts, *Clark* concluded that the district's policy of excluding cisgender boys from girls' volleyball survived heightened scrutiny because the boys and girls at the school had an equal number of overall athletic opportunities, and (per the stipulation) "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* at 1131. Those same factors all weigh in favor of *allowing* B.P.J. to play girls' sports, not categorically excluding her.[4]

*First*, whereas the cisgender boys excluded from participating in girls' volleyball in *Clark* still had an equal number of overall athletic opportunities, 695 F.2d at 1127, transgender girls who are excluded pursuant to H.B. 3293 do *not* have the same number of overall athletic opportunities as their peers. They are prohibited from playing on girls' teams, cannot play on boys' teams, and have extremely

---

[4] *Clark* also noted women had historically been deprived of athletic opportunities compared to men. 695 F.2d at 1131. Transgender girls too have historically been discriminated against. *See Grimm*, 972 F.3d at 611-12.

limited co-ed options, leaving them with virtually *no* school-sponsored athletic opportunities.[5] (JA0920-0921; JA1448-1449; JA3091.)

*Second*, H.B. 3293 conditions participation on girls' teams on factors that themselves have no bearing on the "average physiological differences" that were stipulated in *Clark* as providing an athletic advantage to cisgender boys as compared to cisgender girls. 695 F.3d at 1131. It is undisputed that the largest known biological driver of average differences between the athletic performance of males and females is circulating testosterone levels, which begin to diverge between males and females beginning at puberty. (JA2096; JA2143-2144; JA2526-2527; JA3101-3102.) But H.B. 3293 defines "biological sex" "*solely*" in terms of "reproductive biology and genetics at birth," W. Va. Code § 18-2-25d(b)(1) (emphasis added). There is no evidence that those factors alone, however, have any demonstrated effect on athletic ability. (JA2104; JA3101.)

Moreover, B.P.J. does not have any of the "average physiological differences" stipulated to in *Clark*. 695 F.3d at 1131. Because B.P.J. has been receiving puberty-delaying treatment since the first signs of puberty, she has never experienced circulating testosterone levels typical of cisgender boys following the onset of

---

[5] Because the record shows that there are no co-ed cross-county or track-and-field teams, (JA0920-0921; JA1448-1449; JA3091), the Court does not have to decide whether co-ed teams would provide girls who are transgender with comparable and non-stigmatizing opportunities.

puberty; rather, her circulating testosterone levels are consistent with those typical for cisgender girls. (JA0877; JA0898; JA4511-4512; JA1742-1743; JA3087-3088.) And now that she has begun gender-affirming hormone therapy in addition to her puberty-delaying treatment, she will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution, and secondary sex characteristics that are typically experienced by cisgender girls who go through a typically female puberty. (JA2147.)[6]

Wholly unlike the stipulated record of athletic advantage and substantial displacement in *Clark*, here Defendants presented no evidence (and the District Court cited none) that, as a group, transgender girls like B.P.J. who receive puberty-delaying treatment followed by gender-affirming hormone therapy have average athletic performances that are better than the average athletic performances of cisgender girls as a group. Indeed, Defendants did not identify any studies at all examining the athletic performance of transgender girls and women who received puberty-delaying medication and did not experience endogenous puberty. (JA2665 (admission by Dr. Brown that he is unaware of any studies purporting to measure the athletic performance or physical fitness of transgender girls); JA2525-2526

---

[6] Even as to transgender girls and women who have already gone through endogenous puberty, Defendants failed to justify H.B. 3293's sweeping categorical exclusion, including when transgender girls and women who have gone through endogenous puberty suppress their circulating testosterone. (JA3088.)

(admission by Dr. Brown that he is unaware of any research concerning the athletic performance of transgender women who received puberty-delaying medication).) Instead, Defendants' proffered expert Dr. Gregory Brown—who is the subject of an unresolved *Daubert* motion—cited studies involving testosterone suppression by individuals who had already begun or had completed puberty. (*See, e.g.*, JA2526; JA2531.) These are not B.P.J.'s circumstances. Simply put, there is no evidence in the record to suggest that transgender girls in B.P.J.'s position have or would substantially displace cisgender girls in sports.[7]

