No. 23-1078 (L) (2:21-cv-00316)

# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother; HEATHER JACKSON,

*Plaintiff - Appellant,*

versus

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

*Defendants - Appellees.*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees*

---

On Appeal from the United States District Court for the Southern District of West Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

**JOINT APPENDIX – VOLUME 1 OF 9 (JA0001-JA0530)**

---

*Counsel for Plaintiff-Appellant listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant B.P.J.*

## TABLE OF CONTENTS

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME ONE** | | | |
| District Court Docket Sheet, No. 21-cv-00316 (S.D. W.Va.) | N/A | N/A | JA0001 |
| Declaration of Loree Stark in Support of Plaintiff's Complaint | 5/26/2021 | 1-1 | JA0049 |
| Ex. B of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0052 |
| Ex. D of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0054 |
| Declaration of Heather Jackson in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0057 |
| Declaration of B.P.J. in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0060 |
| Supplemental Declaration of Katelyn Kang in Support of Plaintiff's Motion for Preliminary Injunction | 6/9/2021 | 25 | JA0073 |
| Ex. A of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0077 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0096 |
| Ex. C of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0117 |
| Ex. D of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA00158 |
| Ex. E of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0181 |
| Ex. F of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/8/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0183 |
| Statement of Interest of the United States | 6/17/2021 | 42 | JA0221 |
| Ex. A in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, 2020-2021 Track Coaches Packet | 6/22/2021 | 47-1 | JA0243 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, Athletic Participation/Parental Consent/Physician's Certificate Form | 6/22/2021 | 47-2 | JA0260 |
| Ex. D in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, U.S. Department of Education Office of Civil Rights Revised Letter | 6/23/2021 | 49-4 | JA0265 |
| Ex. F in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Case No: CO/60/2020 In the High Court of Justice Administrative Court | 6/23/2021 | 49-6 | JA0314 |
| Ex. H in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Transgender Guideline | 6/23/2021 | 49-8 | JA0354 |
| Ex. I in Support of State of West Virginia's Opposition for Preliminary Injunction, Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) | 6/23/2021 | 49-9 | JA0397 |
| First Amended Complaint | 7/16/2021 | 64 | JA0413 |
| Memorandum Opinion and Order Granting Preliminary Injunction | 7/21/2021 | 67 | JA0439 |
| The State of West Virginia's Answer to First Amended Complaint [Excerpt pp. 1, 7-8] | 7/30/2021 | 78 | JA0454 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Memorandum Opinion and Order Denying Motions to Dismiss | 12/1/2021 | 129 | JA0457 |
| Memorandum Opinion and Order Granting in Part and Denying in Part Motion to Intervene | 12/1/2021 | 130 | JA0465 |
| Intervenor Lainey Armistead's Proposed Answer to First Amended Complaint [Excerpt pp. 1, 5] | 12/1/2021 | 131 | JA0472 |
| Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch's Answer to Plaintiff's First Amended Complaint [Excerpt pp. 1, 9, 19-20] | 12/15/2021 | 156 | JA0474 |
| Defendants Harrison County Board of Education and Dora Stutler's Answer to First Amended Complaint [Excerpt pp. 1, 8] | 12/15/202 | 157 | JA0478 |
| Defendant West Virginia Secondary School Activities Commission's Answer to First Amended Complaint [Excerpt pp. 1, 9] | 12/15/2021 | 158 | JA0480 |
| Harrison County Board and County Superintendent Stipulation of Uncontested Facts | 3/7/2022 | 252 | JA0482 |
| State Board of Education and State Superintendent Stipulation of Uncontested Facts | 3/30/2022 | 270 | JA0486 |
| West Virginia Secondary School Activities Commission's Memorandum in Support of Motion for Summary Judgment | 4/21/2022 | 277 | JA0490 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 6 in Support of WVSSAC's Motion for Summary Judgment, National Federation of State High School Associations 2020 Rules Book for Track and Field and Cross County | 4/21/2022 | 278-6 | JA0522 |
| Ex. 4 in Support of Motion for Summary Judgment by W. Clayton Burch & West Virginia State Board of Education, West Virginia House Joint Resolution 102 | 4/21/2022 | 283-4 | JA0528 |
| **VOLUME TWO** | | | |
| Ex. C in Support of Motion for Summary Judgment by State of West Virginia, [pp. 1-340] 4/4/2022 Deposition Transcript of Aron Janssen, M.D. | 4/21/2022 | 285-3 | JA0531 |
| Ex. H in Support of Motion for Summary Judgment by State of West Virginia, Graphs | 4/21/2022 | 285-8 | JA0871 |
| Ex. 1 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Heather Jackson | 4/21/2022 | 289-2 | JA0875 |
| Ex. A of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Gender Support Plan | 4/21/2022 | 289-2 | JA0883 |
| Ex. B of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Preferred Name Request Form | 4/21/2022 | 289-2 | JA0888 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. C of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Pictures of B.P.J. | 4/21/2022 | 289-2 | JA0894 |
| Ex. 2 in Support of Motion by B.P.J. for Summary Judgment, Declaration of B.P.J. | 4/21/2022 | 289-3 | JA0897 |
| Ex. 4 in Support of Motion by B.P.J. for Summary Judgment, State of West Virginia's Responses to Plaintiff's First Set of Interrogatories [Excerpt pp. 1, 9] | 4/21/2022 | 289-5 | JA0902 |
| Ex. 5 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-3] State of West Virginia's Responses to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-6 | JA0904 |
| Ex. 6 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15] Defendant Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admissions | 4/21/2022 | 289-7 | JA0907 |
| Ex. 7 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15, 21] Defendant Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-8 | JA0911 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 8 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 16-17] Defendant West Virginia State Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-9 | JA0916 |
| Ex. 10 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 13] WVSSAC's Responses to Second Set of Requests for Admission | 4/21/2022 | 289-11 | JA0919 |
| Ex. 11 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 30-32] Defendant-Intervenor Lainey Armistead's Responses and Objections to Plaintiff's Second Set of Request for Admission | 4/21/2022 | 289-12 | JA0923 |
| Ex. 12 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-158] Redacted 1/21/2022 Deposition Transcript of B.P.J. | 4/21/2022 | 289-13 | JA0927 |
| **VOLUME THREE** | | | |
| Ex. 14 in Support of Motion by B.P.J. for Summary Judgment, [pp. 77-289] Redacted 1/20/2022 Deposition Transcript of Heather Jackson | 4/21/2022 | 289-15 | JA1085 |
| Ex. 15 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 127-128] 1/19/2022 Deposition Transcript of Wesley Scott Pepper | 4/21/2022 | 289-16 | JA1298 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 16 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192, 213-216, 218, 220-222, 236] Redacted 3/8/2022 Vol. 1 Deposition Transcript of Dora Stutler and Dave Mazza (Harrison County Board of Education)<br><br>Stutler Testimony pp. 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192;<br><br>Mazza Testimony pp. 213-216, 218, 220-222, 236 | 4/21/2022 | 289-17 | JA1301 |
| Ex. 17 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-163] 2/11/2022 30(b)(6) Deposition of Bernard Dolan (WVSSAC) with Ex. 5 | 4/21/2022 | 289-18 | JA1340 |
| Ex. 18 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 17, 32, 33, 66-67, 71, 80, 101-102, 113-115. 125-126, 132-136] 2/14/2022 Deposition of Michele Blatt (State Board) | 4/21/2022 | 289-19 | JA1515 |
| Ex. 20 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 94-105, 118-121, 150-157] Redacted 2/24/2022 Deposition Transcript of Gerald Montano, D.O. | 4/21/2022 | 289-21 | JA1536 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 21 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-175] Redacted 3/11/2022 Deposition Transcript of Lainey Armistead | 4/21/2022 | 289-22 | JA1561 |
| **VOLUME FOUR** | | | |
| Ex. 22 in Support of Motion by B.P.J. for Summary Judgment, Declaration and Expert Report of Deanna Adkins, MD | 4/21/2022 | 289-23 | JA1736 |
| Ex. 23 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-323] 3/16/2022 Deposition Transcript of Deanna Adkins, MD | 4/21/2022 | 289-24 | JA1767 |
| Ex. 24 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-25 | JA2090 |
| Ex. 25 in Support of Motion by B.P.J. for Summary Judgment, Rebuttal Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-26 | JA2140 |
| **VOLUME FIVE** | | | |
| Ex. 26 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-290] 3/24/2022 Deposition Transcript of Joshua Safer, M.D. | 4/21/2022 | 289-27 | JA2153 |
| Ex. 27 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Mary D. Fry, PhD | 4/21/2022 | 289-28 | JA2443 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 29 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Gregory A. Brown | 4/21/2022 | 289-30 | JA2485 |
| **VOLUME SIX** | | | |
| Ex. 30 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-282] 3/25/2022 Deposition Transcript of Gregory A. Brown | 4/21/2022 | 289-31 | JA2567 |
| Ex. 31 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Dr. Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-32 | JA2849 |
| Ex. 32 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 98-121, 160-161] 3/28/2022 Deposition Transcript of Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-33 | JA2927 |
| Ex. 33 in Support of Motion by B.P.J. for Summary Judgment, Mountain Hollar MS Invitational Official Team Scores | 4/21/2022 | 289-34 | JA2955 |
| Ex. 34 in Support of Motion by B.P.J. for Summary Judgment, Doddridge Invitational Official Team Scores | 4/21/2022 | 289-35 | JA2957 |
| Ex. 38 in Support of Motion by B.P.J. for Summary Judgment, Email chain re Transgender participation in secondary schools bill with attachment "2021 Green Book Summary of Public Education Bills Enacted During the 2021 Regular Session" [WVSBOE 000012-26] | 4/21/2022 | 289-39 | JA2960 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 39 in Support of Motion by B.P.J. for Summary Judgment, WVSSAC Title 127 Legislative Rule [WVSSAC000133-220] | 4/21/2022 | 289-40 | JA2975 |
| Ex. 40 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of Email chain re Transgender participation in secondary schools [WVSBOE 000006, 08-09, 39] | 4/21/2022 | 289-41 | JA3063 |
| Ex. 41 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of West Virginia State Board of Education's Enrolled Bill Review Form for H.B. 3293 2021 Regular Session [WVSBOE 000038] | 4/21/2022 | 289-42 | JA3067 |
| Ex. 42 in Support of Motion by B.P.J. for Summary Judgment, Screen Capture of Jordan Bridges Facebook page | 4/21/2022 | 289-43 | JA3068 |
| Ex. 43 in Support of Motion by B.P.J. for Summary Judgment, MSNBC Twitter, 4/30/2021 Governor Justice Interview | 4/21/2022 | 289-44 | JA3080 |
| Ex. 44 in Support of Motion by B.P.J. for Summary Judgment, NCAA.org "Board of Governors updates transgender participation policy" | 4/21/2022 | 289-45 | JA3083 |
| Plaintiff's Statement of Undisputed Material Facts | 4/21/2022 | 290 | JA3085 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME SEVEN** | | | |
| Table of Contents of Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment [Armistead Supp. App. 0001-0003] | 5/12/2022 | 300 | JA3112 |
| Supplemental Declaration of Lainey Armistead [Armistead Supp. App. 0004-0006] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3115 |
| Rebuttal Expert Report and Declaration of Dr. Deanna Adkins, M.D. [Armistead Supp. App. 0038-0072] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3118 |
| Rebuttal Expert Report and Declaration of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0136-0166] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3153 |
| Deposition Transcript of James M. Cantor, PH.D. [Armistead Supp. App. 0209-0289] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3184 |
| Errata Sheet to Deposition of Gregory A. Brown, PH.D., FACM [Armistead Supp. App. 0479-0483] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3501 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Excerpt Enrolled Version of HB 3293 [Armistead Supp. App. 0833-0839] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3506 |
| B.P.J.'s Redacted Birth Certificate [Armistead Supp. App. 0840] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3513 |
| Errata Sheet to Deposition of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0841] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3514 |
| Errata Sheet to Deposition of Mary Fry, PH.D. [Armistead Supp. App. 0842-0846] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3515 |
| Errata Sheet to Deposition of B.P.J. [Armistead Supp. App. 0847] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3520 |
| Ex. C in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of James M. Cantor, PhD. | 5/12/2022 | 305-03 | JA3521 |
| Ex. D in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of Stephen B. Levine, MD | 5/12/2022 | 305-04 | JA3629 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME EIGHT** | | | |
| Ex. E in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, [pp. 1-261] 3/29/2022 Deposition Transcript of Mary D. Fry, PhD | 5/12/2022 | 305-05 | JA3737 |
| Ex. G in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Copy of West Virginia Legislature House Bill 3293 | 5/12/2022 | 305-07 | JA4115 |
| Ex. A, Roger G. Brooks' Declaration in Support of Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-01 | JA4124 |
| Table of Contents of Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer [Armistead Daubert App. 0001-0005] | 5/12/2022 | 307-02 | JA4133 |
| Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) [Armistead Daubert App. 0558-0573] in Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-02 | JA4138 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. F of Declaration by Sruti Swaminathan in Support of Motion by B.P.J. to Exclude Expert Testimony of James M. Cantor, Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline | 5/12/2022 | 321-6 | JA4154 |
| Ex. 45 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC's Responses to Plaintiff's First Set of Interrogatories | 5/12/2022 | 332-1 | JA4189 |
| Ex. 46 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Intervenor Lainey Armistead's First Supplemental Disclosures Pursuant to Rule 26(A)(1) | 5/12/2022 | 332-2 | JA4204 |
| Ex. 47 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC Board of Directors Transgender Policy [WVSSAC000008] | 5/12/2022 | 332-3 | JA4214 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 48 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Excerpt of Rules and Regulations of the West Virginia Secondary School Activities Commission [WVSSAC000012, WVSSAC000017] | 5/12/2022 | 332-4 | JA4215 |
| Ex. 2 in Support of Reply by Harrison County Board of Education, Dora Stutler to Plaintiff's Consolidated Opposition, [Excerpt pp. 1, 5] Harrison County Board of Education and Dora Stutler's Responses and Objections to Plaintiff's First Set of Requests | 5/26/2022 | 336-2 | JA4217 |
| Table of Contents of Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony [App. 0001-0006] | 5/26/2022 | 343-1 | JA4219 |
| Tomkinson, G., et al., *European Normative Values for Physical Fitness in Children and Adolescents Aged 9-17 Years: Results From 2,779,165 Eurofit Performances Representing 30 Countries*, [App. 0814-0826] in Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony | 5/26/2022 | 343-1 | JA4225 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. A in Support of Motion *In Limine* by B.P.J. to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity, Redacted Order Granting Petition for Change of Name | 6/22/2022 | 417-1 | JA4238 |
| Plaintiff's Reply in Support of Her Motion *In Limine* to Exclude Evidence and/or Testimony of Bernard Dolan Regarding Certain Hearsay Statements [Excerpt pp. 1-2] | 7/11/2022 | 470 | JA4244 |
| Ex. A in Support of Joint Motion by Lainey Armistead & State of West Virginia to Supplement the Expert Report of Gregory A. Brown, Supplemental Declaration of Gregory A. Brown, Ph.D., FACSM | 10/21/2022 | 500-1 | JA4246 |
| Memorandum Opinion and Order re Motions for Summary Judgment | 1/5/2023 | 512 | JA4256 |
| Judgment Order | 1/5/2023 | 514 | JA4279 |
| Declaration of B.P.J. in Support of Motion for Stay | 1/20/2023 | 515-1 | JA4280 |
| Declaration of Heather Jackson in Support of Motion for Stay | 1/20/2023 | 515-2 | JA4284 |
| Notice of Appeal by B.P.J. | 1/23/2023 | 517 | JA4289 |
| Notice of Appeal by West Virginia Secondary School Activities Commission | 2/1/2023 | 522 | JA4291 |
| Memorandum Opinion and Order re Stay Pending Appeal | 2/7/2023 | 527 | JA4296 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME NINE** | | | |
| Table of Contents of Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4303 |
| Declaration of Lainey Armistead [Armistead App. 0001-0008] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4307 |
| Declaration of Chelsea Mitchell [Armistead App. 0009-0019] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4315 |
| Declaration of Christina Mitchell [Armistead App. 0020-0032] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4326 |
| Declaration of Alanna Smith [Armistead App. 0033-0038] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4339 |
| Declaration of Selina Soule [Armistead App. 0039-0048] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4345 |
| Declaration of Darcy Aschoff [Armistead App. 0049-0053] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4355 |
| Declaration of Cynthia Monteleone [Armistead App. 0054-0058] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4360 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Declaration of Madison Kenyon [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4365 |
| Declaration of Mary Marshall [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4371 |
| Declaration of Haley Tanne [Armistead App. 0070-0074] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4376 |
| Declaration of Linnea Saltz [Armistead App. 0075-0079] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4381 |
| Excerpt of 2019 NCAA Division II Outdoor Track & Field Championship Results [Armistead App. 0080-0081] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4386 |
| Excerpt of 2020 Big Sky Indoor Track & Field Championship Results [Armistead App. 0082-0086] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4388 |
| 2020 Women's Ivy League Swimming & Diving Championship Results [Armistead App. 0087-0108] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4393 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (500 Yard Freestyle) [Armistead App. 0109-0112] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4415 |
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (100 Yard Freestyle) [Armistead App. 0113-0115] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4419 |
| Redacted Deposition of Dr. Kacie Kidd, M.D [Armistead App. 1142-1278] Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA44423 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's First Set of Requests for Admission [Armistead App. 1437-1486] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4560 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission [Armistead App. 1487-1510] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4610 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Errata Sheet to Deposition of Dr. Joshua Safer, M.D. [Armistead App.1535-1537] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4634 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1538-1553] [HCBOE 01167-01172] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4637 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1544-1547] [HCBOE 01265-01268] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4643 |
| Redacted Amended Birth Certificate of B.P.J. | N/A | N/A | JA4647 |

**Query**    **Reports** ▾    **Utilities** ▾    **Help**    **Log Out**

APPEAL

# United States District Court
## Southern District of West Virginia (Charleston)
### CIVIL DOCKET FOR CASE #: 2:21-cv-00316

| | |
|---|---|
| B. P. J. et al v. West Virginia State Board of Education et al | Date Filed: 05/26/2021 |
| Assigned to: Judge Joseph R. Goodwin | Date Terminated: 01/05/2023 |
| Cause: 42:1983 Civil Rights Act | Jury Demand: None |
| | Nature of Suit: 448 Civil Rights: Education |
| | Jurisdiction: Diversity |

**Plaintiff**

**B. P. J.**
*by her next friend and mother*

represented by   **Andrew D. Barr**
COOLEY
Suite 2300
1144 15th Street
Denver, CO 80202
720-566-4121
Fax: 720-566-4099
Email: abarr@cooley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aubrey Sparks**
OUR FUTURE WEST VIRGINIA
1636 Kanawha Boulevard East
Charleston, WV 25311
681-222-0668
Email: Asparks@acluwv.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
8th Floor
1776 K Street, NW
Washington, DC 20006-2304
202-804-6245
Fax: 202-478-0210
Email: asmithcarrington@lambdalegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
Suite 105

**JA0001**

1 West Court Square
Decatur, GA 30030
404-897-1800
Fax: 404-506-9320
Email: ccharles@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Reinhardt**
COOLEY
500 Boylston Street
Boston, MA 02116
617-937-2305
Fax: 617-937-2400
Email: ereinhardt@cooley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A. Block**
AMERICAN CIVIL LIBERTIES UNION
Floor 18
125 Broad Street
New York, NY 10004
212-549-2593
Email: jblock@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julie Veroff**
COOLEY
5th Floor
101 California Street
San Francisco, CA 94111
415-693-2179
Fax: 415-693-2222
Email: jveroff@cooley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn Kang**
COOLEY
55 Hudson Yards
New York, NY 10001
212-479-6849
Fax: 212-479-6275
Email: kkang@cooley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen R Hartnett**

**JA0002**

COOLEY
5th Floor
101 California Street
San Francisco, CA 94111
415-693-2071
Fax: 415-693-2222
Email: khartnett@cooley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Ward**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA FOUNDATION
1614 Kanawha Boulevard, East
Charleston, WV 25311
304-282-6806
Email: nward@acluwv.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sruti J. Swaminathan**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
19th Floor
120 Wall Street
New York, NY 10005
212-809-8585
Fax: 212-809-0055
Email: sswaminathan@lambdalegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
LAMDA LEGAL DEFENSE AND
EDUCATION FUND
Suite 105
1 West Court Square
Decatur, GA 30030
470-225-5341
Fax: 404-506-9320
Email: tborelli@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zoe Helstrom**
COOLEY
20th Floor
3 Embarcadero Center
San Francisco, CA 94111
415-693-2000
Fax: 415-693-2222
Email: zhelstrom@cooley.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Loree Beth Stark**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA
1614 Kanawha Boulevard, East
Charleston, WV 25311
914-393-4614
Email:
lstark@humanrightsdefensecenter.org
*TERMINATED: 10/19/2022*

**Meredith Taylor Brown**
AMERICAN CIVIL LIBERTIES UNION
18th Floor
125 Broad Street
New York, NY 10004
212-519-7887
Fax: 212-549-2649
Email: tbrown@aclu.org
*TERMINATED: 02/10/2022*
*PRO HAC VICE*

**Valeria M. Pelet del Toro**
COOLEY
55 Hudson Yards
New York, NY 10001
212-479-6455
Fax: 212-479-6275
Email: vpeletdeltoro@cooley.com
*TERMINATED: 08/01/2022*
*PRO HAC VICE*

<u>**Plaintiff**</u>

**Heather Jackson**                    represented by   **Andrew D. Barr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aubrey Sparks**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Reinhardt**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A. Block**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julie Veroff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn Kang**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen R Hartnett**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sruti J. Swaminathan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zoe Helstrom**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA0005**

*ATTORNEY TO BE NOTICED*

**Loree Beth Stark**
(See above for address)
*TERMINATED: 10/19/2022*

**Meredith Taylor Brown**
(See above for address)
*TERMINATED: 02/10/2022*
*PRO HAC VICE*

**Valeria M. Pelet del Toro**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*

V.

**Defendant**

**West Virginia State Board of Education**     represented by     **Kelly C. Morgan**
BAILEY & WYANT
P. O. Box 3710
Charleston, WV 25337-3710
304/345-4222
Fax: 304/343-3133
Email: kmorgan@baileywyant.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Vickers Hammond**
BAILEY & WYANT
P. O. Box 3710
Charleston, WV 25337-3710
304/345-4222
Fax: 304/343-3133
Email: khammond@baileywyant.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W. Taylor**
BAILEY & WYANT
P. O. Box 3710
Charleston, WV 25337-3710
304/345-4222
Fax: 304/343-3133
Email: mtaylor@baileywyant.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Harrison County Board of Education**     represented by     **Susan L. Deniker**
STEPTOE & JOHNSON
400 White Oaks Boulevard

Bridgeport, WV 26330
304/624-8000
Fax: 304/624-8183
Email: susan.deniker@steptoe-johnson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Mark Cropp**
STEPTOE & JOHNSON
400 White Oaks Boulevard
Bridgeport, WV 26330
304-933-8145
Email: Jeffrey.Cropp@steptoe-johnson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**West Virginia Secondary School Activities Commission**

represented by **Anthony E. Nortz**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
304-345-1400
Fax: 304/345-1826
Email: anortz@kesnerlaw.com
*LEAD ATTORNEY*

**Kimberly M. Bandy**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
304/345-1400
Fax: 304/343-1826
Email: kbandy@shumanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberta F. Green**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
304/345-1400
Fax: 304/343-1826
Email: rgreen@shumanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Marlowe Rogers**
MILLER & AMOS
Suite 300
2 Hale Street
Charleston, WV 25301
757-635-8836
Email: srogers@shumanlaw.com
*ATTORNEY TO BE NOTICED*

**JA0007**

**Defendant**

**W. Clayton Burch**
*in his official capacity as State*
*Superintendent, and*

represented by **Kelly C. Morgan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Vickers Hammond**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W. Taylor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dora Stutler**
*in her official capacity as Harrison County*
*Superintendent*

represented by **Susan L. Deniker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Mark Cropp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Patrick Morrisey**
*in his official capacity as Attorney General,*
*and*
*TERMINATED: 11/30/2021*

represented by **Curtis R. Capehart**
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
304-558-2021
Fax: 304-558-0140
Email: curtis.r.a.capehart@wvago.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**The State of West Virginia**

represented by **Curtis R. Capehart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas P. Buffington , II**
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
304-558-2021
Fax: 304-558-0140

**JA0008**

Email: Doug.P.Buffington@wvago.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Christian Tryon**
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
304-558-2021
Fax: 304-558-0140
Email: d.tryon@buckeyeinstitute.org
*TERMINATED: 07/22/2022*

**Jessica Anne Lee**
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
Building 1, Room E-26
1900 Kanawha Boulevard, East
Charleston, WV 25305
304-558-2021
Fax: 304-558-0140
Email: Jessica.A.Lee@wvago.gov
*TERMINATED: 08/26/2021*

V.

**Interested Party**

**United States of America**                represented by    **Aria Vaughan**
DEPARTMENT OF JUSTICE
4CON, 10th Floor
950 Pennsylvania Avenue NW
Washington, DC 20530
202-616-2166
Email: aria.vaughan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred B. Westfall , Jr.**
UNITED STATES ATTORNEY'S OFFICE
Suite 4000
300 Virginia Street East
Charleston, WV 25301
304/345-2200
Fax: 304/347-5443
Email: fred.westfall@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer M. Mankins**
UNITED STATES ATTORNEY'S OFFICE
Suite 4000

**JA0009**

300 Virginia Street East
Charleston, WV 25301
304/345-2200
Fax: 304/347-5443
Email: jennifer.mankins@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Lainey Armistead**                    represented by   **Brandon S. Steele**
THE LAW OFFICES OF BRANDON S.
STEELE
Suite 100
3049 Robert C. Byrd Drive
Beckley, WV 25801
304-253-1230
Fax: 304-255-1520
Email: bsteelelawoffice@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christiana M. Kiefer**
ALLIANCE DEFENDING FREEDOM
Suite 600
440 First Street NW
Washington, DC 20001
202-393-8690
Email: ckiefer@adflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry W. Frampton , IV**
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, AZ 85260
480-444-0020
Fax: 480-444-0028
Email: hframpton@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johannes Widmalm-Delphonse**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4667
Fax: 571-707-4656
Email: jwidmalmdelphonse@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Scruggs**

**JA0010**

ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, AZ 85260
480-444-0020
Email:
jscruggs@alliancedefendingfreedom.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua D. Brown**
BROWN & STEELE
Suite 100
3049 Robert C. Byrd Drive
Beckley, WV 25801
304-253-1230
Email: joshua_brown05@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Sechler**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655
Fax: 571-707-4656
Email: psechler@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel Csutoros**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
561-901-9071
Email: rcsutoros@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Greenwood Brooks**
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, AZ 85260
480-444-0020
Fax: 480-444-0028
Email: rbrooks@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy D. Ducar**
LAW OFFICES OF TIMOTHY D. DUCAR

**JA0011**

Suite E
7430 East Butherus Drive
Scottsdale, AZ 85260
480-502-2119
Email: orders@azlawyers.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Travis Christopher Barham**
ALLIANCE DEFENDING FREEDOM
Suite D-1100
1000 Hurricane Shoals Road, NE
Lawrenceville, GA 30043
770-339-0774
Fax: 770-339-6744
Email: tbarham@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyson Charles Langhofer**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655
Email: tlanghofer@adflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/26/2021 | 1 | COMPLAINT. Filing Fee $402.00. Receipt # CHAR019069. (Attachments: # 1 Declaration of Loree Stark, # 2 Proposed Summons as to Dora Stutler, # 3 Proposed Summons as to Harrison County Board of Education, # 4 Proposed Summons as to W. Clayton Burch, # 5 Proposed Summons as to West Virginia Secondary School Activities Commission, # 6 Proposed Summons as to West Virginia State Board of Education, # 7 Receipt, # 8 Civil Cover Sheet) (kew) |
| 05/26/2021 | 2 | MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. (Attachments: # 1 Declarations of Joshua Safer and Heather Jackson, # 2 Proposed Order) (kew) |
| 05/26/2021 | 3 | MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation with proposed document attached (Attachments: # 1 Exhibit A, # 2 Proposed Order) (kew) |
| 05/26/2021 | | CASE assigned to Judge Joseph R. Goodwin. (klc) |
| 05/26/2021 | 4 | STANDING ORDER IN RE: ASSIGNMENT AND REFERRAL OF CIVIL ACTIONS AND MATTERS TO MAGISTRATE JUDGES ENTERED JANUARY 4, 2016. Discovery referred to Magistrate Judge Tinsley. (cc: attys; any unrepresented party) (klc) |
| 05/26/2021 | 5 | ELECTRONIC SUMMONS ISSUED as to W. Clayton Burch, Harrison County Board of Education, Dora Stutler, West Virginia Secondary School Activities Commission, West |

**JA0012**

|  |  | Virginia State Board of Education, re: <u>1</u> Complaint. Summons returnable 21 days. Instructions to Counsel: This is your electronic summons. Please print as many copies of the Summons and Complaint as are necessary to effectuate service under Fed. R. Civ. P. 4. See Proof of Service page of this Summons form for filing a return of service if required by Fed. R. Civ. P. 4(l). (Attachments: # <u>1</u> Summons Issued as to Harrison County Board of Education, # <u>2</u> Summons Issued as to W. Clayton Burch, # <u>3</u> Summons Issued as to West Virginia Secondary School Activities Commission, # <u>4</u> Summons Issued as to West Virginia State Board of Education) (kew) |
|---|---|---|
| 05/27/2021 | <u>6</u> | STATEMENT OF VISITING ATTORNEY from Joshua A. Block on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7955402. (Stark, Loree) (Modified on 5/28/2021 to add party filer) (kew). |
| 05/27/2021 | <u>7</u> | STATEMENT OF VISITING ATTORNEY from Avatara Smith-Carrington on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # BWVSDC-7955405. (Stark, Loree) (Modified on 5/28/2021 to add party filer) (kew). |
| 05/27/2021 | <u>8</u> | STATEMENT OF VISITING ATTORNEY from Tara L. Borelli on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7955408. (Stark, Loree) (Modified on 5/28/2021 to add party filer) (kew). |
| 05/27/2021 | <u>9</u> | STATEMENT OF VISITING ATTORNEY from Carl S. Charles on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7955410. (Stark, Loree) (Modified on 5/28/2021 to add party filer) (kew). |
| 05/27/2021 | <u>10</u> | SUPPLEMENTAL CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Complaint. (Stark, Loree) |
| 05/27/2021 | <u>11</u> | SUPPLEMENTAL CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Motion for Preliminary Injunction. (Stark, Loree) |
| 05/27/2021 | <u>12</u> | SUPPLEMENTAL CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Motion to File Brief in Excess of the Page Limitation. (Stark, Loree) |
| 06/01/2021 | <u>13</u> | SUMMONS RETURNED EXECUTED for West Virginia State Board of Education, re: <u>1</u> Complaint, <u>3</u> MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation, <u>2</u> MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. West Virginia State Board of Education served on 5/28/2021, answer due 6/18/2021. (Stark, Loree) |
| 06/01/2021 | <u>14</u> | SUMMONS RETURNED EXECUTED for W. Clayton Burch, re: <u>1</u> Complaint, <u>3</u> MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation, <u>2</u> MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. W. Clayton Burch served on 5/28/2021, answer due 6/18/2021. (Stark, Loree) |
| 06/01/2021 | <u>15</u> | SUMMONS RETURNED EXECUTED for Dora Stutler, re: <u>1</u> Complaint, <u>3</u> MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation, <u>2</u> MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. Dora Stutler served on 5/28/2021, answer due 6/18/2021. (Stark, Loree) |
| 06/01/2021 | <u>16</u> | SUMMONS RETURNED EXECUTED for West Virginia Secondary School Activities Commission, re: <u>1</u> Complaint, <u>3</u> MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation, <u>2</u> MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. West Virginia Secondary School Activities Commission served on 6/1/2021, answer due 6/22/2021. (Stark, Loree) |
| 06/01/2021 | <u>17</u> | SUMMONS RETURNED EXECUTED for Harrison County Board of Education, re: <u>1</u> Complaint, <u>3</u> MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation, <u>2</u> MOTION by B. P. J., Heather Jackson for a Preliminary |

| | | |
|---|---|---|
| | | Injunction. Harrison County Board of Education served on 6/1/2021, answer due 6/22/2021. (Stark, Loree) |
| 06/02/2021 | 18 | ORDER granting 3 MOTION by B. P. J., Heather Jackson for Leave to File Brief in Excess of the Page Limitation; the Clerk is directed to docket the proposed document [ECF No. 3-1] as Plaintiffs' Memorandum in Support of Plaintiff's Motion for Preliminary Injunction. Signed by Judge Joseph R. Goodwin on 6/2/2021. (cc: counsel of record; any unrepresented party) (kew) |
| 06/02/2021 | 19 | MEMORANDUM OF LAW by B. P. J., Heather Jackson in support of 2 MOTION by B. P. J., Heather Jackson for a Preliminary Injunction (docketed pursuant to #18 order) (kew) |
| 06/03/2021 | 20 | STATEMENT OF VISITING ATTORNEY from Andrew Barr on behalf of Heather Jackson, B. P. J. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7958465. (Stark, Loree) |
| 06/03/2021 | 21 | STATEMENT OF VISITING ATTORNEY from Julie Veroff on behalf of Heather Jackson, B. P. J. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7958472. (Stark, Loree) |
| 06/03/2021 | 22 | STATEMENT OF VISITING ATTORNEY from Kathleen Hartnett on behalf of Heather Jackson, B. P. J. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7958489. (Stark, Loree) |
| 06/03/2021 | 23 | STATEMENT OF VISITING ATTORNEY from Katelyn Kang on behalf of Heather Jackson, B. P. J. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7958498. (Stark, Loree) |
| 06/03/2021 | 24 | STATEMENT OF VISITING ATTORNEY from Elizabeth Reinhardt on behalf of Heather Jackson, B. P. J. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7958508. (Stark, Loree) |
| 06/09/2021 | 25 | SUPPLEMENTAL DECLARATION of Katelyn Kang by B. P. J., Heather Jackson is support of 2 MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. (Barr, Andrew) (Modified on 6/10/2021 to correct link and to add party filer) (kew). |
| 06/10/2021 | 26 | STATEMENT OF VISITING ATTORNEY from Sruti J. Swaminathan on behalf of Heather Jackson, B. P. J.. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-7964227. (Stark, Loree) |
| 06/11/2021 | 27 | EXPEDITED MOTION by B. P. J., Heather Jackson for a Scheduling Order. (Stark, Loree) |
| 06/11/2021 | 28 | PROPOSED ORDER Order Granting Expedited Motion for a Scheduling Order by B. P. J., Heather Jackson. (Stark, Loree) |
| 06/14/2021 | 29 | ORDER denying 27 EXPEDITED MOTION by B. P. J., Heather Jackson for a Scheduling Order; Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction is due on 6/16/2021; Plaintiffs' Reply to the Response is due 6/23/2021. Signed by Judge Joseph R. Goodwin on 6/14/2021. (cc: counsel of record; any unrepresented party) (kew) |
| 06/14/2021 | 30 | NOTICE OF APPEARANCE by Kelly C. Morgan on behalf of W. Clayton Burch, West Virginia State Board of Education. (Morgan, Kelly) |
| 06/14/2021 | 31 | NOTICE OF ATTORNEY APPEARANCE by Roberta F. Green on behalf of West Virginia Secondary School Activities Commission. (Green, Roberta) |

| | | |
|---|---|---|
| 06/15/2021 | 32 | APPEARANCE OF COUNSEL by Susan L. Deniker on behalf of Harrison County Board of Education, Dora Stutler. (Deniker, Susan) |
| 06/15/2021 | 33 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Defendant West Virginia Secondary School Activities Commission (Green, Roberta) |
| 06/15/2021 | 34 | PROOF/CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Complaint and Initial Pleadings to the Solicitor General of the Office of the West Virginia Attorney General Pursuant to FRCP 5.1(b). (Stark, Loree) |
| 06/15/2021 | 35 | AMENDED PROOF/CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Complaint and Initial Pleadings to the Solicitor General of the Office of the West Virginia Attorney General Pursuant to FRCP 5.1(b). (Stark, Loree) |
| 06/15/2021 | 36 | MOTION by Harrison County Board of Education, Dora Stutler, West Virginia Secondary School Activities Commission, West Virginia State Board of Education, W. Clayton Burch for Amended Schedule. (Deniker, Susan) (Modified on 6/15/2021 to add party filer) (kew) |
| 06/15/2021 | 37 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Defendant Harrison County Board of Education (Deniker, Susan) |
| 06/15/2021 | 38 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Defendants W. Clayton Burch, West Virginia State Board of Education (Morgan, Kelly) |
| 06/15/2021 | 39 | ORDER denying 36 Unopposed Motion to Amend the Briefing Schedule; Defendants' Response to the 2 Motion for a Preliminary Injunction is due 6/23/2021; Plaintiffs' Reply is due 6/30/2021. Signed by Judge Joseph R. Goodwin on 6/15/2021. (cc: counsel of record; any unrepresented party) (kew) |
| 06/17/2021 | 40 | UNOPPOSED MOTION by State of West Virginia to Intervene and for Proposed Response Deadline. (Capehart, Curtis) |
| 06/17/2021 | 41 | MEMORANDUM OF LAW by State of West Virginia in support of 40 UNOPPOSED MOTION by State of West Virginia to Intervene and for Proposed Response Deadline. (Capehart, Curtis) |
| 06/17/2021 | 42 | STATEMENT OF INTEREST by United States of America. (Vaughan, Aria) |
| 06/17/2021 | 43 | STIPULATION TO EXTEND TIME TO FILE RESPONSIVE PLEADING to 1 Complaint to 7/2/2021 by West Virginia State Board of Education, West Virginia Secondary School Activities Commission, Heather Jackson, B. P. J., Harrison County Board of Education, W. Clayton Burch, Dora Stutler. (Morgan, Kelly) (Modified on 6/17/2021 to add link to #1 complaint and to add party filers) (kew). |
| 06/17/2021 | | SET ANSWER DEADLINES for W. Clayton Burch, Harrison County Board of Education, Dora Stutler, West Virginia Secondary School Activities Commission, West Virginia State Board of Education to 7/2/2021. (kew) |
| 06/18/2021 | 44 | ORDER directing the 40 Unopposed Motion by State of West Virginia to Intervene is GRANTED; further directing the request for an additional two days to respond to Plaintiffs' Motion for a Preliminary Injunction is DENIED. Signed by Judge Joseph R. Goodwin on 6/18/2021. (cc: counsel of record; any unrepresented party) (ts) |
| 06/21/2021 | 45 | MOTION by Harrison County Board of Education, Dora Stutler for Leave to Exceed the Page Limit Responding to the 2 Motion for Preliminary Injunction. (Deniker, Susan) (Modified on 6/22/2021 to add link to #2 motion) (kew). |

WVSD NextGen CM/ECF Release 1.7.1

| 06/22/2021 | 46 | ORDER granting 45 Motion to Exceed the Page Limit. Signed by Judge Joseph R. Goodwin on 6/22/2021. (cc: counsel of record; any unrepresented party) (kew) |
| 06/22/2021 | 47 | RESPONSE by West Virginia Secondary School Activities Commission to 2 MOTION by B. P. J., Heather Jackson for a Preliminary Injunction. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Green, Roberta) |
| 06/23/2021 | 48 | RESPONSE by W. Clayton Burch, West Virginia State Board of Education in opposition to 2 MOTION by B. P. J., Heather Jackson for a Preliminary Injunction (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Morgan, Kelly) |
| 06/23/2021 | 49 | RESPONSE by State of West Virginia in opposition to 2 MOTION by B. P. J., Heather Jackson for a Preliminary Injunction (Attachments: # 1 Exhibit A, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Capehart, Curtis) |
| 06/23/2021 | 50 | RESPONSE by Harrison County Board of Education, Dora Stutler in opposition to 2 MOTION by B. P. J., Heather Jackson for a Preliminary Injunction (Deniker, Susan) |
| 06/25/2021 | 51 | MOTION by B. P. J., Heather Jackson for Leave to File Consolidated 30-Page Reply Brief in Support of 2 Motion for Preliminary Injunction. (Attachment: # 1 Proposed Order)(Stark, Loree) (Modified on 6/25/2021 to add link to #2 motion) (kew). |
| 06/28/2021 | 52 | ORDER granting 51 Motion Pursuant to Local Rule of Civil Procedure 7.1(a)(2) For Leave to File Consolidated 30-Page Reply Brief in Support of Plaintiff's Motion for Preliminary Injunction. Signed by Judge Joseph R. Goodwin on 6/28/2021. (cc: counsel of record; any unrepresented party) (lca) |
| 06/30/2021 | 53 | CONSOLIDATED REPLY by B. P. J., Heather Jackson to 47 Response and the 48 , 49 and 50 Responses In Opposition. (Attachment: # 1 Supplemental Expert Declaration of Joshua D. Safer) (Stark, Loree) |
| 07/01/2021 | 54 | MOTION by West Virginia State Board of Education, W. Clayton Burch to Dismiss 1 Complaint. (Morgan, Kelly) (Modified on 7/1/2021 to add party filer) (lca). |
| 07/01/2021 | 55 | MEMORANDUM OF LAW by W. Clayton Burch, West Virginia State Board of Education in support of 54 MOTION by West Virginia State Board of Education, W. Clayton Burch to Dismiss 1 Complaint. (Morgan, Kelly) |
| 07/02/2021 | 56 | MOTION by West Virginia Secondary School Activities Commission to Dismiss 1 Complaint. (Green, Roberta) |
| 07/02/2021 | 57 | MEMORANDUM by West Virginia Secondary School Activities Commission in support of 56 MOTION by West Virginia Secondary School Activities Commission to Dismiss 1 Complaint. (Green, Roberta) |
| 07/02/2021 | 58 | MOTION by Harrison County Board of Education, Dora Stutler to Dismiss 1 Complaint. (Deniker, Susan) (Modified on 7/5/2021 to add link to #1 complaint) (kew). |
| 07/02/2021 | 59 | MEMORANDUM OF LAW by Harrison County Board of Education, Dora Stutler in support of 58 MOTION by Harrison County Board of Education, Dora Stutler to Dismiss 1 Complaint. (Deniker, Susan) |
| 07/02/2021 | 60 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Tara L. Borelli updating name and/or firm information. (Borelli, Tara) (Modified on 7/3/2021 to convert event to notice of change of attorney information) (mk). |
| 07/02/2021 | 61 | ANSWER TO 1 Complaint With Jury Demand by State of West Virginia.(Capehart, Curtis) (Modified on 7/3/2021 to add jury demand) (mk). |

| 07/07/2021 | 62 | STATEMENT OF VISITING ATTORNEY from David C. Tryon on behalf of State of West Virginia. Local counsel: Curtis R. A. Capehart. Fee $50.00. Receipt # AWVSDC-7983140. (Capehart, Curtis) (attorney admitted to practice in SDWV on 2/17/2022; no longer appearing pro hac vice) (ts). |
|---|---|---|
| 07/08/2021 | 63 | ORDER AND NOTICE: Motions under Fed. R. Civ. P. 12(b) - 8/5/2021. Last day for Rule 26(f) meeting - 8/30/2021. Last day to file report of Rule 26(f) meeting - 9/7/2021. Scheduling Conference at 9:00 AM on 9/20/2021 at the Robert C. Byrd United States Courthouse, 300 Virginia Street East, Room 6610 (Library/Conference Room), Charleston, WV. Entry of scheduling order - 9/30/2021. Last day to make Rule 26(a)(1) disclosures - 10/4/2021. Signed by Judge Joseph R. Goodwin on 7/8/2021. (cc: counsel of record; any unrepresented parties) (mfo) |
| 07/16/2021 | 64 | FIRST AMENDED COMPLAINT by B. P. J., Heather Jackson against W. Clayton Burch, Harrison County Board of Education, State of West Virginia, Dora Stutler, West Virginia Secondary School Activities Commission, West Virginia State Board of Education, Patrick Morrisey. (Attachment: # 1 Proposed Summons)(Stark, Loree) (Modified on 7/19/2021 to convert event to amended complaint) (kew). |
| 07/16/2021 | 65 | CONSOLIDATED OPPOSITION by B. P. J., Heather Jackson to 54 , 56 and 58 Motions to Dismiss. (Stark, Loree) |
| 07/19/2021 | 66 | ELECTRONIC SUMMONS ISSUED as to Patrick Morrisey, re: 64 First Amended Complaint. Summons returnable 14 days. Instructions to Counsel: This is your electronic summons. Please print as many copies of the Summons and Complaint as are necessary to effectuate service under Fed. R. Civ. P. 4. See Proof of Service page of this Summons form for filing a return of service if required by Fed. R. Civ. P. 4(l). (kew) |
| 07/21/2021 | 67 | MEMORANDUM OPINION & ORDER granting Plaintiff's 2 MOTION for a Preliminary Injunction. While this case is pending, Defendants are enjoined from enforcing Section 18-2-25d against B.P.J. She will be permitted to sign up for and participate in school athletics in the same way as her girl classmates. I find that a bond is unnecessary and waive its requirement in this case. The court further DIRECTS the Clerk to post a copy of this published opinion on the court's website. Signed by Judge Joseph R. Goodwin on 7/21/2021. (cc: counsel of record; any unrepresented party) (arb) |
| 07/26/2021 | 68 | SUMMONS RETURNED EXECUTED for Patrick Morrisey, re: 64 First Amended Complaint. Patrick Morrisey served on 7/20/2021, answer due 8/10/2021. (Stark, Loree) |
| 07/28/2021 | 69 | ORDER denying as moot Defendants' 54 , 56 , and 58 Motions to Dismiss. Signed by Judge Joseph R. Goodwin on 7/28/2021. (cc: counsel of record; any unrepresented party) (btm) |
| 07/30/2021 | 70 | MOTION by West Virginia Secondary School Activities Commission to Dismiss 64 First Amended Complaint. (Green, Roberta) |
| 07/30/2021 | 71 | MEMORANDUM OF LAW by West Virginia Secondary School Activities Commission in support of 70 MOTION by West Virginia Secondary School Activities Commission to Dismiss 64 First Amended Complaint. (Green, Roberta) |
| 07/30/2021 | 72 | MOTION by Harrison County Board of Education, Dora Stutler to Dismiss re: 64 First Amended Complaint. (Deniker, Susan) |
| 07/30/2021 | 73 | MEMORANDUM OF LAW by Harrison County Board of Education, Dora Stutler in support of 72 MOTION by Harrison County Board of Education, Dora Stutler to Dismiss re: 64 First Amended Complaint(mk) |

| 07/30/2021 | 74 | MOTION by W. Clayton Burch, West Virginia State Board of Education to Dismiss With Prejudice re: 64 First Amended Complaint. (Morgan, Kelly) |
| 07/30/2021 | 75 | MEMORANDUM OF LAW by W. Clayton Burch, West Virginia State Board of Education in support of 74 MOTION by W. Clayton Burch, West Virginia State Board of Education to Dismiss With Prejudice re: 64 First Amended Complaint. (Morgan, Kelly) |
| 07/30/2021 | 76 | MOTION by Patrick Morrisey, State of West Virginia to Dismiss Patrick Morrisey in His Official Capacity as Attorney General of the State of West Virginia re: 64 First Amended Complaint. (Capehart, Curtis) |
| 07/30/2021 | 77 | MEMORANDUM OF LAW by Patrick Morrisey, State of West Virginia in support of 76 MOTION by Patrick Morrisey, State of West Virginia to Dismiss Patrick Morrisey in His Official Capacity as Attorney General of the State of West Virginia re: 64 First Amended Complaint (Capehart, Curtis) |
| 07/30/2021 | 78 | ANSWER TO 64 FIRST AMENDED COMPLAINT With Jury Demand by State of West Virginia.(Capehart, Curtis) (Modified on 7/31/2021 to add jury demand) (mk). |
| 08/02/2021 | 79 | STATEMENT OF VISITING ATTORNEY from Meredith Taylor Brown on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-8001642. (Stark, Loree) |
| 08/13/2021 | 80 | CONSOLIDATED MEMORANDUM by B. P. J., Heather Jackson in opposition to 70 MOTION by West Virginia Secondary School Activities Commission, 72 MOTION by Harrison County Board of Education, Dora Stutler and 74 MOTION by W. Clayton Burch, West Virginia State Board of Education to Dismiss With Prejudice, re: 64 First Amended Complaint. (Stark, Loree) |
| 08/13/2021 | 81 | MOTION by B. P. J., Heather Jackson to Strike Jury Demand in 78 Answer to Complaint by State of West Virginia. (Attachment: # 1 Proposed Order Granting Plaintiff's Motion to Strike Jury Demand)(Stark, Loree) |
| 08/13/2021 | 82 | JOINT MOTION by B. P. J., Patrick Morrisey, State of West Virginia to Dismiss Patrick Morrisey in His Official Capacity as Attorney General of the State of West Virginia re: 64 First Amended Complaint. (Attachment: # 1 Proposed Order)(Stark, Loree) (Modified on 8/15/2021 to correct link and to add party filers) (kew). |
| 08/20/2021 | 83 | REPLY by West Virginia Secondary School Activities Commission to 80 Memorandum In Opposition. (Attachment: # 1 Exhibit A)(Green, Roberta) |
| 08/20/2021 | 84 | REPLY by W. Clayton Burch, West Virginia State Board of Education to 80 Consolidated Memorandum in Opposition. (Morgan, Kelly) |
| 08/20/2021 | 85 | REPLY by Harrison County Board of Education, Dora Stutler to 80 Consolidated Memorandum in Opposition. (Deniker, Susan) |
| 08/26/2021 | 86 | NOTICE OF WITHDRAWAL OF COUNSEL by Jessica A. Lee on behalf of State of West Virginia. (Lee, Jessica) |
| 08/27/2021 | 87 | MOTION by B. P. J., Heather Jackson for Leave to File Surreply in Opposition to Defendants' Motion to Dismiss with proposed document attached (Attachments: # 1 Proposed Surreply, # 2 Proposed Order)(Stark, Loree) |
| 08/27/2021 | 88 | RESPONSE by State of West Virginia in opposition to 81 MOTION by B. P. J., Heather Jackson to Strike Jury Demand in 78 Answer to Complaint by State of West Virginia (Capehart, Curtis) |

| 08/30/2021 | 89 | RESPONSE by West Virginia Secondary School Activities Commission in opposition to 87 MOTION by B. P. J., Heather Jackson for Leave to File Surreply in Opposition to Defendants' Motion to Dismiss (Green, Roberta) |
| --- | --- | --- |
| 08/30/2021 | 90 | ORDER directing that Plaintiff's 87 MOTION for Leave to File Surreply in Opposition to Defendants' Motion to Dismiss is DENIED. Signed by Judge Joseph R. Goodwin on 8/30/2021. (cc: counsel of record; any unrepresented party) (msa) |
| 09/03/2021 | 91 | REPLY by B. P. J., Heather Jackson to 88 Response In Opposition. (Stark, Loree) |
| 09/07/2021 | 92 | RULE 26(f) REPORT OF PLANNING MEETING by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, Patrick Morrisey, State of West Virginia. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Stark, Loree) (Modified on 9/8/2021 to add party filers) (kew). |
| 09/08/2021 | 93 | SCHEDULING ORDER directing that the scheduling conference is cancelled and that this case shall proceed as follows: Amendment of pleadings and joinder of parties - 10/26/2021. Deadline for written discovery requests - 2/8/2022. Expert disclosure by party with burden of proof - 1/24/2022. Expert disclosure by opposing party - 2/23/2022. Expert disclosure for rebuttal purposes - 3/11/2022. Deposition deadline and close of discovery - 3/25/2022. Filing of dispositive motions - 4/14/2022. Responses to dispositive motions - 4/28/2022. Reply to response to dispositive motion - 5/5/2022. Hearing on motions for summary judgment on 6/8/2022 at 10:00 AM. Settlement meeting and mediation deadline - 5/25/2022. Filing of motions in limine - 6/22/2022. Responses to motions in limine - 6/29/2022. Plaintiff draft of pretrial order to defendant - 6/20/2022. Integrated pretrial order filed by defendant - 6/27/2022. Pretrial conference on 7/6/2022 at 11:00 AM. Proposed jury instructions filed - 7/18/2022. Final settlement conference on 7/25/2022 at 9:00 AM. Trial on 7/26/2022 at 8:30 AM. Signed by Judge Joseph R. Goodwin on 9/8/2021. (cc: counsel of record; any unrepresented parties) (mfo) |
| 09/10/2021 | | Movant, Lainey Armistead, added pursuant to request of counsel. (ts) |
| 09/10/2021 | 94 | MOTION by Lainey Armistead to Intervene (Steele, Brandon) |
| 09/10/2021 | 95 | MEMORANDUM by Lainey Armistead in support of 94 MOTION by Lainey Armistead to Intervene. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Steele, Brandon) |
| 09/13/2021 | 96 | STATEMENT OF VISITING ATTORNEY from Christiana Holcomb on behalf of Lainey Armistead. Local counsel: Brandon Steele. Fee $50.00. Receipt # AWVSDC-8031384. (Steele, Brandon) |
| 09/13/2021 | 97 | STATEMENT OF VISITING ATTORNEY from Jonathan Scruggs on behalf of Lainey Armistead. Local counsel: Brandon Steele. Fee $50.00. Receipt # AWVSDC-8031399. (Steele, Brandon) |
| 09/15/2021 | 98 | STATEMENT OF VISITING ATTORNEY from Timothy Ducar on behalf of Lainey Armistead. Local counsel: Brandon Steele. Fee $50.00. Receipt # AWVSDC-8033888. (Steele, Brandon) |
| 09/24/2021 | 99 | OPPOSITION by B. P. J., Heather Jackson to 94 MOTION by Lainey Armistead to Intervene. (Stark, Loree) |
| 10/01/2021 | 100 | REPLY MEMORANDUM by Lainey Armistead to 99 Opposition. (Steele, Brandon) |
| 10/04/2021 | 101 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Initial Disclosures. (Green, Roberta) |

| 10/04/2021 | 102 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Initial Disclosures. (Morgan, Kelly) |
| 10/04/2021 | 103 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Initial Disclosures. (Deniker, Susan) |
| 10/04/2021 | 104 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Initial Disclosures. (Stark, Loree) (Modified on 10/5/2021 to add party filer) (kew). |
| 10/04/2021 | 105 | CERTIFICATE OF SERVICE by State of West Virginia for Rule 26(a)(1) Disclosures. (Capehart, Curtis) |
| 10/04/2021 | 106 | CERTIFICATE OF SERVICE by Lainey Armistead for Rule 26(a)(1) Initial Disclosures. (Ducar, Timothy) |
| 10/05/2021 | 107 | CERTIFICATE OF SERVICE by State of West Virginia for First Set of Discovery Requests to Plaintiff. (Capehart, Curtis) |
| 10/18/2021 | 108 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Carl Solomon Charles updating name and/or firm information on behalf of B. P. J., Heather Jackson. (Charles, Carl) |
| 10/18/2021 | 109 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Tara L. Borelli updating name and/or firm information on behalf of B. P. J., Heather Jackson. (Borelli, Tara) (Modified on 10/19/2021 to convert event to notice of change of attorney information) (kew). |
| 10/22/2021 | 110 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Discovery Requests to Defendants. (Stark, Loree) |
| 11/05/2021 | 111 | PROPOSED ORDER Stipulated Protective Order by State of West Virginia, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler. (Capehart, Curtis) (Modified on 11/8/2021 to add party filers) (kew). |
| 11/10/2021 | 112 | ORDER construing the parties' 111 Stipulated Protective Order as a joint motion for the entry of a protective order; directing that the parties' construed joint motion for the entry of a protective order is denied, without prejudice as to refiling. Signed by Magistrate Judge Dwane L. Tinsley on 11/10/2021. (cc: counsel of record; any unrepresented party) (btm) |
| 11/22/2021 | 113 | JOINT MOTION by State of West Virginia, B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, Patrick Morrisey for Entry of a Particularized Protective Order. (Attachment: # 1 Proposed Order)(Capehart, Curtis) (Modified on 11/22/2021 to add party filers) (kew). |
| 11/22/2021 |  | MOTION REFERRED to Magistrate Judge Dwane L. Tinsley: 113 JOINT MOTION by Certain Parties for Entry of a Particularized Protective Order. (kew) |
| 11/22/2021 | 114 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to First Set of Requests for Production. (Green, Roberta) |
| 11/22/2021 | 115 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to First Set of Interrogatories. (Green, Roberta) |
| 11/22/2021 | 116 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Responses to Plaintiff's First Set of Interrogatories to Defendants State Board of West Virginia and W. Clayton Burch. (Morgan, Kelly) |

| 11/22/2021 | 117 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Responses to Plaintiff's First Set of Requests for Production (Morgan, Kelly) |
| 11/22/2021 | 118 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Answers and Objections to Plaintiff's First Set of Interrogatories (Deniker, Susan) |
| 11/22/2021 | 119 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Responses and Objections to Plaintiff's First Set of Requests for Production (Deniker, Susan) |
| 11/23/2021 | 120 | CERTIFICATE OF SERVICE by State of West Virginia for Response to First Set of Interrogatories and Requests for Production. (Capehart, Curtis) |
| 11/23/2021 | 121 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to State of West Virginia's First Set of Interrogatories. (Stark, Loree) |
| 11/23/2021 | 122 | AMENDED CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to First Set of Interrogatories. (Bandy, Kimberly) |
| 11/23/2021 | 123 | ORDER granting 113 Joint Motion for Protective Order. Signed by Magistrate Judge Dwane L. Tinsley on 11/23/2021. (cc: counsel of record; any unrepresented party) (lca) |
| 11/23/2021 | 124 | AMENDED CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to First Set of Requests for Production. (Bandy, Kimberly) |
| 11/23/2021 | 125 | STIPULATED PROTECTIVE ORDER Setting forth the terms for the handling of confidential documents. Signed by Magistrate Judge Dwane L. Tinsley on 11/23/2021. (cc: counsel of record; any unrepresented party) (lca) |
| 11/24/2021 | 126 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Supplemental Responses to First Set of Requests for Production. (Deniker, Susan) |
| 11/30/2021 | 127 | ORDER granting the 82 JOINT MOTION to Dismiss by Plaintiff B.P.J. and Defendants State of West Virginia and Patrick Morrisey, in his official capacity as Attorney General for the State of West Virginia. The claim by Plaintiff B.P.J. against the Attorney General in Count II of the First Amended Complaint, under the Equal Protection Clause, is DISMISSED without prejudice, and the Attorney General is DISMISSED as a party. This order does not affect any other claim or issue in the case. Each side will bear the costs and fees as to this claim against the Attorney General as well as this 82 Joint Motion and the Attorney General's previously-filed 76 Motion to Dismiss. Signed by Judge Joseph R. Goodwin on 11/30/2021. (cc: counsel of record; any unrepresented party) (arb) |
| 12/01/2021 | 128 | ORDER denying as moot 76 MOTION by Patrick Morrisey, State of West Virginia to Dismiss Patrick Morrisey in His Official Capacity as Attorney General of the State of West Virginia. Signed by Judge Joseph R. Goodwin on 12/1/2021. (cc: counsel of record; any unrepresented party) (tmr) |
| 12/01/2021 | 129 | MEMORANDUM OPINION AND ORDER denying 70 , 72 , and 74 Motions to Dismiss are denied. Signed by Judge Joseph R. Goodwin on 12/1/2021. (cc: counsel of record; any unrepresented party) (lca) (Modified on 12/1/2021 to replace unflattened image with flattened image. (lca). |
| 12/01/2021 | | NOTICE OF DOCKET CORRECTION re: 129 Memorandum Opinion and Order. ERROR: Document not flattened. CORRECTION: Document replaced with flattened document. (lca) |
| 12/01/2021 | 130 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 94 MOTION to Intervene and directs the Clerk to docket Intervenor's Proposed Answer to |

| | | |
|---|---|---|
| | | First Amended Complaint. Signed by Judge Joseph R. Goodwin on 12/1/2021. (cc: counsel of record; any unrepresented party) (lca) |
| 12/01/2021 | 131 | ANSWER to 64 First Amended Complaint With Jury Demand by Lainey Armistead; filed pursuant to the 130 Memorandum Opinion and Order. (lca) (Modified on 12/1/2021 to add jury demand) (mk). |
| 12/07/2021 | 132 | NOTICE *of Non-Party Subpoena on Adam Burkhammer* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 133 | NOTICE *of Non-Party Subpoena on Buck Jennings* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 134 | NOTICE *of Non-Party Subpoena on Caleb Hanna* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 135 | NOTICE *of Non-Party Subpoena on Charles Horst* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 136 | NOTICE *of Non-Party Subpoena on Chris Phillips* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 137 | NOTICE *of Non-Party Subpoena on Heather Tully* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 138 | NOTICE *of Non-Party Subpoena on Jordan Bridges* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 139 | NOTICE *of Non-Party Subpoena on Joe Ellington* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 140 | NOTICE *of Non-Party Subpoena on Margitta Mazzocchi* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 141 | NOTICE *of Non-Party Subpoena on Melissa White* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 142 | NOTICE *of Non-Party Subpoena on Rollan Roberts* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 143 | NOTICE *of Non-Party Subpoena on Todd Longanacre* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/07/2021 | 144 | NOTICE *of Non-Party Subpoena on Wayne Clark* by B. P. J., Heather Jackson (Attachment: # 1 Exhibit 1)(Stark, Loree) |
| 12/08/2021 | 145 | JOINT MOTION by State of West Virginia, B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler for Protective Order. (Attachment: # 1 Proposed Order)(Capehart, Curtis) (Modified on 12/8/2021 to add party filers) (kew). |
| 12/08/2021 | | MOTION REFERRED to Magistrate Judge Dwane L. Tinsley: 145 JOINT MOTION by State of West Virginia, B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler for Protective Order. (kew) |
| 12/09/2021 | 146 | ORDER granting 145 JOINT MOTION for Protective Order. Signed by Magistrate Judge Dwane L. Tinsley on 12/9/2021. (cc: counsel of record; any unrepresented party) (lca) |

| 12/09/2021 | 147 | STIPULATED PROTECTIVE ORDER (UPDATED WITH NEW PARTY) Setting forth the terms for the handling of confidential documents. Signed by Magistrate Judge Dwane L. Tinsley on 12/9/2021. (cc: counsel of record; any unrepresented party) (lca) |
| 12/10/2021 | 148 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 12/10/2021 | 149 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 12/10/2021 | 150 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 12/10/2021 | 151 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 12/10/2021 | 152 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Initial Disclosures, First Set of Discovery Requests, and Responses and Objections to State of West Virginia's First Set of Interrogatories and Request for Production. (Stark, Loree) |
| 12/13/2021 | 153 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Jeffrey Mark Cropp appearing on behalf of Harrison County Board of Education, Dora Stutler. (Cropp, Jeffrey) |
| 12/13/2021 | 154 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Reinhardt, Elizabeth) (Modified on 12/14/2021 to add party filer) (kew). |
| 12/13/2021 | 155 | AMENDED CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) (Modified on 12/14/2021 to add party filer) (kew). |
| 12/15/2021 | 156 | ANSWER TO 64 First Amended Complaint with Jury Demand by W. Clayton Burch, West Virginia State Board of Education. (Morgan, Kelly) (Modified on 12/15/2021 to add document link) (lca). |
| 12/15/2021 | 157 | ANSWER TO 64 First Amended Complaint by Harrison County Board of Education, Dora Stutler. (Deniker, Susan) (Modified on 12/16/2021 to correct link) (kew). |
| 12/15/2021 | 158 | ANSWER TO 64 FIRST AMENDED COMPLAINT with Jury Demand by West Virginia Secondary School Activities Commission. (Green, Roberta) (Modified on 12/16/2021 to add link to #64 amended complaint) (kew). |
| 12/17/2021 | 159 | CERTIFICATE OF SERVICE by Lainey Armistead for First Set of Interrogatories and Requests for Production. (Holcomb, Christiana) |
| 12/20/2021 | 160 | NOTICE OF DEPOSITIONS by State of West Virginia of Heather Jackson at 10:00 a.m. and B.P.J. at 3:30 p.m. on 1/19/2022 and Wesley Pepper on at 10:00 a.m. on 1/20/2022. (Capehart, Curtis) |
| 12/20/2021 | 161 | NOTICE *of Non-Party Subpoena on West Virginia State University* by B. P. J., Heather Jackson. (Attachment: # 1 Exhibit A)(Stark, Loree) (Modified on 12/21/2021 to add party filer) (kew). |

WVSD NextGen CM/ECF Release 1.7.1

| | | |
|---|---|---|
| 12/20/2021 | 162 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Discovery Requests to Lainey Armistead. (Stark, Loree) (Modified on 12/21/2021 to add party filer) (kew). |
| 12/20/2021 | 163 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Discovery Requests to West Virginia State Board of Education and W. Clayton Burch. (Stark, Loree) (Modified on 12/21/2021 to add party filer) (kew). |
| 12/20/2021 | 164 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Production to West Virginia Secondary School Activities Commission. (Stark, Loree) (Modified on 12/21/2021 to add party filer) (kew). |
| 12/23/2021 | 165 | AMENDED CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) (Modified on 12/27/2021 to add party filer) (kew). |
| 12/23/2021 | 166 | CERTIFICATE OF SERVICE by Lainey Armistead for Second Set of Interrogatories and Requests for Production. (Holcomb, Christiana) |
| 12/28/2021 | 167 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Supplemental Responses to First Set of Requests for Production. (Green, Roberta) |
| 12/28/2021 | 168 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Supplemental Responses to First Set. (Green, Roberta) |
| 01/06/2022 | 169 | MOTION by B. P. J., Heather Jackson for Protective Order. (Attachments: # 1 Declaration, # 2 Proposed Order)(Stark, Loree) |
| 01/06/2022 | 170 | MOTION by B. P. J., Heather Jackson to Expedite Determination of the 169 Motion for Protective Order. (Attachment: # 1 Proposed Order)(Stark, Loree) (Modified on 1/7/2022 to add link to #169 motion) (kew). |
| 01/06/2022 | | MOTIONS REFERRED to Magistrate Judge Dwane L. Tinsley: 169 MOTION by B. P. J., Heather Jackson for Protective Order, 170 MOTION by B. P. J., Heather Jackson to Expedite. (ts) (Entered: 01/07/2022) |
| 01/06/2022 | | DUPLICATE ENTRY. (Modified on 1/10/2022 to note duplicate entry of previous motion referred entry re: #169 motion) (ts). (Entered: 01/07/2022) |
| 01/07/2022 | 171 | ORDER granting 170 MOTION to Expedite; defendants shall file any response to the 169 Motion for Protective Order by 1/11/2022 and Plaintiff shall file any reply by 1/13/2022. Signed by Magistrate Judge Dwane L. Tinsley on 1/7/2022. (cc: counsel of record; any unrepresented party) (lca) |
| 01/07/2022 | 172 | CERTIFICATE OF SERVICE by Lainey Armistead for First Set of Requests for Admission. (Holcomb, Christiana) |
| 01/11/2022 | 173 | RESPONSE by Lainey Armistead in opposition to 169 MOTION by B. P. J., Heather Jackson for Protective Order (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Steele, Brandon) |
| 01/11/2022 | 174 | RESPONSE by State of West Virginia in opposition to 169 MOTION by B. P. J., Heather Jackson for Protective Order (Capehart, Curtis) |
| 01/12/2022 | 175 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Production of Documents in Response to the State of West Virginia's First Set of Requests for Production. (Stark, Loree) (Modified on 1/13/2022 to add party filer) (ts) |

| 01/12/2022 | 176 | CERTIFICATE OF SERVICE by B. P. J.,Heather Jackson for Second Set of Interrogatories to Defendant County Board of Education and Dora Stutler. (Stark, Loree) (Modified on 1/13/2022 to add party filer) (ts). |
| 01/12/2022 | 177 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Interrogatories to Defendant West Virginia Secondary School Activities Commission. (Stark, Loree) (Modified on 1/13/2022 to add party filer) (ts). |
| 01/13/2022 | 178 | CONSOLIDATED REPLY by B. P. J., Heather Jackson to 173 and 174 Responses in Opposition. (Stark, Loree) (Modified on 1/14/2022 to correct links and to add party filer) (kew). |
| 01/14/2022 | 179 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Supplemental Responses to First Set of Interrogatories. (Morgan, Kelly) |
| 01/18/2022 | 180 | ORDER granting in part and denying in part 169 MOTION for Protective Order, as more fully set forth herein. Signed by Magistrate Judge Dwane L. Tinsley on 1/17/2022. (cc: counsel of record; any unrepresented party) (lca) |
| 01/18/2022 | 181 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to Second Set. (Green, Roberta) |
| 01/18/2022 | 182 | APPEARANCE OF COUNSEL by Joshua D. Brown on behalf of Lainey Armistead. (Brown, Joshua) |
| 01/19/2022 | 183 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to Lainey Armistead's First Set of Interrogatories and Requests for Production. (Stark, Loree) (Modified on 1/20/2022 to add party filer) (kew). |
| 01/21/2022 | 184 | NOTICE OF RULE 30(b)(6) DEPOSITION by B. P. J., Heather Jackson of Harrison County Board of Education on 02/18/2022 at 12:00 p.m. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 185 | NOTICE OF RULE 30(b)(6) DEPOSITION by B. P. J., Heather Jackson of West Virginia State Board of Education on 02/09/2022 at 12:00 p.m. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 186 | NOTICE OF RULE 30(b)(6) DEPOSITION by B. P. J., Heather Jackson of West Virginia Secondary School Activities Commission on 02/11/2022 at 12:00 p.m. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 187 | NOTICE OF DEPOSITIONS by B. P. J., Heather Jackson of David R. Mazza at 12:00 p.m. on 2/28/2022, Danyelle Schoonmaker at 12:00 p.m. on 2/23/2022, and Lainey Armistead at 12:00 p.m. on 3/2/2022. (Stark, Loree)(Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 188 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Requests for Admission and Second Set of Interrogatories to Lainey Armistead. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 189 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Requests for Admission and Second Set of Interrogatories to the State of West Virginia. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 190 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Requests for Admission and Third Set of Interrogatories to Harrison County Board of Education and Superintendent Dora Stutler. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |

| 01/21/2022 | 191 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Requests for Admission and Third Set of Interrogatories to West Virginia State Board of Education and Superintendent W. Clayton Burch. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 192 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for First Set of Requests for Admission and Third Set of Interrogatories to West Virginia Secondary School Activities Commission. (Stark, Loree) (Modified on 1/21/2022 to add party filer) (kew). |
| 01/21/2022 | 193 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental and Amended Responses and Objections to the State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) (Modified on 1/24/2022 to add party filer) (kew). |
| 01/24/2022 | 194 | STATEMENT OF VISITING ATTORNEY from Rachel A. Csutoros on behalf of Lainey Armistead. Local counsel: Brandon Steele. Fee $50.00. Receipt # AWVSDC-8117291. (Steele, Brandon) |
| 01/24/2022 | 195 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Initial Designation of Expert Witnesses. (Stark, Loree) |
| 01/25/2022 | 196 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to Lainey Armistead's Second Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 01/25/2022 | 197 | STATEMENT OF VISITING ATTORNEY from Roger G. Brooks on behalf of Lainey Armistead. Local counsel: Brandon Steele. Fee $50.00. Receipt # AWVSDC-8118719. (Steele, Brandon) |
| 01/28/2022 | 198 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Second Supplemental Responses to First Set of Requests for Production. (Green, Roberta) |
| 01/31/2022 | 199 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Response to State of West Virginia's First Set of Requests for Production and Lainey Armistead's First Set of Requests for Production. (Stark, Loree) |
| 02/02/2022 | 200 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Responses to Second Set of Interrogatories. (Morgan, Kelly) |
| 02/02/2022 | 201 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Responses to Second Set of Requests for Production. (Morgan, Kelly) |
| 02/02/2022 | 202 | CERTIFICATE OF SERVICE by Lainey Armistead for Responses and Objections to First Set of Interrogatories and Requests for Production. (Steele, Brandon) |
| 02/02/2022 | 203 | CERTIFICATE OF SERVICE by State of West Virginia for Second Set of Discovery Requests. (Capehart, Curtis) |
| 02/04/2022 | 204 | INCORRECT ENTRY; IMAGE REMOVED. (Modified on 2/4/2022 to remove image because the incorrect event was used) (kew). |
| 02/04/2022 |  | NOTICE OF DOCKET CORRECTION re: #204 Notice of Attorney Appearance. ERROR: Incorrect event used. CORRECTION: Image removed. (kew) |
| 02/04/2022 | 205 | STATEMENT OF VISITING ATTORNEY from Zo Helstrom on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-8125771. (Stark, Loree) |

| | | |
|---|---|---|
| 02/04/2022 | 206 | STATEMENT OF VISITING ATTORNEY from Henry W. Frampton, IV on behalf of Lainey Armistead. Local counsel: Joshua D. Brown. Fee $50.00. Receipt # AWVSDC-8126001. (Brown, Joshua) |
| 02/07/2022 | 207 | NOTICE OF APPEARANCE by Nicholas Ward on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 02/07/2022 | 208 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for First Set of Interrogatories to Plaintiff. (Deniker, Susan) |
| 02/07/2022 | 209 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for First Set of Requests for Production of Documents to Plaintiff. (Deniker, Susan) |
| 02/07/2022 | 210 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for First Set of Requests for Admission to Plaintiff. (Deniker, Susan) |
| 02/07/2022 | 211 | CERTIFICATE OF SERVICE by Lainey Armistead for Third Set of Interrogatories and Second Set of Requests for Admission to Plaintiff. (Steele, Brandon) |
| 02/08/2022 | 212 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to First Set of Requests for Admission. (Stark, Loree) |
| 02/08/2022 | 213 | CERTIFICATE OF SERVICE by Lainey Armistead for Third Set of Requests for Admission to Plaintiff. (Steele, Brandon) |
| 02/09/2022 | 214 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Third Supplemental Responses to First Set of Requests for Production. (Green, Roberta) |
| 02/09/2022 | 215 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to Second Set of Interrogatories. (Green, Roberta) |
| 02/09/2022 | 216 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to Lainey Armistead. (Stark, Loree) |
| 02/09/2022 | 217 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to State of West Virginia. (Stark, Loree) |
| 02/09/2022 | 218 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to State Superintendent W. Clayton Burch. (Stark, Loree) |
| 02/09/2022 | 219 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to West Virginia State Board of Education. (Stark, Loree) |
| 02/09/2022 | 220 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to West Virginia Secondary School Activities Commission. (Stark, Loree) |
| 02/09/2022 | 221 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to Harrison County Superintendent Dora Stutler. (Stark, Loree) |
| 02/09/2022 | 222 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Requests for Admission to Harrison County Board of Education. (Stark, Loree) |
| 02/10/2022 | 223 | NOTICE OF WITHDRAWAL OF COUNSEL by Meredith Taylor Brown on behalf of B. P. J., Heather Jackson. (Stark, Loree) |
| 02/10/2022 | 224 | NOTICE OF DEPOSITION DUCES TECUM by State of West Virginia of Gerald Montano, DO on 02/24/2022 at 10:00 a.m. (Capehart, Curtis) |
| 02/10/2022 | 225 | NOTICE OF DEPOSITION by State of West Virginia of Kacie Kidd, MD on 02/21/2022 at 10:00 a.m. (Capehart, Curtis) |

| | | |
|---|---|---|
| 02/10/2022 | 226 | NOTICE OF DEPOSITION by State of West Virginia of Matthew Bunner on 2/25/2022 at 10:00 a.m. (Capehart, Curtis) |
| 02/10/2022 | 227 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Answers to Second Set of Interrogatories. (Deniker, Susan) |
| 02/14/2022 | 228 | CERTIFICATE OF SERVICE by Lainey Armistead for First Supplemental Disclosures. (Steele, Brandon) |
| 02/14/2022 | 229 | AMENDED NOTICE OF 30(b)(6) DEPOSITION by B. P. J., Heather Jackson of Harrison County Board of Education on 03/08/2022 at 12:00 P.M. (Attachment: # 1 Exhibit A)(Stark, Loree) |
| 02/16/2022 | 230 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses to First Set of Requests for the Production of Documents. (Stark, Loree) |
| 02/16/2022 | 231 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses to First Set of Requests for the Production of Documents. (Stark, Loree) |
| 02/16/2022 | 232 | NOTICE OF DEPOSITION by Lainey Armistead of Deanna Adkins, MD on March 16, 2022 at 9:00 a.m. (Steele, Brandon) |
| 02/16/2022 | 233 | NOTICE OF DEPOSITION by Lainey Armistead of Joshua Safer, MD on March 24, 2022 at 9:00 a.m. (Steele, Brandon) |
| 02/17/2022 | 234 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Loree Beth Stark updating name and/or firm information on behalf of B. P. J., Heather Jackson. (Stark, Loree) |
| 02/17/2022 | 235 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to First Set of Requests for Admission and Third Set of Interrogatories. (Green, Roberta) |
| 02/18/2022 | 236 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Supplemental Answers to First Set of Interrogatories. (Deniker, Susan) |
| 02/18/2022 | 237 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Second Supplemental Responses to First Set of Requests for Production. (Deniker, Susan) |
| 02/18/2022 | 238 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Answers and Objections to First Set of Requests for Admission and Third Set of Interrogatories. (Deniker, Susan) |
| 02/21/2022 | 239 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Responses to First Set of Request for Admissions and Third Set of Interrogatories. (Morgan, Kelly) |
| 02/21/2022 | 240 | CERTIFICATE OF SERVICE by State of West Virginia for Responses to First Set of Requests for Admission and Second Set of Interrogatories. (Capehart, Curtis) |
| 02/22/2022 | 241 | CERTIFICATE OF SERVICE by Lainey Armistead for Responses and Objections to First Set of Requests for Admission and Second Set of Interrogatories. (Steele, Brandon) |
| 02/23/2022 | 242 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Shannon Marlowe Rogers appearing on behalf of West Virginia Secondary School Activities Commission. (Rogers, Shannon) |
| 02/23/2022 | 243 | CERTIFICATE OF SERVICE by Lainey Armistead, State of West Virginia for Joint Disclosure of Expert Witnesses. (Steele, Brandon) |

WVSD NextGen CM/ECF Release 1.7.1

| 02/24/2022 | 244 | CERTIFICATE OF SERVICE by Lainey Armistead for First Supplemental Production. (Steele, Brandon) |
| 02/25/2022 | 245 | STATEMENT OF VISITING ATTORNEY from Valeria M. Pelet del Toro on behalf of B. P. J., Heather Jackson. Local counsel: Loree Stark. Fee $50.00. Receipt # AWVSDC-8139589. (Stark, Loree) |
| 03/01/2022 | 246 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Response to State of West Virginia's First Set of Requests for Production and Lainey Armistead's First Set of Requests for Production. (Stark, Loree) |
| 03/01/2022 | 247 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Response to State of West Virginia's First Set of Requests for Production and Lainey Armistead's First Set of Requests for Production. (Stark, Loree) |
| 03/01/2022 | 248 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Response to State of West Virginia's First Set of Requests for Production and Lainey Armistead's First Set of Requests for Production. (Stark, Loree) |
| 03/02/2022 | 249 | NOTICE OF DEPOSITIONS by B. P. J., Heather Jackson of Dr. James M. Cantor on 3/21/2022 at 10:00 a.m., Dr. Gregory A. Brown on 3/25/2022 at 10:00 a.m., Dr. Chad T. Carlson on 3/28/2022 at 10:00 a.m., Dr. Stephen B. Levine on 3/30/2022 at 10:00 a.m. (Stark, Loree) |
| 03/03/2022 | 250 | STATEMENT OF VISITING ATTORNEY from Travis C. Barham on behalf of Lainey Armistead. Local counsel: Joshua D. Brown. Fee $50.00. Receipt # AWVSDC-8143485. (Brown, Joshua) |
| 03/03/2022 | 251 | STATEMENT OF VISITING ATTORNEY from Tyson C. Langhofer on behalf of Lainey Armistead. Local counsel: Joshua D. Brown. Fee $50.00. Receipt # AWVSDC-8143503. (Brown, Joshua) |
| 03/07/2022 | 252 | STIPULATION OF UNCONTESTED FACTS by B. P. J., Heather Jackson, Harrison County Board of Education. (Hartnett, Kathleen) (Modified on 3/8/2022 to add party filer) (kew). |
| 03/09/2022 | 253 | CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Responses to Second Set of Requests for Admission. (Green, Roberta) |
| 03/09/2022 | 254 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission. (Stark, Loree) |
| 03/09/2022 | 255 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to Harrison County Board of Education and Dora Stutler's First Set of Interrogatories, Requests for Production, and Requests for Admission. (Stark, Loree) |
| 03/10/2022 | 256 | CERTIFICATE OF SERVICE by West Virginia State Board of Education for Responses to Second Set of Requests for Admission. (Morgan, Kelly) |
| 03/10/2022 | 257 | CERTIFICATE OF SERVICE by W. Clayton Burch for Responses to Second Set of Requests for Admission. (Morgan, Kelly) |
| 03/10/2022 | 258 | CERTIFICATE OF SERVICE by Harrison County Board of Education for Responses and Objections to Second Set of Requests for Admission. (Cropp, Jeffrey) (Modified on 3/11/2022 to remove party filer) (kew). |
| 03/10/2022 | 259 | CERTIFICATE OF SERVICE by Dora Stutler for Responses and Objections to Second Set of Requests for Admission. (Cropp, Jeffrey) (Modified on 3/11/2022 to remove party |

| | | filer) (kew). |
|---|---|---|
| 03/10/2022 | 260 | CERTIFICATE OF SERVICE by Lainey Armistead for Responses and Objections to Second Set of Requests for Admission. (Steele, Brandon) |
| 03/11/2022 | 261 | CERTIFICATE OF SERVICE by W. Clayton Burch, West Virginia State Board of Education for Second Supplemental Responses to First Set of Interrogatories. (Morgan, Kelly) |
| 03/11/2022 | 262 | CERTIFICATE OF SERVICE by State of West Virginia for Responses to Second Set of Requests for Admission. (Capehart, Curtis) |
| 03/17/2022 | 263 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission. (Stark, Loree) |
| 03/17/2022 | 264 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Responses and Objections to Harrison County Board of Education and Dora Stutler's First Set of Interrogatories, Requests for Production, and Requests for Admission. (Stark, Loree) |
| 03/21/2022 | 265 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Second Supplemental Answers to First Set of Interrogatories. (Cropp, Jeffrey) |
| 03/21/2022 | 266 | CERTIFICATE OF SERVICE by Harrison County Board of Education, Dora Stutler for Third Supplemental Responses to First Set of Requests for Production. (Cropp, Jeffrey) |
| 03/22/2022 | 267 | NOTICE OF DEPOSITION by State of West Virginia of Mary Fry, Ph.D. on March 29, 2022 at 9:00 a.m. (Capehart, Curtis) |
| 03/24/2022 | 268 | CERTIFICATE OF SERVICE by Lainey Armistead for Second Subsequent Production. (Steele, Brandon) |
| 03/25/2022 | 269 | NOTICE OF DEPOSITION by Lainey Armistead of Aron Janssen, MD on April 4, 2022 at 8:00 a.m. (Steele, Brandon) |
| 03/30/2022 | 270 | STIPULATION OF UNCONTESTED FACTS by B. P. J., Heather Jackson, West Virginia State Board of Education, W. Clayton Burch. (Hartnett, Kathleen) (Modified on 3/31/2022 to add party filers) (kew). |
| 03/30/2022 | 271 | ORDER granting Plaintiff's 81 Motion to Strike Jury Demand. Signed by Judge Joseph R. Goodwin on 3/30/2022. (cc: counsel of record; any unrepresented party) (btm) |
| 04/01/2022 | 272 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Set of Supplemental Responses and Objections to The State of West Virginia's First Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 04/01/2022 | 273 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Second Supplemental Responses and Objections to Lainey Armistead's First Set of Interrogatories and Requests for Production. (Stark, Loree) |
| 04/05/2022 | 274 | JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, The State of West Virginia, Lainey Armistead to Extend Deadlines for Dispositive Motions and Briefing re: 93 Scheduling Order, to Establish a Schedule for Filing Daubert Motions, and for Leave to File Briefs in Excess of the Page Limitation. (Attachment: # 1 Proposed Order)(Stark, Loree) (Modified on 4/6/2022 to add link to #93 scheduling order and to add party filers) (kew). |
| 04/06/2022 | 275 | ORDER granting 274 Joint Motion to Extend Deadlines for Dispositive Motions and Briefing re: 93 Scheduling Order, to Establish a Schedule for Filing Daubert Motions, and |

3/25/23, 12:30 PM                    WVSD NextGen CM/ECF Release 1.7.1

| | | |
|---|---|---|
| | | for Leave to File Briefs in Excess of the Page Limitation; the parties are allowed to exceed page limitations as set forth herein; and the deadlines in this case are extended and set as follows: Filing of dispositive motions - 4/21/2022. Responses to dispositive motions; filing of Daubert motions - 5/12/2022. Replies to responses to dispositive motions; responses to Daubert motions - 5/26/2022. Replies to responses to Daubert motions - 6/2/2022. Signed by Judge Joseph R. Goodwin on 4/6/2022. (cc: counsel of record; any unrepresented party) (kew) |
| 04/21/2022 | 276 | MOTION by West Virginia Secondary School Activities Commission for Summary Judgment (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Green, Roberta) |
| 04/21/2022 | 277 | MEMORANDUM by West Virginia Secondary School Activities Commission in support of 276 MOTION by West Virginia Secondary School Activities Commission for Summary Judgment. (Green, Roberta) |
| 04/21/2022 | 278 | MOTION by Harrison County Board of Education, Dora Stutler for Summary Judgment (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Deniker, Susan) |
| 04/21/2022 | 279 | INCOMPLETE IMAGE; IMAGE REMOVED. (Modified on 4/21/2022 to remove incomplete image) (kew). |
| 04/21/2022 | | NOTICE OF DOCKET CORRECTION re: #279 Memorandum of Law in Support. ERROR: Missing pages. CORRECTION: Image removed. (kew) |
| 04/21/2022 | 280 | JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia to File Exhibits Under Seal. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Sealed Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9)(Stark, Loree) (Modified on 4/22/2022 to add party filers and to remove memorandum in support and file at entry #293) (kew). (Modified on 6/7/2022 to modify security of ECF 280-8 pursuant to 379 Order) (mk). |
| 04/21/2022 | 281 | MEMORANDUM OF LAW by Harrison County Board of Education, Dora Stutler in support of 278 MOTION by Harrison County Board of Education, Dora Stutler for Summary Judgment (Deniker, Susan) |
| 04/21/2022 | 282 | REFERENCE LIST submitted by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia re: 280 JOINT MOTION by Certain Parties to File Exhibits Under Seal. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Stark, Loree) (Modified on 4/22/2022 to add party filers) (kew). |
| 04/21/2022 | 283 | MOTION by W. Clayton Burch, West Virginia State Board of Education for Summary Judgment (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Morgan, Kelly) |
| 04/21/2022 | 284 | MEMORANDUM OF LAW by W. Clayton Burch, West Virginia State Board of Education in support of 283 MOTION by W. Clayton Burch, West Virginia State Board of Education for Summary Judgment (Morgan, Kelly) |
| 04/21/2022 | 285 | MOTION by State of West Virginia for Summary Judgment. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # |

JA0031

| | | |
|---|---|---|
| | | 8 Exhibit H, # 9 Sealed Exhibit I) (Capehart, Curtis) (Modified on 6/7/2022 to modify security of ECF 285-9 pursuant to 379 Order) (mk). |
| 04/21/2022 | 286 | MOTION by Lainey Armistead for Summary Judgment. (Attachment: # 1 Sealed Appendix in Support)(Steele, Brandon) (Modified on 6/7/2022 to modify security of ECF No 286-1 pursuant to 379 Order) (mk). |
| 04/21/2022 | 287 | MEMORANDUM by State of West Virginia in support of 285 MOTION by State of West Virginia for Summary Judgment. (Capehart, Curtis) |
| 04/21/2022 | 288 | MEMORANDUM by Lainey Armistead in support of 286 MOTION by Lainey Armistead for Summary Judgment. (Steele, Brandon) |
| 04/21/2022 | 289 | MOTION by B. P. J., Heather Jackson for Summary Judgment (Attachments: # 1 Declaration of Loree Stark in Support of Motion for Summary Judgement, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Sealed Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44)(Stark, Loree) (Modified on 6/7/2022 to modify security of ECF No. 289-20 pursuant to 379 Order) (mk). |
| 04/21/2022 | 290 | STATEMENT OF UNDISPUTED MATERIAL FACTS by B. P. J., Heather Jackson re: 289 MOTION by B. P. J., Heather Jackson for Summary Judgment. (Stark, Loree) |
| 04/21/2022 | 291 | MEMORANDUM by B. P. J., Heather Jackson in support of 289 MOTION by B. P. J., Heather Jackson for Summary Judgment. (Stark, Loree) |
| 04/21/2022 | 292 | EXHIBITS by B. P. J., Heather Jackson in support of 289 MOTION by B. P. J., Heather Jackson for Summary Judgment. (Attachments: # 1 Exhibit 13, # 2 Exhibit 14, # 3 Exhibit 15, # 4 Exhibit 16, # 5 Exhibit 19, # 6 Exhibit 20, # 7 Exhibit 21, # 8 Exhibit 26) (Stark, Loree) (Modified on 4/22/2022 to add link to #289 motion) (kew). |
| 04/22/2022 | 293 | MEMORANDUM by Lainey Armistead, W. Clayton Burch, Harrison County Board of Education, B. P. J., Heather Jackson, State of West Virginia, Dora Stutler, West Virginia Secondary School Activities Commission, West Virginia State Board of Education in support of 280 JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, United States of America to File Exhibits Under Seal. (kew) (Modified on 4/26/2022 to add party filer)(mk). |
| 04/22/2022 | | NOTICE OF DOCKET CORRECTION re: 280 Joint Motion to File Under Seal. ERROR: Memorandum in support attached to motion. CORRECTION: Memorandum removed and filed at entry #293. (kew) |
| 04/25/2022 | 294 | CERTIFICATE OF SERVICE by Lainey Armistead for Third Subsequent Production. (Steele, Brandon) |
| 04/25/2022 | 295 | CERTIFICATE OF SERVICE by B. P. J., Heather Jackson for Supplemental Responses and Objections to Harrison County Board of Education and Dora Stutler's First Set of Interrogatories, First Set of Requests for Production, and First Set of Requests for Admission. (Stark, Loree) |

| | | |
|---|---|---|
| 05/05/2022 | 296 | ORDER granting 280 JOINT MOTION to File Exhibits Under Seal; the exhibits attached to this Motion are to be filed UNDER SEAL. It is further ORDERED that the reference list submitted in support of this motion to seal is to remain SEALED. Signed by Judge Joseph R. Goodwin on 5/5/2022. (cc: counsel of record; any unrepresented party) (lca) |
| 05/05/2022 | 297 | EXHIBITS 1 - 9 filed pursuant to the 296 Order. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9) (lca) |
| 05/12/2022 | 298 | RESPONSE by West Virginia Secondary School Activities Commission in opposition to 289 MOTION by B. P. J., Heather Jackson for Summary Judgment (Green, Roberta) |
| 05/12/2022 | 299 | RESPONSE by W. Clayton Burch, West Virginia State Board of Education in opposition to 289 MOTION by B. P. J., Heather Jackson for Summary Judgment (Morgan, Kelly) |
| 05/12/2022 | 300 | SUPPLEMENTAL APPENDIX by Lainey Armistead in support of 286 MOTION by Lainey Armistead for Summary Judgment. (Steele, Brandon) |
| 05/12/2022 | 301 | RESPONSE by Harrison County Board of Education, Dora Stutler in opposition to 289 MOTION by B. P. J., Heather Jackson for Summary Judgment (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Deniker, Susan) |
| 05/12/2022 | 302 | RESPONSE by Lainey Armistead in opposition to 289 MOTION by B. P. J., Heather Jackson for Summary Judgment (Steele, Brandon) |
| 05/12/2022 | 303 | DUPLICATE IMAGE; SEE ENTRY #304. (Modified on 5/16/2022 to remove duplicate entry; see entry #304) (kew). |
| 05/12/2022 | 304 | MOTION by State of West Virginia to (1) Strike Expert Opinion of Professor Mary Fry, (2) Exclude Mary Fry From Providing Expert Testimony and (3) for a Daubert Hearing. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Capehart, Curtis) |
| 05/12/2022 | 305 | BRIEF by State of West Virginia in opposition to 289 MOTION by B. P. J., Heather Jackson for Summary Judgment. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Capehart, Curtis) |
| 05/12/2022 | 306 | MEMORANDUM by State of West Virginia in support of 304 MOTION by State of West Virginia to (1) Strike Expert Opinion of Professor Mary Fry, (2) Exclude Mary Fry From Providing Expert Testimony and (3) for a Daubert Hearing. (Capehart, Curtis) (Modified on 5/16/2022 to correct link) (kew). |
| 05/12/2022 | 307 | MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Deanna Adkins. (Attachments: # 1 Roger G. Brooks Declaration in Support, # 2 Appendix)(Steele, Brandon) |
| 05/12/2022 | 308 | MEMORANDUM by Lainey Armistead, State of West Virginia in support of 307 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Deanna Adkins. (Steele, Brandon) |
| 05/12/2022 | 309 | MOTION by Lainey Armistead to Exclude Expert Testimony of Mary Fry. (Steele, Brandon) |
| 05/12/2022 | 310 | MEMORANDUM by Lainey Armistead in support of 309 MOTION by Lainey Armistead to Exclude Expert Testimony of Mary Fry. (Steele, Brandon) |
| 05/12/2022 | 311 | MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Aron Janssen. (Steele, Brandon) |
| 05/12/2022 | 312 | MEMORANDUM by Lainey Armistead, State of West Virginia in support of 311 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of |

| | | Dr. Aron Janssen. (Steele, Brandon) |
|---|---|---|
| 05/12/2022 | 313 | MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Joshua Safer. (Steele, Brandon) |
| 05/12/2022 | 314 | MEMORANDUM by Lainey Armistead, State of West Virginia in support of 313 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Joshua Safer. (Steele, Brandon) |
| 05/12/2022 | 315 | MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Gregory A. Brown. (Stark, Loree) |
| 05/12/2022 | 316 | MEMORANDUM by B. P. J., Heather Jackson in support of 315 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Gregory A. Brown. (Stark, Loree) |
| 05/12/2022 | 317 | DECLARATION by Joshua Block, on behalf of B. P. J., Heather Jackson in support of 315 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Gregory A. Brown. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(Stark, Loree) |
| 05/12/2022 | 318 | PROPOSED ORDER Granting Motion to Exclude the Expert Testimony of Dr. Gregory A. Brown by B. P. J., Heather Jackson. (Stark, Loree) |
| 05/12/2022 | 319 | MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of James M. Cantor. (Stark, Loree) |
| 05/12/2022 | 320 | MEMORANDUM OF LAW by B. P. J., Heather Jackson in support of 319 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of James M. Cantor. (Stark, Loree) |
| 05/12/2022 | 321 | DECLARATION by Sruti Swaminathan, on behalf of B. P. J., Heather Jackson in support of 319 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of James M. Cantor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Stark, Loree) |
| 05/12/2022 | 322 | PROPOSED ORDER Granting Plaintiff's Motion to Exclude the Expert Testimony of James M. Cantor by B. P. J., Heather Jackson. (Stark, Loree) |
| 05/12/2022 | 323 | MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Stephen B. Levine. (Stark, Loree) |
| 05/12/2022 | 324 | MEMORANDUM OF LAW by B. P. J., Heather Jackson in support of 323 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Stephen B. Levine. (Stark, Loree) |
| 05/12/2022 | 325 | DECLARATION by Sruti Swaminathan, on behalf of B. P. J., Heather Jackson in support of 323 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Stephen B. Levine. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Stark, Loree) |
| 05/12/2022 | 326 | PROPOSED ORDER Granting Plaintiff's Motion to Exclude the Expert Testimony of Stephen B. Levine by B. P. J., Heather Jackson. (Stark, Loree) |
| 05/12/2022 | 327 | MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Chad T. Carlson. (Stark, Loree) |
| 05/12/2022 | 328 | MEMORANDUM OF LAW by B. P. J., Heather Jackson in support of 327 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Chad T. Carlson. (Stark, Loree) |

| 05/12/2022 | 329 | PROPOSED ORDER Granting Plaintiff's Motion to Exclude the Expert Testimony of Chad T. Carlson by B. P. J., Heather Jackson. (Stark, Loree) |
|---|---|---|
| 05/12/2022 | 330 | RESPONSE by State of West Virginia to 290 Statement of Undisputed Material Facts. (Capehart, Curtis) |
| 05/12/2022 | 331 | CONSOLIDATED MEMORANDUM by B. P. J., Heather Jackson in opposition to 276 MOTION by West Virginia Secondary School Activities Commission for Summary Judgment, 278 MOTION by Harrison County Board of Education, Dora Stutler for Summary Judgment, 283 MOTION by W. Clayton Burch, West Virginia State Board of Education for Summary Judgment, 285 MOTION by State of West Virginia for Summary Judgment, 286 MOTION by Lainey Armistead for Summary Judgment. (Stark, Loree) |
| 05/12/2022 | 332 | FIRST SUPPLEMENTAL DECLARATION of Loree Stark, dated 05/12/2022, filed on behalf of B. P. J., Heather Jackson re: 331 Consolidated Memorandum in Opposition. (Attachments: # 1 Exhibit 45, # 2 Exhibit 46, # 3 Exhibit 47, # 4 Exhibit 48, # 5 Exhibit 49, # 6 Exhibit 50, # 7 Exhibit 51, # 8 Exhibit 52, # 9 Exhibit 53, # 10 Exhibit 54, # 11 Exhibit 55, # 12 Exhibit 56, # 13 Exhibit 57, # 14 Exhibit 58, # 15 Exhibit 59, # 16 Exhibit 60, # 17 Exhibit 61, # 18 Exhibit 62, # 19 Exhibit 63)(Stark, Loree) |
| 05/12/2022 | | INCORRECT ENTRY. (Modified on 5/16/2022 to remove referral of motions to Magistrate Judge) (ts). (Entered: 05/16/2022) |
| 05/16/2022 | | NOTICE OF DOCKET CORRECTION re: #303 MOTION by State of West Virginia to (1) Strike Expert Opinion of Professor Mary Fry, (2) Exclude Mary Fry From Providing Expert Testimony and (3) for a Daubert Hearing. ERROR: Motion is a duplicate of the entry at #304. CORRECTION: Duplicate removed; see entry #304. (kew) |
| 05/20/2022 | 333 | ORDER directing that the motion hearing set for 6/8/2022 is canceled. Signed by Judge Joseph R. Goodwin on 5/20/2022. (cc: counsel of record; any unrepresented party) (lca) |
| 05/26/2022 | 334 | REPLY by W. Clayton Burch, West Virginia State Board of Education to 331 Consolidated Memorandum In Opposition. (Morgan, Kelly) |
| 05/26/2022 | 335 | REPLY by West Virginia Secondary School Activities Commission to 331 Consolidated Memorandum In Opposition. (Green, Roberta) (Modified on 5/27/2022 to remove link to 276 motion) (kew). |
| 05/26/2022 | 336 | REPLY by Harrison County Board of Education, Dora Stutler to 331 Consolidated Memorandum In Opposition. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Deniker, Susan) (Modified on 5/27/2022 to remove links to #278 motion and #281 memorandum) (kew). |
| 05/26/2022 | 337 | REPLY MEMORANDUM by State of West Virginia to 331 Consolidated Memorandum In Opposition. (Capehart, Curtis) (Modified on 5/27/2022 to remove link to #285 motion) (kew). |
| 05/26/2022 | 338 | MEMORANDUM by Lainey Armistead, State of West Virginia in response to 315 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Gregory A. Brown. (Steele, Brandon) |
| 05/26/2022 | 339 | MEMORANDUM by Lainey Armistead, State of West Virginia in response to 319 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of James M. Cantor. (Steele, Brandon) |
| 05/26/2022 | 340 | MEMORANDUM by Lainey Armistead, State of West Virginia in response to 327 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Chad T. Carlson. (Steele, Brandon) |

WVSD NextGen CM/ECF Release 1.7.1

| | | |
|---|---|---|
| 05/26/2022 | 341 | MEMORANDUM by Lainey Armistead, State of West Virginia in response to 323 MOTION by B. P. J., Heather Jackson to Exclude Expert Testimony of Stephen B. Levine. (Steele, Brandon) |
| 05/26/2022 | 342 | OPPOSITION by B. P. J., Heather Jackson to 307 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Deanna Adkins. (Stark, Loree) (Modified on 5/27/2022 to remove link to #2 motion) (kew). |
| 05/26/2022 | 343 | AFFIDAVIT by Roger G. Brooks, on behalf of Lainey Armistead, State of West Virginia in support of 338 , 339 , 340 and 341 Memoranda in Response. (Attachment: # 1 Daubert Response Appendix)(Steele, Brandon) (Modified on 5/27/2022 to correct links) (kew). |
| 05/26/2022 | 344 | SECOND SUPPLEMENTAL APPENDIX by Lainey Armistead in support of 286 MOTION by Lainey Armistead for Summary Judgment. (Steele, Brandon) |
| 05/26/2022 | 345 | DECLARATION of Tara L. Borelli, dated 05/26/2022, filed on behalf of B. P. J., Heather Jackson re: 342 Opposition. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Stark, Loree) |
| 05/26/2022 | 346 | OPPOSITION by B. P. J., Heather Jackson to 309 MOTION by Lainey Armistead to Exclude Expert Testimony of Mary Fry., 304 MOTION by State of West Virginia to (1) Strike Expert Opinion of Professor Mary Fry, (2) Exclude Mary Fry From Providing Expert Testimony and (3) for a Daubert Hearing. (Stark, Loree) |
| 05/26/2022 | 347 | REPLY by Lainey Armistead to 331 Consolidated Memorandum In Opposition. (Steele, Brandon) |
| 05/26/2022 | 348 | OPPOSITION by B. P. J., Heather Jackson to 311 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Aron Janssen. (Stark, Loree) |
| 05/26/2022 | 349 | DECLARATION of Joshua Block, dated 05/26/2022, filed on behalf of B. P. J., Heather Jackson re: 348 Opposition. (Attachment: # 1 Exhibit A)(Stark, Loree) |
| 05/26/2022 | 350 | OPPOSITION by B. P. J., Heather Jackson to 313 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Joshua Safer. (Stark, Loree) |
| 05/26/2022 | 351 | OPPOSITION by B. P. J., Heather Jackson to 307 MOTION by Lainey Armistead, State of West Virginia to Exclude Expert Testimony of Dr. Deanna Adkins. (Stark, Loree) |
| 05/26/2022 | 352 | DECLARATION of Tara L. Borelli, dated 05/26/2022, filed on behalf of B. P. J., Heather Jackson re: 351 Opposition. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Stark, Loree) |
| 05/26/2022 | 353 | MOTION by B. P. J., Heather Jackson to Reconsider 130 Memorandum Opinion and Order. (Stark, Loree) |
| 05/26/2022 | 354 | MEMORANDUM OF LAW by B. P. J., Heather Jackson in support of 353 MOTION by B. P. J., Heather Jackson to Reconsider 130 Memorandum Opinion and Order. (Stark, Loree) |
| 05/26/2022 | 355 | DECLARATION of Valeria M. Pelet del Toro, dated 05/26/2022, filed on behalf of B. P. J., Heather Jackson re: 353 MOTION by B. P. J., Heather Jackson to Reconsider 130 Memorandum Opinion and Order. (Attachment: # 1 Exhibit A)(Stark, Loree) |
| 05/26/2022 | 356 | PROPOSED ORDER Order Granting Motion to Reconsider 130 Memorandum Opinion and Order by B. P. J., Heather Jackson. (Stark, Loree) |
| 05/26/2022 | 357 | CONSOLIDATED REPLY by B. P. J., Heather Jackson to 298 , 299 , 301 , 302 Responses In Opposition and 305 Brief In Opposition (Stark, Loree) |

3/25/23, 12:30 PM                    WVSD NextGen CM/ECF Release 1.7.1

| | | |
|---|---|---|
| 05/26/2022 | 358 | REPLY by B. P. J., Heather Jackson to 330 Response to Statement of Undisputed Material Facts. (Stark, Loree) |
| 05/27/2022 | 359 | SECOND SUPPLEMENTAL DECLARATION of Loree Stark, dated May 26, 2022, filed on behalf of B. P. J., Heather Jackson re: 357 Consolidated Reply. (Attachments: # 1 Exhibit 64, # 2 Exhibit 65, # 3 Exhibit 66)(Stark, Loree) |
| 05/31/2022 | 360 | MOTION by Lainey Armistead, State of West Virginia for Extension of Time to Respond to 353 MOTION by B. P. J., Heather Jackson to Reconsider 130 Memorandum Opinion and Order to 6/23/2022. (Steele, Brandon) |
| 06/02/2022 | 361 | REPLY MEMORANDUM by Lainey Armistead, State of West Virginia to 351 Opposition. (Steele, Brandon) |
| 06/02/2022 | 362 | REPLY MEMORANDUM by Lainey Armistead to 346 Opposition. (Steele, Brandon) |
| 06/02/2022 | 363 | REPLY MEMORANDUM by Lainey Armistead, State of West Virginia to 348 Opposition. (Steele, Brandon) |
| 06/02/2022 | 364 | REPLY MEMORANDUM by Lainey Armistead, State of West Virginia to 350 Opposition. (Steele, Brandon) |
| 06/02/2022 | 365 | REPLY MEMORANDUM by State of West Virginia to 346 Opposition. (Capehart, Curtis) |
| 06/02/2022 | 366 | REPLY MEMORANDUM OF LAW by B. P. J., Heather Jackson to 339 Memorandum in Response. (Stark, Loree) |
| 06/02/2022 | 367 | REPLY MEMORANDUM OF LAW by B. P. J., Heather Jackson to 340 Memorandum in Response. (Stark, Loree) |
| 06/02/2022 | 368 | REPLY MEMORANDUM OF LAW by B. P. J., Heather Jackson to 341 Memorandum in Response. (Stark, Loree) |
| 06/02/2022 | 369 | SUPPLEMENTAL DECLARATION of Sruti Swaminathan, dated 06/02/2022, filed on behalf of B. P. J., Heather Jackson in support of 368 Reply Memorandum of Law. (Attachment: # 1 Exhibit J)(Stark, Loree) |
| 06/02/2022 | 370 | REPLY MEMORANDUM OF LAW by B. P. J., Heather Jackson to 338 Memorandum in Response. (Stark, Loree) |
| 06/02/2022 | 371 | SUPPLEMENTAL DECLARATION of Joshua Block, dated 06/02/2022, filed on behalf of B. P. J., Heather Jackson in support of 370 Reply Memorandum of Law. (Attachment: # 1 Exhibit R)(Stark, Loree) |
| 06/03/2022 | 372 | NOTICE OF ERRATA by B. P. J., Heather Jackson re: 370 Reply Memorandum of Law. (Stark, Loree) |
| 06/03/2022 | 373 | REPLY MEMORANDUM OF LAW by B. P. J., Heather Jackson to 338 Memorandum in Response. (Stark, Loree) |
| 06/06/2022 | 374 | JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, Lainey Armistead to Place ECF Nos. [280-8], [285-9], [286-1], [289-20] Under Seal. (Stark, Loree) (Modified on 6/7/2022 to add party filers) (kew). |
| 06/06/2022 | 375 | MEMORANDUM by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, Lainey Armistead |

| | | |
|---|---|---|
| | | in support of 374 JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, Lainey Armistead to Place ECF Nos. [280-8], [285-9], [286-1], [289-20] Under Seal. (Stark, Loree) (Modified on 6/7/2022 to add party filers) (kew). |
| 06/06/2022 | 376 | PROPOSED ORDER Order Granting Joint Motion to Place Documents Under Seal by B. P. J., Heather Jackson. (Stark, Loree) |
| 06/06/2022 | 377 | JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, Lainey Armistead for Leave to File Revised Redacted Exhibits re: ECF Nos. [280-8], [285-9], [286-1], [289-20]. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Stark, Loree) (Modified on 6/7/2022 to add party filers) (kew). |
| 06/06/2022 | 378 | PROPOSED ORDER Order Granting Joint Motion for Leave to File Revised Redacted Exhibits by B. P. J., Heather Jackson. (Stark, Loree) |
| 06/07/2022 | 379 | ORDER granting 377 JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, Lainey Armistead for Leave to File Revised Redacted Exhibits; directing the Clerk to place the following documents UNDER SEAL: ECF No. 280-8, ECF No. 285-9, ECF No. 286-1 and ECF No. 289-20; further directing the parties to file redacted copies of those documents in accordance with Local Rule 49.1.1(a). Signed by Judge Joseph R. Goodwin on 6/7/2022. (cc: counsel of record; any unrepresented party) (mk) |
| 06/09/2022 | 380 | RESPONSE by Lainey Armistead in opposition to 353 MOTION by B. P. J., Heather Jackson to Reconsider 130 Memorandum Opinion and Order (Steele, Brandon) |
| 06/09/2022 | 381 | RESPONSE by State of West Virginia in opposition to 353 MOTION by B. P. J., Heather Jackson to Reconsider 130 Memorandum Opinion and Order (Capehart, Curtis) |
| 06/16/2022 | 382 | CONSOLIDATED REPLY MEMORANDUM OF LAW by B. P. J., Heather Jackson to 380 and 381 Response In Opposition. (Stark, Loree) |
| 06/22/2022 | 383 | MOTION by Harrison County Board of Education, Dora Stutler in Limine *to Preclude Introduction of Testimony by Stutler Elicited Outside of the Scope of the Rule 30(b)(6) Topics* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Deniker, Susan) |
| 06/22/2022 | 384 | MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Regional Principals' Meeting PowerPoint and Recorded Presentation* (Green, Roberta) |
| 06/22/2022 | 385 | MEMORANDUM by West Virginia Secondary School Activities Commission in support of 384 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Regional Principals' Meeting PowerPoint and Recorded Presentation* (Green, Roberta) |
| 06/22/2022 | 386 | MOTION by West Virginia Secondary School Activities Commission in Limine *to Preclude Plaintiff From Offering as Evidence the Assertions Contained in Plaintiff's Statement of Undisputed Facts* (Attachment: # 1 Exhibit A)(Green, Roberta) |
| 06/22/2022 | 387 | MEMORANDUM by West Virginia Secondary School Activities Commission in support of 386 MOTION by West Virginia Secondary School Activities Commission in Limine *to Preclude Plaintiff From Offering as Evidence the Assertions Contained in Plaintiff's Statement of Undisputed Facts* (Green, Roberta) |

| 06/22/2022 | 388 | MOTION by West Virginia Secondary School Activities Commission in Limine *to Preclude Use of Harrison Countys 30(b) Testimony Outside Scope* (Green, Roberta) |
| 06/22/2022 | 389 | MEMORANDUM by West Virginia Secondary School Activities Commission in support of 388 MOTION by West Virginia Secondary School Activities Commission in Limine *to Preclude Use of Harrison Countys 30(b) Testimony Outside Scope* (Green, Roberta) |
| 06/22/2022 | 390 | MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Blatt Exhibit 21* (Green, Roberta) |
| 06/22/2022 | 391 | MEMORANDUM by West Virginia Secondary School Activities Commission in support of 390 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Blatt Exhibit 21* (Green, Roberta) |
| 06/22/2022 | 392 | MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Text and Email Communications* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Bandy, Kimberly) |
| 06/22/2022 | 393 | MEMORANDUM OF LAW by West Virginia Secondary School Activities Commission in support of 392 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Text and Email Communications* (Bandy, Kimberly) |
| 06/22/2022 | 394 | MOTION by State of West Virginia in Limine *to Exclude or Limit Certain Statements of State Superintendent Burch and Related Parties (Hearsay, Relevance, and Limitation Pursuant to Fed. R. Evid. 105)* (Capehart, Curtis) |
| 06/22/2022 | 395 | MEMORANDUM by State of West Virginia in support of 394 MOTION by State of West Virginia in Limine *to Exclude or Limit Certain Statements of State Superintendent Burch and Related Parties (Hearsay, Relevance, and Limitation Pursuant to Fed. R. Evid. 105)* (Capehart, Curtis) |
| 06/22/2022 | 396 | MOTION by State of West Virginia in Limine *to Bar Evidence of Disorders of Sexual Development (Relevance)* (Capehart, Curtis) |
| 06/22/2022 | 397 | MEMORANDUM by State of West Virginia in support of 396 MOTION by State of West Virginia in Limine *to Bar Evidence of Disorders of Sexual Development (Relevance)* (Capehart, Curtis) |
| 06/22/2022 | 398 | MOTION by State of West Virginia, Lainey Armistead in Limine *to Bar Plaintiff's Claims to Undisputed Facts (Fed. R. Evid. 105 and 403)* (Capehart, Curtis) (Modified on 6/23/2022 to add party filer) (kew) |
| 06/22/2022 | 399 | MEMORANDUM by State of West Virginia, Lainey Armistead in support of 398 MOTION by State of West Virginia, Lainey Armistead in Limine *to Bar Plaintiff's Claims to Undisputed Facts (Fed. R. Evid. 105 and 403)* (Capehart, Curtis) (Modified on 6/23/2022 to add party filer) (kew). |
| 06/22/2022 | 400 | MOTION by State of West Virginia in Limine *to Exclude the Partial Transcript of H.B. 3293's Legislative Hearings (Hearsay, Relevance, Incomplete Transcript and Lawyer As Witness)* (Capehart, Curtis) |
| 06/22/2022 | 401 | MEMORANDUM by State of West Virginia in support of 400 MOTION by State of West Virginia in Limine *to Exclude the Partial Transcript of H.B. 3293's Legislative Hearings (Hearsay, Relevance, Incomplete Transcript and Lawyer As Witness)* (Capehart, Curtis) |
| 06/22/2022 | 402 | MOTION by State of West Virginia in Limine *to Exclude Several Legislators' Statements (Hearsay and Relevance)* (Capehart, Curtis) |

JA0039

| 06/22/2022 | 403 | MEMORANDUM by State of West Virginia in support of 402 MOTION by State of West Virginia in Limine *to Exclude Several Legislators' Statements (Hearsay and Relevance)* (Capehart, Curtis) |
| --- | --- | --- |
| 06/22/2022 | 404 | MOTION by State of West Virginia in Limine *to Exclude the Governor's Statements (Hearsay and Relevance)* (Capehart, Curtis) |
| 06/22/2022 | 405 | MEMORANDUM by State of West Virginia in support of 404 MOTION by State of West Virginia in Limine *to Exclude the Governor's Statements (Hearsay and Relevance)* (Capehart, Curtis) |
| 06/22/2022 | 406 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Testimony from Bernard Dolan Regarding Certain Hearsay Statements* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 407 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Testimony and/or Evidence Regarding Contact or Collision Sports* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 408 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Defendant State of West Virginia's Exhibit H* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 409 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding the Potential Number of Gender Identities* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 410 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Defendant-Intervenor's Requests for Admission Nos. 13-61 Concerning Hypothetical Individuals* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 411 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Press Reports* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 412 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding the Proper Medical Treatment for Gender Dysphoria and the Propriety of Plaintiff's Diagnosis and Treatment* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 413 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Statements of Non-Party Witnesses in Supplemental Disclosures* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 414 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude References to Plaintiff by Her Name Given at Birth ("Deadname") or Using Male Pronouns (he/him)* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 415 | DECLARATION of Valeria M. Pelet del Toro, dated 6/22/2022, filed on behalf of B. P. J., Heather Jackson re: 414 MOTION by B. P. J., Heather Jackson in Limine *to Exclude References to Plaintiff by Her Name Given at Birth ("Deadname") or Using Male Pronouns (he/him)* (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Stark, Loree) |
| 06/22/2022 | 416 | MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity* and Supporting Memorandum of Law. (Stark, Loree) |
| 06/22/2022 | 417 | DECLARATION of Tara L. Borelli, dated 6/22/2022, filed on behalf of B. P. J., Heather Jackson re: 416 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity* (Attachment: # 1 Exhibit A)(Stark, Loree) |

| 06/22/2022 | 418 | MOTION by B. P. J., Heather Jackson in Limine *in Limine to Exclude Evidence and/or Argument Regarding Plaintiff's Irrelevant Medical Records* and Supporting Memorandum of Law. (Stark, Loree) |
| --- | --- | --- |
| 06/27/2022 | 419 | AMENDED SCHEDULING ORDER pursuant to Rule 16(b) and Local Rule of Civil Procedure 16.1(e), this case shall proceed as follows: Pretrial conference on 1/9/2023 at 10:00 AM. Proposed jury instructions filed - 1/24/2023. Final settlement conference on 1/30/2023 at 09:00 AM. Trial on 1/31/2023 at 08:30 AM. Signed by Judge Joseph R. Goodwin on 6/27/2022. (cc: counsel of record; any unrepresented parties) (klc) |
| 06/29/2022 | 420 | RESPONSE by Harrison County Board of Education, Dora Stutler in opposition to 407 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Testimony and/or Evidence Regarding Contact or Collision Sports* (Deniker, Susan) |
| 06/29/2022 | 421 | BRIEF by State of West Virginia in opposition to 408 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Defendant State of West Virginia's Exhibit H* (Capehart, Curtis) |
| 06/29/2022 | 422 | ARGUMENT by State of West Virginia in opposition to 406 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Testimony from Bernard Dolan Regarding Certain Hearsay Statements* (Capehart, Curtis) |
| 06/29/2022 | 423 | ARGUMENT by State of West Virginia in opposition to 411 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Press Reports* (Capehart, Curtis) |
| 06/29/2022 | 424 | MEMORANDUM by State of West Virginia in opposition to 412 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding the Proper Medical Treatment for Gender Dysphoria and the Propriety of Plaintiff's Diagnosis and Treatment* (Capehart, Curtis) |
| 06/29/2022 | 425 | BRIEF by State of West Virginia in opposition to 418 MOTION by B. P. J., Heather Jackson in Limine *in Limine to Exclude Evidence and/or Argument Regarding Plaintiff's Irrelevant Medical Records* (Capehart, Curtis) |
| 06/29/2022 | 426 | RESPONSE by Lainey Armistead, State of West Virginia in opposition to 392 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Text and Email Communications* and 384 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Regional Principals' Meeting PowerPoint and Recorded Presentation* (Steele, Brandon) |
| 06/29/2022 | 427 | RESPONSE by Lainey Armistead in opposition to 406 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Testimony from Bernard Dolan Regarding Certain Hearsay Statements* (Steele, Brandon) |
| 06/29/2022 | 428 | RESPONSE by Lainey Armistead, State of West Virginia in opposition to 407 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Testimony and/or Evidence Regarding Contact or Collision Sports* (Steele, Brandon) |
| 06/29/2022 | 429 | COMBINED RESPONSE by Lainey Armistead, State of West Virginia in opposition to 409 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding the Potential Number of Gender Identities* and 410 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Defendant-Intervenor's Requests for Admission Nos. 13-61 Concerning Hypothetical Individuals* (Steele, Brandon) |
| 06/29/2022 | 430 | RESPONSE by Lainey Armistead in opposition to 411 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Press Reports* |

| | | (Steele, Brandon) |
|---|---|---|
| 06/29/2022 | 431 | RESPONSE by Lainey Armistead in opposition to 413 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding Statements of Non-Party Witnesses in Supplemental Disclosures* (Steele, Brandon) |
| 06/29/2022 | 432 | RESPONSE by Lainey Armistead, State of West Virginia in opposition to 414 MOTION by B. P. J., Heather Jackson in Limine *to Exclude References to Plaintiff by Her Name Given at Birth ("Deadname") or Using Male Pronouns (he/him)* (Steele, Brandon) |
| 06/29/2022 | 433 | COMBINED RESPONSE by Lainey Armistead, State of West Virginia in opposition to 416 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity* and 412 MOTION by B. P. J., Heather Jackson in Limine *to Exclude Evidence and/or Argument Regarding the Proper Medical Treatment for Gender Dysphoria and the Propriety of Plaintiff's Diagnosis and Treatment* (Steele, Brandon) |
| 06/29/2022 | 434 | RESPONSE by Lainey Armistead in opposition to 418 MOTION by B. P. J., Heather Jackson in Limine *in Limine to Exclude Evidence and/or Argument Regarding Plaintiff's Irrelevant Medical Records* (Steele, Brandon) |
| 06/29/2022 | 435 | OPPOSITION by B. P. J., Heather Jackson to 384 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Regional Principals' Meeting PowerPoint and Recorded Presentation* (Stark, Loree) |
| 06/29/2022 | 436 | DECLARATION of Sruti Swaminathan, dated 6/29/2022, filed on behalf of B. P. J., Heather Jackson in support of 435 Opposition. (Attachment: # 1 Exhibit A)(Stark, Loree) |
| 06/29/2022 | 437 | OPPOSITION by B. P. J., Heather Jackson to 392 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Text and Email Communications* (Stark, Loree) |
| 06/29/2022 | 438 | DECLARATION of Katelyn Kang, dated 6/29/2022, filed on behalf of B. P. J., Heather Jackson in support of 437 Opposition. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Stark, Loree) |
| 06/29/2022 | 439 | OPPOSITION by B. P. J., Heather Jackson to 390 MOTION by West Virginia Secondary School Activities Commission in Limine *to Exclude Blatt Exhibit 21* (Stark, Loree) |
| 06/29/2022 | 440 | OPPOSITION by B. P. J., Heather Jackson to 388 MOTION by West Virginia Secondary School Activities Commission in Limine *to Preclude Use of Harrison Countys 30(b) Testimony Outside Scope* (Stark, Loree) |
| 06/29/2022 | 441 | CONSOLIDATED OPPOSITION by B. P. J., Heather Jackson to 398 MOTION by State of West Virginia, Lainey Armistead in Limine *to Bar Plaintiff's Claims to Undisputed Facts (Fed. R. Evid. 105 and 403)* (Stark, Loree) |
| 06/29/2022 | 442 | OPPOSITION by B. P. J., Heather Jackson to 394 MOTION by State of West Virginia in Limine *to Exclude or Limit Certain Statements of State Superintendent Burch and Related Parties (Hearsay, Relevance, and Limitation Pursuant to Fed. R. Evid. 105)* (Stark, Loree) |
| 06/29/2022 | 443 | OPPOSITION by B. P. J., Heather Jackson to 383 MOTION by Harrison County Board of Education, Dora Stutler in Limine *to Preclude Introduction of Testimony by Stutler Elicited Outside of the Scope of the Rule 30(b)(6) Topics* (Stark, Loree) |
| 06/29/2022 | 444 | OPPOSITION by B. P. J., Heather Jackson to 396 MOTION by State of West Virginia in Limine *to Bar Evidence of Disorders of Sexual Development (Relevance)* (Stark, Loree) |

| | | |
|---|---|---|
| 06/29/2022 | 445 | OPPOSITION by B. P. J., Heather Jackson to 400 MOTION by State of West Virginia in Limine *to Exclude the Partial Transcript of H.B. 3293's Legislative Hearings (Hearsay, Relevance, Incomplete Transcript and Lawyer As Witness)* (Stark, Loree) |
| 06/29/2022 | 446 | OPPOSITION by B. P. J., Heather Jackson to 404 MOTION by State of West Virginia in Limine *to Exclude the Governor's Statements (Hearsay and Relevance)* (Stark, Loree) |
| 06/29/2022 | 447 | OPPOSITION by B. P. J., Heather Jackson to 402 MOTION by State of West Virginia in Limine *to Exclude Several Legislators' Statements (Hearsay and Relevance)* (Stark, Loree) |
| 07/01/2022 | 448 | SECOND AMENDED SCHEDULING ORDER directing that this case shall proceed as follows: Integrated pretrial order filed by defendant - 12/19/2022. Pretrial conference on 1/9/2023 at 10:00 AM. Proposed jury instructions filed - 1/24/2023. Final settlement conference on 1/30/2023 at 9:00 AM. Trial on 1/31/2023 at 8:30 AM. Signed by Judge Joseph R. Goodwin on 7/1/2022. (cc: counsel of record; any unrepresented parties) (kew) |
| 07/01/2022 | 449 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Anthony E. Nortz requesting removal from the Court service list on behalf of West Virginia Secondary School Activities Commission. (Nortz, Anthony) |
| 07/01/2022 | 450 | JOINT MOTION by State of West Virginia, B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, Lainey Armistead for Extension of Filing Deadline re: 448 Second Amended Scheduling Order. (Capehart, Curtis) (Modified on 7/5/2022 to add link to #448 second amended scheduling order and to add party filers) (kew). |
| 07/05/2022 | 451 | ORDER granting 450 JOINT MOTION by State of West Virginia, B.P.J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, Lainey Armistead for Extension of Filing Deadline re: 448 Second Amended Scheduling Order; replies to motions in limine are due on 7/11/2022. Signed by Judge Joseph R. Goodwin on 7/5/2022. (cc: counsel of record; any unrepresented party) (mfo) |
| 07/11/2022 | 452 | REPLY by Harrison County Board of Education, Dora Stutler to 443 Opposition. (Attachment: # 1 Exhibit A)(Deniker, Susan) |
| 07/11/2022 | 453 | REPLY by West Virginia Secondary School Activities Commission to 441 Consolidated Opposition. (Green, Roberta) (Modified on 7/12/2022 to remove link to #386 motion) (kew). |
| 07/11/2022 | 454 | REPLY by West Virginia Secondary School Activities Commission to 426 Response In Opposition and 435 Opposition. (Green, Roberta) (Modified on 7/12/2022 to remove link to #384 motion) (kew). |
| 07/11/2022 | 455 | REPLY by West Virginia Secondary School Activities Commission to 439 Opposition. (Green, Roberta) (Modified on 7/12/2022 to remove link to #390 motion) (kew). |
| 07/11/2022 | 456 | REPLY by West Virginia Secondary School Activities Commission to 426 Response In Opposition and 437 Opposition. (Green, Roberta) (Modified on 7/12/2022 to remove link to #392 motion) (kew). |
| 07/11/2022 | 457 | REPLY by West Virginia Secondary School Activities Commission to 440 Opposition. (Green, Roberta) (Modified on 7/12/2022 to remove link to #388 motion) (kew). |
| 07/11/2022 | 458 | REPLY by State of West Virginia to 442 Opposition. (Capehart, Curtis) (Modified on 7/12/2022 to remove link to #394 motion and #395 memorandum) (kew). |

| 07/11/2022 | 459 | REPLY by State of West Virginia to 444 Opposition. (Capehart, Curtis) (Modified on 7/12/2022 to remove link to #396 motion and #397 memorandum) (kew). |
| 07/11/2022 | 460 | REPLY by State of West Virginia to 441 Consolidated Opposition. (Capehart, Curtis) (Modified on 7/12/2022 to remove link to #398 motion and #399 memorandum) (kew). |
| 07/11/2022 | 461 | REPLY by State of West Virginia to 445 Opposition. (Capehart, Curtis) (Modified on 7/12/2022 to remove link to #400 motion and #401 memorandum) (kew). |
| 07/11/2022 | 462 | REPLY by State of West Virginia to 447 Opposition. (Capehart, Curtis) (Modified on 7/12/2022 to remove link to #402 motion and #403 memorandum) (kew). |
| 07/11/2022 | 463 | REPLY by State of West Virginia to 446 Opposition. (Capehart, Curtis) (Modified on 7/12/2022 to remove link to #404 motion and #405 memorandum) (kew). |
| 07/11/2022 | 464 | DUPLICATE ENTRY; IMAGE REMOVED. (Modified on 7/15/2022 to remove duplicate image; see ECF #466) (ts). |
| 07/11/2022 | 465 | REPLY by B. P. J., Heather Jackson to 423 Argument In Opposition and 430 Response In Opposition. (Stark, Loree) |
| 07/11/2022 | 466 | REPLY by B. P. J., Heather Jackson to 432 Response In Opposition. (Stark, Loree) |
| 07/11/2022 | 467 | REPLY by B. P. J., Heather Jackson to 431 Response In Opposition. (Stark, Loree) |
| 07/11/2022 | 468 | CONSOLIDATED REPLY by B. P. J., Heather Jackson to 429 Combined Response In Opposition. (Stark, Loree) |
| 07/11/2022 | 469 | REPLY by B. P. J., Heather Jackson to 421 Brief In Opposition. (Stark, Loree) |
| 07/11/2022 | 470 | REPLY by B. P. J., Heather Jackson to 422 Argument In Opposition and 427 Response In Opposition. (Stark, Loree) |
| 07/11/2022 | 471 | REPLY by B. P. J., Heather Jackson to 425 Brief In Opposition and 434 Response In Opposition. (Stark, Loree) |
| 07/11/2022 | 472 | CONSOLIDATED REPLY by B. P. J., Heather Jackson to 420 and 428 Responses In Opposition. (Stark, Loree) |
| 07/11/2022 | 473 | CONSOLIDATED REPLY by B. P. J., Heather Jackson to 424 Memorandum In Opposition and 433 Combined Response In Opposition. (Stark, Loree) |
| 07/12/2022 | 474 | STATEMENT OF VISITING ATTORNEY from Johannes S. Widmalm-Delphonse on behalf of Lainey Armistead. Local counsel: Joshua Brown. Fee $50.00. Receipt # AWVSDC-8227421. (Brown, Joshua) |
| 07/15/2022 |  | NOTICE OF DOCKET CORRECTION re: #464 Motion. ERROR: Duplicate image filed. CORRECTION: Duplicate image removed; see ECF #466. (ts) |
| 07/22/2022 | 475 | NOTICE *of Supplemental Authority* by State of West Virginia re: 285 and 289 Motions for Summary Judgment. (Capehart, Curtis) |
| 07/22/2022 | 476 | NOTICE OF WITHDRAWAL OF COUNSEL by David Christian Tryon on behalf of State of West Virginia. (Tryon, David) (Modified on 7/25/2022 to convert event to notice(other)) (kew). |
| 07/29/2022 | 477 | NOTICE *of Supplemental Authority* by B. P. J., Heather Jackson re: 276 , 278 , 283 , 285 , 286 , 289 Motions for Summary Judgment and 353 Motion to Reconsider. (Stark, Loree) (Modified on 8/1/2022 to correct links) (kew). |

| | | |
|---|---|---|
| 07/29/2022 | 478 | RESPONSE by B. P. J., Heather Jackson in opposition to 475 Notice of of Supplemental Authority. (Stark, Loree) |
| 08/01/2022 | 479 | NOTICE OF WITHDRAWAL OF COUNSEL by Loree Beth Stark for Valeria M. Pelet del Toro on behalf of B. P. J., Heather Jackson. (Stark, Loree) |
| 08/09/2022 | 480 | NOTICE *of Additional Authority* by Harrison County Board of Education, Dora Stutler in support of 278 MOTION by Harrison County Board of Education, Dora Stutler for Summary Judgment. (Deniker, Susan) |
| 08/10/2022 | 481 | RESPONSE by Lainey Armistead in opposition to 477 Supplemental Authority. (Steele, Brandon) |
| 08/10/2022 | 482 | RESPONSE by B. P. J., Heather Jackson in opposition to 480 Notice of Additional Authority. (Stark, Loree) |
| 09/08/2022 | 483 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Avatara Antoinette Smith-Carrington updating name and/or firm information on behalf of B. P. J., Heather Jackson. (Smith-Carrington, Avatara) |
| 09/19/2022 | 484 | MOTION by West Virginia Secondary School Activities Commission for Leave to File Surreply to 470 Reply to Response with proposed document attached (Attachment: # 1 Exhibit A)(Green, Roberta) (Modified on 9/20/2022 to add link to #470 reply) (kew). |
| 09/19/2022 | 485 | NOTICE *of Supplemental Authority* by West Virginia Secondary School Activities Commission in support of 331 Consolidated Memorandum In Opposition, 426 Opposition, 439 Opposition. (Green, Roberta) (Modified on 9/20/2022 to correct links) (kew). |
| 09/28/2022 | 486 | CONSOLIDATED OPPOSITION by B. P. J., Heather Jackson in opposition to 484 MOTION by West Virginia Secondary School Activities Commission for Leave to File Surreply to 470 Reply to Response 485 Notice of Supplemental Authority. (Stark, Loree) |
| 10/04/2022 | 487 | REPLY by West Virginia Secondary School Activities Commission to 486 Consolidated Opposition. (Green, Roberta) (Modified on 10/5/2022 to remove link to #484 motion) (kew). |
| 10/19/2022 | 488 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Andrew Barr in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 489 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Avatara Smith-Carrington in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 490 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Carl Charles in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 491 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Elizabeth Reinhardt in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 492 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Joshua Block in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 493 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Julia Veroff in lieu of Loree Stark on behalf of B. |

WVSD NextGen CM/ECF Release 1.7.1

| | | |
|---|---|---|
| | | P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 494 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Katelyn Kang in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 495 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Kathleen Hartnett in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 496 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Sruti Swaminathan in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 497 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Tara Borelli in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 498 | NOTICE OF SUBSTITUTION OF SPONSORING ATTORNEY by Nicholas Ward substituting as sponsoring attorney for Zoe Helstrom in lieu of Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/19/2022 | 499 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Nicholas Ward substituting within-firm representation for Loree Stark on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 10/21/2022 | 500 | JOINT MOTION by Lainey Armistead, State of West Virginia to Supplement the Expert Report of Dr. Gregory A. Brown. (Attachment: # 1 Exhibit A)(Steele, Brandon) |
| 10/27/2022 | 501 | STATEMENT OF VISITING ATTORNEY from Philip A. Sechler on behalf of Lainey Armistead. Local counsel: Joshua D Brown. Fee $50.00. Receipt # AWVSDC-8297883. (Brown, Joshua) |
| 11/04/2022 | 502 | OPPOSITION by B. P. J., Heather Jackson in opposition to 500 JOINT MOTION by Lainey Armistead, State of West Virginia to Supplement the Expert Report of Dr. Gregory A. Brow. (Ward, Nicholas) |
| 11/08/2022 | 503 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Christiana M. Kiefer updating name and/or firm information on behalf of Lainey Armistead. (Kiefer, Christiana) (Modified on 11/9/2022 to correct signature and replace image) (kew). |
| 11/09/2022 | | NOTICE OF DOCKET CORRECTION re: 503 Notice of Change of Attorney Information. ERROR: Electronic signature missing. CORRECTION: Signature added and image replaced. (kew) |
| 11/11/2022 | 504 | REPLY by Lainey Armistead, State of West Virginia to 502 Response In Opposition. (Steele, Brandon) (Modified on 11/14/2022 to remove link to #500 motion and to add party filer) (kew). |
| 11/18/2022 | 505 | JOINT MOTION by Lainey Armistead, State of West Virginia to Make Rule 26(e) Disclosure as to Dr. Chad Carlson (Attachments: # 1 Exhibit A (Proposed Supplemental Declaration), # 2 Exhibit B)(Steele, Brandon) |
| 11/22/2022 | 506 | JOINT MOTION by B. P. J., Heather Jackson, West Virginia State Board of Education, Harrison County Board of Education, West Virginia Secondary School Activities Commission, W. Clayton Burch, Dora Stutler, State of West Virginia, Lainey Armistead for Status Conference. (Ward, Nicholas) (Modified on 11/23/2022 to add party filers) (kew). |

| 12/02/2022 | 507 | OPPOSITION by B. P. J., Heather Jackson to 505 JOINT MOTION by Lainey Armistead, State of West Virginia to Make Rule 26(e) Disclosure as to Dr. Chad Carlson. (Ward, Nicholas) |
| 12/07/2022 | 508 | NOTICE OF APPEARANCE by Aubrey Sparks on behalf of B. P. J., Heather Jackson. (Ward, Nicholas) |
| 12/09/2022 | 509 | REPLY by Lainey Armistead, State of West Virginia to 507 Opposition. (Steele, Brandon) |
| 12/14/2022 | 510 | JOINT MOTION by B. P. J., Heather Jackson, State of West Virginia, Lainey Armistead to Continue Trial Date and Associated Pretrial Dates re: 448 Second Amended Scheduling Order. (Ward, Nicholas) (Modified on 12/15/2022 to add link to #448 amended scheduling order and to add party filers) (kew). |
| 12/15/2022 | 511 | ORDER granting 510 JOINT MOTION by B. P. J., Heather Jackson, State of West Virginia, Lainey Armistead to Continue Trial Date and Associated Pretrial Dates and directing that all dates established in the Second Amended Scheduling Order 448 are suspended. Signed by Judge Joseph R. Goodwin on 12/15/2022. (cc: counsel of record; any unrepresented party) (mfo) |
| 01/05/2023 | 512 | MEMORANDUM OPINION AND ORDER denying B.P.J.'s 289 Motion for Summary Judgment; denying Defendant WVSSAC's 276 Motion for Summary Judgment; granting the State of West Virginia, the Harrison County defendants, the State Board defendants, and Intervenor Lainey Armistead's 285 , 278 , 283 and 286 Motions for Summary Judgment to the extent they argue that H.B. 3293 is constitutional and complies with Title IX; the preliminary injunction is dissolved; all other pending motions are denied as moot; the Clerk shall post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov. Signed by Judge Joseph R. Goodwin on 1/5/2023. (cc: counsel of record; any unrepresented party) (btm) |
| 01/05/2023 | 513 | JUDGMENT ORDER directing that judgment be entered in accordance with the 512 Memorandum Opinion and Order, and that this case be dismissed and stricken from the docket. Signed by Judge Joseph R. Goodwin on 1/5/2023. (cc: counsel of record; any unrepresented party) (btm) |
| 01/05/2023 | 514 | TRANSMITTED CERTIFIED COPY of 513 Judgment Order to counsel of record and any unrepresented party. (btm) |
| 01/20/2023 | 515 | MOTION by B. P. J., Heather Jackson to Stay Pending Appeal of 512 Memorandum Opinion and Order and 513 Judgment Order. (Attachments: # 1 Declaration of B. P. J., # 2 Declaration of Heather Jackson, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Proposed Order)(Ward, Nicholas) (Modified on 1/23/2023 to add link to #512 memorandum opinion and order and #513 judgment order) (kew). |
| 01/23/2023 | 516 | ORDER re: 515 MOTION by B. P. J., Heather Jackson to Stay Pending Appeal of 512 Memorandum Opinion and Order and 513 Judgment Order; directing the Defendants to jointly respond by 1/27/2023. Signed by Judge Joseph R. Goodwin on 1/23/2023. (cc: counsel of record; any unrepresented party) (lca) |
| 01/23/2023 | 517 | NOTICE OF APPEAL WITH FEE PAID by B. P. J., Heather Jackson as to 513 Judgment Order. Filing Fee $505. Receipt # AWVSDC-8349569. (Ward, Nicholas) |
| 01/24/2023 | 518 | TRANSMITTAL OF NOTICE OF APPEAL TO 4CCA via APPEAL TRANSMITTAL SHEET re: 517 Notice of Appeal to the 4CCA. (arb) |
| 01/24/2023 | 519 | NOTICE OF APPELLATE CASE OPENING BY 4CCA re: 517 Notice of Appeal to the 4CCA in 4CCA Case No. 23-1078. Case Manager: Anisha Walker. (arb) |

| | | |
|---|---|---|
| 01/27/2023 | 520 | RESPONSE by Lainey Armistead, W. Clayton Burch, Harrison County Board of Education, State of West Virginia, Dora Stutler, West Virginia Secondary School Activities Commission, West Virginia State Board of Education in opposition to 515 MOTION by B. P. J., Heather Jackson to Stay Pending Appeal of 512 Memorandum Opinion and Order and 513 Judgment Order. (Steele, Brandon) (Modified on 1/29/2023 to remove terminated party filer) (kew). |
| 01/30/2023 | 521 | REPLY by B. P. J., Heather Jackson to 520 Response In Opposition. (Ward, Nicholas) |
| 02/01/2023 | 522 | NOTICE OF APPEAL WITH FEE PAID by West Virginia Secondary School Activities Commission as to 512 Memorandum Opinion and Order and 513 Judgment Order. Filing Fee $505. Receipt # AWVSDC-8357053. (Green, Roberta) |
| 02/01/2023 | 523 | AMENDED CERTIFICATE OF SERVICE by West Virginia Secondary School Activities Commission for Notice of Appeal. (Green, Roberta) |
| 02/02/2023 | 524 | TRANSMITTAL OF NOTICE OF APPEAL TO 4CCA via APPEAL TRANSMITTAL SHEET re: 522 Notice of Appeal to the 4CCA. (lca) |
| 02/06/2023 | 525 | NOTICE OF APPELLATE CASE OPENING BY 4CCA re: 522 Notice of Appeal to the 4CCA in 4CCA Case No. 23-1130. Case Manager: Anisha Walker. (mfo) |
| 02/06/2023 | 526 | ORDER OF 4CCA as to 517 Notice of Appeal to the 4CCA and 522 Notice of Appeal to the 4CCA in 4CCA Case No. 23-1130. The court consolidates Case No. 23-1078 (L) and Case No. 23-1130 as cross-appeals. The appellants in Case No. 23-1078 (L) shall be considered the appellants for purposes of the consolidated appeals and shall proceed first at briefing and at oral argument. (lca) |
| 02/07/2023 | 527 | MEMORANDUM OPINION AND ORDER denying 515 MOTION by B. P. J., Heather Jackson to Stay Pending Appeal, as set forth more fully herein. Signed by Judge Joseph R. Goodwin on 2/7/2023. (cc: counsel of record; any unrepresented party) (kew) |
| 02/22/2023 | 528 | ORDER OF 4CCA directing that upon consideration of submissions relative to Appellants motion for stay pending appeal relief requested by February 26, 2023, which the court construes as a motion for an injunction pending appeal, the court grants the motion and stays the district courts January 5, 2023, order dissolving its preliminary injunction. (mfo) |
| 03/22/2023 | 529 | REDACTED EXHIBITS by Lainey Armistead in support of 286 MOTION by Lainey Armistead for Summary Judgment. (Steele, Brandon) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/25/2023 12:30:22 | | |
| **PACER Login:** | CL6324 | **Client Code:** | 344010-801-64105 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00316 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

*Defendants*.

Civil Action No. 2:21-cv-00316

Hon.

**DECLARATION OF LOREE STARK**

I, Loree Stark, declare under penalty of perjury of the laws of the United States of America

that the following is true and correct, and state:

1.      I am the Legal Director of the ACLU of West Virginia, counsel of record for

Plaintiff B.P.J, with her next friend and mother, Heather Jackson.  The following is true of my own

personal knowledge, and, if called as a witness, I would and could testify competently thereto.

2.      As set forth below, I have reviewed audio recordings and transcript excerpts of the

West Virginia Legislature's testimony regarding H.B. 3293.  Each excerpt that I reviewed is

accurately described in the respective Exhibit using the timestamp of testimony as available on the

West Virginia Legislature's public recordings, or in the audio files provided below.  I have also

provided hyperlinks where the recordings are available for review.  As of the date of this filing,

each of the hyperlinks is in working order.

3.      Attached hereto as Exhibit A is a true and correct copy of the enacted version of H.B. 3293 (codified at § 18-2-25d).  The bill's text can also be accessed on the West Virginia Legislature's website at:

https://www.wvlegislature.gov/Bill_Status/bills_text.cfm?billdoc=HB3293%20SUB%20ENR.htm&yr=2021&sesstype=RS&i=3293.

4.      Attached hereto as Exhibit B is a true and correct transcription of excerpts from testimony heard during the West Virginia House of Delegates Education Committee Meeting on or around March 18, 2021.  A recording of the testimony is available for download at: https://liquidfiles.cooley.com/link/02OaNUdHjag73hII87u1bQ (last accessed May 21, 2021).

5.      Attached hereto as Exhibit C is a true and correct transcription of excerpts from testimony heard during the West Virginia House of Delegates Judiciary Committee Meeting on or around March 18, 2021.   A recording of the testimony is available at: https://liquidfiles.cooley.com/link/IBA66jDqugGj5EM04cqf2Q (last accessed May 21, 2021).

6.      Attached hereto as Exhibit D is a true and correct transcription of excerpts from testimony heard during the West Virginia House of Delegates Hearing on or around March 25, 2021.  A recording of the testimony is available at:

https://www.youtube.com/watch?app=desktop&v=af_ikMx-PJU (last accessed May 21, 2021).

7.      Attached hereto as Exhibit E is a true and correct transcription of excerpts from testimony heard during the West Virginia Senate Hearing on or around April 8, 2021.  A recording of the testimony is available at: http://bit.ly/3bWYZVf  (accessed May 21, 2021).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

2

JA0050

Executed on May 26, 2021            _/s/ Loree Stark_____
                                    Loree Stark, Esq.

**West Virginia House of Delegates Education Committee**

**DATE:** Thursday, March 18, 2021

**MEMBERS:** Chairman Ellington, Vice-Chairman Higginbotham, Minority Chair Hornbuckle, Minority Vice-Chair Thompson, Delegates Bridges, Clark, Doyle, Evans, Griffith, Hamrick, Hanna, Horst, Jennings, Kelly, J., Kessinger, Kimble, Longanacre, Martin, Mazzocchi, Smith, Statler, Toney, Tully, Walker, Wamsley

Excerpts of testimony on House Bill 3293:

| Time Stamp | Testimony |
|---|---|
| 00:17:46-18:31 | [Delegate Evans]: I believe there definitely are. I stood on the football field this year against a team that definitely had a girl on the football field. We went to Webster County at one time, Webster County had a kicker female. So, I guess it is true that girls can play male sports.<br><br>[Counsel representing H.B. 3293]: Yes.<br><br>[Delegate Evans]: But males cannot play female sports?<br><br>[Counsel representing H.B. 3293]: That's currently the way, the current law-<br><br>[Delegate Evans]: So how does this, how does this bill then affect them, or does it affect it at all?<br><br>[Counsel representing H.B. 3293]: This bill would affect those that changed their sex after birth.<br><br>[Delegate Evans]: Okay. So it has nothing to do with current sex or like, like I'm a guy, I'm not going to change that. So it would not affect me?<br><br>[Counsel representing H.B. 3293] It would not affect you. |
| 00:22:00-00:22:20 | [Delegate Thompson]: Okay. Has, has your office received calls, concerns, complaints regarding anything remotely related to this |

Page 1 of 2

| | about students participating in, in sports or extracurricular activities that you know, that they're…?<br><br>[Sarah Stewart, West Virginia Department of Education]: Surrounding the conversation today, no, we have not. |
|---|---|
| 00:26:46-00:27:18 | [Delegate Walker]: Can you tell me if any trans women have dominated any sporting events?<br><br>[Andrew Schneider, Executive Director of Fairness West Virginia]: Not one athlete who has transitioned has been successful at the highest levels of sport. The lack of success is a strong indication of the fairness of permitting transgender women to compete against cisgender women. In fact, the problem with these bills is that they, they say that all bills, all boys are stronger than all girls. And that is just incorrect. |

### West Virginia House of Delegates

**DATE:** Thursday, March 25, 2021

**SPEAKERS REFERENCED:** Speaker Hanshaw, Clerk Harrison, Delegates Fluharty, Ellington, Garcia, Walker, Mazzochi

**HOUSE ROSTER:** https://www.wvlegislature.gov/house/roster.cfm

Excerpts of testimony on House Bill 3293:

| Time Stamp | Testimony |
|---|---|
| 03:04:56-03:05:19 | [Delegate Fluharty]: So, you know, you've heard, I'm sure you took some testimony up there in committee. Have you had, did you have any testimony of the number of complaints that SSAC has received regarding anybody taking advantage of the single-sex sport system we currently have?<br><br>[Delegate Ellington]: Not in West Virginia.<br><br>[Delegate Fluharty]: So not a single complaint received in West Virginia?<br><br>[Delegate Ellington]: Not at this point in time. |
| 03:17:52-03:18:58 | [Delegate Garcia]: Thank you Mr. Speaker. Each of us, when we put our name on the ballot, first question we were asked is, why do you want to go to Charleston? I didn't come to Charleston to create problems where they don't exist. We've heard that there's no complaints about this in the state of West Virginia, about this issue about some type of advantage, competitive advantage that, that, that individuals, that kids are making this decision just so they can do better at sports. That's not happening. But we are creating a problem. And I, I've talked to a lot of people, and last week was, was talking to somebody about infrastructure and they said, "Infrastructure, who cares? How can I stay in a state like West Virginia when you pass bills like this? When you take up bills like this? How can we get our young people to stay, and how can we ever attract somebody to our state?" |
| 03:26:32-03:31:33 | [Delegate Walker]: Thank you. I appreciate it. Colleagues. We just debated. Freedom. [inaudible 03:26:49] Same difference. I'm not the parent. I don't have a child who is transgender. And not all of us practice the same religion. And we need to be mindful of that while we share our truths, |

Page 1 of 3

**JA0054**

|  | respectfully. But what is so disheartening about this bill is that a child can play a sport until they get to secondary education, where their classmates may not see their differences at all. Where that child may not have been bullied before, we're opening up an opportunity.<br><br>This flag sits on my desk for all the children and adults who are thankful to be alive, and for those who have died. Transgender people, especially transgender black people, are killed at high numbers. If we're going to talk about the rules and the respect and the good book, let's think about those individuals. If we're going to pass judgment, and this is your truth and this is your conviction, what are we saying to the children? This is not about adults. These, this is about children. Those numbers couldn't be answered but I have them. 1.0% of West Virginians at age 13 to 17 years old identify as transgender. 1%. That's 1% that we're not going to allow in team sports, while we build team leadership and we build a bond. And we build athleticism, and we tell them right here, at secondary education, "You don't matter. You're not good enough."<br><br>Once again, I have to go back to when I went through my first year of being here. Cause we had a lot of truths today, and it shakes my soul. You called them butch, you called them the F word. You called them creatures, you called them a disgrace of God. You called them demons, you called them the devil. Well guess what I call them? Love.<br><br>I call them children. I call them future leaders. I call them trendsetters. I call them change makers. I call them to lead. I call them to use their voices. I call them to speak their pain. And I sit, uncomfortable in those moments, so they can have their own movement. Who is this bill helping, and who is it hurting? West Virginia, a place to live, work, raise a family if you choose, only if you're not transgender. Thank you, Mr. Speaker Pro-Tem. |
| 04:01:48-04:03:40 | [Delegate Mazzochi]: Thank you Speaker of Pro-Tem. This is not about freedom. This is about protection. To protect our little girls that are in school. I don't mind everybody playing together in a league. If there are the parents there and everybody, the parents can take, can take care of their children, can watch them. That is all beautiful. But in school at that age when they start at what? 11 or 12, 13, they are at a very important age. And they feel very, as a girl, they feel |

| | |
|---|---|
| | very conscious about their bodies. Not to say that those transgender children are not, but to be honest, I don't want all this mixing and matching and whatever in our, in these locker rooms, I'm sorry.<br><br>The, there is no adult there to supervise. I don't want all this, this, this, whatever you're saying there. You're making a big problem out of nothing. I am sorry. This is not—we have boys and we have girls and we have some that are somewhere in between, and it's a very small minority. And why are we making this a big, huge deal? It is not a big, huge deal that everybody can play in a league. If you have ever played soccer, and I'm telling you, we have our, my family brought soccer into Logan County and my little girl played with the boys and played against the boys. |
| 04:19:33-04:20:26 | [Delegate Ellington]: Thank you, Mr. Speaker. This issue came to the surface in the United States regarding transgenders a few years ago, when two transgender girls were allowed to compete in state track and field meets in Connecticut. They won a combined 15 girls' state indoor and outdoor championship races from 2017 to '19. That's one of the things that started the national debate. As I mentioned, there are 27 states that have put in legislation regarding this. And yes, there are 17 states and the District of Columbia that require inclusion. However, there are six states that have no policy regarding gender identity, or sports, regarding sports whatsoever, and we're one of those. |

Page 3 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff*, <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent, <br><br> *Defendants*. | Civil Action No.   2:21-cv-00316 <br><br> Hon. |

**DECLARATION OF HEATHER JACKSON**

I, Heather Jackson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2.     I am 53 years old.  My husband and I are the parents of two sons, ages 20 and 13, and an 11-year-old daughter.  We have been married for almost 21 years.  We live in Lost Creek, West Virginia.

3.     Our daughter's name is B.P.J.  My daughter and I have a very deep connection and I believe she knows that she can come to me for anything—I love her very much.

4.     I am fiercely protective of B.P.J.  As her mother, I want to see her be able to achieve all of her dreams.

5.     B.P.J. is bright and studious; she makes "straight As" and loves math and science.

6.     B.P.J. is also transgender.  B.P.J. knew from a very young age that "she didn't want her boy parts."  She never wanted to be naked for bathing because she was deeply

1

uncomfortable with and did not want to see certain parts of her body. B.P.J. also did not like standing up to urinate. She would often ask me a lot of questions about my own body and about why our bodies were physically different, if we were both girls.

7.      As a child, B.P.J. also presented differently than my other children, both of whom are boys. At or around the age of four, B.P.J. started asking and was allowed to play dress-up in my clothes around our home. Whenever B.P.J. was provided with the opportunity to pick out her clothes or toys, she always went straight for the "girly" items. I knew this was not a "phase" for her, and that there was something different happening.

8.      When B.P.J. told us that she is a girl and wants to be addressed as a girl, I was not surprised because I spend so much time with her.

9.      Because B.P.J. and I have such an open and communicative relationship, we would have conversations about how she was feeling. The more we talked and the more comfortable she became with expressing how she was feeling and who she is, the more she was able to clearly communicate that she knew she was a girl.

10.     By the time B.P.J. was in the third grade she had chosen her name and was living as herself at home. Towards the end of that school year, B.P.J. informed her father and me that she did not want to continue going to school "dressed as a boy." We agreed she could start going to school dressed as herself.

11.     In 2019, B.P.J. was diagnosed by Dr. Gerald T. Montano at University of Pittsburgh Medical Center with gender dysphoria.

12.     Early in B.P.J.'s social transition, she began seeing a therapist experienced in treating transgender children. In late 2019, when B.P.J.'s gender dysphoria was especially

severe, causing her to be depressed and anxious, her father and I would take her to visit her therapist more often than usual.

13.   B.P.J. started puberty-delaying treatment on June 15, 2020 and has been on this treatment for almost a year.  She began this care under the treatment of a multidisciplinary team of providers, and continues to see providers with expertise in transgender children.

14.   B.P.J. is young and just beginning to explore her interest in sports.

15.   During the 2019-20 and 2020-21 school years, B.P.J. was a member of the cheerleading team for the Bridgeport Youth Football League.  All members of that team were girls.  Even before B.P.J. started cheering with her team, she spent a year learning all the cheer team's routines from the stands.  When B.P.J. received her girls' cheer uniform, she was glowing.  B.P.J. always wanted me to be in the front row of her competitions. During the 2019-20 season, for the first time ever, B.P.J.'s cheer team placed at a cheer competition.

16.   Being on the cheer team dramatically increased B.P.J.'s confidence and happiness.  B.P.J. was supported and accepted by the other girls on her team and her coaches. B.P.J.'s participation on her cheer team taught her the importance of responsibility, trust, and team building.  B.P.J. is especially proud to have served as part of the base for her cheer team's pyramids because it demonstrated to her that her teammates trusted and relied on her in order to complete their routine.

17.   Participating in cheer was a meaningful way for B.P.J. to learn responsibility.  As her mother, I can preach about the importance of responsibility, but her position on her cheer team provided her with the real-life experience of having others rely on her to attend practice and participate, and this has helped her understand responsibility in a deeply personal and meaningful way.

18.     Although B.P.J. enjoyed cheerleading, she joined the cheer team in part because it was one of the only sports offered to her grade level that she was interested in participating in. When B.P.J. begins junior high, however, she wants to try out for Bridgeport Middle School's girls' cross-country and track teams.  I think that B.P.J. may also wish to try out for basketball and/or volleyball, in addition to trying out for and participating on the girls' cross-country and track teams.

19.     From past experience with both of my sons, I believe that the cross-country team starts practicing in July of 2021.  In the past, to be eligible to try out for the team when school starts in August, students must have already participated in 14 practices.  If B.P.J. is unable to begin practicing with other girls in July, she will not have enough time to put 14 practices under her belt before try-outs.

20.     Having the opportunity to run on the cross-country and track teams is important to B.P.J. because B.P.J. comes from a family of runners.  When she was younger, I would take B.P.J. on runs with me through parks and she grew up watching her brothers run on their school teams.  B.P.J. sees my medals on our walls from when I run 5Ks, and her brothers' medals, and she wants the opportunity to be able to run and win some for herself.  More importantly, she wants a continued sense of belonging and camaraderie like she had with the cheer team.

21.     I am so excited for B.P.J. to run and I am truly looking forward to attending her future cross-country and track meets.  B.P.J.'s brothers also are both excited for B.P.J. and looking forward to seeing their sister compete.

22.     B.P.J. has the support of her family, coaches, instructors, and peers.  Our family is very supportive, and my 75-year-old mother, B.P.J.'s grandmother, and step-grandfather are B.P.J.'s biggest supporters.

23.     On May 18, 2021, during a meeting with B.P.J.'s new Principal at Bridgeport Middle School, David Mazza, I was informed that because of H.B. 3293, my daughter will not be permitted to participate on the girls' cross-country or track teams this coming school year.

24.     Principal Mazza explained to me (apparently based on his incorrect assumption that running on the boys' team is an option for B.P.J.) that the coaches for both the girls' and boys' cross-country teams will need to be informed that my daughter is transgender. Principal Mazza told me that this disclosure is necessary because B.P.J. looks and presents like a female, and it would be confusing for the girls' cross-country coach if she saw one of the girls walking over to the boys' side while the teams were practicing.

25.     I am also aware that to try out and participate in the girls' cross-country team, B.P.J. needs to submit a form issued by the West Virginia Secondary School Activities Commission, and completed in part by a physician after a physical exam. A true and correct copy of this form is attached as Exhibit A. The form contains detailed questions about the student's medical history, but does not ask for the student's sex, genetics, or reproductive anatomy.

26.     B.P.J. is a girl. It makes no sense for her to run with the boys. Forcing B.P.J. to compete on the boys' cross-country or track teams will mean that she will stand out like a sore thumb. B.P.J. knows she is not a boy, and we know she is not a boy.

27.     Forcing B.P.J. to run with the boys would completely erase who she is, and it would devastate her. My daughter is simply saying, "Accept me for who I am." Forcing her to run to with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___5-25 - 2021___

Heather Jackson

6

# EXHIBIT A

**WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION** 2021
2875 Staunton Turnpike - Parkersburg, WV 26104
**ATHLETIC PARTICIPATION/PARENTAL CONSENT/PHYSICIAN'S CERTIFICATE FORM**
(Form required each school year on or after May 1st.  File in School Administration Office)

## ATHLETIC PARTICIPATION / PARENTAL CONSENT
### PART I

Name _____ School Year:_____ Grade Entering:_____

Home Address:_____ Home Address of Parents: _____

City: _____ City: _____

Phone: _____ Date of Birth: _____ Place of Birth: _____

Last semester I attended _____(High School) or (Middle School).  We have read the condensed eligibility rules of the WVSSAC athletics.  If accepted as a team member, we agree to make every effort to keep up school work and abide by the rules and regulations of the school authorities and the WVSSAC.

### INDIVIDUAL ELIGIBILITY RULES

Attention Athlete!  To be eligible to represent your school in any interscholastic contest, you:
_____ must be a regular bona fide student in good standing of the school.  (See exception under Rule 127-2-3)
_____ must qualify under the Residence and Transfer Rule (127-2-7)
_____ must have earned at least 2 units of credit the previous semester.  Summer School may be included. (127-2-6)
_____ must have attained an overall "C" (2.00) average the previous semester.  Summer School may be included. (127-2-6)
_____ must not have reached your 15th (MS), 19th (HS) birthday before August 1 of the current school year. (127-2-4)
_____ must be residing with parent(s) as specified by Rule 127-2-7 and 8.
_____ unless parents have made a bona fide change of residence during school term.
_____ unless an AFS or other Foreign-Exchange student (one year of eligibility only).
_____ unless the residence requirement was met by the 365 calendar days attendance prior to participation.
_____ if living with legal guardian/custodian, may not participate at the varsity level. (127-2-8)
_____ must be an amateur as defined by Rule 127-2-11.
_____ must have submitted to your principal before becoming a member of any school athletic team Participation/Parent Consent/Physician Form, completely filled in and properly signed, attesting that you have been examined and found to be physically fit for athletic competition and that your parents consent to your participation. (127-3-3)
_____ must not have transferred from one school to another for athletic purposes. (127-2-7)
_____ must not have received, in recognition of your ability as a HS or MS athlete, any award not presented or approved by your school or the WVSSAC. (127-3-5)
_____ must not, while a member of a school team in any sport, become a member of any other organized team or as an individual participant in an unsanctioned meet or tournament in the same sport during the school sport season (See exception 127-2-10).
_____ must follow All Star Participation Rule.  (127-3-4)
_____ must not have been enrolled in more than (8) semesters in grades 9 to 12.  Must not have participated in more than three (3) seasons while in grades 6-7-8. (Rule 127-2-5).
_____ qualify under homeschool rule. (Rule 127-2-3.11, 127-2-7.2k, 126-26-3.1.1k)

**Eligibility to participate in interscholastic athletics is a privilege you earn by meeting not only the above listed minimum standards but also all other standards set by your school and the WVSSAC.**  If you have any questions regarding your eligibility or are in doubt about the effect any activity or action might have on your eligibility, check with your principal or athletic director.  They are aware of the interpretation and intent of each rule.  Meeting the intent and spirit of WVSSAC standards will prevent athletes, teams, and schools from being penalized.

## PART II - PARENTAL CONSENT

In accordance with the rules of the WVSSAC, I give my consent and approval to the participation of the student named above for the sport **NOT MARKED OUT BELOW:**

| | | | | |
|---|---|---|---|---|
| BASEBALL | CROSS | GOLF | SWIMMING | VOLLEYBALL |
| BASKETBALL | COUNTRY | SOCCER | TENNIS | WRESTLING |
| CHEERLEADING | FOOTBALL | SOFTBALL | TRACK | BAND |

**MEDICAL DISQUALIFICATION OF THE STUDENT-ATHLETE / WITHHOLDING A STUDENT-ATHLETE FROM ACTIVITY**

The member school's team physician has the final responsibility to determine when a student-athlete is removed or withheld from participation due to an injury, an illness or pregnancy.  In addition, clearance for that individual to return to activity is solely the responsibility of the member school's team physician or that physician's designated representative.

I understand that participation may include, when necessary, early dismissal from classes and travel to participate in interscholastic athletic contests.  I will not hold the school authorities or West Virginia Secondary School Activities Commission responsible in case of accident or injury as a result of this participation.  I also understand that participation in any of those sports listed above may cause permanent disability or death.  Please check appropriate space: He/She has student accident insurance available through the school (   ); has football insurance coverage available through the school (   ); is insured to our satisfaction (   ).

I also give my consent and approval for the above named student to receive a physical examination, as required in Part IV, Physician's Certificate, of this form, by an approved health care provider as recommended by the named student's school administration.

I consent to WVSSAC's use of the herein named student's name, likeness, and athletically related information in reports of Inter-School Practices or Scrimmages and Contests, promotional literature of the Association, and other materials and releases related to interscholastic athletics.

**I have read/reviewed the concussion and Sudden Cardiac Arrest information as available through the school and at WVSSAC.org.  (Click Sports Medicine)**

Date: _____Student Signature_____Parent Signature_____

**JA0064**

## PART III – STUDENT'S MEDICAL HISTORY
### (To be completed by parent or guardian prior to examination)

Name _____ Birthdate _____/_____/_____ Grade _____ Age _____

Has the student ever had:

Yes No  1. Chronic or recurrent illness? (Diabetes, Asthma, Seizures, etc.,)
Yes No  2. Any hospitalizations?
Yes No  3. Any surgery (except tonsils)?
Yes No  4. Any injuries that prohibited your participation in sports?
Yes No  5. Dizziness or frequent headaches?
Yes No  6. Knee, ankle or neck injuries?
Yes No  7. Broken bone or dislocation?
Yes No  8. Heat exhaustion/sun stroke?
Yes No  9. Fainting or passing out?
Yes No  10. Have any allergies?
Yes No  11. Concussion?  If Yes_____
                                         Date(s)

Yes No  12. Have any problems with heart/blood pressure?
Yes No  13. Has anyone in your family ever fainted during exercise?
Yes No  14. Take any medicine? List _____
Yes No  15. Wear glasses ___, contact lenses___, dental appliances___?
Yes No  16. Have any organs missing (eye, kidney, testicle, etc.)?
Yes No  17. Has it been longer than 10 years since your last tetanus shot?
Yes No  18. Have you ever been told not to participate in any sport?
Yes No  19. Do you know of any reason this student should not participate in sports?
Yes No  20. Have a sudden death history in your family?
Yes No  21. Have a family history of heart attack before age 50?
Yes No  22. Develop coughing, wheezing, or unusual shortness of breath when you exercise?
Yes No  23. (Females Only) Do you have any problems with your menstrual periods.

**PLEASE EXPLAIN ANY "YES" ANSWERS OR ANY OTHER ADDITIONAL CONCERNS.**

I also give my consent for the physician in attendance and the appropriate medical staff to give treatment at any athletic event for any injury.

SIGNATURE OF PARENT OR GUARDIAN _____ DATE _____/_____/_____

## PART IV – VITAL SIGNS

Height _____ Weight _____ Pulse _____ Blood Pressure _____

Visual acuity:  Uncorrected _____/_____; Corrected _____/_____; Pupils equal diameter:  Y  N

## PART V – SCREENING PHYSICAL EXAM
### This exam is not meant to replace a full physical examination done by your private physician.

| Mouth: | | | Respiratory: | | | Abdomen: | | |
|---|---|---|---|---|---|---|---|---|
| Appliances | Y | N | Symmetrical breath sounds | Y | N | Masses | Y | N |
| Missing/loose teeth | Y | N | Wheezes | Y | N | Organomegaly | Y | N |
| Caries needing treatment | Y | N | Cardiovascular: | | | Genitourinary (males only); | | |
| Enlarged lymph nodes | Y | N | Murmur | Y | N | Inguinal hernia | Y | N |
| Skin - infectious lesions | Y | N | Irregularities | Y | N | Bilaterally descended testicles | Y | N |
| Peripheral pulses equal | Y | N | Murmur with Valsalva | Y | N | | | |

**Any "YES" under Cardiovascular requires a referral to family doctor or other appropriate healthcare provider.**

Musculoskeletal:  (note any abnormalities)

| Neck: | Y | N | Elbow: | Y | N | Knee/Hip: | Y | N | Hamstrings: | Y | N |
|---|---|---|---|---|---|---|---|---|---|---|
| Shoulder: | Y | N | Wrist: | Y | N | Ankle: | Y | N | Scoliosis: | Y | N |

RECOMMENDATIONS BASED ON ABOVE EVALUATION:

After my evaluation, I give my:

_____ Full Approval;

_____ Full approval; but needs further evaluation by Family Dentist ____; Eye Doctor ____; Family Physician _____; Other ____;

_____ Limited approval with the following restrictions: _____;

_____ Denial of approval for the following reasons: _____.

_____     _____/_____/_____

MD/DO/DC/Advanced Registered Nurse Practitioner/Physician's Assistant                           Date

# DON'T LET AN INJURY LEAD TO AN OPIOID ADDICTION

### 2 MILLION ATHLETES ARE EXPECTED TO SUFFER A SPORTS INJURY THIS YEAR

### MANY OF THESE ATHLETES WILL BE PRESCRIBED OPIOID PAINKILLERS

### 75% OF HIGH SCHOOL HEROIN USERS STARTED WITH PRESCRIPTION OPIOIDS

## HIGH SCHOOL ATHLETES ARE AT RISK OF BECOMING ADDICTED TO PRESCRIPTION DRUGS

- 28.4% used medical opioids at least once over a three year period.

- 11% of high school athletes have used an opioid medication for nonmedical reasons.

- Nearly 25% of students who chronically use prescription opioids also use heroin.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • •

## WHAT ARE OPIOIDS?

Opioids are a powerful and addictive type of prescription painkiller that have similar chemical properties and addiction risks as heroin. While opioids may provide temporary relief, they do nothing to address the underlying injury and can have serious side effects.

**These drugs may lead to: dependence, tolerance, accidental overdose, coma and death.**

The most common prescribed opioid painkillers in West Virginia are:

- Oxycodone (OxyContin)

- Hydrocodone (Lortab and Vicodin)

## HOW TO PROTECT YOUR CHILD

- Talk to your healthcare provider about alternative pain management treatment options (see below).

  First-time prescription opioid users have a 64% higher risk of early death than patients who use alternative pain medication.

- If your child is prescribed an opioid painkiller, talk about the dangers of misusing medication, including overuse and medication sharing.

- Monitor your child's intake of prescription medication to ensure he/she is following dosage instructions.

- Safely dispose of any unused medication through a prescription drug drop box or a DEA Take-Back program.

### NON-NARCOTIC PAIN MANAGEMENT ALTERNATIVES

Physical Therapy
Chiropractic
Massage Therapy
Acupuncture
Over-the-Counter Medication




WEST VIRGINIA
ATTORNEY GENERAL'S OFFICE

West Virginia
Board of Medicine



**A FACT SHEET FOR PARENTS**

## What is a concussion?

A concussion is a type of traumatic brain injury. Concussions are caused by a bump or blow to the head. Even a "ding," "getting your bell rung," or what seems to be a mild bump or blow to the head can be serious.

You can't see a concussion. Signs and symptoms of concussion can show up right after the injury or may not appear or be noticed until days or weeks after the injury. If your child reports any symptoms of concussion, or if you notice the symptoms yourself, seek medical attention right away.

## What are the signs and symptoms of a concussion?

If your child has experienced a bump or blow to the head during a game or practice, look for any of the following signs of a concussion:

| SYMPTOMS REPORTED BY ATHLETE | SIGNS OBSERVED BY PARENTS/GUARDIANS |
|---|---|
| • Headache or "pressure" in head<br>• Nausea or vomiting<br>• Balance problems or dizziness<br>• Double or blurry vision<br>• Sensitivity to light<br>• Sensitivity to noise<br>• Feeling sluggish, hazy, foggy, or groggy<br>• Concentration or memory problems<br>• Confusion<br>• Just "not feeling right" or "feeling down" | • Appears dazed or stunned<br>• Is confused about assignment or position<br>• Forgets an instruction<br>• Is unsure of game, score, or opponent<br>• Moves clumsily<br>• Answers questions slowly<br>• Loses consciousness (even briefly)<br>• Shows mood, behavior, or personality changes |

## How can you help your child prevent a concussion or other serious brain injury?

• Ensure that they follow their coach's rules for safety and the rules of the sport.
• Encourage them to practice good sportsmanship at all times.
• Make sure they wear the right protective equipment for their activity. Protective equipment should fit properly and be well maintained.
• Wearing a helmet is a must to reduce the risk of a serious brain injury or skull fracture.
  – However, helmets are not designed to prevent concussions. There is no "concussion-proof" helmet. So, even with a helmet, it is important for kids and teens to avoid hits to the head.

## What should you do if you think your child has a concussion?

SEEK MEDICAL ATTENTION RIGHT AWAY. A health care professional will be able to decide how serious the concussion is and when it is safe for your child to return to regular activities, including sports.

KEEP YOUR CHILD OUT OF PLAY. Concussions take time to heal. Don't let your child return to play the day of the injury and until a health care professional says it's OK. Children who return to play too soon—while the brain is still healing—risk a greater chance of having a repeat concussion. Repeat or later concussions can be very serious. They can cause permanent brain damage, affecting your child for a lifetime.

TELL YOUR CHILD'S COACH ABOUT ANY PREVIOUS CONCUSSION. Coaches should know if your child had a previous concussion. Your child's coach may not know about a concussion your child received in another sport or activity unless you tell the coach.

> **If you think your teen has a concussion:**
> Don't assess it yourself. Take him/her out of play. Seek the advice of a health care professional.

## It's better to miss one game than the whole season.

For more information, visit **www.cdc.gov/Concussion**.

April 2013





## What is Sudden Cardiac Arrest?

- Occurs suddenly and often without warning.
- An electrical malfunction (short-circuit) causes the bottom chambers of the heart (ventricles) to beat dangerously fast (ventricular tachycardia or fibrillation) and disrupts the pumping ability of the heart.
- The heart cannot pump blood to the brain, lungs and other organs of the body.
- The person loses consciousness (passes out) and has no pulse.
- Death occurs within minutes if not treated immediately.

## What are the symptoms/warning signs of Sudden Cardiac Arrest?

- SCA should be suspected in any athlete who has collapsed and is unresponsive
- Fainting, a seizure, or convulsions during physical activity
- Dizziness or lightheadedness during physical activity
- Unusual fatigue/weakness
- Chest pain
- Shortness of breath
- Nausea/vomiting
- Palpitations (heart is beating unusually fast or skipping beats)
- Family history of sudden cardiac arrest at age <50

**ANY of these symptoms/warning signs may necessitate further evaluation from your physician before returning to practice or a game.**

## What causes Sudden Cardiac Arrest?

- Conditions present at birth (inherited and non-inherited heart abnormalities)
- A blow to the chest (Commotio Cordis)
- An infection/inflammation of the heart, usually caused by a virus. (Myocarditis)
- Recreational/Performance-Enhancing drug use.
- Other cardiac & medical conditions / Unknown causes.  (Obesity/Idiopathic)

## What are ways to screen for Sudden Cardiac Arrest?

- The American Heart Association recommends a pre-participation history and physical which is mandatory annually in West Virginia.
- Always answer the heart history questions on the student Health History section of the WVSSAC Physical Form completely and honestly.
- Additional screening may be necessary at the recommendation of a physician.

## What is the treatment for Sudden Cardiac Arrest?

- Act immediately; time is critical to increase survival rate
- Activate emergency action plan
- Call 911
- Begin CPR
- Use Automated External Defibrillator (AED)

## Where can one find additional information?

- Contact your primary health care provider
- American Heart Association (www.heart.org)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>                              *Plaintiff*,<br><br>        v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent,<br><br>                              *Defendants*. | Civil Action No.<br><br>Hon. |

**DECLARATION OF      J**

I, B.P.J., pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2.      I am a girl who is also transgender. I am 11 years old and will be entering the sixth grade this fall at Bridgeport Middle School.  I have two older brothers, ages 13 and 20 years old. I live with my brothers; my Mom, Heather; and my Dad, Wesley in Lost Creek, West Virginia.

3.      Some of my favorite things to do include playing outside with our family's dogs, riding my bike, and jumping on the trampoline.  I am very passionate about math and science and make straight As in school.  Also, I like to play videogames like Apex Legends and Minecraft.

4.      I am a girl.  When I was younger, I remember wanting to play in my mom's clothing and always liking pink and "girly" items.

1

5.      My mom has always been supportive of me, so talking to her about how I was feeling about being a girl and that I wanted to go by the name B.P.J. felt normal to me.

6.      After I talked with my parents about being a girl and wanting to go by the name B.P.J., my mother and father were supportive and began taking me to a therapist who works with transgender people.  I was diagnosed with gender dysphoria.

7.      I am currently on puberty-delaying medication and have been for almost a year.

8.      I first got into cheering because my mom encouraged me to try a sport.  Since I had spent time learning cheer routines while in the stands and my friends were also on the cheer team, I decided to pursue cheer.

9.      I really liked being a cheerleader.  It was fun.  I liked having the chance to be on a team with my friends and learning how to do all the cheers.  I never had any problems with the other girls on the team.

10.     During my first year on the cheer team, our team placed at a cheer competition for the first time ever.  We got third place in competition   It made me feel proud and good about myself to work hard and succeed as a team.

11.     Heading into junior high school, I am excited to try out for the girls' cross-country and track teams.  Although I really enjoyed my time on the cheer team, I sometimes got "stage fright" and would prefer to take up a new sport.  Since I was young, I have always enjoyed running and everyone in my family runs.  My older brothers run cross-country, and my mom runs too.  Seeing my family run has motivated me to want to try out and participate.

12.     Knowing I cannot try out for the girls' cross-country and track teams just because I am a transgender girl is horrible and makes me feel angry and sad.  It hurts to know that I will

not be able to have the chance to run on the girls' team like my friends can because I am a transgender girl.

13.     I do not want to run with the boys and I should not have to run with the boys.

14.     Running with the girls means a lot to me because I am a girl, and I should be treated like a girl.  If I do not get to participate in cross-country or track, I will miss out on the opportunity to spend time with my friends and grow with a new team.

15.     I just want to have a chance to participate in school sports like any other girl.  It is frustrating and hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender.

* * *

**JA0071**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___5-24-2021___         B. P. JC.
                                    B.P.J.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>          *Plaintiff*,<br><br>    v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent,<br><br>          *Defendants*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**SUPPLEMENTAL DECLARATION OF KATELYN KANG**

I, Katelyn Kang, declare under penalty of perjury of the laws of the United States of America that the following is true and correct, and state:

1.     I am an attorney with the law firm Cooley LLP, counsel of record for Plaintiff B.P.J, with her next friend and mother, Heather Jackson.  The following is true of my own personal knowledge, and, if called as a witness, I would and could testify competently thereto.

2.     As set forth below, I have reviewed audio recordings and provided full transcripts of the West Virginia Legislature's testimony regarding H.B. 3293.  Each transcript is accurately described in the respective Exhibit and transcribed to the best of my ability.  Each transcript contains timestamps of testimony as available on the West Virginia Legislature's public recordings, or in the audio files provided below.  I have also provided hyperlinks where the recordings are available for review.  As of the date of this filing, each of the hyperlinks is in working order.

3.      Attached hereto as Exhibit A is a true and correct transcription of testimony heard during the West Virginia House of Delegates Education Committee Meeting on or around March 18, 2021.     A    recording    of    the    testimony    is    available    for    download    at: https://liquidfiles.cooley.com/link/02OaNUdHjag73hII87u1bQ (last accessed June 7, 2021).

4.      Attached hereto as Exhibit B is a true and correct transcription of testimony heard during the West Virginia House of Delegates Judiciary Committee Meeting on or around March 18,    2021.        A    recording    of    the    testimony    is    available    at: https://liquidfiles.cooley.com/link/IBA66jDqugGj5EM04cqf2Q (last accessed June 7, 2021).

5.      Attached hereto as Exhibit C is a true and correct transcription of testimony heard during the West Virginia House of Delegates Hearing on or around March 25, 2021.  A recording of the testimony is available at:

https://www.youtube.com/watch?app=desktop&v=af_ikMx-PJU (last accessed June 7, 2021).

6.      Attached hereto as Exhibit D is a true and correct transcription of testimony heard during the first part of the West Virginia Senate Education Committee on or around April 1, 2021. A recording of the testimony is available at:

http://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20210330/-1/50887 (last accessed June 7, 2021).

7.      Attached hereto as Exhibit E is a true and correct transcription of testimony heard during the second part of the West Virginia Senate Education Committee on or around April 1, 2021.     A    recording    of    the    testimony    is    available    at:    http://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20210401/-1/50893   (last accessed June 7, 2021).

8.      Attached hereto as Exhibit F is a true and correct transcription of testimony heard during the West Virginia Senate Hearing on or around April 8, 2021.  A recording of the testimony is available at:

http://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20210408/-1/50919 (accessed June 7, 2021).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 9, 2021                    */s/ Katelyn Kang*
                                             Katelyn Kang, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                              *Plaintiff*,

        v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

                              *Defendants*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

### CERTIFICATE OF SERVICE

I, Andrew D. Barr, do hereby certify that on this 9th day of June, 2021, I electronically filed a

true and exact copy of the ***Supplemental Declaration of Katelyn Kang*** with the Clerk of Court

and all parties using the CM/ECF System.

                              */s/ Andrew D. Barr*
                              Colorado Bar No. 49644
                              Admitted *pro hac vice*

4
JA0076

**West Virginia House of Delegates Education Committee Discussion of H.B. 3293**

**March 18, 2021**

| | | |
|---|---|---|
| Chairman Ellington: | 00:00:00 | And some of the potential witnesses today or testimony today. Um, clerk, uh, will take us out on quorum and we do have a quorum. So, uh, Vice Chair make a motion to accept the minutes from the previous meeting. |
| Vice Chair: | 00:00:16 | Uh, Mr. Chairman, I move the minutes as presented in the packet, be approved. |
| Chairman Ellington: | 00:00:23 | Uh, you heard the Vice Chair. Any, uh, questions, additions, deletions, directions? Chair here is now all in favor of accepting the minutes from the previous meeting, say aye. |
| Audience: | 00:00:32 | Aye. |
| Chairman Ellington: | 00:00:34 | Those opposed, nay. Ayes appear to have it. Ayes do have it. Minutes adopted. First on the agenda will be an originating bill. Is there any interest in the bill? |
| Counsel: | 00:00:43 | Chairman Ellington, I move the bill. |
| Chairman Ellington: | 00:00:45 | All right, Counsel. Counsel, explain the bill. |
| Counsel: | 00:00:47 | Thank you Chairman Ellington. This bill uh, mens' current code with regard to admission and, uh, participation in single-sex sports. Uh, the bill provides that the birth certificate required for admission to public school must confirm the pupil's sex at the time of birth and the birth certificate. If a birth certificate cannot be obtained, a signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted.

The sex confirmed at the time of admission shall be the pupil's sex for the purposes of participating in SSAC, single-sex interscholastic athletic events. Prior to the students' participation, uh, the SSAC must verify with the county board that each student participating in the single-sex athletics is participating according to, uh, sex listed according to, um, the county provision. And this requirement does not require, it does not apply to co, coed sports, and that's the bill, Mr. Chairman. |
| Chairman Ellington: | 00:01:51 | All right. Any questions of the bill of Counsel? Gentlemen from the, uh, was it 43rd? |
| Del. Thompson: | 00:02:00 | Yep. |

| | | |
|---|---|---|
| Chairman Ellington: | 00:02:01 | I got it right this time. |
| Del. Thompson: | 00:02:10 | Thank you Chairman Ellington. Counsel, would this, if this was adopted, would this apply to, um, all ages, middle school and high school? |
| Counsel: | 00:02:19 | Middle school and high school, not elementary. |
| Del. Thompson: | 00:02:21 | Mm-hmm (affirmative). |
| Counsel: | 00:02:21 | So secondary. |
| Del. Thompson: | 00:02:22 | Okay. Um, how would, the way this bill is written and drafted, you mentioned birth certificate, but, um, so are we going to re-have to require a birth certificate for every time a student wants to play basketball or football? |
| Counsel: | 00:02:41 | No, if you, if you look at the, um, the originating bill, I'm on page one, "Birth certificate is required upon admission to public school." So this just requires that the sex be identified at that time. And then uh, that is the sex that the county would follow, when the student is participating in sports. So know that, that that's already done at the enrollment admissions stage. |
| Del. Thompson: | 00:03:14 | Okay. And correct me if I'm wrong on this, but would this preclude any student from actually participating in a sport? |
| Counsel: | 00:03:25 | It would preclude an opposite sex person from participating in, like in, in, in the opposite sex sport. |
| Del. Thompson: | 00:03:33 | Okay. So would this, like so if a, uh, a person who was born biologically male, um, let me rephrase. A person was born biologically female, but later in life, um, they have began the transition process to identify and become a male. With this bill, and they're taking testosterone, they are taking, they're under medical care and, uh, they're transitioning. So this bill would require them to play, even if they're taking testosterone, they'd be required to play, uh, girls basketball versus boys basketball, which is what they would identify with? |
| Counsel: | 00:04:14 | Right. If I understood, if the person was born as a female, yes. That person would under this, under this bill as it is, would have to apply. |
| Del. Thompson: | 00:04:23 | Even though they're, they're transitioning take it. They might even, they, uh, you know, they appear masculine, they are taking testosterone, they would have to play female sports? |
| Counsel: | 00:04:34 | Correct. |

| | | |
|---|---|---|
| Del. Thompson: | 00:04:35 | Okay. Um, have any other states adopted this? |
| Counsel: | 00:04:43 | Uh, to my knowledge, no other states have. Um, well actually, I, I think there are a couple of states that may have passed similar laws. Um, but in most cases, a lot of those are pending. Uh- |
| Del. Thompson: | 00:04:56 | Am I correct in North Carolina? Did they, did they attempt to pass something similar to this? |
| Counsel: | 00:05:05 | Just a second. |
| Del. Thompson: | 00:05:06 | I believe so. Like maybe around like 2016 or 2017, I thought. |
| Counsel: | 00:05:12 | Uh, hmm. I don't, I don't know about North Carolina. I know there are other states that have, um, introduced various types of legislation. And I don't, that doesn't mean that I think there, there definitely are other states that have looked at different sides of the issue and, um, some have addressed it in policy or have attempted to address it in the legislation. But, um, I don't know specifically about North Carolina. |
| Del. Thompson: | 00:05:37 | So currently, um, students right now who identify, um, with an opposite sex of what they were assigned at birth, they can play whatever sport that they identify with. Is that correct? |
| Counsel: | 00:05:51 | Uh, I, the way I understand it is that, a student would participate in whatever way they're identified in WVEIS. And so that would actually be up to how the county identifies the students. So- |
| Del. Thompson: | 00:06:06 | So this would— |
| Counsel: | 00:06:07 | I'm not sure, I think the answer would be, it depends on how the county identified the student in WVEIS. |
| Del. Thompson: | 00:06:11 | Okay. Um, at, at the appropriate time Chairman Ellington, I don't know who would be appropriate to maybe to really clarify that question for me and is there, maybe the SSAC or, uh, maybe someone from the State Department to kind of get a better understanding of that particular question at the appropriate time. |
| Chairman Ellington: | 00:06:31 | Will do. |
| Del. Thompson: | 00:06:31 | Um, thank you. And then, uh, Counsel is, to your knowledge, um, would this apply to, uh, would this apply only, uh, like you said, secondary school in middle school and high school. Would this have any implications to collegiate sports? |
| Counsel: | 00:06:54 | No, it would not. |

Page 3 of 19

JA0079

| Del. Thompson: | 00:06:55 | Okay. Uh, no further questions at this time. I may have some later though. |
| Chairman Ellington: | 00:07:01 | All right. Gentleman from the 67th. |
| Del. Doyle: | 00:07:04 | Uh, thank you, Chairman Ellington. Uh, Counsel, to follow up on that. Um, the uh, and, and as background, um, some of us, some may be aware that this past football season Vanderbilt University had a female place kicker. Uh, she kicked in several games and is, am I correct that if we pass this bill, that would be prohibited, say for a high school football team in West Virginia, but it would be okay for a college team? |
| Counsel: | 00:07:39 | I believe that in an, I'm, maybe someone from the, um, department will be able to um, clarify this. But- |
| Del. Doyle: | 00:07:39 | Yeah, I, I- |
| Counsel: | 00:07:47 | Even under title, Title IX, if there is not a female sport that the female, that the females must be able to join a male team. |
| Del. Doyle: | 00:07:59 | So- |
| Counsel: | 00:07:59 | So I don't think that is correct. |
| Del. Doyle: | 00:08:01 | So if a high school had a female football team, uh, that person would have to kick for the female football team? |
| Counsel: | 00:08:08 | Correct. |
| Del. Doyle: | 00:08:09 | But would not be prohibited from kicking for the male football team? Uh, do you know of any high schools in West Virginia that have female football teams? |
| Counsel: | 00:08:19 | I don't. |
| Del. Doyle: | 00:08:19 | Thank you. Uh, and, and as background, what had happened here was, two of the place kickers for Vanderbilt, were injured. And the, the woman, uh, this woman was, was a first-rate soccer player and a number of the male football players went to the coach and said, "Listen, we need a kicker and she can do it." This would be prohibited for a high school in West Virginia. Is that correct if this bill passed? |
| Counsel: | 00:08:44 | I don't think so, no. Not according to Title IX. |
| Del. Doyle: | 00:08:48 | So you think Title IX might override this, uh, the, the statute? |
| Counsel: | 00:08:55 | When there is not a female sport, um, federal law- |

| Del. Doyle: | 00:09:01 | Okay. |
|---|---|---|
| Counsel: | 00:09:01 | States that a female- |
| Del. Doyle: | 00:09:02 | Okay. |
| Counsel: | 00:09:02 | Has to be allowed to play, then becomes a coed team. And so that, that and under this bill a coed team is not [crosstalk 00:09:09]. |
| Del. Doyle: | 00:09:08 | So you're, you're . . . Yes, okay. So you are saying that federal law would trump this in that kind of a situation? |
| Counsel: | 00:09:13 | Yes. |
| Del. Doyle: | 00:09:14 | Thank you. |
| Chairman Ellington: | 00:09:16 | Further questions of Counsel, Gentleman from 16th. |
| Del. Hornbuckle: | 00:09:20 | Uh, thank you Mr. Chair. And so to piggyback off the, off the gentleman's question and the Gentleman from the 43rd. If there was a transgender male, uh, that started out life as a male, uh, one years old becomes a female and they're playing for their high school and they are competing in we'll just say, uh, swimming. And there is only a male team, will, will that individual be permitted to, to be on the, on the male team? |
| Counsel: | 00:10:00 | The individual was born male? |
| Del. Hornbuckle: | 00:10:01 | Mm-hmm (affirmative). |
| Counsel: | 00:10:01 | Yes. |
| Del. Hornbuckle: | 00:10:04 | And, and vice versa? |
| Counsel: | 00:10:07 | If there was, if there was a female? |
| Del. Hornbuckle: | 00:10:09 | Yes ma'am. |
| Counsel: | 00:10:11 | If there's not a female team, then that female would be allowed to participate on the male team. |
| Del. Hornbuckle: | 00:10:16 | So, so- |
| Counsel: | 00:10:17 | And then it would become coed. |
| Del. Hornbuckle: | 00:10:19 | Okay. So the, the, the, the, the, what the Gentleman from the 43rd said, uh, a, uh, the individual that started out as a female, uh, then became a male, was taking the hormones and all those |

JA0081

|  |  | things, if there was no, uh, I guess there was only a, a female team, then they would, they would be able to be on that or a male team, I guess, any of the team they would have to be allowed, correct? |
|---|---|---|
| Counsel: | 00:10:43 | Uh, I, I, I'm not, I didn't follow on- |
| Chairman Ellington: | 00:10:47 | Clarify your question. |
| Del. Hornbuckle: | 00:10:48 | The question would be, they, they would be permitted to, to participate on any team, if there was only one team. So regardless of the individual, if there was only a male team, they will be permitted to participate on a female team? |
| Counsel: | 00:11:01 | The federal law is designed to help women excel in sports. So the, the way that it works if there's not a female team, that female can participate on the male, in the male sport, which then becomes coed, but it does not go the other way around. |
| Del. Hornbuckle: | 00:11:19 | Okay. Okay. Thank you. |
| Chairman Ellington: | 00:11:26 | Gentleman from the 19th. |
| Del. Griffith: | 00:11:31 | Thank you Mr. Chairman. And I'm trying to think of scenarios here, whereby this might be um, unclear. And one is, there are many schools who have volleyball programs for girls only, would this mean that any boy who so claimed would be able to go out for the volleyball team, because there was no equivalent male team. Uh, would that be a possible scenario? |
| Counsel: | 00:12:01 | No. |
| Del. Griffith: | 00:12:03 | Why would that be? Uh. |
| Counsel: | 00:12:08 | Currently, uh, a female sports are female sports, and males are not included in that. And this bill would preclude a person who was born male, who then identi—, that person would have to continue to play as a male. |
| Del. Griffith: | 00:12:23 | Okay. |
| Counsel: | 00:12:24 | Does that answer your question? |
| Del. Griffith: | 00:12:25 | Yes. Thank you. |
| Chairman Ellington: | 00:12:27 | [inaudible 00:12:27] the gentlemen that has been challenged before, and they were told they need to start a male team if they were gonna have the male play on it. So further questions to Counsel? Lady from 51st. |

| | | |
|---|---|---|
| Del. Walker: | 00:12:38 | Thank you, Mr. Chairman. Thank you, Counsel. So I have a question, because we do have a foster care system here, and we do have trans individuals in that foster care system. And as you know and we all know, all of those documents don;t come with the student. So, if we had a trans student in a new foster home that did not have the documents, it takes even a while to get a, a doctor's visit scheduled with how we are, so with DHHR. So would the coach assume what this person's identity is, gender? |
| Counsel: | 00:13:21 | According to statute, uh, in order to be admitted in the current statute, I'm on page one, the pupil has to have either a birth certificate or an affidavit of why they don't, which I think would be the secondary case, the case in this with the foster child. Um, and then they need the signed the, the, if they didn't have the birth certificate, would need the physician statement. |
| Del. Walker: | 00:13:47 | So we would not allow this child to play because we didn't have that documentation, and they may not have a, a doctor's appointment at that time? |
| Counsel: | 00:13:57 | I, in order to be admitted, that's, that's the way this bill reads. |
| Del. Walker: | 00:14:02 | So, and I'm not sure if you can answer this question for me. What do we do with children that are born with both sex organs? |
| Counsel: | 00:14:15 | I do not know. |
| Del. Walker: | 00:14:17 | At the appropriate time, Mr. Chair, if we have anyone to answer that question? |
| Chairman Ellington: | 00:14:24 | [inaudible 14:23] Any further questions Counsel? Gentleman from the 43rd. |
| Del. Thompson: | 00:14:35 | Thank you Mr. Chairman. Counsel, on page one of the bill under, uh, section two, line 10 and 11. "So a signed physician statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy." So if we, I'm assuming this is if that a birth certificate cannot be obtained? |
| Counsel: | 00:15:02 | Correct. |
| Del. Thompson: | 00:15:03 | So we're gonna subject the child to go to the, a doctor and essentially show them their genitalia to prove their, what genitals they have. Is that what this says? |
| Counsel: | 00:15:16 | And I'm assuming that doctors have those types of exams in a [crosstalk 00:15:21]. |

Page 7 of 19

**JA0083**

| | | |
|---|---|---|
| Del. Thompson: | 00:15:22 | Well, I'm sure, I'm sure they do for medical purposes, not just to, you know, show and tell. But, um, is that, is that what that reads that they would, they would have to show their genitals to a doctor to prove their? |
| Counsel: | 00:15:35 | I'm not a doctor. I don't know what a doctor would require. |
| Chairman Ellington: | 00:15:46 | I assume the Gentleman wants to ask the chair questions. |
| Del. Thompson: | 00:15:49 | Yeah. (laughs) |
| Chairman Ellington: | 00:15:50 | Um, there are ways to tell on exam what their gender is. |
| Del. Thompson: | 00:15:55 | Without? |
| Chairman Ellington: | 00:15:57 | Well, I mean, you do an exam, pediatricians do exams all the time. |
| Del. Thompson: | 00:16:00 | Right. |
| Chairman Ellington: | 00:16:00 | Children, and- |
| Del. Thompson: | 00:16:01 | I'm talking about like a— |
| Chairman Ellington: | 00:16:02 | Adolescents, you would do an exam and they do have a physical exams at those ages too. So yes, you would probably have to determine whether it was altered or not. |
| Del. Thompson: | 00:16:11 | By like physical— |
| Chairman Ellington: | 00:16:12 | Right. |
| Del. Thompson: | 00:16:13 | Observation? Okay. Uh, thank you Mr. Chair and Counsel. |
| Chairman Ellington: | 00:16:21 | Lady from the 30th, 41st? |
| Del. Tully: | 00:16:24 | The uh, Counsel, do you, are you aware if the WVSSAC requires a physical, sports physical for participation in sports at the secondary level in West Virginia? |
| Counsel: | 00:16:37 | I don't know if it's the SSAC or the county. Um, I'll, I'll defer to the department on that. |
| Del. Tully: | 00:16:41 | Okay. I believe it's the WVSSAC, 'cause I think it's a pretty standard form. Actually, I have it right here. And, um, it also talks about a physical exam and it talks about actually, when you do the physical exam for the G, the genital urinary system, it talks about like actually doing a physical exam for inguinal |

hernias, which are down in the groin folds for those that don't know, and also looking for bilaterally descended testicles.

So there's, those students aren't gonna be put through probably an unnecessary exam that they wouldn't already get to play sports. Would that be a correct assumption based upon this?

| | | |
|---|---|---|
| Counsel: | 00:17:18 | If, if that's what it says, yes. |
| Del. Tully: | 00:17:20 | Thank you. |
| Chairman Ellington: | 00:17:22 | Gentleman from 26th? |
| Del. Evans: | 00:17:28 | Thank, thank you Mr. Chairman. Um, are there any girls in West Virginia currently playing the high school football? |
| Counsel: | 00:17:38 | I believe that the Delegate just said that there was. Maybe that was a college. I'm not sure. |
| Chairman Ellington: | 00:17:44 | [inaudible 00:17:44]. Yeah. |
| Counsel: | 00:17:44 | I, I'm not sure. |
| Del. Evans: | 00:17:46 | I believe there definitely are. I stood on the football field this year against a team that definitely had a girl on the football field. We went to Webster County at one time, Webster County had a kicker female. So, I guess it is true that girls can play male sports. |
| Counsel: | 00:18:04 | Yes. |
| Del. Evans : | 00:18:05 | But males cannot play female sports? |
| Counsel: | 00:18:09 | That's currently the way, the current law— |
| Del. Evans: | 00:18:10 | So how does this, how does this bill then affect them, or does it affect it at all? |
| Counsel: | 00:18:17 | This bill would affect those that changed their sex after birth. |
| Del. Evans: | 00:18:22 | Okay. So it has nothing to do with current sex or like, like I'm a guy, I'm not going to change that. So it would not affect me? |
| Counsel: | 00:18:30 | It would not affect you. |
| Del. Evans: | 00:18:31 | Okay, that's all I want to know. Thank you. |
| Chairman Ellington: | 00:18:34 | Further questions to Counsel? I believe by leave of the committee, we had requests from the school system. Uh, Ms. |

Page 9 of 19

**JA0085**

|  |  | Sarah, would you like to come on up and . .  Ms. Stewart, you've been sworn in before. I think there was a question regarding the school system, as far as what's currently practiced. Um, Gentleman from 43rd, do you have questions and Sarah, if you would just state name and title for the people listening in on. |
|---|---|---|
| Sarah Stewart: | 00:19:05 | Sarah Stewart, West Virginia Department of Education. |
| Chairman Ellington: | 00:19:09 | Gentleman. |
| Del. Thompson: | 00:19:10 | Thank you Mr. Chairman, thank you Sarah. I appreciate you being here again. Um, So my question was, currently what is in place? This bill, it's gonna change? Uh, currently right now, if a student who was born um, biologically female, but is a, a high school student and is transitioning, identifies as a male and is transitioning taking hormones, uh, and she wants to play or he wants to play basketball. How, how is that working right now? Is that a county by county decision? Is it a school decision? Uh, is there, what, what is currently working or in place? |
| Sarah Stewart: | 00:19:49 | Let me be clear that I am a representative from the Department of Education and not a representative from the WVSSAC. |
| Del. Thompson: | 00:19:57 | Correct, I understand that. And I, I, I might have a question for them about that as well, but from your perspective from that. |
| Sarah Stewart: | 00:20:02 | I just, I wanted to make that clear and I, 'cause I don't want to speak for them. It is my understanding, that currently there is no specific rule that address, squarely addresses, transgender student participation in extracurricular activities. Um, there are Title IX considerations that do come into play with, um, coed sports.

And if there is only one sport at a, at a, um, particular school that, that we have to be mindful of Title IX and make sure those opportunities are made available. I do believe there is also a rule that if separate teams are maintained, for example a girl's basketball team and a boy's basketball team, that they, I believe there is an SSAC rule, SSAC guidance that directs that, um, that you play on the, on this, um, whatever sex, um, that the, that the students is, that does not address however, any transgender student issues. |
| Del. Thompson: | 00:21:01 | Okay. Does your department have any policy on transgender students at all or has that not been addressed? |
| Sarah Stewart: | 00:21:09 | Uh, we, um, there is currently a Fourth Circuit decision that is being appealed to the, the United States Supreme Court, dealing with, um, guidance relating to transgender students. Um, as we are in the Fourth Circuit, we are bound at least at this point, by |

|  |  | that guidance. The department has not put out any specific guidance, but it will just be mindful of, of the courts' um, direction in that regard. And should that change, we'll appropriately revise and advise the counties appropriately. |
|---|---|---|
| Del. Thompson: | 00:21:39 | If this bill is passed and we later learn, I don't know, whether the outcome of that court decision may or may not be, could this bill then potentially be in violation of that? |
| Sarah Stewart: | 00:21:47 | I don't want to speculate on what the US Supreme Court would take. |
| Del. Thompson: | 00:21:54 | Right. But not speculation, but is it a possibility that this bill would be in violation? |
| Sarah Stewart: | 00:21:59 | It, it could be. |
| Del. Thompson: | 00:22:00 | Okay. Has, has your office received, um, calls, concerns, complaints regarding anything remotely related to this about students participating in, in sports or extracurricular activities that you know, that they're . . .? |
| Sarah Stewart: | 00:22:17 | Surrounding the conversation today, no, we have not. |
| Del. Thompson: | 00:22:20 | Okay. Um, that's all I have for you Sarah. Thank you. I appreciate it. |
| Chairman Ellington: | 00:22:28 | Gentleman, from the 16th. |
| Del. Hornbuckle: | 00:22:33 | Thank you Mr. Chair. Um, and thank you for being here today. Uh, giving your legal expertise, um, would the WVSSAC have the ability, uh, uh, to set a guideline concerning transgender participation in sports on their own? |
| Sarah Stewart: | 00:22:50 | I do not want to speak for whether or not the WVSSAC— I'm not um, comfortable talking to their authorizing statute and where, where their rulemaking ability lies and ends. Potentially they could, but I think it's a better question addressed to them. |
| Del. Hornbuckle: | 00:23:04 | And are they here today? Oh, I guess not. Oh, thank you. |
| Chairman Ellington: | 00:23:11 | I have a copy of the uh, SSA, WVSSAC um, physical exam certificate, um, Delegate from the 41st asked that it be submitted as a, as an addendum. So, if anyone wants to look at it, they can afterwards. Lady from the 51st. |
| Del. Walker: | 00:23:33 | Thank you Mr. Chairman. Thank you, Sarah for being in here. So we just heard that . . . So, I have a question. When there's a transgender student that is entering K-12 public education, do |

|                      |          | you require besides when that student first entered school, a birth certificate and that student is going through transition, do they need to report anything to the school system? |
|----------------------|----------|---|
| Sarah Stewart:       | 00:24:00 | No. |
| Del. Walker:         | 00:24:03 | Would that WVEIS, will WVEIS change the identification of the child, once they start their transition, if that child and parent wanted that to be changed? |
| Sarah Stewart:       | 00:24:13 | I do not believe at the state level that we have any hard rules or regulations regarding, um, if a, a transgender student wishes to change their designation in WVEIS. Um, I believe counties perhaps have encountered this and have handled it on the local level, um, and appropriately we have not received any complaints at our office regarding that. |
| Del. Walker:         | 00:24:40 | Okay. Thank you very much. |
| Chairman Ellington:  | 00:24:42 | Further questions? Gentleman from the 65th? |
| Del. Clark:          | 00:24:49 | Yes. I've got a current question in regards to, um, we're hearing a lot of talk about, uh, uh, a child born as a female and is transitioning to a male. |

PART 1 OF 4 ENDS [00:25:04]

|                      |          |  |
|----------------------|----------|---|
| Del. Clark:          | 00:25:01 | In high school, on the Board of Education, is, is it a suspendable offense for taking performance enhancing drugs? |
| Sarah Stewart:       | 00:25:15 | Counties do have, um, illegal or controlled substance and illegal substance abuse policies. Um, I think it should be, I rel- I hesitate to speculate and make a broad statement. If you are taking something under the supervision of a physician, um, I, I, I'm not sure. Um, there would have to be a conversation between the county board and the parents about whether or not it was appropriate. But I'm hesitant to say that a, a student that is taking something that's prescribed by a physician could then be disciplined on the school level for that. |
| Del. Clark:          | 00:25:47 | Okay. Um, I reserve my right to ask the same question later. |
| Chairman Ellington:  | 00:25:52 | Okay. Further questions of, uh, Ms. Stewart? None. Thank you, Ms. Stewart. Further questions of Counsel? Other questions? Any amendments? Lady from the 51st, uh, questions or amendment? |
| Del. Walker:         | 00:26:13 | Question. |

| Chairman Ellington: | 00:26:14 | Okay. Of who? Counsel? |
| Del. Walker: | 00:26:15 | Yeah. Can we get, um- |
| Chairman Ellington: | 00:26:19 | Speak into your mic, please. I can't hear you. |
| Del. Walker: | 00:26:21 | Can we get someone from, uh, Fairness West Virginia? I have some questions for you. Thank you. |
| Chairman Ellington: | 00:26:27 | By leave of the committee. Would you state your name and title, sir? I know you've already been sworn in. |
| Andrew Schneider: | 00:26:34 | Thank you. Um, my name is Andrew Schneider, and I'm the Executive Direction of Fairness West Virginia. |
| Chairman Ellington: | 00:26:40 | All right Mr. Schneider. Lady from the 51st has a question. |
| Del. Walker: | 00:26:43 | Thank you, Chairman Ellington. Thank you, Andrew, for being here. |
| Andrew Schneider: | 00:26:45 | Thank you. |
| Del. Walker: | 00:26:46 | Can you tell me if any trans women have dominated any sporting events? |
| Andrew Schneider: | 00:26:53 | Not one athlete who has transitioned has been successful at the highest levels of sport. The lack of success is a strong indication of the fairness of permitting transgender women to compete against cisgender women. In fact, the problem with these bills is that they, they say that all bills, all boys are stronger than all girls. And that is just incorrect. |
| | | Uh, the, look at a young woman from North Carolina named Heaven Fitch, who won the high school state wrestling championship last year. I bring this story up because Heaven is a ci- is a cisgender girl, and yet she beat a bunch of cisgender boys. Young girls have many skills that are better than young boys. |
| | | What counts as an advantage may shift dramatically depending on the sport. For example, factors such as height, weight, and reaction time all affect a participant's advantage depending on the sport. |
| | | A young woman on the volleyball team may be very tall, and yet few people would consider that to be an unfair competitive advantage in her sport. Similarly, a man on the swimming team may have a naturally high hemoglobin count, enabling him to |

take in more oxygen, but he would not be barred from swimming for that reason.

Some cisgender women, like Olymp- Olympic athlete Caster Semenya, naturally produce high levels of testosterone compared to other cisgender women. All bodies are different, and there is no single physical trait that determines if a student will excel in a sport.

| | | |
|---|---|---|
| Del. Walker: | 00:28:27 | Do you know if this has ever occurred in West Virginia? Have you received any calls from anyone in assistance with? |
| Andrew Schneider: | 00:28:38 | We have not. This appears to be a, a solution in search of a problem. Uh, there is no, uh, as I said before, there is no, uh, pattern or examples of, uh, transgender women dominating school sports in West Virginia. |
| Del. Walker: | 00:28:59 | Do you know how many, um, transgender persons that we have playing any sports in West Virginia, K through 12? Or secondary sports, sorry. |
| Andrew Schneider: | 00:29:11 | I, I'm not aware of, that, that data, that number. Um, and I don't know who would, or if that, that kind of statistic is even kept, um, by our secondary schools. Um, but I would imagine there's not many, and clearly it's not an issue, because we, no one has received any complaints about it. I mean, these, these bills come from national organizations that- |
| Chairman Ellington: | 00:29:39 | Um, limit to the question please. |
| Andrew Schneider: | 00:29:41 | Okay, sorry. |
| Del. Walker: | 00:29:41 | Thank you. |
| Chairman Ellington: | 00:29:42 | I, I told you beforehand, we're not going into a prepared speech. |
| Andrew Schneider: | 00:29:45 | Okay. |
| Del. Walker: | 00:29:47 | Thank you, Mr. Schneider. |
| Andrew Schneider: | 00:29:47 | Thank you. |
| Chairman Ellington: | 00:29:49 | Further questions [inaudible 00:29:50]? Gentleman from the 16th? |
| Del. Hornbuckle: | 00:29:53 | Thank you, Chairman Ellington. At the appropriate time, I'd like to ask somebody from the civil liberties group. |

Page 14 of 19

| | | |
|---|---|---|
| Chairman Ellington: | 00:29:59 | Any further questions for Mr. Schneider? All right. Mr. Baumwell, you, uh, have been sworn in. If you would name your name and title. |
| Eli Baumwell: | 00:30:13 | Uh, thank you, Chairman Ellington. My name is Eli Baumwell and I'm the policy director for the American Civil Liberties Union of West Virginia. |
| Chairman Ellington: | 00:30:19 | All right. Gentleman from the 16th has a question. Question? Gentleman from the, uh, 16th? |
| Del. Hornbuckle: | 00:30:29 | Thank you, Mr. Chair. Um, and thank you for being here today, sir. Uh, I got a couple of questions for you. We'll try to be brief. Uh, how will this, uh, affect the state's obligations under Title IX? |
| Eli Baumwell: | 00:30:39 | Uh, Delegate, I do believe, looking at this legislation, it does risk, um, a significant amount of federal funding under Title IX. Um, looking at federal courts, um, as I've looked at some of this legislation, Idaho was enjoined from this, and as Counsel mentioned, um, here in the Fourth Circuit, following the Bo- Bostock ruling, um, we have, we have got Fourth Circuit ruling saying that transgender individuals have to, have to be given, um, access to space based on their gender identity. That's Bo- coming from Bostock. |
| | | There's also now federal executive orders, um, following from those, those ruling in in alignment, rather, with those. Um, so we do risk violating Title IX based on these federal court rulings. |
| Del. Hornbuckle: | 00:31:25 | Uh, when you speak about violations, uh, per any civil law, are there any privacy concerns here with students? |
| Eli Baumwell: | 00:31:32 | There are potential privacy concerns. While students, um, may have to go under, undergo medical examinations to clear them for sports, um, having to disclose, um, whether it be their birth sex or any, uh, gender affirming therapy they might be undergoing is a violation of their potential, is a potentially violation of their privacy. |
| Del. Hornbuckle: | 00:31:48 | Okay. Uh, uh, legally could this have a negative impact on any other students? |
| Eli Baumwell: | 00:31:55 | This particular legislation is tailored solely to, um, athletics. Uh, looking at this particular, um, bill that just originated. Um, other, other pieces of legislation have been more broad, but this one is limited just to athletics. |

| | | |
|---|---|---|
| Del. Hornbuckle: | 00:32:11 | Uh, has there been any case law on, uh, deni- denial of participation leading to any type of, uh, mental health issues with transgender youth? |
| Eli Baumwell: | 00:32:21 | Well, absolutely. There, there's been a lot of, um, research rather. I, I shouldn't say there's case law. But there is a lot of research into, um, the, the mental health of trans youth and what can be done to protect their mental health. And being treated, um, based by their gen- gender identity and being an op- given an opportunity to, um, participate in sports and participate in social activities has certainly been linked with better, uh, mental health outcomes, both in the short and long term. |
| Del. Hornbuckle: | 00:32:53 | All right. Thank you. |
| Chairman Ellington: | 00:32:55 | Further questions for Mr. Baumwell? None? Thank you, sir. |
| Eli Baumwell: | 00:33:01 | Thank you. |
| Chairman Ellington: | 00:33:01 | Further questions of any of the other witnesses? Gentleman from the 65th, who are you? |
| Del. Clark: | 00:33:06 | Do we have anybody from the, uh, West Virginia SSAC here? |
| Chairman Ellington: | 00:33:09 | Uh, unfortunately, they are over on our Senate colleagues' side, uh, working on a bill that's over there at the moment. |
| Del. Clark: | 00:33:15 | Okay. |
| Chairman Ellington: | 00:33:17 | Further questions? Any further questions of Counsel? Chair hears none. Any amendments? None? Chair recognized Vice Chair for motion. |
| Vice Chair: | 00:33:29 | Mr. Chairman, I move that originating House Bill relating to participation in single-sex secondary school winter scholastic athletic events be reported to the floor, with the recommendation that it do pass. |
| Chairman Ellington: | 00:33:42 | Gentleman uh, moved that, uh, House Bill originating on participation in single-sex secondary school ath- interco- interscholastic athletic events be reported to the floor with a recommendation it do pass. Is there any questions or discussion? Gentleman from the 43rd. |
| Del. Thompson: | 00:34:00 | I, I have a . . . Thank you, Chairman Ellington. I have a question. Would it be possible to, uh, lay this over until we could speak to someone from the, the SSAC? To like, actually hear from how that, s- since that is their, kind of, you know, what they kind of control and govern, since that would affect them? |

JA0092

| | | |
|---|---|---|
| Chairman Ellington: | 00:34:19 | Are you moving to lay it over? |
| Del. Thompson: | 00:34:21 | Yes. |
| Chairman Ellington: | 00:34:22 | If you move to lay it over, then I guess- |
| Del. Thompson: | 00:34:23 | Just one day. Or the next meeting. |
| Chairman Ellington: | 00:34:25 | Well, we don't have one day. (laughs) Um. |
| Del. Thompson: | 00:34:29 | We don't have one day? |
| Chairman Ellington: | 00:34:30 | Well, we don't have a meeting tomorrow. |
| Del. Thompson: | 00:34:32 | Oh, it's Wednesday. Thursday. |
| Chairman Ellington: | 00:34:37 | Gentleman moves that we lay this over. That takes a vote and it's non-debatable. So all in favor would say aye. |
| Del. Thompson: | 00:34:43 | Aye. |
| Chairman Ellington: | 00:34:44 | Those opposed, nay. I would say nays have a- |
| Del. Thompson: | 00:34:49 | Division? |
| Chairman Ellington: | 00:34:50 | Well, he had the s- he had the, uh, microphone, so [inaudible 00:34:53]. (laughs) |
| Del. Thompson: | 00:34:56 | Thank you. That worked. (laughs) |
| Chairman Ellington: | 00:34:58 | I could have used my microphone, too. So motion r- |
| Del. Thompson: | 00:35:02 | I did call division, though. |
| Chairman Ellington: | 00:35:03 | Motion, uh, rejected. |
| Del. Thompson: | 00:35:05 | Could I call div- I called division. |
| Chairman Ellington: | 00:35:07 | I think I had already called it, but. Well, okay, we'll call division. Is it sustained? All right, we have it sustained. The clerk will call, call the vote on that. So, if you vote yay, that means we lay it over. If you, uh, vote nay, that means it is rejected. All right.<br><br>Well, those that are in favor of the Gentleman's, uh, motion to lay it over, raise your hands. That's six. Yeah. There's six. |

JA0093

All right. Those, uh, those opposed to the Gentleman's motion, raise your hands. All right, six to thirteen. All right, motion rejected.

Any further amendments? Or actually, we're on discussion. Gentleman from the, uh, 60-uh-7th?

**Del. Doyle:** 00:36:27    Uh, uh, thank you, Chairman Ellington. Um, I oppose the bill for, for, for two reasons. First, uh, in our questions of Counsel, uh, I think it became pretty obvious that, uh, we're on rather dangerous legal ground r- uh, relating to the feds if we pass this bill a- as it is written. So that is one.

A- also, uh, uh, the one, uh, person who testified, the gentleman from Fairness, mentioned, uh, something that I had heard before, as one of the arguments in favor of this, and that is that males are inherently stronger than females. And I, I just have a, a vignette I'd like to, uh, to go over. I've remembered this ever, ever since it happened.

When I was a, a rifle platoon leader in Vietnam, I had a guy in my platoon that weighed barely 100 pounds. He had no upper body strength whatsoever. And the rules were, we have two, what are called, uh, uh, uh, heavy machine guns there, uh, uh, uh, 7.62 machine guns, it's roughly a 30 caliber for those people who are not into metrics. And you had to carry that and 200 rounds of ammunition, and he couldn't carry it.

So, whenever it was his turn, somebody else just volunteered. I am a big time women's college basketball fan, and I'm telling you, every time I see a game, there are people out there playing that could have easily carried that machine gun and 200 rounds of ammunition.

So that's why, uh, I think is p- another part of the reason I think this is a bad bill, and I'm going vote no. Thanks.

**Chairman Ellington:** 00:38:06    Anyone else wish to speak? Gentleman from the 43rd?

**Del. Thompson:** 00:38:11    Thank you, Chairman Ellington. I also want to speak a- against this bill for a multitude of reasons. First, because, I mean, I would like to hear from the SSAC of how this would, you know, uh, impact their rules and impact and see, have a better understanding of how this would be implemented.

I'm also going speak against it for the reason, and I ask what I asked Counsel, pertaining to, if I have a daughter, and she's playing basketball, and she's on a basketball team, and with this bill, um, a person who was born female, identified as male, was taking testosterone, is transitioning, is going to be on the same

team as my daughter, outperforming her, because my daughter is not taking testosterone, this is not, this is not going to be fair to the children of West Virginia.

I under, were there, whatever side you fall on this, it's not, that's not fair. Uh, and also, I have a major problem, and as the the, the Lady from the 41st mentioned about the, the sports physicals, I played basketball and baseball through middle and high school, and um, I, I had to do a physical every year, but I never once, uh, was subjected to, I guess I could've been, to the, the hernia check. So, I have a major problem with forcing children, middle school children or high school children, uh, to, for this purpose, to specifically . . . If it's for a medical reason, I totally understand it and get it, but just to par- just to prove their gender, I don't think that's right. And I don't think any of us would want our children subjected to that.

Uh, so for those reasons, I, uh, strongly, uh, do not support this bill, and I urge you all to do the same. Thank you.

| | | |
|---|---|---|
| Chairman Ellington: | 00:39:55 | Anyone else wishing to speak to the bill? Lady from the 41st. |
| Del. Tully: | 00:39:58 | I'm just want to give a point of clarification, actually, on the addendum, the thing that I provided from the WVSSAC that was the addendum. It was revised in May of 2016, so I don't know when the hernia checks, uh, first originated, but I don't . . . You probably graduated well after 2016, I would assume, sir. |
| Chairman Ellington: | 00:40:22 | Anyone else wishing to speak to the bill? All right, before us is the motion. All those in favor would say aye. Those opposed, nay. Gentleman from the 53rd? |

The Chair is undecided, so uh, let's do that again. All those in favor say aye. Those opposed, nay. (laughs) Got a loud group there. Okay. Division has been called. Yeah, I'm still undecided on that.

So, division. All those in favor, raise your hands. [inaudible 00:41:18] Those opposed, raise your hands. Fifteen, six? Fifteen to six. Motion adopted.

Next thing on the agenda is House Bill 2364. Any interest in the bill?

Page 19 of 19

**West Virginia House of Delegates Judiciary Committee Discussion of H.B. 3293**

**March 18, 2021**

| | | |
|---|---|---|
| Chairman Capito: | 00:41 | . . . left on the agenda. The bill is 3293. We have a guest presenter with us. We're happy to have her back with the co- with the committee today. And whenever she is ready, she may proceed. |
| Counsel: | 00:56 | I thank you Mr., Mr. Chairman. This committee substitute provides that for the purposes of participating in Single Sex Secondary School Interscholastic Athletic events, under the controlled supervision and regulation of the Secondary School Acti- Activities Commission, each county school district shall confirm that the sex of the people identified, on the pupil's original birth certificate provided on his or her admission to public school is the pupil's sex at the time of birth. |
| | | If an original birth certificate was not provided or if the birth certificate provided does not indicate the pupil's sex at the time of birth, a signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered, internal and external reproductive anatomy must be submitted prior to the pupil's participation in single sex secondary school interscholastic ac- ac- athletic events. Prior to the student's participation in single sex inter- secondary school interscholastic athletic events, the SSAC must verify with each county board that each student participating in Single Sex Interscholastic events is participating according to the student's sex at the time of birth. This requirement does not apply to co-educational, uh, sports. And that's a summary of the bill. |
| Chairman Capito: | 02:15 | Thank you very much, Counsel. I appreciate that presentation. Are there questions for Counsel? Are there questions? The Lady from the 4th. |
| Del. Zukoff: | 02:26 | Thank you Mr. Speaker. Do you know if there's any federal re- any federal, um, any federal courts looking at this, um, issue currently? |
| Counsel: | 02:36 | Yeah. There is a case, uh. Grimm versus, I'm not sure I'm going to pronounce the, Glo- Glo- Gloucester County School Board. It's a Fourth Circuit case. It's, it has to do with, uh, a student, uh, transgender male's right to use a male bathroom. |
| Del. Zukoff: | 03:00 | Okay. Nothing involving sports, though? |
| Counsel: | 03:06 | It, it does not, uh, does not- |
| Del. Zukoff: | 03:07 | Specifically? |

Page 1 of 21

**JA0096**

| Counsel: | 03:08 | . . . directly a- uh, state anything about sports. |
|---|---|---|
| Del. Zukoff: | 03:11 | Okay. Have we had this come up before the Department of Education? Have we had any issues around this, this bill that, transgender students participating in sports come before the Department of Education as a concern? |
| Counsel: | 03:26 | It is my understanding that there have been no problems on the county level. |
| Del. Zukoff: | 03:26 | Okay. I checked with mine and there weren't. That's why I was just curious if you knew from a statewide perspective. |
| Counsel: | 03:28 | That's what they'd indicated to me. There had been no problems. |
| Del. Zukoff: | 03:39 | Thank you. |
| Chairman Capito: | 03:40 | Gentleman from the 37th. |
| Del. Pushkin: | 03:44 | Thank you, Mr. Chairman. Thank you, counsel. Um, and I'm sorry I missed the first part of the, of your, uh, presentation of the, uh, of the bill here. But would this preclude a female student from participating in a male sport? |
| Counsel: | 03:59 | No. |
| Del. Pushkin: | 04:00 | It would not? |
| Counsel: | 04:01 | No. Under Title IX, a female has to be allowed to participate in a sport. So, if the, for instance, there are no female football, then the female would be allowed to play in, uh, football, um. |
| Del. Pushkin: | 04:15 | All right. And that would be, I mean the only case I can, cases in West Virginia I could think of would be in sports where there aren't female sports that, that the, that the girls participate in the boys sports. That's the only time I've ever heard of it even happen, anything like this happening in West Virginia. |
| Counsel: | 04:29 | It's my understanding there have not been any issues. I, and the, the re- the executive director of the SSAC is here if anyone wants to talk to him. But I believe there are only, the only solely female sports are volleyball and softball. |
| Del. Pushkin: | 04:46 | So this only affects those two sports? |
| Counsel: | 04:46 | Well, well it would affect the single sex. So, in other words, you have single sex—you have women's basketball and, and men's basketball or- |

| Del. Pushkin: | 04:53 | Yeah. |
| Counsel: | 04:54 | . . . and- |
| Del. Pushkin: | 04:55 | Okay. |
| Counsel: | 04:55 | . . . track- |
| Del. Pushkin: | 04:55 | I got you. I got you. |
| Counsel: | 04:56 | Two, two sets. Yeah. |
| Del. Pushkin: | 04:56 | I got you. |
| Counsel: | 04:56 | Yeah. |
| Del. Pushkin: | 04:58 | Okay, thank you. |
| Chairman Capito: | 05:00 | Further questions of Counsel? Further questions of Counsel? Chair, recognize Gentleman from the 17th. |
| Del. Lovejoy: | 05:07 | Thank you, Chairman Capito. Good afternoon, Counsel. Uh, you mentioned that Grimm case. I tried to read a little bit about it, uh, for today. So that was a Fourth Circuit case, um. |
| Counsel: | 05:07 | Mm-hmm (affirmative). |
| Del. Lovejoy: | 05:17 | The Fourth Circuit is a federal Circuit Court of Appeals. It includes the state of West Virginia, right? |
| Counsel: | 05:23 | Correct. |
| Del. Lovejoy: | 05:24 | And in that case, um, this was not a sports case but it, it dealt with the requirement to use facilities on a school ground with the sex assigned at birth. Is that fair? |
| Counsel: | 05:39 | It did. |
| Del. Lovejoy: | 05:40 | Okay. |
| Counsel: | 05:41 | Uh, the, the, uh, Grimm was born a female and wanted to us- and was transitioned to male, and wanted to use the male bathroom. |
| Del. Lovejoy: | 05:50 | So in that case, the court, the Fourth Circuit, um, found that the student's, uh, rights had been violated under Title IX, right? |
| Counsel: | 06:02 | Yes. |

Page 3 of 21

JA0098

| Del. Lovejoy: | 06:03 | And also, I think second, second basis was under, was it equal protection? |
| Counsel: | 06:08 | Yes. |
| Del. Lovejoy: | 06:08 | And so, what, what, you know, if we're to do something like this and we have a lawsuit come under Title IX, what are the consequences of a school board in West Virginia being found, like that case, to violate Title IX? I mean what, what's the, what are the consequences? |
| Counsel: | 06:26 | Well, uh, the schools receive federal funds. So that is, they're, they're required to follow the federal guidelines, which would include the Fourth Circuit. Um, there is also a recent executive order, um, and so the the, the s- the board, or the department would, is required to follow federal guidelines. So, um, I think the practical effect would be that under the Fourth Circuit case, uh, which is currently there has been a writ filed before the Supreme Court and, um, Grimm has ex- has, uh, petitioned for additional time to answer. And that is the current procedural history right now with that. Um, so in other words, you know, the, the Supreme Court may or may not take the case. If they do, then Fourth court c-, Fourth Circuit would be controlling. If they did take the case, then of course they would issue an opinion. |
| | | Um, but un- as it stands right now, the department would be bound to if a transgender person wanted to use, for instance, a transgender female wanted to use a female bathroom, they would have to allow that transgender female to use the, the female bathroom under this Fourth Circuit case. But the, the bill, the, they would have to play a different sport. |
| Del. Lovejoy: | 07:47 | So, so let me understand the posture. The Fourth Circuit Court of Appeals has rendered a decision that as it stands now, found that school's policy in, in the bathroom context as opposed to the sports context, to violate Title IX. |
| Counsel: | 08:04 | And, and they did not, um, deal with sports specifically and the, that particular person was not involved in sports. So, it did not deal with locker rooms or sports because he was not involved in sports. |
| Del. Lovejoy: | 08:14 | But the basis of that opinion was the Bostock case, is that what it's called? |
| Counsel: | 08:19 | That was one of the cases that was, yes, quoted. |
| Del. Lovejoy: | 08:22 | Bostock was not, was neither a sports nor a bathroom case, right? |

| | | |
|---|---|---|
| Counsel: | 08:25 | I haven't read that entire case. I just- |
| Del. Lovejoy: | 08:28 | But it's employment case. Yeah. |
| Counsel: | 08:29 | . . . did but, yeah. It, in a, I believe a Supreme Court case. Yes. |
| Del. Lovejoy: | 08:31 | Right. |
| Counsel: | 08:32 | Yes. |
| Del. Lovejoy: | 08:32 | Yes. And so, it's a, it's a, it's a 2020 case and it deals with employment discrimination and the Fourth Circuit applied the holdings in the employment discrimination decision of Bostock to apply to the restroom question. And so, if the Fourth Circuit were to also apply that to this situation, we could be passing a law that puts us in violation of Title IX? |
| Counsel: | 09:00 | I mean, it, it, there, there would be a, a question perhaps. I mean, it, there's a slippery, this, this is literally something that is changing every day across the United States. I mean, literally every time I'm, I go on the internet, there's something different happening. So, um, you know, who know, it's hard to say what a court is going to do. But, you know, it, it is, I think pretty safe to say that something like this would be up for, um, liti- litigation because it is being litigated- |
| Del. Lovejoy: | 09:33 | Yes. |
| Counsel: | 09:33 | . . . throughout the country daily. I mean- |
| Del. Lovejoy: | 09:35 | Yes. And we're going to have some guidance soon, won't we? |
| Counsel: | 09:35 | I'm, I- |
| Del. Lovejoy: | 09:38 | With Fourth Circuit, right? |
| Counsel: | 09:39 | Yeah. I mean, ma- uh, yeah. I guess we'll see what the Supreme Court- |
| Del. Lovejoy: | 09:44 | We have a decision from the Fourth Circuit- |
| Counsel: | 09:44 | Mm-hmm (affirmative). |
| Del. Lovejoy: | 09:46 | . . . and we're s- we're at, somebody's at the doorsteps of the United States Supreme Court saying, "We'd like you to take this up on a, on a writ of cert and that decision has not been made yet." But we will know the results of that decision by the US Supreme Court at some point in the, maybe near future, right? |

| Counsel: | 10:02 | We would, yes. |
|---|---|---|
| Del. Lovejoy: | 10:04 | Okay. Um, okay. In addition to losing federal funding if you're found to violate Title IX, um, is the successful claimant also entitled to money damages? |
| Counsel: | 10:17 | Uh, in this case, uh, I believe the way I read the case, uh, the, Grimm received $1. I mean, it was not a money case. |
| Del. Lovejoy: | 10:26 | Well, did they also receive an award of attorney's fees? |
| Counsel: | 10:28 | Attorney's fees, yes. |
| Del. Lovejoy: | 10:29 | Yes, which were more than $1. |
| Counsel: | 10:30 | I'm sure. |
| Del. Lovejoy: | 10:31 | Yeah, um. And so, if for instance, we pass a law that before the Supreme Court rules on the case up there, uh, on the writ, that also is found to violate Title IX, then we could lose our, our federal funding and be on the losing end of litigation in a fee shifting situation, right? |
| Counsel: | 10:51 | I- |
| Speaker 6: | 10:51 | One point of order, point of order, Chairman Capito. |
| Chairman Capito: | 10:55 | Gentleman will state his point of order. |
| Speaker 6: | 10:56 | Um, uh. My friend is, uh, asking Counsel, number one, to speculate and number two, to offer personal opinions. Uh, neither of which are technical in nature so, uh, I would ask the line of question be, uh, prohibited. |
| Chairman Capito: | 11:12 | [crosstalk 00:11:12] well I would just, I would just say the chair's ruling is that the, uh, the Gentleman will, will, will stick to the thrust of the bill. I think the Gentleman is asking counsel to make, uh, a legal assessment of a, of a Fourth Circuit opinion, um, and I think it's, uh, appropriate. Uh, and I think it's appropriate for her to make that distinction as Counsel, so I'll allow question to continue. |
| Del. Lovejoy: | 11:32 | Thank you Mr. Chairman. Um, and I'll try to keep it cleaner. If we pass a law that violates Title IX of the federal law, then the result of a violation is a loss of federal funding. That is a, that is a true statement of the law? |
| Counsel: | 11:47 | I don't know the particular, um, process for loss of funding. I mean, I would hope that, um, it wouldn't be, and you know, I |

|  |  | mean, I would say that there would be a process for that. I don't know. I don't think that- |
|---|---|---|
| Del. Lovejoy: | 12:00 | Can I restate as, can or may? If I say that, would that be a fair statement, that you can lose your federal funding if you pass laws that violate Title IX? |
| Counsel: | 12:11 | It's my understanding that the funding the federal government supplies is based upon the assumption that the laws that it enacts will be followed. |
| Del. Lovejoy: | 12:21 | Okay. Thank you very much. Thank you, Mr. Chairman. |
| Chairman Capito: | 12:24 | Further questions of Counsel? Gentleman from the 37th, did you have questions of Counsel? |
| Del. Pushkin: | 12:29 | At the appropriate time  I'd like to ask you now just to take leave of committee for a, a testimony from, uh [crosstalk 00:12:35]- |
| Chairman Capito | 12:34 | At the appropriate time. Chairman from the 50th for counsel. I recognize Gentleman from the 50th. |
| Del. Garcia: | 12:40 | Thank you, counsel. So, when I look at page two of, uh, let's see, what section is this, p- yeah, page two, line 26, subdivision E of section, it's on another page, 5C, um, it appears that—there's a proviso related to if somebody does not, is not able to provide a birth certificate or their birth certificate does not indicate a sex at the time of birth, correct? |
| Counsel: | 13:21 | I'm, I'm sorry. Can you rephrase that again? I see where you- |
| Del. Garcia: | 13:23 | Yeah, yeah. |
| Counsel: | 13:24 | What was your question again? I'm sorry. |
| Del. Garcia: | 13:24 | So, so that relates to—the proviso relates to a situation, um, if someone is unable to provide their original birth certificate or their birth certificate as it states here, does not indicate people's sex at the time of birth. |
| Counsel: | 13:39 | So, yeah. If you look at page one, the first paragraph, when a student is admitted to a public school, they are to provide a birth certificate. So it goes, it's referring back to that birth certificate. But if, for, for it, but there's also, if the birth certificate cannot be provided, then they have to say, have to have an affidavit proviso. So in the case that their birth certificate was not a, supplied or the, the sex was not identified, then that proviso for |

Page 7 of 21

JA0102

|  |  | the, uh, doctor's affidavit, I mean doctor's statement would apply. Does that answer your question? |
|---|---|---|
| Del. Garcia: | 14:14 | That do- well that doesn't and kind of continuing on further. So, if, if a birth certificate is not provided or if the birth certificate does not indicate the people's sex at the time of birth, I just want to make sure I'm understanding this correctly. So, the, the physician statement that they have to, I guess, they have to figure out about whether the person has unaltered internal and external reproductive anatomy? |
| Counsel: | 14:51 | That's what it says, yes. |
| Del. Garcia: | 14:52 | So, the, that means that anybody who can't fulfill, who can't provide their birth certificate has to undergo an examination, I would imagine some type of genital examination, by that doctor? |
| Counsel: | 15:10 | Well, all of the students are required to have a physical exam to ta- I mean, to participate in sports. |
| Del. Garcia: | 15:17 | But does that necessarily include . . . I mean, you know, again, internal and external reproductive anatomy. I, that, is that something that's normally part of a physical? |
| Counsel: | 15:33 | I don't know. |
| Del. Garcia: | 15:35 | And, and whether it's unaltered. That's, that's what this bill states. |
| Counsel: | 15:40 | That it does, yes. |
| Del. Garcia: | 15:43 | What happens if, if a student has both male and female reproductive anatomy? |
| Counsel: | 15:58 | The bill doesn't address that. |
| Del. Garcia: | 16:03 | That, and, and that's my understanding is, one or 2% of the population of the United States, that, that is, you know, that's, that happens. That's probably not a good, good question for counsel. That's, I didn't really ask a question, so I apologize. That's, that, those are, those are the questions that I have. Thank you. |
| Chairman Capito: | 16:25 | Thank you. Further questions of Counsel? Further questions? I, I had the gent- gent- excuse me, I had the Lady from the 4th followed by the Gentleman from the 13th. |
| Del. Zukoff: | 16:35 | Thank you, Mr. Chairman. Just one last question. You had mentioned when you're answering the Gentleman from the |

|  |  | 17th's question that there's an executive order currently that addresses this issue. Could you give us- |
|---|---|---|
| Counsel: | 16:48 | Oh, I'm sorry. It do- it, there's an executive order that has to do with, um, from, uh, March 8th. |
| Del. Zukoff: | 16:56 | An executive order from? |
| Counsel: | 16:58 | The President, President Biden. |
| Del. Zukoff: | 17:00 | Okay. And what does that say? |
| Counsel: | 17:04 | It is guaranteeing an educational environment free of discrimination on the basis of sex, including ori- sexual orientation and g- or gender identity. |
| Del. Zukoff: | 17:16 | Okay. Thank you. |
| Chairman Capito: | 17:19 | Gentleman from 13th. |
| Del. Zukoff: | 17:20 | I didn't know that. |
| Del. Pinson: | 17:21 | Yes, thank you Mr. Chair, thank you Counsel for your presentation of the bill that's before us. Uh, couple quick questions. I know the question was asked to you, has there been issues of this within the boundaries of our state and I believe that you answered that you weren't aware of any. I'm aware that we do have someone from the SSAC here that could either provide the same answer or their own opinion. Is that correct? |
| Counsel: | 17:51 | Yes, someone, uh, the Executive Director is here. |
| Del. Pinson: | 17:54 | Okay. I'll ask you this. In your preparation of the bill, were you able to find instances in other states where questions surrounding the legality of this same issue have been raised? |
| Counsel: | 18:15 | Yes. |
| Del. Pinson: | 18:16 | Okay. Uh, turning my attention now to the Gavin Grimm case out of Virginia, if I understood your assessment of, of that legal proceeding, the county school board, and I'm not going to try to pronounce it either, they were found to have violated Title IX based on the, the circumstances and the facts surrounding that particular case. Is that correct? |
| Counsel: | 18:53 | Yes, they were. |
| Del. Pinson: | 18:55 | And- |

| Counsel: | 18:55 | Under that case, yes. And under those circumstances, they were. |
| Del. Pinson: | 18:55 | So- |
| Counsel: | 18:58 | And equal protection. |
| Del. Pinson: | 19:00 | Thank you. And we, that case did not deal with the legality of transgender athletes at all. We're dealing with something completely separate from that. Is that correct? |
| Counsel: | 19:14 | It did not deal with sports and it said in there that, that issue was not raised because he did not play sports. |
| Del. Pinson: | 19:21 | Okay. That will be all. Thank you. Thank you, Mr. Chair. |
| Chairman Capito: | 19:23 | Further questions of Counsel. Further questions of Counsel. Uh, Counsel, question from the chair. Under, uh, I understand I think, uh, part, partially the holding in Grimm, um, that it, that, that the, the Grimm's equal protection rights were violated that he was not able to access the men's bathroom. Was, was he, is, is Grimm still able to access to women's bathroom? |
| Counsel: | 19:51 | Uh, initially they, uh, had him using the nurse's bathroom and, but there was, it was inconvenient. It sometimes made him late for classes. And so, then they fashioned a separate, um, bathroom for transgender, uh, people and, or, or they redid the stalls. I, I'm- |
| Chairman Capito: | 20:15 | Was he prohibited- |
| Counsel: | 20:15 | But they, they fashioned [crosstalk 00:20:17]- |
| Chairman Capito: | 20:17 | Was he prohibited from using the women's bathroom? |
| Counsel: | 20:18 | It, it, uh, he, this was a transgender male who was an original female. |
| Chairman Capito: | 20:18 | Right. |
| Counsel: | 20:18 | He was put- |
| Chairman Capito: | 20:24 | Right. |
| Counsel: | 20:24 | . . . prohibited from using the male bathroom. |
| Chairman Capito: | 20:26 | Right. Was he prohibited from using the female bathroom? |
| Counsel: | 20:29 | No. |

JA0105

| Chairman Capito: | 20:30 | Okay. With the holding, is he permitted to use either bathroom still? |
| Counsel: | 20:36 | Uh, it, the holding- |
| Chairman Capito: | 20:38 | If you don't have that, I understand- |
| Counsel: | 20:39 | Let, I mean my, my, well let, let me say he's in college now. So- |
| Chairman Capito: | 20:39 | Okay. |
| Counsel: | 20:43 | . . . this went on for five years. |
| Chairman Capito: | 20:44 | Okay. |
| Counsel: | 20:44 | So, um, it's, it, he's not in high school anymore but- |
| Chairman Capito: | 20:50 | Okay. |
| Counsel: | 20:50 | . . . essentially he, if the, the, he was able to use the bathroom that he identified, that- |
| Chairman Capito: | 20:56 | I understand, I understand- |
| Counsel: | 20:56 | Yeah. |
| Chairman Capito: | 20:57 | . . . the thrust of the, of the whole thing. |
| Counsel: | 20:57 | Mm-hmm (affirmative). |
| Chairman Capito: | 21:00 | I just was curious. Questions? |
| Counsel: | 21:00 | Yeah. |
| Chairman Capito: | 21:02 | The Gentleman from the 37th desires leave of the committee to call a witness. Is that witness on the screen? Oh yeah, okay. Uh. (laughing) Are, are you, uh, able to hear us? |
| Cathryn Oakley: | 21:15 | I am able to hear you. |
| Chairman Capito: | 21:17 | Okay. |
| Cathryn Oakley: | 21:17 | Are you able to hear me? |
| Chairman Capito: | 21:19 | We can hear you. Would you please introduce yourself to the committee and, uh, who you are here representing? |
| Cathryn Oakley: | 21:35 | Yes, definitely. I'm [inaudible 00:21:35]. Hold on one second. |

| Chairman Capito: | 21:35 | Mark, go up and mute that. |
| Mark: | 21:37 | Should I mute that computer? Well, then she won't be able to hear us. |
| Chairman Capito: | 21:39 | Yes, you're right. |
| Cathryn Oakley: | 21:40 | Yeah, I can hear you. What, I'll turn my volume down while I'm introducing myself and then I'll turn it back up so I can hear you. Um, my name is Cathryn Oakley and I am the, uh, State Legislative Director and Senior Counsel at the Human Rights Campaign. Um, the Human Rights Campaign is the nation's largest organization working for equality for the LGBTQ community. Um, and I'm here on behalf of our more than three million members and supporters nationwide, including many in West Virginia, um, in opposition to the bill. And I stand ready to answer questions and, and also provide a brief statement if you allow. |
| Chairman Capito: | 22:19 | Thank you very much, Ms. Oakley. We appreciate you taking time on your Friday to be with us, as they say. So if you would, please raise your right hand. We'll swear you in. Then we'll allow questioning. Would you please raise your right hand? Do you swear to tell the truth, the whole truth and nothing but the truth? |
| Cathryn Oakley: | 22:34 | I do. |
| Chairman Capito: | 22:38 | Thank you very much. Chair recognize chairman from 37th for questions. |
| Del. Pushkin: | 22:41 | Thank you, Mr. Chairman. |
| Chairman Capito: | 22:43 | Hm? Oh. |
| Del. Pushkin: | 22:44 | Thank you, Mr. Chairman and, um, thank you for, uh, attending, uh, uh, the, uh, whatever service we're using now, uh, Ms. Oakley. Can you hear me? |
| Cathryn Oakley: | 22:53 | I can. Thank you so much for having me and, um, to Mark for facilitating my being able to be here. |
| Del. Pushkin: | 22:59 | Okay. And, um, so you've, you, I guess you followed cases like this throughout the country, right? That's, that's part of your job at the Human Rights Campaign, is that correct? |
| Cathryn Oakley: | 23:09 | That's correct. |

| Del. Pushkin: | 23:10 | Okay. Have you, there was asked of Counsel and, and she didn't know of anybody. Do, do you know of any cases in West Virginia? |
| Cathryn Oakley: | 23:18 | I do not know of any cases in West Virginia. |
| Del. Pushkin: | 23:21 | Okay. Um, the, the, but you have . . . Well, first of all, uh, I guess this is based on a premise that a, um, a, uh, transgender athlete would have some sort of advantage over, uh, other participants. Do you, is, I'm trying, have you heard of an actual advantage being created by transgender athletes? |
| Cathryn Oakley: | 23:46 | Yeah. Thank you for that question. That's a really important question. And I'll preface this by saying that groups like the National Women's Law Center and, uh, the Women's Sports Foundation, Women Leaders in College Sports all support inclusive polices that allow transgender athletes to participate. Um, and I, that is because, uh, to, to your excellent point, um, transgender kids, and I, you know, particularly this conversation ends focusing on transgender girls, um, transgender girls, like all girls, uh, have a variety of different bodies. They have a variety of different talents. They have a variety of different interests. |
| | | Some of them will be tall, some of them are short. Some of them are fast, some of them are slow. Some of them will have excellent hand-eye coordination. Others of them will not. Um, and so, you know, the trans pop- the trans population is, is fairly small. Uh, if you are, really only concerned with trans girls, that's then half of that number. And then of course, of those, uh, trans girls, you're, you're talking about only a few that are going to be interested in sports, um, and have, you know, sort of the combination of interest of, of physical capability, um, mental drive, work ethic to be able to excel. |
| Del. Pushkin: | 23:46 | Mm-hmm (affirmative). |
| Cathryn Oakley: | 25:00 | And I think very much to your point, the reason that we do not actually see, uh, instances of problems, uh, in, in the states, um, even though 16 states allow trans youth to participate in sports consistent with their gender identity and have done so for many years, um, there, there are in fact not issues in the states. Um, there is one, uh, case of Connecticut which we can speak about that much has been made of. |
| | | Um, I think it's really been misrepresented what's happened in Connecticut. So, I'm happy to help, uh, diffuse some of the misinformation about that. Um, but there, this is just simply not a problem, particularly in elementary and secondary schools. Um, some of the bills that we're seeing, I know not this one, uh, deal also with collegiate athletics. So, I'll also just say that the NCAA |

has had a policy for more than 10 years regulating, uh, trans, uh, participation in sports. And they also have not seen, you know, women's sports collapse as a result of, uh, people pretending to be girls in order to compete and excel.

Del. Pushkin:    26:06    Okay. Well I, I have a couple concerns about what the real consequences that, uh, this legislation could also have and that would, again, with my next question, um, do you have any statistics on like, about mental health issues or even suicide rates among the transgender teens?

Cathryn Oakley:    26:29    Yes. Um, you know, I want to preface this by saying that, uh, for transgender teens who are able to receive, um, age appropriate, medically necessarily care, um, the numbers are quite different. And in fact, having just one supportive adult in a trans youth's life can make a tremendous difference. But yes, um, trans youths experience extremely high levels of anxiety and depression, um, and also have an extremely high rate unfortunately of suicide and suicidality. Um, particularly, as I say, when they are not, um, supported by adults in their lives.

Um, and we have also found by the way that there is, uh, there is true harm, um, even with bills that are, uh, are challenging trans identity, even when they're introduced but not passed.

Del. Pushkin:    26:29    Hm.

Cathryn Oakley:    27:24    The rhetoric around those bills can be extremely harmful to transgender youth who are hearing them at home.

Del. Pushkin:    27:33    So even though it's unlikely that, that there's going to be participation from transgender girls in sports because we haven't seen it in a whole lot of places, the bill itself could be harmful just for a group that's already extremely alienated, is what you're saying, right?

Cathryn Oakley:    27:48    That's exactly what I'm saying. It's that there's actually no harm here that's being addressed by a piece of legislation like this, but, uh, there's, there's no, there's no, uh, no purpose for it. But there is harm perpetrated by it.

Del. Pushkin:    27:48    That's what I was getting at.

Cathryn Oakley:    28:01    Um, and particularly should it pass, you know, it's targeting an extremely vulnerable group of youth uh-

Del. Pushkin:    28:06    Right.

Cathryn Oakley:    28:07    . . . who as you say, are already experiencing extreme amounts of discrimination. And I, I do think that when we hear this idea that

|  |  | there might be boys who are pretending, um, to be transgender women in order to get an advantage, transgender girls in order to be at an advantage, um, given the amount of discrimination that transgender youth face, uh, it's, it's really, uh, extremely difficult to imagine that that's something that anybody would do. |
|---|---|---|
| Del. Pushkin: | 28:31 | All right. Just a couple more questions. Um, I'm thinking now about, uh, like cisgender girls meaning a female, assigned a female at birth, identifies as a female, a female athlete, okay, who happens to be . . . Have you heard of any instances where it's a female athlete who just happens to be maybe tall, maybe, uh, more muscular than the other girls and the opposing team, or the opposing coach or opposing parents, uh, might make, uh, an accusation that, that, uh, she's not a girl? And then because of a law like this, they would like check into her background or something. Or, or it's been, being brought up because of a law like this. Have you heard of any instances of that, like that sort of thing happening? |
| Cathryn Oakley: | 29:20 | Yeah. Well, it, so there, there's only, um, well now two laws, that are, have passed that are on the books about this. One of them was passed only last week and hasn't yet gone. Last week, I think it was signed. And it has not gone into effect. Um, the other is the, uh, is the similar law that passed in Idaho last year, the HB500. Um, that law has been enjoined. It was challenged, um, in, uh, in the Ninth Circuit and, um, is currently enjoined, suspended from going into effect. So, we haven't had any of these laws in place yet that would give rise to that kind of a, uh, situation. |
| Del. Pushkin: | 29:57 | Ah- |
| Cathryn Oakley: | 29:57 | However, certainly that would be a side effect of what these bills would do is allow for the harassment of cisgender- |
| Del. Pushkin: | 29:57 | Yeah. |
| Cathryn Oakley: | 30:06 | . . . girls who are simply bigger and stronger. And I'll say, I'm 5'10". You can't, probably can't tell over Zoom. Um, I've been 5'10" since I was in sixth grade. Uh, and I promise you that did not come with any kind of sports advantage, no matter what people might think. Um, but certainly, you know, this idea that cisgender girls might be harassed for, you know, going through puberty early or being the first ones to grow, uh, that is, that's absolutely, um, possible that, that, that this bill will enable, uh, harassment for those girls. |
| Del. Pushkin: | 30:39 | Well your answer led me to one last question. First of all, I guess two if you count this one. You're an attorney with the Human Rights Campaign, right? You're a, you're a- |

| Cathryn Oakley: | 30:39 | Yes. |
|---|---|---|

| Del. Pushkin: | 30:46 | . . . you're an attorney? And you said this law hasn't been enacted anywhere 'cause it's in court. So, is it constitutional? |

| Cathryn Oakley: | 30:53 | No. |

| Del. Pushkin: | 30:54 | Okay. Thanks. That's all the questions I have, Mr. Chairman. Thank you very much. |

| Chairman Capito: | 30:59 | Further questions from Ms. Oakley? Further questions from, for Ms. Oakley? Ms. Oakley, thank you so much for being with us today. Uh, I'm sure there's nowhere else you'd rather be on a Friday afternoon. |

| Cathryn Oakley: | 31:11 | Never. Thank you so much. I appreciate it. |

| Chairman Capito: | 31:14 | Of course. Is there further desire by or of any member of the committee to call a witness, um, either that may be in the hallway or that might, uh, come to us virtually? Does any other member of the committee desire leave of the committee? Okay. If not, are there amendments to the bill? Are there amendments to the committee substitute? If not, chair recognizes Gentleman from the 32nd to move the committee substitute. |

| Del. Haynes: | 31:45 | Thank you, Chairman Capito. [inaudible 00:31:48] recommendation that we do that. |

| Chairman Capito: | 31:47 | You have heard the Gentleman's motion. Is there discussion? Gentleman from the 17th. |

| Del. Lovejoy: | 31:52 | Thank you, Mr. Chairman. [inaudible 00:31:53] full opposition to the bill. The timing of the bill is not the best. Um, I think that we have, this is another solution in search of the problem. But even more than that, we have legal guidance on this. We have a case from the Fourth Circuit in August of 2020 which tells you a law in this very area of Title IX. That decision is currently on appeal to the US Supreme Court. I don't know when they will rule but probably before, maybe before we get home or shortly thereafter we'll know whether the granted decision stands. Now, my friends have brought up some questions about that Grimm decision, and my good friend from the 13th said, "Well it's completely separate." |

| | | And I tell you that, that it is true the Grimm case does not deal with sports, but the Grimm case deals with the same issue. You have a school board that enacts a policy that says, students are required to use this facility, um, of the gender assigned at birth, okay. Um, and the Supreme Court, or excuse me, the Fourth Circuit struck it down, said you can't do that without violating |

Title IX. So if you have a policy based on a law that says you have to use or play in the team of the gender assigned at birth, it's not that much of a leap in logic to think that the same thing would apply, especially since Grimm was based on Bostock, which is another 2020 case written by Justice Gorsuch that applied, um, uh, the Title VII of the Civil Rights Act, um, that said discrimination based on sexual orientation and gender identity in the employment context.

So, you know, if you don't think that's the way it's going to go, what's the harm in giving it a couple months to find out what the law's going to be? Save our schools from Title IX violations and, and all the stuff that, um, that comes along with it. And so, I, that's the legal ground. All right. But more than that, I want to talk about the human ground.

Um, I don't know if you know a lot of transgender youth. Um, there's a lot of misconception, there's a lot of myths, there's a lot of stories about what kind of people they are. Um, they get sometimes per- put on these labels as some kind. They're, they're trying to sneak into bathrooms or get unfair competitive advantages and kind of demonized. And we do that a lot. I submit that if you will spend some time talking to some and you p- I promise you, you have them in your district, you'll find that they're like every other kid. And maybe a little worse in the sense that they face things that none of us maybe understand.

They're not trying to get over on anything. They're trying to stay alive today. They're trying to make it through the day, uh, in a, in a world that frankly is, is a little more cruel maybe than it should be. So for me, if I have a child and, and I know several in my, in my district, that the one thing that they have that makes them feel like a part of something, like a human being with dignity and respect, is being on that team, or, or running in that practice, I'm not going to take it away from them and and, and put them back into this, this, this category or subject them to a, what my friend talked, the, the external genitalia inspection. I'm just not going to do that. I don't think it's right. I don't think it's what we need to do for kids.

We've made it a long time being able to figure out how to play sports together and how to use bathrooms and all that. We don't need a law to tell us. Uh, but if you think we need a law, you'll have one here in, in a couple of months. So for those reasons Mr. Chairman, I, I can't support this bill and I hope that, that my friends will join me in opposition.

Chairman Capito:    35:25    Further discussion. Gentleman from the 50th.

| | | |
|---|---|---|
| Del Garcia: | 35:34 | Thank you Mr. Chairman. I'm speaking in opposition of this bill. As somebody who's represented female, uh, women who've been sexually assaulted in prisons, I didn't come to Charleston to force unwanted invasive sexual assaults of young girls, young boys. That's what this bill does. That's what you're doing if you vote yes on this. That's what the language says. That a doctor, that, this isn't a health, this isn't an examination for the purpose of seeing whether somebody's in good health. This is somebody, a doctor looking at whether there's unaltered internal and external reproductive anatomy. |
| | | That is disgusting. This bill singles out a group of people who face a challenging world. And I also didn't come down to Charleston to push somebody over the cliff if they're getting to the point of, of thinking about whether this life is worth living. That is crap. We shouldn't be doing this. Every single human being is made in the image of God. Every single one, whether you understand it or not. Whether you agree with how somebody lives or not, that's what we're talking about here today. I cannot support this bill. |
| Chairman Capito: | 37:42 | Further discussion. Chair recognizes Lady from the 4th. |
| Del. Zukoff: | 37:47 | Thank you Mr. Chairman. I'm also going to re- I'm also going to not support this bill for several reasons, both of which are, have already been mentioned from my friend from the 17th and the 50th. But I'm going to actually come at this from the aspect of a mother and my two daughters. And I raise my children to respect people as they are, not as some preconceived notion of what society thinks they should be. Or to ever put myself in a position that I could understand internally someone's mind, how they were made in the womb, how they came out feeling, how they felt about, you know, um, that they felt that they were always a boy. |
| | | I recently, and you all can look this up, there's a gentleman this week who just pre- he, he testified in the Missouri State Capital this week on a transgender bill similar. Has a, has a, um, child that was born as a boy, always identified as a male. And they, he and his, her mother made him dress as a boy, keep his haircut as a boy, um, had issues. And he had major issues. Was sad all the time, um, asked to dress in his sister's clothes and one day she was outside playing in the front yard with her brother and he called out to them to come to dinner. And she said, "No, it's time. I want to go across the street and play. Daddy, if I come in and change my clothes, can I go?" |
| | | And he realized what he was doing to that child by trying to make them something that they were not. And from a mother's perspective, I happened to be the mother of two very good |

Page 18 of 21

JA0113

athletes. They're adults now. One of my daughters was a two time all-state softball pitcher and a two time all-state basketball guard when she was in high school. My other daughter was a swimmer and qualified every year for the state meets and she swam in college.

So, I can tell you my personal life for 20 years was running with those girls year-round, every sport they were in. They're, some of their best friends to this day as adults are the people that they participated in sports with. It helped them create lifelong friendships. They learned about leadership. They learned about how to get along with other people. All of the aspects that we find that sports, that we all love about sports.

And I think by taking these, taking, asking these children not to participate in the one thing that may bring them joy is just simply wrong. It's wrong for us to make that decision. This decision's going to be made for us very quickly. I think we have better things to do with our time in the West Virginia legislature than put this type of legislation forth. Thank you.

| Chairman Capito: | 40:33 | Is there further discussion? Chair recognizes the Gentleman from the 13th. |
|---|---|---|

| Del. Pinson: | 40:39 | Thank you, Mr. Chair. I'll speak in favor of the bill that's in front of us today. Um, I don't think that maybe some of the dialog that, that has taken place over the last several minutes, several days, several weeks surrounding this topic is meant to be what it, what it has become. Uh, the bill that's in front of us today, uh, does not mean that individuals of this committee or of this body do not respect someone, do not have dignity for someone, despite whatever their gender might be. |

The bill that's in front of us today is trying to place guardrails on the very sports that, that we're talking about, and the participation of those sports. Uh, we have spoke some today about the requests for a birth certificate in order for individuals to be able to participate in these sports. It's not been uncommon for us to request birth certificates for education and sports in the past for age-specific reasons. Just in a quick Google search, one can find that, uh, there is such a thing as age subjectivity where someone perceives themselves to be much younger or much older than they actually are.

And we would agree or at least hope we would agree that guardrails would need to be in place if someone, let's say my age, would want to participate in sports based on a different age. So, what, what we're doing here, and I hope that it's not lost in the dialog, but what we're doing here is talking about placing guardrails on these sports. It's not meant to be demeaning or

|  |  | disrespectful. In fact, I would argue that for the individuals who are participating in their sports based on their natural-born gender, uh, I would argue that to them, it would seem that, that we are being very respectful to their natural-born gender. Thank you, Mr. Chair. |
|---|---|---|
| Chairman Capito: | 43:19 | Chair recognizes the Gentleman from, the Gentleman from the 37th. |
| Del. Pushkin: | 43:23 | Thank you Chairman Capito. Um, as one who has age subjectivity, I think I'm a lot younger than I actually am by the way, but, um, I apologize. You know, we're here at this late hour, uh, debating a bill that I complete, I feel is completely unnecessary. One of the, you know, my friend from the 13th's talking about guardrails. I'll tell you that most roads don't have guardrails because there's not a danger there. You put guardrails up where there's an actual, real danger of someone going off the side of the road but we don't have a single case of it. We are truly creating, looking for a solution in search of a problem and the solution itself is more problematic than the perceived problem. |

We heard through testimony, this is one of the most alienated groups you can think of. Teens who are struggling with their own identity at the . . . All teens are struggling with their own identity. But especially, transgender teens who are, are incredibly alienated and struggling, we're going to, their legislature is, is up, here at 4:00 on a Friday, uh, deliberating this bill that's aimed directly at them for no apparent reason 'cause we don't even have any cases of it here.

So I would not, I mean I, I definitely wouldn't assign motives. I don't know what everybody's motives are. I'm sure there are some folks who really think this is a problem. I would beg of you to do some research and see and you'll find out it hasn't been a problem. And I think that there's a lot of us here who are wondering how they're going to vote. And they don't, they know it's not really a problem but they're still kind of not sure how they're going to come down on this vote. And I would just pray that you can muster up half the courage that these kids have who we're alienating with this bill. If you could muster up half the courage they have and vote this, this bill down 'cause it's completely unnecessary.

| Chairman Capito: | 45:15 | Is there further discussion on a motion? Is there further discussion? If not, the question before the committee is on the Gentleman from the 32nd's motion to report out the committee substitute for House Bill 3293 to the full house for the recommendation of the committee substitute do pass. All in favor, please signify by saying aye. |

Page 20 of 21

| | | |
|---|---|---|
| Audience: | 45:31 | Aye. |
| Chairman Capito: | 45:32 | All those opposed, please signify by saying no. |
| Audience: | 45:34 | No. |
| Chairman Capito: | 45:36 | Aye's appear to have it. |
| Audience: | 45:38 | Division. |
| Chairman Capito: | 45:39 | Division's been called. Please raise one hand if you are in favor. One hand if you are opposed. On the question of adoption, there are 16 yes's and five no's. The motion is adopted and the committee substitute for House Bill 3293 will be reported into the floor with a recommendation that it do pass. There are two subcommittees, uh, that are out there. Actually, there's three subcommittees that are out there. Um, and I believe some of those intend to perhaps meet next week. So, uh, listen for those announcements on the floor. Is there any further business to come before the committee? If not, everybody have a nice weekend. Gentleman from the 32nd. |
| Del. Haynes: | 46:33 | 9:30 |
| Chairman Capito: | 46:36 | 9:30. |
| Del. Haynes: | 46:37 | And Mr. Chairman, I move we adjourn. |
| Chairman Capito: | 46:40 | All those in favor please signify by saying aye. |
| Audience: | 46:43 | Aye. |
| Chairman Capito: | 46:43 | All oppose, no. Aye's appear to have it. |

Page 21 of 21

JA0116

**House of Delegates Discussion of H.B. 3293**

**March 25, 2021**

| | | |
|---|---|---|
| Clerk: | 03:02:45 | Committee substitute for House Bill 3293, relating to single-sex participation in interscholastic athletic events. |
| Speaker: | 03:02:54 | Are there objections to having the bill explained in lieu of having it read? If not, the Gentleman from the 27th, Delegate Ellington to explain the bill. |
| Del. Ellington: | 03:03:01 | Thank you, Mr. Speaker. Uh, this committee substitute provides that for the purposes of participating in single-sex secondary school interscholastic athletic events under the control, supervision, and regulation of the SSAC, that each county school district shall confirm that the sex of the pupil identified on the pupil's original birth certificate be provided upon his or her admission to public school is the pupil's sex at the time of birth. Now, if an original birth certificate was not provided or if the birth certificate provided does not indicate the pupil's sex at the time of birth, a signed physician statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted prior to a pupil's participation in single-sex secondary school interscholastic athletic events. So prior to a student's participation in single-sex secondary school interscholastic athletic events, the SSAC must verify with each county board that each student participating in the single-sex interscholastic events is participating according to the student's sex at the time of birth. Now this requirement does not apply to coeducational secondary school interscholastic athletic events. In addition, this does not apply to elementary school or to higher education participation. Mr. Speaker, I urge the passage of the bill. |
| Speaker: | 03:04:41 | The question before the House is, shall the bill pass? Is there debate on the bill? The Gentleman from the 3rd, Delegate Fluharty, is recognized. |
| Del. Fluharty: | 03:04:51 | Thank you, Mr. Speaker. Will the gentleman yield? |
| Del. Ellington: | 03:04:55 | Yes, sir. |
| Del. Fluharty: | 03:04:56 | So, you know, you've heard, I'm sure you took some testimony up there in committee. Um, have you had, did |

|                    |          | you have any testimony of the number of complaints that SSAC has received regarding anybody taking advantage of the single-sex sport system we currently have? |

Del. Ellington:    03:05:13    Uh, not in West Virginia.

Del. Fluharty:    03:05:14    So not a single complaint received in West Virginia?

Del. Ellington:    03:05:17    Not at this point in time.

Del. Fluharty:    03:05:19    Well, was there any testimony that anticipated having complaints in the future?

Del. Ellington:    03:05:23    There have been in other states.

Del. Fluharty:    03:05:25    In other states. And how many have there been?

Del. Ellington:    03:05:27    Uh, I don't have that number in front of me.

Del. Fluharty:    03:05:29    You don't have that data. So can you tell me how many of in Ohio, for example, a neighboring state?

Del. Ellington:    03:05:32    Uh, I don't have that. No. I do know that a number of states have adopted similar, uh, rules. I think there were 27 states that-

Del. Fluharty:    03:05:42    Rules or laws?

Del. Ellington:    03:05:42    . . . were looking at, or same, the same ty- a similar type of legislation.

Del. Fluharty:    03:05:46    Okay. L- let's get to that. Um, first off, you mentioned it doesn't apply to grade schools, I believe. Correct?

Del. Ellington:    03:05:53    This bill does not look at elementary school participation.

Del. Fluharty:    03:05:59    Okay. At what grade would this be enforced?

Del. Ellington:    03:06:02    This would be secondary school.

Del. Fluharty:    03:06:03    Okay. So at what age are we talking? Is that sixth grade?

Del. Ellington:    03:06:08    That would probably be from sixth on to 12th.

Del. Fluharty:    03:06:11    Okay. So we're talking about at sixth grade, what are you, 11 years old at that, that point in time?

Page 2 of 41

**JA0118**

| Del. Ellington: | 03:06:17 | Thereabouts. |
| Del. Fluharty: | 03:06:18 | So thereabouts 11. This will apply to 11-year olds thereabout. |
| Del. Ellington: | 03:06:23 | If they're in secondary school. |
| Del. Fluharty: | 03:06:24 | Okay. Let's talk about how that currently works now. I pulled the, the form that's currently used for athletic participation per the SSAC, um, and individuals can be examined. And the goal of that examination, I think you would agree with me as a physician, is to find out if that person is physically fit for athletic competition. Are you familiar with how these exams work? |
| Del. Ellington: | 03:06:48 | Uh, I have performed some of them in the past. |
| Del. Fluharty: | 03:06:50 | Uh, that was my, my next question. So you've performed these exams in the past, and there's criteria for it. Includes screening of the abdomen, respiratory, cardiovascular issues. Would you agree with me, the goal of the current physical exam is to make sure the per- the individual, uh, i- is going to safely participate in sports. Right? |
| Del. Ellington: | 03:07:10 | I would agree with that. |
| Del. Fluharty: | 03:07:11 | Okay. And there is through the p- through the screening process as a physician, uh, you're checking for things to, to make sure that individual, uh, will safely participate and there's no risk in that the examination you're doing and the questions you're asking, there's a medical goal at the end of the day for each step. Correct? |
| Del. Ellington: | 03:07:31 | I would agree with that. |
| Del. Fluharty: | 03:07:32 | Okay. Um, what is the medical goal of identifying whether somebody has an un- unaltered internal or ex- external reproductive anatomy? |
| Del. Ellington: | 03:07:41 | The medical goal on this bill is just stating that if, but if they do not have their gender assigned on their birth certificate that one would have to be provided by a physician statement. |
| Del. Fluharty: | 03:07:52 | Well, but through that process, you're not discovering whether they can actually participate safely in sports. |

Page 3 of 41

JA0119

|  |  | You're just discovering their anatomy, uh, their anatomy based upon whether they have unaltered internal or external reproductive anatomy. Right? |
|---|---|---|
| Del. Ellington: | 03:08:08 | That's what this bill is stating. |
| Del. Fluharty: | 03:08:10 | Okay. So there's no actual medical benefit to this exam going to this next level, is there? |
| Del. Ellington: | 03:08:17 | Uh, I would disagree with that. |
| Del. Fluharty: | 03:08:18 | Okay. Why? Tell me how. |
| Del. Ellington: | 03:08:20 | Why? Because if you have an individual that may have, uh, different characteristics that makes their ability stronger or, um, physically stronger or ha- or their habitus is different, that maybe that might affect, uh, injury to other participating students in the same sport. |
| Del. Fluharty: | 03:08:40 | So you're worried about other individuals playing the sport? Of course, we're not actually worried about it because you didn't have a single reference you could cite for me as taking place. |
| Del. Ellington: | 03:08:46 | Well, that's why the single sex, uh, um, interscholastic, uh, activities are based on gender as far as if it's, uh, with girls versus boys, it's separate, as far as putting a boy that might be a lot stronger competing against a girl and injuring the girl. |
| Del. Fluharty: | 03:09:04 | How long have you been practicing medicine? |
| Del. Ellington: | 03:09:06 | I've been practicing medicine for about 30 something years. |
| Del. Fluharty: | 03:09:09 | How many exa- of these exams do you believe you've done in those 30 something years? |
| Del. Ellington: | 03:09:12 | Well, as far as physical exams for sports? |
| Del. Fluharty: | 03:09:15 | Sure. |
| Del. Ellington: | 03:09:15 | Oh, it's several years I did that, but not recently. |
| Del. Fluharty: | 03:09:18 | Okay, several years. So, through the course of your 30 some years as a doctor, have you ever had, uh, any issue |

Page 4 of 41

JA0120

|  |  | with somebody you've examined going on and playing sports and injuring another person and coming back and, and, and you had the issue of whether you should have maybe checked their anatomy a little better? |
|--|--|--|
| Del. Ellington: | 03:09:35 | When you do a physical exam, you're checking anatomy. If you're looking at the genitalia, that's a different thing. |
| Del. Fluharty: | 03:09:40 | Okay. Well this requires, um, checking for unaltered internal anatomy. Do you do that currently? |
| Del. Ellington: | 03:09:49 | You can do that hormonally. |
| Del. Fluharty: | 03:09:50 | You can do it hormonally. Do you do it currently? |
| Del. Ellington: | 03:09:53 | I haven't had to do that for, uh, sports physicals, but I have done that for other exams. |
| Del. Fluharty: | 03:09:58 | Okay. So in your 30 some years of practicing medicine, and, and during that time providing physical examinations for sports, you've never had to check the internal organs? |
| Del. Ellington: | 03:10:09 | Not for sports physicals. |
| Del. Fluharty: | 03:10:10 | Okay. But you would under this bill, right, if there's no birth certificate? |
| Del. Ellington: | 03:10:15 | If I was the one that had to attest to the gender of the, uh, the individual. |
| Del. Fluharty: | 03:10:19 | Okay. So under current law, that's not taking place, but after we pass this today, you as a doctor would now be checking the internal organs to make sure they're unaltered? |
| Del. Ellington: | 03:10:29 | No, the- I, that's not what this bill is saying. |
| Del. Fluharty: | 03:10:33 | Well, excuse me? |
| Del. Ellington: | 03:10:34 | The bill is saying that if someone wants to prove what their gender is without their birth certificate, that they would have to have proof from a physician. That's not necessarily during the sports physical. |
| Del. Fluharty: | 03:10:44 | Well, let's talk about that proof that's required. It's not currently required under law. Okay. If there's no birth |

Page 5 of 41

JA0121

certificate, the proof now required is for you, the physician, to check for unaltered internal and external reproductive anatomy.

| | | |
|---|---|---|
| Del. Ellington: | 03:10:57 | Well, it's not necessarily for me. It could be for whatever physician they want. |
| Del. Fluharty: | 03:11:00 | Okay. For any physician. Okay. If we're going to get, if we're going to play games like that. |
| Del. Ellington: | 03:11:03 | I mean, they mostly have pediatricians and stuff that already know their anatomy. |
| Del. Fluharty: | 03:11:08 | The point is, the point is, Doctor, the point is under the current practice, you're not going around checking for the internal organs as far as the examination related to anything SSAC-related for sports, are you? |
| Del. Ellington: | 03:11:22 | Uh, internal organs can be checked, yes. If you think there's something cardiovascular, if- |
| Del. Fluharty: | 03:11:22 | Is it a requirement? |
| Del. Ellington: | 03:11:27 | Yes there is. If there is a cardiovascular problem, you refer them to a specialist for echos or other workup. |
| Del. Fluharty: | 03:11:33 | But it's not currently a requirement as it would be if they're not- |
| Del. Ellington: | 03:11:36 | If you feel that they're not medically competent to be able to participate, if there's injur- risk of injury to them, you refer them to something else or you deny their ability to participate. |
| Del. Fluharty: | 03:11:44 | How exactly do you check whether pupils, an 11-year-old potentially, an 11-year-old, whether they have unaltered internal reproductive anatomy? Explain that process for us. |
| Del. Ellington: | 03:11:58 | Uh, they would have exams by their provider. |
| Del. Fluharty: | 03:12:01 | O- I- I want to know what the exam's like. Tell me. |
| Del. Ellington: | 03:12:04 | I, I don't think that's in the pro view of what I'm trying to discuss here. I mean, I, I've done internal exams on people before in my practice that all vary in different ages. |

| Del. Fluharty: | 03:12:15 | All right, thanks for- |
| Del. Ellington: | 03:12:16 | I mean, I don't- |
| Del. Fluharty: | 03:12:16 | Your time. |
| Del. Ellington: | 03:12:16 | . . . know if that's pertinent to this part for- |
| Del. Fluharty: | 03:12:18 | Thanks for your time. |
| Del. Ellington: | 03:12:19 | You're welcome. |
| Del. Fluharty: | 03:12:21 | You can have a seat too, I'm done. |
| Speaker 22: | 03:12:22 | [crosstalk 03:12:22] |
| Speaker: | 03:12:22 | The gentleman did not sustain the point of order, so the gentle- the gentleman- |
| Del. Fluharty: | 03:12:39 | Very briefly, to the- |
| Speaker: | 03:12:40 | . . . is still recognized. |
| Del. Fluharty: | 03:12:41 | Briefly to the bill, you could tell that he was uncomfortable answering the questions about the actual exam. Imagine how uncomfortable it's, it's going to be for an 11-year-old who is subjected to it. You know, we had this bill on Friday. I thought about it all weekend. Fired up over it, because, you know, I was raised in a way that, if somebody's being bullied, you have a decision you can make. You could support the bully, you could take up for the person being bullied, or you could remain silent and let it go. |
| | | I'm not going to do that today. I would urge you not to do that today, because as of right now at this legislation, we are the bully. We are the bully, against kids. 11-year-olds. Picking on kids who are already suffering enough, struggling to get by just to be themselves. And because what we do now, we govern in these extremes. People make some Facebook posts and then you, you guys run out and print a bill. |
| | | That's what we do, we govern by Facebook commentary. It's, it's sad. It doesn't make any sense. I know this is going to pass, because you're more concerned with the reelection |

campaign that you are with the real effects on children in this state. I don't get it. I mean, just read this. They have to check whether the pupil's unaltered internal and external reproductive anatomy has to be submitted before participation.

No evidence that it's an issue anywhere really, and it's certainly not an issue in West Virginia. No evidence of it. He couldn't even go through the exam process in detail because he was that uncomfortable with telling us what the details are. So, I'm voting no. It's an easy no vote for me because I'm not going to be the bully. I'm not going to allow the bully to continue to bully kids in silence. I'm just not going to do it.

It's absurd, and I think that's how West Virginians were raised to take up for kids who are being bullied. This does the exact opposite. I'm voting no.

| Speaker: | 03:15:05 | The gentleman from the 10th [inaudible 03:15:07]Conley is recognized. |
| Del. Conley: | 03:15:11 | Thank you Mr. Speaker, may I speak to the bill? |
| Speaker: | 03:15:14 | Yes, gentleman is recognized. |
| Del. Conley: | 03:15:18 | Uh, I appreciate the the, uh, the law that's been presented here, the bill that's been presented here I should say. Um, and it's a, a verification of a law that's already on the books. And, uh, let me just, uh, if you may bear with me, read from that book and read from, to you that law. It's, uh, King James' version, Genesis, chapter one. Starting with verse 26. And God said, "Let us make man in our image after our likeness, and let them have dominion over the fish of the sea, and over the fowl of the air, and over the cattle, and over all of the Earth, and over every creeping thing that creepeth upon the Earth." So God created man in his own image, in the image of God, created him male and female- |
| Speaker: | 03:16:08 | That point of order is raised. That point of order is raised. Gentleman will state the point. |
| Del. Fluharty: | 03:16:12 | Talk about the bill please. |
| Del. Conley: | 03:16:12 | I'm sorry? |

Page 8 of 41

**JA0124**

| Del. Fluharty: | 03:16:13 | That's not related to the bill. That's not related to the bill. His- |
| Speaker 25: | 03:16:17 | [inaudible 03:16:17] |
| Del. Fluharty: | 03:16:18 | Well- |
| Speaker: | 03:16:18 | Let's, let's- |
| Del. Fluharty: | 03:16:20 | He's not there now. |
| Speaker: | 03:16:20 | Let's go ahead and get to it. Gentle- |
| Speaker 25: | 03:16:22 | [inaudible 03:16:22] |
| Del. Conley: | 03:16:24 | . . . is, God created a man and a woman. To believe that there is a man that thinks they should be a woman or a woman that thinks they should be a man, is saying that my God made a mistake. And I've got news for all of you, my God does not make a mistake. So the bottom line is, if you're born a boy, a male, you're a male until you die. If you're born a female, you're a female until you die. So it's only fair that if you're born a male, you compete in male sports. If you're born a female, it's only fair that you compete in a female sport.<br><br>So therefor, I absolutely support this bill 100%. And I would certainly urge everybody else in here to do the same. |
| Speaker: | 03:17:12 | The gentleman from the 16th, Delegate Hornbuckle  is recognized. |
| Del. Hornbuckle: | 03:17:16 | Uh, thank you Mr. Speaker. Would the chairman of education please yield? |
| Del. Ellington: | 03:17:21 | Yes sir. |
| Del. Hornbuckle: | 03:17:22 | Uh, thank you sir. Um, in regards to football, uh, whether it be middle school or high school. Uh, if there is not a girls' team, uh, are girls permitted to play on the football team? |
| Del. Ellington: | 03:17:33 | Under Title IX they are allowed to, but there are inherent risks to injury and they accept those risks. |
| Del. Hornbuckle: | 03:17:39 | But they are allowed to play? |

| | | |
|---|---|---|
| Del. Ellington: | 03:17:41 | Yes they are. |
| Del. Hornbuckle: | 03:17:42 | Thank you sir. |
| Speaker: | 03:17:47 | The gentleman from the 50th, [inaudible 03:17:50] Garcia is recognized. |
| Del. Garcia: | 03:17:52 | Thank you Mr. Speaker. Each of us, when we put our name on the ballot, first question we were asked is, why do you want to go to Charleston? I didn't come to Charleston to create problems where they don't exist. We've heard that there's no complaints about this in the state of West Virginia, about this issue about some type of advantage, competitive advantage that, that, that individuals, that kids are making this decision just so they can do better at sports. That's not happening. But we are creating a problem. And I, I've talked to a lot of people, and, uh, last week, um, was, was talking to somebody about infrastructure and they said, "Infrastructure, who cares? How can I stay in a state like West Virginia when you pass bills like this? When you take up bills like this? How can we get our young people to stay, and how can we ever attract somebody to our state?" |

You know, I also, I didn't come to Charleston to legalize or legitimize unwanted childhood sexual assault. That is what this is. That's absolutely what this is, along with a psychological attack, an emotional attack on some of our most vulnerable people in the state of West Virginia.

And the gentleman from the third said, "Unaltered internal and external reproductive anatomy." That type of examination, that's what we're talking about. That's what, you know, relating to single sex participa- no, no, no. Relating to legalizing a form of childhood assault. That's what we're doing. That's what this bill does.

That should make you uncomfortable. That should make you angry. I know it makes me angry, because these are, these are children. These are children. They live in a harsh world, a cruel world. You know, one in three transgender kids attempt to commit suicide. Did you know that? That was from a letter that we received from the American Academy of Pediatrics, that you have on your desk.

So, I did not come to Charleston to take any action that would make it more likely that anybody who is considering

whether or not this life is worth living anymore, to push them over the edge. I got, um, an email last Friday after we had our judiciary committee meeting, from somebody who works with a number of LGBTQ+ young people. And she was talking about how it had been a struggle to engage them in this legislative session.

And she said in her email, she said, "They care about this bill, but I have not dared to suggest they follow any of the video or audio discussions, out of fear for what they might hear their own representatives say about them." Kind of like what we just heard from the gentleman from the 10th. I mean, do you know that, you know, 2%, 2% of people actually have both reproductive organs.

So, I don't expect that I'm going to change anybody's mind in here, but I do have the opportunity to speak to those children that are listening. And I would just say this, every, every child is a beautiful creature of God. And yes, created in God's image, and beautiful exactly, exactly as they are, regardless of what anybody thinks that they should be like. Regardless of what, whether anybody understands. That doesn't matter. That doesn't matter.

I came to Charleston to do good. I came to Charleston to solve problems. I came to Charleston to protect others. I came to Charleston to speak out against what I see is wrong. And if that means that I don't get to come back to Charleston, then so be it. [inaudible 03:22:56]

| | | |
|---|---|---|
| Speaker: | 03:23:00 | Gentlelady from the 51st, Delegate Walker. |
| Del. Walker: | 03:23:04 | Thank you Mr. p- Speaker Pro-Tem. Will the chairman of education please yield? |
| Speaker 23: | 03:23:11 | Gentleman yields. |
| Del. Ellington: | 03:23:13 | Yes ma'am. |
| Del. Walker: | 03:23:14 | Thank you Mr. Chairman. Can you tell me how many elementary students we have that are transgender in this state? |
| Del. Ellington: | 03:23:29 | I can't tell you how many in this state. I can give you general numbers that I have on transgender. |

| | | |
|---|---|---|
| Del. Walker: | 03:23:36 | No, that's okay sir. I, I just wanted in this state. Thank you. Do you know how many secondary transgender students- |
| Del. Ellington: | 03:23:45 | I do not, I do not have a breakdown on that. I just have .7% of U.S. teenagers- |
| Del. Walker: | 03:23:49 | That's, that's fine. |
| Del. Ellington: | 03:23:50 | Are transgender teens. |
| Del. Walker: | 03:23:51 | I appreciate you. I don't mean to cut you off. Just bear with me as I bear with you. So we, so do you know how many students that this bill would affect, if you can't tell me those numbers? |
| Del. Ellington: | 03:24:04 | I don't, and I don't think you can either. |
| Del. Walker: | 03:24:05 | In, in West Virginia. Okay. |
| Speaker 23: | 03:24:08 | Gentleman may state his point of order. |
| Speaker 24: | 03:24:12 | The, uh, chair of, uh, education has yielded the questions. Uh, uh, I think he should have an opportunity to, uh, answer the questions before, uh, proceeding to the next question. Thank you. |
| Speaker 23: | 03:24:22 | Gentleman's point is well taken to the lady. If you ask a question, please allow the gentleman to answer. |
| Del. Walker: | 03:24:27 | Thank you. Mr. Chairman, no disrespect at all, but if I'm asking for a certain state, could you just say you don't know and we can proceed? Cause I have a list of questions, thank you. Is there any other medical injury or diagnosis that can occur with someone that may cause for an internal or external, um, genitalia to be altered, besides if they choose to be, you know, besides going through the transgender surgeries? |
| Del. Ellington: | 03:25:09 | If you're saying that they choose gender- |
| Del. Walker: | 03:25:10 | No, if they- |
| Del. Ellington: | 03:25:10 | Corrective surgery, then- |
| Del. Walker: | 03:25:12 | Are there any other medical diagnosis that may cause external or internal body organs to be changed? |

JA0128

| Del. Ellington: | 03:25:20 | Not to be changed, but to be ambiguous, then there- |
| Del. Walker: | 03:25:20 | Okay. |
| Del. Ellington: | 03:25:23 | There are genetic disorders, yes. |
| Del. Walker: | 03:25:25 | So there are genetic disorders? |
| Del. Ellington: | 03:25:27 | Yes. |
| Del. Walker: | 03:25:30 | So, if someone was doing this examination, that would need to, it could be an assumption that maybe this was a procedure? |
| Del. Ellington: | 03:25:43 | No. If, uh, at birth, if there was ambiguous genitalia they would do a karyotype to determine what their, uh, what their gender is or if there was some other genetic issues such as Turner's or Klinefelter syndromes, for example. |
| Del. Walker: | 03:26:00 | Can you give us some examples of altered internal or external reproductive? |
| Del. Ellington: | 03:26:07 | Well, altered would be if they're on medications as far as internal. External would be corrective surgeries. |
| Del. Walker: | 03:26:15 | So, when you speak about corrective surgeries, so maybe, um, breast removal if that person had cancer? |
| Del. Ellington: | 03:26:21 | Well someone would've ha- if they had that then yes, but there would be a provider that could attest to that surgery. |
| Del. Walker: | 03:26:27 | Thank you Mr Chairman. Can I speak to the bill Speaker Pro-Tem? |
| Speaker: | 03:26:31 | Gentlelady may proceed. |
| Del. Walker: | 03:26:32 | Thank you. I appreciate it. Colleagues. We just debated. Freedom. [inaudible 03:26:49] Same difference. I'm not the parent. I don't have a child who is transgender. And not all of us practice the same religion. And we need to be mindful of that while we share our truths, respectfully. But what is so disheartening about this bill is that a child can play a sport until they get to secondary education, where their classmates may not see their differences at all. Where that child may not have been bullied before, we're opening up an opportunity. |

This flag sits on my desk for all the children and adults who are thankful to be alive, and for those who have died. Transgender people, especially transgender black people, are killed at high numbers. If we're going to talk about the rules and the respect and the good book, let's think about those individuals. If we're going to pass judgment, and this is your truth and this is your conviction, what are we saying to the children? This is not about adults. These, this is about children. Those numbers couldn't be answered but I have them. 1.0% of West Virginians at age 13 to 17-years-old identify as transgender. 1%. That's 1% that we're not going to allow in team sports, where we build team leadership and we build a bond. And we build athleticism, and we tell them right here, at secondary education, "You don't matter. You're not good enough."

Once again, I have to go back to when I went through my first year of being here. Cause we had a lot of truths today, and it shakes my soul. You called them butch, you called them the F word. You called them creatures, you called them a disgrace of God. You called them demons, you called them the devil. Well guess what I call them? Love.

I call them children. I call them future leaders. I call them trendsetters. I call them change makers. I call them to lead. I call them to use their voices. I call them to speak their pain. And I sit, uncomfortable in those moments, so they can have their own movement. Who is this bill helping, and who is it hurting? West Virginia, a place to live, work, raise a family if you choose, only if you're not transgender. Thank you, Mr. Speaker Pro-Tem.

| | | |
|---|---|---|
| Speaker: | 03:31:33 | Gentleman from the 43rd, Delegate Thompson. |
| Del. Thompson: | 03:31:39 | Thank you Mr. Speaker. Would the chair of education yield for a couple of questions? |
| Speaker: | 03:31:44 | Gentleman yields. |
| Del. Ellington: | 03:31:45 | Yes sir. |
| Del. Thompson: | 03:31:46 | Thank you Mr. Chairman. Um, so, you are a, an OBGYN by practice, correct? |
| Del. Ellington: | 03:31:53 | Yes sir. |

JA0130

| Del. Thompson: | 03:31:54 | So, can you tell me, um, after conception, when do sex organs develop on a fetus? When do they start developing? |
| Del. Ellington: | 03:32:03 | The, the start, immediately, as far as the genetics. |
| Del. Thompson: | 03:32:06 | Okay. So within like, seven to 12 weeks, they're, they should be really kind of, uh, mostly somewhat formed, to an extent? |
| Del. Ellington: | 03:32:13 | Uh, seven to 12 weeks, the genetics is there, and different features over the course of their normal 40-week gestation develop. |
| Del. Thompson: | 03:32:22 | Okay. When do, when does the, the brain start really developing and the, the higher function level of the brain start developing? |
| Del. Ellington: | 03:32:30 | As they get much older when they're out. |
| Del. Thompson: | 03:32:32 | Okay. Um, so would it be- |
| Del. Ellington: | 03:32:36 | [inaudible 03:32:36] |
| Del. Thompson: | 03:32:36 | Correct to say that your sex organs are developing before your brain? Uh, higher function levels of your brain? |
| Del. Ellington: | 03:32:42 | Well, sex organs develop more during puberty. |
| Del. Thompson: | 03:32:45 | Okay, yes, true, but like, I'm talking about solely in utero. Like, whenever they're- |
| Del. Ellington: | 03:32:49 | E- you're talking about external characteristics? |
| Del. Thompson: | 03:32:52 | Yes. |
| Del. Ellington: | 03:32:53 | Well, there are external characteristics at birth, so they develop in utero. |
| Del. Thompson: | 03:32:57 | Okay. |
| Del. Ellington: | 03:32:57 | But the secondary sex characteristics develop during puberty. |
| Del. Thompson: | 03:33:01 | Okay. Um, then, I have a couple questions too. Uh, was the WVSSAC contacted about any of this? Because I know in |

committee we didn't have a rep, because I did have some questions for him but I, we never-

Del. Ellington:    03:33:16    Yes, they, they were contacted, and as was stated during the committee meeting when you asked about that, they were over on our senate colleague's side. But yes, they were contacted and they responded that they abide by Title IX, uh, regulations, uh, for the school system.

Del. Thompson:    03:33:33    Uh, but I also wanted to ask them, and I don't know maybe if you heard, ha- have they heard of any complaints across the state of anyone qu- you know, uh, saying that this is a major problem they're facing in their schools? This is something that's really happening and it's just causing a big problem?

Del. Ellington:    03:33:47    No, they, you'd have to ask them more specifically, but no, they did not point that out to us.

Del. Thompson:    03:33:52    Okay. Um, and in the bill it says that, uh, it's based on a, your birth certificate. Um, who cont- who, who authorizes birth certificates? Is it, it's the state you were born in, right? So if you're born in West Virginia, West Virginia basically, you know, has authority over your birth certificates. If you're born in Ohio, Ohio, the county or city which you're born, they'll have the control of your birth certificate, correct?

Del. Ellington:    03:34:16    Birth certificate's filled out at the time of birth, and it's authorized at the hospital or facility where that happens.

Del. Thompson:    03:34:21    Okay.

Del. Ellington:    03:34:22    By the provider that delivered the person.

Del. Thompson:    03:34:24    So, in, in West Virginia, if a person would change their birth certificate to have their name altered to their new chosen name or, and their gender through a court order, a court decision, um, despite the fact that that has been changed, they would still have to play on the sport of their birth ass- that they were assigned at, at . . . or their, their gender assigned at birth. Is that correct?

Del. Ellington:    03:34:51    They would have to, uh . . . with this bill, they would have to abide by what their gender was at birth.

Page 16 of 41

| Del. Thompson: | 03:34:58 | Even if their birth certificate has been changed to reflect their new- |
| Del. Ellington: | 03:35:00 | Well, well apparently West Virginia does not allow birth certificates to be amended on the basis of sex alone. |
| Del. Thompson: | 03:35:09 | Are you 100% sure on that? |
| Del. Ellington: | 03:35:11 | Uh, that's what counsel has here. They have a West Virginia Supreme Court ruling on July 18th, 2020, ruled, uh, that the code section in 16525, which allows a birth cert- birth certificate to be amended does not authorize the sex on the birth certificate to be changed. |
| Del. Thompson: | 03:35:31 | So even a court order, you're saying, would not allow the birth certificate to be changed? |
| Del. Ellington: | 03:35:35 | Well a court order can change that, but not by West Virginia code for the original birth certificate. |
| Del. Thompson: | 03:35:41 | Okay. Um, I have no further questions but to speak on the bill now. |
| Speaker: | 03:35:47 | Gentleman may proceed. |
| Del. Thompson: | 03:35:49 | So, here we are again. We, uh . . . Here in Charleston we've had a lot of, you know, we have bills that all affect dif- us differently. Some of us are, you know, doctors, some of us are teachers, some of us are insurance salesmen. Some of us, we come from different industries, and we deal with different bills that affect those industries. But, but, a few of us, well the vast majority of us actually have never had to have bills that address who you are as a person, who you love, how you identify. I have for the past three years. I haven't had that privilege. |
| | | As my friend mentioned, West Virginia has 1%. That's the highest rate of transgender students in this n- in this country. And then you look at the demographics. I love demographics, I start looking at that stuff and analyzing it. And I look at it, and you start seeing that number, that percentage drop off significantly when they turn 18. Why? Why, is because they move away. Because we make, we enshrine transphobic language into laws. |

JA0133

They're not respected. They want to go somewhere where they feel safe, welcomed, loved, just left alone to live their lives. Now I, I'm personally appalled and disgusted that a little girl could potentially have to show a stranger her genitalia to, to prove what sex organs she has. Would you feel comfortable with your daughter, whether they are transgender or not, be subjected to that? Cause I wouldn't. It's disgusting.

We heard some other testimony too, of, you know, uh, this is about, you know, fairness, you know, to ensure that, you know, uh, there's no, uh, people assigned male at birth are playing in female sports and they have a better advantage. They're going to be stronger, just because they're born a male. I don't believe that. This isn't about that. This isn't about fairness. This isn't about health. This isn't about safety.

This is about putting those most at risk students, those most at risk kids who are already dealing with something so traumatizing, and telling them, "You can't play this sport." I, I, I know how this is going to go too, but to, to be honest I didn't come to Charleston. When I was campaigning I didn't come here, I didn't ask peop- people weren't asking me, "Hey Cody, please put some, uh, bills on the, the, in the law that, you know, are going to restrict, you know, rights for the LGBTQ+ movement. Please, that's what I really want."

They were asking, "Hey Cody, bring us some jobs. We need some jobs, some good careers. Let's fix our roads. Let's build our roads. Let's finish corridor H and Coalfields Expressway. Let's fix our healthcare, let's fix PEIA." Not one person ha- has ever asked me for legislation e- e- even similar to this. But, here we are. With that being said, I urge rejection to this bill. Thank you, Mr. Speaker.

| Speaker: | 03:40:07 | Gentleman from 36th, Delegate Pritt. |
| Del. Pritt: | 03:40:13 | Thank you Mr. Speaker. Would the chair of education ye-yield once again please. |
| Speaker: | 03:40:17 | Gentleman yields. |
| Del. Ellington: | 03:40:18 | Yes sir. |

| Del. Pritt: | 03:40:20 | Just have a few questions for you. Now, with regards to the part about an examination being performed, it only applies if an original birth certificate was not provided or, if the birth certificate provided was, does not indicate the pupil's sex at the time of birth. Is that right? |
| Del. Ellington: | 03:40:42 | That is what is in the bill. |
| Del. Pritt: | 03:40:43 | And, um, to the best of your knowledge, are secondary school interscholastic athletics voluntary? |
| Del. Ellington: | 03:40:51 | Yes they are. |
| Del. Pritt: | 03:40:52 | They are voluntary, right? |
| Del. Ellington: | 03:40:53 | Yes. |
| Del. Pritt: | 03:40:56 | Okay. And so, based on this, we're not requiring that every single student undergo an examination like this, right? |
| Del. Ellington: | 03:41:04 | No, the, they just give the . . . they have to present their bir- current code pr- they have to present their cu- their birth certificate when they go enter the school system. |
| Del. Pritt: | 03:41:14 | Okay. |
| Del. Ellington: | 03:41:14 | And typically, you'll have the gender on that at the time of birth, so that's usually not an issue. Now, if they come in and they don't have a birth certificate, if they want to par- uh, participate in interscholastic sports, then they have to give evidence of what their gender was at the time of birth. And that would be from their provider that has probably seen them many times before. |
| Del. Pritt: | 03:41:39 | So it's fair to say that this provision would only apply in a very, very, very limited number of situations, and if it does apply, it, the examination would be voluntary? |
| Del. Ellington: | 03:41:51 | Correct. |
| Del. Pritt: | 03:41:52 | Okay. No further questions. Thank you, Mr. Speaker. |
| Speaker: | 03:41:57 | Gentlelady from the 35th, Delegate Young. |
| Del. Young: | 03:42:02 | Thank you, Mr. Speaker. Will the chair of education continue to yield? |

**JA0135**

| Del. Ellington: | 03:42:06 | Yes, ma'am. |
| Del. Young: | 03:42:06 | Thank you. I've got a couple, I'm going to jump around a little bit. Um, okay, so this was a, an originating bill in education? |
| Del. Ellington: | 03:42:14 | Yes it was. |
| Del. Young: | 03:42:15 | Okay, was there a stakeholders' meeting for the, for the purpose of the bill. |
| Del. Ellington: | 03:42:19 | Um, there are stakeholders I guess, uh, citizens of West Virginia. |
| Del. Young: | 03:42:25 | But you didn't have any meetings with like, the SSAC or any sort of transgender groups? |
| Del. Ellington: | 03:42:32 | I didn't. |
| Del. Young: | 03:42:33 | Okay. Um, and did this bill go through the health committee? Cause it seems like a lot about health. |
| Del. Ellington: | 03:42:40 | No, it didn't go through health. It was originated in, uh, in education. |
| Del. Young: | 03:42:45 | Was there a second reference? |
| Del. Ellington: | 03:42:46 | No. |
| Del. Young: | 03:42:47 | Okay. And, um . . . Oh- it went |
| Del. Ellington: | 03:42:51 | [crosstalk 03:42:51] Let me correct myself. No, it went to judiciary. |
| Del. Young: | 03:42:54 | Okay, thank you. |
| Del. Ellington: | 03:42:54 | Second reference. |
| Del. Young: | 03:42:54 | And- |
| Del. Ellington: | 03:42:54 | My apology. |
| Del. Young: | 03:42:57 | No problem. Um, I'm not on either of those committees, so some of this has probably already been asked by people in those committees. Um, would you agree that this bill is about participation and eligibility? |

Page 20 of 41

| | | |
|---|---|---|
| Del. Ellington: | 03:43:09 | Yes. |
| Del. Young: | 03:43:10 | So why is it not in a rule? |
| Del. Ellington: | 03:43:14 | We haven't developed the rule yet. |
| Del. Young: | 03:43:16 | So is this for a rule or is this- |
| Del. Ellington: | 03:43:18 | Yeah, they're, they're, they're all rules as far as participation in sports already. This is, this would, this bill would be amending that. |
| Del. Young: | 03:43:27 | How would this amend the rule? |
| Del. Ellington: | 03:43:29 | It would state that you have to be in the gender that you were assigned at birth to participate in a single-sex interscholastic sport. |
| Del. Young: | 03:43:36 | But isn't this code? |
| Del. Ellington: | 03:43:37 | In the secondary schools. |
| Del. Young: | 03:43:39 | I mean, we're changing code, not the rule. |
| Del. Ellington: | 03:43:41 | Yeah, but the SSAC would have their rules for that, yeah. |
| Del. Young: | 03:43:46 | Okay, and, um, within the rules, so are you familiar with, uh, 127CSR2, which is the eligibility rule? |
| Del. Ellington: | 03:43:53 | I don't have it in front of me but I'll take your word on what you have on it. |
| Del. Young: | 03:43:57 | Okay, and it says, when the rule . . . um, there will be a waiver granted when the rule causes extreme and undue hardship upon the student, so would there be a waiver if this would cause an undue hardship- |

PART 7 OF 9 ENDS [03:44:04]

| | | |
|---|---|---|
| Del. Ellington: | 03:44:08 | Yes. |
| Del. Young: | 03:44:08 | . . . On anybody? |
| Del. Ellington: | 03:44:09 | That's what the school system has. That's what they will probably abide by. |

**JA0137**

| | | |
|---|---|---|
| Del. Young: | 03:44:12 | Good to hear. Um, okay. And also, I'm wondering what sports this applies to because like my friend from the 16th asked, there are some sports and that's in this rule too, that are everybody. |
| Del. Ellington: | 03:44:27 | This is a single-sex sports, it co-educ- co-educational sports are exempted from it. |
| Del. Young: | 03:44:34 | Okay. Um, I mean, what if the, what if the sports aren't co-educational? The rule says that if they're not like, uh, like if one school only has a sport for boys, then girls are allowed to play, so is that considered co-ed then? Like football or wrestling? |
| Del. Ellington: | 03:44:51 | Well, if, uh, if a female participated on the boys team, then I guess it makes it co-ed, but that's what Title IX requires that if there was no female team, then they are allowed to play on the male team. |
| Del. Young: | 03:45:04 | Okay. And how- |
| Del. Ellington: | 03:45:04 | It's not necessarily true the other way around. |
| Del. Young: | 03:45:07 | Okay. Would this affect that at all? |
| Del. Ellington: | 03:45:11 | No. It just says whatever gender they've designated as they get to play on that team. So it doesn't prohibit them from participating on a team. |
| Del. Young: | 03:45:11 | Okay. |
| Del. Ellington: | 03:45:18 | If it's a co-educational team, they could play on anything. |
| Del. Young: | 03:45:21 | Okay. Um, and so back to the birth certificate stuff that you and my friend over here were just chatting about. You said it's just, it's just an original birth certificate that has to be provided? |
| Del. Ellington: | 03:45:35 | Birth certificate at birth. Yeah. Your original birth certificate at birth is what this mandates. |
| Del. Young: | 03:45:39 | Do we let, um, kids participate in sports if they've changed their name on their birth certificate, maybe if they've been adopted or just change their name for whatever reason? |
| Del. Ellington: | 03:45:49 | I'm sure they do. |

| Del. Young: | 03:45:50 | So that's allowed, we're just worried about their genitals. |
| Del. Ellington: | 03:45:56 | It's allowed as far as I, if they change their name or other conditions, just this bill is just staying that it's by the gender that was assigned to them at birth. |
| Del. Young: | 03:46:06 | Okay. And, um, I, it seems like if you don't have your birth certificate, which is in the bill but unchanged, you can get an affidavit, um, explaining the ineligibility. So there are students that go into the school system without a birth certificate. Right? |
| Del. Ellington: | 03:46:24 | Um, I'm sure there are. |
| Del. Young: | 03:46:25 | Okay. So they would not necessarily have that on hand. Um, and it sounds like that this is going to apply to anybody who doesn't have their birth certificate on hand. That so anybody who maybe filled out that affidavit or lost their birth certificate throughout time? |
| Del. Ellington: | 03:46:41 | If they wanted to participate in single-sex athletics. |
| Del. Young: | 03:46:45 | Okay. So like lots of foster kids might not have that kind of stuff. Right? |
| Del. Ellington: | 03:46:48 | Right. |
| Del. Young: | 03:46:48 | So anybody, anybody who doesn't have their birth certificate is going to have to get a genital check to play sports, single-sex sports? |
| Del. Ellington: | 03:46:56 | They would have to have with their provider attest to what their gender was. |
| Del. Young: | 03:47:02 | Okay. And, um, I'm really confused how this bill fits in with the WSSAC, uh, beliefs and objectives that are on their website. |
| Del. Ellington: | 03:47:16 | Their objectives I believe, is to have, uh, provide sports or activities for the students in a safe manner. |
| Del. Young: | 03:47:24 | Yeah. It says, "The commission seeks to present proper ideals of sportsmanship so that coaches, players, authorities, officials, and spectators may combine to any activity enjoyable and productive of physical and social |

Page 23 of 41

benefits to both sides involved in the contest, with partisanship and prejudice eliminated as far as possible." I-

| | | |
|---|---|---|
| Del. Ellington: | 03:47:45 | You have it there. I, I'll take your word on that. Don't disagree. |
| Del. Young: | 03:47:48 | Okay. Thank you. Permission to speak to the bill. |
| Speaker: | 03:47:52 | Lady may proceed. |
| Del. Young: | 03:47:53 | Thank you so much, Mr. Speaker. Um, I think that this bill is all about partisanship and prejudice. We're not eliminating it. We're putting more in, I think it's full of bigotry, and I don't support it. Thank you. |
| Speaker: | 03:48:07 | Gentleman from the 47th, Delegate Phillips. |
| Del. Phillips: | 03:48:12 | Thank you Mr. Speaker. Um, like most issues we have in here, this engenders a lot of emotion on both sides. And I get a little emotional about this. Uh, last night, a young lady that I love very much had a breakout game in girls basketball and scored 19 points. And I've watched her work to earn her spot on that team, and work to earn her playing time on the court. And I, I know what she puts into it. She, uh, is going to the gym every day. She's out running in the rain and the cold and the heat. And it means a lot to her. And, uh, so I was feeling very proud last night. |
| | | And, uh, then I got to thinking about this bill and I, uh, sat down and did a little research and came up with, uh, the 100-meter dash women's world record holder is Florence Griffith Joyner, the United States. She set that in 1988, um, at a time of 10.49 seconds, that was eclipsed in 1989 by James Jett in 10.34 seconds. She also set the 200-meter record in 1988 at the Summer Olympics, and I'm old enough to remember that, um, her time on that was a 21.34. That was eclipsed in 2013 by Dante Price at time of 21.10. |
| | | The current world record holder in the High Jump is Stefka Kostadinova, probably mangled that, of Bulgaria, and her record set in 1987 is six foot, 10 and a quarter inches. The longest held record in the event. It was beat, beaten in, uh, 1998 by Nathan Fields with a seven foot three inches. And finally, the current female record holder in the mile is Stefan Hassan, who in, uh, July of 2019 set a new record at, uh, four, uh, four minutes, 12.33 seconds. That record was |

Page 24 of 41

beaten or was surpassed in 2011. And it was a time of four minutes, 8.8 seconds in the 1600 meter by, uh, Jacob Bertram.

And as we think about this, instead of feeling about it, we need to realize that there are innate physiological advantages for males. And that's why we have unisex sports, we have girls playing basketball and boys playing basketball instead of together, because it's not a fair competitive floor. And, uh, then I come in here today and we find this paper on our desk part of which says the vast majority of the people this law will harm are school kids who just want to play on a sports team. And I absolutely agree with that. That's 100% true. But it's going to harm all the kids playing on that sports team.

Um, it finishes up, it tries to address a problem that does not threaten anyone. And I don't agree with that because it does threaten the kids that, like the young lady I love so much, work incredibly hard to get their spot on the team, to get their playing time on the court. And for many of them to get a college scholarship and further their education. And we are seeing cases around the country of girls records being decimated by biological males who come in and, and wipe the rec- record books clean, and totally dominate competition.

And I know we've had, uh, some alternate feelings on that, but as long as we're thinking about this instead of feeling, I'll go back to all those records I read off. Those are women's current world records, the fastest woman in the world in three different sports and put her in the high jump. The records that I listed off that beat them, weren't Olympians. They weren't professional athletes. Those were the boys high school records in West Virginia. So if you think it's fair competition, you need to go back and tell that little girl that I love, why she's got to compete against a biological male. I'll be voting for the bill. Thank you.

| Speaker: | 03:52:17 | Gentleman from the 16th, Delegate Hornbuckle. |
| Del. Hornbuckle: | 03:52:22 | Um, thank you, Mr. Speaker Pro-Tem. Ladies and gentlemen, there's a lot going on here today, there's a lot being said. And I personally, I really relate to the message and the great words by the Gentlemen from the 50th and the third. Now I know there's also some people in this body |

that relate to the words of the gentlemen from the 47th and the 10th. But on this issue, I'm going to urge all of you, all of us, no matter what side you're on, to put the emotions on the table and to embody who all of us are, which are lawmakers.

We're lawmakers. Now, I want to share with this body that in the summer of 2020, Trump appointee Justice Gorsuch wrote the Bostock opinion. And in that Bostock opinion, talks about discrimination based on gender identity violates federal law in regards to employment. Well, with that, the Fourth Circuit, which we here in West Virginia are included in, they applied that to Virginia's bathroom bill, which was struck down.

So I would invite this body to understand that there is precedent here and upon passage of this bill potentially, it's not going to cut the muster. We're looking for a problem yet again. I would also implore our body about the good back and forth between myself and the chairman of education and also the gentlelady from the 35th. And speaking about Title IX issues. And if there is a football team and there isn't a girls football team, could the girl play on it? And she could. Then the chairman also said that, uh, that young lady would also assume the inherent risks that come with that.

And then that could also go either way. Now, in this case here, if we were to have a transgender child in this state, and they were denied the right to participate again, we're asking for a lawsuit. We're asking for extended litigation. Now that might not seem like much on the surface, but what we're going at here is we're going to hurt all the children involved. Understand we're going to hurt all the children involved, not just the LGBTQ+ community youth. Again, I want to stress the word youth, but the ones who are not a part of that community.

'Cause there could be potential suspensions of the season, Championships could be vacated, again, ongoing litigation. It could really hurt all of our youth. So I think we need to slow down here and understand, regardless of how you feel personally about this situation. Legally, we're asking for a battle and we're no longer going to be lawmakers, we're going to be law breakers. So I would urge you all to take your time and vote this bill down. Thank you.

| Speaker: | 03:55:28 | Gentlelady from the fourth, Delegate Zukoff. |
|---|---|---|
| Del. Zukoff: | 03:55:39 | Maybe I should take that as a sign I'm not supposed to speak, but, um, I'm not going to. [inaudible 03:55:44], um, chair of education can you yield for a few questions. |
| Del. Ellington: | 03:55:52 | Yes, ma'am. |
| Del. Zukoff: | 03:55:53 | We haven't had this issue come up in West Virginia, but if it did come up prior to this law being enacted, how would it be handled? |
| Del. Ellington: | 03:56:05 | Probably by what we're doing now? |
| Del. Zukoff: | 03:56:08 | What? They wouldn't make a child sit out. I'm, I'm anticipating that they wouldn't make a child sit out until we met next year. |
| Del. Ellington: | 03:56:16 | [inaudible 03:56:16]. |
| Del. Zukoff: | 03:56:16 | Who would come up, who would make that decision now, if this came up without the bill that we have before us. |
| Del. Ellington: | 03:56:23 | It would probably just be made on an individual basis by the school. |
| Del. Zukoff: | 03:56:25 | Okay. Um, and you mentioned earlier that there are some children who are born with both sex org- both hormones in both sex organs at birth. It's a very small- |
| Del. Ellington: | 03:56:36 | Uh, I said ambig- I said ambiguous, yeah. |
| Del. Zukoff: | 03:56:38 | Right. And very small group. What would happen? How would, how does that work about, um, determining the gender at birth and on the birth certificate? |
| Del. Ellington: | 03:56:47 | You, uh, you get, you could get their karyotype, which is their genetics. |
| Del. Zukoff: | 03:56:51 | Okay. |
| Del. Ellington: | 03:56:51 | And then you would assign a birth based on what they were at that time on the birth certificate. |
| Del. Zukoff: | 03:56:57 | Okay. And you said that, um, sex organs continue to flourish at puberty. What if that changed? |

| Del. Ellington: | 03:57:05 | That's second, that's secondary sex characteristics at puberty. |

| Del. Zukoff: | 03:57:07 | Okay. All right. Thank you. I just wanted to understand this is, this is all new to me. Um, like many of you on this floor, when I first saw this bill, I have to tell you that I was thinking that, "Man, it wouldn't be fair for girls to have to participate against boys." And then I did my research, as you all know that I love to do. Um, I want you to know that, uh, we heard during committee that the West Virginia Department of Education and the SSAC has not, have not received one issue, not one concern about this, this, this matter. |

I called my local school district and I asked them, do we have many transgendered students? Because like many of you, I simply have never had other than one person who's a city council man who I dear. . . city council lady that who I dearly love in the city of Wheeling, who is a transgender person. I've never had contact with a chan- transgender person before. I had to educate myself about that. Now my children and my, my niece, who's a sophomore at WVU, had a lot to tell me because they accept those children for who they are. We talked about the bills and this about the bills in this, um, that we don't have, that this has really, I think, a solution looking for a problem.

One of many of the bills we've had this year. 16 states provide allowing transgender students to participate in high school sports without requiring medical proof. 10 states provide no guidance at all and allow schools to set their own requirements. We used to be all about local control in this building. That's changed. We have three states, Indiana, Kentucky, and Louisiana, that required general, gender confirmation surgery before they're allowed to play sports. And the rest of the States are all contemplating what to do about this. So at this point, we know what other states have done. We have that we have those, those options.

Um, so again, this has a s- a solution looking for a pro- a solution bill looking for a problem. Now I'm going to take my legislative hat off for a minute. I want to talk to you as a mother, a mother of two daughters. Two daughters who were exceptional athletes, like my friend talked about being his daughter's basketball. My oldest daughter was all state and two sports for two years. She was an outstanding

basketball point guard and an outstanding pitcher in softball. We traveled all around the country watching her play. I spent 25, 20, 20, 25 years of my life following my girls around to sport events. My youngest daughter is a swimmer. Made states every year.

Her freshman year through, through her senior year. And she swam collegiately. So when I talk about girls sports it's something I know a little bit about. And I can tell you that my daughter's participation in sports were because they loved it. With every essence of their being, they loved competing. They loved being on a team. They loved the camaraderie. They learned to cheer for each other. They really put their heart and soul into it because that's what they loved. And we're going to in this state allow transgendered students to participate in sports, and I don't know about you guys—we start Kitty kick and soccer at my area at three years old. We start tee-ball at three years old. We're pretty sports-oriented in the Northern panhandle.

So these children are participating by how they identify until they get to middle school. So the students that they, the children that are their friends, the children that they'd been playing with have been playing with them their entire life if they're really into sports, right? And then we're going to tell these transgender students who love to play sports, just like all of our children do, that you can no longer participate if you want to continue to play with your friends. Is that really the goal? Is that what we want to do as a legislature? Because I can tell you as a mother, I find that very difficult. And for those very reasons, I'll be voting against this bill. And I would urge you to search your soul and do the same. Thank you.

| Speaker: | 04:01:44 | Gentlelady from the 24th, Delegate Mazzocchi. |
| Del. Mazzocchi: | 04:01:48 | Thank you Speaker of Pro-Tem. This is not about freedom. This is about protection. To protect our little girls that are in school. I don't mind everybody playing together in a league. If there is the parents there and everybody, the parents can take, can take care of their children, can watch them. That is all beautiful. But in school at that age when they start at what? 11 or 12, 13, they are at a very important age. And they feel very, as a girl, they feel very conscious about their bodies. Not to say that those transgender children are not, but to be honest, I don't want all this |

mixing and matching and whatever in our, um, in these locker rooms, I'm sorry.

The, there is no adult there to supervise. I don't want all this, this, this, whatever you're saying there. You're making a big problem out of nothing. I am sorry. This is not . . . we have boys and we have girls and we have some that are somewhere in between, and it's a very small minority. And why are we making this a big, huge deal? It is not a big, huge deal that everybody can play in a league. If you have ever played soccer, and I'm telling you, we have our, my family brought soccer into Logan County and my little girl played with the boys and played against the boys.

And we had one Sunday where the mamas played against the kids. And I'm telling you I wanted to play, and I did, because I did when Marco was small. All the mamas played with against the five-year old boys, and we mamas could only win because we had a 14-year-old boy getting in our team. But when Mara was, was, was 12 and 13, and she is playing against the boys, those boys are too big, too powerful, because they knocked me off. I was out, okay? But I wanted to play. But our children in our school had, they have no, no say so. I don't want him to be exposed to something that should not even be here. So I support this bill and I want to end this discussion because it's sickening.

I'm sorry. Everybody is a human being, but don't bring it up that ev- that we are calling your names. No one would call a name, someone a name. And I appreciate all your effort. And I want you to support this because we need to protect our little girls.

| | | |
|---|---|---|
| Speaker: | 04:05:01 | Gentleman from the 36th, Delegate Barach. |
| Del. Barach: | 04:05:06 | All right. Thank you very much, Mr. Speaker. Uh, will the chairman of the education committee yield for a couple of questions? |
| Speaker: | 04:05:13 | Gentleman, yield? |
| Del. Ellington: | 04:05:14 | Yes, sir. |
| Del. Barach: | 04:05:15 | Thank you so much doctor. I didn't mean to make you get up again. |

Page 30 of 41

| | | |
|---|---|---|
| Del. Ellington: | 04:05:19 | All good. I need the exercise. |
| Del. Barach: | 04:05:21 | We've had a lot of questions about this. I might've missed this one, but I'm just trying to figure out why this is such a big deal right now. Why, why do we need this bill? |
| Del. Ellington: | 04:05:29 | You're asking me that? |
| Del. Barach: | 04:05:31 | Yes. |
| Del. Ellington: | 04:05:31 | I was probably going to say it in the closing statement, but, uh, there have been instances throughout the country where this has been an issue as unfair competitive advantage. And this is something that is brought up in 27 other states, uh, that have done that. And also in the U.S. Congress, there are bills related to this same, same, uh, topic. |
| Del. Barach: | 04:05:52 | But 12 states, uh, do allow it. Is that not correct? |
| Del. Ellington: | 04:05:56 | That's their freedom to do so. |
| Del. Barach: | 04:05:57 | And the NC2A, the International Olympic Committee also allow this. Oh, that's pretty heavy, uh, those are pretty heavy hitters with sports. |
| Del. Ellington: | 04:06:04 | That's beyond the purview of this bill. |
| Del. Barach: | 04:06:06 | Yes. But I'm just saying that, that, if, if they feel that it's okay, uh, that that should be something that we could use for a guideline, I would think. And, um, uh, so this, this isn't about, I think what people are afraid of this, isn't about some boy saying, "Hey, guess what? I want to win a trophy. I'm going to put on a girl's jersey and say, I feel like a girl today and I am going to race against these people." When you're talking about transgender, we're talking about people that are, from what I understand, uh, to participate in a sport like that, you have to be going through the transition process, is not, that not correct? |
| Del. Ellington: | 04:06:42 | I don't think this says that. I think it was just, if they identify as transgender, they're going to want to play on whatever team they want to do. |
| Del. Barach: | 04:06:49 | From what I understand, you have to be going through the process and that involves quite a bit of, uh, medical change. Doesn't it? |

| Del. Ellington: | 04:06:55 | This does not say that. |
|---|---|---|
| Del. Barach: | 04:06:56 | But that's, I think what we're, we're dealing with though, isn't it? |
| Del. Ellington: | 04:06:59 | That's what some people are bringing up. |
| Del. Barach: | 04:07:00 | Okay. All right. All right. Well, thank you very much. All right. And I'm just going to go down in, on the record as saying, I think this is a bill based on, on, on not what, what people, what we need. This is based on judging people that are different than the rest of us. And I think we should look out for those people. I'm going to be voting no against this measure. And I hope you'll all, uh, follow suit with me. Thank you very much. |
| Speaker: | 04:07:24 | Gentleman from 39th, Delegate Ferrell. |
| Del. Ferrell: | 04:07:30 | Thank you, Mr. Speaker. The chairman of education, please yield. |
| Speaker: | 04:07:36 | Gentleman, yield. |
| Del. Ellington: | 04:07:37 | Yes, sir. |
| Del. Ferrell: | 04:07:39 | I know you had to address a lot of questions this afternoon. Sorry to have to add one more here at least. But what would you say the spirit of this bill is? |
| Del. Ellington: | 04:07:48 | Spirit I would say is fair competition and safety for all the students. |
| Del. Ferrell: | 04:07:52 | Exactly. Only I would have said safety and then fair competition. Because the number one issue I think comes back to safety. |
| Del. Ellington: | 04:08:00 | Right, I wasn't putting in a particular order. |
| Del. Ferrell: | 04:08:02 | Uh, second question is to follow up question. My colleagues from across the aisle made several, uh, I asked several questions about comparison to sports where girls were allowed to play football, or I actually, my first year teaching, uh, teaching and coaching, I had a girl play on the baseball team 'cause we didn't have a softball team at Dunbar High School and she played over there. But actually those are, would you say those are just exceptional |

situations where a girl is playing up in competition. It's not a situation where I coached girls volleyball and a boy would come down and play on the girls volleyball team, correct?

Del. Ellington:    04:08:39    Title IX does not allow that to happen.

Del. Ferrell:    04:08:41    Right. The, the SSAC has rules against that. Correct?

Del. Ellington:    04:08:44    And SSAC follows Title IX regulations.

Del. Ferrell:    04:08:49    All right. Thank you. Thank you very much. Can I speak to the bill please? After 30 years in education, most of that coaching high school sports, middle school sports, covering all high school sports with my sports media network, having a daughter and a son both participating in sports, I think I know a little bit about sports and the involvement of it, and especially the differences between girls and boys sports. So I coached high school volleyball here in Kanawha Valley. The teams that . . . the net on a volleyball court for the girls is seven foot, four inches and a quarter. This is the same for the guys? No. It's eight foot.

It's my colleague, my colleague over here at Harrison County, she's enjoying this lunch, uh, coaches girls basketball up at Lincoln County or Lincoln High School. They use a smaller basketball because her hands are smaller. And we could go on and on about the differences that are already in place in order to try to, uh, address some sense of fairness. But more importantly, a lot of times just to, just as we said with volleyball, they don't allow the boys to come over and play down in, into the girls level because in a lot of cases, it could even be dangerous. Especially at the net and the swing and the velocity of the ball as it travels, it would be dangerous against the girls.

So, you know, first thing, it's a safety issue. And then second would be fairness issue that [inaudible]. So the spirit of this all, if we look at today is a really, you know, what are we trying to do here? Are we trying to be unfair to a small group of the population? It doesn't matter how small the group it is. You know, we don't want to be unfair to any group. But when we look at the overall population of what we have and, and the group of kids that we're dealing with, we just want to be fair.

We just want to be fair and we're just following guidelines put in place for, for some time. I have a daughter as I mentioned, she's running track this year for Sissonville High School. She's 103 pounds soaking wet. And I just wonder you know, and not that we've had a case here in West Virginia, but would anybody want 185 pound that identifies as transgender to compete against her in the 200? I don't think so. I don't think we would think that's fair. Has anybody spoken up for her today? I don't think so. I haven't heard it.

It's just, (laughs) it's almost like we're upside down. And I think that's what my constituents, when they reach out to me about this bill and about what they see going on in the other states, and I think we mentioned there's 27, maybe other states that are looking into the same matter. We're looking, we're looking at this backwards sometimes as we do a lot of things. And I think people are just fed up and were upset and we might, and hopefully we'll never have a case of this. I hope it's never a situation. I don't think anybody in this body hopes that it's ever a situation.

But we're just getting out in front of it. And I know my time, I spend a little bit time too, when I was, uh, teaching as summers as a lifeguard. One of the things we always did and we worked on was making sure we, you know, we prevented things before they happened. You get out ahead of it. And I know as a physician over there, doctor, you, you know, your, your practice is about preventing the problem instead of, you know, trying to treat it after the fact.

And I think that's all this bill is trying to do, is get out of front, address it. Hey, West Virginia just wants to be fair. We're not trying to discriminate against anybody, but we certainly don't want to hurt 103 pound freshman girl, trying to run track at a high school against a senior who weighs 185 pounds. So I'll be voting yes on this, on this bill. And I would urge you all to join me.

| | | |
|---|---|---|
| Speaker: | 04:12:35 | Gentleman from the 37th, Delegate Pushkin. |
| Del. Pushkin: | 04:12:40 | Thank you, Mr. Speaker. Would, uh, my colleague from the 39th, please yield? |
| Speaker: | 04:12:46 | Gentleman yields. |

| Del. Pushkin: | 04:12:48 | Thank you, sir. So you coach, uh, you're a high school coach? |
| Del. Ferrell: | 04:12:53 | I have been. Yes. |
| Del. Pushkin: | 04:12:54 | You have been. You coach girls sports? |
| Del. Ferrell: | 04:12:56 | Yes I have. |
| Del. Pushkin: | 04:12:57 | Have you ever had a transgender student go out for any of your sports teams? |
| Del. Ferrell: | 04:13:02 | Not to my knowledge. |
| Del. Pushkin: | 04:13:03 | Okay. You never had someone who was male at birth and then identifies as a female try to go out for one of your sports teams in order to gain some unfair advantage over the girls? You ever seen that, sir? |
| Del. Ferrell: | 04:13:13 | Not to my knowledge. |
| Del. Pushkin: | 04:13:14 | Thank you for yielding. That's all the questions that I have for you. Mr. Speaker, if I may address this. Um, my, my friend, my new friend from Logan's right. You know, we're making a big deal out of nothing because guess what? It hasn't happened. Even though West Virginia has the highest percentage of transgender youth, uh, possibly the most, you know, alienated, uh, folks in our, in our, in our state who we're going to further alienate today with this, with this debate, even though we had the highest percentage of these kids, none of them are going out for sports teams. |
| | | There aren't boys out there that are going to pretend to be transgender in order to get, uh, an advance, unfair advantage and excel in a, in a, in a girl sport. It's simply not happening. You know, if you truly believe it is, I suggest you do, uh, you know, a little more research than my friend from the 47th when you're, when you're looking up sports records and see it's not happening here. So the spirit of this bill is not about protection, it's definitely not about fairness. |
| | | What it's about is manufacturing some phony outrage that you can put on postcards in a couple of years and say, act like he did something for somebody. But you didn't do |

**JA0151**

anything for anybody. What you did was you hurt kids, the most alienated kids in our schools. That's who you hurt with this debate. And that's why I'm angry about it. See, it's, it, it's, it is a solution in search of a problem. However, the solution we're talking about is more problematic than the perceived problem that you're making up. And that's the problem I have with this bill.

So let's talk about a binary decision that we're getting ready to make. You can either press green or you can press red. You get two choices on this bill. And I imagine that there's two different types of green votes today. There are those of you who really believe that this is an issue, and we've got to protect these girls from this perceived threat that's not happening. There are those of you who believe that it's a, this is a real issue. For those of you that are going to vote green, because you really think it's a problem, you know, I pray for you to find wisdom and to someday realize that this isn't an issue.

Now, but those of you, and I think you might be in the majority, those of you who know this isn't an issue, but you're going to do it out of political expediency. For those of you who know that it's probably, it's more problematic, uh, for a girl who might be a little bit tall, maybe a little bit muscular, who's good at sports and in the opposing parents and coaches are going to make an issue because of this debate we had today and alienate that poor little girl. For those of you who know that's the bigger problem you're creating here, but you're going to vote anyway because of political expediency, even though you know it's not really happening here.

PART 8 OF 9 ENDS [04:16:04]

| Del. Pushkin: | 04:16:00 | Anyway, because of political expediency, even though you know it's not really happening here, I'm going to pray for you that you find half the courage of these children who you're alienating today, and you vote red and vote this mean-spirited bill down. |
| Speaker: | 04:16:20 | Gentleman from the 46th, Delegate Burkhammer. |
| Del. Burkhammer: | 04:16:25 | Thank you, Mr. Uh, Speaker Pro-Tem. And uh, I'd like the opportunity to speak to this, because e- every bill that we |

take up, we have to ask ourself a question, is, is, who does it hurt? Who does it help?

And so it's been pointed out who we think this bill is going to hurt. And, uh, I'd like to thank my colleagues here that have brought up who that it's going to help. That's women. That's, that's my daughter, that, that is an athlete as well. And, and we can say, well, they don't need any help, that, that there's not an actual gap in, in gender. So as I watched Sports Center this morning, uh, yesterday was Equal Pay Day. And, uh, the U.S. soccer team, Megan Rapinoe, I think was her name, was at the White House, trying to close that gap, trying to continue to stand up for women.

You know, women didn't even have the right to vote until 1920. It's been 100 years ago, women couldn't even vote in our country. It wasn't until 1972 that Title IX was passed. And we've came so far in our country closing that gap. Our colleague from the 35th, before session started, talked about the women in this body right here.

I am proud that we've got a majority leader and an assistant majority leader woman. I'm proud of all the women that are in this body. And can you imagine in a time when that wasn't even capable? Because I can't.

And so today, I rise in support of all of the women here, of all of the little girls playing sports across this land. I stand for them. I stand for women. I support this bill. Thank you.

| | | |
|---|---|---|
| Speaker: | 04:18:29 | Are there those seeking further recognition before I recognize the Gentleman from the 27th to close debate? If not, Gentleman from the 27th to close the debate. Oh, excuse me. Gentlelady from the 51st. |
| Del. Fleischauer: | 04:18:43 | Thank you, Mr. Speaker. My daughter is different. My daughter played sports. My daughter is beautiful. My daughter's intelligent, and she has left this state. And it's this kind of bill that will ensure that she will never come back. Please don't pass this bill. You are demonizing little children, and you're demonizing my baby. Don't do this! |
| Speaker: | 04:19:24 | Are there those seeking further recognition? If not, Gentleman from 27th close the debate. |

**JA0153**

Del. Ellington:     04:19:33     Thank you, Mr. Speaker. This issue came to the surface in the United States regarding tra- transgender a few years ago, when two transgender girls were allowed to compete in state track and field meets in Connecticut. They won a combined 15 girls' state indoor and outdoor championship races from 2017 to '19. That's one of the things that started national debate. As I mentioned, there are 27 states that have put in legislation regarding this. And yes, there are 17 states and, uh, District of Columbia that require inclusion. However, there are six states that have no policy regarding gender identity, or sports, regarding sports whatsoever, and we're one of those.

Now, as was stated before, Title IX does allow girls to have, to be able to participate in sports. They wanted to have some equality. If there is not a girls' team and in school, then they would be allowed to participate on boys' team. As I mentioned, the contrary was not always the case, because there were more boys' teams typically than girls' teams.

Now of course, we talked about the inherent risks of that. And someone accepts the risk when they participate in sports, any sport, but the key is to try to make it as safe as possible. But also to make it fair as possible.

So when we looked at this bill, we were looking at what was happening in our secondary, in our K-12 and higher ed. This bill was targeted mainly toward our secondary school age children. Children under that age typically play sports together. Most of you have, maybe had kids and played so-had them play soccer on co-ed teams. Not an issue. Most of those kids are about the same size, same physique, not a big problem. However, when they reach puberty, that's when things change.

Now you can look at internal and external characteristics, but there are differences. We're not trying to be unequal according to the law. We're just trying to say that there are differences. The ability to play sports is still there, it's just a matter of what team they play on.

So this was targeted toward secondary school. That's where there were big differences. Anyone that's seen kids from middle school to high school, is a big variety in how, to what their habitus is. Some are tall, some are short, some

are heavy, some are thin, some have different abilities. Well, that's where they compete.

Once they get out of high school, on the college level, the NCAA has different rules. It also includes that they also if they are gender, trigen- transgender female, they have to have hormone levels taken for a year before they're able to participate. So there are regulations in that. We wanted to stay away from that we were just dealing with secondary school. That's where the differences in the safety was. SSAC didn't have a big issue about it. They said, "We follow Title IX, we'll do what you tell us."

That's pretty much what we were told. They were hand's distance, staying away. So we looked at what is the gender, the birth certificate is something that they have to use to enter school. That would be their birth gender. If they did not present that, then they would have to have a certi- some certification from their physician saying what gender they were at birth. Doesn't mean they're going to be sexually assaulted, as some people are claiming. Mostly pedatri- pediatricians see these people. I've seen younger girls, I've seen younger boys when I was in training. Most of them aren't a big problem. Most of us gentlemen here have been through exams, especially of the genitalia when we did sports physicals. Anyone who's done hernia exams had to do that. There was not a problem there. And I didn't see any big outcry on that.

If someone had, was it to say a transgender female that had corrective surgery, obviously, someone performed that surgery, and could attest to what the gender was of that person. And you don't even need a physical exam to do that. You can do just the karyotype. There are a number of ways. Blood work, buccal smear, whatever, tells what their gender is. Very easy, non in- relatively non-invasive. So that's not a big issue. All these things that were proposed, that we're going to be torturing these kids and everything. That's not a big problem. It shouldn't be happening.

But we do want to make sure they're in the right part. We don't want to have an unfair advantage. I saw on the news the other day, they were showing, I think it was in Indiana, a girls' basketball team with a transgender girl that was about six foot six, taller than me, playing against all these young girls that were about a foot and a half shorter. I

mean, that is not a very fair advantage. So what this is trying to do is prevent problems coming here.

We have a policy in place. It says these kids can still play if they choose to. Now, if they don't want to participate in interscholastic sports, they don't have to have anything else further done to them. That's strictly voluntary. It's just giving a more fair advantage to them.

It also has nothing to do with locker rooms. It has nothing, you know, when they mentioned Fourth Circuit Court, all that had to do with bathrooms. That was an opinion on bathrooms. Supreme Court hasn't decided anything about locker rooms or sports. That has nothing to do with this bill. Doesn't apply. Maybe it will. As I mentioned, there's legislation in the U.S. Congress, both the House and the Senate, dealing with the same problem.

But until something like that supersedes what we do, it's up to us to decide where we want to go with it. So for the safety, the enjoyment of our kids, and also, I would also say, the emotional status of our students, it goes both ways. Kids that denied the prop, the ability to obtain a scholarship to college, or to be able to participate in an, in a state event or a national event because, uh, maybe some unfair competitive advantage from previous things. Those kids suffer too. So it's not just one sided, and there's a, we're not trying to descrim- we're just saying, if that's what your gender is, that's what your ability would probably be more appropriate for. That's what this bill tends to. So Mr. Speaker, I would recommend passage of this bill.

Speaker:          04:26:27          The question before the House is shall the bill pass. Those in favor of pass the bill will vote aye. Those opposed will vote no. The clerk will prepare the machine.

Has every member voted? Gentleman of the 58th, your vote's not registered. [inaudible 04:27:04] Gentleman wishes to be recorded as having voted in the affirmative.

Clerk will please close the machine and ascertain the result on that question. There were 78 ayes, 20 nays, and two members absent who are not voting. The majority of members having voted in the affirmative, the chair declares the bill passed. The clerk will please report the title.

JA0156

| Clerk: | 04:27:25 | Committee substitute [inaudible 04:27:28] 3293, relating to single-sex participation in interscholastic athletic events. |
|---|---|---|
| Speaker: | 04:27:34 | Are there amendments to the title? If not, the title as read by the clerk will be and remains the title of the bill. For what purpose does Gentleman from the 46th seek recognition? |
| Del. Burkhammer: | 04:27:43 | Thank you, Mr. Speaker. I move that this bill be effective from passage. |
| Speaker: | 04:27:50 | Let's finish the title amendment first. If there are no, if, if, are there amendments to the title? If not the title as read by the clerk will be and remain the title of the bill. |

The Gentleman from the 46th, Delegate Burkhammer, moves that the bill be made effective from passage. The question before the House is the motion that the bill be made effective from passage. Those in favor of the motion will vote aye, those opposed will vote no. The clerk will prepare the machine.

Has every member voted? If so, the clerk will close the machine and ascertain the result on that question. There were 79 ayes, 19 nays, and two members absent and not voting. Two thirds of members having voted in the affirmative, the chair declares the bill effective from passage. The clerk will please report the action of the House to the Senate. Next bill on third reading.

JA0157

**West Virginia Senate Education Committee Discussion of H.B. 3293**

**April 1, 2021**

| | | |
|---|---|---|
| Counsel: | 05:42 | Thank you Madam Chair. Um, House Bill 3293 as passed by the house requires each county school district to confirm that the sex on the birth certificate of every student participating in an SSAC event is a student's sex at the time of birth. If there is no original birth certificate, the student must provide a signed physician statement, and requires the SSAC to check for the county boards that every student is competing according to biological sex. The proposed committee amendment strikes out everything after the enacting clause and provides that the following be added to a new section, Section 18-2-25d. And, um, it adds legislative findings regarding the state's important government interest in ensuring equal athletic opportunity for biological females. Um, it provides definitions for biological sex, female and male. It requires all public secondary schools and public schools of higher education to designate teams according to biological sex using the male, men or boys, female, women or girls, and co-ed classifications, and, um, provides a cause of action for individuals and schools aggrieved and harmed by a violation of this section. |
| Chairwoman Rucker: | 06:57 | Thank you Counsel. Are there questions for Counsel? Senator from Harrison. |
| Senator Romano: | 07:06 | Madam Chair- |
| Chairwoman Rucker: | 07:06 | Yeah. |
| Senator Romano: | 07:07 | . . . um, who is available to speak on this issue today? |
| Chairwoman Rucker: | 07:11 | So we have four, um, speakers that have volunteered to speak on this issue, um, at the appropriate time we can call them forward. Do you have any questions for Counsel? |
| Senator Romano: | 07:23 | Well, I, I wanted to know the names. It will, it will affect my questions. Counsel, so if they can give the names and who they represent. |
| Chairwoman Rucker: | 07:29 | We have Dr. Gilbert Goliath. We have Sissy Costner Boone. We have Chase Strangio, and we have Sydney Mc- |

Page 1 of 23

**JA0158**

|  |  | McEl- McElroy. I, I am sorry if I mispronounced anybody's name. Sorry. |
|---|---|---|
| Senator Romano: | 07:42 | So at least we are doing it in committee, do, do you know who they rep- |
| Chairwoman Rucker: | 07:44 | And I also see Sarah Stewart up there. |
| Senator Romano: | 07:47 | Do, do you know who they represent? |
| Chairwoman Rucker: | 07:49 | Um, I don't have all of that with me. I know, um, one of these individuals is a pediatrician. We have someone who's a deputy director for transgender science with the ACLU. Um, I believe someone is from Marshall, and I think, uh, we have a parent. |
| Senator Romano: | 08:07 | Okay. Cou- I do have some questions for Counsel. Thank you. |
| Chairwoman Rucker: | 08:09 | Okay. Uh, Senator Romano is recognized for questions to Counsel. |
| Senator Romano: | 08:13 | Counsel, I'm, I'm a little concerned about the difference between the original bills that came over from the House and the committee strike and insert or amendment, whatever we're calling it. The, the, the bill from the House as I read it requires that the board of education confirm the biological sex of the student prior to allowing them to participate in, in sports, correct? |
| Counsel: | 08:35 | Yes. |
| Senator Romano: | 08:36 | And it did not allow a parent or another school to challenge the biological sex of the student had, that had been so, um, um, so approved by the school board. In other words, there wasn't an outside challenge that students, uh, um, biological sex, is that correct? |
| Counsel: | 09:01 | No, not in that bill. |
| Senator Romano: | 09:03 | In the House bill. But now the, the, the amendment is, I think it's called on this—is it a strike and insert or amendment? |
| Counsel: | 09:13 | Both. |

Page 2 of 23

JA0159

| | | |
|---|---|---|
| Senator Romano: | 09:14 | Same thing? |
| Counsel: | 09:14 | There's a strike and insert. |
| Senator Romano: | 09:14 | Okay. |
| Counsel: | 09:14 | Strike and insert amendment. |
| Senator Romano: | 09:16 | It replaces everything, I just want to be sure. |
| Counsel: | 09:18 | Yes. |
| Senator Romano: | 09:18 | The strike and insert allows, uh, anybody to challenge the biological sex of a student playing sports in our secondary school system. |
| Counsel: | 09:31 | Um, I don't think that the language allows anybody, um, line 54 says, any individual aggrieved by a violation of this section may bring an action against the county board of education. So I think the purpose here is if there's, um, a biological female that has, you know, lost the state championship to a biological male, that is the kind of person that could bring, um, an action. |
| Senator Romano: | 09:56 | Sure. But that's going to be anybody. Take it from a lawyer, anybody can be aggrieved. And I mean, I can state an, I can state an, an aggrievement sitting here. I'm just, I'm just saying anybody can be aggrieved. It really opens it up though to individuals, correct? |
| Counsel: | 10:10 | Y- you still would have the standing requirement and you would still have to show harm, um, you would still have to show that it's your particular interest, um, that is being protected by this bill. |
| Senator Romano: | 10:21 | Sure. That case is already in court though. It's already going to be a matter of public record, it's already going to be in front of the public, isn't it in order for those issues to be decided? |
| Counsel: | 10:30 | Yes. |
| Senator Romano: | 10:31 | Okay. That's my issue with the, the whole thing, and, and I'm sure I'm going to have a chance to get into it here in a second, but, uh, um, so why the differences, do you have, do you have any idea what the change, what motivated the |

|                    |         |                                                                                                                                                                                                                                                                                          |
|--------------------|---------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    |         | change? Let me ask you this, are we aware of any transgender student playing sports on a team that is opposite their biological birth?                                                                                                                                                     |
| Counsel:           | 10:54   | No, I'm not aware.                                                                                                                                                                                                                                                                        |
| Senator Romano:    | 10:55   | Okay. Do, do you know why the change in the bill from the House bill, 'cause it really risks the bill going back. I mean, we could not get any bill if we allow this change, right?                                                                                                        |
| Counsel:           | 11:05   | I, I think there was some concern on the burden that you're imposing on these county boards to have to check every single athlete that wants to participate. Um, and-                                                                                                                      |
| Senator Romano:    | 11:17   | Go ahead. I'm sorry. I didn't mean to interrupt.                                                                                                                                                                                                                                          |
| Counsel:           | 11:17   | Sorry. Um, and also not every student is going to have access to a birth certificate. So here you are asking the student to establish their sex based on birth certificate, um, and there are lots of situations in which a student doesn't have a birth certificate, and if they don't have onem that bill requires them to then go to a doctor and subject themselves to, um, a physical examination. |
| Senator Romano:    | 11:44   | Well, every child, every student is subject, and correct me if I'm wrong, I'm asking you the question. Isn't every child subject to a physical examination before they can play sports in, in our secondary school system?                                                                 |
| Counsel:           | 11:55   | Yes. But an examination for this purpose would likely exceed the scope of a typical examination. Um, because it-                                                                                                                                                                          |
| Senator Romano:    | 12:01   | What makes you say, what do you base that on?                                                                                                                                                                                                                                             |
| Counsel:           | 12:03   | Based on the original language in the bill which asks to check basically, make the decision based on the the, students, you know, reproductive systems and genitalia.                                                                                                                      |
| Senator Romano:    | 12:14   | No, no. I'm asking you, what, what makes you think that the physical e-exam would be any more invasive? You ever heard of, and I'm just asking you, is that from personal experience, or do you have something that tells you that it's more invasive 'cause I've had them, I've played sports, and trust me, they knew what gender I was when I left that doctor's office. I'm, I'm just wondering if you got some information that I don't. |

| | | |
|---|---|---|
| Counsel: | 12:34 | Well, I don't want to speak on the experience in West Virginia. I do know what my personal experience has been as an athlete in another state, and I just don't know if that would be- |
| Senator Romano: | 12:34 | Sure. |
| Counsel: | 12:34 | . . . relevant. |
| Senator Romano: | 12:45 | Sure. Okay. But in this state, I mean, at least as far as I know, and I'd be interested to see if any of our speakers can speak to it. You know, I, I would, I would almost presume that the physical exam that you're required to undergo would confirm whether you were a male or female, but I, I could be wrong. But, uh, thank you counsel, good job. I'll at the appropriate time, uh, Madam Chair. |
| Chairwoman Rucker: | 13:07 | Uh, sure. At the appropriate time. Are there any other questions to Counsel? It looks like the appropriate time is now. Senator, um, from Harrison, uh, do you have someone you'd like to s- call forward? |
| Senator Romano: | 13:25 | You know, based on, on your- |
| Chairwoman Rucker: | 13:26 | List? |
| Senator Romano: | 13:27 | . . . sheet, I really don't have anybody. I, I would ask anybody that could speak to, um, whether or not, uh, there was sufficient, um, examination that the school board, that if somebody did not have a birth certificate so reflecting their gender, that through the routine examination of every athlete would be able to cover that. Is there anybody that's- |
| Chairwoman Rucker: | 13:50 | Mm-hmm (affirmative). |
| Senator Romano: | 13:51 | . . . willing to speak to that issue? |
| Chairwoman Rucker: | 13:51 | Pretty specific question there. (laughs) |
| Senator Romano: | 13:51 | What's that? |
| Chairwoman Rucker: | 13:55 | Pretty specific question there. |
| Senator Romano: | 13:57 | Well, it's, it's my pretty specific concern. |

Chairwoman Rucker: 13:59    Um, I, I know, um, we have some, oh, a couple of volunteers. Okay. Um, sorry, I do not know your names. Um, is one of you a doctor? Okay. Could you please unmute yourself?

Dr. Sydney McElroy: 14:17    I am a family doctor.

Chairwoman Rucker: 14:19    Oh, okay. Um, well, so may, can you, we'll start with you ma'am, what is your name?

Dr. Sydney McElroy: 14:28    Hi, I'm Dr. Sydney McElroy. I'm a family physician with Marshall Health in Huntington.

Chairwoman Rucker: 14:34    Okay, thank you.

Dr. Sydney McElroy: 14:34    And-

Chairwoman Rucker: 14:34    Thank you for-

Dr. Sydney McElroy: 14:34    Yes.

Chairwoman Rucker: 14:37    . . . identifying yourself. Um, do you mind raising your right hand? We swear in all of our testimonies here.

Dr. Sydney McElroy: 14:42    Sure.

Chairwoman Rucker: 14:42    Please raise your right hand. Do you promise to tell the truth, the whole truth and nothing but the truth so help you God?

Dr. Sydney McElroy: 14:48    I do.

Chairwoman Rucker: 14:49    Thank you so much for joining us. Um, Senator from Harrison.

Senator Romano:        14:53    Thank you. Thank you Doctor for volunteering here. And, and Doctor, what, what I'm trying to determine, I don't know if, if you probably haven't had a chance to see these two bills we're discussing. One bill places, and I'm going to use the word burden, the burden on the school system to confirm the biological gender of the child, either through a birth certificate, and again, the other way that I always thought was relevant was the routine physical exam that every athlete's given before they participate. And the second bill, which essentially allows anybody to challenge

the biological gender of a child playing sports. I, I wondered if, can you speak to that?

Dr. Sydney McElroy: 15:34    Sure. I, I have done hundreds of sports physicals in my career as a family physician, and I can tell you that while I'm imagining what you referenced earlier in a pre-participation sports physical, um, that you went through being a, sort of an examination of your genitalia. I, I, that was probably a check for an inguinal hernia, which has been part of sports physicals for some time, although more recent evidence has actually called into question if we even need to do that. But if we're talking about a cisgendered female or the, a patient that has a vagina, uh, a labia, we would not examine that as part of a pre-participation sports physical, that's not part of the routine examination. Um, and the original language of the bill that I found very concerning that it did not just say external reproductive anatomy, it said internal and external reproductive anatomy.

In order to prove internal reproductive anatomy for someone with a uterus and ovaries, we would have to at the very least place the patient in the lithotomy position, which is when we have them in stirrups, you've probably seen that, if someone's giving birth in a movie or something. Place her in stirrups and do a speculum exam, so use a, a device to widen the vaginal canal and see the bottom of the uterus, the cervix. And if you couldn't do that, then the next option would be some sort of radiological exam, whether that be a trans vaginal ultrasound where we insert a probe into the vagina or a CAT scan or an MRI which would expose them to radiation. So no, that, it would not be part of a standard pre-participation sports physical, or I should say, frankly, any physical exam that a child would undergo as part, I mean, young girls do not have pelvic exams done just so we can look for a uterus, that would be malpractice if we did that.

Senator Romano:    17:29    I can't-

Dr. Sydney McElroy: 17:29    This would not be a standard exam.

Senator Romano:    17:31    I can't imagine it would have to go that in depth, but that's, me, believe me, I'm trying to, what, what I want to avoid is, I mean, tell me this, and, and you're family physician.

Page 7 of 23

JA0164

Dr. Sydney McElroy: 17:31    Yes.

Senator Romano:    17:40    What psychological effect do you think it would have on a young teenage boy or a young teenage girl to get singled out publicly as somebody who was, you know, playing a sport for which they're, um, they've crossed over from a gender perspective. I mean, what, can you tell me as a physician, what, what effect do you think that would have on them psychologically to have that kind of, of scrutiny placed upon them in their school and in their community?

Dr. Sydney McElroy: 18:09    Well, I think that if, if, are you referencing the psychological effect of a transgender athlete being harassed or, or called out by members of the community?

Senator Romano:    18:19    You know, you know, actually I'm not.

Dr. Sydney McElroy: 18:21    Is that what you're asking me?

Senator Romano:    18:22    I'm, I'm thinking back through my school years, and I'm thinking back to, uh, girls that might've been, um, you know, um, you know, built more masculine in nature than, than other girls and, and they were good athletes. And, and, you know, I'm, I'm wondering, and they're females. I mean, there was, at least when I grew up, there was never any doubt they were females, but I'm wondering what would happen if, if they were challenged because somebody felt aggrieved. You know, I w- I wonder if their-

Dr. Sydney McElroy: 18:50    Sure.

Senator Romano:    18:51    . . . if their gender was challenged, what effect do you think that would have on them psychologically?

Dr. Sydney McElroy: 18:55    Uh, I, I think, I think that what you're referencing is exactly a lot of the problem with this. I think that there are so many variations in body type and size and all of those things, especially throughout the middle school, high school years, that to unnecessarily call attention to those differences, whether the student is transgender or cisgender as in the example your giving, would absolutely be embarrassing, uh, humiliating, would put that student through a, a terrible time. I mean, yes, that could be psychologically, and, and especially when you're talking about transgender students, these are kids that already 50% of them are going to

attempt suicide in their life. So they're already under undue stress and pressure.

Um, you know, they're six times more likely to have anxiety and depression. They are 84% of them are, are, you know, afraid of attending school because they feel unsafe there. So, yeah, I think that that's the whole problem is we're trying to define something, um, that could cause great harm instead of just allowing for natural differences between kids to let them all play, let them enjoy the benefits of sports. I think what you're speaking to is the, the problem with the bill in either form-

| | | |
|---|---|---|
| Senator Romano: | 20:06 | And, and just to be clear- |
| Dr. Sydney McElroy: | 20:06 | . . . it's damaging. |
| Senator Romano: | 20:07 | I'm sorry. Go ahead doctor. |
| Dr. Sydney McElroy: | 20:09 | It, it could be damaging to children either way. It could be absolutely psychologically damaging to children. |
| Senator Romano: | 20:14 | And, and we're talking to, I mean, I'm not even getting to the transgender kids who already have tremendous psychological issues they're dealing with. I'm just talking about, you know, a young girl who, who maybe grew up a little faster than everybody else, maybe she's a little bigger than everybody else. I went to school with them. They were, you know, a couple of females in my classes I was afraid of, but, but they were females. But it would have been nothing to challenge their sexual, their gender, you know, if I wanted to, to challenge them because they were, you know, the star of the basketball team, or they were the, you know, the, the star of the soccer team, it would be nothing, and, and that would be devastating to a child that wasn't even having trans- transgender issues, that would just be a regular child, right? |
| Dr. Sydney McElroy: | 20:55 | Yes. Yes. I agree. |
| Senator Romano: | 20:56 | Well, let me see if anybody else has any other questions for you doctor. Thank you for coming on today. |
| Dr. Sydney McElroy: | 21:01 | Oh, no problem. Thank you. |

| | | |
|---|---|---|
| Chairwoman Rucker: | 21:03 | Thank you. Are there any other questions for our guest? It looks like not. Thank you so much for volunteering to come on today. And I know there was, uh, another light on, I believe, it, um, sir, could you identify yourself before the committee? Yes, sir. We, we can't hear you. Can you unmute yourself? Hmm. Sorry. We still hear no sound. Okay, let me look. Um, I, I don't know whether that was, um, Dr. Gilbert Goliath. I'm sorry, there is no sound at all. Yes, um, I, sir, we can't hear you. I don't know if you could try to work out your issue and we'll try to recognize you in a couple of minutes. Thank you. |
| Dr. Gilbert Goliath: | 22:18 | Okay. |
| Chairwoman Rucker: | 22:18 | Oh, there you are. |
| Dr. Gilbert Goliath: | 22:20 | Uh, you got me? |
| Chairwoman Rucker: | 22:21 | We can hear you now. |
| Dr. Gilbert Goliath: | 22:23 | Okay, great. Yeah, no, I concur with what Dr. McElroy said, uh, the psychological issues. |
| Chairwoman Rucker: | 22:29 | Sir, sir, hold on. |
| Dr. Gilbert Goliath: | 22:30 | Oh, I'm sorry. |
| Chairwoman Rucker: | 22:31 | Please identify yourself for the committee. |
| Dr. Gilbert Goliath: | 22:33 | Oh, my, my name is Gilbert Goliath. I'm a pediatrician. |
| Chairwoman Rucker: | 22:37 | Okay. Thank you. Would you please raise your right hand? Do you promise to tell the truth, the whole truth and nothing but the truth so help you God? |
| Dr. Gilbert Goliath: | 22:45 | Yes, I do. |
| Chairwoman Rucker: | 22:46 | Thank you so much. So now you may please go ahead and give us your thoughts. |
| Dr. Gilbert Goliath: | 22:50 | Okay. Sorry about that. So yes, I concur with what Dr. McElroy said about the psychological issues that these, uh, young people would go through if they were in a situation where the gender was questioned. And back to as far as the physical exam is, she was exactly right about, we don't do an intensive physical exam during this pre- uh, sports |

|  |  | participation, because with the males it's very easy to determine the sex, but a little bit more difficult for female, which we don't look at that part of the body, to the genitalia of the female, we look at the external vagina, but that's about the extent of it. So, as she also mentioned about having radiological studies that would need to be performed to prove the gender identity of that young person, uh, that's involved in this, if they plan on participating in a sport. |
|---|---|---|
| Chairwoman Rucker: | 23:43 | Okay. Thank you. Um, I believe that the Senator from Harrison might want to ask you a few questions if that's okay. Senator- |
| Dr. Gilbert Goliath: | 23:43 | Sure. |
| Chairwoman Rucker: | 23:51 | . . . Senator from Harrison. |
| Senator Romano: | 23:53 | Thank you. Thank you Madam Chair. Um, and I'm sorry, could you identify yourself for me again? I apologize. |
| Dr. Gilbert Goliath: | 23:58 | Uh, Dr. Gilbert Goliath, pediatrician. |
| Senator Romano: | 24:01 | Uh, thank you doctor, and thank you for being here. Where, where are you located? |
| Dr. Gilbert Goliath: | 24:05 | In Char- South Charleston, West Virginia. |
| Senator Romano: | 24:07 | Okay. My, my sister-in-law's a pediatrician, so I know you guys all hang together, but, uh, um, I, I'm really concerned, and, and I want you to speak to this, there's two bills before us. The one that came over from the House, which simply says that the board of education will, you know, confirm the gender through a birth certificate, and if there's not a birth certificate, take other steps necessary. The one that we're considering that we call a, uh, committee substitute or a strike and insert, um, allows anybody to challenge the gender of a student who's, uh, playing in a single-sex sport.

In other words, if you're a girls basketball team and you got somebody on that team that's doing really well, but they, you know, might be, you know, reasonably questioned, anybody could bring a suit and challenge the gender of that child. Can, as a pediatrician, can, can you speak to what we're doing to our children by, um, allowing them to be subject to such a challenge, uh, really from, you know, |

|  |  | supposedly anybody it's aggrieved, which really means anybody could bring that type of action to try to challenge that child's gender. What would that do to that child's, um, psychological wellbeing? |
|---|---|---|
| Dr. Gilbert Goliath: | 25:22 | It can be psychologically devastating, uh, and that leads into many of the aspects, uh, leading with depression, anxiety, and just other mental health issues, because it's, being in this state, it's a small community and everyone knows everything, and that can lead to the, uh, young person being ostracized not only from community, but even family members. So I think it takes a heavy, psychological toll on the individual that has gone through the situation. |
| Senator Romano: | 25:52 | And, and would children subjected to that kind of, uh, scrutiny and distress, would, would they be, uh, more likely to have psychological issues and, and, you know, possibly leading to, you know, uh, um, depression and other, you know, psychological maladies, maybe even suicide? |
| Dr. Gilbert Goliath: | 26:11 | Oh, of course, even kids who are not participating in sports, if they have their gender identity questioned, that itself without even being in part, in the sports, it, it hampers a child's psychological, uh, whole, uh, approach. |
| Senator Romano: | 26:25 | And, and, and doctor, if we had, if we had a choice, I, I hate, you know, one of these bill is going to pass. You know, I don't, unfortunately, I, I don't have the, the power to, to, we've never had a case of, I think a, a, the wrong gender playing the wrong sport, but we're going to pass this bill today, I think. Um, but if, if you had a choice between a bill where it was left to the, to the schools to confirm the gender of a child playing in a single, uh, gender sport, or you allow the public at large to be able to challenge the gender of a child, uh, which one would you choose? |
| Dr. Gilbert Goliath: | 27:03 | Well, the one thing is that you would have to want to anatomically identify the gender of the child to make the correct decision. So that's hard to, if, how would the general public be able to do that as opposed to the school, but either, with either one you would still need some type of examination- |
| Senator Romano: | 27:19 | The schools are going to look to- |

| | | |
|---|---|---|
| Dr. Gilbert Goliath: | 27:21 | [inaudible 00:27:21] |
| Senator Romano: | 27:21 | Yeah. The schools are going to look to birth certificates, and it really doesn't say what happens if there's any doubt beyond that. But the, the other bill allows the public to challenge it if they're aggrieved in any way by the, the child who they suspect is not of the correct gender. |
| Dr. Gilbert Goliath: | 27:37 | Then you would have to go with the birth certificate at the present time. |
| Senator Romano: | 27:41 | Yeah. And, and that's what the first bill does with the school, but the second one allows a, a court suit to be filed, a public court suit that would name the child, I presume, so. |
| Dr. Gilbert Goliath: | 27:41 | Right. |
| Senator Romano: | 27:50 | So all right doctor. Well, thank you. |
| Dr. Gilbert Goliath: | 27:55 | All right. You're welcome. |
| Chairwoman Rucker: | 28:00 | Thank you. Um, the Senator from Boone. |
| Senator Stollings: | 28:01 | Thank you Madam Chairman. Uh, Dr. Goliath, uh, we've shared a lot of patients over the years, uh, it's, it's good to see you. (laughs) |
| Dr. Gilbert Goliath: | 28:08 | Good to see you. |
| Senator Stollings: | 28:10 | Uh, again, we've talked about the mental health, and then in some cases also there's hormonal regulation in some of these, uh, children. These hormonal regulations are not necessarily safe, is that correct or? |
| Dr. Gilbert Goliath: | 28:27 | Yes, that's right. |
| Senator Stollings: | 28:29 | Do you, are you aware of just how big an issue this is in West Virginia, uh? |
| Dr. Gilbert Goliath: | 28:36 | I have personally not had any patients myself that have undergone through this situation, but I have been reading a lot about, in other places that they've been dealing with this. |
| Senator Stollings: | 28:51 | And again, are you, are you, do you think you're, and the, uh, other physician, do you think you are in a, uh, in the |

|  |  | majority or the minority of the way, uh, healthcare providers, uh, think about this issue? |
|---|---|---|
| Dr. Gilbert Goliath: | 29:06 | I would tend to believe I'm in the majority. |
| Senator Stollings: | 29:10 | Yeah. And do you know of any, any associations that have come out either for or against this as far as a medical, uh, associations? |
| Dr. Gilbert Goliath: | 29:21 | Well, as far as guidelines, of course, American Academy of Pediatrics they said we should support transgender individuals in all aspects of, uh, medical health and wellbeing, even in the area of sports. Uh, but that's not a guideline, that's just their opinion. Uh, I know personally people in both sides that feel that male is male when it comes to interacting with females because of the, just the difference in the body characteristics, the, uh, metabolism, the bone structure and the body mass. So that makes the difference regardless of what the transgender person feels they are. |
| Senator Stollings: | 30:00 | Okay. Thank you. Thank you, Madam Chairman. |
| Chairwoman Rucker: | 30:03 | Thank you Senator. Um, senior Senator from the floor. |
| Senator Tarr: | 30:06 | Thank you Madam Chair. Uh, can I have a question to counsel please? |
| Chairwoman Rucker: | 30:10 | Okay. Um, one second. Are there any other questions for Dr. Goliath? Thank you. Um, okay. Thank you so much doctor, we really appreciate you being available for the committee. |
| Dr. Gilbert Goliath: | 30:25 | Thank you. |
| Chairwoman Rucker: | 30:29 | Go ahead senior Senator from the floor. |
| Senator Tarr: | 30:31 | Thank you Madam Chair. Counsel, in the section that lands on cause of action I think that some of the, that, uh, senators having con- some concern over the physicians. There's two parts to that, um, one says any individual, and then after that, number two, it's line 58, it says, any school that suffers any direct or indirect harm as a result of violation of this section. And so if, um, would you anticipate that if, if any individual I can see where if, if somebody is, um, uh, an aggrieved parent and they're |

pushing because their child lost and maybe it's by, you know, a millisecond on a race, as opposed to somebody's lap somebody, you know, that's just has, obviously, obvious physical differences.

Um, and then on the second part it says, any school that suffers. So any school I imagine would be a much more tempered approach because I can't see a school that would want to risk harming any child, whereas an angry parent I could see possibly just, I used to coach, uh, tee-ball and little league baseball and that kind of stuff. So I know there's parents that will rip your head off, or call a strike wrong. Um, the, what my question is, is that on the, any individual piece of that, is there a way that, that we can change that to protect the child for one, or does the, any school part, uh, protect that child enough from, from having an accusation that would be false and just, um, something that is, um, adversarial?

| Counsel: | 32:09 | I think maybe for the, any individual, you could probably use language that specifies that it is a student athlete, um, that was directly impacted. Um, I don't know if just relying on schools, um, would be sufficient. |

| Senator Tarr: | 32:31 | So my concern is not, and I think I know where the conversations going about, you know, if, if we're going to take out, um, a cause of action piece. But my concern is, you know, I've, I've got to read a few emails of some of the females where states that do have this problem now going on, where we have males that are participating in female sports, and there's some real harm and real reason to be aggrieved by these individuals. And so taking out the, I assume this is the teeth of the bill, it's the only place I see any teeth. So if we, if, if that is, that whole section were to be removed, is there anything that other than just saying, hey, we hope you don't do this, that this bill accomplishes? |

| Counsel: | 33:12 | It would basically leave it as status quo if you don't provide a, a cause of action. |

| Senator Tarr: | 33:17 | Okay. Thank you. |

| Chairwoman Rucker: | 33:21 | Thank you Senator. Um, Senator from Wetzel do you have questions for counsel? |

| | | |
|---|---|---|
| Senator Clements: | 33:25 | No. Uh, I think I've just basically got it answered, but it says any individual aggrieved, does that, would that prevent or allow just any fan in the stands to file an action? |
| Counsel: | 33:41 | My interpretation would be that it's an individual that's directly aggrieved by a violation, and directly meaning that, it is your interest that this bill intends to protect, and here it's clear that the interest is biological females. |
| Senator Clements: | 33:57 | Well, I'm aggrieved 'cause my team lost. |
| Counsel: | 34:01 | Well, then you might fall under the school, um, provision. |
| Senator Clements: | 34:06 | Okay. That's, I'm just curious, it's not doesn't open it up to just anybody to come in then and file some type of action? |
| Counsel: | 34:13 | No. |
| Senator Clements: | 34:13 | Okay. Thank you. |
| Chairwoman Rucker: | 34:17 | Thank you. Um, Senator Romano, questions for counsel? |
| Senator Clements: | 34:23 | Madam Chair. Counsel, did, did we look at the WVSSAC's policy with regard to challenges such as we're contemplating in this bill? |
| Counsel: | 34:34 | I did talk to someone from WVSSAC and- |
| Senator Clements: | 34:38 | But did you look at the policy? |
| Counsel: | 34:39 | Yes. |
| Senator Clements: | 34:39 | Okay. |
| Counsel: | 34:41 | So the policy is basically just, you wait until there is a, an issue, from my understanding when also talking to the WVSSAC about their policy. |
| Senator Clements: | 34:52 | Well, to me this policy achieves what I think we were looking for, um, you know, that the school makes a determination of the high school student's eligibility including gender, and then it says, any member school may appeal the eligibility of a changed gender student on the grounds of a student's participation in interscholastic athletics would adversely affect competitive equity or safety of teammates or opposing players, such an appeals |

Page 16 of 23

JA0173

heard by the WVSSAC board of directors, which is principals.

The identity of the student shall remain confidential in all discussions, documentation shall remain confidential. And the, and, and then it goes on with some other factors to be considered. I mean, it's, it's more of an equity determination, and maybe that's not what the intent of this bill is, but I think those first two paragraphs, you know, if, if we insist on having this, uh, this, um, comp sub or strike and insert that, you know, we, we allow this to remain in the schools and remain confidential, that would at least protect children from, from unwarranted accusations that are going to destroy their lives. It, was that considered at all by the, by the committee in, in creating this sub committee substitute?

| | | |
|---|---|---|
| Counsel: | 36:06 | Yes. And I think that's actually kind of why this bill changed from the first bill, because it seemed more likely that a student would be subjected to an invasive physical examination just because there might be more students who don't have birth certificates or students from c- you know, from other states coming in that don't have a birth certificate. Um, it just seemed more likely that a student would have to end up going to a doctor just to get clearance to play a sport. |
| Senator Clements: | 36:37 | Well, but, but- |
| Counsel: | 36:38 | This allows everyone- |
| Senator Clements: | 36:39 | . . . if we- |
| Counsel: | 36:40 | . . . to compete right now, and basically in a way affirms the WVSSAC policy, um, and doesn't really, uh, change the status quo, except that it expressly provides a, a cause of action for [crosstalk 00:36:54] |
| Senator Clements: | 36:55 | Let me ask you a question. I'm just asking you individually, and you don't have to answer if you're uncomfortable. But what would you rather do to be one of a class that because you don't have a birth certificate that you get a physical examination like every other kid does, or because somebody singled you out because they saw you play a great game last week and your hair's a little shorter, your shoulders are a little broadened, they accuse you of |

|  |  | being a, a boy, and therefore you're publicly exposed as, you know, someone whose gender is being challenged publicly. What would you prefer? |
|---|---|---|
| Counsel: | 37:27 | I don't think my preference is relevant. (laughs) |
| Senator Clements: | 37:29 | Well, that's a good an- I guess that's a palsy question, but I mean, you know, I, I mean, I just, I just see it to be vastly different in, in a public exposure, a public outing of, of somebody who, who's probably a girl and is going to get, you know, just, I'm really shocked that we want to do this. I really am. Thank you. |
| Chairwoman Rucker: | 37:53 | Um, Senator from Mason. |
| Senator Grady: | 37:58 | Um, so I'm listening to my, um, colleague from Harrison. Um, I have some of the same concerns when it comes to that, is the, the, the last thing we want to do is to, um, embarrass or single out, you know, a young lady. Um, and, and so, you know, looking at the cause of action, my question just is, if we take out where it says any individual aggrieved by a violation, um, what if it was, if the school, so we're talking about SSAC, we're talking about NCAA, we're talking about playing for a school. So the school that that student plays for, if they could, um, you know, if they could seek, let's see, if they would allege a violation, um, with another school board. |
| Counsel: | 38:46 | Mm-hmm (affirmative). |
| Senator Grady: | 38:46 | In your legal opinion, would that keep it more discreet and more not public, meaning, it wouldn't release the name of the, the individual athlete and it would just be between school boards, um, because that's the main concern is not releasing the name of these students. Um, and, you know, would that take care of that problem if, if it was from school to school or, in your opinion? |
| Counsel: | 39:14 | I think it would definitely address that problem a little bit or mitigate that issue. Um, I don't know if there's any other lawyers in the room, but I'm not sure if necessarily a, an underage child needs to have their name on a lawsuit. Um, I don't know if they can be identified as Jane Doe in a lawsuit instead of their name. That might be relevant. Um. |

| Senator Grady: | 39:41 | Okay. Um, so, uh, I'll see if anybody else has any other questions and I'll think on this for a few. Thank you so much. |
| Chairwoman Rucker: | 39:50 | Thank you. Senator, uh, from Brooke. Sorry. Um, you guys have switched seats. Senator from Morgan. |
| Senator Trump: | 40:01 | Thank you Madam Chairman. I, I can weigh in a little bit on this because I know that when, uh, it's probably about the last 20 or 25 years, uh, our Supreme Court has adopted a practice of whenever a case involves, uh, a minor child as a party, uh, and in cases where even, uh, the parties are the adults, but it relates to a private matter involving minor children, they've adopted a practice of using first and last initials to identify the litigants. So you see cases like, uh, AB versus JM, uh, reported all the time. Those are sort of how they report divorce cases now, and the appeals, the appeal decisions in cases where children are removed in a, an abuse or neglect situation from their parents' home, the cases are in re, the children of, you know, AB and JM and that sort of thing. |
| Chairwoman Rucker: | 41:06 | Thank you very much, um, appreciate that. Um, Senator from Brooke. |
| Senator Weld: | 41:11 | Madam Chair, uh, Counsel, I'm going to go to subsection D. So, saying that a government entity, any licensing or accredited, accrediting organization, or any athletic association or organization shall not entertain a complaint, open an investigation, or take other adverse action against the county board of education for maintaining separate athletics. This is, uh, we might have, I think there's an issue in drafting here, and I'll, I'll walk you through it. |
| Counsel: | 41:48 | Okay. |
| Senator Weld: | 41:49 | So first being that, if you go up to page two and c(1), this includes higher education, so the NCAA, NAIA, and JCAA. You come down to, now let's go back to sub D on line 51 it says, "or take any other adverse action against the county board of education." So was that, was that subsection meant to only pertain to junior high and, and, and, uh, high schools? |
| Counsel: | 42:42 | No, I don't believe so. I think because we are dealing with a situation which we're asking both secondary public |

**JA0176**

|                        |        | schools and, uh, public higher education to comply with this, I think you would want to be able to protect public higher education from, um, any complaints for complying with this law. |
|------------------------|--------|---|
| Senator Weld:          | 43:01  | So, so if we, even if, if that were changed then to reflect in addition to the county board of education to, and I don't know what proper term we would use. But, so if if, if we're, if, if, if middle school and, and high school is, uh, you know, the, the athletic association or conference overseeing them is, how do we have, how would we have jurisdiction over telling the NCAA that they can't open an investigation, or that they can't take adverse action against a, a school? |
| Counsel:               | 43:53  | I, I think because we're dealing specifically with a state law that applies to state institutions. |
| Senator Weld:          | 44:01  | But do we have any jurisdiction at all to tell the NCAA you can't open an investigation against a school, or take any adverse action against a school? I mean, what, what jurisdiction would we have a- a- against them that they can't, that they can't open an investigation per se? And I see that, you know, on the state level, if, if, if it's a high school in West Virginia, we have the WVSSAC, or, I mean, it's, it's a different scenario, but. . . |
| Counsel:               | 44:46  | It is a bit ambiguous, and so now I'm thinking whether this is meant to protect, protect against, you know, another government agency, or, um, anything that is related to the government from bringing an action against a school for doing this, and not necessarily a wholly private organization that's unrelated to government activity. |
| Senator Weld:          | 45:21  | Okay. Thank you. Thank you, Madam Chair. |
| Chairwoman Rucker:     | 45:25  | Thank you. Um, senior Senator from 4th. |
| Senator Tarr:          | 45:28  | Thank you Madam Chair. Counsel. Um, on line 59 on the bill, and this is just, 'cause, uh, maybe this is a legal term, um, just like to have it explained. "Private cause of action," does, is private cause of action a, a certain type of cause of action, or is that just saying that the names are kept out, what does it mean by private? |

Page 20 of 23

JA0177

| | | |
|---|---|---|
| Counsel: | 45:47 | It means that you as the citizen have, you have the right, this bill is creating a right for you, um, to, um, what's the word? Pursue a civil remedy, I suppose. |
| Senator Tarr: | 46:06 | Okay. So it just indicates a citizen? |
| Counsel: | 46:10 | Yeah. |
| Senator Tarr: | 46:10 | 'Cause that one's under school. I'm just curious, or is it, or is it that it's keeping stuff confidential? That's what I'm trying to just determine between. |
| Counsel: | 46:28 | Hmm. |
| Senator Tarr: | 46:29 | It's, it's not a confidentiality thing? |
| Counsel: | 46:30 | No, it's not. |
| Senator Tarr: | 46:31 | Okay. That's what I wanted to know. Okay. That's what, that's, that's, that's, that clarifies it enough for me. Thank you. |
| Chairwoman Rucker: | 46:37 | Thank you Senator. Um, Senator from Wood. |
| Senator Wood: | 46:40 | Thank you Madam Chairman. Counsel, uh, I'm sure you did a lot of research of schools where, uh, or at least some research, schools where you have males on, on girls teams, would you have, you have read about a lot of that, seen a lot of that, you have fair amount of knowledge. So at halftime when these girls go into the locker rooms and you have boys on the girls teams, do the, do the boys generally go with them, or do they go into a male locker room? |
| Counsel: | 47:13 | I'm not necessarily sure about, I'm just not really sure about that situation, um, just because this talks about a distinction and, you know, on the playing field and not in the locker rooms. |
| Senator Wood: | 47:25 | Did you read of any situations where the males went into the bathroom with the girls, the locker room with the girls? |
| Counsel: | 47:34 | Well, there is a Fourth Circuit case that would be binding on this jurisdiction where it wasn't in a sports situation, but a biological female transitioning to male, so he identifies as male, um, with, wanted to use the males restroom, and basically the county board told him not to, um, and the |

|  |  | court struck that down because they said that gender identity was not substantially related to your interest in protecting students' privacy. Um, but in the sports context, it's different because biological sex is substantially related to athletic outcomes and, um, and competitive sports and, um, contact sports. |
|---|---|---|
| Senator Wood: | 48:21 | Okay. 'Cause I have shared my memory, uh, just recently seeing a grown man on a girls basketball team. I don't know, he's 50, who identifies as a female sitting in the locker room with these girls, this bill would prevent something like that, right? I mean, if you have no males allowed onto a, a female team, they obviously logically couldn't go- |
| Counsel: | 48:48 | Well- |
| Senator Wood: | 48:48 | . . . into the locker room if they're not on a team, right? |
| Counsel | 48:51 | I see what you're saying, but this bill just speaks not to the privacy issues and entering different lockers- |
| Senator Wood: | 48:57 | But by- |
| Counsel: | 48:58 | . . . but just competing on the field. |
| Senator Wood: | 48:59 | Right. |
| Counsel: | 49:00 | Um, and I don't think that we could even speak to the bathroom situation because that is completely different as the Fourth Circuit determined. |
| Senator Wood: | 49:08 | But if no boys are on the girls team, obviously they couldn't go into the girl's locker room, am I right? |
| Counsel: | 49:14 | If a biological male, um, identified as female and wanted to go into a female bathroom, under the Fourth Circuit, you could, that, that has to be allowed if there's no, um, if that distinction doesn't serve any privacy interest. In other words, if that as- if that individual could still go into the bathroom and privacy would be maintained because there are stalls in there, because there's barriers between the urinals, um, and that's a completely different situation from competition on the field. |
| Senator Wood: | 49:48 | Right. Okay. Thank you. Thank you Madam Chair. |

JA0179

| Chairwoman Rucker: | 49:52 | Thank you. We are approaching, um, the end of our allotted time. So at this time I'm going to, um, consider a motion by the Vice Chair to recess and for us to come back 10 minutes after Health Committee tonight. Um, thank you all. And our guests who are on virtually, if you want to come back, um, we will send you another Team invite. Uh, Senator from Raleigh. |
|---|---|---|
| Vice Chair: | 50:20 | Thank you Madam Chair. I move that we recess until 10 minutes after the Health Committee. |
| Chairwoman Rucker: | 50:29 | Okay. It just went blank. Um, so the motion is to recess until, um, 10 minutes after floor session and, um, the committees and after Health. All those in favor say, aye. |
| Speakers: | 50:42 | Aye. |
| Chairwoman Rucker: | 50:44 | All those opposed say, no. |
| Speakers: | 50:45 | No. |
| Chairwoman Rucker: | 50:45 | In the opinion of the chair, the ayes have it. Thank you. (silence) |

JA0180

**West Virginia Senate Education Committee Discussion of H.B. 3293, pt. 2**

**April 1, 2021**

| | | |
|---|---|---|
| Chairwoman Rucker: | 00:10 | (silence). |
| | | Committee on Senate Education will come to order. We will return to the order of business, which was discussion of, um, House Bill 3293, the proposed, um, strike and insert amendment. |
| | | Counsel, will you please explain changes that have been made, um, since we last met. |
| Counsel: | 00:32 | Yes, so we have a new proposed strike and insert amendment and it's basically, it's very similar to the last one except that it removes protection for educational institutions against adverse action, um, it adds clarifying language to the cause of action provision, um, and addresses privacy concerns, um, and then it also requires the promulgation of rules pursuant to this section. |
| Chairwoman Rucker: | 01:05 | Thank you, counsel. Are there any questions? Is there discussion? Amendments? |
| | | I will recognize the Vice Chair Roberts for a motion. |
| Vice Chair Roberts: | 01:26 | Madam Chair, I move adoption of the amendment explained by counsel. |
| Chairwoman Rucker: | 01:31 | The question is to agree on the language on the amendment as explained by counsel. All those in favor say aye. |
| Multiple: | 01:39 | Aye. |
| Chairwoman Rucker: | 01:40 | All those opposed say no. |
| | | In the opinion of the chair, the ayes have it. I declare the motion adopted. I will recognize the Vice Chair Roberts for another motion. |
| Vice Chair Roberts: | 01:50 | Chairwoman Rucker, I move that the committee substitute for House Bill 3293 be reported to the full Senate with the recommendation that it be passed as amended. |

Page 1 of 2

**JA0181**

Chairwoman Rucker: 02:02      The question is on the motion that the committee substitute for House Bill 3293 as amended be reported to the full Senate with the recommendation that it be passed. All those in favor say aye.

Multiple:          02:13      Aye.

Chairwoman Rucker: 02:14      All those opposed say no.

                              In the opinion of the chair, the ayes have it. Committee substitute for House Bill 3293 as amended will be recorded. If there is no further business to come before the committee, I will ask the Vice Chair Roberts for a motion.

Vice Chair Roberts: 02:14     I move we adjourn.

Chairwoman Rucker: 02:29      The question is on adjournment. All those in favor say aye.

Multiple:          02:33      Aye.

Chairwoman Rucker: 02:34      All those opposed say no.

                              The ayes have it. Have a good evening.

                              (silence).

JA0182

### West Virginia Senate Discussion of H.B. 3293

### April 8, 2021

| | | |
|---|---|---|
| Clerk Cassis: | 01:13:45 | Engrossed Committee Substitute for House Bill 3293 relating to single-sex participation in interscholastic athletic events, third reading of the bill. |
| President Blair: | 01:13:55 | Question is on passage of the bill, Senator from Jefferson. |
| Senator Rucker: | 01:13:58 | Thank you Mr. Chairman. House Bill 3293 as amended by Senate Education provides legislative findings regarding the state's important government interest in ensuring equal athletic opportunity for biological females. It defines biological sex, female and male. It requires all public secondary schools and state institutions of higher education to designate teams according to biological sex. It prohibits biological males from competing on teams designated for biological females, where selection for such team is based upon competitive skill or the activity involved in a contact sport. Provides a cause of action for students aggrieved and harmed by violation of this section and requires the promulgation of rules. Happy to answer any questions, I urge passage. |
| President Blair: | 01:14:49 | Question is on passage of the bill, is there discussion? Senator from Harrison. |
| Senator Romano: | 01:14:55 | Thank you Mr. President, will the Senator from Jefferson yield? |
| President Blair: | 01:14:57 | Will the Senator yield? Senator yields. |
| Senator Romano: | 01:15:01 | Thank you Senator. Senator, you know, I appreciate the changes that were made to the committee's strike and insert, um, after we had some discussion, but I- I did want to kind of ask you a couple questions on what the result of that would be. An indiv- any individual and I-I think it says a student, doesn't it? A minor student or their parent 'cause the- the parent would have to the-the actual, um, challenge of a violation by somebody who may be chan- transgender, um, playing a sport. The-the challenge would come from a student, isn't that correct? I mean a student would be allowed to challenge another player as to whether they're playing in a s- a single-sex sport under the appropriate gender. |

Page 1 of 38

| Senator Rucker: | 01:16:01 | I-I don't believe that it specifies it has to be a student and I want to to point out that, um, the State Board of Education and the Higher Education Policy Commission would have to promulgate rules. There is under the cause of action, it does say that a student aggrieved by a violation of this section may bring an action, but I don't think it specifies that a challenge has to be made by a student. |
| Senator Romano: | 01:16:25 | I'm going to read it, it says any student aggrieved by a violation of this section may bring an action against a county board of education or state institution of higher education. |
| Senator Rucker: | 01:16:34 | Yes, that-that's if there's a violation, um, for not following the state code, but I- were you referring to just challenging whether or not someone was of the right biological? |
| Senator Romano: | 01:16:47 | Well let me be clear, my issue is that private individuals can bring an action. It says student, but that would have to come from a parent of a student I presume 'cause most students in secondary education are minors and they would have to have an adult on their behalf represent them. |
| Senator Rucker: | 01:17:04 | I-I assume that if they're minors that their parents would have to do it on their behalf. |
| Senator Romano: | 01:17:09 | And- and, you know, I- I- again, I appreciate the fact that you've tried to add some confidentiality to this by the student not being identified in the- in the pleading, but if- if a student would be challenged, that student would have to be notified and, you know, some action taken to determine their gender, I presume, would that be accurate? |
| Senator Rucker: | 01:17:34 | That would be accurate and that would probably be specified in the rules that are developed by the Board of Education and Higher Education Policy Commission. |
| Senator Romano: | 01:17:42 | Well, I'm- I'm sticking with secondary education now 'cause I want to ask you, what effect do you think that would have on a 14, 15, 16 year old girl that might be a tomboy, but a hell of an athlete and- an opposing, uh, player or parent of an opposing player challenges them or somebody on the same team challenges them because she's the star of the- of the- of the club and- and they want them all, they want that person off of the club. What- what psychological effect do you think that will have on that |

child, on that poor girl or poor boy that might be a little bit, you know, not, maybe not, you know, manly enough for somebody and they challenge their- their gender.

Senator Rucker: 01:18:23 So, I want to to point out that, um, what we allow for in here is that a student who feels aggrieved by a violation can bring an action against a county board of education or a state institution, not against an individual.

Senator Romano: 01:18:37 But- but it's got to involve the individual. I mean, how- how's the county board of education going to defend itself unless it has that individual pulled out, sent to a physician or some other reputable person to determine what their gender is?

Senator Rucker: 01:18:52 Well, I'm- I'm not a lawyer, but if the State Board of Education and the Higher Education Policy Commission set rules for implementation and the county board of education or state institution does not follow those rules, then they won't be able to defend themselves. But if they're following the rules, I think they- they would be protected because they're following the rules.

Senator Romano: 01:19:13 But- but if that child is identified in any way, if that child is singled out, if nobody else knows but that child, what effect do you think that's going to have on that child's psychological wellbeing?

Senator Rucker: 01:19:25 I don't see where we're singling out any particular student and what I do see is that we're defending, um, women's sports for women, for girls, and we're giving an opportunity for our institutions to, um, have that as their policy, as we are told to do because of Title IX.

Senator Romano: 01:19:47 Well, let me ask you this, was there any evidence that there had ever been any transgender student play for the, uh, single-sex team opposite what their biological birth record indicated? Did we have one case in West Virginia that you know of?

Senator Rucker: 01:20:05 Not that I know of.

Senator Romano: 01:20:06 Okay, do- do you not see that- that what we've done here is open up the opportunity for unfair attacks against boys and girls who, if they're a girl, they may be a little too tomboyish, if they're a boy maybe they're a little too

|                   |          | effeminate, but- but they were opening them up for attack from people who may want to embarrass them even without justification. |
|-------------------|----------|---|

Senator Rucker:    01:20:42    Thank you, um, so I just want to point out two things in response. Um, one is that the, um, court still would need to determine that there's standing that, um, for that student who is making the allegation, um, so it's not like it's an automatic process. And second of all, I just want to point out that this bill is not about transgender individuals, it is about women and girls sports and our, um, our interest in protecting sports for women and girls. And, uh, like again, I want to point out Title IX actually gives the state that responsibility.

Senator Romano:    01:21:24    Is it limited to just girls sports? I thought it applied to both sexes. Am I wrong about that? It appears to be for both sexes, Senator.

Senator Rucker:    01:21:43    Yeah.

Senator Romano:    01:21:44    Unless I'm missing something.

Senator Rucker:    01:21:45    No, I'm sorry just one second 'cause before I answer you I just want to make certain that my answer's correct.

Senator Romano:    01:21:50    That's fine and it really doesn't matter Senator, you don't need to dwell on that, but if you can find it quickly, it'll be helpful.

Senator Rucker:    01:21:57    Sure, no problem. Okay, so in page 3, lines 40 to 42, athletic teams or sports designated for females, women or girls, shall not be open to students of the male sex or selection for such team is based upon competitive skill or the activity involved as a contact sport.

Senator Romano:    01:21:57    Thank you.

Senator Rucker:    01:22:17    And currently I just want to point that, um, girls have been allowed to participate in sports for men, for boys, um, in certain circumstances and that is because they do not always have access to all of the different athletic opportunities. And that is exactly the reason for Title IX and exactly the reason for why we want to protect girls and women sports.

| | | |
|---|---|---|
| Senator Romano: | 01:22:42 | Sure, sure, I do too, I- I don't- |
| Senator Rucker: | 01:22:43 | It is usually- it is usually not a problem when it comes to girls wanting to participate- participate in men's sports, but I just want to point out we're trying to protect girls and women sports. |
| Senator Romano: | 01:22:54 | And I do too and it makes it a little easier for this argument because now all we have to worry about is the poor tomgirl who grows up and, you know, might look a little boyish, do you not think she is going to be open to attack by an opposing team or a teammate for- on the ba- basis of gender? Wrongly? I mean it could be wrongly, but- but if the school board has to defend itself, do you not think they're going to have to- that- that little girl is not going to know that somebody challenged her, challenged her gender? |
| Senator Rucker: | 01:23:25 | So I- I appreciate the hypothetical situation that could occur and as someone who used to be a tomboy and had this, you know, discussion earlier with my staff, um, as the only girl and having four brothers that I grew up with, I- I was an absolute tomboy, I did not like wearing skirts believe it or not and I was very much, um, into athletics and sports. I can tell you that it is still pretty obvious if you are- |
| Senator Romano: | 01:23:54 | I'm sorry, they still what, I missed that. |
| Senator Rucker: | 01:23:55 | It is still pretty obvious if you are of the biological sex and the other issue I want to point out, it's- the way that we wrote this bill and we did it very carefully, it is only if there is, you know, a concern. One of the reasons for why, um, it is in our interest to protect women's and girls' sports is because there is a very big physical difference and advantage for biological males. Um, there's been, um, and I'm not going to be able to cite it off memory, but, you know, I was the captain of my cross-country team and I was really good. And, um, we would run together both the boys and the girls and even though I was the fastest girl on the girls' team, the slowest boy on the boys' team could still, um, beat me. |
| | | So, I mean, that's just one of many examples I could cite and there is an inherent interest that we have in the state to give girls an opportunity, to give women an opportunity. It makes a difference in their ability to get scholarships, it |

makes a difference in their developing of leadership and I will tell you that it was something that is, um, in- inherently of the interest of this state because we do believe in women and girls. There was a statistic that I saw somewhere that said that a high percentage of executives, women executives, CEOs were involved in athletics.

So it just goes to show you that having those opportunities for women and girls is very important in order for us to right the many ways in which women have been disadvantaged.

| Senator Romano: | 01:25:40 | Well Senator, this isn't about opportunity for girls to play without interference from boys 'cause we've never had one of those cases. We've never had any boy try to play on a girls' team. The- the question is, how would you have felt when you were a tomboy growing up if somebody had challenged your gender, what would that have done to your self-esteem, what would that have done to your psychological outlook because there's nothing in this bill that says it has to be a serious concern, it just says that you have a cause of action if you've been aggrieved by a violation. |

So you're going to get to file the case, you're going to get to file it in court and sure it's going to say, you know, Jane Doe versus MH, but that child for the school board to defend themself, they're going to have to have that child examined. That child's going to know that somebody challenged her gender.

| Senator Rucker: | 01:26:30 | I don't think it's going to necessarily have to be an examination and that is one of the reasons to have rules be established. It could be as simple as a birth certificate, it could be as simple as an affidavit signed by the physician, I- I don't think we need to, you know, over complicate it and I'm certain- |
| Senator Romano: | 01:26:46 | Yeah, it may be- |
| Senator Rucker: | 01:26:46 | . . . I'm certain that the HEBC and the Board of Education will choose the simplest method. |
| Senator Romano: | 01:26:50 | It- it may be as simple as an affidavit, it may be as serious as a pelvic exam with a child's feet up in stirrups being examined by an OBGYN. |

| | | |
|---|---|---|
| Senator Rucker: | 01:27:01 | Well, it's a really good thing that as the legislative body, we're going to be able to see those rules when they get developed. |
| Senator Romano: | 01:27:06 | Well, I- I- I'm concerned about it, the rules don't have anything to do with the court challenge section. It does say that the, but- but you know that WVSSAC already has rules in place to prevent boys from being on women's teams? |
| Senator Rucker: | 01:27:20 | Actually they do not. Um, what we have and I've been grateful, um, that we've had a member that's been able to get us all copies of it. So what this document is, is an internal policy for the board of directors to have in case there were to be a question so that they would have something to guide their decision-making, but it is not a rule and they have not established any rules regarding transgender. |
| Senator Romano: | 01:27:46 | You don't- you don't think an internal directive to the- to the board of directors is a rule that they're going to follow? |
| Senator Rucker: | 01:27:50 | No it's not and it has not been voted on or approved by their members. |
| Senator Romano: | 01:27:54 | Are you aware of any instance where there's been a situation where there's been a male on a female team in West Virginia? |
| Senator Rucker: | 01:28:01 | Well, I already answered that, that I- I did not know of- of any West Virginia, but I have heard in other states. |
| Senator Romano: | 01:28:07 | I'm sorry then how do we know they're not going to follow- |
| Senator Rucker: | 01:28:09 | I always want to point out. I'm sorry. |
| Senator Romano: | 01:28:10 | How do you know they're not going to follow their internal directives? |
| President Blair: | 01:28:13 | Gentleman will state his point of order. |
| Senator Trump: | 01:28:17 | Thank you Mr. President, I- I couldn't hear, uh, the answer that was being given to the question, I think the, uh, questioner had moved on to a second question, I don't think the Chairman had completed her answer. |

**JA0189**

| | | |
|---|---|---|
| Senator Romano: | 01:28:31 | Well, I apologize ch- Mr. President, I thought she completed it. |
| President Blair: | 01:28:34 | The- the- the Gentleman's, uh, po- the- the Gentleman's point of order is well taken, questions will be asked and answers will be given. |
| Senator Romano: | 01:28:40 | I apologize Senator, I thought you had finished. Go right ahead. |
| Senator Rucker: | 01:28:43 | No problem, I just wanted to point out that one of the considerations about this internal policy, if you read it, and it was actually highlighted in the copy that we got today, you know, it makes it in this internal policy that the school, the school, the individual school, we're talking about our public schools, would have had the responsibility of dealing with this situation if it were to arise and it would definitely open them up for legal challenge. So, this is one of the reasons for why I think it's important and we did pass a bill earlier that we have some say in these rules because we certainly do not want to put our public schools in a situation where they are going to be, um, sued. And I'm sorry, you may now, if I hope that's okay and you may now ask your second, your other question. |
| Senator Romano: | 01:29:33 | I- I think we got to the second question. Let me ask you then because this includes higher education too, doesn't it? |
| Senator Rucker: | 01:29:40 | Yes it does. |
| Senator Romano: | 01:29:40 | That's our colleges and universities around the state, correct? |
| Senator Rucker: | 01:29:44 | Yes, the public, yes. |
| Senator Romano: | 01:29:46 | The NCAA has very, very, uh, detailed rules on the handling of a situation of a male- a male participating in female sports, don't they? |
| Senator Rucker: | 01:30:00 | No, actually you're- you're not correct, um, and it's something that I did talk about, um, or at least was brought up in the committee, I have their policy with me somewhere in here. Um, it is a guidance, um- |
| Senator Romano: | 01:30:15 | It is a what? |

| Senator Rucker: | 01:30:15 | A guidance, they developed guidance for institutions who want to allow for transgender participation and it is a very, uh, they attempt to be specific and they give certain criteria if you're going to allow a transgender male to participate in women sports. But it is not a rule and it not a policy. |
|---|---|---|
| Senator Romano: | 01:30:36 | Are you aware of guidance not being followed by higher education in West Virginia? |
| Senator Rucker: | 01:30:41 | Not in West Virginia, but there are actually, um, many states that have, um, different, uh, policies and rules that are diverged from what the NCAA policy is, so it has happened before. |
| Senator Romano: | 01:30:53 | Certainly you agree that our statue isn't going to look anything like the NCAA rules or guidance, whatever you want to call them. |
| Senator Rucker: | 01:31:04 | No, it- it's not really addressing their guidance, it is actually, um, creating a protection for women's sports in the state of West Virginia and of course it is the state's authority to enforce Title IX in the state and to determine what their, um, interest is in protecting women's and girls' sports. |
| Senator Romano: | 01:31:26 | I mean I've- I've got the NCAA guidance here, it's a- it's a pretty detailed, uh, set of instructions and- and- and also includes education for our schools. And- and- and again, I'm not faulting you for trying to make sure that girls only have to play girls in single-sex sports, I'm certainly not faulting you. My overriding concern is what effect it's going to have on a 16 or 17 year old girl who may be a little tomboyish who be a heck of an athlete and who gets challenged by a parent of- of the same team or a parent of an opposing team.

And- and you're right, it may be nothing more than showing their birth certificate and then the school complies, but it's going to scar that young lady for the rest of her life. Mr. President, I just want to take a second to say I do not oppose the amendment, it's a heck of a lot better than the original bill, but I will speak in opposition to this bill at the appropriate time, thank you Mr. President. |
| President Blair: | 01:32:30 | Was there further discussion? Junior Senator from the 8th. |

| | | |
|---|---|---|
| Senator Lindsay: | 01:32:33 | Thank you Mr. President if the, uh, the Senator from Jefferson would yield. |
| President Blair: | 01:32:37 | Will the Senator from Jefferson yield? The Senator yields. |
| Senator Lindsay: | 01:32:42 | Thank you, thank you Senator, good morning. |
| Senator Rucker: | 01:32:42 | Good morning. |
| Senator Lindsay: | 01:32:45 | I just, I wasn't planning to address this until we- we took up the bill, but I was the individual who put the, uh, West Virginia, I'm going to go ahead and read it into the record. The transgender policy of the West Virginia Secondary School Activities Commission, this is what it says at the top, in the event a member school or its governing authority determines to permit transgender students to participate in inter sch- scholastic athletics, the WVSSAC has adopted the following policy to govern such participation. |
| | | I don't, that doesn't sound like just an internal document that schools can decide to follow or not or that the WVSSAC can decide to follow or not. |
| Senator Rucker: | 01:33:30 | It's not an internal document of the schools, it's an internal document of the WVSSAC Board of Directors. And we called, um, Bernie Dolan to specifically verify because we had asked in committee, someone had asked for, you know, what is the WVSSAC policy regarding transgender and we were told there wasn't any, so we specifically looked into it. So this is an internal, um, policy for the board of directors that they created in case there were to be a situation in which they want to address this participation of transgender students. |
| Senator Lindsay: | 01:34:05 | But I read that- I'm sorry, I thought you were finished. |
| Senator Rucker: | 01:34:05 | No problem. |
| Senator Lindsay: | 01:34:08 | I read that correctly, the WVSSAC has adopted this policy, right? |
| Senator Rucker: | 01:34:15 | I don't- I don't know what to tell you, Bernie Dolan says this is an internal- an internal policy for the board of directors, it is not one that has been adopted by the WVSSAC as a rule. |

Page 10 of 38

**JA0192**

| Senator Lindsay: | 01:34:26 | Okay, what- I think we're- we're- we're playing games with language here. It does say that the WVSSAC has adopted this policy, correct? |
|---|---|---|
| Senator Rucker: | 01:34:37 | That- that is what it says on the top of here. |
| Senator Lindsay: | 01:34:39 | Okay. |
| Senator Rucker: | 01:34:39 | But above it- it says WVSSAC Board of Directors and I'm just letting you know what Mr. Dolan said. |
| Senator Lindsay: | 01:34:47 | I'm sorry? And- and as far as I know, Bernie Dolan did not testify to- to your, uh, belief as far as the significance of this policy, right? |
| Senator Rucker: | 01:34:59 | No, he did not testify. |
| Senator Lindsay: | 01:35:00 | Because we were told by the West Virginia SSAC that this is their policy and this is what they have the schools follow, so I just want to make sure the record's clear because again, we're playing with words here just to suggest to minimize the import of this policy. But regardless of what you believe this policy is or isn't, I just want to make sure I understand that number one it says the "transgender student school shall make the initial determination as to whether a student may participate in inner scholastic athletics and gender- in a gender that does not match the gender assigned to him." So the school makes that first determination, correct? |
| Senator Rucker: | 01:35:42 | According to this internal document, yes. |
| Senator Lindsay: | 01:35:45 | Sure and if there's a- if there's a conflict with, not a conflict, but if a party is upset with that determination, then it goes to the West Virginia SSAC Board of irectors on appeal, correct? |
| Senator Rucker: | 01:35:59 | I- I'm not a 100% certain, again I point out that I'm not a lawyer and I would assume that if there is a problem or a conflict that that is what would normally happen. |
| Senator Lindsay: | 01:36:10 | Well, that's what the policy says, right? |
| Senator Rucker: | 01:36:13 | Well, actually what I see here is that they would, um, give the school the authority to determine how to handle it. |

Page 11 of 38

JA0193

| Senator Lindsay: | 01:36:23 | Sure. But any such appeal will be heard by the WVSSAC Board of Directors, that's what it says. |
| Senator Rucker: | 01:36:31 | If there's an appeal, yes. |
| Senator Lindsay: | 01:36:32 | Okay and then the Board of Directors decision that says in- in sub-paragraph C, "the Board's deliberations will be limited to the question of whether the transgender student represents a threat to competitive equity or the safety of teammates or opposing players". You see that? |
| Senator Rucker: | 01:36:49 | Yes. |
| Senator Lindsay: | 01:36:50 | So it takes into consideration the safety of- of players and the equity of the issue, correct? |
| Senator Rucker: | 01:36:56 | Correct. |
| Senator Lindsay: | 01:36:57 | And it's specific to every circumstance. |
| Senator Rucker: | 01:37:01 | It's very similar to what we're passing in this legislation today if it were to pass. |
| Senator Lindsay: | 01:37:04 | Well then why would we take, why would this body, if it's similar, why would this body take the decisions away from the school and the- and the West Virginia SAC- AC and the appeals process? |
| Senator Rucker: | 01:37:17 | As I pointed out before, this actually opens up the schools for legal action and it is, um, as I pointed out, not a rule, it is an internal document that they are using if the circumstances were to come up. But it is in the state's interest and obviously this is a policy decision, but it is in the state's interest to protect women and girls' sports and what this bill does would essentially be following this model of protecting women and girls' sports, um, for the future of West Virginia and for the future of our girls. |
| Senator Lindsay: | 01:37:54 | Well this policy does not o- from the West Virginia SSAC does not only protect women, it protects all students. Transgender, uh, or- or- or- or- or all- all students under the sun, not just boys, girls but transgender as well, right? |
| Senator Rucker: | 01:38:14 | Are you- okay, you're asking me if I believe it's doing that? |

| Senator Lindsay: | 01:38:17 | This policy that's been adopted by the West Virginia SSAC? |
| Senator Rucker: | 01:38:22 | I believe that our state law would, if, again, this becomes law, it would also do the same. |
| Senator Lindsay: | 01:38:28 | Well then what's the purpose of the law then other than the political advantages potentially, but if we already have a policy in place as determined by the West Virginia Secondary School Activities, what are we doing here on this bill? |
| Senator Rucker: | 01:38:42 | A- again, I want to point out that this has not been adopted as a rule for the schools, the member schools to follow and it does not provide protection, um, for our schools. |
| Senator Lindsay: | 01:38:55 | Mr. President, may I speak to the amendment? |
| President Blair: | 01:38:59 | You can speak to the bill. |
| Senator Lindsay: | 01:39:05 | Oh, it's already been, oh, okay. Mr. President, I apologize, I thought we were on the amendment. Um, but I'll, may I ask unanimous consent to speak to the bill? |
| President Blair: | 01:39:16 | Yes. Approved. |
| Senator Lindsay: | 01:39:19 | Thank you, thank you, Mr. President. Um, ladies and gentlemen, let's clear as black and white as this page, I'm going to read it into the record again because I think it's worth noting why we don't need HB 3293. "In the event a member school or its governing authority determines to permit tra- transgender students to participate inner- interscholastic athletics, the WVSSAC has adopted the following- following policy to govern such participation." And actually- it's actually called the "WVSSAC transgender student policy." It's specific to the student that is seeking to play a sport, it's a process that seeks to make sure not just for female students, but for all students whether or not the transgender student represents a threat to competitive equity or safety of teammates or opposing players.

So we're here discussing a bill that is already solved if- if the- if the s- if the intentions are true for this bill, a problem that's already solved. I would suggest to you a problem that doesn't exist 'cause we, as a caucus, spoke to |

representatives of the West Virginia Secondary School Activities Commission and they said there wasn't a case on a high school level as far as transgender students. Then in fact if it comes up at all, it comes up in the middle school level. So we're talking fifth, sixth, seventh, and eighth grade, clearly no-one's working for a- a- a college scholarship on that level. The- if I could just share just a few things too as well in addition to that, um, you know, I've said before, like many of you, I've played sports ever since I was eight or nine years old, athletic sports, organized sports. Um, I played on good teams, bad teams, I played on teams where I was the star, I played on teams where I was a- I- I rode the bench pretty hard. One specifically was when I started playing baseball, I played junior league baseball here at Capitol Midwestern in Charleston and I was horrible. I was a horrible player, my brother and I played for Hardee's.

And we only got to play, uh, the last two innings of the game because that's the o- when you're bad, when you're not good at that pat- at- at that sport, that's what ends up happening 'cause you're- you're- you're required to play. The last game of the season, I always played right field for the la- last game of the season my coach put me on third base and I played the entire game and I couldn't catch a ball. Balls went by me all the time, I couldn't field the ball. I was so bad that the coach's wife was screaming from the bleachers to take me out of third base. That's how bad I was, honestly.

And so afterwards, obviously I went home and shed a tear or two, but then we had a, I went back to the, we had a wall in our neighborhood where I could just throw a tennis ball with a mitt because I was convinced that I would come back and play third base the next year. We actually played for an expansion team, Mario's Pizza, the next year. City Councilman Adam Noth played on the same team so we were all All-Stars.

Anyway, I started every game at third base, I completed every game at third base, I was practically an All-Star in that regard, I still couldn't hit a lick, but I was good enough to- to run the base paths. The point of this story is because sports allowed me to overcome my difference, overcome my infirmities. It challenged me for the first time in my life to show that I could overcome these barriers.

And that's a good lesson to learn. I- I like to consider myself a one, uh, uh, a great athlete, but there's no way I was ever going to be an Olympian or play in a pro sport, but that's not what sports is about, it's an outlet. It allows students to overcome challenges. That's an important lesson. Not only that, teams or the groups, if you played on teams, are usually the first groups of people that you're accepted in, that you're welcomed in, the camaraderie. That's just- that's just as important as playing the sport.

Why would we pass legislation, when there's already a policy in place that swoops down and takes that opportunity away from a student, middle school students, I add. 'Cause again, what we heard from WVSSAC was we see this is in middle school, not in high school. And let me remind the body as well because this was said in support of a measure earlier this session, the phrase "our students," remember our students, our children, they're black and white, they're rich and poor, they're abled and disabled, they're gay and straight and they're transgender. Why would we pursue a policy that separates those individuals? There's just no need for it.

PART 3 OF 5 ENDS [01:45:04]

| | | |
|---|---|---|
| Senator Lindsay: | 01:45:02 | Again, because the outlet of sports is so important to a young person's life because it allows them to overcome the challenges, because it allows them to be accepted in a group and we're talking about a specific set of students that are already having issues as- as it is. I can't imagine the pressure of a middle school student who identifies as a different gender trying to get along in their school. I'm all for women sports, but that's not what this bill is. This bill specifically says on page two, "classifications based on gender identity serve no legitimate relationship to the state of West Virginia's interest of promoting equal athletic opportunities." |

So to sell it to the public, we talk about women, but what this bill does is it separates children at their weakest time and there's just no public policy and support of it, there's no benefit to it, all it does is seek to divide. And gives us, the- the public, the nation, another reason to joke about West Virginia for pursuing such a policy in the first place. Vote for our children, vote no on this bill, thank you.

| President Blair: | 01:46:22 | Further discussion. Senior Senator from the 4th. |
|---|---|---|
| Senator Tarr: | 01:46:28 | Thank you, would the Senator yield Chair Lady. |
| President Blair: | 01:46:31 | Senator from Jefferson yield, Senator yields. |
| Senator Tarr: | 01:46:34 | All right, thank you Mr. President and thank you for yielding. So, I was just going back and forth between discussion here between what's considered policies and I think rules and regulations of the SSAC. And I understand that the policy that was laid on our desk, you're saying, is the internal policy, do internal policies or rules and regulations of the SSAC govern sports in West Virginia? |
| Senator Rucker: | 01:46:59 | No. |
| Senator Tarr: | 01:47:01 | So, the- the internal policy and the reason I was looking here is that, you know, I went to SSAC's website as this came up and I was looking, I thought, well, I want to look at this policy. What I found is it says that rules and regulations, the constitution and bylaws of the WVSSAC are the rules and regulations of the commission. So, what we had before us is an internal policy and you're saying that it's not the internal policy that governs sports, but it's the rules and regulations that governs the sport. |
| Senator Rucker: | 01:47:33 | That is correct. |
| Senator Tarr: | 01:47:34 | That's correct? Okay. Um, well, what I found, just appreciating you answering my question, I'll just speak to the bill if that's okay. Mr. President, you know, I just- I just did, um, went in and looked at the constitution and rules and regulations of the WVSSAC that is current on their website here and I did a word search for transgender and it came up zero. This policy which is not what governs sports in West Virginia in- has nothing to do with the rules and regulations that govern sports in West Virginia. |
| | | Because when you look at the rules and regulations of WVSSAC, "transgender" which is mentioned in this policy, one, at least two, three, four, five and so on times is nowhere in the rules and regulations whatsoever of the WVSSAC that governs athletics. And the other thing is I think that, you know, one- the Senator that spoke here a second ago talking about having such a trouble in a sport is one of the issues we're talking about. Because you know |

what, I may not be very competitive in a male sport, but what I could do is identify as female or say that I do and go dominate in a female sport because of the physical advantage that is just naturally given to a male over a female. So and which is what this bill's about, so Mr. President I rise in support of this bill.

| | | |
|---|---|---|
| President Blair: | 01:49:09 | Further discussion, Senator from Bane. Senator from Bane. |
| Senator Stollings: | 01:49:17 | Thank you Mr. President. I'm not sure if this body is concerned about what this bill does or could do to a transgender person in West Virginia. But the West Virginia State Medical Association, the West Virginia Chapter of the American Academy of Pediatrics, the West Virginia Psychological Association and the West Virginia School Psychologist Association and the American Academy of Pediatrics on a national level are very concerned about what this would do to a transgender person, student, in West Virginia. They say many trans youth already face an uphill battle in nearly every part of their lives. 84% of transgender youth feel unsafe at school. Nearly half trans youth attempt suicide, think about that. And the trans community is increasingly the target of violence and harassment. This bill will further ostracize young transgender people from their peers. The West Virginia Chapter of the American Academy of Pediatrics opposes House Bill 3293. Their organization works toward all children and adolescents regardless of gender identity or expression. |

Receiving care to promote optimal physical, mental, and social wellbeing. Any discrimination based on gender identity or expression damages the socio-emotional health of children, families, and society. Again, transgender youth in West Virginia are high at risk- higher risk of suicide than their cisgender peers and this bill will only further the discrimination transgender youth experience. They again ask us to reject this- this bill. Transgender already face higher risk of suicide and depression and again it would further harm too many of West Virginia's most vulnerable.

So whether we are concerned about the unintended consequences of this bill, the people that are specialists and people that are on the frontline clearly, clearly have an issue. So it is with that regard and the fact that I think the SSAC does cover and does have a policy, should this ever

JA0199

become an issue. So we're creating legislation for a problem that doesn't exist and it does have unintended negative consequences. I urge a no-vote.

| | | |
|---|---|---|
| President Blair: | 01:52:30 | Senator from Brooke. |
| Senator Weld: | 01:52:32 | Thank you Mr. President, to stand today and explain my vote on this issue. This is, it's a difficult one, it's an odd one. It's not an issue when I first ran for the legislature in 2014, if- if you had said this was a- bill that you- you'd be debating and taking up, but I- I wouldn't have even understood the concept to be honest with you, Mr. President, it's- it's a tough issue. We're talking about young kids, high school kids, and college athletes, just a tough issue. |

And so I understand the concept as I've started to research it, I still don't understand the whole transgender issue, I don't, I'll fully admit, it's- it- it's just not something that I fully understand. But what I do understand, Mr. President, is the law and so I started to do some research on this issue 'cause it's just something that I didn't know about. So one of the things that I found was that recently, uh, South Dakota had a- a similar piece of legislation and their- their governor Kristi Noem who was a- a- an ardent supporter of- of the legislation before it- it came to her, had to send it back to the legislature.

And- and- the- the bill that they had pertained to higher education, to NCAA, uh, National Junior College Athletic Assassination, NAIA and so, but I- I'm going to read Kristi Noem's statement. The NCAA is a private association, that means they can do what they want to do. If South Dakota passes a law that's against their policy, they will likely take punitive action against us. That means they can pull their tournaments from the state, they could pull their home games, they can even prevent our athletes from playing in their league.

South Dakota's chances of winning a lawsuit against the NCAA are very low. Competing on the national stage means compliance with the nation governing bodies that oversee college athletics. While I certainly do not always agree with actions these sanctioned bodies take, I understand that college- collegiate athletics requires such a system, a 50-state patch work is not workable. The

NCAA's policy is that after a year of hormone suppression therapy, which is something that I do not understand Mr. President, an individual can then play the sport that they want to play and so it's a policy of inclusion after that year.

This would be a policy that at no point becomes inclusionary in the higher education levels. And so we would be against the policy of the NCAA. And- and Governor Noem was accused of catering to the NCAA when she- on that- when she took the veto action and I may likely be accused of doing the same. But I'm not, but I'm a realist and I know the law and I can understand the law.

And the last thing that I want to do Mr. President is have this negatively affect any of our college athletic teams here in the state of West Virginia. I was a college athlete myself, it's hard, it's a lot of work. It's not like high school, there's much more into it, you get one day off, you get Sundays off. And so I couldn't take any action here that would potentially put into jeopardy the hard work that our college athletes put into a season. Because the NCAA, right or wrong, could say WVU, West Liberty, Fairmont, Marshall, whomever, you're no longer in the league, you can't play in the game or we're not going to- you're not going to be a tournament host site.

They could and I don't agree with it, but they could because they're a private entity, we have no jurisdiction over them whatsoever. We don't. And another thing Mr. President is a particular part of this bill that legally I think presents a lot of challenges, could present a lot of challenges for our colleges and universities and I'll read from the bill. "Any student aggrieved by a violation of this section may bring an action against the county board of education or state institution of higher education allegedly responsible for the alleged violation."

"The aggrieved student may seek injunctive relief and actual damages as well as reasonable attorney's fees and court costs if the student substantially prevails." So West Liberty State University, the girls' basketball team plays Notre Dame College, it's- it's in Ohio. So that team has a transgender female on it and she's complied with the NCAA's policy the year. So she comes to- to West Virginia to play West Liberty, well she can't because of the state's policy. So she has been aggrieved by this law, so does she

now have a c- a cause of action, she's an aggrieved person. She's a student who's aggrieved by this section, does she now have a cause of action against West Liberty State University?

On the other side of that, they don't play the game at all. On high school it's- it's a lot different, we've got a lot of high schools in the state of West Virginia. If- if- if Brooke High didn't play Soonbill Big Red, I'm sure they could pick up another school in- in West Virginia to play against. But we only have so many Division I colleges in the state of West Virginia, we only have so many Division II colleges in the state of West Virginia.

We're going to have to start dropping games because the policies don't align and that's my concern here Mr. President is I'm looking down the road prospectively of what could happen by the inclusion of higher education in this. And again, don't get me wrong, I don't think that- that people who have a- a distinct physical physiological advantage who are members of an opposite sex should be allowed to play sport with them. It's unfair. But by including higher education in this, we've added another layer of complexity to an issue that is already extremely complex, extremely difficult, Mr. President, this is something that I couldn't have- have ever imagined that I would deal with as a legislator. When I moved to Washington D.C. in 2003 from- from Wellsburg in Fairmont, the world was a completely different place, it's a lot different than anything I was used to.

And while that kinda prepped me for- for something like this, it really, it- it didn't to the point where I was going to have to make decisions on it. So I don't- I don't make this decision lightly because I agree with the concept, but I also take it as someone who has to look at the reality based in law and that's what's happening underneath this piece of legislation. Thank you, Mr. President.

| | | |
|---|---|---|
| President Blair: | 02:01:07 | Senator from Harrison. |
| Senator Romano: | 02:01:10 | Thank you Mr. President. You know, I- I like the Senator from Brooke struggle with this bill 'cause, you know, I don't have any desire for a 250 pound boy to be playing girls sports, but let me be clear, this isn't about men and women's and girls' locker rooms or any of that stuff, this is |

just a bill about sports. And it's not even about transgender kids from my perspective, it's about your daughter, it's about your niece, your grandniece who might be a little tomboyish and who's going to get called out because we have a provision in here giving private citizens a right to challenge their gender. Can't imagine how devastating that would be to a 14, 15- or 16-year-old girl. You know, I used to get called sissy sometimes, it- it was hard, you know, you get bullied, it's hard when- when people pick on you, imagine if it's the authority. Imagine if it's your school authority that has to bring you in, question you, question your parents, perhaps submit you to a physical examination because some jealous parent who has a kid on your team doesn't like that you get all the accolades and all the newspaper clippings.

Or an opposing team who thinks they can vie for a state championship if you're not on the girls' basketball team and wants to put a little wrench in the winds of a certain school. That's what we're going to allow here, that's what we're going to encourage people to do, we've given private individuals the opportunity to challenge the gender of our children. How reckless. You know, and I hear everybody mincing words about policies and rules and, you know, is it in place, you know why it's only a policy of the WVSSAC, 'cause we've never had one case of a boy trying to play sport, women's sports in- in our high schools.

Not one case, but yet they've gone as far as to write detailed policies on how they're going to handle it if that ever becomes an issue. I don't even want to get started into what we're doing to the outside world, my God we look as backwards as the states that have lost the All-Star games and- and all kinds of sporting and- and entertainment events because we're backwards. We look like a bunch of rednecks from West Virginia and this feeds right into it. You know, I was always proud to be from here, I always used to tell people when I lived in DC and they'd make fun of my drawl or something that, you know, no better place to live than West Virginia 'cause if you need something, your neighbors are going to help you, if you're in trouble, your friends are going to back you and it's a great place to live.

It's not getting like that anymore, we're pushing anybody different than us out, we're telling the world we don't want

you here. We only want who's left here and it gets to be fewer and fewer every year. Now I know somebody salivating in some election room right now, oh we're going to beat them to death, beat them to death with the boys and the girls bathroom advertisement if they vote against this bill. I can assure you that I will spend any amount of money in this state to make sure that everybody know that this bill's about their daughters, it's about their grandchildren, it's about their nieces, it's about them getting attacked because they may be a little tomboyish in high school.

And that that's what the outcome of this bill is going to be and that it was a bill to try to set people up in an election. We're not worried about boys playing girl sports, it's never happened here, how can we be worried about something that's never happened? How could we have a bill that is this bad, makes us look this backwards on- about something that has never happened? In a- in an issue where there's policies written and ready to be employed if it ever does come up and we have the audacity and the arrogance to tell the NCAA what we should be doing in our higher education's scholastic athletics, they're probably chuckling right now listening to this debate if they even bothered to take the time to tune in.

Mr. President, this bill isn't going to do anything to move West Virginia forward, it's going to move West Virginia directly to the back of the room, I urge a no-vote.

President Blair:    02:06:13    Senator from Marion.

Senator Caputo:    02:06:16    Thank you Mr. President, uh, I wish I could be as eloquent sometimes as my friend from Brooke and my friend from Harrison, but I had been sitting here listening to this debate and I'm sorry, I don't struggle at all with a no-vote on this, Mr. President. I struggle none. I have really come to the conclusion that this is a solution looking for a problem. I've sat here and listened to possible challenges, possible court hearings, possible production of birth certificates and gender challenges and maybe even up to and including a physical exam to determine someone's gender.

You know, businesses and professional teams all over the country are shying away from places that have policies like we're looking at in this chamber. Now it's- it's a solution

looking for a problem, Mr. President, but you know, I think one thing we're all losing sight of here is the problem's not the kids, the problem's not the student athletes. I look around this room and there's not a whole lot of youth in here, I hope I don't offend anybody, but there is not a whole lot of youth in here.

When's the last time you sat down and talked to the young people in this state? Are you still campaigning at the McDonald's, having coffee in the mornings with our wonderful retired folks in our neighborhood or are you talking to the kids? They want a more inclusive society, my kids don't give a rat's behind what color you are, what your sexual orientation is, what you do in your personal life. The youth of today want to put that behind us, maybe that's the problem. We're the representatives here, but maybe that's problem, well maybe we're talking to the wrong people.

Maybe we're not talking to the future of West Virginia, maybe we ought to start wondering why our kids want to leave here. And maybe we ought to start admitting to ourself why nobody's coming here. We gotta be honest with each other, we talk a- a pretty big game, we talk about moving West Virginia forward and Mr. President I believe you were sincere when you said you want 400,000 people to move to West Virginia. I've known you for a long time and I believe you were sincere.

But here's a news flash, we're not going to get there by telling people if you don't look like us, if you don't love like us, if you don't think like us, you got a problem in West Virginia. I think we gotta be honest with each other, we're telling people they're not welcome here. I think that may be ought to be on the sign, not welcome to West Virginia but not welcome to West Virginia if you don't think like us because that's what the message is we're sending. You know Mr. President, Tina and I worked really hard raising our kids to treat everybody the same and not look at the differences maybe of what we do and what we look like, but to treat everybody the same but more importantly, our kids taught us to be that way.

Our kids think it's crazy that we're having this debate right now. My daughter tells me all the time, I can't believe you guys are still talking about this kind of stuff and she's right, she's absolutely right Mr. President. Mr. President I know

Page 23 of 38

JA0205

you don't get out on the West Wing much, at least clear out there where I'm at, but there's a sign in my office and it says all kinds welcome here. But more importantly, Mr. President, that sign lives in my heart, lives in my heart that all kinds of people are welcome in my beautiful state, I just wish that the rest of the members that I serve with would welcome people here in the same fashion. Thank you, Mr. President.

| | | |
|---|---|---|
| President Blair: | 02:11:35 | Senator from Ohio. |
| Senator Ihlenfeld: | 02:11:37 | Thank you Mr. President. I want to share with you all words from a very successful businessman. Quote, our purpose is changing business for good and that means using our business to make a positive impact in the lives of our employees as well as our customers. Businesses are starting to see that they have important roles to play in standing up for LGBTQ rights, especially, especially in places where those rights are being violated. This CEO went on to say that he believes making sure customer bases are as diverse and inclusive as possible will help businesses to thrive. |

And I think the same thing can be said about state economies, the more inclusive we are, the more likely it is that our economy will thrive. You want to know what CEO said those words? It's a gentleman by the name of Richard Branson, Sir Richard Branson. Y'all know who he is? He's the CEO of Virgin Atlantic, Virgin Galactic, Virgin Mobile, Virgin Oceanic, Virgin Radio, and the owner and CEO of Virgin Hyperloop. You know what Virgin Hyperloop is? Think if you're from Grant and Tucker County you do. I know the man downstairs knows what Virgin Hyperloop is.

They plan to build a certification center on an 800-acre track in Grant and Tucker Counties that will bring thousands of construction jobs here and millions of dollars in economic impact to our state. Richard Branson is one of the most pro-LGBTQ CEOs in the entire world. And I point this out to you because I don't know how to reach some of you. Some and I don't want to paint too broad of a brush, but some in this room don't seem to care that this bill is cruel, that it's narrow-minded, that it's mean spirited, that it's unnecessary, that it's purely political. Maybe you do care about that part of it.

So I'll go back to a point I've tried to raise in this room this session that might resonate- might resonate and it's purely economical. And I don't like doing that because the economic reasons aren't the first, second, or third reasons why this is a bad bill, but it might resonate with some of you. By voting yes for this bill, you are willing to risk a project that WVU's Bureau of Economic and Business Research predicts will have an annual $48 million impact on our state, annually, $48 million with that Hyperloop project. You're willing to risk that, you're willing to risk that Sir Richard Branson is going to see what we do here and change his mind about building that certification center.

On top of that you're willing to risk all that the NCAA does for us to add on to what the Senator from Brooke said. Two years ago, one of the greatest sporting events that I've witnessed in West Virginia occurred in Morgan Town, the NCAA baseball regional. We were able to host it at that brand new beautiful stadium, there were record crowds. Over 4000 people which is big for a baseball game packed that stadium on the first night, they had sell-out crowds throughout that tournament. The economic impact on the Morgan Town region was in the millions of dollars.

We won't be able to host events like that anymore if we pass a bill like this. The head of the NCAA just made a statement the other day that made it very clear that states that pass bills like this are not ones where he wants to hold tournaments and we can't control what they do. At the tournament level or below. And besides the risk of losing all that I've mentioned, we risk businesses that might want to have a retreat here, that might want to open an office here, that might want to have a headquarters here.

Do you realize what a hard job you're making for Chelsea Ruby, Mitch Carmichael, Ed Gaunch, Michael Grany, you're making their job so difficult to promote tourism and economic development with bills like this. And I think some of you are probably thinking, well, the governor will just veto it so I can vote for it and then he'll take care of it. That's not how it works, number one, we don't know what the governor's going to do with this bill, gosh I hope he would veto it if it passes. But number two, we're still sending a message that this body, this Senate and also the House supports policies like this.

Page 25 of 38

So, I would ask you, Mr. President, are we pro-business, are we really pro-business, are we really trying to grow this state? I'm not sure that we are when we have bills like this running, I'm surprised this bill is even running. I don't have control over what hits committees, I don't have control what hit- about what hits the floor, but you do Mr. President, you could stop bills like this if you cared enough to look the future, if you really wanted 400,000 people to come here, you could do something about it. You yourself could stop it, but you've decided to let this bill run and put it up on the board and ignore what it would do to our state if it passes.

Let me finish by saying this on a more personal note. I have a lot of friends and relatives, loved ones who have moved away from West Virginia because they're gay, because they don't feel welcome here, because they have felt ostracized and I don't blame them, I probably would do the same and that's sad to say. My loved ones who fit into that category not only are wonderful and caring people, but they're also really smart people, they've got really good jobs and they have nice houses, they drive nice cars, they make good money.

But guess what, they don't pay real estate tax in West Virginia, they don't pay sales tax in West Virginia, they don't pay income tax in West Virginia, they pay it in the state where they feel welcome, where they have felt like they needed to move, uh, where they feel love and accepted and- and part of the community. And that's part of the problem, the more people that we say are not welcome, the fewer are going to come here, the harder it's going to be to fulfill the dreams that I think we all have that, uh, the- these bold plans that we have and as I've said before I respect these bold plans, but the more we discuss and vote and pass bills like this, the harder it's going to be to get out of the- the economic slump that we find ourselves in.

And so just like my friend from Marion said, I would challenge you all when you make your vote to think about the younger generation, to think about millennials, to think about Generation Z. I think about my kids many times when I place a vote, to think about whether what we're doing would want- cause them to want to stay here and live here and work here or not. Uh, we can certainly campaign at the McDonald's, uh, with people that our age, uh, but we

JA0208

need to think about those who are up and coming, 16, 18, 25, think about what's important to them and I- I would suggest that they care about inclusion very much so and I would ask all of you to consider that when you place your vote. Thank you, Mr. President.

President Blair:    02:19:57    Thank you.

PART 4 OF 5 ENDS [02:20:04]

Senator Maroney:    02:20:03    Thank you Mr. President. Um, this bill has nothing to do with gay people or those that are gay, and to imply that is, I think, misleading. The bill, the bill it talks about, it's about transgenders. It's about, there's a safety issue involved here in sports. Uh, the Senator from hi- or from, uh, Brooke stood up, uh, half hour ago, and I didn't, I've never spoke to him about this bill. And basically everything he said was things I was thinking. He said it better. He did more research, but they're all, they're all along the lines of my thought process. And from, from a high school sport standpoint or, or middle school standpoint, thi- this bill makes sense. We, I think we need to step in as a state. Uh, I don't, I've heard five or six times with a solution for a problem we don't have. Well, it, it's becoming a problem. Okay. It's, it's, it's happening in other places. I, I'd prefer to have solutions proactively than reactive. I think, I think it's time we address it. It's a tough issue to address. I think we address it. Uh, the, the, the high school component of this bill in, in the middle school, that everything below the college level of this bill, I agree with wholeheartedly. Uh, and I don't have a problem with voting yes for that part of the bill.

Uh, I have a big problem with, uh, with the college part of this bill. I think it's shortsighted and doesn't look into the depth of the issue, uh, as far as the, uh, potential ramifications. See, they've, they've solved their problem or, or they've, by addressing it, they've addressed the problem directly. They have a policy. It requires, the policy includes medical therapy, a year long, a hormonal suppression therapy. And for us to step in and, and, and try to dictate that when we don't have to, because they've already handled it and including that part, that's enough to make me vote no for the bill. We don't have this.

Page 27 of 38

**JA0209**

We don't have this, we don't have a case in, or, or no, no one can cite an example of this in West Virginia as of now. So therefore, maybe we can, we've got six months, eight months before we're back down here. They wouldn't get it right next time. Uh, well, this needs to be addressed at the scholastic level in my opinion. I would vote yes all day long. Uh, I think we, I think sometimes, uh, our emotions or our strong feelings on issues cloud sometimes real impact in judgment and in, in, in carrying it out a little bit too far.

I think we carried this too far further than we had to by including the colleges. Uh, you know, again, and I'm going to to close the way I started this. This bill has nothing to do with gay people or homosexuality. Uh, I have a cousin that's gay. I have, I know plenty of friends. I mean, I, there was no way at all that, that should be misinterpreted as with a vote on this bill. That was, that was misleading. Thank you.

| President Blair: | 02:23:10 | Junior Senator from 4th. |

| Senator Grady: | 02:23:13 | Thank you, Mr. President. I'm standing here, um, with my makeup on my face and my jewelry shining, and, and I look, uh, you know, really, really girly. And I wasn't always that way. I was a tomboy that I've heard several of my colleagues talk about up until I was about 19-years-old before I ever decided that I would try makeup. And I'd like to fix my hair up and maybe wear dresses. Um, I used to, uh, play, uh, I played any sport that I could get my hands on. Uh, if you gave me a ball, I could beat almost all the boys in my class, all my friends in my neighborhood. |

Funny story, just real quick. Um, my guy friends, my, they were in my neighborhood and I went to school with would call my brother to play home and derby or something, and they would say, "Don't tell your sister, but we're going to meet at the school at three o'clock." You know, and I would drive down the road and, and see, uh, on my bicycle and see that they were there and thought, "I wasn't invited. Why wasn't I invited?" And they said, "It's because you always beat me."

You know, and that's it, but I was a tomboy and, and I, and I had a lot of friends that were tomboys, you know, and, and making that as, those insinuations of it's going to

expose, uh, make tomboys feel out of place, just different things like that, I think that's incorrect. Um, I think I'm sti- you know, now I'm, I'm looking at it as a mother of girls, a former athlete. I'm a former athlete who has state championships, national championships, world championships under my belt in different sports, and a coach of girls.

You know, and I, and I look at it and, and I've talked to girls, I've talked to girls who are high school athletes, I've talked to girls who are college athletes, and they're in support of this. You know, when we look at sports, every implement that we use in sports, from the governing rules, um, of the games to tape measures, clocks, um, the court or field dimensions, um, all those things, they're all used to define the boundaries of fair play.

The most basic and fundamental of such of those requirements is age and sex. It has been less than one generation. One generation since women won the hard fought battle of Title IX. What that means is my mom didn't have the fair, the f- the fairness that Title IX supplied. One generation. You know, Title IX was important because it created equal sports programs for women at the high school level and the college level. Mr. President, this bill is not anti-LGBTQIA. It does not discriminate. It simply ensures that our female com- competitors will continue to have those protections, and it protects the integrity of women's sport. For my girls, your girls, and all the girls in West Virginia, I fully support this bill, and I hope that you will too. Thank you.

| President Blair: | 02:26:14 | Senator from Greenbrier. |
| --- | --- | --- |
| Senator Baldwin: | 02:26:16 | Thank you. Thank you, Mr. President. I'm not standing up to speak in hopes to change anybody's mind about their vote. Um, and I'm not standing up to speak expecting to affect the outcome of the vote at all. I'm just speaking as a coach and as a dad and as a pastor, because I got a couple things that I just feel compelled to say, and we've had a good debate here today. I appreciate that out of the body. The first thing that I just have to say, it's been said here, but it was said briefly, and I think folks need to be sure they heard this. |

As the Senator from Boone said before, half of trans kids strongly consider suicide. Half of trans kids strongly consider suicide. That's reported by Forbes magazine based on the 2020 study by the Trevor Project. 60% of trans kids physically harm their own bodies. 60% harm themselves. Half strongly consider suicide. Why? Why? Why would so many trans kids harm themselves and attempt suicide? I would echo what the Senator from Brooke said, this is not something I understand, this is not something that I have lived through, but what I understand from talking to folks who have lived through it is that it's because they don't feel like they fit in. They're bullied, relentlessly. They are not included in anything other kids are included in because they're so obviously different. A lot of people wear their shame on the inside. Trans kids don't have that luxury. They look different. They live in bodies that they often hate, and the isolation that causes leads half, one out of every two trans kids to strongly, to strongly consider suicide. The other thing that I just feel compelled to say is that I've heard people make a religious argument for this bill, and I've heard people say, "Well, God doesn't make mistakes." And I fully agree. God does not make mistakes, but we do all the time.

Every person was made in the image of God, and God didn't make a mistake when God did that. Every person is made in the image of God, and God compels us to love one another just as we've been loved. Even those who are different, I might go s- go so far as to say, especially those who are different from us. And we've just come through Holy Week, we've just come through Easter, spending a lot of time back home in our churches, talking about the way that Jesus spent his time in ministry. And you all know the stories. Jesus didn't hang out with people like us. He didn't really like people like us. He hung out with sinners and outcasts, people that the world's shamed and ridiculed.

In particular, Jesus spent a lot of time with lepers, people who looked different, and because they looked different, they were despised. They were despised so much that they were outcast. The lepers of today's society are transgendered citizens. They are mocked, they're beaten, they are ridiculed, just for being different. People have basic needs. Kids have basic needs that are amplified even further because they are kids. You've got to have support

and acceptance at base. If you don't have that support and acceptance, you're not going to be able to move forward.

You know, we read some of those stories this past Holy Week of, um, Jesus healing the lepers by restoring them to their community. He made them physically well, but what he really did for them is he allowed them to go back home and he allowed them to be accepted for who they were. Mr. President, I thank you for the time to just share some things that are on my heart. Again, not speaking trying to influence anybody. Just had some things that I needed to share, but I have to say, I not only cannot support a bill that further alienates trans kids, but I am compelled to stand on this floor, even if nobody else is listening and having their side conversations and they've already decided about this a long time ago, to stand up and say that our children deserve better.

When we debated the Tebow bill, I supported that. I stood with my colleagues from the other side of the island, supported that because it gave all, all kids an opportunity to play. I don't see how this is any different. We need to let kids be kids. Half of trans kids strongly consider suicide, half. And if this bill passes, I shudder, I shudder to think how that would impact this incredibly vulnerable segment of society. So, let's err on the side of kindness to those who are most vulnerable, let's err on the side of grace, let's err on the side of inclusion. Thank you, Mr. President.

| | | |
|---|---|---|
| President Blair: | 02:32:52 | Is there further discussion before I  recognize the Senator from Jefferson to close debate. Senator from Monongalia[inaudible 02:32:59]. |
| Senator Beach: | 02:32:59 | Mr. President, I move we table the bill, please. |
| President Blair: | 02:33:02 | Motion is tabled the bill. Those in favor we'll vote aye. Those who've opposed will . . . Excuse me. Those who wish to table the bill will say aye. |
| Audience: | 02:33:15 | Aye. |
| President Blair: | 02:33:16 | Those who oppose say no. |
| Audience: | 02:33:18 | No. |

| President Blair: | 02:33:20 | The no's appear to have it. The no's do have it. The motion is rejected. Senator from Raleigh. |

| Senator Roberts: | 02:33:31 | Thank you, Mr. President. I think that the narrative shifts around from the actual bill itself. The bill is designed to protect girls in women's sport. It is not something that is designed to hurt people, it's designed to protect people. I received a couple of emails that kind of lay it out and people should understand. These are actually both from Raleigh County. The first one says, "I am a lesbian in favor of the sports bill. Dear West Virginia legislators. I am a US citizen originally from the Philippines, living in West Virginia with my wife and child. I am urging you today to vote for the sports bill and uphold one aspect of what it is to be born female. |

There are too many groups on both sides of the aisle, trying to politicize a subject that should be 100% science and common sense. Due to the trans movement, what it is to be a female and to be safe in this country is being erased. The entire trans movement is an attack upon woman—womanhood. I urge you to save our young women from allowing biological males into sports locker rooms, et cetera with our girls. I don't understand why we cannot create a third category for the trans to compete with each other instead of harming and taking away opportunities from females."

A second email says, "Dear West Virginia legislators. My name . . . " Oh, and I shouldn't say her name, uh, but she lives in West Virginia in Raleigh County. "I am a married lesbian in the process of adopting my daughter. Please vote yes today to protect my daughter from having to compete against boys. This is a needed bill and large segments of the LGB community support the bill." She makes some other statements there, but I think you get the sentiment.

And I think that the focus is not on the potential or the hypothetical of what might happen that hasn't apparently happened already in West Virginia, but the focus is upon the thousands of girls in sports at all levels in West Virginia that are at risk for injury based on the differences between the biological sexes. And that is very important that this is to protect them, it is not meant to harm others and it's the right thing to do and I support this bill. Thank you.

President Blair:        02:36:49        Further discussion. Senior Senator from the 6th.

Senator Maynard:       02:36:53        Thank you Mr. President. Voting no on this bill is a vote to disintegrate school sports as we know it. Today lines are no longer being drawn, no boundaries. They say, so it's all inclusive. But Mr. President, if this bill is not passed, it will not prepare future generations when, because of the lines will be blurred. Besides religious reasons, besides safety issues, if we sell out to the national, uh, sports associations in sanctioning bodies, uh, if that's the price we put on our, um, safety issues and what we think is right, then, uh, I think we're just selling ourselves out. Mr. President, I'll urge passage of the bill.

President Blair:        02:37:35        Is there further discussion before I recognize the Senator from Jefferson. Senior Senator from the 17th.

Senator Takubo:        02:37:43        Thank you Mr. President. I, um, uh, you know, I think we, we've, we've blurred the lines quite a bit on this one. Um, you know, at the end of the day, uh, the LGBT, everybody tries to make this about, uh, all kinds of different issues. I think it's well-known, I've always been a sponsor, uh, actually lead sponsor of the fairness bill. Uh, you know, I put a flyer on everybody's, um, desks about tonight. Uh, there's going to be a, um, a thank you to legislators at 5:30, Bible Center Church. Come have dinner, no asks.

Um, can I have church afterwards? Well, the church I go to says, "Hey, listen, everybody's broken. And, and the Bible clearly says, there's nobody without sin more than me." So, uh, I'm not getting on any moral high ground and people are trying to take this bill and turn it into that. I don't think that's it at all. Um, it, it comes down to basic, uh, science, like many comments have been made. There's a bigger body mass, you know, up to 10, 11, you know, probably, probably girls have a advantage over boys, but you know, when you get to junior high and high school, there's a reason why you have varsity and JV even amongst the boys because the body mass, uh, is larger and, and people can get hurt. There are clear advantages.

And so, um, to me, this bill is just a clear definition now. Is it a solution looking for a problem? Yes, I think it is. Do I think that any of this has really happened in West Virginia? Do we probably need any this bill for anything in West Virginia? Probably not. Um, but do I 100% firmly believe

that boys should play boy sports and girls should play? Absolutely. Now, uh, to be honest, I really have no issue with a girl playing a boys' sport because again, the body mass issue is not there.

If you've got the athletic ability for a girl to play, uh, boys baseball or, or I really wouldn't have any issue with that. But the, the fact of the matter is, you know, where the masters tournament is on, uh, you know, the top, uh, female golfer, I remember just few years ago, tried to play against the guys in the tournament got killed, and she had, she was like the number one women's golfer eight or nine years in a row. So there's a clear difference. And so that's what the bill does.

Now as a Senator, I have to look at all aspects of the bill and how it relates to my state. Um, when the college aspect got put into this, that's what gave me the heartburn because colleges, the NCAA, they already address this. They do have policies for this. And, and I think Kristi Noem, uh, is probably in the exact same boat that I am. She's 100% in agreement that, that the policy should be boys don't play girls athletics. However, NCAA is trying to do that patchwork of 50 states. They have to be compliant. I don't think that they're some crazy organization. They're having to deal with a lot of different personalities across the country with all these 50 different states, and, and they just want to run a good athletics program for the students, for the athletes, for the country.

And so as a Senator, do I look at this section of the bill and say, could that cause some major problems? I could see somebody trying to pull us out as an example and come football season for W and Marshall and all the college athletes in our state that are trying to move forward, that this could create some major hiccups again for a problem we really don't have. And so I can also see us coming back here and having to try to unwind all of this in some kind of special session or something.

So for that reason, uh, I am going to be a no vote, but I want to make it very clear that the principle of the bill I'm 100% in favor of. I just think we should have left it to the high school athletics alone if a bill was going to be ran. I certainly wouldn't have done it, but, uh, it is my duty as a senator when a bill comes up and, and, uh, I have not been,

uh, voted by my constituents to, to take a pass, I'm expected to vote. So my vote will be read. I just want to make it clear as to the intent of why I'll be voting nay today. Thank you, Mr. President.

President Blair:    02:41:53    Is there a further discussion? Senator from Jefferson to close debate.

Senator Rucker:    02:42:00    Thank you, Mr. President. And I appreciate, um, the robust debate and everyone's expressing their opinion. This is obviously, you know, something that touches people. Um, and before I get to just a final explanation of what this bill does, I just need to, you know, respond to some of the things that were said, and I'm going to start, if that's okay, with the claims about the NCAA. So I have here before me a printout of their, um, transgender policy, and this is going to be from the very first page.

It says, "The purpose of this resource is to provide guidance to NCAA athletic programs about how to ensure transgender student athletes fair, respectful, and legal access to collegiate sports teams based on current medical and legal knowledge." It provides best practice and policy recommendations. It's a recommendation. It's giving them guidance, and further in this policy, it talks about how the science is not settled. There is ongoing research and, you know, this issue of transgender athletes is something that can change based on the science that we, um, as we do more research, as we find out more and as more of this is happening.

In terms of science, because folks really like to point out how we should follow the science, males have larger lungs and denser alveoli in the lungs enabling faster oxygen intake, uptake. They have larger hearts and per stroke pumping volume and more hemoglobin per unit of blood, and increased number of muscle fibers and increased muscle mass. And I'm not going to go through all this. They have larger bones, longer bones, increased mineral density in their bones. U.S. adult males on average are five inches taller than U.S. adult women, and I have pages of this, but I'm not going to read through all of that.

The reality is that the reason for why we're having this discussion Mr. President is because it matters. It matters. There is a difference between men, biological men and

biogo- biological women. This bill does not target transgender and it is not about prohibiting transgender. It does not affect male sports, it does not affect coed sports of which there's a lot of those. It only talks about women's sports and the history of women's sports in the United States. It's a very short one.

Historically, the NCAA had zero interest in women's sports. It wasn't until Title IX that they became interested. The first NCAA men's basketball tournament was in 1939. Do you know when the first NCAA women's basketball tournament was? Not till 1982, 10 years after Title IX was adopted, and nearly 50 years after men. The only reason for Title IX is because women deserve a chance to participate. And there were folks making that point from the side that doesn't plan to support this bill. They were making the point about how s- athletics is about overcoming challenges.

If you pair men and women together, there is a difference in how well they can compete against each other. It doesn't mean they can't do it, and they do. And we have coed sports and we have women participating in men's sports, but there is a difference. And these athletic opportunities, these opportunities to be part of a team, these opportunities to shine, they make a difference in their lives forever, and we've already mentioned it. And others have actually said the same thing. You know, you're talking about scholarships, you're talking about opportunities to get into schools, you're talking about opportunities to demonstrate leadership and cooperation and be part of a team. It is exactly that, that we are wanting to protect for our women and our girls.

This isn't against anyone. It is for, for the policy of helping our girls, helping our women have the opportunity. That is what Title IX was about and that is what the policy has been. This bill does nothing more than codify what is already well-established under federal and state common law. The biological females and biological males are not similarly situated in certain circumstances, and one of those circumstances is in sports.

One of the things I want to make sure I respond to is the discussion as to whether or not where it might be hurting our state somehow, by having this policy of protecting our

Page 36 of 38

JA0218

girls and our women. I must tell you that to me, if you say that you do support women, that you do support our girls, if you say that you want to give them an opportunity, and we have bills, we have bills even this year have been introduced about trying to provide an opportunity for a class that has been historically disadvantaged. Well, this is, this is one of these bills. This is one of the bills that you can support because you want to ensure continued opportunities.

We cannot direct the NCAA. We have no authority over them. We don't. This bill doesn't do that. This bill is about our state institutions, and it is actually our authority to enforce Title IX. That is our authority. We the states are supposed to enforce Title IX. The only student who could bring a cause of action are those who are aggrieved and who have standing. So in conclusion, we really have talked this a lot and we have brought in a whole bunch of different issues into it. But what the reality of this is, is that it is the best interest of the state to protect women and girls and protect the opportunity for them to participate in sports. Supporting this is simply doing that. I urge passage.

| | | |
|---|---|---|
| President Blair: | 02:49:30 | Question for the Senate is shall the bill pass, all those in favor will vote yay, those who oppose will nay. The clerk should prepare the machine. Has every member voted? Has every member voted? If so, the clerk close machine and ascertain the results. On this question, 18 yays, 15 nays, one absent, not voting. More than a majority of those present voting, having voted in the affirmative. I declare the bill passed. The clerk has a Title Nine. |
| Clerk Cassis: | 02:50:10 | Senator Rucker move to amend the title of the bill. |
| President Blair: | 02:50:13 | The questions on adoption of the title amendment, all those in favor say aye. |
| Audience: | 02:50:16 | Aye. |
| President Blair: | 02:50:17 | Those who oppose, no. The ayes appear to have it, the ayes do have it, uh, declare the title amendment adopted. The clerk will communicate the action of the Senate to the house. Senior Senator from the 17th. |
| Senator Takubo: | 02:50:29 | Thank you Mr. President, and I move the Senate stand in recess until 3:00 PM. |

JA0219

| President Blair: | 02:50:32 | Senior Senator from 17 means repeat recess till 3:00 PM. All those in favor say, aye. |
| Audience: | 02:50:37 | Aye. |
| President Blair: | 02:50:38 | Those who oppose, nay. The ayes have it. We'll recess till 3:00 PM. |

PART 5 OF 5 ENDS [02:50:50]

**JA0220**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, *Plaintiff*, | ) ) ) | |
| vs. | ) ) | Case No. 2:21-cv-00316 |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent, *Defendants*. | ) ) ) ) ) ) ) ) ) ) | |

**STATEMENT OF INTEREST OF THE UNITED STATES**

The United States respectfully submits this Statement of Interest, under 28 U.S.C. § 517,[1]

to advise the Court of its view that Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment do not permit West

Virginia to categorically exclude transgender girls[2] from participating in single-sex sports

restricted to girls.

---

[1]  "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."  28 U.S.C. § 517.

[2]  The term "transgender" describes a person whose gender identity differs from the person's sex assigned at birth.  For example, a transgender girl is a person who identifies as a girl but whose sex assigned at birth was male.  The term "cisgender" describes a person whose gender identity is the same as the person's sex assigned at birth.  Given Plaintiff's age, the United States refers only to "girls" and "boys," but the analysis applies equally to women and men.

1

The United States has a significant interest in ensuring that all students, including students who are transgender, can participate in an educational environment free of unlawful discrimination and that the proper legal standards are applied to claims under Title IX and the Equal Protection Clause. The U.S. Department of Justice ("DOJ") and U.S. Department of Education enforce Title IX to protect students from sex discrimination in federally funded education programs and activities. This includes ensuring that recipients offer equal athletic opportunities to students regardless of their sex. DOJ is further charged with coordinating federal agencies' implementation and enforcement of Title IX. 28 C.F.R. Pt. 54; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); 28 C.F.R. 0.51. DOJ also has authority to investigate and resolve complaints that a school board is depriving students of equal protection based on sex (and other bases). 42 U.S.C. § 2000c-6.

Under the law challenged here, West Virginia (or the "State") prohibits girls who are transgender from participating on female "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education." W. Va. Code §§ 18-2-25d(c)(1)-(2) ("H.B. 3293"). The State claims that H.B. 3293 will protect athletic opportunities for girls. Neither the facts nor the law supports that assertion. To be sure, there remain significant barriers to providing full equity in athletics for female students.[3] But permitting participation by transgender girls, who make up "approximately one half of one percent" of the United States' population, is not one of them. *See Hecox v. Little,* 479 F. Supp. 3d 930, 977 (D. Idaho 2020), *appeals docketed*, Nos. 20-35813, 20-35815 (9th Cir.

---

[3]  Indeed, on the day Plaintiff filed this lawsuit, the United States filed an *amicus* brief in the Sixth Circuit to clarify the standards for assessing whether a school equitably meets its students' athletic interests and abilities, regardless of sex. *See* U.S. Br. as Amicus Curiae, *Balow v. Michigan State Univ.*, No. 21-1183 (6th Cir. May 26, 2021).

Sep. 17, 2020). The United States submits this Statement of Interest to provide its view that Plaintiff's Title IX and Equal Protection Clause challenges are likely to succeed on the merits.

## BACKGROUND

The Governor of West Virginia signed H.B. 3293 into law on April 28, 2021, and it is set to go into effect on July 8, 2021. The law mandates that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education . . . shall be expressly designated as [male, female, or coed] based on biological sex." W. Va. Code § 18-2-25d(c)(1). The law defines "biological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." *Id.* § 18-2-25d(b)(1). It further defines "female" to mean "an individual whose biological sex determined at birth is female," with a corresponding definition for "male."[4] *Id.* §§ 18-2-25d(b)(2)-(3). The law prohibits girls who are transgender from participating on girls' sports teams, stating that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex"—where "male sex" is determined by sex assigned at birth—"where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 18-2-25d(c)(2). There is no parallel provision for participation on boys' sports teams. The law also creates a private cause of action for "[a]ny student aggrieved" by a violation, allowing for injunctive relief, damages, fees, and costs against a county board of education or state institution of higher education. *Id.* § 18-2-25d(d)(1). The Legislature's proffered justification is that "[c]lassification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex." *Id.* § 18-2-25d(a)(5). Specifically, "[b]iological males would displace females to a substantial extent if permitted to compete on teams

---

[4] The United States does not concede the accuracy of these definitions.

JA0223

designated for biological females." *Id.* § 18-2-25d(a)(3).

Plaintiff B.P.J is an 11-year-old girl who is transgender. She argues that Defendants' compliance with H.B. 3293 will bar her from participating in school athletics in violation of Title IX and the Equal Protection Clause. No. 1 at 2.[5]  B.P.J. participated on an all-girls cheerleading team while in elementary school, and she wants to participate in girls' athletics as she enters middle school in the 2021-22 school year. No. 2-1 at 21-22. Specifically, B.P.J. wants to try out for Bridgeport Middle School's girls' cross-country and track teams. The middle school principal informed B.P.J.'s mother that her daughter may not participate on the girls' cross-country or track teams because of H.B. 3293. No. 2-1 at 23. B.P.J. does not seek to join the boys' cross-country and track teams because she is a girl and such participation would "devastate" B.P.J., "completely erase who she is," and undermine her social transition. No. 1 at 17; No. 2-1 at 23. Even if B.P.J. wanted to participate on the boys' team, the principal said it would be "confusing" for her to join the boys' teams because she looks like and presents as a girl. No. 2-1 at 23. In reality, then, H.B. 3293 will exclude B.P.J. entirely from the cross-country and track programs at her middle school. B.P.J. has moved for a preliminary injunction, arguing that Defendants' compliance with H.B. 3293 violates Title IX and the Equal Protection Clause. She requests this Court to enjoin West Virginia from enforcing H.B. 3293 and "any other law, custom, or policy that precludes B.P.J.'s participation on girls' school sports teams in West Virginia" and allow B.P.J. to participate on girls' sports teams consistent with her gender identity. No. 19 at 8.

**ARGUMENT**

On a motion for a preliminary injunction, the court reviews: (1) the movant's likelihood

---

[5] "No.__ at __" refers to the docket entry number and page number of documents filed in this case, using the Court's CM/ECF pagination.

4

**JA0224**

of success on the merits; (2) the threat of irreparable harm to the movant absent an injunction; (3) the balance of hardships; and (4) the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). The United States believes that Plaintiff will likely succeed on the merits of her Title IX and equal protection claims and does not address the other factors.

A state law that limits or denies a particular class of people's ability to participate in public, federally funded educational programs and activities solely because their gender identity does not match their sex assigned at birth violates both Title IX and the Equal Protection Clause. H.B. 3293 does exactly this. H.B. 3293's prohibition applies to all transgender girls in public secondary and postsecondary education—regardless of a student's specific circumstances—and to no one else.[6]

H.B. 3293 violates Title IX by effectively prohibiting, solely on the basis of sex, a certain subset of students—girls who are transgender—from participating in athletic programs offered by recipients of federal financial assistance ("recipients"). On its face, H.B. 3293 restricts girls who are transgender from participating on girls' teams. But because forcing transgender girls to participate on boys' teams also causes discriminatory harm, H.B. 3293 affords them no opportunity to participate on single-sex sports teams at all.

H.B. 3293 also violates the Equal Protection Clause. Discriminatory treatment against transgender people is subject to heightened scrutiny because it constitutes both discrimination based on sex and discrimination against a quasi-suspect class. H.B. 3293 fails heightened scrutiny

---

[6] To be sure, West Virginia may not remedy the violation by extending its categorical ban to boys who are transgender. The Supreme Court has explained that federal nondiscrimination mandates protect individuals. By extending its discriminatory ban to boys, West Virginia would not avoid liability, but rather would double it. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) ("Nor is it a defense for an employer to say it discriminates against both men and women because of sex. . . . Instead of avoiding Title VII exposure, this employer doubles it.").

analysis because West Virginia cannot demonstrate that prohibiting a handful of transgender student athletes from playing on athletic teams consistent with their gender identity is substantially related to any important government interest. Thus, this Court should find a likelihood that Plaintiff will succeed on the merits of both her Title IX and Equal Protection Clause claims.

## I.   B.P.J. Is Likely To Prevail On Her Title IX Claim

B.P.J. is likely to prevail on her Title IX claim against Defendants. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's implementing regulations mandate that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 34 C.F.R. § 106.41(a); 28 C.F.R. § 54.450(a). Although the regulations allow recipients to operate or sponsor separate teams based on sex, the regulations do not define "sex" or address how students who are transgender should be assigned to such teams. 34 C.F.R. § 106.41(b); 28 C.F.R. § 54.450(b). The regulations do not require, or even suggest, that recipients assign students who are transgender to teams based on their sex assigned at birth, as H.B. 3293 requires.

This Court should reject any attempt by the State to argue that *the regulations* do not prohibit the assignment of students to teams based on sex assigned at birth, regardless of whether such a classification harms transgender students. When assigning students to single-sex sports teams, a recipient must still comply with the *statutory* prohibition against discrimination based on sex in Title IX itself. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) ("[T]he implementing regulation cannot override the statutory prohibition against

6

*discrimination* on the basis of sex."), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *petition for cert. filed*, No. 20-1163 (Feb. 19, 2021).  And the Supreme Court has recently clarified that discrimination against a person for being transgender *is* discrimination based on sex.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746-47 (2020); *see also Grimm*, 972 F.3d at 619.  Therefore, any interpretation of Title IX's regulations that requires gender identity discrimination would violate the statute's nondiscrimination mandate.  Because H.B. 3293 requires the Defendants to engage in precisely this type of sex discrimination that causes harm to B.P.J., the law violates Title IX.  A discriminatory state law is no defense to a Title IX violation.

   *A.     H.B. 3293 Requires Recipients To Discriminate In Violation Of Title IX*

   B.P.J. prevails on her Title IX claim by showing:  (1) she was excluded from an education program or activity on the basis of sex; (2) the educational institution in question is a recipient of federal financial assistance; and (3) the improper discrimination caused her harm.  *See Grimm*, 972 F.3d at 616 (citation omitted).  The United States believes she is likely to make this showing.

   There is no question that the school district that B.P.J. attends is a recipient of federal funds.  Nor can there be any doubt that B.P.J. will be excluded from a recipient's education program or activity:  Bridgeport Middle School's principal told B.P.J.'s mother that B.P.J. is ineligible for the girls' cross-country and track program.  *See* No. 2-1 at 23.  That is precisely the effect of H.B. 3293.  It excludes all girls who are transgender from participating in girls' athletics in public secondary and postsecondary schools.

   Any argument that B.P.J. has not been excluded because she could join the boys' team is untenable.  B.P.J. is a girl, not a boy.  She describes herself as a girl.  No. 2-1 at 31.  She lives and identifies as a girl in her daily life.  No. 2-1 at 20.  Her middle school principal acknowledged it would be "confusing" for B.P.J. to join the boys' teams given that she neither looks like, nor

JA0227

presents herself as a boy.  No. 2-1 at 23.  As the Fourth Circuit has explained, for purposes of a discrimination analysis, B.P.J. is similarly situated to other girls.  *See Grimm*, 972 F.3d at 610, 618 ("Grimm was similarly situated to other boys, but was excluded from using the boys['] restroom facilities based on his sex-assigned-at-birth.").  Requiring her to join a boys' team would harm B.P.J. for the reasons discussed below.  In practice, Harrison County Schools' compliance with H.B. 3293 will exclude B.P.J. from all of her school's single-sex sports teams.

It is also clear that this exclusion is based on sex.  H.B. 3293 targets girls who are transgender.  In *Bostock*, the Supreme Court explained that "discrimination based on . . . transgender status necessarily entails discrimination based on sex."  *See* 140 S. Ct. at 1746-47.  Following *Bostock*, the Fourth Circuit held that Title IX prohibits discrimination against students because they are transgender.  *Grimm*, 972 F.3d at 616-17; *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *petition for reh'g en banc pending*, No. 18-13592 (11th Cir. Aug. 28, 2020).  In *Grimm*, the Fourth Circuit found that a school board policy violated Title IX because the school board:

> could not exclude Grimm from the boys['] bathrooms without referencing his 'biological gender' under the policy, which it has defined as the sex marker on his birth certificate.  Even if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions.

972 F.3d at 616.  So too here.  H.B. 3293 separates students onto athletic teams by their "sex determined at birth," W. Va. Code § 18-2-25d (b)(2)-(3), and it is impossible to enforce H.B. 3293 against B.P.J. without referencing her sex assigned at birth.

Finally, H.B. 3293 causes B.P.J. discriminatory harm.  To comply with H.B. 3293, B.P.J.'s school district must exclude her from girls' sports entirely, all the way through high school.  *See Gregor v. W. Va. Secondary Sch. Activities Comm'n*, 2020 WL 6292813, at \*4 (S.D. W. Va. Oct.

8

27, 2020) (citations omitted) (acknowledging a person may be irreparably harmed if they cannot participate in a sport at all); No. 2-1 at 60 ("[I]t can be extremely harmful for transgender youth to be excluded from the team consistent with their gender identity.").[7]  B.P.J., unlike her cisgender peers, would miss the many benefits of interscholastic athletics, including skill-building, exercise, motivation, social ties, and increased confidence.  No. 2-1 at 46-47.  As many courts have recognized, this type of exclusion would cause a student like B.P.J. to experience stigma, isolation, and dignitary harm.  *See Grimm*, 972 F.3d at 597-601, 617-18 (bathroom policy made plaintiff feel "alienat[ed]" and "humiliate[ed]"); *Adams*, 968 F.3d at 1307 (bathroom policy made plaintiff feel "sorely 'alienated' and 'different' from other students because he is transgender"); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-47 (7th Cir. 2017) (exclusion from boys' restroom "stigmatized" transgender boy, causing him "significant psychological distress" including "depression and anxiety"), *cert. dismissed*, 138 S. Ct. 1260 (2018); *Dodds v. Dep't of Educ.*, 845 F.3d 217, 221-222 (6th Cir. 2016) (finding that exclusion from the girls' restrooms "had substantial and immediate adverse effects" on plaintiff's "daily life," "health," and "well-being").[8]

Requiring that B.P.J. participate on a boys' team would likewise cause her real and lasting harm.  Joining the boys' team would contravene B.P.J.'s medically-supervised social transition. No. 2-1 at 20-21, 60.  It would "erase who she is" and "devastate her," causing mental and

---

[7]  If she attends a public college in West Virginia, B.P.J. also will be banned from women's intercollegiate sports.

[8]  Conversely, the mere presence of transgender students in sex-segregated spaces that align with their gender identity does not violate cisgender students' Title IX rights.  *See Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 (3d Cir. 2018) (restrooms and locker rooms), *cert. denied*, 139 S. Ct. 2636 (2019); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020) (restrooms, locker rooms, and showers).

emotional distress.  No. 2-1 at 23, 32-33.  Forcing her to run on the boys' team would "constitute harm under Title IX, as it 'invites more scrutiny and attention' from other students, 'very publicly branding all transgender students with a scarlet 'T'.'"  *Grimm*, 972 F.3d at 617-18 (quoting *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) (brackets omitted), *cert. denied*, 139 S. Ct. 2636 (2019)).  Being on a boys' team would make B.P.J. vulnerable to invasive questions, gossip, and ridicule for participating on the "wrong" team.  This "emotional and dignitary" harm is "legally cognizable under Title IX."  *See id.* at 618 (citing *Adams*, 968 F.3d at 1306-07, 1310-11).  On these facts, the United States believes B.P.J. is likely to prevail on the merits of her Title IX claim.

B.     *Title IX Itself Provides Sufficient Protection Against H.B. 3293's Concern That Boys Will Displace Girls In Athletics*

In addition to requiring recipients to discriminate based on sex, the West Virginia Legislature's justification for H.B. 3293 ignores Title IX's existing protections in the athletics context.  The State seeks to justify the law on the theory that "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated.  Biological males would displace females to a substantial extent if permitted to compete on teams designated for biological females."  W. Va. Code § 18-2-25d(a)(3).[9]  As an initial matter, there are no facts to suggest that, in this case, allowing B.P.J. to participate in girls' sports will substantially displace other girls, or that any cisgender boy seeks a spot on a girls' team.  An overview of Title IX's regulations, which can be credited with creating hundreds of thousands of athletic opportunities for girls, demonstrates why H.B. 3293 is unnecessary.

---

[9]  H.B. 3293's definition of "biological males" wrongly conflates two distinct groups, cisgender boys and transgender girls.  The legislature's conflation of these groups is inappropriate given the Fourth Circuit's analysis of similarly situated students in *Grimm*.  972 F.3d at 610, 618 (finding that the plaintiff, a transgender boy, was "similarly situated to other boys").

Since 1975, Title IX's implementing regulations have required recipients to provide equal athletic opportunities for their students regardless of sex. 45 C.F.R. § 86.41(c) (subsequently codified at 34 C.F.R. § 106.41(a) and 28 C.F.R. § 54.450(a)). The regulations recognized that in order to expand opportunities for girls, as the underrepresented sex, recipients could offer sex-segregated sports teams. 45 C.F.R. § 86.41(b) (subsequently codified at 34 C.F.R. § 106.41(b); 28 C.F.R. § 540(b). B.P.J. does not challenge her school's ability to offer separate boys' and girls' sports teams. She simply challenges how her school and her state intend to assign her, as a transgender girl, to a single-sex team.

The regulations further require that a recipient's "selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c); 28 C.F.R. § 54.450(c). The regulation ensures that recipients provide athletic participation opportunities that effectively accommodate the interests and abilities of each sex, and protects against boys usurping girls' athletic participation opportunities. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856-57 (9th Cir. 2014). It does not preclude recipients from treating transgender students consistent with their gender identity. Nor can it. *See Grimm*, 972 F.3d at 618 ("[T]he implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex."). And as a factual matter, there is no discernible risk that transgender girls will somehow "displace" cisgender girls "to a substantial extent." W. Va. Code § 18-2-25d(a)(3); *see also Hecox*, 479 F. Supp. 3d at 977 ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

11

JA0231

Moreover, under Title IX, recipients may both permit transgender girls to participate on girls' athletic teams *and* exclude cisgender boys from the girls' teams. B.P.J. is a girl. She has participated on an all-girls community cheerleading team for the last two years. No. 2-1 at 21. Her middle school principal acknowledged that it would be confusing to identify her any other way. No. 2-1 at 23. Consistent with Fourth Circuit precedent, B.P.J. is similarly situated to other girls. *See Grimm*, 972 F.3d at 610. An analogous claim by a cisgender boy to play on a girls' team rather than the corresponding boys' team would fail because: (1) he lives and presents as a boy and therefore is not similarly situated to girls for purposes of permissibly sex-segregated activities; and (2) he experiences no cognizable "emotional and dignitary harm" from being excluded from the girls' team. *Id.* at 618 (citing *Adams*, 968 F.3d at 1306-07, 1310-11).

At its core, Title IX is about ensuring equal educational opportunities to all students regardless of their sex. Despite its claim of "promot[ing] equal athletic opportunities" for girls, W. Va. Code § 18-2-25d(a)(5), H.B. 3293 does the opposite. It targets a vulnerable and historically marginalized subset of girls and prohibits them from participating in athletics. It bars girls who are transgender from teams that are consistent with their gender identity—and effectively bars them from all single-sex sports teams at the secondary and postsecondary levels—without regard to any individual's specific circumstances and without any facts to suggest that there is a "problem" that requires solving in the first place. H.B. 3293 does so despite the fact that Title IX already protects equal athletic opportunities for all students and H.B. 3293 does so in violation of Title IX's mandate to offer educational opportunities free of sex discrimination.

## II.    H.B. 3293 Cannot Survive Heightened Scrutiny Under The Equal Protection Clause

B.P.J. is also likely to succeed on the merits of her equal protection claim because H.B. 3293 discriminates based on sex and transgender status. The Equal Protection Clause

12

prevents states from discriminating against individuals on the basis of sex and against people who are transgender absent an "exceedingly persuasive" justification. *Grimm*, 972 F.3d at 610-13. The State cannot demonstrate such a justification.

### A.     H.B. 3293 Is Subject To Heightened Scrutiny

To determine whether a statute or policy warrants heightened scrutiny under the Equal Protection Clause, a court asks whether the classification at issue jeopardizes the exercise of a fundamental right or categorizes based on an inherently suspect characteristic. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citations omitted). Heightened scrutiny applies here for two separate reasons: H.B. 3293 discriminates based on sex and H.B. 3293 discriminates based on transgender status.

The Supreme Court has long held that classifications based on sex warrant heightened scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*) (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982)). H.B. 3293 singles out girls who are transgender, including B.P.J., for different treatment based on the sex they were assigned at birth. W. Va. Code § 18-2-25d(b)(1). The Fourth Circuit's controlling precedent holds that excluding transgender students from sex-segregated spaces that align with their gender identity is discrimination based on sex under the Equal Protection Clause. *Grimm*, 972 F.3d at 607-10. Other circuits agree. *See Adams*, 968 F.3d at 1296; *Whitaker By Whitaker*, 858 F.3d at 1051. Just as in *Grimm*, H.B. 3293 discriminates on the basis of sex: it treats B.P.J. differently from all other students with the same gender identity based solely on her sex assigned at birth. 972 F.3d at 608 (school district policy limiting bathroom access to "corresponding biological genders" or sex listed on birth certificate "creates sex-based classifications").

Fourth Circuit precedent also requires heightened scrutiny here because people who are

transgender are a quasi-suspect class. *Grimm,* 972 F.3d at 611–13. The Fourth Circuit observed, "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment." *Id.* at 610-11 (citation omitted). It does not matter that H.B. 3293 categorizes teams without explicitly referencing "transgender students": by categorizing teams based on that law's definition of "biological sex," girls who are transgender are the only group who cannot compete on sports teams that align with their gender identity. W. Va. Code § 18-2-25d(b). Because H.B. 3293 discriminates against a quasi-suspect class—girls who are transgender—this Court must apply heightened scrutiny. *Grimm,* 972 F.3d at 610.

> B.    *H.B. 3293 Is Not Substantially Related To Achieving The State's Articulated Governmental Interest*

H.B. 3293 cannot survive the rigorous analysis that heightened scrutiny demands. To survive heightened scrutiny, the state must show the law "serves important governmental objectives" and the "discriminatory means employed are substantially related to the achievement of those objectives." *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724) (internal quotation marks omitted). "The burden of justification is demanding" and the justification must be "'exceedingly persuasive.'" *Id.* (quoting *Miss. Univ. for Women,* 458 U.S. at 724). The inquiry provides enhanced protection in circumstances where there is a greater danger that the legal classification results from either impermissible prejudice or stereotypes, *see, e.g.*, *Grimm*, 972 F.3d at 614–15, or "a bare . . . desire to harm a politically unpopular group," *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Moreover, when evaluating an articulated governmental interest, the "justification must be genuine, not hypothesized" and "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533; *see also Grimm*, 972 F.3d at 615 (holding that policy restricting access to restroom by

14

**JA0234**

"biological sex" is "marked by misconception and prejudice" against transgender plaintiff) (citation omitted); *Adams*, 968 F.3d at 1297 (finding no substantial relationship between defendants' articulated justification and restroom policy where the concerns were hypothesized and treated transgender plaintiff unfavorably "simply because he defies gender stereotypes"). A classification does not withstand heightened scrutiny when "the alleged objective" differs from the "actual purpose" underlying the classification. *Miss. Univ. for Women,* 458 U.S. at 730.

The State proffers "promoting equal athletic opportunities for the female sex" as its governmental interest. W. Va. Code § 18-2-25d(a)(4). There is no doubt that promoting equal athletic opportunities is an important governmental interest. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011) (citing *Kelley v. Bd. of Tr., Univ. of Ill.*, 35 F.3d 265, 272 (7th Cir. 1994))*.* The State contends this law is necessary to "promote equal athletic opportunities for the female sex" because "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not . . . similarly situated" and "[b]iological males would displace females to a substantial extent if permitted to compete on teams designated for biological females." W. Va. Code § 18-2-25d(a)(3)-(5). But as explained above, Title IX already ensures that cisgender boys will not "displace [girls] to a substantial extent" and the State does not claim that cisgender boys have sought to do so. The truth is H.B. 3293 targets transgender girls. This Court should reject the State's proffered explanation as factually inaccurate, based on biases, and employing overbroad generalizations about transgender girls. Further casting doubt on the State's justification, H.B. 3293 hinders equal athletic opportunities for girls by creating an additional hurdle for participation.

First, the State's justification lacks a factual basis. H.B. 3293's text and legislative record make clear that the law was calculated to exclude girls who are transgender from girls' athletic

15

teams. The State already allows schools to have "separate teams for members of each sex," and under existing state law, cisgender boys cannot join a girls' team except in limited circumstances. W. Va. Code R. § 127-2-3.8.[10] When asked how H.B. 3293 would change this status quo, counsel for the bill explained that it "would affect those that changed their sex after birth." No. 1-1 at 14. Other delegates, including bill sponsors, also made clear that the bill's focus was on transgender girls. No. 1-1 at 21, 25. So, when the State says, "biological males would displace females" in athletics, W. Va. Code § 18-2-25d(a)(3), and defines students by their sex assigned at birth, *id.* § 18-2-25d(b)(1), the State's objective is clear: to define transgender girls as "boys" and then to prevent them from participating on girls' athletics teams. *See VMI*, 518 U.S. at 535-36 ("[B]enign justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." (internal quotation marks and citation omitted)).

Recently, an Idaho District Court found a similar law unconstitutional. *See Hecox*, 479 F. Supp. 3d at 979. The *Hecox* court rejected Idaho's claim that barring girls who are transgender from girls' athletic teams had any relationship to ensuring equality and opportunities for girls' athletics. As was the case in *Hecox*, H.B. 3293's legislative record "reveals no history of transgender athletes ever competing in sports" in West Virginia and no evidence that female athletes have been displaced by transgender athletes in West Virginia. *Id.* at 978. The West

---

[10] H.B. 3293's reliance on *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982), does not support the law's discriminatory means. W. Va. Code § 18-2-25d(a)(3). *Clark* did not address the participation of transgender athletes. Instead, *Clark* upheld a school district's policy that cisgender boys could not play on a girls' volleyball team where "boys' overall opportunity is not inferior to girls'." 695 F.2d at 1131. At issue here is a transgender girl who seeks to play on a girls' team. *Clark* thus provides no support for the State's discriminatory purpose because, simply, transgender women "have not and could not 'displace' cisgender women in athletics 'to a substantial extent.'" *Hecox*, 479 F. Supp. 3d. at 977 (quoting *Clark*, 695 F.3d at 1131).

**JA0236**

Virginia Department of Education's Executive Director of Policy and Government Relations testified that the agency has received no complaints about transgender athletes. No. 1-1 at 14-15. One of the bill's sponsors, Delegate Ellington, stated that he knew of no complaints regarding transgender athletes in West Virginia, *see* No. 1-1 at 9, 19, much less that transgender girls are so numerous and skilled that they could "displace" other women and girls in sports.[11]  Instead, he pointed to "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut." No. 1-1 at 21. The existence of two runners in another state fails to provide an "exceedingly persuasive justification" for H.B. 3293's categorical bar. *See Hecox*, 479 F. Supp. 3d at 979 (citing *VMI*, 518 U.S. at 533). As in Idaho, the record here contains "no evidence to suggest a categorical bar against transgender female athlete's participation in sports is required in order to promote 'sex equality' or to 'protect athletic opportunities for females'" in West Virginia. *Id.* at 978-79 (citation omitted). The State can point to no valid evidence to justify H.B. 3293.

On the contrary, the State disregarded evidence that giving girls who are transgender the same athletic opportunities that all other girls enjoy has not displaced cisgender girls. The West Virginia Legislature had before it evidence that sixteen states successfully allow transgender students to participate in sports consistent with their gender identity. No. 25 at 38-39, 75. The National Collegiate Athletic Association ("NCAA") has allowed transgender students who meet certain conditions to participate in intercollegiate sports consistent with their gender identity for over ten years. *Id.*; *see also* NCAA, *NCAA Inclusion of Transgender Student-Athletes* (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.  Yet, girls and young women who are transgender have not displaced cisgender girls in those states or in college

---

[11]  The bill's co-sponsors and the Governor of West Virginia also stated that they did not know of any girls who are transgender in West Virginia who competed on girls' teams, much less who dominated or displaced cisgender girls. No. 1 at 2, 14.

athletics.  The lack of "empirical evidence that transgender inclusion will hinder sex equality in sports or athletic opportunities" for girls shows that H.B. 3293's exclusion of transgender girls "has no relationship" to the law's objective.  *Hecox*, 479 F. Supp. 3d. at 979, 982.

Second, statements by H.B. 3293's sponsors show that a misunderstanding or fear of transgender girls, and in certain instances, outright anti-transgender bias, rather than an interest in promoting women's athletic opportunities, motivated this bill.  For example, Delegate Mazzochi said that she did not "want all this mixing and matching" of transgender and cisgender children in "locker rooms."  No. 1 at 12.  Delegate Bridges announced on Facebook he was co-sponsoring H.B. 3293, then "liked" comments to his post that advocated for physical violence against girls who are transgender, compared them to pigs, and called them by a pejorative term ("tranny").  Jordan Bridges, "Update: The bill passed out of committee." Facebook (Mar. 16, 2021), https://perma.cc/HA5C-VJ4N.[12]  He also made other anti-transgender comments, saying that "this country is going down hill [sic] fast" in response to a news article discussing transgender-inclusive business practices.    Jordan Bridges, "I swear my hand." Facebook (Oct. 23, 2019), https://perma.cc/8BHK-7V5Z.  The biases and moral disapproval articulated by the bill's sponsors are not justifiable reasons to legislate.  *See Lawrence v. Texas*, 539 U.S. 558, 577-78 (2003) (holding moral disapproval of same-sex sexual conduct was impermissible basis for legislation); *see also Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (finding in a race discrimination suit that "[t]he Constitution cannot control such prejudices but neither can it tolerate them.  Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").[13]

---

[12] The archived and live Facebook pages are available via the permalink.  DOJ has retained permanent copies of these Facebook pages in the event that they are modified or deleted.

[13] Intermediate scrutiny is the appropriate level of review in this case.  But even under rational basis review, H.B. 3293 would fail because bare dislike of an unpopular social group is never a

Third, even if this Court were to credit the State's purported objective of wanting to protect girls' athletic opportunities, H.B. 3293's categorical exclusion of transgender girls is not "substantially related" to that objective, as the equal protection caselaw requires. *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724) (internal quotation marks omitted). H.B. 3293's assumption that transgender girls, as a group, enjoy some inherent competitive advantage over their cisgender classmates ignores the facts of this case. Excluding B.P.J., who has not gone through puberty and is receiving puberty-delaying treatment, No. 2-1 at 21, 32, contributes nothing to ensuring competitive fairness. *See* No. 2-1 at 6-8. By sweeping so broadly, the State proved itself "less concerned with ensuring equality in athletics than [] with ensuring exclusion of transgender women athletes." *Hecox*, 479 F. Supp. 3d at 984.

Finally, H.B. 3293 may hinder rather than promote athletic opportunities for all girls. Though the law purports to bar only transgender girls from joining the girls' team, the practical effect is that *every* girl in West Virginia may be subject to having her eligibility for a single-sex team challenged merely because some other student claims the girl in question is not a "real" girl. This is likely to affect girls who do not adhere to sex stereotypes and who present as less stereotypically feminine. While intended to expose transgender girls, the consequences would be harmful for gender non-conforming cisgender girls as well. Indeed, two doctors testified that being the subject of such a challenge would be "psychologically devastating," "embarrassing, humiliating," "lead to the . . . person being ostracized," and increase her suicide risk. No. 25 at 97-98, 101. Thus, rather than protecting opportunities for girls, the law could reasonably chill

---

legitimate legislative motive. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446-47 (1985)*; Moreno,* 413 U.S. at 534. The State's prohibition of transgender girls from girls' teams is not rationally related to its stated interest of protecting girls' athletic opportunities. *See Cleburne,* 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

athletic participation by all girls who do not conform to sex stereotypes.

H.B. 3293 cannot survive heightened scrutiny. The State cannot point to any valid evidence that allowing transgender girls to participate on girls' sports teams endangers girls' athletic opportunities. Instead, the State legislated based on misconceptions and overbroad assumptions about transgender girls. It is illogical for the State to believe it can protect girls' athletic opportunities by barring girls from playing sports. The harm to B.P.J. is real and it will be lasting. The United States believes B.P.J. will succeed on the merits of her equal protection claim.

## CONCLUSION

Title IX and the U.S. Constitution bar Defendants from implementing the policy commanded by H.B. 3293. That policy does nothing to further the State's purported goal of protecting athletic opportunities for girls. At the same time, it violates the nondiscrimination mandates of Title IX and the Equal Protection Clause.

Respectfully submitted, this 17th day of June, 2021.


LISA G. JOHNSTON                          KRISTEN CLARKE
Acting United States Attorney             Assistant Attorney General
Southern District of West Virginia
                                          PAMELA S. KARLAN
                                          Principal Deputy Assistant Attorney General
                                          Civil Rights Division

_____          SHAHEENA A. SIMONS
FRED B. WESTFALL, JR.                     Acting Deputy Assistant Attorney General
W. Va. State Bar No. 3992                 Civil Rights Division
Assistant United States Attorney, Civil Chief
JENNIFER M. MANKINS
W. Va. State Bar No. 9959
Assistant United State Attorney
300 Virginia Street East, Room 4000       _____
Charleston, WV 25301                      WHITNEY M. PELLEGRINO
Telephone: (304) 345-2200                 Acting Chief
Fax: (304) 347-5104                       ARIA S. VAUGHAN
Fred.Westfall@usdoj.gov                   MICHELLE L. TUCKER
Jennifer.Mankins@usdoj.gov                AMANDA K. DALLO
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Rights Division
/s/ Emma Leheny                           Educational Opportunities Section
EMMA LEHENY                               950 Pennsylvania Ave., NW
Principal Deputy General Counsel          4CON, 10th Floor
                                          Washington, DC 20530
VANESSA SANTOS                            Telephone: (202) 598-9629
JESSICA WOLLAND                           Aria.Vaughan@usdoj.gov
Attorneys                                 NY Bar No. 5044748
Office of the General Counsel
United States Department of Education


*Attorneys for the United States*

JA0241

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Respectfully submitted,

ARIA S. VAUGHAN
Trial Attorney
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
Telephone: (202) 598-9629
Aria.Vaughan@usdoj.gov
NY Bar No. 5044748



**TABLE OF CONTENTS**

*The Interscholastic* Track Program February   (Online)

Track Bulletin ................................................................................................................ 3

Rule Clinic Schedule ..................................................................................................... 5

Rule 127-3-29-Track ..................................................................................................... 6

Pole Vaulter's Weight Verification Form ...................................................................... 7

Sanctioning and Travel/WVSSAC Rule 127-3-16 ....................................................... 8

Submitting Regional Entry Forms (High School Only) ................................................ 9

State Tournament Program Information (High School Only) ..................................... 11

WVSSAC State Tournament Rooming List Information (High School Only) ............ 13

WVSSAC Rooming List-Track (High School Only) .................................................. 14

Coaching Reminders .................................................................................................... 15

Practice Rule/WVSSAC Rule 127-2-13 ...................................................................... 16

Ejection Rule/Bench Clearing Policy ......................................................................... 17

> **For additional information related to sports medicine issues concerning athletic participation, please click the "Sports Medicine" tab on the opening page of our website.**

JA0244

# WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION

**2875 Staunton Turnpike, Parkersburg, WV 26104-7219**

TELEPHONE: 304-485-5494
FAX NUMBER: 304-428-5431

E-MAIL: wvssac@wvssac.org
WEB SITE: www.wvssac.org



# B U L L E T I N

**TO:**       Track Coaches
**FROM:**   Wayne Ryan, CAA, Assistant Executive Director
**DATE:**    January 2021
**SUBJECT:** 2020-2021 Track

**Points of Emphasis:**

1. Pole Vaulting – If your team has pole vaulting, be sure to review Rule 6-5 in the National Federation Rules Book. Your careful review of this information will help to insure the safety of your athletes.

2. Sanctioning & Travel – Please review Rule 127-3-16. All sanctioning requests must be done using the sanction forms found on the WVSSAC website. Failure to have an event sanctioned may result in forfeiture and returning awards won by athletes.

3. Uniform Information – Coaches, it is your responsibility to enforce these items for all participants, including field event participation:

   ➤ Rule 4-3: Violators of these items will not be allowed to participate until such is corrected. Events will not be delayed because of these violations.

4. Please check the WVSSAC Track Program from the February issue of **_The Interscholastic_** concerning the track and field program.

5. Items for Regional and State meets. (Refer to **_The Interscholastic_**)

6. Eligibility sheets are due **online** by the date of the first contest according to the standardized calendar. Hard copies are no longer accepted. Schools will be assessed a $25 (twenty-five dollar) fine if eligibility certificates are not completed before date of first contest.

7. WVSSAC Rules Clinics
   ➤ The WVSSAC will not conduct in person Track Rules Clinics for the 2020-2021 season. Schools and officials will be notified when the clinics are available for viewing online.

**3**

**JA0245**

8. The Board of Directors has ruled that players, coaches, or officials shall not use tobacco during an athletic contest. The penalty requires the official to eject the offender from the confines of the field.

9. **Head Trauma Guidelines** – Refer to the approved Return to Play/Concussion Protocol. RTP refers to return to play and return to practice. The appropriate health care professional will determine when a concussed athlete may return to participation.

10. **Use of Performance Enhancing Substances by Athletes** – It is the philosophy of the National Federation and the WVSSAC that students be encouraged and supported in their efforts to develop and maintain a healthy lifestyle. In promotion of safety and healthy lifestyles, the WVSSAC Sports Medicine Committee requests that coaches assume the responsibility of informing athletes that the uses of such substances should be discontinued especially during the times when dehydration may occur due to potential life threatening consequences. The committee further encourages all athletic trainers to support coaches in promoting healthy lifestyles.

11. **Injury/Participation Procedure at WVSSAC Championship Events** – Medical personnel (athletic trainers) will have the jurisdiction concerning the return of a player to competition after an injury. If a parent refuses to follow the determination of the authorized person, a release form must be signed. Athletic trainers will receive additional information at Rules Clinics.

12. The WVSSAC is actively involved in promoting good sportsmanship in all of our sport programs. I encourage you to promote good sportsmanship by informing parents and athletes of the importance of supporting this concept. Please review the sportsmanship section of the ***Rules & Regulations Handbook*** with your team. I ask that you lead by example.

17. All coaches for each sport are required to complete an Emergency Action Plan (Senate Bill 40). This must be completed online - See your Athletic Director for further information.

**Coaches are asked to carefully review the
Spectator Support Information with players, fans, and parents.**

**National Federation Part I Rules Examination - No longer required for coaches.**

4

# 2020-2021
# Spring Sports Clinics

Spring Clinics for 2020-21 will be online.

Schools and Officials will be emailed the link when the clinics are available.

JA0247

**§127-3-29.  Track and Field (Boys and Girls).**

29.1.  Rules:  Track and Field rules published by the National Federation of State High School Associations are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

29.2.  Organized Team Practice:  Organized team practice may begin on Monday, March 15 for High Schools and Monday, March 22 for Middle Schools.

29.3.  Length of Season:  The track and field season will end for each team or individual by WVSSAC tournament elimination.

29.4.  Maximum Team Contests:  A track and field team will be permitted 16 meets exclusive of sectional, regional, and state contests.

29.5.  Participation Limitations:  Maximum of 4 events per participant per meet.

29.6.  Scrimmages:  Not permitted.

29.7.   Individual students of a team must have practiced on 14 SEPARATE days, exclusive of the day of a contest, before participating in an interscholastic contest.

29.8.  A student may accept awards in WVSSAC sanctioned events and non-sanctioned events during the entire year.  These awards must be consistent with the items specified in the Awards Rule.

29.9.  *Middle School -* The above will apply for Middle School with the following adaptations:

29.9.1.  Middle school  teams will be permitted 14 meets and only 2 meets per week.

29.9.2.  Middle school season will be completed by June 9.

29.9.3.  Participation limitation:  Middle school students, regardless of grade levels (6, 7,  or 8), may compete in a maximum of four events, of which only three may be running events including relays.

## WVSSAC
## POLE VAULTER'S WEIGHT VERIFICATION FORM

**TO ALL MEMBER SCHOOLS** - Member schools will be required to process the <u>POLE VAULTER'S</u> <u>WEIGHT VERIFICATION FORM</u> listing each student participating in the pole vault event. This form is to be on file in the Athletic Director's office prior to a pole vaulter's first interscholastic competition. A copy must be given to the event judge at each meet in which they will vault.

School _____

|  | **Name of Vaulter** | **Weight*** | **Pole Rating** |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |
| 5. | _____ | _____ | _____ |
| 6. | _____ | _____ | _____ |
| 7. | _____ | _____ | _____ |
| 8. | _____ | _____ | _____ |

\* INCLUDES FULL COMPETITION UNIFORM AND FOOTWEAR

Date _____     Signature of Principal _____

Date _____     Signature of Athletic Director _____

Date _____     Signature of Coach _____

## NOTE TO SCHOOL OFFICIALS

Please review the following National Federation rules regarding the pole vault event:

6-5-2; 6-5-3; 6-5-4; and 6-5-5.  Page 47 & 48

rk/Pole Vaulters Wt Verification Form

**7**

**§127-3-16.  Sanctioning and Travel.**

16.1.  A member school shall not enter a contest/competition which requires sanctioning until it is approved.

16.2.  All applications for sanctioning must be submitted to the WVSSAC 30 days prior to the event with the exception of international events.

16.3.  Events requiring National Federation approval are:

16.3.1.  Co-sponsorship Sanction Requirement:  Any interstate event involving two (2) or more schools which is co-sponsored by or titled in the name of an organization outside the high school community (e.g., a university, a theme park, a shoe company), in addition to being sponsored by a member school, an approved school or a state association, shall require sanction of the NFHS office.

16.3.2.  Non-bordering State Sanction Requirement:  Each state association shall sanction through the NFHS office interstate competition by a member school involving either:

a.  More than eight (8) schools, at least one (1) of which is from a state that does not border the host state; or

b.  Five (5) or more states, at least one (1) of which does not border the host state.

16.3.3.  International Event:  Each member state association shall approve and receive NFHS approval for competition by a member school against a school from a foreign country, except for two (2) school and three (3) school competition with a school or schools from Canada or Mexico which necessitates a round trip of less than 600 miles.

16.3.4.  International Event:  Games against Canadian or Mexican schools involving travel of greater than 600 miles, or an event involving more than three (3) schools, one or more of which are from Canada or Mexico, requires a request to the NFHS for international sanction and notice to and sanction by the appropriate National Governing Body.

16.4.  Bordering state events requiring approval are:

16.4.1.  Any interstate event in which four or more schools participate.  (All schools from neighboring states.)

16.4.2.  Any interstate event which involves schools from three or more state high school associations.

16.5.  Intrastate events requiring approval are:

16.5.1.  An event with more than four schools participating or awards given.

16.5.2.  Any event where awards are given.

16.6.  The WVSSAC may assess a fine and/or other penalties against the participating school for violations of the sanction provisions.

16.7.  A member school shall not enter an event that involves travel of more than 600 miles round trip unless it occurs on days when school is not in session.  Sanctioning from the WVSSAC must be granted.

## - - - - - - - HIGH SCHOOL ONLY - - - - - - -

### Submitting Regional Track Entries

All entries for the WVSSAC Regional Track Meets will utilize the Hy-Tek Team Manager Lite and all entries will be provided to the meet director or his/her designee electronically. Team Manager Lite is a software program that eliminates a lot of problems for meet managers. It ensures that coaches have entered athletes into the correct events and it eliminates the mistakes that are made when information is hand entered. **The items in this bulletin that are in bold print are exactly the format that we want used for the Regional Track Meets.** It is our suggestion that you use this same format throughout the regular season.

**You may download the program from the Hy-Tek website:**
www.hy-tekltd.com/track/wintm/index.html

**Or from the following schools track websites**
Bridgeport – www.bridgeporttrack.com
Cabell Midland – www.midlandrunning.com/hy-tek

Once the software is loaded on your computer, you will: Create the team database. Name the database. Select where to store the database. We refer to the athletes as male/female.

Next you will need to identify your team. Click on "Teams" from the TFWin-TM Menu Bar and then click on 'Add" from the Team Browser or click on the "Add New Team" icon. Enter the basic Team information.

**TEAM CODE: Use your WVSSAC numeric code – 0065**
**TEAM NAME: Use your full School Name – Lewis County HS**
**SHORT NAME: Use shortened School Name – Lewis County**
**ALT ABBR: Use Mascot or other Shortened Name – LC or Minutemen**

You can now add your athletes. Click on "Athletes" from the Main Menu Bar and then click on "Add" from the Athlete Browser or click on "Add New Athlete" icon. You need to provide the following information about the athlete: name, gender, team and school year. **Please use the athletes' given name, no nicknames. For the school year, please use 9, 10, 11 and 12.** Click on the "OK" button to save the information that you have entered about this athlete. Repeat this process to add all the members of your team. Click on the "Cancel" button when you are finished.

You will then need the event files for the meet that you a entering. The meet director will provide you with a file that you can import into the Team Manager that will list all of the events and entry rules for their meet. Assign your athletes to their respective events. Then enter a "Custom Entry" mark for their best time, distance or height in that event. For the field events enter distances and heights in the following format: feet – inches. For example, a long jumper whose best jump is 18' 7 ½ " would be entered as 18-7.5 or a pole vaulter with the best height 12' 6" would be 12-6. Relay Events – Enter a "Custom Entry"

9

# - - - - - - - HIGH SCHOOL ONLY - - - - - - -

mark for your relays best time.  You may pick from 4 to 8 athletes (4 primary and 4 alternate) from the list of eligible athletes for your Relay.  You can click and drag them over to Relay positions 1-8 or double-click on the name and TFWin-TM will automatically move them for you.

Exporting Your Meet Entries – From the T & F TEAM MANAGER Main Menu Bar, click on "File" then "Export" then "Meet Entries".  Since you want to email them, specify a directory on your hard drive (one you can find later) as the "Export Drive/Directory".  Now select the meet for which you want to export entries. You should check the option to "Include Relays with your Entry."  When you click "OK", TFWIN-TM will create one zip file that has the following naming convention: TTTTTTT-Entriesxxx.ZIP where "TTTTTTT" is the Team Abbreviation and the "xxx" is a sequential number beginning with "001".  For example, if the Meet Entries are for the Team "LC" the exported meet entry file name would be "LC-Entries001.ZIP".  This zipped file contains a meet entry file – a TCL file.

Check What You Have Exported – After you have built your meet entry export file, click on "Reports" and then "Export/Import File Report" and follow the menu prompts to review EXACTLY what information you exported to the file.  This is a great way to check and verify the meet entries you are sending to the meet host.  This report should match the standard "Meet Entry Report" you have built, but it is a good idea to check it.

Submitting Your Meet Entries – Just use your standard e-mail software and attach the ZIP file (saved on your hard drive or flash drive where you could find it from before) to an e-mail and send it before the entry deadline.  When the meet director receives that file they will import it and your team will be entered in their meet just as you entered them with no mistakes.

For more instructions, you may go to: www.hy-tekltd.com/track/wintm/index.html  and at the bottom of the page click on "Team Manager" and you can download three pages (3 pages) of instructions. You may also visit Bridgeport High Schools' Track website:  www.bridgeporttrack.com then click on "Meet Information" and then click on "Manager Lite Instructions".  Also there is a very good tutorial on the Cabell Midland High School Track website: www.midlandrunning.com/hy-tek

- - - - - - - **HIGH SCHOOL ONLY** - - - - - - -

# State Tournament Program Information

**Goal:**    *To provide a quality program for all championship events*

**What:**    *Track State Championship Program*

**Deadline:** *Monday, June 7, 2021 - Noon - (No extensions past the noon deadline)*

## Required Online Submission Only - *(School Information-Roster-Schedule)*

- ✓ Go to www.wvssac.org click on Admin Login in the upper left corner of homepage
- ✓ Type in your Username and Password as the school Administrator in the appropriate sections and click on Login
- ✓ Click on Submit Rosters.  Under Program select Senior and select **Track**
- ✓ Complete the School Information and head coaches information.  Click Update/Continue
- ✓ Click the Sync button and enter the information requested, then save by clicking the Update/Save Roster button.  Always view your roster for accuracy.
- ✓ If you don't find a student, go to the Eligibility Certificate Form and add the name and return to the Roster and click Sync button.  **Note:** The Sync button feature has been added to update all names on the active Eligibility Certificate Form.  Check for accuracy.  Save all changes to your eligibility certificate and roster.

## Required Items for a Team Page:

*School Information, Head Coach Information, Roster Information.  Update/Complete Online - Printer will use this for the Program Page.*
*Team Picture*
*Individual Head Coaches' Picture*
*Page Sponsor - Please contact a business or the boosters club concerning sponsoring this page.  Ad is about the size of a business card which often times is used.*
*Team Page Cost - $125 - Make checks payable to WVSSAC.  Indicate sport & school in memo section of check.*

> **When emailing the team/coach pictures and page sponsor,  please enter the school name (*No Abbreviations, please*) and sport in the subject line of the email.**

## Questions Contact:    *Katelyn Enoch*
*WVSSAC*
*2875 Staunton Turnpike*
*Parkersburg, WV 26104*
*Phone (304) 485-5494        Fax (304) 428-5431*
*Email: katelyn.enoch@wvssac.org*

- - - - - - - **HIGH SCHOOL ONLY** - - - - - - -



Refer to the previous page
for instructions on
filling out coaching and team
information online.



JA0254

- - - - - - - **HIGH SCHOOL ONLY** - - - - - -

> **Regional Tournament Directors are to give a copy of this Rooming List Information Sheet and the Rooming List to the coach of each state qualifier.**

# WVSSAC
# STATE TOURNAMENT
# ROOMING LIST INFORMATION

Please complete the rooming list for this year's State Track Meet. The form is **online** under Track listed as State Track Meet Rooming List. Area hotels usually provide rooms at a special rate to those teams attending the State Tournament. Payments for teams must be made in full by a **school check** (not personal) for all expenses.

Reservations must be made as early as possible. When speaking with the hotel/motel contact, please be sure to identify your school name and indicate that the reservations are for the state track meet.

Please check the website for the approved list of hotels/motels who will provide rooms for your sport state tournament.

---

### Hotel Policy

Effective with the 2010-2011 school year, member schools that are eligible to receive reimbursement for lodging at state championship sites **MUST** be housed at hotel sites that participate in a cooperative agreement with the WVSSAC. *(Member schools will be notified by information posted on the WVSSAC website and material included in the sport specific coaches packets as to which lodging sites have entered into an agreement with the WVSSAC.)*

*Schools that choose to use unapproved lodging sites will <u>not</u> receive <u>any</u> reimbursement.*

---

rk/H/Hotel Motel/St. Team Rooming List

**13**

· · · · · · · **HIGH SCHOOL ONLY** · · · · · · ·



Find the
State Track Meet Rooming List
online at www.wvssac.org
Go to "Sports" "Track" and then click on
"2020-21 Track Fill In Room List Form".
Fill out the form.
Then, email to wayne.ryan@wvssac.org
or print and fax to 304-428-5431



**14**



# COACHING REMINDERS



**Practice:** Team members must have 14 practices on 14 separate days - 5 days sports specific if participating in another sport during the same sports season. A student must have 5 days of practice if coming from one sports season into the next sports season without interruption of school days. Only students enrolled in the specific member school and a member of team is allowed to practice. Rule 127-2-13.

**Sunday Contests:** Contests or practice on Sunday is prohibited. Practice refers to any group or individual meeting to view films or activity associated with the activity of that sports season. Rule 127-3-14.

**Physical Exam:** Team members must have Athletic Participation/Parental Consent/Physician's Certificate form completed and on file before beginning practice. Rule 127-3-3. (Must be on or after May 1st)

**All-Star Competition:** Any student completing athletic eligibility at the end of current school year because of age or competition of semesters of eligibility may play in one (1) all-star game upon conclusion of the season without loss of eligibility for balance of year. Rule 127-3-4.

**Awards:** Team members can accept awards from school sponsoring a sanctioned event or the school. Wearing apparel, championship rings, equipment, athletic goods that exceeds $100.00 are prohibited from any source. Rule 127-3-5.

**Out of Season Coaching:** Coaches may not promote, initiate, organize, supervise or participate in out-of-season events involving students of the same sport as the grade level coaching assignment and preceding grade level except as specified in Rules 127-3-7.2 and 127-3-7.3. Rule 127-3-7.7.

**Amateur:** Any team member competing for money, receiving any award or prize of monetary value that has not been approved by the WVSSAC, capitalizing on athletic fame or signing a professional playing contract in that sport is prohibited. Rule 127-2-11.

**Participation as Ineligible:** Any student who participates as ineligible may forfeit eligibility for up to 365 days. Rule 127-2-12.

**Non-School Participation:** Participation is limited to school teams only with a few exceptions in individual sports provided the school principal approves and no school contests/activities are missed. Participation includes but is not limited to, practice, fund raising, team pictures, tryouts, etc. Rule 127-2-10.

**Sanctioning and Travel:** A member school shall not enter a contest, tournament, or competition which requires sanctioning until it is approved 30 days prior to the event. Rule 127-3-16.

---

For complete details regarding the above regulations and those governing team memberships, scholarship, undue influence, age, semester, etc. refer to the **_Rules & Regulations Handbook_** or at www.wvssac.org.
This is not a comprehensive listing.

---

**15**

**JA0257**

**§127-2-13.  Practice.**

13.1.   Only students enrolled and eligible to be listed on the eligibility certificate for that sport in the specific member school are allowed to participate in that school's practices.  Exceptions - Rules 127-2-3.2, 127-2-3.5 and 127-2-13.6.

13.2.   The frequency and length of practice is at the discretion of each member school.

13.3.   Member schools of the WVSSAC may practice on any day of the year with the exception of Sunday practice.  Rule 127-3-14.2 further clarifies Sunday practice.

13.4.   Individual players of a team must have practiced

13.4.a.  on 7 SEPARATE days before participating in an interscholastic scrimmage.

13.4.b.  on 14 SEPARATE days, exclusive of the day of a contest, before participating in an interscholastic contest.  The following sport(s) is exempted from the provisions of this rule: golf.

13.4.c  A student athlete who is absent from practice with their team for non-medical reasons, not under a doctor care, for more than fourteen (14) consecutive days must have the required full fourteen (14) practice days before resuming participation in a contest.  Students participating in football must follow the practice progression as set forth in Rule 127-3-23.

13.5.   A student shall not be permitted to engage in interscholastic practice until that student has filed with the principal a completed Athletic Participation/Parental Consent/Physician's Certificate Form.  Rule 127-3-3 further explains this required form.

13.6.   A student academically ineligible may begin practicing 15 school days immediately prior to the date of regaining full eligibility.  (All other ineligible students may not practice.)

13.7.   If a student has established eligibility in a sport requiring 14 separate days of practice and is continuing to participate in that sport or no school days have lapsed from one sport to another sport in a same season, the student may participate in another sport of the season after completing seven separate days of sport specific practice in the second sport.

13.8.   Students participating in a sport(s) in one season must have practiced 14 separate days, exclusive of the day of a contest, to be eligible to participate in a sport in the next season with the following exception:  the student has continued to practice or participate in tournament play without an interruption of school days.  The student must complete seven separate days of sport specific practice in the second sport.

(Ejection Rule / Bench Clearing)

127-4-3 Code for Interscholastic Athletics

3.7. *Statement of Policy.* Insofar as unsportsmanlike actions by students, school administrators, officials, coaches, faculty members, and spectators are concerned, the identical items under the Sportsmanship Rule along with the following guides will be referred to by the WVSSAC:

3.7.a. The school whose coach behaves in a manner likely to have adverse influences on the attitudes of students or spectators may be provided with the choice of taking disciplinary action against that coach or having the entire school disciplined by the WVSSAC.

3.7.b. Any student who in protest lays hands or attempts to lay hands upon an official may be declared ineligible by the principal or by the WVSSAC for up to one year. Any student who strikes an opponent, coach, or a spectator during or following an athletic event may be declared ineligible by the principal or the WVSSAC for a specified period of time up to one year, depending on the seriousness of the act.

3.7.c. Any coach, student, or bench personnel ejected by an official will be suspended for the remainder of the game, match, meet or contest. The coach, student, or bench personnel ejected by an official will also be suspended in additional contest(s): the suspension will be assessed based upon ten (10) percent of the allowed regular season contests or post season progression in a playoff tournament for each sport. Any tenth of a percentage from .1 to .4 will be a suspension equal to the whole number of the percent. Any tenth from .5 to .9 will be an additional contest added to the whole number. The suspension will include the number of indicated contests in that sport and at that level and all other sport contests in the interim at any level. A second ejection will result in the doubling of the suspension assessed for the first ejection. If an individual is ejected for a third time during the same sport season, the individual will be suspended from participating or coaching for 365 calendar days from the date of ejection. In accordance with rule 127-3-15.3, an individual ejected by an official may not appeal that ejection, or any subsequent suspension that is a consequence of the ejection by an official..

3.7.c.1. Any coach, player or bench personnel who has been ejected shall not be permitted to attend any contest(s) during said suspension. He/she shall not be affiliated with the team in any capacity. This would include but not be limited to transportation to or from the contest, meeting with the team before, during or after said contest. He/she is not permitted to be in sight or sound of said contest venue. Regular practice or team meetings not affiliated with a contest are permitted.

3.7.c.2. If suspensions are imposed to a student or bench personnel at the end of the sport season and no contest remains, the suspension is carried over to that particular sport until the next school year. In the case of a senior student, the penalty will continue to the next WVSSAC sponsored sport.

3.7.c.3. Any coach suspension that cannot be enforced during the sport season in which the ejection occurs will be enforced at the beginning of the next season of that same sport.

3.7.d. In case of spectators physically molesting an official, administrator, coach, or student, the school may be given one of two options: 1) file charges against the offender (s) or 2) accept discipline from the WVSSAC. Any person found guilty of W.Va. Code §61-2-15(a) Assault, Battery on Athletic Officials, while these individuals are working or as a result of working an athletic contest, shall be banned from all WVSSAC athletic events for a minimum of 365 days from the date of being found guilty. The school filing charges shall notify the WVSSAC of the incident and outcome of any legal action.

3.7.e. The school that does not lend complete cooperation in the host school's effort to promote the spirit of good sportsmanship may be disciplined by the WVSSAC.

3.7.f. A coach may be considered as committing unsportsmanlike conduct if they make degrading remarks about officials during or after a game either on the field of play, from the bench, or through any public news media, argues with officials, or goes through motions indicating dislike for a decision, protests the decision and actions of officials pertaining to the game during and after the contest, or detains the official on the field of play following a game to request a ruling or explanation of some phase of the game. If a coach feels he/she has a legitimate criticism of a penalty call or a request for a rule interpretation, such criticism or request should be made in the privacy of the coach's office or the official's quarters and should be made in a courteous manner.

3.7.g. A student or team attendant shall not leave the bench area, team box area, or their designated off-field area during a game or contest other than during that time permitted by game or contest rules. A coach shall not leave the bench area, team box area, or the designated off-field area during a game or contest other than during that time permitted by game or contest rules unless a student altercation is taking place and the official requests assistance. Violation of this rule shall cause the coach, student, or team attendant to be immediately ejected from the contest, team penalized according to game or contest rules and that coach, student, or team attendant will not be eligible to participate in the next contest as outlined in §127-4-2.3.

3.8. Procedure. Unsportsmanlike action must be reported in detail to the WVSSAC. A copy of the complaint must also be filed with the principal of the school involved. Each principal involved shall report such information or answers to the report as they deem appropriate. Upon receipt of all reports, the Executive Director and/or the Board of Directors of the WVSSAC shall investigate and adjudicate such reports in accordance with the powers afforded in §127-1-8.6 and 8.7 and §127-1-12.2 and 12.3 of the Constitution. Penalties up to and including suspension of member schools may be made in accordance with §127-4.

3.9. The following defines the different types of disciplinary action which may be assessed for violation of any WVSSAC rule by a member school, administrator, coach, athlete or contest official:

3.9.a. *Warning.* A warning may be given by the Executive Director or Assistant Executive Director. It is official notice that an inexcusable, unethical, or unsportsmanlike action has occurred, is a matter of record, and that such an occurrence must not be repeated.

3.9.b. *Probation.* Probation is a much more severe type of warning and may be expressed two ways: 1) a school, coach, student, or team attendant on probation is told that further violations will lead to a fine or suspension; and/or 2) a school on probation is on conditional WVSSAC membership but may engage in its regular schedule, sanctioned events, and all WVSSAC tournament play, providing a program is filed with the Executive Director of the WVSSAC indicating measures to be taken to alleviate this problem which caused the school to be placed on probation.

3.9.c. *Suspension.* A school/coach suspended from the WVSSAC may not meet in interscholastic competition of any kind with a WVSSAC member school or a school that is a member of another state associated with the National Federation of State High School Associations.

3.9.d. *Fine.* A fine may be levied by the Executive Director.

3.9.e. Each of these sanctions (Warning, Probation, suspension and Fine) may be imposed or levied separately, or in a combination of one or more sanctions.

3.10 *Appeals.* All cases involving disciplinary action against member schools, coaches, students, team attendants, or officials may be protested in accordance with §127-6. However, disciplinary action imposed by an official, including disciplinary action that is a consequence of a decision by an official, such as a suspension for an additional game or games as a consequence of an ejection, is governed by rule 127-3-15.3 and is not subject to appeal.

3.11 Review of Ejections. Disciplinary action imposed by a contest official, including disciplinary action that results in a suspension for an additional game or games as a consequence of an ejection, is not subject to appeal pursuant to Rule §127-6. However, if the individual ejected believes the ejection was improper, he/she may request a review of the ejection by his/her principal. If the principal believes there is merit in the requested review, the principal shall complete and submit the WVSSAC Ejection Review Form within 24 hours or the next business day of the ejection to the Executive Director of the WVSSAC. If a review is properly requested, the WVSSAC will review the officials' special report, the WVSSAC Ejection Review Form, and such other information as the WVSSAC deems appropriate. Upon review, the WVSSAC Executive Director or the designated Assistant Director will either sustain the ejection and any consequent suspension(s), or will determine the ejection was improper and void any consequent suspension(s). A decision by the WVSSAC upon reviewing an ejection is not subject to appeal pursuant to Rule §127-6.

**17**

**JA0259**

**WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION**          2021
2875 Staunton Turnpike - Parkersburg, WV 26104
**ATHLETIC PARTICIPATION/PARENTAL CONSENT/PHYSICIAN'S CERTIFICATE FORM**
(Form required each school year on or after May 1st.  File in School Administration Office)
**ATHLETIC PARTICIPATION / PARENTAL CONSENT**
**PART I**

Name _____   School Year:_____ Grade Entering:_____

Home Address:_____   Home Address of Parents: _____

City: _____   City: _____

Phone: _____ Date of Birth: _____   Place of Birth: _____

Last semester I attended _____(High School) or (Middle School).  We have read the condensed eligibility rules of the WVSSAC athletics.  If accepted as a team member, we agree to make every effort to keep up school work and abide by the rules and regulations of the school authorities and the WVSSAC.

**INDIVIDUAL ELIGIBILITY RULES**
Attention Athlete!  To be eligible to represent your school in any interscholastic contest, you:
_____ must be a regular bona fide student in good standing of the school.  (See exception under Rule 127-2-3)
_____ must qualify under the Residence and Transfer Rule (127-2-7)
_____ must have earned at least 2 units of credit the previous semester.  Summer School may be included. (127-2-6)
_____ must have attained an overall "C" (2.00) average the previous semester.  Summer School may be included. (127-2-6)
_____ must not have reached your 15th (MS), 19th (HS) birthday before August 1 of the current school year. (127-2-2)
_____ must be residing with parent(s) as specified by Rule 127-2-7 and 8.
          _____ unless parents have made a bona fide change of residence during school term.
          _____ unless an AFS or other Foreign-Exchange student (one year of eligibility only).
          _____ unless the residence requirement was met by the 365 calendar days attendance prior to participation.
_____ if living with legal guardian/custodian, may not participate at the varsity level. (127-2-8)
_____ must be an amateur as defined by Rule 127-2-11.
_____ must have submitted to your principal before becoming a member of any school athletic team Participation/Parent Consent/Physician Form, completely filled in and properly signed, attesting that you have been examined and found to be physically fit for athletic competition and that your parents consent to your participation. (127-3-3)
_____ must not have transferred from one school to another for athletic purposes. (127-2-7)
_____ must not have received, in recognition of your ability as a HS or MS athlete, any award not presented or approved by your school or the WVSSAC. (127-3-5)
_____ must not, while a member of a school team in any sport, become a member of any other organized team or as an individual participant in an unsanctioned meet or tournament in the same sport during the school sport season (See exception 127-2-10).
_____ must follow All Star Participation Rule.  (127-3-4)
_____ must not have been enrolled in more than (8) semesters in grades 9 to 12.  Must not have participated in more than three (3) seasons while in grades 6-7-8. (Rule 127-2-5).
_____ qualify under homeschool rule. (Rule 127-2-3.11, 127-2-7.2k, 126-26-3.1.1k)

**Eligibility to participate in interscholastic athletics is a privilege you earn by meeting not only the above listed minimum standards but also all other standards set by your school and the WVSSAC.**  If you have any questions regarding your eligibility or are in doubt about the effect any activity or action might have on your eligibility, check with your principal or athletic director.  They are aware of the interpretation and intent of each rule.  Meeting the intent and spirit of WVSSAC standards will prevent athletes, teams, and schools from being penalized.

**PART II - PARENTAL CONSENT**

In accordance with the rules of the WVSSAC, I give my consent and approval to the participation of the student named above for the sport **NOT MARKED OUT BELOW:**

| BASEBALL | CROSS | GOLF | SWIMMING | VOLLEYBALL |
|---|---|---|---|---|
| BASKETBALL | COUNTRY | SOCCER | TENNIS | WRESTLING |
| CHEERLEADING | FOOTBALL | SOFTBALL | TRACK | BAND |

**MEDICAL DISQUALIFICATION OF THE STUDENT-ATHLETE / WITHHOLDING A STUDENT-ATHLETE FROM ACTIVITY**

The member school's team physician has the final responsibility to determine when a student-athlete is removed or withheld from participation due to an injury, an illness or pregnancy.  In addition, clearance for that individual to return to activity is solely the responsibility of the member school's team physician or that physician's designated representative.

I understand that participation may include, when necessary, early dismissal from classes and travel to participate in interscholastic athletic contests.  I will not hold the school authorities or West Virginia Secondary School Activities Commission responsible in case of accident or injury as a result of this participation.  I also understand that participation in any of those sports listed above may cause permanent disability or death.  Please check appropriate space: He/She has student accident insurance available through the school (   ); has football insurance coverage available through the school (   ); is insured to our satisfaction (   ).

I also give my consent and approval for the above named student to receive a physical examination, as required in Part IV, Physician's Certificate, of this form, by an approved health care provider as recommended by the named student's school administration.

I consent to WVSSAC's use of the herein named student's name, likeness, and athletically related information in reports of Inter-School Practices or Scrimmages and Contests, promotional literature of the Association, and other materials and releases related to interscholastic athletics.

**I have read/reviewed the concussion and Sudden Cardiac Arrest information as available through the school and at WVSSAC.org.  (Click Sports Medicine)**

Date: _____Student Signature_____Parent Signature_____

**JA0260**

**PART III – STUDENT'S MEDICAL HISTORY**
(To be completed by parent or guardian prior to examination)

Name _____ Birthdate _____/_____/_____ Grade _____ Age _____

Has the student ever had:

Yes No  1. Chronic or recurrent illness? (Diabetes, Asthma, Seizures, etc.,)
Yes No  2. Any hospitalizations?
Yes No  3. Any surgery (except tonsils)?
Yes No  4. Any injuries that prohibited your participation in sports?
Yes No  5. Dizziness or frequent headaches?
Yes No  6. Knee, ankle or neck injuries?
Yes No  7. Broken bone or dislocation?
Yes No  8. Heat exhaustion/sun stroke?
Yes No  9. Fainting or passing out?
Yes No 10. Have any allergies?
Yes No 11. Concussion? If Yes_____
                                          Date(s)

PLEASE EXPLAIN ANY "YES" ANSWERS OR ANY OTHER ADDITIONAL CONCERNS.

Yes No 12. Have any problems with heart/blood pressure?
Yes No 13. Has anyone in your family ever fainted during exercise?
Yes No 14. Take any medicine? List
_____
Yes No 15. Wear glasses ___, contact lenses___, dental appliances___?
Yes No 16. Have any organs missing (eye, kidney, testicle, etc.)?
Yes No 17. Has it been longer than 10 years since your last tetanus shot?
Yes No 18. Have you ever been told not to participate in any sport?
Yes No 19. Do you know of any reason this student should not participate in sports?
Yes No 20. Have a sudden death history in your family?
Yes No 21. Have a family history of heart attack before age 50?
Yes No 22. Develop coughing, wheezing, or unusual shortness of breath when you exercise?
Yes No 23. (Females Only) Do you have any problems with your menstrual periods.

I also give my consent for the physician in attendance and the appropriate medical staff to give treatment at any athletic event for any injury.

SIGNATURE OF PARENT OR GUARDIAN _____ DATE _____/_____/_____

**PART IV – VITAL SIGNS**

Height _____ Weight _____ Pulse _____ Blood Pressure _____

Visual acuity: Uncorrected _____/_____; Corrected _____/_____; Pupils equal diameter: Y  N

**PART V – SCREENING PHYSICAL EXAM**
This exam is not meant to replace a full physical examination done by your private physician.

| Mouth: | | | Respiratory: | | | Abdomen: | | |
|---|---|---|---|---|---|---|---|---|
| Appliances | Y | N | Symmetrical breath sounds | Y | N | Masses | Y | N |
| Missing/loose teeth | Y | N | Wheezes | Y | N | Organomegaly | Y | N |
| Caries needing treatment | Y | N | Cardiovascular: | | | Genitourinary (males only); | | |
| Enlarged lymph nodes | Y | N | Murmur | Y | N | Inguinal hernia | Y | N |
| Skin - infectious lesions | Y | N | Irregularities | Y | N | Bilaterally descended testicles | Y | N |
| Peripheral pulses equal | Y | N | Murmur with Valsalva | Y | N | | | |

Any "YES" under Cardiovascular requires a referral to family doctor or other appropriate healthcare provider.

Musculoskeletal: (note any abnormalities)

| Neck: | Y N | Elbow: | Y N | Knee/Hip: | Y N | Hamstrings: | Y N |
|---|---|---|---|---|---|---|---|
| Shoulder: | Y N | Wrist: | Y N | Ankle: | Y N | Scoliosis: | Y N |

RECOMMENDATIONS BASED ON ABOVE EVALUATION:

After my evaluation, I give my:

_____ Full Approval;

_____ Full approval; but needs further evaluation by Family Dentist ____; Eye Doctor ____; Family Physician _____; Other ____;

_____ Limited approval with the following restrictions: _____;

_____ Denial of approval for the following reasons: _____.

_____     _____/_____/_____

**MD/DO/DC/Advanced Registered Nurse Practitioner/Physician's Assistant**                    **Date**

# DON'T LET AN INJURY LEAD TO AN OPIOID ADDICTION

**2 MILLION ATHLETES ARE EXPECTED TO SUFFER A SPORTS INJURY THIS YEAR**

**MANY OF THESE ATHLETES WILL BE PRESCRIBED OPIOID PAINKILLERS**

**75% OF HIGH SCHOOL HEROIN USERS STARTED WITH PRESCRIPTION OPIOIDS**

## HIGH SCHOOL ATHLETES ARE AT RISK OF BECOMING ADDICTED TO PRESCRIPTION DRUGS

- 28.4% used medical opioids at least once over a three year period.

- 11% of high school athletes have used an opioid medication for nonmedical reasons.

- Nearly 25% of students who chronically use prescription opioids also use heroin.

••••••••••••••••••••••••••••••••••••••••••

## WHAT ARE OPIOIDS?

Opioids are a powerful and addictive type of prescription painkiller that have similar chemical properties and addiction risks as heroin. While opioids may provide temporary relief, they do nothing to address the underlying injury and can have serious side effects.

**These drugs may lead to: dependence, tolerance, accidental overdose, coma and death.**

The most common prescribed opioid painkillers in West Virginia are:

- Oxycodone (OxyContin)

- Hydrocodone (Lortab and Vicodin)

## HOW TO PROTECT YOUR CHILD

- Talk to your healthcare provider about alternative pain management treatment options (see below).

    First-time prescription opioid users have a 64% higher risk of early death than patients who use alternative pain medication.

- If your child is prescribed an opioid painkiller, talk about the dangers of misusing medication, including overuse and medication sharing.

- Monitor your child's intake of prescription medication to ensure he/she is following dosage instructions.

- Safely dispose of any unused medication through a prescription drug drop box or a DEA Take-Back program.

### NON-NARCOTIC PAIN MANAGEMENT ALTERNATIVES

Physical Therapy
Chiropractic
Massage Therapy
Acupuncture
Over-the-Counter Medication





**WEST VIRGINIA** ATTORNEY GENERAL'S OFFICE

West Virginia Board of Medicine



**A FACT SHEET FOR PARENTS**

## What is a concussion?

A concussion is a type of traumatic brain injury. Concussions are caused by a bump or blow to the head. Even a "ding," "getting your bell rung," or what seems to be a mild bump or blow to the head can be serious.

You can't see a concussion. Signs and symptoms of concussion can show up right after the injury or may not appear or be noticed until days or weeks after the injury. If your child reports any symptoms of concussion, or if you notice the symptoms yourself, seek medical attention right away.

## What are the signs and symptoms of a concussion?

If your child has experienced a bump or blow to the head during a game or practice, look for any of the following signs of concussion:

| SYMPTOMS REPORTED BY ATHLETE | SIGNS OBSERVED BY PARENTS/GUARDIANS |
|---|---|
| • Headache or "pressure" in head<br>• Nausea or vomiting<br>• Balance problems or dizziness<br>• Double or blurry vision<br>• Sensitivity to light<br>• Sensitivity to noise<br>• Feeling sluggish, hazy, foggy, or groggy<br>• Concentration or memory problems<br>• Confusion<br>• Just "not feeling right" or "feeling down" | • Appears dazed or stunned<br>• Is confused about assignment or position<br>• Forgets an instruction<br>• Is unsure of game, score, or opponent<br>• Moves clumsily<br>• Answers questions slowly<br>• Loses consciousness (even briefly)<br>• Shows mood, behavior, or personality changes |

## How can you help your child prevent a concussion or other serious brain injury?

• Ensure that they follow their coach's rules for safety and the rules of the sport.
• Encourage them to practice good sportsmanship at all times.
• Make sure they wear the right protective equipment for their activity. Protective equipment should fit properly and be well maintained.
• Wearing a helmet is a must to reduce the risk of a serious brain injury or skull fracture.
  – However, helmets are not designed to prevent concussions. There is no "concussion-proof" helmet. So, even with a helmet, it is important for kids and teens to avoid hits to the head.

## What should you do if you think your child has a concussion?

SEEK MEDICAL ATTENTION RIGHT AWAY. A health care professional will be able to decide how serious the concussion is and when it is safe for your child to return to regular activities, including sports.

KEEP YOUR CHILD OUT OF PLAY. Concussions take time to heal. Don't let your child return to play the day of the injury and until a health care professional says it's OK. Children who return to play too soon—while the brain is still healing—risk a greater chance of having a repeat concussion. Repeat or later concussions can be very serious. They can cause permanent brain damage, affecting your child for a lifetime.

TELL YOUR CHILD'S COACH ABOUT ANY PREVIOUS CONCUSSION. Coaches should know if your child had a previous concussion. Your child's coach may not know about a concussion your child received in another sport or activity unless you tell the coach.

> **If you think your teen has a concussion:**
> Don't assess it yourself. Take him/her out of play. Seek the advice of a health care professional.

## It's better to miss one game than the whole season.

For more information, visit www.cdc.gov/Concussion.

April 2015





**SUDDEN CARDIAC ARREST AWARENESS**

## What is Sudden Cardiac Arrest?

- Occurs suddenly and often without warning.
- An electrical malfunction (short-circuit) causes the bottom chambers of the heart (ventricles) to beat dangerously fast (ventricular tachycardia or fibrillation) and disrupts the pumping ability of the heart.
- The heart cannot pump blood to the brain, lungs and other organs of the body.
- The person loses consciousness (passes out) and has no pulse.
- Death occurs within minutes if not treated immediately.

## What are the symptoms/warning signs of Sudden Cardiac Arrest?

- SCA should be suspected in any athlete who has collapsed and is unresponsive
- Fainting, a seizure, or convulsions during physical activity
- Dizziness or lightheadedness during physical activity
- Unusual fatigue/weakness
- Chest pain
- Shortness of breath
- Nausea/vomiting
- Palpitations (heart is beating unusually fast or skipping beats)
- Family history of sudden cardiac arrest at age <50

**ANY of these symptoms/warning signs may necessitate further evaluation from your physician before returning to practice or a game.**

## What causes Sudden Cardiac Arrest?

- Conditions present at birth (inherited and non-inherited heart abnormalities)
- A blow to the chest (Commotio Cordis)
- An infection/inflammation of the heart, usually caused by a virus. (Myocarditis)
- Recreational/Performance-Enhancing drug use.
- Other cardiac & medical conditions / Unknown causes.  (Obesity/Idiopathic)

## What are ways to screen for Sudden Cardiac Arrest?

- The American Heart Association recommends a pre-participation history and physical which is mandatory annually in West Virginia.
- Always answer the heart history questions on the student Health History section of the WVSSAC Physical Form completely and honestly.
- Additional screening may be necessary at the recommendation of a physician.

## What is the treatment for Sudden Cardiac Arrest?

- Act immediately; time is critical to increase survival rate
- Activate emergency action plan
- Call 911
- Begin CPR
- Use Automated External Defibrillator (AED)

## Where can one find additional information?

- Contact your primary health care provider
- American Heart Association (www.heart.org)

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

August 31, 2020

*Sent via email only to:*

*MIZEL001@hartford.gov*
Lori Mizerak
Assistant Corporation Counsel
City of Hartford
550 Main Street, Room 210
Hartford, Connecticut 06103
Attorney for Hartford Public Schools

*dmonastersky@HL-Law.com*
David S. Monastersky, Esq.
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, Connecticut 06114
Attorney for Glastonbury Public Schools
   and Canton Public Schools

*pjmurphy@goodwin.com* &
*lyoder@goodwin.com*
Peter J. Murphy, Esq.
Linda L. Yoder, Esq.
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Attorneys for Connecticut Interscholastic Athletic Conference
   and Danbury Public Schools

*jzelman@fordharrison.com*
Johanna Zelman, Esq.
Ford Harrison
CityPlace II
185 Asylum Street, Suite 610
Hartford, Connecticut 06103
Attorney for Bloomfield Public Schools
   and Cromwell Public Schools

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA0265

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 2 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Re:  Case No. 01-19-4025
<u>Connecticut Interscholastic Athletic Conference</u>

Case No. 01-19-1252
<u>Glastonbury Public Schools</u>

Case No. 01-20-1003
<u>Bloomfield Public Schools</u>

Case No. 01-20-1004
<u>Canton Public Schools</u>

Case No. 01-20-1005
<u>Cromwell Public Schools</u>

Case No. 01-20-1006
<u>Danbury Public Schools</u>

Case No. 01-20-1007
<u>Hartford Public Schools</u>

Dear Attorneys Mizerak, Monastersky, Murphy, Yoder, and Zelman:

The U.S. Department of Education, Office for Civil Rights (OCR) issues this Revised Letter of Impending Enforcement Action[1] in the above-referenced cases.  The earlier Letter of Impending Enforcement Action, dated May 15, 2020, has been updated in light of the Supreme Court's holding in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020).

The Complainant filed complaints against the Connecticut Interscholastic Athletic Conference (CIAC) and the Glastonbury Board of Education (Glastonbury) on behalf of three high school student-athletes and their parents.  The Complainant alleged that the CIAC's policy permitting certain biologically male student-athletes to participate in interscholastic athletics (Article IX, Section B of the CIAC By-Laws, adopted May 9, 2013, and titled, "Transgender Participation" (hereinafter referred to as the Revised Transgender Participation Policy)) discriminated against female student-athletes competing in interscholastic girls' track in the state of Connecticut on the basis of their sex.[2]  Specifically, the Complainant alleged that the Revised Transgender Participation Policy denied girls opportunities to compete, including in state and regional meets, and to receive public recognition critical to college recruiting and scholarship opportunities.  The

---

[1] Section 305 of OCR's *Case Processing Manual* states as follows: "When following the expiration of the 10 calendar day period referenced in CPM subsection 303(g) . . . the recipient does not enter into a resolution agreement to resolve the identified areas of non-compliance, OCR will prepare a Letter of Impending Enforcement Action."

[2] For the purposes of this letter, the terms "male" and "female" are defined by biological sex.  *See Mem. from U.S. Attorney General to U.S. Attorneys Heads of Department Components* (Oct. 4, 2017), available at https://www.justice.gov/ag/page/file/1006981/download; *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020) (leaving undisturbed the government's position, and noting that the Court proceeded "on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female.").

Case 2:21-cv-00316 — Document 62-17 — ARCHIVED AND NOT FOR RELEASE Page 4 of 50 PageID #: 833

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 3 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Complainant further alleged that implementation of the Revised Transgender Participation Policy by Glastonbury, the school attended by one of the complainant student-athletes (Student 1), denied opportunities to girls competing in interscholastic girls' track on the basis of their sex. In addition, the Complainant alleged that the CIAC retaliated against one of the complainant parents (Parent 1), after Parent 1 complained about the Revised Transgender Participation Policy; and that a Glastonbury track coach retaliated against Student 1 for her and her parent's (Parent 2's) advocacy against the Revised Transgender Participation Policy.

Pursuant to OCR's *Case Processing Manual* (the *Manual*),[3] Section 103, OCR also opened an investigation of Bloomfield Public Schools (Bloomfield) and Hartford Public Schools (Hartford), based on allegations that these school districts allowed a biologically male student-athlete (Student A) to participate on their girls' track teams. OCR also opened an investigation of Cromwell Public Schools (Cromwell), based on allegations that this school district allowed a biologically male student-athlete (Student B) to participate on its girls' track team. Additionally, OCR opened an investigation of Canton Public Schools (Canton) and Danbury Public Schools (Danbury), the school districts attended by the other two complainant student-athletes (Students 2 and 3, respectively), following a determination that these school districts may have been involved in alleged acts of discrimination related to the complaints filed against the CIAC and Glastonbury. OCR investigated whether these school districts denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track through implementation of the Revised Transgender Participation Policy, or limited the eligibility or participation of any female student-athletes competing in interscholastic girls' track through implementation of the Revised Transgender Participation Policy.

## Summary of Findings

As detailed below, the actions of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury resulted in the loss of athletic benefits and opportunities for female student-athletes. One complainant student-athlete explained to OCR that no matter how hard she trained, she felt that she could never be good enough to defeat Students A and B. She also stated that female student-athletes were missing out on great opportunities to succeed and felt that female student-athletes could be "completely eradicated from their own sports." Another complainant student-athlete explained to OCR that she felt that she could not fairly compete against Students A and B, because they had a physical advantage over her. In this sense, they were denied the opportunities that Connecticut male student-athletes had of being able to compete, on a level playing field, for the benefits that flow from success in competitive athletics. OCR determined that the participation of Students A and B in girls' track events resulted in lost benefits and opportunities for female student-athletes.

OCR determined that the CIAC, by permitting the participation of certain male student-athletes in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied female student-athletes athletic benefits and opportunities, including advancing to the finals in events, higher level competitions, awards, medals, recognition, and the possibility of greater visibility to colleges and other benefits. Accordingly, OCR determined that

---

[3] https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

Case 2:21-cv-00316 ARCHIVED AND NOT FOR RELIANCE Page 5 of 50 PageID #: 834

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 4 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the CIAC denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX of the Education Amendments of 1972 (Title IX), at 34 C.F.R. § 106.41(a).

OCR determined that the participation of Glastonbury, Canton, and Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Students 1, 2, and 3, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Even though Glastonbury, Canton, and Danbury purported to operate separate teams for members of each sex, Glastonbury, Canton, and Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student-athletes were denied the opportunity to compete in events that were exclusively female, whereas male student-athletes were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Glastonbury's, Canton's, and Danbury's obligations to comply with the regulation implementing Title IX are not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

Student A participated in girls' outdoor track during school year 2017-2018 on the Bulkeley (Hartford) team; and participated in girls' indoor and outdoor track during school year 2018-2019 on Bloomfield's team. OCR determined that the participation of Hartford and Bloomfield in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Student B participated in girls' indoor and outdoor track during school years 2017-2018 and 2018-2019 on Cromwell's team. OCR determined that the participation of Cromwell in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student B's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Hartford's, Bloomfield's, and Cromwell's obligations to comply with the regulation implementing Title IX are not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

For the aforementioned reasons, OCR also determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury treated student-athletes differently based on sex, by denying benefits and opportunities to female students that were available to male students.

With respect to the retaliation allegation filed against the CIAC, there was insufficient evidence to substantiate the Complainant's allegation that the CIAC retaliated against Parent 1 after Parent 1 complained about the Revised Transgender Participation Policy. With respect to the retaliation

Case 2:21-cv-00316 - Document No. 126-2-7-21 - Page 6 of 50 PageID #: 835
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 5 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

allegation filed against Glastonbury, there was insufficient evidence to substantiate the Complainant's allegation that Glastonbury retaliated against Student 1.

Nothing in this letter should be interpreted to impute misconduct on the part of any biologically male students who participated in these competitions.

**Investigation and Issuance of Letter of Impending Enforcement Action**

During the course of the investigation, OCR interviewed the Executive Director of the CIAC; administrators and staff from Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury; and the students and parents on whose behalf the complaint was filed. In addition, OCR reviewed documentation that the Complainant, the CIAC, the school districts, and some of the students and parents submitted. OCR also reviewed publicly available information regarding the CIAC and its member school student-athletes.

At the conclusion of the investigations, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of its findings and determinations that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury had discriminated against female student-athletes. OCR requested that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury enter into resolution agreements to remedy the violations. Because the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury did not enter into resolution agreements, OCR issued letters of impasse to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury on March 17, 2020, in which it advised the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that it would issue this letter if each did not reach an agreement with OCR within 10 calendar days of the date of its impasse letter.[4] OCR issues this Letter of Impending Enforcement Action because the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury have to date failed to voluntarily enter into resolution agreements to remedy the identified violations.

**Jurisdiction**

OCR is responsible for enforcing Title IX, as amended, 20 U.S.C. § 1681 et seq., and its implementing regulations at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in education programs and activities receiving financial assistance from the U.S. Department of Education (the Department).

OCR has jurisdiction over the CIAC as follows:

    a) The CIAC is a direct recipient of Federal funding from the Department through a grant awarded by the Department's Office of Special Education Programs (OSEP) to support the Special Olympics Unified Champion Schools program administered by the CIAC.

---

[4] In emails dated March 27, 2020, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in view of their COVID-19-related duties and responsibilities, OCR was extending the 10-calendar-day deadline to respond to OCR's proposed resolution agreement for a period of 30 days, to April 27, 2020.

ARCHIVED AND NOT FOR RELIANCE
Case 2:21-cv-00316 - Document A2 - Filed 06/23/21 - Page 7 of 50 PageID #: 836
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 6 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

    b) The CIAC is also an indirect recipient of Federal funding. The CIAC is governed by member school representatives who devote official time and district resources to the CIAC (e.g., determine athletic eligibility, make rules for athletic competitions, run state boys' and girls' tournaments, and control state championships). In addition, the CIAC receives revenue through the sale of tickets to tournament contests—revenue that would otherwise go to the schools—and by the assessment of entry fees on schools for participation in various tournaments. The CIAC is also an indirect recipient of Departmental financial assistance through Special Olympics of Connecticut (which receives grant money from OSEP) because several employees of Special Olympics of Connecticut provide to the CIAC technical assistance in the administration of the Special Olympics Unified Champion Schools program.

    c) The CIAC's member schools also have ceded controlling authority over Connecticut's high school athletic program to the CIAC, whose purpose is to supervise, direct, and control interscholastic athletics in Connecticut. In addition to the CIAC's governance by local school representatives (noted above), the Connecticut General Assembly's Office of Legislative Research stated that school districts have the power to organize athletic programs and decide in what sports to compete, adding, "Boards have delegated authority over the organization of interscholastic high school athletics to [the CIAC]. CIAC regulates high school sports, promulgates eligibility and safety and health rules for teams, and organizes and controls games and championships."

OCR has jurisdictional authority under Title IX to investigate Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, because each is a recipient of financial assistance from the Department.

## I.    ATHLETIC BENEFITS AND OPPORTUNITIES

**Findings of Fact**

### *The CIAC's Organizational Structure*

The CIAC is the only association governing interscholastic athletic programs for secondary schools in Connecticut.[5] The CIAC is a division of the Connecticut Association of Schools (CAS). Any public or parochial school accredited by the Connecticut State Department of Education, as well as any private school or academy, and any private school holding associate institutional membership in the CAS can become a member of the CIAC. The CIAC currently has 188 member schools. Member schools sign an annual Membership Agreement, pay annual dues, and agree to abide by the CAS Constitution and the CIAC By-Laws and Eligibility Rules. During school year 2018-2019, the CIAC authorized its member schools to participate in 14 boys' sports and 13 girls' sports. The CIAC By-Laws allow female athletes to participate on boys' teams, but do not permit

---

[5] *See* CIAC Handbook 2019-2020, Section 2.2 ("The CIAC is the only Association which governs interscholastic athletic programs for secondary schools in Connecticut.").

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 7 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

male athletes to participate on girls' teams.  The CIAC administers its athletics programs by way of the CAS Constitution, by-laws, and tournament regulations.[6]

The CIAC has 27 committees corresponding to each of the CIAC-sanctioned sports.  Each committee includes representatives from member schools, including principals, coaches, and athletic directors, as well as former coaches.  These committees coordinate the activities of the sports, including game rules, playing conditions, tournament policies, and sportsmanship initiatives.  The by-laws, along with the CAS constitution, are published every year as part of the CIAC Handbook, which is available on the CIAC website.[7]  The Handbook includes detailed rules and regulations governing athletic administration, scheduling, and eligibility, among other topics.  The CAS Legislative Body is authorized to make changes to the CAS Constitution and the by-laws.  The principals of the CIAC member schools are the voting delegates to the Legislative Body.  The CAS Constitution states that any voting member school may submit a proposed change to the by-laws/regulations through its representative.  The CIAC Board of Control is the governing body for high school interscholastic sports in Connecticut and has 14 voting and 3 non-voting members; the Board of Control has representatives from large, medium, and small schools, urban and rural schools, as well as public, parochial, and technical schools.[8]  The by-laws require that the Board of Control consider any proposed change to a by-law/regulation, act upon it, and submit any proposed by-law/regulation change to member schools for a vote at the annual meeting of the Legislative Body.  The by-laws, including the rules, regulations, and policies contained therein, as well as the tournament regulations are binding on its member schools,[9] and the CIAC has the authority to penalize schools for violation of the by-laws.[10]

During interviews, district staff members confirmed that the districts regarded the by-laws, rules, and regulations, including the Revised Transgender Participation Policy, as binding.  The witnesses further stated that they regarded the CIAC as the only athletic association in Connecticut

---

[6] The by-laws constitute the general rules and policies for athletic administration and participation in the CIAC.  Specific policies, such as the Revised Transgender Participation Policy, are contained within the by-laws.  Further policies regarding sport-specific tournament participation ("tournament regulations") are published each season in a sports information packet.

[7] http://www.casciac.org/pdfs/ciachandbook_1920.pdf (site last visited on April 24, 2020).

[8] The CIAC Board of Control is elected each year by the Legislative Body at the Annual Meeting of the CAS.  The CIAC Board of Control meets monthly during the school year.

[9] *See* the CIAC Handbook 2019-2020, Section 2.4 ("Each member school has the responsibility of knowing and adhering to all CIAC rules and regulations and administering its athletic programs according to those rules.").

[10] *See* the CIAC Handbook 2019-2020, Section 3.0, CIAC By-Laws, Article III, Section C ("The Board of Control shall have the power to assess and to enforce such penalties, including fines, against member schools, principals, athletic directors, coaches and/or members of the coaching staff, as it deems suitable for violations of its Bylaws, Regulations, Rules, Standards of Courtesy, Fair Play and Sportsmanship, Code of Ethics, or any other standard of conduct or any other provision of this Handbook.").  Witnesses OCR interviewed, including the CIAC Executive Director and administrators of member schools, stated that, in general, member schools are responsible for ensuring their own compliance with the CIAC's rules and for self-reporting any violations of those rules.  Member schools can also report other schools for potential violations.  The CIAC Executive Director informed OCR that, to date, no member school has self-reported or reported another member school for a violation of the Revised Transgender Participation Policy.

Case 2:21-cv-00316    Document    Filed    Page 9 of 50 PageID #: 838
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 8 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

that could provide sufficient competitive opportunities for their students.[11]  Witnesses told OCR that if their schools were to withdraw from the CIAC, they likely would encounter difficulties scheduling games against other schools and would be unable to participate in statewide competitions.  An Athletic Director for one of the Districts advised OCR that a CIAC member school would not benefit from playing against a nonmember school because it would not add to the school's record for purposes of qualifying for the state championship.  The same Athletic Director also stated that having a state-wide association makes all of the athletics programs stronger and more consistent with set rules for play and eligibility.

*The CIAC's Adoption of its Revised Transgender Participation Policy*

The CIAC stated that its Board of Control began discussions regarding transgender participation in athletics during school year 2007-2008.  During its 56th Annual Meeting, held on May 8, 2008, the CIAC membership adopted a by-law change concerning the eligibility of transgender athletes, adding new language to Article IX of the CIAC by-laws (the 2008 policy).  Specifically, the 2008 policy allowed transgender student-athlete participation only in accordance with the gender stated on the student's birth certificate unless the student had undergone "sex reassignment."[12]  The 2008 policy set forth specific requirements for post-pubescent sex reassignment, including surgery; legal recognition of the reassignment by proper governmental authorities; hormonal therapy; and a two-year waiting period post-surgical and anatomical changes.[13]  The 2008 policy also provided that a student-athlete seeking participation as a result of a sex reassignment would be able to appeal eligibility determinations through the CIAC's eligibility appeal process.  The stated rationale for the 2008 policy was that "[w]hile the eligibility of transgendered students has not yet been a 'live' issue in Connecticut, the CIAC Board felt that it should be pro-active and have a policy in place for any future eventualities."[14]  The 2008 policy remained in effect until 2013.  The CIAC advised OCR that, during that time period, the CIAC did not receive any requests for a student-athlete to participate on a team that was different from the student's "assigned gender at birth."

The CIAC stated that in 2012, after the Connecticut Legislature passed Public Act 11-55, expanding the scope of Connecticut's anti-discrimination laws to prohibit discrimination on the basis of "gender identity or expression,"[15] the CIAC decided to review and revise the 2008 policy.

---

[11] The CIAC Executive Director stated that there are private schools within Connecticut, such as Taft, Choate, and Kent, that do not belong to the CIAC. These schools belong to the Founders League, whose website describes the league as comprising "highly selective college preparatory schools."  The Founders League includes ten schools from Connecticut and one school from New York.  The Founders League holds its Championship in 13 boys' sports and 12 girls' sports separately, and the CIAC precludes any Founders League schools from competing in any post-season events hosted by the CIAC.  Witnesses opined that they did not know if the Founders League was a feasible alternative for a public school in lieu of becoming a member of the CIAC.

[12] https://www.casciac.org/pdfs/ciachandbook_1213.pdf (site last visited on April 24, 2020)

[13] Under the 2008 policy, a student-athlete who had undergone sex reassignment before puberty was not subject to the requirements detailed above.

[14] The CIAC Annual Meeting minutes. https://www.casciac.org/pdfs/adopted_bylaw_changes_CIAC.pdf (site last visited on April 24, 2020).

[15] P.A. 11-55, which became effective on October 1, 2011, defines "gender identity or expression" as follows:

Case 2:21-cv-00316   Document 74-2   ARCHIVED AND NOT FOR RELIANCE   Page 10 of 50 PageID #: 839

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 9 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The CIAC did so at its Annual Meeting, held on May 9, 2013, when the current Revised Transgender Participation Policy was enacted.  This Policy states, in relevant part:

> [T]his policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates. . . . Therefore, for purposes of sports participation, the CIAC shall defer to the determination of the student and his or her local school regarding gender identification.  In this regard, the school district shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season.  Accordingly, when a school district submits a roster to the CIAC it is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics. . . .  The CIAC has concluded that [these] criteria [are] sufficient to preclude the likelihood that a student will claim a particular gender identity for the purpose of gaining a perceived advantage in athletic competition.[16]

_____

"Gender identity or expression" means a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth, which gender-related identity can be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held, part of a person's core identity or not being asserted for an improper purpose.

_See_ Conn. Gen. Stat. § 46a-51. Specifically, with respect to the public schools, P.A. 11-55 amended § 10-15c of the Connecticut General Statutes to prohibit discrimination on the basis of gender identity or expression, among other bases.  The legislative history of P.A. 11-55 indicates that the topic of athletics was briefly raised during the Connecticut House proceedings on May 19, 2011, in a discussion between Rep. Fox (the bill's proponent) and Rep. Shaban.  In response to Rep. Shaban's question concerning whether, under the bill, a high school boy who wanted to play on the school's girls' basketball team could not be prohibited from doing so, Rep. Fox indicated that he believed, but was not certain, that in that context the intent of the bill was to apply only to a male athlete who had undertaken what Rep. Shaban had described as "affirmative physical changes." Conn. Gen. Assembly House Proceedings 2011, Vol. 54, Part 12 (May 19, 2011) at 4017-4022.

[16] The CIAC informed OCR that the Revised Transgender Participation Policy has been in effect since its adoption on May 9, 2013. The CIAC stated to OCR that the policy contained in the revised by-law no longer required student-athletes to undergo medical treatment or sex reassignment surgery in order to participate in athletics consistent with their gender identity, nor would a student-athlete be required to seek permission from the CIAC in order to participate under the policy in accordance with the student's gender identity; rather, the policy required member schools to submit rosters that reflected the gender identities of their students.  The CIAC further stated that this decision was based on "a determination that a member school is in the best position to identify and confirm that a student-athlete's gender is consistent with the student's gender identity at school and to place the student on the correct team roster." Accordingly, the Board of Control determined that students would not be required to disclose their transgender status to the CIAC.

Case 2:21-cv-00316   Document 63-1   Filed 05/24/21   Page 11 of 50 PageID #: 840
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 10 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Thus, the Revised Transgender Participation Policy eliminated any requirement that transgender student-athletes provide any medical information or documentation to the CIAC or its member schools.

The Connecticut State Department of Education (CSDE) issued a document entitled, "Guidance on Civil Rights Protections and Supports for Transgender Students – Frequently Asked Questions," dated September 2017 (the 2017 FAQs).[17]  The 2017 FAQs state, in relevant part:

> For issues concerning participation in interscholastic competitive sports, schools and districts should consult their counsel and the Connecticut Interscholastic Athletic Association ("CIAC").[18]

On October 11, 2018, the CAS Board of Directors requested that an ad hoc committee examine all the CIAC rules and regulations that relate to gender.  The meeting minutes of the CIAC stated that the purpose of the review was to ensure that the regulations were in alignment state law.[19]  The CIAC established a Gender By-Law Subcommittee in December 2018 to review all of the by-laws relating to gender in order to confirm the current policies and practices or make recommendations for improvements.  In its report to the CIAC Board of Control, dated April 4, 2019, the Subcommittee concluded that the by-laws reviewed were "in alignment with Connecticut law and the CAS-CIAC mission."[20]

### _The CIAC's and School Districts' Implementation of the Revised Transgender Participation Policy_

School district witnesses interviewed stated that none of the districts had a specific written procedure or practice in place to implement the Revised Transgender Participation Policy, but that they followed or would follow the plain language of the policy.  Districts that had not had a transgender student request to participate in athletics stated that should they receive a request from a transgender student to participate in athletics, they would look at the gender identity listed in the student's current school records and then whether the gender identity the student is expressing during the day is consistent with the gender identity listed in the student's school records; e.g., whether the student has requested to use a name and pronouns consistent with that sex.  Witnesses stated that often this process would involve the student's parents, particularly if the student were

---

[17] https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance_faq.pdf?la=en (site last visited on April 24, 2020).  This guidance indicates that the CIAC is responsible for establishing statewide policies for transgender participation in interscholastic competitive sports.

[18] 2017 FAQs, p. 7.  _See_ https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance_faq.pdf?la=en (site last visited on April 24, 2020).

[19] https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance.pdf?la=en (site last visited on April 24, 2020).

[20] The CAS mission statement is as follows: "The Connecticut Association of Schools provides exemplary programs and services that promote excellence in the education of all children."  The CIAC mission statement is as follows: "The CIAC believes that interscholastic athletic programs and competition are an integral part of a student's academic, social, emotional and physical development. The CIAC promotes the academic mission of schools and honorable competition. As such, the CIAC serves as the regulatory agency for high school interscholastic athletic programs and exists to assure quality experiences that reflect high ethical standards and expectations for fairness, equity and sportsmanship for all student-athletes and coaches. The CIAC provides leadership and support for member schools through the voluntary services of dedicated school administrators, athletic directors, coaches and consultants."

Case 2:21-cv-00316    Document 4-12    ARCHIVED AND NOT FOR RELIANCE    Page 12 of 50 PageID #: 841
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

a minor and school records needed to be changed; but that once the student had established his or her gender identity, the school would place the student on the roster of the team associated with that gender. Witnesses from districts that have had transgender students request to participate in athletics detailed a similar internal process; namely, that upon a request from a transgender student, they would review the student's records, speak with the student's teachers/counselors, meet with the student's parents, and if all was consistent, thereafter, place the student on the team roster associated with the student's gender identity.

Every district confirmed to OCR that it believed that no specific documentation, medical or otherwise, was required in order for the district to comply with the policy. District administrators reported that they had not received specific training regarding implementation of the Revised Transgender Participation Policy, although some stated that they had attended workshops or presentations on the topic of transgender athletes generally. Principals and athletics directors interviewed by OCR indicated that transgender student-athlete participation had been discussed either formally or informally at annual professional development conferences, as well as during professional association meetings, and through their respective regional conferences. Witnesses from the districts stated, and the CIAC confirmed to OCR, that the CIAC has not questioned any decisions made by a member school under the policy, nor has it investigated any rosters submitted by member schools with respect to the policy. Glastonbury noted that, in the past, when it had a transgender student wish to participate in athletics, the student's parent offered to provide medical documentation to support their request under the Revised Transgender Policy; however, the CIAC advised Glastonbury that the information was not required.

Additionally, multiple district witnesses stated to OCR that, according to their understanding of the Revised Transgender Participation Policy, it is not the school's or district's role to determine a student's gender. Witnesses from Bloomfield, Danbury, Glastonbury, and Hartford stated that the student initiates the process and informs the district of the student's gender identity; and the district's role is to review the current school records, speak with school staff regarding the student's current gender expression during the school day, and then place the student on the appropriate roster. Witnesses from Bloomfield and Cromwell also stated that if a student were to initially register with the school under a gender identity that differed from the student's biological sex, the school would place the student on the roster of the gender identified in the school registration records; i.e., the district and student would not need to have a discussion or review the student's participation under the Revised Transgender Participation Policy. Both Cromwell and Bloomfield have used this process in their districts.

### _Concerns Raised by Parents and Others to the CIAC Regarding the Policy and the Participation of Biologically Male Students in Track Events_

In 2019, the CIAC received several emails from parents of Connecticut high school students, in which the parents expressed concerns about the policy and specifically about the participation in female track events of biologically male students.

From January 2019 to March 2019, the CIAC received four emails from the father of a female student-athlete at Glastonbury High School (Parent 3). On January 29, 2019, Parent 3 sent an email to the CIAC stating that he and many parents of other female track athletes, as well many of

Case: 2:21-cv-00316    Document 49-2    Filed: 03/27/2023    Page 13 of 50 PageID #: 842

ARCHIVED AND NOT FOR RELIANCE

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 12 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the athletes themselves, believed that the policy was unfair to female track athletes[21] and that the policy raised safety concerns as well, particularly with respect to sports involving physical contact.[22]  With respect to track, he suggested that a compromise could be reached whereby a boy identifying as a girl would be able to compete but would not have the results used for purposes of conference or state records or for all-conference or all-state selection.  Parent 3 requested a meeting with the CIAC officials to discuss the topic.[23]

On February 17, 2019, Parent 3 sent an email to the CIAC stating that the transgender policy affected the outcome of the CIAC State Open Girls Indoor Track Championship held on February 16, 2019.  Specifically, he stated that the performance of a transgender athlete "with all the physiological and anatomical attributes of a male athlete" in the Championship had enabled Bloomfield High School to win the team championship over Glastonbury.  Parent 3 again urged the CIAC to change the policy.  On February 25, 2019, the Executive Director of the CIAC responded to Parent 3, stating that Parent 3's correspondence would be provided to a CIAC subcommittee reviewing the policy.

On March 3, 2019, Parent 3 sent an email to the CIAC again urging the CIAC to change the policy. He further stated that at the New England Regional Indoor Track Championship, held on March 2, 2019, a biologically male athlete finished first in the 55-meter and 300-meter sprints and had helped Bloomfield win first place over Glastonbury in the girls' 4 x 400 meter relay.  On March 10, 2019, Parent 3 sent an email to the CIAC stating that the National Scholastic Athletic Foundation, an organization that hosts the New Balance National high school track and field competition, had established a policy whereby female transgender athletes are required to meet applicable rules established by the National Scholastic Athletics Foundation, USA Track & Field, and International Olympic Committee, which required such athletes to demonstrate that they had undergone hormone treatment.  Parent 3 stated that when Bloomfield's girls' 4 x 400 team recently competed in the New Balance Nationals, it did so without the participation of its biologically male athlete, and that this resulted in a slower time than Bloomfield's team had achieved at the New England championships, when the biologically male athlete had competed.

From February 2019 to March 2019, the CIAC received three emails from a parent (Parent 4).  On February 25, 2019, Parent 4 sent an email to the CIAC expressing concerns about the fairness of the policy.[24]  He stated "the current unfair competitive balance at the State Open has cost 7

---

[21] In part, Parent 3 stated as follows: "Should a boy who identifies as a girl with all of the physiological and anatomical advantages of a boy be able to compete in Connecticut Girls Indoor Track, obtain medals over other girls who have trained hard and care deeply about the results, eradicate existing girls event and state track records and push what would have been the final girl qualifier out of selection for All-Conference and All-State honors?"

[22] In part, Parent 3 stated as follows: "Should safety be compromised in girls high school track or other girls sports such as basketball, soccer or lacrosse to accommodate a boy who identifies as a girl with all of the physiological and anatomical advantages of a boy?"

[23] In addition, Parent 3 attached a copy of an email dated January 27, 2019, that he had sent to officials from the Glastonbury District. In this email, Parent 3 expressed his concerns about the policy's fairness and safety, and he described several recent track meets in which a transgender athlete had finished ahead of other athletes.  Parent 3 asked the Glastonbury officials to make efforts to have the policy changed.

[24] Specifically, he stated that "there are many, myself included, who cannot begin to fathom the policy of the CIAC that has allowed the competitive record of Connecticut Girls High School Track and Field Competitions to be altered

ARCHIVED AND NOT FOR RELIANCE
Case 2:21-cv-00316   Document 54-2   Filed 10/21/21   Page 14 of 50 PageID #: 843
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Connecticut student/athletes the opportunity to compete at the New England Championship" and "[t]his results in a significant negative impact to these cisgender girls through no fault of their own." He also stated the policy unfairly denied these elite athletes an opportunity to gain additional exposure with college coaches and recruiters. In addition, he stated that "[a]t the heart of the competitive fairness issue regarding competition between transgender girls and cisgender girls is the abundance of testosterone present in young biological males."

Further, Parent 4 stated that the CIAC maintains different qualifying standards for girls' and boys' track, which he contended was an acknowledgment that there was a measurable difference in the performance capabilities between genders. He requested that the CIAC adjust the results of the 2019 State Girls Open Competition so as not to include the results of the transgender athletes, and he requested that the policy be changed going forward. He offered several suggestions for a new policy (e.g., establishing a new competitive category for transgender athletes).

The Executive Director of the CIAC responded the same day, stating that Parent 4's correspondence would be shared with the subcommittee reviewing the Revised Transgender Participation Policy. On March 1, 2019, Parent 4 sent an email to the CIAC, stating that he would like to arrange a meeting with the members of the subcommittee reviewing the policy. On March 5, 2019, Parent 4 sent an email to the CIAC stating that, during the New England Indoor Regional Championships on March 2, 2019, spectators from other states had expressed "surprise and concern" that Connecticut permitted transgender athletes to participate.

On June 20, 2019, the CIAC received an email from the mother of a rising female high school student in Connecticut (Parent 5). Parent 5 expressed her concern that the policy was unfair to female athletes because it would allow "genetic males (no matter how they identify themselves) to usurp genetically female athletes in competition."

In a letter to the CIAC, dated April 11, 2017, a head track coach at a Connecticut high school stated that Student B was at a great advantage unless or until the student began taking hormone blockers. He also referred to average high school testosterone levels according to the Mayo Clinic. He then argued that Student B had gender characteristics that females cannot compete with, and that Student B was taking advantage of the CIAC's policies and rules. He requested that the CIAC find a solution that allowed Students A and B to compete but also protected female athletes.

*The CIAC's Rules for Girls' Indoor and Outdoor Track Competition*

The CIAC is organized into various boards and committees, including one committee for each CIAC-sanctioned sport. Each year, the CIAC committee for the respective sport publishes a "Sports Packet/Information Sheet" for the season. The Sports Packet/Information Sheets for girls' indoor and outdoor track set forth, among other things, the procedures for entering student-athletes

---

by the tabulation and classification of results that include transgender athletes that has now spread its impact to not only athletes that have competed directly in these events, but now also their teammates, especially 75 members of the Glastonbury Girls Indoor Track Team, when team records and scoring are impacted."

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 14 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

in events; how many events a student-athlete may participate in;[25] submitting qualifying performances; entrance fees; rules regarding electronic devices; protest procedures; scrimmages; and, regular season score reporting.

The CIAC sets the rules for athletic eligibility and competition across the state. Each sport is divided into divisions/classes, based on the size of the school. The CIAC sports committees determine the tournament or championship class divisions for each sport based on the grade 9-12 enrollments of each school as of October 1 of the past school year. A school can have different classes for each of its sports, and a school's class/division can change depending on the year. The Sports Packet/Information Sheet for each sport sets forth the class/divisions for the current year. For example, during school year 2018-2019, for girls' indoor track, the CIAC had the following classes, from smallest school enrollment to largest: Class S, Class M, Class L, and Class LL. For girls' outdoor track, the CIAC had the following classes: Class S, Class M, Class MM, Class L, and Class LL.

There are eleven conferences/leagues[26] that are based mostly on geographic location, which can include schools from the different CIAC classes. The CIAC does not set regular season competitive schedules; these are set by the individual member schools, individually or through conferences/leagues.[27] However, the CIAC does mandate certain "season limitations," including when the opening day of practice occurs, the minimum number of required practice days prior to the first contest, the maximum number of games or meets played per week, and the maximum number of contests scheduled per season.[28]

For post-season competition, if they met qualifying standards,[29] participants in girls' indoor and outdoor track can participate in a conference/league championship; a class statewide championship; the State Open Championship; and the New England Regional Championship. Each of the eleven conferences/leagues holds a conference/league championship at the end of the indoor and outdoor seasons; and each class holds a class statewide championship at the end of the indoor and outdoor seasons. A student-athlete's eligibility to compete at the indoor and outdoor track State Open Championships is determined by the finish order at the respective class statewide

---

[25] For both girls' indoor and outdoor track, the sport packets state that a competitor shall not compete in more than three events including relays, and any athlete on the tournament roster shall not be entered in more than three events excluding relays; e.g., an athlete may be entered in the 4 x 800, 1600, 3200, and 4 x 400 events, but can only run or be a competitor in three events. A contestant becomes a competitor when the contestant reports to the clerk of course. The rules also state that a competitor who competes in three events at any of the class meets cannot enter any other event at the State Open Championship. The stated rationale is that class championship meets and the State Open are really one meet because advancing to the State Open Championship is predicated on class meet performance. Athletes listed as alternates for relay events may only run if they ran two events or fewer at the class meet; i.e., they are still limited to three events.

[26] http://ciacsports.com/site/?page_id=131 (site last visited on April 24, 2020).

[27] *See* CIAC Handbook, Section 5.0 ("The CIAC has no jurisdiction over regular season interscholastic scheduling problems except as these relate to violation of CIAC policies. Schedul[ing] of interscholastic contests within CIAC season limitations is the responsibility of individual schools and/or leagues.")

[28] *See id.* at page 47.

[29] Schools may only enter athletes who meet the minimum requirements for the event as established by the sports committee for that year, as set forth in the sports information packet.

ARCHIVED AND NOT FOR RELIANCE
Case 2:21-cv-00316   Document 152-1   Filed 03/27/23   Page 16 of 50 PageID #: 845
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 15 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

championships as set forth in the Sports Packet/Information Sheet.[30]  For example, for indoor track for school year 2018-2019, the top 14 finishers in all events in class statewide championships for Classes LL, L, M, and S were eligible to compete in the indoor State Open Championship.  For outdoor track for school year 2018-2019, the top 5 finishers in each of the class statewide championships automatically qualified for the outdoor State Open Championship, as well as all athletes who obtained the special (automatic) standard for their event at the class statewide championship.[31]

The CIAC awards medals to the top 6 competitors based on the order of finish in events at the State Open Championships (both indoor and outdoor), and the top 6 competitors also qualify for the New England Regional Championships.[32]  Thereafter, a student may go on to compete at the national championships, held by the National Scholastic Athletics Foundation (the New Balance Indoor and Outdoor Championships), based on the student's qualifying time.[33]

The CIAC uses a point system to award points by school to determine a school state champion for indoor and outdoor track.  For indoor track, the CIAC uses team scoring based on six places (from first to sixth place, the CIAC awards 10, 8, 6, 4, 2 and 1 points, respectively) for all events.  For outdoor track, the CIAC uses team scoring based on eight places (from first to eighth; 10, 8, 6, 5, 4, 3, 2 and 1 points) only when an eight lane track is used; otherwise the CIAC uses team scoring based on six places (from first to sixth; 10, 8, 6, 4, 2 and 1 points) for the event.  The points earned by each school are then tallied, and the CIAC ranks schools in the order of points from highest to lowest to determine the state champion.[34]

---

[30] The Sports Packet/Information Sheet provides information about the Class/Division Championships and the State Open Championship; including qualifying distances and times for entry into the class championships, as well as eligibility to compete in the State Open Championship.

[31] From at least school years 2012-2013 through 2016-2017, the outdoor sports packet set a CIAC State Open Championship qualifying standard for each event.  For the 100-meter dash, the qualifying standard was 12.60 for all years and for the 200-meter dash, the qualifying standard was 26.70 for all years except 2016-2017, when it was lowered to 26.14.  The sports packets during those years stated that the automatic standard approximated the 8th place finish established in the prior year State Open.  Starting in school year 2017-2018, and continuing in school year 2018-2019, per the Sports Packet, "The special standard will be set each year after the class meets have ended. The special standard will be determined by looking at the performance rankings for each event that includes the top five (5) qualifying performances from each of the class meets. The 12th place performance from the qualifiers will become the automatic standard for that year. All athletes who meet that standard during the current year's class championship will advance to the open."

[32] For outdoor track, the 7th and 8th place finishers in the final for any event will be considered as alternates.

[33] The National Scholastic Athletics Foundation's Transgender Participation Policy & Procedure, updated  December 2019, allows for a transgender student-athlete to submit a qualified entry into a National Scholastic Athletics Foundation competition or make a written request for participation, which the National Scholastic Athletics Foundation then evaluates on a case-by-case basis, including evaluation by an Eligibility Committee comprising at least one medical professional, event director, active age-appropriate coach, and lawyer.  The Eligibility Committee can request any information it believes relevant to the application, including but not limited to interviews with the athlete and/or parents/guardians and coaches, and a review of relevant medical and legal records.  The policy states that a male-to-female athlete who is not taking hormone treatments related to gender transition may not compete in female competitions, but that a female-to-male athlete not taking testosterone related to gender transition may compete in male competitions.

[34] In the outdoor State Open Championship, seeding is done electronically based on an athlete's performance at the Class meets.  An athlete's seed determines the athlete's lane assignment; the athlete with the fastest projected time based on performance at the Class meets is assigned to a middle lane (usually lane 4) and athletes are then placed in lanes in order of seed, working towards the outside lanes.

ARCHIVED AND NOT FOR RELIANCE

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 16 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

### *Complainant Students and Competition Against Students A and B*

The complaint was filed on behalf of three high school female students competing in girls' track in the state of Connecticut: Student 1, attending Glastonbury High School (School 1); Student 2, attending Canton High School (School 2); and Student 3, attending Danbury High School (School 3). The Complainant specifically complained about two students who participated in girls' track in the state of Connecticut: Student A, who competed for Bulkeley High School in the Hartford School District (School A1) in the spring of school year 2017-2018, and Bloomfield High School (School A2) during school year 2018-2019 to the present; and Student B attending Cromwell High School (School B). The CIAC's list of sanctioned sports includes boys' track. Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury each maintained boys' track teams.

In order to determine the impact of the Revised Transgender Participation Policy on Students 1, 2, and 3, OCR reviewed the participation of Students 1, 2, 3, A, and B in post-season conference/league championships, class championships, State Open Championships, and the New England Regional Championships. OCR reviewed information for school years 2017-2018 and 2018-2019.

### *Student 1*

OCR determined that Student 1 was enrolled at School 1 as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. Student 1 was a student-athlete on School 1's girls' varsity indoor and outdoor track teams. Regionally, School 1 participated in the Central Connecticut Conference (CCC). Statewide, School 1 participated in Class LL for indoor and outdoor track.

The Complainant asserted that pursuant to the Revised Transgender Participation Policy, and the resulting participation of Students A and B, the CIAC denied Student 1 opportunities to advance to the finals in an event, to advance to higher levels of competition, and/or win titles at events such as the CIAC Outdoor State Open Championship, held on June 4, 2018; the CIAC Indoor State Open Championship, held on February 16, 2019; and the Indoor New England Regional Championship, held on June 8, 2019.

During an interview with OCR, Student 1 stated that she and other female student-athletes with whom she had spoken found it very difficult to go into a race knowing that no matter what they do, they would never be good enough to win. In a video provided by the Complainant, Student 1 asserted that by permitting transgender athletes to participate in girls' track competitions, she and other athletes had lost opportunities to compete at track meets, to win titles, and to gain attention from college coaches. She further stated that women have fought hard for many years to have opportunities and a voice in sports; and that it is upsetting to realize that no matter how hard she and other female student-athletes train, they will never be good enough to compete against transgender athletes. Student 1 also stated: "I respect these transgender athletes, and I understand that they are just following CIAC policy. But at the same time, it is demoralizing and frustrating for me and for other girls."

ARCHIVED AND NOT FOR RELIANCE

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 17 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The Athletic Director for School 1 acknowledged that some parents had complained that their children did not place at certain meets, but she stated that she was unaware of whether any female students had lost out on competitive opportunities, awards, or wins. School 1's Athletic Director denied that any of the female student-athletes on the girls' indoor or outdoor track teams were denied participation opportunities as a result of having transgender athletes participate in track events. She stated that student-athletes were eligible to participate in all meets that the District participated in if they met the requirements. School 1's Assistant Athletic Director stated that she is aware of Student 1's complaint that she was deprived of an opportunity to advance to the New England Regional Championship due to the participation of transgender athletes.

### *Student 2*

Student 2 was enrolled at School 2 as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. During school years 2017-2018 and 2018-2019, Student 2 was a student-athlete on School 2's varsity girls' indoor and outdoor track teams. Regionally, School 2 participated in the North Central Connecticut Conference (NCCC). Statewide, School 2 participated in Class S for indoor and outdoor track.

The Complainant asserted that, pursuant to the Revised Transgender Participation Policy and the resulting participation of Students A and B, the CIAC denied Student 2 opportunities to advance to higher levels of competition and/or win titles at events such as the 2017 Outdoor State Open Championship, held on June 6, 2017; the New England Regional Championship, held on June 10, 2017; the Class S Indoor Championship held on February 10, 2018; the Outdoor State Open Championship, held on June 4, 2018; the Class S Indoor Championship, held on February 7, 2019; the Indoor State Open Championship, held on February 16, 2019; the Class S Outdoor Championship, held on May 30, 2019; and the Outdoor State Open Championship, held on June 3, 2019.

During an interview with OCR, Student 2 stated that, in addition to the impact the participation of Students A and B had on her and other female student-athletes' ability to win titles and awards, their participation also has had an impact on her and other female student-athletes' ability to obtain recognition from media and college coaches. Student 2's mother (Parent 1) noted that some biologically female track student-athletes had lost out on media recognition because the winner of an event at the state championships gets the opportunity to be interviewed by reporters, while the second and third place finishers do not. Specifically, Parent 1 stated that at the state championships there is a bank of reporters waiting to interview the winners and the winners' names are put in the local papers, and that student-athletes typically do not receive any media recognition when they come in second. Further, Student 2 stated that the participation of Student A, in particular, had an impact on her ability to set class records for the CIAC Class S 100-meter and 200-meter races.

School 2's principal stated that no student-athletes were prohibited from participating; student-athletes went to every meet that the school participated in, and all student-athletes who qualified for state tournaments had the opportunity to compete. However, the principal acknowledged that, at the state level, some people might argue that a transgender athlete defeated a District student (i.e., Student 2); therefore, that student lost out on an award.

ARCHIVED AND NOT FOR RELIANCE

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 18 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

### *Student 3*

OCR determined that Student 3 was enrolled at School 3 as a 9th grade student during school year 2018-2019. Regionally, School 3 participated in the Fairfield County Interscholastic Athletic Conference (FCIAC). Statewide, School 3 participated in Class LL for indoor and outdoor track. During school year 2018-2019, Student 3 was a student-athlete on School 3's girls' varsity outdoor track team.

The Complainant asserted that, pursuant to the Revised Transgender Participation Policy and the resulting participation of Students A and B, the CIAC denied Student 3 opportunities to advance to higher levels of competition and/or win titles at events, such as the Outdoor State Open Championship, held on June 3, 2019. During an interview with OCR, Student 3 stated that when competing against transgender athletes, it was frustrating for her to know that she would not be able to do as well as she otherwise could do. In a video the Complainant provided, Student 3 asserted that even before she gets to the track, she already knows that she is not going to win first or second place if she races against transgender athletes; and that no matter how hard she works, she will not be able to win the top spot.

### *Competition Against Students A and B*

Descriptions of some of the girls' track indoor and outdoor post-season events in which Students 1, 2, and/or 3 participated with Students A and/or B during school years 2017-2018 and 2018-2019 are set forth below.

1. During school year 2017-2018, in the Indoor State Open Championships, Student B participated in the 55-meter dash. In the preliminary for the 55-meter dash, Student B placed 2nd and Student 2 placed 16th. The top 8 finishers advanced to the finals; however, even though Student 2 would not have advanced to the finals even absent Student B's participation, Student B's finish in the top 8 in the preliminary denied an opportunity for the 9th place finisher to advance to the finals. See chart summarizing the results:

| 2017-2018 Indoor State Open Championships Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| Place | Student | Time | School | Seed | Heat |
| 1 | * | 7.26q | * | 7.31 | 1 |
| **2** | **Student B** | 7.30q | School B | 7.31 | 1 |
| 3 | * | 7.34q | * | 7.39 | 3 |
| 4 | * | 7.35q | * | 7.28 | 2 |
| 5 | * | 7.40q | * | 7.39 | 3 |
| 6 | * | 7.42q | * | 7.48 | 3 |
| 7 | * | 7.43q | * | 7.38 | 2 |
| 8 | * | 7.44 | * | 7.44 | 1 |
| 9T | * | 7.53 | * | 7.47 | 3 |
| 9T | * | 7.53 | * | 7.40 | 2 |

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 19 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

| 2017-2018 Indoor State Open Championships | | | | | |
| Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | | |
| Place | Student | Time | School | Seed | Heat |
| --- | --- | --- | --- | --- | --- |
| … | … | … | … | … | |
| 16 | Student 2 | 7.78 | School 2 | 7.46 | 2 |

2. During school year 2017-2018, in the Outdoor State Open Championships, Student A and Student B participated in the 100-meter dash. In the preliminary for the 100-meter dash, Student A placed 1st and Student B placed 4th. The top 8 finishers advanced to the finals, including Student 2 (who placed 2nd) and Student 1 (who placed 8th); however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 100-meter dash, Student A placed 1st, Student B placed 2nd; Student 2 placed 4th; and Student 1 placed 6th. The top six finishers were awarded medals and advanced to the New England Regional Championships, including Student 1 and Student 2; however, Student A's and Student B's finishes in 1st and 2nd place, respectively, denied an opportunity for two female student-athletes to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.[35] Student A placed 1st at the preliminaries of the 100-meter dash at New England Regional Championships. The top 8 finishers advanced to the finals, including Student 2 (who placed 7th);[36] however, Student A's finish in the top 8 in the preliminary denied an opportunity for a female student-athlete to advance to the finals.[37] See charts summarizing the results below:

| 2017-2018 Outdoor State Open Championships | | | | | |
| Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | | |
| Place | Student | Time | School | Seed | Heat |
| --- | --- | --- | --- | --- | --- |
| **1** | **Student A** | 11.75q | School A1 | 11.77 | 3 |
| 2 | Student 2 | 12.26q | School 2 | 12.61 | 2 |
| 3 | * | 12.38q | * | 12.33 | 1 |
| **4** | **Student B** | 12.39q | School B | 12.22 | 2 |
| 5 | * | 12.46q | * | 12.57 | 3 |
| 6 | * | 12.52q | * | 12.74 | 2 |
| 7 | * | 12.54q | * | 12.34 | 1 |
| 8 | Student 1 | 12.58q | School 1 | 12.91 | 3 |
| 9 | * | 12.63 | * | 12.73 | 3 |
| 10 | * | 12.64 | * | 12.68 | 2 |
| … | … | … | … | … | … |
| 25 | * | 13.17 | * | 12.98 | |

---

[35] Student A, Student B, and Student 2 also participated in the 200-meter dash, and finished 1st, 7th and 10th, respectively, in the final. Student A's 1st place finish denied an opportunity for one female student-athlete to advance to the New England Regional Championships in the 200-meter dash, along with the benefit of receiving a medal for the Outdoor State Open Championships.

[36] Student 1 placed 25th.

[37] In the finals of the 100-meter dash, Student A placed 1st, while Student 2 placed 7th.

Case 2:21-cv-00316   Document 49-4   Filed 06/22/22   Page 21 of 50 PageID #: 850
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 20 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2017-2018 Outdoor State Open Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points |
|---|---|---|---|---|
| 1 | **Student A** | 11.72# | School A1 | 10 |
| 2 | **Student B** | 12.29 | School B | 8 |
| 3 | * | 12.36 | * | 6 |
| 4 | Student 2 | 12.39 | School 2 | 5 |
| 5 | * | 12.47 | * | 4 |
| 6 | Student 1 | 12.67 | School 1 | 3 |
| 7 | * | 12.71 | * | 2 |
| 8 | * | 12.80 | * | 1 |

**2017-2018 Outdoor New England Regional Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat | Tie-breaker | State |
|---|---|---|---|---|---|---|
| 1 | **Student A** | 12.46q | School A1 | 5 | | CT |
| 2 | * | 12.59q | * | 4 | | MA |
| 3 | * | 12.64q | * | 3 | | MA |
| 4 | * | 12.65q | * | 1 | | MA |
| 5 | * | 12.81q | * | 1 | 12.805 | CT |
| 6 | * | 12.81q | * | 2 | 2.809 | CT |
| 7 | Student 2 | 12.82q | School 2 | 2 | | CT |
| 8 | * | 12.92q | * | 5 | | RI |
| 9 | * | 12.94 | * | 3 | | MA |
| 10 | * | 12.95 | * | 5 | | MA |
| … | … | … | … | … | … | … |
| 25 | Student 1 | 13.5010 | School 1 | 3 | 13.497 | CT |
| | | | | | | |
| 33 | * | 13.84 | * | 1 | | RI |

**2017-2018 Outdoor New England Regional Championships**
**100-Meter Dash Finals**

| Place | Student | Time | School | Tie breaker | State |
|---|---|---|---|---|---|
| 1 | **Student A** | 11.97 | School A1 | | CT |
| 2 | * | 12.26 | * | | MA |
| 3 | * | 12.31 | * | | MA |
| 4 | * | 12.50 | * | | MA |
| 5 | * | 12.56 | * | 12.554 | CT |
| 6 | * | 12.56 | * | 12.559 | CT |
| 7 | Student 2 | 12.58 | School 2 | | CT |
| 8 | * | 12.69 | * | | RI |

Case 2:21-cv-00316   Document 34-12   Filed 07/27/21   Page 22 of 50 PageID #: 851
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 21 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

3.  During school year 2018-2019, in the Indoor Class S Statewide Championships, Student A and Student B participated in the 55-meter dash.  In the preliminary for the 55-meter dash, Student A placed 1st and Student B placed 2nd.  The top 7 finishers advanced to the finals, including Student 2 (who placed 3rd); however, Student A's and Student B's finishes in the top 7 in the preliminary denied an opportunity for two female student-athletes to advance to the finals.  In the finals of the 55-meter dash, Student A placed 1st, Student 2 placed 2nd, and Student B placed 3rd.  The top 14 finishers advanced to the State Open Championship.  While all three student-athletes advanced to the State Open Championship, Student A's and Student B's participation denied an opportunity to two female student-athletes to participate in the State Open Championship for the 55-meter dash.[38]  See charts summarizing results below:

| 2018-2019 Indoor Class S Statewide Championships Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | |
|---|---|---|---|---|
| Place | Athlete | Time | High School | Heat |
| 1 | **Student A** | 7.16q | School A2 | 8 |
| 2 | **Student B** | 7.30q | School B | 6 |
| 3 | Student 2 | 7.38q | School 2 | 7 |
| 4 | * | 7.61q | * | 1 |
| 5 | * | 7.63q | School A2 | 1 |
| 6 | * | 7.63q | * | 5 |
| 7 | * | 7.68q | * | 3 |
| 8 | * | 7.70 | * | 5 |
| 9 | * | 7.71 | * | 2 |
| 10 | * | 7.74 | * | 4 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 48 | * | 8.37 | * | 3 |

| 2018-2019 Indoor Class S Statewide Championships Girls 55-Meter Dash Finals | | | | |
|---|---|---|---|---|
| Place | Athlete | Time | High School | Points |
| 1 | **Student A** | 7.03 | School A2 | 10 |
| 2 | Student 2 | 7.27 | School 2 | 8 |
| 3 | **Student B** | 7.33 | School B | 6 |
| 4 | * | 7.48 | * | 4 |
| 5 | * | 7.51 | School A2 | 2 |
| 6 | * | 7.53 | * | 1 |
| 7 | * | 7.54 | * | - |

4.  During school year 2018-2019, in the Indoor State Open Championship, Student A and Student B participated in the 55-meter dash.  In the preliminary for the 55-meter dash, Student A placed 1st and Student B placed 2nd.  The top 7 finishers advanced to the

---

[38] Student A also placed 1st in the finals of the 300-meter dash, which denied an opportunity to one girl to participate in the State Open Championship for the 300-meter dash.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 22 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

finals, including Student 2 (who placed 4th); however, Student A's and Student B's finishes in the top 7 in the preliminary would have denied an opportunity for two female student-athletes to advance to the finals, including Student 1 (who placed 8th). In the finals of the 55-meter dash, Student A placed 1st, Student B placed 2nd, and Student 2 placed 3rd. The top six finishers are awarded medals and advance to the New England Regional Championships; however, Student A's and Student B's finishes in 1st and 2nd place, respectively, denied an opportunity for two female student-athletes to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.[39] Further, since Student 2 placed 3rd, Student A's and Student B's participation denied an opportunity to Student 2 to place 1st in the 55-meter dash and receive the benefit of a 1st place medal. In the Indoor New England Regional Championship, in the preliminaries for the 55-meter dash, Student A placed 2nd, Student B placed 3rd, and Student 2 placed 8th. The top 8 finishers advanced to the finals. Although all three advanced to the finals, Student A's and Student B's 2nd and 3rd place finishes, respectively, denied an opportunity to two female student-athletes to advance to the finals. In the finals of the 55-meter dash, Student A placed 1st, Student B placed 3rd, and Student 2 placed 8th. See charts summarizing results below:

**2018-2019 Indoor State Open Championships**
**Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals)**

| Place | Athlete | Time | High School | Heat |
|-------|---------|------|-------------|------|
| **1** | **Student A** | 7.00q | School A2 | 3 |
| **2** | **Student B** | 7.07q | School B | 3 |
| 3 | * | 7.24q | * | 2 |
| 4 | Student 2 | 7.27q | School 2 | 1 |
| 5 | * | 7.27q | * | 1 |
| 6 | * | 7.29q | * | 2 |
| 7 | * | 7.34q | * | 3 |
| 8 | Student 1 | 7.37 | School 1 | 2 |
| 9 | * | 7.41 | * | 3 |
| 10 | * | 7.45 | * | 2 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 16 | * | 7.85 | School A2 | 2 |

**2018-2019 Indoor State Open Championships**
**Girls 55-Meter Dash Final**

| Place | Athlete | Time | High School | Points |
|-------|---------|------|-------------|--------|
| **1** | **Student A** | 6.95 | School A2 | 10 |
| **2** | **Student B** | 7.01 | School B | 8 |
| 3 | Student 2 | 7.23 | School 2 | 6 |

---

[39] Student A also placed 1st in the finals of the 300 meter dash in the Indoor State Open Championships, which denied an opportunity to a female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Indoor State Open Championships.

Case: 2:21-cv-00316   Document 29-2   Filed 06/23/22   Page 24 of 50 PageID #: 853

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 23 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2018-2019 Indoor State Open Championships**
**Girls 55-Meter Dash Final**

| Place | Athlete | Time | High School | Points |
|---|---|---|---|---|
| 4 | * | 7.24 | * | 4 |
| 5 | * | 7.26 | * | 2 |
| 6 | * | 7.33 | * | 1 |
| 7 | * | 7.39 | * | - |

**2018-2019 Indoor New England Regional Championships**
**Girls 55-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Athlete | Time | High School | Heat |
|---|---|---|---|---|
| 1 | * | 7.08q | * MA | 2 |
| **2** | **Student A** | 7.09q | School A2- CT | 4 |
| **3** | **Student B** | 7.24q | School B- CT | 3 |
| 4 | * | 7.28q | *- MA | 3 |
| 5 | * | 7.29q | *- MA | 4 |
| 6 | * | 7.30q | * -CT | 1 |
| 7 | * | 7.30q | *- MA | 1 |
| 8 | Student 2 | 7.30q | School 2 - CT | 1 |
| 9 | * | 7.39 | *- MA | 1 |
| 10 | * | 7.40 | * - RI | 4 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 30 | * | 7.92 | * - VT | 3 |

**2018-2019 Indoor New England Regional Championships**
**Girls 55-Meter Dash Finals**

| Place | Athlete | Time | High School |
|---|---|---|---|
| **1** | **Student A** | 6.94 | School A2- CT |
| 2 | * | 7.04 | * - MA |
| **3** | **Student B** | 7.17 | School B- CT |
| 4 | * | 7.23 | * - MA |
| 5 | * | 7.27 | * - MA |
| 6 | * | 7.27 | * - CT |
| 7 | * | 7.31 | * - MA |
| 8 | Student 2 | 7.32 | School 2 - CT |

5.  During school year 2018-2019, in the Outdoor Class S Statewide Championships, Student A participated in the 100-meter dash and the 200-meter dash; and Student B participated in the 100-meter dash. In the preliminary for the 100-meter dash, Student A placed 2nd and Student B placed 3rd. The top 8 finishers advanced to the finals, including Student 2 (who placed 1st); however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 100-meter dash, Student A placed 1st, Student 2 placed 2nd, and Student B placed 3rd. While all three student-athletes advanced to the

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 24 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

State Open Championship, Student A's participation denied Student 2 the benefit of a 1st place finish in the Class S Statewide Championship for the 100-meter dash. Similarly, in the finals of the 200-meter dash, Student A placed 1st and Student 2 placed 2nd.[40]  While both students advanced to the State Open Championship, Student A's participation denied Student 2 the benefit of a 1st place finish in the Class S Statewide Championship for the 200-meter dash.  See charts summarizing results below:

**2018-2019 Outdoor Class S Statewide Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat |
|---|---|---|---|---|
| 1 | Student 2 | 12.14 | School 2 | 4 |
| 2 | **Student A** | 12.18 | School A2 | 5 |
| 3 | **Student B** | 12.50 | School B | 3 |
| 4 | * | 12.73 | * | 1 |
| 5 | * | 13.05 | * | 1 |
| 6 | * | 13.08 | * | 2 |
| 7 | * | 13.16 | School A2 | 4 |
| 8 | * | 13.22 | * | 5 |
| 9 | * | 13.27 | * | 3 |
| 10 | * | 13.30 | * | 4 |
| … | … | … | … | … |
| 35 | * | 14.28 | * | 5 |

**2018-2019 Outdoor Class S Statewide Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points |
|---|---|---|---|---|
| **1** | **Student A** | 11.93# | School A2 | 10 |
| **2** | Student 2 | 12.02 | School 2 | 8 |
| **3** | **Student B** | 12.28 | School B | 6 |
| 4 | * | 12.82 | * | 5 |
| 5 | * | 12.86 | * | 4 |
| 6 | * | 13.13 | * | 3 |
| 7 | * | 13.14 | * | 2 |
| 8 | * | 13.31 | School A2 | 1 |

**2018-2019 Class S Statewide Championships**
**Girls 200-Meter Dash Finals**

| Place | Student | Time | School | Heat | Points |
|---|---|---|---|---|---|
| 1 | **Student A** | 24.47# | School A2 | 6 | 10 |
| 2 | Student 2 | 24.79 | School 2 | 6 | 8 |
| 3 | * | 25.92 | School A2 | 6 | 6 |
| 4 | * | 26.17 | * | 6 | 5 |

---

[40] Student B scratched.

Case 2:21-cv-00316   Document 43-2   Filed 09/21/22   Page 26 of 50 PageID #: 855
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 25 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2018-2019 Class S Statewide Championships**
**Girls 200-Meter Dash Finals**

| Place | Student | Time | School | Heat | Points |
|---|---|---|---|---|---|
| 5 | * | 26.30 | * | 3 | 4 |
| 6 | * | 26.41 | * | 6 | 3 |
| 7 | * | 26.76 | School A2 | 6 | 2 |
| 8 | * | 26.85 | * | 3 | 1 |
| 9 | * | 26.93 | * | 5 | |
| 10 | * | 27.02 | * | 6 | |
| … | … | … | … | … | … |
| 32 | * | 28.95 | * | 2 | |
| … | … | … | … | … | … |
| -- | **Student B** | SCR | School B | | |

6.  During school year 2018-2019, in the Outdoor State Open Championship, Student A and Student B participated in the 100-meter dash.  In the preliminary for the 100-meter dash, Student A placed 1st and Student B placed 5th.  The top 8 finishers advanced to the finals, including Student 2 (who placed 3rd) and Student 3 (who placed 4th)[41]; however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals.  In the finals of the 100-meter dash, Student 2 placed 1st, Student 3 placed 3rd, and Student B placed 4th.[42]  The top 6 finishers were awarded medals and advanced to the New England Regional Championships; however, Student B's finish in 4th place denied an opportunity for a female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships. Student A, Student 2 and Student 3 also participated in the 200-meter dash and finished 1st, 4th, and 3rd, respectively, in the final.  Student A's 1st place finish denied an opportunity for one female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.  Student A placed 1st in the finals of the 200-meter dash at the Outdoor New England Regional Championships; Student 3 placed 3rd and Student 2 placed 5th. See charts summarizing results below:

**2018-2019 Outdoor State Open Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat | Tie |
|---|---|---|---|---|---|
| 1 | **Student A** | 11.64q | School A2 | 3 | |
| 2 | * | 11.98q | * | 1 | |
| 3 | Student 2 | 12.07q | School 2 | 2 | |
| 4 | Student 3 | 12.11q | School 3 | 3 | |
| 5 | **Student B** | 12.20q | School B | 1 | |
| 6 | * | 12.44q | * | 2 | 12.433 |

---

[41] Student 1 placed 14th.
[42] Student A had a false start and was disqualified.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 26 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2018-2019 Outdoor State Open Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat | Tie |
|---|---|---|---|---|---|
| 7 | * | 12.44q | * | 1 | 12.436 |
| 8 | * | 12.45q | * | 3 | |
| 9 | * | 12.50 | * | 3 | |
| 10 | * | 12.56 | * | 1 | |
| *** | | | | | |
| 14 | Student 1 | 12.79 | School 1 | 3 | |
| *** | | | | | |
| 24 | * | 13.25 | * | 3 | |

**2018-2019 Outdoor State Open Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points | Tie |
|---|---|---|---|---|---|
| 1 | Student 2 | 11.67 | School 2 | 10 | |
| 2 | * | 11.92 | * | 8 | |
| 3 | Student 3 | 12.04 | School 3 | 6 | |
| **4** | **Student B** | 12.22 | School B | 5 | |
| 5 | * | 12.36 | * | 4 | |
| 6 | * | 12.38 | * | 3 | 12.375 |
| 7 | * | 12.38 | * | 2 | 12.378 |
| -- | **Student A** | FS | School A2 | | |

**2018-2019 Outdoor State Open Championships**
Girls 200 Meter Dash Finals

| Place | Student | Time | School | Heat | Points |
|---|---|---|---|---|---|
| **1** | **Student A** | 24.33 | School A2 | 3 | 10 |
| 2 | * | 24.75 | * | 3 | 8 |
| 3 | Student 3 | 25.01 | School 3 | 3 | 6 |
| 4 | Student 2 | 25.24 | School 2 | 3 | 5 |
| 5 | * | 25.38 | * | 3 | 4 |
| 6 | * | 25.55 | * | 3 | 3 |
| 7 | * | 25.63 | * | 2 | 2 |
| 8 | * | 25.79 | * | 2 | 1 |
| 9 | * | 26.28 | * | 2 | |
| 10 | * | 26.44 | * | 2 | |
| … | … | … | … | … | … |
| -- | Student 1 | DNS | School 1 | 2 | |

*Team School Championships Involving Students A and B*

OCR reviewed the race results for the 2018-2019 Indoor State Open Championship and confirmed the following order of finish of schools for the state championship:

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 27 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

- School A2 – 54 points
- School 1 – 39 points
- School 3 – 34 points
- Hillhouse – 34 points
- Norwich Free Academy – 21 points

OCR further confirmed that School A2 earned 10 points for each of Student A's 1st place finishes.  OCR determined that other School A2 student-athletes at the meet earned the team the following points:

- 2nd place in the 300-meter dash, earning School A2 8 points,
- 1st place in the 600-meter run, earning School A2 10 points;
- 5th place in the 4 x 200 relay, earning School A2 2 points; and
- 3rd place in the shot put, earning School A2 6 points

OCR also reviewed the results for the 2018-2019 Outdoor State Open Championships, held on June 3, 2019.  OCR determined that School A2 placed 3rd (38 points) in the team championship, a full 20 points behind School 2, which placed first (58 points) and Windsor, which placed 2nd (43 points).  The top 5 finishers were as follows:

- School 3 – 58 points
- Windsor – 43 points
- School A2 – 38 points
- Norwich Free Academy – 32 points
- Immaculate – 30 points

Student A participated in the 100-meter dash, the 200-meter dash, and the 4 x 400 relay in the 2018-2019 Indoor State Open Championship, and earned 10 points for School A2 for Student A's first place finish in the 200-meter dash; and was also on School A2's 4 x 400 relay team, which placed 1st and also earned 10 points for School A2.

*School Districts Investigated by OCR*

### *Glastonbury:*

Glastonbury advised OCR that as a CIAC member school, it must comply with all of the CIAC's by-laws, policies, rules, and regulations, including the Revised Transgender Participation Policy.  Glastonbury reported that it does not currently have any transgender students of which it is aware participating in its athletics program.  Glastonbury stated that it must allow students to participate on the athletics team consistent with their gender identity because of state law and the Revised Transgender Participation Policy.  Glastonbury stated that it has not challenged the CIAC's Revised Transgender Participation Policy because it is consistent with the requirements of state law, with which Glastonbury already must comply.

Case 2:21-cv-00316   Document 42-2   Filed 09/22/21   Page 29 of 50 PageID #: 858
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 28 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Glastonbury's Athletic Director stated that no female athletes were denied participation on any of their athletic teams as a result of having transgender athletes participate, and that student-athletes were eligible to participate in all meets that the District participated in if they met the requirements (i.e., qualifying marks, selection for relay team which is a determination made at the coaching level). The Athletic Director stated that the complaint filed with OCR addresses what is perceived as an inability to win.

Glastonbury's Principal stated that some district parents complained that a female student was affected by having a transgender student from another team participate in track events. The principal advised OCR that she never verified the times or records brought to her attention, nor did she make a determination regarding the allegations.

In emails dated May 2-10, 2018, Parent 2 requested guidance from the Athletic Director regarding the participation of Student A in girls' track events and whether it was consistent with the CIAC's Revised Transgender Participation Policy. The Athletic Director stated that she had spoken with someone at the CIAC who indicated that Student A would have had to declare her gender identity prior to the start of the school year in August. Parent 2 stated that she informed the CIAC that Student A participated as a male during the indoor season and then as a female during the outdoor season in 2017-2018; and stated that the CIAC advised her that it would be following up with School A1. On May 10, 2018, the Athletic Director advised Parent 2 that she was following up and had placed a call to the CIAC. In an email dated May 11, 2018, the Athletic Director responded to Parent 2, advising her that based on her reading of the CIAC rule, as well as confirmation she received from the CIAC, Student A's participation was in compliance with the Revised Transgender Participation Policy. She noted that if Parent 2 had been told Student A had to declare prior to the start of the school year, that was misinformation, as that requirement is nowhere in the language of the policy. The Athletic Director advised Parent 2 that she also shared this information with the track coach.

On May 23, 2018, Parent 2 advised the Athletic Director via email that she had been discussing transgender eligibility with her legislative office and wanted to make the Athletic Director aware. In an email dated May 29, 2018, Parent 2 asked the Athletic Director if students declaring a gender identity are required to produce any supporting documentation, or if there is a waiting period. In an email dated June 6, 2018, Parent 2 advised the Athletic Director that she intended to request a meeting with the CIAC regarding the transgender policy; the Athletic Director acknowledged the email and stated that there had been articles and some troubling behavior around the issue, and advised that a letter to the CIAC was probably the best route for the parent to take.

In an email dated July 2, 2018, to the Athletic Director, Parent 2 stated that the CIAC had refused to entertain any policy changes in response to her correspondence with them; it was her understanding that member schools set policy; and she wanted to meet with the Athletic Director to share her research. The Athletic Director responded attempting to schedule a time to meet. Thereafter, in an email dated July 18, 2018, Parent 2 forwarded to the Athletic Director copies of responses she had received from the CIAC Executive Director. In the email, she stated that, although the CIAC stated that the state legislature needed to make a change, her state representatives informed her that athletics policies fall under the CIAC's jurisdiction.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 29 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

In an email dated January 27, 2019, to School 1 administrators, Parent 3 alleged that Student A, whom Parent 3 identified as a boy who identifies as a girl, was participating in track and creating an unfair and unsafe environment in girls track. He provided, as an example, that during the 4 x 400 relay event on January 26, 2019, in the second leg, Student A "had physicality" with a runner from Windsor, resulting in a significant lead for Bloomfield. The student-athlete running the last leg of the relay for Windsor was unable to close the gap that Student A had created. He also provided an example that at the Yale Invitational held on January 12, 2019, a student-athlete came in second to Student A, despite having run a faster time than 182 other girls in the 300-meter sprint. He asked that the unsafe and unfair situation be addressed now before it affected other sports.

In response, on January 29, 2019, the District's school board chair emailed Parent 3 and thanked him for sharing his experiences and concerns, but noted that the CIAC handbook indicated that it would be contrary to state and federal law to preclude transgender students from participating. She stated that, accordingly, she did not believe that exclusion was an option, but advised that this was just her opinion.

In an email dated February 17, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 3 asserted that the Revised Transgender Participation Policy directly affected the outcome of School 1's winning the 2018-2019 Indoor State Open Championship held on February 16, 2019. Specifically, Parent 3 stated that School A2 earned the highest number of points due to the participation of Student A, who earned 20 points for the team by herself. Parent 3 alleged that, but for Student A's participation, School 1 would have won the state title. Specifically, Parent 3 asserted that School A2 was only able to win because Student A placed first in two separate events, earning School A2's team 20 of its total 54 points. Parent 3 also noted that Student A participated on the 4 x 400 relay, which earned the school 8 points for second place. Parent 3 acknowledged in his email that it was possible that School A2 still would have placed 2nd in the 4 x 400 relay, even if another athlete had run in Student A's place.[43]

In an email dated February 25, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 4 questioned the inclusion of transgender athletes' competitive times in results, which he argued affected all of the other athletes competing. Parent 4 further stated that recognizing the transgender athletes' results insulted the "current cisgender record holder who has worked hard and competed fairly." Parent 4 also asserted that the potential to compete for a college scholarship was at stake because the participation of transgender athletes resulted in other athletes not being able to compete at the New England Regionals, expand their résumés, and gain additional exposure to college recruiters and coaches. Parent 4 alleged that the CIAC was violating its own rules by allowing transgender athletes to compete; and asked that the results of the State Open Championship be recalculated, and points redistributed, and that the Revised Transgender Participation Policy be changed for the outdoor 2019 season. Parent 4 also suggested potential solutions to continue to allow transgender athletes to compete but change the competitive categories or "which scores count."

---

[43] Parent 3 further asked that the CIAC adopt the NCAA and IOC policy, whereby a transgender athlete must undergo hormone treatment for one year before being able to compete; allow transgender athletes to run in events as exhibition participants where their results do not count; or "another fair and safe solution."

Case 2:21-cv-00316   Document 41-2   Filed 05/27/21   Page 31 of 50 PageID #: 860
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 30 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

In an email dated March 3, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 3 followed up on his original request that the Revised Transgender Participation Policy be revised.  Parent 3 alleged that the policy prevented deserving girls from qualifying for the New England Regionals.  For example, Parent 3 stated that at the New England Regionals on March 2, 2019, a Bloomfield transgender athlete (Student A) placed first in the 55-meter and 300-meter dash events.  He also stated that by participating in the 4 x 400-meter relay event, Student A provided Bloomfield with a .06 second lead over Glastonbury in the final results.

In an email dated March 5, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 4 stated that no other states at the New England Regionals had transgender student-athletes participating, and many people "expressed surprise and concern that their cisgender girls were forced to compete against transgender girls."  In another email dated March 5, 2019, to School 1 administrators, Parent 4 requested a meeting to review the current policy regarding transgender athletes and its impact on competitive fairness; and alleged that "cisgender girls are being deprived of fair and equal opportunity."

In an email dated March 7, 2019, to the District Superintendent, a parent (Parent 5) stated her opinion that the CIAC should adopt NCAA standards regarding transgender participation.  In an email dated March 10, 2019, to School 1 administrators and the CIAC Executive Director, Parent 3 advised that the National Scholastic Athletic Foundation (NSAF), which hosts the national championships, had released statements regarding its transgender policy, which required athletes to take gender affirming hormones.  Parent 3 then stated that at the New England Regionals on March 2, 2019, Bloomfield beat Glastonbury in the 4 x 400 relay with Student A participating on Bloomfield's team.  He then noted that at the New Balance National championships held over March 8-10, 2019, Glastonbury's 4 x 400 relay team came in 14th in the nation, while Bloomfield's came in 34th, running without Student A.

On March 15, 2019, Parent 2 and the Parent 4 met with the Athletic Director and the Principal.  The Principal stated that Parent 2 wanted School 1 to put forth a request for the CIAC to change its policy, and she communicated to them that the school was comfortable with the CIAC's following the state law and was not willing to ask the CIAC to change their policy.  The Athletic Director did not recall that Parent 2 and Parent 4 raised any specific concerns about the policy, other than that the policy set up an uneven playing field.  The Athletic Director stated that it was difficult to keep Parent 2 focused on what was Parent 2's real issue, as Parent 2 had started talking about separate math classes.  The Athletic Director stated that she did not leave the meeting with any clear understanding of what Parent 2 was saying.  She noted that Parent 2 and Parent 4 also wanted to show them photos of other non-district students, which they refused to discuss due to Family and Educational Rights and Privacy Act of 1974 (FERPA).  In an email dated March 18, 2019, following their meeting, Parent 2 summarized her continued concerns that the transgender policy may violate Title IX; included information from her state legislative office that there is no law to be changed and that any changes would be the responsibility of the CIAC and member schools; and provided examples of contradictions within the CIAC policies, relative to co-ed teams.

On March 18, 2019, Parent 3 requested a meeting with administrators at School 1 to discuss the transgender policy.  In an email dated March 25, 2019, to School 1 administrators, Parent 3 stated

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

that he learned that the CIAC had sent out a survey to member schools regarding the transgender policy. He included links to resources in his email and urged School 1 not to just "rubber stamp" the policy. In response to his request, on April 2, 2019, the principal and School 1's Athletic Director met with Parent 3. Both the principal and Athletic Director described the meeting as lasting thirty minutes, per Parent 3's request. The Athletic Director stated that, during the meeting, Parent 3 discussed biological differences and the challenges female athletes face, and what could happen when transgender athletes participate in other sports. The principal stated that Parent 3 was focused on the safety of his child with allowing a transgender student to participate in track. The principal stated that she communicated to Parent 3 that the district was not looking at asking the CIAC to change the transgender policy. On April 2, 2019, Parent 3 emailed the principal and Athletic Director thanking them for meeting with him; he emphasized two points relative to the fairness of the policy and the implications if an elite transgender athlete were ever to participate. He also included resources related to Oregon's policy, as well an NSAF's press release regarding transgender participation.

In an email dated April 12, 2019, to the District Director of Health and Physical Education, K-12 (the Director), Parent 2 acknowledged their recent conversation regarding Title IX; asked the Director for clarification regarding why the principal, as a voting CIAC member, could set different athletic expectations for girls and boys teams and questioned why that did not violate Title IX. Parent 2 also questioned why the CIAC had separate competitions for boys and girls if the CIAC's purpose was just participation, and whether the concept of gender fluidity would satisfy Title IX when there was no distinction between the sexes.

*Canton:*

Canton advised OCR that it was required to comply with the CIAC's Revised Transgender Participation Policy because the CIAC is the governing body for interscholastic athletics. Canton also noted that the Revised Transgender Participation Policy follows state law. Canton reported that it does not currently have any transgender students of which it is aware participating in its athletics program, nor has it challenged the CIAC's Revised Transgender Participation Policy.

*Danbury:*

Danbury stated that it was required to follow the Revised Transgender Participation Policy because the CIAC is the governing body of athletics for the state and it is required to follow all of the CIAC rules, regulations, and policies. Danbury reported that it does not currently have any transgender students of which it is aware participating in its athletics program. Danbury stated that it has not expressed concerns about the policy to the CIAC.

*Hartford (School A1):*

Student A was a 10th grade student who participated on School A1's athletics program during school year 2017-2018.[44] During the indoor track season of school year 2017-2018, Student A

---

[44] During school year 2017-2018, Student A attended another school in Hartford that does not have a sports program; as a result, Student A participated in athletics through School A1's program.

Case 2:21-cv-00316    Document 49-1    Filed 06/23/21    Page 33 of 50 PageID #: 862
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

was a student-athlete on School A1's boys' indoor track team. During the outdoor track season of school year 2017-2018, Student A was a student-athlete on School A1's girls' outdoor track team. School A1 staff stated that as a CIAC member, School A1 is required to follow the CIAC policy and is also required to follow state law.

*Bloomfield:*

Student A was enrolled in School A2 in Bloomfield as an 11th grade student during school year 2018-2019. Bloomfield stated that as a member of the CIAC, it is required to follow the CIAC rules regarding participation, eligibility, and other matters, including the Revised Transgender Participation Policy.[45] Bloomfield denied that Student A's participation has had a negative impact on other female students in the district, as Bloomfield does not cut any students from the girls' indoor or outdoor track teams; therefore, anyone who wishes to participate can. Bloomfield staff opined that while a student may have lost to a transgender student, overall, everyone's performance has benefited from the participation of Student A; and that participation in athletics is not about winning.

*Cromwell:*

Student B was enrolled in School B in Cromwell as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. During school years 2017-2018 and 2018-2019, Student B was a student-athlete on School B's varsity girls' indoor and outdoor track teams.

Cromwell stated that it has one transgender student (Student B) participating in its interscholastic athletics program, and noted that Student B's records since her enrollment at School B in school year 2016-2017 have indicated that she was female; accordingly, Student B was placed on female rosters. Cromwell staff stated that they are required to follow the Revised Transgender Participation Policy as it is set by the CIAC, which is their governing body. Cromwell staff stated that none of their district students have been affected negatively by Student B's participation.

**Legal Standards**

Subpart D of the regulation implementing Title IX prohibits discrimination on the basis of sex in education programs and activities. 34 C.F.R. § 106.31(b)(7) of Subpart D states that in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex, limit any person in the enjoyment of any right, privilege, advantage, or opportunity. 34 C.F.R. § 106.41 of Subpart D specifically applies to athletics. The regulation implementing Title IX, at 34 C.F.R. § 106.41(a), states that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person, or otherwise be discriminated against, in

---

[45] Bloomfield denied that it has received any requests from students to participate in its interscholastic athletics program pursuant to the Revised Transgender Participation Policy. Bloomfield stated that it currently has a transgender student participating on its girls track team (Student A), but noted that the student registered and enrolled at School A2 as a female, i.e., the student's school records indicated that she was female; therefore, Bloomfield was not required to make any determinations pursuant to the policy.

ARCHIVED AND NOT FOR RELIANCE

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 33 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

any interscholastic athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis. The regulation implementing Title IX, at 34 C.F.R. § 106.41(b), states that, notwithstanding the requirements of 34 C.F.R. § 106.41(a), a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.[46] The regulation implementing Title IX, at 34 C.F.R. § 106.6(c), states that the obligation to comply with the regulation is not obviated or alleviated by any rule or regulation of any athletic or other league, which would render any student ineligible to participate or limit the eligibility or participation of any student, on the basis of sex, in any education program or activity operated by a recipient.[47]

The Supreme Court's holding in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020), does not alter the relevant legal standard under 34 C.F.R. § 106.41, or how that provision interacts with 34 C.F.R. § 106.31 or 34 C.F.R. § 106.6. In *Bostock*, the U.S. Supreme Court held that an employer violated Title VII of the Civil Rights Act of 1964 by terminating a transgender employee on the basis of their transgender status. *See Bostock*, 140 S. Ct. at 1743 ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex."). However, the Court expressly declined to decide questions about how its interpretation of Title VII would affect other statutes:

> The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.

*Id.* at 1753. Indeed, the Court clearly stated that the "only question before [it] is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

The Court's holding was consistent with the position of the transgender employee who filed suit in a companion case to *Bostock—R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 140 S. Ct. 1731 (2020). During oral argument before the U.S. Supreme Court, the employee's counsel conceded that the outcome of the case was not relevant, one way or another, to the question of whether a recipient's willingness to allow a biological male who identified as a transgender female to compete against biological females constituted a violation under Title IX:

---

[46] Where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try out for the team offered unless the sport involved is a contact sport. 34 C.F.R. § 106.41(b).

[47] OCR understands that the CIAC and the individual school districts maintain that the Revised Transgender Participation Policy is consistent with, and required by, Connecticut state law. OCR takes no view on the requirements of Connecticut law except to note that the duty to comply with Title IX and its implementing regulation is independent of any such requirements.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 34 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

> JUSTICE GINSBURG: [T]his is a question of someone who has transitioned from male to female … and wants to play on the female team. She is not questioning separate female/male teams. But she was born a man. *She has transitioned. She wants to play on the female team. Does it violate Title IX which prohibits gender-based discrimination*?

> MR. COLE: Right. And I think *the question again would not be affected even by the way that the Court decides this case*, because the question would be, is it permissible to have sex-segregated teams, yes, where they involve competitive skill or – or contact sports, and then the question would be, how do you apply that permissible sex segregation to a transgender individual?

Oral Arg. Tr., *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, No. 18-107, at 17-18, *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/18-107_c18e.pdf. (emphasis added). After reviewing *Bostock*, the Office for Civil Rights concurs with counsel for the employee's concession in *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, that the *Bostock* holding does not alter the legal authority for sex-segregated teams under Title IX. Even if *Bostock* applied to Title IX—a question the Supreme Court expressly declined to address—its reasoning would only confirm that Title IX does not permit a biologically male student to compete against females on a sex-segregated team or in a sex-segregated league.

As an initial matter, despite some similarities, Title IX differs from Title VII in important respects. Title IX has different operative text, is subject to different statutory exceptions, and is rooted in a different Congressional power. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 275, 286-87 (1998). Significantly, unlike Title VII, one of Title IX's crucial purposes is protecting women's and girls' athletic opportunities. Indeed, Title IX was passed, and implemented by regulations, to prohibit discrimination on the basis of sex in education programs and activities and to protect equal athletic opportunity for students who are biological females, including providing for sex-segregated athletics. Congress specifically mandated that the Department of Education consider promulgating regulations to address sports. After first enacting Title IX, Congress subsequently passed another statute, entitled the Javits Amendment, which instructed the Secretary of Education to publish regulations "implementing the provisions of Title IX . . . which shall include with respect to intercollegiate activities reasonable provisions considering the nature of the particular sports." Public Law 93–380 (HR 69), Section 844, 88 Stat 484 (August 21, 1974). Congress indicated in the same bill that following the publication of those regulations, Congress itself would review the regulations and determine whether they were "inconsistent with the Act from which [they] derive[] [their] authority." *Id*.

Pursuant to the Javits Amendment, the Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the athletics regulations. After Congressional review over six days of hearings, Congress ultimately allowed the regulations to go into effect, consistent with its prior statement that Congress itself would review the regulations to ensure consistency with Title IX. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder). In doing so, Congress deemed the Department's athletics regulations to be consistent with Title IX.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

The Department's regulations validly clarify the scope of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams. *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("The degree of deference [to the Department of Education] is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX."). Specifically, although the Department's regulations have long generally prohibited schools from "provid[ing] any athletics separately" on the basis of sex, they permit schools to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a), (b). In those circumstances, men and women are not similarly situated because of their physiological differences, and separating them based on sex is accordingly not prohibited by Title IX. *See Bostock*, 140 S. Ct. at 1740 ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated."). Thus, schools may offer separate-sex teams. Indeed, such separate-sex teams have long ensured that female student athletes are afforded an equal opportunity to participate. 34 C.F.R. § 106.41(c)(1). Those regulations authorize single-sex teams because physiological differences are relevant.

Even assuming that the Court's reasoning in *Bostock* applies to Title IX—a question the Court expressly did not decide—the Court's opinion in *Bostock* would not affect the Department's position that its regulations authorize single-sex teams under the terms of 34 C.F.R. § 106.41(b). The *Bostock* decision states, "An individual's homosexuality or transgender status is not relevant to employment decisions" because an employee's sex is not relevant to employment decisions, and "[se]x plays a necessary and undisguisable role in the decision" to fire an employee because of the employee's homosexual or transgender status. *Bostock*, 140 S. Ct. at 1741, 1737. Conversely, however, there are circumstances in which a person's sex *is* relevant, and distinctions based on the two sexes in such circumstances are permissible because the sexes are not similarly situated. Congress recognized as much in Title IX itself when it provided that nothing in the statute should be construed to prohibit "separate living facilities for the different sexes." *See, e.g.*, 20 U.S.C. §1686; *see also* 34 C.F.R. § 106.32(b) (permitting schools to provide "separate housing on the basis of sex" as long as housing is "[p]roportionate" and "comparable"); 34 C.F.R. § 106.33 (permitting "separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex").

The Court's opinion in *Bostock* also does not affect the Department's position that its regulations authorize single-sex teams based only on biological sex at birth—male or female—as opposed to a person's gender identity. The Court states that its ruling is based on the "assumption" that sex is defined by reference to biological sex, and its ruling in fact rests on that assumption. *See Bostock*, 140 S. Ct. at 1741 ("[T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth."). The logic that an employer must treat males and females as similarly situated comparators for Title VII purposes necessarily relies on the premise that there are two sexes, and that the biological sex of the individual employee is necessary to determine whether discrimination because of sex occurred. Where separating students based on sex is

Case: 2:21-cv-00316   Document 49-2   Filed 06/02/22   Page 37 of 50 PageID #: 866
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 36 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

permissible—for example, with respect to sex-specific sports teams—such separation must be based on biological sex.

Additionally, if *Bostock*'s reasoning under Title VII were applied to policies regarding single-sex sports teams under Title IX, it would confirm that the Department's regulations authorize single-sex teams only based on biological sex.  In *Bostock*, the Court took the position that "homosexuality and transgender status are inextricably bound up with sex," such that "when an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *See id.* at 1742, 1744.  Under that logic, special exceptions from single-sex sports teams based on homosexuality or transgender status would themselves generally constitute unlawful sex discrimination, because homosexuality and transgender status are not physiological differences relevant to the separation of sports teams based on sex.  In other words, if *Bostock* applies, it would require that a male student-athlete who identifies as female not be treated better or worse than other male student-athletes.  If the school offers separate-sex teams, the male student-athlete who identifies as female must play on the male team, just like any other male student-athlete.  For all of these reasons, the Department continues to interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams "for members of *each sex*" (emphasis added), to mean operation of teams for biological males, and for biological females, and does not interpret Title IX to authorize separate teams based on each person's transgender status, or for members of each gender identity.  When a recipient provides "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), the recipient must separate those teams on the basis of biological sex, and not on the basis of homosexual or transgender status.

The holding in *Bostock* addressed the context of an employment situation in which a distinction based on sex was prohibited and not permitted under Title VII.  The *Bostock* holding does not alter the legal authority for single-sex athletic teams under Title IX because Title IX and its implementing regulations permit certain distinctions based on sex under 34 C.F.R. 106.41(b).  The Office for Civil Rights therefore issues this Revised Letter of Impending Enforcement Action to clarify that it will continue to proceed with bringing the recipients in this matter into compliance with Title IX.

## Analysis and Conclusions

The Complainant alleged that the CIAC's Revised Transgender Participation Policy discriminated against female student-athletes competing in interscholastic girls' track in the state of Connecticut on the basis of their sex.  Specifically, the Complainant alleged that as a result of the CIAC's Revised Transgender Participation Policy, Students A and B were permitted to compete in girls' track athletic competitions, which resulted in female student-athletes being denied the benefits of an education program or activity and the opportunities to participate in higher level and/or post-season competitions.

### The CIAC:

OCR determined that the CIAC, by purporting to provide sex-segregated teams under 34 C.F.R. § 106.41(b) yet permitting the participation of biologically male students in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied

Case 2:21-cv-00316    Document 54-2    Filed 03/27/22    Page 38 of 50 PageID #: 867

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 37 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

female student-athletes benefits and opportunities, including to advance to the finals in events; to advance to higher level competitions, such as the State Open Championship or the New England Regional Championship; to win individual and team state championships, along with the benefit of receiving medals for these events; to place higher in any of the above events; to receive awards and other recognition; and possibly to obtain greater visibility to colleges and other benefits. For these same reasons, OCR also determined that the CIAC treated students differently based on sex, by denying opportunities and benefits to female student-athletes that were available to male student-athletes, including the opportunity to compete on and against teams comprised of members of one sex. Indeed, CIAC also treated male student-athletes whose gender identity does not align with their sex more favorably than other male student-athletes, by affording them the opportunity to compete on and against teams comprised of members of the opposite sex.

With respect to the three student-athletes on whose behalf the complaint was filed (Student 1, Student 2, and Student 3), Student A's and Student B's 1st and 2nd place finishes, respectively, in the preliminaries of the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied Student 1, who placed 8th, the opportunity of advancing to the finals in this event, since only the top 7 finishers advanced to the finals. Student A's and Student B's participation in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy had the most significant impact on Student 2. Specifically, Student A's 1st place finish, in the finals of the 2018-2019 Outdoor Class S Statewide Championship for the 100-meter dash and the 200-meter dash, denied Student 2, who placed 2nd in both events, the benefit of a 1st place finish; and Student A's and Student B's 1st and 2nd place finishes, in the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied an opportunity for Student 2, who placed 3rd, to place 1st in the event and receive the benefit of a 1st place medal. Denying a female student a chance to win a championship due to the lack of opportunity to compete on and against teams comprised solely of members of one sex, is inconsistent with Title IX's mandate of equal opportunity for both sexes.[48] Accordingly, OCR determined that the CIAC denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). OCR also has concerns that additional violations may have resulted from the Policy and from Student A's and B's participation in girls' track, including but not limited to losses or lowered placement in regular season meets; losses or lowered placement in conference championships; and an inability for some female student-athletes to participate generally in a race at any level (not just championship level).

With respect to the Team Championships for the 2018-2019 Indoor State Open Championship, absent Student A's participation, School A2 earned 26 points in 4 different events. Adding the 8 points for the 4 x 200 relay, in which School A2 may have placed and earned points even without Student A, School A2 would have earned 34 points, behind School 1, which had 39 points. Subtracting the 8 relay points would have also placed School A behind School 3. Thus, Student A's participation may have denied School 1 and its female student-athletes the benefit of a team

---

[48] See *McCormick v. School District of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("A primary purpose of competitive athletics is to strive to be the best. . . . Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

Case 2:21-cv-00316   Document 49-1   ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 38 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

championship, and may have denied School 3, and other schools, the benefit of a higher placement.[49]

**Glastonbury**:

OCR determined that the participation of Glastonbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 1, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Student 1 and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Further, Glastonbury is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Glastonbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Glastonbury's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Glastonbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 1, and other female student-athletes competing against Students A and B, denied Student 1 the opportunity to place higher in events, such as the 100-meter dash at the 2017-2018 Outdoor State Championship and New England Regional Championship; the 55-meter dash at the 2018-2019 Indoor CCC Regional Championship; and the 200-meter dash at the 2018-2019 Outdoor State Championship. Student A's and Student B's 1st and 2nd place finishes, respectively, in the preliminaries of the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied Student 1, who placed 8th, the opportunity of advancing to the final in this event, since only the top 7 finishers advanced to the finals.

**Canton**:

OCR determined that the participation of Canton in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 2, and other female student-athletes, competing against Students A and B, denied athletic benefits and opportunities to Student 2, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Further, Canton is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Canton placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were

---

[49] With respect to the 2018-2019 Outdoor State Open Championships, held on June 3, 2019. The top five finishers were as follows: School 3: 58 points; Windsor: 43 points; School A2: 38 points; Norwich Free Academy: 32 points; Immaculate: 30 points. Student A's participation earned school A2 an additional 10 to 20 points and a third-place finish when School A2 might otherwise have finished no better than 5th.

Case 2:21-cv-00316    Document 41-4    Filed 07/27/21    Page 40 of 50 PageID #: 869
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 39 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Canton's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Canton in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 2, and other female student-athletes competing against Students A and B, denied Student 2 the opportunity to place higher in events, such as the Class S Outdoor Championships; the Indoor and Outdoor State Open Championships; and the New England Regional Championships. Specifically, Student A's and Student B's 1st and 2nd place finishes respectively, in the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied an opportunity for Student 2, who placed 3rd, to place 1st in the event and receive the benefit of a 1st place medal. Student A's 1st place finish, in the finals of the 2018-2019 Outdoor Class S Statewide Championship for the 100-meter dash and the 200-meter dash, denied Student 2, who placed 2nd in both events, the benefit of a 1st place finish. Student A's 1st place finish in the finals of the State Open Championship in the 200-meter dash denied Student 2, who finished 4th, the benefit of a top-three finish.

**Danbury**:

OCR determined that the participation of Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 3, and other female student-athletes, competing against Students A and B, denied athletic benefits and opportunities to Student 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Further, Danbury is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Danbury's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 3, and other female student-athletes competing against Students A and B, denied Student 3 the opportunity to place higher in events, such as at the Outdoor State Open Championships and the New England Regional Championships. Specifically, Student A's 1st place finish in the finals of the State Open Championship in the 200-meter dash denied Student 3, who finished 3rd, the benefit of placing 2nd in the event; and Student A's 1st place finish in the finals of the 200-meter dash at the Outdoor New England Regional Championships denied Student 3, who finished 3rd the benefit of placing 2nd in the event.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 40 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**Hartford (School A1):**

Student A participated in girls' outdoor track on School A1's team in Hartford during school year 2017-2018.  OCR determined that the participation of School A1 in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a).  Further, Hartford is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b).  Hartford's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC.  34 C.F.R. § 106.6(c).

**Bloomfield**:

Student A participated in girls' indoor and outdoor track for Bloomfield during school year 2018-2019.  OCR determined that the participation of Bloomfield in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a).  Further, Bloomfield is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Bloomfield's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

**Cromwell**:

Student B participated in girls' indoor and outdoor track for Cromwell during school years 2017-2018 and 2018-2019.  OCR determined that the participation of Cromwell in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student B's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a).  Further, Cromwell is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Cromwell's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

For the aforementioned reasons, OCR also determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury treated student-athletes differently based on sex, by denying opportunities and benefits to female student-athletes that were available to male student-athletes.

## II.    RETALIATION

The Complainant also alleged that (1) the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

2019, that the CIAC's Executive Director would no longer accept communications from her; and (2) that Glastonbury's track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by (a) replacing Student 1 on the sprint medley relay team in February 2019; (b) telling Student 1 and her parents that he could not give a good report to college coaches about her in March and May 2019; (c) denying Student 1 a position as a team captain in March 2019; and (d) suggesting that Student 1 should leave the outdoor track team due to her schedule, in March and May 2019.

**Findings of Fact**

1. **Allegation Regarding the CIAC's Retaliation**

OCR determined that the CIAC Handbook in effect during school year 2018-2019 sets forth the CIAC's "Communication Protocol Rules, Regulations and Interpretations" (Communication Protocol). According to the Communication Protocol, the CIAC Board of Control is the official body charged with the responsibility of interpreting the CIAC's rules and regulations. The Communication Protocol provides, in pertinent part, that "[i]nquiries to the CIAC office from parents, student-athletes, coaches and the public requesting an interpretation of the rules and regulations will be referred back to the member school principal or his/her designee." In addition, Section 4.21 of the CIAC Handbook, "Regulation Interpretation/CIAC Protocol in Providing Decisions to School Personnel and Public (Effective July 1, 2006)," provides, in pertinent part, "The CIAC staff will not discuss CIAC rules and regulations with anyone other than school administrators and athletic directors. Telephone inquiries from parents and coaches will not be honored. **All calls from anyone other than the athletic director or school administrator will be referred back to the school.**" (Emphasis in original.)

OCR determined that Parent 1 initially contacted the CIAC about the policy when she sent a letter dated February 21, 2018, to the CIAC's former Executive Director, in which she requested that the CIAC establish a rule to address transgender athletes' participating in the girls' state championship track competitions. In an email dated March 10, 2018, the former Executive Director responded by acknowledging that issues surrounding transgender student-athlete participation are complicated; advising Parent 1 that the CIAC's policy is directly aligned with state anti-discrimination law, including the state's definition of gender to include gender identity; and reminding Parent 1 that most high school athletes are minors and are therefore afforded a unique level of legal protection regarding their right to privacy.

On January 24, 2019, Parent 1 sent an email to the CIAC's current Executive Director, attaching a letter in which she again requested that the CIAC establish a rule for transgender athletes' participating in state championship track competitions and setting forth her own proposal for the placement and scoring of transgender female athletes participating in state championships.[50] The

---

[50] Specifically, Parent 1 proposed the following: "Male-to-female transgender athletes who have not yet undergone hormone therapy should compete as exhibition athletes, with results not included for scoring and placing. This would ensure that the needs of both of these protected classes are met. The transgender athletes would still be able to **participate** on the team in which they identify and the female-born athletes would be afforded the opportunity to **compete** in a race that is not clouded by questions of unfair advantage." (Emphasis in original.)

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 42 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Executive Director responded by email the same day, advising Parent 1 that the appropriate process for addressing her proposal would be to speak with the athletic director or principal at her child's school, as policy or rule proposals "may be submitted through member leagues, sport committees, member principals, [the Connecticut Association of Athletic Directors], or the Connecticut High School Coaches Association." Parent 1 replied to the director's email that same day, January 24, 2019, stating that she would follow up with the principal and athletic director at her child's school to see if they would be willing to submit her proposal.

OCR determined that on February 1, 2019, the principal and the Executive Director spoke by telephone, regarding Parent 1's letter and proposal. The Executive Director memorialized the call in an email to the principal that same day, in which he stated that the CIAC would be convening a gender subcommittee meeting on February 7, 2019, with the task of reviewing all the CIAC bylaws, processes, procedures in which gender plays a role, including the Revised Transgender Participation Policy; and that he would share a redacted copy of Parent 1's letter with the subcommittee members, in order "to provide all points of view to ensure a rich discussion among committee members."

OCR determined that in response to Parent 1's request, made through her building principal, for an in-person meeting with a CIAC representative, the Executive Director attended a meeting at the school with Parent 1 and the principal on February 28, 2019. The Executive Director stated that, at the meeting, he explained to Parent 1 why the CIAC believed that the Revised Transgender Participation Policy was in alignment with Title IX and Connecticut state law, and advised Parent 1 that he believed that Title IX did not apply to the parent's concerns because Title IX does not address winning. Following the meeting, that same day, Parent 1 sent an email to the Executive Director, in which she thanked him for visiting the school and wrote that "[i]t was helpful to hear from you directly regarding the transgender policy and to understand what the CIAC process will be for reviewing this issue."

OCR determined that on March 28, 2019, Parent 1 sent an email to the Executive Director, in which she attached a letter and included links to several websites concerning issues related to the Revised Transgender Participation Policy. The Executive Director responded by email that same day, stating that he had read her email, and cordially reminded her that any further correspondence to the CIAC should come through her principal. The Complainant did not provide, nor did OCR find, evidence of any further communications between Parent 1 and the Executive Director.

The Executive Director denied that he banned Parent 1 from sending communications to him. Rather, the Executive Director stated that he treated Parent 1 in a manner consistent with how he treated other individuals in similar situations, by reminding her of the CIAC's policy that communications must go through the member school's representative. OCR determined that the Executive Director has responded in a similar manner to other parents who sought to communicate directly with him in a similar fashion. OCR determined that none of the similarly situated parents had engaged in protected activities.

## 2. Allegations Regarding Glastonbury Track Coach Retaliation

Case 2:21-cv-00316   Document 49-2   Filed 07/27/21   Page 44 of 50 PageID #: 873
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 43 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The Complainant also alleged that a Glastonbury track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by (a) replacing Student 1 on the sprint medley relay team in February 2019; (b) telling Student 1 and her parents that he could not give a good report to college coaches about her in March and May 2019; (c) denying Student 1 a position as a team captain in March 2019; and (d) suggesting that Student 1 should leave the outdoor track team due to her schedule, in March and May 2019.

**Allegation (a):**

OCR determined that a team made up of students from Glastonbury's girls' indoor track team competed at the 2019 New Balance Nationals Track and Field championships ("Nationals"). The track coach stated that the meet is not a CIAC or school-sanctioned meet; therefore, any student who participates does so on an individual basis, not on behalf of Glastonbury. The track coach stated that, accordingly, the Glastonbury coaches do not choose who may attend the meet or choose which athletes will participate in which events. Rather, the individual students choose, on their own, whether to compete in the meet, and who will compete in the events, including relays. The track coach further stated that it was his understanding that Student 1 was not selected to run in a relay at the meet, but he denied that he played a role in this decision. He further stated that his understanding was that the other athletes decided that Student 1 would not compete in the relay, but he did not know why they had made that decision.

Student 1 confirmed that it is each individual student-athlete's decision whether to attend Nationals, if she qualifies; however, she stated that for relay events, a track coach was responsible for signing up the various teams. Parent 2 indicated that this is to prevent students from different schools entering themselves as a single "power team." Student 1 stated that although she had a qualifying time for the sprint medley relay in December 2018,[51] she was not asked to join the sprint medley relay team for Nationals in March 2019. Student 1 stated that, during the regular season, coaches pick the best athletes that are capable of running times that they would like to see for an overall split in the event, but that she was not fully aware of how the coaches make those determinations. Student 1 acknowledged that she was not sure which coach picked the sprint medley relay team for Nationals, but she assumed that a coach picked the team because that was what was done for all other meets during the season.

**Allegation (b):**

The Complainant stated that at the first practice of the outdoor season on March 16, 2019, the track coach told Parent 4 that he had nothing good to say about Student 1 to a college coach; and on or about May 1, 2019, the track coach told Student 1 that he could not give a good report of her to college coaches.

The track coach denied that he told either Student 1 or her parents that he could not give a good report to college coaches about Student 1. The track coach stated that it is his practice to be completely honest with college coaches, to ensure that college coaches continue to trust and rely

---

[51] The records Glastonbury provided indicate that Student 1 participated on a sprint medley relay team during a meet held on December 22, 2018.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

on his recommendations of athletes. The track coach stated that because of this, on or about March 16, 2019, in the course of a discussion with Parent 4 about the Student 1's workouts and her college future, he told Parent 4 that he is "100% honest with a college coach when asked any questions about any of the athletes."[52] The track coach stated that he had also told Student 1 that he would be 100% honest with college coaches, although he did not recall the date of this conversation or the specific context in which the subject was raised. The track coach also advised OCR that Student 1 has not requested that he give a recommendation or report to any college coach on her behalf, nor has any college coach requested information about Student 1.

Student 1 denied that the track coach told her that he would be honest with any college coaches, and instead maintained that the track coach told her, and Parent 4, that he did not have anything good to say about her and could not give a good report about her. Student 1 stated that the track coach made this statement to her one day when she was letting him know that she was leaving practice for work. Student 1 confirmed that she has not asked the track coach to speak with any coaches on her behalf.

**Allegation (c):**

The Complainant stated that the track coach told Student 1 that he did not select her as team captain because she departed early from practice on Fridays for work, despite her having served as team captain during the indoor season and not receiving any complaints about her as a captain. The track coach stated that students who wish to be considered for a team captain position are required to submit a written statement concerning their interest at the beginning of each season, indoor and outdoor. All of the coaches then select the team captains as a group. If there are any disagreements among the coaches, the track coach makes the final decision regarding the selection. The track coach stated that the qualifications for team captain are hard work, dedication, leadership, sportsmanship, and appropriately representing the high school. The track coach stated that the number of captains for the team typically ranges from three to seven for each season, depending on the size of the team and the number of qualified athletes who apply.

The track coach stated that in December 2018, Student 1 was selected as a captain for the indoor season 2018-2019; but that the decision was not unanimous because at least two coaches questioned Student 1's qualifications for a captain position, stating that they believed that she had not shown enough leadership, dedication and maturity.[53] The track coach stated that despite the concerns raised by other coaches, he chose Student 1 to be a captain for that season because he had observed her helping new athletes on the team and he believed that she would step up to the challenge.

The track coach stated that in March 2019, Student 1 applied to be a captain for the outdoor season 2018-2019. He stated that after speaking with all of the coaches, it was unanimous that they would not select Student 1 to be a captain for a number of reasons. He stated that the main reason was that during the indoor season (December 2018 – January 2019), Student 1 had, on several

---

[52] The track coach stated that in reply to his remark, Parent 4 stated that he understood.
[53] Specifically, an assistant track coach stated that he had concerns about Student 1's being selected as captain because he did not believe that Student 1 had the maturity to be a captain.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 45 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

occasions, displayed poor sportsmanship at meets by ripping off her headband and storming away at the conclusion of her race. In addition, the track coach stated, and another coach confirmed, that during the indoor season, Student 1 often skipped her sprint workouts in favor of spending more time doing her long jump workouts; or claimed that she had an injury and could not do her sprint workouts, despite being able to do her long jump workouts and being cleared by the trainer. An assistant coach confirmed that during the indoor season, Student 1 failed to follow his instructions during practice, often did not complete her workouts, and exhibited poor sportsmanship at meets. Both the assistant coach and another coach agreed that Student 1 should not be selected as a captain for the outdoor season. The track coach stated that during a prior school year, he declined to select a student as team captain because she similarly failed to demonstrate leadership qualities/maturity. Glastonbury stated that this student had not engaged in protected activities.

### Allegation (d):

The Complainant alleged that on or about March 25, 2019, the track coach told Student 1 that she should consider leaving the team if she did not attend full practice every day. The Complainant alleged that the track coach had not asked other student-athletes to leave the team due to missing practices for work commitments. The Complainant also alleged that on or about May 1, 2019, the track coach complained to Student 1 about her missing Friday practices.

The track coach denied that he had an issue with Student 1's leaving practice early on Fridays and denied that he specifically told her that she should leave the team. The track coach stated that he and the other coaches emphasized the importance of practice during meetings held at the beginning of the season with the student-athletes and their parents; but he denied having told any students recently, including Student 1, that they should consider leaving the team if they did not attend full practice every day. The track coach further stated that he was aware that Student 1 left practice early on Fridays for work; and stated that he did not object to this, particularly because the team often ends practice early on Fridays during the winter when the gym is used for high school basketball games and because Friday practices are typically lighter prior to the track team competitions on the weekends.

### Legal Standards

The regulation implementing Title IX, at 34 C.F.R. § 106.71, incorporates by reference 34 C.F.R. § 100.7(e) of the regulation implementing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which provides that no recipient or other person shall intimidate, threaten, coerce or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing held in connection with a complaint. The following three elements must be satisfied to establish a prima facie case of retaliation: (1) an individual engaged in a protected activity; (2) an individual experienced an adverse action caused by the recipient; and (3) there is some evidence of a causal connection between the adverse action and the protected activity. When a prima facie case of retaliation has been established, OCR then determines whether there is a facially legitimate, non-retaliatory

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 46 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

reason for the adverse action; and if so, whether the facially legitimate, non-retaliatory reason is a pretext for retaliation.

**Analysis and Conclusions**

### 1. Allegation Regarding the CIAC's Retaliation

The Complainant alleged that the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the CIAC's Executive Director would no longer accept communications from her.  OCR determined that Parent 1 engaged in protected activity on February 22, 2018, January 24, 2019, and March 28, 2019, when she sent emails expressing concern regarding the Revised Transgender Participation Policy to the CIAC's Executive Director;[54] and on February 28, 2019, when Parent 1 met with the Executive Director in person to discuss her concerns about the policy.  OCR determined that the CIAC was aware of Parent 1's protected activity.

OCR determined, however, that the CIAC proffered a legitimate, non-retaliatory reason for the Executive Director's statement to Parent 1 that "further correspondence to CIAC has to come through your principal"; namely, that the CIAC staff typically did not communicate directly with parents and Parent 1 should have communicated her concerns with the athletic director or school administrator.  OCR determined that the proffered reason was not a pretext for retaliation, as the Executive Director's instruction was consistent with the CIAC policy and the Executive Director's directives to other parents who had not engaged in protected activities.  Therefore, OCR determined that there was insufficient evidence to substantiate the Complainant's allegation that the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the Executive Director would no longer accept communications from her.  Accordingly, OCR will take no further action with respect to this allegation.

### 2. Allegations Regarding Glastonbury Track Coach Retaliation

OCR determined that Parent 2 engaged in protected activity by sending emails to the Athletic Director in May, June, and July 2018, expressing her concerns that as a result of the Revised Transgender Participation Policy "[c]isgender girls are no longer provided opportunities in scholastic athletics that are equal and proportionate to the opportunities that boys are provided"; meeting with the Athletic Director, the principal, and the superintendent, on or about August 1, 2018, to discuss these concerns; meeting with the Athletic Director and Parent 4, on or about March 15, 2019, to again discuss these concerns; and telephoning and sending an email to the School's Title IX Coordinator in March and April 2019.  OCR determined that Parent 2 also engaged in protected activity in May and June 2018, and in March 2019, when she sent emails to the track coach regarding her objections to the policy and a petition that she had initiated in opposition to

---

[54] As discussed previously, Parent 1 communicated with the former the Executive Director in her email on February 22, 2018; and with the current Executive Director from January 24, 2019, onward.

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 47 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the policy.  OCR determined that the Glastonbury track coach was aware of the Parent 2's protected activity.

With respect to Allegation (a), OCR determined that neither the track coach nor any other Glastonbury employee denied Student 1 an opportunity to participate on a sprint medley relay team at the New Balance Nationals.  Rather, the students themselves chose who would participate.  Accordingly, OCR could not substantiate that the track coach or other Glastonbury employee subjected Student 1 to an adverse action.  Absent an adverse action, OCR does not proceed further with retaliation analysis.  Accordingly, OCR will take no further action regarding Allegation (a).

With respect to Allegation (b), OCR must often weigh conflicting evidence in light of the facts and circumstances of each case and determine whether the preponderance of evidence supports the allegation.  Here, OCR did not find that the preponderance of the evidence supported the Complainant's assertion that the track coach told Parent 2 or Student 1 that he would not give a good report about Student 1 to college coaches.  Based on the foregoing, OCR determined that there was insufficient evidence to substantiate that the track coach subjected Student 1 to the alleged adverse action.  Absent an adverse action, OCR does not proceed further with a retaliation analysis.  Accordingly, OCR will take no further action regarding Allegation (b).

With respect to Allegation (c), OCR determined that the Glastonbury proffered a legitimate, non-retaliatory reason for not selecting Student 1 as a captain for the spring 2019 outdoor season; namely, that track coaches had concerns about Student 1's maturity and dedication after the winter 2018 indoor season.  Even assuming that the track coach also told Student 1 that the decision had to do with her leaving practice early on Fridays, OCR determined that would still be a legitimate, non-retaliatory reason for not selecting her.  OCR determined that the proffered reasons were not a pretext for retaliation, as other coaches corroborated the reasons for the decision and the track coach gave an example of another student who had not been re-selected as captain based on similar behaviors, who had not engaged in protected activities.  Additionally, OCR determined that there was no causal connection between the protected activity and the alleged adverse action, as the track coach selected Student 1 as a captain for the indoor season after she and Parent 2 had engaged in protected activities in 2018 and prior to their again engaging in protected activities in 2019.  Therefore, OCR determined that there was insufficient evidence to substantiate the Complainant's allegation that the Glastonbury track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by denying Student 1 a position as a team captain in March 2019.  Accordingly, OCR will take no further action regarding Allegation (c).

With respect to Allegation (d), OCR must often weigh conflicting evidence in light of the facts and circumstances of each case and determine whether the preponderance of evidence supports the allegation.  Here, OCR did not find that the preponderance of the evidence supported the Complainant's assertion that the track coach told Student 1 in March 2019 and May 2019, that she should consider leaving the team if she had to leave practice early.  Based on the foregoing, OCR determined that there was insufficient evidence to substantiate that the track coach subjected Student 1 to the alleged adverse action.  Absent an adverse action, OCR does not proceed further with a retaliation analysis.  Accordingly, OCR will take no further action regarding Allegation (d).

ARCHIVED AND NOT FOR RELIANCE

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 48 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

## Attempts to Resolve the Complaint

Via e-mail on February 12, 2020, OCR notified the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that it had determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury violated Title IX, and provided a proposed resolution agreement (the Agreement) to each that would resolve OCR's compliance concerns.  During subsequent telephone calls with counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, held during the period of February 13, 2020, through March 13, 2020, OCR informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of the specific violation, and explained the nature of the violations and the basis of its findings.  On multiple occasions during these communications, OCR informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of the 90-calendar day timeframe for negotiations as set forth in Section 303(f) of the *Manual*.  OCR also informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that the *Manual* states that OCR may end the negotiation period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached.  On March 12, 2020, counsel for Bloomfield, Hartford, and Cromwell, and on March 13, 2020, counsel for the CIAC, Glastonbury, Canton and Danbury, informed OCR that their clients would not sign the Agreements.

On March 17, 2020, OCR issued impasse letters to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury notifying the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that the negotiations had reached an impasse and a final agreement had not been reached.  Further, the letter informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in accordance with the *Manual*, Section 303(g), if an agreement was not reached within 10 calendar days of the date of the letter, i.e., by March 30, 2020, OCR would issue a Letter of Impending Enforcement Action indicating that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury are in violation of Title IX.  OCR also referred the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury to the *Manual*, at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf, in particular, Sections 303-305 and 601-602, for more information.

In emails dated March 27, 2020, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in view of their COVID-19-related duties and responsibilities, OCR was extending the ten-calendar day-deadline to respond to OCR's proposed resolution agreements for a period of 30 days, to April 27, 2020; and that if agreement was not reached by that date, OCR would issue a Letter of Impending Enforcement Action pursuant to Section 305 of the *Manual*.  None of the entities in this matter—the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury entered into a resolution agreement with OCR to remedy the violations, and a Letter of Impending Enforcement Action was sent on May 15, 2020.  No response to that Letter was received, either before or after the Court's decision in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020), on June 15, 2020.

Based on the failure of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury to resolve the identified areas of noncompliance, OCR will either initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance to

Case 2:21-cv-00316   Document 49-4   Filed 06/23/21   Page 50 of 50 PageID #: 879
ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Page 49 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, or refer the cases to the U.S. Department of Justice for judicial proceedings to enforce any rights of the United States under its laws. OCR will take further enforcement action after no fewer than 10 calendar days from the date of this letter if resolution of these complaints has not yet been reached. This letter constitutes a formal statement of OCR's interpretation of Title IX and its implementing regulations and should be relied upon, cited, and construed as such. Congress explicitly delegated to the OCR the task of prescribing standards for athletic programs under Title IX. As a result, the degree of deference to the Department is particularly high in Title IX cases.

This Letter of Impending Enforcement Action is not intended and should not be interpreted to address the compliance of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury with any other regulatory provision or to address any issues other than those addressed in this letter. The complainant may file a private suit in federal court whether or not OCR finds a violation.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions, please contact Nadja Allen Gill, Compliance Team Leader, at (646) 428-3801, or nadja.r.allen.gill@ed.gov.

Sincerely,

Kimberly M. Richey
Acting Assistant Secretary for Civil Rights

cc:   Glenn Lungarini, CIAC Executive Director, via email only
      Alan B. Bookman, Glastonbury Superintendent, via email only
      Kevin D. Case, Canton Superintendent, via email only
      Dr. Enza Macri, Cromwell Superintendent, via email only
      Dr. Sal V. Pascarella, Danbury Superintendent, via email only
      Dr. James Thompson, Jr., Bloomfield Superintendent, via email only
      Dr. Leslie Torres-Rodriguez, Hartford Superintendent, via email only
      Roger G. Brooks, Alliance Defending Freedom, Complainant, via email only



Neutral Citation Number: [2020] EWHC 3274 (Admin)

Case No: CO/60/2020

**IN THE HIGH COURT OF JUSTICE**
**ADMINISTRATIVE COURT**
**DIVISIONAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 01/12/2020

Before :

**THE PRESIDENT OF THE QUEEN'S BENCH DIVISION**
**LORD JUSTICE LEWIS**
**MRS JUSTICE LIEVEN**
- - - - - - - - - - - - - - - - - - - -
Between :

(1)  QUINCY BELL
(2)  MRS A

Claimants

and

THE TAVISTOCK AND PORTMAN NHS FOUNDATION TRUST

Defendant

NATIONAL HEALTH SERVICE COMMISSIONING BOARD (NHS ENGLAND)

Interested Party

(1)  UNIVERSITY COLLEGE LONDON HOSPITALS NHS FOUNDATION TRUST
(2)  LEEDS TEACHING HOSPITALS NHS TRUST
(3)  TRANSGENDER TREND LTD

Interveners

**Mr Jeremy Hyam QC and Mr Alasdair Henderson** (instructed by **Sinclairslaw**) for the **Claimants**
**Ms Fenella Morris QC and Ms Nicola Kohn** (instructed by **DAC Beachcroft**) for the **Defendant**
**The Interested Party** did not appear and was not represented
**Mr John McKendrick QC** (instructed by **Hempsons**) for the **First and Second Interveners**
**Mr Paul Skinner and Mr Aidan Wills** (instructed by **Ai Law**) for the **Third Intervener**
Hearing dates: **7 and 8 October 2020**

**JA0314**

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.


..............................


THE PRESIDENT OF THE QUEEN'S BENCH DIVISION
LORD JUSTICE LEWIS
MRS JUSTICE LIEVEN

**Dame Victoria Sharp P., Lord Justice Lewis, Lieven J**.

*SECTION A: INTRODUCTION AND BACKGROUND*

1.    This is the judgment of the court.

2.    This is a claim for judicial review of the practice of the defendant, the Tavistock and Portman NHS Foundation Trust, through its Gender Identity Development Service (GIDS) and the first and second Interveners (the Trusts) of prescribing puberty-suppressing drugs to persons under the age of 18 who experience gender dysphoria.

3.    Gender dysphoria or GD is a condition where persons experience distress because of a mismatch between their perceived identity and their natal sex, that is, their sex at birth. Such persons have a strong desire to live according to their perceived identity rather than their natal sex.

4.    Those with gender dysphoria may be referred to GIDS. GIDS may, in turn, refer them to one of two NHS Trusts (the first and second Interveners) whose clinicians may be prepared to undertake medical interventions in relation to those with gender dysphoria. We are concerned in this case with the administration of gonadotropin-releasing hormone agonists (GnRHa) which are hormone or puberty blocking drugs (also called PBs) to suppress the physical developments that would otherwise occur during puberty.

5.    Puberty blocking drugs can in theory be, and have in practice been, prescribed for gender dysphoria through the services provided by the defendant to children as young as 10. It is the practice of the defendant, through GIDS, to require the informed consent of those children and young persons to whom such drugs are prescribed.

6.    The issue at the heart of this claim is whether informed consent in the legal sense can be given by such children and young persons.

7.    The claimants' case is that children and young persons under 18 are not competent to give consent to the administration of puberty blocking drugs. Further, they contend that the information given to those under 18 by the defendant is misleading and insufficient to ensure such children or young persons are able to give informed consent. They further contend that the absence of procedural safeguards, and the inadequacy of the information provided, results in an infringement of the rights of such children and young persons under Article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms (the Convention).

8.    In our view, it is appropriate to consider first, whether a child under 16, or a young person between 16 and 18, can give the requisite consent; and secondly, if, in principle, they can do so, whether the information provided by the defendant and the Trusts is adequate for achieving informed consent.

9.    The court in this case is concerned with the legal requirements of the process of obtaining consent for the carrying out of medical treatment. In considering this issue the court has had to consider evidence on the use of PBs, their impact on the patients, both in the short and long term, and the evidence of the efficacy of their use.  The court is not deciding on the benefits or disbenefits of treating children with GD with PBs, whether in the long or short term. The court has been given a great deal of evidence

about the nature of GD and the treatments that may or may not be appropriate. That is not a matter for us. The sole legal issue in the case is the circumstances in which a child or young person may be competent to give valid consent to treatment in law and the process by which consent to the treatment is obtained.

10.   We have had placed before us written evidence from a wide variety of those engaged in issues surrounding GD and a number of individuals who have been treated or are still being treated with PBs.

11.   On behalf of the defendant and the Trusts there are statements from Dr Polly Carmichael, Director of GIDS, Professor Gary Butler, Consultant in Paediatric Endocrinology at University College Hospital London, and Dr Nurus-Sabah Alvi, Consultant in Paediatric Endocrinology at Leeds General Infirmary and Clinical Lead for Endocrine Liaison Clinics of the GIDS, Leeds. These witnesses describe the process that the children and young people go through at GIDS and at the Trusts. The court has also had a wide range of evidence from a variety of people concerned with the treatment of those under 18 with PBs. We will refer to that evidence and its sources as appropriate below. Our references to a child or children will be to those under the age of 16, and to young person(s) to anyone under the age of 18, save where it is clear from the context that we are referring to anyone under the age of 18.

*Gender Dysphoria*

12.   Gender dysphoria is defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) which provides for one overarching diagnosis of gender dysphoria with separate specific criteria for children and for adolescents and adults:

> "In adolescents and adults gender dysphoria diagnosis involves a difference between one's experienced gender and assigned gender, and significant distress or problems functioning. It lasts at least six months and is shown by at least two of the following:

> 1.   A marked incongruence between one's experienced / expressed gender and primary and / or secondary sex characteristics

> 2.   A strong desire to be rid of one's primary and / or secondary sex characteristics

> 3.   A strong desire for the primary and / or secondary sex characteristics of the other gender

> 4.   A strong desire to be of the other gender

> 5.   A strong desire to be treated as the other gender

> 6.   A strong conviction that one has the typical feelings and reactions of the other gender.

> In children, gender dysphoria diagnosis involves at least six of the following and an associated significant distress or impairment in function, lasting at least six months:

1.  A strong desire to be of the other gender or an insistence that one is the other gender

2.  A strong preference for wearing clothes typical of the other gender

3.  A strong preference for cross-gender roles in make-believe play or fantasy play

4.  A strong preference for toys, games or activities stereotypically used or engaged in by the other gender

5.  A strong preference for playmates of the other gender

6.  A strong rejection of toys, games and activities typical of one's assigned gender

7.  A strong dislike of one's sexual anatomy

8.  A strong desire for the physical sex characteristics that match one's experienced gender."

*Gender Identity Development Service (GIDS)*

13.  The defendant is an NHS Foundation Trust employing specialist staff including child psychologists, psychotherapists, psychiatrists, social workers, family therapists and nurses. Since 1989 it has provided a gender identity development service, a specialised service providing care to patients up to the age of 18 suffering from GD. GIDS is commissioned by the National Health Service Commissioning Board. The statutory mechanism is that under section 3B of the NHS Act 2006, the Secretary of State has the power to require NHS England to arrange services or facilities as may be prescribed by regulations. The Secretary of State has exercised that power (pursuant to Regulation 11 of the National Health Service Commissioning Board and Clinical Commissioning Groups (Responsibilities and Standing Rules) Regulations 2012/2296, which concerns specified services for rare and very rare conditions) that NHS England must arrange for the provision of services including, pursuant to para 56 of Schedule 4, a gender identity development service specifically for children and adolescents in addition to gender dysphoria services more generally (para 57).

14.  Schedule 2, Part A of the NHS Standard Contract, pursuant to which GIDS is provided, sets out the Service Specification which establishes the context of the service, its aims and objectives and the manner in which it will be delivered. As set out in the Service Specification, the service is commissioned to provide specialist assessment, consultation and care including psychological support and physical treatments. The purpose of the treatment is *"to help reduce the distressing feelings of a mismatch between their natal (assigned) sex and their gender identity."* The service also provides support to family and carers of children and young persons so affected.

15.  GIDS recognises three stages of physical intervention that may be appropriate in cases of GD. Stage 1 is the administration of GnRHa (one form of puberty blocker). This is clinically appropriate for children and young people who have reached Tanner Stage 2

of puberty and above. Tanner Stage 2 marks the beginning of the physical development of puberty. In natal girls this is the start of development of the breasts, and in boys the testicles and scrotum begin to get larger. Stage 2 of the treatment is the administration of cross-sex hormones (CSH) which can only be prescribed from around the age of 16. Stage 3 is gender reassignment surgery which is only available via adult services to people aged over 18.

16.    GIDS takes referrals from across England and Wales and from a wide range of professionals in the health, social services and education sectors, and the voluntary sectors. When a referral is made, the case will be discussed with the relevant regional team. If the intake is successful, then the child will then progress to the GIDS waiting list.

17.    As at November 2019 the waiting time for a first assessment at GIDS was between 22-26 months. When a young person reaches the top of the waiting list, they will be invited to the first of a number of assessment appointments at GIDS. The assessment process laid out in the Service Specification anticipates that the assessment process will typically span three to six sessions over 6 months or longer. Most young people will have more sessions than this, and the younger the age the more sessions are likely.

18.    Dr Carmichael said that during assessments young persons will be asked, for example, about: the onset of their gender dysphoria; the consistency of their feelings about their gender; how they identify (cross-gender, non-binary, etc); their relationships with peers and family members; their social functioning in general, thoughts about or experience of puberty; their relationship to their bodies; their attractions or romantic relationships as appropriate based on their age and maturity; and their hopes and expectations for the future.

19.    As this case is brought by way of judicial review of the GIDS policy and practice, rather than a challenge to an individual treatment decision, it is not possible to give a detailed analysis of the facts of an individual case and the degree to which all the matters referred to by Dr Carmichael were explored in the particular case.  We refer at paras 78 to 89 below to the evidence of the experience of the first claimant and some of the other patients of the GIDS service.

20.    Dr Carmichael sets out the broad range of professionals who work within GIDS, their specialism in working with young people with GD and the care that is taken when discussing the young person's expression of their gender identity.

21.    At the end of the assessment period the clinicians will agree a care plan with the young person and their family. Where the young person fulfils the criteria in the Service Specification and has reached at least Tanner Stage 2 of puberty, they will be referred by GIDS to the first and second Interveners for consultation and/or physical assessment with endocrinologists with a view to being prescribed PBs. Dr Carmichael explains that before any referral to the Trusts, GIDS clinicians discuss the treatment with the young person, including explaining side effects.

*The Age and Patient Group for Puberty Blockers*

22.    Until 2011 PBs were only available at GIDS for those aged 16 or older. In 2011 PBs started to be prescribed for those aged 12-15 and in mid-puberty. This was first done between 2011-14 at University College London Hospital (UCLH) under an approved research study known as the Early Intervention Study. The Study took an uncontrolled treatment cohort of 12-15 year olds with established and persistent GD in England. The Study recruited children for 3 years, but there was then a period until February 2019 when the last cohort member began the next stage of therapy (cross-sex hormones).

23.    One of the issues raised in these proceedings is the non-existent or poor evidence base, as it is said to be, for the efficacy of such treatment for children and young persons with GD.

24.    In that context, we note that though this research study was commenced some 9 years ago, at the time of the hearing before us the results of this research had yet to be published. Dr Carmichael says in her witness statement dated 2 February 2020 that a paper is now being finalised for publication. At the hearing we were told that that this paper had been submitted for peer-review but that Professor Viner, one of the authors of it, had yet to respond to issues raised by the reviewers, as he has been otherwise engaged in working on issues relating to the coronavirus pandemic.

25.    The court was however provided with a paper entitled *"The Early Intervention Study. An evaluation of early pubertal suppression in a carefully selected group of adolescents with "Gender Identity Disorder". A statement and update on the Early Intervention Study (dated 2020)".* We refer further to this paper at para 73 below.

26.    There are now two types of endocrine clinic: a clinic for under 15s, referred to as the early intervention clinic, and a clinic for over 15s. The Service Specification states that the early intervention clinic will continue to follow the 2011 Protocol, save that PBs will now be considered for any children *under the age of 12* if they are in established puberty.

27.    The age distribution of those treated with PBs in each year between 2011 and 2020 was not provided to the court. Although the defendant and the Trusts said that such data was available, in the sense that the ages of the children are known, the data has not been collated for each year. However, Ms Ailsa Swarbrick, the Divisional Director of Gender Services at the Trust, has presented evidence in relation to patients referred to endocrinology services in 2019-20 and those treated in earlier years but who were discharged from GIDS in 2019-2020. This work was done in response to recommendations in the GIDS Review Action Plan 2019 (a Review commissioned by the Trust following a report by Dr David Bell) that data would help to inform clinical and service developments and a process of continuous improvement.

28.    We note here that we find it surprising that such data was not collated in previous years given the young age of the patient group, the experimental nature of the treatment and the profound impact that it has.

29.   As it is, for the year 2019/2020, 161 children were referred by GIDS for puberty blockers (a further 10 were referred for other reasons). Of those 161, the age profile is as follows:

      3 were 10 or 11 years old at the time of referral;

      13 were 12 years old;

      10 were 13 years old;

      24 were 14 years old;

      45 were 15 years old;

      51 were 16 years old;

      15 were 17 or 18 years old.

For the year 2019/20, therefore, 26 of the 161 children referred were 13 or younger; and 95 of the 161 (well over 50%) were under the age of 16.

30.   It follows from the information that the court does have on age distribution that some young people could be on PBs for a number of years, in the most extreme case for 5 years between the age of 10 and when they start CSH at 16.

31.   Apart from the age distribution, there are other aspects of the patient group which are relevant to this case. The number of referrals to GIDS has increased very significantly in recent years. In 2009, 97 children and young people were referred. In 2018 that number was 2519.

32.   Further, in 2011 the gender split was roughly 50/50 between natal girls and boys. However, in 2019 the split had changed so that 76 per cent of referrals were natal females. That change in the proportion of natal girls to boys is reflected in the statistics from the Netherlands (Brik et al "*Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria"* 2018). The defendant did not put forward any clinical explanation as to why there had been this significant change in the patient group over a relatively short time.

33.   It is recorded in the GIDS Service Specification and the wider literature that a significant proportion of those presenting with GD have a diagnosis of Autistic Spectrum Disorder (ASD). The Service Specification says:

"There seems to be a higher prevalence of autistic spectrum disorder (ASD) conditions in clinically referred, gender dysphoric adolescents than in the general adolescent population. Holt, Skagerberg & Dunsford (2014) found that 13.3% of referrals to the service in 2012 mentioned comorbid ASD (although this is likely to be an underestimate). This compares with 9.4% in the Dutch service; whereas in the Finnish service, 26% of adolescents were diagnosed to be on the autism spectrum (Kaltiala-Heino et al. 2015)."

34.     The court asked for statistics on the number or proportion of young people referred by GIDS for PBs who had a diagnosis of ASD. Ms Morris said that such data was not available, although it would have been recorded on individual patient records. We therefore do not know the proportion of those who were found by GIDS to be *Gillick* competent who had ASD, or indeed a mental health diagnosis.

35.     Again, we have found this lack of data analysis – and the apparent lack of investigation of this issue - surprising.

*The process of taking consent*

36.     The position taken by GIDS is that they will only refer a young person for PBs if they determine that person is competent to give consent, i.e. is *Gillick* competent within the meaning of competence identified in the decision of the House of Lords in *Gillick v West Norfolk and Wisbech Health Authority* [1986] AC 112.

37.     Dr Carmichael explained that GIDS takes consent from the young person to their case being referred to the Trusts for treatment; however the consent for the actual prescription of the PBs is taken separately by the clinicians working for the Trusts. She set out the careful process by which GIDS gives information to the young persons and to their parents in order to seek to ensure that the young person is in a position to give valid consent. The court was taken through the statements of Dr Carmichael and Professor Butler and various documents to show the level of information and dialogue that was involved in achieving lawful consent to the treatment. The Service Specification includes Section 3.2 on "Informed Consent". This states *"The consequences of treatment decisions can be significant and life-changing"* and states:

> "All efforts will be made to ensure that clients are aware of the longer term consequences of the endocrine treatments, including implications for fertility, and the decision of the competence of the client will be jointly made by the endocrine and psychological members of the Service's integrated team.
>
> The current context of treatment decisions about cross sex hormones in adolescence is that there is limited scientific evidence for the long-term benefits versus the potential harms of the intervention. There are also concerns that it is uncertain whether or not a young person will continue to identify as transgender in the future, given that some subsequently identify in a different way."

38.     The defendant has recently adopted a Standard Operating Procedure for the taking of consent in GIDS. This has taken 2 years to develop and is dated 31 January 2020. Dr Carmichael says at para 33 of her first statement:

> "In advance of any referral by the Trust of a young person for consideration by an endocrinologist for GnRHa treatment, GIDS clinicians discuss treatment with the young person. This includes, checking that the young person's hopes for treatment are realistic, explaining what the treatment can and cannot do, discussing any potential

side-effects, discussing fertility and potential impact on genital development for birth registered males. We have developed visual aids to support this process.

UCLH and LTH have collated extensive written information to help young people and their parents further understand the nature of the drugs, their limitations and the possible side effects. These written documents are given to young people at their first endocrine clinic visit. The written documents act as a reference point for patients with questions whilst they contemplate whether they would like to go ahead with the referral, and subsequently with treatment. In particular, informational slides titled "Have you thought about having children in the future?" explains the impact GnRHa treatment can have on fertility in explicit terms. Young people and their families are encouraged to raise any questions with their GIDS clinicians or at their next endocrine clinic visit."

39.    Ms Morris emphasised that the process of ensuring that consent could validly be given was a discursive and iterative one that involved multiple discussions and answering any questions the young people or their parents might raise. Dr Carmichael said at para 35: "*The GIDS clinicians make it very clear to children and young people that there are both known and unknown risks associated with GnRHa treatment.*" Further, she said at para 41: "*In my experience, those young people we see who are recommended for GnRHa treatment understand the implications and limitations of treatment with GnRHa treatment and are able to consent to this stage of treatment.*"

40.    Professor Butler described the approach to consent at the Trusts as follows:

"For those under 15 years of age all the pre-assessment consultations are individual and occur with a consultant or senior clinical fellow on at least two visits. Parental support (or that of their guardian or social services where appropriate) is a pre-requisite for the under 15 year stream. On occasions, a young person is not deemed, on clinical examination, to be at an appropriate stage of puberty so further follow-up visits are arranged thereafter at 6-12 monthly intervals until a person is deemed at an appropriate physical stage for intervention and taking of consent. This also gives the opportunity to judge the level of emotional cognitive and psychosocial maturity, and capacity.

The decisions at UCLH and Leeds do not automatically follow on from those made at the GIDS Tavistock. They are a reassessment of physical maturity and cognitive capacity in their own right. They may be at odds with the Tavistock formulation (an infrequent event) and thus would be returned to the Tavistock MDT for reconsideration."

41.    Professor Butler said that in his clinic they are careful to ensure that the force behind the decision to seek treatment comes from the young person themselves and is not a consequence of pressure upon them from others around them. The Trusts work closely

with parents to reach a solution that is satisfactory to all and meets the best interests of the child. His clinic has never sought to apply to the Court under its inherent jurisdiction "against" parental opinions because he is concerned that would cause familial frictions. Equally, he suggested UCLH would not wish to have to apply to the court for consent on behalf of the child because it would delay treatment and put an additional burden on GIDS and the Trusts; and because "*it would also increase the distress suffered by the young people themselves, finding that their right to autonomous decision making had been removed from them.*"

42.    Professor Butler said a full written information package is provided to older adolescents. For those under 15 there is an initial individual consultation because of the need for "*individualising the approach for very young people, taking special care to assess their level of knowledge and understanding and they are given the written information package then.*" In relation to impacts on fertility and sexual functioning he says:

> "It is also relevant for the consultation purposes that matters of fertility are discussed and counselling by the team takes place, and the option of meeting a fertility specialist is offered, and often taken up. The options of fertility preservation are discussed with all the young people and it is a requirement of the consent process that they fully understand this at an age appropriate level. This understanding must include that they are unable to have the typical sexual relationship of their identified gender with another person on account of their biological sex organ development, and that other surgical procedures may be necessary later on to achieve this possibility."

43.    He then said: "*it is an absolute requirement before starting any treatment that a young person can fully understand this effect on fertility and sexual functioning according to their age and level of maturation.*"

44.    The court asked for statistical material on the number, if any, of young people who had been assessed to be suitable for PBs but who were *not* prescribed them because the young person was considered not to be *Gillick* competent to make the decision, whether at GIDS or the Trusts. Ms Morris could not produce any statistics on whether this situation had ever arisen. She suggested that in the main, GIDS would work with the young person to give them further information, discuss the matter further and in some cases wait until they had achieved further maturity. The court gained the strong impression from the evidence and from those submissions that it was extremely unusual for either GIDS or the Trusts to refuse to give PBs on the ground that the young person was not competent to give consent. The approach adopted appears to be to continue giving the child more information and to have more discussions until s/he is considered *Gillick* competent or is discharged.

45.    Relevant to the evidence of consent is the evidence of Professor Scott (Director of University College London's Institute of Cognitive Neuroscience). She "*seeks to explain, from a neuroscientific point of view, why I have significant doubts about the ability of young people under the age of 18 years old to adequately weigh and*

> *appreciate the significant consequences that will result from the decision to accept hormonal treatment for gender dysphoria."*

46.     She explained the neurological development of adolescents' brains that leads to teenagers making different, more risky decisions than adults. She said further that this is backed up by behavioural studies showing that when decision making is "hot" (i.e. more emotional), under 18 year olds make less rational decisions than when the responses are made in a colder, less emotional context. Her conclusion was that:

> "11. … given the risk of puberty blocking treatment, and the fact that these will have irreversible effects, that have life-long consequences, it is my view that even if the risks are well explained, that in the light of the scientific literature, that it is very possible for an adolescent to be unable to fully grasp the implications of puberty-blocking treatment. All the evidence we have suggests that the complex, emotionally charged decisions required to engage with this treatment are not yet acquired as a skill at this age, both in terms of brain maturation and in terms of behaviour."

*Parental consent*

47.      If a child cannot give consent for treatment because they are not *Gillick* competent then the normal position in law would be that someone with parental responsibility could consent on their behalf. Mr Hyam sought at one point to argue that a decision as to giving PBs would fall outside the scope of parental responsibility because of the nature of the treatment concerned. However, the GIDS practice in relation to acting on parental consent alone is quite clear. In the response to the pre-action protocol letter the defendant said:

> "36. There is a fundamental misunderstanding in your letter, which states that parents can consent to pubertal suspension on behalf of a child who is not capable of doing so. This is not the case for this service, as is clear from the above. Although the general law would permit parent(s) to consent on behalf of their child, GIDS has never administered, nor can it conceive of any situation where it would be appropriate to administer blockers on a patient without their consent. The Service Specification confirms that this is the case."

It follows that is not necessary for us to consider whether parents could consent to the treatment if the child cannot lawfully do so because this is not the policy or practice of the defendant and such a case could not currently arise on the facts.

*The effect of Puberty Blockers*

48.     PBs have been used for many years to stop precocious puberty. This is a condition experienced largely by children aged 7 or under when puberty commences at a very early age. This condition is seen more often in natal girls but sometimes in natal boys. PBs are used to stop this early onset of puberty and the use of them ceases when the child reaches an appropriate age for puberty. As can be seen from the evidence this use of PBs does not interfere with the onset of puberty at a normal biological age and, as such, will not interfere with normal development of puberty through adolescence.

**JA0325**

49.     The use of PBs in cases of GD is quite different. We have some evidence of the history of this treatment and the meaning of puberty from Professor Hruz (Associate Professor of Paediatrics, Endocrinology and Diabetes at Washington University, St Louis, USA) on behalf of the claimants.

50.     In summary, PBs were first used for such treatment at a Dutch gender clinic in the late 1990s. That clinic developed a protocol, often referred to as the Dutch protocol. The Dutch protocol was published in the European Journal of Endocrinology in 2006 and called for puberty suppression to begin at the age of 12 after a diagnosis of GD. Puberty is understood in medicine or biology as a process of physiological change involving the process of maturation of the gonads. Hormones in a part of the brain secrete a gonadotropin-releasing hormone which, in turn, stimulates the pituitary gland to secrete other hormones. These stimulate the growth of the gonads, that is ovaries in females and testes in males. Further hormones are secreted which contribute to the further development of the primary sex characteristics, the uterus in females and the penis and scrotum in males. The hormones contribute to the development of secondary sex characteristics including breasts and wider hips in girls and wider shoulders, deeper voices and increased muscle mass in boys. Further growth hormones are released, which stimulate growth. With regular injection of the PBs there is no progression of puberty and some regression of the first stages of already developed sexual characteristics. This means that in girls *"breast tissue will become weak and may disappear completely"* and in boys *"testicular volume will regress to a lower volume."*

51.     Under the Dutch protocol, the introduction of CSH starts at age 16. As Professor Hruz explained:

> "29. Then, starting at age 16, cross-sex hormones are administered while GnRH analogue treatment continues, in order to induce something like the process of puberty that would normally occur for members of the opposite sex. In female-to-male patients, testosterone administration leads to the development of "a low voice, facial and body hair growth, and a more masculine body shape" as well as to clitoral engagement and further atrophying of breast tissue. In patients seeking a male-to-female transition, the administration of estrogens will result in "breast development and a female-appearing body shape." Cross-sex hormone administration for these patients will be prescribed for the rest of their lives."

52.     There is some dispute as to the purpose of prescribing PBs. According to Dr Carmichael, the primary purpose of PBs is to give the young person time to think about their gender identity. This is a phrase which is repeated on a number of the GIDS and Trust information documents. The Health Research Authority carried out an investigation into the Early Intervention Study in 2019. Its report was somewhat critical of the description of the purpose and said:

> "The research team described the purpose of pubertal suppression as 'to induce a sex hormone-neutral environment to provide young people with space to decide whether to progress further with gender reassignment treatment as an adult.' This phrase appears to have caused confusion as it has been interpreted by some that the puberty suppression was for use in

any children presenting to the clinic, that there would be no change in the course of any gender identity dysphoria during this time, and that the child could then choose to progress to cross-sex hormone treatment or to stop treatment with subsequent onset of puberty in the birth gender. It has been noted that the participants in this study and other research involving early puberty suppression have progressed to cross-sex hormones. This has raised concerns that the treatment might be responsible for generating persistence, rather than 'creating space to decide'.

It would have reduced confusion if the purpose of the treatment had been described as being offered specifically to children demonstrating a strong and persistent gender identity dysphoria at an early stage in puberty, such that the suppression of puberty would allow subsequent cross-sex hormone treatment without the need to surgically reverse or otherwise mask the unwanted physical effects of puberty in the birth gender. The present study was not designed to investigate the implications on persistence or desistence of offering puberty suppression to a wider range of patients, it was limited to a group that had already demonstrated persistence and were actively requesting puberty blockers."

53.    Professor Butler said that PBs:

"may have some help or advantage in the support of transgender adolescents in some aspects of mental health functioning, in particular with reducing the risk of reduction of suicidal ideation and actual suicidal actions themselves."

54.    See further the reference at para 73 below to the paper presented by Dr Carmichael and Professor Viner in 2014, referring to the Early Intervention Study and the limited evidence of psychological benefit.

55.    As is clear from the literature and referred to by the HRA, the other purpose of giving PBs is stopping the development of the physical effects of puberty (something that obviously varies depending on at what age and stage in pubertal development the PBs are commenced)  because slowing or preventing the early development of secondary sex characteristics during puberty can make a later transition (both medical and social) to living as the opposite sex easier.

*The relationship between Puberty Blockers and Cross-Sex Hormones (CSH)*

56.    GIDS and the Trust place reliance on the fact that Stage 1 treatment with PBs and Stage 2 treatment (CSH) are separate. Thus, so it is said, it is possible for a young person to come off the PBs at any point and not proceed to taking CSH. On one view, this is correct. However, the evidence that we have on this issue clearly shows that practically all children / young people who start PBs progress on to CSH.

57.    No precise numbers are available from GIDS (as to the percentage of patients who proceed from PBs to CSH). There was some evidence based on a random sample of those who in 2019-2020 had been discharged or had what is described as a closing summary from GIDS. However the court did have the evidence of Dr de Vries. Dr de Vries is a founding board member of EPATH (European Professional Association for Transgender Health) and a member of the WPATH (World Professional Association for Transgender Health) Committee on Children and Adolescents and its Chair between 2010 and 2016, and leads the Centre of Expertise on Gender Dysphoria at the Amsterdam University Medical Centre in the Netherlands (CEGD). This is the institution which has led the way in the use of PBs for young people in the Netherlands; and is the sole source of published peer reviewed data (in respect of the treatment we are considering) produced to the court. She says that of the adolescents who started puberty suppression, only 1.9 per cent stopped the treatment and did not proceed to CSH.

58.    We were told that the defendant did not have any data recording the proportion of those on puberty blockers who progress to cross-sex hormones. We were told that in part this resulted from the fact that some would have progressed to adult services and would not be recorded by the defendant. Ms Swarbrick had carried out an analysis of a random sample of 312 of 1648 files of patients discharged from GIDS from 1st March 2019 to 4th March 2020. Dr Carmichael summarised this as:

> "…based on a random sample of those referred to GIDS who had been discharged or had a closing summary from GIDS in 19-20 (analysis B) 16% of patients (49 individuals) had accessed the endocrinology service during their time with GIDS. Of those 16%, 55% (27 individuals) were subsequently approved for or accessed cross-sex hormones during their time with GIDS. This number represents 8.7% of all the patients discharged from GIDS that year. We also know that of the 49 patients who were referred to endocrinology for GnRHa whilst at GIDS, two did not commence GnRHa treatment, and a further five were discharged from GIDS without being referred on to another gender service."

59.    We find it surprising that GIDS did not obtain full data showing the figures and the proportion of those on puberty blockers who remain within GIDS and move on to cross-sex hormones. Although neither Dr Carmichael nor Professor Butler could give the equivalent figures in the United Kingdom to those from the Netherlands, the language used in their witness statements suggests that a similarly high proportion of children and young people in the United Kingdom move from PBs onto CSH.

*The impact of Puberty Blockers and their reversibility*

60.    Both WPATH and the Endocrine Society in their documentation describe PBs as fully reversible. Professor Butler says that "*we do not know everything about the blocker and as far as we know it is a safe reversible treatment with a well-established history.*" Dr Alvi also referred to the history of the use of PBs as showing that they are fully reversible. However, it is important to note that apart from the Amsterdam study, the history of the use of PBs relied upon in this context is *from the treatment of precocious*

*puberty* which is a different condition from GD, and where PBs are used in a very different way.

61.    Dr de Vries was somewhat more nuanced in her evidence. She said:

> "Puberty blocking treatment is fully reversible (see for example section 2.0 of the Endocrine Society's Clinical Practice Guidelines…). By fully reversible I mean that the administration of puberty blockers in young people has no irreversible physical consequences, for example for fertility, voice deepening or breast growth".

62.    At para 20 of her evidence she said:

> "Ethical dilemmas continue to exist around … the uncertainty of apparent long-term physical consequences of puberty blocking on bone density, fertility, brain development and surgical options."

63.    The GIDS Early Intervention Young Person Information Sheet states:

> "What are the possible benefits of starting on hormone blockers?
>
> We have looked at other countries who have given this treatment **and the results** suggest that:
>
> - Hormone blockers which block the body's natural sex hormones may improve the way you feel about yourself.
>
> - If you decide to stop the hormone blockers early **your physical development** will return as usual in your natal gender. **As far as we are aware**, the hormone blockers will not harm your physical or psychological development.
>
> - Hormone blockers will make you feel less worried about growing up in the wrong body and will give you more time and space to think about your gender identity.
>
> What are the possible disadvantages and risks of the hormone blockers?
>
> - Possible side effects from the hormone blockers are hot flushes, headache, nausea and weight gain.
>
> - A short term effect is that your bone strength is shown not to grow as fast as it usually would whilst you are on hormone blockers. However, this will resume once your body is exposed to hormones again. That is why we have to do a bone scan every year to check the thickness of your bones. **We do not fully know how hormone blockers will affect bone strength, the development of your sexual organs, body shape or your final adult height. There**

> **could be other long-term effects of hormone blockers in early puberty that we don't yet know about.**
>
> - Hormone blockers could affect your memory, your concentration or the way you feel about your gender and how likely you are to change your mind about your gender identity.
>
> - Hormone blockers could affect your ability to have a baby. It could take 6 to 12 months longer after stopping the hormone blockers before natal boys start making sperm again or natal girls start maturing eggs in their ovaries. However, hormone blockers do not work as a contraceptive. If you are sexually active, please ask your doctor for advice about birth control." (emphasis added)

64.    A number of aspects of this asserted reversibility are raised by the claimants. PBs stop the physical changes in the body when going through puberty. But in reliance on the evidence of Professor Levine (Clinical Professor of Psychiatry at Western Reserve University, Ohio) and Professor Hruz, the claimants assert that neurological and psychological changes occurring in puberty are less well understood than the physiological changes. Further, the degree to which neurological differences are caused by biological factors like hormones and genes are matters of debate. Professor Levine set out evidence on the degree to which young people mature through adolescence through both social and personal experiences. For young people on PBs that maturing process is stopped or delayed with potential social and psychological impacts which could be described as non-reversible.

65.    Thus, the central point made by the claimants is that although most of the physical consequences of taking PBs may be reversible if such treatment is stopped, the child or young person will have missed a period, however long, of normal biological, psychological and social experience through adolescence; and that missed development and experience, during adolescence, can never be truly be recovered or "reversed".

66.    It is to be noted that prior to June 2020, the NHS website on PBs said:

> "The effects of treatment with GnRH analogues are considered to be fully reversible, so treatment can usually be stopped at any time."

67.    In June 2020 this section was updated to read as follows:

> "**Little is known about the long-term side effects of hormone or puberty blockers in children with gender dysphoria.**
>
> Although the Gender Identity Development Service (GIDS) advises that is a physically reversible treatment if stopped, **it is not known what the psychological effects may be.**

> **It's also not known whether hormone blockers affect the development
> of the teenage brain or children's bones**. Side effects may also include
> hot flushes, fatigue and mood alterations." (emphasis added)

68.    A second key part of the argument about reversibility turns on the relationship between
       PBs and CSH and the degree to which commencing PBs in practice puts a young person
       on a virtually inexorable path to taking CSH. CSH are to a very significant degree not
       reversible. As is set out above at para 57 above, a very high proportion of those who
       start PBs move on to CSH and thus in statistical terms once a child or young person
       starts on PBs they are on a very clear clinical pathway to CSH.

*Evidence base to support the use of Puberty Blockers for Gender Dysphoria*

69.    The claimants submit that the treatment of PBs for GD is properly described as (i)
       experimental (ii) a treatment with a very limited evidence base, and (iii) as a highly
       controversial treatment. The claimants rely on witness statements from a number of
       undoubted experts in various relevant fields and from academic institutions in the
       United Kingdom, the USA, Sweden and Australia who refer to the controversial nature
       of the treatment and its limited evidential support.

70.    It is not however the court's role to judge the weight to be given to various different
       experts in a judicial review.  In our view, more important is the evidence from the
       defendant and the evidence base *it* relies upon for the use of PBs. In the USA the
       treatment of GD is not an FDA approved use and as such PBs can only be used "off-
       label". That does not prevent clinicians, whether in the USA or the United Kingdom,
       from using PBs for this purpose, as long as their use falls within the clinician's
       professional expertise. Professor Butler explained that it is very common for paediatric
       medicines to be used off-label and that this factor does not render the treatment in any
       sense experimental.

71.    However, the lack of a firm evidence base for their use is evident from the very limited
       published material as to the effectiveness of the treatment, however it is measured.

72.    Paul Jenkins, Chief Executive of the defendant said:

       "…it is correct that in recent years, some clinicians [at the Trust] have
       raised their concerns about the use of GnRHa for young people presenting
       with gender dysphoria. Indeed, some have called for the Trust to alter its
       practices and have done so in a variety of ways. We are keenly aware that
       the subject of gender dysphoria raises complex issues and that many have
       strong opinions about it."

73.    The Evaluation Paper on the Early Intervention Study at GIDS, referred to in para 25
       above, gives some (albeit limited) material on the outcome of that study. It summarised
       a meeting paper presented by Dr Carmichael and Professor Viner in 2014 (but not
       published in a peer review journal) as follows:

> "The reported qualitative data on early outcomes of 44 young people who received early pubertal suppression. It noted that 100% of young people stated that they wished to continue on GnRHa, that 23 (52%) reported an improvement in mood since starting the blocker but that 27% reported a decrease in mood. **Noted that there was no overall improvement in mood or psychological wellbeing using standardized psychological measures**." (emphasis added)

74. Ms Morris submitted it is not for this court to determine clinical disagreements between experts about the efficacy of a treatment. We agree. That is a matter for the relevant NHS and regulatory bodies to oversee and to decide. However the degree to which the treatment is experimental and has, as yet, an unknown impact, does go to the critical issue of whether a young person can have sufficient understanding of the risks and benefits to be able lawfully to consent to that treatment.

*Persistence*

75. The claimants submit that there is good evidence that for a significant proportion of young people presenting with GD, the condition resolves itself through adolescence without treatment with PBs. Further, that PBs serve to increase the likelihood of GD, and, as such, can be positively harmful to the child or young person's long-term health. According to DSM5: "*in natal males, persistence of [gender dysphoria] has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%.*" These figures need to be treated with some caution because it may be that the cohort whose persistence was being considered in these statistics was at a lower age and with less clearly established GD than the young people being treated at GIDS.

76. The Dutch study argued that adolescents who show established GD rarely identify as their biological sex. Professor Hruz suggested there may be two reasons for this. It may be that the clinicians made sound diagnoses of persistent GD. Alternatively, it may be that the very fact of the diagnosis and the course of treatment which affirmed that diagnosis (that is, both gender affirmative psychotherapy and the use of PBs) solidified the feeling of cross-gender identification and led the young people to commit to sex reassignment more strongly than they would have done if there had been a different diagnosis and treatment.

77. As already indicated, it is not our role to adjudicate on the reasons for persistence or otherwise of GD. However, the nature of this issue highlights the highly complex and unusual nature of this treatment and the great difficulty there is in fully understanding its implications for the individual young person. In short, the treatment may be supporting the persistence of GD in circumstances in which it is at least possible that without that treatment, the GD would resolve itself.

*SECTION B: EVIDENCE OF THE CLAIMANTS AND OTHER INDIVIDUALS*

78. The first claimant was born a female. In her witness statement in these proceedings she set out her experience of being prescribed PBs and then CSH. It should be noted that some of the details relating to her treatment and the information she was given (at GIDS and the first defendant) is disputed. This case is a judicial review of the GIDS policy,

not a tort action relating to the specific facts surrounding the first claimant's treatment and it is not necessary therefore to resolve any factual dispute. We simply record the first claimant's account. She describes a highly traumatic childhood. From the age of 4 or 5 she displayed gender non-conformity, associating more with male games and clothes. She felt highly alienated at secondary school and took birth control pills to stop her periods. She felt disgusted by her body and became depressed and highly anxious. From the age of 14 she began actively to question her gender identity and started to look at YouTube videos and do research on the internet about gender identity disorder and the transition process. She said: "*I thought I had finally found the answer as to why I felt so masculine, uncomfortable with my female body and why I was so much more similar to a stereotypical boy than to a stereotypical girl in physical expression and interests.*"

79.    When she was 15, the first claimant was referred to GIDS. When she was at the local Children and Adolescent Mental Health Services clinic she remembered: *"the psychiatrist attempted to talk of the gender spectrum as a way of persuading me to not pursue medical transition. I took this as a challenge to how serious I was about my feelings and what I wanted to do and it made me want to transition more. Now I wish I had listened to her."* She was first seen at GIDS aged 16 and had a number of appointments spread out over 1 year and 9 months. She was referred to UCLH in June 2013 and after three appointments commenced PBs. She was given advice about the impact on her fertility, but her priority was to move on to testosterone. She said that at 16, she was not thinking about children and, in any event, egg storage was not available on the NHS.

80.    In April 2014 she was referred to an adult Gender Identity Clinic to discuss surgery. She "*was visualising myself becoming a tall, physically strong young man where there was virtually no difference between me and a biological boy."* After commencing testosterone at 17, changes to her body commenced rapidly: these changes included genital changes, her voice dropping and the growth of facial and body hair. She was on testosterone for 3 years but increasingly began to doubt the process of transition:

> "27. I started to have my first serious doubts about transition. These doubts were brought on by for the first time really noticing how physically different I am to men as a biological female, despite having testosterone running through my body. There were also a lot of experiences I could not relate to when having conversations with men due to being biologically female and socialised in society as a girl. There was an unspoken "code" a lot of the time that I felt I was missing. I remember telling a close male friend at the time about these transition doubts, who responded by telling me that I was being silly and I believed him. This was reinforced by the online forums that I browsed where the consensus was that most transsexual people have doubts and that that is a normal part of transitioning, so the doubts should be ignored. I continued on, pushing the doubts in the far back of my mind and no more doubts creeped in for a while."

81.    Despite these doubts, when she was 20, she had a double mastectomy. In the year following this:

**JA0333**

> "31. … I started to realise that the vision I had as a teenager of becoming male was strictly a fantasy and that it was not possible. My biological make-up was still female and it showed, no matter how much testosterone was in my system or how much I would go to the gym. I was being perceived as a man by society, but it was not enough. I started to just see a woman with a beard, which is what I was. I felt like a fraud and I began to feel more lost, isolated and confused than I did when I was pre-transition."

82.   She described facing the reality of taking a regular dose of drugs for the rest of her life to maintain her male appearance; and the need to have a hysterectomy if she remained a man because of the atrophy of her reproductive organs if she continued to take testosterone.

83.   From January 2019 the first claimant stopped taking testosterone. She now wishes to identify as a woman and is seeking to change her legal sex back to that on her original birth certificate. She said:

> "39. … It is only until recently that I have started to think about having children and if that is ever a possibility, I have to live with the fact that I will not be able to breastfeed my children. I still do not believe that I have fully processed the surgical procedure that I had to remove my breasts and how major it really was. I made a brash decision as a teenager, (as a lot of teenagers do) trying to find confidence and happiness, except now the rest of my life will be negatively affected. I cannot reverse any of the physical, mental or legal changes that I went through. Transition was a very temporary, superficial fix for a very complex identity issue."

84.   The defendant submits the first claimant was given the fullest possible information after a large number of consultations (at least 10) and that she was *Gillick* competent to make the decision to take PBs. Further, the defendant produced witness statements from a number of children and young people who are strongly supportive of the treatment they have received.

85.   J is a 20 year old transgender man who received PBs in 2012 at the age of 12 followed by CSH in 2015. He described how he felt a strong need to become a boy from an early age and how he was bullied at school for his behaviour. He found the onset of female puberty horrifying and unbearable. After a number of sessions at GIDS he was prescribed PBs from the age of 12.

86.   According to J he was given the fullest possible information from the clinicians at GIDS as to the benefits and disbenefits of the treatment. The clinicians strongly challenged his desire to transition and why he had chosen to express his gender identity as male. He was advised as to the impact on fertility if he chose to go on to CSH and surgery. He said: "*I made the decision to proceed with pubertal suppression without pursuing egg preservation. It was a difficult decision to make because I did not know whether I would want biological children in adulthood, but I was certain I would never want to*

JA0334

carry a child and give birth. Ultimately, I made the decision because I had a poor quality of life and without immediate treatment I did not feel I had a future at all." He says: "We discussed sex and I told them the idea of it disgusted me. I knew I would be unable to consider having a sexual relationship as an adult with my body so wrongly formed." He ended his witness statement by saying that he is thankful that his pubertal development was halted as it removed the distress caused by continued development, but he wishes that the PBs were started earlier which would have prevented the need for breast surgery later.

87.    S is a 13 year old trans boy who is on the waiting list at GIDS. He was told that he would have to wait for approximately 24 months to be seen and with his parents decided to see a private provider, GenderGP, where he has been prescribed PBs. We note at this point that the GP in question was removed from the professional register and now operates from outside the United Kingdom. S in his witness statement said:

> "13. … I haven't really thought about parenthood – I have been asked about it by the gender identity specialist I have mentioned but I just have no idea what me in the future is going to think. I haven't had a romantic relationship and it's just not a thing that is really on my radar at the moment."

88.    N, an 18 year old trans woman, who was prescribed PBs when she was 17 years old said:

> "12. The treatment of hormone blockers may very well have saved my life. In the period of my life that I was prescribed them my mental health was spiralling due to my dysphoria and this impacting on my daily life, learning and social interactions. While the first injections of gonapeptyl were slow to take effect they eventually began to alleviate my dysphoria in very real ways. I had to shave less and I didn't have to fear pubertal development anymore. I had the time necessary to think about my situation and decide on further courses of action. This also helped my mental health as it gave me significantly less issues overall allowing me to focus and concentrate on aspects in my life alongside my gender identity rather than my fears of puberty and development overtaking everything else in my life."

89.    The second claimant, Mrs A, is the mother of a 15 year old girl who has ASD. The daughter has a history of mental health and behavioural problems. She "is desperate to run away from all that made her female" and has been referred to CAMHS (Child and Adolescent Mental Health Services). Mrs A is very concerned that her daughter would be referred to GIDS and prescribed PBs. However the daughter has not currently been referred to GIDS and having regard to the defendant's current practice, would not meet the criteria for PBs because her parents would not support that treatment. Mrs A's interest in this action is therefore largely theoretical.

*SECTION C: SUBMISSIONS*

90.     The claimants' primary case is that children or young persons under the age of 18 are not capable of giving consent to the administration of PBs. Their secondary case is that the information given by the defendant and the Interested Party is misleading and inadequate to form the basis for informed consent to be given. In their statement of issues, the claimants put issue one as the adequacy of the information and issue two whether children and young people are capable of giving consent. In our view, the first issue must be whether *Gillick* competence can be achieved, and the secondary or alternative issue, whether the information being given is adequate. We deal with the arguments in that order.

91.     Mr Hyam also raised a third issue (at least in writing). This was a submission that if any young person under the age of 18 is prescribed PBs, their case should be referred to the Court of Protection. In oral argument he accepted that the Court of Protection, being a creature of statute, would have no jurisdiction to consider such referrals. We think that the substance of issue three falls within the terms of issue one.

92.     Mr Hyam stressed that the claimants were not calling into question that GD existed. Nor were they questioning that it could cause extreme distress or that PBs should never be given to people under 18 or that it was never in their best interests for it to be prescribed. The central issue was whether those under 18 could give informed consent.

93.     Mr Hyam submitted that a child still going through puberty is not capable of properly understanding the nature and effect of PBs and weighing the consequences and side effects properly. He pointed to the evidence of the individuals, including that put forward on behalf of the defendant, to show that children of this age cannot understand the implications of matters such as the loss of the ability to orgasm, the potential need to construct a neo-vagina, or the loss of fertility. He argued that the use of PBs to address GD does not have an adequate evidence base to support it and thus should properly be described as experimental treatment. There is evidence that PBs can have significant side effects and there is strong evidence that once a child commences on PBs they will progress to CSH which will cause irreversible changes to the child's body with lifelong medical, psychological and emotional implications for the child. He relies on the harm potentially caused to these vulnerable young people as evidenced by the witness statement of the first claimant.

94.     He submitted that the advice given to the children and young persons is misleading because they are told that the PBs are fully reversible when the current evidence on reversibility or the long term implications of the treatment is limited and unclear. He said further, that the reality is that PBs pave the way for CSH which <u>do</u> have irreversible impacts. Further, the information provided by GIDS fails to tell the child that there are no proven benefits to this treatment in either physical or psychological terms. The information is misleading as to the reversibility of PBs, their purpose and their benefits.

95.     In those circumstances he submitted that the court should be guided by the approach of the Court of Protection in its *Practice Guidance (Court of Protection: Serious Medical Treatment)* [2020] 1 WLR 641 which sets out those decisions relating to medical treatment where an application should be made to the Court of Protection.

96.     Paras 10 and 11 of that Guidance state:

"10. In any case which is not about the provision of life-sustaining treatment, but involves the serious interference with the person's rights under the ECHR, it is:

"highly probable that, in most, if not all, professionals faced with a decision whether to take that step will conclude that it is appropriate to apply to the court to facilitate a comprehensive analysis of [capacity and] best interests, with [the person] having the benefit of legal representation and independent expert advice."

This will be so even where there is agreement between all those with an interest in the person's welfare.

11. Examples of cases which may fall into paragraph 10 above will include, but are not limited to: (a) where a medical procedure or treatment is for the primary purpose of sterilisation; (b) where a medical procedure is proposed to be performed on a person who lacks capacity to consent to it, where the procedure is for the purpose of a donation of an organ, bone marrow, stem cells, tissue or bodily fluid to another person; (c) a procedure for the covert insertion of a contraceptive device or other means of contraception; (d) where it is proposed that an experimental or innovative treatment to be carried out; (e) a case involving a significant ethical question in an untested or controversial area of medicine."

97. The defendant and the first and second Interveners make common cause. Ms Morris argued that the care and treatment provided at GIDS fell within the terms of the Service Specification laid down by NHS England (NHSE) as required in accordance with the international frameworks of WPATH and the Endocrine Society and by the domestic regulatory frameworks of the General Medical Council and the Care Quality Commission. The NHSE is currently undertaking a review of the efficacy of treatment for GD (the Cass Review) which will report in due course, and its findings will be reflected in the Service Specification.

98. She argued that the process at GIDS was "deeply *Montgomery* compliant" (i.e. it met the requirements for informed consent identified by the Supreme Court in *Montgomery v Lanarkshire Health Board* [2015] AC 1430) having regard to the frequent consultations, discussions and the provision of detailed, but age appropriate, information. The "vast majority" of the children referred for PBs are 15 or older she said, and the information given is varied depending on the age and maturity of the child or young person. Where the assessment is that the individual is not initially *Gillick* competent, time is taken to see if their understanding develops and competency can be achieved. The information that is given is what is salient for that individual at that age.

99. As to those between the ages of 16-18, if the young person, the parents and the clinicians are agreed then she submitted there is no justiciable issue and the court has no jurisdiction.

100. Mr McKendrick for the first and second Interveners argued that the child or young person did not need to understand the impact of CSH on their fertility because that did

not fall to be decided at the stage of prescribing PBs. The PBs provided the space for the person to think about further stages. In appropriate cases, a natal girl or young person's eggs could be harvested and preserved in order to preserve their fertility. The critical thing for the child was that s/he had GD and that there was no alternative physical treatment to PBs. Once the child or young person had reached the Endocrine Clinic at the Trust, there was no alternative psychological treatment available because that was a matter within the purview of GIDS and GIDS had referred the child for PBs, although ongoing psychological treatment is provided at GIDS alongside treatment with PBs. Therefore, the Trust clinicians were faced with a child in acute distress with no alternative treatment options. The purpose of the treatment was to alleviate distress and that, according to Mr McKendrick, had been achieved.

101.    When asked by the court what evidence there was that the PBs did achieve the purpose of alleviating distress, in the light of the lack of published research, Mr McKendrick pointed to the evidence of experienced endocrinologists in both Trusts who could see the real benefits of the treatment.

102.    Like Ms Morris, Mr McKendrick said the current practice was not to proceed only on parental consent. However, he did argue that if the child's consent was rendered invalid, the treatment would continue to be lawful if the parents had consented.

103.    The third Intervener is Transgender Trend Ltd., an organisation that provides evidence-based information and resources for parents and schools concerning children with GD. Ms Davies-Arai is the director of that organisation and she has filed a witness statement in these proceedings. She set out concerns about the lack of evidence as to the impacts and effectiveness of PBs and in relation to which patients it is most likely to help. Much of her evidence focused on the increase of referrals to GIDS of teenage natal girls and the cultural factors, including material on the internet and social media, which may play a part in this. She said that GIDS does not offer young people with GD a range of ways to interpret their experience, and the GIDS pathway offers a minimal challenge to the beliefs and ideas of the young person.

104.    Mr Skinner on behalf of Transgender Trend said the case was particularly important because it concerned the deliberate provision by the State of medical treatment to children and young people which may cause harm. The court should be anxious to ensure that vulnerable children, for example those with ASD, are provided with the full protection of the law.

*SECTION D: THE LAW*

105.    In *Gillick v West Norfolk and Wisbech Health Authority* [1986] AC 112, the House of Lords considered the lawfulness of the Secretary of State's policy on giving contraceptive advice to children without parental consent. The House of Lords held by a majority that a doctor could lawfully give contraceptive advice and treatment to a girl aged under 16 if she had sufficient maturity and intelligence to understand that nature and implications of the proposed treatment and provided that certain conditions were satisfied.

106.    Lord Fraser at p. 169B-E said:

> "It seems to me verging on the absurd to suggest that a girl or boy aged 15 could not effectively consent, for example, to have a medical examination of some trivial injury to his body or even to have a broken arm set. Of course the consent of the parents should normally be asked, but they may not be immediately available. Provided the patient, whether the boy or a girl, is capable of understanding what is proposed, and of expressing his or her own wishes, I see no good reason for holding that he or she lacks the capacity to express them validly and effectively and to authorise the medical man to make the examination or give the treatment which he advises. After all, a minor under the age of 16 can, with certain limits, enter into a contract. He or she can also sue and be sued, and can give evidence on oath. ...."

> Accordingly, I am not disposed to hold now, for the first time, that a girl less than 16 lacks the power to give valid consent to contraceptive advice or treatment, merely on account of her age."

107.    Lord Scarman at p. 186A-D said:

> "The law relating to parent and child is concerned with the problems of the growth and maturity of the human personality. If the law should impose upon the process of "growing up" fixed limits where nature knows only a continuous process, the price would be artificiality and a lack of realism in an area where the law must be sensitive to human development and social change. If certainty be thought desirable, it is better that the rigid demarcations necessary to achieve it should be laid down by legislation after a full consideration of all the relevant factors than by the courts confined as they are by the forensic process to the evidenced adduced by the parties and to whatever may properly fall within the judicial notice of judges. Unless and until Parliament should think fit to intervene, the courts should establish a principle flexible enough to enable justice to be achieved by its application to the particular circumstances proved by the evidence placed before them."

And at p.189C-E:

> "When applying these conclusions to contraceptive advice and treatment it has to be borne in mind there is much that has to be understood by a girl under the age of 16 if she is to have legal capacity to consent to such treatment. It is not enough that she should understand the nature of the advice which is being given: she must also have a sufficient maturity to understand what is involved. There are moral and family questions, especially her relationship with her parents; long-term problems associated with the emotional impact of pregnancy and its termination; and there are the risks to health of sexual intercourse at her age, risks which contraception may diminish but cannot eliminate. It follows that a doctor will have to satisfy himself that she is able to appraise these factors

JA0339

> before he can safely proceed upon the basis that she has at law capacity to consent to contraceptive treatment. And it further follows that ordinarily the proper course will be for him, as the guidance lays down, first to seek to persuade the girl to bring her parents into consultation and, if she refuses, not to prescribe contraceptive treatment unless he is satisfied that her circumstances are such that he ought to proceed without parental knowledge and consent."

And p. 191C-D:

> "The truth may well be that the rights of parents and children in this sensitive area are better protected by the professional standards of the medical profession than by "a priori" legal lines of division between capacity and the lack of capacity to consent since any such general dividing line is sure to produce in some cases injustice, hardship, and injury to health."

108. In *R (Axon) v Secretary of State for Health (Family Planning Association Intervening)* [2006] QB 539 Silber J considered *Gillick* in the context of Article 8 of the Convention, the United Nations Convention on the Rights of the Child (UNCRC) and the increasing emphasis on the autonomy of the child. He held that the principles set out in *Gillick* continued to apply, see para 152.

109. There are two cases dealing with children aged 16 or over who refused medical treatment in circumstances where clinicians considered it was clinically indicated. The issue in each was whether the court could nevertheless, authorise the treatment. *Re W (a Minor) (Medical Treatment: Court's Jurisdiction)* [1993] Fam. 64, concerned the case of a 16 year old girl with anorexia nervosa. The local authority applied under the inherent jurisdiction of the High Court to give medical treatment to W without her consent and against her wishes. W relied on section 8 of the Family Law Reform Act 1969, which states:

> "Section 8 is in these terms:

> (1) The consent of a minor who has attained the age of 16 years to any surgical, medical or dental treatment which, in the absence of consent, would constitute a trespass to his person, shall be as effective as it would be if he were of full age; and where a minor has by virtue of this section given an effective consent to any treatment it shall not be necessary to obtain any consent for it from his parent or guardian. (2) In this section 'surgical, medical or dental treatment' includes any procedure undertaken for the purposes of diagnosis, and this section applies to any procedure which is ancillary to any treatment as it applies to that treatment. (3) Nothing in this section shall be construed

as making ineffective any consent which would have been effective if this section had not been enacted."

110.   The Court of Appeal held that section 8 did not confer on a minor an absolute right to determine whether or not she received medical treatment but protected the medical practitioner from an action in trespass. Lord Donaldson analysed *Gillick* and said that Lord Scarman would necessarily have considered that the purpose of section 8 was to provide the medical practitioners treating the child with a defence to either criminal assault or a civil claim for trespass, see pages 76G-H and 78D-F. Lord Donaldson described the effect of the section as being a *"legal flak jacket",* whereby the 16-17 year old is conclusively proved to be *Gillick* competent but this did not mean that someone else who has parental responsibility cannot give consent for the treatment.

111.   When applying his analysis to the facts of W's case, Lord Donaldson said at p. 80G-81B:

> "I have no doubt that the wishes of a 16 or 17-year-old child or indeed of a younger child who is "Gillick competent" are of the greatest importance both legally and clinically, but I do doubt whether Thorpe J was right to conclude that W was of sufficient understanding to make an informed decision. I do not say this on the basis that I consider her approach irrational. I personally consider that religious or other beliefs which bar any medical treatment or treatment of particular kinds are irrational, but that does not make minors who hold those beliefs any the less "Gillick competent". They may well have sufficient intelligence and understanding fully to appreciate the treatment proposed and the consequences of their refusal to accept that treatment. What distinguishes W from them, and what with all respect I do not think that Thorpe J took sufficiently into account (perhaps because the point did not emerge as clearly before him as it did before us), is that it is a feature of anorexia nervosa that it is capable of destroying the ability to make an informed choice. It creates a compulsion to refuse treatment or only to accept treatment which is likely to be ineffective. This attitude is part and parcel of the disease and the more advanced the illness, the more compelling it may become. Where the wishes of the minor are themselves something which the doctors reasonably consider need to be treated in the minor's own best interests, those wishes clearly have a much reduced significance."

112.   Lord Donaldson concluded at p. 84A-B that:

> "No minor of whatever age has power by refusing consent to treatment to override a consent to treatment by someone who has parental responsibility for the minor and a fortiori a consent by the court. Nevertheless such a refusal is a very important consideration in making clinical judgments and for parents and the courts in deciding whether themselves to give consent. Its importance increases with the age and maturity of the minor."

**JA0341**

113.    Balcombe LJ at p. 87G-H agreed with Lord Donaldson that the parents of a 16 and 17 year old retained the right to consent to treatment even if she did not consent, and that the court could continue to exercise its inherent jurisdiction. Nolan LJ did not express a view as to whether parents could consent to treatment where the child had refused, but considered that the court under its inherent jurisdiction could continue to do so. He said, at p. 94D-E:

> "To take it a stage further, if the child's welfare is threatened by a serious or imminent risk that the child will suffer grave and irreversible mental or physical harm, then once again the court when called upon has a duty to intervene. It makes no difference whether the risk arises from the action or inaction of others, or from the action or inaction of the child. Due weight must be given to the child's wishes, but the court is not bound by them. In the present case, Thorpe J was apparently satisfied on the evidence before him that such a risk existed. In my judgment, he was fully entitled to take this view. By the time the matter came to this court, it was impossible to take any other view. For these reasons, I would dismiss the appeal save to the extent of making the necessary variation of the order of Thorpe J."

114.    We were taken to two cases concerning the application of *Gillick* in particularly difficult medical and ethical situations, which are of some assistance in the present case. In *Re L (Medical Treatment: Gillick Competency)* [1998] 2 F.L.R. 810 Sir Stephen Brown P. considered the case of a 14 year old girl with a life threatening condition involving the possibility of a blood transfusion. L was a Jehovah's Witness and would not consent to the blood transfusion. The court ordered that the medical treatment should take place without her consent. The expert clinician appointed by the Official Solicitor is recorded as giving the following evidence:

> "He makes the point that the girl's view as to having no blood transfusion is based on a very sincerely, strongly held religious belief which does not in fact lend itself in her mind to discussion. It is one that has been formed by her in the context of her own family experience and the Jehovah's Witness meetings where they all support this view. He makes the point that there is a distinction between a view of this kind and the constructive formulation of an opinion which occurs with adult experience. That has not happened of course in the case of this young girl."

115.    Sir Stephen Brown then concluded at p. 813:

> "It is, therefore, a limited experience of life which she has – inevitably so – but this is in no sense a criticism of her or of her upbringing. It is indeed refreshing to hear of children being brought up with the sensible disciplines of a well-conducted family. But it does necessarily limit her understanding of matters which are as grave as her own present situation. It may be that because of her belief she is willing to say, and to mean it, 'I am willing to accept death rather than to have a blood transfusion', but it is quite clear in this case that she has not been able to be given all the

details which it would be right and appropriate to have in mind when making such a decision.

I do not think that in this case this young girl is 'Gillick competent'. I base that upon all the evidence that I have heard. She is certainly not 'Gillick competent' in the context of all the necessary details which it would be appropriate for her to be able to form a view about."

116. *Re S (A Child) (Child Parent: Adoption Consent)* [2019] 2 Fam 177 also concerned a child under 16. In that case Cobb J considered the competence of a mother under the age of 16 to consent to her baby being placed for adoption. Cobb J held that it was appropriate and helpful in determining *Gillick* competence to read across and borrow from the relevant concepts and language in the Mental Capacity Act 2005 but cognisant of some fundamental differences, in particular that the assumption of capacity in section 1(2) of that Act did not apply and there was no requirement for any diagnostic characteristic as there is in section 2(1) of the Mental Capacity Act 2005, see paras 15,16 and 60.

117. At paras 34 to 37 Cobb J considered what test he should apply to the information that S needed to understand and then set out the information that would be relevant for the decision in question:

"34. Macur J in *LBL v RYJ and VJ* [2011] 1 FLR 1279, para 24 held that it would not be necessary for a decision-maker to be able to comprehend "all the peripheral detail" in the assessment of capacity to make the relevant decision; in a case concerning residence and the provision of education, Macur J went on to say, at para 58:

"In [the expert's] view it is unnecessary for his determination of RYJ's capacity that she should understand all the details within the statement of special educational needs. It is unnecessary that she should be able to give weight to every consideration that would otherwise be utilised in formulating a decision objectively in her 'best interests'. I agree with his interpretation of the test in section 3 which is to the effect that the person under review must comprehend and weigh the salient details relevant to the decision to be made. To hold otherwise would place greater demands upon RYJ than others of her chronological age/commensurate maturity and unchallenged capacity."

35. In the same vein, Baker J remarked in *H v A Local Authority* [2011] EWHC 1704 at [16(xi)]: "[the] courts must guard against imposing too high a test of capacity to decide issues such as residence because to do so would run the risk of discriminating against persons suffering from a mental disability."

36. Although not cited in argument, I further remind myself of the comments of Chadwick LJ in the Court of Appeal in *Masterman-Lister v Brutton & Co (Nos 1 and 2)* [2003] 1 WLR 1511, para 79: "a person should not be held unable to understand the information relevant to a

decision if he can understand the explanation of that information in broad terms and simple language…" So, says Ms Dolan, it is not necessary for S to understand all the peripheral and non-salient information in the adoption consent form in order to be declared capacitous. Nor does she even need to fully understand the legal distinctions between placement for adoption under a placement order and not under a placement order. Indeed, Ms Dolan herself relies in this regard on *In re A (Adoption: Agreement: Procedure)* [2001] 2 FLR 455, para 43 where Thorpe LJ observes that the differences between freeing and adoption are "complex in their inter-relationship and it is not to be expected that social workers should have a complete grasp of the distinction between the two, or always to signify the distinction in their discussion with the clients" (my emphasis)." If social workers are not expected to understand the complexities of the legislation (or its predecessor) or explain the distinction accurately to the parents with whom they are working asks Ms Dolan, why should a person under the age of 16 be expected to be able to grasp them in order to be able to be declared capacitous?

37. Accordingly, argues the local authority, the salient or "sufficient" information which is required to be understood by the child parent regarding extra-familial adoption is limited to the fundamental legal consequences of the same. The factors discussed at the hearing include: (i) your child will have new legal parents, and will no longer be your son or daughter in law, (ii) adoption is final, and non-reversible; (iii) during the process, other people (including social workers from the adoption agency) will be making decisions for the child, including who can see the child, and with whom the child will live; (iv) you may obtain legal advice if you wish before taking the decision; (v) the child will live with a different family forever; you will (probably) not be able to choose the adopters; (vi) you will have no right to see your child or have contact with your child; it is highly likely that direct contact with your child will cease, and any indirect contact will be limited; (vii) the child may later trace you, but contact will only be re-established if the child wants this; (viii) there are generally two stages to adoption; the child being placed with another family for adoption, and being formally adopted; (ix) for a limited period of time you may change your mind; once placed for adoption, your right to change your mind is limited, and is lost when an adoption order is made."

118.    Cobb J's conclusions were these:

"60… It follows that in order to satisfy the Gillick test in this context the child parent should be able to demonstrate "sufficient" understanding of the "salient" facts around adoption; she should understand the essential "nature and quality of the transaction" (per Munby J in *Sheffield City Council v E* [2005] Fam 326, para 19) and should not need to be concerned with the peripheral.

> 61. It will, however, be necessary for the competent child decision-maker to demonstrate a "full understanding" of the essential implications of adoption when exercising her decision-making, for the independent CAFCASS officer to be satisfied that the consent is valid. If consent is offered under section 19 and/or section 20 of the 2002 Act, it will be necessary for a form to be signed, even if not in the precise format of that identified by Practice Direction 5A. I accept that on an issue as significant and life-changing as adoption, there is a greater onus on ensuring that the child understands and is able to weigh the information than if the decision was of a lesser magnitude: see Baker J in *CC v KK and STCC* [2012] COPLR 627, para 69. This view is consistent with the Mental Capacity Act 2005 Code of Practice, which provides, at paragraph 4.19:
>
> > "a person might need more detailed information or access to advice, depending on the decision that needs to be made. If a decision could have serious or grave consequences, it is even more important that a person understands the information relevant to that decision.""

119.    In determining the level of understanding that the child needs to have to consent to PBs, Mr Hyam attached considerable importance to the decision of the Supreme Court in *Montgomery v Lancashire Health Board*. That case concerned an action in negligence brought by a mother on behalf of her child. The child was disabled as a result of complications during delivery and the mother argued that she should have been advised as to the possibility of delivery by elective caesarean. The central issue for present purposes was the information that the doctor needed to have given the patient in order to establish that she had given informed consent for the treatment.

120.    Lord Kerr set out the requirements placed on a doctor in providing information on risks of injury from treatment in the following terms at para 87:

> "An adult person of sound mind is entitled to decide which, if any, of the available forms of treatment to undergo, and her consent must be obtained before treatment interfering with her bodily integrity is undertaken. The doctor is therefore under a duty to take reasonable care to ensure that the patient is aware of any material risks involved in any recommended treatment, and of any reasonable alternative or variant treatments. The test of materiality is whether, in the circumstances of the particular case, a reasonable person in the patient's position would be likely to attach significance to the risk, or the doctor is or should reasonably be aware that the particular patient would be likely to attach significance to it."

121.    Mr Hyam submitted that in determining whether a child is *Gillick* competent the court should consider what would a *"reasonable person in the patient's position understand",* and in asking that question, he submitted that the "reasonable person" is one with adult knowledge.

122.    Ms Morris went to the opposite extreme. She submitted that when deciding what information needs to be given to the patient and understood by them, the test is a reasonable person in that individual's position, i.e. a reasonable 12 year old (or other

age) with GD. She said that the "salient" information that needs to be provided is what that reasonable patient would attach importance to. She said that seeking consent, certainly for treatment with lifelong implications such as sterilisation will always involve some *"act of imagination"*. Many patients facing life changing treatment, such as the loss of fertility in cancer treatment or endometriosis, will not have had experience of what they are foregoing, for example, fertility. She submitted that the court ought not to be pronouncing on hypothetical cases: rather, it should or could consider the facts of one specific case as and when it arises.

123.    Mr McKendrick submitted that the correct approach in deciding what information was material was to assume a reasonable child of the individual's age.

124.    Mr Skinner pointed out that *Montgomery* concerned an adult and therefore the presumption of capacity in the Mental Capacity Act 2005 applied. That presumption is inapplicable in a case concerning *Gillick* competency where the very issue is whether the child is competent to make the decision. The decision in *Montgomery* was of limited assistance, therefore, in the present case. In determining competence, the child must have sufficient understanding of the factors that are not just relevant to him or her now but which on an objective basis ought to be given weight in the future.

125.    In our view, the following principles can be derived from the cases to which we have referred:

126.    First, the question as to whether a person under the age of 16 is *Gillick* competent to make the relevant decision will depend on the nature of the treatment proposed as well as that person's individual characteristics. The assessment is necessarily an individual one. Where the decision is significant and life changing then there is a greater onus to ensure that the child understands and is able to weigh the information, see *Re S* at para 60.

127.    Secondly, however, that does not mean that it is not possible for the court to draw some lines. The Trusts themselves accept that a 7 year old being treated with PBs for precocious puberty cannot give informed consent and his or her parents must give that consent because of the young age of the child concerned and the nature of the treatment.

128.    Thirdly, efforts should be made to allow the child or young person to achieve *Gillick* competency where that is possible. Clinicians should therefore work with the individual to help them understand the treatment proposed and its potential implications in order to help them achieve competence.

129.    Fourthly, however, that does not mean that every individual under 16 can achieve *Gillick* competence in relation to the treatment proposed. As we discuss below, where the consequences of the treatment are profound, the benefits unclear and the long-term consequences to a material degree unknown, it may be that *Gillick* competence cannot be achieved, however much information and supportive discussion is undertaken.

130.    Fifthly, in order to achieve *Gillick* competence it is important not to set the bar too high. It is not appropriate to equate the matters that a clinician needs to explain, as set out in *Montgomery*, to the matters that a child needs to understand to achieve *Gillick* competence. The consequence of Mr Hyam's approach would be significantly to raise

**JA0346**

the bar for competence and capacity, which would be contrary both to the common law and to a child's Article 8 rights and the importance of supporting individual autonomy.

131.    We adopt the language of Chadwick LJ in *Masterman-Lister v Brutton and Co (Nos 1 and 2)* [2003] 1 WLR 151: a person should be able to "*understand an explanation of that information in broad terms and simple language*", see *Re S* at para 36. Although this was said in a case that concerned an adult's capacity, in our judgment the same approach should be applied to a case concerning *Gillick* competence. The child or young person needs to be able to demonstrate sufficient understanding of the salient facts, see *Re S* at para 60.

132.    Sixthly, we agree with Mr Skinner, that in deciding what facts are salient and what level of understanding is sufficient, it is necessary to have regard to matters which are those which objectively ought to be given weight in the future although the child might be unconcerned about them now. On the facts of this case there are some obvious examples, including the impact on fertility and on future sexual functioning.

*SECTION E: CONCLUSIONS*

133.    The principal issue before this court is in some ways a narrow one. Can a child or young person under the age of 16 achieve *Gillick* competence in respect of the decision to take PBs for GD? The legal position of 16 and 17 year olds is different, and we deal with that below.

134.    The starting point is to consider the nature of the treatment proposed. The administration of PBs to people going through puberty is a very unusual treatment for the following reasons. Firstly, there is real uncertainty over the short and long-term consequences of the treatment with very limited evidence as to its efficacy, or indeed quite what it is seeking to achieve. This means it is, in our view, properly described as experimental treatment. Secondly, there is a lack of clarity over the purpose of the treatment: in particular, whether it provides a "pause to think" in a "hormone neutral" state or is a treatment to limit the effects of puberty, and thus the need for greater surgical and chemical intervention later, as referred to in the Health Research Authority report. Thirdly, the consequences of the treatment are highly complex and potentially lifelong and life changing in the most fundamental way imaginable. The treatment goes to the heart of an individual's identity, and is thus, quite possibly, unique as a medical treatment.

135.    Furthermore, the nature and the purpose of the medical intervention must be considered. The condition being treated, GD, has no direct physical manifestation. In contrast, the treatment provided for that condition has direct physical consequences, as the medication is intended to and does prevent the physical changes that would otherwise occur within the body, in particular by stopping the biological and physical development that would otherwise take place at that age. There is also an issue as to whether GD is properly categorised as a psychological condition, as the DSM-5 appears to do, although we recognise there are those who would not wish to see the condition categorised in that way. Be that as it may, in our judgment for the reasons already identified, the clinical intervention we are concerned with here is different in kind to other treatments or clinical interventions. In other cases, medical treatment is used to remedy, or alleviate the symptoms of, a diagnosed physical or mental condition, and

the effects of that treatment are direct and usually apparent. The position in relation to puberty blockers would not seem to reflect that description.

136.     Indeed the consequences which flow from taking PBs for GD and which must be considered in the context of informed consent, fall into two (interlinking) categories. Those that are a direct result of taking the PBs themselves, and those that follow on from progression to Stage 2, that is taking cross-sex hormones. The defendant and the Trusts argue that Stage 1 and 2 are entirely separate; a child can stop taking PBs at any time and that Stage 1 is fully reversible. It is said therefore the child needs only to understand the implications of taking PBs alone to be *Gillick* competent. In our view this does not reflect the reality. The evidence shows that the vast majority of children who take PBs move on to take cross-sex hormones, that Stages 1 and 2 are two stages of one clinical pathway and once on that pathway it is extremely rare for a child to get off it.

137.     The defendant argues that PBs give the child "time to think", that is, to decide whether or not to proceed to cross-sex hormones or to revert to development in the natal sex. But the use of puberty blockers is not itself a neutral process by which time stands still for the child on PBs, whether physically or psychologically. PBs prevent the child going through puberty in the normal biological process. As a minimum it seems to us that this means that the child is not undergoing the physical and consequential psychological changes which would contribute to the understanding of a person's identity. There is an argument that for some children at least, this may confirm the child's chosen gender identity at the time they begin the use of puberty blockers and to that extent, confirm their GD and increase the likelihood of some children moving on to cross-sex hormones. Indeed, the statistical correlation between the use of puberty blockers and cross-sex hormones supports the case that it is appropriate to view PBs as a stepping stone to cross-sex hormones.

138.     It follows that to achieve *Gillick* competence the child or young person would have to understand not simply the implications of taking PBs but those of progressing to cross-sex hormones. The relevant information therefore that a child would have to understand, retain and weigh up in order to have the requisite competence in relation to PBs, would be as follows: (i) the immediate consequences of the treatment in physical and psychological terms; (ii) the fact that the vast majority of patients taking PBs go on to CSH and therefore that s/he is on a pathway to much greater medical interventions; (iii) the relationship between taking CSH and subsequent surgery, with the implications of such surgery; (iv) the fact that CSH may well lead to a loss of fertility; (v) the impact of CSH on sexual function; (vi) the impact that taking this step on this treatment pathway may have on future and life-long relationships; (vii) the unknown physical consequences of taking PBs; and (viii) the fact that the evidence base for this treatment is as yet highly uncertain.

139.     It will obviously be difficult for a child under 16 to understand and weigh up such information. Although a child may understand the concept of the loss of fertility for example, this is not the same as understanding how this will affect their adult life. A child's attitude to having biological children and their understanding of what this really means, is likely to change between childhood and adulthood. For many children, certainly younger children, and some as young as 10 and just entering puberty, it will not be possible to conceptualise what not being able to give birth to children (or conceive children with their own sperm) would mean in adult life. Similarly, the

meaning of sexual fulfilment, and what the implications of treatment may be for this in the future, will be impossible for many children to comprehend.

140.    Ms Morris submitted that many decisions about complex and long-lasting medical treatment will involve the patient having, to some degree, to imagine themselves into an uncertain future of which they have no experience. However, for the reasons that we have explained in para 135 above we consider the treatment in this case to be in entirely different territory from the type of medical treatment which is normally being considered.

141.    Some of the children and young people who have been treated at GIDS say in their witness statements that the thought of sex disgusted them, or they did not really think about fertility. These normal reactions do not detract from the difficulties surrounding consent and treatment with PBs.  That adolescents find it difficult to contemplate or comprehend what their life will be like as adults and that they do not always consider the longer-term consequences of their actions is perhaps a statement of the obvious.

142.    These various difficulties are compounded by the particular difficulties prevalent in the cohort of children treated at GIDS. On the defendant's case, they suffer considerable psychological distress by reason of their GD and are highly vulnerable. In those circumstances, the consequences of taking PBs on their fertility for example, or on their sexual life, may be viewed as a relatively small price to pay for what may be perceived as a solution to their immediate and real psychological distress. It would not follow however that their weighing of risks and benefits when they might start taking PBs would prevail in the longer-term.

143.    The difficulty of achieving informed consent in these circumstances is further exacerbated by the lack of evidence as to the efficacy of PBs in treating GD and the long-term outcomes of taking it. We entirely accept that the fact that a treatment is experimental, or that the long-term outcomes are not yet known, does not of itself prevent informed consent being given. Otherwise no experimental treatment could ever be consented to. However, the combination here of lifelong and life changing treatment being given to children, with very limited knowledge of the degree to which it will or will not benefit them, is one that gives significant grounds for concern.

144.    We do not think that the answer to this case is simply to give the child more, and more detailed, information. The issue in our view is that in many cases, however much information the child is given as to long-term consequences, s/he will not be able to weigh up the implications of the treatment to a sufficient degree. There is no age appropriate way to explain to many of these children what losing their fertility or full sexual function may mean to them in later years.

145.    *Gillick* makes clear that any decision is treatment and person specific. However, for the reasons that we have set out above, we think that it is appropriate in this case to give clear guidance as to the application of the *Gillick* tests to the treatment and cohort of children in question. The conclusion we have reached is that it is highly unlikely that a child aged 13 or under would ever be *Gillick* competent to give consent to being treated with PBs. In respect of children aged 14 and 15, we are also very doubtful that a child of this age could understand the long-term risks and consequences of treatment in such a way as to have sufficient understanding to give consent. However, plainly the

increased maturity of the child means that there is more possibility of achieving competence at the older age.

146.    In respect of a young person aged 16 or over, the legal position is different. There is a presumption of capacity under section 8 of the Family Law Reform Act 1969. As is explained in *Re W*, that does not mean that a court cannot protect the child under its inherent jurisdiction if it considers the treatment not to be in the child's best interests. However, so long as the young person has mental capacity and the clinicians consider the treatment is in his/her best interests, then absent a possible dispute with the parents, the court generally has no role. We do not consider that the court can somehow adopt an intrusive jurisdiction in relation to one form of clinical intervention for which no clear legal basis has been established.

147.    We do however recognise that in the light of the evidence that has emerged, and the terms of this judgment, clinicians may well consider that it is not appropriate to move to treatment, such as PBs or CSH, without the involvement of the court. We consider that it would be appropriate for clinicians to involve the court in any case where there may be any doubt as to whether the long-term best interests of a 16 or 17 year old would be served by the clinical interventions at issue in this case.

148.    We express that view for these reasons. First, the clinical interventions involve significant, long-term and, in part, potentially irreversible long-term physical, and psychological consequences for young persons. The treatment involved is truly life changing, going as it does to the very heart of an individual's identity. Secondly, at present, it is right to call the treatment experimental or innovative in the sense that there are currently limited studies/evidence of the efficacy or long-term effects of the treatment.

149.    The position of the defendant and the Trusts is that they consider it would be an intrusion into the child or young person's autonomy if a decision about treatment with PBs were to be made by the court not by the patient. They are concerned about the use of NHS and court resources if these decisions have to be made by the court. We do not consider that this is the correct approach. In principle, a young person's autonomy should be protected and supported; however, it is the role of the court to protect children, and particularly a vulnerable child's best interests. The decisions in respect of PBs have lifelong and life-changing consequences for the children. Apart perhaps from life-saving treatment, there will be no more profound medical decisions for children than whether to start on this treatment pathway. In those circumstances we consider that it is appropriate that the court should determine whether it is in the child's best interests to take PBs.  There is a real benefit in the court, almost certainly with a child's guardian appointed, having oversight over the decision. In any case, under the inherent jurisdiction concerning medical treatment for those under the age of 18, there is likely to be a conflict between the support of autonomy and the protective role of the court. As we have explained above, we consider this treatment to be one where the protective role of the court is appropriate.

150.    The claimants' alternative ground is that the information provided by the defendant and the Trusts is inadequate to form the basis of informed consent. We accept that the defendant and the Trusts have in their written information, to children, young people and their parents and carers, tried hard to explain the potential consequences of PBs, including that of moving on to CSH, and to give full information. They have also

**JA0350**

attempted to do this in an age appropriate manner. The problem is not the information given, but the ability of the children and young people, to understand and most importantly weigh up that information. The approach of the defendant appears to have been to work on the assumption that if they give enough information and discuss it sufficiently often with the children, they will be able to achieve *Gillick* competency. As we have explained above, we do not think that this assumption is correct.

*OVERALL CONCLUSION*

151.   A child under 16 may only consent to the use of medication intended to suppress puberty where he or she is competent to understand the nature of the treatment. That includes an understanding of the immediate and long-term consequences of the treatment, the limited evidence available as to its efficacy or purpose, the fact that the vast majority of patients proceed to the use of cross-sex hormones, and its potential life changing consequences for a child. There will be enormous difficulties in a child under 16 understanding and weighing up this information and deciding whether to consent to the use of puberty blocking medication. It is highly unlikely that a child aged 13 or under would be competent to give consent to the administration of puberty blockers. It is doubtful that a child aged 14 or 15 could understand and weigh the long-term risks and consequences of the administration of puberty blockers.

152.   In respect of young persons aged 16 and over, the legal position is that there is a presumption that they have the ability to consent to medical treatment. Given the long-term consequences of the clinical interventions at issue in this case, and given that the treatment is as yet innovative and experimental, we recognise that clinicians may well regard these as cases where the authorisation of the court should be sought prior to commencing the clinical treatment.

153.   We have granted a declaration to reflect the terms of this judgment.

Case 2:21-cv-00316   Document 49-8   Filed 06/23/21   Page 2 of 46 PageID #: 1079

# TRANSGENDER GUIDELINE





TRANSGENDER GUIDELINE

# WORLD RUGBY TRANSGENDER GUIDELINE

## INTRODUCTION

This World Rugby Transgender Guideline document has been developed to provide guidance and information in relation to the participation of transgender players in rugby. The terminology used when discussing issues involving transgender players can be controversial. A glossary is available here that contains more detailed explanations of frequently used terms. The glossary is provided to ensure that the Guideline is clear to everyone who reads it, but it is acknowledged that not all terms are used or agreed on by all people. For the purpose of this Guideline, we will use the terms "women's rugby" and "men's rugby" to refer to the existing participation categories in rugby union.

This Transgender Guideline aims to facilitate the participation of transgender players in rugby where it is possible to do so safely and fairly. Rugby is a sport that involves frequent physical confrontation and collisions and so physiological attributes such as size, stature, strength, speed, and power are important contributors to player safety/welfare and performance. Given rugby's documented risk of injury and the prioritisation of player welfare, it is a sport that faces unique and specific challenges with respect to the participation of transgender players.

The Guideline was developed by a World Rugby working group following research into available scientific literature, detailed and extensive consultation where the working group heard from independent experts in the fields of performance, physiology, medicine, risk, law and socio-ethics, and subsequent research and consultation on matters arising from the meeting. The presentations delivered by each of those experts at the meeting are available on World Rugby's Player Welfare website[1].

Having carefully considered the currently available information, the working group determined World Rugby's current policy. A summary of the position for transgender women is set out here and full guidelines for transgender women are here, a summary of the position for transgender men is set out are here and full guidelines for transgender men are here and the guidelines for non-binary people are set out here.

---

[1] https://playerwelfare.worldrugby.org/?subsection=84.



1

TRANSGENDER GUIDELINE

## SUMMARY FOR TRANSGENDER WOMEN

**Transgender women may not currently play women's rugby**

**Why?** Because of the size, force- and power-producing advantages conferred by testosterone during puberty and adolescence, and the resultant player welfare risks this creates

| Biological Advantages from Testosterone | Resultant Performance Differences |
|---|---|
| • Significant increases in total body mass<br><br>• Significant increases in lean/muscle mass and muscle density<br><br>• Reduction in body fat mass, improving strength and power-to-weight ratio<br><br>• Increased height, changed dimensions of important levers, greater bone density<br><br>• Increased haemoglobin levels<br><br>• Increased heart and lung size | • Significantly greater strength (between 50% and 60% percent by adulthood, with relatively greater upper body strength)<br><br>• Significant speed advantages (between 10% and 15% over various durations)<br><br>• Greater capacity to produce force/power (advantages of between 30% and 40% in explosive movement capabilities)<br><br>• Strength-to-weight and power-to-weight advantages (even after adjusting for mass, height and similar level of performance (elite, untrained etc), males have a 30-40% strength advantage) |

**Risk of Injury is too great**

It has been proposed that the suppression of testosterone for a period of 12 months is sufficient to remove the biological differences that create performance differences summarised above.

Research contradicts this, consistently showing that total mass, muscle mass and/or strength are reduced by at most 5% to 10% when testosterone is suppressed to levels in the female range, for a period of 12 months. With the additional factor of training, either before or during the period of testosterone suppression, it is expected that baseline/pre levels for these variables will be higher, and that training will attenuate the decline in these variables with testosterone reduction. The consequence is that given the size of the biological differences prior to testosterone suppression, this comparatively small effect of testosterone reduction allows substantial and meaningful differences to remain. This has significant implications for the risk of injury in rugby.



Forces and inertia faced by a smaller and slower player during frequent collisions are significantly greater when in contact with a much larger, faster player.  Research has found that the discrepancy in mass and speed is a significant determinant of various head injury risk factors, including neck forces, neck moments and linear and angular acceleration of the head.  When two opponents in a tackle are significantly different with respects to mass or speed, these risk factors increase significantly.  All these factors are 20% and 30% greater when typical male mass is modelled against typical female body mass in the tackle.  Further, the ability to exert force (strength and power) is greater in biological males, and the ability to receive or tolerate that force is reduced in relatively weaker players.  Collectively, this means a dynamic tackle situation would create a large increase in risk for players who lack these physiological attributes relative to their opponents.  Similarly, scrum forces are significantly greater in men's rugby (twice as high for elite men vs elite women, and 40% higher for community level men compared to elite women).  The implication of this finding is a significant increase in injury rates in contact situations, since the magnitude of forces and energy transfer in those contacts will increase substantially as a result of the collection of physical attributes that differ by biological sex.

World Rugby's number one stated priority is to make the game as safe as possible and so World Rugby cannot allow the risk to players to be increased to such an extent by allowing people who have the force and power advantages conferred by testosterone to play with and against those who do not.

**Retention of Meaningful Performance Advantages**

Given that the typical male vs female advantage in the above-described biological variables and hence performance outcomes ranges from 30% to 100%, a substantial and meaningful advantage is retained even after testosterone suppression.  This has implications for performance, given the premium on contact and collisions, speed, force-production and power in rugby.

A detailed explanation of the biological rationale, along with explanations of the effects of testosterone and its potential influence on safety and performance factors can be read in the guidelines for transgender women here.



TRANSGENDER GUIDELINE

## SUMMARY FOR TRANSGENDER MEN

**Transgender men may play men's rugby having provided confirmation of physical ability. Transgender men may not play women's rugby after the process of sex reassignment has begun, if this reassignment includes supplementation with testosterone**

**Why?** Transgender men need to provide confirmation of physical ability to ensure that they are not putting themselves at an unacceptable level of risk when playing against men.

| Confirmation of Physical Ability for men's rugby | Therapeutic Use Exemption |
|---|---|
| • Transgender men will typically not be as heavy, strong and fast as those that they would play with and against<br><br>• Some transgender men will be on testosterone treatments which may reduce some of the biological and performance differences<br><br>• Allowing transgender men to play men's rugby does not increase the risk of injury to teammates or opposition players<br><br>• Transgender men must confirm they understand any increased risk to themselves<br><br>• An experienced independent medical practitioner must provide confirmation that the player is physically capable of playing men's rugby | • Transgender men who are undergoing treatment involving testosterone will be required to obtain a Therapeutic Use Exemption because testosterone is a substance on the WADA Prohibited List[2]<br><br>• If a player played rugby without a valid TUE, he risks committing an Anti-Doping Violation which could result in a significant suspension from rugby |

A detailed explanation rationale can be read in the guidelines for transgender men here.

## COMMITMENT TO ONGOING EVALUATION AND EVIDENCE-BASED GUIDELINES

World Rugby is fully committed to evidence-based player welfare decisions.  As such, the present guidelines have been developed by assessing all currently available scientific evidence pertaining to biological and physiological differences between biological males and females, and the effects of testosterone suppression on those differences.  Related to

---

[2] https://www.wada-ama.org/en/resources/science-medicine/prohibited-list-documents



TRANSGENDER GUIDELINE

these changes are known injury risks and risks factors, which have produced these guidelines.

The Guidelines remain subject to the presentation and publication of new evidence. World Rugby are thus committed to a formal review of the Guideline every three years and will remain current with respects to all available high-quality evidence, with a view to modifying, changing to improving upon this document in future. In support of this, World Rugby has also committed to including transgender research in its annual research priorities and inviting academic institutions from around the world to submit proposals that may be funded if deemed sufficiently high quality. In this way, these guidelines are open to change, as led by high-quality evidence.



JA0357

TRANSGENDER GUIDELINE

## INCLUSION

World Rugby is committed to encouraging transgender people to be involved with rugby. World Rugby actively encourages transgender players to be involved with rugby whether in coaching, refereeing, administration or non-contact forms of the game and World Rugby will offer training courses to those who may find that the way that they are involved in rugby must change because of this Guideline.  Further details are available here.

World Rugby is currently funding research into the safe participation of all players in rugby. Details of the research currently underway, along with details of how to apply for research funding for those who may be interested in that, is available here.

**Mixed-Gender contact rugby**

World Rugby is currently exploring the possibility of an "open category" of rugby in which any player could play, regardless of gender.  World Rugby has committed to exploring this option with its Unions, Associations, International Rugby Players, and trans-advocate groups including Gendered Intelligence and International Gay Rugby.

**Mixed-Gender non-contact rugby**

All players (including transgender players and players with DSD) can play mixed-gender touch or tag rugby.

**Union Responsibilities**

It is strongly recommended that each Union adopts its own regulations to determine the eligibility of transgender players to compete in events taking place under its own jurisdiction.  Unions should take account of the information provided in this Guideline but may also take into account any relevant aspects of local law which apply within the Union's jurisdiction and with which the Union is legally obliged to comply.  See here for further details.



TRANSGENDER GUIDELINE

# TRANSGENDER INFORMATION

## WHAT DOES TRANSGENDER MEAN?

The term '**Transgender**' is used in this Guideline to refer to individuals whose gender identity (i.e. how they identify) is different from the sex identified at birth (whether they are pre- or post-puberty, and whether or not they have undergone any form of medical intervention).

Transgender man: a term used to describe someone who is identified as female at birth but identifies and lives as a man. This is sometimes shortened to trans man, or FTM, an abbreviation for female-to-male.

Transgender woman: A term used to describe someone who is identified as male at birth but identifies and lives as a woman. This is sometimes shortened to trans woman, or MTF, an abbreviation for male-to-female.

A glossary is available here that contains more detailed explanations of frequently used terms.

## WHAT ABOUT PLAYERS WITH DIFFERENCES OF SEX DEVELOPMENT (DSD)?

People with "Differences of Sex Development" (DSD) are not transgender (necessarily, although a person with DSD could of course identify as transgender).  DSDs are a group of rare conditions involving chromosomes, hormones and reproductive organs which usually results in a person's sex development being atypical.  Numerous DSD conditions exists, with different implications for sporting performance, and they should thus not be considered as a single group.

A separate World Rugby Guideline is being developed for players with DSDs and it will be made available upon completion.



7

# GUIDELINES FOR TRANSGENDER WOMEN

## CAN TRANSGENDER WOMEN PLAY RUGBY?

- Transgender women who transitioned pre-puberty and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby (subject to confirmation of medical treatment and the timing thereof)[3]

- Transgender women who transitioned post-puberty and have experienced the biological effects of testosterone during puberty and adolescence cannot currently play women's rugby

- Transgender women can play mixed-gender non-contact rugby

- World Rugby are committed to ongoing evaluation of the guideline and will remain current on all published research that pertains to the biological and physiological implications of testosterone suppression, with a formal review of the Guideline every three years.  In support of this, World Rugby will prioritize support for high quality research projects on transgender rugby players, as part of this commitment to evidence-based guidelines.

## WHY CAN'T TRANSGENDER WOMEN PLAY WOMEN'S RUGBY?

### EFFECTS OF TESTOSTERONE

> Where reference is made to "females" and "males" to explain the effects of testosterone, the references are used to differentiate between "Biological Males" (those who have undergone the androgenizing effects of testosterone commencing at puberty) and "Biological Females" (who have not received the benefits of such androgenization).

Testosterone is an androgenic-anabolic hormone whose functions include reproductive maturation, along with the genesis of male secondary sex characteristics.  From puberty onwards, testosterone levels increase 20-fold in males, but remain low in females, resulting in circulating testosterone concentrations at least 15 times higher in males than in females of any age [1,2].  Among the biological changes initiated by testosterone and its derivatives are:

- Larger and denser lean muscle mass [3,4];

- Greater force-producing capacity of skeletal muscle [5,6];

- Stiffer connective tissue [7];

- Reduced fat mass and different distribution of body fat and lean muscle mass [3];

---

[3] See the Legal Section here for details of how this review would be carried out



JA0360

TRANSGENDER GUIDELINE

- Longer, larger and denser skeletal structure [8,9];

- Changes to cardiovascular and respiratory function that include higher haemoglobin concentration, greater cross-sectional area of the trachea and lower oxygen cost of respiration (as described in [1,10-12]).

Collectively, these biological differences account for large sporting performance differences between males and females.  These include gaps between 9% and 15% for running, swimming and jumping events [13], between 15% and 35% for functional tasks like kicking, throwing, bowling and weightlifting, and in excess of 50% for tasks that involve upper body force production [10], since the biological effects of testosterone creates disproportionately greater strength on their upper compared to lower body, while females show the inverse [14,15].  In weight-lifting events, for instance, even when matched for mass and stature, males lift approximately 30% more weight than females.  Evaluated differently, males are able to lift weights similar to females who weigh 30% to 40% more than them [10].  Functional movements such as explosive jumping are similarly larger in elite males than females, with approximately 30% more power generated during a counter-movement jump [10].

The result of these biological differences is that males outperform females in all sporting activities where speed, size, power, strength, cardiorespiratory and anthropometric characteristics are crucial determinants of performance.  This is true for many thousands of boys and men who have undergone a testosterone-induced puberty, with an effect large enough that 14 to 15-year old boys outperform the best female athletes in history in a range of running, jumping, throwing and strength events [13,16]. The size of these performance differences varies depending on the contributions made by each of the biological variables to performance, and indeed, some may be detrimental to performance in some events (mass during endurance running or cycling events, for example).  Generally, however, there is no overlap in performance between males compared to females at all matched levels of competition from high school to the elite level.  The performance disparity is illustrated by the observation that thousands of teenage boys and adult males are able to outperform the very best biological females every year [13].

Similar performance differences between males and females have been described in non-athletically trained individuals.  Males have muscle mass 30% to 40% greater than females [4], maximal cardiorespiratory capacities ($VO_2$max) 25% to 50% greater than in females [17], cardiovascular parameters between 11% and 43% greater than in females, lower limb strength approximately 50% higher than in females across the lifespan, and upper body strength 50% to 100% higher than in age-matched females [6].  Even when elite females, trained in sports where grip strength is an important component of performance (judo and handball), do not outperform untrained males in a grip strength task, with the very best female performance corresponding to approximately the 58th percentile for males, and a 26% advantage for untrained males compared to typical elite females. Punching performance, a composite movement reliant on strength, power, co-ordination and mass, has been found to be 162% higher in males than in females [18], and 17-year old boys are able to throw a ball further than 99% of adult females [19].



JA0361

TRANSGENDER GUIDELINE

## BIOLOGICAL CONSIDERATIONS FOR RUGBY UNION

The implications of biological and performance differences for rugby are two-fold. First, significant differences in strength, size, speed and power have potential consequences for the safety of participants in rugby, where much of the sport involves contacts in the form of tackles, rucks and mauls, as well as numerous periods of high force production during static contests for the ball, such as the scrum and ruck. Given the documented risk of injury in rugby from contact events in particular [20-24], the elevated possibility of all injuries, including serious injury, from large disparities in size, speed, power, and force, is of concern. Recent modelling of tackles using validated biomechanical models [25,26] suggests that the discrepancy in mass and speed of direct opponents in tackles predicts neck forces, moments and head accelerations. Since these factors contribute directly to injury risk, it is clear that large discrepancies create greater risks for smaller and slower players, particularly when size and speed exist in combination.

Given that the typical male player mass is 20% to 40% greater than typical women mass, that males have strength 40% to 80% greater (unadjusted for mass), and that men are 10% to 15% faster than women despite being heavier, the risk of injury created by large imbalances in mass and speed may be considered significant. To explore this, we assessed the range of masses of players at the international level and applied the findings to a biomechanical model to explore possible implications for injury risk should cross-over scenarios occur.

With respect to mass, we documented the range of sizes of elite men's and women's players from the 2011 Rugby World Cup up to the 2019 Rugby World Cup, finding:

- Typical (median) men's players are 41.1% heavier than typical women's players (103 kg vs 73 kg)

- Among forwards, the heaviest 1% of women players are smaller than the typical men's forward (109kg for women vs 112kg for men)

- The heaviest 1% of women's backs are smaller than typical men's backs (89kg vs 92kg)

- The lightest 1% of men's forwards are approximately equal in mass to the heaviest 10% of women's forwards, while the lightest 2% of men's backs are approximately equal to the heaviest 10% of women's backs

- Figure 1 below shows the frequency histograms for men's and women's players in forward and back positions



TRANSGENDER GUIDELINE



*Figure 1: Frequency histograms for mass of forwards (left panel) and backs (right panel) in elite men's and women's rugby players.  Dotted lines indicate the 50th percentile, while dashed lines indicated the 98th percentile for each group*

## IMPLICATION FOR INJURY RISK – HEAD INJURY MODELS

The  differences observed between men and women with respects to mass may be combined with differences in speed to create a theoretical framework in which the inertial load and forces faced by a smaller and slower player is significantly greater when in contact with a larger, faster player.  This model is intended for illustrative purposes and demonstrates the impact of only one variable known to differ between biological males and females – namely mass – on head injury risk, in a basic parametric model, absent force application and complex movements, as a preliminary impact analysis. The principles illustrated by the model would apply to other injuries.  The addition of speed, and strength or force exerted during contact would further increase the implications of the findings of this illustrative model, summarized below.

The representative figure below illustrates the concept of mass disparity as a risk for injury for ball carriers.  It depicts the linear acceleration (A), angular acceleration (B), neck force (C) and neck moment (D) experienced by ball carriers of different masses when tackled by players with different masses.  Using the known masses of international rugby players, the position of the average male ($M_{50}$) and average female ($F_{50}$) are plotted on each heat map. $F_{90}$ shows the scenario where a tackler (T) corresponding to the 90th percentile for women's mass (see Figure 1) tackles a typical female mass ball carrier (BC).  X indicates the

TRANSGENDER GUIDELINE

hypothetical cross-over scenario in which a typical male tackler mass is involved in a tackle against a ball carrier with a typical female mass.



*Figure 2. Graphical representations of linear acceleration (A), angular acceleration (B), neck force (C) and neck moment (D) for ball carriers of different masses during tackles by tacklers with different masses. $M_{50}$ and $F_{50}$ show the modelled situation when typical/median players tackle one another for men and women, respectively. $F_{90}$ represents a female ball-carrier with typical mass against a tackler in the heaviest 10% of women's body mass. X denotes the cross-over situation that would hypothetically occur for a tackler at the men's median mass tackling a typical female ball carrier*

The modelling shows that a tackle involving players with typical or average mass produces slightly greater accelerations and forces in men ($M_{50}$) than in women ($F_{50}$). This is a function of the higher mass of men's players. Head and neck kinematic and kinetic variables increase significantly when the heaviest 10% of women's body mass is used for the tackler against a typical ball carrier ($F_{90}$), but this extreme "within female-bodied" scenario produces smaller kinetic and kinematic outcomes than if the hypothetical cross-over scenario were to occur, where an average male-bodied player is the tackler and the average female-bodied player the ball carrier (X). The magnitude of the increase in neck forces, moments and accelerations for the ball carrier is between 20% and 30% for typical cross-over scenario compared to the typical female vs female scenario, and is 10% greater for the male-bodied vs female-bodied crossover scenario than a tackle where the heaviest 10% of women are matched against typical women's mass ($F_{90}$).

Were the cross-over to occur in a heavier male-bodied player (for example, the heaviest 10% of male-bodied players), the increase in neck load and head acceleration for the ball carrier approaches 50% compared to the typical tackle scenario in women's rugby. The magnitude of these extreme head accelerations and neck forces are not seen in women and

TRANSGENDER GUIDELINE

are created by cross-over of male-bodied players to women's rugby. Similar differences are seen when examining the accelerations and forces for the tackler's head and neck.

The magnitude of the known risk factors for head injury are thus predicted by the size of the disparity in mass between players involved in the tackle. The addition of speed as a biomechanical variable further increases these disparities, which is relevant given that male players weighing 103kg (the median for men) would be expected to run between 10% and 15% faster than typical female players (mass 73kg), and thus considerably faster than female players who are heavier than the median (eg females at the 90th percentile, Fig 1). This would further compound the disparity created.

Next, it is important to also consider that these models do not account for the ability of players to actively exert force at high rates during tackles. This would be a function of power and strength, which are similarly known to be 30% to 80% greater in biological males than females. When these active applications of force during contact are added to the mass and speed characteristics illustrated and described above, the resultant neck and head forces and accelerations will increase even further, such that the illustrative model shown above depicts the smallest possible risk increase for typical players involved in a tackle as a result of mass alone. The addition of speed and force disparities will increase the magnitude of these risk factors beyond the 20% to 30% we illustrate above.

The implication of these increases is complex to quantify but would result in increased injury risk for the player experiencing the elevated risk outcomes (force and acceleration). This is because head injuries occur when forces and accelerations on the head and neck reach a threshold necessary to cause injury, and which is unique to each tackle situation. A tackle situation that typically produces risk factors within 20% of this threshold would, in the circumstance of a typical male-bodied vs typical female-bodied player illustrated above, be sufficiently increased to cause an injury. The higher risk scenario involving heavier male-bodied players would further increase injury likelihood, since all tackle situations that normally produce kinetic and kinematic variables within 40% to 50% of an injury threshold would now exceed it, a scenario unseen in women's rugby. The addition of strength and speed as described, further increases the risk, such that a number of tackles that currently lie beneath the threshold for injury would now exceed it, causing head injury.

Finally, it must also be considered that the ability to withstand or tolerate forces on the head and neck are required to avoid brain injury. This is the reason neck strength is critical in injury prevention. Since the strength disparities between males and females is so large, including a 50% lower neck isometric strength in females, the reduced ability of female players to tolerate or withstand the forces in tackles is a further risk factor for injury, including head injury as described above, but relevant to all injuries where the rapid application of force or load are responsible for injury.

## IMPLICATIONS FOR INJURY RISK – SCRUM FORCES

The implication of greater mass and force-producing ability in males can be seen in forces measured during scrums in both elite and community level rugby. Research on the forces applied during scrums shows that at the elite level, males produce approximately twice the peak force of females in the scrum. Even at the community level, where peak force is 30% lower than in the elite game, males produce approximately 40% greater peak force during scrums than elite females. Given that force producing and receiving ability is likely to be significantly lower in female community players, the implication is that men's community



level rugby scrums will be considerably more forceful than women's community level scrums.

The risk of particularly serious and catastrophic injuries during scrums has led to a number of law changes specifically designed to depower the scrum to reduce injury risk. This risk would be amplified by large mismatches in strength between opposing players, since the force applied must be withstood by a direct opponent. This is an illustration of how mismatches in strength and size are directly responsible for forces that result in injury.

## TESTOSTERONE AS A PREDICTOR OF PERFORMANCE

It must be noted that the actual testosterone level, measurable in the body, is not a strong predictor of performance within men and within women [27-29]. This is because performance is multifactorial, and testosterone's androgenzing effects contribute to, but do not solely influence the biology and resultant performance outcomes within a group who are able to utilize it. The biological basis for male vs female differences is thus the result of testosterone, but it does not necessarily follow that within men and within women, the hormone is a predictor of performance.

Further, differences in the sensitivity to testosterone between individuals mean that a given level of testosterone is not a sensitive or specific predictor of performance within each group (males and females). This is in part because most males have elevated levels and some degree of sensitivity, while the level in females is significantly lower and rarely exceeds even the very low end of the male range [1]. Therefore, in two homogenous groups that are matched for either the presence or absence of a given variable (males and females for the presence or absence of testosterone, in this case), the predictive value of that variable within a group is greatly diminished, the same way that VO2max is a significant predictor of running or cycling performance across the whole population, but not within a group of elite marathon runners or cyclists, who are already relatively homogenous for that characteristics [30]. Similarly, height is clearly advantageous for professional basketball, but within the National Basketball Association (NBA), where height has already been selected for and participants are in the extreme upper end of the overall population for that characteristic [31], it becomes a poorer predictor of performance.

However, when the same question – does testosterone predict performance across humans of both sexes – is asked of binary categories (males vs females in sport, rather than within males or females), then the predictive power of testosterone is strong, because "high testosterone" during adulthood is a very reliable indicator that the androgenizing effects of testosterone have occurred earlier during life. When understood and assessed this way, testosterone is necessary for peak performance (since the top performers within humans are all male), but it is not sufficient to attain it. It is here that the almost perfect sensitivity of biological sex emerges, since in a ranking list of the top thousand performances in most sport, every year, every single one will be biologically male.

## SUMMARY

In summary, across all performance levels and ages after puberty, testosterone is primarily (though not exclusively) responsible for very large typical differences in the biology of males and females, and consequently, performances between the sexes. These are summarized in Figure 3 below, which combines the biological differences between males



TRANSGENDER GUIDELINE

and females with their performance implications, and is reproduced from a recent article currently in review [10].

*Figure 3: Summary comparison of biological (left table) and performance (right figure) differences between males and females for a range of biological variables and physical activities/events. Reproduced from Hilton & Lundberg [10]*

Given that the women's category exists to ensure protection, safety and equality for those who do not benefit from the biological advantage created by these biological performance attributes, the relevant and **crucial question is whether the suppression of testosterone for a period of 12 months, currently required for transgender women participation in women's sport, is sufficient to remove the biological differences summarized above**?

### EFFECTS OF SUPPRESSION OF TESTOSTERONE

Current policies regulating the inclusion of transgender women in sport are based on the premise that reducing testosterone to levels found in biological females is sufficient to remove many of the biologically-based performance advantages described above. However, peer-reviewed evidence suggests that this is not the case, and particularly that the reduction in total mass, muscle mass, and strength variables of transgender women may not be sufficient in order to remove the differences between males and females, and thus assure other participants of safety or fairness in competition.

Based on the available evidence provided by studies where testosterone is reduced, the biological variables that confer sporting performance advantages and create risks as described previously appear to be only minimally affected. Indeed, most studies assessing mass, muscle mass and/or strength suggest that the reductions in these variables range between 5% and 10% (as described by Hilton & Lundberg [10]). Given that the typical male vs female advantage ranges from 30% to 100%, these reductions are small and the biological differences relevant to sport are largely retained.



TRANSGENDER GUIDELINE

For instance, bone mass is typically maintained in transgender women over the course of at least 24 months of testosterone suppression, with some evidence even indicating small but significant increases in bone mineral density at the lumbar spine [32-34]. Height and other skeletal measurements such as bone length and hip width have also not been shown to change with testosterone suppression, and nor is there any plausible biological mechanism by which this might occur, and so sporting advantages due to skeletal differences between males and females appear unlikely to change with testosterone reduction.

With respects to strength, 1 year of testosterone suppression and oestrogen supplementation has been found to reduce thigh muscle area by 9% compared to baseline measurement [35].    After 3 years, a further reduction of 3% from baseline measurement occurred [36]. The total loss of 12% over three years of treatment meant that transgender women retained significantly higher thigh muscle size (p<0.05) than the baseline measurement of thigh muscle area in transgender men (who are born female and experience female puberty), leading to a conclusion that testosterone suppression in transgender women does not reverse muscle size to female levels [36].

This finding has been replicated and confirmed by numerous studies examining the effects of testosterone suppression on lean body mass or muscle size in transgender women [37-44]. Collectively, these studies find that 1 year of testosterone suppression to female-typical reference levels results in a comparatively modest loss of lean body mass (LBM) or muscle size, with consistent changes between 3% and 5% reduction in LBM after 1 year of treatment (as summarized from source research studies by Hilton & Lundberg [10]).

Muscle force-producing capability is reduced after testosterone suppression, though as appears to be the case for muscle/lean mass, these reductions are considerably smaller in magnitude that the initial male-vs-female differences in these variables.  For instance, hand-grip strength was reduced by 7% and 9% after 1 and 2 years, respectively, of cross-hormone treatment in transgender women [39], and by 4% in 249 transwomen after 1 year of gender-affirming treatment, with no variation between different testosterone levels, age or BMI tertiles [45]. Transgender women retained a 17% grip-strength advantage over transgender men at baseline measurement, with a similarly large, retained advantage when compared to normative data from a reference or comparison group of biological females.

Most recently, Wiik et al found that isokinetic knee extension and flexion strength were not significantly reduced in 11 transgender women after 12 months of testosterone suppression, with a retained advantage of 50% compared to a reference group of biological females and the group of transgender men at baseline [41].  This absence of a reduction in strength occurred in conjunction with a 4% to 5% reduction in thigh volume, and no difference in the contractile density of the muscle, which suggests that the reduction of testosterone for a period of a year had no effect on the force-producing capacity per unit of cross sectional area [41], a variable that is known to be higher in males than females.

In conclusion, longitudinal research studies that have documented changes in lean mass, muscle mass/area and strength show consistently that small decreases occur as a result of testosterone suppression, with a resultant relatively large retained advantage in these variables compared to a group of biological females.



JA0368

TRANSGENDER GUIDELINE

## CONCLUSION

Testosterone exerts significant biological effects on biological males during puberty and adolescence.  This creates large differences in strength, mass, speed, power, and endurance capacity.  In turn, these create player welfare concerns and performance inequality in rugby, given the importance of physical contact and strength in the sport.  Longitudinal research studies on the effect of reducing testosterone to female levels for periods of 12 months or more do not support the contention that variables such as mass, lean mass and strength are altered meaningfully in comparison to the original male-female differences in these variables.  The lowering of testosterone removes only a small proportion of the documented biological differences, with large, retained advantages in these physiological attributes, with the safety and performance implications described previously.  There is currently no basis with which safety and fairness can be assured to biologically female rugby players should they encounter contact situations with players whose biologically male advantages persist to a large degree.

While there is overlap in variables such as mass, strength, speed and the resultant kinetic and kinematic forces we have modelled to explore the risk factors, the situation where a typical player with male characteristics tackles a typical player with female characteristics increases the magnitude of known risk factors for head injuries by between 20% and 30%.  In the event of smaller female players being exposed to that risk, or of larger male players acting as opponents, the risk factors increase significantly, and may reach levels twice as large, at the extremes.  The basis for regulation is the typical scenario, though risk mitigation must be mindful of the potential for worst-case scenarios that may arise.  Both are deemed unacceptably high, because they would result in a number of tackle situations that currently lie beneath a threshold required to cause injury increasing to exceed that threshold.

Thus, it is on the basis of male vs female biological differences, combined with no evidence for removal of their implications for safety and performance, that the guideline is that trans women should not compete in women's rugby.

## ASSESSMENT OF RESEARCH LIMITATIONS AND IMPLICATIONS

It is acknowledged that the published studies currently available on testosterone suppression and physiological changes (compiled and described in Hilton and Lundberg, 2020 and reviewed individually in the proposed policy document) have been conducted in untrained transgender women.  This invites questions over the validity and generalizability of the studies to a sports-playing population.

This is a valid question, and it is acknowledged that research is required to fully address questions arising out of this limitation.  World Rugby is committed to supporting high-quality research proposals in this area, should they be submitted as part of World Rugby's Research programme.

However, this limitation can also be assessed within an understanding of the physiological implications of trained compared to untrained individuals undergoing testosterone suppression.  The application of insights from complementary studies leads to a conclusion that the available research is in fact sufficient to arrive at firm conclusions about safety, performance and retained advantages, and thus the recognized limitations are not



TRANSGENDER GUIDELINE

sufficient to refrain from drawing a conclusion on the likely implications of the transgender research for athletes.

In assessing this issue, two primary questions may be asked:

1. How would training undertaken during the process of testosterone suppression affect the changes observed in muscle and lean body mass, and strength variables, compared to studies done in individuals who do not perform training?

2. How would training prior to a period of testosterone suppression influence:

    a. The baseline or pre-suppression measures for muscle mass and strength in transgender women, and thus the differences in these variables compared to a reference or control group of biological women (cisgender women)?

    b. The likely "end-point" for muscle and lean body mass as well as strength after the testosterone suppression for a period of at least twelve months, once again compared to a reference or comparison group of cisgender women?

Both these questions can be answered by exploring complementary research studies. At present, there is evidence that:

1. **Training during the intervention to lower testosterone levels** can reduce, eliminate, and even reverse any losses in muscle and lean body mass, muscle volume, and muscle strength. This is supported by evidence from various study models in which biological males reduce testosterone to within the female range, and are able to maintain or even increase these physiological variables through training [46-48].

    The implication is that any performance decline as a result of androgen deprivation is minimized or eliminated, and so the studies cited in support of the World Rugby Guideline, while conducted on non-training individuals, establish the minimum possible retained advantage for trans women. That is, they establish that in the absence of training during testosterone suppression, an advantage is retained compared to cisgender women. That advantage is either the same, or very plausibly increased as a result of training.

2. **Training prior to the intervention** will cause increased muscle mass and strength variables at baseline. This means that the initial or "pre-suppression" differences in these variables compared to biological females will be greater than in an untrained trans woman. This rebuts the assertion that trans women are weaker, less muscular and thus more similar to biological females at baseline, within a sporting context, since the transgender woman being considered by World Rugby is much more likely to be trained (or will train once transition begins, as described above).

    Further, once the period of testosterone suppression begins, then the degree to which muscle mass and strength decreases may be either the same or relatively greater in the trained trans women as a result of this higher baseline. Even if the relative loss of muscle mass and strength are higher than in untrained trans women, it is inconceivable, and even physiologically impossible, that a pre-trained athletic



18

trans woman is going to lose so much muscle mass and strength that they end at a point where they are less muscular/lean and weaker than a theoretically untrained (and even 'self-starved') transgender woman.

Therefore, if research on untrained trans women establishes that the retained advantage in muscle mass and strength is corresponds to a value of X percent, this is the smallest possible remaining advantage for a pre-trained trans woman. The effect of training can only be to increase this value or to achieve the same value of X percent retained advantage, but it cannot reduce it further, unless one argues that a trained trans woman will lose so much lean mass and strength that they end up weaker and less muscular than a completely non-athletic individual.

Finally, it is relevant that studies comparing untrained biological males and highly trained females, males retain an advantage despite the training status of biological females. For instance, in a study on grip strength, the strongest elite athletically trained females in sports where grip strength is a performance advantage (judo and handball) are only as strong as untrained biological males at the 58th percentile, with a 26% difference in strength between typical elite females and typical untrained males [49]. Similarly, Morrow & Hosler (1981) found that untrained college-aged males were more than twice as strong as trained female basketball and volleyball players in a bench press task, with the top 5% strongest trained females equal in strength to the weakest 14% of untrained males  This establishes that pre-trained biological females can increase strength beyond that of untrained females, but still do not compare to untrained biological males.

The implication is also that since even typical untrained biological males have a large strength advantage compared to elite and trained females, studies that have documented only small reductions in strength and thus persistence of strength advantages with androgen deprivation in untrained biological males (as in Kvorning et al [46], Chen et al [47] and in studies on transgender women cited herein) should be considered relevant for establishing the smallest possible retained advantage that would exist in the absence of training. As described above, and in studies where training is conducted while testosterone is suppressed [46-48], the advantage will only remain this size or increase.

Finally, it is also recognized that not all sports are affected similarly by the variables we have weighted as crucial for rugby (size, strength, speed, power). Indeed, in some sports, excess mass may be disadvantageous, and thus the model for retained advantage and persistent risk may present differently for different physical activities.

In conclusion, with those recognized limitations, World Rugby is committed to supporting research that may in future establish that biological differences between those to whom testosterone confers significant physiological and performance advantages and those to whom it does not are removed sufficiently to enable participation of transgender women in women's rugby. At the present time, however, based on the best published scientific evidence, that position is unsupported.

The referenced research used to support this position can be viewed here.

## CONCLUSION – TESTOSTERONE, WELFARE AND PERFORMANCE

Having considered all of the currently available information, the working group determined that the best evidence **currently** available means that those who experienced the biological



TRANSGENDER GUIDELINE

effects of testosterone during puberty and adolescence cannot safely or fairly compete in women's rugby.  That means that currently, transgender women may not compete in women's rugby.

World Rugby is committed to encouraging transgender people to remain involved with rugby and is currently funding research to continue to review any evidence that may emerge to enable the participation of transgender women in women's rugby. Details of the research currently underway, along with details of how to apply for research funding for those who may be interested, is available here.



TRANSGENDER GUIDELINE

# GUIDELINES FOR TRANSGENDER MEN

## CAN TRANSGENDER MEN PLAY MEN'S RUGBY?

Transgender men who have transitioned pre- or post-puberty can play men's rugby subject to the following conditions:

- Transgender men who have transitioned pre- or post-puberty can play men's rugby subject to certain conditions (currently: confirmation of physical ability and a Therapeutic Use Exemption (TUE) where necessary, see 1 & 2 below).

- Transgender men who have transitioned pre- or post-puberty cannot play women's rugby, irrespective of the obtaining of a TUE

- Transgender men can play mixed-gender non-contact rugby

1.  Confirmation of physical ability which must include:

- Written acknowledgement and acceptance by the player of the associated risks of playing contact rugby with males who are statistically likely to be stronger, faster and heavier than them, given the predictions this combination of variables makes for injury risk, as described

- Written confirmation from a medical practitioner or qualified coach with an understanding of the demands of rugby, to whom the player is known, that the player is in a physical condition to play and that this view is supported by a musculo-skeletal evaluation and/or other appropriate assessments. The Union/ competition can adopt the spirit of the guideline and make it fit the laws/realities of that particular jurisdiction.

- A template confirmation is attached here.

2.  Therapeutic Use Exemption (where necessary, to play men's rugby)

- It is important for transgender men to consider whether any medical treatment that they are undergoing requires them to obtain a TUE for the use of a substance on the WADA Prohibited List. Treatment with testosterone would require a TUE and playing without a TUE may result in an Anti-Doping Rule Violation which might result in a significant suspension from rugby

- Nothing in this Guideline would be deemed to permit, excuse or justify non-compliance with any of the WADA requirements so it is very important that the player fully understands their obligations

- Further information can be found by contacting your Union and in the WADA Transgender Player TUE Physician Guidelines, available at www.wada-ama.org.



JA0373

TRANSGENDER GUIDELINE

### WHY IS CONFIRMATION OF PHYSICAL ABILITY REQUIRED?

As described previously, males are typically significantly heavier, faster, stronger, and more powerful than typical females. Thus, when comparing typical males to females, there are large and meaningful differences, with similar or even larger differences present when the extreme cases (heaviest male player vs heaviest female player) are compared. This does not necessarily preclude some men from being lighter, less strong and less powerful than many women, but the frequency distributions of, for example, elite rugby players suggests than when matched for performance level, there is small overlap between these variables (see Figure below, which shows the mass and height overlap and spread in elite rugby players). Biomechanical modelling suggests a similar frequency distribution for injury risk factors such as neck forces and moments, and head linear and angular accelerations, where the smaller and slower player experiences larger outcomes suggestive of increased injury risk, as described previously.



Similarly, grip strength, a proxy for upper body strength, is 30 to 40% greater in men than women, while still allowing for overlap, and performance outcomes such as countermovement jump and running speed are significantly different, with males outperforming females by approximately 30% and 15%, respectively.

The principle is thus that transgender men, who have not benefited from the biological changes created by testosterone's effects at puberty, will typically have mass and strength variables that fall into the range of those belonging to biological females in the above-mentioned studies, and will therefore be smaller and less strong, on average, than the men whose data are included in the above studies.



JA0374

TRANSGENDER GUIDELINE

It is therefore prudent, for the purposes of welfare and safety, to request certification to ensure that imbalances are not so large as to create a safety risk to that player.  This is done for various other scenarios in Rugby Union, including in permitting a youth or junior player to play adult rugby, where the differences in size, strength and speed are in fact very similar to those documented between men's and women's rugby players at any given age after puberty.

Similarly, World Rugby's guideline for age-grade participation recognizes that permission may be given to girls to continue playing rugby against boys after the age of 13 (when puberty begins to create physiological differences as a result of testosterone) provided certification is given.  Finally, players are assessed and deemed competent to play in the front row positions, also for their own safety.

### HOW DO I PROVIDE THE CONFIRMATION?

The confirmation of physical ability should be provided to the player's Union's Chief Medical Officer.

### WHY MIGHT A THERAPEUTIC USE EXEMPTION (TUE) BE REQUIRED?

Some transgender men may be undergoing medical treatment that includes the prescription of testosterone (or other drugs) which are "Prohibited Substances" on the WADA Prohibited List (i.e. they are considered to be performance enhancing substances) and they are not permitted without a Therapeutic Use Exemption (TUE).  A TUE provides a player with authorisation to use a Prohibited Substance whilst continuing to play rugby.  Players who medically require the use of a Prohibited Substance are required to obtain a TUE.

Without a TUE, players whose treatment include Prohibited Substances risk committing an Anti-Doping Rule Violation, an offence that may result in a sanction (regardless of the player's circumstances or reasons for such treatment).  That could result in a four-year suspension from sport and therefore it is very important that players understand their obligations to obtain a TUE.



TRANSGENDER GUIDELINE

## GUIDELINES FOR NON-BINARY PEOPLE

"Non-binary" is a term used by people whose gender is identified by them as neither male nor female, or both male and female, or whose gender is not identified as male and/or female.

For non-binary people, the factor that determines which of the categories of rugby they may play in (i.e. men's or women's rugby) is whether or not the player has experienced the biological effects of testosterone during puberty and adolescence.

- Non-binary people who have experienced the biological effects of testosterone during puberty and adolescence can play men's rugby without any restrictions.

- Non-binary people who have experienced the biological effects of testosterone during puberty and adolescence cannot currently play women's rugby.

- Non-binary people who were identified as female at birth and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby (subject to confirmation of medical treatment and the timing thereof).[4]

- Non-binary people who were identified as female at birth and have not experienced the biological effects of testosterone during puberty and adolescence can play men's rugby subject to certain conditions (currently: certification of physical ability and a TUE where necessary).

- Non-binary people who are pre-puberty can play either boys or girls or mixed-gender rugby up to age 12 (in line with World Rugby's mixed-gender guideline[5]) and thereafter, shall participate in rugby in accordance with the above criteria for non-binary people depending on whether they are experiencing the biological effects of testosterone during puberty and adolescence or not.

**PLAYERS WHO HAVE EXPERIENCED OR ARE EXPERIENCING THE BIOLOGICAL EFFECTS OF TESTOSTERONE DURING PUBERTY OR ADOLESCENCE:**

**WHY CAN'T THEY PLAY WOMEN'S RUGBY?**

Concerns have emerged following the publication of new research that suggests that the suppression of testosterone does not reduce the strength of transgender women to the extent previously thought to be the case.

For a detailed explanation of the effects of testosterone on performance and injury risk in rugby, please visit the relevant section here.

---

[4] See the Legal Section here for details of how this review would be carried out
[5] https://playerwelfare.worldrugby.org/?documentid=117

 WORLD RUGBY

JA0376

TRANSGENDER GUIDELINE

Having considered all of the currently available information, the working group determined that the best evidence underlined currently underlined available means that those who experienced the biological effects of testosterone during puberty cannot safely or fairly compete in women's rugby.

World Rugby is committed to encouraging transgender people to remain involved with rugby and is currently funding research to review any new evidence that may emerge to enable the participation of those who had experienced the biological effects of testosterone during puberty in women's rugby if they so wish. Details of the research currently underway, along with details of how to apply for research funding for those who may be interested, is available here.

### NON-BINARY PLAYERS WHO WERE IDENTIFIED AT BIRTH AS FEMALE AND HAVE NOT EXPERIENCED THE BIOLOGICAL EFFECTS OF TESTOSTERONE DURING PUBERTY:

### WHY IS A CONFIRMATION OF PHYSICAL ABILITY REQUIRED?

Individuals who have undergone the androgenizing effects of testosterone during puberty are typically heavier, stronger, and faster than those who have not.  Hence, it is prudent for safety reasons to ensure that large mismatches, which may increase the risk of injury, are avoided.  The male-female differences relevant to these risks are described here.

### WHY MIGHT A THERAPEUTIC USE EXEMPTION (TUE) BE REQUIRED?

Some non-binary people may be undergoing medical treatment that includes the prescription of testosterone, spironolactone or GnRH agonists which are "Prohibited Substances" on the WADA Prohibited List (i.e. they are considered to be performance enhancing substances) and they are not permitted without a Therapeutic Use Exemption (TUE).  A TUE provides a player with authorisation to use a Prohibited Substance whilst continuing to play rugby. Players who medically require the use of a Prohibited Substance are required to obtain a TUE.

Without a TUE, Players risk committing an Anti-Doping Rule Violation, an offence that may result in a sanction regardless of the medical circumstances.  That could result in a four-year suspension from sport and therefore it is very important that players understand their obligations to obtain a TUE.



JA0377

TRANSGENDER GUIDELINE

### HOW DO I STAY INVOLVED IN RUGBY IF I CAN NO LONGER PLAY IN THE CATEGORY THAT I WANT TO?

World Rugby acknowledges that the introduction of this Guideline will mean that some players can no longer play in the category that they want to.  It is possible that will change in the future and World Rugby is funding research to try to find out if there are ways to allow that safely and fairly (see here for details).  In the meantime, there are many other ways to stay involved with rugby:

- Other forms of the game: Many forms of non-contact Rugby exist such as: Tag; Touch; Flag etc all have open categories.

- Coaching: Coaching can be hugely rewarding and can provide players with life lessons, engender a love for the sport and provide an enjoyable vehicle for improvement. World Rugby and its member Unions offer several courses for coaches of children, adolescents, and adults. All courses are open to any participant.

- Refereeing: For many people who may not be able to play, refereeing is a viable alternative to stay close to the game. World Rugby and its member Unions offer several introductory courses and a pathway exists in all Unions for fast-tracking talented individuals.

- Administration: All clubs rely on volunteer administrators. As individuals enter the latter stages of the long-term participant model, then administration becomes a realistic outlet for many. A number of Unions have dedicated support resources for individuals who wish to pursue this path of staying involved.

World Rugby is currently exploring the possibility of an "open category" of rugby in which any player could play, regardless of gender identity.  World Rugby has committed to exploring this option with its Unions, Associations, International Rugby Players, and trans-advocate groups including Gendered Intelligence and International Gay Rugby.



TRANSGENDER GUIDELINE

### WHAT IF I HAVE CONCERNS ABOUT SAFETY OR FAIRNESS RELATING TO SOMEONE I AM PLAYING WITH OR AGAINST?

It is important to note that many people do not meet cultural or local norms or stereotypes related to the expression of gender identity.  All players and Unions ought to take care to consider this when raising any concerns about another player.  In the event that a player or Union has a genuine concern about safety or fairness in relation to another player, the concern should be dealt with as follows:

1. The concerned person should raise their concerns with their Union's Chief Medical Officer (CMO).

2. The Union's CMO should carefully consider the concerns raised, in the context of all of the known facts and if having done so, the CMO determines that the concerns are not frivolous or vexatious, the CMO should contact the World Rugby CMO setting out the basis for the concerns.

3. The World Rugby CMO will engage with the CMO of the Union of the player about whom the concerns have been raised, ensuring confidentiality for the player and involved team-mates and opponents throughout the engagement.

4. The World Rugby CMO and the relevant player's CMO will discuss the situation and agree on the most appropriate actions, based on the specific circumstances

5. In some circumstances, such appropriate actions may include a recommendation that a standardised endocrinological assessment be performed [Appendix].

6. For the avoidance of doubt, no player should or would be forced to undergo any medical or other assessment.  It is a player's responsibility to decide on whether he or she wishes to proceed with any assessment.  However, it should be noted that deciding not to participate in an assessment, having been requested to do so, may have consequences in terms of the player's eligibility to participate in the category of competition that is consistent with his/her/their gender identity, since it may not be possible to determine whether issues of safety or fairness arise without such assessment.



JA0379

# GLOSSARY

**Below are some commonly used terms.  They are provided to ensure that the Guideline is clear to everyone who reads it, but it is acknowledged that not all terms are used or agreed on by all people.**

**Transgender**: used in this Guideline to refer to individuals whose gender identity (i.e. how they identify) is different from the sex identified at birth (whether they are pre- or post-puberty, and whether or not they have undergone any form of medical intervention).

**Transgender man**: used in this Guideline to refer to an individual who is identified as female at birth and did not experience a testosterone-driven puberty but identifies and lives as a man. This is sometimes shortened to trans man, or FTM, an abbreviation for female-to-male.

**Transgender woman**: used in this Guideline to refer to an individual who is identified as male at birth and experienced a testosterone-driven puberty but identifies and lives as a woman. This is sometimes shortened to trans woman, or MTF, an abbreviation for male-to-female.

**Non-binary person**: used in this Guideline to refer to individuals whose gender is neither male nor female, or both male and female, or whose gender does not relate to male and/or female**.**

**Sex**: used in this Guideline to refer to an individual person's biological and physical characteristics, associated with being male or female.

**Gender**: used in this Guideline to refer to the social and cultural contexts related to masculinity and femininity.  It is also often used to refer to a person's sense of self as, for example, a man, woman or non-binary person, and to associated behavioural expressions.

**Expression of gender**: The gender-related signals a person uses, such as name, pronoun, title, clothing, hair, walk, speech and mannerisms and so on.

**Biological male**: For the purposes of this document, refers to a person who produces testosterone at puberty and adolescence, and experiences the resultant androgenizing effects thereof.

**Biological female**: For the purposes of this document, refers to a person who does not produce male levels of testosterone at puberty and adolescence, and thus does not experience the resultant androgenizing effects thereof.



TRANSGENDER GUIDELINE

# REFERENCES

Below is a list of research articles and proceedings that are referred to in the sections above, and which inform this guideline.

1 Handelsman DJ, Hirschberg AL, Bermon S. Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance. *Endocr Rev* 2018; **39:803**–29. doi:10.1210/er.2018-00020

2 Handelsman DJ, Sikaris K, Ly LP. Estimating age-specific trends in circulating testosterone and sex hormone-binding globulin in males and females across the lifespan. *Ann Clin Biochem* 2016; **53:377**–84. doi:10.1177/0004563215610589

3 Lee DH, Keum N, Hu FB, *et al.* Development and validation of anthropometric prediction equations for lean body mass, fat mass and percent fat in adults using the National Health and Nutrition Examination Survey (NHANES) 1999-2006. *Br J Nutr* 2017; **118:858**–66. doi:10.1017/S0007114517002665

4 Janssen I, Heymsfield SB, Wang ZM, *et al.* Skeletal muscle mass and distribution in 468 men and women aged 18-88 yr. *J Appl Physiol* 2000; **89:**81–8. doi:10.1152/jappl.2000.89.1.81

5 Neder JA, Nery LE, Shinzato GT, *et al.* Reference values for concentric knee isokinetic strength and power in nonathletic men and women from 20 to 80 years old. *J Orthop Sports Phys Ther* 1999; **29:116**–26. doi:10.2519/jospt.1999.29.2.116

6 Bohannon RW, Wang Y-C, Yen S-C, *et al.* Handgrip Strength: A Comparison of Values Obtained from the NHANES and NIH Toolbox Studies. *Am J Occup Ther* 2019; **73:7302205080**p1–7302205080p9. doi:10.5014/ajot.2019.029538

7 Lepley AS, Joseph MF, Daigle NR, *et al.* Sex Differences in Mechanical Properties of the Achilles Tendon: Longitudinal Response to Repetitive Loading Exercise. *The Journal of Strength & Conditioning Research* 2018; **32:3070**–9. doi:10.1519/JSC.0000000000002386

8 Brinckmann P, Hoefert H, Jongen HT. Sex differences in the skeletal geometry of the human pelvis and hip joint. *J Biomech* 1981; **14:427**–30. doi:10.1016/0021-9290(81)90060-9

9 Jantz LM, Jantz RL. Secular change in long bone length and proportion in the United States, 1800-1970. *Am J Phys Anthropol* 1999; **110:57**–67. doi:10.1002/(SICI)1096-8644(199909)110:1<57::AID-AJPA5>3.0.CO;2-1

10 Hilton EN, Lundberg TR. Transgender Women in The Female Category of Sport: Is the Male Performance Advantage Removed by Testosterone Suppression? *Preprintsorg* Published Online First: 13 May 2020. doi:10.20944/preprints202005.0226.v1

11 Bermon S. Androgens and athletic performance of elite female athletes. *Curr Opin Endocrinol Diabetes Obes* 2017; **24:246**–51. doi:10.1097/MED.0000000000000335



JA0381

TRANSGENDER GUIDELINE

12    Hirschberg AL, Elings Knutsson J, Helge T, *et al.* Effects of moderately increased testosterone concentration on physical performance in young women: a double blind, randomised, placebo-controlled study. *British Journal of Sports Medicine* 2020; **54:**599–604. doi:10.1136/bjsports-2018-100525

13    Lambelet-Coleman D, Shreve W. Comparing athletic performances: The best elite women to boys and men. Duke Law. https://web.law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperformances.pdf (accessed 20 May2020).

14    Lassek WD, Gaulin SJC. Costs and benefits of fat-free muscle mass in men: relationship to mating success, dietary requirements, and native immunity. *Evolution and Human Behavior* 2009; **30:**322–8. doi: 10.1016/j.evolhumbehav.2009.04.002

15    Stoll T, Huber E, Seifert B, *et al.* Maximal Isometric Muscle Strength: Normative Values and Gender-Specific Relation to Age. *Clin Rheumatol* 2000; **19:**105–13. doi:10.1007/s100670050026

16    Harper J. *Sporting Gender.* Rowman & Littlefield Publishers 2019.

17    Pate RR, Kriska A. Physiological basis of the sex difference in cardiorespiratory endurance. *Sports Medicine* 1984; **1:**87–98. doi:10.2165/00007256-198401020-00001

18    Morris JS, Link J, Martin JC, *et al.* Sexual dimorphism in human arm power and force: implications for sexual selection on fighting ability. *Journal of Experimental Biology* 2020; **223**.

19    Thomas JR, Thomas KT. Development of Gender Differences in Physical Activity. *Quest* 2012; **40:**219–29. doi:10.1080/00336297.1988.10483902

20    Quarrie KL, Hopkins WG. Tackle injuries in professional Rugby Union. *Am J Sports Med* 2008; **36:**1705–16. doi:10.1177/0363546508316768

21    Fuller CW, Brooks JHM, Cancea RJ, *et al.* Contact events in rugby union and their propensity to cause injury. *British Journal of Sports Medicine* 2007; **41:**862–7–discussion867. doi:10.1136/bjsm.2007.037499

22    Tucker R, Raftery M, Fuller GW, *et al.* A video analysis of head injuries satisfying the criteria for a head injury assessment in professional Rugby Union: a prospective cohort study. *British Journal of Sports Medicine* 2017; **51:**1147–51. doi:10.1136/bjsports-2017-097883

23    Tucker R, Raftery M, Kemp S, *et al.* Risk factors for head injury events in professional rugby union: a video analysis of 464 head injury events to inform proposed injury prevention strategies. *British Journal of Sports Medicine* 2017; **51:**1152–7. doi:10.1136/bjsports-2017-097895

24    Cross MJ, Tucker R, Raftery M, *et al.* Tackling concussion in professional rugby union: a case–control study of tackle-based risk factors and recommendations for primary prevention. *British Journal of Sports Medicine* 2017; bjsports–2017–097912. doi:10.1136/bjsports-2017-097912



JA0382

TRANSGENDER GUIDELINE

25      Tierney GJ, Joodaki H, Krosshaug T, *et al.* Assessment of model-based image-matching for future reconstruction of unhelmeted sport head impact kinematics. *Sports Biomech* 2018; **17:33**–47. doi:10.1080/14763141.2016.1271905

26      Tierney GJ, Simms CK. The effects of tackle height on inertial loading of the head and neck in Rugby Union: A multibody model analysis. *Brain Inj* 2017; **31:1925**–31. doi:10.1080/02699052.2017.1385853

27      Bermon S, Hirschberg AL, Kowalski J, *et al.* Serum androgen levels are positively correlated with athletic performance and competition results in elite female athletes. *British Journal of Sports Medicine* 2018; **52:1531**–2. doi:10.1136/bjsports-2018-099700

28      Bermon S, Garnier P-Y. Serum androgen levels and their relation to performance in track and field: mass spectrometry results from 2127 observations in male and female elite athletes. *Br J Sports Med* 2017; **51:1309**–14. doi:10.1136/bjsports-2017-097792

29      Karkazis K, Jordan-Young R, Davis G, *et al.* Out of bounds? A critique of the new policies on hyperandrogenism in elite female athletes. *Am J Bioeth* 2012; **12:3**–16. doi:10.1080/15265161.2012.680533

30      Lucia A, HOYOS J, PÉREZ M, *et al.* Inverse relationship between V̇O2max and economy/efficiency in world-class cyclists. *Medicine & Science in Sports & Exercise* 2002; **34:2079**.

31      Epstein D. *The Sports Gene*. Current Hardcover 2013.

32      Fighera TM, Ziegelmann PK, Rasia da Silva T, *et al.* Bone Mass Effects of Cross-Sex Hormone Therapy in Transgender People: Updated Systematic Review and Meta-Analysis. *J Endocr Soc* 2019; **3:943**–64. doi:10.1210/js.2018-00413

33      Maraka S, Singh Ospina N, Rodriguez-Gutierrez R, *et al.* Sex Steroids and Cardiovascular Outcomes in Transgender Individuals: A Systematic Review and Meta-Analysis. *J Clin Endocrinol Metab* 2017; **102:3914**–23. doi:10.1210/jc.2017-01643

34      Singh-Ospina N, of SMTJ, 2017. Effect of sex steroids on the bone health of transgender individuals: a systematic review and meta-analysis. *academicoupcom*

35      Elbers JM, Asscheman H, Seidell JC, *et al.* Effects of sex steroid hormones on regional fat depots as assessed by magnetic resonance imaging in transsexuals. *Am J Physiol* 1999; **276**: E317–25. doi:10.1152/ajpendo.1999.276.2.E317

36      Gooren LJG, Bunck MCM. Transsexuals and competitive sports. *Eur J Endocrinol* 2004; **151:425**–9. doi:10.1530/eje.0.1510425

37      Mueller A, Zollver H, Kronawitter D, *et al.* Body composition and bone mineral density in male-to-female transsexuals during cross-sex hormone therapy using gonadotrophin-releasing hormone agonist. *Exp Clin Endocrinol Diabetes* 2011; **119:95**–100. doi:10.1055/s-0030-1255074



38      Wierckx K, Van Caenegem E, Schreiner T, *et al*. Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. *J Sex Med* 2014; **11:1999**–2011. doi:10.1111/jsm.12571

39      Van Caenegem E, Wierckx K, Taes Y, *et al*. Preservation of volumetric bone density and geometry in trans women during cross-sex hormonal therapy: a prospective observational study. *Osteoporos Int* 2015; **26:35**–47. doi:10.1007/s00198-014-2805-3

40      Gava G, Cerpolini S, Martelli V, *et al*. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. *Clin Endocrinol (Oxf)* 2016; **85:239**–46. doi:10.1111/cen.13050

41      Wiik A, Lundberg TR, of ERTJ, *et al*. Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals. *academicoupcom*

42      Fighera TM, da Silva E, Lindenau JD-R, *et al*. Impact of cross-sex hormone therapy on bone mineral density and body composition in transwomen. *Clin Endocrinol (Oxf)* 2018; **88:856**–62. doi:10.1111/cen.13607

43      Klaver M, de Blok CJM, Wiepjes CM, *et al*. Changes in regional body fat, lean body mass and body shape in trans persons using cross-sex hormonal therapy: results from a multicenter prospective study. *Eur J Endocrinol* 2018; **178:163**–71. doi:10.1530/EJE-17-0496

44      Auer MK, Ebert T, Pietzner M, *et al*. Effects of Sex Hormone Treatment on the Metabolic Syndrome in Transgender Individuals: Focus on Metabolic Cytokines. *J Clin Endocrinol Metab* 2018; **103:790**–802. doi:10.1210/jc.2017-01559

45      Scharff M, Wiepjes CM, Klaver M, *et al*. Change in grip strength in trans people and its association with lean body mass and bone density. *Endocr Connect* 2019; **8:1020**–8. doi:10.1530/EC-19-0196

46      Kvorning T, Andersen M, Brixen K, *et al*. Suppression of endogenous testosterone production attenuates the response to strength training: a randomized, placebo-controlled, and blinded intervention study. *American Journal of Physiology-Endocrinology and Metabolism* 2006;**291**: E1325–32. doi:10.1152/ajpendo.00143.2006

47      Chen Z, Zhang Y, Lu C, *et al*. Supervised Physical Training Enhances Muscle Strength but Not Muscle Mass in Prostate Cancer Patients Undergoing Androgen Deprivation Therapy: A Systematic Review and Meta-Analysis. *Front Physiol* 2019; **10:843**. doi:10.3389/fphys.2019.00843

48      Hanson ED, Sheaff AK, Sood S, *et al*. Strength training induces muscle hypertrophy and functional gains in black prostate cancer patients despite androgen deprivation therapy. *academicoupcom*

49      Leyk D, Gorges W, Ridder D, *et al*. Hand-grip strength of young men, women and highly trained female athletes. *Eur J Appl Physiol* 2007; **99:415**–21. doi:10.1007/s00421-006-0351-1



JA0384

TRANSGENDER GUIDELINE

## FUTURE RESEARCH FUNDING CONSIDERATIONS

As described previously, the current evidence strongly suggests that the reduction of testosterone levels in transwomen is insufficient to remove biological advantages created during puberty and adolescence, which is the basis for the current policy that disallows transwomen from playing in women's rugby. This is however based on current evidence, and does not preclude the possibility that future evidence, specifically in an athletic, trained population, may emerge to contradict this position, and offer alternative policies.

To this end, World Rugby is committed to supporting such research as part of its global research prioritization. Currently, World Rugby invites research proposals from any eligible applicant, and then assesses the applications through a Scientific Committee comprised of internal and external independent researchers and experts. Those studies that are deemed to fall within the high-priority research areas, and to be of sufficient standard, are then funded by World Rugby.

As part of its commitment to an open, transparent engagement with the rugby-playing community, matters related to transgender physiology and performance will henceforth be included in the World Rugby high priority research areas. This means that any researchers who are exploring questions related to biological differences between males and females can apply to World Rugby for funding. This is not a guarantee that funding will be provided, as the studies are evaluated against a checklist according to best-practice principles, but the field of research will be prioritized, and so candidates may apply for funding that will advance understanding in this field and ensure that the policies that govern the sport are continuously challenged by best-available evidence.

See further details on World Rugby's research process and application for funding at: https://playerwelfare.worldrugby.org/?subsection=72



TRANSGENDER GUIDELINE

# LEGAL ASPECTS OF THE TRANSGENDER GUIDELINE AND APPLICATION IN WORLD RUGBY TOURNAMENT

1. World Rugby, as the international federation responsible for the global governance and regulation of the sport of rugby, has adopted this Transgender Guideline (the "Guideline") in order to facilitate the participation of transgender and non-binary players at the international level of the sport in the category of competition that is consistent with their gender identity, where it is safe and fair to do so.

2. The Guideline operates as a "Policy" in all World Rugby Tournaments.  This means that it will be applied as set out within the Guideline with no amendments thereto.

3. It is strongly recommended that each Union adopts its own regulations to determine the eligibility of transgender players to compete in events taking place under its own jurisdiction.  Unions should take account of the information provided in this Guideline but may also take into account any relevant aspects of local law which apply within the Union's jurisdiction and with which the Union is legally obliged to comply.  For the avoidance of doubt, however, anything that the Union does (or does not do) at national level will not affect the eligibility of transgender players to compete in World Rugby Tournaments. That will instead be determined exclusively by reference to this Guideline.

4. World Rugby wishes to be as inclusive as possible, to impose only necessary and proportionate restrictions on eligibility, and to provide a clear path to participation in the sport for all.

5. World Rugby recognises that transgender players may wish to compete in rugby in accordance with their gender identity. World Rugby wishes to encourage and facilitate such participation, on conditions that go only so far as is necessary to protect the safety of all participants and to ensure fair and meaningful competition.

6. World Rugby took the following into account when developing this Guideline:

   a. World Rugby needs to establish conditions for participation in the sport of rugby, including eligibility categories, that (a) protect the health and safety of participants; and (b) guarantee fair and meaningful competition that displays and rewards the fundamental values and meaning of the sport:

   b. World Rugby wants its Players to be incentivised to make the huge commitments required to excel in the sport, and so to inspire new generations to join the sport and aspire to the same excellence. It does not want to risk discouraging those aspirations by permitting competition that is not safe, fair, or meaningful.

   c. Those who experience a testosterone-driven puberty gain significant advantages in size, strength, and power over those who do not.  Owing to the impact that such advantages can have on sporting performance and on safety, it is necessary to have separate competition categories for males and females in order to preserve the safety fairness and integrity of the sport, for the benefit of all of its participants and stakeholders.



TRANSGENDER GUIDELINE

7. The eligibility conditions established in this Guideline are driven solely by the desire to guarantee fairness and safety within the sport. In no way are they intended as any kind of judgement on or questioning of the gender identity or the dignity of any Transgender Player.

8. The need to respect and preserve the dignity and privacy of transgender players, and to avoid improper discrimination and stigmatisation on grounds of gender identity. All cases arising under this Guideline must be handled and resolved in a fair, consistent, and confidential manner, recognising the sensitive nature of such matters.

9. This Guideline will come into effect on 9TH October 2020 and will apply both to cases arising prior to that date and to cases arising after that date. It will be subject to periodic review to take account of any relevant scientific or medical developments, and may be amended from time to time by World Rugby, with such amendments to take effect from the date specified by World Rugby when it issues the amendments.

10. In the event an issue arises that is not foreseen in this Guideline, it will be addressed by World Rugby in a manner that protects and promotes the imperatives identified above.

11. Queries in relation to this Guideline should be directed as set out here.

## APPLICATION IN WORLD RUGBY TOURNAMENTS

12. This Guideline establishes the conditions enabling transgender and non-binary players ("Relevant Players") to compete in World Rugby Tournaments in the category of competition that is consistent with their gender identity. Further guidance on certain medical aspects of the Guideline can be found in the Appendix.

13. Any Relevant Player who wishes to participate in a World Rugby Tournament agrees, as a condition to such participation:

    a. to comply in full with this Guideline;

    b. to cooperate promptly and in good faith with the Chief Medical Officers ("CMO") of the relevant Union and/or World Rugby and, if necessary the Expert Panel of the relevant Union and/or World Rugby in the discharge of their respective responsibilities under this Guideline, including providing them with all of the information and evidence they request to assess his/her compliance and/or monitor his/her continuing compliance with the eligibility conditions referred to in this Guideline;

    c. to the fullest extent permitted and required under all applicable data protection and other laws, to the collection, processing, disclosure and use of information (including his/her sensitive personal information) as required to implement and apply this Guideline effectively and efficiently;

    d. to follow the procedures set out herein to challenge this Guideline and/or to appeal decisions made under this Guideline, and not to bring any proceedings



JA0387

in any court or other forum that are inconsistent with the relevant clauses herein; and

    e.   to provide written confirmation of his/her agreement with this Guideline upon request by World Rugby.

14. A player may revoke at any time, with or without giving reasons, the player's agreement to participate in a World Rugby Tournament in accordance with this Guideline.  In that event, the player will be deemed to have withdrawn any claim to satisfy the eligibility conditions for transgender players set out herein and may not participate in a World Rugby Tournament.

### ELIGIBILITY CONDITIONS FOR TRANSGENDER MALE ATHLETES

15. Transgender men who have transitioned pre- or post-puberty can play in the male category subject to certain conditions which are currently: (i) certification of physical ability and (ii) possession of a valid Therapeutic Use Exemption where necessary.

16. The confirmation of physical ability must include:

- Written acknowledgement and acceptance by the player of the associated risks of playing contact rugby with males who are statistically more likely to be heavier, stronger, faster and consequently produce more force and power during physical contact situations

- Written confirmation from a medical practitioner with an understanding of the demands of rugby, to whom the player is known, that the player is in a physical condition to play and that this view is supported by a musculo-skeletal evaluation and/or other appropriate assessments.

- A template confirmation is attached here.

17. The Player must provide the confirmation of physical ability (and TUE if applicable) to his Union's CMO for review.  If satisfied with same, the Union's CMO shall provide a copy to World Rugby's Chief Medical Officer no later than six weeks ahead of the World Rugby Tournament in which he wishes to participate.

18. If satisfied with the confirmation of physical ability (and TUE if applicable), World Rugby's CMO will issue a written confirmation, to the player's Union, of that player's eligibility to compete in the male category of competition in World Rugby Tournaments.

19. In the event that the player does not agree with a decision of World Rugby's CMO, he may appeal such decision to the World Rugby Expert Group in accordance with the "Appeals" process set out below.

20. Transgender men who have been treated with testosterone (or similar) may not compete in the female category.



JA0388

TRANSGENDER GUIDELINE

21. In the event that a transgender man decides to stop his hormone treatment and later wishes to take part in the female category of competition, the player's Union's CMO should request World Rugby's CMO to convene the World Rugby Expert Group to consider the individual circumstances and make a decision on whether to permit his participation in the female category, taking all the circumstances into account.

### ELIGIBILITY CONDITIONS FOR TRANSGENDER FEMALE ATHLETES

22. Transgender women who transitioned pre-puberty and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby subject to confirmation of medical treatment and the timing thereof as set out below.

23. In the event that a transgender woman who transitioned pre-puberty wishes to participate in the female category, she must provide medical documentation, from an appropriately qualified medical specialist, to her Union's Chief Medical Officer that she has not experienced and is actively suppressing a testosterone-driven puberty]. The Union's CMO will consider such evidence and if he or she is satisfied, he/she will provide a copy to the World Rugby CMO who if satisfied, will issue a written confirmation, to the player's Union, of that player's eligibility to compete in the female category of competition in World Rugby Tournaments. This process would be renewed on an annual basis.

24. In the event that the player does not agree with a decision of World Rugby's Chief Medical Officer, she may appeal such decision to the World Rugby Expert Group in accordance with the "Appeals" process set out below.

25. Transgender women who transitioned post-puberty and have experienced the biological effects of testosterone during puberty and adolescence cannot currently play women's rugby

26. Transgender women can play mixed-gender non-contact rugby

### ELIGIBILITY CONDITIONS FOR NON-BINARY ATHLETES

27. Non-binary people who were identified as male at birth and have experienced the biological effects of testosterone during puberty and adolescence may play men's rugby.

28. Non-binary people who were identified as male at birth and have experienced the biological effects of testosterone during puberty and adolescence cannot currently play women's rugby.

29. Non-binary people who were identified as male at birth but who have not have not experienced the biological effects of testosterone during puberty and adolescence may participate in female rugby subject to the following conditions: In the event that a non-binary person who was identified as male at birth wishes to participate in women's rugby, they must provide medical documentation, from an appropriately qualified medical specialist, to her Union's Chief Medical Officer that she has not experienced and is actively suppressing a testosterone-driven puberty testosterone-influenced puberty. The Union's CMO will consider such evidence and if he or she is



TRANSGENDER GUIDELINE

satisfied, he/she will provide a copy to the World Rugby CMO who if satisfied, will issue a written confirmation, to the player's Union, of that player's eligibility to compete in the female category of competition in World Rugby Tournaments. This process would be renewed on an annual basis.

30. In the event that the player does not agree with a decision of World Rugby's Chief Medical Officer, she may appeal such decision to the World Rugby Expert Group in accordance with the "Appeals" process set out below.

31. Non-binary people who were identified as female at birth and have not experienced the biological effects of testosterone during puberty and adolescence and who have not undergone any treatment including testosterone (or any similar substance) may play women's rugby.

32. Non-binary people who were identified as female at birth and have experienced the biological effects of testosterone during puberty and adolescence can play men's rugby subject to certain conditions (currently: confirmation of physical ability and a TUE where necessary).

33. The confirmation of physical ability must include:

- Written acknowledgement and acceptance by the player of the associated risks of playing contact rugby with males who are statistically more likely to be heavier, stronger, faster, and consequently produce more force and power during physical contact situations

- Written confirmation from a medical practitioner with an understanding of the demands of rugby, to whom the player is known, that the player is in a physical condition to play and that this view is supported by a musculo-skeletal evaluation and/or other appropriate assessments.

- A template confirmation is attached here.

34. The Player must provide the confirmation of physical ability (and TUE if applicable) to their Union's CMO for review. If satisfied with same, the Union's CMO shall provide a copy to World Rugby's Chief Medical Officer no later than six weeks ahead of the World Rugby Tournament in which he wishes to participate.

35. If satisfied with the confirmation of physical ability (and TUE if applicable), World Rugby's CMO will issue a written confirmation, to the player's Union, of that player's eligibility to compete in the male category of competition in World Rugby Tournaments.

36. In the event that the player does not agree with a decision of World Rugby's CMO, they may appeal such decision to the World Rugby Expert Group in accordance with the "Appeals" process set out below.

37. For the avoidance of doubt, transgender men who have been treated with testosterone (or similar) may not compete in the female category.



TRANSGENDER GUIDELINE

38. For the avoidance of doubt, a transgender men who have not been treated with testosterone (or similar) may choose to play in the female category if they so wish to do so but World Rugby acknowledges that many transgender men would not wish to play in a category that is not consistent with their gender identity.

39. In the event that a transgender man decides to stop his hormone treatment and later wishes to take part in the female category of competition, the player's Union's CMO should request World Rugby's CMO to convene the World Rugby Expert Group to consider the individual circumstances and make a decision on whether to permit his participation in the female category, taking all the circumstances into account

40. Non-binary people who are pre-puberty can play either boys or girls or mixed-gender rugby up to age 12 (in line with World Rugby's mixed-gender guideline[6]) and thereafter, shall participate in rugby in accordance with the above criteria for non-binary people depending on whether they are experiencing the biological effects of testosterone during puberty and adolescence or not.

## RAISING CONCERNS ABOUT A PLAYER

41. In the event that a player or Union has a genuine concern about safety or fairness in relation to another player, the concern shall be dealt with as set out in this section.

42. It is important to note that many people do not meet cultural or local norms or stereotypes related to the expression of gender identity and World Rugby will remind those raising concerns that they ought to take care to consider this when raising any concerns about another player.

43. The concerned person will raise their concerns with their Union's Chief Medical Officer (CMO).

44. The Union's CMO will carefully consider the concerns raised, in the context of all of the known facts and if having done so, the CMO determines that the concerns are not frivolous or vexatious, the CMO will contact the World Rugby CMO setting out the basis for the concerns.

45. The World Rugby CMO will contact the CMO of the Union of the player about whom the concerns have been raised.

46. The World Rugby CMO and the relevant player's CMO will discuss the situation and agree on the most appropriate actions, based on the specific circumstances

47. In some circumstances, such appropriate actions may include an assessment which will involve a multi-disciplinary approach that includes genetic, endocrine and psychological input from a range of experts who specialize in the field of andrology. Further details of testing protocol are available here.

---

[6] https://playerwelfare.worldrugby.org/?documentid=117

 WORLD RUGBY

TRANSGENDER GUIDELINE

48. Having taken the above steps, the World Rugby CMO will make a determination as to whether the player can participate in their selected category, if in the CMO's view, the player complies with this Guideline.

49. In the event that the player or Union does not agree with a decision of World Rugby's CMO, they may appeal such decision to the World Rugby Expert Group in accordance with the "Appeals" process set out below.

## PROVISIONS APPLICABLE TO ALL TRANSGENDER PLAYERS

50. No player should or would be forced to undergo any medical or other assessment. It is a player's responsibility to decide on whether he or she wishes to proceed with any assessment. However, it should be noted that deciding not to participate in an assessment, having been requested to do so, may have consequences in terms of the player's eligibility to participate in the category of competition that is consistent with his/her/their gender identity, since it may not be possible to determine whether issues of safety or fairness arise without such assessment.

51. The following are not required or relevant in order for a transgender player to compete in the category of competition at a World Rugby Tournament that is consistent with his/her gender identity:

    a. legal recognition of the Player's gender identity as the Player's sex; or

    b. surgical anatomical changes.

52. For the avoidance of doubt, the eligibility conditions for transgender players set out in this Guideline operate without prejudice to all other eligibility requirements that are applicable to all players (transgender or otherwise) under the World Rugby Regulations Relating to the Game which must also be satisfied at all relevant times.

53. Nothing in this Guideline is intended to undermine or affect in any way any of the requirements of the World Rugby Regulations Relating to the Game, the World Anti-Doping Code, the WADA International Standards (including the International Standard for Therapeutic Use Exemptions), or World Rugby's anti-doping rules. Nothing in this Guideline will be deemed to permit, excuse or justify non-compliance with any of those requirements, including (without limitation) any requirement for an Player to obtain a Therapeutic Use Exemption for the use of a substance on the WADA Prohibited List, such as testosterone, spironolactone or GnRH agonists.[7]

## APPEALS HEARD BY THE WORLD RUGBY EXPERT PANEL

54. Where the World Rugby CMO requires it, or where a player wishes to appeal the decision of the World Rugby CMO, the World Rugby Expert Group will be convened.

55. The World Rugby Expert Group shall be comprised of a panel of independent experts from the following fields: scientific; medical; legal & risk; social & ethical.

---

[7]     See, e.g., the WADA Transgender Athlete TUE Physician Guideline, available at www.wada-ama.org.



TRANSGENDER GUIDELINE

56. In order to appeal a decision of the CMO, the player must send a Notice of Appeal to World Rugby's CMO within 7 days of receiving the decision.

57. The Notice of Appeal must set out in writing the basis for the player's appeal.

58. Upon receipt of such Notice of Appeal, the World Rugby CMO shall convene the World Rugby Expert Group who shall consider the Player's Appeal as soon as is practicable.

59. The World Rugby Expert Group shall have the power to regulate their own procedures.

60. All decisions of the World Rugby Expert Group shall be final and binding.

61. The Player is responsible for ensuring that the information provided is accurate and complete, and that nothing relevant to the Expert Panel's assessment of the case is withheld. The Player must also provide the appropriate consents and waivers (in a form satisfactory to the Chief Medical Officer) to enable her physician(s) to disclose to the Expert Panel any information that the Expert Panel deems necessary to its assessment.

62. If the Expert Panel has any concerns about the adequacy of the evidence provided by the Player on any particular point, it must give the Player a fair opportunity to try to address those concerns before it comes to its final decision.

63. The Expert Panel will complete its assessment as soon as is reasonably practicable in all of the circumstances of the case. However, in no circumstance will World Rugby or any member of the Expert Panel be liable for any detriment allegedly suffered by the Player or anyone else as a result of the length of time taken by the Expert Panel to complete its assessment.

64. Once it has completed its assessment, the Expert Panel will send its decision in writing to the World Rugby CMO and the relevant Union CMO.

65. The Expert Panel's decision will be final and binding on all parties.

## DISCIPLINARY PROCEEDINGS

66. Where a Player competes in a World Rugby Tournament in a category of competition for which he/she has not satisfied the eligibility conditions set out in this Guideline, World Rugby may take disciplinary action against such person/entity in accordance with World Rugby Regulation 18 pursuant to which the various sanctions set out in World Rugby Regulation 18 may be imposed.

67. In such disciplinary proceedings, a player may not challenge the validity of this Guideline nor may they challenge any decision made under this Guideline.



JA0393

TRANSGENDER GUIDELINE

### DISPUTE RESOLUTION

68. Decisions by the Expert Panel may be appealed to a World Rugby Appeal Committee in accordance with the provisions of World Rugby Regulation 18.

### CONFIDENTIALITY

69. All cases arising under this Guideline, and in particular all Player information provided to World Rugby under this Guideline, and all results of examinations and assessments conducted under this Guideline, will be dealt with in strict confidence at all times. All medical information and data relating to a player will be treated as sensitive personal information and the CMO and Expert Panel will ensure at all times that it is processed as such in accordance with applicable data protection and privacy laws. Such information will not be used for any purpose not contemplated in this Guideline, and will not be disclosed to any third party save (a) as is strictly necessary for the effective application and enforcement of this Guideline; or (b) as is required by law.

70. World Rugby will not comment publicly on the specific facts of a pending case (as opposed to general descriptions of the process and science involved) except in response to public comments attributed to the Player or the Player's representatives.

71. Each member of the Expert Panel must sign an appropriate conflict of interest declaration and confidentiality undertaking in relation to his/her work as a member of the panel if requested to do so.

### COSTS

72. The costs of any assessment, examination, monitoring, reporting, and any other costs involved in complying with the Guideline will be borne by the relevant Player. The standing costs of the Expert Panel will be borne by World Rugby.

### RECOGNITION OF OTHER ELIGIBLITY DECISIONS

73. Noting the specific requirements of each individual sport, it may not be appropriate for World Rugby to recognise and give effect to an eligibility decision of the international federation of another sport with respect to a specific player.  The Guideline applies to all players regardless of any decision or finding as to the player's gender made by any other sporting, public or private entity.

### LIMITATION OF LIABILITY

74. In no circumstances will World Rugby, any member of the Expert Panel, or any of World Rugby's (or any company associated with World Rugby) employees, officers, agents, representatives and other persons involved in the administration of this Guideline be liable in any way in relation to acts done or omitted to be done in good faith in connection with the administration of this Guideline.



TRANSGENDER GUIDELINE

## TEMPLATE FOR CONFIRMATION OF PHYSICAL ABILITY

Confirmation of physical ability of _____[name], transgender man who wishes to take part in male rugby:

I acknowledge and accept the injury risks associated with transgender males playing contact rugby with males who are statistically likely to be stronger, faster and heavier than transgender males, as described in the World Rugby Transgender Guidelines which I have read and understand.  I acknowledge and agrees that I am voluntarily assuming the risk of injury and World Rugby (and/or any of its associated entities) shall have no responsibility or liability in respect of my participation in male rugby.

**Signature of player:**

**Date:**

I confirm that I have an understanding of the physical demands of rugby, and having examined the above-named player, I confirm that the player is in a physical condition to play rugby and that this view is supported by a musculo-skeletal evaluation and/or other appropriate assessments.

**Name of medical practitioner or qualified coach:**

**Signature of medical practitioner or qualified coach:**

**Date:**

The Union/ competition can adopt the spirit of the guideline and make it fit the laws/realities of that particular jurisdiction.



TRANSGENDER GUIDELINE

## QUERIES AND CONTACT INFORMATION

<u>Queries</u>

- In the case of general queries regarding this Transgender Guideline, please contact: Head of Technical Services, World Rugby, World Rugby House, 8-10 Pembroke Street Lower, Dublin 2

- In the case of confidential queries regarding cases affected by this Transgender Guideline, please contact: Chief Medical Officer, World Rugby, World Rugby House, 8-10 Pembroke Street Lower, Dublin 2.



Sports Medicine
https://doi.org/10.1007/s40279-020-01389-3

**REVIEW ARTICLE**



# Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage

Emma N. Hilton[1] · Tommy R. Lundberg[2,3]

© The Author(s) 2020

## Abstract

Males enjoy physical performance advantages over females within competitive sport. The sex-based segregation into male and female sporting categories does not account for transgender persons who experience incongruence between their biological sex and their experienced gender identity. Accordingly, the International Olympic Committee (IOC) determined criteria by which a transgender woman may be eligible to compete in the female category, requiring total serum testosterone levels to be suppressed below 10 nmol/L for at least 12 months prior to and during competition. Whether this regulation removes the male performance advantage has not been scrutinized. Here, we review how differences in biological characteristics between biological males and females affect sporting performance and assess whether evidence exists to support the assumption that testosterone suppression in transgender women removes the male performance advantage and thus delivers fair and safe competition. We report that the performance gap between males and females becomes significant at puberty and often amounts to 10–50% depending on sport. The performance gap is more pronounced in sporting activities relying on muscle mass and explosive strength, particularly in the upper body. Longitudinal studies examining the effects of testosterone suppression on muscle mass and strength in transgender women consistently show very modest changes, where the loss of lean body mass, muscle area and strength typically amounts to approximately 5% after 12 months of treatment. Thus, the muscular advantage enjoyed by transgender women is only minimally reduced when testosterone is suppressed. Sports organizations should consider this evidence when reassessing current policies regarding participation of transgender women in the female category of sport.

**Supplementary Information** The online version contains supplementary material available at https://doi.org/10.1007/s4027 9-020-01389-3.

✉ Tommy R. Lundberg
   tommy.lundberg@ki.se

[1] Faculty of Biology, Medicine and Health, University of Manchester, Manchester, UK

[2] Department of Laboratory Medicine/ANA Futura, Division of Clinical Physiology, Karolinska Institutet, Alfred Nobles Allé 8B, Huddinge, 141 52 Stockholm, Sweden

[3] Unit of Clinical Physiology, Karolinska University Hospital, Stockholm, Sweden

### Key Points

Given that biological males experience a substantial performance advantage over females in most sports, there is currently a debate whether inclusion of transgender women in the female category of sports would compromise the objective of fair and safe competition.

Here, we report that current evidence shows the biological advantage, most notably in terms of muscle mass and strength, conferred by male puberty and thus enjoyed by most transgender women is only minimally reduced when testosterone is suppressed as per current sporting guidelines for transgender athletes.

This evidence is relevant for policies regarding participation of transgender women in the female category of sport.

Published online: 08 December 2020

# 1 Introduction

Sporting performance is strongly influenced by a range of physiological factors, including muscle force and power-producing capacity, anthropometric characteristics, cardiorespiratory capacity and metabolic factors [1, 2]. Many of these physiological factors differ significantly between biological males and females as a result of genetic differences and androgen-directed development of secondary sex characteristics [3, 4]. This confers large sporting performance advantages on biological males over females [5].

When comparing athletes who compete directly against one another, such as elite or comparable levels of school-aged athletes, the physiological advantages conferred by biological sex appear, on assessment of performance data, insurmountable. Further, in sports where contact, collision or combat are important for gameplay, widely different physiological attributes may create safety and athlete welfare concerns, necessitating not only segregation of sport into male and female categories, but also, for example, into weight and age classes. Thus, to ensure that both men and women can enjoy sport in terms of fairness, safety and inclusivity, most sports are divided, in the first instance, into male and female categories.

Segregating sports by biological sex does not account for transgender persons who experience incongruence between their biological sex and their experienced gender identity, and whose legal sex may be different to that recorded at birth [6, 7]. More specifically, transgender women (observed at birth as biologically male but identifying as women) may, before or after cross-hormone treatment, wish to compete in the female category. This has raised concerns about fairness and safety within female competition, and the issue of how to fairly and safely accommodate transgender persons in sport has been subject to much discussion [6–13].

The current International Olympic Committee (IOC) policy [14] on transgender athletes states that "it is necessary to ensure insofar as possible that trans athletes are not excluded from the opportunity to participate in sporting competition". Yet the policy also states that "the overriding sporting objective is and remains the guarantee of fair competition". As these goals may be seen as conflicting if male performance advantages are carried through to competition in the female category, the IOC concludes that "restrictions on participation are appropriate to the extent that they are necessary and proportionate to the achievement of that objective".

Accordingly, the IOC determined criteria by which transgender women may be eligible to compete in the female category. These include a solemn declaration that her gender identity is female and the maintenance of total serum testosterone levels below 10 nmol/L for at least 12 months prior to competing and during competition [14]. Whilst the scientific basis for this testosterone threshold was not openly communicated by the IOC, it is surmised that the IOC believed this testosterone criterion sufficient to reduce the sporting advantages of biological males over females and deliver fair and safe competition within the female category.

Several studies have examined the effects of testosterone suppression on the changing biology, physiology and performance markers of transgender women. In this review, we aim to assess whether evidence exists to support the assumption that testosterone suppression in transgender women removes these advantages. To achieve this aim, we first review the differences in biological characteristics between biological males and females, and examine how those differences affect sporting performance. We then evaluate the studies that have measured elements of performance and physical capacity following testosterone suppression in untrained transgender women, and discuss the relevance of these findings to the supposition of fairness and safety (i.e. removal of the male performance advantage) as per current sporting guidelines.

# 2 The Biological Basis for Sporting Performance Advantages in Males

The physical divergence between males and females begins during early embryogenesis, when bipotential gonads are triggered to differentiate into testes or ovaries, the tissues that will produce sperm in males and ova in females, respectively [15]. Gonad differentiation into testes or ovaries determines, via the specific hormone milieu each generates, downstream in utero reproductive anatomy development [16], producing male or female body plans. We note that in rare instances, differences in sex development (DSDs) occur and the typical progression of male or female development is disrupted [17]. The categorisation of such athletes is beyond the scope of this review, and the impact of individual DSDs on sporting performance must be considered on their own merits.

In early childhood, prior to puberty, sporting participation prioritises team play and the development of fundamental motor and social skills, and is sometimes mixed sex. Athletic performance differences between males and females prior to puberty are often considered inconsequential or relatively small [18]. Nonetheless, pre-puberty performance differences are not unequivocally negligible, and could be mediated, to some extent, by genetic factors and/or activation of the hypothalamic–pituitary–gonadal axis during the neonatal period, sometimes referred to as "minipuberty". For example, some 6500 genes are differentially expressed between males and females [19] with an estimated 3000 sex-specific

differences in skeletal muscle likely to influence composition and function beyond the effects of androgenisation [8], while increased testosterone during minipuberty in males aged 1–6 months may be correlated with higher growth velocity and an "imprinting effect" on BMI and bodyweight [20, 21]. An extensive review of fitness data from over 85,000 Australian children aged 9–17 years old showed that, compared with 9-year-old females, 9-year-old males were faster over short sprints (9.8%) and 1 mile (16.6%), could jump 9.5% further from a standing start (a test of explosive power), could complete 33% more push-ups in 30 s and had 13.8% stronger grip [22]. Male advantage of a similar magnitude was detected in a study of Greek children, where, compared with 6-year-old females, 6-year-old males completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position [23]. In terms of aerobic capacity, 6- to 7-year-old males have been shown to have a higher absolute and relative (to body mass) $VO_{2max}$ than 6- to 7-year-old females [24]. Nonetheless, while some biological sex differences, probably genetic in origin, are measurable and affect performance pre-puberty, we consider the effect of androgenizing puberty more influential on performance, and have focused our analysis on musculoskeletal differences hereafter.

Secondary sex characteristics that develop during puberty have evolved under sexual selection pressures to improve reproductive fitness and thus generate anatomical divergence beyond the reproductive system, leading to adult body types that are measurably different between sexes. This phenomenon is known as sex dimorphism. During puberty, testes-derived testosterone levels increase 20-fold in males, but remain low in females, resulting in circulating testosterone concentrations at least 15 times higher in males than in females of any age [4, 25]. Testosterone in males induces changes in muscle mass, strength, anthropometric variables and hemoglobin levels [4], as part of the range of sexually dimorphic characteristics observed in humans.

Broadly, males are bigger and stronger than females. It follows that, within competitive sport, males enjoy significant performance advantages over females, predicated on the superior physical capacity developed during puberty in response to testosterone. Thus, the biological effects of elevated pubertal testosterone are primarily responsible for driving the divergence of athletic performances between males and females [4]. It is acknowledged that this divergence has been compounded historically by a lag in the cultural acceptance of, and financial provision for, females in sport that may have implications for the rate of improvement in athletic performance in females. Yet, since the 1990s, the difference in performance records between males and females has been relatively stable, suggesting that biological differences created by androgenization explain most of the male advantage, and are insurmountable [5, 26, 27].

Table 1 outlines physical attributes that are major parameters underpinning the male performance advantage [28–38]. Males have: larger and denser muscle mass, and stiffer connective tissue, with associated capacity to exert greater muscular force more rapidly and efficiently; reduced fat mass, and different distribution of body fat and lean muscle mass, which increases power to weight ratios and upper to lower limb strength in sports where this may be a crucial determinant of success; longer and larger skeletal structure, which creates advantages in sports where levers influence force application, where longer limb/digit length is favorable, and where height, mass and proportions are directly responsible for performance capacity; superior cardiovascular and respiratory function, with larger blood and heart volumes, higher hemoglobin concentration, greater cross-sectional area of the trachea and lower oxygen cost of respiration [3, 4, 39, 40]. Of course, different sports select for different physiological characteristics—an advantage in one discipline may be neutral or even a disadvantage in another—but examination of a variety of record and performance metrics in any discipline reveals there are few sporting disciplines where males do not possess performance advantage over females as a result of the physiological characteristics affected by testosterone.

## 3 Sports Performance Differences Between Males and Females

### 3.1 An Overview of Elite Adult Athletes

A comparison of adult elite male and female achievements in sporting activities can quantify the extent of the male performance advantage. We searched publicly available sports federation databases and/or tournament/competition records to identify sporting metrics in various events and disciplines, and calculated the performance of males relative to females. Although not an exhaustive list, examples of performance gaps in a range of sports with various durations, physiological performance determinants, skill components and force requirements are shown in Fig. 1.

The smallest performance gaps were seen in rowing, swimming and running (11–13%), with low variation across individual events within each of those categories. The performance gap increases to an average of 16% in track cycling, with higher variation across events (from 9% in the 4000 m team pursuit to 24% in the flying 500 m time trial). The average performance gap is 18% in jumping events (long jump, high jump and triple jump). Performance differences larger than 20% are generally present when considering sports and activities that involve extensive upper body contributions. The gap between fastest recorded tennis serve

E. N. Hilton, T. R. Lundberg

**Table 1** Selected physical difference between untrained/ moderately trained males and females. Female levels are set as the reference value

| Variable | Magnitude of sex difference (%) | References |
|---|---|---|
| Body composition | | |
|   Lean body mass | 45 | Lee et al. [28] |
|   Fat% | − 30 | |
| Muscle mass | | |
|   Lower body | 33 | Janssen et al. [29] |
|   Upper body | 40 | |
| Muscle strength | | |
|   Grip strength | 57 | Bohannon et al. [30] |
|   Knee extension peak torque | 54 | Neder et al. [31] |
| Anthropometry and bone geometry | | |
|   Femur length | 9.4 | Jantz et al. [32] |
|   Humerus length | 12.0 | Brinckmann et al. [33] |
|   Radius length | 14.6 | |
|   Pelvic width relative to pelvis height | − 6.1 | |
| Tendon properties | | |
|   Force | 83 | Lepley et al. [34] |
|   Stiffness | 41 | |
| $VO_{2max}$ | | |
|   Absolute values | 50 | Pate et al. [35] |
|   Relative values | 25 | |
| Respiratory function | | |
|   Pulmonary ventilation (maximal) | 48 | Åstrand et al. [36] |
| Cardiovascular function | | |
|   Left ventricular mass | 31 | Åstrand et al. [36] |
|   Cardiac output (rest) | 22 | Best et al. [37] |
|   Cardiac output (maximal) | 30 | Tong et al. [38] |
|   Stroke volume (rest) | 43 | |
|   Stroke volume (maximal) | 34 | |
|   Hemoglobin concentration | 11 | |

**Fig. 1** The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike



is 20%, while the gaps between fastest recorded baseball pitches and field hockey drag flicks exceed 50%.

Sports performance relies to some degree on the magnitude, speed and repeatability of force application, and, with respect to the speed of force production (power), vertical jump performance is on average 33% greater in elite men than women, with differences ranging from 27.8% for endurance sports to in excess of 40% for precision and combat sports [41]. Because implement mass differs, direct comparisons are not possible in throwing events in track and field athletics. However, the performance gap is known to be substantial, and throwing represents the widest sex difference in motor performance from an early age [42]. In Olympic javelin throwers, this is manifested in differences in the peak linear velocities of the shoulder, wrist, elbow and hand, all of which are 13–21% higher for male athletes compared with females [43].

The increasing performance gap between males and females as upper body strength becomes more critical for performance is likely explained to a large extent by the observation that males have disproportionately greater strength in their upper compared to lower body, while females show the inverse [44, 45]. This different distribution of strength compounds the general advantage of increased muscle mass in upper body dominant disciplines. Males also have longer arms than females, which allows greater torque production from the arm lever when, for example, throwing a ball, punching or pushing.

## 3.2 Olympic Weightlifting

In Olympic weightlifting, where weight categories differ between males and females, the performance gap is between 31 and 37% across the range of competitive body weights between 1998 and 2020 (Fig. 1). It is important to note that at all weight categories below the top/open category, performances are produced within weight categories

with an upper limit, where strength can be correlated with "fighting weight", and we focused our analysis of performance gaps in these categories.

To explore strength–mass relationships further, we compared Olympic weightlifting data between equivalent weight categories which, to some extent, limit athlete height, to examine the hypothesis that male performance advantage may be largely (or even wholly) mediated by increased height and lever-derived advantages (Table 2). Between 1998 and 2018, a 69 kg category was common to both males and females, with the male record holder (69 kg, 1.68 m) lifting a combined weight 30.1% heavier than the female record holder (69 kg, 1.64 m). Weight category changes in 2019 removed the common 69 kg category and created a common 55 kg category. The current male record holder (55 kg, 1.52 m) lifts 29.5% heavier than the female record holder (55 kg, 1.52 m). These comparisons demonstrate that males are approximately 30% stronger than females of equivalent stature and mass. However, importantly, male vs. female weightlifting performance gaps increase with increasing bodyweight. For example, in the top/open weight category of Olympic weightlifting, in the absence of weight (and associated height) limits, maximum male lifting strength exceeds female lifting strength by nearly 40%. This is further manifested in powerlifting, where the male record (total of squat, bench press and deadlift) is 65% higher than the female record in the open weight category of the World Open Classic Records. Further analysis of Olympic weightlifting data shows that the 55-kg male record holder is 6.5% stronger than the 69-kg female record holder (294 kg vs 276 kg), and that the 69-kg male record is 3.2% higher than the record held in the female open category by a 108-kg female (359 kg vs 348 kg). This Olympic weightlifting analysis reveals key differences between male and female strength capacity. It shows that, even after adjustment for mass, biological males are significantly stronger (30%) than females, and

Table 2 Olympic weightlifting data between equivalent male–female and top/open weight categories

| | Sex | Weight (kg) | Height (m) | Combined record (kg) | Strength to weight ratio | Relative performance (%) |
|---|---|---|---|---|---|---|
| 2019 record in the 55 kg weight-limited category | | | | | | |
| Liao Qiuyun | F | 55 | 1.52 | 227 | 4.13 | |
| Om Yun-chol | M | 55 | 1.52 | 294 | 5.35 | 29.5 |
| 1998–2018 record in the 69-kg weight-limited category | | | | | | |
| Oxsana Slivenko | F | 69 | 1.64 | 276 | 4.00 | |
| Liao Hui | M | 69 | 1.68 | 359 | 5.20 | 30.1 |
| Comparative performances for top/open categories (all time heaviest combined lifts) | | | | | | |
| Tatiana Kashirina | F | 108 | 1.77 | 348 | 3.22 | |
| Lasha Talakhadze | M | 168 | 1.97 | 484 | 2.88 | 39.1 |

*F* female, *M* male

that females who are 60% heavier than males do not overcome these strength deficits.

### 3.3 Perspectives on Elite Athlete Performance Differences

Figure 1 illustrates the performance gap between adult elite males and adult elite females across various sporting disciplines and activities. The translation of these advantages, assessed as the performance difference between the very best males and very best females, are significant when extended and applied to larger populations. In running events, for example, where the male–female gap is approximately 11%, it follows that many thousands of males are faster than the very best females. For example, approximately 10,000 males have personal best times that are faster than the current Olympic 100 m female champion (World Athletics, personal communication, July 2019). This has also been described elsewhere [46, 47], and illustrates the true effect of an 11% typical difference on population comparisons between males and females. This is further apparent upon examination of selected junior male records, which surpass adult elite female performances by the age of 14–15 years (Table 3), demonstrating superior male athletic performance over elite females within a few years of the onset of puberty.

These data overwhelmingly confirm that testosterone-driven puberty, as the driving force of development of male secondary sex characteristics, underpins sporting advantages that are so large no female could reasonably hope to succeed without sex segregation in most sporting competitions. To ensure, in light of these analyses, that female athletes can be included in sporting competitions in a fair and safe manner, most sports have a female category the purpose of which is the protection of both fairness and, in some sports, safety/welfare of athletes who do not benefit from the physiological changes induced by male levels of testosterone from puberty onwards.

**Table 3** Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
|---|---|---|
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters

Time format: minutes:seconds.hundredths of a second

### 3.4 Performance Differences in Non-elite Individuals

The male performance advantages described above in athletic cohorts are similar in magnitude in untrained cohorts. Even when expressed relative to fat-free weight, $VO_{2max}$ is 12–15% higher in males than in females [48]. Records of lower-limb muscle strength reveal a consistent 50% difference in peak torque between males and females across the lifespan [31]. Hubal et al. [49] tested 342 women and 243 men for isometric (maximal voluntary contraction) and dynamic strength (one-repetition maximum; 1RM) of the elbow flexor muscles and performed magnetic resonance imaging (MRI) of the biceps brachii to determine cross-sectional area. The males had 57% greater muscle size, 109% greater isometric strength, and 89% greater 1RM strength than age-matched females. This reinforces the finding in athletic cohorts that sex differences in muscle size and strength are more pronounced in the upper body.

Recently, sexual dimorphism in arm force and power was investigated in a punch motion in moderately-trained individuals [50]. The power produced during a punch was 162% greater in males than in females, and the least powerful man produced more power than the most powerful woman. This highlights that sex differences in parameters such as mass, strength and speed may combine to produce even larger sex differences in sport-specific actions, which often are a product of how various physical capacities combine. For example, power production is the product of force and velocity, and momentum is defined as mass multiplied by velocity. The momentum and kinetic energy that can be transferred to another object, such as during a tackle or punch in collision and combat sports are, therefore, dictated by: the mass; force to accelerate that mass, and; resultant velocity attained by that mass. As there is a male advantage for each of these factors, the net result is likely synergistic in a sport-specific action, such as a tackle or a throw, that widely surpasses the sum of individual magnitudes of advantage in isolated fitness variables. Indeed, already at 17 years of age, the average male throws a ball further than 99% of 17-year-old females [51], despite no single variable (arm length, muscle mass etc.) reaching this numerical advantage. Similarly, punch power is 162% greater in men than women even though no single parameter that produces punching actions achieves this magnitude of difference [50].

## 4 Is the Male Performance Advantage Lost when Testosterone is Suppressed in Transgender Women?

The current IOC criteria for inclusion of transgender women in female sports categories require testosterone suppression below 10 nmol/L for 12 months prior to and during competition. Given the IOC's stated position that the "overriding sporting objective is and remains the guarantee of fair competition" [14], it is reasonable to assume that the rationale for this requirement is that it reduces the male performance advantages described previously to an acceptable degree, thus permitting fair and safe competition. To determine whether this medical intervention is sufficient to remove (or reduce) the male performance advantage, which we described above, we performed a systematic search of the scientific literature addressing anthropometric and muscle characteristics of transgender women. Search terms and filtering of peer-reviewed data are given in Supplementary Table S1.

### 4.1 Anthropometrics

Given its importance for the general health of the transgender population, there are multiple studies of bone health, and reviews of these data. To summarise, transgender women often have low baseline (pre-intervention) bone mineral density (BMD), attributed to low levels of physical activity, especially weight-bearing exercise, and low vitamin D levels [52, 53]. However, transgender women generally maintain bone mass over the course of at least 24 months of testosterone suppression. There may even be small but significant increases in BMD at the lumbar spine [54, 55]. Some retrieved studies present data pertaining to maintained BMD in transgender women after many years of testosterone suppression. One such study concluded that "BMD is preserved over a median of 12.5 years" [56]. In support, no increase in fracture rates was observed over 12 months of testosterone suppression [54]. Current advice, including that from the International Society for Clinical Densitometry, is that transgender women, in the absence of other risk factors, do not require monitoring of BMD [52, 57]. This is explicable under current standard treatment regimes, given the established positive effect of estrogen, rather than testosterone, on bone turnover in males [58].

Given the maintenance of BMD and the lack of a plausible biological mechanism by which testosterone suppression might affect skeletal measurements such as bone length and hip width, we conclude that height and skeletal parameters remain unaltered in transgender women, and that sporting advantage conferred by skeletal size and bone density would be retained despite testosterone reductions compliant with the IOC's current guidelines. This is of particular relevance to sports where height, limb length and handspan are key (e.g. basketball, volleyball, handball) and where high movement efficiency is advantageous. Male bone geometry and density may also provide protection against some sport-related injuries—for example, males have a lower incidence of knee injuries, often attributed to low quadriceps ($Q$) angle conferred by a narrow pelvic girdle [59, 60].

### 4.2 Muscle and Strength Metrics

As discussed earlier, muscle mass and strength are key parameters underpinning male performance advantages. Strength differences range between 30 and 100%, depending upon the cohort studied and the task used to assess strength. Thus, given the important contribution made by strength to performance, we sought studies that have assessed strength and muscle/lean body mass changes in transgender women after testosterone reduction. Studies retrieved in our literature search covered both longitudinal and cross-sectional analyses. Given the superior power of the former study type, we will focus on these.

The pioneer work by Gooren and colleagues, published in part in 1999 [61] and in full in 2004 [62], reported the effects of 1 and 3 years of testosterone suppression and estrogen supplementation in 19 transgender women (age 18–37 years). After the first year of therapy, testosterone levels were reduced to 1 nmol/L, well within typical female reference ranges, and remained low throughout the study course. As determined by MRI, thigh muscle area had decreased by − 9% from baseline measurement. After 3 years, thigh muscle area had decreased by a further − 3% from baseline measurement (total loss of − 12% over 3 years of treatment). However, when compared with the baseline measurement of thigh muscle area in transgender men (who are born female and experience female puberty), transgender women retained significantly higher thigh muscle size. The final thigh muscle area, after three years of testosterone suppression, was 13% larger in transwomen than in the transmen at baseline ($p < 0.05$). The authors concluded that testosterone suppression in transgender women does not reverse muscle size to female levels.

Including Gooren and Bunck [62], 12 longitudinal studies [53, 63–73] have examined the effects of testosterone suppression on lean body mass or muscle size in transgender women. The collective evidence from these studies suggests that 12 months, which is the most commonly examined intervention period, of testosterone suppression to female-typical reference levels results in a modest (approximately − 5%) loss of lean body mass or muscle size (Table 4). No

USCA4 Appeal: 23-1078    Doc: 53-1    Filed: 03/27/2023    Pg: 427 of 553

E. N. Hilton, T. R. Lundberg

**Table 4** Longitudinal studies of muscle and strength changes in adult transgender women undergoing cross-sex hormone therapy

| Study | Participants (age) | Therapy | Confirmed serum testosterone levels | Muscle/strength data | Comparison with reference females |
|---|---|---|---|---|---|
| Polderman et al. [73] | $N=12$ TW 18–36 yr (age range) | T suppression+E supplementation | <2 nmol/L at 4 mo | *LBM* 4 mo −2.2% | *LBM* 4 mo 16% |
| Gooren and Bunck [62] | $N=19$ TW 26±6 yr | T suppression+E supplementation | ≤1 nmol/L at 1 and 3 yr | *Thigh area* 1 yr −9% / 3 yr -12% | *Thigh area* 1 yr 16%/3 yr 13% |
| Haraldsen et al. [63] | $N=12$ TW 29±8 yr | E supplementation | <10 nmol/L at 3 mo and 1 yr | *LBM* 3 mo/1 yr—small changes, unclear magnitude | |
| Mueller et al. [64] | $N=84$ TW 36±11 yr | T suppression+E supplementation | ≤1 nmol/L at 1 and 2 yr | *LBM* 1 yr −4%/2 yr −7% | |
| Wierckx et al. [65] | $N=53$ TW 31±14 yr | T suppression+E supplementation | <10 nmol/L at 1 yr | *LBM* 1 yr −5% | *LBM* 1 yr 39% |
| Van Caenegem et al. [53] (and Van Caenegem et al. [76]) | $N=49$ TW 33±14 yr | T suppression+E supplementation | ≤1 nmol/L at 1 and 2 yr | *LBM* 1 yr −4%/2 yr −0.5% *Grip strength* 1 yr −7%/2 yr −9% *Calf area* 1 yr −2%/2 yr −4% *Forearm area* 1 yr −8%/2 yr −4% | *LBM* 1 yr 24%/2 yr 28% *Grip strength* 1 yr 26%/2 yr 23% *Calf area* 1 yr 16%/2 yr 13% *Forearm area* 1 yr 29%/2 yr 34% |
| Gava et al. [66] | $N=40$ TW 31±10 yr | T suppression+E supplementation | <5 nmol/L at 6 mo and ≤1 nmol/L at 1 yr | *LBM* 1 yr −2% | |
| Auer et al. [67] | $N=45$ TW 35±1 (SE) yr | T suppression+E supplementation | <5 nmol/L at 1 yr | *LBM* 1 yr −3% | *LBM* 1 yr 27% |
| Klaver et al. [68] | $N=179$ TW 29 (range 18–66) | T suppression+E supplementation | ≤1 nmol/L at 1 yr | *LBM 1 yr* Total −3% Arm region −6% Trunk region −2% Android region 0% Gynoid region −3% Leg region −4% | *LBM 1 yr* Total 18% Arm region 28% Leg region 19% |
| Fighera et al. [69] | $N=46$ TW 34±10 | E supplementation with or without T suppression | <5 nmol/L at 3 mo ≤1 nmol/L at 31 mo | *ALM* 31 mo −4% from the 3 mo visit | |
| Scharff et al. [70] | $N=249$ TW 28 (inter quartile range 23–40) | T suppression+E supplementation | ≤1 nmol/L at 1 yr | *Grip strength* 1 yr −4% | *Grip strength* 1 yr 21% |
| Wiik et al. [71] | $N=11$ TW 27±4 | T suppression+E supplementation | ≤1 nmol/L at 4 mo and at 1 yr | *Thigh volume* 1 yr −5% *Quad area* 1 yr −4% *Knee extension strength* 1 yr 2% *Knee flexion strength* 1 yr 3% | *Thigh volume* 1 yr 33% *Quad area* 26% *Knee extension strength* 41% *Knee flexion strength* 33% |

Studies reporting measures of lean mass, muscle volume, muscle area or strength are included. Muscle/strength data are calculated in reference to baseline cohort data and, where reported, reference female (or transgender men before treatment) cohort data. Tack et al. [72] was not included in the table since some of the participants had not completed full puberty at treatment initiation. van Caenegem et al. [76] reports reference female values measured in a separately-published, parallel cohort of transgender men

*N* number of participants, *TW* transgender women, *Yr* year, *Mo* month, *T* testosterone, *E* estrogen. ± Standard deviation (unless otherwise indicated in text), *LBM* lean body mass, *ALM* appendicular lean mass

study has reported muscle loss exceeding the −12% found by Gooren and Bunck after 3 years of therapy. Notably, studies have found very consistent changes in lean body mass (using dual-energy X-ray absorptiometry) after 12 months of treatment, where the change has always been between −3 and −5% on average, with slightly greater reductions in the arm compared with the leg region [68]. Thus, given the large baseline differences in muscle mass between males and females (Table 1; approximately 40%), the reduction achieved by 12 months of testosterone suppression can reasonably be assessed as small relative to the initial superior mass. We, therefore, conclude that the muscle mass advantage males possess over females, and the performance implications thereof, are not removed by the currently studied durations (4 months, 1, 2 and 3 years) of testosterone suppression in transgender women. In sports where muscle mass is important for performance, inclusion is therefore only possible if a large imbalance in fairness, and potentially safety in some sports, is to be tolerated.

To provide more detailed information on not only gross body composition but also thigh muscle volume and contractile density, Wiik et al. [71] recently carried out a comprehensive battery of MRI and computed tomography (CT) examinations before and after 12 months of successful testosterone suppression and estrogen supplementation in 11 transgender women. Thigh volume (both anterior and posterior thigh) and quadriceps cross-sectional area decreased −4 and −5%, respectively, after the 12-month period, supporting previous results of modest effects of testosterone suppression on muscle mass (see Table 4). The more novel measure of radiological attenuation of the quadriceps muscle, a valid proxy of contractile density [74, 75], showed no significant change in transgender women after 12 months of treatment, whereas the parallel group of transgender men demonstrated a +6% increase in contractile density with testosterone supplementation.

As indicated earlier (e.g. Table 1), the difference in muscle strength between males and females is often more pronounced than the difference in muscle mass. Unfortunately, few studies have examined the effects of testosterone suppression on muscle strength or other proxies of performance in transgender individuals. The first such study was published online approximately 1 year prior to the release of the current IOC policy. In this study, as well as reporting changes in muscle size, van Caenegem et al. [53] reported that hand-grip strength was reduced from baseline measurements by −7% and −9% after 12 and 24 months, respectively, of cross-hormone treatment in transgender women. Comparison with data in a separately-published, parallel cohort of transgender men [76] demonstrated a retained hand-grip strength advantage after 2 years of 23% over female baseline measurements (a calculated average of

baseline data obtained from control females and transgender men).

In a recent multicenter study [70], examination of 249 transgender women revealed a decrease of −4% in grip strength after 12 months of cross-hormone treatment, with no variation between different testosterone level, age or BMI tertiles (all transgender women studied were within female reference ranges for testosterone). Despite this modest reduction in strength, transgender women retained a 17% grip strength advantage over transgender men measured at baseline. The authors noted that handgrip strength in transgender women was in approximately the 25th percentile for males but was over the 90th percentile for females, both before and after hormone treatment. This emphasizes that the strength advantage for males over females is inherently large. In another study exploring handgrip strength, albeit in late puberty adolescents, Tack et al. noted no change in grip strength after hormonal treatment (average duration 11 months) of 21 transgender girls [72].

Although grip strength provides an excellent proxy measurement for general strength in a broad population, specific assessment within different muscle groups is more valuable in a sports-specific framework. Wiik et al., [71] having determined that thigh muscle mass reduces only modestly, and that no significant changes in contractile density occur with 12 months of testosterone suppression, provided, for the first time, data for isokinetic strength measurements of both knee extension and knee flexion. They reported that muscle strength after 12 months of testosterone suppression was comparable to baseline strength. As a result, transgender women remained about 50% stronger than both the group of transgender men at baseline and a reference group of females. The authors suggested that small neural learning effects during repeated testing may explain the apparent lack of small reductions in strength that had been measured in other studies [71].

These longitudinal data comprise a clear pattern of very modest to negligible changes in muscle mass and strength in transgender women suppressing testosterone for at least 12 months. Muscle mass and strength are key physical parameters that constitute a significant, if not majority, portion of the male performance advantage, most notably in those sports where upper body strength, overall strength, and muscle mass are crucial determinants of performance. Thus, our analysis strongly suggests that the reduction in testosterone levels required by many sports federation transgender policies is insufficient to remove or reduce the male advantage, in terms of muscle mass and strength, by any meaningful degree. The relatively consistent finding of a minor (approximately −5%) muscle loss after the first year of treatment is also in line with studies on androgen-deprivation therapy in males with prostate cancer, where the annual loss

E. N. Hilton, T. R. Lundberg

of lean body mass has been reported to range between $-2$ and $-4\%$ [77].

Although less powerful than longitudinal studies, we identified one major cross-sectional study that measured muscle mass and strength in transgender women. In this study, 23 transgender women and 46 healthy age- and height-matched control males were compared [78]. The transgender women were recruited at least 3 years after sex reassignment surgery, and the mean duration of cross-hormone treatment was 8 years. The results showed that transgender women had 17% less lean mass and 25% lower peak quadriceps muscle strength than the control males [78]. This cross-sectional comparison suggests that prolonged testosterone suppression, well beyond the time period mandated by sports federations substantially reduces muscle mass and strength in transgender women. However, the typical gap in lean mass and strength between males and females at baseline (Table 1) exceeds the reductions reported in this study [78]. The final average lean body mass of the transgender women was 51.2 kg, which puts them in the 90th percentile for women [79]. Similarly, the final grip strength was 41 kg, 25% higher than the female reference value [80]. Collectively, this implies a retained physical advantage even after 8 years of testosterone suppression. Furthermore, given that cohorts of transgender women often have slightly lower baseline measurements of muscle and strength than control males [53], and baseline measurements were unavailable for the transgender women of this cohort, the above calculations using control males reference values may be an overestimate of actual loss of muscle mass and strength, emphasizing both the need for caution when analyzing cross-sectional data in the absence of baseline assessment and the superior power of longitudinal studies quantifying within-subject changes.

### 4.3 Endurance Performance and Cardiovascular Parameters

No controlled longitudinal study has explored the effects of testosterone suppression on endurance-based performance. Sex differences in endurance performance are generally smaller than for events relying more on muscle mass and explosive strength. Using an age grading model designed to normalize times for masters/veteran categories, Harper [81] analyzed self-selected and self-reported race times for eight transgender women runners of various age categories who had, over an average 7 year period (range 1–29 years), competed in sub-elite middle and long distance races within both the male and female categories. The age-graded scores for these eight runners were the same in both categories, suggesting that cross-hormone treatment reduced running performance by approximately the size of the typical male advantage. However, factors affecting performances in the interim, including training and injury, were uncontrolled

for periods of years to decades and there were uncertainties regarding which race times were self-reported vs. which race times were actually reported and verified, and factors such as standardization of race course and weather conditions were unaccounted for. Furthermore, one runner improved substantially post-transition, which was attributed to improved training [81]. This demonstrates that performance decrease after transition is not inevitable if training practices are improved. Unfortunately, no study to date has followed up these preliminary self-reports in a more controlled setting, so it is impossible to make any firm conclusions from this data set alone.

Circulating hemoglobin levels are androgen-dependent [82] and typically reported as 12% higher in males compared with females [4]. Hemoglobin levels appear to decrease by 11–14% with cross-hormone therapy in transgender women [62, 71], and indeed comparably sized reductions have been reported in athletes with DSDs where those athletes are sensitive to and been required to reduce testosterone [47, 83]. Oxygen-carrying capacity in transgender women is most likely reduced with testosterone suppression, with a concomitant performance penalty estimated at 2–5% for the female athletic population [83]. Furthermore, there is a robust relationship between hemoglobin mass and $VO_{2max}$ [84, 85] and reduction in hemoglobin is generally associated with reduced aerobic capacity [86, 87]. However, hemoglobin mass is not the only parameter contributing to $VO_{2max}$, where central factors such as total blood volume, heart size and contractility, and peripheral factors such as capillary supply and mitochondrial content also plays a role in the final oxygen uptake [88]. Thus, while a reduction in hemoglobin is strongly predicted to impact aerobic capacity and reduce endurance performance in transgender women, it is unlikely to completely close the baseline gap in aerobic capacity between males and females.

The typical increase in body fat noted in transgender women [89, 90] may also be a disadvantage for sporting activities (e.g. running) where body weight (or fat distribution) presents a marginal disadvantage. Whether this body composition change negatively affects performance results in transgender women endurance athletes is unknown. It is unclear to what extent the expected increase in body fat could be offset by nutritional and exercise countermeasures, as individual variation is likely to be present. For example, in the Wiik et al. study [71], 3 out of the 11 transgender women were completely resistant to the marked increase in total adipose tissue noted at the group level. This inter-individual response to treatment represents yet another challenge for sports governing bodies who most likely, given the many obstacles with case-by-case assessments, will form policies based on average effect sizes.

Altogether, the effects of testosterone suppression on performance markers for endurance athletes remain

insufficiently explored. While the negative effect on hemoglobin concentration is well documented, the effects on $VO_{2max}$, left ventricular size, stroke volume, blood volume, cardiac output lactate threshold, and exercise economy, all of which are important determinants of endurance performance, remain unknown. However, given the plausible disadvantages with testosterone suppression mentioned in this section, together with the more marginal male advantage in endurance-based sports, the balance between inclusion and fairness is likely closer to equilibrium in weight-bearing endurance-based sports compared with strength-based sports where the male advantage is still substantial.

## 5 Discussion

The data presented here demonstrate that superior anthropometric, muscle mass and strength parameters achieved by males at puberty, and underpinning a considerable portion of the male performance advantage over females, are not removed by the current regimen of testosterone suppression permitting participation of transgender women in female sports categories. Rather, it appears that the male performance advantage remains substantial. Currently, there is no consensus on an acceptable degree of residual advantage held by transgender women that would be tolerable in the female category of sport. There is significant dispute over this issue, especially since the physiological determinants of performance vary across different sporting disciplines. However, given the IOC position that fair competition is the overriding sporting objective [14], any residual advantage carried by transgender women raises obvious concerns about fair and safe competition in the numerous sports where muscle mass, strength and power are key performance determinants.

### 5.1 Perspectives on Athletic Status of Transgender Women

Whilst available evidence is strong and convincing that strength, skeletal- and muscle-mass derived advantages will largely remain after cross-hormone therapy in transgender women, it is acknowledged that the findings presented here are from healthy adults with regular or even low physical activity levels [91], and not highly trained athletes. Thus, further research is required in athletic transgender populations.

However, despite the current absence of empirical evidence in athletic transgender women, it is possible to evaluate potential outcomes in athletic transgender women compared with untrained cohorts. The first possibility is that athletic transgender women will experience similar reductions (approximately $-5\%$) in muscle mass and strength as untrained transgender women, and will thus retain significant advantages over a comparison group of females. As a result of higher baseline characteristics in these variables, the retained advantage may indeed be even larger. A second possibility is that by virtue of greater muscle mass and strength at baseline, pre-trained transgender women will experience larger relative decreases in muscle mass and strength if they converge with untrained transgender women, particularly if training is halted during transition. Finally, training before and during the period of testosterone suppression may attenuate the anticipated reductions, such that relative decreases in muscle mass and strength will be smaller or non-existent in transgender women who undergo training, compared to untrained (and non-training) controls.

It is well established that resistance training counteracts substantial muscle loss during atrophy conditions that are far more severe than testosterone suppression. For example, resistance exercise every third day during 90-days bed rest was sufficient to completely offset the 20% reduction in knee extensor muscle size noted in the resting control subjects [92]. More relevant to the question of transgender women, however, is to examine training effects in studies where testosterone has been suppressed in biological males. Kvorning et al. investigated, in a randomized placebo-controlled trial, how suppression of endogenous testosterone for 12 weeks influenced muscle hypertrophy and strength gains during a training program (3 days/week) that took place during the last 8 weeks of the 3-month suppression period [93]. Despite testosterone suppression to female levels of 2 nmol/L, there was a significant $+4\%$ increase in leg lean mass and a $+2\%$ increase in total lean body mass, and a measurable though insignificant increase in isometric knee extension strength. Moreover, in select exercises used during the training program, 10RM leg press and bench press increased $+32\%$ and $+17\%$, respectively. While some of the training adaptations were lower than in the placebo group, this study demonstrates that training during a period of testosterone suppression not only counteracts muscle loss, but can actually increase muscle mass and strength.

Males with prostate cancer undergoing androgen deprivation therapy provide a second avenue to examine training effects during testosterone suppression. Testosterone levels are typically reduced to castrate levels, and the loss of lean mass has typically ranged between $-2$ and $-4\%$ per year [77], consistent with the findings described previously in transgender women. A recent meta-analysis concluded that exercise interventions including resistance exercise were generally effective for maintaining muscle mass and increasing muscle strength in prostate cancer patients undergoing androgen deprivation therapy [94]. It is important to emphasize that the efficacy of the different training programs may vary. For example, a 12-week training study of prostate cancer patients undergoing androgen deprivation therapy

included drop-sets to combine heavy loads and high volume while eliciting near-maximal efforts in each set [95]. This strategy resulted in significantly increased lean body mass (+3%), thigh muscle volume (+6%), knee extensor 1RM strength (+28%) and leg press muscle endurance (+110%).

In addition to the described effects of training during testosterone suppression, the effect of training prior to testosterone suppression may also contribute to the attenuation of any muscle mass and strength losses, via a molecular mechanism referred to as 'muscle memory' [96]. Specifically, it has been suggested that myonuclei acquired by skeletal muscle cells during training are maintained during subsequent atrophy conditions [97]. Even though this model of muscle memory has been challenged recently [98], it may facilitate an improved training response upon retraining [99]. Mechanistically, the negative effects of testosterone suppression on muscle mass are likely related to reduced levels of resting protein synthesis [100], which, together with protein breakdown, determines the net protein balance of skeletal muscle. However, testosterone may not be required to elicit a robust muscle protein synthesis response to resistance exercise [100]. Indeed, relative increases in muscle mass in men and women from resistance training are comparable, despite marked differences in testosterone levels [101], and the acute rise in testosterone apparent during resistance exercise does not predict muscle hypertrophy nor strength gains [102]. This suggests that even though testosterone is important for muscle mass, especially during puberty, the maintenance of muscle mass through resistance training is not crucially dependent on circulating testosterone levels.

Thus, in well-controlled studies in biological males who train while undergoing testosterone reduction, training is protective of, and may even enhance, muscle mass and strength attributes. Considering transgender women athletes who train during testosterone suppression, it is plausible to conclude that any losses will be similar to or even smaller in magnitude than documented in the longitudinal studies described in this review. Furthermore, pre-trained transgender women are likely to have greater muscle mass at baseline than untrained transgender women; it is possible that even with the same, rather than smaller, relative decreases in muscle mass and strength, the magnitude of retained advantage will be greater. In contrast, if pre-trained transgender women undergo testosterone suppression while refraining from intense training, it appears likely that muscle mass and strength will be lost at either the same or greater rate than untrained individuals, although there is no rationale to expect a weaker endpoint state. The degree of change in athletic transgender women is influenced by the athlete's baseline resistance-training status, the efficacy of the implemented program and other factors such as genetic make-up and nutritional habits, but we argue that it is implausible that athletic transgender women would achieve final muscle mass and strength metrics that are on par with reference females at comparable athletic level.

## 5.2 The Focus on Muscle Mass and Strength

We acknowledge that changes in muscle mass are not always correlated in magnitude to changes in strength measurements because muscle mass (or total mass) is not the only contributor to strength [103]. Indeed, the importance of the nervous system, e.g. muscle agonist activation (recruitment and firing frequency) and antagonist co-activation, for muscle strength must be acknowledged [104]. In addition, factors such as fiber types, biomechanical levers, pennation angle, fascicle length and tendon/extracellular matrix composition may all influence the ability to develop muscular force [105]. While there is currently limited to no information on how these factors are influenced by testosterone suppression, the impact seems to be minute, given the modest changes noted in muscle strength during cross-hormone treatment.

It is possible that estrogen replacement may affect the sensitivity of muscle to anabolic signaling and have a protective effect on muscle mass [106] explaining, in part, the modest change in muscle mass with testosterone suppression and accompanying cross-hormone treatment. Indeed, this is supported by research conducted on estrogen replacement therapy in other targeted populations [107, 108] and in several different animal models, including mice after gonadectomy [109] and ovariectomy [110].

In terms of other performance proxies relevant to sports performance, there is no research evaluating the effects of transgender hormone treatment on factors such as agility, jumping or sprint performance, competition strength performance (e.g. bench press), or discipline-specific performance. Other factors that may impact sports performance, known to be affected by testosterone and some of them measurably different between males and females, include visuospatial abilities, aggressiveness, coordination and flexibility.

## 5.3 Testosterone-Based Criteria for Inclusion of Transgender Women in Female Sports

The appropriate testosterone limit for participation of transgender women in the female category has been a matter of debate recently, where sports federations such as World Athletics recently lowered the eligibility criterion of free circulating testosterone (measured by means of liquid chromatography coupled with mass spectrometry) to <5 nmol/L. This was based, at least in part, on a thorough review by Handelsman et al. [4], where the authors concluded that, given the nonoverlapping distribution of circulating testosterone between males and females, and making an allowance

for females with mild hyperandrogenism (e.g. with polycystic ovary syndrome), the appropriate testosterone limit should be 5 rather than 10 nmol/L.

From the longitudinal muscle mass/strength studies summarised here, however, it is apparent that most therapeutic interventions result in almost complete suppression of testosterone levels, certainly well below 5 nmol/L (Table 4). Thus, with regard to transgender women athletes, we question whether current circulating testosterone level cut-off can be a meaningful decisive factor, when in fact not even suppression down to around 1 nmol/L removes the anthropometric and muscle mass/strength advantage in any significant way.

In terms of duration of testosterone suppression, it may be argued that although 12 months of treatment is not sufficient to remove the male advantage, perhaps extending the time frame of suppression would generate greater parity with female metrics. However, based on the studies reviewed here, evidence is lacking that this would diminish the male advantage to a tolerable degree. On the contrary, it appears that the net loss of lean mass and grip strength is not substantially decreased at year 2 or 3 of cross-hormone treatment (Table 4), nor evident in cohorts after an average 8 years after transition. This indicates that a plateau or a new steady state is reached within the first or second year of treatment, a phenomenon also noted in transgender men, where the increase in muscle mass seems to stabilise between the first and the second year of testosterone treatment [111].

## 6 Conclusions

We have shown that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, evidence for loss of the male performance advantage, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, is lacking. Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting organizations may need to reassess their policies regarding inclusion of transgender women.

From a medical-ethical point of view, it may be questioned as to whether a requirement to lower testosterone below a certain level to ensure sporting participation can be justified at all. If the advantage persists to a large degree, as evidence suggests, then a stated objective of targeting a certain testosterone level to be eligible will not achieve its objective and may drive medical practice that an individual may not want or require, without achieving its intended benefit.

The research conducted so far has studied untrained transgender women. Thus, while this research is important to understand the isolated effects of testosterone suppression, it is still uncertain how transgender women athletes, perhaps undergoing advanced training regimens to counteract the muscle loss during the therapy, would respond. It is also important to recognize that performance in most sports may be influenced by factors outside muscle mass and strength, and the balance between inclusion, safety and fairness therefore differs between sports. While there is certainly a need for more focused research on this topic, including more comprehensive performance tests in transgender women athletes and studies on training capacity of transgender women undergoing hormone therapy, it is still important to recognize that the biological factors underpinning athletic performance are unequivocally established. It is, therefore, possible to make strong inferences and discuss potential performance implications despite the lack of direct sport-specific studies in athletes. Finally, since athlete safety could arguably be described as the immediate priority above considerations of fairness and inclusion, proper risk assessment should be conducted within respective sports that continue to include transgender women in the female category.

If transgender women are restricted within or excluded from the female category of sport, the important question is whether or not this exclusion (or conditional exclusion) is necessary and proportionate to the goal of ensuring fair, safe and meaningful competition. Regardless of what the future will bring in terms of revised transgender policies, it is clear that different sports differ vastly in terms of physiological determinants of success, which may create safety considerations and may alter the importance of retained performance advantages. Thus, we argue against universal guidelines for transgender athletes in sport and instead propose that each individual sports federation evaluate their own conditions for inclusivity, fairness and safety.

### Compliance with Ethical Standards

**Funding** None. Open access funding provided by Karolinska Institutet.

E. N. Hilton, T. R. Lundberg

**Conflicts of interest** Emma N Hilton and Tommy R Lundberg declare that they have no conflict of interest with the content of this review.

**Authorship contributions** Both authors (ENH and TRL) were involved in the conception and design of this paper, and both authors drafted, revised and approved the final version of the paper.

**Ethics approval** Not applicable.

**Informed consent** Not applicable.

**Data availability** Available upon request.

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

## References

1. Suchomel TJ, Nimphius S, Bellon CR, Stone MH. The importance of muscular strength: training considerations. Sport Med. 2018;48:765–85.
2. Coyle EF. Integration of the physiological factors determining endurance performance ability. Exerc Sport Sci Rev. 1995;23:25–63.
3. Haizlip KM, Harrison BC, Leinwand LA. Sex-based differences in skeletal muscle kinetics and fiber-type composition. Physiology. 2015;30(1):30–9.
4. Handelsman DJ, Hirschberg AL, Bermon S. Circulating testosterone as the hormonal basis of sex differences in athletic performance. Endocr Rev. 2018;39(5):803–29.
5. Sandbakk Ø, Solli GS, Holmberg HC. Sex differences in world-record performance: the influence of sport discipline and competition duration. Int J Sports Physiol Perform. 2018;13(1):2–8.
6. Genel M. Transgender athletes: how can they be accommodated? Curr Sports Med Rep. 2017;16(1):12–3.
7. Coggon J, Hammond N, Holm S. Transsexuals in sport—fairness and freedom, regulation and law. Sport Ethics Philos. 2008;2(1):4–17.
8. Pitsiladis Y, Harper J, Betancurt JO, et al. Beyond fairness. Curr Sports Med Rep. 2016;15:386–8.
9. Reeser JC. Gender identity and sport: is the playing field level? Br J Sports Med. 2005;39(10):695–9.
10. Transgender Policy in Sport. A review of current policy and commentary of the challenges of policy creation. Curr Sports Med Rep. 2019;18(6):239–47.
11. Harper J, Martinez-Patino MJ, Pigozzi F, Pitsiladis Y. Implications of a third gender for elite sports. Curr Sports Med Rep. 2018;17(2):42–4.
12. Singh B, Singh K. The hermeneutics of participation of transgender athletes in sports—intensifying third force. Phys Cult Sport Stud Res. 2011;52(1):44–8.
13. Bianchi A. Transgender women in sport. J Philos Sport. 2017;44:229–42.
14. Harper J, Hirschberg AL, Jose M, et al. IOC consensus meeting on sex reassignment and hyperandrogenism. 2015. https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf. Accessed 28 Nov 2020
15. Carré GA, Greenfield A. The gonadal supporting cell lineage and mammalian sex determination: the differentiation of sertoli and granulosa cells. In: Piprek R, editor. Molecular mechanisms of cell differentiation in gonad development. Results and problems in cell differentiation, vol 58. Cham: Springer; 2016. p. 47–66.
16. Sobel V, Zhu YS, Imperato-McGinley J. Fetal hormones and sexual differentiation. Obstet Gynecol Clin N Am. 2004;31(4):837–xi.
17. Hughes IA. Disorders of sex development: a new definition and classification. Best Pract Res Clin Endocrinol Metab. 2008;22(1):119–34.
18. Tønnessen E, Svendsen IS, Olsen IC, et al. Performance development in adolescent track and field athletes according to age, sex and sport discipline. PLoS ONE. 2015;10(6):e0129014.
19. Gershoni M, Pietrokovski S. The landscape of sex-differential transcriptome and its consequent selection in human adults. BMC Biol. 2017;15(1):7.
20. Lanciotti L, Cofini M, Leonardi A, Penta L, Esposito S. Up-to-date review about minipuberty and overview on hypothalamic-pituitary-gonadal axis activation in fetal and neonatal life. Front Endocrinol. 2018;23(9):410.
21. Becker M, Hesse V. Minipuberty: why does it happen? Horm Res Paediatr. 2020;93(2):76–84.
22. Catley MJ, Tomkinson GR. Normative health-related fitness values for children: analysis of 85347 test results on 9–17-year-old Australians since 1985. Br J Sports Med. 2013;47(2):98–108.
23. Tambalis KD, Panagiotakos DB, Psarra G, et al. Physical fitness normative values for 6–18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method. Eur J Sport Sci. 2016;16(6):736–46.
24. Eiberg S, Hasselstrom H, Grønfeldt V, et al. Maximum oxygen uptake and objectively measured physical activity in Danish children 6–7 years of age: the Copenhagen school child intervention study. Br J Sports Med. 2005;39(10):725–30.
25. Bae YJ, Zeidler R, Baber R, et al. Reference intervals of nine steroid hormones over the life-span analyzed by LC-MS/MS: Effect of age, gender, puberty, and oral contraceptives. J Steroid Biochem Mol Biol. 2019;193:105409.
26. Thibault V, Guillaume M, Berthelot G, et al. Women and men in sport performance: the gender gap has not evolved since 1983. J Sport Sci Med. 2010;9(2):214–23.
27. Millard-Stafford M, Swanson AE, Wittbrodt MT. Nature versus nurture: have performance gaps between men and women reached an asymptote? Int J Sports Physiol Perform. 2018;13(4):530–5.
28. Lee DH, Keum N, Hu FB, et al. Development and validation of anthropometric prediction equations for lean body mass, fat mass and percent fat in adults using the National Health and Nutrition Examination Survey (NHANES) 1999–2006. Br J Nutr. 2017;118(10):858–66.
29. Janssen I, Heymsfield SB, Wang ZM, Ross R. Skeletal muscle mass and distribution in 468 men and women aged 18–88 yr. J Appl Physiol. 2000;89:81–8.
30. Bohannon RW, Wang YC, Yen SC, Grogan KA. Handgrip strength: a comparison of values obtained from the NHANES and NIH Toolbox studies. Am J Occup Ther. 2019;73(2):1–9.
31. Neder JA, Nery LE, Shinzato GT, et al. Reference values for concentric knee isokinetic strength and power in nonathletic men and women from 20 to 80 years old. J Orthop Sports Phys Ther. 1999;29:116–26.

32. Jantz LM, Jantz RL. Secular change in long bone length and proportion in the United States, 1800–1970. Am J Phys Anthropol. 1999;110(1):57–67.

33. Brinckmann P, Hoefert H, Jongen HT. Sex differences in the skeletal geometry of the human pelvis and hip joint. J Biomech. 1981;14(6):427–30.

34. Lepley AS, Joseph MF, Daigle NR, et al. Sex differences in mechanical properties of the Achilles tendon: longitudinal response to repetitive loading exercise. J Strength Cond Res. 2018;32(11):3070–9.

35. Pate RR, Kriska A. Physiological basis of the sex difference in cardiorespiratory endurance. Sports Med. 1984;1(2):87–9.

36. Astrand PO, Cuddy TE, Saltin B, Stenberg J. Cardiac output during submaximal and maximal work. J Appl Physiol. 1964;19:268–74.

37. Best SA, Okada Y, Galbreath MM, et al. Age and sex differences in muscle sympathetic nerve activity in relation to haemodynamics, blood volume and left ventricular size. Exp Physiol. 2014;99(6):839–48.

38. Tong E, Murphy WG, Kinsella A, et al. Capillary and venous haemoglobin levels in blood donors: a 42-month study of 36 258 paired samples. Vox Sang. 2010;98(4):547–53.

39. Dominelli PB, Molgat-Seon Y, Sheel AW. Sex differences in the pulmonary system influence the integrative response to exercise. Exerc Sport Sci Rev. 2019;47(3):142–50.

40. Wingate S. Cardiovascular anatomy and physiology in the female. Crit Care Nurs Clin N Am. 1997;9(4):447–52.

41. Haugen T, Breitschädel F, Wiig H, Seiler S. Countermovement jump height in national team athletes of various sports: a framework for practitioners and scientists. Int J Sports Physiol Perform. 2020 (accessed 4 May 2020 from Researchgate)

42. Thomas JR, French KE. Gender differences across age in motor performance a meta-analysis. Psychol Bull. 1985;98(2):260–82.

43. Antti M, Komi PV, Korjus T, et al. Body segment contributions to javelin throwing during final thrust phases. J Appl Biomech. 1994;10:166–77.

44. Lassek WD, Gaulin SJC. Costs and benefits of fat-free muscle mass in men: relationship to mating success, dietary requirements, and native immunity. Evol Hum Behav. 2009;20(5):322–8.

45. Stoll T, Huber E, Seifert B, et al. Maximal isometric muscle strength: normative values and gender-specific relation to age. Clin Rheumatol. 2000;19(2):105–11.

46. Coleman DL. Sex in sport. Law Contemp Probl. 2017;80:63–126.

47. CAS 2018/O/5794 Mokgadi Caster Semenya v. International Association of Athletics Federation. https://www.tas-cas.org/fileadmin/user_upload/CAS_Award_-_redacted_-_Semenya_ASA_IAAF.pdf. Accessed 28 Nov 2020

48. Sparling PB. A meta-analysis of studies comparing maximal oxygen uptake in men and women. Res Q Exerc Sport. 1980;51(3):542–52.

49. Hubal MJ, Gordish-Dressman H, Thompson PD, et al. Muscle size and strength gain after unilateral resistance training. Med Sci Sport Exerc. 2005;37(6):964–72.

50. Morris JS, Link J, Martin JC, Carrier DR. Sexual dimorphism in human arm power and force: implications for sexual selection on fighting ability. J Exp Biol. 2020;223(Pt 2):jeb212365.

51. Thomas JR, Thomas KT. Development of gender differences in physical activity. Quest. 1988;40(3):219–29.

52. Wiepjes CM, de Jongh RT, de Blok CJM, et al. Bone safety during the first ten years of gender-affirming hormonal treatment in transwomen and transmen. J Bone Miner Res. 2019;34(3):447–54.

53. Van Caenegem E, Wierckx K, Taes Y, et al. Preservation of volumetric bone density and geometry in trans women during

cross-sex hormonal therapy: a prospective observational study. Osteoporos Int. 2015a;26(1):35–47.

54. Singh-Ospina N, Maraka S, Rodriguez-Gutierrez R, et al. Effect of sex steroids on the bone health of transgender individuals: a systematic review and meta-analysis. J Clin Endocrinol Metab. 2017;102(11):3904–13.

55. Fighera TM, Ziegelmann PK, da Silva TR, Spritzer PM. Bone mass effects of cross-sex hormone therapy in transgender people: updated systematic review and meta-analysis. J Endocr Soc. 2019;3(5):943–64.

56. Ruetsche AG, Kneubuehl R, Birkhaeuser MH, Lippuner K. Cortical and trabecular bone mineral density in transsexuals after long-term cross-sex hormonal treatment: a cross-sectional study. Osteoporos Int. 2005;16(7):791–8.

57. Rosen HN, Hamnvik OPR, Jaisamrarn U, et al. Bone densitometry in transgender and gender non-conforming (TGNC) individuals: 2019 ISCD official position. J Clin Densitom. 2019;22(4):544–53.

58. Khosla S, Melton LJ, Riggs BL. Estrogens and bone health in men. Calcif Tissue Int. 2001;69(4):189–92.

59. Sigward SM, Powers CM. The influence of gender on knee kinematics, kinetics and muscle activation patterns during side-step cutting. Clin Biomech. 2006;21(1):41–8.

60. Francis P, Whatman C, Sheerin K, et al. The proportion of lower limb running injuries by gender, anatomical location and specific pathology: a systematic review. J Sport Sci Med. 2019;18(1):21–31.

61. Elbers JM, Asscheman H, Seidell JC, Gooren LJ. Effects of sex steroid hormones on regional fat depots as assessed by magnetic resonance imaging in transsexuals. Am J Physiol. 1999;276(2):E317–25.

62. Gooren LJG, Bunck MCM. Transsexuals and competitive sports. Eur J Endocrinol. 2004;151(4):425–9.

63. Haraldsen IR, Haug E, Falch J, et al. Cross-sex pattern of bone mineral density in early onset gender identity disorder. Horm Behav. 2007;52(3):334–43.

64. Mueller A, Zollver H, Kronawitter D, et al. Body composition and bone mineral density in male-to-female transsexuals during cross-sex hormone therapy using gonadotrophin-releasing hormone agonist. Exp Clin Endocrinol Diabetes. 2011;119(2):95–100.

65. Wierckx K, Van Caenegem E, Schreiner T, et al. Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. J Sex Med. 2014;11(8):1999–2011.

66. Gava G, Cerpolini S, Martelli V, et al. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. Clin Endocrinol (Oxf). 2016;85(2):239–46.

67. Auer MK, Ebert T, Pietzner M, et al. Effects of sex hormone treatment on the metabolic syndrome in transgender individuals: focus on metabolic cytokines. J Clin Endocrinol Metab. 2018;103(2):790–802.

68. Klaver M, De Blok CJM, Wiepjes CM, et al. Changes in regional body fat, lean body mass and body shape in trans persons using cross-sex hormonal therapy: results from a multicenter prospective study. Eur J Endocrinol. 2018;178(2):163–71.

69. Fighera TM, da Silva E, Lindenau JDR, Spritzer PM. Impact of cross-sex hormone therapy on bone mineral density and body composition in transwomen. Clin Endocrinol (Oxf). 2018;88(6):856–62.

70. Scharff M, Wiepjes CM, Klaver M, et al. Change in grip strength in trans people and its association with lean body mass and bone density. Endocr Connect. 2019;8:1020–8.

71. Wiik A, Lundberg TR, Rullman E, et al. Muscle strength, size, and composition following 12 months of gender-affirming

treatment in transgender individuals. J Clin Endocrinol Metab. 2020;105(3):247.

72. Tack LJW, Craen M, Lapauw B, et al. Proandrogenic and antian-drogenic progestins in transgender youth: differential effects on body composition and bone metabolism. J Clin Endocrinol Metab. 2018;103(6):2147–56.

73. Polderman KH, Gooren LJG, Asscheman H, et al. Induction of insulin resistance by androgens and estrogens. J Clin Endocrinol Metab. 1994;79(1):265–71.

74. Aubrey J, Esfandiari N, Baracos VE, et al. Measurement of skeletal muscle radiation attenuation and basis of its biological variation. Acta Physiol (Oxf). 2014;210(3):489–97.

75. Rasch A, Byström AH, Dalen N, Berg HE. Reduced muscle radiological density, cross-sectional area, and strength of major hip and knee muscles in 22 patients with hip osteoarthritis. Acta Orthop. 2007;78(4):505–10.

76. Van Caenegem E, Wierckx K, Taes Y, et al. Body composition, bone turnover, and bone mass in trans men during testosterone treatment: 1-year follow-up data from a prospective case-controlled study (ENIGI). Eur J Endocrinol. 2015b;172(2):163–71.

77. Storer TW, Miciek R, Travison TG. Muscle function, physical performance and body composition changes in men with prostate cancer undergoing androgen deprivation therapy. Asian J Androl. 2012;14(2):204–21.

78. Lapauw B, Taes Y, Simoens S, et al. Body composition, volumetric and areal bone parameters in male-to-female transsexual persons. Bone. 2008;43(6):1016–21.

79. Imboden MT, Swartz AM, Finch HW, et al. Reference standards for lean mass measures using GE dual energy x-ray absorptiometry in Caucasian adults. PLoS ONE. 2017;12(4):e0176161.

80. Bohannon RW, Peolsson A, Massy-Westropp N, et al. Reference values for adult grip strength measured with a Jamar dynamometer: a descriptive meta-analysis. Physiotherapy. 2006;92(1):11–5.

81. Harper J. Race times for transgender athletes. J Sport Cult Identities. 2015;6(1):1–9.

82. Coviello AD, Kaplan B, Lakshman KM, et al. Effects of graded doses of testosterone on erythropoiesis in healthy young and older men. J Clin Endocrinol Metab. 2008;93(3):914–9.

83. Bermon S. Androgens and athletic performance of elite female athletes. Curr Opin Endocrinol Diabetes Obes. 2017;24(3):246–51.

84. Joyner MJ. VO2MAX, blood doping, and erythropoietin. Br J Sports Med. 2003;37(3):190–1.

85. Ekblom B, Goldbarg AN, Gullbring B. Response to exercise after blood loss and reinfusion. J Appl Physiol. 1972;33(2):175–80.

86. Kanstrup IL, Ekblom B. Blood volume and hemoglobin concentration as determinants of maximal aerobic power. Med Sci Sports Exerc. 1984;16(3):256–62.

87. Otto JM, Montgomery HE, Richards T. Haemoglobin concentration and mass as determinants of exercise performance and of surgical outcome. Extrem Physiol Med. 2013;2(1):33.

88. Joyner MJ, Lundby C. Concepts about VO2max and trainability are context dependent. Exerc Sport Sci Rev. 2018;46(3):138–43.

89. T'Sjoen G, Arcelus J, Gooren L, et al. Endocrinology of transgender medicine. Endocr Rev. 2018;40(1):97–117.

90. Klaver M, Dekker MJHJ, de Mutsert R, et al. Cross-sex hormone therapy in transgender persons affects total body weight, body fat and lean body mass: a meta-analysis. Andrologia. 2017. https://doi.org/10.1111/and.12660.

91. Muchicko MM, Lepp A, Barkley JE. Peer victimization, social support and leisure-time physical activity in transgender and cisgender individuals. Leis Loisir. 2014;3–4:295–308.

92. Alkner BA, Tesch PA. Knee extensor and plantar flexor muscle size and function following 90 days of bed rest with or without resistance exercise. Eur J Appl Physiol. 2004;93:294–305.

93. Kvorning T, Andersen M, Brixen K, Madsen K. Suppression of endogenous testosterone production attenuates the response to strength training: a randomized, placebo-controlled, and blinded intervention study. Am J Physiol Metab. 2006;291:E1325-32.

94. Chen Z, Zhang Y, Lu C, et al. Supervised physical training enhances muscle strength but not muscle mass in prostate cancer patients undergoing androgen deprivation therapy: a systematic review and meta-analysis. Front Physiol. 2019;10:843.

95. Hanson ED, Sheaff AK, Sood S, et al. Strength training induces muscle hypertrophy and functional gains in black prostate cancer patients despite androgen deprivation therapy. J Gerontol A Biol Sci Med Sci. 2013;68(4):490–8.

96. Gundersen K. Muscle memory and a new cellular model for muscle atrophy and hypertrophy. J Exp Biol. 2016;219:235–42.

97. Bruusgaard JC, Johansen IB, Egner IM, et al. Myonuclei acquired by overload exercise precede hypertrophy and are not lost on detraining. Proc Natl Acad Sci. 2010;107:15111–6.

98. Murach KA, Dungan CM, Dupont-Versteegden EE, et al. "Muscle Memory" not mediated by myonuclear number?: secondary analysis of human detraining data. J Appl Physiol. 2019;127(6):1814–6.

99. Staron RS, Leonardi MJ, Karapondo DL, et al. Strength and skeletal muscle adaptations in heavy-resistance-trained women after detraining and retraining. J Appl Physiol. 1991;70:631–40.

100. Hanson ED, Nelson AR, West DWD, et al. Attenuation of resting but not load-mediated protein synthesis in prostate cancer patients on androgen deprivation. J Clin Endocrinol Metab. 2017;102(3):1076–83.

101. Roberts BM, Nuckols G, Krieger JW. Sex differences in resistance training. J Strength Cond Res. 2020;34(5):1448–60.

102. Morton RW, Oikawa SY, Wavell CG, et al. Neither load nor systemic hormones determine resistance training-mediated hypertrophy or strength gains in resistance-trained young men. J Appl Physiol. 2016;121:129–38.

103. Balshaw TG, Massey GJ, Maden-Wilkinson TM, et al. Changes in agonist neural drive, hypertrophy and pre-training strength all contribute to the individual strength gains after resistance training. Eur J Appl Physiol. 2017;117:631–40.

104. Balshaw TG, Massey GJ, Maden-Wilkinson TM, et al. Neural adaptations after 4 years vs. 12 weeks of resistance training vs. untrained. Scand J Med Sci Sports. 2018;29(3):348–59.

105. Maden-Wilkinson TM, Balshaw TG, Massey GJ, Folland JP. What makes long-term resistance-trained individuals so strong? A comparison of skeletal muscle morphology, architecture, and joint mechanics. J Appl Physiol. 2020;128:1000–11.

106. Chidi-Ogbolu N, Baar K. Effect of estrogen on musculoskeletal performance and injury risk. Front Physiol. 2019;9:1834.

107. Sørensen MB, Rosenfalck AM, Højgaard L, Ottesen B. Obesity and sarcopenia after menopause are reversed by sex hormone replacement therapy. Obes Res. 2001;9(10):622–6.

108. Greising SM, Baltgalvis KA, Lowe DA, Warren GL. Hormone therapy and skeletal muscle strength: a meta-analysis. J Gerontol A Biol Sci Med Sci. 2009;64(10):1071–81.

109. Svensson J, Movérare-Skrtic S, Windahl S, et al. Stimulation of both estrogen and androgen receptors maintains skeletal muscle mass in gonadectomized male mice but mainly via different pathways. J Mol Endocrinol. 2010;45(1):45–57.

110. Kitajima Y, Ono Y. Estrogens maintain skeletal muscle and satellite cell functions. J Endocrinol. 2016;229(3):267–75.

111. Elbers JMH, Asscheman H, Seidell JC, et al. Long-term testosterone administration increases visceral fat in female to male transsexuals. J Clin Endocrinol Metab. 1997;82(7):2044–7.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, PATRICK MORRISEY in his official capacity as Attorney General, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**FIRST AMENDED COMPLAINT** |

**INTRODUCTION**

1.    B.P.J. is an 11-year-old girl who will start middle school this fall.  While in elementary school, B.P.J. participated on a cheerleading team, where she enjoyed the camaraderie of practicing, playing, and competing alongside a team comprised entirely of girls.  This fall, B.P.J. wants to continue playing sports in middle school by participating on the girls' cross-country and track teams.  B.P.J. comes from a family of runners, and she is excited for her chance to try out and compete.

2.    But without this Court's intervention, B.P.J. will be denied that opportunity simply because she is transgender.  As part of a wave of similar legislation introduced across the country, West Virginia passed a new law in April 2021 that categorically bans B.P.J. and all other girls who are transgender in West Virginia from participating in school sports consistent with their

1

gender identity.  The new statute, which was passed by the legislature as H.B. 3293, is codified

at W. Va. Code § 18-2-25d ("H.B. 3293").[1]

3.      H.B. 3293 was prompted by unfounded stereotypes, false scientific claims, and

baseless fear and misunderstanding of girls who are transgender.  Proponents of H.B. 3293 made

clear that its purpose is to exclude what they referred to as "transgenders"[2] from girls' sports teams.

Yet, as H.B. 3293's sponsors and the Governor have acknowledged, there is no evidence of any

"problem" caused by girls who are transgender participating on sports teams in West Virginia.

4.      By barring B.P.J. and other girls who are transgender from participating in school

athletics, H.B. 3293 discriminates on the basis of sex and transgender status in violation of the

United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681,

*et seq.* ("Title IX").  If allowed to go into effect, H.B. 3293 will cause severe and entirely

unnecessary harms and distress to B.P.J. and other girls who are transgender—an already

vulnerable group of people subject to a history of discrimination that continues to this day.

5.      B.P.J. seeks declaratory and injunctive relief from this Court to allow her to

experience the benefits of athletic participation consistent with her gender identity and without

being singled out from other girls for different treatment simply because she is transgender.

**PARTIES**

**Plaintiff**

6.      B.P.J. is an 11-year-old girl who lives in Harrison County, West Virginia.  She will

attend Bridgeport Middle School in the fall and intends to try out for the girls' cross-country and

---

[1] The enacted version of H.B. 3293 is attached as Exhibit A to the Declaration of Loree Stark ("Stark Declaration") that is filed contemporaneously with this Complaint.
[2] *See* Stark Declaration, Exhibit E (April 8, 2021 West Virginia Senate Hearing).

track teams.  The first week of tryouts begins on August 2, 2021.  B.P.J. brings this suit through her next friend and mother, Heather Jackson.

**Defendants**

7.      Defendant West Virginia State Board of Education ("State Board of Education"), located in Kanawha County, has a statutory duty to supervise the public-school system and is responsible for implementing education policies and programs in West Virginia.  W. Va. Const. art. XII, § 2; W. Va. Code § 18-2-5; *Jones v. W.Va. State Bd. of Educ.*, 218 W. Va. 52, 61 (2005). The State Board of Education's supervisory role, which includes extracurricular activities such as interscholastic athletics, has been delegated to "county boards of education and the West Virginia Secondary School Activities Commission."  *Jones*, 218 W. Va. at 61 (citing W. Va. Code § 18-2-25).

8.      Defendant West Virginia Secondary School Activities Commission ("School Activities Commission"), located in Wood County, controls, supervises, and regulates interscholastic athletics for secondary schools pursuant to the State Board of Education's power under West Virginia Code § 18-2-25.  Such powers may be limited and are supervised by the State Board of Education.  *Id*.  The School Activities Commission possesses rule-making authority under West Virginia Code § 18-2-25.  Upon information and belief, the School Activities Commission is the controlling authority for Bridgeport Middle School's athletic programs.[3]

9.      Defendant Harrison County Board of Education ("County Board of Education") is the governing body of Harrison County's public education system, which includes Bridgeport Middle School.  W. Va. Code § 18-5-1.  The County Board of Education exercises control,

---

[3] *See* School Activities Commission's Rules and Regulations Handbook, at V, https://www.wvssac.org/rules-and-regulations/ (listing Bridgeport Middle School as a "Member School").

supervision, and regulation over Bridgeport Middle School's interscholastic athletics unless and until it delegates such control, supervision, and regulation to the School Activities Commission. W. Va. Code § 18-5-13; W. Va. Code § 18-2-25. On information and belief, the County Board of Education has delegated its control, supervision, and regulation of Bridgeport Middle School's interscholastic athletics to the School Activities Commission.

10.    Defendant State Superintendent W. Clayton Burch is the Chief Executive Officer of the State Board of Education. Defendant Burch executes his official duties in Wood County. Defendant Burch oversees all public schools, county superintendents, and county boards of education in West Virginia. W. Va. Code § 18-3-3. He is sued in his official capacity.

11.    Defendant Superintendent Dora Stutler is the Chief Executive Officer of the County Board of Education. Defendant Stutler executes her official duties in Harrison County. Defendant Stutler is responsible for executing educational policies under the direction of the State Board of Education and the County Board of Education. W. Va. Code § 18-4-10. This includes interscholastic athletics. She is sued in her official capacity.

12.    Defendant Patrick Morrisey is the Attorney General of the State of West Virginia, located at State Capitol Complex, Building 1, Room E-26, Charleston, West Virginia. The Attorney General is the state officer in charge of enforcing all state laws in West Virginia, including H.B. 3293. W. Va. Code Ann. § 5-3-2. Defendant Morrisey is sued in his official capacity. Defendant Morrisey moved to intervene on behalf of the State of West Virginia on June 17, 2021. *See* ECF No. 40. The motion was granted on June 18, 2021. *See* ECF No. 44.

13.    Defendant State of West Virginia oversees and operates the West Virginia State Board of Education, which employs Superintendent W. Clayton Burch. W. Va. Code § 18-2-1.

The State of West Virginia, by its Attorney General Defendant Morrisey, moved to intervene on June 17, 2021. *See* ECF No. 40. The motion was granted on June 18, 2021. *See* ECF No. 44.

## JURISDICTION AND VENUE

14. This action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX.

15. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States, including laws providing for the protection of civil rights, and because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution.

16. Venue is proper in the Charleston Division of the Southern District of West Virginia under 28 U.S.C. § 1391(b)(1) and (2) because Defendants the State Board of Education, the School Activities Commission, and Burch reside in this Division and District and because a substantial part of the events or omissions giving rise to the claims occurred in this Division and District.

17. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

18. This Court has personal jurisdiction over Defendants because they are domiciled in West Virginia and because West Virginia is the location of their denial of Plaintiff's rights under the United States Constitution and the laws of the United States.

## FACTUAL ALLEGATIONS

**A.    Gender Identity and Gender Dysphoria.**

19.    Every individual's sex is multifaceted and comprised of many distinct biological characteristics, including, but not limited to, chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity.

20.    Everyone has a gender identity.  Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity.

21.    A person's gender identity is a fundamental component of their identity that is durable and deeply rooted.  It cannot be changed by social or medical intervention.

22.    When a child is born, a sex designation usually occurs at birth based on a visual assessment of the infant's external genitalia.  Most people are cisgender, meaning that their gender identity aligns with the sex they were assigned at birth.

23.    But not everyone's gender identity aligns with the sex they are assigned at birth. A transgender person is someone who has a gender identity that does not align with their sex assigned at birth.

24.    When a person experiences sustained and clinically significant distress caused by the incongruence between their gender identity and their sex-assigned at birth, they may be diagnosed with "gender dysphoria."  *See* American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V").

25.    Under the widely accepted standards of care developed by The Endocrine Society and the World Professional Association for Transgender Health, the only treatment for gender

dysphoria before puberty is "social transition." Preventing transgender youth from social transition can result in severe anxiety and depression, self-harm, and suicidality.

26.     Moreover, for transgender people of all ages (both pre- and post-puberty), being able to socially transition and live and express themselves consistent with their gender identity is critical to their health and well-being.

27.     As part of the medically necessary social transition, before transgender children reach puberty, they have the option to receive puberty-delaying medical treatment. The puberty-delaying treatment helps pre-pubertal transgender children live in alignment with their gender identity and treats the symptoms of gender dysphoria.

28.     Puberty-delaying treatment pauses endogenous puberty at whatever stage it is at when the treatment begins. This has the impact of limiting the influence of a person's endogenous hormones on their body. For example, a girl who is transgender who undergoes puberty-delaying treatment before her endogenous puberty begins will experience none of the impacts of testosterone that would be typical if she underwent her endogenous puberty.

29.     Because puberty-delaying treatment allows transgender youth to avoid going through their endogenous puberty, it helps mitigate gender dysphoria and prevents them from experiencing permanent physical changes that would otherwise accompany their endogenous puberty.

**JA0419**

**B.      B.P.J.'s Gender, Medical Treatment, and Participation in Sports.**

30.     B.P.J. is a girl who is transgender, which means she is a girl who was assigned the sex of male at birth.  A recent picture of B.P.J. is included below:



31.     B.P.J. knew from a very young age that she is a girl.  By the time she was in the third grade, B.P.J. was living as a girl at home.  At the end of the school year, she informed her mother and father that she did not want to continue going to school "dressed as a boy" and that she wanted to go by the first name B. (a name commonly associated with girls).

32.     B.P.J.'s family supported (and continues to support) B.P.J. living authentically as the girl that she is.

33.     B.P.J. was diagnosed with gender dysphoria in 2019, and she began puberty-delaying treatment on June 15, 2020.  B.P.J. had been receiving this treatment for almost one year at the time West Virginia passed H.B. 3293.

34.     B.P.J. comes from a family of runners, and she plans to try out for the girls' cross-country and track teams at Bridgeport Middle School.  Team tryouts begin on August 2, 2021.

35.     At a young age, B.P.J.'s mother would run with B.P.J. through local parks, which contributed to B.P.J.'s love of running.  B.P.J. has wanted to run on a team since she was in kindergarten.  She has grown up watching her older brothers run on their school teams and her mother compete in organized races.

36.     B.P.J. also likes being on a team and playing sports with other girls.  When B.P.J. competed in cheerleading while in elementary school, she enjoyed the camaraderie of being on a team of girls with her friends and working together as a team to succeed.

37.     Now, just like any other middle school student, B.P.J. wants the chance to explore her athletic interests and try out for the teams that interest her.

**C.     Participation of B.P.J. and Other Transgender Youth in School-Sponsored Athletics.**

38.     For children and young adults, school-sponsored athletics offer a range of benefits that they continue to experience throughout life.  For example, students who participate in high school sports are more likely to finish college and more likely to be actively engaged in planning for their future.  Athletics provide an opportunity to gain confidence, to develop important social, emotional, and coping skills, and to build social connections.  By contrast, when young people are excluded from participating in youth sports, or do not feel accepted or respected, they do not have the opportunity to reap these benefits.

39.     Girls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams.  The only way for a girl who is transgender to experience the benefits associated with sex-separated school

athletics—or to participate in school athletics at all—is for her to participate on the same teams as other girls.

40.    Girls who are transgender are also not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance.  There is scientific consensus that sex chromosomes and genitals alone—*i.e.*, independent of circulating testosterone—do not meaningfully affect athletic performance.  Rather, any population-level performance differences between cisgender boys and cisgender girls in athletic competition are due to circulating testosterone levels that typically diverge significantly starting at puberty.

41.    Girls who are transgender and who receive puberty-delaying treatment followed by gender-affirming hormone therapy never go through their endogenous puberty and thus do not experience physiological changes caused by testosterone.  They experience a hormonal puberty typical of cisgender girls and not cisgender boys.

42.    Girls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty.  The National Collegiate Athletic Association ("NCAA"), World Athletics, and the International Olympic Committee (the "Olympics") all allow women who are transgender to play in women's athletic events after suppressing their levels of testosterone for particular periods of time (*e.g.*, one year) and (for World Athletics or the Olympics) below a particular threshold.

D.    **H.B. 3293**

    1.    **H.B. 3293's Introduction, Debate, Amendment, and Enactment**

43.    Before H.B. 3293 was enacted, a student's eligibility to participate in athletics at the secondary school level in West Virginia was governed by rules promulgated by the School Activities Commission, the executive body with expertise governing scholastic sports. These rules provided separate teams for boys and girls. W. Va. Admin. Code § 127-2-3 (3.8).

44.    Prior to H.B. 3293, West Virginia had no public or formal prohibition on the participation of transgender students in school sports.

45.    On March 18, 2021, H.B. 3293 was introduced in the West Virginia House by Delegate Caleb Hanna. H.B. 3293 was part of a concerted, nationwide effort to target transgender youth for unequal treatment with state legislation.

46.    From the outset, and through the legislative process, proponents of H.B. 3293 made clear that H.B. 3293 was targeted at, and intended only to affect, girls who are transgender.

47.    For example, one of H.B. 3293's sponsors, Delegate Jordan Bridges, announced on Facebook on March 16, 2021 that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). Jordan Bridges, "Update: The bill passed out of committee." Facebook (Mar. 16, 2021), https://perma.cc/HA5C-VJ4N. Delegate Bridges had previously made other anti-transgender comments, such as that "this country is going down hill [sic] fast" in response to a news article discussing transgender-inclusive business practices. Jordan Bridges, "I swear my hand." Facebook (Oct. 23, 2019), https://perma.cc/8BHK-7V5Z.

48.     The operative language of H.B. 3293 as introduced would have required students to provide copies of their birth certificates reflecting their "sex at time of birth" in order to be admitted to public school at any level in West Virginia.  *See* W. Va. Leg. Originating H.B. 3293 (Mar. 16, 2021) § 18-2-5c.[4]  If a student were unable to provide a birth certificate that reflected their "sex at time of birth," the student would have been required to submit an affidavit as well as "[a] signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy."  *Id.* § 18-2-5c(a)(2).

49.     The introduced version of H.B. 3293 further provided that, for purposes of participating in athletics at the secondary level, "[t]he sex identified in subsection (a) above shall be the pupil's sex for the purposes of participating in single-sex secondary school interscholastic athletic events under the control, supervision, and regulation of the West Virginia Secondary Schools Activities Commission."  *Id.* § 18-2-5c(e).

50.     The introduced version of H.B. 3293 also would have required the School Activities Commission to "verify with each county board that each student participating in single-sex interscholastic events [at the secondary level] is participating according to the student's sex at the time of the student's birth."  *Id.* § 18-2-25(f).

51.     On March 18, 2021, the West Virginia House Education Committee held a hearing on H.B. 3293.  When asked how H.B. 3293 would change the status quo in West Virginia—which already had sex separation in sports—counsel for H.B. 3293 replied that the bill "would affect

---

[4]  The introduced version of H.B. 3293 is available on the legislature's website: https://www.wvlegislature.gov/Bill_Status/bills_text.cfm?billdoc=HB3293%20ORG.htm&yr=2021&sesstype=RS&i=3293.

those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth.[5]

52.    During the hearing, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics.  Another witness testified that there had been no instances of girls who are transgender "dominating" sports in West Virginia.  In fact, during the hearing, there was no evidence provided that any girl who is transgender had ever played on a girls' athletic team in West Virginia.

53.    H.B. 3293 passed out of the Education Committee and was heard by the Judiciary Committee on March 18, 2021.  The Judiciary Committee amended H.B. 3293 to state that, for purposes of participating in athletics at the secondary level, if a birth certificate were not provided or did not indicate a student's sex assigned at birth, then a "signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted." *See* W. Va. Leg. Amended H.B. 3293 (Mar. 18, 2021) § 18-2-5c.[6]

54.    As with the first hearing, testimony in the Judiciary Committee focused on students who are transgender.  Opponents of H.B. 3293 again drew attention to the fact that there had been no issues regarding transgender students participating in sports in West Virginia.  As one witness relayed:  while there is "no harm" being addressed by H.B. 3293, "there is harm perpetrated by it."[7]  Nevertheless, H.B. 3293 passed out of the Judiciary Committee, as amended, on March 18, 2021.

---

[5] *See* Stark Declaration, Exhibit B (March 18, 2021 West Virginia House of Delegates Education Committee).
[6]    The Education Committee's amendment to H.B. 3293 is available here: https://www.wvlegislature.gov/Bill_Text_HTML/2021_SESSIONS/RS/bills/HB3293%20SUB.pdf.
[7] *See* Stark Declaration, Exhibit C (March 18, 2021 West Virginia House of Delegates Judiciary Committee).

13

**JA0425**

55.     On March 23, 2021, the West Virginia Delegates debated H.B. 3293 on the House floor.  When asked at this hearing about the number of complaints that the School Activities Commission had received regarding transgender athletes in West Virginia, Delegate Joe Ellington ("Del. Ellington"), a sponsor of H.B. 3293, admitted that he did not know of any complaints in West Virginia.

56.     Again, during the House floor debate, the sponsors of H.B. 3293 made clear that H.B. 3293 is targeted at, and is intended to exclude, girls who are transgender.  Delegate Margitta Mazzochi, a co-sponsor of H.B. 3293, suggested that she did not "want all this mixing and matching" of "transgender children" with non-transgender children in "locker rooms." Likewise, when closing the debate, Del. Ellington described the "issue" solved by H.B. 3293 as being "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut."[8]

57.     During the House floor debate, opponents of H.B. 3293 emphasized that H.B. 3293 was simply "creat[ing] problems where they don't exist."  Others emphasized the negative impact that H.B. 3293 would have on West Virginia's transgender population:  as one Delegate put it, "West Virginia, a place to live, work, raise a family if you choose, only if you're not transgender."[9]

58.     H.B. 3293 was passed out of the House without further amendment on March 25, 2021.

59.     On April 1, 2021, H.B. 3293 was heard in the Senate Education Committee.  The Education Committee amended the House version of the bill, including to make it a new section of the Code (§ 18-2-25d).  The Senate Education Committee's amendment removed the birth

---

[8] *See* Stark Declaration, Exhibit D (March 25, 2021 West Virginia House of Delegates).
[9] *See* Stark Declaration, Exhibit D (March 25, 2021 West Virginia House of Delegates).

14

certificate provisions and defined "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth."  § 18-2-25d(b)(1).  The Senate Education Committee added a cause of action provision allowing "any student" "aggrieved" by a violation of H.B. 3293 to sue the respective county board of education. *Id.* at (d).  In addition, whereas previous iterations of H.B. 3293 had encompassed only secondary school athletics, the Senate Education Committee expanded the breadth of H.B. 3293's scope to encompass collegiate athletics as well.  *Id.* at (c)(1).  This amended version of H.B. 3293 was passed out of the Senate Education Committee to the full Senate.

60.     The Senate debated H.B. 3293 on April 8, 2021.  During the debate, proponents of H.B. 3293 again made clear that H.B. 3293 was targeted towards and intended to affect only transgender youth.  One senator who supported H.B. 3293 explicitly noted that "the bill" is "about transgenders."  Another senator quoted from a letter which described the "trans movement" as "an attack upon womanhood."[10]

61.     Opponents of H.B. 3293 noted that multiple groups of medical professionals, including the West Virginia Chapter of the American Academy of Pediatrics, opposed H.B. 3293, calling attention to statistics on suicide and self-harm among transgender youth.

62.     H.B. 3293, as amended by the Senate Education Committee, passed the Senate floor on April 9, 2021.

63.     On April 28, 2021, Governor Justice signed H.B. 3293 into law.

64.     Governor Justice distanced himself from H.B. 3293 and identified no valid purposes for it.  In an interview on April 30, Governor Justice was asked if he could provide "one example of a transgender child trying to get an unfair advantage."  In response, Governor Justice

---

[10] *See* Stark Declaration, Exhibit E (April 8, 2021 West Virginia Senate Hearing).

15

**JA0427**

replied: "No, I can't really tell you one." [11]  He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority.  It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids.  I mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills.  This is not a priority to me."

### 2.    H.B. 3293 As Enacted

65.    H.B. 3293 becomes effective on July 8, 2021.

66.    H.B. 3293 as enacted categorically excludes participation in school sports in West Virginia at the middle school, high school, and collegiate level by all girls who are transgender.  §§ 18-2-25d(a)-(c).

67.    It does so notwithstanding the statute's purported finding that "Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex."  § 18-2-25d(a)(4).

68.    Specifically, H.B. 3293 requires that all "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education, including a state institution that is a member of the National Collegiate Athletic Association (NCAA)" are "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex."  §§ 18-2-25d(b), (c).

69.    H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* at (c)(2).  There is no parallel provision for boys' teams.

---

[11] https://twitter.com/MSNBC/status/1388132937707802629.

70.      H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female *based solely on the individual's reproductive biology and genetics at birth*." *Id.* at (b)(1) (emphasis added).  Girls who are transgender necessarily cannot show that they are girls under this definition.

71.      H.B. 3293 also provides a cause of action for "[a]ny student" "aggrieved" by a violation of H.B. 3293 to sue for "injunctive relief and actual damages, as well as reasonable attorney's fee and court costs." *Id.* at (d).

72.      H.B. 3293 does not define (or set any limits on) what a "violation" under H.B. 3293 may be and delegates authority to other bodies to establish rules and regulations.

73.      H.B. 3293 thus exposes female athletes to the risk of having to subject themselves to sex-based challenges in order to participate on a school-sponsored girls' athletic team.  The medical history form that the School Activities Commission requires students wishing to participate in school athletics to complete does not refer to sex or gender, or require students to report their reproductive biology or genetics.  As a result, girls whose sex is disputed will be unable to rely on their regular sports exam to make the appropriate showing of "biological sex" under H.B. 3293 and thus may be subject to embarrassing, invasive, and/or costly exams to be allowed to play on the girls' team.  There is no parallel burden placed on boys.

### 3.      H.B. 3293 Excludes Girls Who Are Transgender Based on Their Transgender Status—Not Based on Purported Athletic Advantages

74.      H.B. 3293 excludes girls who are transgender from girls' sports teams based on their transgender status, not on any feature tied to a purported physiological athletic advantage.

75.      Specifically, H.B. 3293 requires that athletic teams be separated based solely on genetics and reproductive anatomy at birth.  W. Va. Code § 18-2-25d(b)(1).  H.B. 3293 precludes

consideration of circulating testosterone in determining "biological sex"—the only sex-related characteristic with any documented relationship to athletic ability.

76.     H.B. 3293 thus categorically bars *any* girl who is transgender from participating in girls' sports without considering factors that have any correlation with athletic ability.  Under H.B. 3293, even girls like B.P.J., who receive puberty-delaying treatment and never go through endogenous puberty, are prohibited from participating on girls' sports teams.

77.     By contrast, H.B. 3293 would allow a boy who is transgender to play on the girls' sports team, even if the boy had received hormone replacement therapy, including exogenous testosterone as part of his treatment for gender dysphoria.

**E.     H.B. 3293 Harms B.P.J. and Other Girls Who Are Transgender.**

78.     B.P.J. was angry and sad when she learned about H.B. 3293 and how it would impact her.  Although B.P.J. is a girl, under H.B. 3293's definition of "biological sex," B.P.J. will be excluded from joining a girls' sports team at school.  W. Va. Code 18-2-25d(b)(1).

79.     If H.B. 3293 is in effect at the start of the Fall 2021 athletic season, B.P.J. will not be able to participate in any activity involving "competitive skill."

80.     Upon information and belief, cross-country running, track, and presumably any other school-sponsored sport of interest to B.P.J. fit that descriptor.

81.     Indeed, on May 18, 2021, the Principal of Bridgeport Middle School—the school that B.P.J. will attend in fall 2021—informed B.P.J.'s mother that B.P.J. will not be permitted to join the girls' cross-country or track teams due to H.B. 3293.  The Principal further stated that if B.P.J. attempted to participate on the boys' team, it would be "confusing" for the cross-country coaches because B.P.J. looks and presents as female, like any other girl.  The Principal said he thus

would have to inform the coaches for both the girls' and boys' cross-country teams that B.P.J. is transgender.

82.     The reality is that B.P.J. cannot—and does not want to—participate on the boys' team because she is a girl, not a cisgender boy.  Doing so would be embarrassing and would undermine her medical treatment for gender dysphoria, which includes living and expressing herself as a girl in all aspects of her life.  Forcing her onto a boys' team would undermine this core part of her identity and medical care.

83.     Barring B.P.J. from participating in school sports prevents her from experiencing the motivation, challenge, camaraderie, and joy that sport has brought her in the past, as well as opportunity to be teammates with other girls participating in athletics.

84.     West Virginia's attempt to force B.P.J. to compete on the boys' team also is a clear sign to her and others that West Virginia does not see or accept her as the girl that she is.

85.     Excluding girls who are transgender from participating in athletics alongside their female peers increases shame and stigma and contributes to negative physical and emotional health outcomes for the girls who are transgender who are excluded.

86.     H.B. 3293 also limits (or eliminates) the benefits of athletics for *all* girls. Exclusionary policies such as that embodied in H.B. 3293 discourage, rather than encourage, participation in athletics.

87.     Moreover, because H.B. 3293 impacts girls and not boys, it puts all girls at risk of having their sex disputed.

**CLAIMS FOR RELIEF**

**COUNT I**
Violation of Title IX
20 U.S.C. § 1681, *et seq.*
Plaintiff against the State of West Virginia, the State Board of Education, the County Board of
Education, and the School Activities Commission

88.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein. Plaintiff brings this Count against the State Board of Education, the County Board of Education, the State of West Virginia, and the School Activities Commission.

89.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

90.     The State of West Virginia, the State Board of Education, and the County Board of Education all are, manage, operate, and/or have controlling authority for educational programs receiving federal financial assistance.

91.     The School Activities Commission receives federal financial assistance directly and/or indirectly through *inter alia* dues paid by its federal-fund-receiving members.

92.     Because secondary school athletics are of a unique nature that require cooperation and a common administration between the various federal-fund-receiving members, these federal-fund-receiving members have ceded controlling authority to the School Activities Commission over secondary school athletics.

93.     The School Activities Commission's existence and purpose is merely a consequence of the inherent need for a centralized body to manage, coordinate, schedule, or otherwise administer secondary school sports in West Virginia.  It thus is a controlling authority

20

JA0432

over a federally funded program, namely, athletic opportunities for federal-fund-receiving educational institutions in West Virginia.

94.     Under Title IX, discriminating against transgender students is discrimination "on the basis of sex."

95.     The statutory language of Title IX does not exempt athletic programs from the broad prohibition on discrimination.  The implementing regulations for Title IX permit sports teams to be separated by sex, but do not mandate such separation.

96.     Neither Title IX, nor its regulations, purport to define "sex" based on reproductive anatomy or genetics at birth.  These authorities also do not specify what constitutes separation of sex for purposes of athletic activities, should a school choose to separate certain sports teams by sex.

97.     H.B. 3293 discriminates against B.P.J. and other girls who are transgender by singling them out for different treatment from cisgender girls and—as a result—preventing them from accessing the benefits of participation in school athletics on an equal basis as other students, in violation of their rights under Title IX.

98.     H.B. 3293 also discriminates against B.P.J. and other girls as compared to boys. H.B. 3293 places girls, but not boys, at risk of having their "biological sex" challenged and accordingly being the focus of an action contending that they do not satisfy the law's definition of female "biological sex."  As a result, H.B. 3293 prevents girls from accessing the benefits of participation in school athletics on an equal basis vis-à-vis boys in violation of their rights under Title IX.

99.     B.P.J. is irreparably harmed by Defendants' illegal conduct in violation of Title IX.

**COUNT II**
Deprivation of Equal Protection
U.S. Const. Amend. XIV
Plaintiff against W. Clayton Burch, Dora Stutler, School Activities Commission, and Patrick
Morrisey

100.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

Plaintiff brings this Count against Defendants State Superintendent W. Clayton Burch in his

official capacity, Harrison County Superintendent Dora Stutler in her official capacity, the School

Activities Commission, and Attorney General Patrick Morrisey in his official capacity.

101.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant

to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the

equal protection of the laws." U.S. Const. amend. XIV, § 1.

102.    Defendants are all governmental actors acting under color of state law for purposes

of 42 U.S.C. § 1983 and the Fourteenth Amendment.

103.    Under the Equal Protection Clause, discrimination based both on sex and

transgender status is subject to heightened scrutiny and is therefore presumptively unconstitutional

absent a showing by the state that the discrimination is substantially related to an important state

interest.

104.    H.B. 3293 discriminates against girls who are transgender by singling them out for

different treatment from cisgender girls and—as a result—prevents them from accessing the

benefits of participation in school athletics on an equal basis as other students based both on sex

and transgender status.

JA0434

105.    Excluding girls who are transgender form participating on girls' sports teams based solely on their "reproductive anatomy and genetics at birth" is not substantially related to any important state interest.

106.    West Virginia passed H.B. 3293 for the impermissible purpose of excluding all girls who are transgender from school athletics.  H.B. 3293's sweeping exclusion of girls who are transgender from participation in school athletics is so disconnected from H.B. 3293's purported justifications that it is impossible to credit them.

107.    H.B. 3293 is based on unfounded stereotypes, false scientific claims, and baseless fear and misunderstanding of girls who are transgender, which are insufficient to justify discriminatory treatment under any level of scrutiny.

108.    H.B. 3293 also discriminates against B.P.J. and other girls as compared to boys. H.B. 3293 places girls, but not boys, at risk of having their "biological sex" challenged and accordingly being the focus of an action contending that they do not satisfy the law's definition of female "biological sex."  As a result, H.B. 3293 prevents girls from accessing the benefits of participation in school athletics on an equal basis vis-à-vis boys in violation of their rights under the Equal Protection Clause.

109.    As a result, Defendants have violated the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

110.    B.P.J. is irreparably harmed by Defendants' illegal conduct in violation of the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment as follows:

JA0435

A.      Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under Title IX;

B.      Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

C.      Preliminarily and permanently enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from enforcing H.B. 3293 or any other law, custom, or policy that precludes Plaintiff's participation on girls' school sports teams in West Virginia;

D.      Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

E.      Awarding Plaintiff nominal damages with respect to her Title IX claim and nominal damages with respect to her equal protection claim against the Schools Activities Commission;

F.      Awarding Plaintiff her costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

G.      Granting such other and further relief as the Court deems just and proper.

24

**JA0436**

Dated: July 16, 2021

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,

 /s/ Loree Stark

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

JA0437

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

*Defendants*.

Civil Action No.

Hon.

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 16th day of July 2021, I electronically filed a

true and exact copy of ***Plaintiff's Amended Complaint*** with the Clerk of Court and all parties

using the CM/ECF System.

/s/ *Loree Stark*
West Virginia Bar No. 12936

26

**JA0438**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

                Plaintiffs,

v.                                   CIVIL ACTION NO.   2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

                Defendants.

## MEMORANDUM OPINION & ORDER

A fear of the unknown and discomfort with the unfamiliar have motivated many of the most malignant harms committed by our country's governments on their own citizens. Out of fear of those less like them, the powerful have made laws that restricted who could attend what schools, who could work certain jobs, who could marry whom, and even how people can practice their religions. Recognizing that classifying human beings in ways that officially sanction harm is antithetical to democracy, the states ratified the Fourteenth Amendment. It ensures that no state may "deny to any person within its jurisdiction the equal protection of the laws." Accordingly, the courts are most juberous of any law—state or federal—that treats groups of people differently.

The matter before me today is a motion to preliminarily enjoin a recently passed state law. Those standing in opposition to this law assert that it was enacted to incite fear and exclude certain persons rather than to address a legitimate government interest. At this point, I have been provided with scant evidence that this law addresses any problem at all, let alone an important problem. When the

government distinguishes between different groups of people, those distinctions must be supported by compelling reasons. Having determined that Plaintiff has a likelihood of success in demonstrating that this statute is unconstitutional as it applies to her and that it violates Title IX, Plaintiff's Motion for a Preliminary Injunction is **GRANTED**.

## I.    Plaintiff and Her Claims

B.P.J. is an eleven-year-old girl preparing to begin the sixth grade at a new school. Like many of her peers, B.P.J. intends to participate in school athletics. She hopes to join both the girls' cross country and track teams. However, B.P.J. was informed by her school that because of a new statute, she will no longer be permitted to join either team because she is a transgender girl.

For a definition of terms such as gender identity,[1] gender dysphoria,[2] cisgender,[3] etc., I refer to the meticulously researched and written opinion in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 594–597 (4th Cir. 2020). I adopt the definition of transgender used in that opinion. "'Transgender' is . . . 'used as an umbrella term to describe groups of people who transcend conventional expectations of gender identity or expression.'" *Grimm*, 972 at 596 (quoting *PFLAG, PFLAG National Glossary of Terms* (July 2019), http://pflag.org/glossary).

B.P.J. writes in depth about her history—revealing publicly what are inherently private details—to educate both the court and public. B.P.J. is a transgender girl who, while assigned the sex of male at birth, knew from a young age that she is a girl. [ECF No. 64, ¶ 31]. By the third grade, B.P.J. was living as a girl at

---

[1] One's "deeply felt, inherent sense" of one's gender. *Grimm*, 927 F.3d at 594.
[2] "[A] condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Grimm*, 927 F.3d at 594–95.
[3] A person whose gender identity aligns with her sex-assigned-at-birth. *Grimm*, 927 F.3d at 594.

home but dressing as a boy at school. *Id.* B.P.J. then asked to change her name to a name commonly associated with girls and began living as a girl in both public and private. *Id.* B.P.J. also joined her elementary school's all-girl cheerleading team. *Id.* at ¶ 36. B.P.J. practiced and competed with this team without incident.

B.P.J. was diagnosed with gender dysphoria in 2019. *Id.* at ¶ 33. She began puberty-delaying treatment on June 15, 2020, to treat that condition.[4]  Plaintiff avers that this treatment, which prevents endogenous puberty and therefore any physiological changes caused by increased testosterone circulation, prevents her from developing any physiological advantage over other girl athletes.[5]

B.P.J., through her mother, filed this lawsuit against the West Virginia State Board of Education, the Harrison County Board of Education, the West Virginia Secondary Schools Activities Commission ("WVSSAC"), State Superintendent W. Clayton Burch, and Harrison County Superintendent Dora Stutler. The State of West Virginia moved to intervene, and that motion was granted. Plaintiff then amended her complaint, [ECF No. 64], naming both the State and Attorney General Patrick Morrisey as defendants.

In her complaint, B.P.J. alleges that Defendants Burch, Stutler, the WVSSAC, and Attorney General Morrisey deprived her of the equal protection guaranteed to her by the Fourteenth Amendment and that the State, the State Board of Education,

---

[4] "The medical treatment for gender dysphoria is to eliminate [] clinically significant distress by helping a transgender person live in alignment with their gender identity." [ECF No. 2-1, Adkins Decl., at 5]. For some transgender youth, the distress from gender dysphoria is addressed through puberty blocking treatment. *Id.* at 6. "Puberty blocking treatment allows transgender youth to avoid going through their endogenous puberty thereby avoiding the heightened gender dysphoria and permanent physical changes that puberty would cause." *Id.* The State cites to experts who question when social transition and puberty blocking treatment are appropriate for young people. *See*, [ECF No. 49, Ex. E]. But what is or should be the default treatment for transgender youth is not the question before the court.

[5] The NCAA and the International Olympic Committee, which both permit transgender women to compete as women in athletic events, require that the athletes suppress their testosterone for a certain period of time or that it be suppressed below a particular threshold.

the Harrison County Board of Education, and the WVSSAC have violated Title IX. [ECF No. 64, at 20–23]. B.P.J. seeks a declaratory judgment that Section 18-2-25d of the West Virginia Code violates Title IX and the Equal Protection Clause; an injunction preventing Defendants from enforcing the law against her; a waiver of the requirement of a surety bond for preliminary injunctive relief; nominal damages; and reasonable attorneys' fees.

The motion for a preliminary injunction that accompanies her complaint seeks relief only insofar as this law applies to her. That is, granting this motion will only prevent the State and other Defendants from enforcing Section 18-2-25d against B.P.J. Whether the law is facially unconstitutional is an issue raised in the Complaint and will be resolved at a later stage of litigation.

## II.    The Law

On March 18, 2021, ten delegates in the West Virginia House of Delegates introduced House Bill 3293, strategically referred to as the "Save Women's Sports Bill." West Virginia Governor Jim Justice signed the bill into law on April 28, 2021, and it was codified as West Virginia Code, Section 18-2-25d, entitled "Clarifying participation for sports events to be based on biological sex of the athlete at birth."

The statute begins by noting that "[t]here are inherent differences between biological males and biological females, and that these differences are cause for celebration, as determined by the Supreme Court of the United States in United States v. Virginia (1996)." § 18-2-25d(a)(1). The statute then provides a series of definitions, all at issue here:

> (1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

4

JA0442

> (2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.
>
> (3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

§ 18-2-25d(b)(1)–(3).

Using these definitions, the gravamen of the statute requires that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education," "shall be expressly designated as one of the following based on biological sex: (A) Males, men, or boys; (B) Females, women, or girls; or (C) Coed or mixed." § 18-2-25d(c)(1). Once those teams are properly designated, the statute goes on to address who may participate on which teams. "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." § 18-2-25d(c)(1).

According to the statute's text, its definition of "biological sex" has nothing to do with gender identity. "Gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." § 18-2-25d(a)(4).

The State asserts that the objective of the statute is to provide equal athletic opportunities for female athletes and to protect the physical safety of female athletes when competing. [ECF No. 49, at 7]. Plaintiff argues that the State's assertion is a

façade concealing the true objective: to exclude transgender girls and women from participating in sports.

### III.   The Preliminary Injunction

The United States Supreme Court and the United States Court of Appeals for the Fourth Circuit have provided district courts with a precise analytical framework for determining whether to grant preliminary injunctive relief. First, B.P.J. must make a clear showing that she will likely succeed on the merits. Second, she must make a clear showing that she is likely to be irreparably harmed absent preliminary relief. Third, she must show that the balance of equities tips in her favor. Finally, B.P.J. must show that an injunction is in the public interest. All four requirements must be satisfied. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010).

### a.   Likelihood of Success on the Merits

As required by *Natural Resource Defense Counsel*, I must first determine if B.P.J. has demonstrated a clear likelihood of success on the merits of either her Equal Protection Claim or her Title IX Claim. I will address each in turn.

### i.   Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The first step in an equal protection analysis is to determine what level of scrutiny I must apply to Section 18-2-25d. The answer to this question turns on what

classifications are created by the law. Plaintiff argues that this law discriminates against transgender girls and only transgender girls because cisgender boys, cisgender girls, and transgender boys are all unaffected by the law's central tenet: non-cisgender girls may not participate on a girls' sports team. [ECF No. 19, at 19]. The State responded that this law does not treat transgender girls differently than other groups because this law is premised on "biological sex," and it treats all "biological males" similarly by prohibiting them from participating on girls' sports teams.

Essentially, the State contends that the Equal Protection Clause is not being violated because B.P.J. is being treated the same under this law as those she is similarly situated with: "biological males" as defined by West Virginia Code § 18-2-25d(b)(3). But this is misleading. Plaintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls. *Accord Grimm*, 972 F.3d at 610 ("The overwhelming thrust of everything in the record . . . is that Grimm was similarly situated to other boys"). Plaintiff has lived as a girl for years. She has competed on the all-girls cheerleading team at her school. She changed her name to a name more commonly associated with girls. And of the girls at her middle school, B.P.J. is the only girl who will be prevented from participating in school-sponsored athletics. Here, there is an inescapable conclusion that Section 18-2-25d discriminates on the basis of transgender status. *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) ("while the physiological differences the Defendants suggest support the categorical bar on transgender women's participation in women's sports may justify the Act, they do not overcome the inescapable conclusion that the Act discriminates on the basis of transgender status"). The question then is what level of scrutiny applies to classifications based on transgender status.

The Fourth Circuit answered that question in *Grimm*. *Stare decisis* requires that I apply intermediate, or heightened, scrutiny to laws that classify people according to transgender status. *Grimm* arrived at this conclusion from two different directions. First, *Grimm* finds that discrimination against transgender people is inherently based in sex, and therefore the level of scrutiny applicable to sex discrimination applies to transgender discrimination. 972 F.3d at 607. In the alternative, *Grimm* finds that transgender people are a quasi-suspect class and therefore entitled to intermediate scrutiny of laws that treat them differently than non-transgender people. *Id.*

To survive a review under intermediate scrutiny, the government must provide an "exceedingly persuasive justification" for the classification created by a law or policy. *Mississippi Univ. For Women v. Hogan*, 458 U.S. 718, 724 (1982). At a minimum, the government must show that "the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* A law discriminating against a quasi-suspect class "must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 648 (1975)).

"Under intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012) (citing *United States v. Chester,* 628 F.3d 673, 683 (4th Cir. 2010)). The party defending the statute must "present[] sufficient probative evidence in support of its stated rationale for

enacting a gender preference, i.e., . . . the evidence [must be] sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metropolitan Dade Cnty.*, 122 F.3d 895, 910 (11th Cir. 1997)); *Concrete Works of Colorado, Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) ("[T]he gender-based measures . . . [must be] based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" (quoting *Mississippi Univ. for Women*, 458 U.S. at 726)).

In this preliminary matter, my inquiry is constrained to whether this statute is unconstitutional *as applied* to B.P.J. An as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Educational Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc)). "It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328 (2006) (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

Here, the State's proffered objective for the statute is to provide equal athletic opportunities for female athletes and to protect female athletes while they participate in athletics. [ECF No. 49, at 7]. B.P.J. argues that I should reject this offered objective and instead find that the State's true objective is to exclude transgender women and girls from participating in state-sponsored athletics. While I need not do so, *Virginia*, 518 U.S. at 536, I will proceed as if the State's offered objective is genuine. Regardless, I find that this statute as applied to B.P.J. is not substantially related to providing equal athletic opportunities for girls.

9

**JA0447**

As described at length in her memorandum in support of her motion for a preliminary injunction, B.P.J. has been living publicly as a girl for over a year at this point. As part of treating her gender dysphoria, B.P.J. has been on puberty delaying drugs for over a year. As a result, B.P.J. has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State.

B.P.J. has provided evidence that any physical advantages that men and boys enjoy are derived from higher concentrations of circulating testosterone. This is supported by both the NCAA policy[6] and the International Olympic Committee's policy[7] that permit transgender women to compete on teams that align with their gender identity so long as those athletes receive testosterone suppressing treatment. According to B.P.J.'s experts, "there is a medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes." [ECF No. 2-1, Safer Decl., at 6–7].

The Defendant cites to an expert who asserts that for transgender athletes who have undergone endogenous puberty, later suppression of testosterone does not eradicate all competitive advantage. [ECF No. 49, Ex. G]. Like Judge Nye in the District of Idaho, I find this opinion unpersuasive. *See Hecox v. Little*, 479 F. Supp. 3d 930, 980 (D. Idaho 2020). While that argument may be relevant to a facial challenge of the statute, it is irrelevant to this as-applied analysis. B.P.J. has not undergone endogenous puberty and will not so long as she remains on her prescribed

---

[6]   *NCAA   Inclusion   of   Transgender   Student-Athletes*,   NCAA   (Aug.   2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf
[7]   *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism*, Int'l Olympic Comm. (Nov. 2015),   https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf.

**JA0448**

puberty blocking drugs. At this preliminary stage, B.P.J. has shown that she will not have any inherent physical advantage over the girls she would compete against on the girls' cross country and track teams.

Further, permitting B.P.J. to participate on the girls' teams would not take away athletic opportunities from other girls. Transgender people make up a small percentage of the population: 0.6% of the adult population generally, and 0.7% of thirteen- to seventeen-year-olds. Herman, Flores, Brown, et al., *Age of Individuals Who Identify as Transgender in the United States*, The Williams Institute (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf. The number of transgender people who wish to participate in school-sponsored athletics is even smaller. Insofar as I am aware, B.P.J. is the only transgender student at her school interested in school-sponsored athletics. Therefore, I cannot find that permitting B.P.J. to participate on the girls' cross country and track teams would significantly, if at all, prevent other girl athletes from participating.

Finally, as applied to B.P.J., this law cannot possibly protect the physical safety of other girl athletes. Cross country and track are not contact sports. The physical ability of one athlete does not put another in danger in the way it might in another sport like football or hockey.

As applied to B.P.J., Section 18-2-25d is not substantially related to protecting girls' opportunities in athletics or their physical safety when participating in athletics. I find that B.P.J. is likely to succeed on the merits of her equal protection claim.

### ii.  Title IX

Success on her Title IX claim would require B.P.J. to show "(1) that [she] was excluded from participation in an education program 'on the basis of sex'; (2) that the

educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616 (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)). There is no question that Defendants named in this case received federal funding or that the athletic programs run by Harrison County are part of an education program. Recognizing this, what remains to be determined is whether B.P.J has demonstrated that she will likely succeed in proving that she is being excluded on the basis of sex and that she was harmed by unlawful discrimination.

That B.P.J. is being excluded from school athletics on the basis of her sex is clear. Like the Fourth Circuit's decision in *Grimm*, I "have little difficulty holding" that Section 18-2-25d discriminates against her "on the basis of sex." *Grimm*, 972 F.3d at 616; *accord Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (holding that discrimination against a person for being transgender is discrimination "on the basis of sex" under Title VII). The law could not exclude B.P.J. from a girls' athletics team without referencing her "biological sex" as defined in the statute. Her sex "remains a but-for cause" of her exclusion under the law. *Grimm*, 972 F.3d at 616.

Again, as in *Grimm*, I also have little difficulty finding that B.P.J. is harmed by this law. All other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity. Under this law, B.P.J. would be the only girl at her school, as far as I am aware, that is forbidden from playing on a girls' team and must join the boys' team. Like the discriminatory policy in *Grimm*, this law both stigmatizes and isolates B.P.J.

The final question is whether the law unlawfully discriminates against B.P.J. In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (quoting *Bostock*, 140 S. Ct. at 1740). Here, as I have stated above, B.P.J. will be treated worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity. Considering all of this, I find that B.P.J. has demonstrated a likelihood of success on the merits for her Title IX claim.

### b.  Irreparable Harm

When a party has shown a likelihood of a constitutional violation, the party has shown an irreparable harm. *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960). Forcing a girl to compete on the boys' team when there is a girls' team available would cause her unnecessary distress and stigma. In addition to the harm to B.P.J., requiring her to compete on the boys' team would also be confusing to coaches and teammates. And not only would B.P.J. be excluded from girls' sports completely; she would be excluded because of who she is: a transgender girl. Having found above that her exclusion is likely to be in violation of the Equal Protection Clause and Title IX, I find that B.P.J. has demonstrated that she will be irreparably harmed if this law were to take full effect.

### c.  Balance of Equities and the Public Interest

Where, as here, the government is a party, the "balance of the equities" and "public interest" prongs of the preliminary injunction test merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating the balance of the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. It is always

in the public interest to uphold constitutional rights. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

It is clearly in the public interest to uphold B.P.J.'s constitutional right to not be treated any differently than her similarly situated peers because any harm to B.P.J.'s personal rights is a harm to the share of American rights that we all hold collectively. The right not to be discriminated against by the government belongs to all of us in equal measure. It is that communal and shared ownership of freedom that makes up the American ideal. The American ideal is one "that never has been yet— And yet must be—the land where *every* man is free." *Let America be America Again, Langston Hughes.*

Plaintiff B.P.J.'s Motion for a Preliminary Injunction is **GRANTED.**

## IV.    Bond Requirement

Plaintiff also seeks to waive the bond required by Federal Rule of Civil Procedure 65(c). "Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." *Hoecst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). This bond can even be waived entirely when the defendant would not suffer any harm from the injunction. *Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Sch.*, No. Civ. A. AW-05-1994, 2005 WL 1075634, at *12 (D. Md. May 5, 2005). I find that a bond is unnecessary and waive its requirement in this case.

## V.    Conclusion

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction [ECF No. 2] is **GRANTED.** While this case is pending, Defendants are enjoined from

enforcing Section 18-2-25d against B.P.J. She will be permitted to sign up for and participate in school athletics in the same way as her girl classmates.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:      July 21, 2021

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

JA0453

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

B.P.J., by her next friend and mother,
HEATHER JACKSON,

     *Plaintiff*,

     vs.

WEST VIRGINIA STATE BOARD OF
EDUCATION; HARRISON COUNTY BOARD
OF EDUCATION; WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION; W. CLAYTON BURCH in his
official capacity as State Superintendent;
DORA STUTLER in her official capacity as
Harrison County Superintendent;
PATRICK MORRISEY in his official
capacity as Attorney General; and THE
STATE OF WEST VIRGINIA,

     *Defendants*.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin

JURY DEMAND ENDORSED HEREIN

**THE STATE OF WEST VIRGINIA'S ANSWER TO FIRST AMENDED COMPLAINT**

     The State of West Virginia, by its Attorney General (the "State"), submits the following

answer and affirmative defenses to First Amended Complaint (Doc. 64).  Any allegation made

by the First Amended Complaint that has not been expressly admitted within this Answer is

denied.  To the extent any section heading or subheading in the First Amended Complaint is not

deemed to be purely for the purpose of organization and, instead, is deemed a factual allegation,

all such headings and subheadings are denied. Further, any reference to complaint means the

First Amended Complaint if not otherwise stated.

1

32.     The State lacks sufficient information to admit or deny the allegations in Paragraph 32 of the First Amended Complaint, including facts personal to Plaintiff, and on that basis denies those allegations.

33.     The State lacks sufficient information to admit or deny the allegations in Paragraph 33 of the First Amended Complaint, including facts personal to Plaintiff, and on that basis denies those allegations.

34.     The State lacks sufficient information to admit or deny the allegations in Paragraph 34 of the First Amended Complaint, including facts personal to Plaintiff, and on that basis denies those allegations.  In answering further, the State, upon information and belief, admits that Bridgeport Middle School cross-country team tryouts are expected to begin August 2, 2021.

35.     The State lacks sufficient information to admit or deny the allegations in Paragraph 35 of the First Amended Complaint, including facts personal to Plaintiff, and on that basis denies those allegations.

36.     The State lacks sufficient information to admit or deny the allegations in Paragraph 36 of the First Amended Complaint, including facts personal to Plaintiff, and on that basis denies those allegations.

37.     The State lacks sufficient information to admit or deny the allegations in Paragraph 37 of the First Amended Complaint, including facts personal to Plaintiff, and on that basis denies those allegations.

38.     In response to Paragraph 38 of the First Amended Complaint, the State admits that school-sponsored athletics offer a range of benefits for some children and young adults and provide an opportunity to develop physically, emotionally, and socially.  In answering further,

JA0455

the State lacks sufficient information to admit or deny the remaining allegations in Paragraph 38 of the First Amended Complaint and on that basis denies those allegations.

39.     The State denies the allegations of Paragraph 39 of the First Amended Complaint.

40.     The State specifically denies the allegations that there is a "scientific consensus" and, further answering, denies all other allegations in Paragraph 40 of the First Amended Complaint.

41.     The State admits that puberty blocker hormone drug treatment impact endogenous puberty.   Answering further, the State denies all other allegations in paragraph 41 of the First Amended Complaint.

42.     Paragraph 42 of the First Amended Complaint does not meet the requirements of Federal Rules of Civil Procedure 8(d)(1).  Answering further, the State  avers that the policies of the National Collegiate Athletic Association ("NCAA"), World Athletics, and the International Olympic Committee (the "Olympics") speak for themselves.  Further answering, the State denies all other allegations therein.

43.     In response to Paragraph 43 of the First Amended Complaint, the State avers that W. Va. Admin. Code § 127-2-3 (3.8) speaks for itself.

44.     In response to Paragraph 44 of the First Amended Complaint, the State avers that West Virginia laws or policies regarding the participation of students in school sports speak for themselves.  Answering further, the State denies the remaining allegations therein, including the implication that H.B. 3293 is a prohibition preventing transgender students from participating in school sports.

45.     The State admits that H.B. 3293 was introduced as an originating bill by the Education Committee for the West Virginia House of Delegates (the "House"), sponsored by

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

        Plaintiffs,

v.                                                                CIVIL ACTION NO.  2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

        Defendants.


## MEMORANDUM OPINION AND ORDER

Pending before the court are three motions to dismiss Plaintiff's First Amended Complaint, filed by Defendant West Virginia Secondary School Activities Commission [ECF No. 70], Defendants Harrison County Board of Education and Dora Stutler [ECF No. 72], and Defendants West Virginia Board of Education and Superintendent W. Clayton Burch [ECF No. 74]. For the following reasons, the motions to dismiss are **DENIED**.

## I.  PRELIMINARY MATTER

Before turning to the merits of the case, I will first address the Court's use of pronouns going forward. I note from the outset that I have consistently used female pronouns to refer to B.P.J. in my opinions. Courts hearing cases involving transgender litigants have long used language respecting the gender identity used by the litigants. *See, e.g., Farmer v. Haas*, 990 F.2d 319, 320 (7th Cir. 1993) ("[T]he defendants say 'he,' but Farmer prefers the female pronoun and we shall respect her preference."); *Farmer v. Circuit Court of Maryland for Baltimore Cty.*, 31 F.3d 219,

JA0457

220 n.1 (4th Cir. 1994) ("This opinion, in accord with Farmer's preference, will use feminine pronouns."); *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401 n.1 (6th Cir. 1997) ("Murray uses the feminine pronoun to refer to herself. Although the government in its brief used the masculine pronoun, for purposes of this opinion we will follow Murray's usage."); *Schwenk v. Hartford*, 204 F.3d 1187, 1192 (9th Cir. 2000) ("In using the feminine rather than the masculine designation when referring to Schwenk, we follow the convention of other judicial decisions involving male-to-female transsexuals which refer to the transsexual individual by the female pronoun."); *Cuoco v. Moritsugu*, 222 F.3d 99, 103 n.1 (2d Cir. 2000) ("We . . . refer to the plaintiff using female pronouns" because "[s]he [is] a preoperative male to female transsexual."); *Smith v. Rasmussen*, 249 F.3d 755, 757 (8th Cir. 2001) ("As did the parties during the proceedings in the district court, we will refer to Smith, in accordance with his preference, by using masculine pronouns."); *Kosilek v. Spencer*, 740 F.3d 733, 737 (1st Cir. 2014) ("We will refer to Kosilek as her preferred gender of female, using feminine pronouns."); *Pinson v. Warden Allenwood USP*, 711 F. App'x 79, 80 (3d Cir. 2018) ("Because Pinson has referred to herself using feminine pronouns throughout this litigation, we will follow her example.").

That being said, it will be necessary in this case to differentiate between males and females, as assigned at birth, without regard to their gender identity. The Court, therefore, adopts the following framework for the language it will use in its opinions going forward:

When referring to a person's sex assigned at birth, I will use the term "biological male" and "biological female." A person who was assigned male at birth but identifies as female I will refer to as a transgender girl or a transgender woman.

2

**JA0458**

A person who was assigned female at birth but identifies as male I will refer to as a transgender boy or a transgender man. A person who was assigned female at birth and identifies as female is a cisgender woman or girl. A person who was assigned male at birth and identifies as male is a cisgender man or boy. I will use the pronouns associated with a person's gender identity. In doing so, I am not expressing any opinion, political, judicial, or otherwise about any issue in this case. I will not order any litigant to use the language that I use.

## II. BACKGROUND

On April 28, 2021, the State of West Virginia passed H.B. 3293, known as the "Protect Women's Sports Act." W. Va. Code § 18-2-25d. ("H.B. 3293" or "the Act"). The Act requires that any sports team sponsored by a public secondary school or higher education institution be expressly designated as a male, female, or coed team. § 18-2-25d(c)(1). Teams designated as "female" are not open to males, while teams designated as "male" are open to either sex. § 18-2-25d(c)(2). The act defines "male" and "female" as a person's "biological sex determined at birth." § 18-2-25d(b)(3).

B.P.J. is an eleven-year-old transgender girl. The complaint alleges that B.P.J. has been "living authentically as the girl she is" since the end of her third grade school year. [ECF No. 64, at ¶¶ 31–32]. She enjoys sports and has competed on girls' sports teams throughout elementary school. [ECF No. 64, at ¶¶31, 36]. Going into middle school, the complaint alleges that she anticipated trying out for girls' sports teams. [*Id.* at ¶ 34]. H.B. 3293 would prevent her from doing so because her sex assigned at birth is male.

B.P.J. has brought suit asserting that H.B. 3293 violates her rights under Title IX and the Equal Protection Clause. Count I of B.P.J.'s First Amended Complaint, against the State of West Virginia, the State Board of Education, the Harrison County Board of Education, and the West Virginia Secondary School Activities Commission ("WVSSAC"), alleges that the law violates Title IX of the Education Amendments of 1972 (20 U.S.C. § 1618 *et seq.*) [*Id.* at ¶¶ 88–99]. Count II, against State Superintendent W. Clayton Burch, Harrison County Superintendent Dora Stutler, and the WVSSAC, alleges that the law violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. [*Id.* at ¶¶ 100–110].[1] All named defendants, except the State of West Virginia, have filed motions to dismiss. The motions to dismiss are filed pursuant to Federal Rules of Civil Procedure 12(b)(1)—lack of subject matter jurisdiction—and 12(b)(6)—failure to state a claim upon which relief can be granted. I will first consider the court's subject matter jurisdiction and then consider whether the plaintiff has adequately stated a claim under both Title IX and the Equal Protection Clause.

## III.   SUBJECT MATTER JURISDICTION

The West Virginia Board of Education and Superintendent Clayton Burch (collectively, the "State Board Defendants") have moved to dismiss the complaint for lack of subject matter jurisdiction. They argue first that Plaintiff lacks standing because the State Board Defendants did not cause her injuries, and second that

---

[1] Both claims named Patrick Morrisey in his official capacity as the Attorney General of West Virginia, but Mr. Morrisey is no longer a defendant because the court has granted the Joint Motion to Dismiss Equal Protection Claim Against Defendant Patrick Morrisey in his Official Capacity as Attorney General of the State of West Virginia. [ECF No. 127].

Plaintiff's claims are not ripe for judicial consideration because the law has not been enforced against her.

The WVSSAC similarly challenges B.P.J.'s standing and the ripeness of her claims. WVSSAC argues that because it has no mandate to enforce the law against B.P.J., it is an improper party. The Harrison County Board of Education and Harrison County Superintendent Dora Stutler (collectively, the "County Board Defendants") argue that their actions are not the cause of B.P.J.'s harm and that they have not and will not enforce the law against her. Though their arguments are clothed in 12(b)(6), they nonetheless challenge Plaintiff's standing and the claims' ripeness. Accordingly, I will address these arguments as if they were made under 12(b)(1).

A.  **Standard of Review**

It is axiomatic that a court must have subject matter jurisdiction over a case before it can render any decision on the merits. A motion to dismiss challenging that jurisdiction arises under Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) covers challenges to Article III standing and ripeness because those issues implicate a court's competency to hear a claim and therefore its subject matter jurisdiction. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) ("[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement . . . by alleging an actual case and controversy."). A defendant can challenge the court's subject matter jurisdiction facially—by arguing that the facts alleged in the complaint are not sufficient to establish jurisdiction—or factually—by arguing that the facts establishing jurisdiction are untrue. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). If a factual challenge is made, the court may hold an evidentiary hearing to test the validity of the jurisdictional allegations. *Id.* However, if a facial

5

challenge is made, as it is here, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

### B.  Discussion

B.P.J. has standing to sue the State Board Defendants, the County Board Defendants, and the WVSSAC. She has adequately alleged an injury-in-fact—that she will be treated differently on the basis of sex; she has asserted that under H.B. 3293, each defendant will take some action that will cause her asserted harm; and she has established that each defendant can redress her claims because a favorable ruling against each will prevent them from enforcing the Act as to B.P.J.

B.P.J.'s claims are ripe against each defendant. First, her claims are fit for judicial review because they do not require any future factual development. The question in this case is whether it is permissible under Title IX or the Equal Protection Clause to prevent B.P.J., a transgender girl, from playing on girls' sports teams. H.B. 3293 requires each defendant to prevent B.P.J. from playing on girls' sports teams; no future factual development will change that effect. Second, and consistent with my ruling on the preliminary injunction, B.P.J. has sufficiently alleged that she will experience hardship if this law is enforced against her.

## IV.  FAILURE TO STATE A CLAIM

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). To achieve facial plausibility, the plaintiff must plead facts allowing the court to draw the reasonable inference that the defendant is liable, moving the claim beyond the realm of mere possibility. *Id.* Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

### A.  DISCUSSION

All named defendants claim that B.P.J. has failed to state a claim upon which relief can be granted under both Title IX and the Equal Protection Clause.

B.P.J. has plausibly stated a claim under Title IX against State Superintendent Burch, Harrison County Superintendent Stutler, and the WVSSAC. She has sufficiently alleged that each defendant (1) will exclude her from participation in an educational event on the basis of sex, (2) receives federal funding, either directly or indirectly, and (3) that the exclusion from school events will cause her harm. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021) (defining the elements of a Title IX claim).

B.P.J. has plausibly stated an equal protection claim against State Superintendent Burch, Harrison County Superintendent Stutler, and the WVSSAC. She has alleged that each defendant, acting under the color of state law, is discriminating against her on the basis of sex. Both the Supreme Court and the Fourth Circuit have ruled that discrimination on the basis of a person's transgender

status is discrimination on the basis of sex. *Bostock v. Clayton Cty.*, ___ U.S. ___, ___,

140 S. Ct. 1731, 1741 (2020); *Grimm*, 972 F.3d at 609; 616 (2020).

## V. CONCLUSION

For the foregoing reasons, the Motions to Dismiss [ECF Nos. 71, 72, 74] are

**DENIED**. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of

record and any unrepresented party.

ENTER:        December 1, 2021

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

JA0464

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

      Plaintiffs,

v.                      CIVIL ACTION NO.  2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

      Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the Court is Proposed Intervenor Lainey Armistead's Motion to Intervene. [ECF No. 94]. Ms. Armistead has moved to intervene both (1) as of right under Federal Rule of Civil Procedure 24(a) and (2) permissively under Federal Rule of Civil Procedure 24(b). For the reasons that follow, Ms. Armistead does not meet the requirements to intervene as a matter of right, but the court will allow her to intervene permissively. Her Motion to Intervene is therefore **DENIED in part and GRANTED in part.**

I.  Relevant Facts

Ms. Armistead is a cisgender girl. She has played soccer most of her life and earned a scholarship to play soccer at West Virginia State University ("WVSU"). She has moved to intervene to defend the constitutionality of H.B. 3293, the "Protect Women's Sports Act." She has, to her knowledge, only competed against biological

1

females both in competition and for slots on the WVSU soccer team. She asserts that she is concerned however that allowing transgender women to compete on women's teams and in women's leagues will put her at risk of injury, of losing her playing spot on her team, or of losing an opportunity to meaningfully compete for a championship title.

She claims the right to intervene because she may be exposed to these risks if the court strikes down H.B. 3293. She further claims the right to intervene as a representative of cisgender women athletes who would be subject to the same risks if H.B. 3293 is declared unconstitutional or if B.P.J. succeeds in her as-applied challenge and is allowed to play women's sports.

## II. Timeliness

Federal Rule of Civil Procedure 24 allows for intervention only after a timely motion. Fed. R. Civ. P. 24(a); (b)(1). To assess timeliness, the district court must determine how far the underlying suit has progressed, the prejudice any resulting delay might cause the other parties, and why the movant was tardy in filing its motion. *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014). Among these factors, the prejudice that the delay causes to existing parties is the most important. *Spring Const. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir. 1980).

Considering these factors, I find that Ms. Armistead's Motion to Intervene was timely filed. First, this case is still in its early stages. At the time the present motion was filed and became ripe, the deadline for amendment of pleadings and joinder of parties had not yet passed. Second, because of the early stage of litigation, the existing parties will not be prejudiced by the addition of another. Additionally, Ms. Armistead maintains that she "will comply with the scheduling deadlines established

2

by this Court's September 8, 2021, order." [ECF No. 95, at 5]; *see Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 557–60 (E.D. Va. 2018) (finding intervention proper, even where the case had advanced significantly, because prejudice was mitigated by a promise to follow the existing scheduling order).

Finally, Ms. Armistead's delay in filing her motion to intervene is reasonable. She waited until after the court issued its preliminary injunction, increasing in her estimation the likelihood that the court's final judgment would harm her. [*Id.* at 5]. The court issued the preliminary injunction on July 21, 2021, and Ms. Armistead intervened on September 10, 2021. According to Ms. Armistead, she spent the time between the preliminary injunction and her motion to intervene considering the ramifications of being the public face supporting a contentious law. The court accepts this justification and finds her motion timely.

III.   **Intervention as of Right**

A court must grant a motion to intervene if the movant can demonstrate "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir, 1991)).

A government defendant, given its "basic duty to represent the public interest," is a presumptively adequate defender of duly enacted statutes. *N.C. State Conference of NAACP v. Berger*, 999 F.3d 915, 932 (4th Cir. 2021) (quoting *Stuart v. Huff*, 706 F.3d 345, 351 (4th Cir. 2013)). "When a statute comes under attack, it is difficult to conceive of an entity better situated to defend it than the government." *Stuart*, 706

3

**JA0467**

F.3d at 351. "[T]he business of the government could hardly be conducted if, in matters of litigation, individual citizens could usually or always intervene and assert individual points of view." *Id.* (quoting 6 *Moore's Federal Practice* § 24.03[4][a][iv][A] (3d ed. 2011)). Accordingly, where both the potential intervenors and the government want the statute constitutionally sustained, the intervenor "must mount a strong showing of inadequacy." *Id.* at 352.

An intervenor can overcome the presumption of adequate representation by showing "adversity of interest, collusion, or nonfeasance." *Berger*, 999 F.3d at 930 (citing *Stuart*, 706 F.3d at 353). Merely alleging a "disagreement over how to approach the conduct of the litigation" is not enough to overcome the presumption of adequacy. *Stuart*, 706 F.3d at 353. "To have such unremarkable divergences of view sow the seeds for intervention as of right risks generating endless squabbles at every juncture over how best to proceed." *Id.* at 354. At least one other district court in this circuit has found "the presumption of adequacy [is] unrebutted where state agency 'answered the [plaintiff's] complaint, has asserted several affirmative defenses, has expressly denied that the [plaintiffs] are entitled to any relief, and has urged the Court to dismiss the action with prejudice." *Makhteshim Agan of N. Am., Inc. v. Nat'l Marine Fisheries Serv.,* No. 8:18-cv-00961-PWG, 2018 WL 5846816, at *5 (D. Md. Nov. 8, 2018).

Here, Ms. Armistead does not rebut the presumption that the State will adequately represent her interests. She has shown neither adversity of interest, collusion, nor nonfeasance. In fact, the State of West Virginia has intervened in this case specifically to defend the constitutionality of the law. Her assertions that the

4

**JA0468**

government does not adequately represent her interests amount to nothing more than "disagreement over how to approach the conduct of litigation."

Accordingly, Ms. Armistead may not intervene as a matter of right.

### IV. Permissive Intervention

District courts enjoy wide discretion in deciding whether to grant permissive intervention. *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003). Pursuant to Rule 24(b) the court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P 24(b)(1). In making this determination, the court should consider whether intervention will cause undue delay or prejudice the original parties. Fed. R. Civ. P. 24(b)(3); *Berger*, 999 F.3d at 927. Ultimately, the court should allow intervention if it will "contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Students for Fair Admissions v. Univ. of N.C.*, 319 F.R.D. 490, 496 (M.D.N.C. Jan 13, 2017) (quoting *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)).

B.P.J. does not challenge Ms. Armistead's assertion that her defense of H.B. 3293 shares common questions of law and fact with the current action. Therefore, I need only examine whether granting permissive intervention will cause undue delay or prejudice to B.P.J. On that score, B.P.J. raises several concerns: that (1) additional parties necessarily complicate case management and increase the burdens of discovery and motions practice; (2) including Ms. Armistead will not provide any factual development that would benefit the existing parties; (3) Ms. Armistead will present frivolous legal arguments; and (4) Ms. Armistead's counsel has a history of intentionally misgendering transgender individuals in this kind of litigation and then

delaying proceedings on the merits while litigating that issue. [ECF No. 99, at 16–17].

I find that allowing Ms. Armistead to intervene will not cause undue delay or prejudice. Ms. Armistead plans to defend H.B. 3293 as a member of the class of people for whom the law was written. She will add a perspective not represented by any of the current defendants. Second, because there has not been significant discovery in this case, adding Ms. Armistead at this point will not significantly add to the parties' discovery burdens. Additionally, she has represented her intent to abide by the current scheduling order, causing no delay. Third, Ms. Armistead indicates several arguments she intends to make that will differ from those of the current defendants.

Finally, B.P.J. argues that Ms. Armistead's counsel has and will continue to "gratuitously misgender" B.P.J. and will delay the proceedings further litigating that issue. [ECF No. 99, at 16–17]. While the parties should always be mindful to show the respect due other parties, the Court will not order any party to use specific language in this case. So long as the terminology used by the parties is properly defined, the parties may use the language they find necessary to support their respective positions. Further, concern that Ms. Armistead's counsel *may* seek to delay these proceedings is mere speculation that does not justify denying permissive intervention.

## V. Conclusion

Ms. Armistead does not qualify for intervention as of right because her interests are adequately represented by the state. However, because this case is in its early stages, the addition of one party will not cause undue prejudice or delay.

Therefore, Ms. Armistead may intervene permissively. The Motion to Intervene [ECF No. 94] is therefore **DENIED in part and GRANTED in part.**

The court **DIRECTS** the Clerk to docket Intervenor's Proposed Answer to First Amended Complaint [ECF No. 95-2] and to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      December 1, 2021

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

7

**JA0471**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, PATRICK MORRISEY in his official capacity as Attorney General, and THE STATE OF WEST VIRGINIA<br><br>*Defendants.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>Jury Trial Demanded |

## INTERVENOR'S PROPOSED ANSWER TO FIRST AMENDED COMPLAINT

Under Federal Rule of Civil Procedure 24(c), Intervenor-Defendant submits the following answer and affirmative defenses to Plaintiff's First Amended Complaint. Intervenor denies any allegation that is not expressly admitted below.

1.   To the extent Plaintiff asserts that B.P.J. is a biological female, Intervenor denies this allegation. Intervenor lacks sufficient knowledge or information to admit or deny the remaining allegations in paragraph 1, so they are denied.

2.   Intervenor admits that West Virginia's legislature passed H.B. 3293 in April 2021 and is codified at W. Va. Code § 18-2-25d. To the extent Plaintiff characterizes H.B. 3293, Intervenor states that the law speaks for itself. Intervenor denies the remaining allegations in paragraph 2.

3.   Intervenor denies the allegations in paragraph 3.

4.   Intervenor denies the allegations in paragraph 4.

34. Intervenor lacks sufficient knowledge or information to admit or deny the allegations in paragraph 34, so they are denied.

35. Intervenor lacks sufficient knowledge or information to admit or deny the allegations in paragraph 35, so they are denied.

36. Intervenor lacks sufficient knowledge or information to admit or deny the allegations in paragraph 36, so they are denied.

37. Intervenor lacks sufficient knowledge or information to admit or deny the allegations in paragraph 37, so they are denied.

38. Intervenor admits that athletics provide benefits to children and young adults. Intervenor lacks sufficient knowledge or information to admit or deny the remaining allegations in paragraph 38, so they are denied.

39. Intervenor denies the allegations in paragraph 39.

40. Intervenor admits that circulating testosterone levels in boys and girls can diverge significantly starting at puberty. Intervenor denies the remaining allegations in paragraph 40.

41. Intervenor denies the allegations in paragraph 41.

42. Intervenor admits that the NCAA, World Athletics, and the International Olympics Committee permit biological males to compete in women's sport events in certain circumstances. Intervenor denies the remaining allegations in paragraph 42.

43. Plaintiff cites to portions of the West Virginia administrative code that speak for themselves. Intervenor lacks sufficient knowledge or information to admit or deny the allegations in paragraph 43, so they are denied.

44. Intervenor denies the allegations in paragraph 44.

45. Intervenor admits that Delegate Caleb Hanna helped sponsor H.B. 3293 in the West Virginia House of Delegates. Intervenor denies the remaining allegations in Paragraph 45.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**B.P.J., by her next friend and mother, HEATHER JACKSON,**

    **Plaintiff,**

**v.**

**WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER, in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,**

    **Defendants,**

**and**

**LAINEY ARMISTEAD,**

    **Defendant-Intervenor.**

**Civil Action No. 2:21-cv-00316**
**Honorable Joseph R. Goodwin**

**DEFENDANTS WEST VIRGINIA STATE BOARD OF EDUCATION
AND SUPERINTENDENT W. CLAYTON BURCH'S ANSWER TO
<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

    **NOW COME** Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch (collectively referred to hereinafter as the "State Board Defendants"), by and through counsel, Kelly C. Morgan, Kristen V. Hammond, Michael W. Taylor, and the law firm of Bailey & Wyant, PLLC, and hereby respond to Plaintiff's First Amended Complaint by stating as follows:

**<u>FIRST AFFIRMATIVE DEFENSE</u>**

    Plaintiff's First Amended Complaint fails to state a cause of action against the State Board Defendants upon which relief can be granted, and therefore, they must be dismissed as a matter of

Amended Complaint, and therefore, deny the same and demand strict proof thereof.

36.     The State Board Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the allegations set forth in Paragraph 36 of Plaintiff's First Amended Complaint, and therefore, deny the same and demand strict proof thereof.

37.     The State Board Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the allegations set forth in Paragraph 37 of Plaintiff's First Amended Complaint, and therefore, deny the same and demand strict proof thereof.

**C.      Participation of B.P.J. and Other Transgender Youth in School-Sponsored Athletics.**

38.     With respect to the allegations set forth in Paragraph 38 of Plaintiff's First Amended Complaint, the State Board Defendants admit that school-sponsored athletics offer a range of benefits for some children and young adults, but lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations set forth therein, and therefore, deny the same and demand strict proof thereof.

39.     The State Board Defendants deny the allegations set forth in Paragraph 39 of Plaintiff's First Amended Complaint and demand strict proof thereof.

40.     The State Board Defendants deny the allegations set forth in Paragraph 40 of Plaintiff's First Amended Complaint and demand strict proof thereof.

41.     The State Board Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the allegations set forth in Paragraph 41 of Plaintiff's First Amended Complaint, and therefore, deny the same and demand strict proof thereof.

42.     With respect to the allegations set forth in Paragraph 42 of Plaintiff's First Amended Complaint, the State Board Defendants aver that the policies, rules, and regulations of the National Collegiate Athletic Association, World Athletics, and International Olympic Committee speak for

85.     The State Board Defendants deny the allegations set forth in Paragraph 85 of Plaintiff's First Amended Complaint and demand strict proof thereof.

86.     The State Board Defendants deny the allegations set forth in Paragraph 86 of Plaintiff's First Amended Complaint and demand strict proof thereof.

87.     The State Board Defendants deny the allegations set forth in Paragraph 87 of Plaintiff's First Amended Complaint and demand strict proof thereof.

### CLAIMS FOR RELIEF

### COUNT I
Violation of Title IX
20 U.S.C. § 1681, *et seq.*
Plaintiff against the State of West Virginia, the State Board of Education, the County Board of Education, and the School Activities Commission

88.     With respect to the allegations set forth in Paragraph 88 of Plaintiff's First Amended Complaint, the State Board Defendants incorporate by reference their answers to each and every allegation set forth in Paragraphs 1 through 87 of Plaintiff's First Amended Complaint as if fully set forth verbatim herein.  The State Board Defendants further admit that Plaintiff brings this Count against the State Board of Education, the County Board of Education, the State of West Virginia, and the School Activities Commission.

89.     With respect to the allegations set forth in Paragraph 89 of Plaintiff's First Amended Complaint, the State Board Defendants aver that Title IX speaks for itself and further assert that the allegations set forth therein consist of legal conclusions and references to a legal authority to which no response is necessary.  To the extent that a response is deemed necessary, the State Board Defendants deny the same and demand strict proof thereof.

90.     With respect to the allegations set forth in Paragraph 90 of Plaintiff's First Amended Complaint, the State Board Defendants admit that the State Board of Education and the County

19

JA0476

Board of Education are governmental entities focused on education and receiving federal financial assistance and deny the remaining allegations set forth therein and demand strict proof thereof.

91.    The State Board Defendants deny the allegations set forth in Paragraph 91 of Plaintiff's First Amended Complaint and demand strict proof thereof.

92.    The State Board Defendants deny the allegations set forth in Paragraph 92 of Plaintiff's First Amended Complaint and demand strict proof thereof.

93.    The State Board Defendants deny the allegations set forth in Paragraph 93 of Plaintiff's First Amended Complaint and demand strict proof thereof.

94.    With respect to the allegations set forth in Paragraph 94 of Plaintiff's First Amended Complaint, the State Board Defendants aver that Title IX speaks for itself and further assert that the allegations set forth therein consist of legal conclusions and references to a legal authority to which no response is necessary.  To the extent that a response is deemed necessary, the State Board Defendants deny the same and demand strict proof thereof.

95.    With respect to the allegations set forth in Paragraph 95 of Plaintiff's First Amended Complaint, the State Board Defendants aver that Title IX and its regulations speak for themselves and further assert that the allegations set forth therein consist of legal conclusions and references to legal authorities to which no response is necessary.  To the extent that a response is deemed necessary, the State Board Defendants deny the same and demand strict proof thereof.

96.    With respect to the allegations set forth in Paragraph 96 of Plaintiff's First Amended Complaint, the State Board Defendants aver that Title IX and its regulations speak for themselves and further assert that the allegations set forth therein consist of legal conclusions and references to legal authorities to which no response is necessary.  To the extent that a response is deemed necessary, the State Board Defendants deny the same and demand strict proof thereof.

JA0477

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants*.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin, District Judge

**DEFENDANTS HARRISON COUNTY BOARD OF EDUCATION
AND DORA STUTLER'S ANSWER TO
<u>FIRST AMENDED COMPLAINT</u>**

For their Answer to the First Amended Complaint, Defendants Harrison County

Board of Education and Dora Stutler (collectively, the "County Board Defendants") state as

follows:

***First Defense***

The First Amended Complaint fails, in whole or in part, to state a claim upon which

relief may be granted.

***Second Defense***

The County Board Defendants respond to the specific allegations of the First

Amended Complaint as follows:

13792262.1

**JA0478**

36.     The County Board Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the First Amended Complaint.

37.     The County Board Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the First Amended Complaint.

C.      **Participation of B.P.J. and Other Transgender Youth in School-Sponsored Athletics.**

38.     The County Board Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the First Amended Complaint.

39.     The County Board Defendants deny the allegations in Paragraph 39 of the First Amended Complaint.

40.     The County Board Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the First Amended Complaint.

41.     The County Board Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the First Amended Complaint.

42.     The County Board Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the First Amended Complaint.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**B.P.J., by her next friend and mother,
HEATHER JACKSON,**

     **Plaintiff,**

**v.**                                **Civil Action No. 2:21-cv-00316
Honorable Joseph R. Goodwin, Judge**

**WEST VIRGINIA STATE BOARD OF EDUCATION,
HARRISON COUNTY BOARD OF EDUCATION,
WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION, W. CLAYTON BURCH
in his official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,**

     **Defendants,**

     **and**

**LAINEY ARMISTEAD,**

     **Intervenor Defendant.**

**DEFENDANT WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES
COMMISSION'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

**NOW COMES** Defendant West Virginia Secondary School Activities Commission

("WVSSAC"), incorrectly designated by Plaintiff as "School Activities Commission" (hereinafter

designated appropriately as "WVSSAC"), by counsel Roberta F. Green, Kimberly M. Bandy, and

Shuman McCuskey Slicer PLLC, and for its Answer to Plaintiff's First Amended Complaint states

and avers as follows:

**INTRODUCTION**

1.     In response to Paragraph 1 of Plaintiff's First Amended Complaint, this Defendant

admits upon information and belief and upon Plaintiff's averments that B.P.J. is an 11-year-old

**JA0480**

**C.    Participation of B.P.J. and Other Transgender Youth in School-Sponsored Athletics.**

38.    In response to Paragraph 38 of Plaintiff's First Amended Complaint, this Defendant admits generally that participating in sports can offer a range of benefits to an individual. In response to the remaining specific allegations contained in Paragraph 38 of Plaintiff's First Amended Complaint, this Defendant lacks sufficient information or knowledge to admit or deny the allegations and therefore denies the same and demands strict proof thereof.

39.    This Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 39 of Plaintiff's First Amended Complaint and therefore denies the same and demands strict proof thereof.

40.    This Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 40 of Plaintiff's First Amended Complaint and therefore denies the same and demands strict proof thereof.

41.    This Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 41 of Plaintiff's First Amended Complaint and therefore denies the same and demands strict proof thereof.

42.    In response to Paragraph 42 of Plaintiff's First Amended Complaint, this Defendant on information and belief admits that the National Collegiate Athletic Association ("NCAA"), World Athletics, and the International Olympic Committee all allow transgender females to participate at some level in women's athletic events under certain circumstances. In response to the remaining allegations contained in Paragraph 42 of Plaintiff's First Amended Complaint, this Defendant lacks sufficient information or knowledge to admit or deny the allegations and therefore denies the same and demands strict proof thereof.

9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                    *Plaintiff*,

v.                                              Civil Action No. 2:21-cv-00316
                                                Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

                    *Defendants*,

and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

### STIPULATION OF UNCONTESTED FACTS

        IT IS HEREBY AGREED AND STIPULATED, by and between the undersigned

counsel, that:

1.  The Harrison County Board of Education and County Superintendent Dora Stutler

    acknowledge and respect that B.P.J. has a female gender identity as recognized in the

    Gender Support Plan [HCBOE 00054-58; HCBOE 00060-64].

2.  Because, as it is currently drafted, House Bill 3293, codified at West Virginia Code § 18-

    2-25d, applies to public secondary schools and states that "[a]thletic teams or sports

designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" and because of the definitions set forth in House Bill 3293, House Bill 3293 prevents B.P.J. from participating on sports teams that are designated for girls and that are sponsored by Bridgeport Middle School, absent an injunction by a court.

3.  House Bill 3293 is a West Virginia State law that applies to County Boards of Education, including the Harrison County Board of Education and its County Superintendent. House Bill 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the Harrison County Board of Education. While the Harrison County Board of Education and its County Superintendent did not devise and have not adopted House Bill 3293 as their own policy, the Harrison County Board of Education and its County Superintendent, absent an injunction by a court, would be compelled and required to enforce House Bill 3293 because it is a mandatory State law that affords them no discretion.

4.  Accordingly, absent the injunction in this action, House Bill 3293 would have prevented the Harrison County Board of Education from permitting B.P.J. to participate on the Bridgeport Middle School girls' cross-country team during the 2021-2022 school year.

5.  B.P.J. participated on the Bridgeport Middle School girls' cross-country team during the 2021-2022 school year without any disruption.

6.  No other Bridgeport Middle School student was displaced by B.P.J.'s participation on the girls' cross-country team.

7.  The Harrison County Board of Education has delegated some level of control, supervision, and regulation of interscholastic athletic events sponsored by Bridgeport Middle School to

the West Virginia Secondary School Activities Commission.

8. The Harrison County Board of Education receives federal funding.


Dated this seventh day of March, 2022.


COUNSEL FOR COUNTY BOARD

BY:___/Susan Deniker/_____

Susan Llewellyn Deniker (WV Bar No. 7992)
Jeffrey M. Cropp (WV Bar No. 8030)
STEPTOE and JOHNSON, LLC
400 White Oaks Boulevard
Bridgeport, WV 26330

*Attorneys for Defendant Harrison
County Board of Education and Dora
Stutler*

COUNSEL FOR PLAINTIFF

BY:_/Kathleen Hartnett/_____

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30
Phone: (404) 897-1880
ccharles@lambdalegal.org

JA0484

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Kathleen Hartnett*
Julie Veroff*
Zoe Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

JA0485

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                        *Plaintiff*,

v.

                                          Civil Action No. 2:21-cv-00316
                                          Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

                        *Defendants*,

and

LAINEY ARMISTEAD,

                        *Defendant-Intervenor*.

**STIPULATION OF UNCONTESTED FACTS**

       IT IS HEREBY AGREED AND STIPULATED, by and between the undersigned counsel,

that:

1. The West Virginia State Board of Education and State Superintendent W. Clayton Burch

      acknowledge that Plaintiff has produced documentation that attests that B.P.J. is

      transgender and identifies as a girl.

2. Absent an injunction by a court, House Bill ("H.B.") 3293, codified at West Virginia Code

      § 18-2-25d, prevents B.P.J. from participating on sports teams that are designated for girls

and are sponsored by Bridgeport Middle School because it applies to public secondary schools and states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport" and because of the definitions set forth in H.B. 3293.

3. Absent an injunction by a court, the West Virginia State Board of Education and Superintendent Burch would be compelled and required to follow H.B. 3293, codified at West Virginia Code § 18-2-25d, because it is a mandatory State law that applies to the West Virginia State Board of Education and the Superintendent of the West Virginia Department of Education that affords them no discretion.

4. Absent an injunction by a court, the West Virginia State Board of Education would be compelled and required to promulgate rules implementing H.B. 3293, codified at West Virginia Code § 18-2-25d, because it is a mandatory State law that affords it no discretion which states that "The State Board of Education shall promulgate rules, including emergency rules, pursuant to § 29A-3B-1 et seq. of this code to implement the provisions of this section."

5. The State Superintendent, as a representative of the West Virginia Department of Education, does not support H.B. 3293, codified at West Virginia Code § 18-2-25d.

**JA0487**

Dated this the 30th day of March, 2022.

COUNSEL FOR STATE BOARD

BY: __/Kelly C. Morgan/_____

Kelly C. Morgan (WV Bar No. 9519)
Michael W. Taylor (WV Bar No. 11715)
Kristen V. Hammond (WV Bar No. 9727)
Bailey & Wyant, LLC
500 Virginia Street, East, Suite 600
P.O. Box 3710
Charleston, WV 25337-3710

*Attorneys for Defendant West Virginia State
Board of Education and W. Clayton Burch*

COUNSEL FOR PLAINTIFF

BY: _/Kathleen Hartnett/_____

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

3

**JA0488**

Kathleen Hartnett*
Julie Veroff*
Zoe Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

JA0489

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**B.P.J., by her next friend and mother,**
**HEATHER JACKSON,**
     **Plaintiff,**

**v.**                                       **Civil Action No. 2:21-cv-00316**
                                         **Honorable Joseph R. Goodwin, Judge**

**WEST VIRGINIA STATE BOARD OF EDUCATION,**
**HARRISON COUNTY BOARD OF EDUCATION,**
**WEST VIRGINIA SECONDARY SCHOOL**
**ACTIVITIES COMMISION, W. CLAYTON BURCH**
**in his official capacity as State Superintendent, and**
**DORA STUTLER in her official capacity as**
**Harrison County Superintendent,**
     **Defendants,**

**And**

**LAINEY ARMISTEAD,**
     **Defendant-Intervenor.**

### WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION'S
### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Now comes West Virginia Secondary School Activities Commission (WVSSAC), by

counsel, Roberta F. Green, Kimberly M. Bandy, Shannon M. Rogers and Shuman McCuskey

Slicer PLLC, and, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, hereby moves

this Court to dismiss all claims asserted against it with prejudice as a matter of law because Plaintiff

has failed to prove an essential element of the case she has the burden to prove.[1] Additionally,

judgment as a matter of law is the necessary and proper outcome in favor of WVSSAC, as,

---

[1] "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In this matter, Plaintiff has alleged that enactment of H.B. 3293 has resulted in violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment when a principal within the Harrison County Board of Education system indicated that, pursuant to H.B. 3293, Plaintiff could not run on the girls' track team. Plaintiff is seeking an order and judgment that H.B. 3293 and its enforcement by Defendants collectively violate her rights under Title IX and the Equal Protection Clause of the Fourteenth Amendment. [2] Plaintiff further asks this Court to permanently enjoin Defendants from enforcing H.B. 3293 or any other law, custom or policy "that precludes Plaintiff's participation on girls' school sports teams in West Virginia."[3]

Plaintiff alleges but has failed to prove that WVSSAC is a federally funded program.[4] Further, Plaintiff has failed to prove that WVSSAC could be a proper party for either her Title IX or her Equal Protection claims because, once again, Plaintiff has failed to prove that WVSSAC is

---

[2] First Amended Complaint (ECF No. 64) at Prayer:

    A. Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under Title IX;

    B. Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

    C. . . . . [P]ermanently enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from enforcing H.B. 3293 or any other law, custom, or policy that precludes Plaintiff's participation on girls' school sports teams in West Virginia;

[3] First Am. Compl. (ECF No. 64) at Prayer at (c).
[4] First Am. Compl. (ECF No 64) at ¶ 91. *See also* Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (ECF No. 80) (Consolidated Response) at 18.

a state actor.[5] Although Plaintiff alleges in the First Amended Complaint that "B.P.J. is irreparably harmed by Defendants' illegal conduct" in violation of Title IX and in violation of the Equal Protection Clause,[6] she has not identified any illegal conduct on the part of WVSSAC. Plaintiff points to no action by WVSSAC that has resulted in discrimination against B.P.J., and thus no basis on which to find that an Equal Protection or Title IX violation has occurred, or that B.P.J. has been damaged by any action of WVSSAC.

Plaintiff has failed to introduce any evidence whatsoever to undercut her initial admission against interest that WVSSAC's policies are gender neutral.[7] Plaintiff has adduced in discovery what West Virginia statutory law provides -- that member schools delegate authority to WVSSAC and that WVSSAC has some level of enforcement power. Yet neither that delegation nor that enforcement power, absent more, is sufficient as a matter of law for any liability to attach to WVSSAC based on future speculative possibilities. Here H.B. 3293 provides for rules to be promulgated,[8] but the evidence adduced in discovery is that State Board rules are neither promulgated nor enforced by WVSSAC but rather are embedded in WVSSAC's rule books, where only the State Board can revise, amend, provide waivers.[9] As a matter of law, none of this converts WVSSAC into a state actor so as to have a role before this Court. None of the allegations nor the facts adduced renders this matter fit for adjudication as against WVSSAC, given that the possibility

---

[5] First Am. Compl. (ECF No. 64) at ¶ 91.

[6] First Am. Compl. (ECF No. 64) at ¶¶ 99, 110.

[7] Declaration of Heather Jackson (ECF No. 2-1) (Jackson Declaration) at ¶25 (p. 23); *see also* First Am. Compl. (ECF No. 64) at ¶ 73.

[8] W. Va. Code Section 18-2-25d(e).

[9] Videotaped Remote Zoom 30(b)(6) Deposition West Virginia Secondary School Activities Commission Bernard Dolan, Friday, February 11, 2022 (Dolan Dep.) (appended hereto as Exhibit A) at 62, testifying that the State Board's 2.0 Rule is embedded in WVSSAC's regulation book but remains the State Board's Rule). *See also* Virtual Videoconference Video-Recorded Deposition of Michele Blatt (2.14.22) (appended hereto as Exhibit B) at 132-33.

of Plaintiff's injury by WVSSAC is remote and the issues presented as to WVSSAC, abstract.

Plaintiff has failed to prove any facts which would make a claim against WVSSAC ripe for pre-

enforcement review, as "balance[ing] the fitness of the issues [as relates to WVSSAC] for judicial

decision with the hardship to the parties of withholding court consideration" relative to WVSSAC

precludes its inclusion here.[10] As a result of Plaintiff's admissions and failures, it remains true at

the close of discovery that WVSSAC has no actionable role under H.B. 3293 and, therefore, never

has had and does not now have a role in this litigation.

Specifically, Plaintiff has alleged that "[t]he State Board of Education's supervisory role,

which includes extracurricular activities such as interscholastic athletics, has been delegated to

'county boards of education and the West Virginia Secondary School Activities Commission.'

*Jones*, 218 W. Va. at 61 (citing W. Va. Code § 18-2-25)."[11]  Plaintiff alleges on information and

belief that "the County Board of Education has delegated its control, supervision, and regulation

of Bridgeport Middle School's interscholastic athletics to the School Activities Commission."[12]

Yet, as a matter of law, that delegation does not convert a private corporation into a state actor,

and Plaintiff has failed to demonstrate more.

In a nutshell, WVSSAC has never been adjudicated a state actor. WVSSAC receives no

federal funds such as to convert it to a state actor. As a matter of law, WVSSAC's determinations

of eligibility and the schools' delegation of authority, absent more, do not anchor these claims.

Beyond that, WVSSAC is differently situated than the athletics or activities organizations in other

jurisdictions who have been adjudicated to be state actors. WVSSAC has no role under H.B. 3293,

and the evidence adduced in discovery is that its role would be limited to delegation and

---

[10] *Air Evac. EMS, Inc., v. Cheatham,* 260 F. Supp. 3d 628, 636-37 (S.D. W. Va. 2017).
[11] Fist Am. Compl. (ECF No. 64) at ¶ 9.
[12]  First Am. Compl. (ECF No. 64) at ¶ 9, citing in part W. Va. Code § 18-2-25.

enforcement, which, once again, are insufficient as a matter of law to convert this private corporation into a state actor. For these reasons and those set out further below, dismissal is the necessary and proper outcome at this time.

In sum, even now, after the close of discovery, none of the pleadings, depositions, interrogatories and admissions have provided Plaintiff with evidence that either Title IX or the Equal Protection Clause of the Fourteenth Amendment is enforceable as against WVSSAC as a matter of law. Conversely, as a matter of fact and law, WVSSAC is not a 'state actor' and does not act under color of law so as to fall within the rubric of either Title IX or Equal Protection. It is undisputed that WVSSAC is a non-profit private corporation and has been since 1916.[13] Where WVSSAC elects voluntarily to follow Title IX given that its members (the member schools) are recipients of federal funding and therefore bound by Title IX,[14] where WVSSAC espouses the ideals of Title IX and voluntarily elects to bind itself,[15] finally, WVSSC does not receive federal funding directly nor is it targeted receive federal moneys from its member schools in the form of dues or otherwise.[16] Whereas WVSSAC received two forms of governmental pandemic assistance and returned a portion of said moneys to the member schools,[17] courts reviewing that assistance have failed to find that its receipt federalizes the recipient or converts the recipient into a 'state actor'[18] – certainly, to all of us who received assistance through that process, up to and including

---

[13] Dolan Dep. (Exhibit A), at 38.
[14] Dolan Dep. (Exhibit A) at 86-87. Whereas WVSSAC knows its member public schools are required to follow Title IX and whereas Mr. Dolan *believes* WVSSAC is as well, *see* First Am. Compl. (ECF No. 64) at ¶81, stating that "Title IX provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.' 20 U.S.C. § 1681(a)."
[15] Dolan Dep. (Exhibit A) at 133-34.
[16] Dolan Dep. (Exhibit A), at 39. *Smith v. NCAA*, 266 F.3d 152, 156-57 (3d Cir. 2001).
[17] Dolan Dep. (Exhibit A) at 81-82. *Rowan Blvd. Assoc. LLC v. Republic First Bank*, 2021 U.S. Dist. LEXIS 151890 (Aug. 12, 2021); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).
[18] *Rowan Blvd. Assoc. LLC v. Republic First Bank*, 2021 U.S. Dist. LEXIS 151890 (Aug. 12, 2021); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).

vaccine subsidy, it would be a slippery slope to so find.[19]  Whereas Plaintiff's First Amended

Complaint relies repeatedly on what it alleges to be control, supervision, regulation, rulemaking,

and a delegation of duties and authority, that process (even assuming it exists, which WVSSAC

does not concede and rather refutes) has been expressly found to be insufficient to turn WVSSAC's

actions into 'color of law' such as to convert WVSSAC into a 'state actor.'[20]

As an initial and fundamental fact, it is clear on the record that WVSSAC has not caused

harm to B.P.J. At the close of discovery, absolutely no grounds exist for Plaintiff to recover

damages or attorney's fees from WVSSAC because WVSSAC's regulations relative to B.P.J. are

gender identical, neutral, non-actionable.[21] Indeed, Plaintiff identifies no enforcement action that

WVSSAC has taken or is slated to take relative to H.B. 3293 – and as a matter of law, WVSSAC's

enforcement actions (eligibility[22]) are insufficient to federalize WVSSAC.  In her First Amended

Complaint, Plaintiff supports her Title IX claim as against WVSSAC by relying upon the

Commission's enabling statute, West Virginia Code Section 18-2-25, which Plaintiff glosses as

"authoriz[ing WVSSAC] to control, supervise, and regulate interscholastic athletic events

alongside county boards."[23] However, previously before this Court, several parties including the

---

[19] U.S. Small Business Association, *Frequently Asked Questions Regarding Participation Of Faith-Based Organizations In The Paycheck Protection Program (PPP) And The Economic Injury Disaster Loan Program (EIDL)* (April 3, 2020).
Chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/viewer.html?pdfurl=https%3A%2F%2Fwww.sba.gov%2Fsites%2Fdefault%2Ffiles%2F2020-04%2FSBA%2520Faith-
Based%2520FAQ%2520Final.pdf&clen=108239&chunk=true

[20] *Smith v. NCAA*, 266 F.3d 152, 155ff (3d Cir. 2001).

[21] Plaintiff does not challenge sex-separated teams. *See* Mem. in Supp. of Pl.'s Mot. Prelim. Inj. (ECF No. 19), at 11 [hereinafter Mem.] at 16. *See also* WVSSAC Track Coaches Packet (appended to West Virginia Secondary School Activities Commission Response to Plaintiff's Motion for Preliminary Injunction (ECF No. 47-1) at Exhibit A at §127-3-22. Cross Country (Boys and Girls), §127-3-29; Track and Field (Boys and Girls).

[22] Dolan Dep. (Exhibit A) at 33-34.

[23] Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (Dkts. 70, 72, and 74) (Consolidated Response) (ECF No. 80) at 13.

Plaintiff have cited and relied upon the precise regulations at issue here – the middle school cross-country and track regulations – which even Plaintiff concedes are neutral. Given that that the rules of statutory construction provide that specific regulations trump a general statute,[24] given that WVSSAC is not a 'state actor,'[25] given Plaintiff's admissions against interest,[26] and given the demonstrated fact of the regulations themselves as they pertain to Plaintiff,[27] the inescapable fact and law of this litigation is that the WVSSAC regulations at issue are gender and therefore transgender neutral, such that Plaintiff's Title IX and Equal Protection claims find no purchase here. Further, the delegation of controlling authority over activities and athletics, even the enforcement of eligibility, has been found to be insufficient to convert the alleged controlling entity into a state actor, absent more.[28]

It remains uncontested that WVSSAC was dropped from an earlier draft of the legislation and that WVSSAC appears nowhere in the statute as enrolled and signed into law. Indeed, the First Amended Complaint details that transition fully.[29] Plaintiff alleges that West Virginia law has changed and that, by necessity, WVSSAC's regulations must change. Indeed, H.B. 3293 does provide for the State Board to promulgate rules to implement the section,[30] yet the evidence adduced in discovery is that State Board rules are neither promulgated nor enforced by WVSSAC but rather are embedded in WVSSAC's rule books, where only the State Board can revise, amend,

---

[24] *S.C. Dept. of Health & Evtl. Control v. Commerce & Indus.,* 372 F.2d 245, 258 (4th Cir. 2004).
[25] *Rowan Blvd. Assoc. LLC v. Republic First Bank,* 2021 U.S. Dist. LEXIS 151890 (Aug. 12, 2021); *Barnes v. Gorman,* 536 U.S. 181, 186 (2002); *Smith v. NCAA,* 266 F.3d 152, 156ff (3d Cir. 2001).
[26] Jackson Declaration (ECF No. 2-1) at ¶25 (p. 23).
[27] *See e.g.,* WVSSAC Track Coaches Packet (appended to West Virginia Secondary School Activities Commission Response to Plaintiff's Motion for Preliminary Injunction (ECF No. 47-1) at Exhibit A at §127-3-22. Cross Country (Boys and Girls), §127-3-29; Track and Field (Boys and Girls).
[28] *Smith v. NCAA,* 266 F.3d 152, 156ff (3d Cir. 2001).
[29] First Am. Compl. (ECF No. 64) at 49-50.
[30] W. Va. Code Section 18-2-25d(e).

provide waivers.[31] Further, given the neutrality of the middle school cross-country and track regulations, Plaintiff is participating now under the existing regulations without impediment, without any recent or mandated particularization to her circumstances, without blunting or revision per the injunction. Once again, given the neutrality of WVSSAC's regulations, Plaintiff can and is participating fully under the regulations as they existed before and during this litigation. Plaintiff does not object to sex separation in sports, and the schools determine their own rosters. Therefore, WVSSAC's role, if any, would be relegated to eligibility, which, absent more, is insufficient to hold it here under Title IX, even assuming WVSSAC were a state actor, which it is not.

Further, no evidence has been adduced that WVSSAC itself has taken or would be called upon to take any action to enforce H.B. 3293 and/or that any of its 'enforcement actions' (read: eligibility appeals[32]) would cause it to become a 'state actor' in so doing. Plaintiff has conceded throughout this litigation that the WVSSAC regulations under which Plaintiff is now participating have been neutral and inclusive at all times and required no engineering or adjustment to allow for Plaintiff's participation, whether with or without the injunction in place. Once again, as relates to cross-country and track, all WVSSAC regulations are uniform across the board in providing one set of regulations for boys and girls.[33] Further, Heather Jackson admits "verification of 'reproductive biology and genetics' is not part of the routine sports physical exam required by Defendant WVSSAC."[34] WVSSAC's physical examination form, the sole registration form

---

[31] Dolan Dep. (Exhibit A) at 62, testifying that the State Board's 2.0 Rule is embedded in WVSSAC's regulation book but remains the State Board's Rule). *See also* Blatt Dep. (Exhibit B) at 132-33.

[32] Dolan Dep. (Exhibit A) at 43, 60, testifying that eligibility determinations start at the school level and are appealed to Mr. Dolan at WVSSAC.

[33] Of note, Plaintiff does not challenge sex-separated teams. *See* Mem. (ECF No. 19) at 11, 16. *See also* WVSSAC Track Coaches Packet (appended to West Virginia Secondary School Activities Commission Response to Plaintiff's Motion for Preliminary Injunction (ECF No. 47-1) at Exhibit A at §127-3-22. Cross Country (Boys and Girls), §127-3-29. Track and Field (Boys and Girls).

[34] *See* Mem. (ECF No. 19) at n.6. *See also* Jackson Declaration (ECF No. 2-1) at Exhibit A at ¶ 26.

WVSSAC requires from athletes for participation, is not impacted by H.B. 3293 and does not have the athletes identify themselves by gender.[35] Indeed, WVSSAC has no access to records to determine a student athlete's gender at any time and knows nothing beyond the rosters prepared and submitted by the member schools.[36] The only regulation that will be adopted will be adopted by the State Board and embedded whole into the WVSSAC regulations (as with the State Board's 2.0 Rule).[37] WVSSAC's only involvement will be to determine disputed eligibility,[38] which, as a matter of law, absent more, does not make it a state actor.

WVSSAC is not mentioned within H.B. 3293. WVSSAC's policies as currently crafted do not and would not impede this Plaintiff from proceeding with middle school Cross-Country or Track as she envisions,[39] nor would they impede other athletes as a matter of law. Plaintiffs do not object to sex separation in sports, and it is WVSSAC's member schools who determine how to roster the students, with the only WVSSAC action relative to that process being anchored in eligibility.[40] As a matter of law, WVSSAC's determination of eligibility, absent more, does not convert it into a state actor,[41] and no modification in the WVSSAC system would be occasioned by any outcome here. As such, Plaintiff's claims against WVSSAC should be dismissed because there is no relief Plaintiff needs from or through WVSSAC and no relief available as against WVSSAC, as it is not a state actor so as to fall within the rubrics of this process.

---

[35] West Virginia Secondary School Activities Commission Response to Plaintiff's Motion for Preliminary Injunction (ECF No. 47-2) at Exhibit B.
[36] Remote Videotaped Deposition of Dora Stutler and Dave Mazza (3.8.22) (HCBOE Dep.) (Exhibit C) at 215; Dolan Dep. (Exhibit A) at 46, 155-56.
[37] Dolan Dep. (Exhibit A) at 54-55, 61, 139-40. *See also* Blatt Dep. (Exhibit B) at 132-33.
[38] Dolan Dep. (Exhibit A) at 60.
[39] *See Grimm v. Gloucester County School Board,* 972 F.3d 586, 619–20 (4th Cir. 2020).
[40] Dolan Dep. (Exhibit A) at 119-20; HCBOE Dep. (Exhibit C) at 216, testifying that "The athletic director puts the information on the boy roster or the girl roster."
[41] *Smith v. NCAA*, 266 F.3d 152, 156ff (3d Cir. 2001).

Whereas Plaintiff has addressed all defendants collectively,[42] WVSSAC is differently situated in terms of its lack of a role under the statute, its neutral regulations that need not change and have not changed in order to allow Plaintiff to participate fully, and in terms of its funding, which does not include federal funds such as to anchor a 'state actor' determination.

In support of this Motion, Defendant states as follows:

## I.   FACTS

Plaintiff B.P.J. is an 11-year-old girl who started middle school in fall 2021 and wished to participate on the girls' cross-county team. First Am. Compl. at ¶ 1. In April of 2021, the West Virginia Legislature passed H.B. 3293, which purports to recognize the inherent differences between biological males and biological females and the valid justification for sex-based classifications in sports. W. Va. Code § 18-2-25d(a). Additionally, H.B. 3293 prohibits participation of biological males, individuals whose biological sex as determined at birth is male, in sports designated for biological females. W. Va. Code § 18-2-25d(c)(2). H.B. 3293 does not mention Defendant WVSSAC and does not create any duties for WVSSAC.[43] H.B. 3293 does establish that the State Board of Education shall promulgate rules, including emergency rules, pursuant to § 29A-3B-1 *et. seq.* of the West Virginia Code to implement the provisions of this section. W. Va. Code § 18-2-25d(e). The undisputed evidence is that State Board rules are embedded in WVSSAC's regulations, and only the State Board can amend, revise, modify, waive its rules.[44]

Plaintiff alleges she was angered and saddened by the passage of H.B. 3293, believing it would prevent her from participating on girls' sports teams in middle school. First Am. Compl. at

---

[42] *See, e.g.,* Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (ECF No. 80).

[43] See, e.g., First Am. Compl. (ECF No. 64) at ¶¶ 49-50.

[44] Dolan Dep. (Exhibit A) at 139; Blatt Dep. (Exhibit B) at 132-33.

¶ 78. In May of 2021, Plaintiff states that she was told by the Principal at Bridgeport Middle School that she would not be allowed to run on the girls' cross-country team due to H.B. 3293. *Id.* at ¶ 81. Plaintiff's First Amended Complaint includes no allegations that anyone from WVSSAC informed her that she would be unable to participate in girls' cross-country, and Plaintiff and her family confirmed that no one contacted WVSSAC about her eligibility or otherwise.[45]

Through the course of discovery, Plaintiff has adduced no evidence that WVSSAC's role or funding is such that, as a matter of law, WVSSAC becomes a state actor or a rightful party to this action. For the reasons set forth herein, dismissal as a matter of law is the necessary and proper resolution at this time.

## II.   <u>STANDARD OF REVIEW</u>

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of "pointing out to the district court . . .that there is an absence of evidence to support the non-moving party's case." *Celotex Corp,* 477 U.S. at 325. If the moving party satisfies this burden, then the non-moving party must set forth specific facts, admissible in evidence, that demonstrate the existence of a genuine issue of material fact for trial. *See id.* at 322-23; Fed. R. Civ. P. 56(c), (e). A "genuine" dispute of

---

[45] *See* Videotaped Videoconference Deposition of BPJ (1.21.22) (BPJ Dep.) (Exhibit D) at 123; Videotaped Deposition of Wesley Scott Pepper (1.19.21) (Pepper Dep.) (Exhibit E) at 127-28; Videotaped Videoconference Deposition of Heather Jackson (1.19.22) (Jackson Dep.) (Exhibit F) at 228-29:

> Q  And do you know whether at any time, like up
> until today, you have contacted WVSSAC to notify them of
> BPJ's interest in running on the girls cross-country
> team?
> A. I have not.

material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). On the other hand, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby,* 477 U.S. at 248.. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find for the non-moving party. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Here, Plaintiff has failed to prove an essential element of the case she has the burden to prove, in pertinent part, that WVSSAC is a state actor such that Title IX and the Equal Protection Clause are enforceable against it as a matter of law.[46] Additionally, judgment as a matter of law is the necessary and proper outcome as against WVSSAC, as, pursuant to Federal Rule of Civil Procedure 56*,* summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Here, Plaintiff has failed to show that, as a matter of law, the authority delegated to it or its duty to determine eligibility make it a state actor so as to be open to enforcement before this Court. Further, Plaintiff has failed to demonstrate that WVSSAC's actions will affect outcome in any way here, as its only potential role might be determining eligibility, to the extent that would occur, which, absent more, is insufficient to bind WVSSAC here.

### III.   ANALYSIS

---

[46] "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

Plaintiff alleges that H.B. 3293 discriminates against B.P.J. in violation of Title IX and the Equal Protection Clause of the 14th Amendment; however, Defendant WVSSAC has taken no action to discriminate against B.P.J. and has no control over the actions of entities that will determine West Virginia law pursuant to or related to H.B. 3293. Further, WVSSAC's actions, if any, taken pursuant to H.B. 3293 (determination of eligibility) fail as a matter of law to bring WVSSAC within the scope of Plaintiff's Title IX or Equal Protection claims. Also, Plaintiff has not alleged that WVSSAC has taken any actions whatsoever toward enforcing the challenged law and, conversely, has identified WVSSAC's policies and forms as gender and therefore transgender neutral.[47] By the express terms of H.B. 3293 itself, WVSSAC has no role and is not envisioned by the Legislature as having a role in enforcing West Virginia's law or establishing regulations regarding its implementation. For these reasons, it is unclear that this pre-enforcement action can remain viable as against WVSSAC.[48] For these reasons and those set out further below, WVSSAC should be dismissed from this action as a matter of law.

---

[47] *See* Jackson Declaration (ECF No. 2-1) at ¶ 25 (p. 23).

[48] *Air Evac. EMS, Inc., v. Cheatham,* 260 F.Supp. 3d 628, 636-37 (S.D. W. Va. 2017):

> To determine whether a case is ripe for pre-enforcement review, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller,* 462 F.3d at 319 (4th Cir. 2006*)* (citation omitted); *see Nat'l Park Hosp. Ass'n v. Dep't of the Interior,* 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003) (setting forth fitness and hardship as the two predominant factors in determining ripeness). With respect to fitness, a claim is unfit for adjudication where the possibility of injury is remote and the issues presented abstract. *Texas v. United States,* 523 U.S. 296, 301, 118 S. Ct. 1257, 140 L. Ed. 2d 406 (1998) ("A claim is not ripe . . . if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, 580-81, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985))); *Miller,* 462 F.3d at 319 (to be ripe, an action in controversy must not be "dependent on future uncertainties.").

**Plaintiff has failed to prove that WVSSAC is a state actor, such that neither Title IX nor the Equal Protections clause is enforceable against her here.**

**I.       WVSSAC is not a State Actor or Agency.**

The Supreme Court of Appeals of West Virginia has considered WVSSAC on multiple occasions and never determined it to be a state actor.  Conversely, West Virginia's Supreme Court expressly found that WVSSAC is not a state agency on the basis that it has been a voluntary association since 1916 (and was not created nor empowered by the Legislature); it is not funded by public moneys; and not all public or private schools in West Virginia have elected to belong. See Syl. pt. 2, 3, *Mayo v. WVSSAC,* 233 W. Va. 88, 96, 872 S.E.2d 224, 232 (2008).[49]

**A. WVSSAC is not a state actor so as to fall within Plaintiff's Equal Protection Claims.**

All of the evidence, admissions and law before this Court at this time demonstrate that WVSSAC is differently situated. Plaintiff has raised claims pursuant to Title IX as against WVSSAC.[50]  However, in order to fall within the mandates of Title IX, WVSSAC would need to be a recipient of federal financial assistance. 20 U.S.C. § 1681, stating that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[51]  WVSSAC's uncontroverted sworn testimony in this matter is that its sources of funding are as follows:

---

[49] *See also* State of West Virginia's Memorandum of Law in Support of its Motion to Intervene and For Proposed Response Deadline (ECF No. 41) at 6, *citing Mayo v. W. Va. Secondary Sch. Activities Comm'n*, 672 S.E.2d 224, 233 (W. Va. 2008).
[50] First Am. Compl. (ECF No. 64) at Count I.
[51] *Davison v. Randall*, 912 F.3d 666, 679 (2019):

> To state a claim under [Title IX], a plaintiff must show that the alleged constitutional deprivation at issue occurred because of action taken by the defendant "under color of . . . state law." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). "The traditional definition of acting under color of state law requires that the defendant in a [Title

14

West Virginia's Secondary School Activities Commission (WVSSAC) receives no dues whatsoever from member schools and has not for more than a decade. WVSSAC sustains itself with corporate sponsorships, advertising revenue and gate proceeds from championship meets and tournaments. WVSSAC's corporate sponsorships, which change over time, from 2019 to the present have included West Virginia Dairy Association/Milk Producers, Farmers & Mechanics, U.S. Army, MetroNews, Midstate Automotive, Field Turf, Spalding, and Caresource.[52]

Whereas WVSSAC might receive de minimis fines or fees from schools or coaches, those moneys have never been demonstrated or determined to be federal funds. Assuming *arguendo* that they could be found to be federal funds, they would be indirectly received, such that no contractual privity exists between WVSSAC and the federal source of those funds.[53]  Pandemic relief[54] has been an evolving area of  consideration relative to 'federal funding,' but courts that have considered the scope of that and similar funding have declined to find that its receipt federalizes the recipient or converts the recipient into a 'state actor.'[55] Applying a contract-based framework to an analysis based in Title VI but including Title IX, the Supreme Court considered whether the recipient had notice of the effect of receiving those moneys, the commensurate obligations, in time to knowingly accept or reject same.[56] Other courts have noted as meaningful that pandemic relief

---

IX] action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)).

[52] WVSSAC's Responses to Plaintiffs First Set of Interrogatories (ECF No. 115) appended hereto as Exhibit G.

[53] *Smith v. NCEAA*, 266 F.3d 152, 162 (2001), declining to apply Title IX on the basis of indirect funding when the recipient did not assume control the program that directly received the funds and was not in the position to expressly reject/receive the funds dependent upon the obligations inherent in that receipt.

[54] Dolan Dep. (Exhibit A) at 81-82. *Rowan Blvd. Assoc. LLC v. Republic First Bank,* 2021 U.S. Dist. LEXIS 151890 (Aug. 12, 2021); *Barnes v. Gorman,* 536 U.S. 181, 186, 122 S. Ct. 2097, 2100 (2002).

[55] *Rowan Blvd. Assoc. LLC v. Republic First Bank,* 2021 U.S. Dist. LEXIS 151890 (Aug. 12, 2021); *Barnes v. Gorman,* 536 U.S. 181, 186 (2002).

[56] *Barnes v. Gorman,* 536 U.S. 181, 186 (2002), positing that "much in the nature of a contract*:* in return for federal funds, the [recipients] agree to comply with federally imposed conditions." The Court declined to impose conditions in the instance of 'vague language' within the act or unintentional violations by persons or entities without knowledge of the imposition of conditions. *Id.* 536 U.S. at 187.

15

moneys or some of them were processed through private lenders prior to reaching end recipients, such that the moneys themselves were indirectly received and without a clear exploration of notice and knowing acceptance of any burden.[57] Plaintiff has done nothing to demonstrate a knowing acceptance of any burden, and the only extant evidence is that WVSSAC's sources of funding do not include federal moneys.[58]

       Plaintiff's Equal Protection Clause claims are equally dependent on WVSSAC's being a 'state actor.'[59]  That is,

> in a claim under the Fourteenth Amendment, the defendant "must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that the non-state actor is engaged in the state's actions." *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999). Put another way, "private activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it to state action: 'Mere approval of or acquiescence in the initiatives of a private party' is insufficient." *Id.* at 507 (citation omitted).[60]

As demonstrated above, WVSSAC is not a recipient of public moneys so as to convert this private corporation into a 'state actor.' Beyond that, however, Plaintiff has alleged that the delegation of the State's authority to WVSSAC converts WVSSAC into a 'state actor' as relates to athletics and activities.[61] Specifically, Plaintiff asserts that "Defendants are all governmental actors acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment."[62] Conversely, WVSSAC is differently situated as a matter of law. Whereas the State and County Boards delegate

---

[57] *Rowan Blvd. Assoc. LLC v. Republic First Bank,* 2021 U.S. Dist. LEXIS 151890
[58] Dolan Dep. (Exhibit A) at 39;  *Smith v. NCEAA*, 266 F.3d 152, 156-57 (2001
[59] "[R]ights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority. The Equal Protection Clause does not . . . add anything to the rights which one citizen has under the Constitution against another." *United Bhd. Of Carpenters* & *Joiners, Local 610 v. Scott,* 463 U.S. 825, 831 (1983) (internal quotation marks and citations omitted).
[60] *Shipman v. Balt. Police Dept.,* 2014 U.S. Dist. Lexis 59733.
[61] *See* First Am. Compl. (ECF No. 64) at 7, 9, 102, citing in pertinent part W. Va. Code § 18-2-5; *Jones v. W.Va. State Bd. of Educ.*, 218 W. Va. 52, 61 (2005).
[62] *See* First Am. Compl. (ECF No. 64) at 102.

authority to WVSSAC, the key distinction for determining that WVSSAC would be a 'state actor' is whether WVSSAC truly assumes control of a federally funded program.[63] Reviewing courts have found expressly that giving WVSSAC the power to enforce the eligibility rules adopted by the State Board and member schools directly against the students does not constitute "ced[ing] authority."[64] Here, the schools have a voluntary relationship with WVSSAC and have retained the authority to withdraw from the association – also found to be a key determinant and a factor mitigating against any finding of control.[65] WVSSAC testified that schools can indeed withdraw, and private schools have done so.[66] While withdrawal means that the member schools would be excluded from the championships, they nonetheless may participate in sports and activities as long as they remain a 'school.'[67] However, reviewing courts have found that even if resignation meant no participation, even if it would 'thwart' the schools' desire to 'remain a powerhouse' among the schools against which it competes, nonetheless, the ability to withdraw is a "'practical alternative to compliance with [WVSSAC's] demands,'" such that WVSSAC does not *control* any of the member programs.[68]  No school is forced to join, another key determinant,[69] and each school must elect to participate.[70] The fact that each member school has an opportunity for input on the rules has been found insufficient to demonstrate *control,* just has their voluntary decision to follow them.[71] As for the eligibility enforcements, should member schools or athletes risk sanctions by violating the regulations or rules, that choice on their part demonstrates a lack of *control* by WVSSAC. The fact that "'options [may be] unpalatable does not mean that they were nonexistent.'"[72] And it is the option to be a member or

---

[63]  *Smith v. NCEAA*, 266 F.3d at 157.
[64] *Id.*
[65] *Id*. at 159.
[66] Dolan Dep. (Exhibit A) at 69.
[67] Dolan Dep. (Exhibit A) at 70.
[68] *Smith*, 266 F.3d at 159, quoting *Cureton v. NCAA,* 198 F.3d 107, 116-18 (3d Cir. 1999).
[69] *Smith*, 266 F.3d at 159.
[70] Dolan Dep. (Exhibit A) at 39.
[71] *Smith*, 266 F.3d at 159, quoting *NCAA v. Tarkanian*, 488 U.S. 179, 195 (1988).
[72] *Smith*, 266 F.3d at 156, quoting *NCAA v. Tarkanian*, 488 U.S. 179, 198 n.19 (1988).

withdraw, the option to follow the rules or face sanctions that undercuts any actionable understanding of control in which to anchor Plaintiff's Equal Protection claim. Finally, the same analysis applies whether the nomenclature is controlling authority, pervasive entwinement, public entwinement – the analysis of *control* "is no less rigorous."[73]

In other instances, federal courts have considered Title IX and Fourteenth Amendment challenges brought as against what might appear to be parallel athletic associations. *See, e.g., Communities for Equity v. Michigan High School Athletic Association,* 80 F. Supp. 2d 729 (W. D. Mich. 2000) (alleging that MHSAA discriminated against female athletes based on inequities in programs including non-traditional and/or shorter seasons and different rules); *Alston v. Virginia High School League, Inc.,* 144 F. Supp.2d 526 (W. D. Va. 1999) (alleging that VHSL denied certain female public school athletes equal treatment, opportunities and benefits based on their sex in violation of Title IX[74]). Beyond those instances, the United States Court of Appeals for the Sixth Circuit considered *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651 (6th Cir. 1981) (challenging coeducational teams in contact sports as a violation of Title IX), and *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 180 F.3d 758 (6th Cir. 1999), *rev'd* 531 U.S. 208 (2001), cited previously by the Plaintiff.  Among the factors these courts considered in determining the propriety of holding the associations accountable under federal law were sources of funding and whether the associations adopted the provisions that were alleged to be violations of federal law. That is, more particularly, the courts considered whether the associations are federally funded or receive support or dues from federally funded programs and/or whether the associations further the objectives of

---

[73] *Smith*, 266 F.3d at 160.
[74] *But see Yellow Springs,* 647 F. Supp. 2d at 658, finding that any resolution by necessity involves the Fourteenth Amendment as well.

federally funded programs. In terms of Equal Protection, the United States Supreme Court in *Brentwood* considered whether the Tennessee association was a 'state actor' given the depth with which its operations were intertwined with a single state's (Tennessee's) activities (as compared to the interstate impact of the NCAA[75]). The District Courts in both *Alston* and *Communities* (relied upon by Plaintiff) addressed Equal Protection, considering whether the athletic (as opposed to activities) associations were 'state actors,' whether they served a public function, and/or whether they had a symbiotic relationship with the State and the regulated activity.[76]

In determining whether the associations were subject to Title IX, then, the courts considered whether the source of funding was public, including flow-through funding from school dues, and/or whether the associations controlled programs or practices in the member school and/or whether the associations held functions at school facilities and/or whether the associations were involved in some manner with every school within the state (as opposed to organizations or programs across more than one state). In overview, Michigan High School Athletic Association (Michigan), Ohio High School Athletic Association (Ohio), Tennessee Secondary School Athletic Association (Tennessee) and WVSSAC are private non-profit or not-for-profit corporations, yet Ohio, Tennessee and Michigan receive some funding through member schools. Virginia High School League (Virginia) is a public, for-profit corporation that has only public schools as members and is funded by member dues.[77] Unlike Michigan, Tennessee, Ohio and Virginia,[78]

---

[75] *Nat'l Collegiate Ath. Ass'n v. Tarkanian,* 109 S. Ct. 454 (1988), finding *inter alia* that NCAA "was not a state actor because it was acting under the color of its own policies rather than under the color of state law and because university did not delegate power to petitioner to take specific action against university or respondent."

[76] *See Alston,* 144 F. Supp. 2d 526, 537.

[77] *Id.* at 527.

[78] *Yellow Springs,* 647 F.2d at 658 (finding that OHSAA issues regulations that reach deep into school administration, including  regulating the member of school administration to handle sports finances; *Alston,* 144 F Supp. 2d at 527 (accepting dues from federally funded School); *Communities,* 80 F. Supp. 2d at 732 (noting that *the bulk* of the money is from gate receipts but that MSHAA regulates within its

however, West Virginia's SSAC receives no dues whatsoever from member schools and has not for at least twenty years.[79] WVSSAC sustains itself with corporate sponsorships, advertising revenue and gate proceeds from championship meets and tournaments. Also, conversely to the Virginia High School League, WVSSAC includes parochial schools among its number, including a significant number of them at the middle school level, which schools receive no federal funds and yet who participate in WVSSAC programs.[80]

In considering the Fourteenth Amendment, the Supreme Court found in *Brentwood* that the Tennessee Association was inextricably bound and intertwined with its member schools so as to be a 'state actor.' As analyzed above, however, that entwinement requires a level of control and federal involvement not present with WVSSAC. Here, WVSSAC does not receive federal funds and does not mandate membership (nor include in its membership every public or parochial school in the state). WVSSAC's policies and regulations make no gender determinations. WVSSAC does not build or challenge rosters, and, perhaps most pointedly, WVSSAC does not have a role under H.B. 3293 (nor is there a cause of action against it included there).

In *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651 (6th Cir. 1981), the Appeals Court considered the applicability and enforcement of Title IX relative to co-educational sports, that is, whether boys and girls may play basketball on the same team. In considering whether Title IX applied to OHSAA, the Court found that

> the focus of both Title IX and the regulations is on "recipients." It is federal aid to "recipients" that will be cut off if Title IX is not complied with. "Recipients" bear ultimate responsibility for providing an equal educational opportunity. The OHSAA is not a "recipient," and does not bear the burden of non-compliance, so

---

member School by requiring that the member School adopt the "Handbook as their own and agree to be primarily responsible for their enforcement").
[79] Dolan Dep. (Exhibit A) at 39.
[80] www.wvssac.org/school-directory

> may not adopt a rule which limits the ability of recipients to furnish girls the same
> athletic opportunities it provides for boys. The OHSAA has not claimed that it
> attempted to frame rules with an eye to achieving the goal of universally applicable
> equal athletic opportunity. Thus, based on this record, we conclude that the
> determination as to compliance with Title IX must be made by individual School,
> not the OHSAA.[81]

Likewise here, pursuant to the direct language of the statute, WVSSAC will not promulgate the regulations envisioned under the statute. Once again, H.B. 3293 provides for the State Board to promulgate rules to implement the section,[82] yet the evidence adduced in discovery is that State Board rules are neither promulgated nor enforced by WVSSAC but rather are embedded in WVSSAC's rule books, where only the State Board can revise, amend, provide waivers.[83] Eligibility enforcement as a matter of law is insufficient to convert WVSSAC into a state actor.[84] Further, Plaintiff has admitted that WVSSAC is unnecessary to the relief she seeks and that the relief she seeks is unavailable through WVSSAC when she cited WVSSAC's regulations, protocols, forms as gender (and therefore transgender) neutral – certainly she has not asserted that relative to any of the other Defendants.[85]

WVSSAC does not receive federal funding, does not regulate the internal operations of member schools, and does not form team rosters. Conversely, WVSSAC opens its membership to public and parochial schools, functions outside any concept of 'state,' and operates in conjunction with regional boards, drawing officials from both West Virginia and Ohio, relying on two local boards of officials that are intrastate: Mid-Ohio Valley Local Board and the West Virginia Ohio

---

[81] *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651, 656 (6ᵗʰ Cir. 1981)
[82] W. Va. Code Section 18-2-25d(e).
[83] (Dolan Dep. (Exhibit A) at 62, testifying that the State Board's 2.0 Rule is embedded in WVSSAC's regulation book but remains the State Board's Rule. *See also* Blatt Dep. (Exhibit B) at 132-33.
[84] *Smith*, 266 F.3d at 159, quoting *Cureton v. NCAA,* 198 F.3d 107, 116-18 (3d Cir. 1999).
[85] Of note, WVSSC is an *activities* commission, as it oversees extracurricular activities beyond traditional 'sports,' such as cheerleading.

Local Board. The Supreme Court of Appeals of West Virginia has expressly found that WVSSAC is not a state agency on the basis that it has been a voluntary association since 1916 (and was not created nor empowered by the Legislature); it is not funded by public moneys; and not all public or private schools in West Virginia have elected to belong.[86] The relevant WVSSAC regulations are uniform across the board in providing one set of regulations for boys and girls,[87] such that not even Plaintiff finds WVSSAC an obstacle to accomplishing federal objectives.

Because Plaintiff has failed to prove that WVSSAC is a 'state actor' such that Title IX and the Equal Protection Clause are actionable as against it,  "the plain language of Rule 56(c) mandates the entry of summary judgment . . . [on the basis that she has failed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on that party will bear the burden of proof at trial[,]" *Celotex Corp.*, 477 U.S. at 322.

> **Plaintiff has failed to prove that WVSSAC has any role or authority under H.B. 3293, and the fact remains, at the close of discovery, that WVSSAC cannot change or affect outcome here. Therefore, no viable cause of action exists as against WVSSAC.**

H.B. 3293 relies entirely upon the State Board of Education, the Higher Education Policy Commission, and the Council for Community and Technical College Education to promulgate rules to implement its provisions.[88] As Plaintiff asserts, the Legislature specifically removed language from H.B. 3293 that would have required WVSSAC to participate in determinations made in accordance with the law.[89] As such, the statute itself occasions no changes in WVSSAC policies nor does it impose any new duties upon WVSSAC. This is highlighted by the fact that Plaintiff expressly does not assert that WVSSAC's regulations or programs violate her rights in

---

[86] Syl. pt. 2, 3, *Mayo v. WVSSAC,* 233 W. Va. 88, 96, 872 S.E.2d 224, 232 (2008).
[87] Of note, plaintiff does not challenge sex-separated teams. *See* Mem. (ECF No. 19) at 16. *See also* note 13, above.
[88] W. Va. Code § 18-2-25d(e) (effective July 8, 2021).
[89] *See* First Am. Compl. (ECF No. 64) at ¶ 49.

22

**JA0511**

any way and, to the contrary, currently allow inclusion regardless of gender/transgender determinations.[90] The evidence adduced in discovery is that the State Board rule mandated by the statute would be embedded in WVSSAC's rules, where WVSSAC's sole role would be eligibility determinations (which do not constitute 'state action').[91] Per the statute as passed, any determinations to be made as to the assignment of a particular student to either a girls' or boys' team will be made at the State or County level and resolved prior to submission of rosters to WVSSAC.[92] At this time, WVSSAC has no role suggested or associated with the law created by H.B. 3293, and, therefore, WVSSAC should not be a party to this action.  This position is highlighted by the fact that H.B. 3293 does not envision a cause of action against WVSSAC for any statutory violation (no doubt because WVSSAC does not affect or make determinations under the statute).[93]

Because of WVSSAC's lack of a role under H.B. 3293, Plaintiff lacks evidence to support her case as against WVSSAC. *Celotex Corp.,* 477 U.S. at 325. Therefore, WVSSAC is entitled to summary judgment because the record as a whole could not lead a rational trier of fact to find for the non-moving party. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

**I.   By its express terms, H.B. 3293 does not include WVSSAC in its enforcement or in any relief thereunder, such that Plaintiff's pre-enforcement action must fail as a matter of law.**

The language of H.B. 3293, in describing those entities against which relief may be sought for any statutory violation, does not reference WVSSAC in any way. The express terms of H.B.

---

[90] Mem. (ECF No. 19), at n.6.  *See also* Consolidated Response (ECF No. 53), stating that "West Virginia already had a long-standing and unchallenged policy of establishing separate school sports teams for boys and girls, as well as no law or policy categorically prohibiting girls who are transgender from playing on girls' teams. *See* W. Va. Code R. § 127-2-3.8; (Dkt. 42 ("U.S. SOI") at 6."
[91] HCBOE Dep. (Exhibit C) at 215; Dolan Dep. (Exhibit A) at 46, 60, 155-56.; Blatt Dep. (Exhibit B) at 132-33.
[92] HCBOE Dep. (Exhibit C) at 214-16.
[93] W. Va. Code § 18-2-25d(d), (e) (effective July 8, 2021).

**JA0512**

3293 contemplate that the State Board of Education, the Higher Education Policy Commission, and the Council for Community and Technical College Education shall promulgate rules to implement its provisions.[94] On information and belief, the State Board has not promulgated regulations as envisioned in H.B. 3293; however, the statute itself occasions no changes in WVSSAC policies nor imposes any new duties on WVSSAC. In fact, as Plaintiff's Complaint indicates, the legislature considered including WVSSAC in H.B. 3293 but ultimately chose not to do so. *See* First Am. Complaint (ECF No. 64) at ¶¶ 49. This statutory silence is reflected as well in the evidence adduced in discovery, where the State Board's rule will be embedded in WVSSAC's regulations,[95] where the schools will create the rosters,[96] where eligibility fails to rise to the level of 'state action.'[97] WVSSAC has no actionable role, and the statute does not envision a cause of action against WVSSAC for any statutory violation (no doubt because enjoining or not enjoining WVSSAC does not affect outcome under this statute).[98]

Plaintiff avers that WVSSAC's involvement is gender and transgender neutral.[99] Plaintiff does not assert that WVSSAC's regulations or programs violate her rights in any way. Plaintiff has asserted that, prior to H.B. 3293, West Virginia had "separate sports teams for boys and girls and did not categorically bar girls like B.P.J. from competing in school sports on girls' teams."[100] In particular, as relates to cross-country and track, all WVSSAC regulations are uniform across

---

[94] W. Va. Code §18-2-25d(e) (effective July 8, 2021).
[95] HCBOE Dep. (Exhibit C) at 215; Dolan Dep. (Exhibit A) at 46, 60, 155-56.; Blatt Dep. (Exhibit B) at 132-33.
[96] HCBOE Dep. (Exhibit C) at 214-16.
[97] *Smith*, 266 F.3d at 156, quoting *NCAA v. Tarkanian*, 488 U.S. 179, 198 n.19 (1988).
[98] W. Va. Code §18-2-25d(d) and (e) (effective July 8, 2021).
[99] Jackson Declaration (ECF No. 2-1) at ¶25 (p. 23). *See Communities,* 459 F.3d at 695, finding that "[d]isparate treatment does not arise from any and all differences in treatment; it occurs only where the offending party '*treats some people less favorably* than others because of their race, color, religion, sex, or national origin'" (emphasis in original).
[100] *See* Mem. (ECF No. 19) at 7, citing §127-2-3.8 (Eligibility), which states in pertinent part "School may sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill."

24

**JA0513**

the board in providing one set of regulations for boys and girls.[101] Further, Heather Jackson admits that "verification of 'reproductive biology and genetics' is not part of the routine sports physical exam required by Defendant WVSSAC."[102] WVSSAC's physical examination form, the sole registration form WVSSAC requires from athletes for participation, is not impacted by H.B. 3293 and does not have the athletes identify themselves by gender.[103]  WVSSAC does not have regulations that categorically ban transgender athletes nor does WVSSAC's enrollment paperwork (physical exam) ask athletes to select or identify themselves by gender. WVSSAC has not determined the appropriate team for B.P.J. but only 'received'[104] the rosters for cross-country or track with her name in place. That is, WVSSAC will not drive outcome, will not determine the solution, will not enforce H.B. 3293, and is not identified or called upon in H.B. 3293 to do anything whatsoever.

For these reasons, as against WVSSAC, Plaintiff's suit is not properly positioned for pre-enforcement review.

> To determine whether a case is ripe for pre-enforcement review, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller [v. Brown]*, 462 F.3d [312], 319 (4th Cir. 2006*)* (citation omitted); *see Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003) (setting forth fitness and hardship as the two predominant factors in determining ripeness). With respect to fitness, a claim is unfit for adjudication where the possibility of injury is remote and the issues presented abstract. *Texas v. United States*, 523 U.S. 296, 301, 118 S. Ct. 1257, 140 L. Ed. 2d 406 (1998) ("A claim is not ripe . . . if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, 580-81, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985))); *Miller*, 462 F.3d at 319 (to be ripe, an action in controversy must not be "dependent on future uncertainties.").[105]

---

[101] Of note, Plaintiff does not challenge sex-separated teams. *See* Mem. (ECF No. 19) at 16. *See also* §127-3-22. Cross Country (Boys and Girls); §127-3-29. Track and Field (Boys and Girls)

[102] *See* Mem. (ECF No. 19) at n.6.

[103] Jackson Declaration (ECF 2-1) at Exhibit A.

[104] HCBOE Dep (Exhibit C) at 218, 236.

[105] *Air Evac. EMS, Inc., v. Cheatham,* 260 F. Supp. 3d 628, 636-37 (S.D. W. Va. 2017).

25

JA0514

For all of the reasons set forth herein, in particular, that WVSSAC's role will be nothing more than potential eligibility determinations which have been expressly to be other than 'state action,' any pre-enforcement action against it is remote, abstract, based on contingencies that no one has proven have any likelihood of occurring. Including WVSSAC creates a substantial hardship for it and yet advances Plaintiff's case not at all. Dismissal is appropriate as against WVSSAC at this time as Plaintiff's remote, abstract claim against it is unfit for adjudication at this time.

### A. Plaintiff recognizes WVSSAC's regulations as neutral and is participating under them now, without intervention or amendment.

WVSSAC's exclusion from the enrolled legislation is meaningful, that the Legislature is presumed to have included or excluded knowingly.[106] Plaintiff has not attempted to refute her admission in her First Amended Complaint that the Legislature specifically removed language from H.B. 3293 that would have required WVSSAC to participate in determinations made in accordance with the law.[107] Plaintiff has produced no evidence that WVSSAC will have a role in implementing H.B. 3293. On all of these points, Plaintiff overlooks that the WVSSAC regulations under which Plaintiff is now participating have been neutral and inclusive at all times and required no engineering or adjustment to allow for Plaintiff's participation, whether with or without the injunction in place. Once again, as relates to cross-country and track, all WVSSAC regulations are uniform across the board in providing one set of regulations for boys and girls.[108] Further, Heather Jackson admits that "verification of 'reproductive biology and genetics' is not part of the routine

---

[106] West Virginia's Code Chapter 18 elsewhere cites WVSSAC, but WVSSAC is expressly excluded in W. Va. Code § 18-2-25d(e). "[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983).
[107] *See, e.g.,* First Am. Compl. at ¶ 50.
[108] Of note, Plaintiff does not challenge sex-separated teams. *See* Mem. (ECF No. 19) at 11. *See also* §127-3-22. Cross Country (Boys and Girls); §127-3-29. Track and Field (Boys and Girls).

sports physical exam required by Defendant WVSSAC."[109] WVSSAC's physical examination form, the sole registration form WVSSAC requires from athletes for participation, is not impacted by H.B. 3293 and does not have the athletes identify themselves by gender.[110]

Where Plaintiff now embraces the broad statute and speculates what authority WVSSAC may gain, the more particularized regulations remain in place without any indication that the Plaintiff's inclusion would mandate change. Where both a broad statute and more specific regulations apply, the general rules of statutory construction provide guidance, whether directly or by analogy:

> Pursuant to elementary principles of statutory construction, unless the legislature has indicated that it intends otherwise, a specific statutory provision controls a more general one. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375, 107 L. Ed. 2d 782, 110 S. Ct. 680 (1990) ("It is an elementary tenet of statutory construction that 'where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one ....'" (*quoting Morton v. Mancari,* 417 U.S. 535, 550-51, 41 L. Ed. 2d 290, 94 S. Ct. 2474 (1974*))); see also Warren v. N.C. Dep't of Human Res.,* 65 F.3d 385, 390 (4th Cir. 1995) ("It is an elementary principle of statutory construction that a specific statutory provision controls a more general one.").[111]

Here, where Plaintiff is participating in cross-country and track pursuant to precise, particularized WVSSAC regulations and form, Plaintiff's reliance on the more generalized enabling statute and on suggestions and specters of what is yet to come is improper. The elemental rules of statutory construction would not allow that upstream migration. Here, where WVSSAC has produced precise and event specific regulations as recognized by Plaintiff as neutral, the Commission's reliance on its regulations would be supportable as well as a matter of law. *Chevron, USA v. NRDC, Inc.,* 104 S. Ct. 2778, 2782 (1984).

---

[109] *See* Mem. (ECF No. 19) at n.6.
[110] Jackson Declaration (ECF No. 2-1) at Exhibits A; West Virginia Secondary School Activities Commission Response to Plaintiff's Motion for Preliminary Injunction (ECF No. 47-2) at Exhibit B.
[111] *S.C. Dept. of Health & Evtl. Control v. Commerce & Indus.,* 372 F.2d 245, 258 (4th Cir. 2004).

Where WVSSAC's regulations are neutral, where WVSSAC will accept/embed the new regulation (not pass it), and where eligibility determinations fail to serve as 'state action,' WVSSAC has no role here, such that dismissal as a matter of law is the necessary and proper outcome at this time.

## IV.    CONCLUSION.

Because Plaintiff has failed to prove that WVSSAC is a state actor, because WVSSAC has no role under H.B. 3293, and because all of the genuine material facts in the light most favorable to the Plaintiff still cannot support a case that any fact-finder could embrace, dismissal of WVSSAC as a matter of law is the necessary and proper outcome at this time.

**WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,**
**By Counsel.**

*/S/ Roberta F. Green*

_____
Roberta F. Green (WVSB #6598)
Kimberly M. Bandy (WVSB #10081)
Shannon M. Rogers (WVSB # 13920)
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street East, Suite 200 (25301
Charleston, WV 25339
(304) 345-1400
(304) 343-1826 FAX
rgreen@shumanlaw.com
kbandy@shumanlaw.com
srogers@shumanlaw.com

JA0517

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**B.P.J., by her next friend and mother,**
**HEATHER JACKSON,**
　　　**Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**Civil Action No. 2:21-cv-00316**
　　　　　　　　　　　　　　　　　　**Honorable Joseph R. Goodwin, Judge**

**WEST VIRGINIA STATE BOARD OF EDUCATION,**
**HARRISON COUNTY BOARD OF EDUCATION,**
**WEST VIRGINIA SECONDARY SCHOOL**
**ACTIVITIES COMMISION, W. CLAYTON BURCH**
**in his official capacity as State Superintendent, and**
**DORA STUTLER in her official capacity as**
**Harrison County Superintendent,**
　　　**Defendants,**

**And**

**LAINEY ARMISTEAD,**
　　　**Defendant-Intervenor.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I, Roberta F. Green, have this day, the 21st day of April, 2022, served a true and exact copy of **"WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT"** with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| Loree Beth Stark | Kathleen R. Hartnett |
| Nicholas Ward | Julie Veroff |
| ACLU of WV FOUNDATION | COOLEY LLP |
| 1614 Kanawha Boulevard, East | 101 California St. – 5th Floor |
| Charleston, WV  25311 | San Francisco, CA 94111-5800 |
| lstark@acluwv.org | khartnett@cooley.com |
| nward@acluwv.org | jveroff@cooley.com |

JA0518

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
kkang@cooley.com


 Andrew Barr
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO  80202-5686
abarr@cooley.com

Joshua Block
Chase Strangio
ACLU FOUNDATION
125 Broad Street
New York, NY  10004
jblock@aclu.org

Sruti Swaminathan
LAMBDA LEGAL
120 Wall St., 19th Floor
New York, NY 10005
sswaminathan@lambdalegal.org


Kelly C. Morgan
Michael W. Taylor
Kristen Vickers Hammond
BAILEY & WYANT, PLLC
500 Virginia St., East, Suite 600
Charleston, WV  25301
kmorgan@baileywyant.com
mtaylor@baileywyant.com
khammond@baileywyant.com

Douglas P. Buffington, II
Curtis R.A. Capehart
Jessica A. Lee
State Capitol Complex
Building 1, Room E-26
Charleston, WV  25305-0220
Curtis.R.A.Capehart@wvago.gov

Elizabeth Reinhardt
COOLEY LLP
500 Boylston St., 14th Floor
Boston, MA  02116-3736
ereinhardt@cooley.com

Avatara Smith-Carrington
LAMBDA LEGAL
3500 Oak Lawn Ave., Suite 500
Dallas, TX 75219
asmithcarrington@lambdalegal.org

Carl Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA  30030
ccharles@lambdalegal.org

Susan Llewellyn Deniker
Jeffrey M. Cropp
STEPTOE and JOHNSON, LLC
400 White Oaks Boulevard
Bridgeport, WV  26330
susan.deniker@steptoe-johnson.com
jeffrey.cropp@steptoe-johnson.com


Tara Borelli
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org


David C. Tryon
West Virginia Atty. General's Office
1900 Kanawha Blvd., E.
Bldg. 1, Rm 26E
Charleston, WV  25305
David.C.Tryon@wvago.gov

**JA0519**

Taylor Brown
American Civil Liberties Union
125 Broad St., 18th Floor
New York, NY 10004
tbrown@aclu.org


Jonathan Scruggs
Roger Greenwood Brooks
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
jscruggs@adflegal.org
rbrooks@adflegal.org

Timothy D. Ducar
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ  85260
tducar@azlawyers.com

Anthony E. Nortz
Kesner & Kesner
112 Capitol Street
Charleston, WV  25301
anortz@kesnerlaw.com

Aria S. Vaughan
U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
aria.vaughan@usdoj.gov

Brandon S. Steele
Joshua D. Brown
Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Ste 100
Beckley, WV  25801
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Christiana Holcomb
Rachel Csutoros
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
cholcomb@adflegal.org
rcsutoros@adflegal.org

Meredith Taylor Brown
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
tbrown@aclu.org

Michael W. Taylor
BAILEY & WYANT PLLC
500 Virginia St., E. – Suite 600
Charleston, WV 25301
mtaylor@baileywyant.com

Fred B. Westfall, Jr.
Jennifer M. Mankins
United States Attorney's Office
300 Virginia Street, East – Rm. 400
Charleston, WV 25301
fred.westfall@usdoj.gov
jennifer.mankins@usdoj.gov

JA0520

*/S/ Roberta F. Green*

_____
Roberta F. Green, Esquire (WVSB #6598)
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street E., Suite 200 (25301)
Charleston, West Virginia
 (304) 345-1400; FAX: (304) 343-1826
*Counsel for Defendant WVSSAC*
rgreen@shumanlaw.com

**JA0521**



| Rule 5-3 | 2020 NFHS Track and Field Rules | Page 32 |

**STAGGERS IN METERS**

**FOR 30-INCH LANES (INDOOR ONLY)**

| Staggers for: | 1 Turn* | 2 Turns | 3 Turns | 4 Turns |
|---|---|---|---|---|
| All lanes | 2.39 m | 4.79 m | 7.18 m | 9.57 m |

**FOR 36-INCH LANES**

| All lanes | 2.87 m | 5.74 m | 8.62 m | 11.49 m |
|---|---|---|---|---|

**FOR 42-INCH LANES**

| All lanes | 3.35 m | 6.70 m | 10.06 m | 13.40 m |
|---|---|---|---|---|

\* A turn is the curved portion of the track. A standard 400-meter track has two turns (curves) in one lap.

**ART. 6** ... For races around one or more curves that are not run in lanes, a curved starting line may be used so that each competitor will run the same distance going into the first curve. The curved starting line may be established by driving a row of pins 10 feet (3 meters) apart, 12 inches (30 centimeters) from the curb. The first pin is to be 12 inches (30 centimeters) from the curb at the start. Usually seven or eight pins are sufficient.

**NOTES:**

1. If a painted line is used to mark the inside lane boundary for Lane 1, the first pin is to be 8 inches (20 centimeters) from the curb at the start. Using a steel tape 100 feet (30 meters) long or longer with the pin farthest from the start as a center, scribe an arc from the pole to the outer curb of the track. This will not be an arc of a circle as the radius will change as the tape loses contact with each successive pin.

2. It is recommended that a dashed line of the same color and curvature as the starting line(s) be painted on the track three meters behind the curved starting line(s) in order to aid in the step-up start.

The 3-meter (10-foot) distance for spacing of the pins is an arbitrary and sufficiently accurate interval. The accompanying diagram will help in properly constructing the starting line.

When using the curved starting line on the straightaway, scribe an arc with the center at the pole and with a radius of 100 feet. In this case, the curved line will be an arc of a circle since the radius is constant. For races around one or more curves where alleys are used, a curved starting line within each alley should be utilized. To accurately equate the starting line, each alley shall be measured separately using this procedure.

**Figure 2**

AB—Curved starting line
AC—Finish line
A—Junction of straightaway and curve
"12" (30cm)
*6" (20 cm) if a 2" raised curb is not used

---

| Page 33 | 2020 NFHS Track and Field Rules | Rule 5-4 |

**ART. 7** ... Hurdle Spacing:

**Boys Competition**

| Distance of Race | No. of Hurdles | Hurdle Height | Starting Line to First Hurdle | Between Hurdles | Last Hurdle to Finish Line |
|---|---|---|---|---|---|
| 55 m | 5 | 39 in. | 13.72 m (45 ft.) | 9.14 m (30 ft.) | 4.72 m (15 ft., 5⅞ in.) |
| 110 m | 10 | 39 in. | 13.72 m (45 ft.) | 9.14 m (30 ft.) | 14.02 m (45 ft. 10⅝ in.) |
| 300 m | 8 | 36 in. | 45 m (147 ft., 7⅜ in.) | 35 m (114 ft., 10 in.) | 10 m (32 ft. 9¾ in.) |

**Girls Competition**

| Distance of Race | No. of Hurdles | Hurdle Height | Starting Line to First Hurdle | Between Hurdles | Last Hurdle to Finish Line |
|---|---|---|---|---|---|
| 55 m | 5 | 33 in. | 13 m (42 ft., 8 in.) | 8.5 m (27 ft., 10¾ in.) | 8 m (26 ft., 3 in.) |
| 100 m | 8 | 33 in. | 13 m (42 ft., 8 in.) | 8.5 m (27 ft., 10¾ in.) | 10.5 m (34 ft., 5¼ in.) |
| 300 m | 8 | 30 in. | 45 m (147 ft., 7⅜ in.) | 35 m (114 ft., 10 in.) | 10 m (32 ft., 9¾ in.) |

**NOTE:** *State associations may adopt either the low (30-inch) or high (33-inch) height in the 100-meter hurdle race for girls, but national records are recognized only at the 33-inch height.

**SECTION 4 TRACK EQUIPMENT**

The NFHS does not perform scientific tests on any specific items of equipment to determine if the equipment poses undue risks to student-athletes, coaches, officials or spectators. Such determinations are the responsibility of equipment manufacturers.

**ART. 1** ... Starting blocks are blocks or pedals mounted on a frame to ensure a rigid surface against which the feet may be braced to start a race. Springs, hand or body supports shall not be permitted.

**ART. 2** ... An adapter on the blocks may be used by competitors, provided it is not necessary to modify the track.

**ART. 3** ... The relay baton shall not exceed 11.81 inches (30 centimeters) in length. Its circumference shall be at least 4 inches and no more than 5 inches (102-127 millimeters). It shall be a smooth, hollow tube, made in one piece of wood, metal or other rigid material. It shall weigh at least 1.766 ounces (50 grams). Tape shall not be used to wrap the baton.

**ART. 4** ... The hurdle shall be constructed to fit within the track lanes, and the top bar shall have a dimension of about 2¾ inches (7 centimeters) in height. It shall be painted white or white with two or more vertical or diagonal stripes.

**ART. 5** ... The pullover force is that force which, when applied to the top of a hurdle, will cause it to overturn.

**ART. 6** ... The hurdle shall be of such weight and balance that it requires a steady pullover force of not less than the following weights at the specified heights as follows:

| 30 in. = 8 lb. | (3.629 kg) | 36 in. = 6 lb. | (2.722 kg) |
|---|---|---|---|
| 33 in. = 7 lb. | (3.175 kg) | 39 in. = 6 lb. | (2.722 kg) |

Rule 6-5     2020 NFHS Track and Field Rules     Page 52

**ART. 22** . . . The planting box shall not contain any foreign materials except planting box padding, which shall meet the ASTM Standards. Such padding can be incorporated into the design of the planting box or can be a padding addition to an existing planting box.

**ART. 23** . . . No person shall be allowed to touch the vaulting pole except the pole may be caught by an assigned official, assigned pole catcher or the competitor, when circumstances warrant, but never to prevent the pole from dislodging the bar. If there is a tailwind that might cause a properly released pole to fall forward, the referee should appoint an official and authorize him/her to catch the pole after it has been properly released.

**ART. 24** . . . After competition has started, the bar shall not be lowered, except to determine a first-place winner when a tie for that place is involved.

**ART. 25** . . . An accurate measurement of the height of the crossbar will be taken before each record attempt. Any displaced crossbar should be placed on the standards in exactly the same position as before its displacement. To ensure this, one face should be marked for identification.

**ART. 26** . . . Measurements shall be recorded to the nearest lesser ¼ inch or centimeter. Measurements shall be made with non-stretchable tape such as fiberglass, nylon, steel or certified scientific measurement device (laser). Measurement of the official height shall be from a point on the same level as the takeoff to the lowest point on the upper side of the crossbar.

**ART. 27** . . . It is a foul if the competitor:

a. Displaces the crossbar from the pins on which it originally rested, with the body or the pole.
   **NOTE:** If the crossbar and/or uprights are placed incorrectly by the contest official, the trial is not recorded as a foul and fails to clear the crossbar.

b. Leaves the ground in an attempt and fails to clear the crossbar.
   **EXCEPTION:** The competitor aborts the approach and in stopping plants the pole and momentum causes his/her feet to leave the ground.

c. During the vault, raises the hand which is uppermost when he/she leaves the ground to a higher point on the pole, or if the hand which was underneath is raised to any point on the pole above the other hand.

d. Allows any part of his/her body or the pole to touch the ground or the landing system beyond the vertical plane of the top of the stopboard, without first clearing the bar.

e. Fails to initiate a purposeful action of completing the requirements of the athletic challenge (trial) within the prescribed time period after the competitor's name is called and after the crossbar and standards have been set.

f. After clearing the crossbar, contacts an upright and displaces the crossbar.

g. Steadies the crossbar with a hand(s) or arm(s).

h. Grips the pole above the top hand-hold band.

i. Touches or catches the pole preventing it from dislodging the crossbar.

**PENALTY: An unsuccessful trial is charged.**

---

Page 53     2020 NFHS Track and Field Rules     Rule 6-6

## SECTION 6 DISCUS THROW

**ART. 1** . . . The discus shall be constructed so that its body is of wood or other suitable material attached to a circumscribing smooth metal or plastic rim. Metal plates shall be set flush with the sides of the wood, plastic or composition material body and in the exact center as a means of acquiring the correct weight. These metal plates shall be circular with a diameter of 2 inches (5 centimeters). Each side of the discus shall be a counterpart of the other side and there shall be no indentations, projecting points or sharp edges. Each side shall taper in a straight line from the beginning of the curve of the rim to the edge of the centrally placed metal plate. A discus constructed entirely of rubber, plastic or metal alloys is legal if it conforms with the specifications for weight, size and shape. The rim of the discus shall not be sandblasted and shall remain smooth.

**ART. 2** . . . The discus shall meet the following specifications:

| | Boys Competition | Girls Competition |
|---|---|---|
| Weight (minimum) | 1.6 kg. (3.527 lb.) | 1.0 kg (2.205 lb.) |
| Diameter (minimum) | 209 mm (8.228 in.) | 180 mm (7.087 in.) |
| (maximum) | 211 mm (8.307 in.) | 182 mm (7.165 in.) |
| Diameter of Core (minimum) | 50 mm (1.968 in.) | 50 mm (1.968 in.) |
| (maximum) | 57 mm (2.244 in.) | 57 mm (2.244 in.) |
| Thickness of Center (minimum) | 40 mm (1.575 in.) | 37 mm (1.457 in.) |
| (maximum) | 42 mm (1.654 in.) | 39 mm (1.535 in.) |
| Rim thickness ¼ inch From Edge: | | |
| (minimum) | 12 mm (0.472 in.) | 12 mm (0.472 in.) |
| (maximum) | 13 mm (0.512 in.) | 13 mm (0.512 in.) |
| Radius of Edge | 6 mm (0.236 in.) | 6 mm (0.236 in.) |

**ART. 3** . . . The throwing circle shall be 8 feet, 2½ inches (2.50 meters) in diameter. The circumference shall be marked with a metal, wood or plastic band which shall not rise more than ¾ inch (1.9 centimeters) above the level of the circle or, if the circle has a surface of asphalt, concrete, wood or other hard material, a painted line 2 inches (5 centimeters) wide may be substituted for the band. The inside edge of the line or band is the limit of the throwing circle.

**ART. 4** . . . Projecting lines, 2 inches (5 centimeters) wide and 8 inches (20 centimeters) long, lying on the diameter extended and outside the circumference, shall be used to designate the back half of the throwing circle. (Figure 7)

**ART. 5** . . . A 34.92-degree sector shall be marked on the ground and drawn from the center of the throwing circle. The inside edges of these lines shall mark the sector. **Refer to Appendix B regarding setting up the sector.**

**ART. 6** . . . The use of a protective cage is required. For portable or permanent installation, there shall be a rear to the cage as well as sides that extend forward at least to the front of the ring. It is recommended that the cage be constructed of

## Rule 6-6    2020 NFHS Track and Field Rules    Page 54

heavy nylon netting or other material that will absorb the energy of the discus to prevent bounce back. **See Appendix A for options regarding dimensions of the cage.**

**NOTES:**
1. The ends of the cage (wing/gate pole) should be placed within 4 to 5 feet of the sector lines.
2. The discus throwing cage is designed to provide limited protection for competitors, officials and spectators in the immediate throwing area. Due to the nature of the event, it does not assure the safety of the store-mentioned personnel.
3. It is recommended that all throwing areas be cordoned off, roped, fenced or flagged well outside the sector lines to minimize the risk of injury for spectators and athletes.



Figure 7



Figure 8



DISCUS/HAMMER PAD SECTION A-A

Figure 9

## Page 55    2020 NFHS Track and Field Rules    Rule 6-7

**ART. 7** . . . Taping of any part of the throwing hand or fingers shall not be permitted unless there is an open wound that must be protected by tape. Taping of the wrist is permissible. Gloves are not permitted; however, a support belt may be worn. No harness or mechanical device attached to the hand or arm shall be used.

**ART. 8** . . . The lines which mark the throwing sector and the limits of the sector. A throw shall be made from inside the circle.

**ART. 9** . . . It is a foul if the competitor:
a. Fails to initiate a purposeful action of completing the requirements of the athletic challenge of the event within one minute after the competitor's name is called.
b. After stepping into the circle, fails to pause before starting the throw.
c. After starting the attempt, touches any surface outside the circle during a throw.
d. Throws the discus so it does not fall within the sector lines.
e. Throws a discus which hits the cage and/or an object outside the sector before landing within the sector.
f. Leaves the circle before the implement has landed.
g. Does not exit the back half of the circle.

**PENALTY: The throw is not measured, but counts as a trial.**

**ART. 10** . . . The measurement shall be from the nearest edge of the first mark made by the discus to the inside edge of the throwing circle nearest such mark, measured along an extended radius of the circle.

**ART. 11** . . . Measurements shall be recorded to the nearest lesser inch or centimeter. Measurements shall be made with nonstretchable tape such as fiberglass, nylon, steel or certified scientific measurement device (laser). The judges shall hold the tape in such a way that the readings will be at the circle.

## SECTION 7 SHOT PUT

**ART. 1** . . . The shot shall be constructed so its body is a solid sphere made of any metal or suitable material not softer than brass, or a shell of such metal filled with lead or other material. The shot shall not have indentations other than a weight marking which must be manufactured in such a manner that no advantage is gained by the grip. For indoor meets only, a shot consisting of a shell of rubber or plastic with a center filled with lead pellets may be used.

**ART. 2** . . . The shot shall meet the following specifications:

| | Boys Competition | Girls Competition |
|---|---|---|
| Weight (minimum) | 5.443 kg (12 lb.) | 4.0 kg (8.818 lb.) |
| Diameter (minimum) | 98.4 mm (3.875 in.) | 95 mm (3.740 in.) |
| (maximum) | 117.5 mm (4.625 in.) | 110mm (4.331 in.) |
| Circumference (minimum) | 12¼ in. (30.91 cm) | 11⅝ in. (29.84 cm) |
| (maximum) | 14½ in. (36.91 cm) | 13⅝ in. (34.56 cm) |

| Rule 6-8 | 2020 NFHS Track and Field Rules | Page 58 |
|---|---|---|

Wrapping the whipcord binding with tape is prohibited.

**Specifications for the alternate rubber tip used in lieu of the metal point:**

| | |
|---|---|
| Overall length of rubber tip | 35–77 millimeters |
| Diameter of front of rubber tip | 14–35 millimeters |
| Thickness at front of rubber tip | 5 millimeter minimum |

**NOTE:** When a rubber tip is used, the metal point shall end in a slightly rounded button-shape or other feature onto which the rubber tip shall be attached. The tip should be made of rubber or an equivalent soft plastic.

**ART. 2 . . .** The javelin shall meet all IAAF specifications. The most important specifications are outlined below:

| | Boys Competition | Girls Competition |
|---|---|---|
| Weight (minimum) | 800 g (1.764 lb.) | 600 g (1.323 lb.) |
| Overall Length | | |
| (minimum) | 260 cm (8 ft. 6⅜ in.) | 220 cm (7 ft. 2⅝ in.) |
| (maximum) | 270 cm (8 ft. 10⁵⁄₁₆ in.) | 230 cm (7 ft. 6⁹⁄₁₆ in.) |
| Length of metal head | | |
| (minimum) | 25 cm (9.842 in.) | 25 cm (9.842 in.) |
| (maximum) | 33 cm (12.992 in.) | 33 cm (12.992 in.) |
| Distance from tip of metal head to center of gravity | | |
| (minimum) | 90 cm (2 ft. 11⁷⁄₁₆ in.) | 80 cm (2 ft. 7½ in.) |
| (maximum) | 106 cm (3 ft. 5¾ in.) | 92 cm (3 ft. ¼ in.) |
| Diameter of shaft at thickest point, front of grip | | |
| (minimum) | 25 mm (0.984 in.) | 20 mm (0.787 in.) |
| (maximum) | 30 mm (1.181 in.) | 25 mm (0.984 in.) |
| | **Boys Competition** | **Girls Competition** |
| Diameter of tail midpoint (minimum) | No less than 90% of diameter of front of grip | No less than 90% of diameter of front of grip |
| Diameter of front midpoint (maximum) | No greater than 90% of diameter of front of grip | No greater than 90% of diameter of front of grip |
| Width of cord grip | | |
| (minimum) | 15 cm (5.906 in.) | 14 cm (5.512 in.) |
| (maximum) | 16 cm (6.299 in.) | 15 cm (5.906 in.) |

**ART. 3 . . .** The runway for the throw should have a minimum length of 120 feet (36.5 meters) and shall be marked by two parallel lines, 13 feet, 1½ inches (4 meters) apart and terminated by a foul-line arc with a radius of 26 feet, 3 inches (8 meters) as shown on Figures 13 and 14. The foul-line arc shall be marked with white marking material or a white metal, plastic or wood band 2¾ inches (7 cm) in width. If using a band, the top surface shall be level with the throwing surface.

---

| Page 59 | 2020 NFHS Track and Field Rules | Rule 6-8 |
|---|---|---|

The line or band shall be in the throwing sector with the edge toward the runway coinciding with the foul-line arc. A line 2¾ inches (7 cm) in width and 2 feet, 5½ inches (75 cm) in length shall be placed or painted on each side of the runway perpendicular to the side boundary lines at the intersection of the foul-line arc and the inside of the side boundaries at the intersection of the side boundary lines. The athlete must exit behind the intersection of the arc and the foul line. (Figures 13 and 14)

**ART. 4 . . .** The throwing sector into which the javelin must fall is that area defined by extending radii through the two intersections of the arc with the runway lines and a point midway between the runway lines and 26 feet, 3 inches (8 meters) from the foul line. (Figure 13)

**ART. 5 . . .** The foul line is the hairline which is used to mark the limit of a competitor's run during a trial. (Figure 13)



Figure 13
Javelin Run-up Lane



Figure 14
Javelin Runway

**ART. 6 . . .** Taping of any part of the throwing hand or fingers shall not be permitted unless there is an open wound that must be protected by tape. Taping of the wrist is permissible. Gloves are not permitted; however, a support belt may be worn.

## Rule 7-1 — 2020 NFHS Track and Field Rules — Page 62

e. In the process of landing or leaving the pit, touches the ground outside the landing area nearer the foul line than the nearest mark made in the landing pit.

f. Fails to initiate the purposeful action of completing the requirements of the athletic challenge (jump/trial) of the event within one minute (or prescribed time limit) after the competitor's name is called. (6-2-2 Table)

**PENALTY: An unsuccessful trial is charged but not measured.**

ART. 9 ... Each legal jump shall be measured perpendicularly to the foul line or its extension and from that point in the pit touched by the person or apparel of the jumper which is nearest the foul line or its extension.

ART. 10 ... The judges shall hold the tape in such a way that the readings will be at the takeoff board.

ART. 11 ... Measurements shall be recorded to the nearest lesser ¼ inch or centimeter. Measurements may be made with non-stretchable tape such as fiberglass, nylon, steel or certified scientific measurement device (laser). Other scientific measuring devices may be used if approved by the games committee.

## Rule 7  Special Events

### SECTION 1 DECATHLON, PENTATHLON, HEPTATHLON

NOTE: The standard scoring for special events should be a point scale established by IAAF unless state association determines otherwise.

ART. 1 ... The boys decathlon shall consist of 10 events which shall be held on two consecutive days in the following order, unless state association rules apply:

| First day | Second day |
| --- | --- |
| 100-meter Dash | 110-meter HH |
| Long Jump | Discus Throw |
| Shot Put | Pole Vault |
| High Jump | Triple Jump or Javelin Throw |
| 400-meter Dash | 1600- or 1500-meter Run |

NOTE: Scoring table for the 1600-meter run is located at www.nfhs.org, Track and Field.

ART. 2 ... The pentathlon shall consist of five events which shall be held in the following order, unless state association rules apply:

| Boys | Girls |
| --- | --- |
| Long Jump | 100-meter HH |
| High Jump | High Jump |
| 200-meter Dash | Shot Put |
| Discus Throw | Long Jump |
| 1600- or 1500-meter Run | 800-meter Run |

NOTE: Scoring table for the 1600-meter run is located at www.nfhs.org, Track and Field.

## Page 63 — 2020 NFHS Track and Field Rules — Rule 8-1

ART. 3 ... The girls heptathlon shall consist of seven events which will be held on two consecutive days in the following order, unless state association rules apply:

| First Day | Second Day |
| --- | --- |
| 100-meter HH | Long Jump |
| High Jump | Javelin Throw* |
| Shot Put | 800-meter Run |
| 200-meter Dash | |

*Some state associations substitute the discus throw for the javelin throw.

### SECTION 2 SPECIAL EVENTS

ART. 1 ... The following may be included in the order of events and shall be conducted under USATF youth event rules unless state association policy determines otherwise (www.usatf.org/about/competition-rules.aspx):
a. Shuttle relays
b. Specialty relays
c. Steeplechase
d. Hammer throw
e. Race walking
f. Indoor weight throw (using legal weight throw cage)

## Rule 8  Cross Country

NOTE: All uniform rules are now in Rule 4-3.

### SECTION 1 COURSE

ART. 1 ... The cross country course shall be 2,500 to 5,000 meters (1.5 to 3.1 miles) in length as determined by the meet director or games committee. Measurement shall be along the shortest possible route a runner may take on the prescribed course. The course shall be clearly marked using one or more of the following methods:
a. A single wide line or boundary lines, both inside and outside, marked with a material which is not injurious to the eyes or skin;
b. The use of a natural or artificial boundary markers; or
c. Signposts with large directional arrows wherever the course turns, or flags about 1 foot square and mounted on stakes which hold them 6 feet or more above the ground.

NOTE: If a single wide line is used, it may or may not mark the shortest possible route that a runner may take.



**Enrolled Version - Final Version**

House Joint Resolution 102 History

OTHER VERSIONS  -  Introduced Version  |

| ✉ Email

Key: Green = existing Code. Red = new code to be enacted

# WEST VIRGINIA LEGISLATURE

## 2022 REGULAR SESSION

## ENROLLED

# House Joint Resolution 102

By Delegates Espinosa, Tully, G. Ward, Maynor, Crouse, Clark, Linville, Barnhart, Barrett, Hanna, and Kimble

[Adopted by the Legislature on March 3, 2022.]

That the question of ratification or rejection of an amendment to the Constitution of the State of West Virginia be submitted to the voters of the state at the next general election to be held in the year 2022, which proposed amendment is that section 2, article XII thereof, be amended and reenacted to read as follows:

**ARTICLE XII.  EDUCATION.**

**§2.  Supervision of free schools.**

Subject to the provisions of this section, the general supervision of the free schools of the State is vested in the West Virginia Board of Education which shall perform the duties prescribed by law. Under its supervisory duties, the West Virginia Board of Education may promulgate rules or policies which shall be submitted to the Legislature for its review and approval, amendment, or

HJR 102 Text

Proposing an amendment to the Constitution of the State of West Virginia, amending section 2, article XII thereof, relating to education and the supervision of free schools; clarifying that the policy-making and rule-making authority of the State Board of Education is subject to legislative review, approval, amendment, or rejection; numbering and designating such proposed amendment; and providing a summarized statement of the purpose of such proposed amendment.

Resolved by the Legislature of West Virginia, two thirds of the members elected to each house agreeing thereto:

That the question of ratification or rejection of an amendment to the Constitution of the State of West Virginia be submitted to the voters of the state at the next general election to be held in the year 2022, which proposed amendment is that section 2, article XII thereof, be amended and reenacted to read as follows:

**ARTICLE XII.  EDUCATION.**

**§2.  Supervision of free schools.**

Subject to the provisions of this section, the general supervision of the free schools of the State is vested in the West Virginia Board of Education which shall perform the duties prescribed by law. Under its supervisory duties, the West Virginia Board of Education may promulgate rules or policies which shall be submitted to the Legislature for its review and approval, amendment, or rejection, in whole or in part, in the manner prescribed by general law.  The board shall consist of nine members to be appointed by the Governor, by and with the advice and consent of the Senate, for overlapping terms of nine years.  No more than five members of the board shall belong to the same political party, and in addition to the general qualifications otherwise required by the Constitution, the Legislature may require other specific qualifications for membership on the board. No member of the board may be removed from office by the Governor except for official misconduct, incompetence, neglect of duty, or gross immorality, and then only in the manner prescribed by law for the removal by the Governor of state elective officers.

The West Virginia Board of Education shall, in the manner prescribed by law, select the State Superintendent of Free Schools who shall serve at its will and pleasure. He or she shall be the chief school officer of the state and shall perform the duties prescribed by law.

The State Superintendent of Free Schools shall be a member of the Board of Public Works as provided by subsection B, section fifty-one, article VI of this Constitution.

*Resolved further*, That in accordance with the provisions of §3-11-1 *et seq*. of the Code of West Virginia, 1931, as amended, the amendment is hereby numbered "Amendment No. 1" and designated as the "Education Accountability Amendment" and the purpose of the proposed amendment is summarized as follows: "The purpose of this amendment  is to clarify that the rules and policies promulgated by the State Board of Education, are subject to legislative review, approval, amendment, or rejection."

The Joint Committee on Enrolled Bills hereby certifies that the foregoing joint resolution is correctly enrolled.

...............................................................

*Chairman, House Committee*

**JA0529**

HJR 102 Text

..............................................................

*Chairman, Senate Committee*

Originating in the House.

Adopted by the Legislature on March 3, 2022.

..................................................................

*Clerk of the House of Delegates*

..................................................................

*Clerk of the Senate*

....................................................................

*Speaker of the House of Delegates*

...................................................................

*President of the Senate*

This Web site is maintained by the West Virginia Legislature's Office of Reference & Information. | Terms of Use | Web Administrator | © 2022 West Virginia Legislature ****

 

**JA0530**