No. 23-1078 (L) (2:21-cv-00316)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother; HEATHER JACKSON,

*Plaintiff - Appellant,*

versus

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

*Defendants - Appellees.*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees*

---

On Appeal from the United States District Court for the Southern District of West Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

## JOINT APPENDIX – VOLUME 2 OF 9 (JA0531-JA1084)

---

*Counsel for Plaintiff-Appellant listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant B.P.J.*

## TABLE OF CONTENTS

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME ONE** | | | |
| District Court Docket Sheet, No. 21-cv-00316 (S.D. W.Va.) | N/A | N/A | JA0001 |
| Declaration of Loree Stark in Support of Plaintiff's Complaint | 5/26/2021 | 1-1 | JA0049 |
| Ex. B of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0052 |
| Ex. D of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0054 |
| Declaration of Heather Jackson in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0057 |
| Declaration of B.P.J. in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0060 |
| Supplemental Declaration of Katelyn Kang in Support of Plaintiff's Motion for Preliminary Injunction | 6/9/2021 | 25 | JA0073 |
| Ex. A of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0077 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0096 |
| Ex. C of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0117 |
| Ex. D of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA00158 |
| Ex. E of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0181 |
| Ex. F of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/8/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0183 |
| Statement of Interest of the United States | 6/17/2021 | 42 | JA0221 |
| Ex. A in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, 2020-2021 Track Coaches Packet | 6/22/2021 | 47-1 | JA0243 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, Athletic Participation/Parental Consent/Physician's Certificate Form | 6/22/2021 | 47-2 | JA0260 |
| Ex. D in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, U.S. Department of Education Office of Civil Rights Revised Letter | 6/23/2021 | 49-4 | JA0265 |
| Ex. F in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Case No: CO/60/2020 In the High Court of Justice Administrative Court | 6/23/2021 | 49-6 | JA0314 |
| Ex. H in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Transgender Guideline | 6/23/2021 | 49-8 | JA0354 |
| Ex. I in Support of State of West Virginia's Opposition for Preliminary Injunction, Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) | 6/23/2021 | 49-9 | JA0397 |
| First Amended Complaint | 7/16/2021 | 64 | JA0413 |
| Memorandum Opinion and Order Granting Preliminary Injunction | 7/21/2021 | 67 | JA0439 |
| The State of West Virginia's Answer to First Amended Complaint [Excerpt pp. 1, 7-8] | 7/30/2021 | 78 | JA0454 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Memorandum Opinion and Order Denying Motions to Dismiss | 12/1/2021 | 129 | JA0457 |
| Memorandum Opinion and Order Granting in Part and Denying in Part Motion to Intervene | 12/1/2021 | 130 | JA0465 |
| Intervenor Lainey Armistead's Proposed Answer to First Amended Complaint [Excerpt pp. 1, 5] | 12/1/2021 | 131 | JA0472 |
| Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch's Answer to Plaintiff's First Amended Complaint [Excerpt pp. 1, 9, 19-20] | 12/15/2021 | 156 | JA0474 |
| Defendants Harrison County Board of Education and Dora Stutler's Answer to First Amended Complaint [Excerpt pp. 1, 8] | 12/15/202 | 157 | JA0478 |
| Defendant West Virginia Secondary School Activities Commission's Answer to First Amended Complaint [Excerpt pp. 1, 9] | 12/15/2021 | 158 | JA0480 |
| Harrison County Board and County Superintendent Stipulation of Uncontested Facts | 3/7/2022 | 252 | JA0482 |
| State Board of Education and State Superintendent Stipulation of Uncontested Facts | 3/30/2022 | 270 | JA0486 |
| West Virginia Secondary School Activities Commission's Memorandum in Support of Motion for Summary Judgment | 4/21/2022 | 277 | JA0490 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 6 in Support of WVSSAC's Motion for Summary Judgment, National Federation of State High School Associations 2020 Rules Book for Track and Field and Cross County | 4/21/2022 | 278-6 | JA0522 |
| Ex. 4 in Support of Motion for Summary Judgment by W. Clayton Burch & West Virginia State Board of Education, West Virginia House Joint Resolution 102 | 4/21/2022 | 283-4 | JA0528 |
| **VOLUME TWO** | | | |
| Ex. C in Support of Motion for Summary Judgment by State of West Virginia, [pp. 1-340] 4/4/2022 Deposition Transcript of Aron Janssen, M.D. | 4/21/2022 | 285-3 | JA0531 |
| Ex. H in Support of Motion for Summary Judgment by State of West Virginia, Graphs | 4/21/2022 | 285-8 | JA0871 |
| Ex. 1 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Heather Jackson | 4/21/2022 | 289-2 | JA0875 |
| Ex. A of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Gender Support Plan | 4/21/2022 | 289-2 | JA0883 |
| Ex. B of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Preferred Name Request Form | 4/21/2022 | 289-2 | JA0888 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. C of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Pictures of B.P.J. | 4/21/2022 | 289-2 | JA0894 |
| Ex. 2 in Support of Motion by B.P.J. for Summary Judgment, Declaration of B.P.J. | 4/21/2022 | 289-3 | JA0897 |
| Ex. 4 in Support of Motion by B.P.J. for Summary Judgment, State of West Virginia's Responses to Plaintiff's First Set of Interrogatories [Excerpt pp. 1, 9] | 4/21/2022 | 289-5 | JA0902 |
| Ex. 5 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-3] State of West Virginia's Responses to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-6 | JA0904 |
| Ex. 6 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15] Defendant Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admissions | 4/21/2022 | 289-7 | JA0907 |
| Ex. 7 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15, 21] Defendant Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-8 | JA0911 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 8 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 16-17] Defendant West Virginia State Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-9 | JA0916 |
| Ex. 10 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 13] WVSSAC's Responses to Second Set of Requests for Admission | 4/21/2022 | 289-11 | JA0919 |
| Ex. 11 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 30-32] Defendant-Intervenor Lainey Armistead's Responses and Objections to Plaintiff's Second Set of Request for Admission | 4/21/2022 | 289-12 | JA0923 |
| Ex. 12 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-158] Redacted 1/21/2022 Deposition Transcript of B.P.J. | 4/21/2022 | 289-13 | JA0927 |
| **VOLUME THREE** | | | |
| Ex. 14 in Support of Motion by B.P.J. for Summary Judgment, [pp. 77-289] Redacted 1/20/2022 Deposition Transcript of Heather Jackson | 4/21/2022 | 289-15 | JA1085 |
| Ex. 15 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 127-128] 1/19/2022 Deposition Transcript of Wesley Scott Pepper | 4/21/2022 | 289-16 | JA1298 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 16 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192, 213-216, 218, 220-222, 236] Redacted 3/8/2022 Vol. 1 Deposition Transcript of Dora Stutler and Dave Mazza (Harrison County Board of Education)<br><br>Stutler Testimony pp. 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192;<br><br>Mazza Testimony pp. 213-216, 218, 220-222, 236 | 4/21/2022 | 289-17 | JA1301 |
| Ex. 17 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-163] 2/11/2022 30(b)(6) Deposition of Bernard Dolan (WVSSAC) with Ex. 5 | 4/21/2022 | 289-18 | JA1340 |
| Ex. 18 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 17, 32, 33, 66-67, 71, 80, 101-102, 113-115. 125-126, 132-136] 2/14/2022 Deposition of Michele Blatt (State Board) | 4/21/2022 | 289-19 | JA1515 |
| Ex. 20 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 94-105, 118-121, 150-157] Redacted 2/24/2022 Deposition Transcript of Gerald Montano, D.O. | 4/21/2022 | 289-21 | JA1536 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 21 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-175] Redacted 3/11/2022 Deposition Transcript of Lainey Armistead | 4/21/2022 | 289-22 | JA1561 |
| **VOLUME FOUR** | | | |
| Ex. 22 in Support of Motion by B.P.J. for Summary Judgment, Declaration and Expert Report of Deanna Adkins, MD | 4/21/2022 | 289-23 | JA1736 |
| Ex. 23 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-323] 3/16/2022 Deposition Transcript of Deanna Adkins, MD | 4/21/2022 | 289-24 | JA1767 |
| Ex. 24 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-25 | JA2090 |
| Ex. 25 in Support of Motion by B.P.J. for Summary Judgment, Rebuttal Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-26 | JA2140 |
| **VOLUME FIVE** | | | |
| Ex. 26 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-290] 3/24/2022 Deposition Transcript of Joshua Safer, M.D. | 4/21/2022 | 289-27 | JA2153 |
| Ex. 27 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Mary D. Fry, PhD | 4/21/2022 | 289-28 | JA2443 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 29 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Gregory A. Brown | 4/21/2022 | 289-30 | JA2485 |
| **VOLUME SIX** | | | |
| Ex. 30 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-282] 3/25/2022 Deposition Transcript of Gregory A. Brown | 4/21/2022 | 289-31 | JA2567 |
| Ex. 31 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Dr. Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-32 | JA2849 |
| Ex. 32 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 98-121, 160-161] 3/28/2022 Deposition Transcript of Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-33 | JA2927 |
| Ex. 33 in Support of Motion by B.P.J. for Summary Judgment, Mountain Hollar MS Invitational Official Team Scores | 4/21/2022 | 289-34 | JA2955 |
| Ex. 34 in Support of Motion by B.P.J. for Summary Judgment, Doddridge Invitational Official Team Scores | 4/21/2022 | 289-35 | JA2957 |
| Ex. 38 in Support of Motion by B.P.J. for Summary Judgment, Email chain re Transgender participation in secondary schools bill with attachment "2021 Green Book Summary of Public Education Bills Enacted During the 2021 Regular Session" [WVSBOE 000012-26] | 4/21/2022 | 289-39 | JA2960 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 39 in Support of Motion by B.P.J. for Summary Judgment, WVSSAC Title 127 Legislative Rule [WVSSAC000133-220] | 4/21/2022 | 289-40 | JA2975 |
| Ex. 40 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of Email chain re Transgender participation in secondary schools [WVSBOE 000006, 08-09, 39] | 4/21/2022 | 289-41 | JA3063 |
| Ex. 41 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of West Virginia State Board of Education's Enrolled Bill Review Form for H.B. 3293 2021 Regular Session [WVSBOE 000038] | 4/21/2022 | 289-42 | JA3067 |
| Ex. 42 in Support of Motion by B.P.J. for Summary Judgment, Screen Capture of Jordan Bridges Facebook page | 4/21/2022 | 289-43 | JA3068 |
| Ex. 43 in Support of Motion by B.P.J. for Summary Judgment, MSNBC Twitter, 4/30/2021 Governor Justice Interview | 4/21/2022 | 289-44 | JA3080 |
| Ex. 44 in Support of Motion by B.P.J. for Summary Judgment, NCAA.org "Board of Governors updates transgender participation policy" | 4/21/2022 | 289-45 | JA3083 |
| Plaintiff's Statement of Undisputed Material Facts | 4/21/2022 | 290 | JA3085 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME SEVEN** | | | |
| Table of Contents of Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment [Armistead Supp. App. 0001-0003] | 5/12/2022 | 300 | JA3112 |
| Supplemental Declaration of Lainey Armistead [Armistead Supp. App. 0004-0006] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3115 |
| Rebuttal Expert Report and Declaration of Dr. Deanna Adkins, M.D. [Armistead Supp. App. 0038-0072] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3118 |
| Rebuttal Expert Report and Declaration of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0136-0166] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3153 |
| Deposition Transcript of James M. Cantor, PH.D. [Armistead Supp. App. 0209-0289] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3184 |
| Errata Sheet to Deposition of Gregory A. Brown, PH.D., FACM [Armistead Supp. App. 0479-0483] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3501 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Excerpt Enrolled Version of HB 3293 [Armistead Supp. App. 0833-0839] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3506 |
| B.P.J.'s Redacted Birth Certificate [Armistead Supp. App. 0840] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3513 |
| Errata Sheet to Deposition of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0841] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3514 |
| Errata Sheet to Deposition of Mary Fry, PH.D. [Armistead Supp. App. 0842-0846] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3515 |
| Errata Sheet to Deposition of B.P.J. [Armistead Supp. App. 0847] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3520 |
| Ex. C in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of James M. Cantor, PhD. | 5/12/2022 | 305-03 | JA3521 |
| Ex. D in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of Stephen B. Levine, MD | 5/12/2022 | 305-04 | JA3629 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME EIGHT** | | | |
| Ex. E in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, [pp. 1-261] 3/29/2022 Deposition Transcript of Mary D. Fry, PhD | 5/12/2022 | 305-05 | JA3737 |
| Ex. G in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Copy of West Virginia Legislature House Bill 3293 | 5/12/2022 | 305-07 | JA4115 |
| Ex. A, Roger G. Brooks' Declaration in Support of Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-01 | JA4124 |
| Table of Contents of Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer [Armistead Daubert App. 0001-0005] | 5/12/2022 | 307-02 | JA4133 |
| Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) [Armistead Daubert App. 0558-0573] in Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-02 | JA4138 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. F of Declaration by Sruti Swaminathan in Support of Motion by B.P.J. to Exclude Expert Testimony of James M. Cantor, Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline | 5/12/2022 | 321-6 | JA4154 |
| Ex. 45 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC's Responses to Plaintiff's First Set of Interrogatories | 5/12/2022 | 332-1 | JA4189 |
| Ex. 46 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Intervenor Lainey Armistead's First Supplemental Disclosures Pursuant to Rule 26(A)(1) | 5/12/2022 | 332-2 | JA4204 |
| Ex. 47 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC Board of Directors Transgender Policy [WVSSAC000008] | 5/12/2022 | 332-3 | JA4214 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 48 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Excerpt of Rules and Regulations of the West Virginia Secondary School Activities Commission [WVSSAC000012, WVSSAC000017] | 5/12/2022 | 332-4 | JA4215 |
| Ex. 2 in Support of Reply by Harrison County Board of Education, Dora Stutler to Plaintiff's Consolidated Opposition, [Excerpt pp. 1, 5] Harrison County Board of Education and Dora Stutler's Responses and Objections to Plaintiff's First Set of Requests | 5/26/2022 | 336-2 | JA4217 |
| Table of Contents of Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony [App. 0001-0006] | 5/26/2022 | 343-1 | JA4219 |
| Tomkinson, G., et al., *European Normative Values for Physical Fitness in Children and Adolescents Aged 9-17 Years: Results From 2,779,165 Eurofit Performances Representing 30 Countries*, [App. 0814-0826] in Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony | 5/26/2022 | 343-1 | JA4225 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. A in Support of Motion *In Limine* by B.P.J. to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity, Redacted Order Granting Petition for Change of Name | 6/22/2022 | 417-1 | JA4238 |
| Plaintiff's Reply in Support of Her Motion *In Limine* to Exclude Evidence and/or Testimony of Bernard Dolan Regarding Certain Hearsay Statements [Excerpt pp. 1-2] | 7/11/2022 | 470 | JA4244 |
| Ex. A in Support of Joint Motion by Lainey Armistead & State of West Virginia to Supplement the Expert Report of Gregory A. Brown, Supplemental Declaration of Gregory A. Brown, Ph.D., FACSM | 10/21/2022 | 500-1 | JA4246 |
| Memorandum Opinion and Order re Motions for Summary Judgment | 1/5/2023 | 512 | JA4256 |
| Judgment Order | 1/5/2023 | 514 | JA4279 |
| Declaration of B.P.J. in Support of Motion for Stay | 1/20/2023 | 515-1 | JA4280 |
| Declaration of Heather Jackson in Support of Motion for Stay | 1/20/2023 | 515-2 | JA4284 |
| Notice of Appeal by B.P.J. | 1/23/2023 | 517 | JA4289 |
| Notice of Appeal by West Virginia Secondary School Activities Commission | 2/1/2023 | 522 | JA4291 |
| Memorandum Opinion and Order re Stay Pending Appeal | 2/7/2023 | 527 | JA4296 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME NINE** | | | |
| Table of Contents of Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4303 |
| Declaration of Lainey Armistead [Armistead App. 0001-0008] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4307 |
| Declaration of Chelsea Mitchell [Armistead App. 0009-0019] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4315 |
| Declaration of Christina Mitchell [Armistead App. 0020-0032] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4326 |
| Declaration of Alanna Smith [Armistead App. 0033-0038] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4339 |
| Declaration of Selina Soule [Armistead App. 0039-0048] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4345 |
| Declaration of Darcy Aschoff [Armistead App. 0049-0053] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4355 |
| Declaration of Cynthia Monteleone [Armistead App. 0054-0058] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4360 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Declaration of Madison Kenyon [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4365 |
| Declaration of Mary Marshall [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4371 |
| Declaration of Haley Tanne [Armistead App. 0070-0074] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4376 |
| Declaration of Linnea Saltz [Armistead App. 0075-0079] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4381 |
| Excerpt of 2019 NCAA Division II Outdoor Track & Field Championship Results [Armistead App. 0080-0081] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4386 |
| Excerpt of 2020 Big Sky Indoor Track & Field Championship Results [Armistead App. 0082-0086] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4388 |
| 2020 Women's Ivy League Swimming & Diving Championship Results [Armistead App. 0087-0108] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4393 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (500 Yard Freestyle) [Armistead App. 0109-0112] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4415 |
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (100 Yard Freestyle) [Armistead App. 0113-0115] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4419 |
| Redacted Deposition of Dr. Kacie Kidd, M.D [Armistead App. 1142-1278] Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA44423 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's First Set of Requests for Admission [Armistead App. 1437-1486] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4560 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission [Armistead App. 1487-1510] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4610 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Errata Sheet to Deposition of Dr. Joshua Safer, M.D. [Armistead App.1535-1537] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4634 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1538-1553] [HCBOE 01167-01172] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4637 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1544-1547] [HCBOE 01265-01268] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4643 |
| Redacted Amended Birth Certificate of B.P.J. | N/A | N/A | JA4647 |

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      CHARLESTON DIVISION

 4                   * * * * * * * *

 5   B.P.J., by her next friend and    *

 6   Mother, HEATHER JACKSON,          *

 7        Plaintiff                    *   Case No.

 8        vs.                          *   2:21-CV-00316

 9   WEST VIRGINIA STATE BOARD OF      *

10   EDUCATION, HARRISON COUNTY        *

11   BOARD OF EDUCATION, WEST          *

12   VIRGINIA SECONDARY SCHOOL         *

13   ACTIVITIES COMMISSION, W.         *

14   CLAYTON BURCH in his official     *

15   Capacity as State Superintendent,*  VIDEOTAPED

16   DORA STUTLER in her official      *  VIDEOCONFERENCE

17   Capacity as Harrison County       *  DEPOSITION

18   Superintendent, PATRICK MORRISEY  *      OF

19   In his official capacity as       *  ARON JANSSEN, M.D.

20   Attorney General, and THE STATE   *  April 4, 2022

21   OF WEST VIRGINIA,                 *

22        Defendants                   *

23              Any reproduction of this transcript
                is prohibited without authorization
24                 by the certifying agency.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1              VIDEOTAPED VIDEOCONFERENCE DEPOSITION

 2                            OF

 3    ARON JANSSEN, M.D., taken on behalf of the Defendant,

 4    State of West Virginia herein, pursuant to the Rules of

 5    Civil Procedure, taken before me, the undersigned, Lacey

 6    C. Scott, a Court Reporter and Notary Public in and for

 7    the State of West Virginia, on Thursday, April 4, 2022,

 8    beginning at 9:09 a.m.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                   A P P E A R A N C E S

 2

 3   JOSHUA BLOCK, ESQUIRE

 4   American Civil Liberties Union Foundation

 5   125 Broad Street

 6   New York, NY  10004

 7       COUNSEL FOR PLAINTIFF

 8

 9   KATHLEEN R. HARTNETT, ESQUIRE

10   ANDREW BARR, ESQUIRE

11   ELIZABETH REINHARDT, ESQUIRE

12   VALERIA M. PELE DEL TORO  ESQUIRE

13   Cooley, LLP

14   3 Embarcadero Center, 20th Floor

15   San Francisco, CA  94111-4004

16       COUNSELS FOR PLAINTIFF

17

18   SRUTI SWAMINATHAN, ESQUIRE

19   Lambda Legal

20   120 Wall Street, 19th Floor

21   New York, NY  10005-3919

22       COUNSEL FOR PLAINTIFF

23

24
```

```
 1                 A P P E A R A N C E S  (cont'd)

 2

 3   DAVID TRYON, ESQUIRE

 4   State Capitol Complex

 5   Building 1, Room E-26

 6   Charleston, WV  25305

 7       COUNSEL FOR STATE OF WEST VIRGINIA

 8

 9   ROBERTA F. GREEN, ESQUIRE

10   Shuman McCuskey Slicer, PLLC

11   1411 Virginia Street East

12   Suite 200

13   Charleston, WV  25301

14       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

15       ACTIVITIES COMMISSION

16

17   SUSAN DENIKER, ESQUIRE

18   Steptoe & Johnson

19   400 White Oaks Boulevard

20   Bridgeport, WV  26330

21       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

22       HARRISON COUNTY SUPERINTENDENT DORA STUTLER

23

24
```

```
 1              A P P E A R A N C E S  (cont'd)

 2

 3   KELLY C. MORGAN, ESQUIRE

 4   Bailey Wyant

 5   500 Virginia Street East

 6   Suite 600

 7   Charleston, WV  25301

 8       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

 9       SUPERINTENDANT W. CLAYTON BURCH

10

11   RACHEL CSUTOROS, ESQUIRE

12   Alliance Defending Freedom

13   15100 North 90th Street

14   Scottsdale, AZ  85260

15       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

16

17   TRAVIS C. BARHAM, ESQUIRE

18   LAWRENCE WILKINSON, LAW CLERK

19   1000 Hurricane Shoals Road NE

20   Suite D 1100

21   Lawrenceville, GA  30043

22       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

23

24
```

```
1                          I N D E X

2

3    DISCUSSION AMONG PARTIES                    11 -  13

4    WITNESS: ARON JANSSEN, M.D.

5    EXAMINATION

6       By Attorney Barham                       13 - 295

7    EXAMINATION

8       By Attorney Tryon                       295 - 388

9    CERTIFICATE                                      390

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        EXHIBIT PAGE

 2

 3                                              PAGE

 4    NUMBER    DESCRIPTION                   IDENTIFIED

 5    1         Expert Report                    14

 6    2         Endocrine Society's Guidelines   32

 7    3         World Health Organization        35

 8    4         Harvard Medical School Study     43

 9    5         American Psychological Association

10              Guidelines                       48

11    6         Lisa Littman Study               53

12    7         Study                            76

13    8         Article by Vandenbussche         82

14    9         Article by Lily Durwood          84

15    10        Statement by Royal Australian and

16              New Zealand College of

17              Psychiatrists                    97

18    11        Policy Change Regarding Hormonal

19              Treatment of Minors             101

20    12        Article by Lisa Nainggolan      106

21    13        Study                           107

22    14        Article Published on Medscape.com 108

23    15        Article in National Health Service 110

24    16        Article by Roberto D'Angelo     115
```

```
1                          EXHIBIT PAGE

2

3                                                  PAGE

4      NUMBER    DESCRIPTION                      IDENTIFIED

5      17        Study by Gibson, et al.            126

6      18        Errata Sheet                       130

7      19        Article by Tordoff, et al.         131

8      20        Article by Amy Green, et al.       133

9      21        Article by Turban, et al.          134

10     22        Article by Achille, et al.         135

11     23        Article by Kuper, et al.           137

12     24        Article by van der Miesen, et al.  138

13     25        Article by De Vries                140

14     26        Article by Biggs                   142

15     27        Article by Costa, et al.           145

16     28        Article by Edwards-Leeper          148

17     29        Article by Edwards-Leeper          149

18     30        Interview by Lisa Selin Davis      176

19     31        Label of Lupron                    218

20     32        Puberty Blockers Document          224

21     33        Endocrine Society's Guidelines     228

22     34        Article by Blakemore               232

23     35        Article by Guss, et al.            245

24     36        Article by Moseson, et al.         247
```

9

```
 1                        EXHIBIT PAGE

 2

 3                                             PAGE

 4     NUMBER    DESCRIPTION               IDENTIFIED

 5     37        Article by Steensma           251

 6     38        Analysis                      251

 7     39        Article by Rae, et al.        256

 8     40        Article by Carmichael, et al. 262

 9     41        Washington Post Article       268

10     42        Out Sports Article            271

11     43        Article by Turban, et al.     276

12     44        Article by Ryan, et al.       280

13     45        Article by Klein and Golub    281

14     46        Form                          315

15

16

17

18

19

20

21

22

23

24
```

```
 1                          OBJECTION PAGE

 2

 3   ATTORNEY                                    PAGE

 4   Block  17, 18, 19, 21, 22, 23, 24, 27, 29, 30, 31, 33,

 5   34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 49, 50,

 6   52, 54, 56, 57, 58, 59, 66, 68, 69, 70, 71, 72, 74, 75,

 7   77, 78, 79, 80, 81, 82, 85, 86, 87, 88, 89, 91, 92, 95,

 8   96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 109,

 9   111, 113, 114, 115, 117, 118, 119, 120, 120, 121, 122,

10   123, 125, 129, 130, 132, 134, 138, 141, 142, 144, 145,

11   147, 153, 154, 156, 157, 158, 160, 161, 163, 165, 166,

12   167, 169, 172, 173, 174, 175, 177, 178, 179, 180, 181,

13   182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 193,

14   194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 206,

15   207, 208, 209, 210, 211, 213, 214, 217, 218, 219, 220,

16   221, 222, 223, 224, 226, 228, 229, 231, 234, 27, 238,

17   240, 241, 242, 243, 244, 245, 246, 247, 250, 254, 255,

18   258, 259, 260, 261, 264, 265, 266, 268, 269, 270, 272,

19   274, 275, 282, 284, 286, 288, 289, 290, 291, 292, 293,

20   294, 295, 298, 300, 301, 302, 303, 304, 308, 309, 310,

21   311, 312, 313, 314, 316, 317, 318, 319, 320, 321, 322,

22   323, 324, 325, 326, 327, 330, 331, 332, 333, 334, 336,

23   337, 337

24
```

11

```
 1                 S T I P U L A T I O N

 2       --------------------------------------------------------

 3       (It is hereby stipulated and agreed by and between

 4       counsel for the respective parties that reading,

 5       signing, sealing, certification and filing are not

 6       waived.)

 7       --------------------------------------------------------

 8                 P R O C E E D I N G S

 9       --------------------------------------------------------

10                 ATTORNEY BARHAM:  Counsel has stipulated

11       that our court reporter present this morning can swear

12       in the witness, so I will let the court reporter take

13       care of that.

14                              ---

15                 ARON JANSSEN, M.D.,

16       CALLED AS A WITNESS IN THE FOLLOWING PROCEEDINGS, AND

17       HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

18       FOLLOWS:

19                              ---

20                 VIDEOGRAPHER:  My name is Jacob Stock.

21       I'm a Certified Legal Video Specialist employed by

22       Sargent's Court Reporting Services.  The date today is

23       April 4th, 2022.  The time on the video monitor reads

24       9:09 a.m.  This deposition is being taken remotely by
```

12

```
1   Zoom conference.  The caption is in the United States
2   District Court for the Southern District of West
3   Virginia, Charleston Division, BPJ, et al., versus West
4   Virginia State Board of Education, et al.  Civil Action
5   Number 2:21-CV-00316.  The name of the witness is Aron
6   Janssen.  Will the attorneys present state their names
7   and the parties they represent?
8           ATTORNEY BARHAM:  My name is Travis
9   Barham.  I represent the intervenors in this case.  And
10  with me is Lawrence Wilkinson.
11          ATTORNEY CSUTOROS:  Rachel Csutoros also
12  for intervenor.
13          ATTORNEY TRYON:  This is David Tryon of
14  the West Virginia Attorney General's Office,
15  representing the State of West Virginia.
16          ATTORNEY DENIKER:  Good morning.  Susan
17  Deniker.  Counsel for Defendants Harrison County Board
18  of Education and Superintendent Dora Stutler.
19          ATTORNEY MORGAN:  This is Kelly Morgan on
20  behalf of the West Virginia Board of Education and
21  Superintendent Burch.
22          ATTORNEY GREEN:  This is Roberta Green
23  here on behalf of West Virginia Secondary School
24  Activities Commission.
```

```
 1                   ATTORNEY BLOCK:  For Plaintiff BPJ, this

 2    is Josh Block from the ACLU.

 3                   ATTORNEY SWAMINATHAN:  This is Sruti

 4    Swaminathan from Lambda Legal on behalf of Plaintiff.

 5                   ATTORNEY HARTNETT:  Good morning.  This

 6    is Kathleen Hartnett at Cooley on behalf of Plaintiff.

 7                   ATTORNEY BARR:  Andrew Barr from Cooley

 8    on behalf of Plaintiff.

 9                   ATTORNEY PELET DEL TORO:  Good morning.

10    This is Valeria Pelet Del Toro from Cooley on behalf of

11    Plaintiff.

12                   ATTORNEY REINHARDT:  This is Elizabeth

13    Reinhardt from Cooley on behalf of Plaintiff.

14                   VIDEOGRAPHER:  If that's everyone, the

15    witness has already been sworn in and we can begin.

16                             ---

17                          EXAMINATION

18                             ---

19    BY ATTORNEY BARHAM:

20        Q.    Good morning, Dr. Janssen.

21        A.    Good morning.

22        Q.    Have you ever had a deposition before?

23        A.    No.

24        Q.    All right.
```

1          I'm going to ask you a series of questions

2    about this case and your involvement in it.  Do your

3    best to answer audibly.  Just nodding the head, while it

4    can be captured on video cannot be captured by our court

5    reporter, and so we'll try to make her life as easy as

6    possible.

7          I'm going to do my best to wait until you finish

8    an answer before starting the next question.  And I will

9    ask that you do the same.  We'll probably violate that

10   rule a few times, but cross talk doesn't translate well

11   on the record.  So if you need to take a break at any

12   time today, please let me know and we will do our best

13   to facilitate that as quickly as possible.  I know we

14   need to take a break at two o'clock.

15      A.    I think about 2:30, 2:45, something like that.

16      Q.    Okay.

17          You just let us know when you need to take it.

18   All right.

19              ATTORNEY BARHAM:  I'm going to show you a

20   document we're going to mark as Exhibit-1.  This will be

21   Tab 90 for online purposes.

22                    ---

23              (Whereupon, Exhibit 1, Expert Report, was

24                 marked for identification.)

```
 1                         ---

 2   BY ATTORNEY BARHAM:

 3      Q.    This is a copy of your expert report in this

 4   case.

 5            Is that correct?

 6      A.    Yes, that is correct.

 7      Q.    If you'll turn to the first page of your CV.

 8   It's probably page 21 of this document.  Do you

 9   have ---?

10            VIDEOGRAPHER:  This is the videographer.

11   Can I ask Counsel to speak up?  You are kind of getting

12   cutoff at the end of your sentences.

13            ATTORNEY BARHAM:  Pardon.  I will do my

14   best.

15   BY ATTORNEY BARHAM:

16      Q.    Do you have a degree in adult psychiatry?

17      A.    There is not a degree in psychiatry.

18      Q.    Okay.

19            So your academic training in psychiatry began

20   with your psychiatry residency?  Is that how it works?

21      A.    I did a medical degree, where there is

22   psychiatry training and then a residency in adult

23   psychiatry and a fellowship in child psychiatry.

24      Q.    Do you consider yourself trained and
```

```
 1    professionally competent in using the American
 2    Psychiatric Association's Diagnostic and Statistical
 3    Manual, DSM-V, to make child and adolescent metal
 4    illness or psychiatric diagnoses generally beyond just
 5    gender dysphoria?
 6        A.    Yes.
 7        Q.    Do you have any residency or fellowship in
 8    pediatrics?
 9        A.    No.
10        Q.    Do you have any residency or fellowship in
11    endocrinology?
12        A.    No.
13        Q.    Do you have any training in sports physiology?
14        A.    No.
15        Q.    Do you have any training in sports medicine?
16        A.    No.
17        Q.    Have you published any papers, conducted any
18    research or given any lectures relating to sports
19    physiology?
20        A.    No.
21        Q.    Have you published any papers, conducted any
22    research or given any lectures relating to sports
23    medicine?
24        A.    No.
```

 1      Q.    Have you published any papers, conducted any

 2   research or given any lectures relating to male

 3   physiological advantages in athletics before, during or

 4   after puberty?

 5      A.    No.

 6            ATTORNEY BLOCK:  Objection to form.  You

 7   can answer.

 8   BY ATTORNEY BARHAM:

 9      Q.    Have you published any papers, conducted any

10   research or given any lectures relating to the impact of

11   any drugs or hormones on athletic performance?

12      A.    No.

13      Q.    Have you published any papers, conducted any

14   research or given any lectures relating to the impact of

15   testosterone suppression on athletic performance?

16      A.    No.

17      Q.    Have you published any papers, conducted any

18   research or given any lectures relating to the effect of

19   transsex surgeries on athletic performance?

20      A.    No.

21            ATTORNEY BLOCK:   Objection. Objection to

22   terminology.

23   BY ATTORNEY BARHAM:

24      Q.    Have you published any papers, conducted any

1   research or given any lectures relating to the safety

2   issues and risks to women associated with transgender

3   participation in female athletics by male athletes?

4             ATTORNEY BLOCK:   Objection to form.

5   Sorry, objection to form.

6             THE WITNESS:   Yeah, I think there's a bit

7   of a premise in there that I don't agree with, but I

8   have not given any lectures about transgender

9   participation in sports.

10  BY ATTORNEY BARHAM:

11     Q.   Do you consider --- do you have any professional

12  expertise related to the concept of fairness?

13     A.   I do not.

14     Q.   Do you have any professional expertise on the

15  definition of fairness?

16     A.   I do not.

17     Q.   Would you agree that fairness is an elusive,

18  subjective concept with malleable boundaries?

19             ATTORNEY BLOCK:   Objection to form.

20             THE WITNESS:   I do not have an opinion on

21  the definition of fairness.

22  BY ATTORNEY BARHAM:

23     Q.   Have you treated or personally examined BPJ?

24     A.   I have not.

1    Q.    You have no direct knowledge as to what Tanner

2    stage BPJ started puberty blockers at the age.

3          Correct?

4    A.    Correct.

5    Q.    You do not know how BPJ's physiology or athletic

6    capabilities compare with genetic females at the same

7    age?

8    A.    I do not.

9          ATTORNEY BLOCK:   Objection to

10   terminology.

11   BY ATTORNEY BARHAM:

12   Q.    This report, Exhibit-1 of 20 pages sets out the

13   complete statement of all opinions that you will testify

14   to at trial.

15         Correct?

16   A.    Which report are you referring to?

17   Q.    The report in front of you, Exhibit-1, Tab 90.

18   A.    And can you repeat the question?   Sorry.

19   Q.    This report sets out a complete statement of all

20   opinions that you will testify to at trial.

21         Correct?

22   A.    I do not know the answer to that.   I mean, I

23   would assume so, but I don't know.   I've never been in a

24   trial, so I don't know if there will be questions asked

```
 1    outside of this document.

 2        Q.    Does this report identify all facts and data

 3    that you considered in forming the opinions that you set

 4    forth in your report?

 5        A.    I wouldn't say it has all facts because I don't

 6    think it is possible to include all facts in an expert

 7    report, but the relevant facts, yes.

 8        Q.    This includes the facts that you'll rely on in

 9    supporting those opinions.

10             Correct?

11        A.    That's correct.

12        Q.    Does your report set out all the reasons for the

13    opinions that you propose to offer?

14        A.    Yes.

15        Q.    Your footnotes cite to I believe 32 scientific

16    or professional articles and you reference some others

17    in your CV.  Are those all the articles that form the

18    basis of the opinions you propose to offer?

19        A.    No.

20        Q.    What other articles form the basis of the

21    opinions you propose to offer?

22        A.    I guess the question is what has formed my

23    professional expertise around gender health, and I've

24    read a lot that aren't necessarily going to be apropos
```

 1    to this specific report.

 2       Q.    But those are the articles that you cited and

 3    referenced in this document are those that you relied

 4    upon as the basis of opinions that you intend to offer.

 5          Correct?

 6       A.    That is correct.

 7       Q.    You currently serve as the Clinical Associate

 8    Professor of Child and Adolescent Psychiatry.

 9          Correct?

10       A.    Yes.

11       Q.    And what institution is that with?

12       A.    It is with Northwestern University Feinberg

13    School of Medicine, and Ann and Robert H. Lurie

14    Children's Hospital of Chicago.

15       Q.    And how much of your time in this position is

16    related to discussing or treating gender dysphoric

17    children and adolescents?

18             ATTORNEY BLOCK:  Objection to

19    terminology.

20             THE WITNESS:  It's hard to quantify.

21    Probably about 40 percent of my time is allocated in

22    some way to either clinical care, research or academics

23    around gender health.

24    BY ATTORNEY BARHAM:

22

```
1     Q.    And what is your compensation for this position?

2     A.    It is roughly $265,000 a year in salary.

3     Q.    You also serve as the Vice Chair of the

4   Pritzker Department of Psychology and Behavioral Health

5   at the Ann and Robert H. Lurie Children's Hospital of

6   Chicago.

7           Correct?

8     A.    That's correct.

9     Q.    And how much of your time in this position is

10  related to discussing or treating gender dysphoric

11  children and adolescents?

12                ATTORNEY BLOCK:  Objection to

13  terminology.

14                THE WITNESS:  Again, it is hard to parse

15  out what specific about my leadership role is around

16  gender health but it is a minority of my day-to-day

17  work in that role.

18  BY ATTORNEY BARHAM:

19    Q.    Do you have an approximate percentage?

20    A.    No.

21    Q.    Twenty-five (25) percent, more or less?

22    A.    Probably ten percent.

23    Q.    Ten percent.  Okay.

24          And what is your compensation for that
```

23

```
 1   position?
 2       A.    I get a stipend of around $30,000.
 3       Q.    You currently serve as the Medical Director of
 4   Outpatient Psychiatric Services at the Lurie Children's
 5   Hospital of Chicago.
 6             Is that correct?
 7       A.    That;s correct.
 8       Q.    And how much of your time in this position is
 9   related to discussing or treating gender dysphoric
10   children and adolescents?
11                 ATTORNEY BLOCK:   Objection to
12   terminology.
13                 THE WITNESS:   About 25 percent of my time
14   is probably spent discussing or related to the health of
15   transgender youth or transgender --- gender diverse
16   youth.
17   BY ATTORNEY BARHAM:
18       Q.    And what is your compensation for that position?
19       A.    There is no compensation.
20       Q.    You currently serve as the Clinical Director of
21   the NYU Gender and Sexuality Services.
22             Is that correct?
23       A.    That is not correct.
24       Q.    When did you conclude your role in that
```

```
 1   position?  I'm referencing page one of your CV.
 2       A.    That was when I moved to Chicago a few years
 3   ago.
 4       Q.    Okay.
 5             So where it says 2011 to present Clinical
 6   Director, NYU Sexuality Service, that is just a typo?
 7       A.    That is a typo, yes.
 8       Q.    You currently serve as the Associate Professor
 9   of Child and Adolescent Psychology at Northwestern
10   University, and we have already discussed that.  Is
11   there a difference between Clinical Associate Professor
12   and Associate Professor of Child and Adolescent
13   Psychiatry?
14       A.    No.
15       Q.    You serve as the Vice Chair of Clinical Affairs
16   at the Pritzker Department of Psychiatry and Behavioral
17   Health at the Lurie Children's Hospital.
18             Correct?
19       A.    That's correct.
20       Q.    And how much time in this position is related to
21   discussing or treating gender dysphoric children and
22   adolescents?
23             ATTORNEY BLOCK:  Objection to
24   terminology.
```

```
1                    THE WITNESS:   I think I answered that one
2    with the guess of about ten percent.
3    BY ATTORNEY BARHAM:
4      Q.     Okay?
5             So that's the same as the Vice Chair of the
6    Department of Psychiatry?
7      A.     Correct.
8      Q.     You currently serve as the Associate Editor for
9    Transgender Health.
10            Correct?
11     A.     That is correct.
12     Q.     And what is your compensation for that position?
13     A.     There is no compensation for that position.
14     Q.     What is that publication's annual income?
15     A.     I do not know.
16     Q.     You serve as a reviewer for LGBT Health.
17            Correct?
18     A.     Yes.
19     Q.     And how much of your time is related --- in that
20   position is related to treating or discussing
21   transgender children and adolescents?
22     A.     I would say 100 percent of my review time with
23   LGBT health is around gender.
24     Q.     Do you receive any compensation for that
```

1   position?

2      A.    I do not.

3      Q.    Do you receive any compensation for your role as

4   a reviewer with the Journal of the Academy of Child and

5   Adolescent Psychiatry?

6      A.    I do not.

7      Q.    You served in various positions with different

8   professional organizations according to paragraphs 11

9   and 12 of your report.  Do any of those positions

10  provide you financial compensation?

11     A.    No.

12     Q.    You founded and directed Gender Variant Youth

13  and Family Network.

14         Correct?

15     A.    Correct.

16     Q.    What's your compensation for that position?

17     A.    Zero.

18     Q.    What is the entity's annual income or budget?

19     A.    Zero.

20     Q.    You indicate in your report that you have seen

21  approximately 500 transgender patients.

22         Is that correct?

23     A.    That is correct.

24     Q.    How many patients do you see per year?

1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:  I'd have to look at my

3     report.  I don't have the information in front of me

4     right now.

5     BY ATTORNEY BARHAM:

6        Q.    Do you have a ballpark of how many patients you

7     see in a year?

8        A.    I don't.

9        Q.    Does this include --- and I'm assuming that your

10    colleagues see additional patients beyond just those

11    that you see.

12             Correct?

13       A.    Correct.

14       Q.    How frequently do you see each patients?

15       A.    I see --- the frequency with which I see

16    patients is dependent upon their clinical need, so

17    between once or twice a week to once every three months.

18       Q.    And how much are patients charged per

19    appointment?

20       A.    Everything is billed to their insurance, so I'm

21    not sure.

22       Q.    Do you receive any other income related to your

23    work on gender dysphoria?

24       A.    I'm being paid for my expert report for this, so

1   that's the only other income I receive.

2      Q.    Do you receive any speaking fees?

3      A.    I have received speaking fees for participation

4   and grand rounds as an example.

5      Q.    And how much would those speaking fees run?

6      A.    It is typically about a thousand dollars per

7   event.

8      Q.    Before the last four years had you provided any

9   expert testimony on issues related to gender dysphoria?

10     A.    Can you clarify the difference between

11  testimonies and reports?  I've submitted a report but

12  not ---.

13     Q.    Okay.

14            So you have submitted a report?

15     A.    Correct.

16     Q.    Do you remember what case that involved?

17     A.    That involves Medicaid and top surgery in

18  Arizona.

19     Q.    Okay.

20            Have you ever provided any testimony in trial

21  or deposition before related to gender dysphoria?

22     A.    I have not.

23     Q.    And how much compensation have you received so

24  far in this case?

1      A.      This case so far, none thus far.

2      Q.      How much are you expecting to receive so far in

3   this case?

4      A.      I haven't added up my invoice yet, but I imagine

5   it's probably around $10,000.

6      Q.      Okay.

7              Do you have any professional expertise related

8   to the legal definition of relevance?

9      A.      I do not.

10     Q.      Do you have any legal training or education?

11     A.      I do not.

12     Q.      When you were preparing your report did you

13   consult the Federal Rules of Evidence or any other legal

14   sources as to the meaning of relevance?

15     A.      I did not.

16     Q.      Several people in this case have referenced

17   disorders of sexual development.  Would you agree that

18   gender dysphoria is not a disorder of sexual

19   development?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  Gender dysphoria has not

22   been classified as a disorder of sexual development.

23   BY ATTORNEY BARHAM:

24     Q.      Of the approximately 500 transgender patients

1   you had seen how many suffered from disorder of sexual

2   development?

3       A.    A minority of patients, less than ten.

4       Q.    So you would agree that the vast majority of

5   individuals with gender dysphoria or who assert a

6   transgender identity do not suffer from a disorder of

7   sexual development.

8           Correct?

9               ATTORNEY BLOCK:  Objection to form.

10              THE WITNESS:  The data we have speaks to

11  the majority of people with gender dysphoria do not have

12  a disorder of sex development.

13  BY ATTORNEY BARHAM:

14      Q.    Do you have any reason to believe that BPJ

15  suffers from a disorder of sexual development?

16      A.    I have not reviewed BPJ's case.

17      Q.    Are you aware of any instance in which an

18  individual with a disorder of sexual development has

19  attempted to play on a girls' or women's sports team in

20  West Virginia?

21      A.    I am not aware.

22      Q.    Is it your opinion that a person's gender

23  identity is durable?

24              ATTORNEY BLOCK:  Objection to form.

```
 1                    THE WITNESS:  Can you define durable?
 2   BY ATTORNEY BARHAM:
 3      Q.    Unchanging.
 4                    ATTORNEY BLOCK:  Objection to form.
 5                    THE WITNESS:  It is my testimony that
 6   there is a concept of gender identity that remains
 7   generally fixed for most people throughout their lives.
 8   BY ATTORNEY BARHAM:
 9      Q.    So it's your opinion that a person's gender
10   identity cannot be changed with medical or mental health
11   intervention.
12          Correct?
13                    COURT REPORTER:  Sorry, Counsel, that
14   question one more time.
15   BY ATTORNEY BARHAM:
16      Q.    So it's your opinion that a person's gender
17   identity cannot be changed with medical or mental health
18   intervention.
19          Correct?
20      A.    Yes.
21                    ATTORNEY BARHAM:  I'm going to hand you
22   what we're going to mark as Exhibit-2.  This will be
23   Tab 5.
24                         ---
```

```
 1                    (Whereupon, Exhibit-2, Endocrine

 2                    Society's Guidelines, was marked for

 3                    identification.)

 4                         ---

 5    BY ATTORNEY BARHAM:

 6       Q.    If you'll turn to page 3873 of this document.

 7    This document is the Endocrine Society's Guidelines,

 8    Endocrine Treatment of Gender Dysphoric or Gender

 9    Incongruent Persons, Endocrine Society Clinical Practice

10    Guideline published in 2017.

11            Correct?

12       A.    That is correct.

13       Q.    On page 3873 of this document the Endocrine

14    Society indicates that this continuum gender identity

15    ranged from all male through something in between to all

16    female yet such a classification does not take into

17    account that people may have gender identities outside

18    this continuum.  For instance, some experience

19    themselves as having both a male and female gender

20    identity whereas others completely renounce any gender

21    classification.  There are also reports of individuals

22    experiencing a continuous and rapid involuntary

23    alternation between a male and female identity.

24            Do you see that?
```

```
 1        A.     I don't see that.

 2        Q.     Second column, towards the bottom of the page.

 3        A.     Yes, I see that.

 4        Q.     Is this consistent with your understanding of

 5   gender identity?

 6               ATTORNEY BLOCK:  Can you give him time to

 7   read?

 8               ATTORNEY BARHAM:  Gladly.

 9               THE WITNESS:  I think there is a

10   difference between a gender identity and how people

11   understand and express that gender identity.  And in the

12   context of this article the rapid involuntary alteration

13   between male and female identity as an example is a case

14   reported of single individuals subjective experience of

15   their gender according to the reference.

16   BY ATTORNEY BARHAM:

17        Q.     And by that you're referring to note ten?

18        A.     Correct.

19        Q.     So according to this document, someone can be

20   one sex or the other, both, neither or in between.

21          Correct?

22               ATTORNEY BLOCK:  Objection to form.

23               THE WITNESS:  I can't speak for the

24   conclusions drawn by the author of this article.
```

```
 1   BY ATTORNEY BARHAM:

 2      Q.    And according to the Endocrine Society a

 3   person's gender identity can change rapidly.

 4           Correct?

 5                  ATTORNEY BLOCK:   Objection to form.

 6                  THE WITNESS:   I'm not a part of the

 7   Endocrine Society, so I'm not sure how they discuss

 8   this.

 9   BY ATTORNEY BARHAM:

10      Q.    According to this document, the Endocrine

11   Society is indicating that there are reports, plural, of

12   individuals, plural, experiencing a continuous and rapid

13   involuntary alternation between male and female gender

14   identity.

15           Correct?

16      A.    That is documented in the article.

17      Q.    Okay.

18      A.    I'm not sure of the governance of the Endocrine

19   Society.

20      Q.    Do you think the Endocrine Society Guidelines

21   are wrong?

22                  ATTORNEY BLOCK:   Objection to form.

23                  THE WITNESS:   I think anything relating

24   to gender identity has to be taken in a broader context
```

1    within both the article in and of itself but in broader

2    practice and specifically around children and

3    adolescents.

4    BY ATTORNEY BARHAM:

5       Q.    So what is your basis for indicating that this

6    statement is potentially inaccurate?

7                        ATTORNEY BLOCK:  Objection to form.

8                        THE WITNESS:  I think there is more

9    context that's needed in order to understand the intent

10   of the authors in this particular section.

11                       ATTORNEY BARHAM:  I'm going to hand you

12   what we will mark as Exhibit-3.  This is the document

13   from the World Health Organization entitled Gender and

14   Health.

15                               ---

16                       (Whereupon, Exhibit-3, World Health

17                        Organization, was marked for

18                        identification.)

19                               ---

20   BY ATTORNEY BARHAM:

21      Q.    Are you familiar with the World Health

22   Organization?

23      A.    I've heard of them.

24      Q.    Do you agree with these World Health

36

```
 1   Organization statements?
 2                   ATTORNEY BLOCK:  Objection to form.  Can
 3   he have time to read the document?
 4                   ATTORNEY BARHAM:  Of course.
 5                   VIDEOGRAPHER:  Counsel, is that Tab 10?
 6                   LAW CLERK WILKINSON:  Tab 10.
 7                   ATTORNEY BARHAM:  It is.
 8                   VIDEOGRAPHER:  Okay.  Thank you.
 9                   THE WITNESS:  Can you repeat the
10   question?
11   BY ATTORNEY BARHAM:
12       Q.    Do you agree with these World Health
13   Organization statements?
14       A.    Not in their entirety.
15       Q.    In what parts do you dispute?
16       A.    The word gender as a concept is much more
17   complicated and I do not agree with their
18   characterization in this page.
19       Q.    So the World Health Organization says that
20   gender itself is a social construct and can change over
21   time.
22             Correct?
23                   ATTORNEY BLOCK:  Objection to form.  Does
24   this document have a URL to it?
```

```
 1                    ATTORNEY BARHAM:  It does, but I don't
 2   see it printed on the document.
 3                    LAW CLERK WILKINSON:  We can get it.
 4                    ATTORNEY BARHAM:  We can supply that.
 5                    THE WITNESS:  I agree that it says on the
 6   document that gender varies from society to society and
 7   can change over time.
 8   BY ATTORNEY BARHAM:
 9      Q.   And according to the World Health Organization,
10   gender identity refers to a person's experience of
11   gender which is a social construct.
12           Correct?
13                    ATTORNEY BLOCK:  Objection to form.
14                    THE WITNESS:  I don't see in the document
15   where it refers to gender identity or defines gender
16   identity.
17   BY ATTORNEY BARHAM:
18      Q.   It says gender interacts with different sex,
19   which refers to the different biological and
20   physiological characteristics of males, females,
21   intersex persons such as chromosomes, hormones and
22   reproductive organs.
23           Correct?
24      A.   That is correctly read.  I don't see gender
```

1   identity defined in this document.

2       Q.    Gender identity refers to a person's deeply held

3   internal and individual experience of gender.

4           Correct?

5       A.    That's what it says here, yes.

6       Q.    If an individual asserts an identity of man or

7   both, how can a clinician verify whether that individual

8   is telling the truth?

9               ATTORNEY BLOCK:  Objection to form.

10              THE WITNESS:  I'm not sure what exactly

11  that means.  The process of an assessment for gender

12  care involves a complex series of interviews,

13  diagnostics.

14  BY ATTORNEY BARHAM:

15      Q.    So how does the clinician assess whether the

16  patient is accurately relating their experiences?

17      A.    In the typical process, particularly around

18  child and adolescent psychiatry, part of the assessment

19  involves information gathered from multiple contexts.

20      Q.    Such as?

21      A.    Such as parents, schools, caregivers, other

22  providers, history over time, et cetera.

23      Q.    And if --- so how does one assess from those

24  various contexts whether someone who's claiming to be

1   male or both is accurately relating what's going on?

2                   ATTORNEY BLOCK:  Objection to form.

3                   THE WITNESS:  Yeah, I guess I don't

4   understand the question exactly.  You know, my job is

5   not necessarily to define what is accurate in someone's

6   own experience.  It's to understand how that fits into

7   typical processes and developmental expectations for the

8   broad range of gender diversity over time.

9   BY ATTORNEY BARHAM:

10     Q.   How do you determine whether someone in that

11  scenario is accurately understanding his own subjective

12  feelings --- his or her subjective feelings?

13                  ATTORNEY BLOCK:  Objection to form.

14                  THE WITNESS:  The context of the

15  treatment is really important.  If an individual is

16  seeking specific interventions that require a mental

17  health assessment, there are specific components of that

18  mental health assessment that must be met.

19  BY ATTORNEY BARHAM:

20     Q.   So what are the treatments that would require a

21  mental health assessment?

22     A.   Puberty blocking medications, hormones or

23  surgery.

24     Q.   And what are the interventions that would not

1   require mental health evaluations, in your opinion?

2            ATTORNEY BLOCK:  Objection to form.

3            THE WITNESS:  It depends upon what

4   guidelines you're talking about and what recommendations

5   that the family is looking for.

6   BY ATTORNEY BARHAM:

7       Q.    Well, what are some of the inventions?  You said

8   there's some interventions that would require a mental

9   health evaluation, so that implies that there are some

10   that would not.  What are the interventions that would

11   not require a mental health evaluation?

12            ATTORNEY BLOCK:  Objection to form.

13            THE WITNESS:  You know, parents giving

14   hugs to their kids is not something that a mental health

15   assessment would require.  Providing a way of helping

16   families to understand their kids or asking questions is

17   not something that requires a mental health evaluation

18   and some children will socially transition prior to any

19   assessments by any mental health professional.

20   BY ATTORNEY BARHAM:

21       Q.    How do you determine --- if an individual

22   asserts a gender identity of male or both, how do you

23   determine whether the individual is making a statement

24   based on societal expectations for a particular gender

```
 1   rather than ---?

 2                  ATTORNEY BLOCK:  Objection.  Travis, I'm

 3   sorry, the male or both phrasing, is that a quote from

 4   something.  I don't have the paper in front of me, so

 5   just want to clarify.

 6                  ATTORNEY BARHAM:  No, that's not a

 7   question from something.  That's just my question.

 8                  ATTORNEY BLOCK:  Okay.

 9                  THE WITNESS:  Can you repeat the

10   question?

11   BY ATTORNEY BARHAM:

12      Q.   If an individual asserts a gender identity male

13   or both, how can a clinician verify whether the

14   individual is making the statement based on societal

15   expectations for a particular gender rather than his own

16   genuine gender?

17                  ATTORNEY BLOCK:  Objection to form.

18                  THE WITNESS:  I personally never had

19   anybody assert an identity of male or both, but part of

20   the assessment of --- if we are diagnosing gender

21   dysphoria is understanding the cultural and social

22   contexts and ensuring that folks are not presenting with

23   a gender identity that is incongruent with their sex

24   assigned at birth because of actual or perceived
```

1  cultural advantages.

2  BY ATTORNEY BARHAM:

3    Q.    And how does one go about assessing the

4  motivations behind the claimed gender identity or

5  transgender sex?

6              ATTORNEY BLOCK:  Objection to form.

7              THE WITNESS:  For any psychiatric

8  assessment this is through a combination of interviews,

9  gathering history from relevant data sources and

10  sometimes for some people structured interviews or

11  scales.

12  BY ATTORNEY BARHAM:

13    Q.    And how long does it take to conduct such an

14  assessment?

15    A.    There is no specific timeframe involved in this

16  assessment.  It really depends upon contextual factors

17  that are hard to nail down.

18    Q.    So if you were treating a child or teenager, how

19  many relevant data sources would you need to get

20  information from in order to make a complete assessment

21  of the child's motivations?

22    A.    I don't think there's ever going to be a

23  concrete answer in terms of how many.  There's not a

24  specific answer of how many sources are necessary.  It's

1   however many sources are necessary to gather the

2   relevant information.

3       Q.   So how do you determine whether you have

4   gathered enough information to make a competent

5   assessment?

6       A.   It's hard to state this in a non-pithy way, but

7   that's kind of what the process of psychiatry and child

8   psychiatry training helps you to learn.

9       Q.   Could you explain to someone who doesn't have

10  the training how you come to the conclusion, okay, I've

11  gathered enough information to make a competent

12  assessment?

13      A.   Sure.  I can try.  How accurate is the reporter

14  in their description of their history.  How much does it

15  align with reports from other informants, how much does

16  it match with or is deviant from expected phenotypic

17  processes with the disorders in question and what is the

18  impression of the evaluator about the accuracy of the

19  statements.

20                  ATTORNEY BARHAM:  I'm going to show you

21  what we will mark as Exhibit-4, this will be Tab 12.

22                          ---

23                  (Whereupon, Exhibit-4, Harvard Medical

24                  School Study, was marked for

44

```
 1              identification.)

 2                          ---

 3   BY ATTORNEY BARHAM:

 4      Q.    Are you familiar with this study?  This is a

 5   study from the Harvard Medical School entitled Gender

 6   Fluidity:  What it Means and Why Support Matters?

 7                    ATTORNEY BLOCK:  Objection.

 8                    THE WITNESS:  This looks like a popular

 9   website article and not a study.

10   BY ATTORNEY BARHAM:

11      Q.    Are you familiar with the author, Dr. Sabrina

12   Katz --- Sabra Katz-Wise?

13      A.    Dr. Katz-Wise has published in the world of

14   transgender health.  I'm not familiar with them

15   personally, I don't know them.

16      Q.    Do you know Dr. Katz-Wise at least by

17   reputation?

18      A.    I don't.  I've only read some studies.

19      Q.    But you would agree that she is highly respected

20   in this area.

21            Correct?

22      A.    I would not be able to offer an opinion.

23      Q.    But she is widely published in this area.

24            Correct?
```

45

1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:  From my recollection, yes.

3    BY ATTORNEY BARHAM:

4       Q.    At the bottom of page two of this document, Dr.

5    Katz-Wise indicates that while some people develop a

6    gender identity early in childhood others may identify

7    with one gender at one time and then another gender

8    later on.

9              Is that correct?

10      A.    You're reading that accurately, yeah.

11      Q.    So according to this article, on page three a

12   gender fluid person is one whose gender identity changes

13   frequently.

14            Correct?

15             ATTORNEY BLOCK:  Objection to form.

16             THE WITNESS:  I do not --- I have not

17   read it in here that it is defined in that way and

18   that's not how I would define gender fluidity.

19   BY ATTORNEY BARHAM:

20      Q.    At least you see the statement at the first full

21   paragraph at the top of page three, ultimately anyone

22   who identifies as gender fluid, is a gender fluid person

23   often the term is used for a person's gender expression

24   or gender identity, essentially their internal sense of

1  self changes frequently?

2              ATTORNEY BLOCK:  Objection.  We're

3  jumping quickly from pages.  Can you give him some more

4  time to read before answering the question?

5              ATTORNEY BARHAM:  Certainly.

6              THE WITNESS:  Yes.  I'm not seeing where

7  that is here.  Can you point that out for me?

8  BY ATTORNEY BARHAM:

9     Q.    Top of page three, just above that, how is

10  gender fluidity related to health in child and teens?

11     A.    Gender fluidity is a very nonspecific term that

12  means very different things to different people.  In the

13  practice of the clinical work with transgender and

14  gender diverse youth, kids who are self identifying as

15  gender fluid, I want to understand what it means to them

16  and what that definition is for that individual.  I

17  don't think there is one established definition of

18  gender fluidity that has been agreed upon.

19     Q.    But at least some respected professionals in

20  this arena indicate that the term gender fluidity means

21  that the person's internal sense of self, their gender

22  identity changes frequently.

23              Correct?

24              ATTORNEY BLOCK:  Objection to form.

1              THE WITNESS:   I can't speak to what Dr.

2    Katz-Wise is using to define it.   The way I would

3    describe gender fluidity, again outside the context of

4    how my patients are actually using the term, is that

5    understanding of the expression of gender identity may

6    change over time.

7    BY ATTORNEY BARHAM:

8       Q.    So you said that their understanding of gender

9    identity can change over time.   Dr. Katz-Wise says that

10   their gender identity changes frequently?

11            Is that correct?

12      A.    That's what it stated in this popular press

13   article.

14      Q.    And Dr. Katz-Wise is an Assistant Professor in

15   Adolescent and Young Adult Medicine at Boston Children's

16   Hospital.

17            Is that correct?

18      A.    I would have to take your word for that.

19      Q.    Okay.

20            Are you aware that she co-directs the Harvard

21   Sexual Orientation and Gender Identity Expression Equity

22   Research Collaborative?

23      A.    I do not know the term, no.

24            ATTORNEY BARHAM:   I'm going to show you

1   what we will mark as Exhibit-5, and this will be Tab 13.

2                              ---

3                  (Whereupon, Exhibit-5, American

4                  Psychological Association Guidelines,

5                  was marked for identification.)

6                              ---

7   BY ATTORNEY BARHAM:

8        Q.    This document is the American Psychological

9   Association Guidelines for Psychological Practice with

10  Transgender and Gender Non-Conforming People.

11           Correct?

12       A.    That is correct.

13       Q.    And on page 836 of this document the APA writes

14  just as some people experience their sexual orientation

15  as being fluid or variable, some people also experience

16  their the gender identity as fluid.

17           Correct?

18       A.    Can you show me on the page where that is?

19       Q.    The bottom of the first paragraph in the first

20  column of page 836.

21       A.    Yes.

22       Q.    So the APA Guidelines say that gender identity

23  can be fluid or changing.

24           Correct?

1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:  Well, I think the important

3    piece is some people experience gender identity as fluid

4    or variable.

5    BY ATTORNEY BARHAM:

6        Q.    So it can be fluid or changing?

7              Correct?

8              ATTORNEY BLOCK:  Objection to form.

9    BY ATTORNEY BARHAM:

10       Q.    For at least some people.

11             Correct?

12             THE WITNESS:  As I would describe it and

13   understand it, that's the experience of expression of

14   gender identity can be fluid over time, which is

15   different.

16   BY ATTORNEY BARHAM:

17       Q.    How is that different to say that one's gender

18   identity changes?

19       A.    It's getting a little complicated in terms of

20   the concepts that we're talking about, but the identity

21   that gender identity is something that is inherently

22   fixed, that how people understand, experience it and

23   express it can change over time.  That's the difference.

24       Q.    But the American Psychological Association at

 1   least describes gender identity as being fluid.

 2        Correct?

 3             ATTORNEY BLOCK:  Objection to form.

 4             THE WITNESS:  In the article that you

 5   have put in front of me it describes that people's

 6   experience of their gender identity is fluid over time.

 7   BY ATTORNEY BARHAM:

 8     Q.    Let's go back to Tab 5, which is Exhibit-2.  Are

 9   you familiar with the Endocrine Society Guidelines?

10     A.    I am.

11     Q.    Is it your view that these guidelines were

12   developed through rigorous scientific processes?

13             ATTORNEY BLOCK:  Objection to form.

14             THE WITNESS:  I agree.

15   BY ATTORNEY BARHAM:

16     Q.    Would you agree that these guidelines were

17   developed by among the most respected researchers in the

18   field?

19             ATTORNEY BLOCK:  Objection to form.

20             THE WITNESS:  I wouldn't disagree with

21   that, no.

22   BY ATTORNEY BARHAM:

23     Q.    Do you respect Dr. Hembree of Columbia

24   University Medical Center?

51

1    A.    I do.

2    Q.    Do you respect Dr. Cohen-Kettenis of the

3 University of Amsterdam?

4    A.    I would say I respect all of these clinicians

5 and researchers, although Sabine Hannema I am not

6 familiar personally.

7    Q.    If you will turn to page 3879 of this document.

8 Right under the heading evidence this article reports

9 that the large majority, about 85 percent of prepubertal

10 children with a childhood diagnosis did not remain GD,

11 slash, gender incongruent in adolescence.

12       Is that correct?

13    A.    That is correctly read, yes.

14    Q.    And footnote 20 of this document cites to Dr.

15 Steensma, de Vries, Cohen-Kettenis article in 2013?

16    A.    That's correct.

17    Q.    These are extensively published original peer

18 reviewed research --- peer reviewed researchers in the

19 field.

20       Correct?

21    A.    Correct.

22    Q.    So this committee reveals evidence that the

23 large majority of children, about 85 percent, with a

24 childhood diagnosis do not remain gender dysphoric in

1  gender adolescence.

2         Correct?

3               ATTORNEY BLOCK:  Objection to form.

4               THE WITNESS:  Yeah, in these studies have

5  been published primarily by the Dutch clinic the rates

6  of dissentience of the diagnosis of gender dysphoria has

7  been upwards of 85 percent.

8  BY ATTORNEY BARHAM:

9    Q.    And at the bottom of the first column of

10 page 3879 the committee indicates that their clinical

11 experience suggests that the persistence of gender

12 dysphoria or gender incongruence can only be reliably

13 assessed after the first signs of puberty.

14        Is that correct?

15   A.    That is what is written, yes.

16   Q.    You have not offered an opinion in your report

17 as to whether or --- whether or to what transgender

18 identity has a biological basis.

19        Is that correct?

20   A.    Let me just make sure that I'm reviewing it.  I

21 have not offered an opinion.

22   Q.    If you will turn to page 76 of Exhibit-2, Tab 5.

23 The committee with all of its experience and presenting

24 all the evidence said that gender dysphoria in children,

53

1   quote, does not invariably persist into adolescence and

2   adulthood.

3            Is that correct?

4        A.   That is correct.

5        Q.   In fact, this committee concluded that that

6   gender dysphoria, a minority of prepubertal children

7   appears to persist in adolescence.

8            Is that correct?

9        A.   That is correct.

10       Q.   I'm going to turn your attention to --- this

11   will be Tab 15, Exhibit-6.

12                        ---

13            (Whereupon, Exhibit-6, Lisa Littman

14            Study, was marked for identification.)

15                        ---

16   BY ATTORNEY BARHAM:

17       Q.   This is a 2021 study by Lisa Littman entitled

18   Individuals Treated for Gender Dysphoria with a Medical

19   and/or Surgical Transition who Subsequently

20   De-transitioned.

21            Is that correct?

22       A.   That is correct.

23       Q.   Are you familiar with this study?

24       A.   I am.

1      Q.    The study was based on survey responses from a

2   hundred adult individuals who were approved for hormonal

3   and/or surgical transition, underwent such transition,

4   lived in a transgender identity for a period of years

5   and then decided to de-transition or revert to a gender

6   identity associated with their biological sex.

7          Is that correct?

8      A.    That is my understanding of the study, yes.

9      Q.    And all of the subjects had detransitioned by

10  discontinuing their medications, having surgeries to

11  reverse the effects of transition or both.

12         Correct?

13         ATTORNEY BLOCK:  Objection to form.  Are

14  you reading something?

15         ATTORNEY BARHAM:  I'm referencing

16  page two, column two, at the bottom of the page.

17         THE WITNESS:  My recollection from the

18  study was that this was all self report, so there was no

19  way to verify if that was correct or true.

20  BY ATTORNEY BARHAM:

21     Q.    But that's at least what the participants

22  reported.

23         Correct?

24     A.    From my recollection.  I'd have to reread the

```
 1   entire study to say for sure but that is my

 2   recollection, yes.

 3      Q.    And if you turn to page eight of the second

 4   column, under the heading de-transition?

 5      A.    I don't have page numbers on mine.

 6             ATTORNEY BLOCK:  Do you reference the

 7   page number at the top?

 8             ATTORNEY BARHAM:  The source contains no

 9   page numbers, making it difficult.

10   BY ATTORNEY BARHAM:

11      Q.    Under the heading detransition it's the page

12   right before table four.

13             ATTORNEY BLOCK:  I'm sorry.  Can I see

14   the heading on the document?  Just for the record, this

15   doesn't appear to be a paginated version of the article

16   where, you know, when I pull it up I get a publication,

17   date and pages.  So I don't know if this is the final

18   version of the article or not, but you can proceed with

19   the questions.

20             ATTORNEY BARHAM:  Counsel, I'll return to

21   your concerns, Mr. Block.

22   BY ATTORNEY BARHAM:

23      Q.    Do you see the one page before the page that

24   contains Table 4?
```

56

```
 1      A.    I do.

 2      Q.    Do you see the heading detransition?

 3      A.    I do.

 4      Q.    And it says there that when participants decided

 5 to detransition they were a mean age of 26.4 years old.

 6            Correct?

 7      A.    That is correct.

 8      Q.    Have you read this study before today?

 9      A.    I have.

10      Q.    So doesn't this study at least suggest that

11 patients may think they have a sense of belonging to the

12 opposite sex but can be mistaken?

13                 ATTORNEY BLOCK:  Objection to form.

14                 THE WITNESS:  I think what this study

15 does is hear experiences from a select group of

16 individuals who are motivated to participate in the

17 study about detransition and hear their experiences of

18 their care.

19 BY ATTORNEY BARHAM:

20      Q.    But the study still indicates that those

21 individuals had a sense of belonging to the opposite sex

22 and later concluded that they were were mistaken.

23            Is that correct?

24      A.    You will have to forgive my clinician nature
```

1   here, but language is important when working with

2   patients who are transitioning.  I don't know if that's

3   the language that they would use or if that is the

4   language that was used in this particular survey.

5        Q.    But the effect of detransitioning is that they

6   at one time thought they belonged to the opposite sex

7   and then later concluded that they did not?

8               ATTORNEY BLOCK:  Objection to the form.

9               THE WITNESS:  Again, I think we would

10  want to know specifically what each individual person,

11  how they described their process.  I don't know what

12  detransition means to those who are taking a relatively

13  anonymous survey, so it's hard to draw a conclusion

14  about the specific nature of it.  The generally accepted

15  upon definition of detransition is generally aligned

16  with somebody who reverts back to a gender identity or

17  gender expression that is more aligned with their sex

18  assigned at birth.

19  BY ATTORNEY BARHAM:

20       Q.    This study defines detransition as discontinuing

21  medications, having surgeries to reverse the effect of

22  transition or both.

23               Is that correct?  It is on page two?

24       A.    Show me where on page two.

1    Q.    The second column of page two, at the bottom of

2  the page?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  Yeah.  I'm not seeing that

5  Dr. Littman is specifically defining detransition but

6  describing the objective of the study for folks who

7  detransitioned by those aspects that you noted.

8  BY ATTORNEY BARHAM:

9    Q.    Okay.

10         But she notes in the last paragraph on that

11  page the objective of the current study was to describe

12  the population of individuals, skipping, who then

13  detransitioned by discontinuing medications, having

14  surgery to reverse the effects of transition or both?

15    A.    That's correct.

16    Q.    So she is indicating what she understands

17  detransitioning to mean in this article.

18         Correct?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  Again I'm not sure how she

21  specifically defines detransition.  It is not

22  necessarily made clear in that statement.

23  BY ATTORNEY BARHAM:

24    Q.    Is it true that people may mistake feelings

```
 1   resulting from trauma, mental illness or homophobia for
 2   a genuine sense of transgender identity?
 3                    ATTORNEY BLOCK:  Objection to form.
 4                    THE WITNESS:  I think there are a lot of
 5   complicated experiences that people may have that make
 6   them question their gender identity.
 7   BY ATTORNEY BARHAM:
 8       Q.   So it's at least possible that people could
 9   mistake feelings resulting from trauma, mental illness
10   or homophobia for genuine sense of transgender identity.
11           Correct?
12                    ATTORNEY BLOCK:  Objection to form.
13                    THE WITNESS:  I don't disagree with that,
14   no.
15   BY ATTORNEY BARHAM:
16       Q.   You said it's complicated, so it sounds like it
17   would be hard sometimes for a clinician to tell with
18   certainty what's going on?
19                    ATTORNEY BLOCK:  Objection to form.
20                    THE WITNESS:  What I would describe is
21   that in anything related to mental health that there are
22   complications and nuances.  This is no different.
23   BY ATTORNEY BARHAM:
24       Q.   Now, I believe you alluded to this a moment ago.
```

 1    You mentioned that this is a self-reporting study and it

 2    obviously concerns an emotionally fraught area of gender

 3    identity.  So is it your position that this does not

 4    produce scientifically meaningful results?

 5        A.    I don't know what you mean by scientifically

 6    meaningful.

 7        Q.    Do you believe that this --- the results of this

 8    article are scientifically reliable?

 9        A.    It depends upon what question is being asked.

10    As a blanket, any kind of selection bias, particularly

11    for this study based upon where the participants were

12    drawn from makes us not want to draw conclusions about

13    their generalized applicability of this study to other

14    transgender folks, including other folks who may have

15    detransitioned, but the goal of science is not

16    necessarily to draw widely applicable conclusions, but

17    to put us in a position where we can ask more questions

18    and improve our care for our patients.

19        Q.    Now, why do you say --- why do you highlight

20    concerns about where the participants were drawn from?

21        A.    I highlight that because it creates a sense of

22    selection bias, which potentially, as I said, can reduce

23    the why applicability of the conclusions drawn.

24        Q.    And why do you say that there is a potential for

1  selection bias in this article?

2      A.    Based upon the websites that Dr. Littman has

3  drawn her participants.

4      Q.    And why do you have concerns about those

5  websites?

6      A.    I have concerns about the websites because of

7  the contents of those websites.

8      Q.    And what is contents of those websites that

9  causes you concern?

10     A.    The content of the websites is unscientific.

11  And I guess I'm not sure how to articulate it in a most

12  defined way very specific to answering a set of

13  questions that reenforces the prestudy hypotheses.

14     Q.    So which websites that she drew participants

15  from cause you concern?

16     A.    As an example, Fourth Wave Now is a website that

17  Dr. Littman had used for some of her study recruitment.

18     Q.    And why are you concerned about the use of

19  Fourth Wave now in the recruitment process?

20     A.    What I would say is that when you're designing a

21  study that presupposes the conclusion and the website is

22  designed to attract people who presuppose that

23  conclusion, that limits the applicability of the

24  results.   It just have to be taken into account.   It

1   doesn't mean that there isn't data from this kind of

2   snowball recruitment that isn't valuable and I wouldn't

3   say that there isn't value to some of Dr. Littman's

4   work, specifically this study as compared to the last,

5   though you have to take it in the context with which it

6   was developed.

7       Q.    So are you suggesting that Dr. Littman

8   presupposed the conclusion that she wanted to reach in

9   designing this survey?

10      A.    I'm less familiar with the design of this study

11  than previous studies that she has designed, which I

12  would say that was correct.

13      Q.    What other websites did she use in the process

14  to cause you concern?

15      A.    I'm not as familiar with this study, so I don't

16  know if she specifically identified which websites.  And

17  I can't recall right now on the others which they were.

18      Q.    If you look at page three she discusses the

19  method and the participants and procedures.  Would

20  reviewing that refresh your recollection as to any

21  concerns about participants?

22      A.    It would not because she does not describe the

23  specific fora.  She describes a closed Facebook group,

24  Tumbler, Twitter and Reddit, but those are large

1    websites that have a lot of different kind of content.

2        Q.    So is it your position that it's not possible to

3    know whether anonymous or any results have any relation

4    to true fact in actual case histories?

5        A.    That is not my position.

6        Q.    Do you have any --- you mentioned earlier

7    something about how these were anonymous results.  So is

8    it possible to know whether they actually corresponded

9    with true cases?

10       A.    I think anonymous surveys, you have to really

11   dig into the specifics of the survey design in order to

12   draw conclusions.  And again, with any study in any

13   survey in particular you just want to make sure you have

14   an understanding of that context how broadly to draw

15   conclusions.

16       Q.    Would you agree that online recruitment does not

17   provide a statistically meaningful sample?

18       A.    I would not agree with that.

19       Q.    Is it your position --- how can an online

20   recruitment produce a statistically meaningful sample?

21       A.    I think I would need to understand the context

22   of what you mean by statistically meaningful.  There is

23   a difference between a survey that could be potentially

24   poorly designed and yet reach statistical significance.

1    You would need to understand the broader context in

2    order to draw conclusions about what that statistical

3    significance means and that means really digging into

4    the specific methodology of this study.  There is a vast

5    literature about efficacy of survey data and it really

6    depends on the specifics.

7        Q.    We've previously referenced paragraph eight of

8    your report where you mention you've seen approximately

9    500 transgender patients.

10                ATTORNEY BLOCK:  Travis, sorry, not to

11   avoid a pending question, but we're almost at one hour,

12   so if this is a good time, if you're moving to a

13   different subject maybe this would be a good time to

14   break.

15                ATTORNEY BARHAM:  Let me wrap up a few

16   more and then we will do that.

17                ATTORNEY BLOCK:  Thanks.

18   BY ATTORNEY BARHAM:

19       Q.    Your clinical practice for children and

20   adolescents started in 2013, about eight years ago.

21            Is that correct?

22       A.    No, I finished medical school in 2011 and have

23   been working with adults, children and adolescents since

24   then.

1       Q.      Okay.

2       A.      Actually that's when I finished --- to go back,

3   that's when I finished my residency and fellowship.  I

4   finished medical school in 2006.  I can't believe it's

5   been long.

6       Q.      And when did you begin your work in child and

7   adolescent psychiatry?

8       A.      I had child and adolescent psychiatry

9   experiences when I was in medical school.

10      Q.      When did you begin practicing child and

11  adolescent psychiatry?

12      A.      That's not a very specific term.  I practiced

13  child psychiatry as a medical student in my training.

14      Q.      When were you licensed, when were you first

15  licensed to practice child and adolescent psychiatry?

16      A.      There's no specific license to practice child

17  psychiatry.  Anybody who is --- has a medical license

18  can practice any medical specialty.  I was Board

19  Certified in Child and Adolescent Psychiatry, which is a

20  different process and I would have to look through to

21  recall the date.  I'm assuming that it's 2012 or 2013.

22  2013 is when I was Board Certified.

23      Q.      So when did you begin --- and you finished your

24  fellowship in child and adolescent psychiatry when?

1    A.    2011.

2    Q.    2011.  When did you begin treating as a child

3  and adolescent psychiatrist children with gender

4  dysphoria?

5              ATTORNEY BLOCK:  Objection to form.

6              THE WITNESS:  I saw children with gender

7  dysphoria during my residency and in my fellowship.

8  BY ATTORNEY BARHAM:

9    Q.    And your fellowship?

10   A.    Between 2006 and 2009.

11   Q.    And what proportion of those patients socially

12 transitioned?

13   A.    Of all of the patients that I saw in my training

14 or in all of the patients that I've seen over my time as

15 a physician?

16   Q.    Let's go first with the training.

17   A.    It was a much smaller number, so probably if I

18 were to guess, and I'm going back, probably close to

19 95 percent.

20   Q.    Ninety-five (95) percent socially transitioned

21 when you were in training?

22   A.    Yes.

23   Q.    And how many of your patients overall have

24 socially transitioned?

67

1    A.    I'm not sure how to answer that question.  Over

2    the course of our time working together, before I

3    started seeing them or --- I'm not sure how to

4    accurately answer that question.

5    Q.    Over the --- just in general how many of your

6    patients socially transitioned, not just while they were

7    being treated under your care?

8    A.    And these are patients who are seeing me

9    specifically through the context of gender or of those

10   500 transgender patients?

11   Q.    Of the 500 transgender patients.

12   A.    Probably --- I mean, it's a guess but probably

13   in the order of 85 percent.

14   Q.    And what proportion of the 500 patients used

15   puberty blockers?

16   A.    Probably a minority of those patients.  If I had

17   to guess, probably 20 percent or less.

18   Q.    And what percent of those 500 transgender

19   patients used cross sex hormones?

20   A.    I don't have my records in front of me, so it

21   would really just be a guess, but probably close to the

22   same percentage that socially transitioned, probably a

23   little bit less than that.

24   Q.    If I recall correctly that's about 85 percent?

68

1    A.    Probably somewhere on the order of that.

2              ATTORNEY BLOCK:  Would now be a good time

3    for that break?

4              ATTORNEY BARHAM:  One last question.

5    BY ATTORNEY BARHAM:

6    Q.    What systems do you have in place to track these

7    patients five years after they have been in your care?

8    A.    I have the same systems as most psychiatrists.

9    We see the patients within our care.  Folks will reach

10   out to us after time has passed and it's one of the

11   great pleasures of being a child psychiatrist, we get to

12   see folks longitudinally.  So there is not a specific

13   system apart from mutual care.

14   Q.    So you rely on them to reach out to you.

15              Is that correct?

16              ATTORNEY BLOCK:  Objection to form.

17              THE WITNESS:  It depends on context.

18   BY ATTORNEY BARHAM:

19   Q.    But do you have any systematic way of tracking

20   all patients five years after they leave your care?

21   A.    There is no systematic way of tracking all

22   patients.

23              ATTORNEY BARHAM:  All right.  Let's take

24   a break.  How long would you all like?

```
 1                    ATTORNEY BLOCK:  Five minutes.
 2                    ATTORNEY BLOCK:  Should we go off the
 3   record?
 4                    VIDEOGRAPHER:  Going off, 10:14 a.m.
 5   OFF VIDEOTAPE
 6                         ---
 7   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 8                         ---
 9   ON VIDEOTAPE
10                    VIDEOGRAPHER:  Back on the record.  The
11   time is 10:27 am.
12   BY ATTORNEY BARHAM:
13      Q.    Moments ago we were discussing Dr. Littman's
14   2021 study, that was Tab 15, Exhibit 6.  Are you aware
15   of any studies that contradict Dr. Littman's data?
16      A.    Can you be more specific?
17      Q.    Are you aware of any studies that contradict Dr.
18   Littman's work survey in this article in Exhibit-6 that
19   find fault with her data?
20                    ATTORNEY BLOCK:  Objection to the form.
21                    THE WITNESS: Yeah.  I'm sorry.  I don't
22   think I understand the question.  There are other
23   articles that have been written about detransition and
24   clinical experiences of patients that have
```

1   detransitioned who have described those experiences.

2   There has not been a specific survey designed of

3   detransitioners outside of this one that I'm aware of.

4   BY ATTORNEY BARHAM:

5       Q.    Has anyone written an article finding fault with

6   the way Dr. Littman interpreted the data that ---?

7                   ATTORNEY BLOCK:  Objection to form.

8                   THE WITNESS:  For this specific data set

9   or for previous?

10  BY ATTORNEY BARHAM:

11      Q.    For this specific data set?

12      A.    For this specific data set, from my

13  recollection, this was studied --- or published just

14  recently so I'm not aware of any.  It doesn't mean that

15  there aren't.

16      Q.    Are you aware of any studies that contradict Dr.

17  Littman's conclusions in this 2021 article?

18      A.    If you give me a moment I will read the

19  conclusion.

20                  ATTORNEY BLOCK:  Objection to form.

21                  THE WITNESS:  Insomuch as Dr. Littman's

22  conclusion is that there's no single narrative to

23  explain the experiences of all individuals who

24  detransitioned and we should take care to avoid painting

1   the population with a broad brush, I agree with that

2   conclusion.

3   BY ATTORNEY BARHAM:

4      Q.    Are you aware of any studies that contradict her

5   conclusions not just in the conclusion section but her

6   description of the detransitioners?

7               ATTORNEY BLOCK:  Objection to the form.

8               THE WITNESS:  I think it's hard to

9   provide a specific answer to that question.  We have to

10  look at each study and judge each individual study based

11  upon the merits.  The conclusions she draws are from a

12  subset of patients with a very specific viewpoint, and I

13  agree with her and her conclusion that there needs to be

14  more research to better understand the broader

15  implications of this care.

16  BY ATTORNEY BARHAM:

17     Q.    You're not aware of any article that has been

18  published specifically critiquing this 2021 study by Dr.

19  Littman.

20          Is that correct?

21     A.    Not that I'm aware of.

22               ATTORNEY BLOCK:  Objection to form.

23  BY ATTORNEY BARHAM:

24     Q.    A few moments ago we were also talking about the

1   patients that you have treated, the 500 transgender

2   patients you referenced in your report, and you

3   mentioned that about 20 percent or less of those had

4   used puberty blockers.  I'm wondering why that

5   percentage is so low.

6                ATTORNEY BLOCK:  Objection to form.

7                THE WITNESS:  I don't know.  Low compared

8   to what?  I think it's important to understand the

9   context that in 2011, when I first started my gender

10  program, that puberty blocking medications were not

11  widely available, cost upwards of $3,000 a month and

12  were not covered by most insurance.  So puberty blockers

13  were not something that were available in the same way

14  they are now.  And I also saw a fair number of adults

15  and older adolescents for whom puberty blockers are not

16  indicated.

17  BY ATTORNEY BARHAM:

18     Q.   So of the 500 patients that you reference in

19  paragraph eight of your report, what percentage of those

20  are adults?

21     A.    I would really have to go back and look.  I

22  mean, in my current practice, I see adolescents and

23  young adults, so kind of parsing out artificially who is

24  18 and up, it would take some time to do that.  Probably

```
 1    in the order of 75 percent are children in adolescence,

 2    25 percent adults.  But of course, over 2011 to now, a

 3    lot of those folks are now adults.

 4        Q.    And when I'm asking about these percentages I

 5    mean when you were treating them.  What percentage of

 6    the patients you were treating were children?

 7        A.    That's my best guess.

 8        Q.    Seventy-five (75) percent?

 9        A.    Yes.

10        Q.    And are you distinguishing between prepubertal

11    children and adolescents in that 75 percent or both?

12        A.    That's both.

13        Q.    Of that 75 --- of all the patients you've seen,

14    at the time you saw them, how many were prepubertal

15    children?

16        A.    Probably --- and again, I have to give this a

17    major caveat.  I would have to go back and look through

18    everything, but I would say probably 25 percent of that

19    75 percent were prepubertal at the time of initial

20    assessment.

21        Q.    And so then the remaining 75 percent of 75 would

22    be adolescents.

23              Is that correct?

24        A.    Correct.
```

1              ATTORNEY BLOCK:  Objection to form.

2    BY ATTORNEY BARHAM:

3        Q.    How many of your patients of those 500 patients

4    have detransitioned in a year?

5        A.    It's kind of a hard question to answer.  The one

6    patient who self identifies as having detransitioned

7    started seeing me after she had detransitioned.

8        Q.    Have any of your patients detransitioned while

9    under your care?

10       A.    Not that I'm aware of.

11       Q.    And is the one patient who detransitioned before

12   starting to see you, is that the only patient you're

13   aware of of the 500 that has detransitioned?

14       A.    That is the only one that I'm aware of, yes.

15   But can I clarify that of those 500 patients there are

16   certainly those who did not choose to transition.

17       Q.    And how many of the 500 chose not to transition?

18       A.    If I had to guess, probably about 10 to 20,

19   probably ten percent.

20       Q.    And did they make that decision before puberty

21   began?

22       A.    It was a mix.

23       Q.    Of those who chose not to transition, how many

24   were children when they made that decision?

1      A.    I couldn't tell you at that point, but

2  significantly more were the prepubertal youth than

3  adolescents.

4      Q.    This is a sensitive question.  I mean no offense

5  by it, but how many of the 500 patients have made the

6  sad decision to commit suicide?

7              ATTORNEY BLOCK:  I'm sorry.  I couldn't

8  heat that.  Can you speak up?

9  BY ATTORNEY BARHAM:

10     Q.    How many of the 500 patients have made the sad

11  decision to commit suicide?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  Is your question how many

14  have completed suicide?

15  BY ATTORNEY BARHAM:

16     Q.    Correct.

17     A.    Of those 500 patients, zero.

18     Q.    How many of those 500 patients have been

19  hospitalized for a psychiatric illness?

20     A.    I do not have that information in front of me.

21     Q.    Do you have any general idea?

22     A.    I don't.

23     Q.    After five or more years what percentage of your

24  patients would be characterized as lost to follow-up?

1      A.     Lost to follow-up is a specific term used in

2   studies, so it's not something that I would use to

3   describe my patients.

4      Q.     How many patients do you lose contact with after

5   five years?

6      A.     Again, I don't know how to answer that question.

7   I've been at my current role for three, so I haven't

8   lost touch with any significant number of patients.

9      Q.     What about patients that you saw before you were

10  in your current position?

11     A.     I'm not in contact with patients from my

12  previous role.

13              ATTORNEY BARHAM:  All right.  Let's go to

14  Tab 110.  This is Exhibit-7 I believe.

15                        ---

16              (Whereupon, Exhibit-7, Study, was marked

17                for identification.)

18                        ---

19  BY ATTORNEY BARHAM:

20     Q.     Are you familiar with this study?

21     A.     I am not.

22     Q.     Have you seen it before today?

23     A.     I have not.

24     Q.     On page one this again has been --- it's

 1  paginated in the top right corner or top inside corner.

 2  On page one the first sentence of the last paragraph

 3  says gender transition is as scientifically fascinating

 4  as it is socially controversial for it poses significant

 5  professional and bioethical challenges for those

 6  clinicians working in the field of gender dysphoria.

 7         Do you agree that gender detransition poses

 8  significant professional and bioethical challenges for

 9  professionals treating gender dysphoria?

10               ATTORNEY BLOCK:  Objection to form.

11               THE WITNESS:  I don't necessarily agree

12  with the language.  And certainly don't agree with the

13  author to use something that's scientifically

14  fascinating.  What I think is that every decision that

15  we make in child psychiatry in particular is fraught

16  with ethical challenges.  This is not any different from

17  the ethical challenges that we face with a lot of other

18  interventions.

19  BY ATTORNEY BARHAM:

20    Q.   What challenges does detransition pose to your

21  profession in your view?

22               ATTORNEY BLOCK:  Objection to form.

23               THE WITNESS:  I don't see how it poses

24  any challenges to my work.

78

1   BY ATTORNEY BARHAM:

2       Q.    Page three of this article, the authors identify

3   several things that may prompt a person's decision to

4   detransition including understanding how past trauma,

5   internalized sexism and other psychological difficulties

6   influence the experience of gender dysphoria.

7             Correct?

8             ATTORNEY BLOCK:   Objection.   Can you give

9   him a chance to read?

10             ATTORNEY BARHAM:   Of course.

11             THE WITNESS:   And can you repeat what you

12   said?

13   BY ATTORNEY BARHAM:

14       Q.    On page three the authors identify several

15   things that may prompt a person's decision to

16   detransition including, quote, understanding how past

17   trauma, internalized sexism and other psychological

18   difficulties influence the experience of gender

19   dysphoria.

20             Correct?

21       A.    Sorry.   Just give me a second to look at the

22   context here.

23       Q.    Sure.

24       A.    I agree that's how it is written and there

1    appears to be no basis from which the author has built

2    that assertion.   There is no methods described in this

3    whatsoever.

4       Q.    I believe the author in that instance is citing

5    Dodsworth 2020, Gonzalez 2019, Herzog 2017, and one,

6    two, three, four other studies.

7            Do you see that?

8       A.    I see those studies.   I'd have to look at the

9    specific studies in order to understand the implications

10   and the context.

11      Q.    But the authors obviously seem to have a basis

12   or at least a citation basis for what they're saying.

13           Is that correct?

14               ATTORNEY BLOCK:   Objection to form.

15               THE WITNESS:   Again, without knowing the

16   specifics of those studies it's hard for me to say.

17   BY ATTORNEY BARHAM:

18      Q.    The authors also indicate that solving previous

19   psychological or slash emotional problems that

20   contributed to gender dysphoria may prompt the decision

21   to detransition.

22           Is that correct?

23      A.    Where is that?

24      Q.    They are citing Butler and Hutchinson, 2020,

80

1    Stella 2016.  It is the same paragraph.

2        A.    Got it.  Yeah I don't know what solving a

3    psychological or emotional problem means in this

4    context.

5        Q.    But these authors are at least indicating that

6    solving these problems, however they mean the term, may

7    prompt a decision to detransition.

8             Is that correct?

9                  ATTORNEY BLOCK:  Objection to form.

10                 THE WITNESS:  I think I've answered how I

11   can answer that.

12   BY ATTORNEY BARHAM:

13       Q.    Okay.

14            Let's go back to Tab 15, which is Exhibit-6.

15   This was the Littman study that we were discussing a

16   moment ago.  On page three --- excuse me, according to

17   Table 5, on page nine, 60 percent of the participants in

18   this survey reported that they became more comfortable

19   identifying as their natal sex.

20            Is that correct?

21                 ATTORNEY BLOCK:  Objection to form.

22                 THE WITNESS:  I see 65 percent of those

23   assigned female at birth and 48 of those assigned male

24   at birth reported that.

1   BY ATTORNEY BARHAM:

2      Q.    So 45 and 15 is 60, so that would be 60 percent

3   of the 100 participants in the study.

4            Correct?

5                   ATTORNEY BLOCK:   Objection to form.

6                   THE WITNESS:   I believe.

7   BY ATTORNEY BARHAM:

8      Q.    I'm sorry.  I didn't hear your answer.

9      A.    I trust your math, yes.

10      Q.    Okay.

11            And on page 12, under the heading discussion,

12   this survey indicates that only a small percentage of

13   detransitioners, 24 percent, informed the clinicians and

14   clinics that facilitated their transfer that they ---

15   their transition that they had detransitioned.

16            Is that correct?

17                   ATTORNEY BLOCK:   Objection to form.

18                   THE WITNESS:   Yes, the participants in

19   the study, that is correct.

20   BY ATTORNEY BARHAM:

21      Q.    And you testified a moment ago, if I recall

22   correctly, please correct me if I'm wrong, that you are

23   aware of only one patient in your career that has

24   detransitioned.

1              Is that correct?

2       A.     That I'm aware of, yes.

3       Q.     Let's go to Tab 116, which is Exhibit-8.

4                       ---

5              (Whereupon, Exhibit-8, Article by

6              Vandenbussche, was marked for

7              identification.)

8                       ---

9  BY ATTORNEY BARHAM:

10      Q.     Are you familiar with this article?

11      A.     I have not read this article.

12      Q.     And this is a 2021 article by I believe a

13 gentleman named --- or an individual named

14 Vandenbussche, Detransitioned Related Needs in Sports.

15             Is that correct?

16      A.     That is correct.

17      Q.     Did you review this article when preparing your

18 report?

19      A.     I did not.

20      Q.     If you look at page four this article examined a

21 sample survey of 237 detransitioners.

22             Is that correct?

23             ATTORNEY BLOCK:  Objection.  Can you give

24 him time to read the document he has never seen before.

83

```
 1                    ATTORNEY BARHAM:  Certainly.

 2                    THE WITNESS:  Can you repeat the

 3    question?

 4    BY ATTORNEY BARHAM:

 5        Q.    This article highlights the results of a survey

 6    of 237 detransitioners.

 7                    Correct?

 8        A.    Yes, as they are defining detransitioning, yes.

 9        Q.    And on page five these authors --- these

10    researchers report that 70 percent of participants

11    detransitioned because they realized that their gender

12    dysphoria was related to other issues.

13                    Correct?

14        A.    Correct.

15        Q.    And that was the most common reported reason for

16    detransitioning.

17                    Correct?

18        A.    As they stated, yes.

19        Q.    In paragraph 43 of your report you cite Lisa

20    Littman's 2018 study.  Paragraph 43.  And you highlight

21    what you describe as serious methodological flaws that

22    render the study meaningless.

23                    Is that correct?

24        A.    Correct.
```

84

1              ATTORNEY BARHAM:   I want to show you

2    Tab 117, and this will be Exhibit 9.  It will be an

3    article by Lily Durwood entitled Mental Health and Self

4    Worth in Socially Transitioned Transgender People.

5                          ---

6              (Whereupon, Exhibit-9, Article by Lily

7              Durwood, was marked for identification.)

8                          ---

9    BY ATTORNEY BARHAM:

10   Q.    Are you familiar with this article?

11   A.    I am.

12   Q.    You cited this in footnote nine of your report

13   as demonstrating the treatment associated with social

14   transitions.

15         Correct?

16   A.    I have to look at the specific footnote.  I know

17   I cited it, but I don't know if it was citing to that

18   specific conclusion.

19   Q.    By all means take a look.

20   A.    Can you point me to where my footnote is?

21   Q.    Footnote nine is --- let me find it myself.

22              ATTORNEY SWAMINATHAN:  It's page 11.

23              THE WITNESS:  Yes.

24   BY ATTORNEY BARHAM:

```
 1      Q.    The Durwood article in 2017 is a survey of

 2   children and their parents about the children's mental

 3   health.

 4           Is that correct?

 5      A.    Correct.

 6      Q.    The children in the Durwood article were not

 7   surveyed or assessed by clinicians.

 8           Is that correct?

 9      A.    I don't know the answer to that.  I'd have to

10   look at the specific ---.

11      Q.    Well, if this is a self report it would be

12   reporting what the children themselves said.

13           Correct?

14           ATTORNEY BLOCK:  Objection.  Let him have

15   time to read the article.

16           THE WITNESS:  The trans youth project was

17   directed by Dr. Ulson involved clinicians in the

18   assessment of the children and their families.  So I'm

19   not sure specifically.  I would have to go through the

20   methods of this one particularly for me to recall.

21           As you will see from the procedure on

22   page 117 whenever possible parents and children

23   completed the measurements in separate rooms or far

24   enough in the same room to be out of ear shot.  And so
```

1   they were researchers who were boarded who were

2   participating in these interviews with the kids and

3   their families.

4   BY ATTORNEY BARHAM:

5       Q.    But those researchers were just recording what

6   the students said out loud?

7       A.    Correct.

8       Q.    So there's no clinical assessment of the

9   children as part of this survey.

10          Is that correct?

11              ATTORNEY BLOCK:  Object to form.

12              THE WITNESS:  I wouldn't be able to

13  answer that question.  It depends upon how it's used.

14  In a research context you might be using the same

15  instruments that we would use for clinical assessments,

16  but for the sake of research purposes it's not used in

17  that way.

18  BY ATTORNEY BARHAM:

19      Q.    But the purpose of this article was just to

20  record what the children said as a self report.

21          Is that correct?

22              ATTORNEY BLOCK:  Objection to form.

23              THE WITNESS:  As far as I understand the

24  point of this article, they utilized child self report

1  which is what is typically used in children mental

2  health studies.

3  BY ATTORNEY BARHAM:

4     Q.    According to page --- the second page of this

5  article, which is page 117, the participants were

6  recruited through word of mouth, national and local

7  support groups, summer camps and online forums for

8  families of transgender and gender nonconforming youth.

9         Correct?

10    A.    That is correct.

11    Q.    Frequently in your report you refer to

12  gender-affirming care.  What in your view are the

13  components of gender-affirming care?

14             ATTORNEY BLOCK:  Objection to form.

15             THE WITNESS:  I think that there is no

16  one agreed upon use of that term and it is used by

17  different people in different context to mean whatever

18  they want it to mean, depending upon who is asking the

19  questions.  The way that I define it, for my own

20  practice, is that it's important for children to be

21  heard and listened to, that any particular gender

22  identity outcome is not better than any other and that

23  the child and families should be directing the process

24  with appropriate assessments and interventions.

1    BY ATTORNEY BARHAM:

2      Q.    How do you handle a situation where parental

3    desires may be differ than the child's desires?

4      A.    That is almost a universal phenomenon of

5    parenthood, so there's not an atypical process.  When

6    there is disagreement about specific issues in the

7    treatment plan those interventions are going to be

8    tailored to the individual families based upon their

9    need.

10     Q.    So when you use gender-affirming care what do

11   you view as the different components or different

12   aspects of gender-affirming care in your practice?

13             ATTORNEY BLOCK:  Objection to form.

14             THE WITNESS:  I think that is also going

15   to be highly context dependent.  I'm a psychiatrist and

16   I see a lot of children with complex psychiatric needs,

17   so my process for gender-affirming care is going to be

18   different than what somebody else might describe as

19   gender-affirming care, but I think I highlighted what I

20   see as the components of it for myself.

21   BY ATTORNEY BARHAM:

22     Q.    I've missed in your list of the different

23   components, so could you explain again what do you see

24   as the components of gender-affirming care?

1    A.    That it should be child and family led, that

2    listening to and understanding the child is an important

3    aspect of the process and that there is no gender

4    identity outcome that is privileged over another.  I'm

5    sure I said it slightly differently than the last time

6    around but the concepts are the same.

7    Q.    Do you consider social transition to be a

8    component of gender-affirming care?

9    A.    I think that understanding the risks, benefits

10   and alternatives of social transition is a part of

11   gender-affirming care.  In that way, sometimes

12   recommending not socially transitioning is a part of

13   gender-affirming care.

14   Q.    But gender-affirming care can be an approach

15   used as part of gender-affirming care.

16         Is that correct?

17              ATTORNEY BLOCK:  Objection to the form.

18              THE WITNESS:  Can you repeat the

19   question?

20   BY ATTORNEY BARHAM:

21   Q.    Social transitioning can be a method used as

22   part of gender-affirming care.

23         Correct?

24   A.    It is an option.

1      Q.      An available tool.

2             Correct?

3      A.      Yes.

4      Q.      Is it your belief that social transition is a

5      type of medical or mental health treatment for gender

6      dysphoria?

7      A.      It's a hard question to answer.  Social

8      transition is a pretty diverse concept that's hard to

9      get as a categorical variable to study, but the

10     implication is that there's a lot of things that are

11     often helpful for mental health that aren't specifically

12     mental health treatments, right, like exercise, regular

13     sleep.  These aren't specific mental health

14     interventions but nevertheless have impacts on mental

15     health outcomes.

16     Q.      Well, in paragraph 90 --- I mean paragraph 36 of

17     your report you say that social transition is a

18     treatment for gender dysphoria?

19     A.      Yeah I would agree with that.

20     Q.      So what kind of treatment is it?

21     A.      It's a psychosocial intervention.

22     Q.      Psychosocial.  What does social transitioning

23     include in your view?

24     A.      I have to recall if I provided an operational

 1  definition for it in my report.  Essentially what we're

 2  talking about is an alignment of gender role and gender

 3  identity.  So that's transition of name, pronouns, hair,

 4  participation in sex-segregated activities, et cetera.

 5      Q.    And so social transition in your view means the

 6  participation in girls or boys athletic teams in

 7  competitions consistent with ones gender identity.

 8          Is that correct?

 9      A.    Again, it's going to be context dependent.  It

10  is not a yes or no question around social transition.

11  What we're going to be doing in the context of an

12  assessment is understanding the risks and benefits of

13  all the various options that we have.

14      Q.    I understand that it can differ from person to

15  person, but participation in girls or boys athletic

16  teams in competition consistent with one's gender

17  identity is an aspect, a possible aspect, of social

18  transitioning.

19          Correct?

20      A.    It may be an option for some students, yes.

21      Q.    Do you consider the use of puberty blockers to

22  be an available tool as part of gender-affirming care?

23      A.    I do.

24              ATTORNEY BLOCK:  Objection to form.

1   BY ATTORNEY BARHAM:

2      Q.    Do you consider the use of cross sex hormones to

3   be an available tool as part of gender-affirming care?

4                  ATTORNEY BLOCK:  Objection to form.

5                  THE WITNESS: Gender-affirming care can

6   include hormones.

7   BY ATTORNEY BARHAM:

8      Q.    Are there any other available tools that you use

9   as part of gender-affirming care?

10     A.    Yes, there is a lot of tools that I use that are

11  involved in gender-affirming care.  Work with the family

12  is one big piece of it.  Work with the school is

13  another.  Referrals for surgery when indicated,

14  recommendations for assessment and treatment of any

15  co-occurring mental health disorder is a part of it.

16     Q.    What is your role in the prescribing of puberty

17  blockers?

18     A.    I'm occasionally in the role of doing a mental

19  health assessment prior to initiation of those

20  medications.

21     Q.    And are you the individual who would prescribe

22  the puberty blockers?

23     A.    I am not.

24     Q.    What type of professional would be responsible

1   for the prescribing?

2      A.   In the clinics that I have worked these are

3   either adolescent medicine specialists or pediatric

4   endocrinologists.

5      Q.   And is the same true with cross sex hormones?

6      A.   Yes.

7      Q.   In your report you describe gender-affirming

8   care as the prevailing model of care for transgender

9   youth.

10      Is that correct?  And I'm referencing

11   paragraph 15 of your report.

12      A.   Yes.

13      Q.   Later on in your report you refer to prevailing

14   standards of care, paragraph 18, paragraph 26, for

15   example.  By that are you referring to gender-affirming

16   care?

17      A.   Which paragraph?

18      Q.   Eighteen (18) and 26.

19      A.   I would say that it is a part of what I'm

20   referring to but not the entirety of what I'm referring

21   to.

22      Q.   What else are you referring to in paragraph 18

23   and 26 when you say prevailing standards of car?

24      A.   This would include a lot of components,

```
 1   including both the Endocrine Society Guidelines, the
 2   World Professional Association for Transgender Health
 3   Guidelines as well as recommendations and ethical
 4   guiding principles of the various governing bodies that
 5   we all work with.
 6        Q.   And you would describe those various documents
 7   that you just referenced as reflecting gender-affirming
 8   care.
 9             Correct?
10        A.   I would have to go through, for example, the
11   Endocrine Society Guidelines to know whether or not they
12   use that specific term.  Again, I think I just want to
13   make sure that I'm emphasizing that gender-affirming
14   care does not have an agreed upon definition so it's
15   controversial and I wouldn't know how to answer that
16   question.
17        Q.   As you use the term and as you define the term
18   in your practice, would you consider the WPATH standards
19   to fall under the umbrella of gender-affirming care?
20        A.   I would yes.
21        Q.   And would you consider the Endocrine Society
22   Guidelines to fall under the umbrella of
23   gender-affirming care?
24        A.   I would, yes.
```

1    Q.    In paragraph 15 of your report you claim that

2    gender-affirming care is endorsed by at least five

3    professional associations.

4              ATTORNEY BLOCK:  Objection to form.

5    BY ATTORNEY BARHAM:

6    Q.    And you reference others.  What other

7    organizations are you alluding to in paragraph 15 of

8    your report?

9    A.    I don't want to get the name of the organization

10   incorrect, but National Association of Social Workers

11   and the National Association of Marital and Family

12   Therapists have released statements about it, but I

13   don't have specific recollection of those sitting here

14   today.

15   Q.    Okay.

16         Are there any other organizations besides those

17   and those listed in paragraph 15?

18   A.    There likely are but none that are coming to

19   mind today.

20   Q.    When you were preparing your report did you

21   consult the standards of care articulated by any

22   international professional organizations?

23   A.    Yes.

24   Q.    Which ones?

1      A.    Both the Endocrine Society Guidelines as well as

2  the WPATH standards of care.

3      Q.    Any other international or professional

4  organizations?

5      A.    Not that I can recall, no.

6      Q.    Are you aware that international and

7  professional organizations have been moving away from

8  using puberty blockers and cross sex hormones on

9  children and adolescents under the age of 16?

10              ATTORNEY BLOCK:  Objection to form.

11              THE WITNESS:  I don't see that that is

12  necessarily accurate.  I'm going to have to take a break

13  in five minutes if that is okay.

14              ATTORNEY BARHAM:  This would be the

15  perfect time.

16              THE WITNESS:  I will be quick.

17              VIDEOGRAPHER:  Going off the record.  The

18  current reads 11:01.

19  OFF VIDEOTAPE

20                      ---

21  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                      ---

23  ON VIDEOTAPE

24              VIDEOGRAPHER:  Back on the record.  The

97

1    current time is 11:06 a.m.

2              ATTORNEY BARHAM:   I'm going to show you

3    what we will mark as Exhibit 10, this will be Tab 91.

4                        ---

5              (Whereupon, Exhibit-10, Statement by

6              Royal Australian and New Zealand College

7              of Psychiatrists, was marked for

8              identification.)

9                        ---

10   BY ATTORNEY BARHAM:

11     Q.    This is a statement from the Royal Australian

12   and New Zealand College of Psychiatrists.

13           Correct?

14              ATTORNEY BLOCK:   Objection.   Can you give

15   him a chance to look at the document?

16              THE WITNESS:   It's what it says.   I don't

17   know what the government structure of this organization

18   is or how they release their statements or how they are

19   developed.

20   BY ATTORNEY BARHAM:

21     Q.    This is Position Statement 103, according to the

22   document.

23           Correct?

24     A.    I will take your word for it if that's what it

98

```
 1    says.
 2        Q.    Right below the title.  And it was published in
 3    August of 2021.
 4              Is that correct?
 5        A.    I don't know where it says that.
 6        Q.    Right below the tab.
 7        A.    Got it.
 8        Q.    The Royal Australian and New Zealand College of
 9    Psychiatrists is the professional body of psychiatrists
10    for those two countries.
11              Is that correct?
12                    ATTORNEY BLOCK:  Objection.
13                    THE WITNESS:  I do not know that.
14    BY ATTORNEY BARHAM:
15        Q.    I'm sorry.  I didn't catch your answer.
16        A.    I do not know.
17        Q.    According to page three of this document, the
18    Royal College has concluded that there are, quote,
19    polarized views and mixed evidence regarding treatment
20    options for people presenting with gender identity
21    concerns, especially children and young people.
22              Do you see that?
23        A.    I see that.
24        Q.    Do you agree with their assessment?
```

1     A.    Yes.

2     Q.    So this means that professionals can disagree

3  with each other as to how to treat children and young

4  people with gender dysphoria.

5           Is that correct?

6           ATTORNEY BLOCK:  Objection to form.

7           THE WITNESS:  Yeah.  I think any

8  treatment decision, you're going to have professionals

9  disagreeing with you about the best course of action.

10  This isn't any different than that.

11  BY ATTORNEY BARHAM:

12     Q.    And on page four of the document the Royal

13  College says that psychiatric assessment and treatment

14  should be both --- should be both based on available

15  evidence and allow for full exploration of a person's

16  gender identity.  And it emphasizes the importance of

17  the psychiatrist's role to undertake for assessment in

18  evidence-based treatment ideally as part of a

19  multidisciplinary team, especially highlighting

20  distinguishing issues which may need addressing and

21  treating.  Do you agree with the Royal College's

22  emphasis on psychiatrists' role and how it's important

23  to ensure appropriate care for gender dysphoria?

24           ATTORNEY BLOCK:  Objection to form.

```
 1                    THE WITNESS:  Psychiatrists are often a

 2      useful adjunct to the team, but isn't a necessary

 3      requirement.  There are many other mental health

 4      professionals who have expertise and can fill this role.

 5      BY ATTORNEY BARHAM:

 6         Q.    And what other professionals do you think could

 7      fill this role?

 8         A.    This would be licensed clinical mental health

 9      professionals.

10         Q.    And those would include?

11         A.    Psychologists, social workers, marital and

12      family therapists and there are probably other titles

13      that are governed by their regulatory boards that I

14      don't recall right now.

15      BY ATTORNEY BARHAM:

16         Q.    And on what are you basing your disagreement

17      with the Royal College's emphasis on the importance of

18      the psychiatrist's role

19                    ATTORNEY BLOCK:  Objection to form and

20      characterization of the document.

21                    THE WITNESS:  The WPATH standards of care

22      as an example does not dictate necessary involvement of

23      a psychiatrist.  And I would have to review the

24      Endocrine Society, but I don't believe that they
```

 1   specifically --- from my guild either.

 2   BY ATTORNEY BARHAM:

 3       Q.    Is it true that psychiatrists have training and

 4   skills that psychologists and marital therapists and

 5   social workers do not have?

 6       A.    That is correct.

 7                   ATTORNEY BARHAM:  I'm going to hand you

 8   what we will mark as Exhibit-11.  And this will be

 9   Tab 92 for those watching online.

10                            ---

11                   (Whereupon, Exhibit-11, Policy Change

12                    Regarding Hormonal Treatment of Minors,

13                    was marked for identification.)

14                            ---

15   BY ATTORNEY BARHAM:

16       Q.    This document is an announcement of a policy

17   change regarding hormonal treatment of minors with

18   gender dysphoria at Astrid Lidgren Children's Hospital.

19   Are you aware that this is the main gender clinic in

20   Sweden?

21                   ATTORNEY BLOCK:  Objection to form.

22                   THE WITNESS:  I don't see any specific

23   information about this document that reports where it's

24   from.

 1   BY ATTORNEY BARHAM:

 2      Q.    Are you aware of Astrid Lindgren Hospital by

 3   reputation?

 4      A.    I don't know if that's the name of it.  No, I

 5   don't recall the specific name of the Swedish Children's

 6   Hospital.

 7      Q.    Are you aware that the Swedish Agency for Health

 8   Technology Assessment and Assessment of Social Services

 9   published an overview of the knowledge base which showed

10   a lack of evidence of both long-term consequences of the

11   treatments of gender dysphoria?

12      A.    I have heard ---.

13            ATTORNEY BLOCK:  Objection to form and

14   where are you quoting from?

15            ATTORNEY BARHAM:  Halfway through the

16   first paragraph of the background section on page one.

17            ATTORNEY BLOCK:  I'm sorry.  Where was

18   this document obtained from?

19            ATTORNEY BARHAM:  I can supply that

20   information, but this is an announcement of a policy

21   change from a Children's Hospital in Sweden.

22            ATTORNEY BLOCK:  Just for the record,

23   this doesn't seem to have a walk --- like --- it just

24   looks like words on a page without other sourcing on it.

1              ATTORNEY BARHAM:  Your objection is

2       noted.

3              THE WITNESS:  I mean without speaking to

4       the providence of the document, I have heard that there

5       was a change within the Swedish establishment in regards

6       to prepubertal youth or prepubertal youth.

7       BY ATTORNEY BARHAM:

8          Q.    And what was your understanding of that change?

9          A.    I would have to look through the specifics to

10      know for sure.

11         Q.    What is your general understanding of the nature

12      of that change?

13         A.    My general understanding was there was a pause

14      on some of the treatments, medical treatments available

15      for children with gender dysphoria.

16         Q.    And by pause, at least according to this

17      document, it means that they had decided hormonal

18      treatments, i.e. puberty blocking and cross sex

19      hormones, will not be initiated in gender-dysphoric

20      patients under the age of 16.

21              Correct?  First bullet point in executive

22      decisions.

23         A.    Again, not knowing the providence of this

24      document, that's what this document says, yes.

1    Q.    Are you aware that the United Kingdom's National

2  Health Service put an end to initiating hormone

3  treatment in new cases of individuals under 16?

4              ATTORNEY BLOCK:  Objection to form and

5  foundation.

6              THE WITNESS:  My understanding is that

7  it's under litigation right now and a final decision has

8  not been reached, but I could be wrong about that.

9  BY ATTORNEY BARHAM:

10    Q.    Are you aware that that's at least a current

11  practice to put an end to initiating hormonal treatment

12  in new patients --- in new cases of individuals under

13  16?

14              ATTORNEY BLOCK:   Objection to form.

15              THE WITNESS:  Can you repeat the

16  question?

17  BY ATTORNEY BARHAM:

18    Q.    Are you aware that the United Kingdom's National

19  Services' current practice is to put an end to

20  initiating hormonal treatments in new cases of

21  individuals under 16?

22              ATTORNEY BLOCK:   Objection to form and

23  foundation.

24              THE WITNESS:  I do not have the NHS

1    policies in front of me, so I cannot speak to that.

2                    ATTORNEY BARHAM:   The document Exhibit

3    --- what number are on, 11.

4                    LAW CLERK WILKINSON:   11, yes

5    BY ATTORNEY BARHAM:

6       Q.    Exhibit 11 indicates, quote, the United

7    Kingdom's National Health Service put an end to

8    initiating hormonal treatment in new cases of

9    individuals under 16.  Do you have any reason to believe

10   that that statement is inaccurate?

11                   ATTORNEY BLOCK:   Just objection that this

12   document came out at a certain time and so it's just not

13   clear what timeframe, you know, this question is

14   referring to.  And just another objection to this

15   document.  This appears to be a translation ---.

16                   ATTORNEY BARHAM:   Your objection is

17   noted.  And we've already agreed that there are the

18   three objections, so I will ask you to cease the

19   speaking objections.

20                   THE WITNESS:   I have reason to doubt it.

21   Yes.

22   BY ATTORNEY BARHAM:

23      Q.    What is your reason to doubt it?

24      A.    My understanding is that there were legal

1  processes involved that have changed the landscape of

2  this care in the U.K.

3     Q.    Are you aware of the National Health Service

4  reinitiating hormonal treatments in new cases of

5  individuals under 16?

6     A.    I am unsure.  That's where my doubt is.

7     Q.    But you're aware that at one time they put an

8  end to those treatments for individuals under the age of

9  16?

10    A.    Yes.

11              ATTORNEY BLOCK:  Objection to form.

12              THE WITNESS:  Yes.

13              ATTORNEY BARHAM:  I'm going to show you

14  what we will mark as Exhibit-12.  This is a document ---

15  an article by Lisa Nainggolan.  I'm probably butchering

16  the last name.

17              LAW CLERK WILKINSON:  Tab 93.

18              ATTORNEY BARHAM:  Tab 93, entitled

19  Hormonal Treatment of Youth with Gender Dysphoria Stops

20  in Sweden.

21                        ---

22              (Whereupon, Exhibit-12, Article by Lisa

23              Nainggolan, was marked for

24              identification.)

```
 1                           ---

 2   BY ATTORNEY BARHAM:

 3      Q.    In the fourth paragraph it indicates that other

 4   centers in Sweden that treat gender dysphoria youth in

 5   Loom and Licopene will follow the lead of the ALB.  Are

 6   you aware that those two clinics had made the same

 7   decision as the Astrid Lindgren Children's Hospital?

 8      A.    I am not.

 9               ATTORNEY BARHAM:  I'm going to show you

10   what we will mark as Exhibit-4 --- I mean, I'm sorry

11   Tab 94, Exhibit 13.

12                           ---

13               (Whereupon, Exhibit-13, Study, was marked

14                   for identification.)

15                           ---

16   BY ATTORNEY BARHAM:

17      Q.    Are you aware that Finland has similarly

18   reversed its course issuing new guidelines that allow

19   puberty blockers only on a case by case basis after

20   extensive psychiatric assessment?

21               ATTORNEY BLOCK:  Objection to form.  And

22   can you give the witness and me a chance to see this

23   document?  Can the document be scrolled down?

24               THE WITNESS:  What I can say about this
```

```
 1   document is that I don't --- I've not heard of what

 2   Cohere Finland is and how their recommendations impact

 3   policies on the ground in Finland.

 4   BY ATTORNEY BARHAM:

 5     Q.    So are you not familiar with Cohere as an

 6   entity?

 7     A.    Correct.

 8     Q.    And that was a question.  Are you?

 9     A.    I am not.

10     Q.    Have you seen this document before today?

11     A.    I have not.

12              ATTORNEY BARHAM:  I'm going to show you

13   what we'll mark as Exhibit 14, and this will be Tab 95

14   for those watching at a distance.

15                            ---

16              (Whereupon, Exhibit-14, Article Published

17               on Medscape.com, was marked for

18               identification.)

19                            ---

20   BY ATTORNEY BARHAM:

21     Q.    This is an article by Betsy McCall published on

22   Medscape.com on October 7th, 2021.

23          Is that correct?

24     A.    Yes.
```

1    Q.    If you look at the third paragraph from the

2   bottom.  Ms. McCall reports that Scandinavian countries,

3   most notably Finland, once eager advocates for the

4   gender-affirmative approach, have pulled back and issued

5   new treatment guidelines in 2020, stating that

6   psychotherapy rather than gender reassignment should be

7   the first line of treatment for gender dysphoric youth.

8   Do you see that?

9    A.    I see that.

10    Q.    Do you agree with that approach?

11             ATTORNEY BLOCK:  Objection to form.

12             THE WITNESS:  Medscape is a popular press

13   forum for discussing issues and the language that is

14   used by this author implies to me that this is not

15   somebody who has a great deal of expertise or

16   understanding in this field.

17   BY ATTORNEY BARHAM:

18    Q.    Do you agree with using psychotherapy rather

19   than gender reassignment as the first line of treatment

20   for gender dysphoric youth?

21    A.    The term gender reassignment in and of itself is

22   not a meaningful term in this context, and so it's

23   unclear what this particular author is trying to get

24   across.  And it's a false dichotomy that is being

1  positive that doesn't actually happen.

2    Q.    Are you aware that Finland had issued new

3  treatment guidelines in 2020?

4    A.    I don't recall the specifics of when guidelines

5  were recommended.  But based upon the document that you

6  placed in front of me it seems to be yes.  But I think

7  the description of those guidelines and what you put in

8  front of me as the Cohere guidelines, which again I'm

9  not sure what they actually represent in terms of their

10 policies, there are contradictions there.

11          ATTORNEY BLOCK:  I'm sorry.  I want to

12 put on the record this document about Finland also

13 appears to be a translation from the original by the

14 Society for Evidence Based Gender Medicine whose website

15 describes it as an unofficial translation.  So I just

16 want to note that for the record.

17          ATTORNEY BARHAM:  So noted.  I'm going to

18 show you what we will mark as Exhibit 15, Tab 96.

19                      ---

20          (Whereupon, Exhibit-15, Article in

21           National Health Service, was marked for

22           identification.)

23                      ---

24 BY ATTORNEY BARHAM:

1      Q.    And I will direct your attention to page 13.

2    This is a --- to identify the document for the record.

3    This is an Evidence Reviewed Gonadotrophin Releasing

4    Hormone Analogs for Children and Adolescents with Gender

5    Dysphoria, from the National Health Service in 2021 ---

6    or in 2020.  On page 13, right at the beginning of the

7    conclusions section the authors indicate that the

8    results of studies that reported impact on the critical

9    outcomes of gender dysphoria and mental health and the

10   important outcomes of body image and psychosocial impact

11   in children and adolescents with gender dysphoria are a

12   very low certainty using modified grade.  They suggest

13   little change with GnRH analogs from baseline to

14   follow-up.  Do you see that?

15     A.    I do not.

16     Q.    First paragraph, under the conclusion.

17     A.    Yes, I see that.

18     Q.    Do you have any scientific basis for disputing

19   this conclusion?

20            ATTORNEY BLOCK:  Objection.  Let him read

21   the document.

22            THE WITNESS:  I mean, without having seen

23   this before, I'm not sure what the scoping was for how

24   they defined which studies to include, which ones were

 1   excluded, which would be required in a validated

 2   metaanalysis type approach.  So without a very specific

 3   description of the methodology it's going to be hard for

 4   me to make an educated statement.

 5   BY ATTORNEY BARHAM:

 6       Q.    If you look at page three of the document, under

 7   executive summary it highlights the nine observational

 8   studies that were included in the evidence review.

 9       A.    Yeah, in a metaanalysis or even a systematic

10   review one of the processes that occurs is you define as

11   the authors what you are searching for, what are the

12   exclusionary and inclusionary criteria for each

13   individual study and a list of every single study that

14   was reviewed and why or why not it was included.  That

15   is missing here, so it's --- I don't know how the

16   authors decided which ones to include or which ones not

17   to include, which makes it hard to draw a conclusion

18   from the report as it stands.

19       Q.    Have you seen any other reports that suggest

20   that the evidence being discussed on page 13 under the

21   conclusions heading isn't anything higher than a very

22   low certainty using modified grade?

23       A.    I'm not 100 percent familiar with modified grade

24   as a methodology, so I can't speak to how that would

1    apply to other studies.

2        Q.    And the next paragraph the authors indicate that

3    studies found differences in outcome could represent

4    changes that are either a questionable clinical value or

5    the studies themselves are not reliable and changes

6    could be due to confounding bias or chance.  Do you

7    agree that that is possible?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  Well, I agree that all

10   things are possible, that scientific literature is not

11   always 100 percent drawing any conclusions.  But again,

12   without knowing specifically how they included what they

13   included or why they included what they included and why

14   they opt to remove others, it's not possible for me to

15   draw a specific conclusion from this.

16   BY ATTORNEY BARHAM:

17       Q.    In paragraph 34 of your report you distinguish

18   Dr. Levine's approach to treating gender dysphoria as

19   --- or you describe it as gender identity conversion

20   model.  Do you recall that?

21       A.    Yes.

22       Q.    In your view are there two approaches to

23   treating gender dysphoria in children and adolescents,

24   the gender-affirming model and the conversion therapy

1   model?

2                    ATTORNEY BLOCK:  Objection to form.

3                    THE WITNESS:  I would not agree with that

4   characterization.

5   BY ATTORNEY BARHAM:

6       Q.    How many other approaches do you see?  How do

7   you categorize the different approaches for treating

8   gender dysphoria in children and adolescents?

9       A.    I don't agree with the premise, but there

10  specific defined treatment paradigms that are used.  I

11  think there are --- there are elements of conversion

12  therapy as I referred to in my report.  There are

13  elements of gender-affirming care and there is a

14  spectrum in between that.

15      Q.    What are the elements --- what are the elements

16  of identity --- gender identity conversion model in your

17  mind?

18      A.    I think the primary element as I understand it

19  in conversion therapy is a presupposition that a

20  transgender outcome is an inherently negative outcome

21  and that engagement or interventions should be put into

22  place in order to make that outcome the least likely as

23  possible.

24      Q.    And in your mind gender-affirming care is care

```
 1   that affirms that child's gender identity.

 2        Correct?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    THE WITNESS: As I described earlier,

 5   there are multiple components to how I would define

 6   gender-affirming therapy.

 7                    ATTORNEY BARHAM:  Let's go to Exhibit 16,

 8   this will be Tab 97.

 9                         ---

10                    (Whereupon, Exhibit-16, Article by

11                    Roberto D'Angelo, was marked for

12                    identification.)

13                         ---

14   BY ATTORNEY BARHAM:

15      Q.   This is an article by Roberto D'Angelo published

16   in 2020, entitled One Science Does Not Fit All.  Are you

17   familiar with these authors?

18      A.   Not personally, no.

19      Q.   Are you familiar with them by reputation?

20      A.   Looking at Dr. D'Angelo's footnotes, given that

21   he works for the Society for Evidence Based Gender

22   Medicine, then I might draw some conclusions from that.

23      Q.   And what conclusions would you draw from that?

24      A.   That there is a presupposition that transgender
```

 1   identity is a negative outcome.

 2       Q.    And why would you draw that conclusion from that

 3   association?

 4       A.    Based upon the description of the care on the

 5   website.  But that would be an assumption.  I would

 6   never do that on any individual basis for any of these

 7   authors without knowing them.

 8       Q.    Beyond the association, do you have any reason

 9   to doubt the scholarly integrity of the authors here?

10       A.    I think you can't really talk about scholarly

11   integrity when it's a letter to the editor.  It's not

12   the same --- same level of evidence as another study

13   would be.

14       Q.    It's a letter to the editor that cites 37

15   different sources.

16           Is that correct?  I'm looking at the last page.

17       A.    The sources aren't numbered, so I don't know how

18   many sources it has, but ---.

19               ATTORNEY BLOCK:  Let him look at it.

20   BY ATTORNEY BARHAM:

21       Q.    The references at the end are numbered.  Excuse

22   me.  I apologize.  I was looking at the wrong document.

23       A.    There are 37 footnotes.  I would assume that you

24   are correct on that.

1      Q.     We are talking about this letter to the editor

2    --- let me clarify for the record because I was looking

3    at the wrong document prior to questioning for which I

4    apologize.  This letter to the editor contains

5    approximately two pages of typed materials listing the

6    references that it uses.

7            Correct?

8      A.     Yes, correct.

9      Q.     Did you review this article when preparing your

10   report?

11     A.     I did not.

12     Q.     Did you review this article before today?

13     A.     I have not.

14     Q.     The article reviews the document published by

15   Turban, et al., in 2020, a study by Turban, et al, in

16   2020.

17            Is that correct?

18     A.     It does.

19                ATTORNEY BLOCK:  Objection to form.

20   BY ATTORNEY BARHAM:

21     Q.     If you look at the last page, that article is

22   the same article that you cited in paragraph 34 of your

23   report.

24            Is that correct?

1    A.    That's correct.

2    Q.    This D'Angelo, et al. criticized Turban on

3 page one for his simplistic affirmation versus

4 conversion binary --- or I should state permeates his

5 narrative and establishes a foundation for their

6 analysis and conclusions.  Do you see that on the first

7 page?

8    A.    What page?

9    Q.    The first page, second column, middle paragraph.

10    A.    I see that, yes.

11    Q.    These authors state the notion that all therapy

12 interventions for gender dysphoria can be categorically

13 classified into this simplistic binary betrays a

14 misunderstanding of the complexity of psychotherapy.

15 Would you agree with that statement?

16         ATTORNEY BLOCK:  Objection to form and

17 asking him questions about an article he hasn't read.

18         THE WITNESS:  The premise of that

19 statement implies a cognition on behalf of the authors

20 of that study that I don't think is necessarily

21 accurate.  I don't think that the authors of the Turban

22 study would suggest that there is a simple binary of

23 therapy interventions.

24 BY ATTORNEY BARHAM:

1      Q.     And you would also say there's not a simplistic

2    binary.

3            Is that correct?

4      A.     That is correct.

5      Q.     So in paragraph 34 of your report you're not

6    trying to draw a --- you're not trying to draw some sort

7    of dichotomy between Dr. Levine's approach and yours?

8                   ATTORNEY BLOCK:  Objection to form.

9                   THE WITNESS:  It is less helpful for me

10   to describe it as identifying a dichotomy but really

11   more focused on the goals of treatment approach.  And if

12   the goal of the treatment approach is a conversion type

13   goal, then I think there is a draw between that and the

14   standard of care of the affirmative model.

15   BY ATTORNEY BARHAM:

16     Q.     So that in your view are there two different

17   treatment goals when treating gender dysphoria?  We can

18   categorize treatment approaches by the goals, conversion

19   therapy versus the gender-affirming model that you have

20   outlined?

21                   ATTORNEY BLOCK:  Objection to form.

22                   THE WITNESS:  The way I would describe

23   the goal of the gender-affirming model is to have a

24   healthy, resilient child whatever the gender identity

1   ends up being, whether that is a cisgender identity or

2   transgender identity.  The difference between that and a

3   conversion therapy is again a presupposition that a

4   transgender identity is an inherently worse outcome

5   which is not focused on the overall mental health and

6   wellbeing of the child.

7   BY ATTORNEY BARHAM:

8      Q.   I understand the distinction that you're making.

9   I'm trying to understand are there --- as we assess

10  different people's approaches to this area, can we

11  characterize them by the goals of their approach into a

12  gender-affirming model and a conversion therapy model

13  and those are basically two different camps.

14          Is that correct?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS: We cannot.

17  BY ATTORNEY BARHAM:

18     Q.   And in saying that I'm not trying to say that

19  therapeutic techniques belong in one or the other.  I'm

20  just trying to say can we categorize treatment

21  approaches by the goals?

22              ATTORNEY BLOCK:  Objection to form.

23  BY ATTORNEY BARHAM:

24     Q.   Because that seems to be what you are doing in

1  paragraph 34 of your report.

2      A.    There's a process versus an outcome question

3  that I'm just not understanding the distinction between

4  for as I'm defining conversion therapy here, it is a

5  specific goal that a transgender outcome is a negative

6  outcome.  For gender-affirming therapy or interventions

7  there is no presupposed outcome that is better than

8  another other than building the mental health and

9  well-being of the child.

10     Q.    Okay.

11     A.    And there is many different ways of approaching

12 that question and intervening that are going to be

13 outside of the scope of a goal-based approach.

14     Q.    It still sounds and again I'm just trying to

15 explore and understand what you're saying here.  It

16 still sounds like there is one approach that has a goal

17 in your view of having the child return to comfort with

18 the child's natal sex and then there is another approach

19 that has a goal that says I don't care where you end up.

20 Is that fair to say?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  Again, I think it really

23 narrows down what's a highly complex question, so it's

24 really hard to give an answer to that.  But if we define

1   conversion as approach one and everything else outside

2   of that, I can work with that if that is helpful for

3   having further discussion or asking more questions.

4   BY ATTORNEY BARHAM:

5      Q.    Is that the way you would describe this

6   situation in the field at present?

7      A.    It is not the way I would describe the situation

8   in the field.

9      Q.    On page five of this article ---.

10          ATTORNEY BLOCK:  I'm sorry, which

11  article?

12          ATTORNEY BARHAM:  On Tab 97 of

13  Exhibit 16.  Dr. D'Angelo's article.

14  BY ATTORNEY BARHAM:

15     Q.    It sounds to me like you are rejecting what

16  these authors describe as a conflation of ethical

17  non-affirming psychotherapy and conversion therapy, next

18  to the last paragraph on the page.

19          ATTORNEY BLOCK:  Objection.  Please give

20  him time to read the page.

21          THE WITNESS:  I've never seen of or heard

22  a definition for ethical non-affirmative psychotherapy,

23  so I don't know what that means.

24  BY ATTORNEY BARHAM:

1      Q.    Is it your position that there is no such thing?

2      A.    I have never heard of such a thing.

3      Q.    On page six, in the first column, the authors

4   write, in fact, some homophobic societies and indeed

5   families that reject homosexuality among their children

6   have embraced the affirmative biomedical pathway, which

7   poses questions as to whether, quote, affirmative care

8   in some cases in some instances serve the role of gay

9   conversion therapy.  Do you believe that that's a

10   legitimate concern?

11      A.    I do not.

12      Q.    Why not?

13      A.    As I mentioned before, affirmative care is not

14   presupposed any one specific outcome.

15      Q.    Do you think that someone can have a concern

16   that affirmative care could serve the role regardless of

17   its dole, serve the role of gay conversion therapy?

18                ATTORNEY BLOCK:  Objection to form.

19                THE WITNESS:  Well, the authors appear to

20   have that concern.  It is not a concern that has been

21   borne out by the literature in my clinical experience.

22   BY ATTORNEY BARHAM:

23      Q.    Do you believe that the authors are reasonable

24   in having that concern?

124

1     A.     I can't speak to what the authors' motivations

2  are for writing this.  I do not know.

3     Q.     Based on your knowledge of the field, do you

4  believe that that's a reasonable concern?

5     A.     I do not.

6     Q.     Why not?

7     A.     Because understanding the overlap and the

8  interaction between gender identity and sexuality and

9  sexual orientation is a part of the assessment process

10  in affirming care.

11     Q.     At the bottom of page one the authors write, if

12  anything other than affirmation is viewed as GICE ---.

13     A.     What page is that?

14     Q.     On page six, I'm sorry.  Same page you were on

15  with the gay affirmative therapy or gay conversion

16  therapy.  The last paragraph in column one of page six.

17  If anything other than affirmation is viewed as GICE, it

18  follows that the provision of psychotherapy in these

19  clinical scenarios can be seen as harmful conversion

20  efforts.  If these therapeutic efforts do not aim to

21  convert or consolidate an identity but instead aim to

22  help individuals gain a deeper understanding of their

23  discomfort with themselves, the factors that have

24  contributed to their distress and their motivations for

```
 1   seeking transition.  Is it your position that there are
 2   no therapeutic interventions that do not aim to convert
 3   or consolidate an identity?
 4                   ATTORNEY BLOCK:  Objection to form.
 5                   THE WITNESS:  What I would say is that
 6   helping individuals gain a deeper understanding of their
 7   discomfort with themselves, the factors contributing to
 8   their distress and their motivations for seeking
 9   transition is a vital and inherent part of
10   gender-affirming care.
11   BY ATTORNEY BARHAM:
12       Q.   But a moment ago you indicated that you were not
13   aware of any ethical non-affirmative psychotherapy?
14       A.   That is not a phrase that I have heard or have
15   heard described.  What the passage that you are
16   referring to describes is a very typical process
17   involved in any kind of standard of care around anything
18   really is understanding motivations and understanding
19   distress.  There is nothing --- there is nothing novel
20   about that description of care that is not already under
21   the umbrella of affirming care.
22       Q.   And a little bit later in that paragraph, I
23   believe at the top of column two of page six, the
24   authors right both conversion and affirmative therapy
```

 1   efforts carry the risk of undue influence potentially

 2   compromising patient autonomy.  Do you agree that that

 3   is a possibility?

 4       A.    Again, I'm not sure what the authors are

 5   referring to when they say affirmation therapy efforts

 6   because what they're describing as ethical,

 7   non-affirmative interventions falls to me under the

 8   clear rubric of affirming care, so I don't know what

 9   they mean by this.

10       Q.    Okay.

11             In paragraph 35 of your report you indicate ---

12   you stated research indicates that social transitioning

13   significantly improves the mental health of transgender

14   young people.

15             Is that correct?

16       A.    Yes.

17             ATTORNEY BARHAM:  And I'm going to show

18   you what we will mark as Exhibit 17.  This is Tab 118

19   for those following from a distance.  This is a study by

20   Gibson, et al. published in 2021.

21                         ---

22             (Whereupon, Exhibit 17, Study by Gibson,

23                  et al., was marked for identification.)

24                         ---

```
 1    BY ATTORNEY BARHAM:

 2       Q.    You've cited this article in footnote nine of

 3    your report.

 4             Is that correct?

 5       A.    Let me just double check.  I believe so.  Yes.

 6       Q.    Under methods on page one of Exhibit-17 it

 7    indicates this a cross-sectional study.

 8             Is that correct?

 9       A.    That is correct.

10       Q.    Can cross-sectional studies be used to

11    demonstrate causation?

12       A.    Not on their own, no.

13       Q.    So this study does not show that social

14    transitions caused any improvement in mental health.

15             Correct?

16       A.    This study demonstrated that there was a

17    correlation between improved mental health and social

18    transition.

19       Q.    So it did not show causation.

20             Is that correct?

21       A.    It did not show causation.

22       Q.    I'm going to show you Exhibit 9.  Let's go back

23    to Exhibit 9.

24             LAW CLERK WILKINSON:  Tab 117.
```

1  BY ATTORNEY BARHAM:

2      Q.    Tab 117.  This is the article by Lily Durwood,

3  et al. published in 2017.  You cited this article also

4  in footnote nine of your report.

5            Is that correct?

6      A.    That is correct.

7      Q.    And we have previously discussed how this

8  article reports what children and parents said about the

9  children's mental health.

10           Is that correct?

11     A.    That is correct.

12     Q.    Really a self report.

13           Correct?

14     A.    I think we went through that earlier.  It was

15  not just a self report.  These were interview led

16  evaluations.

17     Q.    But an interview led self report.

18           Correct?

19     A.    There were also parent reports that were ---.

20     Q.    And so self reports of children, parental

21  reports about their children.

22           Correct?

23     A.    Correct.

24     Q.    Okay.

129

```
 1              And then in footnote nine you also cite a study
 2    by Olson, et al. in 2016, footnote nine of your report.
 3              Correct?
 4       A.    That is correct.
 5       Q.    And in footnote nine you indicate that alleged
 6    statistical errors in that article have already been
 7    corrected in 2018.
 8              Correct?
 9       A.    Correct.
10       Q.    And for that assertion you cite a study by
11    Olson, et al. in 2018.
12              Is that correct?
13       A.    I don't see that.
14                   ATTORNEY BLOCK:  Objection.  Where are
15    you at?
16                   THE WITNESS:  I don't see it.  If you can
17    point to me where that is.
18    BY ATTORNEY BARHAM:
19       Q.    Footnote nine, on page 11, small statistical
20    errors in Olson 2016 had already been corrected in 2018,
21    see Olson, et al., 2018, mental health of transgender
22    student who are supported in their identity throughout.
23       A.    Yes.
24       Q.    Is that correct?
```

1    A.    Yes.

2              ATTORNEY BARHAM:  I'm going to show you

3    what we are going to mark as Exhibit 18.  This will be

4    tab 119.

5                        ---

6              (Whereupon, Exhibit-18, Errata Sheet, was

7              marked for identification.)

8                        ---

9    BY ATTORNEY BARHAM:

10   Q.    This is the errata sheet that you cited in

11   footnote nine of your report.

12        Is that correct?

13   A.    That is correct.

14   Q.    The only change in this 2018 article is the

15   highlight and missing common from the 2016 article.

16        Is that correct?

17              ATTORNEY BLOCK:  Objection to form.

18              THE WITNESS:  Yes.

19   BY ATTORNEY BARHAM:

20   Q.    In paragraph 40 of your report you say that

21   studies have repeatedly documented puberty blocking

22   medication and gender-affirming hormone therapy are

23   associated with mental health benefits in both the short

24   and long term.

1          Is that correct?

2     A.    That is correct.

3     Q.    And the studies that you're citing for that

4  assertion are those listed in footnote 14 of your

5  report.

6          Correct?

7     A.    That is correct.

8     Q.    Are there any others that you are referencing?

9     A.    Those are the only that I'm referencing.

10    Q.    In paragraph 41 of your report you claim that

11 Dr. Cantor fails to discuss many of the studies

12 documenting the benefits of puberty blocking medication.

13 Which of the studies in footnote 14 did he fail to

14 discuss?

15    A.    I would need to review Dr. Cantor's report to

16 know specifically.

17    Q.    Do you recall now which ones he failed to

18 discuss?

19    A.    I do not.

20          ATTORNEY BARHAM:  All right.  I'm going

21 to show you what we will mark as Exhibit-19, and this is

22 Tab 98.

23                    ---

24          (Whereupon, Exhibit-19, Article by

```
 1   Tordoff,                 et al., was marked for

 2   identification.)

 3                            ---

 4   BY ATTORNEY BARHAM:

 5      Q.    This is an article by Tordoff, et al, published

 6   in 2022, entitled Mental Health Outcomes in Transgender

 7   and Non-Binary Youth Receiving Gender-Affirming Care.

 8   This is one of the studies that you cited in footnote 14

 9   of your report?

10      A.    That is correct.

11      Q.    According to table one on page five of this

12   report 65 percent of the participants were also

13   receiving mental health therapy.

14            Is that correct?

15      A.    That is correct.

16      Q.    So it's not possible to determine how much of

17   the improvement was due to puberty blocking medication

18   and gender-affirming hormone therapy and how much was

19   due to the mental health therapy.

20            Correct?

21                 ATTORNEY BLOCK:  Objection to form.

22                 THE WITNESS:  There is a lot of questions

23   in that one singular question about study design and

24   what we know about the history of transgender health
```

```
 1  outcomes prior to the existence of gender-affirming

 2  care.  As this study is designed, it is not designed in

 3  such a way to be able to specifically keep that apart.

 4              ATTORNEY BARHAM:  All right.

 5              I'm going to show you what we will mark

 6  as Exhibit-20, and this will be Tab 99.

 7                           ---

 8              (Whereupon, Exhibit-20, Article by Amy

 9              Green, et al., was marked for

10              identification.)

11                           ---

12  BY ATTORNEY BARHAM:

13     Q.    This is the second article.  This is an article

14  by Amy Green entitled ---- it says et al. entitled

15  Association of Gender Affirming Hormone Therapy with

16  Depression, Thoughts of Suicide and Attempted Suicide

17  Among Transgender and Nonbinary Youth published in 2021.

18  This is the second article that you cited in footnote 14

19  of your report.

20          Is that correct?

21     A.    That is correct.

22     Q.    On page six of this report, column two, the

23  authors indicate that causation cannot be inferred due

24  to this study's cross-sectional design.
```

```
 1              Correct?
 2      A.    That is correct.
 3      Q.    This study also does not prove that puberty
 4  blocking medication and gender-affirming hormone therapy
 5  caused any improvements.
 6              Correct?
 7                    ATTORNEY BLOCK:  Objection to form.
 8                    THE WITNESS:  This study was not designed
 9  to show a causal outcome, no.
10                    ATTORNEY BARHAM:  Let's go to Exhibit 21,
11  this will be Tab 100.
12                        ---
13                    (Whereupon, Exhibit-21, Article by
14                     Turban, et al., was marked for
15                     identification.)
16                        ---
17  BY ATTORNEY BARHAM:
18      Q.    This is an article by Turban, et al. published
19  in 2020 entitled Pubertal Risks for Transgender Youth
20  and Risks of Suicide Ideation --- Suicidal Ideation?
21                    ATTORNEY BLOCK:  Objection to misreading
22  the name of the study.
23  BY ATTORNEY BARHAM:
24      Q.    This is the third article that you cited in
```

1   footnote 13 of your report.

2           Is that correct?

3       A.    That is correct.

4       Q.    And on page seven of this article the authors

5   also indicate that limitations include the

6   cross-sectional --- the study's cross-sectional design,

7   which does not allow for determination of causation.

8           Is that correct?

9       A.    That is correct.

10      Q.    So this study does not prove that puberty

11  blocking medication and gender affirming hormone therapy

12  caused any improvements.

13          Correct?

14      A.    This study was not designed to demonstrate

15  causation.

16          ATTORNEY BARHAM:   I'm going to show you

17  what we will mark as Exhibit-22.   This is an article by

18  Achille, et al. entitled Longitudinal Impact of Gender

19  Affirming Endocrine Intervention on Mental Health and

20  Well-being of Transgender Youths, Preliminary Results

21  published in 2020.

22                            ---

23          (Whereupon, Exhibit-22, Article by

24              Achille, et al., was marked for

```
 1                    identification.)

 2                    ---

 3  BY ATTORNEY BARHAM:

 4     Q.    You also cited this article in footnote 14 of

 5  your report.

 6          Is that correct?

 7     A.    Yes, I did.

 8     Q.    And on page two of this report, the bottom of

 9  the first column, the authors write that most

10  subjects --- quote, most subjects were followed by

11  mental health professionals, closed quote, and quote,

12  those that were not were encouraged to see a mental

13  health professional.

14          Correct?

15     A.    That is correct.

16     Q.    And on page three, the first column, the authors

17  say that after statistically adjusting for psychiatric

18  medication and engagement in counseling, quote, most

19  predictors did not reach statistical significance.

20          Is that correct?

21     A.    Where are you?

22     Q.    Page three, column one, under regression

23  analysis.

24     A.    Correct.
```

1              ATTORNEY BARHAM:  I'm going to show you

2    what we will mark as Exhibit-23, this is Tab 102.

3                     ---

4              (Whereupon, Exhibit-23, Article by Kuper,

5                   et al., was marked for identification.)

6                     ---

7    BY ATTORNEY BARHAM:

8       Q.    This is an article by Kuper, et al. published in

9    2020, entitled Body Dissatisfaction and Mental Health

10   Outcomes of Youth on Gender Affirming Hormone Therapy.

11   On page six --- let me rephrase that for the record.

12   You cited this article in footnote 14 of your report.

13             Is that correct?

14      A.    That is correct.

15      Q.    According to Table 2 on page six none of the

16   results for those receiving puberty suppression were

17   statistically significant.

18             Correct?

19      A.    I need a few minutes.

20      Q.    Take your time.

21      A.    As I read the bottom of that table, there are a

22   number of analyses that reached statistical

23   significance.

24      Q.    But if you look at the lines for each one under

138

1    each of the scores, body dissatisfaction, depressive

2    symptoms, depressive symptoms QIDS, anxiety symptoms,

3    panic symptoms, generalized anxiety symptoms, social

4    anxiety symptoms, separation anxiety symptoms, school

5    avoidance symptoms, the lines marked puberty suppression

6    have no superscript on them.

7            Is that correct?

8                ATTORNEY BLOCK:  Objection to form.

9                THE WITNESS:  That is correct.

10   BY ATTORNEY BARHAM:

11     Q.   So none of those --- none of the specific

12   findings regarding individuals on puberty suppression

13   only were statistically significant.

14           Is that correct?

15     A.   None of them were statistically significant as

16   measured by their reports.

17                ATTORNEY BARHAM:  I'm going to show you

18   what we will mark as Exhibit-24.  This will be Tab 103.

19                        ---

20                (Whereupon, Exhibit-24, Article by van

21                 der Miesen, et al., marked for

22                 identification.)

23                        ---

24   BY ATTORNEY BARHAM:

139

1    Q.    This is an article by van der Miesen, et al.,

2    published in 2020 entitled Psychological Functioning in

3    Transgender Adolescents Before and After Gender

4    Affirmative Care Compared with Cisgender General

5    Population of Peers.  You cited this article in footnote

6    14 of your report.

7              Is that correct?

8    A.    That is correct.

9    Q.    The authors on page five, in column two, the

10   authors of this study ---.

11   A.    What page?

12   Q.    Page five.

13   A.    I have that in the 700s.

14   Q.    Oh 703, sorry.  703.  The fifth page, but it's

15   paginated 703.  The authors of this study indicate that,

16   quote, due to its cross-sectional design, the present

17   study cannot provide evidence about the direct benefits

18   of puberty suppression over time and long-term mental

19   health outcomes?

20             Correct?

21   A.    I don't see where that is.

22   Q.    Next to the last paragraph in the second column.

23   The third and most important --- skipping the

24   cross-sectional design of this study different

140

1    participants in the groups before and after puberty

2    suppression may potentially limit the results?

3         A.    Yes, I see that.

4         Q.    The present study can therefore not provide

5    evidence about the direct benefits of puberty

6    suppression over time and the long-term mental health

7    outcomes.

8              Is that correct?

9         A.    That is correct.

10        Q.    So the authors of this study indicate that

11   conclusions about the long-term benefits of puberty

12   suppression should thus be made with extreme caution,

13   meaning prospective long-term follow-up studies with

14   repeated measured design of individuals being followed

15   over time to confirm.

16             Is that correct?

17        A.    That is correct.

18             ATTORNEY BARHAM:  I'm going to show you

19   what we will mark as Exhibit-25.  This will be Tab 104.

20                        ---

21             (Whereupon, Exhibit-25, Article by de

22             Vries, was marked for identification.)

23                        ---

24   BY ATTORNEY BARHAM:

1      Q.    This is an article by van der Miesen --- or I

2  mean De Vries, et al --- excuse me, De Vries, et al.,

3  2014, Young Adult Psychosocial Outcome After Puberty

4  Suppression and Gender Reassignment.  This is the last

5  article you cite in footnote 14 of your report.

6           Is that correct?

7      A.    That is correct.

8      Q.    At the Dutch clinic patients who receive puberty

9  blockers also receive psychotherapy.

10          Is that correct?

11     A.    That is correct.

12     Q.    So again, there is no way to determine how much

13 of the improvement reflected in this study is due to the

14 puberty blockers and how much is due to the

15 psychotherapy.

16          Correct?

17              ATTORNEY BLOCK:  Objection to the form.

18              THE WITNESS:  Let me restate my response

19 to the previous question.  The Dutch clinic always

20 recommends participation in therapy.  I'm not a

21 100 percent certain that every participant participated

22 in the therapy as directed.

23 BY ATTORNEY BARHAM:

24     Q.    For the most part, the Dutch model combined

```
 1   psychotherapy with puberty blockers.

 2         Correct?

 3               ATTORNEY BLOCK:  Objection.

 4               THE WITNESS:  That is correct.  And may I

 5   state that I think that is part of the reason that the

 6   van der Miesen study is quite important because it does

 7   start to look at the impact of being on the wait list

 8   and the impacts of just getting psychotherapy alone

 9   versus access to puberty suppression and/or hormones.

10               ATTORNEY BARHAM:  I'm going to show you

11   what we're going to mark as Exhibit-26.  Tab 105.

12                          ---

13               (Whereupon, Exhibit-26, Article, was

14                marked for identification.)

15                          ---

16   BY ATTORNEY BARHAM:

17     Q.    This is an article by Michael Biggs published in

18   2020, Gender Dysphoria and Psychological Functioning in

19   Adolescents Treated with GnRHa.  Are you familiar with

20   this study?

21               ATTORNEY BLOCK:  Objection,

22   mischaracterizes the document.

23   BY ATTORNEY BARHAM:

24     Q.    Are you familiar with this letter to the editor?
```

1      A.    I have not read this letter to the editor.

2      Q.    If you look at bottom of page one continuing

3    onto page two, the author writes an additional

4    complication with this treatment is that the Dutch model

5    combines GnRHa with psychological support so the two

6    effects are inevitably conflated.  Do agree with that

7    statement?

8      A.    I do not.

9      Q.    Why?

10     A.    Use of GnRH logs for this kind of intervention

11   were first used in 1999.  So every --- every transgender

12   person prior to 1999 had no access to this kind of

13   treatment.  Between 1999 and probably about 2014 these

14   medications were not widely available and so unavailable

15   for use for most people.  So we have the clinical

16   experience of adults, talking retrospectively, about

17   their experiences as well as the patients that we have

18   treated that did versus did not have access to these

19   interventions.  So we have both clinical experience and

20   some retrospective data that looks at this question

21   specifically.

22     Q.    Can retrospective data demonstrate causation?

23     A.    In some cases it can.

24     Q.    But retrospective data is subject to recall by

```
 1   us in other drawbacks that undermind its reliability.

 2          Correct?

 3                 ATTORNEY BLOCK:  Objection to form.

 4                 THE WITNESS: It depends upon the type of

 5   data that is being calculated.

 6   BY ATTORNEY BARHAM:

 7      Q.    Why do you mean by that?

 8      A.    If it is qualitative interview data, yes, there

 9   is retrospective data that reviews contemporary

10   documentation and charts, lab results, imaging results,

11   et cetera.  That is less confounded by that kind of

12   bias.

13      Q.    When we are talking about people recalling their

14   experiences before hormone therapy was available that

15   would be the qualitative type of data.

16          Correct?

17      A.    Correct.  And when analyzing that data you have

18   to take that into account.

19      Q.    So that still doesn't help me understand why you

20   disagree with that statement because the Dutch model

21   combines hormones with psychosocial --- psychological

22   support, the two effects are inevitably conflated?

23      A.    We have a long history of people receiving

24   psychological support alone.  And with the addition of
```

1    these interventions and this model of care, outcomes

2    improve with specific measures around gender dysphoria.

3        Q.    Over that time the psychological support would

4    have evolved as more understanding was gained.

5            Correct?

6        A.    One would hope, yes.

7                ATTORNEY BLOCK:  Objection to form.

8    BY ATTORNEY BARNHAM:

9        Q.    But for the individuals who receive treatment

10   under the Dutch model, receiving both the hormones and

11   the psychological support, it's impossible to determine

12   how much improvement was due to the psychological

13   support and how much was due to the hormones.

14       Correct?

15               ATTORNEY BLOCK:  Objection to form.

16               THE WITNESS:  There has not been a study

17   that has sought to identify the specific percentage of

18   impact of those two.

19               ATTORNEY BARHAM:  All right.

20               I'm going to show you what we will mark

21   as Exhibit 27.

22                    ---

23               (Whereupon, Exhibit 27, Article, was

24                 marked for identification.)

```
 1                            ---

 2   BY ATTORNEY BARHAM:

 3       Q.    Tab 106.  This is an article by Costa, et al.

 4   In 2015 Psychological Support, Puberty Expression and

 5   Psychosocial Functioning in Adolescents with Gender

 6   Dysphoria.

 7             Is that correct?

 8       A.    That is correct.

 9       Q.    You cite this article in footnote 14 of your

10   report.

11             Is that correct?

12       A.    That's correct.

13       Q.    Now, in this study there were two groups of

14   adolescents, those who receive both puberty --- I mean,

15   both therapy and puberty blockers at the outset and

16   those who received just therapy at the outset.

17             Correct?

18       A.    I'll need a minute to refresh myself.

19       Q.    Sure.  And I'm referencing pages 228, the second

20   column over to 229, the top of the first column.

21       A.    That's correct.

22       Q.    And on page 2211 going over to 2212, the

23   author's note that the difference between the

24   immediately eligible group and the delayed eligible
```

1  group failed to reach significance.

2        Correct?

3    A.    So as I read this, immediately eligible group

4  who had a higher in psychosocial functioning did not

5  show any significant improvement after 12 months, but

6  after 12 months there was a statistical difference.

7    Q.    Then it says finally, even if the end or

8  follow-up study, plan three, immediately eligible group

9  had a five point higher CGAS score than the delayed

10  eligible group, this difference failed to reach

11  significance.

12        Correct?

13    A.    That's correct.  What I have to point out there,

14  is CGAS is the children's global assessment scale, and

15  not a measure of gender dysphoria or quality of life or

16  distress in body.

17    Q.    Is it a measure of a child's mental health?

18              ATTORNEY BLOCK:  Objection.

19              THE WITNESS:  It is a rough and very

20  precise measure of general functioning.

21  BY ATTORNEY BARHAM:

22    Q.    But it is the scale that this study was using.

23        Correct?

24    A.    That is correct.

```
 1                    ATTORNEY BARHAM:  Let's go to tab 28.

 2                        ---

 3                    (Whereupon, Exhibit 28, Article by

 4                    Edwards-Leeper, was marked for

 5                    identification.)

 6                        ---

 7                    THE WITNESS:

 8                    And to clarify the CGAS is something that

 9      is clinician rated of remedy objective criteria.

10      BY ATTORNEY BARHAM:

11         Q.    Do you want to take a break?

12         A.    In a few minutes if that's okay.

13         Q.    Are you aware of Dr. Edwards-Leeper's reputation

14      in the field?

15         A.    I am.

16         Q.    Are you personally acquainted with Dr.

17      Edwards-Leeper?

18         A.    I am.

19         Q.    Have the two of you worked together in the

20      American Psychiatric Academics Association?

21         A.    We have not worked together through the American

22      Psychiatric Association.  Dr. Edwards-Leeper is a

23      psychologist.

24         Q.    She served as a member of the task force to
```

149

```
 1   develop practice guidelines for working with transgender
 2   individuals?  Have you served in a similar capacity with
 3   the American Psychiatric Association?
 4       A.    I have.  And we both worked together on the
 5   WPATH standards of care provision.
 6       Q.    You anticipated my next question.  So you would
 7   agree that Dr. Edwards-Leeper is considered an
 8   international expert in this area.
 9           Correct?
10       A.    Yes.  Dr. Edwards-Leeper is a complicated figure
11   right now, but yes, she has a lot of expertise.
12           ATTORNEY BARHAM:  I want to show you what
13   we will mark as Exhibit 29.  This is Tab 29.
14                          --
15           (Whereupon, Exhibit 29, Article by
16           Edwards-Leeper, was marked for
17           identification.)
18                         ---
19           ATTORNEY BLOCK:  I imagine you have a lot
20   of questions about this next document, and I just want
21   to make sure the witness has a chance to have a bathroom
22   break if it's going to go on for ten minutes or more.
23           ATTORNEY BARHAM:  I have no objection to
24   that.
```

```
 1                    THE WITNESS:  Five minutes.

 2                    ATTORNEY BARHAM:  We will take five

 3   minutes.

 4                    VIDEOGRAPHER:  Going off the record.  The

 5   time is 12:12 p.m.

 6   OFF VIDEO

 7                         ---

 8   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 9                         ---

10   ON VIDEO

11                    VIDEOGRAPHER:  We are back on the record

12   the current time reads 12:21 p.m.

13   BY ATTORNEY BARHAM:

14      Q.    A moment ago we were discussing Dr.

15   Edwards-Leeper and you commented that she is a

16   complicated individual.

17             What did you mean by that?

18      A.    What I mean is that she has published some

19   things in popular press that have led me to be talking

20   about her here.

21      Q.    And would one of those be the document before

22   you Exhibit 29?

23      A.    That is correct.

24      Q.    This is an article published in the Washington
```

151

1    <u>Post</u> by Dr. Edwards-Leeper and Dr. Anderson.

2          Is that correct?

3    A.    That is correct.

4    Q.    What is it --- are there any other publications

5    that Dr. Edwards-Leeper has written recently that caused

6    you to describe her as a complicated figure?

7    A.    No, no.

8    Q.    So just this one article.

9          Is that correct?

10   A.    Yes.

11   Q.    Are you familiar with Dr. Anderson?

12   A.    I am.

13   Q.    She is a clinical psychiatrist?

14   A.    She is a psychologist.

15   Q.    A psychologist.  And Dr. Anderson has been

16   working with transgender youth for a long time.

17         Is that correct?

18   A.    I'm not a hundred percent familiar with Dr.

19   Anderson's history, I don't know.

20   Q.    Was she in the field before you?

21   A.    I don't know.

22   Q.    Dr. Anderson is also a transgender.

23         Is that correct?

24   A.    That is correct.

152

 1    Q.    Dr. Anderson is a member of the American

 2  Psychological Association Committee tasked with writing

 3  guidelines and working with transgender individuals.

 4        Is that correct?

 5    A.    I do not know.

 6    Q.    Dr. Anderson is a former president of the U.S.

 7  Professional Association for Transgender Health.

 8        Is that correct?

 9    A.    That is correct.

10    Q.    Dr. Anderson is a former board member for the

11  World Professional Association for Transgender Health.

12        Correct?

13    A.    I'm not sure.

14    Q.    Beyond the committee assignments listed on

15  page two of your CV have you held any committee

16  assignments for the USPATH or WPATH Organizations?

17    A.    Not additional committee assignments than WPATH

18  or USPATH, no.

19    Q.    In this copy published in the Washington Post

20  Dr. Edwards-Leeper and Dr. Anderson summarizes a

21  situation of a 13-year old natal girl with no prior

22  history of gender dysphoria.  Some issues of sexual

23  assault and depression and then an abrupt announcement

24  of this child of transgender identity.

```
 1              Does that summarize the scenario they outline?

 2      A.     That is the scenario they outlined.

 3                    ATTORNEY BLOCK:  Objection to form.

 4   BY ATTORNEY BARNHAM:

 5      Q.     What percent of your patients first present as a

 6   team without a prior gender dysphoria diagnosis?

 7      A.     Well, first I just want to address the scenario

 8   with Patricia, this is a popular press article, so I

 9   have no idea if Patricia is a real person or an amalgam.

10      Q.     Understood.

11      A.     I hope it's an amalgam, because it would be

12   unethical to not have consent to publish this story.

13   Whether or not a child has a diagnosis of gender

14   dysphoria before they come to see me is dependent upon

15   if they've had previous evaluations, so it's dependent.

16   I don't have a specific number for you.

17      Q.     In general, how many of your patients first

18   present as a team versus first presenting as a child?

19      A.     That is very different, depending upon which

20   cite that I was practicing at.  So in New York I saw

21   more prepubertal youth than I do in Chicago.

22      Q.     So in New York, what percent of your patients

23   first presented as adolescents versus children?

24      A.     I think I answered that question earlier.  If I
```

1    remember it was 25 percent of the 75 percent.

2        Q.    And in Chicago how many --- what percentage of

3    your patients present as adolescents versus as teen?

4        A.    Probably 90 percent during adolescence.

5        Q.    And are those all adolescents who first

6    presented as adolescents or did they first present with

7    gender dysphoria as a child?

8        A.    It's a combination of both.

9        Q.    So of your adolescent patients how many

10   presented first as an adolescent, and how many presented

11   as a child?

12       A.    I don't have that information in front of me.

13       Q.    Do you have a general ballpark idea?

14       A.    No, I mean, the question --- I guess what I'm

15   struggling with is that there are a lot of adolescents

16   who I see who presented the first as adolescent, but

17   have clear symptoms of gender dysphoria going back to

18   childhood.  So I'm not sure how to characterize those

19   children in your question.

20       Q.    What percent of the patients that present

21   themselves to you first as an adolescent are natal

22   female?

23              ATTORNEY BLOCK:  Objection to

24   terminology.

1              THE WITNESS:   I would say in the clinic

2    where I'm practicing, currently certainly over half of

3    the children presenting in adolescence for the first

4    time are assigned female at birth.

5    BY ATTORNEY BARHAM:

6        Q.    And in New York, what percent of the patients

7    that presented to you first as an adolescent or natal

8    female?

9        A.    In New York it was more even split between those

10   assigned female and those assigned male at birth.

11       Q.    And here when you say it's more than 50 percent

12   are we talking 75 percent, we're talking 80 percent,

13   90 percent?

14       A.    I don't have that information in front of me, so

15   I couldn't tell you specifically.  It would be a guess.

16       Q.    Do you have a range?

17       A.    I don't.  I don't.  More than 50 is the closest

18   that I can get right now.

19       Q.    More than 75 percent?

20       A.    Probably not, no.

21       Q.    So somewhere between 50 and 75?

22       A.    That's a good guess.

23       Q.    What proportion of teen girls presenting at your

24   clinic have suffered sexual assault or abuse of any

1    sort?

2        A.    So if we're talking assigned females at birth,

3    is that what you mean?

4        Q.    Yes.  Natal females.

5        A.    Between one out four and one out of eight

6    assigned females at birth who do not identify as

7    transgender have exposure to sexual assault and trauma f

8    some kind.  What we know from the literature is that

9    rates of sexual assault and sexual abuse of transgender

10   youth is higher than that and my patients are relatively

11   similar to that, so probably in the order of 25 to

12   30 percent.

13       Q.    What policies do you have in place to ensure

14   adequate counseling and therapy for that trauma before

15   making any decisions regarding hormones?

16               ATTORNEY BLOCK:  Objection to form.

17               THE WITNESS:  Assessing co-occurring

18   psychiatric disorders or stressors or traumas is an

19   inherent part of any assessment.

20   BY ATTORNEY BARHAM:

21       Q.    Beyond just it being an inherent part of any

22   assessment, do you have any other policies or standards

23   that you use to ensure that the trauma is addressed

24   before making decisions regarding hormones?

1                    ATTORNEY BLOCK:  Objection to form.

2                    THE WITNESS:  I mean, I don't have a

3    written down policy.  Incorporating understanding of

4    trauma is always going to be an important part of any

5    informed assessment prior to moving forward with an

6    intervention.

7    BY ATTORNEY BARHAM:

8        Q.   Do you agree or disagree that before prescribing

9    hormones to a teen girl who has suffered sexual abuse or

10   depression, medical professionals have a responsibility

11   to confirm that the patient has received a thorough

12   mental health assessment, including investigating how

13   other mental health issues and any other changes in her

14   life might be contributing to her desire are perceived

15   transgender identification?

16                   ATTORNEY BLOCK:  Objection to form and

17   terminology.

18                   THE WITNESS:  So for any child regardless

19   of gender, who we are recommending a medical or surgical

20   intervention, we are assessing for the presence of

21   gender dysphoria, the presence of co-occurring

22   psychiatric disorders and their impact on that diagnosis

23   or the capacity to consent to treatment, and a clear

24   understanding of the risks, benefits and alternatives of

1  whatever that intervention may be.

2  BY ATTORNEY BARHAM:

3     Q.    So then --- and that would include investigating

4  how other mental health issues and other changes in her

5  life might be contributing to her desire or perceived

6  transgender identification?

7     A.    That is correct.

8              ATTORNEY BLOCK:   Objection to terminology

9  and pronouns.

10  BY ATTORNEY BARHAM:

11     Q.    Do you agree or disagree that the standards of

12  care recommend mental support and comprehensive

13  assessment for all dysphoric youth before starting

14  medical interventions?

15     A.    I would agree that the current recommendations,

16  which are in the process of being updated recommend that

17  a mental health assessment be in place.  And it's not a

18  mandate that psychotherapy is a requirement prior to

19  initiation of medical care for gender dysphoria, and it

20  is not indicated for every patient.

21     Q.    And that's partly because the standards of care

22  are guidelines not mandates.

23              Correct?

24     A.    It's mostly because of the indications for the

159

```
 1   patient's best interest that psychotherapy is not a
 2   requirement for folks who are otherwise doing well.
 3      Q.    But it's also true that the standards of care
 4   are guidelines not mandates.
 5           Correct?
 6      A.    That is correct.  They are guidelines.
 7      Q.    On page two of this article the author is ---
 8   and by this article I'm referring to tab 29.  The author
 9   has indicated that a study of ten pediatric gender
10   clinics in Canada found that half do not require
11   psychological assessment before initiating puberty
12   blockers or hormones.
13           Is that your policy?
14      A.    Where is this in the article?  I don't see it.
15      Q.    The bottom of page two?
16      A.    What I want to emphasize is this is an opt ed
17   and a popular press outlet and not a study.  So I have
18   no idea where they gathered their information about this
19   or the accuracy of the statement, nor do I know what the
20   authors meant by a psychological assessment.
21      Q.    I understand.  I  did not mean to imply that
22   this article Exhibit --- tap 29 is a study.  I was
23   merely quoting the authors, that a study of ten
24   pediatric gender clinics found that half do not require
```

1   psychological assessment before initiating puberty

2   blockers or hormones.  My question to you is, is that

3   your policy?

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  Again, I can't speak to the

6   accuracy of Dr. Edwards-Leeper and Dr. Anderson's

7   description of a study that I haven't seen.

8   BY ATTORNEY BARHAM:

9      Q.    I'm not asking you to.  I'm asking do you have

10  --- is it your policy at your clinic that you do not

11  require psychological assessments before initiating

12  puberty blockers for hormones?

13     A.    We require psychological assessments prior to

14  initiation, yes.

15                   ATTORNEY TRYON:  Travis, it's Dave Tryon.

16  You referred to this as Tab 29, I believe you mean

17  Exhibit 29.  Is that right?

18                   ATTORNEY BARHAM:  It's both Exhibit 29

19  and Tab 29.

20  BY ATTORNEY BARHAM:

21     Q.    When patients come to you referred by a

22  pediatrician or counselor with no expertise in gender

23  dysphoria assessment or diagnosis, what policies do you

24  have to ensure that the patients receive full and

 1  adequate course of mental healthcare before prescribing

 2  life altering hormones?

 3           ATTORNEY BLOCK:  Objection to form.

 4           THE WITNESS:  As a mental health

 5  professional I'm not the person who is prescribing those

 6  treatments.

 7  BY ATTORNEY BARHAM:

 8    Q.    Before you recommend someone for eligibility for

 9  life-altering hormones?

10           ATTORNEY BLOCK:  Objection to form.

11           THE WITNESS:  Prior to making a

12  recommendation of hormone initiation I'm doing my own

13  assessment and ensuring that those standards are met.

14  BY ATTORNEY BARHAM:

15    Q.    So beyond your own assessments do you have any

16  policies that guide that process?

17    A.    Our clinic has its own policies dependent upon

18  clinical practice or whether or not patients are

19  enrolled in a particular trial, but it is the standard

20  of care as laid out by both Endocrine Society and WPATH

21  that adolescent patients have a psychological

22  assessment.  There's a lot of latitude for what that

23  actually means.

24    Q.    And on page three of this document, Exhibit 29,

1   the bottom of the first paragraph the authors write as a

2   result we may be harming some of the young people we

3   strive to support, people who may not be prepared for

4   the gender transitions they are being rushed into.

5         Do you share the concern of these authors?

6   A.   I don't have numbers on my end.  Which --- where

7   is it?

8   Q.   (Indicating).

9   A.   Got it.  Can you repeat the question?  Sorry.

10   Q.   The authors express concern that we may be ---

11   quote, we may be harming some of the young people we

12   strive to support, people who may not be prepared for

13   the gender transitions they are being rushed into.

14         Do you share the author's concern?

15   A.   I do not.  These are tested hypotheses that can

16   be researched, and this is not what this is.

17   Q.   You said you have no concern that people are

18   being rushed into gender transitions?

19   A.   This is a supposition by these two authors that

20   people are being rushed into gender transition.  I'm not

21   sure what that means, and that has not been the clinical

22   experience that I've had nor what the guidelines

23   recommend.

24   Q.   So you were not aware of people being rushed

1    into transitions that they are not ready for?

2        A.    That has not been my experience, no.

3        Q.    On page four towards the bottom of the page, the

4    authors reference a recent study of 100 detransitioners,

5    38 percent of whom reported that they believe their

6    original dysphoria had been caused by something specific

7    such as trauma, abuse or mental health condition.

8    Fifty-five (55) percent of whom said they did not

9    receive adequate evaluation from a Dr. Or mental health

10   professional before starting transition.

11           Are you aware of that study that authors

12   reference here?

13                   ATTORNEY BLOCK:   Object to form.

14                   THE WITNESS:   I am --- I'm assuming

15   because I think they have a footnote in here somewhere,

16   but it is not in this particular article, but they are

17   receiving to the recent 2021 Littman study

18   detransitioners.

19   BY ATTORNEY BARHAM:

20       Q.    Do you share the concern that some have been

21   misdiagnosed as transgender when their gender dysphoria

22   was, in fact, not innate, but cause by something

23   specific, such as trauma, abuse or mental health

24   condition?

1    A.    I really don't mean to parse this, but I don't

2    know what Dr. Edwards-Leeper or Dr. Anderson's concerns

3    are, but the evidence that we have from the literature

4    and from our clinical experience is that this is not a

5    broad experience of most children.

6    Q.    And what literature, are you referencing when

7    you say we referenced the literature?

8    A.    I'm referencing the literature that I cited in

9    my report.

10   Q.    And which specific portions of your report are

11   you referencing?

12   A.    Let me just take a moment.  What I'm referencing

13   is the longitudinal studies in particular that have

14   followed these kids over time.

15   Q.    And which ones would those be in your report?

16   A.    Really anything from the Dutch clinic is going

17   to have a longitudinal focus to them, but I think what's

18   more important is that in all of these studies, which

19   include some of the Dutch studies both in childhood and

20   adults that have looked at regret rates or detransition

21   have shown that this is a very infrequent occurrence,

22   and there has been nothing I've read within the

23   scientific literature that in, any way, tries to

24   operationalize this idea of children being forced into

165

1   or pressured into transition.

2       Q.    What steps do you take to ensure that gender

3   dysphoria, the child's --- the child's or teen's gender

4   dysphoria was not caused by something specific such as

5   trauma, abuse or mental health condition before

6   recommending someone for puberty blocking or cross sex

7   hormones?

8               ATTORNEY BLOCK:  Objection to form.

9               THE WITNESS:   I perform a thorough

10  evaluation.

11  BY ATTORNEY BARHAM:

12      Q.    Anything beyond the thorough evaluation?

13      A.    A very thorough evaluation.  It involves

14  multiple steps as I described earlier.

15      Q.    So this comprehensive --- the authors actually

16  talk about a comprehensive assessment on page three of

17  their article.  And they indicate that comprehensive

18  assessment and gender exploratory therapy helps ---

19  quote, helps a young person peel back the layers of

20  their developing adolescent identity and examines

21  factors that contribute to their dysphoria.  And those

22  include --- so what steps did you take to identify the

23  factors that may contribute to a child's or teen's sense

24  of dysphoria?

1                    ATTORNEY BLOCK:  Objection to form.

2                    THE WITNESS:  It is a thorough assessment

3     and there are multiple factors within that assessment

4     that speak to those concerns specifically.

5     BY ATTORNEY BARHAM:

6        Q.    And what are those multiple factors?

7        A.    Understanding developmental history, getting

8     multiple performance, doing the diagnostic assessment of

9     any co-occurring mental health conditions and ensuring

10    that those are adequately explored and understood.

11       Q.    What factors in a transgender identity do you

12    identify as most often contributing to gender dysphoria?

13                   ATTORNEY BLOCK:  Objection to form.

14                   THE WITNESS:  I think it's complicated to

15    answer that in a short way, because not every child who

16    identifies as transgender would meet diagnostic criteria

17    for gender dysphoria.  And specifically, if we agreed

18    with the premise that the gender dysphoria is being

19    caused by trauma that's specifically a rule out of the

20    diagnosis of gender dysphoria.  So that is part of what

21    we're doing in an assessment is to understand the role

22    of other potential factors in helping a kid explore and

23    understand their identity.

24    BY ATTORNEY BARHAM:

1      Q.    Then allow me to clarify the question.  What

2   factors other than an innate transgender identity do you

3   identify as most often contributing to a child's

4   transgender identification?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  The children that I have

7   treated over my years of doing this work that describe a

8   gender identity that is inconsistent who don't

9   ultimately meet the criteria for gender dysphoria are

10  often children who have been subjected to multiple types

11  of trauma.  That would be one of the factors.

12  BY ATTORNEY BARHAM:

13     Q.    What other ones would you identify?

14     A.    The other factors are around parental conflicts.

15  That's probably the other large cohort of kids when

16  exploration is the full come around which parents,

17  particularly divorcing parents, are acting in conflict.

18     Q.    So by that you mean, for example one parent

19  supporting an affirmation approach and the other raising

20  concerns about proceeding in that direction?

21                   ATTORNEY BLOCK:  Objection to form.

22                   THE WITNESS:  That's not an infrequent

23  occurrence and this is a very rare outcome to that, but

24  in that cohort of patients who desist, I would say in

1  their identities that is a shared characteristic of some

2  of the patients that I have seen.

3  BY ATTORNEY BARHAM:

4     Q.    So you have not only two factors that could

5  contribute to a child's transgender identification,

6  other than ---?

7     A.    Can I stop you, sir?  I'm not identifying that

8  as a cause or a causal factor in a core gender identity.

9  It is the understanding and expression of that identity

10  that often changes.

11    Q.    Okay.

12          And that is why I was trying to talk about

13  transgender identification more broadly.  But you've

14  identified two factors that contribute to that not

15  necessarily causal but contribute.  Are there any others

16  that you have identified as most often contributing

17  as ---?

18    A.    Not that I have seen.

19    Q.    The authors on page three express a concern

20  about other influences that patients can be subjected

21  to, so as in these assessments patients reflect on the

22  duration of the dysphoria they feel they continue a

23  gender --- the intersection of sexual orientation, et

24  cetera, social media, internet and peer influences.

1          Do you share concerns that teens maybe misled by

2     TikTok or other social media to self diagnose as

3     transgender when, in fact, other factors have driven

4     their gender dysphoria or their transgender

5     identification?

6                    ATTORNEY BLOCK:   Objection to form.

7                    THE WITNESS:   To clarify transgender

8     isn't a diagnosis, so I'm not concerned about that

9     specifically.   And I think that's the study of all

10    phenomenon, whether or not this is occurring, but again,

11    as a part of a comprehensive gender assessment, we are

12    looking at multiple factors beyond a child's

13    self-report.

14    BY ATTORNEY BARHAM:

15       Q.   So do you share concerns that teens may be

16    misled by social media to self declare as transgender

17    when, in fact, other factors have driven their gender

18    dysphoria?

19                    ATTORNEY BLOCK:   Objection.

20                    THE WITNESS:   I would not characterize it

21    in that way.

22    BY ATTORNEY BARHAM:

23       Q.   How would you characterize it?

24       A.   I would characterize it by taking exploration of

1   an identity via TikTok for what it is, as a normal

2   process of adolescent development and having a child who

3   self identifies as transgender as a result of seeing a

4   video on TikTok is not going to be the child who meets

5   the typical phenomenology that we would see with gender

6   dysphoria.  That is part of the assessment that we are

7   evaluating.

8       Q.    Okay.

9             So then in general, you don't agree with the

10  concerns that the authors raise regarding the influence

11  of social media, internet and peer influences.

12            Correct?

13      A.    I would say it's a matter of degree.  I don't

14  think social media has been a particularly healthy thing

15  for kids in general, and understanding how it impacts

16  kids is something that we all need to be learning more

17  about.

18      Q.    In the last paragraph on page three, the authors

19  talk about how the WPATH recommends collaborative

20  approach that involves parents and take into account the

21  complexities of adolescents.

22            Do you see that?

23      A.    Yes.

24      Q.    Do you understand the WPATH standards of care

1    for adolescents to call for a collaborative approach

2    that involves both parents whenever possible?

3        A.    There is not a specific call out within the

4    standards of care for my recollection that say both

5    parents need be involved, but that's certainly implied

6    and is the general practice to include all parents or

7    all family members who are involved in the child's life

8    whomever is going to need to be in the room in order to

9    both get a clear understanding of what's going on as

10   well as make sure the child gets the adequate support to

11   be able to thrive.

12       Q.    So is it your understanding that the WPATH

13   standards of care would allow treatment to proceed based

14   on the consent of one parent?

15       A.    As we talked about earlier, these are guidelines

16   and not mandates.  In practice within the United States

17   almost all consent processes for puberty suppression and

18   hormones go through a two parent consent process

19   whenever possible, even though that is not a requirement

20   of the law.

21       Q.    What I'm trying to get to is what is the

22   requirements of the guidelines, recognizing that the

23   guidelines are not mandatory, but do the guidelines

24   allow for treatment based on the consent of one parent?

1      A.    I think one of the limitations of an

2   international document is that there is not going to be

3   that level of specificity because consent laws are going

4   to be different from state to state, not to mention

5   country to country.

6      Q.    Okay.

7            On page two --- I'm sorry, on page three ---

8   let me clarify again.  I'm sorry I confused myself.  On

9   page two the authors write that after exploring who she

10  was --- after a year of exploring who she was, Patricia

11  no longer felt she was a boy, she decided to stop

12  binding her breasts and wearing boys clothes.

13          What proportion of those who present at your

14  clinic change their minds and decided to remain with or

15  return to the gender identity of their natal sex before

16  undergoing any hormonal treatments?

17                  ATTORNEY BLOCK:  Objection to form.

18                  THE WITNESS:  I'm one practitioner in my

19  clinic, so I don't have the data on everybody.  And I

20  think a lot of that is going to depend upon the

21  population that you are seeing.

22  BY ATTORNEY BARHAM:

23     Q.    What proportion of your patients then changed

24  their mind and decide to remain or return to the gender

```
 1   identity of their natal sex before undergoing any

 2   hormonal treatments?

 3                   ATTORNEY BLOCK:  Objection to form.

 4                   THE WITNESS:  I would say a minority of

 5   patients.

 6   BY ATTORNEY BARHAM:

 7      Q.    Do you have a range?

 8      A.    I don't.  I think when you were asking those

 9   questions at the beginning about my 500 transgender

10   patients in that cohort, and I think 75 percent pursued

11   some things, but being that 25 percent that didn't.

12   Somewhere in there.

13      Q.    On page five of this document, the last page the

14   authors report a rising a number of detransitioners that

15   clinicians report seeing.  Are you aware of this rising

16   number of detransitioners?

17                   ATTORNEY BLOCK:  Objection to form.

18                   THE WITNESS:  I'm aware that these two

19   authors are raising that it's a possibility.  It is not

20   something that I've seen published in the literature.

21   BY ATTORNEY BARHAM:

22      Q.    Have you seen a rising number of detransitioners

23   at your clinic?

24      A.    I think the question is whether or not the
```

1  percentage is changing and that's not an answer we know.

2  I think by definition the more people you see the more

3  folks --- the detransition you're going to see.  And the

4  difference of children who had access to gender care now

5  compared to a decade ago is just orders of magnitude

6  different.  But I don't know or there has not been any

7  evidence that I've seen that the percentage of kids who

8  detransition is any different now than it was a decade

9  ago.

10     Q.   A few paragraphs above what we were just looking

11  at, it says only a quarter of these individuals told

12  their doctors they had reversed their transitions making

13  this population especially hard to track.  Would you

14  agree that this population is difficult to track?

15                 ATTORNEY BLOCK:  Objection to form.

16                 THE WITNESS:   Again, this is not a study

17  and so it's hard to kind of make a pronouncement about a

18  population without a defined understanding of what that

19  population actually is.  Our folks who don't talk to

20  their medical professionals about dissatisfaction in

21  their care, a difficult population to treat, I think,

22  probably by definition that is true.

23  BY ATTORNEY BARHAM:

24     Q.   And to be clear, I wasn't asking if they're

1  difficult to treat, I was just asking would you agree

2  they're difficult to track?

3    A.    I think by definition, yes, if they are not

4  reaching out to their providers or dropping out of

5  studies, yes.

6    Q.    The next to last paragraph of this article

7  begins by saying the pressure by activists, medical and

8  mental health providers along with a national LGBT

9  organizations to silence the voices of detransitioners

10  and sabotage the discussion around what is occurring in

11  the field is unconscionable.  Do you agree that it is

12  concerning that certain organizations are seeking to

13  silence the voice of detransitioners?

14          ATTORNEY BLOCK:  Objection to form.

15          THE WITNESS:  It is not my experience

16  that organizations are seeking to silence the voices of

17  folks who identify as detransitioners, no.

18  BY ATTORNEY BARHAM:

19    Q.    If they were would you agree that that is

20  unconscionable?

21          ATTORNEY BLOCK:  Objection to form.

22          THE WITNESS:  My job as a psychiatrist

23  and a child psychiatrist in particular is to understand

24  the kid who is sitting in front of me in that very

 1  moment.  I want to understand how to best meet their

 2  needs.  So anything that is going to interfere with me

 3  being able to understand that is going to be a problem

 4  for me.

 5              ATTORNEY BARHAM:  I'm going to show you

 6  what we will mark as Exhibit-30.  This is also Tab 30.

 7                        ---

 8              (Whereupon, Exhibit-30, Interview by Lisa

 9              Selin Davis, was marked for

10              identification.)

11                        ---

12  BY ATTORNEY BARHAM:

13     Q.    This is an interview written up by Lisa Selin

14  Davis of Quillette entitled Trans Pioneer Explains her

15  Resignation from the U.S. Professional Association for

16  Transgender Health, published at the beginning of 2022.

17  Are you familiar with this article?

18     A.    I am not.

19     Q.    I'm going to direct your attention to

20  page three.  This is an interview with Dr. Anderson, the

21  same individual who is a co-author of the Washington

22  Post article we were just discussing.

23              Correct?

24     A.    That is correct.

 1    Q.   On page three Dr. Anderson states, the data are

 2    very clear that adolescent girls are coming to gender

 3    clinics in greater proportion than adolescent boys and

 4    this is a change in the last couple of years and it's an

 5    open question, what do we make of that.  We really don't

 6    know what's going on and we should be concerned about

 7    it.  Does her experience match your experience?

 8                    ATTORNEY BLOCK:  Objection to form.

 9                    THE WITNESS:  I think it's consistent in

10    the literature that we've seen more assigned females at

11    birth presenting for care than in the past.

12    BY ATTORNEY BARHAM:

13    Q.   And have you seen this change in balance since

14    approximately 2015?

15    A.   I don't know if I would say --- I could point to

16    one specific year, but with each year it seems like

17    that's --- I think probably that's when the data came

18    out that that demonstrated it.

19    Q.   When do you recall beginning to see this trend

20    develop?

21    A.   I think one of the challenges is that the scope

22    of the literature is limited to a few very specific

23    subsets of where clinical care is practiced, and so we

24    have to just be careful not to completely generalize.

```
 1   So in these specific clinics what we have seen is a

 2   preponderance and an increase of assigned females at

 3   birth.  I can't speak to this being a national

 4   phenomenon, but the literature probably certainly all

 5   points in that direction.  I think personally for me I

 6   just started to see more assigned females at birth

 7   presenting in adolescence I think in the mid 2010s is

 8   not unreasonable.

 9       Q.    Is there any test in scientific understanding as

10   to why this trend in the literature is developing?

11       A.    There is not.

12       Q.    Do you agree that this is something that

13   practitioners should be very concerned about before

14   agreeing to administer sterilizing cross sex hormones to

15   teen girls?

16             ATTORNEY BLOCK:  Objection to form.

17             THE WITNESS:  The thing that's important

18   is what are the specific factors of the child in the

19   family that is sitting in front of you and how to ensure

20   that that child has gotten appropriate care and that

21   we're making a recommendation based upon the best

22   interest of that individual child that is irrespective

23   of population-based changes that are happening.

24   BY ATTORNEY BARHAM:
```

1    Q.    Don't you need to assess though whether the

2    individual in front of you is exemplar of that national

3    --- of that trend in the literature?

4    A.    That's where --- that's where an assessment

5    comes in.

6    Q.    So you would agree then that practitioners

7    should be concerned about this trend before deciding to

8    administer hormones.

9         Correct?

10        ATTORNEY BLOCK:  Objection to form.

11        THE WITNESS:  What I'm stating is that

12   the guidelines for what's involved in assessment have

13   been relatively clear and that we want to make the

14   decisions based upon what's in the best interest and

15   understanding of the patient and family that we are

16   seeing.  We should always be concerned.  We should

17   always be building up our understanding of the field, as

18   well as some of the epidemiology of the field.  But that

19   doesn't change the individual experiences of the patient

20   and the family that we're meeting with.

21   BY ATTORNEY BARHAM:

22   Q.    Okay.

23        At the bottom of page four Dr. Anderson says

24   that she is, quote, worried that there is a new group of

```
 1   adolescents who have preexisting mental health problems

 2   and are looking for an explanation about who they are.

 3   And there's a bit of I would say fantasy about seeking

 4   to form an identity that may then explain their

 5   distress.  You would agree that the adolescent years can

 6   be distressing for many teens, whether they are

 7   transgender or not.

 8           Correct?

 9               ATTORNEY BLOCK:  Objection to form.

10               THE WITNESS:  I would wholly agree with

11   that, yes.

12   BY ATTORNEY BARHAM:

13       Q.   Do you share the concern that some teens who

14   present at clinics are indulging in a fantasy about what

15   a transgender identity will do for them and their

16   distress?

17       A.   I would not put it in that way, no.

18       Q.   As part of your assessment do you have to --- as

19   part of your thorough assessment do you have to assess

20   whether the teen is incorrectly assessing what a

21   transgender identity would do for them and their

22   distress?

23       A.   A part of any formed --- informed consent

24   process is assessing the understanding of the child and
```

1  the family's understanding of the risks, benefits and

2  alternatives of that specific intervention.  That would

3  include an unrealistic belief about what the potential

4  benefits may be.

5      Q.    All right.

6          I want to go to page five of this document.

7  Dr. Anderson indicates earlier today I talked to some

8  parents who brought their child to a health

9  professional.  The child is seen three times by a

10 therapist and then recommended for hormones.  The

11 therapist never talked to the parents.  Do you share her

12 concern that three sessions with a mental health

13 providers is far less than required before a competent

14 diagnosis of a durable transgender identity can be made?

15             ATTORNEY BLOCK:  Objection to the form.

16             THE WITNESS:  I would not.  The objection

17 as I read it in this article that you've put in front of

18 me with the interview with Dr. Anderson, her concern

19 seems to be more about not having spoken to the parents

20 prior to the recommendation.  And I can't take her word

21 for it that this was true.  We hear a lot of things from

22 parents who express frustration with care that is

23 ultimately found not to be accurate.

24 BY ATTORNEY BARHAM:

1      Q.    Would you share the concern that prescribing

2   hormones if one parent is strongly opposed to it is

3   creating a likelihood of family conflict that is going

4   to likely be destabilizing and harmful to the child?

5              ATTORNEY BLOCK:   Objection to the form.

6   Are you referencing something in the article or is this

7   your own question?

8              ATTORNEY BARHAM:   I am referencing

9   page six, where Dr. Anderson says you don't want to rush

10  ahead with a kid, giving them encouragement that they're

11  going to get hormones until we bring their parents

12  along.   Battling the parents is a no win proposition.

13  BY ATTORNEY BARHAM:

14     Q.    So just to be clear about the question do you

15  share the concern that prescribing hormones if one

16  parent is strongly opposed is likely creating the

17  likelihood of family conflict that may be separately

18  destabilizing and harmful to the child?

19              ATTORNEY BLOCK:   Objection to the form

20  and foundation.

21              THE WITNESS:   What I hear Dr. Anderson's

22  concern from this is that battling with parents is a

23  no-win proposition.   I think that's different from

24  recommending a treatment that not all parents agree to.

1    I think it's about the work of psychotherapy, which

2    involves understanding and hearing parents' experiences

3    and objections.

4    BY ATTORNEY BARHAM:

5        Q.    Do you think that prescribing hormones if one

6    parent is strongly opposed is likely creating family

7    conflict that may be separately destabilizing and

8    harmful to the child?

9        A.    I can't answer that question without a specific

10   family scenario in front of me.  I have seen the

11   opposite be the case where the conflict is the creation

12   of the lack of consensus as opposed to the other way

13   around.  And I've seen kids in my experience treating

14   kids who had parents who have opted out of any

15   decisional capacity and the kid's medical care but

16   nevertheless do much better when given access to this

17   care.

18       Q.    But it is also possible that prescribing

19   hormones over the objection of one parent can create

20   conflict within the family.

21           Correct?

22               ATTORNEY BLOCK:  Objection to the form.

23               THE WITNESS:  Understanding the impact of

24   any intervention is a part of that consent process.

1    BY ATTORNEY BARHAM:

2        Q.    I'm just asking if that's a possible outcome?

3        A.    Yes.

4        Q.    All right.

5              Is it your opinion that it's unreasonable to

6    exclude from female teams biological males, and by that

7    I mean people with XY chromosomes, who have gained a

8    physiological advantage as a result of undergoing male

9    puberty?

10       A.    This is outside of the scope of what I was

11   providing my testimony on.

12       Q.    Well, in paragraph 52 of your report you say no

13   reasonable mental health professional could think the

14   act in question is anything but harmful to the mental

15   health of transgender youth and that preventing

16   transgender youth from participating in the same

17   activities as their peers undermines their ability to

18   socially transition and prevents transgender youth from

19   accessing important educational and social benefits.

20             So I'm asking you is it your opinion that it's

21   unreasonable to exclude from female teams biological

22   males who have gained a physiological advantage as a

23   result of undergoing male puberty?

24                       ATTORNEY BLOCK:  Objection to form and

```
 1   scope.

 2                   THE WITNESS:  Again, I can testify to the

 3   mental health aspects of exclusion.  I can't testify to

 4   the endocrinologic changes of the physiologic changes in

 5   sports specifically.

 6   BY ATTORNEY BARHAM:

 7     Q.    I'm not asking you to testify to the

 8   endocrinology aspects of this.  I'm just asking is it

 9   your opinion that if we assume that an individual has

10   gained physiological advantage as a result of undergoing

11   male puberty that it is still unfair to --- or

12   unreasonable to exclude them from competing on a women's

13   team?

14                   ATTORNEY BLOCK:  Objection to form and

15   scope.

16                   THE WITNESS:  That is not an assumption I

17   feel comfortable making.

18   BY ATTORNEY BARHAM:

19     Q.    Well, if you say that it is no reasonable mental

20   health professional can say that this Act is anything

21   but harmful to the mental health of transgender youth

22   that doesn't depend upon whether the child has undergone

23   male puberty or not.

24          Is that correct?
```

1      A.     That is correct.

2      Q.     So even if the child --- even if the individual

3  has undergone male puberty you're saying that no

4  reasonable mental health professional could think that

5  the Act is anything but harmful, barring them from

6  competing on the women's team is anything but harmful.

7         Is that correct?

8      A.     I would say exclusion and isolation from access

9  to same aged peer activities is likely to be harmful

10  from a mental health perspective.

11      Q.     To what extent can puberty blockers started

12  late, such as age 14, unring the bell by reversing

13  physical changes in male puberty?

14         ATTORNEY BLOCK:  Sorry, I can't hear the

15  questions.

16  BY ATTORNEY BARHAM:

17      Q.     To what extent do puberty blockers started late,

18  for example age 14, unring the bell by reversing the

19  physical changes of male puberty?

20         ATTORNEY BLOCK:  Objection to form and

21  scope.

22         THE WITNESS:  It is a complicated

23  question that is best left to an endocrinologist to

24  answer.

1    BY ATTORNEY BARHAM:

2        Q.    Can puberty blockers reverse the physical

3    changes of male puberty to the genitals?

4                    ATTORNEY BLOCK:  Objection to form and

5    scope?

6                    THE WITNESS:  It's the same answer.  I

7    would defer to an endocrinologist on that response.

8    BY ATTORNEY BARHAM:

9        Q.    Can puberty blockers reverse the physical

10   changes to the hair?

11                   ATTORNEY BLOCK:  Same objections.

12                   THE WITNESS:  Again, I would defer to an

13   endocrinologist.

14   BY ATTORNEY BARHAM:

15       Q.    Can they reverse the physical changes to the

16   voice or the muscles?

17                   ATTORNEY BLOCK:  Same objections.

18                   THE WITNESS:  Same answer.

19   BY ATTORNEY BARHAM:

20       Q.    Can they reverse the effect --- the physical

21   changes of male puberty to the heart or lung size?

22                   ATTORNEY BLOCK:  Same objection.

23                   THE WITNESS:   Same answer.

24   BY ATTORNEY BARNHAM:

1    Q.   Isn't it true that puberty blockers just stop

2  further typical male development?

3            ATTORNEY BLOCK:  Same objections.

4            THE WITNESS:  I would --- I would give

5  two responses.  One, I would want an endocrinologist to

6  weigh in on the specifics, but clearly puberty blockers

7  are also prescribed to folks assigned females at birth

8  as well.  There's more than just impacts on testosterone

9  as a result of these medications.

10  BY ATTORNEY BARHAM:

11    Q.   I understand, but you make recommendations for

12  whether people are eligible to receive puberty blocking

13  hormones.

14         Is that correct?

15    A.   That is correct.

16    Q.   So you have to have some understanding of the

17  effects of these medications.

18         Is that correct?

19    A.   That is correct.

20    Q.   So isn't it true that puberty blockers

21  administered to natal males should stop further typical

22  male development?

23            ATTORNEY BLOCK:  Objection to form and

24  scope.

1              THE WITNESS:   I'd have the same answer,

2    and they do more than that.

3    BY ATTORNEY BARNHAM:

4        Q.    What else do they do?

5        A.    Again, I would defer to the endocrinologist for

6    the specific pathophysiology of how GnRH analogs affect

7    a complicated physiology of the body.

8        Q.    But what is your understanding of how they

9    affect because you said they also do other things?

10             ATTORNEY BLOCK:   Objection to form and

11   scope.

12             THE WITNESS:   I think I answered it.   In

13   the GnRH analogs are given an anatomic manner compared

14   to the pulsatile way in which GnRH is released during

15   the puberty, which is what causes the suppression of

16   other hormones more than just testosterone and estrogen.

17   BY ATTORNEY BARNHAM:

18       Q.    If puberty blocking hormones are administered to

19   a natal male, do they cause that individual to undergo

20   typically female pubertal development?

21             ATTORNEY BLOCK:   Objection to form and

22   scope.

23             THE WITNESS:   They do not.

24   BY ATTORNEY BARHAM:

1    Q.    So they just stop further male development.

2         Correct?

3                   ATTORNEY BLOCK:  Same objections.

4                   THE WITNESS:  As kind of a Gestalt pithy

5    response, yes, they cause puberty for assigned females

6    at birth and assigned males at birth who are given these

7    medications.

8    BY ATTORNEY BARNHAM:

9    Q.    When does puberty typically begin in biological

10   males?

11                  ATTORNEY BLOCK:  Same objections.

12                  THE WITNESS:  Those are very known data

13   that an endocrinologist could tell you.

14   BY ATTORNEY BARHAM:

15   Q.    I'm sure, though, that as a psychiatrist you

16   have a general understanding of what ages puberty

17   typically begins in biological males?

18                  ATTORNEY BLOCK:  Same objections.

19                  THE WITNESS:  I do, however, I am

20   assessing individuals who come through my office.  And

21   regardless of what the population says about when

22   puberty is typical, it's going to depend upon who that

23   individual child is and when they develop puberty.

24   BY ATTORNEY BARHAM:

1    Q.    I understand, but my question isn't about an

2    individual.  My question is when does it typically begin

3    in biological males.

4              ATTORNEY BLOCK:  Same objections.

5              THE WITNESS:  Again, this is a very

6    knowable fact-based answer in a population level.  It's

7    not information I have in front of me.

8    BY ATTORNEY BARHAM:

9    Q.    So you have no --- is it your testimony that you

10   have no information as to when puberty typically begins

11   in biological females?

12             ATTORNEY BLOCK:  Can I just give a

13   standing objection to questions asking the witness about

14   the effects --- the endocrinology effects of blockers

15   and hormones, so I don't have to make an objection each

16   time?

17             ATTORNEY BARHAM:  Yes.

18             THE WITNESS:  My testimony is I don't

19   want to give an imprecise answer for a question that

20   there is a specific answer to.

21   BY ATTORNEY BARHAM:

22   Q.    What is your understanding, as you sit here

23   today, as to when puberty typically begins in males?

24   A.    The range for typical puberty in males tends to

1  be around the 12ish mark.  But there is a broad

2  variability.  And again, there is an answer that exists

3  for this question that I don't have in front of me.

4      Q.    Are you familiar with Tanner stages of puberty?

5      A.    I am.

6      Q.    What are the different Tanner stages of puberty?

7      A.    Tanner stages one through five are the different

8  Tanner stages.

9      Q.    So what is Tanner stage one in biological males?

10     A.    It depends upon if we're talking about genitalia

11  or chest development, but it's no pubertal changes,

12  so ---.

13     Q.    And what is two?

14     A.    Two is at the initial stages of pubertal changes

15  that you start to see.  The specifics of the Tanner

16  staging is something that you need to be trained on.  I

17  would not claim myself as an expert in being able to

18  accurately access the Tanner stage of a child.

19     Q.    Do you know when --- at what ages Tanner Stage 2

20  typically initiates in biological males?

21     A.    Again, it's going to be an individualized

22  experience and that's why we do assessments.

23     Q.    Do you have a range, an age range as to when it

24  typically begins?

1      A.    When we talk about the onset of puberty, we're

2    talking about Tanner stage two typically.

3      Q.    And at what age do those typically arise?

4      A.    For assigned males at birth or assigned females?

5      Q.    For biological males.

6                ATTORNEY BLOCK:  Objection to

7    terminology.

8                THE WITNESS:  So for folks assigned male

9    at birth, again, we're going to see it in that 12-ish

10    range.

11    BY ATTORNEY BARHAM:

12     Q.    And Tanner Stage 3, what is that?

13     A.    Further development.  There's tables and charts

14    you would have to look at.  I'm not going to be able to

15    use language to describe it in an accurate way.

16     Q.    And when --- approximately when, what age range

17    does Tanner Stage 3 begin in biological males?

18     A.    That's not an answer that I can give you.

19     Q.    And what is Tanner Stage 4?

20     A.    The same answer is further progression of

21    pubertal changes.

22     Q.    And do you know what age range that typically

23    begins in biological males?

24     A.    Same answer as before.  That's not an answer I

 1  have here.

 2     Q.    And would the same answers hold true for Tanner

 3  Stage 5?  Is that a yes?

 4     A.    That's a yes.  I forgot that nodding ---.

 5     Q.    Yes.  You've been pretty good today.  I've been

 6  impressed.

 7           Doesn't the position that allowing biological

 8  males to play on a girls team if they blocked puberty

 9  before it begins create pressure for parents and

10  children to make puberty blocking decision at a young

11  age?

12                ATTORNEY BLOCK:  Objection to form.

13  BY ATTORNEY BARHAM:

14     Q.    Sort of put them in a now or never situation?

15     A.    Of those 500 patients that I have seen, that has

16  never come up as a concern.

17     Q.    The athletic issue has never come up as a

18  concern?

19     A.    It has not.

20     Q.    Do you think it would --- as a practitioner in

21  the field do you think it would even be ethical for the

22  State of West Virginia to structure its law in a way

23  that puts now or never pressure on parents and children

24  who are dealing with gender dysphoria to decide at an

1  early age whether to stop the natural development of

2  puberty?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  As a child psychiatrist in

5  this field we're doing individual-based assessments with

6  the children and families that are in front of us.  And

7  what that means in the context of this question is that

8  we are assessing all of their different activities,

9  interests and working with all the systems that we can

10  to ensure a safe and appropriate set of decisions that

11  are going to lead to the best outcomes for this

12  individual child and not a medical emphasis that is

13  outside of the scope that I can answer.

14  BY ATTORNEY BARHAM:

15    Q.    But you're familiar with the ethical standards

16  of your field.

17          Is that correct?

18    A.    I am, yes.

19    Q.    Under those ethical standards would it be

20  ethical for the State to structure its law in a way that

21  puts this kind of now or never pressure on parents and

22  children?

23                    ATTORNEY BLOCK:  Objection to form.  Also

24  the witness is in shadow.  I can't really see him for

1   the camera.

2                   THE WITNESS:  Is that better?

3                   ATTORNEY BLOCK:  Yes.

4                   THE WITNESS:  Can you repeat the

5   question?  I'm sorry.

6   BY ATTORNEY BARHAM:

7      Q.   As someone familiar with the ethical standards

8   of psychiatry, do you think it would be ethical for the

9   State of West Virginia to structure its law in a way

10  that puts now or never pressure on parents and children

11  who are dealing with gender dysphoria to decide at an

12  early age whether to stop the natural development of

13  puberty?

14                  ATTORNEY BLOCK:  Objection to form.

15                  THE WITNESS:  I mean that's a question

16  that has a testable hypothesis.  Does X intervention

17  lead to this kind of pressure?  That's not a study that

18  I've ever seen nor has it been my clinical experience

19  that it's been the case.

20  BY ATTORNEY BARHAM:

21     Q.   Would it be ethical to put that kind of pressure

22  on someone under the ethical standards of the field of

23  psychiatry?

24                  ATTORNEY BLOCK:  Objection to form and

```
 1    foundation?

 2                    THE WITNESS:  It is a very theoretical

 3    question that really doesn't enter into it when we are

 4    one on one with these kids and their families.

 5    BY ATTORNEY BARHAM:

 6       Q.    I'm not asking about one on one interactions

 7    with kids and families.  I'm asking in general in theory

 8    is it ethical to put that kind of pressure on someone?

 9                    ATTORNEY BLOCK:  Objection to form and

10    foundation.

11                    THE WITNESS:  I'm sorry I can't give a

12    better answer, but ensuring that a child is making a

13    decision without coercion is a part of the informed

14    consent process.

15    BY ATTORNEY BARHAM:

16       Q.    Is it your opinion that it is unreasonable to

17    exclude from female teams biological males who begin

18    undergoing male puberty but are now on puberty blockers?

19                    ATTORNEY BLOCK:  Objection to form and

20    scope.

21                    THE WITNESS:  Can you repeat the

22    question?

23    BY ATTORNEY BARHAM:

24       Q.    Is it your opinion that it is unreasonable to
```

1   exclude from female teams biological males who begin

2   undergoing male puberty but are now on puberty blockers?

3       A.    Is it unethical is the question?

4       Q.    Unreasonable.

5       A.    Unreasonable.  I would defer to kind of our

6   physiology and endocrinology experts and our medical

7   ethics experts in rendering an opinion on that

8   specifically.

9       Q.    Is it your opinion that it is harmful to youth's

10  mental health to be excluded from female teams

11  biological males who begin undergoing male puberty but

12  are now on puberty blockers?

13      A.    What I would say is that exclusion as well as

14  specific legal exclusion from activities of same-aged

15  peers is likely to be harmful for a kid's mental health.

16      Q.    Now, the Act in question does not prevent a

17  biological male who has gender dysphoria from competing

18  on the boys team.

19          Is that correct?

20              ATTORNEY BLOCK:  Objection to form and

21  scope.

22              THE WITNESS:  I'd need to know specifics.

23  I don't know what you're referring to.  I think lots of

24  people have different policies around how this actually

1  works.

2  BY ATTORNEY BARHAM:

3      Q.    I'm asking your understanding of the statute

4  upon which you're opining.

5      A.    Can you repeat the question, please?

6      Q.    The Act in question does not prevent a

7  biological male who is experiencing gender dysphoria

8  from competing on the boys team.

9           Correct?

10              ATTORNEY BLOCK:  Objection to form and

11  scope.

12              THE WITNESS:  So one, I don't know what

13  biological male necessarily means.

14  BY ATTORNEY BARHAM:

15      Q.    An individual with XY chromosomes, natal male?

16      A.    So assigned male at birth can have a number of

17  reasons why they might not be able to play on the boys

18  team, including intensity of gender dysphoria.

19      Q.    But the law does not prevent them from playing

20  on the boys team.

21           Correct?

22      A.    From my read of the law it does not prevent them

23  from playing on the boys team.  Again, from a mental

24  health perspective, their gender dysphoria may.

1      Q.    So is it harmful to the mental health of a

2   biological male who is experiencing gender dysphoria to

3   be excluded from the women's team even if he is on

4   puberty blockers?

5                ATTORNEY BLOCK:   Objection to form and

6   terminology.

7                THE WITNESS:   Any potential exclusions

8   from a peer-appropriate activity has the potential to

9   have negative consequences on the mental health of that

10  girl.   And again, that's going to be something that on

11  an individual basis we are assessing.

12  BY ATTORNEY BARHAM:

13     Q.    And that would be irrespective of whether the

14  individual is on puberty blockers, begins to undergo

15  male puberty or not.

16          Correct?

17     A.    An individual assessment is going to be

18  inherently tailored to wherever an individual is.

19                ATTORNEY BARHAM:   Why don't we pause for

20  lunch?

21                ATTORNEY BLOCK:   Let's go off the record.

22                VIDEOGRAPHER:   Going off the record.   The

23  current time reads 1:24 p.m.

24  OFF VIDEOTAPE

```
 1                        ---

 2   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 3                        ---

 4   ON VIDEOTAPE

 5               VIDEOGRAPHER:  Back on the record.  The

 6   current time reads 1:53 p.m.

 7   BY ATTORNEY BROOKS:

 8     Q.    What does puberty suppression or puberty

 9   blockers do?

10               ATTORNEY BLOCK:  Objection to form and

11   scope.

12               THE WITNESS:  I think I answered that

13   question before.  So they suppress the endogenous

14   release of testosterone and estrogen as well as some

15   other hormones.

16   BY ATTORNEY BARHAM:

17     Q.    How does puberty suppression differ from cross

18   sex hormones?

19               ATTORNEY BLOCK:  Same objection.

20               THE WITNESS:  Totally different

21   medication.  One suppress hormones and the other is a

22   direct hormone itself.

23   BY ATTORNEY BARHAM:

24     Q.    So cross sex hormones are given with the
```

```
 1  intention of causing development typical to the other

 2  sex.

 3          Correct?

 4    A.    It depends upon the context in which hormones

 5  are used.  And again, I would defer for my endocrinology

 6  colleagues on the specifics.

 7    Q.    So if cross sex hormones are given to a natal

 8  male as part of treatment for gender dysphoria, what is

 9  the intention?

10              ATTORNEY BLOCK:  Objection to form.

11              THE WITNESS:  As I understand it, if an

12  assigned male at birth is given cross sex hormones that

13  is estrogen in order to provide the effects of estrogen

14  on the body.

15  BY ATTORNEY BARHAM:

16    Q.    And the effects of estrogen on the body are what

17  natal females would naturally experience as a result of

18  puberty.

19          Correct

20    A.    I mean, that is correct, yes.

21    Q.    And so if a natal female is given cross sex

22  hormones, she's being given testosterone to create the

23  effects that natal males would naturally experience

24  through puberty.
```

1          Correct?

2      A.    Typically speaking, an assigned female at birth

3  is going to be receiving testosterone and will have the

4  subsequent effects as a result of having testosterone in

5  the bloodstream.

6      Q.    Maybe I was confused, a natal male who is given

7  cross sex hormones?

8      A.    You were right.

9      Q.    I was right, okay.  At what Tanner stage do you

10  recommend that a patient begin puberty blocker hormones?

11      A.    Again, that's going to depend upon an

12  individualized assessment with the family, but never

13  before Tanner Stage 2 of puberty.

14      Q.    And in what age does Tanner Stage 2 begin again?

15          ATTORNEY BLOCK:  Asked and answered.

16          THE WITNESS:  I think I answered that

17  question.  It really depends upon the person.

18  BY ATTORNEY BARHAM:

19      Q.    And typically ---.

20      A.    And for an assigned male at birth we're talking

21  12-ish, but again I would refer to my endocrinology

22  colleagues on the specific dates.

23      Q.    And through what Tanner stage do you recommend

24  that a patient remain on puberty blockers?

1      A.     That's not a question I can speak to.  That's a

2    question for the physician or provider who's prescribing

3    that specific medication.

4      Q.     So after you recommend that a patient receive

5    puberty blocking hormones, what is your continuing

6    involvement in the puberty blocking process?

7      A.     My continuing involvement really depends upon

8    the individual child and family for the sake of a mental

9    health assessment.  For the initiation of puberty

10   suppression it's an assessment for the initiation of

11   puberty suppression.  The involvement thereafter is

12   really dependent upon what the individual needs of that

13   child are.

14     Q.     Do you play any role in continuing to advise

15   whether the patient can continue to receive puberty

16   blocking hormones or come off of them?

17     A.     It really depends upon the context.  If the

18   child is seeking to come off of puberty suppression

19   because of a shift in their understanding of their

20   identity, certainly that's a conversation that I would

21   be involved in.  If they are coming off of puberty

22   suppression because they have a sufficient amount of

23   testosterone or estrogen in their system that they are

24   no longer requiring that from a medical purpose, that's

```
 1    not a discussion that I'm privy to.

 2        Q.    When you are discussing puberty blockers with

 3    patients and their parents do you describe them as

 4    placing a pause on puberty?

 5        A.    That's not specific language that I use.

 6        Q.    Do you describe them as being reversible?

 7        A.    Again, that's not a language that I use.  I'm

 8    much more specific in my discussions.

 9        Q.    So on the issue of whether puberty blocking

10    hormones are reversible, what do you tell parents and

11    patients?

12        A.    I would say, by and large, most of the effects

13    of puberty suppression are reversible.

14        Q.    And when you say by and large what effects are

15    you referencing?

16        A.    What I'm referencing is that the literature is

17    still an open book and we are constantly seeking and

18    learning new information.  We want to understand what

19    those potential new data tell us about the efficacy,

20    safety, et cetera, of these interventions.

21        Q.    So when you say they are by and large the

22    effects are reversible, which effects are you

23    referencing are the by and large?

24        A.    When I say by and large, it's really a caveat to
```

1  allow for the things that we don't yet know.

2      Q.    So which effects are reversible?

3      A.    Virtually all of the effects that we're aware of

4  are reversible.

5      Q.    When you're discussing puberty blockers with

6  patients and their parents do you describe them as safe?

7      A.    Safe isn't a binary concept in my world.  There

8  is no such thing as anything that is completely safe or

9  unsafe.  So we talk about gradations of risk with any

10  intervention.

11      Q.    So for puberty blockers what are the --- what's

12  the gradation of risk?

13      A.    It is individualized to the specific needs of

14  the child and the family.

15      Q.    In general, what is your understanding of the

16  gradations of risk across the board?

17                  ATTORNEY BLOCK:  Objection to form.

18                  THE WITNESS:  I don't have a better

19  answer for you because that's the whole process of doing

20  an informed consent process, is understanding what are

21  the specific risks and benefits and alternatives for

22  that individual child.

23  BY ATTORNEY BARHAM:

24      Q.    Are you aware of the literature regarding any

1  testing of puberty blocking hormones and the gradations

2  of risks presented in those tests?

3      A.    I'm not sure what you mean by tests.

4                  ATTORNEY BLOCK:  Objection to form.

5                  THE WITNESS:  I'm not sure what you mean

6  by testing.

7  BY ATTORNEY BARHAM:

8      Q.    Don't medications undergo testing before they

9  can be used?

10     A.    There's a wide variety of processes by which

11 medications are approved or not approved for certain

12 indications.

13                 ATTORNEY BARHAM:  Let's go to Tab 5.  I

14 believe that's Exhibit-2.

15                 LAW CLERK WILKINSON:  Exhibit-2.

16 BY ATTORNEY BARHAM:

17     Q.    It's the Endocrine Society Guidelines from 2017.

18                 THE WITNESS:   Yes.

19 BY ATTORNEY BARHAM:

20     Q.    On page 3880 the Endocrine Society states we

21 suggest that clinicians begin pubertal hormone

22 suppression therapy --- pubertal hormone suppression

23 after girls and boys first exhibit physical changes of

24 puberty, Tanner stages G-2/B-2.  Is that consistent with

1    your practice?

2                    ATTORNEY BLOCK:  Objection to form.

3                    THE WITNESS:    This is --- the document,

4    as I read it, is a set of guidelines for the practice of

5    care that should be individually applied to each child

6    and family.  My practice takes these recommendations and

7    individually applies them to the specific risks,

8    benefits and alternatives for the child sitting in front

9    of me.

10   BY ATTORNEY BARHAM:

11       Q.    On the prior page in number 1.4 the Endocrine

12   Society recommends against puberty blocking and gender

13   affirming hormone treatment in prepubertal children.  Do

14   you approve the use of puberty blockers before puberty?

15       A.    I do not.

16       Q.    You didn't recommend or prescribe any puberty

17   blockers for BPJ.

18            Is that correct?

19       A.    I have not.

20       Q.    You did not evaluate BPJ before he started

21   taking puberty blockers.

22            Is that correct?

23       A.    I have not evaluated her or seen her, these

24   materials.

1     Q.    Is it your opinion that no responsible clinics

2  begin puberty blocking before puberty begins?

3               ATTORNEY BLOCK:  Objection to form and

4  scope.

5               THE WITNESS:  There's no indication to

6  start puberty blocking agents until Tanner Stage 2.

7  BY ATTORNEY BARHAM:

8     Q.    Isn't it true that there have been no Phase I

9  clinical trials to test the safety of GnRH inhibitors

10  for this age group?

11     A.    That is my understanding, but I would have to

12  specifically review the literature with that question in

13  mind.  I'm not familiar --- completely familiar with the

14  phased nomenclature in this context.

15     Q.    Isn't it true that there have been no Phase I

16  clinical trials to test the safety of GnRH inhibitors

17  for this duration?

18     A.    Again I would need to find a definition of what

19  you are referring to by Phase I specifically.

20     Q.    Isn't it true there have been no clinical trials

21  per FDA rules for this use of puberty blockers?

22     A.    I don't know what is meant by per FDA rules.

23     Q.    Food and Drug Administration rules?

24     A.    Yeah.  I'm not familiar with what their rules

 1  are.  There have been clinical trials of these

 2  medications for this purpose.

 3      Q.    Which clinical trials are you referencing?

 4      A.    There are clinical trials through the Dutch

 5  clinic.  There is also an ongoing clinical trial here in

 6  the U.S., a multi-phase study.

 7      Q.    That study is still ongoing.

 8            Correct.

 9      A.    That is correct.

10      Q.    So there are no completed clinical trials in the

11  United States under FDA rules.

12            Correct?

13      A.    I am not ---.

14                ATTORNEY BLOCK:  Objection to the form.

15                THE WITNESS:  I can't say that I'm

16  familiar with all clinical trials that have ever

17  happened, so that's not a statement I can answer.

18  BY ATTORNEY BARHAM:

19      Q.    You're not aware of any, though?

20      A.    I don't know what is meant by Phase I and what

21  specifically is registered with the FDA for their

22  purposes versus the copious numbers of clinical trials

23  that have happened.

24      Q.    Are you aware of any clinical trials in the

211

1   United States that have been completed regarding the

2   safety of using puberty blockers for gender dysphoria?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  Yeah, I'm not sure how I

5   can answer that because I'm not aware of all of the

6   trials that have occurred.

7                    ATTORNEY BLOCK:  Counsel, can we have a

8   discussion about the scope of this deposition?  I'm

9   happy to have it off the record.  I don't want it to

10  influence the witness at all, but this is a rebuttal

11  witness addressing specific issues and it seems that,

12  you know, there are a lot of questions that are just

13  really far outside the scope.  So I'd love to have a

14  discussion.

15                    ATTORNEY BARHAM:  I'm happy to go off the

16  record.

17                    VIDEOGRAPHER:  Going off the record.  The

18  current time reads 2:07 p.m.

19  OFF VIDEOTAPE

20                          ---

21  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

22                          ---

23  ON VIDEOTAPE

24                    VIDEOGRAPHER:  Back on the record.  The

1   current time reads 2:17 p.m.

2   BY ATTORNEY BARHAM:

3       Q.    We were looking at Tab 5, which is Exhibit-2,

4   page 3874.  About three-quarters down the first column

5   the Endocrine Society indicates, quote, in the future we

6   need more rigorous evaluations of the effectiveness and

7   safety of endocrine and surgical protocols and

8   specifically highlight the need to include a careful

9   assessment of the effect of prolonged delay of puberty

10  in adolescence on bone health, gonadal function and the

11  brain.

12          Do you see that?

13      A.    I see that, yes.

14      Q.    Do you agree that more rigorous evaluations of

15  the safety of endocrine and surgical protocols are

16  needed?

17      A.    I would agree that that's an important goal for

18  all treatments, yes.

19      Q.    Do you agree that because, as the Endocrine

20  Society indicated here, that these evaluations are

21  needed in the future, that this --- that they have not

22  been done yet?

23      A.    Well, this is published in 2017.  There are

24  ongoing trials that are happening now, and some that

1   have had at least preliminary data presented at various

2   meetings that have looked at some of these.

3        Q.    So the issue here is the prolong delay of

4   puberty.  You would agree that it's quite different from

5   treating individuals with precocious puberty.

6        Correct?

7                    ATTORNEY BLOCK:  Objection to form and

8   scope.

9                    THE WITNESS:  As a non-endocrinologist I

10  wouldn't hazard an opinion on that.

11  BY ATTORNEY BARHAM:

12       Q.    Do you treat individuals for precocious puberty?

13       A.    I do not.

14       Q.    Do you agree with the Endocrine Society that

15  there have not yet been a study of how the prolonged

16  delay of puberty affects bone health?

17                    ATTORNEY BLOCK:  Objection to form and

18  scope.

19                    THE WITNESS:  I don't know if I can

20  answer that in the most accurate way.  I know I've seen

21  preliminary data presented at various meetings about

22  impacts on bone health, but I'm not as familiar with the

23  endocrine literature as I am with the mental health

24  literature.

214

1    BY ATTORNEY BARHAM:

2        Q.    Do you agree that there has not yet been a study

3    on the prolonged effect of --- the prolonged delay of

4    puberty affecting gonadal function?

5                    ATTORNEY BLOCK:   Objection to form and

6    scope.

7                    THE WITNESS:   Same answer as to the last

8    one.

9    BY ATTORNEY BARNHAM:

10       Q.    And that is the same as fertility?

11             Correct?

12       A.    There has been more study fertility in those

13   populations.

14       Q.    Do you agree there has not yet been a study on

15   how the prolonged delay of puberty affects the brain?

16       A.    There are ongoing studies.

17       Q.    None complete yet?

18       A.    None that have published thus far that I'm aware

19   of again.

20       Q.    And when you say there are ongoing studies of

21   bone health, none have published so far that you're

22   aware of.

23             Correct?

24       A.    I know I have seen data published at various

1  national and international meetings, so I could not

2  answer that question accurately.  I think things have

3  been published on bone health, but I'm not familiar with

4  --- I'm not as familiar with the endocrinologic

5  literature as I am the mental health literature.

6      Q.   Are you aware of any studies that have been

7  completed regarding the prolonged delay of puberty

8  affecting the cognitive, emotional, social and sexual

9  development?

10     A.   Can you repeat the question?

11     Q.   Are you aware of any studies that have been

12  completed regarding the prolonged delay --- of how the

13  prolonged delay of puberty affects the cognitive,

14  emotional, social and sexual development?

15     A.   There have been a number of studies including

16  studies that we have referenced here that have looked at

17  long-term psychosocial outcomes for these kids.  So

18  certainly some of those items have been looked at quite

19  extensively.  Some have not yet or have studies that are

20  ongoing.

21     Q.   If the Endocrine Society is indicating that all

22  of this is needed research, why are you --- what do you

23  tell parents about the relative safety of puberty

24  blocking hormones?

1    A.    What I would say this was published in 2017, and

2   so we would want to update since then about any

3   literature since then on these potential risks.  What I

4   want to do is make sure that the endocrinologist or the

5   adolescent medicine specialist, whoever it is that is

6   prescribing the specific treatment knows how to have

7   those discussions based on the psychiatric needs of the

8   patients that I'm seeing.

9    Q.    Let's turn to 3872 in this document.  The

10  Endocrine Society indicates that the task force followed

11  the approach recommended by the grading of

12  recommendations and assessments, development and

13  evaluation group.  The international group with

14  expertise in the development and implementation of

15  evidence based guidelines.  Do you see that in the

16  second column?

17   A.    Yes.

18   Q.    And in this document they indicate that the use

19  of the phrase we recommend and the number one are strong

20  recommendations --- use the phrase we recommend ---

21  recommendations use the phrase of we suggest in number

22  two.

23        Is that correct?

24   A.    Correct.

1    Q.    So the recommendations regarding the use of

2    puberty blockers are based on low quality evidence.

3        Correct?

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  What I can state is how

6    this particular working group within the Endocrine

7    Society characterized it using the assessment tool and

8    using this assessment tool that is how it was graded for

9    the sake of this set of guidelines.

10   BY ATTORNEY BARHAM:

11       Q.    Were you aware of this when you drafted your

12   report?

13       A.    Yes.

14       Q.    Do you agree or disagree with this assessment of

15   the quality of the evidence?

16       A.    Based upon how they did it, I would agree.  In

17   the world of child psychiatry this is very common.

18   There is very little that we have in terms of very

19   mainstream standard of care treatments that has anything

20   other than poor quality of evidence based upon using

21   these standards.

22                    ATTORNEY BARHAM:  I'm going to hand you

23   what we will mark as Exhibit 31, and that will be

24   Tab 76?

```
 1                    THE WITNESS:  Thanks.

 2                    LAW CLERK WILKINSON:  You're welcome.

 3                    ---

 4                    (Whereupon, Exhibit 31, Label of Lupron,

 5                     was marked for identification.)

 6                    ---

 7   BY ATTORNEY BARHAM:

 8       Q.    This is the label of Lupron, pharmaceutical

 9   label for Lupron.  Right at the top of page one, this

10   label indicates that Lupron is approved for puberty

11   blocking or delay for precocious puberty.

12          Correct?

13       A.    That is correct.

14       Q.    And precocious puberty is a hormonal imbalance.

15          Correct?

16       A.    I think there's a precise terminology for

17   precocious puberty that involves more than just a

18   hormonal imbalance.

19       Q.    But it's a malfunction of hormonal controls in

20   the brain?

21                    ATTORNEY BLOCK:  Objection to the form.

22                    THE WITNESS:  My understanding as a

23   non-endocrinologist is that's initiation of puberty much

24   earlier than anticipated or expected based upon the
```

1    history of the family.

2    BY ATTORNEY BARHAM:

3       Q.    So Lupron is inspected and approved by the FDA

4    for safety and efficacy for precocious puberty not for

5    all other possible uses.

6             Correct?

7       A.    Correct.

8       Q.    And Lupron was tested only for delaying puberty

9    up until the normal age of puberty.

10             Correct?

11                  ATTORNEY BLOCK:  Objection to form.

12                  THE WITNESS:  I'm not familiar with the

13    literature that was used for gaining the FDA approval

14    for this indication.

15    BY ATTORNEY BARHAM:

16       Q.    If you turn to section 14.1, 14.1 you'll see

17    that it says that this --- Lupron was tested for monthly

18    administration on 6 males and 49 females.

19             Is that correct?

20       A.    That is correct.

21       Q.    And on the next page you'll see it was tested

22    for three months administration on 8 males and 76

23    females.

24             Is that correct?

1       A.    I do not see where it says that.

2       Q.    14.2?

3       A.    Yes.

4       Q.    Do you know why the test was weighted towards

5   girls?

6                   ATTORNEY BLOCK:  Objection to form and

7   scope and foundation.

8                   THE WITNESS:  It would be a mere

9   supposition on my end.

10  BY ATTORNEY BARHAM:

11      Q.    Is it because precocious puberty is more common

12  in girls?

13      A.    I would defer to an endocrinologist on this

14  epidemiology of that.

15      Q.    But the goal of using Lupron in this context is

16  to help steer the body into healthy and normal

17  development.

18        Correct?

19                  ATTORNEY BLOCK:  Objection to form,

20  scope.

21                  THE WITNESS:  Generally speaking I would

22  agree with that.

23  BY ATTORNEY BARHAM:

24      Q.    Prescribing Lupron or other GnRH for gender

1   dysphoria disrupts hormones and developments at an early

2   stage.

3       Correct?

4           ATTORNEY BLOCK:  Objection to the form

5   and scope.

6           THE WITNESS:  Again, as a mental health

7   professional, this would be outside of my area of

8   expertise to comment on that.

9   BY ATTORNEY BARHAM:

10     Q.   Would you agree that normal pubertal development

11   includes bone growth, such as height?

12           ATTORNEY BLOCK:  Objection to form and

13   scope.

14           THE WITNESS:  Yes, I would.

15   BY ATTORNEY BARHAM:

16     Q.   Would you agree that normal pubertal development

17   can include bone strengthening?

18           ATTORNEY BLOCK:  Objection to form and

19   scope.

20           THE WITNESS:  Specifics of that question

21   are really outside of my scope of understanding in the

22   practice that I have.

23   BY ATTORNEY BARHAM:

24     Q.   But in general, you would agree that bones get

1    stronger during puberty, especially for men?

2                    ATTORNEY BLOCK:  Objection to form and

3    scope.

4                    THE WITNESS:  My understanding is that

5    the process of bone health is a quite dynamic, not

6    static nor binary process, so it's more complicated than

7    I feel that I can answer that question to.

8    BY ATTORNEY BARHAM:

9        Q.    But do bones generally get stronger as puberty

10   progresses?

11                   ATTORNEY BLOCK:  Objection to form and

12   scope.

13                   THE WITNESS:  Again, I think it's a more

14   complicated answer than a yes or a no but I'm not ---.

15   BY ATTORNEY BARHAM:

16       Q.    Would you agree that normal pubertal development

17   includes brain development?

18       A.    Yes.

19       Q.    Each of these things have stopped or decreased

20   by the administration of puberty blockers.

21            Correct?

22       A.    I don't think we can say that it's been stopped

23   or decreased.  There's not a term decreasing brain

24   development that has been studied or referred to in the

1  literature as I'm aware of it.

2      Q.    Slower brain development?

3              ATTORNEY BLOCK:  Objection to form.

4              THE WITNESS:  Slower isn't a word that

5  I've used, seen in the literature either.

6              ATTORNEY TRYON:  Travis, can you speak up

7  just a little bit more, please?

8              ATTORNEY BARHAM:  Certainly.

9  BY ATTORNEY BARHAM:

10     Q.    Would you agree that normal pubertal development

11 also includes psychosocial development of an adult

12 identity as a sexual being contemporaneous with ones

13 peers?

14     A.    I would say I would agree with that as an

15 adolescent developmental process, not necessarily as a

16 pubertal developmental process.

17     Q.    What's the --- what's your distinction between

18 an adolescent pubertal development --- excuse me, an

19 adolescent developmental process and a pubertal

20 developmental process?

21     A.    As an example, folks who have delayed puberty,

22 so 16-year olds who I have seen that have yet to undergo

23 all stages of puberty nevertheless develop a sense of

24 identity independent of the fact that their puberty has

1  been delayed.

2     Q.    But their development in that regard is not

3  contemporaneous with their peers.

4           Correct?

5                 ATTORNEY BLOCK:  Objection to form.

6                 THE WITNESS:  In my specific hypothetical

7  some of their development is going to be contemporaneous

8  with their peers.  Some of it will not be.

9                 ATTORNEY BARHAM:  I'm going to show you

10 what we will mark as Exhibit 32.  This will be Tab 73.

11                        ---

12                 (Whereupon, Exhibit 32, Puberty Blockers

13                 Document, marked for identification.)

14                        ---

15                 THE WITNESS:  Can I ask a clarifying

16 question, it is 2:32 east coast time, not central.

17                 ATTORNEY SWAMINATHAN:  Yes.

18                 LAW CLERK WILKINSON:  Tab 73.

19 BY ATTORNEY BARHAM:

20    Q.    This document is a hand out --- or it's from the

21 --- I'm going to butcher the name, Doernbecher

22 Children's Hospital at OHSU from their gender clinic and

23 about puberty blockers document.  At the bottom of page

24 three, this document indicates that researchers have not

```
 1   finished studying how safe puberty blockers are in the

 2   long-term.

 3           Do you agree with that?

 4   A.      Yeah, I would agree with that.

 5   Q.      On the next page this document says that because

 6   puberty block --- because blocking puberty hormones can

 7   weaken your bones, it is best to just take them for just

 8   two or three years.

 9           Do you agree or disagree?

10   A.      That is outside of my scope of expertise.

11           Again, this is a public facing the most like

12   website.  I can't be quite certain what the context of

13   this is, but the individualized discussions you're

14   having with patients and families is always going to be

15   more complex than one or two sentences.

16   Q.      Do you expect to offer any opinion in this case

17   that puberty blockers administered according to your

18   guidelines are safe and reversible?

19   A.      I don't --- I guess I don't understand the

20   question.  I provided my expert testimony and my

21   testimony is focused on the mental health effects of

22   various interventions.

23   Q.      Okay.

24           Do you anticipate saying anything about the
```

1    reversibility of puberty blockers?

2        A.    Other than what I have already discussed, I

3    don't think so.

4        Q.    Let's go to tab 5, I think that's Exhibit 2.

5    And on page 3874, again, about two-thirds down the first

6    column, the Endocrine Society says we still need to

7    study the effects of puberty blocking hormones on

8    gonadal function.

9            Correct?

10       A.    Yes.

11       Q.    That refers to hormone secretion.

12            Correct?

13       A.    Hormone secretion?

14       Q.    Uh-huh (yes).

15       A.    I'm not sure what you mean by that.

16       Q.    Gonadal function refers to the achievement of

17   the production by the gonads of fertile ova or sperm.

18            Correct?

19            ATTORNEY BLOCK:  Objection to form and

20   scope.

21            THE WITNESS:  I can't speak to the

22   author's intent for how they used that language.  It's

23   broader in scope from my perspective than that.

24   BY ATTORNEY BARHAM:

1    Q.    Does it include the achievement of production of

2    fertile ova or sperm?

3    A.    That is a component, yes.

4    Q.    What other components do you have in mind for

5    that term?

6    A.    For gonadal development includes size, shape,

7    sexual functioning.

8    Q.    On page 31, I want to go to --- have we done

9    Tab 6 yet?

10             ATTORNEY BARHAM:  I want to introduce

11   what will be marked as Exhibit 33, this will be Tab 6.

12   These are Endocrine Society guidelines from 2009.

13             LAW CLERK WILKINSON:  I don't think I

14   have that.

15             ATTORNEY BARHAM:  Maybe we do.

16             LAW CLERK WILKINSON:  Six?

17             ATTORNEY BARHAM:  Uh-huh (yes).

18             LAW CLERK WILKINSON:  Uh-uh (no).

19   BY ATTORNEY BARHAM:

20   Q.    We will go back to Tab 5 then, Exhibit 2.  Would

21   you agree that if the administration for puberty

22   blockers for gender dysphoria has irreversible effects

23   on brain development, that would be a serious safety

24   problem?

```
 1                    ATTORNEY BLOCK:  Objection to form.

 2                    THE WITNESS:   All risks are graded risk

 3   an benefits as well as alternatives for each individual

 4   child.

 5   BY ATTORNEY BARHAM:

 6     Q.    But if it had an irreversible affect on brain

 7   development that would still be a serious concern,

 8   regardless of the gradations that we would have to

 9   consider and address it?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  There are a number of

12   interventions that lead to irreversible changes that are

13   beneficial and are not of concern to safety.

14                    ATTORNEY BARHAM:  All right.

15                    Do we have Tab 32?

16                    LAW CLERK WILKINSON:  That one I have.

17                    ATTORNEY BARHAM:  This will be Exhibit

18   33, Tab 32 just to make it conducive.

19                              ---

20                    (Whereupon, Exhibit 33, Endocrine

21                     Society's Guidelines, was marked for

22                     identification.)

23                              ---

24   BY ATTORNEY BARHAM:
```

1     Q.   And if you look on --- at the end of the

2  document where it says for more information, it stated

3  this is a document from the National Institute of Mental

4  Health.

5          Correct?

6               ATTORNEY BLOCK:  Objection to form,

7  foundation.

8               THE WITNESS:  I have no idea of what the

9  context of this website is or what this is from.

10  BY ATTORNEY BARHAM:

11    Q.   But it gives the National Institute of Mental

12  Health's website.

13          Is that correct?

14    A.   It does.

15    Q.   And it says for more information you can e-mail

16  the National Institute of Mental Health e-mail address.

17          Correct?

18    A.   That is correct.

19    Q.   And that's a part of the National Institute.

20          Right?

21    A.   It is.

22    Q.   And the citations it's drawing from articles in

23  1999 and 2000.

24          Correct?

1     A.     That is correct.

2     Q.     On page one in the middle column, the article

3  describes gray matter at the thinking part of the brain.

4         Do you agree with that description?

5     A.     I would describe it as a gross

6  mischaracterization of the complexity of the brain.

7     Q.     What is your understanding of the function of

8  the gray matter?

9     A.     That is one element of it.  I think it is a lot

10  of nuance, I guess is the word that I'm looking for.

11  It's not characterized by that much of a pithy phrase,

12  not of a neuropathologist.

13     Q.     The article talks about a second wave of

14  production in gray matter that peaks around age 11 in

15  girls and 12 in boys.  And the article refers to that as

16  just prior to puberty.  In terms of Tanner stages that

17  would be around Tanner 2 for most boys and girls, would

18  it not?

19     A.     That would be Tanner Stage 1.

20     Q.     That would be Tanner Stage 1.  But by 11 or 12

21  you have already --- by age 12-ish in boys, it's typical

22  for puberty blockers to have been administered.

23         Correct?

24     A.     To use the language of this article, the

1    differences in Tanner stages is caused by the, quote,

2    surging sex hormones not the other way around.  So it's

3    not about age, but it's the exposure to hormones that

4    causes the Tanner stages to develop.

5        Q.    Have you made a study yourself about the timing

6    of brain gray matter development and the puberty

7    hormones in causing that development?

8        A.    I have not.

9        Q.    Do you have any reason to doubt the timing and

10   nature of development as set out in this National

11   Institute of Health publication?

12               ATTORNEY BLOCK:  Objection to form and

13   foundation.

14               THE WITNESS:  I only have the context of

15   this article that you've put in front of me for the

16   first time and in this article they describe the brain

17   changes just happening prior to puberty, which is prior

18   to when we would be initiating any interventions

19   medically.

20   BY ATTORNEY BARHAM:

21       Q.    And it says though that it is possibly the

22   thickening peaks around 11 or 12, depending on girls and

23   boys and that's possibly related to the influence of

24   surging sex hormones.

```
 1          Correct?
 2     A.    If that's what it says, yes.
 3     Q.    Do you know --- have you conducted any studies
 4   to determine the effect of administering puberty
 5   blockers during the ordinary years of puberty and how
 6   that would impact the ordinary development of brain
 7   matter in the brain of a child?
 8     A.    I have not, but it kind of sounds like that is
 9   conflating this as a study, which is definitely not.
10     Q.    No, I'm just asking if you had conducted any
11   such studies?
12     A.    I have not.
13     Q.    Are you aware of any such studies?
14     A.    There are studies that are ongoing now.
15     Q.    That are ongoing.
16          ATTORNEY BARHAM:  Okay.
17          I'm going to show you what we marked as
18   Exhibit 34, this will be Tab 33.
19                    ---
20          (Whereupon, Exhibit 34, Article by
21           Blakemore, et al., was marked for
22           identification.)
23                    ---
24   BY ATTORNEY BARHAM:
```

1      Q.    This is an article by Blakemore, et al.,

2   published in 2010, The Role of Puberty in the Developing

3   Adolescent Brain.  On page 929, the article states the

4   ages at which these peaks in gray matter volume were

5   observed correspond to the sexually dimorphic ages

6   gonadarche, I'm mispronouncing that, onset which

7   suggests possible interactions between puberty hormones

8   and gray matter development.

9          Do you agree or disagree with that statement?

10     A.    I'm not seeing where you're referring to this.

11     Q.    On page 929, first column right above the role

12  of puberty in gray matter development?

13     A.    As stated in this study, the changes were

14  observed to correspond to the ages which suggest

15  possible interactions.  I have no objection to the idea

16  that there are possible interactions between puberty

17  hormones and gray matter development, but again, outside

18  the field of my expertise.

19     Q.    Okay.

20          It also refers to other MRI studies showing a

21  gradual emergence of sexual dimorphisms across puberty.

22  Do you know what sexual dimorphism of the brain means?

23     A.    I do.

24     Q.    What does it mean?

1      A.     Differences that are measurable between folks

2   assigned female and folks assigned male at birth is

3   typically how that is described.

4      Q.     On the first page of this document it says

5   throughout adolescence there are changes in the

6   structure and function of the brain, sexual dimorphism

7   in many of these changes suggest possible relationships

8   to puberty.

9           This article is saying that the available

10  evidence suggests sex links puberty hormones to play a

11  role in stimulating brain development; do you agree?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  Certainly I agree that

14  exposure to sex hormone is a part of brain development

15  for all people.  We know less about the developing brain

16  for transgender youth.

17  BY ATTORNEY BARHAM:

18     Q.     Do you agree this includes a aspects of brain

19  development that differ between healthy males and

20  healthy females?

21              ATTORNEY BLOCK:  Objection as to form.

22              THE WITNESS:  I don't.  I haven't seen

23  any literature that speaks to that specific question.

24  BY ATTORNEY BARHAM:

1    Q.    Okay.

2          Let's go back to Exhibit 2, page 3882?

3                ATTORNEY BLOCK:   What page was that,

4    Counsel?

5                ATTORNEY BARHAM:   3882.

6    BY ATTORNEY BARHAM:

7    Q.    Under the heading side effects, the article

8    indicates that the primary risk of pubertal suppression

9    in GD, gender incongruent adolescents may include,

10   ellipses, unknown effects on brain development, do you

11   see that?

12   A.    I see that.

13   Q.    And in the first column of 3883 indicates that

14   animal data suggests there may be effects of GnRH

15   analogs on cognitive function.

16         Do you see that?

17   A.    I see that.

18   Q.    Cognitive function means the ability to think.

19         Correct?

20   A.    That is one aspect of cognitive functioning.

21   Q.    Do you tell parents and patients that the

22   Endocrine Society has indicated that there are unknown

23   effects on brain development related to the use of

24   puberty blocking hormones?

1     A.    I typically use language that is more similar to

2   how they actually described it in this article which is

3   to say that it may have unknown effects on brain

4   development.

5     Q.    Okay.

6           ATTORNEY BARHAM:  Let's go to Tab 32,

7   which we have already looked at and that is Exhibit.

8           LAW CLERK WILKINSON:  Exhibit 33.

9   BY ATTORNEY BARHAM:

10    Q.    Exhibit 33?

11          ATTORNEY GREEN:  Travis, this is Roberta

12  Green.  I'm sorry to interrupt.  I wondered if you

13  wouldn't mind keeping your voice up I'm just having

14  trouble hearing.  No doubt it's me but it'd be great.

15  Thank you.

16          ATTORNEY BARHAM:  It may also be where

17  I'm located in the room, but I'm getting it from enough

18  people, so I appreciate the reminder.

19          VIDEOGRAPHER:  Counsel, did you say

20  Exhibit 33.

21          ATTORNEY BARHAM:  Exhibit 33.

22  BY ATTORNEY BARHAM:

23    Q.    Page two at the top refers to the gray matter

24  --- or the white matter and how research purports a wave

1   of white matter growth that begins at the front of the

2   brain in early childhood, moves to the side after

3   puberty, striking growth spurts can be seen from age 6

4   to 13 in areas connecting brain regions specialized for

5   language and understanding special relationships.  Ages

6   11, 12 and 13 are sort of the heart and center of

7   puberty.

8              Correct?

9                   ATTORNEY BLOCK:  Objection to form.

10                  THE WITNESS:   It depends upon the child.

11  BY ATTORNEY BARHAM:

12     Q.    In general?

13                  ATTORNEY BLOCK:  Same objection.

14                  THE WITNESS:  I don't want it to be like

15  I'm parsing this out, but it's really important.  We

16  can't apply population based data onto an individual and

17  make conclusions about it.

18  BY ATTORNEY BARHAM:

19     Q.    But we can assess population-based data as to

20  when puberty is generally occurring and generally it's

21  occurring around the ages of 11 to 13?

22     A.    I would agree with the statement that puberty is

23  generally occurring within those age ranges, yes.

24     Q.    And that is also approximately when puberty

```
1   blocking hormones are being prescribed.

2          Is that true?

3      A.   It depends upon the individual.

4      Q.   But generally around age 12 is what you

5   indicated earlier.

6          Correct?

7      A.   It really depends upon the individual.  To

8   clarify, it's based upon Tanner stage as one element,

9   age has one element, psychosocial functioning has

10  another, family choices.  It's a calculus of the risks,

11  benefits and alternatives that guide when we decide to

12  intervene if we decide to intervene.

13     Q.   So you would agree that a teenage brain and

14  cognitive development across puberty is a very

15  complicated area and one that's not easily understood.

16         Correct?

17             ATTORNEY BLOCK:  Objection to form.

18             THE WITNESS:  Yes, adolescent brain

19  development is a complicated phenomenon for sure.  I

20  have no objection to that.

21  BY ATTORNEY BARHAM:

22     Q.   Is that an area of your professional research

23  and investigation?

24     A.   Specifically on neuroscience with regard to
```

 1  adolescent development, no, it is not.

 2                 ATTORNEY BARHAM:  Let's go to Tab 8.

 3                 THE WITNESS:  I need to take another

 4  bathroom break.

 5                 ATTORNEY BARHAM:  Let's just take a break

 6  now.  Let's go off the record.

 7                 VIDEOGRAPHER:  Going off the record.  The

 8  current time reads 2:53 p.m.

 9  OFF VIDEOTAPE

10                        ---

11  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                        ---

13  ON VIDEOTAPE

14                 VIDEOGRAPHER:  Back on the record.  The

15  current time reads 3:00 p.m.

16  BY ATTORNEY BARHAM:

17     Q.    Are you an expert on suicide and suicidality?

18     A.    I guess I don't know exactly how to qualify that

19  response.  I know more than most people about suicide

20  and suicidality, yes.

21     Q.    Have you made any systematic study of suicide

22  among the thousands treated at the NYU Gender and

23  Sexuality Service?

24     A.    I have not.

1    Q.    Have you made any systematic studies of suicide

2  among the thousands treated at the Lurie Children's

3  Hospital here in Chicago?

4    A.    I have a study ongoing.

5    Q.    Has that study generated any preliminary results

6  yet?

7    A.    It has not.

8    Q.    Have you made any systemic studies of suicide

9  among the thousands you've treated at the Gender Variant

10  Youth and Family Network?

11    A.    That is not a clinical service.

12    Q.    Are you aware that suicide for any reason is

13  extremely rare among children younger than 15?

14            ATTORNEY BLOCK:  Objection to form.

15            THE WITNESS:  I would disagree with that

16  as a statement.  It's among one of the top causes of

17  death for children of ages 10 to 15.

18  BY ATTORNEY BARHAM:

19    Q.    And what's your basis for saying that?

20    A.    The CDC data.

21    Q.    Did you cite that data in your report?

22    A.    I did not.

23    Q.    You're not offering an opinion that BPJ faced a

24  high suicide risk unless put on puberty blockers.

1          Correct?

2      A.    I am not.

3      Q.    Has any responsible health authority or

4   organization made a claim that the use of puberty

5   blockers relate to suicide?

6              ATTORNEY BLOCK:  Objection to form.

7              THE WITNESS:  I mean, that's a big list.

8   I don't think any that I'm aware of have made the claim,

9   especially when it comes to causation.

10  BY ATTORNEY BARHAM:

11     Q.    In paragraph 19 of your report you refer to

12  gender-affirming hormone therapy and you make similar

13  statements in paragraphs 39, 40, 41 and 42.  What do you

14  mean by gender affirming hormone therapy?

15     A.    Typically speaking when I'm referring to

16  gender-affirming hormone therapy, these are hormones

17  that are aligned with the gender identity.

18     Q.    So that means the administration of cross sex

19  hormones.

20         Is that correct?

21             ATTORNEY BLOCK:  Objection to form.

22             THE WITNESS:  Yeah.  I mean, I think I

23  would call them gender-affirming hormones.  That is how

24  typically they are referred to in the literature.

 1   BY ATTORNEY BARHAM:

 2      Q.    So this means that you would administer

 3   testosterone to natal females.

 4            Correct?

 5                ATTORNEY BLOCK:  Objection to form.

 6                THE WITNESS:   I personally would not,

 7   but ---.

 8   BY ATTORNEY BARHAM:

 9      Q.    Cross sex hormones or gender-affirming hormones

10   refers to the administration of testosterone to natal

11   females.

12            Correct?

13      A.    Or assigned females at birth, yes, that's

14   correct.

15      Q.    And it means the administration of testosterone

16   suppression of estrogen for natal males.

17            Correct?

18                ATTORNEY BLOCK:  Objection to form.

19                THE WITNESS:  Assigned male at birth,

20   yes.

21   BY ATTORNEY BARHAM:

22      Q.    You mean assigned males at birth?

23      A.    Yes.  Is that what I not said?  Sorry.

24      Q.    What is your role in the administration of cross

243

```
 1    sex hormones?
 2        A.    It depends on the child and the family, but my
 3    role is most often as a mental health professional who
 4    is either doing the assessment or providing care for the
 5    co-occurring psychiatric disorders that are present in
 6    that individual child.
 7        Q.    Cross sex hormones prevent rather than enable an
 8    adolescent from becoming capable of reproducing
 9    sexually.
10           Correct?
11              ATTORNEY BLOCK:  Objection to the form.
12              THE WITNESS:  That's not something that I
13    can answer.  That's out of the scope of my expertise.
14    BY ATTORNEY BARHAM:
15        Q.    You lack an understanding of the effects of
16    administering cross sex hormones?
17              ATTORNEY BLOCK:  Objection to form.
18              THE WITNESS:  I would disagree with that
19    statement.
20    BY ATTORNEY BARHAM:
21        Q.    So my question is what is the effect of
22    administering cross sex hormones on an adolescent's
23    ability to develop and become capable of reproducing
24    sexually?
```

1    A.    It's a highly complicated question that depends

2  upon a lot of factors that are above the scope of my

3  testimony here.  As an example, there are many adult

4  transgender men who become pregnant despite being on

5  testosterone for many years.

6    Q.    And what studies are you referencing that

7  support that statement?

8    A.    I'm not referencing any studies to this.  I'm

9  referencing personal experiences.

10   Q.    Okay.

11         Cross sex hormones cannot cause an adolescent

12 to develop the genitalia associated with his or her ---

13 his or her desired transgender identity.

14         Correct?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS:  That's correct.

17 BY ATTORNEY BARHAM:

18   Q.    Cross sex hormones also cannot achieve male

19 height in a natal female.

20         Correct?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  I would defer to my

23 endocrine colleagues on that answer.

24 BY ATTORNEY BARHAM:

1    Q.   Can cross sex hormones change the hip and leg

2    configuration in a natal male to match that of a natal

3    female?

4              ATTORNEY BLOCK:  Objection to form.

5              THE WITNESS:  I would defer to my

6    endocrine colleagues on that question.

7              ATTORNEY BARHAM:  Let's go to Tab 77.

8    This is probably new.

9              LAW CLERK WILKINSON:  Yes.

10             ATTORNEY BARHAM:  This is an article by

11   Guss, et al. in 2015, entitled Transgender and Gender

12   Non-Conforming Adolescent Care.  This will be

13   Exhibit 35.

14                       ---

15             (Whereupon, Exhibit-35, Article by Guss,

16                  et al., was marked for identification.)

17                       ---

18   BY ATTORNEY BARHAM:

19    Q.   Are you familiar with the authors?

20             LAW CLERK WILKINSON:  I'm sorry.  I gave

21   you the wrong one.  Here is the right one.

22             THE WITNESS:  I know Dr. Shumer.  And we

23   read something by Katz-Wise earlier.  I don't know Carly

24   Guss.

1    BY ATTORNEY BARHAM:

2        Q.    Page four of this document indicates that if a

3    patient is on cross sex hormones it's important to

4    remind them that the side effects may be infertility.

5             Is that correct?

6        A.    Where are you pointing to?

7        Q.    The top of page four.

8        A.    Yes.

9        Q.    Do you agree with that statement?

10       A.    I agree.

11       Q.    Do you know of any long-term studies that will

12   change to what extent infertility caused by taking cross

13   sex hormones can be reversed later in life?

14       A.    There are ongoing studies now, but I'm not aware

15   of any that have published anything.

16       Q.    Have you studied the literature regarding mental

17   health problems in adults resulting from sterility?

18                    ATTORNEY BLOCK:   Objection to form.

19                    THE WITNESS:   I don't know what you mean

20   by studied.   I don't think probably more than any

21   cursory manner.

22   BY ATTORNEY BARHAM:

23       Q.    The use of cross sex hormones to affirm a

24   transgender identity is an off-label use.

1          Correct?

2                    ATTORNEY BLOCK:  Objection to

3     terminology.

4                    THE WITNESS:  If by off label you mean

5     off label for the FDA?

6     BY ATTORNEY BARHAM:

7     Q.    Yes.

8     A.    Yeah, as far as I know.  Again, I'm not

9     prescribing these medications as a psychiatrist.

10    Q.    Earlier you mentioned that some of your

11    patients, some trans --- some women --- natal females

12    who identify as male have been able to become pregnant.

13    Do you recall that testimony?

14    A.    I did not say anything about my patients, I said

15    those were personal experiences.

16    Q.    Personal experiences.  I'm sorry.  I assumed it

17    was patients, so thank you for that correction.  I would

18    like to show you Tab 81.  This is going to be an article

19    by Moseson, et al. in 2020, entitled Pregnancy

20    Intentions and Outcomes, tab 81 for those at home and

21    Exhibit 36 for the record.

22                         --

23                    (Whereupon, Exhibit-36, Article by

24                    Moseson, et al., was marked for

```
 1                   identification.)

 2                        ---

 3  BY ATTORNEY BARHAM:

 4      Q.    Are you familiar with this study?

 5      A.    Certainly not the details of it.  This is the

 6  first time I'm recalling looking at it.

 7      Q.    Are you aware of any other studies regarding the

 8  ability of individuals taking cross sex hormones to

 9  become pregnant?

10      A.    There are a number of ongoing studies that are

11  looking into those questions, yes.

12      Q.    If you look at Table 3 on page number 36, this

13  table indicates there were 79 pregnancies among the

14  respondents who have ever used testosterone.

15           Do you see that?

16      A.    Yes.

17      Q.    And there were 342 among those who have never

18  used testosterone.

19           Do you see that?

20      A.    I see that.

21      Q.    But only 15 of these pregnancies occurred after

22  initiating testosterone.  Is that correct?  And I'm

23  referencing page 33 when I say that, at the bottom of

24  page 33.
```

```
 1                    ATTORNEY BLOCK:   Where is this on page
 2   33?
 3                    ATTORNEY BARHAM:   The very last line on
 4   page 33 extending over onto page 35.
 5                    THE WITNESS:   I see on Table 2 the number
 6   of pregnancies after initiating testosterone was 15.
 7   BY ATTORNEY BARHAM:
 8     Q.   So the other 337 of the pregnancies tell us
 9   nothing about the impact of testosterone on female
10   fertility and the possible impact of birth defects.
11        Correct?
12     A.   Well, the question about fertility certainly
13   doesn't speak to us being able to understand it more
14   based upon the data points.  And without reading the
15   article I don't know if the author said anything about
16   birth defects.
17     Q.   On page 35 it indicates that 2 of the 15 --- or
18   4 of the 15 pregnancies that started while taking
19   testosterone half of them ended in miscarriage.
20        Correct?
21     A.   Yes.
22     Q.   One ended in abortion and one was not reported.
23        Correct?
24     A.   I don't see where that is.
```

1      Q.    It's the same line.  Two of these four

2  pregnancies ended in miscarriage, parentheses, one ended

3  in abortion in the outcome and testosterone duration for

4  the other four were not reported?

5      A.    Yes.

6      Q.    Okay.

7           And there is no data given on the other outcome

8  of the other 11 pregnancies.  So this article does not

9  document a single live birth to a natal female at any

10  time after taking testosterone.

11           Correct?

12               ATTORNEY BLOCK:  Objection to form.  And

13  give him a chance to read, please.

14               THE WITNESS:  I would really have to read

15  the article quite closely to agree with that.  I'm not

16  seeing the text in this article to support that.  In the

17  Pregnancy Intentions and Outcomes, as I'm reading it, it

18  discusses what the potential outcomes are, but it didn't

19  parse those into who had testosterone before or after,

20  so I'm not sure.

21  BY ATTORNEY BARHAM:

22      Q.    Okay.

23           Let me shift gears and turn to paragraph 37 of

24  your report.  There you indicate --- you state that

1    there is no evidence supporting Dr. Levine's speculation

2    that allowing prepubertal children to sexually

3    transition puts children on a conveyor belt to becoming

4    transgender adolescents and adults.  And you say

5    evidence shows that prepubertal children who are likely

6    to have a stable transgender identity into adolescence

7    are the children who are most likely to articulate a

8    strong and consistent need to socially transition.

9            Do you see that?

10    A.    I see that.

11    Q.    And in footnote 11 you cite an article by

12    Steensma published in 2013.

13            Is that correct?

14    A.    That's correct.

15            ATTORNEY BARHAM:  I will show you what

16    we're going to mark as Exhibit 37, Tab 120, and I will

17    also show you Tab 121, which is Exhibit 38.

18                    ---

19            (Whereupon, Exhibit-37, Article by

20            Steensma, was marked for

21            identification.)

22            (Whereupon, Exhibit-38, Analysis, was

23            marked for identification.)

24                    ---

1    BY ATTORNEY BARHAM:

2        Q.    Tab 120, Exhibit 37, is the Steensma article

3    that you cited in footnote 11 of your report.

4              Is that correct?

5        A.    That is correct.

6        Q.    Let's look at Table 1 on page 584.  And it gives

7    --- in the first four columns it gives numbers on

8    persistence and desistance among the study subjects.

9    And about halfway down it delineates how many of the

10   persisting boys and girls and desisting boys and girls

11   had a childhood diagnosis of gender identity disorder.

12             Correct?

13       A.    Correct.

14       Q.    And it also breaks down how many were

15   subthreshold.  I'm presuming that means for gender

16   identity disorder.

17             Correct?

18       A.    That is correct.

19       Q.    So according to Table 1, 91.3 of the 23

20   persisting boys had gender identity disorder.

21             Correct?

22       A.    Correct.

23       Q.    So that means about 21 of the 23 persisting boys

24   had that condition.

```
 1              Correct.

 2       A.     Correct.

 3       Q.     And according to Table 1, 95.8 of the 24

 4  persisting girls had the same diagnosis or 23 of the 24.

 5              Correct?

 6       A.     That's correct.

 7       Q.     And according to the same Table, 39.3 of the 56

 8  desisting boys had that diagnosis.

 9              Correct?

10       A.     That is correct.

11       Q.     So that's 22 of the 56.

12              Correct?

13       A.     I'll take your word for the math.

14       Q.     Well, you can see it on Exhibit-121 (sic).  On

15  Table 1, 58.3 of the 24 desisting girls had gender

16  identity disorder or 14 of the 24.

17              Correct?

18       A.     Correct.

19       Q.     Do you see any reason to dispute the figures set

20  forth on Exhibit --- on Tab 121, Exhibit 39 ---

21  Exhibit 38?

22       A.      No, I have no reason to ---.

23              ATTORNEY SWAMINATHAN:  I think he is

24  looking at the wrong document.
```

1   BY ATTORNEY BARHAM:

2      Q.    I'm talking about this.

3      A.    Got it.  So this is a transposition from

4   Table 1?

5      Q.    Correct.

6      A.    I mean, I'm going to  have ---.

7               ATTORNEY BLOCK:  Just objection.  I'm

8   sorry, can we put on the record what this document is?

9   Is it a reprint of what's in the Steensma or is it new

10  analysis that ---?

11              ATTORNEY BARHAM:  Exhibit 38 is an

12  analysis of the Steensma 2013 article that is

13  Exhibit 37.

14              ATTORNEY BLOCK:  Thank you.  And is

15  there an author of the analysis?

16              ATTORNEY BARHAM:  I'm sorry.  Say that

17  again.

18              ATTORNEY BLOCK:  Is there an author of

19  this analysis?

20              ATTORNEY BARHAM:  Yes, it was me.

21  BY ATTORNEY BARHAM:

22      Q.    So according to the figures that have been

23  calculated from table one of the Steensma article, 80

24  children --- of the 80 children who had gender identity

 1   disorder, 44 persisted and 36 desisted.

 2          Is that correct?

 3              ATTORNEY BLOCK:  Objection to give the

 4   witness a chance to see it on his own what the figures

 5   are.

 6              THE WITNESS:  I'm not sure I understand

 7   what your question is.

 8   BY ATTORNEY BARHAM:

 9     Q.    Of the children with the --- the 80 children who

10   had a diagnosis of gender identity disorder, 44

11   persisted and 36 desisted.

12          Is that correct?

13     A.    I would have to do the math myself for me to say

14   yes to that, but it's about right.

15     Q.    So according to Steensma figures, of the

16   children with the strongest transgender identity as

17   children 55 percent persisted and 45 percent desisted.

18          Correct?

19              ATTORNEY BLOCK:  Objection to form.

20              THE WITNESS:   Again, I would have to run

21   those numbers myself in order to --- unless it's

22   referred to already in the article, but that sounds

23   about right.

24   BY ATTORNEY BARHAM:

```
 1      Q.    In footnote 12 of your report, paragraph 37, you

 2   cite an article by Rae saying for the proposition that

 3   socially transitioning before puberty did not increase

 4   children's cross gender identification and deferring

 5   transgender did not decrease cross gender

 6   identification.

 7           Is that correct?

 8      A.    That is correct.

 9              ATTORNEY BARHAM:  All right.

10              Let's turn to Tab 108.  This will be

11   Exhibit 39, and it will be an article by Rae, et al.

12   published in 2019, Predicting Early Childhood Gender

13   Transitions.

14              ATTORNEY BLOCK:  It's 2:22 central time.

15   So the witness has to take a break at 2:30?

16              THE WITNESS:  I can do 2:45.

17                      ---

18              (Whereupon, Exhibit 39, Article by Rae,

19                  et al., marked for identification.)

20                      ---

21   BY ATTORNEY BARHAM:

22      Q.    Exhibit 39 is the article that you cited in

23   footnote 12 of your report.

24           Is that correct?
```

1     A.    That's correct.

2     Q.    On page 679 the author indicates that

3  replication of this affect is muted preferably from

4  longitudinal study comparing a single group of children

5  before and after transition.

6          Correct?

7     A.    That's correct.

8     Q.    And the authors also indicate that they tested a

9  sample skewed by race, class, parental that education

10 and political affiliation that may or may not affect the

11 children that are socially transitioning now or in the

12 future.

13         Correct?

14    A.    That is correct.

15    Q.    And they also indicate that follow-up occurred

16 only two years after testing and some of the children

17 who had not transitioned could transition in the future

18 and some who had transitioned could not revert in the

19 future.

20         Correct?

21    A.    Correct.

22    Q.    And they indicated that there sample is likely

23 an over estimate of how many gender conforming children

24 in the general population will socially transition.

258

 1          Correct?

 2     A.    Where is that in the article?

 3     Q.    Second column of page 679.

 4     A.    Yes.

 5     Q.    Same column they also indicate that they relied

 6 on a convenient sample of individuals recruited through

 7 lists and events serving transgender children and gender

 8 non-conforming children.

 9          Correct?

10     A.    That is correct.

11     Q.    Let's go back to Tab 5, which is Exhibit 2.

12 Page 3879, the Endocrine Society indicates that if

13 children have completely socially transitioned they have

14 my greater difficulty returning to the original gender

15 on entering puberty.

16          Is that correct?

17     A.    That's correct.  It says it there, but that's

18 based on supposition.

19     Q.    Footnote 40 --- reference number 40 supposition

20 --- reference number 40 is an article by Steensma, et

21 al., published in 2011.

22          Are you saying that that's a supposition?

23               ATTORNEY BLOCK:  Objection to form.

24               THE WITNESS:  No, I'm saying that the

1   part of that article that refers to the theoretical risk

2   is based not on any data that was collected by the

3   researchers in that study.

4   BY ATTORNEY BARHAM:

5      Q.    The Endocrine Society also indicates that the

6   social transition has been found to contribute to the

7   likelihood of persistence.

8           Is that correct?

9      A.    That is a misstating of Dr. Steensma.

10     Q.    That is what the Endocrine Society has

11  concluded.

12          Correct?

13              ATTORNEY BLOCK:  Objection to form.

14              THE WITNESS:  That is what they have

15  written here in the article you presented, yes.

16              ATTORNEY BARHAM:  Let's go to Tab 97

17  number ---.

18              LAW CLERK WILKINSON:  Exhibit 16.

19  BY ATTORNEY BARHAM:

20     Q.    Exhibit Number 16, and we are going to be

21  looking at the sixth page of this document.  And Dr.

22  D'Angelo, et al. article indicates that since almost all

23  the children treated with puberty blockers proceeded to

24  cross sex hormones concerns have been raised that

1  puberty blockers may consolidate gender dysphoria in

2  young people putting them on a lifelong path of

3  biomedical invention.

4        Is that correct?

5             ATTORNEY BLOCK:  Object is to form.

6             THE WITNESS:  Can you show me where that

7  is on this page?

8  BY ATTORNEY BARHAM:

9    Q.    The first column on the second paragraph.  The

10  second column.

11             ATTORNEY TRYON:  Jake, can you scroll

12  down a bit?

13             THE WITNESS:  I would not agree with how

14  you asked that question, I guess.  Can you repeat it or

15  clarify?

16  BY ATTORNEY BARHAM:

17    Q.    I just was reading what it said.  They indicate

18  in this section additionally since almost all of the

19  children treated with puberty blockers proceed to cross

20  sex hormones citing de Vries 2014, concerns have been

21  raised at puberty blockers may consolidate gender

22  dysphoria in young people, putting them on a lifelong

23  path of biomedical interventions?

24    A.    It's bit of a logical leap and also just

 1   incorrect.  The de Vries study specifically was looking

 2   at the children in the Amsterdam clinic, which is not

 3   broadly applicable to other gender clinics across the

 4   rest of the world.

 5       Q.    But you relied upon de Vries 2014 article in

 6   your report as well, didn't you?

 7       A.    I agree.  Yeah.

 8       Q.    So there are professionals who have raised these

 9   concerns and hold the concerns that social transitioning

10   cannot change the outcome for a child.

11           Is that correct?

12               ATTORNEY BLOCK:  Objection to form.

13               THE WITNESS:  I think there's two

14   different questions.  The first question is, do I agree

15   with this statement that almost all children treated

16   with puberty blockers proceed to cross sex hormones?

17   That is not data that we have nor does this article

18   point to data other than the Dutch clinic that has a

19   very specific protocol.

20               The question about whether social

21   transition changes a child's trajectory is a different

22   question.  It is a question that the Dutch have raised

23   as a possibility, but has not, I have not seen any

24   literature that provides evidence for that.

```
 1    BY ATTORNEY BARHAM:

 2        Q.    But you will recognize that there are some

 3    researchers in the field who have raised these concerns

 4    and do hold these concerns.

 5             Correct?

 6        A.    There are researchers in the field who ask these

 7    questions, yes.

 8                  ATTORNEY BARHAM:  Let's go to Tab 38.

 9                  ATTORNEY TRYON:  How late are we going in

10    this session; until 2:30 or 2:45?

11                  ATTORNEY BARHAM:  The witness has

12    indicated he can go to 2:45.

13                  ATTORNEY TRYON:  Okay.

14                  ATTORNEY BARHAM:  Exhibit 40 is an

15    article by Carmichael, et al. 2021, Short-term Outcomes

16    of Pubertal Suppression in a Selected Cohort of 12 to 15

17    year old Young People.  If you'll turn to page 12.

18                            ---

19                  (Whereupon, Exhibit 40, Article by

20                  Carmichael, et al., was marked for

21                  identification.)

22                            ---

23    BY ATTORNEY BARHAM:

24        Q.    Are you familiar with this paper?
```

1    A.    I have not read through this paper, yet.

2    Q.    The lead authors are associated with the

3 Tavistock?

4    A.    That is correct.

5    Q.    And that's part of the National Health Services

6 of the UK.

7          Is that correct?

8    A.    That is correct?

9    Q.    And it's the leading and most respected clinic

10 in the UK.

11         Correct?

12   A.    That I can't answer.

13   Q.    If you'll look at page 12, the authors indicate

14 that one young person decided to stop GnRHa and did not

15 start cross sex hormones due to continued uncertainty

16 and concerns about the side effects of cross sex

17 hormones, the remaining 43 or 98 percent elected to

18 start cross sex hormones.

19         Is that correct?

20   A.    Correct.

21   Q.    So the vast majority of these children who

22 received puberty blockers went onto take cross sex

23 hormones.

24         Correct?

1      A.    That is correct.

2      Q.    Would you agree that the majority of children

3  who receive puberty blockers go on and take cross sex

4  hormones?

5                ATTORNEY BLOCK:  Objection to form.

6                THE WITNESS:   That is not a question

7  that we have an answer to based upon the literature.  A

8  majority of patients with gender dysphoria that are

9  prescribe puberty blockers are not involved in clinical

10  care at either the Tavistock clinic or the Amsterdam

11  clinic.

12  BY ATTORNEY BARHAM:

13      Q.    Is it --- in your practice, do the majority of

14  children who receive puberty blockers for gender

15  dysphoria go on to take cross sex hormones?

16      A.    Based upon the demographic of the patients that

17  I'm seeing, particularly in Chicago, yes, but I'm not

18  seeing the younger kids as much as I did in New York.

19      Q.    So as a practical and ethical matter the

20  decision to put a child on puberty blockers must be

21  considered as equivalent of a decision to put the

22  children on cross sex hormones with all of the

23  considerations and full consent obligations listed in

24  that decision.

```
 1          Correct?
 2                    ATTORNEY BLOCK:  Objection to form.
 3                    THE WITNESS:  No.
 4   BY ATTORNEY BARHAM:
 5      Q.    Why do you say --- why do you disagree?
 6      A.    Inherent in the informed consent process is a
 7   specific discussion of the risk benefits and
 8   alternatives of a specific intervention.  Hormones are
 9   not puberty blockers, it's a separate discussion.
10      Q.    Even though the vast majority according to the
11   research and according to your testimony go onto take
12   cross sex hormones?
13                    ATTORNEY BLOCK:  Objection to form and
14   mischaracterizes testimony.
15                    THE WITNESS:  A description of the
16   potential trajectories of development is a part of the
17   discussion in an informed consent process for the
18   engagement with puberty suppression agents.  It's not
19   the same as informed consent process discussion around
20   the use of hormones at that time.
21   BY ATTORNEY BARHAM:
22      Q.    So when you're having an informed consent
23   discussion surrounding the decision to start puberty
24   blockers, do you discuss with parents and patients the
```

266

```
 1    dangers associated with cross sex hormones?

 2        A.    This is going to be very individualized

 3    discussions that we have with families.  It's a very

 4    momentous decision to make this kind of treatment

 5    choice.  The potential trajectories are all discussed

 6    and there's risk to everything.  I don't think it is

 7    useful to use the term dangers in the context of medical

 8    care but it's about weighing risks of interventions but

 9    also weighing the risks of non-intervening.  And it's

10    appropriate to have those discussions about what those

11    potential outcomes may be with each individual kid.

12        Q.    How do you get informed consent from a child?

13        A.    You get assent from a child, but you get

14    informed consent from a parent.

15        Q.    How do you get --- how can a child even begin to

16    understand the implications of starting puberty blockers

17    and then potentially going to cross sex hormones, the

18    effects that that may have on the fertility when the

19    child is 12-ish?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:   Well, I have a skewed

22    perspective here because of the work that I do, but

23    there are 12-year-olds who are often much more capable

24    of having that kind of informed decision than many
```

 1   adults that I have encountered, which is to say it's an

 2   individualized assessment based upon multiple things,

 3   including the cognitive status of the child, their

 4   capacity to engage back and forth and have an open

 5   discussion and a realistic discussion about the

 6   potential benefits, risks and alternatives in specific

 7   intervention.

 8   BY ATTORNEY BARHAM:

 9       Q.    Is it your position that most 12-year-olds have

10   a better understanding or a better capability of making

11   decisions about their long-term fertility than adults?

12       A.    It is not my position and I will reflect that

13   that was a statement meant in jest, but it does reflect

14   some sense of reality in terms of the maturity level of

15   12-year-olds, not speaking to the maturity level of most

16   20-somethings in the world.

17              ATTORNEY BARHAM:  I think this would be a

18   good time to pause for your appointment and give you a

19   few moments before that starts, so we'll go off the

20   record.

21              VIDEOGRAPHER:  Going off the record.  The

22   current time reads 3:37 p.m.

23   OFF VIDEOTAPE

24                            ---

```
 1    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 2                         ---

 3    ON VIDEOTAPE

 4                  VIDEOGRAPHER:  Back on the record the

 5    current time reads 4:31 p.m.

 6                  ATTORNEY BARHAM:  All right.  Let's go to

 7    Tab 16, which will be Exhibit Number 41.

 8                         ---

 9                  (Whereupon Exhibit 41, Washington Post

10                  Article, was marked for identification.)

11                         ---

12    BY ATTORNEY BARHAM:

13      Q.    This is will be a Washington Post article from

14    January 10, 2022.  Are you aware of the 2021/2022 season

15    swimming events surrounding the University of

16    Pennsylvania's swimmer Lia Thomas?

17                  ATTORNEY BLOCK:  Objection to scope.

18                  THE WITNESS:  I have not been following

19    closely, but I've heard about it.

20    BY ATTORNEY BARHAM:

21      Q.    Okay.

22            On page three of Exhibit 41, the article

23    references that Lia Thomas in her first year in the

24    Women's Division after more than a year of testosterone
```

1    suppression set the Women's Division record in two

2    events.

3            Do you see that?

4     A.    I see that, yes.

5     Q.    And Lia Thomas beat the best time of women's

6    Olympian Torri Huske in the 200 freestyle.

7            Do you see that?

8     A.    I see that.

9            ATTORNEY BLOCK:  I just want to note an

10   objection to foundation, that there's no URL.  This

11   appears to be cut and pasted.  So I'm just noting that

12   for the record.

13           ATTORNEY BARHAM:  And I would note For

14   the record that there is an URL at the bottom of page

15   --- at the bottom of each page.

16           ATTORNEY BLOCK:  Thanks.  It's not

17   visible from what's on the screen.

18           ATTORNEY BARHAM:  Okay.

19           Just trying to be clear.

20   BY ATTORNEY BARHAM:

21    Q.    Is it your position that it is fair for Lia

22   Thomas to compete in the Women's Division of swimming?

23           ATTORNEY BLOCK:  Objection to scope.

24           THE WITNESS:  I don't have an opinion on

1    the fairness.

2    BY ATTORNEY BARHAM:

3       Q.    Do you believe that it's beneficial to Lia

4    Thomas' mental health to compete in the Women's

5    Division?

6       A.    I couldn't tell you that unless I had evaluated

7    Lia Thomas herself.

8       Q.    But it's your opinion as expressed in

9    paragraph 52 of your report that no reasonable mental

10   health professional could conclude that the Act is

11   anything but harmful to the mental health of transgender

12   youth.

13          Is that correct?

14      A.    I would say youth as a class, yes, that is

15   correct, but the specific details of that impact are not

16   going to be known and I wouldn't care to surmise on it

17   for a specific individual that is not under my care.

18      Q.    Okay.

19          But it's your position that allowing a

20   transgender --- or allowing natal males to compete in

21   the Women's Division if they are gender dysphoric is

22   beneficial to their mental health, in general.

23          Correct?

24          ATTORNEY BLOCK:   Objection to terminology

1    and form.

2                    THE WITNESS: In my report, excluding

3    transgender youth can be harmful to their mental health.

4    BY ATTORNEY BARHAM:

5        Q.    And when you say excluding them you mean

6    excluding them from competition consistent with their

7    gender identity.

8            Is that correct?

9        A.    That is correct.

10                   ATTORNEY BARHAM:  All right.

11                   I want to show you Tab 17 now.  This will

12   be Exhibit-42.

13                           ---

14                   (Whereupon, Exhibit 42, Out Sports

15                    Article, was marked for identification.)

16                           ---

17   BY ATTORNEY BARHAM:

18       Q.    Have you read about Iszac Henig before today?

19       A.    I have not.

20       Q.    This is an article from Out Sports published on

21   January 9th, 2022, by Karleigh Webb entitled Trans

22   swimmers Lia Thomas and Iszac Henig went head-to-head in

23   the pool, each getting wins.  Are you aware that Iszac

24   Henig is a biological female who identifies as male?

1    A.    I have not heard of Iszac Henig until today at

2   least by name.

3    Q.    Do you see on the first page of this article the

4   article reads Henig, a trans man competing on the

5   women's swimming team at Yale?

6    A.    I see that, yes.

7    Q.    So in this event a biological male identifies as

8   female, Lia Thomas, competed against a biological female

9   who identifies as male, Iszac Henig, in the women's

10  competition?

11          ATTORNEY BLOCK:  Objection can you give

12  him a chance to read the article.  He's never seen or

13  heard of this before?

14          THE WITNESS:  It seems that is what

15  stipulated in the article.

16  BY ATTORNEY BARHAM:

17   Q.    Okay.

18          According to the terminology you prefer, do you

19  consider Henig to be anything other than a man?

20          ATTORNEY BLOCK:  Objection to form.

21          THE WITNESS:   I will typically ask the

22  individuals that I'm working with or engaging with how

23  they choose to define their own sense of labels.  Not

24  knowing Iszac I can't speak for him.

273

1    BY ATTORNEY BARHAM:

2        Q.    Okay.

3              But according to the terminology that you've

4    been using Iszac would be an individual assigned female

5    sex at birth and identifying as male.

6              Correct?

7        A.    Again, I don't see ---

8        Q.    Henig a trans man?

9        A.    --- a description of his words to describe his

10   identity, so I can't say how he identifies himself, but

11   it appears through that that's how --- that is the

12   implication of the article at least.

13       Q.    In the article it uses masculine pronouns to

14   refer to Henig.

15             Correct?

16       A.    Yes.

17       Q.    Do you think it'd beneficial to Henig's mental

18   health to compete on the women's team?

19       A.    Again, I can't answer that unless I had

20   evaluated Henig myself.

21       Q.    In general, if you have a transgender individual

22   who wants to compete on the team consistent his or her

23   biological sex, do you think it's beneficial to his or

24   her mental health to be allowed to do so?

1                    ATTORNEY BLOCK:  Objection to form.

2                    THE WITNESS:    Again, this is an

3    individualized discussion that you have with patients.

4    With the patients that I've had I have had patients who

5    would be harmed by having to compete with the cohort of

6    kids who were aligned with their sex assigned at birth.

7    BY ATTORNEY BARHAM:

8        Q.    I understand your position about kids who are

9    forced to do something, what about kids who want to

10   compete with that same cohort, do you think it's

11   beneficial to allow them to compete as they see fit?

12       A.    As a mental health professional working with

13   kids and families, it really is an individualized

14   discussion.  There is not going to be a specific answer

15   that's universal for all kids.

16       Q.    Do you believe that if Henig were prevented from

17   competing with the women's team as desired, that it

18   could be harmful to Henig's mental health ---

19                    ATTORNEY BLOCK:  Objection to form.

20   BY ATTORNEY BARHAM:

21       Q.    --- possibly?

22       A.    I can't speak to the specifics about a person

23   that I've never evaluated.

24       Q.    If it is harmful to someone's mental health to

```
 1    be prevented from participating in athletics on a team

 2    consistent with their gender identity, could it be

 3    harmful to their mental health to be prevented from

 4    competing on a team consistent with their biological sex

 5    if they so wanted to?

 6              ATTORNEY BLOCK:  Objection to form.

 7              THE WITNESS:  I think there's a whole

 8    host of hypotheticals that could potentially be

 9    possible.

10    BY ATTORNEY BARHAM:

11       Q.    And that is one of them?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  That's possible.

14              ATTORNEY BARHAM:  Okay.

15    BY ATTORNEY BARHAM:

16       Q.    In paragraph 34 of your report you write a

17    recent study found people who reported experiencing

18    those conversion efforts were more likely to report an

19    attempted suicide, especially those who reported

20    receiving such therapy in childhood.

21          Do you see that?

22       A.    I see that.

23       Q.    And there we are talking about conversion

24    therapy.
```

1          Is that correct?

2     A.    We're talking specifically about the study

3  participants on perceptive perceptions of conversion

4  therapy.

5     Q.    But that's what's meant by those conversion

6  efforts.

7          Correct?

8     A.    Correct.

9     Q.    In footnote six you cite an article by Turban

10  published in 2020.

11          Is that correct?

12     A.    That is correct.

13               ATTORNEY BARHAM:  All right.

14               I'm going to show you Tab 113, which will

15  be Exhibit 43.

16                    ---

17               (Whereupon, Exhibit 43, Article by

18                Turban, et al., was marked for

19                identification.)

20                    ---

21  BY ATTORNEY BARHAM:

22     Q.    This is an article published by Turban, et al.

23  published in 2020, it's entitled Association Between

24  Recalled Exposure to Gender Identity Conversion Efforts

1    and Psychological Distress and Suicide Attempts Among

2    Transgender Adults.  This is the article that you cited

3    in your report.

4            Is that correct?

5    A.    That is correct.

6    Q.    And this is the article cited in footnote six as

7    support for the proposition that studies that found that

8    people who reported conversion efforts are more likely

9    to have reported suicide.

10           Correct?

11   A.    That's correct.

12   Q.    On page two of this article the authors --- and

13   by this article I'm referring to Exhibit 43.  The

14   authors note that they rely upon data from the National

15   Center for Transgender Quality and its 2015 transgender

16   survey.

17           Correct?

18   A.    That is correct.

19   Q.    On page eight of this document, the authors

20   admit that it is cross sectional study designed

21   precludes determination of causation.

22           Correct?

23   A.    I don't have page numbers.  Which one is that?

24   Q.    It's the one with strengths and limitations at

1   the heading at the bottom.

2      A.    Can you repeat the question?

3      Q.    On page eight, the authors admit that the

4   studies cross-sectional study design precludes

5   determination of causation.

6          Correct?

7      A.    That is correct.

8      Q.    The authors also admit that those with worse

9   mental health or internalized transphobia may have been

10  more likely to seek out conversion therapy rather than

11  non GICE therapy suggesting conversion efforts itself

12  were not causative of these poor mental health outcomes.

13         Correct?

14     A.    That is what is written, correct.

15     Q.    Okay.

16         So this study does not establish a causal link

17  between conversion therapy and suicidality.

18         Correct?

19     A.    That is correct.

20     Q.    The authors also admit that they lack data

21  regarding the degree to which GICE occurred.

22         Correct?

23     A.    That is correct.

24     Q.    And they also admit that they lacked information

1  as to what specific modalities were used.

2        Correct?

3     A.    That is correct.

4     Q.    Turban et al., in 2020 also admits that

5  participants were not recruited via random sampling and

6  thus the sample may not be nationally representative.

7        Is that correct?

8     A.    That is correct.

9     Q.    In paragraph 37 you go on to say that

10  conclusions further supported by extensive evidence that

11  rejection of a young person's gender identity by family

12  and peers is the strongest predictor for adverse mental

13  health outcomes.

14        Is that correct?

15     A.    That is correct.

16     Q.    And you cite in that article --- you cite in

17  footnote seven an article by Ryan, et al. published in

18  2010.

19        Is that correct?

20     A.    I'm not seeing that.

21     Q.    In footnote seven?

22     A.    Oh, in footnote seven, yes.

23        ATTORNEY BARHAM:  I'm going to show you

24  what we will mark as Exhibit-44, which is Tab 114, an

1   article by Ryan, et al. published in 2010 entitled

2   Family Acceptance in Adolescence and the Health of LGBT

3   Young Adults.

4                                ---

5                   (Whereupon, Exhibit-44, Article by Ryan,

6                   et al., was marked for identification.)

7                                ---

8   BY ATTORNEY BARHAM:

9       Q.    This is the article that you cited in footnote

10  seven of your report.

11          Correct?

12      A.    That is correct.

13      Q.    On page 206, in the second column, the authors

14  note that they relied on a sample of 245 people.

15          Is that correct?

16      A.    That is correct.

17      Q.    Of that sample, only nine percent identified as

18  transgender.

19          Correct?  That's on page 208.

20      A.    Correct.

21      Q.    That means we're talking about nine people.

22          Correct?  245 times nine percent is 22.05.

23      A.    I'll take your math.

24      Q.    On page 210 the authors admit that they cannot

1  claim that this sample is representative of the general

2  population of LGBT individuals.

3            Is that correct?

4      A.    That is correct.

5      Q.    On page 210 to 211 the authors recognize that

6  this is a retrospective study, which, quote, allows for

7  the potential of recall bias in describing specific

8  family reactions to their LGBT identity.

9            Correct?

10     A.    That is correct.

11     Q.    And then in footnote seven of your report you

12  also cite an article by Klein and Golub published in

13  2016.

14            Correct?

15     A.    That is correct.

16     Q.    All right.

17            ATTORNEY BARHAM:  I'm going to show you

18  what we will mark as Exhibit 45, which is Tab 15.

19                        ---

20            (Whereupon, Exhibit-45, Article by Klein

21            and Golub, was marked for

22            identification.)

23                        ---

24  BY ATTORNEY BARHAM:

1      Q.    This is an article by Klein and Golub entitled

2    Family Rejection as a Predictor of Suicide Attempts.

3    This article simply says that family rejection is a

4    predictor of suicide attempts and substance abuse among

5    transgender and gender non-conforming adults.

6          Correct?

7               ATTORNEY BLOCK:  Objection.  Can you

8    point to where you are reading from?

9               ATTORNEY BARHAM:  The title.

10              THE WITNESS:  They identify as a

11   predictor, yes.

12   BY ATTORNEY BARHAM:

13     Q.    In fact, the word strongest does not even appear

14   in this article.

15          Is that correct?

16              ATTORNEY BLOCK:  Objection.

17              THE WITNESS:  I would have to read the

18   whole article.

19              ATTORNEY BLOCK:  Let him read it.

20              THE WITNESS:   The authors note on

21   page 195 on a multi-variant model moderate levels of

22   family rejection were associated with almost twice the

23   odds of attempted suicide and high levels of family

24   rejection were associated with almost three and a half

283

1    times the odds of attempted suicide.  While there is not

2    any use of the word stronger, I don't see any additional

3    risks that were highlighted in this specific study.

4    BY ATTORNEY BARHAM:

5        Q.    Okay.

6              On page 197 stemming over on to 198 the authors

7    admit that they relied on data NTDS that use sampling

8    techniques that were not random and included a

9    homogenous study population that was largely white,

10   educated and employed.

11             Correct?

12       A.    That is correct.

13       Q.    Do you agree with them that this limits the

14   generalizability of the article's findings?

15       A.    I do.

16       Q.    The authors also admit that the cross sectional

17   nature of the data did not allow us to determine any

18   causal relationship between family rejection and the

19   negative health-related outcomes.

20             Correct?

21       A.    Correct.

22       Q.    The authors also indicate that they did not have

23   any information about the timeframe within which family

24   rejection occurred, including what precipitated the

284

1  event, the severity of the rejection or whether this

2  changed over time.

3         Correct?

4    A.    Correct.

5    Q.    Do you agree with them that these factors might

6  have influenced their results?

7    A.    Sure.

8    Q.    All right.

9         Let's go to Tab 97, which is Exhibit 16.  This

10  article we discussed before, but this reviews the Turban

11  article that you cited in footnote seven of your report.

12         Is that correct?

13    A.    That is correct.

14    Q.    Or footnote six of your report.  Okay.

15         And in your report you are using the Turban

16  2020 article to critique the use of what you describe as

17  conversion therapy.

18         Is that correct?

19              ATTORNEY BLOCK:  Objection to form.

20              THE WITNESS:  I'm just pulling this up

21  where I have it.  As I stated in my report, the Turban

22  article found that people who reported experiencing

23  those conversion efforts were more likely to have

24  reported attempting suicide.

285

1    BY ATTORNEY BARHAM:

2       Q.    So you're using it to critique what you

3    described as conversion therapy.

4            Is that fair?

5       A.    I think that's fair.

6       Q.    On page two of Dr. D'Angelo's letter to the

7    editor he notes at the top of the first --- towards the

8    top of the first column that Turban's analysis used data

9    from the 2015 USTS survey of transgender identifying

10   individuals, this survey is convenient sampling

11   methodology which generates lower quality data.

12           Would you agree that convenient sampling

13   generates low quality data?

14      A.    Convenient sampling generates lower quality

15   data.  And then some other statistical method of study

16   design.  One of the ways that you want to counteract

17   that potential for low quality of data is to have

18   increased number of participants.  The difference of

19   27,000 participants in this particular survey analysis

20   versus say 100 in another, 40 in another does add a

21   little bit more context to the applicability of these

22   findings.

23      Q.    Right below that Dr. D'Angelo, et al. notes that

24   the participants were recruited through transgender

 1   advocacy organizations and subjects were asked to pledge

 2   to promote survey among friends and family.  This

 3   recruiting method yielded a large but highly skewed

 4   sample.  Would you agree that the sample for this survey

 5   was highly skewed?

 6                    ATTORNEY BLOCK:  Objection to form.

 7                    THE WITNESS:  I think we'd have to

 8   understand what specifically you mean by skewed and

 9   skewed in what way.  It's hard to know.

10   BY ATTORNEY BARHAM:

11      Q.   The authors go on in Table 1 to demonstrate what

12   they mean by skewing of the data.  Upon reviewing their

13   information, would you agree that the sample was skewed?

14                    ATTORNEY BLOCK:  Objection to form.

15                    THE WITNESS:  Again, I'm not sure skewed

16   in comparative --- comparison to what?

17   BY ATTORNEY BARHAM:

18      Q.   The authors continue on page two by saying that

19   a number of additional data irregularities in the USTS

20   raise further questions about the quality of the data

21   captured by the survey.  They talk about how high number

22   of survey participants had not transitioned medically or

23   socially, significant number reported no intention to

24   transition in the future.  The information about

1    treatments does not appear to be accurate as a number of

2    respondents reported the initiation of puberty blockers

3    after the age 18, which is highly improbable.  Further,

4    the survey has developed special waiting due to

5    unexpected high proportion of respondents who reported

6    that they were exactly 18 years old.  Do you agree that

7    these irregularities raise serious questions about the

8    reliability of the data?

9        A.    I think these are all elements that you want to

10   take into context as you're establishing validity of the

11   data and the conclusions that could be drawn.

12       Q.    The second column of page two, the authors note

13   that the emphasis on the survey's goals to highlight the

14   injustices suffered by transgender people during the

15   recruitment stage in the introduction of the survey

16   instrument itself made it eligible for reporting adverse

17   experiences due to demand bias.

18            Do you agree that this demand bias likely

19   skewed the responses?

20       A.    I wouldn't agree that it likely, but that

21   implies that we have data that we don't have.  It's a

22   possibility that these authors are raising.

23       Q.    Now, the authors also note that the experience

24   of detransitioners and the sisters were not included, as

1  they were disqualified from completing the survey.  They

2  note that this failure is a serious oversight.

3          Do you agree with them that that's a serious

4  oversight?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  I would need to look at the

7  specific survey instructions for the survey in question

8  to understand the validity of that.  I don't see how in

9  the context of this that folks who detransitioned were

10 specifically excluded, but ---.

11 BY ATTORNEY BARHAM:

12    Q.    Did you review ---?

13    A.    Can you point to where that --- where in the

14 original article or the study that those folks are

15 excluded specifically.  I may have missed it.

16    Q.    I don't have the original survey on hand at the

17 moment.  If it proved that they were excluded, would you

18 agree that that would be a serious oversight?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  It would really depend on

21 how that was done and what the language was used.

22 Without seeing it I can't make a comment otherwise.

23 BY ATTORNEY BARHAM:

24    Q.    What if there was no language involved, it was

1   just those who indicated that they were either desisting

2   or detransitioning or not included in the data set?

3      A.   I would need to see the context of it in order

4   to make a judgment on the validity of that structure.

5      Q.   On page four of this document.  The authors note

6   that Turban's hypothesis is further weakened by a

7   significant flaw in their data analysis failure to

8   control for individuals pre-GICE exposure mental health

9   exposure status, noting that this is a potential

10  compound and may mask reverse causation.

11          Do you have any scientific basis for disputing

12  that concern?

13     A.   Let me review this part of the paper, please.

14          ATTORNEY BLOCK:  Just objection.  I don't

15  think he read the full the sentence.

16          THE WITNESS:  I have not seen any

17  literature on specific risks or predictors for

18  individuals who would be exposed to gender identity

19  conversion efforts, and so the supposition inherent in

20  this paragraph that the authors are making that an

21  individual's underlying poor mental health led to their

22  experience of gender identity conversion efforts is not

23  supported by my understanding of the literature.

24  BY ATTORNEY BARHAM:

1    Q.   Do you have any reason to dispute a potential

2  for a confound or the potential for masking reversed

3  causation that the authors identify here?

4    A.   As I described, I haven't seen any literature

5  that speaks to this nor has that been my clinical

6  experience.

7    Q.   On page two of this document the authors note

8  that Turban's conclusions rest on the assumption that

9  they have a valid way of determining whether or not the

10 respondent was exposed to the unethical practice of

11 conversion therapy.  Do you agree that this lack of

12 context in detail renders the question incapable of

13 differentiating between ethical non-affirming ---

14 non-affirmative neutral and counters unethical

15 conversion therapy?

16   A.   I do not.

17              ATTORNEY BLOCK:  Sorry, objection to

18 form.

19 BY ATTORNEY BARHAM:

20   Q.   Back on page four the authors note that the

21 failure to control for the subjects' baseline mental

22 health makes it impossible to determine whether the

23 mental health or suicidality of a subject person stayed

24 the same or potentially even improved after the

1  non-affirming encounter.  Do you have any scientific

2  basis for disputing this observation?

3           ATTORNEY BLOCK:  Objection to form.

4           THE WITNESS:  Again, if we wanted to go

5  back to the Turban study itself and look more

6  specifically at their methodology and their description

7  that would be a more accurate way of getting a potential

8  ups and downs side of this study other than this letter

9  to the editor.

10 BY ATTORNEY BARHAM:

11    Q.   But do you have any basis for -- any scientific

12 basis for disputing that observation?

13           ATTORNEY BLOCK:  Objection to form.

14           THE WITNESS:  This question gets to a

15 very specific type of study designed methodology.  That

16 is something that typically is done by a data scientist,

17 which is not where my level of expertise is.  There are

18 nuances in it.  What I would say is in a population as

19 large of a survey that having a denominator as high as

20 they had helps to reduce the chances of confounders like

21 the authors in this letter to the editor are describing

22 as problematic.

23 BY ATTORNEY BARHAM:

24    Q.   A little bit later on page five the authors

1  highlight the cross sectional design of the USTS and

2  indicate that presenting a highly confounded association

3  of causation is a serious error.

4        Do you agree that presenting a confounded

5  association as causation is a serious error?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  I have not claimed nor do I

8  understand my reading of the Turban, et al. article to

9  claim causation when an association has been found, and

10  in fact, they specifically called out that it was not

11  causative or at least the analysis could not prove it

12  was causative with a cross-sectional design.

13  BY ATTORNEY BARHAM:

14     Q.    So when you wrote paragraph 34 of your report

15  and said that a study found that people who reported

16  experiencing these conversion efforts were more likely

17  to have reported attempting suicide, especially those

18  who reported receiving such therapy in childhood, were

19  you suggesting that the conversion efforts caused the

20  suicide attempts?

21     A.    I believe in my testimony I am saying that there

22  is a relationship between those who are exposed to

23  conversion efforts and those who have described

24  reporting attempting suicide.

1    Q.    And how would you describe that relationship?

2    A.    As an association.

3    Q.    Is association a synonym for correlation?

4              ATTORNEY BLOCK:  Objection to form.

5              THE WITNESS:  It depends on the context,

6    but generally in plain English association and

7    correlation are relative synonyms for one another.

8    BY ATTORNEY BARHAM:

9    Q.    In this specific context of your report, when

10   you say that you are reporting an association, were you

11   using association in correlation to synonyms?

12   A.    As far as I know I was, yeah.

13   Q.    Have you had patients impacted by not being

14   allowed to play sports consistent with their gender

15   identity?

16   A.    On occasion, yes.

17   Q.    Approximately how many such patients?

18   A.    On the order of less than two or three.

19   Q.    What sports were those patients participating

20   in?

21   A.    I do not recall the specific.  These were ---

22   the two or three that I had were all in the order of

23   between five, six and seven-year-olds.

24   Q.    What was your follow-up with each patient?

 1    A.    With those particular kids?

 2    Q.    Yes.

 3    A.    Without having their charts in front of me, it's

 4  hard to expound.  My typical process would be

 5  understanding why it's happening, what they need and how

 6  to coordinate with whatever program to help make sure

 7  that the kid gets the support that is going to be most

 8  beneficial to them.

 9    Q.    Are you offering an opinion that the State of

10  West Virginia does not have a strong interest in

11  ensuring safe competition for women?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  My testimony is about the

14  mental health impacts.  I don't have an opinion on the

15  state interests of West Virginia in this regard.

16  BY ATTORNEY BARHAM:

17    Q.    Are you offering an opinion that the State of

18  West Virginia does not have a strong interest in

19  ensuring fair competition?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  Same answer.

22  BY ATTORNEY BARHAM:

23    Q.    Would you agree that ensuring fairness and

24  safety is an important state interest.

```
 1                    ATTORNEY BLOCK:  Objection to form and

 2      scope.

 3                    THE WITNESS:  Same answer.

 4                    ATTORNEY BARHAM:  All right.  I believe

 5      those are all my questions for today.  I will turn the

 6      floor over to Mr. Tryon.

 7                    ATTORNEY TYRON:  Okay.

 8                    Here I am.

 9                            ---

10                         EXAMINATION

11                            ---

12      BY ATTORNEY TRYON:

13        Q.    My name's David Tryon.  I am with the West

14      Virginia Attorney General's Office and represent the

15      State of West Virginia.  So we've got about an hour

16      left.  Do you want to just keep on going and finish up

17      or would you like to take a break for five minutes

18      before we finish up?

19        A.    I think let's keep going.  If I have to take a

20      break, I'll let you know.  I appreciate it.

21        Q.    Okay.

22              You bet.  Happy to help you out that way again.

23      I just want to follow up, first of all, on a couple of

24      questions about the Turban study, if I may, that we were
```

1   just discussing.  And Exhibit 16 I believe was the

2   document that addressed that Turban study.

3       A.   I see Exhibit 16 as the letter to the editor

4   from D'Angelo, et al.

5       Q.   And that's the one that we were just looking at

6   addressing the Turban study.

7            Right?

8       A.   Correct.

9       Q.   So let me just ask you, you did cite the Turban

10  study in your report.

11           Right?

12      A.   Yes.

13      Q.   Yeah, and that was to support your opinion.

14           Right?

15      A.   That is to support my opinion, yes.

16      Q.   Now, before you used it did you do something to

17  cite check it to see if there were any articles that

18  either challenged it or critiqued it or criticized it?

19      A.   I would say that a routine review of the

20  literature is a part of my day-to-day practice.  This

21  particular article did not come up in that review.

22      Q.   Okay.

23           Is there a way to specifically search for it to

24  see if --- to look at it and then do a search and see

1  what other articles are quoted or cited?

2      A.      My guess is there probably is, I'm not aware of

3  it.

4      Q.      But I think you said you were not aware of the

5  letter which is Exhibit 16 prior to issuing your expert

6  report.

7          Is that right?

8      A.      That is correct.

9      Q.      Would it have been helpful to have seen that

10  ahead of time?

11      A.      I think it would have been helpful for me to

12  feel more prepared in this deposition.  I don't think it

13  would have changed any of my report.

14      Q.      If you had that, would you have investigated

15  those criticisms to see if they were failed criticisms?

16      A.      The authors of the Turban study had raised most

17  of those criticisms themselves in the context of their

18  report.

19      Q.      And did you independently look at it and

20  determine if they were --- if that caused you some

21  concerns?

22      A.      Concerns wouldn't be the right word.  It's about

23  weighing the evidence and making sure that we understand

24  context and applicability.  There's nothing in this

1   letter to the editor that changes those demands from my

2   reading of the Turban article.

3       Q.    So you are saying that this letter in the Turban

4   article --- I'm sorry, you're saying this letter to the

5   editor does not raise any new issues at all than what

6   the Turban study itself raised.

7           Is that right?

8       A.    I would have to read through this in a more

9   detailed manner to say for certain that no single issue

10  has been addressed.  None of which we discussed today

11  are elements that hadn't been addressed, either by

12  myself reading the Turban article or by the Turban, et

13  al. in the article itself.

14      Q.    But you do not raise any of those concerns in

15  your report, do you?

16                  ATTORNEY BLOCK:  Objection to form.

17                  THE WITNESS:  No.  No, not specifically.

18  BY ATTORNEY TRYON:

19      Q.    Okay.  Fair enough.

20          If you can follow your report now, which I'm

21  forgetting which exhibit that is, Exhibit 1.  Thank you.

22          So first of all, you said you were retained by

23  Counsel for the Plaintiffs as an expert.  Can you tell

24  me when you were retained, please?

1     A.    I would have to pull up my invoice to give you

2    the specific date, and I'm guessing Mr. Block might have

3    that information at the ready.

4     Q.    Unfortunately, I can't depose him.  I would love

5    to, but I don't think he would agree to that.  So as

6    best you can recall --- first of all, was it this year

7    or last year?

8     A.    It was this year to the best of my recollection.

9     Q.    Okay.

10          Was it after the other expert reports came out

11    or before?

12    A.    I believe I was hired or retained.  I don't know

13    what the correct terminology is so forgive me, after the

14    development of the additional expert reports.  It was

15    the rebuttal to those reports that led to my being

16    retained to my recollection.

17    Q.    I'm sorry?

18    A.    From my recollection.  And I'm terrible with

19    dates, so I apologize for that.

20    Q.    In paragraph four, you say --- you explain what

21    you viewed and you mention the reports of Dr. Safer.

22    Does that refer to Dr. Safer's original report that was

23    filed with the Court and his rebuttal report --- strike

24    that.

1          Does that --- so he filed something with the

2    Court originally.  Did you review that one?

3      A.    It was the original report that I had reviewed.

4      Q.    Okay.

5          So let me just be clear.  So he filed an

6    original report back in --- last year and then issued a

7    new report in February of this year and then issued a

8    rebuttal report.  So a total of three.  Did you see all

9    three of those?

10     A.    I would have to see them ---.

11               ATTORNEY BLOCK:  Object to form.

12               THE WITNESS:  I would have to see them in

13   front of me to know if it was something that I had read.

14   I don't know the terminology well enough to know if I

15   was reading the original report or rebuttal report or

16   the third type.

17   BY ATTORNEY TRYON:

18     Q.    So one of them was expert report which was

19   issued I believe in February of this year.  I believe

20   you saw that one.

21     A.    Again, I would have to see the report in front

22   of me to know if it was the one I saw.

23     Q.    Okay.

24          There was another one which was labeled as

 1  rebuttal.  Do you remember if you saw that one?

 2      A.    I would have to go back through my notes.  I

 3  don't have it in front of me, so I apologize for not

 4  recalling.

 5      Q.    Well, let me ask you this question.  Do you

 6  remember how many reports you saw from Dr. Safer?

 7      A.    All I can say is I remember seeing at least two.

 8      Q.    Very good.  And Dr. Adkins, how many of her

 9  reports did you see?

10      A.    I can't be certain, but I think I also saw two

11  of hers.

12      Q.    And I'll represent to you that each of them

13  issued a rebuttal report.  And did you read their

14  rebuttal reports prior to preparing your rebuttal

15  report?

16      A.    I don't have the documentation in front of me in

17  terms of when I was spending time on what piece of this

18  process.  That's a part of my notes that are not here

19  today.

20      Q.    Do you know why you were asked to issue a

21  rebuttal report if Dr. Safer and Dr. Adkins were both

22  issuing rebuttal reports?

23              ATTORNEY BLOCK:  Objection.  Just don't

24  discuss any of the contents of your communications with

```
 1   the attorneys.

 2                    ATTORNEY TRYON:  Correct.

 3                    THE WITNESS:  My understanding was to

 4   rebut the reports of Dr. Levine and Dr. Cantor.

 5   BY ATTORNEY TRYON:

 6      Q.    Is your rebuttal different than the rebuttals of

 7   Dr. Adkins and Dr. Safer?

 8                    ATTORNEY BLOCK:  Objection to form.

 9                    THE WITNESS:  Yes.

10   BY ATTORNEY TRYON:

11      Q.    Pardon me?

12      A.    Yes.

13      Q.    Does your rebuttal report have any opinions

14   which are different from Dr. Safer and Dr. Adkins'

15   reports?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS:  I think it's hard without

18   the specific reports in front of me.  I know they were

19   long documents and I was specifically rebutting the

20   reports of Dr. Levine and Cantor.

21   BY ATTORNEY TRYON:

22      Q.    Do you have any specific reports that are not

23   rebutting Dr. Levine and Dr. Cantor?

24      A.    The process of developing this rebuttal report
```

 1   was for that specific intent.

 2       Q.    So you don't believe you have any original

 3   opinions to report; would that be a fair statement?

 4                ATTORNEY BLOCK:  Objection to form.

 5                THE WITNESS:  I'm not --- I guess I'm not

 6   sure what you mean by original opinions.

 7   BY ATTORNEY TRYON:

 8       Q.    So let's move on.  Do you recall the Costa

 9   study?

10       A.    Yes, we had reviewed one Costa study earlier.

11   Can you remind me of the exhibit number?

12       Q.    I believe it's Exhibit 27?

13       A.    All right.  Okay.

14       Q.    I believe that during that discussion you

15   referred to the standards in there as being rough or

16   imprecise measure and --- let me get this right, and not

17   objective criteria.

18             Do you remember that?

19       A.    I had described the CGAS, the Children's Global

20   Assessment Scale, as an imprecise measure of children's

21   functioning.

22       Q.    And you said not having any objective criteria;

23   can you help with that?

24       A.    Yes, it's a scale from zero to a hundred that is

1   very gestalt that the clinician uses to rate a child.

2   It's not an instrument that I find clinically useful.

3       Q.    Is it not clinically useful because it doesn't

4   have objective criteria?

5       A.    I wouldn't say it's fair to say that there are

6   no objective criteria, but there are at times

7   contradictory objective criteria within the CGAS.  And

8   again I would he have to see the CGAS in front of me to

9   point out those specifics, but there are other

10  functions, or other ways of measuring outcomes than the

11  CGAS.

12      Q.    What is an objective criteria?  What does that

13  term mean in other words?

14                  ATTORNEY BLOCK:  Objection to form.

15                  THE WITNESS:  I guess what would say is

16  we would want a psychometrically valid approach for

17  answering a question, ideally that is of clinical

18  relevance.

19  BY ATTORNEY TRYON:

20      Q.    Can you just repeat your answer for me?  I

21  didn't quite understand it.

22      A.    Probably not the same language.  A

23  psychometrically valid tool that in an ideal world

24  provides some kind of clinical relevance.

1    Q.    Okay.

2          You said psychometrically valid tool.

3          Did I get that right?

4    A.    Psychometrically validated tool, yes.

5    Q.    Validated?

6    A.    Yes.

7    Q.    What is that?

8    A.    Essentially you want to understand that the

9    measure you're using is measuring what it says to

10   measure and is reliable across multiple domains.  The

11   CGAS has been widely used in research, it's just not my

12   favorite tool because I don't find it to have that

13   second domain of having that clinical utility.

14   Q.    Let me ask you to take a look at paragraph 19 of

15   your opinion?

16   A.    I'm looking at it now.

17   Q.    You say at one point it says contrary to the

18   portrayal.  Do you see that sentence?

19   A.    I see that, yes.

20   Q.    Contrary to the portrayal in Dr. Levine and Dr.

21   Cantor's reports, gender-affirming treatment also

22   requires a careful and thorough assessment of a

23   patient's mental health, including co-occurring

24   conditions, history of trauma, and substance abuse among

1    many other factors.  My question for you is with respect

2    to your language, a careful and thorough assessment, and

3    I'd like to then know are there psychometrically

4    validated tools used to do that?

5        A.    There are on occasion, and particularly when

6    we're looking at research outcomes for transgender youth

7    there are a number of psychometrically validated

8    screenings or outcome measures that are used.

9        Q.    What are those?

10       A.    These include most importantly the Utrecht

11   Gender Dysphoria Scale, the Body Image Scale,

12   historically what's in the Dutch data, the Toronto data,

13   and the Costa data and The Tavistock Clinic, all of them

14   were participatory in kind of the informal research

15   group that agreed to collect the same measures, so these

16   included the Achenbach, CBCL, and they use self report.

17       Q.    I'm sorry.  What was the first one you said

18   before Body Image Scale?

19       A.    Utrecht Gender Dysphoria Scale.

20       Q.    Utrecht Gender Dysphoria Scale?

21       A.    Correct.

22       Q.    What is that?

23       A.    It's a measure of the degree and intensity of

24   gender dysphoria.

1    Q.    How is it --- what does it look like?  Does it

2  have a series of scale one to ten on different issues or

3  what is it?

4    A.    It's a series of questions that I'd have to have

5  in front of me to give a better job of describing, but

6  it provides a rating of --- I can't remember what the

7  range is, from zero to somewhere in the low dozens, that

8  correlates with the intensity of gender dysphoria.

9    Q.    Is that something that you use in your practice

10  to diagnose gender dysphoria?

11    A.    It is an element that I have used.

12    Q.    Do you use that with every patient?

13    A.    It is not something that I use with every

14  patient.  The contents of the Utrecht Gender Dysphoria

15  Scale are generally pieces that I'm getting or gathering

16  from every clinical encounter without necessarily

17  utilizing the specific tool.

18    Q.    This statement, a careful and thorough

19  assessment, does that have a --- is there a source for

20  that particular standard?

21    A.    There are a number of sources for this

22  particular standard.  The general practice of children's

23  mental health from my guild in child adolescence

24  psychiatry, there are years of training and

1    certification in order for you to have demonstrated a

2    careful and thorough assessment.  In order to get Board

3    Certified I had to do a careful and thorough assessment

4    in front of a board of examiners, so this is inherent to

5    the practice of mental health.

6       Q.    Is there --- but there is no requirement that

7    these various standardized tools that you mentioned to

8    me, these psychometrically valid tools have to be used,

9    is there?

10      A.    There isn't, and there is not a clinical

11   verification that they be used in every instance.  For

12   the sake of these kind of studies, it's important to

13   have these validated tools so we're all speaking the

14   same language and that outcomes can be tracked over

15   time, but not necessarily in every clinical event is it

16   going to be warranted.

17      Q.    If you don't use them in every clinical event,

18   then how can how can you adequately track something

19   across patients if you wanted to do a study?

20               ATTORNEY BLOCK:  Objection to form.

21               THE WITNESS:  As an example there are a

22   number of psychometrically validated tools that cannot

23   be administered at every clinical encounter, otherwise

24   they would be rendered invalid.  So there's a lot of

1    nuance in these specific tools and I think that level of

2    nuance is really a clinical judgment based upon

3    professional and prevailing standards.

4    BY ATTORNEY TRYON:

5        Q.    Okay.

6             So there's no objective measure of someone

7    other than --- well, let me back up.  So different

8    psychiatrists would come up with different conclusions.

9             Is that right?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  I don't think that's

12   related to what I was speaking about.  I think different

13   psychiatrists would utilize different instruments to

14   provide an assessment, and that's going to change from

15   person to person.  I can't speak to diagnostic

16   reliability for a psychiatrist that I haven't met or

17   trained.

18   BY ATTORNEY TRYON:

19       Q.    Let me ask you how long you would normally spend

20   with a child before --- or adolescent before prescribing

21   puberty blockers?

22                    ATTORNEY BLOCK:  Objection to form.

23                    THE WITNESS:  There is not going to be a

24   single answer to that question.  It really is dependent

1    on the requirements of the assessment, as well as the

2    individual factors of that child and that family.

3    BY ATTORNEY TRYON:

4        Q.    Could ten minutes be long enough?

5        A.    Not in my opinion.

6        Q.    What about 30 minutes?

7        A.    Likely not.

8        Q.    How about an hour?

9        A.    It would be very atypical in my practice to

10   spend that little time prior to making a recommendation

11   for puberty suppression.  I do a much more thorough

12   assessment than an hour.

13       Q.    So how long would a thorough assessment normally

14   take?

15                   ATTORNEY BLOCK:  Objection to form.

16   BY ATTORNEY TRYON:

17       Q.    You said more than an hour I think?

18       A.    Correct.  I would say more than an hour.  I

19   think maybe there's a ceiling, but not a roof.  What I

20   mean by that that is there are certain criteria required

21   in order to make a recommendation for a treatment for

22   gender dysphoria to be offered.  Those include a

23   diagnosis of gender dysphoria, a recognition of any

24   co-occurring mental health issues and whether or not

1   they are adequately well controlled enough to be able to

2   proceed with care.  And a clear understanding of the

3   risks, benefits and alternatives of that treatment.

4   There's no specific timeframe on that as an assessment.

5      Q.    How many visits would you expect to be adequate

6   for a careful and thorough assessment?

7                  ATTORNEY BLOCK:  Objection to form.

8                  THE WITNESS:  And I apologize, it's ---

9   I'm not trying to be evasive.  It really is going to

10  depend upon each individual child.

11  BY ATTORNEY TRYON:

12     Q.    What about is one enough?  Have you ever done it

13  --- given a recommendation for puberty blocker after

14  only one visit for an hour?

15                 ATTORNEY BLOCK:  Compound question.

16                 THE WITNESS:  I have never given a

17  recommendation for puberty suppression after a one hour

18  visit personally.

19  BY ATTORNEY TRYON:

20     Q.    What's the minimum time that you think is

21  adequate?

22                 ATTORNEY BLOCK:  Objection to form.

23                 THE WITNESS:  As I said, I don't think

24  it's based on time.  It's based about the content.

```
1   There are circumstances in which patients have been

2   followed for several years by therapists, that can

3   provide a tremendous amount of collateral information

4   including information provided by parents, family

5   members, community providers, et cetera, that can allow

6   more abbreviated assessment for some people.

7   BY ATTORNEY TRYON:

8      Q.    Is someone as consistently spending only an hour

9   with one patient, with each patient for recommending

10  puberty blockers, that would look kind of like a rubber

11  stamp recommendation wouldn't it?

12              ATTORNEY BLOCK:  Objection.

13  BY ATTORNEY TRYON:

14     Q.    Assuming that it's happening?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS:  I would have to see the

17  specifics in order to make any kind of comment.

18  BY ATTORNEY TRYON:

19     Q.    Isn't it fair for Dr. Levine or Cantor to

20  express concern that in actual practice that may be

21  happening?

22              ATTORNEY BLOCK:  Objection to form.

23              THE WITNESS:  I have not seen anywhere in

24  Dr. Cantor or Dr. Levine's report or within the
```

 1   literature that this is a pervasive thing that is

 2   happening.

 3   BY ATTORNEY TRYON:

 4       Q.   Well, it's not tracked at all so we wouldn't

 5   know, would we, one way or the other?

 6                    ATTORNEY BLOCK:  Objection to form.

 7                    THE WITNESS:  It is a question that could

 8   be asked.  I don't think it's for me to make

 9   suppositions, nor do I think it is for Dr. Cantor and

10   Dr. Levine to make suppositions about the critical care

11   of transgender youth in this context.

12   BY ATTORNEY TRYON:

13       Q.    Is there any --- is there any place where you

14   report any central location where you or your clinic

15   report how much time and effort and what your thorough

16   examination is so that it can be tracked?

17       A.    The site where I'm at now is part of a four-site

18   NIH trial that has published on the specific assessment

19   processes that the kids who are involved in the study

20   engage in.

21       Q.    How many kids are in that trial?

22       A.    I'm not a specific participant in the

23   organization of that trial, so I don't have that

24   information in front of me.

1      Q.    Does your clinic report to that trial?

2      A.    My gender clinic, the gender clinic within the

3  hospital that I work in, there are many patients who are

4  enrolled in that trial, yes.

5      Q.    But it's certainly not mandated, right?

6      A.    No.

7      Q.    When these careful and thorough assessments are

8  done, what type of documentation should be used for

9  that?

10              ATTORNEY BLOCK:  Objection to form.

11              THE WITNESS:  That's a very contextual

12 question.  We have prevailing standards in terms of what

13 should and shouldn't be documented through various

14 professional organizations, but that's going to change

15 from state to state, country to country.

16 BY ATTORNEY TRYON:

17     Q.    And what about in the State of West Virginia?

18     A.    I have no knowledge of documentation

19 requirements in the State of West Virginia.

20     Q.    How about in the United States in general?

21     A.    As far as I'm aware, there are no universal

22 recommendations in terms of specifics of how things are

23 documented.

24     Q.    Are there any organizations like the WPATH or

1    any other organizations that do give recommendations on

2    what documentation to use in America?

3        A.    WPATH has certainly provided some educational

4    events in terms of best practices in documenting, but

5    these aren't specific guidelines or recommendations.  I

6    think it is notable to say that the Dutch clinic in

7    particular has been quite vigorous in their production

8    of research and is quite well respected in the world in

9    terms of how things are structured, and they actually

10   don't even have a letter that their clinicians write

11   and/or see initiation of puberty suppression for

12   gender-affirming hormones.

13                ATTORNEY TRYON:  Jake, if you could bring

14   up the exhibit entitled Adolescent Medicine,

15   Confidential Patient Questionnaire, which has been

16   redacted?

17                VIDEOGRAPHER:  Do you want that marked?

18                ATTORNEY TYRON:  Yes, please, wherever we

19   are at in the next number.

20                VIDEOGRAPHER:  I believe we're at 44.

21                LAW CLERK WILKINSON:  46.

22                ATTORNEY SWAMINATHAN:  46.

23                     ---

24                (Whereupon, Exhibit-46, Form, was marked

```
 1                          for identification.)

 2                              ---

 3                  ATTORNEY TRYON:  If you could bring that

 4      up, Jake.

 5                  VIDEOGRAPHER:  Yes.  Give me one second.

 6      I'm just marking that right now.  We might have to mark

 7      this one physically.  The program won't mark it because

 8      it's a redacted document.

 9                  ATTORNEY TRYON:  Okay.  Then we'll do

10      that to bring that up.  And then, if you could, Jake,

11      just scroll down in this.  I just have a couple

12      questions about this form.

13                  THE WITNESS:  Okay.

14                  ATTORNEY TRYON:  Go onto the next page

15      down.

16      BY ATTORNEY TRYON:

17         Q.    Have you ever seen a form like this?

18                  ATTORNEY BLOCK:  Objection to form.  No

19      pun intended.

20                  THE WITNESS:  Could you be a little more

21      specific?  I mean, I've seen --- this is kind of very

22      typical for a lot of intake-type documents in mental

23      health clinics or in medical clinics.

24      BY ATTORNEY TRYON:
```

1      Q.    So you would characterize this as a typical

2  intake form?

3                    ATTORNEY BLOCK:  Objection.

4                    THE WITNESS:  I wouldn't characterize it

5  in that way.  I have seen typical intake forms that

6  resemble this in some ways.

7  BY ATTORNEY TRYON:

8      Q.    Would this be something that you would consider

9  adequate to document a careful and thorough assessment?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  Again, without knowing the

12  context of the individual's practice, it's impossible

13  for me to say.

14  BY ATTORNEY TRYON:

15     Q.    Is this a form that you would use for careful

16  and thorough assessment of a patient's mental health?

17                   ATTORNEY BLOCK:  Objection to form.

18                   THE WITNESS:  I don't use this form.  I

19  can't say whether or not I was in the context this

20  provider was practicing that I wouldn't use this form as

21  part of my assessment.

22  BY ATTORNEY TRYON:

23     Q.    Fair enough.  Do you use it as a part of your

24  careful thought thorough assessment of the patient's

 1   mental health, are there any other forms that you expect

 2   to see in the caregiver's file about that patient's

 3   mental health?

 4       A.    Not specifically.

 5       Q.    This would be adequate?

 6                 ATTORNEY BLOCK:  Objection to form.

 7                 THE WITNESS:    Again, I can't speak to

 8   the adequacy of it without understanding the context of

 9   the rest of the treatment.

10   BY ATTORNEY TRYON:

11       Q.    Is there any certification that you think is

12   necessary or appropriate for someone to diagnose gender

13   dysphoria?

14       A.    There is no universal certification process.

15   What we have are guidelines and recommendations for

16   ensuring that folks for the mental health prospective,

17   again, medical professionals are able to diagnose gender

18   dysphoria, but from the mental health prospective, it's

19   recommended that we are licensed clinical professionals

20   that have some, if not an expert level of understanding

21   of gender identity issues and having continuing

22   education in the field.  These are ongoing

23   recommendations.  I wouldn't say it was the expertise,

24   but knowledge about standard of care that's congruent

1  with how other disorders are also treated.

2     Q.    Let me ask you about paragraph 16 of your

3  report.

4           Do you see the last sentence there?

5     A.    Yes.

6     Q.    It says HB-3293 does not affect elementary

7  students --- elementary school students who are

8  transgender boys?

9     A.    Yes.

10    Q.    So you previously testified that puberty is ---

11  starts on the average about age 12 for males.

12          Right?

13                ATTORNEY BLOCK:  Objection to form.

14                THE WITNESS:  Again, I would defer to our

15  --- that's an answerable question based upon national

16  data that I don't have in front of me, but 12-ish is,

17  yes.

18  BY ATTORNEY TRYON:

19    Q.    And the range would be --- from what I read, the

20  range is generally between 8 and 14 years old.

21          Right?

22    A.    Again, I would defer to my endocrine colleagues,

23  but yes, that's --- that's pretty typical.

24    Q.    And you're aware that boys go into Middle School

 1   as early as 11 years old or sometimes even earlier.

 2         Right?

 3      A.   I can't say that I'm familiar with how each

 4   state organizes their primary and secondary education

 5   systems.  I'm familiar with how it was in New York and

 6   Illinois, and that was occasionally the case.

 7      Q.   So if an 11-year-old who has not gone through

 8   puberty is in Middle School, then this would definitely

 9   apply to some pre-pubescent children.

10         Right?

11              ATTORNEY BLOCK:  Objection to form.

12   BY ATTORNEY TRYON:

13      Q.   I'm sorry, I didn't make that clear.  So if

14   there are prepubescent boys that are in middle school,

15   then HB-3293 would affect them.

16         Right?

17      A.   I would have to put HB-3293 in front of me to

18   --- to know specifically.  I'd have to refamiliarize

19   myself with it, the specifics of it.

20      Q.   I'm sorry to interrupt you.

21      A.   Yeah, I wouldn't want to comment on something I

22   don't have in front of me right now.

23      Q.   Okay.

24         So just so you know I had to relocate from my

 1   office to my home, and there's a poodle in here that you

 2   may hear.  So forgive if you hear the interruption.

 3                    ATTORNEY BLOCK:  Objection to the

 4   poodle.

 5                    ATTORNEY TRYON:  Let me take one second.

 6   I will be right back.

 7                    THE WITNESS:  Maybe now is a good time

 8   for bathroom break.

 9                    ATTORNEY BLOCK:  Let's go off the record.

10                    VIDEOGRAPHER:  Going off the record the

11   time reads 5:46 p.m.

12   OFF VIDEO

13                         ---

14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15                         ---

16   ON VIDEO

17                    ATTORNEY TYRON:  Okay let's go back on

18   the record.

19                    VIDEOGRAPHER:  Back on the record the

20   current time reads 5:50 p.m.

21   BY ATTORNEY TRYON:

22      Q.    Let me direct you to paragraph 26 of your

23   report?

24      A.    Yep.

1      Q.   So there's the --- let's see, starting with the

2  word prepubertal children who he insists are children

3  with non-conforming gender expression who realize at the

4  onset of puberty that their gender identity is

5  consistent with their sex assigned at birth.  Their

6  understanding of their gender identity changes at the

7  onset of puberty, but their gender identity does not.

8  So that's really a circular argument unless there's some

9  objective external way of proving what that child's

10  gender identity actually is, wouldn't you agree?

11            ATTORNEY BLOCK:  Objection to form.

12            THE WITNESS:  I think that the research

13  that we have on inherent gender identity is relatively

14  recent and needs a little bit more robust follow-up.

15  What we have are studies of cognition as well as some

16  very limited brain imaging studies that point to some

17  element of gender identity that has an objective

18  criteria to it.  These are not studies that are

19  significant enough or have enough participants for us to

20  draw any kind of significant conclusions, but it does

21  speak when paired with clinical experiences of kids who

22  have desisted that the way that they describe their

23  identity is that it is not a fix or a change in their

24  sense of self but more about the expression of their

1   behaviors and their understanding of how they fit into

2   the world that has changed.

3       Q.    So as you say it's too early to really know for

4   sure which of these things it is, right?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  What I would say is it's a

7   preponderance of clinical experience and the studies

8   that we do have point to this being much more likely.

9   BY ATTORNEY TRYON:

10      Q.    Much more likely, is that your testimony?

11      A.    Based on my clinical experiences, yes.

12      Q.    But there's no way that anyone outside of ---

13  there's no objective measurement to make that

14  determination, right?

15                   ATTORNEY BLOCK:  Objection to form.

16                   THE WITNESS:  The way that I would

17  describe it is that gender dysphoria as a diagnosis

18  includes both identity-based criteria that are objective

19  and are measured through the course of the scales that

20  we talked about earlier, as well as measures of role and

21  behavior and congruence with your body.  These are

22  things that are tracked over time in the studies that we

23  have, and when a child desists from that diagnosis of

24  gender dysphoria it is clear at that point that it was

1  primarily the gender role based behaviors that were

2  leading to this diagnosis as opposed to a change in

3  identity.

4  BY ATTORNEY TRYON:

5      Q.   You were freezing up on me, so let me just see

6  if I can understand this by looking at the

7  transcription.  If a child explains the reasons why he

8  or she has a different gender identity, that his or her

9  natal sex, the natal sex designation then later says the

10  opposite, there is really no way of telling whether or

11  not it's just the person's gender identity or the

12  understanding of the identity has changed based on that

13  child's or person's statements.

14          Right?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS:  I would say to complicate

17  matters even further, a number of the studies that are

18  used to describe this desistance phenomenon were first

19  carried out under the DSM-IV.  On the DSM-IV the

20  diagnosis was gender disorder in childhood.  And in that

21  nomenclature, an identity that is incongruent with sex

22  assigned at birth was not one of the required elements.

23  And so there are children who are described in the

24  common parlance as transgender because they met criteria

1    for what was then gender identity disorder, who

2    nevertheless discussed any identity incongruent with

3    their sex at birth.  So that makes it hard to draw firm

4    conclusions about data captured under the DSM-IV.

5    BY ATTORNEY TRYON:

6        Q.    And you are familiar with that diagnostic and

7    statistical manual of mental disorders.

8             Right?

9        A.    I am.

10       Q.    And you cited it in your reports.

11            Right?

12       A.    Correct.

13       Q.    That is a manual to assist in the diagnosis of

14   mental disorders.

15            Right?

16       A.    That is correct.

17       Q.    Is there a value of to classifying a condition

18   as a mental disorders?

19                 ATTORNEY BLOCK:  Objection to form.

20                 THE WITNESS:  I don't know if I can offer

21   an expert opinion on that.  I have a biased --- talk

22   about a selection bias as a psychiatrist and a mental

23   health professional.  I think it's important for us to

24   destigmatize mental illness as much as possible, so

 1  whatever is going to allow folks access to care, I'm
 2  relatively neutral on placing a value on whether or not
 3  something is a diagnosis or not.
 4  BY ATTORNEY TRYON:
 5    Q.    A manual does not recommend any treatments, only
 6  tools for diagnosis.
 7          Is that right?
 8              ATTORNEY BLOCK:   Objection to form.
 9              THE WITNESS:   The main goal of DSM for
10  classifying diagnoses and ensuring stability or
11  reliability of those diagnoses across practice
12  locations.
13  BY ATTORNEY TRYON:
14    Q.    That does not recommend or even provide any
15  treatments.
16          Right?
17    A.    The text of the DSM often recommends or
18  describes treatments.
19    Q.    Does it describe treatments for gender
20  dysphoria?
21    A.    The text was recently revised for gender
22  dysphoria, and so I really want to see the text in front
23  of me for me to talk about it.
24    Q.    So in the DSM-V you don't know if it has any

1   recommendations for treatments in it for gender

2   dysphoria?

3       A.    I don't know in the revised text how much was

4   changed without familiarizing myself with it.  And I'm

5   happy to look at it.  It's a quick read, but primarily

6   the DSM-V as it comes to gender dysphoria is a

7   description of the phenomenology not a recommendation

8   for treatments.

9       Q.    And when was it revised?

10      A.    It was just released about a week ago, maybe

11  two.

12      Q.    Let me ask you to take a look at your report,

13  paragraph 51.  You say to the contrary, as noted

14  previously, stigma and discrimination have been shown to

15  have a profoundly harmful impact on the mental health of

16  transgender people and other minority groups.  Now, when

17  you say stigma and discrimination, you're not referring

18  specifically to not allowing, as using your term, a

19  transgender girl to participate on a girls sports team

20  to be that type of stigma or discrimination, are you?

21              ATTORNEY BLOCK:  Objection to the form.

22              THE WITNESS:  The reference that I

23  referred to in my report I would want to look at,

24  because they had an operational term for stigma and

1    discrimination.  However, there has been literature, I

2    can't remember the names of the authors or the date of

3    the study, that look at specific laws that are enacted

4    to discriminate  against LGBT people and impact on both

5    mental health and medical health, and so those kind of

6    discrimination laws certainly do have real felt impact

7    for transgender folks.

8    BY ATTORNEY TRYON:

9        Q.    So are you saying that this sentence is

10   referring to a law such as HB-3293 or not?

11       A.    I think, as I stated, for the sake of this

12   expert report, the Yhuto reference from 2015 is what I'm

13   using to craft that statement.

14       Q.    I'm sorry, the what from 2015?

15       A.    Footnote number 21.

16       Q.    What are those profound impacts of mental health

17   that you are referring to?

18       A.    Well, as I mentioned earlier in my report are

19   correlation between many exposures that transgender

20   individuals have and increased rates of suicide, self

21   harm, substance use, exposure to trauma that have

22   certainly profound negative impacts for the folks who

23   are experiencing them.

24       Q.    And of those harms that you have just mentioned

1    are you aware of any of them caused by --- to a child or

2    person who was not --- who was a transgender female not

3    allowed to participate on a girls or woman's athletic

4    team?

5        A.    As I had testified to earlier, I think I said

6    I've had two or three patients who are excluded from

7    sports teams, one of which was a child who was assigned

8    male at birth, who at age six was not allowed to

9    participate in the sport.  I can't remember what support

10   it was.  This was a child who was heckled and kicked out

11   of the group of friends that were participating in that

12   sport which led to negative mental health consequences

13   for that individual child.

14       Q.    What specific --- I presume that's thoughts of

15   suicidality.

16             Right?

17       A.    Thankfully at that age they were not.

18       Q.    How did that child adapt to the situation?

19       A.    Well, we worked with the child, the family and

20   the sports team, to understand what this child may need

21   and ended up --- I think it was T ball, I think ended up

22   joining the T ball team.

23       Q.    So how much --- how much of a delay was there

24   between wanting to join the T ball team and being

```
 1   allowed to join the T ball team?

 2      A.    This was years ago, so I don't recall the

 3   specifics.

 4      Q.    Would it be your testimony that any delay at all

 5   between the time of identifying for a natal male

 6   identifying as a female and participating on a female

 7   team would be profoundly harmful?

 8                ATTORNEY BLOCK:  Objection to form.

 9                THE WITNESS:  I have not seen any studies

10   that have asked that question or could speak to the

11   duration of time between exclusion from an activity and

12   the mental health impacts.

13   BY ATTORNEY TRYON:

14      Q.    Is it your position that as soon as the child or

15   person who is a natal male determines or identifies as a

16   female, that that person should be immediately allowed

17   to play on female teams?

18                ATTORNEY BLOCK:  Objection to form and

19   scope.

20                THE WITNESS:  I'm not able to answer that

21   question.  I think that's out of the scope of my

22   expertise.

23   BY ATTORNEY TRYON:

24      Q.    Let me ask it differently because I didn't ask
```

1   it quite as artfully as I could have.  You indicated

2   profoundly harmful or have a profoundly harmful impact.

3   So if a child or adolescent or adult, adult meaning

4   anyone through collegiate age, were to be a natal male

5   and identify as a female and is not allowed to

6   immediately participate on female teams, would that be

7   profoundly harmful, would it have a profoundly harmful

8   impact on their mental health?

9        A.    That would require an individualized assessment

10   of that child or young adult in order to understand the

11   potential impacts specific to that individual.

12        Q.    What if they were required to wait a full year,

13   would that be profoundly --- have a profoundly harmful

14   impact on the mental health of that person?

15             ATTORNEY BLOCK:  Objection to form.

16             THE WITNESS:  Same answer.

17   BY BY ATTORNEY TRYON:

18        Q.    Well as a general rule, do you have any opinion

19   as a general rule?

20             ATTORNEY BLOCK:  Objection to form.

21             THE WITNESS:  General rule of what?  I'm

22   not understanding the question.

23   BY ATTORNEY TRYON:

24        Q.    Let me try again.  So is there --- do you have a

1   general --- I mean you made a generalized statement here

2   in the last sentence of paragraph 51.  So my question

3   is, as it pertains to this generalized statement, is

4   there any delay that would not cause a profoundly

5   harmful impact on the mental health of transgender

6   people if they are denied the opportunity to immediately

7   participate in the sports team of their gender identity?

8              ATTORNEY BLOCK:  Objection to form and

9   characterization.

10             THE WITNESS:  It's a long sentence with a

11  lot of clauses.  I'm trying to --- I'm trying to parse

12  them all out to make sure that I'm answering this

13  accurately.  As I testified to in my report, there's

14  evidence of discrimination, stigma and bias leading to

15  individual harms.  The specific manifestation of those

16  harms are highly individualized and require individual

17  assessment of each child and family in order to know.

18  Which is why you can't speak to the specific impacts for

19  each individual child, but what we know are

20  population-based data.

21     Q.    Is it your view that if after a psychiatrist or

22  psychologist or appropriate healthcare individual

23  determines that there would be a profoundly harmful

24  impact that healthcare professional should be the one to

 1   determine whether or not the child should be allowed to

 2   participate on a girl's team?

 3       A.   I don't have a specific opinion about how sports

 4   administration vary from state to state.  I know it's

 5   very different from state to state.  What I would say is

 6   from a mental health perspective my goal is to help our

 7   kids access spaces that are going to be health promoting

 8   and build resilience.  I think it's important for health

 9   professionals to be involved in the decisions that are

10   made, but I can't speak to the legislative process

11   within the scope of my expertise.

12       Q.   Is the mental health of the cisgender females

13   who might be at a disadvantage of the participation of a

14   transgender female on the team, is their mental health

15   important?

16            ATTORNEY BLOCK:  Objection to form.

17            THE WITNESS:  I would say first that the

18   mental health of cisgender children who have

19   participated in sports is certainly attestable

20   hypothesis to explore and it's not research that I have

21   seen, nor that I'm aware that it exists.  Beyond that,

22   you know, my expertise does not extend to this

23   population as you have asked this question.

24   BY ATTORNEY TRYON:

1    Q.    So then let me ask that specifically, have you

2    treated any cisgender females that have been upset about

3    transgender females participating on the girls team?

4    A.    I have treated cisgender girls who have had

5    transgender teammates.  I have not treated anybody who

6    has expressed any concern or harm from that.

7    Q.    Do you acknowledge that there are those

8    cisgender girls who are suffering from psychological

9    harm from that?

10            ATTORNEY BLOCK:  Objection to form.

11            THE WITNESS:  I would not acknowledge

12    that.  That is not data that I have seen nor has been my

13    personal experience with patients that I have seen or

14    other colleagues who have described this.

15    BY ATTORNEY TRYON:

16    Q.    Are you aware that some of Lia Thomas' cisgender

17    teammates are very upset about Lia Thomas participating

18    on the female swimming team?

19            ATTORNEY BLOCK:  Objection to form.

20            THE WITNESS:  I haven't read much about

21    Lia Thomas or her teammates prior to today, so I'm not

22    aware of any specifics to that.

23    BY ATTORNEY TRYON:

24    Q.    Have you read anything about that incident ---

```
 1   excuse me, that situation?

 2      A.    Well, I've read something today.

 3      Q.    Prior to today?

 4      A.    Which did not mention about teammates being

 5   upset.  I've heard about it, but I have not read it.

 6      Q.    So you're aware of it?

 7      A.    I'm vaguely aware of it, yes.  I've not done any

 8   primary research into it.

 9                ATTORNEY BLOCK:  Could we get a time

10   check?

11                VIDEOGRAPHER:  It looks like I got about

12   three minutes left.

13                ATTORNEY TRYON:  I speak really fast.

14   BY ATTORNEY TRYON:

15      Q.    Well, is there benefits in --- for example, you

16   said that HB --- you've read HB-3293 and you're aware

17   that it does require --- well, first of all, are you

18   aware that HB-3293 does not use the word transgender at

19   all or trans woman or trans girl at all?

20      A.    I would want to look at it specifically to

21   double check that that's correct, but I would take your

22   word for it.

23      Q.    And so in HB-3293, it does require that all

24   biological males must --- let me rephrase that, that
```

1    biological males may not compete on girls teams.

2           Do you understand that?

3      A.    I don't, because biological male as a term is

4    certainly up for debate.

5      Q.    Which word would you like to use?

6      A.    I don't know if there's going to be an answer

7    for that in the context of this particular bill.  I

8    think ---.

9      Q.    How about natal male, does that work?

10     A.    Sure.  We can use that.  I would typically use

11   assigned male at birth, but yes.

12     Q.    Okay.

13          So natal males under this Bill are not allowed

14   to participate on girls sports teams.

15          Do you understand that?

16              ATTORNEY BLOCK:  Objection to form.

17              THE WITNESS:  Yeah.  And I apologize I

18   really don't mean to be parsing, if the text of the Bill

19   is biological males, what that just means is that that

20   is a complex term that doesn't have a universal

21   acceptance.  But I understand that the goal of the Bill

22   is for folks assigned male at birth, not to participate

23   in women's sports teams, yes.

24   BY ATTORNEY TRYON:

1      Q.    If a --- to use your term, a person assigned

2   male at birth is told that that person may not

3   participate on girls sports, and as in so many other

4   things in life, you are told that's the rule and you

5   have to live with it, is there value in learning coping

6   skills to deal with rules that you don't agree with and

7   abide by them?

8              ATTORNEY BLOCK:  Objection to form.

9              THE WITNESS:  I guess the way I would

10  approach it is that if we look at the data, clinical

11  experiences and from the testimonies of transgender

12  individuals that they face enough on a daily basis

13  stigma discrimination exclusion, that they all would

14  benefit from a healthy development of coping skills.

15  Nowhere in the field of psychiatry is it recommended

16  that we expose people to traumatic events for them to

17  develop coping skills to manage through.

18  BY ATTORNEY TRYON:

19      Q.    Well, not to intentionally do so, but there's

20  laws and rules that you made that said you have to live

21  with those rules then it's your position that the rules

22  need to be changed to comply with the wishes of that

23  person?

24              ATTORNEY BLOCK:  Objection to form.

338

1              THE WITNESS:  Again my expert testimony

2    is rebutting the testimony of Dr. Levine and Cantor.  I

3    can't speak to the specific legislative processes in

4    terms of the best way for states to approach a complex

5    issue such as this.

6              ATTORNEY TRYON:  I have no further

7    questions.  Thank you for your time I appreciate it.

8              THE WITNESS:  Thank you.  What is your

9    poodle's name?  Can I ask that off the record?

10             ATTORNEY BLOCK:  We don't have any

11   Redirect questions.  Dr. Janssen will review the

12   transcript.

13             ATTORNEY GREEN:  This is Roberta Green on

14   behalf of WVSSAC.  No questions.

15             ATTORNEY MORGAN:  This is Kelly Morgan on

16   behalf of the West Virginia Board of Education and

17   Superintendant Burch.  I don't have any questions.

18   Thank you.

19             ATTORNEY DENIKER:  Dr. Janssen, thank you

20   for your time today, this is Susan Deniker.  I have no

21   questions.

22             THE WITNESS:  Thank you, guys.

23             VIDEOGRAPHER:  Going off the record.  The

24   current time reads 6:18 p.m.

1                    *  *  *  *  *  *  *  *

2          VIDEOTAPED DEPOSITION CONCLUDED AT 6:18 P.M.

3                    *  *  *  *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

340

1    STATE OF WEST VIRGINIA  )

2                           CERTIFICATE

3            I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6            That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11           That the proceeding is herein recorded

12   fully and accurately;

13           That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19           I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23           OFFICIAL SEAL
             NOTARY PUBLIC
             STATE OF WEST VIRGINIA
             Nicole Montagano
24           Sargent's Court Reporting Service, Inc.
             HUB Business Center Suites              Nicole Montagano,
             Martinsburg WV 25401
             My Commission Expires November 26, 2026
25                                                   Court Reporter

JA0870



[1] *President's Challenge Qualifying Standards*, GRASS VALLEY SCH. DIST., https://gilmore.gvsd.us/documents/Info/Forms/Teacher%20Forms/Presidentialchallengetest.pdf.

[2] James G. Ross & Glen G. Gilbert, *National Children and Youth Fitness Study*, 56 J. OF PHYSICAL EDUC., RECREATION AND DANCE 45, *45-50* (1985).

[3] Rute Santos et al., *Physical Fitness Percentiles for Portuguese Children and Adolescents Aged 10-18 Years*, 32 J. OF SPORT SCI., 1, ** (2014).

[4] Konstantinos D. Tambalis et al., *Physical Fitness Normative Values for 6-18-Year-Old Greek Boys and Girls, Using the Empirical Distribution and the Lambda, Mu, and Sigma Statistical Method*, 16 EUR. J. OF SPORTS SCI.736, *736-46* (2015).

[5] Mark Jon Catley & Grant Tomkinson, *Normative Health-Related Fitness Values For Children: Analysis of 85347 Test Results on 9-17-Year-Old Australians since 1985*, 47 BRIT. J. OF SPORTS MED. 98, ** (2013).

[6] Espen Tonnessen et al., *Performance Development in Adolescent Track and Field Athletes According to Age, Sex and Sport Discipline*, 10 PLOS ONE 1, 1-10 (2015).

[7] David J. Handelsman, *Sex Differences in Athletic Performance Emerge Coinciding with the Onset of Male Puberty*, 87 CLINICAL ENDOCRINOLOGY 68, ** (2017)

*1*



*West Virginia High School 2021 Outdoor Track & Field, ATHLETIC.NET, athletic.net/TrackAndField/WestVirginia (last visited Nov. 8, 2021).*



Roberts Study - Transwomen and Biological Women 1.5 Mile Run in Seconds (42 Transwomen and >567,000 Biological Female Airmen)

Timothy A. Roberts et al., *Effect of Gender Affirming Hormones on Athletic Performance in Transwomen and Transmen: Implications for Sporting Organisations and Legislators*, 55 BRIT. J. OF SPORTS MEDICINE 577, *577-83* (2020).

*3*



Tambalis 2015 Greek Study - Male Advantage Over Female (Sample Size Over 424,000)

Konstantinos D. Tambalis et al., *Physical Fitness Normative Values for 6-18-Year-Old Greek Boys and Girls, Using the Empirical Distribution and the Lambda, Mu, and Sigma Statistical Method*, 16 Eur. J. of Sports Sci.736, *736-46* (2015).

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**DECLARATION OF HEATHER JACKSON**

I, Heather Jackson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2.      I am 54 years old.  My husband, Wesley, and I are the parents of two sons, ages 20 and 14, and an 11-year-old daughter.  We have been married for 21 years.  We live in Lost Creek, West Virginia.

3.      Our daughter's name is B.P.J.  My daughter and I have a very deep connection and I believe she knows that she can come to me for anything—I love her very much.

1

**JA0875**

4.      Wesley and I are fiercely protective of B.P.J.  As her parents, we want to see B.P.J. happy and achieve all her goals.

5.      B.P.J. is bright and studious; she makes "straight As" and loves math and science.

6.      B.P.J. is also transgender.

7.      B.P.J. knew from a very young age that "she didn't want her boy parts."  She never wanted to be naked for bathing because she was deeply uncomfortable with and did not want to see certain parts of her body.  B.P.J. also did not like standing up to urinate.  She would often ask me a lot of questions about my own body and about why our bodies were physically different, if we were both girls.

8.      As a child, B.P.J. also presented differently than my other children, both of whom are boys.  At or around the age of four, B.P.J. started asking and was allowed to play dress-up in my clothes around our home.  Whenever B.P.J. was provided with the opportunity to pick out her clothes or toys, she always went straight for the "girly" items.  I knew this was not a "phase" for her, and that there was something different happening.

9.      When B.P.J. told us that she is a girl and wants to be addressed as a girl, we were not surprised because we spend so much time with her.

10.     Because B.P.J. and I have such an open and communicative relationship, we would have conversations about how she was feeling.  The more we talked and the more comfortable she became with expressing how she was feeling and who she is, the more she was able to clearly communicate that she knew she was a girl.

11.     By the time B.P.J. was in the third grade she had chosen her name and was living as herself at home.  Towards the end of that school year, B.P.J. informed her father and me that

she did not want to continue going to school "dressed as a boy."  We agreed she could start going to school dressed as herself.

12.    In 2019, when B.P.J. was heading into the fourth grade, I met with several school staff at Norwood Elementary School to discuss and create a gender support plan for B.P.J.  The Gender Support Plan is a document the school uses to help guide school staff in supporting B.P.J. in navigating her educational experience as her authentic self.  The plan required school staff to be informed that B.P.J.'s authentic gender is female, and instructed school staff to refer to her with her female name and female pronouns.  School staff were also instructed on how to support B.P.J. if she faced problems from others at school because of her gender.  A true and correct copy of this Gender Support Plan is attached as Exhibit A.

13.    In 2019, we brought B.P.J. to the UPMC Children's Hospital of Pittsburgh's Gender and Sexuality Development Program because B.P.J. was worried about the possibility of going through endogenous puberty.  B.P.J. was diagnosed with gender dysphoria by the Medical Director of the Gender and Sexuality Program, Dr. Gerald T. Montano.  When B.P.J. was initially diagnosed, we were told that puberty delaying treatment was not yet appropriate because she had not begun puberty.  Dr. Montano told us about the first signs of puberty to look out for at home, and we made regular follow-up appointments to monitor B.P.J.'s development.

14.    Once B.P.J. reached the beginning of puberty, Dr. Montano prescribed puberty-delaying treatment on June 15, 2020.  B.P.J. has continuously receive puberty delaying treatment since June 15, 2020, under the care of a multidisciplinary team of providers with expertise in treating transgender adolescents.

15.    Our family enjoys participating in sports, and I am proud to see B.P.J. enjoying sports too.

16.     During the 2019-20 and 2020-21 school years, B.P.J. was a member of the cheerleading team for the Bridgeport Youth Football League.  All members of that team were girls.  Even before B.P.J. started cheering with her team, she spent a year learning all the cheer team's routines from the stands.  When B.P.J. received her girls' cheer uniform, she was glowing.  B.P.J. always wanted me to be in the front row of her competitions.  During the 2019-20 season, for the first time ever, B.P.J.'s cheer team placed at a cheer competition.

17.     Being on the cheer team dramatically increased B.P.J.'s confidence and happiness.  B.P.J. was supported and accepted by the other girls on her team and her coaches.  B.P.J.'s participation on her cheer team taught her the importance of responsibility, trust, and team building.  B.P.J. is especially proud to have served as part of the base for her cheer team's pyramids because it demonstrated to her that her teammates trusted and relied on her in order to complete their routine.

18.     Participating in cheer was a meaningful way for B.P.J. to learn responsibility.  As her mother, I can preach about the importance of responsibility, but her position on her cheer team provided her with the real-life experience of having others rely on her to attend practice and participate, and this has helped her understand responsibility in a deeply personal and meaningful way.

19.     Although B.P.J. enjoyed cheerleading, she joined the cheer team in part because it was one of the only sports offered to her grade level in which she was interested.  When B.P.J. began junior high, however, she was excited to try out for Bridgeport Middle School's girls' cross-country and track teams.

20.     Having the opportunity to run on the girls' cross-country and track teams is important to B.P.J. because B.P.J. comes from a family of runners.  When she was younger, I

would take B.P.J. on runs with me through parks and she grew up watching her brothers run on their school teams.  Additionally, she wanted a continued sense of belonging and camaraderie like she had with the cheer team and hoped to gain that through joining the girls' cross-country team in the fall.

21.    Wesley and I were so excited for B.P.J. to run and I was truly looking forward to attending her future cross-country and track meets.  B.P.J.'s brothers were also both excited for B.P.J. and looked forward to seeing their sister compete.

22.    B.P.J. has the support of her family, coaches, instructors, and peers.  Our family is very supportive, and my 76-year-old mother (B.P.J.'s grandmother), and my step-father (B.P.J.'s step-grandfather) are B.P.J.'s biggest supporters.

23.    On May 18, 2021, I met with B.P.J.'s new Principal at Bridgeport Middle School, David Mazza, to discuss and create B.P.J.'s Gender Support Plan for the sixth grade.  Like the plan we developed for B.P.J. at her elementary school, the plan for Bridgeport Middle School emphasizes that B.P.J. is secure in her identity as a girl and well supported by her parents, school administrators, teachers, and friends. A true and correct copy of that Gender Support Plan is attached as Exhibit B.

24.    During the May 18, 2021 meeting I informed Principal Mazza that B.P.J. wanted to participate on the girls' cross-country and track team.  Principal Mazza communicated to me that, due to H.B. 3293, my daughter would not be permitted to participate on the girls' cross-country or track teams.

25.    On July 12, 2021, conditioning and practice started for the fall 2021 season of cross-country.  While my daughter and I were happy to know she was able to participate in training and conditioning due to an agreement by the Defendants in this case to not enforce H.B.

3293 against her during that period, I was concerned about whether she would be able to try-out for and participate on the girls' cross-country team.

26.      On July 21, 2021, I learned that the court ruled that my daughter would be allowed to try-out for the girls' cross-country and track teams!  At the beginning of August, B.P.J. participated in try-outs for the girls' cross-country team and soon thereafter our family learned that she made the team.

27.      During her first cross-country season, B.P.J. participated in the Mountain Hollar MS Invitational meet and the Doddridge Invitational meet.  At the Mountain Hollar Invitational, B.P.J. placed 51 out of 66 participants and at the Doddridge Invitational, she placed 123 out of 150 participants.

28.      B.P.J. told me that she learned a lot about team work, and that she made many friends through participating on the cross-country team.  She said that she had no problems with any of her teammates and that they had a fun season.  Photos from B.P.J.'s cross-country season are attached hereto as Exhibit C.

29.      It was no surprise to me that by the time track season came, B.P.J. was ready to keep on running.  At the beginning of March, my daughter participated in the required two-week try-outs for the girls' team and on March 11, 2022, we learned that she made the girls' track team.

30.      B.P.J. is a girl.  It is wrong and senseless to try to make her participate on boys' sports teams when there are girls' teams available.  Forcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl.  My daughter is simply saying, "Accept me for who I am."

31.     B.P.J. was so happy to be able to run this school year, and she is so afraid of having that opportunity taken away from her.  Prohibiting her from participating on the girls' team would also set back her medical treatment, which calls for her to be treated as the girl she is in all aspects of her life, and her mental health would suffer if she could no longer do the thing she loves because West Virginia refuses to treat her as a girl.  Forcing her to run with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is, and would be profoundly harmful to her.

* * *

7

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on __04/19/2022__

_____

Heather Jackson

**JA0882**



Dr. Mark A. Manchin
Superintendent

**– Confidential –**
**Gender Support Plan**

The purpose of this document is to create shared understandings about the ways in which the student's authentic gender will be accounted for and supported at school. School staff, caregivers and the student should work together to complete this document.

School/County __Norwood Elementary- Harrison__     Today's Date __8-23-19__
Name Student Uses: __B██████__     Name on Birth Certificate: __P████ J██__
Student's Gender Identity __Female__     Assigned Sex at Birth __Male__   Student Grade Level __4th__
Student's DOB: __████__
Parent(s), Guardian(s), or Caregiver(s) /relation to student
__Heather Jackson / Wesley Pepper_____ / _____
Meeting participants: __Sarah Starkey, Heather Jackson, B████__
__Tara Shields, Jasmine Lowther, Nurse Tina__

---

**PARENT/GUARDIAN INVOLVEMENT**

Are guardian(s) of this student aware and supportive of their child's gender status?  __X__ Yes   ____No

If not, what considerations must be accounted for in implementing this plan? __Mom very supportive,__
__dad has struggled but coming around. Seeking outside__
__help through Church and Paternal side of family's help/support__

**CONFIDENTIALITY, PRIVACY AND DISCLOSURE** __Molly Ober fechter- Leggett- WVU__

How public or private will information about this student's gender be (check all that apply)?

__X__ County staff will be aware (Superintendent, Student Support Services, District Psychologist, etc.)
   Specify the adult staff members: __Dr. Manchin, Sarah Starkey__

__X__ Site level leadership/administration will know (Principal, counselor, etc.)
   Specify the adult staff members: __Tara Shields and school counselors__

__X__ Teachers and/or other school staff will know
   Specify the adult staff members: __All teachers__

____ Student will not be openly "out," but some students are aware of the student's gender
   Specify the students:

__X__ Student is open with others (adults and peers) about gender

____ Other – describe: __B████ is comfortable with others knowing__
__her Gender Identity and transition.__

> EXHIBIT
> WV-17

If the student has asserted a degree of privacy, what steps will be taken if that privacy is compromised, or is believed to have been compromised?
__N/A__

Confidential                                                                                       BPJ 007

JA0883

How will a teacher/staff member respond to any questions about the student's gender from:

Other students? Be open and honest - she is B███ and that makes her happy.

Staff members? Be open and honest - she is B███, and that makes her happy.

Parents/community? Be open and honest - she is B███, and that makes her happy.

## STUDENT SAFETY

Who will be the student's "Trusted Adult" at School? feels comfortable with All teachers →

If this person is not available, what should student do? feels comfortable with All teachers. We showed classrooms with "Safe Space" stickers.

What are expectations in the event the student is feeling unsafe and how will student signal their need for help:

During class Raise hand / Get up and walk to teacher - Yell help

Field Trips - Find Closest trusted Adult    Yell help

In the halls    "    "

Other _____

Other safety concerns/questions: B███ feels safe and comfortable and very much supported.

What should the student's parents do if they are concerned about how others are treating their child at school? Mom and/or Dad Will Contact Tara Shields.

## NAMES, PRONOUNS AND STUDENT RECORDS

What name and gender marker are listed on the student's identity documents? ███ H██ J███

Name/gender marker entered into the Student Information System male but B██ in ( )

Name to be used when referring to the student B███    Pronouns her, she / hers

Can the student's name/gender marker be reflected in the SIS?    If so, how? If not, why not?
Gender Will be male but B███ will be in ( ) next to birth name.

If not, what adjustments can be made to protect this student's privacy (see below)? _____

Who will be the point person at school for ensuring these adjustments are made and communicated as needed? Tara Shields

How will instances be handled in which the incorrect name or pronoun are used by staff members?
if Intentional - Will be Addressed by Principal and or/CO

By students?    "
B███ Will Report to teacher, Mrs. Shields Counselor if continues to be intentional.

BPJ 008

JA0884

Page | 3

If unable to change the student's profile in the student information system, how will the student's privacy be accounted for and maintained in the following situations or contexts:

During registration _____

Completing enrollment _____

With substitute teachers – Jasmine will leave info in plans for sub teacher.

Standardized tests Populated in Wevis

School photos Name B███ will be used

IEPs/Other Services _____

Student cumulative file Populated in Wevis

After-school programs _____

Lunch lines _____

Taking attendance B███ will be in ( )

Teacher grade book(s) Live Grades Populated from Wevis

Official school-home communication _____

Unofficial school-home communication (PTA/other) _____

Outside district personnel or providers _____

Summons to office Staff will use name B███

Yearbook B███ P███ – J███

Student ID/library cards What parents fill out on picture form

Posted lists _____

Distribution of texts or other school supplies _____

Assignment of IT accounts/email address _____

PA announcements _____

If the student's guardians are not aware and/or supportive of the student's gender status, how will school-home communications be handled?

Parents are supportive

What are some other ways the school needs to anticipate the student's privacy being compromised? How will these be handled?

maintain confidentiality and handle as needed.

| USE OF FACILITIES |

Student will use the following bathroom(s) at school: In teacher lounge, first on on ®

Student will change clothes in the following place(s) "

If student/parent have questions/concerns about facilities, who should they contact? Tara Shields

What are the expectations regarding the use of facilities for any class trips? Use family/Gender nutural Bathroom. Go to teacher & teacher make sure Bathroom empty (Kmale) if No Gender nutural Bathroom.

What are the expectations regarding rooming for any overnight trips?

Are there any questions or concerns about the student's access to facilities?
No

JA0885

Page | 4

**EXTRA CURRICULAR ACTIVITIES**

In what extra-curricular programs or activities will the student be participating (sports, theater, clubs, etc)?

B█████ is on a Cheerleading team outside of school. Strings or choir are optional.

What steps will be necessary for supporting the student there?

N/A

Does the student participate in an after-school program? N/A

What steps will be necessary for supporting the student there? N/A

Questions/Notes:

**OTHER CONSIDERATIONS**

Does the student have any sibling(s) at school? _____ Factors to be considered regarding sibling's needs?

Not at Norwood - brother is in Middle School BMS

Does the school have a dress code? Yes  How will this be handled?

→ Not gender specific - No short shorts, or spaghetti straps common sense.

Are there lessons, units, content or other activities coming up this year to consider (growth and development, swim unit, social justice units, name projects, dance instruction, Pride events, school dances etc.)?

N/A Plan will be reviewed at least yearly. Health Education will be discussed next year.

Are there any specific social dynamics with other students, families or staff members that need to be discussed or accounted for?

No

What training(s) will the school engage in to build capacity for working with gender-expansive students? How will the school work to create more gender inclusive conditions for all students? Norwood Staff Recieved training on tolerence and cultural Diversity and LGBTQ+IA on 8/21 and provided protocol and multiple resource sources.

Does the student use school- or district-provided transportation services? If so, how will the student's gender be accounted for?

Bus Driver Randy # 234 will be educated that B█████ is name to be used and of chosen pronouns.

**JA0886**

Page | 5

Are there any other questions, concerns or issues to discuss? _____

_____ *N/A* _____

_____

_____

_____

_____

_____

---

**SUPPORT PLAN REVIEW AND REVISION**

How will this plan be monitored over time? Reviewed At least Yearly but Can be Revisited at Any time within school Year if needed.

What will be the process should the student, family, or school wish to revisit any aspects of the plan (or seek additions to the plan)? Contact Tara Shields or teacher.

What are specific follow-ups or action items emerging from this meeting and who is responsible for them?

| Action Item | Who? | When? |
|---|---|---|
| N/A | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Date/Time of next meeting or check-in _____ Location _____

Will schedule at End of School Year for next School Year.

Sarah Starkey MSW, LGSW

*[signature]*

*[signature]* Tara R. Shields

*[signature]* Jasmine Smith

p ████

*[signature]* Tina Cutler

Confidential

BPJ_011

JA0887



# HARRISON COUNTY SCHOOLS

445 WEST MAIN STREET
POST OFFICE BOX 1370
CLARKSBURG, WEST VIRGINIA 26302-1370
(304) 326-7300
FAX (304) 326-7382

Dora L. Stutler
*Superintendent*

### Preferred Name Request Form

The Harrison County Board of Education is committed to inclusion and recognizes that students may need to use a preferred name to identify themselves comfortably. Please note that although the HCBOE recognizes the importance, in many instances, of using preferred name, your legal name may continue to be necessary for Board of Education business where the legal name is required. Students who use a preferred name should always be prepared to provide legal name identification when needed. Only the first name is permitted to be updated with the Preferred Name Request Form.

Please fill out this form clearly and completely and return it to the Principal of your school. Please note, a parent signature is required. If you have any questions or concerns, please contact the Principal of your school prior to the submission of this form. The preferred name will remain in use until and student requests that it be deactivated. This process for using a preferred name does not impact students who officially change their legal name.

**Legal Name:**

| Legal first Name: | Legal Middle Name: | Legal Last Name: |
|---|---|---|
| ██████ | ██████ | P████-J████ |
| WVEIS # 330049261 | School: BMS | Grade: 6 |

**Preferred Name:**

| Preferred First Name: |
|---|
| B█████ |

Signature B████ P████ ████

Date _____

Parent Signature ~~~~~~~~~~~

Date 5-18-2021

For Office Use Only:

| Principal Signature: |
|---|
| Date Received: |



Dora L. Stutler
Superintendent

– Confidential –
## Gender Support Plan

The purpose of this document is to create shared understandings about the ways in which the student's authentic gender will be accounted for and supported at school. School staff, caregivers and the student should work together to complete this document.

School/County __Bridgeport Middle – Harrison__   Today's Date __5|18|21__
Name Student Uses: __J Becky__   Name on Birth Certificate: ▮▮▮ __Pepper-Jackson__
Student's Gender Identity __female__   Assigned Sex at Birth __male__   Student Grade Level __6th__
Student's DOB: __5|11|10__
Parent(s), Guardian(s), or Caregiver(s) /relation to student
__Heather Jackson / Wesley Pepper__ _____ / ___
Meeting participants: __Tarra Shields, Amber Davis, David Mazza,__
__Lauren Merrill, Heather Jackson, Becky Pepper-Jackson__

### PARENT/GUARDIAN INVOLVEMENT

Are guardian(s) of this student aware and supportive of their child's gender status?  __✓__ Yes  ___No

If not, what considerations must be accounted for in implementing this plan? _____
_____
_____

### CONFIDENTIALITY, PRIVACY AND DISCLOSURE

How public or private will information about this student's gender be (check all that apply)?

__X__ County staff will be aware (Superintendent, Student Support Services, District Psychologist, etc.)
   Specify the adult staff members: __Dora Stutler, Sarah Starkey__

__X__ Site level leadership/administration will know (Principal, counselor, etc.)
   Specify the adult staff members: __Mr. Mazza, Mr. Oldaker, and Lauren Merrill__

__X__ Teachers and/or other school staff will know
   Specify the adult staff members: __All teachers__

____ Student will not be openly "out," but some students are aware of the student's gender
   Specify the students:

__X__ Student is open with others (adults and peers) about gender

__X__ Other – describe: __Becky is comfortable with others knowing__
__her Gender Identity and transition.__

If the student has asserted a degree of privacy, what steps will be taken if that privacy is compromised, or is believed to have been compromised?  _____
_____ N/A _____

EXHIBIT
WV-19

Page | 2

How will a teacher/staff member respond to any questions about the student's gender from:

Other students? Be open and honest – she is Becky; and that makes her happy.

Staff members? Be open and honest – she is Becky; and that makes her happy

Parents/community? Be open and honest – she is Becky; and that makes her happy

**STUDENT SAFETY**

Who will be the student's "Trusted Adult" at School? Mr. Mazza & Mrs. Merrill

If this person is not available, what should student do? find teacher(s) that Becky feels comfortable speaking with.

What are expectations in the event the student is feeling unsafe and how will student signal their need for help:

During class Raise hand / Get up and walk to teacher - yell help

Field Trips find closest trusted adult; yell help

In the halls "

Other

Other safety concerns/questions: Becky feels safe and comfortable and very much supported.

What should the student's parents do if they are concerned about how others are treating their child at school?
Mom and/or Dad will contact Mr. Mazza.

**NAMES, PRONOUNS AND STUDENT RECORDS**

What name and gender marker are listed on the student's identity documents? ▮▮▮▮▮ Pepper-
Jackson; male Becky in ( )
Name/gender marker entered into the Student Information System? male.

Name to be used when referring to the student  Becky     Pronouns her, she, hers

Can the student's name/gender marker be reflected in the SIS? _____ If so, how? If not, why not?
Gender will be male but Becky will be in ( ) next to birth name

If not, what adjustments can be made to protect this student's privacy (see below)?

Who will be the point person at school for ensuring these adjustments are made and communicated as needed?
David Mazza

How will instances be handled in which the incorrect name or pronoun are used by staff members? If intentional – will be addressed by Principal and/or Counselor

By students? "
Becky will report to teacher, Mr. Mazza, Counselor if it continues to be intentional

Confidential

BPJ 003

**JA0890**

Page | 3

If unable to change the student's profile in the student information system, how will the student's privacy be accounted for and maintained in the following situations or contexts:

During registration _____

Completing enrollment _____

With substitute teachers _Teachers will leave info in plans for sub teacher_

Standardized tests _Populated in WVEIS_

School photos _Name Becky will be used_

IEPs/Other Services _____

Student cumulative file _Populated in WVEIS_

After-school programs _____

Lunch lines _populated in WVEIS_

Taking attendance _Becky will be in (          )_

Teacher grade book(s) _Live Grades populated from WVEIS_

Official school-home communication _____

Unofficial school-home communication (PTA/other) _____

Outside district personnel or providers _____

Summons to office _Staff will use name Becky_

Yearbook _Becky Pepper-Jackson_

Student ID/library cards _What parents fill out on picture form._

Posted lists _____

Distribution of texts or other school supplies _____

Assignment of IT accounts/email address _____

PA announcements _____

If the student's guardians are not aware and/or supportive of the student's gender status, how will school-home communications be handled?
_Parents are supportive_

What are some other ways the school needs to anticipate the student's privacy being compromised? How will these be handled?
_maintain confidentiality and handle as needed._

**USE OF FACILITIES**

Student will use the following bathroom(s) at school: _In Counselor's/Nurse's Suite_

Student will change clothes in the following place(s) _"                    "_

If student/parent have questions/concerns about facilities, who should they contact? _David Mazza_

What are the expectations regarding the use of facilities for any class trips? _Use family/Gender neutral bathroom. Go to teacher & teacher make sure female bathroom is empty, if no gender/neutral bathroom option._

What are the expectations regarding rooming for any overnight trips? _____

Are there any questions or concerns about the student's access to facilities? _NO_

_____

_____

BPJ 004

**JA0891**

Page | 4

## EXTRA CURRICULAR ACTIVITIES

In what extra-curricular programs or activities will the student be participating (sports, theater, clubs, etc)?

Cross Country and Track

What steps will be necessary for supporting the student there? Coaches would need to be aware of Becky's transition. If teammates have questions, they could approach the coach or administration.

Does the student participate in an after-school program? Cross Country, Track, Band.

What steps will be necessary for supporting the student there? Teacher would need to be aware of transition and also feel comfortable with answering any student questions. If not, students can ask administration or counselor.

Questions/Notes:

## OTHER CONSIDERATIONS

Does the student have any sibling(s) at school? Factors to be considered regarding sibling's needs?

Brother at Bridgeport Middle School.

Does the school have a dress code? Yes How will this be handled?

Not gender specific - No short shorts or spaghetti straps; common sense

Are there lessons, units, content or other activities coming up this year to consider (growth and development, swim unit, social justice units, name projects, dance instruction, Pride events, school dances etc.)? Plan will be reviewed at least yearly.

Are there any specific social dynamics with other students, families or staff members that need to be discussed or accounted for? NO

What training(s) will the school engage in to build capacity for working with gender-expansive students? How will the school work to create more gender inclusive conditions for all students? BMS will receive training on tolerance and cultural diversity and LGBTQ as arranged by Mr. Mazza during upcoming school year.

Does the student use school- or district-provided transportation services? If so, how will the student's gender be accounted for? Bus #281 Mr. Hollansworth and #294 Mr. Lantz will be informed of name being Becky and preferred pronouns.

Confidential

Page | 5

Are there any other questions, concerns or issues to discuss? _____

_____ N/A _____

_____

_____

_____

_____

_____

---

**SUPPORT PLAN REVIEW AND REVISION**

How will this plan be monitored over time? Plan will be renewed yearly
but can be revisited at any time per request.

What will be the process should the student, family, or school wish to revisit any aspects of the plan (or seek additions to the plan)? Contact Mr. Mazza
_____

What are specific follow-ups or action items emerging from this meeting and who is responsible for them?

| Action Item | Who? | When? |
|---|---|---|
| N/A | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Date/Time of next meeting or check-in _____ Location _____

Meeting will be scheduled at end of school
year for next school year.

Lauren Merrill, BMS Counselor

[signature] 5-18-2021          Becky Pepper Jackson

[signature] David R. Mazza      [signature] Shields      Amber Davis





JA0894










**JA0896**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

### DECLARATION OF     J

I, B.P.J., pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I make this declaration of my own personal knowledge, and, if called as a witness,
I could and would testify competently to the matters stated herein.

2.     I am a girl who is also transgender.  I am 11 years old, and I am in the sixth grade
at Bridgeport Middle School.  I have two older brothers, ages 14 and 20.  I live with my brothers;
my mom, Heather; and my dad, Wesley in Lost Creek, West Virginia.

3.     Some of my favorite things to do include playing outside with our family's dogs,
riding my bike, running with my friends and family, and jumping on the trampoline.  I am very

1

JA0897

passionate about math and science and make straight As in school.  Also, I like to play videogames like Apex Legends, Minecraft, and Overwatch.  I also got an Oculus this year, and I love playing the Beat Saber game.

4.      I knew from when I was very little that I am a girl.  When I was younger, I remember always feeling like I wasn't in the right body and wanting to play in my mom's clothing.

5.      My mom has always been supportive of me, so it felt normal for me to talk to her about how I was feeling about being a girl and that I wanted to go by the name B.P.J.  While talking to my dad was a little bit harder in the beginning, he supported me in wanting to be referred to as B.P.J. and in the fact that I am a girl.

6.      During my fourth-grade year, I went to school dressed in clothes that girls wear, and teachers and staff were using my chosen name.  My mom and I met with my principal, teacher, and others at my school to make a plan for how my school could best support me as a girl.  I was happy with the plan we developed together, and I really felt supported by my classmates and by my school.

7.      One of the ways my parents supported me in being the girl that I am is that they took me to see a team of healthcare professionals who work with transgender people.  I was diagnosed with gender dysphoria in 2019.

8.      I am currently on puberty-delaying medication and have been for almost two years.

9.      In fourth grade, I joined a cheerleading team with other girls.  I first got into cheering because my mom encouraged me to try a sport.  Since I had spent time learning cheer

2

**JA0898**

routines while in the stands at football games and my friends were also on the cheer team, I decided to pursue cheer.

10.     I really liked being a cheerleader.  It was fun.  I liked having the chance to be on a team with my friends and learning how to do all the cheers.  I never had any problems with the other girls on the team.

11.     During my first year on the cheer team, our team placed at a cheer competition for the first time ever.  It made me feel proud and good about myself to work hard and improve as a team.

12.     Heading into junior high school, I was excited to try out for the girls' cross-country and track teams.  Although I really enjoyed my time on the cheer team, I sometimes got "stage fright" and preferred to take up a new sport.

13.     Since I was young, I have always enjoyed running and everyone in my family runs.  My older brothers run cross-country, and my mom runs too.  Seeing my family run has motivated me to want to try out and participate.

14.     Last spring, my mom told me about a law called H.B. 3293 that prevents transgender girls like me from playing on girls' sports teams.  Knowing that I could not try out for the girls' cross-country and track teams just because I am a transgender girl was horrible and made me feel angry and sad.  It hurt to know that I would not be able to have the chance to run on the girls' team like my friends can because of who I am.

15.     I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team.

16.     Running with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls.  If I did not get to participate in cross-

**JA0899**

country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team.

17.    In July 2021, I participated in training and conditioning before the August try-outs for the girls' cross-country team.  Participating in training and conditioning was a positive experience—I had fun getting to know the coaches and teammates, and challenging myself to run as well as I could.

18.    Following try-outs at the beginning of August, I learned that I made the girls' cross-country team.  My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team.  I made so many new friends and loved competing with and supporting my teammates.  We learned about teamwork, having a positive attitude, and how to have fun while being competitive.

19.    Since I was also interested in participating on the girls' track team, I looked forward to spring try-outs.

20.    In early March, I participated in two weeks of try-outs for the girls' track team and on March 11, 2022, I learned that I made the girls' track team.  I was ecstatic.

21.    Ultimately, I just want to have the opportunity to participate in school sports like any other girl.  Sports are an important part of my experience at school, and I was so happy to be able to have the chance to participate in cross-country and track this year with the other girls in my school.  I look forward to many more years of running with my peers.  It is so upsetting and hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender.

* * *

4

**JA0900**

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on  __04/19/2022__

_____
B.P.J.

**JA0901**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

B.P.J., by her next friend and mother,
HEATHER JACKSON,

     *Plaintiff,*

     vs.

WEST VIRGINIA STATE BOARD OF
EDUCATION; HARRISON COUNTY BOARD
OF EDUCATION; WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION; W. CLAYTON BURCH in his
official capacity as State Superintendent;
DORA STUTLER in her official capacity as
Harrison County Superintendent;
PATRICK MORRISEY in his official
capacity as Attorney General; and THE
STATE OF WEST VIRGINIA,

     *Defendants*.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin

## RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT, STATE OF WEST VIRGINIA

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the applicable

Local Rules of the District of West Virginia and this Court, Defendant the State of West Virginia

provides the following in response to Plaintiff's First Set of Interrogatories to Defendant, State of

West Virginia ("First Set of Interrogatories").

### GENERAL OBJECTIONS

1)     The State of West Virginia objects to the following definition as stated in

Plaintiff's First Set of Interrogatories:

**"YOU, YOUR, or YOURS means the State of West Virginia and its governors, attorneys general, agencies, legislators, officials, affiliates, attorneys, accountants, consultants, representatives, and agents."**

**INTERROGATORY NO. 6:** Identify all governmental interests that YOU believe are advanced by H.B. 3293.

RESPONSE:   The State objects to the word "believe" as used in this interrogatory; the State is not a natural person capable of belief or non-belief.  Further objecting, the government interests advanced by the Protection of Women's Sports Act, also known as H.B 3293, are a subject of legal determination.  Without waiver of any objections, the State asserts the following interests, primarily and in general, which are advanced by the Protection of Women's Sports Act:

1.      To Protect Women's Sports

2.      To follow Title IX

3.      To protect women's safety in female athletic sports.

The State reserves the right to further address this issue as this matter progresses, either in its discovery responses, its expert witness disclosures, or its legal briefing.


**INTERROGATORY NO. 7:** Identify all ways that YOU believe the governmental interests identified in Interrogatory No. 6 are advanced by H.B. 3293.

RESPONSE:  Defendant State of West Virginia incorporates the specific objections to Interrogatory 6 above into this response.  The State also objects to the extent that this interrogatory seeks to preview legal arguments relative to governmental interests, which are a subject of legal determination, and is therefore inappropriate.  Without waiver of any objections, Defendant State of West Virginia notes its Brief in Opposition to Motion for Preliminary Injunction and its attached materials and other documents.  In addition, the State may provide further materials and documents through additional expert witness

9

JA0903

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

          *Plaintiff*,

    v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

          *Defendants*,

    and

LAINEY ARMISTEAD,

          *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

### RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION
### TO DEFENDANT, STATE OF WEST VIRGINIA

Pursuant to Federal Rules of Civil Procedure 33 and 36 and the applicable Local Rules of the Southern District of West Virginia and this Court, the Defendant, State of West Virginia (the "State"), provides these responses to Plaintiff's Second Set of Requests for Admission to Defendant, State of West Virginia ("Second Set of RFAs").

### GENERAL OBJECTIONS

The State objects to the definitions of the terms "Cisgender," "Gender Identity," "Transgender," and "Transgender Girl" in the Second Set of RFAs' instructions. Those terms have no definitive legally recognized definition, and those terms do not have an agreed or stipulated meaning in this matter. Any requests for admissions based on these disputed and unproven definitions would necessarily be admissions as to Plaintiff's definitions, which the State declines to do at this point in the litigation.

1

Objecting further, Plaintiff's instructions state: "3. GENDER IDENTITY is synonymous with the meaning used in Plaintiff's First Amended Complaint, paragraphs 19-23." Yet those paragraphs do not contain any definition of the term "gender identity." Accordingly, the instructions for the Second Set of RFAs, even if otherwise acceptable, are vague and unclear.

Further objecting, the Defendant State objects to the definition of "YOU," "YOUR," and "YOURS." As previously discussed in this case, the State of West Virginia alone intervened and was then added as a named defendant via the Amended Complaint, and the Attorney General represents only the State of West Virginia. The Attorney General does not represent any of the other entities or individuals listed in the definition of "YOU, YOUR or YOURS" in these requests and cannot speak on behalf of those entities and individuals here. Accordingly—and consistent with other discovery responses in this matter—any responses are on behalf of the State only.

Further objecting, to the extent that the RFAs ask that the Defendant State admit to its awareness, it is unclear how "awareness" is meant to be applied to the State of West Virginia as (i) "awareness" is distinct from "knowledge" and (ii) the State is an entity which does not have "awareness" as that term is typically understood. Any RFAs seeking such an admission are unclear and consequently seem inappropriate.

Further objecting, the Defendant State objects to any instructions which go beyond Federal Rule 36 and will follow that rule in the event the instructions conflict or go beyond that rule.

### RESPONSES TO REQUESTS FOR ADMISSION

Defendant State of West Virginia incorporates by reference all of the foregoing objections into each of the responses below. Any admission in the responses below are made without waiver of the foregoing objections.

**REQUEST NO. 5:** **Admit that Plaintiff B.P.J. has been diagnosed with gender dysphoria.**

**RESPONSE:** The State objects to this request as it is vague in the sense that the term "diagnosed" suggests a medical diagnosis. The assertion of a diagnosis of gender dysphoria relates to a subjective psychological diagnosis, and it is the State's understanding that the standards for such diagnosis vary and that different medical providers reach such a diagnosis differently. Further responding, the State denies for lack of knowledge. The State acknowledges and admits that there are medical records that record and reflect a diagnosis of gender dysphoria for BPJ that was provided by Dr. Montano and that there has been deposition testimony consistent with these records, but denies all other requests included within this Request.

**REQUEST NO. 6:** **Admit that in 2021 Plaintiff B.P.J. was a member of Bridgeport Middle School's girls' cross-country team.**

**RESPONSE:** The State admits this Request.

**REQUEST NO. 7:** **Admit that Plaintiff B.P.J. placed 51 out of 66 competitors in the girls' middle school cross country Mountain Hollar MS Invitational meet in 2021.**

2

**RESPONSE:** The State denies this Request for lack of knowledge. The State has no knowledge of the source of this information or the validity of such information.

**REQUEST NO. 8:** **Admit that Plaintiff B.P.J. placed 123 out of 150 competitors in the girls' middle school cross country Doddridge Invitational meet in 2021.**

**RESPONSE:** The State denies this Request for lack of knowledge. The State has no knowledge of the source of this information or the validity of such information.

**REQUEST NO. 9:** **Admit that you have not received any complaints associated with Plaintiff B.P.J.'s membership on Bridgeport Middle School's girls' cross country team.**

**RESPONSE:** The State objects to this request as it would not be the recipient of such complaints. Without waiver of the foregoing, the State admits this Request.

**REQUEST NO. 10:** **Admit that no middle school girl was harmed as a result of B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021.**

**RESPONSE:** The State objects to this request as the term "harmed" is vague and has multiple meanings. Without waiver of the foregoing, the State denies for lack of knowledge and further states that it is perhaps unknowable what effect B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021 has had on other participants on that team, participants on other teams, or on others who wanted to participate in this or other events but were dissuaded from such participation or otherwise felt harmed in some way, psychologically or otherwise. Further responding, the State has no knowledge of any physical harm to any middle school girl as a result of Plaintiff B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021.

**REQUEST NO. 11:** **Admit that no middle school girl was injured as a result of Plaintiff B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021.**

**RESPONSE:** The State objects to this request as the term "injured" is vague and has multiple meanings. Without waiver of the foregoing, the State denies for lack of knowledge and further states that it is perhaps unknowable what effect B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021 has had on other participants on that team, participants on other teams, or on others who wanted to participate in this or other events but were dissuaded from such participation or otherwise felt injured in some way, psychologically or otherwise. Further responding, the State has no knowledge of any physical injury to any middle school girl as a result of Plaintiff B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021.

**REQUEST NO. 12:** **Admit that no Bridgeport Middle School girl student was prohibited from joining Bridgeport Middle School's girls' cross-country team in 2021.**

**RESPONSE:** The State denies this Request for lack of knowledge. This type of information is not within the knowledge of the State.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff,*

v.                                                                Civil Action No. 2:21-cv-00316
                                                                  Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

**DEFENDANT SUPERINTENDENT DORA STUTLER'S RESPONSES AND
OBJECTIONS TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant

Superintendent Dora Stutler ("Superintendent Stutler") hereby responds and objects to "Plaintiff's

Second Set of Requests for Admission to Defendant Harrison County Superintendent Dora Stutler"

as follows:

**GENERAL OBJECTION**:  Superintendent Stutler objects to the definitions of

"County Board" and "County Superintendent" as set forth in Plaintiff's requests for admission.

**REQUEST NO. 25:**  Admit that the Harrison County Board of Education and the Harrison County School Superintendent must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:        **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.   Subject to and without waiving the objection, Superintendent Stutler states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the Harrison County Board of Education ("County Board") and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, Superintendent Stutler admits this request because, absent an injunction by a court, the County Board and the County Superintendent would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board and the County Superintendent no discretion.

**REQUEST NO. 26:**  Admit that H.B. 3293 prohibits the Harrison County Board of Education and the Harrison County Superintendent from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**RESPONSE**:        **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.   Subject to and without waiving the objection, Superintendent Stutler states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County

Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, Superintendent Stutler admits this request because, absent an injunction by a court, the County Board and the County Superintendent would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board and the County Superintendent no discretion.

**REQUEST NO. 27:**  Admit that the West Virginia Secondary School Athletic Commission must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:          **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, Superintendent Stutler is not in a position to admit or deny this request because it concerns the West Virginia Secondary School Athletic Commission's obligations under H.B. 3293.

**REQUEST NO. 28:**  Admit that H.B. 3293 prohibits the West Virginia Secondary School Athletic Commission from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School

**RESPONSE**:          **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, Superintendent Stutler is not in a position to admit or deny this request because it concerns the West Virginia Secondary School Athletic Commission's obligations under H.B. 3293.

**REQUEST NO. 29:**  Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), offered at Bridgeport Middle School.

**RESPONSE**:          Denied.

**REQUEST NO. 48:**  Admit that when enforcing West Virginia State law you act on behalf of the State of West Virginia.

**RESPONSE**:           **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.   Subject to and without waiving the objection, Superintendent Stutler admits this request.

**REQUEST NO. 49:**  Admit that when enforcing West Virginia State law you are a State Actor for purposes of 42 U.S.C. § 1983.

**RESPONSE**:           **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.   Subject to and without waiving the objection, Superintendent Stutler admits this request.

**REQUEST NO. 50:**  Admit that you are required to enforce H.B. 3293 assuming the Court has not enjoined you from doing so.

**RESPONSE**:           **OBJECTION**.  Superintendent Stutler objects to the extent this request is seeking a legal conclusion.   Subject to and without waiving the objection, Superintendent Stutler states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, Superintendent Stutler admits this request because, absent an injunction by a court, the County Board and the County Superintendent would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board and the County Superintendent no discretion.

14095490.1                                    15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff*,

v.                                                        Civil Action No. 2:21-cv-00316
                                                          Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

**DEFENDANT HARRISON COUNTY BOARD OF EDUCATION'S RESPONSES AND
OBJECTIONS TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant Harrison

County Board of Education ("County Board") hereby responds and objects to "Plaintiff's Second

Set of Requests for Admission to Defendant Harrison County Board of Education" as follows:

**GENERAL OBJECTION**:  The County Board objects to the definitions of

"County Board" and "County Superintendent" as set forth in Plaintiff's requests for admission.

Those definitions are overly broad and outside the permissible scope of discovery under the

14094080

**JA0911**

**REQUEST NO. 25:**  Admit that the Harrison County Board of Education and the Harrison County School Superintendent must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 26:**  Admit that H.B. 3293 prohibits the Harrison County Board of Education and the Harrison County Superintendent from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this

request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 27:** Admit that the West Virginia Secondary School Athletic Commission must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board is not in a position to admit or deny this request because it concerns the West Virginia Secondary School Athletic Commission's obligations under H.B. 3293.

**REQUEST NO. 28:**  Admit that H.B. 3293 prohibits the West Virginia Secondary School Athletic Commission from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board is not in a position to admit or deny this request because it concerns the West Virginia Secondary School Athletic Commission's obligations under H.B. 3293.

**REQUEST NO. 29:**  Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), offered at Bridgeport Middle School.

**RESPONSE**:          Denied.

**REQUEST NO. 30:**  Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-

Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 49:**  Admit that but for the injunction in this case (Dkt. 67) the Harrison County School Board and schools within the Harrison County School District would not take any actions that violated H.B. 3293.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 50:**  Admit that, but for the injunction in this case (Dkt. 67), the Harrison County School Board and Bridgeport Middle School would not have permitted Plaintiff

14094080

15

**JA0914**

Board admits that it has delegated some, but not all, regulation of interscholastic athletic events to the West Virginia Secondary School Activities Commission.

**REQUEST NO. 65:**  Admit that the State Board of Education controls you. See Code of West Virginia §18-2-5.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board denies this request because West Virginia Code §18-2-5 states that "the State Board of Education shall exercise general supervision of the public schools of the state, and shall promulgate rules[.]"

**REQUEST NO. 66:**  Admit that you receive federal financial assistance.

**RESPONSE**:        Admitted.

**REQUEST NO. 67:**  Admit that you must comply with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits this request.

Dated this the 10th day of March, 2022.

<table>
<tr><td></td><td>*/s/ Susan L. Deniker*</td></tr>
<tr><td></td><td>Susan L. Deniker        (WV ID #7992)<br>Jeffrey M. Cropp        (WV ID #8030)</td></tr>
<tr><td>STEPTOE & JOHNSON PLLC<br>   OF COUNSEL</td><td>400 White Oaks Boulevard<br>Bridgeport, WV 26330-4500<br>(304) 933-8000</td></tr>
<tr><td></td><td>*Counsel for Defendants Harrison County Board of Education and Dora Stutler*</td></tr>
</table>

14094080

21

**JA0915**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**B.P.J., by her next friend and mother, HEATHER JACKSON,**

**Plaintiff,**

**v.**

**WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER, in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,**

**Defendants,**

**and**

**LAINEY ARMISTEAD,**

**Defendant-Intervenor.**

**Civil Action No. 2:21-cv-00316**
**Honorable Joseph R. Goodwin**

## DEFENDANT WEST VIRGINIA STATE BOARD OF EDUCATION'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION

**NOW COMES** Defendant West Virginia State Board of Education (hereinafter "WVBOE"),

by and through counsel, Kelly C. Morgan, Kristen V. Hammond, Michael W. Taylor, and the law

firm of Bailey & Wyant, P.L.L.C., and, pursuant to Rule 33 of the *Federal Rules of Civil Procedure*,

hereby responds and objects to "*Plaintiff's Second Set of Requests for Admissions to Defendant West

Virginia State Board of Education*" as follows:

## GENERAL OBJECTIONS AND PRELIMINARY STATEMENT

A.      WVBOE objects to the definitions as stated in Plaintiff's Second Set of Requests for

**RESPONSE:  Objection.  The phrase "derive social benefits" is vague, undefined, and subject to multiple interpretations. Without waiving this objection, WVBOE admits that there are certain benefits to students from participation on athletic teams offered by public secondary schools in West Virginia.**

**REQUEST NO. 45:**

Admit that students derive psychological benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**RESPONSE: Objection.  The phrase "derive psychological benefits" is vague, undefined, and subject to multiple interpretations. Without waiving this objection, WVBOE admits that there are certain benefits to students from participation on athletic teams offered by public secondary schools in West Virginia.**

**REQUEST NO. 46:**

Admit that interscholastic athletic competition benefits middle school students.

**RESPONSE: Objection.  The phrase "benefits" is vague, undefined, and subject to multiple interpretations. Without waiving this objection, WVBOE admits that there are certain benefits to middle school students who participate in interscholastic sports.**

**REQUEST NO. 47:**

Admit that middle school students who participate in interscholastic athletics receive benefits regardless whether they win or lose.

**RESPONSE: Objection.  The phrase "benefits" is vague, undefined, and subject to multiple**

16

**interpretations. Without waiving this objection, WVBOE admits that there are certain benefits to middle school students who participate in interscholastic sports.**

**REQUEST NO. 48:**

Admit that Plaintiff B.P.J.'s gender is identified as "male" in the West Virginia Education Information System ("WVEIS").

**RESPONSE: WVBOE admits this Request.**

**REQUEST NO. 49:**

Admit that you have the ability to change Plaintiff B.P.J.'s gender in WVEIS to "female."

**RESPONSE: WVBOE denies this Request as it does not have this ability.**

**REQUEST NO. 50:**

Admit that you are required to supervise public secondary schools in West Virginia.

**RESPONSE: WVBOE admits that it has general supervision and oversight over the free schools of the state of West Virginia, not including private schools.**

**REQUEST NO. 51:**

Admit that you have control over the county boards of education in West Virginia.

**RESPONSE: WVBOE admits that it can only exercise such "control" as it possesses by West Virginia Constitution or statute.  WVBOE denies this request to the extent that W.Va. Code §18-2-25 speaks for itself.**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,
      Plaintiff,

v.                               Civil Action No. 2:21-cv-00316
                               Honorable Joseph R. Goodwin, Judge

WEST VIRGINIA STATE BOARD OF EDUCATION,
HARRISON COUNTY BOARD OF EDUCATION,
WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION, W. CLAYTON BURCH
in his official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,
      Defendants,

      and

LAINEY ARMISTEAD,
      Intervenor Defendant.

WVSSAC'S RESPONSES TO SECOND SET
OF REQUESTS FOR ADMISSION

      Now comes West Virginia Secondary School Activities Commission (WVSSAC), by counsel, and responds to Plaintiff's Second Set of Requests for Admission, as follows. Defendant West Virginia Secondary School Activities Commission has not completed discovery in this civil action and has not completed its preparation for trial.  For these reasons, the Defendant's responses are based upon only such information and documents as are presently available and known to WVSSAC.  Further discovery and independent investigation may lead to other responsive information and/or documents. The following responses are given in good faith but without prejudice to the Defendant's right to produce evidence of subsequently discovered facts or documents.

REQUEST NO. 27: Admit that the West Virginia Secondary School Athletic Commission must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE:**

**Admitted and denied. WVSSAC denies that H.B. 3293 includes express provisions, prescriptions, duties or other relative to WVSSAC. However, WVSSAC admits that it must follow all laws that include a duty for it.**

REQUEST NO. 28: Admit that H.B. 3293 prohibits the West Virginia Secondary School Athletic Commission from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**RESPONSE:**

**Objection; calls for a legal conclusion; incomplete hypothetical. Further, WVSSAC denies that H.B. 3293 includes express provisions, prescriptions, duties or other relative to WVSSAC, including, by example only, adopting or enforcing related policies. For these reasons and based upon the fact that WVSSAC has insufficient first-hand information on these issues and the underlying variables as relates to this student, WVSSAC admits only that it cannot adopt or enforce any policy that conflicts with state law.**

REQUEST NO. 29: Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), offered at Bridgeport Middle School.

**RESPONSE:**

**Denied. On information and belief as to the use of the phrase in HB 3293, football, cheer, wrestling, baseball.**

REQUEST NO. 30: Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that compete interscholastically offered at any public secondary school located in West Virginia.

**RESPONSE:**

**Denied. On information and belief as to the use of the phrase in HB 3293, football, cheer, wrestling, baseball.**

8

**JA0920**

REQUEST NO. 31: Admit that there are no cross-country teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that compete interscholastically offered by any member school of the West Virginia Secondary School Activities Commission.

**RESPONSE:**

**Admitted.**


REQUEST NO. 32: Admit that there are no athletic leagues designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that comprise teams from more than one school supervised by the West Virginia Secondary School Activities Commission.

**RESPONSE:**

**Objection; form of the question (which WVSSAC does not understand). In a good faith effort to respond and reserving all rights to amend, revise, retract or other upon clarification, WVSSAC asserts that the coed or mixed sports of football, cheer, wrestling, baseball allow for competition between schools.**


REQUEST NO. 33: Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C))," that compete interscholastically offered by any public secondary school under the supervision of the West Virginia State Board of Education.

**RESPONSE:**

**Denied. On information and belief as to the use of the phrase in HB 3293, football, cheer, wrestling, baseball.**


REQUEST NO. 34: Admit that H.B. 3293 does not prohibit a cisgender girl student at Bridgeport Middle School from joining a girls' athletic team offered at Bridgeport Middle School.

**RESPONSE:**

**Objection; calls for a legal conclusion. Without waiving that objection, on information and belief, admitted.**


9

**JA0921**

REQUEST NO. 47: Admit that middle school students who participate in interscholastic athletics receive benefits regardless whether they win or lose.

**RESPONSE:**

**Objection; form of the question – overly broad, vague ('benefits'). However, on information and belief only, WVSSAC admits that, in general, participation in interscholastic athletics 'benefits' middle school students, win or lose, by providing provides an opportunity for leadership, personal health, camaraderie and cooperation.**

REQUEST NO. 48: Admit that after H.B. 3293 was signed into law you decided that, for athletic eligibility purposes, a student athlete's gender would be determined by referring to the gender identified in West Virginia Education Information System ("WVEIS").

**RESPONSE:**

**Denied. The extent to which WVSSAC relied upon WVEIS was not changed by H.B. 3293. However, of note, WVSSAC has no access to and therefore no direct reliance upon WVEIS.**

REQUEST NO. 49: Admit that Plaintiff B.P.J.'s gender is identified in WVEIS as "male."

**RESPONSE:**

**WVSSAC has no independent knowledge of this assertion that would allow it to admit or deny same. Therefore, based upon that lack of knowledge, WVSSAC denies the assertion.**

REQUEST NO. 50: Admit that, as long as H.B. 3293 is in effect, you will not permit a student designated as "male" in WVEIS to participate on Bridgeport Middle School's girls' cross-country team unless ordered to permit that student to participate by a court.

**RESPONSE:**

**WVSSAC denies that H.B. 3293 includes express provisions, prescriptions, duties or other relative to WVSSAC, including, by example only, adopting or enforcing related policies. For these reasons and based upon the fact that WVSSAC has insufficient first-hand information on these issues and the underlying variables in WVEIS as relates to the referenced student, WVSSAC admits that it cannot adopt or enforce any policy that conflicts with state law.**

13

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**DEFENDANT-INTERVENOR LAINEY ARMISTEAD'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION** |

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure and the applicable Local Rules of the District West Virginia and this Court, Defendant-Intervenor Lainey Armistead provides the following answers to Plaintiff's Second Set of Requests for Admission to Defendant-Intervenor.

**GENERAL OBJECTIONS**

1.      Ms. Armistead objects to the following Definitions presented in Plaintiff's First Set of Requests for Admission to Defendant-Intervenor:

**CISGENDER means a person whose gender identity aligns with the sex they were assigned at birth.**

1

which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

Subject to these objections, Ms. Armistead admits that other than Plaintiff B.P.J., she is currently not aware of and has no personal or independent knowledge of the current internal sense of self of members of the athletic teams at Bridgeport Middle School, nor does she have any reason to know or possess that information.

**REQUEST NO. 43:**

Admit that other than Plaintiff B.P.J., you are not aware of a transgender student athlete participating on an athletic team offered by a public secondary school in West Virginia.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

Subject to these objections, Ms. Armistead admits that she is currently not aware of, and she has no personal or independent knowledge of the internal sense of self of members of the athletic team offered by a public secondary school in West Virginia, nor would she have any reason to know or possess that information.

**REQUEST NO. 44:**

Admit that students derive social benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**ANSWER:** Ms. Armistead objects to the term "social benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of social benefits different individuals

experience and Ms. Armistead has no personal or independent knowledge of the social benefits that students other than herself may or may not derive from participating on athletic teams. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead admits that she has personally derived social benefits as a student from playing soccer when the competition was safe and fair such as mental and physical toughness, perseverance, good sportsmanship, the value of hard work and discipline, the importance of teamwork, and leadership. Ms. Armistead further admits that she has observed other fellow athletes similarly benefiting from participation on athletic teams and believes that students generally benefit from participation when the competition is safe and fair. But Ms. Armistead never participated in sports in secondary schools in West Virginia and therefore cannot speak to the personal experience of every student.

**REQUEST NO. 45:**

Admit that students derive psychological benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**ANSWER:** Ms. Armistead objects to the term "psychological benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of psychological benefits different students may or may not experience from participating on athletic teams offered by public secondary schools in West Virginia. And Ms. Armistead has no personal or independent knowledge of the psychological benefits that students other than herself may or may not derive from participating on athletic teams. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

31

JA0925

Subject to these objections, Ms. Armistead admits that she has personally derived psychological benefits from playing soccer when the competition was safe and fair such as mental and physical toughness, perseverance, good sportsmanship, the value of hard work and discipline, the importance of teamwork, and leadership. Ms. Armistead further admits that she has observed fellow athletes similarly benefitting from participation on athletic teams when the competition is safe and fair. But Ms. Armistead never participated in sports in secondary schools in West Virginia and therefore cannot speak to the personal experience of every student.

**REQUEST NO. 46:**

Admit that interscholastic athletic competition benefits middle school students.

**ANSWER:** Ms. Armistead objects to the term "benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of benefits different students may or may not experience from interscholastic athletic competition. And Ms. Armistead has no personal or independent knowledge of the all the benefits that middle school students may or may not derive from interscholastic athletic competition. Ms. Armistead also objects to the term "middle school students" as overbroad, vague, and ambiguous. It is not clear whether Plaintiff refers to middle school students in West Virginia, the United States of America, or the entire world. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead lacks personal and independent knowledge of how and if interscholastic competition benefits each and every middle school student, but she admits that interscholastic competition—when fair and safe—generally benefits students and she has personally benefitted from such fair and safe competition.

**REQUEST NO. 47:**

32

**JA0926**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      CHARLESTON DIVISION

 4                     * * * * * * * *

 5   B.P.J., by her next friend and   *

 6   Mother, HEATHER JACKSON,          *

 7       Plaintiff                     *  Case No.

 8       vs.                           *  2:21-CV-00316

 9   WEST VIRGINIA STATE BOARD OF      *

10   EDUCATION, HARRISON COUNTY        *

11   BOARD OF EDUCATION, WEST          *

12   VIRGINIA SECONDARY SCHOOL         *

13   ACTIVITIES COMMISSION, W.         *

14   CLAYTON BURCH in his official     *

15   Capacity as State Superintendent,*  VIDEOTAPED

16   DORA STUTLER in her official      *  VIDEOCONFERENCE

17   Capacity as Harrison County       *  DEPOSITION

18   Superintendent, PATRICK MORRISEY  *     OF

19   In his official capacity as       *  BPJ

20   Attorney General, and THE STATE   *  January 21, 2022

21   OF WEST VIRGINIA,                 *

22       Defendants                    *

23            Any reproduction of this transcript
              is prohibited without authorization
24                by the certifying agency.
```

```
 1                VIDEOTAPED VIDEOCONFERENCE DEPOSITION

 2                              OF

 3   BPJ, taken on behalf of the Defendant, State of West

 4   Virginia herein, pursuant to the Rules of Civil

 5   Procedure, taken before me, the undersigned, Nicole

 6   Montagano, a Court Reporter and Notary Public in and for

 7   the State of West Virginia, on Friday, January 21, 2022,

 8   beginning at 10:09 a.m.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    A P P E A R A N C E S

 2

 3     JOSHUA BLOCK, ESQUIRE

 4     American Civil Liberties Union Foundation

 5     125 Broad Street

 6     New York, NY  10004

 7     COUNSEL FOR PLAINTIFF

 8

 9     LOREE STARK, ESQUIRE

10     ACLU of West Virginia

11     P.O. Box 3952

12     Charleston, WV  25339

13        COUNSEL FOR PLAINTIFF

14

15     KATHLEEN R. HARTNETT, ESQUIRE

16     ANDREW BARR, ESQUIRE

17     JULIE VEROFF, ESQUIRE

18     ZOE HELSTROM, ESQUIRE

19     Cooley, LLP

20     3 Embarcadero Center

21     20th Floor

22     San Francisco, CA  94111-4004

23        COUNSELS FOR PLAINTIFF

24
```

```
 1              A P P E A R A N C E S  (cont'd)

 2

 3   SRUTI SWAMINATHAN, ESQUIRE

 4   Lambda Legal

 5   120 Wall Street

 6   19th Floor

 7   New York, NY  10005-3919

 8        COUNSEL FOR PLAINTIFF

 9

10   DAVID TRYON, ESQUIRE

11   CURTIS R.A. CAPEHART, ESQUIRE

12   State Capitol Complex

13   Building 1, Room E-26

14   Charleston, WV  25305

15        COUNSEL FOR STATE OF WEST VIRGINIA

16

17   ROBERTA F. GREEN, ESQUIRE

18   KIMBERLY M. BANDY, ESQUIRE

19   SHANNON ROGERS, ESQUIRE

20   Shuman McCuskey Slicer, PLLC

21   1411 Virginia Street East, Suite 200

22   Charleston, WV  25301

23        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

24        ACTIVITIES COMMISSION
```

```
 1                 A P P E A R A N C E S  (cont'd)

 2

 3   SUSAN DENIKER, ESQUIRE

 4   Steptoe & Johnson

 5   400 White Oaks Boulevard

 6   Bridgeport, WV  26330

 7       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 8        HARRISON COUNTY SUPERINTENDENT DORA STUTLER

 9

10   KELLY C. MORGAN, ESQUIRE

11   KRISTEN V. HAMMOND, ESQUIRE

12   Bailey Wyant

13   500 Virginia Street East

14   Suite 600

15   Charleston, WV  25301

16       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

17        SUPERINTENDANT W. CLAYTON BURCH

18

19   TIMOTHY D. DUCAR, ESQUIRE

20   Law Office of Timothy D. Ducar

21   7430 East Butherus Drive

22   Suite E

23   Scottsdale, AZ  85260

24       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
 1                      I N D E X

 2

 3   DISCUSSION AMONG PARTIES                  11 -   15

 4   WITNESS: BPJ

 5   EXAMINATION

 6      By Attorney Capehart                   15 - 122

 7   EXAMINATION

 8      By Attorney Rogers                    122 - 123

 9   EXAMINATION

10      By Attorney Deniker                  123 - 142

11   EXAMINATION

12      By Attorney Hammond                  143 - 144

13   EXAMINATION

14      By Attorney Ducar                    144 - 155

15   DISCUSSION AMONG PARTIES                155 - 157

16   CERTIFICATE                                    158

17

18

19

20

21

22

23

24
```

7

```
 1                           EXHIBIT PAGE

 2

 3                                               PAGE

 4      NUMBER    DESCRIPTION                  IDENTIFIED

 5      Exhibit 1    Davis Medical Records       --*

 6      Exhibit 1R   Davis Medical Records       --*

 7      Exhibit 2    Davis Medical Records       --*

 8      Exhibit 3    WVU Medical Records         --*

 9      Exhibit 4    UPMC Children's Medical

10                   Records                     --*

11      Exhibit 5    UPMC Children's Medical

12                   Records                     --*

13      Exhibit 6    UPMC Children's Medical

14                   Records                     --*

15      Exhibit 7    UPMC Children's Medical

16                   Records

17      Exhibit 8    UPMC Children's Medical

18                   Records                     --*

19      Exhibit 9    UPMC Children's Medical

20                   Records                     --*

21      Exhibit 11A Progress Notes               --*

22      Exhibit 11B Progress Notes               --*

23      Exhibit 11C Progress Notes               --*

24      Exhibit 11D Progress Notes               --*
```

```
 1                          EXHIBIT PAGE

 2

 3                                              PAGE

 4      NUMBER          DESCRIPTION            IDENTIFIED

 5      Exhibit 12   UPMC Children's Medical

 6                   Records                      --*

 7      Exhibit 13   UMPC Children's Medical

 8                   Records                      --*

 9      Exhibit 14   WVU Medical Records          --*

10      Exhibit 15   WVU Medical Records          --*

11      Exhibit 16   WVU Medical Records          --*

12      Exhibit 17   Gender Support Plan          --*

13      Exhibit 18   Preferred Name Request Form  --*

14      Exhibit 19   Gender Support Plan          --*

15      Exhibit 20   Student Information          --*

16      Exhibit 20R  Student Information          --*

17      Exhibit 21   Screening Results           --*

18      Exhibit 21R  Screening Results           --*

19      Exhibit 22   Birth Certificate           --*

20      Exhibit 22R  Birth Certificate           --*

21      Exhibit 23   Heart Walk Article          --

22      Exhibit 23R  Heart Walk Article          --

23      Exhibit 24   Photo                       --

24      Exhibit 24R  Photo                       --
```

9

```
 1                        EXHIBIT PAGE

 2

 3                                           PAGE

 4      NUMBER        DESCRIPTION            IDENTIFIED

 5      Exhibit 25  WV Record                 --

 6      Exhibit 26  Photo of Mom and BPJ      --

 7      Exhibit 27  Article                   --

 8      Exhibit 28  Article                   --

 9      Exhibit 29  Lambda Legal Article      --

10      Exhibit 30  Declaration of Heather

11                  Jackson                   --

12      Exhibit 31  Declaration of BJP        --

13      Exhibit 32  First Amended Complaint   --

14      Exhibit 33  Standards of Care         --

15      Exhibit 34  House Bill 3293           --

16

17

18

19

20

21

22

23      * CONFIDENTIAL EXHIBITS

24
```

```
1                        OBJECTION PAGE

2

3    ATTORNEY                              PAGE

4    Hartnett    19, 23, 24, 26, 26, 27, 27, 29, 29, 30, 30,

5    30, 31, 31, 31, 32, 32, 33, 33, 34, 34, 34, 35, 35, 36,

6    36, 37, 37, 38, 38, 39, 41, 41, 42, 43, 43, 44, 44, 45,

7    46, 48, 49, 50, 51, 52, 52, 53, 54, 54, 55, 57, 59, 60,

8    61, 62, 62, 63, 63, 66, 67, 68, 68, 69, 70, 70, 70, 71,

9    72, 72, 73, 74, 74, 75, 76, 76, 78, 79, 80, 81, 81, 82,

10   84, 85, 85, 85, 86, 87, 87, 88, 88, 89, 89, 90, 90, 94,

11   94, 95, 96, 97, 97, 98, 99, 100, 100, 101, 101, 102,

12   103, 104, 104, 107, 108, 108, 109, 109, 110, 110, 111,

13   112, 113, 113, 114, 116, 117, 118, 118, 119, 120, 120,

14   121, 121, 128, 133, 135, 137, 139, 140, 142, 144, 146,

15   146, 147, 148, 150, 150, 150, 151, 151, 151, 153, 153,

16   154, 155, 155, 156

17

18

19

20

21

22

23

24
```

```
 1                   S T I P U L A T I O N

 2    --------------------------------------------------------

 3    (It is hereby stipulated and agreed by and between

 4    counsel for the respective parties that reading,

 5    signing, sealing, certification and filing are not

 6    waived.)

 7    --------------------------------------------------------

 8                   VIDEOGRAPHER:  We're now on the record.

 9    My name is Jacob Stock.  I'm a Certified Legal Video

10    Specialist employed by Sargent's Court Reporting

11    Services, which is located at 210 Main Street,

12    Johnstown, PA 15901.  The date today is January 21st,

13    2022.  The current time reads 10:09 a.m., Eastern

14    Standard Time.  This deposition is being taken remotely

15    by Zoom conference.  The caption of the case is in the

16    United States District Court for the Southern District

17    of West Virginia, Charleston Division, BPJ, by her Next

18    Friend and Mother, Heather Jackson versus West Virginia

19    State Board of Education, et al.  Civil Action Number

20    2:21-CV-00316.  The name of the witness is BPJ.

21                   Will the attorneys present state their

22    names and the parties they represent?

23                   ATTORNEY CAPEHART:  This is Curtis

24    Capehart for the State of West Virginia.  And with me is
```

1   my colleague, David Tryon.

2          ATTORNEY HARTNETT:  Good morning.  This

3   is Kathleen Hartnett from Cooley, LLP, for Plaintiff

4   BPJ, who is the witness today.  And the other

5   Plaintiff's Counsel could introduce themselves, first

6   with the others from Cooley and then we could go to

7   ACLU, ACLU of West Virginia and Lambda.

8          ATTORNEY BARR:  Good morning.  This is

9   Andrew Barr from Cooley, LLP, on behalf of the

10  Plaintiff.

11         ATTORNEY VEROFF:  Good morning.  This is

12  Julie Veroff from Cooley, LLP, on behalf of the

13  Plaintiff.

14         ATTORNEY HELSTROM:  Good morning.  This

15  is Zoe Helstrom from Cooley, LLP, on behalf of the

16  Plaintiff.

17         ATTORNEY BLOCK:  Good morning.  This is

18  Josh Block from ACLU on behalf of Plaintiff.

19         ATTORNEY STARK:  Good morning.  This is

20  Loree Stark with the ACLU of West Virginia on behalf of

21  the Plaintiff.

22         ATTORNEY SWAMINATHAN:  Good morning.

23  This is Sruti Swaminathan from Lambda Legal on behalf of

24  Plaintiff.

```
 1              ATTORNEY DENIKER:  Good morning.  I'm
 2   Susan Deniker with Steptoe and Johnson, counsel for
 3   Defendants Harrison County Board of Education and
 4   Harrison County Superintendant Dora Stutler.
 5              ATTORNEY GREEN:  Good morning.  This is
 6   Roberta Green on behalf of West Virginia Secondary
 7   School Activities Commission, and I will let me
 8   colleagues introduce.
 9              ATTORNEY BANDY:  Hello.  This is Kimberly
10   Bandy also on behalf of West Virginia Secondary School
11   Activities Commission.
12              ATTORNEY HAMMOND:  Good morning.  This is
13   Kristen Hammond.  And Kelly Morgan is also on here with
14   Bailey and Wyant and we represent the West Virginia
15   State Board of Education and Superintendant Burch.
16              ATTORNEY DUCAR:  Good morning.  Timothy
17   Ducar here on behalf of the Intervenor, Lainey
18   Armistead.
19              ATTORNEY HOLCOMB:  Good morning.
20   Christiana Holcomb with Alliance Defending Freedom on
21   behalf of the Intervenor.
22              ATTORNEY CSUTOROS:  Good morning.  This
23   Rachel Csutoros on behalf of Alliance Defending Freedom
24   on behalf of the Intervenor.
```

```
 1              ATTORNEY BROWN:  And good morning.  Josh

 2   Brown on behalf of the Intervenor.

 3              VIDEOGRAPHER:  And if that's everybody,

 4   the court reporter can swear in the witness so we can

 5   begin the deposition.

 6              COURT REPORTER:  Can you please raise

 7   your hand, BPJ?

 8                        ---

 9                   BPJ,

10   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

11   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

12   FOLLOWS:

13                        ---

14              COURT REPORTER:  Thank you.

15              ATTORNEY HARTNETT:  Before we begin this

16   morning, if it's okay with Mr. Capehart, the parties

17   were going to put on the record a couple of stipulations

18   about objections that they had reached for today's

19   proceedings.  I would just direct the record in this

20   case to the record of the deposition yesterday of

21   Heather Jackson held on January 20th, and the same

22   stipulations with respect to objections for

23   legal/medical and expert testimony with respect to

24   terminology and with respect to potentially
```

```
 1   mischaracterization of the evidence.  Those same
 2   stipulations would hold today.  And so for the record,
 3   the Plaintiff agrees to that.  And it would be helpful I
 4   think if the other Defendants could just assent to those
 5   stipulations for today on the record.
 6             ATTORNEY DENIKER:  This is Susan Deniker.
 7   I stipulate to that.
 8             ATTORNEY GREEN:  This is Roberta Green on
 9   behalf of WVSSAC.  We stipulate to that.
10             ATTORNEY HAMMOND:  This is Kristen
11   Hammond, and we also stipulate to that.
12             ATTORNEY DUCAR:  This is Tim Ducar.  We
13   also stipulate to that.
14             ATTORNEY CAPEHART:  And the State does as
15   well.
16             ATTORNEY CAPEHART:  Anything else,
17   Kathleen, or should I go ahead?
18             ATTORNEY HARTNETT:  Nothing here.
19             ATTORNEY CAPEHART:  All right.  Thanks
20   very much.
21                         ---
22                      EXAMINATION
23                         ---
24   BY ATTORNEY CAPEHART:
```

1    Q.    Well, good morning.  Nice to finally get to meet

2    you.  My name is Curtis Capehart, as I said just a

3    minute ago.  I represent the State of West Virginia in

4    this.  Now up to this point we've been referring to you

5    by the initials as BPJ because that is the way you have

6    been identified in the Complaint that started this

7    lawsuit.  Now, is that okay or would you prefer that I

8    call you something else while we're talking here today?

9    Because initials can be a little awkward.  So if you

10   feel more comfortable with me calling you something

11   else, that's perfectly fine.  You just let me know what

12   that could be.

13   A.    You can call me B█████.

14   Q.    Okay.

15         ATTORNEY HARTNETT:  If I could just say

16   for the record, not to interrupt, that we filed with the

17   BPJ initials in light of the Rules of Court, but the

18   Plaintiff Counsel has no objection to you referring to

19   her as B████ in this deposition.

20         ATTORNEY CAPEHART:  Okay.

21   BY ATTORNEY CAPEHART:

22   Q.    You are represented by counsel here today and is

23   that Kathleen, Ms. Hartnett, that was speaking just now?

24   A.    Yes.

```
 1     Q.    Have you ever been involved in a lawsuit before?

 2     A.    No.

 3     Q.    So you've probably never been deposed before,

 4  have you?

 5     A.    Can you repeat the question?

 6     Q.    Sure.  You haven't been deposed before then,

 7  have you?

 8     A.    No.

 9     Q.    Okay.

10           Also if there is a time where you have trouble

11  understanding me or hearing me, just do what you just

12  did there, let me know and I'll try and speak up a

13  little bit.  We don't have the best microphone

14  placements in here, so that might be a thing as we go

15  through today.

16           So as I go through and answer --- I'm sorry, if

17  I go through and ask you questions today, I just need

18  you to try to remember to answer verbally, not just nod

19  your head or shake your head because there is a video,

20  but we need to have those verbal responses so we can

21  truly understand what your answer is.  And if you do not

22  understand a question, that's fine.  You just need to

23  say so so that I can try and put together a better

24  question or try to explain more of what I'm trying to
```

18

```
1    learn.  Okay?
2            Now, if you answer one of questions that I ask
3    you today, we are going to assume that you understand
4    it.  So if there is any kind of confusion, we don't want
5    to deal with any of that.  It's better you just ask me
6    and I'll try and improve my question for you.
7            Does that all make sense?
8    A.    Yes.
9    Q.    Okay.
10           Also, I want to kind of touch on a couple of
11   other things here before I get started with some
12   questioning.  Just understand that we are not here to
13   judge you.  We're just trying to learn some of the facts
14   here, things we don't know.  This lawsuit was filed
15   trying to have a West Virginia State Law declared
16   invalid under the U.S. Constitution and another Federal
17   Law referred to as Title 9.  And that's --- that's
18   pretty serious.  So we, as the lawyers for the State,
19   have an obligation to defend that law.  That means I
20   have to ask you some questions that might make all of us
21   uncomfortable a little bit, but I have an obligation to
22   try and get through these.  That's not my goal.  I'm
23   just trying to find out information.  Okay?
24           Now, also if I ask you a question that makes
```

1   you very uncomfortable, tell me, and I can try, if I

2   can, to rephrase it in a way to make you not

3   uncomfortable.  I can't say that I won't ask those kinds

4   of questions because there's some things that we have to

5   ask questions about, some things that we need to get

6   your testimony on, but I'm not trying to make you feel

7   bad or upset you in any way.

8          Okay?

9     A.   Okay.

10          ATTORNEY HARTNETT:  I would just object

11   to the extent you're seeking the witness to agree with

12   your description of your role.  But on the other hand, I

13   appreciate you letting her know that she can let you

14   know if she has an upsetting question.

15   BY ATTORNEY CAPEHART:

16     Q.   Also, I'm just going to --- a word about

17   objections.  Sometimes when we go through these, your

18   lawyer might make an objection.  I may ask a question,

19   Kathleen may same objection, something else.  Now, if

20   that happens, the lawyers may have to have a

21   conversation.  It's unlikely, but the lawyers may have

22   to talk about something, at which point you wouldn't be

23   able to hear us or see us.  We don't think that's going

24   to happen, but we at least want to let you know.

```
 1            Also, generally, if your lawyer says objection,
 2    you can go ahead and answer the question unless your
 3    lawyer directs you not to.
 4        A.   Okay.
 5        Q.   Oh, and one last thing.  If you need to take a
 6    break for any reason, go to the bathroom, get more
 7    water, something of that nature, just let me know and we
 8    will take a break as soon as we can.  We just can't take
 9    a break if I've asked a question and we are waiting for
10    you to finish your answer.
11            Does that make sense?
12        A.   Yes.
13        Q.   Okay.  Great.
14            We will try and get through this as quickly as
15    we can.  I'm sure you have a lot of other things that
16    you would rather do on a Friday.  So with that, let me
17    ask you, if you can, to please state your name for the
18    record.
19        A.   First and last?
20        Q.   Yes, please.
21        A.   B█████  P█████  J█████████.
22        Q.   Great.  What is your address?
23        A.   Could you repeat the question?
24        Q.   Sure.  What is your home address?
```

 1       A.    I'm not sure.

 2       Q.    Okay.

 3             And where do you go to school?

 4       A.    Bridgeport Middle School.

 5       Q.    Do you remember signing a document called a

 6   Declaration back when this lawsuit was first getting

 7   started?

 8       A.    I can't remember.

 9       Q.    Okay.

10             If you could look at --- it's marked Exhibit

11   31.

12             ATTORNEY CAPEHART:   Court Reporter, if

13   you could pull up that exhibit also.

14   BY ATTORNEY CAPEHART:

15       Q.    So do you have Exhibit 31 in front of you?

16       A.    Yes.

17       Q.    It's also up on the screen, just to make sure

18   that we're all looking at this document here?

19             MS. JACKSON:   This is this.

20   BY ATTORNEY CAPEHART:

21       Q.    There's on the screen electronic version of it,

22   too.

23             ATTORNEY HARTNETT:   For the record, we

24   have copies of the exhibits face down in the room with

```
 1   the witness, and the witness may feel free to pick up

 2   the exhibit once it's referred to by the questioning

 3   counsel and look at the hard copy.

 4   BY ATTORNEY CAPEHART:

 5      Q.    Okay.

 6            Looking at this, now if you look at the last

 7   page, I believe it is number page four, it has the

 8   initials BPJ there and then some handwritten

 9   signature-like initials of BPJ.  Looking at those, do

10   you recognize those?

11      A.    Yes.

12      Q.    And that's your handwriting, I guess?

13      A.    Yes.

14      Q.    Okay.  Thanks very much.

15            Looking at this, does it jog your memory a

16   little bit that this is something you had to deal with

17   back when the lawsuit was started?

18      A.    Not really.

19      Q.    Okay.

20            And do you remember signing it?

21      A.    A little bit.

22      Q.    I know it's been a while, so I thought you might

23   want to go and look at a couple of these things to

24   remember what was in here.
```

23

```
 1                    MS. JACKSON:  Do you want to read through

 2     it?

 3                    THE WITNESS:  No.

 4     BY ATTORNEY CAPEHART:

 5        Q.    If you want to take a minute, you can kind of

 6     read all through it.  You just go ahead and let us know

 7     when you've had a chance to do that.

 8                    MS. JACKSON:  You need to tell them when

 9     you're done.

10                    THE WITNESS:  Oh, I'm done.

11     BY ATTORNEY CAPEHART:

12        Q.    Thank you.

13            Now, since you signed this back in May of last

14     year, obviously it's been quite a while since May.  And

15     is anything --- well, let me rephrase.  Back at that

16     time, if you look on page two, this was --- in

17     paragraph 11 you were talking about trying out for

18     cross-country and track.  And obviously, with the

19     passage of time, you tried out for the track team,

20     right, cross-country track team.

21                    ATTORNEY HARTNETT:  Objection, form.

22                    THE WITNESS:  I tried out cross-country.

23     Track is not a sport that was available at that time.

24     BY ATTORNEY CAPEHART:
```

24

```
 1      Q.    Is track a spring sport?

 2      A.    Yes.

 3      Q.    Okay.

 4            So you tried out for cross-country.  Did you

 5   make the cross-country team?

 6      A.    Yes.

 7      Q.    Back on the bottom of the first page, under the

 8   paragraph number four, it describes that you when you

 9   were younger would play with your mom's clothes, liked

10   paint and girly items.  Whenever you said girly items

11   there with the quotations around it, what kind of items

12   are those?

13      A.    Items that had maybe unicorns on it, sparkles,

14   anything that would stick out in general that was maybe

15   a mystical creature that was like a unicorn maybe.  I

16   had some stuff that was pandas because I really like

17   pandas, and they were always multi-colored.  And that's

18   about it.

19      Q.    Okay.

20            I'm going to set that off to the side for a

21   minute and just ask you a few other questions.  Your

22   mother told us that you are comfortable explaining your

23   gender identity.  Are you?

24            ATTORNEY HARTNETT:  Objection to form.
```

1                    THE WITNESS:  Yes.

2    BY ATTORNEY CAPEHART:

3        Q.    Can you explain to me what is your gender

4    identity?

5        A.    I am female and I go by the pronoun she or her.

6        Q.    Do you also refer to yourself as a transgender

7    girl?

8        A.    No.  I refer myself as a girl because I am a

9    girl, and that's it.

10       Q.    Okay.

11             Does it bother you if someone does refer to you

12   as a transgender girl?

13       A.    No, because that's still calling me a girl, but

14   I prefer to be called as just a girl.

15       Q.    Okay.

16             Did you have a problem with --- looking back at

17   your Declaration, at Exhibit 31, in paragraph 12 it

18   says, the second line, I am a transgender girl.  Is that

19   okay with you that that's written that way?

20       A.    Yes, that is fine because that is --- that's

21   still showing that I am a girl and that is on a ---

22   that's on my Declaration.

23       Q.    And transgender female or transgender girl, are

24   both of those terms accurate?

1                    ATTORNEY HARTNETT:  Objection to form.

2                    THE WITNESS:  Yes, because I am a

3    transgender female and a transgender girl.

4    BY ATTORNEY CAPEHART:

5        Q.    Okay.

6              I just want to make sure I got the terminology

7    down.  Do you remember the first time you heard the term

8    transgender?

9        A.    I can't remember.

10       Q.    Okay.

11             As long as you remember, you just --- have you

12   always had an understanding of what transgender means?

13       A.    I don't know, I don't think so.

14       Q.    So --- and I'm not trying to put words in your

15   mouth.  I'm just trying to understand.  So do you think

16   there was a time that you didn't, but at some point you

17   learned it, you just don't remember when that was?

18       A.    Yes.

19       Q.    All right.

20             Do you have any recollection of a time when you

21   were not a transgender girl?

22                    ATTORNEY HARTNETT:  Objection to form.

23                    THE WITNESS:  A little bit of a memory,

24   but not much.

 1   BY ATTORNEY CAPEHART:

 2      Q.    What kind of a memory do you have --- let me

 3   back up.  How old is that memory?

 4      A.    Four or five years.

 5      Q.    Okay.

 6            Was that memory --- what were you doing that

 7   you can remember, I guess, maybe not being a transgender

 8   girl at that time?

 9                 ATTORNEY HARTNETT:  Objection to form.

10                 THE WITNESS:  I think I was learning

11   something in school and I found it really interesting.

12   BY ATTORNEY CAPEHART:

13      Q.    Okay.

14            You don't remember what that was that you were

15   learning, do you?

16      A.    No.

17      Q.    Your mother also told us that at some point when

18   you were younger you told her that you were a girl.  Do

19   you remember the first time you told your mother that?

20      A.    I can't remember.

21      Q.    Okay.

22            Do you remember the first time you told someone

23   other than your mother that you were a transgender girl?

24                 ATTORNEY HARTNETT:  Objection to form.

1                    THE WITNESS:   I --- can you say it again?

2    BY ATTORNEY CAPEHART:

3        Q.    Sure.  I will try to make it a little bit

4    better, too.  Do you remember the time that you first

5    told someone other than your mother that you were a

6    girl?

7        A.    Yes.

8        Q.    Okay.

9              Can you tell me about that?

10       A.    It was in school.  It was new, whenever I just

11   came out, and it was the year of 4th grade.

12       Q.    Okay.

13             Do you remember who you were talking to?

14       A.    I don't remember.

15       Q.    Now, you said that was 4th grade, that that was

16   the year that you came out.  Do you use terminology like

17   socially transition when you talk about that time?

18       A.    Could you repeat the question?

19       Q.    Sure.  Let me ask a different one.  Are you

20   familiar with the term social transition or to socially

21   transition?

22       A.    No.

23       Q.    Okay.

24             When you --- and I'm going to use your term,

```
 1    okay.  When you said you came out in 4th grade and that

 2    was the time when you maybe started talking to other

 3    people about being a girl, you don't really remember who

 4    that was, but generally how was that time for you?

 5                      ATTORNEY HARTNETT:  Objection to form.

 6                      THE WITNESS:  It was good because I made

 7    a lot of new friends.  A lot of people were really nice

 8    to me.

 9    BY ATTORNEY CAPEHART:

10       Q.    Were your old friends nice to you, too?

11       A.    Yes.

12       Q.    How was everybody at your school, teachers and

13    other folks that worked there?

14                      ATTORNEY HARTNETT:  Objection to form.

15                      THE WITNESS:  They were very good about

16    it.

17    BY ATTORNEY CAPEHART:

18       Q.    Did you have any bad experiences that year?

19       A.    No.

20       Q.    Okay.

21             B█████, for you what does it mean to be female

22    or to be a girl?

23       A.    Could you repeat the question?

24       Q.    Sure.  I'm trying to understand your perspective
```

1   on things, and so that's why I'm just asking, to you,

2   what does it mean to be a girl or to be female?

3                   ATTORNEY HARTNETT:  Objection to form.

4                   THE WITNESS:  It means --- it means

5   everything.  I've always wanted to be a girl.

6   BY ATTORNEY CAPEHART:

7       Q.    Okay.

8             And what is it about a girl or female that

9   makes them different from boys or males?

10                  ATTORNEY HARTNETT:  Objection to form.

11                  THE WITNESS:  How they act and how they

12  dress their selves.

13  BY ATTORNEY CAPEHART:

14      Q.    Okay.

15            Anything else other than how they act or how

16  they dress?

17      A.    Not that I can think of right now.

18      Q.    Okay.

19            How do girls or females dress differently than

20  boys or males?

21                  ATTORNEY HARTNETT:  Objection to form.

22                  THE WITNESS:  Females would wear ---

23  normally wear dresses and males would normally wear

24  tuxedos and suits.  And their casual clothes are most of

```
 1   the time different but sometimes can be the same.
 2   BY ATTORNEY CAPEHART:
 3      Q.   Okay.
 4           So do I look like I'm dressed like a male
 5   because I'm wearing a suit jacket and tie?
 6               ATTORNEY HARTNETT:  Objection to form.
 7               THE WITNESS:  Yes.
 8   BY ATTORNEY CAPEHART:
 9      Q.   Okay.
10      A.   Because that is also how you present yourself.
11      Q.   Okay.
12           Is presenting one's self, when you say that, is
13   that different than how one dresses and how one acts or
14   is it both of those together?
15               ATTORNEY HARTNETT:  Objection to form.
16   Sorry.
17               THE WITNESS:  It's kind of a mix of all
18   of it.
19   BY ATTORNEY CAPEHART:
20      Q.   Now, when you say that how someone acts is
21   different regarding girls to boys, what do you mean by
22   that?
23      A.   Normally ---.
24               ATTORNEY HARTNETT:  Objection to form.
```

1              THE WITNESS:  Most of the time males will

2    look very big and buff and females most of the time do

3    not like that look, but some can.

4    BY ATTORNEY CAPEHART:

5       Q.    Okay.

6              What else about how a person acts puts them in

7    a more of a female category than a male category?

8              ATTORNEY HARTNETT:  Objection to form.

9              THE WITNESS:  They would maybe --- they

10   wouldn't want to look like a guy.  A guy wouldn't want

11   to look like a girl and a girl wouldn't want to look

12   like a guy unless --- unless you do, which sometimes

13   people do do that.

14   BY ATTORNEY CAPEHART:

15      Q.    Okay.

16             So if someone is trying to look like a guy,

17   then they are going to wear more what I'll call

18   traditional attire, like you said, maybe like a tuxedo

19   or a suit with a coat and a tie and they may want to

20   look bigger and buff and in an overall way present

21   themselves as male.

22             Is that right?

23             ATTORNEY HARTNETT:  Objection to form.

24             THE WITNESS:  Most of the time but not

33

```
 1  all the time.
 2  BY ATTORNEY CAPEHART:
 3     Q.   Okay.
 4          Are there actions or things that people do that
 5  make you think this person is acting more like a male or
 6  someone is acting more like a female?
 7                    ATTORNEY HARTNETT:  Objection to form.
 8                    THE WITNESS:  Sometimes.
 9  BY ATTORNEY CAPEHART:
10     Q.   Okay.
11          When you say sometimes what are you thinking
12  about?
13     A.   Maybe people are walking around because
14  sometimes it's how they walk that you can tell and their
15  hair sometimes.
16     Q.   What kind of hair is more male as compared with
17  hair that is more female to you?
18                    ATTORNEY HARTNETT:  Objection to form.
19                    THE WITNESS:  I think longer hair is more
20  ladylike and short hair is more manly, but sometimes
21  people do like an option of that where people --- where
22  guys will like long hair and girls will like short hair.
23  BY ATTORNEY CAPEHART:
24     Q.   I think my father would agree with you on what
```

1  you said there.  Are there other kind of behaviors that

2  people exhibit that are more male or more female besides

3  walking and maybe kind of their physical posture?

4                    ATTORNEY HARTNETT:  Objection to form.

5                    THE WITNESS:  Not really, no.

6  BY ATTORNEY CAPEHART:

7    Q.    Okay.

8          Besides, as you said, males would be more big

9  and buff and females not really liking that look as

10  much, although some of them do, are there other physical

11  attributes that makes you think someone is more male or

12  more female?

13                    ATTORNEY HARTNETT:  Objection to form.

14                    THE WITNESS:  Not really.

15  BY ATTORNEY CAPEHART:

16    Q.    Does height have anything to do with it?

17                    ATTORNEY HARTNETT:  Objection to form.

18                    THE WITNESS:  No, because that can go

19  either way.  That's genetics if you're tall or not.

20  BY ATTORNEY CAPEHART:

21    Q.    As you have been growing up, from what I

22  understand, you talk with your mom a lot.

23          Right?

24    A.    Yes.

35

```
 1      Q.    Have you ever talked with your mother about what

 2   it means to be female?

 3      A.    Yes.

 4      Q.    Okay.

 5            What did your mother --- strike that.

 6            Did your mother try to help you as you were

 7   going through this process to kind of understand this a

 8   little bit more what is male and female?

 9                 ATTORNEY HARTNETT:  Objection to form.

10                 THE WITNESS:  Could you repeat the

11   question?

12   BY ATTORNEY CAPEHART:

13      Q.    Sure.  As you've been growing up and as you've

14   been talking with your mother over the years as you

15   realized, as you said, you're a girl and as we were just

16   talking about, that there are certain things in your

17   mind that go more with being female rather than being

18   male, did you and your mom have conversations about that

19   same kind of thing we were just discussing?

20                 ATTORNEY HARTNETT:  Objection to form.

21                 THE WITNESS:  Yes.

22   BY ATTORNEY CAPEHART:

23      Q.    Okay.

24            What did you all talk about?
```

```
 1      A.    We talked about looks and --- mainly looks and
 2   that was about it.
 3      Q.    Okay.
 4            Did you talk about makeup?
 5      A.    Yes.
 6      Q.    Okay.
 7            Is that something to you that is more female or
 8   more male?
 9      A.    More female, but some males do wear them ---
10   wear it.
11      Q.    Did you and your mom talk about jewelry?
12      A.    Ish, not really because jewelry can be worn by
13   males and females.
14      Q.    That's fair.  I'm wearing some myself right now.
15   Did you all talk about anything else other than those
16   few things that you just provided to me and also the
17   makeup?
18                 ATTORNEY HARTNETT:  Objection to form.
19                 THE WITNESS:  Not really.
20   BY ATTORNEY CAPEHART:
21      Q.    Okay.
22            Have you ever had any of those kinds of
23   conversations with your father?
24                 ATTORNEY HARTNETT:  Objection to form.
```

1                THE WITNESS:  Not really because I don't

2    think he would understand it because he is a guy that is

3    --- he really --- he likes doing manly stuff and I don't

4    think he'd understand makeup.

5    BY ATTORNEY CAPEHART:

6       Q.    So with all that in mind, I'm just trying to

7    understand how you think about some of these things.

8    How do you define girls and boys?

9                ATTORNEY HARTNETT:  Objection to form.

10               THE WITNESS:  Males try to look muscular

11   and they do --- they lift weights and have short hair,

12   but girls can also do that, but it's most commonly found

13   with guys.  With girls, they usually have long hair, but

14   guys can have that, too.  They wear makeup and have

15   different clothing than males.

16   BY ATTORNEY CAPEHART:

17      Q.    Okay.

18            Are there activities that girls or females like

19   to do that men don't like to do or that males don't like

20   to do?

21               ATTORNEY HARTNETT:  Objection to form.

22               THE WITNESS:  Not really because sports

23   are for everyone and they should --- and every --- and

24   any person should be able to play.

38

1    BY ATTORNEY CAPEHART:

2       Q.     I thank you for that.  I was making it a little

3    bit more broad than that even though.  Are there other

4    things outside of sports that may be girls and females

5    like to do that typically, from your experience, boys

6    and males don't like to do?

7                      ATTORNEY HARTNETT:  Objection to form.

8                      THE WITNESS:  Not really because anything

9    that a female could do a male could do, and anything a

10   male could do a female could do.

11   BY ATTORNEY CAPEHART:

12      Q.     And among all of your friends, are they mostly

13   girls, mostly boys or all across both boys and girls?

14      A.     They are mostly girls, but I do have some guy

15   friends.

16      Q.     What do you like to do with your friends that

17   are girls?

18      A.     We hang out, sometimes we play video games.

19      Q.     Do you go --- do you like going to the mall or

20   shopping?  I know that has been harder recently since

21   COVID?

22                      ATTORNEY HARTNETT:  Objection to form.

23                      THE WITNESS:  Sometimes, but not really

24   because of COVID.

1   <u>BY ATTORNEY CAPEHART</u>:

2     Q.    Do you do the same kind of things with your

3   friends that are boys?

4     A.    We also hang out.  We talk about video games, we

5   play video games, so, yes, about the same.

6     Q.    Okay.

7          At some point you decided to change your name.

8   Do you remember when you decided to do that?

9     A.    When I came out.

10     Q.    So in 4th grade, as you mentioned earlier?

11     A.    I came out in the third --- the summer of third

12   grade.  But when I was like actually talking to people

13   and stuff about it, it was 4th grade.  So yes, when I

14   came out.

15     Q.    Okay.

16          And so when did you start going by B█████?

17     A.    The summer of third grade.

18     Q.    Did you go by B████ at school at that time, too,

19   or did you wait until fourth grade for that?

20            <u>ATTORNEY HARTNETT</u>:  Objection to form.

21            <u>THE WITNESS</u>:  It was the summer of third

22   grade and I was kind of presenting through third grade,

23   but I didn't go by B████, just --- at that point I

24   waited until fourth grade.

```
1   BY ATTORNEY CAPEHART:

2      Q.   Okay.

3           How did you select your new name?

4      A.   I've always liked the name, so that's what I

5   liked.

6      Q.   Okay.

7           And why did you decide at that time that you

8   needed a new name?

9      A.   Because I didn't think my name fit for me.

10     Q.   Okay.

11          And you're familiar with the term dead name.

12          Right?

13     A.   Yes.

14     Q.   Okay.

15          Do you remember the first time that you

16  encountered that word --- or I'm sorry, that term?

17     A.   That term?  When I came out, I was told that I

18  could be dead named and they told me what that was.  And

19  then later I looked it up and figured out what it was

20  more in depth.

21     Q.   Okay.

22          Do you remember who it was that had told you

23  that you could be dead named?

24     A.   I can't remember.
```

```
 1      Q.    Was it your mom?

 2      A.    It may have been, but I can't remember.

 3      Q.    From what your mother and your father told us,

 4   it sounds like your mother has been the parent that has

 5   taken you to all but maybe one of your appointments to

 6   talk to people about being a transgender girl.  Is that

 7   about right from your recollection?

 8            ATTORNEY HARTNETT:  Objection to form.

 9            THE WITNESS:  Yes, that is about right.

10   BY ATTORNEY CAPEHART:

11      Q.    Have you had a lot of appointments to talk with

12   doctors or other healthcare providers about being a

13   transgender girl?

14            ATTORNEY HARTNETT:  Objection to form.

15            THE WITNESS:  I wouldn't say it was a

16   lot, but I also wouldn't say it was like a little.  It

17   was a good amount of appointments.

18   BY ATTORNEY CAPEHART:

19      Q.    Okay.

20            After one of those appointments you received a

21   diagnosis of gender dysphoria.  Have you been told that

22   before?

23      A.    Yes.

24      Q.    Okay.
```

```
 1          When was the first time you remember

 2   encountering that term gender dysphoria?

 3      A.   I don't know the date, but I think my mom told

 4   me that I had it.

 5      Q.   Okay.

 6          Do you remember generally when that was?

 7      A.   I can't remember.  It may have been 2021 or

 8   2022.

 9      Q.   Also, when you're remembering something, if you

10   remember it by year, I know that is how I remember a lot

11   of things growing up, if something happened at a

12   particular year of school rather than a calendar year.

13   You know, if that's a frame of remembering for you, too,

14   that is fine also.  Calendar years aren't as important.

15          Do you know what gender dysphoria is?

16      A.   A little bit about it, but I don't know the

17   actual definition.

18      Q.   Okay.

19          Did you look it up and research it like you did

20   dead name after you heard it?

21                ATTORNEY HARTNETT:  Objection to form.

22                THE WITNESS:  I don't think so because if

23   I did I'd probably know more about it.

24   BY ATTORNEY CAPEHART:
```

```
 1        Q.    And you said --- do you remember the doctor
 2   visit where you first heard one of your doctors use that
 3   term?
 4        A.    I can't remember.
 5        Q.    Do you remember an appointment with Dr. Montano?
 6        A.    Yes, I remember some of the appointments with
 7   him.
 8        Q.    Okay.
 9              There is some medical records that show that
10   you had an appointment with Dr. Montano where he did a
11   full assessment of you in the summer of 2019.  Do you
12   remember that by any chance?
13              ATTORNEY HARTNETT:  Objection to form.
14              THE WITNESS:  Not really because that was
15   a long time ago.
16   BY ATTORNEY CAPEHART:
17        Q.    Do you remember any appointment with Dr. Montano
18   that was a longer appointment where you talked about a
19   lot of things?
20              ATTORNEY HARTNETT:  Objection to form.
21              THE WITNESS:  Not really because they all
22   felt like they went by so fast because during the things
23   I usually had to miss a day of school, and I was always
24   thinking about what I missed.
```

44

```
1    BY ATTORNEY CAPEHART:

2       Q.    I did the same thing at your age.

3             Whenever you had those appointments with Dr.

4    Montano or at Dr. Montano's office, I know oftentimes at

5    those appointments it's not just the doctor, that there

6    are sometimes other people that work there that will

7    come in and see a patient during the appointment time.

8    What do you recall about those appointments and who you

9    met with?

10                  ATTORNEY HARTNETT:  Objection to form.

11                  THE WITNESS:  I can't remember, but I ---

12   I don't remember their name, but I remember a time where

13   someone else went in there.

14   BY ATTORNEY CAPEHART:

15      Q.    Do you remember the kinds of things that you

16   would talk about with Dr. Montano or any of the other

17   people at those appointments?

18      A.    Maybe --- I don't know.  I can't remember.

19      Q.    When you were at appointments at Dr. Montano's

20   office, do you recall him or any of his staff running

21   tests on you?

22                  ATTORNEY HARTNETT:  Objection to form.

23                  THE WITNESS:  I can't recall.

24   BY ATTORNEY CAPEHART:
```

**JA0970**

1    Q.    Okay.

2         At those appointments do you remember hearing

3    people talking about how to treat gender dysphoria?

4    A.    I can't remember.

5    Q.    Has your mother discussed with you how your

6    gender dysphoria is being treated now?

7    A.    Maybe back whenever I --- whenever I was

8    diagnosed with it, but I can't remember.

9    Q.    Whenever there's any decisions that have to get

10   made about your treatment for your gender dysphoria,

11   does your mother talk with you about that and explain

12   everything that's happening?

13   A.    Yes.

14   Q.    Okay.

15        When you all are having those conversations and

16   a decision has to be made, does your mother let you make

17   those decisions?

18              ATTORNEY HARTNETT:  Objection to form.

19              THE WITNESS:  Yes, I am part of the

20   making of the decisions what happens to me.

21   BY ATTORNEY CAPEHART:

22   Q.    Okay.

23        Do you and your mother ever disagree about what

24   should be done?

```
 1                  ATTORNEY HARTNETT:  Objection to form.

 2                  THE WITNESS:  Not --- not --- I don't

 3     think we have, but there is a possibility that could

 4     happen or could have happened and I don't recall.

 5     BY ATTORNEY CAPEHART:

 6        Q.   Okay.

 7             Give me just a second.

 8                  ATTORNEY HARTNETT:  Also, I think it

 9     might be a good time to take a quick break just given

10     the youth and amount of water consumption.  So maybe we

11     can take a five to ten-minute bathroom break when it's

12     good for you, Curtis.

13                  ATTORNEY CAPEHART:  Oh, yeah, that's

14     actually perfectly fine.

15                  ATTORNEY HARTNETT:  Can we take a

16     ten-minute break?  Yeah, let's just take a ten-minute

17     break so we're are not all back too early.

18                  ATTORNEY CAPEHART:  Sounds great.

19                  VIDEOGRAPHER:  Going off the record.  The

20     current time reads 11:01 a.m.

21     OFF VIDEOTAPE

22                       ---

23     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

24                       ---
```

```
 1   ON VIDEOTAPE
 2              VIDEOGRAPHER:   We are back on the record.
 3   The current time reads 11:13 a.m.
 4   BY ATTORNEY CAPEHART:
 5      Q.    Okay.
 6              Well, during the break I was going back over
 7   some notes and just have a couple of questions that kind
 8   of relate to some things we already talked about and
 9   then I'm going to move on.
10              Okay?
11      A.    That Declaration that we had looked at earlier,
12   I recall that you had mentioned when you first looked at
13   it you didn't recall seeing it, you didn't recall
14   signing it, you then looked at your initial signatures
15   and then you had read the rest of the document.  After
16   we went through all of that, did that jog your memory
17   any.  Do you remember signing it?
18      A.     I do remember signing it, but I kind of have a
19   little bit of memory seeing it, but I do have a memory
20   signing it.
21      Q.    Okay.
22              Also, when you recalled learning and hearing
23   the term about dead name and that someone might do that
24   to you at school, did anyone actually do that to you at
```

```
 1   school?

 2      A.    Not that I can remember.

 3      Q.    Okay.

 4            I think you had also said you kind of did some

 5   research.  What kind of research did you do looking into

 6   that term?

 7      A.    Just looking what it meant, looking up what it

 8   meant.

 9      Q.    Did you look it up in a book or on the internet?

10      A.    The internet.

11      Q.    Okay.

12            Do you recall where on the internet you found

13   it?

14      A.    I think I looked it up on Google and I did

15   another one, but I can't remember what it was.  It was

16   one of the unpopular ones.

17      Q.    Okay.

18            Also, when you were --- or when we were talking

19   about the characteristics or things that make a person

20   more female or more male you had said that height really

21   didn't make a difference, that that was really more

22   genetic.  Do genetics have something more to do with

23   being a girl or a boy?

24                   ATTORNEY HARTNETT:  Objection to form.
```

1             THE WITNESS:  I wouldn't know.

2  BY ATTORNEY CAPEHART:

3     Q.    Also, is there anything that definitively makes

4  a person a girl or a female versus a boy or a male?

5             ATTORNEY HARTNETT:  Objection to form.

6             THE WITNESS:  Could you repeat the

7  question?

8  BY ATTORNEY CAPEHART:

9     Q.    Sure.  And I will preface it with kind of what

10 we were kind of talking about before.  You were

11 describing how there were a lot of things that are

12 typically --- and I don't think you used that word but

13 I'm going to use it, more typically associated with

14 males like tuxedos or suits, short hair, being buff,

15 working out, that sort of thing, and other things that

16 were more typically associated with being female,

17 wearing dresses, longer hair, not preferring to have

18 that maybe over muscled physique, wearing makeup, that

19 sort of thing, and that there were even some other

20 things you said are maybe more associated with males,

21 but that doesn't mean that females don't do it or vice

22 versa.  I think that's what you said.

23             So I'm wondering is there anything in your mind

24 that if you see a person doing that or wearing that or

50

```
 1   whatever that thing might be, is there something that

 2   you, if you see it associated with a person, you think

 3   only boys do that or only girls do that?

 4                    ATTORNEY HARTNETT:  Objection to form.

 5                    THE WITNESS:  No, because if I see

 6   someone like that and I don't --- I don't immediately

 7   go, oh, that's a guy, oh, that's a girl.  I ask them,

 8   oh, what are your pronouns, what is your gender

 9   identity.  And that's --- that's the better way to

10   figure out what they --- what they are and if they're

11   male or female or what --- if they're nonbinary or

12   whatever they are.

13   BY ATTORNEY CAPEHART:

14       Q.    You mentioned a term nonbinary.  Can you explain

15   what nonbinary means?

16       A.    It is a person that doesn't identify as a male

17   or female and they go by they/them pronouns.

18       Q.    Do you know anyone that is nonbinary?

19       A.    One of my lawyers is.

20       Q.    Do you know anybody at your school or your

21   hometown that is nonbinary?

22       A.    I don't think so.

23       Q.    Okay.

24                    ATTORNEY HARTNETT:  Heather, do you want
```

 1  a minute for a break?

 2              MS. JACKSON:  Just to get a sip of water.

 3              ATTORNEY HARTNETT:  Can you give her a

 4  mute to, the court reporter, just to let her work

 5  through that?  It's happened to all of us.  No worries.

 6              MS. JACKSON:  It went down the wrong

 7  pipe.

 8              ATTORNEY CAPEHART:  And again, if you

 9  need to take another break, that's fine, too.  All okay

10  on your end?

11              MS. JACKSON:  We're good.

12              ATTORNEY CAPEHART:  Okay.

13  BY ATTORNEY CAPEHART:

14    Q.   I don't want to upset you, but I need to ask a

15  couple of questions about some comments that, according

16  to what we learned, your father had made in the past.

17              ATTORNEY HARTNETT:  Objection to form.

18              ATTORNEY CAPEHART:  That wasn't a

19  question, but okay.

20  BY ATTORNEY CAPEHART:

21    Q.   We understand that ---.

22              ATTORNEY HARTNETT:  Sorry.  Just to make

23  clear my objection was that you were stating that

24  certain statements had been made, and I'm objecting to

```
 1   the foundation.
 2                    ATTORNEY CAPEHART:  Okay.
 3                    ATTORNEY HARTNETT:  Go ahead.
 4   BY ATTORNEY CAPEHART:
 5      Q.   I've looked at some records and there are some
 6   notations and ████████████████████████████████████████
 7   ██████████████████████████     When we were talking with
 8   your mother she had said she did not know what had
 9   happened there.  Can you tell me what had happened when
10   that occurred?
11                    ATTORNEY HARTNETT:  Objection to form.
12                    THE WITNESS:  Could you repeat the
13   question?
14   BY ATTORNEY CAPEHART:
15      Q.   Sure.  We've seen in some records a notation
16   ████████████████████████████████████████████████████████
17   ██████████████████████████     Your mother did not
18   know what had happened on that occasion.  She recalled
19   that when this happened, but she didn't know what had
20   actually occurred ████████████████████████████████
21        Do you remember that?
22                    ATTORNEY HARTNETT:  Objection to form.
23   Go ahead.
24                    THE WITNESS:  I can't remember, but I'm
```

```
 1   pretty sure it was --- I was scared of something that
 2   was --- honestly I shouldn't have been scared of.  It
 3   was nowhere near me.  It was probably a spider or
 4   something.  But just the phrase ████████████████
 5   ████████████████████████████████ it is like don't be
 6   scared of that, there's no reason to.  It's just another
 7   use of don't be scared of that.
 8   BY ATTORNEY CAPEHART:
 9     Q.    Okay.
10           We were --- we were just wondering what had
11   happened there because, as I recall, when this was being
12   discussed yesterday, that your mother indicated you were
13   very upset when you had ████████████████████████
14   ████████████████████████████████████████████████████
15   ████████████████████████   Does that help you
16   remember anything more?
17                 ATTORNEY HARTNETT:  Objection, form.
18                 THE WITNESS:  Not really.
19   BY ATTORNEY CAPEHART:
20     Q.    Also, we seen a note in one of the medical
21   records that was, again, discussed yesterday and your
22   mother said we would need to ask you about it.  ████████
23   ████████████████████████████████████████████████████
24   ████████████████████████████████████████████████████
```

54

1    ███████

2                    ATTORNEY HARTNETT:  Objection to form.

3                    THE WITNESS:  Could you restate the

4    question?

5    BY ATTORNEY CAPEHART:

6       Q.   Sure.  We were looking at some records and there

7    was some notation ██████████████████████████

8    ████████████████████  Your mother wasn't familiar with

9    that and said we should ask you about it.  So I'm asking

10   you if you recall ever discussing that with one of your

11   treaters?

12                   ATTORNEY HARTNETT:  Objection to form.

13                   THE WITNESS:  I don't remember discussing

14   that with anyone besides my mom really.  But it was a

15   long time ago, so I --- I can't remember if I did or

16   not.

17   BY ATTORNEY CAPEHART:

18      Q.   Okay.

19           Do you know what that would relate to, that

20   reference ████████████████████████

21      A.   He probably got mad at me, like really mad in

22   the situation, and he was probably threatening ████████

23   ███████████████████

24      Q.   Has that happened sometimes?

1      A.    A long time ago.  It doesn't happen anymore now.

2      Q.    Did it happen on multiple occasions or just

3  once?

4      A.    It was --- well, it was a couple of times maybe

5  in like the same three days or something like that, but

6  after those three days it stopped.

7      Q.    Did you talk with your mom about it when that

8  happened?

9      A.    Yes.

10     Q.    Okay.

11           Did she tell you that she was going to talk to

12  your father for you?

13           ATTORNEY HARTNETT:  Objection.  Go ahead.

14           THE WITNESS:  She --- I think she did.

15  She talked to him, and that's why he stopped doing it.

16  BY ATTORNEY CAPEHART:

17     Q.    ███████████████████████████?

18     A.    Could you restate it?

19     Q.    Sure.  Do you have appointments from time to

20  time to ████████████████████████████████████

21  ███████████████████████████████████

22     ██      ████

23     ██      ████

24        ██████████████

```
 1                    ATTORNEY CAPEHART:  We've got a fire
 2   drill going on.  Hold on, everybody.
 3                    THE WITNESS:  What happened?
 4                    MS. JACKSON:  They have a fire alarm
 5   going off.
 6                    THE WITNESS:  Oh.
 7                    VIDEOGRAPHER:  Do you want to go off the
 8   record?
 9                    ATTORNEY HARTNETT:  We're fine with that.
10                    VIDEOGRAPHER:  Going off the record.  The
11   current time reads 11:25 a.m.
12   OFF VIDEOTAPE
13                         ---
14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
15                         ---
16   ON VIDEOTAPE
17                    VIDEOGRAPHER:  Back back on the record.
18   The current time reads 11:41 a.m.
19                    ATTORNEY GREEN:  All right.  Thank you
20   and I will just hop in for a minute.  This is Roberta
21   Green on behalf of WVSSAC.  And I just wanted to note
22   for the record the appearance of my co-counsel, Shannon
23   Rogers, who's with me on behalf of WVSSAC.  I just
24   wanted to note that for the record and I'll hop off.
```

1   Thanks.

2                    ATTORNEY CAPEHART:  Okay.

3                    Now that we are through our building

4   emergency, if I could ask the court reporter to go back

5   to the last line of actual testimony.  I don't recall

6   what point during that event we broke off the record,

7   but if you could go back and tell us where we were

8   whenever loud noises started happening.

9                    COURT REPORTER:  The question, sure.  Do

10  you have any appointments from time to █████████████

11  ████████████████████████████████████████████████████

12  ██████████████████  Answer, yes.  Question, okay.  Who do

13  you meet with?  And then that's when the fire drill

14  happened.

15                   ATTORNEY CAPEHART:  Thank you.

16  BY ATTORNEY CAPEHART:

17     Q.    Becky, let's just pick up there.  Who do you

18  meet with?

19     A.    I meet with ███████    His name is ████████

20     Q.    Okay.

21           Do you know what office or group ████████ is

22  with?

23                   ATTORNEY HARTNETT:  Objection to form.

24                   THE WITNESS:  Could you repeat the

```
 1   question?
 2   BY ATTORNEY CAPEHART:
 3       Q.    Sure.  Is ███████████████████ or is
 4   ██████ part of a ███████████?
 5       A.    I don't know.
 6       Q.    Do you know the name --- I'm sorry.  I cut you
 7   off.  Go ahead.
 8       A.    I just go to him for ████████  That's ---.
 9       Q.    Okay.
10             How often do you meet with ███████
11       A.    It just depends because sometimes maybe it's
12   once a month, but it can be anytime.  If we call him and
13   we need to go, he usually has a spot open.
14       Q.    Okay.
15             And just generally speaking, what kind of
16   things do you discuss with █████████
17       A.    █████████████████████████████████
18   ███████████
19       Q.    Okay.
20             Whenever you meet with ████████ do you go in
21   alone or does your mother go in with you?
22       A.    It depends.  It usually starts with me and my
23   mom in there, then she waits out in the lobby and we
24   talk.  And sometimes I go out and my mother talks to him
```

59

```
 1    and then we get back --- we both go in the room at the
 2    end and then we say bye and then we leave.
 3        Q.    Okay.
 4              And how do you like that process, going to talk
 5    to ███████
 6        A.    I love it because I can talk about ██████
 7    █████
 8        Q.    Does that help you to feel better?
 9        A.    Uh-huh (yes).
10        Q.    Do you know --- excuse me, do you know whether
11    you have had any ██████████████████████?
12                    ATTORNEY HARTNETT:  Objection to form.
13                    THE WITNESS:  Could you rephrase that?
14    BY ATTORNEY CAPEHART:
15        Q.    Yes.  And let me back up and ask another
16    question I had forgotten to ask earlier.  Do you know
17    what ████████ profession is?
18        A.    I don't know.
19        Q.    Okay.
20        A.    All I know is that he is a ██████████  That's
21    what I know.
22        Q.    Okay.
23              And do you know whether ████████ is a ████████ of
24    some sort or just a ████████
```

60

1          ATTORNEY HARTNETT:  Objection to form.

2          THE WITNESS:  I do not know.

3    BY ATTORNEY CAPEHART:

4    Q.    Okay.  Okay.

5          Now, if you could look at Exhibit 34.  Do you

6    have the document marked as Exhibit 34 in front of you?

7    It says West Virginia Legislature at the top and then in

8    the middle of the page there's a line that says House

9    Bill 3293.

10   A.    Yes, we have that.

11   Q.    Okay.  Great.

12         Have you ever seen this before?

13   A.    I don't think so.

14   Q.    Okay.

15         So if you --- this is just of kind of a cover

16   page for what was House Bill 3293 that passed the

17   legislature and was signed the Governor last year.  This

18   is the --- this is the bill, the law that your lawsuit

19   is challenging.

20         Now, if you look --- start looking at page two

21   you'll see there is a lot of text here.  Have you seen

22   any of this before?  You don't have to read it all, just

23   kind of glance over it.  And if you think you may have

24   seen parts before, you can say so, but ---.

**JA0986**

1    A.    I don't think I've seen this before.

2    Q.    Okay.  Okay.  All right.

3          Well, I'm not going to ask you to read the

4    whole thing right now.  I'm just going to ask you about

5    a couple of parts of it.

6          Okay?

7    A.    Uh-huh (yes).

8    Q.    Because there's a lot to read here.

9          ATTORNEY HARTNETT:  I'll just refer to

10   our standing objection.  Thank you.

11          ATTORNEY CAPEHART:  Sure.  Sure.

12   BY ATTORNEY CAPEHART:

13   Q.    On what's marked at the bottom of the page as

14   page two you'll see that there are kind of a column of

15   numbers that run down the left-hand side of the page

16   there.  The top number on page two should be a ten?

17   A.    Uh-huh (yes).

18   Q.    Okay.

19          And I'll just refer to those lines to direct

20   you to a couple of spots.  Okay.  And just so you know,

21   that's a standard part of what a bill looks like so that

22   whenever they're looking at legislation people can refer

23   to a procedure or line.  That way they can follow it

24   more easy.

1           So the lines I'm going to direct you to are 25

2    and 26.  This is a definition that is set forth in this

3    bill and it is down in West Virginia Code.  So just read

4    that and let me know when you've read that definition in

5    this bill.

6       A.    I've read it.

7       Q.    Okay.

8           Do you think that's a proper definition of

9    biological sex?

10              ATTORNEY HARTNETT:  Objection to

11   terminology.  Make that a standing objection.

12              THE WITNESS:  I would not know that if I

13   --- if that would be ---.

14   BY ATTORNEY CAPEHART:

15      Q.    Okay.

16          Have you ever heard people use language like

17   biological sex or biological female?

18              ATTORNEY HARTNETT:  Objection to form.

19              THE WITNESS:  Yes, I've heard people use

20   that.

21   BY ATTORNEY CAPEHART:

22      Q.    Okay.

23          Has anyone ever explained what they mean when

24   they have used that terminology around you?

1      A.    I don't think so or I just can't remember.

2      Q.    Okay.

3            This definition, at lines 25 and 26, does this,

4   based on the way that you have heard people use the term

5   in the past, is this about what you think they meant?

6                ATTORNEY HARTNETT:  Objection to form.

7                THE WITNESS:  Yes.

8   BY ATTORNEY CAPEHART:

9      Q.    Okay.

10           So now that you've read that in this bill

11  that's what that term means, look up at lines 21 and 22

12  and let me know when you've read those two lines.

13     A.    Okay.

14     Q.    Do you agree with that statement at lines 21 and

15  22?

16                ATTORNEY HARTNETT:  Objection to form.

17                THE WITNESS:  I don't because I think if

18  someone wants to play on the girls team, like me, they

19  should be able to even though they are --- they're not

20  following that requirement.

21  BY ATTORNEY CAPEHART:

22     Q.    Okay.

23           Before I move on to ask some questions about

24  cheerleading and track, I just want to talk about a

```
 1   couple of other words that we were just touching on.

 2   But I just want to make sure that we understand each

 3   other or at least you understand me.  You have heard

 4   people use the term biological female or the term

 5   biological male before.

 6          Is that correct?

 7   A.    Yes.

 8   Q.    Okay.

 9          And just so we're clear, if I use the term

10   biological female or biological girl, I'm describing

11   people who were determined to be female at the time of

12   birth.  Okay?  I'm not looking at the statute.  I'm just

13   saying like if I use that term, that's what I'm talking

14   about.  Just so that if I use a word and you're not sure

15   what I mean, I'm trying to explain in advance so there's

16   no confusion.  Does that make sense?

17   A.    Yes.

18   Q.    Okay.

19          And also, if I say biological male or

20   biological boy I mean someone who was determined to be

21   male at the time of birth.

22   A.    Yes.

23   Q.    So if I use that --- if I use that kind of

24   terminology that is what I'm talking about, people who
```

```
 1   were determined to be that at the time of birth.  Okay?
 2           When did you first get interested in sports?
 3       A.   I've always liked running.  And I think
 4   running's a sport, so since I could walk and run.
 5       Q.   What kind of sports, in addition to running,
 6   have you been interested in?
 7       A.   Cheering was one.  I was a little bit interested
 8   in volleyball, but not anymore.
 9       Q.   Why not?
10       A.   I just never --- I just didn't --- I just lost
11   liking of it.
12       Q.   Whenever I say interested in --- let me
13   rephrase.  Whenever you say that you are interested in
14   running, you were interested in cheer and been part of a
15   team and for a short time you are interested in
16   volleyball but aren't really interested anymore, do you
17   mean interested in participating and playing those
18   sports?
19       A.   Yes.
20       Q.   Okay.
21           Are there other sports that you have been
22   interested in from the perspective of being a viewer but
23   maybe not a participant?
24       A.   Could you repeat the question?
```

66

```
 1        Q.    Sure.  Besides the three that you just talked
 2   about, running, cheer, volleyball, are there other
 3   sports that you have an interest in as a viewer, as a
 4   person that's in the stand watching it, or watching it
 5   on television, but you don't have an interest in playing
 6   or taking part?
 7        A.    I like watching football.
 8        Q.    Okay.
 9              Anything else?
10        A.    That's about it.
11        Q.    Does your mom watch football?
12        A.    Yeah.  We like the same team.
13        Q.    What team?
14        A.    The Cleveland Browns.
15        Q.    Do you like any other football teams?
16        A.    Not really, no.
17        Q.    Do you just watch professional football or do
18   you watch college, too?
19        A.    Just professional.
20        Q.    Now, have your parents encouraged you to be
21   involved in sports?
22              ATTORNEY HARTNETT:  Objection to form.
23              THE WITNESS:  I'd say so that they
24   encouraged me.
```

1    BY ATTORNEY CAPEHART:

2       Q.    Okay.

3             Now that you've been on a couple of different

4    kind of teams, girls cross-country and also cheer when

5    you were younger, do you enjoy getting to compete as

6    part of a team?

7       A.    Yes, I do.

8       Q.    If you were in a sport where you weren't on a

9    team, that you were just an individual on a team, would

10   you enjoy that also?

11      A.    No, because that's not --- that's not on ---

12   you're not on a team, you're not doing teamwork, that's

13   just by yourself.

14      Q.    So is the bigger appeal to you in sports being

15   part of a team, being part of a group, working towards a

16   common goal?

17                  ATTORNEY HARTNETT:  Objection to form.

18                  THE WITNESS:  Could you repeat the

19   question?

20   BY ATTORNEY CAPEHART:

21      Q.    Sure.  You said you wouldn't really like being

22   in an individual sport, maybe something like, I don't

23   know, figure skating maybe, because you wouldn't be part

24   of a team, you would be --- that you like being part of

```
 1   a team?

 2       A.    Yes.

 3       Q.    So is that what draws you to some of the sports

 4   that you are interested in, the team aspect?

 5       A.    Yeah, the team aspect and I can make new

 6   friends.

 7       Q.    Do you consider yourself competitive whenever

 8   you're playing sports or when you're playing games with

 9   your friends?

10             ATTORNEY HARTNETT:  Objection to form.

11             THE WITNESS:  I want to call myself

12   competitive.  I'm just a person that likes playing

13   games.  I'm not like, oh, I got to win.  I just like

14   playing them, doing sports.

15   BY ATTORNEY CAPEHART:

16       Q.    Okay.

17             Do you have some friends that are like that?

18       A.    Yeah, I have a couple of friends.

19       Q.    I think we all have a couple of friends that are

20   like that.

21             So in those sports that you're interested in,

22   including football, do you think rules are really

23   important in sports?

24             ATTORNEY HARTNETT:  Objection to form.
```

 1              THE WITNESS:  Yes, I think rules are

 2  important because you wouldn't want someone having an

 3  unfair advantage, like cheating.

 4  BY ATTORNEY CAPEHART:

 5     Q.    Right.

 6     A.    And like ---.

 7     Q.    Sorry.  Go ahead.

 8     A.    Like in baseball, I don't know what it's called,

 9  but getting a better grip on the ball, that's cheating.

10  That's not fair.

11     Q.    So do you think rules are a big part of or an

12  important part of making sure that sports are fair?

13     A.    Yes.

14              ATTORNEY HARTNETT:  Objection to form.

15  Sorry, B█████  Just make sure you give me a chance to

16  object, but you should then give your answer.  So let's

17  try that one again.

18              ATTORNEY CAPEHART:  Court Reporter, can

19  you repeat the last question?

20              THE WITNESS:  Could you repeat the last

21  question?

22              COURT REPORTER:  Question, so do you

23  think rules are a big part of or an important part of

24  making sure that sports are fair?

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  I think they are a big part

 3    of making sports fair.

 4    BY ATTORNEY CAPEHART:

 5       Q.   What does it mean for sports, for competition to

 6    be fair?

 7                    ATTORNEY HARTNETT:  Objection to form.

 8                    THE WITNESS:  Well, sometimes it can mean

 9    losing --- maybe winning unfair and winning things

10    because if people are cheating then they could get --- I

11    don't know if there's a cash prize.  So if they cheat,

12    they're going to get that.  That's not fair because they

13    get something out of cheating.

14    BY ATTORNEY CAPEHART:

15       Q.   So it sounds like that you're saying that if

16    somebody breaks a rule like the one that you were

17    talking about in baseball, and by breaking that rule

18    that helps them to win or beat someone else, that that

19    wouldn't be fair.  Is that what you're ---?

20                    ATTORNEY HARTNETT:  Objection.

21                    THE WITNESS: Yes.

22    BY ATTORNEY CAPEHART:

23       Q.   I'm sorry.  I think I lost part of your answer

24    there.
```

```
 1      A.     Yes, that's what I'm saying.

 2      Q.     Who do you think should make up the rules for

 3 sports?

 4                 ATTORNEY HARTNETT:  Objection to form.

 5                 THE WITNESS:  I don't know.

 6 BY ATTORNEY CAPEHART:

 7      Q.     I'm going to ask you a couple of questions about

 8 your time on cheerleading.  How many years were you on

 9 the cheer team?

10      A.     I was on the cheer team for two years.

11      Q.     Okay.

12             And if I recall from what your mother had told

13 us, it was part of the Bridgeport Youth --- is it

14 Bridgeport Youth Football League?  Is that what it was?

15                 MS. JACKSON:  Yes.

16                 COURT REPORTER:  I'm sorry.  Ms. Jackson,

17 did you say yes or was it the witness.  I'm sorry.

18                 MS. JACKSON:  I said yes.

19 BY ATTORNEY CAPEHART:

20      Q.     My understanding is that that's not affiliated

21 with the schools in any way, that's an independent, what

22 a lot of people would maybe call midget football league

23 and that that league has cheerleading teams also.

24             Is that right?
```

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  Yes.  Sorry.

 3   BY ATTORNEY CAPEHART:

 4      Q.    Okay.

 5            I just want to make sure I understood that.

 6   That's how things were when my daughter did midget cheer

 7   --- midget league cheer, also.

 8         What team were you on like B, C D?  Do you

 9   recall?

10                    ATTORNEY HARTNETT:  Objection to form.

11                    THE WITNESS:  I was on Bridgeport Pee Wee

12   Red.

13   BY ATTORNEY CAPEHART:

14      Q.    Okay.

15            And were the members of that team all within

16   --- all the same age or within a year of each other?

17      A.    They were within a year of each other.

18      Q.    So was that third and fourth or fourth and

19   fifth?

20      A.    I think it was fourth and fifth.

21      Q.    Did you enjoy being on the cheerleading team?

22      A.    Yeah, it was really fun.

23      Q.    Did you like cheering at sidelines at games more

24   than competition cheer?
```

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  I did like cheering on

 3      sidelines better because I had stage fright and I feel

 4      whenever I was cheering on the sidelines most of the

 5      people were paying attention to the game, so I didn't

 6      have as much stage fright.  But at competition, that was

 7      the main thing that everyone was focusing on.

 8      BY ATTORNEY CAPEHART:

 9          Q.    When you would be part of the team and working

10      on your competition cheer, you all did stunts.

11                Is that correct?

12          A.    Yes, that is correct.

13          Q.    Did you get to be a flyer or were you a base?

14          A.    I was a base.

15          Q.    Did you enjoy that more than going up in the

16      air?

17          A.    Definitely, because I have a fear of heights.

18          Q.    Understandable.  So now that you're in Middle

19      School you were on the cross-country track team this

20      fall and you're also interested in running track.

21                Is that correct?

22          A.    Yes.

23          Q.    Okay.

24                I know I've seen in some reports and maybe in
```

1  your Declaration, too, you mentioned that there were

2  other people in your family that had run.  Is that the

3  basis for your interest in being on cross-country and

4  also doing track this spring?

5      A.   Yes.

6      Q.   Bridgeport Middle doesn't have coed teams, does

7  it?

8                    ATTORNEY HARTNETT:  Objection to form.

9                    THE WITNESS:  Could you repeat the

10  question?

11  BY ATTORNEY CAPEHART:

12      Q.   Sure.  Do you know what a coed team is?  Have

13  you heard that term before?

14      A.   No.

15      Q.   Okay.

16           I realize I'm probably dating myself a little

17  bit there.  That term is not really used all that

18  frequently maybe nowadays, but that just essentially

19  means that coed would be, you know, boys and girls all

20  on the same team together.  And I guess you don't.  You

21  just have a boys team and a girl teams.

22           Right?

23      A.   Yes.

24                    ATTORNEY HARTNETT:  Objection to form.

```
 1                    THE WITNESS:  Sorry.

 2   BY ATTORNEY CAPEHART:

 3      Q.    Now, in this --- for spring track you're going

 4   to try out for the girls team.

 5           Correct?

 6      A.    Yes.

 7      Q.    Now, that tryout and also the one for

 8   cross-country track, are those competitive tryouts where

 9   everybody has to run and be timed?

10                    ATTORNEY HARTNETT:  Objection to form.

11                    THE WITNESS:  Kind of because when we did

12   cross-country, all of us made it.  But I was told that

13   the year before, when I was in 5th grade, that they had

14   to cut people because there was too many.  So I think

15   that they only cut people if there's not --- if there is

16   too many.

17   BY ATTORNEY CAPEHART:

18      Q.    Do you know how many there were on cross-country

19   this fall?

20      A.    I don't know.

21      Q.    Okay.

22           If there is some upper limit, though, your team

23   didn't reach that limit in terms of participants?

24      A.    I think it may have been exactly the limit or
```

1  less, but I don't know.

2      Q.    You don't remember anyone that tried out not

3  making the team, though?

4      A.    Nope.    Everyone made it if they didn't quit.

5      Q.    Okay.

6            Do you remember how many meets or events you

7  went to this past fall?

8      A.    I don't know for a fact, but it was around seven

9  to eight.

10     Q.    And were all of those competitive team events

11  where they were tracking everyone's times with a team

12  placing at the end?

13            ATTORNEY HARTNETT:    Objection to form.

14            THE WITNESS:    Yes, there was.

15  BY ATTORNEY CAPEHART:

16     Q.    Okay.

17            How did you all do this fall?

18     A.    We did very good.

19     Q.    Great.    Did you place at most of the events that

20  the team went to?

21            ATTORNEY HARTNETT:    Objection to form.

22  BY ATTORNEY CAPEHART:

23     Q.    And by team I mean did the team place at the

24  event that your team participated in?

 1      A.    Most of the time, yes.  Some of them weren't,

 2  but we always got close.

 3      Q.    Did your team get first place at any of the

 4  events?

 5      A.    Yes.

 6      Q.    How did that feel to be part of a team that got

 7  first place at one of these events?

 8      A.    It felt awesome.  It felt great.

 9      Q.    Okay.

10          So just because I don't know a tremendous

11  amount about cross-country or track and field, for

12  cross-country do you understand how the scoring works or

13  how the timing ends up with a team being first place or

14  second place or last place?

15      A.    I do not know.

16      Q.    But you would like to win, right?  You would

17  like your team to win.

18          Right?

19      A.    Yes.

20      Q.    What track sports do you want to run in this

21  spring, track events I should say?

22      A.    I'm thinking about doing long distance.

23      Q.    And by long distance what does that mean in

24  terms of the actual distance?

78

1      A.      There is a mile, two miles, and I think there

2   may be a three-mile one.

3      Q.      So are you training to build up your stamina to

4   those right now?

5      A.      Not currently just because it is really cold

6   out.

7      Q.      That's fair.  Just like I was asking you to help

8   me understand a little bit about how cross-country does

9   its scoring and placing, I think I know a little bit

10  more about track and field.  In events like the distance

11  runs, the one, two or even --- one mile, two mile or

12  even longer distances, there are individual places in

13  each of those events.

14          Correct?

15     A.      Uh-huh (yes).

16     Q.      So do the first, second, third place finishers

17  get metals in those?

18                  ATTORNEY HARTNETT:  Objection to form.

19                  THE WITNESS:  I'm not sure because this

20  would be my first year doing track.

21  BY ATTORNEY CAPEHART:

22     Q.      And do you know whether the outcome of those

23  individual races are then factored into some overall

24  team standing?

79

1    A.    I do not know.

2    Q.    Okay.

3          Now, at all of these events that you have

4    participated in this past fall with the girls track team

5    and then the ones that you would like to be part of this

6    spring for track and field, those are just girls teams

7    against girls teams.

8          Is that correct?

9                ATTORNEY HARTNETT:  Objection to form.

10               THE WITNESS:  I do not know because,

11   again, this is my first year.

12   BY ATTORNEY CAPEHART:

13   Q.    Okay.

14         Now, at the cross-country events you went to

15   this past fall, when your team got first place, that was

16   just competing against a girls team.

17         Correct?

18   A.    Yes.

19   Q.    Okay.

20         At those same events or meets are there also

21   boys teams present?

22   A.    Yes.

23   Q.    Okay.

24         But your team only competed against the girls

80

1   teams.

2       Correct?

3       A.   Yes.

4       Q.   Would you have liked for your teams to have

5   competed against boys teams and girls teams?

6       A.   At a couple of meets they did.  But when they

7   do, they only tallied the girls points and the guys

8   teams differently and then they did the teams' totals.

9       Q.   Okay.

10      Did anyone explain to you why they did that

11  that way?

12      A.   I don't know.

13      Q.   Okay.

14      Do you think that they may have done those

15  tallies differently because someone thought that boys

16  could run faster than girls?

17          ATTORNEY HARTNETT:  Objection to form.

18          THE WITNESS:  I don't know.  I don't know

19  that.

20  BY ATTORNEY CAPEHART:

21      Q.   Okay.

22      A.   But whenever we started the --- a different ---

23  like the guys would go five minutes before and then five

24  minutes later the girls would go, so it was easier to

1  tally up all the points.

2     Q.    Okay.

3           Do you think that the boys can run faster than

4  the girls?

5               ATTORNEY HARTNETT:  Objection to form.

6               THE WITNESS:  I do not believe so because

7  I also think that is a genetic thing, if you are fast or

8  not.

9  BY ATTORNEY CAPEHART:

10    Q.    Okay.

11          From what I remember reading somewhere you're

12  pretty good with math.

13          Is that fair to say?

14    A.    Yes.

15               ATTORNEY HARTNETT:  Objection to form.

16               THE WITNESS:  Sorry.

17               ATTORNEY HARTNETT:  That is okay.

18  BY ATTORNEY CAPEHART:

19    Q.    Do you know what statistics are?

20    A.    I am familiar with the word, but I don't know

21  what it means.

22    Q.    Okay.

23          Would you and your teammates sometimes compare

24  times after meets?

1    A.    Sometimes.

2    Q.    Okay.

3          And at the cross-country events, was the course

4    that you would run a different length every time?

5    A.    It was always around 2 miles to 2.3, so --- so

6    not really.

7    Q.    Okay.

8          I was just curious because I have a number of

9    friends that are athletes and they really seem to enjoy

10   talking about statistics, you know, how fast they run or

11   in baseball a batting average or in football a

12   quarterback's completion percentage or something, that

13   those are, it seems for folks in and around sports, ways

14   that you can try to evaluate or to get a sense of

15   something about a person or group of people.  Have you

16   heard and seen statistics talked about when you watch

17   those football broadcasts with your mom?

18               ATTORNEY HARTNETT:  Objection to the

19   narrative and to the question form.

20               THE WITNESS:  Could you repeat the

21   question?

22               ATTORNEY CAPEHART:  Sure.

23   BY ATTORNEY CAPEHART:

24   Q.    Have you seen or heard statistics talked about

1   on those football broadcasts that you watch with your

2   mom?

3      A.    Sometimes, but I don't really pay attention to

4   those because I mainly like watching the game.

5      Q.    That's fair.

6               MS. JACKSON:  Excuse me.  She needs to

7   use the restroom.

8               ATTORNEY CAPEHART:  Absolutely.  Take a

9   break.

10              MS. JACKSON:  Can you get through?

11              VIDEOGRAPHER:   Going off the record.

12   The current time reads 12:18 p.m.

13   OFF VIDEOTAPE

14                        ---

15   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                        ---

17   ON VIDEOTAPE

18              VIDEOGRAPHER:  We are back on the record.

19   The current time reads 12:25 p.m.

20   BY ATTORNEY CAPEHART:

21      Q.    All right.

22              Well, let's see.  When we left off I was just

23   asking you about things about statistics.  Have you ever

24   looked up any statistical data about cross-country for

1    people your age?

2        A.    No, I have not looked up the statistics for

3    people my age.

4        Q.    And I think I framed that question as for

5    cross-country.  Have you ever done that with track and

6    field, for example, the one mile or the two mile?

7        A.    No, I have not.

8        Q.    If you were to see statistics that show that, on

9    average, 11-year-old biological boys were 20 percent

10   faster than 11-year-old biological females in the mile

11   run, would that surprise you?

12                  ATTORNEY HARTNETT:  Objection to form.

13                  THE WITNESS:  Yes, because I think

14   biological --- it's all about genetics, if you're fast

15   or not.

16   BY ATTORNEY CAPEHART:

17       Q.    So if you're fast or not is about genetics?

18       A.    I think it is, but it could be not.

19       Q.    Okay.

20             If that were true, that there is a statistic

21   somewhere that shows that 11-year-old biological boys

22   are 20 percent faster than biological girls of the same

23   age, would it be fair to have the biological boys

24   running in the mile race with biological girls?

1                    ATTORNEY HARTNETT:  Objection to form.

2                    THE WITNESS:  Can you say the question

3    again?

4    BY ATTORNEY CAPEHART:

5       Q.    Sure.  If there were statistics that did show

6    that difference of 20 percent between biological boys at

7    a certain age and biological girls at that same age,

8    would it be fair to allow biological boys to run that

9    same race as the biological girls?

10                   ATTORNEY HARTNETT:  Objection to form.

11                   THE WITNESS:  If they identify as a

12   female, then I think, yes.  But if not, then I don't

13   think that it should.

14   BY ATTORNEY CAPEHART:

15      Q.    Okay.

16            So you said if they identify as a female, then

17   they should be able to run with the biological girls?

18      A.    Yes.

19      Q.    Did I hear you right?

20      A.    Yes.

21      Q.    Okay.

22            So then could any biological boy be on the

23   girls team so long as they identify as female?

24                   ATTORNEY HARTNETT:  Objection to form.

```
1                    THE WITNESS:  I think so.  Sorry.

2                    ATTORNEY HARTNETT:  Sorry.

3    BY ATTORNEY CAPEHART:

4      Q.    And when you say they identify as female, just

5    explain that to me so I make sure I understand it.

6      A.     When people are transgender from male to female,

7    like me, that's what I think is identifying as a female.

8      Q.    Okay.

9           Is it enough for someone in your mind to

10   identify as female for them to just say that they

11   believe they're female or do they need to do something

12   more than that?

13                   ATTORNEY HARTNETT:  Objection to form.

14                   THE WITNESS:  I think they need to have

15   an appearance and there has to be a reason.  Like ---

16   well, not a reason, but they have to --- they have to

17   not just say, oh, I identify as female, I should run.

18   They should have already been transitioned.  It can't

19   just be out of nowhere.  Like, oh, all of the sudden,

20   now that I started, I just realize that I can do this,

21   oh, I'm transgender.  That's --- I don't think that ---

22   I think maybe --- I don't know, a year into the

23   transition that you should be able to.

24   BY ATTORNEY CAPEHART:
```

1    Q.    Okay.

2          So when you say a year into their transition

3    do, you mean like just their social transition, the way

4    they are presenting themselves?

5    A.    Yes.

6    Q.    Okay.

7          For that kind of hypothetical person that you

8    were describing there, if they had gone a year into

9    their transition, as I think you've described it, then

10   in your mind that's what they need to do so that they

11   could be on the girls team?

12              ATTORNEY HARTNETT:  Objection to form.

13              THE WITNESS:  Yes.

14   BY ATTORNEY CAPEHART:

15   Q.    Okay.

16         Do they --- do they need to be doing something

17   else like taking puberty blockers or something of that

18   nature?

19              ATTORNEY HARTNETT:  Objection to form.

20              THE WITNESS:  I think they should be on

21   puberty blockers to do it because if they have hit

22   puberty, then that's a different story because they hit

23   puberty and that's not changeable.

24   BY ATTORNEY CAPEHART:

```
 1        Q.    Okay.

 2              When they hit puberty and that's not

 3    changeable, explain that to me a little if you can.

 4              ATTORNEY HARTNETT:  Objection to form.

 5    Go ahead.

 6              THE WITNESS:  If they've hit puberty,

 7    then they are maturing and they are going to get a

 8    deeper voice.  A girl would get a bigger Adam's apple

 9    and then that's really it.  And I think that gives them

10    more of an unfair advantage.  I could be wrong, but I

11    think after they hit puberty, I don't know, I think

12    something happens, but I'm not sure.

13    BY ATTORNEY CAPEHART:

14        Q.    Do you think there is something else that

15    happens besides the depth of voice and the Adam's apple?

16        A.    I think they may get faster because their

17    testosterone levels will rise.

18        Q.    Okay.

19              And do you think that's not an issue for

20    someone that hasn't gone through puberty yet?

21              ATTORNEY HARTNETT:  Objection to form.

22              THE WITNESS:  Sorry.  Yes, because their

23    testosterone levels, if they are on puberty blockers,

24    won't be as high and they won't be --- it won't be high
```

1    and it won't give them any advantage.

2    BY ATTORNEY CAPEHART:

3        Q.    If there was someone in that situation that

4    wasn't on puberty blockers, do you think that would be

5    unfair for that person to be on a girls team?

6                    ATTORNEY HARTNETT:  Objection to form.

7                    THE WITNESS:  As long as they haven't hit

8    puberty, then I think it's fine.  But if they have hit

9    puberty, then I think they should maybe go on hormone

10   blockers and then maybe then, because I --- I could be

11   wrong, but I think their testosterone levels will drop

12   if they go on hormone blockers after puberty.

13   BY ATTORNEY CAPEHART:

14       Q.    Okay.

15             Do you think that they also need to be getting

16   treated for gender dysphoria?

17                   ATTORNEY HARTNETT:  Objection to form.

18                   THE WITNESS:  I don't think that matters

19   because if they don't have gender dysphoria, why should

20   they be getting treated for it.

21   BY ATTORNEY CAPEHART:

22       Q.    So if there was a person that went through that,

23   a biological boy who had done all the things that you

24   say needed to be done and they could be on the girls

1   team, but at some point in the future that person

2   decided they wanted to, I don't know, revert back to

3   being on the boys team for sports, should that be

4   allowed?

5                    ATTORNEY HARTNETT:  Objection to form.

6                    THE WITNESS:  If they want to, then yes,

7   go ahead, because they will --- if they are --- if they

8   still have the requirements to be on the girls team,

9   then they will be on puberty blockers and then the

10  testosterone levels will still be low.  So --- but if

11  they get off, then they'll just raise back, and they

12  could still run on the boys team, but they can't run on

13  the girls.

14  BY ATTORNEY CAPEHART:

15     Q.    Okay.

16           You've been talking about puberty blockers like

17  a person that knows about them, which I think you do.

18  What do you know about puberty blockers?

19                   ATTORNEY HARTNETT:  Objection to the

20  preamble and to the form.

21                   THE WITNESS:  Okay.

22           Could you repeat the question?

23  BY ATTORNEY CAPEHART:

24     Q.    Sure.  What do you know about puberty blockers?

1   A.   They stop hormone levels from rising and they

2   have --- they have a chance for --- they have side

3   effects, but if you are transgender they can help ---

4   they can help with the process of a transition because

5   it will stop you from hitting puberty and you won't grow

6   an Adam's apple, you won't grow facial hair and your

7   voice won't get deeper.

8   Q.   Okay.

9        You're receiving puberty blocking medications

10  now.

11       Is that correct?

12  A.   Yes, that's correct.

13  Q.   Okay.

14       Did you want to start that medication to delay

15  or prevent puberty?

16  A.   Yes, that is correct.

17  Q.   Okay.

18       We had talked some about your doctors'

19  appointments before.  You had some appointments before

20  receiving the puberty blockers.

21       Correct?

22  A.   Yes, that is correct.

23  Q.   Okay.

24       Do you remember an appointment where you talked



1    with a doctor about getting puberty blocking meds?

2        A.      Yes.







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                ATTORNEY CAPEHART:  I think this is a

19 good spot to take a break.  The next part that I'm going

20 to get into I think is going to take a little more time

21 than we have.  I see it's 12:41, so if it's all right

22 with everyone, I suggest we go off the record and talk

23 about when we come back.

24                ATTORNEY HARTNETT:  That's fine with us.



```
 1                    VIDEOGRAPHER:  Going off the record.  The

 2    current time reads 12:41 p.m.

 3    OFF VIDEOTAPE

 4                         ---

 5    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 6                         ---

 7    ON VIDEOTAPE

 8                    VIDEOGRAPHER:  We are back on the record.

 9    The current time reads 1:19 p.m.

10    BY ATTORNEY CAPEHART:

11       Q.    Okay.

12             Well, before I move onto something else, I just

13    wanted to follow up on something that you had mentioned

14    before the break, B▇▇▇.  And I hope you had a good

15    break.  You had mentioned testosterone before.  Where

16    had you learned about what testosterone is?

17       A.    The doctors.

18       Q.    Okay.

19             Like Dr. Montano, those people?

20       A.    Yes.
```



1

2

3

4

5

6

7

8

9

10    BY ATTORNEY CAPEHART:

11        Q.    Okay.

12            You had mentioned before in relation to a

13    biological boy running on a girls team and that they

14    would need to, I think you had said --- I'm not trying

15    to put words in your mouth, but I think you had said

16    something along the lines that they would need to be

17    taking some kind of medication relative to the

18    testosterone if they were either going through puberty

19    or had gone through puberty.

20            ATTORNEY HARTNETT:    Objection to form.

21    BY ATTORNEY CAPEHART:

22        Q.    Do you remember that when we were talking

23    earlier?

24        A.    Yes.

1     Q.    Okay.

2           Why did you mention testosterone relative to

3     how a biological boy might be performing in running?

4     A.    Because I think that --- that after --- whenever

5     you half an increase of testosterone, that --- I think

6     that increases your athletic ability, but I could be

7     wrong there.

8     Q.    Okay.  Fair enough.

9           Do you know that because of what the doctors

10    had talked to you about?

11              ATTORNEY HARTNETT:  Objection to form.

12              THE WITNESS:  I am pretty sure, yeah.

13    BY ATTORNEY CAPEHART:

14    Q.    Okay.

15          Have you had done any independent research

16    yourself to learn more about testosterone?

17    A.    I don't recall.  I may have, but I don't

18    remember.

19    Q.    Okay.

20          Do you recall reading the Complaint in this

21    lawsuit?

22    A.    I do not.

23    Q.    Okay.

24          If you could look at Exhibit 32 for just a

```
 1   minute.  Okay.  It says Exhibit WV-32 at the bottom

 2   right corner and has a lot of other words, but in

 3   boldface in the upper right center are the words First

 4   Amended Complaint.  Okay.  This is as it says is the

 5   First Amended Complaint, means there was an original

 6   Complaint that had been amended once in its first

 7   Amended Complaint.  Do you recall ever having seen this

 8   before now that you are getting a chance to look at it?

 9        A.    Yes, I think so.

10        Q.    Okay.

11              Do you remember reading over it yourself?

12        A.    I don't think so.

13        Q.    Okay.

14              Do you remember anyone discussing with you what

15   was in the Complaint?

16        A.    I think I discussed it with my mom.

17        Q.    But you don't know everything that's in here

18   because you haven't read it yourself.

19              Is that correct?

20        A.    I don't.

21                   ATTORNEY HARTNETT:  Objection.

22                   THE WITNESS:  I don't remember if I have

23   or haven't.

24   BY ATTORNEY CAPEHART:
```

```
1      Q.    Okay.

2            You don't remember if you have or have not.

3   Okay.

4            Now, I think we had talked before about the

5   fact that your lawsuit is challenging the HB 3293.  You

6   may have remembered we had looked at that very briefly

7   and I had directed you to a couple of parts of it and

8   you had said you hadn't read the whole thing.  And I

9   will also represent to you that it also had some other

10  definitions in there for biological male and female.  Do

11  you believe there is a difference between biological

12  males and biological females?

13                ATTORNEY HARTNETT:  Objection to form and

14  the preamble.

15                THE WITNESS:  I don't know.

16  BY ATTORNEY CAPEHART:

17      Q.    Okay.

18            You don't know if there is any difference

19  between a biological boy and a biological girl?

20                ATTORNEY HARTNETT:  Objection to form.

21                THE WITNESS:  I don't know.  I don't know

22  if there is a difference.

23  BY ATTORNEY CAPEHART:

24      Q.    Okay.
```

1        Do you think there are physical differences

2  between a biological boy and a biological girl?

3              ATTORNEY HARTNETT:  Objection.

4              THE WITNESS:  Could you repeat the

5  question?

6  BY ATTORNEY CAPEHART:

7    Q.    Sure.  Do you think there are physical

8  differences between a biological boy and a biological

9  girl?

10    A.    Yes.

11    Q.    Okay.

12              ATTORNEY HARTNETT:  And I just have a

13  standing objection in terminology, but I will not

14  continue to make that objection.

15              ATTORNEY CAPEHART:  Noted.  Thank you.

16  BY ATTORNEY CAPEHART:

17    Q.    What do you understand the physical differences

18  are between a biological boy and a biological girl?

19    A.    A biological boy has a penis and a biological

20  girl has a vagina.

21    Q.    Okay.

22        Do you believe there are any other physical

23  differences between a biological boy and a biological

24  girl?

1      A.    There --- yes, but that part could be with

2    either one, because long hair could also be with a guy

3    or like that's --- like if a girl, a biological girl,

4    would probably have long hair, but a guy could also have

5    long hair.  And then a guy could have --- a guy could

6    have short hair and a girl could also have that.  And a

7    biological guy would probably want to look muscular, but

8    a biological girl would probably --- could probably want

9    to look like that.

10     Q.    So apart from a superficial difference like hair

11   length or how much someone works out and also the

12   difference in genitalia, are you aware of any other

13   differences?

14                    ATTORNEY HARTNETT:  Objection to form.

15                    THE WITNESS:  Not that I can think of

16   right now.

17   BY ATTORNEY CAPEHART:

18     Q.    Okay.  Okay.

19          Can you all look at Exhibit 26?  Do you have

20   Exhibit 26?

21     A.    Yes.

22     Q.    This looks like it is an article from the

23   Gazette Mail.  If you flip to the second page of the

24   exhibit, the fourth block of text up from the bottom it

1    reads, quote, I just want to run, I come from a family

2    of runners, close quoted, P█████ J██████ said in a news

3    release.  Quote, I know how hurtful a law like this is

4    to all kids like me who just want to play sports with

5    their classmates, and I'm doing this for them.  Trans

6    kids deserve better, closed quote.  B████, do you

7    remember talking to a reporter before this article got

8    written?

9        A.    Yes.

10       Q.    Okay.

11             And the quoted language that I was just reading

12   there that's also in the exhibit, do you remember saying

13   that?

14       A.    Yes.

15       Q.    Okay.

16             So those are your words, no one was

17   paraphrasing something you were trying to tell them

18   then?

19       A.    No.

20       Q.    Okay.

21             Is a trans kid an appropriate term to use?

22             ATTORNEY HARTNETT:  Objection, form.

23             THE WITNESS:  Could you repeat the

24   question?

 1   BY ATTORNEY CAPEHART:

 2     Q.    Sure.  In the quote it says trans kids deserve

 3   better.  I'm just curious, is trans kids a normal term

 4   that is used and is acceptable to use?

 5             ATTORNEY HARTNETT:  Objection, form.

 6             THE WITNESS:  Could you repeat the

 7   question one more time?

 8   BY ATTORNEY CAPEHART:

 9     Q.    Sure.  And I'm not trying to trick you.  I'm

10   just trying to understand because you used the term

11   trans kids, and I think I've seen it in maybe another

12   article, too, and I just thought I encountered it

13   another experience.  So I'm asking the question is that

14   an acceptable term to use to refer to transgender boys

15   or transgender girls?

16             ATTORNEY HARTNETT:  Same objection.

17             THE WITNESS:  Yes.

18   BY ATTORNEY CAPEHART:

19     Q.    Is it okay to call you a trans kid?

20     A.    If you don't know that I don't know my name and

21   you know I'm trans, then yes, that's acceptable.  But if

22   you know my name and you're purposely calling me that,

23   then not really, but it's still fine.

24     Q.    Yeah.  And I don't intend to.  I was just

1    curious ---

2        A.    Yes.

3        Q.    --- from the nuances and the acceptable use of

4    the term.  So thank you.  Excuse me.  If you can look

5    at Exhibit 27.

6                    ATTORNEY HARTNETT:  And just for the

7    record and the witness's knowledge, B████, you should

8    feel free to review the full exhibit before you answer

9    questions if you want to.

10                   THE WITNESS:  Okay.

11                   MS. JACKSON:  So that's the first page.

12                   ATTORNEY CAPEHART:  You all just let me

13   know whenever you're ready to proceed.

14                   Okay?

15                   ATTORNEY HARTNETT:  I'm sorry.  I think

16   B████ is ready.

17                   THE WITNESS:  Yeah.

18                   ATTORNEY CAPEHART:  Okay.  Thank you.

19   BY ATTORNEY CAPEHART:

20       Q.    I'm going to try to make sure I direct you to

21   the proper page.  It looks like it's the last page of

22   the text, which looks like it's about the fourth to the

23   last page of the exhibit.  At the top of the page the

24   test begins with the word when Justice.  Right there.

1   Have you all found that on your hard copy?

2       A.    Yes.

3       Q.    Okay.  All right.

4             So let's see, this first block here that reads

5   when Justice signed the Bill banning transgender girls

6   from sports teams, B███ was devastated she said.  Then

7   another quote, I felt horrible because I knew then I

8   couldn't run with the other girls.  Do you remember

9   talking to the author of this piece before it came out?

10      A.    Yes.

11      Q.    Okay.

12            And does that quote seem right?  Do you

13  remember saying that?

14      A.    Yes.

15      Q.    Okay.

16            Now, I recall earlier you mentioned that you

17  hadn't read the bill, the new law yourself, but here you

18  said you couldn't run with the other girls after the

19  Governor signed it.  How did you know that since you

20  hadn't read through the bill?

21      A.    I was told by my mom.

22      Q.    Okay.

23            Do you remember when you and your mother had

24  that discussion?

```
 1       A.    I don't remember.

 2       Q.    All right.

 3             Were you aware of this bill before your mom

 4  told you that it was now a law?

 5       A.    I was aware of it, but I didn't know that it was

 6  going to get signed.

 7       Q.    Okay.

 8             What did you know about it before your mom told

 9  you it was signed and was now a law?

10       A.    That I wouldn't be able to run with the girls

11  once it got signed.

12       Q.    Okay.  All right.

13             If you move down to and look at the fourth

14  block of text there on the page it says as hard as it is

15  to be a trans kid and a mother of a trans kid, suddenly

16  thrust into the public eye in a conservative state,

17  B███ and Jackson agree that the potential payoff makes

18  it all worth it.  You don't have a problem with the

19  author using trans kid there, do you?

20       A.    No.

21       Q.    Okay.

22             How hard has it been in Bridgeport and Lost

23  Creek to be a trans kid, as the author says?

24                   ATTORNEY HARTNETT:  Objection to form.
```

1                    THE WITNESS:  Could you --- could you

2    repeat the question?

3    BY ATTORNEY CAPEHART:

4       Q.    Sure.  This little bit of language here is

5    talking about it being hard to be a trans kid and the

6    mother of a trans kid, so my question is how hard has

7    that been on you in Bridgeport and Lost Creek?

8                    ATTORNEY HARTNETT:  Objection to form.

9                    THE WITNESS:  Well, a lot of the people

10   don't support it and don't agree with it, so that's what

11   makes it hard.

12   BY ATTORNEY CAPEHART:

13      Q.    Okay.

14            You had said that school had gone really well

15   with your transition.

16            Correct?

17      A.    Uh-huh (yes).

18      Q.    Okay.

19            So are these people you're describing now, are

20   these all people outside of school?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  Yes.

23   BY ATTORNEY CAPEHART:

24      Q.    Okay.

```
 1              What kind of people are these?
 2                    ATTORNEY HARTNETT:  Objection to form.
 3                    THE WITNESS:  Usually adults.
 4   BY ATTORNEY CAPEHART:
 5      Q.   Okay.
 6           Are these people you know or strangers?
 7      A.   Strangers.
 8      Q.   Well, what have they done?
 9      A.   Just not --- just be mean in general.
10      Q.   Well, how are they being mean?
11      A.   They don't support it.  Sometimes people call me
12   names, just be mean.
13      Q.   Okay.
14           Does this happen often?
15      A.   Not as much now, but it used to happen a lot.
16      Q.   When you say used to happen a lot, do you mean
17   back at the time that you transitioned or before that or
18   after that?
19      A.   Well ---.
20                    ATTORNEY HARTNETT:  Objection to form.
21                    THE WITNESS:  Well, at the time and a
22   little bit after because I was so --- I was new to it
23   and I didn't know how to handle people like being
24   meaning about it.
```

 1   BY ATTORNEY CAPEHART:

 2       Q.    Okay.

 3             Would people be mean to you when your parents

 4   were around?

 5       A.    They wouldn't do it like directly to my face

 6   usually.  They would say it to my mom or my dad and then

 7   my parents would tell me.  So it wasn't usually directly

 8   to me.

 9       Q.    So when they would say these things, you weren't

10   in the presence of these people when they were saying

11   them?

12       A.    Most of the time, yes.

13       Q.    Oh, okay.

14             But then your mom and your dad would have

15   people say things to them and then your mom and dad

16   would tell you about what other people had said?

17             ATTORNEY HARTNETT:  Objection to form.

18   BY ATTORNEY CAPEHART:

19       Q.    Is that correct?

20       A.    Yes, but sometimes they wouldn't tell me just

21   I'm assuming to try not to make me sad.

22       Q.    Have any other kids ever said the kind of things

23   to you that your parents said adults had told them?

24             ATTORNEY HARTNETT:  Objection to form.

```
 1                    THE WITNESS:  No.

 2   BY ATTORNEY CAPEHART:

 3      Q.   No?  Do you and your family attend a church?

 4      A.   Not anymore.

 5      Q.   Okay.

 6           Did you before?

 7      A.   For a short period of time, yes.

 8      Q.   Okay.

 9           Did you ever have any issues or problems there?

10      A.   No.

11      Q.   So there weren't any adults at that church that

12   were mean to you or that said mean things to your

13   parents that you know of?

14      A.   At that time I was not transitioned yet, so

15   there was no comments like that.

16      Q.   Okay.

17           Do you remember when you had said your mom had

18   explained to you because the bill was now signed you

19   wouldn't be able to run, did she explain what part of

20   the new law would stop you from running?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  No, she just told me that

23   because of this I couldn't run.

24   BY ATTORNEY CAPEHART:
```

1      Q.    Okay.

2            And because you haven't read the bill yourself,

3      you don't have any knowledge of what part of the bill

4      prevents you from running.

5            Is that correct?

6      A.    Yes.

7                  ATTORNEY HARTNETT:   Objection to form.

8      BY ATTORNEY CAPEHART:

9      Q.    Thank you.   All right.   Let's see Exhibit 28.

10     I just was going to interject that you are free to read

11     the entirety if you would like to, the 20 pages.   It's a

12     lot, but I have no problem telling you the only thing

13     I'm going to ask you about is the portion on the last

14     page, the part under the subtitle B███'s trials.

15                 MS. JACKSON:   Thank you.

16                 ATTORNEY CAPEHART:   You're welcome.

17                 THE WITNESS:   I'm ready.

18     BY ATTORNEY CAPEHART:

19     Q.    Okay.   Great.

20           Do you remember talking to this author from

21     ESPN?

22     A.    I can't remember.

23     Q.    It sounds like your tryouts were pretty

24     challenging.

```
 1          Is that true?

 2    A.    Yes.

 3    Q.    Okay.

 4          Do you recall expressing anything to this

 5    reporter that's quoted here or otherwise described?

 6                ATTORNEY HARTNETT:  Objection to the

 7    form.

 8                THE WITNESS:  Could you repeat the

 9    question?

10    BY ATTORNEY CAPEHART:

11    Q.    Sure.  Do you recall saying this part that's

12    quoted here about your friends or discussing any of the

13    rest of it with the reporter?

14    A.    I don't remember, but I think I remember saying

15    maybe some of this, but I can't remember.  I can't

16    remember.

17    Q.    Okay.  Okay.

18          And it seems like you were understandably

19    excited to have made the team.

20          Is that right?

21    A.    Yes.

22    Q.    Okay.

23          How many girls were on the team this past fall?

24                ATTORNEY HARTNETT:  Objection.  I'm
```

```
 1    sorry.
 2                      THE WITNESS:  I don't know.
 3    BY ATTORNEY CAPEHART:
 4        Q.    Okay.
 5              And you were the only transgender girl on the
 6    team.
 7              Is that correct?
 8                      ATTORNEY HARTNETT:  Objection to form.
 9                      THE WITNESS:  As I knew of, there may
10    have been people that haven't come yet, but of what I
11    knew I was the only one.
12    BY ATTORNEY CAPEHART:
13        Q.    So far as you know, you're the only transgender
14    girl on the team.
15              Is that correct?
16        A.    Yes.
17        Q.    Okay.  Okay.
18              Exhibit 29, which is much shorter.  Okay.  Take
19    a look at that, however much you would like to, and then
20    let me know whenever you'd like to proceed.
21        A.    I'm done reading.
22        Q.    Okay.
23              Let's see.  Just below kind of the mid point of
24    the page, about the third block of real text it starts
```

1   off with a quote there and it says, quote, I just want

2   to run and the State wants to stop me from running as

3   part of a team at my school, end quote, said B████, an

4   11-year0old Middle School student.  Quote, I love

5   running and being part of the team and the State of West

6   Virginia should explain in court why they won't let me,

7   end quote.  Do you remember saying or writing that?

8       A.    I remember saying that.

9       Q.    Okay.

10              Who did you say that to?

11      A.    I can't remember.

12      Q.    Okay.

13              But those are all your words.

14              Correct?

15      A.    Uh-huh (yes).

16      Q.    Okay.

17      A.    Yes.

18      Q.    In what ways --- strike that.

19              When you say that the State of West Virginia

20  should explain in court why they won't let you be part

21  of the team, are you referring to HB-3293?

22      A.    Yes.

23      Q.    But as you said earlier, you're not sure what

24  part of that prevents you from running, you just know

 1   that it does because you have been told that.

 2          Correct?

 3                    ATTORNEY HARTNETT:  Objection to form.

 4                    THE WITNESS:  Yes.

 5   BY ATTORNEY CAPEHART:

 6      Q.    Okay.

 7          Sorry for that.  B███, are you aware of or

 8   have you read anything that the State has filed with the

 9   Court in this case?

10      A.    I think I've skimmed through a couple of things,

11   but not really read them.

12      Q.    Okay.

13          Those couple of things that you think you have

14   skimmed through, do you recall what those were?

15      A.    One of them was the one thing we just read ---

16   the thing that we went through just a little bit, I

17   skimmed through that.  And there was another one, but I

18   don't remember which one it was.

19      Q.    Okay.

20          The thing that we went just went through, I

21   apologize, we have gone through a few things.

22      A.    Just now, the one just now I skimmed through,

23   couple of paragraphs.  I'm pretty sure at least.

24      Q.    Do you mean Exhibit 29?

 1                    MS. JACKSON:   This?

 2                    THE WITNESS:   Yes.

 3    BY ATTORNEY CAPEHART:

 4        Q.    Exhibit 29 is not anything that the State has

 5    written.   I'm just explaining what this is.   And my

 6    understanding is that this is a news release from Lambda

 7    Legal.   So you think there may have been something else,

 8    though, that you looked at, you're just not really sure?

 9        A.    Yeah.

10        Q.    Okay.   Okay.

11              Give me just a second to check a couple of

12    things.   Okay.   There's a couple of things to just run

13    through real quick and then I think I might be done.

14    One, just following back up on the thought of why the

15    State won't let you run, why do you think, to use your

16    words from this press release, that the State won't let

17    you run?

18        A.    Could you repeat the question?

19        Q.    Sure.   In the release here there is, as you

20    said, your language saying that you want the State to

21    explain in court why they won't let you, referring back

22    to being part of a team and running.   Why do you --- why

23    do you think that is?

24                    ATTORNEY HARTNETT:   Objection.   Form.

 1                    THE WITNESS:  Because I don't think there

 2  is a good enough reason for me to not be able to run.

 3  BY ATTORNEY CAPEHART:

 4      Q.    Okay.

 5            When you say there's not a good enough reason,

 6  has someone spoken to you or explained some reason why

 7  they think that the State wouldn't let you run?

 8                    ATTORNEY HARTNETT:  Objection to form.

 9                    THE WITNESS:  Could you repeat the

10  question?

11                    ATTORNEY CAPEHART:  Court Reporter, can

12  read that question back for us?

13                    COURT REPORTER:  When you say there is

14  not a good enough reason, has someone --- has someone

15  --- I'm sorry.  When you say there's not a good enough

16  reason, has someone spoken to you or explained some

17  reason why they think that the State wouldn't let you

18  run?

19                    ATTORNEY HARTNETT:  Objection.

20                    THE WITNESS:  No one has explained the

21  reason, but that's why I think there's not a good enough

22  reason for me to not run.

23  BY ATTORNEY CAPEHART:

24      Q.    So you have not had any conversations with

 1  anyone who could explain what reasons the State may have

 2  presented as to why they passed this bill?

 3                    ATTORNEY HARTNETT:  I would just object

 4  to the extent this would entail any conversations with

 5  your lawyers, B███, and you should not testify about

 6  those conversations.  If there are conversations other

 7  than ones with your lawyer, you can testify about that.

 8                    THE WITNESS:  What was --- can you repeat

 9  the question?

10  BY ATTORNEY CAPEHART:

11    Q.    Sure.  And to pick up on Kathleen's comment, I'm

12  not trying to get you to divulge any confidential

13  communications that you had with your lawyers, but I'm

14  just trying to understand your comment where you said

15  that there is not a good enough reason and that no one

16  has explained a reason why the State passed this bill.

17  So I'm asking you what kind of conversations have you

18  had, if any, with anyone other than your lawyers about

19  the reason why this bill may have been passed?

20    A.    I haven't had any conversations with any of my

21  lawyers.

22    Q.    Okay.

23          Have you talked with your mom about why this

24  law may have been passed?

120

```
 1      A.     I don't think I have, no.

 2      Q.     And you already said you have not looked at any

 3   of the State's filings or documents that it has put in

 4   before the Court in this case?

 5              ATTORNEY HARTNETT:  Objection, MT.

 6              THE WITNESS:  I don't think so.

 7   BY ATTORNEY CAPEHART:

 8      Q.     Okay.

 9             You don't recall whether you have seen those,

10   but you don't believe so, is that what you said

11   previously?

12              ATTORNEY HARTNETT:  Objection, MT.

13              THE WITNESS:  Yes.

14   BY ATTORNEY CAPEHART:

15      Q.     Okay.

16             Real briefly, look back at Exhibit 31, which is

17   the Declaration that you looked at when we started.

18   Just let me know when you have it.

19      A.     We have the Declaration.

20      Q.     Okay.

21             Look at page three, if you would.  Got it?

22      A.     Uh-huh (yes), yes.

23      Q.     Okay.

24             There at paragraph number 13 it says, I do not
```

1   want to run with the boys and I should not have to run

2   with the boys.  What's wrong with running with the boys?

3       A.   I'm not a boy.  I'm a girl.  I should be able to

4   run with the girls.

5       Q.   Okay.

6           Are there any competitive concerns if you did

7   run with the boys?

8             ATTORNEY HARTNETT:   Objection.  Form.

9             THE WITNESS:   No.  I just think I'm a

10   girl and I shouldn't have to run with the boys.  I

11   should be able to run with the girls because I am a

12   girl.

13   BY ATTORNEY CAPEHART:

14       Q.   Okay.

15           One other --- one other quick question for you.

16   Do you know that under the law you could run with the

17   boys if you wanted to.

18           Right?

19             ATTORNEY HARTNETT:   Objection to form.

20             THE WITNESS:   That I could if I wanted

21   to, but that's not --- I'm not running with the boys

22   because I am a girl.

23   BY ATTORNEY CAPEHART:

24       Q.   Okay.

122

```
 1              I just wanted to make sure that someone had

 2      apprised you that the law does not prevent that, that

 3      new law.  Fair enough.  And I believe that's everything

 4      I have for you right now.  Thank you very much for your

 5      patience.

 6                        ATTORNEY CAPEHART:  And whoever the next

 7      person in line wants to take over the questioning, go

 8      right ahead.

 9                        ATTORNEY HARNETT:  And I know we haven't

10      gone for an hour yet, but I just wanted to check to see,

11      B███, do you need a bathroom break before we do more

12      questions?

13                        THE WITNESS:  I'm good.

14                        ATTORNEY ROGERS:  I think I'm next if I'm

15      understanding the order that was established earlier

16      this week.

17                        Is that right?

18                        ATTORNEY HARTNETT:  I believe Roberta

19      went next.

20                        ATTORNEY ROGERS:  All right.

21                              ---

22                           EXAMINATION

23                              ---

24      BY ATTORNEY ROGERS:
```

123

1      Q.    Hi, B███.  My name is Shannon Rogers.  I am one

2   of the attorneys that represents the West Virginia

3   Secondary School Activities Commission, which is

4   sometimes referred to as the WVSSAC.  And so when I'm

5   saying WVSSAC that's what I'm referring to.

6           Does that make sense?

7      A.    Yes.

8      Q.    Okay.

9           Had you ever had heard of the WVSSAC before?

10     A.    I don't think so.

11     Q.    Okay.

12          Do you know if you have ever spoken to anybody

13  who is with the WVSSAC?

14     A.    I don't know.

15     Q.    You don't know?  Okay.

16          Do you know if anybody --- well, strike that.

17          So you don't think you've ever communicated or

18  you just don't remember?

19     A.    I don't think I've ever communicated.

20                 ATTORNEY ROGERS:  Okay.

21             I don't have any other questions.  Thank

22  you, B███.

23                       ---

24                 EXAMINATION

```
 1                            ---

 2    BY ATTORNEY DENIKER:

 3       Q.    Hi, B██████.  My name is Susan Deniker.  I'm an

 4    attorney who works at a law firm called Steptoe and

 5    Johnson, and I represent the Harrison Board of Education

 6    and the Superintendant Dora Stutler.  Thank you for your

 7    time today.  I know it has been a long day and I know

 8    it's hard to sit in front of a computer screen, so thank

 9    you.  You've done a really great job.

10            I'm going to ask you a few questions about your

11    experience in school and in cross-country.  If I ask you

12    anything that doesn't make sense or that you don't

13    understand, please let me know.  You've done a really

14    great job with that today, but will you let me know if I

15    ask you something that you don't understand?

16       A.    Yes.

17       Q.    Very good.

18            And then also, if you need to take a break at

19    any time, just let me know and we'll be glad to take a

20    break.

21            Okay?

22       A.    Okay.

23       Q.    So yesterday I got to ask some questions of your

24    mom and she told me that you went to elementary school
```

```
 1    at Norwood Elementary.

 2            Is that correct?

 3    A.    Yes.

 4    Q.    And did you go to Norwood Elementary School from

 5    kindergarten through the fifth grade?

 6    A.    Yes.

 7    Q.    How did you like Norwood?

 8    A.    It was a nice school.  I really enjoyed it.

 9    Q.    Did you have a good experience there?

10    A.    Yeah.

11    Q.    Was Mrs. Stutler your principal for a period of

12    the time that you were at Norwood Elementary School?

13    A.    Yes.

14    Q.    Did you know her then?

15    A.    Like know her --- could you repeat the question?

16    Q.    Sure.  No.  It probably wasn't a very good

17    question.  Did you sometimes have interactions with Mrs.

18    Stutler when she was your principal?

19    A.    Yes.

20    Q.    And how was that?  Was she nice with you when

21    you dealt with her?

22    A.    Yes.

23    Q.    Did you think she was a good principal?

24    A.    Yes.
```

```
 1     Q.    Who was the principal after Mrs. Stutler?

 2     A.    Mrs. Shields.

 3     Q.    And did you like Mrs. Shields?

 4     A.    Yeah.

 5     Q.    Was she nice to you when you were at school?

 6     A.    Yes.

 7     Q.    Now, I know you said earlier that you came out

 8  in the fourth grade.

 9          Is that right?

10     A.    I came out in the summer of third grade, but in

11  school it was in the fourth grade.

12     Q.    Okay.

13          And something else I should have said to you at

14  the beginning is that I want to use terms that you're

15  comfortable with.  And so if I don't use the right

16  terms, you correct me.

17          Okay?

18     A.    Okay.

19     Q.    So when you started school in the fourth grade

20  it is my understanding then you came to school

21  presenting as a girl, as a female.

22          Is that correct?

23     A.    Yes.

24     Q.    And did you have any discussions with your
```

1  teachers or the principal or anyone else at Norwood

2  about making that change?

3      A.    Yes.

4      Q.    Tell me about those communications that you

5  would have had.

6      A.    I think it was the day before school started we

7  went to the school to establish where --- everything

8  about what the teacher should be calling me, where my

9  bathroom would be and everything like that.

10     Q.    Were you part of that meeting, B███?

11     A.    Yes.

12     Q.    Do you recall who else was in that meeting?

13     A.    There was Mrs. Louder, it was the principal.  I

14 don't know if it at the time it was Mrs. Stutler or Mrs.

15 Shields and someone else.  I can't remember their name.

16     Q.    Was the school counselor maybe part of that

17 meeting?

18     A.    I think so.

19     Q.    Was Mrs. Louder your teacher that year?

20     A.    Yes.

21     Q.    And was your mom also in that meeting?

22     A.    Yes.

23     Q.    Anyone else that you remember?

24     A.    Not really, no.

128

 1    Q.    Were you happy with what came out of that

 2  meeting?

 3    A.    Yes.

 4    Q.    You were comfortable with the agreements that

 5  was reached with regard to the name that would be used

 6  and the bathroom facilities and any other accommodations

 7  that would be made for you?

 8              ATTORNEY HARTNETT:  Objection.

 9              THE WITNESS:  Yes.

10  BY ATTORNEY DENIKER:

11    Q.    And then how did fourth grade go?  Was it a good

12  --- was it a good year for you?

13    A.    Yeah.

14    Q.    Did you feel that the teachers and the principal

15  and the other employees of the school were supportive of

16  you?

17    A.    Yes, very.

18    Q.    Good.  And did you feel that they treated you

19  kindly and fairly?

20    A.    Yes.

21    Q.    And it sounds like from your earlier testimony

22  that you also had a good experience with the students in

23  the school.

24              Is that correct?

```
 1        A.    Yes.

 2        Q.    Tell me about your fifth grade year at Norwood

 3   Elementary School.  Did you have a good experience that

 4   year?

 5        A.    Yes.  There was brand new teachers and my

 6   teacher was Ms. Watson.  She was a very nice teacher.

 7        Q.    And do you feel that everyone at the school was

 8   supportive of you?

 9        A.    Yes.

10        Q.    Did you feel that everybody treated you in a

11   fair and kind manner?

12        A.    Yes.

13        Q.    And so you had a good school year in fifth grade

14   as well?

15        A.    Yes.

16        Q.    Do you recall having any other meetings in

17   fourth or fifth grade to discuss your transitioning to

18   being --- to presenting as a girl at school?

19        A.    Not that I can remember.  Beginning of fourth

20   grade was the only one I think.

21        Q.    And then it's my understanding that this year

22   you started at Bridgeport Middle School.

23              Is that right?

24        A.    Yes.
```

130

1    Q.    And are you in the sixth grade this year, B███?

2    A.    Yes.

3    Q.    Do you remember when you were in Norwood

4  Elementary School having a meeting and filling out a

5  document that was called a Gender Support Plan?

6    A.    Yes, I remember that.

7    Q.    And did you participate in the meeting where

8  that plan was discussed?

9    A.    Yes.

10    Q.    And did you think that that was a good meeting?

11    A.    Yes.

12    Q.    Were you happy with the outcome of what was

13  agreed upon at that meeting?

14    A.    Yes.

15    Q.    And then you had another one of those meetings

16  with school officials before you started at the Middle

17  School.

18          Is that right?

19    A.    Yes.

20    Q.    And I think that that meeting happened in May of

21  2021, which would have been the end of your fifth grade

22  year.

23          Is that --- does that sound right?

24    A.    Yes.

131

```
 1     Q.    And were you a part of that meeting?

 2     A.    Yes.

 3     Q.    Do you remember who else was a part of that

 4  meeting?

 5     A.    We had my new principal, Mr. Mazza, the

 6  counselor there, Mrs. Shields and my mom.

 7     Q.    And were you comfortable with what was discussed

 8  and agreed upon at that meeting?

 9     A.    Yes.

10     Q.    And how has sixth grade been so far?

11     A.    It's been good.

12     Q.    Do you like Mr. Mazza?

13     A.    Yes.

14     Q.    He is your principal this year.

15           Is that right?

16     A.    Yes.

17     Q.    Do you feel like Mr. Mazza is supportive of you?

18     A.    Yes, very.

19     Q.    Good.  And do you think that he treats you in a

20  kind and fair manner?

21     A.    Yes.

22     Q.    How are your classes this year?  Do you like

23  them?

24     A.    Yeah, I like my classes.  I have really nice
```

1   teachers.

2       Q.    I think I saw that you are a straight A student.

3   Maybe I saw that in something that your mom wrote.

4           Is that right?

5       A.    Yes.

6       Q.    Congratulations.  Good for you.  Do you feel

7   that your teachers are fair and supportive of you?

8       A.    Yes.

9       Q.    And are you comfortable with the arrangements

10  that the school has made for you this year in terms of

11  addressing how you want to present at school as being a

12  girl?

13      A.    Yes.

14      Q.    I know that we have discussed today sports and

15  your participation in sports, and I heard you say that

16  you love running.

17          Is that right?

18      A.    Yes.

19      Q.    And I understand that you tried out for the

20  girls cross-country team.

21          Is that correct?

22      A.    Yes.

23      Q.    So I want to talk to you a little bit about that

24  process.  The cross-country team, did they do some

 1  training and conditioning over the summer before the

 2  year started?

 3      A.    Yes.  There was a week of conditioning before

 4  the season started.

 5      Q.    And did that happen over the summer?

 6      A.    Yes.

 7      Q.    Did you participate in that conditioning?

 8      A.    Yes.

 9      Q.    And how was that experience?  Was that a

10  positive experience for you?

11      A.    Yes.

12      Q.    And then tryouts I think were in August for

13  cross-country.

14          Is that right?

15      A.    Yes.

16      Q.    And were you permitted to try out for the girls

17  cross-country team?

18      A.    Could you ---?

19      Q.    Let me rephrase that.  Were you allowed to try

20  out for the girls cross-country team?

21              ATTORNEY HARTNETT:  Objection to form.

22              THE WITNESS:  Yes.

23  BY ATTORNEY DENIKER:

24      Q.    And was that the team you wanted to try out for?

```
 1      A.    Yes.

 2      Q.    And did you make the team?

 3      A.    Yes.

 4      Q.    And I think you said this year they didn't have

 5   any cuts.

 6            Is that right?

 7      A.    Yes.

 8      Q.    Who were your coaches for cross-country this

 9   year?

10      A.    I had Ms. Schoonmaker, Ms. --- Coach Flesher and

11   Coach McBrayer.

12      Q.    And did they coach both the girls and the boys

13   cross-country teams?

14      A.    Yes.

15      Q.    How was your season?

16      A.    It was good.

17      Q.    Did you like cross-country?

18      A.    Yes.

19      Q.    Did you believe that your coaches treated your

20   fairly and kindly this season?

21      A.    Yes.

22      Q.    Did you feel that they were supportive of you?

23      A.    Yes.

24      Q.    So you think it's fun to run up hills and
```

1    through water and mud, B███?

2        A.    Yes.

3        Q.    Because that's what cross-country is about,

4    isn't it?

5        A.    Yes.

6        Q.    It's a hard sport I think.  Do you think it's

7    hard?

8        A.    It depends if you've done it before and how much

9    you run normally.

10       Q.    Do you think you would like to do it again?

11       A.    Yes.

12       Q.    And I heard you talk a little bit about track.

13   Are there other --- is track something that you're

14   interested in doing?

15       A.    Yes.

16       Q.    And I heard you said you might want to be --- do

17   the distance running in track.

18            Is that right?

19       A.    Yes.

20       Q.    You're a tough girl.  Cross-country and distance

21   running and track, those are the hard once, aren't they?

22            ATTORNEY HARTNETT:  Objection to form.

23            THE WITNESS:  It just depends if you've

24   ran before or whatever you've done.

136

1   BY ATTORNEY DENIKER:

2       Q.    I think that you're right.  I think it depends

3   how good of shape you're in.  Are you planning to

4   condition in the off season?

5       A.    If it's not freezing, then yes.

6       Q.    I understand.  We were talking about what a cold

7   day it is here in West Virginia, isn't it?

8       A.    Yes.

9       Q.    B████, has anybody in the school system ever

10  told you that Harrison County Schools wouldn't let you

11  participate on a girls sports team for any reason?

12                  ATTORNEY HARTNETT:  Objection to form.

13                  THE WITNESS:  After a bill was passed,

14  not --- I don't think there was because when the bill

15  was passed, I already went trying out and then we ---

16  then the whatever it was called where I could do ---

17  where I could play in the sports team from the Judge

18  came out.

19  BY ATTORNEY DENIKER:

20      Q.    And I just want to make clear, did any of your

21  coaches ever tell you that you couldn't run on the girls

22  team?

23      A.    No.

24      Q.    Did Mr. Mazza ever tell you that you couldn't

```
 1  run on the girls team?

 2      A.    No.

 3      Q.    Did any of your teachers tell you that you

 4  couldn't run on the girls team?

 5      A.    No.

 6      Q.    And did Mrs. Stutler ever tell you that you

 7  couldn't run on the girls team?

 8      A.    There was not a cross-country back then, so I

 9  couldn't run whenever she was my principal, so ---.

10      Q.    And that was when you were in elementary school.

11            Is that right?

12      A.    Yes.

13      Q.    And that's a good point that you brought up,

14  B█████.   There aren't any school sports in elementary

15  school in Harrison County, are there?

16                  ATTORNEY HARTNETT:  Objection to form.

17                  THE WITNESS:  No, you're very limited to

18  them and most of them aren't even in the school.  You

19  have to do them outside of school.

20  BY ATTORNEY DENIKER:

21      Q.    Did you have any school-sponsored sports at

22  Norwood Elementary School?

23      A.    I don't know.  I don't --- yeah, I don't know.

24      Q.    Okay.
```

138

```
 1          Did you try out or participate in any sports

 2   that were run by the school while you were at Norwood?

 3       A.    I --- no.

 4       Q.    And so let me go back and ask you about Mrs.

 5   Stutler.  So it's kind of funny.  You had Mrs. Stutler

 6   as your principal at Norwood for a little bit.

 7          Is that right?

 8       A.    Yes.

 9       Q.    And do you know where she went after she left

10   Norwood?

11       A.    The Board of Education.

12       Q.    She did.  She went to the Central Board Office.

13   And did you know that she's now the Superintendant of

14   Schools?

15       A.    I did not know that.  I just knew she went to

16   the Board of Education.

17       Q.    Well, she's actually your school superintendant

18   now.  And have you had any communications with her since

19   she became superintendant?

20       A.    No.

21       Q.    Well, now you know who your superintendant is.

22   So if you see her at school you can call her

23   Superintendant Stutler now.

24          B____, let me check my notes and see if I have
```

139

```
1   any other questions.  I think I'm just about done.
2           B███, did you have any conversations with
3   anybody that works for the Harrison County Board of
4   Education, teachers, principals, anybody like that,
5   coaches, regarding this House Bill 3293?
6                   ATTORNEY HARTNETT:  Objection to form.
7                   THE WITNESS:  Could you repeat the
8   question?
9   BY ATTORNEY DENIKER:
10    Q.    Sure.  Did you talk with anybody who works for
11  the Harrison County Board of Education or is somehow
12  connected with the Board of Education about House Bill
13  3293?
14    A.    I think I did.  I think I may have.  I'm not
15  sure.  I can't remember her name.  It started with an S,
16  I know that.
17    Q.    Do you know what that --- what the woman you're
18  referring to, do you know what her job was?
19    A.    I do not know.
20    Q.    Was it a teacher or a principal?
21    A.    I don't know that.  I just --- she was at one of
22  our meetings, and I think we may have talked a little
23  bit about that.
24    Q.    And was that one of your Gender Support Plan
```

```
 1  meetings?
 2     A.    Yes.
 3     Q.    Okay.
 4           And was that the one before you were going into
 5  Middle School?
 6     A.    I think.  I can't remember.  I just --- I can't
 7  remember, but I think she either talked about that or
 8  the Gender Support Plan.
 9     Q.    Okay.
10           Do you remember what she said about House Bill
11  3293?
12     A.    I do not.  Because she may have not talked about
13  it.  She --- because she was there at one of our
14  meetings, so she could have not, but I think she did.
15     Q.    But you don't remember what was said?
16     A.    I don't.
17     Q.    Okay.
18           Do you remember any conversations with anybody
19  at school or anybody affiliated with the school about
20  House Bill 3293?
21                 ATTORNEY HARTNETT:  Objection, form.
22                 THE WITNESS:  Not that I can think of off
23  the top of my head.
24  BY ATTORNEY DENIKER:
```

1    Q.    And B█████, I should have clarified.  Do you know

2    what I'm talking about when I say House Bill 3293?

3    A.    Yeah, HB-3293.  Yes.

4    Q.    Okay.

5          I just wanted to make sure that you knew what I

6    was talking about.  I thought that you did.

7          B█████, if you had any concerns about how you

8    were being treated at school, would you feel comfortable

9    going to talk to Mr. Mazza about that?

10   A.    Yes.  If I was being treated bad, then I would

11   talk to Mr. Mazza.

12   Q.    Would you also feel comfortable going to some of

13   your teachers about that?

14   A.    Yes.

15   Q.    But do you feel that overall all of the teachers

16   and administrators, including your principals at

17   Bridgeport Middle School, have been supportive of your

18   status as a transgender student?

19   A.    Could you repeat the question?

20   Q.    Sure.  And I apologize, it was a long one.  Do

21   you believe that the teachers and administrators, and

22   that would include the principals and the other

23   employees at Bridgeport Middle School, have been

24   supportive of your transgender status?

1    A.    Yes, I think they have been supportive.

2    Q.    When you were on the cross-country team did you

3  believe your teammates were supportive of you?

4    A.    Yes.

5    Q.    And how about in school, have you had any issues

6  with other students or problems with students related to

7  your transgender status?

8              ATTORNEY HARTNETT:  Objection to form.

9              THE WITNESS:  No.  No.

10             ATTORNEY DENIKER:  B█████, those are all

11  the questions I have for you now.  Thanks so much for

12  your time today.

13             ATTORNEY HARTNETT:  We can take a break.

14  I think this might be a good time to take a break and

15  then we can come back for questions.

16             VIDEOGRAPHER:  Okay.  Going off the

17  record.  The current time reads 2:28 p.m.

18  OFF VIDEOTAPE

19                       ---

20  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

21                       ---

22  ON VIDEOTAPE

23             VIDEOGRAPHER:  We are back on the record.

24  The current time reads 2:42 p.m.

```
 1                             --

 2                        EXAMINATION

 3                            ---

 4   BY ATTORNEY HAMMOND:

 5      Q.    Hi, B███.  My name is Kristen Hammond.  And I'm

 6   an attorney with the law firm of Bailey and Wyant.  And

 7   I represent the West Virginia State Board of Education

 8   and the State Superintendant Clayton Burch.  And I just

 9   have I think a few questions for you today.  Do you know

10   what the State Board of Education is?

11      A.    I don't know.

12      Q.    Okay.

13            And do you know or have you ever heard of the

14   West Virginia State Superintendant Clayton Burch?

15      A.    No.

16      Q.    Okay.

17            So I guess since you do not know them, do you

18   have any memory or any recall of maybe talking to

19   anybody at the State level or at the Board of Education

20   level regarding this lawsuit or regarding the House Bill

21   or your sports?  How about we limit it to that?

22      A.    I don't remember if I have or not.

23      Q.    Okay.

24            So you just don't recall.  Could you possibly
```

```
 1  have talked to somebody?

 2              ATTORNEY HARTNETT:  Objection to form.

 3              THE WITNESS:  Could you repeat the

 4  question?

 5  BY ATTORNEY HAMMOND:

 6    Q.   Yes.  I just want to see --- you say you don't

 7  recall talking to anybody.  Do you think that it's a

 8  possibility that you did talk to somebody or you don't

 9  believe that you've talked to anybody?

10    A.   I don't believe I've talked to anybody.

11              ATTORNEY HAMMOND:  Okay.  Thank you for

12  your time.  I just had a couple of questions, and that's

13  all I have for you today.  Thank you.

14                       ---

15                    EXAMINATION

16                       ---

17  BY ATTORNEY DUCAR:

18    Q.   Good afternoon, B███.  I'm Timothy Ducar.  I

19  represent the Intervenor in this case.  I wanted to ask

20  you a question about Exhibit 29.  Do you have that

21  available?

22              MS. JACKSON:  Give me a second to find

23  it.

24              ATTORNEY DUCAR:  Yes, that's it.  Can you
```

```
 1   scroll down just four paragraphs?  Thank you.
 2   BY ATTORNEY DUCAR:
 3     Q.    B██████, you had testified earlier that paragraph
 4   that starts with I just want to run, that you had ---
 5   that's a quote from you.
 6           Correct?
 7     A.    Yes.
 8     Q.    I just wanted to know, is that a quote that you
 9   wrote on paper and provided to somebody or wrote on a
10   computer and provided to somebody or did you actually
11   say that with your --- verbally?
12     A.    I said that.
13     Q.    Verbally?
14     A.    Yeah, I said that verbally.
15     Q.    Thank you.  When did you decide you liked
16   running?
17     A.    I've always liked running.  It's from when I
18   could walk, I liked running.
19               ATTORNEY DUCAR:  We're done with this
20   exhibit, Mr. Court Reporter.  Thank you.
21   BY ATTORNEY DUCAR:
22     Q.    When did you decide you wanted to try out for
23   the girls cross-country team?
24     A.    I've always wanted to do cross-country, so when
```

1  I had the chance I decided I wanted to.

2      Q.    And did you know about it because your brothers

3  ran?

4      A.    Yes.

5      Q.    Did your mom encourage you to try out for the

6  girls team?

7              ATTORNEY HARTNETT:  Objection to form.

8              THE WITNESS:  Yes.  Yes, she encouraged

9  me.

10  BY ATTORNEY DUCAR:

11     Q.    And these try-outs were last summer.

12           Correct?

13     A.    Yes.

14     Q.    Going into sixth grade?

15     A.    Yes.

16     Q.    Did your dad encourage you to try out for the

17  girls team?

18     A.    Yes.

19     Q.    Earlier you testified that you did well in

20  cross-country.  Did you have any rankings?

21              ATTORNEY HARTNETT:  Object to the form.

22              THE WITNESS:  I --- could you rephrase

23  the question?

24  BY ATTORNEY DUCAR:

147

```
1     Q.    Do you have any idea how well you did on your
2  team as an individual?
3     A.    I don't know.
4     Q.    Do they keep track of individual times and ---?
5     A.    I think they put it on a website.
6     Q.    Is that something you have ever seen?
7     A.    My mom looks at it, but I don't.
8     Q.    Do you have any indication whether or not you
9  were one of the better runners or not one of the better
10 runners on the team?
11             ATTORNEY HARTNETT:  Objection to form.
12             THE WITNESS:  I don't know.  I think I
13 was good.
14 BY ATTORNEY DUCAR:
15    Q.    Do you want to run cross-country again next
16 year?
17    A.    Yes.
18    Q.    Track tryouts are coming up in the spring.
19           Correct?
20    A.    Yes.
21    Q.    And you intend to try out for track?
22    A.    Yes.
23    Q.    Do you want to compete in any other sports
24 besides track and cross-country?
```

```
 1      A.    Not really.

 2      Q.    Why not?

 3      A.    I don't find any other sport really interesting

 4   besides running.

 5      Q.    You said trusting?

 6      A.    Interesting.

 7      Q.    What does that mean?

 8      A.    What is interesting?

 9      Q.    Oh, interesting.  I misheard you.  Thank you.

10   And I think I misheard you on something else, so I'm

11   going to re-ask the question.  Do you like to compete?

12              ATTORNEY HARTNETT:  Objection to the

13   form.

14              THE WITNESS:  I'm not a really

15   competitive person.  I just play a sport because I think

16   it's fun.

17   BY ATTORNEY DUCAR:

18      Q.    Do you consider yourself a good athlete?

19      A.    Yes.

20      Q.    What makes you a good athlete?

21      A.    I'm good at running, good at the sports I do.

22      Q.    Do you try hard to win?

23      A.    Yes.  Well --- yes.

24      Q.    Have you talked to anybody else about playing
```

1  other sports other than cross-country and track?

2      A.    I've talked to my mom about playing other

3  sports.

4      Q.    What sports have you talked to her about?

5      A.    Volleyball and maybe basketball.

6      Q.    And describe for me what you guys talked about

7  as far as volleyball and basketball?

8      A.    We talked about trying new sports.

9      Q.    When did you two talk about those subjects?

10     A.    I can't remember.

11     Q.    Was it in the last six months or ---?

12     A.    I don't --- I can't remember.

13     Q.    Did you bring up the idea of playing volleyball

14  to her?

15     A.    Yes.

16     Q.    And what did she say?

17     A.    That's a good idea.

18     Q.    Did she say that about basketball as well?

19     A.    I think she may have brought up basketball, but

20  I can't remember.  It may have been me or her.

21     Q.    Did you feel like she was encouraging you to

22  play volleyball?

23     A.    She liked the idea.  So I wouldn't say

24  encouraged, but she thought it was a good idea.

```
 1      Q.    Did she think playing basketball was a good

 2   idea?

 3                   ATTORNEY HARTNETT:  Objection to form.

 4                   THE WITNESS:  I think so, yes.

 5   BY ATTORNEY DUCAR:

 6      Q.    And as you sit here right now, you don't have

 7   any plans to go out for a volleyball or a basketball

 8   team.

 9        Correct?

10      A.    No, not right now.  No.

11      Q.    Do you foresee yourself running on the

12   cross-country team or on the track team later in high

13   school?

14                   ATTORNEY HARTNETT:  Objection to form.

15                   THE WITNESS:  Yes, yes.

16   BY ATTORNEY DUCAR:

17      Q.    Do you see yourself running on the cross-country

18   team or track team if you ever go to college on a

19   college team?

20                   ATTORNEY HARTNETT:  Same objection.

21   Objection to form.

22                   THE WITNESS:  Maybe, but I haven't

23   thought that far ahead.

24   BY ATTORNEY DUCAR:
```

```
 1        Q.     Sure.  When was the first time you remember

 2   thinking that you wanted to be a girl?

 3                       ATTORNEY HARTNETT:  Objection to form.

 4                       THE WITNESS:  I can't remember.

 5   BY ATTORNEY DUCAR:

 6        Q.     Do you remember the first time you talked to

 7   somebody about the fact that you wanted to become a

 8   girl?

 9                       ATTORNEY HARTNETT:  Objection.

10                       THE WITNESS:  I also can't --- I don't

11   remember.

12   BY ATTORNEY DUCAR:

13        Q.     There's a statement in the record that indicates

14   you feel like a girl.  What does feeling like a girl

15   mean?

16                       ATTORNEY HARTNETT:  Objection to form.

17                       THE WITNESS:  I just know that I want to

18   be a girl and I feel like a girl inside.

19   BY ATTORNEY DUCAR:

20        Q.     You picked out the name B███    for yourself.

21               Correct?

22        A.     Yes.

23        Q.     When did you do that?

24        A.     Whenever I transitioned.
```

```
 1     Q.    Going into fourth grade?

 2     A.    Yes.

 3     Q.    How did you pick that name?

 4     A.    I've always liked it.

 5     Q.    Me, too.  I have a daughter named B█████

 6           Did anyone else help you pick that name?

 7     A.    I think my friends liked that name, too.

 8     Q.    When did you start wearing girl's clothing at

 9  home?

10     A.    I mean, I've always wanted my mom's clothes, so

11  I really started dressing like that maybe at home, third

12  grade, the year of third grade.

13     Q.    Did you ask your parents if you could do it or

14  did you just do it?

15     A.    I just did it.

16     Q.    What was their reaction?

17     A.    Positive.

18     Q.    When did you first ask your parents to refer to

19  you as she or her?

20     A.    When I transitioned.

21     Q.    Going into fourth grade?

22     A.    Yes.

23     Q.    When did you start presenting as a girl in other

24  ways at home?  I guess that would be makeup, other ways
```

 1  besides clothing.

 2              ATTORNEY HARTNETT:  Objection to form.

 3              THE WITNESS:  Could you restate the

 4  question, please?

 5  BY ATTORNEY DUCAR:

 6      Q.    Yeah.  I'll withdraw that question.

 7            When did you start presenting as a girl at

 8  home?

 9      A.    It started when I was really young.

10              ATTORNEY HARTNETT:  Objection.

11              THE WITNESS:  But I fully started wearing

12  clothes on my own, not wearing my mother's, around the

13  third-grade year.

14  BY ATTORNEY DUCAR:

15      Q.    Do you wear jewelry?

16      A.    Not a lot.  I used to wear earrings but not

17  anymore.

18      Q.    Do you wear makeup?

19      A.    No.

20      Q.    Are there other ways you presented at home as a

21  girl besides dressing as a girl?

22      A.    Well, I always wanted girly --- a girly room and

23  girly items.

24      Q.    And you started wearing girls clothing in fourth

```
 1   grade.

 2         Correct?

 3      A.    Yes.

 4      Q.    Do you recall the first time you saw a doctor or

 5   a therapist about your desire to be a girl?

 6      A.    I can't remember.

 7      Q.    How did you first learn about puberty blocking

 8   treatment?

 9      A.    Could you repeat the question, please?

10      Q.    How did you first learn about puberty blocking

11   treatment?

12      A.    My mom.  My mom told me about it whenever I

13   transitioned.

14      Q.    And is that something that you wanted to do?

15      A.    Yes.

16      Q.    At some point you wanted to start hormone

17   therapy?

18      A.    Yes.

19      Q.    Do you know what that means?

20      A.    Getting female hormones.

21      Q.    B____, do you ever feel anxious?

22              ATTORNEY HARTNETT:  Objection to form.

23              ATTORNEY DUCAR:  Let me restate that.

24   That's fair.
```

```
 1   BY ATTORNEY DUCAR:

 2       Q.    Does the fact that you are transitioning make

 3   you feel anxious?

 4       A.    No.

 5       Q.    Does the fact that you're part of this lawsuit

 6   make you feel anxious?

 7                   ATTORNEY HARTNETT:  Objection to form.

 8                   THE WITNESS:  No.

 9   BY ATTORNEY DUCAR:

10       Q.    Do you know what the word anxious means?

11       A.    Nervous.

12       Q.    Do you know what gender dysphoria is?

13       A.    Yes.

14   █    ███████████████████████████████████████

15   ████████████████████

16           █████████████████████   █████████████████

17           █████████████████   █████████████████████

18   █████████████████████████

19                   ATTORNEY DUCAR:  Thank you, B████.  I

20   have no further questions for you today.

21                   ATTORNEY CAPEHART:  We have no further

22   questions at this time.  We're just going to note as we

23   have in the last two depositions the possibility of

24   having to revisit something.  If for some reason some
```

156

```
1    medical records would could to light, although I

2    understand that's unlikely, we're still noting that, but

3    you would object to that?

4              ATTORNEY HARTNETT:  Yes, we object, but

5    we appreciate you making the record you want to make.

6              ATTORNEY CAPEHART:  Thank you.

7              ATTORNEY HARTNETT:  I'm sorry.  Just on

8    that point, though, I mean, is there any specific item

9    that you lack today that you need to make a record?

10             ATTORNEY CAPEHART:  I think our concern

11   has been the possibility of new records that might be

12   produced following the depositions.

13             ATTORNEY HARTNETT:  Okay.  Thank you.

14             ATTORNEY CAPEHART:  Thank you.

15             ATTORNEY HARTNETT:  I mean, is anyone

16   else going to have any further questioning?  Sorry.

17   Just for the witness's awareness, we're confirming

18   whether or not there will be additional questioning from

19   any Defendant.

20             ATTORNEY ROGERS:  I don't have any

21   further questions.

22             ATTORNEY DENIKER:  I have no further

23   questions.  Thank you again for your time today, B████.

24             ATTORNEY HAMMOND:  I have no further
```

```
 1   questions.  Thank you.

 2                   ATTORNEY DUCAR:  I have nothing further.

 3   Thank you.

 4                   ATTORNEY HARTNETT:  And we also have no

 5   questions for the witness today.

 6                   VIDEOGRAPHER:  Okay.  If there are no

 7   further questions, that concludes today's deposition.

 8   And the current time reads 3:01 p.m.

 9                   COURT REPORTER:  Is it reading and

10   signing for your client?

11                   ATTORNEY HARTNETT:  Yes.  I'm sorry.  I

12   meant to say that on the record.

13                        * * * * * * *

14           VIDEOTAPED VIDEOCONFERENCE DEPOSITION

15                   CONCLUDED AT 3:01 P.M.

16                        * * * * * * *

17

18

19

20

21

22

23

24
```

```
                                                     158
 1   STATE OF WEST VIRGINIA  )

 2                    CERTIFICATE

 3            I, Nicole Montagano, a Notary Public in

 4   and for the State of West Virginia, do hereby

 5   certify:

 6            That the witness whose testimony appears

 7   in the foregoing deposition, was duly sworn by me

 8   on said date, and that the transcribed deposition

 9   of said witness is a true record of the testimony

10   given by said witness;

11            That the proceeding is herein recorded

12   fully and accurately;

13            That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19            I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23

24                              Nicole Montagano,

25                              Court Reporter
```

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Nicole Montagano
Sargent's Court Reporting Service, Inc.
HUB Business Center Suites
Martinsburg WV 25401
My Commission Expires November 26, 2026