No. 23-1078 (L) (2:21-cv-00316)

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

B.P.J., by her next friend and mother; HEATHER JACKSON,

*Plaintiff - Appellant,*

versus

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON
COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY
SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his
official capacity as State Superintendent; DORA STUTLER, in her official
capacity as Harrison County Superintendent,

*Defendants - Appellees.*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees*

---

On Appeal from the United States District Court for the Southern District of
West Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

**JOINT APPENDIX – VOLUME 3 OF 9 (JA1085-JA1735)**

---

*Counsel for Plaintiff-Appellant listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant B.P.J.*

## TABLE OF CONTENTS

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME ONE** | | | |
| District Court Docket Sheet, No. 21-cv-00316 (S.D. W.Va.) | N/A | N/A | JA0001 |
| Declaration of Loree Stark in Support of Plaintiff's Complaint | 5/26/2021 | 1-1 | JA0049 |
| Ex. B of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0052 |
| Ex. D of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0054 |
| Declaration of Heather Jackson in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0057 |
| Declaration of B.P.J. in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0060 |
| Supplemental Declaration of Katelyn Kang in Support of Plaintiff's Motion for Preliminary Injunction | 6/9/2021 | 25 | JA0073 |
| Ex. A of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0077 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0096 |
| Ex. C of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0117 |
| Ex. D of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA00158 |
| Ex. E of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0181 |
| Ex. F of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/8/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0183 |
| Statement of Interest of the United States | 6/17/2021 | 42 | JA0221 |
| Ex. A in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, 2020-2021 Track Coaches Packet | 6/22/2021 | 47-1 | JA0243 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, Athletic Participation/Parental Consent/Physician's Certificate Form | 6/22/2021 | 47-2 | JA0260 |
| Ex. D in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, U.S. Department of Education Office of Civil Rights Revised Letter | 6/23/2021 | 49-4 | JA0265 |
| Ex. F in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Case No: CO/60/2020 In the High Court of Justice Administrative Court | 6/23/2021 | 49-6 | JA0314 |
| Ex. H in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Transgender Guideline | 6/23/2021 | 49-8 | JA0354 |
| Ex. I in Support of State of West Virginia's Opposition for Preliminary Injunction, Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) | 6/23/2021 | 49-9 | JA0397 |
| First Amended Complaint | 7/16/2021 | 64 | JA0413 |
| Memorandum Opinion and Order Granting Preliminary Injunction | 7/21/2021 | 67 | JA0439 |
| The State of West Virginia's Answer to First Amended Complaint [Excerpt pp. 1, 7-8] | 7/30/2021 | 78 | JA0454 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Memorandum Opinion and Order Denying Motions to Dismiss | 12/1/2021 | 129 | JA0457 |
| Memorandum Opinion and Order Granting in Part and Denying in Part Motion to Intervene | 12/1/2021 | 130 | JA0465 |
| Intervenor Lainey Armistead's Proposed Answer to First Amended Complaint [Excerpt pp. 1, 5] | 12/1/2021 | 131 | JA0472 |
| Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch's Answer to Plaintiff's First Amended Complaint [Excerpt pp. 1, 9, 19-20] | 12/15/2021 | 156 | JA0474 |
| Defendants Harrison County Board of Education and Dora Stutler's Answer to First Amended Complaint [Excerpt pp. 1, 8] | 12/15/202 | 157 | JA0478 |
| Defendant West Virginia Secondary School Activities Commission's Answer to First Amended Complaint [Excerpt pp. 1, 9] | 12/15/2021 | 158 | JA0480 |
| Harrison County Board and County Superintendent Stipulation of Uncontested Facts | 3/7/2022 | 252 | JA0482 |
| State Board of Education and State Superintendent Stipulation of Uncontested Facts | 3/30/2022 | 270 | JA0486 |
| West Virginia Secondary School Activities Commission's Memorandum in Support of Motion for Summary Judgment | 4/21/2022 | 277 | JA0490 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 6 in Support of WVSSAC's Motion for Summary Judgment, National Federation of State High School Associations 2020 Rules Book for Track and Field and Cross County | 4/21/2022 | 278-6 | JA0522 |
| Ex. 4 in Support of Motion for Summary Judgment by W. Clayton Burch & West Virginia State Board of Education, West Virginia House Joint Resolution 102 | 4/21/2022 | 283-4 | JA0528 |
| **VOLUME TWO** | | | |
| Ex. C in Support of Motion for Summary Judgment by State of West Virginia, [pp. 1-340] 4/4/2022 Deposition Transcript of Aron Janssen, M.D. | 4/21/2022 | 285-3 | JA0531 |
| Ex. H in Support of Motion for Summary Judgment by State of West Virginia, Graphs | 4/21/2022 | 285-8 | JA0871 |
| Ex. 1 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Heather Jackson | 4/21/2022 | 289-2 | JA0875 |
| Ex. A of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Gender Support Plan | 4/21/2022 | 289-2 | JA0883 |
| Ex. B of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Preferred Name Request Form | 4/21/2022 | 289-2 | JA0888 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. C of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Pictures of B.P.J. | 4/21/2022 | 289-2 | JA0894 |
| Ex. 2 in Support of Motion by B.P.J. for Summary Judgment, Declaration of B.P.J. | 4/21/2022 | 289-3 | JA0897 |
| Ex. 4 in Support of Motion by B.P.J. for Summary Judgment, State of West Virginia's Responses to Plaintiff's First Set of Interrogatories [Excerpt pp. 1, 9] | 4/21/2022 | 289-5 | JA0902 |
| Ex. 5 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-3] State of West Virginia's Responses to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-6 | JA0904 |
| Ex. 6 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15] Defendant Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admissions | 4/21/2022 | 289-7 | JA0907 |
| Ex. 7 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15, 21] Defendant Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-8 | JA0911 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 8 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 16-17] Defendant West Virginia State Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-9 | JA0916 |
| Ex. 10 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 13] WVSSAC's Responses to Second Set of Requests for Admission | 4/21/2022 | 289-11 | JA0919 |
| Ex. 11 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 30-32] Defendant-Intervenor Lainey Armistead's Responses and Objections to Plaintiff's Second Set of Request for Admission | 4/21/2022 | 289-12 | JA0923 |
| Ex. 12 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-158] Redacted 1/21/2022 Deposition Transcript of B.P.J. | 4/21/2022 | 289-13 | JA0927 |
| **VOLUME THREE** | | | |
| Ex. 14 in Support of Motion by B.P.J. for Summary Judgment, [pp. 77-289] Redacted 1/20/2022 Deposition Transcript of Heather Jackson | 4/21/2022 | 289-15 | JA1085 |
| Ex. 15 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 127-128] 1/19/2022 Deposition Transcript of Wesley Scott Pepper | 4/21/2022 | 289-16 | JA1298 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 16 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192, 213-216, 218, 220-222, 236] Redacted 3/8/2022 Vol. 1 Deposition Transcript of Dora Stutler and Dave Mazza (Harrison County Board of Education)<br><br>Stutler Testimony pp. 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192;<br><br>Mazza Testimony pp. 213-216, 218, 220-222, 236 | 4/21/2022 | 289-17 | JA1301 |
| Ex. 17 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-163] 2/11/2022 30(b)(6) Deposition of Bernard Dolan (WVSSAC) with Ex. 5 | 4/21/2022 | 289-18 | JA1340 |
| Ex. 18 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 17, 32, 33, 66-67, 71, 80, 101-102, 113-115. 125-126, 132-136] 2/14/2022 Deposition of Michele Blatt (State Board) | 4/21/2022 | 289-19 | JA1515 |
| Ex. 20 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 94-105, 118-121, 150-157] Redacted 2/24/2022 Deposition Transcript of Gerald Montano, D.O. | 4/21/2022 | 289-21 | JA1536 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 21 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-175] Redacted 3/11/2022 Deposition Transcript of Lainey Armistead | 4/21/2022 | 289-22 | JA1561 |
| **VOLUME FOUR** | | | |
| Ex. 22 in Support of Motion by B.P.J. for Summary Judgment, Declaration and Expert Report of Deanna Adkins, MD | 4/21/2022 | 289-23 | JA1736 |
| Ex. 23 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-323] 3/16/2022 Deposition Transcript of Deanna Adkins, MD | 4/21/2022 | 289-24 | JA1767 |
| Ex. 24 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-25 | JA2090 |
| Ex. 25 in Support of Motion by B.P.J. for Summary Judgment, Rebuttal Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-26 | JA2140 |
| **VOLUME FIVE** | | | |
| Ex. 26 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-290] 3/24/2022 Deposition Transcript of Joshua Safer, M.D. | 4/21/2022 | 289-27 | JA2153 |
| Ex. 27 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Mary D. Fry, PhD | 4/21/2022 | 289-28 | JA2443 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 29 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Gregory A. Brown | 4/21/2022 | 289-30 | JA2485 |
| **VOLUME SIX** | | | |
| Ex. 30 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-282] 3/25/2022 Deposition Transcript of Gregory A. Brown | 4/21/2022 | 289-31 | JA2567 |
| Ex. 31 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Dr. Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-32 | JA2849 |
| Ex. 32 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 98-121, 160-161] 3/28/2022 Deposition Transcript of Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-33 | JA2927 |
| Ex. 33 in Support of Motion by B.P.J. for Summary Judgment, Mountain Hollar MS Invitational Official Team Scores | 4/21/2022 | 289-34 | JA2955 |
| Ex. 34 in Support of Motion by B.P.J. for Summary Judgment, Doddridge Invitational Official Team Scores | 4/21/2022 | 289-35 | JA2957 |
| Ex. 38 in Support of Motion by B.P.J. for Summary Judgment, Email chain re Transgender participation in secondary schools bill with attachment "2021 Green Book Summary of Public Education Bills Enacted During the 2021 Regular Session" [WVSBOE 000012-26] | 4/21/2022 | 289-39 | JA2960 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 39 in Support of Motion by B.P.J. for Summary Judgment, WVSSAC Title 127 Legislative Rule [WVSSAC000133-220] | 4/21/2022 | 289-40 | JA2975 |
| Ex. 40 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of Email chain re Transgender participation in secondary schools [WVSBOE 000006, 08-09, 39] | 4/21/2022 | 289-41 | JA3063 |
| Ex. 41 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of West Virginia State Board of Education's Enrolled Bill Review Form for H.B. 3293 2021 Regular Session [WVSBOE 000038] | 4/21/2022 | 289-42 | JA3067 |
| Ex. 42 in Support of Motion by B.P.J. for Summary Judgment, Screen Capture of Jordan Bridges Facebook page | 4/21/2022 | 289-43 | JA3068 |
| Ex. 43 in Support of Motion by B.P.J. for Summary Judgment, MSNBC Twitter, 4/30/2021 Governor Justice Interview | 4/21/2022 | 289-44 | JA3080 |
| Ex. 44 in Support of Motion by B.P.J. for Summary Judgment, NCAA.org "Board of Governors updates transgender participation policy" | 4/21/2022 | 289-45 | JA3083 |
| Plaintiff's Statement of Undisputed Material Facts | 4/21/2022 | 290 | JA3085 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME SEVEN** | | | |
| Table of Contents of Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment [Armistead Supp. App. 0001-0003] | 5/12/2022 | 300 | JA3112 |
| Supplemental Declaration of Lainey Armistead [Armistead Supp. App. 0004-0006] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3115 |
| Rebuttal Expert Report and Declaration of Dr. Deanna Adkins, M.D. [Armistead Supp. App. 0038-0072] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3118 |
| Rebuttal Expert Report and Declaration of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0136-0166] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3153 |
| Deposition Transcript of James M. Cantor, PH.D. [Armistead Supp. App. 0209-0289] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3184 |
| Errata Sheet to Deposition of Gregory A. Brown, PH.D., FACM [Armistead Supp. App. 0479-0483] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3501 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Excerpt Enrolled Version of HB 3293 [Armistead Supp. App. 0833-0839] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3506 |
| B.P.J.'s Redacted Birth Certificate [Armistead Supp. App. 0840] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3513 |
| Errata Sheet to Deposition of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0841] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3514 |
| Errata Sheet to Deposition of Mary Fry, PH.D. [Armistead Supp. App. 0842-0846] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3515 |
| Errata Sheet to Deposition of B.P.J. [Armistead Supp. App. 0847] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3520 |
| Ex. C in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of James M. Cantor, PhD. | 5/12/2022 | 305-03 | JA3521 |
| Ex. D in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of Stephen B. Levine, MD | 5/12/2022 | 305-04 | JA3629 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME EIGHT** | | | |
| Ex. E in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, [pp. 1-261] 3/29/2022 Deposition Transcript of Mary D. Fry, PhD | 5/12/2022 | 305-05 | JA3737 |
| Ex. G in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Copy of West Virginia Legislature House Bill 3293 | 5/12/2022 | 305-07 | JA4115 |
| Ex. A, Roger G. Brooks' Declaration in Support of Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-01 | JA4124 |
| Table of Contents of Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer [Armistead Daubert App. 0001-0005] | 5/12/2022 | 307-02 | JA4133 |
| Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) [Armistead Daubert App. 0558-0573] in Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-02 | JA4138 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. F of Declaration by Sruti Swaminathan in Support of Motion by B.P.J. to Exclude Expert Testimony of James M. Cantor, Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline | 5/12/2022 | 321-6 | JA4154 |
| Ex. 45 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC's Responses to Plaintiff's First Set of Interrogatories | 5/12/2022 | 332-1 | JA4189 |
| Ex. 46 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Intervenor Lainey Armistead's First Supplemental Disclosures Pursuant to Rule 26(A)(1) | 5/12/2022 | 332-2 | JA4204 |
| Ex. 47 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC Board of Directors Transgender Policy [WVSSAC000008] | 5/12/2022 | 332-3 | JA4214 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 48 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Excerpt of Rules and Regulations of the West Virginia Secondary School Activities Commission [WVSSAC000012, WVSSAC000017] | 5/12/2022 | 332-4 | JA4215 |
| Ex. 2 in Support of Reply by Harrison County Board of Education, Dora Stutler to Plaintiff's Consolidated Opposition, [Excerpt pp. 1, 5] Harrison County Board of Education and Dora Stutler's Responses and Objections to Plaintiff's First Set of Requests | 5/26/2022 | 336-2 | JA4217 |
| Table of Contents of Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony [App. 0001-0006] | 5/26/2022 | 343-1 | JA4219 |
| Tomkinson, G., et al., *European Normative Values for Physical Fitness in Children and Adolescents Aged 9-17 Years: Results From 2,779,165 Eurofit Performances Representing 30 Countries*, [App. 0814-0826] in Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony | 5/26/2022 | 343-1 | JA4225 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. A in Support of Motion *In Limine* by B.P.J. to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity, Redacted Order Granting Petition for Change of Name | 6/22/2022 | 417-1 | JA4238 |
| Plaintiff's Reply in Support of Her Motion *In Limine* to Exclude Evidence and/or Testimony of Bernard Dolan Regarding Certain Hearsay Statements [Excerpt pp. 1-2] | 7/11/2022 | 470 | JA4244 |
| Ex. A in Support of Joint Motion by Lainey Armistead & State of West Virginia to Supplement the Expert Report of Gregory A. Brown, Supplemental Declaration of Gregory A. Brown, Ph.D., FACSM | 10/21/2022 | 500-1 | JA4246 |
| Memorandum Opinion and Order re Motions for Summary Judgment | 1/5/2023 | 512 | JA4256 |
| Judgment Order | 1/5/2023 | 514 | JA4279 |
| Declaration of B.P.J. in Support of Motion for Stay | 1/20/2023 | 515-1 | JA4280 |
| Declaration of Heather Jackson in Support of Motion for Stay | 1/20/2023 | 515-2 | JA4284 |
| Notice of Appeal by B.P.J. | 1/23/2023 | 517 | JA4289 |
| Notice of Appeal by West Virginia Secondary School Activities Commission | 2/1/2023 | 522 | JA4291 |
| Memorandum Opinion and Order re Stay Pending Appeal | 2/7/2023 | 527 | JA4296 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME NINE** | | | |
| Table of Contents of Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4303 |
| Declaration of Lainey Armistead [Armistead App. 0001-0008] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4307 |
| Declaration of Chelsea Mitchell [Armistead App. 0009-0019] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4315 |
| Declaration of Christina Mitchell [Armistead App. 0020-0032] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4326 |
| Declaration of Alanna Smith [Armistead App. 0033-0038] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4339 |
| Declaration of Selina Soule [Armistead App. 0039-0048] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4345 |
| Declaration of Darcy Aschoff [Armistead App. 0049-0053] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4355 |
| Declaration of Cynthia Monteleone [Armistead App. 0054-0058] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4360 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Declaration of Madison Kenyon [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4365 |
| Declaration of Mary Marshall [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4371 |
| Declaration of Haley Tanne [Armistead App. 0070-0074] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4376 |
| Declaration of Linnea Saltz [Armistead App. 0075-0079] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4381 |
| Excerpt of 2019 NCAA Division II Outdoor Track & Field Championship Results [Armistead App. 0080-0081] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4386 |
| Excerpt of 2020 Big Sky Indoor Track & Field Championship Results [Armistead App. 0082-0086] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4388 |
| 2020 Women's Ivy League Swimming & Diving Championship Results [Armistead App. 0087-0108] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4393 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (500 Yard Freestyle) [Armistead App. 0109-0112] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4415 |
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (100 Yard Freestyle) [Armistead App. 0113-0115] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4419 |
| Redacted Deposition of Dr. Kacie Kidd, M.D [Armistead App. 1142-1278] Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA44423 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's First Set of Requests for Admission [Armistead App. 1437-1486] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4560 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission [Armistead App. 1487-1510] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4610 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Errata Sheet to Deposition of Dr. Joshua Safer, M.D. [Armistead App.1535-1537] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4634 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1538-1553] [HCBOE 01167-01172] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4637 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1544-1547] [HCBOE 01265-01268] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4643 |
| Redacted Amended Birth Certificate of B.P.J. | N/A | N/A | JA4647 |

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     CHARLESTON DIVISION

 4                    * * * * * * * *

 5   B.P.J., by her next friend and   *

 6   Mother, HEATHER JACKSON,         *

 7        Plaintiff                   *  Case No.

 8        vs.                         *  2:21-CV-00316

 9   WEST VIRGINIA STATE BOARD OF     *

10   EDUCATION, HARRISON COUNTY       *

11   BOARD OF EDUCATION, WEST         *

12   VIRGINIA SECONDARY SCHOOL        *

13   ACTIVITIES COMMISSION, W.        *

14   CLAYTON BURCH in his official    *

15   Capacity as State Superintendent,* VIDEOTAPED

16   DORA STUTLER in her official     * VIDEOCONFERENCE

17   Capacity as Harrison County      * DEPOSITION

18   Superintendent, PATRICK MORRISEY *     OF

19   In his official capacity as      * HEATHER JACKSON

20   Attorney General, and THE STATE  * January 20, 2022

21   OF WEST VIRGINIA,                *

22        Defendants                  *

23             Any reproduction of this transcript
               is prohibited without authorization
24                by the certifying agency.
```

78

1              VIDEOTAPED VIDEOCONFERENCE DEPOSITION

2                            OF

3      HEATHER JACKSON, taken on behalf of the Defendant, State

4      of West Virginia herein, pursuant to the Rules of Civil

5      Procedure, taken before me, the undersigned, Nicole

6      Montagano, a Court Reporter and Notary Public in and for

7      the State of West Virginia, on Wednesday, January 20,

8      2022, beginning at 11:13 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2

 3     JOSHUA BLOCK, ESQUIRE

 4     American Civil Liberties Union Foundation

 5     125 Broad Street

 6     New York, NY  10004

 7     COUNSEL FOR PLAINTIFF

 8

 9     LOREE STARK, ESQUIRE

10     ACLU of West Virginia

11     P.O. Box 3952

12     Charleston, WV  25339

13         COUNSEL FOR PLAINTIFF

14

15     KATHLEEN R. HARTNETT, ESQUIRE

16     ANDREW BARR, ESQUIRE

17     JULIE VEROFF, ESQUIRE

18     ZOE HELSTROM, ESQUIRE

19     Cooley, LLP

20     3 Embarcadero Center

21     20th Floor

22     San Francisco, CA  94111-4004

23         COUNSELS FOR PLAINTIFF

24
```

```
 1              A P P E A R A N C E S  (cont'd)

 2

 3   SRUTI SWAMINATHAN, ESQUIRE

 4   Lambda Legal

 5   120 Wall Street

 6   19th Floor

 7   New York, NY  10005-3919

 8        COUNSEL FOR PLAINTIFF

 9

10   DAVID TRYON, ESQUIRE

11   CURTIS R.A. CAPEHART, ESQUIRE

12   State Capitol Complex

13   Building 1, Room E-26

14   Charleston, WV  25305

15        COUNSEL FOR STATE OF WEST VIRGINIA

16

17   ROBERTA F. GREEN, ESQUIRE

18   Shuman McCuskey Slicer, PLLC

19   1411 Virginia Street East

20   Suite 200

21   Charleston, WV  25301

22        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

23        ACTIVITIES COMMISSION

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   SUSAN DENIKER, ESQUIRE

 4   Steptoe & Johnson

 5   400 White Oaks Boulevard

 6   Bridgeport, WV  26330

 7       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 8       HARRISON COUNTY SUPERINTENDENT DORA STUTLER

 9

10   KELLY C. MORGAN, ESQUIRE

11   KRISTEN V. HAMMOND, ESQUIRE

12   Bailey Wyant

13   500 Virginia Street East

14   Suite 600

15   Charleston, WV  25301

16       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

17       SUPERINTENDANT W. CLAYTON BURCH

18

19   TIMOTHY D. DUCAR, ESQUIRE

20   Law Office of Timothy D. Ducar

21   7430 East Butherus Drive

22   Suite E

23   Scottsdale, AZ  85260

24       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
 1            A P P E A R A N C E S (cont'd)

 2

 3   JOSHUA BROWN, ESQUIRE

 4   CHRISTIANA HOLCOMB, ESQUIRE

 5   RACHEL CSUTOROS, ESQUIRE

 6   Alliance Defending Freedom

 7   15100 North 90th Street

 8   Scottsdale, AZ  85260

 9       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                          I N D E X

 2

 3   DISCUSSION AMONG PARTIES                    88 -   92

 4   WITNESS: HEATHER JACKSON

 5   EXAMINATION

 6      By Attorney Tryon                        92 -  226

 7   EXAMINATION

 8      By Attorney Green                       227 -  229

 9   EXAMINATION

10      By Attorney Deniker                     229 -  267

11   EXAMINATION

12      By Attorney Morgan                      267 -  272

13   EXAMINATION

14      By Attorney Ducar                       273 -  285

15   RE-EXAMINATION

16      By Attorney Tryon                       285 -  287

17   DISCUSSION AMONG PARTIES                   287 -  288

18   CERTIFICATE                                       289

19

20

21

22

23

24
```

84

```
 1                      EXHIBIT PAGE

 2

 3                                          PAGE

 4     NUMBER    DESCRIPTION                IDENTIFIED

 5     Exhibit 1   Davis Medical Records      --*

 6     Exhibit 1R  Davis Medical Records      --*

 7     Exhibit 2   Davis Medical Records      --*

 8     Exhibit 3   WVU Medical Records        --*

 9     Exhibit 4   UPMC Children's Medical

10                 Records                    --*

11     Exhibit 5   UPMC Children's Medical

12                 Records                    --*

13     Exhibit 6   UPMC Children's Medical

14                 Records                    --*

15     Exhibit 7   UPMC Children's Medical

16                 Records

17     Exhibit 8   UPMC Children's Medical

18                 Records                    --*

19     Exhibit 9   UPMC Children's Medical

20                 Records                    --*

21     Exhibit 11A Progress Notes             --*

22     Exhibit 11B Progress Notes             --*

23     Exhibit 11C Progress Notes             --*

24     Exhibit 11D Progress Notes             --*
```

**JA1092**

```
 1                          EXHIBIT PAGE

 2

 3                                              PAGE

 4    NUMBER         DESCRIPTION               IDENTIFIED

 5    Exhibit 12   UPMC Children's Medical

 6                 Records                       --*

 7    Exhibit 13   UMPC Children's Medical

 8                 Records                       --*

 9    Exhibit 14   WVU Medical Records          --*

10    Exhibit 15   WVU Medical Records          --*

11    Exhibit 16   WVU Medical Records          --*

12    Exhibit 17   Gender Support Plan          --*

13    Exhibit 18   Preferred Name Request Form  --*

14    Exhibit 19   Gender Support Plan          --*

15    Exhibit 20   Student Information          --*

16    Exhibit 20R  Student Information          --*

17    Exhibit 21   Screening Results           --*

18    Exhibit 21R  Screening Results           --*

19    Exhibit 22   Birth Certificate           --*

20    Exhibit 22R  Birth Certificate           --*

21    Exhibit 23   Heart Walk Article           --

22    Exhibit 23R  Heart Walk Article           --

23    Exhibit 24   Photo                        --

24    Exhibit 24R  Photo                        --
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

**JA1093**

```
 1                          EXHIBIT PAGE

 2

 3                                              PAGE

 4    NUMBER         DESCRIPTION              IDENTIFIED

 5    Exhibit 25  WV Record                      --

 6    Exhibit 26  Photo of Mom and BPJ           --

 7    Exhibit 27  Article                        --

 8    Exhibit 28  Article                        --

 9    Exhibit 29  Lambda Legal Article           --

10    Exhibit 30  Declaration of Heather

11                Jackson                        --

12    Exhibit 31  Declaration of BJP             --

13    Exhibit 32  First Amended Complaint        --

14    Exhibit 33  Standards of Care              --

15    Exhibit 34  House Bill 3293                --

16

17

18

19

20

21

22

23    * CONFIDENTIAL EXHIBITS

24
```

```
 1                        OBJECTION PAGE

 2

 3    ATTORNEY                               PAGE

 4    Block    98, 98, 101, 106, 106, 107, 112, 113, 113, 114,

 5    115, 117, 119, 122, 122, 122, 128, 129, 131, 132, 139,

 6    143, 145, 146, 148, 149, 155, 156, 160, 177, 181, 181,

 7    182, 187, 188, 193, 195, 196, 200, 200, 202, 202, 204,

 8    213, 213, 214, 214, 215, 217, 217, 219, 219, 219, 220,

 9    220, 222, 224, 237, 239, 255, 255, 258, 258, 270, 271,

10    276, 277, 278, 279, 279, 280, 283, 287

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                 S T I P U L A T I O N

 2      ----------------------------------------------------------

 3      (It is hereby stipulated and agreed by and between

 4      counsel for the respective parties that reading,

 5      signing, sealing, certification and filing are not

 6      waived.)

 7      ----------------------------------------------------------

 8                 P R O C E E D I N G S

 9      ----------------------------------------------------------

10                 ATTORNEY TRYON:  This is David Tryon on

11      behalf of the State of West Virginia conducting this

12      deposition on behalf of the State of West Virginia.  We

13      have had off the record some discussions among all the

14      counsel about some various stipulations about how to go

15      forward with the deposition and with objections, and I

16      think the best thing for me to do, since Josh, since you

17      were the one that is making the objections in this case,

18      you give your thoughts about how we can handle those

19      objections and then we can all state how we concur with

20      them.  Is that fair enough or do you want me to state

21      them?

22                 ATTORNEY BLOCK:  No, I can state them.

23      And I think I'll state each type of objection.  The

24      first is that several objections have come up to
```

```
 1  questions that in our view seem to call for legal expert

 2  or medical opinion.  And our understanding from our

 3  discussions with Defense Counsel is that they do not

 4  intend for any of their questions to seek an answer

 5  based on legal/medical or otherwise expert opinion and

 6  they will specifically state otherwise if they are

 7  seeking a legal/expert or medical opinion.  And so based

 8  on that understanding, we will just make a standing

 9  objection to any question insofar as it calls for a

10  legal expert or medical opinion and won't be making a

11  specific objection to each question as it occurs.

12             ATTORNEY TRYON:  Agreed.  And that

13  applies to this deposition.  And to the extent that we

14  address it at other depositions, we'll address that

15  separately.

16             Right?

17             ATTORNEY BLOCK:  Yes.  So if each counsel

18  could say that they agree to this way of handling those

19  objections for purposes of this deposition.

20             ATTORNEY DENIKER:  I'm in agreement with

21  that.

22             ATTORNEY MORGAN:  I am as well.

23             ATTORNEY DUCAR:  I am as well.

24             ATTORNEY BLOCK:  The second set of
```

```
 1  objections that came up were objections to terminology

 2  regarding gender identity, being transgender, the

 3  definition of sex, gender transition, that in our view

 4  are vague and that we think can lead to confusion about

 5  what the terminology means and whether the terminology

 6  is even medically appropriate.  And so we object to any

 7  questions that could be used to imply that the language

 8  used in that question actually is medically appropriate

 9  language.  But we don't want those to unnecessarily

10  interrupt the deposition, but at the same time we think

11  it could be helpful to clarify some of the language so

12  it doesn't cause problems for any counsel down the road.

13  And so we propose that we can handle that issue by ---

14  if terminology that we think is vague and problematic

15  comes up, we will simply say objection to terminology

16  and say we have a standing objection to that terminology

17  without then reiterating objections each subsequent time

18  the terminology is used.  And so is that procedure

19  acceptable to Defense Counsel?

20            ATTORNEY TRYON:  Agreed on behalf of the

21  State of West Virginia.

22            ATTORNEY DENIKER:  I'm agreeable to that

23  as well.

24            ATTORNEY MORGAN:  I'm agreeable as well.
```

91

```
 1                    ATTORNEY DUCAR:  Tim Ducar on behalf of

 2   Armistead, yes.

 3                    ATTORNEY BLOCK:  And the Commission had a

 4   chance to put their statement on the record.  Roberta?

 5                    ATTORNEY GREEN:  Yes, I agree.  I'm good

 6   with that.

 7                    ATTORNEY BLOCK:  And the final issue is

 8   there are several objections on the basis that we

 9   thought it mischaracterized the witness's testimony.  We

10   of course, you know, do not want the objections to

11   impede the questioning or somehow, you know,

12   unintentionally affect how the witness responds.  We

13   discussed that, instead of saying mischaracterizes the

14   testimony, we would say objection MT and that would

15   allow us to preserve the objection without the witness

16   hearing the grounds for it.  So is that an acceptable

17   approach for all of Defense Counsel?

18                    ATTORNEY TRYON:  Yes.

19                    ATTORNEY DENIKER:  I'm also agreeable to

20   that.

21                    ATTORNEY MORGAN: I am as well.

22                    ATTORNEY GREEN:  And I agree as well.

23                    ATTORNEY DUCAR:  I agree as well.

24                    ATTORNEY BLOCK:  Terrific.  I think that
```

```
 1  resolves everything unless I missed something.

 2                  ATTORNEY TRYON:  No, I think that's

 3  right.  I think we are ready to go with the expectation

 4  that we are ready to go.  I would like to take a real

 5  quick bathroom break, to be honest.

 6                  ATTORNEY BLOCK:  That sounds good.

 7  Should we convene at 10:50?

 8                  ATTORNEY TRYON:  10:55 is fine with me.

 9                  ATTORNEY HARTNETT:  Why don't we do

10  10:55, and that will make sure we get the printed

11  copies?

12                         ---

13  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

14                         ---

15                  VIDEOGRAPHER:  We are on the record.

16  The current time reads 11:13 a.m.  This is the continued

17  deposition of Heather Denise Jackson.

18                         ---

19                  HEATHER DENISE JACKSON,

20  CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

21  HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AND SAID AS

22  FOLLOWS:

23                         ---

24                  CONTINUED EXAMINATION
```

93

---

BY ATTORNEY TRYON:

Q.    Ms. Jackson, thank you for joining us again

today.  And I apologize for the delay here.  We were

trying to accomplish some things amongst the lawyers to

streamline the process today, and sorry to keep you

waiting for so long.

First of all, I just want to tell you that ---

two things.  First of all, you're still under oath.  So

everything you say today, you're still under oath just

as yesterday.

Okay?

A.    Yes.

Q.    And then we also had some discussions off the

record about how we're going to handle --- excuse me,

certain objections.  And some of them we have agreed to

standing depositions --- excuse me, standing objections.

And we will need to --- I'm sorry.  I'm seeing another

message.  I'm distracted.  So we will just explain that

to you in a moment, but one of the other counsel

suggested that we all ought to identify ourselves for

the record since we do have some different people today

than yesterday.  So just for the record, I'm David

Tryon, representing the State of West Virginia.

94

1           ATTORNEY BLOCK:  I'm Joshua Block,

2  representing the Plaintiff and the witness.  And after I

3  finish introducing myself, I'll have co-counsel from

4  Cooley followed by co-counsel from Lambda Legal followed

5  by co-counsel from ACLU of Virginia identify themselves.

6           ATTORNEY HARTNETT:  Good morning.  This

7  is Kathleen Hartnett from Cooley for Plaintiff and the

8  witness.

9           ATTORNEY BARR:  Good morning.  This is

10  Andrew Barr from Cooley for Plaintiff and the witness.

11           ATTORNEY VEROFF:  Good morning.  This is

12  Julie Veroff from Cooley for BPJ and the witness.

13           ATTORNEY HELSTROM:  Good morning.  This

14  is Zoe Helstrom from Cooley for Plaintiff and the

15  witness.

16           ATTORNEY SWAMINATHAN:  Good morning.

17  This is Sruti Swaminathan for Plaintiff and the witness

18  from Lambda Legal?

19           ATTORNEY TRYON:  Roberta?

20           ATTORNEY GREEN:  Yes, Roberta Green, West

21  Virginia Secondary School Activities Commission.

22           ATTORNEY DENIKER:  Good morning,

23  everyone.  This is Susan Deniker, Counsel for Defendants

24  Harrison County Board of Education and Harrison County

1  Board of Education Superintendant Dora Stutler.

2              ATTORNEY DUCAR:  Good morning.  Timothy

3  Ducar on behalf of Intervenor, Lainey Armistead.

4              ATTORNEY HOLCOMB:  Good morning.

5  Christiana Holcomb on behalf of Intervenor.

6              ATTORNEY CSUTOROS:  Good morning.  Rachel

7  Csutoros on behalf of Intervenor.

8              ATTORNEY BROWN:  Joshua Brown on behalf

9  of the Intervenor.

10             ATTORNEY MORGAN: Kelly Morgan and Kristen

11 Hammond on behalf of the West Virginia Board of

12 Education and Superintendant Burch.

13             ATTORNEY STARK:  Hi.  I'm Loree Stark.

14 I'm with the American Civil Liberties Union of West

15 Virginia, and I'm here on behalf of Plaintiff.

16             ATTORNEY CAPEHART:  Curtis Capehart on

17 behalf of the State of West Virginia.

18 BY ATTORNEY TRYON:

19    Q.    Okay.

20          Ms. Jackson, I'll come back to you now.  So

21 we've have placed a number --- one of the things that we

22 wanted to do is put some hard copies in your office

23 there to facilitate going through the documents more

24 quickly.  So when I refer to a document you will be able

 1  to pick it up and look at it in hard copy.  I will also

 2  probably be putting it up on the screen as well.

 3              ATTORNEY TRYON:  But before we actually

 4  get started with any questions, Josh, do you want to

 5  state what --- you're going to use certain

 6  abbreviations?

 7              ATTORNEY BLOCK:  Sure.  We put on the

 8  record that there will be certain objections where I use

 9  an abbreviation for it.  So if I make an objection that

10  you don't understand, that's because we stipulated that

11  we will use an abbreviation for that objection.

12              ATTORNEY TRYON:  Okay.

13  BY ATTORNEY TRYON:

14     Q.    So let's get started.  First of all, do you have

15  any questions from yesterday, Ms. Jackson, or anything

16  you need to correct from what your testimony was

17  yesterday?

18     A.    Not off the top of my head, no.

19     Q.    Okay.

20           After your deposition yesterday, did you talk

21  to your husband or anyone else about your deposition?

22     A.    No.

23     Q.    Did you talk to your husband about his

24  deposition?

1    A.    No.

2    Q.    Okay.

3          So I want to start off talking about BPJ and

4    when BPJ was born.  These are things that seem obvious

5    to me, but I just want to make sure I understand.  When

6    BPJ was born, BPJ had male body parts.

7          Right?

8    A.    Correct.

9    Q.    And still has those male body parts.

10         Right?

11   A.    Correct.

12   Q.    And when BPJ was born you considered BPJ as a

13   male.

14         Is that true?

15   A.    Yes.

16   Q.    And at that time did you refer to BPJ as your

17   son?

18   A.    Yes.

19   Q.    And did that change at some point?

20   A.    Yes.

21   Q.    And at some point did --- what changed?

22   A.    She started presenting female characteristics

23   around the age of three.

24   Q.    And at some point you started to refer to BPJ as

98

1   your daughter?

2       A.    Yes.

3       Q.    When was that?

4       A.    I don't know of an exact date.

5       Q.    Okay.

6             So you said at about three years old BPJ

7   started presenting with --- I'm sorry, how did you say

8   it?

9       A.    Female characteristics, mannerisms, those type

10  of things.

11      Q.    And at that point did you start referring to BPJ

12  as your daughter or was it later?

13      A.    It was probably around the age of four.

14      Q.    Does BPJ understand or recognize that BPJ was

15  born as a biological male?

16              ATTORNEY BLOCK:  Objection to

17  terminology, and I will make that a standing objection.

18              THE WITNESS:  She was born as a male with

19  a penis.

20  BY ATTORNEY TRYON:

21      Q.    And my question, though, is does --- sorry, does

22  BPJ currently recognize that BPJ was born as a

23  biological male?

24              ATTORNEY BLOCK:  Objection.  Calls for

99

```
 1   speculation.
 2                    THE WITNESS:   Yes, she knows she was born
 3   as a male.
 4   BY ATTORNEY TRYON:
 5      Q.    Does it cause BPJ distress for someone to refer
 6   to BPJ as a biological male?
 7      A.    Yes.
 8      Q.    Can you describe that for me a little bit, that
 9   stress?
10      A.    She gets upset, she cries, she gets angry.
11      Q.    And when did that start?
12      A.    That started at an early age, around three or
13   four.
14      Q.    So at about three or four you said that BPJ
15   started to present as a female.
16            Did I get that right?
17      A.    Yes.
18      Q.    Can you tell me what specifically that means to
19   present as a female?
20      A.    From an early age she didn't want to wear male
21   clothes.  She wanted to wear my clothes as dresses.
22   When she was learning how to go to the bathroom, to
23   urinate, she didn't want to stand to urinate.  She
24   wanted to sit down to urinate.  She didn't understand
```

1   why she had a penis and I didn't.

2       Q.   Anything else?

3       A.   She requested at an early age for, I think it

4   was a birthday present, her own makeup kit.

5       Q.   Anything else?

6       A.   When she would pose for pictures, she would pose

7   with her leg tucked in more of a feminine stance.

8       Q.   I'm afraid I don't understand that.

9       A.   Put your hand on your hip, put your hip out a

10  little bit and cock your leg.

11      Q.   So when you're standing?

12      A.   Yeah, like when she is standing for a photo.

13      Q.   Anything else?

14      A.   Those are what comes to me off the top of my

15  head.

16      Q.   And those were all done at age three or did we

17  condense that timeframe?

18      A.   Like three to four.

19      Q.   Three to four.  And when BPJ asked why BPJ had a

20  penis, what was your explanation?

21      A.   Because she was born a boy and boys have

22  penises.

23      Q.   And what was BPJ's reaction?

24      A.   That that wasn't right.

1    Q.    Can you expound on that?

2    A.    She didn't, at that point, identify as a male,

3    so she told me I was incorrect.

4    Q.    That you were incorrect that --- that what?

5    A.    That she was a male because she had a penis.

6    Q.    And so I'm just trying to understand.  So BPJ

7    was saying that BPJ was a female in spite of having a

8    penis or that BPJ did not have a penis or what?  I

9    honestly don't understand?

10             ATTORNEY BLOCK:  Objection, compound.

11             THE WITNESS:  She's saying that she has a

12   penis, but she's not a male.

13   BY ATTORNEY TRYON:

14   Q.    That's what BPJ said at three years old?

15   A.    Well, she didn't have quite that language.  It

16   was more like I'm a girl.

17   Q.    She did know the word penis at the time?

18   A.    Yes.  We've always used correct terms for

19   genitalia.

20   Q.    And forgive me if this is insensitive, but I'm

21   just trying to understand.  Why did --- how did she no

22   that you had one and you didn't?

23   A.    Because she would follow me into the bathroom.

24   Q.    Okay.

102

```
 1            Did she --- did BPJ recognize that her brothers
 2   were males?
 3      A.    She recognized that we referred to them as
 4   males.
 5      Q.    Did BPJ ever ask what the difference was between
 6   BPJ and your other sons?
 7      A.    No.
 8      Q.    Let me ask you to look at Exhibit 30.
 9                ATTORNEY TRYON:  And I will ask the court
10   reporter to pull that up as well.  I lost some video
11   feed for her, for the witness.  There she is.
12                VIDEOGRAPHER:  You have her pinned?
13                ATTORNEY TRYON:  No.  There we go.  Okay.
14   I pinned Josh.  How do I unpin Josh?
15                VIDEOGRAPHER:  The same way you pinned
16   him.
17                ATTORNEY TRYON:  Okay.
18                Now I got it.  Sorry for the delay.
19   BY ATTORNEY TRYON:
20      Q.    Ms. Jackson, have you seen this document before?
21      A.    Yes.
22      Q.    Have you reviewed it before today?
23      A.    When I originally --- when I originally declared
24   it.
```

103

```
 1    Q.    And on the last page, that's your signature.
 2          Is that right?
 3    A.    I don't have that page.
 4    Q.    Okay.
 5          I take it back.  So page six is the signature
 6  page.  Do you have that?
 7    A.    I have to page five.
 8    Q.    Okay.
 9          I just saw you scroll past it.  Right there?
10    Q.    Yeah.  So you see that?
11    A.    Yes.
12    Q.    Is that your signature?
13    A.    It is.
14    Q.    And it was signed on 5/25/2021?
15    A.    Yes.
16    Q.    So who prepared this document?
17    A.    Well, the lawyers would have written it up and I
18  reviewed it.  They --- I told them what I told them and
19  they typed it.
20    Q.    Okay.
21          And is your --- at the time you said this is
22  true and accurate.  Do you still believe the entire
23  thing is true and accurate to the best of your knowledge
24  and belief?
```

```
 1       A.    Yes.

 2       Q.    Great.  Let me ask you, first of all, paragraph

 3   four is I'm fiercely protective of BPJ.  What do you

 4   mean by that?

 5       A.    Just as any parent would be fiercely protective

 6   of their child.

 7       Q.    Then you say, as her mother, I want to see her

 8   be able to achieve all her dreams.  Can you tell me what

 9   her dreams are at this point?

10       A.    Well, in regards to this, she wanted to be able

11   to run on the cross-country team, and that is what she

12   had dreamed of.

13       Q.    Was that all you were referring to at the time

14   you signed this Declaration?

15       A.    Well, I want to see her do well in life.  I

16   mean, if she tells me she wants to go to college, I want

17   to see her achieve that.  At the age of 11 they don't

18   have a whole lot of dreams.

19       Q.    When you signed this, did BPJ express any other

20   dreams that she had --- that he or she had?

21       A.    Not that comes to mind.

22       Q.    Okay.

23             And then the next --- in paragraph six it says

24   BPJ from a very young age that she didn't want her boy
```

```
 1  parts.  Was there anything else about that statement
 2  other than what you've already told me?
 3      A.    No, that's very accurate.
 4      Q.    Before that it says BPJ is also transgender.
 5  What does that word, transgender, mean to you, as you
 6  signed this?
 7      A.    She was designated at birth as a male, but she
 8  is a female.
 9      Q.    And hopefully I'm not repeating from yesterday,
10  but when you say she is a female that is --- can you
11  tell me why she is a female?
12      A.    She identifies as a female.
13      Q.    And just so I'm clear, that's why you say that
14  BPJ is transgender?
15      A.    Correct, she is a female.
16      Q.    Okay.
17            Next you say she never wanted to be naked for
18  bathing because she was deeply uncomfortable with and
19  did not want to see certain parts of her body.  So how
20  did she bathe?
21      A.    She bathed, but we would keep a wet washcloth
22  over her genitals.
23      Q.    What would happen when she saw her genitals?
24      A.    She would be deeply upset.
```

106

```
 1      Q.    Can you explain that to me a little bit?  I
 2   don't mean to pry, but what did that mean, that BPJ
 3   would be upset?
 4      A.    She wouldn't like seeing it.  She would be
 5   upset, she would be frustrated, visibly frustrated.
 6      Q.    Did she yell, cry, scream, say don't look at me?
 7   What happened?
 8                ATTORNEY BLOCK:  Objection.  Compound.
 9                THE WITNESS:  She would be deeply upset
10   in the form of she would say I don't want that.
11   BY ATTORNEY TRYON:
12      Q.    Did she just say that or did she yell, raise her
13   voice?
14      A.    She would be very stern.
15      Q.    When BPJ first was reacting this way, as you
16   described it, did you insist that BPJ was, in fact, a
17   male or did you just accept her statement that she was a
18   female?
19                ATTORNEY BLOCK:  Objection to form.
20                THE WITNESS:  When she told me she was a
21   female, I accepted her statement as true.
22   BY ATTORNEY TRYON:
23      Q.    From the very first time or did it take some
24   time to accept that?
```

```
 1      A.    No, from the first time that she told me she was

 2   a girl I believed that she believed she was a girl.

 3      Q.    And then --- but if I remember your earlier

 4   testimony, I think you said that it was a little while

 5   before you started referring to BPJ as your daughter.

 6            Is that right?

 7                ATTORNEY BLOCK:  Objection, MT.

 8   BY ATTORNEY TRYON:

 9      Q.    Did you answer?

10      A.    Correct.

11      Q.    So let me see if I understand it.  You initially

12   --- you right away accepted her belief that she was a

13   female, but didn't actually refer to BPJ as your

14   daughter until some time later?

15      A.    It took me a while to learn the terminology.

16      Q.    How long did it take you to learn the

17   terminology?

18      A.    I don't know the answer to that, but for three

19   years --- for three years I'd been calling her my son so

20   it took a while.

21      Q.    And what terminology is that?

22      A.    To refer to her as a female.

23      Q.    And where did you learn the terminology, as

24   you've said it?
```

```
 1      A.     To refer to her as a female?

 2      Q.     Yes.

 3      A.     She told me that she is a female.

 4      Q.     Okay.

 5             Well, then I guess I'm misunderstanding,

 6   because you said it took you a while to learn the

 7   terminology.  What do you mean by that?

 8      A.     For three years I had been calling her my son,

 9   so I had to learn to call her my daughter.

10      Q.     I get it.  You didn't like --- I thought you

11   meant you had to go read some books or something.

12   You're not saying that?

13      A.     No.  I know what a daughter is.

14      Q.     Okay.  Understood.

15             And paragraph seven says, as a child BPJ also

16   presented differently from my other children, both of

17   who are boys.  Do either one of your other --- let me

18   rephrase that.  The boys that you --- you have two other

19   children who are sons.

20             Right?

21      A.     Correct.

22      Q.     Are either one of them transgender?

23      A.     No, they are not.

24      Q.     And you --- in paragraph seven you say whenever
```

109

1    BPJ was provided with the opportunity to pick out her

2    clothes or toys, she always went straight for the girly

3    items.  Can you tell me what those girly items --- what

4    that means?

5        A.    She would want to shop in the girls sections of

6    the stores.  She wanted dresses and lacy tutus, sparkly

7    clothes.  She wanted the girls clothes.

8        Q.    Anything else?

9        A.    Same thing with shoes.  She wanted the girls

10   shoes.

11       Q.    What toys are you referring to as girly items?

12       A.    Toys would be her dolls that she would have

13   growing up.

14       Q.    What kind of dolls?

15       A.    Plush.

16       Q.    So like girl dolls or animal dolls?  I'm not

17   sure I understand.

18       A.    Girl dolls that are plush.

19       Q.    And paragraph eight is when BPJ told us that she

20   was a girl and wants to be dressed as a girl, I was not

21   surprised because I spend so much time with her, can you

22   expound on that?

23       A.    Well, when I'm not at work, I'm with her.

24       Q.    So how much time do you spend with her?

110

 1   A.    I am with her other than nine hours a day.

 2   Q.    Paragraph nine ---.

 3             ATTORNEY TRYON:  Can I ask the court

 4   reporter to take control and scroll down?  Thank you.

 5   BY ATTORNEY TRYON:

 6   Q.    Because BPJ and I have such an open

 7   communicative relationship we have --- would have

 8   conversations about how she was feeling.  Can you tell

 9   me about those conversations?

10   A.    Conversations in regards to how she is feeling

11   regarding she didn't want her penis, that she identified

12   as a female.

13   Q.    And then the next sentence, the last part says

14   more, she was able to clearly communicate that she knew

15   she was a girl.  What do you mean by more clearly

16   indicates?

17   A.    As she learned language skills as she grew up.

18   Q.    So what language skills --- and what language

19   changed for her to communicate that?

20   A.    As her vocabulary increased.

21   Q.    So for example, what additional words was she

22   using?

23   A.    She would use the word vagina when she learned

24   that term.  She would use the term breasts when she

111

1  learned that term.  She learned the term brassiere.

2    Q.    When BPJ first informed you that BPJ was a girl,

3  did you --- did this cause you any concern or stress or

4  anxiety?

5    A.    I worried about any sort of --- I don't know

6  what the word is I'm looking for --- discrimination she

7  might receive.

8    Q.    Did you at that time --- at that time had you

9  heard of the term transgender?

10    A.    Yes.

11    Q.    And in what context had you already heard the

12  term transgender?

13    A.    I'm sorry.  Could you repeat that?

14    Q.    Sure.  In what context had you heard the term

15  transgender?

16    A.    Just in referring to people as transgender.

17    Q.    Had you known anybody that was transgender

18  before BPJ told you that BPJ was a girl?

19    A.    I did not.

20    Q.    Were you surprised when BPJ announced that BPJ

21  was a girl?

22    A.    No.

23    Q.    Why is that?

24    A.    She had been presenting as a girl.

112

1  Q. I see.  So you expected BPJ at some point to

2 tell you that BPJ was a girl?

3  A. Yes.

4      ATTORNEY BLOCK:  Objection, MT.

5 BY ATTORNEY TRYON:

6  Q. Back in --- at the end you say you knew this was

7 not a phase for her and that there was something

8 different happening.  How did you know it was not a

9 phase?

10  A. It never went away.  It just became more

11 intense.  I had already raised two sons and realized

12 that she was a girl.  She was being raised as a

13 daughter.  She was telling me that she was a girl.

14  Q. At what point did you conclude that it was not a

15 phase?

16  A. I don't know a date for that.

17  Q. Well, was it before --- I presume it was after

18 BPJ announced that BPJ was a girl.

19    Is that right?

20  A. Yes, but I don't know the date of that either.

21  Q. But you believe it was approximately at age

22 three?

23  A. Three to four.

24  Q. At some point did BPJ say that BPJ wanted

1   breasts?

2       A.    Yes.

3       Q.    Do you remember when that was?

4       A.    I don't remember the date.

5       Q.    Was it in the past two years or do you recall at

6   all?

7       A.    I don't recall.

8       Q.    And why did BPJ want breasts?

9       A.    Because girls have breasts.

10      Q.    Does BPJ understand at that time --- let me

11  start that over.  At that time, when BPJ said that BPJ

12  wanted breasts, did BPJ understand the purpose of

13  breasts?

14              ATTORNEY BLOCK:  Objection, calls for

15  speculation.

16              THE WITNESS:  I don't know that she knew

17  the purpose of breasts, no.

18  BY ATTORNEY TRYON:

19      Q.    Have you ever informed BPJ or had BPJ somehow

20  learned the purpose of breasts?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  She knows she was breastfed

23  as a child, so she knows that milk comes out of them.

24  BY ATTORNEY TRYON:

```
 1      Q.    Had you ever had any discussions with BPJ about

 2   the purpose of breasts?

 3      A.    No.

 4      Q.    Do you know if BPJ expects that once --- if BPJ

 5   has an operation to give --- to put breasts in place,

 6   does BPJ expect the ability to lactate?

 7                  ATTORNEY BLOCK:  Objection.  Objection to

 8   form and calls for speculation.

 9                  THE WITNESS:  Yeah, we've never had that

10   discussion.

11   BY ATTORNEY TRYON:

12      Q.    So you don't know?

13      A.    I would presume that she knows that it doesn't

14   work that way because she knows she can't have children.

15   She can't give birth.

16      Q.    Okay.

17            And how do you know that?

18      A.    Because we've talked about that.

19      Q.    Tell me about that conversation.

20      A.    That she doesn't have a uterus and that's what

21   you carry a baby in, is a uterus.

22      Q.    Do you recall when you had that discussion?

23      A.    I don't know the date.

24      Q.    Was it within the past year?
```

115

| | | |
|---|---|---|
| 1 | A. | I don't know when it was. |
| 2 | Q. | Was it before or after this lawsuit was filed? |
| 3 | A. | I don't know the answer to that. |
| 4 | Q. | Did that cause distress to BPJ to know that BPJ |

would not be able to have children?

6     A.     No.

7     Q.     Does BPJ --- let me rephrase that.  Has BPJ told

8 you that BPJ wants a vagina?

9     A.     Yes.

10     Q.     Do you remember when that was?

11     A.     I do not know the date.

12     Q.     And do you know why BPJ wants to have a vagina?

13     A.     Because she's a girl.

14     Q.     And for BPJ that's an indicator that BPJ is a

15 girl?

16     A.     She wants to be a girl.  She is a girl.  She

17 wants the genitalia to match.

18     Q.     Well, I want to ask this question again.  It's

19 important for me to understand the situation.  Has BPJ

20 thought about this in the context of sexual relations?

21     A.     No.

22                ATTORNEY BLOCK:  Objection to form and

23 calls for speculation.

24 BY ATTORNEY TRYON:

1    Q.    And how do you know that BPJ has not ---?

2    A.    We have not talked about sexual relations.

3  She's 11.

4    Q.    Fair enough.

5              ATTORNEY TRYON:  Paragraph ten, if the

6  court reporter can put the document back up on the

7  screen.

8  BY ATTORNEY TRYON:

9    Q.    By the time BPJ was in the third grade she had

10  chosen her name and was living as herself at home.  What

11  name did she choose?

12    A.    She chose the name B██████.

13    Q.    Do you know why she chose the name B█████?

14    A.    She said she liked the name.

15    Q.    Did she talk to you about it before choosing the

16  name?

17    A.    Nope.  She told me that that was the name she

18  was picking.

19    Q.    So paragraph ten says third grade.  How old was

20  BPJ at that time?

21    A.    I don't know how old someone is in the third

22  grade.

23    Q.    I'm asking how old BPJ was at the time that BPJ

24  went into the third grade.

117

```
 1      A.    I don't know off the top of my head how old you

 2   are when you enter into third grade.

 3      Q.    Do you know how old BPJ was when BPJ entered

 4   kindergarten?

 5      A.    She was five.

 6      Q.    So then in the third grade, would that make BPJ

 7   eight?

 8      A.    Roughly.

 9      Q.    So between third grade and eighth grade in the

10   public she presented outwardly as a male?

11                  ATTORNEY BLOCK:  Objection.

12                  ATTORNEY TRYON:  I don't think I said

13   that right.  Let me try that again.  Apologize.

14   BY ATTORNEY TRYON:

15      Q.    Between the age of three and eight do I

16   understand correctly that she presented to the general

17   public as a male?

18      A.    At school.

19      Q.    Okay.

20            And what about outside school?

21      A.    It would depend on the function.  If it was

22   around family, she presented as a female and wore female

23   clothes.  If it was a function she didn't feel

24   comfortable in, like a funeral, she would present as she
```

USCA4 Appeal: 23-1078   Doc: 53-3   Filed: 03/27/2023   Pg: 65 of 674

118

1  would in school.

2     Q.   As a boy?

3     A.   She would wear male clothes.

4     Q.   And thank you for that clarification.  So ---

5  and then so she would dress as a boy at school and then

6  would she come home and change?

7     A.   Immediately.

8     Q.   And did BPJ --- when you say BPJ was around

9  family, do you mean just your immediate family or

10  extended family?

11    A.   Extended family.

12    Q.   And who would that extended family be just so I

13  understand your term?

14    A.   Aunts, uncles, grandparents.

15    Q.   Did anyone express a surprise at the beginning

16  that BPJ was now dressing as a boy (sic)?

17    A.   Not to me they didn't.

18    Q.   So to this day, no one outside your immediate

19  family has --- let me rephrase it.  To this day, no one

20  in your extended family has ever said why is BPJ

21  presenting as a --- or dressed as a boy when BPJ is a

22  girl?  No, let me start that all over again.

23         Let me see if I understand this.  When BPJ was

24  between the ages of three and eight when BPJ was around

```
 1   extended family BPJ would dress as a girl.
 2          Is that right?
 3   A.    Correct.
 4   Q.    Okay.
 5          I got a little confused.  And during all that
 6   time none of your extended family ever said to you or
 7   anyone else that you were able to hear why is BPJ
 8   wearing girl's clothing when BPJ is a boy?
 9                    ATTORNEY BLOCK:  Objection to form.
10                    THE WITNESS:  Are you asking if they
11   expressed it to me?
12   BY ATTORNEY TRYON:
13   Q.    Either to you or someone you heard them say it
14   to?
15   A.    Well, when she was first introduced in female
16   clothes they asked why, and I said she is a girl.
17   Q.    And what was their reaction?
18   A.    Oh.
19   Q.    That was it?
20   A.    That is it.
21   Q.    Okay.
22          When BPJ would go to school dressed as a boy
23   prior to the third grade, did that cause BPJ any
24   distress?
```

1    A.    She didn't like dressing as a boy, but she was

2    worried about being made fun of at school if she dressed

3    like a girl.

4    Q.    Can you repeat your answer there?

5    A.    She didn't like dressing as a boy at school.

6    Q.    But she --?

7    A.    But she did because she was afraid that she

8    would be made fun of if she dressed as a girl at school.

9    Q.    Thank you.

10         When BPJ started wearing a dress at school did

11   BPJ get made fun of?

12   A.    No.

13   Q.    Now, when you say when BPJ came home BPJ would

14   change into girl's clothing, does that mean always a

15   dress or something else?

16   A.    Oh, it could be leggings, it could be her

17   pajamas, not necessarily always a dress.

18   Q.    That's what I'm wondering, because girls many

19   times wear pants.  So does BPJ now that BPJ is

20   identifying as a girl wear jeans or pants to school?

21   A.    She does not wear jeans.

22   Q.    Other pants?

23   A.    She wears leggings.

24   Q.    Why not jeans?

121

1    A.    She doesn't like jeans.

2    Q.    I want to shift gears a little bit here.  So BPJ

3  had a different birth name than B████.

4        Correct?

5    A.    Correct.

6    Q.    And does it disturb you to see or hear BPJ's

7  birth name?

8    A.    Disturb?  I don't understand what you mean by

9  disturb.

10   Q.    Does it cause you any anxiety to see BPJ's birth

11 name, for example, on the Birth Certificate or other

12 places where it's been written down?

13   A.    Oh, it just seems foreign to me because she's

14 been B████ for so long.

15   Q.    Does it cause distress for BPJ to see BPJ's

16 birth name?

17   A.    Yes, it does.

18   Q.    Can you describe that?  And forgive me if you've

19 already told me this yesterday, and I may have

20 forgotten, but does it --- tell me about what that

21 distress is.

22   A.    She gets angry and upset and doesn't understand

23 why her dead name is on there.

24   Q.    Where did you learn the term dead name?

1      A.      From B█████ .

2      Q.      How did B█████  learn the term dead name?

3                      ATTORNEY BLOCK:  Speculation.

4                      THE WITNESS:  I don't know.

5   BY ATTORNEY TRYON:

6      Q.      When did B█████  start using term dead name?

7                      ATTORNEY BLOCK:  Objection.

8                      THE WITNESS:  I don't know the name.

9   BY ATTORNEY TRYON:

10     Q.      Was it before or after the lawsuit was filed?

11     A.      Before.

12     Q.      More than a year before that?

13     A.      I don't know.

14     Q.      Can you give me any kind of approximation at all

15  when BPJ started using the term dead name?

16     A.      No, I cannot.

17     Q.      Well, do you know if BPJ initially heard that

18  from lawyers?

19                     ATTORNEY BLOCK:  Objection, calls for

20  speculation.

21                     THE WITNESS:  I don't know where she

22  heard it from.

23  BY ATTORNEY TRYON:

24     Q.      When is the first time you heard it?  From B█████

123

1   I think you said, is that right or not?

2      A.     B███     told me the name --- the term dead name.

3                  ATTORNEY TRYON:  Let's go off the record

4   for just a moment.

5                  VIDEOGRAPHER:  Going off the record.  The

6   current time reads 12:01 p.m.

7   OFF VIDEOTAPE

8                  ATTORNEY TRYON:  So I'm about to get into

9   a different line of questioning.  I want to be

10  respectful about everybody's thoughts about lunch.  I'm

11  happy to keep on going for another half-hour or hour,

12  but I just want to make sure that --- I want to be

13  respectful with other people's feelings on that.  Well,

14  hearing no objection, I'm going to keep going unless

15  somebody speaks up, including you, ma'am.  If you ---

16  you're the star here.  You and the court reporter are

17  the most important people here, so if you feel the need

18  to take a break ---.

19                  THE WITNESS:  I'm okay.

20                  ATTORNEY TRYON:  Okay.

21                  ATTORNEY DUCAR:  Can we take five

22  minutes?

23                  ATTORNEY TRYON:  Yes.

24                  ATTORNEY DUCAR:  Thank you.

```
 1                            ---

 2   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 3                            ---

 4   ON VIDEOTAPE

 5                VIDEOGRAPHER:  We are back on the record.

 6   The current time reads 12:09 p.m.

 7   BY ATTORNEY TRYON:

 8      Q.    Okay.

 9            Ms. Jackson, I want to talk to you now about

10   some issues about sports.  Now, this may overlap a

11   little bit from your testimony from yesterday.  It's a

12   problem --- well, not too much.  But to the extent that

13   it does, you know, I will try and ask questions that are

14   consistent with our questions and answers from

15   yesterday.  But if you feel like I'm somehow

16   misrepresenting your testimony or anything from

17   yesterday, please let me know and I will try and be

18   respectful of your prior testimony.

19            Okay?

20      A.    Yes, sir.

21      Q.    So when did BPJ first get interested in sports?

22      A.    She was in elementary school.

23      Q.    Do you remember which grade?

24      A.    Fourth.
```

125

```
 1      Q.    And what was the sport she became interested in?

 2      A.    Cheerleading.

 3      Q.    What was her interest?

 4      A.    She liked to cheer.

 5      Q.    Since I haven't been a cheerleader, can you tell

 6  me what that means that she liked to cheer?

 7      A.    So she would go to the games, hers would have

 8  been football, and you cheer for your team.  You learn

 9  the routines and you learn the cheers.

10      Q.    And I believe you told me at that time she was

11  identifying as a female.

12            Is that right?

13      A.    Correct.

14      Q.    And the team that she was watching, was that a

15  school team or some other type of team?

16      A.    Bridgeport Youth Football League.

17                 COURT REPORTER:  I'm sorry, what football

18  league did you say, ma'am.

19                 THE WITNESS:  Bridgeport Youth.

20  BY ATTORNEY TRYON:

21      Q.    Is that a school-sponsored team?

22      A.    It is not sponsored by the school, it's

23  sponsored by the counties.

24      Q.    And is there a sponsor for the cheer team or was
```

1    there at the time?

2        A.    All inclusive with the football team, if that's

3    --- I'm guessing.  I think that's what you're asking.

4        Q.    Yes.   That answers my question.

5             Were there any boys on that cheer team?

6        A.    There were not.

7        Q.    Did you attend those games with BPJ?

8        A.    Yes.

9        Q.    How often did you go to those games?

10       A.    Every time they had one.

11       Q.    Was that just because you were interested in

12   those football games or did one of your other children

13   play in the football game?

14       A.    One year I had a son who played on the football

15   team.  Another year I did not have a son that played on

16   the football team.

17       Q.    And you went anyway?

18       A.    Absolutely.

19       Q.    Is that because you like football or is it

20   because BPJ liked football?  Why was that?

21       A.    I like football.

22       Q.    And did BPJ express any interest in playing on

23   the football team?

24       A.    No.

127

```
1    Q.    But BPJ was interested in the cheer team, as I

2  recall from some things that I read, at that time just

3  interested but was not part of the team.

4         Is that right?

5    A.    Correct.

6    Q.    And as I recall from something I read, BPJ then,

7  before getting on the team, learned some of the cheers.

8         Is that right?

9    A.    Correct.

10   Q.    And was it the very next year when BPJ joined

11 the cheer team or not?

12   A.    Yes.

13   Q.    So in the fifth grade BPJ was on the cheer team?

14   A.    Correct.

15   Q.    Were there tryouts for the cheer team?

16   A.    There were not tryouts.

17   Q.    So just anybody who wanted to be on the cheer

18 team could be on the cheer team?

19   A.    Yes.  You had to present the proper

20 documentation.  You had to fill out the forms and give a

21 Birth Certificate and a physical.

22   Q.    Was that cheer team open for both boys and

23 girls?

24   A.    I don't know the answer to that.
```

128

1    Q.    Did they ask you when you presented your

2   documentation or when BPJ applied in some fashion if BPJ

3   was a boy or a girl?

4    A.    They did not ask me.

5    Q.    Forgive me.  I can't find it in my notes.  At

6   fourth grade was BPJ already dressing as a female at

7   school?

8    A.    Yes.

9    Q.    Did your husband go to any of those football

10  games with you and BPJ?

11   A.    Yes.  Like which year, though?

12   Q.    The first year before BPJ was on the cheer team?

13   A.    Yes.

14   Q.    And what about the year once BPJ was on the

15  cheer team?

16   A.    When work permitted he would go.

17   Q.    Did you encourage BPJ to sign up for the cheer

18  team?

19   A.    She told me she wanted to sign up for the cheer

20  team.

21   Q.    And then did you encourage her to do so or just

22  say whatever you want to do or something like that?

23   A.    I said if she wants to cheer ---.

24              ATTORNEY BLOCK:  Objection to form.

```
 1                    THE WITNESS:  I said said if she wanted
 2   to cheer --- I said if she wanted to cheer, she could
 3   cheer.
 4   BY ATTORNEY TRYON:
 5      Q.    It required your parent consent I presume.
 6            Is that right?
 7      A.    Correct.
 8      Q.    Would that be just either your consent or your
 9   husband's or both?
10      A.    Either/or.
11      Q.    At that time in the third grade did BPJ express
12   any interest in any other sports?
13      A.    There are no other sports available to her.
14      Q.    Why?
15      A.    They didn't offer anything at her school.
16      Q.    You mean in that grade?
17      A.    Yeah.
18      Q.    And then after that did BPJ want to be involved
19   in any other sports?
20      A.    After that when?
21                    ATTORNEY BLOCK:  Objection, vague.
22                    ATTORNEY TRYON:  Thank you for the
23   clarification.
24   BY ATTORNEY TRYON:
```

130

1    Q.    After the fourth grade did --- either in or

2  after the fourth grade did BPJ become interested in any

3  other sports?

4    A.    She wanted to run, but there was no running

5  sport available to her at her age.

6    Q.    Okay.

7          About what grade or age was that when BPJ was

8  interested?

9    A.    In the --- let's see, that would have been the

10  fifth grade.

11    Q.    The fifth grade?

12    A.    The fifth grade, she's interested in running.

13    Q.    So going into the fifth grade or while she was

14  in the fifth grade?

15    A.    I'm not sure of the date.

16    Q.    Okay.

17          But initially there was no track team --- I'm

18  sorry, you said cross-country.

19          Right?

20    A.    Right.  Correct.

21    Q.    So at that point there was no cross-country

22  available for BPJ because of BPJ's age?

23    A.    Correct.

24    Q.    Were there other track sports that BPJ was

1    interested in?

2        A.    Just running.

3        Q.    Right.  So running encompasses --- and I'm no

4    expert on track, but I thought that track included

5    cross-country and other running events.

6              Is that right or wrong?

7        A.    Track can do running and other field events.

8        Q.    So was it just cross-country that BPJ was

9    interested in or other running events?

10       A.    That's what we were focusing on at the time

11   because that's what she knew.

12       Q.    Why did she know --- when you say that you are

13   talking about cross-country?

14       A.    Cross-country, yes.

15       Q.    And why was that what she knew?

16       A.    Because her --- her siblings ran cross-country.

17       Q.    So was BPJ interested in any kind of

18   cross-country or specific cross-country events?

19                  ATTORNEY BLOCK:  Objection, vague.

20                  THE WITNESS:  Yeah, I don't understand

21   the question.  Cross-country is cross-country.

22   BY ATTORNEY TRYON:

23       Q.    Okay.

24              So some places have --- I don't know this.  I

132

1   will ask this.  As far as I know, there is boys

2   cross-country and girls cross-country.  And I presume

3   there may also be coed cross-country teams.

4           Do you know about that?

5                   ATTORNEY BLOCK:  Objection to form.

6                   THE WITNESS:  The only one that was

7   available was in the sixth grade, and it was a boys

8   cross-country and a girls cross-country.

9   BY ATTORNEY TRYON:

10   Q.    And as I understand it, BPJ prefers to try out

11   for the girls cross-country team.

12         Right?

13   A.    Yes, because she's a girl.

14   Q.    Okay.

15         I just want to establish first that is what she

16   wanted, she wanted to try out for the girls

17   cross-country team.

18         Right?

19   A.    Yes.

20   Q.    And did she ever say I don't want to try out for

21   the boys cross-country team?

22   A.    Correct.

23   Q.    And she said that because I'm a girl, I want to

24   be on the girls cross-country team or words to that

**JA1140**

133

1  effect?

2     A.    She said she wanted to run with the girls on the

3  girls cross-country team.

4     Q.    Did she have any friends who were girls that

5  were on the team already?

6     A.    She knew of some people that were not in her

7  grade that were in cross-country that were friends with

8  her brother.

9     Q.    And those were girls or boys?

10    A.    Girls.

11    Q.    Did she know any boys that were on the boys

12  cross-country team?

13    A.    Her siblings.

14    Q.    Great.  Anybody else of her age group?

15    A.    Not that I know of.

16    Q.    From what I've read, I gather that the tryouts

17  for the girls cross-country team are competitive.

18         Is that your understanding?

19    A.    Correct.

20    Q.    And then once you get on the cross-country team,

21  are the races themselves competitive?

22    A.    Correct.

23    Q.    And did BPJ want to be competitive or just only

24  participate and she didn't care if she won?

134

```
 1     A.    Oh no, she --- she was competitive.

 2     Q.    So she wanted to win?

 3     A.    Yeah.

 4     Q.    And did she work hard at it?

 5     A.    She trained every day.

 6     Q.    And how did she do?

 7     A.    She ran cross-country.

 8     Q.    Okay.

 9           How did she do compared to others?

10     A.    She never finished first.  She never finished

11   second.

12     Q.    She wanted to finish first or second, though, I

13   take it?

14     A.    Every kid wants to.

15     Q.    I'm sorry?

16     A.    Every kid wants to finish first.

17     Q.    Including her, right?

18     A.    Yes.

19     Q.    Do the boys and girls cross-country teams ever

20   compete against each other?

21     A.    There are races where they call them one and

22   done, where everybody runs together.  And there are

23   races where they are separated out.  It just depends on

24   the format of the host school.
```

135

```
 1     Q.    So the ones --- they call them won and done.

 2           Is that right?

 3     A.    Yes.

 4     Q.    That means everybody runs together, all the boys

 5  and all the girls?

 6     A.    Correct.

 7     Q.    Have you ever observed any of those?

 8     A.    I believe there was one last year.

 9     Q.    Did you go do that?

10     A.    Yeah.

11     Q.    And did BPJ participate in that?

12     A.    Yes.

13     Q.    How did BPJ do?

14     A.    She didn't finish last.

15     Q.    Okay.

16           Did BPJ finish ahead of any of the boys?

17     A.    Yes.

18     Q.    And did --- how many boys was she faster than?

19     A.    I don't know the answer to that.

20     Q.    Do you know how many kids were in that

21  particular race?

22     A.    No, I don't.

23     Q.    Do you remember what the name of that event was?

24     A.    No, I don't.
```

```
 1        Q.    Do you remember where it was or what school it

 2   was at?

 3        A.    No, I don't.

 4        Q.    Okay.

 5              When BPJ --- let me back up.  BPJ, she made the

 6   team obviously.

 7              Right?

 8        A.    Correct.

 9        Q.    Were any of the other people who tried out for

10   it, did they not get on the team?

11        A.    I don't know the answer to that.  I don't know

12   --- I'm not privy to that information, as to who tried

13   out and who made it.

14        Q.    Well, I'm going to ask you this question.  I

15   think based on our discussions yesterday I think I know

16   the answer, but I'm going to ask it anyway just to make

17   sure I understand, but do you think that boys on the

18   boys cross-country team should be allowed to compete

19   against the girls on the girls cross-country team?

20        A.    If they identify as female?  Is that what you're

21   asking, if they identify as female?

22        Q.    Well, let's start with that.  If they identify

23   as female, should they be allowed to compete against the

24   girls on the girls cross-country team?
```

1    A.    Anybody who identifies as female should be able

2    to run on the girls cross-country team.

3    Q.    And as to boys who do not identify as girls,

4    should they be allowed to run on the girls

5    cross-country?

6    A.    It is not permitted at the school that she's at.

7    Q.    And do you have an opinion if they should be

8    allowed to?

9    A.    If there's a boys team, that they're running on

10   the boys team if they don't identify as female.

11   Q.    So you don't think they should be allowed to run

12   on the girls team unless they identify as a girl.

13        Is that right?

14   A.    I believe that anybody who identifies as female

15   should be able to run on the female's cross-country team

16   or track team or ---.

17   Q.    Right.  But my question is if a boy, not

18   identifying as a girl, just wants to compete against the

19   girls on the cross-country team for girls, do you think

20   that should be allowed or not?

21   A.    Is there a boys team available?

22   Q.    Yes.

23   A.    Then I would think they would run on the boys

24   team.

138

```
 1      Q.    What if they just want --- what if they just

 2   wanted to run on the girls team instead without

 3   identifying as a girl, do you think that person should

 4   be allowed to?

 5      A.    I don't know that I understand the question.

 6      Q.    Okay.

 7           We'll move on.

 8                ATTORNEY TRYON:  Let me just take a break

 9   here and determine if I can skip some of my questions

10   here to speed things up.  Give me just a moment.

11                VIDEOGRAPHER:  Do we want to go off the

12   record or just stay on?

13                ATTORNEY BLOCK:  Let's go off the record.

14                ATTORNEY TRYON:  Just a minute.  I will

15   be right back.  Just a minute.

16                ATTORNEY BLOCK:  So we're off the record.

17                VIDEOGRAPHER:  Yeah, we're off the record

18   at 12:29 p.m.

19   OFF VIDEOTAPE

20                      ---

21   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                      ---

23   ON VIDEOTAPE

24                VIDEOGRAPHER:  We are back on the record.
```

139

1    The current time reads 12:33 p.m.

2                    ATTORNEY TRYON:  Thank you.

3    BY ATTORNEY TRYON:

4        Q.    Just to clarify one thing that we were

5    discussing and you used term identify as a female.  Can

6    you tell me what you understand that means, to identify

7    as a female?

8        A.    Choose to live your life as a female because you

9    are a female.

10       Q.    So we were talking about boys and girls

11   cross-country teams and other running events.  And

12   yesterday we talked about if you were aware of any

13   statistics on how fast boys and girls can run.  I want

14   to ask you would it surprise you to know that there are

15   statistics that show on average 11-year-old biological

16   boys are about 20 percent faster than 11-yearold

17   biological girls in the one-mile run.

18                    ATTORNEY BLOCK:  Objection to form and

19   terminology.  And I will make the terminology a standing

20   objection.

21                    THE WITNESS:  I don't know that I'm

22   surprised.  I don't know that I'm not surprised.

23   BY ATTORNEY TRYON:

24       Q.    In the context of cross-country, does BPJ take

1  showers or change clothing at school?

2    A.    She changes into her uniform at school.

3    Q.    Does she use the locker room to do that?

4    A.    She uses a private bathroom by the counselor's

5  office to do that.

6    Q.    Who may use that private bathroom?

7    A.    I don't know who beside her uses that bathroom.

8    Q.    Is it just a unisex bathroom or what?

9    A.    Again, I don't know who all uses it to be boys

10  or girls or both.  I don't know.

11    Q.    Have you been in it?

12    A.    I've seen it.

13    Q.    Okay.

14          And so can you describe it for me?  Does it

15  just have one toilet in there and a sink or more than

16  that?

17    A.    Yes, just one.

18    Q.    So one person can go in there, shut the door,

19  lock it and use the facilities.

20          Is that right?

21    A.    Correct.

22    Q.    And is BPJ satisfied with that arrangement?

23    A.    She doesn't mind it.  She would rather use the

24  female facilities, but she doesn't mind it.  She says it

1   has the good toilet paper.

2       Q.    Well, that's a good reason to use it.  Is there

3   a reason that BPJ does not use the female facilities?

4       A.    She was told at the school that that was the

5   bathroom that she is supposed to use.

6       Q.    Have you objected to that arrangement?

7       A.    I have not.

8                  ATTORNEY TRYON:  Okay.

9                  It's 12:37.  I would propose to change

10  topics and move forward unless you people want to take

11  lunch now.  If I keep going forward, I would probably on

12  this next topic go until past 1:00.  So we can either go

13  for another half hour or so or we can take a break now.

14  Whatever you prefer.  Ma'am, what is your preference?

15                 THE WITNESS:  I'm fine to go another half

16  hour.

17                 ATTORNEY TRYON:  And Josh, are you okay

18  with that.

19                 ATTORNEY BLOCK:  I prefer to keep going,

20  yes.

21                 ATTORNEY TRYON:  Very good.

22  BY ATTORNEY TRYON:

23      Q.    When you first --- let me back up and ask a

24  different question.  Are you familiar with the term

1  gender dysphoria?

2     A.    Yes.

3     Q.    When did you first become aware of that term?

4     A.    When my daughter was diagnosed with gender

5  dysphoria.

6     Q.    So when BPJ was approximately three or four and

7  said I am a girl, you were not aware of that term.

8           Is that correct?

9     A.    No.  When she first told me that she was a girl,

10 I was not aware of that.

11    Q.    And how did your husband react when BPJ said

12 that BPJ was a girl, not a boy?

13    A.    How did he react to me?

14    Q.    To the announcement, whether it came from you or

15 from BPJ?

16    A.    Concerned.

17    Q.    Did he learn about it at approximately the same

18 time that you did?

19    A.    Yeah.

20    Q.    When you say concerned, can you explain that a

21 little better?

22    A.    Concerned about any sort of discrimination that

23 she may have later in life.

24    Q.    Was he at all distressed to learn that the child

```
 1   who he believed to be his son was now claiming to be a

 2   daughter?

 3                    ATTORNEY BLOCK:  Objection to the form

 4   and argumentative.

 5                    THE WITNESS:  I don't know if he was

 6   upset.

 7                    ATTORNEY TRYON:  Can you look at

 8   Exhibit 17 with me, please?

 9   BY ATTORNEY TRYON:

10      Q.    Let me know when you have that in front of you.

11      A.    I do.

12      Q.    This is fairly a short document so take a look

13   through there and let me know when you are able to

14   familiarize yourself with it.

15                    ATTORNEY TRYON:  If counsel would like us

16   to scroll through that, let me know and we'll have the

17   court reporter do that.

18                    ATTORNEY BLOCK:  I'm fine without the

19   scrolling.

20   BY ATTORNEY TRYON:

21      Q.    Have you seen this document before?

22      A.    Yes.

23      Q.    When did you first see this?

24      A.    When we filled it out.
```

144

1    Q.    Is this your handwriting?

2    A.    No, that's not my handwriting.

3    Q.    Do you know whose handwriting that is?

4    A.    The person that filled it out.

5    Q.    Okay.

6          Is that somebody at the school?

7    A.    Yes.

8    Q.    And just for the record, this a Gender Support

9    Plan dated 8/23/19.  So were you in the meeting where

10   this was filled out?

11   A.    Yes.

12   Q.    And there was some sort of meeting?

13   A.    Yes, it was individuals in a room with paper.

14   Q.    And on the last page it shows what appears to be

15   a signature of B███.  Would that be BPJ?

16   A.    Yes.

17   Q.    And at the time that this was filled out on

18   August 23, 2019, you reviewed it at that time?

19   A.    Was I what at that time?

20   Q.    Did you --- did you fill --- I'm sorry, did you

21   review it at that time?

22   A.    Yes, yes.

23   Q.    And did BPJ review it at that time?

24   A.    She didn't review the document.  She was in the

145

 1  meeting.

 2      Q.    Is there a reason that she did not review it?

 3      A.    No reason.

 4      Q.    In the first paragraph, under where it says

 5  parent/guardian involvement ---

 6      A.    Correct.

 7      Q.    --- the language there says mom very supportive,

 8  dad has struggled but coming around, seeking outside

 9  help through church and parental side of families

10  help/support?

11              ATTORNEY BLOCK:  Objection.  You misread

12  the document.

13              ATTORNEY TRYON:  Oh, I'm sorry.  What did

14  I miss.

15              ATTORNEY BLOCK:  Paternal instead of

16  parental.

17  BY ATTORNEY TRYON:

18      Q.    Ma'am, can you help me out here?  To me it looks

19  like it says paternal?

20              ATTORNEY BLOCK:  Yeah.  I think you said

21  parental unless I misheard.

22              ATTORNEY TRYON:  Oh, okay.

23  BY ATTORNEY TRYON:

24      Q.    So my question then is when it says dad

```
1   struggled, what's that referring to?

2      A.    He was concerned, but on page three it says

3   parents are supportive.

4      Q.    I understand.  We can get to page three in a

5   minute, but when it says dad had struggled, does that

6   mean that he was uncomfortable with what I'll

7   characterize as the changing of BPJ's gender?

8      A.    He was ---.

9                     ATTORNEY BLOCK:  Objection to form.

10                    THE WITNESS:  He was worried about any

11  sort of discrimination.

12  BY ATTORNEY TRYON:

13     Q.    And then but coming around, what does but coming

14  around mean?

15     A.    I don't know.

16     Q.    Well, you gave the information --- let me strike

17  that.

18         Who gave the information to the person filling

19  this out?

20     A.    I don't know if she paraphrased or what, but it

21  doesn't look like it's a quote.

22     Q.    Who gave the information to the person filling

23  this out?

24     A.    She would have been questioning me.
```

147

```
 1      Q.     Not BPJ?

 2      A.     BPJ was in the meeting, but I don't believe she

 3   was questioned directly in regards to that.

 4      Q.     The next part says seeking outside help through

 5   church.   What outside help was dad seeking through

 6   church?

 7      A.     Talking to the minister.

 8      Q.     About what?

 9      A.     Trying to reconcile religion and his daughter.

10      Q.     And what reconciliation was that?

11      A.     I don't know.  I wasn't privy to those

12   conversations.

13      Q.     Did you tell the person filling out this form

14   that dad was seeking outside help through the church?

15      A.     Yes.

16      Q.     Which church is that, by the way?

17      A.     He goes to a different church than me.

18      Q.     Do you know what denomination?

19      A.     It's the --- it's the Church of God, whatever

20   denomination that is.

21      Q.     And you don't go to that church?

22      A.     I don't go to that church.

23      Q.     But he told you that he was seeking help from

24   the church?
```

1                    <u>ATTORNEY BLOCK</u>:  Objection.  Objection

2    marital communication, privileged.

3    <u>BY ATTORNEY TRYON:</u>

4        Q.    Well, don't tell me the exact --- just tell me

5    in general if that was the purpose of seeking help.

6        A.    He was trying to reconcile religion versus his

7    daughter.

8        Q.    Do you know what that religion believes with

9    respect to this issue?

10       A.    No, I don't go to that church.

11       Q.    And then it says and paternal side of family's

12   help/support.  Can you explain what you meant when you

13   conveyed that information ---?

14       A.    They are also members of that church.

15       Q.    Down further at the bottom of that page it says

16   B███  is comfortable with others knowing her gender

17   identity and transition.  Can you explain to me what was

18   --- well, let me back up.  Does that accurately

19   represent what you told the person filling out this

20   form?

21       A.    Yes.

22       Q.    Can you explain to me a little more about what

23   that means that she's --- that B███ is comfortable with

24   others knowing her gender identity and transition?

 1      A.    Just that --- it's just that.  She is

 2   comfortable with others knowing.  She'll talk to you

 3   about it if you want to.

 4      Q.    So she's comfortable talking about the

 5   transition from being a boy to a girl?

 6              ATTORNEY BLOCK:  Objection to

 7   terminology.  I'll make that a standing objection.

 8              THE WITNESS:  She's comfortable with

 9   explaining her transgender identity.

10   BY ATTORNEY TRYON:

11      Q.    Does that include explaining that I was once a

12   boy and now I'm a girl, however --- you know, I'm not

13   trying to put it in --- those words in anybody's mouth.

14   That's the concept I'm trying to understand.

15      A.    I've never witnessed a conversation where that

16   was said.

17      Q.    Okay.

18              Then how do you know what BPJ was comfortable

19   with?

20      A.    Because I've witnessed her talking to people

21   about her transgender identity.

22      Q.    Great.  And so what have you observed her

23   saying?

24      A.    That she is transgender and that she is living

1   life as a female.

2      Q.    Anything beyond that?

3      A.    I would have to have a specific question.

4      Q.    Anything else you can remember right now?

5      A.    No.

6      Q.    On the next page ---.

7             ATTORNEY TRYON:  And Counsel, if you need

8   me to bring up the page, please say so.  Oh, great, it's

9   being brought up.  Okay.

10  BY ATTORNEY TRYON:

11      Q.    Gender will be male, do you see that part down

12  almost at the bottom?

13      A.    Oh, yeah, I see that.

14      Q.    But B▮▮▮ will be in parentheses next to birth

15  name.  So why would the gender be male?

16      A.    I think it has to do with the WEVAS System.

17      Q.    Can you explain that?

18      A.    No, I don't understand WEVAS at all.

19      Q.    Okay.

20          When this was filled out, you can see on that

21  page, for example, what name and gender marker are

22  listed on the student's identity documents, and there is

23  what we call a redaction, a black mark.

24      A.    Okay.

1   Q.   That covers up some information.  Would that

2   information have been BPJ's birth name?

3   A.   Yes.

4   Q.   So remind me, did BPJ read this document before

5   she --- before BPJ signed it?

6   A.   She was in the meeting, but she didn't read it

7   line for line, no.

8   Q.   Okay.

9        But did sign it?

10  A.   Yes.  We were to sign it that we were present.

11  Q.   On the page marked at the lower right-hand

12  corner BPJ 010, I think it's the fourth page --- yeah,

13  it says page four at the top.  See at the bottom it says

14  received training, that part there?

15  A.   Oh, okay.

16  Q.   It says Norwood staff received training on

17  tolerance and cultural diversity and LGBTQ --- I think

18  that's plus IA on 8/21.

19       Do you see that?

20  A.   Yes, I do see that.

21  Q.   Do you know what that's referring to?

22  A.   No, I don't.

23  Q.   Have you ever been provided with any further

24  information on what tolerance or cultural diversity or

1  similar training that is given to the staff?

2      A.    No.

3      Q.    Next it says and provided protocol and multiple

4  resources --- multiple resource sources.  Was that

5  meaning that you were provided with that information or

6  that was information that was provided to the Norwood

7  staff?

8      A.    To the Norwood staff.

9      Q.    Were you provided any resource sources at the

10 time that this was filled out?

11     A.    No.

12     Q.    Going back up to the first page where we talk

13 about your husband seeking outside help through the

14 church, did his views or feelings change in any way

15 after seeking that --- after getting help through the

16 church?

17     A.    He has reconciled his religion with his

18 transgender daughter.

19     Q.    Did he explain to you how?

20     A.    No.

21     Q.    Let me ask you to look at Exhibit 11C.  In fact,

22 ma'am, if you could grab 11A, B, C and E.  And I

23 apologize let me look at 11D first, D as in David.  So

24 take a look at this, and I'll ask you a few questions

153

1    about it.

2         A.    Go ahead.

3         Q.    Okay.

4              And for the record, Exhibit 11D, at the top is

5    --- has the name of Andrew James Spurr, M.D., and it

6    says progress notes and it says encounter date, December

7    16, 2020.  Do you see that at the top, ma'am?

8         A.    Yes.

9         Q.    I want to make sure we are looking at the same

10   thing together.  And it says history obtained from

11   mother --- well, let me back up.  First of all, have you

12   ever seen this document before?

13        A.    No.

14        Q.    Do you remember --- it says on here, history

15   obtained from mother.  B█████ was not present for this

16   tele-medicine visit.

17             Do you see that?

18        A.    Yes.

19        Q.    Do you remember this --- that you had --- were

20   involved in this tele-medicine visit, as it says?

21        A.    Yes.

22        Q.    And I want to direct you to the next paragraph

23   that says B████is very happy with stopping puberty.  Is

24   that something that you reported to the doctor?

154

1      A.     Yes.

2      Q.     And it was directed to the doctor not, someone

3  else?

4      A.     To Andrew James Spurr.

5      Q.     Right.  How did you come to speak with Andrew

6  James Spurr?  How did you find him as a doctor?

7      A.     He was on --- he was just on that call as a

8  resident.  I don't know how he got assigned to us.  It's

9  the one and only time he was ever assigned to us.  I

10 don't know if Dr. Montano was out or what.

11     Q.     So Dr. Spurr is in Dr. Montano's office?

12     A.     I would presume so, yes.

13     Q.     It says she, referring to B████, wants to know

14 when she can start hormone therapy.  Were you told

15 anything in response to that?

16     A.     I was not told anything in response to that.

17     Q.     Next it says wants to get breasts and get rid of

18 her penis.  You reported that to the doctor?

19     A.     Correct.

20     Q.     And did he have any response to that?

21     A.     No.

22     Q.     You next said she is experiencing dysphoria ---

23 strike that.

24            The document says she is experiencing dysphoria

```
 1    with leg growth hair.  Did you use that terminology with

 2    the doctor?

 3                    ATTORNEY BLOCK:  Objection, misread the

 4    text.

 5    BY ATTORNEY TRYON:

 6        Q.    Let me try again, she is experiencing dysphoria

 7    ███████████████████.  Did you use the term dysphoria

 8    when speaking to the doctor?

 9        A.    He used the term dysphoria.

10        Q.    And what terminology did you use when you spoke

11    to the doctor?

12    ██   ███████████████████████████████████

13    ██████████

14    ██   ███████████████████████████████████

15        A.    Correct.

16    ██   ███████████████████████████████████

17    ████████████████    And did you, in fact, tell the doctor

18    that?

19        A.    Yes.

20        Q.    And when --- so this is --- the encounter date

21    is December 16, 2020.  ████████████████████

22    ████████████████████████

23        A.    I don't know the date that he said it.  The date

24    --- the encounter date is just the date of the
```

```
 1   appointment.

 2       ██       ████████████████████████████████████████

 3   ███████████

 4       A.    I'm guessing yes.

 5       Q.    And he said that to BPJ?

 6       A.    Correct.

 7       Q.    Why did he say that?

 8       A.    I don't know.

 9       Q.    Did you observe it?

10       A.    I observed the aftereffects.

11       Q.    So you didn't actually hear him say that?

12       A.    No, she came and reported it to me.

13       Q.    She being BPJ?

14       A.    Correct.

15       Q.    What did BPJ say about it?

16       A.    She was crying and was upset.

17       ██       ████████████████████████████████████████

18       A.    According to her.

19       Q.    What did that mean to BPJ?

20                   ATTORNEY BLOCK:   Objection.   Calls for

21   speculation.

22                   THE WITNESS:   I just know that it upset

23   her, that she was crying and was upset.

24   BY ATTORNEY TRYON:
```

1    ███   █████████████████████████████

2    █████████████████████████████████████

3    ████████████

4        A.    I don't know what they were doing outside.  I

5    know they were outside because she came inside.

6        Q.    Has your husband ever said that to BPJ before

7    that, to your knowledge?

8        A.    To my knowledge, no.

9        Q.    Did BPJ say he said this to me before, or this

10   is the first time, or any other discussion about it?

11       A.    No other discussion about it.

12       Q.    This just seems odd to me, so maybe I'll just

13   ask the question.  ███████████████████████

14   ███████████████████████

15       A.    Yeah.

16       Q.    Why would that be reported?

17       A.    ██████████████████████████████████

18   ████████████████   My guess is he didn't read the case

19   file.

20       Q.    Okay.  Okay.

21       ██████████████████████████████████

22   █████████████████████████████████████

23   Who's that transgender psychologist?

24       A.    There was one locally, but he left after ---

1    during the COVID session and I never did get to see him.

2       Q.    Who was that?

3       A.    I don't know what his name was.

4       Q.    And has --- have you ever found a transgender

5    psychologist?

6       A.    We have found a psychologist that specializes in

7    transgender care.

8       Q.    Who is that?

9       A.    Doctor Matthew Bunner.

10      Q.    When is the first time that you saw Doctor

11   Matthew Bunner?

12      A.    I don't know.  It would be in the medical

13   records, but I don't know the date off the top of my

14   head.

15      Q.    All right.

16            Well, then we will find it in the medical

17   records in a bit.  Was there a reason that B█████ was not

18   present for this tele-medicine visit?

19      A.    I was out of town.  My dad died.

20      Q.    Sorry about that, by the way.

21            So prior to this appointment you had not ---

22   let me rephrase that.  Prior to this appointment --- or

23   this encounter on December 16, 2020, BPJ had not yet met

24   with a psychiatrist or a psychologist.

```
 1              Is that right?
 2      A.     Yeah, correct.
 3      Q.     And is Doctor Matthew Bunner, is he a
 4  psychiatrist or psychologist?
 5      A.     I'm not sure of his credentials.
 6      Q.     Prior to this data, ████████████████████
 7  ████████████████████████████       Do you believe that
 8  to be accurate date, more or less?
 9      A.     That's accurate.
10      Q.     Do you know what a ██████████████  is?
11      A.     Yes, it's a hormone blocker.
12      Q.     Can you describe for the record how that's
13  implanted?
14      A.     The skin is separated from the tissue below it
15  and it's slid in underneath the skin and secured with a
16  suture.
17      Q.     And where on the body?
18      A.     Where is hers?
19      Q.     Yes.
20      █████  ████████████████████████████████████████
21  ████████████████████
22      Q.     Well, I don't know where ████████████, but
23  it gives me a good idea.  Thank you.
24              And then how long is that supposed to last?  Do
```

160

```
1    you need to replace it at some point?

2       A.    It will have to be replaced at some point.

3       Q.    Do you know how long?

4       A.    It depends on her labs.

5       Q.    Were you given a general time period for whether

6    it's a year, two years, six months?

7    ████  ████████████████████████████████████████████

8    ████████████████████████

9       Q.    So from what I understand from what you told me,

10   then ████████████████████  before BPJ met with a

11   psychologist or psychiatrist.

12           Is that right?

13      A.    Correct.

14      Q.    Is there a reason you didn't wait to talk to a

15   psychologist or psychiatrist before doing this ---

16   taking this action?

17      A.    We couldn't get in anywhere because of COVID.

18      Q.    Is that the only reason?

19      A.    Yes.

20      Q.    Did you feel it was important to actually have

21   BPJ meet with a psychiatrist or psychologist before

22   taking this action?

23           ATTORNEY BLOCK:  Objection to form.

24           ████████████.  ████████████████████
```

```
1    ████████████████████████████████████████████████

2    BY ATTORNEY TRYON:

3        Q.    Are you familiar with the Tanner stages?

4        A.    With what?  I'm sorry.

5        Q.    The Tanner stages, T-A-N-N-E-R?

6        A.    I'm not sure.

7        Q.    Can you look at Exhibit 11A, please?

8        A.    11A.  Oh, yeah.

9        Q.    Okay.

10             Take a look at that document and let me know

11   when you're ready.  I just have a question or two.

12       A.    Okay.

13       Q.    All right.

14             ████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ██████████████████████████  She has been followed up

17   for gender dysphoria with desire to start hormone

18   blockers, ██████████████████████████████  Does

19   that refresh your recollection what the Tanner stage one

20   means?

21       A.    Yes.

22       Q.    What's your understanding of that?

23       A.    They take --- it almost looks like a beaded

24   necklace, but it's different size representation of
```

 1   testicular formation and they compare it to her testes

 2   in order to see what stage they are.

 3       Q.    What's the purpose of that?

 4       A.    To measure the testes.

 5       Q.    And is --- why do that?

 6       A.    Because it's a sign of puberty.

 7       Q.    And is there a particular Tanner stage that you

 8   need to be at in order to get the hormone blocker?

 9       A.    I do not know the answer to that.  I'm not sure

10   which stage you must be at.

11       Q.    Is that indicative --- do they use that in some

12   fashion to determine when you insert a --- or start

13   using the hormone blockers?

14       A.    They use it as a sign for puberty.

15       Q.    And does puberty have something to do with when

16   you --- well, let me just ask it this way.  As I

17   understand it, before --- the doctors do not want to use

18   hormone blockers until you start into puberty Tanner

19   Stage 2?

20       A.    Okay.

21       Q.    Do you have any information on --- do you

22   believe that is accurate or not?

23       A.    I don't know.

24       Q.    Okay.

1           When you --- let me rephrase that.  Did both

2    you and BPJ meet with the doctor, a doctor to discuss

3    the pros and cons or any side effects of using hormone

4    blockers?

5        A.    Yes.

6        Q.    So would that have been just you or would BPJ

7    have been involved as well?

8        A.    B█████ would have been involved as well.

9        Q.    How about your husband?

10       A.    He was working.  I would have to relay the

11   information after I got back from the doctor.

12       Q.    And did you relay that information to him?

13       A.    Yes.

14       Q.    Was he okay with using hormone blockers?

15       A.    We read like the package insert information.

16       Q.    Okay.

17       A.    To look at the possible side effects.

18       Q.    And what were the possible side effects,

19   according to that insert?

20       A.    Some of them off the top of my head was

21   decreased size in testes, osteoporosis.

22       Q.    Were you concerned about the side effects?

23       A.    The benefit outweighed the risk.

24       Q.    And what was the risk?  Those side effects?

1    A.    The risk would be the side effects.

2    Q.    And what was the benefit?

3    A.    The benefit would be help with her transition.

4    Q.    Explain what you mean by transition.

5    A.    To live her life authentically, to stop the male

6    hormones.

7    Q.    What would the male hormones do as you

8    understand it?

9    A.    Male hormones would cause her penis size to

10   increase, her testicle size to increase, body hair to

11   start forming, Adam's apple would start forming, her

12   voice would change.

13   Q.    And those are all things that you wanted to

14   avoid happening?

15   A.    She wanted to avoid happening.

16   Q.    How about you, did you care one way or the

17   other?

18   A.    I wanted her to live her most authentic life.

19   Q.    What did you mean by that, her most authentic

20   life?

21   A.    I wanted her to be able to live as a female, as

22   she wished to live.

23   Q.    Why does that make it her authentic life?

24   A.    Because she's a girl.

1    Q.    Okay.

2          So I'm done with this exhibit.

3                ATTORNEY TRYON:  I'm finished with

4    Exhibits 11A, B, C and D, so we can put those aside.

5    It's 1:15.  This would be a convenient place to stop if

6    we want to for lunch.  Would you like to do that, ma'am,

7    or do you want to keep going?

8                THE WITNESS:  I need a break to use the

9    restroom.

10                ATTORNEY TRYON:  Would you like to take a

11   half an hour for lunch?

12                THE WITNESS:  Sure.

13                ATTORNEY TRYON:  Okay.

14                Everybody else is good with that?

15                ATTORNEY DENIKER:  That's fine.

16                ATTORNEY BLOCK:  See you at 1:45.

17                VIDEOGRAPHER: Going off the record.  The

18   current time is 1:15 p.m.

19   OFF VIDEOTAPE

20                      ---

21   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                      ---

23   ON VIDEOTAPE

24                VIDEOGRAPHER:  We are back on the record.

```
 1   The current time reads 1:47 p.m.
 2   BY ATTORNEY TRYON:
 3      Q.    Let's go to Exhibit 14, if you wouldn't mind,
 4   ma'am.  This Exhibit 14 is a group of medical records.
 5   Take your time and look through there and let me know
 6   when you're finished and then we'll come back to the
 7   first couple of pages for some questions.
 8                         ---
 9   (WHEREUPON, WITNESS REVIEWS DOCUMENT.)
10                         ---
11             THE WITNESS:  I've read the first page.
12   BY ATTORNEY TRYON:
13      Q.    Are you finished?
14      A.    Yes.
15      Q.    Great.  Let me go back and first ask you a
16   question on page two of the document on the bottom that
17   says page three?
18      A.    Okay.
19   ██ ████████████████████████████████████████████████
20   ████████████████████████████████████████████████████
21   ████████████████████████████████        Before I ask
22   you a question about that let me just back up.  So this
23   appears to be from an office visit with a Jean
24   Someshwar.
```

167

```
 1            Is that right?
 2       A.    Yes.  That's about as good as I can pronounce
 3  it.
 4       Q.    Were you in attendance at this meeting?
 5       A.    Yes.
 6       Q.    Was BPJ in attendance?
 7       A.    Yes.
 8       Q.    So then going back to my question, what I just
 9  read on the second page, where it's marked as page three
10  on the bottom.  ███████████████████████████████
11  ████████████████████████████████████████████ Do
12  you --- did you or BPJ say something that triggered this
13  note?
14       A.    BPJ.
15       Q.    And what did BPJ say that you believe triggered
16  this note?
17       A.    Well, it's in quotes, so I'm saying that she
18  said that.
19       ███  ██████████████████████████████████████████
20  ██████████████████
21       A.    Yeah.
22       Q.    What does that mean?
23       A.    I'm going to guess when they are in fights or
24  spats.
```



```
 1

 2

 3    A.    Probably have to ask Becky that one.

 4    Q.    Did she expound at all during this meeting?

 5    A.    Not according to the notes.

 6    Q.    I'm asking you from your memory?

 7    A.    I don't remember.

 8

 9

10    A.    Yes.

11    Q.    I'm sorry?

12    A.    Yes.

13    Q.    And what does that mean?

14    A.    To me?

15    Q.    Yes.

16    A.    To me I would say that you would use it to lash

17 out at somebody.

18

19

20                                    I don't know.

21    Q.    Did you observe anything like this?

22    A.    No.

23

24
```

1    A.    Not to me.

2    Q.    Are you aware of BPJ saying this to anyone else?

3    A.    No.

4    Q.    Back on page one, starting --- let's go back up

5  on the screen.  Let's see.  Okay, that's right.  ██████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ████████████████████    How did you locate Dr. Montano in

10  Pittsburgh?

11    A.    Doctor Montano came to me through

12  recommendations from friends.

13    Q.    Excuse me, what friends?

14    A.    Friends that we know, one of which has a

15  transgender male child.

16    Q.    And who is that?

17    A.    I only know her first name.

18    Q.    Which is?

19    A.    Carolyn.

20    Q.    Does Carolyn live --- well, where does Carolyn

21  live?

22    A.    Clarksburg.

23    Q.    Just for the record, how far is Clarksburg from

24  where you live?

170

```
 1      A.    Oh, maybe 30 minutes.

 2      Q.    And how do you know Carolyn?

 3      A.    I met her through the PFLAG Group in Morgantown.

 4      Q.    So what does PFLAG stand for?

 5      A.    I don't know.

 6      Q.    What is the PFLAG Group?

 7      A.    The group that I attend is a group of parents

 8  who have transitioning children.

 9      Q.    Did BPJ attend meetings with a different PFLAG

10  group?

11      A.    No.

12      Q.    At the bottom of this page, towards the bottom,

13  if you could scroll down.  Okay.  Right there.  It says

14  family was going to PFLAG meetings.  But due to COVID,

15  meetings had been virtual B███ misses seeing her PFLAG

16  friends in person.  So was B███ going to the same

17  meetings as you?

18      A.    Yes.

19      Q.    You indicated that the group you went to was for

20  parents?

21      A.    Parents with children who were transitioning.

22  So the parents would meet and the children would play.

23      Q.    So the children would play like what?

24      A.    On the playground.
```

```
 1      Q.    Okay.

 2            And they are both boys and girls?

 3      A.    Yes.

 4      Q.    That's kind of a weird question, given the

 5   context, so I'm not quite sure.  Would it include --- I

 6   guess it would be trans boys and trans girls.  Is that

 7   the proper way to say that?

 8      A.    It includes just gender boys and girls and

 9   transgender boys and girls.

10      Q.    Very good.  So in these meetings what did the

11   parents talk about?

12      A.    The issues that we might have in the community,

13   like in our churches or in finding daycare or in support

14   groups.

15      Q.    And you said something that I didn't understand.

16   You said parents with children that are transitioning,

17   which suggests they are in the process of making a

18   transition.  Is that what that means?

19      A.    Yes.

20      Q.    And so what is that process of transitioning?

21      A.    Well, with every parent and child, that's ---

22   that's up to them.

23      Q.    Can you explain in broad terms what that

24   transitioning process is?
```

1      A.      Identifying as your gender identity and living

2   authentically.

3      Q.      So simply, stating that you are a different

4   gender than your birth gender.  Is that all that's

5   required for that transitioning process?

6      A.      That's how it can start.

7      Q.      Okay.

8              So that's how it starts, but what happens after

9   that?

10     A.      Like I said, with every parent and child it's

11   going to be different.  With their cases, it may be

12   different than my case.

13     Q.      And with your case then, tell me about that.

14     A.      Okay.

15             Well, she presented around age three or four

16   wearing my clothes, wearing my shirts as dresses, not

17   wanting to sit to urinate.

18     Q.      So that's part of the transitioning process?

19     A.      I'm sorry?

20     Q.      You're saying that's part of the transitioning

21   process?

22     A.      That was part of B███████ transitioning process.

23     Q.      Thank you for that clarification.

24             Let's see.  Back up a little.  ██████████████

173

4          Do you see that?

5     A.    I'm looking.

6     Q.    It's about the middle of that paragraph.

7     A.    Okay.  I see it.

8     Q.    I can point it out on the screen, but you found

9  it.

10    A.    Yeah, I found it.

11    Q.    So tell me about the process for a legal name

12 change to the extent that you know about it.

13    A.    Well, it involves a lot of documents with

14 legalese on it that's very difficult for me to weave my

15 way through.  But for the name change process, we have

16 to fill out a form, several forms.  They have to be

17 notarized, filed with the Circuit Court, then it goes

18 before a Judge, as I understand it.

19    Q.    And what have you done in that --- you or BPJ

20 have done in that process?

21    A.    We've gotten forms.  We've gotten them

22 notarized.  Wes has got to get his notarized, which he

23 is supposed to be getting done today.  And then we go up

24 to the Courthouse to submit it with $200.

1    Q.    Do you know of anything else beyond that?

2    A.    That's all I know so far.

3    Q.    So why have you waited until now to do that?

4    A.    Because it's been very hard for me to understand

5    and try to figure out what the documents are saying.

6    The first time I filled them out I filled them out

7    incorrectly.

8    Q.    How did you find out you filled them out

9    incorrectly?

10   A.    I took them up to the Circuit Court and they

11   said you did it wrong.

12   Q.    Okay.

13         And when was that?

14   A.    A couple of weeks ago.

15   Q.    So why did you wait until a few weeks ago to

16   start the name change?

17   A.    I'm been overwhelmed by the forms.

18   Q.    When did you first get the forms?

19   A.    I've had the forms for probably six months.

20   Q.    Okay.

21         So just to help me out, I'm not trying to

22   insult you or anything, but I'm just trying to

23   understand because you --- because BPJ changed BPJ's

24   name to B█████ several years ago.

175

```
 1          Right?

 2     A.   Correct.

 3     Q.   And so why didn't you and/or B███   move forward

 4  at that time?

 5     A.   We were deciding on middle names.

 6     Q.   Have you decided on any middle name?

 7     A.   Yes, we have.

 8     Q.   What is that?

 9     A.   It will be Maranlynn.

10     Q.   So you spent the past several years just working

11  on a middle name.

12          Is that right?

13     A.   Yes.

14     Q.   You're laughing about that.  Why?

15     A.   Because she didn't want the name Meridan and I

16  wanted the name Maridan, so we came to a compromise that

17  it is Maranlynn.  Plus the Lynn comes from her uncle and

18  she wanted to ask her uncle permission to use his middle

19  name as her middle name.

20  ██   ████

21       ████████████████████████

22  ████████████████████████  ███████

23  █████████████████████  Can you explain

24  that to me, please?
```

1    A.    I don't know what ███████████ mean.

2  That would be a doctor term.

3  ███  █████████████████████

4  ████████████████████████████████

5  What is your understanding of what that hormone therapy

6  is?

7    A.    She can either get implants or injections and

8  get hormones, female hormones, start female hormones.

9  It depends on her labs and if she goes into

10  osteoporosis.  If she goes into osteoporosis from the

11  ███████████, she would have to start hormones

12  sooner.

13    Q.    And what would those hormones do?

14    A.    It would help her live authentically as a

15  female.

16    Q.    You need to be more specific.  Would those

17  hormones cause physical changes to BPJ's body?

18    A.    Yes.

19    Q.    What would those physical changes be?

20    A.    She could grow breasts.

21    Q.    Just to be clear, you say she could grow

22  breasts.  Would it actually trigger breast growth?

23    A.    Isn't that the same thing?

24    Q.    You said could, which is a possibility.  I'm

177

1  asking if that is, in fact, ---.

2      A.    I'm not a doctor.  I'm going to guess that

3  that's, you know, could be.

4      Q.    No, I just want to understand --- make sure

5  we're communicating.  And I think we are, so thank you.

6  ███████████████████████████████████████████   Is that

7  what she said?

8      A.    That's her words.

9      Q.    And we talked about this a little bit before,

10 but ██████████████████████, do you know what that means?

11    ██   ████████████████████████████████████████████████

12 ████████████████████████

13     Q.    Do you know what age that is or what triggers

14 that?

15     A.    I don't know at what age it's legal in the State

16 of West Virginia.

17     Q.    So is that the only thing that would stop it

18 from happening sooner is just the legal age part?

19                 ATTORNEY BLOCK:  Objection to form.

20                 THE WITNESS:  And if she was medically

21 able to.  If she has reached all of the milestones that

22 she's supposed to reach, being a transgender female on

23 hormone blockers, on hormone replacement therapy.

24 BY ATTORNEY TRYON:

1    Q.    Do you know how that is accomplished?

2    A.    Well, they take the penis and they split it

3  almost like a banana and they peel back the skin and

4  they take all of that and they put it into a cavity

5  inside the pelvis and create a vagina out of the

6  erectile tissue from the penis.

7    Q.    I guess the answer's yes.  Is she aware that

8  that is what the procedure is?

9    A.    Yes.

10    Q.    Was that --- who explained that to BPJ?

11    A.    I did.

12    Q.    And what was BPJ's reaction?

13    A.    Ouch.

14    Q.    That exact word?

15    A.    Yep.

16    Q.    After you explained that did BPJ still want to

17  proceed?

18    A.    Yep.

19    Q.    So I just want to go back to your discussions

20  with Carolyn I think it was who recommended Dr. Montano.

21  Do I remember that correctly?

22    A.    Yes.

23    Q.    And what exactly did Carolyn say about Dr.

24  Montano?

```
 1      A.    That he specialized in transgender care.

 2      Q.    Did you receive recommendations for any other

 3  doctors that specialized in transgender care?

 4      A.    He was the only one that we could find in the

 5  area that specialized in transgender care.  He is quite

 6  good.

 7      Q.    When you say he is quite good, what do you mean?

 8      A.    He is very good working with B█████  He talks to

 9  her on her level.

10      Q.    So did you review any other doctors for

11  specializing in transgender care before settling in with

12  Dr. Montano?

13      A.    Nope.

14      Q.    And then you then decided to change doctors.

15            Is that right?

16      A.    Right.

17      Q.    And why is that?

18      A.    Doctor Kidd is practicing closer to home and

19  she's within my healthcare network.

20      Q.    Did you interview with anybody else to see if

21  you wanted to use someone else instead?

22      A.    Nope, she's the only one in my area.

23      Q.    Are you satisfied with Dr. Kidd so far?

24      A.    Yes.
```

180

 1    Q.    How many meetings have you and/or BPJ had with

 2   Dr. Kidd?

 3    A.    Two.  We were introduced to her in group with a

 4   bunch of --- with that Dr. Someshwar.  We were

 5   introduced in a group there and then one on one with her

 6   later on.

 7    Q.    Can you turn to --- it's marked at the bottom as

 8   page seven?  It also has what is called Bates stamp BPJ

 9   152 at the bottom.

10              ATTORNEY TRYON:  And if the court

11   reporter would put that up.

12              THE WITNESS:  Okay.

13   ███████████████

14    ███   ████

15       █████████████████████████████

16   █████████████████████████████████

17   ████████████

18      █████████████

19    ██   ███

20    █   ██████████████████████████████

21   ████████████████   ███████████████

22   ███████████████████████████

23   █████████    This was something that you reported or BPJ

24   reported?



```
 1
 2
 3
 4
 5
 6
 7
 8
 9    Q.    And that was as of April of 2021?

10    A.    Yeah.

11
12
13
14          Is that a fair statement or not?

15               ATTORNEY BLOCK:  Objection to form.

16               THE WITNESS:  Not.  I wouldn't say that.

17    BY ATTORNEY TRYON:

18    Q.    Okay.

19
20
21
22
23
24
```

1    ██  ███

2    ██        ████████████████████████████

3    ████████████        Both you and BPJ were in this

4    particular meeting.

5            Is that right?

6    A.     Correct.

7    Q.     And do you know if this statement came from

8    something that you said or that BPJ said?

9    A.     I don't know.

10                   ATTORNEY BLOCK:   Objection to the form.

11   BY ATTORNEY TRYON:

12   Q.     I'm a little confused as to this form, so it's

13   unclear to me if this is from a discussion with Mr.

14   Bunner or with Dr. Someshwar.

15           Do you know?

16   A.     This whole note?

17   Q.     This particular paragraph anyways?

18   A.     Oh, well it would be in the same notes as the

19   whole packet from the WVU Healthcare University Town

20   Center.

21   Q.     Right.   So maybe I can ask the question a little

22   better perhaps.   When you went to this appointment on

23   April 1st, 2021, who did you meet with?

24   A.     I don't know who this note is from.   I don't

183

 1   know.  It says progress note continued.  I don't know

 2   where the first page is.

 3       Q.    Okay.

 4             The first page would be the prior page that

 5   appears to me, but let me ask you if you met on this

 6   occasion with Matthew Bunner?

 7       A.    I don't know who this meeting was with.

 8       Q.    Do you remember a meeting on --- I mean, this

 9   reports a meeting that you've just indicated to me that

10   you attended?

11       A.    Yes.

12       Q.    Okay.

13       A.    Yes.

14       Q.    Okay.

15       A.    I've been to a lot of doctors' appointments and

16   I don't know which doctor this is from.

17       Q.    Okay.

18       A.    It doesn't say.

19       Q.    Well, it has two names throughout the documents.

20   One is --- if you go to the prior page, on page six, I

21   will let the court reporter bring that up.  Towards the

22   top it says I saw and examined the patient.  I received

23   resident's note.  I agree with the findings and plan of

24   care as documented in the resident's note.  Any

 1    exceptions/additions are edited/noted.  Jean Someshwar.

 2        A.    Jean Someshwar (corrects pronunciation).

 3        Q.    Thanks.

 4        A.    So this note would be from Dr. Someshwar or

 5    however you pronounce it.

 6        Q.    But then down below it says progress notes by

 7    Bunner, Matthew, LPC?

 8        A.    Okay.

 9        Q.    So let me first ask, do you specifically

10    remember meeting with Jean Someshwar?

11        A.    I remember being in one meeting with him, yes.

12        Q.    Is Jean a man or a woman?

13        A.    I don't know how they identify as.

14        Q.    Okay.

15              But you said --- all right.  And Matthew

16    Bunner, do you know who Matthew Bunner is?

17        A.    Yes, I do.

18        Q.    In the middle of the page here it refers to

19    editor being Matthew Bunner and the author as being

20    Matthew Bunner.

21        A.    Okay.

22        Q.    So it appears --- and correct me if I'm wrong,

23    but it appears that Mr. Bunner also met with you on that

24    date?

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 132 of 674

185

1      A.    Yes, there was a group of people there.

2      Q.    Who else was there besides Mr. Bunner and Jean

3   Someshwar?

4      A.    I don't know.

5      Q.    Was there others?

6      A.    Yeah.  There was nurses.

7      Q.    Was this all one big meeting or separate

8   meetings?

9      A.    It was a big group.  It was B███ and I in a

10  room with these people.

11     Q.    How many people?

12     A.    I don't remember.

13     Q.    Can you give me --- more than five?

14     A.    I don't remember.

15     Q.    At the bottom of page seven, under procedure, do

16  you see that?

17     A.    Yes.

18  ██ ████████████████████████████████████████████████

19  ██████████████████████████  Do you remember that procedure

20  as represented there?

21     A.    I don't remember that.

22     Q.    Then next it says provided assessment/treating

23  utilizing some or all interventions below from WPATH

24  standards of care version seven.

1          Do you see that?

2     A.    Yes.

3     Q.    Do you remember that assessment being or

4     treatment being provided to you?

5     A.    I don't know what WPATH Standards of Care

6     version seven is.

7     Q.    Have you ever --- so have you ever heard that

8     term WPATH Standards of Care?

9     A.    No.

10    Q.    And you've never seen the document just titled

11    WPATH Standards of Care?

12    A.    No.

13    Q.    First item under there is one, directly assess

14    gender dysphoria in children and adolescents.  Was that

15    discussed with you?

16    A.    It looks like it was an assessment on their

17    part.

18    Q.    And was that assessment when they were

19    discussing it to you and BPJ?

20    A.    I presume that they made their assessment based

21    on their interview.

22    Q.    And do you know what their assessment was?

23    A.    No.

24    Q.    Do you remember what was discussed in that

187

 1  interview?

 2     A.    Well, if I go to the first page I can read what

 3  was discussed.  But other than that ---.

 4     Q.    You don't have any independent recollection?

 5     A.    No.

 6     Q.    If you could go to the next page marked

 7  page eight.

 8     A.    Okay.

 9     Q.    At the top it's got Item Number 4, it talks

10  about referring adolescents for additional physical

11  interventions.  And the second sentence says the

12  referral should include documentation of an assessment

13  of gender dysphoria and mental health, the adolescent's

14  eligibility for physical interventions outlined below,

15  comma, the medical health professional's role and

16  expertise and any other information pertinent to the

17  use, health and referral for specific treatments.  Are

18  you aware of any such referral?

19                    ATTORNEY BLOCK:  Objection to the form.

20                    THE WITNESS:  She already had blockers.

21  BY ATTORNEY TRYON:

22     Q.    Understood.  This is not limited to puberty

23  blockers.

24  ████  ████████████████████████████████████████████████

188

1   ███████████████████████████████████████████

2   ██████████████████████

3        Q.    Right.  Do you anticipate a referral for any

4   other physical interventions?

5        A.    I don't know the answer to that.

6        Q.    Prior to getting the puberty blocker, was there

7   documentation of BPJ's --- strike that.

8             Let me start that over.  Prior to getting the

9   puberty blocker, ███████████████████  was there, to your

10  knowledge, an assessment of gender dysphoria and mental

11  health of BPJ?

12       A.    The assessment was made by Dr. Montano.

13       Q.    Do you know what documentation there is for that

14  assessment?

15       A.    No, I don't.

16       Q.    Earlier in this deposition I asked you if you

17  have documentation, and you said you have documents.

18  What documents do you have relative to BPJ's gender

19  dysphoria?

20                 ATTORNEY BLOCK:  Objection, MT.

21                 THE WITNESS:   I have copies of her

22  Gender Care Plans given to me by the schools.  Is that

23  what you mean?

24  BY ATTORNEY TRYON:

1    Q.    I'm just asking a broad question to see what

2   documents you have.

3    A.    Oh, off the top of my head, I don't have them

4   with me.

5    Q.    Okay.

6         And off the top of your head you mentioned the

7   plan assessments from the schools.  Anything else?

8    A.    I have --- I have the Gender Care Assessment ---

9   or Gender Care Plans from Norwood and I got one from

10   Bridgeport.  I have those.  And I have some copies of

11   partial of her records from UPMC that I gave to Dr. Kidd

12   at WVU.

13    Q.    Have you shared those documents with your

14   counsel?

15    A.    They're here.

16    Q.    Okay.

17         So the documents --- when you say here you mean

18   in the conference room there?

19    A.    Yes, they're with your exhibits.

20    Q.    Okay.

21         Any other documents that are not with the

22   exhibits that you've seen so far that you think you have

23   in your possession?

24    A.    No, I don't have anything other than what I

190

1   said.

2       Q.    If you go to what's now page nine.

3       A.    Okay.

4   ███ ███████████████████████████████████████████████

5   ██████████████████████████████████

6       A.    Yes.

7       Q.    Is that what that represents, ████████████?

8       A.    █████████████████████████████████    It's

9   definitely not mine.

10  ███ ███████████████████████████████████████████████

11  ██████████████████████

12            Right?

13      A.    Correct.

14      Q.    And this is measured --- do you see down below,

15  at the bottom of that little chart, it says for boys?

16      A.    Where does it say that at?

17      Q.    So I'll just point with the cursor.  It's kind

18  of hard to see on the screen, but right here.  On the

19  hard copy that I have it's a little clearer?

20      A.    I don't see the cursor moving on my screen.  Oh,

21  now I do.

22            VIDEOGRAPHER:  To move the cursor on your

23  screen you have to click first and then you can move it.

24            ATTORNEY TRYON:  Oh.

```
 1                    VIDEOGRAPHER:  There you go.

 2                    THE WITNESS:  If you say that's what it

 3   says then I can't read that, but ---.

 4   BY ATTORNEY TRYON:

 5       Q.    Okay?

 6       A.    And I have it in this copy, too, and I can't

 7   read it there either.

 8       Q.    Yeah.  You know, I understand because I have a

 9   copy under which is probably a copy and you have a ---.

10       A.    A copy of a copy.

11       Q.    But it does say --- in mine it says --- I can't

12   read all of it.  ████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████  ██████████████████████████  ████████

15   ████████████████████████████████████████████████████

16   ████████  ████████████████████████████████████

17   ████████████████████████

18       A.    You would have to ask them.

19       Q.    That was never discussed with you, I take it?

20       A.    No.

21       Q.    I will just note for the record on BP --- within

22   this document there is on Bates stamp BPJ 162 --- you

23   don't need to look at it, but there are some markings on

24   that page that says Dr. Brunner/Dr. Someshwar, and it
```

192

1   says 2021.  I belive those are handwritten notes.  Those

2   were not on the original.  Those are my notes only.  My

3   apologies.  Those should have been taken off before this

4   started.

5                    VIDEOGRAPHER:  I'm sorry.  Did you want

6   me to scroll to that one?

7                    ATTORNEY TRYON:  No, unless somebody else

8   wants to see it.  But that's just for the record, so if

9   people see that in the future, they can say --- they can

10  understand what that is.

11                   VIDEOGRAPHER:  Okay.

12  BY ATTORNEY TRYON:

13      Q.    Let me go back to Exhibit 1.  If you could take

14  a quick look through here.  I don't have any specific

15  questions.  I just have a general question.  If you want

16  to take a look through there.

17      A.    Okay.

18      Q.    So these documents came from the local Board of

19  Education as part of this discovery process.  I think

20  that's right.  Yes.  And I apologize, West Virginia 1-R

21  you have got to look at.

22      A.    Let me grab that.

23                   ATTORNEY BLOCK:  Do you have a Bates

24  number for that?

193

```
1                    ATTORNEY TRYON:  HBCBOE 00075.

2                    ATTORNEY BLOCK:  Thank you.

3    BY ATTORNEY TRYON:

4       Q.    So my question on this, first of all, is so

5    these are medical records from the Davis Medical Center.

6    The date of the visit appears to be May 13, 2014.  And I

7    believe I saw something in here that indicated that

8    these were given to the school in 2016.  And I was

9    interested to know if you recall why these were

10   submitted to the school at that time?

11                   ATTORNEY BLOCK:  Objection.  Foundation.

12                   THE WITNESS:  The school requires their

13   vaccination records and their oral evaluations.

14   BY ATTORNEY TRYON:

15      Q.    What do you mean by oral evaluations?

16      A.    Their dentist.

17      Q.    Oh, okay.  So this has more information than

18   just the vaccinations.  Were you just being

19   overinclusive when you sent this to them?

20      A.    I just gave them the well child visit.

21      Q.    Okay.

22            If you could turn to Exhibit 3, please.  Do you

23   know --- never mind.  We don't need Exhibit 3.  Exhibit

24   4?
```

194

1    A.    Exhibit 4.  Okay.

2    Q.    Take a look through there and then I will have a

3  few questions.

4    A.    Okay.

5    Q.    At the top it says that it's from UPMC

6  Children's Hospital of Pittsburgh and it says adolescent

7  medicine evaluation.  And the child listed is P███████

8  J██████.  The first name is blocked out.  It references

9  male, age nine years old.  And then down below it has a

10  date of July 15, 2019.  Do you see that?  No, it's at

11  the top of that page.

12    A.    Oh.

13    Q.    Right at the very top of the page.

14    A.    Oh, I see it, next to Montano's name.  Okay.

15    Q.    Yes.  Do you remember having a visit on or about

16  that date?

17    A.    I don't remember it, but I'm sure there was.

18    Q.    And that was with Dr. Montano or --- yeah, Dr.

19  Montano?

20    A.    Yes.

21    Q.    Without referencing the notes here specifically,

22  do you remember what was discussed at this visit?

23    A.    I don't remember what was discussed at this

24  visit.

195

1    Q.    Do you remember the purpose of it?

2    A.    I'm guessing just continued care plan.

3    Q.    Do you remember --- tell me from what you know

4    who Dr. Montano is.

5    A.    Doctor Gerald Montano.  He specializes in gender

6    dysphoria, in transitional care patients.

7    Q.    And it appears to me from my review of the

8    records, please correct me if I'm wrong, that this is

9    the first time when there was a diagnosis of gender

10   dysphoria by a medical professional?

11              ATTORNEY BLOCK:  Objection to form.

12   BY ATTORNEY TRYON:

13   Q.    Is that in your memory or not?

14   A.    I don't know.

15   ███ ████████████████████████████████████████████

16   ████████████  ██████████████████████████████████████

17   █████████  ██████████████████████████  ██████████████

18   █████████████

19   A.    No.

20   Q.    So it says B███, legal name P███ J██████, is

21   a nine-year-old transgender female coming to the clinic

22   for gender dysphoria.  So does that suggest that's the

23   purpose of this visit.

24              Is that right?

196

```
 1        A.    Okay.
 2                    ATTORNEY BLOCK:  Objection.
 3     BY ATTORNEY TRYON:
 4        Q.    Is that consistent with your memory?
 5        A.    I'm just going by what the notes say, and the
 6     notes say that we're there for gender dysphoria.
 7        Q.    Okay.
 8        ██████████████████████████████████████████
 9     ████████████████████████████████████████████████
10     ████████   ████████████████████████████████████
11     ████████████████████████████████████████████████
12     ██████████████████████████████████████████████
13     ██████████████████████████████
14              Do you see all that?
15        A.    Yes.
16        Q.    And do you remember reporting this information
17     to Dr. Montano or that BPJ reported this information to
18     Dr. Montano on or about July 15, 2019?
19        ███   ████████████████████████████████████
20     ████████████████████████████████████████████████
21        Q.    Okay.
22              And just to be clear, BPJ was in attendance for
23     this meeting as well?
24        A.    Yes.
```



1

2

3

4

5

6

7

8

9     Q.     So you don't know what that means then?

10    A.     I would presume it meant

11

12

13    Q.     Now, on the third page, which is labeled BPJ 036

14    in the lower right hand corner, do you have that?

15    A.     Under social history?

16    Q.     Yes.

17    A.     Yes.

18

19

20

21

22

23

24

```
 1   was?
 2       A.   No, I don't.
 3       Q.   Do you know how it was conducted?
 4       A.   No, I don't.
 5       Q.   Do you know of any documentation for it?
 6       A.   No, I don't.
 7       Q.   Other than what is here before us?
 8       A.   Unless it's in one of these exhibits, I don't
 9   know.
10       Q.   Okay.
11            Dr. Montano, did he diagnose BPJ with gender
12   dysphoria?
13       A.   Yes.
14       Q.   Do you know the basis of his diagnosis?
15       A.   No.  I presume that went with his medical
16   training to diagnose.
17       Q.   Right.  Do you know what factors or anything
18   else that he used to make that diagnosis?
19       A.   That would be a question for him.
20       Q.   It will be a question for him, but I'm asking
21   you if you know.
22       A.   I don't know.  I'm not a doctor.
23       Q.   So if you go to page four --- let me know when
24   you are there?
```

1        A.    Okay.

2        Q.    At the bottom, where it says history suggests

3    that B█████ suggests --- excuse me, history suggests that

4    B█████ suffers from gender dysphoria.

5              Have you seen that note before today?

6        A.    No.

7        Q.    And then it says the World Professional

8    Association for Transgender Health.  Are you familiar

9    with that organization?

10       A.    No, sir.

11       Q.    Have you ever heard of that organization before

12   today?

13       A.    No, sir.

14   ████ ███████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   █████████████████    Do you remember Dr. Montano discussing

19   that with you?

20       A.    Yes.

21       Q.    What else do you remember about what he

22   discussed with you?

23       A.    Just informed --- that just falls under informed

24   consent.  Just --- he just told us the benefits and the

1   risks.

2       Q.    And if I recall correctly, you then discussed

3   these risks with your husband.

4           Is that right?

5       A.    Correct.

6               ATTORNEY BLOCK:  Objection, MT, vague.

7   BY ATTORNEY TRYON:

8       Q.    And both --- so B███, you and your husband are

9   all comfortable with the risks for infertility?

10      A.    Yes.

11      Q.    Has B███ ever expressed an interest in having

12  children?

13      A.    It has not really come up.  I mean, she gets mad

14  at her brother, she says stuff like I'm never having

15  children.

16      Q.    Sorry for laughing, but that is kind of funny.

17      A.    Just in --- just in situations like that.

18      Q.    Yeah.  Yeah.  Were you advised --- let me

19  rephrase that.  Did Dr. Montano advise you that the

20  majority of pre-pubescent children with gender dysphoria

21  desist from gender dysphoria if given affirmation

22  therapy?

23              ATTORNEY BLOCK:  Objection.

24  BY ATTORNEY TRYON:

201

```
 1      Q.    Sorry.  Let me just start that all over again.
 2   In fact, you can strike that all.
 3            Let me ask you to take a look at Exhibit 33,
 4   please.
 5      A.    Thirty-three (33)?
 6      Q.    Correct.
 7      A.    Okay.  I have it.
 8      Q.    Ma'am, I will represent to you that this is an
 9   excerpt from the Standards of Care of the World
10   Professional Association for Transgender Health.  It
11   goes through page 21.  And this is the seventh version.
12   And I have a few questions about it.  You can either
13   read the entire thing right now or you can just wait for
14   me to ask you a question and then if you want to read
15   other parts of it as well, you can do that.
16      A.    I've never seen this before.
17      Q.    Okay.
18            So Dr. Montano, as I mentioned earlier in the
19   document that we were looking at before, references the
20   Standards of Care for the World Professional Association
21   of Transgender Health.
22            Do you recall that?
23      A.    I remember it was mentioned in that other
24   document.
```

```
 1       Q.    Right.

 2                  ATTORNEY BLOCK:  Objection to form.

 3    BY ATTORNEY TRYON:

 4       Q.    Let me ask you to turn to page five.

 5       A.    I don't see page numbers.

 6       Q.    At the very bottom right it has page numbers.

 7    It looks like they may not have printed very well.  At

 8    the top it says gender non-conformity is not the same as

 9    gender dysphoria.

10       A.    The difference between gender non-conformity and

11    gender dysphoria?

12       Q.    At the top it says gender non-conformity is not

13    the same.  Yes.  Right.  On page four it says the

14    difference between gender non-conformity and gender

15    dysphoria and then I have a question for you on page

16    five, at the top of page five.  Take a look at that

17    paragraph and then I have a question about it.  And then

18    if you want to --- before you answer my question, if you

19    want to look at more you can, but I don't think you will

20    need to.

21       A.    The one that says gender nonconformity refers to

22    the extent, that paragraph?

23       Q.    That paragraph.

24                  ATTORNEY BLOCK:  And while she's looking
```

 1  at this document, I will just refer back to our standing

 2  objections.

 3                  ATTORNEY TRYON:  Thank you.

 4                  THE WITNESS:  Okay.

 5  BY ATTORNEY TRYON:

 6      Q.   So my question is did Dr. Montano explain to you

 7  the difference between gender nonconformity and gender

 8  dysphoria?

 9      A.   No.

10      Q.   Having read that, do you think it would have

11  been useful for him to explain that to you?

12      A.   No.

13      Q.   If you could turn to page 11, please?

14      A.   I have no page numbers.

15      Q.   Well, keep scrolling down on the screen.  Do you

16  see --- they're not as faint on the copy that is on the

17  screen, but at the lower right-hand corner it says

18  page 11.  So if you count in it would be about 13 pages,

19  but it says differences between children and adolescents

20  with gender dysphoria.  That's the topic near the top of

21  the page.

22      A.   Okay.

23           I found the page.

24      Q.   Okay.

```
 1            I'm just going to read the first --- the

 2    sentence that I'm interested in, couple of sentences.

 3    And then I'm going to ask you a question.  And if you

 4    would like to read more of them --- of this before

 5    answering you may.  But it says an important difference

 6    between gender dysphoric children and adolescents is in

 7    the proportion for whom dysphoria persists into

 8    childhood --- excuse me, into adulthood.  Gender

 9    dysphoria during childhood does not inevitably continue

10    into adulthood.  Rather follow-up studies of pre-pubetal

11    children, mainly boys, who were referred to clinics for

12    assessment of gender dysphoria, the dysphoria persisted

13    into adulthood for only 6 to 23 percent of children.

14    And my question is did Dr. Montano explain that to you?

15       A.    No.

16                 ATTORNEY BLOCK:  Objection to form.

17    First, there's a footnote in that paragraph that I think

18    is illegible on the piece of paper.  And second, you

19    didn't read the entire paragraph.

20                 ATTORNEY TRYON:  I'll read the footnotes

21    that's not illegible because it's legible on my copy.

22    My apologies for that.

23    BY ATTORNEY TRYON:

24       Q.    It says gender nonconforming behaviors in
```

```
 1  children may continue into adulthood but such behaviors

 2  are not necessarily indicative of gender dysphoria and a

 3  need for treatment.  As described in Section 3, gender

 4  dysphoria is not synonymous in gender expression.  So

 5  when you're finished with your review, let me know.  I'm

 6  just interested if Dr. Montano did explain that to you.

 7      A.    I don't remember.

 8      Q.    Would that have been helpful for you to have

 9  that information?

10      A.    No.

11              ATTORNEY TRYON:  Off the record for just

12  one moment, please.

13              VIDEOGRAPHER:  Going off the record.  The

14  current time reads 2:52 p.m.

15  OFF VIDEOTAPE

16                      ---

17  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

18                      ---

19  ON VIDEOTAPE

20              VIDEOGRAPHER:  Back on the record.  The

21  current time reads 2:53 p.m.

22              THE WITNESS:  Yes.  And I can't see that

23  footnote either on my copies.

24  BY ATTORNEY TRYON:
```

1    Q.    Yes, my apologies.  I don't know why that didn't

2  come through on the photocopy, but we'll try and remedy

3  that.  Okay.  I'm finished with that exhibit.

4         At what point did you start considering suing

5  the State to have this law declared unconstitutional?

6    A.    When I realized that it was going to affect my

7  child.

8    Q.    And was that before or after the law was

9  actually passed?

10    A.    It was after it was signed by the Governor.

11    Q.    And how did you come to be aware of it?

12    A.    Be aware of the law?

13    Q.    Yes.

14    A.    That it was in consideration or that it was

15  signed?

16    Q.    Well, let's start with consideration.  When did

17  you first become aware that it was under consideration?

18    A.    I don't know the date.  I remember seeing it on

19  the news, that it was under consideration.

20    Q.    And at that time were you aware that it could

21  affect your child?

22    A.    I was alarmed.

23    Q.    Did you contact any legislators about it?

24    A.    Yes.

1      Q.    Who did you contact?

2      A.    Romano and Patrick.  I can't remember his last

3   name.

4      Q.    Are they --- do you remember which house they're

5   in?

6      A.    No, I don't.

7      Q.    And how did you contact them?

8      A.    Via email.

9      Q.    Do you remember the contents of the emails?

10     A.    Asking them to vote against it.

11     Q.    Did they vote against it?

12     A.    I don't know.

13     Q.    Do you have a copy of that email?

14     A.    I have no idea.

15     Q.    Was it the same email to each one of them?

16     A.    Yes.

17     Q.    And you sent it from your computer?

18     A.    Yeah.

19     Q.    Would it still be on your computer?

20     A.    I don't think so.  I don't know.

21     Q.    Why do you think so?  You said you don't think

22   so.  Why would it not be?

23     A.    Because at that point I didn't keep emails.

24     Q.    Can you look on your computer and see if you

1  still have, them please?  Obviously not right now.

2       A.    Okay.

3                 ATTORNEY TRYON:  And then if so, we would

4  request copies of those from counsel.  And we can make a

5  formal request or we can just have this be the formal

6  request if you prefer?

7                 ATTORNEY BLOCK:  I prefer this to be the

8  formal request.  We will follow up with you.

9                 ATTORNEY TRYON:  Thank you.

10  BY ATTORNEY TRYON:

11      Q.    Did you ever receive a response from either one

12  of those legislators?

13      A.    No.

14      Q.    Did that bother you?

15      A.    Yes.

16      Q.    Did you do any kind of follow-up?

17      A.    No.

18      Q.    Did you contact any other public officials about

19  that piece of legislation?

20      A.    I called the Governor's Office and asked them

21  not to sign it.

22      Q.    Did you get to talk to the Governor?

23      A.    No.

24      Q.    Do you know who you talked to?

```
 1      A.    A voicemail.

 2      Q.    Did you ever hear back?

 3      A.    No.

 4      Q.    He never saw this?

 5      A.    No.

 6      Q.    And then once you saw that the law was actually

 7   passed, did you do anything else?

 8      A.    I contacted the ACLU and asked if they were

 9   going to fight against this law.

10      Q.    And how did you contact them?

11      A.    By phone.

12      Q.    Was that your first contact with the ACLU?

13      A.    Correct.

14      Q.    About anything at all?

15      A.    Yep.

16      Q.    And why did you think to call the ACLU?

17      A.    Because they fight for civil liberties.

18      Q.    So you just had that background knowledge about

19   the ACLU, you thought I will call the ACLU or was there

20   anything else that triggered your ---?

21      A.    I felt like my daughter's --- I felt like my

22   daughter's civil liberties were being violated.

23      Q.    And that was after the law was passed?

24      A.    Correct.
```

210

```
 1      Q.    On the Complaint it has your name as next friend

 2  and mother of BPJ.

 3            Do you recall that?

 4      A.    Yes.

 5      Q.    And do you know why your name is on there?

 6      A.    Because I'm the next friend and mother of BPJ.

 7      Q.    Do you know why that is legally --- what the

 8  legal impetus behind that is?

 9      A.    The next friend part?

10      Q.    Do you know why your name needs to be on that

11  part of the document?

12      A.    Because I'm the adult.  I'm the mom.

13      Q.    So it's your understanding simply because BPJ is

14  a minor your name needed to be on there in some

15  capacity?

16      A.    Yes.

17      Q.    Did you review the Complaint before it was

18  filed?

19      A.    I don't remember.  I reviewed documents.

20      Q.    Let's take a look at Exhibit 32, which is the

21  Complaint.

22            ATTORNEY BLOCK:  Before we do that I just

23  want to check to see if the witness needs a break at

24  all.
```

```
 1                    THE WITNESS:  I'm good.

 2                    ATTORNEY TRYON:  I'm nearing the end.

 3                    THE WITNESS:  Oh, yeah, this.

 4    BY ATTORNEY TRYON:

 5        Q.    Before we turn to that, let me ask you real

 6    quick, my colleague gave two names.  Would the

 7    legislators have been Patrick Martin?

 8        A.    Pat Morrisey.

 9        Q.    Okay.

10              Well, Morrisey is the Attorney General.  Is

11    there another Morrisey?  Mike Romano?

12        A.    Mike Romano, yeah.

13        Q.    Okay.

14              Having this in front of you now, do you recall

15    reviewing this before it was filed?

16        A.    Yes.

17        Q.    On page eight there is a picture of BPJ?

18        A.    Yeah.

19        Q.    Is that a picture that you supplied?

20        A.    Yes.

21        Q.    And so it appears to be to me that BPJ is

22    wearing makeup.

23              Is that right?

24        A.    Yes, for cheer competition.
```

```
 1     Q.    And did BPJ apply that makeup or did you?

 2     A.    We both did it.

 3     Q.    And BPJ is wearing an Indian jersey.

 4           Is that right?

 5     A.    Correct.

 6     Q.    Is BPJ part American Indian?

 7     A.    No, she cheers for the Indians.

 8     Q.    Is that the name of the local team?

 9     A.    Yes.

10     Q.    Not the Cleveland Indians?

11     A.    No, not that they're known as Cleveland Indians

12   anymore.

13     Q.    I understand.

14     A.    The Cleveland Guardians.

15     Q.    I understand.  I'm from Cleveland.

16     A.    Oh, are you a Browns fan?

17     Q.    You know, I think we'll just leave that alone.

18   We can talk about it off the record.  How's that?

19         Were you asked if you agreed with everything in

20   here before it was filed?

21     A.    Yes.

22     Q.    And do you understand the legal issues?

23     A.    Which legal issues?

24     Q.    Well, it talks about on --- you know, I should
```

```
 1   just clarify.  What I'm showing you is the Amended

 2   Complaint.  There was a prior Complaint that was filed

 3   and then there was a subsequent that was filed for

 4   clarification for the record.  So on page 20 there's

 5   count one?

 6       A.   Yes.

 7              ATTORNEY BLOCK:  Just objection.  I'm

 8   just going to refer back to our standing objections.

 9              ATTORNEY TRYON:  Okay.  I haven't asked

10   the question yet, but that's okay.

11   BY ATTORNEY TRYON:

12       Q.   Having --- did you review this count one?

13       A.   A while back.

14       Q.   And in your own mind or your own terminology

15   would you be able to explain what you understand count

16   one to ask or claim?

17       A.   Well, I'd say that she is protected under Title

18   IX.

19       Q.   What do you know about Title IX?  And if you

20   don't know anything about it, that's okay.  I'm just

21   asking for your --- what you know because your lawyers

22   are the ones that really put this aspect of it together.

23   I just want to understand your understanding.

24              ATTORNEY BLOCK:  Objection to the form.
```

1  BY ATTORNEY TRYON:

2      Q.    Go ahead.

3      A.    You could be denied based on your sex, meaning

4  your biological sex.

5      Q.    I didn't understand your answer.  Could you say

6  that again?

7      A.    You could be denied benefits based on your

8  biological sex, benefits afforded to you under Title IX.

9      Q.    And then Count 2, if you could take a look at

10  that and tell me what your own understanding of what

11  that is about?

12      A.    It's about the equal protection clause of the

13  14th Amendment.

14      Q.    Do you know anything about that?

15            ATTORNEY BLOCK:  Objection, vague.

16  BY ATTORNEY TRYON:

17      Q.    Do you know anything about the equal protection,

18  the claim for equal protection --- excuse me, the 14th

19  Amendment, the equal protection clause?

20      A.    It's just equal protection under the law.

21      Q.    Have you looked into what that law is at all on

22  your own?

23            ATTORNEY BLOCK:  Objection, vague.

24            THE WITNESS:  No.

```
 1   BY ATTORNEY TRYON:
 2       Q.    I didn't hear you.
 3       A.    No.
 4       Q.    Let me go back to the title, though.  I'm just
 5   going to ask you one more question about it.  Where it
 6   says BPJ, her next friend and mother, Heather Jackson,
 7   is there a reason you were selected to be the next
 8   friend as opposed to your husband as the next friend and
 9   father?
10       A.    I'm the one that reached out for help in the
11   first place.
12       Q.    Did anyone ask if your husband wanted to be
13   named on here as also another next friend and parent?
14             ATTORNEY BLOCK:  Just objection to the
15   extent that this calls for communications with your
16   attorneys.  I'm instructing you not to answer.
17   BY ATTORNEY TRYON:
18       Q.    Without any communication with your attorney,
19   did you have a discussion with your husband about him
20   being named on here?
21       A.    My husband and I have been hand in hand
22   throughout this whole procedure.
23       Q.    I understand.  That wasn't my question.  My
24   question was did you have any discussion with his name
```

 1 | appearing on here as well?

 2 |    A.    No.

 3 |    Q.    Let me ask you about Exhibit WV 23R.

 4 |    A.    Okay.

 5 |    Q.    So on the third page of this document?

 6 |    A.    Yes.

 7 |              ATTORNEY TRYON:  Can the court reporter

 8 | put that up?

 9 |              VIDEOGRAPHER:  I'm looking.  I don't see

10 | a 23R, I just see a 23.

11 |              ATTORNEY TRYON:  Put up 23, and then it

12 | should be --- if you scroll down it should be there.

13 |              VIDEOGRAPHER:  So I got that article and

14 | then it moves into 24.

15 |              ATTORNEY TRYON:  Well, my apologies.  We

16 | will use 23 for this deposition.  And as we've already

17 | indicated, we will not be using this exhibit with BPJ.

18 | BY ATTORNEY TRYON:

19 |    Q.    So on the --- so can you look at 23?

20 |    A.    Yes.

21 |    Q.    So on the --- this is an article from 2016.  And

22 | in 2016 you were already referring to BPJ as B█████ and

23 | using the pronouns her.

24 |              Right?

217

1    A.    Correct, with family.

2    Q.    So then, yes, my question is on page three, when

3    you're talking to apparently the reporter you say

4    Stratton looks forward to it.  He does this every year

5    because he says he wants to help other babies.  Why did

6    you continue to use ███████ name in public?

7              ATTORNEY BLOCK:  Objection, the document

8    looks like ████████ is in brackets from the quote you

9    read.

10             ATTORNEY TRYON:  Yes.

11   BY ATTORNEY TRYON:

12   Q.    So ma'am, let's be ---.

13             ATTORNEY TRYON:  Thank you for that

14   clarification.

15   BY ATTORNEY TRYON:

16   Q.    Did you, in fact, refer to BPJ as ████████ when

17   you talked to the reporter for this article?

18   A.    Yes.

19   Q.    And why did you do that?

20   A.    Because it was public, not private.

21   Q.    And when did you go public?

22             ATTORNEY BLOCK:  Objection, vague.

23             THE WITNESS:  I don't know the date.

24   BY ATTORNEY TRYON:

**JA1225**

218

1      Q.    Okay.

2            Let's take a look at 25.

3                  VIDEOGRAPHER:  There's 23R.  It was right

4      after 24R.

5                  ATTORNEY TRYON:  Oh, well, my apologies.

6      BY ATTORNEY TRYON:

7      Q.    Do you have 25 in front of you?

8      A.    Correct.

9      Q.    So on the second page of that exhibit it appears

10     to have a quote from BPJ saying I just want to run.  I

11     come up from a family of runners, P████   J██████ said in

12     a news release.  I know how hurtful a law like this is

13     to all kids like me who just want to play sports with

14     their classmates and I'm doing this for them.  Trans

15     kids deserve better, closed quote.  Now, sometimes

16     newspapers misreport things, so I'm asking you if you

17     know if that's an accurate quote?

18     A.    That is accurate.

19     Q.    Was that an oral statement that BPJ made?

20     A.    Oral.

21     Q.    And did you help her come up with that or did

22     BPJ come up with that all on BPJ's own?

23     A.    BPJ.

24     Q.    So what exactly is BPJ doing for others, for

```
 1   them?
 2                   ATTORNEY BLOCK:  Objection, vague,
 3   foundation.
 4                   THE WITNESS:  She wants all kids to be
 5   able to run with the teams that they identify with or
 6   play with the teams that they identify with.
 7   BY ATTORNEY TRYON:
 8      Q.    And trans kids deserve better, do you know what
 9   that meant?
10                   ATTORNEY BLOCK:  Objection, speculation.
11                   THE WITNESS:  They deserve to be treated
12   equally.
13   BY ATTORNEY TRYON:
14      Q.    On the next page, at the top of that page, the
15   second paragraph says the Complaint complains that House
16   Bill 3293 was prompted by unfounded stereotypes.  Do you
17   have an opinion on what those unfounded stereotypes are?
18      A.    Unfounded stereotypes ---.
19                   ATTORNEY BLOCK:  Just objection to
20   reading only part of the sentence.
21   BY ATTORNEY TRYON:
22      Q.    Go ahead.
23      A.    The fear that if she runs on a girls team, that
24   she's going to beat all the other girls because she was
```

```
 1  born as a biological sex male.  That's an unfounded
 2  stereotype.
 3      Q.    How about false scientific claims, do you know
 4  what that is?
 5      A.    Same thing.
 6      Q.    Do you know what baseless fear and
 7  misunderstandings of girls who are transgender, do you
 8  know what that refers to?
 9      A.    Same thing.
10      Q.    Well, what's the fear?
11      A.    The fear that they're going to beat out all the
12  other competition and win all the awards and get all the
13  scholarships.
14      Q.    Okay.
15            And just to be clear that --- I think I
16  understood the prior testimony, you don't have any data
17  or articles or scientific claims to support this data,
18  do you?
19                  ATTORNEY BLOCK:  Objection to form.
20                  THE WITNESS:  I don't have anything.
21  BY ATTORNEY TRYON:
22      Q.    Has anything been shown to you?
23                  ATTORNEY BLOCK:  Objection to form,
24  vague.
```

221

1    BY ATTORNEY TRYON:

2        Q.    You're shaking your head no.  Is that a no?

3        A.    Shown to me in regards to ---?

4        Q.    Thank you for asking for that clarification.  Do

5    you have any --- this talks about false scientific

6    claims.  Do you have any scientific evidence to show

7    that those claims are false?

8        A.    I don't have anything to show that they're false

9    or true.

10       Q.    And you haven't seen anything, have you?

11       A.    No.

12       Q.    Okay.

13             Let me ask you to take a look at Exhibit 27.

14   And I'm going to ask you a question about the seventh

15   page in.  It's actually the last page of the article

16   itself.

17       A.    Okay.

18       Q.    All right.

19             So on that page B███ is quoted as --- B███

20   was devastated.  She said, quote, I felt horrible

21   because I knew then I couldn't run with the other girls.

22   So is that her quote or did somebody supply that to her?

23       A.    No, that's her.

24       Q.    And then it says B████   immediately started

1 discussing potential lawsuit with her mom.  Can you

2 explain that to me?

3   A.   She wanted to know what we could do to fight it.

4   Q.   Did she raise that before you did or ---

5   A.   Yes.

6   Q.   --- on her own?

7   A.   Yes.  She wanted to know how we could fight it.

8   Q.   So it sounds like, and correct me if I'm wrong,

9 it sounds like the lawsuit was initially --- let me

10 rephrase that.  Was the lawsuit her idea or just the

11 idea of fighting it?

12   A.   The idea of fighting it.

13             ATTORNEY BLOCK:  Objection to the form.

14             THE WITNESS:  The idea of fighting it.

15 BY ATTORNEY TRYON:

16   Q.   And then how was the idea of a lawsuit, how did

17 that come to pass?

18   A.   That was the only way we could fight it.

19   Q.   Well, did you come up with that idea or did that

20 idea come after you called the ACLU?

21   A.   I asked for help.

22   Q.   In the form of a lawsuit or was that a

23 suggestion they made to you?

24   A.   No, a suggestion I made.

1      Q.     Okay.

2             Exhibit 29.

3      A.     Okay.

4      Q.     I'm going to ask you a question about the third

5   paragraph down.  That starts with the term --- with the

6   words that I just want to run.  Take your time to read

7   through this as much as you want, and I just have a

8   question about that.

9      A.     Okay.

10     Q.     So this appears to be a press release by Lambda

11  Legal.  And this appears to be a quote attributed to

12  B████.  In the third paragraph it says I just want to

13  run and the State wants to stop me from running as part

14  of a team at my school, said B████, an 11-year-old

15  middle school student.  I love running and being part of

16  a team.  And the State of West Virginia should explain

17  in court why they won't let me, closed quote.

18            You know, sometimes in the press releases like

19  this the person putting together the press release puts

20  together a quote and then attributes it to --- shows it

21  to the person to whom it's attributed and says is this

22  okay for me to say.  And other times it's something that

23  the person quoted actually said.  Can you tell me which

24  one of those it is?

224

```
 1      A.     That's B███.

 2                  ATTORNEY BLOCK:  Objection to the form.

 3   Objection to the form.

 4                  THE WITNESS:  That's B███.

 5   BY ATTORNEY TRYON:

 6      Q.     So she came up with this quote all on her own?

 7      A.     Yes.

 8      Q.     And so she wants the State of West Virginia to

 9   explain in court why they won't let BPJ run as part of

10   the team.

11             Right?

12      A.     Yes.

13      Q.     Okay.

14             When this lawsuit was filed, did she understand

15   that she might be subject to a deposition?

16      A.     We didn't even know what a deposition was.

17      Q.     Okay.

18             So I'll ask the same question of you, although

19   I think the answer is obvious.  At the time that you

20   filed this lawsuit, did you know that you might be

21   subject to a deposition?

22      A.     I didn't even know what a deposition was.

23      Q.     So the answer would be no?

24      A.     That would be a no.
```

225

```
 1                    ATTORNEY TRYON:  Let me go off the record

 2     for just a minute and see if I have any other questions.

 3                    VIDEOGRAPHER:  Going off the record.  The

 4     current time reads 3:23 p.m.

 5     OFF VIDEOTAPE

 6                         ---

 7     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 8                         ---

 9     ON VIDEOTAPE

10                    VIDEOGRAPHER:  We are back on the record.

11     The current time reads 3:27 p.m.

12     BY ATTORNEY TRYON:

13        Q.    I want to go back and just reconfirm something

14     about --- you said you wrote to two legislators.  And we

15     just checked to see which legislators are in your

16     district, and one is Patrick Martin and one is Mike

17     Romano.

18        A.    That's who it is.  It's Patrick Martin.

19        Q.    Okay.

20              Very good.  And then I'm interested, given

21     there's been a fair amount of publicity in this case,

22     have you received media inquiries about this case?

23        A.    The only inquiries I have had has come to me

24     through my lawyers.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

**JA1233**

```
 1       Q.    Okay.

 2             Do you have any --- has anyone contacted you

 3   about you or BPJ being some sort of representative or

 4   advocate for transgender rights?

 5       A.    No.

 6       Q.    And you said that you have received --- no, let

 7   me rephrase that.  Have you received any press inquiries

 8   about this case through your attorneys?

 9       A.    The inquiries I have were the ones that you

10   brought forth as exhibits.

11       Q.    There weren't any others?

12       A.    No.

13       Q.    Well, I should represent to you there are a few

14   others that I have not shown.

15       A.    Okay.

16       Q.    So I'm not trying to trick you.  I just want to

17   --- but you don't remember any others right now?

18       A.    No, but I haven't seen all the exhibits either.

19   I don't know if you have them in here as exhibits.

20       Q.    Yeah, and that's fine.  If you don't remember

21   any others, that's all right.  There are one or two

22   more, but that's okay.

23             ATTORNEY TRYON:  I don't think I have any

24   other questions at this time, subject to any follow-up
```

1   after other questions and any other reservation rights

2   we might make at the end of this deposition.  Thank you

3   for your time.

4              ATTORNEY BLOCK:  Before other counsel

5   begins, do you need a break, Heather?

6              THE WITNESS:  I would like to use the

7   restroom.

8              ATTORNEY BLOCK:  Okay.

9              So let's come back at 3:35, everyone.

10              ATTORNEY TRYON:  Okay.  Thank you.

11              VIDEOGRAPHER:  Going off the record.  The

12   current time reads 3:29 p.m.

13   OFF VIDEOTAPE

14                     ---

15   (WHEREUPON, A BREAK WAS TAKEN.)

16                     ---

17   ON VIDEOTAPE

18              VIDEOGRAPHER:  We are back on the record.

19   The current time reads 3:36 p.m.

20                     ---

21                   EXAMINATION

22                     ---

23   BY ATTORNEY GREEN:

24     Q.   All right.  We are back on the record.  And I've

228

1   just --- the State has signed off officially, and so ---

2   oh, there you are.  You just popped her into the screen.

3   It took me a minute to find her.

4           Ms. Jackson, my name is Roberta Green.  I'm an

5   attorney here on behalf of West Virginia Secondary

6   School Activities Commission, also known as WVSSAC.

7           Do you know the those initials, WVSSAC?

8       A.   Yes, I know the WVSSAC initials.  Yes.

9       Q.   Okay.  Great.  So if I refer to it then --- it

10   as WVSSAC, you'll know who I mean?

11      A.   Yes, yes.

12      Q.   That will save us ten words every time I --- so

13   I just have a few questions for you today.  If I

14   understood your testimony correctly, you learned of

15   House Bill 3293 when you heard about it on the news.

16           Is that accurate?

17      A.   Yes, that's accurate.

18      Q.   Do you recollect whether at any time prior to

19   learning of House Bill 3293 you had notified WVSSAC of

20   BPJ's interest in running on the girls cross-country

21   team?

22      A.   I did not notify them of her desire.

23      Q.   All right.

24           And at any time prior to filing the lawsuit do

```
 1   you recall whether you ever notified WVSSAC of BPJ's
 2   interest in running on the girls cross-country team?
 3       A.   I did not contact the WVSSAC in advance.
 4       Q.   All right.
 5            And do you know whether at any time, like up
 6   until today, you have contacted WVSSAC to notify them of
 7   BPJ's interest in running on the girls cross-country
 8   team?
 9       A.   I have not.
10                 ATTORNEY GREEN:  Okay.
11            I don't think I have any other questions.
12   So thank you very much.  I appreciate it.
13                          ---
14                      EXAMINATION
15                          ---
16   BY ATTORNEY DENIKER:
17       Q.   Good afternoon, Ms. Jackson.  My name is Susan
18   Deniker.  I introduced myself earlier today, but I
19   represent the Harrison County Board of Education and
20   superintendant Dora Stutler in this litigation.  Thank
21   you for your time today.  I know it's been a long day
22   and I appreciate you hanging in there with us.
23            I do have some additional questions for you.
24   If I ask you anything that you don't understand today
```

230

```
 1   please tell me and I'll be glad to rephrase the
 2   question.  If you don't do that I will assume that you
 3   have understood the question.
 4          Is that fair?
 5   A.    Okay.
 6   Q.    Thank you.
 7          Ms. Jackson, tell me about BPJ's education.
 8   Did she start her education in Harrison County schools?
 9   A.    Yes, she started her education in Harrison
10   County schools.
11   Q.    And did she start in pre-K or in kindergarten?
12   A.    Kindergarten.
13   Q.    Did she have any formal education before going
14   to kindergarten?  In other words, was she in a
15   pre-school program or a pre-K program anywhere before
16   starting kindergarten?
17   A.    No.
18   Q.    And did she do her entire elementary schooling
19   at Norwood Elementary?
20   A.    Yes, she did.
21   Q.    Tell me the first --- well, in general, how was
22   your experience for --- how was the experience for BPJ
23   at the Norwood Elementary School did she have a positive
24   experience at that elementary school?
```

231

 1       A.      She had a positive experience.

 2       Q.      The current Superintendent of Harrison County

 3   schools is Dora Stutler.  Was she the principal at

 4   Norwood during part of the time period that BPJ would

 5   have been enrolled at Norwood Elementary School?

 6       A.      Yes, she was.

 7       Q.      So you had interactions with Ms. Stutler while

 8   she was the principal at Norwood.

 9               Is that true?

10       A.      Interactions, yes.

11       Q.      And were your interactions with her positive?

12       A.      I think I've received a couple phone calls from

13   her in regards to B███, that maybe she had concerns

14   over not getting a homework assignment in or that kind

15   of thing, but it was positive criticism.

16       Q.      So your interactions with Ms. Stutler when she

17   was principal at Norwood Elementary School were all

18   professional in nature?

19       A.      Yes.

20       Q.      And you didn't have any concerns with those

21   communications?

22       A.      No concerns.

23       Q.      Did your other --- did your two older children,

24   your sons, did they go through Norwood Elementary School

232

1   as well?

2       A.    Yes.

3       Q.    And did you have any issues or concerns when

4   they went through Norwood Elementary School?

5       A.    Correct that.  My oldest one transferred from

6   St. Mary's to Bridgeport Middle.  My second one was all

7   in Norwood.

8       Q.    Okay.

9       A.    I think his kindergarten year, there was no room

10  at Norwood and he had to go to Johnson.

11      Q.    Very good.

12            So you transferred your oldest child to St.

13  Mary's?

14      A.    From St. Mary's directly to Bridgeport Middle,

15  so I correct that.

16      Q.    So your middle --- your middle child, that child

17  did go through Norwood Elementary School?

18      A.    Yes, yes.

19      Q.    Any issues or concerns during his time at

20  Norwood Elementary School?

21      A.    No.

22      Q.    When did you first make any employees of Norwood

23  Elementary School or anybody in Harrison County schools

24  aware that BPJ identified as a female and was a

233

1   transgender student?

2       A.    I contacted Mr. James Thornton, who was the

3   school counselor, but I don't know the date.

4       Q.    Do you recall what grade BPJ was in at the time?

5       A.    Third.

6       Q.    And Mr. Thornton was the guidance counselor at

7   Norwood Elementary School at that time?

8       A.    Yes.

9       Q.    And can you tell me at about that communication?

10  What was discussed when you contacted Mr. Thornton?

11      A.    That B███ is a transgender female and wishes to

12  be --- conduct her life as such and her pronouns were

13  she/her.

14      Q.    What was Mr. Thornton's response to that?

15      A.    He understood and was going to take it to a

16  higher power.  I'm guessing it was the principal at the

17  time.

18      Q.    Was there anything else that you can recall that

19  was part of that initial communication with Mr. Thornton

20  about BPJ's transgender status?

21      A.    That she was going to start presenting as a

22  female at school.

23      Q.    And then what was Mr. Thornton's response to

24  that?

234

1  A. The same, that he would go ahead and handle what

2 had to be handled on his end.

3  Q. Did you find him to be supportive of ---?

4  A. Yes.

5  Q. Did you say extremely?

6  A. Extremely supportive of Becky's transition.

7  Q. Very good.  Did Mr. Thornton, in fact, get back

8 to you after he spoke with the principal?

9  A. I don't recall.

10  Q. What was --- what was the next communication

11 that you recall having with the school officials with

12 regard to B████████ transition?

13  A. I would have had contact with her teacher at

14 that time.  I can't remember her name at that time.  And

15 realizing that she was going to have questions or that

16 the students would have questions, but I can't remember

17 that teacher's name.  I apologize.

18  Q. That's no problem.

19   Tell me about the nature of your communications

20 with --- this would have been the third grade teacher.

21   Is that correct?

22  A. Right, right.  That she was going to start

23 presenting as a female at school.

24  Q. And was the teacher supportive of that?

1      A.    Yes.

2      Q.    And then BPJ did start presenting as a female at

3   school I think I heard you testify earlier.

4            Is that correct?

5      A.    That is correct.

6      Q.    Were there any problems or issues with that?

7      A.    The only thing that I know of is that the

8   teacher did get questions as to why B▮▮▮ was dressing

9   the way she was dressing, and her answer was she's B▮▮▮

10  and that's what makes her happy.

11     Q.    Were you comfortable with that response from the

12  teacher?

13     A.    Yes.

14     Q.    And so in the third grade did you have any

15  concerns with regard to how the school handled B▮▮▮

16  transition?

17     A.    No, I did not.

18     Q.    And then BPJ also would have been enrolled at

19  Norwood Elementary School in the fourth and fifth

20  grades.

21           Is that true?

22     A.    That is correct.

23     Q.    And at that point she was --- in those grades

24  she was fully transitioned ---

1    A.    Correct.

2    Q.    --- to being a female student.

3          Is that correct?

4    A.    Correct.

5    Q.    And did you have any issues or concerns with the

6    way school officials handled that?

7    A.    School officials handled it quite well.

8    Q.    So during BPJ's tenure as a student at Norwood

9    Elementary School did you have any concerns or issues

10   with regard to how school officials handled --- how your

11   daughter wanted to handle her transgender status and how

12   she wanted to present at school?

13   A.    They respected her transition and her

14   transgender status.  They used her correct pronouns,

15   which was she/her.

16   Q.    That was something that was important to you and

17   BPJ.

18         Is that correct?

19   A.    Correct.

20   Q.    So part of that --- my understanding is that

21   part of the communications that you would have had with

22   school officials at Norwood Elementary School included

23   completing a Gender Support Plan for BPJ.

24         Is that correct?

1      A.    That is correct.

2      Q.    And I'll ask you --- I'm going to ask you about

3   both Gender Support Plans because I know you're having

4   to grab things.  I'm going to ask you about Exhibits 17

5   and 19, if you want to pull them out.  We'll look at

6   Exhibit 17 first.

7      A.    I've got 17 in front of me.

8      Q.    Okay.  Very good.  We'll start there.  We can

9   get to 19 when we get there.

10          And you can take as much time as you want to

11  review this, but my initial question is going to be is

12  this the Gender Support Plan that was in place when BPJ

13  was at Norwood Elementary School?

14     A.    Yes, it is.

15     Q.    And you would agree with me that this document

16  is dated August 23rd, 2019?

17     A.    Correct.

18     Q.    And this was a document that the Harrison County

19  Board of Education had in place, so that there was a

20  process to discuss a combination of a student who's

21  transgender like BPJ.

22          Is that correct?

23               ATTORNEY BLOCK:  Objection to form.

24               THE WITNESS:  That's my understanding.

238

1    BY ATTORNEY DENIKER:

2        Q.    And in fact, did you meet with school officials

3    from the Harrison County Board of Education to develop

4    this Gender Support Plan to support BPJ?

5        A.    I met with the people that are listed on the

6    last page of the Gender Peer Support Plan.

7        Q.    Was there anybody present in the meeting on

8    August 23rd, 2019, whose name doesn't appear on the

9    signature page on page five, which is Bates number BPJ

10   011?

11       A.    I don't know.  I know that we were all supposed

12   to sign it to say that we were there in attendance.  So

13   I presume everyone signed it.

14       Q.    In looking at this signature page, do you recall

15   anybody being there whose name you don't see there?

16       A.    I don't off the top of my head, no.

17       Q.    Is your signature on this document?

18       A.    Yes, ma'am, it is.

19       Q.    And it looks like BPJ's signature is on this

20   document as well.

21             Is that correct?

22       A.    Correct, because she was in attendance.  She had

23   to sign it.

24       Q.    So she was part of this meeting.

239

```
 1            Is that right?
 2       A.    That's correct.
 3       Q.    Did you find the school officials that
 4    participated in this process to be respectful of you and
 5    of BPJ?
 6       A.    Yes, I did.
 7       Q.    And did you find that the purpose of this was to
 8    help accommodate any needs that BPJ might have as a
 9    transgender student?
10               ATTORNEY BLOCK:  Objection to form.
11               THE WITNESS: That's my understanding that
12    that was the purpose of the document.
13    BY ATTORNEY DENIKER:
14       Q.    Did you --- were you in agreement with the
15    Gender Support Plan that was put into place through this
16    August 23rd, 2019 document?
17       A.    Yes, I was in agreement with it.
18       Q.    Was BPJ in agreement with it?
19       A.    Yes, as much as she understood.  Yes.
20       Q.    And did you believe that the school followed
21    through and accommodated her in accordance with this
22    Gender Support Plan while she was at the Norwood
23    Elementary School?
24       A.    They followed the Gender Support Peer Plan, yes.
```

240

```
 1      Q.    So is it fair to say that you didn't have any
 2   issues or concerns of BPJ's treatment as a transgender
 3   student during the time that she was a student at
 4   Norwood Elementary School?
 5      A.    I would say correct.
 6                  COURT REPORTER:  I'm sorry.  I'm sorry.
 7   Can you state that question one more time?  It was a
 8   little fast.
 9                  ATTORNEY DENIKER:  I will try to do that.
10   BY ATTORNEY DENIKER:
11      Q.    Is it fair to say that you did not have any
12   issues or concerns with BPJ's treatment as a transgender
13   student during the time that she was enrolled as a
14   student at Norwood Elementary School?
15      A.    We had no issues.
16      Q.    Ms. Jackson, to confirm, it is my understanding
17   that Harrison County Schools does not offer
18   school-sponsored athletics for students who are in
19   elementary school.  Is that consistent with your
20   understanding?
21      A.    That's my understanding.
22      Q.    And I heard you testify earlier that BPJ
23   participated in cheerleading, which was not a
24   school-related activity, while we was in elementary
```

241

1    school.

2           Is that correct?

3      A.    That was through the Bridgeport Youth Football.

4      Q.    And that's not affiliated with the Harrison

5    County Board of Education.

6           Is that correct?

7      A.    That is --- that is correct.

8      Q.    So the first time that BPJ was eligible to

9    participate in school-sponsored sports was when she went

10   to middle school for this coming academic year.

11          Is that correct?

12     A.    That is correct.

13     Q.    And BPJ, is she currently in the 6th grade?

14     A.    That is correct.

15     Q.    And is she still 11 years old?

16     A.    Yes.

17     Q.    And prior to her --- so she would have

18   transferred from Norwood Elementary School to Bridgeport

19   Middle School for the beginning of this academic year.

20          Is that correct?

21     A.    Correct.

22     Q.    And it's my understanding that Bridgeport Middle

23   School is a three-year middle school that has grades

24   six, seven and eight.

242

```
 1              Is that correct?
 2       A.     That is correct.
 3       Q.     Your older children, your two sons, have they
 4   both gone through Bridgeport Middle School?
 5       A.     Yes, they have.
 6       Q.     So you're familiar with the school?
 7       A.     Yes.
 8       Q.     And you were familiar with it before BPJ
 9   enrolled there.
10              Is that correct?
11       A.     Yes.
12       Q.     And did you have --- well, strike that.
13              Now, I am going to ask you to look at Exhibit
14   Number 19, if you can find it, please.
15       A.     I got to find it.  Can they bring it up on the
16   screen rather than me finding it?
17       Q.     Yes.  And if you need to see a paper copy, I'll
18   be glad to take a break for you to be able to find it.
19       A.     That's okay.  I can look on the screen.  I'm
20   familiar with this document.
21       Q.     Great.  Would you agree with me that this
22   document we just marked as Exhibit West Virginia 19 is a
23   Gender Support Plan for BPJ, which is dated May 18th,
24   2021?
```

1      A.    Correct.

2      Q.    And was this a meeting that you would have had

3  with school officials to create another Gender Support

4  Plan for BPJ?

5      A.    Correct.

6      Q.    May 18th of 2021, at that time am I correct that

7  BPJ would have been finishing her 5th-grade year at

8  Norwood at that time?

9      A.    Yes.

10     Q.    So this meeting was done in preparation for

11  BPJ's transition to Bridgeport Middle School.

12          Is that correct?

13     A.    Correct, and the meeting was held at Norwood.

14     Q.    And as before, the folks that were in

15  attendance, are their signatures on page five of this

16  document, which is Bates number BPJ 006?

17     A.    Yes, I presume that is everyone that was there.

18  We were all asked to sign in if we attended.

19     Q.    And again, as I asked you before, is there

20  anybody who you recall being present for this meeting

21  whose name or signature doesn't appear on page five of

22  this document?

23     A.    I don't think so.

24     Q.    Is your signature on this document?

244

```
 1      A.    Yes, it is.

 2      Q.    And I also see BPJ's signature on this document.

 3            Is that correct?

 4      A.    Yes.

 5      Q.    This included --- even though it was held at

 6   Norwood Elementary School, this did include school

 7   officials from Bridgeport Middle School.

 8            Is that correct?

 9      A.    Correct.

10      Q.    And this included a discussion about

11   accommodation for BPJ once she got to the middle school

12   for this current academic year.

13            Is that correct?

14      A.    Correct.

15      Q.    Was this meeting conducted professionally in

16   your opinion?

17      A.    Yes.

18      Q.    And were you able to discuss wishes, ideas, and

19   concerns you had about accommodations for BPJ as she was

20   starting into the middle school?

21      A.    Yes.

22      Q.    And did you feel like this was a positive

23   meeting?

24      A.    Yes.
```

245

```
 1      Q.   Dave Mazza is somebody who's on the signature

 2   page.  He's the principal at Bridgeport Middle School.

 3           Is that correct?

 4      A.   That is correct.

 5      Q.   Did you know Mr. Mazza before you had this

 6   meeting?

 7      A.   Yes.

 8      Q.   And again, you would have been a parent of

 9   students who have been at Bridgeport Middle School.

10           Is that correct?

11      A.   That is correct.

12      Q.   Your middle child, Ms. Jackson, I'm trying to

13   figure out the ages, is he a couple of years older than

14   BPJ?

15      A.   Thirteen (13).

16      Q.   He's 13.  And what grade is he currently in?

17      A.   Eighth.

18      Q.   So you have two children currently at the middle

19   school.

20           Is that correct?

21      A.   That is correct.

22      Q.   Okay.

23           So Mr. Mazza wasn't new to you in this meeting?

24      A.   That is correct.
```

```
1      Q.    And did you have a --- prior to this meeting,

2   did you have a positive relationship with Mr. Mazza?

3      A.    That is correct.

4      Q.    He's a nice guy, isn't he?

5      A.    He is.

6      Q.    And my experience with him has been that he's

7   very student centered.  Has that been your experience as

8   it relates to your children?

9      A.    He's extremely student oriented.

10     Q.    He really cares about the students, doesn't he?

11     A.    I believe so, yes.

12     Q.    And I see that Tarra Shields was on this

13   document.  Is she the counselor at Bridgeport Middle

14   School?

15     A.    She's the principal I believe now, isn't she?

16     Q.    Is she one of the principals there?

17     A.    I think so, at Norwood.

18     Q.    At Norwood?

19     A.    At Norwood.

20     Q.    That's right.  That's right, Ms. Jackson.  So

21   she was there as the Norwood principal.

22           Is that correct?

23     A.    Correct, correct.

24     Q.    And it looks like Ms. Merrill was there and she
```

247

```
 1    is a counselor at Bridgeport Middle School.
 2              Is that correct?
 3      A.    That is correct.
 4      Q.    And how was your experience with her in this
 5    meeting?
 6      A.    Can you be more specific?
 7      Q.    Sure.  Was she professional with you?
 8      A.    Yes.
 9      Q.    And was she helpful in terms of identifying
10    appropriate accommodations for your daughter as she was
11    getting ready to transition to the middle school?
12      A.    Yes.
13      Q.    Did you feel that the Bridgeport Middle School
14    team was committed to making your daughter's transition
15    to the school as a transgender student a positive
16    experience?
17      A.    Yeah.  The only concern that was raised was the
18    concern about her participating in cross-country.
19      Q.    And I wanted to talk to you about this, Ms.
20    Jackson.  Let me ask you this.  Other than conversation
21    as it related to participation on the cross-country
22    team, did you have any concerns at all about what was
23    discussed during this meeting for the Gender Support
24    Plan on May 18th, 2021?
```

1    A.    No.

2    Q.    So during this meeting it sounds like you did

3  have a discussion with the school officials with regard

4  to BPJ's participation in athletics.

5          Is that correct?

6    A.    That is correct.

7    Q.    And in fact, that's part of this plan is to

8  discuss --- that is a topic to be discussed.

9          Is that correct?

10   A.    I'm sorry.  Can you repeat that?

11   Q.    Sure.  And I probably didn't ask it very well.

12 And let me actually ask you by looking at the document.

13 Let's look at page four of the document.  And this is

14 Bates number BPJ 005.  And Ms. Jackson, I will ask you

15 to look at the top of that document as we scroll up to

16 it.  And there's a specific section on this Gender

17 Support Plan to have a discussion about the student's

18 participation in extracurricular activities.

19         Would you agree with that?

20   A.    Yeah, there's definitely information there

21 regarding that.

22   Q.    And it specifically also addresses sports,

23 doesn't it?

24   A.    Yes, specifically is cross-country and track.

1      Q.    Okay.

2            And so I think the question on the form, it

3      says, in what extracurricular programs or activities

4      will the student be participating and then in

5      parentheses it says sports, theater, clubs, et cetera,

6      question mark.  Did I read that accurately, Ms. Jackson?

7      A.    Yes.

8      Q.    And then in handwriting under that question it

9      says cross-country and track.

10           Is that right?

11     A.    That is correct.

12     Q.    And did you fill this document out?

13     A.    No, that is Ms. Merrill's handwriting.

14     Q.    Okay.

15           And the entries that say cross-country and

16     track, did that --- where did that information come

17     from?

18     A.    From B█████ and myself, that she wanted to

19     participate in cross-country and track.

20     Q.    Okay.

21           And that was noted on this form.

22           Is that correct?

23     A.    Correct.

24     Q.    And was there a discussion about BPJ's

1    participation in school sports and specifically

2    cross-country and track since BPJ expressed an interest

3    in that participation?

4        A.    Yes.  What was discussed is actually on that

5    next line, about the coaches have to be aware of the

6    transition.

7        Q.    Okay.

8             The next line says what steps will be necessary

9    for supporting the student there.  And as you noted, it

10   says coaches would need to be aware of Becky's

11   transition.  If teammates have questions, they can

12   approach the coach or administration.  Did you have any

13   concern with that?

14       A.    The only concern I had at the time was, was she

15   going to be able to run on the girls cross-country team.

16       Q.    And did you ask that question during the

17   meeting?

18       A.    It came up during the meeting.  I don't know if

19   it was in question form or in statement form.

20       Q.    Do you remember who brought it up?

21       A.    I brought it up.

22       Q.    Do you remember what you said during the

23   meeting?

24       A.    Not specifically, just that I was concerned that

1    she would be able to run on the girls cross-country

2    team.

3       Q.    And did somebody respond to that inquiry from

4    you?

5       A.    David Mazza.

6       Q.    And what did Mr. Mazza say?

7       A.    That it would all depend on how the bill was

8    going to come about, and that if she wanted to run, she

9    wouldn't be able to run on the girls cross-country

10    because of the bill.

11       Q.    And when you say the bill, are you talking about

12    House Bill 3293?

13       A.    Yeah.

14       Q.    And is that the bill that --- is it your

15    understanding that it's House Bill 3293 that your

16    current litigation seeks to overturn and address?

17       A.    Yes.

18       Q.    So were you aware as of the date of this Gender

19    Support Plan, May 18th, 2021, what the status of House

20    Bill 3293 was?

21       A.    I just knew it was in legislature.

22       Q.    And Mr. Mazza was also aware of it, it sounds

23    like from his response to you.

24           Is that your understanding?

 1      A.     Yes.

 2      Q.     And so was there any further discussion of BPJ's

 3  ability to run on the girls team other than what you

 4  have already told me?

 5      A.     That was the gist of the conversation, was

 6  regarding my concerns whether or not she would be able

 7  to run on the girls cross-country team.

 8      Q.     And so you were aware of the House Bill --- and

 9  were you aware that it was a state law?

10      A.     All I knew was about the bill.

11      Q.     Okay.

12            And were you aware that that was a bill that

13  was considered and passed by the West Virginia State

14  Legislature?

15      A.     I'm not sure what year it was passed.  I know it

16  was signed by the Governor in April.

17      Q.     So you understood that the bill was signed by

18  the Governor.

19            Correct?

20      A.     Yes.

21      Q.     I'm not trying to quiz you on dates here, Ms.

22  Jackson, but were you aware that at some point the West

23  Virginia Legislature passed that bill?

24      A.     Yes.  Yes, it was passed.  Yes.

1    Q.    Would you agree with me that there is no

2  Harrison County Schools rule or policy that addresses

3  transgender student participation in sports?

4    A.    I don't know that there is or is not.

5    Q.    Has anybody ever told you that there is a

6  Harrison County policy or rule that would prohibit BPJ

7  from participating in a girls sports team?

8    A.    No one has ever told me that.

9    Q.    And the only discussion that you had with Mr.

10 Mazza with regard to BPJ's participation on a girls

11 sports team related specifically to House Bill 3293.

12         Is that correct?

13   A.    Can you repeat that question, please?

14   Q.    Sure.  The only conversation you had with Mr.

15 Mazza with regard to BPJ's ability to participate in a

16 girls sports team at Bridgeport Middle School related to

17 House Bill 3293.

18         Is that correct?

19   A.    Yes.

20   Q.    Have you had any communication with any other

21 official of Harrison County Board of Education or

22 Harrison County Schools related to BPJ's ability to

23 participate in girls sports?

24   A.    No, I have not.

1      Q.    So the only communication related to this

2    occurred with Mr. Mazza on May 18th, 2021.

3           Is that correct?

4      A.    Correct.

5      Q.    And your only discussion about a possible

6    limitation of BPJ's ability to participate in girls

7    sports related to House Bill 3293.

8           Correct?

9      A.    I'm sorry.  I thought I answered that.  Can you

10   repeat the question?  I'm confused.

11     Q.    Sure.  And your only communication then with

12   anybody in Harrison County Schools related to BPJ's

13   ability to participate on a girls sports team was with

14   Mr. Mazza.

15          Correct?

16     A.    Correct.

17     Q.    And that conversation only related to BPJ's

18   ability to run as it would have been impacted by House

19   Bill 3293.

20          Is that correct?

21     A.    The conversation was in regards to how --- if

22   she would be able to run on the girls cross-country team

23   and that would have been dictated by that House Bill.

24     Q.    Mr. Mazza didn't tell you that it would be

1  dictated by anything else, did he?

2      A.    No.

3      Q.    And Mr. Mazza, he did not indicate to you that

4  he wouldn't permit BPJ to participate on the girls team

5  personally.

6          Is that correct?

7                  ATTORNEY BLOCK:  Objection to form.

8                  THE WITNESS:  Yeah.  Can you repeat that

9  question?

10  BY ATTORNEY DENIKER:

11      Q.    Sure.  Did Mr. Mazza tell you that he personally

12  had any objection to BPJ participating on a girls sports

13  team?

14      A.    He never said those words, no.

15      Q.    Okay.

16          And did anybody else in Harrison County Schools

17  affiliated with Harrison County Schools in any way tell

18  you that they wouldn't permit or had a problem with BPJ

19  participating in a girls sports team?

20                  ATTORNEY BLOCK:  Objection.  Compound

21  question.

22                  THE WITNESS:  I didn't contact --- I

23  wasn't in contact with any other individuals.

24  BY ATTORNEY DENIKER:

1    Q.    So you didn't have any communications with

2    anybody else about that.

3            Is that correct?

4    A.    That is correct.

5    Q.    Is there any other communication that you had

6    with anybody in Harrison County Schools about BPJ's

7    participation on a girls sports team other than what we

8    just talked about?

9    A.    No.

10   Q.    Were you otherwise comfortable --- well, strike

11   that.

12           This Gender Support Plan that is dated

13   May 18th, 2021, is that currently in effect for BPJ?

14   A.    Yes.

15   Q.    And were you in agreement with that when you

16   signed it on May 18th, 2021?

17   A.    Correct.

18   Q.    And have you had any issues or concerns or

19   problems with the implementation of this Gender Support

20   Plan during the school year?

21   A.    With the Gender Support Plan I've had no issues.

22   Q.    Did you raise any concerns with anybody within

23   the Harrison County Board of Education or Harrison

24   County Schools about your objections or disagreements

257

```
1    with House Bill 3293?
2        A.    I hadn't had any conversations with those
3    individuals.
4        Q.    And when you say I hadn't I just want to make
5    sure that sitting here today have you had any
6    discussions with anybody affiliated with Harrison County
7    Board of Education other than the communication you had
8    with Mr. Mazza about concerns or problems you had with
9    House Bill 3293?
10       A.    I have not.
11       Q.    Are you aware that there is an elected Board of
12   Education for all of the county Boards of Education in
13   West Virginia?
14       A.    Yes.
15       Q.    And are you aware that there is a specific
16   County Board --- elected County Board of Education for
17   Harrison County Schools?
18       A.    Yes.
19       Q.    Did you have any communications with anybody on
20   the elected Board of Education with regard to BPJ and
21   her ability to participate in girls sports teams?
22       A.    I've had no contact with anybody on the elected
23   board.
24       Q.    Have you had any communication with Dora Stutler
```

1   with regard to BPJ's ability to participate in school

2   sports?

3      A.    No.

4      Q.    Was BPJ permitted to participate in summer

5   conditioning with the Bridgeport Middle School

6   cross-country team in the summer of 2021?

7      A.    Yes.

8               ATTORNEY BLOCK:  Objection to form.

9   BY ATTORNEY DENIKER:

10     Q.    And it's my understanding that the Middle School

11  cross-country team at Bridgeport Middle School does the

12  summer conditioning where they run together.

13           Is that correct?

14     A.    They --- they all condition together, but they

15  separate out into groups, if that makes sense.

16     Q.    How were those groups separated?  Do you know?

17     A.    Normally by speed in the conditioning

18  environment.

19     Q.    Are they separated by sex or gender in any way?

20     A.    Only by boys team and girls team.

21     Q.    And was BPJ permitted to run then with the girls

22  teams in the girls groups?

23     A.    Correct.

24               ATTORNEY BLOCK:  Objection to form.

259

BY ATTORNEY DENIKER:

Q.    Did you have any issues or concerns with how BPJ was treated concerning conditioning?

A.    No.  The coaches were very respectful of her pronouns and her transgender identity.

Q.    And was that true for the entire cross-country season?

A.    The coaches --- yes, the coaches were very much so, yes.

Q.    So you had --- did BPJ have a positive experience participating on the girls cross-country team?

A.    Yes.

Q.    And so I got a little bit ahead of myself because we were talking about summer conditioning and then there were tryouts for cross-country.

      Is that correct?

A.    That's correct.

Q.    And did that take place in August of 2021?

A.    Yes.

Q.    And BPJ tried out for the girls cross-country team.

      Is that correct?

A.    That is correct.

1    Q.    And she was permitted to do so by the middle

2    school.

3           Is that right?

4    A.    That is correct.

5    Q.    And was she selected for membership on the girls

6    cross-country team?

7    A.    That is correct.

8    Q.    And I think I heard you testify earlier that she

9    did compete through the whole season on the girls

10   cross-country team.

11          Is that right?

12   A.    That is correct.

13   Q.    And she had a good experience doing that?

14   A.    Yes, she did.

15   Q.    Good.  I'm glad to hear that.  And I had to

16   laugh when Mr. Tryon was asking you questions about

17   where she placed because it's clear to me that he has

18   never been to a middle school cross-country meet because

19   they're just --- even in high school, there are just

20   tons of kids and lots of runners, aren't there?

21   A.    There's tons of them, yes.

22   Q.    And just for the record, my kids never came in

23   first or second either, so I understand that.

24          Who were the coaches for the cross-country team

1  this year at the Bridgeport Middle School?

2      A.    Schoonmaker or Shumaker, I'm not sure how to

3  pronounce her name, and I can't remember the names of

4  the other two.

5              ATTORNEY BLOCK:  Sorry.  Just can you

6  give me a five-second pause while I move to the other

7  room.  My son is about to come home from school.

8              ATTORNEY DENIKER:  Absolutely.  No

9  problem.

10             ATTORNEY BLOCK:  Shift over.  All set.

11             ATTORNEY DENIKER:  That was fast.

12             ATTORNEY BLOCK:  Small apartment.

13  BY ATTORNEY DENIKER:

14     Q.    Ms. Jackson, I was asking you about the

15  Bridgeport cross-country coaches.  Are the coaches the

16  same for the girls and the boys teams?

17     A.    Yes, they are.

18     Q.    And was the head coach Danielle I think maybe

19  it's Schoonmacher?

20     A.    Yes.

21     Q.    And then you said there were two other coaches.

22  I think one of them may be Natalie McBriar?

23     A.    Yes, that is one of them.

24     Q.    Is that correct?

```
 1     A.    Yes.

 2     Q.    And do you who the other one was?

 3     A.    I can't remember her name.

 4     Q.    But your daughter would have interacted with

 5  these coaches throughout the season?

 6     A.    Correct.

 7     Q.    And didn't have any issue or problem with them.

 8           Is that correct?

 9     A.    That is correct.

10     Q.    Did she have any issues or problems with other

11  students on the cross-country team?

12     A.    At one point she came home and reported that

13  somebody had told her that she's not a real girl.  I

14  asked her at that point if she reported it to the coach

15  and she said that she did.

16     Q.    And do you know whether the situation was

17  addressed by the coaches?

18     A.    I do not know.

19     Q.    Did you follow up with the coaches to discuss

20  this concern?

21     A.    I did not.

22     Q.    Did you feel that BPJ had handled it herself and

23  you were comfortable with that?

24     A.    Oh, quite well, yes.
```

263

1    Q.    And were there any issues after that with

2    students, after BPJ raised this concern with the

3    coaches?

4    A.    There was not.

5    Q.    If you thought that there was a further problem

6    would you have gotten involved and either addressed it

7    with either the coaches or school officials?

8    A.    Most definitely.

9    Q.    Is it fair to say you didn't think that was

10   necessary?

11   A.    Correct.

12   Q.    That season is over now.

13         Is that correct?

14   A.    That is correct.

15   Q.    And is BPJ --- did she try out for any winter

16   sports at the middle school?

17   A.    No, she did not.

18   Q.    Does she intend to try out for any spring

19   sports?

20   A.    Yes, she does.

21   Q.    And what does she intend to try out for?

22   A.    Track.

23   Q.    And has --- have you had any communications with

24   school officials about her ability to try out for track

1  this spring?

2      A.    We have not.

3      Q.    Is it your understanding that she will be

4  permitted to try out for the girls track team?

5      A.    I don't have an understanding whether she'll be

6  permitted or not.

7      Q.    Because you have not had any discussions.

8            Is that correct?

9      A.    Correct.

10     Q.    Let me talk more candidly about BPJ's school

11 year.  And I'm sorry if I already asked you this, but at

12 the middle school she's I guess almost halfway through

13 her sixth grade year.

14           Is that correct?

15     A.    That is correct.

16     Q.    And is she having a good school year?

17     A.    She's having an excellent school year.  After

18 she learned her locker combination, everything went

19 well.

20     Q.    Right now all of us are having a flashback to

21 middle school and the trauma that was remembering your

22 locker code.  I understand that, Ms. Jackson.  And do

23 you feel that the school has appropriately implemented

24 the Gender Support Plan that you agreed upon?

265

1     A.    Yes.

2     Q.    And you don't have any issues or concerns with

3 how school officials have treated BPJ this school

4 year-to-date?

5     A.    No.

6     Q.    I want to follow up on a question that Mr. Tryon

7 asked about cross-country meets this fall.  You

8 mentioned that some meets --- I think you called them

9 one and done meets?

10    A.    Yes.

11    Q.    And I think you described that everybody ---

12 they have the girls teams and the boys teams all run at

13 one time.

14          Is that correct?

15    A.    Correct, correct.

16    Q.    And in those situations the boys teams are still

17 competing against the boys teams and the girls teams are

18 still competing against the girls teams.

19          Is that correct?

20    A.    Yes.  The statistics go towards the appropriate

21 team.

22    Q.    That was what I assumed was the case in those

23 meets, but I just wanted to ask you.  I haven't seen one

24 of those, but I figured they still separated the results

USCA4 Appeal: 23-1078   Doc: 53-3   Filed: 03/27/2023   Pg: 213 of 674

```
 1   by girls teams and boys teams.
 2           Right?
 3       A.    Correct.
 4       Q.    And in those situations BPJ would have been
 5   listed on girls roster and would have been competing
 6   against other girls teams.
 7           Correct?
 8       A.    That is correct.
 9       Q.    I did notice in one of the pictures that was
10   provided through your counsel in discovery there were
11   some pictures of BPJ at various cross-country meets this
12   fall.  It looks like she was having a good time.
13           Was that correct?
14       A.    That is correct.
15       Q.    I saw the one of her in the creek, and I will
16   tell you that I have been there with my daughter and
17   what a muddy mess.  Huh?
18       A.    Yes, very much so.
19       Q.    But the middle school kids love it.  I don't
20   know if BPJ loved it, but I know that my daughter
21   thought it was great to get muddy.
22       A.    The creek crossing runs are her favorites.
23       Q.    Let me just look at my notes here, Ms. Jackson.
24   I'm almost done.
```

1          I want to go back briefly to your

2    communications with Mr. Mazza about House Bill 3293.

3    Mr. Mazza did not tell you that he agreed with that

4    bill, did he?

5        A.    He didn't say he agreed or disagreed.

6        Q.    And did anybody employed by Harrison County

7    Schools or any elected official of Harrison County

8    Schools ever tell you that they agreed with House Bill

9    3293?

10       A.    I've had no communication with anybody in that

11   genre whether they agreed or disagreed.

12       Q.    And that would include Superintendant Stutler,

13   she also didn't tell you that she agreed with House Bill

14   3293.

15          Correct?

16       A.    Yes, there has been no communication between me

17   or her whether she agrees or disagrees.

18               ATTORNEY DENIKER:   Ms. Jackson, thank

19   you.  I don't have any further questions at this time.

20                       ---

21                    EXAMINATION

22                       ---

23   BY ATTORNEY MORGAN:

24       Q.    Ms. Jackson, my name is Kelly Morgan and I

 1    represent the West Virginia Board of Education and

 2    Superintendant Burch.  Can you hear me okay?

 3        A.    Yes.

 4        Q.    All right.

 5              I only anticipate a few questions here, so I

 6    don't anticipate going very long.  But if you don't

 7    understand my question, please let me know.  Otherwise,

 8    I'm going to assume that you understood my question if

 9    you answer my question.

10              Is that fair?

11        A.    Okay.  Yes.

12        Q.    All right.

13              Had you ever had any discussions with anyone

14    from the West Virginia Board of Education?

15        A.    I have not.

16        Q.    And when I say the West Virginia Board of

17    Education, what does that mean to you?

18        A.    I don't know how to answer that.  That means the

19    West Virginia Board of Education.

20        Q.    Do you know what the West Virginia Board of

21    Education is?

22        A.    Yeah, the governing body of the board --- of the

23    educational system.

24        Q.    Can you describe that any more for me as to what

269

1    your understanding is?

2        A.    No, I cannot.

3        Q.    Do you know like the hierarchy of how that's set

4    up at all?

5        A.    No.

6        Q.    Okay.

7              Do you know where they are in relation to say

8    Harrison County Board of Education?

9        A.    No.

10       Q.    Fair enough.

11       A.    Do you mean physically where they're located?

12       Q.    No, not physically?

13       A.    Oh, okay.

14       Q.    Like as who might give direction to who?

15       A.    Oh, okay.  No.

16       Q.    Or who does what or anything like that?

17       A.    No.

18       Q.    Okay.  Fair enough.

19              I just wondered.  Have you ever talked to

20    Superintendant Burch?

21       A.    No.

22       Q.    Have you ever contacted his office?

23       A.    No.

24       Q.    Are you aware of anyone in your family who has

```
 1    contacted the West Virginia Board of Education or

 2    Superintendant Burch?

 3        A.    I am not aware.

 4        Q.    Do you have any reason to believe that the West

 5    Virginia Board of Education had any specific role or

 6    involvement in the passage of House Bill 3293?

 7        A.    I don't know.

 8        Q.    You wouldn't know one way or another?

 9        A.    Nope.

10        Q.    Okay.

11              And so if you never had any contact with the

12    West Virginia Board of Education or Superintendant

13    Burch, is it fair to say that you don't have any

14    complaints of anything that they've done in this case

15    with regard to BPJ?

16                    ATTORNEY BLOCK:   Objection to form.

17                    THE WITNESS:   Can you repeat the

18    question?

19    BY ATTORNEY MORGAN:

20        Q.    Sure.   Let me even rephrase it a different way.

21    Do you have any complaints as to anything that the West

22    Virginia Board of Education has done with regard to BPJ?

23        A.    Up to this point they have let her run on the

24    girls cross-country team, so we're happy with that.
```

1    Q.    And when you say they, who are you referring to?

2    A.    The Board of Education.  They have not ---

3    because of the stay, they didn't tell her she couldn't

4    run.

5    Q.    And are you specifically referring to Harrison

6    County Board of Education?

7    A.    I'm referring to any Board of Education.

8    Q.    You said earlier that you had never been

9    contacted by anyone for BPJ to be, in essence, the

10   spokesperson for transgender rights.

11         Is that right?

12   A.    That's correct.

13   Q.    Had you ever contemplated her being a

14   spokesperson for transgender rights?

15   A.    Heavens, no.

16   Q.    You said that you had a family friend who also

17   had a transgender, I believe male.

18         Is that right?

19   A.    That's correct.

20   Q.    What discussions have you had with that friend

21   regarding transgender rights?

22         ATTORNEY BLOCK:  Objection.  Vague.

23         THE WITNESS:  Yeah, I'm not sure how to

24   answer that.  I mean ---.

272

 1  BY ATTORNEY MORGAN:

 2      Q.    As you sit here today, can you think of anything

 3  specific about things you might do to promote

 4  transgender rights?

 5      A.    What we would do as individuals to promote it?

 6      Q.    Yes.

 7      A.    Like publicly promote it?

 8      Q.    Sure.

 9      A.    No.

10      Q.    Have you talked to this friend?  And I forget

11  her name.

12      A.    Carolyn.

13      Q.    Carolyn.  Have you talked to Carolyn about this

14  case?

15      A.    No.

16      Q.    Do you know whether B███ has talked to Carolyn

17  or her transgender son, if I'm using that term

18  correctly, about this case?

19      A.    She has not.

20            ATTORNEY MORGAN:  Ms. Jackson, those are

21  all the questions that I have for you.  Thank you.

22            And before someone questions, I think it

23  was Tim possibly, I may be switching to a different

24  device so just be patient if I drop off this for the

273

```
 1   court reporter and all other counsel.  I'll be joining

 2   on another device.  Thank you again.

 3                              ---

 4                         EXAMINATION

 5                              ---

 6   BY ATTORNEY DUCAR:

 7     Q.    Good afternoon, Ms. Jackson.  I'm Tim Ducar and

 8   I represent Lainey Armistead, an intervenor in this

 9   case.  You previously --- strike that.

10          Let's go back to this cross-country competition

11   example that we were talking about because I am

12   unfamiliar with it.  Is this one and done competition

13   everybody runs all at one time but the rankings are kept

14   track somehow?

15     A.    Correct.

16     Q.    And you said the rankings are done in what

17   manner?

18     A.    Sometimes they have chips, sometimes it's done

19   manually.

20     Q.    So it is separated by gender or sex or is it

21   separated by --- how are those separated?

22     A.    Sorry.  There's a huge echo.

23               ATTORNEY MORGAN:  Sorry.  That may have

24   been me.  I think I fixed it.
```

1                    THE WITNESS:  Okay.

2                    I'm sorry.  Mr. Ducar, could you repeat?

3    BY ATTORNEY DUCAR:

4        Q.    How are the groups that are competing separated

5    in those kinds of events?

6        A.    I'm not sure how the logistics works.  I've

7    never worked an event where that happens, so I'm not

8    sure how they do it.

9        Q.    Okay.

10                   But when BPJ ran in an event like that, I guess

11   she only ran in one, would you describe her as not being

12   first, not being second, not being last, but how?

13       A.    I wouldn't know to tell you where she ranked.

14       Q.    Okay.

15                   On the times that she competed against --- on

16   the girls team, she didn't end up first, second or last.

17   Was she in the front of the pack?  Was she in the back?

18   How did she end up?

19       A.    She was in the back of the pack.

20       Q.    So the second 50 percent anyway.

21             Correct?

22       A.    She was not in the top 50 percent.

23       Q.    She still enjoyed herself.

24             Right?

1    A.    She had a blast.

2    Q.    You previously testified that BPJ was born a

3  male.  Can you please explain what you meant when you

4  said BPJ was born a male?

5    A.    She was born as a male in that she was

6  designated male at birth because she had a penis when

7  she was born.

8    Q.    Is there any other characteristics that would

9  conclude you to say BPJ was born a male?

10    A.    No.  That is how they're identified when you

11  give birth.  They look at the genitalia and tell you

12  it's a boy or a girl.

13    Q.    You previously testified the reason BPJ is

14  female is based upon BPJ's identification as a female.

15  In your view, how does someone know what they identify

16  as?

17    A.    She knows that she's a female just like I know

18  that I'm a female and you know that you're a male.

19    Q.    So it's something somebody knows internally.

20          Correct?

21    A.    Yes.  She knows that she's a female.

22    Q.    And the way one identifies whether or not

23  they're male or female is their internal thought about

24  that.

 1          Correct?

 2                    ATTORNEY BLOCK:  Objection to form.

 3                    THE WITNESS:  Their internal thought and

 4     their outward thought.

 5     BY ATTORNEY DUCAR:

 6     Q.    How they act, is that what you're saying?

 7     A.    How they express themselves, if they come out

 8     and say that I am a female.

 9     Q.    Very well.

10          You testified earlier that someone who

11     identifies as a female should be able to run on girls

12     cross-country teams.  Do you think it's true even if the

13     person was born a biological male and has not taken

14     puberty blockers?

15     A.    Yes.

16     Q.    Earlier you testified that BPJ showed female

17     characteristics at about age three.  What are female

18     characteristics that she would have --- or that BPJ

19     displayed?

20     A.    Her mannerisms, her choice of clothing, limited

21     vocabulary but able to say that she's a girl, expressing

22     concern over the fact that she had a penis.

23     Q.    I presume you supported her the entire time when

24     she was showing these characteristics?

1      A.     Yes, I nurtured her.

2      Q.     Did you ever dissuade BPJ's from these

3  characteristics?

4      A.     Nope.

5      Q.     Have you ever?

6      A.     Nope.

7      Q.     How do you feel about BPJ's transitioning?

8      A.     I think she's a beautiful little girl.

9      Q.     Do you think her desire to transform is

10  permanent?

11      A.     Yes.

12      Q.     What happens if BPJ changes BPJ's mind and wants

13  to transition back?

14                  ATTORNEY BLOCK:   Objection to form.

15  BY ATTORNEY DUCAR:

16      Q.     Would you support that?

17      A.     I would support her true self, however she

18  chooses live authentically.

19      Q.     So would you support de-transitioning if that is

20  what BPJ wanted to do?

21      A.     If some day she came to me and said she chose to

22  de-transition, yes, I would support her.

23      Q.     Does the fact that BPJ wants to transition or is

24  transitioning causing you any anxiety?

278

```
 1      A.    Just worried about any sort of discrimination

 2   that she may face.

 3      Q.    Anything else?

 4      A.    No.

 5      Q.    Is it causing your husband any anxiety?

 6      A.    You would have to ask him.

 7      Q.    None that you're aware of?

 8      A.    It seems that he's doing just fine.

 9      Q.    Is it causing BPJ any anxiety?

10                ATTORNEY BLOCK:   Objection to form.

11                THE WITNESS:   If she gets misgendered,

12   she's upset.

13   BY ATTORNEY DUCAR:

14      Q.    Is there anything else about the transitioning

15   that causes her anxiety?

16      A.    No.   She's happy to transition.

17      Q.    How about this lawsuit, is this lawsuit causing

18   you anxiety?

19      A.    The whole process of it is quite overwhelming.

20      Q.    Is it causing your husband anxiety?

21      A.    You would have to ask him on that one.

22      Q.    Is it causing BPJ anxiety?

23      A.    Not that I know of.

24      Q.    Has your husband told you about how he feels
```

**JA1286**

```
 1   about BPJ's desire to transition?

 2      A.    I know that he supports her.

 3      Q.    Do you have any hesitation about BPJ's interest

 4   in socially or medically transitioning?

 5      A.    Can you repeat that, please?

 6      Q.    Do you have any hesitation about BPJ's interest

 7   in socially or medically transitioning?

 8      A.    No hesitation.

 9      Q.    Have you encouraged BPJ's interest in

10   transitioning?

11      A.    I have helped ---.

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  I have helped her in her

14   desire to transition.

15   BY ATTORNEY DUCAR:

16      Q.    So that would be yes.

17              Correct?

18      A.    I helped her in her desire to transition.

19      Q.    Have you encouraged her?

20      A.    I have helped her.

21              ATTORNEY BLOCK:  Objection to the form.

22   BY ATTORNEY DUCAR:

23      Q.    So you have not encouraged BPJ?

24      A.    I wouldn't use the word encourage.
```

280

 1      Q.    Do you think it's important that team sports

 2    have fair rules?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    ATTORNEY DUCAR:  Excuse me.  What is

 5    wrong with the form?  That's a simple question.

 6                    ATTORNEY BLOCK:   I think the fair rules

 7    is vague.

 8                    ATTORNEY DUCAR:  Okay.  Thank you.

 9    BY ATTORNEY DUCAR:

10      Q.    So I'll ask it again.  Ms. Jackson, do you think

11    it's important that team sports have fair rules?

12      A.    I think rules are necessary in society.

13      Q.    Do you think it's important that team sports

14    have fair rules?

15      A.    What constitutes fair?

16      Q.    Well, that's a good question.  Okay.  I'll move

17    on then.

18            Do you have any long-term treatment goals for

19    BPJ?

20      A.    Well, I hope she'll continue her blockers until

21    she's ready for her next step, whatever she and her

22    doctors decide that need be.

23      Q.    You're going to follow the medical advice of the

24    doctors.

1          Correct?

2     A.    Correct.

3     Q.    Whose idea was it for BPJ to start puberty

4  blockers?

5     A.    She expressed her desire to start the puberty

6  blockers.  She was concerned about her body producing

7  male hormones.

8     Q.    Earlier you testified that Dr. Montano talked to

9  you about risks of puberty blockers.

10          Did you understand what he said?

11    A.    Yes.

12    Q.    Did BPJ understand what he said?

13    A.    Yes.

14    Q.    And do you understand the long-term

15  ramifications of BPJ taking puberty blockers?

16    A.    As I read the package insert.

17    Q.    What do you understand the risks to be of cross

18  sex hormones?

19    A.    I don't understand the question.

20    Q.    You talked about hormone therapy throughout this

21  deposition.

22          Correct?

23    A.    Correct.

24    Q.    What do you define as hormone therapy?

```
 1      A.    Well, in her particular case she will be
 2   receiving female hormones.
 3      Q.    Do you understand the risks of her taking female
 4   hormones?
 5      A.    Yes.
 6      Q.    Does B      ?
 7      A.    Yes.
 8      Q.    And you understand the long-term ramifications
 9   of BPJ taking these hormones.
10            Correct?
11      A.    I know there are risks.
12      Q.    And BPJ knows those as well.
13            Right?
14      A.    There are risks, yes.
15      Q.    What are those risks?
16      A.    Possibility of increased chance of cancer.
17      Q.    Anything else?
18      A.    Non-reversible characteristics.
19      Q.    For example, what would that be?
20      A.    Decreased size in testes.
21      Q.    Anything else?
22      A.    If she would eventually want to go off the
23   hormones, a decreased size in breasts.
24      Q.    Anything else?
```

1    A.    Those are the biggies.

2    Q.    Earlier I did not hear that Dr. Montano talked

3    about the risks of testosterone.  Did Dr. Montano talk

4    to you about the risks of testosterone?

5    A.    She's not taking testosterone.

6    Q.    Did Dr. Montano ever talk to you about that?

7    A.    She won't be taking testosterone.

8    Q.    Does that mean no?

9    A.    No, because she's not taking testosterone.

10   Q.    Has any medical professional talked to you about

11   the risks of taking testosterone?

12   A.    No, because she wouldn't be taking testosterone.

13   Q.    Is BPJ eligible to compete on Bridgeport Middle

14   Schools cross-country team, girls?

15            ATTORNEY BLOCK:  Objection to form.

16            THE WITNESS:  She was permitted to

17   participate this past season.

18   BY ATTORNEY DUCAR:

19   Q.    Bridgeport Middle School has a boys

20   cross-country team.

21         Correct

22   A.    Correct.

23   Q.    Is BPJ eligible to compete on Bridgeport Middle

24   School's boys cross-country team?

```
 1      A.     She would not participate.

 2      Q.     Do you know if BPJ is eligible to do so?

 3      A.     It was irrelevant to the conversation in regards

 4   that she would refuse to try out for the boys

 5   cross-country team.

 6      Q.     So is it fair to say you're not sure?

 7      A.     I don't know if she would be eligible.

 8      Q.     I believe in your Declaration you said that

 9   BPJ's running on a boys cross-country team is not an

10   option.  What did you mean by that?

11      A.     She will not be running on a boys cross-country

12   team.  She has exhibited absolutely no desire to run on

13   a boys cross-country team.

14      Q.     Are there situations where it would be not fair

15   to allow a male, a biological male, to run on a girls

16   cross-country team?

17      A.     Can you repeat the question?

18      Q.     Are there situations where it would be not fair

19   to allow a biological male to run on a girls

20   cross-country team?

21      A.     If a biological male identifies as a female they

22   should be allowed to run on a girls cross-country team

23   or play girls sports.

24      Q.     Okay.
```

285

```
1            But my question is, is there a situation where

2    it wouldn't be fair to allow that to happen?

3       A.   I guess I don't understand how the wording of it

4    --- it's almost like you are using a double negative.

5    I'm not understanding the question.

6       Q.   Is it --- can you think of a situation where it

7    would be unfair to allow a biological male to run on a

8    girls cross-country team?

9       A.   No, I can't think of a situation.

10                ATTORNEY DUCAR:  Thank you, Ms. Jackson.

11   I have nothing further for you.

12                ATTORNEY TRYON:  I have two follow-up

13   questions.

14                         ---

15                  RE-EXAMINATION

16                         ---

17   BY ATTORNEY TRYON:

18      Q.   You indicated that ---.

19                ATTORNEY DUCAR:  I'm sorry.  Can I

20   interrupt?

21                ATTORNEY TRYON:  Yes.

22                ATTORNEY DUCAR:  I have like three other

23   questions that I forgot about.  I'm sorry to interrupt.

24                ATTORNEY TRYON:  Okay.  Go ahead.
```

```
 1                    ATTORNEY DUCAR:  All right.  Do you need
 2      a break, Heather?
 3                    THE WITNESS:  I just need to get a little
 4      more water.  I'm out.
 5                    ATTORNEY DUCAR:  Okay.
 6                    I'm changing my mind.  I've already
 7      handled these questions, so I'm sorry for interrupting
 8      and now I have no further questions.
 9                    THE WITNESS:  Got it.
10      BY ATTORNEY TRYON:
11         Q.    Two quick questions.  You indicated during some
12      of the other questioning that BPJ intends to or wants to
13      run in track this next year.
14                    Is that right?
15         A.    That is correct.
16         Q.    Do you know which events that BPJ wants to or
17      intends to run in this next year?
18         A.    She's interested in distance running.
19         Q.    Can you be more specific?
20         A.    The mile, two-mile.
21         Q.    Any others?
22         A.    She's not really experienced any of the other
23      events in track because this would be her first year to
24      be exposed to them.  So she hasn't really raised any
```

287

```
 1   desire because she hasn't experienced them.

 2       Q.    Okay.

 3             So what about cross-country, does BPJ want to

 4   do them again?

 5       A.    Oh, yes.

 6       Q.    Great.  Then when running in these meets, these

 7   cross-country meets, it's my understanding that BPJ was

 8   competing against both sixth, seventh and eighth

 9   graders.

10             Is that right?

11       A.    That is correct.

12       Q.    Ninth graders?

13       A.    No.

14       Q.    That's true for all cross-country that BPJ's

15   grade levels.

16             Right?

17       A.    That is correct.

18             ATTORNEY TRYON:  Thank you.  I have no

19   further questions with the caveat in the event that we

20   need to reopen this upon delivery of additional

21   documents we would want to continue this deposition.

22   Other than that, I have no other questions.

23             ATTORNEY BLOCK:  And Plaintiff would

24   object to any continuation of the deposition.
```

```
1                    ATTORNEY GREEN:  On behalf of WVSSAC I
2      have no further questions.  Thank you, Ms. Jackson.
3                    THE WITNESS:  Thank you.
4                    ATTORNEY DENIKER:  I have no further
5      questions.  Thank you for your time today, Ms. Jackson.
6                    THE WITNESS:  Thank you.
7                    ATTORNEY MORGAN:  I have no further
8      questions.  Thank you so much.
9                    THE WITNESS:  Thank you.
10                   ATTORNEY DUCAR:  I have nothing further.
11     Thank you so much.
12                   THE WITNESS:  Thank you.
13                   ATTORNEY BLOCK:  And the witness will
14     review the transcript in accordance with the Rules.
15                   VIDEOGRAPHER:  If there are no further
16     questions, then that this concludes the deposition.  The
17     time reads 4:49 p.m.
18                         * * * * * * *
19              VIDEOTAPED VIDEOCONFERENCE DEPOSITION
20                   CONCLUDED AT 4:49 P.M.
21                         * * * * * * *
22
23
24
```

Case 2:21-cv-00316   Document 289-15   Filed 04/21/22   Page 214 of 214 PageID #: 10964

```
                                                                289
 1   STATE OF WEST VIRGINIA  )

 2                      CERTIFICATE

 3             I, Nicole Montagano, a Notary Public in

 4   and for the State of West Virginia, do hereby

 5   certify:

 6             That the witness whose testimony appears

 7   in the foregoing deposition, was duly sworn by me

 8   on said date, and that the transcribed deposition

 9   of said witness is a true record of the testimony

10   given by said witness;

11             That the proceeding is herein recorded

12   fully and accurately;

13             That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19             I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23      OFFICIAL SEAL
        NOTARY PUBLIC
        STATE OF WEST VIRGINIA
24      Nicole Montagano                 Nicole Montagano,
        Sargent's Court Reporting Service, Inc.
        HUB Business Center Suites
25      Martinsburg WV 25401             Court Reporter
        My Commission Expires November 26, 2026
```

```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                     CHARLESTON DIVISION

4                    * * * * * * * *

5   B.P.J., by her next friend and    *

6   Mother, HEATHER JACKSON,          *

7       Plaintiff                     *   Case No.

8       vs.                           *   2:21-CV-00316

9   WEST VIRGINIA STATE BOARD OF      *

10  EDUCATION, HARRISON COUNTY        *

11  BOARD OF EDUCATION, WEST          *

12  VIRGINIA SECONDARY SCHOOL         *

13  ACTIVITIES COMMISSION, W.         *

14  CLAYTON BURCH in his official     *

15  Capacity as State Superintendent,*

16  DORA STUTLER in her official      *

17  Capacity as Harrison County       * VIDEOTAPED DEPOSITION

18  Superintendent, PATRICK MORRISEY  *      OF

19  In his official capacity as       * WESLEY SCOTT PEPPER

20  Attorney General, and THE STATE   * January 19, 2022

21  OF WEST VIRGINIA,                 *

22      Defendants                    *

23            Any reproduction of this transcript
              is prohibited without authorization
24               by the certifying agency.
```

1      A.    A couple of years back my wife was talking about

2  it.  Like I said, I can't give you the exact date.

3      Q.    And do you recall whether at any time prior to

4  hearing about the House bill from your wife, any time

5  prior to that, you notified WVSSAC of BPJ's interest in

6  cross-country?

7      A.    I didn't personally, no.

8      Q.    Do you recall whether at any time prior to

9  filing the lawsuit or your family filed the lawsuit you

10  notified WVSSAC of BPJ's interest in running

11  cross-country?

12      A.    I did not.

13      Q.    All right.

14          And do you recall whether any time prior to

15  today, this moment, you notified WVSSAC of BPJ's

16  interest in cross-country?

17              ATTORNEY HARTNETT:  Objection to

18  foundation.

19              THE WITNESS:  My wife would have that

20  information.  I don't --- I don't know that information.

21  I don't have that information.

22  BY ATTORNEY GREEN:

23      Q.    All right.

24          And I was asking whether you personally had it.

```
 1    Have you personally had any communications with WVSSAC?
 2        A.    No.
 3                    ATTORNEY GREEN:  I don't have any other
 4    questions.  I appreciate your time.
 5                    THE WITNESS:  Thank you.
 6                    ATTORNEY GREEN:  Thank you.
 7                        ---
 8                    EXAMINATION
 9                        ---
10    BY ATTORNEY DENIKER:
11        Q.    Mr. Pepper, my name is Susan Deniker. I am
12    counsel for the Harrison County Board of Education and
13    the Harrison County Board of Education's Superintendant
14    Dora Stutler.  Thank you for your time today.  We
15    appreciate it.  I have a few questions for you.  Have
16    you been involved in any meetings with any officials,
17    any employees of Harrison County Board of Education
18    relating to BPJ's gender identity and any accommodation
19    of her gender identity in the school system?
20        A.    I have not.
21        Q.    Okay.
22              Have you had a conversation with any employee
23    of the Harrison County Board of Education at anytime
24    with regard to your daughter's gender identity?
```

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                      CHARLESTON DIVISION
    _____
 4  B.P.J. by her next friend and)
 5  mother, HEATHER JACKSON,      )
 6              Plaintiff,        )
       vs.                        ) Case No.
 7  WEST VIRGINIA STATE BOARD OF ) 2:21-cv-00316
 8  EDUCATION, HARRISON COUNTY    )
    BOARD OF EDUCATION, WEST      )
 9  VIRGINIA SECONDARY SCHOOL     )
10  ACTIVITIES COMMISSION, W.     )
    CLAYTON BURCH in his official)
11  capacity as State            )
12  Superintendent, DORA STUTLER,)
    in her official capacity as  )
13  Harrison County              )
14  Superintendent, and THE STATE)
15  OF WEST VIRGINIA,            )
16              Defendants.       )
                And               )
17  LAINEY ARMISTEAD,            )
18          Defendant-Intervenor.)
    _____)
19              REMOTE VIDEOTAPED DEPOSITION OF
20                      DORA STUTLER
                          AND
21                      DAVE MAZZA
                   Tuesday, March 8, 2022
22                      Volume I
    Reported by:
23  ALEXIS KAGAY, CSR No. 13795
24  Job No. 5079542
25  PAGES 1 - 240
```

Page 1

```
 1      Q   Did you or anyone at the county board present

 2    the county board members with the -- with the bill

 3    H.B. 3293?

 4      A   No.

 5      Q   Has the board voted in any way relating to     01:05:04

 6    policies around H.B. 3293?

 7      A   No.

 8      Q   What is the county board's relationship with

 9    the Department of Education?

10      A   I believe, as the superintendent, I am the     01:05:21

11    conduit from the County Board of Education to my

12    board.  So information that comes from the state

13    board is usually a conduit through me to the board,

14    although my board has -- our state boards have their

15    own association that also has a relationship with    01:05:50

16    the state board, and they do have a fall meeting and

17    a winter meeting to update board members.  So

18    they -- they have a relationship outside of my

19    relationship with the state board through that

20    organization.                                        01:06:08

21      Q   When you say "they," who are you referring

22    to?

23      A   My board members.  My five board members are

24    part of a state -- it's just an association.  Like I

25    have an association for superintendents, there's an  01:06:23
```

Page 38

```
 1      Q    Just so I understand, you've said "adopt a
 2   policy."  What I'm asking is, are there instances
 3   where the policy comes directly from the county
 4   board?
 5      A    No.  As far as creating the policy, like        01:08:07
 6   writing it, the actual making of the policy, I
 7   don't --
 8      Q    No problem.  Thank you.
 9           If the county board disagrees with a policy
10   that's been presented by the state board, will it       01:08:40
11   still adopt that policy?
12      A    We have no choice but to follow state board
13   policy.
14      Q    So what is the purpose of having votes as it
15   relates to policies?                                    01:08:56
16      A    They're -- I guess it's -- we adopt state
17   policy.  We use the language for state policy.  And
18   that is our guidance.
19           If we have a local policy, and it would be
20   something like our local discipline policy, we have     01:09:08
21   an overarching state policy for safe and supportive
22   schools, policy 4373, and it gives you examples of
23   how you would discipline, if this occurs.
24           A local policy would take that policy, adopt
25   all the same language as the state policy, but we       01:09:31
```

Page 40

```
1        A    That's been approved by my board, by my

2     five-member board.

3        Q    Understood.  Is the county board

4     superintendent responsible for monitoring H.B. 3293?

5             MS. DENIKER:  Objection to the form.        01:14:04

6             THE WITNESS:  That -- there is a current

7     injunction with that rule, so we're...

8     BY MS. REINHARDT:

9        Q    Is the county board superintendent

10    responsible for monitoring state policies that are    01:14:30

11    adopted by the county board?

12            MS. DENIKER:  Objection to form.

13            THE WITNESS:  Would you repeat that question.

14    BY MS. REINHARDT:

15       Q    Is the county board superintendent           01:14:41

16    responsible for monitoring policies, let's say state

17    policies, that are adopted by the county board?

18            MS. DENIKER:  Same objection.

19            THE WITNESS:  Our -- our county board

20    policies are following state board policy.           01:15:01

21    BY MS. REINHARDT:

22       Q    And is the county board superintendent

23    responsible for monitoring those?

24            MS. DENIKER:  Same objection.

25            THE WITNESS:  We enforce the policy as it     01:15:13
```

Page 44

```
 1    comes down from the State and our local board

 2    because we're required to enforce state policy.

 3    BY MS. REINHARDT:

 4        Q    And how do you enforce it, state policy?

 5        A    We follow what the rule says.              01:15:40

 6        Q    Does the rule describe how it should be

 7    enforced?

 8            MS. DENIKER:   Objection to the form.

 9            THE WITNESS:   Generally, we know how to

10    enforce the rule.  And if we had questions about a    01:16:02

11    state board policy, we would contact the state board

12    to make clarification.

13    BY MS. REINHARDT:

14        Q    Understood.  And what is your relationship

15    with the county board superintendent -- I'm sorry,    01:16:14

16    let -- let me rephrase that.

17            What is your relationship with the state

18    board superintendent?

19        A    I contact him when I need to.  He's -- he is

20    available, and our state board is available, our     01:16:32

21    state department.

22        Q    In what instances would you need to -- in

23    what instances would you need to discuss things with

24    the state board superintendent?

25        A    I've had contact with our state board      01:16:49
```

Page 45

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 245 of 674

1    Q    Understood.  Does the county board have any

2    policies pertaining to sports?

3    A    We have minimal.  We have two.

4    Q    And what are those two policies?

5    A    We have a policy on extracurricular          01:44:45

6    activities for 6 to 12, just defining what

7    extracurricular would be for 6 to 12th grade.  And

8    the other policy that we have is on how you obtain a

9    letter, how are you a lettermen, as far as sports is

10   concerned.                                        01:45:07

11   Q    When were those policies developed?

12   A    I believe 2008 was one.  I don't remember the

13   date on the other.  They were early.  They're --

14   they're older policies.

15   Q    So as it relates to the lettermen policy,     01:45:20

16   I'll use that as an example, who is responsible for

17   enforcing it?

18   A    That would be the school AD and the athletic

19   program at the school.  That would be really

20   pertaining to the high school athletic directors.   01:45:40

21   Q    And does the county board ever need to step

22   in, as far as enforcing those policies?

23   A    Only if there would be a disagreement.  I

24   would assume that if a child thought they were

25   supposed to get a letter, and they didn't, then I   01:46:00

Page 56

```
 1    would probably be -- it would be brought to my

 2    attention.

 3       Q   Understood.  And just for clarity, does the

 4    county board have any policies related to sex

 5    separation in sports?                              01:46:12

 6       A   No, we do not have an adopted policy for

 7    that.  We follow SSAC guidelines on what teams are

 8    coed.

 9       Q   Does the County have any policies pertaining

10    to transgender students?                           01:46:40

11       A   No.

12       Q   What do you know about H.B. 3293?

13          MS. DENIKER:  Objection to the form.

14          THE WITNESS:  It -- it was a state law passed

15    in July of '21.                                    01:47:05

16    BY MS. REINHARDT:

17       Q   What does H.B. 3293 do?

18          MS. DENIKER:  Objection to the form.

19          THE WITNESS:  I can really only tell you what

20    I know when I read the statute.  It's a -- it makes 01:47:24

21    a distinction between -- it begins by saying that

22    there is an inherent difference between a male and a

23    female.  It talks about safety during sporting

24    activities or doing -- during athletics.  And it

25    also addresses the equity or displacement of female 01:47:46
```

Page 57

```
 1      Q    And once the association made you aware of

 2   H.B. 3293, did you report -- did you report anything

 3   related to H.B. 3293 to someone you report to?

 4           And I can rephrase that if that was not

 5   clear.                                            01:59:29

 6      A    No.

 7      Q    Did you discuss H.B. 3293 with anyone who

 8   reports to you?

 9      A    No.

10      Q    Was the County Board of Education -- did the   01:59:45

11   County Board of Education have a role in drafting

12   H.B. 3293?

13      A    No.

14      Q    Did the county board provide any comments or

15   thoughts to the legislature regarding H.B. 3293 that   02:00:01

16   you are aware of as Superintendent Stutler?

17      A    Are you speaking about my county-elected

18   board or --

19      Q    The County Board of Education, generally.

20      A    No.                                            02:00:22

21      Q    How was H.B. 3293 described to you as

22   Superintendent Stutler?

23           MS. DENIKER:  Objection to the form.

24           THE WITNESS:  I truly just read the

25   administrative updates, and I will tell you that we   02:00:42
```

Page 62

```
 1          Do you see that?
 2      A   Yes.
 3      Q   Then on the following page, which is
 4  HCBOE 00345, it says, "WV House Bill 3293."
 5          Do you see that?                        02:04:54
 6      A   Yes.
 7      Q   And is it correct that you, as Dora Stutler,
 8  were not present for this presentation?
 9      A   I do not attend all of those association
10  meetings.  So I do not recall that particular    02:05:12
11  presentation.  These attorneys do present often at
12  these organization meetings.
13      Q   After this presentation, did any of the --
14  other superintendents that are members of this
15  associations speak with you about a presentation?  02:05:33
16      A   No.
17      Q   Has the county board had any conversations
18  with the State Board of Education, prior to the
19  enactment of H.B. 3293, about students who are
20  transgender participating in sports?              02:05:54
21      A   No.
22      Q   Now, looking at this page, which I believe is
23  345, is that the same page you're currently on?
24      A   Yes.
25      Q   Can you just review it and let me know if    02:06:07
```

Page 65

```
 1    preparation for actions brought under this section?
 2        A   We have retained counsel for the current
 3    lawsuit that we've been named in.
 4        Q   Other than this action, has there been any
 5    other preparation as to this Cause of Action section    02:09:30
 6    from House Bill 3293?
 7        A   No.
 8        Q   Did the county board have any conversations
 9    with employees at Bridgeport Middle School prior to
10    the enactment of H.B. 3293?                             02:09:47
11          MS. DENIKER:  Objection to the form.
12          Are you asking about --
13          MR. TRYON:  Objection.
14          MS. DENIKER:  -- 3293?
15          MS. REINHARDT:  Can you please repeat that,       02:10:01
16    Ms. Deniker?
17          MS. DENIKER:  Yes, I'm sorry, I objected to
18    the form.  And then I was asking for clarification.
19          Why don't I just let you re-ask the question.
20    I apologize.                                            02:10:11
21          MS. REINHARDT:  No problem.
22    BY MS. REINHARDT:
23        Q   Did the county board have any conversations
24    with employees at Bridgeport Middle School prior to
25    the enactment of H.B. 3293 related to transgender       02:10:18
```

Page 68

```
 1    students participating in sports?

 2        A    There was a gender support plan being created

 3    at Norwood Elementary for B.P.J.  She was going to

 4    attend Bridgeport Middle School.

 5        Q    So --                                        02:10:49

 6        A    And there's a section -- there's a section on

 7    that plan, Are you an athlete?

 8        Q    Other than the gender support plan that

 9    you're speaking of, were there any other

10    conversations with Bridgeport Middle School           02:11:04

11    employees about transgender students

12    participations -- participation in sports?

13        A    No.

14        Q    Did the county board have any conversations

15    with employees at Norwood Elementary School prior to   02:11:18

16    the enactment of H.B. 3293 about students who are

17    transgender participating in sports?

18        A    No.

19        Q    What is the county board's rule as it relates

20    to H.B. 3293?                                          02:11:45

21            MS. DENIKER:  Objection to the form.

22            THE WITNESS:  It's like any other state law.

23    But there's an injunction, so that was never

24    enacted.

25    BY MS. REINHARDT:                                      02:11:58
```

                                                  Page 69

```
 1
 2       Q   Has H.B. 3293 been enforced against any other
 3    student other than B.P.J.?  I apologize.
 4       A   There's an injunction against it.  We take --
 5    we've taken no action.                              02:12:17
 6           MS. REINHARDT:  Susan, I believe the rest of
 7    my questions relate to topic 10, so if it suits the
 8    parties, we'll take a break now for about
 9    20 minutes, and then I would ask the county board to
10    have David Mazza present.                           02:12:39
11           MS. DENIKER:  And then are done with all
12    other topics upon which Ms. Stutler will be
13    testifying on?
14           MS. REINHARDT:  I am not.
15           MS. DENIKER:  Okay.                          02:12:51
16           THE VIDEOGRAPHER:  So -- okay.
17           MS. REINHARDT:  We can also go off the
18    record.
19           THE VIDEOGRAPHER:  Yeah, let's discuss --
20    okay.  We're -- we're going off the record.  The    02:13:00
21    time is 2:13 p.m., and this is the end of Media Unit
22    No. 2.
23           One moment.
24           (Recess.)
25           THE VIDEOGRAPHER:  All right.  We are back on 02:53:32
```

Page 70

```
 1          THE WITNESS:  No.  Because we are not

 2   operating under House B. -- House Bill 3293.

 3   BY MS. REINHARDT:

 4      Q    Despite the injunction, if one was not put in

 5   place, would the process that you've described be      03:09:05

 6   the same for H.B. 3293?

 7          MS. DENIKER:  Object to the form.

 8          THE WITNESS:  If a student -- if a student

 9   athlete is objecting to something, according to SSAC

10   rules, they could follow that process.                 03:09:20

11   BY MS. REINHARDT:

12      Q    Thank you.  Did the county board have any

13   conversations with WVSSAC prior to the enactment of

14   H.B. 3293 about students who are transgender

15   participating in sports?                               03:09:40

16      A    No.

17      Q    Do you know who Bernie Dolan is?

18      A    Yes.

19      Q    Who is Bernie Dolan?

20      A    He's the executive director of the SSAC.       03:09:52

21      Q    Did the county board have any conversations

22   with Mr. Dolan, prior to the enactment of H.B. 3293,

23   about students who are transgender participating in

24   sports?

25      A    No.                                            03:10:11
```

Page 83

```
 1    questions, I want to see if I can confirm what you

 2    previously stated.

 3          Can you confirm whether or not the county

 4    board had any conversations with anyone outside of

 5    the County Board of Education about H.B. 3293 as it    03:16:44

 6    relates to students who are transgender

 7    participating in school sports?

 8          MS. DENIKER:  Objection on the basis it's

 9    been asked and answered.

10          You can answer.                                  03:16:59

11          THE WITNESS:  I am unaware of any

12    conversations.

13    BY MS. REINHARDT:

14      Q   If the preliminary injunction was not in

15    place, what would be required of the county board as   03:17:07

16    it relates to H.B. 3293?

17          MS. DENIKER:  Objection to the form.

18          THE WITNESS:  We -- we have not acted or

19    changed the way that we would continue with sports

20    in our athletic programs and --                        03:17:39

21    BY MS. REINHARDT:

22      Q   And that -- and that's true even if the

23    injunction was not in place?

24          MS. DENIKER:  Objection to the form.

25          THE WITNESS:  The board has taken no action      03:17:52
```

Page 89

 1   as it relates to this house bill.

 2   BY MS. REINHARDT:

 3       Q   I'm asking what that'd be required to do.

 4           MS. DENIKER:  Objection to the form.

 5           THE WITNESS:  We receive the house bill.        03:18:14

 6   It's not enacted.  We've made no action on that.

 7   And I could not speak on what actions would be

 8   taken.  We have not had to address that.

 9   BY MS. REINHARDT:

10       Q   Who will be responsible for promulgating      03:18:36

11   rules to implement H.B. 3293?

12           MS. GREEN:  Object to the form.

13           MS. DENIKER:  Objection to the form.

14           THE WITNESS:  It would be the same process we

15   would with any new house bill or rule that we have.   03:18:49

16   BY MS. REINHARDT:

17       Q   And that's in line with how you characterized

18   the process earlier in this deposition; is that

19   correct?

20           MS. DENIKER:  Objection to the form.          03:19:04

21           THE WITNESS:  I believe so.

22   BY MS. REINHARDT:

23       Q   I am just trying to not make you reiterate

24   the -- your process for implementing policies, but

25   if you prefer, I am happy to hear that.               03:19:20

                                                          Page 90

```
 1      A   I think I have been asked that.  It's a --

 2   it's a complicated question.  When you're talking

 3   about board policies, our board can only enact

 4   policies that they vote on and it becomes the

 5   policy.  We have adopted state board policy, and we      03:19:43

 6   will mirror the language of the state board policy.

 7          Can the County adopt their own policy?  We

 8   can.  If it's presented to the board, it's acted on,

 9   they vote on it.

10          I don't -- I guess I'm not sure what you're     03:20:03

11   asking me.

12      Q   That answers my question.  Thank you.

13          Could the county board issue any rules in

14   conflict with H.B. 3293?

15      A   No.                                             03:20:26

16      Q   To your knowledge, has the county board ever

17   violated any rules promulgated by the State Board of

18   Education?

19          MS. DENIKER:  Objection to the form.

20          THE WITNESS:  Not that I'm aware of.            03:20:43

21   BY MS. REINHARDT:

22      Q   Thank you.  I'm going to move on to topics as

23   they relate to topic 4.

24          I want to talk a little bit about

25   Plaintiff B.P.J. in this case and her experience in    03:20:59
```

Page 91

```
 1      Q    Thank you.  And Josh Thorton, you said, was a
 2   counselor.
 3          Are the counselors at Norwood Elementary
 4   School employed by the county board?
 5      A    Yes.                                    03:25:20
 6      Q    What qualifications are required to become a
 7   counselor in the county boar- -- in the county?
 8      A    They -- they have to be certified counselors
 9   through the national school counseling association
10   and through our state.                          03:25:39
11      Q    Was Mr. Thorton made aware of B.P.J.'s status
12   as a girl who is transgender?
13          MS. DENIKER:  Objection to form.
14          MR. TRYON:  Objection.
15          THE WITNESS:  I am unaware of that.       03:25:49
16   BY MS. REINHARDT:
17      Q    Was Principal Mazza informed that B.P.J. is a
18   girl?
19          MS. DENIKER:  Objection to the form.
20          THE WITNESS:  I believe he was contacted when  03:26:05
21   she was going to go there as a sixth grader and
22   there was an update to the gender support plan.
23   That would be when Mr. Mazza was informed.
24   BY MS. REINHARDT:
25      Q    Are you aware of any conversation between   03:26:19
```

Page 95

```
 1   Principal Mazza and Heather Jackson regarding
 2   B.P.J. playing on girls' sports teams?
 3       A   I am only aware of the gender support plan
 4   that took place between Heather Jackson, the mother;
 5   and Mr. Mazza, and there were a few in that meeting,    03:26:39
 6   at that gender support plan meeting.
 7       Q   Were you in attendance at that meeting?
 8       A   I was not.
 9       Q   So how did you become aware that
10   Principal Mazza and Heather Jackson had a meeting       03:26:58
11   regarding the gender support plan?
12           And please do not inform us of -- of any
13   conversations you may have had with counsel.
14       A   I reviewed the gender support plan as it
15   related to this case.                                   03:27:10
16       Q   And in preparation for this case, did you
17   speak with Principal Mazza?
18       A   I did.
19       Q   And did you -- did he inform you of any
20   conversation between him and Heather Jackson            03:27:26
21   regarding B.P.J.'s ability to play on girls' sports
22   teams?
23           MS. DENIKER:  I'm going to object to the
24   extent that it -- that the question calls for
25   information that she learned as part of                 03:27:38
```

Page 96

```
 1    attorney-client privileged communications.

 2          To the extent that you have had

 3    communications with Mr. Mazza that were not part of

 4    the attorney-client privilege, you may answer, but

 5    I'm going to instruct you not to answer with regard     03:27:51

 6    to any attorney-client privileged communications.

 7          THE WITNESS:  The gender support plan

 8    involved multiple people, and all the items on that

 9    gender support plan were discussed, and she checked

10    that she would be an athlete at Bridgeport Middle.      03:28:05

11          (Exhibit 27 was marked for identification

12           by the court reporter and is attached hereto.)

13    BY MS. REINHARDT:

14      Q   Thank you.  I am now going to move tab 9 into

15    the "Marked Exhibits" folder.  I'll let you know        03:28:20

16    once it's there.  It will be marked as Exhibit 27.

17          You may refresh.  And please let me know once

18    you see Exhibit 27.

19      A   I see that.

20      Q   Are you familiar with this e-mail?                03:29:05

21          And please take your time to review it, if

22    necessary.

23      A   I am.

24      Q   And are how are you familiar with this

25    e-mail?                                                 03:29:16
```

Page 97

```
 1      A    It was between the -- my board president and
 2   myself.
 3      Q    Is Gary Hamrick the board president you're
 4   referring to?
 5      A    Yes.                                      03:29:26
 6      Q    And what is his role?
 7      A    He's the -- I guess you want to say the
 8   president of my board.  He leads the meetings and...
 9      Q    Thank you.  And if you look at the e-mail, he
10   writes (as read):                                03:29:49
11          "Even though it is a new state law,
12           Mazza should have informed you that
13           he denied a transgender student."
14          Am I reading that correctly?
15      A    You are.                                 03:30:01
16      Q    And you respond (as read):
17          "Agree.  First I heard."
18          Am I reading that correctly?
19      A    I was agreeing that it was a new state law.
20      Q    And were you saying -- and what did you mean 03:30:12
21   by "first I heard"?
22      A    It's the first I heard that we had a -- a
23   lawsuit.  I believe he's referring to the MetroNews
24   article.  And I think that's where he got his
25   information, possibly.                           03:30:36
```

Page 98

```
 1      Q   Did you speak with Principal Mazza upon

 2   learning about the incidents alleged in the

 3   complaint, which I believe was attached to this

 4   e-mail?

 5          MS. DENIKER:  And again, I will just instruct   03:30:47

 6   you that to the extent that -- you're not to answer

 7   with regard to any attorney-client privileged

 8   communications, but if you had other communications,

 9   you can answer with regard to those.

10          THE WITNESS:  Would you ask me that again.      03:31:06

11   BY MS. REINHARDT:

12      Q   Did you speak with --

13          MS. DENIKER:  If you just give me a

14   continuing -- I'll just continue that same

15   instruction, but I won't interrupt you, if that's     03:31:16

16   okay, so the witness can hear the question.

17          MS. REINHARDT:  Thank you, Mrs. Deniker.

18   BY MS. REINHARDT:

19      Q   I'm wondering if you spoke with Mr. Mazza

20   upon learning about the allegations in the            03:31:28

21   complaint.

22      A   I did not.

23      Q   Did any employees of the county board raise

24   concerns about B.P.J. being a girl who is

25   transgender?                                          03:31:48
```

Page 99

```
 1        A    No.

 2        Q    Under H.B. 3293, can cisgender girls play on

 3    girls' sports teams?

 4             MS. DENIKER:  Objection to the form.

 5             MR. TRYON:  Objection.                          03:32:07

 6             THE WITNESS:  Yes.

 7    BY MS. REINHARDT:

 8        Q    Under H.B. 3293, can girls who are

 9    transgender play on the girls' sports teams?

10             MS. DENIKER:  Object to the form.               03:32:20

11             MR. TRYON:  Same objection.

12             (Simultaneous speaking.)

13             MS. DENIKER:  And I'm so sorry to interrupt

14    here, but I heard the same question you just asked,

15    which makes me believe that I didn't hear it            03:32:31

16    correctly.

17             So if you would preserve all of our

18    objections, could you ask that again, please?

19             MS. REINHARDT:  Yes.

20    BY MS. REINHARDT:                                        03:32:41

21        Q    Under H.B. 3293, can girls who are

22    transgender play on girls' sports teams?

23        A    If it's a -- no, but they can on coed teams.

24        Q    And what -- what's your --

25             (Simultaneous speaking.)                        03:33:00
```

Page 100

```
 1    BY MS. REINHARDT:

 2        Q    Correct.

 3        A    They would be rostered the same as their --

 4    whatever they are on WVEIS.  We would be required to

 5    roster them male or female.                        03:40:49

 6        Q    Why are you required?

 7             MS. GREEN:  Object to the form.

 8             THE WITNESS:  That's the rules we have from

 9    the WVSSAC say.

10    BY MS. REINHARDT:                                  03:41:15

11        Q    You said the rules from WSSAC (sic)?  Did I

12    hear that properly?

13             MS. GREEN:  Object to the form.

14        A    Yes.  And we do go by what is in WVEIS.

15    BY MS. REINHARDT:                                  03:41:33

16        Q    Is there a benefit to playing on sports

17    teams?

18             MS. DENIKER:  Objection to the form.

19             THE WITNESS:  Absolutely.

20    BY MS. REINHARDT:                                  03:41:45

21        Q    What are those benefits?

22        A    Cooperation, teamwork, watching out for your

23    fellow players.  There's a lot of benefit to having

24    a team sport.

25        Q    Would you say B.P.J. benefited from        03:41:59
```

Page 106

```
 1    for the fifth-grade year?
 2        A    Tarra Shields -- in conversation with
 3    Tarra Shields, they put this plan into place, her
 4    going into fourth grade.  And, now, this is from
 5    Tarra Shields.  There were -- they -- she had a --      04:08:05
 6    I'm talking from Tarra, that she had a good
 7    fourth-grade year.  They were going -- she was going
 8    into the fifth grade, and they felt there was really
 9    no need to change anything.
10           At any time, a parent can request that the       04:08:20
11    plan be reviewed.  So I would take that if there's
12    not another plan dated, that they felt that, you
13    know, she was having a good two years.
14        Q    And who are you referring to when you say
15    "they"?                                                 04:08:35
16        A    I -- I would say Tarra Shields, this team
17    that was with her at Norwood.  And you've also got
18    to understand the parent is involved in this.
19    And -- and B████.
20        Q    Did the county board implement any policies    04:08:46
21    related to transgender students after implementing
22    B████'s gender support plan?
23        A    No.
24        Q    Now I'm going to ask you to go back to what
25    was previously marked as WV-19.                         04:09:05
```

```
 1              THE WITNESS:  I think I've said this.  When

 2      the county board gets a new law, we -- we have to

 3      abide by that rule.  It was not our rule.  And the

 4      county board is given those rules; we have to abide

 5      by those, period.                               04:50:27

 6      BY MS. REINHARDT:

 7         Q   I'm wondering if the county board supported

 8      H.B. 3293 when it was being considered by the

 9      legislation.

10              MS. DENIKER:  Same objection to the form.  04:50:43

11              THE WITNESS:  I'm not going to -- I don't

12      know how to really answer that other than we support

13      all of our students in the sense that we need to

14      make them comfortable and aware and -- and support

15      them in their surroundings.                      04:50:58

16      BY MS. REINHARDT:

17         Q   So you are not aware of any rule prior to

18      H.B. 3293 in West -- where a school in West Virginia

19      had to follow the gender in WVEIS in order for a

20      student to participate on a sports team?         04:51:14

21              MR. TRYON:  Objection.

22              MS. GREEN:  Object to the form.

23              THE WITNESS:  I'm not aware of any other

24      school in West Virginia.

25      ///
```

Page 145

```
 1           MS. DENIKER:  And I'm going to ask for --
 2     this is Susan Deniker again.
 3           What is the scope of timing on your question,
 4     Ms. Reinhardt?
 5           MS. REINHARDT:  It will be from January 1st,    04:57:03
 6     2019, to present.
 7           THE WITNESS:  No.
 8     BY MS. REINHARDT:
 9       Q    Thank you.  And just as one last final
10     follow-up question, has the county board implemented   04:57:12
11     any Title IX policies pertaining to transgender
12     students' participation in sports?
13       A    No.
14           MS. REINHARDT:  Thank you very much,
15     Superintendent Stutler.  I believe that opposing       04:57:26
16     counsel may have a few questions for you.
17           THE WITNESS:  Thank you.
18
19                        EXAMINATION
20     BY MS. GREEN:                                          04:57:34
21       Q    Hello, Superintendent Stutler.  This is
22     Roberta Green with WVSSAC --
23           MS. GREEN:  Kelly, did -- were you guys
24     hopping on to go first?  Okay.  I'll just leap to
25     the front of the line, then.                           04:58:02
```

Page 150

```
 1              (Exhibit 40 was marked for identification

 2           by the court reporter and is attached hereto.)

 3      BY MR. FRAMPTON:

 4         Q   All right.  What I have listed as -- marked

 5      as Exhibit 40 should be -- should be available to       05:44:22

 6      you now.

 7              And this is my last exhibit, so you're almost

 8      done with me.

 9         A   I have it.

10         Q   All right.  Is this document also something     05:45:03

11      that you reviewed in preparation for your

12      deposition?

13         A   Yes.

14         Q   Okay.  The first page, is this a listing of

15      how the Bridgeport Middle School cross-country          05:45:16

16      athletes did in the Ritchie County meet on Saturday,

17      October 1st?

18              MS. REINHARDT:  Objection to form.

19              And I'll put a standing objection that these

20      questions are outside of the scope.                     05:45:29

21              MR. FRAMPTON:  Yes, happy to grant you a

22      standing objection.

23              THE WITNESS:  Yes.

24      BY MR. FRAMPTON:

25         Q   And so as with the last one we looked at, all    05:45:35
```

                                                    Page 183

```
 1    of the students on this page would be

 2    Bridgeport Middle School students; right?

 3        A   Yes.

 4        Q   And you would agree that B.P.J. has a time

 5    that is faster than three of the girls listed on      05:45:49

 6    this spreadsheet; correct?

 7            MS. REINHARDT:  Objection to form.

 8            THE WITNESS:  Yes, there are three names

 9    below hers.

10    BY MR. FRAMPTON:                                        05:46:02

11        Q   Do you have any idea what the yellow

12    highlighting means?

13        A   I do not.

14        Q   It was worth a try.

15        A   I do not.                                       05:46:18

16        Q   The next two pages, are these just a -- a --

17    sort of compilation of how the Bridgeport Middle

18    School cross-country athletes did across a number of

19    meets in the fall 2021 season?

20            MS. REINHARDT:  Objection to form.             05:46:38

21            MS. DENIKER:  This is Susan Deniker.

22    Objection to form.

23            THE WITNESS:  It looks like it is a

24    compilation of meets and times.

25    BY MR. FRAMPTON:                                        05:46:58
```

Page 184

```
 1        Q    Do you know how that process is done?

 2        A    Not from beginning to end.  I know parts.

 3        Q    Is it fair to say that you will defer

 4   testimony on behalf of the Harrison County Board of

 5   Education about rostering for school sports in          05:54:29

 6   Harrison County to the other designee for today's

 7   30(b)(6) deposition?

 8        A    Yes.

 9        Q    You were also asked questions today about

10   House Bill 3293.                                         05:54:44

11        Superintendent Stutler, are you familiar with

12   that house bill that was passed by the West Virginia

13   legislature?

14        A    Yes.

15        Q    And you would have reviewed that bill; is     05:54:55

16   that correct?

17        A    Yes.

18        Q    You were asked some questions about whether

19   the Harrison County Board of Education supported

20   that bill, and I want to ask you more specific          05:55:03

21   questions about that.

22        Did the Harrison County Board of Education as

23   an entity do anything officially to advocate or

24   support that bill?

25        MS. REINHARDT:  Objection to form.                 05:55:15
```

Page 191

```
 1              THE WITNESS:  No.

 2     BY MS. DENIKER:

 3        Q   Did any employee or agent of Harrison County,

 4     in their official capacities, take any action to

 5     advocate for the passage of that bill?            05:55:25

 6              MS. REINHARDT:  Objection.

 7              THE WITNESS:  No.

 8     BY MS. DENIKER:

 9        Q   Did any employee or agent of the

10     Harrison County Board of Education in any way      05:55:34

11     contribute to the passage of that bill by providing

12     testimony or information to support passage of

13     House Bill 3293?

14              MS. REINHARDT:  Objection to form.

15              THE WITNESS:  No.                         05:55:48

16     BY MS. DENIKER:

17        Q   Did the Harrison County Board of Education,

18     through the elected board, pass any policy

19     proclamation or other statement that related to

20     House Bill 3293 in any way?                        05:56:00

21        A   No.

22        Q   Has the Harrison County Board of Education

23     taken any action to implement the provisions of

24     House Bill 3293 as you sit here today?

25        A   No.                                         05:56:13
```

Page 192

1    items that only go to certain people.

2         The secretaries have, usually, residency

3    information, scheduling, the schedules, things like

4    that, but some of the stuff that is put in the

5    WVEIS, it's mostly my counselor, myself and my          06:40:03

6    assistant.

7       Q   In WVEIS, are students' names listed and

8    other -- so I'm asking, are student names listed,

9    including their ID number?

10      A   That is correct.                                  06:40:16

11      Q   And are students' genders listed in WVEIS?

12      A   Yes, they are.

13      Q   And if a student were to participate in a

14   school athletic program, would the athletic director

15   need to check WVEIS to know which team the student      06:40:39

16   needed to be on?

17      A   No.

18      Q   How is it -- how are students designated

19   between teams?

20      A   They are given an information sheet that is       06:40:48

21   filled out by them or the -- the student or the

22   parent.  That information goes back to the athletic

23   director who then puts it in a portal that would be

24   seen by the WVSSAC.

25      Q   Does that portal have a name?                     06:41:03

Page 213

```
 1      A    It's part of the WVSSAC website where you

 2   see -- I'm not sure if you've visited that website,

 3   but there's an admin login.

 4      Q    And is -- is the information the athletic

 5   director provides not a part of WVEIS?              06:41:28

 6      A    It is not part of WVEIS.

 7      Q    And is that information used to create a

 8   roster?

 9      A    That information is used to create a roster.

10      Q    So WVEIS is not used to create a roster; is   06:41:43

11   that correct?

12          MS. DENIKER:  Object --

13          THE WITNESS:  That is correct.

14          MS. DENIKER:  -- to the form.

15   BY MS. REINHARDT:                                    06:41:51

16      Q    And if I'm understanding correctly, the

17   administrative director would list whichever gender

18   is completed by a parent or the athlete in the form

19   you noted earlier; is that correct?

20      A    That would be correct.                       06:42:10

21      Q    And does Bridgeport Middle School have any

22   policies as it relates to gender separation in

23   sports?

24      A    We don't have any policies.

25      Q    Is Bridgeport Middle School required to      06:42:32
```

Page 214

```
 1    follow any other policies related to gender

 2    separation in sports?

 3            MS. GREEN:  Object to the form.

 4            MS. DENIKER:  I also object to the form.

 5            THE WITNESS:  Bridgeport Middle follows the      06:42:53

 6    guidelines set by the WVSSAC.

 7    BY MS. REINHARDT:

 8       Q    And what are those guidelines as it relates

 9    to gender separation in sports?

10            MS. GREEN:  Object to the form.                  06:43:06

11            MS. DENIKER:  Object to the form.

12            THE WITNESS:  Those guidelines come in the

13    form of rostering, where -- for example, my athletic

14    director receives from the track coach, who is the

15    boys track coach, he would roster them on the WVEIS     06:43:23

16    system as a B, goes into the B portal.  And if my

17    athletic director receives the information from the

18    girls' coach, it would go on the G side, which is --

19    would be the girl.

20    BY MS. REINHARDT:                                        06:43:44

21       Q    So the athletic director implements a

22    student's gender into WVEIS; is that correct?

23            MS. DENIKER:  Objection to the form and also

24    asked and answered.

25            MS. GREEN:  I'll object to the form as well.     06:43:56
```

Page 215

```
 1    Thank you.

 2          MS. DENIKER:  Do you need to have -- if

 3    you'll give me a standing objection on that.  Maybe

 4    we should have the court reporter read back the

 5    question so that the witness could hear it, if        06:44:09

 6    that's okay, Ms. Reinhardt.

 7          MS. REINHARDT:  That would be great.  I'll

 8    give you a standing objection.

 9          If the court reporter could please read my

10    question back.                                        06:44:18

11          (Record read.)

12          MS. DENIKER:  If you need to hear it again,

13    you can ask for it to be repeated.

14          THE WITNESS:  Repeat that again, please, I'm

15    sorry.                                                06:44:46

16          MS. REINHARDT:  If the court reporter could

17    please read that again.

18          And I believe it should be "input."  I

19    apologize if I wasn't clear.

20          (Record read.)                                  06:45:08

21          THE WITNESS:  The athletic director puts the

22    information on the boy roster or the girl roster.

23    BY MS. REINHARDT:

24       Q   And where -- okay.  I think I understand.

25          And are B and G the only options for the --     06:45:33
```

Page 216

```
1    BY MS. REINHARDT:

2       Q   And if a -- if a student is gender

3    nonconforming, does the school have a policy on what

4    would be put as their gender for school sports?

5       A   Can you repeat that again, please?          06:47:27

6       Q   If a student is gender nonconforming -- and

7    what I mean by that is they neither identify as just

8    a boy or a girl -- does the school have a policy for

9    how they're listed on a sports team's roster?

10      A   We do not.                                   06:47:43

11      Q   Does the school have a policy related to what

12   transgender students are listed as for the purposes

13   of sports teams' rosters?

14      A   We do not.

15      Q   I'm just going to make sure I have -- I've   06:47:59

16   asked all my questions on this topic.  One second.

17          Other than school policies, does WVSSAC have

18   any policies that you would follow related to

19   students' genders listed on school sports?

20          MS. GREEN:  Object to the form.             06:48:33

21          MS. DENIKER:  Object to the form.

22          THE WITNESS:  I have never seen any

23   information like that from the SSAC.

24   BY MS. REINHARDT:

25      Q   Thank you.  And I want to ask if you've ever 06:48:42
```

Page 218

```
 1    support meeting back in May of '21.
 2         Q   And what was the conversation about?
 3         A   As we were going through the gender support
 4    plan, and we were finishing up, she was -- Heather
 5    was asking specific questions about band.  I said      06:50:15
 6    that would not be a problem.  You know, we do offer
 7    related art classes other than our five core
 8    classes, which is reading, English, science, math,
 9    social studies.  So we were pretty much asking B████
10    what other related art classes she would be            06:50:33
11    interested in other than band.  She -- B████ said,
12    art.  And we do offer STEAM, etcetera.
13         And then Heather asked me, B████ wants to
14    participate in cross-country.  I said, No problem.
15    And then Heather asked me, B████ wants to run with     06:50:48
16    the girls.  And I -- I know -- I've known Heather --
17    I've had both of her -- I had her oldest son go
18    through, and she has another son that is an
19    eighth-grader in our building.  And I looked at
20    Heather, and I said, You did hear about the bill       06:51:07
21    that was signed into law, that's going into effect
22    in July.
23         And she said, We know all about that.
24         And that was the only discussion we had with
25    this law that went into effect in the state of         06:51:17
```

Page 220

```
 1    West Virginia.
 2        Q   And if you know, did Mrs. Jackson take that
 3    to mean that B████  would have to participate on the
 4    boys' sports team?
 5            MS. DENIKER:  Objection to the form of the        06:51:30
 6    question, calls for speculation.
 7            THE WITNESS:  I honestly don't know.
 8    BY MS. REINHARDT:
 9        Q   And what was the purpose in raising H.B. 3293
10    with Mrs. Jackson?                                        06:51:48
11        A   Her question was pretty forward, and I just
12    wondered if she knew that that bill was going to
13    turn into a law in July.
14        Q   Understood.  I'm just checking my notes.  One
15    moment.                                                   06:52:13
16            And just for background information, do
17    you -- have you ever coached any sports?
18        A   I have.
19        Q   Which sports have you coached?
20        A   I've coached football and track.                 06:52:26
21        Q   And were those in Harrison County?
22        A   Football was in Monongalia County, 1989, and
23    track was in Harrison County, 1991, Lincoln High
24    School.  Football was the -- what was then
25    Westover Junior High, which is now Westwood Middle.      06:52:51
```

Page 221

```
 1        Q    Thank you.  And do you see a benefit in

 2    participating in school sports?

 3        A    Absolutely.

 4        Q    And what are those benefits as you know them

 5    as Principal Mazza?                                    06:53:01

 6             MR. TRYON:  Objection.

 7             THE WITNESS:  I --

 8             MS. DENIKER:  Objection to the form.

 9             THE WITNESS:  My benefits of having two

10    children of my own, I believe it develops            06:53:11

11    discipline, teamwork.  There's nothing better than

12    teamwork.  I truly believe once you do graduate

13    college and go into the workforce, you will always

14    be working as a team with someone.  Trust.  I see a

15    lot of trust with sports.  And it's just great        06:53:31

16    conditioning just to be part of something, just to

17    be part of a team.

18    BY MS. REINHARDT:

19        Q    I understand that.  I played basketball and

20    volleyball, so I can appreciate those.                06:53:42

21             Do you think B.P.J. gained any benefits from

22    participating on a sports team?

23             MS. DENIKER:  Objection to the form.

24             MR. TRYON:  Objection.

25             THE WITNESS:  I believe so.  I believe so.    06:54:03
```

1    sports team.

2          Do you recall that testimony?

3      A    I do.

4      Q    Does the athletic director input any

5    information into WVEIS relating to a student's        07:16:04

6    athletic participation?

7      A    It does not.  It goes into the WVSSAC portal

8    to put that information in for eligibility.

9      Q    And I think you also testified about whether

10   the athletic -- about the information the athletic     07:16:20

11   director uses as a source of information to input

12   information into the WVSSAC portal.

13         Does the athletic director pull information

14   from WVEIS to put into that WVSSAC portal?

15     A    It does not.  It uses an informational sheet.   07:16:41

16   I want to say I believe it's an WVSSAC sheet that's

17   standard to all the schools.  The information is

18   filled out on that sheet.  He uploads it into the

19   portal.  And if -- for example, if that child is a

20   sixth-grader, that information will stay in there      07:16:59

21   and each year it -- it transfers over.

22         MS. DENIKER:  Okay.  Thank you, Mr. Mazza.  I

23   do not have any further questions.

24         MS. REINHARDT:  Mr. Mazza, we don't have any

25   redirect questions.                                   07:17:10

                                          Page 236

```
1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
3                     CHARLESTON DIVISION
4
5    B.P.J. BY HER NEXT FRIEND AND      )
     MOTHER, HEATHER JACKSON,           )
6                                       )
              PLAINTIFF,                )
7                                       ) CIVIL ACTION NO.
         VS.                            ) 2:21-cv-00316
8                                       )
     WEST VIRGINIA STATE BOARD OF       )
9    EDUCATION, HARRISON COUNTY BOARD   )
     OF EDUCATION, WEST VIRGINIA        )
10   SECONDARY SCHOOL ACTIVITIES        )
     COMMISSION, W. CLAYTON BURCH IN    )
11   HIS OFFICIAL CAPACITY AS STATE     )
     SUPERINTENDENT, DORA STUTLER IN    )
12   HER OFFICIAL CAPACITY AS HARRISON )
     COUNTY SUPERINTENDENT, AND THE     )
13   STATE OF WEST VIRGINIA,,           )
                                        )
14              DEFENDANTS,             )
                                        )
15          AND                         )
                                        )
16   LAINEY ARMISTEAD,                  )
                                        )
17           DEFENDANT-INTERVENOR.      )
     _____  )
18
19          VIDEOTAPED REMOTE ZOOM 30(b)(6) DEPOSITION
20     WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION
21                     BERNARD DOLAN
22               FRIDAY, FEBRUARY 11, 2022
23
24   JOB NO. 5079532
25   REPORTED BY:  DAYNA HESTER, C.S.R. 9970
```

Page 1

```
 1    VIDEOTAPED REMOTE ZOOM 30(B)(6) DEPOSITION OF WEST
 2    VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION BERNARD
 3    DOLAN, TAKEN ON BEHALF OF PLAINTIFF B.P.J., BY HER NEXT
 4    FRIEND AND MOTHER, HEATHER JACKSON, AT 12:18 P.M., EASTERN
 5    STANDARD TIME, FRIDAY, FEBRUARY 11, 2022, WITH THE WITNESS
 6    (PHYSICALLY PRESENT WITH COUNSEL), COURT REPORTER, AND
 7    VIDEOGRAPHER APPEARING REMOTELY VIA ZOOM VIDEOCONFERENCE,
 8    BEFORE DAYNA HESTER, C.S.R. NO. 9970.
 9
10    APPEARANCES OF COUNSEL:
11    FOR PLAINTIFF B.P.J., BY HER NEXT FRIEND AND MOTHER,
      HEATHER JACKSON:
12
           COOLEY, LLP
13         BY:  KATELYN KANG, ESQ.
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
14         BY:  VALERIA M. PELET DEL TORO, ESQ.
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
15         55 HUDSON YARDS
           NEW YORK, NEW YORK  10001-2157
16         (212) 479-6849
           KKANG@COOLEY.COM
17         VPELETDELTORO@COOLEY.COM
18         COOLEY, LLP
           BY:  KATHLEEN R. HARTNETT, ESQ.
19              (PRESENT VIA ZOOM VIDEOCONFERENCE)
           BY:  JULIE VEROFF, ESQ.
20              (PRESENT VIA ZOOM VIDEOCONFERENCE)
           BY:  ZOË HELSTROM, ESQ.
21              (PRESENT VIA ZOOM VIDEOCONFERENCE)
           3 EMBARCADERO CENTER, 20TH FLOOR
22         SAN FRANCISCO, CALIFORNIA  94111-4004
           (415) 693-2000
23         KHARTNETT@COOLEY.COM
           JVEROFF@COOLEY.COM
24         ZHELSTROM@COOLEY.COM
25         -- APPEARANCES CONTINUED ON NEXT PAGE --
```

Page 2

```
 1    APPEARANCES OF COUNSEL (CONTINUED):
 2    PLAINTIFF B.P.J., BY HER NEXT FRIEND AND MOTHER, HEATHER
      JACKSON (CONT'D):
 3
          COOLEY, LLP
 4        BY:  ANDREW BARR, ESQ.
               (PRESENT VIA ZOOM VIDEOCONFERENCE)
 5        1144 15TH STREET, SUITE 2300
          DENVER, COLORADO  80202-2686
 6        (720) 566-4121
          ABARR@COOLEY.COM
 7
 8        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
          BY:  JOSHUA BLOCK, SENIOR STAFF ATTORNEY
 9             (PRESENT VIA ZOOM VIDEOCONFERENCE)
          125 BROAD STREET
10        NEW YORK, NEW YORK  10004
          (212) 549-2569
11        JBLOCK@ACLU.ORG
12        AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA
          FOUNDATION
13        BY:  NICHOLAS WARD, STAFF ATTORNEY
               (PRESENT VIA ZOOM VIDEOCONFERENCE)
14        BY:  LOREE STARK, LEGAL DIRECTOR
               (PRESENT VIA ZOOM VIDEOCONFERENCE)
15        P.O. BOX 3952
          CHARLESTON, WEST VIRGINIA  25339-3952
16        (914) 393-4614
          NWARD@ACLUWV.ORG
17        LSTARK@ACLUWV.ORG
18
          LAMBDA LEGAL
19        BY:  SRUTI SWAMINATHAN, STAFF ATTORNEY
               YOUTH NATIONAL HEADQUARTERS
20             (PRESENT VIA ZOOM VIDEOCONFERENCE)
          120 WALL STREET, 19TH FLOOR,
21        NEW YORK, NEW YORK  10005-3919
          (212) 809-8585
22        SWAMINATHAN@LAMBDALEGAL.ORG
23
24
25        -- APPEARANCES CONTINUED ON NEXT PAGE --
```

Page 3

```
 1    APPEARANCES OF COUNSEL (CONTINUED):
 2    FOR DEFENDANT WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES
      COMMISSION:
 3
           SHUMAN MCCUSKEY SLICER PLLC
 4         BY:  ROBERTA F. GREEN, ESQ.
                (PRESENT VIA ZOOM VIDEOCONFERENCE WITH WITNESS)
 5         BY:  KIMBERLY M. BANDY, ESQ.
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
 6         1411 VIRGINIA STREET EAST, SUITE 200
           CHARLESTON, WEST VIRGINIA  25301
 7         (304) 345-1400
           RGREEN@SHUMANLAW.COM
 8         KBANDY@SHUMANLAW.COM
 9
      FOR DEFENDANT WEST VIRGINIA STATE BOARD OF EDUCATION,
10    W. CLAYTON BURCH IN HIS OFFICIAL CAPACITY AS STATE
      SUPERINTENDENT:
11
           BAILEY & SLOTNICK P.L.L.C.
12         BY:  KELLY C. MORGAN, ESQ.
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
13         BY:  KRISTEN V. HAMMOND, OF COUNSEL
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
14         500 VIRGINIA STREET EAST, SUITE 600
           CHARLESTON, WEST VIRGINIA  25301
15         (304) 720-0711
           KMORGAN@BAILEYWYANT.COM
16         KHAMMOND@BAILEYWYANT.COM
17
      FOR DEFENDANT THE STATE OF WEST VIRGINIA:
18
           OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
19         BY:  CURTIS CAPEHART, DEPUTY ATTORNEY GENERAL
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
20         BY:   JESSECA RENEE CHURCH, DEPUTY ATTORNEY GENERAL
           1900 KANAWHA BOULEVARD EAST
21         CHARLESTON, WEST VIRIGINIA  25305
           (304) 558-2021
22         CURTIS.R.A.CAPEHART@WVAGO.GOV
           JESSECA.R.CHURCH@WVAGO.GOV
23
24
25         -- APPEARANCES CONTINUED ON NEXT PAGE --
```

Page 4

```
 1    APPEARANCES OF COUNSEL (CONTINUED):
 2    FOR DEFENDANT HARRISON COUNTY BOARD OF EDUCATION, DORA
      STUTLER IN HER OFFICIAL CAPACITY AS HARRISON COUNTY
 3    SUPERINTENDENT:
 4         STEPTOE & JOHNSON PLLC
           BY:  JEFFREY M. CROPP, OF COUNSEL
 5              (PRESENT VIA ZOOM VIDEOCONFERENCE)
           400 WHITE OAKS BOULEVARD
 6         BRIDGEPORT, WEST VIRIGINIA  26330
           (304) 933-8145
 7         JEFFREY.CROPP@STEPTOE-JOHNSON.COM
 8
      FOR DEFENDANT-INTERVENOR LAINEY ARMISTEAD:
 9
           ALLIANCE DEFENDING FREEDOM
10         BY:  JONATHAN SCRUGGS, SENIOR COUNSEL
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
11         BY:  HAL FRAMPTON, SENIOR COUNSEL
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
12         BY:  CATIE BYRD KELLEY, LEGAL COUNSEL
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
13         BY:  CHRISTIANA HOLCOMB, LEGAL COUNSEL
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
14         15100 NORTH 90TH STREET
           SCOTTSDALE, ARIZONA  85260
15         (480) 444-0020
           JSCRUGGS@ADFLEGAL.ORG
16         HFRAMPTON@ADFLEGAL.ORG
           CKELLEY@ADFLEGAL.ORG
17         HOLCOMB@ADFLEGAL.ORG
18
           LAW OFFICES OF TIMOTHY D. DUCAR, P.L.C
19         BY:  TIMOTHY DANIEL DUCAR, ESQ.
                (PRESENT VIA ZOOM VIDEOCONFERENCE)
20         9280 EAST RAINTREE DRIVE, SUITE 104
           SCOTTSDALE, ARIZONA  85260
21         (480) 502-2119
           ORDERS@AZLAWYERS.COM
22
23
24
25         -- APPEARANCES CONTINUED ON NEXT PAGE --
```

Page 5

```
 1    APPEARANCES (CONTINUED):

 2    ALSO PRESENT:

 3         HEATHER HUTCHENS, GENERAL COUNSEL
           WEST VIRGINIA DEPARTMENT OF EDUCATION
 4         (PRESENT VIA ZOOM VIDEOCONFERENCE)

 5         MICHELE BLATT, DEPUTY SUPERINTENDENT
           WEST VIRGINIA DEPARTMENT OF EDUCATION
 6         (PRESENT VIA ZOOM VIDEOCONFERENCE)

 7         SHAWNA HYNES, VIDEOGRAPHER
           (PRESENT VIA ZOOM VIDEOCONFERENCE)

 8
           LINDSAY DUPHILY, VERITEXT CONCIERGE
 9         (PRESENT VIA ZOOM VIDEOCONFERENCE)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

```
 1                       I N D E X
 2    DEPONENT              EXAMINATION              PAGE
 3    BERNARD DOLAN
 4                       BY MS. KANG               14
 5                       BY MR. CROPP              158
 6
 7
 8        QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
 9                        (NONE.)
10
                         E X H I B I T S
11
      EXHIBIT NO.    PAGE    DESCRIPTION
12
      EXHIBIT 1      18      FILE TITLED
13                          "EXHIBIT 0001 - TAB 14.PDF"
14    EXHIBIT 2      33      FILE TITLED
                            "EXHIBIT 0002 - TAB 19.PDF"
15
      EXHIBIT 3      47      FILE TITLED
16                          "EXHIBIT 0003 - TAB 09.PDF"
17    EXHIBIT 4      91      FILE TITLED
                            "EXHIBIT 0004 - TAB 11.PDF"
18
      EXHIBIT 5      103     FILE TITLED
19                          "EXHIBIT 0005 - TAB 18.PDF"
20    EXHIBIT 6      121     FILE TITLED
                            "EXHIBIT 0006 - TAB 15.PDF"
21
      EXHIBIT 7      126     FILE TITLED
22                          "EXHIBIT 0007 - TAB .02.PDF"
23    EXHIBIT 8      128     FILE TITLED
                            "EXHIBIT 0008 - TAB 07.PDF"
24
25             -- EXHIBITS CONTINUED ON NEXT PAGE --

                                        Page 7
```

```
1                    E X H I B I T S (CONTINUED)
2        EXHIBIT NO.      PAGE      DESCRIPTION
3        EXHIBIT 9        140       FILE TITLED
                                    "EXHIBIT 0009 - TAB 01.PDF"
4
         EXHIBIT 10       142       FILE TITLED
5                                   "EXHIBIT 0010 - TAB 06.PDF"
6        EXHIBIT 11       146       FILE TITLED
                                    "EXHIBIT 0011 - TAB 03.PDF"
7
         EXHIBIT 12       148       FILE TITLED
8                                   "EXHIBIT 0012 - TAB 04.PDF"
9        EXHIBIT 13       151       FILE TITLED
                                    "EXHIBIT 0013 - TAB 17.PDF"
10
         EXHIBIT 14       152       FILE TITLED
11                                  "EXHIBIT 0014 - TAB 08.PDF"
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 8
```

```
1              ZOOM VIDEOCONFERENCE DEPOSITION

2                   FRIDAY, FEBRUARY 11, 2022

3             12:18 P.M. EASTERN STANDARD TIME

4

5             THE VIDEOGRAPHER:  Good afternoon.

6             We are going on the record at 12:18 p.m.    12:18

7     EST on February 11th, 2022.                         12:18

8             Please note that the microphones may pick   12:18

9     up background noise, private conversations, and     12:18

10    interference if unmuted.                            12:18

11            When muted remember to unmute to speak on    12:18

12    the record.                                         12:18

13            Audio and video recording will continue to   12:18

14    take place unless all parties agree to go off the   12:18

15    record.                                             12:18

16            This is Media Unit 1 of the video-recorded   12:18

17    deposition of 30(b)(6) witness Bernie Dolan taken by  12:19

18    counsel for plaintiff in the matter of B.P.J., by   12:19

19    her next friend and mother, Heather Jackson, versus  12:19

20    West Virginia State Board of Education, et al.,      12:19

21    filed in the United States District Court for the   12:19

22    Southern District of West Virginia, Charleston      12:19

23    Division.  Case Number 2:21-cv-00316.               12:19

24            This deposition is being conducted via      12:19

25    Veritext Virtual Zoom technology and all parties are  12:19
```

Page 9

| | | |
|---|---|---|
| 1 | attending remotely. | 12:19 |
| 2 | My name is Shawna Hynes from the firm | 12:19 |
| 3 | Veritext Legal Solutions, and I am the videographer. | 12:19 |
| 4 | The court reporter is Dayna Hester from | 12:19 |
| 5 | the firm Veritext Legal Solutions. | 12:20 |
| 6 | I am not related to any party in this | 12:20 |
| 7 | action, nor am I financially interested in the | 12:20 |
| 8 | outcome. | 12:20 |
| 9 | Counsel present and everyone attending | 12:20 |
| 10 | remotely will state their appearances and | 12:20 |
| 11 | affiliations for the record. | 12:20 |
| 12 | If there are any objections to proceeding, | 12:20 |
| 13 | please state them at the time of your appearance | 12:20 |
| 14 | beginning with the noticing attorney. | 12:20 |
| 15 | MS. KANG:  Hi. | 12:20 |
| 16 | My name is Katelyn Kang.  I'm an attorney | 12:20 |
| 17 | at the law firm of Cooley LLP, and I'm here on | 12:20 |
| 18 | behalf of the plaintiff. | 12:20 |
| 19 | And I'll let my co-counsel introduce | 12:20 |
| 20 | themselves. | 12:20 |
| 21 | MS. HARTNETT:  Hi. | 12:20 |
| 22 | This is Kathleen Hartnett from Cooley LLP | 12:20 |
| 23 | for plaintiff. | 12:20 |
| 24 | MR. BARR:  Good afternoon. | 12:20 |
| 25 | This is Andrew Barr from Cooley LLP on | 12:20 |

Page 10

```
 1    behalf of plaintiff.                               12:20

 2            MS. VEROFF:  Hello.                         12:20

 3            This is Julie Veroff from Cooley LP on      12:20

 4    behalf of plaintiff.                               12:20

 5            MS. STARK:  Hi.                             12:20

 6            This is Loree Stark with the American       12:20

 7    Civil Liberties Union of West Virginia on behalf of 12:21

 8    plaintiff.                                         12:21

 9            MR. WARD:  Hi.                              12:21

10            Nicholas Ward, ACLU West Virginia, on       12:21

11    behalf of plaintiff.                               12:21

12            MS. HELSTROM:  Hi.                          12:21

13            This is Zoë Helstrom from Cooley LLP on     12:21

14    behalf of plaintiff.                               12:21

15            MS. PELET DEL TORO:  Hi.                    12:21

16            This is Valeria Pelet del Toro from Cooley  12:21

17    LLP on behalf of plaintiff.                        12:21

18            MS. GREEN:  Hi.                             12:21

19            Am I too soon?                             12:21

20            MR. BLOCK:  Hi.                             12:21

21            This is Josh Block from ACLU on behalf of   12:21

22    plaintiff.                                         12:21

23            MS. SWAMINATHAN:  And hi.                   12:21

24            This is Sruti Swaminathan from Lambda       12:21

25    Legal on behalf of plaintiff.                      12:21
```

Page 11

```
 1              MS. GREEN:  This is Roberta Green, Shuman    12:21
 2    McCuskey & Slicer.  I'm here on behalf of WVSSAC.      12:21
 3              And here with me today is our deponent       12:22
 4    30(b)(6) witness Bernie Dolan.                         12:22
 5              MS. BANDY:  Hello.                            12:22
 6              This is Kimberly Bandy also on behalf of     12:22
 7    West Virginia SSAC.                                    12:22
 8              MS. MORGAN:  This is Kelly Morgan on         12:22
 9    behalf of the West Virginia State Board of Education   12:22
10    and Superintendent Burch.                              12:22
11              I have with me as well general counsel       12:22
12    Heather Hutchens and Deputy Superintendent Michelle    12:22
13    Blatt as our representative.                            12:22
14              MR. CAPEHEART:  This is Curtis Capeheart     12:22
15    the West Virginia Attorney General's office on         12:22
16    behalf of the defendant State of West Virginia.        12:22
17              Also with me in my office is another         12:22
18    individual from the office, Jesseca Church.            12:22
19              MR. CROPP:  My name is Jeffrey Cropp.  I'm   12:22
20    with Steptoe & Johnson.  We represent defendants       12:22
21    Harrison County Board of Education and                 12:22
22    Superintendent Dora Stutler.                           12:22
23              MS. HAMMOND:  Hi.                             12:23
24              This is Kristen Hammond.  I'm also on        12:23
25    behalf of the West Virginia State Board of Education   12:23
```

Veritext Legal Solutions
866 299-5127

**JA1351**

```
 1    and Superintendent Burch.                              12:23

 2              MR. SCRUGGS:  All right.  I think that        12:23

 3    leaves us as intervenor.                               12:23

 4              Jonathan Scruggs on behalf of the            12:23

 5    Intervenor with Alliance Defending Freedom.            12:23

 6              And also attending today on behalf of the    12:23

 7    intervenor is my -- let me get my list here -- Catie   12:23

 8    Kelly, Christiana Holcomb, Hal Frampton, and           12:23

 9    Timothy Ducar.                                         12:23

10              And that is it.                              12:23

11              THE VIDEOGRAPHER:  Thank you.                12:23

12              If that's everybody, will the court          12:23

13    reporter please swear in the witness.                  12:23

14              THE REPORTER:  Okay.  And because it is a    12:23

15    federal case, I do have a read-on.  One second.        12:23

16              My name is Dayna Hester.  This statement     13:08

17    is to acknowledge my obligations pursuant to Federal   13:08

18    Rules of Civil Procedure.                              13:08

19              Rule 30(b), Subsection 5(a).  My business    13:08

20    address is 707 Wilshire Boulevard, Los Angeles,        13:08

21    California.  The videographer has stated the           13:08

22    additional required information.

23              Rule 30(b), Subsection 5(c).  Upon           13:08

24    completion of the deposition, if there is a

25    stipulation about the custody of the transcript or
```

Page 13

```
 1    other pertinent matters, I will recite such
 2    stipulation(s).  Additionally, the videographer will
 3    read-off when the deposition concludes.
 4            So with this being said, I will now swear
 5    in the witness.
 6            Mr. Dolan, please, raise your right hand.
 7            THE WITNESS:  [Witness did as requested].
 8            THE REPORTER:  Do you affirm the testimony
 9    you are about to give in the cause now pending will
10    be the truth, the whole truth, and nothing but the
11    truth?                                          12:24
12            THE WITNESS:  I do.                     12:24
13            THE REPORTER:  Thank you.               12:24
14
15                    BERNARD DOLAN
16            having been first duly sworn, was
17            examined and testified as follows:
18
19                    EXAMINATION                     12:25
20    BY MS. KANG:                                    12:25
21       Q.   Hi.  Good afternoon, Mr. Dolan.  How are  12:25
22    you?                                            12:25
23       A.   Good.  How are you?                     12:25
24       Q.   Doing well.                             12:25
25            Thank you so much for spending your Friday  12:25
```

Page 14

| | | |
|---|---|---|
| 1 | afternoon with us. | 12:25 |
| 2 | Before we get started, would you please | 12:25 |
| 3 | state and spell your name for the record. | 12:25 |
| 4 | A.   Bernard, B-E-R-N-A-R-D; Dolan, D-O-L-A-N. | 12:25 |
| 5 | Q.   Mr. Dolan, before we get started, we have | 12:25 |
| 6 | some housekeeping items.  So the oath you just took | 12:25 |
| 7 | is the same oath you would take if you were | 12:25 |
| 8 | testifying in a courtroom.  So what that means is | 12:25 |
| 9 | you must testify truthfully and not leave out any | 12:25 |
| 10 | important facts. | 12:25 |
| 11 | Is there any reason you cannot testify | 12:25 |
| 12 | truthfully today? | 12:25 |
| 13 | A.   No. | 12:25 |
| 14 | Q.   Please give verbal answers to any of my | 12:25 |
| 15 | questions.  Nodding or shaking your head cannot, | 12:25 |
| 16 | unfortunately, be captured by the court reporter. | 12:25 |
| 17 | So the answer you just gave was perfect. | 12:25 |
| 18 | If you don't understand the question, | 12:25 |
| 19 | please let me know, and I'm happy to try to rephrase | 12:25 |
| 20 | it or make it clear for you.  If you answer, I will | 12:25 |
| 21 | assume you understood.  Is that fair? | 12:25 |
| 22 | A.   Yes. | 12:25 |
| 23 | Q.   And just to be clear, when I ask questions | 12:25 |
| 24 | I am not seeking communications that you had with | 12:26 |
| 25 | your attorney. | 12:26 |

Page 15

```
 1              Because the court reporter is taking down      12:26
 2    what we say on the record, I'll do my best to avoid      12:26
 3    talking over you and to avoid talking at the same        12:26
 4    time as you.                                             12:26
 5              And then, finally, I'm going to try to do      12:26
 6    a break every hour or so -- but if at any point you      12:26
 7    need a break, we'll finish up whatever question we       12:26
 8    are on, and we can take a break whenever you feel        12:26
 9    comfortable.                                             12:26
10              Does that sound fair?                          12:26
11        A.   Yes, ma'am.                                     12:26
12        Q.   Have you ever had your deposition taken         12:26
13    before?                                                  12:26
14        A.   Yes.                                            12:26
15        Q.   When was it?                                    12:26
16        A.   Two years ago, I believe.                       12:26
17        Q.   What was it about?                              12:26
18        A.   A herpes case in wrestling.                     12:26
19        Q.   So were you testifying on behalf of the        12:26
20    WVSSAC?                                                  12:26
21        A.   Yes, ma'am.                                     12:26
22        Q.   And going forward if I say the                  12:26
23    "Commission" instead of the "WVSSAC," would that be      12:26
24    all right with you?                                      12:26
25        A.   That is fine.                                   12:26
```

Page 16

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 295 of 674

```
 1            Q.    So you mentioned it's a herpes case.  Can      12:26
 2     you tell me whether you testified on behalf of the          12:27
 3     W- -- of the Commission or was it in your personal          12:27
 4     capacity?                                                   12:27
 5            A.    I believe it was on behalf of the              12:27
 6     Commission, but I'm -- I wouldn't -- I'm not sure.          12:27
 7            Q.    Have you ever -- have you ever had your        12:27
 8     deposition taken other than this time?                      12:27
 9            A.    Not that I recall.                             12:27
10            Q.    Have you ever testified at trial?              12:27
11            A.    Yes.                                           12:27
12            Q.    When was this?                                 12:27
13            A.    Couple years -- I would say probably three     12:27
14     or four years ago.                                          12:27
15            Q.    What was it about?                             12:27
16            A.    A golf ruling in a championship.               12:27
17            Q.    And so were you also testifying on behalf      12:27
18     of the Commission?                                          12:27
19            A.    Yes, ma'am.                                    12:27
20            Q.    Did you bring anything with you today?         12:27
21            A.    Just a bottle of water.                        12:27
22            Q.    Good.                                          12:27
23                  And do you understand that you are here to     12:27
24     respond to a 30(b)(6) deposition notice?                    12:28
25            A.    Yes.                                           12:28
```

                                                        Page 17

```
 1          Q.   Do you know what a 30(b)(6) deposition --   12:28
 2    deposition notice is?                                  12:28
 3          A.   Yes.                                        12:28
 4          Q.   Have you had a chance to review the         12:28
 5    deposition notice?                                     12:28
 6          A.   Yes.                                        12:28
 7          Q.   So in that deposition notice, there were a  12:28
 8    number of topics.                                      12:28
 9               Are you familiar with each of the topics    12:28
10    described in that notice?                              12:28
11          A.   Yes.                                        12:28
12          Q.   So if you go into your Marked Exhibits      12:28
13    folder, I'm going to introduce to you a document       12:28
14    that's been marked as Exhibit 1.                       12:28
15               (Deposition Exhibit 1 was marked for        12:28
16               identification and is attached hereto.)     12:28
17    BY MS. KANG:                                           12:28
18          Q.   Let me know when you have had a chance to   12:28
19    pull that up.                                          12:28
20          A.   Okay.  Exhibit 1, the deposition notice.    12:28
21          Q.   That's correct.                             12:28
22               And I'm going to ask you to scroll down to  12:28
23    Page 6 of Exhibit A.  I believe it's Page 7 of the     12:28
24    actual pdf, if that's helpful, or Page 6.              12:29
25          A.   Yes.  Okay.                                 12:29
```

Page 18

| | | |
|---|---|---|
| 1 | Q.   Great. | 12:29 |
| 2 | So I'm going to go through each of the | 12:29 |
| 3 | topics and just ask you a few questions about them. | 12:29 |
| 4 | So for Topic 1, what did you do to prepare | 12:29 |
| 5 | for Topic 1? | 12:29 |
| 6 | A.   Looked at our organization. | 12:29 |
| 7 | Q.   Did you review any documents? | 12:29 |
| 8 | A.   Our rules and regulations. | 12:29 |
| 9 | Q.   And by looked at your organization, did | 12:29 |
| 10 | you mean -- | 12:29 |
| 11 | A.   Review -- | 12:29 |
| 12 | Q.   -- look at your -- sorry.  Go ahead. | 12:29 |
| 13 | A.   Just -- there's a part of our rules and | 12:29 |
| 14 | regulations that has a history of the organization. | 12:29 |
| 15 | Q.   Got it. | 12:29 |
| 16 | Is there any reason you can't give full | 12:29 |
| 17 | and complete testimony on Topic 1? | 12:29 |
| 18 | A.   No. | 12:29 |
| 19 | Q.   When preparing for Topic 1, did you | 12:30 |
| 20 | consult with anyone other than your attorney? | 12:30 |
| 21 | A.   No. | 12:30 |
| 22 | Q.   Moving on to Topic 2, same question.  What | 12:30 |
| 23 | did you do to prepare for Topic 2? | 12:30 |
| 24 | A.   Probably just discuss with my attorney. | 12:30 |
| 25 | Q.   And did you review any documents? | 12:30 |

Page 19

| | | |
|---|---|---|
| 1 | A.   Not necessary for that one. | 12:30 |
| 2 | Q.   And just to clarify, you didn't talk to | 12:30 |
| 3 | anyone other than your attorney? | 12:30 |
| 4 | A.   No. | 12:30 |
| 5 | Q.   For Topic 3, what did you do to prepare | 12:30 |
| 6 | for Topic 3? | 12:30 |
| 7 | A.   Looked at our handbook, rules and | 12:30 |
| 8 | regulations handbook. | 12:30 |
| 9 | Q.   Did you review any other document? | 12:30 |
| 10 | A.   No. | 12:30 |
| 11 | Q.   Did you consult with anyone other than | 12:30 |
| 12 | your attorney? | 12:30 |
| 13 | A.   No. | 12:30 |
| 14 | Q.   And is there any reason you cannot give | 12:30 |
| 15 | full and complete answers on behalf of the | 12:30 |
| 16 | Commission for that topic? | 12:30 |
| 17 | A.   No. | 12:30 |
| 18 | Q.   For Topic 4, what did you do to prepare | 12:31 |
| 19 | for it? | 12:31 |
| 20 | A.   Rules and regulations handbook. | 12:31 |
| 21 | Q.   Did you review anything else? | 12:31 |
| 22 | A.   No. | 12:31 |
| 23 | Q.   Did you consult with anyone other than | 12:31 |
| 24 | your attorney? | 12:31 |
| 25 | A.   No. | 12:31 |

Page 20

```
 1          Q.   And is there any reason you cannot give        12:31
 2     full and complete answers on behalf of the              12:31
 3     Commission for Topic 4?                                 12:31
 4          A.   No.                                            12:31
 5          Q.   For Topic 5, what did you do to prepare        12:31
 6     for that?                                               12:31
 7          A.   Looked at our rules and regulations and       12:31
 8     probably researched my email.                           12:31
 9          Q.   Can you clarify for me what you mean by        12:31
10     researched your email?                                  12:31
11          A.   Just search the email to make sure I          12:31
12     didn't have any communication with the plaintiffs.      12:31
13          Q.   Did you consult with anyone other than        12:31
14     your attorney for Topic 5?                              12:32
15          A.   No.                                            12:32
16          Q.   And is there any reason you cannot give        12:32
17     full and complete answers on behalf of the              12:32
18     Commission?                                             12:32
19          A.   No.                                            12:32
20          Q.   Sorry.  I know these questions are            12:32
21     repetitive, but I do appreciate it.                     12:32
22               For Topic 6, what did you do to prepare        12:32
23     for Topic 6?                                            12:32
24          A.   Researched -- or looked through my emails     12:32
25     as well as text messages.                               12:32
```

Page 21

```
1          Q.   Did you review any documents?            12:32
2          A.   Not really.  Just -- I'm sorry.          12:32
3               Our transgender policy or our Board      12:32
4     policy.  That was all.                             12:32
5          Q.   Did you review any of the emails or text 12:32
6     messages that you searched for?                    12:32
7          A.   I probably would have read them for -- to 12:32
8     determine whether there was any substance to them, 12:32
9     yes.                                               12:33
10         Q.   Did you consult with anyone other than   12:33
11    your attorney for Topic 6?                         12:33
12         A.   No.                                      12:33
13         Q.   And is there any reason you cannot give  12:33
14    full and complete answers on behalf of the         12:33
15    Commission for Topic 6?                            12:33
16         A.   No.                                      12:33
17         Q.   For Topic 7, what did you do to prepare  12:33
18    for it?                                            12:33
19         A.   Looked at our rules and regulations      12:33
20    handbook.                                          12:33
21         Q.   Did you review any documents other than  12:33
22    the rules and regulations handbook?                12:33
23         A.   No.                                      12:33
24         Q.   Did you consult with anyone other than   12:33
25    your attorney about Topic 7?                       12:33
```

Page 22

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 301 of 674

```
 1              A.   No.                                  12:33

 2              Q.   And is there any reason you cannot give  12:33

 3       full and complete answers on behalf of the       12:33

 4       Commission?                                       12:33

 5              A.   No.                                  12:33

 6              Q.   For Topic 8, what did you do to prepare  12:33

 7       for Topic 8?                                      12:33

 8              A.   Reviewed text messages and emails    12:33

 9       concerning House Bill 3293.                       12:34

10              Q.   Did you review anything else?        12:34

11              A.   No.                                  12:34

12              Q.   Did you consult with anyone other than  12:34

13       your attorney?                                    12:34

14              A.   No.                                  12:34

15              Q.   And is there any reason you cannot give  12:34

16       full and complete answers on behalf of the       12:34

17       Commission?                                       12:34

18              A.   No.                                  12:34

19              Q.   For Topic 9, what did you do to prepare  12:34

20       for Topic 9?                                      12:34

21              A.   Reviewed the rules and regulations   12:34

22       handbook.                                         12:34

23              Q.   Did you review anything other than the  12:34

24       rules and regulations handbook?                   12:34

25              A.   No.                                  12:34
```

Page 23

```
 1          Q.   Did you consult anyone other than your      12:34

 2     attorney?                                              12:34

 3          A.   No.                                          12:34

 4          Q.   Is there any reason you cannot give full     12:34

 5     and complete answers on behalf of the Commission?     12:34

 6          A.   No.                                          12:34

 7          Q.   All right.  We're almost there.             12:34

 8               For Topic 10, what did you do to prepare     12:34

 9     for it?                                                12:34

10          A.   Reviewed the rules and regulations           12:34

11     handbook.                                              12:35

12          Q.   Did you review anything else?                12:35

13          A.   No.                                          12:35

14          Q.   Did you -- did you consult anyone other      12:35

15     than your attorney?                                    12:35

16          A.   No.                                          12:35

17          Q.   Is there any reason you cannot give full     12:35

18     and complete answers on behalf of the Commission?     12:35

19          A.   No.                                          12:35

20          Q.   For Topic 11, what did you do to prepare     12:35

21     for it?                                                12:35

22          A.   Reviewed the rules and regulations           12:35

23     handbook as well as the Board policy on transgender.  12:35

24          Q.   Did you review anything else?                12:35

25          A.   No.                                          12:35
```

Page 24

**JA1363**

```
 1          Q.   Did you consult with anyone other than      12:35
 2     your attorney?                                         12:35
 3          A.   No.                                          12:35
 4          Q.   Is there any reason you cannot give full     12:35
 5     and complete answers on behalf of the Commission?      12:35
 6          A.   No.                                          12:35
 7          Q.   For Topic 12, what did you do to prepare     12:35
 8     for it?                                                12:35
 9          A.   Reviewed the rules and regulations           12:36
10     handbook.                                              12:36
11          Q.   Did you review anything else?                12:36
12          A.   No.                                          12:36
13          Q.   Did you consult with anyone other than      12:36
14     your attorney?                                         12:36
15          A.   No.                                          12:36
16          Q.   Is there any reason you can't give full      12:36
17     and complete answers on behalf of the Commission?      12:36
18          A.   No.                                          12:36
19          Q.   For Topic 13, what did you do to prepare     12:36
20     for it?                                                12:36
21          A.   Read the rule -- read the House Bill 3293.   12:36
22          Q.   Did you review anything else?                12:36
23          A.   Just our rules and regulations.             12:36
24          Q.   Did you consult with anyone other than      12:36
25     your attorney?                                         12:36
```

Page 25

| | | |
|---|---|---|
| 1 | A.   No. | 12:36 |
| 2 | Q.   And is there any reason you cannot give | 12:36 |
| 3 | full and complete answers on behalf of the | 12:36 |
| 4 | Commission? | 12:36 |
| 5 | A.   I -- I did consult -- I probably -- I had | 12:37 |
| 6 | a communication with Melissa White from House | 12:37 |
| 7 | Education.  She had sent me documents -- or a | 12:37 |
| 8 | document.  So I would say I communicated with | 12:37 |
| 9 | Melissa White about House Bill 3293. | 12:37 |
| 10 | Q.   Was this in preparation for this | 12:37 |
| 11 | deposition? | 12:37 |
| 12 | A.   No.  I'm sorry. | 12:37 |
| 13 | Q.   No need to apologize. | 12:37 |
| 14 | All right.  Last -- last topic.  What did | 12:37 |
| 15 | you do to prepare for Topic 14? | 12:37 |
| 16 | A.   Primarily reviewed the rules and | 12:37 |
| 17 | regulations handbook and the transgender Board | 12:37 |
| 18 | policy and look at emails and text messages. | 12:37 |
| 19 | Q.   Anything else? | 12:38 |
| 20 | A.   No. | 12:38 |
| 21 | Q.   Did you consult with anyone other than | 12:38 |
| 22 | your attorney? | 12:38 |
| 23 | A.   No. | 12:38 |
| 24 | Q.   Is there any reason you cannot give full | 12:38 |
| 25 | and complete answers on behalf of the Commission? | 12:38 |

Page 26

```
 1         A.   No.                                      12:38

 2         Q.   So for some of these topics, you mentioned  12:38

 3    reviewing emails and documents.  Do you know if    12:38

 4    those emails and documents have been produced to   12:38

 5    Plaintiff?                                          12:38

 6         A.   They all have, yes.                       12:38

 7         Q.   All right.  Thank you.                    12:38

 8              MS. KANG:  You can take down Exhibit 1.   12:38

 9    BY MS. KANG:                                        12:38

10         Q.   Do you understand that you're testifying  12:38

11    about these topics in the deposition notice on     12:38

12    behalf of the Commission?                           12:38

13         A.   Yes.                                      12:38

14         Q.   So just to be clear, when I ask for your  12:38

15    position on something, I -- I'm asking for the     12:38

16    position of -- of the Commission unless I say      12:38

17    otherwise.                                          12:38

18              You understand?                           12:38

19         A.   Yes, ma'am.                               12:38

20         Q.   In general, what did you do to prepare for  12:38

21    today's deposition?                                 12:38

22         A.   Again, reviewed the rule -- the rules and  12:39

23    regulations.                                        12:39

24         Q.   Did you meet with anyone other than your  12:39

25    attorney?                                           12:39
```

Page 27

```
 1        A.   No.                                    12:39
 2        Q.   Did you discuss today's deposition with   12:39
 3   anyone other than your attorney?                 12:39
 4        A.   Just that I had it scheduled so people  12:39
 5   would know in the office not to send me calls.   12:39
 6        Q.   So other employees at -- at the        12:39
 7   Commission; is that right?                        12:39
 8        A.   Yes, ma'am.                             12:39
 9        Q.   Do you know who B.P.J. is?             12:39
10        A.   By name only, yes.                     12:39
11        Q.   Do you know anything else about her?   12:39
12             MS. GREEN:  I'll just object to the form,  12:39
13   to the extent he knows things from me, from counsel.  12:39
14             THE WITNESS:  I have -- only know what --  12:39
15   the documents that have been sent to me.  I don't  12:39
16   know anything firsthand about her.               12:40
17   BY MS. KANG:                                     12:40
18        Q.   Do you agree that B.P.J. is a girl who is  12:40
19   transgender?                                      12:40
20             MS. GREEN:  I'll object to the form.  And  12:40
21   I'll just object outside the scope.              12:40
22             THE WITNESS:  It's been presented to me  12:40
23   that way.                                         12:40
24   BY MS. KANG:                                     12:40
25        Q.   Are you aware that B.P.J. ran          12:40
```

Page 28

```
 1    cross-country on the girls' team at Bridgeport      12:40
 2    Middle School?                                      12:40
 3         A.   Yes.                                      12:40
 4         Q.   How did you become aware of that?         12:40
 5         A.   Through the court case.                   12:40
 6         Q.   Have you ever spoken to B.P.J.?           12:40
 7         A.   I have not.                               12:40
 8         Q.   Have you ever spoken to B.P.J.'s parents? 12:40
 9         A.   No.                                       12:40
10              MS. GREEN:  And I'll just object to the   12:40
11    extent this is outside the scope.                   12:40
12    BY MS. KANG:                                        12:40
13         Q.   Have you ever spoken to B.P.J.'s sibling? 12:40
14         A.   No.                                       12:40
15         Q.   Now, I want to just talk a little bit     12:40
16    about your personal background to sort of better    12:41
17    understand your selection as -- as the witness for  12:41
18    the 30(b)(6) deposition.                            12:41
19              What is your position at the Commission?  12:41
20         A.   I am the executive director.              12:41
21         Q.   What are your responsibilities as         12:41
22    executive director?                                 12:41
23         A.   Generally oversee the organization, assign 12:41
24    duties and evaluate staff, make decisions when      12:41
25    there's disagreement amongst schools.               12:41
```

Page 29

```
1          Q.   What sort of duties do you assign?        12:41
2          A.   Director of all the tournaments.  So      12:41
3     each -- each assistant executive director is        12:41
4     assigned multiple sports that they will oversee     12:41
5     and -- and put on the tournaments.                  12:41
6               I assign secretarial duties to the        12:41
7     secretarial staff.                                  12:41
8          Q.   How many assistant executive directors do 12:42
9     you have?                                           12:42
10         A.   Three.                                    12:42
11         Q.   So I believe you said you make decisions  12:42
12    when schools have disputes.  Is that accurate?      12:42
13         A.   Yes, ma'am.                               12:42
14         Q.   Can you tell me a little bit -- a little  12:42
15    bit more about that.                                12:42
16              MS. GREEN:  I'll just object.  Outside the 12:42
17    scope.                                              12:42
18              THE WITNESS:  If there is a difference    12:42
19    on -- opinion on eligibility of a student in one    12:42
20    school, one school may say they are eligible, one   12:42
21    school may say they are ineligible.  So we gather   12:42
22    the facts, and we'll make a determination.          12:42
23    BY MS. KANG:                                        12:42
24         Q.   And by "we," do you mean you as the       12:42
25    executive director or the Commission?               12:42
```

Page 30

```
 1          A.   The Commission.                        12:42

 2          Q.   And who is --                          12:42

 3          A.   And I -- I'm sorry.  Me as the executive   12:42

 4     director for the Commission.                     12:42

 5          Q.   Understood.                            12:42

 6               How long have you been the executive  12:42

 7     director?                                        12:43

 8          A.   Seven years.                           12:43

 9          Q.   Have you held any other positions at the  12:43

10     Commission?                                      12:43

11          A.   No.                                    12:43

12          Q.   Do you --                              12:43

13          A.   Pardon me.  Wait a minute.             12:43

14               I was on the Board of Directors at one  12:43

15     point.                                           12:43

16          Q.   And when was that?                     12:43

17          A.   That -- I believe it was 2012 to 2014.  12:43

18          Q.   What was your role when you were on the  12:43

19     Board of Directors?                              12:43

20               MS. GREEN:  Object to the form.        12:43

21               THE WITNESS:  Approve -- approve the   12:43

22     workings of the organization to proof financial  12:43

23     reports, those things.                           12:43

24               Also to hear appeals of students or   12:43

25     coaches who have been -- who violated the rule and  12:43
```

Page 31

| | | |
|---|---|---|
| 1 | they come up before the Board to either appeal their | 12:44 |
| 2 | discipline or appeal their ineligibility. | 12:44 |
| 3 | BY MS. KANG: | 12:44 |
| 4 |     Q.   Do you report to anyone currently as the | 12:44 |
| 5 | executive director? | 12:44 |
| 6 |     A.   I have ten Board members, yes. | 12:44 |
| 7 |     Q.   Is that the same Board of Directors that | 12:44 |
| 8 | you were just talking about? | 12:44 |
| 9 |     A.   Yes, ma'am. | 12:44 |
| 10 |     Q.   Does anyone report to you? | 12:44 |
| 11 |     A.   My eight other staff members report to me, | 12:44 |
| 12 | yes. | 12:44 |
| 13 |     Q.   What are their titles? | 12:44 |
| 14 |     A.   Three of -- | 12:44 |
| 15 |         MS. GREEN:  Object.  Outside the scope. | 12:44 |
| 16 |         And can I just have a continuing objection | 12:44 |
| 17 | for the outside scope, or you want be to keep | 12:44 |
| 18 | hopping in? | 12:44 |
| 19 |         MS. KANG:  Yes.  I'll grant you a | 12:44 |
| 20 | continuing objection for outside the scope, Roberta. | 12:44 |
| 21 |         MS. GREEN:  Thank you.  Thank you. | 12:44 |
| 22 |         THE WITNESS:  There are three assistant | 12:44 |
| 23 | executive directors, one events communication | 12:44 |
| 24 | coordinator, one bookkeeper, and three secretaries. | 12:44 |
| 25 | /// | |

Page 32

```
 1    BY MS. KANG:                                        12:45
 2         Q.   Have you ever been employed by -- employed 12:45
 3    by the Attorney General's Office of the State of    12:45
 4    West Virginia?                                      12:45
 5         A.   No.                                       12:45
 6         Q.   Have you ever been employed by the        12:45
 7    West Virginia House of Delegates?                   12:45
 8         A.   No.                                       12:45
 9         Q.   Have you ever been employed by the        12:45
10    West Virginia Senate?                               12:45
11         A.   No.                                       12:45
12         Q.   Have you ever been employed by the        12:45
13    Harrison County Board of Education?                 12:45
14         A.   No.                                       12:45
15         Q.   Have you ever been employed by the        12:45
16    West Virginia State Board of Education?             12:45
17         A.   No.                                       12:45
18         Q.   So I am going to introduce to you a       12:45
19    document that is going to be marked as Exhibit 2.   12:45
20              And I'll let you know when it should      12:45
21    appear in your Marked Exhibit folder.               12:45
22              (Deposition Exhibit 2 was marked for      12:45
23              identification and is attached hereto.)   12:45
24    BY MS. KANG:                                        12:45
25         Q.   So if you go to your Marked Exhibit       12:45
```

Page 33

| | | |
|---|---|---|
| 1 | folder, you should now see a document that's been | 12:45 |
| 2 | marked as Exhibit 2. | 12:45 |
| 3 | Let me know when you see it. | 12:46 |
| 4 | A.   Okay. | 12:46 |
| 5 | Q.   So on Page 2 of Exhibit 2, you'll see a | 12:46 |
| 6 | section entitled "Bernie Dolan," and this is -- I'll | 12:46 |
| 7 | represent to you that this is a screenshot that I | 12:46 |
| 8 | took from the Commission website on February 10th, | 12:46 |
| 9 | 2022.  And in the bottom left corner you'll see the | 12:46 |
| 10 | URL stamp where I pulled it from the website. | 12:46 |
| 11 | And I'd just like to ask you a few | 12:46 |
| 12 | questions about your biography in -- on this page. | 12:46 |
| 13 | Do you agree with what's written in the | 12:46 |
| 14 | paragraph on Page 2 of Exhibit 2 under "Bernie | 12:46 |
| 15 | Dolan"? | 12:46 |
| 16 | MS. MORGAN:  Counsel, this is Kelly | 12:46 |
| 17 | Morgan. | 12:46 |
| 18 | I do not see an Exhibit 2 in the Egnyte. | 12:46 |
| 19 | MS. KANG:  So if you're -- if anyone is | 12:46 |
| 20 | having trouble accessing the Marked Exhibits, I | 12:46 |
| 21 | recommend clicking on the folder again to refresh | 12:46 |
| 22 | it. | 12:46 |
| 23 | Let me know if you continue to have | 12:47 |
| 24 | problems. | 12:47 |
| 25 | THE WITNESS:  I do -- I agree with what is | 12:47 |

Page 34

| | | |
|---|---|---|
| 1 | written there. | 12:47 |
| 2 | BY MS. KANG: | 12:47 |
| 3 |     Q.   Where did you work before your current | 12:47 |
| 4 | role at the Commission? | 12:47 |
| 5 |     A.   Ohio County Schools. | 12:47 |
| 6 |     Q.   How long did you work there? | 12:47 |
| 7 |     A.   30 years. | 12:47 |
| 8 |     Q.   Whoa. | 12:47 |
| 9 |     Did you interact with any transgender | 12:47 |
| 10 | individuals in that role? | 12:47 |
| 11 |     A.   I did not. | 12:47 |
| 12 |     Q.   When did you attend West Virginia | 12:47 |
| 13 | University? | 12:47 |
| 14 |     A.   I graduated in '85; so probably '81 to | 12:47 |
| 15 | '85. | 12:47 |
| 16 |     Q.   And when did you attend Salem | 12:47 |
| 17 | International University? | 12:47 |
| 18 |     A.   I would say '99 to 2000 or 2000 to 2001. | 12:47 |
| 19 |     Q.   What is the Super Six? | 12:47 |
| 20 |     A.   State football championship. | 12:48 |
| 21 |     Q.   What was your role there? | 12:48 |
| 22 |     A.   I had a variety of roles starting out from | 12:48 |
| 23 | assistant media director over the years to being the | 12:48 |
| 24 | director -- once I was the athletic director of | 12:48 |
| 25 | Wheeling Park High School. | 12:48 |

Page 35

```
 1           Q.    What was your role as the athletic        12:48
 2     director?                                             12:48
 3           A.    I was the athletic director at Wheeling   12:48
 4     Park High School.                                     12:48
 5                 What was the question?                    12:48
 6           Q.    Sure.                                      12:48
 7                 Could you tell me what some of your       12:48
 8     responsibilities were in that role?                  12:48
 9           A.    I would oversee the coaches, do their    12:48
10     evaluations, purchase equipment for each team, as   12:48
11     well as coordinate transportation, and also make    12:48
12     sure all eligibility information was submitted to    12:48
13     the Commission -- Commission as well as accurate.    12:48
14           Q.    What is the state golf tournament?        12:49
15           A.    State championship for golf.              12:49
16           Q.    And what was your role there?             12:49
17           A.    The director.                             12:49
18           Q.    What is OVAC?                              12:49
19           A.    It's the Ohio Valley Athletic Conference. 12:49
20     It was the conference that Wheeling Park was a       12:49
21     member of, and still is, but it's the athletic       12:49
22     conference for the high schools.                     12:49
23           Q.    What was your role there?                 12:49
24           A.    I served on executive Board a couple of  12:49
25     the years while I was the athletic director at       12:49
```

Page 36

```
 1    Wheeling Park.                                      12:49

 2         Q.    Finally, what is WVADA?                  12:49

 3         A.    West Virginia Athletic Directors         12:49

 4    Association.                                        12:49

 5         Q.    What was your role there?                12:49

 6         A.    I served on the executive Board -- or the  12:49

 7    Board of Directors for a couple of years while I was  12:49

 8    the athletic director at Wheeling Park High School.  12:49

 9         Q.    And do you yourself play sports?         12:50

10         A.    A little bit still.                      12:50

11         Q.    What sports do you play?                 12:50

12         A.    Tennis a little bit.  Basketball a little  12:50

13    bit.  Pickleball.                                   12:50

14         Q.    Do you currently coach any sports?       12:50

15         A.    I do not.                                12:50

16         Q.    Did you used to coach?                   12:50

17         A.    I did.                                   12:50

18         Q.    What did you coach?                      12:50

19         A.    18 years I coached boys' and girls' track  12:50

20    at Wheeling Park High School;                       12:50

21              12 as the head coach for both boys and    12:50

22    girls;                                              12:50

23              Assistant coach of football;             12:50

24              And assistant coach of girls' basketball.  12:50

25         Q.    Thank you.                               12:50
```

Page 37

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 316 of 674

```
 1              MS. KANG:  You can take down Exhibit 2      12:50
 2    now.                                                 12:50
 3    BY MS. KANG:                                         12:50
 4         Q.   So now I want to move into talking a       12:50
 5    little bit more about the Commission and its         12:50
 6    structure.                                           12:50
 7              When was the Commission founded?           12:50
 8         A.   In 1916.                                   12:50
 9         Q.   Why was it founded?                        12:51
10         A.   To primarily handle disputes between       12:51
11    schools at that point, and they did provide          12:51
12    championship opportunities for schools.              12:51
13         Q.   What sort of disputes between schools?     12:51
14         A.   As I said earlier, it could be             12:51
15    eligibility; it could have been breaking of          12:51
16    contracts; could be officials, you know -- who --    12:51
17    what officials get assigned to games.                12:51
18              So there is quite a bit of conflict        12:51
19    possible.                                            12:51
20         Q.   How does the Commission define secondary   12:51
21    sports?                                              12:51
22         A.   Secondary sports, we are -- we oversee the 12:51
23    sports that we currently have, which is -- a number  12:51
24    of them.                                             12:52
25              But the -- what happens is, as the schools 12:52
```

Page 38

| | | |
|---|---|---|
| 1 | offer these sports as clubs, once there is enough | 12:52 |
| 2 | schools that offer the sports, then they would | 12:52 |
| 3 | petition us to recognize an additional sport.  So we | 12:52 |
| 4 | have, I believe, 19 championships at this point. | 12:52 |
| 5 | Q.   What grades count as a secondary grade? | 12:52 |
| 6 | A.   6th through 12. | 12:52 |
| 7 | Q.   Do you know if Bridgeport Middle School | 12:52 |
| 8 | qualifies as a secondary school? | 12:52 |
| 9 | A.   They are a member of our association.  So | 12:52 |
| 10 | yes. | 12:52 |
| 11 | Q.   Can you tell me what is a member of | 12:52 |
| 12 | your -- what does a member of your association mean? | 12:52 |
| 13 | A.   First of all, initially there was | 12:52 |
| 14 | a initia- -- an initiation fee.  And there were | 12:52 |
| 15 | dues.  But we have not charged dues for 20 years. | 12:52 |
| 16 | To be a member, you just have to | 12:53 |
| 17 | provide -- you have to agree to follow all the rules | 12:53 |
| 18 | and regulations as well as provide an opportunity | 12:53 |
| 19 | for a boy sport and a girl sport in each of the | 12:53 |
| 20 | seasons. | 12:53 |
| 21 | Q.   So each member school has to offer a boys' | 12:53 |
| 22 | team or a girls' team for each support? | 12:53 |
| 23 | A.   Yes. | 12:53 |
| 24 | Q.   Is that right? | 12:53 |
| 25 | A.   Yes.  Yes. | 12:53 |

Page 39

```
 1        Q.   And you said you stopped collecting dues      12:53
 2    for 20 years; is that correct?                          12:53
 3        A.   Yes.                                           12:53
 4        Q.   Why did the Commission stop collecting         12:53
 5    dues?                                                    12:53
 6        A.   At that point, it was more trouble than it     12:53
 7    was worth it.  There wasn't that much money coming      12:53
 8    in from dues.  It was before my time, though.           12:53
 9        Q.   Understood.                                    12:53
10             How many employees does the Commission         12:53
11    have currently?                                         12:53
12        A.   Nine.                                          12:53
13        Q.   Is there someone who is considered in          12:54
14    charge of the Commission?                               12:54
15        A.   I would assume -- I am the executive           12:54
16    director.  So I would be in charge.  But I still        12:54
17    answer to my Board of Directors.                        12:54
18        Q.   So does the Commission have a relationship     12:54
19    with the State Board of Education in West Virginia?     12:54
20        A.   We do have a relationship, number one.  As     12:54
21    our rules are promulgated from our members, they       12:54
22    will submit rules to be voted on by the membership     12:54
23    at our Board of Control.                                12:54
24             If at the Board of Control they pass by a      12:54
25    majority, then those rules get submitted to the        12:54
```

Page 40

```
 1    State Board of Education who would then put them out    12:54

 2    for public comment.                                     12:54

 3            And they would have final vote on whether       12:54

 4    or not the rule becomes law.  And if it does, they      12:54

 5    will submit that to the Secretary of State's office.    12:55

 6        Q.   So just to clarify, who submits the rules      12:55

 7    to the Board of Control again?                          12:55

 8        A.   Principals.  We are a principals               12:55

 9    organization.  So each principal has one vote in our    12:55

10    membership.                                             12:55

11        Q.   And are you the principal of your member       12:55

12    school?                                                 12:55

13        A.   Yes, ma'am.                                    12:55

14        Q.   Do you personally, as the executive           12:55

15    director, work with the State Board of Education of     12:55

16    West Virginia?                                          12:55

17        A.   Not directly.                                  12:55

18            MS. GREEN:  I'm sorry.  Could -- I'm            12:55

19    sorry.                                                  12:55

20            Ms. Kang, would you repeat the question?        12:55

21            MS. KANG:  Sure.                                12:55

22    BY MS. KANG:                                            12:55

23        Q.   Do you personally, as the executive           12:55

24    director, have a role or relationship with the State    12:55

25    Board of Education of West Virginia?                    12:55
```

Page 41

1    A.   I don't have a -- I mean, I have a working    12:55

2    relationship because we deal with same schools.  But    12:55

3    as far as on a daily basis of any interaction, no --    12:55

4    other than they approve the rules.    12:56

5    Q.   Does the Commission have a relationship    12:56

6    with the County Board of Education?    12:56

7    A.   Not really.  We are a principals    12:56

8    organization.  We do communicate with county boards.    12:56

9    But our membership are the high schools.    12:56

10    Q.   What sort of communication --    12:56

11    A.   And --    12:56

12    Q.   Oh, sorry.    12:56

13    What sort of communications would you have    12:56

14    with the County Board?    12:56

15    A.   Oftentimes we would -- if there is rules    12:56

16    or memos that we go out and send out, sometimes we    12:56

17    will send them to the County Boards of Education    12:56

18    that -- to keep them up to date on what is going on    12:56

19    with the Commission.    12:56

20    Q.   By "rules," do you mean the Commission's    12:56

21    rules?    12:56

22    A.   It could be -- yes, the Commission rules.    12:56

23    Yep.  Yes.    12:57

24    Q.   Does the Commission determine who can play    12:57

25    on a secondary school sports team?    12:57

Page 42

```
 1              MS. GREEN:  Object to the form.        12:57
 2              THE WITNESS:  When you say "Commission," 12:57
 3     it's not the nine members here at the office.   12:57
 4              The Commission, technically, is made up by 12:57
 5     the 286 members.  So they have voted in the rules, 12:57
 6     and they are required by law -- by the -- being a 12:57
 7     member to follow those rules.  So only when there is 12:57
 8     a dispute do we intervene.                       12:57
 9     BY MS. KANG:                                     12:57
10         Q.   So I'd ask who makes the initial       12:57
11     determination of a student's eligibility?       12:57
12         A.   That would be the school.              12:57
13         Q.   I believe you mentioned earlier the -- a 12:57
14     dispute process.  So the student -- or a student's 12:57
15     eligibility is disputed.                         12:57
16              Can you walk me through what would happen 12:57
17     there?                                           12:57
18         A.   It could be a school sending -- if     12:57
19     Student A left School Number 1, went to School   12:58
20     Number 2, and didn't follow the normal transfer  12:58
21     procedures, School A might file a complaint to say, 12:58
22     "Hey, can you look at so-and-so because they never 12:58
23     sat out with School B, or Number 2."             12:58
24              So we would intervene and get the       12:58
25     information, work with the two schools, and come up 12:58
```

Page 43

| | | |
|---|---|---|
| 1 | with a final answer. | 12:58 |
| 2 | Q.   What sort of information would you look | 12:58 |
| 3 | at? | 12:58 |
| 4 | A.   Whether they -- when they enrolled at the | 12:58 |
| 5 | school, who they -- are they still living with their | 12:58 |
| 6 | parents, same household, did they -- did they make a | 12:58 |
| 7 | bona fide move, and whether they have a 2.0 or not. | 12:58 |
| 8 | Things like that. | 12:58 |
| 9 | Q.   Anything else? | 12:58 |
| 10 | A.   Could be age.  There's a number of rules | 12:58 |
| 11 | for eligibility, but those are the biggest ones. | 12:58 |
| 12 | Q.   So if a student is deemed ineligible by | 12:59 |
| 13 | the Commission, is that student -- student | 12:59 |
| 14 | prohibited from playing? | 12:59 |
| 15 | A.   The student would be prohibited from | 12:59 |
| 16 | playing in a varsity or JV game.  There's only a | 12:59 |
| 17 | limited exception as to when they would be able to | 12:59 |
| 18 | even practice with the team.  But for the most part, | 12:59 |
| 19 | if you're ineligible, you're ineligible for all | 12:59 |
| 20 | activities for that team. | 12:59 |
| 21 | Q.   And I believe you mentioned that you have | 12:59 |
| 22 | 286 member schools.  Do you know if that includes | 12:59 |
| 23 | all the schools -- secondary schools in | 12:59 |
| 24 | West Virginia? | 12:59 |
| 25 | A.   It does not. | 12:59 |

Page 44

```
 1          Q.   Do you know how many schools are not a       12:59
 2   member school in West Virginia?                          12:59
 3          A.   I do not.                                    12:59
 4          Q.   If the Commission finds a person is          12:59
 5   ineligible, is there an appeal process?                  12:59
 6          A.   Yes, there is.                               12:59
 7          Q.   Can you walk me through what that appeal     13:00
 8   process looks like?                                      13:00
 9          A.   They would -- I would send them a letter     13:00
10   telling them initially that they were determined         13:00
11   ineligible.  If they would like a hearing in front       13:00
12   of our Board of Directors, then along with the           13:00
13   level -- along with a letter of ineligibility, I         13:00
14   would send the appeal papers that they would fill        13:00
15   out and return to me.                                    13:00
16               And then within 30 days, I would bring       13:00
17   them before our Board of Directors for them to make      13:00
18   a decision to grant a waiver or not.  And the Board      13:00
19   can grant a waiver for rule fails to accomplish what     13:00
20   it was intended for or there's a hardship on the         13:00
21   student.                                                 13:00
22          Q.   What sort of hardship would count?           13:00
23          A.   It -- it's up to the Board of Directors.     13:00
24   So there is -- there's no marker that you have to        13:00
25   hit.  So there's lots of different things that may       13:01
```

Page 45

| | | |
|---|---|---|
| 1 | have come up. | 13:01 |
| 2 |     Q.   Have you taken part in the appeal process | 13:01 |
| 3 | before? | 13:01 |
| 4 |     A.   When I was a member of the Board of | 13:01 |
| 5 | Directors, yes. | 13:01 |
| 6 |     Q.   So is it the Board of Directors that makes | 13:01 |
| 7 | the determination on the appeal? | 13:01 |
| 8 |     A.   Yes. | 13:01 |
| 9 |     Q.   Are you familiar with WVEIS, the | 13:01 |
| 10 | West Virginia Education Information System? | 13:01 |
| 11 |     A.   Yes. | 13:01 |
| 12 |     Q.   Does the Commission have any control over | 13:01 |
| 13 | the information that goes into WVEIS? | 13:01 |
| 14 |     A.   No.  We have no access to that note. | 13:01 |
| 15 |     Q.   In West Virginia, to your knowledge, has a | 13:01 |
| 16 | college team ever competed against a middle school | 13:01 |
| 17 | team? | 13:02 |
| 18 |     A.   Has a college team ever competed against a | 13:02 |
| 19 | middle school? | 13:02 |
| 20 |     Q.   That's correct. | 13:02 |
| 21 |     A.   It would be against our rule if they did. | 13:02 |
| 22 | But no, not to my knowledge. | 13:02 |
| 23 |     MS. KANG:  So I'm going to introduce a | 13:02 |
| 24 | document to you that's going to be marked as | 13:02 |
| 25 | Exhibit 3, and I'll let you know when folks can | 13:02 |

Page 46

```
 1    access it in their Marked Exhibit folder.              13:02
 2              (Deposition Exhibit 3 was marked for          13:02
 3              identification and is attached hereto.)       13:02
 4              MS. KANG:  So Exhibit 3 should now be in      13:02
 5    everyone's Marked Exhibit folder.  If you don't see     13:02
 6    it, try clicking on the folder again to refresh it.     13:03
 7    BY MS. KANG:                                            13:03
 8         Q.   Mr. Dolan, let me know when you're able to    13:03
 9    access Exhibit 3.                                       13:03
10         A.   Okay.                                         13:03
11         Q.   Do you recognize this document?              13:03
12         A.   It is our rules and regulations handbook.    13:03
13    Yes.                                                    13:03
14         Q.   Do you know who prepared this document?      13:03
15         A.   Over time it's -- you know -- you know,      13:03
16    it's the charge of one of my secretaries to -- once    13:03
17    rules are changed, to submit the changes.  But we      13:03
18    take care of that in -- in the office here.            13:03
19         Q.   So is this a Commission that's responsible   13:03
20    for the information in the rules and regulations       13:03
21    handbook?                                              13:03
22         A.   Yes.                                          13:03
23         Q.   So you'll notice that on the first page of   13:03
24    Exhibit 3 it says that this was revised and printed    13:04
25    August 2021.                                           13:04
```

Page 47

| | | |
|---|---|---|
| 1 | Is this the most recent version of the | 13:04 |
| 2 | rules and regulations? | 13:04 |
| 3 | A.   Yes.   There may be editorial changes | 13:04 |
| 4 | between then, but that's the most recent copy we | 13:04 |
| 5 | have, yes. | 13:04 |
| 6 | Q.   So is it fair to say -- | 13:04 |
| 7 | A.   For -- | 13:04 |
| 8 | Q.   I'm sorry.  Go ahead. | 13:04 |
| 9 | A.   For the current year. | 13:04 |
| 10 | Q.   So is it fair to say that this document | 13:04 |
| 11 | is -- is currently in effect? | 13:04 |
| 12 | A.   Yes. | 13:04 |
| 13 | Q.   And just to be clear, is this the rules | 13:04 |
| 14 | and regulations handbook that you reviewed when | 13:04 |
| 15 | preparing for this deposition? | 13:04 |
| 16 | A.   Yes. | 13:04 |
| 17 | Q.   Is the Commission required to follow these | 13:04 |
| 18 | rules and regulations? | 13:04 |
| 19 | A.   The Commission as well as all the member | 13:04 |
| 20 | schools, yes. | 13:04 |
| 21 | Q.   So I believe you might have mentioned it | 13:04 |
| 22 | earlier, but just to be clear, can you walk me | 13:04 |
| 23 | through the rule-making process of the rules and | 13:05 |
| 24 | regulations in this handbook? | 13:05 |
| 25 | A.   Okay.  Any principal can submit a rule | 13:05 |

Page 48

| 1 | proposal.  It has to be in by January 15th. | 13:05 |
| 2 | This rule proposal would then be looked at | 13:05 |
| 3 | by our constitution and bylaws committee.  They | 13:05 |
| 4 | would make sure that it's legal and written | 13:05 |
| 5 | appropriate. | 13:05 |
| 6 | In the next week here, we'll be sending | 13:05 |
| 7 | out those proposals, all of our rule proposal | 13:05 |
| 8 | changes out to our membership. | 13:05 |
| 9 | We will meet in the -- the first week of | 13:05 |
| 10 | in April.  And we will go over all of the rule | 13:05 |
| 11 | proposals, and we'll vote on them individually. | 13:05 |
| 12 | If they pass by a majority, they'll move | 13:05 |
| 13 | on to the State Board of Education, who puts them | 13:05 |
| 14 | out for comment.  And then they will vote on them | 13:05 |
| 15 | whether or not they will move forward as part of our | 13:06 |
| 16 | rule book. | 13:06 |
| 17 | Q.   What do you mean by you make sure that the | 13:06 |
| 18 | proposed rule is legal? | 13:06 |
| 19 | A.   Sometimes the way it's written may not be | 13:06 |
| 20 | appropriate.  You know, there just may be | 13:06 |
| 21 | misspellings, misinterpretation.  So any changes we | 13:06 |
| 22 | make would go back to the person who made it.  We | 13:06 |
| 23 | would re-read it and say, "Is this what your intent | 13:06 |
| 24 | was" to make sure it's written properly. | 13:06 |
| 25 | Q.   And just to be clear, who exactly votes on | 13:06 |

Page 49

| | | |
|---|---|---|
| 1 | the proposed rule in the Commission? | 13:06 |
| 2 | A.   At our Board of Control, all 286 members | 13:06 |
| 3 | are eligible to vote.  So if they come to our annual | 13:06 |
| 4 | meeting, we will discuss each item.  And then the | 13:07 |
| 5 | next day we vote on every item that we have. | 13:07 |
| 6 | Q.   So it -- it would be the Board of Control | 13:07 |
| 7 | and any member school who participate in that | 13:07 |
| 8 | meeting that would vote on that rule? | 13:07 |
| 9 | A.   That is correct. | 13:07 |
| 10 | Q.   Who amends these rules if they need | 13:07 |
| 11 | amendments? | 13:07 |
| 12 | A.   Beforehand, it would be the constitution | 13:07 |
| 13 | and bylaws.  There is a committee that we have | 13:07 |
| 14 | that -- made up of five principals. | 13:07 |
| 15 | Q.   Who is responsible for enforcing these | 13:07 |
| 16 | rules? | 13:07 |
| 17 | A.   All of the member schools plus the SSAC | 13:07 |
| 18 | office itself. | 13:07 |
| 19 | Q.   What happens if a member school doesn't | 13:07 |
| 20 | follow these rules? | 13:07 |
| 21 | A.   Either the coach, the administration, or | 13:07 |
| 22 | the school itself could face any sort of penalty | 13:07 |
| 23 | from a letter of warning to suspension or fine. | 13:08 |
| 24 | Q.   By "suspension," do you mean suspension | 13:08 |
| 25 | from being a member school? | 13:08 |

Page 50

| | | |
|---|---|---|
| 1 | A.   I don't know if we have ever suspended | 13:08 |
| 2 | anybody from being a member school, but it would be | 13:08 |
| 3 | suspicion of games, maybe not able to participate in | 13:08 |
| 4 | championships. | 13:08 |
| 5 | But, to my knowledge, we have never | 13:08 |
| 6 | suspended anybody from being a member. | 13:08 |
| 7 | Q.   Is it possible for the Commission to | 13:08 |
| 8 | cancel a school's membership? | 13:08 |
| 9 | A.   I'm not sure. | 13:08 |
| 10 | Q.   To your knowledge, has anyone ever | 13:08 |
| 11 | submitted a rule proposal about the participation of | 13:08 |
| 12 | transgender students? | 13:08 |
| 13 | A.   No. | 13:08 |
| 14 | Q.   So I'm going to be just walking you | 13:09 |
| 15 | through a couple of excerpts in this exhibit.  And | 13:09 |
| 16 | it is quite long.  So I'm only going to be pointing | 13:09 |
| 17 | to certain sections. | 13:09 |
| 18 | So with that said, as I am going through, | 13:09 |
| 19 | if you want me to slow down or pause, or you want to | 13:09 |
| 20 | read over something, just -- just let me know. | 13:09 |
| 21 | So I'm going to ask you to turn to Page 99 | 13:09 |
| 22 | of the pdf.  In the bottom right-hand corner, it | 13:09 |
| 23 | will be stamped WVSSAC000216.  And let me know | 13:09 |
| 24 | whenever you happen to get there. | 13:09 |
| 25 | A.   What page again? | 13:10 |

Page 51

```
 1          Q.   So it's Page 99 of the pdf.  But I believe    13:10
 2     it's Page 85 of the actual document.                    13:10
 3          A.   Okay.                                          13:10
 4          Q.   And just for future reference, when I --       13:10
 5     when I say Page 99 or Page 2, I'm referring the page     13:10
 6     of the pdf not the page numbers that may be written     13:10
 7     in the exhibit.                                          13:10
 8              MS. GREEN:  His assistant is slow.  He has     13:10
 9     got a really slow assistant over here who is paging     13:10
10     through a page at a time.  We should be back in         13:10
11     about two weeks.                                         13:10
12              THE WITNESS:  Is it the organizational         13:10
13     chart?                                                   13:10
14     BY MS. KANG:                                             13:10
15          Q.   That's correct.                               13:10
16          A.   Okay.  Yes.  I am there.                       13:10
17          Q.   Do you recognize this organizational          13:10
18     chart?                                                   13:10
19          A.   I do.                                          13:11
20          Q.   Do you believe that accurately reflects       13:11
21     the organizational structure of the Commission?         13:11
22          A.   Except for the State Board of Education,      13:11
23     they only have oversight of our -- they have final      13:11
24     say of our rules.  So that may be why they are          13:11
25     placed at the top.                                       13:11
```

Page 52

| | | |
|---|---|---|
| 1 | The Board of Directors -- I'm not sure it | 13:11 |
| 2 | accurately reflects our organization.  But yeah. | 13:11 |
| 3 | Q.   Would -- | 13:11 |
| 4 | A.   The Board of Directors does not answer to | 13:11 |
| 5 | the Board of Control, I guess. | 13:11 |
| 6 | Q.   So, I guess, where would you place the | 13:11 |
| 7 | Board of Directors in the organizational chart to | 13:11 |
| 8 | make it more accurate? | 13:11 |
| 9 | A.   Well, I would probably and will probably | 13:11 |
| 10 | move State Board of Education, National Federation | 13:11 |
| 11 | out of the chart, and Board of Directors would be at | 13:11 |
| 12 | the top.  Board of Control would be where the | 13:11 |
| 13 | National Federation is. | 13:12 |
| 14 | Q.   So is it fair to say that the Board of | 13:12 |
| 15 | Directors is probably the one at the head of the | 13:12 |
| 16 | organization? | 13:12 |
| 17 | A.   That is correct. | 13:12 |
| 18 | Q.   I'm just going to ask you few questions | 13:12 |
| 19 | about a couple of these -- of these entries on the | 13:12 |
| 20 | organizational chart. | 13:12 |
| 21 | Can you tell me a little more about the | 13:12 |
| 22 | State Board of Education's relationship with the | 13:12 |
| 23 | Board of Control specifically. | 13:12 |
| 24 | A.   With the Board of Control, the State Board | 13:12 |
| 25 | of Education has final -- they will review and put | 13:12 |

Page 53

| | | |
|---|---|---|
| 1 | the rules out for comments by the general public, | 13:12 |
| 2 | and they'll have the final say on the votes. | 13:12 |
| 3 | That's probably the only relationship the | 13:12 |
| 4 | State Board of Education has with the Board of | 13:12 |
| 5 | Control. | 13:13 |
| 6 | Q.   I know you touched a bit on this earlier, | 13:13 |
| 7 | but could you tell me a bit more about what the | 13:13 |
| 8 | Board of Control's role is in the Commission. | 13:13 |
| 9 | A.   The Board of Control's charge is to vote | 13:13 |
| 10 | for rule changes, either vote them up or down. | 13:13 |
| 11 | Q.   What do you mean by "vote them up or | 13:13 |
| 12 | down"? | 13:13 |
| 13 | A.   When the -- they are put up for a vote, | 13:13 |
| 14 | whether it's to create a new rule or not, it's their | 13:13 |
| 15 | vote -- it's a majority of the Board of Control that | 13:13 |
| 16 | is there that day for the vote. | 13:13 |
| 17 | It either passes or it fails.  If it | 13:13 |
| 18 | passes, it goes on to the State Board of Education. | 13:13 |
| 19 | Q.   Does the State Board ever promulgate rules | 13:13 |
| 20 | that the Commission has to follow? | 13:13 |
| 21 | A.   The State Board has a 2.0 policy that is | 13:13 |
| 22 | in our rule book, but it never passed our Board of | 13:14 |
| 23 | Control.  It was -- it's a State Board of Education | 13:14 |
| 24 | policy. | 13:14 |
| 25 | Q.   Does the Commission have to follow that | 13:14 |

Page 54

| | | |
|---|---|---|
| 1 | 2.0 rule? | 13:14 |
| 2 | A.   Yes.   And all of our members. | 13:14 |
| 3 | Q.   Are you aware of any other rules from the | 13:14 |
| 4 | State Board of Education? | 13:14 |
| 5 | A.   Not really. | 13:14 |
| 6 | Q.   What is the Board of Control's | 13:14 |
| 7 | relationship with the directors, if any? | 13:14 |
| 8 | A.   Five of the Board of Directors are | 13:14 |
| 9 | principals; so five of those principals would be | 13:14 |
| 10 | members of the Board of Control.   That's about | 13:14 |
| 11 | the -- the best relationship -- the only | 13:14 |
| 12 | relationship they have. | 13:14 |
| 13 | Q.   What is the Board of Control's | 13:14 |
| 14 | relationship with the executive director? | 13:14 |
| 15 | A.   None, really.   I mean, the Board -- the | 13:15 |
| 16 | Board -- the five members of the Board of Directors | 13:15 |
| 17 | that are principals represented an administrative | 13:15 |
| 18 | district.   And so the Board -- the Board of | 13:15 |
| 19 | Directors answers to schools in their district.   So | 13:15 |
| 20 | that's the only indirect connection between myself | 13:15 |
| 21 | and the Board of Control. | 13:15 |
| 22 | Q.   And there are ten Board of | 13:15 |
| 23 | Directors members; is that right? | 13:15 |
| 24 | A.   Yes, ma'am. | 13:15 |
| 25 | Q.   Does any member of the Board of Directors | 13:15 |

Page 55

```
 1    ever promulgate or propose rules?               13:15
 2         A.   If they are one of the five principals 13:15
 3    they can, yes.                                   13:15
 4         Q.   Can you tell me a little bit more about 13:15
 5    what your assistant executive directors do in   13:16
 6    relation to the rules in this handbook?         13:16
 7         A.   Basically they -- they can help interpret 13:16
 8    the rules between our member schools, if there is 13:16
 9    issues.                                          13:16
10              But they primarily are responsible for the 13:16
11    championships in their particular sports.  But they 13:16
12    can answer questions and interpretations on disputes 13:16
13    of the rule book between schools.               13:16
14         Q.   By overseeing the championship, does that 13:16
15    include issuing rules for the championship?     13:16
16         A.   No.  All of our playing rules are created 13:16
17    by the National Federation.  There are some times 13:16
18    that they have -- by state adoption that you can 13:16
19    modify rules, but we follow the NFHS playing rules 13:16
20    100 percent.                                     13:17
21         Q.   So the --                              13:17
22         A.   Close a 100 percent.  As close to a    13:17
23    100 percent as possible.                         13:17
24         Q.   So does -- so the Commission does not have 13:17
25    any of its own rules in relation to championship? 13:17
```

Page 56

```
 1        A.   No.   There are rules in there that govern     13:17

 2   how many people are at the game; you know, how many      13:17

 3   teams are at the game; where the game is going to be     13:17

 4   held.  All those things.  The time.  The place.          13:17

 5   Those are all determined by our Board of Directors.      13:17

 6        And then they are given the charge to               13:17

 7   myself or my -- my assistants to run those               13:17

 8   championships on those days.                             13:17

 9        Q.   What does the Sports Medicine Committee        13:17

10   do?                                                      13:17

11        A.   They advise us in all of our rules and         13:17

12   regulations that go in for each sport for safety.        13:18

13   For instance, concussion, heat illness, sudden           13:18

14   cardiac arrest, whether we are making modifications      13:18

15   to practice schedules based on their -- their            13:18

16   expertise.                                               13:18

17        And so they will make recommendations to            13:18

18   us for modifying sports to make it more safe.            13:18

19        Q.   So who makes up the Sports Medicine            13:18

20   Committee?                                               13:18

21        A.   There's a variety of doctors and athletic      13:18

22   trainers.  I believe there is -- I mean, there is a      13:18

23   number of them.  At least 12.  I'm not sure of the       13:18

24   exact number because they come off and on.  But          13:18

25   yeah.  So they -- that's who makes it up is a            13:18
```

Page 57

| | | |
|---|---|---|
| 1 | variety of medical personnel. | 13:18 |
| 2 | Q.   And do they report to you? | 13:19 |
| 3 | A.   They would make recommendations to me to | 13:19 |
| 4 | give to the Board of Directors if we happen to have | 13:19 |
| 5 | changes about -- sport-specific things, practice, | 13:19 |
| 6 | things like that.  Things that are not in the rule | 13:19 |
| 7 | book, but they are modifications or rules that they | 13:19 |
| 8 | would apply. | 13:19 |
| 9 | Heat illness is a big example.  They are | 13:19 |
| 10 | providing recommendations on how long a practice is, | 13:19 |
| 11 | what you are allowed to do at a practice, and things | 13:19 |
| 12 | like that. | 13:19 |
| 13 | Q.   Do you happen to know if anyone from the | 13:19 |
| 14 | West Virginia Legislature spoke with anyone from the | 13:19 |
| 15 | Sports Medicine Committee before H.B. 3293 was | 13:19 |
| 16 | passed? | 13:19 |
| 17 | A.   Not that I know of. | 13:19 |
| 18 | MS. KANG:  So I think now might be a good | 13:19 |
| 19 | time for a five- to ten-minute break, just let you | 13:19 |
| 20 | stretch your legs a little bit. | 13:20 |
| 21 | THE WITNESS:  Okay. | 13:20 |
| 22 | MS. KANG:  Roberta, are you all right with | 13:20 |
| 23 | that? | 13:20 |
| 24 | MS. GREEN:  Yes.  I think it's a good | 13:20 |
| 25 | time. | 13:20 |

Page 58

```
 1              MS. KANG:  All right.  So why don't we --      13:20
 2    why don't we take a break until about 1:30.            13:20
 3              THE WITNESS:  Okay.                           13:20
 4              THE VIDEOGRAPHER:  This marks the end of      13:20
 5    Media Number 1.  Going off the record.  The time is    13:20
 6    1:20.                                                   13:20
 7              (Brief recess.)                               13:34
 8              THE VIDEOGRAPHER:  This marks the             13:34
 9    beginning of Media Number 2 in the deposition of       13:34
10    30(b)(6) Witness Bernie Dolan.                         13:34
11              Back on the record.  The time is 1:35.       13:35
12    BY MS. KANG:                                           13:35
13         Q.   Mr. Dolan, before I move on to my next       13:35
14    topic, I just want to ask you two more quick           13:35
15    questions about the Sports Medicine Committee.         13:35
16              To your knowledge, has the Sports Medicine   13:35
17    Committee or anyone from that committee ever made a    13:35
18    recommendation regarding transgender participation    13:35
19    in athletics?                                          13:35
20         A.   I don't believe it's ever been on the        13:35
21    agenda, no.                                            13:35
22         Q.   Do you know if the Sports Medicine           13:35
23    Committee has ever made a recommendation on girls      13:35
24    playing on boys' teams?                                13:35
25         A.   Not in my tenure here, no.  I don't know     13:35
```

Page 59

```
 1    about previous.                                    13:35
 2        Q.    All right.  So I'm going to have a similar   13:35
 3    set of questions next.  So just diving a little bit   13:35
 4    more into the Commission's role at -- role in     13:35
 5    sports.                                            13:35
 6            Can you tell me -- I know you mentioned    13:35
 7    some earlier -- what factors are currently used to  13:36
 8    determine a student's eligibility?                13:36
 9        A.    Number one is do they live with their --  13:36
10    are they enrolled in the school;                  13:36
11            Number two, do they live with their       13:36
12    parents;                                           13:36
13            Number three, do they reside in the       13:36
14    district where their school is;                   13:36
15            What's -- what's their age as of          13:36
16    August 1st of the -- that current year;           13:36
17            Are they playing on any other teams       13:36
18    outside the school team.                           13:36
19            Those are the majority -- and do they have  13:36
20    a 2.0.                                             13:36
21            Those are the majority of the eligibility  13:36
22    reasons that somebody might not be eligible for a  13:36
23    period of time.                                    13:36
24        Q.    If I could just put a pin in that.       13:36
25            So a student could be ineligible for a    13:36
```

Page 60

| | | |
|---|---|---|
| 1 | certain period of time and then gain eligibility? | 13:36 |
| 2 | A.   Yes. | 13:37 |
| 3 | Q.   And the factors that are used to determine | 13:37 |
| 4 | a student's eligibility -- are those the rules and | 13:37 |
| 5 | regulations in the handbook plus the rules | 13:37 |
| 6 | promulgated by the State Board of Education? | 13:37 |
| 7 | A.   It is the -- the rules that are in our | 13:37 |
| 8 | rule book, as well as the 2.0, which is the | 13:37 |
| 9 | West Virginia Department of ED's rule, State Board | 13:37 |
| 10 | of Education. | 13:37 |
| 11 | It's in our rule book, but it's not | 13:37 |
| 12 | technically our rule, but it's for all of our | 13:37 |
| 13 | member -- all of our public schools, and our private | 13:37 |
| 14 | schools follow it too. | 13:37 |
| 15 | Q.   Do the -- do the county boards of | 13:37 |
| 16 | education in West Virginia have any rules that | 13:37 |
| 17 | determine a student's eligibility? | 13:37 |
| 18 | MS. GREEN:  And I'll just object to the | 13:37 |
| 19 | form. | 13:37 |
| 20 | THE WITNESS:  They are not supposed to | 13:37 |
| 21 | have any rules additional than ours.  They have | 13:38 |
| 22 | given over the rights of overseeing sports to the | 13:38 |
| 23 | SSAC. | 13:38 |
| 24 | BY MS. KANG: | 13:38 |
| 25 | Q.   When a student's eligibility is in | 13:38 |

Page 61

| | | |
|---|---|---|
| 1 | dispute, who makes the final determination as to | 13:38 |
| 2 | that student's eligibility? | 13:38 |
| 3 | A.   I would make the initial -- well, the | 13:38 |
| 4 | school makes the initial call.  I would then either | 13:38 |
| 5 | verify or overturn their decision based upon the | 13:38 |
| 6 | facts. | 13:38 |
| 7 | And then if they're not happy with the | 13:38 |
| 8 | answer that I get, they want to appeal that, they | 13:38 |
| 9 | take that to the Board of Directors.  And if they | 13:38 |
| 10 | are -- if my ruling is sustained at the Board of | 13:38 |
| 11 | Directors, they have a Board of Review that they | 13:38 |
| 12 | could go to to get one final opportunity for a | 13:38 |
| 13 | waiver. | 13:38 |
| 14 | Q.   And the Board of Review is that different | 13:39 |
| 15 | from the Board of Control? | 13:39 |
| 16 | A.   It is.  The Board of Review is the final | 13:39 |
| 17 | Board that has seven members and may or may not be | 13:39 |
| 18 | connected to the schools.  It's more general.  But | 13:39 |
| 19 | they are appointed by the State Board of Education. | 13:39 |
| 20 | Q.   Is the Board of Review a part of the | 13:39 |
| 21 | Commission? | 13:39 |
| 22 | A.   They are appointed by the Board of -- or | 13:39 |
| 23 | the State Board of Education.  So I think you've | 13:39 |
| 24 | seen them say WVSSAC Board of Review, but we have no | 13:39 |
| 25 | input as to whether or not -- who the members are. | 13:39 |

Page 62

```
 1          Q.    Are any Commission members currently part      13:39

 2    of the Board of Review?                                    13:39

 3          A.    There may be one member who is a Board         13:39

 4    office personnel who also serves on the                    13:40

 5    Commission -- or on the Board of Review as the             13:40

 6    athletic director's association, but she is not a          13:40

 7    member -- she's not an employee of one of the              13:40

 8    schools.  She works at the county office.                  13:40

 9          Q.    Which county office?                           13:40

10          A.    I believe Lewis County office.                13:40

11          Q.    Okay.  So I want us to go back to              13:40

12    Exhibit 3.  And this will be Page 16 of the pdf.           13:40

13    And in the bottom right-hand corner it will be Bates       13:40

14    stamped VSV- -- WVSSAC000133.  And let me know             13:40

15    whenever you get a chance to review it.                    13:40

16            MS. GREEN:  And, Ms. Kang, what was the            13:40

17    pdf page?                                                  13:41

18            MS. KANG:  Sure.  It's Page 16.                    13:41

19            MS. GREEN:  15 or 16?                              13:41

20    BY MS. KANG:                                               13:41

21          Q.    16.  1,6.                                      13:41

22          A.    Okay.  I'm at 14 now.                          13:41

23            MS. GREEN:  Sorry.                                 13:41

24            THE WITNESS:  Okay.                                13:41

25            MS. GREEN:  And what does it read at the           13:41
```

Page 63

```
 1   bottom?                                            13:42

 2   BY MS. KANG:                                       13:42

 3        Q.   WVSSAC000133.                            13:42

 4        A.   Yep.  Okay.  Yes.                        13:42

 5        Q.   At the top of Exhibit 3, Page 16, you'll 13:42

 6   note it says, "Title 127 Legislative Rule."        13:42

 7             Do you know what a legislative rule is?  13:42

 8        A.   I assume -- no.  All of our rules are 127. 13:42

 9   So I think that's the area that we are in.  But I  13:42

10   would probably be guessing if I did, you know.     13:42

11             MS. GREEN:  Yeah.                         13:42

12             THE WITNESS:  Yeah.                       13:42

13   BY MS. KANG:                                        13:42

14        Q.   Do you know who promulgated this specific 13:42

15   rule?                                               13:42

16             MS. GREEN:  I'll just object to the form. 13:42

17             THE WITNESS:  Well, our rules have been in 13:42

18   place since 1916.  So over time, all of our rules  13:42

19   have had some modification every year.             13:43

20             So as far as when that particular rule,  13:43

21   the most current part, I couldn't tell you.        13:43

22             It's probably -- well, it says it was    13:43

23   effective in September 9 of 2019.  So that means   13:43

24   there was a rule change at the Board of Control in 13:43

25   2019.                                              13:43
```

                                                    Page 64

```
 1    BY MS. KANG:                                      13:43

 2        Q.    Okay.  I just want to draw your attention   13:43

 3    to the section on the same page it says "127-1-2   13:43

 4    Name."                                             13:43

 5            And in this paragraph -- I'll read out a   13:43

 6    section.  But take your time reading it as well.   13:43

 7            It says [as read]:                         13:43

 8                "Extracurricular activities of the     13:43

 9                students in the public secondary       13:43

10                schools are controlled pursuant to     13:43

11                W. Va. Code 18225, and authority for   13:43

12                the delegation of such control to the  13:43

13                Commission is granted by statute."     13:44

14        A.    Yes.                                     13:44

15        Q.    Now, did I -- did I read this correctly? 13:44

16        A.    You did.                                 13:44

17        Q.    Is this statement accurate?              13:44

18        A.    I believe it's accurate.  But it's not   13:44

19    inclusive if that's the -- because it's -- we have 13:44

20    private schools as members also.                   13:44

21            But the legislature apparently, by         13:44

22    statute, only dealt with the public schools.       13:44

23        Q.    Do you know how many private schools are 13:44

24    part of your membership?                           13:44

25        A.    Somewhere around 20.  I don't know the   13:44
```

Page 65

```
 1    exact number.                                    13:44
 2         Q.   Are you familiar at all with West Virginia  13:44
 3    Code 18225?                                      13:44
 4         A.   Yes.                                    13:44
 5         Q.   What is your understanding of it?      13:44
 6              MS. GREEN:  I'll just object to the extent  13:44
 7    it would call for a legal conclusion.            13:44
 8              THE WITNESS:  It was when they authorized  13:45
 9    the WVSSAC.                                       13:45
10    BY MS. KANG:                                      13:45
11         Q.   What do you mean "authorized WVSSAC"?  13:45
12         A.   We had been an organization since 1916.  13:45
13    And in the late '60s, they -- for some reason they  13:45
14    put us in the code, I guess.                     13:45
15         Q.   What does "extracurricular activities" in  13:45
16    this section mean?                               13:45
17         A.   It would be sports and band.           13:45
18         Q.   Does it include club sports?           13:45
19         A.   No.  Not -- not in terms of the WVSSAC,  13:45
20    no.                                              13:45
21         Q.   When does a club sport become a sport that  13:46
22    is controlled by the WVSSAC?                     13:46
23         A.   When there is more than 30 -- more than 20  13:46
24    we can recognize it.                             13:46
25              At 32 teams, when there are 32 individual  13:46
```

Page 66

| | | |
|---|---|---|
| 1 | teams, our Board can authorize a championship for | 13:46 |
| 2 | one class. | 13:46 |
| 3 | If there is 50 percent of our | 13:46 |
| 4 | membership -- of the high school membership, they | 13:46 |
| 5 | could authorize two classes; 75 percent they could | 13:46 |
| 6 | authorize three. | 13:46 |
| 7 | Q.   So I'm going to draw your attention now | 13:46 |
| 8 | staying on the same page on Exhibit 3 to the section | 13:46 |
| 9 | that says, "127-1-3 Goals." | 13:46 |
| 10 | And I'm also going to refer you to the | 13:46 |
| 11 | section that says "3.1."  And I'll read it out loud. | 13:46 |
| 12 | And feel free to take your time reading it as well. | 13:46 |
| 13 | [As read]: | 13:46 |
| 14 | "This Commission, through the | 13:46 |
| 15 | employment of instrumentalities | 13:46 |
| 16 | hereinafter established, shall | 13:47 |
| 17 | supervise and control interscholastic | 13:47 |
| 18 | athletics and band activities among | 13:47 |
| 19 | member schools." | 13:47 |
| 20 | A.   Okay. | 13:47 |
| 21 | Q.   Did I read this correctly? | 13:47 |
| 22 | A.   You did. | 13:47 |
| 23 | Q.   Is this statement accurate? | 13:47 |
| 24 | MS. GREEN:  Object to form. | 13:47 |
| 25 | THE WITNESS:  Yes. | 13:47 |

Page 67

```
 1    BY MS. KANG:                                    13:47
 2         Q.   What does "supervise and control      13:47
 3    interscholastic athletics" mean?                13:47
 4              MS. GREEN:  Object to the form.        13:47
 5              THE WITNESS:  Provide the rules and make  13:47
 6    sure that everybody is following the rules.     13:47
 7    BY MS. KANG:                                     13:47
 8         Q.   And how do you make sure that everyone is  13:47
 9    following the rules?                             13:47
10         A.   Well, usually it -- you know, it's brought  13:47
11    to our attention either through members of the  13:47
12    public, schools in particular.  Sometimes we see  13:47
13    violations in the newspaper, and we follow up on  13:47
14    them.                                            13:48
15         Q.   By "follow up," you mean you reach out to  13:48
16    the individual member school?                    13:48
17         A.   Yes.  And ask them for a written response  13:48
18    as to what the allegation might be.              13:48
19         Q.   And do you have a rough estimate of how  13:48
20    many violations happen a year?                   13:48
21         A.   How many violations?  Or how many times  13:48
22    are we called about a violation?                 13:48
23         Q.   Let's say, how many times you are called  13:48
24    for a violation.                                 13:48
25         A.   If I had to guess, it would probably be  13:48
```

Page 68

```
 1    two or three a month.  Not counting the appeals --      13:48

 2    the student appeals.                                    13:48

 3         Q.   How does a school stop being a member of      13:48

 4    the WVSSAC?                                             13:48

 5         A.   To be honest with you, I'm not sure how a     13:49

 6    public school does.                                     13:49

 7              The private school simply writes us a         13:49

 8    letter and says, "We no longer want to be a member      13:49

 9    of your organization."  There's no penalty for          13:49

10    withdrawal.                                             13:49

11         Q.   Is there a reason why it's a different        13:49

12    rule for a private school versus a public school?       13:49

13         A.   I guess a public could withdraw.              13:49

14         Q.   To your knowledge, has any public school      13:49

15    ever withdrawn?                                         13:49

16         A.   No.  Just -- they have consolidated; and,     13:49

17    therefore, they become a new school, or they've         13:49

18    closed and have been absorbed into a new school.        13:49

19    But, to my knowledge, no public school has ever not     13:49

20    been a member.                                          13:49

21         Q.   Are all public schools in West Virginia       13:49

22    currently members?                                      13:49

23         A.   All public secondary schools 6 through 12,    13:49

24    yes.                                                    13:49

25         Q.   If a school is not a member of the            13:49
```

Page 69

| | | |
|---|---|---|
| 1 | Commission, could it still offer interscholastic | 13:49 |
| 2 | sports? | 13:49 |
| 3 | A.   Yes. | 13:49 |
| 4 | Q.   Can a school that is not a member compete | 13:50 |
| 5 | with member schools? | 13:50 |
| 6 | A.   As long as they are a school, yes. | 13:50 |
| 7 | Q.   So now I would like to draw your attention | 13:50 |
| 8 | to Page 17 of Exhibit 3, it should be just the next | 13:50 |
| 9 | page down. | 13:50 |
| 10 | And I'll ask you to look at the paragraph | 13:50 |
| 11 | that starts "127-1-4. Membership." | 13:50 |
| 12 | A.   Okay. | 13:50 |
| 13 | Q.   And that paragraph says [as read]: | 13:50 |
| 14 | "The WVSSAC shall be composed of the | 13:50 |
| 15 | principals or designee, of those public | 13:50 |
| 16 | or private secondary schools which have | 13:50 |
| 17 | certified in writing to the State | 13:50 |
| 18 | Superintendent of Schools of | 13:50 |
| 19 | West Virginia [paren] (State | 13:50 |
| 20 | Superintendent) that they have elected | 13:50 |
| 21 | to delegate the control, supervision, | 13:50 |
| 22 | and regulation of their interscholastic | 13:50 |
| 23 | athletic and band activities." | 13:50 |
| 24 | Did I read that correctly? | 13:50 |
| 25 | A.   Yes. | 13:50 |

Page 70

```
 1          Q.   Is this statement accurate?              13:51
 2               MS. GREEN:  Object to the form.          13:51
 3               THE WITNESS:  Yes.                       13:51
 4    BY MS. KANG:                                        13:51
 5          Q.   What does it mean to "delegate the       13:51
 6    control, supervision, and regulation of their       13:51
 7    interscholastic athletic and band activities"?      13:51
 8               MS. GREEN:  Object to the form.          13:51
 9               THE WITNESS:  It means that the WVSSAC and 13:51
10    its member schools will write rules and everybody   13:51
11    will follow them.                                   13:51
12               And so they can't have rules of their own 13:51
13    that are separate from the rules that we have all   13:51
14    agreed to.                                          13:51
15    BY MS. KANG:                                        13:51
16          Q.   So just to be a clear, a member school   13:51
17    cannot issue its own rules -- is that -- for        13:51
18    interscholastic athletics; is that right?           13:51
19          A.   Not if it's in conflict with our rule.   13:51
20          Q.   Can it issue rules that are not in       13:51
21    conflict with the SSAC rules?                       13:51
22          A.   Sure.                                    13:51
23          Q.   Did Bridgeport Middle School delegate its 13:52
24    control, supervision, and regulation of             13:52
25    interscholastic athletic activities to the          13:52
```

Page 71

```
 1    Commission?                                           13:52

 2         A.   I'm sure they did at one time, yes.         13:52

 3         Q.   So we're going to stay on the same page,    13:52

 4    but I'm going to draw your attention to the section   13:52

 5    that starts with 4.2.b.  Says [as read]:              13:52

 6              "The principal or designee is and           13:52

 7              shall be responsible for conducting         13:52

 8              interscholastic athletic

 9              and band activities of the school in

10              accordance with the constitution,

11              bylaws, rules and regulations of the

12              Commission which have been adopted by

13              the Board of Control of the Commission

14              for the governing of such

15              activities."                                13:52

16         A.   Okay.                                       13:52

17         Q.   Did I read this correctly?                  13:52

18         A.   Yes.                                        13:52

19         Q.   Do you believe this statement is accurate?  13:52

20              MS. GREEN:  Object to the form.             13:52

21              THE WITNESS:  Yes.                          13:52

22    BY MS. KANG:                                          13:52

23         Q.   What happens if a principal or a designee   13:52

24    breaks one of the Commission's rules?                 13:53

25         A.   There's a -- depends upon what the rule is  13:53
```

Page 72

| | | |
|---|---|---|
| 1 | and how often, it could be a letter of discipline, | 13:53 |
| 2 | it could be a verbal warning, or it could go all the | 13:53 |
| 3 | way up to suspension or fine. | 13:53 |
| 4 | Q.   So am I right that, when a member school | 13:53 |
| 5 | makes a determination of what students are eligible | 13:53 |
| 6 | to play secondary sports, it has to follow the rules | 13:53 |
| 7 | and regulations of the Commission? | 13:53 |
| 8 | A.   Yes. | 13:53 |
| 9 | Q.   So now I'm going to ask you to scroll down | 13:53 |
| 10 | two more pages to Page 19.  It should be stamped | 13:53 |
| 11 | WVSSAC000136 of Exhibit 3.  Let me know whenever | 13:53 |
| 12 | you're there. | 13:53 |
| 13 | A.   Okay.  We're there. | 13:53 |
| 14 | Q.   I'm sorry.  Let me actually take you to | 13:54 |
| 15 | Page 20.  That's Bates stamped -137 of Exhibit 3. | 13:54 |
| 16 | A.   Okay. | 13:54 |
| 17 | Q.   So in the section that says "127-1-8. | 13:54 |
| 18 | Board of Directors," it says [as read]: | 13:54 |
| 19 | "The Board of Directors shall have | 13:54 |
| 20 | authority to administer the regulations | 13:54 |
| 21 | of the WVSSAC." | 13:54 |
| 22 | Did I read that correctly? | 13:54 |
| 23 | A.   You did. | 13:54 |
| 24 | Q.   Do you believe the statement is accurate? | 13:54 |
| 25 | A.   Yes. | 13:54 |

Page 73

```
 1          Q.   What does administer the regulations of      13:54

 2   the WVSSAC mean?                                         13:54

 3              MS. GREEN:   Object to the form.              13:54

 4              THE WITNESS:   Make sure everybody is         13:54

 5   following the rules as written and interpreted.          13:54

 6              (Simultaneously speaking.)                    13:54

 7   BY MS. KANG:                                             13:54

 8          Q.   By "interpreted," who --                     13:54

 9          A.   The --                                       13:55

10          Q.   -- makes -- oh, sorry.                        13:55

11          A.   Just --                                      13:55

12          Q.   Did you --                                   13:55

13          A.   As the rules are written.                   13:55

14          Q.   Does it mean anything else?                 13:55

15          A.   No.                                          13:55

16          Q.   I'm going to ask you to scroll one more     13:55

17   page down to the page that's Bates stamped              13:55

18   WVSSAC -138.  It should be Page 21 of the pdf of        13:55

19   Exhibit 3.                                              13:55

20          A.   Okay.                                        13:55

21          Q.   So I'll draw your attention to              13:55

22   Section 8.5, which says [as read]:                      13:55

23              "The Board of Directors shall have           13:55

24              power to decide all cases of                 13:55

25              eligibility of students and                  13:55
```

Page 74

| | | |
|---|---|---|
| 1 | participants in interscholastic | 13:55 |
| 2 | athletic and band activities.  The | 13:55 |
| 3 | Board may also exercise discretionary | 13:55 |
| 4 | powers it may deem necessary for the | 13:55 |
| 5 | furtherance of education and | 13:55 |
| 6 | interscholastic athletic and band | 13:55 |
| 7 | activities in the secondary schools of | 13:56 |
| 8 | West Virginia." | 13:56 |
| 9 | Did I read that correctly? | 13:56 |
| 10 | A.   You did. | 13:56 |
| 11 | Q.   Do you believe this statement is accurate? | 13:56 |
| 12 | MS. GREEN:  Object to the form. | 13:56 |
| 13 | THE WITNESS:  Yes. | 13:56 |
| 14 | BY MS. KANG: | 13:56 |
| 15 | Q.   What does it mean "Shall have the power to | 13:56 |
| 16 | decide all cases of eligibility of students and | 13:56 |
| 17 | participants in interscholastic athletic and band | 13:56 |
| 18 | activities"? | 13:56 |
| 19 | MS. GREEN:  Object to form. | 13:56 |
| 20 | THE WITNESS:  If I have -- if the school | 13:56 |
| 21 | or I have determined somebody to be ineligible, they | 13:56 |
| 22 | can grant a waiver to make them eligible. | 13:56 |
| 23 | BY MS. KANG: | 13:56 |
| 24 | Q.   Can anyone other than the Commission grant | 13:56 |
| 25 | a waiver? | 13:56 |

Page 75

```
 1          A.   Well, the Commission cannot.  The Board of      13:56
 2    Directors can.  And then the Board of Review can.           13:56
 3    But the -- the office itself cannot grant waivers.          13:56
 4               I'll take that back.                             13:56
 5               I can grant a waiver if it's been ruled          13:56
 6    before in a similar fashion by the Board, but I             13:57
 7    don't have -- I don't execute that.                         13:57
 8          Q.   So is it fair to say that if the Board of        13:57
 9    Review issues a determination of a student's                13:57
10    eligibility and the current student before you has a        13:57
11    similar set of facts, you can rely on that previous         13:57
12    determination?                                              13:57
13               MS. GREEN:  Object to the form.                  13:57
14               THE WITNESS:  The rule says that, but            13:57
15    they're never -- I've yet to find two cases that are        13:57
16    exactly similar.  So...                                     13:57
17    BY MS. KANG:                                                13:57
18          Q.   But you have the ability to -- to do so?         13:57
19          A.   It says that we have the ability to do so,       13:57
20    yes.                                                        13:57
21          Q.   So now I'd like to -- we're staying on the       13:57
22    same page -- draw your attention to Paragraph 8.7           13:57
23    and 8.8.                                                    13:57
24               So I'll read Paragraph 8.7 first.  It says       13:57
25    [as read]:                                                 13:57
```

Page 76

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 355 of 674

```
 1                   "At the request of the Board of        13:58

 2              Directors, a Deputy Board Member may        13:58

 3              investigate matters of eligibility and      13:58

 4              other violations of the rules and           13:58

 5              regulations of the WVSSAC.  The Deputy       13:58

 6              Board Member shall submit to the Board       13:58

 7              of Directors a written report of            13:58

 8              findings and recommendations for            13:58

 9              disposition of the case(s)."                13:58

10              Did I read that correctly?                  13:58

11         A.   You did.                                    13:58

12         Q.   Do you believe this statement is accurate?  13:58

13              MS. GREEN:  Object to form.                 13:58

14              THE WITNESS:  Yes.                          13:58

15     BY MS. KANG:                                         13:58

16         Q.   When would the Board of Directors request   13:58

17     an investigation into matters of eligibility?        13:58

18         A.   If something was brought to them by a       13:58

19     member school or the public at large.                13:58

20         Q.   Are there any Deputy Board Members          13:58

21     currently?                                           13:58

22         A.   There are ten.                              13:58

23         Q.   Who do they report to?                      13:58

24         A.   They have very few -- very few              13:58

25     responsibilities.  We have not asked them to         13:59
```

Page 77

```
1    investigate.  We -- you know, we feel like it has      13:59
2    put some them in difficult positions.  So most of      13:59
3    the investigations come out of our office.             13:59
4         Q.   Can you tell me a little bit more about      13:59
5    putting them in difficult positions; what you mean     13:59
6    by that.                                               13:59
7         A.   If they have to go into somebody else's      13:59
8    school and make a determination on eligibility or      13:59
9    where somebody lives, it could be a rival school and   13:59
10   people might not want them there.                      13:59
11            So, you know, we have taken it over          13:59
12   because it's unbiased if we're looking at it.          13:59
13        Q.   So are the Deputy Board Members designees    13:59
14   or members of the member school?                       13:59
15        A.   They are principals of a member school,      13:59
16   yes.                                                   14:00
17        Q.   So now on Paragraph 8.8 it says [as read]:   14:00
18            "The Board of Directors shall have           14:00
19            the power to investigate through the
20            Deputy Board Member, or in
21            such other manner as may be found
22            advisable, matters of eligibility and
23            other violations of rules when the
24            Board deems it advisable to do so on
25            the basis of information furnished,
```

Page 78

```
 1              even though a formal protest is not

 2              filed."

 3              Did I read that correctly?              14:00

 4      A.   You did.                                   14:00

 5      Q.   Is this statement accurate?               14:00

 6              MS. GREEN:  Object to the form.         14:00

 7              THE WITNESS:  It is.                    14:00

 8   BY MS. KANG:                                       14:00

 9      Q.   So when would the Board -- when would the  14:00

10   Board deem it advisable to investigate matters of  14:00

11   eligibility even without formal protest?           14:00

12      A.    Sometimes they --                         14:00

13              MS. GREEN:  Object to the form.         14:00

14              I'm sorry.                              14:00

15              THE WITNESS:  Oh.  I'm sorry.           14:00

16              Sometimes they get anonymous letters that 14:00

17   would supply some information; and, you know, they 14:00

18   would -- now they would ask us because I also can  14:00

19   investigate.  And so we would do it and then --    14:00

20   instead of our Board -- Deputy Board just because we 14:01

21   don't want to put them in a position where they    14:01

22   would be ruling on a -- sometimes a competitor.    14:01

23   BY MS. KANG:                                       14:01

24      Q.   And what is the difference between a       14:01

25   formal protest versus an informal protest?         14:01
```

Page 79

```
 1          A.   A formal protest would be somebody's --    14:01
 2    has written it and put their name to it.              14:01
 3               Informal would be an anonymous letter or a 14:01
 4    phone call.                                           14:01
 5          Q.   So I'm going to ask you to scroll one page 14:01
 6    down in Exhibit 3 to the page that is Bates           14:01
 7    Stamped -139.  It should be Page 22 of the pdf.       14:01
 8          A.   Okay.                                      14:01
 9          Q.   So I am looking at Section 127-1-9 titled  14:01
10    "Funds."                                              14:01
11          A.   Okay.                                      14:01
12          Q.   How -- how is the Commission funded?       14:01
13          A.   All of our revenue comes from championship 14:02
14    events, ticket sales at championship events;          14:02
15               Regional basketball ticket sales;          14:02
16               Playoffs for football;                     14:02
17               Registering of officials;                  14:02
18               Coaches Education;                          14:02
19               And corporate partnership.                 14:02
20          Q.   Are there any other sources of revenue?    14:02
21          A.   None of any significance.                  14:02
22          Q.   By "none of any significance," what do you 14:02
23    mean?                                                 14:02
24          A.   There would be maybe some fines in there   14:02
25    for people -- coaches not paying -- or not            14:02
```

Page 80

| | | |
|---|---|---|
| 1 | evaluating their officials or not putting scores in. | 14:02 |
| 2 | Things like that. | 14:02 |
| 3 | Q.   How much money are those fines usually? | 14:02 |
| 4 | A.   $25 or $50 or $10, depending upon what it | 14:02 |
| 5 | is for. | 14:03 |
| 6 | Q.   Now, you mentioned the Coaches Education. | 14:03 |
| 7 | Could you tell me a bit more about what that is. | 14:03 |
| 8 | A.   The legislature requires that our coaches | 14:03 |
| 9 | who are non-teachers must have a Coaches Education. | 14:03 |
| 10 | And this is a State Board of Education.  But they | 14:03 |
| 11 | have charged us with providing the education, but | 14:03 |
| 12 | State Board of Education would do the certification. | 14:03 |
| 13 | Q.   Do the coaches pay the Commission for this | 14:03 |
| 14 | education? | 14:03 |
| 15 | A.   They do. | 14:03 |
| 16 | Q.   Is the Commission a for-profit | 14:03 |
| 17 | organization? | 14:03 |
| 18 | A.   We are not. | 14:03 |
| 19 | Q.   Do you receive any funds from the federal | 14:03 |
| 20 | government? | 14:03 |
| 21 | A.   We received from -- some pandemic funds. | 14:03 |
| 22 | But that was all through the small | 14:03 |
| 23 | business authority. | 14:04 |
| 24 | Q.   Anything else? | 14:04 |
| 25 | A.   We have received GEAR funding from -- | 14:04 |

Page 81

```
 1    through the Department of Education for monies to go    14:04
 2    back to the school through AEDs, wet globe bulbs        14:04
 3    [verbatim], reimbursement for travel, things like      14:04
 4    that.                                                   14:04
 5           Because everybody was in short -- low           14:04
 6    attendance, and so we were trying to find a way to     14:04
 7    help them with their money.                             14:04
 8       Q.   By "gear funding," do you mean sports gear     14:04
 9    or...                                                   14:04
10       A.   For them they also had limited attendance     14:04
11    and limited games.  So --                               14:04
12           Did I miss the question?                        14:04
13           Okay.  What was your question again?           14:04
14       Q.   Oh.  I just asked that by "gear funding,"     14:04
15    did you mean sports gear?                               14:04
16       A.   No.  No.  It is -- I think it's -- GEAR is    14:05
17    the program.                                            14:05
18       Q.   Understood.                                    14:05
19           And was this all during the pandemic?          14:05
20       A.   Yes, ma'am.                                    14:05
21       Q.   Do you receive any funds from your member     14:05
22    schools?                                                14:05
23       A.   The only funds we receive at this time        14:05
24    would be fines that they would have to pay for not     14:05
25    attending, not putting in scores.                       14:05
```

Page 82

```
1            Sometimes our events might be held at       14:05
2   their schools; so they would collect the gate and    14:05
3   then write us a check.                                14:05
4            But that's pretty much all we get from the   14:05
5   schools.                                              14:05
6        Q.  And how much are the fines?                  14:05
7        A.  For not putting in an evaluation, it's       14:05
8   $10;                                                  14:05
9            For not doing your eligibility, it's $25;    14:05
10           And if you don't put in a score, it's $50.   14:05
11       Q.  Is any of the Commission's revenue shared    14:06
12  with the member schools?                              14:06
13       A.  Yes.                                         14:06
14       Q.  How is it shared?                            14:06
15       A.  We -- we give reimbursement back to the      14:06
16  schools.  Each sport has a different formula, but we  14:06
17  help with travel and meal money at most of the        14:06
18  events.                                               14:06
19           At football they also get a commission of    14:06
20  the gate.  20 percent the first week, 15 percent the  14:06
21  second, 10 the third, and 5 at the championship.      14:06
22       Q.  If you had to estimate, what percentage of   14:06
23  Commission funds go to the member schools?            14:06
24       A.  When you say go to the schools, you mean     14:06
25  actually cash sent back to them?  Or do you mean      14:07
```

Page 83

```
 1    services to the school?                         14:07
 2        Q.   Let's start with cash sent back to them.   14:07
 3             MS. GREEN:  Object to the form.         14:07
 4             THE WITNESS:  I would say $300,000 out of   14:07
 5    a probably $1.5 million budget.                 14:07
 6    BY MS. KANG:                                     14:07
 7        Q.   So what about services?               14:07
 8        A.   The services -- oh.  I'm sorry.       14:07
 9             Services would be higher because -- I  14:07
10    would think it's probably closer to $700,000   14:07
11    depending upon what you call as "giving back".  14:07
12             You know, if it's -- some people would say   14:07
13    that the expenses to put on tournaments is a way to   14:07
14    give back.                                       14:07
15             Direct expenses would be, you know, the   14:07
16    things that we are purchasing for them right now,   14:07
17    which would be the AED and the wet globe bulb and   14:07
18    the cooling submersion tubs.                    14:07
19        Q.   So what -- what is encompassed in the term   14:08
20    "services"?                                      14:08
21        A.   Services.  Each -- each season we travel   14:08
22    around the state to meet with all principals for a   14:08
23    regional principal meeting.                     14:08
24             We also travel around the state to meet   14:08
25    with each sport during each -- at the beginning of   14:08
```

Page 84

```
1    each season to make sure -- we go over all the rules    14:08
2    and regulations that are current.                       14:08
3            Those are some of -- as well as expenses        14:08
4    that we incur hosting the tournaments for them.         14:08
5            And the coaches -- you know, we have -- we      14:08
6    have expenses in materials for Coaches Education.       14:08
7        Q.   I believe you mentioned you stopped            14:09
8    collecting dues from your members.                      14:09
9            Do you currently have any plans to resume       14:09
10   collecting dues?                                        14:09
11       A.   No.  We have a proposal from one of our        14:09
12   principals for this year to strike out the -- all of    14:09
13   the dues' language and inserting language in there      14:09
14   that says, "Could resume at any time when               14:09
15   necessary."                                             14:09
16       Q.   So, now, sticking with Exhibit 3, I'm          14:09
17   actually going to ask you to go back up to Page 6 of    14:09
18   the pdf and the Bates stamp is WVSSAC000123.  And       14:09
19   let me know whenever you get there.                     14:09
20       A.   Okay.                                          14:10
21       Q.   So I'm going to direct you to the              14:10
22   paragraph that begins with "Discrimination             14:10
23   Prohibited."                                            14:10
24           Take your time reading it, and let me know      14:10
25   whenever you are finished reading that paragraph.       14:10
```

Page 85

| | | |
|---|---|---|
| 1 | A.   [Witness reviews document]. | 14:10 |
| 2 | Okay. | 14:10 |
| 3 | Q.   Do you know who wrote this portion of the | 14:10 |
| 4 | handbook? | 14:10 |
| 5 | A.   I do not. | 14:10 |
| 6 | Q.   Do you know how long this portion has been | 14:10 |
| 7 | in the handbook? | 14:10 |
| 8 | A.   I do not. | 14:10 |
| 9 | Q.   Do you remember ever reviewing this | 14:10 |
| 10 | section of the handbook? | 14:10 |
| 11 | A.   Yes. | 14:10 |
| 12 | Q.   When did you review it? | 14:11 |
| 13 | A.   I -- | 14:11 |
| 14 | Q.   Oh.  Go ahead. | 14:11 |
| 15 | A.   I would say a couple of years ago.  We've | 14:11 |
| 16 | tried to have a book study and go through all of | 14:11 |
| 17 | these. | 14:11 |
| 18 | Q.   When you reviewed it a couple of years | 14:11 |
| 19 | ago, did you believe the Commission was required to | 14:11 |
| 20 | comply with Title IX? | 14:11 |
| 21 | A.   Yes. | 14:11 |
| 22 | Q.   Is the Commission currently required to | 14:11 |
| 23 | comply with Title IX? | 14:11 |
| 24 | MS. GREEN:  I'll just object to the form. | 14:11 |
| 25 | THE WITNESS:  I would believe that the | 14:11 |

Page 86

```
 1    schools are required to follow Title IX.  But I      14:11

 2    believe we believe it also.                          14:11

 3    BY MS. KANG:                                          14:11

 4        Q.    Now, I want to turn your attention to the   14:11

 5    section below that titled "Beliefs and Objectives."   14:11

 6            Take a moment to read the first paragraph      14:11

 7    and let me know whenever you are done.                14:11

 8        A.    [Witness reviews document].                 14:11

 9            Okay.                                          14:12

10        Q.    What are "proper ideals of sportsmanship,"  14:12

11    as written in this paragraph?                         14:12

12            MS. GREEN:  Object to the form.                14:12

13            THE WITNESS:  Are you on Paragraph 1 or 3?     14:12

14    BY MS. KANG:                                          14:12

15        Q.    Paragraph 1 [verbatim] of the Beliefs and   14:12

16    Objectives section.                                   14:12

17        A.    What was your question again?               14:12

18        Q.    Sure.                                        14:12

19            What are -- what are the proper ideals of      14:12

20    sportsmanship?                                         14:12

21            I'm sorry.  I --                                14:12

22        A.    The --                                       14:12

23        Q.    I am referring to Paragraph 3.  You had it   14:12

24    right the first time.                                  14:12

25        A.    Okay.                                         14:12
```

Page 87

```
 1            Sportsmanship is that everybody's on a        14:12
 2    fair playing field.  And the -- you should be         14:12
 3    gracious in losing and winning.                       14:13
 4        Q.   What do you mean by "fair playing field"?    14:13
 5             MS. GREEN:  Object to the form.              14:13
 6             THE WITNESS:  Same age.  Same gender.        14:13
 7    BY MS. KANG:                                          14:13
 8        Q.   Anything else?                               14:13
 9        A.   No.                                          14:13
10             When I say "same age," it would be same     14:13
11    programatic level.  So middle -- middle school kids   14:13
12    cannot play against high school but freshmen can      14:13
13    play against seniors.                                 14:13
14        Q.   What are physical -- the physical and        14:13
15    social benefits that are referenced in this           14:13
16    paragraph?                                            14:13
17        A.   Just good -- for one, just good health.      14:13
18    Participation.  Also, you know, we believe that       14:13
19    it's -- the competitive part is good, and the         14:14
20    training part is beneficial to the student athlete.   14:14
21        Q.   Why do you believe it's beneficial?          14:14
22        A.   Studies we have read.  And as a              14:14
23    participant a long time ago.                          14:14
24        Q.   What does "partisanship and prejudice"       14:14
25    mean in this paragraph?                               14:14
```

Page 88

```
 1          A.   Partisanship and prejudice would mean that   14:14
 2     it's equal.  You know, one side -- especially        14:14
 3     with -- you know, as far as equipment or what -- if  14:14
 4     you come to a game, you can't have lush seats for    14:15
 5     you and the other team have foldable chairs and      14:15
 6     things like that.  So that's part- -- partisan.      14:15
 7               You know, all the equipment at a game has  14:15
 8     to be the same equipment everybody is using.  Same   14:15
 9     ball.  Same rims.  Everything is the same.           14:15
10          Q.   What do you mean by "prejudice" in this    14:15
11     paragraph?                                           14:15
12          A.   Prejudice would mean, you know -- you      14:15
13     know, is there some advantage to one team over       14:15
14     another.                                             14:15
15          Q.   What sort of advantage are you referring   14:15
16     to?                                                  14:15
17          A.   Could be something as simple as a tarp     14:15
18     over your bench as opposed to the other team not     14:15
19     having it;                                           14:15
20               Could be as simple as a heater.  You might 14:16
21     have a heater on a sideline at a cold game and they  14:16
22     don't.                                               14:16
23               So things that would make the game unfair  14:16
24     that are outside of the game.                        14:16
25          Q.   Is there anything else that you believe    14:16
```

Page 89

| | | |
|---|---|---|
| 1 | would make the game unfair? | 14:16 |
| 2 | MS. GREEN:  Object to the form. | 14:16 |
| 3 | THE WITNESS:  There are probably other | 14:16 |
| 4 | things, but right off the top of my head not sure. | 14:16 |
| 5 | Could be something as simple as how far | 14:16 |
| 6 | you got to walk to your locker room in between | 14:16 |
| 7 | games. | 14:16 |
| 8 | BY MS. KANG: | 14:16 |
| 9 | Q.   Do you believe that allowing transgender | 14:16 |
| 10 | students to participate on sports teams consistent | 14:16 |
| 11 | with their gender identity is consistent with the | 14:16 |
| 12 | goals identified in this paragraph? | 14:16 |
| 13 | MS. GREEN:  Object to the form. | 14:16 |
| 14 | THE WITNESS:  I believe our -- our Board | 14:16 |
| 15 | policy was that, if it was not safe or unfair | 14:16 |
| 16 | advantage, then it would be okay for them to | 14:17 |
| 17 | participate. | 14:17 |
| 18 | BY MS. KANG: | 14:17 |
| 19 | Q.   Does Bridgeport Middle School | 14:17 |
| 20 | cross-country count as an interscholastic athletic? | 14:17 |
| 21 | A.   It does. | 14:17 |
| 22 | MS. KANG:  So I'm actually about to move | 14:17 |
| 23 | into the next session.  I think we are up on an | 14:17 |
| 24 | hour. | 14:17 |
| 25 | Roberta, do you have preference as to | 14:17 |

Page 90

```
 1     whether you want me to get started or you want to       14:17

 2     take a break now?                                        14:17

 3               THE WITNESS:  I'm good.                         14:17

 4               MS. GREEN:  All right.  Let's do --             14:17

 5               THE WITNESS:  I can't go to the bathroom.       14:17

 6               MS. GREEN:  I know.  Really no need for a       14:17

 7     bathroom break over here.                                14:18

 8               MS. KANG:  All right.  Well, if it's okay       14:18

 9     with you, we'll go on a little bit longer.               14:18

10               Let me know if you do need a break.            14:18

11               So we can take down Exhibit 3.                 14:18

12     BY MS. KANG:                                             14:18

13          Q.  And I want to talk a little bit about some      14:18

14     of the statistics that the Commission turns over to      14:18

15     various organizations.                                   14:18

16               So I'm going to introduce an exhibit that      14:18

17     will be marked as Exhibit 4.                             14:18

18               MS. KANG:  And I'll let you know when it's     14:18

19     in everyone's folders.                                   14:18

20               (Deposition Exhibit 4 was marked for           14:19

21               identification and is attached hereto.)        14:19

22               MS. KANG:  Exhibit 4 should now be in          14:19

23     everyone's Marked Exhibit folder.                        14:19

24               Let me know if anyone has trouble              14:19

25     accessing it.                                            14:19
```

Page 91

```
 1   BY MS. KANG:                                    14:19

 2        Q.   And, Mr. Dolan, let me know whenever you  14:19

 3   have it up.                                     14:19

 4        A.   Okay.                                 14:19

 5             MS. GREEN:  Counsel, was there a certain  14:19

 6   page in the exhibit?                            14:19

 7             MS. KANG:  Yeah.                       14:19

 8   BY MS. KANG:                                    14:19

 9        Q.   If you go to Page 6 to start, that would  14:19

10   be great.  And the Bates stamp is -365.         14:19

11             MS. GREEN:  I'm sorry.                 14:19

12             THE WITNESS:  That's fine.             14:19

13             Is this the "2016-'17 Participation    14:19

14   Report"?                                        14:19

15   BY MS. KANG:                                    14:19

16        Q.   Do you believe it is?                 14:19

17        A.   Okay.                                 14:20

18             [Witness reviews document].           14:20

19             Okay.                                 14:20

20        Q.   So I'm going to represent to you that this  14:20

21   is a document that was produced by your counsel in  14:20

22   response to one of plaintiff's discovery requests.  14:20

23             If you want to read the text of the    14:20

24   request, it's Request Number 15 in this same    14:20

25   document.                                       14:20
```

Page 92

| | | |
|---|---|---|
| 1 | Do you recognize this document that is | 14:20 |
| 2 | before you right now? | 14:20 |
| 3 | A.    I do. | 14:20 |
| 4 | Q.    What is it? | 14:20 |
| 5 | A.    This is a participation -- the National | 14:20 |
| 6 | Federation of High School keeps track of how many | 14:20 |
| 7 | participants are in each sport, trying to find | 14:20 |
| 8 | trends among the sports, which ones are growing, | 14:20 |
| 9 | which ones are falling; and if they are falling, how | 14:20 |
| 10 | come. | 14:20 |
| 11 | Q.    What is the National Federation of State | 14:21 |
| 12 | High School Associations? | 14:21 |
| 13 | A.    It is the association of 51 members, the | 14:21 |
| 14 | 50 states plus Washington, D.C., and they primarily | 14:21 |
| 15 | provide the sport-specific rules for almost all of | 14:21 |
| 16 | our events. | 14:21 |
| 17 | Q.    How long have you provided these | 14:21 |
| 18 | statistics to the Federation? | 14:21 |
| 19 | A.    To be honest with you, they've been | 14:21 |
| 20 | tracking them, but I couldn't tell you how long we | 14:21 |
| 21 | have. | 14:21 |
| 22 | Q.    Do you think it's -- | 14:21 |
| 23 | A.    I would assume. | 14:21 |
| 24 | Q.    Go ahead. | 14:21 |
| 25 | A.    I would assume -- it's a -- it's an | 14:21 |

```
 1    ongoing thing; so I would think it's probably been      14:21

 2    done for a number of years.                             14:21

 3         Q.   More than ten?                                14:21

 4         A.   Yes.                                          14:21

 5         Q.   More than 20?                                 14:21

 6         A.   Probably.                                     14:21

 7         Q.   Why do you provide these statistics to the    14:21

 8    NFHS?                                                   14:22

 9         A.   They -- they gather them for the whole        14:22

10    country to try to monitor which sports are growing      14:22

11    in popularity and which ones might not be.  And the     14:22

12    ones that aren't, they're trying to look and see        14:22

13    why.                                                    14:22

14         Q.   I'm just going to ask you a few questions     14:22

15    to help me understand how to read this chart.           14:22

16              Did you prepare this document?                14:22

17         A.   I personally did not prepare it.  But this    14:22

18    is a document prepared by our office, yes.              14:22

19         Q.   Do you know who prepared this document?       14:22

20         A.   Alice Goodwin in our office.                  14:22

21         Q.   What's her position?                          14:22

22         A.   Secretary.                                    14:22

23         Q.   Is she your secretary?                        14:22

24         A.   No.                                           14:22

25         Q.   Do you know which secretary she is?           14:22
```

Page 94

```
 1          A.   Well, we don't all have specific          14:22

 2     secretaries.  She works primarily with Greg Reed,   14:23

 3     but we all ask different people to do different      14:23

 4     things, depending upon what the level of activity    14:23

 5     going on in the office for that particular staff     14:23

 6     member is.                                           14:23

 7          Q.   What is Greg Reed's role?                  14:23

 8          A.   Assistant executive director.             14:23

 9          Q.   Do you contribute any information to this 14:23

10     document?                                            14:23

11          A.   This document is -- I personally do not.  14:23

12     It's pulled from our website.  And it probably -- it 14:23

13     is self-populating, I believe.  So she doesn't       14:23

14     actually type it in there.  They pull it from our    14:23

15     eligibility sheets.                                  14:23

16          Q.   And who is "they"?                         14:23

17          A.   Our -- our web designer created this form, 14:23

18     and it self-populates from that form, from their     14:24

19     eligibility.                                         14:24

20          Q.   So in the second column of this chart, it 14:24

21     says "Senior."                                       14:24

22               What does that mean?                       14:24

23          A.   "Senior" means "high school."             14:24

24          Q.   So senior --                               14:24

25          A.   9 through 12.                             14:24
```

Page 95

```
 1          Q.   So it's any grade from 9 to 12?        14:24
 2          A.   It's a combination of 9 through 12, yes.  14:24
 3          Q.   If we go over to the third column, the one  14:24
 4     that says "Male," what does that mean?         14:24
 5          A.   That -- it's the same -- when we do our  14:24
 6     eligibility sheets by sport, for instance, football,  14:24
 7     football doesn't differentiate between boys and  14:24
 8     girls.  It's -- they're asking for the number of  14:24
 9     participants.                                   14:25
10          When you get to girls' track, it can only  14:25
11     be done by girls; so, therefore, that -- that's why  14:25
12     there's not -- there's a zero in girls' track for  14:25
13     males and boys' track has a number but girls' does  14:25
14     not.                                            14:25
15          So football is the number of participants.  14:25
16     So in the blue column under "Male," it would be the  14:25
17     number of male -- or number of people in football.  14:25
18     Could be male or female because our eligibility  14:25
19     doesn't differentiate between the two.          14:25
20          Q.   So just to be clear, even if a girl plays  14:25
21     on the football team, she will not show up in the  14:25
22     column that says "Female" for football?         14:25
23          A.   That's correct.  Because they're asking  14:25
24     for the number of participants in football, and it's  14:25
25     primarily football -- it's primarily a male sport.  14:26
```

Page 96

```
 1    So it falls under the male category.  That's the      14:26

 2    best we could do for them.                            14:26

 3            Similarly, cheer is primarily a cheer          14:26

 4    event, but there are boys.  But there's no number in   14:26

 5    there.  So we just -- it's just the total number in    14:26

 6    that -- for that particular sport.                     14:26

 7        Q.   Okay.  Scroll all the way over to the         14:26

 8    gray-colored columns.  They're labeled as              14:26

 9    "Mid/Junior."                                          14:26

10            What does "Mid/Junior" mean?                   14:26

11        A.   It was either middle school or junior high    14:26

12    and -- you know.  I don't believe we have any more     14:26

13    junior high.  So probably could be fixed to say just   14:26

14    middle school.                                         14:26

15        Q.   What grades would those be?                   14:26

16        A.   6th through 8.                                14:26

17        Q.   So now I'm going to ask you to -- to          14:26

18    scroll down to Page 11.  It will be Bates              14:27

19    stamped -370.                                          14:27

20            Let me know whenever you get there.            14:27

21        A.   Okay.                                         14:27

22        Q.   So the last year that you produced this       14:27

23    document is 2020 to 2021.                              14:27

24            Do you know when the 2021 to 2022              14:27

25    statistics will be published?                          14:27
```

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 376 of 674

| | | |
|---|---|---|
| 1 | A.   We submitted them over the summer. | 14:27 |
| 2 | Obviously, our spring sports aren't -- aren't in | 14:27 |
| 3 | place yet.  So we wouldn't have numbers for them. | 14:27 |
| 4 | Q.   For the 2021 to 2022 period, do you know | 14:27 |
| 5 | if B.P.J. will be listed in the "Female" column or | 14:27 |
| 6 | the "Male" column? | 14:27 |
| 7 | MS. GREEN:  Object to form. | 14:28 |
| 8 | THE WITNESS:  Which team is she on? | 14:28 |
| 9 | BY MS. KANG: | 14:28 |
| 10 | Q.   She is on the cross-country team for | 14:28 |
| 11 | girls. | 14:28 |
| 12 | A.   And then that's where she will be listed. | 14:28 |
| 13 | Because it's just pulling the number off of the | 14:28 |
| 14 | eligibility of that particular team. | 14:28 |
| 15 | Q.   And the numbers that are submitted, are | 14:28 |
| 16 | they coming from the member schools themselves? | 14:28 |
| 17 | A.   They -- the member schools have to submit | 14:28 |
| 18 | their eligibility on our site.  And from there, | 14:28 |
| 19 | it takes the total of each school and puts them in | 14:28 |
| 20 | their category. | 14:28 |
| 21 | Q.   So I'm going to ask you to scroll down one | 14:28 |
| 22 | more page to the doc- -- to the document that is | 14:28 |
| 23 | Bates Stamped -371. | 14:28 |
| 24 | A.   Okay. | 14:28 |
| 25 | Q.   So this is also a document that was | 14:28 |

Page 98

| | | |
|---|---|---|
| 1 | produced by your counsel in response to one of | 14:29 |
| 2 | plaintiff's discovery requests. | 14:29 |
| 3 | If you want the read the text of that | 14:29 |
| 4 | request, you can look at Request 14 on Page -4 of | 14:29 |
| 5 | this exhibit. | 14:29 |
| 6 | Do you recognize this document? | 14:29 |
| 7 | A.   This is a form from the National | 14:29 |
| 8 | Federation that puts our participation numbers into | 14:29 |
| 9 | their chart. | 14:29 |
| 10 | So the numbers that came off of that chart | 14:29 |
| 11 | for '18/'19 would match these numbers. | 14:29 |
| 12 | All those sports that are activities that | 14:29 |
| 13 | are -- have zeros by them, those are activities or | 14:29 |
| 14 | sports that we do not offer.  But they are offered | 14:29 |
| 15 | through the National Federation. | 14:29 |
| 16 | Q.   So you do not -- you as a Commission do | 14:29 |
| 17 | not make this form? | 14:29 |
| 18 | A.   No.  They send this back to us.  This is | 14:29 |
| 19 | basically a verification of the form we sent to | 14:30 |
| 20 | them. | 14:30 |
| 21 | Q.   So is it fair to say that the National | 14:30 |
| 22 | Federation takes information that you give them and | 14:30 |
| 23 | puts it into this form? | 14:30 |
| 24 | A.   Yes, ma'am. | 14:30 |
| 25 | Q.   So I noticed that the year only goes to | 14:30 |

Page 99

```
1    2018 to 2019.  Is there a reason why we don't have      14:30

2    the 2019 to 2020 statistics?                            14:30

3         A.   I don't know if that's the most recent        14:30

4    one.  Because obviously with COVID and them not         14:30

5    working from the office for a long period of time, I    14:30

6    don't know if they have not submitted the most          14:30

7    recent years.                                           14:30

8         Q.   So in the column that says "Boys School,"     14:30

9    what does this column indicate?                         14:30

10        A.   Are we still on Page 7?                        14:30

11        Q.   Yes.  We are -- we are on Page 12.             14:31

12        A.   12.  Okay.                                     14:31

13        Q.   The Bates stamp is -371.                       14:31

14        A.   And which one am I looking for?                14:31

15        Q.   Yeah.  So if you go over, it's the fourth      14:31

16   column.  It says "Boys School."                         14:31

17        A.   Boys -- okay.                                  14:31

18        Q.   Yeah.                                          14:31

19        A.   These are -- these are the schools that        14:31

20   are offering basketball.  If you are looking at         14:31

21   basketball, there is 124 schools who are offering       14:31

22   boys' basketball.  And there are 124 schools that       14:31

23   are offering girls' basketball.                         14:31

24            You'll notice that "Baseball" has 122.          14:31

25   There are no girls -- there are no girls' baseball       14:31
```

Page 100

```
 1    teams.  That's why it is a "0."                  14:31
 2         Q.   Got it.                                14:31
 3              And then the boys participation, does that  14:31
 4    reflect that 3,052 boys participated of the      14:31
 5    124 schools that offer boys' basketball?         14:32
 6         A.   Yes.                                    14:32
 7              And I would believe this is just high   14:32
 8    school.  It's not middle school also.            14:32
 9         Q.   Do you know if co-ed teams are reflected  14:32
10    on the chart?                                     14:32
11         A.   Again, co-ed teams would be -- they would  14:32
12    be reflected as the -- the majority sport.  So, for  14:32
13    instance, baseball, it could be co-ed if a girl  14:32
14    wanted to play baseball.  But she would be listed on  14:32
15    the -- the school was offering boys' baseball -- or  14:32
16    they are offering baseball, the girl would simply be  14:32
17    listed on the eligibility and be counted as a    14:32
18    baseball participant, not as a female.           14:33
19              So in this -- this study that they are  14:33
20    doing is simply the number of participants in that  14:33
21    sport, not a breakdown of boys and girls if it's  14:33
22    co-ed.                                            14:33
23         Q.   Who determines whether to make a team   14:33
24    co-ed?                                            14:33
25         A.   Well, if you have enough boys and have  14:33
```

Page 101

```
 1     enough girls to have a team, then if we are offering     14:33
 2     boys and girls, then you have to have a separate          14:33
 3     team.                                                     14:33
 4              For instance, cross-country, you can have        14:33
 5     one girl and she could make up a team or she could        14:33
 6     be the team.  But if you only have one soccer girl,       14:33
 7     she couldn't be the team.  So she would have to play      14:33
 8     with the boys.  And that would be co-ed at the time.      14:34
 9        Q.   Is it fair to say that what makes a sport         14:34
10     co-ed depends on the sport?                               14:34
11              MS. GREEN:  Object to the form.                  14:34
12              THE WITNESS:  It depends on the sport -- I       14:34
13     would say depends upon the participants.                  14:34
14              If there are enough of each gender to            14:34
15     participate, we would have separate -- separate           14:34
16     championships.                                            14:34
17     BY MS. KANG:                                              14:34
18        Q.   So is it fair to say that once a certain          14:34
19     number of participants is reached for boys and            14:34
20     girls, they have to be separate?                          14:34
21        A.   At some point based on the number, we             14:34
22     would make a recommendation to the Board of               14:34
23     Directors that we now have enough to break them and       14:35
24     have a stand-alone.                                       14:35
25        Q.   Can you give me an example of when you            14:35
```

Page 102

```
1    made that recommendation?                      14:35

2        A.   We haven't made it yet.  But I will tell   14:35

3    you that we're -- you know, we have offered more   14:35

4    opportunities for girls in golf.  And our number of   14:35

5    girls playing golf has gone up significantly.    14:35

6            We'll watch the numbers.  And, as time    14:35

7    goes on, if we -- if the numbers continue to grow,   14:35

8    then they will have the opportunity to have a    14:35

9    stand-alone program for girls' golf.  Right now,   14:35

10   they play on the boys' team or the co-ed team.   14:35

11           MS. KANG:  So we can take down this    14:35

12   exhibit, and I'm going to introduce a different   14:35

13   document as the next exhibit, which I believe is   14:36

14   Exhibit 5.                                       14:36

15           (Deposition Exhibit 5 was marked for    14:36

16            identification and is attached hereto.)   14:36

17           MS. KANG:  Exhibit 5 is now in everyone's   14:36

18   Marked Exhibit folder.  Please let me know if you   14:36

19   have trouble accessing it.                       14:36

20   BY MS. KANG:                                     14:36

21       Q.   Mr. Dolan, let me know once you have it   14:36

22   up.                                              14:36

23           And once you have it up, if you could go   14:36

24   to Page 5 of the pdf, that would be great.       14:36

25       A.   Okay.                                   14:36
```

Page 103

| | | |
|---|---|---|
| 1 | Q.   So I would like to draw your attention to | 14:36 |
| 2 | Interrogatory Number 13 on Exhibit 5. | 14:37 |
| 3 | What does "participation mixed as | 14:37 |
| 4 | indicated to respond to demand" mean? | 14:37 |
| 5 | A.   "Identify all WVSSAC sponsored sports in | 14:37 |
| 6 | which students may participate on a team designated | 14:37 |
| 7 | as co-ed or mixed." | 14:37 |
| 8 | Is that the question?  And why cheer is | 14:37 |
| 9 | considered mixed? | 14:37 |
| 10 | Q.   Yeah.  That -- why don't we start there. | 14:37 |
| 11 | Why is cheer considered mixed? | 14:37 |
| 12 | A.   It has both boys and girls.  So it could | 14:37 |
| 13 | be co-ed or mixed. | 14:37 |
| 14 | Q.   What is the difference between calling | 14:37 |
| 15 | cheer mixed and saying that "participation mixed as | 14:38 |
| 16 | indicated to respond to demand"? | 14:38 |
| 17 | A.   Basically because cheer almost always has | 14:38 |
| 18 | boy members.  Wrestling is starting to get a number | 14:38 |
| 19 | of them.  Baseball very seldom has -- it's very | 14:38 |
| 20 | seldom a mixed sport.  And football is very seldom. | 14:38 |
| 21 | But golf is transitioning into its own sport. | 14:38 |
| 22 | Q.   By "seldom," do you mean girls seldom | 14:38 |
| 23 | participate on those teams? | 14:38 |
| 24 | A.   That is correct. | 14:38 |
| 25 | Q.   Just to be clear, football is a boys' | 14:38 |

Page 104

| | | |
|---|---|---|
| 1 | team, but if a girl wants to play football, she | 14:39 |
| 2 | would be permitted to play on that team? | 14:39 |
| 3 | A.   That's correct. | 14:39 |
| 4 | Q.   If a boy wanted to play on a girls' team, | 14:39 |
| 5 | would they be permitted to? | 14:39 |
| 6 | A.   No. | 14:39 |
| 7 | Q.   Why not? | 14:39 |
| 8 | A.   Because girls have been -- they've been | 14:39 |
| 9 | denied opportunity in the past, and by allowing boys | 14:39 |
| 10 | to participate on girls' teams that are strictly | 14:39 |
| 11 | girls, for instance, girls' soccer, girls' | 14:39 |
| 12 | basketball, volleyball and softball, that girls | 14:39 |
| 13 | would then lose opportunity. | 14:39 |
| 14 | Q.   Do you have any rules preventing a boy | 14:39 |
| 15 | from playing on a girls' team? | 14:39 |
| 16 | A.   Yes. | 14:39 |
| 17 | Q.   What rule would that be? | 14:39 |
| 18 | A.   I have to find it in my rule book. | 14:40 |
| 19 | Q.   Why don't we go back to the rule book, and | 14:40 |
| 20 | I'll ask you a few questions on that. | 14:40 |
| 21 | So we'll go back to Exhibit 3. | 14:40 |
| 22 | (Simultaneously speaking.) | 14:40 |
| 23 | THE WITNESS:  I'm trying to -- | 14:40 |
| 24 | BY MS. KANG: | 14:40 |
| 25 | Q.   And it should be -- | 14:40 |

Page 105

```
 1          A.   Try --                              14:40

 2          Q.   It should be Exhibit 3.  It should be   14:40

 3   Page 17, and the Bates stamp should end in -148.    14:40

 4          A.   Page 17 talks about our membership.     14:40

 5          Q.   Yes.  I'm looking at Paragraph 3.8 of   14:40

 6   Exhibit 3 on -148.                                  14:40

 7          A.   Okay.                                   14:40

 8          Q.   Take a moment to read Paragraph 3.8 and 14:41

 9   let me know when you've had a chance to finish       14:41

10   reading it.                                         14:41

11          A.   What page are you on again?  Because I  14:41

12   don't have 3.8.                                     14:41

13          Q.   No problem.  It's page 17.  The Bates   14:41

14   stamp should end in -148.                           14:41

15          A.   17 of the pdf document or 17 of our --  14:41

16   that's numbered on our rule book?                   14:41

17          Q.   This might be page -- this might be 17  14:41

18   that's numbered in your rule book.  My apologies.   14:41

19   It's Page 31 of the pdf.                            14:41

20          A.   Okay.  We're getting there.            14:41

21          MS. GREEN:  We should have music to play     14:41

22   through the...                                      14:41

23          THE WITNESS:  Okay.  Scroll down.            14:41

24          Okay.  Yep.  Yes.  Yes.  3.8.               14:42

25   ///
```

Page 106

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 385 of 674

```
 1    BY MS. KANG:                                      14:42

 2         Q.   Is that the rule that you were thinking of   14:42

 3    that prevented a transgender boy from playing on a    14:42

 4    girls' team?                                       14:42

 5         A.   Yes.                                     14:42

 6              MS. GREEN:  Object to the form, if I     14:42

 7    can --                                             14:42

 8              THE WITNESS:  Okay.  Back up?            14:42

 9              MS. GREEN:  Yes.                         14:42

10    BY MS. KANG:                                       14:42

11         Q.   Why was this rule enacted?              14:42

12         A.   I would assume to -- it complies with    14:42

13    Title IX, but it's -- you know, we're trying to not   14:42

14    allow boys to participate in girls' events to either  14:42

15    hurt them or dominate them.                        14:42

16         Q.   When was this rule, Section 3.8, enacted?   14:42

17         A.   I would have to find that out.  I'd have   14:42

18    to go back through all of our rules and find when it  14:42

19    was -- when it was enacted.                        14:42

20         Q.   Do you believe that it was enacted within  14:43

21    the past five years?                               14:43

22         A.   No.                                      14:43

23         Q.   Past ten?                                14:43

24         A.   No.                                      14:43

25         Q.   Past 20?                                 14:43
```

Page 107

```
 1        A.   I -- I'm not sure.  I don't know if it's        14:43
 2   gone that far.  But I would say a significant             14:43
 3   number, yes.  I don't know if it's made it to 20.         14:43
 4        Q.   Fair enough.                                    14:43
 5             So the team is separated by boys' and           14:43
 6   girls' teams.  Can a student ask to participate on a      14:43
 7   co-ed team?                                               14:43
 8        A.   If there is a boys' team and a girls'           14:43
 9   team -- are we talking about, like, boys' and girls'      14:43
10   basketball and can the girls' basketball player play      14:44
11   on the boys' team?  Is that what you're asking?           14:44
12        Q.   Yes.                                            14:44
13        A.   They cannot.  If there is a team for them,      14:44
14   they must play on the team of their gender.               14:44
15        Q.   Let's go back to Exhibit 5.                     14:44
16             And then I think once we are done with          14:44
17   that exhibit, we can take a break.                        14:44
18             So let's go back to Page 5 of the pdf.  I       14:44
19   just have a few follow-up questions.  Back to             14:44
20   Interrogatory Number 13.                                  14:44
21        A.   Okay.                                           14:44
22        Q.   What grades does junior varsity cover?          14:44
23        A.   It doesn't have a grade.  It could be 9 to      14:44
24   12.  You could be a senior and still on the junior        14:44
25   varsity.  If some -- some schools because of numbers      14:44
```

Page 108

```
 1    will have just the varsity.  Some will have varsity    14:45

 2    and j- -- junior varsity.  And some will have          14:45

 3    varsity, junior varsity, and a freshman team.          14:45

 4            So just different designation of those          14:45

 5    teams.                                                 14:45

 6        Q.   What does junior varsity mean?                14:45

 7        A.   Junior varsity --                             14:45

 8            MS. GREEN:  I was just going to object to       14:45

 9    the form.                                              14:45

10            THE WITNESS:  Okay.                            14:45

11            When you have too many kids and you            14:45

12    have -- you want an opportunity for them, you have a   14:45

13    junior varsity as long as you can get a schedule for   14:45

14    them.                                                  14:45

15    BY MS. KANG:                                           14:45

16        Q.   What does "varsity" mean?                     14:45

17        A.   You are the team that participates for the    14:45

18    state championships.                                   14:45

19        Q.   What does "freshman" mean?                    14:45

20        A.   Some large schools want to give more          14:45

21    opportunity to their student athletes.  So they have   14:45

22    too many kids for a junior varsity, JV; so they have   14:46

23    a separate freshman program.                           14:46

24        Q.   Just to be clear, if a student wants to       14:46

25    play a sport that is not in this list -- so it's not   14:46
```

Page 109

```
 1    cheer, wrestling, baseball, football, or golf --     14:46
 2    they have to join either the boys' or girls' team?   14:46
 3         A.   I think that's everybody that is not       14:46
 4    included, yes.                                        14:46
 5         Q.   One last question before we take a break.  14:46
 6              I would like to draw your attention to      14:46
 7    Page 9 of Exhibit 5, and this is the response to     14:46
 8    Interrogatory Number 14.                              14:46
 9         A.   Okay.                                        14:46
10         Q.   So just to be clear, to make sure I am      14:46
11    reading this chart correctly, in the first row that  14:46
12    starts with "Andrew Jackson Middle School," it       14:46
13    indicates that one girl participated in wrestling.   14:47
14              Is that an accurate -- is that an accurate  14:47
15    interpretation?                                       14:47
16         A.   It is.                                       14:47
17         Q.   How do you collect these statistics?        14:47
18         A.   This was a survey of the schools because,   14:47
19    when they do their eligibility, it doesn't            14:47
20    distinguish between boys and girls.                   14:47
21              So in order to find out who is playing      14:47
22    what sports, how many -- how many girls are           14:47
23    participating in -- in the sports that allow boys     14:47
24    and girls, the co-ed or mixed, we -- we have to       14:47
25    survey them to find out.                              14:47
```

Page 110

```
 1          Q.   When was this survey done?              14:47
 2          A.   In the last two weeks, I would imagine.  I  14:47
 3     forget.  I mean, it was in the last three -- two to  14:47
 4     three weeks.                                      14:47
 5          Q.   Why did you survey the schools?         14:47
 6          A.   Just to find out how many girls were    14:47
 7     participating in our -- since we don't have accurate  14:47
 8     data of how many girls are playing different sports,  14:48
 9     this was our opportunity to go ahead and -- and poll  14:48
10     our membership.                                   14:48
11          Not every school replied.  And we don't      14:48
12     have a way to verify it.  It was just for us to have  14:48
13     an idea.  We looked --                            14:48
14          Q.   Are there any -- oh.  Go ahead, please.  14:48
15          A.   We would look at this data, for instance,  14:48
16     golf and wrestling, to determine how close we are to  14:48
17     having its own sport.                             14:48
18          Q.   Is this data the current data?  Or is this  14:48
19     data, like, a participation across all years --    14:48
20          A.   And again --                            14:48
21          Q.   -- of all time?                         14:48
22          A.   I believe -- you know, it wasn't a       14:48
23     certified data.  Schools were primarily listing    14:48
24     second -- second -- or last year's spring sports and  14:48
25     this year's winter and fall.                      14:49
```

Page 111

| | | |
|---|---|---|
| 1 | So, obviously, they don't know how many | 14:49 |
| 2 | baseball, softball, track, and tennis participants | 14:49 |
| 3 | we have coming up because we haven't had our teams | 14:49 |
| 4 | yet. | 14:49 |
| 5 | MS. KANG:  Okay.  I think now is a good | 14:49 |
| 6 | time for everybody to take a break, if that is all | 14:49 |
| 7 | right with you, Mr. Dolan. | 14:49 |
| 8 | THE WITNESS:  Sure. | 14:49 |
| 9 | Okay.  Roberta, is that -- does that work | 14:49 |
| 10 | for you? | 14:49 |
| 11 | MS. GREEN:  Sure.  Thank you. | 14:49 |
| 12 | MS. KANG:  Of course. | 14:49 |
| 13 | THE VIDEOGRAPHER:  This marks the end of | 14:49 |
| 14 | Media Number 2. | 14:49 |
| 15 | Going off the record.  The time is 2:49. | 14:49 |
| 16 | (Brief recess.) | 14:59 |
| 17 | THE VIDEOGRAPHER:  This marks the | 15:00 |
| 18 | beginning of Media Number 3 in the deposition of | 15:00 |
| 19 | 30(b)(6) Witness Bernie Dolan. | 15:00 |
| 20 | Back on the record.  The time is 3:01. | 15:00 |
| 21 | BY MS. KANG: | 15:00 |
| 22 | Q.  Mr. Dolan, would it be harmful to a | 15:01 |
| 23 | student if they were forbidden from playing school | 15:01 |
| 24 | sports? | 15:01 |
| 25 | MS. GREEN:  Object to the form. | 15:01 |

Page 112

```
 1              THE WITNESS:  There are lots of kids who      15:01
 2   are, I think, not allowed to participate for            15:01
 3   whatever reason.  It could be eligibility things.       15:01
 4   So happens to a lot of kids right now.                  15:01
 5              We do think there are benefits to            15:01
 6   participation.                                          15:01
 7   BY MS. KANG:                                            15:01
 8       Q.   What sort of benefits does playing a           15:01
 9   school sport afford?                                    15:01
10       A.   Giving an opportunity for leadership,          15:01
11   personal health, camaraderie, cooperation.             15:01
12       Q.   I want to talk a little bit about House        15:01
13   Bill 3293, or H.B. 3293, and a little bit more about   15:01
14   the Commission's policy for H.B. 3293 was enacted.     15:01
15       A.   Okay.                                          15:02
16       Q.   Do you believe that H.B. 3293 forbids         15:02
17   B.P.J. from playing on a girls' team?                  15:02
18              MS. GREEN:  Object to the perform.          15:02
19              THE WITNESS:  I would believe it did        15:02
20   before the court case.  Yes.                           15:02
21   BY MS. KANG:                                           15:02
22       Q.   Have you ever talked to any organizations      15:02
23   outside of the State of West Virginia regarding        15:02
24   H.B. 3293?                                              15:02
25       A.   Not that I know of.                            15:02
```

Page 113

```
1         Q.   Have you ever talked to any organizations      15:02

2    outside of West Virginia concerning transgender          15:02

3    athletes generally?                                      15:02

4         A.   We may have talked -- you know, our            15:02

5    National Federation, it was probably on a -- one of      15:02

6    our either winter meetings or summer meetings there      15:02

7    was probably a topic.                                    15:02

8              And I would have to go back and look, but      15:02

9    the state may have put up a presentation on whatever     15:02

10   their -- whatever their rule was.                        15:02

11        Q.   Do you remember when this meeting              15:03

12   occurred?                                                15:03

13        A.   I do not.                                      15:03

14        Q.   Do you know which state proposed a rule?       15:03

15             MS. GREEN:  Object to the form.                15:03

16             THE WITNESS:  I believe the presentation       15:03

17   was from Connecticut.                                    15:03

18   BY MS. KANG:                                             15:03

19        Q.   Do you remember what the rule they             15:03

20   proposed was?                                            15:03

21             MS. GREEN:  Object to the form.                15:03

22             THE WITNESS:  I don't know.  They weren't      15:03

23   proposing a rule; they were explaining their rule.      15:03

24   BY MS. KANG:                                             15:03

25        Q.   Do you remember what their rule was?           15:03
```

Page 114

| | | |
|---|---|---|
| 1 | A.    I believe it was full participation by | 15:03 |
| 2 | gender identity. | 15:03 |
| 3 | Q.    Okay.  So I'm going to ask you a few | 15:03 |
| 4 | questions about the Commission's policy.  Before I | 15:03 |
| 5 | do so, just to be totally clear on the record, I'm | 15:03 |
| 6 | just going to give you some terms that I'll explain | 15:04 |
| 7 | my definitions for.  So whenever I ask you | 15:04 |
| 8 | questions, this is what I mean. | 15:04 |
| 9 | When I use the term "cisgender," I am | 15:04 |
| 10 | referring to someone whose gender identity matches | 15:04 |
| 11 | the sex they were assigned at birth.  So, for | 15:04 |
| 12 | example, if someone was assigned male at birth and | 15:04 |
| 13 | they identify as a male, that person would be a | 15:04 |
| 14 | cisgender boy. | 15:04 |
| 15 | When I use the term "transgender," I am | 15:04 |
| 16 | referring to someone whose gender identity does not | 15:04 |
| 17 | match the sex they were assigned at birth.  So, for | 15:04 |
| 18 | example, if someone was assigned male at birth but | 15:04 |
| 19 | then they identify as female, that person would be a | 15:04 |
| 20 | transgender girl or woman. | 15:04 |
| 21 | And so for purposes of the questions I | 15:04 |
| 22 | will be asking next, I'll be using these definitions | 15:04 |
| 23 | for -- for clarity. | 15:04 |
| 24 | Are you all right with that? | 15:04 |
| 25 | A.    Yes. | 15:04 |

Page 115

```
 1                    MS. GREEN:  Objection to form.        15:04

 2                    THE WITNESS:  Sorry.                   15:04

 3                    Yes.                                   15:04

 4       BY MS. KANG:                                        15:04

 5            Q.   And then you may already understand this, 15:04

 6       but when I use the phrase "H.B. 3293," I am         15:04

 7       referring to House Bill 3293.                       15:04

 8                    Are you familiar with this bill?       15:05

 9            A.   Yes.                                      15:05

10            Q.   To your knowledge, has a cisgender boy    15:05

11       ever played on a girl's sports team?               15:05

12                    MS. GREEN:  Objection to the form.     15:05

13                    THE WITNESS:  Not to my knowledge.     15:05

14       BY MS. KANG:                                        15:05

15            Q.   To your knowledge, has it ever been raised 15:05

16       as an issue?                                        15:05

17                    MS. GREEN:  Object to the form.        15:05

18                    THE WITNESS:  No.                      15:05

19       BY MS. KANG:                                        15:05

20            Q.   Currently, if a cisgender girl wants to   15:05

21       play football, is she permitted to do so on the    15:05

22       boys' team?                                         15:05

23            A.   Yes.  Because there's no girls' team at   15:05

24       the moment.                                         15:05

25            Q.   Before H.B. 3293 was enacted, did the     15:05
```

Page 116

```
 1     Commission allow transgender students to participate    15:06

 2     on sports teams consistent with their gender            15:06

 3     identity?                                               15:06

 4              MS. GREEN:  Object to the form.                15:06

 5              THE WITNESS:  Our policy ident- --             15:06

 6     whatever the school identified them in WVEIS was how    15:06

 7     we recognize them.                                      15:06

 8     BY MS. KANG:                                            15:06

 9        Q.  Can you tell me a little bit more about          15:06

10     this policy?                                            15:06

11              MS. GREEN:  Object to the form.                15:06

12              THE WITNESS:  Basically, it was to protect     15:06

13     athletes from harm or unfairness because of physical    15:06

14     abilities.  So whatever the school identified them      15:06

15     at if -- if everybody was okay with that, they got      15:06

16     to participate.                                         15:06

17              If it ever came to a point where somebody      15:07

18     was too big, too strong, or it wasn't safe for that     15:07

19     person to play, then they could appeal to the Board.    15:07

20     BY MS. KANG:                                            15:07

21        Q.  Can you tell me a little bit more about          15:07

22     what you mean by "it wasn't safe" for them to play?     15:07

23        A.  Could be a volleyball player who could           15:07

24     jump much higher than the girls, much stronger.  And    15:07

25     when he hits the ball, could hurt the -- hurt the       15:07
```

Page 117

```
 1    other participants.                              15:07
 2        Q.   How did the Commission come up with this    15:07
 3    policy?                                          15:07
 4        A.   It was actually created by my predecessor. 15:07
 5    And just came in in the beginnings of my time.  And  15:07
 6    they were just addressing an issue that hadn't come  15:07
 7    to West Virginia at this point, but they wanted to   15:08
 8    have something in there as a temporary stopgap   15:08
 9    measure.                                         15:08
10            And to this point, no one has written a   15:08
11    rule to be voted on -- our -- by our membership.  So 15:08
12    that has been the -- our guidance since 2016.    15:08
13        Q.   Who was your predecessor?               15:08
14        A.   Gary Ray.                               15:08
15        Q.   And why did he feel the need to enact this  15:08
16    policy?                                          15:08
17            MS. GREEN:  Object to the form.          15:08
18            THE WITNESS:  As we went to the national  15:08
19    meetings more and more, people were saying this was  15:08
20    an issue, and so they wanted -- you know, it had not  15:08
21    hit West Virginia yet but wanted to have something   15:08
22    in place to protect the kids.                    15:09
23    BY MS. KANG:                                     15:09
24        Q.   Did you ever receive any complaints about  15:09
25    this policy?                                     15:09
```

Page 118

```
1        A.   No.                                    15:09

2        Q.   Do you know who specifically drafted the    15:09

3   policy?                                          15:09

4        A.   I believe it was probably my predecessor   15:09

5   Gary Ray and -- and the legal counsel at the time.   15:09

6        Q.   Do you know if anyone else participated in   15:09

7   the drafting?                                    15:09

8        A.   I don't think so.                      15:09

9        Q.   Was this policy ever implemented?      15:09

10       A.   We have never used it, if that's what you   15:09

11  are asking.                                      15:09

12       Q.   What do you mean by "never used it"?   15:09

13       A.   Nobody ever brought up a case -- I'm not   15:09

14  even aware of any case of transgender participating.   15:09

15  Therefore, nobody ever brought it to the Board to   15:10

16  decide whether or not it was fair or safe.       15:10

17       Q.   When a school determines a student's   15:10

18  gender, is that always put into WVEIS?           15:10

19            MS. GREEN:  Object to the form.        15:10

20            THE WITNESS:  I am not sure what they put   15:10

21  in WVEIS, to be honest with you.  I'm not -- you   15:10

22  know, each school, I would assume, has rules and   15:10

23  regulations they have to do.                     15:10

24  BY MS. KANG:                                     15:10

25       Q.   Is it fair to say that the Commission   15:10
```

Page 119

```
 1    looked to WVEIS to determine a student's gender?        15:10

 2         A.   We have -- we don't have access to WVEIS.     15:10

 3    We would ask the school to provide what they have       15:10

 4    designated the student as in WVEIS.                     15:10

 5         Q.   Has this always been the case?                15:11

 6         A.   I would assume that it's always been the      15:11

 7    case.  Even before we had a policy, the school          15:11

 8    determined what they put in WVEIS.                      15:11

 9         Q.   Have you received any complaints about        15:11

10    B.P.J.'s participation?                                 15:11

11         A.   Not that I know of.                           15:11

12         Q.   And to be clear, you haven't received any     15:11

13    complaints about transgender students participating     15:11

14    in West Virginia?                                       15:11

15         A.   No.                                           15:11

16         Q.   Have any transgender students ever asked      15:11

17    the Commission if they could participate in sports      15:11

18    at a secondary school level?                            15:11

19              MS. GREEN:  Object to the form.               15:11

20              THE WITNESS:  I had one boy who wanted to     15:11

21    be a -- play volleyball, and we told him he couldn't    15:12

22    play volleyball because it was a girls' sport.  And     15:12

23    he said, "Then I'll be a boy -- I'll be a girl."        15:12

24              And -- but he wasn't -- he never did          15:12

25    anything else with it.  And we assumed he just          15:12
```

Page 120

| 1 | wanted to play volleyball because it never came back | 15:12 |
| 2 | up. | 15:12 |
| 3 | I did have contact with a school who said | 15:12 |
| 4 | they had one student who one day identified as a | 15:12 |
| 5 | girl, next day a boy, and back and forth.  But we | 15:12 |
| 6 | have not heard anything more from that student. | 15:12 |
| 7 | So... | 15:12 |
| 8 | BY MS. KANG: | 15:12 |
| 9 | Q.   When was that? | 15:12 |
| 10 | A.   That would have been in the last year. | 15:12 |
| 11 | Q.   Do you remember which school it was from? | 15:12 |
| 12 | A.   Yes. | 15:12 |
| 13 | Q.   Which school was it? | 15:12 |
| 14 | A.   South Charleston High School. | 15:12 |
| 15 | Q.   So I'm going to introduce a document | 15:13 |
| 16 | that's going to be marked as Exhibit 6. | 15:13 |
| 17 | I'll let you know when it's available in | 15:13 |
| 18 | your folder. | 15:13 |
| 19 | (Deposition Exhibit 6 was marked for | 15:13 |
| 20 | identification and is attached hereto.) | 15:13 |
| 21 | MS. KANG:  Exhibit 6 is now available in | 15:13 |
| 22 | the shared exhibit folder. | 15:13 |
| 23 | BY MS. KANG: | 15:13 |
| 24 | Q.   Mr. Dolan, let me know when you have had a | 15:13 |
| 25 | chance to look at it. | 15:13 |

Page 121

```
 1        A.   [Witness reviews document].              15:13

 2             Okay.                                    15:13

 3        Q.   Do you recognize this document?          15:14

 4        A.   Yeah.  This was our transgender Board of 15:14

 5   Directors policy.                                  15:14

 6        Q.   Is this the same policy that we were     15:14

 7   discussing earlier?                                15:14

 8        A.   Yes.                                      15:14

 9        Q.   So I want to draw your attention to Bullet 15:14

10   Point 1, which says [as read]:                     15:14

11             "The transgender student's school        15:14

12             shall make the initial determination as  15:14

13             to whether a student may participate in  15:14

14             interscholastic athletics in a gender    15:14

15             that does not match the gender assigned  15:14

16             to him or her at birth."                 15:14

17             Did I read that correctly?               15:14

18        A.   Yes.                                      15:14

19        Q.   Why did the Commission give the initial  15:14

20   determination to the transgender student's school? 15:14

21             MS. GREEN:  Object to the form.          15:14

22             THE WITNESS:  First of all, we -- we don't 15:14

23   know this student.  There would be no way for us to 15:14

24   know all the factors.                              15:14

25             So the school is the entity that works   15:14
```

Page 122

| | | |
|---|---|---|
| 1 | closely with that student and the parents and the | 15:15 |
| 2 | family on a daily basis. | 15:15 |
| 3 | BY MS. KANG: | 15:15 |
| 4 | Q.   Why did the Commission think transgender | 15:15 |
| 5 | students should be able to participate on teams | 15:15 |
| 6 | consistent with their identity? | 15:15 |
| 7 | MS. GREEN:  Object to the form. | 15:15 |
| 8 | THE WITNESS:  I assume that the school | 15:15 |
| 9 | would put them in the proper place, wherever the | 15:15 |
| 10 | school decided based on all the factors. | 15:15 |
| 11 | BY MS. KANG: | 15:15 |
| 12 | Q.   Did you ever consider implementing a | 15:15 |
| 13 | hormone requirement in this policy? | 15:15 |
| 14 | MS. GREEN:  I'm sorry.  I didn't hear what | 15:15 |
| 15 | you said, Ms. Kang. | 15:15 |
| 16 | MS. KANG:  Sure. | 15:15 |
| 17 | BY MS. KANG: | 15:15 |
| 18 | Q.   Did you ever consider implementing a | 15:15 |
| 19 | hormone requirement in this policy? | 15:15 |
| 20 | MS. GREEN:  Thank you. | 15:15 |
| 21 | Object to the form. | 15:15 |
| 22 | THE WITNESS:  Our -- it was my | 15:15 |
| 23 | predecessor's.  So I'm not sure of their discussion | 15:15 |
| 24 | as to whether or not they were going to put that in | 15:16 |
| 25 | or not. | 15:16 |

Page 123

```
 1    BY MS. KANG:                                    15:16
 2         Q.   Did you or your staff ever consider   15:16
 3    putting in this policy -- putting in a hormone  15:16
 4    requirement?                                    15:16
 5              MS. GREEN:  Object to the form.       15:16
 6              THE WITNESS:  No.  Because we would not 15:16
 7    change the policy.  I think it would -- if it was 15:16
 8    going to change, it was going to be changed by a 15:16
 9    rule by our membership and was never brought forward 15:16
10    as a rule proposal.                             15:16
11    BY MS. KANG:                                    15:16
12         Q.   Am I right to say that this policy was not 15:16
13    a rule?                                         15:16
14         A.   That's correct.                       15:16
15         Q.   What's the difference between this policy 15:16
16    versus a rule?                                  15:16
17         A.   This never went before the membership to 15:16
18    have a vote; so I don't think it has the power of a 15:16
19    rule.                                           15:16
20         Q.   What sort of power would that be?     15:16
21         A.   Well, this was giving guidance to a Board 15:16
22    of Directors.                                   15:17
23              But a rule is voted on and -- and approved 15:17
24    by the State Board of Education; so it is the rule 15:17
25    of law for high school athletics from the WVSSAC. 15:17
```

Page 124

```
 1         Q.   What do you mean by it provided guidance      15:17
 2    to the Board of Directors?                              15:17
 3         A.   Would allow them to grant waivers if          15:17
 4    somebody -- if it was unsafe or unfair to other         15:17
 5    students or to this student.                            15:17
 6         Q.   By unfair to the student, do you mean         15:17
 7    unfair to the trans student?                            15:17
 8         A.   Either one.  Either one.  For safety or       15:17
 9    given them advantages that made it unfair.              15:17
10         Q.   Am I right that this policy does not          15:18
11    mention anything about WVEIS?                           15:18
12              MS. GREEN:  Object to the form.               15:18
13              THE WITNESS:  I don't believe it -- I         15:18
14    don't believe it mentions WVEIS.  It does say that      15:18
15    the school will make the initial determination.         15:18
16    BY MS. KANG:                                            15:18
17         Q.   Under this policy, what happens if a          15:18
18    student's gender marker in WVEIS is, let's say --       15:18
19    let's say, male, but the school treats the student      15:18
20    as female?  What would the SAC do in that situation?    15:18
21              MS. GREEN:  I'll object to the form.          15:18
22    Speculative.                                            15:18
23              THE WITNESS:  I think we would have to        15:18
24    look at all the factors that were involved in -- you    15:18
25    know, I'm not even sure what the factors would be,      15:19
```

                                                Page 125

| | | |
|---|---|---|
| 1 | but I think we would have to, you know, have | 15:19 |
| 2 | everything presented to us to make a determination. | 15:19 |
| 3 | BY MS. KANG: | 15:19 |
| 4 | Q.   So is it fair to say, in that case you | 15:19 |
| 5 | would not strictly follow WVEIS? | 15:19 |
| 6 | MS. GREEN:  Object to the form. | 15:19 |
| 7 | THE WITNESS:  We would -- it would be in | 15:19 |
| 8 | the cases where it was unsafe and unfair that we | 15:19 |
| 9 | would not be following WVEIS.  If we felt like it | 15:19 |
| 10 | was unsafe or unfair to the participants, other | 15:19 |
| 11 | participants or the transgender student, then the | 15:19 |
| 12 | Board can override it. | 15:19 |
| 13 | BY MS. KANG: | 15:19 |
| 14 | Q.   Okay.  I'm going to ask you to turn your | 15:19 |
| 15 | attention to a document that I'm going to be marking | 15:19 |
| 16 | as Exhibit 7. | 15:19 |
| 17 | MS. KANG:  And I'll let you know when it's | 15:19 |
| 18 | available in everyone's folder. | 15:19 |
| 19 | (Deposition Exhibit 7 was marked for | 15:20 |
| 20 | identification and is attached hereto.) | 15:20 |
| 21 | MS. KANG:  Exhibit 7 should now be | 15:20 |
| 22 | available in everyone's Marked Exhibit folder. | 15:20 |
| 23 | BY MS. KANG: | 15:20 |
| 24 | Q.   And let me know, Mr. Dolan, whenever you | 15:20 |
| 25 | have a chance to -- to look at it. | 15:20 |

Page 126

| | | |
|---|---|---|
| 1 | A.    Okay. | 15:20 |
| 2 | Q.    So this is an email that was produced by | 15:20 |
| 3 | your counsel in response to one of plaintiff's | 15:20 |
| 4 | document request. | 15:20 |
| 5 | Do you remember this particular email? | 15:20 |
| 6 | A.    After I went back and searched it, yeah. | 15:20 |
| 7 | And I don't remember -- I didn't remember it until I | 15:21 |
| 8 | was looking for it. | 15:21 |
| 9 | Q.    Is bernie.dolan@wvssac.org your email | 15:21 |
| 10 | address? | 15:21 |
| 11 | A.    It is. | 15:21 |
| 12 | Q.    Who is Daniel Swartos? | 15:21 |
| 13 | A.    He is the executive director for the | 15:21 |
| 14 | South Dakota High School Athletic Association -- or | 15:21 |
| 15 | Activities Association. | 15:21 |
| 16 | Q.    Is that an association in South Dakota? | 15:21 |
| 17 | A.    Yes. | 15:21 |
| 18 | Q.    So I'd like to draw your attention to | 15:21 |
| 19 | Page 2 of this pdf that's been Bates Stamped -224. | 15:21 |
| 20 | Let me know whenever you get there. | 15:21 |
| 21 | A.    Okay. | 15:21 |
| 22 | Q.    In this email you say [as read]: | 15:21 |
| 23 | "It has not been challenged yet." | 15:21 |
| 24 | To clarify, are you referring to the | 15:21 |
| 25 | policy that we looked at in Exhibit 6? | 15:21 |

Page 127

| | | |
|---|---|---|
| 1 | A.    Right.  It had not gone through any court | 15:22 |
| 2 | action.  Yes. | 15:22 |
| 3 | Q.    Were you concerned that the policy was | 15:22 |
| 4 | going to be challenged at some point? | 15:22 |
| 5 | A.    All of our -- all of our policies get | 15:22 |
| 6 | challenged at some point.  So... | 15:22 |
| 7 | Q.    Fair enough. | 15:22 |
| 8 | A.    Yes. | 15:22 |
| 9 | Q.    So now I'm going to introduce a document | 15:22 |
| 10 | as Exhibit 8.  One moment. | 15:22 |
| 11 | MS. KANG:  Exhibit 8 is now available in | 15:22 |
| 12 | everyone's Marked Exhibit folder. | 15:22 |
| 13 | (Deposition Exhibit 8 was marked for | 15:22 |
| 14 | identification and is attached hereto.) | 15:22 |
| 15 | BY MS. KANG: | 15:22 |
| 16 | Q.    Mr. Dolan, let me know whenever you have | 15:22 |
| 17 | it open. | 15:22 |
| 18 | A.    Okay. | 15:23 |
| 19 | Q.    So I know this was a while ago, but do you | 15:23 |
| 20 | remember the meeting that is referenced in | 15:23 |
| 21 | Exhibit 8? | 15:23 |
| 22 | A.    Not specifically.  But yes. | 15:23 |
| 23 | Q.    Do you remember at all who was present at | 15:23 |
| 24 | this meeting? | 15:23 |
| 25 | A.    It's probably in the minutes. | 15:23 |

Page 128

```
 1                 THE WITNESS:  Can you scroll down to the      15:23
 2      next page and see...                                    15:23
 3                 MS. GREEN:  Okay.                             15:23
 4                 THE WITNESS:  Keep going.  See if             15:23
 5      there's...                                              15:23
 6                 [Witness reviews document].                  15:24
 7                 I do not remember.  I would assume it was    15:24
 8      all of my Board of Directors, though.                   15:24
 9      BY MS. KANG:                                            15:24
10          Q.   How often does the Board of Directors          15:24
11      meet?                                                   15:24
12          A.   Mostly once a month.  There a couple of        15:24
13      months that we don't meet.  So about ten times a        15:24
14      year.                                                   15:24
15          Q.   Is this Board of Directors report given to     15:24
16      anyone outside of the Board of Directors?               15:24
17                 MS. GREEN:  Object to the form.              15:24
18                 THE WITNESS:  I'm not sure because we        15:24
19      don't give it out anymore.  So I don't know if          15:24
20      that's -- if this came from the interscholastic or      15:24
21      if it was Board of Directors report that somebody       15:24
22      would have submitted.                                   15:24
23                 I don't do it currently; so I don't know     15:25
24      if it was -- who it went to in the past.                15:25
25      ///
```

```
 1    BY MS. KANG:                                    15:25
 2        Q.   Did it used to go to someone before?   15:25
 3        A.   I don't know.  That's what I...         15:25
 4        Q.   So I want to draw your attention to Page 2  15:25
 5    of the pdf.  It's been Bates Stamped -283.  And it's  15:25
 6    Bullet Point 4 "Legal Update."                  15:25
 7             And in Bullet Point 4, you'll see another  15:25
 8    Bullet Point iv that says "Transgender."        15:25
 9             Read that paragraph and let me know when  15:25
10    you are finished.                               15:25
11        A.   [Witness reviews document].             15:25
12             Okay.                                   15:25
13        Q.   Regarding this specific topic, what was  15:25
14    discussed?                                       15:26
15             MS. GREEN:  Object to the form.          15:26
16             THE WITNESS:  Based on the information   15:26
17    there -- obviously, I can't remember in 2016 -- but  15:26
18    we were discussing the policy and how it was -- how  15:26
19    schools would -- how it would work with the schools.  15:26
20    BY MS. KANG:                                     15:26
21        Q.   And what do you mean "how it would work  15:26
22    with the schools"?                              15:26
23        A.   Well, it says, Number 1, the school would  15:26
24    make the first determination; did they meet all  15:26
25    other eligibility requirements; was it fair     15:26
```

Page 130

```
 1    competition if the school allows; you know, was        15:26

 2    there an appeal process; and then make sure that we     15:26

 3    look at each case on an individual basis and kind       15:26

 4    of -- where the Board stood.                            15:26

 5         Q.   What do you mean by "where the Board          15:26

 6    stood"?                                                 15:26

 7         A.   I don't know what the discussion was at       15:27

 8    that point.                                             15:27

 9         Q.   I notice that in this line it says            15:27

10    [as read]:                                              15:27

11              "Editing our transgender policy and          15:27

12              guidelines...."                               15:27

13              As far as you know, was there any editing     15:27

14    that was done to the policy?                            15:27

15         A.   I don't believe we edited anything because    15:27

16    it's still the exact same policy that -- that they      15:27

17    approved months earlier.                                15:27

18         Q.   Do you remember if the Board of               15:27

19    Directors -- the Board of Directors unanimously         15:27

20    approved this policy?                                   15:27

21         A.   I don't know.                                 15:27

22         Q.   Do you remember if anything was ever          15:27

23    conveyed outside of the Board of Directors regarding    15:27

24    this policy?                                            15:27

25              MS. GREEN:  Object to the form.               15:27
```

Page 131

```
 1              THE WITNESS:  When we meet with our        15:27

 2    principals and -- when we meet with our principals   15:27

 3    and also at an administrative workshop for a number  15:28

 4    of years, we indicated that whatever they determined 15:28

 5    we would accept as long as it was not unsafe or      15:28

 6    unfair.                                              15:28

 7    BY MS. KANG:                                         15:28

 8       Q.   So is it fair to say that your member        15:28

 9    schools were aware of this policy?                   15:28

10       A.   Well, I would think at different times.      15:28

11    Again, the turnover at schools is high.  So if --    15:28

12    did somebody -- every person -- did we verify that   15:28

13    they heard it?  I don't know.                        15:28

14              But the turnover is relatively high at all 15:28

15    of our schools, especially at the principal level.   15:28

16    So...                                                15:28

17       Q.   Would it be fair to say that at one point    15:28

18    you did inform the member schools about this policy? 15:28

19              MS. GREEN:  Object to the form.            15:28

20              THE WITNESS:  As long as they attended our 15:29

21    meetings, yes.  They might not --                    15:29

22    BY MS. KANG:                                         15:29

23       Q.   And by --                                    15:29

24       A.   -- have attended.                            15:29

25       Q.   And by "meetings," do you mean the Board     15:29
```

Page 132

```
 1   of Directors meetings?                              15:29
 2        A.   No.  It would be our regional principals  15:29
 3   meetings that we did at the beginning of each year. 15:29
 4        Q.   Does the Commission report H.B. 3293?     15:29
 5             MS. GREEN:  Object to form.               15:29
 6             THE WITNESS:  I don't think we ever --    15:29
 7   there was ever a position on it.  I think our       15:29
 8   position has been we support Title IX and try to    15:29
 9   give more opportunities for girls.  But bottom line 15:29
10   is we are not allowed to discriminate by our rule --15:29
11   by our policies.                                    15:29
12   BY MS. KANG:                                        15:29
13        Q.   By "not allowed to discriminate," do you 15:29
14   mean also not allowed to discriminate against       15:29
15   transgender students?                               15:30
16        A.   I would think we are not allowed to -- we 15:30
17   are not allowed to discriminate against transgender.15:30
18   That's correct.                                     15:30
19        Q.   Could you tell me a little bit more about 15:30
20   what you mean by advance Title IX?                  15:30
21        A.   Well, we continued to offer more          15:30
22   opportunities and protect the opportunities that    15:30
23   girls have.                                         15:30
24             We have increased the opportunities for   15:30
25   girl golfers to participate just against girls.  So 15:30
```

Page 133

```
 1      our number of girls' golfers has risen tremendously.    15:30
 2              We also have supported a girls' only            15:30
 3      wrestling invitational that has allowed more girls      15:30
 4      to participate in wrestling.                            15:30
 5              We have encouraged schools to make sure         15:31
 6      that Title IX is followed when they are putting in      15:31
 7      fields, putting in locker rooms, money for programs,    15:31
 8      and things like that.                                   15:31
 9          Q.   Do you believe that Title IX also protects     15:31
10      transgender girls?                                      15:31
11              MS. GREEN:  Object to the form.                 15:31
12              THE WITNESS:  I -- I am not sure.  I think       15:31
13      that it -- it has been ruled that way, yes.             15:31
14      BY MS. KANG:                                            15:31
15          Q.   Have there ever been any safety concerns       15:31
16      with girls playing on the boys' team?                   15:31
17              MS. GREEN:  Object to the form.                 15:31
18              THE WITNESS:  The girls are choosing to         15:31
19      participate.  So I think all kids there's -- there's    15:31
20      an oppor- -- there's a possibility of injury.  And      15:31
21      so, you know, it -- it's brought out in their           15:31
22      preparticipation physical that, you know, there is a    15:31
23      possibility of injury.                                  15:32
24      BY MS. KANG:                                            15:32
25          Q.   To your knowledge, have there been any         15:32
```

Page 134

```
 1     injuries from a girl playing on a boys' team?        15:32
 2                MS. GREEN:  Object to the form.           15:32
 3                THE WITNESS:  Oh, I'm sure.  I mean, I    15:32
 4     don't know specifically.  But there's -- people get 15:32
 5     hurt every day in every sport.  So I'm sure somebody 15:32
 6     has gotten hurt in football or wrestling.           15:32
 7     BY MS. KANG:                                        15:32
 8         Q.   In the context of school sports, what is   15:32
 9     competitive skill?                                  15:32
10                MS. GREEN:  Object to the form.           15:32
11                THE WITNESS:  Skill needed to be          15:32
12     successful in that sport.                           15:32
13     BY MS. KANG:                                        15:32
14         Q.   Does cross-country require competitive     15:32
15     skill?                                              15:32
16                MS. GREEN:  Object to the form.           15:32
17                THE WITNESS:  I would think so.           15:32
18     BY MS. KANG:                                        15:32
19         Q.   Do you know whether any girls who tried    15:32
20     out for cross-country at Bridgeport Middle School   15:32
21     for the fall of 2021 were unable to join the team?  15:32
22                MS. GREEN:  Object to the form.           15:33
23                THE WITNESS:  We were not involved in the 15:33
24     selection.  So I don't know.                        15:33
25     ///
```

Page 135

```
 1   BY MS. KANG:                                    15:33
 2       Q.   Believe it or not, I am on my last set of   15:33
 3   questions.  So thank you for bearing with me so far.  15:33
 4   Hopefully, we can get this done early.          15:33
 5           So now I want to talk a little bit more   15:33
 6   about House Bill 3293.                          15:33
 7           Were you involved at all in the passage of  15:33
 8   H.B. 3293?                                      15:33
 9           MS. GREEN:  Object to the form.          15:33
10           THE WITNESS:  I wouldn't say I was       15:33
11   involved in the passage.                        15:33
12           Oftentimes I get asked to come down and   15:33
13   speak.  And I was asked to speak to the Democratic  15:33
14   caucus.  And I pretty much said what I said earlier.  15:33
15   We support girls' sports and continued to offer more  15:33
16   opportunities for them.  But we're not allowed to   15:33
17   discriminate.                                   15:34
18   BY MS. KANG:                                    15:34
19       Q.   Besides the Democratic caucus, did you   15:34
20   speak to anyone else?                           15:34
21       A.   I had communication with Melissa White,  15:34
22   who was -- is the counsel for House Ed.         15:34
23       Q.   And did you think --                    15:34
24       A.   And I think that --                     15:34
25       Q.   Go ahead.                               15:34
```

Page 136

```
 1          A.    I don't think -- I don't think we spoke      15:34

 2     about it.  She had sent me an email about it.           15:34

 3          Q.    Did you speak to any legislative committee   15:34

 4     about H.B. 3293?                                        15:34

 5                MS. GREEN:  Object to the form.              15:34

 6                THE WITNESS:  I spoke to the caucus.  I      15:34

 7     was down there as a witness in front of finance, I      15:34

 8     believe, Senate finance -- or House finance.  But I     15:34

 9     was never called in to -- to give an opinion or any     15:34

10     information.                                            15:34

11     BY MS. KANG:                                            15:34

12          Q.    So you were called in as a witness but you   15:34

13     didn't testify?                                         15:34

14          A.    They told me to be available.                15:34

15          Q.    Were you told anything about H.B. 3293       15:35

16     before it was passed?                                   15:35

17                MS. GREEN:  Object to the form.              15:35

18                THE WITNESS:  Actually, I was sent an        15:35

19     email from Melissa White.  But when I looked at it,     15:35

20     the beginning of it was a home school bill.             15:35

21                So I assumed she sent the wrong bill.        15:35

22     And -- but it did say "transgender" at the top.  So     15:35

23     I sent it to the legal counsel who was helping us       15:35

24     with legislative activity.  Or --                       15:35

25                MS. GREEN:  And I'll object to the form.     15:35
```

Page 137

| | | |
|---|---|---|
| 1 | THE WITNESS:  Okay. | 15:35 |
| 2 | MS. GREEN:  Caution him regarding | 15:35 |
| 3 | conversations with counsel. | 15:35 |
| 4 | THE WITNESS:  Okay. | 15:35 |
| 5 | BY MS. KANG: | 15:35 |
| 6 | Q.   By "counsel," was it counsel at the | 15:35 |
| 7 | Commission? | 15:35 |
| 8 | A.   It is counsel -- | 15:35 |
| 9 | MS. GREEN:  I'll just -- | 15:35 |
| 10 | THE WITNESS:  Okay. | 15:35 |
| 11 | MS. GREEN:  -- object to the form. | 15:36 |
| 12 | THE WITNESS:  Okay. | 15:36 |
| 13 | It was counsel we've had at -- that we | 15:36 |
| 14 | used during legislative time. | 15:36 |
| 15 | BY MS. KANG: | 15:36 |
| 16 | Q.   Who is this person? | 15:36 |
| 17 | MS. GREEN:  I'll just object to the form. | 15:36 |
| 18 | I think they're in the privilege log.  We identified | 15:36 |
| 19 | them. | 15:36 |
| 20 | Do you know the name of the firm? | 15:36 |
| 21 | THE WITNESS:  Dinsmore & Shohl is the law | 15:36 |
| 22 | firm. | 15:36 |
| 23 | BY MS. KANG: | 15:36 |
| 24 | Q.   Did any legislators tell you about the | 15:36 |
| 25 | purpose of H.B. 3293? | 15:36 |

Page 138

| | | |
|---|---|---|
| 1 | MS. GREEN:  Object to the form. | 15:36 |
| 2 | THE WITNESS:  I don't remember having that | 15:36 |
| 3 | conversation with any of them.  I had one email from | 15:36 |
| 4 | Senator Unger, who sent me the NCAA guidelines at | 15:36 |
| 5 | the time.  It was unsolicited and didn't have | 15:36 |
| 6 | anything, really, with it, just a link to the NCAA | 15:36 |
| 7 | guidelines. | 15:37 |
| 8 | BY MS. KANG: | 15:37 |
| 9 | Q.   Did you respond to that email? | 15:37 |
| 10 | A.   I did not. | 15:37 |
| 11 | Q.   Has the Commission taken any steps to | 15:37 |
| 12 | contemplate policies or rules concerning the | 15:37 |
| 13 | implementation of H.B. 3293? | 15:37 |
| 14 | MS. GREEN:  Object to the form. | 15:37 |
| 15 | THE WITNESS:  The legislation 3293 charged | 15:37 |
| 16 | the Department of Ed with creating the rule.  So | 15:37 |
| 17 | we're going to wait for those guidelines to come out | 15:37 |
| 18 | and then probably just bring them into our rule book | 15:37 |
| 19 | like we did the 2.0. | 15:37 |
| 20 | BY MS. KANG: | 15:37 |
| 21 | Q.   But to be clear, if the State Board | 15:37 |
| 22 | promulgates a rule, will the Commission have to | 15:37 |
| 23 | follow that rule? | 15:38 |
| 24 | A.   Our schools would have to follow it, | 15:38 |
| 25 | which, if all of our schools have to follow it, I | 15:38 |

Page 139

```
 1    would say we're following it, yes.              15:38

 2         Q.   Okay.  I'm going to introduce a document   15:38

 3    as Exhibit 9, and I'll let you know when it's    15:38

 4    available.                                       15:38

 5              (Deposition Exhibit 9 was marked for   15:38

 6              identification and is attached hereto.)  15:39

 7              MS. KANG:  Exhibit 9 is now available in  15:39

 8    the Marked Exhibits folder.                      15:39

 9    BY MS. KANG:                                     15:39

10         Q.   And let me know when you have a chance to   15:39

11    pull it up, Mr. Dolan.                           15:39

12         A.   Okay.                                  15:39

13         Q.   So these are some text messages that your   15:39

14    counsel produced in response to Plaintiff's      15:39

15    discovery requests.  It's been Bates stamped     15:39

16    WVSSAC000001.  And I'm going to represent to you   15:39

17    that these are texts between you and             15:39

18    Stephen Baldwin.                                 15:39

19              Do you remember this conversation?     15:39

20         A.   Yes.                                   15:39

21              MS. GREEN:  Object to the form.        15:39

22              THE WITNESS:  Yes, I do.               15:39

23    BY MS. KANG:                                     15:39

24         Q.   Who is Stephen Baldwin?               15:39

25         A.   Senator from Greenbrier County.        15:39
```

Page 140

```
 1        Q.   Is this the same Democratic office that    15:40

 2   you were just talking about?                         15:40

 3        A.   Yes, ma'am.                                15:40

 4        Q.   Why did you decide to participate in this  15:40

 5   meeting?                                             15:40

 6             MS. GREEN:  Object to the form.            15:40

 7             THE WITNESS:  Oftentimes I -- I don't feel 15:40

 8   like I have a choice.  When the legislature calls, I 15:40

 9   need to go down and be heard.                        15:40

10   BY MS. KANG:                                         15:40

11        Q.   Did you bring any documents with you to    15:40

12   this meeting?                                        15:40

13        A.   Just the -- just our board policy.         15:40

14        Q.   Do you remember if you were shown any      15:40

15   documents at the meeting?                            15:40

16        A.   I don't remember.                          15:40

17        Q.   Did the Democratic Caucus give you any     15:40

18   documents?                                           15:40

19        A.   I don't remember if they gave me the bill  15:40

20   at that time or not.  So I'm not sure.               15:40

21        Q.   So if you scroll down to the document      15:41

22   that's Bates Stamped -006.  And I believe it's       15:41

23   Page 6 of 7 of the pdf of Exhibit 9.                 15:41

24        A.   Okay.                                      15:41

25        Q.   Do you know who Rucker is?                 15:41
```

Page 141

```
 1        A.   Senator Rucker is the Senate education    15:41

 2   chair.                                              15:41

 3        Q.   Do you agree with her statement that it is  15:41

 4   not a real policy?                                  15:41

 5        A.   I believe it is a policy that -- but it   15:41

 6   had not -- it didn't go through a rule-writing      15:42

 7   process and was never challenged in court and       15:42

 8   upheld.                                             15:42

 9             So we think it was an internal policy,    15:42

10   yes, that we give our --                            15:42

11        Q.   What do you mean --                       15:42

12        A.   We give our board the opportunity to hear  15:42

13   cases of appeals.                                   15:42

14        Q.   Can you clarify what you mean by "internal  15:42

15   policy"?                                            15:42

16        A.   Well, it wasn't in our rule book.         15:42

17        Q.   So I'm going to introduce an additional   15:42

18   document as Exhibit 10.                             15:42

19             (Deposition Exhibit 10 was marked for     15:43

20             identification and is attached hereto.)   15:43

21             MS. KANG:   Exhibit 10 is now available in  15:43

22   the Marked Exhibits folder.                         15:43

23   BY MS. KANG:                                        15:43

24        Q.   Let me know when you have it up,          15:43

25   Mr. Dolan.                                          15:43
```

Page 142

| | | | |
|---|---|---|---|
| 1 | A. | [Witness reviews document]. | 15:43 |
| 2 | | Okay. | 15:43 |
| 3 | Q. | Do you remember this email? | 15:43 |
| 4 | A. | After I looked it back up, yes. | 15:44 |
| 5 | Q. | And is that still your email address at | 15:44 |
| 6 | the top? | | 15:44 |
| 7 | A. | It is. | 15:44 |
| 8 | Q. | Who is John Raby? | 15:44 |
| 9 | A. | John Raby is an Associated Press reporter. | 15:44 |
| 10 | Q. | Had you spoken to him before? | 15:44 |
| 11 | A. | Probably in a different capacity.  When I | 15:44 |
| 12 | was the director of Super Six, he was a reporter | | 15:44 |
| 13 | that would come to games.  So... | | 15:44 |
| 14 | Q. | So on the first page of Exhibit 10, | 15:44 |
| 15 | Mr. Raby asks the question [as read]: | | 15:44 |
| 16 | | "What does the WVSSAC think of the | 15:44 |
| 17 | | bill?" | 15:44 |
| 18 | | And then if you go to the next page of | 15:44 |
| 19 | Exhibit 10, in response you write [as read]: | | 15:44 |
| 20 | | "The WVSSAC has supported Title IX | 15:44 |
| 21 | | for the last 50 years...Title IX has | 15:44 |
| 22 | | non discrimination language that we | 15:44 |
| 23 | | support." | 15:45 |
| 24 | | What do you mean by "Title IX has | 15:45 |
| 25 | | non-discrimination language that we support"? | 15:45 |

Page 143

```
1          A.    I believe in the Title IX document it says    15:45
2    you can't discriminate.  And so we support Title IX;    15:45
3    so we have to support the whole thing.    15:45
4          Q.    You also say in your response that    15:45
5    [as read]:    15:45
6               "This has increased the quantity and    15:45
7               quality of opportunities for girls in    15:45
8               our schools."    15:45
9               What opportunities do you believe has been    15:45
10   increased?    15:45
11         A.    Well, when I was in school, which would    15:45
12   have been the early -- early '70s, may or may not    15:45
13   have had girls' basketball at all and wouldn't have    15:45
14   had volleyball or soccer, for sure, swim.  So over    15:45
15   the last 50 years, we have increased the sports that    15:45
16   girls can participate in a hundred times over.    15:45
17         Q.    Do you believe that B.P.J. should have the    15:45
18   right to these opportunities?    15:46
19              MS. GREEN:  Object to the form.    15:46
20              THE WITNESS:  I believe we'll follow the    15:46
21   rule -- the law.    15:46
22   BY MS. KANG:    15:46
23         Q.    What do you mean by "follow the law"?    15:46
24         A.    Whatever -- whatever the Department of Ed    15:46
25   writes as the rule, then we have to implement that    15:46
```

Page 144

| | | |
|---|---|---|
| 1 | with all of our schools. | 15:46 |
| 2 | Q.   Do you believe that B.P.J.'s participation | 15:46 |
| 3 | in cross-country harms any of these opportunities? | 15:46 |
| 4 | MS. GREEN:  Object to the form. | 15:46 |
| 5 | THE WITNESS:  Well, "harm" is a -- a | 15:46 |
| 6 | unique word because harm might be that it might not | 15:46 |
| 7 | physically harm somebody, but they -- you know, harm | 15:46 |
| 8 | might be that you take somebody's position on the | 15:46 |
| 9 | team. | 15:46 |
| 10 | In cross-country, only the top seven kids | 15:46 |
| 11 | get to compete on the varsity team, whether it's | 15:46 |
| 12 | middle school or high school.  If you are | 15:46 |
| 13 | number seven and you get bumped out, there might be | 15:46 |
| 14 | harm. | 15:47 |
| 15 | But, in general, physical harm, I don't | 15:47 |
| 16 | believe so. | 15:47 |
| 17 | BY MS. KANG: | 15:47 |
| 18 | Q.   Do you know if B.P.J. has, as you say, | 15:47 |
| 19 | bumped out another girl? | 15:47 |
| 20 | A.   I do not. | 15:47 |
| 21 | MS. GREEN:  Object to the form. | 15:47 |
| 22 | THE WITNESS:  Okay. | 15:47 |
| 23 | MS. KANG:  So I am going to introduce | 15:47 |
| 24 | another document as Exhibit 11. | 15:47 |
| 25 | /// | |

Page 145

```
 1                    (Deposition Exhibit 11 was marked for        15:47

 2                    identification and is attached hereto.)      15:48

 3            MS. GREEN:  Okay.                                    15:48

 4            MS. KANG:  Exhibit 11 is now available in            15:48

 5     everyone's Marked Exhibit folder.                           15:48

 6   BY MS. KANG:                                                  15:48

 7       Q.   Let me know when you have it up.                     15:48

 8            And, Mr. Dolan, we can take a five-minute            15:48

 9     break, I think, after -- after this email, before we       15:48

10     wrap up.                                                    15:48

11       A.   Okay.                                                15:48

12            Scroll down.                                         15:48

13            Okay.                                                15:48

14       Q.   Do you recognize this email?                        15:48

15       A.   I do.                                                15:48

16       Q.   Do you remember this email?                         15:48

17       A.   I don't know if I remember it.  But I               15:48

18     recognize it, yes.                                          15:48

19       Q.   Who is Josh Weekley?                                 15:48

20       A.   He runs RunWV which keeps track of all              15:48

21     boys' and girls' track and cross-country times and         15:49

22     posts them on runwv.com.                                    15:49

23       Q.   Why did you contact him?                            15:49

24       A.   I was looking for data in comparing girls'          15:49

25     times to boys' times.                                       15:49
```

Page 146

```
 1        Q.   Why did you want that data?              15:49

 2        A.   Just curious to see if there were        15:49

 3   advantages that boy -- if -- what the actual data  15:49

 4   showed for comparison of boys' and girls' times.   15:49

 5        Q.   Did you ask in response to any questions 15:49

 6   from the West Virginia Legislature?                15:49

 7        A.   I don't remember the time frame of this; 15:49

 8   so I don't know if it was before or after or during 15:49

 9   the legislative time.                              15:49

10        Q.   Did you ever get the data from Josh      15:49

11   Weekley?                                           15:50

12        A.   Did not.  Did not.  They had computer    15:50

13   problems and so...                                 15:50

14        Q.   What did you mean by "a transgender issue" 15:50

15   on the --                                          15:50

16        A.   Again --                                 15:50

17        Q.   -- first page?                           15:50

18        A.   I was asking -- I was just telling him.  I 15:50

19   was trying to compare boys' times and girls' times 15:50

20   and what hap- -- you know, what the actual times   15:50

21   were of boys and girls competing against each other. 15:50

22             MS. GREEN:  Okay.  I think if folks are  15:50

23   all right, we will take a five-minute break, and   15:50

24   then I should have -- let's see -- I should have a  15:50

25   couple more exhibits to go through.                15:50
```

Page 147

| | | |
|---|---|---|
| 1 | But we'll take a pause here and come back | 15:50 |
| 2 | around 3:56. | 15:50 |
| 3 | THE WITNESS:  Okay. | 15:50 |
| 4 | THE VIDEOGRAPHER:  Going off the record. | 15:50 |
| 5 | The time is 3:51. | 15:50 |
| 6 | (Brief recess.) | 15:57 |
| 7 | THE VIDEOGRAPHER:  Back on the record. | 15:57 |
| 8 | The time is 3:57. | 15:57 |
| 9 | BY MS. KANG: | 15:57 |
| 10 | Q.   Mr. Dolan, I'm going to introduce another | 15:57 |
| 11 | document as Exhibit 12. | 15:57 |
| 12 | A.   Okay. | 15:57 |
| 13 | Q.   And I'll let you know when it's in there. | 15:57 |
| 14 | (Deposition Exhibit 12 was marked for | 15:57 |
| 15 | identification and is attached hereto.) | 15:58 |
| 16 | MS. KANG:  Okay.  Exhibit 12 is now | 15:58 |
| 17 | available in the Marked Exhibits folder. | 15:58 |
| 18 | BY MS. KANG: | 15:58 |
| 19 | Q.   Let me know when you have had a chance to | 15:58 |
| 20 | pull it up. | 15:58 |
| 21 | A.   Scroll down. | 15:58 |
| 22 | That's it.  Okay. | 15:58 |
| 23 | Okay. | 15:58 |
| 24 | Q.   Is this the same Melissa White as the one | 15:59 |
| 25 | you were referencing earlier? | 15:59 |

Page 148

```
 1          A.   Yes.                                      15:59

 2          Q.   Do you know what Melissa White's position 15:59

 3     is?                                                 15:59

 4          A.   Well, on the paper it says Chief Counsel  15:59

 5     for Committee on Education of West Virginia House of 15:59

 6     Delegates.                                          15:59

 7          Q.   Do you know why Melissa White reached out 15:59

 8     to you regarding H.B. 3293?                         15:59

 9          A.   There may have been original language in  15:59

10     there that may have identified the WVSSAC.  I don't 15:59

11     know.  But it involves athletics; so I'm sure, as a 15:59

12     courtesy, she was sending me something.             15:59

13          Q.   Had you spoken to her about athletics     15:59

14     before this email?                                  15:59

15               MS. GREEN:  I'll object to the form.      15:59

16               THE WITNESS:  This -- that -- last year or 15:59

17     in general?                                         15:59

18     BY MS. KANG:                                        15:59

19          Q.   In general.                               15:59

20          A.   Yeah.  I mean, every time there is        15:59

21     legislation involving athletics, home school,       15:59

22     whatever, it's not unusual for them to contact me   15:59

23     about our position or our input on it.              16:00

24          Q.   So you notice in the top-right corner,    16:00

25     Thursday, March 11th is underlined.                 16:00
```

Page 149

```
 1              Was this the first time that Melissa White    16:00
 2    spoke to you about H.B. 3293?                           16:00
 3              MS. GREEN:  Object to the form.               16:00
 4              THE WITNESS:  I believe it was.  I may        16:00
 5    have been underlining that as I was gathering my        16:00
 6    documents to make sure I got them all out of my         16:00
 7    email.  So that might be why that was underlined.       16:00
 8    BY MS. KANG:                                            16:00
 9         Q.   In this email, she asks for your thoughts     16:00
10    on H.B. 3293.                                           16:00
11              Did you provide her with any thoughts?        16:00
12         A.   I did not.  It was -- it -- I thought         16:00
13    there was an attachment to that, and I sent it off.     16:01
14              Was there -- oh, yeah.  There it is.  Down    16:01
15    at the bottom.                                          16:01
16              And I didn't -- I didn't open it.  I sent     16:01
17    it off to Dinsmore & Shohl.                             16:01
18         Q.   Did you ever have any verbal                  16:01
19    communications with Melissa White about this bill?     16:01
20         A.   The only communication I could -- might       16:01
21    have had is that when she asked me to come to the       16:01
22    finance meeting and wait outside.  And then I was       16:01
23    told I wasn't needed.                                   16:01
24              MS. KANG:  I'm going to introduce a           16:01
25    document as Exhibit 13.                                 16:01
```

Page 150

| | | |
|---|---|---|
| 1 | (Deposition Exhibit 13 was marked for | 16:02 |
| 2 | identification and is attached hereto.) | 16:02 |
| 3 | MS. KANG:  Exhibit 13 is now available in | 16:02 |
| 4 | everyone's Marked Exhibit folder. | 16:02 |
| 5 | BY MS. KANG: | 16:02 |
| 6 | Q.   So let me know when you have it up.  And | 16:02 |
| 7 | once you have it up, if you could scroll to the very | 16:02 |
| 8 | last page that has been Bates stamped -370.  Let me | 16:02 |
| 9 | know. | 16:02 |
| 10 | A.   Okay. | 16:02 |
| 11 | Q.   Do you recognize this text exchange? | 16:02 |
| 12 | A.   Yes. | 16:02 |
| 13 | Q.   Is the Melissa at the top of the thread | 16:03 |
| 14 | referring to Melissa White? | 16:03 |
| 15 | A.   Yes. | 16:03 |
| 16 | Q.   Do you know why she asked for the | 16:03 |
| 17 | transgender policy? | 16:03 |
| 18 | MS. GREEN:  Object to the form. | 16:03 |
| 19 | THE WITNESS:  At some point, I don't -- | 16:03 |
| 20 | I'm not sure of the date.  But at some point we | 16:03 |
| 21 | were -- you know, we had told them that we had a | 16:03 |
| 22 | Board policy for transgender. | 16:03 |
| 23 | So I'm sure she was trying to get a copy | 16:03 |
| 24 | of that. | 16:03 |
| 25 | /// | |

Page 151

```
 1   BY MS. KANG:                                      16:03

 2        Q.   Who is "them"?                          16:03

 3        A.   House -- House Education.               16:03

 4        Q.   Did you provide the policy to her?     16:03

 5        A.   I'm sure I did.                         16:03

 6        Q.   Did she say anything to you afterwards  16:03

 7   about the transgender policy?                     16:03

 8        A.   Not that I recall.                      16:03

 9        Q.   Did the two of you discuss H.B. 3293 after  16:03

10   this text conversation at any point?             16:04

11             MS. GREEN:  Object to the form.        16:04

12             THE WITNESS:  Not that I recall.       16:04

13             MS. KANG:  I'm just going to introduce one  16:04

14   last exhibit, Exhibit 14.                        16:04

15             (Deposition Exhibit 14 was marked for  16:04

16             identification and is attached hereto.)  16:04

17             MS. KANG:  Exhibit 14 is now available in  16:04

18   the Marked Exhibits folder.                      16:04

19   BY MS. KANG:                                      16:04

20        Q.   And let me know when you have it up.   16:04

21             THE WITNESS:  That is 11.              16:04

22             MS. GREEN:  Oh.  I'm sorry.  Uploaded  16:04

23   error there.                                      16:04

24             THE WITNESS:  It was 9.  Yeah.         16:04

25             There it is.                           16:04
```

Page 152

| | | |
|---|---|---|
| 1 | MS. GREEN:  I'm sorry. | 16:04 |
| 2 | THE WITNESS:  Okay. | 16:05 |
| 3 | BY MS. KANG: | 16:05 |
| 4 | Q.  So on the first page that is Bates | 16:05 |
| 5 | Stamped -286, you will see it reads "Regional | 16:05 |
| 6 | Principals' Meetings." | 16:05 |
| 7 | What is the purpose of the Regional | 16:05 |
| 8 | Principals' Meetings? | 16:05 |
| 9 | A.  It's when we make sure that any new rules, | 16:05 |
| 10 | we go over them.  And then also -- most importantly, | 16:05 |
| 11 | they get their C&I cards, which are all the coaches | 16:05 |
| 12 | get in free to games. | 16:05 |
| 13 | And so that's the only reason why they | 16:05 |
| 14 | come to the meeting, sadly to say, not to hear me | 16:05 |
| 15 | speak. | 16:06 |
| 16 | Q.  And apologies for my ignorance.  But | 16:06 |
| 17 | what's a C&I card? | 16:06 |
| 18 | A.  Courtesy and identification card.  It's | 16:06 |
| 19 | like a free pass into all high school games. | 16:06 |
| 20 | Q.  All right.  Scroll down one page in | 16:06 |
| 21 | Exhibit 14 to the page Bates Stamped -287. | 16:06 |
| 22 | A.  Is it the schedule? | 16:06 |
| 23 | Q.  No.  It's just the first -- | 16:06 |
| 24 | A.  Regional Principals' Meeting? | 16:06 |
| 25 | Q.  That's correct. | 16:06 |

Page 153

| | | |
|---|---|---|
| 1 | A.   First slide? | 16:06 |
| 2 | Q.   That's -- that's correct. | 16:06 |
| 3 | A.   Okay. | 16:06 |
| 4 | Q.   So are these the slides that were | 16:06 |
| 5 | presented at this meeting? | 16:06 |
| 6 | A.   Yes. | 16:06 |
| 7 | Q.   Do you know who prepared these slides? | 16:06 |
| 8 | A.   Each of us prepared our -- our portion, | 16:06 |
| 9 | myself and the three assistants.  So we all have | 16:06 |
| 10 | different areas to cover. | 16:07 |
| 11 | Q.   By "three assistants," you mean your three | 16:07 |
| 12 | assistant executive directors? | 16:07 |
| 13 | A.   Uh-huh. | 16:07 |
| 14 | Q.   So I want to draw your attention to what's | 16:07 |
| 15 | been Bates stamped -346.  Apology if I -- will | 16:07 |
| 16 | identify the page number in a moment. | 16:07 |
| 17 | So it is Page 61 of the pdf. | 16:07 |
| 18 | A.   Okay. | 16:07 |
| 19 | Q.   Do you recognize this slide? | 16:07 |
| 20 | A.   I'm not there yet. | 16:07 |
| 21 | MS. GREEN:  I'm sorry. | 16:07 |
| 22 | BY MS. KANG: | 16:07 |
| 23 | Q.   Oh.  I'm sorry. | 16:07 |
| 24 | A.   Yes. | 16:08 |
| 25 | Q.   Do you know who prepared this slide? | 16:08 |

Page 154

| | | |
|---|---|---|
| 1 | A.    This would have been Cindy Daniel. | 16:08 |
| 2 | Q.    And she is one of your -- | 16:08 |
| 3 | A.    Assistant executive directors. | 16:08 |
| 4 | Q.    So in the second bullet point here, it | 16:08 |
| 5 | says [as read]: | 16:08 |
| 6 | "WVSSAC's current position is that | 16:08 |
| 7 | gender is identified in WVEIS for | 16:08 |
| 8 | athletic participation purposes." | 16:08 |
| 9 | What does this mean? | 16:08 |
| 10 | A.    Well, I think this was before the ruling | 16:08 |
| 11 | that B.P.J. could participate; so that we were still | 16:08 |
| 12 | reiterating it in our policy at the time until we | 16:08 |
| 13 | got the final ruling from the Department of Ed. | 16:09 |
| 14 | Q.    Just to be clear, if someone's gender in | 16:09 |
| 15 | WVEIS is male, does that mean they would have to | 16:09 |
| 16 | play on the boys' team? | 16:09 |
| 17 | A.    Yes. | 16:09 |
| 18 | Q.    Before H.B. 3293 was enacted and under | 16:09 |
| 19 | your trans policy, did you just rely on the school's | 16:09 |
| 20 | determination of gender or would you go into WVEIS | 16:09 |
| 21 | and look at WVEIS? | 16:09 |
| 22 | A.    We don't have access to WVEIS; so we | 16:09 |
| 23 | wouldn't be able to.  And, to our knowledge, we | 16:09 |
| 24 | didn't have any other cases prior to this. | 16:09 |
| 25 | Q.    So in this slide, when it says "the | 16:09 |

Page 155

| | | |
|---|---|---|
| 1 | current position is that gender is identified in | 16:09 |
| 2 | WVEIS," would you have to depend on the school's | 16:09 |
| 3 | determination? | 16:09 |
| 4 |     A.   Yes. | 16:09 |
| 5 |     Q.   Can the information in WVEIS for someone's | 16:10 |
| 6 | gender be changed? | 16:10 |
| 7 |         MS. GREEN:  Object to the form. | 16:10 |
| 8 |         THE WITNESS:  I'm not sure what the rules | 16:10 |
| 9 | are for WVEIS. | 16:10 |
| 10 | BY MS. KANG: | 16:10 |
| 11 |     Q.   Do you know who contributes information to | 16:10 |
| 12 | WVEIS? | 16:10 |
| 13 |         MS. GREEN:  Object to the form. | 16:10 |
| 14 |         THE WITNESS:  Each school does, but I'm | 16:10 |
| 15 | not sure, like, who in each school. | 16:10 |
| 16 | BY MS. KANG: | 16:10 |
| 17 |     Q.   Do you remember if this slide was | 16:10 |
| 18 | discussed during the regional principals' meeting? | 16:10 |
| 19 |     A.   Probably was.  I would say yes. | 16:10 |
| 20 |     Q.   What was discussed? | 16:10 |
| 21 |         MS. GREEN:  Object to the form. | 16:10 |
| 22 |         THE WITNESS:  Just what was on the slide, | 16:10 |
| 23 | that current law is being challenged, and we were | 16:10 |
| 24 | waiting for final ruling from the Department of Ed. | 16:10 |
| 25 | /// | |

Page 156

```
 1    BY MS. KANG:                                       16:10

 2         Q.   Anything else?                           16:10

 3         A.   As it relates to transgender as it relates  16:10

 4    to this slide, you mean?                           16:10

 5         Q.   That's correct.                          16:11

 6         A.   I don't think there was anything more    16:11

 7    discussed, from my knowledge.                      16:11

 8              MS. KANG:  So I believe that is all my   16:11

 9    questions.                                         16:11

10              I'm going to go off the record for about 16:11

11    five minutes or so and see if there's anything else  16:11

12    I need to ask.                                     16:11

13              But, otherwise, I think we're at the     16:11

14    finish line, Mr. Dolan.                            16:11

15              THE WITNESS:  Good.                       16:11

16              THE VIDEOGRAPHER:  Off the record.  The  16:11

17    time is 4:11.                                      16:11

18              (Brief recess.)                          16:17

19              THE VIDEOGRAPHER:  Back on the record.   16:17

20    The time is 4:18.                                  16:17

21              MS. KANG:  Mr. Dolan, I am finished asking  16:17

22    my questions.  I will reserve the right to ask any 16:17

23    questions depending on other parties' questions.   16:18

24    I'll also reserve the right to ask questions if    16:18

25    there are changes in the errata.  But otherwise I  16:18
```

Page 157

| | | |
|---|---|---|
| 1 | think we're -- you're done with me for today. | 16:18 |
| 2 | THE WITNESS:  Okay.  Thank you. | 16:18 |
| 3 | THE VIDEOGRAPHER:  Is there anybody else | 16:18 |
| 4 | with questions or should I go ahead and close out? | 16:18 |
| 5 | MR. SCRUGGS:  This is Jonathan Scruggs for | 16:18 |
| 6 | the intervenor.  No questions from us. | 16:18 |
| 7 | MS. MORGAN:  This is Kelly Morgan. | 16:18 |
| 8 | No questions for the State Board and | 16:18 |
| 9 | Superintendent Burch. | 16:18 |
| 10 | MR. CROPP:  This is Jeffrey Cropp for | 16:18 |
| 11 | Harrison County Board of Education and Dora Stutler. | 16:18 |
| 12 | | 16:18 |
| 13 | EXAMINATION | 16:18 |
| 14 | BY MR. CROPP: | 16:18 |
| 15 | Q.  I just have a couple of follow-up | 16:18 |
| 16 | questions, Mr. Dolan. | 16:19 |
| 17 | A.  Okay. | 16:19 |
| 18 | Q.  Regarding Exhibit 6, which is the | 16:19 |
| 19 | transgender policy, was a copy of that policy ever | 16:19 |
| 20 | distributed to the member schools? | 16:19 |
| 21 | A.  I don't believe so. | 16:19 |
| 22 | Q.  Okay.  Was a copy of the transgender | 16:19 |
| 23 | policy ever given to the principals? | 16:19 |
| 24 | A.  I don't believe so. | 16:19 |
| 25 | Q.  Was a copy of that transgender policy ever | 16:19 |

Page 158

```
 1    given to the County Boards of Education?              16:19

 2         A.   I don't believe so.                         16:19

 3         Q.   Was a copy of the transgender policy ever   16:19

 4    given to the county superintendents?                  16:19

 5         A.   I don't believe so.                         16:19

 6         Q.   You mentioned that -- at a regional         16:19

 7    meeting that that policy was reviewed with the        16:19

 8    principals who attended the -- that meeting.          16:19

 9              But my question is, is that -- was that     16:19

10    just at the first meeting where the policy was        16:19

11    introduced, or did you go over that policy every      16:19

12    regional meeting after it was introduced?             16:19

13              MS. GREEN:  Object to the form.             16:19

14              THE WITNESS:  Normally, we would -- you     16:20

15    mean each year?  Or do you mean, like, when we do     16:20

16    ten of them, was it brought up at each ten?           16:20

17    BY MR. CROPP:                                         16:20

18         Q.   Each year.  So it was introduced in one     16:20

19    year.  My question is at the subsequent years -- did  16:20

20    you go over that policy during the subsequent years   16:20

21    at that -- at all ten regional meetings?              16:20

22         A.   I would say it was -- I don't know when it  16:20

23    came off, but it was on the agenda for a number of    16:20

24    years, yes.                                           16:20

25         Q.   Whether you say --                          16:20
```

Page 159

```
1          A.   I don't --                              16:20

2          Q.   Go ahead.                               16:20

3          A.   I don't remember if it was on this past 16:20

4    year -- it was on this year with Cindy's slide, but 16:20

5    normally it was on mine.                            16:20

6               So I don't -- I would have to go back and 16:20

7    check all my -- if we record them.  And if you     16:20

8    didn't go to the meeting, then you were able to    16:20

9    listen to the recording.                           16:20

10         Q.   Okay.  This policy -- excuse me.         16:20

11              The policy was never voted on by the    16:21

12   member schools, the transgender policy?            16:21

13         A.   That's correct.                         16:21

14              MR. CROPP:  I don't have any further    16:21

15   questions.                                          16:21

16              Thank you.                               16:21

17              MR. CAPEHEART:  Curtis Capeheart for the 16:21

18   State.                                              16:21

19              I have no questions.                     16:21

20              Thank you, Mr. Dolan.                    16:21

21              THE WITNESS:  Thank you.                 16:21

22              THE VIDEOGRAPHER:  Okay.  That looks like 16:21

23   everybody.  So I'll go ahead and close out unless  16:21

24   there is anything else.                             16:21

25              THE REPORTER:  And this is the reporter. 16:21
```

Page 160

```
 1              I did hear that there will be an errata      16:21

 2    sheet.  So is the witness reviewing?                   16:21

 3              MS. GREEN:  Yes.  We'll read and sign.       16:21

 4    And if I could --                                      16:21

 5              This is Roberta Green.                       16:21

 6              So if I could please have it sent to me,     16:21

 7    and I'll get with Mr. Dolan.                           16:21

 8              THE REPORTER:  Thank you.                    16:21

 9              THE VIDEOGRAPHER:  Thank you.                16:21

10              We are off the record at 4:22 p.m. EST,      16:21

11    and this concludes today's testimony given by         16:22

12    30(b)(6) Witness Bernie Dolan.  The total number of   16:22

13    Media Units used was three.  And will be retained by  16:22

14    Veritext Legal Solutions.                             16:22

15              (Whereupon, at 4:22 p.m., the deposition

16              of BERNARD DOLAN was adjourned.)

17                      --- oOo ---

18

19

20

21

22

23

24

25

                                             Page 161
```

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 440 of 674

```
 1

 2

 3

 4            I, BERNARD DOLAN, hereby certify under penalty

 5    of perjury under the laws of the State of California that

 6    the foregoing is true and correct.

 7            Executed this _____ day of

 8    _____, 2022, at _____,

 9    California.

10

11

12    _____

13    BERNARD DOLAN

      30(b)(6) DEPOSITION

14    WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION

15

16

17

18

19

20

21

22

23

24

25

                                              Page 162
```

```
 1    STATE OF CALIFORNIA                           )

 2    COUNTY OF LOS ANGELES                         )   SS.

 3

 4            I, Dayna Hester, C.S.R. No. 9970, in

 5    and for the State of California, do hereby certify:

 6            That, prior to being examined, the witness named

 7    in the foregoing deposition was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing but the

 9    truth;

10            That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction, and

13    the same is a true, correct, and complete transcript of

14    said proceedings;

15            That if the foregoing pertains to the original

16    transcript of a deposition in a Federal Case, before

17    completion of the proceedings, review of the transcript

18    { XX } was { } was not required;

19            I further certify that I am not interested in

20    the event of the action.

21            Witness my hand this 26th day of February,

22    2022.

23

24            Certified Shorthand Reporter

25            for the State of California
```

                                                    Page 163

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**B.P.J., by her next friend and mother,**
**HEATHER JACKSON,**
      **Plaintiff,**

**v.**
                     **Civil Action No. 2:21-cv-00316**
                     **Honorable Joseph R. Goodwin, Judge**

**WEST VIRGINIA STATE BOARD OF EDUCATION,**
**HARRISON COUNTY BOARD OF EDUCATION,**
**WEST VIRGINIA SECONDARY SCHOOL**
**ACTIVITIES COMMISION, W. CLAYTON BURCH**
**in his official capacity as State Superintendent, and**
**DORA STUTLER in her official capacity as**
**Harrison County Superintendent,**
      **Defendants,**

**And**

**LAINEY ARMISTEAD,**
      **Intervenor Defendant.**

### CERTIFICATE OF SERVICE

I hereby certify that I, Roberta F. Green, have this day, the 9th day of February, 2022, served a true and exact copy of ***"WVSSAC's Responses to Plaintiff's Second Set of Interrogatories"*** with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following counsel of record:

Loree Stark
ACLU of WV FOUNDATION
P.O. Box 3952
Charleston, WV  25339-3952
lstark@acluwv.org

Kathleen R. Hartnett
Julie Veroff
COOLEY LLP
101 California St., 5th Floor
San Francisco, CA 94111-5800
khartnett@cooley.com

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
kkang@cooley.com

Elizabeth Reinhardt
COOLEY LLP
500 Boylston St., 14th Floor
Boston, MA  02116-3736
ereinhardt@cooley.com

**Exhibit**
**0005**

**JA1503**

Andrew Barr
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO  80202-5686
abarr@cooley.com

Joshua Block
Chase Strangio
ACLU FOUNDATION
125 Broad Street
New York, NY  10004
jblock@aclu.org

Sruti Swaminathan
LAMBDA LEGAL
120 Wall St., 19th Floor
New York, NY 10005
sswaminathan@lambdalegal.org

Kelly C. Morgan
BAILEY & WYANT, PLLC
500 Virginia St., East, Suite 600
Charleston, WV  25301
kmorgan@baileywyant.com

Douglas P. Buffington, II
Curtis R.A. Capehart
Jessica A. Lee
State Capitol Complex
Building 1, Room E-26
Charleston, WV  25305-0220
Curtis.R.A.Capehart@wvago.gov

Taylor Brown
American Civil Liberties Union
125 Broad St., 18th Fl.
New York, NY  10004
tbrown@aclu.org

Jonathan Scruggs
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ  85260
jscruggs@adflegal.org

Avatara Smith-Carrington
LAMBDA LEGAL
3500 Oak Lawn Ave., Suite 500
Dallas, TX 75219
asmithcarrington@lambdalegal.org

Carl Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA  30030
ccharles@lambdalegal.org

Susan Llewellyn Deniker
STEPTOE and JOHNSON, LLC
400 White Oaks Boulevard
Bridgeport, WV  26330
susan.deniker@steptoe-johnson.com

Tara Borelli
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

David C. Tryon
West Virginia Atty. General's Office
1900 Kanawha Blvd., E.
Bldg. 1, Rm 26E
Charleston, WV  25305
David.C.Tryon@wvago.gov

Brandon Steele
The Law Offices of Brandon S.
Steele
3049 Robert C. Byrd Drive, Ste 100
Beckley, WV  25801
bsteelelawoffice@gmail.com

Christiana Holcomb
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC  20001
cholcomb@adflegal.org

Timothy D. Ducar
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
tducar@azlawyers.com

*/S/ Roberta F. Green*

Roberta F. Green, Esquire (WVSB #6598)
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street E., Suite 200 (25301)
Charleston, West Virginia
Phone: (304) 345-1400
Facsimile: (304) 343-1826
*Counsel for Defendant WVSSAC*
rgreen@shumanlaw.com
kbandy@shumanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,
     Plaintiff,

v.
                            Civil Action No. 2:21-cv-00316
                            Honorable Joseph R. Goodwin, Judge

WEST VIRGINIA STATE BOARD OF EDUCATION,
HARRISON COUNTY BOARD OF EDUCATION,
WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISION, W. CLAYTON BURCH
in his official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,
     Defendants,

And

LAINEY ARMISTEAD,
     Intervenor Defendant.

### WVSSAC'S RESPONSES TO PLAINTIFF'S
### SECOND SET OF INTERROGATORIES

Now comes West Virginia Secondary School Activities Commission (WVSSAC), by

counsel, and responds to Plaintiff's Second Set of Interrogatories to Defendant The West Virginia

Secondary School Activities Commission.[1]

---

[1] Defendant has not completed discovery in this civil action and has not completed its preparation for trial. For these reasons, the Defendant's responses are based upon only such information and documents as are presently available and known to WVSSAC. Further discovery and independent investigation may lead to other responsive information and/or documents. The following responses are given in good faith but without prejudice to the Defendant's right to produce evidence of subsequently discovered facts or documents.
    The Defendant avails itself of all rights under the Federal Rules of Civil Procedure and such other applicable rules and law, and objects to the instructions contained in Plaintiff's discovery requests to the extent such instructions attempt to impose burdens on the Defendant that are outside the scope of the Rules or the law generally. The Defendant is not bound to follow any instructions which may be contrary to the Rules and other law.

## INTERROGATORIES

**INTERROGATORY NO. 13:**    Identify all WVSSAC sponsored sports in which students may participate on a team designated as co-ed or mixed.  If any such sport includes designations of a particular level (*e.g.,* varsity, junior varsity, freshman, intramural), please also include such designations.

**RESPONSE:**

**Available at both middle and high school:**

**Cheer is mixed.**

**Participation mixed as indicated to respond to demand:**
**Wrestling**
**Baseball - Freshman**
**Football – Varsity, Junior Varsity, Freshman**
**Golf (transitioning toward having a separate girls' designation) – Varsity, Junior Varsity**

**INTERROGATORY NO. 14:**    Identify all co-ed or mixed teams participating in WVSSAC sponsored competition, including (a) the name of the school and (b) the sport in which the team competes.  If any team (or subpart of a team) is designated as being of a particular level (*e.g.,* varsity, junior varsity, freshman, intramural), please also include that designation.

**RESPONSE:**

WVSSAC does not track this information. However, please see attached excel spreadsheet for member schools' self-report. WVSSAC000366-369.

> **WEST VIRGINIA SECONDARY SCHOOL**
> **ACTIVITIES COMMISSION,**
> **By Counsel.**

JA1507

*/S/ Roberta F. Green*

Roberta F. Green (WVSB #6598)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
Post Office Box 3953 (25339)
1411 Virginia Street East, Suite 200 (25301
Charleston, WV 25339
(304) 345-1400
(304) 343-1826 FAX
rgreen@shumanlaw.com
kbandy@shumanlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,
    Plaintiff,

v.

        Civil Action No. 2:21-cv-00316
        Honorable Joseph R. Goodwin, Judge

WEST VIRGINIA STATE BOARD OF EDUCATION,
HARRISON COUNTY BOARD OF EDUCATION,
WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION, W. CLAYTON BURCH
in his official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,
    Defendants,

    and

LAINEY ARMISTEAD,
    Intervenor Defendant.

### VERIFICATION

STATE OF WEST VIRGINIA;

COUNTY OF WOOD, to-wit:

    Bernie Dolan, being first duly sworn, upon his oath does hereby depose and say that he has read the answers to interrogatories in the foregoing and believes that the facts contained therein, except insofar as they are stated to be upon information and belief, are believed to be true; that the responses set forth herein, subject to inadvertent and undiscovered errors, are based on and therefore necessarily limited by the records and information in existence, presently recollected and thus far discovered in the course of the preparation of these responses; that consequently, he reserves the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that subject to the limitations set forth herein, said responses are true to the best of his knowledge, information and belief.

By: _Bernie Dolan_____
    Bernie Dolan

JA1509

Taken, subscribed and sworn to before me this _9th_ day of _February_, 2022.

My commission expires: _July 3, 2022_.

_Laura Wallace_
Notary Public

[SEAL]

LAURA WALLACE
Notary Public Official Seal
State of West Virginia
My Comm. Expires Jul 3, 2022
2875 Staunton Turnpike Parkersburg WV 26104

WVSSAC000386

| What is the name of your school? | How many girls participated in Football | How many girls participated in Wrestling | How many girls participated in Golf? | How many boys participated in Cheer? | How many girls participated in Baseball? |
|---|---|---|---|---|---|
| Andrew Jackson Middle School | 0 | 0 | 1 | 0 | 0 |
| Andrew Middle School | | | | 0 | 0 |
| Aurora School | 0 | 0 | 0 | 0 | 0 |
| Barboursville Middle School | 0 | 1 | 2 | 0 | 0 |
| Beckley - Stratton Middle School | 0 | 5 | 2 | 0 | 0 |
| Berkeley Springs High School | 1 | 2 | 1 | 0 | 0 |
| Bittermehassett Middle School | 1 | 1 | 1 | 0 | 0 |
| Bluefield High School | 0 | 0 | 0 | 0 | 0 |
| Bluefield Middle School | 0 | 0 | 0 | 0 | 0 |
| Braxton County High School | 1 | 0 | 1 | 0 | 0 |
| Bridge Street Middle School | 0 | 0 | 0 | 1 | 0 |
| Bridgeport High School | 1 | 1 | 1 | 1 | 0 |
| Bridgeport Middle | 0 | 1 | 0 | 0 | 0 |
| Brooke High School | 2 | 2 | 1 | 0 | 0 |
| Bruceton School | 2 | 0 | 0 | 0 | 0 |
| Buffalo | 1 | 2 | 1 | 0 | 0 |
| Cameron High School | 0 | 0 | 0 | 0 | 0 |
| Cameron Middle High School | 0 | 0 | 1 | 0 | 0 |
| Capital High School | 0 | 0 | 1 | 0 | 0 |
| Capon Bridge Middle | 0 | 0 | 0 | 0 | 0 |
| Central Preston MS | 2 | 2 | 0 | 0 | 0 |
| CEREDO-KENOVA MIDDLE SCHOOL | 1 | 1 | 0 | 0 | 0 |
| Chapmanville Middle School | 0 | 1 | 1 | 0 | 0 |
| Chapmanville Regional High School | 1 | 0 | 1 | 0 | 0 |
| Charles Town Middle School | 1 | 3 | 0 | 0 | 0 |
| Charleston Catholic | 0 | 0 | 2 | 1 | 0 |
| Clay Battelle Middle/High School | 1 | 1 | 2 | 1 | 0 |
| Clay County High School | 0 | 1 | 2 | 0 | 0 |
| Clay County Middle School | 0 | 0 | 0 | 0 | 0 |
| Crum PK8 | 0 | 0 | 0 | 0 | 0 |
| Doddridge County High | 0 | 2 | 2 | 0 | 0 |
| East bank middle | 1 | 1 | 0 | 1 | 0 |
| East Fairmont High School | 1 | 2 | 0 | 1 | 0 |
| East Hardy High School | 0 | 8 | 0 | 0 | 0 |
| Eastern Greenbrier Middle School | 1 | 3 | 0 | 0 | 0 |
| Edison | 0 | 3 | 2 | 0 | 0 |
| Elkins High School | 0 | 0 | 6 | 0 | 0 |
| Elkins Middle School | 0 | 0 | 0 | 0 | 0 |
| Elkview Middle | 0 | 0 | 2 | 0 | 0 |
| Fairmont Catholic #0201 | 0 | 0 | 0 | 0 | 0 |
| Fairmont Senior | 0 | 0 | 1 | 0 | 0 |
| Fairview middle | 0 | 0 | 0 | 0 | 0 |
| Fayetteville PK8 | 0 | 0 | 0 | 0 | 0 |
| FGPK8 | 0 | 0 | 0 | 0 | 0 |
| Fort Gay Pre K-8 | 0 | 0 | 0 | 1 | 0 |
| Frankfort High School | 0 | 0 | 0 | 1 | 1 |
| George Washington High School | 1 | 1 | 3 | 1 | 0 |
| George Washington Middle | 0 | 1 | 0 | 1 | 0 |
| Gilmer | 0 | 1 | 1 | 1 | 0 |
| Glen Fork Elementary and Middle School | 0 | 0 | 0 | 4 | 0 |
| Glenwood School | 0 | 0 | 3 | 0 | 0 |
| Grafton High School | 0 | 1 | 0 | 0 | 0 |
| Greater Beckley Christian | 0 | 0 | 0 | 0 | 0 |

WVSSAC000367

| School | | | | | |
|---|---|---|---|---|---|
| Greater Beckley Christian School | 0 | 0 | 0 | 0 | 0 |
| Greenbrier East | 0 | 1 | 0 | 2 | 0 |
| Greenbrier West | 0 | 1 | 0 | 2 | 1 |
| Hamilton Middle | 0 | 0 | 1 | 0 | 0 |
| Hamlin PK8 | 0 | 0 | 0 | 1 | 0 |
| Hampshire | 0 | 0 | 0 | 1 | 0 |
| Harman | 0 | 0 | 0 | 0 | 0 |
| Harts PK-8 | 4 | 0 | 0 | 0 | 0 |
| Hayes Middle School | 0 | 0 | 0 | 0 | 0 |
| Hedgesville | 0 | 0 | 2 | 0 | 1 |
| Hedgesville Middle | 0 | 1 | 0 | 0 | 0 |
| Herbert Hoover High School | 0 | 0 | 0 | 1 | 0 |
| Horace Mann Middle | 0 | 1 | 3 | 0 | 0 |
| Horace Mann Middle School | 0 | 0 | 4 | 0 | 0 |
| Huntington East Middle | 0 | 0 | 4 | 0 | 0 |
| Huntington High | 0 | 0 | 3 | 0 | 0 |
| Huntington Middle School | 1 | 0 | 1 | 2 | 0 |
| Hurricane Middle | 0 | 0 | 3 | 1 | 0 |
| Independence High School | 1 | 0 | 1 | 1 | 1 |
| Jackson Middle School | 0 | 0 | 2 | 1 | 0 |
| James Monroe High School | 0 | 0 | 0 | 0 | 0 |
| Jefferson High School | 0 | 1 | 0 | 2 | 0 |
| John Adams Middle School | 0 | 0 | 4 | 2 | 0 |
| John marshall | 0 | 0 | 8 | 2 | 2 |
| Kasson Elementary Middle School | 0 | 0 | 0 | 0 | 0 |
| Kermit pk-8 | 0 | 0 | 0 | 0 | 1 |
| Keyser High School | 0 | 0 | 0 | 0 | 0 |
| Lenore PK8 | 0 | 0 | 0 | 1 | 0 |
| Lewis County High School | 0 | 1 | 1 | 1 | 1 |
| Liberty High School | 0 | 0 | 1 | 0 | 0 |
| Lincoln County High School | 0 | 0 | 0 | 0 | 0 |
| Lincoln High School | 1 | 0 | 2 | 0 | 0 |
| Lincoln Middle School | 0 | 0 | 0 | 4 | 0 |
| Logan High School | 0 | 0 | 1 | 2 | 0 |
| Logan Middle | 0 | 0 | 0 | 0 | 1 |
| Long Drain School | 0 | 0 | 0 | 0 | 0 |
| Madison Middle School | 1 | 0 | 0 | 0 | 0 |
| Madonna | 0 | 0 | 0 | 1 | 0 |
| Madonna high school | 0 | 0 | 2 | 1 | 0 |
| Magnolia High School | 0 | 0 | 0 | 0 | 0 |
| Man High School | 0 | 0 | 0 | 1 | 0 |
| Man Middle School | 0 | 0 | 0 | 0 | 0 |
| Mannington Middle School | 1 | 0 | 0 | 1 | 0 |
| Martinsburg High | 0 | 0 | 0 | 0 | 0 |
| Matewan PK-8 | 0 | 0 | 0 | 2 | 0 |
| Meadow Bridge High School | 0 | 0 | 2 | 1 | 0 |
| Midland Trail High School | 0 | 0 | 0 | 0 | 0 |
| Mingo Central High School | 0 | 0 | 2 | 2 | 0 |
| Monongah Middle School | 0 | 0 | 0 | 0 | 0 |
| Montcalm High School | 0 | 0 | 0 | 0 | 0 |
| Moorefield High School | 0 | 0 | 1 | 1 | 1 |
| Morgantown High | 2 | 0 | 4 | 0 | 0 |
| Moundsville Middle School | 1 | 0 | 0 | 1 | 0 |
| Mountain Ridge Middle School | 0 | 0 | 0 | 0 | 0 |

WVSSAC000368

| School | | | | |
|---|---|---|---|---|
| Mountain View Middle School | 0 | 0 | 0 | 1 |
| Mountaineer Middle (H) | 0 | 0 | 0 | 3 |
| Mountaineer Middle Morgantown | 0 | 0 | 0 | 3 |
| Mountaineer middle school (Harrison) | 0 | 0 | 1 | 3 |
| Musselman HS | 0 | 0 | 2 | 1 |
| Musselman Middle | 0 | 2 | 0 | 0 |
| New Martinsville School | 0 | 0 | 0 | 0 |
| Nicholas County High School | 0 | 2 | 2 | 0 |
| Nitro High School | 0 | 0 | 0 | 0 |
| North Marion | 2 | 0 | 0 | 0 |
| Notre Dame High School | 0 | 0 | 1 | 0 |
| Oak Glen High School | 0 | 1 | 2 | 0 |
| OAK GLEN MIDDLE SCHOOL | 0 | 1 | 0 | 1 |
| Oak Hill High | 0 | 0 | 1 | 0 |
| Oak Hill Middle School | 0 | 0 | 0 | 0 |
| Paden City High School----We have grades 7-12 | 0 | 0 | 0 | 0 |
| Park Middle | 0 | 6 | 1 | 2 |
| Parkersburg Catholic High School (7-12) | 0 | 0 | 0 | 0 |
| Parkersburg South | 0 | 1 | 1 | 0 |
| Paw Paw | 0 | 0 | 0 | 0 |
| Pendleton County High School | 0 | 0 | 1 | 0 |
| Petersburg high/middle (7-12) | 0 | 3 | 0 | 0 |
| Peterstown Middle School | 0 | 0 | 0 | 0 |
| PikeView High School | 0 | 0 | 1 | 0 |
| PikeView Middle School | 0 | 0 | 0 | 0 |
| Poca High School | 0 | 0 | 0 | 3 |
| Poca Middle School | 0 | 0 | 1 | 1 |
| Pocahontas County High School | 0 | 0 | 1 | 1 |
| Point Pleasant Jr/Sr High School | 0 | 1 | 0 | 4 |
| Princeton Senior | 0 | 1 | 1 | 1 |
| Pt.Pleasant Jr/Sr HS | 0 | 0 | 2 | 1 |
| Ravenswood High School | 0 | 1 | 1 | 1 |
| Richwood High School | 0 | 0 | 0 | 4 |
| Richwood Middle School | 0 | 0 | 4 | 1 |
| Ripley High School | 0 | 0 | 0 | 0 |
| Ripley middle school | 0 | 0 | 1 | 0 |
| Ritchie County High School | 0 | 0 | 0 | 1 |
| River View High School | 0 | 1 | 1 | 1 |
| Riverside | 0 | 0 | 0 | 0 |
| Riverside Middle | 0 | 2 | 2 | 0 |
| Roane County High School | 0 | 1 | 0 | 0 |
| Robert C. Byrd High School | 0 | 1 | 1 | 0 |
| Robert L. Bland Middle School | 0 | 0 | 0 | 0 |
| Romney Middle School | 0 | 0 | 0 | 0 |
| Saint Francis de Sales School | 0 | 6 | 0 | 0 |
| Scott High School | 0 | 0 | 0 | 4 |
| Shady Spring High School | 0 | 39 | 0 | 0 |
| Shepherdstown Middle | 0 | 1 | 2 | 1 |
| Sherman High School | 1 | 1 | 4 | 1 |
| Sherrard | 1 | 1 | 3 | 1 |
| Sissonville High School | 0 | 0 | 0 | 0 |
| Sissonville Middle School | 0 | 1 | 1 | 2 |
| South Charleston High School | 1 | 0 | 0 | 0 |
| South Harrison | 1 | 1 | 0 | 0 |

WVSSAC000369



| School | | | | | |
|---|---|---|---|---|---|
| South Harrison middle school | 2 | 0 | 0 | 0 | 0 |
| Spring Mills High School | 1 | 2 | 1 | 0 | 0 |
| Spring Mills Middle School | 0 | 0 | 0 | 0 | 0 |
| Spring Valley | 1 | 2 | 3 | 1 | 0 |
| St albans | 0 | 1 | 0 | 0 | 0 |
| St. Francis Central Catholic School | 0 | 1 | 1 | 0 | 0 |
| St. Marys High | 0 | 1 | 1 | 2 | 0 |
| Summers County High School | 1 | 0 | 1 | 0 | 0 |
| Summersville Middle School | 0 | 1 | 0 | 2 | 0 |
| Tolsia High school | 0 | 0 | 0 | 0 | 0 |
| trap hill middle school | 0 | 0 | 2 | 0 | 0 |
| Triadelphia Middle | 0 | 0 | 1 | 1 | 0 |
| Trinity Christian School | 0 | 0 | 0 | 1 | 0 |
| Tucker County High School | 0 | 0 | 0 | 0 | 0 |
| Tucker Valley Middle | 0 | 0 | 0 | 0 | 0 |
| Tug Valley | 0 | 0 | 0 | 0 | 0 |
| Tygarts Valley | 1 | 0 | 1 | 0 | 0 |
| Tyler consolidated | 1 | 0 | 1 | 0 | 0 |
| Union High School | 0 | 0 | 3 | 0 | 0 |
| University | 0 | 1 | 0 | 0 | 0 |
| Valley High School (Wetzel) | 0 | 0 | 0 | 0 | 0 |
| Valley PK 8 | 0 | 0 | 0 | 0 | 0 |
| Van JR/SR High School | 0 | 1 | 2 | 1 | 0 |
| WAHAMA JR/SR HIGH | 1 | 1 | 1 | 1 | 0 |
| Warm Springs Middle School | 1 | 0 | 0 | 1 | 0 |
| Warwood | 0 | 0 | 0 | 0 | 0 |
| Wayne HS | 0 | 0 | 3 | 0 | 0 |
| wayne middle | 0 | 1 | 1 | 0 | 0 |
| Weir high school | 1 | 2 | 2 | 0 | 0 |
| Weir Middle School | 0 | 0 | 1 | 0 | 0 |
| West Fairmont Middle School | 1 | 1 | 0 | 1 | 0 |
| West Side Middle School | 0 | 0 | 2 | 0 | 0 |
| Western Greenbrier Middle School | 0 | 0 | 0 | 0 | 0 |
| Westside High School | 1 | 0 | 0 | 0 | 0 |
| Wheeling Central Catholic High School | 0 | 2 | 2 | 2 | 0 |
| Wheeling Middle | 2 | 0 | 0 | 0 | 0 |
| Wheeling Park High School | 0 | 1 | 1 | 1 | 0 |
| Wirldwood Middle School | 4 | 0 | 0 | 2 | 0 |
| Williamson PK8 | 0 | 0 | 0 | 0 | 0 |
| Winfield High School | 2 | 2 | 0 | 20 | 4 |
| Winfield middle | 1 | 0 | 1 | 0 | 0 |
| Wirt County High School | 0 | 0 | 0 | 0 | 0 |
| Wood county Christian school | 0 | 0 | 0 | 0 | 0 |
| Wyoming East High School | 0 | 0 | 0 | 0 | 0 |
| | 60 | 133 | 147 | 87 | 9 |

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    CHARLESTON DIVISION
 4
 5  B.P.J. by her next friend and    )
    mother, HEATHER JACKSON,          )
 6                                    )
                Plaintiff,            )
 7                                    )
                vs.                   ) Civil Action No.
 8                                    ) 2:21-cv-00316
    WEST VIRGINIA STATE BOARD OF      )
 9  EDUCATION, HARRISON COUNTY BOARD  )
    OF EDUCATION, WEST VIRGINIA       )
10  SECONDARY SCHOOL ACTIVITIES       )
    COMMISSION, W. CLAYTON BURCH in   )
11  his official capacity as State    )
    Superintendent, DORA STUTLER in   )
12  her official capacity as          )
    Harrison County Superintendent,   )
13  and THE STATE OF WEST VIRGINIA,   )
                                      )
14              Defendants.           )
                                      )
15              and                   )
                                      )
16  LAINEY ARMISTEAD,                 )
                                      )
17              Defendant-Intervenor. )
    _____  )
18
19          VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
20               DEPOSITION OF MICHELE BLATT
21               Monday, February 14, 2022
22  Remotely Testifying from Charleston, West Virginia
23
24   Reported By:  Hanna Kim, CLR, CSR No. 13083
25    Job No. 5079505
```

                                              Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                   CHARLESTON DIVISION
 4
 5   B.P.J. by her next friend and    )
     mother, HEATHER JACKSON,         )
 6                                    )
              Plaintiff,              )
 7                                    )
              vs.                     )  Civil Action No.
 8                                    )  2:21-cv-00316
     WEST VIRGINIA STATE BOARD OF     )
 9   EDUCATION, HARRISON COUNTY BOARD )
     OF EDUCATION, WEST VIRGINIA      )
10   SECONDARY SCHOOL ACTIVITIES      )
     COMMISSION, W. CLAYTON BURCH in  )
11   his official capacity as State   )
     Superintendent, DORA STUTLER in  )
12   her official capacity as         )
     Harrison County Superintendent,  )
13   and THE STATE OF WEST VIRGINIA,  )
                                      )
14            Defendants.             )
                                      )
15            and                     )
                                      )
16   LAINEY ARMISTEAD,                )
                                      )
17            Defendant-Intervenor.   )
     _____  )
18
19            Virtual videoconference video-recorded
20     deposition of MICHELE BLATT, taken pursuant to the
21     stipulations of counsel thereof, taken on behalf
22     of the Plaintiff, on Monday, February 14, 2022,
23     remotely testifying from Charleston, West
24     Virginia, before Hanna Kim, CLR, Certified
25     Shorthand Reporter, No. 13083.
```

                                              Page 2

```
 1        A.    No.

 2        Q.    And do you understand that you're here in

 3   response to a 30(b)(6) deposition notice?

 4        A.    Yes.

 5        Q.    Do you know what a 30(b)(6) deposition is?   12:17:07

 6        A.    Yes.  I just learned that Friday.

 7        Q.    Excellent.

 8              And have you had a chance to review the

 9   deposition notice?

10        A.    Yes.                                          12:17:17

11        Q.    Great.

12              And so you're familiar with a 12 topics

13   described in the notice?

14        A.    Yes.

15        Q.    Wonderful.                                   12:17:25

16              So if you'll please go into your "Marked

17   Exhibits" folder on Exhibit Share, you should see

18   Exhibit 15.

19              Please go ahead and open that exhibit, and

20   let me know when you have it open.                      12:17:37

21              MS. MORGAN:  We have it open.

22              MS. VEROFF:  Wonderful.

23              (Blatt Deposition Exhibit 15 was marked

24              electronically.)

25   BY MS. VEROFF:                                          12:17:45
```

Page 17

```
 1          A.    No.

 2          Q.    Do you have any kids?

 3          A.    I do.

 4          MS. MORGAN:   I'm -- I'm going to con- --

 5    give me a continuing objection.  I don't understand    12:42:21

 6    why this would be relevant to her 30(b)(6)

 7    deposition here.

 8          MS. VEROFF:  Very happy to give you a

 9    continuing deposition [sic], and -- and we'll wrap

10    up shortly.                                             12:42:36

11    BY MS. VEROFF:

12          Q.    Do any of your kids play school sports?

13          A.    Yes.

14          Q.    What sports do they play?

15          A.    My son ran cross country and track.  My    12:42:43

16    daughter played basketball, volleyball, and ran

17    cross country and track.

18          Q.    Great.

19                And before today, did you know who B.P.J.

20    was?                                                   12:43:02

21          A.    Just in preparing for this case.

22          Q.    But outside of preparing for this case,

23    did you know who she was?

24          A.    Just from news articles.

25          Q.    And has anyone at the State Board ever had  12:43:15
```

Page 32

```
 1    direct communications with B.P.J.?

 2         A.   No.

 3         Q.   Has anyone at the State Board ever had

 4    direct communications with B.P.J.'s mother?

 5         A.   No.                              12:43:30

 6         Q.   Has anyone at the State Board ever had

 7    direct communications with B.P.J.'s father?

 8         A.   No.

 9         Q.   And has anyone at the State Board ever had

10    direct communications with one of B.P.J.'s   12:43:43

11    siblings?

12         A.   No.

13         Q.   I want to shift to talking a little bit

14    about the state superintendent.

15              Have you ever met Superintendent Burch?   12:43:55

16         A.   Yes.

17         Q.   I would imagine so, given your role.

18              How long has Superintendent Burch been in

19    his position?

20         A.   Approximately two years.         12:44:06

21         Q.   And how is someone selected to be the

22    state superintendent?

23         A.   The state superintendent is selected by

24    the State Board of Education.

25         Q.   And is there a term limit for the   12:44:23
```

Page 33

1          A.    The Department of Education or the -- the

2    Board of Education?

3          Q.    I'll ask about them separately.  So,

4    first, the Department of Education.

5          A.    Okay.  The -- no.                          13:30:29

6          Q.    And does the State Board have any role

7    with respect to school sports in West Virginia?

8          A.    Just in the approval of the rules that the

9    secondary school's association -- the SSAC

10   presents to them.                                      13:30:45

11         Q.    Does the State Board currently have any

12   roles pertaining to school sports?

13         A.    Only one.  It's in relation to the 2.0 GPA

14   for eligibility.

15         Q.    So can you tell me a little bit more about  13:30:58

16   what that rule involves?

17         A.    Just that students are required to

18   maintain a 2.0 in order to participate in a sport.

19         Q.    And are there any other rules that the

20   State Board has regarding school sports?              13:31:12

21         A.    No.

22         Q.    Does the State Board monitor participation

23   in school sports?

24         A.    No.

25         Q.    Does the State Board have any rules        13:31:24

Page 66

1    regarding students who are transgender?

2         A.    No.

3         Q.    Has the State Board ever received any

4    complaints regarding students who are transgender

5    participating in school sports?                    13:31:41

6         A.    No.

7         Q.    Has the superintendent ever received any

8    complaints regarding students who are transgender

9    participating in school sports?

10        A.    No.                                       13:31:56

11        Q.    So I want to shift back to talking more

12   specifically about H.B. 3293.  Are you familiar

13   with H.B. 3293?

14        A.    Yes.

15        Q.    Does H.B. 3293 require the State Board to   13:32:09

16   promulgate rules to implement H.B. 3293?

17        A.    Yes.

18        Q.    And has the State Board chosen an employee

19   to be the person responsible for promulgating the

20   rules to implement H.B. 3293?                      13:32:26

21        A.    No.

22        Q.    I'd like to introduce a new exhibit now.

23   I'll let you know when it's available in your

24   "Marked Exhibits" folder.

25              (Blatt Deposition Exhibit 18 was marked   13:32:43

Page 67

1      A.   No, not -- not with the State Board.

2      Q.   And -- and so who has had those

3  discussions?

4      A.   And I may have misspoke when you said

5  "discussions."  But just stating that we would          13:36:36

6  look at the language and the policy would

7  replicate what is in State Code.

8      Q.   I see.

9           So there have been any discussions at the

10  State Board regarding H.B. 3293?                        13:36:45

11      A.   No.

12      Q.   And have there been any actions taken at

13  the State Board to prepare to promulgate rules

14  implementing H.B. 3293?

15      A.   No.  Again, we had not got to that prior       13:37:01

16  to the lawsuit.

17      Q.   Okay.  And so just to confirm, is it your

18  testimony that the State Board hasn't taken any

19  action to promulgate rules implementing H.B. 3293

20  because this lawsuit was filed?                         13:37:17

21      A.   Well, it's just the time frames and

22  because of the lawsuit, there -- we had not

23  had time --

24      Q.   And --

25           (Simultaneous speaking.)                       13:37:26

                                                        Page 71

```
 1              MS. MORGAN:  Object to form.
 2              THE WITNESS:  I mean, the -- the State
 3    Board has not had that discussion, as they have not
 4    started to promulgate a rule.
 5    BY MS. VEROFF:                                   13:45:54
 6        Q.   And just to confirm, aside from
 7    rule-making, has the State Board taken any other
 8    action to contemplate the implementation of H.B.
 9    3293?
10              MS. MORGAN:  Object to form.           13:46:10
11              THE WITNESS:  No, not to my knowledge.
12    BY MS. VEROFF:
13        Q.   I'd like now to ask you about some of the
14    people who are listed on the State Board's initial
15    disclosures.                                     13:46:21
16              Let's start with Sarah Stewart.
17              Do you know who Sarah Stewart?
18        A.   Sarah Stewart was our previous legislative
19    liaison attorney that worked with -- at the
20    Department of Education.                         13:46:34
21        Q.   And do you say "previous" because she no
22    longer works at the Department of Education?
23        A.   Correct.
24        Q.   And when did she leave that role?
25              MS. MORGAN:  Object to form.           13:46:43
```

Page 80

```
 1        Q.    Thank you.

 2              And -- and just to confirm, as I said at

 3        the outset, I'm not asking for any confidential

 4        communications that you've had with your counsel.

 5        I'm just asking about the nature of your              14:20:03

 6        preparation for today's deposition.

 7              So just looking for whether or not you

 8        spoke with someone.

 9              And so when Heather Hutchens writes here

10        that H.B. 3293 is, quote, "much ado about            14:20:12

11        nothing," what was her reason for concluding that

12        H.B. 3293 was "much ado about nothing"?

13              MS. MORGAN:   Object to form and

14        speculation.

15              THE WITNESS:   The only thing I would say       14:20:27

16        is that we've not had an issue in West Virginia

17        regarding transgender in sports.

18        BY MS. VEROFF:

19        Q.    Does the State Board agree that H.B. 3293

20        is much ado about nothing?                            14:20:38

21              MS. MORGAN:   Object to form.

22              THE WITNESS:   I could not answer to that

23        for the State Board.

24        BY MS. VEROFF:

25        Q.    And are you here speaking today on behalf       14:20:46
```

Page 101

```
 1    of the State Board?
 2              MS. MORGAN:  Asked and answered.
 3    Obviously she has been designated to testify as to
 4    the 12 topics identified in the notice.
 5              THE WITNESS:  Yes.                    14:20:57
 6    BY MS. VEROFF:
 7       Q.   But you don't know the State's position on
 8    whether the -- I'm sorry, the State Board's
 9    position on whether it would agree that H.B. 3293
10    is "much ado about nothing"?                    14:21:09
11              MS. MORGAN:  Object to form.
12              THE WITNESS:  I just know that we don't
13    see an issue in West Virginia.
14    BY MS. VEROFF:
15       Q.   Okay.                                   14:21:18
16              So I'm going to introduce a new exhibit
17    now.  I'll let you know when you can expect to see
18    it in the "Marked Exhibits" folder.
19              (Blatt Deposition Exhibit 20 was marked
20              electronically.)                      14:21:40
21    BY MS. VEROFF:
22       Q.   If you'll refresh your "Marked Exhibits"
23    folder, you should now see what's marked as
24    Exhibit 20.  Please just let me know when you have
25    it up.                                          14:21:51
```

                                              Page 102

1    that they -- they review the agency's summary of

2    the bill in determination, recommendations that

3    they would make to the governor.

4    BY MS. VEROFF:

5        Q.   And besides Sarah Stewart, who prepared    14:33:11

6    the Enrolled Bill Review Form, did anyone else at

7    the Department of Education review this Enrolled

8    Bill Form [verbatim] for H.B. 3293?

9        A.   I can't speak exactly to this bill.  But

10   the normal process is the state superintendent    14:33:32

11   would review prior to submitting.

12       Q.   And do you know if the state

13   superintendent reviewed this Enrolled Bill Form

14   [verbatim] for H.B. 3293?

15           MS. MORGAN:  Object to form.    14:33:41

16           THE WITNESS:  I can't -- I believe so, but

17   I can't speak for definite.

18   BY MS. VEROFF:

19       Q.   And on the second page of the PDF, which

20   is Bates stamped WVSBOE 000038, there's Item    14:33:50

21   Number 14, which says, "Is a Governor's veto

22   recommended?  If yes, please explain."

23           And the answer provided is "The WVDE does

24   not support this bill."

25           Did I read that correctly?    14:34:08

Page 113

1          A.   Yes.

2          Q.   And does WVDE stand for West Virginia

3     Department of Education here?

4          A.   Yes.

5          Q.   And is it correct that the Department of     14:34:17

6     Education did not support H.B. 3293?

7          A.   Department of Education did -- as we've

8     talked --

9               (Interruption in audio/video.)

10              THE COURT REPORTER:  Excuse me.  Could you    14:34:31

11    please start over your answer.  There was an

12    interruption in audio.

13              THE WITNESS:  The -- the Department of

14    Education did not see that we had an issue with

15    transgender in sports that would require us to take    14:34:43

16    the necessary steps and work to promulgate a rule.

17              And then also, normally a rule in relation

18    to sports would have been created by the SSAC and

19    then brought forth to the Board of Education.

20    BY MS. VEROFF:                                          14:35:04

21         Q.   And were there any other reasons besides

22    those two that the Department of Education didn't

23    support H.B. 3293?

24         A.   Not that I'm aware of.

25         Q.   And who made the decision that the           14:35:13

                                                  Page 114

```
 1    Department of Education didn't support H.B. 3293?
 2         A.   Well, as I -- as I said a little bit
 3    earlier, I will -- you know, it's a discussion
 4    between our legislative attorney and the state
 5    superintendent.                              14:35:29
 6         Q.   And were the reasons that the Department
 7    of Education didn't support H.B. 3293 written down
 8    anywhere?
 9         A.   Not to my knowledge.
10         Q.   And were there any memos or other    14:35:41
11    documents prepared that underlie --
12              (Interruption in audio/video.)
13              THE COURT REPORTER:  Excuse me.  Could you
14    please start over.
15              MS. VEROFF:  Of course.             14:35:53
16    BY MS. VEROFF:
17         Q.   Were there any documents that capture
18    the -- the reasoning arising at the conclusion
19    that the Department of Education doesn't support
20    the bill?                                    14:36:02
21         A.   No, I don't believe there are any
22    documents for -- for any other bill.
23         Q.   And did the Department of Education tell
24    any legislators that it didn't support H.B. 3293?
25         A.   Not necessarily.  I mean, I don't know  14:36:19
```

Page 115

```
 1    BY MS. VEROFF:

 2        Q.   Thank you.

 3             And under H.B. 3293, can B.P.J., the

 4    plaintiff in this case, play on a girls' sports

 5    team?                                          14:45:23

 6        A.   No.  According to this statute, no.

 7        Q.   And why can't she play on a girls' sports

 8    team?

 9             MS. MORGAN:  Object to form.

10             THE WITNESS:  Because the statute would    14:45:32

11    prohibit it.

12    BY MS. VEROFF:

13        Q.   If B.P.J. were a cisgender girl, could she

14    play on girls' sports teams under H.B. 3293?

15             MS. MORGAN:  Objection to form.          14:45:40

16             THE WITNESS:  According --

17             MR. TRYON:  Objection.

18             THE WITNESS:  According to what I read in

19    the statute, yes.

20    BY MS. VEROFF:                                  14:45:47

21        Q.   Does the State Board believe that H.B.

22    3293 is necessary?

23             MS. MORGAN:  Object to form.

24             THE WITNESS:  So we've not had an issue in

25    the past is what we've -- we had said from -- you  14:45:59
```

Page 125

```
 1    know, throughout the thing, that it's not been a

 2    concern in West Virginia.

 3    BY MS. VEROFF:

 4         Q.   And does the State Board believe that H.B.

 5    3293 advances any important government interests?    14:46:10

 6              MS. MORGAN:  Object to form.

 7              THE WITNESS:  I'm not aware -- or I mean,

 8    I -- not that we're aware of.

 9    BY MS. VEROFF:

10         Q.   Is it -- so just to confirm, do you mean    14:46:20

11    that you're not aware of whether the State Board

12    thinks that any important government interests are

13    advanced, or do you mean that the State Board does

14    not believe that any important government

15    interests are advanced by H.B. 3293?               14:46:34

16         A.   There -- the State Board --

17              MR. TRYON:  This is David Tryon.

18    Objection to calls for a legal conclusion.

19              MS. MORGAN:  Object form.

20              THE WITNESS:  The -- the -- the State    14:46:42

21    Board is not aware if there is or is not a

22    relationship for -- for that.

23    BY MS. VEROFF:

24         Q.   Great.

25              MS. VEROFF:  So I think at this time, I    14:46:51
```

Page 126

```
 1    the rules.
 2        Q.   Okay.  Very good.
 3             And in terms of the 2.0 rule, I recollect
 4    you spoke to the 2.0 rule.
 5             Do you recollect that testimony?        15:06:54
 6        A.   Yes, that that was the only reference to
 7    sports participation that's in a State Board
 8    policy.
 9        Q.   All right.
10             And in terms of who actually has a --    15:07:05
11             (Interruption in audio/video.)
12             THE COURT REPORTER:  Excuse me.  If you
13    would please start over.  There was an interruption
14    in audio.
15    BY MS. GREEN:                                    15:07:17
16        Q.   So in terms of who actually has authority
17    to enforce or waive the 2.0 rule, that would be
18    the State Board; wouldn't it?
19        A.   No.  That would be the authority of the --
20    enforcement of the 2.0 rule lies with the schools  15:07:35
21    and with the counties, mainly with the schools who
22    are reviewing the -- the records of the students.
23        Q.   Okay.  And very good point.  Thank you for
24    clarifying, not SSAC.
25             SSAC doesn't enforce the State Board's    15:07:49
```

Page 132

 1   rules; correct?

 2          MS. VEROFF:  Objection as to counsel

 3   testifying.

 4   BY MS. GREEN:

 5      Q.   State -- State Board rule, your one rule;   15:07:59

 6   is that true?

 7      A.   Elig- -- eligibility is determined at the

 8   school level.

 9      Q.   All right.

10          And in terms of -- I think during the      15:08:07

11   pandemic, the State Board had waived or changed

12   compliance with the 2.0 rule, and that was done by

13   the State Board; wasn't it?

14      A.   Yes.

15      Q.   That's not SSAC doing that with your rule,  15:08:20

16   was it?

17      A.   No.

18      Q.   And I'm not sure whether I asked you or

19   not -- and maybe counsel will all object and tell

20   me I did.                                          15:08:38

21          But in terms of any sorts of

22   communications Bernie Dolan had with the

23   legislature or didn't have, any sort of e-mails

24   Bernie Dolan sent, any sort of communication, you

25   would defer to Mr. Dolan to speak for himself,     15:08:50

                                           Page 133

1    would you not?

2        A.   Yes.

3        Q.   Thank you.  Appreciate it.

4        A.   Thank you.

5            MS. GREEN:  No further questions at this        15:08:58

6    time.  Thank you, all.

7            MR. TRYON:  Ms. Blatt, my name the David

8    Tryon.  I don't see my video coming up yet.

9    But anyways, my name is David Tryon, on behalf of

10   the State of West Virginia.  Thank you very much        15:09:12

11   for your time today.  We have no questions.  Thank

12   you.

13           THE WITNESS:  Thank you.

14           MS. GREEN:  Good afternoon, Ms. Blatt.  My

15   name is Susan Deniker.  I represent the Harrison        15:09:27

16   County Board of Education and Superintendent

17   Stutler.  Thank you for your time today.  I do not

18   have any questions.

19           THE WITNESS:  Thank you.

20           MS. MORGAN:  So I have a few clarifying         15:09:37

21   questions that I would like to ask Ms. Blatt.

22                      EXAMINATION

23   BY MS. MORGAN:

24       Q.   You were asked about the 2.0 rule, both by

25   plaintiff's counsel as well as counsel for SSAC.        15:09:48

Page 134

1    And just want to clarify.

2           That is a -- a rule that was promulgated

3    by the West Virginia Board of Education; correct?

4        A.   Yes.

5        Q.   And it was -- it is to be implemented,        15:10:01

6    enforced by who?

7        A.   By this -- membership schools.

8        Q.   Is that similar to what will happen in the

9    future if a rule is promulgated by the Board of

10   Education?                                              15:10:19

11       A.   Yes.

12          MS. VEROFF:  Objection as to form.

13   BY MS. MORGAN:

14       Q.   Has the State Board of Education ever

15   discussed 3293 at a meeting -- discussed House          15:10:38

16   Bill, that it was codified, 3293, at a board

17   meeting?

18       A.   No, they have not.

19          MS. VEROFF:  Objection.  Asked and

20   answered.                                               15:10:51

21   BY MS. MORGAN:

22       Q.   Have they taken any vote or action?

23       A.   No, they have not.

24       Q.   Has the department received any complaints

25   about --                                                15:11:07

Page 135

```
 1              MS. VEROFF:  Object- --

 2              (Simultaneous speaking.)

 3              (Interruption in audio/video.)

 4     BY MS. MORGAN:

 5       Q.   -- stu- -- has the State Board of       15:11:12

 6     Education or the Department of Education received

 7     any complaints by any individuals about

 8     transgender athletes participating in sports?

 9       A.   No, we have not.

10       Q.   When --                                 15:11:29

11              MS. MORGAN:  Let's go off the record just

12     for a moment.

13              THE VIDEOGRAPHER:  Okay.  We're going off

14     the record.  The time is 3:11 p.m.

15              (Off the record.)                     15:12:01

16              THE VIDEOGRAPHER:  We're back on the

17     record at 3:12 p.m.

18              Go ahead.

19     BY MS. MORGAN:

20       Q.   Topic 8 states that it's about "Your    15:12:53

21     Policies, Documents and Communications Concerning

22     the separation of boys and girls in sports in West

23     Virginia prior to and following the passage of

24     H.B. 3293."  [As read]

25              Are -- are there any policies, documents  15:13:11
```

Page 136

```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      CHARLESTON DIVISION

4                    *  *  *  *  *  *  *  *

5   B.P.J., by her next friend and    *

6   Mother, HEATHER JACKSON,          *

7       Plaintiff                     *   Case No.

8       vs.                           *   2:21-CV-00316

9   WEST VIRGINIA STATE BOARD OF      *

10  EDUCATION, HARRISON COUNTY        *

11  BOARD OF EDUCATION, WEST          *

12  VIRGINIA SECONDARY SCHOOL         *

13  ACTIVITIES COMMISSION, W.         *

14  CLAYTON BURCH in his official     * CONFIDENTIAL

15  Capacity as State Superintendent,* VIDEOTAPED

16  DORA STUTLER in her official      * VIDEOCONFERENCE

17  Capacity as Harrison County       * DEPOSITION

18  Superintendent, PATRICK MORRISEY  *      OF

19  In his official capacity as       * GERALD MONTANO, D.O.

20  Attorney General, and THE STATE   * February 24, 2022

21  OF WEST VIRGINIA,                 *

22      Defendants                    *

23            Any reproduction of this transcript
              is prohibited without authorization
24                by the certifying agency.
```

1    that's actually made a formal diagnosis of gender

2    dysphoria for BPJ?

3        A.    That I do not know.

4        Q.    I have been told that there's something called

5    --- that gender identity is fluid.

6              Is that right?

7                    ATTORNEY BLOCK:  Objection to form.

8                    ATTORNEY JONES:  Form and terminology.

9                    ATTORNEY TRYON:  Let me back up.

10   BY ATTORNEY TRYON:

11       Q.    What does the term gender identity mean?

12       A.    Gender identity is an immutable characteristic

13   of someone's feeling of either being a woman or a man or

14   something in between or another gender, which could be a

15   combination of bio, psychosocial, societal expectations

16   and their own sense of what their gender identity is.

17       Q.    Can gender identity be fluid?

18                    ATTORNEY JONES:  Objection to form.

19                    THE WITNESS:  It cannot be fluid.  It is

20   immutable.

21   BY ATTORNEY TRYON:

22       Q.    So if another medical professional said that

23   gender identity is fluid, that person would be wrong in

24   your estimation?

1          ATTORNEY JONES:  Objection to scope.

2    He's not here as an expert.

3    BY ATTORNEY TRYON:

4        Q.    You can answer.

5        A.    I would say they're using --- that would be

6    incorrect definition of what gender identity is.

7        Q.    I've also been told that gender identity

8    evolves.  Are you saying --- is that right or wrong?

9          ATTORNEY BLOCK:  Objection to the form.

10   BY ATTORNEY TRYON:

11       Q.    Or that it can evolve.  Would that be right or

12   wrong.

13         ATTORNEY BLOCK:  Objection to form.

14         ATTORNEY JONES:  And scope.

15         THE WITNESS:  Can you clarify what do you

16   mean by evolve?

17   BY ATTORNEY TRYON:

18       Q.    Change over time.

19       A.    No.

20       Q.    Have you ever --- is gender identity something

21   that is observable externally or only what some person

22   feels?

23         ATTORNEY BLOCK:  Objection to form.

24         ATTORNEY JONES:  Form.  You can answer.

```
 1                    THE WITNESS:  That is something that a
 2   person only knows.
 3                    ATTORNEY TRYON:  Jacob, I'm trying to
 4   find the documents used previously.  Trying to find
 5   Exhibit 4.
 6                    VIDEOGRAPHER:  Give me one moment here.
 7   That would be --- 4 would be in the one marked 1 through
 8   9.  Correct?
 9                    ATTORNEY TRYON:  Correct.
10                    VIDEOGRAPHER:  Okay.
11                    It should be shared with you.  You might
12   see it in a folder labeled shared with you.
13                    ATTORNEY TRYON:  Shared with group.
14   There we go.  Okay.
15                    Jacob, is there a way to get through here
16   without clicking the arrow button so I can get through
17   faster?
18                    VIDEOGRAPHER:  You can highlight the
19   number and type in, you know, whatever number page you
20   want to go to.
21                    ATTORNEY TRYON:  Thank you.
22                    Okay.  This is Exhibit 4.
23   BY ATTORNEY TRYON:
24        Q.   Can you see that, Doctor Montano?
```

```
1      A.     I cannot see it.

2      Q.     Oh, let me know when you see it.

3      A.     It's loading.  Sorry.

4      Q.     That's okay.

5      A.     I see it.

6      Q.     Do you recognize this document?

7      A.     Yes.

8      Q.     What is it?

9      A.     That is the physical documentation when I first

10  saw BPJ.

11     Q.     How is this form filled out?  Do you see this

12  form just like this on the system and you type in your

13  information or is this just a separate internal form

14  that then populates this?

15     A.     It's the template within the electronic medical

16  record.

17     Q.     Are you saying this is the actual template or

18  there is a template that you --- on the system that you

19  type into which then populates this form?

20                    ATTORNEY BLOCK:  Objection to form.

21                    ATTORNEY JONES:  Objection to form.

22                    THE WITNESS:  Is there --- can you

23  rephrase that question?

24  BY ATTORNEY TRYON:
```

98

1    Q.    Yeah.  I'm just trying to understand.  When you
2    --- when --- you don't fill things out in paper, right?
3    You do it right on the computer.

4          Is that correct?

5    A.    Yes.

6    Q.    And when you pull up --- go to enter information
7    on the computer, does the document look like this
8    Exhibit 4?

9    A.    Yes, it's like a pre-form template that I use.

10   Q.    And what's the source of the template?  Is it
11   something that you developed or that UPMC developed or
12   something that Epic developed or something else?

13   A.    It's a template I developed.

14   Q.    Is this form in the Epic system now?

15   A.    Yes.

16   Q.    And more than form.  I guess I should say ---
17   rephrase that.  Is this actual document in the Epic
18   system?

19   A.    Are you referring to WV 4?

20   Q.    Yes.

21   A.    Yes.  It's in the electronical medical record
22   system.

23   Q.    At the top here it has got the designation of
24   male.

```
 1              Do you see that?
 2      A.      Yes.
 3      Q.      Why does it say male?
 4      A.      Because that is the legal sex of the patient.
 5      Q.      Is there any other reason that the designation
 6  of male should be in here?
 7                      ATTORNEY BLOCK:  Objection to form.
 8                      ATTORNEY JONES:  Objection to form.
 9                      THE WITNESS:  From my custom and
10  practice, it's important to know what organs that person
11  has.  So it's a good thing to know.
12  BY ATTORNEY TRYON:
13      Q.      Does that mean that BPJ is a biological male?
14                      ATTORNEY BLOCK:  Objection to form.
15                      ATTORNEY JONES:  Objection to form.
16                      THE WITNESS:  The way I would describe it
17  is that B█████ or BPJ was assigned male at birth.
18  BY ATTORNEY TRYON:
19      Q.      Does the term biological male have a meaning?
20                      ATTORNEY BLOCK:  Objection to form.
21                      THE WITNESS:  To answer your question, it
22  is a very misleading and to some people offensive
23  meaning.
24  BY ATTORNEY TRYON:
```

1      Q.    Is it offensive to you?

2      A.    No.

3      Q.    In what way is it misleading?

4      A.    Because it disqualifies someone's gender

5  identity when you describe them as biologically male.

6      Q.    Does the term --- how does the term male as used

7  in this document differ from the term biological male?

8      A.    Going back to my assigned male at birth, this is

9  what that patient was assigned at birth typically based

10  on what the doctors see in their genitalia.

11      Q.    Now, ███████████████████████████████

12  ███████████████████████

13     ██     ████████████████████████████████████

14  ███████████████████████████████████████████████████

15  ████████████████████████████

16      Q.    Under desire or secondary sex characteristics of

17  other gender, slash, to be other gender, in that part of

18  this form can you tell me what part of the template and

19  what items you actually inputted?

20      A.    So the heading desire to get rid of secondary

21  sex characteristics and then the expectations for

22  today's visit and then hopes for hormone therapy, those

23  are part of the template.  And then the words afterwards

24  are something that I input based on the patient

1    response.

2        Q.    And the words desire for secondary sex

3    characteristic of other gender, slash, to be other

4    gender, that's part of the template?

5        A.    Yes.

6        Q.    And then severity of wanting to be another

7    gender is based on the following, that's part of the

8    template?

9        A.    Yes.

10        Q.    And then there's four items underneath that,

11    hairstyle, clothing, shoes and name.  Are those part of

12    the template?

13        A.    Yes.

14        Q.    And the Y after each one of those, is that

15    something that you inputted into the system?

16        A.    Yes.

17        Q.    I presume Y stands for yes.

18            Correct?

19        A.    Yes.  Yes.

20        Q.    So are you the one that created the template

21    that listed hairstyle, clothing, shoes and name.

22            Is that right?

23        A.    Yes.

24        Q.    Why did you choose those particular four

1    categories?

2       A.    That was based on my training on what questions

3    would be high yield and also based on my understanding

4    of the criteria for gender dysphoria.

5       Q.    So you just limited it to four there, not ---

6    why didn't you have more characteristics?

7       A.    I felt that those would be sufficient enough to

8    indicate someone's desire to be of the other gender.

9       Q.    When it says been expressing herself as female,

10   that's template?

11      A.    No, that actually was something I inputted

12   myself.

13      Q.    Okay.

14            So including the one year?  That question is

15   not entirely clear.  Let me try again.  So it says been

16   expressing herself as female, colon, one year.  That

17   entire phrase is something you inputted separately, not

18   part of the template?

19      A.    I'm sorry.  I had a recording phrase.  I don't

20   know if you said something.

21      Q.    The language, it says been expressing herself as

22   female.  Is that language part of the template or

23   something you typed in?

24      A.    That is something I typed in.

1    Q.    And then the one year, you typed that in?

2    A.    Yes.

3    Q.    And that was based on what BPJ and/or BPJ's mom

4 told you?

5    A.    Both of them.

6    Q.    ████████████████████████  ████████████

7 █████████████████████████████████

8 █████████████████████████  ███████████████

9 █████████████████

10   ██    ████

11   ██    ████████████████████████████████

12   ██    ███████████████████████████████

13 ████████████████████████████████

14   ██    ████████████████████████

15   ██    ████

16   Q.    So I don't really understand what that's saying.

17 Can you explain that?

18   A.    To be honest, I don't understand what it means

19 either.

20   Q.    On the next page, under social and psychosocial

21 habits it says no data available.  Did you type in no

22 data available?

23   A.    No.

24   Q.    And the next part says a detailed psychosocial

1   assessment was conducted and documented confidentially

2   and relevant recommendations and health education was

3   offered to the patient and family.  Is that part of the

4   template or is that something you typed in?

5        A.    That is part of the template.

6        Q.    And was that psychosocial assessment conducted?

7        A.    Yes.

8        Q.    And how is it documented?

9        A.    It was documented through that confidential

10  Adolescent Medicine Questionnaire.

11       Q.    The two-page document that we looked at earlier?

12       A.    Yes.

13       Q.    Any other documentation on that psychosocial

14  assessment?

15       A.    No.

16       Q.    On the page we're looking at, which is page five

17  of 6, also labeled at the bottom BPJ 038, at the top

18  there's a part that says we discussed with B▮▮▮ and her

19  parents/caregiver the nature, effects, benefits, et

20  cetera.

21             Do you see that paragraph?

22       A.    Yes.

23       Q.    How much of that is part of the template and how

24  much of that was actually typed in by you?

```
 1      A.    That was part of the template, but it's my

 2  custom and practice to describe all of that when I'm

 3  counseling my patients.

 4      Q.    And so it says that you offered a refer to the

 5  fertility services at Magee Womens Hospital.  Why did

 6  you offer her a referral to the fertility services at

 7  Magee Womens Hospital?

 8      A.    The reason being is that if B████ were to decide

 9  to get a puberty blocker, ████████████████████████

10  ████████████████.  And so I always --- it's my custom

11  and practice to always counsel my parents that that is a

12  possibility and they should consult with a fertility

13  specialist to understand what would happen if this

14  person were to go or use puberty blockers.

15      Q.    Well, will BPJ be able to produce any eggs with

16  or without puberty blockers?

17      A.    I apologize.  ████████████████████████████████

18  ████████████████████████████████████████

19      Q.    You threw me there.  One more question about

20  this form, back on the first page, page one of eight I

21  think it is.  So under history of present illness ---

22  OFF VIDEOTAPE

23      Q.    --- incongruence, it says identifies as

24  transgender instead of male.  What does it take to
```

```
 1      A.      I do not recall what their response was.

 2      Q.      Did you suggest any names?

 3      A.      That I don't know.

 4      Q.      Do you typically give your patients names of

 5   therapists?

 6      A.      Yeah, my --- yes, my custom and practice is I

 7   actually consult our behavioral health team and then

 8   they speak with our patients to help find a therapist if

 9   they need one.

10      Q.      Next is Exhibit 11B.  I'm sorry, I need to go

11   back to 11A for a moment.  So under physical exam, do

12   you see that?

13      A.      Yes.

14      Q.      It shows a reference to BP and then also to BMI.

15   What is BMI?

16      A.      BMI is a measurement of the weight in ratio to

17   someone's height.

18      Q.      And why is that tracked?

19      A.      Because it helps determine if --- a patient

20   might be having difficulties with obesity if it's too

21   high of a number.

22      Q.      And BMI percentages are divided into categories

23   for comparison to similar populations.

24              Is that right?
```

1    A.    Yes.

2    Q.    Is it important to compare people to the correct

3  grouping?

4                ATTORNEY BLOCK:  Objection to form.

5                ATTORNEY TRYON:  Let me rephrase.

6  BY ATTORNEY TRYON:

7    Q.    Go ahead.

8    A.    No, you can rephrase the question, please.

9    Q.    Why are they divided into categories to compare

10 for comparison to similar populations?

11   A.    It helps create a normalized data to help

12 pediatricians in general to figure out if someone is

13 outside the typical range.

14   Q.    And they're dividing it between boys and girls.

15         Right?

16   A.    Yes.

17   Q.    And this one shows that BPJ was in the ▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19         Right?

20   A.    Yes.

21   Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮

23   ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮



ATTORNEY JONES:  Objection to form.

BY ATTORNEY TRYON:

Q. ████████████████████████████████████

████████████████████████████████████

████████████████

█ ████████████████████████████████████

████████████████████████████████████

████████████████

Q.    So in your opinion, should BPJ have been

compared on BMI with ██████████████████████

██████████████

ATTORNEY JONES:  Objection, scope.

BY ATTORNEY TRYON:

Q.    Go ahead.

A.    There's a debate as to which ones to be used and

our --- at least in my practice, if this is something

pertinent, I will try to do both boys and girls and make

a comparison.

Q.    So you think for BPJ you should track BPJ on

both boy's and girl's charts?

```
 1                    ATTORNEY JONES:  Objection, scope.
 2   BY ATTORNEY TRYON:
 3       Q.    Is that right?
 4       A.    That's what I would do.
 5       Q.    Well, this is your form.  Can't you modify it to
 6   do that?
 7                    ATTORNEY JONES:  Objection, scope, asked
 8   and answered.
 9   BY ATTORNEY TRYON:
10       Q.    Go ahead.  You can answer.
11                    ATTORNEY JONES:  I don't want to give a
12   speaking objection.
13                    ATTORNEY TRYON:  I'll give you a standing
14   objection on this.
15                    THE WITNESS:  Can you repeat the
16   question?
17   BY ATTORNEY TRYON:
18       Q.    Well, let me back up.  Maybe I misunderstood
19   something.  This form that you're --- that is being
20   filled out here, is this a form that you created?
21       A.    It's a template I created, yes.
22       Q.    So on the template, are you able to add an
23   additional category for BMI percentiles for girls as
24   well as boys?
```

```
 1     Q.     And you did enter that information, B████
 2  Pepper-Jackson desires, as indicated by that superscript
 3  there.
 4          Right?
 5     A.     Can you refer ---?
 6     Q.     Where it says --- at the very bottom there is a
 7  blank, a redaction, and it says Pepper --- well, B████
 8  Pepper-Jackson --- well, the deletion, desires.  You
 9  inputted those words.
10          Right?
11     A.     The ████████ part, yes.
12     Q.     So you were able to insert ███████ insertion?
13     A.     Yes, they allow for comments.
14               ATTORNEY JONES:  With, all due respect,
15  if you look at the blank Pepper-Jackson it's GM.1T.  GM,
16  if you go to the attribution key on WV 0024 is Montano,
17  Gerald, and then 1T is template.  So if we're doing what
18  you said before and you're going to the left, the blank
19  Pepper-Jackson is part of the template.
20               ATTORNEY TRYON:  Okay.
21  BY ATTORNEY TRYON:
22     Q.     Help me out here.  So blank Pepper-Jackson is in
23  the template, Mr. Montano?
24     A.     Yes, that's part of the procedure note.  It
```

1  automatically generates the name.

2              ATTORNEY JONES:  And again, I just object

3  to this line of questioning.  I mean ---.

4              ATTORNEY TRYON:  I'm going to move on to

5  the next exhibit.

6              ATTORNEY JONES:  Thank you.

7  BY ATTORNEY TRYON:

8     Q.    So sharing with you Exhibit 42.  Let me know

9  when you can see that.

10    A.    Yes, I see that.

11    Q.    And I'm going to go to the third page of that

12 document.  And if we look down you see the paragraph

13 that starts B███      Oh, there's a couple places.  Under

14 history of present illness, the second paragraph, do you

15 see that?

16    A.    Yes.

17    Q.    And it says she wants to know when she can start

18 hormone therapy.  ████████████████████████████

19 ████████████      And so do you have an idea --- did you

20 already decide when BPJ can start hormone therapy at

21 that point?

22    A.    No.

23    Q.    Did you ever discuss a timeframe for that with

24 BPJ and Heather Jackson?

```
 1      A.    No.

 2      Q.    How about a timeline for ███████████████

 3  █████

 4      ███     █████

 5      Q.    Then it said below recently her dad said ███████

 6  which caused distress.  What do you remember about that

 7  conversation?

 8      A.    Exactly what it says there.

 9      Q.    So you just remember that --- who told you that

10  dad said ███████, Heather or BPJ?

11      A.    Heather.

12      Q.    And that caused distress to whom?

13      A.    That caused distress to B█████.

14      Q.    And did B█████ explain that?

15      A.    As you can see she wasn't present in that visit.

16  I was speaking solely to mom.  So this is from mom's

17  point of view.

18      Q.    Yeah, thank you for pointing that out.  Lastly,

19  it says she has not ███████████.  Why would that be put

20  in there?

21                ATTORNEY JONES:  Real quick, I'm just

22  going to object to the --- to the form of the question.

23  You're asking him to interpret a note of his resident.

24  I mean, as a supervising physician, you know, there are
```

```
 1  some things, but you know some --- I'm just going to

 2  object to the form of the question.

 3  BY ATTORNEY TRYON:

 4      Q.    Well, let's back up.  Did you review the

 5  information in this form?

 6      A.    Yes.

 7      Q.    And it says she had ████████████.  Did you

 8  review that?

 9      A.    Yes.

10      Q.    And why did you let that stay in there?

11      A.    I do not recall.

12      Q.    I mean, it's impossible for ████████████

13  ████████

14          ████████

15      ██  ████████

16      Q.    I'll show you Exhibit 43.  Have you seen this

17  document before --- oops, I need to start.  Let me know

18  when you see that.

19      A.    Yes.

20      Q.    This is from May 17, 2021.  And then the second

21  page is from 5/17/2021.  And this shows under telephone

22  encounter that your name and author is your name.  And

23  then it says, hi, scheduling team, can you please reach

24  out to this family to schedule a follow-up appointment
```

1  with me.

2        Do you see that?

3    A.   Yes.

4    Q.   Why did you want to have a follow-up

5  appointment?

6    A.   It's routine practice to have the patient return

7  every three months once they're put on the puberty

8  blocker to make sure everything is going all right.

9    Q.   And did you have that follow-up appointment?

10    A.   It did not happen.

11    Q.   Do you know why?

12    A.   That I don't know why.  They didn't make that

13  appointment.

14    Q.   Did you have --- forgive me if I don't get the

15  terminology correct.  Did you recommend or prescribe any

16  further treatment for BPJ other than the ███████

17    A.   No.

18    Q.   I'm showing you Exhibit 45.  First page is just

19  a confidential disclosure statement that came with these

20  documents when we received them.  And then the next

21  three pages are for --- well, I don't know how to

22  characterize this, but they're dated 5 --- excuse me.  I

23  can't even --- it looks like the active coverage is as

24  of 12/31/2021, so it looks like that's the date of this

1  document but the problem listed --- yeah, so 12/31/2021.

2  Do you recognize this document?

3      A.    It looks like a duplicate of the previous

4  document.

5      Q.    Can you look through here and tell me if

6  everything in here looks to be correct?

7              ATTORNEY JONES:  Objection to form.  What

8  --- just this page only?

9              ATTORNEY TRYON:  No, all three pages.  I

10  guess a total of --- after the first page, disclosure

11  statement, the rest of the document.

12              ATTORNEY JONES:  So just so we're clear,

13  not going by the Bates --- well, we can go by the Bates.

14  It would be WV 002 through WV ---.

15              ATTORNEY TRYON:  0004.

16              ATTORNEY BLOCK:  I'm just going to make

17  an objection to form.  A lot of this information is

18  blank.

19              THE WITNESS:  From what I'm reading in

20  the information here, this is all correct.

21  BY ATTORNEY TRYON:

22      Q.    I didn't hear you.

23      A.    From what I'm reading in the information here in

24  the exhibit they are correct.

```
 1      Q.     And I recognize there's some information that
 2  does not appear here and I'm just asking you to be clear
 3  about the information that does appear here.  So does
 4  that --- your answer remain the same?
 5      A.     Yes.
 6      Q.     Let me ask you one question under problem list,
 7  where it says ███████████████████████████
 8             Do you see that?
 9      A.     Yes.
10             ATTORNEY JONES:  On WV 000 ---.
11  BY ATTORNEY TRYON:
12      Q.     Is this ████████ and the answer is no?
13      A.     Yes, I see that.
14      Q.     So can you explain that to me?  Does that mean
15  that gender dysphoria is not a chronic condition or does
16  it mean something else?  I don't understand it.
17      A.     If I understand this completely, when you put in
18  the diagnosis in the chart, sometimes that would be
19  specific to that date only.  So it doesn't list that as
20  chronic.  That date is only specific to that date from
21  my understanding of how the electronic medical records
22  is listed.
23             ATTORNEY JONES:  Again, objection to this
24  line of questioning.  I'm not exactly sure if Doctor
```

1  Montano was even the person filling out this part of the

2  form.  So you're essentially asking him to interpret

3  what someone else put.

4            VIDEOGRAPHER:  Mr. Tryon, you appear to

5  be muted.  Mr. Tryon?  Can everybody hear me?

6            THE WITNESS:  I can hear you.

7            VIDEOGRAPHER:  Okay.

8            I'm going to send him a message.  Give me

9  one second.

10            ATTORNEY HARTNETT:  This is Kathleen

11  Hartnett for the Plaintiff.  Just for the record, the

12  volume is going in and out for a lot of people listening

13  to it.  So whatever is happening to him may be what's

14  been happening to us sporadically throughout the

15  deposition.

16            VIDEOGRAPHER:  Okay.

17            ATTORNEY TRYON:  I got booted.  I am

18  back.  Can you guys hear me?

19            VIDEOGRAPHER:  Yes.  I just sent you a

20  chat message.

21            ATTORNEY TRYON:  Okay.

22            VIDEOGRAPHER:  Okay.

23  BY ATTORNEY TRYON:

24      Q.   I'm sorry.  So my question that I was trying to

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                      CHARLESTON DIVISION
    _____
 4  B.P.J. by her next friend and)
 5  mother, HEATHER JACKSON,      )
 6              Plaintiff,        )
      vs.                         ) Case No.
 7  WEST VIRGINIA STATE BOARD OF ) 2:21-cv-00316
 8  EDUCATION, HARRISON COUNTY    )
    BOARD OF EDUCATION, WEST      )
 9  VIRGINIA SECONDARY SCHOOL     )
10  ACTIVITIES COMMISSION, W.     )
    CLAYTON BURCH in his official)
11  capacity as State            )
12  Superintendent, DORA STUTLER,)
    in her official capacity as  )
13  Harrison County              )
14  Superintendent, and THE STATE)
15  OF WEST VIRGINIA,            )
              Defendants,        )
16  LAINEY ARMISTEAD,            )
17          Defendant-Intervenor.)
    _____)
18            REMOTE VIDEOTAPED DEPOSITION OF
19                    LAINEY ARMISTEAD
20                  Friday, March 11, 2022
21                       Volume I
22  Reported by:
23  ALEXIS KAGAY, CSR No. 13795
24  Job No. 5082427
25  PAGES 1 - 175
```

                                            Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
      _____
 4   B.P.J. by her next friend and)
 5   mother, HEATHER JACKSON,      )
 6            Plaintiff,           )
        vs.                       ) Case No.
 7   WEST VIRGINIA STATE BOARD OF ) 2:21-cv-00316
 8   EDUCATION, HARRISON COUNTY   )
     BOARD OF EDUCATION, WEST     )
 9   VIRGINIA SECONDARY SCHOOL    )
10   ACTIVITIES COMMISSION, W.    )
     CLAYTON BURCH in his official)
11   capacity as State            )
12   Superintendent, DORA STUTLER,)
     in her official capacity as  )
13   Harrison County              )
14   Superintendent, and THE STATE)
15   OF WEST VIRGINIA,            )
              Defendants,         )
16   LAINEY ARMISTEAD,            )
17          Defendant-Intervenor. )
      _____)
18
19           Videotaped deposition of LAINEY ARMISTEAD,
20   Volume I, taken on behalf of Plaintiff, with all
21   participants appearing remotely, beginning at
22   12:03 p.m. and ending at 5:03 p.m. on Friday,
23   March 11, 2022, before ALEXIS KAGAY, Certified
24   Shorthand Reporter No. 13795.
25
```

                                              Page 2

1    APPEARANCES (via Zoom Videoconference):

2

3  For the Intervenor:

4      ALLIANCE DEFENDING FREEDOM

5      BY:  CATIE KELLEY

6      BY:  JONATHAN SCRUGGS

7      BY:  CHRISTIANA HOLCOMB

8      BY:  RACHEL CSUTOROS

9      BY:  HAL FRAMPTON

10     BY:  TIMOTHY DUCAR

11     Attorneys at Law

12     20116 Ashbrook Place

13     Suite 250

14     Ashburn, Virginia 20147

15     CKelly@adflegal.org

16     JScruggs@adflegal.org

17     CHolcomb@adflegal.org

18     RCsutoros@adflegal.org

19     TDucar@adflegal.org

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES (Continued):

 2

 3   For defendants Harrison County Board of Education and

 4   Superintendent Dora Stutler:

 5       STEPTOE & JOHNSON PLLC

 6       BY:  SUSAN L. DENIKER

 7       Attorney at Law

 8       400 White Oaks Boulevard

 9       Bridgeport, West Virginia 26330

10       304.933.8154

11       Susan.Deniker@Steptoe-Johnson.com

12

13

14   For the State of West Virginia:

15       WEST VIRGINIA ATTORNEY GENERAL

16       BY:  DAVID TRYON

17       Attorney at Law

18       112 California Avenue

19       Charleston West Virginia 25305-0220

20       681.313.4570

21       David.C.Tryon@wvago.gov

22

23

24

25
```

Page 4

```
 1   APPEARANCES (Continued):

 2

 3   For West Virginia Secondary School Activities

 4   Commission:

 5       SHUMAN MCCUSKEY & SLICER

 6       BY:  ROBERTA GREEN

 7       Attorney at Law

 8       1411 Virginia Street E

 9       Suite 200

10       Charleston, West Virginia 25301-3088

11       RGreen@Shumanlaw.com

12

13   For West Virginia Board of Education and Superintendent

14   Burch, Heather Hutchens as general counsel for the

15   State Department of Education:

16       BAILEY & WYANT, PLLC

17       BY:  KELLY MORGAN

18       Attorney at Law

19       500 Virginia Street

20       Suite 600

21       Charleston, West Virginia 25301

22       KMorgan@Baileywyant.com

23

24

25
```

Page 5

```
 1    APPEARANCES (Continued):

 2

 3   For Plaintiff:

 4      LAMBDA LEGAL

 5      BY:  SRUTI SWAMINATHAN

 6      Attorney at Law

 7      120 Wall Street

 8      Floor 19

 9      New York, New York 10005-3919

10      SSwaminathan@lambdalegal.org

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

```
 1    APPEARANCES (Continued):

 2

 3    For The Plaintiff, B.P.J.:

 4       COOLEY

 5       BY:  KATHLEEN HARTNETT

 6       BY:  ELIZABETH REINHARDT

 7       BY:  KATELYN KANG

 8       BY:  ANDREW BARR

 9       BY:  MATT MARTINEZ

10       BY:  JULIE VEROFF

11       Attorneys at Law

12       500 Boylston Street

13       14th Floor

14       Boston, Massachusetts 02116-3740

15       617.937.2305

16       Khartnett@cooley.com

17       EReinhardt@cooley.com

18       KKang@Cooley.com

19       ABarr@Cooley.com

20       MMartinez@Cooley.com

21       JVeroff@cooley.com

22

23

24

25
```

Page 7

```
 1    APPEARANCES (Continued):

 2

 3   For the Plaintiff:

 4      AMERICAN CIVIL LIBERTIES UNION

 5      BY:  JOSHUA A. BLOCK

 6      125 Broad Street

 7      18th Floor

 8      New York, New York 10004

 9      JBlock@aclu.org

10      212.549.2500

11

12   Also Present:

13      MITCH REISBORD - VERITEXT CONCIERGE

14

15   Videographer:

16      DAVE HALVORSON

17

18

19

20

21

22

23

24

25
```

Page 8

```
 1                         INDEX

 2    WITNESS                          EXAMINATION

 3    LAINEY ARMISTEAD

 4    Volume I

 5

 6              BY MR. BARR                    14

 7

 8

 9                       EXHIBITS

10    NUMBER              DESCRIPTION          PAGE

11    Exhibit 43   West Virginia State University   122

12                 Board of Governors Document, BOG

13                 #14 Policy, Title: Unlawful

14                 Discrimination and Harassment,

15                 Sexual Harassment, Grievance

16                 Procedures, Child Abuse and

17                 Neglect Reporting and

18                 Relationships

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

**JA1569**

1                    PREVIOUSLY MARKED EXHIBITS

2     NUMBER                                              PAGE

3     Exhibit 34                                            78

4     Exhibit 39                                           144

5     Exhibit 40                                           149

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 10

```
 1                    Friday, March 11, 2022

 2                         12:03 p.m.

 3             THE VIDEOGRAPHER:  Okay.  Good afternoon.

 4             We are on the record at 12:04 p.m. on

 5    March 11th, 2022.  This is media unit 1 in the        12:03:44

 6    video-recorded deposition of Lainey Armistead in the

 7    matter of B.P.J. by Heather Jackson versus

 8    West Virginia State Board of Education, et al.

 9             It's filed in the U.S. District Court for the

10    Southern District of West Virginia in the Charleston    12:04:04

11    Division.  The case number is 2:21-cv-00316.

12             This deposition is being held virtually.  My

13    name is Dave Halvorson.  I'm the videographer here from

14    Veritext.  And I'm here with the court reporter,

15    Alexis Kagay, also from Veritext.                       12:04:25

16             Counsel, can you please all identify

17    yourselves so the witness can be sworn in.

18             MR. BARR:  Yes.  Good afternoon.

19             This is Andrew Barr from the law firm

20    Cooley, LLP.  I'll have the rest of my co-counsel       12:04:37

21    introduce themselves before defense and intervenor

22    counsel.

23             THE VIDEOGRAPHER:  Okay.

24             MS. HARTNETT:  Hi.  This is Kathleen Hartnett

25    from Cooley for the plaintiffs.                         12:04:48
```

                                                        Page 11

```
 1              MS. VEROFF:  This is Julie --

 2              MS. KANG:  This is --

 3              MS. VEROFF:  Oh, sorry, Katelyn, go ahead.

 4              MS. KANG:  Hi.  This is Katelyn Kang from

 5      Cooley on behalf of the plaintiff.

 6              MS. VEROFF:  This is Julie Veroff from Cooley,

 7      LLP, on behalf of the plaintiff.

 8              MS. REINHARDT:  This is Elizabeth Reinhardt

 9      with Cooley, LLP, for the plaintiff.

10              MS. SWAMINATHAN:  This is Sruti --

11              MR. BLOCK:  Josh --

12              MS. SWAMINATHAN:  -- Swaminathan -- sorry,

13      Josh, go ahead.

14              MR. BLOCK:  No, no, you go ahead.

15              MS. SWAMINATHAN:  This is Sruti Swaminathan

16      from Lambda Legal on behalf of the plaintiff.

17              MR. BLOCK:  Josh Block from the ACLU on behalf

18      of plaintiff.

19              MS. HOLCOMB:  If that's everyone from

20      Plaintiff, this is Christiana Holcomb with Alliance     12:05:29

21      Defending Freedom on behalf of the intervenor,

22      Lainey Armistead.

23              And with me, we also have my colleague

24      Hal Frampton, Jonathan Scruggs, Catie Kelley,

25      Rachel Csutoros and Timothy Ducar.                      12:05:42
```

                                                    Page 12

```
 1            MS. DENIKER:  Good afternoon.

 2            This is Susan Deniker, counsel for defendants

 3   Harrison County Board of Education and Superintendent

 4   Dora Stutler.

 5            MS. MORGAN:  Kelly Morgan on behalf of the      12:05:56

 6   West Virginia Board of Education and

 7   Superintendent Burch.

 8            MS. ROGERS:  This is Shannon Rogers on behalf

 9   of the West Virginia Secondary School Activities

10   Commission.  And I believe Roberta Green is on Zoom on   12:06:07

11   behalf of the SSAC as well.

12            MS. GREEN:  I am.  Thank you.

13            MR. TRYON:  This is David Tryon from the West

14   Virginia Attorney General's Office on behalf of the

15   State of West Virginia.                                  12:06:21

16            THE VIDEOGRAPHER:  Is that everyone?  Last

17   chance.

18            All right.  Go ahead, let's swear in the

19   witness, please.

20            (Witness sworn.)                                12:06:34

21            THE VIDEOGRAPHER:  Please proceed.

22            MR. BARR:  Before we get started, I just

23   wanted to memorialize for the record that the parties

24   have agreed that objections to form will preserve all

25   objections other than privilege and that there will be   12:06:58
```

```
 1    no speaking objections on the record.

 2              And, Attorney Holcomb, if you could confirm

 3    that.

 4              MS. HOLCOMB:  I concur.  Thank you.

 5              MR. BARR:  Would the rest of defense counsel   12:07:08

 6    please also concur.

 7              MS. DENIKER:  This is Susan Deniker.  I'm in

 8    agreement with that.

 9              MS. MORGAN:  This is Kelly Morgan.  I'm in

10    agreement.                                              12:07:22

11              MS. ROGERS:  This is Shannon Rogers.  I'm in

12    agreement.

13              MR. TRYON:  That's fine.

14              MR. BARR:  Okay.  I believe that's all defense

15    counsel.                                                12:07:38

16

17                        LAINEY ARMISTEAD,

18    having been administered an oath, was examined and

19    testified as follows:

20

21                        EXAMINATION

22    BY MR. BARR:

23        Q   Good afternoon.  My name is Andrew Barr.  I'm

24    with the law form of Cooley, LLP.  I'm located in

25    Denver.  I use the pronouns of he and him, and I'm     12:07:40
```

Page 14

```
 1    representing the plaintiff B.P.J. in this case.

 2            Would you please state your name and spell it

 3    for the record.

 4        A    Lainey Armistead, L A-I-N-E-Y

 5    A-R-M-I-S-T-E-A-D.                                12:08:01

 6        Q    And which pronouns do you use?

 7        A    She/her.

 8        Q    Is it okay with you -- is it okay with you if

 9    I refer to you as "Ms. Armistead" today?

10        A    That's okay.                             12:08:14

11        Q    Am I pronouncing your name correctly?

12        A    Yes.

13        Q    So before we get started, I want to discuss a

14    few things about the process for today.

15            The oath you've taken is the same oath you   12:08:28

16    would take in a court of -- courtroom.

17            Do you understand that?

18        A    Yes.

19        Q    That means you must testify truthfully and not

20    leave out any important facts.                    12:08:36

21            Is there any reason you cannot testify

22    truthfully today?

23        A    No.

24        Q    Okay.  Please give verbal answers to my

25    questions.  Nonverbal answers, such as nodding or   12:08:45
```

| | |
|---|---|
| 1 | shaking your head, can't be reflected in the |
| 2 | transcript; and, therefore, I need you to answer |
| 3 | verbally. |
| 4 | Do you understand? |
| 5 | A   Yes.                                          12:08:54 |
| 6 | Q   If you don't understand a question that I ask, |
| 7 | I promise you it isn't a trick question; I probably |
| 8 | just worded it poorly.  So just ask me to ask again, |
| 9 | okay? |
| 10 | A   Okay.                                         12:09:07 |
| 11 | Q   And what that does mean is if you do not ask |
| 12 | me to reword it, I'll assume you understood the |
| 13 | question, okay? |
| 14 | A   Okay. |
| 15 | Q   At no point today am I asking about the       12:09:17 |
| 16 | substance of communications that you've had with your |
| 17 | attorneys.  So if I ask a question and you think that's |
| 18 | what I'm asking you, please do not give me any |
| 19 | information you have, based on conversation with your |
| 20 | attorney, okay?                                   12:09:32 |
| 21 | A   Got it. |
| 22 | Q   We're obviously on the -- the Zoom platform, |
| 23 | which makes it very important we don't speak over each |
| 24 | other.  So let me finish my question, and I will let |
| 25 | you finish your answer.  Understood?              12:09:47 |

Page 16

```
 1        A   Got it.
 2        Q   And then we're here today talking about
 3   House Bill 3293 that's been codified at West Virginia
 4   Code 18-2-25d.  I'm going to refer to that just as
 5   "H.B. 3923" -- or "3293."  Is that okay?              12:10:09
 6        A   Yes.
 7        Q   I'm also certainly going to mess those numbers
 8   up and perhaps call it 3923 or something else.
 9            Do you understand that if I talk about
10   House Bill 3293 or a similar set of numbers, I'm       12:10:23
11   actually talking about House Bill 3293?
12        A   Yes.
13        Q   Okay.  There's a couple of words we're going
14   to be using today that I just want to explain to you
15   what I mean by those words so that we have -- we all   12:10:31
16   have a similar understanding about what I'm asking.
17            When I say the word "cisgender," I mean
18   someone whose gender identity matches the sex they were
19   assigned at birth.
20            Do you understand what that means?           12:10:52
21            MS. HOLCOMB:  Objection to form.
22            MR. TRYON:  Objection.
23            MR. BARR:  And, defense counsel, I'm willing
24   to give you a standing objection to terminology
25   throughout this because I feel like we've established,  12:10:58
```

                                                        Page 17

```
 1    over the past couple of weeks, we're just going to have

 2    a fundamental disagreement on terminology, and I don't

 3    think there's a reason you should have to object every

 4    single time I say the word "transgender" or

 5    "cisgender."                                    12:11:11

 6            MR. TRYON:  I'm objecting -- I'm objecting to

 7    your definitional actions -- instructions.  Excuse me.

 8            MR. BARR:  Understood.

 9    BY MR. BARR:

10       Q   Ms. Armistead, do you know what I mean when I   12:11:23

11    say the word "cisgender"?

12       A   I understand what you are referring to.

13       Q   Okay.  Just to be clear, what am I referring

14    to?

15       A   You are talking about a biological male.   12:11:36

16       Q   Well, let's -- let's make sure we're all

17    talking about the same thing here.

18            When I say "cisgender," I'm saying someone

19    whose gender identity matches the sex they were

20    assigned at birth.                              12:11:52

21            Is that something that you are able to

22    understand moving forward in this deposition?

23            MR. TRYON:  Objection.

24            MS. HOLCOMB:  Object to form.

25            THE WITNESS:  I understand what you are   12:12:04
```

Page 18

```
 1    referring to.

 2            MR. BARR:  Okay.  Hold on.  My lights just

 3    turned off for some reason.

 4            I apologize.  In making an effort to be

 5    environmentally friendly, my lights turn off every 47      12:12:29

 6    minutes, so I'll try to avoid that.

 7    BY MR. BARR:

 8        Q   Same thing, Ms. Armistead, when I say

 9    "transgender," what I'm referring to is someone whose

10    gender identity does not match the sex they were      12:12:41

11    assigned at birth.

12            Do you understand that?

13            MR. TRYON:  Objection.

14            MS. HOLCOMB:  Same objection.

15            THE WITNESS:  I understand what you are      12:12:48

16    referring to.

17    BY MR. BARR:

18        Q   So when I say the word "cisgender" or

19    "transgender" today, those are the definitions I am

20    using.      12:12:54

21        A   Okay.

22        Q   When I say "B.P.J.," I'm referring to the

23    plaintiff in this case.

24            Do you understand that?

25        A   Yes.      12:13:06
```

                                                              Page 19

1       Q   Did you prepare for this deposition?

2       A   Yes.

3       Q   How?

4           MS. HOLCOMB:  And I'll just object to the

5   extent that it calls for any privileged attorney-client    12:13:23

6   communications, but, Lainey, you can answer.

7           THE WITNESS:  I prepared with my attorneys.

8   BY MR. BARR:

9       Q   Other than speaking with your attorneys, did

10  you do anything else to prepare for this deposition?    12:13:33

11      A   No.

12      Q   Did you review any documents?

13      A   When I was speaking to my attorneys.

14      Q   Okay.  Which documents were those?

15      A   Documents that have already been turned over    12:13:56

16  to the plaintiff, such as my declaration.

17      Q   Other than your declaration, what documents

18  did you review?

19      A   I reviewed documents that we turned over to

20  the plaintiff.    12:14:18

21      Q   I understand.  I'm asking which ones.

22      A   I don't recall all the documents that we

23  reviewed or turned over to the plaintiff.

24      Q   Well, let's just work on identifying some of

25  those.    12:14:34

                                              Page 20

```
1              So you said the declaration.  Beyond the
2      declaration, what did you review to prepare for this
3      deposition?
4          A   I reviewed scholarship information.  I
5      reviewed text messages with my mom and my declaration.   12:14:52
6          Q   Is that it?
7          A   I don't recall all of the documents that I
8      reviewed.
9          Q   When did you review these?
10         A   Within the last week.                           12:15:10
11         Q   But the only thing you remember looking at was
12     your declaration, some text messages and scholarship
13     information.
14             Did I understand that correctly?
15         A   Yes.                                            12:15:26
16         Q   Have you ever had your deposition taken
17     before?
18         A   No.
19         Q   Have you ever testified at trial?
20         A   No.                                             12:15:41
21         Q   Did you bring anything with you today?
22         A   My laptop.
23         Q   Are you referring to your laptop during this
24     deposition?
25         A   What do you mean?                               12:15:58
```

Page 21

```
1        Q   So explain to me why you brought your laptop

2    to the deposition.

3        A   So I could be in the deposition via Zoom.

4        Q   Is there anyone else in the room with you?

5        A   Yes.                                    12:16:20

6        Q   Who else is in the room?

7        A   Christiana and Catie.

8        Q   And by "Christiana" and "Catie," you're

9    referring to your attorneys?

10       A   Yes.                                    12:16:39

11       Q   Other than your laptop, did you bring anything

12   else with you today?

13       A   I brought water, snacks, a book bag, a laptop

14   charger.

15       Q   Any documents?                          12:17:02

16       A   No.

17       Q   Have you ever been a party to a lawsuit?

18       A   No.

19       Q   Other than this case, have you ever intervened

20   in a lawsuit?                                   12:17:21

21       A   No.

22       Q   Did you know what an intervenor was prior to

23   this lawsuit?

24       A   Kind of.

25       Q   What is your understanding of an intervenor?  12:17:39
```

Page 22

```
 1        A   My understanding is that it's someone who can

 2   intervene for a certain side that they support and

 3   hopefully maintain the bill or law and keep it in

 4   place.

 5        Q   And was that your understanding before or        12:18:02

 6   after you intervened in this case?

 7        A   After.

 8        Q   What was your understanding of an intervenor

 9   before this case?

10        A   It was a vague understanding that I had heard    12:18:16

11   from a TV show or something.  It wasn't a clear

12   understanding.

13        Q   So what was that vague understanding?

14        A   Someone who supports a bill or law.

15        Q   Why did you decide to intervene in this case?    12:18:40

16        A   Because I care about women's sports and the

17   sport that I play, and I think that it's a good law.

18        Q   How did you decide to actually intervene?

19            I understand you support the bill, but it

20   sounds like you didn't really understand what an         12:19:10

21   intervenor was prior to this lawsuit, so I'm trying to

22   understand how you actually intervened in this case.

23            MS. HOLCOMB:  And I'll just object to the

24   extent it calls for any communications between Lainey

25   and myself.                                               12:19:23
```

Page 23

```
 1              THE WITNESS:  I don't know how to answer that

 2      question without divulging privileged information.

 3      BY MR. BARR:

 4          Q   Let me ask it a different way.

 5              Prior to discussing this case with the ADF,   12:19:32

 6      were you interested in intervening?

 7              And by "ADF," I mean your attorneys.

 8          A   No.

 9          Q   Was intervening an easy decision?

10          A   No.                                            12:19:53

11          Q   Why not?

12          A   Because it's not always easy standing up for

13      what you believe when you know other people do not also

14      believe in that, and it's a public thing, and I was

15      nervous about it.                                      12:20:21

16          Q   Did you talk with anyone about the decision

17      prior to making it?

18              MS. HOLCOMB:  Same objection.

19      BY MR. BARR:

20          Q   Other than your attorneys.                    12:20:34

21          A   Yes.

22          Q   Who?

23          A   My parents, my coach and my siblings.

24          Q   Anyone else?

25          A   I may have talked about it with my best friend 12:20:56
```

```
 1    before I chose to intervene.

 2         Q    Explain to me those discussions with your

 3    parents.

 4         A    I asked them what they thought about the law

 5    and how they -- if they thought that intervening would    12:21:28

 6    be a good decision on my part, and they supported me.

 7         Q    Did you approach your parents about

 8    intervening, or did your parents approach you about

 9    intervening?

10         A    I approached my parents.                        12:21:48

11         Q    And you said your parents supported your

12    decision; is that right?

13         A    Yes.

14         Q    Did they explain why they supported your

15    decision?                                                 12:22:10

16         A    Soccer is a huge deal in my family, and it's

17    something that I grew up with, and my dad grew up

18    coaching me and other female athletes and male

19    athletes, and he thinks that it was a good -- he thinks

20    that it's a good law because he's seeing the              12:22:34

21    differences, and he encouraged me.

22         Q    What about your mom?

23         A    My mom is supportive in all that I do.

24         Q    There's nothing you have done your mom doesn't

25    support?                                                  12:22:56
```

Page 25

1      A   She is supportive with everything that I do.

2      Q   When did you reach out to your attorneys, ADF?

3          MS. HOLCOMB:  Again, objection to the extent

4   it calls for communications, Lainey, between your

5   attorneys and you.                              12:23:22

6          MR. BARR:  I'm just asking about the initial

7   reach-out.  There certainly wouldn't have been a

8   relationship between client and attorney at that point.

9          THE WITNESS:  I don't recall the exact time

10  when I first got in contact with ADF.            12:23:34

11  BY MR. BARR:

12     Q   Was it before or after the bill had been

13  passed?

14     A   After.

15     Q   So are -- are we thinking June timeframe of   12:23:48

16  last year?

17     A   I don't recall an exact date.

18     Q   Just give me a -- a timeframe.  I'm trying to

19  understand the sequence of events.

20     A   I would say it was sometime in 2021.        12:24:21

21     Q   So you don't recall even time of year that you

22  had reached out to them?

23     A   I don't remember the first conversation I had

24  with her, no.

25     Q   And who is "her" in that sentence?           12:24:40

                                              Page 26

```
 1         A   My attorney, Christiana.

 2         Q   How did you find ADF when you decided you

 3    wanted to intervene?

 4         A   My mom has a friend who works for ADF.

 5         Q   Who is that friend?                    12:25:08

 6         A   Jamie Metzger.

 7         Q   Did your mom speak with Jamie about this case?

 8             MS. HOLCOMB:  Object to form.

 9             THE WITNESS:  I can't comment on the

10    conversations that my mom has with other people.    12:25:25

11    BY MR. BARR:

12         Q   I didn't ask for the substance.  I'm just

13    asking if your mom reached out to her friend regarding

14    this case.

15             MS. HOLCOMB:  Again, object to form.    12:25:40

16             THE WITNESS:  I'm not sure if my mom reached

17    out to her or not.

18    BY MR. BARR:

19         Q   So you spoke to your parents about

20    intervening, your mom happened to have a friend at ADF,  12:25:50

21    and that's how you got connected with ADF.  Am I

22    understanding that correctly?

23         A   No.

24         Q   So what happened?

25         A   I don't know how to answer that question    12:26:11
```

Page 27

```
 1    without giving privileged information -- information

 2    with my attorney and I.

 3         Q   I certainly don't want privileged information.

 4             Would it be fair to say that the first time

 5    you thought about intervening in this case was in        12:26:20

 6    connection with the discussion with your attorneys?

 7         A   Yes.

 8         Q   And you don't recall when that was?

 9         A   It was sometime last year.

10         Q   Was it your -- your mom's friend Jamie who      12:26:42

11    encouraged you to join as an intervenor?

12         A   No.

13         Q   Who encouraged you to join as an intervenor?

14             MR. TRYON:  Objection.

15             THE WITNESS:  I made the decision after         12:27:12

16    talking with my -- I made the decision after a lot of

17    thought, prayer and then communications with my

18    parents.

19    BY MR. BARR:

20         Q   What's Jamie's last name?                       12:27:33

21         A   Metzger.

22         Q   Do you know what Jamie Metzger does at ADF?

23         A   I do not.

24         Q   How does your mom know Jamie?

25             MS. HOLCOMB:  Object to form.                   12:27:51
```

                                                      Page 28

```
 1              THE WITNESS:  My -- through my mom's adoption
 2     agency.
 3     BY MR. BARR:
 4         Q   Could you explain that with a little more
 5     detail, please?                                   12:28:05
 6         A   I'm not sure exactly how they know each other,
 7     but I do believe that it was from my mom's adoption
 8     agency, and Jamie writes articles about adoption.
 9         Q   Help me understand.  Your mom knows Jamie
10     because of articles that Jamie has written that pertain  12:28:37
11     to adoptions?
12         A   I believe so.
13         Q   What's the nature of these articles?
14              MS. HOLCOMB:  Object to form.
15              THE WITNESS:  It's about adoption.      12:28:55
16     BY MR. BARR:
17         Q   But specifically, what is -- what -- is
18     Jamie -- what is Jamie saying in these articles about
19     adoption?
20              MS. HOLCOMB:  Object to form.           12:29:08
21              THE WITNESS:  I don't know.  You'd have to
22     read them.
23     BY MR. BARR:
24         Q   Have you read them?
25         A   I might have read one of them.  I don't really  12:29:17
```

Page 29

```
 1    recall.  It was a long time ago.

 2         Q   Would you consider your mom friends with Jamie

 3    or just happens to read Jamie's articles?

 4         A   I'm not sure on their relationship.  I can't

 5    speculate on that.                              12:29:47

 6         Q   What's your understanding?

 7         A   I believe Jamie has interviewed my mom for

 8    adoption purposes.

 9         Q   Did Jamie reach out to your mom regarding this

10    case?                                           12:30:02

11            MS. HOLCOMB:  Object to form.

12            MR. TRYON:  Objection.

13            THE WITNESS:  No.

14    BY MR. BARR:

15         Q   So your mom reached out to Jamie; is that  12:30:12

16    right?

17         A   No.

18            MS. HOLCOMB:  Object to form.

19    BY MR. BARR:

20         Q   So explain to me what happened.         12:30:21

21         A   What happened with what?

22         Q   Well, you -- you told me that you found ADF

23    because your mom was friends with Jamie.  Did I get

24    that right?

25         A   Yes.                                    12:30:43
```

Page 30

```
 1        Q    You also told me that Jamie didn't reach out

 2    to your mom and your mom didn't reach out to Jamie;

 3    right?

 4        A    Regarding this case.

 5        Q    Well, that's -- that's what I'm trying to        12:30:59

 6    understand.

 7             How did you get connected with ADF for this

 8    case?

 9        A    I don't know how to answer that question

10    without giving privileged information.                    12:31:09

11        Q    Okay.  What did your siblings think about you

12    intervening in the case?

13        A    They were supportive.

14        Q    Explain to me those discussions you had with

15    them.                                                     12:31:31

16        A    I asked them what their opinion was on the

17    law, and they agreed with the substance of the law, and

18    they said that I would be brave to participate in the

19    case.

20        Q    What do you think they meant when they said      12:31:54

21    you would be brave?

22             MS. HOLCOMB:  Object to form.

23             THE WITNESS:  I don't know -- I can't

24    speculate on what they were thinking.

25    BY MR. BARR:                                              12:32:07
```

Page 31

```
 1          Q    You know what the word "brave" means; right?

 2               MS. HOLCOMB:  Object to form.

 3               THE WITNESS:  I have an understanding of the

 4    word "brave."

 5    BY MR. BARR:                                          12:32:24

 6          Q    So why would your siblings describe you as

 7    brave for intervening in a lawsuit?

 8               MS. HOLCOMB:  Object to form.

 9               THE WITNESS:  I don't know exactly what they

10    were thinking whenever they described me as brave.    12:32:39

11    BY MR. BARR:

12          Q    What did your coach think when you talked

13    about intervening?

14               MS. HOLCOMB:  Object to form.

15               THE WITNESS:  I don't know what my coach was  12:32:49

16    thinking.

17    BY MR. BARR:

18          Q    What did your coach say to you in response to

19    you telling your coach you might intervene in this

20    case?                                                 12:32:57

21          A    She told me that she would be supportive,

22    although she wasn't sure if she would want, herself, to

23    get involved with the case, but she was supportive of

24    my decision to get involved in the case.

25          Q    Why didn't any of your teammates try to      12:33:20
```

                                                          Page 32

```
 1    intervene with you?

 2            MS. HOLCOMB:  Object to form.

 3            THE WITNESS:  I don't know why they did not

 4    decide to, but at least one of them was interested.

 5    BY MR. BARR:                                    12:33:40

 6        Q   Who is that?

 7            MS. HOLCOMB:  And I will just object to the

 8    extent that this calls for communication in

 9    anticipation of litigation, but, Lainey, you may

10    answer.                                         12:33:50

11            THE WITNESS:  Sinead.

12    BY MR. BARR:

13        Q   Could you say that name again, please?

14        A   Sinead.

15        Q   How do you spell that?                  12:33:58

16        A   S-I-N-E-A-D.

17        Q   What's Sinead's last name?

18        A   Samarczuk.

19        Q   That's going to take a minute, so bear with us

20    as we try to spell that one.                    12:34:23

21            Go ahead, please.

22        A   S-A-M-A-R-C-Z-U-K.

23        Q   Do you mind if I just refer to your teammate

24    as "Sinead" because the last name I'm certainly going

25    to mess up?                                     12:34:46
```

Page 33

```
1          A    That is fine.

2          Q    Why did Sinead ultimately decide not to

3     intervene?

4               MS. HOLCOMB:  Object to form and to the extent

5     it calls for privileged communications with counsel.   12:34:57

6               THE WITNESS:  I don't know how to answer that

7     without divulging confidential information --

8     privileged information.

9     BY MR. BARR:

10         Q    You said Sinead's on your team; right?        12:35:09

11         A    Yes.

12         Q    You never discussed this with Sinead?

13         A    Discussed it when with Sinead?

14         Q    Well, let's start at the beginning.

15              Tell me about the first discussion you had    12:35:36

16    with Sinead about intervening in this lawsuit.

17         A    I asked her if she would want to intervene

18    with me.

19         Q    You approached Sinead about interviewing.  Did

20    I get that right?                                       12:35:59

21         A    Yes.

22         Q    How did you get the idea to approach Sinead?

23              MS. HOLCOMB:  Again, objection, to the extent

24    it calls for privileged communications.

25    BY MR. BARR:                                            12:36:07
```

Page 34

```
 1        Q    I'll rephrase.
 2             Other than a discussion with your attorney,
 3    why did you approach Sinead to intervene in this case?
 4        A    She and I are very close friends.
 5        Q    Did you approach anyone else on your team?      12:36:27
 6        A    Yes.
 7        Q    Who?
 8        A    Brooklyn.
 9        Q    What's Brooklyn's last name?
10        A    Pritt.                                          12:36:43
11        Q    Anyone else?
12        A    No, I did not approach anyone else on my team
13    to intervene for this case.
14        Q    Why didn't you ask your entire team, if this
15    is an important lawsuit to protect women's sports?       12:37:07
16        A    I'm not as close with all of my teammates for
17    something that was such a big deal.  They -- I'm
18    very -- I love my teammates, we are close, but this is
19    something that I was nervous about, intervening, and it
20    was a big decision to make, so I just wanted to see      12:37:33
21    what Brooklyn and Sinead thought about it.
22        Q    Did you discuss that with Sinead and Brooklyn?
23        A    Discuss what?
24        Q    Did you invite them to intervene in the case?
25        A    I asked them if they would be interested in     12:37:56
```

Page 35

USCA4 Appeal: 23-1078   Doc: 53-3   Filed: 03/27/2023   Pg: 535 of 674

```
 1    doing so.

 2         Q    And, presumably, they said no; right?

 3         A    By the time they had reached a decision, it

 4    was too late for other people to intervene, is my

 5    understanding.                                    12:38:17

 6         Q    Well, what decision did they reach?

 7         A    Both of them wanted to get involved in some

 8    type of way, but it was too late for Sinead, and

 9    Brooklyn is very, very busy with school and work and

10    other things, so she just didn't have the time.     12:38:49

11         Q    I asked a -- a little bit of a different

12    question.

13              They ultimately both decided not to intervene;

14    right?

15         A    That wasn't their decision.  It was too late  12:38:57

16    for Sinead.

17         Q    Had it not been too late, would Sinead have

18    joined?

19         A    I believe so, but I can't answer that for

20    certain.                                             12:39:17

21         Q    Is Sinead still a student at West Virginia

22    State University?

23         A    She is currently in England.

24         Q    Is she still a student at West Virginia State

25    University?                                          12:39:33
```

Page 36

```
 1        A   I believe she's still enrolled, yes.

 2        Q   Is she still on your team?

 3        A   I believe she's still on the team.  She's just

 4   taking a semester off, but -- she might return; she

 5   might not.                                        12:39:48

 6        Q   Is Brooklyn still a student at West Virginia

 7   State?

 8        A   Yes.

 9        Q   Is Brooklyn still on your team?

10        A   Yes.                                      12:40:02

11        Q   Are there any other of your teammates who you

12   believe might be -- let me rephrase that.

13            Are there any other of your teammates that you

14   believe would have intervened but for a timing issue?

15        A   It's possible.                           12:40:19

16        Q   A lot of things are possible.  I'm asking if

17   there's any specific names you have of someone you

18   believe you would like to have intervened.

19        A   I can't speculate on what other people want.

20        Q   So you have no reason to think that there's  12:40:42

21   another one of your teammates who would have liked to

22   intervened?

23            MR. TRYON:  Objection.

24            THE WITNESS:  Again, I can't speculate on what

25   other people want.                                12:40:59
```

Page 37

```
 1    BY MR. BARR:

 2         Q   I'm not asking you to speculate.

 3             Do you have reason to believe that any of your

 4    other teammates wanted to intervene in this case?

 5             MS. HOLCOMB:  Object to form.              12:41:06

 6             MR. TRYON:  Objection.

 7             THE WITNESS:  I don't know.

 8    BY MR. BARR:

 9         Q   Can you provide me with the name of one of

10    your teammates, other than Sinead and Brooklyn, who   12:41:20

11    wanted to intervene in this case?

12             MR. TRYON:  Objection.

13             MS. HOLCOMB:  Object to form.

14             The witness:  I don't know what my teammates

15    would have wanted to do.                           12:41:37

16    BY MR. BARR:

17         Q   Where are you from?

18         A   Owensboro, Kentucky.

19         Q   What's the closest big city to Owensboro, just

20    so I can understand geography?                     12:42:02

21         A   Louisville, Kentucky.

22         Q   Did you grew up a Cardinals fan?

23         A   No.

24         Q   Does that make you a UK fan?

25         A   Yes.                                      12:42:20
```

```
 1        Q    How old are you?

 2        A    21.

 3        Q    Did you grow up in the same house as your

 4   parents?

 5        A    Yes.                                    12:42:43

 6        Q    You mentioned siblings.  How many siblings do

 7   you have?

 8        A    I have two biological brothers.

 9        Q    Only because of the way you phrased that, do

10   you have a sibling that you wouldn't consider        12:43:07

11   biological?

12        A    I have two adopted siblings, but,

13   unfortunately, I am not in contact with them anymore.

14        Q    How old are your -- are -- are your adopted

15   siblings also brothers?                              12:43:26

16        A    They are siblings, a brother and sister.

17        Q    As you described it, your biological siblings,

18   what are their names?

19        A    Kyler and Declan.

20        Q    Did you say Kyler, with a K?               12:43:47

21        A    Yes.

22        Q    What does Kyler do?

23        A    Kyler works at UPS.

24        Q    And what about Declan?

25        A    He is a student athlete in university.     12:44:02
```

Page 39

```
 1          Q    And where does Kyler live?

 2          A    Louisville, Kentucky.

 3          Q    And what school does Declan attend?

 4          A    Brescia University.

 5          Q    I'm sorry, what's it called?          12:44:23

 6          A    Brescia.

 7          Q    Where is that located?

 8          A    In Owensboro, Kentucky.

 9          Q    It's close to home.

10               What is your adopted brother's name?  12:44:39

11          A    David.

12          Q    What does David do?

13          A    I'm not sure.

14          Q    When is the last time you spoke with David?

15          A    When I was 16.                        12:44:52

16          Q    Where does David live?

17          A    I have no idea.  I'm not sure.

18          Q    What's your adopted sister's name?

19          A    Gabby.

20          Q    Are Gabby and David biological siblings?  12:45:19

21          A    Yes.

22          Q    When is the last time you spoke with Gabby?

23          A    I'm not sure.

24          Q    Was it around the last time you spoke to David

25     or some other time?                             12:45:47
```

                                                     Page 40

```
 1              MS. HOLCOMB:  Object to form.

 2              THE WITNESS:  I'm not sure.  It was a long

 3    time ago.

 4    BY MR. BARR:

 5         Q   I take it you don't know where Gabby lives?    12:45:55

 6         A   No.

 7         Q   Are David and Gabby still in touch with your

 8    parents?

 9         A   I'm not sure.

10         Q   Are David and Gabby still in touch with Kyler?  12:46:14

11              MS. HOLCOMB:  Object to form.

12              THE WITNESS:  I'm not sure.
```

▮ ▬▬▬▬▬▬

▮ ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬ ▬▬▬▬

▮ ▬▬▬▬ ▬▬▬▬

▮ ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬

▮ ▬▬▬

▮ ▬▬▬▬▬

▮ ▮ ▬▬▬▬▬▬▬▬▬ ▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▮ ▬▬

```
23         Q   And Gabby went with him?

24         A   No.  She was older, so she was already out of

25    our house.                                         12:47:04
```

Page 41

```
 1       Q    Okay.  What do you currently do?

 2       A    I am a student athlete.

 3            MS. HOLCOMB:  Just -- may I jump in here for a

 4    moment, Andrew?

 5            MR. BARR:  Yes.                          12:47:26

 6            MS. HOLCOMB:  Do you need a break?

 7            I -- I understand you may be moving to a

 8    different line of questioning.

 9            Do you need a break?  Okay.

10            Andrew, would you be amenable to --       12:47:32

11            MR. BARR:  No worries.  We'll take a break.

12            How about we come back at 1:00?  Does that

13    work for you?

14            MS. HOLCOMB:  That works great.  Thank you.

15            THE VIDEOGRAPHER:  Okay.  We are going off the  12:47:43

16    record -- sorry.  We're going off the record.  The time

17    is 12:48 p.m., and this is the end of Media Unit No. 1.

18            (Recess.)

19            THE VIDEOGRAPHER:  All right.  We are back on

20    the record at 1:00 p.m., and this is the beginning of     01:00:18

21    Media Unit No. 2.

22            Go ahead, please.

23    BY MR. BARR:

24       Q    Ms. Armistead, you stated you were a student

25    at West Virginia State University; is that right?       01:00:26
```

                                                        Page 42

```
 1          A   Yes.

 2          Q   Are you employed anywhere?

 3          A   Yes.

 4          Q   Where do you work?

 5          A   I work as a work-study student, and I work at    01:00:37

 6   Red Lobster.

 7          Q   What's a work-study student?

 8          A   I work in the Dean's office of my college.

 9          Q   And what do you do there?

10          A   I answer the phone, run errands, talk to         01:00:56

11   professors.

12          Q   Largely administrative tasks, am I

13   understanding that correctly?

14          A   Yes.

15          Q   And what do you do at Red Lobster?               01:01:17

16          A   I'm a server.

17          Q   Any other jobs at the moment?

18          A   If you consider soccer a job, then sure.

19          Q   Do you consider soccer a job?

20          A   I love it, but I have to show up, and I'm        01:01:36

21   getting a scholarship for it, so...

22          Q   Let's talk about soccer separately.

23              Other than Red Lobster and the Dean's office,

24   do you have any other jobs?

25          A   No.                                              01:01:50
```

                                                            Page 43

| | | |
|---|---|---|
| 1 | Q   Where is West Virginia State University? | |
| 2 | A   Like, the address? | |
| 3 | Q   The city. | |
| 4 | A   Dunbar. | |
| 5 | Q   If I call it "West Virginia State," will that | 01:02:10 |
| 6 | be okay with you? | |
| 7 | A   Yes. | |
| 8 | Q   Did you grow up rooting for West Virginia | |
| 9 | State? | |
| 10 | A   No. | 01:02:26 |
| 11 | Q   You mentioned UK earlier.  Was that your team | |
| 12 | growing up? | |
| 13 | A   Sure. | |
| 14 | Q   You tell me.  I'm just asking. | |
| 15 | A   I like it.  I wouldn't say I necessarily had a | 01:02:39 |
| 16 | team growing up. | |
| 17 | Q   What conference is West Virginia State in? | |
| 18 | A   The Mountain East Conference. | |
| 19 | Q   How many teams are in that conference? | |
| 20 | A   I'm not sure. | 01:02:57 |
| 21 | Q   Is it closer to ten or closer to 20? | |
| 22 | A   Closer to ten. | |
| 23 | Q   Are those schools all located within | |
| 24 | West Virginia? | |
| 25 | A   I don't think so, but I'm not sure where | 01:03:20 |

Page 44

```
 1    they're all located.

 2         Q   Are you aware that the NCAA has divisions?

 3         A   Yes.

 4         Q   What division is West Virginia State in for

 5    girls' soccer?                                    01:03:36

 6         A   Division II.

 7         Q   How many NCAA divisions are there?

 8         A   Three.

 9         Q   What is your understanding of the difference

10    between Division I, II and III?                   01:03:54

11         A   I believe it's based off of school size and

12    the ability for D-I and D-II to give athletic aid and

13    scholarship.

14         Q   Is one division generally thought to be more

15    competitive than another?                         01:04:16

16         A   Division I is usually thought to be more

17    competitive, but I think all three are very

18    competitive.  We're college athletes.

19         Q   Do you think Division I is more competitive?

20         A   I think --                               01:04:34

21             MR. TRYON:  Objection.

22             THE WITNESS:  I think that we're all very

23    competitive.

24    BY MR. BARR:

25         Q   I don't take issue with that.  I'm -- I'm sure  01:04:56
```

Page 45

```
 1    you're right there.  I'm just asking if you believe

 2    Division I is more competitive than Division II.

 3            MS. HOLCOMB:  Object to form.

 4            MR. TRYON:  Objection.

 5            THE WITNESS:  What do you mean by         01:05:13

 6    "competitive"?

 7    BY MR. BARR:

 8        Q   As a general matter, if a Division I women's

 9    soccer team played a Division II women's soccer team,

10    who would you expect to win?                    01:05:16

11            MS. HOLCOMB:  Objection.

12            THE WITNESS:  Generally, we would expect the

13    Division I team to win.

14    BY MR. BARR:

15        Q   How big is West Virginia State, in terms of  01:05:33

16    student size?

17        A   Couldn't tell you.

18        Q   How did you pick West Virginia State?

19        A   There were a myriad of reasons.

20        Q   What -- what was the primary reason?       01:05:51

21        A   Because of the opportunity that West Virginia

22    State gave me.

23        Q   What opportunity is that?

24        A   To play soccer -- to play soccer and have a

25    very good scholarship.                           01:06:15
```

                                                        Page 46

```
 1        Q   Did you consider going to any other colleges?

 2        A   Yes.

 3        Q   How many?

 4        A   How many did I visit or consider?  What do you

 5    mean?                                              01:06:43

 6        Q   Let's start with, how many other colleges did

 7    you consider attending?

 8        A   I'm not sure.

 9        Q   Less than 20?

10        A   Less than 20.                              01:06:57

11        Q   Less than ten?

12        A   Seriously considered, yes, less than ten.

13        Q   Less than five?

14        A   Probably about five.

15        Q   What -- what were the five colleges you       01:07:14

16    seriously considered attending?

17            MS. HOLCOMB:  Object to form.

18            MR. TRYON:  I also object.

19            THE WITNESS:  I didn't say that it was

20    definitely five.                                  01:07:34

21    BY MR. BARR:

22        Q   I'll rephrase.  I'm not trying to put words in

23    your mouth.

24            Tell me the colleges you seriously considered

25    attending.                                        01:07:41
```

                                                    Page 47

```
 1        A    West Virginia State, Austin Peay,

 2   Transylvania, Kentucky Wesleyan.   And that's all of the

 3   ones that I seriously considered.

 4        Q    Other than West Virginia State, did you have

 5   an opportunity to play soccer at those schools?        01:08:17

 6        A    Yes.

 7        Q    Which ones?

 8        A    Kentucky Wesleyan and Transylvania.

 9        Q    Did Kentucky Wesleyan offer you a scholarship?

10        A    For what?                                     01:08:47

11        Q    For soccer.

12        A    I had communications with their coach, but

13   there was nothing official for an athletic scholarship.

14        Q    To make sure I'm clear, there was no official

15   offer of an athletic scholarship at Kentucky Wesleyan?  01:09:11

16        A    I don't believe so.

17        Q    Same question for Transylvania, were you

18   offered an athletic scholarship for Transylvania?

19        A    Transylvania is a D-III school, so they can't

20   give athletic scholarship.                              01:09:32

21        Q    Were you offered an athletic scholarship for

22   any school other than West Virginia State?

23        A    Yes.

24        Q    What school is that?

25        A    Brescia University.                           01:09:46
```

Page 48

```
 1          Q   I'm sorry, you cut out.  Could you repeat

 2     that?

 3          A   Brescia.

 4          Q   Is that the same school that your brother goes

 5     to?                                              01:09:59

 6          A   Indeed.

 7          Q   But you weren't seriously considering

 8     attending that school, were you?

 9          A   No.

10          Q   Any other schools offer you an athletic   01:10:14

11     scholarship?

12          A   Many schools e-mailed me saying that they

13     would give me scholarships, but I never really

14     conversed with any others ones, no.

15          Q   So no formal offers for athletic scholarships  01:10:33

16     other than the two we just discussed?

17          A   No formal offers, correct.

18          Q   Is Kentucky Wesleyan a Division I or

19     Division II school?

20          A   Division II.                             01:10:52

21          Q   What do you study at West Virginia State?

22          A   Political science.

23          Q   Anything else?

24          A   What do you mean?

25          Q   Let me ask it a different way.  What's your  01:11:20
```

                                                          Page 49

```
 1   major, currently?

 2        A   Political science.

 3        Q   Do you have a minor?

 4        A   I am on track to get a minor in psychology.

 5        Q   What year are you, in terms of freshman,        01:11:48

 6   sophomore, etcetera?

 7        A   I -- this will be my third year of college.

 8        Q   And when you say "this," as we sit here today,

 9   in March, you're a junior, or you are saying the

10   upcoming school year that starts in August, you'll be a   01:12:06

11   junior?

12        A   What do you mean?

13        Q   I'm trying to understand if you've been

14   attending West Virginia State for four semesters or

15   6 semesters.                                              01:12:22

16        A   I have attended it for six semesters, I think.

17   Since fall of 2019, and I have continuously studied at

18   West Virginia State.

19        Q   Thank you.  That's helpful.  And that answers

20   the question.                                            01:12:44

21            Are you on track to graduate at the end of

22   next school year?

23        A   I am not sure of my exact graduation plans

24   yet.

25        Q   What do you mean by that?                       01:12:57
```

                                                          Page 50

```
1        A   I mean that I could graduate this May,

2   tentatively, but I definitely want to utilize my NCAA

3   eligibility and possibly continue playing and studying

4   at West Virginia State.

5        Q   I think I read you have two years of          01:13:25

6   eligibility left; is that right?

7        A   If I graduate in May, I'll actually have three

8   years of eligibility left.

9        Q   If you graduate in May, do you plan on using

10  that eligibility either at West Virginia State or some   01:13:43

11  other institution?

12       A   I would love to.

13       Q   Do you have any current plans to do that?

14       A   My plans aren't set in stone yet.  I had

15  health concerns this past semester.  So as long as I     01:14:01

16  can figure that out and my body allows it, I would

17  definitely want to continue playing soccer.

18       Q   I certainly don't want to get into your health

19  concerns at all.  I am curious if they impact your

20  ability to play soccer.                                  01:14:20

21       A   They --

22           MR. TRYON:  Objection.

23           THE WITNESS:  They don't actually affect my

24  abilities to play.

25  ///
```

Page 51

```
 1    BY MR. BARR:

 2        Q   So help me understand how that impacts your

 3    decision on graduation.

 4        A   Because I have to decide if I want to take

 5    medicine that would impair me to play, but as it          01:15:01

 6    currently is, I can play.

 7        Q   So I'm not a doctor, I don't understand how

 8    any of that works, but what I hear you saying is if you

 9    do whatever the doctors are saying is an option, you'd

10    have to stop playing soccer; is that right?               01:15:22

11            MR. TRYON:  Objection.

12            MS. HOLCOMB:  Object to form.

13            THE WITNESS:  I'm not my doctor either.  I

14    just know the options, and I'm weighing them carefully

15    to decide what my next step will be, and I'm not sure     01:15:35

16    yet, but I would love to stay in West Virginia and play

17    soccer.  And I am still currently on the team, so...

18    BY MR. BARR:

19        Q   Were you in with the roster for -- the season

20    is over right now; right?                                 01:15:54

21        A   We are in a spring semester, but yes, it is a

22    fall sport.

23        Q   So, currently, there's no practices or games;

24    right?

25        A   We are in the spring semester, so there is        01:16:07
```

Page 52

```
 1    practices, it's just not for our season.

 2         Q   I don't -- I don't understand.  What do you

 3    mean?

 4         A   So, typically, in collegiate sports, you have

 5    a season, and right now, we're in our offseason, but we    01:16:28

 6    are still allowed to practice and play scrimmage games,

 7    according to NCAA rules.

 8         Q   And those are official practices and official

 9    scrimmages?

10         A   With our coach in West Virginia, yes,           01:16:43

11    West Virginia State.

12         Q   Are you still participating in those practices

13    and scrimmages?

14         A   Yes.

15         Q   As we sit here today, do you expect to be on    01:16:52

16    the team next fall?

17         A   I would love to be.

18         Q   Slightly different question.

19             Do you expect to be?

20         A   I am not sure what the future holds yet         01:17:12

21    because of the health concerns, and I have to carefully

22    see and weigh the options.

23         Q   I understand that.

24             When do you think you'll have to make that

25    decision?  I assume your coach is interested.            01:17:37
```

```
 1        A   She hasn't given me a specific time to make

 2   the decision yet.

 3        Q   Do you have an expectation of when that

 4   timeframe will be?

 5        A   I don't make the rules.                    01:17:54

 6        Q   Just asking if you have an expectation of when

 7   that timeframe will be, if you need to decide if you're

 8   going to play or not.

 9            MS. HOLCOMB:  Objection.

10            THE WITNESS:  I don't have an expectation.  01:18:10

11   BY MR. BARR:

12        Q   When is scholarship awarded for next school

13   year?

14        A   For whom?

15        Q   For you.                                    01:18:27

16        A   Typically, we re-sign the paper in the spring,

17   stating our scholarship, but my coach can decide when

18   to allow us to sign the papers.  Some people sign in

19   June, July, August.  It's up to our coach.

20        Q   When did you sign last year?                01:19:04

21        A   Sometime in the spring.

22        Q   February?

23        A   I think that's winter.

24        Q   Okay.  When -- what month did you sign your

25   scholarship award last year?                         01:19:33
```

Page 54

```
 1        A   I'm not sure.

 2        Q   Where would we have to go to find that date

 3    out?

 4        A   I don't know.  I don't have any papers on it.

 5        Q   It sounds like you signed a paper, and I'm        01:19:44

 6    just trying to figure out when.

 7            MS. HOLCOMB:  Object to form.

 8            THE WITNESS:  I'm not sure of the exact date.

 9    It was sometime in 2021.

10    BY MR. BARR:                                              01:19:59

11        Q   So what is the spring to you, if it doesn't

12    include February?

13            MS. HOLCOMB:  Object to form.

14            THE WITNESS:  Maybe March through June.

15    BY MR. BARR:                                              01:20:17

16        Q   So as you sit here today, you believe that you

17    would have signed your scholarship award package

18    sometime between March and June of last year; is that

19    right?

20        A   Yes.                                              01:20:28

21        Q   Do you expect that that same timeframe would

22    apply to this year?

23        A   I don't know.

24        Q   Do you have any reason to think it won't?

25            MR. TRYON:  Objection.                            01:20:55
```

Page 55

```
 1            THE WITNESS:  My coach is very patient.  And

 2    seeing as I'm a captain and a starter, I'm sure that

 3    she would give me as much time as she could to keep me

 4    on the team.

 5    BY MR. BARR:                                    01:21:08

 6        Q   What is your coach's name?

 7        A   Lisa Mann.

 8        Q   How do you spell your coach's last name?

 9        A   M-A-N-N.

10        Q   Have you had discussions with Coach Mann about  01:21:22

11    the possibility of you not playing next year?

12        A   Yes.

13        Q   Explain -- when was the first conversation you

14    had with Coach Mann regarding the possibility you don't

15    play next year?                                 01:21:38

16        A   Sometime in February.

17        Q   How many discussions have you had with

18    Coach Mann regarding the possibility you don't play

19    next year?

20        A   I'm not sure.                           01:21:56

21        Q   More than five?

22        A   I'm not sure.

23        Q   More than ten?

24            MS. HOLCOMB:  Object to form.

25            THE WITNESS:  I don't know.             01:22:17
```

                                                    Page 56

```
 1    BY MR. BARR:

 2        Q    More than 20?

 3             MS. HOLCOMB:  Object to form.

 4             THE WITNESS:  I don't recall saying it was

 5    more than ten either.                            01:22:24

 6    BY MR. BARR:

 7        Q    It sounds like you're not sure.  I'm just

 8    trying to get a range here.

 9        A    More than one, less than 20, probably.

10        Q    And that's the closest estimate you can give  01:22:37

11    on the number of discussions you've had with Coach Mann

12    about this?

13        A    Yes.

14             MR. TRYON:  Objection.

15    BY MR. BARR:                                     01:22:50

16        Q    What -- what was Coach Mann's response?

17        A    She wants me to do what's best for me.

18        Q    Did she say anything else?

19        A    She would love for me to stay on the team.

20        Q    Did she also say that she would like to use  01:23:07

21    that scholarship award for a different player if you're

22    not going to come back?

23        A    She did not tell me that.

24        Q    What else did she say?

25        A    To keep her updated.                    01:23:25
```

Page 57

```
 1        Q   Have you kept her updated?

 2        A   As much as I possibly can, because I'm not

 3   sure what my future holds yet.

 4        Q   So what did you tell her in your first update?

 5        A   I don't recall what I told her on the first      01:23:47

 6   update.

 7        Q   So you've updated your coach at least once,

 8   but you have no recollection of what you told

 9   Coach Mann?

10        A   I didn't say that.  You asked what I said on     01:24:07

11   my first update.  I'm not sure.  There's been a couple

12   conversations, more than one, like I said.

13        Q   Okay.  If we take all the update meetings

14   together, what have -- what have you conveyed to

15   Coach Mann?                                                01:24:23

16        A   I've conveyed that I am still wanting to

17   practice and be a part of the team, and I'm not sure

18   what my plans are for the fall.

19        Q   At no point Coach Mann said, hey, it would be

20   really nice to know by X date?                            01:24:46

21        A   She would like to know, but she's never given

22   me an exact date, no.

23        Q   Did she give you a timeframe?

24        A   No.

25        Q   If you graduate in May, can you still play on    01:24:57
```

Page 58

```
1    the team?

2         A    Yes.

3         Q    How?

4         A    Because I am interested in possibly getting a

5    Master's degree at West Virginia State, and I still        01:25:20

6    have three years of NCAA eligibility, which would mean

7    I can continue playing in the fall.

8         Q    So you would play as a graduate student; is

9    that right?

10        A    That is what I'm saying.                          01:25:36

11        Q    What Master's are you interested in pursuing?

12        A    Master's of Public Administration.

13        Q    When's the application due for that?

14        A    I'm not sure.  I'd have to ask the professor.

15        Q    Have you looked into it?                          01:25:56

16        A    I see the chair of the department or of the

17   Master's of Public Administration a couple times a

18   week, and yes, we have discussed it.

19        Q    How long of a program is that?

20        A    It depends on the -- how many hours you take,     01:26:15

21   but I would expect a year and a half.

22        Q    Why are you interested in getting a Master's

23   of Public Administration?

24        A    It would mean continuing my academic career

25   and athletic career, which are both things that I love.     01:26:48
```

Page 59

```
 1        Q    Did I read somewhere you want to be a lawyer?

 2        A    Yes.

 3        Q    Does West Virginia State have a law school?

 4        A    No.

 5        Q    Have you considered, upon graduation, going to    01:27:07

 6   law school?

 7        A    Yes.

 8        Q    Did you take the LSAT?

 9        A    Yes.

10        Q    Have you applied to law school?                   01:27:17

11        A    Yes.

12        Q    Where did you apply?

13        A    I applied to University of Florida, FSU and

14   ASU.

15        Q    Warm states.  Totally understand.                 01:27:41

16             Any other schools?

17        A    I don't think I've sent in my official

18   applications to any other schools, no.

19        Q    What other schools are you planning to send an

20   official application to?                                    01:27:59

21        A    Possibly the University of Houston.

22        Q    Any others?

23        A    I haven't really considered it because I'm not

24   sure if I'm even going to be going to law school in the

25   fall.                                                       01:28:15
```

Page 60

```
 1         Q    You've applied to three programs; is that

 2    right?  FSU, UF and ASU?

 3         A    Yes.

 4         Q    Have you been admitted?

 5         A    I haven't gotten any decisions.              01:28:28

 6         Q    When do you expect to hear back?

 7         A    Hopefully soon.

 8         Q    If you get in, will you go?

 9         A    I don't know, because I would still love to

10    continue playing soccer.  I'm not ready to give it up   01:28:56

11    yet.

12         Q    Is there any reason you can't play soccer at

13    FSU or UF or ASU?

14         A    I'm not sure if I would be able to play soccer

15    and do law school.                                     01:29:13

16         Q    So it's not an eligibility concern; it's just

17    a timing concern?

18         A    Yes.

19         Q    Do you think you'd make the team at FSU?

20              MS. HOLCOMB:  Object to form.                01:29:29

21              MR. TRYON:   Objection.

22              THE WITNESS:  I would hope so.  That would be

23    cool.

24    BY MR. BARR:

25         Q    Am I mistaken?  Didn't Florida State win the  01:29:42
```

Page 61

```
 1   national championship a couple of years ago for women's

 2   soccer?

 3       A    They could have.  I don't keep up with FSU

 4   sports.

 5       Q    Do you expect you'd make the team at            01:29:54

 6   University of Florida?

 7            MS. HOLCOMB:  Object to form.

 8            MR. TRYON:  Objection.

 9            THE WITNESS:  I don't know.

10   BY MR. BARR:                                             01:30:09

11       Q    I presume you don't know if you would make the

12   team at Arizona State either?

13            MS. HOLCOMB:  Same objection.

14            THE WITNESS:  I don't make the decisions for

15   those coaches.                                           01:30:20

16   BY MR. BARR:

17       Q    If you get into law school, are you going to

18   try out for the team, or that's the end of soccer?

19            MR. TRYON:  Objection.

20            MS. HOLCOMB:  Object to form.                   01:30:28

21            THE WITNESS:  I don't know.  I definitely

22   don't think that I said if I get into law school, I'm

23   definitely -- it's definitely the end of law school --

24   or soccer, I mean.

25   ///
```

Veritext Legal Solutions
866 299-5127

```
 1    BY MR. BARR:
 2         Q   Have you reached out to the coaches at any of
 3    those programs?
 4         A   No.  That would be illegal to do because I'm
 5    not in the transfer portal.                          01:30:54
 6         Q   You're not transferring; you're graduating;
 7    right?
 8         A   I still --
 9             MS. HOLCOMB:  Object to the form.
10             MR. BARR:  I'm sorry, could you repeat that?  01:31:04
11    That got --
12             MS. HOLCOMB:  I would like to put my objection
13    back on the record, please.
14             You can go.
15             THE WITNESS:  I still can't reach out to those  01:31:12
16    schools.
17    BY MR. BARR:
18         Q   When are you able to reach out to those
19    schools?
20         A   I haven't looked into that because I really   01:31:17
21    love playing at West Virginia State University.
22         Q   But if I understand you correctly, there's a
23    possibility you end up in law school, come the fall;
24    right?
25             MS. HOLCOMB:  Object to form.                 01:31:41
```

Page 63

```
 1              MR. TRYON:  Objection.

 2              THE WITNESS:  As you said earlier, a lot of

 3   things are possible.

 4   BY MR. BARR:

 5       Q   Well, you've applied to three of them, and      01:31:52

 6   you're waiting to hear back; right?

 7              MR. TRYON:  Objection.

 8              MS. HOLCOMB:  Object to form.

 9              THE WITNESS:  I want to play soccer at

10   West Virginia State.                                    01:32:05

11   BY MR. BARR:

12       Q   But you couldn't do that if you were in law

13   school; right?

14              MS. HOLCOMB:  Object to form.

15              THE WITNESS:  I could not do that if I was in  01:32:13

16   law school, correct.

17   BY MR. BARR:

18       Q   Is the only interest you have in the Master's

19   of Public Administration to play soccer?

20       A   That's not the only reason.                     01:32:32

21       Q   What other reasons are there?

22       A   I would be learning and getting a better

23   education while I was playing soccer and cultivating

24   relationships and learning important school skills.

25       Q   Why do you think you could play soccer in the   01:33:07
```

Page 64

```
 1    Master's program, but not during a law school program?

 2         A    I don't know if a Master's program is as

 3    vigorous as law school will be.

 4         Q    When do you intend to apply for the Master's

 5    program?                                          01:33:30

 6              MS. HOLCOMB:  Object to form.

 7              THE WITNESS:  As I said earlier, I still don't

 8    know what I'm going to be doing yet.

 9    BY MR. BARR:

10         Q    Would you say it's more likely than not that   01:33:42

11    you graduate this May?

12              MR. TRYON:  Objection.

13              THE WITNESS:  I'm not sure.

14    BY MR. BARR:

15         Q    What's your expectation, sitting here today?   01:33:54

16              MS. HOLCOMB:  Object to form.

17              THE WITNESS:  It's really not set in stone

18    yet.

19    BY MR. BARR:

20         Q    I'm not asking if it's set in stone.  I'm just   01:34:09

21    saying today, March 11th, are you expecting to graduate

22    in May?

23              MS. HOLCOMB:  Object to form.

24              MR. TRYON:  Objection.

25              THE WITNESS:  It's possible.               01:34:24
```

Page 65

```
 1   BY MR. BARR:

 2        Q   Ms. Armistead, do you plan on graduating in

 3   May?  It's two months away.  It's a fairly

 4   straightforward question.

 5            MS. HOLCOMB:  Andrew, I don't mean to provide    01:34:38

 6   a speaking objection, but I do think this is getting a

 7   little bit excessive and harassing.  That has been

 8   asked and answered.  I suggest that you move on.

 9            MR. BARR:  Attorney Holcomb, I'm asking a very

10   simple question that hasn't been answered.  I'm just    01:34:50

11   asking what her expectation is for two months from

12   today, that's it.

13            MS. HOLCOMB:  And she has told you multiple

14   times that she does not yet know.  That is asked and

15   answered.  Please proceed.                              01:35:01

16            MR. BARR:  Well, the question stands.

17            THE WITNESS:  I am not sure, but if I do, I

18   would still like to continue my education at

19   West Virginia State.

20   BY MR. BARR:                                            01:35:21

21        Q   When do you expect that you'll know if you're

22   going to graduate in May?

23            MS. HOLCOMB:  Object to form.

24            THE WITNESS:  I don't know.  Hopefully before

25   May.                                                    01:35:43
```

Page 66

```
 1   BY MR. BARR:

 2        Q   Has Coach Mann talked to you about graduation?

 3            MS. HOLCOMB:  Object to form.

 4            THE WITNESS:  What do you mean?

 5   BY MR. BARR:                                    01:36:03

 6        Q   When -- in one or more of those updates you've

 7   had with Coach Mann, have you talked about graduation

 8   with her?

 9        A   I think, yes.

10        Q   What did Coach Mann say?               01:36:31

11        A   She wants me to get my Master's degree at

12   State, if I chose to graduate this May, or she would

13   want me to not graduate and just get two Bachelor's

14   degrees so I could continue on in the fall without

15   graduating.                                     01:36:58

16        Q   What other Bachelor degree are you

17   considering?

18            MS. HOLCOMB:  Object to form.

19            THE WITNESS:  It's not -- I'm not certain.  I

20   would be interested in psychology.              01:37:13

21   BY MR. BARR:

22        Q   Did you file a form to graduate in May?

23        A   Yes.

24        Q   When did you file that form?

25        A   Sometime before the due date.          01:37:28
```

```
 1              MR. BARR:  Attorney Holcomb, can you produce

 2      that because that's certainly relevant to your

 3      discovery request?

 4              MS. HOLCOMB:  We can certainly see if we can

 5      obtain that.                                        01:37:52

 6              MR. BARR:  Thank you.

 7              While we're at it, if you could obtain the

 8      scholarship agreements that happened in the last two

 9      years and their date of signature, that would also

10      clearly fall within our discovery request.         01:38:02

11              MS. HOLCOMB:  Yeah, we don't have access to

12      those, Lainey does not have them in her possession, but

13      we can see if we can obtain them.

14              MR. BARR:  Thank you.

15      BY MR. BARR:                                        01:38:11

16         Q   Do you have any plans to withdraw the form

17      you've already filed to graduate in two months?

18         A   Filing the form doesn't automatically mean

19      that I graduate.

20         Q   I'm just asking if you have any plans to     01:38:27

21      withdraw the form.

22         A   I don't know what my plans are yet.

23         Q   But sitting here today, you have no plans to

24      do that?

25              MS. HOLCOMB:  Object to form.               01:38:35
```

                                                              Page 68

```
 1              THE WITNESS:  Sitting here today, I am not
 2      sure what my future holds yet.
 3      BY MR. BARR:
 4          Q   I understand that.  But your future for the
 5      two -- next two months, do you plan on withdrawing that   01:38:48
 6      form?
 7              MS. HOLCOMB:  Objection to form.
 8              MR. TRYON:  Objection.
 9              THE WITNESS:  I'm not sure.
10      BY MR. BARR:                                             01:39:07
11          Q   Have you talked to your parents about
12      graduating?
13          A   Yes.
14          Q   Explain to me those discussions.
15          A   We have talked about all of the different       01:39:19
16      options that I have, one being which I could graduate,
17      another where I continue without graduating and get
18      another Bachelor's degree, another where I get a
19      Master's degree at State or go to law school.
20              But as I said earlier, there are a lot of       01:39:48
21      options that I have to weigh carefully, but I would
22      definitely love to be at West Virginia State.
23          Q   What would your dad like you to do?
24          A   What?
25              MS. HOLCOMB:  I'm sorry, could you please       01:40:03
```

Page 69

```
 1    restate the question?

 2            MR. BARR:  Yes, absolutely.

 3    BY MR. BARR:

 4        Q    In having those discussions you just

 5    described, what is your understanding of what your dad    01:40:09

 6    would like you to do?

 7        A    He wants me to decide for myself, and he said

 8    that he would support my decision.

 9        Q    He has no preference?

10            MS. HOLCOMB:  Object to form.                      01:40:28

11            THE WITNESS:  I don't know what my dad's

12    preference is.

13    BY MR. BARR:

14        Q    So you've had these discussions with your

15    parents and your dad just stated whatever you decide is    01:40:39

16    fine with him?

17            MR. TRYON:  Objection.

18            MS. HOLCOMB:  Object to form.

19            THE WITNESS:  He wants me to do what I deem

20    best for myself.  I'm the one who is going to be           01:40:54

21    graduating or staying or playing soccer.  So,

22    ultimately, both of my parents want me to decide to do

23    what's best for me.

24            Would he love to continue seeing me play

25    because I've been playing since I was little?  I'm -- I    01:41:13
```

                                                        Page 70

```
 1    would assume he would.

 2    BY MR. BARR:

 3        Q   Does your mom have a preference for what you

 4    do?

 5            MS. HOLCOMB:  Object to form.                01:41:23

 6            THE WITNESS:  She said that she would be

 7    supportive.

 8    BY MR. BARR:

 9        Q   I understand that.  And I'm sure your parents

10    would be supportive.  I'm just curious if your mom has  01:41:36

11    a preference for what decision you make for yourself.

12            MS. HOLCOMB:  Object to form.

13            MR. TRYON:  Objection.

14            THE WITNESS:  I know she likes watching me

15    play soccer, but I can't answer on what she wants me to  01:41:52

16    do.

17    BY MR. BARR:

18        Q   So you've had the discussions about graduating

19    with your parents, and as far as you can tell, they're

20    okay with whatever you choose?                        01:42:02

21            MR. TRYON:  Objection.  Come on.

22            MS. HOLCOMB:  Objection.

23            THE WITNESS:  They'll be supportive, I

24    believe.

25    ///
```

                                                    Page 71

```
 1   BY MR. BARR:

 2        Q   Do your parents want you to go to law school?

 3            MS. HOLCOMB:  Object to form.

 4            THE WITNESS:  I'm not sure exactly what they

 5   want me to do with my life.                          01:42:35

 6   BY MR. BARR:

 7        Q   Have you talked to them about the Master's of

 8   Public Administration?

 9        A   Yes.

10        Q   What did they say about that?               01:42:47

11        A   They told me that they would be supportive of

12   whatever I did.  I believe my mom would like me to get

13   my MPA.

14        Q   Do you believe your dad wants you to get your

15   MPA?                                                 01:43:17

16            MS. HOLCOMB:  Object to form.

17            MR. TRYON:  Objection.

18            THE WITNESS:  I don't know.  My parents would

19   want me to do whatever I see fit.

20   BY MR. BARR:                                         01:43:30

21        Q   But sitting here today, you're just not sure

22   what that is?

23            MS. HOLCOMB:  Object to form.

24            MR. TRYON:  Objection again.

25            THE WITNESS:  I don't think that's what I    01:43:48
```

Page 72

1    said.

2    BY MR. BARR:

3        Q   What did you say?

4        A   They want me to do what I think is best for my

5    future.                                                01:43:56

6        Q   Maybe my question wasn't clear, I'm sorry.

7            My question was, sitting here today, you don't

8    know what you think is best for your future?

9            MS. HOLCOMB:  Object to form.

10           THE WITNESS:  I know what I would love to do,  01:44:12

11   and that's to continue playing the sport that I love.

12   BY MR. BARR:

13       Q   But it's uncertain whether that will happen or

14   not?

15           MS. HOLCOMB:  Object to form.                  01:44:23

16           MR. TRYON:  I'm sorry, Mr. Barr, could you

17   repeat that?  I couldn't hear it.

18           MR. BARR:  Yes, I said, and it's uncertain

19   whether that will happen?

20           MS. HOLCOMB:  Object to form.                  01:44:34

21           THE WITNESS:  I don't know yet.

22   BY MR. BARR:

23       Q   Do you know who B.P.J. is?

24       A   I know that that's the plaintiff.

25       Q   What do you know about B.P.J.?               01:44:53

                                                        Page 73

```
 1        A    There's nothing that I know for certain about

 2    B.P.J. other than she's the plaintiff.

 3        Q    What do you mean there's nothing you know for

 4    certain?

 5        A    You asked me what I knew about her.  I don't      01:45:16

 6    know who that is.  I don't know who -- I know that

 7    P.B. -- B.P.J. is the plaintiff.

 8        Q    You've never met or spoke with B.P.J. before?

 9        A    No.

10        Q    Are you aware that B.P.J. is 11 years old?       01:45:32

11        A    I don't know.

12        Q    Are you aware that B.P.J. ran cross-country on

13    her middle school's girls' cross-country team last

14    year?

15        A    I don't know.                                    01:45:51

16        Q    You don't know that?

17        A    (No response.)

18        Q    I'm sorry, that was a question.

19             You -- you're not -- you're not aware that

20    B.P.J. ran on her middle school's girls' cross-country    01:46:02

21    team last fall?

22        A    I don't know.

23        Q    You don't know, or you're not aware of that?

24             MS. HOLCOMB:  Objection.

25             THE WITNESS:  I don't know.                      01:46:28
```

Page 74

```
 1    BY MR. BARR:

 2         Q   Are you aware that B.P.J.'s middle school

 3    supports her inclusion on the girls' team?

 4         A   I don't know.

 5         Q   Are you aware that B.P.J.'s school has a      01:46:54

 6    transgender support plan for B.P.J.?

 7         A   I don't know.

 8         Q   Do you know anything about B.P.J's athletic

 9    interests?

10         MS. HOLCOMB:  Object to form.               01:47:31

11         THE WITNESS:  I don't know.

12    BY MR. BARR:

13         Q   Sitting here today, do you know anything about

14    B.P.J. at all other than the fact --

15         MS. HOLCOMB:  Object to form.               01:47:47

16    BY MR. BARR:

17         Q   -- that B.P.J. is the plaintiff?

18         MS. HOLCOMB:  Object to form.

19         THE WITNESS:  I believe that B.P.J. doesn't

20    like the law from West Virginia.                 01:47:59

21    BY MR. BARR:

22         Q   What law is that?

23         A   H.B. -- sorry, the numbers, I forget -- 3293.

24         Q   You -- I get distracted with the numbers all

25    the time, so don't worry about that.             01:48:24
```

Page 75

```
 1          So other than your understanding that

 2    B.P.J. doesn't like H.B. 3293, do you know anything

 3    else about B.P.J.?

 4        A   No.

 5        Q   Would you be surprised to learn that B.P.J.'s   01:48:48

 6    school didn't have to cut any girls when they allowed

 7    B.P.J. to play on the girls' team last year?

 8          MS. HOLCOMB:  Object to form.

 9          THE WITNESS:  I don't know.

10    BY MR. BARR:                                           01:49:10

11        Q   What is your understanding of how

12    B.P.J. placed in the cross-country events that she

13    participated in last year?

14        A   I don't know.

15        Q   Do you have any understanding at all?  First?  01:49:26

16    Last?  Middle of the pack?

17        A   I don't know.

18        Q   Do you know how many events B.P.J.

19    participated in last year for cross-country?

20        A   No.                                            01:49:51

21        Q   Did you run cross-country growing up?

22        A   No.  I would run races, but it wasn't

23    organized cross-country.

24        Q   What kind of races?

25        A   Just in elementary school, we would have races  01:50:13
```

Page 76

```
 1   once a year.
 2        Q   Explain -- explain that to me.  Some sort
 3   of -- everybody in the school goes down to the field
 4   and runs a distance, something like that?
 5        A   Something like that, divided by grade and      01:50:35
 6   gender.
 7        Q   Did you win?
 8        A   Yes.
 9        Q   Every time?
10        A   Yes.                                           01:50:55
11        Q   Were you first for everyone in your grade?
12        A   For all the girls, yes.
13        Q   What years is this?
14        A   Kindergarten through fifth grade.
15        Q   Have you been a part of any other organized or  01:51:13
16   semiorganized running events, other than that?
17        A   No.
18            MR. BARR:  Let's go off the record.
19            THE VIDEOGRAPHER:  All right.  I was on mute.
20            Okay.  We're going off the record.  The time   01:51:37
21   is 1:52 p.m., and this is the end of Media Unit
22   Number 2.
23            One moment.
24            (Recess.)
25            THE VIDEOGRAPHER:  Okay.  We are back on the    02:06:12
```

Page 77

```
 1    record at 2:06 p.m., and this is the beginning of Media

 2    Unit No. 3.

 3            Go ahead, please.

 4            MR. BARR:  Ms. Armistead, I just introduced to

 5    you and your counsel what has been previously marked as    02:06:24

 6    West Virginia Exhibit 34.  Let me know you've got that

 7    in front of you.

 8            THE WITNESS:  I have it in front of me.

 9    BY MR. BARR:

10        Q    Do you recognize this document?                    02:06:34

11        A    It looks like H.B. 3293.

12        Q    Have you read this before?

13        A    Sorry?

14        Q    Have you read what is now Exhibit WV-34 prior

15    to seeing it now?                                           02:07:02

16        A    I have read a little bit of it before, but not

17    the whole thing.

18        Q    What part of it did you read before?

19        A    The -- article 2, paragraph 1 and 2.

20        Q    Did you read anything else?                        02:07:29

21        A    Not a full read, no.

22        Q    So prior to today, article 2, section 1 and 2,

23    you've -- you've read, but everything else -- this will

24    be -- I'm just trying to gauge timing -- it will be new

25    for you?                                                    02:07:56
```

Page 78

```
 1        A    Yeah.

 2        Q    What is your understanding of the impact of

 3   H.B. 3293?

 4        A    My understanding is that it will keep

 5   biological women competing with biological women in        02:08:10

 6   sports.

 7        Q    Where did you get that understanding?

 8             MS. HOLCOMB:  I'll just object to the extent

 9   it calls for any communications with counsel, but

10   Lainey, you may answer.                                    02:08:28

11             THE WITNESS:  Through conversations with my

12   attorney.

13   BY MR. BARR:

14        Q    Other than in discussions with your attorney,

15   do you have any other reason to think that's what          02:08:42

16   H.B. 3293 does?

17        A    I had heard that that's what they did too.

18        Q    Who did you hear that from?

19        A    I don't remember exactly.

20        Q    Do you remember when you had that               02:09:25

21   conversation?

22             MS. HOLCOMB:  Object to form.

23             THE WITNESS:  I don't know how to answer that

24   question without giving privileged information.

25   ///
```

                                                      Page 79

```
 1    BY MR. BARR:
 2         Q   Let me ask it a different way.
 3             Is your entire understanding of the impact of
 4    H.B. 3293 based on discussions with your attorney?
 5         A   Yes.                                     02:09:43
 6         Q   Under this law, can B.P.J. play on a girls'
 7    school sports team?
 8             MS. HOLCOMB:  Object to form.
 9             MR. TRYON:  Objection.
10             THE WITNESS:  I can't make a legal        02:10:15
11    determination.
12    BY MR. BARR:
13         Q   Is it your understanding that this law would
14    prohibit B.P.J. from playing on her school's girls'
15    team?                                             02:10:28
16         A   I'm not sure.
17         Q   So sitting here today, you don't know one way
18    or the other whether B.P.J. could play on the girls'
19    team based --
20             MS. HOLCOMB:  Ob- --                      02:10:44
21    BY MR. BARR:
22         Q   -- on this law?
23             MS. HOLCOMB:  Sorry.  Object to form.
24             THE WITNESS:  I'm not sure because I'm not an
25    attorney.                                         02:10:54
```

Page 80

```
 1    BY MR. BARR:

 2        Q   What is your understanding of what happens if

 3    you win in this lawsuit?

 4        A   I'm not sure.

 5        Q   Why did you think it would be important to        02:11:11

 6    intervene if you don't understand the impact of

 7    intervening?

 8        A   I believe that keeping this law in place will

 9    result in fair and equitable playing for women in -- in

10    sports.                                                    02:11:37

11            MR.  BARR:  That wasn't my question.

12            Court Reporter, can you read back the

13    question, please.

14            (Record read.)

15            MS. HOLCOMB:  I'll just object to form.           02:12:03

16            THE WITNESS:  I understand that intervening

17    means that I think that the bill is a good step of

18    legislation, and I believe that it will help keep the

19    playing fields even and equal, and that's why I thought

20    it was so important to intervene.                         02:12:38

21    BY MR. BARR:

22        Q   That brings me back to -- maybe I just didn't

23    understand your answer before.

24            What happens if you win?

25        A   I guess the law stays as it is.                   02:12:57
```

                                                        Page 81

```
1          Q   And what happens if you lose?

2          A   I can't speculate on what will happen if I

3      lose.  I'm not sure.

4          Q   Do you have any understanding at all?

5              MS. HOLCOMB:  Object to form.              02:13:21

6              MR. TRYON:  Objection.

7              THE WITNESS:  I don't know.

8      BY MR. BARR:

9          Q   Why did you intervene in the lawsuit if you

10     don't know what happens if you win or lose?          02:13:39

11             MS. HOLCOMB:  Object to form.

12             MR. TRYON:  Objection.

13             THE WITNESS:  Again, that's not what I said.

14             I understand that if -- if this law stays in

15     place, that women will be protected and it will keep  02:13:53

16     the playing field even and equitable for women in

17     sports.

18     BY MR. BARR:

19         Q   Which women?

20         A   Women --                                    02:14:05

21             MR. TRYON:  Objection.

22             THE WITNESS:  I'm confused on your question.

23     BY MR. BARR:

24         Q   Well, you said that the law will protect

25     women's sports, something along those lines, and I'm  02:14:25
```

Page 82

1    asking, which women is it protecting?

2        A    Women.

3        Q    All women?

4        A    Biological women in sports.

5        Q    When did you first become aware of this law?    02:14:43

6            MS. HOLCOMB:  Object to form and also to the

7    extent that it calls for privileged information again.

8            MR. BARR:  You know, Christiana, I would be

9    willing to just -- I'm not trying to get any privileged

10   information at all.  And if the answer is that    02:15:03

11   Ms. Armistead didn't know about this law until she

12   spoke with your office, I'll -- I'll move on.  I'm just

13   trying to understand.

14           MS. HOLCOMB:  Sure.  We've -- this is also

15   asked and answered a couple of times, which is in part    02:15:14

16   while I raised the objection again.  But yes, I will

17   continue to maintain attorney-client privileged

18   objections.

19   BY MR. BARR:

20       Q    Okay.  So I'll ask again, when did you first    02:15:26

21   become aware of this law?

22           MS. HOLCOMB:  Same objection.

23           THE WITNESS:  I can't answer that without

24   divulging privileged information with my attorney.

25   BY MR. BARR:    02:15:37

Page 83

```
 1        Q   Was Jamie Metzger part of that conversation?

 2        A   No.

 3        Q   I don't want to know anything that was said,

 4   but who was at that -- who was present for that

 5   conversation?                                          02:15:55

 6        A   Christiana.

 7        Q   Anyone else?

 8        A   No.

 9        Q   But you don't recall when that conversation

10   happened?                                              02:16:13

11            MS. HOLCOMB:  Objection to form again.

12            THE WITNESS:  Sometime in 2021.

13   BY MR. BARR:

14        Q   Was it on the phone?

15        A   I don't recall.                               02:16:30

16        Q   Was it in person?

17        A   No.

18        Q   So it was in some type of virtual format,

19   phone, computer, something like that?

20        A   Yes.                                          02:17:01

21        Q   Did Ms. Holcomb reach out to you, or did you

22   reach out to Ms. Holcomb?

23            MS. HOLCOMB:  Again, objection to the extent

24   it calls for privileged information.

25            And I'm not sure why we're retreading ground  02:17:13
```

Veritext Legal Solutions
866 299-5127

```
 1    that's already been covered, Counsel.

 2           MR. BARR:  I went back and looked at the

 3    transcript, and I still don't fully understand, so I'm

 4    just trying to make sure we have clarify on the record.

 5           MS. HOLCOMB:  I also want to just state my        02:17:24

 6    objection to revisiting ground already trod.

 7           MR. BARR:  Noted.

 8           THE WITNESS:  I don't know how to give you an

 9    answer without divulging attorney-client privileges.

10    BY MR. BARR:                                            02:17:38

11       Q   Ms. Holcomb can certainly correct me, but the

12    manner in -- who -- who reached out to who wouldn't be

13    a privileged communication, I'm aware of, and I didn't

14    hear Ms. Holcomb direct you not to answer based on

15    privilege.  So I'll ask the question again.             02:17:55

16           Did Ms. Holcomb reach out to you?

17       A   Yes.

18       Q   Does this law apply to club sports?

19           MR. TRYON:  Objection.

20           MS. HOLCOMB:  Object to form.                    02:18:20

21           THE WITNESS:  I don't know.

22    BY MR. BARR:

23       Q   Does it apply to grade school sports?

24           MS. HOLCOMB:  Objection to form.

25           MR. TRYON:  Objection.                           02:18:28
```

                                                        Page 85

```
 1                  THE WITNESS:  I don't know.

 2      BY MR. BARR:

 3          Q    Does it apply to intramural sports at

 4      West Virginia State?

 5                  MR. TRYON:  Objection.              02:18:38

 6                  MS. HOLCOMB:  Objection to form.

 7                  THE WITNESS:  I don't know.

 8      BY MR. BARR:

 9          Q    Does it apply to all the schools in your

10      conference?                                     02:18:48

11                  MS. HOLCOMB:  Objection.

12                  MR. TRYON:  Objection.

13                  THE WITNESS:  I don't know.

14      BY MR. BARR:

15          Q    Does it apply to all school-sponsored sports  02:18:58

16      in West Virginia?

17                  MS. HOLCOMB:  Object to form.

18                  MS. MORGAN:  Object to form.

19                  MR. TRYON:  Objection.

20                  THE WITNESS:  I don't know.         02:19:08

21      BY MR. BARR:

22          Q    Tell me what you do know about this law.

23          A    I don't know anything because I'm not an

24      attorney.

25          Q    So to the extent you've said things about this  02:19:22
```

Page 86

```
 1    law in other contexts, you didn't have a basis to say
 2    that?
 3            MS. HOLCOMB:  Object to form.
 4            THE WITNESS:  Can you repeat the question?
 5    BY MR. BARR:                                    02:19:42
 6       Q   Sure.  I understood your last answer to be
 7    that you don't understand the scope or impact of this
 8    law because you're not a lawyer.  Did I say that
 9    correctly?
10            MS. HOLCOMB:  Object to form.             02:19:56
11            THE WITNESS:  That's not what I said.
12    BY MR. BARR:
13       Q   What did you say?
14       A   I said I'm not going to make legal
15    commentation on something that I can't make legal    02:20:03
16    commentation on because I'm not an attorney.
17       Q   And by "legal commentation," you mean whether
18    or not the law applies to a particular school or a
19    particular person; is that right?
20            MS. HOLCOMB:  Object to form.             02:20:23
21    BY MR. BARR:
22       Q   You tell me what you meant by "legal
23    commentation."
24       A   Any legal commentary, I'm going to say I don't
25    know.                                           02:20:36
```

Page 87

1          Q    And discussing the impact of this law would

2     fall in legal commentary, as far as you understand it?

3          A    What do you mean, the impact?

4          Q    Well, I asked if you knew if this law applied

5     to club sports.  Is that something that you would        02:20:56

6     consider legal commentary?

7          A    I don't know if it applies.

8          Q    And then I asked if this law applied to every

9     school in your conference.  Is that something you would

10    consider legal commentary?                               02:21:20

11         A    I said I don't know.

12         Q    And then I said, tell me what you do know

13    about this law.

14              MS. HOLCOMB:  Object to form.

15              THE WITNESS:  What my understanding is, is      02:21:26

16    that this will protect women in sports.

17    BY MR. BARR:

18         Q    What do you mean by "protect"?

19         A    Women are built different than biological men.

20    Biological men are stronger, fitter, faster, have a      02:22:09

21    bigger stature, in general, than women.  So this law,

22    it was put into place to protect women, women's safety

23    and their interests.

24         Q    Is this law accomplishing what you just said

25    by excluding transgender women?                          02:22:28

                                                               Page 88

```
 1              MS. HOLCOMB:  Object to form.

 2              MR. TRYON:  Objection.

 3              THE WITNESS:  Can you restate the question,

 4       please?

 5              MR. BARR:  Is --                          02:22:45

 6              Court Reporter, could you read the question

 7       back, please.

 8              (Record read.)

 9              MS. HOLCOMB:  Same objection.

10              THE WITNESS:  Can you restate it in a       02:23:05

11       different way?

12       BY MR. BARR:

13          Q   Is it that you don't understand the question?

14              MS. HOLCOMB:  Object to form.

15              THE WITNESS:  I just would like you to restate  02:23:11

16       it in a different way.

17       BY MR. BARR:

18          Q   You just told me a series of things that you

19       believe the law is accomplishing; is that right?

20          A   Yes.                                       02:23:27

21          Q   And you said fairness, and I believe you said

22       safety; is that right?

23          A   Correct.

24          Q   And my question to you is, how is this law

25       accomplishing those goals?                        02:23:41
```

Page 89

```
 1              MS. HOLCOMB:  Object to form.

 2              THE WITNESS:  By -- by protecting fairness and

 3    safety for biological women in sports.

 4    BY MR. BARR:

 5       Q   I understand that that's what you believe the    02:24:01

 6    goal of the law to be.  I'm asking how it does that.

 7              MS. HOLCOMB:  Object to form.

 8              MR. TRYON:  Objection.

 9              THE WITNESS:  That's not for me to interpret.

10    BY MR. BARR:                                            02:24:13

11       Q   Well, you're intervening in this lawsuit to

12    protect the law.  I'm trying to understand why.

13              What do you think this law is doing?  How does

14    it accomplish those goals?

15              MS. HOLCOMB:  Object to form.                 02:24:22

16              MR. TRYON:  Objection.

17              THE WITNESS:  I don't know.  I think I already

18    answered your question.

19    BY MR. BARR:

20       Q   So you don't know how the law accomplishes       02:24:36

21    those goals; you're just aware that those are the goals

22    of the law?

23              MR. TRYON:  Objection.

24              MS. HOLCOMB:  Object to form.

25              THE WITNESS:  I'm aware that that's what, I    02:24:52
```

                                                        Page 90

```
1    believe, the law would be doing if it's in effect, yes.

2    BY MR. BARR:

3         Q   If the law is in effect, can B.P.J. play on a

4    girls' team?

5              MS. HOLCOMB:  Object to form.              02:25:00

6              THE WITNESS:  I don't know.

7    BY MR. BARR:

8         Q   If the law is in effect, can a transgender

9    woman play on a girls' team?

10             MS. HOLCOMB:  Object to form.              02:25:13

11             MR. TRYON:   Objection.

12             THE WITNESS:  I don't know.

13   BY MR. BARR:

14        Q   Does this law apply to contact sports?

15             MS. HOLCOMB:  Object to form.              02:25:40

16             THE WITNESS:  I don't know.

17   BY MR. BARR:

18        Q   Does this law apply to noncontact sports?

19             MS. HOLCOMB:  Object to form.

20             THE WITNESS:  I don't know.              02:25:57

21   BY MR. BARR:

22        Q   Do you have any understanding what sports this

23   law applies to?

24             MS. HOLCOMB:  Object to form.

25             THE WITNESS:  I don't know.              02:26:09
```

Page 91

```
 1    BY MR. BARR:

 2        Q   Do you know if this law applies to esports,

 3    when people sit around and play video games on behalf

 4    of their school?

 5            MS. HOLCOMB:  Object to form.              02:26:28

 6            THE WITNESS:  I don't know.

 7    BY MR. BARR:

 8        Q   Do you know if this law is different than the

 9    NCAA's policy regarding transgender women playing

10    school sports?                                     02:26:45

11            MS. HOLCOMB:  Object to form.

12            THE WITNESS:  I don't know.

13    BY MR. BARR:

14        Q   You said it's your understanding this law will

15    protect women for safety and fairness reasons.  Did I   02:27:02

16    understand that correctly?

17        A   Yes.

18        Q   Are there any other things that this law does?

19            MS. HOLCOMB:  Object to form.

20            THE WITNESS:  I told you what my understanding   02:27:15

21    was.

22    BY MR. BARR:

23        Q   I'm just trying to make sure I'm comprehensive

24    in understanding what you told me.  I heard "fairness

25    and safety."  Is there anything else?             02:27:31
```

Page 92

```
 1              MS. HOLCOMB:  Object to form.

 2              THE WITNESS:  I don't know.

 3    BY MR. BARR:

 4        Q   Would you be surprised to learn that this law

 5    does not apply to every school in your conference?    02:28:01

 6              MS. HOLCOMB:  Objection.

 7              MR. TRYON:  Objection.

 8              THE WITNESS:  I don't know.

 9    BY MR. BARR:

10        Q   You don't know if you would be surprised, or    02:28:11

11    you didn't know that that was the case?

12              MS. HOLCOMB:  Object to form.

13              MR. TRYON:  Objection.

14              THE WITNESS:  I just don't know.

15    BY MR. BARR:                                           02:28:24

16        Q   I heard you.  I'm trying to figure out what

17    you don't know.

18              Do you not know that the law doesn't apply to

19    every school in your conference?

20              MS. HOLCOMB:  Object to form.              02:28:34

21              MR. TRYON:  Objection.

22              THE WITNESS:  I don't know.  No, I don't know.

23    BY MR. BARR:

24        Q   Is this law changing things from the way they

25    were before?                                          02:29:00
```

Page 93

```
 1              MS. HOLCOMB:  Object to form.

 2              MR. TRYON:  Objection.

 3              THE WITNESS:  I don't know.

 4   BY MR. BARR:

 5       Q    Would you expect that if a law is passed, it's   02:29:15

 6   meant to change things?

 7              MS. HOLCOMB:  Object to form.

 8              MR. TRYON:  Objection.

 9              THE WITNESS:  I don't know.

10   BY MR. BARR:                                              02:29:25

11       Q    Do you know any transgender people?

12              MR. TRYON:  Objection.

13              MS. HOLCOMB:  Object to form.

14              THE WITNESS:  I have an -- had an acquaintance

15   a few years ago, that there are rumors that they have    02:29:55

16   transitioned or started a transition or something, but

17   I'm really not certain.

18   BY MR. BARR:

19       Q    Who is that person?

20       A    I don't know the name they currently go by.     02:30:09

21       Q    Well, I appreciate you not using their former

22   name.

23              Other than that person, do you know any

24   transgender people?

25              MS. HOLCOMB:  Object to form.               02:30:29
```

Page 94

```
 1              THE WITNESS:  Not to my knowledge, but I don't
 2      know.
 3      BY MR. BARR:
 4          Q   Have you ever competed in a soccer game with
 5      or against someone who's transgender?            02:30:44
 6          A   I'm not sure.  I don't know.
 7          Q   Are there any transgender women playing on a
 8      team in the Mountain East Conference.
 9              MR. TRYON:  Objection.
10              THE WITNESS:  I don't know.              02:31:05
11      BY MR. BARR:
12          Q   Have you ever heard of the phrase "inner sense
13      of self"?
14          A   No.
15          Q   If I asked you to tell me what that phrase   02:31:20
16      means, would you be able to do that?
17              MR. TRYON:  Objection.
18              MS. HOLCOMB:  Object to form.
19              THE WITNESS:  No.
20      BY MR. BARR:                                    02:31:27
21          Q   Have you ever seen that phrase written on a
22      piece of paper?
23          A   It's possible.  I do a lot of reading.
24          Q   But nothing specific comes to mind?
25          A   Correct.                                02:31:42
```

Page 95

```
 1           Q    What do you know about puberty blockers?

 2                MR. TRYON:  Objection.

 3                MS. HOLCOMB:  Object to form.

 4                THE WITNESS:  I don't know.

 5    BY MR. BARR:                                        02:32:11

 6           Q    Have you ever heard of puberty blockers?

 7           A    I've heard of that.

 8           Q    What is your understanding of what puberty

 9    blockers are?

10                MR. TRYON:  Objection.              02:32:27

11                MS. HOLCOMB:  Same objection.

12                THE WITNESS:  I don't know.

13    BY MR. BARR:

14           Q    So you've heard of it, but you don't have an

15    understanding of what it means?              02:32:33

16           A    Correct.

17           Q    Have you ever heard of hormone replacement

18    therapy?

19           A    Yes.

20           Q    Do you have an understanding of what that is?  02:32:46

21                MS. HOLCOMB:  Object to form.

22                THE WITNESS:  I don't know.

23    BY MR. BARR:

24           Q    I'm sorry, I didn't hear you.

25           A    I don't know.                      02:32:56
```

                                                      Page 96

```
1        Q    Do you have any thoughts about what happens to
2    someone who starts puberty blockers before going
3    through puberty?
4        A    I don't know.
5        Q    Have you ever read anything that describes      02:33:22
6    what might happen to someone who takes puberty blockers
7    before going through puberty?
8        A    I'm not sure.
9        Q    Do you think transgender girls are faster than
10   you?                                                     02:33:50
11           MR. TRYON:  Objection.
12       A    I think in general, biological males are
13   stronger, fitter, faster and have a bigger stature than
14   women do.
15   BY MR. BARR:                                             02:34:11
16       Q    My question was, do you think transgender
17   girls are faster than you?
18           MR. TRYON:  Objection.
19           MS. HOLCOMB:  Objection; form.
20           THE WITNESS:  I think in general, biological     02:34:18
21   males are faster than me, yes.
22   BY MR. BARR:
23       Q    So if I'm hearing you correctly, and I'm not
24   trying to put words in your mouth, your response was
25   that all biological males are faster than you?           02:34:44
```

Page 97

```
 1              MR. TRYON:  Objection.

 2              MS. HOLCOMB:  Objection.

 3    BY MR. BARR:

 4        Q   Is that what you said?

 5        A   I believe I said in general.          02:34:57

 6        Q   Do you believe that all transgender girls --

 7    let me rephrase it.

 8              Do you believe, in general, transgender girls

 9    are faster than you?

10              MS. HOLCOMB:  Objection --             02:35:12

11              MR. TRYON:  Objection; asked and answered.

12              THE WITNESS:  I already answered that.

13    BY MR. BARR:

14        Q   You answered about biological males.  I'm

15    asking about transgender girls.                 02:35:24

16              MS. HOLCOMB:  Object to form.

17              MR. TRYON:  Objection.

18              THE WITNESS:  I believe biological males are

19    in gen- -- are generally faster than females.

20    BY MR. BARR:                                    02:35:36

21        Q   Every time that I ask about a transgender girl

22    and you respond with "biological males," are we, from

23    your perspective, talking about the same thing, the

24    same group of people?

25        A   Yes.                                    02:35:47
```

Page 98

```
 1        Q   So if I ask a question and you respond saying
 2    "biological males," I can understand you to be, from my
 3    perspective, my definition, meaning a transgender girl;
 4    is that right?
 5            MS. HOLCOMB:  Object to form.              02:36:02
 6            MR. TRYON:  Objection.
 7            THE WITNESS:  I'm just going to answer the
 8    questions how I know to answer the questions.
 9    BY MR. BARR:
10        Q   I understand, but I'm just trying to speed    02:36:14
11    this up for both of us.  If I can understand that when
12    I say "transgender girl" and you respond with
13    "biological male," if we're -- if you're answering the
14    question I'm asking, and we're all talking about the
15    same group of people with our understood difference of  02:36:27
16    opinion there, it's going to allow us to run through
17    the next set of questions faster, but I'm happy to not
18    do that if you don't want to.
19            MS. HOLCOMB:  Object to form.
20            MR. TRYON:  Objection.                     02:36:40
21            THE WITNESS:  I'm still going to answer how
22    I've been answering.
23    BY MR. BARR:
24        Q   Okay.  Do you believe that transgender girls
25    are bigger than you?                              02:37:04
```

Page 99

```
 1              MS. HOLCOMB:  I'm sorry, Andrew, we didn't
 2       fully hear your question.
 3              MR. BARR:  I asked if it was her belief that
 4       transgender girls are bigger than her.
 5              THE WITNESS:  In general, biological men are      02:37:20
 6       bigger than women, yes.
 7       BY MR. BARR:
 8          Q   Where did you form that opinion?
 9          A   Observation.
10          Q   Is that it?                                      02:37:40
11          A   Yes.  Looking around, in everyday life, I can
12       see that biological men are typically bigger than me.
13          Q   Do you recognize there's a difference between
14       transgender women and biological men?
15              MS. HOLCOMB:  Object to form.                    02:38:11
16              THE WITNESS:  I don't know.
17       BY MR. BARR:
18          Q   Why do you keep using the phrase "biological
19       male"?
20              MS. HOLCOMB:  Object to form.                    02:38:24
21              THE WITNESS:  Because that's my vocabulary.
22       BY MR. BARR:
23          Q   Why don't you also say "biological female,"
24       then?
25              MS. HOLCOMB:  Object to form.                    02:38:51
```

```
 1              MR. TRYON:  Objection.

 2              THE WITNESS:  I don't know.

 3      BY MR. BARR:

 4          Q   So a typical conversation, you'll say "women"

 5      and "biological males"?                          02:39:01

 6              MS. HOLCOMB:  Object to form.

 7              THE WITNESS:  I don't know.  Probably not.

 8      BY MR. BARR:

 9          Q   So why do you keep saying that today?

10              MS. HOLCOMB:  Object to form.            02:39:14

11              MR. TRYON:  Objection.

12              THE WITNESS:  Because I'm choosing to.

13      BY MR. BARR:

14          Q   Why are you making that decision?

15              MS. HOLCOMB:  Object to form.            02:39:26

16              THE WITNESS:  That's how I'm choosing to

17      answer your questions.

18      BY MR. BARR:

19          Q   Okay.  Well, let me -- help me.  What is a

20      biological male?                                 02:39:41

21              MS. HOLCOMB:  Object to form.

22              THE WITNESS:  Someone who -- I believe someone

23      whose gender is male, assigned male at birth and is a

24      male.

25      BY MR. BARR:                                     02:40:09
```

                                                    Page 101

```
 1        Q    That's a biological male?

 2        A    Yes.

 3        Q    What word do you describe someone who was

 4    assigned male at birth, but their gender identity is

 5    female?                                        02:40:25

 6            MS. HOLCOMB:  Object to form.

 7            THE WITNESS:  I would say "biological male."

 8    BY MR. BARR:

 9        Q    So explain to me the difference between what I

10    ask and what you're saying for biological male.    02:40:43

11            MR. TRYON:  Objection.

12            MS. HOLCOMB:  Object to form.

13            THE WITNESS:  I'm sorry?

14    BY MR. BARR:

15        Q    If I heard you correctly, you said a        02:40:58

16    biological male is someone who is assigned the sex of

17    male at birth, has a gener -- gender identity of male.

18    Did I get that correct?

19            MS. HOLCOMB:  Object to form.

20            THE WITNESS:  I'm not sure.  I'm not a doctor.  02:41:13

21    BY MR. BARR:

22        Q    Okay.  Let's -- let's start over.  I must have

23    misheard you.

24            What is your understanding of what a

25    biological male is?                              02:41:22
```

Page 102

```
1          A    I'm not a doctor.

2          Q    I -- I understand that you're not a doctor.

3               What is your understanding of what a

4     biological male is?

5          A    I don't know.                              02:41:32

6          Q    The court reporter could tell us, but I bet

7     you used the word -- the phrase "biological male" more

8     than 30 times.  What does it mean?

9               MS. HOLCOMB:  Object to form.

10              MR. TRYON:  I'm just going to object.  Asked   02:42:17

11    and answered.

12              THE WITNESS:  Someone who was -- I think

13    someone who was assigned male at birth and identifies

14    as a male.

15    BY MR. BARR:                                         02:42:41

16         Q    Okay.  That's what I heard you say the first

17    time, so I appreciate you clarifying that.

18              What do you call someone who was assigned male

19    at birth but identifies as a female?

20              MS. HOLCOMB:  Object to form.               02:42:52

21              THE WITNESS:  Biological male.

22    BY MR. BARR:

23         Q    So regardless how the person identifies, you

24    would call them a biological male?

25              MR. TRYON:  Objection.                      02:43:09
```

                                                     Page 103

```
 1              THE WITNESS:  I didn't say what I would call

 2    them.  That's just how I'm referring to what you're

 3    asking today, biological males.

 4    BY MR. BARR:

 5       Q   So if it wasn't today, what would you refer to    02:43:22

 6    them as?

 7              MS. HOLCOMB:  Object to form.

 8              MR. TRYON:  Objection.

 9              THE WITNESS:  I would think it's someone who's

10    a biological male.                                       02:43:42

11         MR. BARR:  Court Reporter, could you read the

12    answer prior to the last answer, please.

13         (Record read.)

14    BY MR. BARR:

15       Q   So what would you call them?                      02:44:05

16              MS. HOLCOMB:  Object to form.

17              THE WITNESS:  If someone asks me to call them

18    by a certain name, then I would, but that doesn't mean

19    that it changes what I am considering a biological

20    male.                                                    02:44:22

21    BY MR. BARR:

22       Q   Could you explain that?  Because that doesn't

23    make any sense to me.

24       A   I would respect what someone would want their

25    name to be called.                                       02:44:36
```

Page 104

```
 1        Q    So if somebody walked up and said, I'm a

 2    transgender female, you would refer to them as a

 3    transgender female?

 4        A    I --

 5             MS. HOLCOMB:  Object to form.              02:44:52

 6             MR. TRYON:  Objection.

 7             THE WITNESS:  If someone asked me to call them

 8    by "Joe," then I would call them by their name -- by

 9    what name that they told me that they wanted to be

10    called, which would be "Joe," "Michael," whatever it    02:45:04

11    would be, but that doesn't change my answer of

12    biological male.

13    BY MR. BARR:

14        Q    I think I understand what you're -- you are

15    saying that you would respect the name that they would   02:45:18

16    like to be called, but regardless, you would still

17    consider someone who was assigned male at birth a

18    biological male?

19        A    Yes.

20        Q    Where did you learn that phrase?              02:45:37

21             That's not how most people talk in day-to-day

22    conversation, so I'm trying to understand why you're

23    choosing to use it today.

24        A    I thought it would clarify the conversation so

25    you would know what I was talking about.              02:46:01
```

Page 105

```
 1        Q    And why did you think that?

 2        A    Because of your terms that you've been using.

 3        Q    I don't -- I don't understand.  The terms that

 4   I'm using have led -- let you to use the term

 5   "biological male"?                                    02:46:30

 6             MR. TRYON:  Objection.

 7             MS. HOLCOMB:  Object to form.

 8             THE WITNESS:  I think it's -- it's clarifying

 9   the conversation, but I will just refer to all

10   biological males as "males" from now on, if you would   02:46:42

11   prefer.

12   BY MR. BARR:

13        Q    No, you should answer however you feel most

14   comfortable.  I'm just trying to make sure I

15   understand.                                           02:46:52

16             When did you first use the phrase "biological

17   male"?

18        A    I couldn't tell you.

19        Q    You've been using it your whole life?

20        A    I might have said it a long time ago at some   02:47:04

21   point.  I'm not sure.

22        Q    If you were to introduce me to your brother,

23   would you say, This is Declan, a biological male?

24             MR. TRYON:  Objection; harassment.

25             MS. HOLCOMB:  Object to form.              02:47:22
```

                                                        Page 106

```
 1              THE WITNESS:  No.

 2    BY MR. BARR:

 3         Q   How would you introduce me to Declan?

 4         A   "This is Declan."

 5         Q   So what changed that you want to use the        02:47:38

 6    phrase "biological male" today if you don't use it in

 7    common speak?

 8              MR. TRYON:  Objection; asked and answered

 9    about three times now.

10              MS. HOLCOMB:  Object to form.               02:47:53

11              THE WITNESS:  I think I answered that.

12    BY MR. BARR:

13         Q   Just give me a moment.

14              Did I hear you say earlier that you're not

15    aware of having been on a team with a transgender girl? 02:48:35

16         A   I'm not aware of that, no.

17         Q   Have you ever been injured by a transgender

18    girl?

19         A   Not to my knowledge.

20         Q   Have you ever been harmed by a transgender    02:48:55

21    girl?

22              MR. TRYON:  Objection.

23              MS. HOLCOMB:  Object to form.

24              THE WITNESS:  Not to my knowledge.

25    ///
```

Page 107

```
 1    BY MR. BARR:

 2         Q   Do you play any sports at West Virginia State

 3    other than soccer?

 4         A   No.

 5         Q   Do you have plans to play any other sports at    02:49:31

 6    West Virginia State other than soccer?

 7         A   No.

 8         Q   Do you believe that H.B. 3293 applies to the

 9    West Virginia women's soccer team?

10             MS. HOLCOMB:  Object to form.                    02:49:48

11             THE WITNESS:  I'm not sure.

12    BY MR. BARR:

13         Q   What position do you play?

14         A   Left center back.

15         Q   Have you always played that position?           02:50:03

16         A   No.

17         Q   What position did you play before that?

18         A   I've played in many different positions on the

19    soccer field.

20         Q   And when did you become a left center back as    02:50:24

21    a regular position?

22         A   My sophomore year of college.

23         Q   What position were you your freshman year of

24    college?

25         A   Left wingback or left center back.              02:50:41
```

Page 108

```
 1        Q   Why did you change?

 2        A   I was needed for the left center back

 3   position.

 4        Q   Your choice or the coach's choice?

 5            MS. HOLCOMB:  Object to form.              02:51:11

 6            THE WITNESS:  My coach's choice.

 7   BY MR. BARR:

 8        Q   You don't seem happy with that choice; is that

 9   right?

10            MS. HOLCOMB:  Object to form.              02:51:22

11            THE WITNESS:  I love both positions probably

12   equally.

13   BY MR. BARR:

14        Q   Well, I was a wingback, and I loved running,

15   you know, the edges of the field, so I would understand  02:51:39

16   if you were a little upset about it, but in any event.

17            Is your team good?

18        A   Yes.

19        Q   How long has West Virginia State had a team, a

20   women's soccer team?                                02:52:00

21        A   Since fall of 2019.

22        Q   You were on the inaugural team; right?

23        A   Yes.

24        Q   Did you play your freshman year?

25        A   Yes.                                       02:52:21
```

Page 109

```
 1        Q    Did you start?

 2        A    Yes.

 3        Q    Every game?

 4        A    I was injured, but other than that, yes.

 5        Q    How were you injured?                      02:52:41

 6        A    I had to sit out one game for a fractured

 7   foot, and I think that's it for my freshman year.

 8        Q    What was your record freshman year?

 9        A    I don't recall.  Good.  It was good, though.

10        Q    More wins than losses?                     02:53:15

11        A    Yes.

12        Q    Did you go to the conference tournament that

13   year?

14        A    Since it was an inaugural season, no.

15        Q    The conference didn't allow you to play?    02:53:41

16             Explain that.

17        A    For first-year teams, although we were playing

18   games and competing, it was not for the title.  That is

19   how I still have an extra year of NCAA eligibility and

20   one of the reasons that I decided to come to           02:54:03

21   West Virginia State.

22        Q    I understood the part about eligibility.

23             Why did that encourage you to attend

24   West Virginia State?

25        A    Because it would let me play soccer for       02:54:15
```

Page 110

```
 1   longer.

 2        Q   What was your team's record last year, 2020?

 3        A   I'm not sure of the record, but we qualified

 4   for the tournament.

 5        Q   Did you win the tournament?                  02:54:36

 6        A   No.

 7        Q   Did you make it to the finals?

 8        A   No.

 9        Q   How did you guys do?

10        A   We lost in the first round.                  02:54:51

11        Q   What about this year, 2021?

12        A   Oh, I was answering for this last season,

13   sorry.

14        Q   No, that's okay.

15            So in 2021, this year, you qualified for the  02:55:14

16   tournament, but didn't make it past the first round; is

17   that right?

18        A   Yes.

19        Q   What happened in 2020, last year?

20            I imagine COVID impacted your season or       02:55:23

21   something, but I'm still curious how you-all did.

22        A   Yes, COVID impacted it.  So instead of the

23   fall, we played a shorter spring season.  And I don't

24   remember how we did, but we didn't get into the

25   tournament.                                            02:55:41
```

Page 111

```
1          Q   I imagine it was a big step to -- to qualify
2     this year.
3          A   Yes.  It was impressive for our first official
4     season in the NCAA.
5          Q   Over the last three years, have you played a      02:55:59
6     college called "Notre Dame"?  And I'm not talking about
7     the Fighting Irish.  I'm talking about the Notre Dame
8     in your conference.
9          A   Yes.
10         Q   Did you play the Fighting Irish?                   02:56:13
11         A   No, we didn't.
12         Q   So if I -- if I talk about Notre Dame, you'll
13    understand I'm talking about the Notre Dame in your
14    conference?
15         A   Yes.                                               02:56:23
16         Q   Do you know where Notre Dame is located?
17         A   I'm not sure.
18         Q   Would it surprise you to find out it is not in
19    West Virginia?
20             MS. HOLCOMB:  Object to -- object to form.         02:56:36
21             THE WITNESS:  That wouldn't surprise me.
22    BY MR. BARR:
23         Q   How about a school called "Frostburg"?
24         A   What about it?
25         Q   Have you played a game against Frostburg?          02:56:53
```

                                                    Page 112

| | | |
|---|---|---|
| 1 | A   Yes. | |
| 2 | Q   Do you know where Frostburg is located? | |
| 3 | A   Not in West Virginia. | |
| 4 | Q   I'm asking you. | |
| 5 | A   I don't know.  It was a guess. | 02:57:06 |
| 6 | Q   Would you be surprised to find out it's not in | |
| 7 | West Virginia? | |
| 8 | MS. HOLCOMB:  Object to form. | |
| 9 | THE WITNESS:  No. | |
| 10 | BY MR. BARR: | 02:57:15 |
| 11 | Q   Do you have any understanding of whether | |
| 12 | H.B. 3293 applies to Notre Dame? | |
| 13 | MS. HOLCOMB:  Object to form. | |
| 14 | THE WITNESS:  I don't know. | |
| 15 | BY MR. BARR: | 02:57:28 |
| 16 | Q   The same question for Frostburg. | |
| 17 | MS. HOLCOMB:  Same objection. | |
| 18 | MR. TRYON:  Objection. | |
| 19 | THE WITNESS:  I don't know. | |
| 20 | BY MR. BARR: | 02:57:40 |
| 21 | Q   If you end up playing on the team next year, | |
| 22 | do you anticipate you'll play against Notre Dame? | |
| 23 | MS. HOLCOMB:  Object to form. | |
| 24 | THE WITNESS:  Most likely. | |
| 25 | /// | |

Page 113

```
 1    BY MR. BARR:

 2        Q   And you say most likely because they're one of

 3    the schools in your conference; right?

 4        A   Right.

 5        Q   Do you also expect that if you were to play on   02:58:02

 6    the team next year, you would play against Frostburg,

 7    given that Frostburg is in your conference?

 8            MS. HOLCOMB:  Object to form.

 9            THE WITNESS:  It's likely.

10    BY MR. BARR:                                             02:58:17

11        Q   Do you have any understanding whether a

12    transgender woman can play on Frostburg or Notre Dame's

13    team?

14            MR. TRYON:  Objection.

15            MS. HOLCOMB:  Object to form.                    02:58:37

16            THE WITNESS:  I don't know.

17    BY MR. BARR:

18        Q   If you found out that a transgender woman was

19    on Notre Dame or Frostburg's team, what would you do?

20            MR. TRYON:  Objection.                           02:58:46

21            MS. HOLCOMB:  Object to form.

22            THE WITNESS:  I would play a soccer game.

23    BY MR. BARR:

24        Q   I understand you have a medical concern that

25    may impact soccer, but assuming that everything goes     02:59:19
```

                                                       Page 114

1   well for you and that doesn't impact your game, do you

2   plan on playing competitive soccer after college?

3           MS. HOLCOMB:  Object to form.

4           THE WITNESS:  What kind of competitive soccer?

5   BY MR. BARR:                                           02:59:35

6       Q   Do you have -- fair.  I'll ask a different

7   question.

8           Do you have any plans to play soccer

9   postgraduation, of any kind?

10      A   If the opportunity arises, I would love to     02:59:50

11  continue playing soccer.

12      Q   What type of opportunities are you aware of

13  for playing soccer postgraduation?

14      A   I'm sure in many cities there are women's

15  teams that I could join for things like that.          03:00:26

16      Q   So some type of recreational, fun league is

17  what you're referencing?

18      A   Yes.

19      Q   Any plans of trying out or trying to join the

20  U.S. women's national team?                            03:00:47

21      A   No.

22      Q   Do you know anybody on that team?

23      A   No.

24      Q   Would you agree with me they're probably the

25  best players in the country, if not the world, when it  03:01:10

                                              Page 115

```
 1    comes to women's soccer?

 2            MS. HOLCOMB:  Object to form.

 3            THE WITNESS:  I think that they are amazing

 4    athletes.

 5    BY MR. BARR:                                    03:01:30

 6        Q   What was your reaction when you saw that they

 7    recently got equal pay for women on the national team?

 8            MS. HOLCOMB:  Object to form.

 9            THE WITNESS:  I was happy for them.

10    BY MR. BARR:                                    03:01:53

11        Q   Did you happen to see their game last month in

12    Texas?

13        A   I did not.

14        Q   Did you see the team came out publicly

15    supporting transgender youth?                   03:02:06

16            MR. TRYON:  Objection.

17            MS. HOLCOMB:  Object to form.

18            THE WITNESS:  I did not see that.

19            MR. BARR:  We can go off the record.

20            THE VIDEOGRAPHER:  All right.  We are going  03:02:28

21    off the record.  The time is 3:03 p.m., and this is the

22    end of Media Unit No. 3.

23            (Recess.)

24            THE VIDEOGRAPHER:  We where back on the record

25    at 3:13 p.m., and this is the beginning of Media Unit  03:13:03
```

Page 116

```
 1    No. 4.

 2             Go ahead, please.

 3    BY MR. BARR:

 4         Q    Ms. Armistead, do you know what Title IX is?

 5         A    I -- I've heard of it before.            03:13:19

 6         Q    What is your understanding of Title IX?

 7         A    I believe it's to give equal opportunities to

 8    women.

 9         Q    Do you have any other understandings about

10    Title IX?                                          03:13:46

11         A    I don't know for certain.

12         Q    So if I heard you correctly, Title IX is about

13    protecting women's rights; is that right?

14             MR. TRYON:  Objection.

15             MS. HOLCOMB:  Object to form.             03:14:14

16             THE WITNESS:  In my opinion, yes.

17    BY MR. BARR:

18         Q    How did you form that opinion?

19         A    I believe we have to have Title IX trainings

20    to participate in collegiate athletics.           03:14:31

21         Q    And those are annual, aren't they?

22         A    Yes.

23         Q    So at this point, you've attended three

24    Title IX trainings; is that right?

25         A    I'm not sure about the third one yet.    03:14:45
```

Page 117

```
 1        Q    So you know you've attended two and possibly a

 2   third; is that fair?

 3        A    I believe so, yes.

 4        Q    Who conducts that training?

 5        A    I think it might be online.  I'm not for sure.   03:15:05

 6        Q    That wasn't a fair question, I'm sorry.

 7             Is that put on by your school?

 8        A    Yes.

 9        Q    So as a student athlete, you're required to

10   sit through a Title IX training on some type of basis.   03:15:27

11   Is that accurate?

12        A    Yes.

13        Q    What did you learn at those trainings?

14        A    I don't recall specifics.

15        Q    Do you believe that your school complies with   03:15:50

16   Title IX?

17             MS. HOLCOMB:  Object to form.

18             MR. TRYON:  Objection.

19             THE WITNESS:  I don't know.

20   BY MR. BARR:                                               03:16:09

21        Q    Do you have any reason to think your school

22   doesn't comply with Title IX?

23        A    I have no reason to think that, no.

24        Q    Do women's rights include transgender women's

25   rights?                                                    03:16:30
```

Page 118

```
 1              MS. HOLCOMB:  Object to form.

 2              MR. TRYON:  Objection.

 3              THE WITNESS:  I believe that women's --

 4       whenever I am referring to women's rights, I'm

 5       referring to biological women's rights.          03:16:48

 6       BY MR. BARR:

 7          Q   Does that mean transgender women don't have

 8       rights?

 9              MR. TRYON:  Objection.

10              MS. HOLCOMB:  Object to form.            03:16:57

11              THE WITNESS:  That's definitely not what I

12       said.

13       BY MR. BARR:

14          Q   If Title IX protects women's rights, but not

15       transgender women's rights, what rights do transgender  03:17:14

16       women have?

17              MR. TRYON:  Objection; asked and answered.

18              MS. HOLCOMB:  Object to form.

19              THE WITNESS:  I don't know.

20       BY MR. BARR:                                   03:17:34

21          Q   Do you think transgender women should be

22       protected by the law?

23              MR. TRYON:  Objection.

24              MS. HOLCOMB:  Object to form.

25              By what law?                            03:17:50
```

                                                    Page 119

```
 1    BY MR. BARR:

 2        Q    Just any law.

 3             MS. HOLCOMB:  Object to form.

 4             THE WITNESS:  I believe that living in the

 5    United States allows all people in the United States to    03:18:01

 6    have rights and protections under the Constitution.

 7    BY MR. BARR:

 8        Q    And that would include transgender women?

 9             MR. TRYON:  Objection.

10             THE WITNESS:  That would include everyone.    03:18:19

11    BY MR. BARR:

12        Q    Does West Virginia State do a good job of

13    protecting women's rights?

14             MS. HOLCOMB:  Object to form.

15             THE WITNESS:  I don't have any reason to think    03:18:39

16    that it doesn't.

17    BY MR. BARR:

18        Q    Have any of your school's policies regarding

19    Title IX harmed you?

20             MS. HOLCOMB:  Object to form.    03:18:53

21             THE WITNESS:  I don't know what you're asking.

22    BY MR. BARR:

23        Q    Has your school ever done something, on the

24    premise that Title IX requires them to do so, that you

25    disagree with?    03:19:16
```

Page 120



1          MS. HOLCOMB:  Object to form.

2          THE WITNESS:  Not to my knowledge.

3     BY MR. BARR:

12          MR. BARR:  Let's go off the record.

13          MS. HOLCOMB:  Yeah, that sounds great.

14          THE VIDEOGRAPHER:  Hang on.  Hang on.  Hang

15     on.                                          03:20:30

16          We're going off the record.  The time is

17     3:21 p.m.

18          (Recess.)

19          THE VIDEOGRAPHER:  All right.  We are back on

20     the record at 3:29 p.m.                      03:28:54

21          Go ahead, please.

22          (Lainey Armistead left the room.)

Page 121



14                (Lainey Armistead entered the room.)

15                MR. BARR:  Ms. Armistead, I've introduced an    03:29:49

16   exhibit, Exhibit 43.  Let me know when you've got it in

17   front of you.

18                (Exhibit 43 was marked for identification

19         by the court reporter and is attached hereto.)

20                THE WITNESS:  Got it.                          03:30:12

21                MS. HOLCOMB:  If you'll hold for just one

22   moment, I don't.

23                Okay.  You're good to proceed.  Thank you.

24   BY MR. BARR:

25           Q    Do you recognize the document, Ms. Armistead?    03:30:19

                                                        Page 122

```
 1        A    Um.

 2        Q    I can ask a different question.

 3            Is this the policy that would have presented

 4    to you on an annual basis as part of the Title IX

 5    training at West Virginia State University?          03:30:42

 6        A    It could have been.

 7        Q    So this document, Exhib- -- Exhibit 43, is

 8    entitled "Unlawful Discrimination and Harassment,

 9    Sexual Harassment, Grievance Procedures, Child Abuse

10    and Neglect Reporting and Relationships."            03:31:14

11            Did I read that correctly, Ms. Armistead?

12        A    Yes.

13        Q    And this is published by the West Virginia

14    State University Board of Governors as BOG Policy

15    No. 14.                                              03:31:31

16            Did I read that correctly?

17        A    Yes.

18        Q    You have the right to read this whole policy,

19    if you would like; otherwise, I can direct you to

20    specific questions.  You let me know what you prefer.  03:31:38

21        A    You can direct me.

22        Q    Okay.  If you go to the bottom of page 1,

23    you'll see section 3.1.  Tell me when you see that.

24        A    Got it.

25        Q    Cognoscente of the break we just had, I'm    03:31:58
```

```
1    going to just pinpoint a couple of specific words and

2    phrases for you; however, if you would like to read the

3    whole paragraph, you're more than welcome to do so,

4    okay?

5            3.1 says (as read):                        03:32:10

6            "Title IX of the Education

7            Amendments...and other state and

8            federal laws prohibit unlawful

9            discrimination on the basis of sex."

10           Do you see that?                           03:32:23

11    A   I do see that.

12    Q   Did I read that correctly?

13    A   Yes.

14    Q   If you keep going, it says (as read):

15           "In accordance with The West Virginia      03:32:37

16           Higher Education Policy Commission and

17           Board of Governors Policy #17, the

18           University considers" --

19           And I'm going to skip through some of these.

20           (As read):                                 03:32:47

21           -- sex and gender and gender identity

22           as protected under federal, state and

23           local antidiscrimination laws as

24           protected characteristics and will not

25           permit unlawful discrimination or          03:33:00
```

Page 124

```
 1            harassment.
 2            Did you follow that?
 3       A   Yes.
 4       Q   What do you understand the phrase "basis of
 5   sex" mean -- to mean?                              03:33:15
 6       A   I believe that that is referring to the gender
 7   of someone.
 8       Q   Do you have any reason to dispute your
 9   school's statement that Title IX and other state and
10   federal laws prohibit unlawful discrimination on the   03:33:45
11   basis of sex?
12            MS. HOLCOMB:  Object to form.
13            THE WITNESS:  I don't know.
14   BY MR. BARR:
15       Q   You don't know if you have a reason to dispute  03:33:59
16   it, or you just don't know if that's true?
17            MS. HOLCOMB:  Object to form.
18            THE WITNESS:  I don't know if I have a reason
19   to dispute it.
20   BY MR. BARR:                                       03:34:08
21       Q   Does that mean you don't have a reason to
22   dispute it?
23            MS. HOLCOMB:  Object to form.
24            THE WITNESS:  I don't know.
25   ///
```

Page 125

```
 1    BY MR. BARR:

 2         Q   Okay.  Scroll down and you'll go to

 3    section 5.1.  Are you there?

 4         A   Yes.

 5         Q   All right.  The very first clause, and that's    03:34:28

 6    where we'll stop, it says (as read):

 7              "The University prohibits Protected

 8              Class Discrimination and Harassment."

 9              Did I read that correctly?

10         A   Yes.                                             03:34:40

11         Q   Do you know what discrimination is?

12              MS. HOLCOMB:  Object to form.

13              THE WITNESS:  I have heard that word before.

14    BY MR. BARR:

15         Q   What is your understanding of the meaning of    03:34:57

16    the word "discrimination"?

17              MR. TRYON:  Objection.

18              MS. HOLCOMB:  Object to form.

19              THE WITNESS:  I think it's a broad word, and

20    it would be hard for your -- me to give you a             03:35:16

21    definition without looking it up.

22    BY MR. BARR:

23         Q   Okay.  How about harassment, do you know what

24    the word "harassment" means?

25              MS. HOLCOMB:  Object to form.                   03:35:26
```

Page 126

```
1              MR. TRYON:  Objection.

2              THE WITNESS:  I have a good idea of what the

3     word "harassment" means.

4              MR. BARR:  Okay.  Let's --

5              MR. TRYON:  Excuse me, Andrew, can we excuse      03:35:41

6     the witness for a minute?  I'd like to talk about

7     something on the record without -- without the witness.

8              MS. HOLCOMB:  You can step out.

9              (Lainey Armistead left the room.)

10             MR. TRYON:  Christiana, is she out of the         03:35:57

11    room?

12             MS. HOLCOMB:  Yes, she is now.

13             MR. TRYON:  So, you know, forgive me, but I

14    don't understand how this witness could possibly

15    provide any useful information about a school policy     03:36:06

16    that is full of legalisms, and if you want to depose

17    somebody on it, it ought -- ought to be the school,

18    about what the school -- school's view is on this form.

19             What her form -- her views on this form are

20    seem to me to be completely irrelevant, and I'm not      03:36:19

21    sure why we're going through this.  I -- I suppose you

22    can -- can do this, but it seems like a waste of time.

23             And could you just kind of enlighten me how

24    you think this is in some way relevant, especially with

25    this witness?                                            03:36:33
```

Page 127

```
 1          MR. BARR:  This is the Title IX policy in a

 2   case about Title IX, and I'm just curious what the

 3   witness's understanding of Title IX is.

 4          MR. TRYON:  But it doesn't matter what this

 5   witness's understanding of Title IX is.  That is in      03:36:45

 6   fact the legal dispute across the country about what

 7   Title IX means.

 8          So how is this witness in any way relevant to

 9   what Title IX --

10          MR. BARR:  Mr. Tryon --                           03:36:56

11          MR. TRYON:  -- actually means?

12          MR. BARR:  Mr. Tryon, do you want to have this

13   discussion off the record, or no?

14          MR. TRYON:  No, I wanted it on the record so I

15   can understand what you're doing --                      03:37:04

16          MR. BARR:  Okay.  And --

17          MR. TRYON:  -- and why we're going to spend an

18   hour talking about a form that she just can't possibly

19   give a legal interpretation on.

20          MR. BARR:  I'm not asking for a legal             03:37:13

21   interpretation.  I have every right to ask about this,

22   as you acknowledged.  So if we're going to stay on the

23   record, let's just keep going.

24          MR. TRYON:  I didn't really acknowledge that,

25   but go ahead.  So you're not -- you can't justify to me  03:37:18
```

Page 128

```
 1    why we're doing this?

 2            MR. BARR:  I just told you why we're doing

 3    this.

 4            MR. TRYON:  Yeah, but she can't -- she's not

 5    competent -- she's not a competent witness to talk        03:37:27

 6    about this policy.  And anything you get from her is

 7    going to be completely irrelevant at trial.

 8            Can't we just cut this part out and move on?

 9            MR. BARR:  No, Mr. Tryon, we cannot.

10            MR. TRYON:  All right.  Well, I'm --              03:37:43

11            MR. BARR:  I recall there is --

12            MR. TRYON:  -- making my objection on the

13    record for any further questions on this, for this

14    witness.

15            MS. HOLCOMB:  I'll likewise object.              03:37:51

16            If we're ready, I'll have her brought back in.

17            MR. BARR:  Thank you.

18            (Lainey Armistead entered the room.)

19    BY MR. BARR:

20        Q   Sorry for all the up-and-down, Ms. Armistead.   03:38:44

21            If you could scroll down to section 23,

22    please.  And inside 23, go to the definition of

23    Title IX.  It's maybe four pages after the section

24    starts.

25        A   Okay.                                           03:39:22
```

Page 129

```
 1              MR. TRYON:  I'm sorry, where are we?

 2              MR. BARR:  Mr. Tryon, we are looking at the

 3    definition of Title IX in section 23 of Exhibit 43.

 4    BY MR. BARR:

 5         Q   Ms. Armistead --                          03:39:38

 6              MR. TRYON:  Thank you.

 7    BY MR. BARR:

 8         Q   Ms. Armistead, do you see that it says (as

 9    read):

10              "'Title IX' means Title IX of the         03:39:40

11              Education Amendments of 1972.

12              Title IX prohibits discrimination on

13              the basis of sex in education programs

14              or activities receiving federal

15              financial assistance"?                    03:39:49

16              Did I read that correctly?

17         A   Yes.

18         Q   Okay.  So let's stay in section 23.  Scroll up

19    just a little bit, and you'll see a definition for on

20    the basis of sex.  Tell me when you're there.        03:40:04

21         A   Got it.

22         Q   (As read):

23              "'On the Basis of Sex' or 'Based on

24              Sex' means gender, gender identity,

25              including transgender status, sexual       03:40:17
```

Page 130

```
 1              orientation and/or stereotypical

 2              notions of what is female/feminine

 3              versus male/masculine or a failure to

 4              conform to those gender stereotypes."

 5          Did I read that correctly?              03:40:30

 6      A   Yes.

 7      Q   Scroll up just a little bit further and you'll

 8   see a definition for education program or activity.

 9   Tell me when you see that.

10      A   Got it.                                  03:40:53

11      Q   (As read):

12              "'Education Program or Activity'

13              includes locations, events, or

14              circumstances over which the

15              University exercises substantial      03:41:00

16              control" --

17              I'm going to skip through the next part and

18   then go to "athletic programs."

19              Do you see that?

20      A   Yes.                                     03:41:10

21      Q   Did I read that correctly, knowing that I

22   excerpted part of that definition?

23      A   Yes.

24      Q   So let's scroll back down to the definition of

25   Title IX, the first definition you looked at.       03:41:27
```

Page 131

```
 1            Do you see that?

 2       A    Yes.

 3       Q    So according to this policy, Title IX

 4   prohibits discrimination on the basis of sex.

 5            We just looked at what the definition of basis   03:41:44

 6   of sex is, and it includes transgender status, doesn't

 7   it?

 8            MS. HOLCOMB:  Object to form.

 9            MR. TRYON:  Objection.

10            THE WITNESS:  That was --                         03:41:52

11   BY MR. BARR:

12       Q    We can scroll up -- I'm sorry, I didn't mean

13   to cut you off.  What did you say?

14       A    That was written on -- what I read, yes.

15       Q    Okay.  So according to this policy, on the      03:42:06

16   basis of sex includes transgender status; is that

17   correct?

18       A    That is what I read.

19       Q    And according to this policy, on the basis of

20   sex includes gender identity; right?                     03:42:22

21            MR. TRYON:  I'm objecting to any further

22   questions on this document for this witness.  Will you

23   give me a standing objection for that, please?

24            MR. BARR:  Noted.

25            THE WITNESS:  I don't know.                      03:42:46
```

Page 132

```
 1    BY MR. BARR:

 2         Q   Do you went to go back up and look at the

 3    definition on the basis of sex again?

 4         A   That's not necessary.

 5         Q   Do you agree with me that on the basis of sex,   03:42:54

 6    as it relates to this policy, includes transgender

 7    status and gender identity?

 8              MS. HOLCOMB:  Object to form.

 9              THE WITNESS:  That's what I read.

10    BY MR. BARR:                                              03:43:07

11         Q   And that education programs or activities

12    includes school-sponsored athletics; right?

13              MS. HOLCOMB:  Object to form.

14              THE WITNESS:  It could mean that.

15    BY MR. BARR:                                              03:43:22

16         Q   We just looked at the definition of education

17    programs and activities, and it included

18    school-sponsored athletics; right?

19              MS. HOLCOMB:  Object to form.

20              THE WITNESS:  That was the definition that was  03:43:37

21    presented.

22    BY MR. BARR:

23         Q   So using the definitions that were presented

24    in this policy, Title IX prohibits discrimination on

25    the basis of transgender status or gender identity and   03:43:55
```

Page 133

```
 1   school-sponsored athletics receiving federal financial

 2   assistance; right?

 3            MS. HOLCOMB:  Object to form.

 4            THE WITNESS:  I'm not really sure exactly what

 5   the policy is talking about.                      03:44:17

 6   BY MR. BARR:

 7       Q   Would you agree with me that I read that

 8   correctly, using the definitions provided in the

 9   policy?

10       A   I heard what you said based on the document    03:44:23

11   that you presented.

12       Q   Did I say it correctly based on the document

13   that I presented?

14       A   Yes.

15       Q   Isn't that exactly what you are seeking to do  03:44:43

16   in this lawsuit?

17            MS. HOLCOMB:  Object to form.

18            MR. TRYON:  Objection.

19            THE WITNESS:  No.

20   BY MR. BARR:                                       03:45:10

21       Q   How isn't it?

22            MS. HOLCOMB:  Object to form.

23            MR. TRYON:  Objection.

24            THE WITNESS:  I don't know.

25   ///
```

Veritext Legal Solutions
866 299-5127

```
 1    BY MR. BARR:

 2         Q    If you win in this lawsuit, wouldn't that mean

 3    that B.P.J. would be excluded on the basis of her

 4    transgender status and gender identity from

 5    participating on the school-sponsored girls' team?      03:45:48

 6              MS. HOLCOMB:  Object to form.

 7              MR. TRYON:  Objection.

 8              THE WITNESS:  I'm not a lawyer, so I can't

 9    answer that.

10    BY MR. BARR:                                            03:46:05

11         Q    In any of the discovery responses that you've

12    prepared for this case, did you acknowledge that

13    B.P.J. would be excluded from the girls' team at her

14    school because of H.B. 3293?

15              MS. HOLCOMB:  Object to form.                 03:46:24

16              THE WITNESS:  I don't know.

17    BY MR. BARR:

18         Q    Did you review the discovery responses before

19    they were sent over to us?

20         A    Yes.                                          03:46:35

21         Q    Do you recall any discovery responses

22    regarding whether B.P.J. would be excluded from her --

23    her school's girls' cross-country team?

24         A    I don't recall.

25         Q    Let's keep talking about B.P.J.  We earlier   03:46:53
```

Page 135

```
 1    discussed that B.P.J. participated in several

 2    cross-country events in the fall of 2021.

 3          Do you remember that?

 4      A   I remember what you said about that.

 5      Q   And if I remember what you said, you didn't     03:47:19

 6    have a -- an understanding of whether B.P.J.

 7    participated, how many times she participated or how

 8    she did.  Is that accurate?

 9      A   Correct.

10      Q   And, in fact, you didn't have an understanding  03:47:35

11    of what B.P.J. had done at all as it relates to

12    athletics, if I understood you correctly?

13      A   I don't know anything -- I don't really know

14    B.P.J., the plaintiff, so I can't comment on her

15    personal -- their personal successes or how they do in  03:47:58

16    events.

17      Q   Okay.  I'm not asking you to accept my

18    terminology here, okay?

19          Will you accept that B.P.J. is a transgender

20    girl who played on a girls' team, just for the purposes  03:48:17

21    of this question?  I'm not asking you to understand or

22    agree with my terminology.

23          MS. HOLCOMB:  Object to form.

24          MR. TRYON:  Objection.

25    ///
```

Page 136

```
 1    BY MR. BARR:

 2        Q   I'll just ask the question.  I'm not trying to

 3    be tricky.  I just want to make sure that you

 4    understand what I'm asking.

 5            Given that B.P.J. is a transgender girl, do       03:48:38

 6    you expect that she won the events that she

 7    participated in?

 8            MS. HOLCOMB:  Object to form.

 9            THE WITNESS:  I --

10            MR. TRYON:  Objection.                            03:48:52

11            THE WITNESS:  -- don't know.

12    BY MR. BARR:

13        Q   What's your expectation based on what you told

14    me earlier about advantages?

15            MS. HOLCOMB:  Same objection.                    03:49:01

16            MR. TRYON:  Objection.

17            THE WITNESS:  I don't know how B.P.J.

18    performed, and I wouldn't be expected to know how

19    she -- they performed.

20    BY MR. BARR:                                             03:49:20

21        Q   Would you be surprised if B.P.J. got last

22    place?

23            MR. TRYON:  Objection.

24            MS. HOLCOMB:  Object to form.

25            THE WITNESS:  I don't know.                       03:49:32
```

Page 137

```
 1    BY MR. BARR:
 2        Q   I realize you don't know how B.P.J. placed,
 3    and I'm not asking that question.
 4            My question is, would you be surprised if
 5    B.P.J. got last?                                    03:49:48
 6        A   I understood your question, and again, I don't
 7    know.
 8        Q   So you have no -- nothing would surprise you,
 9    whether B.P.J. got first or last or something in
10    between?                                            03:50:00
11            MS. HOLCOMB:  Object to form.
12            MR. TRYON:  Objection.
13            THE WITNESS:  That's not what I said.
14    BY MR. BARR:
15        Q   Okay.  What did you say?                    03:50:38
16        A   I just said I don't know, from your question.
17    In general, I would think that -- I believe that
18    biological males have advantages, but does that mean in
19    all cases that happens?  Maybe; maybe not.
20            But I don't really know the specifics or what 03:51:00
21    to be expected from B.P.J. because I don't know that
22    person.
23        Q   Okay.  You raised a good question.
24            Do you expect that there might be exceptions
25    to these advantages that you've talked about?       03:51:13
```

Page 138

```
 1        A   I think that it's -- I'm bigger than some

 2   biological males, but in general, biological males are

 3   bigger, stronger, faster than me, and it should -- and

 4   only biological women should be competing against me.

 5        Q   And that was for two reasons, fairness and      03:51:41

 6   safety; right?

 7        A   Yes.

 8        Q   What safety concern do you have with middle

 9   school cross-country and B.P.J. participating on the

10   girls' team?                                             03:51:58

11            MS. HOLCOMB:  Object to form.

12            THE WITNESS:  I'm intervening for all women

13   athletes and sports, and that includes contact sports

14   that I'm a part of.

15   BY MR. BARR:                                             03:52:18

16        Q   B.P.J. is the plaintiff here, and B.P.J.

17   doesn't play a contact sport.  So I'm asking where the

18   safety issue comes up -- comes in on middle school

19   cross-country.

20            MS. HOLCOMB:  Same objection.                   03:52:35

21            MR. TRYON:  Objection.

22            THE WITNESS:  My concerns are fairness and

23   safety for all women athletes in all sports.

24   BY MR. BARR:

25        Q   Understood.  What is the safety concern for     03:52:47
```

Page 139

```
 1   middle school cross-country and B.P.J. participating on

 2   the girls' team?

 3           MS. HOLCOMB:  Object to form.

 4           THE WITNESS:  I don't know.

 5   BY MR. BARR:                                    03:53:00

 6       Q   When it comes to fairness, what fairness are

 7   you concerned about?

 8       A   In general, biological males are faster than

 9   biological women.

10       Q   So I'm not putting words in your mouth.    03:53:32

11           Is the concern that the transgender girl would

12   win the race to the detriment of the cisgender girl?

13   Is that the fairness concern?

14           MR. TRYON:  Objection.

15           MS. HOLCOMB:  Object to form.             03:53:44

16           THE WITNESS:  That is not the only concern.

17   BY MR. BARR:

18       Q   What are the other concerns?

19       A   It's just not fair for biological males to

20   compete with biological women in any sports.       03:54:31

21       Q   I heard you say that.  I'm trying to

22   understand why you believe that.

23           MS. HOLCOMB:  I'm sorry, was there a question?

24           MR. BARR:  Yes.

25   ///
```

```
1    BY MR. BARR:

2         Q   Why do you believe that?

3         A   I believe I already answered that question.

4         Q   Could you tell me it again because I certainly

5    didn't hear it.  I'm trying to understand why you          03:55:03

6    believe that B.P.J. creates a fairness issue running

7    middle school cross-country on the girls' team?

8              MS. HOLCOMB:  Objection to form.

9              MR. TRYON:  Objection.

10             THE WITNESS:  Because, in general, biological    03:55:23

11   males are stronger, fitter, faster than biological

12   women.

13   BY MR. BARR:

14        Q   And if I understand you, the concern would be

15   that transgender girls would win and cisgender girls       03:55:38

16   would not because of these advantages you're talking

17   about; is that right?

18             MS. HOLCOMB:  Objection to form.

19             THE WITNESS:  I'm aware of my blessings and

20   opportunities that I was able to have because of the       03:55:57

21   fair playing that I have seen throughout my life, and I

22   want to make sure that I fight for that for other

23   women, to make sure that they are not having to compete

24   with biological males, in whatever sport that they do.

25   ///
```

Page 141

```
 1   BY MR. BARR:
 2       Q   I understand.  And you've told me that you
 3   want to do that for two reasons, safety and fairness;
 4   is that right?
 5       A   Yes.                                03:56:27
 6       Q   And we talked about safety with middle school
 7   cross-country, and you stated you don't know what the
 8   safety issue is with B.P.J. running cross-country on
 9   the girls' team; right?
10           MS. HOLCOMB:  Object to form.        03:56:49
11           THE WITNESS:  I don't know.
12   BY MR. BARR:
13       Q   Right.  So the two things that you're
14   concerned about, safety and fairness, we've talked
15   about safety, and now I'm trying to understand what   03:57:04
16   would be unfair about B.P.J. running cross-country on
17   the girls' team at her middle school.
18           MR. TRYON:  Objection.
19           MS. HOLCOMB:  Objection to form.
20           THE WITNESS:  H.B. 3293 is to promote equality  03:57:31
21   for all women in all sports, so I think that that
22   answers my -- your question.
23   BY MR. BARR:
24       Q   Perhaps I'm just not following.  I don't know
25   how that answers the question about what fairness issue  03:57:53
```

Page 142

1    arises with B.P.J. running on the girls' cross-country

2    team at her middle school.

3         MS. HOLCOMB:  I'm going to object as asked and

4    answered multiple times.

5         MR. BARR:  Attorney Holcomb, if you can tell    03:58:07

6    me what the answer is, I'll be happy to move on.  I

7    haven't heard an answer yet.

8         MS. HOLCOMB:  I think she's answered your

9    question at least three times to the best of her

10   ability.  So it's asked and answered.    03:58:17

11        MR. BARR:  I'll -- I'll try it a different

12   way.

13   BY MR. BARR:

14      Q   Ms. Armistead, can you point to any specific

15   fairness issue you're concerned about as it relates to    03:58:25

16   B.P.J. running on the girls' cross-country team at her

17   middle school?

18        MS. HOLCOMB:  Objection to form.

19        THE WITNESS:  I am not certain for specifics

20   on her -- on B.P.J., but I do know that this law    03:59:04

21   promotes fairness and equality for all women, including

22   those who run cross-country at age 11 and college

23   athletes in a contact sport, such as myself.

24   BY MR. BARR:

25      Q   Okay.  Just to make sure that I've understood    03:59:26

Page 143

```
 1    you, you -- do not have a specific fairness issue to

 2    point to based on my last question.  Did I understand

 3    that correctly?

 4            MS. HOLCOMB:  Object to form.

 5            MR. TRYON:  Objection.                      03:59:37

 6            THE WITNESS:  That's not what I said.  I just

 7    said overall it's -- it wouldn't be fair for all women.

 8    BY MR. BARR:

 9        Q   But specifics, there's no specific thing you

10    can point to for B.P.J.; right?                     03:59:50

11        A   I don't know.

12            MR. BARR:  I -- I've introduced an exhibit.

13    It's actually previously marked as Exhibit 39.  Let me

14    know when you have it.

15            THE WITNESS:  Got it.                        04:00:35

16    BY MR. BARR:

17        Q   Have you ever heard of the Doddridge

18    Invitational cross-country meet?

19        A   No.

20        Q   If you would like to read the e-mail and look  04:00:45

21    at the exhibit, please let me know; otherwise, I'll

22    just ask my question.  It's whatever is best for you.

23        A   I read it.

24        Q   Okay.  If you could scroll down to page 2,

25    please, you'll see two tables.  The table on the left  04:01:13
```

Page 144

```
 1    says "BMS XC-Boys," and the table on the right says

 2    "BMS XC-Girls."

 3            Do you see that?

 4        A   Yes.

 5        Q   Do you know what BMS references?          04:01:32

 6        A   I do not.

 7        Q   I'll represent to you that it's Bridgeport

 8    Middle School.

 9            Have you ever heard of Bridgeport Middle

10    School?                                          04:01:46

11        A   No.

12        Q   Okay.  And then on the table on the right, it

13    also says "BMS," which, again, is Bridgeport Middle

14    School.

15            Do you know what XC-Girls means?         04:01:56

16        A   Yes.

17        Q   What does that mean?

18        A   Cross-country girls.

19        Q   Okay.  So let's focus on the table on the

20    right.                                           04:02:12

21            Do you see that there are approximately 20

22    names -- or 20 times listed?  The names have been

23    redacted for privacy reasons.  Do you see that?

24        A   Yes.

25        Q   And you see that one name has not been      04:02:29
```

Page 145

```
 1    redacted, and that's B████ B██████-J██████.

 2            Do you see that?

 3        A   Yes.

 4        Q   I'm going to represent to you that

 5    B████ B██████-J██████ is B.P.J., the plaintiff in this    04:02:39

 6    case, okay?

 7        A   Okay.

 8        Q   What do you think this table that is entitled

 9    "BMS XC-Girls" is telling us?

10            MS. HOLCOMB:  Object to form.              04:02:57

11            THE WITNESS:  I don't know.

12    BY MR. BARR:

13        Q   Does it look like it may be a listing of

14    individual students' times at the

15    Doddridge Invitational on Thursday, September 16th?    04:03:15

16        A   Yes.

17        Q   And if we look at that table on the right, it

18    has three columns, one for distance, one for actual

19    time and one for pace per mile.

20            Do you see that?                          04:03:30

21        A   Yes.

22        Q   And this table on the right, we're just

23    talking about girls; right?

24            MS. HOLCOMB:  Object to form.

25            THE WITNESS:  That is what the document says.    04:03:49
```

Page 146

```
 1    BY MR. BARR:

 2         Q    Okay.  How did B.P.J. do at the

 3    Doddridge Invitational, according to this table?

 4         A    B.P.J. ran 1.9 miles in 21 minutes and

 5    50 seconds.                                    04:04:18

 6         Q    B.P.J. finished towards the back of the

 7    Bridgeport Middle School girls; right?

 8              MS. HOLCOMB:  Object to form.

 9              THE WITNESS:  B.P.J. wasn't in the lead, no.

10    BY MR. BARR:                                   04:04:46

11         Q    In fact, B.P.J. finished in 13th of 16

12    finishes; right?

13              MS. HOLCOMB:  Object to form.

14              THE WITNESS:  That might be what the table

15    shows.                                         04:05:13

16    BY MR. BARR:

17         Q    Do you see on the table how a few of the times

18    are highlighted yellow and the rest are white?

19         A    Yes.

20         Q    What does that yellow highlighting mean?  04:05:29

21              MS. HOLCOMB:  Object to form.

22              THE WITNESS:  I don't know.

23    BY MR. BARR:

24         Q    Do you know how middle school cross-country

25    team times are determined?                     04:05:45
```

Page 147

```
 1        A    No.

 2        Q    Would you have any basis to state that

 3   B.P.J. impacted the team time --

 4             MS. HOLCOMB:  Object to form.

 5             Sorry, I didn't mean to cut you off.      04:06:05

 6             THE WITNESS:  I don't know.

 7   BY MR. BARR:

 8        Q    You don't know how the team time is

 9   determined?

10        A    Correct.                                  04:06:18

11        Q    And, therefore, you would have no basis to

12   state whether B.P.J.'s times impacted the

13   Bridgeport Middle School team time; correct?

14        A    I don't know.

15        Q    I just want to make sure we're clear on the  04:06:37

16   record.

17             You don't know what?

18        A    What was your question again?

19        Q    I'm asking if you have any basis to state

20   whether B.P.J. impacted the Bridgeport Middle School  04:06:54

21   team time at the Doddridge Invitational.

22             MS. HOLCOMB:  Object to form.

23             THE WITNESS:  I don't know.

24   BY MR. BARR:

25        Q    You don't know whether B.P.J. did or didn't  04:07:15
```

Page 148

```
 1    impact it?

 2           MS. HOLCOMB:  Object to form.

 3           THE WITNESS:  I don't know.

 4    BY MR. BARR:

 5       Q    So you wouldn't be in a position to state that    04:07:31

 6    B.P.J. led to some other student's time not being

 7    included in the team time; right?

 8       A    Can you say that again, please?

 9       Q    Sure.  You're not in a position to state one

10    way or the other whether B.P.J.'s time impacted another   04:07:56

11    student's time included on the team time at the

12    Doddridge Invitational?

13           MS. HOLCOMB:  Object to form.

14           THE WITNESS:  Correct.  I don't run

15    cross-country.  I do know about soccer, though.           04:08:17

16           MR. BARR:  I've introduced another exhibit.

17    It's previously been marked as Exhibit 40.  Please let

18    me know when it appears.

19           THE WITNESS:  Got it.

20           MS. HOLCOMB:  I'm sorry, give me one moment.        04:09:02

21    Mine is still attempting to refresh.

22           MR. BARR:  No problem.  Tell me when you're

23    ready.

24           MS. HOLCOMB:  All right.  I'm ready.  Thank

25    you.                                                      04:09:22
```

Page 149

```
 1              MR. BARR:  Sure.

 2     BY MR. BARR:

 3         Q   Ms. Armistead, Exhibit 40, do you see tables

 4     similar to the tables we just saw on Exhibit 39?

 5         A   They look similar.                        04:09:31

 6         Q   But in this case, the right-hand table says

 7     "BMS," which we've discussed is Bridgeport Middle

 8     School, "XC-Girls," cross-country girls, for the

 9     Ritchie County event on Saturday, October 1st.

10              Do you see that?                         04:09:53

11         A   Yes.

12         Q   Do you have any understanding of what the

13     highlighted parts of this table mean?

14         A   No.

15         Q   How did B.P.J. do in this event?          04:10:07

16              MS. HOLCOMB:  Object to form.

17              THE WITNESS:  According to the table, she

18     didn't place -- B.P.J. didn't place in the top half.

19     BY MR. BARR:

20         Q   And I'm happy for you to look at the rest of  04:10:45

21     Exhibit 40, and you can take as much time as you would

22     like, but I'll represent to you that B.P.J. never has

23     times that are highlighted in this exhibit.

24              But my understanding is you don't have an

25     understanding whether the highlighting has some   04:11:03
```

```
 1    indication one way or the other; is that right?

 2            MS. HOLCOMB:  Object to form.

 3            THE WITNESS:  As stated, I am not a

 4    cross-country runner, so no, I don't know.

 5    BY MR. BARR:                                    04:11:27

 6        Q   If you could scroll to the last page of

 7    Exhibit 40.

 8            Are you there?

 9        A   Yes.

10        Q   You'll see at the top it says "Time Trial   04:11:42

11    Comparison."

12            Did I read that correctly?

13        A   You did.

14        Q   And then in the two columns to the right of

15    that, there's the cross-country time trial at    04:11:56

16    Bridgeport City Park on October 7th, 2021, and the

17    column to the right of that is the cross-country time

18    trial, Bridgeport City Park, on August 24th, 2021.

19            Do you see that?

20        A   Yes.                                     04:12:12

21        Q   Inside those columns, on the far left side,

22    there's a subcolumn that says "TT Place."

23            Do you see that?

24        A   Yes.

25        Q   What do you think TT Place means?        04:12:27
```

```
 1              MR. TRYON:  Objection.

 2              MS. HOLCOMB:  I'm going to object to form.

 3              THE WITNESS:  I have no idea.

 4    BY MR. BARR:

 5         Q    If I told you it meant time trial place, would   04:12:43

 6    you be willing to accept that for purposes of this

 7    exhibit?

 8              MS. HOLCOMB:  Object to form.

 9              MR. TRYON:  Objection.

10              THE WITNESS:  Yes.                               04:12:54

11    BY MR. BARR:

12         Q    On October 7th, 2021, what place did

13    B.P.J. earn?

14              MS. HOLCOMB:  Object to form.

15              THE WITNESS:  According to this document,        04:13:21

16    24th.

17    BY MR. BARR:

18         Q    How many participants are indicated to have

19    participated, on this document?

20         A    28.                                              04:13:29

21         Q    So on October 7, 2021, according to

22    Exhibit 40, B.P.J. got 24th of 28 participants; is that

23    right?

24         A    That's what the document indicates.

25         Q    And let's move over to August 24th.             04:13:52
```

Page 152

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 652 of 674

```
 1              What place did B.P.J. get on August 24th?

 2              MS. HOLCOMB:  Object to form.

 3              THE WITNESS:  30th.

 4   BY MR. BARR:

 5       Q   And I'm not going to ask you the total        04:14:15

 6   participants, because that column is very hard to

 7   interpret and I don't want to be unfair, but you would

 8   agree with me that B.P.J. was at the very low end of

 9   that table as well?

10       A   Lower than others.                            04:14:34

11       Q   Lower than almost everybody else; right?

12              MS. HOLCOMB:  Object to form.

13              THE WITNESS:  That is what the document

14   indicates.

15   BY MR. BARR:                                          04:14:54

16       Q   Do you still think it's unfair for B.P.J. to

17   participate?

18              MS. HOLCOMB:  Object to form.

19              MR. TRYON:  Objection.

20              THE WITNESS:  It also looks like B.P.J. was  04:15:06

21   competing against people in sixth, seventh and eighth

22   grade.  So I don't know if sixth-graders are typically

23   in the top of their class.

24   BY MR. BARR:

25       Q   Based on this document, do you still think    04:15:33
```

Page 153

```
 1    it's unfair for B.P.J. to have participated?

 2          MS. HOLCOMB:  Object to form.

 3          MR. TRYON:  Objection.

 4          THE WITNESS:  Based on this document, I don't

 5    know.                                          04:15:49

 6    BY MR. BARR:

 7      Q   Do you still believe B.P.J. has superior speed

 8    compared to her classmates, having seen these

 9    documents?

10          MR. TRYON:  Objection.                   04:16:05

11          MS. HOLCOMB:  Objection to form.

12          THE WITNESS:  This document doesn't really

13    give a fair comparison.

14    BY MR. BARR:

15      Q   Why not?                                 04:16:15

16      A   As I said, B.P.J. is competing with people in

17    sixth, seventh and eighth grade.  And in my experience,

18    whenever I was in sixth grade, playing soccer, I was

19    having difficulties against the seventh- and

20    eighth-graders.                                04:16:40

21          MR. BARR:  Attorney Holcomb, we've been going

22    for about an hour.  Do you want a break, or do you want

23    to keep going?

24          MS. HOLCOMB:  Would you like a break, Lainey?

25          THE WITNESS:  Let's go.                  04:17:01
```

Page 154

```
 1            MS. HOLCOMB:  Andrew, any estimate of how much
 2     longer you plan to go?
 3            MR. BARR:  No, sorry.  Some of these questions
 4     that I expected to go quick have taken a little longer
 5     than anticipated.  So I would hate to give any false     04:17:18
 6     expectations there.
 7            MS. MORGAN:  Andrew, this is Kelly Morgan.
 8     I'm just asking because of family obligations again
 9     here.  Are we looking at an hour or two --
10            THE VIDEOGRAPHER:  Are we going to go off --    04:17:29
11            MR. BARR:  Let's go off the record.
12            THE VIDEOGRAPHER:  Are we going to --
13            MR. BARR:  Yeah, let's go off the record.
14            THE VIDEOGRAPHER:  Okay.  One moment.
15            We're going off the record.  The time is        04:17:34
16     4:18 p.m., and this is the end of Media Unit No. 4.
17            (Recess.)
18            THE VIDEOGRAPHER:  All right.  We are back on
19     the record at 4:37 p.m., and this is the beginning of
20     Media Unit No. 5.                                       04:37:25
21            Please go ahead.
22     BY MR. BARR:
23       Q   Ms. Armistead, I was going through my notes
24     and realized I didn't ask you the question I thought
25     was most important, which is, what's your favorite      04:37:34
```

Page 155

```
 1   soccer team?  Do you have one?

 2       A    Chelsea.

 3       Q    Kind of going through some tough times with

 4   ownership of Chelsea at the moment, but -- okay.  So

 5   you do follow professional soccer?                04:37:48

 6       A    A little bit, yes.

 7       Q    Do you -- do you follow any women's

 8   professional teams?

 9       A    I keep up with the U.S. women's national team

10   a little bit.                                     04:38:01

11       Q    But other than the national team?

12       A    No.

13       Q    I'm a Liverpool fan, so I had to ask.

14            Okay.  So, clearly, you love soccer.  I

15   understand all that.  I want to understand why you love  04:38:19

16   soccer.  And, specifically, what do you get out of it?

17       A    I get an opportunity to compete and -- I get

18   so much out of soccer.  It keeps me in shape.  I have

19   the ability to make great friends and lasting

20   connections with my teammates.  And I'm still friends  04:38:46

21   with teammates from high school and club teams.  And

22   I've learned a lot about perseverance and teamwork,

23   cooperation.  There's so much that soccer has taught me

24   throughout my life, and I wouldn't be the person I am

25   today without it.                                 04:39:06
```

                                                    Page 156

1      Q   I know you focused on soccer, but do you think

2   that would be true of most athletes' experience, having

3   played sports in a -- you know, as a child or adult?

4        MS. HOLCOMB:  Object to form.

5        THE WITNESS:  I believe that a lot of people      04:39:29

6   probably have the same experiences as I do, but I can't

7   speak for sure on other people's experiences.

8   BY MR. BARR:

9      Q   Understood.  You said you played club -- club

10  soccer.  Did I hear that right?                         04:39:41

11     A   Yes.

12     Q   Do you still play club stocker?

13     A   No.  I'm unable to do so due to being a

14  college athlete.

15     Q   When did you start playing club soccer?         04:39:57

16     A   Probably around seven or eight years old.

17     Q   Did your school offer a soccer team when you

18  were seven or eight years old?

19     A   I don't believe so.  I just played club until

20  I was able to play in middle school.                    04:40:21

21     Q   When did your stop playing club soccer?

22     A   My senior year of high school.

23     Q   Were you ever invited to an ODP program,

24  Olympic developmental program?

25     A   Yes.                                             04:40:43

Page 157

```
1          Q   Did you attend?

2          A   I attended for a little bit before moving

3     school -- or before moving across the state, so...

4          Q   Where were you living before Owensboro?

5          A   I am from Owensboro, and then I moved to        04:41:03

6     Louisville, Kentucky, and then I moved back to

7     Owensboro.

8          Q   And those two cities are far enough apart you

9     had to change club teams as part of that move?

10         A   Yes.                                            04:41:27

11         Q   And did I understand that one of those teams

12    offered the ODP and the other one did not; is that

13    right?

14         A   ODP is more of a state -- a state development

15    program.  So I could have continued to do so, but where  04:41:40

16    I moved, it would have been three hours to drive

17    instead of just right beside my hometown.

18         Q   How long did you participate in the ODP?

19         A   I don't recall.  Not long.

20         Q   Not long?                                       04:42:08

21             Did you have the opportunity to do any

22    traveling for ODP?

23         A   Not ODP, but I had the opportunity to travel

24    for my club team.

25         Q   What -- what was the name of your club team?    04:42:21
```

Page 158

```
 1          A    Kentucky Fire.

 2          Q    Was that the -- did you have a different club

 3     team when you moved and what was the name of that?

 4          A    Owensboro.

 5          Q    And it was when you were on Kentucky Fire that   04:42:39

 6     you had the ODP opportunities; is that right?

 7          A    Yes.

 8          Q    How old were you when that happened?

 9          A    I don't remember.

10          Q    I'm -- was it seven or eight when you started?  04:42:58

11     Was it when you were 18 as --

12          A    Probably middle school.

13          Q    Did you benefit from the ODP?

14          A    I did not benefit from ODP, but I definitely

15     benefitted from club.                                     04:43:18

16          Q    Did any of your schools offer a women's soccer

17     team before West Virginia State?

18          A    High schools?

19          Q    Sure.  Did your high school have a women's

20     soccer team?                                              04:43:37

21          A    Yes.

22          Q    Did you play on it?

23          A    I did.

24          Q    Was your club team or your high school team

25     better?                                                   04:43:54
```

Page 159

```
 1              MS. HOLCOMB:  Object to form.

 2              THE WITNESS:  I would probably say my club

 3    team was better.

 4    BY MR. BARR:

 5        Q   That's generally true, right, the club team is    04:44:06

 6    a more select group of athletes than any particular

 7    school, as a general matter?

 8        A   In general, yes.

 9        Q   Any of your club teammates play college

10    soccer?                                                    04:44:28

11              MS. HOLCOMB:  Object to form.

12              THE WITNESS:  Yes.

13    BY MR. BARR:

14        Q   Any of them playing with or against you in

15    Mountain East Conference?                                  04:44:41

16        A   No.

17        Q   Do you think those athletes benefitted from

18    soccer similarly to the way you did?

19              MS. HOLCOMB:  Object to form.

20              THE WITNESS:  I can't speak on their            04:44:59

21    experiences.

22              MR. TRYON:  Excuse me, sorry to interrupt, but

23    Kelly just texted me, and she said she's in the waiting

24    room trying to get in, if the court reporter could let

25    her in.                                                    04:45:17
```

Page 160

| 1 | THE REPORTER: Ms. Morgan, are you in? |
|---|---|

```
 1              THE REPORTER:  Ms. Morgan, are you in?

 2              MS. MORGAN:  Yes, I am.  Thank you.

 3              THE REPORTER:  Okay.  Sorry about that.

 4     BY MR. BARR:

 5         Q   Do you have any social media accounts?        04:45:47

 6         A   Yes.

 7         Q   I admittedly don't, so please bear with me in

 8     clunky language, but what platforms do you have an

 9     account with?

10         A   I have an account with Twitter, Instagram,    04:46:02

11     Facebook, Snapchat.  And those are the only ones that I

12     use.

13     BY MR. BARR:

14         Q   Do you use them daily?

15         A   Most days.                                     04:46:24

16         Q   Have people ever reached out to you on those

17     platforms to talk about this law or your participation

18     in the lawsuit?

19         A   Yes.

20         Q   Does it happen regularly?                      04:46:52

21         A   No.

22         Q   Has it happened one time? five times? ten

23     times?

24         A   I'm not sure.  Not very many times.

25         Q   More than once, less than 20; is that fair?   04:47:12
```

Page 161

```
 1        A   Yes.

 2        Q   More than five times, less than 20?

 3        A   I would probably just say less than ten, and

 4    that's as close as I would feel comfortable getting.

 5        Q   Do you remember if that was via Facebook or      04:47:30

 6    one of the other platforms you described?

 7        A   I think it was on Facebook and Twitter.

 8        Q   Have you ever sent a message or reached out to

 9    people about this lawsuit or the law using one of those

10    social media accounts?                                   04:48:02

11        A   No.

12        Q   Has anyone ever e-mailed you about this law,

13    other than your attorneys?

14        A   I don't think so.

15        Q   Have you ever e-mailed anyone about this law?    04:48:22

16        A   I shared information with a friend who was

17    interested in intervening.

18        Q   Is that one of the friends you told me about

19    earlier, Sinead or Brooklyn?

20        A   Yes.  Sinead.                                    04:48:55

21        Q   Are you familiar with the NCAA's image and

22    likeness policy?

23        A   I am.

24        Q   What's your understanding of how the -- is it

25    okay if I call it the NIL policy?                        04:49:13
```

Page 162

```
 1        A    Yes.

 2        Q    What's your understanding of the NIL policy?

 3        A    My understanding is that athletes can benefit

 4   from their name; and, two, they are -- sign contracts

 5   with companies and be a name for a -- for a brand and      04:49:37

 6   get paid for doing so.

 7        Q    Is it okay with you if I reference what you

 8   just described as an endorsement?

 9        A    If that's how you want to reference it, sure.

10        Q    We can call it whatever you'd like.  I just am   04:49:59

11   trying to use a faster word than that whole

12   description.

13        A    That's fine.

14        Q    Are you currently under an endorsement deal

15   with anyone?                                               04:50:13

16        A    No.

17        Q    Do you have any plans to be under an

18   endorsement deal?

19        A    I'm not sure.  I would like to try.  That

20   would be something I would be interested in.  Of          04:50:31

21   course, it was just a very recent law that was created,

22   a new -- a new policy, so I haven't really looked into

23   it too much yet.

24        Q    Is it accurate to say you'd be interested in

25   it, but sitting here today, you don't have any specific   04:50:54
```

Page 163

```
1    plans to enter into an endorsement deal?

2         A    Yes.

3         Q    Have you ever been interviewed related to this

4    lawsuit by someone other than your attorney?

5         A    No.                                    04:51:16

6         Q    No reporters, TV appearances, anything like

7    that?

8         A    No.

9         Q    Do you know who Selina Soule is?

10        A    No.                                    04:51:39

11        Q    Do you know who Chelsea Mitchell is?

12        A    No.

13        Q    Do you know who Christina Mitchell is?

14        A    No.

15        Q    Do you know who Alanna Smith is?       04:52:00

16        A    No.

17        Q    Do you know who Lanay Sultz is?

18        A    No.

19        Q    Do you know who Margaret O'Neil is?

20        A    No.                                    04:52:13

21        Q    Do you know who Cynthia Monteleone is?

22        A    No.

23        Q    Do you know who Madison Kenyon is?

24        A    No.

25        Q    Do you know who Mary Kate Marshall is?  04:52:26
```

Page 164

```
 1        A    No.

 2        Q    Do you know who Darcy Ashoff is?

 3        A    No.

 4        Q    Do you know anyone on the University of

 5   Pennsylvania's women's swimming or diving team?      04:52:41

 6        A    I do not.

 7        Q    Do you know who Haley Tan is?

 8        A    No.

 9        Q    And just to make sure I'm being fair with you,

10   there's a chance the last name is Tani.              04:53:00

11            So do you know anyone named Haley Tani?

12        A    No.

13        Q    Do you know anyone who claims to have been

14   harmed by a transgender girl or woman playing on a

15   girls' team, specifically?                           04:53:17

16            MS. HOLCOMB:  Object to form.

17            THE WITNESS:  No, I don't know personally.

18   BY MR. BARR:

19        Q    Have you spoken with any of the people I just

20   named?                                               04:53:30

21        A    No, I don't think so.  No.

22        Q    I have a list of about 25 more people.  I can

23   cut that short if I just understand that you haven't

24   spoken to anyone who's claimed to have been harmed by a

25   transgender woman's participation on a girls' team.  Is  04:53:51
```

Page 165

```
 1    that accurate?

 2            MS. HOLCOMB:  Object to form.

 3            THE WITNESS:  I don't -- I don't know the

 4    names -- I don't know how to give you that information

 5    without --                                          04:54:10

 6    BY MR. BARR:

 7        Q   I'll just go through them.  That's fine.  I

 8    was just trying to make this --

 9        A   I -- I wouldn't know the names.  I've talked

10    to two girls that were clients of Christiana's, but I  04:54:18

11    don't know -- or recall their names.

12        Q   Are those two girls a party to this lawsuit?

13        A   No.

14        Q   When did you speak to them?

15        A   After I decided to intervene, probably.  Maybe  04:54:40

16    before.

17        Q   How did you locate these two girls?

18            MS. HOLCOMB:  And I'll just object generally

19    to the extent it calls for attorney-client privileged

20    communications.                                     04:55:01

21            You may answer.

22            THE WITNESS:  Just by Christiana.

23    BY MR. BARR:

24        Q   What did you discuss with these two girls?

25        A   They just told me about their experiences that  04:55:24
```

Page 166

```
 1    they've had in their lawsuits, and that was the extent

 2    of it.

 3         Q   Did you ask to speak with them, or did they

 4    ask to speak with you?

 5              MS. HOLCOMB:  Object to form.              04:55:45

 6              THE WITNESS:  I don't know how to answer that

 7    without divulging client-attorney privilege.

 8    BY MR. BARR:

 9         Q   I'll -- I'll ask a different way because I

10    certainly don't want any privileged communications.   04:55:59

11         Did you ask to be put in touch with these two

12    girls?

13         A   I could have.  I don't recall.

14         Q   You don't know their names?

15         A   I do not recall their names.              04:56:23

16         Q   And if I'm understanding correctly, you found

17    these two girls through your counsel?

18         A   Yes.

19         Q   Did these two girls encourage you to intervene

20    in this case?                                       04:56:51

21         A   They just told me about their experiences.

22         Q   What experiences are you talking about?

23         A   Their experience with their lawsuits.

24         Q   What did they tell you?

25         A   I don't recall specifics of the conversation,  04:57:20
```

Page 167

```
 1    but it was encouraging, what they told me.  That's what

 2    I remember from it.

 3        Q   What do you mean it was encouraging, what they

 4    told you?  Encouraging what?

 5        A   It wasn't encouraging anything specifically.    04:57:36

 6    It was just encouraging to me what they were saying.

 7        Q   I understood.  I misunderstood.

 8            So you found the conversation encouraging.

 9            I -- I feel like I might have misunderstood

10    that.                                                   04:57:52

11            So is that what you're saying, you found the

12    conversation encouraging?

13        A   Yes.

14        Q   And you don't remember if this happened before

15    or after you decided to intervene?                      04:58:02

16            MS. HOLCOMB:  Objection to form.

17            THE WITNESS:  I do not recall.

18    BY MR. BARR:

19        Q   Was it before or after you were put in touch

20    with your attorney?                                     04:58:17

21            MS. HOLCOMB:  Objection to form.

22            THE WITNESS:  Well, I said -- I already

23    answered that.

24    BY MR. BARR:

25        Q   Maybe I misunderstood.                          04:58:32
```

```
 1              Your -- so your -- your attorney put you in

 2      touch with these people; you just don't remember who

 3      asked for the contact; is that correct?

 4           A   Yes.

 5           Q   Have you spoken with those two girls more than    04:58:49

 6      once?

 7           A   No.

 8           Q   Other than those two girls, have you spoken

 9      with anyone else about this lawsuit beyond your family,

10      those two friends you told me about and your attorneys?   04:59:03

11           A   Yes.

12           Q   Who else?

13           A   My best friend.

14           Q   And who is that?

15           A   Allison.                                          04:59:16

16           Q   You might have told me that earlier, and I may

17      have forgotten, so I apologize if that's what happened.

18              What is Allison's last name?

19           A   Raymond.

20           Q   Is Allison a classmate of yours?                  04:59:27

21           A   No.  She is a hometown friend.  We went to

22      high school together.

23           Q   Anyone else?

24           A   Yes.  Two other hometown friends.

25           Q   Who -- who are those friends?                     04:59:45
```

Page 169

```
 1          A    Savanna and Haley.

 2          Q    Anyone else?

 3          A    My extended family, when they visited for the

 4    holidays.

 5          Q    What was the nature of those discussions?        05:00:03

 6          A    I wanted to keep them updated on my life, and

 7    I told them about H.B. -- the law -- 3293, and all of

 8    my family was encouraging and supportive.

 9          Q    And just so you know, if you say "the law," I

10    understand you're talking about H.B. 3293.  It's very     05:00:30

11    hard for me to remember the number, so I'm very

12    sympathetic to that.

13               Did you write an op-ed?

14          A    I'm sorry?

15          Q    Did you write an opinion piece for a            05:00:55

16    newspaper?

17          A    I -- I don't know what you're talking about.

18          Q    Okay.  So sitting here today, everything we've

19    talked about, do you object to B.P.J. playing on the

20    Bridgeport Middle School girls' cross-country team?       05:01:15

21               MS. HOLCOMB:  Objection to form.

22               THE WITNESS:  I don't know.

23               MR. BARR:  Okay.  That's it for me.  I'm happy

24    to turn it over to everyone else.  I do want a couple

25    of minutes just to make sure that my notes are clean.     05:01:32
```

Page 170

1    So I do reserve that right, but I'm happy to pass it to

2    Mr. Tryon or whoever else is in line.

3            And -- and, Ms. Armistead, thank you for your

4    time today.  I apologize for a long day on a Friday,

5    but hopefully you're able to make whatever -- whatever     05:01:47

6    plans you had tonight still.

7            THE WITNESS:  Thank you.

8            MR. TRYON:  Hello, Ms. Armistead.  How are

9    you?

10           THE WITNESS: I'm good.  How are you?            05:02:03

11           MR. TRYON:  I'm good.  So thank you so much

12   for your time.  We always appreciate when deponents

13   come in and take their time to participate in these --

14   these situations.

15           And I have no questions, so thank you for your   05:02:14

16   time.

17           MS. DENIKER:  This is Susan Deniker.  I have

18   no questions.  Thank you.

19           MS. MORGAN:  This is Kelly Morgan.  I don't

20   have any questions.  Thank you, Lainey.                 05:02:34

21           MS. ROGERS:  This is Shannon Rogers.  I don't

22   have any questions.  Thank you.

23           MR. TRYON:  So can we go off the record now?

24   Are we done?

25           MR. BARR:  I believe Attorney Holcomb may or     05:02:59

Page 171

USCA4 Appeal: 23-1078    Doc: 53-3    Filed: 03/27/2023    Pg: 671 of 674

```
 1   may not have questions.  I just want to make sure that

 2   it's clear.

 3          MS. HOLCOMB:  I do not have any questions.

 4   Thank you.  Just wanted to confirm there were no

 5   further defendants.                              05:03:09

 6          MR. BARR:  And with -- we -- we can go off the

 7   record.  And there's too many people on the same thing

 8   to understand who is going to speak next, so I -- I

 9   understand that.

10          THE VIDEOGRAPHER:  So we -- are we done for    05:03:15

11   the day, then, or are we going to come back on?

12          MR. BARR:  I -- I believe we're finished

13   unless I hear otherwise --

14          THE VIDEOGRAPHER:  Okay.

15          MR. BARR:  -- from counsel.                05:03:22

16          THE VIDEOGRAPHER:  So I'm -- I'm going go

17   close the record then.  All right?

18          Okay.  We are off the record at 5:04 p.m., and

19   this ends today's testimony given by Lainey Armistead.

20          The total number of media used was five and    05:03:35

21   will be retained by Veritext Legal Solutions.

22                  (TIME NOTED:  5:03 p.m.)

23

24

25

                                              Page 172
```

1         I, LAINEY ARMISTEAD, do hereby declare under

2    penalty of perjury that I have read the foregoing

3    transcript; that I have made any corrections as appear

4    noted, in ink, initialed by me, or attached hereto;

5    that my testimony as contained herein, as corrected, is

6    true and correct.

7         EXECUTED this _____ day of _____,

8    20_____, at _____, _____.

9                 (City)              (State)

10

11

12

13

14          _____

15              LAINEY ARMISTEAD

16                VOLUME I

17

18

19

20

21

22

23

24

25

Page 173

```
 1   RE: BPJ vs. WEST VIRGINIA STATE BOARD OF EDUCATION
 2   LAINEY ARMISTEAD (JOB NO. 5082427)
 3
 4              E R R A T A  S H E E T
 5   PAGE_____ LINE_____ CHANGE_____
 6   _____
 7   REASON_____
 8   PAGE_____ LINE_____ CHANGE_____
 9   _____
10   REASON_____
11   PAGE_____ LINE_____ CHANGE_____
12   _____
13   REASON_____
14   PAGE_____ LINE_____ CHANGE_____
15   _____
16   REASON_____
17   PAGE_____ LINE_____ CHANGE_____
18   _____
19   REASON_____
20   PAGE_____ LINE_____ CHANGE_____
21   _____
22   REASON_____
23
24   _____     _____
25   LAINEY ARMISTEAD                      Date

                                              Page 174
```

```
 1

 2

 3            I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify:

 5            That the foregoing proceedings were taken

 6    before me at the time and place herein set forth; that

 7    any witnesses in the foregoing proceedings, prior to

 8    testifying, were placed under oath; that a record of

 9    the proceedings was made by me using machine shorthand

10    which was thereafter transcribed under my direction;

11    further, that the foregoing is an accurate

12    transcription thereof.

13            I further certify that I am neither financially

14    interested in the action nor a relative or employee of

15    any attorney of any of the parties.

16            IN WITNESS WHEREOF, I have this date subscribed

17    my name.

18            Dated: March 25, 2022

19

20

21

22    _____

23    ALEXIS KAGAY

24    CSR NO. 13795

25
```

Page 175