No. 23-1078 (L) (2:21-cv-00316)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother; HEATHER JACKSON,

*Plaintiff - Appellant,*

versus

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

*Defendants - Appellees.*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees*

---

On Appeal from the United States District Court for the Southern District of West Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

**JOINT APPENDIX – VOLUME 6 OF 9 (JA2567-JA3111)**

---

*Counsel for Plaintiff-Appellant listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant B.P.J.*

## TABLE OF CONTENTS

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME ONE** | | | |
| District Court Docket Sheet, No. 21-cv-00316 (S.D. W.Va.) | N/A | N/A | JA0001 |
| Declaration of Loree Stark in Support of Plaintiff's Complaint | 5/26/2021 | 1-1 | JA0049 |
| Ex. B of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0052 |
| Ex. D of Declaration of Loree Stark in Support of Complaint, Excerpts of Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 5/26/2021 | 1-1 | JA0054 |
| Declaration of Heather Jackson in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0057 |
| Declaration of B.P.J. in Support of Plaintiff's Motion for Preliminary Injunction | 5/26/2021 | 2-1 | JA0060 |
| Supplemental Declaration of Katelyn Kang in Support of Plaintiff's Motion for Preliminary Injunction | 6/9/2021 | 25 | JA0073 |
| Ex. A of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0077 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/18/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0096 |
| Ex. C of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 3/25/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0117 |
| Ex. D of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA00158 |
| Ex. E of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/1/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0181 |
| Ex. F of Supplemental Declaration of Katelyn Kang, Testimony on House Bill 3293, dated 4/8/2021 - West Virginia House of Delegates Education Committee | 6/9/2021 | 25 | JA0183 |
| Statement of Interest of the United States | 6/17/2021 | 42 | JA0221 |
| Ex. A in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, 2020-2021 Track Coaches Packet | 6/22/2021 | 47-1 | JA0243 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. B in Support of Harrison County Board's Opposition to Motion for a Preliminary Injunction, Athletic Participation/Parental Consent/Physician's Certificate Form | 6/22/2021 | 47-2 | JA0260 |
| Ex. D in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, U.S. Department of Education Office of Civil Rights Revised Letter | 6/23/2021 | 49-4 | JA0265 |
| Ex. F in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Case No: CO/60/2020 In the High Court of Justice Administrative Court | 6/23/2021 | 49-6 | JA0314 |
| Ex. H in Support of State of West Virginia's Opposition to Motion for a Preliminary Injunction, Transgender Guideline | 6/23/2021 | 49-8 | JA0354 |
| Ex. I in Support of State of West Virginia's Opposition for Preliminary Injunction, Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) | 6/23/2021 | 49-9 | JA0397 |
| First Amended Complaint | 7/16/2021 | 64 | JA0413 |
| Memorandum Opinion and Order Granting Preliminary Injunction | 7/21/2021 | 67 | JA0439 |
| The State of West Virginia's Answer to First Amended Complaint [Excerpt pp. 1, 7-8] | 7/30/2021 | 78 | JA0454 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Memorandum Opinion and Order Denying Motions to Dismiss | 12/1/2021 | 129 | JA0457 |
| Memorandum Opinion and Order Granting in Part and Denying in Part Motion to Intervene | 12/1/2021 | 130 | JA0465 |
| Intervenor Lainey Armistead's Proposed Answer to First Amended Complaint [Excerpt pp. 1, 5] | 12/1/2021 | 131 | JA0472 |
| Defendants West Virginia State Board of Education and Superintendent W. Clayton Burch's Answer to Plaintiff's First Amended Complaint [Excerpt pp. 1, 9, 19-20] | 12/15/2021 | 156 | JA0474 |
| Defendants Harrison County Board of Education and Dora Stutler's Answer to First Amended Complaint [Excerpt pp. 1, 8] | 12/15/202 | 157 | JA0478 |
| Defendant West Virginia Secondary School Activities Commission's Answer to First Amended Complaint [Excerpt pp. 1, 9] | 12/15/2021 | 158 | JA0480 |
| Harrison County Board and County Superintendent Stipulation of Uncontested Facts | 3/7/2022 | 252 | JA0482 |
| State Board of Education and State Superintendent Stipulation of Uncontested Facts | 3/30/2022 | 270 | JA0486 |
| West Virginia Secondary School Activities Commission's Memorandum in Support of Motion for Summary Judgment | 4/21/2022 | 277 | JA0490 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 6 in Support of WVSSAC's Motion for Summary Judgment, National Federation of State High School Associations 2020 Rules Book for Track and Field and Cross County | 4/21/2022 | 278-6 | JA0522 |
| Ex. 4 in Support of Motion for Summary Judgment by W. Clayton Burch & West Virginia State Board of Education, West Virginia House Joint Resolution 102 | 4/21/2022 | 283-4 | JA0528 |
| **VOLUME TWO** | | | |
| Ex. C in Support of Motion for Summary Judgment by State of West Virginia, [pp. 1-340] 4/4/2022 Deposition Transcript of Aron Janssen, M.D. | 4/21/2022 | 285-3 | JA0531 |
| Ex. H in Support of Motion for Summary Judgment by State of West Virginia, Graphs | 4/21/2022 | 285-8 | JA0871 |
| Ex. 1 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Heather Jackson | 4/21/2022 | 289-2 | JA0875 |
| Ex. A of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Gender Support Plan | 4/21/2022 | 289-2 | JA0883 |
| Ex. B of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Redacted Preferred Name Request Form | 4/21/2022 | 289-2 | JA0888 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. C of the Declaration of Heather Jackson in Support of Motion by B.P.J. for Summary Judgment, Pictures of B.P.J. | 4/21/2022 | 289-2 | JA0894 |
| Ex. 2 in Support of Motion by B.P.J. for Summary Judgment, Declaration of B.P.J. | 4/21/2022 | 289-3 | JA0897 |
| Ex. 4 in Support of Motion by B.P.J. for Summary Judgment, State of West Virginia's Responses to Plaintiff's First Set of Interrogatories [Excerpt pp. 1, 9] | 4/21/2022 | 289-5 | JA0902 |
| Ex. 5 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-3] State of West Virginia's Responses to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-6 | JA0904 |
| Ex. 6 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15] Defendant Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admissions | 4/21/2022 | 289-7 | JA0907 |
| Ex. 7 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 15, 21] Defendant Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-8 | JA0911 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 8 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 16-17] Defendant West Virginia State Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 4/21/2022 | 289-9 | JA0916 |
| Ex. 10 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 8-9, 13] WVSSAC's Responses to Second Set of Requests for Admission | 4/21/2022 | 289-11 | JA0919 |
| Ex. 11 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 30-32] Defendant-Intervenor Lainey Armistead's Responses and Objections to Plaintiff's Second Set of Request for Admission | 4/21/2022 | 289-12 | JA0923 |
| Ex. 12 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-158] Redacted 1/21/2022 Deposition Transcript of B.P.J. | 4/21/2022 | 289-13 | JA0927 |
| **VOLUME THREE** | | | |
| Ex. 14 in Support of Motion by B.P.J. for Summary Judgment, [pp. 77-289] Redacted 1/20/2022 Deposition Transcript of Heather Jackson | 4/21/2022 | 289-15 | JA1085 |
| Ex. 15 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 127-128] 1/19/2022 Deposition Transcript of Wesley Scott Pepper | 4/21/2022 | 289-16 | JA1298 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 16 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192, 213-216, 218, 220-222, 236] Redacted 3/8/2022 Vol. 1 Deposition Transcript of Dora Stutler and Dave Mazza (Harrison County Board of Education)<br><br>Stutler Testimony pp. 38, 40, 44-45, 56-57, 62, 65, 68-70, 83, 89-91, 95-100, 106, 125, 145, 150, 183-184, 191-192;<br><br>Mazza Testimony pp. 213-216, 218, 220-222, 236 | 4/21/2022 | 289-17 | JA1301 |
| Ex. 17 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-163] 2/11/2022 30(b)(6) Deposition of Bernard Dolan (WVSSAC) with Ex. 5 | 4/21/2022 | 289-18 | JA1340 |
| Ex. 18 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 17, 32, 33, 66-67, 71, 80, 101-102, 113-115. 125-126, 132-136] 2/14/2022 Deposition of Michele Blatt (State Board) | 4/21/2022 | 289-19 | JA1515 |
| Ex. 20 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1, 94-105, 118-121, 150-157] Redacted 2/24/2022 Deposition Transcript of Gerald Montano, D.O. | 4/21/2022 | 289-21 | JA1536 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 21 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-175] Redacted 3/11/2022 Deposition Transcript of Lainey Armistead | 4/21/2022 | 289-22 | JA1561 |
| **VOLUME FOUR** | | | |
| Ex. 22 in Support of Motion by B.P.J. for Summary Judgment, Declaration and Expert Report of Deanna Adkins, MD | 4/21/2022 | 289-23 | JA1736 |
| Ex. 23 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-323] 3/16/2022 Deposition Transcript of Deanna Adkins, MD | 4/21/2022 | 289-24 | JA1767 |
| Ex. 24 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-25 | JA2090 |
| Ex. 25 in Support of Motion by B.P.J. for Summary Judgment, Rebuttal Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE | 4/21/2022 | 289-26 | JA2140 |
| **VOLUME FIVE** | | | |
| Ex. 26 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-290] 3/24/2022 Deposition Transcript of Joshua Safer, M.D. | 4/21/2022 | 289-27 | JA2153 |
| Ex. 27 in Support of Motion by B.P.J. for Summary Judgment, Expert Report and Declaration of Mary D. Fry, PhD | 4/21/2022 | 289-28 | JA2443 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 29 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Gregory A. Brown | 4/21/2022 | 289-30 | JA2485 |
| **VOLUME SIX** | | | |
| Ex. 30 in Support of Motion by B.P.J. for Summary Judgment, [pp. 1-282] 3/25/2022 Deposition Transcript of Gregory A. Brown | 4/21/2022 | 289-31 | JA2567 |
| Ex. 31 in Support of Motion by B.P.J. for Summary Judgment, Declaration of Dr. Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-32 | JA2849 |
| Ex. 32 in Support of Motion by B.P.J. for Summary Judgment, [Excerpt pp. 1-2, 98-121, 160-161] 3/28/2022 Deposition Transcript of Chad T. Carlson, M.D., FACSM | 4/21/2022 | 289-33 | JA2927 |
| Ex. 33 in Support of Motion by B.P.J. for Summary Judgment, Mountain Hollar MS Invitational Official Team Scores | 4/21/2022 | 289-34 | JA2955 |
| Ex. 34 in Support of Motion by B.P.J. for Summary Judgment, Doddridge Invitational Official Team Scores | 4/21/2022 | 289-35 | JA2957 |
| Ex. 38 in Support of Motion by B.P.J. for Summary Judgment, Email chain re Transgender participation in secondary schools bill with attachment "2021 Green Book Summary of Public Education Bills Enacted During the 2021 Regular Session" [WVSBOE 000012-26] | 4/21/2022 | 289-39 | JA2960 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 39 in Support of Motion by B.P.J. for Summary Judgment, WVSSAC Title 127 Legislative Rule [WVSSAC000133-220] | 4/21/2022 | 289-40 | JA2975 |
| Ex. 40 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of Email chain re Transgender participation in secondary schools [WVSBOE 000006, 08-09, 39] | 4/21/2022 | 289-41 | JA3063 |
| Ex. 41 in Support of Motion by B.P.J. for Summary Judgment, Excerpt of West Virginia State Board of Education's Enrolled Bill Review Form for H.B. 3293 2021 Regular Session [WVSBOE 000038] | 4/21/2022 | 289-42 | JA3067 |
| Ex. 42 in Support of Motion by B.P.J. for Summary Judgment, Screen Capture of Jordan Bridges Facebook page | 4/21/2022 | 289-43 | JA3068 |
| Ex. 43 in Support of Motion by B.P.J. for Summary Judgment, MSNBC Twitter, 4/30/2021 Governor Justice Interview | 4/21/2022 | 289-44 | JA3080 |
| Ex. 44 in Support of Motion by B.P.J. for Summary Judgment, NCAA.org "Board of Governors updates transgender participation policy" | 4/21/2022 | 289-45 | JA3083 |
| Plaintiff's Statement of Undisputed Material Facts | 4/21/2022 | 290 | JA3085 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME SEVEN** | | | |
| Table of Contents of Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment [Armistead Supp. App. 0001-0003] | 5/12/2022 | 300 | JA3112 |
| Supplemental Declaration of Lainey Armistead [Armistead Supp. App. 0004-0006] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3115 |
| Rebuttal Expert Report and Declaration of Dr. Deanna Adkins, M.D. [Armistead Supp. App. 0038-0072] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3118 |
| Rebuttal Expert Report and Declaration of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0136-0166] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3153 |
| Deposition Transcript of James M. Cantor, PH.D. [Armistead Supp. App. 0209-0289] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3184 |
| Errata Sheet to Deposition of Gregory A. Brown, PH.D., FACM [Armistead Supp. App. 0479-0483] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3501 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Excerpt Enrolled Version of HB 3293 [Armistead Supp. App. 0833-0839] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3506 |
| B.P.J.'s Redacted Birth Certificate [Armistead Supp. App. 0840] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3513 |
| Errata Sheet to Deposition of Dr. Aron Janssen. M.D. [Armistead Supp. App. 0841] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3514 |
| Errata Sheet to Deposition of Mary Fry, PH.D. [Armistead Supp. App. 0842-0846] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3515 |
| Errata Sheet to Deposition of B.P.J. [Armistead Supp. App. 0847] in Supplemental Appendix to Defendant-Intervenor's Motion for Summary Judgment | 5/12/2022 | 300 | JA3520 |
| Ex. C in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of James M. Cantor, PhD. | 5/12/2022 | 305-03 | JA3521 |
| Ex. D in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Declaration of Stephen B. Levine, MD | 5/12/2022 | 305-04 | JA3629 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME EIGHT** | | | |
| Ex. E in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, [pp. 1-261] 3/29/2022 Deposition Transcript of Mary D. Fry, PhD | 5/12/2022 | 305-05 | JA3737 |
| Ex. G in Support of Opposition by State of West Virginia to Plaintiff's Motion for Summary Judgment, Copy of West Virginia Legislature House Bill 3293 | 5/12/2022 | 305-07 | JA4115 |
| Ex. A, Roger G. Brooks' Declaration in Support of Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-01 | JA4124 |
| Table of Contents of Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer [Armistead Daubert App. 0001-0005] | 5/12/2022 | 307-02 | JA4133 |
| Hilton & Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage* (2021) [Armistead Daubert App. 0558-0573] in Appendix to Defendant-Intervenor and the State of West Virginia's Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer | 5/12/2022 | 307-02 | JA4138 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. F of Declaration by Sruti Swaminathan in Support of Motion by B.P.J. to Exclude Expert Testimony of James M. Cantor, Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline | 5/12/2022 | 321-6 | JA4154 |
| Ex. 45 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC's Responses to Plaintiff's First Set of Interrogatories | 5/12/2022 | 332-1 | JA4189 |
| Ex. 46 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Intervenor Lainey Armistead's First Supplemental Disclosures Pursuant to Rule 26(A)(1) | 5/12/2022 | 332-2 | JA4204 |
| Ex. 47 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, WVSSAC Board of Directors Transgender Policy [WVSSAC000008] | 5/12/2022 | 332-3 | JA4214 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. 48 of First Supplemental Declaration of Loree Stark in Support of B.P.J.'s Consolidated Opposition to Defendants' Motions for Summary Judgment, Excerpt of Rules and Regulations of the West Virginia Secondary School Activities Commission [WVSSAC000012, WVSSAC000017] | 5/12/2022 | 332-4 | JA4215 |
| Ex. 2 in Support of Reply by Harrison County Board of Education, Dora Stutler to Plaintiff's Consolidated Opposition, [Excerpt pp. 1, 5] Harrison County Board of Education and Dora Stutler's Responses and Objections to Plaintiff's First Set of Requests | 5/26/2022 | 336-2 | JA4217 |
| Table of Contents of Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony [App. 0001-0006] | 5/26/2022 | 343-1 | JA4219 |
| Tomkinson, G., et al., *European Normative Values for Physical Fitness in Children and Adolescents Aged 9-17 Years: Results From 2,779,165 Eurofit Performances Representing 30 Countries*, [App. 0814-0826] in Appendix of Daubert Response to Defendant-Intervenor and the State of West Virginia's Joint Memorandums in Opposition to Plaintiff's Motions to Exclude Experts' Testimony | 5/26/2022 | 343-1 | JA4225 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Ex. A in Support of Motion *In Limine* by B.P.J. to Exclude Evidence and/or Argument Intended to Question Plaintiff's Gender Identity, Redacted Order Granting Petition for Change of Name | 6/22/2022 | 417-1 | JA4238 |
| Plaintiff's Reply in Support of Her Motion *In Limine* to Exclude Evidence and/or Testimony of Bernard Dolan Regarding Certain Hearsay Statements [Excerpt pp. 1-2] | 7/11/2022 | 470 | JA4244 |
| Ex. A in Support of Joint Motion by Lainey Armistead & State of West Virginia to Supplement the Expert Report of Gregory A. Brown, Supplemental Declaration of Gregory A. Brown, Ph.D., FACSM | 10/21/2022 | 500-1 | JA4246 |
| Memorandum Opinion and Order re Motions for Summary Judgment | 1/5/2023 | 512 | JA4256 |
| Judgment Order | 1/5/2023 | 514 | JA4279 |
| Declaration of B.P.J. in Support of Motion for Stay | 1/20/2023 | 515-1 | JA4280 |
| Declaration of Heather Jackson in Support of Motion for Stay | 1/20/2023 | 515-2 | JA4284 |
| Notice of Appeal by B.P.J. | 1/23/2023 | 517 | JA4289 |
| Notice of Appeal by West Virginia Secondary School Activities Commission | 2/1/2023 | 522 | JA4291 |
| Memorandum Opinion and Order re Stay Pending Appeal | 2/7/2023 | 527 | JA4296 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| **VOLUME NINE** | | | |
| Table of Contents of Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4303 |
| Declaration of Lainey Armistead [Armistead App. 0001-0008] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4307 |
| Declaration of Chelsea Mitchell [Armistead App. 0009-0019] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4315 |
| Declaration of Christina Mitchell [Armistead App. 0020-0032] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4326 |
| Declaration of Alanna Smith [Armistead App. 0033-0038] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4339 |
| Declaration of Selina Soule [Armistead App. 0039-0048] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4345 |
| Declaration of Darcy Aschoff [Armistead App. 0049-0053] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4355 |
| Declaration of Cynthia Monteleone [Armistead App. 0054-0058] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4360 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Declaration of Madison Kenyon [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4365 |
| Declaration of Mary Marshall [Armistead App. 0065-0069] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4371 |
| Declaration of Haley Tanne [Armistead App. 0070-0074] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4376 |
| Declaration of Linnea Saltz [Armistead App. 0075-0079] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4381 |
| Excerpt of 2019 NCAA Division II Outdoor Track & Field Championship Results [Armistead App. 0080-0081] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4386 |
| Excerpt of 2020 Big Sky Indoor Track & Field Championship Results [Armistead App. 0082-0086] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4388 |
| 2020 Women's Ivy League Swimming & Diving Championship Results [Armistead App. 0087-0108] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4393 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (500 Yard Freestyle) [Armistead App. 0109-0112] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4415 |
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (100 Yard Freestyle) [Armistead App. 0113-0115] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4419 |
| Redacted Deposition of Dr. Kacie Kidd, M.D [Armistead App. 1142-1278] Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA44423 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's First Set of Requests for Admission [Armistead App. 1437-1486] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4560 |
| Plaintiff's Redacted Responses and Objections to Defendant-Intervenor Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission [Armistead App. 1487-1510] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4610 |

| Document | Filed Date | ECF Number | Page Number |
|---|---|---|---|
| Errata Sheet to Deposition of Dr. Joshua Safer, M.D. [Armistead App.1535-1537] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4634 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1538-1553] [HCBOE 01167-01172] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4637 |
| Redacted Harrison County Board of Education Document Production [Armistead App.1544-1547] [HCBOE 01265-01268] in Appendix to Defendant-Intervenor's Motion for Summary Judgment | 3/22/2023 | 529 | JA4643 |
| Redacted Amended Birth Certificate of B.P.J. | N/A | N/A | JA4647 |

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5     _____
                                     )
 6     B.P.J. by her next friend and)
       mother, HEATHER JACKSON,      )
 7                                   )
                 Plaintiff,          )
 8                                   )   No. 2:21-cv-00316
          vs.                        )
 9                                   )
       WEST VIRGINIA STATE BOARD OF )
10     EDUCATION, HARRISON COUNTY    )
       BOARD OF EDUCATION, WEST      )
11     VIRGINIA SECONDARY SCHOOL     )
       ACTIVITIES COMMISSION, W.     )
12     CLAYTON BURCH in his official)
       capacity as State            )
13     Superintendent, DORA STUTLER,)
       in her official capacity as  )
14     Harrison County              )
       Superintendent, and THE STATE)
15     OF WEST VIRGINIA,            )
                                    )
16              Defendants.         )
                                    )
17          And                     )
                                    )
18     LAINEY ARMISTEAD,            )
                                    )
19          Defendant-Intervenor.)
       _____)
20
               REMOTE VIDEOTAPED DEPOSITION OF
21                 GREGORY BROWN, Ph.D.
                Friday, March 25, 2022
22                    Volume I
23     Reported by:
       ALEXIS KAGAY
24     CSR No. 13795
       Job No. 5122856
25     PAGES 1 - 282
```

Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA CHARLESTON
 3                             DIVISION
 4
 5     _____
       B.P.J. by her next friend and)
 6     mother, HEATHER JACKSON,       )
                                      )
 7               Plaintiff,           )
                                      )
 8       vs.                          )   No. 2:21-cv-00316
                                      )
 9     WEST VIRGINIA STATE BOARD OF  )
       EDUCATION, HARRISON COUNTY     )
10     BOARD OF EDUCATION, WEST       )
       VIRGINIA SECONDARY SCHOOL      )
11     ACTIVITIES COMMISSION, W.      )
       CLAYTON BURCH in his official)
12     capacity as State             )
       Superintendent, DORA STUTLER,)
13     in her official capacity as   )
       Harrison County               )
14     Superintendent, and THE STATE)
       OF WEST VIRGINIA,              )
15                                    )
                 Defendants.          )
16                                    )
                 And                  )
17                                    )
       LAINEY ARMISTEAD,              )
18                                    )
                 Defendant-Intervenor.)
19     _____)
20              Videotaped deposition of GREGORY BROWN, Ph.D.,
21     Volume I, taken on behalf of Plaintiff, with all
22     participants appearing remotely, beginning at 7:02 a.m.
23     and ending at 4:03 p.m. on Friday, March 25, 2022,
24     before ALEXIS KAGAY, Certified Shorthand Reporter
25     No. 13795.
```

Page 2

```
 1    APPEARANCES (via Zoom Videoconference):

 2

 3   For the Intervenor:

 4      ALLIANCE DEFENDING FREEDOM

 5      BY:  HAL FRAMPTON

 6      BY:  RACHEL CSUTOROS

 7      Attorneys at Law

 8      20116 Ashbrook Place

 9      Suite 250

10      Ashburn, Virginia 20147

11      HFrampton@adflegal.org

12

13   For West Virginia Secondary School Activities

14   Commission:

15      SHUMAN MCCUSKEY & SLICER

16      BY:  ROBERTA GREEN

17      Attorney at Law

18      1411 Virginia Street E

19      Suite 200

20      Charleston, West Virginia 25301-3088

21      RGreen@Shumanlaw.com

22

23

24

25

                                          Page  3
```

USCA4 Appeal: 23-1078    Doc: 53-6    Filed: 03/27/2023    Pg: 27 of 568

```
 1   APPEARANCES (Continued):

 2

 3  For the State of West Virginia:

 4     WEST VIRGINIA ATTORNEY GENERAL

 5     BY:  DAVID TRYON

 6     Attorney at Law

 7     112 California Avenue

 8     Charleston West Virginia 25305-0220

 9     681.313.4570

10     David.C.Tryon@wvago.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                Page 4

```
 1    APPEARANCES (Continued):

 2

 3   For The Plaintiff, B.P.J.:

 4       COOLEY

 5       BY:  ANDREW BARR

 6       BY:  ELIZABETH REINHARDT

 7       BY:  KATELYN KANG

 8       BY:  ZOE HOLSTROM

 9       BY:  KATHLEEN HARTNETT

10       BY:  JULIE VEROFF

11       Attorneys at Law

12       500 Boylston Street

13       14th Floor

14       Boston, Massachusetts 02116-3740

15       617.937.2305

16       ABarr@cooley.com

17       EReinhardt@cooley.com

18       EReinhardt@cooley.com

19       ZHolstrom@cooley.com

20       KHartnett@cooley.com

21       JVeroff@cooley.com

22

23

24

25
```

Page 5

```
 1    APPEARANCES (Continued):

 2

 3   For Plaintiff:

 4       LAMBDA LEGAL

 5       BY:  SRUTI SWAMINATHAN

 6       BY:  AVATARA SMITH

 7       BY:  CARL CHARLES

 8       Attorneys at Law

 9       120 Wall Street

10       Floor 19

11       New York, New York 10005-3919

12       SSwaminathan@lambdalegal.org

13       ASmith@lambdalegal.org

14       CCharles@lambdalegal.org

15

16   For the Plaintiff:

17       AMERICAN CIVIL LIBERTIES UNION

18       BY:  JOSHUA A. BLOCK

19       125 Broad Street

20       18th Floor

21       New York, New York 10004

22       JBlock@aclu.org

23       212.549.2500

24

25
```

Page 6

```
1    APPEARANCES (Continued):

2

3    For defendants Harrison County Board of Education and

4    Superintendent Dora Stutler:

5        STEPTOE & JOHNSON PLLC

6        BY:  JEFFREY M. CROPP

7        Attorney at Law

8        400 White Oaks Boulevard

9        Bridgeport, West Virginia 26330

10       304.933.8154

11       Jeffrey.cropp@steptoe-Johnson.com

12

13

14   For West Virginia Board of Education and Superintendent

15   Burch, Heather Hutchens as general counsel for the

16   State Department of Education:

17       BAILEY & WYANT, PLLC

18       BY:  MICHAEL TAYLOR

19       Attorney at Law

20       500 Virginia Street

21       Suite 600

22       Charleston, West Virginia 25301

23       MTaylor@Baileywyant.com

24

25
```

Page  7

```
 1   Also Present:

 2       LINDSAY DUPHILY - VERITEXT CONCIERGE

 3

 4   Videographer:

 5       KIMBERLEE DECKER

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 8

```
1                         INDEX
2    WITNESS                           EXAMINATION
3    GREGORY BROWN, Ph.D.
4    Volume I
5
6               BY MR. BLOCK                    16
7
8
9                      EXHIBITS
10   NUMBER              DESCRIPTION          PAGE
11   Exhibit 64   Declaration of Gregory A. Brown,   24
12                PH.D., FACSM
13
14   Exhibit 65   Declaration of Professor Gregory   26
15                Brown, Soule Matter
16
17   Exhibit 66   Expert Declaration of Gregory A.   26
18                Brown, Ph.D., FACSM, Hecox Matter
19
20   Exhibit 67   White Paper - Concerning Male      28
21                Physiological and Performance
22                Advantages in Athletic
23                Competition and the Effect of
24                Testosterone Suppression on Male
25                Athletic Advantage, Gregory A.
```

                                        Page 9

```
 1                        Brown, Ph.D., December 14, 2021

 2

 3      Exhibit 68    Video Clip                              59

 4

 5      Exhibit 69    Women's Sports Policy Working      111

 6                    Group Briefing Book a Request to

 7                    Congress and the Administration

 8                    to Safeguard Girls' and Women's

 9                    Sport & Include Transgender

10                    Athletes

11

12      Exhibit 70    Commonwealth of Pennsylvania      123

13                    House of Representatives

14                    Education Committee Public

15                    Hearing, Presentation on HB 972

16                    (GLEIM) Fairness in Women's

17                    Sports Act

18

19      Exhibit 71    "Proandrogenic and Antiandrogenic  139

20                    Progestins in Transgender Youth:

21                    Differential Effects on Body

22                    Composition and Bone Metabolism"

23

24      Exhibit 72    The Journal of Sexual Medicine      149

25                    "Transgender Health: Early
```

Page 10

1                        Hormonal Treatment Affects Body
2                        Composition and Body Shape in
3                        Young Transgender Adolescents"
4
5       Exhibit 73       Brown Blog Post                      161
6
7       Exhibit 74       "Transwomen Competing in Women's     177
8                        Sports: What we know, and what we
9                        don't"
10
11      Exhibit 75       "Re-Affirming the Value of the       201
12                       Sports Exception to Title IX's
13                       General Non-Discrimination Rule"
14
15      Exhibit 76       "Transgender Women in the Female     209
16                       Category of Sport: Perspectives
17                       on Testosterone Suppression and
18                       Performance Advantage"
19
20      Exhibit 77       World Rugby Transgender Women         217
21                       Guidelines
22
23      Exhibit 78       "How does hormone transition in      219
24                       transgender women change body
25                       composition, muscle strength and

                                            Page 11

```
 1                    haemoglobin? Systematic review

 2                    with a focus on the implications

 3                    for sport participation"

 4

 5   Exhibit 79   "Integrating transwomen and          228

 6                    female athletes with Differences

 7                    of Sex Development (DSD) into

 8                    Elite Competition: The FIMS 2021

 9                    Consensus Statement"

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 12
```

```
 1                    Friday, March 25, 2022

 2                         7:02 a.m.

 3

 4            THE VIDEOGRAPHER:  Good morning.  We are on

 5     the record at 9:02 a.m. on March 25th of 2022.  All        07:02:02

 6     participants are attending remotely.

 7            Audio and video recording will continue to

 8     take place unless all parties agree to go off the

 9     record.

10            This is media unit 1 of the recorded          07:02:20

11     deposition of Gregory A. Brown, Ph.D., taken by counsel

12     for the plaintiff, in the matter of B.P.J., by her next

13     friend and mother, Heather Jackson, versus

14     West Virginia State Board of Education, et al., filed

15     in the United States District Court, for the Southern    07:02:36

16     District of West Virginia, Charleston Division, Case

17     Number 2:21-cv-00316.

18            My name is Kimberlee Decker from Veritext

19     Legal Solution (sic), and I am the videographer.  The

20     court reporter is Alexis Kagay.  I am not related to     07:02:57

21     any party in this action, nor am I financially

22     interested in the outcome.

23            Counsel and all present will now state their

24     appearances and affiliations for the record.  If there

25     are any objections to proceeding, please state them at   07:03:10
```

Page 13

```
 1    the time of your appearance, beginning with the

 2    noticing attorney.

 3           MR. BLOCK:  Good morning.  My name is

 4    Josh Block from the ACLU.  My pronouns are he/him.  And

 5    I am here on behalf of the plaintiff, B.P.J.        07:03:26

 6           And I'll let my co-counsel introduce

 7    themselves.

 8           MS. HARTNETT:  Good morning.  This is

 9    Kathleen Hartnett from Cooley for plaintiff.

10           MR. BARR:  Good morning.  Andrew Barr from   07:03:38

11    Cooley, also for plaintiff.

12           MS. KANG:  Good morning.  Katelyn Kang from

13    Cooley, also for plaintiff.

14           MS. REINHARDT:  Good morning.  Elizabeth

15    Reinhardt with Cooley for plaintiff.                07:03:52

16           MS. HELSTROM:  Hello.  This is Zoe Helstrom

17    with Cooley, also for plaintiff.

18           COUNSEL SWAMINATHAN:  Good morning.  This is

19    Sruti Swaminathan from Lambda Legal on behalf of

20    plaintiff.                                          07:04:04

21           MR. CHARLES:  Good morning.  Carl Charles,

22    he/him, with Lambda Legal for plaintiff.

23           MS. SMITH-CARRINGTON:  Good morning.  Avatara

24    Smith-Carrington from Lambda Legal on behalf of

25    plaintiff.                                          07:04:18
```

Page 14

```
1            MR. FRAMPTON:  I -- I think that's everyone
2    for plaintiff, but if not, correct me.
3            This is Hal Frampton with Alliance Defending
4    Freedom for the intervenor.
5            MS. CSUTOROS:  This is Rachel Csutoros from      07:04:29
6    Alliance Defending Freedom for the intervenor.
7            MR. TRYON:  This is David Tryon with
8    West Virginia state attorney general's office on behalf
9    of the State of West Virginia.
10           MR. CROPP:  This is Jeffrey Cropp on behalf of   07:04:45
11   defendants Harrison County Board of Education and
12   Superintendent Dora Stutler.
13           MS. GREEN:  This is Roberta Green, Shuman
14   McCuskey Slicer, here on behalf of WVSSAC.
15           MR. TAYLOR:  This is Michael Taylor, law firm    07:05:04
16   of Bailey & Wyant, on behalf of the West Virginia State
17   Board of Education and W. Clayton Burch,
18   superintendent.
19           THE VIDEOGRAPHER:  Thank you.
20           Will the court reporter please swear in the
21   witness.
22
23           GREGORY BROWN, Ph.D.,
24   having been administered an oath, was examined and
25   testified as follows:
```

Page 15

```
1
2                            EXAMINATION
3    BY MR. BLOCK:
4         Q    Good morning, Dr. Brown.  How are you today?
5         A    I'm doing fine.  Thank you.              07:05:38
6              How are you today, Mr. Block?
7         Q    I'm good.  I'm good.
8              This is our second time seeing each other
9    virtually for a deposition, isn't it?
10        A    It is.  It is.                           07:05:48
11        Q    Well, could you state your name for the
12   record, please.
13        A    My name is Gregory Allen Brown.
14        Q    And have you had your deposition taken before?
15        A    Yes, I have.                             07:06:04
16             MR. FRAMPTON:  Josh, real -- real quick, just
17   before we get too far, I just want to memorialize for
18   the record, are we proceeding under the same agreement
19   that all objections except to form and scope are
20   reserved?                                          07:06:16
21             MR. BLOCK:  Yes.  And -- and I'd like to
22   actually also propose that, of course, any party is
23   free to object on their own, but it is also not
24   necessary for multiple parties to object to the same
25   question that -- an objection from one defendant or    07:06:33
```

Page 16

```
 1    intervenor will preserve the objections for everyone

 2    else as well.

 3              Is that also acceptable?

 4              MR. FRAMPTON:  That -- that's acceptable to

 5    the intervenor.                                  07:06:51

 6              MR. TRYON:  This is David Tryon.  That is

 7    acceptable to the State.

 8              MS. GREEN:  This is Roberta Green.  That's

 9    acceptable to WVSSAC.

10              MR. CROPP:  This is Jeffrey Cropp.  That's    07:07:03

11    acceptable to the Harrison County Board of Education

12    and Dora Stutler.

13              MR. TAYLOR:  This is Michael Taylor.  That's

14    acceptable for the State Board of Education and

15    Superintendent Burch.                            07:07:14

16              MR. BLOCK:  Excellent.

17    BY MR. BLOCK:

18        Q   So other than your deposition with me, have

19    you had any other depositions taken?

20        A   No, I have not.                          07:07:27

21        Q   All right.  Great.

22              So I'll just review with you some ground rules

23    again, which you're -- you're probably familiar with,

24    and I have three of them.

25              You know, the first is that -- actually, it's   07:07:35
```

Page 17

```
 1    less applicable for a video deposition, but it's

 2    important that all of your responses be verbal instead

 3    of head nods so that we can have a -- a transcript of

 4    your responses.

 5            Does that sound good to you?                  07:07:53

 6        A   Yes.  Thank you.

 7        Q   Sure.  The second is that we need to make sure

 8    not to speak over each other.  So if you could wait for

 9    me to complete my question before answering and I'll

10    wait for you to complete your answer before I ask      07:08:06

11    another question.

12            Does that sound fair?

13        A   I'll do my best.

14        Q   So will I.

15            And the third is that, you know, as always,    07:08:16

16    it's my job to ask questions that you understand.  So

17    if there's anything about my question you don't

18    understand, I'm going to rely on you to explain to me

19    that you don't understand it, and I will do my best to

20    rephrase it.  But if you answer the question, I'm going 07:08:32

21    to assume that meant that you understood what I was

22    saying, okay?

23        A   Sounds fair.

24        Q   Terrific.

25            All right.  How did you prepare for the        07:08:44
```

                                                              Page 18

```
 1    deposition today?
 2         A    Reviewed what I had written for my
 3    declaration, the expert report.  I had a good
 4    breakfast, got a good night's sleep.  I have met with
 5    attorneys for Alliance Defending Freedom and          07:09:03
 6    David Tryon to brief me on, you know, what happens in a
 7    deposition, what I should expect.
 8              MR. FRAMPTON:  I'm going to instruct the
 9    witness, you don't -- anything that we discussed is
10    privileged.  So you can certainly tell him that you met   07:09:16
11    with us, but the substance of that discussion should
12    not be told.
13              THE WITNESS:  Okay.
14    BY MR. BLOCK:
15         Q    Did -- in preparation for the deposition, did   07:09:25
16    you review anything that was not cited in your report?
17         A    Yes.  Like previous exercise physiology
18    textbooks, lots of other things that probably weren't
19    cited in there, just in the course of general
20    knowledge.                                            07:09:47
21         Q    And -- and you -- you've reviewed those to
22    refresh your understanding of them in preparation for
23    today's deposition?
24         A    Yes.  And also in preparation for teaching my
25    classes and those types of things.                    07:10:00
```

                                                    Page 19

```
 1        Q    Did you conduct any additional research to

 2   prepare for today's deposition?

 3        A    Can you explain what you mean by "research"?

 4        Q    Well, I guess, did you look for new articles

 5   in the field or anything like that in preparation for      07:10:17

 6   the deposition?

 7        A    Yes.  In preparation for the deposition, I

 8   have looked to see if there have been any relevant new

 9   publications, and I haven't come up with any that I

10   haven't cited in the deposition.                           07:10:33

11        Q    Great.  Have you been retained as an expert

12   witness before?

13        A    Yes.

14        Q    I want to get a complete list of all of the

15   times you've been retained as an expert witness.           07:10:46

16             So could you tell me, to the best of your

17   recollection, the first time you were retained as an

18   expert witness?

19        A    That would be for the case of Soule versus the

20   Connecticut Interscholastic Athletic Association (sic).    07:11:05

21        Q    And who retained you for that case?

22        A    Alliance Defending Freedom.

23        Q    Great.  What is the next case in which you

24   were retained as an expert witness?

25        A    The next case is Hecox versus Little in the      07:11:17
```

Page 20

1    state of Idaho.

2         Q    And who retained you as an expert witness in

3    that case?

4         A    That was the Idaho attorney general's office.

5         Q    And what's the next case where you were          07:11:31

6    retained as an expert witness?

7         A    The next case is in Florida, and I apologize,

8    I cannot remember the names and initials on that versus

9    State of Florida.

10        Q    And what's the general subject of that          07:11:42

11   litigation?

12        A    Similar to this one, State of Idaho, as

13   regarding a state law on women's participation in

14   women's sports.

15        Q    A Florida state law?                            07:11:57

16        A    Yes.

17        Q    And who retained you in that case?

18        A    Andy Bardos, if I remember correctly on his

19   last name.  I apologize if I don't get the

20   pronunciation correctly.  And that is -- they're        07:12:16

21   working for the State of Florida.

22        Q    Is there any other case in which you've been

23   retained as an expert witness?

24        A    I have agreed to serve as an expert witness in

25   the state of Arkansas if there is a case that were to    07:12:35

                                                    Page 21

```
 1   come forth there.

 2        Q    Related to sports?

 3        A    Yes.  Yeah, same topic.

 4        Q    But not as an expert in any other litigation

 5   in Arkansas about other types of legislation; right?      07:12:47

 6        A    That's correct.

 7        Q    Is there any other case in which you've been

 8   retrained as an expert witness?

 9        A    Just want to verify that I said them.  So

10   Soule versus CIAC, Idaho, Florida, Arkansas and then       07:13:05

11   the current case.

12        Q    Okay.  How about in Tennessee, are you an

13   expert witness in Tennessee?

14        A    No.

15        Q    Have you been retained as a nontestifying       07:13:27

16   expert witness in connection with any litigation?

17        A    No.

18        Q    Okay.  All right.  So I'm going to just review

19   with you some previous expert reports you filed.

20             Actually, before I do that, have you filed an   07:13:43

21   expert report yet in the Florida litigation?

22        A    No.

23        Q    Okay.  All right.  So -- so this is going to

24   be the moment of truth.  I'm going to attempt to move a

25   document into Exhibit Share, and we'll see -- we'll see    07:13:57
```

Page 22

```
1    how that -- that works.  All right.

2            All right.  Let's see.

3            Actually, first, I'm going to try to get

4    your -- your current expert report into here.  Just

5    give me half a second.                          07:14:26

6        A    Take your time.

7        Q    Yeah, no, I might need to take my time.

8            All right.  No, here's the one in your case.

9            All right.  Moving it into our "Marked

10   Exhibits" folder.  And in a moment, like when you   07:14:40

11   refresh, you should hopefully see a document.

12       A    So is the document 2022.02.23 Brown Expert

13   Report PDF?

14       Q    Yes.  And -- and just --

15           MR. BLOCK:  Lindsay, does that automatically  07:15:09

16   get marked as a -- a sequential exhibit number?

17           MS. DUPHILY:  It -- I -- I'll fix it.  And

18   I'll show you -- you need to mark it as a -- introduce

19   it as an exhibit.  You just moved it.

20           MR. BLOCK:  I just moved it.  Okay.  So sorry.  07:15:22

21   How -- how do we --

22           MS. DUPHILY:  I can -- I can correct it.  Go

23   ahead and continue, and I will correct it.

24           MR. BLOCK:  Okay.  And -- thanks.

25           Will you be able to do that for the subsequent  07:15:28
```

                                                              Page 23

```
 1    ones, too?

 2            And sorry for my incompetence.

 3            MS. DUPHILY:  Why don't I just -- I will input

 4    the next ones and then show you on the break how to do

 5    it.                                              07:15:39

 6            (Exhibit 64 was marked for identification

 7        by the court reporter and is attached hereto.)

 8            MR. BLOCK:  Terrific.  Thank you so much.

 9    BY MR. BLOCK:

10        Q   All right.  Do you recognize this document?   07:15:41

11        A   Yes, I do.

12        Q   What is it?

13        A   It is my expert declaration for the case of

14    B.P.J. versus West Virginia.

15        Q   And when is it -- when is it dated?          07:16:01

16        A   It states:  "Executed on February 23, 2022."

17        Q   And that's your signature next to it?

18        A   Yes, that is.

19        Q   Okay.  So now I'm just going to take you

20    through some previous reports that you filed.       09:16:18

21            So if you hit refresh, you should see another

22    document titled "Brown PI decl."

23        A   Yes.

24        Q   Great.  Do you recognize that document?

25        A   Yes, I do.                                  09:17:01
```

Page 24

```
 1        Q    What is it?
 2        A    That is my expert declaration in the case of
 3   Soule versus Connecticut Association of Schools.
 4        Q    Great.  And when is that dated?
 5        A    Dated February 12th, 2020.                    09:17:22
 6        Q    Terrific.  Let me take a look at that.
 7             All right.  Let me show you another one, I'm
 8   sorry.
 9             MS. DUPHILY:  Maybe -- maybe we should
10   quickly, it's up to you --                              09:17:40
11             MR. BLOCK:  Yeah, let's do a little bit --
12   let's go off the record, and you can give me a
13   tutorial, and then we can be -- save time.
14             THE VIDEOGRAPHER:  We are off the record at
15   9:18 a.m.                                               09:17:49
16             (Recess.)
17             THE VIDEOGRAPHER:  We are on the record at
18   9:21 a.m.
19   BY MR. BLOCK:
20        Q    All right.  Dr. Brown, during our break, we  09:21:05
21   sort of recorrected and marked the exhibits we
22   previously looked at.
23             Could you, just for the record, look at the
24   document marked Exhibit 64, please.
25        A    All right.  Exhibit 064.                      09:21:26
```

                                                     Page 25

```
 1        Q    And what is that exhibit?

 2        A    That is my expert declaration for B.P.J.

 3   versus West Virginia.

 4             (Exhibit 65 was marked for identification

 5        by the court reporter and is attached hereto.)    09:21:35

 6   BY MR. BLOCK:

 7        Q    Terrific.  And -- now, can you look at the

 8   document marked Exhibit 65, please.

 9        A    All right.  065.

10        Q    And what is that --                          09:21:52

11        A    Yes --

12        Q    What -- what -- what is that document?

13        A    That is my declaration in the case of

14   Soule versus Connecticut Association of Schools.

15             MR. BLOCK:  Great.  All right.  And now I'm  09:22:10

16   going to give you another document to look at in a

17   minute.  In your folder should be appearing a document

18   marked Exhibit 66.

19             (Exhibit 66 was marked for identification

20        by the court reporter and is attached hereto.)    09:22:16

21   BY MR. BLOCK:

22        Q    Could you let me know when you see that

23   document?

24        A    Exhibit 066 - WV AG?

25        Q    Yes.                                          09:22:29
```

                                                          Page 26

```
 1        A   And on the first page of that, it's got, in

 2   large bold capital letters, "Exhibit B"?

 3        Q   Uh-huh.

 4        A   Okay.

 5        Q   Could you go to the second page?          09:22:46

 6        A   Yes.

 7        Q   All right.  And could -- do you recognize this

 8   document?

 9        A   Yes, I do.

10        Q   And what is it?                           09:22:50

11        A   That is my expert declaration for the case of

12   Hecox versus Little.

13        Q   Terrific.  And if you scroll down to -- to

14   near the end, which I -- if we can find the date on

15   which that one was executed.  It should be on page 69  09:23:05

16   of the PDF.

17            Are you -- do you see it?

18        A   I'm still scrolling.

19        Q   All right.  You can also type in "69" in

20   the -- the -- the top box, if that make it easier too.  09:23:33

21        A   Sorry.  Sorry, I tried to type in "69," and I

22   accidentally Google searched for that.

23        Q   Oh, well.  Have you gotten to it yet?

24        A   Still scrolling.

25        Q   All right.                                09:24:19
```

Page 27

```
 1              MS. DUPHILY:  If you download these exhibits,
 2     you can also access them easier with your software.
 3              MR. FRAMPTON:  I think he's almost there.
 4              THE WITNESS:  All right.  I see my signature
 5     page.  Well, yeah, executed 3rd June 2020.          09:24:34
 6     BY MR. BLOCK:
 7         Q   Terrific.  And then for this litigation of
 8     B.P.J., at the PI stage, you also submitted a copy of
 9     this Hecox declaration; is that right?
10         A   Yes.                                          09:24:53
11              MR. BLOCK:  Okay.  And then I want to show you
12     another document in a second.
13              So this document is going to be marked, as
14     soon as I'm able to mark it, as Exhibit 67.  Let me
15     know when it's visible for you.                       09:25:36
16              (Exhibit 67 was marked for identification
17           by the court reporter and is attached hereto.)
18              THE WITNESS:  All right.  Exhibit 067 -
19     Gregory Brown Male Athletic --
20     BY MR. BLOCK:                                         09:25:49
21         Q   Yes.
22         A   Yes.
23         Q   What is this document?
24         A   That is a "White Paper Concerning Male
25     Physiological and Performance Advantages in Athletic  09:25:58
```

                                                    Page 28

```
 1    Competition and The Effect of Testosterone Suppression

 2    on Male Athletic Advantage."

 3        Q    And it's dated December 14th, 2021; correct?

 4        A    That is correct.

 5        Q    Now, this document was not prepared as an        09:26:11

 6    expert report in -- in any litigation, was it?

 7             MR. FRAMPTON:  Object to the form.

 8    BY MR. BLOCK:

 9        Q    Why did you prepare this document?

10        A    I was asked by Alliance Defending Freedom to     09:26:25

11    prepare a white paper.

12        Q    Okay.  And what is a -- a white paper as

13    opposed to an expert report?

14             MR. FRAMPTON:  Same objection.

15             Go ahead.                                         09:26:36

16             THE WITNESS:  White paper is often used by an

17    organization, a company, something like that, for

18    gaining insight or information on a topic.

19    BY MR. BLOCK:

20        Q    Okay.  So did you -- what did you understand     09:26:48

21    to be the -- the purpose of this white paper?

22        A    My understanding was that this was for

23    Alliance Defending Freedom and affiliated and interest

24    organizations to be able to review the research that I

25    summarize in that paper.                                  09:27:10
```

                                                          Page 29

```
 1        Q   Okay.  And did you -- did you have an

 2   understanding that this white paper would be used for

 3   any lobbying purposes?

 4            MR. FRAMPTON:  Object to the form.

 5   BY MR. BLOCK:                                        09:27:25

 6        Q   You can answer, if you understand.

 7        A   My understanding was that Alliance Defending

 8   Freedom could do it with what they wanted and people

 9   could ask them for it for purposes that people want to

10   use it for.                                          09:27:38

11        Q   But did you -- so did you know one way or

12   another whether the -- the document would be used for

13   purposes of lobbying?

14        A   I assumed that it would be introduced to

15   people who are interested in what the science says on  09:27:57

16   the matter of transgender athletes competing in women's

17   sports.

18        Q   And those would include legislators?

19        A   Yes.

20        Q   Okay.  And, in fact, you have testified in   09:28:11

21   support of legislation to restrict the ability of

22   transgender girls and women to participate in women's

23   sports; is that right?

24            MR. TRYON:  Objection --

25            MR. FRAMPTON:  Object to the form.           09:28:26
```

                                                     Page 30

```
 1            MR. TRYON:  -- terminology.

 2            MR. FRAMPTON:  Josh, real quick, could we do

 3    our usual standing objection on terminology so that we

 4    don't have to jump in on that every time?

 5            MR. BLOCK:  You know -- yes.  Yes, you can.      09:28:37

 6    I -- I will have some questions on that, and you can --

 7    you -- you can -- if we could -- I'll give you that

 8    standing objection, but the witness has also used some

 9    of these terms himself in written reports, so I'm -- I

10    want to have a little colloquy with him about that.       09:28:57

11    BY MR. BLOCK:

12        Q   But -- but in the meantime, you -- you have in

13    fact testified in support of legislation similar to

14    the -- the legislation at issue in this case; is that

15    right?                                                    09:29:13

16            MR. FRAMPTON:  Object to the form.

17            Go ahead.

18            THE WITNESS:  Yes, I have testified in front

19    of legislative bodies regarding legislation clarifying

20    the participation of biological females in women's       09:29:25

21    sports.

22    BY MR. BLOCK:

23        Q   The participation of biological females, or

24    did you mean -- did you mean to say transgender females

25    or, to use your language, biological males?  I just      09:29:36
```

Page 31

```
 1    want to know the -- want to make sure you spoke

 2    correctly.

 3         A    The legislation was to limit the participation

 4    in girls and women's sports to biological females.

 5         Q    Great.  And so where -- which states did you      09:29:50

 6    testify in -- in support of legislation?

 7         A    I may not be able to remember all of them.  I

 8    will give you my best recollection.

 9              Ohio, Pennsylvania, Texas, South Dakota,

10    Maine, North Carolina are ones that I think I testified    09:30:14

11    either in person or through Zoom.

12         Q    And who asked you to testify in each of those

13    states?

14         A    That would vary from one state to the next.

15         Q    Okay.  So let -- let's take them one at a         09:30:36

16    time.

17              In Ohio, who asked you to testify?

18         A    Center for Christian Virtue.

19         Q    And in Texas, who asked you to testify?

20         A    Texas Values, if I remember correctly, is        09:30:50

21    their name.

22         Q    And in North Carolina, who asked you to

23    testify?

24         A    I can't remember their name exactly, but it

25    was something along North Carolina Family Values,          09:31:04
```

Page 32

```
 1    something like that.

 2         Q    In Pennsylvania, who asked you to testify?

 3         A    Pennsylvania Family Alliance, if I remember

 4    correctly.

 5         Q    And in Maine, who asked you to testify?          09:31:17

 6         A    That, I think, was Save Women's Sports.

 7         Q    And do you know whether the legislatures in

 8    any of those states received copies of your white

 9    paper?

10         A    I do not know if they received copies of my    09:31:32

11    white paper.

12         Q    When you testified in those states, did you

13    refer to any of the analysis or research you conducted

14    in the white paper?

15         A    I -- many of those were testified last year    09:31:47

16    before I had completed the white paper.

17         Q    So what about the ones that were after you had

18    completed the white paper?

19         A    After completing the white paper, I know I had

20    referred to my previous expert declaration in          09:32:04

21    Connecticut and Idaho.  I don't remember if I referred

22    specifically to the white paper.

23         Q    So in Pennsylvania, you don't know if the

24    Pennsylvania legislature had a copy of your white paper

25    or not?                                                  09:32:21
```

                                                            Page 33

```
 1        A    No.   That was before I had written the white

 2   paper.

 3        Q    So when did you -- during what period of time

 4   did you write the white paper?

 5        A    Well, I started working on it essentially as      09:32:30

 6   soon as I had finished the declaration for Idaho, just

 7   as -- you know, trying to update as new research or new

 8   information became available.  And so it was over the

 9   course of a year and a half, year and three-quarters

10   that I was working on the -- the white paper.           09:32:50

11        Q    And had ADF asked you to -- to create the

12   right -- excuse me -- the white paper a year and a half

13   before the publication date?

14             MR. FRAMPTON:  Object to the form.

15             THE WITNESS:  No.  I was just updating the      09:33:05

16   information so that I would be current on the topic.

17   BY MR. BLOCK:

18        Q    And so when were you asked to -- to write down

19   that information in the form of a white paper?

20        A    Sometime this last fall.  I can't remember.     09:33:19

21   September, October, somewhere in those lines, but I

22   cannot remember exactly.

23        Q    Okay.  Were you paid for -- to write the white

24   paper?

25        A    No, I was not.                                09:33:40
```

Page 34

```
 1        Q    So you have disclosed in your report that your

 2   hourly rate for preparing your expert report; is that

 3   right?

 4        A    That is correct.

 5        Q    But is it fair to say that a substantial         09:33:56

 6   portion of the expert report was based on the white

 7   paper?

 8             MR. FRAMPTON:  Object to the form.

 9             THE WITNESS:  That would be fair to say that.

10   BY MR. BLOCK:                                              09:34:05

11        Q    Okay.  So to the extent that any of the work

12   in the expert report was already conducted for the

13   white paper, then that was essentially done for free;

14   is that fair?

15             MR. FRAMPTON:  Same objection.                   09:34:19

16             Go ahead.

17             THE WITNESS:  Yes, it would be fair to say

18   that the white paper was not paid for, for my work on

19   that, and so overlap between the white paper and the

20   expert report was primarily volunteer work.               09:34:30

21   BY MR. BLOCK:

22        Q    And when you first became interested in the

23   topic of the participation of transgender people in

24   sports, you were the person who reached out to ADF; is

25   that right?                                                09:34:46
```

                                                                Page 35

```
1          A    That is correct.

2          Q    And why did you do that?

3          A    I had seen a news report about the Soule

4     versus Connecticut case and -- well, a -- a report.  I

5     guess I shouldn't say "news" because I can't remember      09:35:00

6     where I saw it.  And so I reached out to Alliance

7     Defending Freedom to see if I could be of help.

8          Q    So you -- you personally feel strongly about

9     this issue; is that fair?

10              MR. FRAMPTON:   Object to the form.              09:35:16

11              THE WITNESS:   I don't know that I would

12    characterize my interest as a feeling so much as an

13    intellectual and professional interest.

14    BY MR. BLOCK:

15         Q    Is there any other circumstance in which        09:35:25

16    you've reached out to an organization to volunteer

17    yourself as an expert source?

18         A    Yes.

19         Q    What -- can you tell me what those situations

20    are?                                                       09:35:47

21         A    I have reached out to legislators in the state

22    of Nebraska to state that I am an exercise physiologist

23    and would be willing to help if they have questions on

24    litigation in this -- or legislation in this area, not

25    just trans women's -- transgender individuals in          09:36:07
```

                                                        Page 36

```
1    sports, but relative to my professional expertise in

2    exercise physiology.

3         Q   Okay.  Any other instance?

4         A   I am trying to remember.

5             I -- I can't remember others.  They may have     09:36:30

6    happened, where I reached out and did not get a

7    response.

8         Q   But sitting here today, you can't remember

9    what those other instances were?

10        A   That is correct.                                 09:36:41

11        Q   Okay.  And you -- you're not sure that there

12   were other instances; is that right?

13        A   That is correct.

14        Q   All right.  So that -- that's all my questions

15   on that topic.                                            09:36:56

16            I do have some questions just about

17   terminology here.

18            You know what the term "cisgender" means;

19   right?

20            MR. FRAMPTON:  Object to the form.               09:37:05

21            THE WITNESS:  Cisgender means a person whose

22   gender identity aligns with their biology.

23   BY MR. BLOCK:

24        Q   And you don't have any objection to using the

25   word "cisgender," do you?                                 09:37:17
```

Page 37

```
1          A   Yes, I do.

2          Q   You've used the word "cisgender" in other

3     publications, haven't you?

4          A   I have.

5          Q   Okay.  Why did you use the word "cisgender" in    09:37:28

6     those publications?

7          A   Because it is a frequently used term in the --

8     in this field, and so it is probably the appropriate

9     term to use.

10         Q   So why do you have an objection to using that     09:37:42

11    term in the deposition if -- if that's the appropriate

12    term to use?

13             MR. FRAMPTON:  Object to the form.

14             THE WITNESS:  I know of individuals who do not

15    like the term "cisgender" because when it is applied in   09:38:00

16    the term such as "cis male" or "cis female," they

17    consider it to be infringing upon their identity as

18    male or female and the "cis" is unnecessary.

19    BY MR. BLOCK:

20         Q   Do you consider the word -- the term             09:38:20

21    "cisgender male" to be infringing upon your identity as

22    a male?

23             MR. FRAMPTON:  Object to the form.

24             THE WITNESS:  No, I do not.

25    ///
```

```
 1    BY MR. BLOCK:
 2        Q    Okay.  Who are the individuals that -- that
 3    you know that view the term "cisgender" as infringing
 4    on their own identity?
 5        A    I could not tell you every person I know that      09:38:43
 6    states that.  I have colleagues and coworkers that have
 7    stated that to me in private conversations, family
 8    members that have stated that to me in private
 9    conversations.  Even students have stated to me that
10    they do not like being referred to as cisgender.          09:39:02
11        Q    And have any of those people, to the best of
12    your knowledge, been directly referred to as being
13    cisgender?
14        A    To my knowledge, yes, they have.
15        Q    Okay.  So -- but you -- you personally don't      09:39:19
16    view the term "cisgender male" as infringing on your
17    own identity; correct?
18        A    That is correct.
19        Q    Okay.  So if I use the term "cisgender" during
20    this deposition, you'll understand what I'm talking       09:39:34
21    about; correct?
22        A    Yes, I understand it is the term commonly used
23    in this type of matter, legally and professionally.
24        Q    Okay.  And if -- if I ask you to clarify
25    whether a particular statement that you made is           09:39:50
```

Page 39

```
1    referring to cisgender males, you -- you would be able

2    to clarify that for me; correct?

3              MR. FRAMPTON:  Object to the form.

4              THE WITNESS:  Yes, it is my understanding that

5    a cisgender male is an individual who is biologically    09:40:04

6    male and their gender identity is male.

7    BY MR. BLOCK:

8         Q   And you know what the term "transgender"

9    means; right?

10             MR. FRAMPTON:  Same objection.               09:40:15

11             THE WITNESS:  Yes.

12   BY MR. BLOCK:

13        Q   What does it mean?

14        A   Transgender is for someone whose gender

15   identity does not align with their biological sex.      09:40:25

16        Q   And you don't have any objection to using the

17   word "transgender" in this deposition, do you?

18        A   No, I do not.

19        Q   Okay.  And you've used the word "transgender"

20   in your own writings, haven't you?                      09:40:38

21        A   That is correct.

22        Q   Okay.  Do you know what the term "transgender

23   woman" means?

24             MR. FRAMPTON:  Same objection.

25             THE WITNESS:  I get confused with transgender   09:40:45
```

Page 40

```
 1    woman sometimes because I'm not sure if that means a

 2    trans woman or someone who is transgender that

 3    identifies as a woman.

 4            Does that make sense?

 5    BY MR. BLOCK:                                        09:41:00

 6       Q   Yeah.  Well, so do you know what the term

 7    "trans woman" means?

 8       A   Yes, I do.

 9       Q   Okay.  What -- what does the word "trans

10    woman" mean to you?                                  09:41:09

11       A   A trans woman is an individual who is

12    biologically male but whose gender identity is that of

13    a woman.

14       Q   And you've used the term "trans woman" in your

15    writings, haven't you?                               09:41:19

16       A   That is correct.

17       Q   Okay.  So if I ask you to clarify whether the

18    people you refer to in a question are trans women,

19    you'll be able to clarify that for me?

20            MR. FRAMPTON:  Object to the form.           09:41:34

21            THE WITNESS:  Yes, I will do my best.

22    BY MR. BLOCK:

23       Q   Okay.  And do you know what the term

24    "transgender girl" means?

25       A   Same as with transgender woman, it is         09:41:42
```

Page 41

```
 1    sometimes confusing to me if they mean if this is a boy

 2    that identifies as girl or a girl that identifies as

 3    boy.

 4         Q   How about if I use the term "trans girl,"

 5    will -- do you understand what that would mean?          09:42:01

 6         A   Yes, I understand "trans girl."

 7         Q   Okay.  And what does trans girl mean to you?

 8         A   A trans girl is a juvenile/youth/child whose

 9    biological sex is male but who identifies as a girl.

10         Q   Okay.  You've been using the phrase            09:42:18

11    "biological sex"; correct?

12         A   That is correct.

13         Q   What is your understanding of what the term

14    "biological sex" means?

15         A   So sex is a biological variable.  Sex is      09:42:29

16    determined at conception with the conferral of sex

17    chromosomes.

18         Q   And is it your understanding that "biological

19    sex" refers to anything other than chromosomes?

20         A   Yes.                                            09:42:53

21         Q   So what else besides chromosomes does the term

22    "biological sex" refer to?

23         A   So if we are referring to a person who is a

24    biological male, they would have sex chromosomes of

25    male and their body system of organization,             09:43:08
```

                                                   Page 42

```
 1    anatomically and physiologically, would be around the

 2    production of small gametes, which means sperm.

 3         Q    And how would you refer to the biological sex

 4    of someone with complete androgen insensitivity

 5    syndrome?                                              09:43:32

 6              MR. FRAMPTON:  Object to the form.

 7              THE WITNESS:  My understanding of someone with

 8    complete androgen insensitivity syndrome is they are

 9    biologically male, but they are not receptive to

10    androgens, but their body is still organized around the  09:43:43

11    production of sperm.

12    BY MR. BLOCK:

13         Q    And how would you refer to the biological sex

14    of someone with XXY chromosomes?

15         A    If I remember correctly --                   09:43:59

16              MR. TRYON:  I would like to just object to the

17    scope.

18              Thank you.

19              MR. FRAMPTON:  Objection; form, scope.

20              THE WITNESS:  If I remember correctly, XXY is  09:44:08

21    Turner syndrome, in which a person is biologically

22    male.  They have an extra X chromosome, but they are

23    still male.

24    BY MR. BLOCK:

25         Q    So you define biological sex as male if there  09:44:22
```

Page 43

```
 1    is a Y chromosome present?

 2            MR. FRAMPTON:  Object to the form, scope.

 3            THE WITNESS:  That is the beginning of sex

 4    determination, is if there is a Y or an X chromosome.

 5    BY MR. BLOCK:                                      09:44:44

 6        Q    Right.  So as to -- to clarify, so as long as

 7    there's a Y chromosome, you, in your understanding of

 8    the term "biological sex," would view that person as

 9    being biologically male?

10            MR. FRAMPTON:  Same objections, form and      09:44:56

11    scope.

12            Go ahead.

13            THE WITNESS:  That is my understanding, yes.

14    BY MR. BLOCK:

15        Q    Okay.  And when -- do you have any opinions on  09:45:02

16    whether a person with complete androgen insensitivity

17    syndrome should be allowed to play on sports teams for

18    girls and women?

19            MR. FRAMPTON:  Objection; form and scope.

20            Go ahead.                                   09:45:28

21            THE WITNESS:  So situations such as complete

22    androgen insensitivity syndrome is very debated in the

23    sports science community right now on how best to

24    handle those individuals and where they should

25    participate in sports.                             09:45:41
```

                                                    Page 44

```
 1    BY MR. BLOCK:

 2         Q   And what's your opinion?

 3              MR. FRAMPTON:  Same objections.

 4              THE WITNESS:  So I have been retained as an

 5    expert witness in this matter primarily dealing with      09:45:49

 6    biological male and biological female and not as an

 7    expert on disorders or differences of sexual

 8    development.  And so I would say I probably would not

 9    be the best person to offer a statement on where

10    someone with CAIS should participate.                     09:46:05

11    BY MR. BLOCK:

12         Q   But you just testified earlier that you view

13    someone with -- with CAIS as being a biological male,

14    isn't that so?

15         A   That is correct.                                 09:46:18

16         Q   And so if you're providing expert testimony on

17    the participation of biological males, wouldn't that

18    include testimony about a biological male with -- in

19    your words -- with CAIS?

20              MR. FRAMPTON:  Objection; form and scope.       09:46:33

21              THE WITNESS:  If I had been asked to provide

22    expert information on that matter, I could perhaps look

23    more into it, but I have not been asked to provide

24    expert witness, expert statement on where individuals

25    with disorders/differences of sexual development should   09:46:52
```

                                                      Page 45

```
 1    participate.

 2    BY MR. BLOCK:

 3        Q   Okay.  So you -- you have no expert opinion on

 4    the participation of people with DSDs in sports for

 5    girls and women; right?                              09:47:05

 6            MR. FRAMPTON:  Objection; form and scope.

 7            Go ahead.

 8            THE WITNESS:  In my declaration, there is a

 9    small statement in there about DSDs, and I will stand

10    by that statement.                                   09:47:15

11    BY MR. BLOCK:

12        Q   All right.  Well, let's look to that.

13            If you could turn to that -- that exhibit

14    and -- and identify for me the statement about DSDs.

15        A   Which exhibit number is that?               09:47:34

16        Q   That's a good question.  I think it's Exhibit

17    Number -- separate windows are tough.  I believe it's

18    the first one up there, Exhibit 64.

19            So it might be in paragraph 4 of your report,

20    if you could look at that.                           09:48:20

21        A   All right.  I am looking at paragraph 4.

22        Q   Okay.  Is this the reference to DSDs that

23    you're -- that you were referring to just now?

24        A   That is correct.

25        Q   Okay.  So the -- the first sentence -- the    09:48:31
```

Page 46

1    first two sentences of that paragraph say (as read):

2            "Although disorders of sexual

3            development (DSDs) are sometimes

4            confused with discussions of

5            transgender individuals, the two are        09:48:43

6            different phenomena.  DSDs are

7            disorders of physical development.

8            Many DSDs are 'associated with genetic

9            mutations that are now well known to

10           endocrinologists and geneticists.'"         09:48:57

11           Did I read that correctly?

12      A    Yes, you did.

13      Q    Okay.  And so that's the extent of your expert

14   testimony about DSDs?

15      A    That is correct.                             09:49:07

16      Q    Okay.  Do you know if complete androgen

17   insensitivity syndrome is associated with a genetic

18   mutation?

19           MR. FRAMPTON:  Object to the form.

20           THE WITNESS:  I will stand by that statement  09:49:24

21   which is a quote from the endocrinology --

22   Endocrine Society.

23   BY MR. BLOCK:

24      Q    But sitting here today, you don't know whether

25   CAIS is associated with a genetic mutation, do you?    09:49:32

Page 47

```
 1              MR. FRAMPTON:  Same objection.

 2              THE WITNESS:  I do not know off the top of my

 3    head.

 4    BY MR. BLOCK:

 5         Q    Okay.  So -- so to the best of your knowledge,    09:49:44

 6    does H.B. 3293 make any distinction between people with

 7    DSDs and people who are transgender?

 8              MR. FRAMPTON:  Objection; form and scope.

 9              THE WITNESS:  I would need to refresh my

10    reading on that bill to see what it states on that        09:50:06

11    matter.

12    BY MR. BLOCK:

13         Q    So -- but the scope of your expert testimony,

14    when you provide opinions about people who, in your

15    language, are biological males, you are limiting your     09:50:14

16    expert opinion to people who are biological males

17    who -- who are either cisgender males or trans girls

18    and trans women; is that right?

19              MR. FRAMPTON:  Same objections.

20              THE WITNESS:  Can you please restate the         09:50:39

21    question for me?

22    BY MR. BLOCK:

23         Q    Yeah.  So -- so you're providing testimony

24    about, quote, biological males; correct?

25         A    Biological males and biological females.        09:50:46
```

                                                          Page 48

```
 1        Q    Okay.  So in terms of biological males, the
 2    only biological males you're addressing in your
 3    testimony, to -- to use your phrase, biological males,
 4    are cisgender boys and men and trans girls and women,
 5    but not any biological males, in your language, that      09:51:07
 6    have DSDs; is that fair?
 7               MR. FRAMPTON:  Objection; form and scope.
 8               Go ahead.
 9               THE WITNESS:  Yes, I was not asked to offer
10    expert opinion on differences or disorders of sexual      09:51:17
11    development.
12    BY MR. BLOCK:
13        Q    All right.  Including people who you consider
14    to be biological males who have DSDs; correct?
15               MR. FRAMPTON:  Same objection.                 09:51:28
16               THE WITNESS:  That is correct.
17    BY MR. BLOCK:
18        Q    Okay.  Do you know what the term "sex assigned
19    at birth" refers to?
20        A    Yes, I understand the term "sex assigned at      09:51:47
21    birth."
22        Q    Okay.  So -- so if I use the term "sex
23    assigned at birth," you can understand what I'm saying?
24        A    Yes, I can understand what you're saying.
25        Q    Okay.  Great.                                    09:51:56
```

Page 49

```
 1            I have some questions just about your

 2    education and research background, but, you know, I'd

 3    prefer not to belabor them by going through your CV

 4    line by line.  So I'm going to ask you questions, and

 5    if you think you need to refer specifically to your CV,   09:52:20

 6    we can do that, but I'm hoping that's not necessary.

 7            So as part of your formal education, you never

 8    took any courses regarding transgender people; is that

 9    right?

10       A   I did not take a course where the title of the   09:52:34

11    course was "Transgender Individuals."

12       Q   Okay.  And did you take a course where

13    transgender individuals were discussed?

14       A   Yes.

15       Q   And how many courses?                            09:52:52

16       A   That would be difficult to say.  To give a

17    number, I mean, I would be speculating right now.  It's

18    been 20 years.

19       Q   Do you -- do you have any specific

20    recollection of any courses where transgender people    09:53:10

21    were discussed?

22       A   I am pretty sure that transgender individuals

23    were discussed in the undergraduate Abnormal Psychology

24    class I took.  Very possibly in General Psychology.

25    Possibly discussed in any of the numerous physiology    09:53:25
```

Page 50

```
 1    classes as an undergraduate or graduate student.

 2    Possibly in the endocrinology class as a graduate

 3    student.

 4         Q   This is all just possibly; right?  You don't

 5    have a specific recollection?                          09:53:44

 6         A   Just thinking, also some of the sociology

 7    classes may have included it.  But, again, it might

 8    have; it might not have been.  And also, whether that

 9    was a discussion that the instructor initiated or the

10    students initiated, I couldn't testify at this point.  09:54:00

11         Q   Okay.  You received your undergrad degree in

12    1997; right?

13         A   That is correct.

14         Q   Do you -- do you think it's -- it's plausible

15    that you had a lot of discussions about transgender    09:54:11

16    people from 1993 to 1997?

17         A   Yes, it's very plausible.

18         Q   Okay.  Have you ever -- as part of your --

19    obtaining any -- any of your degrees, did you ever

20    conduct any research concerning transgender people?    09:54:32

21         A   Can you clarify what you mean by "research"?

22         Q   I -- I mean original research, where you have

23    a hypothesis and you test it.

24         A   So, no, I did not conduct any primary research

25    on transgender individuals.                            09:54:55
```

Page 51

```
 1        Q    Okay.  Did you conduct any other form of

 2   research other than what you referred to as primary

 3   research?

 4        A    I probably looked for research papers or maybe

 5   saw research papers on transgender individuals.  Again,    09:55:07

 6   it may have been as part of an assigned reading in a

 7   class, or it may have been something come across in

 8   other reading for general knowledge.

 9        Q    You're just saying that this could have

10   happened, but you don't have a specific recollection of    09:55:20

11   it, do you?

12        A    That is correct.  I did not write down in a

13   diary when I would read a paper.

14        Q    Well, no, but you -- sitting here today, you

15   don't have any recollection of ever reading a paper on     09:55:30

16   transgender people as part of obtaining your

17   undergraduate, your Master's or your Ph.D. degrees;

18   correct?

19        A    I don't think that's what I said.

20        Q    Well, so --                                      09:55:44

21        A    I think I said I -- I might have.  I didn't

22   say that I did not.

23        Q    Well, but you don't have any affirmative

24   memory of doing so?

25             MR. FRAMPTON:  Object to the form.               09:55:55
```

Page 52

```
 1          THE WITNESS:  What do you mean by "affirmative

 2     memory"?

 3     BY MR. BLOCK:

 4        Q    Well, by -- by saying you might have, that --

 5     that's different to me than saying you remember doing      09:56:04

 6     it in some form, but don't remember the exact time or

 7     place.  So I'm trying to clarify whether you remember

 8     doing it, but can't, you know, put your finger on

 9     exactly when it happened, or whether you're saying you

10     can't rule out the possibility that you did it.           09:56:20

11          So are you saying that you can't rule out the

12     possibility that you did it?

13        A    So I am saying that it's very likely that I

14     had discussions in classes on transgender individuals.

15     It's very likely that there was a paper that I read or    09:56:35

16     more than one paper regarding transgender individuals,

17     possibly even a textbook chapter.

18        Q    Okay.  And do you consider reading a textbook

19     chapter or paper for class to be academic research?

20        A    Reading a scholarly paper would be considered     09:56:56

21     academic research as it could lead to something like a

22     literature review, a meta-analysis, and it is an

23     essential part of the research process.

24        Q    Right.  But you didn't do any reading as part

25     of preparing for literature review or meta-analysis;      09:57:11
```

Page 53

```
 1   correct?

 2       A    I did not include any in my literature review

 3   or meta-analysis.  I may have done reading as part of

 4   my Master's thesis and doctoral dissertation.

 5           I know for a fact, because of the topic of my    09:57:38

 6   Master's thesis and doctoral dissertation, I had to

 7   read very widely on steroid hormone, biogenesis and

 8   actions.

 9       Q    So we had a discussion about some of this two

10   years ago.  Do you think your memory about what -- your    09:57:59

11   readings was more accurate two years ago or more

12   accurate today?

13           MR. FRAMPTON:  Object to the form.

14           THE WITNESS:  I would say more accurate today

15   because I have -- since you asked me this two years    09:58:14

16   ago, I've thought about it more to remember, okay, did

17   this happen in Abnormal Psychology, in Sports

18   Psychology, something like that.

19   BY MR. BLOCK:

20       Q    Okay.  So I just want to be clear about a    09:58:23

21   distinction between conducting reading as in a -- as a

22   class assignment and conducting reading as part of your

23   research process.  All right?  Does that distinction

24   make sense to you?

25       A    Yes.    09:58:41
```

Page 54

1    Q   Okay.  So you've -- you've talked about maybe

2  reading a paper or a chapter as part of a class

3  assignment; correct?

4    A   Yes.

5    Q   Okay.  So in terms of reading as part of your     09:58:52

6  own independent research process, do you have any

7  recollection of doing any reading about transgender

8  people as part of your own independent research process

9  while obtaining your degrees?

10    A   I don't have a specific recollection of doing     09:59:09

11  that independently while reading my -- while performing

12  my Master's and doctoral research, but, again, I might

13  have.

14    Q   Okay.  So since receiving your doctorate until

15  the time when you first reached out to ADF, have you --   09:59:28

16  had you ever conducted any research concerning

17  transgender people?

18    A   Once again, please clarify what you mean by

19  "research."

20    Q   All right.  Well, let's do primary research.     09:59:42

21    A   No, I had not done primary research of

22  transgender individuals.

23    Q   Had you ever conducted any literature review

24  regarding transgender people?

25    A   I have not formally written a literature       09:59:56

Page 55

```
 1    review.
 2        Q    Had you ever written a meta-analysis about
 3    transgender people?
 4        A    No, I had not performed a meta-analysis
 5    regarding transgender individuals.                    10:00:07
 6        Q    Okay.  So what other professional research
 7    might you have done regarding transgender people?
 8        A    Trying to keep up with the legislation in
 9    sports regarding the participation of transgender
10    individuals and then on seeing the legislation, out of   10:00:25
11    my own curiosity, looking to see what research was
12    informing that legislation.
13        Q    Okay.  In terms of original research that
14    you've done, have any of the subjects in your original
15    research been transgender, to the best of your         10:00:41
16    knowledge?
17        A    To the best of my knowledge, none of any
18    subjects have been transgender.
19        Q    Okay.  Have you worked with transgender people
20    in any capacity?                                        10:00:52
21            MR. FRAMPTON:  Object to the form.
22            THE WITNESS:  I -- I think there are
23    individuals at the university that are transgender that
24    I have worked with on committees or other things.
25    ///
```

Page 56

```
 1    BY MR. BLOCK:

 2        Q    Okay.  How many transgender people do you

 3    think you've met?

 4            MR. FRAMPTON:  Same objection.

 5            THE WITNESS:  I can think of two by name and     10:01:22

 6    others that I've met, but -- I've met a lot of people,

 7    and so to try and come up with a number that were

 8    transgender is going to be very, very difficult.

 9    BY MR. BLOCK:

10        Q    Have you ever appeared on any podcasts?          10:01:41

11        A    Yes.

12        Q    Which ones?

13        A    I probably can't name all of them.

14        Q    Okay.

15        A    I can do my best.                                10:01:55

16        Q    Great.

17        A    So there was a podcast Muscle for Life with --

18    with Mike Matthews, I think.  I was on the Megyn Kelly

19    podcast.  I was on Munk Debates podcast.  I was on

20    Governor Ricketts' podcast.  There's another one out     10:02:18

21    there that I remember the podcast.  I don't remember

22    the name of it.

23        Q    Do you remember approximately when the

24    Megyn Kelly podcast was?

25        A    A little less than a year ago, if I remember     10:02:39
```

Page 57

1    right.

2        Q    And what was the topic of that podcast?

3        A    That was regarding the participation of

4    biological males in female sports.

5        Q    And what was the Munk Debates podcast?        10:02:51

6        A    That was also about biological males

7    participating in female -- in women's sports.

8        Q    And when -- when was that podcast?

9        A    Last summer, maybe late last summer.

10       Q    Okay.  And when you refer to biological males   10:03:12

11   in these podcasts, did you discuss at all people with

12   DSDs?

13       A    If we did, it was not a major topic of

14   discussion.

15       Q    Okay.  So your -- your podcast with          10:03:24

16   Governor Ricketts, that's on his show "The Nebraska

17   Way"; is that -- is that correct?

18       A    That is correct.

19       Q    Okay.  And you appeared on September 1st,

20   2021?                                                 10:03:42

21       A    I will trust you on the date on that.  I don't

22   remember myself.

23       Q    All right.  Does that sound around the time?

24       A    That sounds like the right time period.

25            MR. BLOCK:  Okay.  Great.                    10:03:53

                                                           Page 58

```
 1              So I'm going to introduce an exhibit marked 68
 2      and if you can open it up.
 3              The concierge -- it's an -- it's a video clip,
 4      and the concierge is going to have to play it for us.
 5              But let me know what appears on -- on your         10:04:18
 6      screen before -- before I ask the concierge to -- to
 7      play it.
 8              Do you see a file?
 9              (Exhibit 68 was marked for identification
10           by the court reporter and is attached hereto.)      10:04:28
11              THE WITNESS:  I see Exhibit 068 - Clip, space,
12      2005.
13      BY MR. BLOCK:
14          Q   Okay.  I'm going to have -- I'm going to ask
15      the concierge to play the clip now.  And it's -- it's a  10:04:37
16      little bit over a minute long.  I didn't want to -- you
17      to think that I've cut anything off here.  And then
18      after the clip plays, I'll ask you a few questions
19      about it.
20              Does that sound okay?                             10:04:50
21          A   Will the clip show up in the -- in this Zoom
22      meeting, or is it going to be a different window?
23          Q   It's going to show up as a screen share --
24          A   Okay.
25          Q   -- right now.                                    10:05:05
```

Page 59

```
 1            Can you see the screen share?

 2       A   Yes.

 3       Q   Great.

 4           (Video clip played.)

 5           MR. BLOCK:  Thank you to the concierge.      10:06:32

 6   BY MR. BLOCK:

 7       Q   Does -- does this video clip appear to be an

 8   accurate excerpt of your interview with

 9   Governor Ricketts?

10       A   Yes, that's me.                             10:06:41

11       Q   Okay.  Do you still agree with everything you

12   said in that video clip?

13           MR. FRAMPTON:  Objection; form and scope.

14           MR. TRYON:  Objection; scope.

15   BY MR. BLOCK:                                       10:06:50

16       Q   You can answer.

17       A   Can you repeat your question, please?

18       Q   Do you still agree with everything you said in

19   that video clip?

20       A   Yes, I do.                                  10:06:58

21       Q   Okay.  You're not a mental health expert;

22   right?

23       A   That is correct.

24       Q   You don't have any education or training

25   that -- that would provide a basis for you to offer an   10:07:10
```

                                                    Page 60

```
 1    expert opinion on the proper healthcare for transgender

 2    youth, do you?

 3            MR. FRAMPTON:  Objection; form and scope.

 4            Go ahead.

 5            THE WITNESS:  No, I would not be called upon     10:07:19

 6    to offer treatment for transgender individuals.

 7    BY MR. BLOCK:

 8       Q   But my question is, to offer an expert opinion

 9    on treatment for transgender individuals, you don't

10    have any, you know, credentials that would allow you to   10:07:34

11    provide an expert opinion on that topic, do you?

12            MR. FRAMPTON:  Same objection.

13            Go ahead.

14            THE WITNESS:  I have not been asked to offer

15    an expert opinion on the psychological or psychiatric     10:07:44

16    care of transgender individuals.

17    BY MR. BLOCK:

18       Q   But my question is, do you have the

19    credentials and training that would allow you to offer

20    such an opinion, if you were asked?                       10:07:52

21            MR. FRAMPTON:  Same objection.

22            THE WITNESS:  No, I do not have those

23    credentials or degrees.

24    BY MR. BLOCK:

25       Q   Okay.  In this clip, you used the word            10:08:07
```

                                                      Page 61

```
 1      "transgenderism"; right?

 2           A    That is correct.

 3           Q    Is that a medical term?

 4                MR. FRAMPTON:  Objection; form and scope.

 5                THE WITNESS:  I'm not sure what you mean, is     10:08:19

 6      it a medical term?

 7      BY MR. BLOCK:

 8           Q    What does transgenderism mean?

 9           A    An individual who is transgender.

10           Q    Okay.  In any of the -- the scholarly articles   10:08:28

11      that you've read about transgender people, have any of

12      them used the term "transgenderism"?

13           A    I cannot recall, to answer that question, if

14      they have or have not.

15           Q    Okay.  In the clip, you mentioned Ben Shapiro;   10:08:45

16      correct?

17           A    That is correct.

18           Q    Who is Ben Shapiro?

19           A    Ben Shapiro is an individual that does a lot

20      of podcasts, news clips, news interviews, speaking at      10:09:00

21      organizations on social and political matters.

22           Q    Do you -- do you think he's a reliable source

23      of authority on mental healthcare for transgender

24      youth?

25                MR. FRAMPTON:  Objection; form and scope.        10:09:19
```

Page 62

```
 1              THE WITNESS:  In the role that he is filling,

 2    I think Ben Shapiro is able to provide reliable

 3    information on what has been written in these matters.

 4    BY MR. BLOCK:

 5         Q   Okay.  And reliable enough that you -- you      10:09:32

 6    thought it was worth repeating to the audience of the

 7    podcast; correct?

 8              MR. FRAMPTON:  Same objections.

 9              THE WITNESS:  That is correct.

10    BY MR. BLOCK:                                            10:09:49

11         Q   Okay.  In what context have you heard his

12    opinions about transgender youth?

13         A   Do you mean context or format?

14         Q   Let's start with format.

15         A   So in a number of videos and radio clips and   10:10:02

16    seeing on the news, I have seen Ben Shapiro make

17    statements regarding transgender individuals.

18         Q   And has that affected your own opinion on

19    these issues?

20              MR. FRAMPTON:  Objection; form and scope.     10:10:21

21              THE WITNESS:  No, I don't think what he has

22    said has affected my opinion.

23    BY MR. BLOCK:

24         Q   Has it affected your opinion on mental

25    healthcare for transgender youth?                       10:10:37
```

Page 63

```
 1              MR. FRAMPTON:  Same objection.

 2              THE WITNESS:  I don't think it has affected my

 3    opinion on healthcare for transgender youth.

 4    BY MR. BLOCK:

 5        Q   Okay.  Is new toy syndrome a medical term?    10:10:47

 6              MR. FRAMPTON:  Same objections.

 7              THE WITNESS:  No.

 8    BY MR. BLOCK:

 9        Q   Okay.  Do you think that receiving

10    gender-affirming care is analogous to playing with a    10:10:56

11    new toy?

12              MR. FRAMPTON:  Objection; form and scope.

13              THE WITNESS:  I'm sorry, can you state the --

14    restate the question?

15    BY MR. BLOCK:                                           10:11:13

16        Q   Yeah.  Do you -- do you think transgender

17    youth receiving gender-affirming care is analogous to a

18    person playing with a new toy?

19              MR. FRAMPTON:  Same objections.

20              THE WITNESS:  In the context that I quoted     10:11:22

21    Ben Shapiro, in that interview, it is a good analogy.

22    BY MR. BLOCK:

23        Q   How is it a good analogy?

24        A   As I explained in that, also as it was

25    explained by Ben Shapiro, when people get a new toy,     10:11:37
```

Page 64

```
 1    they're often very happy with it, and then the newness
 2    wears off.  That is drawn as an analogy to what has
 3    been demonstrated in scholarly literature about
 4    transgender individuals.
 5        Q   What scholarly literature?                    10:11:53
 6            MR. FRAMPTON:  Objection; form and scope.
 7            THE WITNESS:  The research is cited on the
 8    SEGM web page.
 9    BY MR. BLOCK:
10        Q   What's SEGM?                                  10:12:05
11        A   I may not be able to tell you precisely, but
12    it is something like Society for Evidence-Based Gender
13    Medicine.
14        Q   And why have you been reading the SEGM web
15    page?                                                 10:12:25
16            MR. FRAMPTON:  Objection; form and scope.
17            THE WITNESS:  It is a good place to find
18    information about transgender individuals to help make
19    sure that I am staying current on the information in
20    this area.                                            10:12:34
21    BY MR. BLOCK:
22        Q   How is information about the mental healthcare
23    of transgender individuals relevant to you in your
24    work?
25            MR. FRAMPTON:  Same objections.               10:12:48
```

                                                    Page 65

```
 1          THE WITNESS:  The mental healthcare is often

 2    associated with the use of either puberty blockers,

 3    testosterone suppression, estrogen administration,

 4    which then has physiological effects.

 5    BY MR. BLOCK:                                    10:13:06

 6       Q   So -- so you read about -- well, I -- I guess,

 7    could you explain further?  How -- how is utility of

 8    the mental healthcare relevant to your opinion about

 9    physiological issues and athletic advantages?

10          MR. FRAMPTON:  Same objection, form and scope.  10:13:27

11          THE WITNESS:  If an individual is being given

12    a physiologically active medicine, such as a puberty

13    blocker, such as testosterone suppression or

14    administration of estrogen, that will affect their

15    physiology, which then may or may not have an affect on  10:13:47

16    their ability to compete in athletics.

17          So it is important to know what is being done.

18    BY MR. BLOCK:

19       Q   Does -- does the mental health impacts of

20    those treatments matter in terms of the physiological  10:14:04

21    effects?

22       A   If the mental health treatment includes the

23    administration of physiological substances, then it

24    affects physiological responses.

25       Q   Yeah, so, I guess, that's not really answering  10:14:25
```

Page 66

```
1    my question.
2            So you -- you -- you talked about how, in your
3    opinion, the positive mental effects of
4    gender-affirming care for some people would -- are like
5    a new toy, that they have a positive effect and then      10:14:39
6    that positive mental health effect wears off, and my
7    question is whether the -- the fact that you alleged
8    that positive mental health effect would wear off has
9    any implication for the physiological results of having
10   taken that medication.                                    10:15:04
11           Does that make sense?
12           MR. TRYON:  Objection --
13           MR. FRAMPTON:  Objection; form.
14           MR. TRYON:  -- form.
15           THE WITNESS:  I would ask you to try and break    10:15:11
16   that question down a little more.
17   BY MR. BLOCK:
18       Q   Sure.
19       A   I'm not sure where you're going.
20       Q   Sure.  So the -- if -- if -- assuming that --     10:15:17
21   taking it as an assumption, that puberty blockers and
22   gender-affirming hormones had no positive health
23   effects for mental health, how would that assumption
24   impact your opinion on the physiological effects of
25   taking those medications?                                 10:15:43
```

Page 67

```
 1            MR. FRAMPTON:  Objection; form and scope.

 2            Go ahead.

 3            THE WITNESS:  Well, puberty blockers and

 4    testosterone suppression and estrogen administration

 5    are physiological active substances.  What they do for    10:15:57

 6    mental health compared to what they do for athletic

 7    performance and physiological responses might be

 8    separate issues.

 9    BY MR. BLOCK:

10        Q   Okay.  So if they're separate issues, why do    10:16:08

11    you read about the mental health effects of taking

12    those medications?

13            MR. FRAMPTON:  Same objections.

14            THE WITNESS:  I think I previously answered

15    this question, to know what are the treatments that are    10:16:27

16    being used that could then affect physiological

17    responses to exercise.

18    BY MR. BLOCK:

19        Q   Okay.  So what other sources of information do

20    you consult on the -- the mental health effects of    10:16:39

21    puberty blockers and gender-affirming hormones?

22            MR. FRAMPTON:  Objection; scope.

23            THE WITNESS:  So I will find scholarly

24    articles and read those to find information.  A lot of

25    the information, if I find it on a web page, I will    10:17:01
```

                                                    Page 68

```
 1    look to see if it is to a scholarly journal, scholarly

 2    article that's reputable, but then I can verify that

 3    the information on the web page is valid, at least

 4    based on what has been presented in scholarly

 5    literature.  Of course, you see things in the news as    10:17:18

 6    well; right?

 7    BY MR. BLOCK:

 8         Q    Is there any scholarly article that -- that

 9    likens gender-affirming care to a new toy?

10              MR. FRAMPTON:  Objection; form and scope.       10:17:32

11              THE WITNESS:  I could not say.

12    BY MR. BLOCK:

13         Q    Okay.  What scholarly articles, sitting here

14    today, can -- can you think of having read on the topic

15    of mental healthcare for transgender youth?              10:17:46

16              MR. FRAMPTON:  Same objection; form and scope.

17              THE WITNESS:  So there was a review on the

18    effects of puberty blockers that was put out by Sweden,

19    Karolinski Institute, and so I read that article and

20    looked up a number of the articles that were referenced  10:18:11

21    in there.  Similar type of thing came out of

22    Great Britain, their national health organization,

23    something like that.  And so I looked at a lot of those

24    articles.

25              I -- I have also, again, coming across some on  10:18:24
```

Page 69

```
 1    PubMed or Google Scholar.  I've seen other articles

 2    looking at the effects of hormone treatment in

 3    transgender individuals and measures of mental health.

 4    BY MR. BLOCK:

 5         Q    And can you remember any of the articles on      10:18:39

 6    PubMed or Google Scholar?

 7         A    I cannot remember them by author or title.

 8         Q    Okay.  Have you read the Endocrine Society

 9    guidelines on providing gender-affirming care to

10    transgender people?                                        10:18:58

11         A    I --

12              MR. FRAMPTON:  Objection; scope.

13              Go ahead.

14              THE WITNESS:  I have read the information on

15    the web page.  I have read the article.  I cannot         10:19:04

16    remember which journal it's published in.

17    BY MR. BLOCK:

18         Q    Well, I'm sorry, what -- what -- what are you

19    referring to when you say a web page and an article?

20         A    So the Endocrine Society has a web page         10:19:22

21    regarding the administration of puberty blockers and

22    estrogen -- or testosterone suppression, estrogen

23    administration for -- for transgender individuals.  And

24    so I have read through that web page, and there is an

25    article associated with the information on that web       10:19:42
```

Page 70

```
 1   page that was published in a scholarly journal.

 2        Q    Okay.  And -- and that -- that would be the --

 3   the -- the 2017 guidelines for care of people with

 4   gender dysphoria and gender incongruence?

 5        A    That is my recollection, yes.            10:19:57

 6        Q    When did you read that?

 7        A    Sometime in the past year.

 8        Q    So at the time of our past deposition, you

 9   hadn't read that yet; is that correct?

10        A    As I recall, that is correct.            10:20:14

11        Q    Okay.  But -- but since then, you have read

12   it?

13        A    Yes.  You seem to make a strong suggestion

14   that I should read that.

15        Q    Okay.  Did you learn anything from reading it?  10:20:26

16        A    Yes, I did.

17        Q    What did you learn?

18        A    I learned that the recommendations of the

19   Endocrine Society for testosterone suppression result

20   in much, much lower testosterone concentration than    10:20:39

21   those recommended by world -- or, sorry, by world sport

22   or by the Olympics.

23        Q    Great.  Just to close the loop, can you think

24   of any other source of information or political

25   commentator you've heard and talk about transgender     10:21:05
```

Page 71

```
 1    youth who you think provides a good description of the

 2    science?

 3              MR. FRAMPTON:  Objection; form and scope.

 4              THE WITNESS:  So I've cited a number of papers

 5    in my article -- or, sorry, in my expert declaration.    10:21:25

 6    So I've read those articles of scholars.

 7              As far -- as far as political commentary, it's

 8    all over the place these days, so it's hard to identify

 9    who has or has not opined on that.

10        Q    All right.  Do you -- I'm going to turn to a      10:21:42

11    new line of questions.  Do you need a break before

12    then?

13        A    Yeah, let's take five.

14        Q    Okay.  Great.

15              THE VIDEOGRAPHER:  We are off the record at      10:21:59

16    10:22 a.m.

17              (Recess.)

18              THE VIDEOGRAPHER:  We are on the record at

19    10:29 a.m.

20              MR. BLOCK:  Great.                               10:29:11

21    BY MR. BLOCK:

22        Q    I want to go back in time and ask you about

23    the time that you first reached out to ADF on this

24    issue of the participation of transgender athletes.

25              Do you remember who you contacted at ADF?       10:29:30
```

                                                    Page 72

```
 1        A   I do not remember who I contacted.

 2        Q   And do you remember why you knew that ADF was

 3   the organization to contact?

 4        A   I saw a news clip or information online about

 5   the Soule versus CIAC case, and it identified Alliance    10:29:57

 6   Defending Freedom as representing Selina Soule.

 7        Q   Okay.  And, you know, at the time you first

 8   contacted ADF, had you done any research on the -- the

 9   effects of puberty blockers or gender-affirming

10   hormones on transgender people?                           10:30:19

11        A   Once again, what do you mean by "research"?

12        Q   Have you -- had you read anything on the -- on

13   the physiological effects of gender-affirming care at

14   the time you first reached out to ADF?

15        A   Yes, I had.                                      10:30:39

16        Q   What had you read?

17        A   I had read some articles on the effects of

18   gender-affirming hormone therapy, to use your

19   terminology on that, on various physiological factors,

20   such as muscle size or strength or muscle mass, those    10:30:55

21   types of things.

22        Q   You -- you had already read that research

23   before you reached out to ADF?

24        A   I had read some.

25        Q   Okay.  And had you read that research before    10:31:10
```

Page 73

```
 1     you saw the news item about the transgender runners in

 2     Connecticut?

 3         A   Yes.

 4         Q   Okay.  So -- so you -- you had previously had

 5     occasion to read research on the effects of              10:31:26

 6     gender-affirming hormones on muscle mass, and then you

 7     saw the news clip about the runners in Connecticut, and

 8     then you contacted ADF?  That's the chronology of how

 9     it went?

10              MR. FRAMPTON:  Objection; form.                 10:31:39

11              THE WITNESS:  Yes, that sounds like a correct

12     timeline.

13     BY MR. BLOCK:

14         Q   Okay.  And what -- what would have prompted

15     you to -- to do any research specifically on the        10:31:48

16     effects of gender-affirming hormones before seeing the

17     news item about transgender people in Connecticut?

18         A   As I had mentioned previously, staying up to

19     date on what the laws are or the rules, I guess would

20     be a more appropriate way to say it, regarding the      10:32:10

21     participation of transgender women in women's sports or

22     trans women in women's sports.  Student questions,

23     asking about that.  Particularly after 2019, when

24     Cecé Telfer won the 400-meter hurdles in Division II,

25     because I had some students that were there and had     10:32:35
```

Page 74

```
1    questions.

2         Q    What do you mean, that were there?

3         A    I have students that are student athletes that

4    compete in Division II women's track and field and were

5    at that national championship where Cecé Telfer won the    10:32:53

6    400-meter hurdles.

7         Q    And were those students upset that Cecé Telfer

8    had won?

9              MR. FRAMPTON:  Form.

10             THE WITNESS:  The students had questions and      10:33:05

11   many of them stated questions such as how can that be

12   fair.

13   BY MR. BLOCK:

14        Q    So were they upset?

15             MR. FRAMPTON:  Same objection.                    10:33:20

16             THE WITNESS:  I guess I would need more

17   clarification on "upset."

18   BY MR. BLOCK:

19        Q    So they didn't think it was fair?

20        A    That would be correct.                            10:33:32

21        Q    And so in response to those student questions,

22   you -- you started doing research; is that right?

23        A    I had been looking it prior to the student

24   questions, but in response to the student questions, I

25   suppose you could say I tried to dig deeper.               10:33:52
```

Page 75

1    Q    Okay.  So what -- what -- how had you been

2    looking into it before the student questions?

3    A    Before the student questions, I would look at

4    the policies as put out by the NCAA, put out by the

5    N -- IOC and tried to look at research that informed     10:34:08

6    those policies by searching Google Scholar, PubMed,

7    reading news articles about it and see if they had

8    links or information on research.

9    Q    And what about Cecé's participation did the

10   students think were unfair?                              10:34:26

11   A    Cecé is a biological male and was competing in

12   women's sports.

13   Q    And why did they think that was unfair?

14   A    They thought it was unfair for a biological

15   male to compete in women's sports.                       10:34:43

16   Q    And when you say you did earlier research on

17   NCAA policy and the IOC, you know, what had prompted

18   you to do that research?

19   A    It's an important topic in sports, in my

20   field.  It's possible that the textbook I was using at   10:35:03

21   the time had a statement on it.

22   Q    Had you done any research on the participation

23   of Caster Semenya in the IOC?

24   A    I have read some news articles on

25   Caster Semenya and probably heard some things on         10:35:20

Page 76

```
 1    podcasts about Caster Semenya.
 2        Q   Okay.  But you didn't do any research about
 3    that?
 4        A   I -- again, more than news articles, I cannot
 5    recall a specific article that said this was          10:35:37
 6    Caster Semenya's medical condition in the scholarly
 7    literature.
 8        Q   Okay.  But you were more interested in doing
 9    research on transgender athletes than on athletes like
10    Caster Semenya; is that fair?                          10:35:54
11            MR. FRAMPTON:  Objection; form.
12            THE WITNESS:  That would be fair to say.
13    BY MR. BLOCK:
14        Q   Okay.  And why is that?
15        A   We are dealing with separate issues.          10:36:06
16    Disorders of sexual development are not the same as a
17    transgender individual.
18        Q   And so why were you more interested in the
19    participation -- researching the participation of
20    transgender individuals as opposed to individuals with  10:36:20
21    DSDs?
22            MR. FRAMPTON:  Same objection.
23            THE WITNESS:  The policies seem to, if I
24    recall, state "transgender individuals."  The student
25    questions were about transgender individuals.  The     10:36:35
```

Page 77

```
 1    stuff I was seeing in the news was about transgender

 2    individuals.

 3    BY MR. BLOCK:

 4         Q    When did the topic of the participation of

 5    transgender individuals in -- in sports first come to      10:36:45

 6    your attention?

 7         A    That would be very challenging to say, but I

 8    would say sometime after 2004.

 9         Q    Why sometime after 2004?

10         A    That seems to be the first IOC policy I          10:37:04

11    remember that addressed transgender individuals.

12         Q    And when did a transgender individual first

13    participate in the Olympics?

14         A    I don't know.

15         Q    You have no idea?                                10:37:23

16         A    No.

17         Q    Do you know if it was, like, before 2010?

18         A    I don't know.

19         Q    Okay.  You have no -- do you have any

20    knowledge or recollection of any transgender people        10:37:45

21    participating in the Olympics?

22         A    Would you consider the participation of

23    Bruce Jenner to be a transgender individual

24    participating in the Olympics?

25         Q    About a -- a -- a transgender person competing   10:38:01
```

Page 78

**JA2644**

```
 1   post transition.

 2        A    So I do know of someone that has done that.

 3        Q    Who?

 4        A    Laurel Hubbard.

 5        Q    Okay.  Anyone before her?              10:38:19

 6        A    I cannot recall anyone before that.

 7        Q    Okay.  When did you first -- when did you

 8   first become -- well, let me -- I'll -- I'll -- I'll

 9   come back to that.

10             When -- when is the first time a transgender   10:38:42

11   person -- a transgender woman competed in women's

12   tennis events?

13        A    I -- I don't know.

14        Q    You -- you have no idea?

15        A    There's something I seem to recall of a     10:39:05

16   situation that was in the '70s or '80s, but I can't

17   recall off the top of my head more specifics.

18        Q    Does the name Renée Richards refresh your

19   recollection about it?

20        A    So as you mention that, yes, the name     10:39:24

21   Renée Richards playing tennis -- again, I couldn't, at

22   this point in time, put it in a timeframe other than I

23   think it was probably before I was even in college.

24        Q    Okay.  And when did you first become aware

25   that that had happened?                          10:39:40
```

                                                        Page 79

```
 1        A   Sometime in the past 15 or so years.  In my
 2    readings, I remember seeing something about
 3    Renée Richards.
 4        Q   Okay.  And did the readings -- what did the
 5    readings say about her?                          10:39:55
 6        A   I can't recall at this point in time.
 7        Q   Okay.  And did you have any feelings about
 8    whether it was fair for her to be participating in
 9    women's tennis in the '70s?
10            MR. FRAMPTON:  Objection; form and scope.   10:40:06
11            Go ahead.
12            THE WITNESS:  I -- I would, once again, go
13    back to my statement that if Renée Richards was a
14    biological male, then biological males have advantages
15    over biological females in sports.               10:40:23
16    BY MR. BLOCK:
17        Q   Yeah, but I'm just -- I'm asking about, sir,
18    when you formed an opinion about -- about
19    Renée Richards, if you do -- if you did form an opinion
20    about Renée Richards, like when you -- when you first   10:40:35
21    heard about it, did you have an opinion about it being
22    fair or unfair?
23            MR. FRAMPTON:  Same objection.
24            MR. TRYON:  Objection.
25            THE WITNESS:  So I -- I think I answered that   10:40:46
```

                                                        Page 80

1    when I stated that biological males should not be

2    competing in women's sports.

3    BY MR. BLOCK:

4        Q    Okay.  So -- but you had that opinion the

5    first time you heard about Renée Richards; right?        10:40:58

6            MR. FRAMPTON:  Same objections.

7            THE WITNESS:  Again, where I can't put in a

8    specific timeframe when I first heard about

9    Renée Richards, I can't say if Renée Richards

10   influenced my opinion one way or another or what my      10:41:15

11   opinion was before reading that article.

12   BY MR. BLOCK:

13       Q    So did you have an opinion about the

14   participation of transgender athletes in women's sports

15   before you did further research on the topic?            10:41:32

16           MR. FRAMPTON:  Objection; form and scope.

17           THE WITNESS:  Well, as long as I can recall,

18   sports has been separated.  So you have sports for men,

19   meaning biological men, and sports for women, meaning

20   biological women, and that separation has been there.    10:41:51

21   Again, as long as I can recall, my knowledge of anatomy

22   and physiology, since I have been involved in study of

23   anatomy and physiology as a student, indicates there

24   are differences.

25   ///

                                                     Page 81

```
 1   BY MR. BLOCK:

 2        Q   Okay.  And so -- so that was your -- that was

 3   your sort of baseline assumption before you conducted

 4   research, that -- that it would be unfair to allow a

 5   transgender woman to participate in women's sports?        10:42:16

 6             MR. FRAMPTON:  Objection --

 7             MR. TRYON:  Objection.

 8             MR. FRAMPTON:  -- form.

 9             THE WITNESS:  I think it would be fair to say

10   that based on the experience that sports have been         10:42:26

11   separated by sex and knowing of the differences between

12   biological males and biological females, there's a --

13   they should be separated on sex.

14   BY MR. BLOCK:

15        Q   All right.  Just going to -- going on to a --      10:42:47

16   a new topic now.

17             In your report, you say that even before

18   puberty, prepubertal boys outperform prepuberto --

19   prepubertal girls in athletic competition; right?

20        A   Yes, I state that in my report.                   10:43:08

21        Q   Okay.  And you -- and you attribute those

22   differences in performances to biological factors

23   instead of social ones?

24             MR. FRAMPTON:  Objection; form.

25             You can --                                       10:43:17
```

Page 82

```
 1          THE WITNESS:  Yes, biological factors are the
 2     primary reason that boys outperform girls in athletic
 3     events.
 4     BY MR. BLOCK:
 5          Q    Yeah, so -- but for prepubertal boys and          10:43:29
 6     prepubertal girls, you attribute their difference in
 7     performance to biological factors?
 8          A    That is correct.
 9          Q    Okay.  What biological factors provide an
10     advantage to prepubertal boys over prepubertal girls?      10:43:48
11          A    Boys have more lean body mass, which includes
12     more lean muscle mass, than girls.  There are perhaps
13     other factors that contribute to that more lean body
14     mass and more muscle mass.
15          Q    What does that -- what does that mean, there      10:44:09
16     other factors that contribute to the more lean body
17     mass and lean muscle mass?
18          A    Well, having a Y chromosome compared to being
19     XX chromosome, there are a multitude of genes in
20     muscles that respond to the Y chromosome differently       10:44:30
21     than they do to X chromosomes.
22          Q    And is there any research on how they respond
23     before puberty?
24          A    The research is focused on the fact that there
25     is a difference in lean body mass before puberty.          10:44:50
```

Page 83

```
 1        Q    Okay.  So besides --

 2        A    To the best of my knowledge.

 3        Q    Sorry, I didn't mean to cut you off.

 4             Besides lean body mass and lean muscle mass,

 5   are there any other physiological differences connected   10:45:01

 6   to athletic performance between boys and girls --

 7             MR. FRAMPTON:  Same objection.

 8   BY MR. BLOCK:

 9        Q    -- before puberty?

10        A    Yes.  There are differences in overall growth   10:45:12

11   between boys and girls, as evidenced by the CDC and the

12   World Health Organization having separate growth charts

13   for both male and female fetuses and for boys and

14   girls.

15        Q    But -- but in terms of physiological            10:45:25

16   characteristics associated with athletic performance,

17   what other physiological differences besides 10 percent

18   difference in lean body mass and lean muscle mass?

19             MR. FRAMPTON:  Objection; form:

20             THE WITNESS:  I would say -- that is the one    10:45:43

21   that we will focus on because that is the one that has

22   been fairy well demonstrated.  There has to be

23   something else that contributes that lean body mass

24   biologically.

25   ///
```

Page 84

```
 1    BY MR. BLOCK:
 2        Q    Okay.  Do you -- but you can't think of any
 3    other measurable factor besides lean body mass that is
 4    tied to athletic performance advantages for prepubertal
 5    boys over prepubertal girls; right?                    10:46:21
 6            MR. FRAMPTON:  Objection; form.
 7            Go ahead.
 8            THE WITNESS:  Well, the paper by Eiberg that's
 9    cited in my report demonstrated differences in VO2 max,
10    even when controlled for lean body mass, it seemed like  10:46:33
11    the boys' VO2 max was higher.
12    BY MR. BLOCK:
13        Q    Okay.  Did the McManis article also confirm
14    those findings?
15        A    I would need to look at the McManis article to  10:46:46
16    refer.  I cannot remember if McManis -- it was written
17    after Eiberg, I think, but I cannot remember if they
18    cite Eiberg.
19        Q    Okay.  Well, we might -- we might come back to
20    that.                                                   10:47:33
21            The difference in lean body mass and lean
22    muscle mass that you refer to in your report is a
23    10 percent difference?
24            MR. FRAMPTON:  Objection; form.
25            Go ahead.                                       10:47:40
```

Page 85

```
 1              THE WITNESS:  The 10 percent number is stated

 2     in the article by McManis.

 3     BY MR. BLOCK:

 4         Q   Do you have any other knowledge of the

 5     difference besides 10 percent?                    10:47:49

 6         A   I cite several articles demonstrating

 7     difference in body composition in children prepuberty.

 8     I would need to look at those articles to either

 9     calculate the difference myself or see if they specify

10     the difference.                                    10:48:05

11         Q   But in your report, you -- you quoted the

12     10 percent figure; correct?

13         A   That is correct.

14         Q   Okay.  If you could turn to your report, which

15     I believe is -- is Exhibit 46 -- 64.  I got that    10:48:24

16     flipped.

17         A   All right.

18         Q   Thank you.  I'm going to point you to a

19     specific paragraph in a second.

20              Paragraph 42 on page 17.                   10:49:27

21         A   Sorry, the page numbering on the document is

22     different than the page number that Acrobat --

23         Q   No.

24         A   -- is taking me to, so it will take me a

25     second, sorry.                                      10:49:59
```

Page 86

```
 1        Q    Sure thing.

 2        A    All right.   Paragraph 42.

 3        Q    You say (as read):

 4             "No -- No single physiological

 5             characteristic alone accounts for all        10:50:05

 6             or any one of the measured advantages

 7             that men enjoy in athletic

 8             performance."

 9             Do you see that?

10        A    Yes, I do.                                   10:50:13

11        Q    Okay.  So does a difference in lean body mass

12   account for all or any one of the measured advantages

13   that men enjoy in athletic performance?

14        A    Lean body mass is a major factor that provides

15   men -- males with athletic advantages over females.    10:50:34

16        Q    Does it -- does it alone account for all or

17   any one of the measured advantages that men enjoy in

18   athletic performance?

19             MR. FRAMPTON:  Objection; form.

20             THE WITNESS:  I think I've answered your       10:50:57

21   question by stating it's a major factor, but not the

22   only factor.

23   BY MR. BLOCK:

24        Q    Is -- are there any studies about the -- a

25   difference -- about the effect of a 10 percent          10:51:04
```

                                                          Page 87

```
 1    difference in lean body mass on athletic performance?

 2        A   I'm going to say yes, I'm sure there's studies

 3    that are correlating lean body mass with performance.

 4        Q   But my question is a 10 percent difference in

 5    lean body mass.                                    10:51:26

 6            MR. FRAMPTON:  Objection; form.

 7            THE WITNESS:  Again, there are -- I -- I will

 8    say there are studies that are correlating percent lean

 9    body mass with athletic performance in all sorts of

10    different events, and so that would include a          10:51:42

11    10 percent difference, along with other differences,

12    probably.

13    BY MR. BLOCK:

14        Q   You -- you don't cite anything in your report

15    that purports to study the effect of a -- a 10 percent  10:51:51

16    difference in lean body mass in athletic performance,

17    do you?

18            MR. FRAMPTON:  Same objection.

19            THE WITNESS:  Can you clarify what you're

20    trying to ask me there?                               10:52:05

21    BY MR. BLOCK:

22        Q   In your report, do you cite any studies

23    reflecting what affect a difference in -- I'll say that

24    again, sorry.

25            Do you, in your report, cite any studies     10:52:21
```

Page 88

```
 1    measuring the effect of a 10 percent difference in lean

 2    body mass on athletic performance?

 3            MR. FRAMPTON:  Objection; form.

 4            THE WITNESS:  I don't recall citing any

 5    studies that specifically identify how much a          10:52:35

 6    10 percent advantage enhances performance.

 7    BY MR. BLOCK:

 8        Q   Okay.  Thank you.

 9            Are you aware of any study proving that

10    differences in athletic performance between prepubertal  10:53:01

11    boys and girls are caused by biological factors and not

12    social ones?

13            MR. FRAMPTON:  Objection; form.

14            THE WITNESS:  From a scientific standpoint,

15    science does not prove.                                 10:53:19

16    BY MR. BLOCK:

17        Q   Science does not prove what?

18        A   Science doesn't prove anything from a

19    scientific standpoint.

20        Q   Well, do you have -- are there any articles   10:53:31

21    that purport to exclude social factors as a cause of

22    difference in performance between prepubertal boys and

23    prepubertal girls?

24        A   Yes.  Eiberg.

25        Q   How does that purport to exclude social        10:53:47
```

Page 89

```
1    factors?
2        A   So Eiberg measured six- to seven-year-old boys
3    and girls, very objectively measured physical activity
4    in those children, measured very objectively VO2 max in
5    those children and body composition in those children      10:54:09
6    and found that even for the children of the same amount
7    of physical activity, boys have higher fitness.
8        Q   And what -- what do you mean, even for
9    children of the same physical activity?
10       A   So boys and girls that engage in the same       10:54:24
11   amount of physical activity -- running, jumping,
12   whatever constitutes physical activity -- the boys had
13   higher fitness.
14       Q   So -- but does this mean physical activity in
15   terms of what was measured, like for a particular       10:54:40
16   event, or -- or physical activity in all aspects of
17   their life?
18       A   This was physical activity as measured by an
19   accelerometer which measures the quantity and intensity
20   of physical activity during the time period the       10:54:54
21   accelerometer is worn.
22       Q   Okay.  So can you just explain to me how that
23   can give you information about, you know, whether these
24   boys and girls, as a general matter, like, were equally
25   physically active, like, outside of the laboratory?       10:55:16
```

Page 90

1    A   Sure.  So an accelerometer is a small device

2    that is typically worn on your belt, usually on your

3    right hip, aligned over your knee, and then that

4    accelerometer, because of the scientific engineering --

5    okay, I'll call it voodoo magic, but that's not really        10:55:37

6    the right way to say it.  The way the accelerator

7    works, it measures the movement of the body, and then

8    it quantifies that movement as far as intensity.

9        And then after your study period, you have the

10   person wear the accelerometer for the period of time          10:55:54

11   you want, typically free living, you put it on the

12   children and ask them to wear it for a week or two

13   weeks or however long, then you come back, you connect

14   the accelerometer to the computer, it downloads the

15   information from the accelerometer, gives you what are        10:56:07

16   known as counts.  And again, you can quantify those

17   counts as sedentary, light, moderate or vigorous

18   intensity physical activity.

19       So between the two, you get an amount of

20   physical activity, an intensity of physical activity         10:56:22

21   for the given time period of study.

22    Q   And so what -- what this study found is that

23   people who were similarly -- like, just active during

24   the period in which they were wearing this device, the

25   boys were more physically fit than the girls?                 10:56:45

Page 91

```
 1        A   Yes, for boys and girls with the same quantity
 2   of physical activity, same intensity, as equal as
 3   possible could be measured, the boys were more fit than
 4   the girls.
 5        Q   And how was fitness measured?              10:57:02
 6        A   Fitness was measured for body composition and
 7   VO2 max.
 8        Q   Got it.  Did the study measure any athletic
 9   performances?
10        A   This was not a study of competitive athletic   10:57:23
11   performances.
12        Q   Got it.  So it just -- it was about body
13   composition, meaning like percentage of fat?  Is that
14   what you meant by "body composition"?
15        A   That would be a measure of how much of your    10:57:40
16   body is fat, how much of your body is lean body mass.
17        Q   Got it.  And -- and VO2 is the other thing
18   measured?
19        A   So VO2 max is maximal aerobic capacity, which
20   accounts for 30 to 40 percent of the performance in     10:57:55
21   endurance-type activities.
22        Q   Okay.  So if what's being measured is the
23   percentage of lean body mass and we already know
24   that -- that prepubertal boys, on average, would have
25   10 percent more lean body mass than -- than girls, what  10:58:12
```

Page 92

```
 1    does the study add to that, in terms of translating

 2    that into an athletic advantage?

 3              MR. FRAMPTON:  Objection; form.

 4              THE WITNESS:  What the study is doing is

 5    quantifying and clarifying the differences between boys    10:58:29

 6    and girls that -- well, for the same amount of physical

 7    activity, boys have a higher VO2 max than girls.

 8         Q    Anything else besides the VO2 max?

 9              MR. FRAMPTON:  Objection; form.

10              THE WITNESS:  And again, body composition,        10:58:51

11    which, again, lean body mass is another determinant of

12    potential for athletic performance and performance in

13    sorts.

14    BY MR. BLOCK:

15         Q    But -- but that's just confirming something       10:59:02

16    that we already know, that -- that prebertal boys --

17    prepubertal boys have, on average, 10 percent more lean

18    body mass?

19              MR. FRAMPTON:  Objection; form.

20              THE WITNESS:  If I recall, the study also          10:59:17

21    validated that for the same body composition, the boys

22    had a higher VO2 max.  I would need to refer to the

23    study to verify if that was in there.

24         Q    Okay.  Anything else that -- that you think

25    purports to exclude social causes as a difference in       10:59:41
```

Page 93

```
 1   measured athletic performance --
 2           MR. HAMPTON:  Objection; form.
 3   BY MR. BLOCK:
 4       Q   -- between prepubertal boys and prepubertal
 5   girls?                                          10:59:56
 6           MR. FRAMPTON:  Sorry, same objection.
 7           Go ahead.
 8           THE WITNESS:  So again, those papers that I
 9   cite showing the differences in body composition
10   between prepubertal boys and prepubertal girls because   11:00:03
11   lean body mass is a biological factor.
12   BY MR. BLOCK:
13       Q   Right.  But besides body composition, I'm
14   talking about athletic performance.  And is there
15   anything else that purports exclude social causes for    11:00:17
16   differences in athletic performance as opposed to body
17   composition?
18           MR. FRAMPTON:  Same objection.
19           THE WITNESS:  To the best of my knowledge,
20   there are no studies quantifying the effects of social   11:00:30
21   causes on differences in athletic performance or
22   physiological factors of athletic performance between
23   boys and girls.
24   BY MR. BLOCK:
25       Q   In preparation for your report, did you         11:00:41
```

                                                    Page 94

```
 1    conduct original research on the athletic performance

 2    of prepubertal boys and prepubertal girls?

 3         A   I have --

 4             MR. FRAMPTON:  Objection; form.

 5             Go ahead.                                    11:00:59

 6             THE WITNESS:  I have downloaded, as stated in

 7    my report, data from Athletic.net, looking at the

 8    performance of seven-and eight-year-old children, of

 9    nine- and ten-year-old children, which are presumed to

10    be prepubertal, and not just the numbers in the report,  11:01:14

11    but other data, I have analyzed it statistically, and

12    the boys outperform the girls in all of the track

13    events that I analyzed.

14    BY MR. BLOCK:

15         Q   Have you tried to have your analysis published  11:01:25

16    anywhere?

17         A   The analysis is being presented at UNK Student

18    Research Day Thursday of next week.  After

19    presentation, the student author and I will probably

20    explore publication opportunities.                   11:01:39

21    BY MR. BLOCK:

22         Q   All right.  But you haven't so far?

23         A   No, I have not submitted it for publication

24    yet.

25         Q   Okay.  You've been writing on this topic in    11:01:46
```

Page 95

```
 1    the form of white papers and expert reports for over

 2    two years now; right?

 3         A   That is correct.

 4         Q   Have you ever attempted to submit any of your

 5    analysis for publication?                              11:02:02

 6         A   I have not submitted these papers for

 7    publication.

 8         Q   But your -- have you ever, like, tried to

 9    submit your research on this topic in -- in general for

10    publication?                                           11:02:18

11            MR. FRAMPTON:  Objection; form.

12            THE WITNESS:  So in general, do you mean

13    differences between boys and girls?

14    BY MR. BLOCK:

15         Q   I mean on the participation of transgender    11:02:27

16    girls and women.

17         A   So as stated in my declaration, I have the

18    Physiology Educator (sic) Community of Practice blog

19    post that I have written, that was reviewed prior to

20    being published on the web, and I have the presentation 11:02:43

21    I made at the American Physiological Society Sex and

22    Gender conference.

23         Q   Okay.  Anything else?

24         A   Those are the only two that I can remember

25    that I have put out for public dissemination.          11:02:58
```

Page 96

 1        Q    Okay.  And were -- were either of those two

 2    examples peer reviewed?

 3        A    They were both peer reviewed.

 4        Q    Okay.  Have you had -- well, we'll look at --

 5    we'll look at those in -- in a minute, but there's no      11:03:16

 6    other example of you attempting to submit work on this

 7    topic to a peer-reviewed publication?

 8        A    I have reached out to a journal editor about a

 9    possible letter to the editor, but the journal said

10    they don't publish letters to the editor.                  11:03:40

11        Q    Okay.  Why didn't you attempt to have your

12    white paper, you know, published by a peer-reviewed

13    journal?

14        A    Well, quite honestly, because Emma Hilton,

15    Tommy Lundberg, Joanna Harper and FIMS have all already    11:03:59

16    published on this and have done a pretty good job

17    reviewing the literature, so I'm not sure that another

18    review of the literature is going to add to the

19    scholarly knowledge.

20        Q    What did the letter to the editor that you        11:04:12

21    wanted to write say?

22        A    I just asked the editor if they would accept a

23    letter regarding the participation of trans women in

24    women's sports.

25        Q    What publications was that?                       11:04:27

                                                          Page 97

1      A   I cannot remember if it was Medicine & Science

2    in Sports & Exercise or the Journal of Strength and

3    Conditioning Research.

4      Q   Okay.  And did you say what the letter would

5    opine about?                                    11:04:43

6      A   No.

7          MR. FRAMPTON:  Objection; form.

8          THE WITNESS:  Sorry.

9          I just asked if they would accept a letter on

10   the topic.                                      11:04:52

11   BY MR. BLOCK:

12     Q   Okay.  Are you aware of any studies that

13   specifically examine the athletic performance of

14   prepubertal transgender girls?

15         MR. FRAMPTON:  Objection; form.           11:05:07

16         THE WITNESS:  I am not aware of any studies

17   evaluating the performance of prepubertal biological

18   gir- -- biological boys competing in girls' sports.

19   BY MR. BLOCK:

20     Q   Okay.  So let's -- we agreed before that if I   11:05:18

21   say the term, you know, "trans girls," you understand

22   what I'm saying; right?

23     A   Yes.  I just am speaking to make sure I'm

24   clear to myself in what I'm saying.

25     Q   Okay.  So, you know, I -- I understand that   11:05:31

                                                    Page 98

```
 1    there's physical fitness data on -- on prepubertal boys

 2    versus prepubertal girls, and my question is, are you

 3    aware of any data that specifically breaks out

 4    prepubertal trans girls and reports on their

 5    performance?                                      11:05:53

 6         A    I am not aware of any data analyzing trans

 7    girls.

 8         Q    Okay.  So are you aware of any data comparing

 9    the performance of prepubertal trans girls to

10    prepubertal cis girls?                            11:06:12

11         A    I am not aware of any research on that topic.

12         Q    Okay.  If you could turn to page -- sorry --

13    paragraph 114 of your report again.

14         A    Yes, paragraph 114, page 37.

15         Q    Okay.  I have to pull it up, too.        11:06:38

16              All right.  And it -- it continues from page

17    37 to 38.  You say (as read):

18              "While boys exhibit some performance

19              advantages even before puberty, it is

20              both true and" --                        11:06:52

21              Sorry, my -- my PDF -- I'll read this again

22    for the record.  I apologize.  (As read):

23              "While boys exhibit some performance

24              advantages even before puberty, it is

25              both true and well known to common        11:07:03
```

Page 99

```
 1              experience that the male advantage

 2              increases rapidly, and becomes much

 3              larger, as boys undergo puberty and

 4              become men.  Empirically, this can be

 5              seen by contrasting the modest              11:07:17

 6              advantages reviewed immediately above

 7              against the large performance

 8              advantages enjoyed by men that I have

 9              detailed in Section II."

10              Did I read that right?                      11:07:26

11     A   It sure seemed like you read it word for word.

12     Q   All right.  Thanks, I did my best.

13         So even though you contend that boys have a

14   performance advantage before puberty, you believe those

15   advantages are modest when compared with the large       11:07:41

16   performance advantages resulting from puberty?

17         MR. FRAMPTON:  Objection; form.

18         THE WITNESS:  Yes, they are smaller than the

19   advantages that occur after puberty.

20   BY MR. BLOCK:                                            11:07:55

21     Q   Okay.  And -- and "modest" was your word;

22   right?

23     A   Yes, "modest" was my word.

24     Q   Okay.  And do you think it's unfair for

25   prepubertal boys and girls in elementary school to --   11:08:11
```

Page 100

```
 1    to play on coed or mixed teams?

 2            MR. FRAMPTON:  Objection; form, scope.

 3            THE WITNESS:  Before puberty, boys have

 4    athletic advantages compared to girls.

 5    BY MR. BLOCK:                                    11:08:29

 6       Q   Do you think it's unfair for prepubertal boys

 7    and girls in elementary school to play on coed or mixed

 8    teams?

 9            MR. FRAMPTON:  Same objections.

10            THE WITNESS:  I really haven't been retained   11:08:38

11    as an expert witness to state fair or unfair in this

12    matter as much as to provide the information and allow

13    the policymakers to determine fair versus unfair.

14    BY MR. BLOCK:

15       Q   Okay.  So you're not, in your expert report,   11:08:50

16    providing an opinion on whether it's fair for trans

17    girls and women to compete on women's sports teams; is

18    that right?

19            MR. FRAMPTON:  Objection; form and scope.

20            Go ahead.                                11:09:05

21            THE WITNESS:  In my expert report, I have done

22    my best to focus on the known biological differences

23    between males and females, how those known biological

24    differences gives male an athletic advantage and how

25    that athletic advantage is not erased by a transgender   11:09:17
```

Page 101

```
 1    identity or the use of puberty blockers, gender --

 2    transgender hormones.

 3    BY MR. BLOCK:

 4        Q   Okay.  So you don't provide an expert opinion

 5    on whether the goals of fairness, safety and          11:09:30

 6    transgender inclusion are reconcilable?

 7            MR. FRAMPTON:  Objection; form.

 8            THE WITNESS:  If I recall correctly, I think I

 9    quote a source or two that state on that or perhaps

10    paraphrase a source or two on what has been stated on  11:09:49

11    that.

12    BY MR. BLOCK:

13        Q   Okay.  So -- so just to clarify the scope of

14    the opinions you're offering, you are not presenting an

15    expert opinion on whether it is fair or unfair for     11:09:57

16    girls and women who are transgender to participate on

17    girls and women's sports teams; correct?

18            MR. FRAMPTON:  Objection; form.

19            THE WITNESS:  I have tried to focus on the

20    biological differences and how those differences       11:10:16

21    provide male advantages and how those differences are

22    not erased due to transgender identity or

23    gender-affirming hormone therapy.  I have tried to not

24    give an opinion on fair versus unfair.

25    ///
```

Page 102

```
 1    BY MR. BLOCK:
 2         Q    Okay.  And, you know, I apologize for being
 3    persnickety in the phrasing of the question, but I want
 4    to make sure that -- that -- that you're not answering
 5    about what you're focusing on.  I want to know whether    11:10:45
 6    any evidence is going to be submitted in the form of an
 7    expert opinion by you regarding fairness of girls and
 8    women who are transgender participating in -- in girls
 9    and women's sports.
10         So I'm just going to ask it again, and I would       11:11:05
11    just appreciate a "yes" or "no" answer, if you're
12    capable of giving it.
13         Are you providing an expert opinion in this
14    case regarding whether it is fair or unfair for girls
15    and women who are transgender to compete on girls and     11:11:18
16    women's sports teams?
17         MR. FRAMPTON:  Objection; form, scope.
18         Go ahead.
19         THE WITNESS:  I don't think I can answer that
20    as a yes-or-no question because the information           11:11:30
21    demonstrates that there's an advantage for biological
22    males.  And so then we come to a question of fair,
23    which is a very challenging metaphysical question that
24    I would prefer others address.
25    ///
```

Page 103

```
 1    BY MR. BLOCK:

 2         Q   So you -- you are not an expert on whether it

 3    is fair or unfair for girls and women who are

 4    transgender to participate on girls and women's sports

 5    teams?                                              11:12:01

 6             MR. FRAMPTON:  Objection; form.

 7             THE WITNESS:  I'm not a sports philosopher in

 8    whom that field would fall into.

 9    BY MR. BLOCK:

10         Q   Right.  Therefore, you are not providing an   11:12:15

11    expert opinion on whether it is fair or unfair for

12    girls and women who are transgender to participate on

13    girls and women's sports teams?

14             MR. FRAMPTON:  Same objection.

15             THE WITNESS:  As I've said, I've done my best   11:12:25

16    to try and stick to the data and not give my opinion on

17    what is fair or unfair.

18    BY MR. BLOCK:

19         Q   I'm sorry, Dr. Brown, this -- this really

20    should be like a -- a simple question.  Because when   11:12:35

21    you say "focus" and "I've tried to," that -- that's

22    just not answering my question.  I just really need a

23    question (sic) on whether evidence is going to be

24    submitted in this case, from you, in the form of an

25    expert opinion under Federal Rules of Evidence 702 on   11:12:50
```

Page 104

```
 1    whether or not it is fair or unfair for girls and women

 2    who are transgender to participate.

 3            Regardless of whether it's your focus,

 4    regardless of whether you're trying -- what you're

 5    trying or not trying to do, I just need a "yes" or "no"   11:13:07

 6    answer on whether you are providing an expert opinion

 7    on the topic of fairness.

 8            MR. FRAMPTON:  Same objection.

 9            THE WITNESS:  So would you allow me a few

10    minutes to review the conclusions to my declaration?      11:13:21

11    Because I don't want to say something that is

12    contradictory to what I have said in what is submitted

13    as an expert declaration.

14            MR. BLOCK:  All right.  We can -- we can go

15    off the record, if you would like to do that right now.   11:13:38

16            Does counsel want to go off the record?

17            MR. FRAMPTON:  No, we don't need to go off the

18    record.  If he wants to review something, he can review

19    it.

20            MR. BLOCK:  Well, I'm not taking time out from    11:13:47

21    the deposition for him to review what -- what his

22    expert opinions are in -- in this case.

23            So, you know, if he wants to do it during a

24    break, you know, you're welcome to, but you're not

25    using my deposition time to answer a simple question.     11:14:00
```

```
 1            I mean, this witness should know what he's
 2      providing an expert opinion on, so --
 3            MR. FRAMPTON:  And I think he's told you about
 4      three times now, but again, I don't need to argue that
 5      on the record.                                11:14:13
 6      BY MR. BLOCK:
 7         Q   But you know you're not providing an expert
 8      opinion on whether it's fair or unfair for prepubertal
 9      girls and boys in elementary school to play on coed or
10      mixed sports teams?                           11:14:28
11         A   I think I've already answered that question
12      with my statement about focusing on what the science is
13      saying on who has advantages.
14         Q   All right.  Are you qualified to offer an
15      expert opinion on fairness?                   11:14:39
16            MR. FRAMPTON:  Objection; form.
17            THE WITNESS:  Who is a qualified expert to
18      offer an opinion on fairness?
19      BY MR. BLOCK:
20         Q   I don't know.  Are you?                 11:14:53
21            MR. FRAMPTON:  Same objection.
22            Go ahead.
23            THE WITNESS:  I think I can offer fairness as
24      far as my understanding of what the policies and
25      procedures are that are set to determine what is fair  11:15:08
```

Page 106

```
 1    in sports.

 2    BY MR. BLOCK:

 3        Q   Your personal opinion; right?

 4            MR. FRAMPTON:  Same objection.

 5            THE WITNESS:  No.  For instance, there are a      11:15:27

 6    lot of policies that specify the -- that use of

 7    performance-enhancing substances are unfair, in which

 8    that is something that I would teach in my sports -- my

 9    sport nutrition class.  Since I'm teaching it in a

10    class, I've been judged by my peers to be an expert on   11:15:41

11    that.

12    BY MR. BLOCK:

13        Q   Okay.  But are you qualified to offer an

14    expert opinion on whether it's fair or unfair for girls

15    and women who are transgender to compete in women's      11:15:50

16    sports?

17            MR. FRAMPTON:  Same objection.

18            THE WITNESS:  Am I qualified?  Well, the

19    policies state that it is not fair.  And so if I am

20    following the policy, I suppose I am an expert in that.  11:16:02

21    BY MR. BLOCK:

22        Q   I don't understand what that means.

23        A   So when I teach in my classes, in my field, in

24    my expertise, quite often we discuss and teach about

25    the policies on what is fair participation or unfair     11:16:20
```

Page 107

```
 1     participation.  Since I'm teaching it and I'm judged by

 2     my peers as an expert in it, then I would say I can

 3     give an expert opinion on it.

 4          Q    Who -- who are -- who -- who judges you as

 5     quali- -- what peers judge you as qualified to -- to        11:16:40

 6     give an expert opinion on whether it's fair for girls

 7     and women who are transgender to compete in girls and

 8     women's sports?

 9          A    Well, my -- again, I've been accepted by my

10     peers as an expert to present on this topic, on the         11:16:59

11     participation and the physiological effects of

12     transgender individuals.

13          Q    Right.  My question was about fairness.

14               Have you been -- who, among your peers, have

15     said that you are qualified to opine on the fairness of     11:17:16

16     the participation of girls and women who are

17     transgender in -- in girls and women's sports?

18          A    My colleagues at the university I work at,

19     administrators at the university I work at, they honor

20     my opinion.                                                 11:17:35

21          Q    I thought that your opinion in this matter

22     just reflects your own views, not the views of the

23     university; is that right?

24          A    That is correct.

25          Q    Okay.  So what do you mean by -- when you say     11:17:43
```

Page 108

```
 1    that the university honors your opinion?

 2         A    They allow me to express my opinion, and they

 3    recognize that it falls within my discipline and my

 4    field and the scope of my professional expertise.

 5         Q    How did they recognize that?                  11:18:03

 6         A    They've told me.

 7         Q    Who has told you?

 8         A    The athletic director, the -- one of the

 9    senior vice chancellors, I can't remember her full

10    title, another one of the vice chancellors for academic  11:18:24

11    and student affairs.

12         Q    Has any --

13         A    Along -- along with some of my colleagues in

14    the department.

15         Q    Did the university tell you to testify in this  11:18:32

16    case?

17         A    The university did not tell me to or not to

18    testify in this case.

19         Q    Okay.  Did any of the -- your -- your

20    colleagues that honor your opinions, are any of them    11:18:43

21    experts in fairness?

22              MR. FRAMPTON:  Objection; form.

23              THE WITNESS:  Well, one of them is a -- I

24    guess his area would be sports sociology and sports

25    psychology and does a lot of work in the area of        11:19:03
```

Page 109

```
 1    policies and procedures for sports, so I would say that

 2    he's probably an expert in fairness.

 3    BY MR. BLOCK:

 4        Q   Have you been invited by any sort of

 5    professional policymaking organizations to participate    11:19:15

 6    in crafting policies?

 7        A   No, I have not.

 8        Q   Okay.  Do you know whether West Virginia has

 9    any laws or policies regarding sex-separated sports for

10    prepubertal children?                                     11:19:43

11            MR. FRAMPTON:  Objection; form.

12            THE WITNESS:  My understanding of the law that

13    we're meeting about now does specify that you

14    participate in sports based on biological sex.

15    BY MR. BLOCK:                                             11:19:57

16        Q   Do you -- do you know whether West Virginia

17    has any laws or policies regarding the participa- --

18    let me say this again.

19            Do you know whether West Virginia has any laws

20    or policies regarding sex-separated sports in            11:20:13

21    elementary school?

22            MR. FRAMPTON:  Objection; form.

23            THE WITNESS:  If I recall correctly, this law

24    applies to elementary school.

25    ///
```

```
 1    BY MR. BLOCK:

 2        Q   Would your opinions in this case change if you

 3    were to learn that the law doesn't apply to elementary

 4    school?

 5            MR. FRAMPTON:  Objection to form.          11:20:36

 6            THE WITNESS:  No, my opinion would not change

 7    because there are biological differences between males

 8    and females that give males an inherent athletic

 9    advantage.

10    BY MR. BLOCK:                                      11:20:45

11        Q   Do you think it's reasonable for a state to

12    say that it wants sex-separated teams beginning in

13    middle school, but not in elementary school?

14            MR. FRAMPTON:  Objection; form.

15            THE WITNESS:  I think it is reasonable since  11:21:06

16    most of the time younger children's leagues are

17    considered developmental and the children are not

18    competing for prizes or honors.  A lot of times that

19    competition begins in middle or high school.

20            MR. BLOCK:  Okay.  That -- that's a great     11:21:24

21    lead-in to the next exhibit.  So if you would give me a

22    second to make that happen.

23            (Exhibit 69 was marked for identification

24          by the court reporter and is attached hereto.)

25    ///
```

Page 111

```
 1    BY MR. BLOCK:
 2         Q   All right.  Soon appearing in your folder will
 3    be a document marked Exhibit 69.  Let me know when
 4    that's available.
 5             Do you see it?                          11:22:09
 6         A   Exhibit 69, Briefing Book, WSPWG?
 7         Q   Yes.  And you cite to this document in your
 8    report; right?
 9         A   Yes, I think I do.
10         Q   Okay.  Great.                           11:22:21
11             If you could turn to footnote 2, I believe,
12    footnote 2, page 8 of the document.
13             Can you let me know when you get to that?
14         A   Footnote 2, page 8 starts off with the word
15    "endocrinologists."                              11:22:51
16         Q   Yes.
17         A   Yes.
18         Q   Okay.  If you look at what that footnote 2,
19    like, refers to, in the third paragraph, beginning with
20    "at the same time."                              11:23:05
21             Do you see in the text "at the same time"?
22         A   Sorry.
23         Q   Yeah.  Sure.  The third paragraph from the top
24    of the page begin- --
25         A   Oh, sorry.  Sorry.  Yes, I've got it.   11:23:19
```

Page 112

```
 1        Q    Yeah.  The second sentence of that paragraph,

 2   it says (as read):

 3             "Because the onset of male puberty —

 4             normally around ages 11 - 12 in boys —

 5             is the physical justification for         11:23:30

 6             separate sex sport..."

 7             And then that's what triggers the footnote 2;

 8   correct?

 9        A    Yes.

10        Q    Okay.  And then footnote 2 says (as read):   11:23:39

11             "Endocrinologists explain that puberty

12             in boys should start between ages 9-13

13             and in girls between ages 8-12; that

14             puberty usually takes 4-5 years to

15             complete so that 95% of boys will have      11:23:53

16             started puberty by age 13.  This

17             timing is consistent with the formal

18             position of the Women's Sports

19             Foundation providing that '[p]rior to

20             puberty, females and males should           11:24:05

21             compete with and against each other on

22             coeducational teams.'"

23             Did I read that correctly?

24        A    Yes, you read that correctly.

25        Q    Okay.  And then it cites to a document from  11:24:21
```

Page 113

```
 1    the Women's Sports Foundation; correct?

 2         A   Yes.

 3         Q   Did you read that document?

 4         A   I cannot recall specifically if I've read that

 5    or not.  I think I probably did, but I can't recall.    11:24:29

 6         Q   Okay.  And so you understand that it's the

 7    position of the Women's Sports Foundation that prior to

 8    puberty, females and males should complete with and

 9    against each other on coeducational teams?

10         A   Well, that is what is stated in this document.   11:24:51

11         Q   Okay.  Do you feel like you -- do you feel

12    that you are qualified to offer an expert opinion on

13    the fairness of elementary school kids participating on

14    coeducational teams?

15              MR. FRAMPTON:  Objection; form.               11:25:08

16              THE WITNESS:  I think I can offer information

17    on the differences in -- the -- the biological

18    differences between boys and girls and how that gives

19    boys an advantage in athletics.

20    BY MR. BLOCK:                                            11:25:23

21         Q   Do you think the Women's Sports Foundation is

22    a better source of information than you on what

23    benefits prepubertal girls in athletic participation?

24              MR. FRAMPTON:  Objection; form.

25              THE WITNESS:  Can you rephrase that question?  11:25:40
```

                                                      Page 114

```
 1    BY MR. BLOCK:

 2         Q    Yeah, yeah.

 3              Who -- who -- who do you think is a better

 4    source of authority on -- on -- on -- on what is in the

 5    best interest of prepubertal girls when it comes to          11:25:53

 6    athletics, you or the Women's Sports Foundation?

 7              MR. FRAMPTON:   Objection; form.

 8              THE WITNESS:  I think this may be a situation

 9    where I don't agree with the Women's Sports Foundation.

10    BY MR. BLOCK:                                                 11:26:08

11         Q    Okay.  If you go back to -- to your report, on

12    page 4, page 4 of your report.  It's not in numbered

13    paragraphs yet.  And this is Exhibit 64, I believe.

14         A    Okay.  Page 4 where I have "Overview"?

15         Q    Yes.                                                11:26:59

16         A    All right.

17         Q    In the first bullet point, you say (as read):

18              "At the level of (a) elite, (b)

19              collegiate, (c) scholastic, and (d)

20              recreational competition, men,                      11:27:10

21              adolescent boys, or male children,

22              have an advantage over equally aged,

23              gifted, and trained women, adolescent

24              girls, or female children in almost

25              all athletic events."                               11:27:19
```

Page 115

```
 1            Is that right?
 2       A    That is correct.
 3       Q    Okay.  So do you think that -- that
 4    prepubertal boys and prepubertal girls should not be
 5    playing in competition with each other in recreational    11:27:34
 6    events?
 7            MR. FRAMPTON:  Objection; form.
 8            THE WITNESS:  I think if they are competing
 9    for prizes, for awards, the boys have an advantage.
10    BY MR. BLOCK:                                              11:27:45
11       Q    And, therefore, they should not be competing
12    against each other for prizes and awards?
13            MR. FRAMPTON:  Objection; form, scope.
14            THE WITNESS:  I would say that if we are --
15    yeah, the boys should not be competing against the        11:28:06
16    girls if they're competing for prizes and awards.
17    BY MR. BLOCK:
18       Q    Do you think that in the case of transgender
19    girls and women after puberty, do you think they should
20    not be allowed to play on recreational teams with         11:28:24
21    cisgender girls and women?
22            MR. FRAMPTON:  Objection; form, scope.
23            THE WITNESS:  I have concerns about the safety
24    of cisgender girls and women competing against
25    biologically male -- sorry -- trans women.                11:28:45
```

                                                      Page 116

```
 1    BY MR. BLOCK:
 2         Q   Do you think that cisgender girls and women
 3    should be allowed to play on football teams with
 4    biological boys?
 5              MR. FRAMPTON:  Objection; form, scope.        11:29:00
 6              THE WITNESS:  If the girls are informed of the
 7    risks, then the girls should be able to make an
 8    informed choice on that matter.
 9    BY MR. BLOCK:
10         Q   So you don't think it's the -- the -- safety   11:29:13
11    reasons should prohibit cisgender girls and women from
12    playing football with cisgender boys?
13              MR. FRAMPTON:  Same objection.
14              THE WITNESS:  If the girls would like to play
15    on the boys' team and they and their parents make an    11:29:28
16    informed choice that they're willing to accept those
17    risks, then I think that is up to them to choose.
18    BY MR. BLOCK:
19         Q   Okay.  And -- and do you think that cisgender
20    girls and women should be allowed to play on wrestling  11:29:42
21    teams with cisgender boys and men?
22              MR. FRAMPTON:  Same objection.
23              THE WITNESS:  I would say the same statement,
24    if they are aware of the inherent risks and recognize
25    the advantages that males have, they can make that      11:29:56
```

Page 117

```
 1    choice.

 2    BY MR. BLOCK:

 3        Q   Going back to recreational competition, do you

 4    think that transgender girls and women should not be

 5    allowed to play recreational sports on girls and        11:30:07

 6    women's teams if the sport is a noncontact or collision

 7    sport?

 8            MR. FRAMPTON:  Same objection.

 9            THE WITNESS:  If it is a women's league, then

10    that should be limited to biological women.             11:30:25

11    BY MR. BLOCK:

12        Q   Even if they're not competing for prizes?

13            MR. FRAMPTON:  Same objection.

14            THE WITNESS:  Can I walk through this for just

15    a minute?                                                11:30:37

16    BY MR. BLOCK:

17        Q   Sure.

18        A   Oh.  So if women are signing up for a women's

19    recreational league, I think they do so with the

20    expectation they will be playing -- and even if it's    11:30:47

21    not competing for prizes, but they are competing --

22    with other women.  And so introducing a trans woman is

23    not fair to the women that have said that they are

24    competing against biological women.

25        Q   Why isn't it fair if they're not competing for  11:31:04
```

                                                   Page 118

```
 1    prizes?

 2            MR. FRAMPTON:  Same objection.

 3            THE WITNESS:  Well, if they are competing --

 4    even if it's not prizes, they are competing.

 5    BY MR. BLOCK:                                        11:31:21

 6       Q   What if they're just -- just participating

 7    together for recreational purposes?

 8            MR. FRAMPTON:  Objection; form.

 9            THE WITNESS:  Then I think that the cisgender

10    women still need to be fully informed of whether there  11:31:38

11    will be trans women or not, and then they could make

12    their choice on a recreational pickup game type of

13    play.

14    BY MR. BLOCK:

15       Q   Okay.  If -- how about riflery, should          11:31:47

16    transgender girls and women be allowed to play on a

17    recreational riflery league with cisgender girls and

18    women?

19            MR. FRAMPTON:  Objection; form and scope.

20            THE WITNESS:  Once again, if they are just out  11:32:14

21    shooting for fun and they're not competing and the

22    recognition is that it is not exclusively a women's

23    event.  All of those need to be considered.

24    BY MR. BLOCK:

25       Q   Do you think transgender girls and women have   11:32:28
```

                                                        Page 119

```
 1    an athletic advantage over cisgender girls and women

 2    when it comes to riflery?

 3            MR. FRAMPTON:  Objection; form and scope.

 4            THE WITNESS:  Yes, I do think that transgender

 5    girls and women have an advantage over cisgender girls    11:32:41

 6    and women because you still have to hold the rifle, you

 7    still have to feel the recoil, and a larger individual

 8    will have less felt recoil.

 9    BY MR. BLOCK:

10        Q    So in terms of recreational activities, if a    11:33:16

11    policy said that transgender girls and women can't

12    compete in, you know, championship competition but can

13    compete on recreational teams with cisgender girls and

14    women and that policy is well known, is it your

15    position that transgender girls and women should still,   11:33:43

16    you know, not be allowed to compete on the -- to

17    participate on those recreational teams with cisgender

18    girls and women?

19            MR. FRAMPTON:  Objection; form and scope.

20            THE WITNESS:  It's kind of a long, complicated    11:33:57

21    question.  Can you simplify it for me?

22    BY MR. BLOCK:

23        Q    Well, your -- your answer on recreational

24    teams was that you want the cisgender people to be

25    informed that a transgender person might be there.        11:34:12
```

                                                        Page 120

```
 1              So my question is, assuming that they're
 2      informed, do you still think that transgender girls and
 3      women should not be allowed to participate on
 4      recreational teams with cisgender girls and women?
 5              MR. FRAMPTON:  Objection; form, scope.        11:34:27
 6              THE WITNESS:  So if the governing policies for
 7      that recreational league indicate that transgender
 8      girls and women can compete there and if it doesn't
 9      violate some type of law that would regulate the
10      funding for that recreational league and if the        11:34:36
11      women -- if everyone is fully informed of who they will
12      be playing with in this recreational league, then that
13      would be okay for the trans women to participate in
14      that league.
15      BY MR. BLOCK:                                          11:34:59
16         Q   But you think that the cisgender girls and
17      women would need to be specifically notified that there
18      is an identifiable trans participant on the team as
19      opposed to just knowing that as a matter of policy
20      there might be one?                                    11:35:15
21              MR. FRAMPTON:  Same objection.
22              THE WITNESS:  My experience tells me that a
23      lot of women would like to know that.
24      BY MR. BLOCK:
25         Q   Why?                                            11:35:23
```

Page 121

```
 1        A    Because --

 2             MR. FRAMPTON:  Same objection.

 3             Go ahead.

 4             THE WITNESS:  Because they want to know who

 5     they're competing against and because of our          11:35:29

 6     longstanding policy of sex-segregated sports, they want

 7     to know if they're playing on a coed team or a

 8     sex-segregated team.

 9     BY MR. BLOCK:

10        Q    When you say your experience tells you that    11:35:42

11     women would like to know that, what experience?

12        A    Talking with friends and family members,

13     students, colleagues, those types of things.

14             MR. BLOCK:  So I -- I am going to another

15     section.  I'm happy to continue going, unless you need  11:36:13

16     a -- a break.

17             THE WITNESS:  I need a bathroom break.

18             MR. BLOCK:  Sure.  See you in five minutes.

19             THE WITNESS:  All right.  Thanks.

20             THE VIDEOGRAPHER:  We are off the record at     11:36:24

21     11:36 a.m.

22             (Recess.)

23             THE VIDEOGRAPHER:  We are on the record at

24     11:47 a.m.

25             MR. BLOCK:  Great.                              11:47:20
```

                                                       Page 122

```
 1    BY MR. BLOCK:

 2         Q    Dr. Brown, during the break, did you have a

 3    chance to review your expert report to determine

 4    whether you're offering an opinions on fairness?

 5              MR. FRAMPTON:  Objection; form.            11:47:30

 6              THE WITNESS:  I didn't take advantage of that

 7    time to look at that.

 8              MR. BLOCK:  Okay.  I'm going to mark another

 9    exhibit here.  So this -- this exhibit, which will

10    appear shortly, is going to be marked as Exhibit 70.   11:47:58

11              (Exhibit 70 was marked for identification

12          by the court reporter and is attached hereto.)

13    BY MR. BLOCK:

14         Q    Please let me know when it's up on your

15    screen.                                              11:48:05

16         A    All right.  Exhibit 70, 070 - 2021.

17         Q    Yes.  Can you tell me -- well, first of all,

18    have you ever seen this document?

19         A    You know, I can't promise that I have seen

20    this document.                                       11:48:38

21         Q    Okay.  What does -- this is a document -- I've

22    got to scroll back up to page 1 of this document

23    myself.

24              This document is a transcript of hearings

25    in -- in the Pennsylvania house of representatives on  11:48:56
```

Page 123

```
 1    H.B. 972, Fairness in Women's Sports Act.

 2           Is that -- do you agree that's what this

 3    document appears to be?

 4        A   Yes, that appears to be a transcript of a

 5    hearing on that.                                    11:49:14

 6        Q   Okay.  And that hearing was on August 4th,

 7    2021; correct?

 8        A   That's what it says.

 9        Q   Okay.  And do you remember providing testimony

10    as part of this hearing?                            11:49:24

11        A   I do remember providing testimony for that.

12        Q   Okay.  Terrific.

13           If you can go to page 15.

14        A   Sorry.  It's loading slowly.  As I scroll, I

15    have to wait for the page to load.                  11:49:54

16        Q   Yeah.  No, I -- I appreciate that.

17        A   Okay.  Page 15?

18        Q   Yes.

19        A   Starts off "Biological sex confers"?

20        Q   Yeah.                                       11:50:03

21        A   Okay.

22        Q   "Biological" -- I'm just going to read it into

23    the record.  (As read):

24           "Biological sex confers inherent

25           athletic advantages to human males           11:50:09
```

Page 124

```
 1          compared to human females such that

 2          even before puberty, males have

 3          10 percent more muscle mass, less body

 4          fat, larger hearts and lungs, denser

 5          bones, and other anatomical and            11:50:20

 6          physiological traits that give males

 7          inherent athletic advantages over

 8          comparably aged and trained females."

 9          Did I read that right?

10      A   Yes.                                        11:50:31

11      Q   And do you recall giving that testimony?

12      A   Yes.

13      Q   Is it true that -- that prepubertal boys have

14   denser bones than prepubertal girls?

15      A   I would need to look back at my research   11:50:50

16   that -- you know, the papers that I've read to see on

17   that.

18      Q   Okay.  Is it -- is it true that prepubertal

19   boys have larger hearts and lungs than prepubertal

20   girls?                                            11:51:01

21      A   They have larger lungs.  And again, I would

22   want to refer back to my research on the larger hearts.

23      Q   Okay.  Now, if you go to page 16.

24      A   Okay.

25      Q   Actually, go to page 17, line 3.          11:51:31
```

                                                    Page 125

```
 1              You say (as read):

 2              "And a male to female individual will

 3              never experience nor need to learn how

 4              to cope with menstrual-cycle

 5              challenges, whereas 50 to 71 percent        11:51:49

 6              of female athletes expressed concerns

 7              that their menstrual cycle may

 8              influence their physical performance."

 9              Did I read that right?

10       A    Yes, you did.                                11:52:03

11       Q    So is it your testimony that one advantage

12   that transgender girls and women have over cisgender

13   girls is that they don't have to worry about their

14   menstrual-cycle concerns?

15              MR. FRAMPTON:  Objection to the form and   11:52:09

16   scope.

17              Go ahead.

18              THE WITNESS:  Yes, that is what I said in this

19   situation in Philadelphia.

20   BY MR. BLOCK:                                         11:52:16

21       Q    Okay.  Do you --

22       A    Sorry, Harrisburg.

23       Q    Okay.  Are you offering that opinion in this

24   case?

25       A    I did not include that opinion in my written 11:52:23
```

                                                        Page 126

```
 1    statement for this case.
 2         Q    Okay.  Are you offering that opinions now in
 3    this case?
 4         A    I would offer that opinions now.
 5         Q    Okay.  And -- so do you think that cisgender      11:52:33
 6    girls who are not menstruating have an advantage over
 7    cisgender girls who do menstruate?
 8              MR. FRAMPTON:  Objection; form, scope.
 9              THE WITNESS:  So the research regarding the
10    effects of the menstrual cycle on athletic performance     11:52:53
11    are very difficult and very confusing and some
12    instances so -- show that phase of the menstrual cycle
13    influence a performance, some do not.
14              But as I stated there, depending on which
15    survey you're looking at, 50 to 71 percent of female       11:53:11
16    athletes are concerned that their menstrual cycle will
17    negatively impair their performance.
18    BY MR. BLOCK:
19         Q    Okay.  Do you think we should have separate
20    teams for girls and women who menstruate and girls and     11:53:22
21    women who don't?
22              MR. FRAMPTON:  Same objection.
23              THE WITNESS:  No, I do not.
24    BY MR. BLOCK:
25         Q    Why not?                                          11:53:36
```

Page 127

```
 1        A    Because they're all biologically female.

 2        Q    Even though some of them would have the

 3   advantage of not having to worry about their menstrual

 4   cycle; is that right?

 5             MR. FRAMPTON:  Same objection.              11:53:46

 6             THE WITNESS:  Again, what -- can you please

 7   rephrase that?

 8             There were some questions -- some statements

 9   in there that were more absolute than I'm comfortable

10   answering.                                           11:54:00

11   BY MR. BLOCK:

12        Q    Okay.  So despite the fact that cisgender

13   girls and women who don't menstruate don't have to

14   worry about how their menstrual cycle will affect

15   athletic performance, you think that it's still fair   11:54:13

16   for girls and women who menstruate to participate on

17   the same sports teams as girls and women who don't

18   menstruate; correct?

19             MR. FRAMPTON:  Objection; form and scope.

20             THE WITNESS:  So when you're talking about   11:54:30

21   menstruate, I want to make sure we're on the same page

22   here.

23             Do you mean they have lost having their

24   menstrual cycle?

25   ///
```

Page 128

```
 1    BY MR. BLOCK:

 2         Q   I -- you know, I -- some -- that -- that could

 3    be one thing.  Some -- some girls and women who are cis

 4    don't have a menstrual cycle.

 5              So for whatever reason, a cisgender girl and      11:54:58

 6    women who do not menstruate, should they be playing on

 7    different teams from girls and women who do menstruate?

 8              MR. FRAMPTON:  Objection; form and scope.

 9              THE WITNESS:  So loss of the menstrual cycle

10    is generally a negative connotation for a woman in       11:55:15

11    terms of athletic performance.  It would indicate

12    somewhere progressing on the female athlete triad.  And

13    so they're still biological women.  They should still

14    be on the women's team.

15    BY MR. BLOCK:                                            11:55:39

16         Q   So is it really relevant one way or another

17    whether or not someone is menstruating to their

18    athletic performance?

19              MR. FRAMPTON:  Same objection.

20              THE WITNESS:  Again, 50 to 71 percent of       11:55:47

21    female athletes are concerned that their menstrual

22    cycle will influence their physical athletic

23    performance.

24    BY MR. BLOCK:

25         Q   So is it relevant to their athletic            11:56:01
```

Page 129

```
 1    performance whether or not someone is menstruating?
 2              MR. FRAMPTON:  Same objection.
 3              THE WITNESS:  For some women, it is.  For some
 4    women, it is not.
 5    BY MR. BLOCK:                                    11:56:21
 6        Q   In your report, you refer, several times, to
 7    something called "puberty blockers"; right?
 8        A   Yes.
 9        Q   Okay.  So I want to make sure that we're using
10    the same terminology when we're using that phrase.   11:56:34
11              When I use the phrase "puberty blockers," I'm
12    referring to gonadotropin-releasing hormone analogues.
13              Is that consistent with your understanding of
14    the term "puberty blockers"?
15        A   I know the gonadotropin-releasing hormone.  I   11:56:53
16    cannot remember if the word is "analogues" or
17    "antagonists" or "agonists."
18        Q   Okay.  So GR- --
19        A   GnR- -- yes.
20        Q   I'm sorry, can you say that again?          11:57:06
21        A   Yeah.  G-N-R-H-As.  And again --
22        Q   So --
23        A   -- I cannot remember specifically what the A
24    stands for.
25        Q   So -- so it's your understanding that the term  11:57:13
```

Page 130

```
 1      "hormone blockers" refers to GnRHa's; correct?

 2          A    Puberty blockers.

 3          Q    Sorry.  Puberty blockers.

 4               It's your understanding that the term "puberty

 5      blocker" refers to the GnRHa's; correct?              11:57:27

 6          A    That is correct.

 7          Q    Okay.  Great.

 8               If we go to paragraph 110 of your report --

 9      again, that's Exhibit 64.  Let me know when you're --

10      when you get there.                                   11:57:39

11          A    Paragraph 110 is what I'm headed for?

12          Q    Yep.

13          A    All right.  Paragraph 110, page 36.

14          Q    Great.  So in paragraph 110, you say -- if you

15      go, like -- one, two, three, four -- five lines down,   11:58:18

16      after the parenthetical number 9, you say (as read):

17               "While it is outside my expertise, my

18                understanding is that current practice

19                with regard to administration of

20                puberty blockers is similar in the           11:58:33

21                United States."

22               I think you're referring to as in the UK; is

23      that correct?

24          A    Yes.

25          Q    Okay.  And then you say (as read):            11:58:43
```

                                                        Page 131

```
 1              "Tanner stages 2 and 3 generally

 2              encompass" --

 3         You say "an range," but I think you mean "a

 4    range" -- sorry -- "a age range" -- no, I messed that

 5    up.  I'll say that again.  I apologize for inserting an   11:59:00

 6    error into your -- your sentence.

 7         You say (as read):

 8              "Tanner stages 2 and 3 generally

 9              encompass an age range from 10 to 14

10              years old, with significant              11:59:07

11              differences between individuals."

12         And then you go on to say that you're not

13    aware of research directly addressing the implications

14    for athletic capability of the use of puberty blockers.

15         So, you know, my question is, when you wrote    11:59:24

16    that paragraph, did you think it -- did you consult the

17    Endocrine Society guidelines that we had previously

18    discussed?

19         MR. FRAMPTON:  Objection to form.

20         THE WITNESS:  I cannot recall if I             11:59:45

21    specifically looked at the Endocrine Society guidelines

22    as I was writing that.  As I -- as I said, "as I

23    recall," I think, is the wording I used.

24    BY MR. BLOCK:

25         Q   Okay.  Did you make any effort to determine   11:59:57
```

Page 132

```
 1    what the -- the practice in the United States is with
 2    regard to administering puberty blockers?
 3          MR. FRAMPTON:  Objection; form.
 4          Go ahead.
 5          THE WITNESS:  Well, there's the              12:00:13
 6    Endocrine Society guidelines, but those are not
 7    specific to the United States, if I recall, and so I --
 8    BY MR. BLOCK:
 9       Q   Right.
10       A   -- don't know of a specific United States    12:00:22
11    policy compared to the UK policy.  I think it's more of
12    a this is the policy.
13       Q   Yeah, got it.
14           But did you make any effort to determine what
15    the practice is in the United States?                12:00:35
16       A   I'm -- yes, I know I did look into it.
17       Q   How?  How did you look into it?
18       A   Reading scholarly literature on the topic to
19    see what it says.  Looking at web pages on the topic.
20       Q   So -- so you read scholarly literature and web  12:00:57
21    pages on the topic and you couldn't determine whether
22    the practice in the United States is to administer
23    puberty blockers at Tanner II versus Tanner III?
24          MR. FRAMPTON:  Objection; form.
25          THE WITNESS:  As I said there, my -- that is    12:01:16
```

Page 133

```
 1    outside my scope of my expertise, and so I don't want

 2    to be construed as saying this is the policy.  So I was

 3    trying to make sure that I was not giving specific

 4    medical advice on when someone should be administering

 5    puberty blockers.                              12:01:32

 6    BY MR. BLOCK:

 7        Q   If you submitted an article to a peer-reviewed

 8    journal and it included a sentence saying "while it is

 9    outside my expertise, my understanding is that," you

10    know, and then the sentence continued, do you think    12:01:48

11    that type of statement would be accepted in a

12    peer-reviewed article?

13        A   It would need to be taken in the context of

14    the type of article.  And some reviewers would find it

15    acceptable because -- acknowledging what I don't know,  12:02:06

16    and others would say perhaps not.

17        Q   Do you think that your expert report in this

18    case should be held to the same standards that a

19    peer-reviewed article would be held to?

20            MR. FRAMPTON:  Objection; form, scope.        12:02:21

21            THE WITNESS:  No, this is not held in the same

22    standards of a peer-reviewed article.

23    BY MR. BLOCK:

24        Q   Why not?

25        A   This is written for a different audience.      12:02:31
```

Page 134

```
 1        Q    So why -- why should it not be held to the
 2   same standards?
 3             MR. FRAMPTON:  Objection; form and scope.
 4             THE WITNESS:  Once again, this is written for
 5   a different audience.  This is not written for the      12:02:48
 6   other experts in the field.  This is written to provide
 7   information to policymakers and in a legal situation
 8   like this.
 9   BY MR. BLOCK:
10        Q    Well, but do you think that the -- regardless  12:02:58
11   of the style in which something is written, do you
12   think the same underlying rigor should be required for
13   an expert report as a peer-reviewed article?
14             MR. FRAMPTON:  Objection; form and scope.
15             THE WITNESS:  No, an expert report is not      12:03:17
16   going to be held to the same rigor as a peer-reviewed
17   article.
18   BY MR. BLOCK:
19        Q    Okay.  So you -- do you think that the
20   opinions expressed in an expert report don't have to be  12:03:27
21   as reliable as the opinions expressed in a
22   peer-reviewed article?
23             MR. FRAMPTON:  Objection; form and scope.
24             THE WITNESS:  The opinions in an expert report
25   need to be accurate, they need to be correct.           12:03:43
```

Page 135

```
 1    BY MR. BLOCK:

 2         Q    Yeah, but that wasn't my question.

 3              Can you answer my question, please?

 4         A    Can you restate my your question, please?

 5              MR. BLOCK:  Could the reporter read back my      12:03:50

 6    question?

 7              THE REPORTER:  Yes.

 8              (Record read.)

 9              MR. FRAMPTON:  Objection; form and scope.

10              THE WITNESS:  Generally, in a peer-reviewed      12:04:16

11    article, you are not providing opinions; you are

12    summarizing literature.  And that's primarily what I've

13    done here, is summarize literature.

14    BY MR. BLOCK:

15         Q    Do you think the accuracy of the -- of your     12:04:26

16    summaries in an expert report should be held to the

17    same standard as the accuracy of summaries in a

18    peer-reviewed article?

19              MR. FRAMPTON:  Objection; form and scope.

20              THE WITNESS:  The information needs to be        12:04:43

21    correct, accurate, truthful.

22              MR. BLOCK:  Can you read back my question,

23    Reporter?

24              (Record read.)

25              MR. FRAMPTON:  Objection; form and scope.        12:05:06
```

Page 136

```
 1              THE WITNESS:  I thought I answered that by
 2      saying it needs to be accurate and correct and
 3      truthful.
 4      BY MR. BLOCK:
 5         Q    Can you answer the question?           12:05:13
 6              I -- I asked -- give me a "yes" or "no"
 7      answer, please.
 8              MR. FRAMPTON:  Same objection.
 9              THE WITNESS:  I don't know that this is really
10      a yes-or-no question.                          12:05:25
11      BY MR. BLOCK:
12         Q    Are there different standards of accuracy for
13      an expert report than for a peer-reviewed article?
14              MR. FRAMPTON:  Objection; form and scope.
15              THE WITNESS:  They both need to be accurate   12:05:45
16      and correct.  The writing style is so phenomenally
17      different.
18      BY MR. BLOCK:
19         Q    All right.  But they -- but the accuracy needs
20      to be the same; correct?                       12:05:58
21              MR. FRAMPTON:  Same objection.
22              THE WITNESS:  Yes, they need to be accurate
23      and correct.
24      BY MR. BLOCK:
25         Q    Okay.  Is it fair to say that you did not   12:06:03
```

Page 137

```
 1    approach the task of writing this report with the same

 2    analytical rigor that you would have approached the

 3    task of writing a peer-reviewed article?

 4            MR. FRAMPTON:  Objection; form and scope.

 5            THE WITNESS:  That would not be a correct      12:06:16

 6    statement.

 7    BY MR. BLOCK:

 8        Q   Okay.  Would you be comfortable submitting the

 9    opinions that you expressed in this report in a

10    peer-reviewed article?                                 12:06:26

11        A   Yes, I would be comfortable submitting them in

12    a peer-reviewed article.

13        Q   Okay.  If we could go back to your report, to

14    paragraph 111.  So your report is Exhibit 64.

15        A   So paragraph 111 starts "Tack et al."          12:06:50

16        Q   Yes, it does.

17            It says (as read):

18            "Tack et al. (2018) observed that in

19            21 transgender-identifying biological

20            males, administration of antiandrogens         12:07:02

21            for 5-31 months (commencing at 16.3 ±

22            1.21 years of age)" --

23            And then I think it says "age" again in

24    parentheses.  Or -- or is that just in my copy?  I'm

25    sorry.  I -- this is the second time I've -- I've       12:07:17
```

1    introduced an error into your words, so I will start

2    that over again.

3              (As read):

4              "111.  Tack et al. (2018) observed

5              that in 21 transgender-identifying        12:07:31

6              biological males, administration of

7              antiandrogens for 5-31 months

8              (commencing at 16.3 ± 1.21 years of

9              age) resulted in nearly, but not

10             completely, halting of normal            12:07:45

11             age-related increases in muscle

12             strength."

13             Okay.  Did I read that correctly?

14      A   Yes, you did.

15             MR. BLOCK:  All right.  Sorry for the error    12:07:54

16    the first time around.

17             So I'm going to introduce an exhibit now.

18             Okay.  And so this exhibit, when it -- when it

19    pops up in your folder, will be marked Exhibit 71.

20             (Exhibit 71 was marked for identification    12:08:26

21        by the court reporter and is attached hereto.)

22    BY MR. BLOCK:

23      Q   Can you please let me know when you see it.

24      A   All right.  Exhibit 71.

25      Q   All right.  Is that -- is this the Tack    12:08:41

                                            Page 139

```
 1    article that you are referring to?

 2         A   Yes, it is.

 3         Q   Okay.  Great.

 4             So do you think this article is relevant to

 5    the discussion about whether transgender girls who      12:08:53

 6    receive puberty blockers have an athletic advantage

 7    over cisgender girls?

 8         A   Yes, I think it is relevant.

 9         Q   Okay.  Now, if you remember the conversation

10    we had a few minutes ago, we agreed that puberty        12:09:06

11    blockers referreds to -- refers to GnRHa's; correct?

12         A   That is correct.

13         Q   Okay.  Did any of the transgender girls in the

14    study receive GnRHa's?

15         A   Not as I recall.                                12:09:22

16         Q   In fact, the transgender girls in the study

17    actually received a different type of hormone

18    medication called progestins; isn't that right?

19         A   That is correct.

20         Q   So this isn't actually a study about puberty    12:09:43

21    blockers, is it?

22             MR. FRAMPTON:  Objection; form.

23             THE WITNESS:  I never said this was a study

24    about puberty blockers.

25    ///
```

```
 1    BY MR. BLOCK:

 2        Q   Why did you include this paragraph in a

 3    discussion about the effects of puberty blockers?

 4        A   Well, I clarified, in this paragraph, that

 5    they were using antiandrogens.  Because as the authors    12:10:05

 6    have stated on page 2148 (as read):

 7              This will contribute to determining

 8              the place of GnRHa and progestins,

 9              respectively, in the pharmacological

10              treatment of trans youth and to             12:10:20

11              improving our knowledge on the

12              long-term effects of these

13              interventions, as has been suggested

14              recently.

15              And then they cite a source.                12:10:27

16        Q   So in paragraph 110 of your report, you begin

17    a discussion about the effects of puberty blockers on

18    athletic performance; correct?

19        A   Let me refer back to -- just to make sure

20    we've got the right paragraph number there.          12:10:47

21              Paragraph 110.  Yes, that paragraph does bring

22    up the idea of puberty suppression and puberty

23    blockers.

24        Q   Okay.  And then in paragraph 111, you discuss

25    this article by Tack; correct?                       12:11:22
```

Page 141

```
 1        A    That is correct.

 2        Q    And then in paragraph 112, you say (as read):

 3             "Klaver et al. (2018 at 256)

 4             demonstrated that the use of puberty

 5             blockers did not eliminate the            12:11:37

 6             differences in lean body mass between

 7             biological male and female teenagers."

 8             Correct?

 9        A    That is correct.

10        Q    And then paragraph 113, again, begins with the   12:11:44

11   words "the effects of puberty blockers"; isn't that

12   right?

13        A    That is correct.

14        Q    Okay.  So paragraph 110, 112 and 113 are all

15   discussing the effects of puberty blockers; correct?   12:11:55

16        A    Yes.

17        Q    And -- but paragraph 111, which is in between

18   110 and 112, is describing a study that does not

19   involve puberty blockers; correct?

20             MR. FRAMPTON:  Objection; form.           12:12:15

21             THE WITNESS:  That's correct.

22   BY MR. BLOCK:

23        Q    Do you think that someone reading your report

24   could form the false impression that this article in

25   fact discusses puberty blockers when in reality it   12:12:24
```

Page 142

```
 1    doesn't?

 2            MR. FRAMPTON:  Objection; form.

 3            THE WITNESS:  If someone is reading it and

 4    pays attention to the statement of antiandrogens, they

 5    would know that those are not puberty blockers.      12:12:35

 6    BY MR. BLOCK:

 7        Q   Do you -- I thought you said recently that

 8    this report is not meant for an audience of experts in

 9    the field; right?

10            MR. FRAMPTON:  Objection; form.             12:12:46

11            THE WITNESS:  That is correct.

12    BY MR. BLOCK:

13        Q   Okay.  So do you think a lay audience, not of

14    experts in the field, would immediately understand that

15    antiandrogens are different from puberty blockers in    12:12:58

16    the context of this discussion?

17            MR. FRAMPTON:  Objection; form.

18            THE WITNESS:  So that's a difficult question

19    for me to answer because as I read through it, I notice

20    paragraph 110, puberty blockers, 112, -13, -14, all     12:13:13

21    specifically state puberty blockers, 111 states

22    antiandrogens.  As I read that, as a critical thinker,

23    I would then say, well, why does this say antiandrogens

24    rather than puberty blockers and what -- learn the

25    difference.                                           12:13:32
```

Page 143

```
 1    BY MR. BLOCK:

 2         Q   So why does a paragraph in your report, in the

 3    middle of discussing puberty blockers, talk about

 4    antiandrogens at all?

 5         A   Because, to the best of my knowledge, that is      12:13:43

 6    the only research that is out there on the effects of

 7    transgender hormone treatment in teenagers on muscle

 8    strength.

 9         Q   I see.  But wouldn't it be better to include

10    that article in the subsequent sections of your report      12:14:01

11    that discuss the effect of suppressing testosterone?

12             MR. FRAMPTON:  Objection; form.

13             THE WITNESS:  I think this is a matter of

14    opinion.  I think it fits well because this is focusing

15    on transgender youth.                                       12:14:17

16    BY MR. BLOCK:

17         Q   Oh, okay.  So your -- your testimony is this

18    section of the article is supposed to address the topic

19    of transgender youth in general and not the topic of

20    puberty suppression.  Is that your testimony?              12:14:32

21         A   No.  My testimony is this is about transgender

22    youth, including puberty suppression, and what we know

23    on the topic of transgender youth and how it would

24    affect athletic performance.

25         Q   I see.  Let's go to the beginning of this          12:14:49
```

```
 1    section, which is several pages up.  It's a long

 2    section.  But the section begins on page 28 of your

 3    report.  23 on the bottom pagination, 28 of the PDF.

 4    And paragraph 68.

 5        A   All right.                              12:15:28

 6        Q   Okay.  So beginning with paragraph 68, you are

 7    discussing -- oh, sorry.  I -- can we just go a little

 8    further down, to subsection A?  I skipped over it

 9    myself.  So this is actually paragraph 71.

10        A   Okay.                                   12:15:55

11        Q   Thank you.

12            So subsection A (as read):

13            "Boys exhibit advantages in athletic

14            performance even before puberty."

15            Did I correctly read that that's the     12:16:04

16    subsection?

17        A   Yes, that is correct.

18        Q   Okay.  And then, you know, if you -- if you

19    continue scrolling, you can take your time, it's a

20    bunch of paragraphs on, you know, physiological      12:16:14

21    characteristics before puberty, athletic performance

22    before puberty; correct?

23        A   Yes.

24        Q   All right.  And if you keep -- keep scrolling,

25    I think all the way until we get to -- I -- I believe  12:16:31
```

```
 1    it's paragraph 110.

 2        A   Yes.

 3        Q   All right.  So for all these paragraphs until

 4    110, you've been discussing characteristics of boys

 5    before puberty; correct?                              12:16:53

 6        A   Yes.  The athletic differences and

 7    physiological differences between biolo- -- between

 8    boys and girls before puberty.

 9        Q   Okay.  And then in paragraph 110, you say (as

10    read):                                                12:17:03

11            "For the most part, the data I review

12             above relate to pre-pubertal children.

13             Today, we also face the question of

14             inclusion in female athletics of males

15             who have undergone 'puberty               12:17:13

16             suppression.'"

17             Isn't that right?

18        A   Yes.

19        Q   Okay.  So what connects paragraph 110 to

20    everything that came before it, as I understand it, is  12:17:22

21    that it's supposed to provide information on athletic

22    performance and advantages of what you call biological

23    males who have not experienced endogenous, typically

24    male, puberty yet; correct?

25            MR. FRAMPTON:  Objection; form.              12:17:49
```

Page 146

```
 1              THE WITNESS:  Yes, so if I understand what
 2     you're referring to there, there's a lot of paragraphs
 3     there about the differences between males and females
 4     before puberty.
 5     BY MR. BLOCK:                                      12:18:02
 6          Q   Right.  Okay.
 7              And so -- and what thematically connects that
 8     to puberty blockers is that -- the argument is that
 9     girls who are transgender and on puberty blockers never
10     experience, typically, male puberty; correct?        12:18:15
11              MR. FRAMPTON:  Same objection.  Objection to
12     form.
13              THE WITNESS:  Can you state that again,
14     please?
15     BY MR. BLOCK:                                       12:18:25
16          Q   Yeah.  So transgender girls on hormone
17     blockers never experience, typically, male puberty if
18     they begin the blockers at stage Tanner II; is that
19     right?
20              MR. FRAMPTON:  Objection; form, scope.       12:18:39
21              THE WITNESS:  That is my understanding.
22     BY MR. BLOCK:
23          Q   Okay.  And so that's thematically what
24     connects the discussion of prepubertal kids to the
25     discussion of trans girls on puberty blockers; correct?  12:18:52
```

Page 147

```
 1              MR. FRAMPTON:  Objection; form.

 2              THE WITNESS:  So what you're saying is there's

 3   kind of a rough transition there?

 4   BY MR. BLOCK:

 5       Q   Well, I -- I'm saying that -- I'm just asking    12:19:04

 6   why are they in the same subsection that discusses

 7   biological males before puberty?

 8       A   Well, because the puberty blockers would halt

 9   puberty.  That is the purpose of them.

10       Q   Exactly.  So this then leads to my question of    12:19:24

11   why do you then have a paragraph discussing

12   antiandrogens administered, you know, near the end of

13   puberty?

14              MR. FRAMPTON:  Objection; form.

15              THE WITNESS:  Because that is the only           12:19:42

16   information we have on teenagers and how their gender

17   treatment of hormones would be influenced.

18              If you look at some of those previous tables

19   and the tables in the appendix that go along with that,

20   they go up to 17-year-old children.                        12:19:57

21   BY MR. BLOCK:

22       Q   Right.  But the -- the subsection is talking

23   ability prepubertal children; right?

24              MR. FRAMPTON:  Objection; form.

25              THE WITNESS:  That is the primary focus of       12:20:06
```

                                                  Page 148

```
 1    that subjection, yes.

 2    BY MR. BLOCK:

 3        Q   Okay.  And the -- the teenagers discussed in

 4    the Tack study are not prepubertal teenagers; correct?

 5        A   That's correct.  They are mid-prepubertal.    12:20:26

 6        Q   All right.  Well, now let's look at

 7    paragraph 112 of your report which discusses a 2018

 8    study by Klaver.

 9            Is that your understanding of how to pronounce

10    the name Klaver?                                       12:20:41

11        A   Yes, that is my understanding of how to

12    pronounce the name.  Thanks for asking.

13            MR. BLOCK:  Okay.  Great.  And please feel

14    free to correct me if I pronounce anyone else's name

15    incorrectly.                                           12:20:54

16            All right.  I'm going to introduce an exhibit.

17    This exhibit, when it appears on your screen, is going

18    to be marked as Exhibit 72.

19            (Exhibit 72 was marked for identification

20         by the court reporter and is attached hereto.)    12:21:14

21    BY MR. BLOCK:

22        Q   Please let me know when it's visible.

23        A   Exhibit 072 - Klaver - Early Hormonal

24    Treatment...

25        Q   Right.  And is this the article that you're    12:21:28
```

Page 149

```
 1    referring -- that you are referring to in

 2    paragraph 112?

 3         A   I think so.  Without double-checking between

 4    my references cited, I -- I think this is the same

 5    article.                                      12:21:46

 6         Q   Okay.  Is it your understanding that the

 7    people in this study received puberty blockers at the

 8    beginning of Tanner II?

 9         A   As I recall, they received puberty blockers,

10    and I cannot recall the Tanner stage.  I remember it    12:22:06

11    giving the ages.

12         Q   Okay.  What -- what age?

13         A   Average age of fourteen and a half, if I

14    remember correctly.

15         Q   Okay.  And is fourteen and a half typically    12:22:15

16    the beginning of Tanner stage II?

17         A   Not typically.

18         Q   Okay.  So if you go to page 254 of the Klaver

19    study --

20         A   2-5-4, yes.                                    12:22:37

21         Q   All right.  2-5-4.

22             And if you look at the column that says

23    "Transwomen," it says (as read):

24             "Age at start of GnRHa, 14.5 ± 1.8."

25             Is that right?                               12:22:59
```

Page 150

```
 1        A    Yes.

 2        Q    Okay.  And so accord- -- so with those

 3   figures, that means that the earliest that any of the

 4   trans girls in the study received puberty blockers was

 5   at age 12.7; correct?                              12:23:14

 6        A    Do you want me to take the time to do the math

 7   on that?

 8        Q    Well, 14.5 minus 1.8 is 12.7, but --

 9        A    So that's only one standard deviation.  That

10   only accounts for, basically, a third of the          12:23:37

11   individuals below and above that age.  So take out

12   another 1.8 to get two standard deviations away.

13        Q    Got it.

14        A    And you take they way that 1.8 again to

15   encompass the whole 99.99 percent.                    12:23:50

16        Q    Oh, okay.  So what's your understanding of the

17   youngest age at which someone -- the girls in the study

18   receive puberty blockers, just -- if you can do it

19   or -- without --

20        A    Just eyeball it.  I'll say 10.7.             12:24:04

21        Q    Okay.  Thank you.

22             But the average age is 14.5; right?

23        A    That is the average age, yes.

24        Q    Okay.  Great.

25             Now, you see in paragraph 112 of your report, 12:24:14
```

Page 151

```
 1    which -- let me pull it up directly so I don't misread

 2    it again.

 3            Paragraph 112 of your report, the first

 4    sentence you say (as read):

 5            "Klaver et al. (2018 at 256)              12:24:29

 6            demonstrated that the use of puberty

 7            blockers did not eliminate the

 8            differences in lean body mass between

 9            biological male and female teenagers."

10            Did I read that right?                     12:24:40

11       A   I'm still getting to 112, sorry.

12            That -- that -- that sounds correct, but I'm

13    not --

14       Q   Right.

15       A   -- there to verify.                          12:24:49

16            All right.  Now I'm at 112.

17       Q   Okay.  I'll read it again.  (As read):

18            "Klaver et al. (2018 at 256)

19            demonstrated that the use of puberty

20            blockers did not eliminate the            12:25:03

21            differences in lean body mass between

22            biological male and female teenagers."

23            Did I read that sentence right?

24       A   Yes.

25       Q   Okay.  And then it says (as read):         12:25:09
```

                                                    Page 152

```
 1              "Subsequent use of puberty blockers

 2              combined with cross-sex hormone use

 3              (in the same subjects) still did not

 4              eliminate the differences in lean body

 5              mass between biological male and          12:25:19

 6              female teenagers."

 7              Is that right?

 8      A   Yes.

 9      Q   Okay.  Great.

10              Did Klaver report any findings on percentage   12:25:26

11   of body fat?

12      A   Let me look.

13              Yes.

14      Q   And -- and what were the findings on -- on

15   body fat?                                            12:25:45

16      A   Just looking at it to make sure I'm reading

17   these correctly.

18              So it gives -- this is table -- or, sorry,

19   figure 2.  At the top of figure 2, there is percent

20   body fat presented.                                  12:26:08

21      Q   Yep.  And the first part of that graph,

22   page 256, table 2, shows the percent body fat of the

23   trans women being virtually the same as the body fat of

24   the cis women; correct?

25      A   Sorry, how do you zoom on this Exhibit Share?   12:26:26
```

```
 1          It's a tiny graph on my screen.

 2          MS. DUPHILY:  If you take your mouse on to the

 3    bottom and push, you should be able to see a plus and a

 4    minus to make it look bigger.

 5          THE WITNESS:  Okay.  Ah, there we are.       12:26:47

 6          All right.  Sorry, it's taking me a minute to

 7    zoom in on that.

 8          MR. BLOCK:  Sure thing.

 9          THE WITNESS:  Okay.  So to make sure we're

10    looking at the same figure, the trans women are shown    12:27:05

11    in the solid line, the trans men are shown in the light

12    gray line, the cis men are shown in the dotted line,

13    and the cis women are shown in the hash line; correct?

14    BY MR. BLOCK:

15       Q   Correct.                                  12:27:19

16       A   Okay.  So the percent body fat in the trans

17    women and the percent body fat in the cis women, the

18    lines overlap at the part indicated as "Start CHT."

19       Q   Okay.  So that indicates that by the time the

20    trans women in the study had begun CHT, their           12:27:42

21    percentages of body fat overlapped with the percentages

22    of body fat for cis women; right?

23       A   That is correct.

24       Q   Okay.  And is body fat -- percentage of body

25    fat a factor in athletic advantage?                     12:28:01
```

Page 154

```
 1       A   Yes, it is.  Having excess body fat is

 2   considered a disadvantage.

 3       Q   Okay.  So why didn't you mention this finding

 4   in your summary of the Klaver study?

 5       A   Because I mentioned the next part of the        12:28:16

 6   figure demonstrating that there was not elimination of

 7   the difference in lean body mass.

 8       Q   No, I understand that, but why did you just

 9   report on the lean body mass and not the body fat

10   finding?                                                12:28:31

11           MR. FRAMPTON:  Objection; form.

12           THE WITNESS:  Because lean body mass is a more

13   important determinant of athletic performance.

14   BY MR. BLOCK:

15       Q   I see.  Does your report ever say that lean     12:28:45

16   body mass is a more important determinant?

17           MR. FRAMPTON:  Objection; form.

18           THE WITNESS:  I have stated multiple times in

19   there that lean body mass is a determinant of athletic

20   performance, and I've stated that -- and I have stated  12:29:02

21   that excess body fat is a disadvantage.

22   BY MR. BLOCK:

23       Q   Okay.  But my question is, do you state that

24   lean body mass is a more important determinant?

25           MR. FRAMPTON:  Objection; form.             12:29:19
```

                                                    Page 155

```
 1              THE WITNESS:  I don't recall where I specified

 2      which is more or least important in --

 3              MR. BLOCK:  Okay.

 4              THE WITNESS:  -- in regards to body

 5      composition.                                    12:29:23

 6      BY MR. BLOCK:

 7         Q   Okay.  You have a whole section in your report

 8      on the subject of body fat percentage; correct?

 9         A   Again, I would have to look to see if it's a

10      whole section, if we're talking about a couple    12:29:38

11      paragraphs, a couple of pages or whatnot, but, yes, I

12      talk about body composition.

13         Q   Okay.  And you don't cite this study when you

14      discuss body composition related to fat; correct?

15         A   So I'm -- you're saying that I'm not citing    12:29:51

16      Klaver in my previous discussions of body composition

17      as a determinant of athletic performance?

18         Q   In your discussion of the role of body fat in

19      the -- as a determinant of athletic performance, you

20      never cite to the findings of this Klaver article;   12:30:09

21      correct?

22         A   I -- I don't think so.  I think these are the

23      only paragraphs where I cite the Klaver articles, and

24      we're talking specifically about with the puberty

25      blockers.                                        12:30:23
```

Page 156

```
 1        Q   I see.  So -- but you -- you cite a finding of
 2   the Klaver article that you think is -- supports your
 3   view, but you don't cite a finding of the Klaver
 4   article that cuts against your view.  Is that a fair
 5   statement?                                          12:30:41
 6            MR. FRAMPTON:  Objection; form.
 7            THE WITNESS:  Yes, I would say that it's fair
 8   to say that I don't cite Klaver on the differences in
 9   percent body fat.
10   BY MR. BLOCK:                                       12:30:55
11        Q   Okay.  So you testified earlier that you think
12   that an expert report needs to be held to the same
13   standards of accuracy as a peer-reviewed article;
14   right?
15        A   Yes, that is correct.                      12:31:06
16            MR. FRAMPTON:  Objection --
17            THE WITNESS:  Oh, sorry.
18   BY MR. BLOCK:
19        Q   So do -- do you think your -- your paragraph
20   about Klaver is an accurate summary of the article in  12:31:14
21   its entirety?
22            MR. FRAMPTON:  Objection; form.
23            THE WITNESS:  The paragraph is not intended to
24   be a summary of the article in its entirety.
25   ///
```

Page 157

```
 1   BY MR. BLOCK:

 2       Q   Okay.  The paragraph is -- is just intended to

 3   pick out the portions of the article that support your

 4   argument; is that right?

 5           MR. FRAMPTON:  Objection; form.              12:31:33

 6           THE WITNESS:  The paragraph is intended to

 7   demonstrate that biological males retain athletic

 8   advantages.

 9   BY MR. BLOCK:

10       Q   Well, the -- the article doesn't say anything  12:31:44

11   about athletic advantages; correct?

12       A   I do not recall that the article uses the word

13   "athletic advantages."

14       Q   All right.  If you go to -- if you look at

15   page 255 of the Klaver article.  So I think that's,    12:32:02

16   like, one page before the -- the -- where we were

17   looking.

18       A   You're looking at table 2?

19       Q   No.  I'm -- I am just looking at the -- the --

20   the text of it.                                        12:32:25

21       A   Okay.

22       Q   If you look at the first full sentence in the

23   text that begins with "As a result."

24       A   Okay.

25       Q   Do you see that?                               12:32:45
```

Page 158

```
 1        A   Yes, I do.

 2        Q   All right.  It says (as read):

 3            "As a result of these changes, in

 4            young adult transwomen at age 22" --

 5            Excuse me.  (As read):                    12:32:56

 6            "As a result of these changes, in

 7            young adult transwomen at 22 years of

 8            age, SDS for WHR, body fat, and LBM

 9            showed greater similarity to ciswomen

10            than to cismen."                          12:33:08

11            Did I read that correctly?

12        A   Yes, you read that correctly.

13        Q   Okay.  And do you mention that finding in your

14    report?

15        A   I do not think I quote that in my report.   12:33:17

16        Q   Okay.  All right.

17            MR. BLOCK:  It's 1:30 -- can we go off the

18    record?

19            THE WITNESS:  Is that okay with you going off

20    the record?                                       12:33:41

21            MS. DUPHILY:  Kimberlee, are you there?

22            THE WITNESS:  Nope.

23            MS. DUPHILY:  We're going off the record at

24    approximately 1:32 p.m. [Sic]

25            (Recess.)                                 12:38:29

                                              Page 159
```

```
 1              THE VIDEOGRAPHER:  We are on the record at
 2      12:38 p.m.
 3              MR. BLOCK:  Okay.  Great.
 4      BY MR. BLOCK:
 5          Q   I'd like to move on from the topic of puberty    12:38:43
 6      blockers and ask a few questions about trans women who
 7      suppress circulating levels of testosterone after
 8      puberty.
 9              Can we turn to page 56 of your report?
10          A   Come on.  Waiting for it to load.             12:39:04
11              All right.  So page 56 by the page numbers;
12      correct?
13          Q   Correct.
14          A   All right.  I'm there.
15          Q   Great.  So if you go to the third bullet       12:39:27
16      point, you say (as read):
17              "The administration of androgen
18              inhibitors and cross-sex hormones to
19              men or adolescent boys after the onset
20              of male puberty does not eliminate the      12:39:40
21              performance advantage that men and
22              adolescent boys have over women and
23              adolescent girls in almost all
24              athletic events."
25              Did I read that right?                       12:39:50
```

                                            Page 160

```
 1        A   Yes, you did.

 2        Q   Okay.  Great.

 3            Have you read the expert reports that -- the

 4     expert reports that Dr. Safer submitted in this case?

 5        A   Yes, I read the reports by Dr. Safer.          12:40:00

 6        Q   All right.  You read both the initial and the

 7     rebuttal reports?

 8        A   Yes.

 9        Q   Okay.  Isn't it fair to say that the effects

10     of male to female hormone treatment on important        12:40:10

11     determinants of athletic performance still remain

12     largely unknown?

13            MR. FRAMPTON:  Object to form.

14            THE WITNESS:  Sorry, I blanked out there for a

15     second after the objection.                            12:40:28

16            There are still a lot of questions.  There are

17     still a lot of questions.

18            MR. BLOCK:  Okay.  So I'd like to show you

19     another exhibit.  And we have to mark it as such.

20            All right.  This is going to hopefully appear    12:41:08

21     on your screen as Exhibit 73.

22            (Exhibit 73 was marked for identification

23         by the court reporter and is attached hereto.)

24     BY MR. BLOCK:

25        Q   Can you let me know when -- when you see it?     12:41:18
```

Page 161

```
1          A    All right.  Exhibit 073 - Brown Blog Post.

2          Q    Yes.  Do you recognize what this document is?

3          A    Yes.

4          Q    What is it?

5          A    That is my blog post for the Physiology        12:41:38

6     Educators Community of Practice about The Olympics,

7     sex, and gender in the physiology classroom.

8          Q    Okay.  What -- what is the Physi- --

9     Physiology Educators Community of Practice blog?

10         A    So this is a blog sponsored by the American    12:41:58

11    Physiological Society and their -- specifically their

12    educators' interest group -- it probably has a

13    different name than that, but that's what it is -- just

14    sharing information for other teachers in physiology,

15    typically geared towards college-level educators.      12:42:16

16         Q    And is there a submission process?

17         A    Yes, there is.

18         Q    What -- what is that submission process?

19         A    Well, you have to contact the person that runs

20    the blog post and say you are interested.  They connect  12:42:33

21    you, then, to the editor for Advances in Physiology

22    Education who then asks what you would like to blog on

23    and lets you know of available times, and then once you

24    agree on that, you'll submit it.  And then, once again,

25    the editor reviews it, someone else associated also     12:42:55
```

Page 162

```
1    reviews it prior to being put up on the web.

2        Q   Okay.  And so did you reach out with your

3    interest in -- in submitting something?

4        A   Yes, I did.

5        Q   You weren't invited to submit something;      12:43:13

6    correct?

7        A   I did receive an in- -- an e-mail inviting to

8    submit to the Peacock blog, and I e-mailed back and

9    said, yes, I'm interested.

10       Q   And did -- were you invited to submit         12:43:27

11   something on the topic of transgender women

12   participating in sports?

13       A   The invitation was not specific on what I

14   was -- would be blogging on.

15       Q   And was it an invitation to you individually,  12:43:43

16   or was it an invitation to a larger group?

17       A   I think both, honestly.  There is an

18   invitation that goes out, periodically, to the larger

19   group of published a paper in Advances in Physiology

20   Education and received an invitation to me.            12:44:03

21       Q   Okay.  And so did this blog go through a

22   revision process after you first submitted it?

23       A   There was one round of revisions, if I

24   remember correctly.

25       Q   Okay.  And do you remember what feedback you   12:44:23
```

Page 163

```
 1    got during the revision process?

 2        A   The feedback was very positive, and I was told

 3    that this is an extremely important topic that needs to

 4    be presented.  And I really think the feedback was

 5    relevant to the -- the -- the graph that I had in there   12:44:41

 6    to ensure that I had appropriate copyright permission

 7    or whatever permission to have that reproduced.

 8        Q   Okay.  Great.

 9            This blog post doesn't discuss prepubertal

10    children; right?                                          12:44:57

11        A   Sorry, I'm just reviewing it to see.

12            I don't recall that it discusses prepubertal

13    children.

14        Q   And the blog also doesn't discuss trans girls

15    and women who received puberty blockers and never went    12:45:25

16    through endogenous puberty; right?

17            MR. FRAMPTON:  Objection to the form.

18            THE WITNESS:  I don't recall discussing that

19    in there, and I'm not seeing it, as I look at the blog

20    post.                                                     12:45:43

21    BY MR. BLOCK:

22        Q   Okay.  So if you can just go to page 2, and if

23    you go to the first full paragraph on page 2, beginning

24    with the -- the second sentence, do you --

25        A   Yes.                                              12:46:04
```

Page 164

```
1         Q    -- see that?

2         A    Yes, I do.

3         Q    Okay.  So the second sentence there says (as

4    read):

5              "It is also important to note that the        12:46:18

6              effects of male-to-female hormone

7              treatment on the important

8              determinants of athletic performance

9              remain largely unknown."

10             Did I read that right?                        12:46:26

11        A    Yes, you did.

12        Q    Okay.  Do you still agree with that statement?

13        A    Yes, I still agree with that statement.

14        Q    And so you think it's important to note that

15   the effects remain largely unknown; correct?           12:46:36

16             MR. FRAMPTON:  Objection; form.

17             THE WITNESS:  Yes.  Prior to allowing

18   biological males to compete in female sports, we should

19   have a better understanding of how that process would

20   influence competition.                                 12:46:52

21   BY MR. BLOCK:

22        Q    Okay.  So in your expert report, do you ever

23   note that the effects of male to female hormone

24   treatment on important determinants of athletic

25   performance advantage remain largely unknown?          12:47:05
```

Page 165

```
 1        A   I could look and see, but I think I say --

 2   state something in my conclusion where there are still

 3   a lot of variables that have not been measured.

 4   BY MR. BLOCK:

 5        Q   Okay.  In this paragraph that I was reading      12:47:20

 6   from, I'm just going to go into the next one.  It says

 7   (as read):

 8            "Measurements of VO2max in transwomen

 9            using direct or indirect calorimetry

10            are not available."                              12:47:35

11            Did I read that right, even if I didn't

12   pronounce it correctly?

13        A   Yes.

14        Q   Okay.

15        A   "Calorimetry" is how I say it because it kind    12:47:41

16   of flows when you say it fast.

17        Q   Okay.  That makes sense.

18            Do you ever note in your expert report that

19   measurements of VO2 max in trans women using direct or

20   indirect calorimetry are not available?                  12:47:59

21        A   Once again, I would need to refer back to my

22   report in the conclusions to see if I had included that

23   in there.

24        Q   Do you think it would make sense to have

25   included that in there?                                  12:48:16
```

                                                        Page 166

```
 1              MR. FRAMPTON:  Objection; form.

 2              THE WITNESS:  Yes, I think it would make sense

 3    to include that in there, but it also -- like I said, I

 4    cannot recall if I did or did not.

 5    BY MR. BLOCK:                                    12:48:33

 6        Q   Okay.  Well, let's -- well, let's look at your

 7    report on -- so if you begin on page 39 of your report.

 8        A   All right.

 9        Q   All right.  So this is -- Roman numeral V says

10    (as read):                                        12:49:04

11              "The available evidence shows that

12              suppression of testosterone in a male

13              after puberty has occurred does not

14              substantially eliminate the male

15              athletic advantage."                    12:49:14

16              Right?  That -- that's what section Roman

17    numeral V says; correct?

18        A   That is correct.

19        Q   Okay.  And then subsection A on that page

20    talks about (as read):                            12:49:25

21              "Empirical studies find that males

22              retain a strong performance advantage

23              even after lengthy testosterone

24              suppression."

25              Correct?                                12:49:31
```

                                                  Page 167

```
 1        A    Correct.

 2        Q    All right.   Then on 40, there's a subsection

 3    that says, "Hand Grip Strength."

 4        A    Okay.

 5        Q    Okay.   And if you -- apologies.   You know,      12:49:38

 6    I -- I should have directed you to page 46,

 7    subsection B of that.   So if you can just skip ahead to

 8    46.

 9        A    Okay.   Page 46.

10        Q    Great.   Thank you.                               12:50:00

11             So subsection B says (as read):

12             "Testosterone suppression does not

13             reverse important male physiological

14             advantages."

15             Right?                                            12:50:09

16        A    Yes.

17        Q    Okay.   And then if you turn the page, on 47,

18    at the -- page 47, at the bottom, there's a little

19    discussion on cardiovascular advantages; right?

20        A    Yes.                                              12:50:20

21        Q    All right.   And where would VO2 -- where would

22    the discussion of VO2 max go?   Would that be in the

23    "Cardiovascular Advantage" section or in a different

24    subsection of this discussion?

25             MR. FRAMPTON:   Object to the form.              12:50:40
```

                                                          Page 168

```
 1              THE WITNESS:  It would probably belong in the

 2     cardiovascular advantages.

 3     BY MR. BLOCK:

 4         Q   Okay.  So do you see, just in this subsection,

 5     a discussion of the fact that measurements of VO2 max in   12:50:51

 6     trans women using direct or indirect calorimetry are

 7     not available?

 8         A   I have not directly made that statement.

 9         Q   Okay.  And if -- toggling back over to -- to

10     Exhibit 73, your blog post, after that statement I just   12:51:17

11     read, you say (as read):

12              "Measurements of muscle strength in

13              standard lifts (e.g. bench press, leg

14              press, squat, deadlift, etc.) in

15              transwomen are not available."           12:51:29

16              Is that correct?

17         A   That is correct.

18         Q   All right.  Do you disclose that information

19     in your expert report?

20              MR. FRAMPTON:  Objection to the form.      12:51:39

21              THE WITNESS:  In my expert report, I talk

22     about the measurements of strength that have been

23     conducted.

24     BY MR. BLOCK:

25         Q   But you do not discuss the measurements of    12:51:52
```

                                              Page 169

1    strength that have not been conducted; correct?

2            MR. FRAMPTON:  Objection to the form.

3            THE WITNESS:  I'm scrolling up to see if I

4    have some statement in there about, you know, specific

5    measurements.                                        12:52:13

6            Here again, no, I do not specifically state

7    that those measurements have not been conducted.

8    BY MR. BLOCK:

9        Q    Okay.  And then in the next sentence of the

10   blog post, you say (as read):                        12:52:27

11            "Nor have there been evaluations of

12            the effects of male-to-female hormone

13            therapy on agility, flexibility, or

14            reaction time."

15            Is that right?                               12:52:37

16       A    That is correct.

17       Q    Okay.  And you do not, in your report, say

18   anything about whether -- about the effects of hormone

19   therapy on agility, flexibility or reaction time, do

20   you?                                                 12:52:55

21            MR. FRAMPTON:  Objection to the form.

22            THE WITNESS:  On page 39, I state that only a

23   limited number of studies have directly measured the

24   effect of testosterone suppression and the

25   administration of female hormones on the athletic    12:53:05

                                              Page 170

```
 1    performance of males.  And so then I go through those

 2    studies which, you know, by default, then says those

 3    other things have not been studied.

 4    BY MR. BLOCK:

 5         Q    Okay.  But you do discuss agility, flexibility    12:53:18

 6    and reaction time when you're discussing the advantages

 7    of cisgender men over cisgender women; right?

 8         A    Yes.

 9         Q    Okay.  But then you don't have -- well, let me

10    just read the next part of the -- the blog post.  (As      12:53:39

11    read):

12              "There has been no controlled research

13              evaluating how male-to-female hormone

14              treatment influences the adaptations

15              to aerobic or resistance training."         12:53:50

16              Is that correct?

17         A    That is correct.

18         Q    And again, that's not something you mention in

19    your report; correct?

20              MR. FRAMPTON:  Objection to the form.        12:54:01

21              THE WITNESS:  It is indirectly stated with my

22    statement about limited number of studies.

23    BY MR. BLOCK:

24         Q    Okay.  And then the final sentence in that

25    paragraph is (as read):                                12:54:10
```

                                                Page 171

```
 1              "And there are only anecdotal reports

 2              of the competitive athletic

 3              performance of transwomen before and

 4              after using male-to-female hormone

 5              treatment."                              12:54:20

 6              Is that right?

 7         A    That is correct.

 8         Q    Okay.  So it's fair to say that when you

 9    discuss Cecé Telfer in your report, that's an example

10    of one of the anecdotal reports you refer to in this   12:54:31

11    sentence; correct?

12         A    That's correct.

13         Q    Okay.  So the discussion of Cecé Telfer and

14    Lia Thomas and Andraya Yearwood and Terry Miller, those

15    are, to use your words from the blog post, quote, only   12:54:56

16    anecdotal reports; correct?

17              MR. FRAMPTON:  Objection to the form.

18              Go ahead.

19              THE WITNESS:  If I may state, in my

20    declaration, I do cite a prepublished study by           12:55:12

21    Michael Joyner that is evaluating -- or, sorry,

22    Senefeld and Joyner that is evaluating Lia Thomas.

23              But yes, those -- those would primarily be

24    anecdotal reports.

25    ///
```

Page 172

```
 1    BY MR. BLOCK:
 2         Q    Okay.  If you go to the second sentence in the
 3    final paragraph, you say, (as read):
 4              In the end, whether it is safe and
 5              fair to include transgender athletes          12:55:46
 6              and athletes with DSD in women's
 7              sports comes down to a -- to a few
 8              facts that can be extrapolated, lots
 9              of opinions, and an interesting but
10              complicated discussion.                       12:55:57
11              Did I read that right?
12         A    I'm sorry, where were you reading that from?
13         Q    Yeah, it's the -- it's the second sentence in
14    the last paragraph of your blog post.
15         A    Okay.  There.                                 12:56:12
16         Q    Okay.  I'll read it again.  (As read):
17              In the end, whether it is safe and
18              fair to include transgender athletes
19              and athletes with DSD in women's
20              sports comes down to a few facts that         12:56:21
21              can be extrapolated, lots of opinions,
22              and an interesting but complicated
23              discussion.
24              Is that right?
25         A    That is correct.                              12:56:31
```

Page 173

```
 1        Q    And you still agree with that statement?

 2        A    Yes.

 3        Q    Okay.  What do you -- what do you mean by

 4   "interesting but complicated discussion"?

 5        A    Well, as I was writing this for fellow        12:56:43

 6   educators, this could be a very complicated discussion

 7   because of -- this could be a very heated topic.

 8        Q    Okay.  So when you say that there -- "a few

 9   facts that can be extrapolated, lots of opinions, and

10   an interesting but complicated discussion," were you    12:57:09

11   referring at all to the underlying substance being

12   interesting but complicated?

13             MR. FRAMPTON:  Objection to the form.

14             THE WITNESS:  Yeah, I'm not sure what you mean

15   by "underlying substance."                              12:57:25

16   BY MR. BLOCK:

17        Q    Yeah, is the discussion of whether -- aside

18   from something being heated, is -- is the -- this topic

19   complicated?

20             MR. FRAMPTON:  Objection to the form.         12:57:40

21             THE WITNESS:  Yes, this is a complicated

22   topic.

23   BY MR. BLOCK:

24        Q    Okay.  So if we go to your report again --

25   let's see -- on page 57 of your report.                 12:57:57
```

Page 174

```
 1        A    All right.  Page 57.

 2        Q    So if you look just at the paragraph beginning

 3   with the word "but."

 4        A    Okay.  All right.

 5        Q    All right.  You say -- you know, actually,      12:58:32

 6   instead, let's go a few sentences above that, so in the

 7   middle of the previous paragraph beginning with -- the

 8   sentence beginning with "instead."

 9             Do you see that?

10        A    I'm sorry, which --                            12:58:49

11        Q    So this is about five -- five lines from the

12   top.

13        A    Okay.  Yes.  It says, "Instead, the IOC"?

14        Q    Yeah.  So this says --

15        A    Okay.                                          12:58:58

16        Q    -- (as read):

17             Instead, the IOC calls on other

18             sporting bodies to define criteria for

19             transgender inclusion, while demanding

20             that such criteria simultaneously         12:59:05

21             ensure fairness, safety, and inclusion

22             for all.  The recent -- recently

23             updated NCAA policy on transgender

24             participation also relies on other

25             sporting bodies to establish criteria     12:59:19
```

Page 175

```
 1              for transgender inclusion while

 2              calling for fair competition and

 3              safety.

 4              But what we currently know tells us

 5              that these policy goals—fairness,        12:59:28

 6              safety, and full transgender

 7              inclusion—are irreconcilable for many

 8              or most sports.

 9              Did I read those sentences correctly?

10        A    Yes, you did.                             12:59:40

11        Q    Okay.  How come -- why, in your blog post, did

12   you not say that the goals of fairness, safety and full

13   transgender inclusion are irreconcilable?

14              MR. FRAMPTON:  Objection to the form.

15              THE WITNESS:  The purpose of the blog post was   12:59:58

16   to stimulate discussions in classroom while providing a

17   little bit of guidance, but not advocate for a specific

18   position within a classroom.

19   BY MR. BLOCK:

20        Q    Why didn't you say in your expert report that   01:00:13

21   whether it is safe and fair to include transgender

22   athletes and athletes with DSD in women's sports comes

23   down to a few facts that can be extrapolated, lots of

24   opinions, in an interesting but complicated discuss?

25              MR. FRAMPTON:  Objection to the form.           01:00:28
```

```
 1              THE WITNESS:  I think that a reasonable person
 2    would come to those conclusions after reading all --
 3    how many pages of my report?
 4    BY MR. BLOCK:
 5         Q    Okay.  So it's your expert testimony that        01:00:39
 6    whether it is safe and fair to include trans girls and
 7    women on girls and women's sports teams comes down to a
 8    few facts that can be extrapolated, lots of opinions
 9    and an interesting but complicated discussion?
10              MR. FRAMPTON:  Object to the form.              01:01:01
11              THE WITNESS:  Yes, I will stand by that
12    statement in my blog post.
13              MR. BLOCK:  Okay.  Great.
14              So I'm going to now ask a few questions about
15    your other, you know -- your other publication or        01:01:17
16    submission on this topic.  Let me just move it into the
17    actual exhibits.
18              Let's see.  So I -- this is a PowerPoint
19    document.  It's going to marked as Exhibit 74, although
20    I am not sure that it is actually going to work,          01:02:07
21    showing up, so please let me know if it actually shows
22    up for you.
23              (Exhibit 74 was marked for identification
24         by the court reporter and is attached hereto.)
25              THE WITNESS:  All right.  I see Exhibit 074.     01:02:21
```

Page 177

```
 1              MR. BLOCK:  Okay.  And I think we're going to

 2     need some assistance in how -- how do we zoom in again,

 3     Concierge?

 4              MS. DUPHILY:  You just hold your mouse over

 5     the bottom of the image, and you'll see the positive      01:02:37

 6     and negative-looking glasses at the bottom, and you

 7     can -- there's a menu.

 8              Do you see that?

 9              MR. BLOCK:  Mouse over the image?

10              MS. DUPHILY:  You want to click on it when       01:02:54

11     you're --

12              MR. BLOCK:  All right.

13              MS. DUPHILY:  Did you do it?

14              MR. FRAMPTON:  With the witness, we're not

15     getting that.                                             01:03:03

16              MS. DUPHILY:  Hold on a minute.  Let me see.

17              MR. TRYON:  Yeah, this is Dave Tryon.  I've

18     seen that on other exhibits, but this one, it's not

19     showing up for me.

20              MR. BLOCK:  If you're able to download a         01:03:19

21     copy --

22              MS. DUPHILY:  Yeah, you're probably better off

23     downloading this because it's a PowerPoint.

24     BY MR. BLOCK:

25         Q   Have you been able to download it, Dr. Brown?    01:04:02
```

                                                        Page 178

```
 1        A    It appears that my computer is trying to

 2   update PowerPoint at this very moment.

 3        Q    Okay.

 4             MR. BLOCK:  So why don't we -- can we go off

 5   the record, please?                              01:04:12

 6             MR. FRAMPTON:  It looks like it's nearly --

 7             THE VIDEOGRAPHER:  We are off the record at

 8   1:04 p.m.

 9             (Recess.)

10             THE VIDEOGRAPHER:  We are on the record at   01:05:37

11   1:05 p.m.

12             MR. BLOCK:  Thanks.

13   BY MR. BLOCK:

14        Q    So is this a presentation that you authored,

15   Dr. Brown?                                        01:05:51

16        A    Yes, it is.

17        Q    And the title of this presentation is

18   "Transwomen Competing in Women's Sports: What We Know,

19   and What We Don't"; is that right?

20        A    That is correct.                        01:06:01

21        Q    Okay.  And what conference did you submit this

22   presentation to?

23        A    This was the American Physiological Society

24   Sex and Gender conference, if I remember the title

25   correctly.                                        01:06:18
```

                                                Page 179

```
 1        Q   Yeah.  If I -- if I said it was called "The
 2   New Trends in Sex and Gender Medicine" conference, does
 3   that sound accurate to you?
 4        A   Yes.
 5        Q   Okay.  And am I right that the conference took   01:06:28
 6   place from October 19th to October 22nd?
 7        A   That sounds correct.
 8        Q   Okay.  Did you attend any meetings or panel
 9   discussions as part of this conference?
10        A   So this was a virtual conference for everyone.   01:06:42
11        Q   Uh-huh.
12        A   And so, yes, I sat in on discussions and panel
13   discussions and presentations and such.
14        Q   Okay.  Did you sit in on the panel discussion
15   at this conference titled "New Trends in Transgender     01:07:05
16   Medicine"?
17        A   I honestly can't remember if I sat in and
18   attended that or not.
19        Q   Okay.  You have no recollection one way or the
20   other?                                                    01:07:18
21        A   Yeah, I -- there was a lot of meetings, a lot
22   of presentations and a lot of discussions, so I can't
23   say exactly which ones I was in and which ones I was
24   not.
25        Q   Do you think it would have been informative to   01:07:32
```

Page 180

```
 1    attend that presentation?

 2        A   Yes.

 3            MR. FRAMPTON:  Objection to the form.

 4            THE WITNESS:  Sorry.

 5            MR. FRAMPTON:  Go ahead.                    01:07:39

 6    BY MR. BLOCK:

 7        Q   You can answer.

 8        A   Yes, it -- it would have been informative.

 9        Q   Okay.  And do you think it would have been at

10    least as relevant to your research as Ben Shapiro?    01:07:49

11            MR. FRAMPTON:  Object to the form.

12            THE WITNESS:  It's possible that I had a

13    conflicting obligation that made it so I'm not able to

14    attend.  Again, I know that I did with all of them, I

15    wasn't able to attend every single session I wanted    01:08:04

16    because of other obligations.

17    BY MR. BLOCK:

18        Q   I see.  But -- but my question is, would -- it

19    would be a more reliable source of information than

20    Ben Shapiro, was my question.                    01:08:19

21            MR. FRAMPTON:  Object to the form.

22            THE WITNESS:  I guess that would depend on

23    what we're asking, Ben Shapiro is -- is speaking about

24    and where he is citing his sources versus what is being

25    discussed in that discussion.                    01:08:37
```

                                                     Page 181

```
 1    BY MR. BLOCK:
 2         Q   Okay.  Now, would -- would this
 3    presentation quali- -- would -- could this be
 4    prescribed as a poster presentation?
 5         A   Yes.                                    01:08:51
 6         Q   Okay.  Does your CV identify it as a poster
 7    presentation?
 8         A   I don't think my CV discriminates on my
 9    various academic presentations, as to what format they
10    were presented in.                               01:09:06
11         Q   Okay.  So it's not your regular practice to
12    denote whether a presentation is specifically a poster
13    presentation?
14         A   That is correct.
15         Q   Okay.  All right.  What was the review process  01:09:13
16    for submitting this?
17         A   So I -- I was encouraged by an editor from the
18    American Journal of Physiology to submit to this, after
19    having read my blog post.  I submitted it, paid the
20    abstract submission fee, like any other professional  01:09:34
21    conference, and awaited for acceptance of the abstract.
22         Q   And what -- were there edits to the abstract
23    sent back to you?
24         A   No.  They don't edit the abstracts.
25         Q   Okay.  All right.                       01:09:47
```

Page 182

```
 1              If you go to the bottom right-hand corner of

 2      this presentation, there's a box titled "What we don't

 3      know"; right?

 4          A    Correct.

 5          Q    Okay.  And then -- and this box says, "What We     01:10:09

 6      Don't Know," and then the first bullet is "No

 7      controlled training studies with male-to-female hormone

 8      use"; correct?

 9          A    Correct.

10          Q    Okay.  And -- and again, as we discussed          01:10:20

11      before, that -- that statement is not in your expert

12      report; right?

13              MR. FRAMPTON:  Object to the form.

14              THE WITNESS:  That statement is not verbatim

15      in my expert report.                                      01:10:36

16      BY MR. BLOCK:

17          Q    And then the second bullet point is "No

18      measurements of changes in VO2max, running economy,

19      lactate threshold, anaerobic power (e.g. Wingate test),

20      vertical jump, 1-Repetition Maximum (e.g. bench press,     01:10:47

21      leg press, squat, deadlift), or many other common

22      determinants of athletic performance"; correct?

23          A    That is correct.

24          Q    And that information in that bullet point is

25      not included in your expert report; correct?              01:11:05
```

Page 183

```
 1              MR. FRAMPTON:  Object to the form.

 2              THE WITNESS:  Again, in my expert report, I

 3      state that there is limited evaluation.  I don't make

 4      that statement exactly.

 5      BY MR. BLOCK:                                    01:11:17

 6         Q   Okay.  How come this poster presentation

 7      doesn't say that the policy goals of fairness, safety

 8      and full transgender inclusion are irreconcilable for

 9      many or most sports?

10              MR. FRAMPTON:  Object to the form.        01:11:28

11              THE WITNESS:  This poster was put together and

12      presented before the recent IOC or NCAA adjustments,

13      stating that that was a requirement.  And again, the

14      poster is summarizing the science of what we know and

15      what we do not know.                             01:11:48

16      BY MR. BLOCK:

17         Q   So would you feel comfortable making the

18      statement to a -- a peer-reviewed publication that the

19      policy goals of fairness, safety and full transgender

20      inclusion are irreconcilable?                    01:12:05

21         A   Yes, I would feel very comfortable saying that

22      in a peer-reviewed pol- -- publication or presentation.

23         Q   Can you tell me your understanding of what

24      this case is about?

25              MR. FRAMPTON:  Object to the form.        01:12:31
```

Page 184

```
 1            Go ahead.
 2            THE WITNESS:  So the State of West Virginia,
 3   like about currently 11 other states, if I recall,
 4   passed a law to limit participation in women's sports
 5   to biological women.                          01:12:43
 6            In this case, a young trans girl has retained
 7   some lawyers and filed a lawsuit asking to be able to
 8   participate in girls sports.
 9            The judge has given an injunction specifically
10   for the plaintiff, but not halting the law overall.   01:13:05
11   BY MR. BLOCK:
12      Q    And do you -- so the -- the plaintiff's name
13   is -- is Becky.
14            Do you oppo- -- do you think Becky should not
15   be allowed to participate on her middle school       01:13:23
16   cross-country team?
17            MR. FRAMPTON:  Object to the form and scope.
18            THE WITNESS:  So my understanding is the
19   plaintiff is biologically male, so a trans girl, who
20   wants to compete on girls sports.                01:13:39
21   BY MR. BLOCK:
22      Q    Yes.  And -- and so what's the answer to my
23   question?
24      A    So --
25            MR. FRAMPTON:  Same objections.          01:13:54
```

Page 185

```
 1              THE WITNESS:  So if we were to follow the law,

 2       then the plaintiff should not be participating in

 3       girls' sports.

 4       BY MR. BLOCK:

 5          Q   Yeah, but it's your -- is it your expert          01:14:01

 6       opinions that Becky should not be participating in the

 7       girls' cross-country team at her middle school?

 8              MR. FRAMPTON:  Objection; form and scope.

 9              THE WITNESS:  So my expert statement, expert

10       declaration, is not meant to make judgments on an      01:14:17

11       individual basis, but overall policy and law.

12       BY MR. BLOCK:

13          Q   Okay.  Well, so you -- you made a distinction

14       between the fact that the injunction is -- applies only

15       to Becky and not to the -- the statute on its face, and  01:14:31

16       so I'm just trying to figure out whether your expert

17       opinion is only about other applications of the statute

18       to people beyond Becky or whether you are also offering

19       expert testimony with respect to the specific issue of

20       Becky's as-applied challenge.                            01:14:51

21              MR. FRAMPTON:  Objection; form and scope.

22              THE WITNESS:  I've not made any statements

23       that I'm aware of specific to an individual plaintiff

24       in this case or -- I don't think in any of the cases.

25       ///
```

Page 186

```
 1    BY MR. BLOCK:

 2        Q   Okay.  So you're not offering an expert

 3    opinions in this case with regard to whether Becky, as

 4    an individual, should be allowed to participate on her

 5    girl's cross-country team in middle school?          01:15:22

 6            MR. FRAMPTON:  Objection; form and scope.

 7            THE WITNESS:  I'm offering an expert opinion

 8    based on what the science says and what we know overall

 9    regarding differences between males and females and how

10    those differences are affected by transgender hormone   01:15:37

11    use.

12    BY MR. BLOCK:

13        Q   Okay.  And are you offering any opinion on

14    whether Becky, as an individual, has any athletic

15    advantages compared to cisgender girls?              01:15:52

16            MR. FRAMPTON:  Objection; form and scope.

17            THE WITNESS:  I'm not making statements

18    specific to Becky.  I am talking about boys and girls

19    overall.

20    BY MR. BLOCK:                                         01:16:07

21        Q   Okay.  And it's possible that Becky, as an

22    individual, as opposed to people with a male sex

23    assigned at birth overall -- let me just rephrase that.

24            It's possible that Becky, as an individual,

25    may not have any athletic advantages compared with   01:16:21
```

                                                    Page 187

```
 1    cisgender girls; right?

 2            MR. FRAMPTON:  Object to the form and scope.

 3            THE WITNESS:  Based on the information I have

 4    read, the information cited in my expert report, if we

 5    are comparing the plaintiff to a similarly aged trained    01:16:34

 6    and gifted girl, the plaintiff, as a biological male,

 7    will have athletic advantages.

 8    BY MR. BLOCK:

 9        Q   Well, that -- that raises questions for me.

10            I -- I -- I guess my understanding of your       01:16:49

11    report was that you were discussing average group-based

12    differences between males and females; right?

13        A   If you look at my --

14            MR. FRAMPTON:  Objection; form.

15            Go ahead.                                         01:17:01

16            THE WITNESS:  If you look at my report, I -- I

17    provide information on individuals in the 10th

18    percentile, individuals in the 50th percentile,

19    individuals in the 90th percentile, and state multiple

20    times if we compare equally trained, gifted and          01:17:14

21    talented same-age individuals, the males have an

22    advantage.

23    BY MR. BLOCK:

24        Q   Well, what do you mean by "gifted"?

25        A   There are many gifts that could help a person    01:17:25
```

Page 188

```
 1    be a better athlete than others, whether --
 2         Q   So --
 3         A   -- whether it is something biological, whether
 4    that is something with family support.
 5         Q   Okay.  But -- so when -- when you're          01:17:43
 6    discussing the physiological characteristics that, on
 7    average, make cisgender boys have better outcomes in
 8    athletic performance than cisgender girls, you're not
 9    saying that every single cisgender boy has
10    physiological characteristics that make -- that give    01:18:03
11    them an advantage over the average cisgender girl of
12    the same age and training, are you?
13              MR. FRAMPTON:  Object to the form.
14              THE WITNESS:  When we look at the data, if you
15    compare comparably gifted aged and trained males and    01:18:24
16    females, the males have an advantage.
17    BY MR. BLOCK:
18         Q   Yeah, but you're -- you're smuggling in the
19    word "gifted" here, and you're including these
20    physiological characteristics as meaning gifted, it    01:18:34
21    sounds like.
22              I'm trying to isolate your testimony about
23    physiological advantages, okay?
24              And so it's possible there's -- there's plenty
25    of boys that are shorter than girls; right?            01:18:46
```

Page 189

1          A   Yes, there are some boys that are shorter than

2    some girls.

3          Q   Yes.  So not -- not every -- and there are

4    some boys that are shorter than the average girl of the

5    same age; correct?                                    01:19:04

6          A   Yes, there are some boys that are shorter than

7    the average girl.

8          Q   Okay.  So not -- not every -- so even if

9    males, on average, are taller than females, on average,

10   not every male is gifted with greater height than the   01:19:18

11   average girl of the same age; right?

12         A   50 percent of men are taller than 90 percent

13   of women.

14         Q   Yeah.  And I know you're -- you're -- you're

15   making a statement, though, that that doesn't answer my  01:19:38

16   question.  And so I'm taking that as -- is the answer

17   to my question "correct"?

18         A   Could you restate the question, please?

19         Q   Yes.  Not every boy is taller than the average

20   cisgender woman; right?                                 01:19:54

21             Let me switch from boys to gir- -- to a woman.

22             Not every cisgender boy is taller than the

23   average cisgender girl of the same age; correct?

24         A   If I can -- I'm -- I'm just a little confused

25   here because you are comparing an absolute of every boy  01:20:13

Page 190

```
 1    with average.
 2         Q   Yes, I -- I -- I am.  I -- I'm saying that it
 3    is entirely possible that there's an individual that is
 4    not taller than the -- an individual who is a boy that
 5    is not taller than the average girl, the mean -- or the      01:20:31
 6    mean height of girls of the same age; right?
 7         A   Yes.  So if you look at the distribution
 8    curves for body height, boys on the shorter end of the
 9    distribution curve may be shorter than girls in the
10    average of the distribution curve.                           01:20:47
11         Q   And -- and the same is true for speed; right?
12         A   If I may, I would actually like to refer back
13    to the graphs by Gabe Higgard so we could look and see
14    where the slowest boys are relative to the
15    50th percentile for the girls in those competitions.         01:21:09
16         Q   Okay.  We can -- so we -- I appreciate that.
17    We can refer back to that later.
18             Are -- are you familiar at all with Becky's
19    athletic performance?
20         A   No.  I know nothing of Becky's athletic             01:21:26
21    performance.
22         Q   Okay.  And you -- as we said before, you are
23    not providing expert testimony about her as an
24    individual; correct?
25         A   Right.  I'm providing testimony on overall          01:21:41
```

                                                        Page 191

```
 1    what we would see if we compare equal, as much as

 2    possible, males to females.

 3        Q    And is it your understanding of -- of this law

 4    that it prevents girls who are transgender from

 5    participating on the same sports teams as cisgender      01:22:06

 6    girls?

 7            MR. FRAMPTON:  Object to the form and scope.

 8            THE WITNESS:  My understanding is, yes, this

 9    states that people should participate in sports

10    based -- based on their biological sex.                  01:22:21

11    BY MR. BLOCK:

12        Q    Right.  And, therefore, transgender girls

13    should not be allowed to participate on the same sports

14    team as cisgender girls; correct?

15            MR. FRAMPTON:  Same objection.                   01:22:32

16            THE WITNESS:  Just going to rephrase that.

17            So trans girls should not be competing with

18    cis girls, yes.

19    BY MR. BLOCK:

20        Q    Okay.  Thank you.                               01:22:40

21            And you think H.B. 3293 -- well, let me say,

22    do you know what I'm talking about when I refer to

23    H.B. 3293?

24        A    I know we're talking about H.B.  I don't

25    remember the number.  I will assume that it is the law   01:22:57
```

Page 192

```
 1    in West Virginia.

 2         Q   Okay.  Great.

 3             You think H.B. 3293 is justified by science;

 4    right?

 5             MR. FRAMPTON:  Object to the form and scope.    01:23:06

 6             THE WITNESS:  Yes, I do.

 7    BY MR. BLOCK:

 8         Q   Okay.  And you think it's justified by science

 9    even though it applies to trans girls who, as a result

10    of puberty blockers and gender-affirming hormones,        01:23:23

11    never go through endogenous puberty; right?

12             MR. FRAMPTON:  Same objections.

13             THE WITNESS:  Yes.

14    BY MR. BLOCK:

15         Q   And you think H.B. 3293 is justified by          01:23:29

16    science even though it applies to trans girls and women

17    who go through endogenous puberty and then take

18    medication to lower their levels of circulating

19    testosterone; right?

20             MR. FRAMPTON:  Same objections.                  01:23:43

21             THE WITNESS:  Yes.

22    BY MR. BLOCK:

23         Q   Okay.  And you think H.B. 3293 is justified by

24    science even though it applies the same categorical

25    rule to all sex-separated sports instead of creating      01:23:50
```

Page 193

```
 1    different standards for different sports; is that

 2    right?

 3           MR. FRAMPTON:  Same objections.

 4           THE WITNESS:  Yes.

 5    BY MR. BLOCK:                                    01:24:01

 6       Q   Okay.  I would like to direct your attention

 7    to paragraph 8 of your report.  Let me know when you're

 8    there.

 9       A   It is on page 7, under item II, "Biological

10    men"?                                            01:24:29

11       Q   Yes.

12       A   Okay.

13       Q   Okay.  Make sure I'm there myself.

14           Okay.  So I'm just going to read this to you,

15    beginning with the second sentence.  (As read):  01:24:44

16           "I cited many" --

17           Actually, I'll begin with the first sentence.

18    Sorry.

19           You say (as read):

20           "Nevertheless, these differences have       01:24:52

21           been extensively studied and measured.

22           I cited many of these studies in the

23           first paper on this topic that I

24           prepared, which was submitted in

25           litigation in January 2020.               01:25:03
```

```
 1           Since then, in light of current
 2           controversies, several authors have
 3           compiled valuable collections or
 4           reviews of data extensively
 5           documenting this objective fact about      01:25:11
 6           the human species, as manifest in
 7           almost all sports, each of which I
 8           have reviewed and found informative.
 9           Did I read that correctly so far?
10     A     Yes, you did.                              01:25:23
11     Q     Okay.  Thanks.
12           And you say (as read):
13           "These include Coleman (2020), Hilton
14           & Lundberg (2021), World Rugby (2020),
15           Harper (2021), Hamilton (2021), and a     01:25:36
16           'Briefing Book' prepared by the
17           Women's Sports Policy Working Group
18           (2021).
19           Did I read that right?
20     A     Yes.                                       01:25:46
21     Q     Okay.  And if you -- if you could look at
22   the -- that list that you gave, and I'd like you to --
23   to tell me -- and I -- and I will write it down --
24   which of those sources support excluding transgender
25   girls and women from sports if they have had puberty    01:26:08
```

```
 1    blockers and gender-affirming hormones and, as a
 2    result, have not gone through endogenous puberty.
 3              MR. FRAMPTON:  Object to the form.
 4              THE WITNESS:  Can you please rephrase that
 5    question?  It was just kind of long.              01:26:21
 6    BY MR. BLOCK:
 7         Q    Yeah, sure.
 8              So I -- I'm talking about trans girls who have
 9    been on puberty blockers and, as a result, not
10    experienced endogenous puberty.                   01:26:33
11              Which of the sources identified in paragraph 8
12    support excluding those trans girls who are on puberty
13    blockers from participating in girls and women's
14    sports?
15              MR. FRAMPTON:  Object to the form.        01:26:47
16              THE WITNESS:  I cannot recall right now which
17    or if any of those papers discuss specifically puberty
18    blockers.
19    BY MR. BLOCK:
20         Q    Okay.  So -- so you can't recall whether any  01:26:58
21    of those papers discuss puberty blockers at all.  Is
22    that what you're saying?
23         A    I'm saying I cannot recall if they advocate
24    for preventing people who have used puberty blockers
25    from participating in girls' sports.              01:27:15
```

```
 1        Q   Okay.  Can you recall if any of them advocate

 2   in favor of allowing girls who use puberty blockers to

 3   participate in girls and women's sports?

 4        A   Well, as we discussed earlier, the Women's

 5   Sports Policy Working Group has a statement about that,   01:27:37

 6   and I think World Rugby has a statement about that.

 7        Q   Okay.  Any others?

 8        A   I can't recall from the others.

 9        Q   Okay.  So just in terms of what you can

10   recall, at least two of them advocate in favor of         01:27:52

11   allowing trans girls on puberty blockers to participate

12   and you can't recall if any of the others support

13   excluding girls who are transgender?

14             MR. TRYON:  Objection.

15             MR. FRAMPTON:  Same objection.  Form.           01:28:17

16             THE WITNESS:  So I can't recall specifically.

17   I think Hilton and Lundberg have some mention on that

18   topic, but again, I can't recall without referring back

19   to the paper to look.

20   BY MR. BLOCK:                                              01:28:28

21        Q   Okay.  And so which of the sources cited in

22   this paragraph advocate in favor of excluding trans

23   girls and women who go through puberty and then

24   suppress testosterone?

25             MR. FRAMPTON:  Objection; form.                 01:28:46
```

Page 197

```
 1            Go ahead.
 2            THE WITNESS:  I think that is Hilton and
 3    Lundberg and World Rugby and Harper and Hamilton and
 4    the Women's Sports Policy Working Group.
 5    BY MR. BLOCK:                                    01:28:55
 6        Q   Okay.  So it's Hilton and Lundberg and Harper
 7    and World Rugby and Women's Sports Policy Working
 8    Group?
 9        A   And, I think, Hamilton.
10        Q   Okay.  You think that those five sources     01:29:12
11    advocate in favor of excluding transgender girls and
12    women from participating on girls and women's sports
13    team if they have gone through endogenous puberty and
14    then lowered their levels of circulating testosterone?
15            MR. FRAMPTON:  Object to the form.          01:29:36
16            THE WITNESS:  Yes, I think those all indicate
17    that women deserve to compete in a protected category.
18    BY MR. BLOCK:
19        Q   Okay.  And then which of the sources cited in
20    paragraph 8 advocate in favor of having a categorical  01:29:49
21    rule that apply to all sports instead of
22    differentiating based on what sport is at issue?
23            MR. FRAMPTON:  Object to the form.
24            THE WITNESS:  So World Rugby is speaking
25    specifically about rugby; and, therefore, I would not  01:30:14
```

Page 198

```
1    expect it to talk too much about other sports.

2            If I recall correctly, Hamilton states

3    specifically that women deserve to compete in a

4    protected category, which implies all sports.

5            Hilton and Lundberg advocate for sex          01:30:31

6    segregation of sports, and, as far as I know, it's for

7    all sports.

8            And Harper indicates that trans women have a

9    retained athletic advantage compared to cisgender

10   women.                                                01:30:45

11   BY MR. BLOCK:

12       Q   And so just to clarify, my question isn't

13   whether or not there should be separation in those --

14   in all sports; the question is whether or not there

15   should be the same rules for excluding transgender    01:30:58

16   girls and women in all sports.

17           MR. FRAMPTON:  Objection; form.

18           THE WITNESS:  I guess you'll need to rephrase

19   the question because I thought I answered it.

20   BY MR. BLOCK:                                          01:31:17

21       Q   Yeah.  So IOC used to have a single standard

22   that applied to all sports.  They then changed their

23   policy so that individual standards could be crafted

24   for different sports.

25           H.B. 3293 has a single standard that applies  01:31:30
```

Page 199

```
 1    to all sports.

 2           My question is which of the sources support

 3    having a single standard that applies to all sports

 4    instead of having individual standards crafted to

 5    different sports.                                    01:31:46

 6           MR. FRAMPTON:  Objection to the form.

 7           THE WITNESS:  I would need to review each of

 8    them to be specific and certain.  So going off of

 9    memory, Hilton and Lundberg, Hamilton, Women's

10    Sport (sic) Policy Working Group, again, as I recall,  01:32:05

11    without looking at them specifically, state that it

12    should be categorical women's sports and men's sports.

13           MR. BLOCK:  Okay.  Can we go off the record

14    for a second?

15           MR. FRAMPTON:  Sure.                          01:32:19

16           THE VIDEOGRAPHER:  We are off the record at

17    1:32 p.m.

18           (Recess.)

19           THE VIDEOGRAPHER:  We are on the record at

20    2:08 p.m.                                            02:08:00

21    BY MR. BLOCK:

22       Q   Good afternoon, Dr. Brown.

23       A   Mr. Block, how are you doing?

24       Q   I -- I'm good.

25           Okay.  So, you know, we -- just before the    02:08:12
```

Page 200

```
 1    break, we had just a series of questions about some of

 2    the sources quoted in your report, and I'm trying to

 3    just pull back, again, the -- the paragraph where this

 4    was discussed.

 5            This is paragraph 8, page 7, from your expert        02:08:32

 6    report, you know, marked Exhibit 64.

 7        A   Yes.

 8        Q   And, you know, we -- we had a series of

 9    questions about them.  And if you recall, my questions

10    focused on three features of H.B. 3293.  One is the      02:08:46

11    fact that it excludes trans girls and women even if

12    they've had blockers.  Two is that it includes trans

13    girls and women if they've gone through puberty and

14    suppressed their testosterone.  And three is that it

15    has an across-the-board rule.  And I asked you a series   02:09:09

16    of questions about those elements of it, and now I'm

17    going to turn to looking at the sources cited in

18    paragraph 8, with an eye towards those elements.  So

19    that's not a question for you; that's just to orient

20    you for the next couple of questions.                     02:09:27

21            MR. BLOCK:  So if you could look in your

22    exhibit file, Exhibit 75, that should be a PDF of

23    Coleman -- of the first Coleman article.  Coleman 2020.

24            (Exhibit 75 was marked for identification

25         by the court reporter and is attached hereto.)       02:09:46
```

Page 201

```
 1              THE WITNESS:  Yes.  By Doriane Coleman and

 2      Michael Joyner and Donna L.

 3      BY MR. BLOCK:

 4          Q   Yes.  All right.  So if we look at that

 5      article -- if you could turn to page 130 of her      02:10:12

 6      article.  Let me know when you're there.  It's near the

 7      end.

 8          A   Still scrolling.  Almost there.

 9              All right.  Page 130.  Duke Journal of Gender

10      and Law Policy, Volume 27:69, 2020.                   02:10:49

11          Q   Yep.  Okay.

12              Now, just to preface this, you know, this

13      article uses the phrase "category affirming" and

14      "category defeating."

15              Are you familiar with those terms?           02:11:01

16          A   If I remember correctly, category affirming

17      applies to male and female.  Is that correct?

18          Q   So my understanding, which I'll represent to

19      you, is that category affirming means that the

20      participation is consistent with the purposes of having  02:11:20

21      a female category, and category defeating means

22      allowing someone to participate would sort of defeat

23      the purpose of having a female category.

24              So if -- does that ring a bell at all for you?

25          A   Yes, it does.  It does.                      02:11:37
```

                                                     Page 202

```
 1       Q    Okay.  So if you look at the -- the paragraph

 2   beginning "In high school" --

 3       A    Uh-huh.

 4       Q    -- "In high school intramural."

 5            Do you see that?                           02:11:48

 6       A    Yes, I do.

 7       Q    Okay.  So it says (as read):

 8            "In high school intramural, junior

 9            varsity, and regular season play,

10            where institutional goals are            02:11:57

11            primarily related to health and

12            fitness and to the development of

13            social skills, unconditional inclusion

14            of gender diverse students according

15            to their gender identity rather than     02:12:06

16            their sex will usually be category

17            affirming."

18            Do you see that?

19       A    I do.

20       Q    Okay.  So that sentence indicates that it  02:12:12

21   would be consistent with the female category according

22   to Coleman 2020 to have -- to allow trans girls to

23   participate in intramural, junior varsity and regular

24   season play without any medical interventions

25   whatsoever.  Do you agree?                        02:12:39
```

                                                    Page 203

```
 1              MR. FRAMPTON:  Object to the form.

 2              THE WITNESS:  I'm looking at the sentence

 3    after that, however, which has some exceptions, which

 4    would include invitational and postseason

 5    opportunities.                                02:12:53

 6    BY MR. BLOCK:

 7        Q    Yes.  Is it your understanding that H.B. 3293

 8    is limited to excluding trans girls from invitational

 9    and postseason opportunities?

10              MR. FRAMPTON:  Object to the form.   02:13:04

11              THE WITNESS:  Yes, it is my understanding that

12    the law in West Virginia states that biological females

13    only compete in female sports.

14    BY MR. BLOCK:

15        Q    Right.  But not just -- not just the   02:13:22

16    invitational and postseason opportunities of female

17    sports; right?

18              MR. FRAMPTON:  Same objection.

19              THE WITNESS:  Yes, it is my understanding that

20    it is all parts of the sports.               02:13:31

21    BY MR. BLOCK:

22        Q    Right.  So the H.B. 3293 does not allow trans

23    girls to participate on girls' teams in the regular

24    season play of sports; correct?

25              MR. FRAMPTON:  Object to the form.   02:13:46
```

Page 204

```
 1              THE WITNESS:  I will trust your interpretation

 2     on that.

 3     BY MR. BLOCK:

 4        Q   Would you support a policy of allowing trans

 5     girls to participate in regular season play?        02:14:01

 6              MR. FRAMPTON:  Object to the form and scope.

 7              THE WITNESS:  Inasmuch as biological males

 8     have inherent athletic advantages over biological

 9     females, I think the category should be retained.

10     BY MR. BLOCK:                                        02:14:19

11        Q   Yeah, I know.  I'm -- I'm sorry, I really just

12     need like a clear answer to my questions.

13              This article draws a distinction between

14     allowing trans girls to play in regular season play

15     versus in postseason opportunities.  I'm just trying to  02:14:30

16     get an answer from you about whether you agree with

17     that distinction or not.  So --

18              MR. FRAMPTON:  Objection to the form that

19     misstates the article.

20              MR. BLOCK:  Okay.                            02:14:44

21     BY MR. BLOCK:

22        Q   So --

23              MR. FRAMPTON:  You can go ahead and answer.

24     BY MR. BLOCK:

25        Q   So do you think that trans girls should not be  02:14:45
```

Page 205

```
 1    allowed to play on girls' teams for regular season

 2    play?

 3            MR. FRAMPTON:  Object to the form.

 4            Go ahead.

 5            THE WITNESS:  I think that whether it's          02:14:58

 6    regular season, preseason, postseason, males have

 7    inherent athletic advantages; therefore, we should

 8    protect women's sports and men's sports.

 9    BY MR. BLOCK:

10        Q    So -- so that's a yes?                          02:15:13

11            MR. FRAMPTON:  Same objection.

12            THE WITNESS:  I think you could take that as a

13    yes.

14    BY MR. BLOCK:

15        Q    Thank you.                                      02:15:17

16            All right.  Then if you go down, continuing in

17    the article, the paragraph that says -- let me find

18    this.  All right.  The paragraph above that begins with

19    "where combined."  (As read):

20            Where combined teams or practices               02:15:44

21            coupled with sex segregated

22            competition cannot be -- cannot

23            accomplish institutional goals, the

24            accommodations approach detailed in

25            Part IIIC4 should be adopted."                  02:15:55
```

Page 206

```
 1              And that cross references a section that I

 2     don't think we need to turn to for purposes of this

 3     question, but let me know if you disagree.

 4              Then the -- then the paragraph continues,

 5     so -- (as read):                              02:16:08

 6              "This will be the case" --

 7              Meaning the accommodations approach should be

 8     adopted.

 9              (As read):

10              -- "in circumstances where sex        02:16:14

11              segregated teams and events remain

12              necessary to secure parity of

13              opportunity for females.  Where the

14              accommodations approach is adopted,

15              trans students will train and compete  02:16:24

16              consistent with their gender identity

17              so long as their inclusion can be

18              relevantly conditioned.  The NCAA

19              transgender policy is illustrative of

20              a hormonal condition in this category;  02:16:38

21              others that do not require

22              medicalization— such as handicaps,

23              offsets, and quotas— exist as more

24              appropriate models for the high school

25              sports space.                          02:16:45
```

```
 1            Do you see that?
 2      A   Yes, I see that.
 3      Q   Okay.  So am I correct in saying that this
 4   article points to the NCAA transgender policy as
 5   illustrative of a model of allowing trans girls to      02:16:58
 6   participate so long as their inclusion can be
 7   relatively -- relevantly conditioned?
 8            MR. FRAMPTON:  Object to the form.
 9            THE WITNESS:  And I'm unclear what they mean
10   by "relevantly conditioned," so I don't know how I can   02:17:21
11   answer that.
12   BY MR. BLOCK:
13      Q   Okay.  Why do you think they're citing the
14   NCAA transgender policy?
15      A    This is the old NCAA policy, not the current   02:17:35
16   NCAA policy, and the old NCAA policy did have a
17   statement about testosterone suppression.
18      Q   So -- and so they are citing testosterone
19   suppression as an example of an accommodations approach
20   that should be used in circumstances for sex-segregated  02:18:00
21   teams and events remain necessary to secure parity of
22   opportunity for females; right?
23            MR. TRYON:  Objection.
24            MR. FRAMPTON:  Object to the form.
25            THE WITNESS:  And again, what -- I'm still not  02:18:19
```

Veritext Legal Solutions
866 299-5127

**JA2774**

```
 1    sure what you're asking me here.

 2    BY MR. BLOCK:

 3        Q   Sure.  I'm -- I'm asking, does this article

 4    support a policy of -- of excluding trans girls and

 5    women from all female athletic events, even if they        02:18:28

 6    suppress testosterone after puberty?

 7            MR. FRAMPTON:  Same objection.

 8            THE WITNESS:  As I read it, this article is

 9    kind of confusing on that.

10            MR. BLOCK:  Okay.  All right.  I'll -- I'll        02:18:50

11    leave that article at that.

12            Let's next look at the Hilton and Lundberg

13    article, which I will cue up for you.  For some reason,

14    Exhibit Share is being slow.

15            (Exhibit 76 was marked for identification        02:19:43

16          by the court reporter and is attached hereto.)

17    BY MR. BLOCK:

18        Q   Okay.  This should pop up on your exhibit list

19    as Exhibit 76.

20        A   All right.  Exhibit 076 - Hilton - Transgender   02:20:00

21    Women...?

22        Q   Yes.

23        A   Okay.

24        Q   So, you know, we discussed this, you know,

25    as -- you -- you cited this as an exam- -- as,            02:20:12
```

Page 209

```
 1    potentially, an example of an article supporting a

 2    categorical rule across sports; correct?

 3         A   That is correct.

 4         Q   Okay.  And you cited this, potentially, as an

 5    example of an article supporting an exclusion of trans    02:20:29

 6    girls and women even if they've suppressed

 7    testosterone; right?

 8              MR. FRAMPTON:  Same -- object to the form.

 9              THE WITNESS:  Yes.

10    BY MR. BLOCK:                                             02:20:40

11         Q   Okay.  Great.

12              So let's look on page 211 of this article.

13              Let me know when you're there.

14         A   All right.  Yep, page 211.

15         Q   Great.  All right.  Sorry.  One second.        02:21:08

16              All right.  If you look on the right-hand

17    column, the second -- the third sentence there, where

18    it begins, "It is also," do you see that?

19         A   So page 211, right-hand column?

20         Q   Second full paragraph, third sentence.          02:21:44

21         A   Yes.  "It is also important to recognize..."

22         Q   Yeah.  So that says (as read):

23              "It is also important to recognize the

24              performance in most sports may be

25              influenced by factors outside muscle           02:21:58
```

```
 1              mass and strength, and the balance

 2              between inclusion, safety and fairness

 3              therefore differs between sports."

 4              Do you see that?

 5    A    Yes.                                          02:22:06

 6    Q    Okay.  Does that refresh your recollection at

 7   all about whether or not this article advocates for a

 8   single across-the-board rule?

 9              MR. FRAMPTON:  Object to the form.

10              THE WITNESS:  It doesn't make a clear    02:22:21

11   statement one way or the other, necessarily.

12   BY MR. BLOCK:

13    Q    Okay.  So let's continue reading.

14              If you go to the final full paragraph.

15    A    Okay.                                         02:22:47

16    Q    The second sentence beginning with

17   "regardless."

18    A    Okay.

19    Q    Okay.  It says (as read):

20              "Regardless of what the future will      02:22:54

21              bring in terms of revised transgender

22              policies, it is clear that different

23              sports differ vastly in terms of

24              physiological determinants of success,

25              which may create safety considerations   02:23:05
```

Page 211

```
 1                 and may alter the importance of

 2                 retained performance advantages.

 3                 Thus, we argue against universal

 4                 guidelines for transgender athletes in

 5                 sport and instead propose that each        02:23:17

 6                 individual sports federation evaluate

 7                 their own conditions for inclusivity,

 8                 fairness and safety."

 9                 Do you see that?

10      A    Yes, I do.                                       02:23:26

11      Q    Okay.  So is it fair to say that this article,

12   they state that they argue against universal guidelines

13   for transgender athletes in sport?

14             MR. FRAMPTON:  Object to form.

15             THE WITNESS:  Yes, that would be a correct     02:23:42

16   statement based on what is written right there.

17   BY MR. BLOCK:

18      Q    Okay.  So based on what is written right

19   there, they do not support a single categorical rule

20   that applies equally to all sporting events; correct?    02:23:52

21             MR. FRAMPTON:  Same objection.

22             THE WITNESS:  Based on that sentence, that is

23   correct.

24   BY MR. BLOCK:

25      Q    Okay.  Let's go to page 209 of this.             02:23:59
```

                                                              Page 212

```
 1              At the top of the page, on the left-hand

 2      column.

 3          A   Okay.

 4          Q   Okay.  The paragraph beginning -- I mean, not

 5      the paragraph.  The sentence beginning with the word      02:24:28

 6      "however."

 7              Do you see that --

 8          A   Yes.

 9          Q   -- right in the middle of that first

10      paragraph?                                                02:24:35

11              All right.  It says (as read):

12              "However, given the plausible

13              disadvantages with testosterone

14              suppression mentioned in this section,

15              together with the more marginal male              02:24:43

16              advantage in endurance-based sports,

17              the balance between inclusion and

18              fairness is likely closer to

19              equilibrium in weight-bearing

20              endurance-based sports compared with              02:24:55

21              strength-based sports where the male

22              advantage is still substantial.

23              Do you see that?

24          A   Yes, I do.

25          Q   All right.  So -- and feel free to read more      02:25:03
```

Page 213

```
 1    of that paragraph of which this is an excerpt, but is

 2    it fair to say that the authors of this article are

 3    saying there is a substantial advantage for

 4    strength-based sports for transgender women who

 5    suppress testosterone, but when it comes to -- when it      02:25:25

 6    comes to weightbearing endurance-based sports, the

 7    balance between inclusion and fairness is likely closer

 8    to equilibrium?

 9          MR. FRAMPTON:  Object to the form.

10          MR. TRYON:  Objection.                                 02:25:45

11          THE WITNESS:  I think you need to take that

12    particular statement in context of the other

13    information presented in this article in which the

14    authors clearly demonstrate a 10 to 13 percent

15    advantage in endurance performance for males compared      02:25:57

16    to females relative to the 30 to 60 percent -- I guess

17    I could look up at the table and tell you exactly the

18    percent -- that they're showing for advantage in

19    strength-based sports.

20          And then if you look at the para- -- the            02:26:10

21    sentence right above what you've quoted, they mention

22    about unknown effects on vari- -- a number of the

23    determinants of endurance performance.

24          And so I really can't say too much beyond that

25    that is kind of a speculative statement.                    02:26:26
```

Page 214

```
 1    BY MR. BLOCK:

 2        Q   I see.  So if you look on page 208, there's a

 3    discussion about -- on the right-hand column, there's a

 4    discussion about hemoglob- -- hemoglobin levels being

 5    reduced with once testosterone is suppressed; correct?    02:26:48

 6        A   Yes.  Second paragraph down, page 208, starts

 7    "Circulating hemoglobin."

 8        Q   Right.  And if you -- and then if you look at

 9    the next paragraph, it also says (as read):

10            "The typical increase in body fat             02:27:07

11             noted in transgender women may also be

12             a disadvantage for sporting activities

13             (e.g. running) where body weight (or

14             fat distribution) presents a marginal

15             disadvantage."                                02:27:21

16            Right?

17        A   Correct.

18        Q   Okay.  All right.  I'll leave it at that

19    article.

20            We already -- you mentioned the World Rugby    02:27:36

21    policies, and you already noted that World Rugby allows

22    girls and women -- trans girls and women to -- I guess

23    I'll start over.

24            You already mentioned that World Rugby allows

25    trans women to participate in women's rugby if they've   02:27:55
```

Page 215

```
 1    had puberty blockers and, therefore, not experienced

 2    endogenous puberty; right?

 3           MR. FRAMPTON:  Object to form.

 4           Go ahead.

 5           I'm sorry.  I couldn't tell if you finished      02:28:11

 6    the question.

 7           Go --

 8           MR. FRAMPTON:  But objection.

 9           Go ahead and answer.

10           THE WITNESS:  All right.  That is my             02:28:14

11    understanding of what World Rugby has stated.

12    BY MR. BLOCK:

13      Q   Okay.  So you don't need me to put on the

14    screen a -- a copy of the World Rugby policy to -- to

15    point out that provision, do you?                       02:28:27

16      A   I would ask you to put it on the screen so we

17    can evaluate if they cite any sources to make that

18    statement.

19      Q   Sure.  Let's put that -- let's put it on the

20    screen.  One second.                                    02:28:40

21           MS. DUPHILY:  Did you say you wanted to put

22    something on the screen or --

23           MR. BLOCK:  No, I'll take -- I'll take care of

24    it.  I'm just looking up which specific one I want to

25    put up.                                                 02:29:03
```

Page 216

```
 1              MS. DUPHILY:  Okay.

 2              (Exhibit 77 was marked for identification

 3         by the court reporter and is attached hereto.)

 4    BY MR. BLOCK:

 5         Q   All right.  So this is going to pop up as      02:29:22

 6    marked as Exhibit 77.  Let me know when you see it.

 7         A   All right.  Exhibit 077 - World Rugby

 8    Transgender...?

 9         Q   Yes.  All right.  And you see it says, "Can

10    transgender women play rugby?" right?                   02:29:58

11         A   Yes.

12         Q   Okay.  And the first bullet point says (as

13    read):

14              "Transgender women who transitioned

15              pre-puberty and have not experienced         02:30:08

16              the biological effects of testosterone

17              during puberty and adolescence can

18              play women's rugby (subject to

19              confirmation of medical treatment and

20              the timing thereof).                          02:30:18

21              Right?

22         A   Yes, I see that.

23         Q   Okay.  The third bullet point also says (as

24    read):

25              "Transgender women can play               02:30:22
```

                                                    Page 217

```
 1              mixed-gender non-contact rugby."

 2              Right?

 3      A    Yes.

 4      Q    Okay.  And if we -- scroll down.

 5              Do you know -- do you know if World Rugby at     02:31:00

 6      all talks about any advantages for -- between boys and

 7      girls before puberty?

 8      A    I don't recall this document from World Rugby

 9      evaluating differences between boys and girls

10      prepuberty.                                             02:31:25

11      Q    Can you recall any document from World Rugby

12      evaluating that?

13      A    Sitting here right now, I cannot recall that

14      World Rugby has evaluated and cited sources on

15      differences before puberty or the effect of puberty    02:31:45

16      blockers on those differences.

17      Q    Okay.  All right.

18              So that's -- that's World Rugby.  So we can

19      put that down as not supporting a policy of excluding

20      trans girls and women from participating in girls and   02:32:04

21      women's sports if they've had puberty blockers;

22      correct?

23              MR. FRAMPTON:  Object to the form.

24              THE WITNESS:  I think it's important that

25      that's specific to rugby.                               02:32:18
```

Page 218

```
1    BY MR. BLOCK:
2        Q   I -- I understand.  But the -- the answer to
3    my question is correct; right?
4            MR. FRAMPTON:  Object to the form.
5            THE WITNESS:  Isn't that what I said?        02:32:26
6    BY MR. BLOCK:
7        Q   No.  You -- you've made a different statement,
8    so I -- I just -- I need you to answer my question
9    before you make a different statement.
10           So it's fair to say that -- that             02:32:35
11   World Rugby -- this World Rugby policy does not support
12   excluding trans girls and women from girls and women's
13   teams in rugby if they have been on hormone blockers
14   and not experien- -- puberty blockers and not
15   experienced endogenous puberty; correct?             02:32:58
16           MR. FRAMPTON:  Object to the form.
17           THE WITNESS:  Yes, that is correct, as you
18   stated, the World Rugby statement is about rugby.
19           (Exhibit 78 was marked for identification
20        by the court reporter and is attached hereto.)  02:33:10
21   BY MR. BLOCK:
22       Q   Okay.  All right.  Now let's look at the
23   Harper 2021 article.
24           All right.  This is going to appear on your
25   screen as Exhibit 78.  Please let me know once you have  02:33:36
```

Page 219

1    it.

2         A    All right.  Exhibit 078 - Harper.

3         Q    All right.  See if I can grab -- all right.

4    So if you go to page 7.  Let me know when you're there.

5         A    All right.  Page 7 of 9.                    02:34:17

6         Q    Yeah.  So if you look at the first full

7    paragraph, beginning with "in contrast," do you see

8    that?

9         A    Yes.

10        Q    Okay.  It says (as read):                   02:34:35

11             "In contrast to strength-related data,

12             blood cell findings revealed a

13             different time course of change.

14             After 3-4 months on GAHT" -- which is

15             gender-affirming hormone therapy --        02:34:48

16             "the HCT or Hgb levels of transwomen

17             matched those of cisgender women, with

18             levels remaining stable within the

19             'normal' female range for studies

20             lasting up to 36 months."                  02:35:02

21             Do you see that?

22        A    Yes, I do.

23        Q    Okay.  And then if you look at the bottom of

24   the paragraph, so that's the top of the second column,

25   it says (as read):                                   02:35:19

                                                     Page 220

```
 1              "Given this, and that the changes in

 2              Hgb/HCT follow a different time course

 3              than strength changes, sport-specific

 4              regulations for transwomen in

 5              endurance versus strength sports may        02:35:30

 6              be needed."

 7         Do you see that?

 8    A    Yes, I see that.

 9    Q    Okay.  So is this Harper article advocating

10    for a single categorical rule that doesn't distinguish   02:35:41

11    between endurance sports and strength sports?

12              MR. FRAMPTON:  Object to the form.

13              THE WITNESS:  That would appear to be correct.

14    BY MR. BLOCK:

15    Q    Okay.  Now, if you look at the bottom right,     02:35:53

16    so the last paragraph, bottom right of page 7, it says

17    (as read):

18              "Although the data we present are

19              meaningful, the effects of GAHT on

20              these parameters, or indeed athletic        02:36:15

21              performance in transgender people who

22              engage in training and competition,

23              remain unknown."

24         Do you see that?

25    A    Yes.                                             02:36:23
```

Page 221

```
 1        Q   Okay.  Great.

 2             And then if we move down -- actually, never

 3   mind.  I'll come -- I'll come back to this article.

 4   I -- I have one more to quote for you, and then I'll

 5   come back to this article.                        02:36:44

 6             If you go to page 8, at the very end, the

 7   second to last sentence.

 8        A   Is that the one that starts "Whether

 9   transgender"?

10        Q   Yes.  It says (as read):               02:36:57

11             Whether --

12        A   Okay.

13        Q   (As read):

14             "Whether transgender and cisgender

15             women can engage in meaningful sport,   02:37:02

16             even after gender-affirming hormone

17             therapy, is a highly debated question.

18             However, before this question can be

19             answered with any certainty, the

20             intricacies and complexity of factors   02:37:12

21             that feed into the development of

22             high-performance athletes warrant

23             further investigation of attributes

24             beyond those assessed herein."

25             Do you see that?                        02:37:23
```

                                                     Page 222

```
 1        A   I see that.
 2        Q   Okay.  So do the authors of this article
 3   believe that the information they present here allows a
 4   policy maker to determine with any certainty whether
 5   transgender and cisgender women can engage in          02:37:38
 6   meaningful sport after GAHT?
 7            MR. FRAMPTON:  Object to the form.
 8            MR. TRYON:  Objection.
 9            THE WITNESS:  The authors state that that
10   question cannot be answered.                           02:37:52
11   BY MR. BLOCK:
12        Q   Okay.  And you -- do you think the question
13   can be answered?
14            MR. FRAMPTON:  Object to the form.
15            Go ahead.                                      02:38:05
16            THE WITNESS:  I think that the question can be
17   answered sufficiently that we should not do away with
18   existing policies until further information
19   demonstrating the removal of biological male advantage
20   has been obtained.                                      02:38:18
21   BY MR. BLOCK:
22        Q   Okay.  Let me ask that again.
23            So the -- the -- the -- because I'm just not
24   sure it came out clearly.
25            So the authors of this article say -- I'm just 02:38:32
```

Page 223

```
 1    going to read it again for the record.  (As read):

 2              "Whether transgender and cisgender

 3              women can engage in meaningful sport,

 4              even after gender-affirming hormone

 5              therapy, is a highly debated question.        02:38:47

 6              However, before this question can be

 7              answered with any certainty, the

 8              intricacies and complexity of factors

 9              that feed into the development of

10              high-performance athletes warrant          02:38:56

11              further investigation of attributes

12              beyond those assessed herein."

13              Do you agree or disagree with that statement?

14              MR. FRAMPTON:  Object to the form.

15              Go ahead.                                   02:39:08

16              THE WITNESS:  So what is the question I'm

17    agreeing with or not agreeing with?

18    BY MR. BLOCK:

19         Q    I -- I believe the question is that until --

20    until the intricacies and complexity of factors that   02:39:24

21    feed into the development of high-performance

22    athletes -- let me ask the question again in a -- in a

23    clearer way.

24              Do you -- the -- the question is, do you -- is

25    the information presented in this article sufficient    02:39:37
```

Page 224

```
 1    for a policy maker to answer with any certainty whether

 2    transgender and cisgender women can engage in

 3    meaningful sport after gender-affirming hormone

 4    therapy?

 5            MR. FRAMPTON:  Same objection.              02:39:55

 6            Go ahead.

 7            THE WITNESS:  What is meant by "meaningful

 8    sport"?

 9    BY MR. BLOCK:

10       Q   What -- what do you think is meant by        02:39:59

11    "meaningful sport"?

12       A   I asked first.

13       Q   So you can't answer the question without

14    knowing more what they mean by "meaningful sport"?

15       A   Yes, I would like know what they mean more by  02:40:19

16    "meaningful sport."

17       Q   Okay.  Do you think that -- all right.  We can

18    come back to this article later too.

19            So a question about the Hamilton article.  You

20    have several times, if I'm right, referenced a        02:40:45

21    statement in the Hamilton article about how women have

22    a right to compete in a protected category; is that

23    right?

24       A   Yes, I have stated that.

25       Q   Okay.  Is there any other portion of the       02:41:02
```

Page 225

```
 1    Hamilton article that you remember?
 2            MR. FRAMPTON:  Object to the form.
 3            THE WITNESS:  I remember there was a lot of
 4    statements in the Hamilton article that seemed
 5    confusing and contradictory.                        02:41:18
 6    BY MR. BLOCK:
 7        Q   What do you mean by "confusing and
 8    contradictory"?
 9        A   Again, if I'm remembering the article
10    correctly, it seemed like they would make a statement  02:41:30
11    in one place about how trans women retain significant
12    advantages and then in another statement state
13    something about how those advantages wouldn't influence
14    sport performance and then come back and state that
15    those are advantages that influence sport performance.  02:41:48
16            I'm -- I'm grossly generalizing here, but that
17    was my impression because I read a lot of the article.
18        Q   Okay.  Which portions of the article did you
19    decide to cite in your report?
20            MR. FRAMPTON:  Object to the form.           02:42:06
21            THE WITNESS:  The -- if I'm remembering
22    correctly, that is a direct quote from Hamilton, that
23    cisgender women deserve to compete in a protected
24    category, and I thought that was a very clear statement
25    from that article.                                   02:42:22
```

Page 226

```
 1    BY MR. BLOCK:
 2        Q   Okay.  But -- but you had said before that
 3    several statements in the article are contradictory;
 4    right?
 5        A   Yes.                                         02:42:30
 6        Q   Okay.  And in your report, you quoted the
 7    statements that you believe support excluding trans
 8    girls and women from female sports; is that right?
 9            MR. FRAMPTON:  Object to the form.
10            THE WITNESS:  Yes, I quoted from Hamilton    02:42:56
11    those parts that -- yeah, as you said.
12    BY MR. BLOCK:
13        Q   Okay.  But you didn't quote any of the
14    portions of the Hamilton article that are contradictory
15    with that; right?                                    02:43:19
16            MR. FRAMPTON:  Object to the form.
17            THE WITNESS:  I didn't put quotations in there
18    that were confusing and contradictory to other
19    quotations in the article.
20    BY MR. BLOCK:                                        02:43:28
21        Q   Well, so if there's two quotations in the
22    article, one of them supports allowing trans women to
23    participate and the other one opposes allowing
24    transgender women to participate, you decided to cite
25    to the quote that opposes allowing trans women to     02:43:42
```

Page  227

```
 1    participate; right?
 2             MR. FRAMPTON:  Object to the form.
 3             THE WITNESS:  Yes, that is what I quoted.
 4    BY MR. BLOCK:
 5        Q    Okay.  And why did you choose to cite the        02:43:55
 6    portions that you believe support opposing -- I'll ask
 7    again.
 8             Why did you choose to cite to the portions
 9    that would support excluding transgender women instead
10    of the portions of the article that you think support   02:44:08
11    including them?
12             MR. FRAMPTON:  Object to the form.
13             THE WITNESS:  Because as I read the article
14    and evaluated the information, I thought it was a clear
15    statement opposing the inclusion of trans women in       02:44:22
16    women's sports.
17             (Exhibit 79 was marked for identification
18         by the court reporter and is attached hereto.)
19    BY MR. BLOCK:
20        Q    Okay.  So let's look at the -- let's look at    02:44:28
21    the article.
22             So this will appear on your screen in a second
23    as Exhibit 79.  Let me know when it appears.
24        A    All right.  Exhibit 079 - Hamilton.
25        Q    Okay.  Is this article that you were           02:45:19
```

                                                          Page 228

```
 1    referencing when you cited to the 2021 Hamilton

 2    article?

 3        A   Yes.  I think I also refer to it in my

 4    declaration as the FIMS 2021 statement.

 5        Q   Yeah.  What -- what is FIMS?              02:45:33

 6        A   It's the International Sports Medicine

 7    Federation.  I think it's French, is why it's like

 8    Federation International Medicine Sport.  That's why it

 9    becomes FIMS.

10        Q   Uh-huh.                                   02:45:46

11        A   Beyond that, it's just a -- it's a

12    professional organization of people interested in

13    sports medicine.

14        Q   Is -- in your -- your report, you say that the

15    statement is "signed by more than 60 sports medicine   02:46:01

16    experts from prestigious institutions around the

17    world"; is that right?

18        A   What page is that on my declaration so I make

19    sure I'm agreeing to a number that --

20        Q   Sure.  It's paragraph 167, which is page 56 of  02:46:16

21    the PDF.  And it's page 51 of the bottom pagination.

22        A   All right.  Yes, that is what I stated in my

23    declaration.

24        Q   Okay.  So the views expressed by this body,

25    you think, are entitled to significant weight; right?   02:46:36
```

Page 229

```
 1              MR. FRAMPTON:  Object to the form.

 2              THE WITNESS:  It is an -- it is a statement

 3    from an organization that is, you know, a respected

 4    organization.

 5    BY MR. BLOCK:                                    02:46:58

 6         Q    Okay.  If you turn to page 2 of this, so

 7    page 1402, at the top left, there's a little box that

 8    says "Key Points."

 9              Do you see that?

10         A    Yes.                                   02:47:08

11         Q    Okay.  Key Points.  And the first point there

12    is (as read):

13              "The use of testosterone concentration

14              limits of 5 nmol/L in transwomen and

15              DSD women athletes is a justifiable      02:47:19

16              threshold based on the best available

17              scientific evidence."

18              Did I read that right?

19         A    You read that correctly.

20         Q    And so of the points in this article     02:47:29

21    highlighted as the key points, this is the first one;

22    right?

23              MR. FRAMPTON:  Object to the form.

24              THE WITNESS:  Yes, that appears to be the

25    first highlighted key point.                      02:47:39
```

Page 230

```
 1   BY MR. BLOCK:

 2        Q   Okay.  But you didn't choose to mention this

 3   first key point in your report; right?

 4        A   That is correct.

 5        Q   Okay.  Why not?                          02:47:49

 6        A   I disagree with that key point.

 7        Q   Okay.  So you only highlighted -- you only

 8   cited to the portions of this article that you agreed

 9   with; right?

10        MR. FRAMPTON:  Object to the form.           02:47:58

11        THE WITNESS:  I cited the information that I

12   agree with after evaluating the other scientific

13   information.

14   BY MR. BLOCK:

15        Q   Let's go to 1409.                        02:48:22

16        Do you see that?

17        A   Yes.

18        Q   Okay.  So the third bullet point here, when we

19   get to -- this is -- I'm sorry, under -- this whole

20   section of bullet points is under the subsection 5.7  02:48:41

21   "FIMS Consensus Statements for the Integration of DSD

22   Women and Transwomen Athletes into Elite Female Sport";

23   right?

24        A   That is correct.

25        Q   All right.  So based on the foregoing    02:48:53
```

Page 231

```
 1    information discussed in the article, these are the

 2    consensus statements that FIMS agreed upon; right?

 3         A    That's a reasonable conclusion, yes.

 4         Q    Okay.  So the third bullet point on the

 5    right-hand column is (as read):                        02:49:13

 6             "Transwomen have a (sic) right to

 7              compete in sports.  However, cisgender

 8              women have the right to compete in a

 9              protected category."

10             Is that right?                                02:49:26

11         A    That's correct.

12         Q    Okay.  And this bullet point is a bullet point

13    that you included in your report; right?

14         A    Correct.

15         Q    Okay.  Do you know if you included any of the  02:49:33

16    other bullet points in your report?

17         A    I don't think I included any of the other

18    bullet points.

19         Q    Okay.  So let's look at some of those other

20    bullet points.                                         02:49:46

21             If you go two bullet points down from the --

22    the one we just looked at, it says (as read):

23             "As each sport can vary greatly in

24              terms of physiological demands, we

25              support the view held also by others        02:49:58
```

Page 232

```
 1              stating that individual

 2              sport-governing bodies should develop

 3              their own individual policies based on

 4              broader guidelines developed on the

 5              best available scientific evidence,          02:50:09

 6              determined experimentally from a

 7              variety of sources with a particular

 8              preference for studies on transwomen

 9              and DSD women athletes."

10              Did I read that right?                       02:50:19

11        A   Yes.

12        Q   Okay.  So this bullet point supports having

13   different policies developed by different sport's

14   governing bodies; right?

15              MR. FRAMPTON:  Object to the form.           02:50:32

16              THE WITNESS:  That is a great example of a

17   bullet point that seems contradictory to a previous

18   statement.

19   BY MR. BLOCK:

20        Q   Okay.  But this statement here does not        02:50:39

21   support an across-the-board policy that applies to all

22   difference types of sports; is that right?

23              MR. FRAMPTON:  Same objection.

24              Go ahead.

25              THE WITNESS:  That is correct.               02:50:54
```

Page 233

```
 1    BY MR. BLOCK:
 2         Q    And then two more bullet points down, it says
 3    (as read):
 4              "The use of serum testosterone
 5              concentrations as the primary              02:51:17
 6              biomarker to regulate the inclusion of
 7              athletes into male and female
 8              categories is currently the most
 9              justified solution as it is supported
10              by the available scientific literature    02:51:27
11              and should be implemented at the elite
12              level, where there is an emphasis on
13              performance enhancement."
14              Did I read that right?
15         A    Yes, you read that correctly.             02:51:38
16         Q    Okay.  And that's -- that's similar to the key
17    point that we talked about before, on the second page;
18    right?
19         A    That is similar to that previous key point.
20         Q    Okay.  And then if you turn the page, the     02:51:46
21    first full -- fir- -- excuse me -- the first full
22    bullet point at the top, you know, again, is --
23    essentially restates the -- the key point that we
24    discussed before; is that right?
25              MR. FRAMPTON:  Same objection.            02:52:04
```

Page 234

```
 1              Go ahead.
 2              THE WITNESS:  Yes.  That reiterates the
 3    5 nmol/L threshold for testosterone.
 4    BY MR. BLOCK:
 5         Q   Okay.  And then the sentence also says that    02:52:14
 6    that threshold may be modified as new evidence arises
 7    for an event or sport-specific concentrations; is that
 8    right?
 9         A   Yes, that is what it says.
10         Q   Okay.  And so -- so that -- that bullet point   02:52:28
11    and the other bullet point we looked at about the use
12    of serum testosterone and the other bullet point about
13    having individual policies for individual sports are
14    bullet points that you disagreed with; right?
15         A   That is correct.                                02:52:49
16         Q   Okay.  And because you disagreed with them,
17    you did not include them in your report?
18              MR. FRAMPTON:  Object to the form.
19              Go ahead.
20              THE WITNESS:  That is correct.                 02:53:01
21    BY MR. BLOCK:
22         Q   Okay.  But at least according to this
23    document, the -- all the authors of this statement had
24    agreed on those bullet points as consensus statements;
25    right?                                                   02:53:19
```

Page 235

```
 1              MR. FRAMPTON:  Object to the form.

 2              THE WITNESS:  Assuming that the authors, you

 3      know, agreed to it with their signature, that is a

 4      reasonable assumption.

 5      BY MR. BLOCK:                                      02:53:31

 6          Q   Okay.  Great.

 7              And actually -- in fact -- one second.

 8              All right.  If you look at page 1403, it

 9      says -- at the bottom of that first paragraph, do you

10      see where it says "all statements"?                02:54:16

11          A   The bottom of which paragraph?

12          Q   Sorry.  On the right-hand column, on

13      page 1403, under the "Methods" section, do you see

14      that?  The paragraph begins with -- with "here."

15      "Here, we present."                                02:54:37

16          A   Yes.

17          Q   Okay.  So the last sentence -- the last two

18      sentences say (as read):

19              "All statements received unanimous

20              approval by all named authors except       02:54:48

21              for the statement on the testosterone

22              limit of 5 nmol/L, which received

23              majority approval and the voting

24              result is included in this (sic)

25              article."                                  02:54:59
```

Page 236

```
 1          Do you see that?

 2     A    Yes, I see that.

 3     Q    All right.  So let's go down to what the

 4  voting results were for that.

 5          Okay.  It's actually on the bullet points that   02:55:20

 6  we looked at before, on 1410.

 7     A    On page 1410?

 8     Q    Uh-huh.

 9     A    All right.

10     Q    Okay.  So beginning with -- so the first --      02:55:38

11  the second full bullet point, it says (as read):

12          "The statement on the testosterone

13          concentration threshold for transwomen

14          and DSD women athletes was the only

15          point of contention for the FIMS            02:55:48

16          Panel.  All 70 authors voted, of whom

17          87% were in favour of the 5 nmol/L

18          threshold, 2% of the authors were in

19          favour of a threshold of 8 nmol/L, 2%

20          were in favour of a threshold around         02:56:04

21          the upper testosterone concentration

22          of normal healthy females of

23          0.2-1.7 nmol/L, and 8% of authors were

24          in favour of no change to the limit

25          until further evidence was acquired."         02:56:18
```

Page 237

```
 1          Do you see that?
 2      A   Yes, I see that.
 3      Q   Okay.  So -- so based on this paragraph, it
 4  appears that none of the 70 authors supported a policy
 5  of prohibiting trans women from participating, you        02:56:35
 6  know, regardless of how low they suppressed their
 7  circulating testosterone levels; right?
 8          MR. FRAMPTON:  Object to the form.
 9          THE WITNESS:  Can you restate the question?
10  BY MR. BLOCK:                                             02:56:58
11      Q   Sure.  Did any of the 70 au- -- 70 authors
12  vote in favor of prohibiting trans women completely
13  from prohibiting -- from -- from participating in
14  women's sports regardless of how low they -- they
15  lowered their levels of circulating testosterone?        02:57:15
16          MR. FRAMPTON:  Same objection.
17          THE WITNESS:  I would really like to read the
18  article more and not just look at this particular
19  statement on their decision on what they thought were
20  acceptable testosterone levels.                          02:57:27
21  BY MR. BLOCK:
22      Q   Okay.  But based on this paragraph, it appears
23  that none of the 70 authors supported a policy
24  analogous to H.B. 3293; right?
25          MR. FRAMPTON:  Same objection.                    02:57:46
```

                                                      Page 238

```
 1              THE WITNESS:  And this is another example of
 2     something that is confusing and contradictory to me, is
 3     when they say that cisgender women deserve a protected
 4     category and then have this kind of a statement.
 5     BY MR. BLOCK:                                    02:57:57
 6         Q    Well, isn't one way to reconcile it that it's
 7     possible to have a protected category for cisgender
 8     women if appropriate conditions are placed on the
 9     participation of trans women?
10              MR. FRAMPTON:  Object to the form.       02:58:17
11              THE WITNESS:  My understanding of the
12     intention of the authors is then it would no longer be
13     a protected category.
14     BY MR. BLOCK:
15         Q    Well, it would be protected from participation 02:58:24
16     by cisgender men or anyone else with circulating levels
17     of testosterone over the threshold limit; right?
18              MR. FRAMPTON:  Same objection.
19              THE WITNESS:  Within the -- the field, a
20     protected category of women typically means biological 02:58:38
21     women.
22     BY MR. BLOCK:
23         Q    Okay.  Let's look at the next document.
24              All right.  And, actually, we already marked
25     this one as an exhibit.  This is the women's policy     02:58:57
```

Page 239

```
 1    briefing book.  So this is Exhibit 69, if you could

 2    pull it up again.

 3         A   All right.  Women's Sports Policy Working

 4    Group, Briefing Book?

 5         Q   Yes.                                      02:59:21

 6             All right.  If you look at page 15.

 7         A   All right.  Page 15.

 8         Q   So at the -- the top, you can see this is

 9    their Proposed Amendment to the Title IX Regulations.

10             Do you see that?                          03:00:04

11         A   Yes.

12         Q   Okay.  So if we scroll down to subsection C,

13    Treatment of Transgender Athletes, do you see that?

14         A   Yes.

15         Q   Okay.  So -- so subsection (c)(1) says (as  03:00:12

16    read):

17             Because trans girls/women who have not

18             begun male puberty do not have

19             significant male linked -- male

20             sex-linked advantages, they shall be      03:00:24

21             included in girls' and women's sports

22             without conditions or limitations.

23             Do you see that?

24         A   I see that.

25         Q   All right.  So to the extent that H.B. 3293  03:00:33
```

Page 240

```
 1    prohibits trans girls and women from participating in

 2    women's sports, even if they have not experienced

 3    endogenous male puberty, the authors of this briefing

 4    book would disagree with H.B. 3293, to that extent?

 5           MR. FRAMPTON:  Object to the form.        03:00:56

 6           THE WITNESS:  I don't think that I can speak

 7    on behalf of these authors for what they agree or

 8    disagree with regarding H.B. 323 (sic) -- whatever it

 9    is.  Sorry.

10    BY MR. BLOCK:                                    03:01:12

11       Q   Okay.  So do you think that subsection (c)(1)

12    is consistent with H.B. 3293?

13           MR. FRAMPTON:  Object to the form.

14           THE WITNESS:  Well, (c)(1) says they shall be

15    included in girls and women's sports.            03:01:28

16    BY MR. BLOCK:

17       Q   So the answer to my question is yes?

18           MR. FRAMPTON:  Object to the form.

19    BY MR. BLOCK:

20       Q   I mean -- no, I'll just ask that again.   03:01:40

21           Can you just give me a "yes" or "no" answer so

22    I don't have to worry about getting a clean transcript?

23           So just -- my question is, is section (c)(1)

24    consistent with H.B. 3293?

25           MR. FRAMPTON:  Same objection.            03:01:52
```

Page 241

```
 1              Go ahead.

 2              THE WITNESS:  I think there is an

 3      inconsistency there.

 4      BY MR. BLOCK:

 5         Q    Okay.  Thank you.                    03:02:02

 6              If you look at section (c)(3), it says (as

 7      read):

 8              "Trans girls/women who have

 9              experienced all or part of male

10              puberty and who have sufficiently   03:02:14

11              mitigated their male sex-linked

12              advantages — through surgery and/or

13              gender affirming hormones consistent

14              with the rules of their international

15              federations — may participate in    03:02:25

16              girls'/women's sport without

17              additional conditions or limitations."

18              Do you see that?

19         A    I see that.

20         Q    Okay.  And so section (c)(3) is also 03:02:32

21      inconsistent with H.B. 3293; correct?

22              MR. FRAMPTON:  Same objection.

23              Go ahead.

24              THE WITNESS:  I would say that it may or may

25      not, apparently depending on the rules of the 03:02:44
```

Page 242

```
 1    international federations.
 2    BY MR. BLOCK:
 3       Q   Okay.  So are there any international
 4    federations, aside from rugby, that categorically
 5    exclude girls and women who are transgender from          03:02:58
 6    participating in the female category?
 7       A   There have been a lot of changes in those
 8    lately and a lot of organizations debating that, and so
 9    I can't say for certain whether there is or is not an
10    organization or no organizations that specifically        03:03:16
11    state that.
12       Q   But you consider yourself an expert on this
13    issue, don't you?
14       A   Yes.  And there's at lot of organizations that
15    are in process of making decisions, and so I can't say    03:03:29
16    what their decisions are when they have not released
17    their decisions.
18       Q   All right.  Well, has any organization
19    released a decision excluding trans girls and women
20    from participating in the female category, even if they   03:03:43
21    have lowered their circulating testosterone, besides
22    rugby?
23       A   I know swimming had a recent change, and I
24    can't remember the exact wording on that, and -- again,
25    that's what I can remember right now at this moment.      03:04:10
```

Page 243

```
 1        Q    All right.  Does -- did the recent change from

 2   swimming categorically exclude trans girls and women

 3   from participating in women's swimming events?

 4             MR. FRAMPTON:  Objection to the form.

 5             THE WITNESS:  I would need to look at the        03:04:28

 6   document to be sure.

 7   BY MR. BLOCK:

 8        Q    Isn't it true that the new swimming policy

 9   extended the period of hormone suppression to three

10   years?  Does that sound familiar to you?                  03:04:46

11        A    As you say it, it sounds familiar, but I can't

12   be sure if I'm remembering it because you told me I

13   should remember it.

14        Q    Okay.  Well, we'll -- we'll get you a -- a

15   copy of that.                                             03:05:05

16             And then subsection (4) says (as read):

17             "Trans girls/women who have

18             experienced all or part of male

19             puberty and who have not, or only

20             insufficiently, mitigated their male             03:05:19

21             sex-linked advantages according to the

22             international federation standards in

23             their sport may be accommodated within

24             girls'/women's sports but not in

25             head-to-head competition with female             03:05:31
```

Page 244

```
 1              athletes."

 2              Do you see that?

 3       A   I see that.

 4       Q   Okay.  And so that also is inconsistent with

 5   H.B. 3293; correct?                                   03:05:39

 6              MR. FRAMPTON:  Object to the form.

 7              THE WITNESS:  This is somewhat of a confusing

 8   statement because how is somehow included in women's

 9   sports if they're not competing head-to-head with

10   women.                                                03:05:50

11   BY MR. BLOCK:

12       Q   Well, there's scrimmages and, you know, team

13   practices and other events that are not for trophies.

14              Those are some examples; right?

15       A   And I would ask, are they really included,    03:06:07

16   then, if they can only participate in limited aspects

17   of the sport.

18       Q   Okay.  But my question is whether or not this

19   is consistent with H.B. 3293.

20              And so section (c)(4) is inconsistent with  03:06:22

21   H.B. 3293; correct?

22              MR. FRAMPTON:  Object to the form.

23              THE WITNESS:  I would need to refer back to

24   the bill to be certain, but I think that your statement

25   is, yes, this is an inconsistency.                    03:06:39
```

                                                    Page 245

```
 1   BY MR. BLOCK:

 2        Q   Okay.  Let's go back to your report.  So

 3   that's Exhibit -- oh, I'm sorry, I just want to make

 4   sure we got through all of the sources cited in that

 5   paragraph of your report.  So let me -- let's turn to      03:07:09

 6   your report and just make sure we've -- we've looked at

 7   all of them because I don't want to leave any out.

 8           I believe -- is this on page 8?  Or

 9   paragraph 8?  It's paragraph 8, I believe.  On page 7,

10   paragraph 8.                                              03:07:30

11           Let me know when you're there.

12        A   I'm there.

13        Q   Okay.  So we looked at Coleman 2020; correct?

14        A   Yes.

15        Q   And Hilton and Lundberg 2021; correct?          03:07:42

16        A   Yes.

17        Q   And World Rugby?

18        A   Yes.

19        Q   And Harper 2021?

20        A   Yes.                                             03:07:53

21        Q   And Hamilton 2021?

22        A   Yes.

23        Q   And a briefing book prepared by the Women's

24   Sports Policy Working Group 2021; right?

25        A   Yes.                                             03:08:00
```

Page 246

1      Q    Okay.  So now that we've looked at all of

2   those, do any of them advocate in favor of excluding

3   girls and women who are trans from participating in

4   women's sports if they have had puberty blockers and

5   not gone through endogenous puberty?                    03:08:17

6          MR. FRAMPTON:  Object to the form.

7          Go ahead.

8          THE WITNESS:  I still think that that

9   statement from Hamilton, where they say women deserve a

10  protected category, with the understanding that         03:08:24

11  protected category, as it is used in the field, means

12  biological women only.

13  BY MR. BLOCK:

14     Q    Okay.  But other portions of the -- the

15  Hamilton statement don't support that; correct?         03:08:39

16     A    Correct.

17     Q    Okay.  So after reviewing all these sources,

18  let's see, how -- how many of them do we think support

19  excluding girls and women who are transgender if

20  they've experienced puberty and then suppressed their   03:09:04

21  testosterone?

22         MR. FRAMPTON:  Object to the form.

23         THE WITNESS:  So as we've reviewed these

24  sitting here, I would say Hamilton supports it, with

25  the caveat that it is, at times, contradictory.         03:09:20

                                              Page 247

```
 1    BY MR. BLOCK:
 2        Q   Okay.  And did any of these sources support
 3    having a single across-the-board rule that applied to
 4    all sporting events?
 5            MR. FRAMPTON:  Object to the form.          03:09:37
 6            THE WITNESS:  Again, the same statement with
 7    Hamilton seems to state that, with the caveat that, I
 8    guess, you and I can agree there is some contradiction
 9    or confusion there.
10    BY MR. BLOCK:                                       03:09:51
11        Q   Okay.  Let's look at page 4 of your report.
12        A   All right.  Page 4, Overview.
13        Q   Yes.  If you look at the second bullet point.
14        A   Okay.
15        Q   It says (as read):                          03:10:13
16            "Biological male physiology is the
17            basis for the performance advantage
18            that men, adolescent boys, or male
19            children have over women, adolescent
20            girls, or female children in almost         03:10:25
21            all athletic events."
22            Did I read that right?
23        A   Yes, you read that correctly.
24        Q   Okay.  And so your expert opinions about
25    transgender women are based on the premise that       03:10:34
```

Page 248

```
 1    transgender women who have not had any gender-affirming
 2    medical interventions will have the same physiology as
 3    cisgender men; right?
 4            MR. FRAMPTON:  Object to the form.
 5            THE WITNESS:  Yes, they are still biological    03:10:51
 6    males.
 7    BY MR. BLOCK:
 8        Q    And will have the same physiological
 9    characteristics that are the basis for the performance
10    advantage; correct?                                    03:10:59
11            MR. FRAMPTON:  Same objection.
12            THE WITNESS:  That is correct.  Male
13    physiology is the basis of the performance advantage.
14    BY MR. BLOCK:
15        Q    So let's go back to that Hamilton article we   03:11:09
16    were discussing.  So that is, I believe, Exhibit 79.
17        A    All right.
18        Q    Okay.  Can you go to page 1402, please.
19        A    All right.  1402.
20        Q    Okay.  Pull that up.                           03:11:39
21            If you look on the right-hand column, on this
22    little table 1 --
23        A    Yes.
24        Q    -- do you see that?
25            And then you go -- one, two, three, four --     03:11:54
```

Page 249

```
 1    five items down there, there's a line that begins with

 2    "the assumption."

 3            Do you see that?

 4        A   I do see that.

 5        Q   Okay.  And that sentence says (as read):        03:12:04

 6            "The assumption that the physiology of

 7            elite DSD women and transwomen

 8            athletes is the same as elite male

 9            athletes is an oversimplified view."

10            Do you see that?                               03:12:15

11        A   I see that statement.

12        Q   Okay.  And you didn't cite to that statement

13    in your report; right?

14        A   I disagree with that statement.

15        Q   And, therefore, because you disagreed with it,  03:12:23

16    you chose not to cite it in your report?

17            MR. FRAMPTON:  Object to the form.

18            THE WITNESS:  I don't think it's appropriate

19    to cite a statement that I don't think I can defend.

20    BY MR. BLOCK:                                          03:12:36

21        Q   Okay.  Do you think it's appropriate to cite

22    an article who -- that contains many statements that --

23    that you don't think you can defend?

24            MR. FRAMPTON:  Object to the form.

25            THE WITNESS:  Yes.  Trying to cite that there  03:12:53
```

Page 250

```
 1    is a lot of information out there.

 2    BY MR. BLOCK:

 3        Q   I see.

 4            If we go to page 1406 -- well, actually,

 5    before going there, were you aware of this statement in    03:13:07

 6    the Hamilton article at the time that you wrote your

 7    report?

 8        A   Yes.  I cited the Hamilton article.  I had

 9    read it.

10        Q   All right.  You -- okay.  So you read the          03:13:22

11    whole thing, and then you picked out certain statements

12    to cite?

13        A   Correct.

14        Q   Okay.  So if you go to page 1406.

15            Do you -- do you see your role in this case as     03:13:45

16    an advocate for one side or the other?

17            MR. FRAMPTON:  Object to the form.

18            THE WITNESS:  I have been retained to give my

19    expert opinion, my expert analysis of the data.

20    BY MR. BLOCK:                                              03:14:01

21        Q   All right.  And to -- but do -- do you see

22    your role in this case as presenting the portions of

23    the data that support one side?

24            MR. FRAMPTON:  Object to the form.

25            THE WITNESS:  I think my role is to present        03:14:19
```

Page 251

 1    the data and the information with which I agree with as

 2    an expert.

 3    BY MR. BLOCK:

 4        Q   Okay.  So you -- you don't see your role in

 5    this case as prevent- -- presenting an overview of the        03:14:32

 6    data for and against H.B. 3293; right?

 7            MR. TRYON:  Objection.

 8            MR. FRAMPTON:  Object to form.

 9            THE WITNESS:  I think I'm suppo- -- my role is

10    presenting the information from the best of my               03:14:52

11    expertise and analysis of it, which -- what I think is

12    the correct information.

13    BY MR. BLOCK:

14        Q   Okay.  Not -- so -- so you don't think -- if

15    the Court wanted just an overview of the information        03:15:07

16    out there for and against H.B. 3293, your expert report

17    wouldn't be the source of getting that; right?

18            MR. FRAMPTON:  Object to the form.

19            MR. TRYON:  Objection.

20            THE WITNESS:  I would think that would be a          03:15:27

21    specific request made by the Court to get information.

22    BY MR. BLOCK:

23        Q   So -- but you saw -- but you said, when you

24    wrote your blog post, that, you know, the purpose of

25    that blog post was to provide information for educators    03:15:46

                                                        Page 252

```
 1    to use on their own, to teach the subject; right?

 2        A   That is correct.

 3        Q   Okay.  And so you wrote that blog post with a

 4    different purpose in mind than you wrote this document;

 5    right?                                              03:16:03

 6        A   Yes.  The blog post was intended for

 7    educators.

 8        Q   And do you think that it's important for

 9    educators to have accurate information?

10            MR. FRAMPTON:  Object to the form.          03:16:20

11            THE WITNESS:  Yes, educators need accurate

12    information.

13    BY MR. BLOCK:

14        Q   Okay.  So do -- do you think educators need

15    information different from what the court needs?      03:16:26

16            MR. FRAMPTON:  Object to the form.

17            THE WITNESS:  Truthful information is truthful

18    information, and I've done my best to present truthful

19    information.

20    BY MR. BLOCK:                                        03:16:40

21        Q   Okay.  So let's go to 1406 of -- of Hamilton.

22            MR. TRYON:  Before you go on.

23            Mr. Frampton, I can't hear you when you're

24    objecting.  If you could speak a little louder, please.

25            MR. FRAMPTON:  Sure.                          03:17:08
```

Page 253

```
 1    BY MR. BLOCK:

 2         Q   So in -- in 1406, in the paragraph beginning

 3    with the words "despite the lack," do you see that?

 4         A   Page 1406?

 5         Q   Left -- left-hand column --              03:17:23

 6         A   Okay.  Yeah.  That's three down?

 7         Q   Yes.

 8         A   Okay.

 9         Q   Okay.  If you look at, I think, the third

10    sentence, after it says "Table 1," in parentheses, it   03:17:39

11    says (as read):

12             "Data showing lower baseline isometric

13             torque and muscle volume in transwomen

14             compared to cisgender males highlight

15             the problematic nature of inferring      03:17:50

16             that transwomen and cisgender males

17             are the same, as this ignores the

18             impact of gender-affirming treatments

19             such as HRT and GAS and the

20             psychological effects of gender          03:18:00

21             dysphoria such as low self-esteem,

22             anxiety and/or depression, and

23             becoming socially isolated."

24             Do you see that?

25         A   I see that.                              03:18:09
```

                                              Page 254

```
 1        Q   Okay.  Do you disagree that there is data

 2   showing lower baseline isometric torque and muscle

 3   volume for trans women compared to cisgender women?

 4        A   So if I'm remembering correctly, reference 51

 5   here is probably to the -- the article by Wiik and       03:18:26

 6   Lundberg and others.  That is the only paper I'm aware

 7   of that evaluated isometric torque and muscle volume in

 8   transgender individuals.

 9            Can I refer to that paper to verify?

10        Q   Yeah.  If you look at 51, it -- it does go       03:18:40

11   back to the -- the Wiik article.

12            You're saying you want to look directly at the

13   Wiik article?

14        A   I would like to.

15        Q   All right.  Well, we can try to make time for    03:18:51

16   that later.

17            So -- but sitting here, you're saying you're

18   not sure that that sentence accurately reports the --

19   the findings of the Wiik article?

20        A   Yeah, I can't remember for -- right now what     03:19:08

21   the baseline data were in the Wiik article, whether

22   they were statistically significant or just numerically

23   different or what.

24        Q   Okay.

25        A   I can see the graph in my mind, but not in       03:19:22
```

Page 255

```
 1    enough detail to completely answer that.

 2         Q   Okay.  Hold on one second.  All right.

 3             Let's go to the Harper article again.  So that

 4    is Exhibit 78.

 5         A   All right.                              03:20:13

 6         Q   So if you go to page 7 of the Harper.

 7         A   All right.

 8         Q   All right.  There's a paragraph that begins

 9    with "of interest."

10             Do you see that?                        03:20:42

11         A   Right-hand side, first full paragraph, under

12    the table?

13         Q   Yes.

14         A   Okay.

15         Q   All right.  Where it says (as read):    03:20:48

16             "Of interest, compared with cisgender

17             men, hormone-naive transwomen

18             demonstrate 6.4%-8.0% lower lean body

19             mass, 6.0%-11.4% lower muscle CSA and

20             approximately 10%-14% lower handgrip     03:21:05

21             strength."

22             Do you see that?

23         A   Yes.

24         Q   And then it says (as read):

25             "This disparity is noteworthy given      03:21:14
```

Veritext Legal Solutions
866 299-5127

```
 1              that hormone-naive transwomen and

 2              cisgender men have similar

 3              testosterone levels."

 4              Do you see that?

 5      A    Yes.                                      03:21:20

 6      Q    Okay.  So do you have any reason to disagree

 7   with those reported findings?

 8      A    I would like to include the next sentence,

 9   where it says "explanations for this strength

10   difference are unclear," and continuing on with that,  03:21:37

11   indicating that the trans women may actively refrain

12   from building muscle and/or engaging in disordered

13   eating.

14              So there's a whole statement of speculative

15   explanations for that.                           03:21:51

16      Q    So do you -- do you have any explanations for

17   those differences?

18      A    Well, we have no known biological markers in

19   which we can draw blood or a sample of something to say

20   that a person is transgender.  And so it would      03:22:10

21   apparently be a social explanation for why the

22   transgender individuals have lower handgrip strength

23   and smaller muscles.

24      Q    Okay.  And so does that -- does that affect

25   whether or not having lower handgrip strength and    03:22:31
```

                                                   Page 257

```
 1   stronger (sic) muscles gives an advantage in athletic

 2   performance?

 3           MR. FRAMPTON:  Object to the form.

 4           Go ahead.

 5           THE WITNESS:  In those cited studies, the        03:22:43

 6   handgrip strength of the trans women was in the 90 to

 7   95th percentile for cisgender women.

 8           So while they may be slightly less strong than

 9   a typical male, they are considerably stronger than the

10   typical female.                                          03:22:57

11     Q   Okay.  Right.  But my -- but my question is,

12   in terms of comparing the strength of trans women to

13   the strength of cis men, don't those studies show that,

14   with respect to those indicators of athletic

15   performance, the trans women are not the same as the     03:23:19

16   cis men?

17           MR. FRAMPTON:  Object to the form.

18           THE WITNESS:  So, Mr. Block, are you trying to

19   say that smaller, weaker men are trans women?

20   BY MR. BLOCK:                                            03:23:37

21     Q   I'm -- I'm asking my question.

22         Can you answer my question, please?

23     A   Could you please clarify the question?

24     Q   Yes.

25         Don't those -- doesn't that data show that --     03:23:47
```

Page 258

 1    to use the words of Harper -- hormone-naive trans women

 2    may not, on average, have the same athletic attributes

 3    as cisgender men?

 4            MR. FRAMPTON:  Object to the form.

 5            Go ahead.                              03:24:05

 6            THE WITNESS:  I think there are a whole lot of

 7    qualifying statements that need to be included in that.

 8    BY MR. BLOCK:

 9       Q   Okay.  And so putting aside the cause of these

10    differences, putting aside whether those causes are,    03:24:22

11    you know, physiological or as a result of social

12    factors, all right, at the end of the day, regardless

13    of the cause, doesn't this data reflect that on a

14    population level, hormone-naive trans women may not, on

15    average, have the same athletic attributes as cisgender  03:24:46

16    men?

17            MR. FRAMPTON:  Same objection.

18            Go ahead.

19            THE WITNESS:  Those studies were not

20    attempting to evaluate baseline population-wide          03:24:57

21    strength for trans women, and so I don't think that we

22    can accurately extrapolate them to the population of

23    trans women.

24    BY MR. BLOCK:

25       Q   Okay.  If the participa- -- in the               03:25:08

                                                   Page 259

```
 1     participants on -- in those studies had performed

 2     physical fitness tests alongside cisgender men, would

 3     it be reasonable to assume that the participants in

 4     these studies would not have performed as well on those

 5     physical fitness tests?                          03:25:26

 6             MR. FRAMPTON:  Object to form.

 7             THE WITNESS:  So if we are stating these

 8     participants, yes, these participants were not as

 9     strong as their comparison group.

10             But I do again want to caveat that neither of  03:25:40

11     these groups really were designed to represent

12     population-wide strength or body mass distributions.

13     BY MR. BLOCK:

14         Q   Now, you've discussed in your article -- or

15     your article -- you've discussed in your report, you   03:25:57

16     know, your view that once you have acquired muscle

17     mass, that lowering your circulating testosterone does

18     not sufficiently reduce that muscle mass to eliminate a

19     performance advantage; is that right?

20         A   I think you've appropriately characterized     03:26:20

21     what I've stated.

22         Q   Thank you.

23             And so in your article, do -- or in your

24     report, do you discuss at all whether if someone lowers

25     their circulating testosterone before acquiring a lot   03:26:37
```

                                                    Page 260

```
1    of muscle mass or doing exercises or training, whether
2    having a lower level of testosterone would restrict
3    their ability to add new muscle mass?
4            MR. FRAMPTON:  Object to the form.
5            THE WITNESS:  I don't think I addressed that     03:27:04
6    topic specifically, as far as how much reducing
7    testosterone and then engaging in training can
8    compensate for reduced testosterone.
9    BY MR. BLOCK:
10       Q   Okay.  So let's say the -- the trans women in    03:27:16
11   this study and the cis men in the study both engage in
12   the same types of exercise regimens, but the trans
13   women, given their lower baselines and -- have these
14   lower baselines and have lowered their testosterone
15   before engaging in these exercise regimens, is it -- do   03:27:49
16   you have an expert opinion on whether you would expect
17   that these trans women, having lowered their
18   testosterone levels, would be able to acquire new
19   muscle mass at the same degree as the cis men who had
20   not lowered their testosterone levels?                    03:28:05
21           MR. FRAMPTON:  Object to the form.
22           THE WITNESS:  Based on research not cited in
23   my article, because I didn't think it was worth going
24   into in that particular publication -- or that expert
25   declaration, there is information that in middle-aged     03:28:20
```

Page 261

```
 1   men who suppress their testosterone and such as a

 2   treatment for prostate health problems, they're able to

 3   engage in strength training to overcome the lost

 4   testosterone.  And so that is the closest to a

 5   speculative statement we can make regarding of how          03:28:43

 6   transgender women, or trans women, would respond to

 7   training.

 8   BY MR. BLOCK:

 9        Q   Okay.  If we go back to the Hamilton article

10   for a second.  I apologize.  If you go to 1407 of the       03:29:05

11   Hamilton article.

12           Let me know when you're there, okay?

13        A   All right.  1407.  I'm there.

14        Q   Uh-huh.  It says -- halfway through the -- the

15   first paragraph there, there's a sentence that begins       03:30:11

16   "in contrast."

17           Do you see that?

18        A   Page 1407.  Are we on the left-hand side?

19        Q   I'm sorry, on the right-hand side.

20        A   Ah, okay.  I wondered.                             03:30:26

21           There we go.  Right-hand side, just after

22   citation to 61, it says, "In contrast."

23        Q   Right.  It says (as read):

24           "In contrast, when bioavailable

25           testosterone was reduced to castrate           03:30:34
```

Page 262

```
1              levels in young men, isometric

2              strength did not increase after

3              resistance exercise training."

4         Are you familiar with that study that --

5    that's being referred to?                          03:30:48

6      A   I am not familiar with that study.

7      Q   Okay.  If you look at footnote 62 of the

8    article, it says it's a study by Kvorning,

9    K-V-O-R-N-I-N-G, from 2006.

10             Just sitting here today, does -- are you   03:31:09

11   familiar with the Kvorning study from 2006?

12     A   That -- that study is not ringing a bell.

13     Q   Okay.

14             Okay.  The -- the name of the study is

15   "Suppression of endogenous testosterone production   03:31:27

16   attenuates the response to strength training: a

17   randomized, placebo-controlled, and blinded

18   intervention study."

19             Still doesn't ring a bell?

20     A   Still not ringing a bell.                      03:31:40

21     Q   Okay.  So if -- if -- from the title of that

22   study, does the study seem to be in tension with the

23   study you just cited to me about how people, the

24   cisgender men, who are on therapies that lower their

25   tosterone -- testosterone being able to have strength  03:32:01
```

Page 263

```
 1    training to overcome the deficit?

 2            MR. FRAMPTON:  Object to the form.

 3            THE WITNESS:  Looking at that study and the

 4    study I was referring to, it appears that the two are

 5    somewhat contradictory, but it's also hard to say with    03:32:21

 6    this saying young men and the older -- the other one

 7    was dealing with older men.

 8            Without looking at both studies side by side,

 9    it's really hard to make a comparison.

10    BY MR. BLOCK:                                              03:32:32

11        Q   Okay.  So in the -- in the Hamilton article,

12    after the sentence I read, it says (as read):

13            "Assuming these findings are

14            replicated and if extrapolated to

15            elite DSD women athletes and                       03:32:46

16            transwomen athletes, they would imply

17            that decreasing bioavailable

18            testosterone concentrations would

19            mitigate to some extent any previous

20            sporting advantage due to the                      03:32:57

21            previously high testosterone

22            concentrations."

23        Do you agree with that sentence?

24            MR. FRAMPTON:  Object to the form.

25            THE WITNESS:  Would mitigate to some extent,       03:33:12
```

Page 264

```
 1    yes.

 2    BY MR. BLOCK:

 3         Q    Okay.

 4              MR. BLOCK:  Can we take a break and go off the

 5    record?                                              03:33:19

 6              THE VIDEOGRAPHER:  We are off -- off the

 7    record at 3:33 p.m.

 8              (Recess.)

 9              THE VIDEOGRAPHER:  We are on the record at

10    3:43 p.m.                                            03:43:29

11    BY MR. BLOCK:

12         Q    Hi, Dr. Brown.  I -- I won't keep you too much

13    longer, but -- but I do have some -- I'm going to keep

14    you a little bit longer, though.

15              If --                                      03:43:39

16         A    No worries.

17         Q    If we could go to the Hilton article again,

18    which is marked as Exhibit -- I can't see it on my

19    computer.  One sec.  The Hilton article is Exhibit 76.

20         A    All right.                                 03:44:05

21         Q    All right.  Thanks.

22              If you look at page 208, under 4.3.

23         A    Yes.

24         Q    All right.  Just the second sentence there, it

25    says (as read):                                      03:44:35
```

                                                        Page 265

```
 1            "Sex differences in endurance

 2            performance are generally smaller than

 3            for events relying more on muscle mass

 4            and explosive strength."

 5       Do you see that?                              03:44:43

 6    A   Yes, I see that.

 7    Q   Okay.  Do you -- do you agree with that

 8  statement?

 9    A   Typically, the differences between males and

10  females for endurance running events or swimming events  03:44:52

11  are somewhere in the range of 10 to 13 percent compared

12  to the 25 percent or more in strength sports.

13    Q   So -- so that means you agree with that

14  statement?

15    A   Yes.                                         03:45:08

16    Q   Okay.  Thanks.

17            All right.  If you look at, again, 208, it

18  says -- the paragraph before 4.3.

19    A   That big long one?

20    Q   Yep.                                         03:45:49

21            And near -- like two-thirds down, there's a

22  sentence that begins with "furthermore."

23            Do you see that?

24    A   Okay.  Furthermore, given the (sic) cohorts?

25    Q   Yeah.  So I -- I just want to direct your    03:46:01
```

Page 266

```
 1    attention to the first half of the sentence.  This is

 2    the Hilton article.  And it says (as read):

 3              "Furthermore, given that cohorts of

 4              transgender women often have slightly

 5              lower baseline measurements of muscle       03:46:15

 6              and strength than control males."

 7              Do you see that?

 8       A   Yes.

 9       Q   Okay.  And then if you follow that footnote,

10    it goes to footnote 53, and there's an article by      03:46:25

11    someone whose name I can't pronounce.  It's Van

12    C-A-E-N-E-G-E-M.

13              Are you able to click through to footnote 53?

14       A   Can we agree to call that Van C?

15       Q   Oh, good -- good call.  Yes.                    03:46:46

16       A   Yeah, I don't know how to say the last name

17    either.

18       Q   Okay.  All right.

19              And so could you -- you see the footnote?

20       A   Yes.                                            03:46:52

21       Q   Okay.  And the footnote is to an article that

22    says, "Preservation of volumetric bone density and

23    geometry in trans women during cross-sex hormonal

24    therapy: a prospective observational study"; right?

25       A   Yes.                                            03:47:06
```

                                              Page 267

 1      Q    Okay.  And so Hilton cites this article for

 2   the proposition that -- I have to get -- I don't want

 3   to misquote her.  Hold on -- it says -- cites for the

 4   proposition that cohorts of transgender women often

 5   have slightly lower baseline measurements of muscle and    03:47:36

 6   strength than control males; right?

 7      A    Yes, that is what it says.

 8      Q    Okay.  And so that's a sim- -- that's similar

 9   to the statement in the Hamilton article; right?

10         MR. FRAMPTON:  Object to the form.          03:47:47

11         THE WITNESS:  I'm sorry, can we go back to

12   what the Hamilton article says, or could you --

13   BY MR. BLOCK:

14      Q    Sorry, I'm -- I just want to -- you know, we

15   looked at two sources that talk about how the baseline    03:47:54

16   measurements of trans women are not always the same as

17   the baseline measurements of control cis men.  And we

18   looked at two studies saying that, one was the Hamilton

19   study and one was the Harper study.  And all I want to

20   do is add this study as -- this article as a third        03:48:13

21   article making that observation.

22         Would you agree that this article is another

23   article that at least makes the observation that the

24   baseline measurements for trans women appear to often

25   be lower than the baseline measurements for cisgender     03:48:36

 1    men who are used as controls?

 2            MR. FRAMPTON:  Object to the form.

 3            THE WITNESS:  I -- I think in this article by

 4    Hilton, a couple of key points here is where it says

 5    "cohorts of transgender women," not saying population        03:48:53

 6    representative sampling or anything like that.  And

 7    then there's a lot of further qualifications that you

 8    go on in that sentence emphasizing caution with

 9    interpreting these data.

10    BY MR. BLOCK:                                                03:49:10

11        Q   Yeah.  Well, so, actually, I have a question

12    for you.

13            So you talk about how these are just cohorts

14    of trans women, not population samples, but you cite to

15    these same articles in support of your argument that --     03:49:20

16    about the effects of gender-affirming hormones, don't

17    you?

18        A   Yes, I cite these articles.

19        Q   Okay.  So how come -- can't the same caveat be

20    made that whatever conclusions you're drawing about         03:49:39

21    trans women from these articles don't necessarily apply

22    to trans women at a population level?

23            MR. FRAMPTON:  Object to the form.

24            THE WITNESS:  These are the best sources of

25    information that we have, and the studies looking at        03:49:54

                                                        Page 269

```
 1    changes over time or changes in strength, muscle mass

 2    and such that I've cited, that was the purpose of the

 3    study, was to evaluate those changes and then

 4    statistically apply it to a population whereas those

 5    studies were not designed to get a population baseline    03:50:13

 6    sampling for normative data.

 7    BY MR. BLOCK:

 8        Q   Okay.  Well, that -- I'm glad you made that

 9    point because -- let's go to -- to your expert report

10    where -- on page -- on page -- let me make sure I have    03:50:28

11    the right page.

12            So page 2 -- actually, go to page 1, so I'm

13    not missing anything.

14            Let me know when you're at page 1.

15        A   So is page 1 Personal Qualifications and          03:51:02

16    Disclosure?

17        Q   It is.

18        A   Okay.

19        Q   So right before the bullet points, you say (as

20    read):                                                    03:51:08

21            "Articles that I have published that

22            are closely related to topics that I

23            discuss in this white paper

24            include..."

25            And then there's a list.  Right?                  03:51:14
```

Page 270

```
 1          A   Yes.

 2          Q   And -- and then if you go to the -- the second

 3    to last bullet point.

 4          A   Yes.

 5          Q   Do you see that?                              03:51:26

 6              That says (as read):

 7              "A study finding (among other things)

 8              that height, body mass, and maximal

 9              oxygen consumption were higher in a

10              group of male NCAA Division 2 distance      03:51:36

11              runners, while women NCAA Division 2

12              distance runners had higher percent

13              body fat."

14              Do you see that?

15          A   Yes.                                        03:51:48

16          Q   Okay.  And we discussed this study during our

17    previous deposition.  Do you remember that?

18          A   Yeah.  It's a fun paper.

19          Q   Yeah.  But we discussed how this data about

20    height, body mass and oxygen consumption was base- --  03:52:00

21    was data -- baseline data that you took of -- of these

22    athletes, but the purpose of the study was not to do a

23    population-wide, you know, sampling of -- of height,

24    body mass and oxygen consumption; right?

25          A   Yes, that is correct.                       03:52:22
```

Page 271

```
 1        Q   Okay.  So -- so what you just said before,

 2    when we were talking about the -- the cohorts of trans

 3    women, you had said, well, the purpose of those studies

 4    was not to provide population sampling on, you know,

 5    the physiological characteristics of -- of the trans      03:52:43

 6    women in the study; therefore, you couldn't extrapolate

 7    that as a general matter, all trans women were likely

 8    to have similar characteristics.

 9            Is that -- is that a fair summary of what you

10    had just said?                                            03:52:59

11            MR. FRAMPTON:  Object to the form.

12            THE WITNESS:  Yes, that is a fair summary.

13    BY MR. BLOCK:

14        Q   But in your description of your study here, do

15    you think a reader, reading that sentence, would think   03:53:10

16    that you are making the statement that as a general

17    matter, on a population-wide basis, you found in your

18    study that height, body mass and mox -- maximal oxygen

19    consumption were higher for the male NCAA competitors

20    compared to female NCAA competitors?                      03:53:32

21            MR. FRAMPTON:  Object to the form.

22            THE WITNESS:  I'm kind of unclear with what

23    you're trying to ask.

24    BY MR. BLOCK:

25        Q   Yeah, so I'm saying that this happened to be     03:53:45
```

1    the data for a particular cohort that you're doing a

2    different study on; correct?

3            MR. FRAMPTON:  Object to the form.

4            THE WITNESS:  So, yes, as I've stated, this is

5    a group of male and female Division II distance          03:53:57

6    runners.

7    BY MR. BLOCK:

8        Q   Okay.  And so that study wouldn't allow you to

9    draw any conclusions generalizable to other males and

10   females about, you know, what their comparative height,  03:54:10

11   body mass and oxygen consumption would be; right?

12           MR. FRAMPTON:  Same objection.

13           THE WITNESS:  I don't think I've ever

14   purported that that was the purpose of this study.

15   BY MR. BLOCK:                                             03:54:24

16       Q   You don't think that someone reading that

17   sentence, where it says the study -- a study finding

18   these things, you don't think someone reading that

19   sentence would have the impression that that was the

20   purpose of the study?                                     03:54:40

21           MR. FRAMPTON:  Object to the form.

22           THE WITNESS:  Those were findings of the

23   study.  That's what I have states, is those are

24   findings of the study.

25   ///

```
 1    BY MR. BLOCK:

 2        Q   Was the rest of the -- is the rest of the

 3    study relevant to the topic of this case?

 4        A   You mean is that the male athletes were faster

 5    than the female athletes?                          03:55:10

 6        Q   I mean -- what -- what I mean is you -- you --

 7    you select this finding from the study, but were any

 8    other findings from that study relevant to this case?

 9        A   Yes, we could say that.  For the same heart

10    rate, the men were faster than the women.          03:55:32

11        Q   Okay.  Okay.  Let's go to -- to page 4.

12        A   On my declaration?

13        Q   Yeah.  Or your report.

14        A   Yeah, just make sure we're on the same -- so

15    this is the overview?                              03:55:54

16        Q   Yes.  And I just want to direct your attention

17    to the three bullet points that you've listed there.

18            Do you see them?

19        A   Yes, I do.

20        Q   Okay.  Are you offering any expert opinions in  03:56:11

21    this case other than the opinions contained in those

22    three bullet points?

23            MR. FRAMPTON:  Object to the form.

24            THE WITNESS:  Well, I -- I mean, those are the

25    basis for everything else, those three bullet points,  03:56:35
```

Page 274

```
 1    and most of the other information is trying to support

 2    and substantiate why I drew those conclusions.

 3    BY MR. BLOCK:

 4        Q   Okay.  So -- but there are no -- I appreciate

 5    that.                                            03:56:48

 6            There's -- you're not offering an opinions on

 7    any other issue, are you?

 8            MR. FRAMPTON:  Object to the form.

 9            THE WITNESS:  Kind of unclear what you're

10    asking.                                          03:57:07

11            I think it states there fairly clearly what

12    I'm -- the -- the statements I'm trying to make.

13    BY MR. BLOCK:

14        Q   Yeah, I'm just trying to nail down the full

15    scope of the expert opinions you're offering here.  And  03:57:24

16    so you're not offering any expert opinions on the

17    appropriateness of particular modes of healthcare for

18    trans people; is that right?

19        A   That is correct, I'm not offering an opinion

20    on healthcare for transgender individuals.       03:57:45

21        Q   Okay.  And you are not -- you discuss these

22    bullet points, what you say are advantages, but you are

23    not offering an opinions on whether particular policies

24    are fair or unfair in light of the data that you

25    present here, are you?                           03:58:08
```

Page 275

```
 1              MR. FRAMPTON:  Object to the form and scope.

 2              Go ahead.

 3              THE WITNESS:  So I think this comes back to

 4      our previous discussion where we discuss the

 5      irreconcilable differences between inclusion and        03:58:21

 6      fairness.

 7      BY MR. BLOCK:

 8          Q   Yes, it does, which is why I'm coming back to

 9      it.

10              So I -- I -- you know, I understand that, you   03:58:37

11      know, you have laid out your criteria, your -- excuse

12      me -- your credentials for proving -- for providing an

13      expert opinion on whether an advantage exists, and so

14      I -- I -- I just want to find out whether or not, you

15      know, the -- in light of that information you present   03:58:58

16      regarding the existence or nonexistence of an

17      advantage, whether a particular policy maker will then

18      decide that something is fair or unfair, is not -- is

19      not something that you are providing an expert opinion

20      on; right?                                              03:59:18

21              MR. FRAMPTON:  Same objection.

22              Go ahead.

23              THE WITNESS:  So I'm trying to detail the

24      advantages, the differences between males and females

25      biologically, documenting the advantages in athletic   03:59:30
```

Page 276

```
 1    performance the males have over female, documenting
 2    what we know regarding transgender individuals and
 3    their -- the treatments that they might receive and how
 4    that would affect athletic advantages, and then
 5    bringing up the point that there is, apparently, some      03:59:47
 6    irreconcilable differences -- I'm not sure if that's
 7    the best way to state it, but I state it in the
 8    document -- between goals of inclusion and fairness.
 9    BY MR. BLOCK:
10        Q   Yeah, I guess -- someone reading your              04:00:00
11    report -- you know, let's say someone reads all the
12    information in the report, absorbs all the facts, you
13    know, and then, you know, is asked, based on all the
14    facts presented in your report, is it fair to include
15    trans girls and women or not to include them, would you   04:00:21
16    have any greater expertise in answering that ultimate
17    question than anyone else who has absorbed the facts
18    you presented in your report?
19            MR. FRAMPTON:  Object to the form.
20            THE WITNESS:  Are you saying does every piece      04:00:46
21    of knowledge I've ever written put on -- on this
22    document and someone would know everything that I know?
23    BY MR. BLOCK:
24        Q   No.  I'm saying that based on these facts, you
25    know, someone needs to draw a conclusion about what's     04:01:02
```

Page 277

```
 1    fair, okay?  And so my question is -- you know, I

 2    understand that you're providing an expert -- you know,

 3    opinions on the -- the -- the -- the facts you say in

 4    your report.  All my question is that, you know, the

 5    second step of drawing a conclusion about what's fair      04:01:18

 6    or unfair is not something that you are an expert on;

 7    right?

 8              MR. FRAMPTON:  Object to the form.

 9              Go ahead.

10              THE WITNESS:  I would hope that someone would     04:01:33

11    read my document, and they're also going to read the

12    document from the other experts, weigh the evidence and

13    make a decision on what is -- what is fair.

14    BY MR. BLOCK:

15         Q    And -- and you are not offering, you know,       04:01:52

16    that decision, that ultimate decision, as part of your

17    expert report; right?  That's for someone else to

18    decide?

19              MR. FRAMPTON:  Object to the form.

20              THE WITNESS:  Yes, that is my intention, is       04:02:16

21    that someone else will weigh the information, weigh the

22    data and make their decision.

23              MR. BLOCK:  All right.  Thank you, Dr. Brown.

24    I have no further questions.

25              MR. FRAMPTON:  Anyone else?                       04:02:37
```

```
 1              MS. GREEN:  This is Roberta Green on behalf of

 2    WVSSAC.  No questions.

 3              THE VIDEOGRAPHER:  Can we go off the record,

 4    Attorney Block?

 5              MR. BLOCK:  Sure.  Unless anyone else wants to    04:02:52

 6    say on the record that they don't have any other

 7    questions.

 8              MR. CROPP:  This is Jeffrey Cropp with

 9    Harrison County Board of Education and Dora Stutler.  I

10    have no question.                                            04:02:57

11              MR TAYLOR:  Michael Taylor on behalf of the

12    State BOE and Superintendent Burch.  No questions.

13              MR. TRYON:  Dave Tryon.  No questions.

14              MR. FRAMPTON:  Hal Frampton for the

15    intervenor.  No questions.

16              It sounds like we're done.

17              MR. BLOCK:  See you in another two years,

18    Dr. Brown.

19              (Simultaneous speaking.)

20              MS. DUPHILY:  Hold on.  Let's take this off       04:03:24

21    the record.  One second.

22              THE VIDEOGRAPHER:  We are off the record at

23    4:03 p.m., and this concludes today's testimony given

24    by Gregory Brown.

25              The total number of media used was eight and      04:03:31
```

```
 1    will be retained by Veritext Legal Solutions.
 2                   (TIME NOTED:  4:03 p.m.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 280

```
1            I, GREGORY BROWN, Ph.D., do hereby declare

2    under penalty of perjury that I have read the foregoing

3    transcript; that I have made any corrections as appear

4    noted, in ink, initialed by me, or attached hereto;

5    that my testimony as contained herein, as corrected, is

6    true and correct.

7            EXECUTED this _____ day of _____,

8    20_____, at _____, _____.
                        (City)                    (State)

9

10

11

12        _____

              GREGORY BROWN, Ph.D.

13                  Volume I

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 281
```

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5          That the foregoing proceedings were taken

6    before me at the time and place herein set forth; that

7    any witnesses in the foregoing proceedings, prior to

8    testifying, were placed under oath; that a record of

9    the proceedings was made by me using machine shorthand

10   which was thereafter transcribed under my direction;

11   further, that the foregoing is an accurate

12   transcription thereof.

13          I further certify that I am neither financially

14   interested in the action nor a relative or employee of

15   any attorney of any of the parties.

16          IN WITNESS WHEREOF, I have this date subscribed

17   my name.

18

19   Dated: April 5, 2022

20

21

22   _____

                ALEXIS KAGAY

23              CSR NO. 13795

24

25

                                              Page 282

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

B.P.J., by her next friend and mother, HEATHER JACKSON,

        *Plaintiff,*

    vs.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOLS ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent, DORA STUTLER, in her official capacity as the Harrison County Superintendent, and the STATE OF WEST VIRGINIA,

        *Defendants,*

    and

LAINEY ARMISTEAD,

        *Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

---

**DECLARATION OF DR. CHAD T. CARLSON, M.D., FACSM**

    I, Dr. Chad T. Carlson, pursuant to 28 U.S. Code § 1746, declare under penalty of perjury under the laws of the United States of America that the facts contained in my Expert Report of Dr. Chad T. Carlson, M.D., FACM prepared for *B.P.J. v. West Virginia*, attached hereto, are true and correct to the best of my knowledge and belief, and that the opinions expressed therein represent my own expert opinions.

    Executed on February 23, 2022.

                                Chad T. Carlson, MD

i

**Expert Report of Dr. Chad Thomas Carlson, M.D., FACM
prepared for *B.P.J. v. West Virginia*
February 23, 2022**

**JA2851**

## TABLE OF CONTENTS

Table of Contents ............................................................................ iv

Introduction.................................................................................... 1

Credentials .................................................................................... 5

   I.   OVERVIEW ................................................................ 8

  II.  A BRIEF HISTORY OF THE RATIONALE FOR SEPARATION OF SPORT BY SEX................................................................................. 10

 III.   UNDERSTANDING THE CAUSES OF SPORTS INJURIES ................... 13

     A.  The epidemiological model of injury .......................................13

     B.  The biomechanical model of injury .........................................18

 IV.   THE PHYSICS OF SPORTS INJURY ................................................ 20

  V.  GENDER DIFFERENCES RELEVANT TO INJURY .................................... 24

     A.  Height and weight .....................................................25

     B.  Bone and connective tissue strength .......................................26

     C.  Speed ...........................................................27

     D.  Strength/Power .......................................................27

     E.  Throwing and kicking speed ...............................................30

 VI.   ENHANCED FEMALE VULNERABILITY TO CERTAIN INJURIES....... 33

     A.  Concussions...........................................................35

     B.  Anterior Cruciate Ligament injuries .......................................42

VII.   TESTOSTERONE SUPPRESSION WILL NOT PREVENT THE HARM TO FEMALE SAFETY IN ATHLETICS ............................................. 46

     A.  Size and weight........................................................51

     B.  Bone density...........................................................52

     C.  Strength ..............................................................52

     D.  Speed ................................................................55

Conclusion ................................................................................... 56

Bibliography.................................................................................. 61

Appendix – List of Publications ................................................................ 71

Curriculum Vitae (Abbreviated) ................................................................ 72

# INTRODUCTION

Up to the present, the great majority of news, debate, and even scholarship about transgender participation in female athletics has focused on track and field events and athletes, and the debate has largely concerned questions of fairness and inclusion. However, the transgender eligibility policies of many high school athletic associations in the United States apply with equal force to all sports, including sports in which players frequently collide with each other, or can be forcefully struck by balls or equipment such as hockey or lacrosse sticks. And in fact, biologically male transgender athletes have competed in a wide range of high school, collegiate, and professional girls' or women's sports, including, at least, basketball,[1] soccer,[2] volleyball,[3] softball,[4] lacrosse,[5] and even women's tackle football.[6]

---

[1] https://www.espn.com/espnw/athletes-life/story/_/id/10170842/espnw-gabrielle-ludwig-52-year-old-transgender-women-college-basketball-player-enjoying-best-year-life (accessed 2/17/22)

[2] https://www.unionleader.com/news/education/nh-bill-limits-women-s-sports-to-girls-born-female/article_d1998ea1-a1b9-5ba4-a48d-51a2aa01b910.html; https://www.outsports.com/2020/1/17/21069390/womens-soccer-mara-gomez-transgender-player-argentina-primera-division-villa-san-marcos (accessed 6/20/21)

[3] https://news.ucsc.edu/2016/09/challenging-assumptions.html (accessed 6/20/21); https://www.outsports.com/2017/3/20/14987924/trans-athlete-volleyball-tia-thompson (accessed 6/20/21)

[4] https://www.foxnews.com/us/californias-transgender-law-allows-male-high-schooler-to-make-girls-softball-team (accessed 6/20/21)

[5] https://savewomenssports.com/f/emilys-story?blogcategory=Our+Stories (accessed 6/20/21)

[6] https://www.outsports.com/2017/12/13/16748322/britney-stinson-trans-football-baseball (accessed 6/20/21); https://www.mprnews.org/story/2018/12/22/transgender-football-player-prevails-in-lawsuit (accessed 6/20/21)

1

**JA2853**

The science of sex-specific differences in physiology, intersecting with the physics of sports injury, leaves little doubt that participation by biological males in these types of girls' or women's sports, based on gender identity, creates significant additional risk of injury for the biologically female participants competing alongside these transgender athletes.

In 2020, after an extensive review of the scientific literature, consultation with experts, and modeling of expected injuries, World Rugby published revised rules governing transgender participation, along with a detailed explanation of how the new policy was supported by current evidence. World Rugby concluded that "there is currently no basis with which safety and fairness can be assured to biologically female rugby players should they encounter contact situations with players whose biological male advantages persist to a large degree," and that after puberty, "the lowering of testosterone removes only a small proportion of the documented biological differences." Hence, World Rugby concluded that biological men should not compete in women's rugby. (World Rugby Transgender Women Guidelines 2020.) World Rugby has been criticized by some for its new guidelines, but those criticisms have often avoided discussions of medical science entirely, or have asserted that modeling scenarios can overstate true risk. What cannot be denied, however, is that World Rugby's approach is evidence-based, and rooted in concern for athlete safety. As a medical doctor who has spent my career in sports medicine, it is my opinion that World Rugby's assessment of the evidence is scientifically sound, and that injury modeling

2

JA2854

meaningfully predicts that biologically male transgender athletes do constitute a safety risk for the biologically female athlete in women's sports.

In a similar vein, in 2021, the UK Sports Councils' Equality Group released new guidance for transgender inclusion in organized sports. This guidance was formulated after extensive conversations with stakeholders, a review of scientific findings related to transgender athletes in sport through early 2021, and an assessment of the use by some sport national governing bodies of case-by-case assessment to determine eligibility. Noteworthy within these stakeholder consultations was a lack of consensus on any workable solution, as well as concerns related to athlete safety and "adherence to rules which give sport validity." The Literature Review accompanying the guidance document further noted that "[t]here are significant differences between the sexes which render direct competition between males and females . . . unsafe in sports which allow physical contact and collisions." (UK Sports Councils' Equality Group Literature Review 2021 at 1.) Their review of the science "made clear that there are retained differences in strength, stamina and physique between the average woman compared with the average transgender woman....with or without testosterone suppression." (UK Sports Councils' Equality Group Guidance at 3.) This was also reflected in their ten guiding principles, stating that physical differences between the sexes will "impact safety parameters in sports which are combat, collision or contact in nature." (UK Sports Councils' Equality Group Guidance 2021 at 7.) Ultimately, UK Sport

3

**JA2855**

concluded that the full inclusion of transgender athletes in women's sports "cannot be reconciled within the current structure of sport," stating that "the inclusion of transgender people into female sport cannot be balanced regarding transgender inclusion, fairness and safety in gender-affected sport where there is meaningful competition . . . . due to retained differences in strength, stamina and physique between the average woman compared with the average transgender woman…, with or without testosterone suppression." (UK Sports Councils' Equality Group Guidance 2021 at 6.) Finally, UK Sport affirmed the use of sex categorization in sport, along with age and disability, as important for the maintenance of safety and fairness. (UK Sports Councils' Equality Group Guidance 2021 at 7-8.)

Unfortunately, apart from World Rugby's careful review and the recent release of UK Sports Councils' guidance, the public discourse is lacking any careful consideration of the question of safety. As a physician who has spent my career caring for athletes, I find this silence about safety both surprising and concerning. It is my hope through this white paper to equip and motivate sports leagues and policy makers to give adequate attention to the issue of safety for female athletes when transgender policies are being considered. I first explain the nature and causes of common sports injuries. I then review physiological differences between male and female bodies that affect the risk and severity of injuries to females when biological males compete in the female category, and

explain why testosterone suppression does not eliminate these heightened risks to females. Finally, I explain certain conclusions about those risks.

## CREDENTIALS

1.      I am a medical doctor practicing Sports Medicine, maintaining an active clinical practice at Stadia Sports Medicine in West Des Moines, Iowa. I received my M.D. from the University of Nebraska College of Medicine in 1994 and completed a residency in family medicine at the University of Michigan in 1997.

2.      Following my time in Ann Arbor, I matched to a fellowship in Sports Medicine at Ball Memorial Hospital in Muncie, Indiana, training from 1997 to 1999, with clinical time split between Central Indiana Orthopedics, the Ball State Human Performance Laboratory, and the Ball State University training room. I received my board certification in Sports Medicine in 1999, which I continue to hold. Since residency training, my practice has focused on Sports Medicine–the treatment and prevention of injuries related to sport and physical activity.

3.      Since 1997, I have served in several clinical practices and settings as a treating physician, including time as team physician for both the University of Illinois and Ball State University, where I provided care to athletes in several sports, including football, ice hockey, basketball, field hockey, softball, gymnastics, soccer, and volleyball. In the course of my career, I have provided coverage for NCAA Power Five Conference championships and NCAA National

5

JA2857

Championship events in basketball, field hockey and gymnastics, among other sports, as well as provided coverage for national championship events for U.S.A. gymnastics, and U.S. Swimming and Diving. I have also covered professional soccer in Des Moines.

4.    Since 2006, I have been the physician owner of Stadia Sports Medicine in West Des Moines, Iowa. My practice focuses on treatment of sports and activity-related injury, including concussive injury, as well as problems related to the physiology of sport.

5.    I have served in and provided leadership for several professional organizations over the course of my career. In 2004, I was designated a Fellow of the American College of Sports Medicine (ACSM). I have served on ACSM's Health and Science Policy Committee since 2010, and for a time chaired their Clinical Medicine Subcommittee. From 2009 to 2013, I served two elected terms on the Board of Directors of the American Medical Society for Sports Medicine (AMSSM), and during that time served as Chair of that body's Practice and Policy Committee. I was subsequently elected to a four-year term on AMSSM's executive committee in 2017, and from 2019-20, I served as AMSSM's President. AMSSM is the largest organization of sports medicine physicians in the world. I gained fellowship status through AMSSM in 2020–my first year of eligibility. My work for ACSM and AMSSM has brought with it extensive experience in public policy as relates to Sports Medicine.

JA2858

6.      In 2020, I was named as AMSSM's first board delegate to the newly-constituted Physical Activity Alliance. I am a named member of an NCAA advisory group on COVID-19, through which I provided input regarding the cancellation of the basketball tournament in 2020. I also serve as a member of the Iowa Medical Society's Sports Medicine Subcommittee and have been asked to serve on the Iowa High School Athletic Association's newly-forming Sports Medicine Advisory Committee.

7.      I have served as a manuscript reviewer for organizational policy pronouncements, and for several professional publications, most recently a sports medicine board review book just published in 2021. I have published several articles on topics related to musculoskeletal injuries in sports and rehabilitation, which have been published in peer-reviewed journals such as Clinical Journal of Sports Medicine, British Journal of Sports Medicine, Current Reviews in Musculoskeletal Medicine, Athletic Therapy Today, and the Journal of Athletic Training. In conjunction with my work in policy advocacy, I have helped write several pieces of legislation, including the initial draft of what became the Sports Medicine Licensure Clarity Act, signed into law by President Trump in 2018, which eases the restrictions on certain practitioners to provide health services to athletes and athletic teams outside of the practitioner's home state. A list of my publications over the past ten (10) years is included as an appendix to this report.

JA2859

8.    In the past four years, I have not testified as an expert witness in a deposition or at trial.

9.    I am being compensated for my services as an expert witness in this case at the rates of $650 per hour for consultation, $800 per hour for deposition testimony, and $3,500 per half-day of trial testimony.

## I.    OVERVIEW

10.    In this statement, I offer information and my own professional opinion on the potential for increased injury risk to females in sports when they compete against biologically male transgender athletes.[7] At many points in this statement, I provide citations to published, peer-reviewed articles that provide relevant and supporting information to the points I make.

11.    The principal conclusions that I set out in this white paper are as follows:

> a. Government and sporting organizations have historically considered the preservation of athlete safety as one component of competitive equity.
>
> b. Injury in sport is somewhat predictable based on modeling assumptions that take into account relevant internal and external risk factors.

---

[7] In the body of this paper, I use the terms "male" and "female" according to their ordinary medical meaning—that is to say, to refer to the two biological sexes. I also use the word "man" to refer to a biologically male human, and "woman" to refer to a biologically female human. In the context of this opinion, I include in these categories non-syndromic, biologically-normal males and females who identify as a member of the opposite sex, including those who use endogenous hormone suppression to alter their body habitus. In contexts that are not focused on questions of biology and physiology, terms of gender are sometimes used to refer to subjective identities rather than to biological categories – something I avoid for purposes of a paper focused on sports science

8

**JA2860**

c. Males exhibit large average advantages in size, weight, and physical capacity over females—often falling far outside female ranges. Even before puberty, males have a performance advantage over females in most athletic events. Failure to preserve protected female-only categories in contact sports (broadly defined) will ultimately increase both the frequency and severity of injury suffered by female athletes who share playing space with these males.

d. Current research supports the conclusion that suppression of testosterone levels by males who have already begun puberty will not fully reverse the effects of testosterone on skeletal size, strength, or muscle hypertrophy, leading to persistence of sex-based differences in power, speed, and force-generating capacity.

12.    In this white paper, I use the term "contact sports" to refer broadly to all sports in which collisions between players, or collisions between equipment such as a stick or ball and the body of a player, occur with some frequency (whether or not permitted by the rules of the game), and are well recognized in the field of sports medicine as causes of sport-related injuries.[8] The 1975 Title IX implementing regulations (34 CFR § 106.41) say that "for purposes of this [regulation] contact sports include boxing, wrestling, rugby, ice hockey, football, basketball, *and other sports* the purpose or major activity of which involves bodily contact."  Certainly, all of the sports specifically named in the regulation fall within my definition of "contact sport."  Mixed martial arts, field hockey (Barboza 2018), soccer (Kuczinski 2018), rugby (Viviers 2018), lacrosse

---

[8] It is common to see, within the medical literature, reference to distinctions between "contact" and "collision" sports. For purposes of clarity, I have combined these terms, since in the context of injury risk modeling, there is no practical distinction between them.

**JA2861**

(Pierpoint 2019), volleyball,[9] baseball, and softball also involve collisions that can and do result in injuries, and so also fall within my definition.

## II.    A BRIEF HISTORY OF THE RATIONALE FOR SEPARATION OF SPORT BY SEX

13.    World Rugby is correct when it notes that "the women's category exists to ensure protection, safety, and equality" for women. (World Rugby Transgender Women Guidelines 2020.) To some extent, those in charge of sport governing bodies in the modern era have always recognized the importance of grouping athletes together based on physical attributes, in order to ensure both safety and competitive balance. Weight classifications have existed in wrestling since it reappeared as an Olympic event in 1904. Women and men have participated in separate categories since the advent of intercollegiate sporting clubs early in the 20th century. When Title IX went into effect in 1975, there were just under 300,000 female high school athletes, and fewer than 10,000 female collegiate athletes. With the changes that resulted from Title IX, it was assumed that newly-available funds for women in sport would ensure the maintenance of existing, or creation of new, sex-segregated athletic teams that would foster greater participation by women. This has been borne out subsequently; by the first half of the 1980's these numbers had risen to 1.9 million and nearly 100,000 respectively. (Hult 1989.)

---

[9] See https://www.latimes.com/sports/story/2020-12-08/stanford-volleyball-hayley-hodson-concussions-cte-lawsuit, and https://volleyballmag.com/corinneatchison/ (both accessed 6/20/21).

10

**JA2862**

14.    The rationale for ongoing "separate but equal" status when it came to sex-segregated sports was made clear within the language of the original implementing regulations of Title IX , which, acknowledging real, biologically-driven differences between the sexes, created carve-out exceptions authorizing sex-separation of sport for reasons rooted in the maintenance of competitive equity. Importantly, the effect of these innate sex-based differences on the health and safety of the athlete were acknowledged by the express authorization of sex-separated teams for sports with higher perceived injury risk—i.e., "contact sports." (Coleman 2020.)

15.    In the almost half century since those regulations were adopted, the persistent reality of sex-determined differences in athletic performance and safety has been recognized by the ongoing and nearly universal segregation of men's and women's teams–even those that are not classically defined as being part of a contact or collision sport.

16.    Now, however, many schools and sports leagues in this country are permitting males to compete in female athletics—including in contact sports—based on gender identity. In my view, these policies have been adopted without careful analysis of safety implications. Other researchers and clinicians have addressed questions of the negative impact of such policies on fairness, or equality of athletic experiences for girls and women, in published articles, and in court submissions. One recent review of track and field performances, including sprints, distance races and field events, noted that men surpass the

11

**JA2863**

top female performance in each category between 1000 and 10,000 times *each year*, with hundreds or thousands of men beating the top women in each event. (Coleman & Shreve.) Although this was not their primary focus, World Rugby well-summarized the point when it observed that in a ranking list of the top thousand performances in most sports, every year, *every one* will have been achieved by a biological male. (World Rugby Transgender Women Guidelines 2020.) Although most easily documented in athletes who have gone through puberty, these differences are not exclusively limited to post-pubescent athletes either.

17.    I have reviewed the expert declaration of Gregory A. Brown, Ph.D., FACM of February 23, 2022, provided in this case, which includes evidence from a wide variety of sources, including population-based mass testing data, as well as age-stratified competition results, all of which support the idea that prepubertal males run faster, jump higher and farther, exhibit higher aerobic power output, and have greater upper body strength (evidenced by stronger hand grip and better performance with chin-ups or bent arm hang) than comparably aged females. This performance gap is well-documented in population-based physiologic testing data that exists in databases such as the Presidential Fitness Test, the Eurofit Fitness test, and additional mass testing data from the UK and Australia. Collectively, this data reveals that pre-pubertal males outperform comparably aged females in a wide array of athletic tests including but not limited to the countermovement jump test, drop jump test, change of direction

12

**JA2864**

test, long jump, timed sit-up test, the 10 X 5 meter shuttle run test, the 20 meter shuttle run test, curl-ups, pull-ups, push-ups, one mile run, standing broad jump, and bent arm hang test. Dr. Brown further references studies showing a significant difference in the body composition of males and females before puberty. In sum, a large and unbridgeable performance gap between the sexes is well-studied and equally well-documented, beginning in many cases before puberty. In this white paper, I focus on some of these differences as they touch on the question of athlete safety.

## III.   UNDERSTANDING THE CAUSES OF SPORTS INJURIES

18.     The causes for injury in sport are multifactorial. In recent decades, medical researchers have provided us an evolving understanding of how sports injuries occur, as well as the factors that make them more or less probable, and more or less severe. Broadly speaking, there are two ways of modeling injury: the epidemiological model, and the biomechanical model. These models are not mutually exclusive, but provide complementary conceptual frameworks to help us stratify risk in sport.

### A.     The epidemiological model of injury

19.     From a practical standpoint, sports medicine researchers and clinicians often use the "epidemiological model" to explain, prevent and manage sports injuries. Broadly speaking, this model views an injury in sport as the product of internal and external risk factors, triggered by an inciting event. In other words, a given injury is "caused" by a number of different factors that are

unique to a given situation. (Meeuwise 1994.) When the interplay of these factors exceeds the injury threshold, injury occurs. One example of how this interplay might work would be a female distance runner in track who develops a tibial stress fracture, with identified risks of low estrogen state from amenorrhea (suppression of menses), an aggressive winter training program on an indoor tile surface, and shoes that have been used for too many miles, and are no longer providing proper shock absorption. Most risk factors ebb and flow, with the overall injury risk at any given time fluctuating as well. Proper attention to risk factor reduction *before* the start of the sports season (including appropriate rule-making) is the best way to reduce actual injury rates *during* the season.

20.    As alluded to, the risk factors associated with injury can be broadly categorized as internal or external. Internal risk factors are internal to the athlete. These include relatively fixed variables, such as the athlete's age, biological sex, bone mineral density (which affects bone strength) and joint laxity, as well as more mutable variables such as body weight, fitness level, hydration state, current illness, prior injury, or psychosocial factors such as aggression.

21.    External risk factors are, as the name suggests, external to the athlete. These include non-human risks such as the condition of the playing surface or equipment, athletic shoe wear, or environmental conditions. Other external risk factors come from opposing competitors, and include such

14

**JA2866**

variables as player size, speed, aggressiveness, and overall adherence to the rules of the game. As already mentioned, these risks can be minimized through the proper creation and enforcement of rules, as well as the appropriate grouping of athletes together for purposes of competition. To the latter point, children don't play contact sports with adults and, in the great majority of cases, men and women compete in categories specific to their own biological sex. Certainly these categorical separations are motivated in part by average performance differences and considerations of fairness and opportunity. But they are also motivated by safety concerns. When properly applied, these divisions enhance safety because, when it comes to physical traits such as body size, weight, speed, muscle girth, and bone strength, although a certain amount of variability exists within each group, the averages and medians differ widely *between* the separated groups.[10]

22.    Thus, each of these commonly utilized groupings of athletes represents a pool of individuals with predictable commonalities. Epidemiological risk assessment is somewhat predictable and translatable as long as these pools remain intact. But the introduction of outside individuals

---

[10] In some cases, safety requires even further division or exclusion. A welterweight boxer would not compete against a heavyweight, nor a heavyweight wrestle against a smaller athlete. In the case of youth sports, when children are at an age where growth rates can vary widely, leagues will accommodate for naturally-occurring large discrepancies in body size by limiting larger athletes from playing positions where their size and strength is likely to result in injury to smaller players. Thus, in youth football, players exceeding a certain weight threshold may be temporarily restricted to playing on the line and disallowed from carrying the ball, or playing in the defensive secondary, where they could impose high-velocity hits on smaller players.

JA2867

into a given pool (e.g. an adult onto a youth football team, or males into most women's sports) would change the balance of risk inside that pool. Simply put, when you introduce larger, faster, and stronger athletes from one pool into a second pool of athletes who are *categorically* smaller (whether as a result of age or sex), you have altered the characteristics of the second pool, and, based on known injury modeling, have statistically increased the injury risk for the original athletes in that pool. This, in a nutshell, is the basis for World Rugby's recommendations.

23.    Most clinical studies of the epidemiology of sports injuries use a multivariate approach, identifying multiple independent risk factors and examining how these factors might interact, in order to determine their relative contribution to injury risk, and make educated inferences about causation. (Meeuwise 1994.)

24.    In applying the multivariate approach, the goal is to keep as many variables as possible the same so as to isolate the potential effect of a single variable (such as age or biological sex) on injury risk, as well as to determine how the isolated variable interacts with the other analyzed variables to affect injury risk. Failure to consider relevant independent variables can lead to error. Researchers focusing on differences between male and female athletes, for example, would not compare concussion rates of a high school girls' soccer team to concussion rates of a professional men's soccer team, because differences in the concussion rate might be due to a number of factors besides sex, such as age,

body mass, relative differences in skill, speed, or power, as well as differences in training volume and intensity.

25.    As indicated earlier, an injury event is usually the end product of a number of different risk factors coming together. (Bahr 2005.) A collision between two soccer players who both attempt to head the ball, for example, might be the inciting event that causes a concussion. Although the linear and angular forces that occur through sudden deceleration would be the proximate cause of this injury, the epidemiological model of injury would also factor in "upstream" risks, predicting the possibility of an injury outcome for each athlete differently depending on the sum of these risks. If the collision injury described above occurs between two disparately-sized players, the smaller athlete will tend to decelerate more abruptly than the larger athlete, increasing the smaller athlete's risk for injury. Additional discrepancies in factors such as neck strength, running speeds, and muscle force generation capacity all result in differing risks and thus, the potential for differing injury outcomes from the same collision. As I discuss later in this white paper, there are significant statistical differences between the sexes when it comes to each of these variables, meaning that in a collision sport where skeletally mature males and females are playing against one another, there is a higher statistical likelihood that injury will result when collisions occur, and in particular there is a higher likelihood that a female will suffer injury. This again is the basis for the recent decision by World Rugby to disallow the crossover of men into women's rugby,

regardless of gender identity. (World Rugby Transgender Women Guidelines 2020.) The decision-making represented by this policy change is rational and rooted in objective facts and objective risks of harm, because it takes real, acknowledged, and documented physical differences between the sexes (in many cases before adolescence), and models expected injury risk on the basis of the known differences that persist even after hormone manipulation.

### B.    The biomechanical model of injury

26.    Sports medicine researchers and clinicians also consider a biomechanical approach when it comes to understanding sports injuries. In the biomechanical model of injury, injury is considered to be analogous to the failure of a machine or other structure. Every bone, muscle, or connective tissue structure in an athlete's body has a certain load tolerance. Conceptually, when an external "load" exceeds the load tolerance of a given structure in the human body, an injury occurs. (Fung 1993 at 1.) Thus, researchers focus on the mechanical load—the force exerted on a bone, ligament, joint or other body part—and the load tolerance of that impacted or stressed body part, to understand what the typical threshold for injury is, and how predictable this might be. (McIntosh 2005 at 2-3.) Biomechanical models of injury usually consider forces in isolation. The more consistent the movement pattern of an individual, and the fewer the contributions of unexpected outside forces to the athlete, the more accurate biomechanical predictions of injury will be.

18

**JA2870**

27.    Biomechanical modeling can be highly predictive in relatively simple settings. For example, in blunt trauma injury from falls, mortality predictably rises the greater the fall. About 50% of people who fall four stories will survive, while only 10% will survive a fall of seven stories. (Buckman 1991.) As complexity increases, predictability in turn decreases. In sport, the pitching motion is highly reproducible, and strain injury to the ulnar collateral ligament (UCL) of the elbow can be modeled. The load tolerance of the UCL of a pitcher's elbow is about 32 Newton-meters, but the failure threshold of a ligament like this in isolation is not the only determinant of whether injury will occur. During the pitching motion, the valgus force imparted to the elbow (gapping stress across the inner elbow that stretches the UCL) routinely reaches 64 Newtons, which is obviously greater than the failure threshold of the ligament. Since not all pitchers tear their UCLs, other variables innate to an athlete must mitigate force transmission to the ligament and reduce risk. The load tolerance of any particular part of an athlete's body is thus determined by other internal factors such as joint stiffness, total ligament support, muscle strength across the joint, or bone mineral density. Injury load can be self-generated, as in the case of a pitcher's elbow, or externally-generated, as in the case of a linebacker hitting a wide receiver. While load tolerance will vary by individual, as described above, and is often reliant on characteristics innate to a given athlete, external load is determined by outside factors such as the nature of the playing surface or

19

**JA2871**

equipment used, in combination with the weight and speed of other players or objects (such as a batted ball) with which the player collides. (Bahr 2005.)

28.    As this suggests, the two "models" of sports injuries described above are not in any sense inconsistent or in tension with each other. Instead, they are complementary ways of thinking about injuries that can provide different insights. But the important point to make regarding these models is that in either model, injury risk (or the threshold for injury) rises and falls depending on the size of an externally-applied force, and the ability of a given athlete to absorb or mitigate that force.

## IV.    THE PHYSICS OF SPORTS INJURY

29.    Sports injuries often result from collisions between players, or between a player and a rapidly moving object (e.g. a ball or hockey puck, a lacrosse or hockey stick). In soccer, for example, most head injuries result from collisions with another player's head or body, collision with the goal or ground, or from an unanticipated blow from a kicked ball. (Boden 1998; Mooney 2020.) In basketball, players often collide with each other during screens, while diving for a loose ball, or while driving to the basket. In lacrosse or field hockey, player-to-player, or player-to-stick contact is common.

30.    But what are the results of those collisions on the human body? Basic principles of physics can cast light on this question from more than one angle. A general understanding of these principles can help us identify factors

**JA2872**

that will predictably increase the relative risk, frequency, and severity of sports injuries, given certain assumptions.

31.    First, we can consider **energy**. Every collision involves an object or objects that possess energy. The energy embodied in a moving object (whether a human body, a ball, or anything else) is called kinetic energy.

32.    Importantly, the kinetic energy of a moving object is expressed as: $E_k = \frac{1}{2}mv^2$. That is, kinetic energy is a function of the mass of the object multiplied by the *square* of its velocity. (Dashnaw 2012.) To illustrate with a simple but extreme example: if athletes A and B are moving at the same speed, but athlete A is twice as heavy, athlete A carries twice as much kinetic energy as athlete B. If the two athletes weigh the same amount, but athlete A is going twice as fast, athlete A carries four times as much kinetic energy as athlete B. But as I have noted, the kinetic energy of a moving object is a function of the mass of the object multiplied by the square of its velocity. Thus, if athlete A is twice as heavy, and moving twice as fast, athlete A will carry eight times the kinetic energy of athlete B into a collision.[11]

33.    The implication of this equation means that what appear to be relatively minor discrepancies in size and speed can result in major differences in energy imparted in a collision, to the point that more frequent and more severe injuries can occur. To use figures that correspond more closely to average

---

[11] $2 \times 2^2 = 8$

21

**JA2873**

differences between men and women, if Player M weighs only 20% more than Player F, and runs only 15% faster, Player M will bring *58% more kinetic energy* into a collision than Player F.[12]

34.    The law of conservation of energy tells us that energy is never destroyed or "used up." If kinetic energy is "lost" by one body in a collision, it is inevitably transferred to another body, or into a different form. In the case of collision between players, or between (e.g.) a ball and a player's head, some of the energy "lost" by one player, or by the ball, may be transformed into (harmless) sound; some may result in an increase in the kinetic energy of the player who is struck (through acceleration, which I discuss below); but some of it may result in *deformation* of the player's body—which, depending on its severity, may result in injury. Thus, the greater the kinetic energy brought into a collision, the greater the potential for injury, all other things being equal.

35.    Alternately, we can consider force and *acceleration*, which is particularly relevant to concussion injuries.

36.    Newton's third law of motion tells us that when two players collide, their bodies experience equal and opposite forces at the point of impact.

37.    Acceleration refers to the rate of change in speed (or velocity). When two athletes collide, their bodies necessarily accelerate (or decelerate) rapidly: stopping abruptly, bouncing back, or being deflected in a different

---

[12] $1.2 \times (1.15)^2 = 1.587$

direction. Newton's second law of motion tells us that: $F = ma$ (that is, force equals mass multiplied by acceleration). From this equation we see that when a larger and a smaller body collide, and (necessarily) experience equal and opposite forces, the smaller body (or smaller player, in sport) will experience more rapid acceleration. We observe this physical principle in action when we watch a bowling ball strike bowling pins: the heavy bowling ball only slightly changes its course and speed; the lighter pins go flying.

38.   This same equation also tells us that if a given player's body or head is hit with a *larger* force (e.g., from a ball that has been thrown or hit faster), it will experience *greater* acceleration, everything else being equal.

39.   Of course, sport is by definition somewhat chaotic, and forces are often not purely linear. Many collisions also involve angular velocities, with the production of rotational force, or torque. Torque can be thought of as force that causes rotation around a central point. A different but similar equation of Newtonian physics  governs the principles involved.[13] Torque is relevant to injury in several ways. When torque is applied through joints in directions those joints are not able to accommodate, injury can occur. In addition, rotational force can cause different parts of the body to accelerate at different rates—in some cases, very rapid rates, also leading to injury. For example, a collision where the

---

[13] In this equation, $\tau = I\alpha$, torque equals moment of inertia multiplied by angular acceleration, where "moment of inertia" is defined as $I = mr^2$, that is, mass multiplied by the square of the distance to the rotational axis.

23

**JA2875**

body is impacted at the waist can result in high torque and acceleration on the neck and head.

40.    Sport-related concussion—a common sports injury and one with potentially significant effects—is attributable to linear, angular, or rotational acceleration and deceleration forces that result from impact to the head, or from an impact to the body that results in a whiplash "snap" of the head. (Rowson 2016.) In the case of a concussive head injury, it is the brain that accelerates or decelerates on impact, colliding with the inner surface of the skull. (Barth 2001 at 255.)

41.    None of this is mysterious: each of us, if we had to choose between being hit either by a large, heavy athlete running at full speed, or by a small, lighter athlete, would intuitively choose collision with the small, light athlete as the lesser of the two evils. And we would be right. One author referred to the "increase in kinetic energy, and therefore imparted forces" resulting from collision with larger, faster players as "profound." (Dashnaw 2012.)

V.    GENDER DIFFERENCES RELEVANT TO INJURY

42.    It is important to state up front that it is self-evident to most people familiar with sport and sport injuries that if men and women were to consistently participate together in competitive contact sports, there would be higher rates of injury in women. This is one reason that rule modifications often

exist in leagues where co-ed participation occurs.[14] Understanding the physics of sports injuries helps provide a theoretical framework for why this is true, but so does common sense and experience. All of us are familiar with basic objective physiological differences between the sexes, some of which exist in childhood, and some of which become apparent after the onset of puberty, and persist throughout adulthood. And as a result of personal experience, all of us also have some intuitive sense of what types of collisions are likely to cause pain or injury. Not surprisingly, our "common sense" on these basic facts about the human condition is also consistent with the observations of medical science. Below, I provide quantifications of some of these well-known differences between the sexes that are relevant to injury risk, as well as some categorical differences that may be less well known.

### A.   Height and weight

43.    It is an inescapable fact of the human species that males as a group are statistically larger and heavier than females. On average, men are 7% to 8% taller than women. (Handelsman 2018 at 818.) According to the most recently available Centers for Disease Control and Prevention (CDC) statistics, the weight of the average U.S. adult male is 16% greater than that of the average U.S. adult female. (CDC 2018.) This disparity persists into the athletic cohort.

---

[14] For example, see https://www.athleticbusiness.com/college/intramural-coed-basketball-playing-rules-vary-greatly.html (detailing variety of rule modifications applied in co-ed basketball). Similarly, coed soccer leagues often prohibit so-called "slide tackles," which are not prohibited in either men's or women's soccer. See, e.g..,
http://www.premiercoedsports.com/pages/rulesandpolicies/soccer.

Researchers find that while athletes tend on average to be lighter than non-athletes, the weight difference between the average adult male and female athlete remains within the same range—between 14% and 23%, depending on the sport analyzed. (Santos 2014; Fields 2018.) Indeed, World Rugby estimates that the typical male rugby player weighs 20% to 40% more than the typical female rugby player. (World Rugby Transgender Women Guidelines 2020.) This size advantage by itself allows men to bring more force to bear in a collision.

### B.    Bone and connective tissue strength

44.    Men have bones in their arms, legs, feet, and hands that are both larger and stronger per unit volume than those of women, due to greater cross-sectional area, greater bone mineral content, and greater bone density. The advantage in bone size (cross-sectional area) holds true in both upper and lower extremities, even when adjusted for lean body mass. (Handelsman 2018 at 818; Nieves 2005 at 530.) Greater bone size in men is also correlated with stronger tendons that are more adaptable to training (Magnusson 2007), and an increased ability to withstand the forces produced by larger muscles (Morris 2020 at 5). Male bones are not merely larger, they are stronger per unit of volume. Studies of differences in arm and leg bone mineral density – one component of bone strength – find that male bones are denser, with measured advantages of between 5% and 14%. (Gilsanz 2011; Nieves 2005.)

JA2878

45. Men also have larger ligaments than women (Lin 2019 at 5), and stiffer connective tissue (Hilton 2021 at Table 1), providing greater protection against joint injury.

### C.    Speed

46. When it comes to acceleration from a static position to a sprint, men are consistently faster than women. World record sprint performance gaps between the sexes remain significant at between 7% and 10.5%, with world record times in women now exhibiting a plateau (no longer rapidly improving with time) similar to the historical trends seen in men. (Cheuvront 2005.) This performance gap has to do with, among other factors, increased skeletal stiffness, greater cross-sectional muscle area, denser muscle fiber composition and greater limb length. (Handelsman 2018.) Collectively, males, on average, run about 10% faster than females. (Lombardo 2018 at 93.) This becomes important as it pertains to injury risk, because males involved in sport will often be travelling at faster speeds than their female counterparts in comparable settings, with resultant faster speed at impact, and thus greater impact force, in a given collision.

### D.    Strength/Power

47. In 2014, a male mixed-martial art fighter identifying as female and fighting under the name Fallon Fox fought a woman named Tamikka Brents, and caused significant facial injuries in the course of their bout. Speaking about their fight later, Brents said:

> "I've fought a lot of women and have never felt the
> strength that I felt in a fight as I did that night. I can't
> answer whether it's because she was born a man or
> not because I'm not a doctor. I can only say, I've never
> felt so overpowered ever in my life, and I am an
> abnormally strong female in my own right."[15]

48.    So far as I am aware, mixed martial arts is not a collegiate or high

school interscholastic sport. Nevertheless, what Brent experienced in an

extreme setting is true and relevant to safety in all sports that involve contact.

In absolute terms, males as a group are substantially stronger than women.

49.    Compared to women, men have "larger and denser muscle mass,

and stiffer connective tissue, with associated capacity to exert greater muscular

force more rapidly and efficiently." (Hilton 2021 at 201.) Research shows that on

average, during the prime athletic years (ages 18-29) men have, on average, 54%

greater total muscle mass than women (33.7 kg vs. 21.8 kg) including 64%

greater muscle mass in the upper body, and 47% greater in the lower body.

(Janssen 2000 at Table 1.) The cross-sectional area of muscle in women is only

50% to 60% that of men in the upper arm, and 65% to 70% of that of men in the

thigh. This translates to women having only 50% to 60% of men's upper limb

strength and 60% to 80% of men's lower limb strength. (Handelsman 2018 at

812.) Male weightlifters have been shown to be approximately 30% stronger

than female weightlifters of equivalent stature and mass. (Hilton 2021 at 203.)

But in competitive athletics, since the stature and mass of the average male

---

[15] https://bjj-world.com/transgender-mma-fighter-fallon-fox-breaks-skull-of-her-female-opponent/

28

**JA2880**

exceeds that of the average female, actual differences in strength between average body types will, on average, exceed this. The longer limb lengths of males augment strength as well. Statistically, in comparison with women, men also have lower total body fat, differently distributed, and greater lean muscle mass, which increases their power-to-weight ratios and upper-to-lower limb strength ratios as a group. Looking at another common metric of strength, males average 57% greater grip strength (Bohannon 2019) and 54% greater knee extension torque (Neder 1999). Research shows that sex-based discrepancies in lean muscle mass begin to be established from infancy, and persist through childhood to adolescence. (Davis 2019; Kirchengast 2001; Taylor 1997; Taylor 2010; McManus 2011.)

50.    Using their legs and torso for power generation, men can apply substantially larger forces with their arms and upper body, enabling them to generate more ball velocity through overhead motions, as well as to generate more pushing or punching power. In other words, isolated sex-specific differences in muscle strength in one region (even differences that in isolation seem small) can, and do combine to generate even greater sex-specific differences in more complex sport-specific functions. One study looking at moderately-trained individuals found that males can generate 162% more punching power than females. (Morris 2020.) Thus, multiple small advantages aggregate into larger ones.

### E.    Throwing and kicking speed

51.    One result of the combined effects of these sex-determined differences in skeletal structure is that men are, on average, able to throw objects faster than women. (Lombardo 2018; Chu 2009; Thomas 1985.) By age seventeen, the *average* male can throw a ball farther than 99% of seventeen-year-old females—which necessarily means at a faster initial speed assuming a similar angle of release— despite the fact that factors such as arm length, muscle mass, and joint stiffness individually don't come close to exhibiting this degree of sex-defined advantage. One study of elite male and female baseball pitchers showed that men throw baseballs 35% faster than women—81 miles/hour for men vs. 60 miles/hour for women. The authors of this study attribute this to a sex-specific difference in the ability to generate muscle torque and power. (Chu 2009.) A study showing greater throwing velocity in male versus female handball players attributed it to differences in body size, including height, muscle mass, and arm length. (Van Den Tillaar 2012.) Interestingly, significant sex-related difference in throwing ability has been shown to manifest even before puberty, but the difference increases rapidly during and after puberty. (Thomas 1985 at 266.) These sex-determined differences in throwing speed are not limited to sports where a ball is thrown. Males have repeatedly been shown to throw a javelin more than 30% farther than females. (Lombardo 2018 Table 2; Hilton 2021 at 203.) Even in preadolescent children, differences exist. International youth records for 5- to

**JA2882**

12-year-olds in the javelin show 34-55% greater distance in males vs. females using a 400g javelin.[16]

52.    Men also serve and spike volleyballs with higher velocity than women, with a performance advantage in the range of 29-34%. (Hilton 2021.) Analysis of first and second tier Belgian national elite male volleyball players shows ball spike speeds of 63 mph and 56 mph respectively. (Forthomme 2005.) NCAA Division I female volleyball players—roughly comparable to the second-tier male elite group referenced above—average a ball spike velocity of approximately 40 mph (18.1 m/s). (Ferris 1995 at Table 2.) Notably, based on the measurements of these studies, male spiking speed in *lower* elite divisions is almost 40% greater than that of NCAA Division I female collegiate players. Separate analyses of serving speed between elite men and women Spanish volleyball players showed that the average power serving speed in men was 54.6 mph (range 45.3–64.6 mph), with maximal speed of 76.4 mph. In women, average power serving speed was 49 mph (range 41–55.3 mph) with maximal speed of 59 mph. This translates to an almost 30% advantage in maximal serve velocity in men. (Palao 2014.)

53.    Recall that kinetic energy is dependent on mass and the square of velocity. A volleyball (with fixed mass) struck by a male, and traveling an

---

[16] http://age-records.125mb.com/.

31

**JA2883**

average 35% faster than one struck by a female, will deliver 82% more energy to a head upon impact.

54.    The greater leg strength and jumping ability of men confer a further large advantage in volleyball that is relevant to injury risk. In volleyball, an "attack jump" is a jump to position a player to spike the ball downward over the net against the opposing team. Research on elite national volleyball players found that on average, males exhibited a 50% greater vertical jump height during an "attack" than did females. (Sattler 2015.) Similar data looking at countermovement jumps (to block a shot) in national basketball players reveals a 35% male advantage in jump height. (Kellis 1999.) In volleyball, this dramatic difference in jump height means that male players who are competing in female divisions will more often be able to successfully perform a spike, and this will be all the more true considering that the women's net height is seven inches lower than that used in men's volleyball. Confirming this inference, research also shows that the successful attack percentage (that is, the frequency with which the ball is successfully hit over the net into the opponent's court in an attempt to score) is so much higher with men than women that someone analyzing game statistics can consistently identify games played by men as opposed to women on the basis of this statistic alone. These enhanced and more consistently successful attacks by men directly correlate to their greater jumping ability and attack velocity at the net. (Kountouris 2015.)

55.    The combination of the innate male-female differences cited above, along with the lower net height in women's volleyball, means that if a reasonably athletic male is permitted to compete against women, the participating female players will likely be exposed to higher ball velocities that are outside the range of what is typically seen in women's volleyball. When we recall that ball-to-head impact is a common cause of concussion among women volleyball players, this fact makes it clear that participation in girls' or women's volleyball by biologically male individuals will increase concussion injury risk for participating girls or women.

56.    Male sex-based advantages in leg strength also lead to greater kick velocity. In comparison with women, men kick balls harder and faster. A study comparing kicking velocity between university-level male and female soccer players found that males kick the ball with an average 20% greater velocity than females. (Sakamoto 2014.) Applying the same principles of physics we have just used above, we see that a soccer ball kicked by a male, travelling an average 20% faster than a ball kicked by a female, will deliver 44% more energy on head impact. Greater force-generating capacity will thus increase the risk of an impact injury such as concussion.

## VI.    ENHANCED FEMALE VULNERABILITY TO CERTAIN INJURIES

57.    Above, I have reviewed physiological differences that result in the male body bringing greater weight, speed, and force to the athletic field or court,

33

**JA2885**

and how these differences can result in a greater risk of injury to females when males compete against them. It is also true that the female body is more vulnerable than the male body to certain types of injury even when subject to comparable forces. This risk appears to extend to the younger age cohorts as well. An analysis of Finnish student athletes from 1987-1991, analyzing over 600,000 person-years of activity exposures, found, in students under fifteen years of age, higher rates of injury in girls than boys in soccer, volleyball, judo and karate. (Kujala 1995.) Another epidemiological study looking specifically at injury rates in over 14,000 middle schoolers over a 20 year period showed that "in sex-matched sports, middle school girls were more likely to sustain *any* injury (RR = 1.15, 95% CI = 1.1, 1.2) or a time-loss injury (RR = 1.09, 95% CI = 1.0, 1.2) than middle school boys." In analyzed both-sex sports (i.e., sex-separated sports that both girls and boys play, like soccer), girls sustained higher injury rates, and greater rates of time-loss injury. (Beachy 2014.) Another study of over 2000 middle school students at nine schools showed that the injury rate was higher for girls' basketball than for football (39.4 v 30.7/1000 AEs), and injury rates for girls' soccer were nearly double that of boys' soccer (26.3 v. 14.7/1000 AEs). (Caswell 2017.) In this regard, I will focus on two areas of heightened female vulnerability to collision-related injury which have been extensively studied: concussions, and anterior cruciate ligament injuries.

### A.    Concussions

58.    Females are more likely than males to suffer concussions in comparable sports, and on average suffer more severe and longer lasting disability once a concussion does occur. (Harmon 2013 at 4; Berz 2015; Blumenfeld 2016; Covassin 2003; Rowson 2016.) Females also seem to be at higher risk for post-concussion syndrome than males. (Berz 2015; Blumenfeld 2016; Broshek 2005; Colvin 2009; Covassin 2012; Dick 2009; Marar 2012; Preiss-Farzanegan 2009.)

59.    The most widely-accepted definition of sport-related concussion comes from the Consensus Statement on Concussion in Sport (see below).[17] (McCrory 2018.) To summarize, concussion is "a traumatically induced transient

---

[17] "Sport related concussion is a traumatic brain injury induced by biomechanical forces. Several common features that may be utilised in clinically defining the nature of a concussive head injury include:

SRC may be caused either by a direct blow to the head, face, neck or elsewhere on the body with an impulsive force transmitted to the head.

SRC typically results in the rapid onset of short-lived impairment of neurological function that resolves spontaneously. However, in some cases, signs and symptoms evolve over a number of minutes to hours.

SRC may result in neuropathological changes, but the acute clinical signs and symptoms largely reflect a functional disturbance rather than a structural injury and, as such, no abnormality is seen on standard structural neuroimaging studies.

SRC results in a range of clinical signs and symptoms that may or may not involve loss of consciousness. Resolution of the clinical and cognitive features typically follows a sequential course. However, in some cases symptoms may be prolonged.

The clinical signs and symptoms cannot be explained by drug, alcohol, or medication use, other injuries (such as cervical injuries, peripheral vestibular dysfunction, etc) or other comorbidities (e.g., psychological factors or coexisting medical conditions)."

35

**JA2887**

disturbance of brain function and involves a complex pathophysiological process" that can manifest in a variety of ways. (Harmon 2013 at 1.)

60.    Sport-related concussions have undergone a significant increase in societal awareness and concurrent injury reporting since the initial passage of the Zachery Lystedt Concussion Law in Washington State in 2009 (Bompadre 2014), and the subsequent passage of similar legislation governing return-to-play criteria for concussed athletes in most other states in the United States. (Nat'l Cnf. of State Leg's 2018). Concussion is now widely recognized as a common sport-related injury, occurring in both male and female athletes. (CDC 2007.) Sport-related concussions can result from player-surface contact or player-equipment contact in virtually any sport. However, sudden impact via a player-to-player collision, with rapid deceleration and the transmission of linear or rotational forces through the brain, is also a common cause of concussion injury. (Covassin 2012; Marar 2012; Barth 2001; Blumenfeld 2016; Boden 1998; Harmon 2013 at 4.)

61.    A large retrospective study of U.S. high school athletes showed a higher rate of female concussions in soccer (79% higher), volleyball (0.6 concussions/10,000 exposures, with 485,000 reported exposures, vs. no concussions in the male cohort), basketball (31% higher), and softball/baseball (320% higher). (Marar 2012.) A similarly-sized, similarly-designed study comparing concussion rates between NCAA male and female collegiate athletes showed, overall, a concussion rate among females 40% higher than that of

36

**JA2888**

males. Higher rates of injury were seen across individual sports as well, including ice hockey (10% higher); soccer (54% higher); basketball (40% higher); and softball/baseball (95% higher). (Covassin 2016.) The observations of these authors, my own observations from clinical practice, and the acknowledgment of our own Society's Position Statement (Harmon 2013), all validate the higher frequency and severity of sport-related concussions in women and girls.

62.    Most epidemiological studies to date looking at sport-related concussion in middle schoolers show that more boys than girls are concussed. There are fewer studies estimating concussion *rate*. This is, in part, because measuring injury rate is more time and labor-intensive. Researchers at a childrens' hospital, for example, could analyze the number of children presenting to the emergency department with sport-related concussion and publish findings of absolute number. However, to study concussion incidence, athlete exposures also have to be recorded. Generally speaking, an athlete exposure is a single practice or game where an athlete is exposed to playing conditions that could reasonably supply the necessary conditions for an injury to occur. Rates of athletic injury, concussion among them, are then, by convention, expressed in terms of injury rate per 1000 athletic exposures. More recently, some studies have been published that analyze the rates of concussion in the middle school population. Looking at the evidence, the conclusion can be made that females experience increased susceptibility to concussive injuries before puberty. For example, Ewing-Cobbs, et al. (2018) found elevated post-

concussion symptoms in girls across all age ranges studied, including children between the ages of 4 and 8. Kerr's 2017 study of middle school students showed over three times the rate of female vs male concussion in students participating in sex-comparable sports [0.18 v. 0.66/1000 A.E.'s]. (Kerr 2017.) This is the first study I am aware of that mimics the trends seen in adolescent injury epidemiology showing a higher rate of concussion in girls than boys in comparable sports.

63.    More recent research looking at the incidence of sport-related concussions in U.S. middle schoolers between 2015 and 2020, found that the rate of concussion was higher in middle school athletes than those in high school. In this study, girls had more than twice the rate of concussion injury (0.49/1000 athletic exposures vs 0.23/1000 AE) in analyzed sports (baseball/softball, basketball, soccer and track), as well as statistically greater time loss. (Hacherl 2021 (Journal of Athletic Training); Hacherl 2021 (Archives of Clinical Neuropsychology).) The authors hypothesized that the increasing incidence of concussion in middle school may relate to "other distinct differences associated with the middle school sport setting itself, such as, the large variations in player size and skill."[18]

64.    In addition, females on average suffer materially greater cognitive impairment than males when they do suffer a concussion. Group differences in

---

[18] https://www.nata.org/press-release/062421/middle-school-sports-have-overall-higher-rate-concussion-reported-high-school.

cognitive impairment between females and males who have suffered concussion have been extensively studied. A study of 2340 high school and collegiate athletes who suffered concussions determined that females had a 170% higher frequency of cognitive impairment following concussions, and that in comparison with males, female athletes had significantly greater declines in simple and complex reaction times relative to their preseason baseline levels. Moreover, the females experienced greater objective and subjective adverse effects from concussion even after adjusting for potentially protective effect of helmets used by some groups of male athletes. (Broshek 2005 at 856, 861; Colvin 2009; Covassin 2012.)

65.    This large discrepancy in frequency and severity of concussion injury is consistent with my own observations across many years of clinical practice. The large majority of student athletes who have presented at my practice with severe and long-lasting cognitive disturbance have been adolescent girls. I have seen girls remain symptomatic for over a year, and lose ground academically and become isolated from their peer groups due to these ongoing symptoms. For patients who experience these severe effects, post-concussion syndrome can be life-altering.

66.    Some of the anatomical and physiological differences that we have considered between males and females help to explain the documented differences in concussion rates and in symptoms between males and females. (Covassin 2016; La Fountaine 2019; Lin 2019; Tierney 2005; Wunderle 2014.)

Anatomically, there are significant sex-based differences in head and neck anatomy, with females exhibiting in the range of 30% to 40% less head-neck segment mass and neck girth, and 49% lower neck isometric strength. This means that when a female athlete's head is subjected to the same load as an analogous male, there will be a greater tendency for head acceleration, and resultant injury. (Tierney 2005 at 276-277.)

67.     When modeling the effect of the introduction of male mass, speed, and strength into women's rugby, World Rugby gave particular attention to the resulting increases in forces and acceleration (and injury risk) experienced in the head and neck of female players. Their analysis found that "the magnitude of the known risk factors for head injury are . . . predicted by the size of the disparity in mass between players. The addition of [male] speed as a biomechanical variable further increases these disparities," and their model showed an increase of up to 50% in neck and head acceleration that would be experienced in a typical tackle scenario in women's rugby. As a result, "a number of tackles that currently lie beneath the threshold for injury would now exceed it, causing head injury." (World Rugby Transgender Women Guidelines 2020.) While rugby is notoriously contact-intensive, similar increases to risk of head and neck injury to women are predictable in any sport context in which males and females collide at significant speed, as happens from time to time in sports including soccer, softball, and basketball.

40

**JA2892**

68.    In addition, even when the heads of female and male athletes are subjected to identical accelerative forces, there are sex-based differences in neural anatomy and physiology, cerebrovascular organization, and cellular response to concussive stimuli that make the female more likely to suffer concussive injury, or more severe concussive injury. For instance, hypothalamic-pituitary disruption is thought to play a role in post-concussion symptomatology that differentially impacts women. (McGroarty 2020; Broshek 2005 at 861.) Another study found that elevated progesterone levels during one portion of the menstrual cycle were associated with more severe post-concussion symptomatology that differentially impacted women. (Wunderle 2014.)

69.    As it stands, when females compete against each other, they already have higher rates of concussive injury than males, across most sports. The addition of biologically male athletes into women's contact sports will inevitably increase the risk of concussive injury to girls and women, for the multiple reasons I have explained above, including, but not limited to, the innate male advantage in speed and lean muscle mass. Because the effects of concussion can be severe and long-lasting, particularly for biological females, we can predict with some confidence that if participation by biological males in women's contact sports based on gender identity becomes more common, more biological females will suffer substantial concussive injury and the potential for long-term harm as a result.

41

**JA2893**

**B.    Anterior Cruciate Ligament injuries**

70.    The Anterior Cruciate Ligament ("ACL") is a key knee stabilizer that prevents anterior translation of the tibia relative to the femur and also provides rotatory and valgus knee stability.[19] (Lin 2019 at 4.) Girls and women are far more vulnerable to ACL injuries than are boys and men. The physics of injury that we have reviewed above makes it inevitable that the introduction of biologically male athletes into the female category will increase still further the occurrence of ACL injuries among girls or women who encounter these players on the field.

71.    Sports-related injury to the ACL is so common that it is easy to overlook the significance of it. But it is by no means a trivial injury, as it can end sports careers, require surgery, and usually results in early-onset, post-traumatic osteoarthritis, triggering long-term pain and mobility problems later in life. (Wang 2020.)

72.    Even in the historic context in which girls and women limit competition to (and so only collide with) other girls and women, the rate of ACL injury is substantially higher among female than male athletes. (Flaxman 2014; Lin 2019; Agel 2005.) One meta-analysis of 58 studies reports that female athletes have a 150% relative risk for ACL injury compared with male athletes, with other estimates suggesting as much as a 300% increased risk. (Montalvo 2019; Sutton 2013.) Particularly in those sports designated as contact sports, or

---

[19] Valgus force at the knee is a side-applied force that gaps the medial knee open.

**JA2894**

sports with frequent cutting and sharp directional changes (basketball, field hockey, lacrosse, soccer), females are at greater risk of ACL injury. In basketball and soccer, this risk extends across all skill levels, with female athletes between two and eight times more likely to sustain an ACL injury than their male counterparts. (Lin 2019 at 5.) These observations are widely validated, and consistent with the relative frequencies of ACL injuries that I see in my own practice.

73.     When the reasons underlying the difference in the incidence of ACL injury between males and females were first studied in the early 1990s, researchers speculated that the difference might be attributable to females' relative inexperience in contact sports, or to their lack of appropriate training. However, a follow-up 2005 study looking at ACL tear disparities reported that, "Despite vast attention to the discrepancy between anterior cruciate ligament injury rates between men and women, these differences continue to exist." (Agel 2005 at 524.) Inexperience and lack of training do not explain the differences. Sex seems to be an independent predictor of ACL tear risk.

74.     In fact, as researchers have continued to study this discrepancy, they have determined that multiple identifiable anatomical and physiological differences between males and females play significant roles in making females more vulnerable to ACL injuries than males. (Flaxman 2014; Lin 2019; Wolf 2015.) Summarizing the findings of a number of separate studies, one researcher recently cited as anatomical risk factors for ACL injury smaller ligament size,

43

JA2895

decreased femoral notch width, increased posterior-inferior slope of the lateral tibia plateau, increased knee and generalized laxity, and increased body mass index (BMI). With the exception of increased BMI, each of these factors is more likely to occur in female than male athletes. (Lin 2019 at 5.) In addition, female athletes often stand in more knee valgus (that is, in a "knock-kneed" posture) due to wider hips and a medially-oriented femur. Often, this is also associated with a worsening of knee valgus during jump landings. The body types and movement patterns associated with these valgus knee postures are more common in females and increase the risk for ACL tear. (Hewett 2005.)

75.    As with concussion, the cyclic fluctuation of sex-specific hormones in women is also thought to be a possible risk factor for ACL injury. Estrogen acts on ligaments to make them more lax, and it is thought that during the ovulatory phase of menses (when estrogen levels peak), the risk of ACL tear is higher. (Chidi-Ogbolu 2019 at 1; Herzberg 2017.)

76.    Whatever the factors that increase the injury risk for ACL tears in women, the fact that a sex-specific difference in the rate of ACL injury exists is well established and widely accepted.

77.    Although non-contact mechanisms are the most common reason for ACL tears in females, tears related to contact are also common, with ranges reported across multiple studies of from 20%-36% of all ACL injuries in women. (Kobayashi 2010 at 672.) For example, when a soccer player who is kicking a ball is struck by another player in the lateral knee of the stance leg, medial and

rotational forces can tear the medial collateral ligament (MCL), the ACL, and the meniscus. Thus, as participation in the female category based on identity rather than biology becomes more common (entailing the introduction of athletes with characteristics such as greater speed and lean muscle mass), and as collision forces suffered by girls and women across the knee increase accordingly, the risk for orthopedic injury and in particular ACL tears among impacted girls and women will inevitably rise.

78.    Of course there exists variation in all these factors within a given group of males or females. However, it is also true that within sex-specific pools, size differential is somewhat predictable and bounded, even considering outliers. When males are permitted to enter into the pool of female athletes based on gender identity rather than biological sex, there is an increased possibility that a statistical outlier in terms of size, weight, speed, and strength—and potentially an extreme outlier—is now entering the female pool. Although injury is not guaranteed, risks to female participants will increase. And as I discuss later, the available evidence together suggests that this will be true even with respect to males who have been on testosterone suppression for a year or more. World Rugby relied heavily upon this when they were determining their own policy, and I think it is important to reiterate that this policy, rooted in concern for athlete safety, is justifiable based upon current evidence from medical research and what we know about biology.

45

**JA2897**

## VII.  TESTOSTERONE SUPPRESSION WILL NOT PREVENT THE HARM TO FEMALE SAFETY IN ATHLETICS

79.    A recent editorial in the New England Journal of Medicine opined that policies governing transgender participation in female athletics "must safeguard the rights of all women—whether cisgender or transgender." (Dolgin 2020.) Unfortunately, the physics and medical science reviewed above tell us that this is not practically possible. If biological males are given a "right" to participate in the female category based on gender identity, then biological women will be denied the right to reasonable expectations of safety and injury risk that have historically been guaranteed by ensuring that females compete (and collide) only with other females.

80.    Advocates of unquestioning inclusion based on gender identity often contend that hormonal manipulation of a male athlete can feminize the athlete enough that he is comparable with females for purposes of competition. The NCAA's Office of Inclusion asserts (still accessible on the NCAA website as of this writing) that "It is also important to know that any strength and endurance advantages a transgender woman arguably may have as a result of her prior testosterone levels dissipate after about one year of estrogen or testosterone suppression therapy."[20] (NCAA 2011 at 8.) Whether or not this is true is a critically important question.

---

[20] https://www.ncaa.org/sports/2016/3/2/lesbian-gay-bisexual-transgender-and-questioning-lgbtq.aspx

81.     At the outset, we should note that while advocates sometimes claim that testosterone suppression *can* eliminate physiological advantages in a biological male, none of the relevant transgender eligibility policies that I am aware of prior to 2021 requires any demonstration that it has *actually* achieved that effect in a particular male who seeks admission into the female category. The Connecticut policy that is currently at issue in ongoing litigation permits admission to the female category at the high school level without requiring any testosterone suppression at all. Prior to their new policy, just announced in January 2022, the NCAA's policy required no demonstration of any reduction of performance capability, change in weight, or regression of any other physical attribute of the biological male toward female levels. It did not require achievement of any particular testosterone level, and did not provide for any monitoring of athletes for compliance. Moving forward, through a phasing process, the NCAA will ultimately require athletes in each sport to meet requirements of their sport's national governing body (NGB). If no policy exists, the policy of that sport's international governing body applies, or, finally, if no policy exists there, the 2015 policy of the International Olympic Committee (IOC) will apply. The 2015 IOC policy requires no showing of any diminution of any performance capability or physical attribute of the biological male, and requires achievement and compliance monitoring only of a testosterone level below 10nmol/liter—a level far above levels occurring in normal biological

females (0.06 to 1.68 nmol/L).[21] Indeed, female athletes with polycystic ovarian disorder—a condition that results in elevated testosterone levels—rarely exceed 4.8 nmol/L, which is the basis for setting the testing threshold to detect testosterone *doping* in females at 5.0 nmol/L. Thus, males who qualify under the 2015 IOC policy to compete as transgender women may have testosterone levels—even after hormone suppression—*double* the level that would disqualify a biological female for doping with testosterone.[22]

82.     As Dr. Emma Hilton has observed, the fact that there are over 3000 sex-specific differences in skeletal muscle alone makes the hypothesis that sex-linked performance advantages are attributable solely to current circulating testosterone levels improbable at best. (Hilton 2021 at 200-01.)

83.     In fact, the available evidence strongly indicates that no amount of testosterone suppression can eliminate male physiological advantages relevant to performance and safety. Several authors have recently reviewed the science and statistics from numerous studies that demonstrate that one year (or more) of testosterone suppression does not substantially eliminate male performance advantages. (Hilton 2021; De Varona 2021; Harper 2021.) As a medical doctor, I will focus on those specific sex-based characteristics of males who have

---

[21] Normal testosterone range in a healthy male averages between 7.7 and 29.4 nmol/L.

[22] In November 2021, the IOC released new guidelines, deferring decision-making about a given sport's gender-affectedness to its governing body. The current NCAA policy, however, still utilizes the 2015 IOC policy to determine an athlete's eligibility in event that the sport's national and international governing bodies lack policies to determine eligibility.

undergone normal sex-determined pubertal skeletal growth and maturation that are relevant to the *safety* of female athletes. Here, too, the available science tells us that testosterone suppression does not eliminate the increased risk to females or solve the safety problem.

84.    The World Rugby organization reached this same determination based on the currently available science, concluding that male physiological advantages that "create risks [to female players] appear to be only minimally affected" by testosterone suppression. (World Rugby Transgender Women Guidelines 2020.)

85.    Surprisingly, so far as public information reveals, the NCAA's Committee on Competitive Safeguards is not monitoring and documenting instances of transgender participation on women's teams for purposes of injury reporting. In practice, the NCAA is conducting an experiment which in theory predicts an increased frequency and severity of injuries to women in contact sports, while at the same time failing to collect the relevant data from its experiment.

86.    In their recent guidelines, UK Sport determined that, "based upon current evidence, testosterone suppression is unlikely to guarantee fairness between transgender women and natal females in gender-affected sports." (UK Sports Councils' Equality Group Guidance 2021 at 7.) They also warned that migration to a scenario by NGBs where eligibility is determined through case-by-case assessment "is unlikely to be practical nor verifiable for entry into

gender-affected sports," in part because "many tests related to sports performance are volitional," and incentives on the part of those tested would align with intentional poor performance. (UK Sports Councils' Equality Group Guidance 2021 at 8.)

87.    Despite these concerns, this appears to be exactly the route that the IOC is taking, as reflected in their Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity, released in November of 2021.[23] In it, the IOC lists two disparate goals. First, that "where sports organizations elect to issue eligibility criteria for men's and women's categories for a given competition, they should do so with a view to . . . [p]roviding confidence that no athlete within a category has an unfair and disproportionate competitive advantage . . . [and] preventing a risk to the physical safety of other athletes." (IOC Framework 2021 § 4.1.) At the same time, governing bodies are not to preclude any athlete from competing until evidence exists based upon "robust and peer-reviewed research that . . . demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes" – research moreover that "is largely based on data collected *from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility*

---

[23] The IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations is available at https://stillmed.olympics.com/media/Documents/News/2021/11/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf?_ga=2.72651665.34591192.1645554375-759350959.1644946978

*criteria aim to regulate*." (IOC Framework 2021 § 6.1) Finally, affected athletes may appeal any evidence-based decision-making process through a further "appropriate internal mediation mechanism, such as a Court of Arbitration for Sport." (IOC Framework 2021 § 6.1.) Rather than cite any of the growing evidence that testosterone suppression cannot mitigate sex-based performance differences, the IOC's new policy remains aspirational and opaque. And yet the research relating to hormonal suppression in transgender athletes, as confirmed by World Rugby and UK Sport, already speaks very clearly to the fact that males retain a competitive advantage over women that cannot be eliminated through testosterone suppression alone. What follows is a brief summary of some of these retained differences as they relate to sport safety.

A.   **Size and weight**

88.   Males are, on average, larger and heavier. As we have seen, these facts alone mean that males bring more kinetic energy into collisions, and that lighter females will suffer more abrupt deceleration in collisions with larger bodies, creating heightened injury risk for impacted females.

89.   I start with what is obvious and so far as I am aware undisputed—that after the male pubertal growth spurt, suppression of testosterone does not materially *shrink* bones so as to eliminate height, leverage, performance, and weight differences that follow from simply having longer, larger bones, and being subsequently taller.

**JA2903**

90.    In addition, multiple studies have found that testosterone suppression may modestly reduce, but does not come close to eliminating the male advantage in muscle mass and lean body mass, which together contribute to the greater average male weight. Researchers looking at transitioning adolescents found that the weight of biological male subjects *increased* rather than decreased after treatment with an antiandrogen testosterone suppressor. (Tack 2018.) In one recent meta-analysis, researchers looking at the musculoskeletal effects of hormonal transition found that even after males had undergone 36 months of therapy, their lean body mass and muscle area remained above those of females. (Harper 2021.) Another group in 2004 studied the effects of testosterone suppression to less than 1 nmol/L in men after one or more years, but still found only a 12% total loss of muscle area by the end of thirty-six months. (Gooren 2004.)

**B.    Bone density**

91.    Bone mass (which includes both size and density) is maintained over *at least* two years of testosterone suppression (Singh-Ospina 2017; Fighera 2019), and one study found it to be preserved even over a median of 12.5 years of suppression (Hilton 2021; Ruetsche 2005).

**C.    Strength**

92.    A large number of studies have now observed minimal or no reduction in strength in male subjects following testosterone suppression. In one recent meta-analysis, strength loss after twelve months of hormone therapy

52

ranged from negligible to 7%. (Harper 2021.) Given the baseline male strength advantage in various muscle groups of from approximately 25% to 100% above female levels that I have noted in Section V.D above, even a 7% reduction leaves a large retained advantage in strength. Another study looking at handgrip strength—which is a proxy for general strength—showed a 9% loss of strength after two years of hormonal treatment in males who were transitioning, leaving a 23% retained advantage over the female baseline. (Hilton 2021.) Yet another study which found a 17% retained grip strength advantage noted that this placed the median of the group treated with hormone therapy in the 95th percentile for grip strength among age-matched females. (Scharff 2019.) Researchers looking at transitioning adolescents showed no loss of grip strength after hormone treatment. (Tack 2018.)

93.    One recent study on male Air Force service members undergoing transition showed that they retained more than two thirds of pretreatment performance advantage over females in sit-ups and push-ups after between one and two years of testosterone-reducing hormonal treatment. (Roberts 2020.) Another recently-published observational cohort study looked at thigh strength and thigh muscle cross-sectional area in men undergoing hormonal transition to transgender females. After one year of hormonal suppression, this group saw only a 4% decrease in thigh muscle cross-sectional area, and a negligible decrease in thigh muscle strength. (Wiik 2020.) Wiik and colleagues looked at isokinetic strength measurements in individuals who had undergone at least 12

53

months of hormonal transition and found that muscle strength was comparable to baseline, leaving transitioned males with a 50% strength advantage over reference females. (Wiik 2020.) Finally, one cross-sectional study that compared men who had undergone transition at least three years prior to analysis, to age-matched, healthy males found that the transgender individuals had retained enough strength that they were still outside normative values for women. This imbalance continued to hold even after *eight* years of hormone suppression. The authors also noted that since males who identify as women often have lower baseline (i.e., before hormone treatment) muscle mass than the general population of males, and since baseline measures for this study were unavailable, the post-transition comparison may actually represent an overestimate of muscle mass regression in transgender females. (Lapauw 2008; Hilton 2021.)

94.    World Rugby came to the same conclusion based on its own review of the literature, reporting that testosterone suppression "does not reverse muscle size to female levels," and in fact that "studies assessing [reductions in] mass, muscle mass, and/or strength suggest that reduction in these variables range between 5% and 10%. Given that the typical male vs female advantages range from 30% to 100%, these reductions are small." (World Rugby Transgender Women Guidelines 2020.)

95.    It is true that most studies of change in physical characteristics or capabilities over time after testosterone suppression involve untrained subjects

54

JA2906

rather than athletes, or subjects with low to moderate training. It may be assumed that all of the Air Force members who were subjects in the study I mention above were physically fit and engaged in regular physical training. But neither that study nor those studies looking at athletes quantify the volume or type of strength training athletes are undergoing. The important point to make is that the only effect strength training could have on these athletes is to *counteract* and reduce the limited loss of muscle mass and strength that does otherwise occur to some extent over time with testosterone blockade. There has been at least one study that illustrates this, although only over a short period, measuring strength during a twelve-week period where testosterone was suppressed to levels of 2 nmol/L. During that time, subjects actually increased leg lean mass by 4%, and total lean mass by 2%, and subject performance on the 10 rep-max leg press improved by 32%, while their bench press performance improved by 17%. (Kvorning 2006.)

96.    The point for safety is that superior strength enables a biological male to apply greater force against an opponent's body during body contact, or to throw, hit, or kick a ball at speeds outside the ranges normally encountered in female-only play, with the attendant increased risks of injury that I have already explained.

**D.    Speed**

97.    As to speed, the study of transitioning Air Force members found that these males retained a 9% running speed advantage over the female control

55

group after one year of testosterone suppression, and their average speed had not declined significantly farther by the end of the 2.5 year study period. (Roberts 2020.) Again, I have already explained the implications of greater male speed on safety for females on the field and court, particularly in combination with the greater male body weight.

## CONCLUSION

Since the average male athlete is larger and exerts greater power than the average female athlete in similar sports, male–female collisions will produce greater energy at impact, and impart greater risk of injury to a female, than would occur in most female-female collisions. Because of the well-documented physiological testing and elite performance differences in speed and strength, as well as differences in lean muscle mass that exist across all age ranges, the conclusions of this paper can apply to a certain extent before, as well as during, and after puberty. We have seen that males who have undergone hormone therapy in transition toward a female body type nevertheless retain musculoskeletal "legacy" advantages in muscle girth, strength, and size. We have also seen that the additive effects of these individual advantages create multiplied advantages in terms of power, force generation and momentum on the field of play. In contact or collision sports, sports involving projectiles, or sports where a stick is used to strike something, the physics and physiology reviewed above tell us that permitting male-bodied athletes to compete against, or on the same team as females—even when undergoing testosterone

56

suppression—must be expected to create predictable, identifiable, substantially increased, and unequal risks of injuries to the participating women.

Based on its independent and extensive analysis of the literature coupled with injury modeling, World Rugby recognized the inadequacy of the International Olympic Committee's policy to preserve safety for female athletes in their contact sport (the NCAA policy is even more lax in its admission of biological males into the female category). Among the explicit findings of the World Rugby working group were the following:

- Forces and inertia faced by a smaller and slower player during collisions are significantly greater when in contact with a larger, faster player.

- Discrepancies in mass and speed (such as between two opponents in a tackle) are significant determinants of various head and other musculoskeletal injury risks.

- The risk of injury to females is increased by biological males' greater ability to exert force (strength and power), and also by females' reduced ability to receive or tolerate that force.

- Testosterone suppression results in only "small" reductions in the male physiological advantages. As a result, heightened injury risks remain for females who share the same field or court with biological males.

- These findings together predict a significant increase in injury rates for females in rugby if males are permitted to participate based on gender identity, *with or without testosterone suppression*, since the magnitude of forces and energy transfer during collisions will increase substantially, directly correlated to the differences in physical attributes that exist between the biological sexes.

Summarizing their work, the authors of the World Rugby Guidelines said that, "World Rugby's number one stated priority is to make the game as safe as

57

**JA2909**

possible, and so World Rugby cannot allow the risk to players to be increased to such an extent by allowing people who have the force and power advantages conferred by testosterone to play with and against those who do not." (World Rugby Transgender Guidelines 2020.) As my own analysis above makes clear, I agree with the concerns of UK Sport and the conclusions of World Rugby regarding risk to female athletes. Importantly, I also agree that it must be a high priority for sports governing bodies (and other regulatory or governmental bodies governing sports) to make each sport as safe as reasonably possible. And in my view, medical practitioners with expertise in this area have an obligation to advocate for science-based policies that promote safety.

The *performance* advantages retained by males who participate in women's sports based on gender identity are readily recognized by the public. When an NCAA hurdler who ranked 200th while running in the collegiate male division transitions and immediately leaps to a number one ranking in the women's division;[24] when a high school male sprinter who ranked 181st in the state running in the boys' division transitions and likewise takes first place in the girls' division (De Varona 2021), the problem of fairness and equal opportunities for girls and women is immediately apparent, and indeed this problem is being widely discussed today in the media.

---

[24] https://en.wikipedia.org/wiki/Cece_Telfer (accessed 6/20/21)

58

**JA2910**

The causes of sports injuries, however, are multivariate and not always as immediately apparent. While, as I have noted, some biological males have indeed competed in a variety of girls' and women's contact sports, the numbers up till now have been small. But recent studies have reported very large increases in the number of children and young people identifying as transgender compared to historical experience. For example, an extensive survey of 9th and 11th graders in Minnesota found that 2.7% identified as transgender or gender-nonconforming— well over 100 times historical rates (Rider 2018), and many other sources likewise report this trend.[25]

Faced with this rapid social change, it is my view as a medical doctor that policymakers have an important and pressing duty not to wait while avoidable injuries are inflicted on girls and women, but instead to proactively establish policies governing participation of biological males in female athletics that give proper and scientifically-based priority to safety in sport for these girls and women. Separating participants in contact sports based on biological sex preserves competitive equity, but also promotes the safety of female athletes by protecting them from predictable and preventable injury. Otherwise, the hard science that I have reviewed in this white paper leaves little doubt that eligibility policies based on ideology or gender identity rather than science, will,

---

[25] https://www.nytimes.com/2016/07/01/health/transgender-population.html?.?mc=aud_dev&ad-keywords=auddevgate&gclid=Cj0KCQjwkZiFBhD9ARIsAGxFX8BV5pozB9LI5Ut57OQzuMhu rWThv BMisV9NyN9YTXIzWl7OAnGT6VkaAu0jEALw_wcB&gclsrc=aw.ds (accessed 6/20/21)

over time, result in increased, and more serious, injuries to girls and women
who are forced to compete against biologically male transgender athletes. When
basic science and physiology both predict increased injury, then leagues, policy-
makers, and legislators have a responsibility to act to protect girls and women
before they get hurt.

> Chad Carlson, M.D.,
> FACSM Stadia Sports
> Medicine West Des
> Moines, Iowa Past-
> President, AMSSM

# BIBLIOGRAPHY

Agel, J. et al., Anterior cruciate ligament injury in National Collegiate Athletic Association basketball and soccer: a 13-year review. Am. J. Sports Med. 33(4):524-531 (2005).

Athletic Business, "College intramural playing rules vary greatly." https://www.athleticbusiness.com/college/intramural-coed-basketball-playing-rules-vary-greatly.html.

Bahr, R. and T. Krosshaug, Understanding injury mechanisms: a key component of preventing injuries in sport. Br. J. Sports Med 39:324-329 (2005).

Barboza, S.D. et al., Injuries in field hockey players: a systematic review. Sports Med. 48:849-66 (2018).

Barth, J.T. et al., Acceleration-deceleration sport-related concussion: the gravity of it all. J. Athletic Training 36(3):253-56 (2001).

Beachy, G. and M. Rauh, Middle school injuries: a 20-year (1988-2008) multisport evaluation. J. Athl. Train. 49(4):493-506 (2014).

Berz, K. et al., Sex-specific differences in the severity of symptoms and recovery rate following sports-related concussion in young athletes. The Physician and Sports Med. 41(2):58-63 (2015).

BJJ World, "Transgender MMA Fighter Fallon Fox Breaks Skull of Her Female Opponent." https://bjj-world.com/transgender-mma-fighter-fallon-fox-breaks-skull-of-her-female-opponent/.

Blankenship, M.J. et al., Sex-based analysis of the biomechanics of pitching. 38th International Society of Biomechanics in Sport Conference (July 2020).

Blumenfeld, R.S. et al., The epidemiology of sports-related head injury and concussion in water polo. Front. Neurol. 7(98) (2016).

Boden, B.P. et al., Concussion incidence in elite college soccer players. Am. J. Sports Med. 26(2):238-241 (1998).

Bohannon, R.W. et al., Handgrip strength: a comparison of values obtained from the NHANES and NIH toolbox studies. Am. J. Occ. Therapy 73(2) (March/April 2019).

Bompadre, V. et al., Washington State's Lystedt Law in concussion
    documentation in Seattle public high schools. J. Athletic Training
    49(4):486-92 (2014).

Broshek, D.K. et al., Sex differences in outcome following sports-related
    concussion, J. Neurosurg. 102:856-63 (May 2005).

Buckman, R. F. and Buckman, P.D., Vertical deceleration trauma: principles of
    management. Surg .Clin. N. Am. 71(2):331–44 (1991).

Caswell, S.V., et al., Epidemiology of sports injuries among middle school
    students. Brit. J. of Sports Med. 51(4):305 (2017).

Centers for Disease Control, CDC National Health Statistics Report Number
    122, 12/20/2018.

Centers for Disease Control, Nonfatal traumatic brain injuries from sports and
    recreation activities–United States, 2001-2005, JAMA 298(11):1271-72
    (Sept 2007).

Cheuvront, S.N. et al., Running performance differences between men and
    women: an update. Sports Med. 35(12):1017-24 (2005).

Chidi-Ogbolu, N. and K. Baar, Effect of estrogen on musculoskeletal
    performance and injury risk. Front. Physiol. 9:1834 (2019).

Chu, Y. et al., Biomechanical comparison between elite female and male
    baseball pitchers. J. Applied Biomechanics 25:22-31 (2009).

Coleman, D.L. and W. Shreve, Comparing athletic performances: the best elite
    women to boys and men.
    web.law.duke.edu/sites/default/files/centers/sportslaw/comparingathletic
    perform ances.pdf. (Accessed 06/20/21)

Coleman, D. L. et al., Re-affirming the value of the sports exception to Title
    IX's general non-discrimination rule. Duke J. of Gender and Law Policy
    27(69):69134 (2020).

Colvin, A.C. et al., The role of concussion history and gender in recovery from
    soccer-related concussion. Am. J. Sports Med, 37(9):1699-1704 (2009).

Covassin, T. et al., Sex differences and the incidence of concussions among
    collegiate athletes. J. Ath. Training 38(3):238-244 (2003).

Covassin, T. et al., Sex differences in reported concussion injury rates and time
    loss from participation: an update of the National Collegiate Athletic

Association Injury Surveillance Program from 2004-2005 through 2009-2009. J. Ath. Training 51(3):189-194 (2016).

Covassin, T. et al., The role of age and sex in symptoms, neurocognitive performance, and postural stability in athletes after concussion. Am. J. Sports Med. 40(6):1303-1312 (2012).

Dashnaw, M.L. et al., An overview of the basic science of concussion and subconcussion: where we are and where we are going. Neurosurg. Focus 33(6) E5 (2012).

Davis, S.M., et al., Sex Differences in Infant Body Composition Emerge in First 5 Months of Life. J. Pediatr. Endocrinol. Metab. 32(11): 1235–1239 (2019)

De Varona, D. et al., Briefing book: a request to Congress and the Administration to preserve girls' and women's sport and accommodate transgender athletes. Women's Sports Policy Working Group (2021), available at https://womenssportspolicy.org/wp-content/uploads/2021/02/Congressional-Briefing-WSPWG-Transgender-Women-Sports-2.27.21.pdf.

Dick, R.W., Is there a gender difference in concussion incidence and outcomes? Br. J. Sports Med. 43(Supp I):i46-i50 (2009).

Dolgin, J., Transgender women on college athletic teams – the case of Lindsay Hecox. NEJM 383(21):2000-2002 (2020).

Ewing-Cobbs, et al., Persistent postconcussion symptoms after injury. Pediatrics 142(5):e20180939 (2018).

Ferris, D.P. et al., The relationship between physical and physiological variables and volleyball spiking velocity. J. Strength & Cond. Research 9(1):32-36 (1995).

Fields, J.B. et al., Body composition variables by sport and sport-position in elite collegiate athletics. J. Strength & Cond. Research 32(11):3153-3159 (Nov 2018).

Fighera, T.M. et al., Bone mass effects of cross-sex hormone therapy in transgender people: updated systematic review and meta-analysis. J. Endocrine Soc. 3(5):943-964 (May 2019).

Flaxman, T.E. et al., Sex-related differences in neuromuscular control: implications for injury mechanisms or healthy stabilization strategies? J. Ortho. Research 310-317 (Feb 2014).

**JA2915**

Forthomme, B. et al., Factors correlated with volleyball spike velocity. AJSM 33(10):1513-1519 (2005).

Fung, Y.C.,The application of biomechanics to the understanding of injury and healing. A.M. Nahum et al. (eds), Accidental Injury, Springer Science & Business Media: New York (1993).

Gay, T., Football physics: the science of the game. Rodale Books (2004).

Gilsanz, V. et al., Age at onset of puberty predicts bone mass in young adulthood. J. Pediatr. 158(1):100-105 (Jan 2011).

Gooren, L.J.G. et al., Transsexuals and competitive sports. Eur. J. Endocrinol. 151:425-9 (2004).

Hacherl, S.L., et al., Concussion rates and sports participation time loss in sex-comparable middle school sports. Archives of Clinical Neuropsychology 36:650 (2021).

Hacherl, S.L., et al., Concussion rates in U.S. middle school athletes from the 2015-16 to 2019-20 school years. J. Athl. Train. 56(6s):S-21 (2021).

Handelsman, D.J. et al., Circulating testosterone as the hormonal basis of sex differences in athletic performance. Endocrine Reviews 39(5):803-829 (Oct 2018).

Harmon, K.G. et al., American Medical Society for Sports Medicine position statement: concussion in sport. Br. J. Sports Med. 47:15-26 (2013).

Harper, J. et al., How does hormone transition in transgender women change body composition, muscle strength and haemoglobin? Systematic review with a focus on the implications for sport participation. BJSM 55(15):865-72 (2021).

Herzberg, S.D. et al., The effect of menstrual cycle and contraceptives on ACL injuries and laxity: a systematic review and meta-analysis. Orthop. J. Sports Med. 5(7) (2017).

Hewett, T.E. et al., Biomechanical measures of neuromuscular control and valgus loading of the knee predict anterior cruciate ligament injury risk in female athletes: a prospective study. AJSM 33(4):492-501 (2005).

Hilton, E. N. and T.R. Lundberg, Transgender women in the female category of sport: perspectives on testosterone suppression and performance advantage. Sports Medicine 51:199-214 (2021).

64

Hon, W.H.C. and S.H. Kock, Sports related fractures: a review of 113 cases. J. Orhopaedic Surg. 9(1):35-38 (2001).

Howell, D.R. et al., Collision and contact sport participation and quality of life among adolescent athletes. J. Athletic Training 55(11):1174-1180 (2020).

Hult, J.S., Women's struggle for governance in U.S. amateur athletics. Int. Rev. for Soc. of Sports 24(3):249-61 (1989).

International Olympic Committee. IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations (2021).

Janssen, I. et al., Skeletal muscle mass and distribution in 468 men and women aged 18-88 yr. J. Appl. Physiol. 89:81-88 (2000).

Kellis, S.E. et al., The evaluation of jumping ability of male and female basketball players according to their chronological age and major leagues. J. Strength and Conditioning Res. 13(1):40-46 (1999).

Kerr, Z., et al., Concussion rates in U.S. middle school athletes, 2015-16 school year, Am. J. Prev. Med. 53(6):914-18 (2017).

Kirchengast, S., Sexual dimorphism in body composition, weight status and growth in prepubertal school children from rural areas of eastern Austria. Collegium Antropologicum 25(1):21-30 (2001).

Kobayashi, H. et al., Mechanisms of the anterior cruciate ligament injury in sports activities: A twenty-year clinical research of 1700 athletes. J. Sports Science & Medicine 9:669-675 (2010).

Kountouris, P. et al., Evidence for differences in men's and women's volleyball games based on skills effectiveness in four consecutive Olympic tournaments. Comprehensive Psychology 4(9) (2015).

Kuczinski, A. et al., Trends and epidemiologic factors contributing to soccer-related fractures that presented to emergency departments in the United States. Sports Health 11(1):27-31 (2018).

Kujala U.M., et al., Acute injuries in soccer, ice hockey, volleyball, basketball, judo, and karate: analysis of national registry data. BMJ 311(7018):1465-68 (1995).

Kvorning, T. et al., Suppression of endogenous testosterone production attenuates the response to strength training: a randomized, placebo-

controlled, and blinded intervention study. Am. J. Physiol .Metab. 291:E1325-E1332 (2006).

La Fountaine, M.F. et al., Preliminary evidence for a window of increased vulnerability to sustain a concussion in females: a brief report. Front. Neurol. 10:691 (2019).

Lapauw, B. et al., Body composition, volumetric and areal bone parameters in male-to-female transsexual persons. Bone 43:1016-21 (2008).

Lin, C. et al., Sex differences in common sports injuries. PM R 10(10):1073-1082 (2019).

Lombardo, M.P. and R. O. Deaner, On the evolution of sex differences in throwing. Qu. Review of Bio. 93(2):91-119 (2018).

Los Angeles Times, "Volleyball star Haley Hodson had it all, until blows to her head changed everything." https://www.latimes.com/sports/story/2020-12-08/stanford-volleyball-hayley-hodson-concussions-cte-lawsuit.

Magnusson, S.P. et al., The adaptability of tendon loading differs in men and women. Int. J. Exp. Pathol. 88:237-40 (2007).

Marar, M. et al., Epidemiology of concussions among United States high school athletes in 20 sports. Am. J. Sports Med. 40(4):747-755 (2012).

McCrory, P. et al., Consensus statement on concussion in sport—the 5th international conference on concussion in sport held in Berlin, October 2016. BJSM 51:838-847 (2018).

McGroarty, N.K. et al., Sport-related concussion in female athletes: a systematic review. Orthop. J. Sports Med. 8(7) (2020).

McIntosh, A.S., Risk compensation, motivation, injuries, and biomechanics in competitive sport, Br. J. Sports Med (39):2-3 (2005).

McManus, A. and N. Armstrong, Physiology of elite young female athletes. J Med & Sport Sci 56:23-46 (2011).

Meeuwise, W.H., Assessing causation in sports injury: a multifactorial model. Clinical J. of Sports Med. 4(3):166-70 (1994).

Montalvo, A.M. et al., Anterior cruciate ligament injury risk in sport: a systematic review and meta-analysis of injury incidence by sex and sport classification. J. Ath. Training 54(5):472-482 (2019).

66

**JA2918**

Montalvo, A.M. et al., "What's my risk of sustaining an ACL injury while playing sports?": a systematic review with meta-analysis. Br. J. Sports Med. 53:10031012 (2019).

Mooney, J. et al., Concussion in soccer: a comprehensive review of the literature. Concussion 5(3) (2020).

Morris, J.S. et al., Sexual dimorphism in human arm power and force: implications for sexual selection on fighting ability. J. Exp. Biol. 223(Pt 2) (2020).

National Collegiate Athletic Association, Inclusion of transgender student-athletes. https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf (August 2011).

National Conference of State Legislatures, Report on traumatic brain injury legislation. https://www.ncsl.org/research/health/traumatic-brain-injury-legislation.aspx#1 (2018).

Neder, J.A. et al., Reference values for concentric knee isokinetic strength and power in nonathletic men and women from 20 to 80 years old. J. Orth. & Sports Phys. Therapy 29(2):116-126 (1999).

New York Times, "Estimate of U.S. transgender population doubles to 1.4 Million adults." https://www.nytimes.com/2016/07/01/health/transgender-population.html?.?mc=aud_dev&ad-keywords=auddevgate&gclid=Cj0KCQjwkZiFBhD9ARIsAGxFX8BV5pozB9LI5Ut57OQzuMhurWThvBMisV9NyN9YTXIzWl7OAnGT6VkaAu0jEALw_wcB&gclsr c=aw.ds. (July 1, 2016).

Nieves, J.W. et al., Males have larger skeletal size and bone mass than females, despite comparable body size. J. Bone Mineral Res. 20(3):529-35 (2005).

Palao, J.M. et al., Normative profiles for serve speed for the training of the serve and reception in volleyball. The Sport Journal (July 2014).

Pierpoint, L. et al., The first decade of web-based sports injury surveillance: descriptive epidemiology of injuries in US high school boys' (and girls) lacrosse (2008–2009 Through 2013–2014) and National Collegiate Athletic Association men's lacrosse (2004–2005 Through 2013–2014). J. Athl. Training 54(1):30-41 (2019).

Preiss-Farzanegan, S.J. et al., The relationship between gender and postconcussion symptoms after sport-related mild traumatic brain injury. PM R 1(3):245-53 (2009).

Rider, G.N. et al., Health and care utilization of transgender and gender nonconforming youth: a population-based study. Pediatrics 141:3 (March 2018).

Roberts, T.A. et al., Effect of gender affirming hormones on athletic performance in transwomen and transmen: implications for sporting organisations and legislators. BJSM 0:1-7 (2020).

Rowson, S. et al., Biomechanical perspectives on concussion in sport, Sports Med. Arthrosc. 24(3):100-107 (Sept 2016).

Ruetsche, A.G. et al., Cortical and trabecular bone mineral density in transsexuals after long-term cross-sex hormonal treatment: a cross-sectional study. Osteoporos. Int. 16:791-798 (2005).

Sakamoto, K. et al., Comparison of kicking speed between female and male soccer players. Procedia Engineering 72:50-55 (2014).

Santos, D.A. et al., Reference values for body composition and anthropometric measurements in athletes. PLOSOne 9(5) (May 2014).

Sattler, T. et al., Vertical jump performance of professional male and female volleyball players: effects of playing position and competition level. J. Strength and Conditioning Res. 29(6):1486-93 (2015).

Scharff, M. et al., Change in grip strength in trans people and its association with lean body mass and bone density. Endocrine Connections 8:1020-28 (2019).

Singh-Ospina, N. et al., Effect of sex steroids on the bone health of transgender individuals: a systematic review and meta-analysis. J. Clin. Endocrinol. Metab. 102(11):3904-13 (Nov 2017).

Sutton, K.M. et al., Anterior cruciate ligament rupture: differences between males and females. J. Am. Acad. Orthop. Surg. 21(1):41-50 (2013).

Tack, L.J.W. et al., Proandrogenic and antiandrogenic progestins in transgender youth: differential effects on body composition and bone metabolism. J. Clin. Endocrinol. Metab, 103(6):2147-56 (2018).

Taylor, R.W., et al., Gender differences in body fat content are present well before puberty. Int. J. Obes. Relat. Metab. Disord. 21(11): 1082-4 (1997).

Taylor, R.W., et al., Sex differences in regional body fat distribution from pre-to postpuberty. Obesity 18(7): 1410-16 (2010).

Thomas, J.R. and K. E. French, Gender differences across age in motor performance: a meta-analysis. Psych. Bull. 98(2):260-282 (1985).

Tierney, R.T. et al., Gender differences in head-neck segment dynamic stabilization during head acceleration. Med. and Sci. in Sports and Exercise, American College of Sports Medicine 37(2):272-9 (2005).

UK Sports Councils' Equality Group, Guidance for Transgender Inclusion in Domestic Sport, https://equalityinsport.org/docs/300921/Guidance%20for%20Transgender%20Inclusion%20in%20Domestic%20Sport%202021.pdf (2021).

UK Sports Councils' Equality Group, International Research Literature Review, https://equalityinsport.org/docs/300921/Transgender%20International%20Research%20Literature%20Review%202021.pdf (2021).

Van Den Tillaar, R. and J. M. H. Cabri, Gender differences in the kinematics and ball velocity of overarm throwing in elite team handball players. J. Sports Sciences 30(8):807-813 (2012).

Viviers, P. et al., A review of a decade of rugby union injury epidemiology: 20072017. Sports Health 10(3):223-27 (2018).

VolleyballMag.com, "Hit by volleyballs: concussions have changed coach Corinne Atchison's life." https://volleyballmag.com/corinneatchison/ (9/25/16).

Wang, L. et al., Post-traumatic osteoarthritis following ACL injury. Arthritis Res. and Therapy 22(57) (2020)

Wiik, A., T. R Lundberg et al., Muscle strength, size, and composition following 12 months of gender-affirming treatment in transgender individuals. J. Clinical Endocrin. & Metab. 105(3):e805-813 (2020).

Wikipedia, "Cece Telfer." https://en.wikipedia.org/wiki/Cece_Telfer.

Wolf, J.M. et al., Male and female differences in musculoskeletal disease. J. Am. Acad. Orthop. Surg. 23:339-347 (2015).

World Regby Transgender Guidelines. https://www.world.rugby/the-game/player-welfare/guidelines/transgender (2020).

**JA2921**

World Rugby Transgender Women Guidelines. https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women (2020).

Wunderle, K. et al, Menstrual phase as predictor of outcome after mild traumatic brain injury in women. J. Head Trauma Rehabil. 29(5):E1-E8 (2014).

**JA2922**

## APPENDIX – LIST OF PUBLICATIONS

**Publications of Dr. Chad Thomas Carlson, M.D., FACSM**

Sports Medicine CAQ Study Guide, Healthy Learning, 2021 [editor].

SEXUAL VIOLENCE IN SPORT: AMERICAN MEDICAL SOCIETY FOR SPORTS MEDICINE POSITION STATEMENT. Published in Curr Sports Med Reports June 2020;19(6):232-4; Clin J Sports Med June 8 2020; Br J Sports Med 2020;0:1-3.

Traveling with Medication. NCAA Sports Science Institute Bulletin, 2015 http://www.ncaa.org/sport-science-institute/traveling-medication.

A SURVEY OF STATE MEDICAL LICENSING BOARDS: CAN THE TRAVELING TEAM PHYSICIAN PRACTICE IN YOUR STATE? 2013. Jan (47)1:60-62.

AXIAL BACK PAIN IN THE ATHLETE: PATHOPHYSIOLOGY AND APPROACH TO REHABILITATION. Curr Rev Musculoskel Med. 2009 (2):88-93.

THE NATURAL HISTORY AND MANAGEMENT OF HAMSTRING INJURIES. Curr Rev Musculoskel Med 2008 (1):120-128.

SPONDYLOLYSIS AND THE ATHLETE. Athletic Ther Today. 2007 (12)4:37-39.

"ACUTE SUBDURAL HEMATOMA IN A HIGH SCHOOL FOOTBALL PLAYER," J Athl Training, 38;2(63), 2003.

THE RELATIONSHIP OF EXCESSIVE WEIGHT LOSS TO PERFORMANCE IN HIGH SCHOOL WRESTLERS – A PILOT STUDY; presented at the AMSSM national meeting, San Diego, CA, 2000; Clinical Journal of Sport Medicine 10(4):310, October, 2000.

# CURRICULUM VITAE (ABBREVIATED)

**Chad Thomas Carlson, MD**

> Work Address: Stadia Sports Medicine
> 6000 University Ave.
> Suite 250
> West Des Moines, IA, 50266
> Phone (515) 221-1102
>
> Active professional licenses: IA, NE, CA, TX, TN, NC, AZ, FL (telemed)
>
> Board certified family medicine, ABMS 1998; recertified 2005, 2012
>
> Board certified sports medicine, ABMS 1999; recertified 2009, 2019

EDUCATION:

- Fellowship:  Sports Medicine -- Ball Memorial Hospital/Central Indiana Orthopedics, 1997-1999; Completed 4/99
- Residency:  University of Michigan Department of Family Medicine,1994-97
- University of Nebraska College of Medicine
  M.D. obtained May 1994
- University of Nebraska at Lincoln
  B.S. with majors in history (emphasis American) and biology obtained May 1990

EMPLOYMENT HISTORY:

- Physician Owner, Stadia Sports Medicine, West Des Moines, IA, 2006 - present
- Staff Physician, University of Illinois, 9/04-6/06
- Director, Carle Sports Medicine, Carle Foundation Hospital, Urbana, IL, 2001-2004; Team physician, University of Illinois.
- Private practice, Ionia County Hospital, Ionia, MI, 1999-2001.

HOSPITAL AFFILIATIONS:

- Iowa Methodist Hospital, Des Moines
- Mercy Medical Center, Des Moines

PROFESSIONAL HONORS/AWARDS:

- Appointed to Board of Directors, Physical Activity Alliance, 2020
- Appointed to joint AMSSM/NCAA COVID-19 Working Group, March 2020-present
  - Medical advisory panel, 2021 Women's Division I NCAA Basketball Tournament
- AMSSM Founders Award 2019, awarded once annually for the Sports Medicine Physician nationally who best exemplifies the practice of Sports Medicine
- Fellow designation, American Medical Society for Sports Medicine, 2019
- Elected to Executive Committee, American Medical Society for Sports Medicine, 2017-21
  - **President of AMSSM, 2019-2020**

72

**JA2924**

- Practice/Policy Committee, AMSSM, 2007-2016 (Former Chair)
  - Author of US HR 921, the Sports Medicine Licensure Clarity Act, which passed the US House of Representatives and Senate in January 2017, and was signed into law by President Trump, 2017
- Appointed member of physician liaison group to the NCAA to discuss return to sport strategies in the COVID-19 pandemic, 2020
- Appointed to Board of Directors, Running the Race, 2018-present
- Sports Ultrasound Committee, Policy Co-Chair, AMSSM, 2015-2017
- Elected to Board of Directors, American Medical Society for Sports Medicine, 2009-2013.
- Member, Health and Science Policy Committee, ACSM, 2010-present
  - Chair, Clinical Medicine Subcommittee, HSPC, ACSM, 2012-2015
- Iowa Medical Society Leadership Development Committee, 2022
- Member of Sports Medicine Subcommittee for the Iowa State Medical Society, 2007-present
  - Iowa designate to National Youth Sports Safety Summit
    - New York City – 2015
    - Indianapolis – 2016
    - Kansas City – 2017
- AMSSM designate for the American Academy of Orthopaedic Surgeons' Knee Osteoarthritis Quality Measure review committee, 2014-2016
- Associate Editor, Current Reviews in Musculoskeletal Medicine, 2006-2010.
- Fellow, American College of Sports Medicine:  Designated in 2004


SPECIAL QUALIFICATIONS:

- Prior legal consulting work in cases with both local and national reach
- Extensive training in office musculoskeletal injury
- Oversight of treadmill stress testing/metabolic stress testing
- Independent consultation regarding establishment of individual exercise programs consistent with revised ACSM guidelines
- Proficient at evaluation/management of bone mineral density problems at all ages

- Qualified procedurally for:
  - Ultrasound diagnostic testing and guided injections
  - Joint injection/aspiration
  - Percutaneous tenotomy (TENEX)
  - Rotator cuff barbotage
  - Lactate/Anaerobic threshold, $VO_{2\ MAX}$/ exercise testing
  - Laryngoscopy for vocal cord assessment
  - Compartment pressure assessment
  - Ultrasound-guided nerve blocks
- Extensive experience speaking to large national groups on issues pertaining to sports medicine, including, but not limited to:
  - Overuse Injury
  - Head and Neck Injuries on the Field
  - Exercise-Induced Asthma
  - The Shoulder Exam
  - Principles of Exercise Prescription
  - Traumatic Brain Injury in Sport
  - The Knee Exam
  - The Ankle Exam
  - The Hip Exam
  - The Pre-Participation Exam
  - Cardiopulmonary Exercise Testing for Determination of Training Zone Estimates and to Identify Causes of Exercise-Related Dyspnea
  - Athletic Amenorrhea
  - Advocacy in Sports Medicine
  - Medical Practice Economics

73

**JA2925**

PUBLICATIONS/RESEARCH:

- Sports Medicine CAQ Study Guide, Healthy Learning, Monterey, CA. 2021.[editor].
- AXIAL BACK PAIN IN THE ATHLETE:  PATHOPHYSIOLOGY AND APPROACH TO REHABILITATION. Curr Rev Musculoskel Med. 2009 (2):88-93
- SPONDYLOLYSIS AND THE ATHLETE.  Athletic Ther Today. 2007 (12)4:37-39.
- THE NATURAL HISTORY AND MANAGEMENT OF HAMSTRING INJURIES.  Curr Rev Musculoskel Med 2008 (1):120-128.
- A SURVEY OF STATE MEDICAL LICENSING BOARDS: CAN THE TRAVELING TEAM PHYSICIAN PRACTICE IN YOUR STATE?  BJSM. 2013. Jan (47)1:60-62.
- SEXUAL VIOLENCE IN SPORT:  AMERICAN MEDICAL SOCIETY FOR SPORTS MEDICINE POSITION STATEMENT
    - Curr Sports Med Reports June 2020;19(6):232-4.
    - Clin J Sports Med June 8 2020;
    - Br J Sports Med 2020;0:1-3
- "ACUTE SUBDURAL HEMATOMA IN A HIGH SCHOOL FOOTBALL PLAYER," J Athl Training, 38;2(63), 2003
- Traveling with Medication. NCAA Sports Science Institute Bulletin, 2015  http://www.ncaa.org/sport-science-institute/traveling-medication
- THE RELATIONSHIP OF EXCESSIVE WEIGHT LOSS TO PERFORMANCE IN HIGH SCHOOL WRESTLERS – A PILOT STUDY;  presented at the AMSSM national meeting, San Diego, CA, 2000  Clinical Journal of Sport Medicine 10(4):310, October, 2000

74

**JA2926**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    CHARLESTON DIVISION
 4
 5     _____
                                     )
 6     B.P.J. by her next friend and)
       mother, HEATHER JACKSON,      )
 7                                   )
                 Plaintiff,          )
 8                                   )  No. 2:21-cv-00316
            vs.                      )
 9                                   )
       WEST VIRGINIA STATE BOARD OF )
10     EDUCATION, HARRISON COUNTY    )
       BOARD OF EDUCATION, WEST      )
11     VIRGINIA SECONDARY SCHOOL     )
       ACTIVITIES COMMISSION, W.     )
12     CLAYTON BURCH in his official)
       capacity as State            )
13     Superintendent, DORA STUTLER,)
       in her official capacity as  )
14     Harrison County              )
       Superintendent, and THE STATE)
15     OF WEST VIRGINIA,            )
                                     )
16               Defendants.         )
                                     )
17     LAINEY ARMISTEAD,             )
                                     )
18                                   )
       Defendant-Intervenor.         )
19     _____
20
               REMOTE VIDEOTAPED DEPOSITION OF
21          CHAD T. CARLSON, M.D., FACSM
                 Monday, March 28, 2022
22                    Volume I
23     Reported by:
       ALEXIS KAGAY
24     CSR No. 13795
       Job No. 5122881
25     PAGES 1 - 227
```

                                                    Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5   _____
                                    )
 6   B.P.J. by her next friend and )
     mother, HEATHER JACKSON,       )
 7                                  )
              Plaintiff,            )
 8                                  )No. 2:21-cv-00316
          vs.                       )
 9                                  )
     WEST VIRGINIA STATE BOARD OF   )
10   EDUCATION, HARRISON COUNTY     )
     BOARD OF EDUCATION, WEST       )
11   VIRGINIA SECONDARY SCHOOL      )
     ACTIVITIES COMMISSION, W.      )
12   CLAYTON BURCH in his official  )
     capacity as State             )
13   Superintendent, DORA STUTLER, )
     in her official capacity as    )
14   Harrison County               )
     Superintendent, and THE STATE )
15   OF WEST VIRGINIA,              )
                                    )
16              Defendants.         )
                                    )
17   LAINEY ARMISTEAD,              )
                                    )
18                                  )
     Defendant-Intervenor.          )
19   _____
20        Videotaped deposition of CHAD T. CARLSON,
21   M.D., FACSM, Volume I, taken on behalf of Plaintiff,
22   with all participants appearing remotely, beginning
23   at 9:01 a.m. and ending at 3:19 p.m. on Monday,
24   March 28, 2022, before ALEXIS KAGAY, Certified
25   Shorthand Reporter No. 13795.
```

                                                    Page 2

```
 1        A    Okay.  I've got it.

 2        Q    So if you go to paragraph -- so page 9,

 3   paragraph 11 C.

 4        A    Okay.

 5        Q    And in the middle of paragraph 11 C, the --    11:10:07

 6   there's a sentence that begins with "Even before."

 7        A    Correct.

 8        Q    So there you say (as read):

 9             "Even before puberty, males have a

10             performance advantage over females          11:10:24

11             in most athletic events."

12             Correct?

13        A    That is correct.

14        Q    And that sentence wasn't contained in your

15   first version of your white paper from June 2021;      11:10:32

16   right?

17        A    As I said, that was not the focus of that

18   paper, so that's correct.

19        Q    Okay.  Why did you decide to include it in

20   this paper?                                            11:10:48

21        A    When --

22             MR. FRAMPTON:  Objection to the form.

23             Go ahead.

24             THE WITNESS:  When I was retained by

25   West Virginia in this case, discussions between        11:11:04
```

Page 98

```
 1    attorneys at ADF and attorneys at West Virginia --
 2           MR. TRYON:  I just want to insert here,
 3    please don't -- again, this is attorney-client --
 4    don't get into attorney-client protected
 5    information.  So discussions with counsel are        11:11:26
 6    protected.
 7           MR. FRAMPTON:  Right.
 8           MR. TRYON:  But to the extent that you can
 9    answer that without disclosing that -- those
10    communications, you may do so.                       11:11:32
11           MR. FRAMPTON:  Yeah, same -- same
12    instruction.
13           THE WITNESS:  Okay.  So I -- I -- I guess
14    what I would say is that the initial report was
15    filed -- was created prior to being retained by the  11:11:42
16    State of West Virginia and the updated paper that
17    you have was updated to include the prepubertal
18    population because my understanding is that the
19    defendant in this case is -- is young.
20    BY MR. BLOCK:                                        11:12:14
21       Q   Before you were asked to update the white
22    paper, did you have an expert opinion regarding the
23    safety implications of prepubertal boys and girls
24    playing together?
25           MR. FRAMPTON:  Objection to the form.         11:12:26
```

Page 99

```
 1          THE WITNESS:  Many of the considerations that
 2     exist in that first paper are relevant to the
 3     prepubertal group.  I suspected that they would
 4     probably hold, and I do believe that they hold.
 5     BY MR. BLOCK:                                    11:12:58
 6        Q    So -- so before you were asked to update your
 7     paper, you had an expert opinion that it would be
 8     unsafe for prepubertal girls and play -- and boys to
 9     play together?
10          MR. FRAMPTON:  Objection to the form.       11:13:10
11          THE WITNESS:  As I said, I suspected that
12     there was probably risk in that population as well.
13     BY MR. BLOCK:
14        Q    Now, you talked about the literature review
15     you conducted for creating your white paper.  What  11:13:31
16     sort of literature review did you conduct for the
17     process of updating the right -- the white paper to
18     discuss prepubertal kids?
19        A    I went more into the picture on population
20     testing, looking at what differences in performance  11:14:01
21     were between boys and girls.  I looked at
22     international and national performance records,
23     databases.  I looked at ratified standards for --
24     that had been determined through, for instance, the
25     presidential physical fitness test.               11:14:35
```

                                                   Page 100

```
 1        Q    How did you identify what sources to look at?
 2        A    PubMed.  I own -- well, PubMed.
 3        Q    Did you review any sources that were not
 4    included in Dr. Brown's 2022 expert report?
 5             MR. FRAMPTON:  Objection to the form.          11:15:06
 6             THE WITNESS:  I couldn't speak to that
 7    because I haven't cross-referenced his bibliography
 8    to mine.
 9    BY MR. BLOCK:
10        Q    In paragraph 16, page 12 of your report,       11:15:26
11    could you turn to that?
12        A    Yes, I'm there.
13        Q    So -- so right before paragraph 17, the --
14    the final sentence in paragraph 16, it says (as
15    read):                                                  11:15:53
16             "Although most easily documented in
17             athletes who have gone through
18             puberty, these differences are not
19             exclusively limited to
20             post-pubescent athletes either."              11:16:04
21             Did I read that right?
22        A    You did.
23        Q    Okay.  And how -- can you explain to me how
24    these differences are most easily documented in
25    athletes who have gone through puberty?                 11:16:17
```

                                                    Page 101

```
 1      A   Of course.

 2          The differences between men and women with

 3      regards to strength and -- both upper and lower

 4      body -- and muscle mass and power increase,

 5      there's -- there's greater separation between the      11:16:48

 6      sexes after puberty has occurred.  That doesn't mean

 7      that there's no difference prior.

 8      Q   But you -- you say it's most easily

 9      documented.  What did you mean by "most easily

10      documented"?                                           11:17:07

11          MR. FRAMPTON:  Object to the form.

12          MR. BLOCK:  I'm sorry, what's the -- what's

13      the form objection to that?

14          MR. FRAMPTON:  The objection is I -- I

15      don't -- I don't think you've properly stated what     11:17:30

16      he said.

17      BY MR. BLOCK:

18      Q   What -- what did you mean when you said "most

19      easily documented"?

20      A   Meaning that the -- that wider differences         11:17:39

21      are more apparent than narrow differences.

22      Q   So paragraph 17 says (as read):

23          "I have reviewed the expert

24          declaration of Gregory A. Brown,

25          Ph.D., FACM of February 23, 2022,               11:17:58
```

Page 102

```
1               provided in this case..."

2               Correct?

3        A    Correct.

4        Q    Okay.  And the date of this document that

5    we're reading from is also February 23rd, 2022;        11:18:09

6    correct?

7        A    Correct.

8        Q    Okay.  So how did you read Dr. Brown's expert

9    declaration dated the same day as your declaration?

10       A    That was provided to me by attorneys at ADF.    11:18:31

11       Q    Did you read Dr. Brown's declaration after it

12   had already been signed?

13       A    I can't speak to when he signed that, so I

14   don't know the answer to that question.

15       Q    Did you review Dr. Brown's declaration on       11:18:52

16   February 23rd, 2022?

17       A    I don't recall when I reviewed it.

18       Q    Now, the sentence continues -- I'll just read

19   it from the beginning again.

20           (As read):                                       11:19:15

21           "I have reviewed the expert

22           declaration of Gregory A. Brown,

23           Ph.D., FACM of February 23, 2022,

24           provided in this case, which

25           includes evidence from a wide            11:19:23
```

                                                    Page 103

```
 1            variety of sources, including
 2            population-based mass testing data,
 3            as well as age-stratified
 4            competition results, all of which
 5            support the idea that prepubertal        11:19:35
 6            males run faster, jump higher and
 7            farther, exhibit higher aerobic
 8            power output, and have greater upper
 9            body strength (evidenced by stronger
10            hand grip and better performance         11:19:45
11            with chin-ups or bent arm hang) than
12            comparably aged females."
13            Did I read that right?
14      A    You did.
15      Q    Okay.  And then you go on to say that this is   11:19:55
16   documented in Presidential Fitness Test, Euro
17   Fitness Test and additional mass testing data from
18   the UK and Australia; correct?
19      A    Correct.
20      Q    Now, are those fitness tests what you were   11:20:05
21   referring to earlier when you were discussing
22   additional research you had done to update your
23   white paper?
24      A    Yes.
25      Q    Okay.  Do you actually cite to those fitness   11:20:18
```

Page 104

```
 1    test results in the bibliography of this white

 2    paper?

 3        A   I don't believe that that's in there.

 4        Q   Okay.  So does this refresh your recollection

 5    about whether you -- about how -- I'll take this --     11:20:36

 6    I'll -- strike that.  I'll ask again.

 7            Do you -- did you become aware of these

 8    differences in test results from reading Dr. Brown's

 9    declaration?

10        A   No.  I had been familiar with some of those    11:20:55

11    papers prior.

12        Q   When did you become familiar with them?

13        A   In the course of -- likely in the course of

14    initial review, on -- on PubMed searches.

15        Q   Can you turn to page 61 of the document?       11:21:24

16    That's your bibliography.

17        A   Okay.

18        Q   Can you point out to me the sources in the

19    bibliography addressing performance differences

20    between -- or -- or differences in body composition    11:22:03

21    between prepubertal girls and prepubertal boys?

22        A   We're speaking to performance differences;

23    correct?

24        Q   Or physiological differences.

25        A   Papers that I referenced are not in there.     11:23:25
```

Page 105

```
 1       Q    Okay.  Why not?
 2       A    I reviewed -- papers that I had reviewed
 3   beforehand were referenced within Dr. Brown's
 4   report.
 5       Q    On the -- if -- going back to paragraph 17,    11:24:26
 6   which is -- well, if you could go back to
 7   paragraph 17.  So that's pages 12 and 13.
 8            12 and 13.  Hopefully, I said that correctly.
 9            If you could go to the end of paragraph 17,
10   which is on page 13.                                   11:24:51
11       A    Okay.
12       Q    Let me know when you're there.
13       A    I'm there.
14       Q    Okay.  It says (as read):
15            In sum, a large and unbridgeable               11:25:01
16            performance gap exists between
17            the" -- "exists" --
18            Let me try that again.  I need another cup of
19   coffee.
20            It says (as read):                             11:25:11
21            "In sum, a large and unbridgeable
22            performance gap between the sexes is
23            well-studied and equally
24            well-documented, beginning in many
25            cases before puberty."                         11:25:20
```

                                                    Page 106

```
 1            Do you see that sentence?
 2       A    I do.
 3       Q    Okay.  Is -- do you believe that the
 4   performance gap before puberty is unbridgeable?
 5       A    No, that's not what I said.              11:25:37
 6       Q    That's why I'm asking the question.
 7       A    No.
 8       Q    Do -- do you --
 9       A    What -- what it says is large and
10   unbridgeable performance gap between the sexes is    11:25:46
11   well-studied beginning in many cases before puberty.
12       Q    Okay.  In -- in many cases, is there an
13   unbridgeable performance gap before puberty?
14       A    I believe, based on the -- I believe if you
15   look at the -- of how sex-based records break down,   11:26:14
16   that we're talking about upper-end performance that
17   it reflects, in -- as I said, in many cases, an
18   unbridgeable gap.
19       Q    How about average differences between boys
20   and girls before puberty, is the gap so large to be   11:26:44
21   unbridgeable?
22       A    Not in all cases, no.
23       Q    In which case is -- is it large enough to be
24   unbreakable?
25       A    Well, for example, boys can outperform girls   11:27:02
```

                                                 Page 107

 1    as early as age seven and ups at between 100 and

 2    1200 percent improved.

 3       Q   And do you have an expert opinion on whether

 4    or not those differences are attributable to innate

 5    physiological characteristics?                        11:27:41

 6       A   As -- as a physician who works with athletes

 7    of all ages, every day, I do have an opinion that

 8    biology plays a role in the measured performance

 9    differences that exist in the literature with

10    respect to prepubertal children, yes.                11:28:11

11       Q   So you said biology plays a role.

12           Is biology the exclusive thing that plays a

13    role?

14       A   I'm not aware of any peer-reviewed study that

15    looks at the exact contribution of biology versus    11:28:36

16    other causes when it comes to performance in

17    prepubertal children.

18       Q   Are you -- are you aware of any data

19    measuring the performance of transgender girls

20    before puberty in -- in athletic contests or         11:28:51

21    physical fitness studies?

22       A   I'm not aware of any literature looking

23    specifically at prepubertal transgender girls in --

24    in their performance of sport, no.

25       Q   Just to clarify the scope of your expert      11:29:14

                                                    Page 108

1    opinions in this case, are you providing an expert

2    opinion in this case regarding athletic advantages

3    between males and females?

4         MR. FRAMPTON:  Objection; form.

5         Go ahead.                            11:29:46

6         THE WITNESS:  I am providing an opinion in

7    this case on the safety issues that exist when those

8    of one sex cross over and participate in sports.

9    BY MR. BLOCK:

10     Q   So -- so your expert opinion in this case is   11:30:01

11    exclusively about the safety issues; correct?

12         THE VIDEOGRAPHER:  I believe Dr. Carlson's

13    Internet might have been having a problem.  You

14    might need to repeat your question.

15         MR. BLOCK:  Sure.                11:30:37

16    BY MR. BLOCK:

17     Q   So your expert testimony in this case is

18    exclusively about the safety issues involved when

19    males and females play together; right?

20         MR. FRAMPTON:  Objection; form.      11:30:53

21         Go ahead.

22         THE WITNESS:  It is about the safety issues

23    that are involved when males and -- when males cross

24    over into women's sports particularly, and some of

25    that opinion relates to differences in certain   11:31:08

Page 109

```
 1    variables, such as speed.
 2    BY MR. BLOCK:
 3       Q   You're not providing an expert opinion on the
 4    fairness of allowing transgender girls to
 5    participate on girls' teams; right?              11:31:29
 6       A   I'm not providing an opinion on fairness as
 7    relates to transgender participation, no.
 8       Q   If you could go to paragraph 21 of your
 9    report -- it's on page 15.  So about four lines from
10    the top -- there's a sentence that begins with "To   11:32:12
11    the latter point."
12       A   "To the latter point, children don't play
13    contact sports..."?
14       Q   Yeah.  So it says (as read):
15           "To the latter point, children don't    11:32:28
16           play contact sports with adults and,
17           in a great majority of cases, men
18           and women compete in categories
19           specific to their own biological
20           sex."                                   11:32:37
21           Do you see that?
22       A   I do.
23       Q   Okay.  And so that sentence has been changed
24    from the version of that sentence that appeared in
25    your June 2021 report; correct?               11:32:49
```

Page 110

1        A   I can't recall.  I'd have to go back and look

2    at that report.

3        Q   Okay.  Let's go back and look at it.  It's on

4    page 11 of your earlier report.

5        A   Okay.                                    11:33:37

6        Q   All right.  So on page 11 of your report,

7    paragraph 18, a couple lines from the bottom, it

8    says (as read):

9            "To the latter point, children don't

10           play contact sports with adults and,      11:33:45

11           as has already been discussed, after

12           the onset of puberty, men and women

13           compete in categories specific to

14           their own biological sex."

15           Do you see that?                          11:33:54

16       A   I do.

17       Q   Okay.  And so then in your February report,

18   the -- the words after "the onset of puberty" are

19   taken out, and the words "in the great majority of

20   cases" are -- are put in; is that right?          11:34:10

21       A   Correct.

22       Q   Okay.  And so why did you make that change?

23       A   Well, I believe, as we had discussed, the

24   focus on the first draft was primarily in the

25   adolescent age and later, and the second draft was   11:34:23

                                              Page 111

```
 1    expanded slightly to include consideration of the
 2    prepubertal athlete.  And since sport -- gender --
 3    or sex stratification in youth teams is still widely
 4    prevalent, they altered those words.
 5        Q   Are you providing an expert opinion in this      11:34:50
 6    case about transgender girls and women who never go
 7    through endogenous puberty as a result of puberty
 8    blockers followed by gender-affirming hormones?
 9            MR. FRAMPTON:  Objection; form.
10            THE WITNESS:  Can you -- you ask that one        11:35:07
11    more time?
12    BY MR. BLOCK:
13        Q   Yeah.  So are you providing an expert
14    report -- excuse me, I'll say it again.
15            Are you providing an expert opinion in this      11:35:14
16    case about transgender girls and women who never go
17    through endogenous puberty as a result of taking
18    puberty blockers followed by gender-affirming
19    hormones?
20            MR. FRAMPTON:  Same objection.                   11:35:29
21            Go ahead.
22            THE WITNESS:  So to the extent that they are
23    prepubertal biological males, yes.
24    BY MR. BLOCK:
25        Q   How about to the extent that they have           11:35:36
```

                                              Page 112

 1    received puberty blockers followed by

 2    gender-affirming hormones to stimulate the

 3    equivalent of a typically female puberty?

 4          MR. FRAMPTON:  Objection; form.

 5          THE WITNESS:  My opinion in this case extends    11:35:51

 6    to sports safety issues in both the prepubertal and

 7    the pubertal population.

 8    BY MR. BLOCK:

 9      Q    Okay.  Does it address safety issues of the

10    participation of transgender girls and women who      11:36:11

11    receive puberty blockers and then receive

12    gender-affirming hormone therapy that has effects on

13    bone and muscle structure and causes them to

14    develop, you know, typically female hips and -- and

15    things like that?                                      11:36:26

16          MR. FRAMPTON:  Objection to form.

17          MR. TRYON:  Objection; form.

18          THE WITNESS:  That's -- that's a complex

19    question.  Can you unpack that a little bit?

20    BY MR. BLOCK:                                          11:36:39

21      Q    Sure.  So you, so far -- in response to my

22    questions about people who have blockers, you've

23    equated transgender girls who have blockers to

24    prepubertal boys and someone who has -- a

25    transgender girl who has puberty blockers and then    11:36:52

                                                    Page 113

```
 1   receives gender-affirming hormones, you know,

 2   stimulates a lot of other changes that prepubertal

 3   boys don't have; correct?

 4        MR. FRAMPTON:  Objection to form.

 5        THE WITNESS:  I don't --                     11:37:05

 6        MR. FRAMPTON:  Go ahead.

 7        THE WITNESS:  I don't think that that's been

 8   widely looked at.  I know that there's -- I -- I

 9   don't think that that's been widely looked at or

10   extensively looked at, as to what the effects of    11:37:16

11   that treatment would be on athletic performance.

12   BY MR. BLOCK:

13     Q   Are you providing an expert opinion on what

14   the effects of that treatment would be on safety?

15        MR. FRAMPTON:  Object to the form.           11:37:36

16        Go ahead.

17        THE WITNESS:  I'm providing an opinion on the

18   potential effects on safety of a biological male,

19   even at age 10 or 11, pick your age, of crossing

20   over into a woman's sport and participating in     11:37:53

21   contact and collision sports.

22   BY MR. BLOCK:

23     Q   All right.  That's not the answer to my

24   question.  I -- I asked are you providing an expert

25   opinion on the safety of -- of some -- a transgender  11:38:03
```

                                                    Page 114

```
 1    girl who has received blockers and then

 2    gender-affirming hormones participating on girls'

 3    sports teams.

 4       A   Am I -- I -- I am providing an opinion on the

 5    potential safety issues of a hypothetical individual   11:38:39

 6    like this participating on girls' sport team --

 7    girls' sports teams, yes.

 8       Q   What -- what's your basis for providing an

 9    expert opinion regarding a transgender girl who has

10    received blockers and then gone on to receive         11:38:57

11    gender-affirming hormones?

12       A   That would have to do with whether or not

13    there are differences between the sexes at the time

14    of puberty.

15       Q   Well, I'm talking about someone who has       11:39:21

16    received blockers but then received gender-affirming

17    hormones to stimulate the equivalent of a typically

18    female puberty.

19           Are you -- what's your basis for providing an

20    expert opinion on the safety risks of that person     11:39:39

21    participating on girls' sports?

22           MR. TRYON:  Objection.

23           THE WITNESS:  To my --

24           MR. FRAMPTON:  Objection to form.

25    ///
```

Page 115

```
 1    BY MR. BLOCK:
 2        Q    You can answer.
 3        A    There's not extensive research looking at the
 4    situation that you're talking about.
 5        Q    So --                                      11:39:59
 6        A    The effect of sports -- of gender-affirming
 7    hormones on sports participation.
 8        Q    So if there's not a lot of research, do you
 9    have a basis for offering an expert opinion about
10    it?                                                 11:40:16
11            MR. FRAMPTON:   Same objection.
12            Go ahead.
13            THE WITNESS:   My opinion is grounded in an
14    understanding of what plays into injury risk and
15    differences that exist between the sexes.           11:40:30
16    BY MR. BLOCK:
17        Q    Do you know what differences exist for --
18    between a cisgender woman and a transgender woman
19    who received puberty blockers followed by
20    gender-affirming hormones?                          11:40:49
21            MR. TRYON:   Objection to form.
22            THE WITNESS:   My -- my understanding is there
23    is retained differences in lean body mass between
24    them.
25    ///
```

Page 116

```
 1    BY MR. BLOCK:

 2        Q    What's that understanding based on?

 3        A    The one study I'm familiar with that looked

 4    at that, which was authored by Klaver.

 5        Q    And that's a study that you didn't cite in        11:41:10

 6    your report; correct?

 7        A    Correct.

 8        Q    You only looked at that study for the first

 9    time in preparing for this deposition; correct?

10        MR. FRAMPTON:  Objection to the form.                  11:41:22

11    BY MR. BLOCK:

12        Q    You can answer.

13        A    I looked at it in preparation for this

14    deposition, yes.

15        Q    So you looked at it for the first time after     11:41:37

16    you had already submitted your report; correct?

17        A    Correct.

18        Q    And is it your understanding that the people

19    in that study received puberty blockers at the

20    beginning of Tanner II?                                    11:41:49

21        A    Around -- I believe around age 13, 14.

22        Q    And as a medical doctor, what's your

23    understanding of when Tanner II typically begins for

24    boys?

25        A    Again, I'm a sports medicine physician.  I'm      11:42:05
```

Page 117

```
 1    not an endocrinologist.
 2        Q    Well --
 3            MR. FRAMPTON:  Did it not pick up his answer?
 4    I thought he answered the -- there was no reaction
 5    when he said an age, so I just wanted to make sure    11:42:27
 6    it was picked up.
 7            MR. BLOCK:  It was not.
 8            MR. FRAMPTON:  Okay.
 9            THE WITNESS:  I said age 12.
10    BY MR. BLOCK:                                         11:42:34
11        Q    Age 12.
12            Have you done any modeling of the safety
13    risks associated with prepubertal boys playing on
14    sports teams with prepubertal girls?
15            MR. FRAMPTON:  Objection to the form.         11:42:57
16            Go ahead.
17            THE WITNESS:  Define what you mean by
18    "modeling."
19    BY MR. BLOCK:
20        Q    You discuss modeling of safety risks in your   11:43:08
21    report, don't you?
22        A    Correct.
23        Q    So that's what I mean by "modeling."
24            Have you conducted any modeling of the safety
25    risks of prepubertal boys playing on teams with      11:43:22
```

                                                    Page 118

1    prepubertal girls?

2        A    I'm not sure what you mean by modeling these

3    risks.  The -- the extent to which prepubertal kids

4    do or don't fit into that model depends on whether

5    there are measurable differences between the sexes        11:43:50

6    in terms of things like speed or strength.

7        Q    And so --

8        A    To the extent that there are measurable

9    differences noted between them, then, yes, the model

10   applies.                                                  11:44:13

11       Q    But you haven't actually done that modeling,

12   have you?

13           MR. FRAMPTON:  Objection to the form.

14           THE WITNESS:  I thought I answered that

15   question.  I'm not sure -- do you mean have I          11:44:22

16   published data on that?

17   BY MR. BLOCK:

18       Q    Not have you published it.  Have you done it

19   yourself?  Have you plugged the values into

20   equations and -- and come up with a model similar        11:44:35

21   to, you know, rugby's model?

22           MR. FRAMPTON:  Objection to the form.

23           Go ahead.

24           THE WITNESS:  Have I taken a calculator and

25   calculated this out with prepubertals?  I'm not sure   11:44:56

Page 119

```
 1      I understand why that's necessary.
 2            If -- if -- there either are or there aren't
 3      differences between the sexes in terms of variables
 4      that equate to athletic performance or -- or lead to
 5      athletic performance, and if there are, then           11:45:19
 6      absolute injury risk can be increased.
 7   BY MR. BLOCK:
 8      Q   So you don't -- no -- no matter how small a
 9      difference is, you don't think that's relevant to
10      assessing, you know, safety risks?                     11:45:33
11            MR. FRAMPTON:  Object to the form.
12            THE WITNESS:  I'm not sure what you're asking
13      there, but -- but measurable differences can lead to
14      increased safety risk, yes.
15   BY MR. BLOCK:                                              11:45:55
16      Q   World Rugby actually calculated a -- a model
17      of the safety risks of an average man playing rugby
18      with an average woman; correct?
19      A   Correct.  That was part of their process.
20      Q   Okay.  And so they went through the steps of        11:46:12
21      actually calculating it; correct?
22      A   They did.
23      Q   Okay.  And -- but you did not go through
24      those steps for purposes of calculating a safety
25      risk of an -- prepubertal boys playing on teams with    11:46:26
```

Page 120

```
 1    prepubertal girls; right?

 2          MR. FRAMPTON:  Same objection.

 3          THE WITNESS:  Well, I think I speak to the --

 4    in the paper as to how that risk might be

 5    calculated.                                      11:46:39

 6    BY MR. BLOCK:

 7      Q    Yeah, you -- you spoke to how it might be

 8    calculated, but you didn't actually calculate it;

 9    correct?

10      A    I'm not -- I'm not sure where you're going    11:46:46

11    with that, but --

12      Q    I just need a "yes" or "no" answer whether

13    you did it or not.

14          MR. FRAMPTON:  Object to the form.

15          Go ahead.                                   11:46:55

16    BY MR. BLOCK:

17      Q    You did not actually go through the steps of

18    calculating the model of the safety risk for

19    prepubertal boys playing with prepubertal girls?

20      A    I did not take, for example, an              11:47:02

21    eight-year-old male and -- his mass and speed into a

22    force equation and then compare it to another

23    eight-year-old female.  I'm not sure what that

24    was -- would accomplish.

25      Q    Okay.  So how -- so you don't have the -- the  11:47:19
```

                                              Page 121

```
 1            MR. FRAMPTON:  That was probably garbled, but

 2    I object to the form.

 3            Go ahead and answer the question.

 4            THE WITNESS:  I do not.

 5    BY MR. BLOCK:                                    12:50:44

 6      Q   Do you know whether the participation of this

 7    plaintiff in sports would pose any more of a safety

 8    risk than the participation of any other cisgender

 9    girl in sports?

10            MR. FRAMPTON:  Object to the form.        12:51:02

11            THE WITNESS:  Because I don't know the

12    particulars of this person, I certainly could not

13    speak to that.

14    BY MR. BLOCK:

15      Q   Are you providing an -- expert testimony at    12:51:15

16    all regarding safety risks from cross-country?

17      A   I was asked to provide a report on safety

18    risks as relates to participation in -- of athletes

19    in contact in collision sports, but that's

20    defined -- the -- the nature of that is defined       12:51:42

21    within my paper.

22      Q   Okay.  So it does not -- so contact and

23    collision sports does not include cross-country;

24    correct?

25      A   That's correct.                               12:51:52
```

Page 160

```
 1        Q    And contact and collision sports doesn't
 2    include track and field; correct?
 3        A    Correct.
 4        Q    Okay.  Do you -- would it be fair to say that
 5    the effects of male-to-female hormones on important     12:52:27
 6    determinants of athletic performance still remain
 7    largely unknown?
 8        A    I -- I -- I didn't hear -- the effects of
 9    male and female hormones on what?
10        Q    On determinants of athletic performance        12:52:42
11    remain largely unknown.
12            MR. FRAMPTON:  Object to the form.
13            Go ahead.
14            THE WITNESS:  What do you mean by "largely
15    unknown"?                                                12:52:52
16    BY MR. BLOCK:
17        Q    I don't know.  Do you think it's a fair
18    statement, that they remain largely unknown?
19            MR. FRAMPTON:  Object to the form.
20            THE WITNESS:  I think that there's good          12:53:04
21    evidence that testosterone has a significant impact
22    on performance.
23    BY MR. BLOCK:
24        Q    But do you think the effects of lowering
25    circulating testosterone on athletic performance        12:53:17
```

Page 161



### Athletic NET
Team Results Management

# Mountain Hollar MS Invitational [MS]

📄 **OFFICIAL**   📅 Thu, Sep 2, 2021   📍 University High School     72 Followers   [Sign In to Follow]

← **Womens 3,200 Meters Junior Varsity**

[All Grades ▾] [All Teams ▾] [All Divisions ▾] [≡ Other Filters ▾] [✏ Highlighter]

**Team Spread** ▾

Spread between runners on each te...

## Official Team Scores

| | |
|---|---|
| 1. Suncrest | 29 |
| 2. South (Morgantown) | 39 |
| 3. Mountaineer (Morgantown) | 78 |
| 4. Bridgeport | 99 |

| | | | | |
|---|---|---|---|---|
| 1. | 8 | Stella Bleech | 15:54.3 | South (Morgantown) |
| 2. | 8 | Chloe Sickles | 16:00.4 | South (Morgantown) |
| 3. | 7 | Emma Zhou | 16:12.8 | Suncrest |
| 4. | 7 | Janie Gilchrest | 16:14.5 | Suncrest |
| 5. | 8 | Mia McCutcheon | 16:19.7 | Suncrest |
| 6. | 7 | Linsey Kramer | 16:41.3 | East Fairmont |
| 7. | 8 | Maliah Dalton | 16:41.8 | South (Morgantown) |
| 8. | 7 | Maddie Fritsch | 16:48.6 | Mountaineer (Morgantown) |
| 9. | 6 | JJ Monroy | 16:53.8 | Suncrest |
| 10. | 7 | Paige Snyder | 16:55.4 | East Fairmont |
| 11. | 7 | Olivia Lupo | 17:00.9 | Suncrest |
| 12. | 7 | Chelsea Payne | 17:02.9 | Braxton County |
| 13. | 7 | Graylee Linville | 17:09.8 | Bridgeport |
| 14. | 7 | Lauren Krantz | 17:10.6 | Suncrest |
| 15. | 7 | Elizabeth Esposito | 17:11.9 | Suncrest |
| 16. | 7 | Ayla McCasi | 17:13.9 | South (Morgantown) |
| 17. | 7 | Kylie Cline | 17:20.7 | Covenant Christian |
| 18. | 7 | Miley Dong | 17:21.8 | Suncrest |
| 19. | 8 | Adrienne Reger | 17:25.3 | Mountaineer (Morgantown) |
| 20. | 7 | Grayson Martucci | 17:27.8 | Suncrest |
| 21. | 6 | Anna Houde | 17:32.8 | Suncrest |
| 22. | 6 | Emma Kniceley-See | 17:34.4 | Bridgeport |
| 23. | 6 | Kelea Anderson | 17:38.3 | Suncrest |
| 24. | 7 | Maria Strager | 17:41.9 | Mountaineer (Morgantown) |
| 25. | 7 | A. Monroe | 17:49.4 | Suncrest |
| 26. | 8 | Allie Myers | 17:49.6 | Suncrest |
| 27. | 8 | Brynn Lewis | 18:01.1 | Suncrest |
| 28. | 8 | Emily McDonald | 18:12.6 | South (Morgantown) |
| 29. | 8 | Samantha Zizzi | 18:16.1 | South (Morgantown) |
| 30. | 6 | Arianna Howell | 18:17.7 | South (Morgantown) |
| 31. | 8 | Anna McBee | 18:25.3 | Mountaineer (Morgantown) |
| 32. | 6 | Maggie Bailey | 18:30.3 | Suncrest |
| 33. | 8 | Avery Dickerson | 18:33.8 | South (Morgantown) |
| 34. | 8 | Elaina Beard | 18:42.9 | South (Morgantown) |
| 35. | 8 | Nataline Wolfe | 18:54.2 | Mountaineer (Morgantown) |
| 36. | 7 | Braydan Whitesel | 18:59.8 | Braxton County |
| 37. | 8 | Maya Ramsey-Murry | 19:06.3 | Suncrest |
| 38. | 7 | Hannah Staley | 19:28.2 | Suncrest |
| 39. | 6 | Emily Liu | 19:53.9 | Suncrest |
| 40. | 7 | Maria Abelsayed | 20:00.9 | Suncrest |

**JA2955**

| 41. | 7 | Zuzanna Michalski | 20:14.3 | Mountaineer (Morgantown) |
|---|---|---|---|---|
| 42. | 7 | Addison Berg | 20:28.6 | Covenant Christian |
| 43. | 8 | Payton Janssen | 20:43.7 | Bridgeport |
| 44. | 6 | Rylee Lemley | 20:52.8 | Mountaineer (Morgantown) |
| 45. | 6 | Sara Minchau | 20:54.5 | Mountaineer (Morgantown) |
| 46. | 0 | Brigid Wilson | 20:56.9 | Suncrest |
| 47. | 7 | Ashlyn Poach | 21:42.5 | St. Francis Central Catholic |
| 48. | 6 | Margaret (Maggie) Cable | 21:46.1 | Bridgeport |
| 49. | 6 | Claire Jones | 22:02.3 | South (Morgantown) |
| 50. | 6 | Alden Owen | 22:24.4 | St. Francis Central Catholic |
| 51. | 6 | Becky Pepper-Jackson | 22:33.9 | Bridgeport |
| 52. | 8 | Faith Noss | 22:42.7 | Central Preston |
| 53. | 7 | Caitlin Murray | 22:55.7 | Bridgeport |
| 54. | 7 | Alexis Thomas | 22:55.9 | South (Morgantown) |
| 55. | 7 | Elsa Meyer | 23:48.1 | Suncrest |
| 56. | 8 | Shea Lingo | 23:52.8 | Suncrest |
| 57. | 8 | Macy Giles | 24:12.1 | South (Morgantown) |
| 58. | 7 | Lilah Allison | 24:23.5 | Suncrest |
| 59. | 6 | Peyton Ice | 24:34.7 | East Fairmont |
| 60. | 7 | Elizaveta Abbitt | 24:51.2 | St. Francis Central Catholic |
| 61. | 8 | Keirston Pugh | 24:55.9 | Bridgeport |
| 62. | 7 | Olivia Markley | 25:03.8 | East Fairmont |
| 63. | 7 | Baylee Yost | 25:29.2 | Suncrest |
| 64. | 7 | Amelia Fisher | 26:47.8 | Mountaineer (Morgantown) |
| 65. | 6 | Emma Sherwin | 26:50.2 | Mountaineer (Morgantown) |
| 66. | 6 | Havanna Davis | 30:26.8 | Suncrest |

2022 RunnerSpace.com

2022 Athletic.net - All rights reserved

**JA2956**



Team Results Management

# Doddridge Invitational  MS

🟩 **OFFICIAL**  📅 Thu, Sep 16, 2021  📍 Doddridge County Park

0 Followers    Sign In to follow

← **Womens 3,000 Meters Middle School**

All Grades ▾   All Teams ▾   All Divisions ▾   ☰ Other Filters ▾   ✏ Highlighter

## Official Team Scores    —

| | | |
|---|---|---|
| 1. | Pleasants County | 61 |
| 2. | Braxton County | 76 |
| 3. | East Fairmont | 110 |
| 4. | Tyler Consolidated | 122 |
| 5. | Warren Local | 138 |
| 6. | Mountaineer (Clarksburg) | 166 |
| 7. | Taylor County | 197 |
| 8. | West Fairmont | 210 |
| 9. | Bridgeport | 213 |
| 10. | Wirt County | 273 |
| 11. | Buckhannon-Upshur | 281 |
| 12. | Ritchie County | 286 |
| 13. | Washington Irving | 320 |
| 14. | Lincoln | 385 |
| 15. | Westwood | 427 |

## 📊 Charts & Hypothetical Scores

**Did you know meets hosted by** ⭐ **Site Supporters display additional analysis tools?**

Are you a meet host? Learn About Supporter Benefits

| | | | | |
|---|---|---|---|---|
| 1. | 7 | Anna Bennett | 12:00.24 | Pleasants County |
| 2. | 8 | Kailee Haymond | 12:31.40 | East Fairmont |
| 3. | 8 | Addison Lloyd | 12:59.85 | Braxton County |
| 4. | 7 | Makenna Martin | 13:13.89 | Tyler Consolidated |
| 5. | 8 | Tillie Cinalli | 13:20.28 | West Fairmont |
| 6. | 7 | Bailey Pritt | 13:25.51 | Braxton County |
| 7. | 8 | Marley Sias | 13:25.77 | Doddridge County |
| 8. | 7 | Maddie Smith | 13:33.78 | Pleasants County |
| 9. | 8 | Annabelle Skidmore | 13:34.41 | East Fairmont |
| 10. | 7 | Julia Angiulli | 13:37.77 | Mountaineer (Clarksburg) |
| 11. | 8 | Bentlee Williams | 13:39.15 | Ritchie County |
| 12. | 7 | Avry Bennett | 13:41.59 | Pleasants County |
| 13. | 7 | Kaitlyn Key | 13:45.11 | Mountaineer (Clarksburg) |
| 14. | 7 | Mackinzey Budner | 13:46.29 | Braxton County |
| 15. | 7 | Maddy Cox | 13:47.57 | Tyler Consolidated |
| 16. | 7 | Ella Egidi | 13:50.85 | West Fairmont |
| 17. | 8 | Sophia Austin | 14:03.10 | Taylor County |
| 18. | 8 | Kaelyn Robinson | 14:04.38 | Wirt County |
| 19. | 6 | Mariah Whitlock | 14:06.40 | Pleasants County |
| 20. | 8 | Hollyn Reed | 14:07.19 | Warren Local |
| 21. | 8 | Sophie Stuck | 14:10.78 | East Fairmont |
| 22. | 6 | Hayden Henderson | 14:13.00 | Bridgeport |
| 23. | 8 | Payton Trent | 14:14.16 | Doddridge County |
| 24. | 7 | Ashley McBrayer | 14:25.36 | Bridgeport |
| 25. | 7 | Leah Payne | 14:29.83 | Braxton County |
| 26. | 7 | Savana Burd | 14:33.84 | Pleasants County |
| 27. | 8 | Abby Whited | 14:40.57 | Warren Local |
| 28. | 7 | Aslee Pate | 14:43.89 | Warren Local |
| 29. | 7 | Madison Altman | 14:52.44 | Washington Irving |
| 30. | 7 | Lily Dillaman | 15:05.31 | Tyler Consolidated |
| 31. | 7 | Brea Lathon | 15:15.32 | Mountaineer (Clarksburg) |
| 32. | 8 | Camryn Westbrook | 15:16.49 | Tyler Consolidated |
| 33. | 6 | Reece Carpenter | 15:17.18 | Braxton County |
| 34. | 7 | Natalee Cartwright | 15:18.76 | Taylor County |
| 35. | 7 | Suzanna Whipkey | 15:19.69 | Warren Local |

JA2957

| 36. | 7 | Kylie Cline | 15:20.97 | Covenant Christian |
|---|---|---|---|---|
| 37. | 6 | Madison Knabenshue | 15:21.68 | Buckhannon-Upshur |
| 38. | 8 | Cate Edgell | 15:25.72 | Warren Local |
| 39. | 8 | Cassidy McCarthy | 15:29.05 | Warren Local |
| 40. | 7 | Avery Moore | 15:30.57 | West Fairmont |
| 41. | 7 | Paige Snyder | 15:31.35 | East Fairmont |
| 42. | 6 | Natalie Beltner | 15:36.94 | Taylor County |
| 43. | 8 | Annika Shuman | 15:39.36 | Mountaineer (Clarksburg) |
| 44. | 7 | Nevaeh Bolin | 15:40.56 | Ritchie County |
| 45. | 7 | Piper Woofter | 15:41.55 | East Fairmont |
| 46. | 6 | Liza Saas | 15:43.62 | Washington Irving |
| 47. | 8 | Absidee Carpenter | 15:45.71 | East Fairmont |
| 48. | 7 | Ryleigh Bills | 15:46.26 | East Fairmont |
| 49. | 6 | Andi Fiber | 15:49.01 | Tyler Consolidated |
| 50. | 8 | Addison Sole | 15:52.64 | Taylor County |
| 51. | 8 | Addi McGrady | 15:53.95 | Pleasants County |
| 52. | 8 | Lauren Pritt | 15:54.66 | Braxton County |
| 53. | 7 | Audrey Duckworth | 15:57.28 | Braxton County |
| 54. | 7 | Savannah Holden | 15:58.87 | South Harrison |
| 55. | 8 | Chloe Marsh | 15:59.26 | Bridgeport |
| 56. | 8 | Issabella Speece | 16:00.13 | Wirt County |
| 57. | 6 | Haley Woody | 16:12.03 | Buckhannon-Upshur |
| 58. | 7 | Jenna Willey | 16:12.53 | Lincoln |
| 59. | 8 | Lilly Haught | 16:18.77 | Tyler Consolidated |
| 60. | 6 | LenaRose Walker | 16:21.19 | Buckhannon-Upshur |
| 61. | 8 | Olivia Pursley | 16:24.74 | Wirt County |
| 62. | 7 | Linsey Kramer | 16:27.30 | East Fairmont |
| 63. | 6 | Destinee Gray | 16:31.57 | Pleasants County |
| 64. | 6 | Olivia Kimball | 16:32.52 | Pleasants County |
| 65. | 7 | Jordyn McIntyre | 16:40.49 | Bridgeport |
| 66. | 6 | Emma Kniceley-See | 16:40.90 | Bridgeport |
| 67. | 8 | Grace Dearth | 16:46.01 | Warren Local |
| 68. | 7 | Adalyn Moreland | 16:47.91 | Warren Local |
| 69. | 6 | Emma Ahmed | 16:50.77 | Bridgeport |
| 70. | 7 | Peyton Stevens | 16:51.80 | Taylor County |
| 71. | 8 | Lily Cross | 16:52.96 | Wirt County |
| 72. | 6 | Chelsea Payne | 16:56.79 | Braxton County |
| 73. | 6 | Isabella Eddy | 16:58.08 | Lincoln |
| 74. | 7 | Jahna Brown | 16:59.20 | Tyler Consolidated |
| 75. | 7 | Anya Morehead | 17:02.83 | Buckhannon-Upshur |
| 76. | 7 | Rania Singh | 17:03.24 | Warren Local |
| 77. | 6 | Anna Wycoff | 17:05.47 | East Fairmont |
| 78. | 7 | Avery Kessler | 17:13.69 | South Harrison |
| 79. | 7 | Zoey Bunner | 17:20.92 | Ritchie County |
| 80. | 8 | Kenna Keener | 17:25.26 | Taylor County |
| 81. | 7 | Lauren Brown | 17:25.54 | South Harrison |
| 82. | 6 | MillieCate Currey | 17:25.73 | Bridgeport |
| 83. | 6 | Chloe Lewis | 17:25.91 | Buckhannon-Upshur |
| 84. | 8 | Kamryn Watkins | 17:26.10 | Westwood |
| 85. | 7 | Brooklyn Davis | 17:26.62 | Pleasants County |
| 86. | 7 | Ayla Lilly | 17:36.60 | West Fairmont |
| 87. | 7 | Graylee Linville | 17:39.26 | Bridgeport |
| 88. | 6 | Colleen Freed | 17:41.70 | Ritchie County |
| 89. | 6 | Isabella Bowers | 17:48.16 | Buckhannon-Upshur |
| 90. | 7 | Rayonna Cain | 17:50.94 | Mountaineer (Clarksburg) |
| 91. | 7 | Autumn Cecil | 17:52.63 | Pleasants County |
| 92. | 6 | Ciarra Spring | 17:53.10 | Taylor County |
| 93. | 7 | Adreona Moore | 17:55.20 | Washington Irving |
| 94. | 7 | Annelise Mace | 18:01.32 | Bridgeport |
| 95. | 8 | Paiton Thompson | 18:05.51 | Bridgeport |
| 96. | 8 | Novalee Bennett | 18:06.60 | Braxton County |
| 97. | 8 | Bella Casto | 18:11.22 | Westwood |
| 98. | 6 | Alexis Buffey | 18:15.84 | West Fairmont |
| 99. | 6 | Lyla Garcia | 18:30.05 | West Fairmont |
| 100. | 6 | Reagan Sturgeon | 18:41.15 | Pleasants County |
| 101. | 7 | Olivia Roberts | 18:44.28 | Tyler Consolidated |
| 102. | 7 | Sophia Fox | 18:47.12 | Buckhannon-Upshur |
| 103. | 8 | Cynthia Wigel | 19:10.95 | Wirt County |
| 104. | 7 | Emily Brackman | 19:15.00 | Washington Irving |
| 105. | 7 | Addison Berg | 19:27.35 | Covenant Christian |
| 106. | 6 | Payton Janssen | 19:35.99 | Bridgeport |
| 107. | 7 | Kate Urso | 19:37.61 | Notre Dame |
| 108. | 8 | Regan Hardway | 19:42.54 | West Fairmont |
| 109. | 6 | Katrina Guthrie | 19:46.20 | Lincoln |
| 110. | 6 | Margaret (Maggie) Cable | 19:49.23 | Bridgeport |
| 111. | 6 | Ainsley Alexander | 19:54.42 | Taylor County |
| 112. | 6 | Alyena Mcle | 19:57.22 | Buckhannon-Upshur |
| 113. | 6 | Kaitlin Davis | 19:57.95 | Buckhannon-Upshur |
| 114. | 8 | Jacelyn Niethamer | 20:19.84 | Westwood |
| 115. | 8 | Ava Scolapio | 20:34.53 | Washington Irving |
| 116. | 8 | Erika Church | 20:35.32 | Lincoln |
| 117. | 8 | Giana Armistead | 20:39.78 | West Fairmont |
| 118. | 6 | Amelia Weekley | 20:44.27 | Pleasants County |
| 119. | 7 | Marley Rider | 21:00.11 | West Fairmont |
| 120. | 8 | Natalie Klemm | 21:03.86 | Warren Local |
| 121. | 7 | Bella Allen | 21:10.10 | Pleasants County |
| 122. | 8 | Breanna Cutright | 21:14.63 | Mountaineer (Clarksburg) |
| 123. | 6 | Becky Pepper-Jackson | 21:50.47 | Bridgeport |

| 124. | 7 | Olivia Markley | 21:57.35 | East Fairmont |
|---|---|---|---|---|
| 125. | 7 | Claire McElwayne | 22:01.21 | Notre Dame |
| 126. | 7 | Mercy Frase | 22:02.14 | South Harrison |
| 127. | 6 | Makinsey Jeffers | 22:02.35 | Pleasants County |
| 128. | 8 | Keirsten Pugh | 22:06.93 | Bridgeport |
| 129. | 6 | Heaven Pittman | 22:09.28 | Tyler Consolidated |
| 130. | 6 | Annaleigh Pierce | 22:10.80 | Lincoln |
| 131. | 7 | Caitlin Murray | 22:25.51 | Bridgeport |
| 132. | 8 | Ali Wilfong | 22:27.85 | Taylor County |
| 133. | 6 | Raley Cochran | 22:42.76 | Lincoln |
| 134. | 6 | Peyton Ice | 22:46.22 | East Fairmont |
| 135. | 6 | Taylor Krolick | 23:11.16 | Ritchie County |
| 136. | 6 | Autumn Wolfe | 23:18.39 | Westwood |
| 137. | 8 | Kate Gaines | 23:26.56 | Westwood |
| 138. | 6 | MaraBeth Hines | 23:49.05 | Buckhannon-Upshur |
| 139. | 6 | Jordan Cox | 23:55.91 | Taylor County |
| 140. | 6 | Arabella Jones | 24:06.51 | Taylor County |
| 141. | 7 | Cailee Singh | 24:24.88 | Lincoln |
| 142. | 6 | Haley Cross | 24:54.03 | Wirt County |
| 143. | 8 | Elizabeth Conley | 25:08.96 | Washington Irving |
| 144. | 8 | Andrea Huffman | 25:16.94 | Ritchie County |
| 145. | 6 | Skylar Hayes | 25:36.46 | Lincoln |
| 146. | 8 | Aaliyah Dodrill | 25:40.69 | Lincoln |
| 147. | 6 | Lillie Nardella | 27:40.92 | Notre Dame |
| 148. | 6 | Bella Yates | 28:48.53 | Bridgeport |
| 149. | 6 | Zoe Fisher | 29:16.46 | Tyler Consolidated |
| 150. | 6 | Sierra Perdue | 30:00.69 | Wirt County |



BEYOND LUXURY,
THIS IS ELEVATED TRAVEL.

2022 RunnerSpace.com

2022 Athletic.net - All rights reserved

JA2959

Sarah,

Per our discussion.

Thank you,
Melissa

Melissa J. White
Chief Counsel
Committee on Education
West Virginia House of Delegates
Room 432M
1900 Kanawha Boulevard, East
Charleston, WV  25305


**From:** Melissa White
**Sent:** Thursday, March 11, 2021 9:53 AM
**To:** Bernie Dolan <bernie.dolan@wvssac.org>; Bernie Dolan <bdolan@k12.wv.us>
**Subject:** Transgender participation in secondary schools bill

Bernie,

Attached is a draft of an originating bill regarding transgender participation in sports.  I kept it short.  There are obviously certain things that would need to be handled in a rule, unless you have language that you would like to see in the bill.  Please let me know your thoughts and if there are any unintended consequences.  The Chairman does not want to keep girls from participating in boys sports when there are not girls teams.

Thanks,
Melissa

Melissa J. White
Chief Counsel
Committee on Education
West Virginia House of Delegates
Room 432M
1900 Kanawha Boulevard, East
Charleston, WV  25305

3

WVSBOE 000012



# 2021 Green Book

*Summary of Public Education Bills Enacted During the 2021 Regular Session*



EXHIBIT

B

WVSBOE 000013



**West Virginia Board of Education**
2021-2022

**Miller L. Hall,** President
**Thomas W. Campbell, CPA,** Vice President
**F. Scott Rotruck,** Financial Officer

**Robert W. Dunlevy,** Member
**A. Stanley Maynard, Ph.D.,** Member
**Daniel D. Snavely, M.D.,** Member
**Debra K. Sullivan,** Member
**Nancy J. White,** Member
**James S. Wilson, D.D.S.,** Member

**Sarah Armstrong Tucker, Ph.D.,** Ex Officio
Chancellor
West Virginia Higher Education Policy Commission
West Virginia Council for Community and Technical College Education

**W. Clayton Burch,** Ex Officio
State Superintendent of Schools
West Virginia Department of Education

# CODE CHANGES

| Code | Bill | Code | Bill | Code | Bill | Code | Bill |
|---|---|---|---|---|---|---|---|
| §3-8-12 | HB 2009 | §18-5-16 | SB 375 | §18-9B-8 | HB 3177 | §18-31-4 | HB 2013 |
| §5-10-19 | HB 3191 | §18-5-18e | HB 3177 | §18-9B-9 | HB 3177 | §18-31-5 | HB 2013 |
| §11-1C-10 | HB 2581 | §18-5-43 | HB 3177 | §18-9B-10 | HB 3177 | §18-31-6 | HB 2013 |
| §11-3-15c | HB 2581 | §18-5-45a | SB 11 | §18-9B-11a | HB 3177 | §18-31-7 | HB 2013 |
| §11-3-15f | HB 2581 | §18-5G-1 | HB 2012 | §18-9B-12 | HB 3177 | §18-31-8 | HB 2013 |
| §11-3-15h | HB 2581 | §18-5G-2 | HB 2012 | §18-9B-13 | HB 3177 | §18-31-9 | HB 2013 |
| §11-3-15l | HB 2581 | §18-5G-4 | HB 2012 | §18-9B-14 | HB 3177 | §18-31-10 | HB 2013 |
| §11-3-23 | HB 2581 | §18-5G-5 | HB 2012 | §18-9B-15 | HB 3177 | §18-31-11 | HB 2013 |
| §11-3-23a | HB 2581 | §18-5G-6 | HB 2012 | §18-9B-17 | HB 3177 | §18-31-12 | HB 2013 |
| §11-3-24 | HB 2581 | §18-5G-9 | HB 2012 | §18-9B-18 | HB 3177 | §18-31-13 | HB 2013 |
| §11-3-24a | HB 2581 | §18-5G-10 | HB 2012 | §18-9B-19 | HB 3177 | §18A-2-16 | HB 2267 |
| §11-3-24b | HB 2581 | §18-5G-11 | HB 2012 | §18-9B-20 | HB 3177 | §18A-2-25 | HB 3293 |
| §11-3-25 | HB 2581 | §18-5G-13 | HB 2012 | §18-9B-21 | HB 3177 | §18A-3-1 | HB 2029 |
| §11-3-25a | HB 2581 | §18-5G-14 | HB 2012 | §18-9D-15 | HB 2906 | §18A-3-2a | SB 14 |
| §11-3-32 | HB 2581 | §18-5G-15 | HB 2012 | §18-10H-4 | HB 3177 | §18A-3-2a | HB2029 |
| §11-10A-1 | HB 2581 | §18-7A-13a | HB 3191 | §18-30A-1 | HB 2001 | §18A-4-2 | SB 680 |
| §11-10A-7 | HB 2581 | §18-7A-36 | HB 3177 | §18-30A-2 | HB 2001 | §18A-4-8 | HB 2145 |
| §11-10A-8 | HB 2581 | §18-8-1 | HB 2013 | §18-30A-3 | HB 2001 | §18A-4-8a | HB 2145 |
| §11-10A-10 | HB 2581 | §18-8-1a | HB 2785 | §18-30A-4 | HB 2001 | §18A-4-16 | HB 3266 |
| §11-10A-19 | HB 2581 | §18-8-11 | SB 431 | §18-30A-5 | HB 2001 | §21-1A-4 | HB 2009 |
| §11-21-12m | HB 2001 | §18-9-3a | SB 651 | §18-30A-6 | HB 2001 | §21-5-1 | HB 2009 |
| §11-21-25 | HB 2001 | §18-9A-6a | HB 3177 | §18-30A-7 | HB 2001 | §21-6-3 | SB 435 |
| §11-24-10a | HB 2001 | §18-9A-7 | HB 3177 | §18-30A-8 | HB 2001 | §21-6-4 | SB 435 |
| §17B-2-7 | SB 356 | §18-9A-8a | HB 3177 | §18-30A-9 | HB 2001 | §21-6-5 | SB 435 |
| §18-2-5c | HB 3293 | §18-9A-15 | HB 2852 | §18-30A-10 | HB 2001 | §21-6-10 | SB 435 |
| §18-2-5d | HB 3177 | §18-9A-16 | HB 3177 | §18-30A-11 | HB 2001 | §49-2-113 | SB 89 |
| §18-2-9 | SB 636 | §18-9A-25 | HB 2013 | §18-30A-12 | HB 2001 | §55-19-1 | SB 277 |
| §18-2-13b | HB 3177 | §18-9B-1 | HB 3177 | §18-30A-13 | HB 2001 | §55-19-2 | SB 277 |
| §18-2-24 | HB 3177 | §18-9B-2 | HB 3177 | §18-30A-14 | HB 2001 | §55-19-3 | SB 277 |
| §18-2-29 | HB 3177 | §18-9B-3 | HB 3177 | §18-30A-15 | HB 2001 | §55-19-4 | SB 277 |
| §18-2-35 | HB 3177 | §18-9B-4 | HB 3177 | §18-30A-16 | HB 2001 | §55-19-5 | SB 277 |
| §18-2E-4a | HB 3177 | §18-9B-5 | HB 3177 | §18-31-1 | HB 2013 | §55-19-6 | SB 277 |
| §18-3-9b | HB 3177 | §18-9B-6 | HB 3177 | §18-31-2 | HB 2013 | §55-19-7 | SB 277 |
| §18-4-12 | HB 3177 | §18-9B-6a | HB 3177 | §18-31-3 | HB 2013 | §55-19-8 | SB 277 |
| §18-5-15g | HB 2791 | §18-9B-7 | HB 3177 | | | §55-19-9 | SB 277 |

Legend for this page:
- **Black** designates amended code.
- **Red** designates stricken code.
- **Green** designates new code.

# TABLE OF CONTENTS

**2021 Regular Legislative Session**

Senate Bill 11: Declaring work stoppage or strike by public employees to be unlawful........................................1
*Adds: §18-5-45a*

Senate Bill 14: Providing for additional options for alternative certification for teachers...............................1
*Amends: §18A-3-2a*

Senate Bill 89: Exempting certain kindergarten and preschool programs offered by private schools from registration requirements ........................................................................................................................2
*Amends: §49-2-113*

Senate Bill 277: Creating COVID-19 Jobs Protection Act ................................................................................2
*Adds: §55-19-1; §55-19-2; §55-19-3; §55-19-4; §55-19-5; §55-19-6; §55-19-7; §55-19-8; §55-19-9*

Senate Bill 356: Allowing for written part of drivers' exam given in high school drivers' education course ........................................................................................................................................................3
*Amends: §17B-2-7*

Senate Bill 375: Relating to county boards of education policies for open enrollment.........................3
*Amends: §18-5-16*

Senate Bill 431: Relating to school attendance notification requirements to DMV.........................3
*Amends: §18-8-11*

Senate Bill 435: Requiring county superintendents to authorize certain school principals or administrators at nonpublic schools to issue work permits for enrolled students.........................4
*Amends: §21-6-3; §21-6-4; §21-6-5; §21-6-10*

Senate Bill 636: Requiring certain history and civics courses be taught in schools...........................4
*Amends: §18-2-9*

Senate Bill 651: Allowing county boards of education to publish financial statements on website...........5
*Amends: §18-9-3a*

Senate Bill 680: Allowing State Superintendent of Schools define classroom teachers certified in special education..............................................................................................................................6
*Amends: §18A-4-2*

House Bill 2001: Relating generally to creating the West Virginia Jumpstart Savings Program......................6
*Adds: §11-21-12m; §11-21-25; §11-24-10a; §18-30A-1; §18-30A-2; §18-30A-3; §18-30A-4; §18-30A-5; §18-30A-6; §18-30A-7; §18-30A-8; §18-30A-9; §18-30A-10; §18-30A-11; §18-30A-12; §18-30A-13; §18-30A-14; §18-30A-15; §18-30A-16*

House Bill 2009: Relating to limitations on the use of wages and agency shop fees by employers and labor organizations for political activities..........................................................................................8
*Add: §7-5-25*
*Amends: §8-5-12; §12-3-13b; §18A-4-9; §21-5-1; §21-5-3; §45A-2-116*

House Bill 2012: Relating to Public Charter Schools ............................................................ 8
*Amends: §18-5G-1; §18-5G-2; §18-5G-4; §18-5G-5; §18-5G-6; §18-5G-9; §18-5G-10; §18-5G-11*
*Adds: §18-5G-13; §18-5G-14; §18-5G-15*

House Bill 2013: Relating to the Hope Scholarship Program ............................................... 10
*Amends: §18-8-1*
*Adds: §18-9A-25; §18-31-1; §18-31-2; §18-31-3; §18-31-4; §18-31-5; §18-31-6; §18-31-7; §18-31-8; §18-31-9;*
*§18-31-10; §18-31-11; §18-31-12; §18-31-13*

House Bill 2029: Relating to teacher preparation clinical experience programs ................... 11
*Amends: §18A-3-1; §18A-3-2a*

House Bill 2145: Relating to student aide class titles .......................................................... 12
*Amends: §18A-4-8; §18A-4-8a*

House Bill 2267: Establishing an optional bus operator in residence program for school districts ........... 12
*Amends: §18A-2-15*

House Bill 2581: Providing for the valuation of natural resources property and an alternate method of
appeal of proposed valuation of natural resources property ............................................... 13
*Amends: §11-1 C-10; §11-3-15c; §11-3-15 f; §11-3-15h; §11-3-15i; §11-3-23; §11-3-23a; §11-3 -24; §11-3-24a;*
*§11- 3-25a; §11-3-32; §11-10 A-1; §11-10A-7; §11-10A-8; §11-10A-10; §11-10A-19*
*Repeal: §11-3 -24 b; §11-3-25*

House Bill 2785: Relating to public school enrollment for students from out of state ............... 14
*Amends: §18-8-1a*

House Bill 2791: Relating to enrollment and costs of homeschooled or private school students at
vocational schools .............................................................................................................. 14
*Adds: §18-5-15g*

House Bill 2852: Relating to distribution of the allowance for increased enrollment ................... 15
*Amends: §18-9A-15*

House Bill 2906: Relating to the School Building Authority's allocation of money ..................... 15
*Amends: §18-9D-15*

House Bill 3177: Removing expired, outdated, inoperative and antiquated provisions and report
requirements in education .................................................................................................. 16
*Repeals: §18-2-5d; §18-2-13b; §18-2-24; §18-2-29; §18-2-35; §18-2E-4a; §18-3-9b; §18-4-12; §18-5-18e;*
*§18-5-43; §18-7A-36; §18-9A-8a; §18-9B-11a; §18-10H-4*
*Amends: §18-9A-6a; §18-9A-7; §18-9A-16; §18-9B-1; §18-9B-2; §18-9B-3; §18-9B-4; §18-9B-5; §18-9B-6;*
*§18-9B-6a; §18-9B-7; §18-9B-8; §18-9B-9; §18-9B-10; §18-9B-12; §18-9B-13; §18-9B-14; §18-9B-15; §18-9B-*
*17; §18-9B-18; §18-9B-19; §18-9B-20; §18-9B-21*

WVSBOE 000017

House Bill 3191: Requiring employers to send certain notifications when retirants are hired as temporary, part-time employees..................................................................................................... 16
  *Amend: §5-10-19; §18-7A-13a*

House Bill 3266: Providing for termination of extracurricular contract upon retirement ...............................17
  *Amends: §18A-4-16*

House Bill 3293: Relating to single-sex participation in interscholastic athletic events...............................17
  *Amends: §18-2-5c*

WVSBOE 000018

**JA2966**

## Senate Bill 11:  Declaring work stoppage or strike by public employees to be unlawful

*Effective Date:*      June 2, 2021

*Code Reference:*     Adds: §18-5-45a

*WVDE Contact:*      Heather Hutchens, General Counsel, Office of Legal Services

*Bill Summary:*       The bill confirms that a work stoppage or strike by public employees, and specifically employees of a county board of education, is both unlawful and disruptive to the delivery of the constitutionally required thorough and efficient education. The bill outlines when an employee is participating in a concerted work stoppage, strike, or interruption of operations. This bill clarifies that an employee may not take personal leave to participate in a work stoppage/strike and clarifies that a county board may not utilize accrued or equivalent instruction time or alternate delivery models to cancel or make up lost days. The bill clarifies that the West Virginia Board of Education (WVBE) waiver process cannot be utilized to waive the employment term or minimum instructional term if the noncompliance is because of a work stoppage or strike. This bill clarifies participation is a ground for termination, but if the county does not terminate the employee, the employee's salary should be prorated to account for the absence.

## Senate Bill 14:  Providing for additional options for alternative certification for teachers

*Effective Date:*      May 27, 2021

*Code Reference:*     Amends: §18A-3-2a

*WVDE Contact:*      Carla Warren, Director, Educator Development and Support

*Bill Summary:*       The bill proposes an alternative certification pathway for individuals to obtain a professional teaching certificate. The bill sets forth four requirements that on individual must obtain to be eligible to receive a professional teaching certificate: (1) hold a bachelor's degree; (2) submit to a criminal history check; (3) successfully complete pedagogical training or pedagogical course(s) that are in substantive alignment with nationally recognized pedagogical standards, or approved/established by the state board; and (4) pass the same subject matter and competency tests required of traditional program applicants for licensure.

1

WVSBOE 000019

**JA2967**

**Senate Bill 89:** **Exempting certain kindergarten and preschool programs offered by private schools from registration requirements.**

*Effective Date:*        July 4, 2021

*Code Reference:*      Amends: §49-2-113

*WVDE Contact:*        Monica DellaMea, Director, Early and Elementary Learning Services

*Bill Summary:*         The passage of this bill no longer requires certain early childhood programs to obtain approval of its operations from the secretary of the West Virginia Department of Health and Human Resources through the child care licensure process. This includes kindergarten, preschool, or school education programs operated by a public school or which is accredited by the West Virginia Department of Education or any other kindergarten, preschool, or school programs which operates with sessions not exceeding four hours per day for any child pre-k and kindergarten programs. Any kindergarten, preschool, or school education program operated by a private, parochial, or church school recognized by the West Virginia Department of Education under Policy 2330 are also not required to obtain approval of its operations.

**Senate Bill 277:** **Creating COVID-19 Jobs Protection Act**

*Effective Date:*        March 11, 2021

*Code Reference:*      Adds: §55-19-1; §55-19-2; §55-19-3; §55-19-4; §55-19-5; §55-19-6; §55-19-7; §55-19-8; §55-19-9

*WVDE Contact:*        Legal Services

*Bill Summary:*         The bill provides immunity to county boards of education, among other, to claims arising from the COVID-19 pandemic, provided the county board (or any of its employees or agents) did not intentionally engage in conduct with actual malice to cause injury.

2

WVSBOE 000020

## Senate Bill 356: Allowing for written part of drivers' exam given in high school drivers' education course.

*Effective Date:*     June 24, 2021

*Code Reference:*     Amends: §17B-2-7

*WVDE Contact:*     Joey Wiseman, Director, Middle and Secondary Learning Services

*Bill Summary:*     The bill allows for West Virginia Driver Education Instructors to administer a knowledge test developed by the Division of Motor Vehicles. Any person who successfully completes a test administered by a driver education instructor is exempt from the proof of school enrollment requirements.

## Senate Bill 375: Relating to county boards of education policies for open enrollment.

*Effective Date:*     July 6, 2021

*Code Reference:*     Amends: §18-5-16

*WVDE Contact:*     Legal Services

*Bill Summary:*     The bill makes a few changes to the modifications that were made in the 2019 education omnibus bill relating to intercounty transfers (where a student seeks to attend school in a county other than the one where he or she resides) and reinserts funding language that was inadvertently omitted in the 2019 bill. Substantively, the bill says that an intercounty transfer application may only be denied by a county board of education if there is no classroom space available. If an intercounty transfer request is denied, the denial must be in writing and sent to both the parents of the student and the West Virginia Department of Education (WVDE), with explanation of denial and notification of appeal rights, within three business days.

## Senate Bill 431: Relating to school attendance notification requirements to DMV.

*Effective Date:*     June 24, 2021

*Code Reference:*     Amends: §18-8-11

*WVDE Contact:*     Charlene Coburn, Officer, Support and Accountability Services

*Bill Summary:*     The bill authorizes DMV to accept electronic verification of a student's attendance and satisfactory academic progress from a county board of education. Verification of these two items is statutorily required prior to issuance of a driver's license or learner's permit.

3

WVSBOE 000021

## Senate Bill 435: Requiring county superintendents to authorize certain school principals or administrators at nonpublic schools to issue work permits for enrolled students.

| | |
|---|---|
| *Effective Date:* | June 24, 2021 |
| *Code Reference:* | Amends: §21-6-3; §21-6-4; §21-6-5; §21-6-10 |
| *WVDE Contact:* | Legal Services |
| *Bill Summary:* | The bill permits individuals that are authorized to issue graduation credentials (nonpublic school administrators and homeschool parents) to issue a work permit to children 14 or 15 years of age provided the current statutory requirements for issuing a work permit are satisfied (i.e., written statement from prospective employer that they intend to employ the child; brief description of job child will perform; review of birth certificate verifying child's age; for children attending a nonpublic schools, a certificate showing school attendance). The bill imposes the same responsibilities and penalties for improper issuance of a work permit on nonpublic school administrators and home school parents that are currently imposed upon county superintendents issuing work permits. |

## Senate Bill 636: Requiring certain history and civics courses be taught in schools.

| | |
|---|---|
| *Effective Date:* | July 9, 2021 |
| *Code Reference:* | Amends: §18-2-9 |
| *WVDE Contact:* | Sonya White, Officer, Office of Teaching and Learning<br>Joey Wiseman, Director, Middle and Secondary Learning Services, Office of Teaching and Learning |
| *Bill Summary:* | The bill adds the following topics/areas that must be taught in all public, private, parochial, and denominational schools in West Virginia:<br><br>· Institutions and structure of American government, such as the separation of powers, the Electoral College, and federalism.<br><br>· American political philosophy and history utilizing writings from prominent figures in Western civilization, such as Aristotle, Thomas Hobbes, John Locke, and Thomas Jefferson.<br><br>· Objective and critical analysis of ideologies throughout history, including capitalism, republicanism, democracy, socialism, communism, and fascism. |

WVSBOE 000022

In providing this instruction, the bill directs that teachers use primary sources and interactive learning techniques, such as mock scenarios, debates, and open and impartial discussions.

The WVBE is directed to develop academic standards for middle and high school students that cover the required instruction and publish a list of approved instructional resources pursuant to 18-2A-1, et seq. The WVBE is required to consult with "other entities" prior to adopting standards; the bill lists the following entities as possible entities to consult: Florida Joint Center for Citizenship, College Board, Bill of Rights Institute, Hillsdale College, Gilder Lehrman Institute of American History, Constitutional Sources Projects, educators, school administrators, postsecondary education representatives, elected officials, business and industry leaders, parents, and the public.

The WVBE is also required to provide a testing/assessment for the history and civics courses required. Such assessments must measure a students' factual and conceptual knowledge including how facts interrelate and the reasons behind historical documents and events. All students in public, private, parochial, and denominational schools are required to take these assessments.

## Senate Bill 651: Allowing county boards of education to publish financial statements on website.

| | |
|---|---|
| *Effective Date:* | July 6, 2021 |
| *Code Reference:* | Amends: §18-9-3a |
| *WVDE Contact:* | Amy Willard, School Operations Officer, Office of School Operations and Finance |
| *Bill Summary:* | Starting with financial statements to be published in the fall of 2024, the bill extends the time for county boards of education (CBOE) to annually publish their financial statement in the newspaper from 90 days to 120 days. |

Also starting in 2024, the bill provides an electronic option in place of posting the financial statement in the newspaper if certain conditions were met. After conducting a properly noticed public hearing at which interested persons could express their views electronic publication, a CBOE could post its financial statement on the CBOE's website. The first year the CBOE utilizes the electronic option it is required to publish in the newspaper for two consecutive weeks the availability of the financial statement on the CBOE's website.

5

WVSBOE 000023

In addition to all financial information currently required to be included in the CBOE's financial statement, if the CBOE utilizes the electronic option to post financial statement it must also include the following information: (1) all persons having a contract with the county board (all professional and service personnel, including substitutes) and the amount paid to each; (2) budget estimates; and (3) list of names of each entity receiving less than $250 from any fund showing the amount paid and purpose for which it was paid. Financial statements posted on the CBOE website must remain posted until the posting of the following year's financial statement.

## Senate Bill 680: Allowing State Superintendent of Schools define classroom teachers certified in special education.

*Effective Date:*      July 5, 2021

*Code Reference:*      Amends: §18A-4-2

*WVDE Contact:*      Amy Willard, School Operations Officer, Office of School Operations and Finance

*Bill Summary:*      This is a 'clean-up' bill to a provision included in HB206 (passed in 2019) that provides a three step pay bump to special education classroom teachers.

## House Bill 2001: Relating generally to creating the West Virginia Jumpstart Savings Program

*Effective Date:*      June 9, 2021

*Code Reference:*      Adds: §11-21-12m; §11-21-25; §11-24-10a; §18-30A-1; §18-30A-2; §18-30A-3; §18-30A-4; §18-30A-5; §18-30A-6; §18-30A-7; §18-30A-8; §18-30A-9; §18-30A-10; §18-30A-11; §18-30A-12; §18-30A-13; §18-30A-14; §18-30A-15; §18-30A-16

*WVDE Contact:*      Amy Willard, School Operations Officer, Office of School Operations & Finance
Phillip Uy, Financial Officer

*Bill Summary:*      The bill establishes the West Virginia Jumpstart Savings Program as a result of the Legislature recognizing the importance of cultivating an environment in West Virginia where tradespersons and entrepreneurs can be successful in their careers and remain in their home state. The program is to be operable on or before July 1, 2022.

• The bill indicates that the program shall be administered by the West Virginia Jumpstart Savings Board (Board) and outlines the seven members who serve on the Board. The bill outlines the powers and

6

WVSBOE 000024

JA2972

authority of the Board to successfully administer the program.
· The bill also outlines the duties and responsibilities of the Treasurer, who is also the chairman and presiding officer of the Board.

· The bill further establishes the Jumpstart Savings Trust Fund and Jumpstart Savings Expense Fund for the administration of the program and outlines the process for selecting financial organizations to act as depositories and managers for the programs.

· The bill defines the eligibility criteria for opening a Jumpstart Savings Account and for when the Treasurer will deposit $100 into a newly opened account.

· The bill defines qualifying expenses, which include:

> » The purchase of tools, equipment, or supplies by the beneficiary to be used exclusively in an occupation or professional for which the beneficiary is required to:
> » Complete an apprenticeship program through the United States Department of Labor

· Complete an apprenticeship program required by state or legislative rule

· Earn a license or certification from an Advanced Career Education (ACE) career center; or

· Earn an associate degree or certification from a community and technical college.
> » Fees for required certification or licensure for the beneficiary to practice a trade or occupation in the state as described above.
> » Costs incurred by the beneficiary that are necessary to establish a business in this state in which the beneficiary will practice an occupation or profession as described above, when the costs are exclusively incurred and paid for the purpose of establishing and operating such business.

· The bill provides for certain tax benefits for contributors to a Jumpstart Savings Account. For West Virginia personal income tax purposes, a taxpayer's adjusted gross income is reduced by an amount equal to the taxpayer's contribution to a Jumpstart Savings Account, up to $25,000 in a single taxable year, with a carryforward provision not to exceed five taxable years.  A similar modification is allowed in an amount equal to a distribution received from a Jumpstart Savings Accounts that is used to pay for qualified expenses, not to exceed $25,000 for the taxable year.

· The bill provides for certain nonrefundable tax credits against West Virginia personal income tax and corporate net income tax for a

7

matching contribution made by a qualified employer into a Jumpstart Savings Account if the beneficiary of the account is an employee of the taxpaying employer and if the beneficiary is a West Virginia resident. The tax credit allowed may not exceed $5,000 per employee per taxable year and an employer may not claim a credit against more than one type of tax for a single contribution to a Jumpstart Savings Account.

· The bill requires the Board to promulgate legislative, procedural, or emergency rules that outline specific requirements related to the program.

## House Bill 2009: Relating to limitations on the use of wages and agency shop fees by employers and labor organizations for political activities.

*Effective Date:*    June 17, 2021

*Code Reference:*    Add: §7-5-25
Amends: §8-5-12; §12-3-13b; §18A-4-9; §21-5-1; §21-5-3; §45A-2-116

*WVDE Contact:*    Legal Services

*Bill Summary:*    Relating to limitations on the use of wages and agency shop fees by employers and labor organizations for political activities.  House Bill 2009 prohibits the deduction or assignment of union, labor organization or club dues or fees from the earnings of county board of education employees. As for wage assignments for permissible purposes, the bill also removes the requirement that assignments of an employee's future wages must be notarized. It will now be sufficient if the assignment is in writing.

## House Bill 2012: Relating to Public Charter Schools

*Effective Date:*    June 1, 2021

*Code Reference:*    Amends: §18-5G-1; §18-5G-2; §18-5G-4; §18-5G-5; §18-5G-6; §18-5G-9; §18-5G-10; §18-5G-11
Adds: §18-5G-13; §18-5G-14; §18-5G-15

*WVDE Contact:*    Legal Services

*Bill Summary:*    The bill makes the following changes to the existing public charter school law:

· Increases the cap on charter schools from 3 to 10 every three years.

8

127CSR1

TITLE 127
LEGISLATIVE RULE
WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION

SERIES 1
CONSTITUTION

§127-1-1. General.

1.1. Scope. — These rules establish the organization and duties of the West Virginia Secondary School Activities Commission.

1.2. Authority. — W. Va. Constitution, Article XII, §2, and W. Va. Code §§18-2-5, 18-2-25, 18 225a, and 18225b.

1.3. Filing Date. — July 11, 2019.

1.4. Effective Date. — September 9, 2019.

1.5. Repeal of Former Rule. — This legislative rule amends W. Va. 127CSR1, West Virginia Secondary School Activities Commission Series 1, Constitution, filed August 10, 2018, and effective October 9, 2018.

§127-1-2. Name.

2.1. The name of this organization shall be the West Virginia Secondary School Activities Commission (WVSSAC/Commission), a voluntary organization. Extracurricular activities of the students in the public secondary schools are controlled pursuant to W. Va. Code §18225, and authority for the delegation of such control to the Commission is granted by statute.

§127-1-3. Goals.

3.1. This Commission, through the employment of the instrumentalities hereinafter established, shall supervise and control interscholastic athletics and band activities among member schools.

3.2. In the performance of these functions it shall be the aim of the Commission:

3.2.a. To stress the cultural values, appreciations, and skills involved in these interscholastic activities, and to promote cooperation and friendship;

3.2.b. To limit these interscholastic activities in both character and quantity so that these activities and events may be looked upon as promoting the objectives of secondary education, and as such shall not interfere with nor abridge the regular program of teachers and students in the performance of their duties;

3.2.c. To encourage economy in expenses of these interscholastic activities;

3.2.d. To discourage long trips for interscholastic activities; and

3.2.e. To establish minimum standards of conduct for both active and spectator participants, coaches, and all other school personnel at all interscholastic activities approved, sponsored, or controlled by this Commission.

1

WVSSAC000133

**127CSR1**

§127-1-4. Membership.

4.1. The WVSSAC shall be composed of the principals or designee, of those public or private secondary schools which have certified in writing to the State Superintendent of Schools of West Virginia (State Superintendent) that they have elected to delegate the control, supervision, and regulation of their interscholastic athletic and band activities.

4.2. Membership in the Commission shall be predicated upon accepting the following conditions:

4.2.a. The principal or designee is and shall be the sole representative of the school in all matters pertaining to the constitution, bylaws, rules and regulations of the Commission;

4.2.b. The principal or designee is and shall be responsible for conducting interscholastic athletic and band activities of the school in accordance with the constitution, bylaws, rules and regulations of the Commission which have been adopted by the Board of Control of the Commission for the governing of such activities;

4.2.c. Pay the annual dues charged by the Commission;

4.2.d. The principal or designee shall file a statement with the Executive Director of the Commission agreeing to abide by and support the constitution and the rules and regulations of the Commission.

4.2.e. A member school must sponsor one sport per gender during each season - fall, winter, and spring. Schools having membership prior to the 2007-2008 school year are exempt from this provision.

4.2.f. At the annual meeting of the Board of Control, the Executive Director shall announce the names of the principals whose schools have become new members.

4.2.f.1. A middle school shall be a school so designated and approved by the West Virginia Department of Education.

4.2.f.2. A senior high school consists of grades 9, 10, 11, and 12, established by law, and so designated and approved by the West Virginia Department of Education (WVDE).

4.2.g. The first year of membership will be a probationary year with the school not being allowed participation in WVSSAC sponsored tournaments.

4.2.h. A one-time membership fee of $1,500.00 will be afforded senior high schools, $500.00 to middle schools, or $2,000.00 to combined middle/senior high schools.

4.2.i. Public schools seeking membership that are created as a result of consolidation or splitting of existing member schools shall be exempt from the provisions in subsection 4.2.g.

4.3. A school, through its principal, coach, or other official, is not permitted to enter into an agreement with any other school to waive the standards of eligibility of students or waive or change any other requirement established in these regulations.

4.4. Any member violating the regulations of this Commission and refusing to abide by the decision of the Board of Directors or the Review Board shall be subject to the penalties hereinafter set forth. (See §127-6-2 of these regulations.)

WVSSAC000134

**127CSR1**

4.5  In accordance with WV Code § 18-2-25(e), a preparatory athletic program whose participants attend a secondary school in West Virginia for academic instructions may become a non-participating member of the commission, upon application, solely for the purpose of competing on the national level: *Provided,* that the preparatory athletic program shall pay the same fees as member schools. Such recognition does not entitle the preparatory athletic program to compete against a member school during the regular season or in any commission state championship events. And the participants in the preparatory athletic program who attend a secondary school in West Virginia for academic instruction are not eligible to participate on any interscholastic athletic team at the secondary school providing academic instruction. Successful applicants will be issued a Certificate of Recognition by the commission which will expire on June 30 of each year.

**§127-1-5. Administration.**

5.1.  The administration of the WVSSAC shall be vested in the secondary school principal and who shall constitute a Board of Control.  The Board of Control shall determine the regulation of interscholastic athletic and band activities among the schools represented by the members of the Commission and shall have charge of all Commission funds, and in order to expedite the regulations of activities shall delegate and assign to the Board of Directors hereinafter constituted, and the Executive Director, hereinafter constituted, and working through the Board of Directors, authority to interpret and enforce these regulations. The Board of Control shall delegate and assign to the Board of Trustees, hereinafter constituted, the power and authority to hold title to and manage the property owned by the Commission. These regulations of the Commission shall be the articles, rules, explanations, and interpretations which have been voted upon and approved by a majority vote of the members of the Board of Control present and voting at the annual meeting of the Commission. Fifty members shall constitute a quorum for the transaction of all business at the annual meeting and approval is by a majority vote of the members of the Board of Control present and voting at the annual meeting of the Commission.

5.2.  At the annual or called meetings of the Board of Control of the WVSSAC each member shall have one vote on each question or proposition under consideration.  A member may appoint, by a written statement to the president of the Commission, the assistant principal or other member of the faculty to represent the school at meetings of the Board of Control, but no such appointment shall absolve the member of responsibility as defined in these regulations.

5.3.  The Board of Control of the WVSSAC shall, at its annual meetings, elect officers of the Commission and define their duties as provided in §127-1-6 of these regulations.  The officers so elected shall be members of the Board of Directors of the WVSSAC with the powers and duties assigned to it by §127-1-8 of the regulations of the Commission.  The Board of Directors shall be the executive body of the Commission and shall administer the regulations of the Commission.  Further, the Board of Directors shall enforce the provisions of these regulations through the application of penalties provided under §127-6-2 of these regulations. Adjudication of disagreements and disputes among members of the Commission shall be one of the chief duties of the Board of Directors.  Such adjudication may, however, be appealed to the Review Board.

5.4.  The Board of Control of the WVSSAC shall delegate to the Board of Directors, hereinafter constituted, the authority to define, devise, and/or create five administrative districts in the State of West Virginia:

5.4.a.  Effective July 1, 1971, and until such time as it is necessary to change the boundaries of such districts, the five administrative districts shall be as follows:

5.4.a.1.  First District: Brooke, Calhoun, Doddridge, Gilmer, Hancock, Harrison, Marion, Marshall, Ohio, Taylor, Tyler, and Wetzel.

5.4.a.2.  Second District:  Barbour, Berkeley, Grant, Hampshire, Hardy, Jefferson, Mineral, Monongalia, Morgan, Pendleton, Preston, Randolph, Tucker, and Upshur.

3

WVSSAC000135

**127CSR1**

5.4.a.3. Third District: Boone, Braxton, Clay, Kanawha, Lewis, Nicholas, Putnam, and Roane.

5.4.a.4. Fourth District: Cabell, Jackson, Lincoln, Logan, Mason, Pleasants, Ritchie, Wayne, Wirt, and Wood.

5.4.a.5. Fifth District: Fayette, Greenbrier, Mercer, Mingo, McDowell, Monroe, Pocahontas, Raleigh, Summers, Webster, and Wyoming.

5.4.b. Any change in the boundaries of the administrative districts adopted by the Board of Directors shall be submitted for approval to the Board of Control at the annual meeting. Any change requires two thirds affirmative vote of the members present and voting at the annual Board of Control meeting.

5.4.c. Any adopted and approved changes in the boundaries of the administrative districts shall not be cause for reducing the length of the regular term of office of an incumbent officer member.

**§127-1-6. Officers and Duties.**

6.1. There shall be five elected officer-members of the WVSSAC, each of whom shall be a principal of a secondary school in West Virginia.

6.1.a. The elected officer-members shall constitute the Board of Directors of the WVSSAC.

6.1.b. One officer-member shall be elected to a regular term each year at the annual meeting of the Commission. The runner-up candidate in each election shall be declared the alternate officer member and shall serve any portion of the officer-member's unexpired term which may occur. If the alternate officer-member is not thus determined, then a separate election shall be held to do so. Both the officer-member and alternate-officer-member shall be from the same administrative district.

6.1.c. The regular term of an elected officer-member shall be a period of five years and the term shall begin on Monday of Week 40 of the NFHS Calendar, following the member's election.

6.1.d. An elected officer-member shall be eligible to serve two regular five year terms in succession. Upon completion of the two successive terms, a former officer-member shall not be appointed to, nor elected to fill, a vacancy of an unexpired term during the five year period immediately following the expiration of a regular term. Serving more than one half of an unexpired five year term shall constitute one of the two permitted successive terms.

6.1.e. The election shall be by ballot when more than one candidate from the same administrative district is nominated for officer-member. When more than two candidates from the same administrative district are nominated for officer-member, the balloting shall continue until one candidate receives a majority of the votes cast. The candidate with the least number of votes on each ballot shall be dropped from each subsequent ballot.

6.1.f. At the first meeting of the Board of Directors following the close of the annual meeting of the Commission, the Board of Directors shall elect one of its officer members to serve as president and one to serve as vice president.

4

WVSSAC000136

**127CSR1**

6.2. Two or more members serving as principals of secondary schools located in the same administrative district shall be ineligible to serve as officer-members simultaneously.

6.3. The term of an officer-member shall end immediately upon their agreement to accept a position that would make them ineligible to hold office in this Commission. However, in the event that a director ceases to meet the qualifications for their position but remains in good standing in the last year of their term, such director shall be given the option to remain in their position for the remainder of the assigned term. The vacancy would then be filled at the next annual Board of Control meeting.

6.4. The annual honorarium of each of the officer-members shall be $500.00.

6.5. The Executive Director shall act as treasurer, and shall pay out monies from the funds belonging to this Commission in payment of bills only upon order of the president.

6.6. The president shall furnish bond in the amount of $20,000. The Executive Director shall furnish bond in the amount of $100,000. The premium for both of these bonds shall be paid by the Commission.

6.7. The Board of Directors may submit questions for discussion and ascertain sentiment of the schools by means of questionnaires. No vote to alter these regulations shall be taken except at the annual meeting of the Commission, except that the Board of Directors may, in case of emergency, with the consent of the Board of Directors, enact and adopt all necessary rules and regulations, whether by deletion, amendment, revision, or addition, and which emergency rules and regulations shall be filed with the Secretary of State and thereafter submitted at the next annual meeting of the Commission for formal adoption or rejection.

§127-1-7. Meetings.

7.1. The annual meeting of the WVSSAC shall be planned by the Executive Director and the Board of Directors of the Commission.

7.2. Special meetings may be called by order of the president of the Commission. Fifty principals constitute a quorum to transact business.

§127-1-8. Board of Directors.

8.1. The Board of Directors shall have authority to administer the regulations of the WVSSAC.

8.2. The State Superintendent or representative designee, a representative from the West Virginia Board of Education (WVBE), a representative selected by the West Virginia School Boards Association, a representative selected by the West Virginia School Administrators Association, and a representative selected by the West Virginia Athletic Directors Association, shall serve as appointive members of the Board of Directors. These members shall be accorded full voting privileges but shall be ineligible to be elected or to serve as an officer of WVSSAC.

8.2.a. The president of the West Virginia Association of Secondary School Principals (WVASSP) shall serve as an ex-officio member of the Board of Directors. However, serving the one year term as an ex-officio member shall not render that member ineligible to be elected to a regular five year term as an officer-member provided they are otherwise eligible.

8.3. The Board of Directors shall have authority to appoint an Executive Director, except as hereinafter provided, and such additional assistance as may be necessary to assure efficient functioning of the work of

5

WVSSAC000137

## 127CSR1

the WVSSAC. Furthermore, the Board of Directors shall have authority to fix and pay salaries to the Executive Director and to other personnel appointed to assist the Executive Director. The Board of Directors shall also have authority to devise a plan of retirement benefits for the Executive Director and other full-time personnel appointed to assist the Executive Director.

8.3.a. At least one of the personnel appointed to assist the Executive Director shall have the status of Assistant Executive Director. The appointment of the Assistant Executive Director shall be made by the Board of Directors only upon the nomination and recommendation by the Executive Director. In case the Board of Directors fails to appoint the person nominated, the Executive Director shall nominate and recommend another person and submit the name to the Board of Directors at such time as the Board may direct. The length of the contract term of office of the Assistant Executive Director shall be the same as that prescribed for the Executive Director in §127-1-11.1-11.2 of these regulations. No Assistant Executive Director shall be removed during the contract term of office except for just and reasonable cause as prescribed in §127-1-11.3.

8.3.b. All other personnel to assist the Executive Director shall be recommended by the Executive Director before being considered for employment by the Board of Directors.

8.3.c. The Board of Directors will annually evaluate the performance of the Executive Director. It shall be the responsibility of the Executive Director to evaluate Assistant Executive Directors. The Executive Director must submit a list of areas of concern to be addressed. From that list, a plan of improvement would be implemented by the Executive Director. Failure on the part of the Assistant Executive Director and other personnel to comply with the plan of improvement could result in disciplinary action up to and including dismissal.

8.4. The Board of Directors shall have power of appointment to fill vacancies in its membership until the vacancies are filled regularly at the next annual meeting of the Commission.

8.5. The Board of Directors shall have power to decide all cases of eligibility of students and participants in interscholastic athletic and band activities. The Board may also exercise discretionary powers it may deem necessary for the furtherance of education and interscholastic athletic and band activities in the secondary schools of West Virginia.

8.6. The Board of Directors shall appoint Deputy Board Members who will serve at the will and pleasure of the Board of Directors.

8.7. At the request of the Board of Directors, a Deputy Board Member may investigate matters of eligibility and other violations of the rules and regulations of the WVSSAC. The Deputy Board Member shall submit to the Board of Directors a written report of findings and recommendations for disposition of the case(s).

8.8. The Board of Directors shall have the power to investigate through the Deputy Board Member, or in such other manner as may be found advisable, matters of eligibility and other violations of rules when the Board deems it advisable to do so on the basis of information furnished, even though a formal protest is not filed.

8.9. The Board of Directors shall divide the state into regions and sections for the purpose of administration and for tournaments or meets of any interscholastic athletic or band activity.

WVSSAC000138

### 127CSR1

8.10. The Board of Directors shall hold hearings and render decisions in all contested cases.

8.11. Five (5) officer-members present and eligible to vote at any meeting of the Board of Directors shall constitute a quorum to transact all business.

8.12. The minutes of regular and special meetings of the Board of Directors shall be submitted to principals of all member schools.

§127-1-9. Funds.

9.1. The annual dues for members of this Commission shall be based upon the student enrollment of the school they represent.

9.1.a. A $30.00 flat membership fee for all three- and four-year schools on the first 100 students, or fraction thereof, enrolled in a school.

9.1.b. After the first 100 students enrolled, the membership will be $10.00 per 100 additional students, or fraction thereof, up to 1,000 students.

9.1.c. For each 100 students above 1,000 an additional $5.00 per 100 students, or fraction thereof, is to be added.

9.1.d. A combined middle/high school shall pay a flat fee of $30.00 for grades 7 and 8, and $10.00 per 100, or fraction thereof, for grades 9, 10, 11, and 12 up to 1,000 students and $5.00 per 100, or fraction thereof, above 1,000 students.

9.1.e. A $30.00 fee is the ceiling for all middle schools/schools without grades 9-12.

9.1.f. Dues for the year are payable on or before February 1 of each year. Membership in the Commission shall extend from July 1 to June 30 in any year and shall be lapsed if dues are not paid on or before February 15. The enrollment figure to be used to determine the amount of dues shall be the gross enrollment of all students at the close of the second month of the current school year. In case a membership has lapsed, the member school may not be reinstated until the dues for the year of such lapsed membership, plus a penalty of $25.00 reinstatement fee, have been paid to the Commission.

9.2. The Board of Directors may reduce the amount of annual dues of the members for any year.

9.3. The Board of Directors is authorized to levy entry fees and assessments for the conducting of any interscholastic athletic or band activity when the activity is not self-supporting. Fees and assessments from one activity division shall not be used for the support of another.

9.4. The Commission shall determine the expenditures of money, but superseding power is given to the Board of Directors to use funds as are necessary to carry on its work.

9.5. The fiscal year of this Commission extends from July 1 to June 30. All monies paid as dues to the Commission, as well as all monies derived from any contest or other event sponsored by the Commission become quasi-public funds and as such shall be subject to an annual audit by the West Virginia Tax Commissioner. A written summary of the audit shall be a part of the annual report of the Executive Director to the Board of Control.

WVSSAC000139

**127CSR1**

9.6.  In case of dissolution of the WVSSAC, all funds of the Commission shall be prorated equally and distributed to the County Boards of Education or governing bodies of the members of the Commission. Provided, however, that governing boards of those schools that become members of the Commission subsequent to January 1, 1968, shall be entitled to a prorated share of only that portion of the Commission's fund which has been collected, earned, and accumulated between the inception of such membership and the actual dissolution of the Commission.

**§127-1-10. Amendments.**

10.1.  The articles, bylaws, rules and regulations of the WVSSAC may be amended as provided in this section.

10.2.  A Constitution and Bylaws Committee, consisting of five members of the Commission, shall be appointed by and shall serve at the will and pleasure of the Board of Directors.  The Board of Directors shall designate one of the members so appointed to serve as the chairman of such committee.

10.3.  The Board of Directors shall give due consideration to maintaining a balance of representation by programmatic level as defined in §127-1-4.2 of this regulation when making new appointments to the Constitution and Bylaws Committee. However, an incumbent member of the committee shall not be ruled ineligible to continue to serve on the committee solely because they become principal of a secondary school different from that from which they were originally appointed.

10.4.  It shall be the function and purpose of the Constitution and Bylaws Committee to provide continuity and cohesion in the rules and regulations governing the interscholastic athletic and band activity programs in West Virginia. Further, it shall be the function and purpose of the Constitution and Bylaws Committee to address what it considers, as needed, interim constitutional rule changes for possible Board of Directors' consideration.

10.5.  Expenses for authorized meetings of the Constitution and Bylaws Committee shall be defrayed from the funds of the WVSSAC.

10.6.  Proposed changes to these regulations may be submitted by any member of the WVSSAC.  Such proposed changes, whether by revision, addition or deletion, shall be postmarked or received by the WVSSAC office by January 15 of each year in order to permit the Constitution and Bylaws Committee to study such proposed changes and to submit them, by mail, to the membership 30 days prior to the annual meeting of the Commission.

10.7.  At the annual meeting of the WVSSAC each proposed change received by the Constitution and Bylaws Committee, and those interim emergency rules and regulations enacted by the Committee, shall be presented to the membership of the Commission for discussion and formal adoption or rejection.  The Committee may accompany each presentment with an explanation of the effect of the proposed change upon present rules and objectives of the Commission.  The Committee may also recommend adoption or rejection of the proposal along with the Committee numerical vote for the recommendation.

10.8.  The president of the Commission shall appoint a parliamentarian to serve at the meetings of the Commission to decide questions of procedure during the meetings.  Roberts Rules of Order shall be followed in conducting the annual meeting and all other meetings.

WVSSAC000140

## 127CSR1

10.9.  An amendment to the regulations of the WVSSAC shall become effective following the annual meeting at which such amendment was adopted and such adoption is formally approved by the WVBE in accordance with W. Va. Code and such other rules and regulations promulgated by the WVBE.

10.10.  Nothing in these regulations shall be construed as limiting or in any way affecting the validity of emergency rules and regulations which have been duly approved by the Board of Directors in accordance with §127-1-6.7 of this regulation.  Emergency rules and regulations will be effective upon the date they are filed with the Secretary of State of State of West Virginia and remain in effect until the next meeting of the Commission.

### §127-1-11.  Executive Director.

11.1.  The Board of Directors shall employ the Executive Director and Assistant Executive Director.  At the discretion of the Board of Directors these positions will be given from one year to four year contracts.  These contracts may be renegotiated prior to expiration.  If a new contract is not to be negotiated, individuals in these positions will be notified in writing six months prior to the end of the contract period.  A letter to this effect shall be sent to the President of the WVASSP.

11.2.  If a vacancy occurs in the office of the Executive Director or Assistant Executive Director position during any contract period, the Board of Directors shall fill such vacancy.  The exception will be that if a person serving as a Board of Directors member or one who has served in that capacity within the preceding one year prior to the vacancy becomes a candidate for one of the positions, the authority to fill the vacancy of the position shall be vested in the Constitution and Bylaws Committee.

11.3.  The Executive Director shall not be removed during the term of office contract period except for just and reasonable cause.  Reasonable cause may include, but not be limited to the following: immorality, incompetency, cruelty, insubordination, intemperance, willful neglect of duty, unsatisfactory performance, the conviction of a felony or a guilty plea or a plea of nolo contendere to a felony charge.

### §127-1-12.  Duties of the Executive Director.

12.1.  The Executive Director shall carry on the work incident to the efficient functioning of the Commission.  The general management and administration of the program of officiating for the interscholastic athletic activities sponsored by this Commission is considered a proper function of the Commission.

12.1.a.  The Executive Director shall be responsible for assigning general areas of responsibilities and directing the activities of the Assistant Executive Directors as such responsibilities relate to the work of the Commission.  (Revised 2019-20)

12.1.b.  Based on employee evaluations and/or employee performance, the Executive Director shall make the appropriate recommendation of the employment status of all other employees.

12.2.  The Executive Director shall receive complaints and make investigations concerning the eligibility of member school students who participate in athletic and band activities.  The Executive Director shall also receive complaints and make investigations concerning violations of the rules of the Commission.

12.3.  The Executive Director shall render decisions and impose penalties in athletic eligibility and other disputes subject to review by the Board of Directors.  The Executive Director shall have the discretion to

9

WVSSAC000141

**JA2983**

## 127CSR1

grant exceptions to the rules based upon previous Board of Directors' decisions on cases of a similar nature. Appeals of rendered decisions by the Executive Director shall be filed within 30 days of the decision unless otherwise stated.

12.4.  It shall be the duty of the Executive Director to make a full and complete written report to the county board of education or governing body regarding any disciplinary action taken by the Board of Directors against a member school which is located in the county in which the board of education or governing body has jurisdiction.

12.5.  The Executive Director shall attend state meetings of the WVASSP and report, when requested by the principals, on the work of the Commission office.

12.6.  The Executive Director shall attend the meetings, when practicable, of the National Federation of State High School Associations and bring meeting reports to the attention of the Commission and the Board of Directors.

12.7.  The Executive Director shall devote full time to the work assigned by the Board of Directors. The Executive Director shall hold no other remunerative office or position and shall not officiate at any inter-scholastic contest.

12.8.  The Executive Director shall represent West Virginia in conferences and controversies involving other states.

12.9.  The Executive Director shall exercise all rights and privileges pertaining to eligibility and to representation with the National Federation of State High School Associations granted to members by the Board of Directors and principals by these regulations.

§127-1-13.  Review Board.

13.1.  A WVSSAC Review Board is hereby established.

13.1.a.  The Review Board shall consist of seven members to be appointed by the WVBE upon recommendation by the State Superintendent.  No person, other than a county superintendent of schools, and a representative of the West Virginia Athletic Directors Association, shall be appointed or shall serve who is employed by the WVBE or any county board of education.  All members of the Review Board shall be residents of the State of West Virginia.

13.1.b.  Each of the following associations shall be requested to present three nominations to the State Superintendent for membership on the Review Board:

13.1.b.1.  West Virginia Bar Association;

13.1.b.2.  West Virginia Association of School Administrators;

13.1.b.3.  West Virginia State Medical Association;

13.1.b.4.  West Virginia Sportswriter Association;

13.1.b.5.  West Virginia Athletic Directors Association; and

WVSSAC000142

**127CSR1**

13.1.b.6. West Virginia Association of Retired School Employees.

13.1.c. Members of the Review Board need not be members of the association which submitted their names in nomination and shall be appointed for a term of five years. Prior to the expiration date of the term of each member of the Review Board, the respective association will nominate three representatives to the State Superintendent who shall subsequently recommend one to the WVBE.

13.1.d. The term of office of each member of the Review Board will begin upon the acceptance of the appointment and will expire on June 30 of the year in which the term expires.

13.1.e. The member with the shortest remaining tenure on the Review Board shall serve as its chairman. Each appointed member of the Review Board shall have equal voting privileges.

13.1.f. In the same manner as prescribed in §127-1-13.1.a through 13.1.c of this regulation, the WVBE shall have power to fill any vacancy which occurs in the membership of the Review Board. Such appointments shall be made at the next regular or called meeting of the WVBE following the existence of a vacancy, and shall be for the unexpired term of the position vacated.

13.1.g. Members of the Review Board shall serve without pay but shall be reimbursed for actual expenses incident to the performances of their duties upon presentation to WVDE an itemized sworn statement thereof. Costs shall be taxed by the Review Board at its discretion, not to exceed the actual expenses incurred, against the party who fails to prevail and the Review Board may, in its discretion, if it so desires, require any appealing party to post security for costs with the State Superintendent in the sum of $200.

13.1.h. The Review Board will sit for hearings within a reasonable time after the aggrieved party having a matter for review files an appeal, but not longer than 30 days after such appeal is filed, and at such other times as the Review Board may determine, at the State Capitol in Charleston, or in such other place as the Chair of the Review Board may elect.

13.2. The WVDE shall make available adequate and competent secretarial services to record the proceedings and transactions of each meeting of the Review Board and to prepare the official written report, required in these regulations, on each decision rendered by the Review Board.

13.3. Any decision of the Board of Directors involving a penalty, protest, or interpretation of the rules and regulations of this Commission governing interscholastic athletic or band activities may be appealed to the Review Board in the manner hereinafter described. Such appeal may be made by any member of the aggrieved party directly affected by the decision of the Board of Directors and aggrieved by such decision of the Board of Directors.

13.3.a. Appeals must be filed with the State Superintendent within 15 days after any final decision of the Board of Directors of the WVSSAC.

13.3.b. Upon receipt of any appeal, the State Superintendent shall immediately notify each member of the Review Board of the appeal and the Chair of the Review Board shall set a date, time, and place for hearing and shall immediately notify all interested parties, in writing, of the same.

WVSSAC000143

**JA2985**

## 127CSR1

13.3.c. The filing of any appeal shall not stay enforcement nor act to supersede the prior ruling or decision of the Board of Directors. However, pending the hearing of any appeal, at its discretion, the Board of Directors may grant a stay of enforcement upon such terms as it deems proper.

13.4. Proceedings for review shall be instituted by filing a petition, and five copies of same, with the State Superintendent within 15 days after the date upon which such party received notice of the final order or decision of the Board of Directors. A copy of the petition shall be served upon the WVSSAC or its Executive Director and all other parties of record by registered or certified mail. The petition shall state whether the appeal is taken on questions of law or questions of fact, or both. No appeal bond shall be required to effect any such appeal.

13.4.a. Within 15 days after receipt of a copy of the petition by the WVSSAC, or its Executive Director, or within such further time as the Review Board may allow, the Commission or the Executive Director shall transmit to the Review Board, the original or a certified copy of the entire record of the proceedings under review, including a transcript of all testimony and all papers, motions, documents, evidence, and records as were before the Commission, all Commission staff memoranda submitted in connection with the case, and a statement of matters officially noted; but, by stipulation of all parties to the review proceedings, the record may be shortened. The expense of preparing such record shall be taxed as a part of the costs of the appeal. The appellant shall provide security for costs involved. Upon demand by any party to the appeal, the Commission shall furnish, at the cost of the party requesting same, a copy of such record. In the event the complete record is not filed with the Review Board within the time provided for in this section, the appellant may apply to the Review Board to have the case docketed, and the Review Board shall order such record filed. Failure of the Commission to file the record within the time stipulated shall automatically stay the enforcement of the order or decision of the Board of Directors, in that particular case, and such stay shall continue until such record is filed.

13.4.b. Appeals taken on questions of law, fact, or both, shall be heard upon assignment of error filed in the case or set out in the briefs of the appellant. Errors not argued by brief may be disregarded, but the Review Board may consider and decide errors which are not assigned or argued.

13.4.c. The review shall be conducted by the Review Board without a jury and shall be upon the records made before the Commission, except that in cases of alleged irregularities in procedure before the Commission not shown in the record, testimony thereon may be taken before the Review Board. The Review Board may hear oral arguments and require written briefs.

13.5. After hearing all evidence and arguments, the Review Board shall render a decision in one of three forms:

13.5.a. Sustaining the ruling of the Board of Directors;

13.5.b. Reversing the ruling of the Board of Directors; or

13.5.c. Remanding the matter to the Board of Directors for further action.

13.5.c.1. The Review Board shall reverse, vacate, or modify the order or decision of the Board of Directors if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions, or orders are:

13.5.c.1.A. In violation of constitutional or statutory provisions;

WVSSAC000144

**127CSR1**

13.5.c.1.B. In excess of the statutory authority or jurisdiction of the Commission;

13.5.c.1.C. Made upon unlawful procedures;

13.5.c.1.D. Affected by other error of law;

13.5.c.1.E. Clearly wrong in view of the reliable probative and substantial evidence on the whole record; or

13.5.c.1.F. Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

13.5.c.2. Four members, present and eligible to vote, shall constitute a quorum for the Review Board to transact all business.

13.5.c.3. A majority vote of those members of the Review Board in attendance at any hearing shall be required to render a decision. Such decision shall be final and binding on all parties concerned.

13.5.c.4. Within 30 days from the date of any hearing, the Review Board shall make a written report of its decision, stating briefly therein its reasons for such a decision. Copies of the report shall be mailed to the State Superintendent, the Executive Director of the WVSSAC and, upon written request, to other interested parties.

13.6. Nothing in these regulations shall be construed to limit the Board of Directors in performing its regular duties as provided in the regulations of the WVSSAC; in making investigations and initiating proceedings against any member of the Commission; in making interpretations of the rules of eligibility of student athletes or band members; or in imposing penalties for the violations of any rules, regulations, or bylaws of the Commission.

13.6.a. §127-1-8.5, and §127-6-3.2, *Violation of the Rules*, infer or state that decisions of the Board of Directors are final and are hereby modified only to the extent that such final ruling of the Board of Directors may be appealed within the time limit in the manner prescribed elsewhere in these regulations and affirmed, reversed, or remanded by the Review Board. (Revised 2019-20)

**§127-1-14. Rules and Regulations.**

14.1. The constitution and bylaws of the WVSSAC are the rules and regulations of the Commission.

**§127-1-15. Board of Trustees.**

15.1. The Board of Directors shall appoint a five member Board of Trustees. Each trustee shall be a principal of a member school and shall serve at the will and pleasure of the Board of Directors. Two or more members serving as principals of secondary schools located in the same administrative district shall be ineligible to serve as trustees at the same time.

15.2. The Board of Trustees and their lawfully appointed successors shall hold title to all real estate and other property owned by the WVSSAC except as shall be directed otherwise by the Board of Control.

WVSSAC000145

## 127CSR1

15.3. The Board of Trustees shall elect from the membership thereof, to hold office for a term of one year or until a successor shall be elected, a Chair and, if need requires, a Vice-Chair, Secretary and Treasurer.

15.4. The Board of Trustees shall serve without pay or honorarium.

15.5. If it so elects, the Board of Control shall direct the Board of Trustees to incorporate in accordance with the pertinent laws of West Virginia and in such manner as will fully protect and exempt from any and all legal liability the individual officers and members, jointly and severally, of the WVSSAC for an account of the debts and other obligations of every kind and description of the Commission.

15.6. Should a trustee withdraw from membership of the Commission or be excluded therefrom, that trusteeship therein shall automatically cease from the date of such withdrawal or exclusion.

15.7. Should a trustee refuse, within five days from the receipt thereof, to execute a legal instrument relating to any property of the Commission, when directed to do so by the Board of Control or the Board of Directors, and when all legal requirements have been satisfied with reference to execution, the Board of Directors may declare that membership on the Board of Trustees vacated.

15.8. The Board of Control and/or the Board of Directors may direct the trustees with respect to the purchase, sale, mortgage, encumbrance, construction, repairing, remodeling and maintenance of any and all property, real and personal, as may be committed to the trustees by the Board of Control or Board of Directors.

WVSSAC000146

**127CSR2**

**TITLE 127**
**LEGISLATIVE RULE**
**WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION**

**SERIES 2**
**ATHLETICS, PROVISIONS GOVERNING ELIGIBILITY**

**§127-2-1. General.**

1.1. Scope. — These rules establish the provisions governing student eligibility to participate in interscholastic athletics.

1.2. Authority. — W. Va. Constitution, Article XII, §2, and W. Va. Code §§18-2-5, 18-2-25, 18-2-25a, and 18225b.

1.3. Filing Date. — July 13, 2021.

1.4. Effective Date. — September 13, 2021.

1.5. Repeal of Former Rule. — This legislative rule amends W. Va. 127CSR2, West Virginia Secondary School Activities Commission Series 2, Athletics, Provisions Governing Eligibility, filed July 13, 2021, and effective September 13, 2021.

**§127-2-2. Waivers.**

2.1. The West Virginia Secondary School Activities Commission (WVSSAC/Commission) Board of Directors (Board of Directors) is authorized to grant a waiver to a rule when it determines the rule fails to accomplish the purpose for which it is intended or when the rule causes extreme and undue hardship upon the student.

2.2. Speculative loss of college scholarship is not considered a basis for granting a waiver to these rules.

**§127-2-3. Enrollment and Team Membership.**

3.1. To be eligible for participation in interscholastic athletics, a student must be enrolled fulltime in a member school as described in §127-2-6 on or before the 11th instructional day of the academic year. Enrollment must be continuous after the student has officially enrolled in the school.
3.2. Students can participate in interscholastic activities only in schools in which they are enrolled; however, an exception may be granted by the Board of Directors as follows:
3.2.a. if a feeder school does not afford students the opportunity to participate and they are otherwise eligible.
3.2.b. for students from the West Virginia Schools for the Deaf and the Blind (WVSDB) to participate at Hampshire High School or Romney Middle School (only in sports not available at WVSDB).
3.2.c. Member schools containing grades 6 and/or 7 and/or 8 may combine students from two or more schools within the county to form one interscholastic team in a sport. Requests for permission to

WVSSAC000147

**127CSR2**

combine students from two or more schools in the same private/parochial or public school system must be submitted annually to the WVSSAC in writing by the superintendent of the private/parochial or public school system. Schools which are combining to form one team must be feeder schools for the same high school, and at least one school must have sufficient numbers for a team. If more than two schools are involved, principals are to evaluate the number of available participants in each school and shall combine schools to provide as many teams as sufficient numbers allow. Sufficient numbers will be defined as the number of a starting line-up plus 50% (for odd number line-ups, round up).

3.2.d. Students enrolled in the 9th grade may participate only on high school teams. Sixth grade students of a K-6 elementary feeder school may participate on their middle school team if granted permission by the county board of education or governing body of a private/parochial school and the school principals involved. Members of a 9th grade team at a high school may be grouped for practice with members of the varsity team. However, if a 9th grade student participates in a varsity scrimmage or game, that student becomes ineligible for the 9th grade team. Participation is defined as dressing and being available to play in a game, regardless if the player enters the game.

3.2.e. Students at a middle feeder school who are not provided the opportunity to participate because of age may move up to their high school if granted permission by the county board of education or governing body of a private/parochial school and the school principals involved.

3.3. A student academically ineligible by rule may begin practicing 15 school days immediately prior to the dates of regaining full eligibility provided all other eligibility requirements are met.

3.4. Students enrolled in the following grades in member schools will be eligible for middle school participation.

3.4.a. Grades 6, 7, and 8 may compete with and against schools/teams of the same configuration.

3.4.b. Stand-alone 9th grade programs at a high school may compete with and against schools/teams of the same grade configuration. An 8th grade student not provided the opportunity to participate at their member school because the sport is not offered may choose to participate on a standalone 9th grade team at their feeder high school, provided the student is otherwise eligible.

3.5. Sixth grade students are eligible to participate in all interscholastic sport teams, including football, in the middle/feeder elementary school in which they are enrolled.

3.6. Students who are enrolled in a grade below the 9th are not eligible for a high school team. Students enrolled in a grade below the 6th will not be eligible for a middle school team.

3.7. Twelfth grade students will be eligible for spring sports until the close of the school's season.

3.8. Schools may sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill. If a school sponsors a team in a particular sport for members of one sex but sponsors no such team for members of the other sex, and athletic opportunities for members of that sex previously have been limited, members of the excluded sex must be allowed to try out for the team offered. For example, because overall athletic opportunities for females have previously been limited, females will be allowed to try out for baseball, but males will not be allowed to try out for volleyball or softball.

3.9. Students enrolled at West Virginia School for the Deaf will be allowed to participate in sports at the West Virginia School for the Blind. Students from the West Virginia School for the Blind will be allowed to participate in sports at the West Virginia School for the Deaf.

WVSSAC000148

**127CSR2**

3.10.  Boarding students at member schools, with the exception of students at the WVSDB, are not eligible.  (Definition: A boarding student is one who receives room and board that is provided by the school unless such residence is based on Court Order or State Action.)

3.11.  Homeschooled students receiving home instruction pursuant to W.Va. Code §18-8-1(c), shall be considered eligible for participating in interscholastic athletic events and other extracurricular activities of public secondary school serving the attendance zone in which the student lives who (1) has been homeschooled for at least one year immediately preceding interscholastic athletic participation; (2) has demonstrated satisfactory evidence of academic progress for the immediately preceding academic year; (3) is enrolled in at least one virtual instructional course per semester, consistent with the applicable virtual instruction policy of the county board in which the home schooled student lives and the applicable virtual instruction policy of the State Board of Education; and (4) is otherwise eligible to participate as a result of being subject to all other eligibility rules applicable to a non-homeschooled students.

**§127-2-4.  Age.**

4.1.  A student in high school who becomes 19 before August 1 and a student in middle school who becomes 16 before August 1 shall be ineligible for interscholastic competition.

4.2.  A student in grade 8 or below who becomes 15 before August 1 shall be ineligible for interscholastic competition at that level.

4.3.  A student in grade 8 or below who becomes 15 on or after August 1 shall remain eligible for the entire academic year at that level.

**§127-2-5.  Semester and Season.**

5.1.  A student may have the privilege to participate in the interscholastic program for four consecutive years (eight consecutive semesters or equivalent) after entering the 9th grade.

5.2.  While in grades 6, 7, and 8, a student shall not participate in more than three seasons in any single interscholastic activity.

5.3.  Ten days of attendance or enrollment shall constitute a semester of eligibility.  Ten days includes the day of enrollment, the last day of attendance, and the elapsed time between, provided that they are days when school was actually in session.

5.4.  The number of semesters of athletic eligibility of a student is determined by semesters of enrollment and attendance and not by semesters of participation.  (This applies for students in grades 912 only).

5.5.  A student whose eligibility expires with the end of a semester shall not become ineligible until report cards are issued or five school days into the next semester, whichever occurs first.  The student will be considered eligible any days between the two semesters.

5.6.  Any part of a contest or interscholastic event in which a student competes shall be counted as a season for that sport in grades 6-12 and a semester of participation in grades 9-12.

5.7.  The Board of Directors is authorized to grant a waiver to the Semester and Season Rule when it feels the rule fails to accomplish the purpose for which it is intended and when the rule causes extreme and undue hardship upon the student.  Waivers may be granted in the following circumstances:

WVSSAC000149

## 127CSR2

5.7.a. The Board of Directors is authorized to consider cases in which a student entering 9th grade did not stay in continuous enrollment because of personal illness, or no school was available, or because of other undue hardship reasons ascertained through investigation.

5.7.b. The Board of Directors may provide release from the continuous enrollment restriction provided no participation has occurred during the semester(s) in question.

5.7.c. In no event may a student be allowed to participate for more than four seasons in any one sport in grades 9-12.

5.8. The Board of Directors may also assess appropriate penalties to the student or to the school if the Board of Directors determines through its investigation that the student or the school tried to evade the rule by subterfuge.

**§127-2-6. Scholarship.**

6.1. A student is required to be enrolled in the equivalent of four content area courses toward graduation.

6.1.a. If a student is taking a multiple period course, such as block or vocational courses for a full morning or afternoon, it may be counted as more than one course.

6.1.b. If a student has been declared ineligible according to the standards outlined above, the student may attend summer school and have eligibility reinstated if the student meets the standards at the conclusion of summer school.

6.1.c. If a student has been declared ineligible according to the standards outlined above, the student may have eligibility reinstated at midpoint of the course if the student is meeting the standards at that time.

6.2. A student not attempting four full credit subjects during a semester must complete nine weeks of school work to regain consideration for eligibility. **(Revised 2009-10)**

6.3. Any student who withdraws from school and does not re-enroll within ten school days of that withdrawal date will lose eligibility for the remainder of that semester.

6.4. Credit deficiencies cannot be made up after the last day of the semester except in a case where a student whose final examinations and course credit are delayed due to illness verified by a physician or as established by local board of education policy.

6.5. The official school transcript will be used to determine a student's eligibility and will be regarded as final.

6.6. In accordance with §126CSR26, West Virginia Board of Education (WVBE) Policy 2436.10, Participation in Extracurricular Activities (C Rule), students must maintain a 2.0 grade point average to participate in interscholastic athletics.

**§127-2-7. Residence-Transfer. (Revised 2008-09; 2019-20)**

WVSSAC000150

## 127CSR2

7.1. Part A - Residence - This residence rule applies to all students enrolled in grades 6-12 in all member schools.

7.1.a. A student shall be eligible in the school located in the attendance zone in which the student's parents reside. Public secondary school attendance zones shall be established by official action by each county board of education. The attendance zones of a private/parochial member school shall be identical with the attendance zone of the public school in which the private/parochial member school is located. In the event of overlapping attendance zones, a student shall be eligible at the school in which the student first chooses to enroll upon entering the 9th grade.

7.1.b. When a town or city is located in two counties and only one public secondary school is located in the town or city, students living in the town or city may attend this secondary school if mutually agreed upon by the two county boards of education and approved by the Board of Directors. A student shall be eligible at the school in which the student first chooses to enroll upon entering 9th grade.

7.1.c. A student who is in the care of the West Virginia Department of Health and Human Resources (WVDHHR) shall be eligible to participate in interscholastic athletics as a member of the athletic teams of the secondary school in the zone in which the WVDHHR places the student in a home, provided the student is otherwise eligible.

7.1.d. A student entering a school as an "unaccompanied youth" under the conditions of the federal McKinney-Vento Act may be granted eligibility for interscholastic competition by the Board of Directors in accordance with §127-2-1.

7.1.e. A student may be eligible outside the specified zone of attendance if the student has been in attendance in that zone the immediate preceding year (365 days). There can be no change of residence involving change of attendance zone during the immediate preceding year (365 days).

7.1.f. A student whose parents have resided in the school zone for a minimum of one academic year, during which the student has been in attendance for a minimum of one academic year, and whose parents make a bona fide change of residence to a new school zone during the academic year may:

7.1.f.1. Retain eligibility as long as the student retains continuous enrollment and attendance, or;

7.1.f.2. Transfer at time of change of residence to the school in the attendance zone in which the parents are now residing and be eligible in that school, or;

7.1.f.3. Transfer at any time prior to the start of the next academic year to the school in the attendance zone in which the student's parents are residing and be eligible for interscholastic activities at the receiving school.

7.1.f.4. However, a student who has started participation in a sport, which would include practice or contest, that they were participating in at a WVSSAC member school, may not participate in that sport for that sport season at the WVSSAC member school to which they transferred, so long as that transfer was within one contiguous county of their former member school. (Revised 2015-16)

7.1.g. A student whose parents have resided in the school zone for less than one academic year, during which the student has been in attendance for less than one academic year, and whose parents make a bona fide change of residence to a new school zone during the school term may:

WVSSAC000151

## 127CSR2

7.1.g.1. Retain eligibility for the balance of the academic year, provided the student retains continuous enrollment and attendance; or

7.1.g.2. Transfer at time of change of residence to the school in the attendance zone in which the parents are now residing and be eligible in that school; or

7.1.g.3. If a student chooses to remain enrolled at the school outside the attendance zone in which the student's parents reside at the conclusion of the academic year the student will be ineligible for the next academic year.

7.1.h. Foreign exchange students, attending a member school under the auspices of a Council on Standards for International Educational Travel (CSIET) student exchange program, shall be considered eligible regarding residence for a maximum period of one calendar year. A foreign exchange student may not be a graduate of the secondary school of the home country and must maintain eligibility in a member school. A foreign exchange program must assign students to schools by a method which insures that no student, school, or other interested party may influence the assignment for athletic purposes.

7.1.i. A student returning from an approved foreign exchange program may resume interscholastic competition in the member school in which the student was enrolled at the point of interruption, provided the student does not fulfill graduation requirements while participating in the exchange program and provided the student meets all requirements relative to age and semesters of eligibility.

7.2. Part B - Transfer. (Revised 2008-09)

7.2.a. If a student transfers during the academic year from one secondary school to another secondary school, the student shall be ineligible for 365 days from date of enrollment, absent a bona fide change of residence. Students who are ineligible under this rule may practice during the period of ineligibility, given they meet all other factors of eligibility outlined in §126-26-3. Determination of a bona fide change of residence depends upon the facts of each case and is defined as, but not limited to: (Revised 2020-21)

7.2.a.1. The original residence must be abandoned as a residence; in that the original residence is sold, rented, or disposed of as a residence, and must not be used as a residence by the immediate family;

7.2.a.2. The change is being made with the intent that the move is permanent;

7.2.a.3. The entire family must make the change;

7.2.a.4. Documentation of connection of utilities to the residence (e.g. power, water, waste, sewer);

7.2.a.5. Change of voter's registration, driver's license, mailing address, etc.;

7.2.a.6. If a student returns to a previously abandoned residence, the student shall be ineligible for 365 days from the date of enrollment. (Revised 20018-19)

7.2.b. If the transfer is from a private/parochial school to a member school in the zone where the student's parents reside, a student is eligible providing: (1) the student is enrolling in a member school for the first time, and (2) the principals of both private/parochial and member schools involved concur that undue influence is not involved with the transfer.

WVSSAC000152

## 127CSR2

7.2.c. A student may be transferred from one attendance zone to another zone within the same county by a county board of education and maintain eligibility. The transfer must be initiated by county board of education personnel to fulfill certain special education program(s) not available in the attendance zone from which the student is transferred. Upon the completion of the special program, the student must return to the attendance zone of the student's residence.

7.2.d. For the purpose of athletic eligibility, the Commission does not recognize emancipated minor status as it relates to transfer, except as might occur in marriage and relocation to another school zone.

7.2.e. Notwithstanding any other provisions of WVSSAC rules and regulations, if a student transfers for athletic reasons, the student will be ineligible for 365 days from the date of enrollment. A transfer for athletic reasons depends upon the facts of each case and is defined as, but not limited to:

7.2.e.1. Seeking a superior athletic team;

7.2.e.2. Seeking a team consistent with the student's ability;

7.2.e.3. Seeking relief from conflict with the philosophy or action of an administrator, teacher, or coach relating to athletics;

7.2.e.4. Seeking a means to nullify punitive action by the previous school.

7.2.f. If a student enrolls who has been released and accepted by formal actions of county boards of education or similar governing bodies of a private/parochial school which have verified that such transfer is not for athletic purposes, the student will be granted immediate eligibility provided all other rules are met. The enrollment transfer must occur at the beginning of the 9th grade academic year with the student enrolled on or before the eleventh instructional day of the beginning of the academic year and provided that the student is residing with the parents. With respect to a student whose parents reside in an attendance zone containing more than one member school, at the time of enrollment in an outofdistrict school at the beginning of the student's 9th grade academic year, the student must identify a "home" school. In the event the student later elects to utilize "transfer back" (§127-2-7.2.g), the student is only eligible to transfer back to the identified "home" school. Once a student has been a member of a team that has participated in a scrimmage or contest, the student has established eligibility at that school. (Revised 2012-13; 2017-18)

7.2.g. Transfer Back. During the 9th, 10th, 11th, and 12th grades, a student shall be entitled to one transfer back from a school located outside the attendance zone where the student's parents reside into the member school located within the attendance zone where the student's parents reside. This school must be the home school identified in the initial enrollment in the out of district school. Any student transferring under the provisions of this rule will not become eligible until the completion of the academic year in which the transfer occurs. Eligibility will begin with the succeeding fall sports season, or immediately if the transfer back is completed on or before the eleventh instructional day of the beginning of the academic year. Once a student has been a member of a team that has participated in a scrimmage or contest, the student has established eligibility at that school.

7.2.h. If a member middle school student is released and accepted by formal actions of county board of education or governing body of a private/parochial school which have verified that such transfer is not for athletic purposes, the student will be granted immediate eligibility provided all other rules are met. The transfer must occur at the beginning of the academic year with the student enrolled on or before the eleventh instructional day of the beginning of the academic year and provided that the student is residing

WVSSAC000153

## 127CSR2

with the parents. Once a student has been a member of a team that has participated in a scrimmage or contest, the student has established eligibility at that school.

7.2.i. The eligibility of a student whose parents are divorced or legally separated is determined by court decree establishing residency with one parent.

7.2.j. After establishing initial residency with one parent, all subsequent transfers will require a period of ineligibility for 365 days from date of enrollment unless a change of residency is decreed by the court.

7.2.k Any homeschooled students participating in interscholastic athletics pursuant to W. Va. Code §18-2-25(d) who leaves a member school during the school year is subject to the same rules protocols that apply to non-homeschool student transfers.

### §127-2-8. Adoption/Guardianship.

8.1. A student shall be eligible to participate in interscholastic athletics and activities only if: (1) residing with one or both of the parents; (2) residing with a testamentary guardian following the death of the parents; or (3) residing in a location where the student was placed by the WVDHHR pursuant to §1272-7.1.c.

8.2. The residence of a testamentary guardian shall constitute the residence of the ward when, and only when: (1) the testamentary guardian has been duly appointed by the last will and testament of the student's last surviving parent; (2) the testamentary guardian has duly qualified as such before the proper tribunal in West Virginia; and (3) the student is actually residing in the household of the testamentary guardian at the time of the student's sport participation.

8.3. Notwithstanding any other provision of the WVSSAC rules and regulations, any student residing with a guardian/custodian other than a testamentary guardian may not compete for a school in any sport on the varsity level but may compete at the junior varsity level. If a student elects to participate at the junior varsity level pursuant to this rule, the student may not participate at the varsity level even after being enrolled at the school for 365 days. However, if a student elects to participate at the junior varsity level pursuant to this rule, and then commences to reside with a custodial parent, the student may participate at the varsity level notwithstanding the fact that the student had previously participated at the junior varsity level pursuant to this rule.

8.4. Notwithstanding any other provisions of WVSSAC rules and regulations, legal guardian/custodian may not be changed for athletic reasons. A transfer for athletic reasons is defined in §127-2-7.2.e.1-4.

### §127-2-9. Undue Influence - Recruiting.

9.1. The use of influence by a person or group, connected or not connected with the school, to secure or retain a student for athletic participation is not permitted and may cause the student to be ineligible and may cause certain sanctions to be placed against the member school.

9.2. An employee of the school system shall not initiate any communication regarding athletic participation or enrollment with a student, parent of a student, guardian, or family member, in person or through a third party, prior to enrollment. This does not include the introduction of athletic programs to students at feeder schools. (Revised 2014-15)

WVSSAC000154

**127CSR2**

9.3.  A student, parent of a student, or guardian shall not be offered for the purpose of encouraging enrollment in a school or participation in an athletic program any inducement, such as free tuition, jobs, supplies, uniforms, other than that which is provided for all students.

§127-2-10.  Non-school Participation.

10.1.  During the academic year and while a member of a school team, a student shall neither participate, which includes, but is not limited to, fund-raising activities, team picture, tryouts, etc., on any formally organized non-school team in the same sport, nor shall the student compete as an individual unattached in non-school formally organized competition in the same sport.  The following sports are exempted from the provisions of this rule:  cross country, golf, swimming, tennis, track, and wrestling, provided that: (Revised 2011-12)

10.1.a.  participation is approved by the student's principal; and

10.1.b.  the student misses no school-sponsored athletic contest involving a team in that sport.

10.2.  A student may participate as a member of a national team (and the actual, direct tryouts thereof) which is defined as:

10.2.a.  one selected by the national governing body of the sport;

10.2.b.  while representing the National Federation in an International Schoolsport Federation;

10.2.c.  as a representative of the United States in recognized national or international events; or

10.2.d.  a qualifier for the West Virginia Golf Association's Amateur Championship or the United States Golf Association's United States Amateur Championship.

10.3.  A student who has participated on a non-school team or as an individual unattached in nonschool formally organized competition after the beginning practice date of that sport will be ineligible for participation on that school team for that season in that particular sport except as provided by §127210.1 and §127-2-10.2.

§127-2-11.  Amateur.

11.1.  A student who represents a school in an interscholastic sport shall be an amateur in that sport.  An amateur athlete is one who engages in athletic competition solely for the physical, mental, social, and pleasure benefits derived therefrom.  An athlete forfeits amateur status in a sport by:

11.1.a.  competing for money or other monetary compensation (allowable travel, meals, and lodging expenses may be accepted);

11.1.b.  receiving any award or prize of monetary value which has not been approved by the WVSSAC;

11.1.c.  capitalizing on athletic fame by receiving money or gifts of monetary value (scholarships to institutions of higher learning are specifically exempted);

24

WVSSAC000155

**JA2997**

## 127CSR2

11.1.d. signing a professional playing contract in that sport.

11.2. Accepting a nominal, standard fee or salary for instructing, supervising, or officiating in organized youth sports program or recreation, playground, or camp activities shall not jeopardize amateur status. "Organized youth sports program" includes both school and non-school programs. Compensation for giving private lessons is permissible if approved by the WVSSAC.

11.3. A student who loses amateur status may apply to the WVSSAC for reinstatement in the interscholastic program after a waiting period of one complete high school season (starting practice date through state tournament or end of season) for that sport.

11.4. A senior student may participate in a professional tryout either during or after the season of that sport provided that:

11.4.a. it does not occur on the day of a school contest of that sport; and

11.4.b. it meets with the principal's approval.

§127-2-12. Participation as an Ineligible.

12.1. Any student who participates in an interscholastic athletic contest as an ineligible, either knowingly or inadvertently, shall be ineligible for a period not to exceed 365 days as determined by the WVSSAC Executive Director.

§127-2-13. Practice.

13.1. Only students enrolled and eligible to be listed on the eligibility certificate for that sport in the specific member school are allowed to participate in that school's practices. Exceptions are §§12723.2, 1272-3.5, and 127-2-13.6. (Revised 2012-13)

13.2. The frequency and length of practice is at the discretion of each member school.

13.3. Member schools of the WVSSAC may practice on any day of the year with the exception of Sunday practice. §127-3-14.2 further clarifies Sunday practice.

13.4. Individual players of a team must have practiced:

13.4.a. on **five** separate days before participating in an interscholastic scrimmage. (Effective September 13, 2021)

13.4.b. on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. The following sport(s) is exempted from the provisions of this rule: golf. (Effective September 13, 2021)

13.4.c. a student athlete who is absent from practice with their team for non-medical reasons, and not under a doctor care, for more than 14 consecutive days must have the required full 14 practice days before resuming participation in a contest. Students participating in football must follow the practice progression as set forth in §127-3-23. (Revised 2011-12)

WVSSAC000156

**127CSR2**

13.5. A student shall not be permitted to engage in interscholastic practice until that student has filed with the principal a completed Athletic Participation/Parental Consent/Physician's Certificate Form. §1273 3 further explains this required form.

13.6. A student academically ineligible may begin practicing 15 school days immediately prior to the date of regaining full eligibility. (All other ineligible students may not practice.)

13.7. If a student has established eligibility in a sport requiring 14 separate days of practice and is continuing to participate in that sport or no school days have lapsed from one sport to another sport in a same season, the student may participate in another sport of the season after completing five separate days of sport specific practice in the second sport. (Revised 2018-19)

13.8. Students participating in a sport(s) in one season must have practiced 14 separate days, exclusive of the day of a contest, to be eligible to participate in a sport in the next season with the following exception: the student has continued to practice or participate in tournament play without an interruption of school days. The student must complete five separate days of sport specific practice in the second sport.

**§127-2-14. Concussion.** (Revised 2013-14)

14.1. Pursuant to W. Va. Code §18-2-25a, member schools are to provide information in the format approved by the Board of Directors to appropriate school administrators, coaches, interscholastic athletes, and their parents or guardians describing the nature and risk of concussion and head injury, including the risks of continuing to play or practice after a concussion or head injury. Annually, all interscholastic athletes and their parents are required to sign and return a statement that they have read the information provided to them prior to the interscholastic athlete beginning practice or competition for that scholastic year. (See, WVSSAC, Sports Medicine tab, Sports Medicine Packet: Athletic Participation/ Parental Consent/Physician's Certificate Form (Physical Exam Form), A Parent's Guide to Concussions (Information to parents), available on the WVSSAC website at http://www.wvssac.org.)

14.2. Each head coach of member schools is required annually to complete a concussion and head injury recognition and return-to-play protocol course approved by the WVSSAC. (See, WVSSAC, Sports Medicine tab, Sports Medicine Packet: Coach's Course, available on the WVSSAC website at http://www.wvssac.org.)

14.3. An interscholastic athlete suspected of a concussion or head injury by a licensed health care professional or by the head coach or athletic trainer shall be removed from play or practice and not returnto-play or practice until the athlete is evaluated by a licensed health care professional trained in the evaluation and management of concussions and receives written clearance to return-to-play and practice from the licensed health care professional. (See, WVSSAC, Sports Medicine tab, Sports Medicine Packet: available on the WVSSAC website at http://www.wvssac.org.)

14.4. Any of the following who have appropriate training in the evaluation and management of head injuries shall be considered as the licensed health care professional enumerated in this rule:

14.4.a. Medical Doctor (MD);

14.4.b. Doctor of Osteopathy (DO);

14.4.c. Doctor of Chiropractic (DC);

14.4.d. Advanced Registered Nurse Practitioner (ARNP);

WVSSAC000157

127CSR2

14.4.e.  Physician Assistant (PA-C); or

14.4.f.  Registered Certified Athletic Trainer (ATC/R).

14.4g.  Physical Therapist (PT)

14.5.  Member schools must submit the concussion report form to the WVSSAC within 30 days of an interscholastic athlete suffering or being suspected of suffering a concussion or head injury in a practice or game. (See, WVSSAC, Sports Medicine tab, Sports Medicine Packet, available on the WVSSAC website at http://www.wvssac.org.)

14.6.  The WVBE shall be notified if any of the documents referred to in this section of the rule are revised, amended, or altered as to form or content.  The documents shall include but not be limited to:  Athletic Participation/Parental Consent/Physician's Certificate Form (Physical Exam Form); A Parent's Guide to Concussions (Information to Parents), Coach's Course, Return to Play Protocol, Concussion Report form. All forms are found in the WVSSAC Sports Medicine Packet and are available under the Sports Medicine tab, Sports Medicine Packet on the WVSSAC website at http://www.wvssac.org.)

§127-2-15.  Emergency Action Plan (EAP).  (Revised 2020-21)

15.1.  Effective December 31, 2017, each member school shall adopt and submit to the WVSSAC and to the county board of education an EAP for athletics, designed to respond to athletic injuries that occur on school property during school-sponsored athletic practices and events.

15.2.  Each EAP shall include:

15.2.a.   Implementation of the EAP for every sport at every level.  The EAP shall discuss how it is to be implemented with the participation of the school's principal and athletic director (if any), coaches, and athletes.

15.2.b.  Training.  The EAP shall include any necessary training for any person designated as responsible for any portion of the implementation of the EAP.  Training may be in person or online, as may be available to the school.

15.2.c.  Protocol for summoning emergency medical assistance.  The EAP shall discuss how the school's sports teams will assign responsibility for summoning emergency medical assistance in the case of an emergency during a practice or event.

15.2.d.  Protocol for beginning Cardiopulmonary Resuscitation (CPR).  The EAP shall discuss how the school's sports teams will assign responsibility for beginning CPR in the event it is necessary.  Each sports team must have individuals trained in CPR.  The school shall provide proper training to any individual assigned responsibility for performing CPR.

15.2.e.  Requirement for Automated External Defibrillator (AED); Protocol for the use of AED. Each member school will have an AED on the school or event grounds during the duration of all athletic events and practices.  The EAP must address how the school's sports teams will assign responsibility for retrieving and using an AED in the event it is necessary.  Each sports team must be instructed on the location of the nearest

WVSSAC000158

## 127CSR2

AED to any practice or event facility. The school shall provide proper training to any individual assigned responsibility for using an AED. **(Revised 2020-21)**

15.2.f. Protocol for the treatment of heat stroke. The EAP must address how the school's sports teams will prepare for and treat heat stroke. Each sports team that practices outdoors is recommended to have available an emersion tub, and must have water, ice, and towels, to be used for the treatment of heat stroke. The EAP must address how the school's sports teams will assign responsibility for obtaining these items and preparing them before a practice or game begins.

15.2.g. Written records. The EAP shall require that each of the school's sports teams assign responsibility for the items discussed above at the beginning of each season, and record those assignments on a written record, which record shall be retained by the sports team and the school.

15.2.h. Symptoms and risk factors for sudden cardiac arrest. The EAP shall require that schools train athletes, coaches, and volunteers about the symptoms and risk factors for sudden cardiac arrest.

15.2.i. Coordination with local Emergency Medical Systems. The EAP shall require that schools coordinate with their local Emergency Medical Services (EMS) personnel, notifying EMS personnel of the availability of AEDs at the school, and notifying EMS personnel of the EAP adopted by the school.

15.2.j. Follow up retraining. The EAP shall require that school sports teams that respond to an emergency incident meet to discuss their response after the incident has passed. Discussion shall center on the team's response to the incident, areas for improvement, and retraining that may be necessary, and any counseling that may be required for the individuals involved.

15.3. Schools may, but are not required to adopt the Anyone Can Save a Life Program (available at www.anyonecansavealife.org), which meets all of the requirements of this rule, to be implemented as that schools EAP in compliance with this rule.

15.4. Each EAP adopted pursuant to this rule shall be provided to the county board of education, and shall be retained by the county board of education until the EAP is superseded by a revised EAP.

WVSSAC000159

126CSR26

TITLE 126

LEGISLATIVE RULE

BOARD OF EDUCATION

SERIES 26

PARTICIPATION IN EXTRACURRICULAR ACTIVITIES (2436.10)

**§126-26-1. General.**

1.1. Scope. — This legislative rule establishes academic eligibility of students to participate in extracurricular activities both during and after normal school hours in West Virginia public schools.

1.2. Authority. — W. Va. Constitution, Article XII, §2; and W. Va. Code §18-2-5 and §18-2-25(d).

1.3. Filing Date. — November 12, 2020.

1.4. Effective Date. — December 14, 2020.

1.5. Repeal of Former Rule. — This legislative rule amends W. Va. 126CSR26, Policy 2436.10, Participation in Extracurricular Activities, filed May 16, 2008, and effective June 16, 2008.

**§126-26-2. Applicability.**

2.1. This policy applies only to interscholastic athletics, student government, and class officers in grades 6-12. Excluded from this policy are co-curricular activities which are closely related to identifiable academic programs/areas of study and which serve to complement academic curricular activities such as vocational, linguistic, mathematic, scientific, forensic, theatrical, musical, journalistic, and other similar academic cocurricular activities.

**§126-26-3. Eligibility.**

3.1. In order to participate in the extracurricular activities to which this policy applies, a student must meet all state and local attendance requirements and:

3.1.a. Maintain a 2.0 average.

3.1.a.1. A 2.0 average is defined as a grade-point average (GPA) of 2.0 or better on a scale where an "A" mark earns 4 points, a "B" is awarded 3 points, a "C" is worth 2 points, a "D" is given a value of 1 point, and an "F" is worth 0 points.

3.1.a.2. For purposes of achieving the clearest and most uniform application of the policy for those schools which use a numerical grading system, all numerical grades shall be converted to the corresponding letter grade. Each letter grade shall be assigned the appropriate value as set forth above, and the average thereof computed to determine whether the student is eligible. No enhanced value should be given for a "plus" or "minus" designation, such as "B+" or "C-"; all grades with the same letter designation have the same numerical value in the 4.0 scale.

WVSSAC000160

**JA3002**

3.1.a.3. In computing a student's GPA for purposes of this policy, all subjects undertaken by the student and for which a final grade is recorded are to be considered. Athletic practice may not be counted as a subject. The total number of classes taken is divided into the total number of grade points earned to determine the GPA. Classes for which a pass/fail is awarded will be included in computing the GPA only if the student failed the class.

3.1.a.4. A student's eligibility will be determined for each semester by the student's GPA the previous semester (or, in schools which do not use the traditional semester approach, during the previous 18 week period).

3.1.a.5. If a student does not maintain a 2.0 average for the semester, the student will be ineligible for participation for the following semester. Students not meeting eligibility requirements shall be reviewed at the mid-point of the second semester (the nine week point) to determine whether the student has achieved a 2.0 average.

3.1.a.6. If a student does not earn a 2.0 average by the end of the second semester, the student may attend summer school to raise the GPA so that the student is eligible for participation at the beginning of the next school year. For purposes of computing the GPA after summer school, all of the student's grades from the second semester plus the student's grade from the summer school will be used to determine the GPA.

3.1.a.7. A student who has not achieved a 2.0 GPA for the previous semester may have eligibility reinstated at midsemester if the student has attained at least a 2.0 GPA. In schools and/or counties where the traditional semester approach is not used, the nine week point shall be utilized in place of the midsemester.

3.1.a.8. In the case of students with exceptionalities as set forth in W. Va. 126CSR16, Policy 2419, Regulations for the Education of Students with Exceptionalities, if grades are given, all grades received from placements in regular classrooms and special education classrooms should be included when computing the GPA. Exceptional students placed in ungraded programs will be eligible for participation in extracurricular activities if their records indicate that they are making satisfactory progress in meeting the objectives of their individualized education program (IEP).

3.1.a.9. Students who have had a break in public school attendance for any reason may be required to establish eligibility after re-enrollment in the public school. If the county accepts the transfer of credits/grades earned in the non-public setting, then those credits/grades shall be used in determining academic eligibility. If the county does not accept the transfer of credits/grades earned in the non-public setting, then eligibility must be established after re-enrollment in the public school setting. Eligibility shall be gained at midsemester (nine week point) if the student has attained at least a 2.0 GPA. In schools and/or counties where the traditional semester approach is not used, the nine week point shall be utilized in place of the midsemester.

3.1.a.10. Students who are entering public schools or other West Virginia Secondary Schools Activities Commission (WVSSAC) member schools for the first time will be eligible for participation as follows:

3.1.a.10.A. Students who have not earned grades that the receiving school will accept for credit upon transfer will be eligible upon enrollment and must have a 2.0 GPA at the end of the semester in which they enroll to remain eligible.

WVSSAC000161

3.1.a.10.B. Students who have earned grades that the receiving school will accept for credit upon transfer must have earned a 2.0 GPA in the previous semester to be eligible upon enrollment.  If not eligible upon enrollment, the student shall become eligible at the midsemester (nine week point) if the student has attained at least a 2.0 GPA.

3.1.a.11.  Homeschooled students participating in interscholastic athletics pursuant to W. Va. Code §18-2-25(d) will be eligible for participation, provided that the student:

3.1.a.11.A.  complies with the rules promulgated by the WVSSAC;

3.1.a.11.B.  has demonstrated satisfactory evidence of academic progress for the immediately preceding year and that the student's average test results for the immediately preceding year are within or above the fourth stanine in all subject areas; and

3.1.a.11.C.  is enrolled in at least one virtual instructional course per semester, consistent with the applicable virtual instruction policies of the county in which the homeschooled student lives and the applicable virtual instruction policies of the WVBE.  A homeschooled student who fails to receive a "C" grade or higher at the conclusion of the virtual instruction course or semester, whichever is earliest, shall be ineligible to continue participation and remain ineligible for the following semester.

**§126-26-4. Severability.**

4.1.  If any provision of this policy or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this policy.

WVSSAC000162

**JA3004**

Questions and Answers

1.    How do you compute GPA with block scheduling?

Answer:   After careful review of eligibility determination and block scheduling, it appears that perhaps this issue has been made too complicated. If one keeps in mind that eligibility is based upon half credits of the previous semester (18 weeks), eligibility may easily be determined by using the Student Permanent Record Card and the amount of credit attempted.

The following three recordings should clarify GPA computation for eligibility:

(1)          Semester Recording: All full credit courses with final course grade recorded.

| Course | Grade | Attempted Credit | Quality Points |
|--------|-------|------------------|----------------|
| English 10 | A | 1 | 4 |
| History | B | 1 | 3 |
| Band | C | 1 | 2 |
| Algebra | D | 1 | 1 |

GPA:  (4+3+2+1) -:- 4 = 2.5  eligible

(2)          Semester Recording:  All full credit courses with nine week grades recorded.

| English 10 | A/B | 1 |
|------------|-----|---|
| History | C/B | 1 |
| Band | C/C | 1 |
| Algebra | D/F | 1 |

GPA: (4+3+2+3+2+2+1+0) -:- 8 = 2.125  eligible

(3)          Semester Recording: Combination of full and half credit courses recorded.

| English | A | 1 |
|---------|---|---|
| History | B | 1 |
| Band | C | 1 |
| Civil War | C | .5 |
| Tumbling | B | .5 |

GPA: (4+4+3+3+2+2+2+3) -:- 8 = 2.875 or (4+3+2+1+1.5) -:- 4 = 2.875  eligible

*In all cases, the computation of summer school grades will be based upon the method of recording on the Student Permanent Record Card and the amount of credit attempted.

2.   How do you compute the 2.0 average?

Answer: (1)          The basis for computing the grade-point average (GPA) will be the number of regularly scheduled periods, exclusive of study hall, non-graded classes, audited classes, or pass/fail classes for which a passing grade is given.

(2)          One grade will be given for each period.  If two (2) or more classes are taken during a period within a semester, the letter grade for each class will be converted to its appropriate grade point and averaged by the number of classes to determine a grade point for that period.

Examples:

(1)          2 classes

9 weeks class - grade B - 3
9 weeks class - grade C - 2
            5 -:- 2    =   2.5 average

(2)          3 classes

6 weeks class - grade B - 3
6 weeks class - grade D - 1
6 weeks class - grade D - 1
            5  -:- 3    =    1.66 average

The letter grade for each of the other periods will be converted to a grade point.  Then all the grade points will be totaled and divided by the number of periods.

WVSSAC000163

**JA3005**

Examples:

(1) 2 classes in one period     2.5 average
Math ------------------------------ C=   2.0
Social Studies --------------------- C=  2.0
English ----------------------------- F=   0.0
Science ----------------------------- C=  2.0
Music-------------------------------- B=  3.0
                          11.5  -:-  6 =  1.916   ineligible

(2) 3 classes in one period     1.7 average
Math ------------------------------- B=  3.0
Social Studies -------------------- C=  2.0
English ------------------------------ B=  3.0
Science ----------------------------- D=  1.0
                         10.7 -:- 5 =  2.14   eligible

3.   How do you compute summer school?

Answer: The basis for determining the number of periods will be the number of half credits awarded. Each half credit will count as one period and will be added to all grades earned during the second semester. The average will then be recomputed.

Example:

a.  Classes from the previous semester:

2 classes in one period     2.5 average
Math ------------------------------ C=   2.0
Social Studies --------------------- C=  2.0
English ----------------------------- F=   0.0
Science ----------------------------- C=  2.0
Music ------------------------------- B=  3.0
                       11.5  -:-  6 =  1.916   ineligible

b.  Classes for summer school:

English - 1/2 credit - ------------ B=  3
Algebra - 1/2 credit - ------------ B=  3
                       6

Final Average:

2 classes in one period     2.5 average
Math ------------------------------ C=   2.0
Social Studies --------------------- C=  2.0
English ----------------------------- F=   0.0
Science ----------------------------- C=  2.0
Music ------------------------------- B=  3.0
English ----------------------------- B=  3.0
Algebra ----------------------------- B=  3.0
                       17.5 -:- 8 =  2.1875 eligible

4.   How are grades averaged if a student is in a class three days in a week and study hall the other two?

Answer:  The grade earned for the class will be pro-rated to arrive at a period grade. In other words, if a class meets three days a week for a semester, that class would count as three-fifths or .6 in the calculation. For example:

Physical Education (3 days per week) --- A = 4 points x .6 (3/5) = 2.4

Physical Education-(.6) -------- A =  2.4
Math ------------------------------- C =  2.0
Social Studies --------------------- C =  2.0
English ----------------------------- F =  0.0
Science ----------------------------- C =  2.0
Music ------------------------------- B =  3.0

WVSSAC000164

**JA3006**

11.4 -:- 5.6 = 2.0358  eligible

5. If a student attends vo-tech school for three class periods but only receives one grade for these 3 periods, how do you compute the average?

   Answer:    The grade will be counted three times and considered as three periods.

6. How do you compute the grade when a student is taking three subjects during a class period during a semester?

   Answer:    The grades for each subject will be averaged to get a class grade.  For example:

   | | | |
   |---|---|---|
   | 1st 6 weeks - | grade B = | 3.0 |
   | 2nd 6 weeks - | grade C = | 2.0 |
   | 3rd 6 weeks - | grade C = | 2.0 |
   | | | 7.0 -:- 3 = 2.333 - grade point average for that class period |

7. How will schools on modular schedules without traditional class periods be computed?

   Answer:    Each grade per one-half unit will be counted as one period.  Classes for which less than one-half unit is awarded may be grouped together to form one-half unit (at least 4,050 minutes) and the grades earned in those classes then computed as in question 6.  In grades 7 and 8, where units are not awarded, classes may be grouped by using the length the regularly scheduled period rather than the one-half unit as the basis for computation.

8. May a student practice during the period of ineligibility?

   Answer:    No, if the student does not have a 2.0 average, he or she may not practice, with one exception.  The exception is that a student may begin practicing 15 practice days before the end of his/her period of ineligibility (at nine weeks and at end of semester), if it can be confirmed that the student has a 2.0 average at that time.

9. In cases where students are attempting to regain their eligibility at midsemester, what is meant by most recent grading period?

   Answer:    In systems utilizing a nine week marking period, the students must have a 2.0 GPA for that grading period.  In systems utilizing a six week marking period, the student must have a 2.0 GPA at that grading period and continue to maintain a 2.0 GPA until midsemester (nine weeks).

   a.    If the most recent grading period is six weeks and a student has achieved at least a 2.0 GPA, the student may begin practice and if the student still has at least a 2.0 GPA at the end of nine weeks, he/she will be eligible the tenth week.

   b.    If the most recent grading period is nine weeks, the school may check the student's grades at six weeks and allow the student to begin practice if the student has achieved at least a 2.0 GPA.  At the end of the grading period (nine weeks in this case), the student will be eligible the tenth week if the 2.0 or better has been maintained.

10. How is the GPA computed if a student fails a class in summer school?

   Answer:    All summer school grades will be considered in determining a student's eligibility for the following semester.

11. If a student has a 2.0 at the end of the second semester and chooses to go to summer school, can he/she lose their eligibility if they fail classes?

   Answer:    No.  Previous semester GPA can't be lowered by summer school grades.

12. If a student fails second semester English, can it be made up in summer school?

   Answer:    Yes, however, when determining the GPA, both grades (second semester and summer school) must be averaged.

13. What happens if a student has an incomplete?

   Answer:    All incompletes will be computed as an "F" until made up.  This applies to the C-Rule only and not the West Virginia Secondary School Activities Commission Scholarship Rule.

WVSSAC000165

14. If a student comes from an elementary school and does not have a 2.0 average, is he or she eligible?

   Answer: Yes. Any student entering the sixth grade of a middle school for the first time will be eligible. This student must have a "C" average at the end of the first semester to remain eligible.

15. What happens if a student transfers from out of state?

   Answer: He or she must have a 2.0 average in the school previously attended for the previous semester.

16. What happens if a student transfers from another county which has numerical grades?

   Answer: The numerical grades must be changed to letter grades using the sending county's grading scale.

17. If a student moves in from another state and the school had a weighted grading scale, how do you compute his/her average?

   Answer: A weighted grading scale cannot be used. Every grade will be converted using the four point scale and then computed.

18. Can a second semester class be wiped out or deleted after attending summer school in computing the 2.0 average?

   Answer: No. All classes taken during the second semester and summer school will be used in computing the GPA.

19. May a student repeat a class for which he or she has received a low grade in summer school or during a regular semester to raise the GPA?

   Answer: The criteria for retaking a course depends upon local school and/or county policy. However, the method of computation would be the same as those used for averaging summer school classes.

20. If a student has established eligibility for the semester, can he lose eligibility prior to the end of the semester?

   Answer: No.

21. What happens if a student withdraws from a class?

   Answer: Local policies regarding withdrawal from class must be followed. Grades recorded will be calculated as in questions 20, 21, and 22.

22. In determining eligibility, how are classes for which pass/fail grade averaged?

   Answer: Pass/fail classes must be included only if the student failed the class.

23. What classes must be considered in computing the "C" average for eligibility?

   Answer: All subjects that are undertaken by a student and for which a grade is recorded.

24. Are there activities not considered when computing eligibility?

   Answer: Yes. Study Hall, non-graded classes and audited classes are not considered when computing the average.

25. Does a student need to meet any other scholarship rule in order to participate in extracurricular activities?

   Answer: Yes. Students must meet all rules and regulations of the WVSSAC and rules of local board of education.

26. Does a team manager need to have a C-average?

   Answer: Yes, all student assistants must have a C-average.

27. How do you compute grades if a student is taking three different courses in Vo-Tech school?

   Answer: Each grade for the three courses will be considered in computing the average.

0175t/0010t

WVSSAC000166

## 127CSR3

### TITLE 127
### LEGISLATIVE RULE
### WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION

### SERIES 3
### PROVISIONS GOVERNING CONTESTS

**§127-3-1. General.**

1.1.  Scope. — These rules govern the conduct of athletic contests.

1.2.  Authority. — W. Va. Constitution, Article XII, §2, and W. Va. Code §§18-2-5, 18-2-25, 18-2-25a, and 18225b.

1.3.  Filing Date. — July 13, 2021.

1.4.  Effective Date. — September 13, 2021.

1.5.  Repeal of Former Rule. — This legislative rule amends W. Va. 127CSR3, West Virginia Secondary School Activities Commission Series 3, Provisions Governing Contests, filed July 13, 2021, and effective September 13, 2021.

**§127-3-2. Duties and Responsibilities of the Principal.**

2.1.  The principal of each member school is recognized as the school representative and as such is accountable to the West Virginia Secondary School Activities Commission (WVSSAC/Commission) for conduct of the athletic programs of that school.

2.2.  The principal or designee shall notify coaches and faculty (§1273-6) of the rules and regulations of this Commission. It shall be that individual's responsibility to notify those students participating in WVSSAC activities. Failure of the principal in performing this responsibility will not prevent the Commission from enforcing its rules and regulations.

2.3.  The principal shall have the authority to delegate responsibilities or duties; however, such delegation shall not relieve the principal of responsibility for any infraction of the rules and regulations of this Commission by coaches and faculty.

2.4.  The principal has the authority to designate a member of the faculty who must supervise all inter-scholastic activities.

2.5.  The principal is responsible for adequate team and crowd control measures at home contests in which the school participates, assuring that the school's participants and fans conduct themselves in a proper manner, and assuring that all fans and officials are provided adequate protection. In situations where contests are played on neutral sites, the responsibilities will be shared by participating school principals.

2.6.  The principal has the right to exclude a contestant who would not represent the school in an appropriate manner, a student who fails to maintain a satisfactory scholastic standing, or a student who has been excluded for a serious illness or injury.

36

WVSSAC000167

**JA3009**

## 127CSR3

2.7. The principal will be responsible for signing all game contracts, seeking sanctioning of necessary events, and signing all certificates of eligibility prior to student participation.

2.8. The principal may designate the assistant principal or other faculty member to provide representation and/or to participate in all voting matters at a Board of Control meeting which is further explained in the Constitution.

2.9. The principal shall have such other powers as will encourage the growth, development and expansion of the athletic program for the welfare of the students, the school, and the WVSSAC.

2.10. The principal, assistant principal, and athletic director of each member school shall be admitted to any WVSSAC sanctioned event. Vocational principals and assistant principals shall also be admitted. This admittance will be by presentation of the WVSSAC Courtesy Card and a photo identification.

2.11. The principal and assistant principal of each member school, who upon retirement is a member in good standing with the WVSSAC, shall receive a WVSSAC permanent Courtesy and Identification Card. This card shall allow admittance to any WVSSAC sponsored event. This admittance will be by presentation of the WVSSAC Courtesy Card and photo identification. Spouses of deceased principals and assistant principals shall have a WVSSAC permanent Courtesy and Identification Card with the same admittance stipulations transferred to them upon request to the WVSSAC.

2.12. WVSSAC Courtesy and Identification Cards shall be honored at all events involving WVSSAC member schools with the exception of state tournaments.

§127-3-3. Physical Examination — Parental Permission.

3.1. The Athletic Participation/Parental Consent/Physician's Certificate Form allows for annual updates rather than a complete physical examination.

3.2. A student shall not be permitted to engage in interscholastic practice or participate in an interscholastic contest until that student has filed with the principal a completed Athletic Participation/Parental Consent/Physician's Certificate Form. This form must be signed by all parties: student, parent(s), physician. Consent and approval for sport(s) in which a student is requesting participation must be approved by both parent and physician.

3.3. A physical examination form must be completed no earlier than May 1 for an upcoming year. The physical is valid until completion of the last WVSSAC state tournament during the next academic year.

§127-3-4. All-Star Participation.

4.1. Only a graduating senior, or any student completing athletic eligibility at the end of the current academic year because of age or completion of semesters of eligibility, may play in one All-Star game upon conclusion of each season without loss of athletic eligibility for the balance of that year. (Revised 2019-20)

§127-3-5. Awards.

5.1. Only a member school or a school sponsoring a sanctioned event may give the following awards to a student or team: medal, trophy, cup, certificate, ribbon, plaque, unattached letter, unattached chevron, or any similar award.

WVSSAC000168

**127CSR3**

5.2.  A student may accept on an individual or team basis the above specified awards in the following situations:

5.2.a.  from a member school for participation;

5.2.b.  in a sanctioned event;

5.2.c.  in a non-sanctioned event, at any time in the following sports:  cheerleading, cross country, golf, swimming, tennis, track, or wrestling;

5.2.d.  in a non-sanctioned event, but not during the school sports season for the following sports: football, basketball, volleyball, baseball, lacrosse, softball, or soccer.

5.3.  A student may not receive the following awards with a retail value that exceeds $100.00:

5.3.a.  Apparel - sweaters, jackets, jerseys, shoes, etc.

5.3.b.  Equipment - radio, televisions, etc.

5.3.c.  Athletic goods - batons, tennis rackets, bats, golf bag, tennis or golf balls, etc.

5.3.d.  Money (scholarships to institutions of higher learning are exempted.)

5.4.  Purchase of an item as identified in §127-3-5.3, whereby any portion is donated by a school, booster club, auxiliary agency, or any other group or organization is prohibited.

5.5.  Nothing in §127-3-5 shall be interpreted to affect the recognition of scholarship or scholastic achievements.

**§127-3-6. Coaches.**

6.1.  A member of a school faculty, substitute teacher, or student teacher, with West Virginia Department of Education (WVDE) Authorized Certification, shall be allowed to coach an athletic team.  A member of a private/parochial school facility, substitute teacher, regardless of WVDE certification status, shall be allowed to coach an athletic team.  An authorized certified individual may coach if they meet all of the requirements in §127-3-6.4.

6.2.  A public school substitute teacher is defined as a person who has met the licensure requirements as specified by the West Virginia Board of Education (WVBE) and has been approved as a substitute teacher of that county board of education.  Private/parochial school substitutes must meet requirements of respective governing bodies.

6.3.  A college student fulfilling teacher training responsibilities as a student teacher may be assigned certain coaching responsibilities during that period of training.  This assignment will be administratively consistent with the student teacher's role in the classroom, and shall be approved by the county board of education or the governing body of a private/parochial school.  The student teacher will work directly under the supervision of the appointed coach or assistant coach.

WVSSAC000169

**127CSR3**

6.4. An authorized certified coach must meet the following requirements:

6.4.a. The coach is employed under a contract with a county board of education which specifies a rate of pay equivalent to the rate for professional educators who accept similar duties as extra duty assignments and which provides for liability insurance associated with the activity;

6.4.b. The coach has successfully completed approved training: NFHS Sport Science, Sport First Aid, and WV Component (14 hours of instruction and test) and has received WVDE Authorization;

6.4.c. Coaching authorizations are for one year.

6.5. The head coach shall be required to attend any sports rules clinic in the coaching assignment which is sponsored by this Commission. Schools failing to have a head coaching position filled at the time of the clinic will be required to have a school representative present at the rules clinic.

6.6. All coaches, athletic directors, and band directors of member schools who, upon retirement from a full time teaching, school service, or administrative position at a member school, have at least 20 years of service as a coach, athletic director, band director, or combination thereof shall receive a lifetime WVSSAC Courtesy and Identification Card. This card shall allow admittance to any WVSSAC sponsored event. This admittance will be by presentation of the WVSSAC Courtesy and Identification Card and photo identification. Spouses of deceased coaches, athletic directors, and band directors shall have a WVSSAC permanent Courtesy and Identification Card with the same admittance stipulations transferred to them upon request to the WVSSAC.(Revised 2019-20)

**§127-3-7. Out-of-Season Coaching.** (Revised 2016-17)

7.1. Philosophy — A student should have the opportunity to engage voluntarily in school athletic activities provided that the student is eligible, that such activities do not interfere with the student's educational development and their activities do not conflict with the principles of wholesome amateur athletics. The WVSSAC discourages the exploitation of students by overzealous individuals and organizations who attempt to impose an obligation or pressure on the student. Athletic participation should be used for the pleasure and satisfaction that is derived from athletic competition in a variety of experiences.

7.2. School organized out-of-season practice or related activities shall be permitted with principal approval during three consecutive weeks established by each county board of education or by the governing body of a private/parochial school. These three consecutive weeks may begin on or after Monday of Week 49, and must conclude by Friday of Week 4 of the NFHS Standardized Calendar; provided, there will be no out-of-season practice or related activities during the week of July 4th as determined by the NFHS Standardized Calendar (refer to handbook appendix). Participation must be open to all students, voluntary, and not required directly or indirectly for membership on a school team. Participation by students during these weeks does not meet §127-2-13.4.

7.2.a. With principal approval, each sport program may use **twelve** "flex-days" from Monday of Week 49 through Friday of Week 48 of the next academic year. A flex-day is a day, outside the regular season and outside the three week practice window, when a coach may have sport-specific contact with student athletes. Flex-days shall not be used during the first week of each high or middle school sport season. Use of any part of a day for an activity will count as a full day of activity. (Revised 2020-21)

WVSSAC000170

**JA3012**

## 127CSR3

7.3.  A coach or principal designee of each sport or activity may be present as an observer, lecture participant, staff member, [or in any capacity at any summer camp] during weeks established in §12737.2 and §127-3-7.2.a.

7.4.  A coach or designee shall not work with individuals in any form of drills or practice of the grade level coaching assignment and preceding grade level except during those dates specified as the season for that specific sport or as designated in §§127-3-7.2, 127-3-7.2.a, and 127-3-7.3 of this rule.

7.5.  Coaches may participate in a formal development program of the United States Olympic Committee (USOC) involving students of the same sport as their coaching assignments. The formal development program must be under the official guidance of the USOC through the National Governing Body (NGB) of the sport.  The NGB must assure in writing to the WVSSAC that coaches will receive formal orientation and that strict supervision and monitoring of coaches will ensure that no recruitment or inappropriate influence will be exerted on students.

7.6.  Conditioning/Recreation Programs — Throughout the academic year, students who are not participating in a school's athletic program may voluntarily participate in an off-season conditioning program. This program also may occur during the summer, subject to county board of education or governing body approval and the following provisions:

7.6.a.  Participation in the program must be open to all students enrolled in the school providing the program.

7.6.b.  Participation is voluntary and is not required directly or indirectly for membership on a school team.

7.6.c.  Students will provide their own clothing (sweatsuit, shoes, etc.).

7.6.d.  Activities will be limited to running, weight training, and stretching exercises. Agility drills that do not involve specific skills of a given sport are permitted.

7.6.e.  Specific equipment pertaining to a given sport may not be used.  This includes such items as footballs, basketballs, volleyballs, wrestling mats, discuses, etc.

7.6.f.  In cases where schools schedule all students into the last period of the school day, the guidelines in §§127-3-7.6.c, 127-3-7.6.d, and 127-3-7.6.e shall apply unless the class is considered a part of the physical education program and credit is earned.  There shall be no teaching of sport specific skills in this case unless those same skills and course of study are taught in all physical education classes at this same time of the academic year.

7.6.g.  The county board of education may choose to compensate the supervisor or director of conditioning/recreation programs.

7.7.  Coaches may not promote, initiate, organize, supervise, or participate in out-of-season events involving students of the same sport as the grade level coaching assignment and preceding grade level except as specified in §§127-3-7.2, 127-3-7.2.a, and 127-3-7.3. The county board of education shall be authorized to approve a coach to organize and/or supervise a recreation program for students. However, this type assignment must be recreational in nature, include a variety of activities, and comprise no coaching or in-

WVSSAC000171

### 127CSR3

struction of that same sport as the school coaching assignment. In addition to the above, gymnasiums or facilities opened for recreational activities must use the following requirements:

7.7.a. The gymnasium or field is open to all students for participation.

7.7.b. Various activities are available to students and are not limited to one sport or activity on a given day.

7.7.c. Supervisor or director must be approved by the county board of education or governing body.

7.7.d. There is no coaching or instruction in the skills and technique in any sport.

7.7.e. Comparable opportunities are provided both sexes.

7.7.f. Participation is voluntary and is not required directly or indirectly for membership on a school team.

7.8. The principal is responsible for adherence to these requirements.

**§127-3-8. Forfeit and Restitution.**

8.1. A written request for investigation of an eligibility issue in any sport may be filed by a member school principal with the WVSSAC Executive Director. Individual and/or team awards will not be affected if the request is filed more than 42 calendar days past the conclusion of the State Championship in that sport.

8.2. When a student is declared ineligible subsequent to competing as an individual, or a penalty has been imposed or action taken by the WVSSAC, the student's performance shall be stricken from the records and the points contributed to the team total deleted. The team standings will be adjusted accordingly, and any awards received shall be returned.

8.3. When a student is declared ineligible subsequent to representing the school in team competition or a penalty has been imposed by the WVSSAC, the contest(s) may be forfeited. The team standing in the final standing will be adjusted, and the team awards and the ineligible student's awards may be returned.

8.4. If a team, or student participating in an individual contest, leaves the playing area in protest and fails to complete the contest, the contest is forfeited and the school principal or designee and the violator may be required to appear before the WVSSAC Executive Director to indicate why additional action should not be taken.

8.5. If a coach is ejected from a contest and an assistant coach or assigned school representative is not available to continue as coach, the contest is terminated and forfeited to the opponent.

8.6. If a student is deemed ineligible under WVSSAC rules, but participates in interscholastic competition in accordance with the terms of a court order or injunction, and the order or injunction ultimately otherwise adjudicated so that injunctive relief is/was not warranted, any one of the following actions may be taken in the interest of fairness or restitution to the competing schools:.

8.6.a. Require that individual or team performance records achieved during participation by such ineligible student shall be vacated or stricken; or

WVSSAC000172

127CSR3

8.6.b. Require that team or individual victories be forfeited to opponent(s); or

8.6.c. Require that team or individual awards earned by such individual or team be returned to the Commission.

§127-3-9. Game Officials.

9.1. All officials utilized in interscholastic games and contests in West Virginia must be registered with the WVSSAC, except in the case of emergency, §127-3-9.4 may be invoked. A game officials' registration plan shall be established by the WVSSAC Board of Directors (Board of Directors).

9.2. Officials for interscholastic contests shall be agreed upon mutually by the competing schools at least two weeks before the scheduled date of contest. Coaches or other persons connected with competing schools shall not officiate at the contest unless all competing consent.

9.3. The host school initiates the selection of game officials. It is highly recommended that the host school contract officials for all interscholastic contests. Contractual agreements are between the school and the official.

9.4. The WVSSSAC Executive Director shall be empowered to authorize the use of non-registered officials for athletic contests where registered officials are not available and scheduled athletic contests risk cancellation.

9.5. All officials registered with the WVSSAC are subject to and required to abide by the rules and regulations set forth in these rules and the "West Virginia Secondary School Activities Commission Officials' Handbook", which is revised and published yearly. WVSSAC registered officials are provided the same opportunity for appeal of any decisions as set forth in the rules.

9.6. The official shall:

9.6.a. Attend a state WVSSAC rules clinic in the sport for which the official is registered. Failure to comply will result in suspension for that year.

9.6.b. Attend four local Officials' Board meetings. Failure to comply will result in suspension for that year.

9.6.c. Take Part I and Part II NFHS Rules Examinations in the sports where specified. Failure to take Part I will result in a five point deduction for the purpose of classification at the end of that sport season. Failure to take Part II Exam will result in suspension the following year.

9.6.d. Abstain from consuming intoxicating beverages on the day of the assigned contest prior to and during the contest, and after, in the vicinity of the playing area of the contest.

9.6.e. Abstain from the use of smokeless or any other forms of tobacco in the vicinity of the playing area of the contest.

9.6.f. Abstain from the use of illegal drugs.

WVSSAC000173

**127CSR3**

9.6.g.  Be fair, impartial, unbiased, professional, and competent in officiating.

9.6.h.  Be in and maintain proper physical and mental condition as verified by the physical examination form submitted to the WVSSAC; dress and appearance must be appropriate.

9.6.i.  Be at the site of the contest in adequate time to care for necessary pre-contest duties or as specified in the NFHS Rules.

9.6.j.  Maintain self-control under all conditions.

9.6.k.  Refrain from commenting upon or discussing a team, play, game situation, or fellow official.

9.6.l.  Conduct the game so as to enlist the cooperation of students, coaches, and spectators in the interest of good sportsmanship.

9.6.m.  Comply with any WVSSAC rule, regulation, Constitution, or directive, and particularly those regulations pertaining to filing Special Reports and Official Ratings of Schools.

9.6.n.  Honor all existing officiating contracts with member schools unless a valid reason is presented and accepted by the involved school.  Accepting a game involving a higher level of competition is not a valid reason to cancel a contract.  (Revised 2019-20)

9.6.o.  Comply with local board rules as set forth in board regulations.

9.7.  The WVSSAC Executive Director shall have the power to penalize for violations of these rules.  Any official penalized under these rules shall have the right to appeal to the Board of Directors.  The WVSSAC Executive Director shall inform fully a penalized official of appeal rights.

**§127-3-10.  Classification.** (Revised 2019-20)

10.1.  Excluding boys and girls basketball, each member high school shall be classified as either AAA, AA, or A based on the enrollment figures in grades 9, 10, 11, and 12 at the end of the second school month of the odd numbered year preceding the classification.  (Revised 2011-12; 2018-19)

10.2.  Excluding boys and girls basketball, classification of member high schools shall be determined every four years on the even numbered years and will remain in effect for a four year period unless the school experiences a 20% change in enrollment using WVDE enrollment figures at the end of the second school month.  Classification changes due to a 20% change in enrollment becomes effective next academic year.

10.3.  A school may choose to compete in WVSSAC tournaments in any class above its classification providing proper notification is made to the WVSSAC prior to Friday of week 27 after classification has been approved by the Board of Directors.  Approval of this option will be for a four year period and will be effective for individual sports sponsored by the school.

10.4.  Excluding boys and girls basketball, the Board of Directors may structure the WVSSAC tournament series in each sport by classification (AAA-AA-A).  Each sport will be structured according to the level of interest and accommodation for tournament alignment.  The WVSSAC will conduct a survey of the membership prior to any change of structure of any given sport.

WVSSAC000174

## 127CSR3

10.5. Excluding boys and girls basketball, if a consolidation of two or more member schools occurs during the classification period, the new member school will be reclassified based on the combined enrollment of 9, 10, 11, and 12 in the consolidating schools.

10.6. Each member high school shall be classified in boys and girls basketball as either AAAA, AAA, AA, or A based on a total score given by the classification model that considers the following factors: enrollment, location and economics. For an explanation of the classification model, and how scores are assigned, see Glossary.

10.7. Classification of member high schools in boys and girls basketball shall be determined in the next regular reclassification year and will remain in effect for a two year period unless the school experiences a 20% change in enrollment using WVDE enrollment figures at the end of the second school month and qualifies to be moved according to the classification model. Classification changes due to a 20% change in enrollment and the classification model becomes effective next academic year.

10.8. A school may choose to compete in WVSSAC tournaments in one class above its classification in boys and girls basketball providing proper notification is made to the WVSSAC prior to April 1 of a new classification year. Approval of this option will be for a two year period and will be effective for individual sports sponsored by the school.

10.9. In boys and girls basketball, the Board of Directors may structure the WVSSAC tournament series in each sport by classification (AAAA-AAA-AA-A). Each sport will be structured according to the level of interest and accommodation for tournament alignment. The WVSSAC will conduct a survey of the membership prior to any change of structure of any given sport.

10.10. If a consolidation of two or more member schools occurs during the two year period, the new member school will be reclassified in boys and girls basketball based on the classification applied to the newly classification model applied to the new consolidated school consolidated school.

10.11. No member school shall, based on the classification, be compelled to play more than one class up from where it would be classifieds in a four class system based strictly on enrollment.

### §127-3-11. Exchange of Eligibility Certificates.

11.1. Commission approved eligibility certificates are required at the beginning of the season of each sport and prior to the first contest.

11.2. The principal is responsible for the proper completion of the certificate.

11.3. The names of the students on all middle school, 9th grade, junior varsity and varsity teams shall be submitted on the school's master eligibility.

11.4. Student additions to the team must be certified immediately on an eligibility certificate submitted to the WVSSAC. (Revised 2007-08)

11.5. Principals will verify student eligibility using birth certificates to confirm a student's age. Disputed cases shall be reviewed and approved by the WVSSAC Executive Director prior to participation.

WVSSAC000175

**127CSR3**

11.6. Changes to a student's age, number of semesters of attendance or semester credits on an eligibility certificate must be reported to and approved by the WVSSAC prior to participation.

11.7. Schools that fail to send the required eligibility information to the WVSSAC prior to the first contest will be assessed a fine of $25.00 payable to the WVSSAC.  (Revised 2007-08)

**§127-3-12. Legal Opponents.**

12.1. WVSSAC member schools shall not participate against any public, private, or parochial secondary school whose status has not been recognized by that group's governing body.

12.2. WVSSAC member schools shall not participate against schools that have been placed under a specified sanction, including member schools and out of state schools.

12.3. WVSSAC member schools shall not participate in any interscholastic contest or practice against non-school teams or involving alumni participants.

**§127-3-13. Contracts.**

13.1. All interscholastic contest contracts shall be prepared in duplicate on forms furnished by the WVSSAC.  Contracts should include specific dates, financial guarantee provisions, adequate forfeiture stipulations, and all other items listed on the contract.

13.2. In order for a contract between two schools to be binding, it must be signed by the principal or designee of both schools.

13.3. Contracts between both schools may be canceled in the following situations:

13.3.a. If either principal or designee fails to sign the contract.

13.3.b. If either school is forced to suspend its school schedule.

13.3.c. If one school fails to return the signed contract to the other school within 30 days of receipt.

13.3.d. Upon written mutual consent of the contracting parties.

13.3.e. The Board of Directors may annul a contract when deemed necessary for the furtherance of interscholastic athletics in West Virginia, or when provisions of the contract are contrary to Commission rules.

13.4. Contracts executed by the principal are binding on the principal's successor.

13.5. A school will forfeit an athletic contest during regular season or scheduled tournament play if cancellation is caused by teachers, support personnel, or school patrons acting as a striking body.  If both participating schools are affected by strike, cancellation shall be considered no contest.  Regular season cancellation may be rescheduled during that same season by agreement of the involved parties and the Board of Directors. (Revised 2019-20)

**§127-3-14. Sunday Contests.**

WVSSAC000176

**127CSR3**

14.1. WVSSAC member schools shall not engage in any practice, contest, meet, or tournament on Sunday. However, in case of emergency, State Championship finals may be played on Sunday after 1:00 p.m.

14.2. Sunday practice shall be defined as any team, group, or individual meeting to view films, hold shooting practice, or any other activity associated with the sport.

**§127-3-15. Sports Rules — Game Protests.**

15.1. The current edition of official High School Rules published by the NFHS are the official rules used in contests, meets, and tournaments played by WVSSAC schools. The Board of Directors may modify such rules as provided by the NFHS. Any modified rules published in special bulletins or "The Interscholastic" shall apply.

15.2. In the absence of published NFHS rules, the Board of Directors may authorize competition under prevailing rules and regulations as modified for amateur competition.

15.3. Contests or ejections shall not be protested. Accordingly, the Board of Directors is not authorized to order contests replayed or ejections reconsidered.

**§127-3-16. Sanctioning and Travel.**

16.1. A member school shall not enter a contest/competition which requires sanctioning until it is approved by the WVSSAC.

16.2. All applications for sanctioning must be submitted to the WVSSAC 30 days prior to the event, with the exception of international events.

16.3. Events requiring NFHS approval are:

16.3.a. Co-sponsorship Sanction Requirement: Any interstate event involving two or more schools, which is co-sponsored by or titled in the name of an organization outside the high school community (e.g., a university, a theme park, a shoe company), in addition to being sponsored by a member school, an approved school, or a state association, shall require sanction of the NFHS office.

16.3.b. Non-bordering State Sanction Requirement: Each state association shall sanction through the NFHS office interstate competition by a member school involving either:

16.3.b.1. More than eight schools, at least one of which is from a state that does not border the host state; or

16.3.b.2. Five or more states, at least one of which does not border the host state.

16.3.c. International Event: Each member state association shall approve and receive NFHS approval for competition by a member school against a school from a foreign country, except for two school and three school competition with a school or schools from Canada or Mexico which necessitates a round trip of less than 600 miles.

WVSSAC000177

## 127CSR3

16.3.d. International Event: Games against Canadian or Mexican schools involving travel of greater than 600 miles, or an event involving more than three schools, one or more of which are from Canada or Mexico, requires a request to the NFHS for international sanction and notice to and sanction by the appropriate National Governing Body.

16.4. Bordering state events requiring approval are:

16.4.a. Any interstate event in which four or more schools participate. (All schools from neighboring states.)

16.4.b. Any interstate event which involves schools from three or more state high school associations.

16.5. Intrastate events requiring approval are:

16.5.a. An event with more than four schools participating; or

16.5.b. Any event where awards are given.

16.6. The WVSSAC may assess a fine and/or other penalties against the participating school for violations of the sanction provisions.

16.7. A member school shall not enter an event that involves travel of more than 600 miles round trip unless it occurs on days when school is not in session. The WVSSAC must sanction the event.

### §127-3-17. WVSSAC Tournaments.

17.1. Participation in Commission sponsored and directed sectional, regional and state tournaments exclusively shall be limited to WVSSAC member schools. (Revised 2019-20)

17.2. The Board of Directors shall divide the state into sections and regions for the purpose of determining championships in Commission sponsored sports. The Board of Directors shall direct and arrange for tournaments, meets, and contests leading to and including state championships. The WVSSAC will provide member school principals the opportunity to review and comment on the alignment prior to the presentation to the Board of Directors. Principals will sign a form to verify receipt and return the form to the WVSSAC office within ten days from the date of the bulletin.

17.3. The Board of Directors shall have general control over sectional tournaments. The detailed management of these sectional tournaments, however, shall be under the control of the schools assigned to each respective section.

17.4. All net earnings from tournaments conducted under the supervision of the Board of Directors shall be turned over to the Commission unless otherwise specified by the Board of Control. Sectional or regional assessments may be charged to cover the cost of a tournament trophy furnished by the WVSSAC.

17.5. The Board of Directors may approve participation by member middle schools in county, league or conference tournament. Tournament play on the state level for member middle schools is prohibited.

17.6. State tournaments conclude only after all games, matches, or events are completed.

WVSSAC000178

**127CSR3**

**§127-3-18. Season Regulations.**

18.1. The Commission uses the NFHS standardized calendar to schedule all activities. Each sport season shall have an established beginning and ending date for practice and interscholastic contests based on a standardized calendar.

**§127-3-19. Baseball.**

19.1. Rules: Baseball rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modifications.

19.2. Organized Team Practice: Organized team practice will begin Monday of Week 35 and the first contest may be played on Wednesday of Week 37.

19.3. Length of Season: The baseball season ends for each team by WVSSAC tournament elimination.

19.4. Maximum Team Contests: A baseball team is permitted to play no more than 32 games exclusive of sectional, regional, and state tournament contests.

19.5. Scrimmages: Teams may conduct two baseball scrimmages with another high school. (See Glossary.)

19.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. **(Effective September 13, 2021)**

19.7. Student Participation:

19.7.a. A student may not play or practice on a non-school baseball team while a member of the school team.

19.7.b. A student shall not participate in more than 32 games in one season, exclusive of sectional, regional, and state tournament contests. Serving as a "courtesy or pinch runner" is not considered "participation" in a game.

19.8. During the sport season, a student may accept awards only in WVSSAC sanctioned events. Awards must comply with §127-3-5. Outside the sport season, students may accept only compliant awards in non-sanctioned events.

19.9. Middle Schools — The above will apply for middle schools with following adaptations:

19.9.a. Middle school teams may play 18 games including tournaments sanctioned by the WVSSAC.

19.9.b. Middle school season will be completed by Saturday of Week 45.

19.9.c. Middle school teams are permitted one scrimmage. (See Glossary.)

**§127-3-20. Basketball (Boys and Girls).**

WVSSAC000179

## 127CSR3

20.1. Rules: Basketball rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

20.2. Organized Team Practice: Organized team practice for girls will begin on Monday of Week 19 and Monday of Week 20 for boys. The first contest for girls may be played on Tuesday of Week 22 and Tuesday of Week 23 for boys.

20.3. Length of Season: The boys' and girls' basketball seasons will end for each team at tournament elimination.

20.4. Maximum Team Contests: A varsity or junior varsity basketball team will be permitted to play no more than 22 games in the regular season exclusive of sectional, regional, and state tournament contests.

20.4.a. The maximum number of quarters for a student in one season is 110 exclusive of sectional, regional, and state tournament contests.

20.4.b. A student can play only five quarters in one day.

20.4.c. Participation in a quarter, regardless of time, will be considered one quarter.

20.4.d. Overtime is considered as an extension of the fourth quarter.

20.5. A high school basketball team is permitted to participate in a preview and a scrimmage or two scrimmage games. (See Glossary.)

20.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (**Effective September 13, 2021**)

20.7. A student may not play or practice on a non-school team while a member of the school team.

20.8. During the sport season a student may accept awards only in WVSSAC sanctioned events Awards must comply with the §127-3-5. Outside the sport season, students may accept only compliant awards in non-sanctioned events.

20.9. Middle Schools — The above rules will apply for middle schools with the following adaptations: (Revised 2018-19)

20.9.a. Girls may begin practice on Monday of Week 18 and boys on Monday of Week 19. The first contest for girls may be played on Wednesday of week 21 and Wednesday of week 22 for boys.

20.9.b. The girls basketball season will end on Saturday of Week 33 and Saturday of Week 34 for boys.

20.9.c. Tournament play on the state level shall be prohibited.

20.9.d. Boys and girls basketball teams will be permitted to play no more than 20 games. Tournament exception does not apply.

20.9.e. All middle students may play a maximum of 100 quarters for one season.

20.9.f. All middle students may play a maximum of five quarters per day. (Revised 2019-20)

WVSSAC000180

**127CSR3**

20.9.g. A member school sponsoring games involving teams which combine students in 7th and 8th grades must play those games in quarters of six minutes.

20.9.h. Middle schools are not permitted to play an alumni game.

20.9.i. Scrimmages: Middle school teams are permitted one scrimmage. (See Glossary.)

**§127-3-21. Cheerleading.**

21.1. Rules: Cheerleading rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.  (Revised 2010-11)

21.2. Organized Practice: Organized team practice will begin on Monday of Week 5.

21.3. Length of Season: The high school spirit and competitive season will begin Monday of Week 5. The competitive season will end for each team at their cheer tournament elimination.  The high school spirit season will end on the last day of the Girls' State Basketball Tournament or Boys' State Basketball Tournament.

21.4. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

21.5. A student may accept awards in WVSSAC sanctioned events and non-sanctioned events during the entire year.  These awards must be consistent with the items specified in §127-3-5.

21.6. Middle Schools — The above rules will apply for middle schools with the following adaptations:

21.6.a. Organized Team Practice: Organized team practice will begin on Monday of Week 6.

21.6.b. The middle school spirit and competitive cheer season will begin Monday of Week 6.  The competitive season will end Saturday of Week 18.  The middle school spirit season will end on the last day of the middle school girls' or boys' basketball season.

**§127-3-22. Cross Country (Boys and Girls).**

22.1. Rules: Cross country rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

22.2. Organized team practice will begin on Monday of Week 5 and the first meet may be held on Saturday of Week 7.

22.3. Length of Season: The cross country season will end for each team or individual at tournament elimination.

22.4. Maximum Team Contests: A cross country team will be permitted 16 meets exclusive of regional and state contests.

22.5. Scrimmages: Schools may conduct two cross country scrimmages with another high school may be conducted. (See Glossary.)

WVSSAC000181

**127CSR3**

22.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

22.7. A student may accept awards in WVSSAC sanctioned events and non-sanctioned events during the entire year. These awards must be consistent with the items specified in the §127-3-5.

**§127-3-23. Football.**

23.1. Rules: Football rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

23.2. Organized Team Practice: Organized team conditioning practice will begin on Monday of Week 5 and the first contest may be played during Week 8.

23.2.a. The following table establishes for high school the **equipment/contact level**, earliest date for scrimmage or GridORama, date for first contest, and date season must be completed.

| Year | First Date Organized Practice Helmets Only No Contact | First Date Helmet & Shoulder Pads Soft Equipment Contact Bag, shields sleds, tackling wheel, etc. | Full Pads Soft Equipment Contact Bag, shields sleds, tackling wheel, etc. | Full Pads Full Contact | Earliest Scrimmage Or Grid-O-Rama After 4:00 PM | First Contest | Date Season Must be Completed |
|---|---|---|---|---|---|---|---|
| 2021 | Aug. 2 & 3 | Aug. 4 & 5 | Aug. 6 | Aug. 7 | Aug. 13 | Aug. 23 | Nov. 6 |
| 2022 | Aug. 1 & 2 | Aug. 3 & 4 | Aug. 5 | Aug. 6 | Aug. 12 | Aug. 22 | Nov. 5 |
| 2023 | Jul 31 & Aug. 1 | Aug. 2 & 3 | Aug. 4 | Aug. 5 | Aug. 11 | Aug. 21 | Nov. 4 |
| 2024 | Aug 5 & 6 | Aug. 7 & 8 | Aug. 9 | Aug. 10 | Aug. 16 | Aug. 26 | Nov. 9 |
| 2025 | Aug. 4 & 5 | Aug. 6 & 7 | Aug. 8 | Aug. 9 | Aug. 15 | Aug. 25 | Nov. 8 |

23.2.b. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

23.2.c. In season football camps sponsored by a member school or by other school related organizations where football coaching and instruction are given are not permitted.

23.2.d. The use of football uniforms, protective equipment, tackling or blocking dummies, charging sleds, or similar devices are strictly prohibited during the conditioning program. During the date of pads no live contact, the use of sleds, shields, and blocking dummies is allowed to permit gradual adaptation of the students to carrying the weight of their pads and adjusting to temperature variation.

23.3. Length of Season: The football season will end for each team at the end of the regular season or by play-off elimination.

23.4. Maximum Team Contests: A football team will be permitted to play no more than 10 games exclusive of the play-off games.

23.4.a. The total number of quarters for a student in one season is 50 exclusive of the play-off games.

23.4.b. A student may only play four quarters in one day.

WVSSAC000182

**127CSR3**

23.4.c.  Any student who participated in one or more downs in one quarter shall be charged with one quarter of play.  Downs in which the football teams are in a free kick formation, or the offensive team is in a scrimmage kick formation, as defined in the NFHS Football Rule Book, will not count as a down.

23.4.d.  Overtime is considered as an extension of the fourth quarter.

23.4.e.  Interscholastic practice game in which teams representing a member school play against alumni or others is not be allowed.

23.5.  A football team is permitted to participate in a Grid-O-Rama and one preseason scrimmage or two preseason scrimmages.  (See Glossary for definitions of Grid-O-Rama and Scrimmage.)

23.6.  Special Regulations:

23.6.a.  All rules and regulations of these bylaws pertaining to football are also applicable to sixman and eight-man football.

23.6.b.  Any member of a freshman team who plays in a varsity contest (scrimmage, Grid-o-Rama or game) is ineligible to return to the freshman team.

23.6.c.  A student may not play or practice on a non-school football team while a member of the school team.

23.7.  A student may accept awards for WVSSAC sanctioned and non-sanctioned events during the entire year.  These awards must be consistent with the items specified in the §127-3-5.

23.8.  The Board of Directors is authorized to adopt a point rating system and overall procedure for determining a state champion in each class.

23.9.  Middle Schools:  The above rules will apply for middle schools with the following adaptations:

23.9.a.  Organized team conditioning practice will begin on Monday of Week 6 and the first game played during Week 9.

23.9.b.  The following table establishes the first date for organized practice, the first date pads with no live contact, the first date for live contact, earliest date for a scrimmage, the date for first game and the date season must be completed.

| Year | First Date Organized Practice | Pads No Live Contact | Contact Allowed Full Equip. | Date For Scrimmage | Earliest For First Game | Date Season Must Be Completed |
|------|------|------|------|------|------|------|
| 2021 | Aug. 9 | Aug. 16 | Aug. 19 | Aug. 23 | Week 9 | Oct. 30 |
| 2022 | Aug. 8 | Aug. 15 | Aug. 18 | Aug. 22 | Week 9 | Oct. 29 |
| 2023 | Aug. 7 | Aug. 14 | Aug. 17 | Aug. 21 | Week 9 | Oct. 28 |
| 2024 | Aug. 12 | Aug. 19 | Aug. 22 | Aug. 26 | Week 9 | Nov. 2 |
| 2025 | Aug. 11 | Aug. 18 | Aug. 21 | Aug. 25 | Week 9 | Nov. 1 |

23.9.c.  The football season will end on Saturday of Week 17.

23.9.d.  Not more than eight interscholastic football games shall be played, excepting one league playoff game.  There shall be a nine game limit, even if league playoff games are used, and the extra game is

WVSSAC000183

### 127CSR3

limited to two teams. Leagues choosing to have the extra playoff game may participate in a two quarter Grid-O-Rama in place of a scrimmage game, if agreed to before the start of the season.

23.9.e.  The total number of quarters for a middle school student in one season is 40, exclusive of the playoff game in §127-3-23.4.

23.9.f.  A middle school football team is allowed one preseason scrimmage under the following conditions:

23.9.f.1.  Scrimmage will not be played under game conditions.

23.9.f.2.  Scrimmage must be played prior to first game of regular season.

23.9.f.3.  Admission may be charged.

23.9.f.4.  Registered officials may be used.

23.9.g.  Middle school football teams may play overtime periods in regular season games. In season ending championship games, a tie breaking procedure shall be established and used if at the end of two overtime periods, the score remains tied. A maximum of two overtime periods are permitted in accordance with the NFHS Football Rules "20 yard line overtime procedure.'

23.9.h.  Middle school game ball:  The football used involving only students in the 8th grade and below shall be the youth football.  Modification of the rule is listed in the NFHS Rule Book, Rule 1-3-1.

23.9.i.  Length of Quarters:  For teams composed of students in any combination of 6th, 7th, and 8th grades, the length of quarters shall be eight minutes.

23.9.j.  A 9th grade team in a high school program will follow the rules provided for high school.

**§127-3-24.  Golf (Boys and Girls).**

24.1.  Rules:  Golf rules published by the United States Golf Association are the official rules for all interscholastic competition unless otherwise provided by WVSSAC modifications.

24.2.  Organized Team Practice: Organized team practice will begin on Monday of Week 5 and the first contest may be played on any day after the first day of the season.

24.3.  Length of Season:  The golf season will end for each team or individual at tournament elimination.

24.4.  Maximum Team Contests:  A high school golf team will be permitted to play no more than 18 varsity matches, 18 JV matches, and 18 girls' JV matches.  A male or female participant may play no more than a total of 18 matches exclusive of regional and state tournament contests between the varsity, JV, and girls' JV matches. Girls who participate on school teams who do not have a minimum of three female partici-pants may participate as individuals in girls' JV matches as long as the total number of matches they play between varsity, JV, and girls' JV does not exceed 18. Each interscholastic contest counts as one, whether it is nine or 18 holes, and regardless of number of opponents.

24.5.  Scrimmages:  Not permitted.

WVSSAC000184

**127CSR3**

24.6. A student may accept awards in WVSSAC sanctioned events and non-sanctioned events during the entire year. These awards must be consistent with the items specified in §127-3-5.

24.7. Middle School Golf: The above will apply for middle schools with the following adaptations:

24.7.a. Middle school teams are permitted to play no more than 14 matches.

24.7.b. There shall be one season for golf in middle school, either fall or spring; however, the season selected shall be no longer than ten weeks.

**§127-3-25. Soccer (Boys and Girls).**

25.1. Rules: Soccer rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modifications.

25.2. Organized Team Practice: Organized team practice will begin on Monday of Week 5 and the first contest may be played on Friday of Week 7.

25.3. Length of Season: The soccer season will end for each team by WVSSAC tournament elimination.

25.4. Maximum Team Contests: A soccer team will be permitted to play no more than 20 matches exclusive of sectional, regional, and state tournaments.

25.4.a. The maximum number of halves for a student in one season will be 50, exclusive of sectional, regional, and state tournaments.

25.4.b. A student shall not be permitted to participate in more than three halves during any one day. Play in any part of a half counts as one half. In an overtime game, the overtime shall be considered an extension of the second half.

25.5. A high school soccer team is permitted to participate in a soccer-o-rama and one preseason scrimmage or two preseason scrimmages. (See Glossary.)

25.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

25.7. A student may not play or practice on a non-school soccer team while a member of the school team.

25.8. A student may accept awards only in WVSSAC sanctioned events during the season of that sport. These awards must be consistent with the items specified in §127-3-5. Students may accept only this same type of award in non-sanctioned events outside the sport season.

25.9. Middle Schools: The above will apply for middle schools with the following adaptations:

25.9.a. Middle school teams may play 14 matches including tournaments sanctioned by the WVS-SAC.

WVSSAC000185

## 127CSR3

25.9.b. Organized team practice will begin on Monday of Week 6 and the first contest may be played on Monday of Week 9.

25.9.c. Middle school season will be completed by Saturday of Week 17.

25.9.d. The maximum number of halves for a student in one season will be 28.

25.9.e. Middle school teams are permitted one scrimmage. (See Glossary.).

### §127-3-26. Softball.

26.1. Rules: Softball rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modifications.

26.2. Organized Team Practice: Organized team practice will begin on Monday of Week 35 and the first contest may be played on Wednesday of Week 37.

26.3. Length of Season: The softball season will end for each team by WVSSAC tournament elimination.

26.4. Maximum Team Contests: A softball team will be permitted to play no more than 32 contests exclusive of sectional, regional and state contests.

26.5. Scrimmages: Two softball scrimmages with another high school may be conducted. (See Glossary.).

26.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. **(Effective September 13, 2021)**

26.7. Student Participation:

26.7.a. A student may not play or practice on a non-school softball team while a member of the school team.

26.7.b. A student shall not participate in more than 32 games in one season, exclusive of sectional, regional and state tournament contests. Serving as a "courtesy or pinch runner" is not considered "participation" in a game.

26.8. During the sport season, a student may accept awards only in WVSSAC sanctioned events. These awards must be compliant with §127-3-5. Outside the sport season students may accept only compliant awards in non-sanctioned events.

26.9. Middle Schools: The above will apply for middle schools with the following adaptations:

26.9.a. Middle school teams may play 18 games including tournaments sanctioned by the WVSSAC.

26.9.b. Middle school season will be completed by Saturday of Week 45.

26.9.c. Middle school teams are permitted one scrimmage. (See Glossary.)

WVSSAC000186

## 127CSR3

**§127-3-27. Swimming (Boys and Girls).**

27.1. Rules: Swimming rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

27.2. Organized Team Practice: Organized team practice will begin on Monday of Week 17 and the first contest may be on Wednesday of Week 19.

27.3. Length of Season: The swimming season will end for each team or individual by WVSSAC tournament elimination.

27.4. Maximum Team Contests: A swimming team will be permitted 16 contests exclusive of sectional, regional, and state contests.

27.5. Scrimmages: Two swimming scrimmages with another high school may be conducted. (See Glossary.).

27.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. **(Effective September 13, 2021)**

27.7. A student may accept awards in WVSSAC sanctioned events and non-sanctioned events during the entire year. These awards must be consistent with the items specified in §127-3-5.

27.8. The above will apply for middle schools with the following adaptations: (Revised 2018-19)

27.8.a. Middle school teams will be permitted 14 meets.

**27.8.b. There shall be one season for Middle school swimming, either winter or spring. However, the season selected shall be no longer than 12 weeks.** (Revised 2021-22)

27.8.c. Middle school season will be completed by Saturday of Week 31.

27.8.d. Middle school teams are permitted one scrimmage. (See Glossary.).

**§127-3-28. Tennis (Boys and Girls).**

28.1. Rules: Tennis rules published by the United States Tennis Association are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

28.2. Organized Team Practice: Organized team practice will begin on Monday of Week 35 and the first contest may be played on Wednesday of Week 37.

28.3. Length of Season: The tennis season will end for each team or individual at tournament elimination.

28.4. Maximum Team Contests: A tennis team will be permitted 22 matches exclusive of sectional, regional, and state contests.

28.4.a. Dual, triangular and quadrangular matches count as one match. Matches in which five or more schools participate count as two matches.

WVSSAC000187

## 127CSR3

28.5. Scrimmages: Two tennis scrimmages with another high school may be conducted. (See Glossary.)

28.6. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

28.7. A student may accept awards in WVSSAC sanctioned events or non-sanctioned events during the entire year. These awards must be consistent with the items specified in §127-3-5.

28.8. Middle Schools: The above will apply for middle schools with the following adaptations: (Revised 2018-19)

28.8.a. Middle school teams may play 16 matches including tournaments sanctioned by the WVSSAC.

28.8.b. Middle school teams are permitted one scrimmage. (See Glossary.)

28.8.c. There shall be one season for tennis in middle school, either fall or spring; however, the season selected shall be no longer than 12 weeks.

### §127-3-29. Track and Field (Boys and Girls).

29.1. Rules: Track and Field rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

29.2. Organized Team Practice: Organized team practice will begin on Monday of Week 35 and the first contest may be on Wednesday of Week 37.

29.3. Length of Season: The track and field season will end for each team or individual by WVSSAC tournament elimination.

29.4. Maximum Team Contests: A track and field team will be permitted 16 meets exclusive of sectional, regional, and state contests.

29.5. Participation Limitations: Maximum of four events per participant per meet.

29.6. Scrimmages: Not permitted.

29.7. Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

29.8. A student may accept awards in WVSSAC sanctioned events and non-sanctioned events during the entire year. These awards must be consistent with the items specified in §127-3-5.

29.9. Middle Schools — The above will apply for middle schools with the following adaptations: (Revised 2018-19)

29.9.a. Middle school teams will be permitted 14 meets and only two meets per week.

29.9.b. Middle school season will be completed by Thursday of Week 46.

WVSSAC000188

## 127CSR3

29.9.c.  Participation limitation:  Middle school students, regardless of grade levels (6, 7, or 8), may compete in a maximum of four events, of which only three may be running events, including relays.

§127-3-30.  Volleyball (Girls).

30.1.  Rules:  Volleyball rules published by NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

30.2.  Organized Team Practice: Organized team practice will begin on Monday of Week 6 and the first contest may be played on Wednesday of Week 8.

30.3.  Length of Season:  The volleyball season will end for each team by WVSSAC tournament elimination.

30.4.  Maximum Team Contest:  A volleyball team will be permitted no more than 22 playing dates exclusive of sectional, regional, and state contests.

30.4.a.  Dual, triangular, and quadrangular matches count as one playing date.  Matches in which five or more schools participate count as two playing dates.

30.5.  In dual competition, a student may participate in a maximum of four games against the same opponent if a match is two of three games and six games if the varsity match is three of five games.

30.6.  Scrimmages:  Two volleyball scrimmages with another high school, or one scrimmage and one preview may be conducted.  (See Glossary.)

30.7.  Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. **(Effective September 13, 2021)**

30.8.  A student may not play or practice on a non-school volleyball team while a member of the school team.

30.9.  A student may accept awards only in WVSSAC sanctioned events during the season of that sport. These awards must be consistent with the items specified in §127-3-5.  Students may accept only this same type of award in non-sanctioned events outside the sport season.

30.10.  Middle Schools:  The above will apply for middle schools with the following adaptations:

30.10.a.  Middle school teams will be permitted **18** playing dates. **(Revised 2021-22)**

30.10.b.  Organized team practice will begin on Monday of Week 7 and the first contest may be played on Wednesday of Week 9.

30.10.c.  Middle school season will be completed by Saturday of Week 17.

30.10.d.  Middle school teams are permitted one scrimmage or one preview.  (See Glossary.)

§127-3-31.  Wrestling (Boys).

WVSSAC000189

**JA3031**

## 127CSR3

31.1.  Rules: Wrestling rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.

31.2.  Organized Team Practice: Organized team practice will begin on Monday of Week 20 and the first contest may be played on Wednesday of Week 22.

31.3.  Length of Season:  The wrestling season will end for each team or individual at tournament elimination.

31.4.  Maximum Team Contest:  A wrestling team will be permitted to have 18 weigh-ins exclusive of regional and state tournaments. (Revised 2018-19)

31.4.a.  Triangular and quadrangular weigh-ins count as one weigh-in.  Weigh-ins in which five or more schools participate count as two weigh-ins. A dual meet, in which only two teams compete, shall only count as one-half of a weigh-in point. (Revised 2020-21)

31.5.  Scrimmages: Two wrestling scrimmages with another high school may be conducted. (See Glossary.)

31.6.  Individual students of a team must have practiced on **12** separate days, exclusive of the day of a contest, before participating in an interscholastic contest. (Effective September 13, 2021)

31.7.  A student may accept awards only in WVSSAC sanctioned events during the season of that sport. These awards must be consistent with the items specified in §127-3-5.  Students may accept only this same type of award in non-sanctioned events outside the sport season.

31.8.  Middle Schools: The above will apply for middle schools with the following adaptations:

31.8.a.  Organized Team Practice: Organized team practice will begin on Monday of Week 19 and the first contest may be played on Wednesday of Week 22.

31.8.b.  Middle school teams may have 16 weigh-ins excluding any conference tournament. (Revised 2016-17; 2018-19)

31.8.c.  Middle school teams are permitted one scrimmage under the same conditions as a high school.

31.8.d.  Middle school season will be completed by Saturday of Week 33.

WVSSAC000190

**127CSR4**
TITLE 127
LEGISLATIVE RULE
WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION

SERIES 4
PROVISIONS GOVERNING CONDUCT

**§127-4-1. General.**

1.1. Scope. -- These rules govern conduct for active and spectator participants, coaches and all other school personnel at interscholastic athletic events.

1.2. Authority. -- W. Va. Constitution, Article XII, §2 and W. Va. Code §18-2-5.

1.3. Filing Date. -- July 11, 2019.

1.4. Effective Date. -- September 9, 2019.

1.5. Repeal of Former Rule. — This legislative rule amends W. Va. 127CSR4, West Virginia Secondary School Activities Commission Series 4, Provisions Governing Conduct, filed July 9, 2015, and effective September 8, 2015.

**§127-4-2. Sportsmanship.**

2.1. Member schools are required to conduct all relations with other schools in a spirit of good sportsmanship. Acts which are prima facie evidence of failure to abide by this rule are those which are noted below and others of similar nature which violate the accepted code of good sportsmanship.

2.2. It shall be the responsibility of the home schools to take proper steps and precautions to insure that crowd and spectator control is handled reasonably at all interscholastic athletic contests including all post season athletic contests whether home or away. In addition to the spectators, attention must be directed to the safety, comfort, and security of the coaches, officials, and students. Their seating accommodations should protect them from spectator interference.

2.3. It shall be the responsibility of any team, student, coach, or attendant to remain in or a part of a contest until its normal end as provided by the National Federation Rules of that particular sport. The exception to the above would be provided by the same National Federation Rules of that particular sport. The penalty for a violation by a coach, student, or team attendant will not only involve ejection during that particular contest but shall also involve that student, coach, or team attendant not being a part of that school's team for the next regularly scheduled contest(s) or post season progression in a playoff tournament, as regulated in §127-4-3.7.3. The coach, student, or team attendant may practice in the days prior to the contest but may not dress or participate on the day of the contest. Rule 127-3-8 further explains the forfeiture consequences. (Revised 2011-12)

2.4. It shall be the responsibility of a member school to use every means at its disposal to impress upon its faculty, student body, team members, coaching staff, and officials the values of sportsmanship in preparation for the conduct and management of interscholastic contests.

WVSSAC000191

**127CSR4**

2.5. It shall be the responsibility of an administrator, spectator, student, or coach to follow those directions provided for in the Code for Interscholastic Athletics.

**§127-4-3. Code for Interscholastic Athletics.**

3.1. The school administrator shall:

3.1.a. Encourage and promote friendly relationships and good sportsmanship throughout the school by requiring courtesy and proper decorum at all times, by acquainting students and others in the community with ideals of good sportsmanship and by so publicizing these concepts and attitudes that all members of the school and community will understand their meaning.

3.1.b. Insist upon implicit compliance with all rules and regulations of the West Virginia Secondary School Activities Commission, hereinafter referred to in this rule as the WVSSAC.

3.1.c. Secure WV registered officials for all contests.

3.1.d. Insist upon adequate safety provisions for all activities, for both participants and spectators.

3.1.e. Approve only those activities and schedules which are educationally and physically sound for the student.

3.1.f. Encourage all to judge the success of the athletic program on the basis of the education goals and the attitude of the participants and spectators, rather than on the basis of the number of games won or lost.

3.1.g. Insist that the students exemplify the highest standards of good sportsmanship as a means of inculcating desirable spectator attitudes.

3.1.h. Provide adequate hygienic, sanitary, and attractive facilities for the dressing and housing of visiting teams and officials.

3.1.i. Review with staff the Sportsmanship Rule.

3.2. The coach shall:

3.2.a. Demonstrate high ideals, good habits, and desirable attitudes in personal behavior and demand the same standards of the students.

3.2.b. Recognize that the purpose of competition is to promote the physical, mental, social, and emotional well-being of the students and that the most important values of competition are derived from playing the game fairly.

3.2.c. Be a modest winner and a gracious loser.

3.2.d. Maintain self-control at all times, accepting adverse decisions without public display of emotion or of dissatisfaction with the officials.

WVSSAC000192

**JA3034**

**127CSR4**

3.2.e. Cooperate with the school principal in the planning, scheduling and conduct of sports activities.

3.2.f. Employ accepted educational methods in coaching, giving all students an opportunity to use and develop initiative, leadership, and judgment.

3.2.g. Pay close attention to the physical condition and well-being of the students refusing to jeopardize the health of an individual for the sake of improving the team's chances to win.

3.2.h. Teach students that it is better to lose fairly than win unfairly.

3.2.i. Prohibit gambling, profanity, abusive language, and similar violations of good sportsmanship.

3.2.j. Refuse to disparage an opponent, an official, or others associated with athletic activities and discourage gossip and questionable rumors concerning them.

3.2.k. Properly supervise students under their immediate care and specifically observe a coach's responsibilities in conjunction with state interscholastic contests.

3.3. The spectator shall:

3.3.a. Realize that they represent the school just as definitely as does the member of a team, and, therefore, has an obligation to be a true sportsman, encouraging through this behavior the practice of good sportsmanship by others.

3.3.b. Recognize that good sportsmanship is more important than victory by approving and applauding good team play, individual skill and outstanding examples of sportsmanship and fair play exhibited by either team.

3.3.c. Recognize that, since the primary purpose of interscholastic athletics is to promote the physical, mental, moral, social, and emotional well-being of the students through the medium of contests, victory or defeat is in reality of secondary importance.

3.3.d. Treat visiting teams and officials as guests, extending to them every courtesy.

3.3.e. Be modest in victory and gracious in defeat.

3.3.f. Respect the judgment and integrity of officials, realizing that their decisions are based upon game conditions as they observe them.

3.4. The student shall:

3.4.a. Be courteous to visiting teams and officials.

3.4.b. Participate to the limit of their ability. The true student does not give up, nor do they quarrel, cheat, bet, or grandstand.

3.4.c. Be modest when successful and be gracious in defeat. A true "sport" does not offer excuses for failures.

WVSSAC000193

**127CSR4**

3.4.d. Maintain a high degree of physical fitness by observing team and training rules conscientiously.

3.4.e. Demonstrate loyalty to the school by maintaining satisfactory scholastic standing and by participating in and supporting other school activities.

3.4.f. Understand and observe the rules of the game and the standards of eligibility.

3.4.g. Respect the integrity and judgment of officials and accept their decisions without questions.

3.4.h. Respect the facilities of host schools and the trust entailed in being a guest.

3.4.i. The cheerleader shall always cheer positively for the team and never negatively against the opponent.

3.5. The official shall:

3.5.a. Place the welfare of the student above all other considerations.

3.5.b. Know the game rules thoroughly and give intelligent interpretations.

3.5.c. Maintain confidence and control from start to finish.

3.5.d. Work cooperatively with fellow officials and game administrators.

3.5.e. Refrain from exhibiting emotions or arguing with a student or coach. Maintain self-control under all conditions.

3.5.f. Be fair, impartial and professional.

3.5.g. Be neat and dress in the appropriate uniform.

3.5.h. Be in adequate physical condition for the demands of the particular sport.

3.5.i. Refrain from commenting upon or discussing a team, play, game situation, or fellow official.

3.5.j. So conduct the game as to enlist the cooperation of students, coaches, and spectators in the interest of good sportsmanship.

3.6. *Protection, Facilities, and Assistance.*  The home team is expected to furnish supervision. Outdoor facilities or playing facilities should be separated from the spectators by a restraining barrier (fence, wire, rope, etc.). Officials should be provided with a parking space, private dressing facilities not accessible to unauthorized personnel, and should be paid no later than half-time of game. The use of trained, competent, adult "assistant officials," i.e., scorers, timers, chain and down marker crews, etc., is strongly recommended.

3.7. *Statement of Policy.* Insofar as unsportsmanlike actions by students, school administrators, officials, coaches, faculty members, and spectators are concerned, the identical items under the Sportsmanship Rule along with the following guides will be referred to by the WVSSAC:

WVSSAC000194

## 127CSR4

3.7.a.  The school whose coach behaves in a manner likely to have adverse influence on the attitudes of students or spectators may be provided with the choice of taking disciplinary action against that coach or having the entire school disciplined by the WVSSAC.

3.7.b.  Any student who in protest lays hands or attempts to lay hands upon an official may be declared ineligible by the principal or by the WVSSAC for up to one year.  Any student who strikes an opponent, coach, or a spectator during or following an athletic event may be declared ineligible by the principal or the WVSSAC for a specified period of time up to one year, depending on the seriousness of the act.

3.7.c.  Any coach, student, or bench personnel ejected by an official will be suspended for the remainder of the game, match, meet or contest.  The coach, student, or bench personnel ejected by an official will also be suspended in additional contest(s); the suspension will be assessed based upon ten (10) percent of the allowed regular season contests or post season progression in a playoff tournament for each sport.  Any tenth of a percentage from .1 to .4 will be a suspension equal to the whole number of the percent.  Any tenth from .5 to .9 will be an additional contest added to the whole number.  The suspension will include the number of indicated contests in that sport and at that level and all other sport contests in the interim at any level.  A second ejection will result in the doubling of the suspension assessed for the first ejection.  If an individual is ejected for a third time during the same sport season, the individual will be suspended from participating or coaching for 365 calendar days from the date of ejection.  In accordance with Rule 127315.3, an individual ejected by an official may not appeal that ejection, or any subsequent suspension that is a consequence of the ejection by an official. (Revised 2012-13; 2015-16)

3.7.c.1.  Any coach, player or bench personnel who has been ejected shall not be permitted to attend any contest(s) during said suspension.  He/she shall not be affiliated with the team in any capacity.  This would include but not be limited to transportation to or from the contest, meeting with the team before, during or after said contest.  He/she is not permitted to be in sight or sound of said contest venue.  Regular practice or team meetings not affiliated with a contest are permitted.(Revised 2007-08)

3.7.c.2.  If suspensions are imposed to a student or bench personnel at the end of the sport season and no contest remains, the suspension is carried over to that particular sport until the next school year.  In the case of a senior student, the penalty will continue to the next WVSSAC sponsored sport.

3.7.c.3.  Any coach suspension that cannot be enforced during the sport season in which the ejection occurs will be enforced at the beginning of the next season of that same sport.

3.7.d.  In case of spectators physically molesting an official, administrator, coach, or student, the school may be given one of two options: 1) file charges against the offender (s) or 2) accept discipline from the WVSSAC.  Any person found guilty of W. Va. Code §61-2-15(a) Assault, Battery on Athletic Officials, while these individuals are working or as a result of working an athletic contest, shall be banned from all WVSSAC athletic events for a minimum of 365 days from the date of being found guilty.  The school filing charges shall notify the WVSSAC of the incident and outcome of any legal action.

3.7.e.  The school that does not lend complete cooperation in the host school's effort to promote the spirit of good sportsmanship may be disciplined by the WVSSAC.

3.7.f.  A coach may be considered as committing unsportsmanlike conduct if they make degrading remarks about officials during or after a game either on the field of play, from the bench, or through any public news media, argues with officials, or goes through motions indicating dislike for a decision, protests

WVSSAC000195

### 127CSR4

the decision and actions of officials pertaining to the game during and after the contest, or detains the official on the field of play following a game to request a ruling or explanation of some phase of the game. If a coach feels he/she has a legitimate criticism of a penalty call or a request for a rule interpretation, such criticism or request should be made in the privacy of the coach's office or the official's quarters and should be made in a courteous manner.

3.7.g.  A student or team attendant shall not leave the bench area, team box area, or their designated off-field area during a game or contest other than during that time permitted by game or contest rules.  A coach shall not leave the bench area, team box area, or the designated off-field area during a game or contest other than during that time permitted by game or contest rules unless a student altercation is taking place and the official requests assistance.  Violation of this rule shall cause the coach, student, or team attendant to be immediately ejected from the contest; team penalized according to game or contest rules; and that coach, student, or team attendant will not be eligible to participate in the next contest as outlined in §127-4-2.3. (Revised 2019-20)

3.8.   Procedure.  Unsportsmanship action must be reported in detail to the WVSSAC.  A copy of the complaint must also be filed with the principal of the school involved.  Each principal involved shall report such information or answers to the report as they deem appropriate.  Upon receipt of all reports, the Executive Director and/or the Board of Directors of the WVSSAC shall investigate and adjudicate such reports in accordance with the powers afforded in §127-1-8.6 and 8.7 and §127-1-12.2 and 12.3 of the Constitution. Penalties up to and including suspension of member schools may be made in accordance with §127-4.

3.9.  The following defines the different types of disciplinary action which may be assessed for violation of any WVSSAC rule by a member school, administrator, coach, athlete or contest official: (Revised 2007-08)

3.9.a.  *Warning.*  A warning may be given by the Executive Director or Assistant Executive Director.  It is official notice that an inexcusable, unethical, or unsportsmanship action has occurred, is a matter of record, and that such an occurrence must not be repeated.

3.9.b.  *Probation.*  Probation is a much more severe type of warning and may be expressed two ways: 1) a school, coach, student, or team attendant on probation is told that further violations will lead to a fine or suspension; and/or 2) a school on probation is on conditional WVSSAC membership but may engage in its regular schedule, sanctioned events, and all WVSSAC tournament play, providing a program is filed with the Executive Director of the WVSSAC indicating measures to be taken to alleviate this problem which caused the school to be placed on probation.

3.9.c.  *Suspension.*  A school/coach suspended from the WVSSAC may not meet in interscholastic competition of any kind with a WVSSAC member school or a school that is a member of another state associated with the National Federation of State High School Associations.

3.9.d.  *Fine.*  A fine may be levied by the Executive Director.

3.9.e.  Each of these sanctions (Warning, Probation, Suspension and Fine) may be imposed or levied separately, or in a combination of one or more sanctions.

3.10.  *Appeals.*  All cases involving disciplinary action against member schools, coaches, students, team attendants, or officials may be protested in accordance with §127-6.  However, disciplinary action imposed by an official, including disciplinary action that is a consequence of a decision by an official, such as a suspension for an additional game or games as a consequence of an ejection, is governed by Rule 127-3-15.3 and is not subject to appeal.

WVSSAC000196

**127CSR4**

3.11. *Review of Ejections.* Disciplinary action imposed by a contest official, including disciplinary action that results in a suspension for an additional game or games as a consequence of an ejection, is not subject to appeal pursuant to Rule §127-6. However, if the individual ejected believes the ejection was improper, he/she may request a review of the ejection by his/her principal. If the principal believes there is merit in the requested review, the principal shall complete and submit the WVSSAC Ejection Review Form within 24 hours or the next business day of the ejection to the Executive Director of the WVSSAC. If a review is properly requested, the WVSSAC will review the officials' special report, the WVSSAC Ejection Review Form, and such other information as the WVSSAC deems appropriate. Upon review, the WVSSAC Executive Director or the designated Assistant Director will either sustain the ejection and any consequent suspension(s), or will determine the ejection was improper and void any consequent suspension(s). A decision by the WVSSAC upon reviewing an ejection is not subject to appeal pursuant to Rule §127-6.

WVSSAC000197

**JA3039**

**127CSR5**

**TITLE 127**
**LEGISLATIVE RULE**
**WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION**

**SERIES 5**
**BAND ACTIVITIES**

**§127-5-1. General.**

1.1. Scope. — These rules and regulations govern band activities.

1.2. Authority. — W. Va. Constitution, Article XII, §2, and W. Va. Code §§18-2-5, 18-2-25, 18-2-25a, and 18225b.

1.3. Filing Date. — August 10, 2018.

1.4. Effective Date. — October 9, 2018.

1.5. Repeal of Former Rule. — This legislative rule amends W. Va. 127CSR5, West Virginia Secondary School Activities Commission Series 5, Band Activities, filed June 7, 2002, and effective August 5, 2002.

**§127-5-2. Enrollment and Membership - Band.**

2.1. All members of a member school band must be enrolled in that school; §127-5-2.3 is the only exception.

2.2. Majorettes, flag corps, drill teams, etc. are considered an integral part of the band and shall be adjudicated and governed accordingly. Any performance by a majorette, member of a flag corps or drill team, without the band, shall not be considered a band activity.

2.3. Instrumental music students in 7th and 8th grades of a feeder school which does not have its own band and who receive their instruction from the band director of the senior high band in which the students will eventually enroll shall be eligible to participate in the band directed by their instructor. (Revised 2018-19)

2.4. Participants in secondary school interscholastic band activities shall be eligible only for the number of years in which they are enrolled and attending a secondary school.

2.5. Students enrolled in schools serving grades five through eight may be eligible to participate in all band activities.

**§127-5-3. Scholarship - Band.**

3.1. All students are required to be enrolled in the equivalent of at least four content area course credits toward graduation. Failure to earn passing marks in the equivalent of at least four content area courses toward graduation shall render a student ineligible for the following semester.

3.1.a. Two of those four content area course credits must be in English-language arts, social studies, mathematics or science, and may or may not be in the same subject.

WVSSAC000198

**127CSR5**

3.1.b. If a student has completed all state, county, and school requirements, they may select four full credits from any area of the curriculum offered by the school.

3.1.c. If a student is taking a multiple period block course, such as vocational courses for a full morning or afternoon, it may be counted as more than one course. The number of courses counted will be equal to the units of full credits given; however, §127-5-1.1 and §127-5-1.2 apply.

3.2. Full credit may be awarded for outside courses and experimental programs developed by the school itself provided that it meets standards established by the county and West Virginia Board of Education. Such credit must be earned during the regular school term.

3.3. In order for a withdrawn student or expelled student to regain eligibility, they must complete one semester of school work.

3.4. Scholastic deficiencies cannot be made up after the last day of the semester, except when a student's final examination(s) and course credit are delayed due to illness verified by a physician.

3.5. In all cases, the official school transcript determines a student's eligibility and is regarded as final.

3.6. A student promoted to the 7th grade for the first time is considered to have satisfied scholastic requirements and is permitted to participate during the first semester of initial enrollment in that grade, provided the student is otherwise eligible.

**§127-5-4. Festivals - Band.**

4.1. The West Virginia Secondary School Activities Commission (WVSSAC/Commission) Board of Directors (Board of Directors) shall divide the state into regions for the purpose of band festivals and shall have the authority to place bands in those regions. They shall also determine the time, place, and management of these events.

4.2. All bands participating in those festivals shall be composed of students that meet the qualification standards set forth in these rules.

4.3. The Board of Directors shall appoint directors for the festivals. One of their responsibilities will be to contract adjudicators for the festivals.

4.4. Newly established programs are not required to participate in the regional festival.

**§127-5-5. Sanctioning - Band.**

5.1. On or before September 1 of each school year, the Board of Directors shall provide each member school a list of approved school sponsored and non-school sponsored contests and activities in which member bands may participate during the ensuing year.

5.2. Additions to this list may be made after September 1 of each school year, provided that the request for approval is filed with the Commission office at least 30 days prior to the activity.

5.3. In order to qualify for approved participation in activities outside the home county and counties contiguous to the home county (including out-of-state), bands of member schools must have participated

WVSSAC000199

**127CSR5**

within the guidelines of the WVSSAC Band Festival Plan in the most recently conducted regional band festival.

5.4. A school band shall not be absent from school more than five school days each year for the purpose of participating in band activities.

5.5. The regulations above apply only during the regular school term.

**§127-5-6. Awards - Band.**

6.1. Only a member school or a non-school organization sponsoring an activity approved by this Commission may give the following awards to a student or band: medal, trophy, cup, certificate, ribbon, plaque, unattached letter, unattached chevron, or similar award.

6.2. A student may accept as an individual or member of a school band the above specified awards in the following situations:

6.2.a. from a member school for participation;

6.2.b. in a sanctioned event; or

6.2. c. in a non-sanctioned event during the summer.

6.3. A student may not receive the following awards from any source:

6.3.a. Wearing apparel - sweaters, jackets, etc.;

6.3.b. Equipment - radio, television, etc.;

6.3.c. Music instruments, batons, etc.; and

6.3.d. Money (scholarship to institutions of higher learning are exempted).

6.4. Member school bands may accept prizes and/or gratuities for participation in sanctioned events during the school term and in non-sanctioned events during the summer.

6.5. Purchase for a student of an item mentioned in §127-5-6.3.1-4 whereby a portion is donated by a school, booster club, auxiliary agency, or any other group or organization is prohibited.

6.6. Nothing in §127-5-6 shall be interpreted to affect the recognition of scholarship or scholastic achievement.

6.7. Any student who accepts an award in any band activity, other than those approved in these rules, shall be ineligible to participate in any band activity for 365 days.

**§127-5-7. Classification of Schools - Band.**

7.1. There shall be three classes of schools for bands: Class AAA, Class AA, and Class A. The Board of Directors is authorized to determine the size of enrollment in each class.

WVSSAC000200

127CSR5

7.2.  Classification shall be determined every four years in the even numbered year and, when established, shall remain in effect for four school years.  Classification shall be based on the second month's enrollment of the previous odd numbered year.

7.3.  Enrollment standard for schools will be the active enrollment of the total number of students in grades 9, 10, 11, and 12.

7.4.  Member middle schools will not be given a classification.  **(Revised 2018-19)**

WVSSAC000201

**JA3043**

## 127CSR6

### TITLE 127
### LEGISLATIVE RULE
### WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION

### SERIES 6
### VIOLATIONS OF THE RULES

§127-6-1. General.

1.1. Scope - These rules govern the procedures for protests, contested cases and waiver of rules.

1.2. Authority - W.Va. Constitution, Article XII, §2 and W.Va. Code §18-2-25.

1.3. Filing Date - July 13, 2007.

1.4. Effective Date - September 11, 2007.

1.5 Repeal of Former Rule. This legislative rule amends W. Va. 127CSR6, West Virginia Secondary School Activities Commission Series 6, Violation of the Rules, filed June 7, 2002 and effective August 6, 2002.

§127-6-2. Powers of the Board of Directors to Impose Penalties.

2.1. All violations of rules and questions of dispute are within the power of the Board of Directors to investigate, through the Executive Director, or other authorized person or persons, and to impose such penalties as are prescribed elsewhere in this Constitution and Bylaws and as listed below.

2.2. If the Board of Directors finds a school guilty of violating the provisions of this Constitution and Bylaws, said Board of Directors has the power to:

2.2.1. Declare the school ineligible for championship honors or other activities for the current year in the activity in which the offense occurred.

2.2.2. Place the school on probation for a period of time not to exceed 365 days from date of such finding. Such probation may include the loss of voting rights for the member and/or the loss of the privilege of the member school to participate in any or all interscholastic events which are sanctioned, controlled or sponsored by this Commission, and/or the imposition of other restrictive measures as the Board of Directors may deem advisable.

2.2.3. Assess such fines as are deemed necessary and just.

2.2.4. Impose such other additional penalties as may seem justifiable in the particular case considered.

§127-6-3. Method for Protests - Deputies.

3.1. If charges against any member of the Commission cannot be satisfactorily resolved by the Deputy Board Member in the region in which such charges originate, then the charges shall be submitted in writing to the Executive Director of the West Virginia Secondary School Activities Commission (WVSSAC).

3.2. If the Executive Director is unable to resolve the charges in a manner satisfactory to the schools concerned, he shall submit the protest to the Board of Directors and the decision of said Board shall be final except as provided in Section 127-1-13.3.1 of the Constitution.

WVSSAC000202

## 127CSR6

3.3. In no case shall a protest be heard by said Board unless the principal bringing the charges notifies in writing the principal of the school being protested. A copy of such notification shall accompany the protest sent to the Executive Director.

3.4. The principal of a school against which charges have been preferred shall be permitted to appear before the Board of Directors.

### §127-6-4. Method of Protests - Executive Director.

4.1. If the Executive Director has reason to believe that any member of the WVSSAC has or is violating the rules of the Commission he shall make such investigation as he deems necessary to determine the innocence or guilt of the suspected member.

4.2. The Executive Director shall then report his findings to the principal of the offending school and set a time and place for a meeting with the principal of the school, at which meeting the principal shall be permitted to submit any pertinent evidence in defense of his school.

4.3. If the principal is not then satisfied with the decision of the Executive Director, a request may be made for a hearing before the Board of Directors at such time and place as is convenient for both the principal and the Board.

4.4. In no case shall the Board of Directors hear charges and render a decision unless the principal is given an opportunity to appear in defense of his school. After all evidence has been submitted, the Board of Directors shall render a decision which shall be final except as provided in §127-1-13.3 of the Constitution.

### §127-6-5. Method of Protests - Contested Cases.

5.1. Commencement of an appeal in a contested case by an aggrieved party, hereinafter named the petitioner, shall be instituted by the filing of a verified petition which shall contain:

5.1.1. The name and address of the petitioner.

5.1.2. The interest of the petitioner.

5.1.3. A statement of facts.

5.1.4. A statement of jurisdiction.

5.1.5. A designation of the applicable rule or rules involved.

5.1.6. An assignment of errors relied upon.

5.1.7. A statement of the relief requested.

5.2. Petitions for appeal shall be served upon the WVSSAC by registered or certified mail.

5.3. The Executive Director, or any other interested party, may file an answer, but failure to file an answer will be interpreted as a denial of the allegations contained in the petition. If they elect to file an answer, it shall contain the following:

WVSSAC000203

**127CSR6**

5.3.1.  Allegation of facts with denials, additional facts or other pertinent data.

5.3.2.  A statement of other applicable rules and statutes.

5.3.3.  A statement of objections, if any, to the parties or other portion of the petition.

5.3.4.  Designation of other interested parties.

5.4.  All answers shall be filed with the Board of Directors within five (5) days after receipt of the petition for appeal.

5.5.  In the event that the parties are unable to dispose of the issues without a hearing or if the Board of Directors elects to proceed without a pre-hearing conference, the Executive Director shall notify all parties in writing of the date, time and place set for a hearing on the appeal.  The notice shall be given at least seven (7) days in advance of the time set for the hearing and shall contain a short and plain statement of the issues involved.  Said hearing shall be conducted in conjunction with a regularly scheduled meeting of the Board of Directors.  In this event, costs for such a meeting shall not be taxed against the petitioner(s).

5.6.  The matter may be heard at a special meeting of the Board of Directors provided the petitioner(s) agrees in writing to pay all costs incidental to such meeting.  Such costs shall not exceed the actual expenses incurred.  The Board of Directors, at its discretion, may require the petitioner(s) to post adequate security for such costs with the Executive Director.

5.7.  If the petitioner(s)' appeal should prevail at the special meeting of the Board of Directors or at a subsequent hearing before the Review Board, the security deposit or the posted costs shall be returned to the petitioner(s).

5.8.  All parties to any appeal may represent themselves or be represented by an attorney licensed to practice law in the State of West Virginia.

5.9.  Irrelevant, immaterial, or unduly repetitious evidence shall be excluded.  Objections to evidentiary offers shall be noted in the record.  Any party to any such hearings may vouch the record as to any excluded testimony or other evidence.

5.10.  All evidence, including papers, records, Commission staff memoranda, and documents, in the possession of the Commission, of which it desires to avail itself, shall be offered and made a part of the record in the case.  Documentary evidence may be received in the form of copies of excerpts or by incorporation by reference.

5.11.  Every party shall have the right of cross-examination of witnesses who testify, and shall have the right to submit rebuttal evidence.

5.12.  All of the testimony and evidence of any such hearing shall be reported by stenographic notes and characters or by mechanical means.  All rulings on the admissibility of testimony and evidence shall also be reported.  The Board of Directors shall prepare an official record, which shall include reported testimony and exhibits in each contested case, and all Commission staff memoranda and data used in consideration of the case, but it shall not be necessary to transcribe the reported testimony unless required for purpose of rehearing or review.  Informal disposition may also be made of any contested case by stipulation, agreed settlement, consent order or default.

WVSSAC000204

## 127CSR6

### §127-6-6. Review Board.

6.1. Any decision of the Board of Directors involving penalty, protest or interpretation of the rules and regulations of this Commission may be appealed to the Review Board in the manner hereinafter described. Said appeal may be made by any member of the aggrieved party which is directly affected by the decision of the Board of Directors and aggrieved by such decision of the Board of Directors.

6.2. Appeals must be filed with the State Superintendent of Schools of West Virginia within fifteen days after any final decision of the Board of Directors of the WVSSAC.

6.3. Upon receipt of said appeal, the State Superintendent of Schools shall immediately notify each member of the Review Board of said appeal and the Chairman of said Review Board who shall forthwith set a date, time and place for hearing and shall immediately notify all interested parties, in writing, of the same.

6.4. The filing of any appeal shall not stay enforcement nor act to supersede the prior ruling or decision of the Board of Directors. However, pending the hearing on any appeal, at its discretion, the Board of Directors may grant a stay of enforcement upon such terms as it deems proper.

6.5. Proceedings for review shall be instituted by filing a petition, in quintuplicate, with the State Superintendent of Schools within fifteen days after the date upon which such party received notice of the final order or decision of the Board of Directors. A copy of the petition shall be served upon the WVSSAC or its Executive Director and all other parties of record by registered or certified mail. The petition shall state whether the appeal is taken on questions of law or questions of fact, or both. No appeal bond shall be required to effect any such appeal.

6.6. Within fifteen days after receipt of a copy of the petition by the WVSSAC or its Executive Director, or within such further time as the Review Board may allow, said Commission or said Executive Director shall transmit to such Review Board, the original or a certified copy of the entire record of the proceedings under review, including a transcript of all testimony and all papers, motions, documents, evidence and records as were before the said Commission, all Commission staff memoranda submitted in connection with the case, and a statement of matters officially noted; but, by stipulation of all parties to the review proceedings, the record may be shortened. The expense of preparing such record shall be taxed as a part of the costs of the appeal. The appellant shall provide security for costs involved. Upon demand by any party to the appeal, said Commission shall furnish, at the cost of the party requesting same, a copy of such record. In the event the complete record is not filed with the Review Board within the time provided for in this section, the appellant may apply to the Review Board to have the case docketed, and the Review Board shall order such record filed. Failure of the said Commission to file the record within the time stipulated shall automatically stay the enforcement of the order or decision of the Board of Directors, in that particular case, and such stay shall continue until such record is filed.

6.7. Appeals taken on questions of law, fact or both, shall be heard upon assignment of error filed in the cause or set out in the briefs of the appellant. Errors not argued by brief may be disregarded, but the Review Board may consider and decide errors which are not assigned or argued.

6.8. The review shall be conducted by the Review Board without a jury and shall be upon the records made before the Commission, except that in cases of alleged irregularities in procedure before the Commission not shown in the record, testimony thereon may be taken before the Review Board. The Review Board may hear oral arguments and require written briefs.

WVSSAC000205

**127CSR6**

6.9.  After hearing all evidence and arguments, the Review Board shall render a decision in one of three forms:  (1)  sustaining the ruling of the Board of Directors; (2) reversing the ruling of the Board of Directors; or (3) remanding the matter to the Board of Directors for further action.  The Board of Review shall reverse, vacate or modify the order or decision of the Board of Directors if the substantial rights of the petitioner or petitioners have been prejudiced because of the administrative findings, inferences, conclusions, decisions or order are (1) in violation of constitutional or statutory provisions; or (2) in excess of the statutory authority or jurisdiction of the Commission; or (3) made upon unlawful procedures; or (4) affected by other error of law; or (5) clearly wrong in view of the reliable probative and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

6.10.  Four members, present and voting, shall constitute a quorum for the Review Board to transact all business.

6.11.  A majority vote of those members of the Review Board in attendance at any hearing shall be required to render a decision.  Such decision shall be final and binding on all parties concerned.

6.12.  Within thirty (30) days from the date of any hearing, the Review Board shall make a written report of its decision, stating briefly therein its reasons for such a decision.  Copies of the report shall be mailed to the State Superintendent of Schools, the Executive Director of the WVSSAC and, upon written request, to other interested parties.

6.13.  Nothing in this Article shall be construed to limit the Board of Directors in performing its regular duties as provided in the Constitution and Bylaws of the WVSSAC; in making investigations and initiating proceedings against any member of said Commission; in making interpretations of the rules of eligibility of student athletes, cheerleaders or band members; or in imposing penalties for the violations of any rules, regulations, or Bylaws of said Commission.

6.14.  The Constitution §127-1-8.5 and Rules §127-6-2, §127-6-3.2 and §127-6-4.4 which infer or state that decisions of the Board of Directors are final, are hereby modified only to the extent that such final ruling of the Board of Directors may be appealed within the time limit in the manner prescribed elsewhere in this Article and affirmed, reversed or remanded by the Board of Review.

WVSSAC000206

**JA3048**

## HIGH SCHOOL
### WVSSAC STANDARDIZED CALENDAR
### 2021-2027

| | Date and-or Week No. | 2021-2022 | 2022-2023 | 2023-2024 | 2024-2025 | 2025-2026 | 2026-2027 |
|---|---|---|---|---|---|---|---|
| **BAND** | | | | | | | |
| State Contest | Mon. of Wk. 38 to Sat. of Wk. 43 | Mar. 21 Apr. 30 | Mar. 20 Apr. 29 | Mar. 18 Apr. 27 | Mar. 24 May 3 | Mar. 23 May 2 | Mar. 22 May 1 |
| **BASEBALL** | | | | | | | |
| Season Starts | Mon. of Wk. 35 | Feb. 28 | Feb. 27 | Feb. 26 | Mar. 3 | Mar. 2 | Mar. 1 |
| 1st Contest May Be Held | Wed. of Wk. 37 | Mar. 16 | Mar. 15 | Mar. 13 | Mar. 19 | Mar. 18 | Mar. 17 |
| Sectional | (45-46) Mon-Sat | May 9-21 | May 8-20 | May 6-18 | May 12-24 | May 11-23 | May 10-22 |
| Regional | (47) Mon-Sat | May 23-28 | May 22-27 | May 20-25 | May 26-31 | May 25-30 | May 24-29 |
| State | (48) Thurs-Sat | June 2-4 | June 1-3 | May 30-June 1 | June 5-7 | June 4-6 | June 3-5 |
| **BASKETBALL BOYS'** | | | | | | | |
| Season Starts | Mon. of Wk. 20 | Nov. 15 | Nov. 14 | Nov. 13 | Nov. 18 | Nov. 17 | Nov. 16 |
| 1st Contest May Be Held | Tues. of Wk. 23 | Dec. 7 | Dec. 6 | Dec. 5 | Dec. 10 | Dec.9 | Dec. 8 |
| Sectional | (34-35) Fri-Sat | Feb. 25-Mar. 5 | Feb. 24-Mar. 4 | Feb. 23-Mar. 2 | Feb. 28-Mar. 8 | Feb. 27-Mar. 7 | Feb. 26-Mar. 6 |
| Regional | (36) Tues-Thurs | Mar. 8-10 | Mar. 7-9 | Mar. 5-7 | Mar. 11-13 | Mar. 10-12 | Mar. 9-11 |
| State | (37) Wed-Sat | Mar. 16-19 | Mar. 15-18 | Mar. 13-16 | Mar. 19-22 | Mar. 18-21 | Mar. 17-20 |
| **BASKETBALL GIRLS'** | | | | | | | |
| Season Starts | Mon. of Wk. 19 | Nov. 8 | Nov. 7 | Nov. 6 | Nov. 11 | Nov. 10 | Nov. 9 |
| 1st Contest May Be Held | Tues. of Wk. 22 | Nov. 30 | Nov. 29 | Nov. 28 | Dec. 3 | Dec. 2 | Dec. 1 |
| Sectional | (33-34) Fri-Sat | Feb. 18-26 | Feb. 17-25 | Feb. 16-24 | Feb. 21-Mar. 1 | Feb. 20-28 | Feb. 19-27 |
| Regional | (35) Tues-Thurs | Mar. 1-3 | Feb. 28-Mar. 2 | Feb. 27-29 | Mar. 4-6 | Mar. 3-5 | Mar. 2-4 |
| State | (36) Wed-Sat | Mar. 9-12 | Mar. 8-11 | Mar. 6-9 | Mar. 12-15 | Mar. 11-14 | Mar. 10-13 |
| **CHEERLEADING** | | | | | | | |
| Season Starts | Mon. of Wk. 5 | Aug. 2 | Aug. 1 | July 31 | Aug. 5 | Aug. 4 | Aug. 3 |
| Regional | (18) Sat | Nov. 6 | Nov. 5 | Nov. 4 | Nov. 9 | Nov. 8 | Nov. 7 |
| State Contest | (23) Sat | Dec. 11 | Dec. 10 | Dec. 9 | Dec. 14 | Dec.13 | Dec. 12 |
| Season Ends | | Mar. 19 | Mar. 18 | Mar. 16 | Mar. 22 | Mar. 21 | Mar. 20 |
| **CROSS COUNTRY** | | | | | | | |
| Season Starts | Mon. of Wk. 5 | Aug. 2 | Aug. 1 | July 31 | Aug. 5 | Aug. 4 | Aug. 3 |
| 1st Contest May Be Held | Sat. of Wk. 7 | Aug. 21 | Aug. 20 | Aug. 19 | Aug. 24 | Aug. 23 | Aug. 22 |
| Regional | (16) Thurs-Sat | Oct. 21-23 | Oct. 20-22 | Oct. 19-21 | Oct. 24-26 | Oct. 23-25 | Oct. 22-24 |
| State | (17) Sat | Oct. 30 | Oct. 29 | Oct. 28 | Nov. 2 | Nov. 1 | Oct. 31 |
| **FOOTBALL** | | | | | | | |
| Season Starts | Mon. of Wk. 5 | Aug. 2 | Aug. 1 | July 31 | Aug. 5 | Aug. 4 | Aug. 3 |
| 1st Contest May Be Held | Wk. 8 | Aug. 22 | Aug. 22 | Aug. 21 | Aug. 26 | Aug. 25 | Aug. 24 |
| Play-Off 1st Round | (19) Fri-Sat | Nov. 12-13 | Nov. 11-12 | Nov. 10-11 | Nov. 15-16 | Nov. 14-15 | Nov. 13-14 |
| Play-Off 2nd Round | (20) Fri-Sat | Nov. 19-20 | Nov. 18-19 | Nov. 17-18 | Nov. 22-23 | Nov. 21-22 | Nov. 20-21 |
| Play-Off 3rd Round | (21) Fri-Sat | Nov. 26-27 | Nov. 25-26 | Nov. 24-25 | Nov. 29-30 | Nov. 28-29 | Nov. 27-28 |
| Championship | (22) Fri-Sat | Dec. 3-4 | Dec. 2-3 | Dec. 1-2 | Dec. 6-7 | Dec.5-6 | Dec. 4-5 |
| **GOLF** | | | | | | | |
| Season Starts | Mon. of Wk. 5 | Aug. 2 | Aug. 1 | July 31 | Aug. 5 | Aug. 4 | Aug. 3 |
| 1st Contest May Be Held | Tues. of Wk. 5 | Aug. 3 | Aug. 2 | Aug. 1 | Aug. 6 | Aug. 5 | Aug. 4 |
| Regional | (13) Mon | Sept. 27 | Sept. 26 | Sept. 25 | Sept. 30 | Sept.29 | Sept.28 |
| State | (14) Tues-Wed | Oct. 5-6 | Oct. 4-5 | Oct. 3-4 | Oct. 8-9 | Oct. 7-8 | Oct. 6-7 |
| **SOCCER** | | | | | | | |
| Season Starts | Mon. of Wk. 5 | Aug. 2 | Aug. 1 | July 31 | Aug. 5 | Aug. 4 | Aug. 3 |
| 1st Contest May Be Held | Fri. of Wk. 7 | Aug. 20 | Aug. 19 | Aug. 18 | Aug. 23 | Aug. 22 | Aug. 21 |
| Sectional | (16) Mon-Sat | Oct. 18-23 | Oct. 17-22 | Oct. 16-21 | Oct. 21-26 | Oct. 20-25 | Oct. 19-24 |
| Regional Final | (17) Tues, Thurs | Oct. 26, 28 | Oct. 25, 27 | Oct. 24, 26 | Oct. 29, 31 | Oct. 28, 30 | Oct. 27, 29 |
| State | (18) Fri-Sat | Nov. 5-6 | Nov. 4-5 | Nov. 3-4 | Nov. 8-9 | Nov. 7-8 | Nov. 6-7 |
| **SOFTBALL** | | | | | | | |
| Season Starts | Mon. of Wk. 35 | Feb. 28 | Feb. 27 | Feb. 26 | Mar. 3 | Mar. 2 | Mar. 1 |
| 1st Contest May Be Held | Wed. of Wk. 37 | Mar. 16 | Mar. 15 | Apr. 29-May 11 | Mar. 19 | Mar. 16 | Mar. 17 |
| Sectional | (44-45) Mon-Sat | May 2-14 | May 1-13 | May 1-13 | May 5-17 | May 4-15 | May 3-14 |
| Regional | (46) Mon-Sat | May 16-21 | May 15-20 | May 13-18 | May 19-24 | May 18-23 | May 17-22 |
| State | (47) Wed-Thurs | May 25-26 | May 24-25 | May 22-23 | May 28-29 | May 27-28 | May 26-27 |
| **SWIMMING** | | | | | | | |
| Season Starts | Mon. of Wk. 17 | Oct. 25 | Oct. 24 | Oct. 23 | Oct. 28 | Oct. 27 | Oct. 26 |
| 1st Contest May Be Held | Wed. of Wk. 19 | Nov. 10 | Nov. 9 | Nov. 8 | Nov. 13 | Nov. 12 | Nov. 11 |
| Regional | (31) Sat | Feb. 5 | Feb. 4 | Feb. 3 | Feb. 8 | Feb. 7 | Feb. 6 |
| State | (33) Thurs-Fri | Feb. 17-18 | Feb. 16-17 | Feb. 15-16 | Feb. 20-21 | Feb. 19-20 | Feb. 18-19 |
| **TENNIS** | | | | | | | |
| Season Starts | Mon. of Wk. 35 | Feb. 28 | Feb. 27 | Feb. 26 | Feb. 25 | Mar. 2 | Mar. 1 |
| 1st Contest May Be Held | Wed. of Wk. 37 | Mar. 16 | Mar. 15 | Mar. 13 | Mar. 13 | Mar. 18 | Mar. 17 |
| Regional | (44) Mon-Sat | May 2-7 | May 1-6 | Apr. 29-May 4 | Apr. 29-May 4 | May 4-9 | May 3-8 |
| State | (45) Thurs-Sat | May 12-14 | May 11-13 | May 10-12 | May 9-11 | May 14-16 | May 13-15 |
| **TRACK** | | | | | | | |
| Season Starts | Mon. of Wk. 35 | Feb. 28 | Feb. 27 | Feb. 26 | Mar. 3 | Mar. 2 | Mar. 1 |
| 1st Contest May Be Held | Wed. of Wk. 37 | Mar. 16 | Mar. 15 | Mar. 13 | Mar. 19 | Mar. 18 | Mar. 17 |
| Regional | (45) Wed-Sat | May 11-14 | May 10-13 | May 8-11 | May 14-17 | May 13-16 | May 12-15 |
| State | (46) Fri-Sat | May 20-21 | May 19-20 | May 17-18 | May 23-24 | May 22-23 | May 21-22 |
| **VOLLEYBALL** | | | | | | | |
| Season Starts | Mon. of Wk. 6 | Aug. 9 | Aug. 8 | Aug. 7 | Aug. 6 | Aug. 11 | Aug. 10 |
| 1st Contest May Be Held | Wed. of Wk. 8 | Aug. 25 | Aug. 24 | Aug. 23 | Aug. 28 | Aug. 27 | Aug. 26 |
| Sectional | (18) Mon-Thurs. | Nov. 1-4 | Oct. 31-Nov. 3 | Oct. 30-Nov. 2 | Oct. 29-Nov. 1 | Nov. 3-6 | Nov. 2-5 |
| Regional | (18) Sat | Nov. 6 | Nov. 5 | Nov. 4 | Nov. 3 | Nov. 8 | Nov. 7 |
| State | (19) Fri-Sat | Nov. 12-13 | Nov. 11-12 | Nov. 10-11 | Nov. 10-11 | Nov. 14-15 | Nov. 13-14 |
| **WRESTLING** | | | | | | | |
| Season Starts | Mon. of Wk. 20 | Nov. 15 | Nov. 14 | Nov. 13 | Nov. 18 | Nov. 17 | Nov. 16 |
| 1st Contest May Be Held | Wed. of Wk. 22 | Dec. 1 | Nov. 30 | Nov. 29 | Dec. 4 | Dec.3 | Dec. 2 |
| Regional | (33) Sat | Feb. 19 | Feb. 18 | Feb. 17 | Feb. 22 | Feb. 21 | Feb. 20 |
| State | (35) Thurs-Sat | Mar. 3-5 | Mar. 2-4 | Feb. 29-Mar. 2 | Mar. 6-8 | Mar.5-7 | Mar. 4-6 |

WVSSAC000207

# MIDDLE SCHOOL
## WVSSAC STANDARDIZED CALENDAR
### 2021-2027

| | Date and-or Week No. | 2021-2022 | 2022-2023 | 2023-2024 | 2024-2025 | 2025-2026 | 2026-2027 |
|---|---|---|---|---|---|---|---|
| **BAND** State Contest | Mon. of Wk. 38 to Sat. of Wk. 43 | Mar. 21 Apr. 30 | Mar. 20 Apr. 29 | Mar. 18 Apr. 27 | Mar. 21 May 3 | Mar. 23 May 2 | Mar. 22 May 1 |
| **BASEBALL** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 35 Wed. of Wk. 37 Sat. of Wk. 45 | Feb. 28 Mar. 16 May 14 | Feb. 27 Mar. 15 May 13 | Feb. 26 Mar. 13 May 11 | Mar. 3 Mar. 19 May 17 | Mar. 2 Mar. 18 May 16 | Mar. 1 Mar. 17 May 15 |
| **BASKETBALL BOYS'** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 19 Wed. of Wk. 22 Sat. of Wk. 34 | Nov. 8 Dec. 1 Feb. 26 | Nov. 7 Nov. 30 Feb. 25 | Nov. 6 Nov. 29 Feb. 24 | Nov. 11 Dec. 4 Mar. 1 | Nov. 10 Dec.3 Feb. 28 | Nov. 9 Dec. 2 Feb. 27 |
| **BASKETBALL GIRLS'** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 18 Wed. of Wk. 21 Sat. of Wk. 33 | Nov. 1 Nov. 24 Feb. 19 | Oct. 31 Nov. 23 Feb. 18 | Oct. 30 Nov. 22 Feb. 17 | Nov. 4 Nov. 27 Feb. 22 | Nov. 3 Nov. 26 Feb. 21 | Nov. 2 Nov. 25 Feb. 20 |
| **CHEERLEADING** Season Starts Season Ends | Mon. of Wk. 6 Sat. of Wk. 34 | Aug. 9 Feb. 26 | Aug. 8 Feb. 25 | Aug. 7 Feb. 24 | Aug. 12 Mar. 1 | Aug. 11 Feb. 28 | Aug. 10 Feb. 27 |
| **CROSS COUNTRY** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 5 Wed. of Wk. 7 Tues. of Wk. 16 | Aug. 2 Aug. 18 Oct. 19 | Aug. 1 Aug. 17 Oct. 18 | July 31 Aug. 16 Oct. 17 | Aug. 5 Aug. 21 Oct. 22 | Aug. 4 Aug. 20 Oct. 21 | Aug. 3 Aug. 19 Oct. 20 |
| **FOOTBALL** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 6 (9) Mon-Sat (17) Sat | Aug. 9 Aug. 30-Sept. 4 Oct. 30 | Aug. 8 Aug. 29-Sept. 3 Oct. 29 | Aug. 7 Aug. 28-Sept. 2 Oct. 28 | Aug. 12 Sept. 2-7 Nov. 2 | Aug. 11 Sept. 1-6 Nov. 1 | Aug. 10 Aug. 31-Sept.5 Oct. 31 |
| **GOLF** | There shall be one season for golf in middle school, either fall or spring; however, the season selected shall be no longer than 10 weeks. | | | | | | |
| **SOCCER** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 6 Mon. of Wk. 9 Sat. of Wk. 17 | Aug. 9 Aug. 30 Oct. 30 | Aug. 8 Aug. 29 Oct. 29 | Aug. 7 Aug. 28 Oct. 28 | Aug. 12 Sept. 2 Nov. 2 | Aug. 11 Sept. 1 Nov. 1 | Aug. 10 Aug. 31 Oct. 31 |
| **SOFTBALL** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 35 Wed. of Wk. 37 Sat. of Wk. 45 | Feb. 28 Mar. 16 May 14 | Feb. 27 Mar. 15 May 13 | Feb. 26 Mar. 13 May 11 | Mar. 3 Mar. 19 May 17 | Mar. 2 Mar. 18 May 16 | Mar. 1 Mar. 17 May 15 |
| **SWIMMING** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 17 Wed. of Wk. 19 Sat. of Wk. 32 | Oct. 25 Nov. 10 Feb. 12 | Oct. 24 Nov. 9 Feb. 11 | Oct. 23 Nov. 8 Feb. 10 | Oct. 28 Nov. 13 Feb. 15 | Oct. 27 Nov. 12 Feb. 14 | Oct. 26 Nov. 11 Feb. 13 |
| **TENNIS** | There shall be one season for tennis in middle school, either fall or spring; however, the season selected shall be no longer than 12 weeks. | | | | | | |
| **TRACK** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 35 Wed. of Wk. 37 Thurs. of Wk. 46 | Feb. 28 Mar. 16 May 19 | Feb. 27 Mar. 15 May 18 | Feb. 26 Mar. 13 May 16 | Mar. 3 Mar. 19 May 22 | Mar. 2 Mar. 18 May 21 | Mar. 1 Mar. 17 May 20 |
| **VOLLEYBALL** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 7 Wed. of Wk. 9 Sat. of Wk. 17 | Aug. 16 Sept. 1 Oct. 30 | Aug. 15 Aug. 31 Oct. 29 | Aug. 14 Aug. 30 Oct. 28 | Aug. 19 Sept. 4 Nov. 2 | Aug. 18 Sept. 3 Nov. 1 | Aug. 17 Sept. 2 Oct. 31 |
| **WRESTLING** Season Starts 1st Contest May Be Held Season Ends | Mon. of Wk. 19 Wed. of Wk. 22 Sat. of Wk. 33 | Nov. 8 Dec. 1 Feb. 19 | Nov. 7 Nov. 30 Feb. 18 | Nov. 6 Nov. 29 Feb. 17 | Nov. 11 Dec. 4 Feb. 22 | Nov. 10 Dec. 3 Feb. 21 | Nov. 9 Dec. 2 Feb. 20 |

WVSSAC000208

NATIONAL FEDERATION
STANDARDIZED PROCEDURE FOR NUMBERING CALENDAR WEEKS

| | 2021-22 | 2022-23 | 2023-24 | 2024-25 | 2025-26 |
|---|---|---|---|---|---|
| 1 | 7/4-7/10 | 7/3-7/9 | 7/2-7/8 | 7/7-7/13 | 7/6-7/12 |
| 2 | 7/11-7/17 | 7/10-7/16 | 7/9-7/15 | 7/14-7/20 | 7/13-7/19 |
| 3 | 7/18-7/24 | 7/17-7/23 | 7/16-7/22 | 7/21-7/27 | 7/20-7/26 |
| 4 | 7/25-7/31 | 7/24-7/30 | 7/23-7/29 | 7/28-8/3 | 7/27-8/2 |
| 5 | 8/1-8/7 | 7/31-8/6 | 7/30-8/5 | 8/4-8/10 | 8/3-8/9 |
| 6 | 8/8-8/14 | 8/7-8/13 | 8/6-8/12 | 8/11-8/17 | 8/10-8/16 |
| 7 | 8/15-8/21 | 8/14-8/20 | 8/13-8/19 | 8/18-8/24 | 8/17-8/23 |
| 8 | 8/22-8/28 | 8/21-8/27 | 8/20-8/26 | 8/25-8/31 | 8/24-8/30 |
| 9 | 8/29-9/4 | 8/28-9/3 | 8/27-9/2 | 9/1-9/7 | 8/31-9/6 |
| 10 | 9/5-9/11 | 9/4-9/10 | 9/3-9/9 | 9/8-9/14 | 9/7-9/13 |
| 11 | 9/12-9/18 | 9/11-9/17 | 9/10-9/16 | 9/15-9/21 | 9/14-9/20 |
| 12 | 9/19-9/25 | 9/18-9/24 | 9/17-9/23 | 9/22-9/28 | 9/21-9/27 |
| 13 | 9/26-10/2 | 9/25-10/1 | 9/24-9/30 | 9/29-10/5 | 9/28-10/4 |
| 14 | 10/3-10/9 | 10/2-10/8 | 10/1-10/7 | 10/6-10/12 | 10/05-10/11 |
| 15 | 10/10-10/16 | 10/9-10/15 | 10/8-10/14 | 10/13-10/19 | 10/12-10/18 |
| 16 | 10/17-10/23 | 10/16-10/22 | 10/15-10/21 | 10/20-10/26 | 10/19-10/25 |
| 17 | 10/24-10/30 | 10/23-10/29 | 10/22-10/28 | 10/27-11/2 | 10/26-11/1 |
| 18 | 10/31-11/6 | 10/30-11/5 | 10/29-11/4 | 11/3-11/9 | 11/2-11/8 |
| 19 | 11/7-11/13 | 11/6-11/12 | 11/5-11/11 | 11/10-11/16 | 11/9-11/15 |
| 20 | 11/14-11/20 | 11/13-11/19 | 11/12-11/18 | 11/17-11/23 | 11/16-11/22 |
| 21 | 11/21-11/27 | 11/20-11/26 | 11/19-11/25 | 11/24-11/30 | 11/23-11/29 |
| 22 | 11/28-12/4 | 11/27-12/3 | 11/26-12/2 | 12/1-12/7 | 11/30-12/6 |
| 23 | 12/5-12/11 | 12/4-12/10 | 12/3-12/9 | 12/8-12/14 | 12/7-12/13 |
| 24 | 12/12-12/18 | 12/11-12/17 | 12/10-12/16 | 12/15-12/21 | 12/14-12/20 |
| 25 | 12/19-12/25 | 12/18-12/24 | 12/17-12/23 | 12/22-12/28 | 12/21-12/27 |
| 26 | 12/26-1/1 | 12/25-12/31 | 12/24-12/30 | 12/29-1/4 | 12/28-1/3 |
| 27 | 1/2-1/8 | 1/1-1/7 | 12/31-1/6 | 1/5-1/11 | 1/4-1/10 |
| 28 | 1/9-1/15 | 1/8-1/14 | 1/7-1/13 | 1/12-1/18 | 1/11-1/17 |
| 29 | 1/16-1/22 | 1/15-1/21 | 1/14-1/20 | 1/19-1/25 | 1/18-1/24 |
| 30 | 1/23-1/29 | 1/22-1/28 | 1/21-1/27 | 1/26-2/1 | 1/25-1/31 |
| 31 | 1/30-2/5 | 1/29-2/4 | 1/28-2/3 | 2/2-2/8 | 2/1-2/7 |
| 32 | 2/6-2/12 | 2/5-2/11 | 2/4-2/10 | 2/9-2/15 | 2/8-2/14 |
| 33 | 2/13-2/19 | 2/12-2/18 | 2/11-2/17 | 2/16-2/22 | 2/15-2/21 |
| 34 | 2/20-2/26 | 2/19-2/25 | 2/18-2/24 | 2/23-3/1 | 2/22-2/28 |
| 35 | 2/27-3/5 | 2/26-3/4 | 2/25-3/2 | 3/2-3/8 | 3/1-3/7 |
| 36 | 3/6-3/12 | 3/5-3/11 | 3/3-3/9 | 3/9-3/15 | 3/8-3/14 |
| 37 | 3/13-3/19 | 3/12-3/18 | 3/10-3/16 | 3/16-3/22 | 3/15-3/21 |
| 38 | 3/20-3/26 | 3/19-3/25 | 3/17-3/23 | 3/23-3/29 | 3/22-3/28 |
| 39 | 3/27-4/2 | 3/26-4/1 | 3/24-3/30 | 3/30-4/5 | 3/29-4/4 |
| 40 | 4/3-4/9 | 4/2-4/8 | 3/31*-4/6 | 4/6-4/12 | 4/5*-4/11 |
| 41 | 4/10-4/16 | 4/9*-4/15 | 4/7-4/13 | 4/13-4/19 | 4/12-4/18 |
| 42 | 4/17*-4/23 | 4/16-4/22 | 4/14-4/20 | 4/20*-4/26 | 4/19-4/25 |
| 43 | 4/24-4/30 | 4/23-4/29 | 4/21-4/27 | 4/27-5/3 | 4/26-5/2 |
| 44 | 5/1-5/7 | 4/30-5/6 | 4/28-5/4 | 5/4-5/10 | 5/3-5/9 |
| 45 | 5/8-5/14 | 5/7-5/13 | 5/5-5/11 | 5/11-5/17 | 5/10-5/16 |
| 46 | 5/15-5/21 | 5/14-5/20 | 5/12-5/18 | 5/18-5/24 | 5/17-5/23 |
| 47 | 5/22-5/28 | 5/21-5/27 | 5/19-5/25 | 5/25-5/31** | 5/24-5/30** |
| 48 | 5/29-6/4** | 5/28-6/3** | 5/26-6/1** | 6/1-6/7 | 5/31-6/6 |
| 49 | 6/5-6/11 | 6/4-6/10 | 6/2-6/8 | 6/8-6/14 | 6/7-6/13 |
| 50 | 6/12-6/18 | 6/11-6/17 | 6/9-6/15 | 6/15-6/21 | 6/14-6/20 |
| 51 | 6/19-6/25 | 6/18-76/24 | 6/16-6/22 | 6/22-6/28 | 6/21-6/27 |
| 52 | 6/26-7/2 | 6/25-7/1 | 6/23-6/29 | 6/29-7/5 | 6/28-7/4 |

* Easter Sunday
** Memorial Day week

78

WVSSAC000209

**JA3051**

APPENDIX C

PAST MEMBERS - BOARD OF DIRECTORS

**1916-17**
John G. Graham (Huntington), President
Benjamin H. Williams (Bluefield), Vice President
H.P. Johns (Wheeling), Secretary-Treasurer

**1917-19**
John G. Graham (Huntington), President
Benjamin H. Williams (Bluefield), Vice President
George H. Colebank (Fairmont), Secretary-Treasurer

**1919-20**
John G. Graham (Huntington), President
John L. Stewart (Parkersburg), Vice President
H.W. Piggott (Grafton), Secretary-Treasurer

**1920-22**
Lakin F. Roberts (Charleston), President
Jesse E. Riley (New Martinsville), Vice President
A.J. Gibson (Elkins), Secretary-Treasurer

**1922-23**
R.W. Shumaker (Spencer), President
Walter Riddle (Bridgeport), Vice President
A.J. Gibson (Elkins), Secretary-Treasurer

**1923-25**
H.W. Piggott (Parkersburg), President
E.E. Church (Martinsburg), Vice President
H.Y. Clark (Grafton), Secretary-Treasurer

**1925-26**
S.C. Grose (Welch), President
P.E. King (Wheeling), Vice President
H.Y. Clark (Grafton), Secretary-Treasurer

**1926-27**
S.C. Grose (Welch), President
O.D. Lambert (Kingwood), Vice President
C.M. Stalnaker (Cairo), Secretary-Treasurer

**1927-29**
Leslie D. Moore (Spencer), President
E.Q. Swan (Huntington), Vice President
C.M. Stalnaker (Cairo), Secretary-Treasurer

**1929-30**
E.Q. Swan (Huntington), President
E.G. Kuhn (Farmington), Vice President
C.M. Stalnaker (Beckley), Secretary-Treasurer

**1930-31**
E.G. Kuhn (Farmington), President
I.E. Ewing (Wheeling), Vice President
C.M. Stalnaker (Logan), Secretary-Treasurer

**1931-32**
I.E. Ewing (Wheeling), President
Vice President, Vacant — Appointed for each meeting
S. Key Dickinson (Clarksburg), Secretary-Treasurer

**1932-34**
I.E. Ewing (Wheeling), President
Rocco J. Gorman (Charleston), Vice President
S. Key Dickinson (Clarksburg), Secretary-Treasurer

**1934-39**
C.W. Jackson (Bluefield), President
C.A. Tesch (Salem), Vice President
I.E. Ewing (Wheeling), Secretary-Treasurer

**1939-44**
George M. Speicher (Dunbar), President
Dan H. Perdue (Fayetteville), Vice President
I.E. Ewing (Wheeling), Secretary-Treasurer

**1944-46**
George M. Speicher (Dunbar), President
Dan H. Perdue (Fayetteville), Vice President
I.E. Ewing (Wheeling), Secretary-Treasurer

**1946-47**
George M. Speicher (Dunbar), President
Dan H. Perdue (Fayetteville), Vice President
Fred P. Weihl (Weston), Treasurer

**1947-48**
George M. Speicher (Dunbar), President
C.F. Walker (Wellsburg), Vice President
Fred P. Weihl (Weston), Treasurer

**1948-53**
C.F. Walker (Wellsburg), President
Jonathan Y. Lowe (Milton), Vice President
Fred P. Weihl (Weston), Treasurer

**1953-59**
Jonathan Y. Lowe (Milton and Beverly Hills), President
W.G. Eismon (Charles Town), Vice President
Fred P. Weihl (Weston), Treasurer

**1959-60**
Jonathan Y. Lowe (Beverly Hills), President
John W. Saunders (Shady Spring), Vice President
Fred P. Weihl (Weston), Treasurer

**1960-61**
Jonathan Y. Lowe (Beverly Hills), President
Jake H. Moser (Saint Albans Junior High), Vice President
Fred P. Weihl (Weston), Treasurer

**1962-64**
Jake H. Moser (Saint Albans Junior High), President
Roy Coffman (Lewisburg), Vice President
Fred P. Weihl (Weston), Treasurer

**1964-66**
Roy Coffman (Alderson), President
Larney R. Gump (Barrackville), Vice President
Fred P. Weihl (Weston), Treasurer

**1966-68**
Fred P. Weihl (Berkeley Springs), President (1967)
Scott H. Davis (Morgantown), 1967
Larney R. Gump (Barrackville), Vice President
Alva T. Ball (Dunbar), Member (1967)
E.F. Garrity (DuPont Junior High), Member
Charles W. Dean, Jr., (Gary), Member
Cliff West (Wayne), Member

**1968-70**
Cliff West (Wayne), President
Charles W. Dean, Jr., (Gary), Vice President
Edwin M. Bartrug (Marmet Junior High), Member
Henry Hamilton (Elkins), Member (1969)
Robert H. Kidd, State Department of Education (Charleston), Member
Harry A. Stansbury, State School Boards Assoc. (Charleston), Member8

WVSSAC000210

**1970-71**
E.W. Malcolm (Fairmont Senior), President
Edwin M. Bartrug (Marmet Junior High), Vice President
C.W. Dean (Gary), Member
Jackson L. Flanigan (Charles Town), Member
Ray H. Watson (Wirt County), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Orlan C. Fowler, State School Boards Assoc. (Clarksburg), Member
William H. Calhoun (Herbert Hoover), Ex-Officio Member

**1971-72**
Edwin M. Bartrug (Marmet Junior High), President
Ray H. Watson (Wirt County), Vice President
Jackson L. Flanigan (Charles Town), Member
Acie B. Stewart (Herndon), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Orlan C. Fowler, State School Boards Assoc. (Clarksburg), Member

**1972-73**
Ray H. Waston (Wirt County), President
Jackson L. Flanigan (Jefferson), Vice President
Acie B. Stewart (Herndon), Member
Keith L. Holt (East Fairmont), Member
C.P. Wells (Nicholas County), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Orlan C. Fowler, State School Boards Association (Clarksburg), Member

**1973-74**
Keith L. Holt (East Fairmont), President
William G. Griffith (Horace Mann Junior High), Vice President
Ray H. Watson (Wirt County), Member
Acie B. Stewart (Herndon), Member
Ray Waldo, Jr. (Martinsburg Senior), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Orlan C. Fowler, State School Boards Assoc. (Clarksburg), Member

**1974-75**
Acie B. Stewart (Herndon), President
Ray Waldo, Jr. (Martinsburg Senior), Vice President
Ray H. Watson (Wirt County), Member
Keith L. Holt (East Fairmont), Member
John W. Lyons (Herbert Hoover), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Carlton A. Buttrey, State School Boards Assoc. (St. Marys), Member

**1975-76**
Ray Waldo, Jr. (Martinsburg Senior), President
James E. Hamrick (Clendenin Junior High), Vice President
Keith L. Holt (East Fairmont), Member
Robert W. Eakins (Williamstown), Member
Acie B. Stewart (Herndon), Member
Robert L. Turner (Big Creek), Ex-Officio Member
Robert H. Kidd, State Department of Education (Charleston), Member
Carlton A. Buttrey, State School Boards Assoc. (St. Marys), Member

**1976-77**
James E. Hamrick (Clendenin Junior High), President
Robert W. Eakins (Williamstown), Vice President
Ray Waldo, Jr. (Martinsburg Senior), Member
Keith L. Holt (East Fairmont), Member
George W. Keatley (Princeton), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Carlton A. Buttrey, State School Boards Assoc. (St. Marys), Member
Merrell S. McIlwain (South Charleston), Ex-Officio Member

**1977-78**
Robert W. Eakins (Williamstown), President
George W. Keatley (Princeton), Vice President
Warren Carter (Jefferson), Member
Keith L. Holt (East Fairmont), Member
James E. Hamrick (Clendenin Junior High), Member
Robert H. Kidd, State Department of Education (Charleston), Member
Carlton A. Buttrey, State School Boards Assoc. (St. Marys), Member

**1978-79**
George W. Keatley (Princeton), President
Warren Carter (Jefferson), Vice President
James E. Hamrick (Clendenin Junior High), Member
Robert W. Eakins (Williamstown), Member
Sam Scolapio, Jr. (Washington Irving), Member
Dr. Daniel B. Taylor, State Department of Education (Charleston), Member
Carlton A. Buttrey, State School Boards Assoc. (St. Marys), Member
Paris Hume (Greenbrier East), Ex-Officio Member

**1979-80**
Warren L. Carter (Jefferson), President
Sam Scolapio, Jr. (Washington Irving), Vice President
Robert W. Eakins (Williamstown), Member
George W. Keatley (Princeton), Member
Robert L. Perkins (Nicholas County), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
John T. Grossi (Weir), Ex-Officio Member

**1980-81**
Sam Scolapio, Jr. (Washington Irving), President
Robert L. Perkins (Nicholas County), Vice President
George W. Keatley (Princeton), Member
Warren L. Carter (Jefferson), Member
William F. Gainer (Hamilton Jr.), Member
Edna Mae Phillips, State Dept. of Education (Beckley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
John T. Grossi (Weir), Ex-Officio Member

**1981-82**
Robert L. Perkins (Nicholas County), President
William F. Gainer (Hamilton Junior High), Vice President
Warren L. Carter (Jefferson), Member
Sam Scolapio, Jr. (Washington Irving), Member
James T. Lane (Northfork), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Richard D. Johnson (Broadway Junior), Ex-Officio Member

**1982-83**
William F. Gainer (Hamilton Junior High), President
James T. Lane (Northfork), Vice President
Robert L. Perkins (Nicholas County), Member
Sam Scolapio, Jr. (Washington Irving), Member
John J. Cole (Musselman), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Jackson L. Flanigan, WV Assoc. of School Adm. (Martinsburg), Member
Norma L. Winter (Sissonville), Ex-Officio Member

**1983-84**
James T. Lane (Northfork), President
John J. Cole (Musselman), Vice President
Robert L. Perkins (Nicholas County), Member
William F. Gainer (Hamilton Junior High), Member
Vincent Paoletti (John Marshall), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Jackson L. Flanigan, WV Assoc. of School Adm. (Martinsburg), Member
James O. Gore (Peterstown), Ex-Officio Member

WVSSAC000211

**1984-85**
John J. Cole (Musselman), President
Vincent Paoletti (John Marshall), Vice President
William F. Gainer (Hamilton Junior High), Member
James T. Lane (Northfork), Member
David Gillispie (Washington Junior High, South Charleston), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Jackson L. Flanigan, WV Assoc. of School Adm. (Martinsburg), Member
Edward B. Prendergast (Richwood), Ex-Officio Member

**1985-86**
Vincent Paoletti (John Marshall), President
David Gillispie (Lincoln Junior High), Vice President
John J. Cole (Musselman), Member
James T. Lane (Northfork), Member
Jack D. Wiseman (Ripley), Member
Jackson L. Flanigan, WV Assoc. of School Adm. (Martinsburg), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Dr. Russell George, (Berkeley Springs), Ex-Officio Member

**1986-87**
David Gillispie (McKinley Junior High), President
Jack D. Wiseman (Ripley), Vice President
John J. Cole (Musselman), Member
George W. Keatley (Princeton), Member
Vincent Paoletti (John Marshall), Member
Jackson L. Flanigan, WV Assoc. of School Adm. (Martinsburg), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Harold Nicholson (Parkersburg), Ex-Officio Member

**1987-88**
David Gillispie (McKinley Junior High), President
Jack D. Wiseman (Ripley), Vice President
Dr. Russell George (Berkeley Springs), Member
George W. Keatley (Princeton), Member
Vincent Paoletti (John Marshall), Member
Dr. Jackson L. Flanigan, WV Assoc. of School Adm. (Martinsburg), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Edna Mae Phillips, State Department of Education (Beckley), Member
Gary J. McClung (Meadow Bridge), Ex-Officio Member

**1988-89**
Jack D. Wiseman (Ripley), President
George W. Keatley (Princeton), Vice President
Dr. Russell George (Berkeley Springs), Member
David Gillispie (McKinley Junior High), Member
Gerald Trembush (Moundsville Junior High), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Kathryn Roten, State Department of Education (Charleston), Member
Stephen Baldwin, WV Assoc. of School Administrators, (Lewisburg), Member
Michael Kessinger (Bramwell), Ex-Officio Member

**1989-90**
George Keatley (Princeton), President
Gerald Trembush (Moundsville Junior High), Vice President
Thomas Kidd (John Adams Junior High School), Member
Donald Knotts (Frankfort), Member
Jack D. Wiseman (Ripley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Kathryn Roten, State Department of Education (Charleston), Member
Stephen Baldwin, WV Assoc. of School Administrators, (Lewisburg), Member
Gary Greenfield, (Hedgesville Middle), Ex-Officio Member

**1990-91**
Gerald Trembush (Moundsville Junior High), President
Donald Knotts (Frankfort), Vice President
Thomas Kidd (John Adams Junior High), Member
George Keatley (Princeton), Member
Jack Wiseman (Ripley), Member
Jimmy D. Morris, State School Boards Assoc. (Clay), Member
Kathryn Roten, State Department of Education (Charleston), Member
Stephen Baldwin, WV Assoc. of School Administrators, (Lewisburg), Member
Robert G. Bonar, (Calhoun County High School), Ex-Officio Member

**1991-92**
Thomas Kidd (John Adams Junior High), President
Jack Wiseman (Ripley), Vice President
Gerald Trembush (Moundsville Junior High) Member
George Keatley (Princeton), Member
Frank Aliveto (Hedgesville), Member
Jimmy D. Morris, State School Boards Association (Clay), Member
Dr. N. Blaine Groves, State Department of Education (Martinsburg), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Mike Cunningham, (Clendenin Junior High School), Ex-Officio Member

**1992-93**
Thomas Kidd (John Adams Junior High), President
Jack Wiseman (Ripley), Vice President
Gerald Trembush (Moundsville Junior High) Member
George Keatley (Princeton), Member
Frank Aliveto (Hedgesville), Member
Edward W. Fields, State School Boards Association (Hancock), Member
Dr. N. Blaine Groves, State Department of Education (Martinsburg), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Mike Cunningham, (Clendenin Junior High School), Ex-Officio Member

**1993-94**
Jack Wiseman (Ripley), President
George Keatley (Princeton), Vice President
Frank Aliveto (Hedgesville), Member
Thomas Kidd (John Adams Junior High), Member
Dr. N. Blaine Groves, State Department of Education (Martinsburg), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Gary Ray, Athletic Directors Association (Oak Hill), Member
Edward W. Fields, County Boards of Education
Leon Pilewski (Washington-Irving), Ex-Officio Member

**1994-95**
Frank Aliveto (Hedgesville), President
Joe McClung (Meadow Bridge), Vice President
Fred Aldridge (Ravenswood), Member
Dr. Charles Wagoner, State Board of Education (Weston), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Gary Ray, Athletic Directors Association (Oak Hill), Member
Jimmy Wyatt (Tyler Consolidated), Member
Dennis Bennett (Richwood), Member
Dr. N. Blaine Groves, State Department of Education (Martinsburg), Member
Edward W. Fields, County Board of Education (New Cumberland), Member
Wilma Zigmond (Logan), Ex-Officio Member

**1995-96**
Joe McClung (Meadow Bridge), President
Jimmy Wyatt (Tyler Consolidated), Vice President
Frank Aliveto (Hedgesville), Member
Fred Aldridge (Ravenswood), Member
Dr. Charles Wagoner, State Board of Education (Weston), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Mike Hayden, Athletic Directors Association (Parkersburg), Member
Dennis Bennett (Richwood), Member
Edward W. Fields, County Board of Education (New Cumberland), Member

WVSSAC000212

**JA3054**

**1996-97**
Jimmy Wyatt (Tyler Consolidated), President
Dennis Bennett (Richwood), Vice President
Frank Aliveto (Hedgesville), Member
Joe McClung (Meadow Bridge), Member
Fred Aldridge (Ravenswood), Member
Dr. Charles Wagoner, State Board of Education (Weston), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Mike Hayden, Athletic Directors Association (Parkersburg), Member
Edward W. Fields, County Board of Education (New Cumberland), Member
Paul J. Morris, State Department of Education (Dunbar), Member

**1997-98**
Dennis Bennett (Richwood), President
Joe McClung (Meadow Bridge), Vice President
Charles S. Buell (Huntington), Member
Jimmy Wyatt (Tyler Consolidated), Member
David Rogers (Martinsburg South Middle), Member
Dr. Charles Wagoner, State Board of Education (Weston), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Don Hetzel, Athletic Directors Association (Jefferson), Member
Edward W. Fields, County Board of Education (New Cumberland), Member
Paul J. Morris, State Department of Education (Dunbar), Member

**1998-99**
Joe McClung (Meadow Bridge), President
Roy McCase (Parkersburg South), Member
Dennis Bennett (Richwood), Member
Jimmy Wyatt (Tyler Consolidated), Member
David Rogers (Martinsburg South Middle), Member
J. D. "Jimmy" Morris, State Board of Education (Clay), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Don Hetzel, Athletic Directors Association (Jefferson), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member

**1999-00**
Joe McClung (Meadow Bridge), President
David Rogers (Martinsburg South Middle), Vice President
Roy McCase (Parkersburg South), Member
Dennis Bennett (Richwood), Member
Jimmy Wyatt (Tyler Consolidated), Member
J. D. "Jimmy" Morris, State Board of Education (Clay), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Don Dellinger, Athletic Directors Association (Hedgesville), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member

**2000-01**
David Rogers (Martinsburg South Middle), President
Jimmy Wyatt (Tyler Consolidated), Vice President
Joe McClung (Meadow Bridge), Member
Roy McCase (Parkersburg South), Member
Dennis Bennett (Richwood), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Don Dellinger, Athletic Directors Association (Hedgesville), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member

**2001-02**
Jimmy Wyatt (Tyler Consolidated), President
Dennis Bennett (Richwood), Vice President
Ray Londeree (Oak Hill), Member
David Rogers (Martinsburg South Middle), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member

**2002-03**
Dennis Bennett (Richwood), President
Ray Londeree (Oak Hill), Vice President
Jimmy Wyatt (Tyler Consolidated), Member
David Rogers (Martinsburg South Middle), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Stephen Baldwin, WV Assoc. of School Administrators (Lewisburg), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member
William Niday (Parkersburg), Member

**2003-04**
Ray Londeree (Oak Hill), President
David Rogers (Martinsburg South Middle), Vice President
Dennis Bennett (Richwood), Member
Warren Grace (Paden City), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Frank Aliveto, County Superintendents (Berkeley Co.), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member
Tom Eschbacher (Parkersburg South), Member

**2004-05**
Ray Londeree (Oak Hill), President
David Rogers (Martinsburg South Middle), Vice President
Thomas Kidd (John Adams JH), Member
Warren Grace (Paden City), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Frank Aliveto, County Superintendents (Berkeley Co.), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Keith Donley, County Board of Education (Wellsburg), Member
Paul J. Morris, State Department of Education (Dunbar), Member
Tom Eschbacher (Parkersburg South), Member

**2005-06**
David Rogers (Martinsburg South Middle), President
Thomas Kidd (John Adams JH), Vice President
Ray Londeree (Oak Hill), Member
Warren Grace (Paden City), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Frank Aliveto, County Superintendents (Berkeley Co.), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Jack Wiseman, County Board of Education (Ravenswood), Member
Sandra Chapman, State Department of Education (Wheeling), Member
Tom Eschbacher (Parkersburg South), Member

**2006-07**
Warren Grace (Paden City), President
Thomas Kidd (John Adams JH), Vice President
Ray Londeree (Valley [F]), Member
David Rogers (Martinsburg South Middle), Member
Tom Eschbacher (Parkersburg South), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Frank Aliveto, County Superintendents (Berkeley Co.), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Jack Wiseman, County Board of Education (Ravenswood), Member
Sandra Chapman, State Department of Education (Wheeling), Member

**2007-08**
Thomas Kidd (John Adams JH), President
Tom Eschbacher (Parkersburg South), Vice President
Warren Grace (Paden City), Member
Ben Disibbio (PikeView), Member
Don Dellinger (Hedgesville), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Frank Aliveto, County Superintendents (Berkeley Co.), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Jack Wiseman, County Board of Education (Ravenswood), Member
Sandra Chapman, State Department of Education (Wheeling), Member

WVSSAC000213

**JA3055**

**2008-09**
Tom Eschbacher (Parkersburg South), President
Ben Disibbio (PikeView), Vice President
Thomas Kidd (John Adams JH), Member
Warren Grace (Paden City), Member
Don Dellinger (Hedgesville), Member
Ronald Spencer, State Board of Education (Smithburg), Member
Edward Toman, County Superintendents (Gilmer Co.), Member
Harold Erwin, Athletic Directors Association (Eleanor), Member
Ernie Moore, County Board of Education (Gassaway), Member
Sandra Chapman, State Department of Education (Wheeling), Member

**2009-10**
Ben Disibbio (PikeView), President
Don Dellinger (Hedgesville), Vice President
Mike Arbogast (South Charleston), Member
Tom Eschbacher (Parkersburg South), Member
Warren Grace (Paden City), Member
Ronald Spencer, WV State Superintendents Designee (Smithburg), Member
Edward Toman, County Superintendents (Gilmer Co.), Member
Jeff Bailey, Athletic Directors Association (Morgantown), Member
Ernie Moore, County Board of Education (Gassaway), Member
Robert Dunlevy, WV State Board of Education (Wheeling), Member

**2010-11**
Don Dellinger (Hedgesville), President
Mike Arbogast (South Charleston), Vice President
Tom Eschbacher (Parkersburg South), Member
Bernie Dolan (Wheeling Park), Member
Ben Disibbio (PikeView), Member
Ronald Spencer, WV State Superintendents Designee (Smithburg), Member
Edward Toman, County Superintendents (Gilmer Co.), Member
Jeff Bailey, Athletic Directors Association (Morgantown), Member
Ernie Moore, County Board of Education (Gassaway), Member
Robert Dunlevy, WV State Board of Education (Wheeling), Member

**2011-12**
Mike Arbogast (South Charleston), President
Bernie Dolan (Wheeling Park), Vice President
Don Dellinger (Hedgesville), Member
Tom Eschbacher (Parkersburg South), Member
Ben Disibbio (PikeView), Member
Ronald Spencer, WV State Superintendents Designee (Smithburg), Member
Edward Toman, County Superintendents (Gilmer Co.), Member
Ron Allen, Athletic Directors Association (Hedgesville), Member
Perry Cook, County Board of Education (Oceana), Member
Robert Dunlevy, WV State Board of Education (Wheeling), Member

**2012-13**
Bernie Dolan (Wheeling Park), President
Tom Eschbacher (Parkersburg South), Vice President
David Cottrell (Clay-Battelle), Member
Mike Arbogast (South Charleston), Member
Ben Disibbio (PikeView), Member
Ronald Spencer, WV State Superintendents Designee (Smithburg), Member
Edward Toman, County Superintendents (Gilmer Co.), Member
Ron Allen, Athletic Directors Association (Hedgesville), Member
Jim Crawford, County Board of Education (St. Albans), Member
Robert Dunlevy, WV State Board of Education (Wheeling), Member

**2013-14**
Tom Eschbacher (Parkersburg South), President
Ben Disibbio (PikeView), Vice President
Mike Arbogast (South Charleston), Member
David Cottrell (Clay-Battelle), Member
Rick Jones (John Marshall), Member
Dan Erenrich (Morgantown), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Ted Gillespie, County Board of Education (Princeton), Member
Robert Dunlevy, WV State Board of Education (Wheeling), Member
Ronald Spencer, WV State Superintendents Designee (Smithburg), Member

**2014-15**
Tom Eschbacher (Parkersburg South), President
David Cottrell (Clay-Battelle), Vice President
Mike Arbogast (South Charleston), Member
Rick Jones (John Marshall), Member
Dan Erenrich (Morgantown), Member
Craig Lee Loy (Valley [F]), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Gregory Prudich, County Board of Education (Princeton), Member
Robert Dunlevy, WV State Board of Education (Wheeling), Member
Ronald Spencer, WV State Superintendents Designee (Smithburg), Member

**2015-16**
David Cottrell (Clay-Battelle), President
Rick Jones (John Marshall), Vice President
Mike Arbogast (South Charleston), Member
Craig Lee Loy (Valley [F]), Member
Wayne Ryan (Summers County), Member
Greg Webb (Huntington), Member
Gregory Prudich, County Board of Education (Princeton), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Dr. James Wilson, WV State Board of Education (Glen Dale), Member
Robert Dunlevy, WV State Superintendents Designee (Wheeling), Member

**2016-17**
Mike Arbogast (South Charleston), President
Craig Lee Loy (Valley [F]), Vice President
David Cottrell (Clay-Battelle), Member
Harold Erwin (Eleanor, Retired), Member
Vacant
Vacant
Jim Crawford, County Board of Education (St. Albans), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Dr. James Wilson, WV State Board of Education (Glen Dale), Member
Robert Dunlevy, WV State Superintendents Designee (Wheeling), Member

**2017-18**
Mike Arbogast (South Charleston), President
Craig Lee Loy (Valley [F]), Vice President
David Cottrell (Clay-Battelle), Member
Jamie Tallman (Union), Member
David Nuzum (East Fairmont), Member
Richard Summers (Jackson Middle), Member
Jim Crawford, County Board of Education (St. Albans), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Dr. James Wilson, WV State Board of Education (Glen Dale), Member
Robert Dunlevy, WV State Superintendents Designee (Wheeling), Member

**2018-19**
Craig Lee Loy (Valley [F]), President
Richard Summers (Jackson Middle), Vice President
Mike Arbogast (South Charleston), Member
David Cottrell (Clay-Battelle), Member
Jamie Tallman (Union), Member
Gregory Moore (South Harrison), Member
Jim Crawford, County Board of Education (St. Albans), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Dr. James Wilson, WV State Board of Education (Glen Dale), Member
Robert Dunlevy, WV State Superintendents Designee (Wheeling), Member

WVSSAC000214

**JA3056**

**2019-20**

Richard Summers ( Jackson Middle), President
David Cottrell (Clay-Battelle),  Vice President
Craig Lee Loy (Valley F), Member
Michael Kelley (Herbert Hoover), Member
Art Pellito (Bridgeport Middle), Member
Gregory Moore(South Harrison), Member
Jim Crawford, County Board of Education (St. Albans), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Dr. James Wilson, WV State Board of Education (Glen Dale), Member
Robert Dunlevy, WV State Superintendents Designee (Wheeling), Member

**2020-21**

David Cottrell (Clay-Battelle), President
Gregory Moore(South Harrison), Vice President
Craig Lee Loy (Valley F), Member
Michael Kelley (Herbert Hoover), Member
Art Pellito (Bridgeport Middle), Member
Jimmy Frashier (Ripley), Member
Jim Crawford, County Board of Education (St. Albans), Member
Eddie Campbell, County Superintendents (Tucker Co.), Member
Dr. James Wilson, WV State Board of Education (Glen Dale), Member
Robert Dunlevy, WV State Superintendents Designee (Wheeling), Member

WVSSAC000215



WVSSAC ORGANIZATIONAL CHART

WVSSAC000216

JA3058

# INDEX

Page No.

Administration ..................................................................................... 3

Adoption and Guardianship ................................................................. 21

Age ...................................................................................................... 17

All-Star Participation ....................................................................... XIII; 35

Amateur ............................................................................................... 23

Amendments ......................................................................................... 7
    Appointment of Parliamentarian ..................................................... 8
    Constitution and By-Law Committee ............................................... 8
    Procedure ........................................................................................ 8

Attendance Zone ................................................................................. 19

Awards ................................................................................................. 35

Band .................................................................................................... 62
    Awards ............................................................................................ 64
    Classification ................................................................................... 65
    Enrollment and Membership ........................................................... 62
    Festivals ......................................................................................... 62
    Sanctioning ..................................................................................... 63
    Scholarship ..................................................................................... 62

Baseball .............................................................................................. 45

Basketball (Boys and Girls) ................................................................ 45

Bench Clearing .................................................................................... 60

Board of Directors .............................................................................. 5
    Officers & Duties ............................................................................ 4
    Meetings ......................................................................................... 5
    Past Board of Directors Members ................................................... 74
    Penalties ......................................................................................... 66

Board of Control .................................................................................. 2
    Administrative Districts ................................................................... 3
    Meetings ......................................................................................... 3

Board of Trustees ............................................................................... 13
    Appointments ................................................................................. 13
    Duties ............................................................................................. 13

Camps .............................................................................................. 37; 47

"C" Rule (2436-10) .............................................................................. 25

Certificates of Eligibility ..................................................................... 41

Cheerleading ....................................................................................... 46

Classification ....................................................................................... 40

Coaches ............................................................................................... 36
    Coach Ejection ......................................................... 38; 56; 59; 60
    Certification .................................................................................... 36
    Out-Of-Season Coaching ................................................................ 37

Concussions ........................................................................................ 24

Conduct ............................................................................................... 57

Contest ........................................................................................... XIII; 42

WVSSAC000217

JA3059

Contracts ................................................................................................................ 44

Courtesy & Identification Card
    Principal ........................................................................................................ 35
    Coaches ........................................................................................................ 37
    Athletic Director ............................................................................................. 38

Cross Country (Boys and Girls) ............................................................................ 49

Department of Health and Human Services ......................................................... 20

Disciplinary Action ........................................................................................... 62; 64

Ejection Policy ..................................................................................................... 62

Eligibility ....................................................................................................... 16; 26; 43
    Adoption and Guardianship ......................................................................... 23
    Age ............................................................................................................... 18
    Amateur ........................................................................................................ 24
    "C" Rule (2436-10) ....................................................................................... 43
    Certificates ................................................................................................... 29
    Enrollment .................................................................................................... 16
    Non-School Participation .............................................................................. 23
    Scholarship ................................................................................................... 18
    Semester and Season .................................................................................. 18
    Transfer and Residence ............................................................................... 19

Emergency Action Plan ....................................................................................... 27

Enrollment ........................................................................................................... 15

Executive Director ................................................................................................. 9
    Appointment ................................................................................................... 9
    Duties .............................................................................................................. 9
    Protests ......................................................................................................... 71
    Term of Office ................................................................................................. 9

Football ............................................................................................................... 50

Foreign Exchange Students ................................................................................. 21

Forfeit and Restitution ......................................................................................... 38

Funds ..................................................................................................................... 7
    Annual Dues ................................................................................................... 9
    Entry Fees and Assessment .......................................................................... 9
    Expenditures .................................................................................................. 9
    Fiscal Year ..................................................................................................... 9

Game ................................................................................................................. XIII

Golf (Boys and Girls) .......................................................................................... 53

Guardianship ....................................................................................................... 23

Ineligible Participant ........................................................................................... 24

Legal Opponents ................................................................................................. 44

Membership ........................................................................................................... 1

National Federation of State High School Associations .................................. XI; XIII
    Calendar ....................................................................................................... 75
    Sport Rules ................................................................................................... 45

Non-school Participation ..................................................................................... 23

Officials ............................................................................................................... 41

Parental Permission ............................................................................................ 62

Penalties ........................................................................................................ 64; 70

WVSSAC000218

**JA3060**

Physical Examination ..................................................................................................... 36

Practice ........................................................................................................................... 25
Principal - Duties and Responsibilities ........................................................................... 35

Protests ................................................................................................................... 45; 70; 71
    Contested Cases ....................................................................................................... 71
    Game ........................................................................................................................ 43
    Review Board ...................................................................................................... 10; 73
    School .................................................................................................................. 66; 67

Recruiting ........................................................................................................................ 22

Residence ....................................................................................................................... 19

Review Board .................................................................................................................. 10
    Duties ....................................................................................................................... 11
    Membership .............................................................................................................. 10

Rules and Regulations (Definition Of) ............................................................................ 13

Sanctioning ............................................................................................................... 47; 66
    Athletic ..................................................................................................................... 47
    Band ......................................................................................................................... 66

Season Regulations ....................................................................................................... 47

Scholarship ............................................................................................................... 19; 26

Semester and Season .................................................................................................... 18

Soccer (Boys and Girls) ................................................................................................. 54

Softball ............................................................................................................................ 55

Sport Rules ..................................................................................................................... 45
    National Federation .................................................................................................. 45
    USGA ........................................................................................................................ 53
    USTA ........................................................................................................................ 56

Sportsmanship ................................................................................................................ 59
    Administrator ............................................................................................................. 60
    Student ...................................................................................................................... 61
    Coach ........................................................................................................................ 60
    Official ....................................................................................................................... 62
    Spectator .................................................................................................................. 61
    Disciplinary Action .................................................................................................... 64

Standardized Calendar ................................................................................................... 75

Sunday Contests ............................................................................................................ 44

Swimming (Boys and Girls) ............................................................................................ 55

Team Membership .......................................................................................................... 16

Tennis (Boys and Girls) .................................................................................................. 57

Track and Field (Boys and Girls) .................................................................................... 57

Transfer .......................................................................................................................... 19

Travel .............................................................................................................................. 46

Undue Influence ............................................................................................................. 23

Volleyball ........................................................................................................................ 57

WVSSAC000219

JA3061

Wrestling --------------------------------------------------------------------- 58
WVSSAC --------------------------------------------------------------- 1; 4
    Officers and Duties --------------------------------------------- 4
WVSSAC Tournaments --------------------------------------------- 47

WVSSAC000220

**JA3062**

**Sarah Stewart**

| | |
|---|---|
| **From:** | Heather Hutchens |
| **Sent:** | Monday, March 15, 2021 10:53 AM |
| **To:** | Mary Catherine Tuckwiller; Sarah Stewart; Stephanie Abraham |
| **Subject:** | RE: Transgender participation in secondary schools bill |

It seems like much ado about nothing. I don't think any of it is necessary.

Heather L. Hutchens
General Counsel
Office of General Counsel

West Virginia DEPARTMENT OF
EDUCATION

1900 Kanawha Boulevard, East
Charleston, WV 25305-0330
304.558.3667 P
304.558.0048 F
wvde.us

f | i | YT

The information contained in this e-mail message may be confidential information, and may also be privileged. If you are not the intended
recipient, any use, interference with, disclosure, or copying of this material is unauthorized and prohibited. If you have received this message in
error, please notify us by return mail and delete the original message.

**From:** Mary Catherine Tuckwiller
**Sent:** Monday, March 15, 2021 10:31 AM
**To:** Sarah Stewart <sarah.a.stewart@k12.wv.us>; Heather Hutchens <hhutchens@k12.wv.us>; Stephanie Abraham
<stephanie.abraham@k12.wv.us>
**Subject:** RE: Transgender participation in secondary schools bill

At line 65, they convolute gender and sex when the focus throughout the bill seems to be sex – I realize the issue is
when someone is transitioning genders but there is no prior reference in the bill to gender or sex – and the question, I
suppose, is how will this issue arise?

Also will every student athlete produce a birth certificate now, and then they will call any suspect birth certificates into
question, or will they only request from those who assert a transition?  It says birth certificate that doesn't appear to be
original – a child who is adopted by a step-parent won't have their original birth certificate.  I would think for equitable
application purposes everyone might need to produce one.  Who is making the judgment call on the veracity of the birth
certificate and who is evaluating the evidence?  SSAC or the high school or the county board?  I looked up some similar
legislation in other states and it seems to dictate the student must obtain medical exam/confirmation based on these
factors:

http://billstatus.ls.state.ms.us/documents/2021/html/SB/2500-2599/SB2536IN.htm

1

WVSBOE 000006

**Sarah Stewart**
Government Affairs Counsel
Superintendent's Office



1900 Kanawha Boulevard, East
Charleston, WV 25305-0330
304.558.3667 t
304.558.0048 f
304.807.6020 c
wvde.us

f i YT

The document contains information that may be privileged or private or otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, copying, distribution or use of this message and any attachments is strictly prohibited. If you have received this message in error, please notify us by return email and delete the original message.

**From:** Melissa White <Melissa.White@wvhouse.gov>
**Sent:** Monday, March 15, 2021 9:44 AM
**To:** Sarah Stewart <sarah.a.stewart@k12.wv.us>
**Subject:** FW: Transgender participation in secondary schools bill

> [EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the sender and know the content is safe.

Sarah,

Per our discussion.

Thank you,
Melissa

Melissa J. White
Chief Counsel
Committee on Education
West Virginia House of Delegates
Room 432M
1900 Kanawha Boulevard, East
Charleston, WV 25305

**From:** Melissa White
**Sent:** Thursday, March 11, 2021 9:53 AM
**To:** Bernie Dolan <bernie.dolan@wvssac.org>; Bernie Dolan <bdolan@k12.wv.us>
**Subject:** Transgender participation in secondary schools bill

Bernie,

3

Attached is a draft of an originating bill regarding transgender participation in sports. I kept it short: There are obviously certain things that would need to be handled in a rule, unless you have language that you would like to see in the bill. Please let me know your thoughts and if there are any unintended consequences. The Chairman does not want to keep girls from participating in boys sports when there are not girls teams.

Thanks,
Melissa

Melissa J. White
Chief Counsel
Committee on Education
West Virginia House of Delegates
Room 432M
1900 Kanawha Boulevard, East
Charleston, WV 25305

4

## Sarah Stewart

| | |
|---|---|
| From: | Melissa White <Melissa.White@wvhouse.gov> |
| Sent: | Monday, March 15, 2021 9:44 AM |
| To: | Sarah Stewart |
| Subject: | FW: Transgender participation in secondary schools bill |
| Attachments: | Transgender orginating bill.docx |

> [EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the sender and know the content is safe.

Sarah,

Per our discussion.

Thank you,
Melissa

Melissa J. White
Chief Counsel
Committee on Education
West Virginia House of Delegates
Room 432M
1900 Kanawha Boulevard, East
Charleston, WV  25305


**From:** Melissa White
**Sent:** Thursday, March 11, 2021 9:53 AM
**To:** Bernie Dolan <bernie.dolan@wvssac.org>; Bernie Dolan <bdolan@k12.wv.us>
**Subject:** Transgender participation in secondary schools bill

Bernie,

Attached is a draft of an originating bill regarding transgender participation in sports.  I kept it short.  There are obviously certain things that would need to be handled in a rule, unless you have language that you would like to see in the bill.  Please let me know your thoughts and if there are any unintended consequences.  The Chairman does not want to keep girls from participating in boys sports when there are not girls teams.

Thanks,
Melissa

Melissa J. White
Chief Counsel
Committee on Education
West Virginia House of Delegates
Room 432M

1

9. Unless otherwise noted, the agency has reviewed the technical sufficiency of the bill and finds as follows:
   a. All code sections in the body of the bill are in the title and enacting section. Yes
   b. Bill title complies with Section 30, Article VI of the WV Constitution. Yes
   c. All cross references and citations to federal and state law are correct. Yes
   d. The numbering of sections, subsections, subdivisions, paragraphs, subparagraphs, clauses and any consecutive similar designation is correct. Yes
   e. Dates, numbers, and punctuation are sufficiently plain and clear to ascertain what the law is and to give effect to it. Yes
   f. Effective date of the bill and internal effective dates are not in conflict. Yes
   g. No other technical errors were identified for which the agency would recommend a technical veto.

10. Agency Rule Making:
    a. Does the bill require a legislative rule? WVBE Policy
    b. Does the agency currently have sufficient rule-making authority regarding the subject matter of the bill? n/a
    c. Are emergency rules mandated? Permitted? Does the bill provide for emergency rule authorization status? If not, does the agency need emergency rule making authorization status? n/a

11. Identify whether the bill creates any new funds or accounts or mandates the agency to transfer or distribute monies from accounts under agency control: None

12. Describe any changes to fees, taxes, rates, or revenues: None

13. Agency comments (This may include whether the agency supports, opposes or is neutral about the bill. If the agency questions the constitutionality of the bill, if the bill conflicts with other provisions of state code or federal law, if the agency substantially disagrees with the public policy of the bill, or the agency will suffer undue hardship to make the bill effective, please explain)

14. Is a Governor's veto recommended? If yes, please explain. The WVDE does not support this bill.

15. Please identify whether any other state agency should also provide a bill review: HEPC

16. Preparer's name and title: Sarah Stewart, Government Affairs Counsel

    Date: April 19, 2021

WVSBOE 000038

🔒 **Page**Vault

| | |
|---|---|
| Document title: | Facebook |
| Capture URL: | https://www.facebook.com/jordan.bridges.353/posts/3963151450395149 |
| Captured site IP: | 157.240.229.35 |
| Page loaded at (UTC): | Fri, 04 Jun 2021 18:57:49 GMT |
| Capture timestamp (UTC): | Fri, 04 Jun 2021 19:13:04 GMT |
| Capture tool: | v7.7.13 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 2 |
| Capture ID: | dcc5c34d-d043-40ed-ab39-e36d3e84fa3c |
| User: | doj-chayes |
| Estimated post date | Tue, 16 Mar 2021 12:00:00 GMT |
| Post author | Jordan Bridges |
| Post reaction count | 265 |
| Post comment count | 147 |

PDF REFERENCE #:    4e7XRX71cUdx8EVoMTDm61

**JA3068**



Document title: Facebook
Capture URL: https://www.facebook.com/jordan.bridges.353/posts/3963151450395149
Capture timestamp (UTC): Fri, 04 Jun 2021 19:13:04 GMT
Estimated post date: Tue, 16 Mar 2021 12:00:00 GMT

**JA3069**

**Page Vault**

| | |
|---|---|
| Document title: | Facebook |
| Capture URL: | https://www.facebook.com/jordan.bridges.353/posts/3963151450395149 |
| Captured site IP: | 157.240.229.35 |
| Page loaded at (UTC): | Fri, 04 Jun 2021 18:57:49 GMT |
| Capture timestamp (UTC): | Fri, 04 Jun 2021 19:13:48 GMT |
| Capture tool: | v7.7.13 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 2 |
| Capture ID: | 1627b63a-b9f2-44c9-bb0b-fa6cdda10163 |
| User: | doj-chayes |
| Estimated post date | Tue, 16 Mar 2021 12:00:00 GMT |
| Post author | Jordan Bridges |
| Post reaction count | 265 |
| Post comment count | 147 |

PDF REFERENCE #:     d8ZjRs3i2q4QSf3UaL8HuY



Document title: Facebook
Capture URL: https://www.facebook.com/jordan.bridges.353/posts/3963151450395149
Capture timestamp (UTC): Fri, 04 Jun 2021 19:13:48 GMT
Estimated post date: Tue, 16 Mar 2021 12:00:00 GMT

Page 1 of 1

JA3071

**🔒 Page Vault**

| | |
|---|---|
| Document title: | Facebook |
| Capture URL: | https://www.facebook.com/jordan.bridges.353/posts/3963151450395149 |
| Captured site IP: | 157.240.229.35 |
| Page loaded at (UTC): | Fri, 04 Jun 2021 18:57:49 GMT |
| Capture timestamp (UTC): | Fri, 04 Jun 2021 19:15:04 GMT |
| Capture tool: | v7.7.13 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 2 |
| Capture ID: | 3695f9c0-4eec-4076-917e-9cb4e6e38898 |
| User: | doj-chayes |
| Estimated post date | Tue, 16 Mar 2021 12:00:00 GMT |
| Post author | Jordan Bridges |
| Post reaction count | 265 |
| Post comment count | 147 |

PDF REFERENCE #:      xmCDRE87bSvARqL2mYrPL6

**JA3072**



Document title: Facebook
Capture URL: https://www.facebook.com/jordan.bridges.353/posts/3963151450395149
Capture timestamp (UTC): Fri, 04 Jun 2021 19:15:04 GMT
Estimated post date: Tue, 16 Mar 2021 12:00:00 GMT

Page 1 of 1

JA3073

**🔒 PageVault**

| | |
|---|---|
| Document title: | Facebook |
| Capture URL: | https://www.facebook.com/jordan.bridges.353/posts/3963151450395149 |
| Captured site IP: | 157.240.229.35 |
| Page loaded at (UTC): | Fri, 04 Jun 2021 18:57:49 GMT |
| Capture timestamp (UTC): | Fri, 04 Jun 2021 19:15:42 GMT |
| Capture tool: | v7.7.13 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 2 |
| Capture ID: | 122aced0-21cb-4397-b197-c6bf21e92e6b |
| User: | doj-chayes |
| Estimated post date | Tue, 16 Mar 2021 12:00:00 GMT |
| Post author | Jordan Bridges |
| Post reaction count | 265 |
| Post comment count | 147 |

PDF REFERENCE #:        cDKZ4knbdBSBZwYp8yuFe9

**JA3074**



Document title: Facebook
Capture URL: https://www.facebook.com/jordan.bridges.353/posts/3963151450395149
Capture timestamp (UTC): Fri, 04 Jun 2021 19:15:42 GMT
Estimated post date: Tue, 16 Mar 2021 12:00:00 GMT

JA3075

**PageVault**

| | |
|---|---|
| Document title: | Facebook |
| Capture URL: | https://www.facebook.com/jordan.bridges.353/posts/3963151450395149 |
| Captured site IP: | 157.240.229.35 |
| Page loaded at (UTC): | Fri, 04 Jun 2021 18:57:49 GMT |
| Capture timestamp (UTC): | Fri, 04 Jun 2021 19:18:36 GMT |
| Capture tool: | v7.7.13 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 2 |
| Capture ID: | 76057521-0996-4408-8ecc-997f1ec74ca7 |
| User: | doj-chayes |
| Estimated post date | Tue, 16 Mar 2021 12:00:00 GMT |
| Post author | Jordan Bridges |
| Post reaction count | 265 |
| Post comment count | 147 |

PDF REFERENCE #:    dAB34mwvkoB1mfyqjdQLB6

**JA3076**



**Larry Baisden**
I think the movie Kindergarten Cop said it best about what boys have and girls have.
Woman have fought for woman's rights for many years now, but now these trannys want to erase everything the woman have fought for because they aren't capable of making the team they should be playing for.

How about this, if they want equal rights then create a sports program just for them.
For example: u will have boys basketball, girls basketball, and Tranny basketball.
Like · 11w

**Timothy Lorene Light**
Whatever you are born as should be what you participate in. There is only 2 genders.
Like · 11w

**Wilma Adkins**
Boys do not belong in a girls restroom n Vice versa if they want to be transgender then let them find transgender sport, if the transgender say male sports r to rough then to bad u don't participate, u only participate in the gender u were born with or u don't participate at all
Like · 11w · Edited

**John Robert Williamson**
Yes! Boys don't need to play on the girls team

Document title: Facebook
Capture URL: https://www.facebook.com/jordan.bridges.353/posts/3963151450395149
Capture timestamp (UTC): Fri, 04 Jun 2021 19:18:36 GMT
Estimated post date: Tue, 16 Mar 2021 12:00:00 GMT

**JA3077**

**Page Vault**

| | |
|---|---|
| Document title: | Facebook |
| Capture URL: | https://www.facebook.com/jordan.bridges.353/posts/3963151450395149 |
| Captured site IP: | 157.240.229.35 |
| Page loaded at (UTC): | Fri, 04 Jun 2021 18:57:49 GMT |
| Capture timestamp (UTC): | Fri, 04 Jun 2021 19:19:21 GMT |
| Capture tool: | v7.7.13 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 2 |
| Capture ID: | f815bea6-aff8-465a-8e76-722a9569c6ab |
| User: | doj-chayes |
| Estimated post date | Tue, 16 Mar 2021 12:00:00 GMT |
| Post author | Jordan Bridges |
| Post reaction count | 265 |
| Post comment count | 147 |

PDF REFERENCE #:     odWVVn8YPkA975cX12YXXP

**JA3078**



Document title: Facebook
Capture URL: https://www.facebook.com/jordan.bridges.353/posts/3963151450395149
Capture timestamp (UTC): Fri, 04 Jun 2021 19:19:21 GMT
Estimated post date: Tue, 16 Mar 2021 12:00:00 GMT

JA3079



**JA3080**

Twitter

# Explore

⚙ Settings

Seems like a helluva guy.

💬 26    🔁 43    ♡ 1,350    ⬆

**Molly** @mememoreme · Apr 30, 2021
Also, I wouldn't want him anywhere near my daughter - as a coach or as a governor.

💬 16    🔁 18    ♡ 756    ⬆

Show replies

**Berks** 🏞🏕🌲 @bshires1010 · Apr 30, 2021
Replying to @MSNBC and @SRuhle
That was great journalism at work. TY

💬    🔁    ♡ 12    ⬆

**RobbieRob** @RobertW97616297 · Apr 30, 2021
Replying to @MSNBC and @SRuhle
I was told to or else!

GIF  ALT

💬    🔁    ♡ 3    ⬆

**wolfonthehill** @wolfonthehill · Apr 30, 2021
Replying to @MSNBC and @SRuhle
This is how questions should be framed. Well-done.

💬    🔁    ♡ 31    ⬆

🔍 Search Twitter

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

4/19/22, 10:5...    MSNBC on Twitter: "@GRMilk asks Jen Justice about signing a bill regarding transgender athletes: Rules can you give ...

Twitter

# Explore

⚙ Settings

🔍 Search Twitter

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

JA3082

USCA4 Appeal: 23-1078    Doc: 53-6    Filed: 03/27/2023    Pg: 540 of 568

4/19/22, 10:56 AM Case 2:21-cv-00316   Document 289-45   Filed 04/21/22   Page 2 of 3 PageID #: 13992
Board of Governors updates transgender participation policy | NCAA.org

NCAA.org



Board of Governors updates transgender participation policy
Policy will take effect immediately, and impacted athletes can regain eligibility later if approved by divisions
Media Center
Posted: 1/19/2022 8:41:00 PM

The NCAA Board of Governors on Wednesday voted in support of a sport-by-sport approach to transgender participation that preserves opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete. The new policy, effective immediately, aligns transgender student-athlete participation for college sports with recent policy changes from the United States Olympic and Paralympic Committee and International Olympic Committee.

Like the Olympics, the updated NCAA policy calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors. If there is no NGB policy for a sport, that sport's international federation policy would be followed. If there is no international federation policy, previously established IOC policy criteria would be followed.

The Board of Governors urged the divisions to provide flexibility to allow for additional eligibility if a transgender student-athlete loses eligibility based on the policy change provided they meet the newly adopted standards.

JA3083

The policy is effective starting with the 2022 winter championships. Transgender student-athletes will need to document sport-specific testosterone levels beginning four weeks before their sport's championship selections. Starting with the 2022-23 academic year, transgender student-athletes will need documented levels at the beginning of their season and a second documentation six months after the first. They will also need documented testosterone levels four weeks before championship selections. Full implementation would begin with the 2023-24 academic year.

"We are steadfast in our support of transgender student-athletes and the fostering of fairness across college sports," said John DeGioia, chair of the board and Georgetown president. "It is important that NCAA member schools, conferences and college athletes compete in an inclusive, fair, safe and respectful environment and can move forward with a clear understanding of the new policy."

"Approximately 80% of U.S. Olympians are either current or former college athletes," said Mark Emmert, NCAA president. "This policy alignment provides consistency and further strengthens the relationship between college sports and the U.S. Olympics."

Additionally, the NCAA's Office of Inclusion and the Sport Science Institute released the Gender Identity and Student-Athlete Participation Summit Final Report. The report assists ongoing membership efforts to support inclusion, fairness, and the mental and physical health of transgender and non-binary student-athletes in collegiate sport.

The Board of Governors met Wednesday in Indianapolis as part of the 2022 NCAA Convention. For more on key topics from the 2022 NCAA Convention, visit ncaa.org/convention.

Copyright ©2022 NCAA.org

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

I.    **B.P.J. Is A Girl Who Is Transgender.**

1.    B.P.J. is an eleven-year-old girl who is also transgender. (Ex. 2[1] (Declaration of B.P.J.) ¶ 2; Ex. 12 (Deposition Transcript of B.P.J.) at 25:3-5, 25:11-14, 25:23-26:3; Ex. 13 (Deposition Transcript of Heather Jackson, Jan. 19) at 59:5-6; Ex. 15 (Deposition Transcript of Wesley Scott Pepper) at 46:16-20; Dkt. No. 252 (Stipulation of Uncontested Facts Agreed to by Harrison County Board of Education, County Superintendent Dora Stutler, and Plaintiff) ("County Stip.") ¶ 1; Dkt. No. 270 (Stipulation of Uncontested Facts Agreed to by West Virginia State Board of Education, State Superintendent W. Clayton

---

[1] "Ex." refers to an exhibit attached to the April 21, 2022, declaration of Loree Stark submitted in support of Plaintiff B.P.J.'s motion for summary judgment.

**JA3085**

Burch, and Plaintiff) (WVBOE Stip.) ¶ 1; Dkt. No. 158 (WVSSAC's Answer to Plaintiff's First Amended Complaint ("WVSSAC Ans.")) ¶¶ 1, 6, 30.) B.P.J. was designated male at birth and has a female gender identity. (Ex. 1-A (Declaration of Heather Jackson) at 1; Ex. 1-B at 2.)

2. B.P.J. is fiercely protected by her mother, Heather Jackson; unconditionally loved by her father, Wesley Pepper; and has the support of her older brothers and grandparents. (Ex. 1 ¶¶ 4, 22–23; Ex. 2 ¶ 5; Ex. 15 at 165:21-166:1, 185:5-16.)

3. When B.P.J. was in third grade, she socially transitioned at school to living and presenting in accordance with her identity as a girl. (Ex. 1 ¶ 11; Ex. 12 at 39:6-39:24.) "Social transition" means allowing a transgender child to live and be socially recognized in accordance with their gender identity. (Ex. 22 (Declaration and Expert Report of Deanna Adkins, M.D.) ¶ 27.)

4. B.P.J.'s elementary school and middle school have both acknowledged and respect that B.P.J.'s gender identity is female. (Dkt. No. 252 (County Stip.) ¶ 1.)

5. When B.P.J. was in elementary school, her school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Ex. 1-A at 1; Ex. 2 ¶ 6; Dkt. No. 252 (County Stip.) ¶ 1.)

6. Under this plan, school staff were informed that B.P.J.'s authentic gender is female, and were instructed to refer to her with her female name and using female pronouns. (Ex. 1-A at 2–3.)

7. Under the gender support plan, school staff were also informed on how to support B.P.J. if she faced problems from others at school because of her gender. (Ex. 1-A at 2–3.)

8. B.P.J.'s middle school created a similar plan. (Ex. 1-B.)

2

**JA3086**

9.      Like the elementary school plan, B.P.J.'s middle school gender support plan confirmed that B.P.J.'s parents are aware of and supportive of her gender identity and that B.P.J. "is comfortable with others knowing her gender identity and transition," and provided that "all teachers," students, and multiple administrators and county staff would be made aware of her gender identity. (Ex. 1-B at 2.)

10.      Under the elementary and middle school gender support plans, if anyone has questions about B.P.J.'s identity, teachers and staff should "[b]e open and honest" and respond, "[s]he is [B.P.J.]; and that makes her happy." (Ex. 1-A at 2; Ex. 1-B at 3.)

11.      B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Ex. 2 ¶ 6; Ex. 12 at 130:3-132:13.)

12.      In 2019, B.P.J. was diagnosed with gender dysphoria by Dr. Gerald Montano, a pediatrician at the University of Pittsburgh Medical Center Children's Hospital of Pittsburgh's Gender and Sexuality Development Program. (Ex. 1 ¶ 13; Ex. 2 ¶ 7; Ex. 20 (Deposition Transcript of Gerald Montano, D.O.) at 93:17-19; Ex. 5 (State of West Virginia's Response to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 6 (Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 7 (Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5.)

13.      On June 15, 2020, at the first signs of puberty—known as the "Tanner 2" stage of pubertal development—B.P.J. began receiving puberty delaying (or "blocking") treatment, in accordance with the Endocrine Society's clinical guidelines for treating gender dysphoria. (Ex. 1 ¶ 14.)

14.   B.P.J. has been on puberty delaying treatment for nearly two years. (Ex. 1 ¶ 14; Ex. 2 ¶ 8; Ex. 20 at 115:22-116:4; Ex. 19 (Deposition Transcript of Kacie Kidd, M.D.) at 89:22-90:18.)

15.   "Puberty blocking treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins." (Ex. 22 ¶ 30.)

16.   When administered to transgender girls at the beginning of the "Tanner 2" stage of sexual maturity, puberty-blocking medication prevents transgender girls from experiencing levels of circulating testosterone above what is typical for non-transgender girls and women. (Ex. 24 (Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 50; Ex. 25 (Rebuttal Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 17; Ex. 22 ¶ 31.)

17.   As a result of receiving puberty-delaying medication at the beginning of the "Tanner 2" stage of pubertal development, B.P.J. has not gone through her endogenous puberty and has not experienced the effects of testosterone that would be typical if she underwent her full endogenous puberty. (Ex. 22 ¶¶ 30–31; Ex. 19 at 119:22-120:15.) Specifically, she has never experienced levels of circulating testosterone above what is typical for non-transgender girls and women. (Ex. 24 ¶ 50; Ex. 25 ¶ 17; Ex. 22 ¶ 31.)

18.   If B.P.J. goes on to receive gender-affirming hormone therapy, she will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously and will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution, and secondary sex characteristics that are typically experienced by non-transgender girls who go through a typically female puberty. (Ex. 25 ¶ 17; Ex. 22 ¶ 43.)

4

**JA3088**

**II.    B.P.J.'s Wishes To Participate In And Experience The Benefits Of School Sports.**

19.    B.P.J. has always liked running and loves playing team sports. (Ex. 2 ¶¶ 3, 13; Ex. 12 at

65:2-4, 145:15-18, 67:21-68:6.)

20.    While in elementary school, she enjoyed participating in a recreational cheerleading team

with other girls. (Ex. 1 ¶¶ 16–18; Ex. 2 ¶¶ 9–11; Ex. 12 at 72:21-72:22.)

21.    As someone who comes from a family of runners, B.P.J. also grew up running and

watching her older brothers and mother run competitively and as part of a team. (Ex. 1

¶ 20; Ex. 2 ¶ 13.)

22.    School-sponsored athletics offer a range of educational and social benefits for children and

young adults, including camaraderie, cooperation, leadership, teamwork, watching out for

fellow players, trust, physical fitness, perseverance, sportsmanship, and discipline. (Dkt.

No. 78 (State of West Virginia's Answer to Plaintiff's First Amendment Complaint) ("State

Ans.") ¶ 38; Dkt. No. 131 (Lainey Armistead's Answer to Plaintiff's First Amended

Complaint) ("Armistead Ans.") ¶ 38; Dkt. No. 156 (West Virginia State Board of

Education's Answer to Plaintiff's First Amendment Complaint) ("WVBOE Ans.") ¶ 38;

Dkt. No. 157 (Harrison County Board of Education's Answer to Plaintiff's First

Amendment Complaint) ("County Ans.") ¶ 38; Dkt. No. 158 (WVSSAC Ans.) ¶ 38; Ex.

27 (Expert Report and Declaration of Mary D. Fry, Ph.D.) ¶¶ 18, 37; Ex. 16 (Deposition

Transcript of Harrison County Board of Education 30(b)(6) Designees) at 106:22-106:24,

222:9-17; Ex. 8 (West Virginia State Board of Education's Responses to Plaintiff's Second

Set of Requests for Admission) Nos. 45–47; Ex. 17 (Deposition Transcript of WVSSAC

30(b)(6) Designee) at 113:8-11; Ex. 21 (Deposition of Lainey Armistead) at 156:17-25;

Dkt. No. 95-1 (Declaration of Lainey Armistead) ¶ 27; Ex. 11 (Lainey Armistead's

5

**JA3089**

Responses and Objections to Plaintiff's Second Set of Requests for Admission) Nos. 44–45.)

23.    The benefits from school athletics can contribute to greater success in college and throughout life. (Ex. 27 ¶¶ 18, 37.)

24.    These benefits exist regardless of whether a student wins or loses. (Ex. 5 No. 47; Ex. 6 No. 47; Ex. 8 No. 47; Ex. 9 (State Superintendent W. Clayton Burch's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 10 (WVSSAC's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 11 No. 47; Ex. 27 ¶ 35).

25.    These benefits are advanced when all athletes have the opportunity to play the sport they love. (Ex. 27 ¶ 18.)

26.    Encouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all participants. (Ex. 27 ¶¶ 28–30, 35.)

27.    Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized. (Ex. 27 ¶¶ 26, 34.)

28.    Excluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all participants. (Ex. 27 ¶¶ 37–41.)

29.    B.P.J. has experienced benefits from participating in cheerleading in the past and from participating in cross-country in the 2021-22 school year. (Ex. 1 ¶¶ 17–18, 28; Ex. 2 ¶¶ 10–11, 16–18.)

JA3090

30.    B.P.J. hopes to continue to experience such benefits from playing on girls' teams in the future. (Ex. 2 ¶ 21.)

**III.    Prior To H.B. 3293, West Virginia Had A Longstanding Policy Of Sex Separation In School Sport And Did Not Categorically Bar Transgender Students From Participating.**

31.    Before it passed H.B. 3293, West Virginia had a general, longstanding, and unchallenged policy establishing separate school sports teams for boys and girls. *See* W. Va. Code R. § 127.

32.    Almost all sports in West Virginia at the public secondary school level are separated into boys' and girls' teams. (Ex. 17 109:24-110:4.) The exceptions are cheerleading, football, baseball, wrestling, and golf. (Ex. 10 Nos. 29–30; Ex. 17 at 109:24-110:4.)

33.    Cheer teams are always designated as "coed" or "mixed," whereas football, baseball, wrestling, and golf teams are boys' teams that permit girls to play if they so desire because no separate girls' teams exist, and so are considered "mixed . . . to respond to demand." (Ex. 17 at 104:2-105:6.)

34.    In practice, cheer "almost always has boy [and girl] members," but baseball and football are "very seldom" actually mixed. (Ex. 17 at 104:17-20.)

35.    There are no co-ed teams for cross-country or track at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)

36.    Under rules established by the West Virginia Secondary School Activities Commission ("WVSSAC")—which were already in existence when H.B. 3293 was enacted—cisgender boys are prohibited from playing on girls' teams at the public secondary school level. (Ex. 17 at 105:4-105:16; Ex. 39 (WVSSAC000148) at § 127-2-3.8; Ex. 7 Nos. 38–39; Ex. 8 Nos. 38–39; Ex. 10 Nos. 38–39; Ex. 11 Nos. 38–39.)

**JA3091**

37.   By contrast, girls may choose to play on a boys' team if they wish to do so and no girls' team exists, as is the case with football, baseball, wrestling, and golf. (Ex. 17 104:2-105:6.)

38.   West Virginia did not have a law or policy prohibiting girls who are transgender from playing on girls' teams before it passed H.B. 3293.

39.   Before H.B. 3293, the WVSSAC Board of Directors had an internal policy that allowed students who are transgender to participate on teams consistent with their gender identity if the transgender student's school allowed them to participate, based on its considerations of whether that specific student's participation would impact "fair competition among high school teams." (Ex. 37 (WVSSAC000008).) Under the internal policy, if another school contested the transgender student's eligibility to play, then the Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (*Id.*)

40.   The WVSSAC received no complaints about this internal policy, and the WVSSAC is not aware of any instances of a transgender student attempting to participate under this policy. (Ex. 17 at 118:23-119:16.)

41.   Since 2011, the National College Athletics Association ("NCAA") has allowed women who are transgender to participate on women's teams after completing one year of testosterone suppression. (Ex. 24 ¶ 38.)

42.   In 2022, the NCAA announced that it had revised its policy to adopt a "sport-by-sport approach" that "calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors." (Ex. 24 ¶ 39.)

**IV.    H.B. 3293 Categorically Bans Transgender Girls And Women From Participating On Girls' And Women's Sports Teams.**

43.    On April 9, 2021, West Virginia passed H.B. 3293. W. Va. Code § 18-2-25d. H.B. 3293 went into effect 90 days later. *Id.*

44.    H.B. 3293 categorically bans all girls who are transgender from participating in school sports from middle school through college. W. Va. Code § 18-2-25d.

45.    H.B. 3293 requires that all public secondary school or college sports in West Virginia be "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex." W. Va. Code §§ 18-2-25d(b), (c).

46.    H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1).

47.    H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2). There is no parallel provision for boys' teams.

48.    The legislative findings for H.B. 3293 reject the notion of allowing students to play on sports teams consistent with their "gender identity," asserting that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(4).

49.    H.B. 3293's definition of "biological sex" categorically excludes B.P.J. and any other transgender girl from playing sports at the middle school, high school, and collegiate levels. (Ex. 5 Nos. 24 (admitting "that H.B. 3293 prohibits Plaintiff B.P.J. from participating on

**JA3093**

girls' athletic teams at all public secondary schools located in West Virginia"), 36–37; Ex. 6 Nos. 36–37; Ex. 7 Nos. 20–22, 36–37; Ex. 8 Nos. 36–37; Ex. 9 Nos. 20–22, 36–37; Ex. 10 Nos. 36–37; Ex. 11 Nos. 36–37; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2; Ex. 16 at 100:21-101:4; Ex. 17 at 113:16-20; Ex. 28 (Deposition Transcript of Mary D. Fry, Ph.D.) 180:18-20 (Q. [from Attorney David Tryon] Well, right now the rule is HB-3293, which says that [a] transgender girl must participate on the boys['] team.).)

50.   H.B. 3293 does not prohibit a cisgender girl at any public secondary school in West Virginia from joining a girls' athletic team. (Ex. 5 Nos. 34–35; Ex. 6 Nos. 34–35; Ex. 7 Nos. 34–35; Ex. 8 Nos. 34–35; Ex. 9 Nos. 34–35; Ex. 10 Nos. 34–35; Ex. 11 Nos. 34–35; Ex. 16 at 100:2-101:4; Ex. 18 (Deposition Transcript of State Board of Education 30(b)(6) Designee) at 124:11-25, 125:3-19.)

51.   Melissa White, counsel for the House of Delegates Education Committee, referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill" (Ex. 40 (WVSBOE 000008).)

52.   Melissa White also described the bill as a "[t]ransgender originating bill" (Ex. 40 (WVSBOE000039)) and a "bill regarding transgender participation in sports" (Ex. 40 (WVSBOE000009).)

53.   During debates over the bill, when asked how H.B. 3293 would change the status quo in West Virginia, the counsel representing the bill replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth. (Ex. 35 (West Virginia House of Delegates Education Committee Testimony, Mar. 18, 2021) at 9.)

54.   A member of the West Virginia House of Delegates and Chairman of the Education Committee, Joe Ellington, described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to compete in state track and field meetings in Connecticut." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 3; Dkt. No 25 (Supplemental Declaration of Katelyn Kang) Ex. C at 37–38.)

55.   During the debate in the Senate, one senator, Michael J. Maroney, expressly noted that "the bill" is "about transgenders." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 2; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)

56.   Another senator, Rollan Roberts, shared a constituent letter stating that the "trans movement is an attack upon womanhood." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 3; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)

57.   On March 16, 2021, Delegate Jordan Bridges announced on Facebook that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). (Ex. 42 (Jordan Bridges, "Update: The bill passed out of committee," Facebook, https://perma.cc/HA5C-VJ4N (March 16, 2021)).)

58.   The sole justification for H.B. 3293 offered in the legislative text is "promot[ing] equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5). The law discusses

equal athletic opportunities only in terms of the "substantial" displacement of female athletes. *Id.* § 18-2-25d(a)(3)-(4).

59.    During the discovery period, the State identified additional rationalizations that it claims are advanced by H.B. 3293: (1) "[t]o [p]rotect [w]omen's [s]ports," (2) "[t]o follow Title IX," and (3) "[t]o protect women's safety in female athletic sports." (Ex. 4 (State of West Virginia's Responses to Plaintiff's First Set of Interrogatories) No. 6.)

60.    During a House committee hearing of the bill, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics. (Ex. 35 at 11.)

61.    The bill's sponsors also acknowledged that they were not aware of a single instance of a transgender athlete having ever competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from such participation. (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. B (West Virginia House of Delegates Education Committee, Mar. 18, 2021) at 1–2, Ex. C (West Virginia House of Delegates Judiciary Committee, Mar. 18, 2021) at 1, Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 1.)

62.    When Governor Justice was asked after signing the bill whether he could give "one example of a transgender child trying to get an unfair advantage," he responded, "No, I can't really tell you one." Ex. 43 (MSNBC on Twitter, https://twitter.com/MSNBC/status/1388132937707802629 [https://perma.cc/G8VM-QGYU] (April 30, 2021).) He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority. It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids. I

**JA3096**

mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills. This is not a priority to me." (*Id.*)

63.   Defendants were not aware of any transgender student athletes participating on an athletic team offered by a public secondary school in West Virginia when H.B. 3293 was passed. (Defendants' Responses to Plaintiff's Second Set of Requests for Admission Nos. 40–41.)

64.   Defendants are not currently aware of a transgender student athlete other than B.P.J. participating on an athletic team offered by Bridgeport Middle School or any other public secondary school in West Virginia. (Ex. 5 Nos. 42–43; Ex. 6 Nos. 42–43; Ex. 7 Nos. 42–43; Ex. 8 Nos. 42–43; Ex. 9 Nos. 42–43; Ex. 10 Nos. 42–43; Ex. 11 Nos. 42–43; Ex. 17 at 119:13-16.)

65.   WVSSAC has not received any complaints about transgender students participating in school sports in West Virginia. (Ex. 17 at 120:9-15.)

66.   The West Virginia Department of Education's General Counsel described H.B. 3293 as "much ado about nothing." (Ex. 40 (WVSBOE000006).)

67.   The West Virginia Department of Education did not support H.B. 3293 when it was passed. (Ex. 41 (WVSBOE000038).)

68.   The State Board's 30(b)(6) witness testified that the Board had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in school sports, and that the Department of Education, State Board, and State Superintendent have never received any complaints regarding students who are transgender participating in school sports. (Ex. 18 at 67:3-10, 101:15-17, 102:12-13, 113:19-114:16, 125:24-126:2, 135:24-136:19.)

69.    The West Virginia Department of Education and the State Superintendent still do not support H.B. 3293. (Dkt. No. 270 (WVBOE Stip.) ¶ 5.)

**V.    H.B. 3293's Exclusive Reliance On "Biological Sex" And Categorical Bar To The Participation Of Transgender Women And Girls Is A Stark Departure From The Inclusive Policies Of Major Sporting Associations.**

70.    H.B. 3293 classifies school sports teams "according to biological sex" and defines "biological sex" as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(a)(5), (b)(1).

71.    Scientists recognize that a person's sex encompasses different biological components, including sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and external genitalia, and other secondary sex characteristics, which are not always aligned in the same direction. (Ex. 25 ¶¶ 5–6 (and sources cited therein)); Ex. 23 (Exhibit 4 to Deposition Transcript of Deanna Adkins, M.D. (Hembree WC, et al. Endocrine Treatment of Gender Dysphoria/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab 2017; 102:3869-3903 ("Endocrine Society Guidelines 2017") at 3875)).)

72.    Although the precise biological causes of gender identity are unknown, gender identity itself has biological underpinnings, possibly as a result of variations in prenatal exposure to sex hormones, gene sequences, epigenetics, or a combination of factors. (Ex. 25 ¶ 6 (and sources cited therein); Ex. 23 (Endocrine Society Guidelines 2017 at 3874–75).)

73.    H.B. 3293's requirement that teams be separated "based solely on the individual's reproductive biology and genetics at birth" is a stark departure from the prior policy in West Virginia and is not the rule used by elite sporting organizations.

74.    The NCAA, World Athletics, and the International Olympic Committee ("IOC") all permit transgender girls and women to compete in women's sport events after suppressing their levels of testosterone for particular periods of time or below particular thresholds. (Dkt. No. 78 (State Ans.) ¶ 42; Dkt. No. 131 (Armistead Ans.) ¶ 42; Dkt. No. 156 (WVBOE Ans.) ¶ 42; Dkt. No. 157 (County Ans.) ¶ 42; Dkt. No. 158 (WVSSAC Ans.) ¶ 42; Ex. 24 ¶¶ 27–39.)

75.    The NCAA's policy is described above. *See supra* ¶¶ 41–42. The NCAA policy aims to "preserve[] opportunity for transgender-student athletes." (Ex. 45 (NCAA, *Board of Governors updates transgender participation policy* (Jan. 19, 2022), https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx).)

76.    Since 2011, World Athletics, the international governing body for track-and-field athletics, has required that women with elevated levels of circulating testosterone lower their levels of testosterone below a threshold amount in order to compete in elite international women's sports competitions. (Ex. 24 ¶ 27.)

77.    In 2019, World Athletics adopted regulations allowing women who are transgender to participate in elite international women's sports competitions if their total testosterone level in serum is beneath a particular threshold—5 nmol/L—for at least one year before competition. (Ex. 24 ¶ 29.)

78.    The IOC published formal eligibility rules for the participation of transgender women in 2003. Those rules required that transgender women athletes could compete in women's events only if they had genital surgery, a gonadectomy (*i.e.*, removal of the testes), and legal documentation of female sex. (Ex. 24 ¶ 31.)

15

JA3099

79.  In 2015, the IOC adopted new policies allowing women who are transgender to participate on women's teams if they demonstrated that their total testosterone level in serum was below 10 nmol/L for at least one year prior to competition. (Ex. 24 ¶ 33.)

80.  In 2021, the IOC adopted a new "Framework on Fairness, Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations," which replaces the 2015 guidance. (Ex. 24 ¶ 34.)

81.  Unlike the IOC's 2003 and 2015 policies, the IOC's 2021 framework does not attempt to adopt a single set of eligibility standards for the participation of transgender athletes that would apply universally to every IOC sport. Instead, the 2021 framework provides a set of governing principles for sporting bodies to follow when adopting eligibility rules for their particular sport. (Ex. 24 ¶ 35.)

82.  Under the 2021 framework, "[n]o athlete should be precluded from competing or excluded from competition on the .exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.) "Until evidence . . . determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.)

83.  The 2021 framework further provides that "[a]ny restrictions arising from eligibility criteria should be based on robust and peer reviewed research that: (a) demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes; (b) is largely based on data collected from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility criteria aim to regulate; and (c) demonstrates that such

disproportionate competitive advantage and/or unpreventable risk exists for the specific sport, discipline and event that the eligibility criteria aim to regulate." (Ex. 24 ¶ 37.)

84.   USA Swimming recently adopted a policy allowing girls and women who are transgender to apply to compete in elite events if they demonstrate that their "prior physical development . . . as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender [f]emale competitors" and they "demonstrate[] that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L . . . continuously for a period of at least thirty-six (36) months before the date of the Application." (Ex. 29 (Declaration of Gregory A. Brown, P.H.D., F.A.C.S.M.) ¶ 177.)

85.   A person's genetic makeup and internal and external reproductive anatomy are not useful indicators of athletic performance and have not been used in elite competition for decades. (Ex. 24 ¶ 49.)

86.   Some people with 46,XY chromosomes may have inactive testosterone receptors (a syndrome called "complete androgen insensitivity syndrome, CAIS") which means they do not respond to testosterone despite very high levels. (Ex. 24 ¶ 26(b).)

87.   Usually, people with CAIS have female gender identity and have external genitalia that are typically female. They do not develop the physical characteristics associated with typical male puberty. (Ex. 24 ¶ 26(b).)

88.   It has long been recognized that women with CAIS do not have an athletic advantage over other women simply by virtue of having XY chromosomes. (Ex. 24 ¶ 59.)

89.   There is a medical consensus that the largest known biological cause of average differences in athletic performance between non-transgender men as a group and non-transgender

women as a group is circulating testosterone beginning with puberty. (Ex. 24 ¶ 25; Ex. 25 ¶ 8; Ex. 29 ¶ 114 ("While boys exhibit some performance advantage even before puberty, it is both true and well known to common experience that the male advantage increases rapidly, and becomes much larger, as boys undergo puberty and become men.").)

90.    Before puberty, boys and girls typically have the same levels of circulating testosterone, and age-grade competitive sports records show only modest differences in athletic performance between non-transgender boys and non-transgender girls. (Ex. 24 ¶¶ 24–25; Ex. 26 (Exhibit 4 to Deposition Transcript of Joshua D. Safer (Handelsman 2018 ("Age-grade competitive sports records show minimal or no female disadvantage prior to puberty[.]"))); Ex. 26 ¶ 114 (describing differences as "modest").)

91.    There have been no studies purporting to establish that any modest differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are attributable to innate physiology as opposed to social factors. (Ex. 30 (Deposition Transcript of Gregory A. Brown) at 94:19-23; Ex. 25 ¶ 9.)

92.    H.B. 3293 does not provide for any consideration of circulating testosterone levels. W. Va. Code § 18-2-25d.

**VI.    H.B. 3293 Harms B.P.J.**

93.    Under H.B. 3293, B.P.J. is forbidden from playing on a girls' team at Bridgeport Middle School, or on a girls' athletic team at any public secondary school in West Virginia. (Ex. 5 Nos. 20-24; Ex. 6 Nos. 20-24; Ex. 7 Nos. 20-24; Ex. 8 Nos. 20-24; Ex. 9 Nos. 20-24; Ex. 10 Nos. 20-24; Ex. 11 Nos. 20-24; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2.)

94.    In May 2021, B.P.J.'s mother, Heather Jackson, met with B.P.J.'s new Principal at Bridgeport Middle School, David Mazza, regarding a gender support plan for B.P.J., which specified the ways the school would support B.P.J. as a girl. (Ex. 1 ¶ 23; Ex. 16 at 95:25-96:6).

95.    At that same meeting, Ms. Jackson informed Principal Mazza that B.P.J. wanted to participate on the girls' cross-country team. (Ex. 1 ¶ 24; Ex. 1-B at 5; Ex. 14 (Deposition Transcript of Heather Jackson (Jan. 20, 2022)) at 250:14-252:7; Ex. 16 at 220:2-16.) In response to Ms. Jackson's statement, Principal Mazza communicated to Ms. Jackson that B.P.J. would not be able to run on the girls' cross-country team because of H.B. 3293. (Ex. 1 ¶ 24; Ex. 12 at 129:21-130:2, 106:16-21, 107:3-11; Ex. 13 at 21:22-22:16; Ex. 14 at 250:8-251:12; Ex. 16 at 220:19-22; Dkt. No. 157 (County Ans.) ¶¶ 63–65.)

96.    B.P.J. "just want[s] the opportunity to participate in school sports like any other girl." (Ex. 2 ¶ 21.)

97.    Forcing B.P.J. to run on the boys' team would be stigmatizing, isolating, hurtful, and devastating for her. (Ex. 1 ¶¶ 30–31; Ex. 2 ¶¶ 14–16, 21.)

98.    According to B.P.J., "[Being a girl] means—it means everything." (Ex. 12 29:24-30:5.) "I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team." (Ex. 2 ¶ 15; *see also* Ex. 12 at 120:24-121:4.)

99.    According to B.P.J., "[r]unning with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls. If I did not get to participate in cross-country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team." (Ex. 2 ¶ 16.) "It is so upsetting and

hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender." (Ex. 2 ¶ 21.)

100.    According to B.P.J.'s mother, "[i]t is wrong and senseless to try to make [B.P.J.] participate on boys' teams when there are girls' teams available. Forcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl." (Ex. 1 ¶ 30.) "Forcing her to run with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (Ex. 1 ¶ 31.)

101.    B.P.J. does not have the option of running on a co-ed team, as there is no co-ed cross-country or track team at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)

102.    Preventing B.P.J. from playing sports with other girls will deprive B.P.J. of experiences of competition, friendship, and responsibility that come from participation in school sports. (Ex. 1 ¶¶ 28, 31; Ex. 2 ¶¶ 10–11, 14, 16–18.)

103.    It is hurtful and frustrating for B.P.J. to be denied the opportunity to play on girls' sports teams, and to be treated differently because she is transgender. (Ex. 2 ¶¶ 14, 21.)

104.    Allowing Defendants to enforce H.B. 3293 against B.P.J. would send a signal to B.P.J. that her state refuses to see her for the girl that she is. (Ex. 1 ¶ 31.)

**VII.    B.P.J.'s Lawsuit Challenges Her Exclusion From Girls' Sports Under H.B. 3293.**

105.    B.P.J. filed this lawsuit on May 26, 2021, arguing that H.B. 3293 as applied to her violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and the Equal Protection Clause of the United States Constitution. (Dkt. No. 1 (Complaint).)

20

**JA3104**

106. B.P.J.'s Title IX claim is pleaded against the State of West Virginia, the State Board of Education, the County Board of Education, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 20.)

107. B.P.J.'s Equal Protection Clause claim is pleaded against State Superintendent W. Clayton Burch, County Superintendent Dora Stutler, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 22; Dkt. No. 127 (Order dismissing without prejudice B.P.J.'s equal protection claim against the Attorney General in his official capacity).)

108. The Harrison County Board of Education is the governing body of Harrison County's public education system. W. Va. Code § 18-5-1. The County Superintendent is responsible for executing educational policies under the direction of the State Board and County Board, including interscholastic athletics. W. Va. Code § 18-4-10.

109. "[A]bsent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J." (Dkt. No. 252 (County Stip.) at ¶¶ 3–4.) The County Board and County Superintendent's role in enforcing the law is "mandatory, not merely optional." (Dkt. No. 73 (Harrison County Board of Education's Memo in Support of Motion to Dismiss First Amended Complaint) at 2, 6; *see also* Ex. 16 at 44:15-45:12, 145:1-145:5.)

110.  "Absent an injunction by a court," the State Board and Superintendent Burch "would be compelled and required to follow H.B. 3293" and the State Board "would be compelled and required to promulgate rules implementing H.B. 3293." (Dkt. No. 270 (WVBOE Stip.) ¶¶ 3–4; *see also* Ex. 18 at 118:1-3.)

JA3105

111.    Without an injunction, the WVSSAC "cannot adopt or enforce any policy" allowing girls who are transgender to participate on girls' sports teams that "conflicts with state law." (Ex. 10 No. 50.)

112.    The State Board is federally funded. (Dkt. No. 156 (WVBOE Ans.) ¶ 90; *see also* Ex. 18 at 39:19-40:3.)

113.    The County Board is federally funded. (Dkt. No. 157 (County Ans.) ¶ 90; *see also* (Dkt. No. 252 (County Stip.) ¶ 8); Ex. 7 No. 66).)

114.    The State Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code § 18-2-25; (Ex. 18 at 35:22-24.)

115.    The County Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code §§ 18-2-25, 18-5-13; (Ex. 16 at 53:24-54:10.)

116.    WVSSAC was given controlling authority over federally funded secondary school athletic programs by the State and County Boards. W. Va. Code § 18-2-25; (Ex. 39 (WVSSAC000133-38) (outlining the WVSSAC's powers over secondary schools and their athletics)).

117.    WVSSAC member schools must follow WVSSAC's rules and regulations when "conducting interscholastic athletic[s]" (Ex. 39 (WVSSAC0000134)) and when determining whether a student is eligible to play secondary school sports. (Ex. 17 at 73:4-73:8.)

22

JA3106

118.   WVSSAC's Board of Directors has "the power to decide all cases of eligibility of students and participants in interscholastic athletic[s]." (Ex. 39 (WVSSAC000138); *see also* Ex. 17 at 61:25-62:13.)

119.   WVSSAC's athletic handbook provides that it must comply with Title IX. (Ex. 38 (WVSSAC000017).)

**VIII.   This Court's Preliminary Injunction Allowed B.P.J. To Participate On Her School's Girls' Cross-Country And Track Teams, All Without Incident.**

120.   After this Court issued its preliminary injunction on July 21, 2021, B.P.J. was permitted to participate on Bridgeport Middle School's girls' cross-country team. (Ex. 5 No. 6; Ex. 6 No. 6; Ex. 7 No. 6; Ex. 8 No. 6; Ex. 9 No. 6; Ex. 10 No. 6; Ex. 11 No. 6.)

121.   B.P.J. participated in the Mountain Hollar MS Invitational meet and the Doddridge Invitational meet while she was on the cross-country team. (Ex. 1 ¶ 27.)

122.   In the Mountain Hollar Invitational, B.P.J. placed 51 out of 66 participants. (Ex. 1 ¶ 27; Ex. 33 (Mountain Hollar Invitational Stats).)

123.   In the Doddridge Invitational meet, B.P.J. placed 123 out of 150 participants. (Ex. 1 ¶ 27; Ex. 34 (Doddridge Invitational Stats, HCBOE_1167-HCBOE_1168).)

124.   According to B.P.J.: "My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team. I made so many new friends and loved competing with and supporting my teammates. We learned about teamwork, having a positive attitude, and how to have fun while being competitive." (Ex. 2 ¶ 18.)

125.   In Spring 2022, B.P.J. tried out for, made, and began running on the girls' track team at Bridgeport Middle School. (Ex. 3 (Plaintiff's Second Set of Supplemental Responses and Objections to State of West Virginia's First Set of Interrogatories and Requests for Production) No. 9.)

126. B.P.J. was "ecstatic" to learn she qualified for the track team and "look[s] forward to many more years of running with [her] peers." (Ex. 2 ¶¶ 20–21.)

127. There were no complaints associated with B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team. (Dkt. No. 252 (County Stip.) ¶ 5; Ex. 5 No. 9; Ex. 6 No. 9; Ex. 7 No. 9; Ex. 8 No. 9; Ex. 9 No. 9; Ex. 10 No. 9; Ex. 11 No. 9.)

128. No student was cut from or otherwise not permitted to participate on the cross-country team as a result of B.P.J.'s participation. (Dkt. No. 252 (County Stip.) ¶ 6.)

129. Defendant-Intervenor could not identify "any specific fairness issue" related to B.P.J.'s participation in girls' cross-country at her middle school. (Ex. 21 at 143:14-20.)

130. Defendant-Intervenor responded, "I don't know," when asked whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team." (Ex. 21 170:13-170:22.)

131. Girls and women who are transgender have competed in a wide range of contact and collision sports in high school and college, including basketball, soccer, volleyball, softball, lacrosse, and women's tackle football, without any reported injuries to cisgender girls. (Ex. 31 (Declaration of Dr. Chad T. Carlson, M.D., F.A.C.S.M.) at 1; Ex. 32 (Deposition Transcript of Dr. Chad T. Carlson) at 124:6-125:4, 154:12-156:16.)

132. There are significant variations in height, weight, and muscle mass within the population of cisgender girls, and within the population of cisgender boys, such that student athletes all the time play with or compete against students who are bigger, faster, and/or stronger than them, whether they are participating in single sex or co-ed teams. (Ex. 25 at 12 ¶ 27; Ex. 28 at 49:19-50:5, 51:18-22, 52:16-24, 189:13-19.)

133. Any safety considerations attendant to differences in height, weight, and muscle mass are already addressed in West Virginia secondary schools through even-handed rules and the use of proper equipment. (Ex. 16 at 164:3-14, 228:14-22.)

134. Any actual safety concerns attendant to girls who are transgender playing on girls' sports teams "can be addressed through even-handed rules instead of discriminating based on transgender status." (Ex. 25 at ¶ 4(d).)

135. Defendant-Intervenor could not identify any safety concern resulting from B.P.J.'s participation on her middle school girls' cross-country team. (Ex. 21 at 139:25-140:4, "Q: . . . What is the safety concern for middle school cross-country and B.P.J. participating on the girls' team? . . . THE WITNESS: I don't know.")

136. The State does not know of any middle school girl who was physically harmed by B.P.J.'s participation on the Bridgeport Middle School girls' cross-country team. (Ex. 5 No. 10.)

**IX.    Lainey Armistead Will Graduate West Virginia State University In May 2022.**

137. Defendant-Intervenor Lainey Armistead will graduate from West Virginia State University in May 2022. (Ex. 22 at 67:21-25.)

Dated: April 21, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 21st day of April, 2022, I electronically filed a true and exact copy of the ***Statement of Undisputed Material Facts*** with the Clerk of Court and all parties using the CM/ECF System.

*/s/ Loree Stark*

Loree Stark
West Virginia Bar No. 12936