Nos. 23-1078(L), 23-1130

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

B.P.J., by her next friend and mother, HEATHER JACKSON,

Plaintiff-Appellant

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, *et al.*,

Defendants-Appellees

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

Intervenors-Appellees
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON
_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING REVERSAL
_____

KRISTEN CLARKE
 Assistant Attorney General

BONNIE I. ROBIN-VERGEER
ELIZABETH PARR HECKER
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 616-5550

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................. 1

STATEMENT OF THE ISSUES........................................................................... 3

STATEMENT OF THE CASE .............................................................................. 3

    *1.*    *Background* ............................................................................ 3

        *a.*    *H.B. 3293* ......................................................... 3

        *b.*    *Factual Background*.................................................. 4

        *c.*    *Procedural History* ................................................ 5

            *i.*    *The Preliminary Injunction Decision* ............................ 6

            *ii.*    *The Summary Judgment Opinion* .................................. 8

SUMMARY OF THE ARGUMENT ..................................................................... 11

ARGUMENT

    I    H.B. 3293 VIOLATES THE EQUAL PROTECTION
           CLAUSE AS APPLIED TO TRANSGENDER GIRLS
           LIKE B.P.J. ....................................................................... 13

        *A.*    *H.B. 3293 Warrants Heightened Scrutiny* ............................... 14

        *B.*    *H.B. 3293 Fails Heightened Scrutiny Because The*
            *Law Does Not Further The State's Asserted Interests*............. 15

    II    H.B. 3293 VIOLATES TITLE IX .................................................... 21

        *A.*    *Title IX's Prohibition Of Discrimination "On The*
            *Basis Of Sex" Includes Discrimination Based On*
            *Gender Identity* ....................................................... 21

**TABLE OF CONTENTS (continued):**          **PAGE**

B.   *Title IX Regulations Do Not Permit Funding
Recipients To Categorically Ban Transgender
Girls From Participating In A School's Athletics
Program Consistent With Their Gender Identity* ..................... 24

C.   *H.B. 3293's Categorical Ban Violates Title IX* ....................... 27

CONCLUSION ................................................................................. 30

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                                           **PAGE**

*Adams* v. *School Bd. of St. John's Cnty.*,
    57 F.4th 791 (11th Cir. 2022) (en banc)............................................ 14, 20, 23

*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020)........................................ 8, 21-22

*Brandt* v. *Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022)............................................14

*Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53 (2006)...........................22

*Decker* v. *Northwest Env't Def. Ctr.*, 568 U.S. 597 (2013).....................................27

*Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir.),
    as amended Aug. 28, 2020, cert. denied, 141 S. Ct. 2878 (2021)......... *passim*

*Hecox* v. *Little*, 479 F. Supp. 3d 930 (D. Idaho 2020)...................................... 18, 29

*Kentuckians for Commonwealth, Inc.* v. *Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ..........................................................................27

*Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718 (1982) ...............................15

*Nordlinger* v. *Hahn*, 505 U.S. 1 (1992) ..................................................................13

*Ramos* v. *Town of Vernon*, 353 F.3d 171 (2d Cir. 2003)........................................16

*Sessions* v. *Morales-Santana*, 137 S. Ct. 1678 (2017) ...........................................19

*United States* v. *Virginia*, 518 U.S. 515 (1996)......................................................15

*Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017),
    cert. dismissed, 138 S. Ct. 1260 (2018)............................................ 14, 16, 23

**STATUTES:** **PAGE**

Education Amendments Act of 1972
    20 U.S.C. 1681 *et seq.* (Title IX) ............................................................ 1-2
    20 U.S.C. 1681(a) ............................................................ 2, 21, 27
    20 U.S.C. 1682 ............................................................2

42 U.S.C. 2000c-6 ............................................................2

42 U.S.C. 2000h-2 ............................................................2

Education Amendments of 1974
    Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974) ............................................25

W. Va. Code § 18-2-25d (2021) ............................................................3

W. Va. Code § 18-2-25d(a)(1) ............................................................4

W. Va. Code § 18-2-25d(a)(3) ............................................................4, 18

W. Va. Code § 18-2-25d(a)(5) ............................................................4

W. Va. Code § 18-2-25d(b)(1)-(3) ............................................................4

W. Va. Code § 18-2-25d(c) ............................................................4

W. Va. Code § 18-2-25d(c)(2) ............................................................4

**REGULATIONS:**

3 C.F.R. 298 (1980 comp.), Exec. Order No. 12,250 ............................................2

28 C.F.R. 0.51 ............................................................2

28 C.F.R. Pt. 54 ............................................................2

34 C.F.R. Pt. 106 ............................................................2

34 C.F.R. 106.31(b)(4) ............................................................25

**REGULATIONS (continued):**                                        **PAGE**

34 C.F.R. 106.33 ............................................................. 23, 26

34 C.F.R. 106.34(a)............................................................24

34 C.F.R. 106.41(a)....................................................... 25, 27

34 C.F.R. 106.41(b) ................................................... *passim*

45 C.F.R. 86.41(b) .............................................................25

87 Fed. Reg. 41,538 (July 12, 2022)....................................29

**RULE:**

Fed. R. App. P. 29(a) ...........................................................2

