No. 23-1078

═══════════════════════════════

IN THE

# United States Court of Appeals
# for the Fourth Circuit

─────────────

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff-Appellant*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,

*Defendants-Appellees*,

and

LAINEY ARMSTEAD,

*Intervening Defendant-Appellee*.

─────────────

On Appeal from the United States District Court
for the Southern District of West Virginia
Case No. 2:21-cv-00316
Honorable Joseph R. Goodwin

─────────────

**BRIEF OF *AMICI CURIAE* NATIONAL WOMEN'S LAW CENTER AND 51 ADDITIONAL ORGANIZATIONS IN SUPPORT OF APPELLANT AND REVERSAL**

─────────────

FATIMA GOSS GRAVES
EMILY MARTIN
SUNU CHANDY
SHIWALI PATEL
AUDEN PERINO
HUNTER F. IANNUCCI
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle NW
Washington, DC 20036

JESSICA L. ELLSWORTH
*Counsel of Record*
KAITLYN A. GOLDEN
DEVIN M. URNESS
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae*

April 3, 2023

═══════════════════════════════

(Additional counsel listed on the following page)

SARAH W. KELLER
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
Telephone: (703) 610 8368

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-1078__    Caption: __B.P.J. et al. v. West Virginia State Board of Education et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__See attachment.__
(name of party/amicus)

_____

who is _____Amici Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jessica L. Ellsworth                    Date:    4/3/2023

Counsel for: Amici Curiae

- 2 -

Print to PDF for Filing

## LIST OF *AMICI CURIAE*

1. A Better Balance
2. American Federation of Teachers, AFL-CIO
3. Anti-Defamation League
4. Autistic Self Advocacy Network
5. California Women's Law Center
6. Center for Women's Health and Human Rights, Suffolk University
7. Clearinghouse on Women's Issues
8. Collective Power for Reproductive Justice
9. Desiree Alliance
10. Equal Rights Advocates
11. Equity Forward
12. Equality California
13. Family Equality
14. Feminist Majority Foundation
15. FORGE, Inc.
16. Gender Justice
17. Gibbs Law Group
18. Girls for Gender Equity (GGE)
19. GLBTQ Legal Advocates & Defenders
20. GLSEN
21. Human Rights Campaign Foundation
22. If/When/How: Lawyering for Reproductive Justice
23. KWH Law Center for Social Justice and Change
24. Lawyers Club of San Diego
25. Medical Students for Choice
26. NARAL Pro-Choice America
27. National Association of Social Workers
28. National Center for Lesbian Rights
29. National Crittenton
30. National Organization for Women Foundation
31. National Women's Law Center
32. National Women's Political Caucus
33. Oasis Legal Services
34. Physicians for Reproductive Health

35. Planned Parenthood South Atlantic
36. Progress Florida
37. Public Counsel
38. Public Justice
39. Religious Coalition for Reproductive Choice
40. Reproductive Health Access Project
41. SPARK Reproductive Justice NOW, Inc.
42. SIECUS
43. Squire Patton Boggs US LLP
44. Stop Sexual Assault in Schools (SSAIS)
45. The Women's Law Center of Maryland
46. Tom Homann LGBTQ+ Law Association
47. Washington Lawyers' Committee for Civil Rights and Urban Affairs
48. Women Lawyers Association Los Angeles
49. Women Lawyers On Guard Inc.
50. Women's Bar Association of the District of Columbia
51. Women's Law Project
52. WV FREE (West Virginia Focus: Reproductive Education and Equity)

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF INTEREST OF *AMICI* ............................................... 1

INTRODUCTION ................................................................................... 3

I.      H.B. 3293 BANS WOMEN AND GIRLS WHO ARE TRANSGENDER FROM SCHOOL SPORTS IN VIOLATION OF TITLE IX AND THE EQUAL PROTECTION CLAUSE...................................................... 7

      A.     H.B. 3293 Violates Title IX. ........................................ 8

      B.     H.B. 3293 Violates the Equal Protection Clause. .......... 11

II.     H.B. 3293 HARMS CISGENDER WOMEN AND GIRLS AND DOES NOT ADDRESS ACTUAL BARRIERS TO GENDER EQUITY IN SCHOOL SPORTS. ........................................... 18

      A.     Cisgender Girls Who Do Not Conform to Sex Stereotypes, Particularly Black, Brown, and Intersex Girls, Will Be Disproportionately Targeted and Harmed by H.B. 3293.. ............................................... 19

      B.     There Is No Evidence That Transgender-Inclusive Athletics Policies Are Harmful to Cisgender Women and Girls. .................................................................. 23

CONCLUSION ...................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES:**

*A.H. v. Minersville Area Sch. Dist.*,
408 F. Supp. 3d 536 (M.D. Pa. 2019)....................................................11

*B.P.J. v. W. Va. State Bd. of Educ.*,
550 F. Supp. 3d 347 (S.D.W. Va. 2021).................................................4

*B.P.J. v. W. Va. State Bd. of Educ.*,
No. 2:21-CV-00316, 2023 WL 111875 (S.D.W. Va. Jan. 5, 2023) ...........*passim*

*B.P.J. v. W. Va. State Bd. of Educ.*,
No. 2:21-CV-00316, 2023 WL 1805883 (S.D.W. Va. Feb. 7, 2023) ..........16, 17

*Bostock v. Clayton Cnty., Ga.*,
140 S. Ct. 1731 (2020).................................................................*passim*

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
503 U.S. 60 (1992)........................................................................10

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) .......................................................*passim*

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005).....................................................................8, 9

*Jennings v. Univ. of N.C. at Chapel Hill*,
240 F. Supp. 2d 492 (M.D.N.C. 2002) ............................................27

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
286 F. Supp. 3d 704 (D. Md. 2018)................................................10

*Morgan v. U.S. Soccer Fed'n, Inc.*,
445 F. Supp. 3d 635 (C.D. Cal. 2020) ............................................27

*N. Haven Bd. of Educ. v. Bell*,
456 U.S. 512 (1982).....................................................................9

*Neal v. Bd. of Trs. of Cal. State Univs.*,
198 F.3d 763 (9th Cir. 1999) .......................................................9

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Parents for Priv. v. Dallas Sch. Dist. No. 2*,
    326 F. Supp. 3d 1075 (D. Or. 2018) ...................................................11

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017)............................................................................12

*United States v. Virginia*,
    518 U.S. 515 (1996)...................................................................*passim*

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of
    Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ................................................12, 18

**STATUTES:**

20 U.S.C. § 1681 *et seq.*.........................................................................1

W. Va. Code § 18-2-25d ..........................................................................3

W. Va. Code § 18-2-25d(a)(1) ...............................................................13

W. Va. Code § 18-2-25d(a)(5) .................................................................5

W. Va. Code § 18-2-25d(b) .................................................................3, 4

W. Va. Code § 18-2-25d(b)(1)............................................................4, 15

W. Va. Code § 18-2-25d(c)....................................................................15

W. Va. Code § 18-2-25d(c)(1) .................................................................4

W. Va. Code § 18-2-25d(c)(2) .............................................................3, 4

**REGULATIONS:**

34 C.F.R. § 106.31(b)(4)..........................................................................8

34 C.F.R. § 106.41(a)...............................................................................8

34 C.F.R. § 106.41(b) ..............................................................................8

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

**LEGISLATIVE:**

West Virginia House Bill 3293 ........................................................................*passim*

