No. 23-1078

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff-Appellant*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,

*Defendants-Appellees*,

and

LAINEY ARMSTEAD,

*Intervening Defendant-Appellee*.

On Appeal from the United States District Court
for the Southern District of West Virginia
Case No. 2:21-cv-00316
Honorable Joseph R. Goodwin

**BRIEF IN SUPPORT OF APPELLEES AND AFFIRMANCE SUBMITTED BY *AMICI CURIAE* THOMAS MORE SOCIETY AND NATIONAL ASSOCIATION OF EVANGELICALS**

Arthur A. Schulcz, Sr., Esq.
VA Bar No. 30174
*Counsel of Record*
Chaplains Counsel, PLLC
21043 Honeycreeper Place
Leesburg, VA 20175
Phone: (703) 645-4010
Fax: (703) 645-4011
Email: art@chaplainscounsel.com

Timothy Belz, Esq.
J. Matthew Belz, Esq.
CLAYTON PLAZA LAW GROUP, L.C.
112 South Hanley, Second Floor
St. Louis, Missouri 63105-3418
Phone: (314) 726-2800
Fax: (314) 863-3821
tbelz@olblaw.com
jmbelz@olblaw.com
*Special Counsel for Thomas More Society*

*Counsel for Amici Thomas More Society and National Association of Evangelicals*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1078  Caption: B.P.J. v. West Virginia State Board of Education, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Thomas More Society and National Association of Evangelicals

who are amici, make the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity? NO
2. Does party/amicus have any parent corporations? NO If yes, identify all parent corporations, including all generations of parent corporations:
3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? NO If yes, identify all such owners: N/A
4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? NO If yes, identify entity and nature of interest: N/A
5. Is party a trade association? (amici curiae do not complete this question) YES NO If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or

whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ *Arthur A. Schulcz, Sr., Esq.*   Date: May 2, 2023

Counsel for: Amici Thomas More Society and National Association of Evangelicals

## TABLE OF CONTENTS

Disclosure Statement ………………………………………………………. i

Table of Authorities …………………………………………………………. iv

Interests of *Amici Curiae* ………………………………………………….. 1

Summary of Argument ……………………………………………………… 3

Argument ……………………………………………………………………..  4

    I.    By its own terms, *Bostock* did not decide cases regarding the application of Title IX to issues such as single-sex sports, bathrooms, or locker rooms. …………………………………………… 4

    II.    Application of Title VII employment discrimination principles under *Bostock* to the Title IX questions presented in the case at bar makes no sense. ………………………………………………….. 5

Conclusion …………………………………………………………………… 11

Certificate of Compliance …………………………………………………… 12

Certificate of Service ……………………………………………………….. 13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty., Fla.*,
 57 F.4th 791 (11th Cir. 2022) (en banc) ............................................................... 5

*B.P.J. v. West Virginia State Board of Education*,
 2023 WL 111875 (S.D. W. Va., Jan. 5, 2023) ....................................................... 7

*Bostock v. Clayton County*,
 140 S. Ct. 1731 (2020) ................................................................................. *passim*

*Cannon v. University of Chicago*,
 441 U.S. 677 (1979) ............................................................................................... 9

*Grimm v. Gloucester Cnty. Sch. Bd.*,
 972 F.3d 586 (4th Cir. 2020) ................................................................................ 4

*Meriwether v. Hartop*,
 992 F.3d 492 (6th Cir. 2021) ................................................................................ 5

*Pelcha v. MW Bancorp, Inc.*,
 988 F.3d 318 (6th Cir. 2021) ................................................................................ 5

*Pennhurst State Sch. & Hospital v. Halderman*,
 451 U.S. 1 (1981) ................................................................................................... 6

*Steward Mach. Co. v. Davis*,
 301 U.S. 548 (1937) ............................................................................................... 6

*United States v. Virginia (VMI)*,
 518 U.S. 515 (1996) ............................................................................................... 9

*West Virginia v. Environmental Protection Agency*,
 142 S. Ct. 2587 (2022) .......................................................................................... 5

