No. 23-1078

# United States Court of Appeals for the Fourth Circuit

———————————

B.P.J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON,
PLAINTIFF-APPELLANT,

*v.*

WEST VIRGINIA BOARD OF EDUCATION, ET AL.,
DEFENDANTS-APPELLEES,
AND
THE STATE OF WEST VIRGINIA AND LAINEY ARMISTEAD,
INTERVENORS-APPELLEES.

———————————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA,
NO. 21-CV-316, HON. JOSEPH R. GOODWIN, PRESIDING*

———————————

**BRIEF OF CONCERNED WOMEN FOR AMERICA AND
SAMARITAN'S PURSE AS *AMICI CURIAE* SUPPORTING
APPELLEES AND AFFIRMANCE**

———————————

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement .................................................................i

Table of Authorities ................................................................................. iii

Interest of *Amici Curiae* ...........................................................................1

Introduction ...............................................................................................3

Argument....................................................................................................4

    I.     B.P.J.'s novel as-applied theory eliminates the distinction between intermediate and strict scrutiny...............................5

          A.     B.P.J.'s as-applied intermediate scrutiny theory would require perfect fit.......................................8

          B.     Precedent opposes B.P.J.'s theory. ...........................11

          C.     The consequences of B.P.J.'s theory would be significant.................................................17

    II.    The Act satisfies intermediate scrutiny. .............................21

Conclusion ...............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)....................................23

*Adkins v. Rumsfeld*, 464 F.3d 456 (4th Cir. 2006)....................................19

*B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 WL 111875 (S.D.W.V. Jan. 5, 2023)....................................4–5

*Califano v. Jobst*, 434 U.S. 47 (1977) .................................... 13, 24

*Califano v. Webster*, 430 U.S. 313 (1977)....................................23

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ....................................6

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)....................................3, 5

*Craig v. Boren*, 429 U.S. 190 (1976)....................................9

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ....................................8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)....................................20

*Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020)..... 14, 15

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Economic Development*, 438 F.3d 195 (2d Cir. 2006) ....................................21

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)....................................20

*Lehr v. Robertson*, 463 U.S. 248 (1983) .................................... 14, 16

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) ....................................20

*Metro Broad., Inc. v. FCC*, 497 U.S. 547 (1990) ............................................. 23–24

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ................. 3, 7, 14

*Nguyen v. INS*, 533 U.S. 53 (2001)........................................ 4, 12–13, 18, 23

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007).....6

*Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022)....................................9

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ....................................23

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017) ........................................ 10, 16

*Turner Broad. System, Inc. v. FCC*, 512 U.S. 622 (1994)..........................................7

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ................................................5

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)..................................7

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) ................................. 3, 14, 22

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................ 4, 6, 21, 23

*Vance v. Bradley*, 440 U.S. 93 (1979) ....................................................................20

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989).............. 4, 7, 11–12, 18, 23–24

**OTHER AUTHORITIES**

Br. of Amici Curiae Ala., Ark., and 19 Other States in Supp. of Applicants'
    Emergency Appl. to Vacate Inj., *West Virginia v. B.P.J.*, 2023 WL 2801383 ....21

## INTEREST OF *AMICI CURIAE*

Concerned Women for America ("CWA") is the largest public policy organization for women in the United States, with about half a million supporters in all 50 states. CWA advocates for traditional values that are central to America's cultural health and welfare. CWA is made up of people whose voices are often overlooked—average American women whose views are not represented by the powerful or the elite. CWA has a substantial interest in this case. CWA's mission includes ensuring that female athletes can fully participate in sports fairly and safely. Thus, CWA advocates for laws that limit participation in female sports to biological females.[1]

Samaritan's Purse is a nondenominational, evangelical Christian organization formed in 1970 to provide spiritual and physical aid to hurting people around the world. The organization seeks to follow the command of Jesus to "go and do likewise" in response to the story of the Samaritan who helped a hurting stranger. Samaritan's Purse operates in over 100 countries providing crisis relief, sharing the hope and love of Jesus Christ with those in the gutters and ditches of the world in their darkest hour of need. The ministry operates relief programs around the world for vulnerable women who are victims of war, famine, and disaster and through

---

[1] Pursuant to <u>Fed. R. App. P. 29(a)(4)(E)</u>, no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

1

maternal and child healthcare. Samaritan's Purse's concern arises when concepts of Biblical and scientific reality are threatened by executive, legislative or judicial action compelling ideologies that diminish common grace related to safety, fairness, privacy, speech, and religious free exercise.

