No. 23-1078

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

B.P.J. by next friend and mother, HEATHER JACKSON,

*Plaintiffs-Appellant / Cross-Appellee,*

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON
COUNTY BOARD OF EDUCATION; W. CLAYTON BURCH, in his official
capacity as State Superintendent; DORA STUTLER, in her official capacity as
Harrison County Superintendent,

*Defendant /Appellees,*

and

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,

*Defendant-Appellee / Cross Appellant,*

and

THE STATE OF WEST VIRGINIA, LAINEY ARMISTEAD,

*Intervenor /Appellee.*

On appeal from the United States District Court for the Southern District of
West Virginia
Case No. 2:21-cv-00316 (Goodwin, J.)

**CORRECTED BRIEF OF AMICUS CURIAE DEFENSE OF FREEDOM INSTITUTE**
**in Support of Defendant-Appellees and Affirmance**

Henry P. Wall
1735 St. Julian Place, Suite 200
Columbia, South Carolina
Tel: (803) 252-7693

Donald A. Daugherty, Jr.
Defense of Freedom Institute
1455 Penn. Ave., NW, Ste. 400
Washington, DC 20004

**Table of Contents**

INTEREST OF AMICUS CURIAE…………………………………………...……...1

SUMMARY OF ARGUMENT…………………………………………………..…1

ARGUMENT………………………………………………………………….4

    I.    Heightened Scrutiny does not require a perfect fit between the act
And B.P.J.'s individual circumstances…………………………………..4

    II.    This court should not second guess proper legislative line
drawing…………………………………………………………………13

    III.    Intermediate scrutiny as proposed by B.P.J. runs counter to
Precedent for as-applied challenges on constitutional grounds
other than equal protection……………………..………………………16

CONCLUSION…………………………………………………………...20

TABLE OF AUTHORITIES

## Cases

*B.P.J. v. West Virginia State Bd. of Educ.*, 2023 U.S. Dist. LEXIS 1820 (S.D. W.Va. Jan. 5, 2023)……………………………………...… 4, 7

*Bd. of Trustees v. Fox*, 492 U.S. 469, 480 (1989)…………...…………………17

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019)……………………….………10

*Buckley v. Valeo*, 424 U.S. 1 (1976)……………………...…………..…..17, 20

*Califano v. Webster*, 430 U.S. 313, 320 (1977)……………………….....7

*Citizens United v. FEC*, 558 U.S. 310 (2010)…………...…………………….…....10

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)………………………………………………..………….…...4, 17

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)……………….…………………………….…...……9

*Clark v. Arizona Interscholastic Assoc.*, 695 F.2d 1126, 1129-31 (9th Cir. 1982)……………………………......7, 16

*Craig v. Boren*, 429 U.S. 190 (1976)……………………………………......5, 7

*FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638 (2022)……………………....19

*Feeney*, 442 U.S. 256 (1979)………………………………………......5, 13

*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F. 3d. 586 (4th Cir. 2020)…...……………………………...........4, 5, 6, 9, 12, 13, 15

*H.B. Rowe Co. v. Tippett*, 615 F.3d 233 (4th Cir. 2010)……………………………………………………….…...4, 5

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)…….……………….…..…………….…..………15

*McCutcheon v. FEC*, 572 U.S. 185 (2014)…………....................……….....17, 19
.
*Michael M. v. Superior Court*, 450 U.S. 464 (1981)……………...…...…...….6, 15

*Miller v. Albright*, 523 U.S. 420 (1998)……………………………..….…...….6

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718
(1982)………………………………………………...….…………....6

*Nguyen v. INS*, 533 U.S. 53 (2001) ………….….…………….….……...….4, 5, 6, 14

*Randall v. Sorrell*, 548 U.S. 230, 248 (2006)……………………………..20

*Reed v. Reed*, 404 U.S. 71 (1971)……………………….…………...........…13

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017)………………………….5, 6

*Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180 (1997)…………………..4

*United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993)…………..……….17

*United States v. Virginia*, 518 U.S. 515 (1996)…………..………4, 5, 6, 7, 10, 11

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)…………………………18, 19

*Whitaker v. Kenosha Unified Sch. District*,
858 F.3d 1034 (7th Cir. 2017)……………………………..……….…..……..12

