No. 23-1078

# In the United States Court of Appeals for the Fourth Circuit

B.P.J., by her next friend and mother; HEATHER JACKSON,
*Plaintiffs-Appellants*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY
BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as
State Superintendent; and DORA STUTLER, in her official capacity as Harrison
County Superintendent,
*Defendants-Appellees*,

and

THE STATE OF WEST VIRGINIA; LANEY ARMISTEAD,
*Intervenors-Appellees*.

**On Appeal from the United States District Court
for the Southern District of West Virginia,
No. 2:21-cv-00316 (Goodwin, J.)**
———————————

**MOTION FOR LEAVE TO FILE BRIEF OF PARENTS DEFENDING
EDUCATION AS *AMICUS CURIAE*
IN SUPPORT OF APPELLEES AND AFFIRMANCE**
———————————

J. MICHAEL CONNOLLY
JAMES F. HASSON
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
mike@consovoymccarthy.com
*Counsel for Parents Defending Education*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Parents Defending Education hereby certifies that it has no parent company and no publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(3), Parents Defending Education ("PDE") moves for leave to file the attached brief as *amicus curiae* in support of Appellees. All parties have been notified of PDE's intent to file this brief. Plaintiff-Appellant and Intervenor-Appellees have consented to the filing of this brief. Defendant-Appellees have not indicated a position.

PDE is a nationwide, grassroots membership organization consisting largely of parents of school-aged children. PDE's mission is to prevent the politicization of K-12 education, including government attempts to limit personal and professional developmental opportunities for female students in service to radical ideologies. PDE furthers this mission through network and coalition building, disclosure of harmful school policies, advocacy, and, if necessary, litigation.

The proposed brief provides relevant arguments about the proper interpretation of Title IX in light of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). As the brief explains, B.P.J. proposes an interpretation of Title IX that is neither supported by the text of the law itself nor required by *Bostock*. Thus, the brief adds pertinent arguments on issues central to the proper resolution of this case.

For these reasons, the Court should grant the motion and file the attached brief.

Dated: May 3, 2023

Respectfully Submitted,

_/s/ J. Michael Connolly_

J. MICHAEL CONNOLLY
JAMES F. HASSON
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
(703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com

_Counsel for Parents Defending Education_

## CERTIFICATE OF COMPLIANCE

This motion complies with Rule 32(a)(7)(B) because it contains 203 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: May 3, 2023                    _/s/ J. Michael Connolly_____

## CERTIFICATE OF SERVICE

I filed this motion with the Court via ECF, which will email everyone requiring notice.

Dated: May 3, 2023                    _/s/ J. Michael Connolly_____

**No. 23-1078**

# In the United States Court of Appeals for the Fourth Circuit

B.P.J., by her next friend and mother; HEATHER JACKSON,
*Plaintiffs-Appellants*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY
BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as
State Superintendent; and DORA STUTLER, in her official capacity as Harrison
County Superintendent,
*Defendants-Appellees*,

and

THE STATE OF WEST VIRGINIA; LANEY ARMISTEAD,
*Intervenors-Appellees.*

**On Appeal from the United States District Court
for the Southern District of West Virginia,
No. 2:21-cv-00316 (Goodwin, J.)**
_____

**AMICUS BRIEF OF PARENTS DEFENDING EDUCATION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**
_____

J. MICHAEL CONNOLLY
JAMES F. HASSON
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
mike@consovoymccarthy.com
*Counsel for Parents Defending Education*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Parents Defending Education hereby certifies that it has no parent company and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Rule 26.1 Corporate Disclosure Statement ..................................................i

Table of Authorities .............................................................................iii

Interest of *Amicus Curiae*........................................................................1

Summary of Argument .............................................................................2

Argument .............................................................................................4

I.    The Supreme Court's decision in *Bostock v. Clayton County* does not authorize schools to condition eligibility for women's athletics on gender identity instead of biological sex ..................................................................4

Conclusion...........................................................................................13

Certificate of Compliance .......................................................................14

Certificate of Service .............................................................................14

# TABLE OF AUTHORITIES

## Cases

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) (en banc) ................................................... 3, 5, 9

*Bear Creek Bible Church v. Equal Emp. Opportunity Comm'n*,
    571 F. Supp. 3d 571 (N.D. Tex. 2021) ............................................................ 9

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020) .......................................................... 3, 4, 8, 9, 10, 12

