No. 23-1078

# In the United States Court of Appeals for the Fourth Circuit

B.P.J., by her next friend and mother; HEATHER JACKSON,

*Plaintiffs-Appellants,*

*v.*

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

*Defendants-Appellees,*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the Southern District of West Virginia, No. 2:21-cv-00316 The Honorable Joseph R. Goodwin, Judge

## BRIEF OF *AMICUS CURIAE* INDEPENDENT WOMEN'S LAW CENTER SUPPORTING APPELLEES AND AFFIRMANCE

Jennifer C. Braceras
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
jennifer.braceras@iwf.org

Gene C. Schaerr
  *Counsel of Record*
Cristina Martinez Squiers
Annika Boone Barkdull
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for* Amicus Curiae *Independent Women's Law Center*

May 3, 2023

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* .................. 1

SUMMARY OF ARGUMENT .................................................. 3

ARGUMENT .................................................................. 5

I.   Title IX Was Enacted To Increase Opportunities For Women and Girls, Not To Reduce Them. ................................... 5

    A.   Title IX Remedies the Historical Denial of Opportunities for Biological Women and Girls in Sports. ............................................................... 6

    B.   Single-Sex Teams Are Critical to Providing Biological Girls and Women Opportunity in Sports. ................................................................. 8

II.   Interpreting Title IX To Prohibit Discrimination In Athletics on the Basis of Gender Identity Contradicts the Express Language of the Statute and Regulations and Inevitably Harms Female Athletes. ................................ 12

    A.   Title IX Is Premised on a Binary Concept of Biological Sex. ................................................. 12

    B.   Although *Bostock* Did Not Address the Question Presented Here, It Reinforces Title IX's Binary Concept of Sex. ............................................. 14

    C.   *Grimm*'s Holding Does Not Apply to This Case. ............. 17

III.   Appellants' Proposed Disposition Would Take Opportunities Away from Women and Girls and Threaten the Very Existence of Single-Sex Sports. ................. 20

    A.   Applying *Bostock*'s But-For Test to Athletics Would Open Up Women's Sports to All Males, Not Just Those Who Identify as Women. ........................................ 20

B.    A Ruling for Appellants Will Impose Conflicting Legal Obligations on Athletic Associations and Schools. ...............................................................24

C.    A Ruling for Appellants Would Eradicate the Constitutional Basis for Title IX's Single-Sex Teams. ..........................................................................25

CONCLUSION ...................................................................27

CERTIFICATE OF COMPLIANCE ................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*B.P.J. v. W. Va. State Bd. of Educ.*,
  No. 2:21-cv-00316, 2023 WL 111875 (S.D. W.Va. 2023) ......................27

*Bauer v. Lynch*,
  812 F.3d 340 (4th Cir. 2016) ..........................................................17, 18

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) .............................................3, 14, 15, 16, 17, 20

*City of L.A., Dep't of Water & Power v. Manhart*,
  435 U.S. 702 (1978) ........................................................................18, 19

*Equity In Athletics, Inc. v. Dep't of Educ.*,
  639 F.3d 91 (4th Cir. 2011) ...................................................................26

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1989) .................................................................................5

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ...................................................14, 17, 18

*Kelley v. Bd. of Trs.*,
  35 F.3d 265 (7th Cir. 1994) ...................................................................26

*Kleczek v. R. I. Interscholastic League, Inc.*,
  612 A.2d 734 (R.I. 1992) .......................................................................17

*McCormick ex. rel. McCormick v. Sch. Dist. of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004) .....................................................5, 6, 7, 11

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ...............................................................................26

*Neal v. Bd. of Trustees of Cal. State Univs.*,
  198 F.3d 763 (9th Cir. 1999) ...................................................................9

iii

*O'Connor v. Bd. of Educ. of Sch. Dist. 23*,
  449 U.S. 1301 (1980) ...................................................................... 7

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
  667 F.3d 910 (7th Cir. 2012) ..................................................... 9, 12

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ....................................................................... 19

*United States v. Virginia*,
  518 U.S. 515 (1996) .................................................................... 9, 26

*Williams v. Sch. Dist. of Bethlehem*,
  998 F.2d 168 (3d Cir. 1993) .......................................................... 22

**Regulation**

34 C.F.R. § 106.41 ............................................................. 7, 13, 16, 24

**Statutes**

20 U.S.C. § 1681 .................................................................... 5, 12, 13

42 U.S.C. § 2000e-2 ............................................................................ 3

Pub. L. No. 93-380, § 844, 88 Stat. 484.......................................... 6

West Virginia Code § 18-2-25d.................................................... 2

