IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1078 (L)
(2:21-cv-00316)

B.P.J., by her next friend and mother; HEATHER JACKSON
*Appellants*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON
COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY
SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his
official capacity as State Superintendent; DORA STUTLER, in her official
capacity as Harrison County Superintendent
*Defendant-Appellees,*

and THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD
*Intervenors-Appellees*

.

**BRIEF *AMICUS CURIAE* OF
22 BUSINESS EXECUTIVES IN SUPPORT OF
INTERVENORS-APPELLEES**

Reese R. Boyd, III, Esq.
Davis & Boyd LLC
Post Office Box 70517
Myrtle Beach, SC 29572
(843) 839-9800
(843) 839-9801 (fax)
reese@davisboydlaw.com

May 3, 2023

i

# Table of Contents

Table of Contents ........................................................... ii

Table of Authorities ...................................................... iii

Corporate Disclosure Statement ................................... v

Interests of the *Amici Curiae* ............................................ 1

Summary of Argument .................................................... 3

Argument ........................................................................ 4

I.    School athletic *particpation* is highly corelated with success in the labor market ................................. 4

II.    Records of athletic *accomplishment* are also correlated with labor market success. ........................ 7

III.    The predictable effect of the records on the athletes' academic and labor market value supports the state's interests .................................................... 10

IV.    Intervenors' position ensures that men and women's sports are treated equally with respect to participation and accomplishment. ........................... 11

Addendum A – List of Individual *Amici* ........................... 16

Addendum B - Certificates ............................................ 18

## Table of Authorities

### Cases

*Chang* v. *Univ. of Rhode Island*, 606 F. Supp. 1161, 1256 (D.R.I. 1985) -------- 12

*Tuan Anh Nguyen* v. *INS*, 533 U.S. 53, 60 (2001) ---------------------------------- 10

### Statutes

20 U.S.C. § 1681 ------------------------------------------------------------------------11

W. VA. CODE § 18-2-25d -----------------------------------------------------------------11

### Other Authorities

Betsey Stevenson, *Beyond the Classroom: Using Title IX to Measure the Return to High School Sports*, 92 Rev. Econ. & Stat., at 284-301 (2010) ------------------- 6

Bradley T. Ewing, *Athletes and Work*, Econ. Letters, Apr. 1998, at 113 --------- 5

Bradley T. Ewing, *The Labor Market Effects of High School Athletic Participation: Evidence from Wage and Fringe Benefit Differentials*, J. Sports Econ., Jun. 2007, at 255–265 ----------------------------------------------------- 5

Daniel Bowen & Jay Greene, *Does Athletic Success Come at the Expense of Academic Success?,* J. Res. in Educ., Fall 2012, at 2-23 ---------------------------- 8

Ernst & Young, *How can winning on the playing field prepare you for success in the boardroom?* March 2020 ----------------------------------------------------------------- 9

Gallup, Inc., A Study of NCAA Student-Athletes: Undergraduate

    Experiences and Post-College Outcomes (2020)----------------------------------8

John M. Barron, Bradley T. Ewing & Glen R. Waddell, *The Effects of High*

    *School Athletic Participation on Education and Labor Market Outcomes*, 82 Rev.

    Econ. & Stat., at 409-421 -----------------------------------------------------------5

Kevin Kniffin, Brian Wansink, & Mitsuru Shimizu, *Sports at Work: Anticipated*

    *and Persistent Correlates of Participation in High School Athletics*, J.

