No. 23-1078

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff - Appellant/Cross - Appellee,*

versus

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

*Defendants - Appellees,*
and

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,

*Defendant - Appellee/Cross - Appellant,*
and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees.*

---

On Appeal from the United States District Court for the Southern District of West Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

## RESPONSE/REPLY BRIEF OF PLAINTIFF-APPELLANT/CROSS-APPELLEE B.P.J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

---

*Counsel for Plaintiff-Appellant/Cross-Appellee listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
158 West Ponce De Leon Ave.
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant/Cross-Appellee B.P.J.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................2

    I.    H.B. 3293 Violates The Equal Protection Clause As Applied To
        B.P.J. ...................................................................................2

        A.    H.B. 3293 Discriminates Based On Transgender Status. ..........2

            1.    H.B. 3293 Explicitly Discriminates Against Girls
                Who Are Transgender Based On Transgender
                Status. ..........................................................................3

            2.    H.B. 3293's Only Function Is To Discriminate
                Against Transgender Girls. ..............................................4

            3.    The Stated Purpose Of H.B. 3293 Was To
                Discriminate Against Girls Who Are Transgender. ........6

        B.    B.P.J.'s As-Applied Equal Protection Claim Requires An
            As-Applied Analysis. .................................................10

        C.    Defendants Obfuscate Their Demanding Burden Under
            Heightened Scrutiny To Justify Their Categorical
            Exclusion. ...............................................................19

        D.    H.B. 3293's Categorical Exclusion Is Not Substantially
            Related To The State's Proffered Interests, As Applied
            To B.P.J. ................................................................22

            1.    Categorically Excluding B.P.J. From All Girls'
                 Sports Is Not Substantially Related To "Protecting
                Women's Sports." ..........................................................26

                a.    Defendants Wrongly Focus On
                     Physiological Differences Between
                     Cisgender Males And Cisgender Females
                     Generally. ..........................................................26

                  b.    Defendants Elide That H.B. 3293 Prohibits
                     Consideration Of The Physiological Factor
                     Most Responsible For Differences In
                     Athletic Performance—Circulating
                     Testosterone. .....................................................27

# TABLE OF CONTENTS
### (continued)

**Page**

      c.    Defendants Misrepresent The Evidence About Differences In Prepubertal Athletic Performance .......................................................... 28

    2.    Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Safety." ........................................................... 33

II.    H.B. 3293 Violates Title IX As Applied to B.P.J. ............................ 34

    A.    H.B. 3293 Excludes B.P.J. "On the Basis of Sex." ................. 35

    B.    H.B. 3293 Subjects B.P.J. to Discrimination that Harms Her. ...................................................................................... 38

    C.    Title IX's Athletic Regulations Do Not Authorize Discrimination Against Transgender Students. ...................... 40

        1.    Title IX's Text Does Not Authorize Discrimination Against B.P.J. ..................................................................... 40

        2.    Title IX's History Does Not Support Discrimination Against B.P.J. ....................................... 43

        3.    Title IX's Purpose Does Not Support Discrimination Against B.P.J. ....................................... 45

III.    All Defendants Are Properly Subject To Suit. .................................. 46

    A.    The Harrison County Board Of Education And Superintendent Stutler Are Proper Defendants And Forfeited Any Arguments Otherwise ....................................... 46

    B.    WVSSAC Is A Proper Defendant ............................................ 49

        1.    WVSSAC Is Required To Enforce H.B. 3293 Against B.P.J. ........................................................................ 49

        2.    WVSSAC Is A Proper Equal Protection Clause Defendant .................................................................... 50

        3.    WVSSAC Is A Proper Title IX Defendant .................... 53

        4.    B.P.J.'s Claims Against WVSSAC Are Ripe ................ 55

CONCLUSION ................................................................................. 55

## TABLE OF AUTHORITIES

**Page**

**Cases**

*A.B. by C.B. v. Haw. State Dep't of Educ.*,
  386 F. Supp. 3d 1352 (D. Haw. 2019)................................................53

*Adams v. School Board of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022) ........................................................4

*Alston v. Va. High Sch. League, Inc.*,
  144 F. Supp. 2d 526 (W.D. Va. 1999)..............................................53

*Bostic v. Schaefer*,
  760 F.3d 352 (4th Cir. 2014) ..........................................................48

*Bostock v. Clayton County, Georgia*,
  140 S. Ct. 1731 (2020)............................................................*passim*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001)..........................................................51, 52, 54

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019).......................................................15, 16

*Califano v. Jobst*,
  434 U.S. 47 (1977)..........................................................15, 16, 17

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)......................................................9, 15, 16, 17

*City of L.A., Cal. v. Patel*,
  576 U.S. 409 (2015)..........................................................................6

*Clark v. Arizona Interscholastic Association*,
  695 F.2d 1126 (9th Cir. 1982) ...................................................23, 25

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
  80 F. Supp. 2d 729 (W.D. Mich. 2000) ......................................52, 53

*Condiff v. Hart Cnty. Sch. Dist.*,
  770 F. Supp. 2d 876 (W.D. Ky. 2011)..............................................47

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)............................................................38

*Dodds v. U.S. Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016) ............................................37

*Doe v. CVS Pharm., Inc.*,
   No. 18-cv-01031-EMC, 2022 WL 3139516 (N.D. Cal. Aug. 5,
   2022) ............................................................................53

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) ............................................37

*Educ. Media Co. at Va. Tech, Inc. v. Insley*,
   731 F.3d 291 (4th Cir. 2013) ............................................18

*Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*,
   693 F.3d 1303 (10th Cir. 2012) ........................................39

*Estes v. Midwest Products, Inc.*,
   24 F. Supp. 2d 621 (S.D. W. Va. 1998)............................54

*Fitzgerald v. Barnstable Sch. Comm.*,
   555 U.S. 246 (2009)........................................................47

*Foster v. Univ. of Md.-E. Shore*,
   787 F.3d 243 (4th Cir. 2015) ............................................47

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998)........................................................48

*Gentry v. E. W. Partners Club Mgmt. Co.*,
   816 F.3d 228 (4th Cir. 2016) ............................................36

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
   822 F.3d 709 (4th Cir. 2016) ......................................41, 42

*Grimm v. Gloucester County School Board*,
   972 F.3d 586 (4th Cir. 2020) ....................................*passim*

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Harley v. Wilkinson*,
  988 F.3d 766 (4th Cir. 2021) ......................................................17, 18

*Hecox v. Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020) .........................................*passim*

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of
  Am., UAW v. Johnson Controls, Inc.*,
  499 U.S. 187 (1991).......................................................................48

*Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*,
  182 W. Va. 454 (1989) ..............................................................50, 51

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010).......................................................................11

*Jones v. W. Va. State Bd. of Educ.*,
  622 S.E.2d 289 (W. Va. 2005).......................................................50

*Lehr v. Robertson*,
  463 U.S. 248 (1983).......................................................................12

*Mahdi v. Stirling*,
  20 F.4th 846 (4th Cir. 2021) ..........................................................47

*McGee v. Cole*,
  115 F. Supp. 3d 765 (S.D. W. Va. 2015).........................................49

*McGee v. Va. High Sch. League, Inc.*,
  No. 11 Civ. 35, 2011 WL 4501035 (W.D. Va. Sept. 28, 2011) .........52

*Md. Highways Contractors Ass'n v. Maryland*,
  933 F.2d 1246 (4th Cir. 1991) .......................................................29

*Miller v. Johnson*,
  515 U.S. 900 (1995).......................................................................12

*Miller v. Mandrin Homes, Ltd.*,
  305 F. App'x 976 (4th Cir. 2009) ...................................................30

## TABLE OF AUTHORITIES
### (continued)

Page

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
436 U.S. 658 (1978)..................................................................47, 48

*N.C. State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ...............................................9

*Nat'l Ass'n of Agric. Emps. v. Trump*,
462 F. Supp. 3d 572 (D. Md. 2020)...................................55

*Neese v. Becerra*,
No. 2:21-cv-162-Z, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) ...............37

*Norse v. City of Santa Cruz*,
629 F.3d 966 (9th Cir. 2010) ...............................................29

*Obergefell v. Hodges*,
576 U.S. 644 (2015)..............................................................39

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998)................................................................44

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) ........................................36, 52

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979)............................................................8, 9

*Ramos v. Town of Vernon*,
353 F.3d 171 (2d Cir. 2003) .........................................11, 12

*Richards v. U.S. Tennis Ass'n*,
93 Misc. 2d 713 (Sup. Ct. 1977)........................................43

*Ruffin v. Shaw Indus., Inc.*,
149 F.3d 294 (4th Cir. 1998) ..............................................29

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017)..........................................................13, 24

vi

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Shalala v. Ill. Council on Long Term Care,*
  529 U.S. 1 (2000) .......................................................55

*Sheppard v. Visitors of Va. State Univ.,*
  993 F.3d 230 (4th Cir. 2021) ....................................37

*Smith v. NCAA,*
  266 F.3d 152 (3d Cir. 2001) .....................................54

*Tineo v. Att'y Gen. U.S. of Am.,*
  937 F.3d 200 (3d Cir. 2019) ...............................12, 24

*Tuan Anh Nguyen v. I.N.S.,*
  533 U.S. 53 (2001) ..............................................14, 24

*United States v. AMC Ent., Inc.,*
  549 F.3d 760 (9th Cir. 2008) ....................................38

*United States v. Edge Broad. Co.,*
  509 U.S. 418 (1993) ............................................17, 18

*United States v. Virginia,*
  518 U.S. 515 (1996) ..........................................*passim*

*United States v. Windsor,*
  570 U.S. 744 (2013) ...................................................6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ....................................................9

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .................................................17

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
  858 F.3d 1034 (7th Cir. 2017) .............................22, 37

*White Coat Waste Project v. Greater Richmond Transit Co.,*
  35 F.4th 179 (4th Cir. 2022) ....................................11

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
  477 F.3d 1282 (11th Cir. 2007) ..........................................................53

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High*
  *Sch. Athletic Ass'n*,
  647 F.2d 651 (6th Cir. 1981) .....................................................45, 54

**Statutes**

20 U.S.C. § 1681(a) .........................................................................36, 38

42 U.S.C. § 2000e-2(a)(1)....................................................................36

W. Va. Code
  § 18-2-25d..........................................................................49, 50
  §§ 18-2-25d(a)(4)..........................................................................3
  § 18-2-25d(b)(1)................................................................3, 20, 27

**Other Authorities**

34 C.F.R.
  § 106.33.......................................................................................41, 42
  § 106.41(a) .........................................................................................41
  § 106.41(b) .........................................................................................41
  § 106.41(c) .........................................................................................41

Alison K. Heather et al., *Transwoman Elite Athletes: Their Extra*
  *Percentage Relative to Female Physiology*, 19 Int'l J. Env't Res.
  Pub. Health 9103 (2022)......................................................................33

Deborah Brake, *Title IX's Trans Panic,* 29 William & Mary J. of
  Race, Gender, & Soc. Just. 41 (2023)..................................................44

Doriane Coleman & Nancy Hogshead-Maker, *It's not wrong to*
  *restrict transgender athletes. But base it on evidence, ethics,*
  Arizona Republic (Mar. 17, 2020).......................................................25

Doriane Coleman et al., *Pass the Equality Act, but Don't Abandon*
  *Title IX*, Wash. Post. (Apr. 29, 2019) .................................................25

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

McManus, A. and N. Armstrong, *Physiology of elite young female athletes*. J Med & Sport Sci 56:23-46 (2011)......................................................30

## INTRODUCTION

This case is about B.P.J., a 13-year-old girl from West Virginia who wants to play school sports with her friends.  B.P.J., who is transgender, is recognized as a girl in all aspects of her life—among other things, she has a gender support plan at school and a corrected birth certificate from West Virginia recognizing her as female.  She has never gone through endogenous puberty and is instead experiencing a hormonal puberty typical of cisgender girls.  And as the District Court rightly noted, "not one child has been or is likely to be harmed by B.P.J.'s continued participation on her middle school's cross country and track teams."  (JA4298.)

