No. 23-1078

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff-Appellant*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, *et al.*,

*Defendants-Appellees*,

and

STATE OF WEST VIRGINIA, *et al.*

*Intervenors-Appellees.*

On Appeal from the United States District Court
for the Southern District of West Virginia (Charleston)
Case No. 2:21-cv-00316

## REPLY IN SUPPORT OF
## MOTION TO SUSPEND THE INJUNCTION PENDING APPEAL

PATRICK MORRISEY
  *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
lindsay.s.see@wvago.gov

LINDSAY S. SEE
  *Solicitor General*
  *Counsel of Record*

MICHAEL R. WILLIAMS
  *Principal Deputy Solicitor*
  *General*

SPENCER J. DAVENPORT
GRANT A. NEWMAN
  *Assistant Solicitors General*

*Counsel for Intervenor-Appellee State of West Virginia*

[additional counsel listed on signature page]

# TABLE OF CONTENTS

Introduction ...................................................................................................... 1

Argument .......................................................................................................... 1

    I.      Significant Changes In B.P.J.'s Athletic Performance Make The Injunction Against The Public Interest ....................................................... 1

    II.     All Of The Injunction Factors Are Properly Before The Court ............... 8

    III.   The Balance Of Harms And Public Interest Support Relief ................. 10

Conclusion ...................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Zurich Ins. Co.*,
　667 F.2d 1162 (4th Cir. 1982)...................................................................................5

*Brown v. Gilmore*,
　533 U.S. 1301 (2001)...................................................................................................7

*Brooks v. State Coll. Area Sch. Dist.*,
　No. 4:22-CV-01335, 2022 WL 17366397 (M.D. Pa. 2022).................................7

*Centennial Broad., LLC v. Burns*,
　433 F. Supp. 2d 730 (W.D. Va. 2006)................................................................9, 10

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
　886 F.2d 1191 (9th Cir. 1989)....................................................................................2

*E.E.O.C. v. Freeman*,
　778 F.3d 463 (4th Cir. 2015)......................................................................................3

*Horne v. Flores*,
　557 U.S. 433 (2009)..........................................................................................2, 5, 8

*L.J. v. Wilbon*,
　633 F.3d 297 (4th Cir. 2011).....................................................................................9

*Maryland v. King*,
　567 U.S. 1301 (2012)................................................................................................11

*Multi-Channel TV Cable. Co. v. Charlottesville Quality Cable*
　*Operative Co.*,
　No. 94-2569, 1995 WL 406612 (4th Cir. 1995).....................................................9

*Rufo v. Inmates of Suffolk Cnty. Jail*,
　502 U.S. 367 (1992)....................................................................................................7

*Stone v. Trump*,
　400 F. Supp. 3d 317 (D. Md. 2019).........................................................................9

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008).........................................................................................................8

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

**Statute**

W. VA. CODE § 18-2-25(d)(a)(5) ........................................................................... 6

**Other Authorities**

DAVID G. KNIBB, FEDERAL COURT OF APPEALS MANUAL
 (7th ed. May 2023 update) .................................................................................. 8

*Espen Tønnessen*, et al., *Performance Development in Adolescent Track and Field Athletes According to Age, Sex and Sport Discipline*, 10 PLoS One (June 4, 2015) ............................................................ 4

## INTRODUCTION

B.P.J. doesn't dispute displacing far more girls this spring track-and-field season than ever before—including two girls who would otherwise have had a spot at conference championships. The question now is whether those changed circumstances make it inequitable to leave the injunction in place going into the fall season. The answer is yes.

The response argues "nothing to see here" because "the fact that B.P.J. outperformed some cisgender girls is not new." Resp.14. But finishing "regularly" and "consistently … near the back of the pack," ECF No. 34, at 6, 13, is markedly different from averaging in the top ten and excluding girls from participating in championship events, Mot.17. So the assumption that B.P.J.'s participation comes at no one's expense, ECF No. 49, at 14, no longer holds.

No matter how the Court weighed the injunction factors half a year ago, these new circumstances shift the balance. The Court should suspend the injunction.

## ARGUMENT

**I.  Significant Changes In B.P.J.'s Athletic Performance Make The Injunction Against The Public Interest.**

B.P.J. contests none of the key facts. Not that B.P.J.'s improved performance qualified for one of only three slots at conference championships in two events. Mot.15. Not that B.P.J. displaced 100 different girls at various spring meets over 280 times. Mot.16-17. And not that B.P.J. finished in the

1

top 10 in most of the events in which B.P.J. competed this spring. Mot.16. So things *have* changed since the Court entered the injunction. The question is whether the change is "significant" enough that keeping it is "detrimental to the public interest." *Horne v. Flores*, 557 U.S. 433, 447 (2009). It is—whether the Court views B.P.J.'s upswing in overall placement terms or relative to other teammates.