Nor is there any evidence of substantial displacement caused by transgender girls in West Virginia prior to H.B. 3293, *see supra* at 18-19, or by B.P.J. herself during her three seasons of competition over the last year-and-a-half under the preliminary injunction. B.P.J. regularly finishes towards the back of the pack at her cross-country meets, and in spring 2022, did not even qualify for the running events on her track team so instead competed in shotput and discus, where she again placed near the bottom. *See supra* at 14. Even Intervenor Lainey Armistead could not

---

[7] Defendants' expert contended that cisgender boys perform better than cisgender girls in some fitness contests even before puberty (*see* JA2512-2525), but admitted that these alleged differences are "modest," that no studies have examined the performance of transgender girls, and that no studies have addressed whether the "modest" differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are attributable to innate biological causes rather than social causes, such as greater encouragement of athleticism in young boys. (JA3102; JA2266; JA2144.)

identify "any specific fairness issue" related to B.P.J.'s participation in girls' cross-country when she was asked during her deposition. (JA1703; JA1730; JA3108.) As the District Court found, "not one child has been or is likely to be harmed by B.P.J.'s continued participation on her middle school's cross country and track teams." (JA4298.)

### 2. Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Safety."

Defendants also have not demonstrated an "exceedingly persuasive" connection between barring B.P.J. from girls' sports under H.B. 3293 and protecting the safety of cisgender girls. *VMI*, 518 U.S. at 534. As the District Court recognized at the preliminary injunction stage, "[c]ross country and track are not contact sports. The physical ability of one athlete does not put another in danger." (JA0449.) Accordingly, it held that, "as applied to B.P.J., this law cannot possibly protect the physical safety of other girl athletes." (JA0449.)

At summary judgment, the District Court correctly found that "West Virginia had no 'problem' from transgender students playing school sports and creating . . . unsafe conditions" when it passed H.B. 3293. (JA4264.) However, the District Court did not expressly address whether Defendants had met their burden to show that excluding B.P.J. substantially advanced the safety of cisgender girls. They have not. No Defendant attempted to advance a connection between the asserted safety justification and the sports B.P.J. plays, let alone an exceedingly persuasive one.

43

Defendants' putative expert, Dr. Carlson, who is the subject of an unresolved *Daubert* motion, focused only on contact sports involving a risk of collision, and expressly disclaimed having any expert opinion concerning cross-country or track and field. (JA2861-2862; JA2908; JA2953-2954.) Intervenor could not identify any safety concern resulting from B.P.J.'s participation on her middle school girls' cross-country team (JA1699-1700; JA3109), and the State admitted it is not aware of any middle school girl who was physically harmed by B.P.J.'s participation on the cross-country team. (JA0906; JA3109.) Heightened equal protection scrutiny is not satisfied by an interest rooted in "fears" that have not "materialized." *Grimm*, 972 F.3d at 614. "[S]ufficient probative evidence" is required. *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010). Defendants have not carried their burden to show that categorically barring B.P.J. from girls' sports teams advances any asserted interest in protecting the safety of cisgender girls.

* * *

Because Defendants failed to provide any "exceedingly persuasive justification" for categorically excluding B.P.J. from all girls' sports on the basis of her transgender status, B.P.J. is entitled to summary judgment on her as-applied equal protection claim.

### E.    H.B. 3293 Fails Any Level Of Scrutiny As Applied To B.P.J.

Although heightened scrutiny applies and is dispositive, *see supra* I.D, H.B. 3293 fails any level of scrutiny as applied to B.P.J. The law's sweeping exclusion—reaching every sport at every level between middle school and college, and every transgender girl regardless of whether she has gone through endogenous puberty or has circulating testosterone levels typical of cisgender girls—"is so far removed from [the] particular justifications" claimed to support it that it is "impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

Defendants maintain that cisgender girls are substantially displaced when a single transgender girl places anything other than absolute last. (JA0032 (ECF No. 287, 288); Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Cir., *State of W. Va., et al. v. B.P.J.*, No. 22A800 (U.S. Mar. 9, 2023) at 36-37; Reply in Support of Application to Vacate the Injunction Entered by the United States Court of Appeals for the Fourth Cir., *State of W. Va., et al. v. B.P.J.*, No. 22A800 (U.S. Mar. 22, 2023) at 12-13.) The District Court correctly rejected such an extreme and unreasonable notion. (JA4298) ("I am unpersuaded, as Defendants have argued, that B.P.J. finishing ahead of a few other children, would have placed one spot higher without her participation constitutes a substantial injury."). Indeed, that Defendants claim displacement even when B.P.J. finishes at the back of the pack reveals that Defendants' real objection is to B.P.J.'s

mere presence on a girls' team at all. Plainly, "excluding transgender women and girls from women's sports entirely" is "an invalid interest." *Hecox*, 479 F. Supp. 3d at 984-85. Accordingly, H.B. 3293 fails under any level of equal protection scrutiny.