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

Nos. 23-1078(L), 23-1130

B.P.J., by her next friend and mother, HEATHER JACKSON,

Plaintiff-Appellant

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, *et al.*,

Defendants-Appellees

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

Intervenors-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING REVERSAL

———————————

**INTEREST OF THE UNITED STATES**

The United States has a significant interest in ensuring that all students,

including students who are transgender, can participate in an educational

environment free from unlawful sex discrimination and that the proper legal

standards are applied to claims under Title IX of the Education Amendments of

- 2 -

1972 (Title IX), 20 U.S.C. 1681 *et seq.*, and the Equal Protection Clause.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. 1681(a).  The Department of Justice (DOJ) and the Department of Education (ED), among other agencies, enforce Title IX, and both agencies have issued regulations implementing the statute.  See 34 C.F.R. Pt. 106 (ED); 28 C.F.R. Pt. 54 (DOJ).  Where it serves as a funding agency or upon referral from ED, DOJ may enforce Title IX against recipients of federal financial assistance.  20 U.S.C. 1682.  DOJ also is charged with coordinating federal agencies' implementation and enforcement of Title IX.  Exec. Order No. 12,250, 3 C.F.R. 298 (1980 comp.); 28 C.F.R. 0.51.

In addition to its Title IX enforcement authority, DOJ has authority to investigate and resolve complaints that a public school is depriving students of equal protection based on sex (and other bases), 42 U.S.C. 2000c-6, and may intervene in cases of general public importance involving alleged denials of the "equal protection of the laws under the fourteenth amendment to the Constitution." 42 U.S.C. 2000h-2.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

- 3 -

## STATEMENT OF THE ISSUES

1.  Whether West Virginia statute H.B. 3293 violates the Equal Protection Clause because categorically excluding transgender girls like B.P.J. from participating on certain school-sponsored athletic teams designated for women and girls is not substantially related to the State's asserted interests in ensuring safety and equal opportunity.

2.  Whether H.B. 3293, which categorically bans transgender women and girls from participating on certain school-sponsored athletic teams designated for women and girls, violates Title IX.

## STATEMENT OF THE CASE

*1.   Background*

*a.      H.B. 3293*

On March 18, 2021, the West Virginia legislature passed H.B. 3293, entitled "Clarifying participation for sports events to be based on biological sex of the athlete at birth."  W. Va. Code § 18-2-25d.  The law begins with legislative findings, including, *inter alia*, that (1) "[t]here are inherent differences between biological males and biological females"; (3) "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated," and "[b]iological males would displace females to a substantial extent if permitted to compete on teams designated for biological females"; and

- 4 -

(5) "[c]lassification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex."  See W. Va. Code § 18-2-25d(a)(1), (3), (5).

H.B. 3293 defines "[b]iological sex" as an "individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth," and defines "[f]emale" and "[m]ale" in terms of an individual's "biological sex" as determined at birth.  W. Va. Code § 18-2-25d(b)(1)-(3).  It requires that athletic teams "sponsored by any public secondary school or a state institution of higher education  *  *  *  shall be expressly designated as" either male, female, or coed, "based on biological sex."  *Id.* § 18-2-25d(c).  Finally, the law mandates that teams designated for females "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* § 18-2-25d(c)(2).

*b.    Factual Background*

Plaintiff-appellant B.P.J. is a 12-year-old girl who is transgender.  JA4256.  B.P.J. began expressing a female gender identity at three years old, and by the end of the third grade, she had transitioned socially to present as a girl, including at school.  JA4256-4257.  In 2019, B.P.J. was diagnosed with gender dysphoria.  JA4257.  She currently is receiving medical treatment for her gender dysphoria and takes puberty-blockers.  JA4257.  As a result, she has not undergone male puberty.

- 5 -

JA4257.  B.P.J.'s elementary and middle schools have treated B.P.J. as a girl since
her transition, including by using her female name and pronouns.  JA0877.

While in elementary school, B.P.J. participated on an all-girls recreational
cheerleading team without incident.  JA0441.  As she prepared to enter middle
school in the 2021-2022 school year, she hoped to try out for the girls' cross-
country and track teams.  JA4257.  In May 2021, however, the principal at her
middle school informed B.P.J.'s mother that B.P.J. would not be able to run on the
girls' teams because of H.B. 3293.  JA4257.

### c.    Procedural History

B.P.J., through her mother, sued the West Virginia State Board of Education,
its then-Superintendent W. Clayton Burch, the Harrison County Board of
Education and its Superintendent Dora Stutler, and the West Virginia Secondary
Schools Activities Commission, alleging violations of Title IX and the Equal
Protection Clause and seeking declaratory and injunctive relief.  Doc. 1; JA4260.[1]
After the State of West Virginia intervened, B.P.J. amended her complaint to add
the State as a defendant.  JA0413-0438; JA4259.[2]

---

[1]  "Doc. __, at __" refers to the docket entry and page number of documents
filed on the district court's docket that are not included in the Joint Appendix.