**RULE:**

Federal Rule of Appellate Procedure 29(a)(4)(E) ......................................................1

**OTHER AUTHORITIES:**

ACLU Kentucky, *Statement on Veto of SB83, Ban on Trans Girls in Girls' Sports* (Apr. 6, 2022), https://www.aclu-ky.org/en/press-releases/statement-veto-sb83-ban-trans-girls-girls-sports ...................................26

Elizabeth Adetiba, *Caster Semenya and the Cruel History of Contested Black Femininity*, SB Nation (Apr. 20, 2020), https://www.sbnation.com/2020/4/20/21227661/caster-semenya-world-athletics-regulation-body-racism ............................................................19

Rachel Axon, *New Zealand's Laurel Hubbard Makes History as First Transgender Woman to Compete at Olympics*, USA Today (Aug. 2, 2021), https://www.usatoday.com/story/sports/olympics/2021/08/02/laurel-hubbard-becomes-openly-first-trans-woman-compete-olympics/5451329001/ ........................................................................25

Canadian Centre for Ethics in Sport, *Transgender Women Athletes and Elite Sport: A Scientific Review* (2022), https://www.cces.ca/sites/default/files/content/docs/pdf/transgenderwomenathletesandelitesport-ascientificreview-e-final.pdf ..................16, 17, 24

*Canadian Soccer Player Quinn Becomes the First Out Trans and Nonbinary Gold Medalist*, NPR (Aug. 6, 2021), https://www.npr.org/2021/08/06/1025442511/canadian-soccer-player-quinn-becomes-first-trans-and-nonbinary-olympic-gold-meda. ........................................................................25

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Caster Semenya Says Testosterone Case Against IAAF Has
   'Destroyed' Her 'Mentally and Physically'*, BBC (July 1, 2019),
   https://bbc.in/2KG2pkC. ...................................................................22

David Crary & Lindsay Whitehurst, *Lawmakers Can't Cite Local
   Examples of Trans Girls in Sports*, AP (Mar. 3, 2021),
   https://apnews.com/article/lawmakers-unable-to-cite-local-trans-
   girls-sports-914a982545e943ecc1e265e8c41042e7 ..........................................26

Dawn Ennis, *IAAF Called Caster Semenya Biologically Male*,
   Outsports (June 19, 2019),
   https://www.outsports.com/2019/6/19/18691210/iaaf-caster-
   semenya-biologically-male-testosterone-olympics-southafrica-
   athlete. .................................................................................22

Shoshana K. Goldberg, *Fair Play: The Importance of Sports
   Participation for Transgender Youth*, Ctr. for Am. Progress (2021),
   https://www.americanprogress.org/wp-
   content/uploads/sites/2/2021/02/Fair-Play-correction2.pdf ........................17, 18

Jeff Grabmeier, *Want to Play College Sports? A Wealthy Family
   Helps*, Science Daily (Aug. 30, 2021),
   https://www.sciencedaily.com/releases/2021/08/210830081819.ht
   m .......................................................................................17

Pat Griffin & Helen J. Carroll, *On the Team: Equal Opportunity for
   Transgender Student Athletes* (2010),
   https://www.goucher.edu/policies/documents/NCLR-Equal-
   Opportunity-For-Transgender-Student-Athletes.pdf. ..........................................25

Human Rights Watch, *'They're Chasing Us Away From Sport':
   Human Rights Violations in Sex Testing of Elite Women Athletes*
   (Dec. 4, 2020), https://www.hrw.org/report/2020/12/04/theyre-
   chasing-us-away-sport/human-rights-violations-sex-testing-elite-
   women ..................................................................................20

InterAct, *What Is Intersex?*, https://interactadvocates.org/faq/ (last
   visited Mar. 30, 2023) ..................................................................18

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Milton Kent et al., *Beating Opponents, Battling Belittlement: How
   African-American Female Athletes Use Community to Navigate
   Negative Images*, Sch. of Glob. Journalism & Commc'ns, Morgan
   State Univ. (2018),
   https://www.documentcloud.org/documents/4528427-The-Image-
   of-Black-Women-in-Sports2.html#document/ ..................................................21

Letter from NWLC et al. to Senate Judiciary Comm., *Statement of
   Women's Rights and Gender Justice Organizations in Support of
   the Equality Act* (Mar. 16, 2021),
   https://nwlc.org/resources/statement-of-womens-rights-and-
   gender-justice-organizations-in-support-of-the-equality-act-2/ ..........................2

*Male vs Female Professional Sports Salary Comparison*, Adelphi
   Univ. (May 20, 2021), https://online.adelphi.edu/articles/male-
   female-sports-salary/..............................................................................................27

Gabriel R. Murchison et al., *School Restroom and Locker Room
   Restrictions and Sexual Assault Risk Among Transgender Youth*,
   143 PEDIATRICS 1 (2019)....................................................................................14

NWLC, *Fulfilling Title IX's Promise: Let Transgender and Intersex
   Athletes Play* (2022), https://nwlc.org/wp-
   content/uploads/2019/09/NWLC_Trans50th_FactSheet.pdf ......................17, 24

NWLC et al., *Statement of Women's Rights and Gender Justice
   Organizations in Support of Full and Equal Access to
   Participation in Athletics for Transgender People* (Apr. 9, 2019),
   https://nwlc.org/wp-content/uploads/2019/04/Womens-Groups-
   Sign-on-Letter-Trans-Sports-4.9.19.pdf ................................................................3

Nat'l Coal. for Women and Girls in Educ., *Title IX at 50: A Report by
   The National Coalition for Women and Girls in Education* (2022),
   https://nwlc.org/wp-content/uploads/2022/06/NCWGE-Title-IX-
   At-50-6.2.22-vF.pdf ...............................................................................................6

# TABLE OF AUTHORITIES—Continued

**Page(s)**

Nat'l Collegiate Athletic Assoc., *The State of Women in College Sports* (2022), https://s3.amazonaws.com/ncaaorg/inclusion/titleix/2022_State_of_Women_in_College_Sports_Report.pdf............................................................27

Brooke Newman, *The Long History of Racist Attacks on Serena Williams*, Wash. Post (Sept. 11, 2018), https://www.washingtonpost.com/outlook/2018/09/11/long-history-behind-racist-attacks-serena-williams/....................................................21

Anna North, *"I Am a Woman and I Am Fast": What Caster Semenya's Story Says about Gender and Race In Sports*, VOX (May 3, 2019), https://www.vox.com/identities/2019/5/3/18526723/caster-semenya-800-gender-race-intersex-athletes. ......................................................22

Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes*, N.Y. Times Magazine (June 28, 2016), https://www.nytimes.com/2016/07/03/magazine/the-humiliating-practice-of-sex-testing-female-athletes.html. ......................................................23