**Statutes**

20 U.S.C. § 1681(a) .................................................................................... 6, 8, 9

20 U.S.C. § 1686 ................................................................................................ 8

20 U.S.C. § 1691(a)(9) ....................................................................................... 8

42 U.S.C. § 2000e ........................................................................................... 5, 6

**Regulations**

34 C.F.R. 106.34(a) ............................................................................................ 7

34 C.F.R. 106.41 ................................................................................................ 7

## INTEREST OF *AMICUS CURIAE*[1]

The Thomas More Society ("TMS") is a national public interest law firm dedicated to restoring respect in the law for freedom of speech and religious liberty. A 501(c)(3) nonprofit incorporated in Illinois with offices in Chicago and Omaha, TMS pursues its purposes through civic education, litigation, and related activities. In this effort, TMS has represented many individuals and organizations in federal and state courts and filed numerous *amicus curiae* briefs with the aim of protecting the rights of individuals and organizations to communicate their political and social views, as well as to faithfully practice their religion, as guaranteed by the Constitution.

The National Association of Evangelicals ("NAE") is a nonprofit association of evangelical Christian denominations, churches, charitable organizations, mission societies, and individuals that includes more than 50,000 local churches from 74 different denominations. NAE serves a constituency of over 20 million people. NAE believes that venerable civil rights statutes are the sole policy charge

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel further represent that no party or party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparation or submission of this brief; and that no person other than the amici and counsel identified herein contributed money that was intended to fund preparation or submission of this brief.

1

of the United States Congress, and that such statutes should not be unilaterally extended in their scope by the judicial branch.

2

## SUMMARY OF ARGUMENT

In *Bostock v. Clayton County, Georgia,* 140 S. Ct. 1731 (2020), the Supreme Court held that an employer violates Title VII, which makes it unlawful to discriminate against an individual "because of" the individual's sex, by firing an individual for being homosexual or being a transgender person.

The purpose of this brief is to summarize what *Bostock* said about the limits of its own reach and what the majority of circuits that have weighed in have said: specifically, that *Bostock's* interpretation of Title VII is limited to the facts and statutory provisions at issue in that case and does not apply even to other portions of Title VII, much less to other statutes like Title IX.

This brief further argues that employment discrimination under Title VII presents issues quite different from the Title IX issues in the case at bar. Title IX embraces and accounts for sex distinctions in myriad situations, including school-based athletics, performing arts, and other instances in which acknowledged differences between males and females have been accounted for by Congress. It does so to achieve not blind equality, but equal opportunities in light of the physiological differences between males and females.

3

# ARGUMENT

I. **By its own terms, *Bostock* did not decide cases regarding the application of Title IX to issues such as single-sex sports, bathrooms, or locker rooms.**

The understandable fear that *Bostock* would be read to sweep broadly and alter other federal civil rights legislation or preempt state laws was expressly raised and then disposed of by Justice Gorsuch for the Court. "[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753.

The Court was very specific:

> The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex."

*Id.* The Court emphasized that *Bostock* should not be seen as determinative as to the meaning of other laws, even other Title VII provisions:

> [N]one of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. . . . Whether other policies and practices might or might not qualify as unlawful discrimination or find justification under other provisions of Title VII are questions for future cases, not these.

*Id.*

Noting these limitations, the Eleventh Circuit recently refused to follow the Fourth Circuit[2] in applying the interpretive rule of *Bostock* and Title VII to Title

---

[2] *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).

4

IX. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty., Fla.,* 57 F.4th 791 (11th Cir. 2022) (en banc) (7-4 ruling). The Sixth Circuit has also been vigilant in refusing to apply *Bostock* beyond Title VII. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (*Bostock*, by its own terms, extending no further than Title VII); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (recognizing *Bostock* does not extend to Title IX, citing textual differences).

**II.    Application of Title VII employment discrimination principles under *Bostock* to the Title IX questions presented in the case at bar makes no sense.**

Title VII effects strict equality between individuals in the workplace by requiring employers to make sex-blind employment decisions. Title IX, on the other hand, provides equality of opportunity for all by requiring institutions to account for physiological differences between the sexes. So, unlike Title VII's implementation of a rule of strict *equality* for each individual,[3] Title IX acknowledges that single-sex sports, for example, exist in order to accommodate the typical physical *inequalities*, or at least dissimilarities, that naturally divide men and women.