**INTRODUCTION**

Under the established intermediate scrutiny rule, B.P.J. loses. Pitting boys against girls in sports is unfair. The State has an important objective in ensuring equal athletic opportunities for girls. And the Act is substantially related to that objective because boys generally have an athletic advantage over girls. To avoid this result, B.P.J. proposes an unprecedented theory of as-applied intermediate scrutiny focused on an individual's circumstances. On that theory, even if a law satisfies intermediate scrutiny, any person can claim an exemption by showing that the State's objective may not fully apply to that individual person. That theory would transform intermediate scrutiny into the functional equivalent of strict scrutiny by requiring otherwise constitutional laws to have a perfect fit with the challenger's individual circumstances.

But never has "[i]ntermediate scrutiny . . . require[d] a perfect fit." *United States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011), abrogated on other grounds by *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The Supreme Court has explained that courts "should look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before [it]." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). Under intermediate scrutiny, "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not

on the extent to which it furthers the government's interests in an individual case."
*Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989).

Rather than adopt B.P.J.'s novel as-applied approach—which even the United States as *amicus* refuses to endorse—this Court should analyze the Act under the accepted intermediate scrutiny standard: a law containing a sex classification is valid if "substantially related" to an "important governmental objective." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up). The Act easily meets these requirements. Even B.P.J. agrees that providing equal athletic opportunities for females is an important governmental objective. *See B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 WL 111875, at *6 (S.D.W.V. Jan. 5, 2023). And as the district court held, "the physical characteristics that flow from [sex] are substantially related to athletic performance and fairness in sports." *Id.* at *8. Thus, even if B.P.J. does not have a competitive advantage over girls, the Act still passes intermediate scrutiny because it does not have to be "capable of achieving its ultimate objective in every instance." *Nguyen v. INS*, 533 U.S. 53, 70 (2001). The Court should affirm.

## ARGUMENT

According to B.P.J., "the equal protection question presented by this case" is whether "categorically excluding B.P.J. from girls' school sports because of [B.P.J.'s] transgender status is substantially related to an important government interest." Opening Br. 33. That is the wrong question. Unlike strict scrutiny,

4

intermediate scrutiny asks whether a law's group classification is *sufficiently* tailored to the State's interest. That question focuses on the group classification, and the main question about the individual plaintiff is simply whether they are a member of the group subject to the law's classification. Unlike some applications of strict scrutiny, intermediate scrutiny does not require that the law be the least restrictive means of furthering the State's interest. B.P.J.'s as-applied intermediate scrutiny theory would collapse this distinction between strict and intermediate scrutiny. That theory is unsupported by precedent. It would upend state regulatory schemes and revolutionize constitutional adjudication in many areas, including rational basis review. Under a proper application of intermediate scrutiny, the Act is easily constitutional because it is substantially related to the important governmental objective of protecting girls by recognizing biological differences.