*White Coat Waste Project v. Greater Richmond Transit Co.*,
35 F.4[th] 179 (4th Cir. 2022)……………………………...……………….…..10, 11

**STATUTES**

West Virginia § 18-2-25d (2023)…………………………………..2, 6, 7, 11

## INTEREST OF AMICUS CURIAE[1]

The Defense of Freedom Institute for Policy Studies, Inc. ("DFI") is a nonprofit, nonpartisan 501(c)(3) institute dedicated to defending and advancing freedom and opportunity for every American family, student, entrepreneur, and worker and to protecting the civil and constitutional rights of Americans at school and in the workplace. Former senior leaders of the U.S. Department of Education ("the Department") who are experts in education law and policy founded DFI in 2021. DFI possesses significant legal expertise and policy experience in interpreting and administering Title IX of the Education Amendments of 1972 and the Department's implementing regulations. DFI also has significant experience litigating challenges to the constitutionality of statutes under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

## SUMMARY OF ARGUMENT

Between strict and rational basis scrutiny of the constitutional validity of statutes, a range of different intermediate scrutiny approaches have developed.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for Amicus Curiae certifies that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party, or any other person besides Amicus Curiae, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties participating in this litigation have received proper notice of the filing of this brief, and have either consented or raised no objection to the filing of this brief to counsel for Amicus Curiae.

B.P.J. would add yet another variation – namely, heightened scrutiny of sex classifications under the Fourteenth Amendment's Equal Protection Clause as applied exclusively to individual transgender persons bringing the challenge. This Court should reject B.P.J.'s novel approach.

B.P.J. argues that the Save Women's Sports Bill, codified at West Virginia Code § 18-2-25d (2023) (the "Act"), does not fit West Virginia's interest in increasing opportunities for women and girls to participate in athletics because biology is not substantially related to such opportunities as applied to B.P.J. However, the relevant issue is not whether the statutory means fit B.P.J. exclusively. The Equal Protection Clause did not require West Virginia to customize for B.P.J. its means for protecting sports opportunities for girls. Rather, the relevant fit is between excluding biological boys from girls sports and the Act's goal, and that fit is entirely reasonable, thereby satisfying intermediate review.

B.P.J.'s argument relies heavily on the slippery distinction between facial and as-applied challenges. According to B.P.J., raising the latter means that the Act must fit B.P.J. perfectly without regard to its broader effects; however, facial and as-applied conventions are merely tools for a court to decide the extent of the remedy that is appropriate **after** it has already found the challenged rule to be unconstitutional because, for example, the rule lacks a reasonable fit.

2

In drawing lines, a legislature must consider the rights of all its citizens. The Act reflects legitimate concerns of biological females and their parents, and was not driven by bigotry towards transgender students. The legislative determination that in athletic competition, biology is a more relevant criterion than gender identity was well-founded and not based on, for example, archaic stereotypes about differences between the sexes. Ensuring that laws enacted by state legislatures provide equal protection does not justify a federal court substituting its policy judgments. Judicial deference to legislative line drawing is especially warranted in a complex societal issue of only recent concern, where line drawing is particularly fraught with uncertainty.

Finally, B.P.J.'s approach would disrupt settled constitutional jurisprudence in other areas. All the myriad types of intermediate scrutiny contemplate an assessment of means-end fitness. Like sex discrimination, restrictions on certain types of First Amendment speech are subject to intermediate review. The perfect fit demanded by B.P.J. would run counter to precedent upholding the constitutionality of advertising regulations; time, place and manner restrictions; and limits on political contributions.