*Clark, By & Through Clark v. Arizona Interscholastic Ass'n*,
    695 F.2d 1126 (9th Cir. 1982) ......................................................................... 2

*Conley v. Nw. Fla. State College*,
    145 F. Supp. 3d 1073 (N.D. Fl. 2015) ............................................................ 6

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) .......................................................................................... 5

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) ............................................................ 3, 11, 12, 13

*Hurlburt v. Black*,
    925 F.3d 154 (4th Cir. 2019) ........................................................................ 12

*Muro v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*,
    2019 WL 5810308 (E.D. La. Nov. 7, 2019) ................................................... 6

*Neese v. Becerra*,
    --- F. Supp. 3d ---, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) ......................... 12

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) .......................................................................... 9

*Tennessee v. United States Dep't of Educ.*,
    2022 WL 2791450 (E.D. Tenn. July 15, 2022) ............................................... 9

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ..................................................................................5

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) .............................................................................5

**Statutes**

20 U.S.C. §1681, *et seq.* ....................................................................................4

20 U.S.C. §1681(a)(2) .........................................................................................5

20 U.S.C. §1681(a)(8) .........................................................................................5

20 U.S.C. §1682 ..................................................................................................6

Pub. L. 93-380, §844, 88 Stat 484 (Aug. 21, 1974) .........................................4

**Regulations**

34 C.F.R. §106.33 ...............................................................................................6

34 C.F.R. §106.40(b)(1) ......................................................................................6

34 C.F.R. §106.41 ...............................................................................................2

34 C.F.R. §106.41(a) ...........................................................................................4

34 C.F.R. §106.41(b) ......................................................................................6, 7

**Other Authorities**

Deborah Brake, *The Struggle for Sex Equality in Sport and the Theory Behind Title IX*, 34
   U. Mich. J. L. Reform 13 (2000) ..........................................................1

Beth A. Brooke-Marciniak & Donna de Varona, *Amazing Things Happen When You
   Give Female Athletes the Same Funding as Men*, World Econ. F. (Aug. 25, 2016),
   https://bit.ly/3LSqCle ...............................................................................2

Doriane Lambelet Coleman, et al., *Re-affirming the Value of the Sports Exception to Title
   IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69 (2020) .........7

iv

H.B. 3293 ................................................................................................. 2, 7

U.S. Department of Education, Office of Civil Rights, *Letter to Kim Mooney* (Oct. 16, 2020), https://bit.ly/3LU4cjr ................................................................. 11

U.S. Dep't of Educ. Office for Civil Rights, *Memorandum re: Bostock v. Clayton Cnty.* (Jan. 8, 2021), https://bit.ly/3AsVNw0 ..................................................... 10

## INTEREST OF *AMICUS CURIAE*[1]

Parents Defending Education ("PDE") is a nationwide, grassroots membership organization consisting largely of parents of school-aged children. PDE's mission is to prevent the politicization of K-12 education, including government attempts to limit personal and professional developmental opportunities for female students in service to radical ideologies. PDE furthers this mission through network and coalition building, disclosure of harmful school policies, advocacy, and, if necessary, litigation.

This case directly implicates PDE's mission, and its outcome will have real-world consequences for PDE's members. Title IX was enacted to prevent discrimination against and ensure equal opportunities for female students. By any metric, it has been wildly successful in achieving that purpose. Over the past five decades, Title IX has "precipitated a virtual revolution for girls and women in sports" and spurred "significant increases in athletic participation" at "all levels of education." Deborah Brake, *The Struggle for Sex Equality in Sport and the Theory Behind Title IX*, 34 U. Mich. J. L. Reform 13, 15 (2000). Indeed, "the number of girls playing high school sports [increased] from one in twenty-seven" in 1972 to "one in three" by 2000. *Id.*

This new era of opportunity has provided measurable benefits for adolescent girls and their families. "Girls who play sports stay in school longer, suffer fewer health

---

[1] This brief was not authored in whole or in part by counsel for a party. No person other than the amicus made a monetary contribution intended to fund the preparation or submission of this brief.

problems, enter the labor force at higher rates, and are more likely to land better jobs. They are also more likely to lead." Beth A. Brooke-Marciniak & Donna de Varona, *Amazing Things Happen When You Give Female Athletes the Same Funding as Men*, World Econ. F. (Aug. 25, 2016), https://bit.ly/3LSqCle.