**Other Authorities**

The Associated Press,
  *Civil rights probe opened into transgender athlete policy*,
  NBC News (Aug. 9, 2019) ............................................................ 25

Zuri Berry,
  *In Massachusetts, Boys Playing on Girls Teams Causes a*
  *Ruckus*, MaxPreps (Jan. 10, 2012) ........................................... 23

Jennifer C. Braceras,
  *FACT CHECK: Can Transgender Athletes Eliminate
  The Male Athletic Advantage By Suppressing Testosterone?*,
  Indep. Women's Forum (Jan. 13, 2022)................................................9

Doriane Lambelet Coleman,
  *Sex in Sport*, 80 Law & Contemp. Probs. 63 (2017)...........6, 10, 11, 12

Mike Cullity,
  *Equal Rights vs. Title IX*, ESPN (June 15, 2012) ...............................22

Tom Daykin,
  *This Milwaukee hockey facility doesn't need ice - just girl power*,
  Milwaukee J. Sentinel (Feb. 7, 2017) ..................................................21

Tom Fargo,
  *Coalition takes field hockey concerns to State House*,
  Bos. Herald (Jan. 23, 2020)..................................................................22

Beverly Hallberg & Riley Gaines,
  *Riley Gaines: Why Competing Against Lia Thomas Isn't Fair to
  Female Swimmers*, Indep. Women's Forum (Apr. 22, 2022)...............10

Indep. Women's Forum & Indep. Women's Law Ctr.,
  *Competition: Title IX, Male-Bodied Athletes, and the
  Threat to Women's Sports* (2021) ....................................................8, 19

Tim Layden,
  *Is it fair for Caster Semenya to compete against women
  at the Rio Olympics?*, Sports Illustrated (Aug. 11, 2016)......................8

Nancy Leong, *Against Women's Sports*,
  95 Wash. U. L. Rev. 1251 (2018) ........................................................24

Letter from Riley Gaines, to Gov. Charlie Baker,
  President, Nat'l Collegiate Athletic Ass'n (Jan. 5, 2023)..............10, 11

Rick Reilly, *Not Your Average Skirt Chaser*,
  Sports Illustrated (Nov. 26, 2001) .......................................................22

Robin Ryle,
    *Opinion, The Case of Transgender Athletes. Why Sports*
    *Aren't Fair and That's OK*, Newsweek (Feb. 17, 2021)........................23

Elizabeth Sharrow,
    *Five States Ban Transgender Girls From Girls' School*
    *Sports. But Segregating Sports By Sex Hurts All Girls*,
    Wash. Post (Apr. 16, 2021) .................................................................23

Caleb R. Trotter,
    *Approaching 50 Years: Title IX's "Competitive Skill"*
    *Exception to the Prohibition on Single-Sex Sports*,
    10 Miss. Sports L. Rev. 153 (2021) ....................................................26

USA Field Hockey,
    *Massachusetts Interscholastic Athletic Association*
    *Sanctions Boys High School Field Hockey*,
    TeamUSA.org (June 1, 2021)........................................................22, 23

Kaylee McGee White,
    *The Women Who Lost to Lia Thomas*, Indep. Women's Forum
    (Mar. 21, 2022) ...................................................................................11

Women's Sports Found.,
    *50 Years of Title IX* (2022) ...............................................................19

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[1]

Appellants' proposed interpretation of Title IX and the Equal Protection clause poses an existential threat to female athletics, the prospect of which is of significant concern to *amicus* Independent Women's Law Center (IWLC). IWLC is deeply concerned that, if courts and agencies adopt a "but-for" test for discrimination under Title IX and its athletic regulations, they will establish a regime that not only discriminates against females in contravention of the plain text and purposes of that statute but, ultimately, threatens the very existence of single-sex sports.

Indeed, allowing even a single male to compete in women's sports can take numerous opportunities from women and girls—not only opportunities to win, but also opportunities for roster spots, playing time, leadership roles, and scholarships. This is not fair. It is discriminatory.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties except for Defendant-Appellee the West Virginia Secondary School Activities Commission consented to the filing of this brief, which is accompanied by a motion for leave to file.

And it violates the very statute that Appellants argue requires such a result.

It also contravenes the mission of IWLC, which is a project of Independent Women's Forum (IWF), a nonprofit, non-partisan 501(c)(3) organization founded by women to foster education and debate about legal, social, and economic policy issues. IWF promotes access to free markets and the marketplace of ideas and supports policies that expand liberty, encourage personal responsibility, and limit the reach of government, especially on matters of particular concern to women. IWLC supports this mission by advocating for equal opportunity, individual liberty, and women's sex-based rights.