    Leadership & Organizational Stud.*,* May 2015 at 217–230 (2015) -------------4

<u>REGULATIONS</u>

34 C.F.R. § 106.41(c)(1), (10)-------------------------------------------------------- 11, 13

# CORPORATE DISCLOSURE STATEMENT

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1078__      Caption: __BPJ v. West Virginia State Board of Education__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Busienss Executive Amici__
(name of party/amicus)

_____

who is _____amici_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?   ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
   If yes, identify all such owners:

12/01/2019 SCC      - 1 -

v

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO

If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO

If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO

If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO

If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Reese R. Boyd, III, Esq.       Date: May 2, 2023

Counsel for: amici

- 2 -

**Print to PDF for Filing**    **Reset Form**

vi

### Interests of the *Amici Curiae*[1]

The *amici* are 22 current or retired business executives, listed at Addendum A. They have significant experience in American business leadership and hiring practices. As executives, they represent a wide range of experience and industries. They are each familiar with the hiring practices of their employers and their industries, and with the skills and acumen necessary to succeed in competitive business.

These *amici* are also familiar with the role that records of athletic participation and accomplishment play in hiring decisions. Records of athletic participation and accomplishment predict labor market success. Achievement

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than the *amici* and their counsel contributed money that was intended to fund preparing or submitting the brief. Pursuant to Fed. R. App. P. 29(a)(3), all of the parties received timely notice, but one party has not not provided consent. Therefore, your *amici* have filed for leave of Court.

under a fair Title IX standard – the standard protected by West Virginia and supported by Intervenors—is a remarkably strong indicator of the skills necessary to lead teams. Therefore, your *amici* have an interest in making sure that athletic records of men and women continue to provide relevant hiring information, and in making sure that the records are set and retained using the same level of fairness for men and women. Your *amici* believe the position of Intervenor Armistead secures this fundamental fairness, and adheres to equal protection.

The *amici* appear here as individuals. While present or past employers are noted to show the *amici's* relevant experience, the statements here are not made on behalf of persons or businesses other than the *amici*.

### Summary of Argument

1. Athletic participation is highly correlated with labor market success and gender equality.

2. Records of athletic accomplishment are also correlated with labor market success.

3. The predictable effect of the records on the athletes' academic and labor market value supports the State's interests.

4. Intervenor Armistead's position ensures that men and women's sports are equally treated with respect to social concerns about transgender athlete participation.

#### Argument

### I.   School athletic *particpation* is highly corelated with success in the labor market.

Academic study after academic study confirms something your *amici* know through experience: participation in high school athletics is correlated with career success.

A 2015 study revealed that hiring managers associate participation in athletics with higher leadership, self-confidence, and self-respect when compared to students who participate in non-athletic extracurricular activities. [2] This data underscores the importance of school athletic activities in preparing young people for future success. The same study also used biodata to show that male varsity athletes continued to have higher-status careers *sixty years* after high school.[3] Varsity athletes also showed more pro-social behaviors, like often volunteering their time.[4]

---

[2] *See* Kevin Kniffin, Brian Wansink, & Mitsuru Shimizu, *Sports at Work: Anticipated and Persistent Correlates of Participation in High School Athletics*, J. Leadership & Organizational Stud.*,* May 2015 at 217–230 (2015).

[3] *Id.*

[4] *Id.*

In another study, this time in 2000, scholars found that athletic participation increases wages and educational attainment.[5]

Yet another study, conducted in 1998, showed that former high school athletes are more likely to be employed in roles associated with more favorable labor market outcomes than non-athletes. Bradley T. Ewing, now a professor at Texas Tech University, published this groundbreaking study, providing invaluable insight into the potential benefits of athletic participation.[6]

In 2007, Professor Ewing went on to find that high school athletes fare better in terms of compensation structure (wages and fringe benefits) than their non-athlete counterparts.[7]

---

[5] *See* John M. Barron, Bradley T. Ewing & Glen R. Waddell, *The Effects of High School Athletic Participation on Education and Labor Market Outcomes*, 82 Rev. Econ. & Stat., at 409-421.

[6] Bradley T. Ewing, *Athletes and Work*, Econ. Letters, Apr. 1998, at 113.

[7] *See* Bradley T. Ewing, *The Labor Market Effects of High School Athletic Participation: Evidence from Wage and Fringe Benefit Differentials*, J. Sports Econ., Jun. 2007, at 255–265.