Defendants do not even attempt to provide a good reason—much less the exceedingly persuasive one that heightened scrutiny requires—for prohibiting B.P.J. from continuing to play on the girls' sports teams that have become like a "second family" to her.  (JA0900; JA4282.)  Instead, Defendants insist on mischaracterizing B.P.J.'s narrow, as-applied challenge as a demand for sports to be universally separated based exclusively on gender identity.  Defendants also conspicuously ignore the facts of B.P.J.'s case, instead fixating on other potential athletes who have nothing to do with B.P.J. or her as-applied claims.  And they ignore this Court's controlling precedent, asking this Court instead to follow out-of-circuit decisions that are irreconcilable with *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020).

1

Finally, to the extent that Defendants engage with the actual record in this case, Defendants mischaracterize that too. Defendants repeatedly—and falsely—insinuate that the District Court based its decision on one of their putative expert reports, but that report was subject to a *Daubert* challenge that the District Court did not resolve and so could not have been a basis for summary judgment. And, in any event, that report's assertions fail to justify B.P.J.'s exclusion.

As to the cross-appeal by the West Virginia Secondary School Activities Commission ("WVSSAC"), the District Court correctly concluded that WVSSAC is required to enforce H.B. 3293 against B.P.J. and is properly subject to suit under the Equal Protection Clause and Title IX.

The District Court's judgment in Defendants' favor should be reversed.

## ARGUMENT

Defendants' response brief ("RB") fails to disturb the conclusion that, based on the undisputed material facts, H.B. 3293 violates the Equal Protection Clause and Title IX as applied to B.P.J. Summary judgment should be entered for B.P.J., and the statute permanently enjoined as applied to her.

## I.     H.B. 3293 Violates The Equal Protection Clause As Applied To B.P.J.

### A.     H.B. 3293 Discriminates Based On Transgender Status.

Contrary to Defendants' claims, H.B. 3293 does not simply affirm sex-separation in sports. (RB18.) H.B. 3293's textual command, function, and

acknowledged purpose is to discriminate based on transgender status by eliminating the prior ability of transgender girls to play on girls' sports teams in West Virginia based on their transgender status.

### 1. H.B. 3293 Explicitly Discriminates Against Girls Who Are Transgender Based On Transgender Status.

As B.P.J. explained in her opening brief ("OB"), H.B. 3293's anti-transgender discrimination is plain from the statutory text. (OB23-26.) H.B. 3293 explicitly declares that "gender identity serve[s] no legitimate relationship" to participation on school sports teams and restricts participation on girls' teams based "solely" on "biological sex," which the statute newly defines as a person's "reproductive biology and genetics at birth." W. Va. Code §§ 18-2-25d(a)(4), (b)(1). Like the discriminatory policy at issue in *Grimm*, *see* 972 F.3d at 608-10, H.B. 3293 expressly distinguishes between "gender identity" and "biological sex," and defines "biological sex" in a way that treats the two concepts as "separate and distinct," W. Va. Code §§ 18-2-25d(a)(4), (b)(1). H.B. 3293's explicit separation of "gender identity" and "biological sex" necessarily targets only transgender students, who, unlike cisgender students, have a gender identity that is different from their sex assigned at birth. The statute thus "on its face discriminates between cisgender athletes, who may compete on athletic teams consistent with their gender identity, and transgender [female] athletes, who may not compete on athletic teams consistent

3

with their gender identity." *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020).

Defendants do not offer any response to Plaintiff's textual argument. They simply maintain that H.B. 3293 is "a sex-based classification" because it separates students onto "male" and "female" sports teams based on their "biological sex." (RB18.) They wholly ignore the statute's explicit references to "gender identity."

## 2. H.B. 3293's Only Function Is To Discriminate Against Transgender Girls.

H.B. 3293 also facially discriminates based on transgender status because its only function is to discriminate against girls who are transgender. Relying extensively on the Eleventh Circuit's decision in *Adams v. School Board of St. Johns County,* 57 F.4th 791 (11th Cir. 2022) (en banc), an out-of-circuit decision that rejects and is directly contrary to *Grimm*'s holding, Defendants assert that H.B. 3293 does not discriminate against girls who are transgender because the law "treats [transgender girls] 'no differently' from" cisgender boys. (RB21; *see also* RB19, 22.) *Grimm* forecloses that argument. *See* 972 F.3d at 609-10 (rejecting school district's argument that "'biological gender'" restroom policy treated all students "the same"). As the District Court recognized when it issued a preliminary injunction, "[a]ll other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys . . . —are permitted to play on sports teams that best fit their gender identity." (JA0450.) But because B.P.J. is a girl who is

transgender, H.B. 3293 treats her differently by excluding her from playing on the girls' team. The way to treat B.P.J. "no differently from" other students is to treat her like other girls—not to treat her like a cisgender boy.

Defendants also assert that H.B. 3293 does not discriminate based on transgender status because transgender girls allegedly "share the same physiological characteristics" as cisgender boys. (RB21.) But that (inaccurate) assertion goes to whether treating transgender girls equivalently to cisgender boys for purposes of school athletics is *justified*, not whether H.B. 3293 classifies based on transgender status in the first place. "[W]hile the physiological differences the Defendants suggest support the categorical bar on transgender women's participation in women's sports may"—or may not—"justify the Act, they do not overcome the inescapable conclusion that the Act discriminates on the basis of transgender status." *Hecox*, 479 F. Supp. at 975.[1]

Particularly given the statute's express distinction between "gender identity" and "reproductive biology and genetics at birth," *see supra* Section I.A.1, Defendants cannot rebrand H.B. 3293's facial discrimination as merely having a

---

[1] In a similar vein, Defendants state that *Grimm* "criticizes sex stereotypes; it does not forbid sex-based distinctions when sex is relevant." (RB22.) B.P.J. does not argue otherwise (assuming those distinctions are substantially related to an important governmental interest). Defendants again confuse the question whether heightened scrutiny *applies* with the question whether the discrimination *survives* heightened scrutiny.

disparate impact on girls who are transgender. (RB21.) The Act's *only* function is to treat transgender girls differently. "The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015). The fact that H.B. 3293's "operation in practice" excludes girls who are transgender—and only girls who are transgender—from girls' sports teams confirms its facial discrimination against transgender girls. *United States v. Windsor*, 570 U.S. 744, 771 (2013); *see also Hecox*, 479 F. Supp. 3d at 977.

### 3. The Stated Purpose Of H.B. 3293 Was To Discriminate Against Girls Who Are Transgender.

H.B. 3293 was also unquestionably passed for the specific purpose of excluding girls who are transgender from playing on girls' sports teams. (OB14-16 (collecting evidence); JA4270, JA4277.) The Chief Counsel of H.B. 3293's originating committee referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill," a "[t]ransgender originating bill," and a "bill regarding transgender participation in sports." (JA3063; JA3094.) When asked how H.B. 3293 would change the status quo in West Virginia, counsel representing the bill stated that H.B. 3293 "would affect those that changed their sex after birth." (JA3094; JA0085.) The Chairman of the originating committee also described the "issue" that H.B. 3293 was designed to address as "two transgender girls" who "were allowed to compete in state track and field meetings in Connecticut." (JA0153-

6

0154; JA3095.)  Per a State Senator, "the bill" was "about transgenders." (JA0214; JA3095.)  And Governor Justice focused on transgender students when asked about the need for H.B. 3293, saying that the law was not "a priority" for him because "we only have 12 kids maybe in our state that are transgender-type kids."  (JA3067; JA3096-3097.)

Defendants' response brief openly acknowledges that H.B. 3293 was enacted to ensure that transgender girls could no longer participate in girls' school sports. Among other things, Defendants describe H.B. 3293 as a "solution" to transgender women competing "in women's sports" (RB3); point to specific high-profile transgender female athletes (RB3, RB6); state that "[t]he West Virginia Legislature passed the Act after noting the recent instances of [transgender female] athletes competing in women's sports at the international, national, and state levels" (RB7); and claim that the Legislature's "concern" about the participation of transgender girls in girls' sports "was especially relevant in West Virginia, as West Virginia may have the highest per capita rate of transgender youth in the country"  (RB7).  The focus of Defendants' *amici* on transgender female athletes confirms the same.[2]

---

[2] *See* 78 Female Athletes et al. Amicus Br. 13-20 (ECF 112) (detailing cisgender girls' and women's objections to competing against transgender girls and women); 25 Athletic Officials and Coaches of Female Athletes Amicus Br. 12-13 (ECF 97-2) (discussing specific transgender women athletes); Female Olympic Rowers Amicus Br. 5, 8 (ECF 103-1) (discussing transgender athletes).

Defendants nonetheless contend (wrongly) that H.B. 3293 simply "reaffirm[ed]" West Virginia's longstanding designation of sex-separated sports teams. (RB8.) Even if that were so, heightened scrutiny applies if a decision maker has "selected *or reaffirmed* a particular course of action . . . 'because of[]' . . . its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). Moreover, Defendants' assertion that H.B. 3293 simply reaffirmed the status quo is false. As the legislative counsel for the bill candidly acknowledged, H.B. 3293 changed the landscape for transgender girls (and only for transgender girls). (JA3094; JA0085.) Prior to H.B. 3293, WVSSAC's policy allowed for transgender students to participate on teams consistent with their gender identity on a case-by-case basis. (OB26-27.) H.B. 3293's novel definition of "biological sex" newly excludes transgender girls from girls' sports teams, while changing nothing for cisgender students. (OB26-27.)[3]

Instead of engaging with the significant evidence confirming that H.B. 3293 was enacted to exclude transgender girls from girls' school sports, Defendants try to recast B.P.J.'s argument about H.B. 3293's openly acknowledged discriminatory purpose as one about animus, and contend that B.P.J. has not shown that the

---

[3] Defendants assert that no transgender girls were previously known to have taken advantage of WVSSAC's transgender-inclusive policy. (RB23.) But the mere fact that there has been no reported use of the pre-existing inclusive policy does not mean that it did not exist, or that H.B. 3293 did not change the status quo from one of case-by-case inclusion to categorical exclusion.