*First*, the spring track-and-field season shows a significant change in B.P.J.'s competition results. Placing ahead of "some" girls, Resp.14, is not the same as placing ahead of most girls. Yes, Movants argued that displacements matter even short of keeping someone off the podium; displacing anyone does harm. *E.g.* Mot.17-18 (quoting *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989)). But displacing many more girls than before in a way that denies some of them participation opportunities is worse. This is not "the exact same argument," Resp.15, as before.

It's too high a level of generality to say B.P.J. "improved" from sixth to seventh grade and "placed ahead of some cisgender girls (and behind others)." Resp.14. The same is true for any student who bumped up one spot in the rankings, whether to second place or second-to-last. It's the significantly increased *degree* of displacement that is new. Before the injunction, B.P.J. displaced girls 105 times across eleven events. Mot.App.17-30. Since, B.P.J. displaced girls at spring meets over 280 times in thirteen events. Mot.17. B.P.J.'s examples show the same: Placing 35 out of 53 and 57 out of 61 in discus

2

and shotput at spring 2022 meets, Resp.15, is materially different than averaging 9th and 10th in those events a year later, Mot.16-17.

We also have a different type of displacement now: keeping some girls from competing *at all*. Again, B.P.J. doesn't dispute that three slots were available for conference championship events, and that B.P.J.'s improvement meant B.P.J.—and not someone else—got one of those slots in discus and shotput. Mot.15-16; *id.* at 16 (same for statewide invitational).

*Second*, there's been a significant change relative to the rest of the team. B.P.J. says Movants misrepresented the statistics. Resp.20-21. But some of the points B.P.J. raises highlight how Movants sought to *avoid* any suggestion of "omitting data [that] might distort the result." *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) (Agee, J., concurring). Regardless, tweaking which data to use for comparison doesn't change the bottom line.

For instance, Movants compared B.P.J. to top performers in one sport and seventh graders in another because it's arguable that B.P.J. is similarly situated to both populations. And B.P.J.'s performance was atypical to both. B.P.J. surmises that this effort was meant to exclude I.M.'s strong performance in the discus event. But Movants didn't include I.M. there because she was in eighth grade, and B.P.J. was in seventh. Mot.App.1, 35. And anyway, I.M.'s rate of improvement was warped by a single outlier performance where she improved her previous best by over 25 feet. Mot.App.35-36. Excluding the outlier, I.M. improved a more modest 17% over the track season. Mot.App.35-36. So B.P.J. showed consistently atypical

3

improvement relative to the comparably consistent performance of the team—I.M. included.

B.P.J. also questions looking to percentages at all, insisting that methodology "obscures the[] numbers" because B.P.J.'s "throwing distances were much worse" than peers' when B.P.J. started. Resp.22-23. Leave aside that Movants included all the absolute figures in the motion and appendix—everything is in the open. More important, the fact that B.P.J. started so far behind and then jumped to championship-level performance is the point. It's not "entirely predictable," Resp.6, for any athlete to suddenly make that leap. B.P.J. also never suggests how Movants *should* compare the data; analyses of this sort often look to percentages. *Cf. Espen Tønnessen*, et al., *Performance Development in Adolescent Track and Field Athletes According to Age, Sex and Sport Discipline*, 10 PLoS One 4-5 (June 4, 2015), https://bit.ly/3Y1yXqM.

B.P.J. further faults Movants for using 2022-2023 figures in some instances and 2023 information alone in others. Resp.21; *see also* Resp.23 n.4 (suggesting best and worst are better indicators than first and last). But the numbers are not better for B.P.J. even looking only to best and worst 2023 performances. Take discus. Using a worst-best metric, B.P.J. improved from 50' 4" to 68' 7"—a 36% spread. Mot.App.1. The two other seventh graders improved by only about 11% and 19%. Things look no different across the 2022 and 2023 seasons for everyone. In 2022, for example, the best result in shot put for I.M.—B.P.J.'s preferred comparator—was 28' 2.5". Mot.App.35. In

4

2023, I.M. bumped up her personal record to 35' 3", which is about a 25% improvement. In contrast, B.P.J. improved from 18' 10" to 28' 10", about a 53% improvement. Mot.App.1-2.

So any way you cut it, the real-world data show much more than an "entirely predictable spring track-and-field season." Resp.6. They reveal a "significant change" in "factual conditions" that warrants reinstating the district court's order pending appeal. *Horne*, 557 U.S. at 447.