## II.    H.B. 3293 Violates Title IX As Applied to B.P.J.

To prevail on her Title IX claim, B.P.J. must show "(1) that [she] was excluded from participation in an education[al] program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [her] harm," which may include "emotional and dignitary harm." *Grimm*, 972 F.3d at 616, 618; *accord Peltier*, 37 F.4th at 129. As with its assessment of B.P.J.'s equal protection claim, the District Court's Title IX analysis and conclusion were wrong and contrary to precedent. Because H.B. 3293 excludes B.P.J. from school sports on the basis of sex and this improper discrimination harms her, B.P.J. is entitled to summary judgment on her Title IX claim.

### A.    H.B. 3293 Excludes B.P.J. On The Basis of Sex.

It is undisputed that school athletic programs are "educational programs" for purposes of Title IX. *See Mercer v. Duke Univ.*, 401 F.3d 199, 207 (4th Cir. 2005) 34 C.F.R. § 106.41. As Defendants acknowledge, participating in sports yields myriad educational benefits, including cooperation, leadership, teamwork, watching

out for fellow players, trust, physical fitness, perseverance, sportsmanship, and discipline. (JA0924-0926; JA0919; JA0455-0456; JA3089-3090.)

It is also undisputed that H.B. 3293 excludes B.P.J. from athletic teams on the basis of "sex." The Supreme Court held in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), that discrimination against transgender employees is discrimination because of sex under Title VII, and this Court had repeatedly held that *Bostock*'s reasoning applies to Title IX. *See Peltier*, 37 F.4th at 130 n.22; *Grimm*, 972 F.3d at 616. "By discriminating against transgender persons, [H.B. 3293] unavoidably discriminates against persons with one sex identified at birth and another today," *Bostock*, 140 S. Ct. at 1746, and punishes B.P.J. for "not conforming to [her] sex-assigned-at-birth." *Grimm*, 972 F. 3d at 617 n.15.

### B. Defendants Receive Federal Funds.

The State Board and County Board both admit to being federally funded (JA0476-0477; JA0484; JA0915; JA3106) and the State of West Virginia does not dispute that it is subject to Title IX.

The only Title IX Defendant that claims not to receive federal funding is WVSSAC, but WVSSAC is subject to Title IX because it exercises control over federally funded athletic programs. (JA2975-2980; JA3106-3107); W. Va. Code § 18-2-25. "[A]ny entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient

47

of federal aid." *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000); *accord Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007).

In West Virginia, WVSSAC was given controlling authority over secondary school athletics by the State and County Boards of Education. (JA0483-484; JA2975-2980; JA3106); W. Va. Code § 18-2-25. For example, member schools must follow WVSSAC's rules and regulations when "conducting interscholastic athletic[s]" and when determining whether a student is eligible to play secondary school sports, and WVSSAC's Board of Directors has "the power to decide all cases of eligibility of students and participants in interscholastic athletic[s]." (JA2976; JA1400-1401; JA1412; JA2979; JA3106-3107.) Indeed, WVSSAC explicitly acknowledges in its own athletic handbook that it must comply with Title IX. (JA3983.)

## C.    H.B. 3293 Harms B.P.J. Through Unlawful Discrimination.

Under both Title VII and Title IX, unlawful discrimination entails more than mere differential treatment. It "mean[s] treating that individual worse than others who are similarly situated" and employing "distinctions or differences in treatment that injure protected individuals," *Bostock* 140 S. Ct. at 1740, 1753 (incorporating standard from *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 59 (2006)); *see Grimm*, 972 F.3d at 618 (adopting *Bostock* and *Burlington* standard for Title IX).

48

For example, in *Grimm*, this Court held that a school policy discriminated against a transgender boy within the meaning of Title IX by excluding him from using the boys' restrooms. In so doing, this Court recognized that Grimm, a transgender boy, was similarly situated to other boys, *see* 972 F.3d at 609-10, 618, and "was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender," *id.* at 618. This Court also had "no difficulty holding that Grimm was harmed" by this discrimination because being excluded from the boys' restrooms made Grimm feel "stigmatized and isolated" and "invite[d] more scrutiny and attention from other students." *Id.* at 617-18 (internal quotations omitted).