[2]  Additionally, the district court permitted Lainey Armistead, a cisgender
female college athlete, to intervene as a defendant.  JA4260.  B.P.J. also named the

- 6 -

###### i.    *The Preliminary Injunction Decision*

On May 26, 2021, B.P.J. moved for a preliminary injunction to ensure that she would be allowed to compete on the girls' track and cross-country teams during the pendency of the case.  JA4259-4260.  The district court granted the preliminary injunction, finding that B.P.J. had demonstrated a likelihood of success on both her equal protection and Title IX claims.  JA0439-0453.

With respect to B.P.J.'s equal protection claim, the district court held that B.P.J. "is not most similarly situated with cisgender boys; she is similarly situated to other girls."  JA0445 (citing *Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir.), as amended Aug. 28, 2020, cert. denied, 141 S. Ct. 2878 (2021)).  The court recognized that because the West Virginia law discriminated against B.P.J. because she was transgender, this Court's controlling precedent held that the law was subject to heightened scrutiny.  JA0446 (citing *Grimm*, 972 F.3d at 607).

The State's proffered objectives for the statute were to provide "equal athletic opportunities" for female students and to protect female students while they participate in sports.  JA0443.  The district court determined, however, that, as applied to B.P.J., the statute was not substantially related to those objectives and that the State thus had failed to present the "exceedingly persuasive justification"

---

West Virginia Attorney General as a defendant, but he has since been dismissed from the lawsuit.  JA4259.

- 7 -

necessary to satisfy intermediate scrutiny. JA0446 (citation omitted); JA0449.

The court explained that B.P.J. "has been on puberty delaying drugs for over a

year" and thus "has not undergone and will not undergo endogenous puberty."

JA0448. B.P.J. therefore had "shown that she will not have any inherent physical

advantage over the girls she would compete against on the girls' cross country and

track teams." JA0449.

Further, the district court held that "permitting B.P.J. to participate on the

girls' teams would not take away athletic opportunities from other girls" because

"[t]ransgender people make up a small percentage of the population," and "[t]he

number of transgender people who wish to participate in school-sponsored

athletics is even smaller." JA0449. Indeed, the record indicated that B.P.J. was

"the only transgender student at her school interested in school-sponsored

athletics." JA0449. Thus, allowing B.P.J. to participate on the girls' cross-country

and track teams would not prevent other girls from participating. JA0449. Finally,

because "[c]ross country and track are not contact sports," the court explained that

permitting B.P.J. to participate would not endanger the safety of any other student.

JA0449. It concluded that "[a]s applied to B.P.J.," the law "is not substantially

related to protecting girls' opportunities in athletics or their physical safety when

participating in athletics." JA0449.

- 8 -

Next, the district court held that B.P.J. was likely to succeed on her Title IX claim. JA0451. The court observed that H.B. 3293 discriminated against B.P.J. on the basis of sex because she was "being excluded from school athletics on the basis of her sex." JA0450 (citing *Grimm*, 972 F.3d at 616, and *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020)). The court observed that under Title IX, "discrimination means treating [an] individual worse than others who are similarly situated." JA0451 (alteration omitted) (quoting *Grimm*, 972 F.3d at 618, and *Bostock*, 140 S. Ct. at 1740). The court found that because "B.P.J. will be treated worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity," she had "demonstrated a likelihood of success on the merits for her Title IX claim." JA0451. The court also had "little difficulty finding that B.P.J. [wa]s harmed by" H.B. 3293, because "[a]ll other students * * * are permitted to play on sports teams that best fit their gender identity." JA0450.

### ii.    *The Summary Judgment Opinion*

After the close of discovery, all parties moved for summary judgment. On January 5, 2023, in an opinion that departed sharply from its previous one, the district court held in favor of the State on both B.P.J.'s equal protection and Title IX claims.

- 9 -

First, although the district court reiterated its previous holding that intermediate scrutiny applies to B.P.J.'s equal protection claim, it held that H.B. 3293's definitions of "biological sex" and of "girl" were substantially related to an important governmental interest in "providing equal athletic opportunities for females." JA4274-4275. This, the court asserted, is because "biological sex" "dictates physical characteristics that are relevant to athletics." JA4272. The court explained that individuals "with male chromosomes * * * naturally undergo male puberty, resulting in an increase of testosterone." JA4272. And, the court continued, "it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes." JA4272. Thus, the court concluded, "the state's classification based on biological sex" was "substantially related to its interest in providing equal athletic opportunities for females." JA4272.

The district court rejected B.P.J.'s assertion that these generalizations did not apply to transgender girls who took "puberty blockers or other hormone therapies to mitigate any athletic advantage over cisgender females." JA4272. The court stated that "[w]hile this may be true for B.P.J., other transgender girls may not take those medications." JA4273. The court asserted that "[s]ex-based classifications fall under intermediate scrutiny and therefore do not have a 'narrowly-tailored' requirement." JA4274. Because "a transgender girl is biologically male and,

- 10 -

barring medical intervention, would undergo male puberty like other biological males," and because "biological males generally outperform females athletically," the court held that "[t]he state is permitted to legislate sports rules on this basis." JA4273-4274.