Jason Pham, *Serena Williams Shut Down Body Critics: 'I Am Strong and Muscular — and Beautiful'*, Bus. Insider (May 31, 2018), https://www.businessinsider.com/serena-williams-shut-down-body-critics-who-said-she-was-born-a-guy-2018-5. .........................................21

The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020* (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf .................................................................................7

Patricia Vertinsky et al., *More Myth than History: American Culture and Representations of the Black Female's Athletic Ability*, 25 J. of Sport Hist. 532 (1998) ........................................................19

Gina Vivinetto, *Serena Williams on How She Struggles With Cruel Remarks About Her Body*, Today (Sept. 7, 2017), https://on.today.com/3rfwDLQ.........................................................21

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Women's Sports Found., *50 Years of Title IX: We're Not Done Yet* (2022), https://www.womenssportsfoundation.org/wp-content/uploads/2022/05/Title-IX-at-50-Report-FINALC-v2-.pdf ................... 26

Emine Yucel, *Men's And Women's NCAA March Madness Facilities, Separate and Unequal, Spark Uproar*, NPR (Mar. 19, 2021), https://www.npr.org/2021/03/19/979395795/mens-and-womens-ncaa-march-madness-facilities-separate-and-unequal-spark-uproar ................. 27

## STATEMENT OF INTEREST OF *AMICI*[1]

This brief is filed by *amici* National Women's Law Center ("NWLC") and 51 additional organizations committed to gender justice, including the rights of lesbian, gay, bisexual, transgender, queer, and intersex ("LGBTQI") individuals, and to protecting women and girls from discrimination, including women and girls of color from discrimination on the basis of race and sex. *See* Addendum (listing amici)

NWLC is a nonprofit organization that fights for gender justice—in the courts, in public policy, and in our society—working across issues that are central to the lives of women and girls—with a particular focus on women and girls of color, LGBTQI people, and low-income women and families. Since 1972, NWLC has worked to secure equal opportunity in education for women and girls through full enforcement of the U.S. Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and other laws prohibiting sex discrimination. NWLC has participated as counsel or amicus curiae in cases before the Supreme Court and federal courts of appeal to secure equal treatment and opportunity based on sex, including in the context of school athletics. NWLC has

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel further represent that no party or party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparation or submission of this brief; and that no person other than the amici and counsel identified herein contributed money that was intended to fund preparation or submission of this brief.

long worked for the full enforcement of Title IX, and seeks to ensure that all individuals, including LGBTQI individuals, enjoy strong legal protections against sex discrimination.

NWLC and the additional *amici* have a shared interest in ensuring that protections against sex discrimination include protections for LGBTQI students. As a group of organizations, *amici* are dedicated to ensuring that all women and girls are protected from discrimination based on sex stereotypes, particularly women and girls of color who face heightened discrimination based on race and sex. *Amici* include organizations that are experts in securing protections against sex discrimination, including under Title IX and the U.S. Constitution, and advocating for the rights of LGBTQI people, including in educational settings.

This brief outlines the harm West Virginia House Bill 3293 ("H.B. 3293") will continue to have on all women and girls, including cisgender women and girls, in violation of the Equal Protection Clause and Title IX. *Amici* submit this brief to make clear that organizations committed to women's and girls' rights firmly recognize that gender equity in schools requires equal access to participation in athletics for transgender women and girls.[2] *Amici* reject the incorrect assumption that

---

[2] *See, e.g.*, Letter from NWLC et al. to Senate Judiciary Comm., *Statement of Women's Rights and Gender Justice Organizations in Support of the Equality Act* (Mar. 16, 2021), https://nwlc.org/resources/statement-of-womens-rights-and-gender-justice-organizations-in-support-of-the-equality-act-2/; NWLC et al.,

the rights of cisgender and transgender women and girls are pitted against each other in sports and elsewhere. Instead, *amici* find common cause in addressing the actual harms created by sex discrimination, including through enforcement of the protections contained in Title IX and the U.S. Constitution.

## **INTRODUCTION**

In April 2021, West Virginia passed H.B. 3293 to categorically bar transgender women and girls from participating on women's and girls' public-school sports teams from middle school through college. W. Va. Code § 18-2-25d. West Virginia passed this law even though there was no known instance of a transgender student playing school sports in this state, much less any "problem" created by transgender girls playing on girls' teams. *See B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2023 WL 111875, *4 (S.D.W. Va. Jan. 5, 2023). But the West Virginia legislature still chose to target transgender girls, banning their participation on "female[]" contact-sport teams and teams requiring competitive skill in public school sports. W. Va. Code § 18-2-25d(c)(2).[3] A month after H.B. 3293 passed,

---

*Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People* (Apr. 9, 2019), https://nwlc.org/wp-content/uploads/2019/04/Womens-Groups-Sign-on-Letter-Trans-Sports-4.9.19.pdf.

[3] Specifically, the law bans girls who are transgender from participation in school sports by requiring that all public-school sports teams in West Virginia "be expressly designated" based on students' "biological sex." W. Va. Code § 18-2-25d(b), (c)(1).

3

B.P.J., an 11-year-old transgender girl, was told she could not run on her middle school girls' cross-country team because of her transgender status. B.P.J. had begun living as a girl in all aspects of her life before starting fourth grade. B.P.J. has taken puberty blockers for almost three years and previously participated in school athletics as a cheerleader in elementary school. Throughout her childhood, B.P.J. has watched her brothers and mother run, which motivated her desire to try out for the girls' cross-country and track teams. She was devastated by the prospect of not being able to participate in school sports after H.B. 3293 passed. B.P.J. filed suit seeking to enjoin H.B. 3293, and the district court entered a preliminary injunction. The court found that she had a likelihood of success on her claims and faced irreparable harm because forcing her "to compete on the boys' team when there is a girls' team available would cause her unnecessary distress and stigma." *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 357 (S.D.W. Va. 2021).

But at summary judgment, and without explaining the deviation from its prior ruling, the district court abruptly reversed course and concluded that H.B. 3293 did not violate Title IX or the Equal Protection Clause. *See B.P.J.*, 2023 WL 111875, at

---

The law defines "biological sex" as "an individual's physical form as a male or female *based solely on the individual's reproductive biology and genetics at birth*." *Id.* § 18-2-25d(b)(1) (emphasis added). The law singles out transgender women and girls by banning "students of the male sex" from teams "designated for females, women, or girls" or those requiring competitive skill. *Id.* § 18-2-25d(c)(2).

*8–9. That ruling is contrary to binding Fourth Circuit precedent. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). It is also flatly wrong in its improper reliance on group-based generalizations and debunked sex stereotypes. To hold that H.B. 3293 was constitutional, the court invoked the overbroad contention that biological sex confers a competitive advantage through an analysis completely divorced from B.P.J.'s circumstances—despite the as-applied nature of B.P.J.'s challenge. This reasoning is contrary to the Supreme Court's prohibitions on relying on overbroad generalizations when applying heightened scrutiny. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*").