The fundamental difference between these two venerable civil rights acts begins with their text. Title VII prohibits discrimination "because of . . . sex" (42

---

[3] Even Title VII, with all its rules of strict sexual equality, does account for women being different from men when it comes to pregnancy and childbirth. 42 U.S.C. § 2000e(k).

5

U.S.C. § 2000e-2(a)), whereas Title IX prohibits discrimination "on the basis of sex" (20 U.S.C. § 1681(a)). Also fundamental, Title VII prohibits discrimination in employment alone (42 U.S.C. § 2000e-2(e)), whereas Title IX prohibits discrimination in any "program or activity" by a recipient of "Federal financial assistance" (20 U.S.C. § 1681(a)). Employment is not comparable to the involvement of Title IX in team sports or coed dating on campus or sexist behavior at fraternity parties. Title VII is an exercise by Congress of its power under the Commerce Clause whereas Title IX is an exercise by Congress of its Spending Power.[4] Title VII applies to all employers with 15 or more employees (42 U.S.C. § 2000e(b)), whereas Title IX applies more narrowly by targeting only educational institutions (20 U.S.C. § 1681(a)). Title VII safeguards as protected classes "race, color, religion, sex, and national origin" (42 U.S.C. § 2000e-2(a)), whereas Title IX is focused solely on equality based on "sex" (20 U.S.C. § 1681(a)), which

---

[4] A safeguard of our federal system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17 (1981). Thus, the "legitimacy of Congress' power to legislate under the [S]pending [Power] . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 585–98 (1937)).

6

engenders physiological differences that matter when it comes to, for example, sports[5] and the performing arts.

In January 2023, in the case at bar, the federal district court in *B.P.J. v. West Virginia State Board of Education*, 2023 WL 111875 (S.D. W. Va., Jan. 5, 2023), upheld a State of West Virginia law enacted to ensure equal opportunities for women in sports. The court sensibly observed:

> Whether a person has male or female sex chromosomes determines many of the physical characteristics relevant to athletic performance. Those with male chromosomes, regardless of their gender identity, naturally undergo male puberty, resulting in an increase in testosterone in the body. [The claimant] herself recognizes that "[t]here is a medical consensus that the largest known biological cause of average differences in athletic performance between [males and females] is circulating testosterone beginning with puberty." . . . While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes.

*Id.* at *7.[6] Sex similarly affects an individual's participation in the performing arts like voice,[7] dance, or theater, where distinct male and female characteristics are

---

[5] *See* 34 C.F.R. 106.34(a)(1) and 106.41 (athletics at educational institutions; single-sex sports).

[6] The district court went on to conclude, *inter alia*, that the word "sex" in Title IX means biological sex (male-female) and thus did not reach the plaintiff's allegations of discrimination on the basis of transgender status. *Id.* at *21-*22.

[7] *See* 34 C.F.R. 106.34(a)(4) (single-sex choir).

7

both impactful and prized, and are thus taken into account by Title IX in order to achieve overall equality of opportunity.

Title IX codifies respect for differences between the sexes throughout the statute. Respect for privacy and unique bonding between the sexes, for example, is evident in Title IX's rule of construction allowing for universities to provide dormitories and Greek-letter chapter houses that are segregated by sex. 20 U.S.C. § 1686. Moreover, Title IX exempts from strict equality between the sexes the historic practice of maintaining all-women and all-men colleges (20 U.S.C. § 1681(a)(5)), along with YMCAs and YWCAs, youth character-building organizations such as Boy Scouts and Camp Fire Girls (20 U.S.C. § 1681(a)(6)(B)), and the longstanding American Legion programs of Boys State and Girls Nation (20 U.S.C. § 1681(a)(7)).[8] Title IX specifically allows organizations to host father-son and mother-daughter dinners and other activities, acknowledging the unique bond between a parent and a child of the same sex, and recognizing that the unique value of these traditions would be destroyed by a rule of unyielding egalitarianism. Finally, Title IX's text provides for beauty pageants that are a source of contestation and earned college scholarships available exclusively to young women (20 U.S.C. § 1691(a)(9)). None of these protections

---

[8] The American Legion selects promising youth leaders, locates them on a college campus during a week each summer, and puts them through a simulated program of electing and operating a state legislature and governor.