## I.     B.P.J.'s novel as-applied theory eliminates the distinction between intermediate and strict scrutiny.

As the district court rightly explained, the general rule is that "courts presume that a law is constitutional," and they "may only overturn a law if the challenger can show that the law's classification is not rationally related to *any* government interest." *B.P.J.*, 2023 WL 111875, at *5 (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973)). But courts are more suspicious of certain classifications. Thus, laws that "classif[y] by race, alienage, or national origin" "are subjected to strict scrutiny." *City of Cleburne*, 473 U.S. at 440. Such "classifications are simply too

pernicious to permit any but the most exact connection between justification and classification," and the government "must demonstrate that the use of individual racial classifications . . . is narrowly tailored to achieve a compelling government interest." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (cleaned up). In some contexts, strict scrutiny requires the government to "show that it has adopted the least restrictive means of achieving [its] interest," "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Sex-based classifications receive lesser scrutiny. As the Supreme Court has recognized, "[t]he two sexes are nor fungible," and there are "inherent differences" between the sexes that "are enduring." *Virginia*, 518 U.S. at 533 (cleaned up). These "inherent differences" "remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints." *Id.* Thus, sex classifications receive "intermediate scrutiny," which requires that the classification "serve[] important governmental objectives" with means that "are substantially related to the achievement of those objectives." *Id.* (cleaned up).

Courts also apply intermediate scrutiny in contexts outside of Fourteenth Amendment equal protection claims. For instance, courts apply intermediate scrutiny for sex discrimination claims against the federal government under the Fifth Amendment's Due Process Clause. *See Frontiero v. Richardson*, 411 U.S. 677, 690–

6

91 (1973). Courts also apply intermediate scrutiny to certain speech restrictions, such as content-neutral time, place, or manner restrictions. In these cases, "a regulation need not be the least speech-restrictive means of advancing the Government's interests," but it cannot "burden *substantially more* speech than is necessary to further the government's legitimate interests." *Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 662 (1994) (emphasis added) (quoting *Ward*, 491 U.S. at 799). And, before the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), this Court applied intermediate scrutiny in Second Amendment cases, which required "a reasonable fit between the challenged law and a substantial governmental objective." *Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021). "[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective." *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011), abrogated on other grounds by *Bruen*, 142 S. Ct. 2111.

In sum, courts understand intermediate scrutiny to have two main requirements: (1) the government must have an important interest, and (2) the law must reasonably—but not precisely—further that interest. These are the defining components of intermediate scrutiny.

B.P.J. does not claim that the district court broadly erred in applying intermediate scrutiny. Instead, B.P.J. attacks the court's "focus[] on hypothetical

7

transgender girls generally, rather than B.P.J. specifically." Opening Br. 35. B.P.J. argues that this Court should only consider "whether Defendants have established that categorically excluding B.P.J."—not biological boys generally—"from girls' sports . . . is substantially related to an important government interest." *Id.* at 33. B.P.J. insists that the district court erred by not considering "any of the facts of B.P.J.'s individual circumstances." *Id.* at 35.

B.P.J.'s novel intermediate scrutiny theory is flawed for three reasons. First, it would require perfect fit of the sort required, if ever, only by strict scrutiny. Second, it is unsupported by precedent. Third, it would upend state regulatory schemes and constitutional adjudication in many areas of law.

## A.   B.P.J.'s as-applied intermediate scrutiny theory would require perfect fit.

B.P.J.'s proffered theory would collapse the distinction between strict and intermediate scrutiny, requiring a perfect fit between an otherwise lawful classification and the contours of a specific plaintiff's circumstances. When applying strict scrutiny, at least in some contexts, courts examine whether "application of the [legal] burden *to the person* represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (emphasis added). That approach may make sense when the least restrictive means test applies. If even one burdensome application of a law subject to strict scrutiny is unnecessary to achieve the government's objective, then arguably

8

the law *could not* be the least restrictive means. That would mean it flunks strict scrutiny, and the plaintiff subjected to the unnecessary burden wins. Again, strict scrutiny is not always applied this way, and this application may be arguable in some circumstances, but it is at least logically possible to consider such an "as-applied" strict scrutiny argument.