3

## **ARGUMENT**

### I. HEIGHTENED SCRUTINY DOES NOT REQUIRE A PERFECT FIT BETWEEN THE ACT AND B.P.J.'S INDIVIDUAL CIRCUMSTANCES.

Under the Equal Protection Clause, government classifications based on sex like those in the Act are subject to heightened scrutiny, a form of intermediate review. *Nguyen v. INS*, 533 U.S. 53, 60-61 (2001); *United States v. Virginia*, 518 U.S. 515, 533 (1996); *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010). In addition, although the Supreme Court has not weighed in, this Circuit recently extended heightened scrutiny to classifications based on gender identity.[2] *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 610-13 (4th Cir. 2020).

Intermediate scrutiny of any alleged violation of constitutional rights requires that the means chosen by the government reasonably fit the public interest served. *See Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993); *see also Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 214 (1997) (challenged law must not

---

[2] Because only a few, recent cases have discussed standards for reviewing alleged equal protection violations based on gender identity, it is not clear if heightened scrutiny of sex and of gender identity classifications are identical. The District Court acknowledged the possibility of illegal discrimination against transgender persons per *Grimm* but, as in *Grimm*, 972 F.3d at 607 n.4, its equal protection analysis relied on better-developed precedent in the area of sex discrimination. *See B.P.J. v. West Virginia State Bd. of Educ., 2023* U.S. Dist. LEXIS 1820, at *16-18 (S.D. W.Va. Jan. 5, 2023). The discussion in this brief does similarly.

"burden substantially more [constitutionally-protected activity] than is necessary to further [the government's] interest"). In the specific context of sex discrimination, heightened scrutiny requires that a state actor show "'exceedingly persuasive justification'" 1) that the challenged classification promotes "'important governmental objectives'" and 2) that it is "'substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531, 533); *Nguyen*, 533 U.S. at 60-61; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979); *Craig v. Boren*, 429 U.S. 190, 197-202 (1976). Neither of the two steps of the means–ends test focus on the individual plaintiff; rather, they more broadly consider the constitutional validity of the rule at issue.

Intermediate scrutiny requires less of a showing by the government than does strict scrutiny, the most exacting standard of review. *H.B. Rowe*, 615 F.3d at 242; *Grimm*, 972 F.3d at 607 (scrutiny of alleged discrimination based on "[s]ex is somewhere in the middle" between strict and rational basis scrutiny). Most relevant here, the challenged rule need not "be capable of achieving its ultimate objective in every instance" to satisfy the fitness requirement. *Nguyen*, 533 U.S. at 70. In other words, a perfect fit is not necessary.

B.P.J. does not contend that the Act's goal of providing sports opportunities for girls and women through separate teams is insufficiently important to satisfy

intermediate review. B.P.J. argues only that the Act does not fit that goal because defining "girl" and "woman" based on biological sex is not substantially related to achieving it.[3] (Opening Br. 37-45.) This argument fails for two reasons.

First, the highest scrutiny does not apply to sex classifications like those in the Act because "the Supreme Court has recognized 'inherent differences' between the biological sexes that might provide appropriate justification for distinctions." *Grimm*, 972 F.3d at 607-08 (citing *Virginia*, 518 U.S. at 534). "To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen*, 533 U.S. at 73; *see also Miller v. Albright*, 523 U.S. 420, 444-45 (1998); *Virginia*, 518 U.S. at 533; *Michael M. v. Superior Court*, 450 U.S. 464, 471-73 (1981). Here, the Act's definitions rely on biology, not "archaic and stereotypic notions," *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982), or "obsolescing view[s]" about differences between the sexes, *Sessions*, 582 U.S. at 62-63.

---

[3] The Act's definitions provide,

(1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

(2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.

W. Va. Code § 18-2-25d(b)(1) & (2).

6

The extensive evidentiary basis for the District Court's finding that biological differences were an appropriate justification for the Act's definition of "female" need not be recounted in an amicus brief.  Suffice it to say that after an assiduous review of the 3,000+ page record, the Court was persuaded that a reasonable fit existed between the goal of protecting opportunities in sports for girls and the Act's use of biology to differentiate between girls and boys.  *B.P.J.*, 2023 U.S. Dist. LEXIS 1820, at *25-26·  West Virginia chose not an "inaccurate proxy" but, in fact, the most "germane bas[i]s" for separating boys and girls sports teams.  *Craig*, 429 U.S. at 198.