Enjoining H.B. 3293 will reverse this progress by effectively eliminating single-sex athletics throughout the state. By conditioning eligibility for girls' sports based on a student's biological sex rather than their internal perception of gender, the law upholds Title IX's guarantee of "equal athletic opportunity for members of *both sexes*." 34 C.F.R. §106.41 (emphasis added). Federal courts and common-sense observers have long recognized that, "due to average physiological differences, males [will] displace females to a substantial extent if they [are] allowed to compete" in women's sports, and that "athletic opportunities for women [will] be diminished" as a result. *Clark, By & Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). That is exactly what will continue to happen to female athletes in West Virginia and across the Fourth Circuit if Appellant prevails.

## SUMMARY OF ARGUMENT

Congress passed Title IX to ensure that female students in the United States could access the same benefits and opportunities enjoyed by male students. As one might expect, Title IX recognizes two categories of students: males and females. Consistent with its purpose, the law repeatedly speaks about benefits provided by "one sex" versus "the other sex," and sometimes references "both sexes." Title IX, by its

very nature, is comparative: it requires school administrators—and the courts overseeing them—to compare the opportunities afforded to one group with the opportunities afforded to another.

It is impossible to compare two things, however, if neither has a verifiable definition. The issue before the Court in this case is straightforward: what did Congress mean when it required equal treatment for members of each "sex"? Appellant tries to sidestep this question by invoking the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). *See* Appellant's Br. 47. But *Bostock* interpreted a different statute—with a different structure and different purpose—and the Court specifically disavowed that its reasoning was controlling for Title IX purposes. And while *Grimm* applied *Bostock* to a discrete issue in the Title IX context, the Court's reasons for doing so are inapplicable to this case.

The plain text, structure, history, and purpose of Title IX all point to one conclusion: that "sex" refers to biological and inalterable differences between males and females, and the law protects athletic competitions that are separated on that basis. As the Eleventh Circuit recently observed, "[t]here simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813-14 (11th Cir. 2022) (en banc). Because West Virginia's policy provides equal opportunities for both sexes, it is

permissible under—and, in fact, *required by*—Title IX. The district court's decision should be affirmed.

## ARGUMENT

**I.    The Supreme Court's decision in *Bostock v. Clayton County* does not authorize schools to condition eligibility for women's athletics on gender identity instead of biological sex.**

Title IX of the Education Amendments of 1972 prohibits educational institutions that receive federal funds from excluding, denying the benefits of a program or activity, or otherwise discriminating against individuals "on the basis of sex." 20 U.S.C. §1681, *et seq.*

While Title IX does not itself mention sports, its implementing regulations clarify that the law's protections extend to student athletes. *See* 34 C.F.R. §106.41(a) ("No person shall, on the basis of sex, be excluded from participation in ... any interscholastic, intercollegiate, club or intramural athletics."). Importantly, Congress specifically mandated the creation of those regulations only two years after it enacted Title IX. In 1974, Congress passed the Javits Amendment, which directed the Department of Education to promulgate rules "implementing the provisions of Title IX," including "reasonable provisions considering the nature of the particular sports." Pub. L. 93-380, §844, 88 Stat 484 (Aug. 21, 1974). To ensure that the Department fulfilled Title IX's purpose, the Javits Amendment stated that Congress would review the sports-related regulations to assess whether they were "inconsistent with the Act from which [they] derive[] [their] authority." *Id.*

Put simply, Title IX requires any school that receives federal funds to provide equal athletic opportunities to students of each sex. Basic canons of statutory interpretation leave no doubt that Title IX's use of the term "sex" refers to a binary classification based on biological differences between males and females. To parse the meaning of a statute, courts must "interpret [its] words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (cleaned up). The "overwhelming majority of dictionaries" when Title IX was enacted "define[d] 'sex' on the basis of biology and reproductive function." *Adams*, 57 F.4th at 812 (listing definitions from six contemporary dictionaries); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex, like race and national origin, is an *immutable characteristic* determined solely by the accident of birth." (emphasis added)).

This straightforward interpretation is also supported by other sections of the law. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole." (cleaned up)). Section 1681(a)(2), for instance, distinguishes between "institution[s] which admit[] only students of one sex" and "institution[s] which admit[] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) likewise refers to sex in binary terms. Under that provision, if father-son or mother-daughter activities are provided for "one sex," then reasonably comparable activities must be provided for "the other sex." §1681(a)(8).