IWLC writes to describe the public interest in single-sex sports, to detail the harms caused by this Court's injunction against West Virginia Code § 18-2-25d(c)(1) ("Sports Act"), and to explain how reversal would undermine the legal rationale for any single-sex athletic teams.

## SUMMARY OF ARGUMENT

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from "fir[ing] someone simply for being . . . transgender." *Id.* at 1737. That is the case, the Court held, because "[a]n employer who fires an individual for being . . . transgender fires that person for traits or actions it would not have questioned in members of a different sex" and thus violates Title VII's prohibition on sex discrimination in employment. *Id.* at 1737.[2]

In this case, the Court is confronted by a question nowhere presented—much less resolved—in *Bostock*: Does the prohibition of discrimination "on the basis of sex" in Title IX and its athletic regulations ban educational institutions from separating teams by biological sex and from forbidding male-bodied athletes from competing on teams designated for women or girls? For the reasons explained below and by

---

[2] This brief uses the term "sex" to refer to one's biological sex recognized at birth. It uses the term "woman" to mean an adult human female, and the term "female" to mean the biological sex that produces ova or eggs. It uses the phrase "male-bodied athlete" to clarify the sex of a biological male (trans-identified or not) who is competing (or seeking to compete) on a women's team.

Appellees, the district court correctly concluded that neither the Equal Protection Clause nor Title IX bans single-sex teams or requires schools to allow male-bodied athletes to compete on female teams.

There is no question that allowing a male-bodied athlete to take a roster spot from a female harms the female athlete. Even on no-cut teams, female athletes lose out when coaching resources and playing time that would otherwise be devoted to them are directed toward males. Thus, a decision prohibiting institutions from taking biological sex into account when structuring athletic programs reduces numerous athletic opportunities for biological women and girls. In the long run, moreover, such a decision undermines the legal justification for maintaining any sex-specific athletic teams, threatening the very existence of women's sports.

This Court should affirm the decision below, which allowed West Virginia to ensure that equal opportunities are provided to female athletes.

## ARGUMENT

### I.   Title IX Was Enacted To Increase Opportunities For Women and Girls, Not To Reduce Them.

More than fifty years ago, Congress enacted the landmark sex equality law Title IX. Part of the Education Amendments of 1972, Title IX bans sex discrimination in all federally funded education programs. It states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Congress passed Title IX to end unjust sex discrimination in education and to expand educational opportunities for women and girls. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1989) (one of Title IX's principal objectives was "[t]o avoid the use of federal resources to support discriminatory practices"); *McCormick ex. rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286, 295 (2d Cir. 2004) ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities"). But Congress did *not* pass this landmark protection to force females to compete for resources and playing time against male-

5

bodied athletes, trans-identified or not, who have inherent physical advantages and have long had abundant athletic opportunities.

## A. Title IX Remedies the Historical Denial of Opportunities for Biological Women and Girls in Sports.

There is no question that "girls and women were historically denied opportunities for athletic competition based on stereotypical views that participating in highly competitive sports was not 'feminine' or 'ladylike.'" *Id.* at 295; *see also* Doriane Lambelet Coleman, *Sex in Sport*, 80 Law & Contemp. Probls. 63, 84 (2017) ("In the beginning, females were classified out of sport—that is, they were excluded entirely because of sex.") [hereinafter "*Sex in Sport*"]. Accordingly, although Title IX originally made no mention of athletics, Congress in 1974 passed an amendment directing the Department of Health, Education, and Welfare to issue regulations implementing Title IX in "intercollegiate athletic activities." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612. Those regulations generally provide that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be

discriminated against in any interscholastic, intercollegiate, club or intramural athletics." 34 C.F.R. § 106.41(a).

The regulations then go on to expressly permit single-sex teams. For non-contact sports, institutions "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill." *Id.* § 106.41(b); *see also O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307–08 & n.5 (1980) (Stevens, J., in chambers) (refusing to vacate a stay that prohibited female student from trying out for boys' basketball team where school also had a girls' team). For contact sports, sex-based exclusions are permitted even where the school does not offer a team for the excluded sex. 34 C.F.R. § 106.41(b).

Whatever choices an educational institution makes, the regulations require it "to provide equal athletic opportunity for members of both sexes." *Id.* § 106.41(c). That requirement is not limited solely to the opportunity to play. *See id.* (citing factors Department of Education will consider in evaluating program). As the Second Circuit has recognized, because "[a] primary purpose of competitive athletics is to strive to be the best," Title IX requires that schools provide girls with the same "chance to be champions" they provide boys. *McCormick*, 370 F.3d at 294–95.