Title IX helps ensure that women receive these benefits. Betsey Stevenson's 2010 analysis of the effect of Title IX is widely cited by scholars. Professor Stevenson currently teaches at the University of Michigan, and was chief economist for the U.S. Department of Labor from 2010 to 2011.[8] Her study "reveal[ed] that a 10-percentage point rise in state-level female sports participation generates a 1 percentage point increase in female college attendance and a 1 to 2 percentage point rise in female labor force participation. Furthermore, greater opportunities to play sports leads to greater female participation in previously male-dominated occupations, particularly in high-skill occupations."[9]

---

[8] *See* https://fordschool.umich.edu/faculty/betsey-stevenson.

[9] Betsey Stevenson, *Beyond the Classroom: Using Title IX to Measure the Return to High School Sports*, 92 Rev. Econ. & Stat., at 284-301 (2010) (full text available at https://www.nber.org/papers/w15728, last accessed April 27, 2023).

## II. Records of athletic *accomplishment* are also correlated with labor market success.

Your *amici* also observe that records of athletic accomplishment are key to hiring decisions. High school athletics develop skills that predict career success, which increase as athletes compete and succeed at higher levels. Successful records at elite levels in high school often lead to higher levels of competition in college - and can ultimately lead to professional or Olympic competition. These higher levels of competition are directly related to business leadership and executive talent. Especially for elite athletes like Intervenor, proper documentation of their accomplishments can open the door to higher-level jobs.

*Amici's* personal experiences are supported by academic and professional studies. A small but growing number of studies show that records of *higher achievement* or participation at *higher levels* within athletics also affects labor market outcomes. So not only does it matter that a student participates in athletics, the student athlete receives some market benefits from showing athletic wins at higher levels.

For example, a 2020 study conducted by Gallup for the NCAA showed that collegiate athletes fared better on several important outcomes after

college.[10] College athletes were more likely to earn advanced degrees than non-athlete students. And college athletes were slightly more likely to have a good job waiting for them after graduation.[11]

In another example, a 2012 study by Daniel Bowen and Jay Greene explored the relationship between academic success and a high school's success in sports.[12] High schools with more wins correlate with academic achievement, even after controlling for demographics. Instead of detracting students from academics, students in a school focused on athletic achievement can also expect higher performance academically.

Thus, elite success opens doors to elite jobs. These effects are particularly strong for women athletes, who can use the fair playing field of school

---

[10] *See* Gallup, Inc., A Study of NCAA Student-Athletes: Undergraduate Experiences and Post-College Outcomes (2020), at 3 (available at https://www.gallup.com/file/education/312941/NCAA%20Student-Athlete%20Outcomes.pdf).

[11] *Id.*

[12] Daniel Bowen & Jay Greene, *Does Athletic Success Come at the Expense of Academic Success?,* J. Res. in Educ., Fall 2012, at 2-23 (full text available at https://eric.ed.gov/?id=EJ1098405).

8

athletics to show competitive success. From 2013 to 2016, corporate services firm Ernst & Young worked with male and female corporate leaders to study the effects of participation and success on the careers of women athletes.[13] They report an "undeniable correlation between athletic and business success." In their survey, 94% of women executives had some background in sports, and over half had participated at university levels. 80% of women Fortune 500 executives had played competitive sports. 74% of all executives believed playing sports helped a woman progress faster.[14] The records of achievement are predictably, undeniably linked to corporate success.

_____

[13] *See* Ernst & Young, *How can winning on the playing field prepare you for success in the boardroom?* March 2020 (available at https://www.ey.com/en_us/women-fast-forward/how-can-winning-on-the-playing-field-prepare-you-for-success-in-the-boardroom, last accessed April 27, 2023)

[14] *Id.*

### III. The predictable effect of the records on the athletes' academic and labor market value supports the state's interests.