Legislature acted based on animus against transgender people. (RB23-25.) But Defendants wrongly conflate two strands of equal protection doctrine: (a) showing a purpose of classifying based on a trait subject to heightened scrutiny, such as race or transgender status, versus (b) showing a desire to harm a particular group. The former goes to whether a law discriminates based on a suspect or quasi-suspect characteristic and so is subject to a heightened form of scrutiny, and the latter goes to whether the law can survive even rational basis review, because the "bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985). Although B.P.J. contends that H.B. 3293 fails any level of scrutiny (OB15-16), for purposes of whether to apply heightened scrutiny, the question is simply whether H.B. 3293 was passed "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" girls who are transgender. *Feeney*, 442 U.S. at 279. (OB30.) And here, there is ample evidence that H.B. 3293 was passed "at least in part 'because of'" its exclusionary impact on transgender girls. *See also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) ("Challengers need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the legislation, just that it was "*a* motivating factor.'" (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977))).

9

Even the legislator statements cited by Defendants make the law's discriminatory purpose clear (RB25): Delegate Pinson stated that H.B. 3293 was concerned with protecting "the individuals who are participating in their sports based on their natural-born gender" (JA0114-0115); Delegate Ferrell said he did not think "anybody [would] want 185 pound [sic] that identifies as transgender to compete against [his daughter]" (JA0150); and Delegate Ellington said the "issue . . . regarding []transgender [sic]" that H.B. 3293 was intended to address arose "when two transgender girls were allowed to compete in state track and field meets in Connecticut," discussed the National Collegiate Athletic Association's ("NCAA") policy on transgender athletes, and noted that he had seen news coverage of "a transgender girl" playing girls' high school basketball in Indiana (JA0154-0155).

Defendants claim these legislators "did not act from improper intent." (RB24-25.) B.P.J. disagrees. (OB15-16.) But regardless whether these statements (and the ample other evidence) establish that H.B. 3293 was motivated by a bare desire to harm transgender girls, the evidence certainly establishes that the law's purpose was to exclude transgender girls from girls' school sports teams and so is subject to heightened scrutiny as a transgender-status classification.

### B. B.P.J.'s As-Applied Equal Protection Claim Requires An As-Applied Analysis.

B.P.J.'s as-applied challenge to H.B. 3293 requires the Court to focus on her specific circumstances—namely, that she has "consistently and persistently"

identified as a girl for years, *Grimm*, 972 F.3d at 619, and has never gone through endogenous puberty and so has never had levels of circulating testosterone akin to those of cisgender boys but instead has levels of circulating testosterone typical of cisgender girls. (OB33-36.) Unlike a facial challenge, an as-applied challenge focuses on the law's application to the plaintiff, and so "depends on the identity or circumstances of the plaintiff." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining that a facial claim "challenges application of the law more broadly," whereas an as-applied claim is focused on "the particular circumstances of [the] plaintiffs"); *Ramos v. Town of Vernon*, 353 F.3d 171, 174 n.1 (2d Cir. 2003) (undertaking an as-applied heightened equal protection scrutiny analysis because the complaint "allege[d] the ways the ordinance has infringed on [plaintiffs'] rights in their specific circumstances").

In bringing an as-applied challenge, B.P.J. follows the same analytical path outlined in *Grimm*. Defendants attempt to minimize the nature of the as-applied inquiry in *Grimm*, contending that this Court's legal analysis was not specific to Grimm, only its grant of relief. (RB36.) That is wrong. *Grimm* "limited" its consideration of the school district's restroom policy to its application to "transgender students who"—like Gavin Grimm—"'consistently, persistently, and insistently' express a binary gender." 972 F.3d at 596 (explaining that the Court did

11

not consider the policy's application to "other gender-expansive youth who may identify as nonbinary, youth born intersex who do or do not identify with their sex-assigned-at-birth, and others whose identities belie gender norms"). And this Court in *Grimm* considered "everything in the record—from Grimm's declaration, to his treatment letter, to the amicus briefs"—in holding that "Grimm was similarly situated to other boys." *Id.* at 610; *see also id.* at 589, 619 (noting Grimm's diagnosis with gender dysphoria and hormone treatment). B.P.J. likewise asks this Court to consider in her as-applied challenge that she has "consistently, persistently, and insistently" identified as a girl and began puberty-delaying treatment at the onset of endogenous puberty.

Despite Defendants' assertions to the contrary, *Grimm*'s analysis is consistent with other cases considering as-applied equal protection challenges under heightened scrutiny.[4] Indeed, heightened equal protection scrutiny is particularly compatible with taking account of a plaintiff's individual circumstances in an as-applied challenge because "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat [persons] as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). Heightened equal

---

[4] *See, e.g.*, *Grimm*, 972 F.3d at 593, 606-07; *Lehr v. Robertson*, 463 U.S. 248, 267 (1983); *Ramos*, 353 F.3d at 187; *Tineo v. Att'y Gen. U.S. of Am.*, 937 F.3d 200, 215 (3d Cir. 2019); *Hecox*, 479 F. Supp. 3d at 989.

protection scrutiny thus is focused on ensuring that individuals have "equal opportunity to aspire, achieve, participate in and contribute to society based on their *individual* talents and capacities." *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 532 (1996) (emphasis added); *see also id.* at 550 ("[G]eneralizations about 'the way women are,' estimates of what is appropriate for *most women*, no longer justify denying opportunity to women whose talent and capacity place them outside the average description."); *id.* ("It is on behalf of these women"—*i.e.*, those who wanted to attend the Virginia Military Institute and were "capable of all of the individual activities required" and could "meet the physical standards"—"that the United States has instituted this suit, and it is for them that a remedy must be crafted.") (internal citations omitted).

For these reasons, Defendants get things backwards when they assert that "too much variety persists within the class of 'transgender girls' to make subclasses like 'transgender girls who take puberty blockers.'" (RB29.) The existence of "variety" among girls who are transgender is precisely why Defendants cannot justify their sweeping, categorical exclusion based solely on transgender status instead of a more germane basis for classification. *See Sessions v. Morales-Santana*, 582 U.S. 47, 63 n.13 (2017) (explaining that "[e]ven if stereotypes . . . have 'statistical support,' [the Supreme Court's] decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn"

(quoting *J.E.B. v. Ala. ex rel. T. B.*, 511 U.S. 127, 139 n.11 (1994))). Regardless whether all or "most women" and girls who are transgender receive puberty-delaying medication and gender-affirming hormones, the "dispositive realit[y]" is that at least "some women" and girls who are transgender do receive those medications and do not have any of the physiological characteristics that Defendants point to as the source of athletic advantage. *VMI*, 518 U.S. at 550.

Defendants cite *Nguyen* to argue that equal protection heightened scrutiny does not require that laws using sex classifications "be capable of achieving [their] ultimate objective in every instance." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001). But it does require that "[t]he fit between the means and the important end" be "exceedingly persuasive." *Id.* As applied to B.P.J., who has not and never will go through endogenous puberty, the fit is not even rational. And, as far as the record shows, B.P.J. is the only transgender girl who has sought to participate on girls' sports teams in West Virginia, and the only one who has been prohibited from doing so under H.B. 3293.[5] Far from demanding that H.B. 3293 achieve its ultimate goal "in every instance," B.P.J. simply asks that Defendants provide an exceedingly

---

[5] For this reason, among others, Defendants' criticism of B.P.J. for bringing her as-applied challenge "individually," rather than focusing on a "broader group" of transgender girls receiving the same puberty-delaying treatment (RB35), is unfounded.

persuasive justification to justify the application of H.B. 3293 to her—the one and only actual application of the statute to date.

Even though *Grimm* and the Supreme Court's sex discrimination precedents clearly establish otherwise, Defendants insist that as-applied equal protection challenges under heightened scrutiny are never cognizable. (RB33.) They construct that wrongheaded argument by mischaracterizing case law concerning facial and/or as-applied challenges, and by cobbling together snippets from doctrinal tests in other areas of the law to misrepresent the rigor and focus of the heightened equal protection scrutiny inquiry.

First, Defendants misleadingly excerpt from *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), *Cleburne*, and *Califano v. Jobst*, 434 U.S. 47 (1977), to imply that as-applied challenges are, as a general matter, not cognizable. With respect to *Bucklew*, Defendants quote the portion of the opinion stating that "classifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation." (RB33 (quoting 139 S. Ct. at 1127).) But Defendants omit the portion of *Bucklew* explaining that the classification as facial or as-applied "affects *the extent to which the invalidity of the challenged law must be demonstrated* and the corresponding 'breadth of the remedy.'" 139 S. Ct. at 1127 (emphasis added). Thus, in B.P.J.'s as-applied challenge, the invalidity of H.B. 3293 "must be demonstrated" only as to B.P.J. rather than as to all transgender girls, using

the same "substantive rule of law"—heightened equal protection scrutiny—as would apply in a facial challenge.  *Id.*[6]

Next, with respect to *Cleburne*, Defendants quote the Supreme Court's statement that courts "should look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before" it.  (RB35 (quoting 473 U.S. at 446).)  But that statement was about how to determine whether a classification should be recognized as quasi-suspect—not, as relevant here, how to adjudicate as-applied challenges once the applicable level of scrutiny is ascertained.  *See* 473 U.S. at 442-46.  Notably, in *Cleburne*, after determining that disability is not a quasi-suspect classification based on its consideration of developmentally disabled people "as a general matter," *id.* at 446, the Supreme Court then went on to strike down the challenged ordinance *as applied* to the plaintiff based on the plaintiff-specific facts before it, *see id.* at 448-50.

Finally, Defendants cite *Califano*, a rational basis equal protection decision to contend that courts can never focus on a plaintiff's individual characteristics, whether a claim is "[as]-applied or not."  (RB34 (citing *Califano*, 434 U.S. at 55).)

---

[6] In *Bucklew*, by contrast, the petitioner maintained that "a different standard entirely should govern as-applied challenges" to methods of execution under the Eighth Amendment.  139 S. Ct. at 1126.  Namely, he argued that precedent requiring challengers to identify the existence of an alternative method of execution should apply only in facial challenges, not as-applied ones.  *Id.*

*Califano* says nothing about how to evaluate as-applied challenges under heightened scrutiny. And, as just noted, the Supreme Court in *Cleburne* made clear that an as-applied equal protection challenge *can* take account of individual circumstances even under rational basis review. Indeed, the language from *Califano* that Defendants quote about judging a "broad legislative classification . . . by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples" (RB34 (quoting 434 U.S. at 55)) was made in the context of evaluating a facial challenge, not an as-applied one, *see* 434 U.S. at 50.