B.P.J.'s remaining arguments are no reason to set aside these on-the-ground results. For one thing, arguing it doesn't really matter where B.P.J. finishes is an about-face from prior litigation positions. Until now, B.P.J. always argued that finishing in the back is at least a large factor why, in B.P.J.'s view, playing on the girls team harms no one. B.P.J. told the Court in February that because "B.P.J. consistently finishes near the back of the pack," ECF No. 34, at 25, "no one" will be harmed by "B.P.J.'s continued participation on girl's middle-school sports teams." ECF No. 49, at 14. A month later B.P.J. similarly argued that finishing "ahead of a few other runners" is "not displacement." Resp. Opp. to Appl. to Vacate 37, *West Virginia v. B.P.J.*, No. 22A800 (U.S. Mar. 20, 2023); *see also, e.g.*, ECF No. 34, at 6 (emphasizing that B.P.J. "regularly finish[es] near the back of the pack"); ECF No. 52, at 15, 21, 52, 55. Especially in this equities-focused posture, the Court should hold B.P.J. to the consequences of that position. *Cf. Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1167 n.3 (4th Cir. 1982) (explaining that "earlier tak[ing] a directly contrary position" can be grounds for judicial skepticism).

5

Similarly, given B.P.J.'s focus on weaker performance results when it helped B.P.J., it is hard to see how an opposite swing is *not* the type of changed circumstance that could warrant modification. Certainly new medical decisions would be appropriate grounds, too. Resp.14. But the "risk" of significantly improved athletic performance that B.P.J. agreed could allow Movants to "seek to modify the injunction," ECF No. 49, at 15 n.10, might manifest in other ways, too. Now there's no "might." The risk proved real.

Nor does speculating about why B.P.J. got better change things. B.P.J. attributes the improved performance to "train[ing] diligently and put[ting] in many extra hours," so the "improvement has nothing to do with being transgender." Resp.23. Movants respect B.P.J.'s commitment and effort. But ensuring that all students who work hard begin from the same biological starting point is exactly the fairness concern that animated H.B. 3293. W. VA. CODE § 18-2-25(d)(a)(5). B.P.J. also does not (and cannot) suggest that no one else on the team worked hard, so that factor is not unique to explain B.P.J.'s disproportionate rankings rise.

Ultimately, B.P.J. would count all gains to training, while Movants warned that results like these are expected over time when a biological male—even on hormones—plays on the girls team. *E.g.*, ECF No. 48, at 29. Regardless, what matters on the equities side is that B.P.J. is displacing biological girls to a much greater extent than before. To *them*, that's injury no matter why it happens. And now, it's greater than before.

6

B.P.J.'s theory would also mean no results could ever justify modification; even sweeping state championships could be attributed to hard work. That cannot be right. However the Court decides causation as part of the merits questions, it does not change whether someone experiences harm. *See, e.g.*, *Brooks v. State Coll. Area Sch. Dist.*, No. 4:22-CV-01335, 2022 WL 17366397, at *7 (M.D. Pa. 2022) (explaining "courts' longstanding finding that lost opportunity" in "student athletics can be considered irreparable harm").

Lastly, the changed circumstances call for suspending the injunction in full. Where B.P.J. improved so significantly, the Court should not withhold relief because B.P.J. plans to participate in different events this fall. All track-and-field events require athletic ability and strength; this is no apples-to-oranges comparison. Nor does any rule require waiting after finding harm in one area to see if it will appear in precisely the same way in a related one. B.P.J.'s "tailoring" case from the consent-decree context emphasizes that parties—who agreed to the original order, unlike here—have a heavy burden to show more than that it is "no longer convenient to live with the [decree's] terms." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). Here, since injunctions are extraordinary, slow-to-issue remedies, *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers), holding Movants to a sport-by-sport burden, and *before* B.P.J.'s running results are available, gets things backward.

7

## II. All Of The Injunction Factors Are Properly Before The Court.

B.P.J. brushes aside the rest of the motion, complaining that anything not specifically addressed to the markedly changed circumstances is an "unauthorized supplemental brief." Resp.11. But nothing is improper in explaining why the injunction factors support lifting it or in using non-identical sources from past briefs to do so.

An unadorned, notice-style motion laying out B.P.J.'s new track-and-field results is certainly one approach: Movants could have stopped with incorporating prior briefing on other issues relevant to injunctive relief, as B.P.J. does for several arguments. *See* Resp.13 n.2. But a motion like that would lack context. Movants bear "the burden of establishing that changed circumstances warrant relief," *Horne*, 557 U.S. at 447—meaning that "continued enforcement" is "detrimental to the public interest," *id.* (cleaned up), and B.P.J. no longer "qualifies" for injunctive relief, DAVID G. KNIBB, FEDERAL COURT OF APPEALS MANUAL § 21:7 (7th ed. May 2023 update). And because the injunction factors weigh together when determining whether a party "qualifies," context matters. The Court may well view the interplay differently with one side of the scale heavier now than it was before. *E.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23-24 (2008) (explaining that "irreparable injury" could be "outweighed by the public interest and the [party's] interest").