*Grimm*'s reasoning and holding apply equally here. *First*, just as Grimm was similarly situated to other boys because of his "persistent and consistent gender identity," *id.* at 610, B.P.J. is similarly situated to her the other girls at her school. For years, B.P.J. has lived as a girl and been recognized as a girl at school. (JA0482; JA0876-0877; JA0883; JA0888; JA0898; JA3086-3087.) As the District Court correctly concluded at the preliminary-injunction stage, in light of the reality of B.P.J.'s day-to-day life, "Plaintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls." (JA0445.)

Defendants argue—and the District Court on summary judgment wrongly agreed—that B.P.J. is not similarly situated to other girls and is instead similarly

situated to cisgender boys because of "physical characteristics relevant to athletic performance." (JA4272); *see also* W. Va. Code § 18-2-25d(a)(3) (asserting as legislative finding that "biological males and biological females are not in fact similarly situated . . . [i]n the context of sports involving competitive skill or contact"). The District Court reasoned that people "with male chromosomes, regardless of their gender identity, naturally undergo male puberty, resulting in an increase in testosterone in the body," and "there is a medical consensus that the largest known biological cause of average differences in athletic performance between males and females is circulating testosterone beginning with puberty." (JA4272.)

Defendants and the District Court ignore, however, that this case is an as-applied challenge on behalf of a transgender girl who has never gone through male puberty. B.P.J. has been receiving puberty-delaying medication since the onset of puberty, and is receiving gender-affirming hormone therapy to allow her to go through a typically female puberty and develop typically female physical characteristics. There are no "physical characteristics relevant to athletic performance" (JA4272) that distinguish B.P.J. from her cisgender teammates.

*Second*, just as in *Grimm*, H.B. 3293 does not merely treat B.P.J. differently from people who are similarly situated. It treats her worse. Unlike other girls, B.P.J. alone is prohibited from participating on the girls' sports team, and, by excluding

50

her from the team consistent with her gender identity, H.B. 3293 treats B.P.J. worse than *all* her peers. *See Grimm*, 972 F.3d at 618 (noting that Grimm "alone could not use the restroom corresponding with his gender"). "All other students in West Virginia secondary schools—cisgender girls, cisgender boys, [and] transgender boys . . .—are permitted to play on sports teams that best fit their gender identity." (JA0450.) B.P.J. alone may not.

The exclusion from the girls' team not only prevents B.P.J. from participating in school sports with other girls, but it prohibits her from participating in school athletics entirely. As the District Court recognized in its preliminary injunction decision, "[f]orcing a girl to compete on the boys' team when there is a girls' team available would cause her unnecessary distress and stigma [and] would be confusing to coaches and teammates." (JA0451); (*see also* JA0880-0881; JA3104); *Grimm*, 972 F.3d at 610 n.10 (forcing Grimm to use the girls' restrooms "fails to meaningfully reckon with what it means for [Grimm] to be a transgender boy") (quotation marks omitted). B.P.J. also does not have the option of running on a co-ed team, as there is no co-ed cross-country or track team at Bridgeport Middle School or at any other public secondary school in West Virginia. (JA0920-0921; JA3104.)

Losing the ability to participate in school athletics would deprive B.P.J. of a wide range of educational and social benefits. (JA0455; JA2447-2453; JA3089-3090.) B.P.J.'s own experience during the past two years illustrates the positive

impact of athletics. B.P.J.'s friends on the "cross-country and track-and-field teams have become [her] second family over the last two years." (JA0900; JA4282.) B.P.J.'s mother has "never seen [B.P.J.] happier" than when she "pick[s] her up from practices and take her to meets." (JA4286.) Being able to participate on a team has allowed her to make many friends, show sportsmanship towards her team and girls from other schools, and motivate herself and her teammates to try their hardest at practices and meets. (JA0900; JA4281-4282.) If B.P.J. "had not been able to join the cross-country or track-and-field teams these last few years, [she] would have missed out on challenging [her]self with all the amazing friends [she] made and the time [they] got to spend together." (JA0900; JA4281.)

Excluding B.P.J. from school sports also inflicts dignitary harm by stigmatizing B.P.J. and isolating her from other students. (JA0880-0881; JA0899-0900; JA3104-3105.) As in *Grimm*, B.P.J.'s exclusion "very publicly brand[s]" her and "all transgender students with a scarlet 'T'"— marking them, publicly, as different from their peers. 972 F.3d at 617-18 (internal quotation marks and alterations omitted); *cf. J.E.B.*, 511 U.S. at 142 (explaining that when a juror is excluded based on sex "[t]he message it sends to all those . . . who may later learn of the discriminatory act, is that certain individuals, for no reason other than gender, are presumed unqualified"). The stigma of different treatment "is an invitation to subject" B.P.J. and other girls who are transgender to further "discrimination both

in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003).

> **D.    Excluding B.P.J. From Girls' Teams Is Not The Same As Excluding A Cisgender Boy From Girls' Teams.**

Despite the overwhelming evidence of how B.P.J. is harmed by H.B. 3293, Defendants disingenuously assert that there is no meaningful distinction between B.P.J.'s Title IX claim and a claim that could be brought by a hypothetical cisgender boy with low testosterone. But Title IX requires courts to look beyond facile comparisons when determining whether "discrimination" exists and to focus on "[t]he real social impact" of a particular action. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998). Whether disparate treatment amounts to discrimination under that standard "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (quoting *Oncale*, 523 U.S. at 85).

"All the circumstances" includes the reality—otherwise recognized by the State, which has revised her birth certificate to reflect as much—that B.P.J. is a girl. "Context matters," and being forced to play on a boys' team is "immaterial in some situations"—*i.e.*, for cisgender boys—but "material in others"—*i.e.*, for transgender girls. *Burlington*, 548 U.S. at 69 (citations omitted). A hypothetical cisgender boy with low testosterone experiences no cognizable emotional and dignitary harm from

participating on the boys' team instead of the girls' team because he is a boy; his participation on the boys' team is thus consistent with his gender identity. By contrast, B.P.J. is a girl, not a boy. Forcing her to compete on a boys' team would deny who she is. (JA0880-0881; JA3104); *cf.* Transcript of Oral Argument at 15:2-6, *Bostock v. Clayton County, Georgia*, No. 17-1618, and *Altitude Express, Inc. v. Zarda*, No. 17-1623 (Gorsuch, J.) ("[T]here are male and female bathrooms, there are dress codes that are otherwise innocuous, right, most—most people would find them innocuous. But the affected communities will not. And they will find harm."). Far from equating transgender girls with cisgender boys, Title IX requires that courts take these differences into account.

### E.      Title IX's Athletic Regulations Do Not Authorize Discrimination Against Transgender Students.

The District Court also wrongly concluded that "Title IX authorizes sex separate sports in the same manner as H.B. 3293," offering only the cursory conclusion that "[t]here is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex." (JA4276-4277.) But H.B. 3293's exclusion of girls who are transgender is not authorized by Title IX's athletic regulations. The District Court's conclusion to the contrary, lacking in any citation to legal authority, was error.

Under Title IX's athletic regulations, schools are generally prohibited from "provid[ing] athletics separately" "on the basis of sex," but "may" do so "where

selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a)-(b). And regardless of whether a school provides sex-separated teams or mixed teams, schools are still required to provide "equal athletic opportunity for members of both sexes." *Id.* § 106.41(c).

Title IX's athletic regulations closely resemble the statute's restroom regulation analyzed in *Grimm*. The restroom regulation, 34 C.F.R. § 106.33, interprets Title IX to allow for "separate toilet, locker room, and shower facilities on the basis of sex," so long as they are "comparable" to each other. But as this Court explained in *Grimm*, the restroom regulation did not authorize a school board to exclude Grimm from the sex-separated restroom consistent with his gender identity. *Grimm* held that the regulation merely indicates "that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means." 972 F.3d at 618.

The same is true here. Title IX's athletic regulations indicate that the act of creating sex-separated teams in and of itself is not discriminatory—not that the West Virginia legislature can use whatever sex-based criteria is wishes to completely exclude B.P.J. from school sports. As in *Grimm*, the permissibility of separating teams by sex does not answer the question presented here: whether a statute may categorically exclude B.P.J. from all sex-separated sports because of the

55

incongruence between her gender identity and sex assigned at birth.

Without acknowledging *Grimm*'s analysis of Title IX's restroom regulation, the District Court assumed that Title IX's athletic regulations allowed sex separation solely because of biological differences. (JA4276-4277.) As demonstrated above, that is wrong.[8] Moreover, "transgender individuals often defy binary categorization on the basis of physical characteristics alone." *Grimm*, 972 F.3d at 621 (Wynn, J., concurring). Thus, Title IX regulations "shed[] little light on how exactly to determine the 'character of being either male or female' where those indicators diverge." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017). In any event, there is nothing in Title IX or its regulations that authorizes the West Virginia legislature to cherry-pick criteria designed to exclude transgender girls while ignoring the physiological characteristics that are actually relevant to athletic performance.

---

[8] Title IX's allowance for sex separation did not solely "depend on the assertion of innate biological differences between the sexes, but rather on the historic and societal reality that girls and women have not had the benefit of anywhere near the same opportunities as boys and men to develop their athleticism." Deborah Brake, *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. 41, 70 (2023) (footnotes omitted). Title IX's legislative history repeatedly attributes the lack of equal athletic opportunities to the socialization of girls and women to conform to sex stereotypes. *See, e.g.*, *Sex Discrimination Reguls. Hearings Before the Subcomm. On Postsecondary Educ. of the Comm. On Educ. & Labor, House of Representatives*, 98th Cong. 179, 179 (1975) (Statement of Sen. Birch Baye); *id.* at 197 (Statement of Rep. Stewart McKinney).

\* \* \*

Because H.B. 3293 discriminates against B.P.J. on the basis of sex in a federally funded education program and causes her harm in the process, the District Court's judgment against B.P.J. should be reversed and this Court should grant summary judgment to B.P.J. on her Title IX claim.

## III.    The Court Should Instruct The District Court To Enter A Permanent Injunction.

In addition to granting summary judgment for B.P.J., this Court should remand to the District Court with instructions to convert the preliminary injunction barring enforcement of H.B. 3293 against B.P.J. into a permanent one.[9] As the District Court explained—and as this Court recognized in its interim order staying the dissolution of the preliminary injunction (ECF No. 50)—the equities in this case overwhelmingly favor B.P.J. Enforcing H.B. 3293 against B.P.J. will profoundly harm her during "a memorable and pivotal time in [her] life" and relegate her to "watch[ing] her teams compete from the sidelines." (JA4298.) By contrast, "not one child has been or is likely to be harmed by B.P.J.'s continued participation on her

---

[9] Each named Defendant is a proper subject of injunctive relief because each Defendant is obliged to implement H.B. 3293 and enforce it against B.P.J. (*See* JA0462 (holding that "each defendant will take some action that will cause [B.P.J.'s] asserted harm," that "each defendant can redress her claims," and that B.P.J.'s "[c]laims are ripe against each defendant," and thus denying motions to dismiss filed by the State Board Defendants, County Board Defendants, and WVSSAC); JA0483; JA0486; JA0922; JA3105-3106.)

middle school's cross country and track teams" with her friends. (*Id*.) "It is in the public interest that all children who seek to participate in athletics have a genuine opportunity to do so." (*Id*.)  Indeed, protecting politically unpopular groups from legislators' unfounded fears are some of "[t]he proudest moments of the federal judiciary." *Grimm*, 972 F.3d at 620.

## CONCLUSION

For the foregoing reasons, B.P.J. respectfully requests that this Court reverse the District Court's Order denying Plaintiff's motion for summary judgment and granting Defendants' and Intervenor's motions for summary judgment; enter judgment in favor of Plaintiff-Appellant; and remand to the District Court to enter permanent injunctive relief. Alternatively, the Court should vacate and remand for the District Court to evaluate B.P.J.'s as-applied claims under the proper standard.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument pursuant to Local Rule 34(a).

Dated: March 27, 2023

/s/ Kathleen Hartnett

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant B.P.J.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(g), I certify that this motion complies with applicable type-volume and length limitations because this motion contains 12,993 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(4)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

Dated: March 27, 2023

*/s/ Kathleen Hartnett*
Kathleen Hartnett

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Plaintiff-Appellant B.P.J., by Her Next Friend and Mother, Heather Jackson, with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on March 27, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 27, 2023

_/s/ Kathleen Hartnett_
Kathleen Hartnett