The district court also changed course on B.P.J.'s Title IX claim. JA4275-4277. The court began by pointing out that "Title IX permits sex-separate athletic teams 'where selection for such teams is based upon competitive skill or the activity involved is a contact sport.'" JA4275 (quoting 34 C.F.R. 106.41(b)). The court stated that "[t]here is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex." JA4276-4277. And the court found that "Title IX authorizes sex separate sports in the same manner as H.B. 3293, so long as overall athletic opportunities for each sex are equal." JA4276. The court concluded that "[s]hort of any medical intervention that will differ for each individual person, biological males are not similarly situated to biological females for purposes of athletics." JA4277. In response to B.P.J.'s argument that H.B. 3293 excludes transgender girls from sports entirely, the court countered that transgender girls "are permitted to try out for boys' teams." JA4277.

Accordingly, the district court dissolved the preliminary injunction, denied summary judgment for B.P.J., and granted summary judgment for defendants as to whether H.B. 3293 is constitutional and complies with Title IX. JA4277.

- 11 -

## SUMMARY OF THE ARGUMENT

1.  West Virginia's H.B. 3293 categorically bans all female students who are transgender from participating on certain school-sponsored athletic teams consistent with their gender identity.  This Court's binding precedent dictates, and the defendants do not dispute, that the statute warrants intermediate scrutiny under the Equal Protection Clause.  Under that standard, defendants must identify an important interest that is genuine and not hypothesized, and must demonstrate that the law is substantially related to achieving that objective.  H.B. 3293 fails intermediate scrutiny because defendants have not shown that its categorical restriction on transgender girls' participation on girls' athletic teams is substantially related to the State's asserted interests in ensuring safety and equal athletic opportunity for women and girls in West Virginia.

First, prohibiting all transgender girls from participating on certain girls' athletic teams does not serve the State's asserted interest in ensuring equal opportunity.  Some transgender girls (including B.P.J.) take puberty blockers and thus have not developed physical characteristics that might give them a sex-based competitive advantage over cisgender girls.  And the small number of transgender girls in West Virginia—and even smaller number of transgender girls who want to participate in school-sponsored athletic teams—means that H.B. 3293 does not substantially relate to the State's asserted interest in avoiding displacement of

cisgender girls in school athletics. Nor does H.B. 3293 substantially relate to the State's asserted interest in student safety. The statute prohibits transgender girls from participating even in sports that involve little to no physical contact and applies to transgender girls who have not gone through endogenous puberty and thus do not fit the State's overbroad generalizations regarding the relative size, speed, and athletic abilities of boys versus girls. As such, H.B. 3293 is not substantially related to the State's asserted justifications, and thus fails intermediate scrutiny.

2. Furthermore, H.B. 3293 violates Title IX because it constitutes a categorical ban on transgender girls' participation on certain athletic teams, which is inconsistent with Title IX's overarching goal of ensuring equal opportunity. Title IX prohibits discrimination on the basis of sex in education programs or activities that receive federal financial assistance. By prohibiting transgender girls from participating on girls' sports teams because their sex assigned at birth was male, and thus causing them harm, H.B. 3293 discriminates on the basis of sex.

Additionally, the district court erred in relying on the Title IX regulation, 34 C.F.R. 106.41(b), to reject B.P.J.'s Title IX claim. That regulation generally allows federal-funding recipients to provide sex-separate teams where selection for such teams is based on competitive skill or the activity involved is a contact sport. Contrary to the court's assumption that Section 106.41(b) authorizes recipients to

- 13 -

require students participating on athletic teams to do so consistent with their sex assigned at birth, the regulation is silent as to the athletic teams on which transgender students may participate. Because neither Title IX nor its regulations authorize recipients to categorically ban transgender girls from participating on girls' teams, such a ban violates Title IX's general nondiscrimination mandate.

## ARGUMENT

### I

### H.B. 3293 VIOLATES THE EQUAL PROTECTION CLAUSE AS APPLIED TO TRANSGENDER GIRLS LIKE B.P.J.

The Equal Protection Clause generally prohibits government actors "from treating differently persons who are in all relevant respects alike." *Nordlinger* v. *Hahn*, 505 U.S. 1, 10 (1992); see also *Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606 (4th Cir.), as amended Aug. 28, 2020, cert. denied, 141 S. Ct. 2878 (2021). "When considering an equal protection claim," this Court "first determine[s] what level of scrutiny applies" and then "ask[s] whether the law or policy at issue survives such scrutiny." *Id.* at 607.

H.B. 3293 warrants intermediate scrutiny both because it classifies based on sex and because it discriminates against transgender women and girls as a class. Furthermore, the law fails heightened scrutiny because, given its categorical application to all transgender women and girls, there is an inadequate fit between the means and ends of the statute. As B.P.J.'s case illustrates, H.B. 3293's

- 14 -

categorical exclusion of *all* transgender girls from participating on athletic teams that align with their gender identity—which extends even to students who have never gone through endogenous puberty and who want to play a non-contact sport in middle school—is not substantially related to achieving the State's asserted interests in preserving athletic opportunities for women and girls and protecting the safety of student athletes.

## A.    *H.B. 3293 Warrants Heightened Scrutiny*

As established under binding precedent, H.B. 3293 warrants heightened scrutiny both because it classifies based on sex, and because transgender individuals constitute a quasi-suspect class.  In *Grimm* v. *Gloucester County School Board*, this Court held that a school district's policy of assigning students to restrooms based on the sex listed on the student's birth certificate "necessarily rests on a sex classification," and "[o]n that ground alone, heightened scrutiny should apply."  972 F.3d at 608.[3]  The Court alternatively held that "heightened scrutiny applies because transgender people constitute at least a quasi-suspect class."  *Id.* at

---

[3]  Other federal courts of appeals have agreed that laws discriminating against transgender individuals are subject to heightened scrutiny because such laws classify on the basis of sex.  See, *e.g.*, *Adams* v. *School Bd. of St. John's Cnty.*, 57 F.4th 791, 803 (11th Cir. 2022) (en banc); *Brandt* v. *Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022); *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051-1052 (7th Cir. 2017), cert. dismissed, 138 S. Ct. 1260 (2018).

- 15 -

610.  The district court thus held, and the State does not appear to dispute, that

heightened scrutiny applies to B.P.J.'s equal protection claim.  JA4269.

B.    *H.B. 3293 Fails Heightened Scrutiny Because The Law Does Not Further*
      *The State's Asserted Interests*

1.  H.B. 3293 fails heightened scrutiny because it is not substantially related

to the State's asserted interests in ensuring safety and equal opportunity.  To satisfy

heightened scrutiny, the government's justification for a gender classification

"must be genuine, not hypothesized."  *United States* v. *Virginia*, 518 U.S. 515, 533

(1996).  The State must show that the law "serves important governmental

objectives" and, crucially, that the "discriminatory means employed are

substantially related to the achievement of these objectives."  *Id.* at 524 (quoting

*Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718, 724 (1982)).

The district court held that "[s]ex-based classifications fall under

intermediate scrutiny and therefore do not have a 'narrowly-tailored' requirement."

JA4274.  While the court was correct that unlike strict scrutiny, intermediate

scrutiny does not require the government to achieve its interest via the least

restrictive means, laws that classify based on sex still must be "substantially related

to a sufficiently important governmental interest."  *Grimm*, 972 F.3d at 608

(citation omitted).  The court's failure to examine whether H.B. 3293's categorical

ban on transgender students participating on athletic teams consistent with their

- 16 -

gender identity is substantially related to advancing the State's asserted interests
was error.

For example, in *Grimm*, this Court rejected a school board's claim that
privacy concerns justified its policy prohibiting transgender students from using
the restroom consistent with their gender identity. 972 F.3d at 614. The Court
pointed out that the school board "cite[d] to no incident [where a transgender
student threatened student privacy], either in Gloucester County or elsewhere."
*Ibid.* The Court further explained that the policy "ignores the growing number of
school districts across the country who are successfully allowing transgender
students such as Grimm to use the bathroom matching their gender identity,
without incident" and "its own seven-week experience with doing the same in
Gloucester County High School." *Ibid.* Because the board's primary argument
was "based upon sheer conjecture and abstraction," it failed intermediate scrutiny.
*Ibid.*

Similarly, in *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858
F.3d 1034, 1052 (7th Cir. 2017), the Seventh Circuit held that the school board had
failed to substantiate its asserted privacy concerns because "[a] transgender
student's presence in the restroom provides no more of a risk to other students'
privacy rights than the presence of an overly curious student of the same biological
sex." See also *Ramos* v. *Town of Vernon*, 353 F.3d 171, 186- 187 (2d Cir. 2003)

- 17 -

(applying intermediate scrutiny to hold unconstitutional a town curfew as applied to minors whose parents permitted them to be out past the curfew, where "there [wa]s a conspicuous lack of relationship between the contours of the problem identified by the Vernon Town Council and the curfew ordinance enacted in response"). These cases show that classifications that warrant intermediate scrutiny must be reasonably drawn to advance a State's purported justifications.

2. Excluding all transgender girls—including middle-school-aged transgender girls who have not undergone endogenous male puberty—from participating on any girls' athletic teams is not substantially related to the State's interest in ensuring equal opportunity for girls. B.P.J., for example, is taking puberty blockers and has not gone through male puberty; thus, she has not developed physical characteristics that could give her a competitive advantage over other girls. JA4257. Indeed, the record shows that since the preliminary injunction was issued in this case, B.P.J. has participated on the girls' cross-country team with no issues and no competitive advantage over the other girls on the team. See Doc. 291, at 9-10 (explaining that B.P.J. has consistently placed toward the bottom in her cross-country meets). H.B. 3293 makes no attempt to connect its strictures on transgender girls' participation in athletics to the interests the State advances—instead dealing in "sheer conjecture and abstraction" about these students, *Grimm*, 972 F.3d at 614. Defendants have not shown, and cannot

- 18 -

show, that categorical exclusions like this one, which fail to draw distinctions between transgender students who are differently situated, is substantially related to its interests in ensuring equal athletic opportunity.

Similarly, the State cannot show that its broad-brush treatment of all transgender girls in middle school and later grades as a monolithic group is substantially related to the asserted goal of preventing female displacement in athletics. See W. Va. Code § 18-2-25d(a)(3). As the district court found in its preliminary injunction order, transgender individuals make up a minuscule portion of thirteen- to seventeen-year-olds, and "[t]he number of transgender people who wish to participate in school-sponsored athletics is even smaller." JA0449. In fact, "B.P.J. is the only transgender student at her school interested in school-sponsored athletics." JA0449; see also *Hecox* v. *Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020) ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women."). Thus, the State's categorical exclusion of all transgender girls—including those who, like B.P.J., have no sex-based competitive advantage over other girls—from competing in school athletics like the girls' track and cross-country teams is not substantially

- 19 -

related to achieving the State's asserted interest in ensuring equal athletic

opportunities for girls in West Virginia.

3.  Nor can the State show that H.B. 3293's sweeping prohibition is

reasonably drawn to promote the State's asserted interest in protecting the safety of

student athletes.  Defendants argued below that "boys are generally taller, bigger,

faster, and stronger than girls."  Doc. 73, at 3.  But these generalizations do not

apply to many transgender students, particularly those who, like B.P.J., have not

gone through male puberty and are taking puberty blockers.  JA4257.  As such,

they are too overbroad to satisfy intermediate scrutiny.  See *Sessions* v. *Morales-*

*Santana*, 137 S. Ct. 1678, 1693 n.13 (2017) ("[O]ur decisions reject measures that

classify unnecessarily and overbroadly by gender when more accurate and

impartial lines can be drawn.").  Moreover, as the district court recognized in its

preliminary injunction order, "[c]ross country and track are not contact sports," so

"[t]he physical ability of one athlete does not put another in danger in the way it

might in another sport like football or hockey."  JA0449.

Despite purporting to further equal athletic opportunities for West Virginia's

female students, H.B. 3293 fails to take into account relevant factors such as

whether a student has gone through puberty or has undergone medical

interventions such as hormone suppressants, whether there has been any actual

displacement of cisgender females as a result of transgender students'

- 20 -

participation, and whether specific sports or levels of competition implicate any of the concerns purportedly motivating the legislation. This Court need not decide exactly how close a fit would justify the sex-based exclusion of transgender girls from West Virginia's school-sponsored athletic teams—it is enough to conclude that the near-total lack of means-ends fit here does not satisfy intermediate scrutiny.

4. For the same reasons, this Court should give no weight to the Eleventh Circuit's decision in *Adams* v. *School Board of St. John's County*, 57 F.4th 791 (11th Cir. 2022) (en banc). The plaintiff there, a transgender boy, brought an as-applied equal protection claim against a school board for prohibiting him from using the boys' restrooms at his high school. *Id.* at 800. Similar to the district court here, the *Adams* court failed to consider whether applying a restroom policy mandating that students use the restroom consistent with their sex assigned at birth to transgender students like the plaintiff actually advanced the school district's asserted interest in privacy. Because *Adams* conflicts with this Court's analysis in *Grimm*, see 972 F.3d at 614, it is not instructive here.

For these reasons, H.B. 3293 violates the Equal Protection Clause and should be declared invalid as applied to B.P.J.

- 21 -

## II

## H.B. 3293 VIOLATES TITLE IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). By categorically prohibiting transgender female students from participating on certain athletic teams designated as being for women or girls, H.B. 3293 creates a substantial obstacle for funding recipients in West Virginia to accomplishing Congress's objective in enacting Title IX: ensuring equal athletic opportunity. And contrary to the district court's reading, the Title IX regulation permitting schools to separate certain athletic teams by sex does not authorize categorical bans on transgender girls' participation in girls' sports.

A.  *Title IX's Prohibition Of Discrimination "On The Basis Of Sex" Includes Discrimination Based On Gender Identity*

In *Bostock* v. *Clayton County*, the Supreme Court held that firing a person who is gay or transgender because of their sexual orientation or gender identity violates Title VII of the Civil Rights Act of 1964 (Title VII) because it constitutes discrimination "because of sex." 140 S. Ct. 1731, 1740-1741 (2020). The Court defined the term "discrimination" in the Title VII context to include "distinctions or differences in treatment that injure protected individuals." *Id.* at 1753 (quoting

- 22 -

*Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 59 (2006)).  The Court explained that "it is impossible to discriminate against a person for being  *  *  * transgender without discriminating against that individual based on sex."  *Id.* at 1741.

Two months after the Supreme Court decided *Bostock*, this Court held in *Grimm* v. *Gloucester County School Board* that a school board's policy prohibiting the plaintiff, a transgender boy, from using the boys' restroom at his high school violated Title IX.  972 F.3d 586, 619 (4th Cir.), as amended Aug. 28, 2020, cert. denied, 141 S. Ct. 2878 (2021).  The *Grimm* Court stated that "[a]fter [*Bostock*]," it had "little difficulty holding that a bathroom policy precluding [the plaintiff] from using the boys['] restrooms discriminated against him 'on the basis of sex.'"  *Id.* at 616; see *ibid.* (noting that Title VII case law "guides our evaluation of claims under Title IX").  The Court pointed out that the school board "could not exclude Grimm from the boys['] bathrooms without referencing his 'biological gender' under the policy."  *Ibid.*  Therefore, "[e]ven if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions."  *Ibid.*  The *Grimm* Court also found that the sex-based discrimination caused the plaintiff harm.  *Id.* at 617-618.

- 23 -

The *Grimm* Court rejected the school board's claim that Title IX regulations permitting sex-separate restrooms immunized its policy excluding Grimm from the boys' restroom. 972 F.3d at 618-619; see 34 C.F.R. 106.33 (interpreting Title IX to allow "separate toilet, locker room, and shower facilities on the basis of sex," as long as such facilities are "comparable" to one another). The Court held that "[a]ll [Section 106.33] suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means." *Grimm*, 972 F.3d at 618. For these reasons, the Court concluded that the school board policy excluding Grimm from the boys' restroom violated Title IX. *Id.* at 618-619; see also *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048-1052 (7th Cir. 2017) (holding that transgender student was likely to succeed on his Title IX claim against school district for refusing to permit him to use the restroom consistent with his gender identity, because discrimination against student constituted impermissible sex stereotyping), cert. dismissed, 138 S. Ct. 1260 (2018).[4]

---

[4] The Eleventh Circuit's holding in *Adams* v. *School Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (2022) (en banc) that Adams's Title IX claim fails because Title IX regulations authorize separation on the basis of sex assigned at birth squarely conflicts with this Court's holding in *Grimm* that the same regulation did not provide school districts free rein to exclude transgender students from restrooms that align with their gender identity. See *Grimm*, 972 F.3d at 618.

- 24 -

Under this Court's binding precedent, it is clear that H.B. 3293 discriminates based on sex. It prohibits transgender girls from participating on girls' sports teams because their sex assigned at birth was male. This is discrimination "on the basis of" sex. *Grimm*, 972 F.3d at 616-617. The question here, then, is whether Title IX regulations, which generally allow schools to provide sex-separate athletic teams where selection is based upon competitive skill or the activity is a contact sport, 34 C.F.R. 106.41(b), actually permit federal-funding recipients to categorically ban *all* transgender girls from participating on those teams consistent with their gender identity. As explained below, they do not.

B.    *Title IX Regulations Do Not Permit Funding Recipients To Categorically Ban Transgender Girls From Participating In A School's Athletics Program Consistent With Their Gender Identity*

Title IX's regulatory scheme is designed to ensure equal opportunity. In most contexts, Title IX requires schools to achieve this goal through coeducation—prohibiting the separation of students by sex. See, *e.g.*, 34 C.F.R. 106.34(a) (providing that except in limited circumstances, "a recipient shall not provide or otherwise carry out any of its education programs or activities separately on the basis of sex, or require or refuse participation therein by any of its students on the basis of sex"). The regulations set forth a similar rule for athletics: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against

- 25 -

in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. 106.41(a); see also 34 C.F.R. 106.31(b)(4).

Congress expressly clarified ED's discretion, however, to take a different approach in its regulations with respect to sex separation in the athletics context. Responding to concerns that Title IX would interfere with existing practices in intercollegiate athletics, Congress enacted the Javits Amendment as part of the Education Amendments of 1974. The amendment directed the Secretary of Health, Education, and Welfare (HEW) to promulgate regulations "relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974). In response, HEW promulgated a regulation in 1975 that provided, in relevant part, that "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 45 C.F.R. 86.41(b) (subsequently codified at 34 C.F.R. 106.41(b)).

The district court relied heavily on this regulation in rejecting B.P.J.'s Title IX claim, declaring that "[t]here is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex." JA4276-4277. As a result, the

- 26 -

court held that Section 106.41(b) permits funding recipients to require all students who participate on athletic teams to do so consistent with their "biological sex." JA4276-4277.  But contrary to the court's pronouncement, Section 106.41(b) does not dictate the athletic teams on which transgender students may participate.  Title IX and its regulations do not use the term "biological sex" or define the term "sex," and, more importantly, do not require that federal-funding recipients treat transgender students consistent with their "biological sex."

This Court already has recognized that Title IX's regulations do not mandate separation on the basis of "biological sex" in analogous circumstances in *Grimm* with respect to 34 C.F.R. 106.33, which permits federal-funding recipients to provide separate restrooms on the basis of sex.  There, the Court explained that the regulation "suggests * * * that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means."  972 F.3d at 618 (citation omitted).  The same is true here.  Section 106.41(b) is silent as to which athletic teams transgender students may join, and thus does not provide a "safe harbor" for categorical bans from sex-separate athletic teams based on a student's birth-assigned sex.[5]

_____

    [5]  Because 34 C.F.R. 106.41(b) does not address how to assign transgender students to sex-separate teams, the fact that H.B. 3293 applies only to "teams

- 27 -

C.    *H.B. 3293's Categorical Ban Violates Title IX*

Title IX broadly prohibits discrimination on the basis of sex in education

programs that receive federal financial assistance.  20 U.S.C. 1681(a).  As in any

case, Title IX's regulations must be read consistently with this core

nondiscrimination mandate.  See *Decker* v. *Northwest Env't Def. Ctr.*, 568 U.S.

597, 609 (2013) ("[R]egulations, in order to be valid, must be consistent with the

statute under which they are promulgated.") (citation omitted); *Kentuckians for*

*Commonwealth, Inc.* v. *Rivenburgh*, 317 F.3d 425, 440 (4th Cir. 2003) ("[B]ecause

a regulation must be consistent with the statute it implements, any interpretation of

a regulation naturally must accord with the statute as well.") (citation omitted).  To

that end, Title IX and its regulations permit the exclusion of transgender students

from participating on athletic teams consistent with their gender identity *only* to the

extent that such exclusion is consistent with the statute's requirement that federal-

funding recipients provide equal opportunity in athletics programs.  See 34 C.F.R.

106.41(a) ("No person shall, on the basis of sex, be excluded from participation in,

[or] be denied the benefits of,  * * *  athletics [programs] offered by a

---

* * *  based upon competitive skill" and "contact sport[s]" does not save it.  See
JA4276-4277.  The district court found that these exceptions "largely mirror[] Title
IX," JA4277, but that is not the case because, as explained above, unlike H.B.
3293, Title IX's athletics regulations do not require that all students, regardless of
their gender identity, be assigned to sex-separate teams based on "biological sex."

- 28 -

recipient.").  Bans that extend beyond that (as categorical bans do) violate the general nondiscrimination mandate in the statute and the regulations.

Because a recipient's criteria for separating students on the basis of sex in athletics must be drawn to cohere with Title IX's equal-opportunity goals, the validity of adopting eligibility criteria to participate on a particular male or female athletic team depends on the context.  For instance, the justifications for doing so may be different for a high school tennis team, where bodily contact between participants is nonexistent or minimal, than for a high school basketball team, where such contact is frequent.  Likewise, whether adopting such criteria for teams involving "competitive skill," see 34 C.F.R. 106.41(b), is consistent with Title IX's equal-opportunity goals may depend on multiple factors, such as the age or grade level of the students involved.  That Title IX may permit recipients to take these considerations into account in operating sex-separate athletic teams does not mean, however, that recipients are free to ignore equal opportunity concerns, including harms to excluded students, and instead impose a categorical ban on transgender girls' participation on teams consistent with their gender identity.[6]

---

[6]  This Court should reject the district court's determination (JA4277) that a transgender girl could join the boys' team, and the implication that access to a boys' team would negate the discrimination she experiences because of her sex. As this Court and others have recognized, forcing a girl who is transgender to join a boys' team would result in a dignitary harm similar to excluding her completely from girls' teams.  See, *e.g.*, *Grimm*, 972 F.3d at 617-618 (describing dignitary

- 29 -

ED has indicated that it would consider in a forthcoming notice of proposed

rulemaking (NPRM) what criteria, if any, recipients should be permitted to use to

establish students' eligibility to participate on a particular male or female athletic

team. See 87 Fed. Reg. 41,538 (July 12, 2022).[7]  But bans that categorically

exclude transgender students from participating consistent with their gender

identity preclude recipients from taking into account any other considerations that

may be necessary to ensuring equal opportunity.  Accordingly, such bans are

simply too broad to conform to Title IX's fundamental antidiscrimination mandate.

---

harm that results from treating transgender children inconsistent with their gender identity); *Hecox* v. *Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020) ("Participating in sports on teams that contradict one's gender identity is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical.") (internal quotation marks and citation omitted); see also JA1736; JA1742 (expert declaration stating that "requiring a girl who is transgender to participate in single-sex activities for boys can be deeply harmful and disruptive to treatment").

[7]  ED's NPRM currently is under review within the Office of Management and Budget.  See Office of Information and Regulatory Affairs, https://www.reginfo.gov/public/do/eoDetails?rrid=308363.

- 30 -

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant

of summary judgment to defendants.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Elizabeth Parr Hecker
BONNIE I. ROBIN-VERGEER
ELIZABETH PARR HECKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-5550

**CERTIFICATE OF COMPLIANCE**

I certify that the attached BRIEF FOR UNITED STATES AS AMICUS

CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING

REVERSAL does not exceed the type-volume limitation imposed by Federal Rules

of Appellate Procedure 29(a)(5) and 32(a)(7)(B).  The brief was prepared using

Microsoft Office Word 2019 and contains 6,438 words of proportionally spaced

text, excluding the parts of the brief exempted by Federal Rule of Appellate

Procedure 32(f).  The typeface is 14-point Times New Roman font.

s/ Elizabeth Parr Hecker
ELIZABETH PARR HECKER
 Attorney

Date:  April 3, 2023