H.B. 3293 directly harms B.P.J. now, and it will prevent other transgender and intersex women and girls in West Virginia from playing school sports,[4] while promoting the fundamentally incorrect idea that transgender-inclusive athletics policies harm cisgender women and girls. *See* W. Va. Code § 18-2-25d(a)(5)

---

[4] In addition to the errors identified here and by party counsel, the district court also erred in finding Defendants-Appellees lack animus towards transgender girls like B.P.J. West Virginia has been unrelenting in its campaign to erase support and resources for transgender youth (such as a recently passed ban on affirming healthcare for transgender youth) and have taken extraordinary steps of seeking an order from the Supreme Court overturning this Court's reinstatement of the preliminary injunction, seeking to expel a *single* transgender girl from being part of her middle school track team. This coordinated effort to target transgender youth makes it difficult to imagine how the district court could conclude that Appellees lack animus towards transgender girls like B.P.J.

(finding that H.B. 3293 is "necessary to promote equal athletic opportunities for the female sex."). Additionally, H.B. 3293 harms cisgender women and girls who do not conform to stereotypes, particularly Black and brown girls, who will be disproportionately targeted and harmed by H.B. 3293.

These harms do not occur in a vacuum. West Virginia passed H.B. 3293 rather than addressing real issues of gender equity in women's and girls' sports, like disparate participation rates, unequal funding, fewer opportunities to play sports, and ongoing problems of sexual abuse and harassment.[5] These are the kinds of actual problems that West Virginia is invited to solve, if the state is energized to fight for equality for women and girls in school sports.

Playing sports provides students with a supportive network and social connectedness through positive peer relationships and acceptance that can minimize stigma and isolation. It also improves students' academic outcomes and builds leadership skills. These effects are particularly important for transgender students who disproportionately experience hostility and discrimination at school. And when they are supported and protected from discrimination, including having their gender affirmed and accepted, transgender youth are healthy, happy, and thriving and

---

[5] *See* Nat'l Coal. for Women and Girls in Educ., *Title IX at 50: A Report by The National Coalition for Women and Girls in Education* (2022), https://nwlc.org/wp-content/uploads/2022/06/NCWGE-Title-IX-At-50-6.2.22-vF.pdf ("NCWGE Report").

consistently report lower rates of suicide attempts.[6] Inclusive athletic policies are thus necessary to help protect the well-being and educational success of transgender students like B.P.J.

In this brief, *amici* highlight two central points: (1) H.B. 3293 bans transgender girls from school sports in violation of the protections against sex discrimination in Title IX and the U.S. Constitution and (2) H.B. 3293 harms cisgender girls, particularly Black and brown girls, and certainly does not serve to meet its purported justification of protecting athletic opportunities for cisgender women and girls. As the district court conceded, this is a solution seeking a problem; *amici* contend that while there are many gender justice concerns in school sports, inclusion of transgender students on sports teams is not one of them.

## I.     H.B. 3293 BANS WOMEN AND GIRLS WHO ARE TRANSGENDER FROM SCHOOL SPORTS IN VIOLATION OF TITLE IX AND THE EQUAL PROTECTION CLAUSE.

Excluding transgender girls, like B.P.J., from girls' athletic teams constitutes sex discrimination that violates both Title IX and the Equal Protection Clause. *See B.P.J.*, 2023 WL 111875, at *8. The district court failed to follow this Circuit's precedent in *Grimm*, including *Grimm*'s analysis for as-applied challenges to school policies that discriminate based on transgender status, and also erred in its

---

[6] *See, e.g.*, The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020* 9 (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf.

conclusions regarding Title IX's protections for transgender students. *See id.* at *8, *9–10; *Grimm*, 972 F.3d at 606–610. The district court improperly relied on overbroad generalizations about women and girls' abilities and athletic performance in violation of the Equal Protection Clause.

### A.    H.B. 3293 Violates Title IX.

Under Title IX, sex discrimination occurs when a school subjects someone to "separate or different rules of behavior, sanctions, or other treatment" on the basis of sex that results in the denial of an educational benefit (including participation on sports teams). 34 C.F.R. § 106.31(b)(4); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). However, Title IX's implementing regulations allow certain exceptions from this general nondiscrimination rule, including permitting—but *not requiring*—schools to maintain sex-segregated athletics in limited circumstances. *See* 34 C.F.R. § 106.41(b). This limited exception for separate sports teams does not mean that athletics are exempt from Title IX. *Id.* § 106.41(a). Prohibiting women and girls who are transgender from playing on sports teams "corresponding to [their] gender" violates Title IX. *See Grimm*, 972 F.3d at 618–19. As detailed below, the U.S. Supreme Court in *Bostock* and federal courts across the country have held that federal statutes prohibiting sex discrimination include

discrimination on the basis of transgender status. This Circuit's own precedent requires the same conclusion.

This Court and the Supreme Court dictate a broad interpretation of Title IX. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) ("There is no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.'" (alteration in original) (citation omitted)); *Jackson*, 544 U.S. at 174, 179 (stating that Title IX must be read broadly and extending the protections of Title IX to cover forms of sex discrimination not expressly referenced in the statute); *Grimm*, 972 F.3d at 616–19. A narrow reading of Title IX ignores that "Title IX is a dynamic statute, not a static one." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 769 (9th Cir. 1999). Because Title IX "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex,'" the statute should not be interpreted in the limited—and discriminatory— fashion that Appellees proposed. *See Jackson*, 544 U.S. at 173 (citation omitted). Thus, Appellees' artificial reading of Title IX as requiring that only an individual's biological sex assigned at birth be considered in evaluating a sex discrimination claim cannot be squared with precedent from this Court.

A statutory prohibition on sex discrimination logically includes a prohibition on discrimination based on transgender status. The Supreme Court plainly stated so in *Bostock*–that discrimination tied to sexual orientation or transgender status

"necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020). This is because, as the Court explained, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id*. at 1741–42. The two are inextricably linked. *Id*. Even before Bostock, federal courts have concluded that prohibitions on sex discrimination include discrimination based on transgender status, including under Title IX. *See M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018) (interpreting Title IX to include discrimination based on transgender status). Indeed, this Court applied the reasoning in *Bostock* to Title IX when deciding *Grimm*.[7] *Grimm*, 972 F.3d at 616. *Grimm* establishes that the exclusion of B.P.J. on the basis of her transgender status is exclusion based on sex. In *Grimm*, this Court held that a school district excluding a transgender boy from the boys' school restrooms is sex discrimination based on transgender status in violation of Title IX. *Id*. at 616-617, 620-621. The binding precedent of *Grimm* thus establishes that B.P.J. may not be excluded from playing on girls' sports teams on the basis of her transgender status.

---

[7] While *Bostock* was a Title VII case, since passage of Title IX in 1972, federal courts, including this one, have used Title VII as a guidepost for interpretation of Title IX. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (relying on Title VII precedent when stating that Title IX imposes a duty on schools not to discriminate on the basis of sex); *Grimm,* 972 F.3d at 616 ("Although *Bostock* interprets Title VII . . . , it guides our evaluation of claims under Title IX.") (citing *Jennings v. Univ. of N.C. at Chapel Hill*, 482 F.3d 686, 695 (4th Cir. 2007)).

Excluding a transgender girl from school activities enjoyed by girls "undoubtedly harm[s] those students and prevent[s] them from equally accessing educational opportunities and resources" and thus discriminates on the basis of sex. *Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018), *aff'd sub nom. Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *see Grimm*, 972 F.3d at 617 (finding "no difficulty holding that Grimm was harmed"). If all students *except for* a transgender student can engage in an activity, then that student is singled out, excluded, and discriminated against based on transgender status. *See Grimm*, 972 F.3d at 617; *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 564 (M.D. Pa. 2019).

H.B. 3293 forces girls who are transgender to compete on boys' athletic teams, negating their identities and in effect barring them from playing school sports. Students who are not transgender are not categorically banned from such participation by H.B. 3293 and thus H.B. 3293 discriminates based on sex in violation of Title IX.

**B.    H.B. 3293 Violates the Equal Protection Clause.**

Equal protection case law is clear: "Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *VMI*, 518 U.S. at 531 (citation omitted). The Supreme Court and this Circuit have also dictated that protections against sex discrimination include

protection against discrimination based on transgender status. *See Bostock*, 140 S. Ct. at 1741-43, 1747; *Grimm*, 972 F.3d at 607–611 (applying heightened scrutiny because a policy restricting restroom use based on "biological gender" was a sex-based classification that discriminated against transgender people); *see also Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051-53 (7th Cir. 2017) (applying heightened scrutiny to a school district's policy requiring students to use restrooms based on the sex on their birth certificates). The district court thus correctly determined that heightened scrutiny applies to H.B. 3293. *See B.P.J.*, 2023 WL 111875, at *5–6 (citing *Grimm*, 972 F.3d at 611).

Despite nominally applying heightened scrutiny, the district court deviated from Circuit and Supreme Court precedent. To survive an Equal Protection Clause challenge, *VMI* instructs that the state's justification for differential treatment "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." 518 U.S. at 533; *see also Sessions v. Morales-Santana*, 582 U.S. 47, 63 (2017). And the justification must be "genuine, not hypothesized or invented." *VMI*, 518 U.S. at 516. Despite those instructions, in upholding H.B. 3293, the district court relied on overbroad generalizations and improperly credited the hypothesized and invented harms the state claimed resulted from allowing transgender girls to play sports with other girls.

12

In passing H.B. 3293, West Virginia selectively excerpted language from *VMI* suggesting "inherent differences" between men and women "are cause for celebration." W. Va. Code § 18-2-25d(a)(1). This context-free quotation fundamentally misconstrues *VMI*. In *VMI*, the Court made clear that such differences should not be utilized "for denigration of the members of either sex or for artificial constraints on an individual's opportunity." 518 U.S. at 533. H.B. 3953 does exactly that. *See Grimm*, 972 F.3d at 608 (noting courts have recognized "various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes").

H.B. 3293 plainly denigrates and targets transgender girls using the precise type of overbroad generalizations forbidden by *VMI*, specifically hypothesized, insurmountable competitive advantages of student-athletes based solely on sex assigned at birth.[8] *See B.P.J.*, 2023 WL 111875, at *8 ("The fact is, however, that a

---

[8] *VMI* provides a roadmap for analysis of the constitutionality of sex-separated athletics teams. There, the Court found an alternative women's program was not an equal alternative since it paled in comparison to VMI in its "range of curricular choices and faculty stature, funding, prestige, alumni support and influence." *VMI*, 518 U.S. at 553. Similarly, here, the equal protection violation stems from H.B. 3293 excluding transgender girls from participation on girls' teams based on an overbroad generalization while providing no truly equal alternative. Being forced to play on the boys' team is not a meaningfully equal alternative for transgender girls due to the stigma it creates and increased risk of harassment and harm it places on them. Singling transgender girls out by forcing them to play on the boys' team makes them

13

transgender girl is biologically male and, barring medical intervention, would undergo male puberty like other biological males. And biological males generally outperform females athletically."). The categorical exclusion of transgender girls from equal athletic opportunities based on this overbroad generalization does not survive heightened scrutiny. *See VMI*, 518 U.S. at 541 ("State actors controlling gates to opportunity, we have instructed, may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'") (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)).

In reaching its "general" conclusions about the abilities and physical advantages of student-athletes based solely on sex assigned at birth, the district court eschewed *Grimm*'s careful approach to an as-applied challenge to instead rely squarely on the overbroad generalizations and hypothetical harms that *VMI* expressly prohibits. *See id.* at 533. The district court's errors began when it considered the statute's definition of "biological sex" and its relationship to a purported government interest. H.B. 3293 defined "biological sex" to specifically exclude transgender girls from participating in school sports with other girls, *see* W. Va. Code § 18-2-25d(b)(1), (c), and the court claimed that such classification "is

---

a target for harassment and violence by other students, including sexual assault, which transgender girls are already at an increased risk for. *See* Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, 143 Pediatrics 1, 5 (2019).

substantially related to its important interest in providing equal athletic opportunities for females." *B.P.J.*, 2023 WL 111875, at *6. This decision was rooted in the court's conclusions that "it is *generally* accepted that, on average, males outperform females athletically because of inherent physical difference" and that this is "a *general* principle that realistically reflects the average physical differences between the sexes." *Id.* at *7 (emphasis added).

That error is particularly important here because B.P.J.'s as-applied challenge incorporates her three-year history of taking puberty blockers, meaning she will not go through the same endogenous puberty as biological males. *See id.* at *8. "Puberty blocking treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins." J.A.3088 (quoting Declaration and Expert Report of Deanna Adkins, M.D. ¶ 30). Because B.P.J. began her puberty blocking treatment at the first signs of puberty, she "has never experienced levels of circulating testosterone above what is typical for non-transgender girls and women." J.A.3088. But contrary to this evidence, and to *Grimm*, *see* 972 F.3d at 611, the district court wrongly assumed that B.P.J. was similarly situated to cisgender boys with low circulating testosterone rather than other girls, *see B.P.J.*, 2023 WL 111875, at *8. Setting aside the fact that B.P.J.'s participation in cross country *never* harmed or

displaced cisgender girls who competed against her,[9] the district court's assumption disregards the factual record.

Second, the categorical exclusion of transgender women and girls in H.B. 3293 is not substantially related to the State's asserted interest in protecting competition for cisgender girls and is based on hypothesized harms to cisgender women and girls. In fact, the sponsors of H.B. 3293 could not identify a single transgender student-athlete in secondary school or college in West Virginia, much less point to any competitive disadvantage that has arisen from transgender girls in the state playing sports with other girls. *See id.* at *4. Additionally, most of the reliable research[10] addressing transgender athletes has refuted claims that women and girls who are transgender as a whole have a competitive advantage over cisgender women and girls in sports; in addition, socioeconomic status, access to external resources, coaching, facilities, and additional training are frequently

---

[9] It is undisputed that B.P.J. finished near the back of the pack in each cross-country race she participated in. *See* J.A.4285–86 (detailing B.P.J.'s placement in races); *see also B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 WL 1805883, at *1 (S.D.W. Va. Feb. 7, 2023) (noting the lack of harm to other girls).

[10] Opponents of transgender inclusion in sports typically rely on skewed and inapplicable research that uses data about cisgender men's bodies to craft policy affecting transgender women athletes, even though research shows it is misleading and leads to flawed data to compare transgender women's bodies to cisgender men. Canadian Centre for Ethics in Sport, *Transgender Women Athletes and Elite Sport: A Scientific Review* 37 (2022), https://www.cces.ca/sites/default/files/content/docs/pdf/transgenderwomenathletes andelitesport-ascientificreview-e-final.pdf (hereinafter "CCES").

overlooked as factors conferring athletic success.[11] In short, West Virginia has manufactured a "problem" where none exists. *See id.* As even the district court conceded, "not one child has been or is likely to be harmed by B.P.J.'s continued participation on her middle school's cross country and track teams." *B.P.J. v. W. Va. State Bd. of Educ.*, 2023 WL 1805883, at *1 (S.D.W. Va. Feb. 7, 2023).

Indeed, in states where women and girls who are transgender are included in school sports, data shows that participation for all women and girls has remained steady or even increased, but states that ban transgender student sport participation have seen drops in school sport participation by all women and girls.[12] Since 2008, 17 states and the District of Columbia have passed laws protecting transgender students' right to participate in school sports.[13] And in recognition of the longtime contribution to sports from transgender girls, many athletic associations have

---

[11] CCES, *supra* note 10, at 36; *see also* Jeff Grabmeier, *Want to Play College Sports? A Wealthy Family Helps*, Science Daily (Aug. 30, 2021), https://www.sciencedaily.com/releases/2021/08/210830081819.htm. Women athletes and gender-justice organizations have likewise consistently refuted that including transgender athletes causes cisgender women and girls any harm. *See generally supra* note 2.

[12] *See, e.g.*, Shoshana K. Goldberg, *Fair Play: The Importance of Sports Participation for Transgender Youth*, Ctr. for Am. Progress 14-15 (2021), https://www.americanprogress.org/wp-content/uploads/sites/2/2021/02/Fair-Play-correction2.pdf ("CAP Report").

[13] *Id.* at 11; NWLC, *Fulfilling Title IX's Promise: Let Transgender and Intersex Athletes Play* 2 (2022), https://nwlc.org/wp-content/uploads/2019/09/NWLC_Trans50th_FactSheet.pdf.

formally codified their right to participate in accordance with their gender identity.[14]
Since these laws and association policies were adopted, there has been no dominance
by transgender athletes or threat to girls' sports in these jurisdictions.

At bottom, the district court erroneously "privilege[d] sex-assigned-at-birth
over [B.P.J.'s] medically confirmed, persistent and consistent gender identity," *see*
*Grimm*, 972 F.3d at 610, and the court's athletic opportunity argument "is based
upon sheer conjecture and abstraction," *see id.* (quoting *Whitaker*, 858 F.3d at 1052),
in violation of the Equal Protection Clause. Reversal is therefore required.

## II.   H.B. 3293 HARMS CISGENDER WOMEN AND GIRLS AND DOES NOT ADDRESS ACTUAL BARRIERS TO GENDER EQUITY IN SCHOOL SPORTS.

In addition to effectively banning transgender girls from participating in
school sports, H.B. 3293 and the district court's decision rest on inaccurate
stereotypes about athleticism, biology, and gender. These stereotypes are
particularly harmful to cisgender and intersex women and girls[15] who are "less
feminine" than gender stereotypes prescribe and who would likely be scrutinized

---

[14] *See, e.g.*, CAP Report, *supra* note 12, at 8, 11.

[15] "Intersex is an umbrella term for differences in sex traits or reproductive
anatomy." InterAct, *What Is Intersex?*, https://interactadvocates.org/faq/ (last visited
Mar. 30, 2023). "Intersex people are born with these differences or develop them in
childhood. There are many possible differences in genitalia, hormones, internal
anatomy, or chromosomes." *Id.* It is estimated that about 1.7 percent of people are
born intersex. *Id.*

18

under H.B. 3293 because of their failure to conform to these gender stereotypes. These harms are likely to land especially intensely on Black and brown girls, because of intertwined racial and sex-based stereotypes casting them as "overly strong" or "manly."[16] This would deprive many cisgender girls of the well-documented physical, psychological, and academic benefits associated with sport participation.

### A. Cisgender Girls Who Do Not Conform to Sex Stereotypes, Particularly Black, Brown, and Intersex Girls, Will Be Disproportionately Targeted and Harmed by H.B. 3293.

Ensuring equal educational opportunities means providing opportunities for all women and girls to play school sports—not gatekeeping *which* women and girls can participate. Banning certain girls from playing sports merely because they are transgender does not benefit any girl student-athlete. Sports bans similar to H.B. 3293 have led to excessive policing and questioning of the girlhood of cisgender girls. This includes invasive and dangerous "sex verification" practices that force women and girls to submit to a variety of humiliating and unscientific

---

[16] *See, e.g.*, Patricia Vertinsky et al., *More Myth than History: American Culture and Representations of the Black Female's Athletic Ability*, 25 J. of Sport Hist. 532, 541 (1998) (Black women athletes are often described as "masculine," which is rooted in the myth that African Americans were suited for physical labor during slavery because of their "'natural' brute strength"); Elizabeth Adetiba, *Caster Semenya and the Cruel History of Contested Black Femininity*, SB Nation (Apr. 20, 2020), https://www.sbnation.com/2020/4/20/21227661/caster-semenya-world-athletics-regulation-body-racism (governing sports bodies enforce the belief that the white, cisgender woman's body is the paradigm of "womanhood," and anything outside of that is "manly" and "unacceptable").

practices for the purported reason of assessing whether they are "enough" of a woman or girl to play alongside their peers.[17] Such policies especially harm women and girls who do not conform to sex stereotypes, particularly Black and brown women and girls, intersex girls, and transgender and gender-nonconforming women and girls.

H.B. 3293 risks creating an environment where "every girl in West Virginia may be subject to having her eligibility for a single-sex team challenged merely because some other student claims the girl in question is not a 'real' girl." J.A.0239 (Statement of Interest of the United States). In fact, during debate over H.B. 3293, doctors testified that challenging a student's eligibility could be "embarrassing," "humiliating," and "psychologically devastating" for any girl. J.A.0165, J.A.0168–0169.

Black and brown women and girls are particularly vulnerable to harm from the types of exclusionary policies West Virginia has imposed. As shown many times throughout history, when Black and brown women's bodies fall outside of traditional notions of white femininity, they are subject to policing, discrimination, and

---

[17] *See, e.g.*, Human Rights Watch, *'They're Chasing Us Away From Sport': Human Rights Violations in Sex Testing of Elite Women Athletes* (Dec. 4, 2020), https://www.hrw.org/report/2020/12/04/theyre-chasing-us-away-sport/human-rights-violations-sex-testing-elite-women.

harassment.[18] Harmful racist and sexist stereotypes have resulted in a long history of sporting bodies, competitors, and the media targeting women and girls of color. For example, when Tidye Pickett and Louise Stokes became the first Black women to represent the U.S. in the 1936 Olympics, an official proposed that the IOC "should create a special category of competition for them [Pickett and Stokes]—the unfairly advantaged 'hermaphrodites' who regularly defeated 'normal women' . . . ."[19]

Serena Williams is perhaps the most prominent woman to experience this type of racist and sexist policing. She has endured significant discrimination and scrutiny of her body, including claims that "[s]he is built like a man" and "[she] was born a guy, all because of [her] arms, or because [she's] strong."[20] This bigotry against Williams rests on narrow and sexist notions of femininity which equate muscular

---

[18] *See, e.g.*, Brooke Newman, *The Long History of Racist Attacks on Serena Williams*, Wash. Post (Sept. 11, 2018), https://www.washingtonpost.com/outlook/2018/09/11/long-history-behind-racist-attacks-serena-williams/.

[19] Milton Kent et al., *Beating Opponents, Battling Belittlement: How African-American Female Athletes Use Community to Navigate Negative Images*, Sch. of Glob. Journalism & Commc'ns, Morgan State Univ. 9 (2018), https://www.documentcloud.org/documents/4528427-The-Image-of-Black-Women-in-Sports2.html#document/.

[20] Gina Vivinetto, *Serena Williams on How She Struggles With Cruel Remarks About Her Body*, Today (Sept. 7, 2017), https://on.today.com/3rfwDLQ; Jason Pham, *Serena Williams Shut Down Body Critics: 'I Am Strong and Muscular — and Beautiful'*, Bus. Insider (May 31, 2018), https://www.businessinsider.com/serena-williams-shut-down-body-critics-who-said-she-was-born-a-guy-2018-5.

strength with masculinity and muscular weakness with femininity.

The harmful impact of this invasive and humiliating gender policing on athletes is real. Caster Semenya—a Black woman and Olympic track champion— has faced many years of racist body policing from competitors and "experts" who questioned her gender based on her speed.[21] On top of this public scrutiny, she was subjected to a battery of tests to assess whether she should be allowed to compete with women, which culminated in an international sporting body excluding Semenya from women's competitions based on its conclusion that she has differences in sex development.[22] Semenya reported feeling targeted and "crucified" by this scrutiny, and stated that it "destroyed [her] mentally and physically."[23]

Santhi Soundarajan, an Indian sprinter who finished second in the 800 meters at the 2006 Asian Games, likewise faced intense scrutiny about her gender from

---

[21] Anna North, *"I Am a Woman and I Am Fast": What Caster Semenya's Story Says about Gender and Race In Sports*, VOX (May 3, 2019), https://www.vox.com/identities/2019/5/3/18526723/caster-semenya-800-gender-race-intersex-athletes.

[22] Dawn Ennis, *IAAF Called Caster Semenya Biologically Male*, Outsports (June 19, 2019), https://www.outsports.com/2019/6/19/18691210/iaaf-caster-semenya-biologically-male-testosterone-olympics-southafrica-athlete.

[23] *Caster Semenya Says Testosterone Case Against IAAF Has 'Destroyed' Her 'Mentally and Physically'*, BBC (July 1, 2019), https://bbc.in/2KG2pkC.

athletics bodies and the media for having a "deep voice" and a "flat chest."[24] After allegedly "fail[ing]" a sex verification test, she was stripped of her silver medal. "[T]ormented by ongoing scrutiny and unbearably embarrassed, she attempted suicide, reportedly by swallowing poison."[25]

H.B. 3293—under the guise of protecting cisgender women—will only further these kinds of harms perpetuated against girls perceived as gender nonconforming, especially those who are Black, brown, and intersex.

### B.    There Is No Evidence That Transgender-Inclusive Athletics Policies Are Harmful to Cisgender Women and Girls

Transgender-inclusive athletics policies do not harm cisgender women and girls. Indeed, Appellees do not claim that all women and girls will be harmed unless transgender women and girls are excluded from women's sports teams. Appellees are not even aware of a single transgender athlete competing in a secondary school or higher education sports team in West Virginia.

In the absence of any evidence of actual harms, the district court instead rested its conclusions on fundamentally flawed and outdated sex stereotypes about the differences between boys and girls. Although the district court acknowledged that

---

[24] Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes*, N.Y. Times Magazine (June 28, 2016), https://www.nytimes.com/2016/07/03/magazine/the-humiliating-practice-of-sex-testing-female-athletes.html.

[25] *Id.*

"the social, medical, and physical transition of each transgender person is unique," *B.P.J.*, 2023 WL 111875, at *8, it failed to recognize that it necessarily follows that the "general principle" it relied on—that transgender women and girls have categorical athletic advantages over cisgender women and girls—is inaccurate and based on stereotypes around masculine bodies being inherently more athletic, as well as stereotypes about the qualities connected with athleticism and athletic success.[26] Differences in shapes, sizes and physiological makeups may be advantageous or disadvantageous based on the athlete's sport. For example, standing four feet, eight inches tall, gymnast Simone Biles is significantly shorter than the average woman.[27] Rather than being perceived as providing an unfair advantage, her stature is "seen as positive and as a factor in [her] athletic success . . . includ[ing] winning an Olympic Gold Medal."[28]

Most importantly for this case, the assumption that transgender girls will be inherently more athletically skilled is "especially inaccurate when applied to youth who are still developing physically and who therefore display a significantly broader

---

[26] CCES, *supra* note 10, at 6 ("[O]nly certain biomedical factors are policed under a mandate of 'fairness' in elite sport," even though there is "strong evidence that financial material resources (such as access to infrastructure and equipment, nutrition, time to train, higher salaries) are associated with advantage in sport.").

[27] NWLC, *supra* note 13.

[28] *Id.*

range of variation in size, strength, and skill than older youth and adults."[29] That is particularly true when considering girls like B.P.J., who take puberty blockers that stop them from experiencing a cisgender boy's endogenous puberty.[30] *See* J.A.3088.

Similarly, the belief that transgender girls will displace their cisgender peers in school sports is also not supported by the actual state of play. Transgender and intersex girls have been playing school sports for decades. In that time, only one transgender athlete has been part of a team that medaled at the Olympics.[31] And only one woman who is transgender has competed at the Olympics in an individual event, and she did not advance toward medal contention.[32] Simply stated, H.B. 3293 is a

---

[29] Pat Griffin & Helen J. Carroll, *On the Team: Equal Opportunity for Transgender Student Athletes* 16 (2010), https://www.goucher.edu/policies/documents/NCLR-Equal-Opportunity-For-Transgender-Student-Athletes.pdf.

[30] The simple fact that B.P.J has never entered endogenous puberty due to puberty blocker treatment highlights the absurdity of relying upon broad generalizations about one's sex assigned at birth.

[31] *Canadian Soccer Player Quinn Becomes the First Out Trans and Nonbinary Gold Medalist*, NPR (Aug. 6, 2021), https://www.npr.org/2021/08/06/1025442511/canadian-soccer-player-quinn-becomes-first-trans-and-nonbinary-olympic-gold-meda.

[32] Rachel Axon, *New Zealand's Laurel Hubbard Makes History as First Transgender Woman to Compete at Olympics*, USA Today (Aug. 2, 2021), https://www.usatoday.com/story/sports/olympics/2021/08/02/laurel-hubbard-becomes-openly-first-trans-woman-compete-olympics/5451329001/.

solution looking for a problem, as the purported problem it seeks to address is not substantiated by data.[33]

At the same time, there are many well-documented problems of gender inequity in women's sports. Despite 50 years since the passage of Title IX, girls have fewer opportunities to play sports in school: there were still fewer high school participation opportunities for girls in 2019 than existed for boys in 1972.[34] The landscape is even bleaker for girls of color, who have fewer opportunities than boys of color and white girls.[35] Sports teams for women and girls regularly receive worse

---

[33] *See also* David Crary & Lindsay Whitehurst, *Lawmakers Can't Cite Local Examples of Trans Girls in Sports*, AP (Mar. 3, 2021), https://apnews.com/article/lawmakers-unable-to-cite-local-trans-girls-sports-914a982545e943ecc1e265e8c41042e7 (noting states that cannot cite an instance where transgender student-athletes created issues for their cisgender peers); ACLU Kentucky, *Statement on Veto of SB83, Ban on Trans Girls in Girls' Sports* (Apr. 6, 2022), https://www.aclu-ky.org/en/press-releases/statement-veto-sb83-ban-trans-girls-girls-sports (noting Kentucky legislators cited no examples of students being harmed from inclusion of transgender students).

[34] Women's Sports Found., *50 Years of Title IX: We're Not Done Yet* 31 (2022), https://www.womenssportsfoundation.org/wp-content/uploads/2022/05/Title-IX-at-50-Report-FINALC-v2-.pdf.

[35] NCWGE Report, *supra* note 5, at 34.

material resources[36] and less funding.[37] Women professional athletes are paid far less than men (even when they outperform their male counterparts.)[38] Women and girl athletes face sexual harassment and abuse from coaches, doctors, and trainers,[39] which "interfer[es] with [their] education and participation in sports." *Jennings v. Univ. of N.C. at Chapel Hill*, 240 F. Supp. 2d 492, 511 (M.D.N.C. 2002). Ensuring equitable resources and addressing harassment is far more likely to increase opportunities for girls to play sports so that all girls can access the benefits associated with participation in sport. West Virginia has failed to tackle actual inequity in women's and girls' sports, and has instead addressed a problem that does not exist.

---

[36] Emine Yucel, *Men's And Women's NCAA March Madness Facilities, Separate and Unequal, Spark Uproar*, NPR (Mar. 19, 2021), https://www.npr.org/2021/03/19/979395795/mens-and-womens-ncaa-march-madness-facilities-separate-and-unequal-spark-uproar.

[37] Nat'l Collegiate Athletic Assoc., *The State of Women in College Sports* 31 (2022), https://s3.amazonaws.com/ncaaorg/inclusion/titleix/2022_State_of_Women_in_College_Sports_Report.pdf (noting that among the largest U.S. universities, the "spending for men's athletics is almost three times more than what is reported for women's athletics").

[38] *Morgan v. U.S. Soccer Fed'n, Inc.*, 445 F. Supp. 3d 635, 656 (C.D. Cal. 2020) (noting various ways the United States Senior Women's National Team makes less than the Men's National Team); *Male vs Female Professional Sports Salary Comparison*, Adelphi Univ. (May 20, 2021), https://online.adelphi.edu/articles/male-female-sports-salary/.

[39] *See* N'dea Yancey-Bragg, *1 in 4 College Athletes Say They Experienced Sexual Abuse From an Authority Figure, Survey Finds,* USA Today (Aug. 26, 2021), https://www.usatoday.com/story/news/nation/2021/08/26/college-athlete-report-sexual-assault-common-survey/8253766002/.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in Plaintiff-Appellant's brief, the District Court's order should be reversed.

Respectfully submitted,

/s/ *Jessica L. Ellsworth*

JESSICA L. ELLSWORTH
*Counsel of Record*
KAITLYN A. GOLDEN
DEVIN M. URNESS
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jessica.ellsworth@hoganlovells.com

SARAH W. KELLER
HOGAN LOVELLS US LLP
8350 Broad St., 17th Floor
Tysons, VA 22102
Telephone: (703) 610-6100

FATIMA GOSS GRAVES
EMILY MARTIN
SUNU P. CHANDY
SHIWALI PATEL
AUDEN PERINO
HUNTER F. IANNUCCI
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle NW
Washington, DC 20036

April 3, 2023                    *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the type-volume limitations in <u>Fed. R. App. P. 29(a)(5)</u> and 32(a)(7) because it contains 6,449 words, excluding those parts exempted by <u>Fed. R. App. P. 32(f)</u>.

This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because the brief was produced in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

<u>/s/ Jessica L. Ellsworth</u>
Jessica L. Ellsworth

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 3, 2023, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Jessica L. Ellsworth<br>
Jessica L. Ellsworth

**ADDENDUM**

## <u>ADDENDUM – LIST OF *AMICI CURIAE*</u>

The National Women's Law Center is joined in this amicus brief by the following 51 organizations:

1. A Better Balance
2. American Federation of Teachers, AFL-CIO
3. Anti-Defamation League
4. Autistic Self Advocacy Network
5. California Women's Law Center
6. Center for Women's Health and Human Rights, Suffolk University
7. Clearinghouse on Women's Issues
8. Collective Power for Reproductive Justice
9. Desiree Alliance
10. Equal Rights Advocates
11. Equity Forward
12. Equality California
13. Family Equality
14. Feminist Majority Foundation
15. FORGE, Inc.
16. Gender Justice
17. Gibbs Law Group
18. Girls for Gender Equity (GGE)
19. GLBTQ Legal Advocates & Defenders
20. GLSEN
21. Human Rights Campaign Foundation
22. If/When/How: Lawyering for Reproductive Justice
23. KWH Law Center for Social Justice and Change
24. Lawyers Club of San Diego
25. Medical Students for Choice
26. NARAL Pro-Choice America
27. National Association of Social Workers
28. National Center for Lesbian Rights
29. National Crittenton
30. National Organization for Women Foundation
31. National Women's Political Caucus

A1

32. Oasis Legal Services
33. Physicians for Reproductive Health
34. Planned Parenthood South Atlantic
35. Progress Florida
36. Public Counsel
37. Public Justice
38. Religious Coalition for Reproductive Choice
39. Reproductive Health Access Project
40. SPARK Reproductive Justice NOW, Inc.
41. SIECUS
42. Squire Patton Boggs US LLP
43. Stop Sexual Assault in Schools (SSAIS)
44. The Women's Law Center of Maryland
45. Tom Homann LGBTQ+ Law Association
46. Washington Lawyers' Committee for Civil Rights and Urban Affairs
47. Women Lawyers Association Los Angeles
48. Women Lawyers On Guard Inc.
49. Women's Bar Association of the District of Columbia
50. Women's Law Project
51. WV FREE (West Virginia Focus: Reproductive Education and Equity)