8

provided in Title IX,[9] which celebrate and preserve distinctions between females and males, is compatible with the strict ban on sex distinctions in the workplace that is at the heart of Title VII.

When it enacted Title IX fifty years ago, Congress was addressing the problem that, particularly within educational institutions, girls and women had fewer opportunities than boys and men. *See Cannon v. University of Chicago*, 441 U.S. 677, 681 n.2, 695 n.16, 704 n.36 (1979). Title IX does not attempt to bridge this gap between the sexes by denying that there are physiological differences between males and females such as muscle mass and bone structure, or that these differences are not learned socially or by nurture and thus are not going away. *See United States v. Virginia (VMI)*, 518 U.S. 515, 533, 540-41 (1996). On the contrary, Title IX acknowledges immutable differences between the sexes and tries to eliminate inequalities of opportunity that result from natural differences and other sources.

Because Title IX is fundamentally a statute designed to promote opportunities for women, it would undermine its very purpose to interpret it as allowing biological males to enter and dominate female sports teams. Treating the

---

[9] With respect to these exemptions and rules of construction, Congress's operative definition of "sex" in Title IX is binary. A person is either one of two sexes, male or female. For example, the text of Title IX allows transition "from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*." 20 U.S.C. § 1681(a)(2) (emphasis added).

9

biological sexes as equivalent in physical activities would disadvantage females on the very sports teams Title IX protects out of respect for the sexes' natural differences. Thus, interpreting Title IX to require such a result contradicts the statute's fundamental rationale of providing equal opportunities between the distinct sexes. Applying the *Bostock* rationale to Title IX would therefore defy common sense.

In sum, it follows from the fact that Title IX's regulatory scheme specifically addresses differences between the sexes that its text prohibiting discrimination "on the basis of sex" does not require that institutions ignore biological sex altogether, as Appellant suggests. This Court should therefore decline Appellant's invitation to eviscerate Title IX by interpreting it as sex-blind akin to Title VII and *Bostock*. Any reversal in Title IX's purpose and implementation should come from Congress, rather than the judiciary.

## CONCLUSION

For at least the foregoing reasons, it is apparent that the *Bostock* decision regarding Title VII does not support the position of the Plaintiff-Appellant in the case at bar with respect to Title IX.

May 2, 2023

Respectfully submitted,

/s/ *Arthur A. Schulcz, Sr.*
Arthur A. Schulcz, Sr., Esq.
VA Bar No. 30174
*Counsel of Record*
Chaplains Counsel, PLLC
21043 Honeycreeper Place
Leesburg, VA 20175
Phone: (703) 645-4010
Fax: (703) 645-4011
Email: art@chaplainscounsel.com

Timothy Belz, Esq.
J. Matthew Belz, Esq.
CLAYTON PLAZA LAW GROUP, L.C.
112 South Hanley, Second Floor
St. Louis, Missouri 63105-3418
Phone: (314) 726-2800
Fax: (314) 863-3821
tbelz@olblaw.com
jmbelz@olblaw.com
*Special Counsel for Thomas More Society*

*Counsel for Amici Thomas More Society and National Association of Evangelicals*

11

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitations in Fed. R. App. P. 29(a)(5) and 32(a)(7) because it contains 2,162 words, excluding those parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was produced in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

May 2, 2023                                    */s/ Arthur A. Schulcz, Sr.*
                                               Arthur A. Schulcz, Sr., Esq.
                                               *Counsel for Amici*

## CERTIFICATE OF SERVICE

I certify that on May 2, 2023, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

May 2, 2023                                  */s/ Arthur A. Schulcz, Sr.*
                                             Arthur A. Schulcz, Sr., Esq.
                                             *Counsel for Amici*

13