An as-applied intermediate scrutiny theory, by contrast, is incoherent. "[I]ntermediate scrutiny is less onerous than strict scrutiny." *Recht v. Morrisey*, 32 F.4th 398, 410 (4th Cir. 2022) (cleaned up). By definition, the tailoring required by intermediate scrutiny is less than the "narrow tailoring" or "least restrictive means" required by strict scrutiny. *See id.* ("[T]hat a statute fails strict scrutiny means little for how it would fare under a more lenient intermediate standard."). Thus, intermediate scrutiny tolerates overinclusivity that strict scrutiny would not. Certainly, intermediate scrutiny does not tolerate too much overinclusivity. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 202 (1976) ("[A] correlation of 2%" between sex and the relevant behavior "must be considered an unduly tenuous 'fit.'"). But it must tolerate laws that have *some* unnecessary burdensome applications. While a 2% correlation might be too little, 100% is far too much to demand. *See id.* at 204 (calling for merely "a legitimate, accurate proxy"); *infra* p. 23 (collecting more cases). Otherwise, intermediate scrutiny is no different from strict scrutiny.

Contrary to B.P.J.'s theory, it is incoherent to ask whether the law's application to a single plaintiff is permissibly overinclusive. That inquiry has no meaning. Instead, the overinclusivity question must focus on the group as classified by the law. In other words, the overinclusivity question is exactly what the traditional intermediate scrutiny standard says: whether the law's overall, group-wide classification is sufficiently tailored to an important interest. That connection is assessed by reference to group-wide characteristics. The longstanding "two remedial alternatives" confirms this group focus: "withdrawal of benefits from the favored class" or "extension of benefits to the excluded class." *Sessions v. Morales-Santana*, 582 U.S. 47, 72–73 (2017). Under intermediate scrutiny, the law cannot be invalid simply because its application to a single plaintiff is unnecessarily burdensome. Again, it is nonsensical to ask whether the law is too "overbroad[]" as it pertains to a single person. *Id.* at 64 n.13.

The United States as *amicus* provides a helpful contrast, as it refuses to press B.P.J.'s as-applied intermediate scrutiny theory. According to the United States, "the State's categorical exclusion of all transgender girls—including those who, like B.P.J., have no sex-based competitive advantage over other girls—from competing in school athletics like the girls' track and cross-country teams is not substantially related to achieving the State's asserted interest in ensuring equal athletic opportunities for girls in West Virginia." *Amicus* Br. 18–19. As discussed below and by the

10

State, that argument is wrong, but what matters is that the United States is making a subtly but importantly different argument from B.P.J. The United States argues that the law is overbroad as applied to the group of "all transgender girls," merely using B.P.J. as an example to show that supposed overinclusivity. That is different from B.P.J.'s argument, which is that the law is invalid as applied to B.P.J. just because the State's asserted interests supposedly do not apply to B.P.J. *See* Opening Br. 33–34. Under this theory, B.P.J. would win here even if every single other transgender girl were proved to be dominant in girls' sports. As the United States' refusal to sign on to this novel theory suggests, B.P.J.'s theory bears no relation to intermediate scrutiny. To maintain the distinction between strict and intermediate scrutiny, the Court should reject B.P.J.'s novel theory.

### B.    Precedent opposes B.P.J.'s theory.

The weight of precedent is against B.P.J.'s as-applied intermediate scrutiny theory. Time and again, the Supreme Court and this Court have said that individual characteristics have no bearing on a law's constitutionality under intermediate scrutiny. Take *Ward v. Rock Against Racism*, where the respondent argued that a city's requirement that it use the city's sound equipment and sound technician for its performance failed intermediate scrutiny. 491 U.S. at 787–90. The city justified its regulation on the ground that it would "eliminate[] the problems of inexperienced technicians and insufficient sound volume that had plagued some bandshell performers

11

in the past." *Id.* at 801. The Court noted that "this concern [was] not applicable to respondent's concerts, which apparently were characterized by more-than-adequate sound amplification." *Id.* In other words, the city's interest was not furthered by requiring Rock Against Racism to use the provided equipment and technician. But this "fact [was] beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Id.* The Court continued: "the regulation's effectiveness must be judged by considering all the varied groups that use the bandshell, and it is valid so long as the city could reasonably have determined that its interests overall would be served less effectively without the sound-amplification guideline than with it." *Id.*

Likewise, in *Nguyen*, the Supreme Court applied intermediate scrutiny to a law providing different citizenship rules for children born abroad and out of wedlock depending on whether the citizen parent was the mother or the father. The Court recognized two important governmental interests that this statute served: "assuring that a biological parent-child relationship exists," and "ensur[ing] that the child and the citizen parent have some demonstrated opportunity" to establish a relationship that "consists of the real, everyday ties that provide a connection between child and citizen parent and, in turn, the United States." 533 U.S. at 62, 64–65. The plaintiffs argued that there was no "guarantee" that the law would always advance these

interests. *Id.* at 69. The Court held that "[t]his line of argument misconceives" "the manner in which we examine statutes alleged to violate equal protection." *Id.* "None of our gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Id.* at 70. Instead, it is enough that "the means adopted by Congress are in substantial furtherance of important governmental objectives." *Id.*; *accord Califano v. Jobst*, 434 U.S. 47, 55 (1977) ("[B]road legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples.").

Similarly, when this Court applied intermediate scrutiny to Second Amendment cases, it did not require a perfect fit based on unique circumstances. In *Harley*, this Court explicitly "decline[d]" to "review [the challenger's] individual characteristics as part of [its] consideration of his as-applied challenge to" the firearm restriction. 988 F.3d at 769–70. This Court explained that the challenger's position was "fundamentally flawed because it effectively would create an exception to the statute that does not exist. The statute imposes a flat prohibition, with no reference to individual circumstances." *Id.* at 770; *see id.* at 774 (Wynn, J., concurring) (agreeing that a plaintiff cannot "pursu[e] an as-applied challenge . . . [by] arguing that his specific circumstances mean that [the statute] is unconstitutional as applied to him" because "the statutory structure speaks for itself").

13

Along the same lines, in *Staten*, this Court explained that it did not matter if the individual barred from possessing a firearm would not "misuse a firearm against a spouse, former spouse, or other person with whom such person had a domestic relationship"—the conduct targeted by the restriction. 666 F.3d at 167. The "net cast by" the statute "may be somewhat over-inclusive." *Id.* That is because "[i]ntermediate scrutiny does not require a perfect fit." *Id.* Of course, these Second Amendment cases were abrogated by the Supreme Court in *Bruen*, but not because of this Court's misunderstanding of what intermediate scrutiny requires. This Court's explanation of the standard was correct: whether a law passes intermediate scrutiny does not turn on the challenger's individual circumstances.

The Act prohibits biological boys from competing in girls' sports, and it contains no exceptions. If the Court lets B.P.J.'s individual circumstances control its adjudication of the Act's constitutionality, it "effectively would create an exception to the statute that does not exist" and a perfect fit requirement for intermediate scrutiny cases. *Harley*, 988 F.3d at 770. This approach is "fundamentally flawed." *Id.*

B.P.J. relies on *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), and *Lehr v. Robertson*, 463 U.S. 248 (1983). Neither case adopts B.P.J.'s theory. In *Grimm*, this Court affirmed summary judgment for a transgender student who challenged a school board's policy that required individuals to use the restroom that corresponded to their biological sex. 972 F.3d at 608, 613–15. Despite a few

14

references to an "as applied" challenge, the Court in *Grimm* did not purport to change the established intermediate scrutiny test. Rather, it applied that test in the same way the United States does here: using the plaintiff as an example of why the law was supposedly overbroad—*not* holding the law invalid solely because of the student's individual characteristics. Thus, in the section of *Grimm* applying heightened scrutiny, this Court said that "the Board ignores the reality of how *a transgender child* uses the bathroom" ("by entering a stall and closing the door")—then gave Grimm as an example. 972 F.3d at 613–14 (emphasis added) ("Grimm used the boys restrooms for *seven weeks* without incident."). The focus was on the class of "transgender child[ren]," *not* Grimm's unique characteristics. Likewise, the Court said that "[t]he Board does not present any evidence that a transgender student" "is likely to be a peeping tom," considering evidence "in school districts across the country." *Id.* at 614. All this led the Court to conclude that the "nature of the asserted privacy concerns" was "hypothetical." *Id.* at 615. Based on these findings, it held that "the Board's policy [was] not substantially related to its important interest in protecting students' privacy." *Id.* at 613. The focus of intermediate scrutiny remained on the group classified by the regulation, with the individual plaintiff merely serving as an example. Nothing in *Grimm* changes the longstanding intermediate scrutiny analysis or supports B.P.J.'s novel theory requiring a perfect fit.

15

B.P.J.'s other case, *Lehr*, is far afield. There, the Court upheld a law that "guarantee[d] to certain people the right to veto an adoption and the right to prior notice of any adoption proceeding." 463 U.S. at 266. Specifically, under the challenged law, "[t]he mother of an illegitimate child is always within that favored class, but only certain putative fathers are included." *Id.* Because the unwed father in *Lehr* "never established a substantial relationship with his daughter," the government could constitutionally distinguish between him and others like him and unwed fathers who "are in fact similarly situated [to the mother] with regard to their relationship with the child." *Id.* at 267.

*Lehr* did not apply intermediate scrutiny at all. Instead, it found no equal protection violation because the plaintiffs were not "similarly situated" to those in the supposedly favored group. *Id.*; *see Morales-Santana*, 582 U.S. at 64 n.12 ("The 'similarly situated' condition was not satisfied in *Lehr*."). In other words, the Court held that the regulation discriminated between parents with "a substantial relationship" with their child and parents without such a relationship, not based on sex. *Lehr*, 463 U.S. at 266. Here, by contrast, all appear to agree that intermediate scrutiny applies. If anything, *Lehr*'s focus on the comparator group underscores the flaws with B.P.J.'s individual-focused theory.

### C.    The consequences of B.P.J.'s theory would be significant.

Beyond disregarding precedent, B.P.J.'s novel theory would have significant negative consequences. It would permit a plaintiff to demand perfect tailoring to his situation, forcing the government to abandon enforcement of the law writ large to avoid plaintiffs with often undetectable unique circumstances. B.P.J.'s reformulation of intermediate scrutiny would also alter vast swaths of law, including Fourteenth Amendment equal protection, Fifth Amendment due process, and First Amendment speech. Decades of precedent would be disturbed, and intermediate scrutiny would essentially morph into strict scrutiny, which is supposed to be reserved for the most inherently suspect laws.

First, the practical consequences of B.P.J.'s theory would be severe. Laws that are facially valid—and further important government interests like protecting girls and women from harm—would no longer be enforced. That is because states will be unable to predict when some plaintiff with unique (and, as here, unapparent) circumstances might come along and suffer a supposed as-applied violation. Rather than face a steady trickle of lawsuits and potentially crushing liability, states will simply not enforce these laws, even if they are valid as against every other person in the world. And again, in the intermediate scrutiny realm, those laws protect important state interests. All those who are protected by the laws—here, young girls—will suffer.

B.P.J.'s theory will also unsettle precedent. Under that theory, many cases from this Court and the Supreme Court would have been decided differently. For example, the Supreme Court in *Ward* would likely have held that forcing Rock Against Racism to comply with the city's amplification requirements did not further the city's justification for the regulation because Rock Against Racism's amplification was "more-than-adequate." 491 U.S. at 801. And it would be a rare city that would continue to enforce such a law, notwithstanding the damage such nonenforcement would cause to important interests.

Likewise, the Supreme Court in *Nguyen* would likely have found that the "ultimate objective" of the statute at issue was not furthered by enforcing it against Nguyen, and thus the statute would have been held unconstitutional. *See* 533 U.S. at 70. As discussed, *Nguyen* considered a statute providing different steps for immigrants to attain citizenship depending on whether the unwed father or unwed mother was a citizen. *Id.* at 62. The government's asserted interests in parent-child relationships were not implicated by the facts in *Nguyen*, as the petitioner's relation to his citizen father was shown through a DNA test, and the petitioner had lived with his father in the United States from age five until at least age 22. *Id.* at 57. Though *Nguyen* held that the statute need not "be capable of achieving its ultimate objective in every instance," *id.* at 70, B.P.J.'s theory would require the opposite holding.

Further, if this Court accepts B.P.J.'s theory and permits a challenger to demand a perfect fit between a law and that challenger's unique circumstances, the Court would be sanctioning formerly meritless claims. As the Supreme Court has warned, if a plaintiff can change the substantive law by labeling a claim "as-applied," the courts will be plagued with "pleading games." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019). While the "line between facial and as-applied challenges can sometimes prove amorphous, and not so well defined," "the label is not what matters." *Id.* "To hold now, for the first time, that choosing a label changes the meaning of the Constitution would only guarantee a good deal of litigation over labels, with lawyers on each side seeking to classify cases to maximize their tactical advantage. Unless increasing the delay and cost . . . is the point of the exercise, it's hard to see the benefit in placing so much weight on what can be an abstruse exercise." *Id.*

Finally, what's sauce for intermediate scrutiny is sauce for rational basis review. B.P.J.'s theory would revolutionize rational basis review, for it would mean that courts must consider whether the government's regulation of a *particular person* is rationally related to a legitimate government interest. That has never been the test. "Under the rational basis test a court must determine (1) whether the purpose that animates the challenged laws and regulations is legitimate, and (2) whether it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose." *Adkins v. Rumsfeld*, 464 F.3d 456, 469 (4th Cir. 2006)

(cleaned up). "[S]tate classifications" that are subject to rational basis review "cannot be determined on a person-by-person basis." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 85–86 (2000). "Our Constitution permits States to draw lines [for non-suspect classes] when they have a rational basis for doing so at a class-based level, even if it is 'probably not true' that those reasons are valid in the majority of cases." *Id.* at 86; *see also Gregory v. Ashcroft*, 501 U.S. 452, 473 (1991) (upholding mandatory retirement for judges while acknowledging that "[i]t is probably not true that most" judges suffer deterioration in old age, and "[i]t may not be true at all"); *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (holding that a mandatory retirement law passed rational basis review even though "individual" "employees may be able to perform past" the age limit); *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 311, 314–17 (1976) (holding that mandatory retirement for police officers passed rational basis review even though the challenger was in "excellent physical and mental health" and was still "capable of performing the duties of a uniformed officer").

To be sure, closer scrutiny is warranted under intermediate scrutiny. But the question is whether the relevant equal protection scrutiny level in an as-applied case is adjudicated by reference to the plaintiff's own circumstances. If intermediate scrutiny requires that the government's interests be borne out in the individual case, rational basis scrutiny logically would as well. That is true even if a lesser interest

suffices under rational basis review. Once again, B.P.J.'s theory would upend constitutional law.

B.P.J. does not address any of these consequences, though presumably they account, at least in part, for the United States' reticence to endorse B.P.J.'s theory. Yet B.P.J. well understands what the United States tries to avoid: that B.P.J. can only succeed if this Court accepts an unprecedented reformulation of intermediate scrutiny. B.P.J.'s theory is logically incoherent and incompatible with precedent. Its consequences would be severe. The Court should not adopt it.

## II.    The Act satisfies intermediate scrutiny.

As shown, the proper question before this Court is the one the district court correctly decided: whether the law's means "are substantially related" to "important governmental objectives." *Virginia*, 518 U.S. at 533 (cleaned up). They are.

Even if it is true that B.P.J. and other biological boys who have halted endogenous puberty have no significant advantage over biological girls—an unlikely proposition to any casual viewer of fourth grade sports—the Act passes intermediate scrutiny.[2] As discussed, this Court addressed a similar claim in an as-applied

---

[2] B.P.J. suggests that B.P.J. should be classified as a transgender girl, not a biological male. Opening Br. 31. But the law only classifies people into two groups: biological males and biological females. If B.P.J. believes that the class is incorrectly defined, then this Court should review that claim under rational basis review. *See Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 210–12 (2d Cir. 2006); *see also* Br. of Amici Curiae Ala., Ark., and 19 Other States in Supp. of Applicants' Emergency Appl. to Vacate Inj. 10–16, *West Virginia v. B.P.J.*, 2023 WL 2801383.

challenge to a firearm restriction for domestic violence misdemeanants, for which this Court applied intermediate scrutiny. *See Staten*, 666 F.3d at 168. The Court "recognize[d] that the net cast by [the Act] may be somewhat over-inclusive given that every domestic violence misdemeanant would not necessarily misuse a fire-arm." *Id.* at 167. But, as this Court explained, "this observation merely suggests that the fit is not perfect. Intermediate scrutiny does not require a perfect fit." *Id.*

Here, B.P.J. asserts that the State failed to show that "as a group, transgender girls like B.P.J. who receive puberty-delaying treatment followed by gender-affirm-ing hormone therapy have average athletic performances that are better than the av-erage athletic performances of cisgender girls as a group." Opening Br. 41. B.P.J. further insists that there is no "evidence of substantial displacement caused by transgender girls in West Virginia . . . or by B.P.J." during the injunction. *Id.* at 42. Finally, B.P.J. claims that the "Defendants have not carried their burden to show that categorically banning B.P.J. from girls' sports teams advances any asserted interest in protecting the safety of cisgender girls." *Id.* at 44.

Essentially, these are all claims that the Act is "over-inclusive given that every [transgender girl] would not necessarily" outperform, displace, or hurt biological girls. *Staten*, 666 F.3d at 167. But these "observations merely suggest that the fit is not perfect." *Id.* Intermediate scrutiny "does not require a perfect fit." *Id.*

22

Under well-settled equal protection precedent, intermediate scrutiny only requires a "substantial relation." *E.g.*, *Virginia*, 518 U.S. at 533; *id.* at 573–74 (Scalia, J., dissenting); *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981) (upholding the exclusion of women from selective-service registration even though "a small number of women could be drafted for noncombat roles"); *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977) (per curiam) (upholding a statute providing higher Social Security benefits for women than for men because "women *on the average* received lower retirement benefits than men." (emphasis added)). The Supreme Court has held that a "substantial relation" is shown where a classification, "*in the aggregate*," advances the underlying objective, even if the classification does not do so "in every case." *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 579 (1990) (emphasis added), overruled on other grounds by *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). Once again, "[n]one of [the Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Instead, "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward*, 491 U.S. at 801.

B.P.J.'s argument contradicts all this precedent. B.P.J. ignores the Supreme Court's directive to consider the Act's "relation to the overall problem," and instead

urges this Court to analyze the "extent to which it furthers the government's interests in [B.P.J.'s] case." *See id.* That is why B.P.J. focuses so much on B.P.J.'s own circumstances and not on the Act's overall goal of providing equal athletic opportunities for biological girls. *See* Opening Br. 33–34. Even if B.P.J.'s exclusion does not achieve this interest—which is far from clear—the focus of the "substantial relation" prong is on the Act's "relation . . . to the overall problem the government seeks to address." *Ward*, 491 U.S. at 801. Thus, whether B.P.J. will outperform, replace, or hurt biological women is irrelevant. *See Jobst*, 434 U.S. at 55 (noting that courts must "judge[] by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples"). As the district court found, the State has shown that, "in the aggregate," biological girls are better served when biological boys are not competing against them. *Metro Broad.*, 497 U.S. at 579. The Act is substantially related to the State's interest in providing equal athletic opportunities for girls and is thus constitutional.

## CONCLUSION

For these reasons, the Court should affirm summary judgment in favor of the State.

Respectfully submitted,

s/ Christopher Mills
CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amici Curiae*

MAY 3, 2023

25

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 5,583 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated:  May 3, 2023

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated:  May 3, 2023

s/ Christopher Mills
 Christopher Mills