Second, differential treatment based on sex may be permitted in order to make up for past sexual discrimination.  *Virginia*, 518 U.S. at 533 (citing *Califano v. Webster*, 430 U.S. 313, 320 (1977)); *Craig v. Boren*, 429 U.S. 190, 198 n.6 (1976) (citing cases).  Such is the case here, where the goals of the Act include overcoming an historical lack of athletic opportunities for girls.  W. Va. Code § 18-2-25d(a)(3) (citing *Clark v. Arizona Interscholastic Assoc.*, 695 F.2d 1126, 1129-31 (9th Cir. 1982) (given lack of athletic opportunities for females in the past, encouraging female involvement in sports is legitimate and important governmental interest and separation of teams by sex promotes that interest)).

B.P.J. further asserts that the District Court incorrectly analyzed the fit between biology and the Act's purpose. B.P.J. contends that the Court mistakenly believed "that it could not focus on facts specific to B.P.J. because doing so would be the equivalent of importing strict scrutiny's 'narrowly-tailored' requirement into heightened scrutiny. . . . But the alternative to 'narrow tailoring' is not 'no tailoring.'" (Opening Br. 36.)

B.P.J.'s straw man can easily be dismissed. No defendant argues for "no tailoring;" rather, all maintain that the Act reasonably fits West Virginia's interest in providing opportunities for girls to participate in sports, as required by heightened scrutiny.

Importantly, the issue is not whether the means fit B.P.J. exclusively. The Equal Protection Clause did not require West Virginia to customize for B.P.J. its means for protecting sports opportunities for girls. Rather, the relevant fit is between excluding biological boys from girls sports and the Act's goal, and that fit is entirely reasonable given the science establishing the natural advantages of males in athletics.

Furthermore, it would be impossible as a practical matter to evaluate whether the Act treats B.P.J. equally considering B.P.J. in isolation. The equal protection analysis only works by comparing B.P.J. to someone else. Specifically, heightened

scrutiny requires looking at how the challenged rule affects persons who are similarly-situated to B.P.J.  *See Grimm*, 972 F.3d at 607 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (equal protection is "'essentially a direction that all persons similarly-situated shall be treated alike'").  Here, B.P.J. is similarly-situated to other biological boys[4] (regardless of whether they identify as girls) and the Act treats them all equally:  they cannot join girls teams, but they can join boys teams.

The District Court properly recognized that the dispositive issue before it was "whether the legislature's chosen definition of 'girl' and 'woman' . . . is constitutionally permissible," 2023 U.S. Dist. LEXIS 1820, at *3 (S.D. W.Va. Jan. 5, 2023), not how the Act treats B.P.J. alone.

Only **after** completing both steps of heightened review, and having determined that the substantive law at issue is unconstitutional, will a court then look to the challenger's individual circumstances.  It does so in order to determine the appropriate remedy (e.g., severing a challenged provision from the rest of the statute).  Facial and as-applied approaches relate to the extent that a statute remains

---

[4] B.P.J. argues that a lower testosterone level due to receiving treatment to delay puberty distinguishes B.P.J. from biological boys.  (Opening Br. 40-41.)  The constitutionality of the Act cannot depend on current, personal medical decisions, and B.P.J. has the right to choose to forego such treatment later.

viable after its constitutional invalidity has been determined through appropriate scrutiny. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("classifying a lawsuit as facial or as-applied affects the . . . 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation") (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)).

B.P.J. would create different intermediate scrutiny tests for facial and as-applied challenges, with review of a statute more rigorous for the latter. That B.P.J. characterizes the instant challenge as as-applied, however, is much less significant than B.P.J. represents. B.P.J. correctly notes that courts generally prefer as-applied over facial evaluations, (Opening Br. 35); however, because B.P.J. has disclaimed a right to facial relief (and because there has never been a threshold showing that the Act was unconstitutional in the first place), this judicial preference is not relevant here. "The line between facial and as-applied challenges . . . has not been particularly 'well-defined,'" *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 203 (4th Cir. 2022) (quoting *Citizens United*, 558 U.S. at 331), and is a weak reed on which to hang B.P.J.'s unorthodox approach.

If the constitutional validity of a rule depended on whether it was challenged on its face or as-applied, *Virginia* would be inapposite. This cannot be the case. While *Virginia* was not an as-applied challenge and, instead, the United States

contended that the state policy at issue had no constitutional application under any circumstances, *see* 518 U.S. at 557-58, there is no dispute that *Virginia*'s substantive test for determining unlawful sex discrimination under the Equal Protection Clause governs here.

Although "[a]n as-applied challenge . . . depends on the identity or circumstances of the plaintiff," *White Coat*, 35 F.3d at 205, it does not do so exclusively or without consideration of the circumstances of all who are affected by the statute at issue.

B.P.J. argues that "the District Court refused to undertake the required as-applied analysis, and instead focused on hypothetical transgender girls generally, rather than B.P.J. specifically." (Opening Br. 35.) But the Act's effects on others are not merely hypothetical. That other transgender girls, as well as biological girls, were third-parties not before the Court does not mean that the Act's effects on them were not relevant to its constitutionality. Most significantly, the legislative findings supporting the Act included that biological girls in West Virginia would be displaced without the Act's protections. W. Va. Code § 18-2-25d(a)(3). West Virginia did not need to wait for such displacement to occur before acting.

B.P.J. appears to concede that application of the Act against transgender girls with, for example, normal testosterone levels would be constitutional. Thus, if

anything, the fact that B.P.J. is the only known party who has low testosterone and is adversely affected by the Act's bar on participation in girls' sports shows that it is at least reasonably tailored to fit the broader public interest.

*Grimm* does not govern the outcome here. In *Grimm*, this Court held that sex-segregated bathrooms were not substantially related to students' interests in bodily privacy. 972 F.3d at 613-14. Like here, there was no dispute in *Grimm* that an important government interest supported the challenged policy. However, the interests of cisgender boys in bodily privacy were fully addressed by the fact that the transgender boy "'enter[ed] a stall and clos[ed] the door.'" *Grimm*, 972 F.3d at 613 (quoting *Whitaker v. Kenosha Unified Sch. District*, 858 F.3d 1034, 1052 (7th Cir. 2017). The biological differences between cisgender and transgender boys then became moot, and the policy barring transgender boys from entering the boys' bathroom at all did not fit the goal of protecting bodily privacy. By contrast, the means for addressing the interest in opportunities for girls to participate in sports is not as simple as closing the door to a bathroom stall.

Finally, B.P.J.'s as-applied challenge may not be as narrow or modest as it purports to be. The District Court stated that B.P.J. "seeks a legal declaration that a transgender girl is 'female[,]'" 2023 U.S. Dist. LEXIS 1820, at *13, and that B.P.J. asked it "to find that specifically excluding transgender girls from the definition of

12

'girl' . . . is unconstitutional . . . . ," *id.*, at *23. Thus, B.P.J. appears to seek relief that goes well beyond enjoining enforcement of the Act against B.P.J. alone. And under the doctrine of stare decisis, a decision from this Court allowing a biological boy to participate on girls sports teams would have preclusive effect across the four states in this Circuit in addition to West Virginia.

## II.  THIS COURT SHOULD NOT SECOND GUESS PROPER LEGISLATIVE LINE DRAWING.

With the Act, West Virginia answered the question of who is "female" for purposes of athletic competition in schools. West Virginia did not enact it to "punish" B.P.J. or other transgender girls for gender nonconformity or otherwise, *see Grimm*, 972 F.3d at 608; it did so to protect opportunities for biological girls to compete. Preventing biological boys who are transgender from competing on girls sports teams is only an incidental effect, *see Feeney* 424 U.S. at 273-77, and West Virginia's answer should not be disturbed.

No law affects everyone in a uniform manner. *Feeney*, 442 U.S. at 271-72; *Reed v. Reed*, 404 U.S. 71, 75 (1971). Thus, equal protection focuses on whether a challenged statute places people into different classes and treats them unequally for reasons "wholly unrelated to the objective of the statute." *Reed*, 404 U.S. at 75. Equal protection does not eliminate a legislature's power to classify but, rather,

measures the basic validity of such classifications to make sure they are constitutionally sound. *Feeney*, 442 U.S. at 271-72.

B.P.J.'s prescription for as-applied challenges would require an individualized, subjective analysis by every school presented with a situation like the one here. It would also raise difficult questions, such as whether the school must require that B.P.J. continue to take puberty-delaying medication or otherwise monitor B.P.J.'s physical development going forward to compete against biological girls. Such considerations might have had some relevance, and West Virginia's legislature could have chosen to include them in the Act, but the Equal Protection Clause did not require it to do so. *Nguyen*, 533 U.S. at 68-69.

Practical means for addressing an issue of public policy are a quintessentially legislative determination. Federal courts should be extremely hesitant to interfere with such line drawing by states in complex policy matters. This is especially true given that incidents of biological boys displacing biological girls in athletics are of relatively recent vintage, making West Virginia's situation a prime candidate for allowing individual states to act as "laboratories of democracy" for handling new societal issues.

Confusion over some of the basic terms used to discuss transgender participation in athletics reflects the need for definitional clarification, such as is

14

provided by the Act.  As *Grimm* acknowledged, the Supreme Court itself has used "sex" and "gender" interchangeably in past equal protection cases, *see Grimm*, 972 F.3d at 607 n.8, but that may no longer hold true in the current debate.  West Virginia had authority to try to add some clarity in an area where the meaning of many relevant, fundamental terms has become less commonly-understood than before.

The Act is a solution in **anticipation** of problems that have occurred in Connecticut and other states, where biological boys dominated girls track and field events, displacing and causing other harm to the biological girls against whom they competed.  West Virginia did not have to wait for the problem to arise before passing legislation to deal with it.  Unlike the judiciary, which generally looks backward in time, a fundamental task of any legislature is to try to predict future problems and then enact policies to address them before harm occurs.  Courts "accord substantial deference to the predictive judgments of the legislature when conducting intermediate scrutiny," *Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011); *see also Michael M.*, 450 U.S. at 470 (state's legislative finding "is entitled to great deference"), and this Court should do so here.

School districts do not have unlimited resources for athletics.  Thus, allowing a biological boy to participate would nearly always result in a biological girl being

displaced from a girl sports team.[5]  Preventing such displacement of biological girls is inherent in the Act's requirement that students be "select[ed] for such teams based on competitive skill."  § 18-2-25(c)(2); *see also* § 18-2-25d(a)(3) (citing *Clark* (9th Cir. 1982)).  This is true regardless whether the transgender girl dominates every competition or, like B.P.J., tends to finish towards the back of the pack.  And although B.P.J. claims that noncontact sports like cross-country should be treated differently, equal protection does not mean that the legislature must fashion separate rules for each sport.

West Virginia was not required to curate its law to fit B.P.J.  Legislatures must draw lines, and these will sometimes be imperfect.  Nonetheless, absent clear constitutional invalidity, imperfect laws must govern, not men and women imposing their will ad hoc on fellow citizens.

## III.   INTERMEDIATE SCRUTINY AS PROPOSED BY B.P.J. RUNS COUNTER TO PRECEDENT FOR AS-APPLIED CHALLENGES ON CONSTITUTIONAL GROUNDS OTHER THAN EQUAL PROTECTION.

Evaluating the constitutional validity of a statute based exclusively on the plaintiff's individual circumstances would have repercussions beyond   equal

---

[5] Although the evidentiary record may be unclear as to whether specific biological girls have been displaced, B.P.J. sought a stay from this Court expressly to participate in February 2023 "tryouts" for Spring 2023 track-and-field.  This suggests a process in which all girls who try out will not make the team.

protection jurisprudence. The myriad types of intermediate scrutiny all contemplate an assessment of means-end fitness. Like sex discrimination, restrictions on certain types of First Amendment speech are subject to intermediate review. The perfect fit demanded by B.P.J. would run counter to Supreme Court precedent upholding on intermediate scrutiny the constitutionality of advertising regulations; time, place and manner restrictions; and limits on political contributions.

Intermediate scrutiny under the First Amendment requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the best single disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)). "Within those bounds [courts] leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Cincinnati*, 507 U.S. at 416 n.12 (quoting *Bd. of Trustees v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks and citations omitted)). Importantly, as with equal protection review of sex classifications, "'the validity of the [challenged] regulation depends **on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case.**'" *United States v. Edge Broadcasting*

*Co.*, 509 U.S. 418, 430 (1993) (emphasis added) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989)).

Thus, for example, in *Edge Broadcasting*, the Court rejected an as-applied First Amendment challenge to a federal statute banning lottery advertising in states without state-sanctioned lotteries. The challenge had been brought by a radio broadcaster that was located in a non-lottery state, but was near the border with a lottery state, and 90% of its listeners were located in the adjoining state. *See Edge Broadcasting*, 509 U.S. at 423-24. Like B.P.J., the broadcaster argued that enforcement of the statute against it did not further the government's statutory goal (which, in *Edge Broadcasting*, was discouraging lottery participation in states that prohibited lotteries). *Id.* at 429-30. The Court rejected this argument, saying that the statute's constitutional validity was judged by its relation to the general problem of accommodating both lottery and nonlottery states, not the plaintiff's individual circumstances. *Id.*, at 428-31.

Similarly, laws regulating "the time, place, or manner of protected speech must be narrowly tailored to serve the Government's legitimate, content-neutral interest but [they] need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as . . . the regulation promotes a substantial government interest that would be achieved less

18

effectively absent the regulation.'" *Ward*, 491 U.S. at 798–99.  In *Ward*, a city regulation requiring park bandshell performers to use, inter alia, a sound technician provided by the city in order to ensure sufficient sound volume for audiences was not judged for fitness based solely on the plaintiff, which had demonstrated "more-than-adequate sound amplification;" "the regulation's effectiveness must be judged by considering all the varied groups that use the bandshell." *Id.*, at 801.

For restrictions on campaign finance activity, preventing quid pro quo corruption (or its appearance) is the linchpin governmental interest.  "This Court has recognized only one permissible ground for restricting political speech:  the prevention of 'quid pro quo' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1652 (2022) (citing *McCutcheon*, 572 U.S. at 207). However, in evaluating the constitutionality of contribution limits, the issue is not whether a particular donor expects some quid pro quo; that is, a donor could not challenge a limit as-applied based on his or her individual but sincere expectation of no "political favor" in exchange for a contribution.

Similarly, in determining the precise contribution amount that will best deter such corruption while, at the same time, allowing the fullest possible expression of financial support for a candidate, the Court has conceded that it has "'no scalpel to probe'" the effectiveness of various contribution limits and must defer to Congress.

*Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (quoting *Buckley v. Valeo*, 424 U.S. 1, 30 (1976)).    Similar deference to legislative line drawing while conducting intermediate scrutiny is proper in evaluating the Act's definitions.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth by appellees, this Court should affirm the District Court's decision.

s/Henry P. Wall
Henry P. Wall
1735 St. Julian Place, Suite 200
Columbia, South Carolina
Tel: (803) 252-7693
*Attorney for Amicus Defense of Freedom Institute*

Donald A. Daugherty, Jr.
Defense of Freedom Institute
1455 Penn. Ave., NW, Ste. 400
Washington, DC  20004
*Attorney for Amicus Defense of Freedom Institute*

May 3, 2023