A common-sense understanding of "sex" under Title IX is also reinforced by the law's implementing regulations. For example, Title IX regulations specify that discrimination against a student "on the basis of pregnancy" constitutes discrimination "on the basis of sex." 34 C.F.R. §106.40(b)(1); *see* 20 U.S.C. §1682. Federal courts have recognized this rule as a valid corollary to Title IX's ban on sex-based discrimination, based on the understanding that "sex" refers to "the 'structural' and 'functional' differences between male and female bodies." *Conley v. Nw. Fla. State College*, 145 F. Supp. 3d 1073, 1077 (N.D. Fl. 2015); *see also Muro v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019) ("[A]n adverse action taken against a student on the basis of pregnancy or pregnancy-related conditions is taken *because of* her sex." (emphasis original)). Indeed, the reference to "sex" in this context could not possibly contemplate gender identity because biological males are incapable of pregnancy no matter how they identify. Mirroring the language contained in the statute itself, Title IX regulations also frequently refer to sex in binary and biological terms. *See*, *e.g.*, 34 C.F.R. §106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" but specifying that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex").

Title IX regulations also contain a provision authorizing sex-specific competitions when "contact sports" are involved. 34 C.F.R. §106.41(b). The regulations define "contact sports" to include boxing, football, and any "other sports the purpose

or major activity of which involves bodily contact." *Id.* The wisdom of this rule is intuitive if "sex" refers to biological characteristics. But separating contact sports by sex makes no sense if "sex" is unmoored from physical differences and determined entirely by each student's internal sense of their gender. If Title IX's protections turned on a particular student's self-identification instead of his or her physical attributes, limiting participation in contact sports to one group but not the other would make no sense.[2]

Based on this overwhelming evidence, the legal conclusion here is straightforward: Title IX and its attendant regulations require schools to provide equal opportunities to male and female student athletes; the equality of those opportunities is evaluated in the context of biological sex; and H.B. 3293 upholds that standard because it delineates eligibility for girls' athletic competitions based on physiological factors— the only relevant metric in the athletic context. *See, e.g.*, Doriane Lambelet Coleman, et al., *Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 87–88 (2020) ("[I]t is neither myth nor outdated stereotype that there are inherent differences between those born male and those born

---

[2] By way of example, an elite male lacrosse player can shoot a lacrosse ball between 80-95 miles-per-hour. For this reason, goalies in men's lacrosse games wear helmets and chest protectors to prevent serious injury from projectiles flying towards them at 130 feet-per-second. An elite female lacrosse player, by contrast, shoots the same ball at least 20-30 miles-per-hour slower. Thus, goalies in female lacrosse games have no need for head and chest protection and only wear protective eyeglasses. If Appellant prevails, however, a 14-year-old female lacrosse goalie with no protective equipment could be forced to stare down high-velocity shots from a 17-year-old, biologically male competitor.

female and that those born male, including transgender women and girls, have physiological advantages in many sports.").

Contra Appellant, the Supreme Court's decision in *Bostock v. Clayton County* changes none of this. In *Bostock*, the Court held that discrimination "because of sex" under Title VII prohibited employers from terminating employees because of their transgender status. *See* 140 S. Ct. 1731, 1739 (2020). The Court "agree[d] that homosexuality and transgender status are distinct concepts from sex," but it concluded that firing employees "based on homosexuality or transgender status" still triggers Title VII's protections because the employer's action "necessarily entails" a decision "made in part because of the affected individuals' sex." *Id.* at 1746-47. The Court's decision thus rested on the premise that sex is binary and immutable, and that an employee's biological sex is a necessary component of any determination about whether "discrimination because of sex" has occurred under Title VII. Put differently, whether an adverse action against a transgender employee violates Title VII under *Bostock* depends not on the specific nature of the employee's gender identity but instead on how the *employer* treats the employee as compared to *other employees of the same biological sex.*

*Bostock*'s reasoning is inapplicable to this case for at least four reasons. First, the Court "proceed[ed] on the assumption that 'sex' … refer[red] only to biological distinctions between male and female." *Id.* at 1739. Second, "[t]he *Bostock* decision only addressed sex discrimination under Title VII; the Supreme Court expressly declined to 'prejudge' how its holding would apply to 'other federal or state laws that prohibit sex

discrimination' such as Title IX." *Tennessee v. United States Dep't of Educ.*, 2022 WL 2791450, at \*15 (E.D. Tenn. July 15, 2022) (quoting *Bostock*, 140 S. Ct. at 1753). Third, Title IX and its implementing regulations contain several carve-outs specific to biological sex that are not present in Title VII. Finally, Title IX's application to single-sex athletics does not involve the "but-for causation" factor underlying the Court's narrow ruling in *Bostock*.

For this reason, several federal courts have recognized that "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Bear Creek Bible Church v. Equal Emp. Opportunity Comm'n*, 571 F. Supp. 3d 571, 621 (N.D. Tex. 2021) (similar). For example, the Eleventh Circuit recently rejected a Title IX challenge to a school district policy requiring students to use bathrooms based on their biological sex, rather than their gender identity. *See Adams*, 57 F.4th at 811. In the process, the en banc court held that *Bostock*'s reasoning was inapplicable in the Title IX context. *See id.* ("We cannot, as the Supreme Court did in *Bostock*, decide only whether discrimination based on transgender status necessarily equates to discrimination on the basis of sex."). *Bostock* was distinguishable, the court held, "because Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Id.* The Eleventh Circuit noted that if Title IX's reference to "'sex' were ambiguous enough to include 'gender identity,'" then those "carve-out[s], as well as the various carveouts under the implementing regulations, would be rendered meaningless." *Id.* at 813.

The Department of Education also evaluated Title IX's scope in the immediate aftermath of *Bostock* and concluded that the Court's decision did not change the decades-long consensus that Title IX's protections are grounded in biological sex. In a January 2021 memorandum, the Department reiterated that its "longstanding construction of the term 'sex' in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enactment." U.S. Dep't of Educ. Office for Civil Rights, *Memorandum re: Bostock v. Clayton Cnty.*, 1 (Jan. 8, 2021), https://bit.ly/3AsVNw0 ("*Bostock* Memo"). The Department noted that "Title IX text is very different from Title VII text in many important respects." *Id.* Like the Sixth and Eleventh Circuits and other federal courts, the *Bostock* Memo also pointedly observed that the Supreme Court "decided [*Bostock*] narrowly, specifically refusing to extend its holding to Title IX and other differently drafted statutes." *Id.* The *Bostock* Memo emphasized that "[u]nder Title IX and its regulations, a person's biological sex *is* relevant for the considerations involving athletics, and distinctions based thereon are permissible." *Id.* at 7 (emphasis original). The Department further specified that "schools *must* consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate." *Id.* (emphasis added).

The January 2021 *Bostock* Memo was consistent with the Department's other pronouncements in 2020. On October 16, 2020, for instance, the Department Office of Civil Rights settled a complaint against Franklin Pierce University, which had alleged that

the University violated Title IX by "den[ying] female student-athletes equal athletic benefits and opportunities by permitting transgender athletes to participate in women's intercollegiate athletic teams." U.S. Department of Education, Office of Civil Rights, *Letter to Kim Mooney*, 1 (Oct. 16, 2020), https://bit.ly/3LU4cjr. The settlement agreement required the University "to rescind the Policy [and] cease any and all practices related thereto." *Id.* at 6. The terms of the settlement notwithstanding, the Department took the opportunity to make its views known:

> [I]f *Bostock*'s reasoning under Title VII were applied to policies regarding single-sex sports teams under Title IX, it would *confirm that the Department's regulations authorize single-sex teams only based on biological sex*. In *Bostock*, the Court took the position that "homosexuality and transgender status are inextricably bound up with sex," such that "when an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." Under that logic, special exceptions from single-sex sports teams based on homosexuality or transgender status would themselves generally constitute unlawful sex discrimination, because homosexuality and transgender status are not physiological differences relevant to the separation of sports teams based on sex. In other words, if *Bostock* applies, it would require that a male student-athlete who identifies as female not be treated better or worse than other male student-athletes. If the school offers separate-sex teams, the male student-athlete who identifies as female must play on the male team, just like any other male student-athlete.

*Id.* at 5 (emphasis added).

This Court's 2-1 decision in *Grimm* is not to the contrary. *Grimm* involved an as-applied challenge to a school district policy requiring a transgender student to use school bathrooms that aligned with the student's biological sex. 972 F.3d at 616. The Court held that the policy violated Title IX because the plaintiff "was treated worse

than students" who were similarly situated, "because [the plaintiff] alone could not use the restroom corresponding with [the plaintiff's] gender." *Id.* at 618. *Grimm* never discussed Title IX in the unique circumstance of intramural athletics, which—more than any other issue—are inextricably intertwined with physical realities that are concrete and measurable. To the contrary, the court merely cited *Bostock* for the proposition that "discrimination 'means treating an individual worse than others who are similarly situated.'" *Id.* (cleaned up).

*Bostock*, however, turned on the majority's finding that *"an individual employee's sex is not relevant"* to their employment. 140 S. Ct. at 1741 (emphasis added). That reasoning simply does not apply to single-sex sports under Title IX, which was enacted precisely because sex *is relevant* to athletics. Thus, to the extent that *Grimm* purported to apply *Bostock*'s reasoning, *but see Neese v. Becerra*, --- F. Supp. 3d ---, 2022 WL 16902425, at *6 (N.D. Tex. Nov. 11, 2022) (describing the panel's "scant analysis"), the court's decision in that case is distinguishable.[3]

---

[3] If the Court disagrees and finds that *Grimm* controls, then it should revisit that decision en banc and overrule it. As explained above, any outcome in this case that is dictated by *Grimm* would be plainly incompatible with Title IX's plain meaning. Moreover, to the extent that *Grimm* found the meaning of "sex" under Title IX to be ambiguous, *see* 972 F.3d at 618, the legislative history detailed above should have removed all doubts that "sex" refers to biological differences, *see Hurlburt v. Black*, 925 F.3d 154, 164 (4th Cir. 2019) (looking to legislative history for guidance when the meaning of a statutory term is ambiguous).

Indeed, applying *Grimm's* reductive "but-for" test to school sports would mean that a school somehow violates Title IX by excluding students from a *sex-specific* athletic league that is authorized by Title IX itself. If that is the case, then Title IX is meaningless, and the congressional promise of equal opportunities for members of each sex has been illusory from the start. In sum, nothing in the text, history, or implementing regulations of Title IX contemplates sports separated by gender identity rather than biological sex.

## CONCLUSION

This Court should affirm the district court's order granting summary judgment to Appellees.

Dated: May 3, 2023                    Respectfully Submitted,

                                      _/s/ J. Michael Connolly_

                                      J. MICHAEL CONNOLLY
                                      JAMES F. HASSON
                                      CONSOVOY MCCARTHY PLLC
                                      1600 Wilson Boulevard, Suite 700
                                      (703) 243-9423
                                      mike@consovoymccarthy.com
                                      james@consovoymccarthy.com


                                      *Counsel for Parents Defending Education*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7)(B) because it contains 3,288 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: May 3, 2023                     _/s/ J. Michael Connolly_

**CERTIFICATE OF SERVICE**

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: May 3, 2023                     _/s/ J. Michael Connolly_

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## APPEARANCE OF COUNSEL FORM

**BAR ADMISSION & ECF REGISTRATION:** If you have not been admitted to practice before the Fourth Circuit, you must complete and return an Application for Admission before filing this form. If you were admitted to practice under a different name than you are now using, you must include your former name when completing this form so that we can locate you on the attorney roll. Electronic filing by counsel is required in all Fourth Circuit cases. If you have not registered as a Fourth Circuit ECF Filer, please complete the required steps at Register for eFiling.

**THE CLERK WILL ENTER MY APPEARANCE IN APPEAL NO.** 23-1078 _____ as

☑ Retained  ☐ Court-appointed(CJA)  ☐ CJA associate  ☐ Court-assigned(non-CJA)  ☐ Federal Defender

☐ Pro Bono  ☐ Government

COUNSEL FOR: Parents Defending Education _____

_____ as the
(party name)

☐ appellant(s) ☐ appellee(s) ☐ petitioner(s) ☐ respondent(s) ☑ amicus curiae ☐ intervenor(s) ☐ movant(s)

/s/ J. Michael Connolly _____
(signature)

**Please compare your information below with your information on PACER. Any updates or changes must be made through PACER's Manage My Account.**

| | |
|---|---|
| J. Michael Connolly | 703-243-9423 |
| Name (printed or typed) | Voice Phone |
| Consovoy McCarthy PLLC | |
| Firm Name (if applicable) | Fax Number |
| 1600 Wilson Blvd., Ste. 700 | |
| Arlington, VA 22209 | mike@consovoymccarthy.com |
| Address | E-mail address (print or type) |

**CERTIFICATE OF SERVICE** *(required for parties served outside CM/ECF)*: I certify that this document was served on _____ by ☐ personal delivery; ☐ mail; ☐ third-party commercial carrier; or ☐ email (with written consent) on the following persons at the addresses or email addresses shown:

| | |
|---|---|
| | |

_____          _____
Signature                                    Date