7

**B.    Single-Sex Teams Are Critical to Providing Biological Girls and Women Opportunity in Sports.**

The premise behind sex-specific sports is the simple scientific reality that, on average, males are stronger, faster, and more powerful than females. *See* Indep. Women's Forum & Indep. Women's Law Ctr., *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports* 17–18 (2021) (providing detailed overview of the scientific literature on the significant and enduring nature of the male-female athletic gap) [hereinafter *Competition*], available at https://www.iwf.org/competition-report/.[3] In fact, research confirms that, overall, "[t]here is [a] 10 to 12% difference between male and female athletic performance."[4] Studies also make clear that testosterone

---

[3] The male-female athletic differential is not the result of human variation between top athletes and non-athletes. Nor is it the result of socialization, unequal opportunity, or lack of funding. Rather, the male-female athletic gap is almost entirely the result of biology. *See Competition* at 17.

[4] Tim Layden, *Is it fair for Caster Semenya to compete against women at the Rio Olympics?*, Sports Illustrated (Aug. 11, 2016), https://tinyurl.com/jh5mazht.

8

suppression cannot completely eliminate the gap or the male athletic advantage.[5]

Given the "enduring" "[p]hysical differences between men and women," *United States v. Virginia*, 518 U.S. 515, 533 (1996), female athletes will not have the same "chance to be champions" if forced to compete against male-bodied athletes. Title IX and its regulations thus play a crucial role in leveling the proverbial "playing field" by adopting a binary approach to athletics that explicitly contemplates separate teams for males and females.

And this binary approach has worked. It has "chang[ed] society's view of female athletes" by "showcas[ing] their athletic ability and competitiveness." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012). It has fostered the "realization by many that women's sports [can] be just as exciting, competitive, and lucrative as men's sports." *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

---

[5] Jennifer C. Braceras, *FACT CHECK: Can Transgender Athletes Eliminate The Male Athletic Advantage By Suppressing Testosterone?*, Indep. Women's Forum (Jan. 13, 2022), https://tinyurl.com/yfz4388b.

But all that progress risks being unraveled if female-bodied athletes must compete against male-bodied athletes. Such a "sex blind" or open-sport approach would have "the perverse effect of enabling non-elite boys and men to win spots and championships from elite girls and women."[6]

The experience of 12-time All-American and 5-time SEC Champion swimmer Riley Gaines confirms these dangers.[7] Gaines competed against Lia Thomas, a male-bodied athlete who swam on the men's team at the University of Pennsylvania for three years before coming out as transgender and competing on the women's team, skyrocketing to win the national championship in the NCAA Division I women's 500-yard freestyle.[8] In the 200-yard freestyle, 5'6" Gaines beat the odds to tie 6'4" Thomas—down to a hundredth of a second—for 5th place.[9] But Riley was

---

[6] *Sex in Sport* at 97.

[7] Letter from Riley Gaines, to Gov. Charlie Baker, President, Nat'l Collegiate Athletic Ass'n (Jan. 5, 2023), available at https://tinyurl.com/mv9ez7eu (hereinafter "Letter").

[8] *Id.*

[9] Beverly Hallberg & Riley Gaines, *Riley Gaines: Why Competing Against Lia Thomas Isn't Fair to Female Swimmers*, Indep. Women's Forum (Apr. 22, 2022), https://tinyurl.com/yf7m8wfr.

told that Thomas would receive the 5th place trophy at the award ceremony for "photo purposes."[10]

Riley was not the only female swimmer to be deprived of the honors she earned that day. Other women lost opportunities to compete and receive medals, including 5th-year senior and former finalist Reka Gyorgy, who placed 17th and thus lost a final spot to Thomas, and 9th-place finisher Tylor Mathieu who was likewise excluded from the final and thus prevented from becoming an All-American.[11] As Gyorgy explained, every event a male-bodied athlete competed in "was one spot taken away from biological females."[12]

Even putting aside championships—although Title IX requires that girls have equal access to these, too, *see McCormick*, 370 F.3d at 294–95—a decision to allow *any* male-bodied athlete to join a girls' or women's team would obviously take away playing time and resources that would otherwise be devoted to female players.[13] Female "athletic ability" and

---

[10] Letter, *supra* note 7.

[11] Kaylee McGee White, *The Women Who Lost to Lia Thomas*, Indep. Women's Forum (Mar. 21, 2022), https://tinyurl.com/3v26a2ry.

[12] *Id.*

[13] *See Sex in Sport* at 97–98 & nn.173–76.

"competitiveness" would be showcased no longer, undermining the decades of progress Title IX has achieved. *Parker*, 667 F.3d at 916. Maintaining single-sex teams is thus vital to preserving opportunities for women and girls to excel.

## II. Interpreting Title IX To Prohibit Discrimination In Athletics on the Basis of Gender Identity Contradicts the Express Language of the Statute and Regulations and Inevitably Harms Female Athletes.

Title IX prohibits discrimination "on the basis of" a single characteristic: "sex." To imbue Title IX with extratextual "sex blind" requirements based on "gender," "gender identity," or any other trait not mentioned in the statute would collapse the regulatory scheme in on itself. After all, Title IX was created in response to pervasive discrimination against biological females—not as scaffold-legislation for new gender identity constructs.

### A. Title IX Is Premised on a Binary Concept of Biological Sex.

Title IX and its accompanying regulations adopt a biological and binary definition of sex. *See* 20 U.S.C. § 1681(a); *Sex in Sport* at 69 n.29. Indeed, immediately after prohibiting discrimination on the basis of "sex," the statute goes on to refer to "both sexes," 20 U.S.C. § 1681(a)(2),

a phrase that would make no sense if the term "sex" were being used to describe the range of identifications included within the concept of gender identity.

The statute likewise refers to "Men's" and "Women's" organizations, "the membership of which has traditionally been limited to persons of one sex," 20 U.S.C. § 1681(a)(6)(B), and requires that, if opportunities "are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of *the other sex*," *id.* § 1681(a)(8) (emphasis added). The regulations governing sports are in accord. *See* 34 C.F.R. § 106.41(c) (requiring institutions to "provide equal athletic opportunity for members of both sexes"); *see also id.* § 106.41(b) (referring to members of the "excluded sex," singular). There can be no question, therefore, that a state law requiring that athletic teams sponsored by public secondary schools or state institutions of higher education be expressly designated as either male, female or coed, based on biological sex, is in compliance with the Title IX, so long as equal athletic opportunities are available to those athletes affected by the law. *See* W. Va. Code § 18-2-25d(c)(1).

13

As shown below, applicable precedent does not hold otherwise. Both the Supreme Court's decision in *Bostock* and this Court's decision in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) are inapposite.

**B.    Although *Bostock* Did Not Address the Question Presented Here, It Reinforces Title IX's Binary Concept of Sex.**

*Bostock* raised the question whether discrimination based on transgender status constituted discrimination on the basis of sex as that term is used in Title VII. *Bostock*, 140 S. Ct. at 1737. But this case concerns a different question: whether designating a student's participation on a sports team based on biological *sex* necessarily entails discrimination based on transgender status. Those are not the same issues. The law excludes B.P.J. from the girls' cross-country and track teams not because B.P.J. is transgender but because B.P.J. is a male-bodied athlete.

In addition, the Court in *Bostock* did *not* define sex to mean anything other than biological sex at birth. To the contrary, it proceeded on the assumption that the term "refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739; *see also id.* at 1746–47

14

("agree[ing] that homosexuality and transgender status are distinct concepts from sex").

The Court reasoned, however, that because discrimination against a trans-identified employee requires awareness of the employee's sex at birth (in comparison to that employee's gender identity or mode of gender expression at work), discrimination against that employee *is* sex discrimination prohibited by Title VII. *Id.* at 1741 (employer violates statute when it "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth"). The Court explained that an employer who fires a person for being trans-identified does so "for traits or actions it would not have questioned in members of a different sex." *Id.* at 1737. The Court thus understood the trans-identified employee as belonging to "a different sex" than the one with which the employee identified. *Id.* Under *Bostock,* sex and gender identity simply are not equivalent.

The Supreme Court's analysis in *Bostock* is, in any event, inapplicable in this case, because it dealt with an entirely different statute. *Bostock* interpreted Title VII, which governs discrimination in the workplace and establishes that "[a]n individual employee's sex is not

15

relevant to the selection, evaluation, or compensation of employees." 140 S. Ct. at 1741 (internal quotation marks and citation omitted). The Court here is asked to interpret Title IX, which governs discrimination in educational programming, including athletics. And when it comes to athletics, sex *is* relevant. In fact, it is often dispositive. Title IX, therefore, does not require a sex-blind environment. To the contrary, and as explained above, both Title IX and its regulations explicitly refer to sex in a binary way. Title IX's athletic regulations contemplate that schools will offer—and need to offer—separate sex-based teams in order to comply with the requirement that they provide *equal* athletic opportunities for *both* sexes. *See* 34 C.F.R. § 106.41(b)–(c). Precisely because of the biological differences that warrant different treatment of women and men, Title IX's regulations permit men and women to be treated differently.

The significant differences between Title VII and Title IX mean that, when it comes to athletic opportunities, differentiating between the two sexes is not prohibited discrimination. As the Supreme Court has held, "[d]iscrimination" in the legal sense involves treating "similarly situated" people differently. *Bostock*, 140 S. Ct. at 1740. As Title IX

16

recognizes, however, different treatment of the sexes is warranted when it comes to athletics because the two sexes are *not* similarly situated. *Bostock'*s conclusion that employment discrimination against a trans-identified person "necessarily entails discrimination based on sex" under Title VII, *id.* at 1747, is inapplicable to the athletics governed by Title IX, where males and females are not similarly situated. *See Kleczek v. R. I. Interscholastic League, Inc.*, 612 A.2d 734, 738 (R.I. 1992) ("Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition."); *cf. Bauer v. Lynch,* 812 F.3d 340, 350 (4th Cir. 2016) ("Men and women simply are not physiologically the same for the purposes of physical fitness programs"). Indeed, if the Sports Act's providing for single-sex sports teams constitutes unlawful sex discrimination, then Title IX's regulations are equally discriminatory.

## C. *Grimm*'s Holding Does Not Apply to This Case.

This Court's decision in *Grimm* does not change the analysis. *Grimm* relied on *Bostock*'s reasoning that discrimination on the basis of transgender status necessarily includes discrimination on the basis of sex. *Grimm*, 972 F.3d at 616. But, like *Bostock*, *Grimm* did not face the converse question of whether designating sports teams based on

17

biological sex constitutes discrimination on the basis of transgender status. Furthermore, this Court recognized in *Grimm* that "[i]n the Title IX context, discrimination means treating [an] individual worse than others who are similarly situated." *Id.* at 618 (cleaned up). As this Court has long recognized, in the context of athletics, biological men and biological women "simply are not physiologically the same," and thus are not similarly situated, *Bauer*, 812 F.3d 340, 350 (4th Cir. 2016), rendering *Grimm* inapplicable to the question of sports.

The *Grimm* court also noted the possibility—but did not decide— that *Bostock*'s Title VII theory of sex-stereotyping could be imported into Title IX in the context of public-school restrooms. *Grimm*, 972 F.3d at 617 n.15. Regardless of the merits of the sex-stereotyping theory for that question, it does not apply in the context of athletics.

To the contrary, the Supreme Court has explained that Title VII forbids sex stereotyping because it is an "irrational impediment[] to job opportunities." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978). Thus, "employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females," because those stereotypes are "fictional difference[s]" irrelevant

18

to work. *Id.* at 707; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group."), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107(a), 105 Stat. 1071 (codified at 42 U.S.C. § 2000e–2(m) (2012)).

On the other hand, the biological differences between men and women that undergird Title IX's athletic regulations are neither "fictional" nor "irrational." *See Competition* 17–31 (describing physiological differences in males and females and summarizing the scientific literature on the male athletic advantage). Ensuring that single-sex teams exist for women, as the Sports Act does, is not sex stereotyping. It is a recognition of science and an attempt to implement Title IX, the goal of which was to increase opportunities for females.[14]

---

[14] In that regard, the success of Title IX and its athletic regulations cannot be overstated. Prior to the passage of Title IX, only one in 27 high school girls participated in organized sports. By 2018, three in five participated. *See* Women's Sports Found., *50 Years of Title IX* (2022), https://tinyurl.com/wccu4865. Only 31,852 women played college sports during the 1971-72 school year. During the 2019-20 school year, the number of female college athletes reached 221,212. *Competition* at 6.

19

III. **Appellants' Proposed Disposition Would Take Opportunities Away from Women and Girls and Threaten the Very Existence of Single-Sex Sports.**

As explained above, *Bostock* does not apply to athletics under Title IX because male and female athletes are not similarly situated. Any decision to reverse the district court and apply *Bostock*'s analysis to athletics will have far-reaching implications and jeopardize Title IX's purpose: providing equal opportunities in athletics for female athletes.

A. **Applying *Bostock*'s But-For Test to Athletics Would Open Up Women's Sports to All Males, Not Just Those Who Identify as Women.**

In *Bostock*, the Supreme Court held that an employment decision that would have been made differently "but for" an employee's biological sex discriminates in violation of Title VII. 140 S. Ct. at 1742. Applying that test to athletics under Title IX would call into question not just individual coaching decisions about particular players, but the existence of single-sex teams altogether. That is because a coach who decides that an otherwise qualified male athlete cannot play on a women's team is clearly making a decision that would have been different "but for" the student's sex, which *Bostock* forbids.

20

Suppose, for example, that a male student who is cut from the men's lacrosse team then tries out for the women's team and demonstrates that he is a better player than any of the female students. The application of *Bostock* to Title IX would forbid a coach from denying a roster spot to the athletically superior male player simply because he is male, all at the expense of the very biological girls and women Title IX is designed to protect.

This scenario has already occurred in sports such as field hockey, where schools tend not to offer men's teams. Schools initially created many of these programs to increase opportunities for female athletes, so as to comply with Title IX.[15] But now some of those same teams have been forced to include males. In Massachusetts, for example, schools have been obligated to allow boys to participate on girls' field hockey teams if the schools do not offer a corresponding team for boys. Allowing males to compete on those teams has raised alarm among parents, officials, and coaches alike, not to mention the female players who have been injured

---

[15] See Tom Daykin, *This Milwaukee hockey facility doesn't need ice - just girl power*, Milwaukee J. Sentinel (Feb. 7, 2017), https://tinyurl.com/yta9dcyp (explaining that "[s]everal universities added field hockey as a women's sport after Title IX").

or reported feeling "scared" when forced to compete against physically larger and stronger male athletes.[16] In the 2010 Western Massachusetts Division I title game, for example, a male player scored the winning goal "on a late breakaway, colliding at full speed" with the female goaltender, who experienced a concussion on the play and suffered from severe headaches for about six months thereafter.[17] The problems caused by males playing on girls' teams were so acute that last year the Massachusetts Interscholastic Athletic Council ratified a vote to approve Boys High School Field Hockey, although schools will still have to field mixed-sex teams if they do not have teams for each sex.[18]

---

[16] Rick Reilly, *Not Your Average Skirt Chaser*, Sports Illustrated (Nov. 26, 2001), https://tinyurl.com/2p97z75v (quoting one female field hockey player as stating, after playing against a male, 220-pound former football lineman: "I was scared . . . . I don't think he has a right to come into our game and make us scared."); *see* Tom Fargo, *Coalition takes field hockey concerns to State House*, Bos. Herald (Jan. 23, 2020) (describing coalition of parents, coaches, and officials seeking to change rules governing boys' participation in girls' field hockey), https://tinyurl.com/nhht2ct6; *see also Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 169–70, 176–77 (3d Cir. 1993) (remanding for fact-finding on Title IX, Equal Protection, and Pennsylvania Equal Rights Amendment challenges to school's attempt to bar male plaintiff from playing on girls' field hockey team).

[17] Mike Cullity, *Equal Rights vs. Title IX*, ESPN (June 15, 2012), https://tinyurl.com/25wemr4p.

[18] USA Field Hockey, *Massachusetts Interscholastic Athletic Association Sanctions Boys High School Field Hockey*, TeamUSA.org

As explained above, neither Title IX nor the Equal Protection clause require the dismantling of single-sex teams. Yet a growing number of women's sports abolitionists seek to accomplish just that. Opponents of single-sex sports argue that separate men's and women's athletic teams constitute a form of segregation that damages women and girls.[19] Women's sports abolitionists believe that allowing males and females to compete in separate divisions reinforces pernicious stereotypes about male and female abilities and perpetuates the presumption that sex is binary.[20] For these activists, the inclusion of transgender athletes on

---

(June 1, 2021), https://tinyurl.com/ycktrxec. Girls' swim teams have similarly been required to include male athletes, one of whom broke a female record that had previously stood for decades. See Zuri Berry, *In Massachusetts, Boys Playing on Girls Teams Causes a Ruckus*, MaxPreps (Jan. 10, 2012) (quoting holder of girls' record broken by boy as stating: "I have held the south sectional 50 freestyle record for 26 years. That is a very long time. It's time that that record be broken. But broken by a talented swimmer who is a girl."), https://tinyurl.com/bdftw3m8.

[19] *See, e.g.,* Elizabeth Sharrow, *Five States Ban Transgender Girls From Girls' School Sports. But Segregating Sports By Sex Hurts All Girls*, Wash. Post (Apr. 16, 2021) (arguing that single-sex teams reinforce gender stereotypes and arguing in favor of open-sport), https://tinyurl.com/2p9y723b.

[20] See, e.g., Robin Ryle, *Opinion, The Case of Transgender Athletes. Why Sports Aren't Fair and That's OK*, Newsweek (Feb. 17, 2021), https://tinyurl.com/3u7cmrzr (asserting that "sports remain one of the last strongholds for the cult of gender differences" and suggesting that sex is not a meaningful category when it comes to competitive sport);

single-sex teams is not an end in itself; rather, it is a vehicle for getting rid of single-sex sports in their entirety. Applying *Bostock*'s but-for test to sports will help them achieve this radical objective.

**B.    A Ruling for Appellants Will Impose Conflicting Legal Obligations on Athletic Associations and Schools.**

In short, the district court's interpretation of Title IX allows educational institutions that receive federal funding to provide equal athletic opportunities to both sexes, even if athletic distinctions are sex-based. Reversing that ruling would prevent such institutions from making any sex-based distinctions at all, regardless of whether such distinctions are relevant to important educational interests. Under Appellants' proposed interpretation, schools will be required to allow athletes who were born male to compete on women's teams without restriction or exception. And yet, Title IX and its athletic regulations still require that schools provide equal athletic opportunities for "both sexes." 34 C.F.R. § 106.41 (c). How can schools with limited budgets, roster spots, and scholarship money possibly satisfy both obligations? They cannot.

---

Nancy Leong, *Against Women's Sports*, 95 Wash. U. L. Rev. 1251, 1251 (2018).

24

Nor can the Department of Education enforce Title IX in a way that both ensures equal athletic opportunity for biological females and the inclusion of trans-identified, male-bodied athletes. For example, the Department's Office for Civil Rights opened an investigation into whether Connecticut's policy allowing male-bodied athletes to participate in women's track discriminates against female athletes.[21] Title IX cannot both require that athletic associations provide equal athletic opportunities for biological males and females *and* prohibit athletic associations from excluding male-bodied athletes from female teams and competitions. The statute can do one or the other, not both.

### C. A Ruling for Appellants Would Eradicate the Constitutional Basis for Title IX's Single-Sex Teams.

Equating "sex" with "gender identity" under Title IX's athletic regulations threatens single-sex sports in an additional way. As one commenter has noted, "the very constitutional basis for allowing differential treatment on the basis of sex (so long as the proper scrutiny is applied and satisfied) hinges on there being physical differences

---

[21] The Associated Press, *Civil rights probe opened into transgender athlete policy*, NBC News (Aug. 9, 2019), https://tinyurl.com/mr2fkxua.

25

between the sexes."[22] Title IX's provisions separating men's and women's sports teams are based on those differences and have been repeatedly held constitutional because they were designed to "remov[e] the legacy of sexual discrimination—including discrimination in the provision of extra-curricular offerings such as athletics." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011) (quoting *Kelley v. Bd. of Trs.*, 35 F.3d 265, 272 (7th Cir. 1994)). Because Title IX "directly protects the interests of the disproportionately burdened gender, it passes constitutional muster." *Kelley*, 35 F.3d at 272 (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982)).

If, however, the Court were to accept the argument that there is no difference under Title IX between biological girls and male-bodied, trans-identified athletes, that would severely undermine, if not eradicate, the constitutional basis for single-sex teams. Under those circumstances, the regulatory exception permitting such teams could no longer be justified as based upon the "enduring" "[p]hysical differences between men and women." *Virginia*, 518 U.S. at 533. Nor would the regulations "directly

---

[22] Caleb R. Trotter, *Approaching 50 Years: Title IX's "Competitive Skill" Exception to the Prohibition on Single-Sex Sports*, 10 Miss. Sports L. Rev. 153, 169 (2021).

protect the interests" of girls and women, who will lose playing time, resources, and championships to male-bodied counterparts. Yet all of that is necessary for Title IX to remain constitutionally justified under current precedent.

The district court's decision was consistent with that framework and serves the public interest in protecting equal athletic opportunity for women. A contrary ruling would threaten the progress girls and women have taken decades to make under Title IX.

## CONCLUSION

Title IX and its implementing regulations have done a world of good for females seeking athletic opportunities on par with those offered to males. Nothing in the text of those provisions or applicable precedent requires that those opportunities be offered on a sex-blind basis, to the detriment of the girls and women whom the statute was designed to advance. The district court correctly held that the law "furthers, not violates, Title IX," and that the law "is substantially related to the important government interest of providing equal athletic opportunities for females." *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 WL 111875, at *8, *9 (S.D. W.Va. 2023). Reversal would be error, and it

would also disregard the public interest in single-sex sports and the harm done by enjoining application of the Sports Act.

This Court should dissolve the injunction and affirm the decision of the district court.

Dated: May 3, 2023

Respectfully submitted,

*s/ Gene C. Schaerr*

Gene C. Schaerr
  *Counsel of Record*
Cristina Martinez Squiers
Annika Boone Barkdull*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

Jennifer C. Braceras
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
jennifer.braceras@iwf.org

*Counsel for* Amicus Curiae
*Independent Women's Law Center*

*Not yet admitted in D.C.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because it contains 5,353 words, excluding the portions exempted by Fed. R. App. 32(f). The brief's typesize and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font.

Dated: May 3, 2023

*s/ Gene C. Schaerr*
Gene C. Schaerr