Experts generally agree that involvement in athletic activities is linked to improved academic and professional success. Therefore, denying female athletes access to women's athletics would harm them. The Intervenors argued to the Supreme Court that equal protection requires that any differentiation based on sex must serve an "important" government "objective[]" and that the "means" used must be "substantially related[] to" the State's goal. *Tuan Anh Nguyen* v. *INS*, 533 U.S. 53, 60 (2001).

The Sports Act *does* protect important government objectives. Not only does it protect fair athletic competition, but your *amici* believe it also protects educational objectives. The Sports Act is substantially related to protecting academic and professional outcomes that would be adversely affected if "women's" school activities are redefined contrary to their basis in biology.

Appellant suggests that hormone therapy could be used to block the effects of male puberty, such that B.P.J. should be treated the same as a biological female. But this overlooks the other social and biological differences accounted for in Title IX, which cannot be reduced to identity, viewpoint, or

10

puberty. Title IX is not concerned about whether individuals have undergone endogenous puberty. A male student might not experience endogenous puberty for some other reason besides their viewpoint on identity. It is not the experience of male puberty that justifies separating women and men into different classifications. Rather, laws like the Sports Act are related to the State's educational interests in school activities, and in providing fair and equal opportunities to compete to both men and women.

Just as Title IX says, the State has a legitimate interest in providing equal opportunities to both sexes in school activities beyond athletics. These classifications are substantially related to its concerns about educational and labor market outcomes, and so the Sports Act does not violate equal protection.

## IV. Intervenors' position ensures that men and women's sports are treated equally with respect to participation and accomplishment.

The Sports Act, W. VA. CODE § 18-2-25d, does not violate Title IX. Title IX, 20 U.S.C. § 1681, *et seq.*, is not a law to ensure that women can *participate* in athletics, as beneficial as participation in athletics can be. Title IX prohibits discrimination on the basis of sex in school activities, and its

enabling regulations require equal athletic opportunity for fair *competition* and *public recognition*. *See* 34 C.F.R. § 106.41(c)(1), (10).

A pair of seemingly contradictory aphorisms describes a long, philosophical debate about the meaning of athletic competition. Pierre de Coubertin, founder of the modern Olympic Games, once said that "the most important thing in the Olympic Games is not to win but to take part, just as the most important thing in life is not the triumph but the struggle." On the other hand, Vince Lombardi is popularly credited with saying, "Winning isn't everything. Men, it's the only thing." But these maxims are not contradictory; they capture two ideas. There is something universal about the benefits of striving and personal improvement that comes from 'taking part.' But it is also true that winning and success inspires humanity, too, and that benefits careers. *See Chang* v. *Univ. of Rhode Island*, 606 F. Supp. 1161, 1256 (D.R.I. 1985)("…there is an objective evaluation scheme in the coaching domain: the won-lost record.") True, there is something universally pleasant about watching (or playing) basketball or football, but there is another feeling altogether to win an NCAA Championship or the Super Bowl (where the winner takes home the Lombardi Trophy). And in no small irony, even when

trying to say winning isn't everything, Coubertin resorted to giving top honors to "the struggle."

This Court does not have to decide whether participation or victory is the higher aspiration; it need not pick between Coubertin and Lombardi. But Intervenor's position on Title IX protects both participation and competitive recognition. "Nondiscrimination" in this area is not satisfied by letting everyone participate. And nondiscrimination is not satisfied merely by teams labeled "men's" and "women's." Title IX is not satisfied when women are denied fair competition, recognition, and public acclaim. The athletic offerings to each sex must allow that sex an opportunity to participate in competitions that accommodate their abilities, in a way that lets them earn victories and be recognized for their achievements. *See* 34 C.F.R. § 106.41(c)(1), (10).

Your *amici* note that *only women's competitions* would be disadvantaged by the participation policy proposed by B.P.J.'s attorneys. Cisgender males can benefit from participation and pursue the glories of success in a men's activity; it is improbable that a biological female could compete against elite male athletes, at least, solely through hormone intervention. But biological women competing in the category of women's sports would face the

competitive, ideological, and medical burdens raised by transgender interventions. It is this kid of differential treatment on the basis of sex that should be held to violate Title IX.

Intervenors' position on Title IX ensures fair treatment, and continuation of the clear signals that have allowed high-achieving female athletes to have successful careers. Your *amici* are concerned that the clear signals sent by records of athletic participation and success will be less reliable for women if Intervenors' position is rejected.

## Conclusion

Participation in women's athletics and the records associated with it can point to future career success. Rigorous studies have shown the labor market advantages of athletic records for athletes like Intervenor Armistead. It is only through Intervenors' position that female athletes can ensure their records are accurately maintained, which is essential to the success of their careers. Therefore, your *amici* respectfully urge the Court to uphold the validity of the Sports Act.

Respectfully submitted,

s/Reese R. Boyd, III, Esq.
Reese R. Boyd, III, Esq.
(SC Bar #: 007151)
Davis & Boyd LLC
Post Office Box 70517
Myrtle Beach, SC 29572
(843) 839-9800
(843) 839-9801 (fax)
reese@davisboydlaw.com
*Attorney for Amici Business*
*Executives*

## Addendum A – List of Individual *Amici*

List of individual *amici,* including relevant experience and company:[15]

1. Gary Archer, President, Let's Play Sports, Texas

2. Shannon Badger, Managing Partner, Badger CPA

3. Scott Barr, Steward of Southwest Exteriors in Texas

4. Robert Bortins, CEO, Classical Conversations

5. Lewis Brazelton, President/Founder, Brazelton Auto, Texas

6. Scotty Carroll, President/Owner, Trammel Creek Management, Inc., Tennessee

7. Stephen Casey, CEO, Datapoint Media Group

8. Peter Demos, President and Attorney with Demos' Restaurants in Tennessee

9. Lisa A Fullerton – President/CEO A Novel Idea, LLC, Texas

---

[15] Institutions of individual *amici* are listed for identification purposes only. The opinions expressed are those of the individual *amici*, and not necessarily of their affiliated institutions.

10. Anthony Hahn, President/CEO, Conestoga Wood Specialties Corporation, Pennsylvania

11. Douglas Hunter, CEO, Doug Hunter, LLC, South Carolina

12. Joseph Hurt, President of PBP Fabrication, Inc., Odessa, TX

13. Simon Lee, CEO, EIS Office Solutions, Inc., TX

14. Thomas Okarma, Tom Okarma Consulting, Arizona

15. Joe A. Patterson, Jr., Vice President, Crockett National Bank, Texas

16. Sam Rust, Manager, Life Bridge Capital, Colorado

17. Nicole Sdao, Founder/CEO - LetsTHRIVE360, Wisconsin

18. Dennis Sledge, Owner, Specified Industrial Products, Texas

19. Dan Stege, Founder / CEO, Distinct Defense, LLC

20. Suzanne Tacconelly, Founder & CEO of Blessings in the Breeze, Texas

21. Samuel P Thevanayagam, CEO, Parts Life Inc., New Jersey

22. Richard Williams, CEO, Lineage

## Addendum B - Certificates

### Certificate of Compliance with Rule 32(G)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and 29(5) because this brief contains 3,187 words, even without excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced, roman typeface with serifs (Equity) using Microsoft Word, set at 14 points.

Date: May 3, 2023
s/Reese R. Boyd, III, Esq.
Attorney for *Amici*


### Certificate of Service

I hereby certify that on May 3, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the 4th Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that a paper copy of this brief has been sent by First Class mail, on the same date, to the clerk's office.

Date: May 3, 2023
s/ Reese R. Boyd, III, Esq.
Attorney for *Amici*

18