After incorrectly casting doubt on the viability of as-applied challenges in general, Defendants try to distort the as-applied inquiry under heightened equal protection scrutiny by drawing on aspects of other doctrinal tests that also happen to be referred to as "intermediate scrutiny." (*See* RB34 (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (content-neutral time, place, and manner restrictions); *United States v. Edge Broad. Co.*, 509 U.S. 418 (1993) (commercial speech); *Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021) (Second Amendment).) But these various other forms of tests labelled "intermediate scrutiny" all have different doctrinal elements and were crafted to vindicate different constitutional principles. The Supreme Court has never used the standards for "time, place, and manner" or "commercial speech" cases interchangeably with the standard for equal protection sex discrimination cases, and neither should this Court. There is not a single,

universally applicable "intermediate scrutiny" test that applies across all types of constitutional claims regardless of the substantive area of law.

Moreover, Defendants do not even accurately describe the cases they cite. For example, they claim that *Edge Broadcasting* explained how to conduct an "equal-protection analysis" (RB34), but that is wrong. In fact, *Edge Broadcasting* concerned application of First Amendment commercial speech doctrine. 509 U.S. at 427. And contrary to Defendants' characterization, *Edge Broadcasting* explained that a statute's application "to a single person or entity" *is relevant* and "properly should be dealt with under the fourth factor of the *Central Hudson* test," which asks whether the regulation is sufficiently tailored. 509 U.S. at 427. Accordingly, this Court has applied *Edge Broadcasting* to take account of plaintiffs' "individual circumstances" under *Central Hudson*'s fourth factor in an as-applied challenge. *See Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 300 (4th Cir. 2013).[7]

Had the District Court undertaken the proper as-applied analysis, it would have asked whether categorically excluding B.P.J.—who identifies as a girl and has

---

[7] *Harley*, which applied a "reasonable fit" standard drawn from commercial speech, 988 F.3d at 769, did not foreclose consideration of individual circumstances in all as-applied Second Amendment challenges. Its analysis was limited to the statute at issue, which was narrowly targeted to individuals with domestic violence misdemeanor convictions. The Court acknowledged that "individual circumstances may be relevant" in "as-applied challenges" to other firearms statutes. *Id.* at 770-71.

never experienced endogenous puberty—from girls' school sports because of her transgender status is substantially related to an important government interest. (OB33-34.)  Its refusal to do so because not all transgender girls receive puberty-delaying treatment and hormone therapy (JA4273), and its decision instead to ask whether categorically barring all cisgender boys and transgender girls together substantially advances the asserted interests, were error, and lack any support in heightened equal protection scrutiny case law.

### C. Defendants Obfuscate Their Demanding Burden Under Heightened Scrutiny To Justify Their Categorical Exclusion.

To survive heightened scrutiny, the government must provide an "exceedingly persuasive justification" for H.B. 3293's discrimination against girls who are transgender. *VMI*, 518 U.S. at 531.  "The burden of justification is demanding and [] rests entirely on the State"—*not* B.P.J.  *Id.* at 533.

Instead of carrying their burden to justify H.B. 3293's categorical exclusion, Defendants accuse B.P.J. of advancing and failing to justify a categorical policy of gender identity-based sports eligibility.  They claim that B.P.J. is arguing for a "blanket rule" that prohibits consideration of "biological sex" (RB12) and mandates "gender identity as the *only* proper consideration for sorting out competitive sports teams" (RB16; *see also* RB31).  Defendants do not cite any filing in which B.P.J. has argued for such a "blanket rule" because B.P.J. has never so argued.  Instead, they cite only the District Court's statement that, based on B.P.J.'s "responses to

requests for admission, it appears that B.P.J. really argues that transgender girls are similarly situated to cisgender girls for purposes of athletics at the moment they verbalize their transgender status, regardless of their hormone levels."  (JA4274.) But the District Court did not cite any request for admission in which B.P.J. took that position, and she did not.  This case is not about whether all girls who are transgender must be categorically included in all girls' sports teams based on their gender identity; it is about whether H.B. 3293 may be constitutionally applied to B.P.J.

In truth, the only categorical rule regarding gender identity at issue in this case is that set out in H.B. 3293.  The law declares that eligibility to participate on a girls' sports team must be based "solely on the individual's reproductive biology and genetics at birth."  W. Va. Code § 18-2-25d(b)(1).  H.B. 3293 thus categorically precludes any consideration of gender identity when determining whether girls who are transgender may participate on girls' teams, for *any* sport at *any* level of competition at *any* grade from middle school onward.

Having wrongly projected onto B.P.J. the argument that school sports should be separated solely based on gender identity, Defendants then rebut their own strawman by misrepresenting the testimony from B.P.J.'s expert witness, Dr. Safer. (*See* RB4, RB10, RB13, RB20, RB28.)  As Dr. Safer testified—and as Defendants do not dispute—there is a medical consensus that the largest known biological cause

of the average differences in athletic performance between cisgender men as a group and cisgender women as a group is their levels of circulating testosterone, which start to diverge beginning with puberty.  (JA2096; JA2143-2144; JA2526-2527; A3101-3102.)  But H.B. 3293 *prohibits* schools from considering puberty or testosterone and instead mandates separation based solely on reproductive biology and genetics at birth, which—as Dr. Safer testified—are not by themselves useful indicators of athletic performance.  (JA2104; JA2319.)  Defendants now trumpet an alleged concession by Dr. Safer that "gender identity itself" is also "not a useful indicator of athletic performance."  (JA2319-2320.)  But that does not somehow rehabilitate H.B. 3293.  Neither gender identity nor reproductive biology and genetics at birth are by themselves an indicator or cause of average differences in athletic performance.

Defendants further attempt to rebut the imaginary "gender identity only" rule with a broad attack on the validity of gender identity, calling it an "unworkable" criteria that is "fluid," "shifting," "private," and not "visible to others."  (RB30, RB46-47.)  But Defendants' ruminations about hypothetical gender fluid students are irrelevant to this case, where the record is clear that B.P.J. has consistently and persistently identified as a girl.  (OB7-9.)  It was certainly not "unworkable" for B.P.J.'s school administrators to recognize and treat B.P.J. as the girl that she is (OB8), nor for the State of West Virginia to amend her birth certificate to recognize

her name as B. and her "sex" as "female" (OB8; JA4647). As in *Grimm*, the "question [in this case] is limited to how [H.B. 3293] implicate[s] the rights of [a] transgender student[] who 'consistently, persistently, and insistently' express[es] a binary gender." 972 F. 3d 618; *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (similar).

Finally, Defendants claim that B.P.J. "offers shifting versions of what line *would* be constitutionally allowed." (RB17.) But again, B.P.J. is not required to take a position on which (if any) various sports policies might be constitutional for other people to successfully argue that *H.B. 3293* is unconstitutional as applied *to her*. The only question here is whether Defendants have shown that excluding B.P.J. from girls' school sports teams pursuant to a policy that categorically bars all transgender girls from all girls' sports teams in all circumstances can survive heightened equal protection scrutiny. They have not. *See, e.g.*, U.S. Amicus Br. 18 (ECF 68-1) (emphasizing that H.B. 3293's categorical exclusion of all transgender girls wrongly treats them "as a monolithic group").

### D. H.B. 3293's Categorical Exclusion As Applied To B.P.J. Is Not Substantially Related To The State's Proffered Interests.

Heightened equal protection scrutiny in this as-applied challenge requires Defendants to show that categorically excluding B.P.J. from all girls' sports substantially advances the asserted interests in avoiding the "substantial" displacement of cisgender female athletes and protecting their safety. (OB37.)

Defendants have not done so.

As B.P.J. explained in her opening brief (OB39-40), when the Ninth Circuit in *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), permitted the exclusion of cisgender boys from a girls' school volleyball team, it did so because: (a) per the parties' stipulation, cisgender boys would "on average" be "better" athletes and so have an "undue advantage"; (b) women and girls have historically been deprived of athletic opportunities compared to men and boys; (c) the boys and girls at the school had an equal number of overall athletic opportunities; and (d) in light of the stipulation about advantage, the cisgender boys would "displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* at 1127, 1131. Those factors justifying the creation of separate sports teams for boys and girls all weigh in favor of *including* B.P.J. on teams with other girls, not excluding her. *See Hecox*, 479 F. Supp. 3d at 976-78; *id.* at 976 ("[T]he principals outlined in *Clark* . . . do not appear to hold true for women and girls who are transgender."). The existence of "separate but equal [athletic teams] in schools on a male/female basis . . . says nothing about what happen[s]" when transgender girls are categorically banned from participating in athletics. *Grimm*, 972 F.3d at 625 (Wynn, J., concurring).

Defendants do not attempt to show that most of the considerations set forth in *Clark* apply here. They do not dispute that, unlike cisgender men and boys, girls

and "women who are transgender have historically been discriminated against, not favored." *Hecox*, 479 F. Supp. 3d at 977. They do not seriously dispute that, whereas cisgender boys excluded from participating in girls' sports still have an equal number of overall athletic opportunities, under H.B. 3293, girls who are transgender in West Virginia do not—they are prohibited from playing on girls' teams, cannot play on boys' teams, and have extremely limited co-ed options, leaving them with virtually no overall athletic opportunities.[8]   And Defendants acknowledge that there was no evidence of transgender girls even participating in school sports in West Virginia prior to H.B. 3293, let alone participating and substantially displacing cisgender girls.[9]   (RB7-8, RB23.)

---

[8] These concessions of harm are critical to the Court's analysis of B.P.J.'s equal protection claim. Whether a classification survives heightened scrutiny depends not only on whether the classification is statistically accurate, but also on whether the classification is being employed in a manner that inflicts harm. Thus, in *Nguyen*, the Supreme Court upheld a sex-based classification because the challenged policy was "not marked by misconception and prejudice" and imposed only a "minimal" burden without "inordinate and unnecessary hurdles." 533 U.S. at 73, 93. *See Sessions*, 582 U.S. at 66 (distinguishing *Nguyen's* parental-acknowledgment requirement as imposing a "minimal" burden); *Tineo*, 937 F.3d at 215 (same); *Grimm*, 972 F.3d at 615 (noting that the policy in *Nguyen* was "'marked by misconception and prejudice'" (quoting *Nguyen*, 533 U.S. at 73)). A categorical bar inflicting stigma and harm like H.B. 3293 finds no support in *Nguyen*, whether challenged facially or as-applied.

[9] As to B.P.J. herself, Defendants do not dispute that there is no evidence she has substantially displaced anyone during her three seasons of competition on girls' cross-country and track-and-field teams. (OB42.) Tellingly, rather than talk about B.P.J.—the actual Plaintiff in this case—Defendants instead ask this Court to focus

Instead, Defendants focus entirely on claiming that what the parties in *Clark* stipulated as to athletic advantage between boys and girls generally is true as to athletic advantage between transgender girls and cisgender girls specifically. In so doing, Defendants wrongly focus on the differential treatment of all girls compared to all boys instead of the transgender exclusion at issue; ignore the actual provisions of H.B. 3293; and misrepresent the evidence in the record about the physiological characteristics of transgender girls as compared to cisgender girls.

When B.P.J.'s as-applied claim is properly analyzed under heightened equal protection scrutiny, it is clear that Defendants come nowhere close to demonstrating an "exceedingly persuasive" connection between barring B.P.J. from girls' sports pursuant to H.B. 3293's categorical exclusion and protecting against the substantial displacement and injury of cisgender girls. *VMI*, 518 U.S. at 534; *see also* U.S. Amicus Br. 13-20 (ECF 68-1).

---

on a handful of elite collegiate and high school transgender female athletes from outside West Virginia. (RB6-7.)

Defendants also acknowledge that no national elite sporting association goes as far as H.B. 3293's categorical ban; even under the most restrictive policies, transgender girls like B.P.J. who never went through endogenous puberty can still play on girls' teams. (RB10-11, RB32-33.) Similarly, even the advocates to whom Defendants point as favoring restrictions on girls and women who are transgender do not support categorical bans. (*Compare* RB52 (citing Doriane Coleman et al., *Pass the Equality Act, but Don't Abandon Title IX*, Wash. Post. (Apr. 29, 2019), *with* Doriane Coleman & Nancy Hogshead-Maker, *It's not wrong to restrict transgender athletes. But base it on evidence, ethics,* Arizona Republic (Mar. 17, 2020) (criticizing categorical ban similar to H.B. 3293).)

1.  **Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Sports."**

    a.  **Defendants Wrongly Focus On Physiological Differences Between Cisgender Males And Cisgender Females Generally.**

Defendants focus on their mantra that there are "physiological differences" between males and females generally. (RB9, RB19-20, RB39, RB46, RB51.) But the cases they cite and the proffered expert claims to which they point (which are subject to unresolved *Daubert* motions) concerning alleged differences between males and females do not bear on whether *transgender girls* specifically (as opposed to cisgender boys and transgender girls as an undifferentiated group) have an athletic advantage compared to cisgender girls, let alone transgender girls who have never gone through endogenous puberty (like B.P.J.). Because H.B. 3293 is a transgender-status classification, it is the exclusion of transgender girls from girls' school sports teams—not the treatment of transgender girls and cisgender boys together as an undifferentiated group—that must be substantially related to the State's proffered interests. (OB31-33.) Moreover, Defendants' assertions about "average physiological differences" between males and females (RB20, RB39) do not provide an exceedingly persuasive justification (or even a rational one) for categorically excluding B.P.J. because she does not have any of the "physiological differences" associated with endogenous puberty.

> **b.** **Defendants Elide That H.B. 3293 Prohibits Consideration Of The Physiological Factor Most Responsible For Differences In Athletic Performance—Circulating Testosterone.**

H.B. 3293 conditions participation on girls' teams on factors that themselves have no bearing on the "average physiological differences" to which Defendants point. (OB40.) Defendants wrongly claim that "B.P.J. has admitted that biological sex is an accurate proxy for athletic performance." (RB30.) Not so. B.P.J. has always maintained that "biological sex" as defined by H.B. 3293—"reproductive biology and genetics at birth," W. Va. Code § 18-2-25d(b)(1)—has no demonstrated effect on athletic performance. (OB40.) Rather, it is undisputed that circulating testosterone, the levels of which begin to diverge at puberty, is the largest known biological driver of generalized differences in athletic advantage. (OB40.) H.B. 3293, however, prohibits any consideration of circulating testosterone levels. Thus, even if a transgender girl (like B.P.J.) has never undergone endogenous puberty and has circulating testosterone levels similar to those of cisgender girls, she is still excluded from girls' sports teams, despite lacking the physiological characteristic known to be most responsible for any divergence in athletic performance.[10]

---

[10]    Defendants claim that "B.P.J. has no answer for biological men who take these same drugs for different medical reasons of their own." (RB29.) But Defendants have not identified any examples of cisgender boys taking "these same drugs" in a manner that prevents them from going through endogenous puberty and instead

Defendants have no response to this argument. They simply parrot the District Court's statement that "sex chromosomes determine[] many of the physical characteristics relevant to athletic performance" (JA4272; *see* RB28 (similar)), without acknowledging that the District Court's point was actually that "male chromosomes" are correlated with "male puberty," which "result[s] in an increase in testosterone in the body," and that it is that increase in testosterone that causes the divergence in athletic performance between males and females generally. (JA4272.) In other words, sex chromosomes themselves do not drive average differences in athletic performance; circulating testosterone does.

### c.    Defendants Misrepresent The Evidence About Differences In Prepubertal Athletic Performance.

Further, Defendants misrepresent the status and content of the evidence about the physiological characteristics of transgender girls as compared to cisgender girls

---

undergoing a typically female puberty. Even if such cisgender boys existed, they are boys and so face no harm from playing on boys' teams.

For the same reason, this Court should reject Defendants' attempt to falsely equate permitting all girls to play on boys' teams when no girls' team exists with forcing transgender girls to play on boys' teams when girls' teams do exist. (RB8.) The former ensures that girls have the opportunity to play all sports, even those for which there is no designated girls' team (like football), while still recognizing them as girls, whereas the latter denies that transgender girls are girls and pushes them out of sports altogether. *See Grimm*, 972 F.3d at 610 & n.10 (explaining that equating transgender boys with cisgender girls is the product of "bias" and "misconceptions," and that attempting to force Grimm to use the girls' restrooms "fails to 'meaningfully reckon with what it means for [Grimm] to be a transgender boy'").

prior to puberty.  Citing testimony from their putative expert witness, Dr. Gregory Brown, Defendants falsely assert that girls who are transgender have an innate pre-existing athletic advantage over cisgender girls even before puberty.  (RB10, RB13, RB30-31.)  That evidence, however, is not properly before this Court.  The District Court neither considered nor credited Dr. Brown's assertions when it granted summary judgment against B.P.J. because those portions of Dr. Brown's testimony are subject to a pending *Daubert* motion that the District Court never resolved.  (JA4277 (denying motion "as moot").)  "[A] district court must . . . rule on evidentiary objections that are material to its ruling," *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc), and evidence that would be inadmissible at trial may not be considered on summary judgment, *see Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 300 (4th Cir. 1998); *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).  Accordingly, Dr. Brown's assertions regarding prepubertal youth were not—and could not have been—considered by the District Court.[11]

---

[11] Defendants' broader insistence that the District Court's about-face between its preliminary injunction and summary judgment decisions was the result of its consideration of "a full record" is likewise misleading.  (RB4; *see also* RB13, RB18.)  Although the parties engaged in extensive discovery (much of which was unnecessary and intrusive to B.P.J.), the District Court barely mentioned the record in its summary judgment decision, and each of Defendants' putative experts was subject to a pending *Daubert* motion that the District Court did not resolve.  (JA4277.)  Indeed, the only mention by the District Court of any evidence in the record regarding athletic advantage is its observation that although "there is much

But even if Dr. Brown's testimony about prepubertal advantage were admissible, his unsupported assertions would still be insufficient to create a triable question of fact in Defendants' favor. *See Miller v. Mandrin Homes, Ltd.*, 305 F. App'x 976, 979 (4th Cir. 2009). To start, Dr. Brown's expert report and Defendants' brief blatantly misrepresent the so-called "seminal work" from McManus and Armstrong that Dr. Brown purports to rely upon. (RB30-31 (citing JA2514 (discussing McManus, A. and N. Armstrong, *Physiology of elite young female athletes*. J Med & Sport Sci 56:23-46 (2011))).) The McManus and Armstrong article did *not* find "*significant* physiological differences" between prepubertal boys and girls in "bone density, body composition, cardiovascular function, metabolic function, and other physiological factors." (RB30-31 (quoting JA2514 (emphasis added)).) Rather, the article found that prepubertal differences across those measurements were "minimal", "small," or nonexistent. (*See* JA2145 ("Prior to 11 years of age differences in average speed are minimal. . . . [S]mall sex difference in fat mass and percent body fat are evident from mid-childhood . . . . [B]one characteristics differ little between boys and girls prior to puberty . . . . There is little evidence that prior to puberty pulmonary structure or function limits oxygen uptake

---

debate over whether and to what extent hormone therapies *after puberty* can reduce a transgender girl's athletic advantage over cisgender girls," it is "true" that "[B.P.J.] has not gained the physical characteristics typical of males during and after puberty." (JA4273 (emphasis added).)

. . . . [N]o sex differences in arterial compliance have been noted in pre- and early-pubertal children."); *see also* JA0034 (ECF No. 316 at 12); JA0037 (ECF No. 370 at 3–4).)[12]

Dr. Brown's expert report and Defendants' brief also mischaracterize the available evidence measuring the athletic performance of prepubertal boys and girls. Namely, as discussed in B.P.J.'s *Daubert* motion, Dr. Brown's expert report ignored two of the most significant articles in the field, which found that average sex-based differences in age-grade competitive sports were between 0 and 6% depending on the sport, differences they characterized as "minimal" or nonexistent. (JA0034 (ECF No. 316 at 9 & n.1, 15-16 & n.6); JA0037 (ECF No. 370 at 6-7).)

Instead of engaging with the leading studies designed to measure differences in athletic performance between prepubertal boys and girls who have chosen to participate in athletics, Dr. Brown's report relied upon population-based physical fitness surveys of school-age children. (JA2515-2522.) Those population-based surveys did not consider or account for whether more prepubertal boys participate in athletics or compare prepubertal boy athletes with prepubertal girl athletes, and

---

[12] When B.P.J. pointed out Dr. Brown's mischaracterizations in her *Daubert* motion, Defendants moderated Dr. Brown's sweeping claims in their opposition to the motion, stating that McManus "found measurable differences . . . in *some* areas that contribute to athletic performance." (JA0035 (ECF No. 338 at 13–14).) In their brief to this Court, however, they return to embracing Dr. Brown's exaggerations.

so provide no reliable basis for attributing any differences in performance results between prepubertal boys and girls to innate biology rather than social factors such as greater societal encouragement of athleticism in boys and greater opportunities for boys to play sports. (JA2144.) Indeed, Dr. Brown conceded at his deposition that "there are no studies quantifying the effects of social causes" versus "physiological factors" on differences in "athletic performance" between prepubertal boys and girls. (JA2660.) Further, there would be no reliable basis for Dr. Brown to conclude that transgender girls experience the same socialization to sports as cisgender boys, particularly because transgender girls by definition defy stereotypes associated with their sex assigned at birth.

Perhaps because of the flaws and misrepresentations in Dr. Brown's report, Defendants assert that B.P.J. bears the burden of pointing to "scientific evidence" showing "that the administration of puberty blockers to [transgender girls] before puberty eliminates *pre-existing* athletic advantage." (RB31.) But there is no scientific evidence showing that there are pre-existing athletic advantages to be eliminated. Defendants also accuse B.P.J. of engaging in "speculation" and deny that they have any responsibility to show that transgender girls "who receive puberty-delaying treatment followed by gender-affirming hormone therapy perform better on average than [cisgender girls] as a group." (RB31 (quotation marks omitted).) But Defendants—not B.P.J.—bear the burden of proof under heightened

scrutiny. *VMI*, 518 U.S. at 533. And they are the ones speculating, in the face of contrary studies, that differences in physical fitness surveys for prepubertal cisgender boys and cisgender girls reflect innate physiological differences that give prepubertal transgender girls an athletic advantage over prepubertal cisgender girls. Yet Defendants admit: (a) that any alleged differences in athletic performance between prepubertal cisgender boys and prepubertal cisgender girls are "modest"; (b) that no studies have addressed whether those "modest" differences are attributable to innate biological causes rather than social causes; and (c) that no studies have examined the performance of transgender girls. (JA3102; JA2266; JA2144.) In light of those admissions, Defendants have failed to create a triable question of fact that could demonstrate an "exceedingly persuasive" reason for their categorical exclusion of a transgender girl like B.P.J.[13]

### 2. Categorically Excluding B.P.J. From All Girls' Sports Is Not Substantially Related To "Protecting Women's Safety."

Defendants have essentially abandoned their second proffered interest—

---

[13] Defendants cite an article outside the record (RB53) speculating that exposure to testosterone in utero provides an athletic advantage for cisgender boys because there is "a possibility" of greater "later-life aggressiveness." Alison K. Heather et al., *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, 19 Int'l J. Env't Res. Pub. Health 9103 at 3 (2022). That extra-record article was not before the District Court and is not properly before this Court, and in any event, relies on impermissible sex stereotypes, *VMI*, 518 U.S. at 549, and lacks scientific credibility (JA2145); *see also* American Academy of Pediatrics et al. Amicus Br. 11-12 (ECF 71-1).

"safety"—only vaguely gesturing at supposed safety concerns implicated by the participation of transgender girls in girls' school sports. (RB9-10.) And they make no effort to connect those supposed concerns to the non-contact sports B.P.J. plays, let alone demonstrate that any such connection is an "exceedingly persuasive" one. *VMI*, 518 U.S. at 533. They simply speculate that B.P.J. may one day "take up contact sports." (RB35.) "[F]ears" that have not "materialized" are hardly sufficient to satisfy heightened equal protection scrutiny. *Grimm*, 972 F.3d at 614. Defendants have not carried their burden to show that categorically barring B.P.J. from girls' sports teams advances any interest in protecting the safety of cisgender girls.

\* \* \*

Because Defendants failed to provide any "exceedingly persuasive justification" for categorically excluding B.P.J. from all girls' sports on the basis of her transgender status, B.P.J. is entitled to summary judgment on her as-applied equal protection claim.[14]

## II.    H.B. 3293 Violates Title IX As Applied to B.P.J.

As explained in B.P.J.'s opening brief, B.P.J. has satisfied all the elements of her Title IX claim as a matter of law. The undisputed facts show "(1) that [she] was excluded from participation in an education[al] program 'on the basis of sex';

---

[14] Although heightened scrutiny applies and is dispositive, H.B. 3293 fails any level of scrutiny as applied to B.P.J. (OB45-46.)

(2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [her] harm." (OB46 (quoting *Grimm*, 972 F.3d at 616).) Other than WVSSAC, Defendants do not contest that they receive federal funding or that school athletics are an educational program under Title IX. And Defendants only half-heartedly dispute that H.B. 3293 excludes B.P.J. on the basis of sex and causes her harm.

Instead of applying the framework governing Title IX claims, Defendants argue that by authorizing schools to provide sex-separated teams, Title IX necessarily authorizes schools to harm girls who are transgender by excluding them from the same teams as other girls. Although Defendants attempt to dress up that argument as based on the alleged "text, history, and purpose" of Title IX, their arguments ultimately boil down to their unsupported assertion that allowing girls who are transgender to participate on girls' teams does "not make sense" and "would make Title IX's text and rules incoherent." (RB45.) But the undisputed evidence shows that B.P.J. is similarly situated to other girls and that her participation harms no one. Accepting Defendants' framing would only "vindicate the [Defendants'] own misconceptions" and stereotypes about "what it means to be" a transgender girl. *Grimm*, 972 F.3d at 610 & n.10.

## A.    H.B. 3293 Excludes B.P.J. "On the Basis of Sex."

H.B. 3293 excludes B.P.J. from athletic teams "on the basis of sex." (OB46-

47.)  *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), held that discriminating against an employee based on their transgender status is discrimination "because of" that "individual's . . . sex" under Title VII.  And this Court has already held (twice) that *Bostock*'s reasoning applies to Title IX and similarly prohibits discrimination against transgender students based on their transgender status.  *See Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 130 & n.22 (4th Cir. 2022) (en banc); *Grimm*, 972 F.3d at 616.[15]

Undeterred by this Court's precedents, Defendants assert that *Bostock*'s reasoning should not apply to Title IX.  (RB48-51.)  But the precedents applying *Bostock* to Title IX flow inexorably from the parallel plain text of Title VII and Title IX.  Both statutes focus on discriminatory treatment of individuals, not groups:  Title VII protects "any individual," 42 U.S.C. § 2000e-2(a)(1), and Title IX protects "[any] person," 20 U.S.C. § 1681(a).  And both statutes require merely "but for" causation:  Title VII prohibits discrimination "because of" sex, 42 U.S.C. § 2000e-2(a)(1), and Title IX prohibits discrimination "on the basis of" sex, 20 U.S.C. § 1681(a).  *See Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235-36 (4th Cir. 2016) ("We see no 'meaningful textual difference' between [the term 'on the

---

[15] *Peltier* discussed *Bostock*'s application to Title IX in the body of the opinion, not merely "in a secret footnote."  (RB48); *see Peltier*, 37 F.4th at 130 (providing a lengthy quote from *Bostock* and stating "[t]he same reasoning applies here").

basis of'] and the terms 'because of,' 'by reason of,' or 'based on'—terms that the Supreme Court has explained connote 'but-for' causation."). Given those "key drafting choices"—*i.e.*, "to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries"—discrimination against an individual because her gender identity differs from her sex assigned at birth is prohibited by both statutes' plain terms. *Bostock*, 140 S. Ct. at 1753; *accord Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (noting "the similarity in language prohibiting sex discrimination in Titles VII and IX" and holding that *Bostock* applies to Title IX).[16]

As contrary authority, Defendants cite the poorly reasoned, out-of-circuit district court decision in *Neese v. Becerra*, No. 2:21-cv-162-Z, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) (Kacsmaryk, J.), to argue that the phrase "on the basis of sex" in Title IX "doesn't mean the same thing" as the phrase "because of . . . sex" and requires more than but-for causation. (RB48-49.) *Neese* offered no text-based argument for its conclusions, and *this* Court's precedents have repeatedly held that "on the basis of sex" in Title IX requires but-for causation. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021). It should "go[] without saying

---

[16] Even before *Bostock*, the Sixth and Seventh Circuits held that discrimination against transgender students violates Title IX by punishing them for gender nonconformity. *See Whitaker*, 858 F.3d at 1048-50; *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016) (per curiam).

that" this Court's "pronouncements [are] the final word within [this] Circuit's geographical area, subject only to en banc or Supreme Court review." *United States v. AMC Ent., Inc.*, 549 F.3d 760, 771 (9th Cir. 2008).

## B.    H.B. 3293 Subjects B.P.J. to Discrimination that Harms Her.

Categorically excluding B.P.J. from participating on any girls' sports teams at any level of competition discriminates against her based on her transgender status in violation of Title IX.  (OB48-54); *see also* U.S. Amicus Br. 21-29 (ECF 68-1).  B.P.J. is similarly situated to other girls at her middle school, and H.B. 3293 does not merely treat B.P.J. differently from people who are similarly situated but treats her worse by denying her the benefits of school athletics available to all other students. (OB50-51); *see also* The Trevor Project Amicus Br. 12-24 (ECF 54-2); American Academy of Pediatrics et al. Amicus Br. 7, 21-30 (ECF 71-1); New York et al. Amicus Br. 14-16, 19-20 (ECF 70-1); Current and Former Professional, Olympic, and International Athletes in Women's Sports et al. Amicus Br. (ECF 67-2).

As Defendants acknowledge (RB38), Title IX "not only protect[s] [students] from discrimination but also specifically shield[s] [them] from being 'excluded from participation in' or 'denied the benefits of'" a recipient's "'education program or activity' . . . on the basis of gender." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). According to Defendants, "these words forbid schools from shutting out or hindering

biological females [sic] from enjoying, participating in, or reaping educational benefits" from sports. (RB38.) Title IX's text, however, does not restrict its protections to those people Defendants deem to be "biological females." Indeed, "Title IX does not limit its coverage at all, outlawing discrimination against any 'person,' broad language the Court has interpreted broadly." *Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1311 (10th Cir. 2012) (Gorsuch, J.). Any "person," includes B.P.J. And H.B. 3293's categorical ban violates B.P.J.'s statutory protections by "shutting [her] out" and "hindering [her] from enjoying, participating in, or reaping educational benefits" from school-sponsored athletics. (RB38.) By contrast, excluding cisgender boys—even those with "low testosterone or limited athletic ability" (RB52)—from girls' teams does not shut them out, as they can participate on boys' teams.

Defendants assert that "B.P.J.'s lifestyle" is irrelevant and maintain that she can participate in athletics by joining a boys' team. (RB52.) That argument "is analogous to claiming [lesbian and gay] individuals are not prevented from marrying under statutes preventing same-sex marriage because" they "could marry someone of a different sex." *Hecox*, 479 F. Supp. 3d at 984. The Supreme Court rejected that argument, recognizing that for lesbians and gay men who seek to participate in the institution of marriage, "same-sex marriage is their only real path to this profound commitment." *Obergefell v. Hodges*, 576 U.S. 644, 658 (2015). The same is true

here:  B.P.J.'s "only real path" to participating in school athletics is to participate on the girls' team with other girls.  (JA3103-3104.)

### C.    Title IX's Athletic Regulations Do Not Authorize Discrimination Against Transgender Students.

Instead of engaging with the applicable framework for evaluating Title IX claims, Defendants assert that girls who are transgender can be categorically excluded from girls' teams because of the "text, history, and purpose" of Title IX's athletic regulations.  (RB38.)  But their arguments distort the "text, history, and purpose," and instead simply advance their own unsupported belief that including girls who are transgender on girls' teams does "not make sense."   (RB45.) Defendants offer no evidence that Title IX's drafters shared Defendants' "misconceptions" and stereotypes about "what it means to be" a transgender girl. *Grimm*, 972 F.3d at 610 & n.10.  "Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations."  *Bostock*, 140 S. Ct. at 1754.  Doing so would "neglect the promise that all persons are entitled to the benefit of the law's terms." *Id.* at 1751.

### 1.    Title IX's Text Does Not Authorize Discrimination Against B.P.J.

Nothing in the text of Title IX or its regulations purports to authorize discrimination against transgender students.   The regulations generally prohibit

schools from providing athletics separately "on the basis of sex," but allow schools to "sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a)-(b). The regulations further provide that regardless of whether a school provides sex-separated or mixed teams, schools must "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Defendants argue that these regulations necessarily authorize schools to exclude transgender girls from girls' sports teams based solely on their sex assigned at birth. According to Defendants, the regulations "envision sex as a binary concept" by using the phrases "members of each sex" and "*both* sexes.'" (RB43 (quoting 34 C.F.R. §§ 106.41(b), (c)).)

This Court addressed that same argument in *G.G.* and *Grimm*. The restroom regulation at issue there also referred to providing restrooms for "students of one sex" and "students of the other sex." 34 C.F.R. § 106.33. This Court nevertheless held (twice) that the regulation's authorization for sex-separated restrooms did not also authorize schools to categorically exclude transgender students from the facilities consistent with their gender identity. *See G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017); *Grimm*, 972 F.3d at 618.

In *G.G.* this Court had "little difficulty concluding that the language itself—

41

'of one sex' and 'of the other sex'—refers to male and female students." 822 F.3d at 720. But, this Court continued, "[a]lthough the regulation may refer unambiguously to males and females, it is silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms." *Id.* This Court reaffirmed that observation in *Grimm*. Once again analyzing the text of 34 C.F.R. § 106.33, this Court explained that "[a]ll [the regulation] suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory." *Grimm*, 972 F.3d at 618. The regulation did not speak to Grimm's challenge, which was not to "sex-separated restrooms" but rather to the school board's "discriminatory exclusion of himself from the sex-separated restroom matching his gender identity." *Id.* So too here. As an implementing regulation, 34 C.F.R. § 106.33, "cannot override the *statutory* prohibition against discrimination on the basis of sex." *Grimm*, 972 F.3d at 618 (emphasis added).

Defendants provide no textual basis for why *G.G.* and *Grimm*'s analyses should not apply with equal force to Title IX's athletic regulations. Instead, Defendants say that athletics are different from restrooms because "biological differences matter in sports." (RB51.) But even if those alleged differences (when they actually exist) may be relevant in some cases when determining whether a particular policy constitutes "discrimination," they are not a basis for reading into Title IX a wholesale exception to the underlying statutory prohibition.

2. **Title IX's History Does Not Support Discrimination Against B.P.J.**

Defendants' "history" argument fares no better. Defendants assert that Title IX and the athletic regulations authorize discrimination against girls who are transgender because the historical impetus for Title IX and the regulations was to provide equal athletic opportunity for cisgender girls and women. (RB41-42, RB45-56.) Defendants appear to assume that when Title IX passed in 1972 and the athletic regulations were issued in 1975, it was understood that sports would be separated based on what Defendants refer to as "biological sex." (RB45.)

The Supreme Court rejected a similar argument in *Bostock*, and this Court likewise should reject it here. The defendants in *Bostock* argued that "'no one' in 1964 or for some time after would have anticipated" that Title VII would be interpreted to prohibit discrimination based on sexual orientation or transgender status. 140 S. Ct. at 1750. "[L]urking just behind such objections," the Supreme Court observed, "resides a cynicism that Congress could not possibly have meant to protect a disfavored group." *Id.* at 1751. Just as there is reason to doubt whether that assumption is "really true" as to Title VII, there is reason to doubt Defendants' assumption here. *Id.* at 1750. As only one example, a few years after Title IX's regulations were finalized, Renée Richards won the legal right to compete in the women's division of the U.S. Open Tennis Championship as a transgender woman under New York State's Human Rights Law. *See Richards v. U.S. Tennis Ass'n*, 93

43

Misc. 2d 713, 400 (Sup. Ct. 1977).  So "at least *some* people" in the 1970s did not share Defendants' assumption that sex-separated teams for girls and women could not include girls and women who are transgender.  *See Bostock*, 140 S. Ct. at 1750. And although Defendants purport to draw support from Professor Deborah Brake for their assumption that the justification for sex-separated sports teams rests exclusively on biological differences, Professor Brake has explained that Title IX's allowance for sex separation did *not* solely "depend on the assertion of innate biological differences between the sexes, but rather on the historic and societal reality that girls and women have not had the benefit of anywhere near the same opportunities as boys and men to develop their athleticism."  Deborah Brake, *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. 41, 70 (2023). Indeed, Professor Brake has criticized attempts to exclude girls who are transgender from girls' sports as "rest[ing] on a biological determinism that has historically and continues to hurt women's equality in general and women's prospects for equal athletic opportunity in particular."  *Id.* at 85.[17]

---

[17] Even if Defendants' historical premise were accepted as true, it still would not override the plain meaning of the statutory and regulatory text.  "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

### 3. Title IX's Purpose Does Not Support Discrimination Against B.P.J.

Ultimately, Defendants contend that anything short of a categorical ban on girls who are transgender would be inconsistent with Title IX's purpose of providing equal athletic opportunity to girls and women. But the statute and regulations permit sex-separated teams as one possible *means* of providing athletic opportunity, not as an *ends* unto itself. Title IX's purpose is to protect equal athletic opportunity, not to create sex-separated teams, much less mandate separation by genetics and reproductive biology at birth. *Cf. Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (striking down high school athletic association rule mandating sex-separation for all teams as inconsistent with Title IX).

As B.P.J.'s very positive experience playing on girls' teams shows (OB11, OB42), there is no inherent conflict between providing athletic opportunity through sex-separated teams and including girls who are transgender on girls' teams. Accordingly, organizations consistently dedicated to protecting opportunity for female athletes strongly oppose H.B. 3293 and similar discriminatory bans. *See* National Women's Law Center et al. Amicus Br. (ECF 69-3); Current and Former Professional, Olympic, and International Athletes in Women's Sports et al. Amicus Br. (ECF 67-2); The Trevor Project Amicus Br. at 26-27 (ECF 54-2).

Title IX protects all persons—including people who are transgender—from discrimination on the basis of sex, and nothing in the statute excludes school-sponsored athletics from the ambit of its protections.  "[N]one of [Defendants'] contentions about what [they] think the law was meant to do, or should do, allow us to ignore the law as it is." *Bostock*, 140 S. Ct. at 1745.[18]

* * *

Because H.B. 3293 discriminates against B.P.J. on the basis of sex in a federally funded educational program and causes her harm in the process, the District Court's judgment against B.P.J. should be reversed and this Court should grant summary judgment to B.P.J. on her Title IX claim.

## III.   All Defendants Are Properly Subject To Suit.

### A.    The Harrison County Board Of Education And Superintendent Stutler Are Proper Defendants And Forfeited Any Arguments Otherwise.

The Harrison County Board of Education and Superintendent Stutler argue in a footnote for an "alternative ground[] for affirmance"—namely, that they are not

---

[18] Despite Defendants' suggestion, the relief B.P.J. seeks is not in tension with the Biden Administration's recently issued Notice of Proposed Rulemaking. (RB11.) B.P.J.'s position is simply that H.B. 3293's categorical ban on the participation of transgender girls on girls' school sports teams is unlawful as applied to her.  Granting her summary judgment says nothing about whether a more nuanced law or policy would survive legal challenge.  Plainly, the United States itself does not see a conflict; it filed a brief in support of B.P.J., not Defendants.  *See* U.S. Amicus Br. (ECF 68-1).

proper defendants under Title IX and the Equal Protection Clause, respectively. (RB53-54 n.*.)  An argument raised only in a footnote of a principal brief is forfeited.  *See, e.g.*, *Mahdi v. Stirling*, 20 F.4th 846, 847 n.36 (4th Cir. 2021); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015).  But even if this Court were to consider the County Board and Superintendent Stutler's alternative arguments, it should reject them.  (*See* ECF No. 331 at 16-20; ECF No. 357 at 5-7.)

The County Board contends that it is not liable under Title IX because it did not pass H.B. 3293 and is merely enforcing the statute as required by state law. (RB53-54 n.*.) But unlike constitutional claims for damages against a municipality, Title IX does not require that discrimination be pursuant to a municipal policy or custom.  It merely requires an act of intentional discrimination.  *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009) (distinguishing between *Monell* and Title IX claims); *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876, 881 n.3 (W.D. Ky. 2011) ("Defendants['] application of the *Monell* 'policy or custom' standard to Title IX claims is incorrect and not supported by the case law."). The question for Title IX liability thus is not whether the County Board originated the policy behind H.B. 3293 but whether the County Board will knowingly subject B.P.J. to discrimination on the basis of sex as a result of its role in enforcing H.B. 3293 against her.

Here, the County Board admits that, but for the current injunction, it would

enforce H.B. 3293 against B.P.J.  (JA3105; JA0482-0483; RB54 n.*.)  Pursuant to the Supremacy Clause, however, the County Board could have chosen to comply with its obligations under Title IX rather than its obligations under H.B. 3293, an illegal state law.  *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 209 (1991) ("When it is impossible for an employer to comply with both state and federal requirements, this Court has ruled that federal law pre-empts that of the States.").  The County Board thus "has authority to address the alleged discrimination and to institute corrective measures" but has not done so.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).  The County Board accordingly is liable under Title IX.

Superintendent Stutler likewise argues that she is not a proper defendant for B.P.J.'s equal protection claim because she is enforcing a West Virginia law, not a County policy or custom.  (RB54 n.* (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978)).)  But B.P.J. is not bringing a *Monell* claim against Superintendent Stutler in her capacity as a county official; she is bringing an *Ex parte Young* claim against her in her capacity as a state official.  And as Superintendent Stutler acknowledges, she can therefore "be subject to an injunction."  (RB54 n.*); *see Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014) (noting that municipal court clerk could be enjoined from enforcing unconstitutional state law under *Ex parte Young* when he had "some connection with

48

the enforcement of the act").  Superintendent Stutler's contention that any monetary award assessed against her is the State's responsibility should be addressed in connection with a post-judgment motion for attorneys' fees, not during resolution of the merits.  *See McGee v. Cole*, 115 F. Supp. 3d 765, 773 (S.D. W. Va. 2015) (apportioning attorneys' fees between county and state after final judgment had been entered).

> **B.    WVSSAC Is A Proper Defendant.**

WVSSAC's only argument for summary judgment was that it is not a proper defendant.  The District Court correctly rejected that argument.  WVSSAC is required to enforce H.B. 3293 against B.P.J., is a state actor under the Equal Protection Clause, and has controlling authority over secondary school interscholastic athletics in West Virginia for purposes of Title IX, and B.P.J.'s claims against WVSSAC are ripe.

> **1.    WVSSAC Is Required To Enforce H.B. 3293 Against B.P.J.**

WVSSAC emphasizes that it "was not involved in the enactment of" H.B. 3293 and has thus far "taken no action relative to B.P.J." (RB54-55), but neither assertion is relevant to whether WVSSAC is a proper defendant here.  WVSSAC does not dispute that it is required to comply with H.B. 3293.  Nor could it. H.B. 3293 governs the "designation of athletic teams or sports that are sponsored by any public secondary school," W. Va. Code § 18-2-25d, and WVSSAC is statutorily

designated to supervise and regulate interscholastic athletics in West Virginia, *id.*; *Jones v. W. Va. State Bd. of Educ.*, 622 S.E.2d 289, 298 (W. Va. 2005). And as the District Court correctly recognized in denying WVSSAC's motion to dismiss, absent an injunction, WVSSAC is required to enforce H.B. 3293 against B.P.J. (JA0462.) WVSSAC enforces rules and regulations related to student eligibility to play sports and is the entity ultimately responsible for determining B.P.J.'s eligibility to play on girls' sports teams. (JA1412; JA2980; JA2999; JA3106-3107.) WVSSAC also must follow any rules promulgated by the State Board of Education pursuant to H.B. 3293. (JA0499; RB56.) And H.B. 3293 prevents WVSSAC from using its internal policy allowing transgender girls to play on girls' school sports teams on a case-by-case basis. (JA0922.) WVSSAC is thus properly subject to an injunction.

### 2. WVSSAC Is A Proper Equal Protection Clause Defendant.

WVSSAC is a state actor properly subject to the Equal Protection Clause. "Every court that has considered the question whether associations like the [WVSSAC] are state actors have found that those organizations are so intertwined with the state that their acts constitute state action." *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 458 n.4 (1989). Indeed, the West Virginia Supreme Court has *twice* adjudicated that WVSSAC is a state actor. *See id.* at 458; *Jones*, 622 S.E.2d at 295 (concluding, in suit against WVSSAC, that "there is no question that the equal protection claim involves state action").

Those decisions and that of the District Court (JA4262) are plainly correct. WVSSAC is "so intertwined with the state" that its "acts constitute state action." *Israel*, 182 W. Va. at 458 n.4; (JA4262) ("WVSSAC cannot exist without the state, and the state cannot manage statewide secondary school activities without the WVSSAC."). "Every public secondary school in West Virginia is a member of the WVSSAC" (JA4262-4263)—indeed, "[n]o public school has ever not been a member" (JA1408); school principals help set WVSSAC's rules and regulations, which are subject to the approval of the State Board of Education; and state representatives sit on the WVSSAC board that enforces those rules (JA4263; *see also* JA2976; JA4196-4200). B.P.J.'s middle school, like all member schools, has agreed to "delegate the control, supervision, and regulation of the interscholastic athletic . . . activities" to WVSSAC and adhere to WVSSAC's policies and procedures. (JA2975-2976.) Member schools that fail to obey WVSSAC's rules are sanctioned. (JA1411-1412.) Accordingly, the District Court held that "WVSSAC's nominally private character is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." (JA4262 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001)).)

51

Multiple courts have likewise held state athletic associations to be state actors when these factors were present. *See e.g.*, *Brentwood*, 531 U.S. at 295, 299-303 (state action due to pervasive entwinement of state school officials in association's structure); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 740 (W.D. Mich. 2000) (collecting cases); *McGee v. Va. High Sch. League, Inc.*, No. 11 Civ. 35, 2011 WL 4501035, at *2 (W.D. Va. Sept. 28, 2011), *aff'd sub nom. Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714 (4th Cir. 2012) ("Because statewide athletic associations are almost entirely comprised of and governed by government entities and representatives, the Supreme Court has deemed these associations to be state actors.").   WVSSAC contends that the District Court "overlooked the particulars of WVSSAC's structure that are different from entities in decisions" from other courts (RB57), but never specifies what those differentiating "particulars" are.

WVSSAC also claims that it cannot be a state actor because it has taken no action "relative to B.P.J. or the Act" (RB57), but the "challenged action" (RB58 (quoting *Peltier*, 37 F.4th at 115)) here is WVSSAC's future enforcement of H.B. 3293 against B.P.J., which B.P.J. has sued to prevent.

WVSSAC is a proper defendant under the Equal Protection Clause.

### 3.    WVSSAC Is A Proper Title IX Defendant.

WVSSAC is subject to Title IX because it exercises controlling authority over federally funded public school athletic programs. (JA3106-3107; JA0483-0484; JA0492; JA2975-2980); *see, e.g.*, *Doe v. CVS Pharm., Inc.*, No. 18-cv-01031-EMC, 2022 WL 3139516, at *12 (N.D. Cal. Aug. 5, 2022) (collecting cases that "applied the 'controlling authority' test to find that an entity is covered under Title IX" and explaining that "an entity that does not directly receive federal funding may nonetheless be covered where the entity . . . exercises controlling authority over a federally funded program"); *Cmtys. for Equity*, 80 F. Supp. 2d at 735 (holding that "any entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid"); *Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 533 (W.D. Va. 1999) (same); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) ("[I]f we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to . . . avoid Title IX liability."); *A.B. by C.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357-58 (D. Haw. 2019) (describing cases holding that "an entity that has controlling authority over a federally funded program is also subject to the anti-discrimination provisions of Title IX" as "persuasive and instructive" and holding

53

that an interscholastic association with controlling authority over federally funded interscholastic athletic programs was plausibly alleged to be subject to Title IX). WVSSAC vaguely protests that its controlling authority "does not exist as characterized" (RB58), but does not specify the mischaracterization.

WVSSAC's citation to *Smith v. NCAA*, 266 F.3d 152 (3d Cir. 2001), is inapposite. (RB59.) *Smith* concerned the NCAA, which has member schools across multiple states that it allows to retain institutional control over their athletic programs, not a state-level scholastic athletic association whose member schools have ceded their control over school athletics. 266 F.3d at 156-57; *see Brentwood*, 531 U.S. at 298 (explaining that the conclusion that NCAA was not a state actor would not hold for "an organization whose member public schools are all within a single State").

WVSSAC's reliance on *Yellow Springs* is similarly unpersuasive. (RB59.) That case simply held that a state-level scholastic athletic association could not adopt a rule that prevented its member schools from complying with Title IX, not that such associations are exempt from Title IX.[19] *Yellow Springs*, 647 F.2d at 656-57.

WVSSAC is a proper defendant under Title IX.

---

[19] WVSSAC's citation to *Estes v. Midwest Products, Inc.*, 24 F. Supp. 2d 621 (S.D. W. Va. 1998) (RB59) is puzzling. *Estes* is a product liability case concerning a motion to dismiss for lack of personal jurisdiction. It has nothing to do with equal protection or Title IX.

### 4.    B.P.J.'s Claims Against WVSSAC Are Ripe.

As the District Court correctly held in denying WVSSAC's motion to dismiss, B.P.J.'s claims against WVSSAC are ripe.  (JA0462.)  WVSSAC protests that it "may never" enforce H.B. 3293 against her (RB60), but there is no question that WVSSAC is required to comply with H.B. 3293 and enforce it against B.P.J.  *See supra* Section IV.B.1; (JA0920).  As the District Court observed, "H.B. 3293 requires each defendant to prevent B.P.J. from playing on girls' sports teams; no future factual development will change that effect."  (JA0462.)

None of WVSSAC's cited cases, which all involved statutory schemes that provided administrative remedies, disturb this conclusion.  (RB60 (citing *Nat'l Ass'n of Agric. Emps. v. Trump*, 462 F. Supp. 3d 572, 581 (D. Md. 2020) (pre-enforcement judicial review barred where plaintiff did not first exhaust administrative remedies under statutory scheme); *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000) (same)).)  Here, there are no administrative remedies that B.P.J. must exhaust to challenge H.B. 3293.

### CONCLUSION

For the foregoing reasons and those set forth in her opening brief, the Court should reverse the District Court's Order denying Plaintiff's motion for summary judgment and granting Defendants' and Intervenor's motions for summary judgment; affirm the District Court's order denying summary judgment to

WVSSAC; enter judgment in favor of Plaintiff; and remand to the District Court to enter permanent injunctive relief.  Alternatively, the Court should vacate and remand for the District Court to evaluate B.P.J.'s as-applied claims under the proper standard, including, as necessary, ruling on the admissibility of expert evidence.

Dated: May 26, 2023                    */s/ Kathleen Hartnett*

Joshua A. Block                         Kathleen Hartnett
AMERICAN CIVIL LIBERTIES                Julie Veroff
UNION FOUNDATION                        Zoë Helstrom
125 Broad Street, 18th Floor            COOLEY LLP
New York, NY 10004                      3 Embarcadero Center, 20th Floor
Phone: (212) 549-2569                   San Francisco, CA 94111
                                        Phone: (415) 693-2000
                                        khartnett@cooley.com
Sruti Swaminathan
LAMBDA LEGAL                            Andrew Barr
120 Wall Street, 19th Floor             COOLEY LLP
New York, NY 10005                      1144 15th St. Suite 2300
Phone: (212) 809-8585                   Denver, CO 80202-5686
                                        Phone: (720) 566-4000
Tara Borelli
Carl Charles                            Katelyn Kang
LAMBDA LEGAL                            COOLEY LLP
158 West Ponce De Leon Ave.             55 Hudson Yards
Suite 105                               New York, NY 10001-2157
Decatur, GA 30030                       Phone: (212) 479-6000
Phone: (424) 298-7911

Aubrey Sparks                           Elizabeth Reinhardt
Nick Ward                               COOLEY LLP
AMERICAN CIVIL LIBERTIES                500 Boylston Street, 14th Floor
UNION OF WEST VIRGINIA                  Boston, MA 02116-3736
FOUNDATION                              Phone: (617) 937-2305
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435                   Mariah A. Young
                                        COOLEY LLP
                                        110 N. Wacker Drive
                                        Suite 4200
                                        Chicago, IL 60606
                                        Phone: (312) 881-6500

                                        *Counsel for Plaintiff-Appellant/Cross-*
                                        *Appellee B.P.J.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(g), I certify that this motion complies with applicable type-volume and length limitations because this motion contains 13,408 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(4)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

Dated: May 26, 2023

*/s/ Kathleen Hartnett*
Kathleen Hartnett

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Plaintiff-Appellant/Cross-Appellee B.P.J., by Her Next Friend and Mother, Heather Jackson, with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on May 26, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 26, 2023

*/s/ Kathleen Hartnett*
Kathleen Hartnett