Nor do this Court's precedents require the silence B.P.J. demands. The unpublished decision B.P.J. cites explains that motions to revisit injunctions

8

must in fact argue changed circumstances—this motion does—and that parties cannot use them to avoid the consequences of missing an appeal or reconsideration deadline. *Multi-Channel TV Cable. Co. v. Charlottesville Quality Cable Operative Co.*, No. 94-2569, 1995 WL 406612, at *2 (4th Cir. 1995) (motions "should not serve as an avenue of untimely review" (cleaned up)). And though *L.J. v. Wilbon* criticizes a party for an argument already raised, the Court was concerned that they had not *developed* it below, raising it in "only one footnote in a reply." 633 F.3d 297, 305 n.6 (4th Cir. 2011).

As for the district court decisions, one quotes *L.J.* and emphasizes the Court's analysis is "flexible" in this context. *Stone v. Trump*, 400 F. Supp. 3d 317, 332 (D. Md. 2019). The other gives context to the "no relitigating issues" rule by explaining that parties cannot "seek[] to dissolve a preliminary injunction based *solely* on the amplification of old theories or new theories that could have been presented earlier." *Centennial Broad., LLC v. Burns*, 433 F. Supp. 2d 730, 734 (W.D. Va. 2006) (emphasis added). That's not what's happening here. B.P.J. does not argue the State is adding new legal theories to the mix—the response describes the challenged points as a "rehash[ing]" that "bolster[s]" existing arguments. Resp.11-12.

At bottom, B.P.J. objects to a few new cases and articles. Resp.12-13. But appellate parties are not forbidden from going beyond the exact cases and other support they cited before. In other words, "citing sources that [the State] could have included in their merits briefing but did not," Resp.11, is different from arguing legal "theories that could have been presented earlier."

9

*Centennial*, 433 F. Supp. 2d at 734. Here, Movants are neither adding new arguments nor going beyond the scope of the question now—whether, given the changed facts, the mix of factors supports an injunction.

### III. The Balance Of Harms And Public Interest Support Relief.

Movants and B.P.J. agree that opportunities to play and win matter to student athletes. Resp.24; Mot.21-22. And Movants do not discount B.P.J.'s interests—we simply urge the Court to recognize, as B.P.J. appears unwilling to do, that this factor weighs on *both* sides. Now, it counsels lifting the injunction.

More girls are being displaced through the injunction than before, and to a much greater degree. Even the district court—which ruled for the State even though it thought B.P.J. had the better of the equities—based its equities analysis largely on the fact that "B.P.J. often finish[es] near the end of the pack" and displaced only "a few other children." JA4298. That rationale isn't true anymore. Losing opportunities to place higher in the rankings and, now, to compete in championship events is real harm for other members of the team. Mot.22-23. That harm only stands to get worse next season. And on the other side, B.P.J.'s injury is at least mitigated by the opportunity to play on another team. A less preferred option is not no option, especially where B.P.J. elected not to engage the authorities explaining that stigmatic injuries aren't cognizable in this context or explain why there would be stigma given B.P.J.'s praise for the school community's support. Mot.24-25.

10

The public interest weighs on Movants' side, too. Equal opportunities and fair competition are important goals. Mot.25-26. And the State "suffers a form of irreparable injury," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), every day it is unable to enforce the law its representatives enacted. So the equites join the merits, and now firmly support relief.

## CONCLUSION

The Court should suspend the injunction pending appeal.

Respectfully submitted,

PATRICK MORRISEY
   ATTORNEY GENERAL

Lindsay S. See
   *Solicitor General*

/s/ Michael R. Williams
Michael R. Williams
   *Principal Deputy*
   *Solicitor General*

Spencer J. Davenport
Grant A. Newman
   *Assistant Solicitors General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021

*Counsel for Intervenor-Appellee*
*State of West Virginia*

/s/ John J. Bursch
John J. Bursch
Christiana M. Kiefer
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
jbursch@ADFlegal.org
ckiefer@ADFlegal.org
(616) 450-4235

Johannes S. Widmalm-Delphonse
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy.
Lansdowne, VA 20176
jwidmalmdelphonese@ADFlegal.org
(571) 707-4655

Jonathan A. Scruggs
Jacob P. Warner
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
jscruggs@ADFlegal.org
jwarner@ADFlegal.org
(480) 444-0020

*Counsel for Intervenor-Appellee*
*Lainey Armistead*

12

## CERTIFICATE OF COMPLIANCE

1. This reply complies with Fed. R. App. P. 27(d)(2)(A) because it contains 2,599 words.

2. This reply complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams