# EXHIBIT A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11707

_____

PAUL A. EKNES-TUCKER,
Rev.,
BRIANNA BOE,
individually and on behalf of her minor son, Michael Boe,
JAMES ZOE,
individually and on behalf of his minor son, Zachary Zoe,
MEGAN POE,
individually and on behalf of her minor daughter, Allison Poe,
KATHY NOE, et al.,
individually and on behalf of her minor son, Christopher Noe,

                                        Plaintiffs-Appellees,

*versus*

GOVERNOR, OF THE STATE OF ALABAMA,
ATTORNEY GENERAL, STATE OF ALABAMA,

DISTRICT ATTORNEY, FOR MONTGOMERY COUNTY,
DISTRICT ATTORNEY, FOR CULLMAN COUNTY,
DISTRICT ATTORNEY, FOR LEE COUNTY, et al.,

                                           Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cv-00184-LCB-SRW

_____

Before LAGOA, BRASHER, Circuit Judges, and BOULEE,* District
Judge.

LAGOA, Circuit Judge:

      This appeal centers around section 4(a)(1)–(3) of Alabama's
Vulnerable Child Compassion and Protection Act (the "Act"). Sec-
tion 4(a)(1)–(3) of the Act states that "no person shall engage in or
cause" the prescription or administration of puberty blocking med-
ication or cross-sex hormone treatment to a minor "for the purpose
of attempting to alter the appearance of or affirm the minor's per-
ception of his or her gender or sex, if that appearance or perception
is inconsistent with the minor's sex." Thus, section 4(a)(1)–(3)

_____

* Honorable J. P. Boulee, United States District Judge for the Northern District
of Georgia, sitting by designation.

makes it a crime in the State of Alabama to take part in providing puberty blockers or cross-sex hormone treatment to a minor for purposes of treating a discordance between the minor's biological sex and sense of gender identity.

Shortly after the Act was signed into law, a group of transgender minors, their parents, and other concerned individuals challenged the Act's constitutionality, claiming that it violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. As part of that lawsuit, the district court issued a preliminary injunction enjoining Alabama from enforcing section 4(a)(1)–(3) of the Act pending trial, having determined that the plaintiffs are substantially likely to succeed on both of the aforementioned claims. Specifically, as to the due process claim, the district court held that there is a constitutional right to "treat [one's] children with transitioning medications subject to medically accepted standards" and that the restrictions of section 4(a)(1)–(3) likely impermissibly infringe upon that constitutional right. As to the equal protection claim, the district court held that section 4(a)(1)–(3) classifies on the basis of sex by classifying on the basis of gender nonconformity and likely amounts to unlawful discrimination under the intermediate scrutiny standard applicable to sex-based classifications.

On review, we hold that the district court abused its discretion in issuing this preliminary injunction because it applied the wrong standard of scrutiny. The plaintiffs have not presented any authority that supports the existence of a constitutional right to

"treat [one's] children with transitioning medications subject to medically accepted standards." Nor have they shown that section 4(a)(1)–(3) classifies on the basis of sex or any other protected characteristic. Accordingly, section 4(a)(1)–(3) is subject only to rational basis review. Because the district court erred by reviewing the statute under a heightened standard of scrutiny, its determination that the plaintiffs have established a substantial likelihood of success on the merits cannot stand. We therefore vacate the preliminary injunction.

## I.    BACKGROUND

The Act was passed by the Alabama Legislature on April 7, 2022, and signed into law by Governor Kay Ivey the following day, thereby set to become effective on May 8, 2022.

### A.    *The Text of the Act*

The Act contains eleven sections. For the sake of completeness, each section is described below.

**Section 1** establishes the title of the Act.

**Section 2** sets forth the following findings by the Alabama Legislature:

> (1)    The sex of a person is the biological state of being female or male, based on sex organs, chromosomes, and endogenous hormone profiles, and is genetically encoded into a person at the moment of conception, and it cannot be changed.

(2)     Some individuals, including minors, may experience discordance between their sex and their internal sense of identity, and individuals who experience severe psychological distress as a result of this discordance may be diagnosed with gender dysphoria.

(3)     The cause of the individual's impression of discordance between sex and identity is unknown, and the diagnosis is based exclusively on the individual's self-report of feelings and beliefs.

(4)     This internal sense of discordance is not permanent or fixed, but to the contrary, numerous studies have shown that a substantial majority of children who experience discordance between their sex and identity will outgrow the discordance once they go through puberty and will eventually have an identity that aligns with their sex.

(5)     As a result, taking a wait-and-see approach to children who reveal signs of gender nonconformity results in a large majority of those children resolving to an identity congruent with their sex by late adolescence.

(6)     Some in the medical community are aggressively pushing for interventions on minors that medically alter the child's hormonal balance and remove healthy external and internal sex organs when the child expresses a desire to appear as a sex different from his or her own.

(7)     This course of treatment for minors commonly begins with encouraging and assisting the

child to socially transition to dressing and presenting as the opposite sex. In the case of prepubertal children, as puberty begins, doctors then administer long-acting GnRH agonist (puberty blockers) that suppress the pubertal development of the child. This use of puberty blockers for gender nonconforming children is experimental and not FDA-approved.

(8)    After puberty blockade, the child is later administered "cross-sex" hormonal treatments that induce the development of secondary sex characteristics of the other sex, such as causing the development of breasts and wider hips in male children taking estrogen and greater muscle mass, bone density, body hair, and a deeper voice in female children taking testosterone. Some children are administered these hormones independent of any prior pubertal blockade.

(9)    The final phase of treatment is for the individual to undergo cosmetic and other surgical procedures, often to create an appearance similar to that of the opposite sex. These surgical procedures may include a mastectomy to remove a female adolescent's breasts and "bottom surgery" that removes a minor's health reproductive organs and creates an artificial form aiming to approximate the appearance of the genitals of the opposite sex.

(10)    For minors who are placed on puberty blockers that inhibit their bodies from experiencing the natural process of sexual development, the overwhelming majority will continue down a path toward cross-sex hormones and cosmetic surgery.

(11)    This unproven, poorly studied series of interventions results in numerous harmful effects for minors, as well as risks of effects simply unknown due to the new and experimental nature of these interventions.

(12)    Among the known harms from puberty blockers is diminished bone density; the full effect of puberty blockers on brain development and cognition are yet unknown, though reason for concern is now present.  There is no research on the long-term risks to minors of persistent exposure to puberty blockers.  With the administration of cross-sex hormones comes increased risks of cardiovascular disease, thromboembolic stroke, asthma, COPD, and cancer.

(13)    Puberty blockers prevent gonadal maturation and thus render patients taking these drugs infertile.  Introducing cross-sex hormones to children with immature gonads as a direct result of pubertal blockade is expected to cause irreversible sterility.  Sterilization is also permanent for those who undergo surgery to remove reproductive organs, and such persons are likely to suffer through a lifetime of complications from the surgery, infections, and other difficulties requiring yet more medical intervention.

(14)    Several studies demonstrate that hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual.  For example, individuals who undergo cross-sex cosmetic surgical procedures have been found to suffer from elevated mortality rates higher than the general

population. They experience significantly higher rates of substance abuse, depression, and psychiatric hospitalizations.

(15) Minors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications, including permanent sterility, that result from the use of puberty blockers, cross-sex hormones, and surgical procedures.

(16) For these reasons, the decision to pursue a course of hormonal and surgical interventions to address a discordance between the individual's sex and sense of identity should not be presented to or determined for minors who are incapable of comprehending the negative implications and life-course difficulties attending to these interventions.

**Section 3** provides definitions for the terms "minor," "person," and "sex." Section 3(1) incorporates the definition of "minor" established in section 43-8-1 of the Alabama Code, first enacted in 1975, which is "[a] person who is under 19 years of age." Ala. Code § 43-8-1(18). Section 3(2) defines the term "person" to include "[a]ny individual"; "[a]ny agent, employee, official, or contractor of any legal entity"; and "[a]ny agent, employee, official, or contractor of a school district or the state or any of its political subdivisions or agencies." Section 3(3) defines the term "sex" to mean "[t]he

biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."

**Section 4**, in broad terms, makes it a felony to perform certain medical practices on minors for certain purposes, and reads as follows:

> (a)        Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
>> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>>
>> (2) Prescribing or administering supraphysiologic[1] doses of testosterone or other androgens to females.
>>
>> (3) Prescribing or administering supraphysiologic doses of estrogen to males.
>>
>> (4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

---

[1] Supraphysiologic means of or pertaining to an amount "greater than normally present in the body." *See Supraphysiologic*, *Merriam-Webster*, https://www.merriam-webster.com/medical/supraphysiological.

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidio-plasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

(b)      Subsection (a) does not apply to a procedure undertaken to treat a minor born with a medically verifiable disorder of sex development, including ei-ther of the following:

(1) An individual born with external biological sex characteristics that are irresolvably ambiguous, in-cluding an individual born with 46 XX chromo-somes with virilization, 46 XY chromosomes with under virilization, or having both ovarian and tes-ticular tissue.

(2) An individual whom a physician has otherwise diagnosed with a disorder of sexual development, in which the physician has determined through genetic or biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female.

(c)      A violation of this section is a Class C felony.

**Section 5**, in broad terms, prohibits certain school employees from withholding certain information about mi-nor students from their parents and from encouraging or

coercing minor students to do the same. The section reads as follows:

> No nurse, counselor, teacher, principal, or other ad-ministrative official at a public or private school at-tended by a minor shall do either of the following:
>
> (1)    Encourage or coerce a minor to withhold from the minor's parent or legal guardian the fact that the minor's perception of his or her gender or sex is in-consistent with the minor's sex.
>
> (2)    Withhold from a minor's parent or legal guard-ian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex.

**Section 6** clarifies that, except as provided for in section 4, nothing in the Act shall be construed as "limiting or preventing" certain mental health professionals from "rendering the services for which they are qualified by training or experience involving the application of recognized principles, methods, and procedures of the science and professional of psychology and counseling."

**Section 7** similarly clarifies that "[n]othing in this section shall be construed to establish a new or separate standard of care for hospitals or physicians and their patients or otherwise modify, amend, or supersede" certain other laws of the State of Alabama.

**Section 8** is a severability clause. It provides that, "[i]f any part, section, or subsection of [the Act] or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect parts, sections, subsections, or applications of this act

that can be given effect without the invalid part, section, subsection, or application."

**Section 9** clarifies that the Act "does not affect a right or duty afforded to a licensed pharmacist by state law."

**Section 10** clarifies that, "[a]lthough this bill would have as its purpose or effect the requirement of a new or increased expenditure of local funds," it is "excluded from further requirements and application under Amendment 621, as amended by Amendment 890 . . . because [it] defines a new crime or amends the definition of an existing crime."

**Section 11**, the final section, establishes that the Act "shall become effective 30 days following its passage and approval by the Governor, or its otherwise becoming law."

### B.    *Procedural History*

On April 19, 2022, a group of plaintiffs initiated this challenge to the Act seeking declaratory and injunctive relief. The group consisted of transgender minors (the "Minor Plaintiffs"), the parents of those transgender minors (the "Parent Plaintiffs"), healthcare providers who regularly treat transgender youth (the "Provider Plaintiffs"), and Reverend Paul A. Eknes-Tucker, the Senior Pastor at Pilgrim Church in Birmingham, Alabama, who

frequently counsels parents of transgender children (collectively, "Plaintiffs").[2]

The original complaint generally alleged that: (1) the Act violates the Due Process Clause of the Fourteenth Amendment by depriving the Parent Plaintiffs of their right to direct the upbringing of their children (Count I); (2) the Act violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against the Minor Plaintiffs on the bases of sex and transgender status (Count II); (3) the Act is preempted by section 1557 of the Affordable Care Act (Count III); (4) the Act violates the Free Speech Clause of the First Amendment (Count IV); and (5) the Act is void for vagueness under the Due Process Clause of the Fourteenth Amendment (Count V). That complaint named the Attorney General of Alabama and several state officials (collectively, "Alabama") as defendants.[3]

Two days later, Plaintiffs filed a motion for preliminary injunction, seeking a ruling preventing the enforcement of the Act in advance of its May 8, 2022, effective date.[4] In light of that request,

---

[2] Reverend Eknes-Tucker is not included as a plaintiff in the operative pleading, the Second Amended Complaint, nor does he take part in this appeal.

[3] The original complaint also included Governor Ivey as a defendant, but the parties subsequently moved to dismiss her from the action on May 3, 2022, pursuant to a joint understanding that she and her office would be bound by any forthcoming injunctive relief. The district court granted that request.

[4] The motion is styled as a "motion for a temporary restraining order and/or preliminary injunction." However, because Alabama received notice of the

the district court expedited the briefing schedule and scheduled a hearing for the first week of May.

On April 29, 2022, the United States filed a motion to intervene, as well as its own motion for preliminary injunction similarly seeking to prevent enforcement of the Act.  Shortly thereafter, fifteen states moved for leave to file an amicus brief in support of Alabama.  That was followed by a group of at least twenty-two professional medical and mental health organizations jointly moving for leave to file an amicus brief in support of Plaintiffs.  The district court ultimately granted the motion to intervene and the motions to file amicus briefs, giving the United States permission to participate in the preliminary injunction hearing and taking the amicus briefs under advisement.

The three-day hearing on Plaintiffs' motion for preliminary injunction began on May 4, 2022.  On that first day, the district court discussed the motion for intervention and heard opening arguments from the parties.  At that time, Plaintiffs represented that they were no longer challenging the portions of section 4 that ban surgical intervention, i.e., subsections (a)(4)–(6), and were instead focusing on the portions of section 4 that ban puberty blockers and cross-sex hormone treatment, i.e. subsections (a)(1)–(3).  The following day, the parties commenced their presentation of the evidence.

---

request for injunctive relief, the motion subsequently was addressed only as a motion for preliminary injunction.

Plaintiffs first tendered Dr. Linda Hawkins and Dr. Morissa Ladinsky as experts in the treatment of gender dysphoria in minors. Dr. Hawkins is the director of the Gender and Sexuality Development Clinic at the Children's Hospital of Philadelphia. She has specialized in treating LGBT youth for roughly twenty-two years and worked with over 4,000 transgender youth. During her testimony, Dr. Hawkins defined "gender identity" as "the internal authentic hardwired sense of one's self as male or female." She further testified that a blanket prohibition on puberty blockers and hormone treatment would be "devastating" for transgender youth, comparing it to "removing somebody's cancer treatment and just expecting them to be okay."

Dr. Ladinsky is an associate professor of pediatrics at the Heersink School of Medicine at the University of Alabama at Birmingham ("UAB") and a board-certified pediatrician at the affiliated hospital. Dr. Ladinsky opened a gender clinic at UAB in the fall of 2015 and, at the time of her testimony, had worked with an estimated 400 to 450 minors suffering from gender dysphoria. Dr. Ladinsky discussed the guidelines on the treatment of gender dysphoria in youth that the UAB gender clinic follows and noted that those guidelines are endorsed by the American Academy of Pediatrics. She also noted that consent forms must be signed by all legal parents and guardians before a minor's hormonal therapy can begin. According to Dr. Ladinsky, puberty blockers pose some risks but, overall, are safe and reversible. She described the risks posed by puberty blockers and cross-sex hormones, related to fertility and sexual function, as "small side effect risks." Dr. Ladinsky also

testified that the youngest minor for which she prescribed puberty blockers was an eleven-year-old female and that about 85 percent of her patients who have taken puberty blockers have gone on to take cross-sex hormones. In her opinion, it is "uncommon" for a minor patient taking puberty blockers to stop experiencing gender dysphoria and begin identifying with their biological sex.

Plaintiffs then called Megan Poe (one of the Parent Plaintiffs), Dr. Rachel Koe (one of the Provider Plaintiffs), and Reverend Eknes-Tucker to testify about their personal knowledge and experience regarding gender dysphoria.

Poe is the mother of a biological male who identifies as a female. When asked how her child presents as a female, Poe testified that her child "is very over the top girly," "loves makeup and hair," and "[is] always worried about her clothes." The child began showing signs of a female gender identity at the age of two, according to Poe, by wanting girl toys and girl clothes. The child started puberty blockers in sixth grade and then started hormone therapy at the age of fourteen. Poe reported that her child now is "so happy" and "thriving" and has not experienced any side effects from the treatment. She insisted that her child is "definitely not [experiencing] a phase" and is "never going to grow out of this." Poe also said she was afraid that her child would commit suicide if the treatments were no longer available.

Dr. Koe is a pediatrician in southeast Alabama. Dr. Koe reported that she treats transgender adolescents but has never treated a patient with gender dysphoria who later desisted or expressed

regret about receiving these types of treatments. She also testified that, if the Act takes effect, it will leave her "stuck in a place where [she doesn't] know how to proceed" nor how to provide care for patients with gender dysphoria.

Reverend Eknes-Tucker is the Senior Pastor at Pilgrim Church in Birmingham, Alabama, and has been a pastor for 45 years. Reverend Eknes-Tucker testified that there have been transgender individuals in every congregation that he has served and that he has given advice to parents of transgender children on numerous occasions. He clarified that he has not given medical advice but that he has helped connect parents of transgender children with doctors who provide gender-affirming care.

In addition to this live testimony, Plaintiffs produced as evidence various organizational medical guidelines, sworn declarations, research articles, and other documents.

Next, the United States, as an intervenor on behalf of Plaintiffs, tendered Dr. Armand H. Antommaria as an expert in bioethics and treatment protocols for adolescents suffering from gender dysphoria. Dr. Antommaria is the chair of pediatric ethics and an attending physician at Cincinnati Children's Hospital Medical Center. During his testimony, Dr. Antommaria addressed the dearth of randomized controlled trials for the treatment of minors with puberty blockers and cross-sex hormone therapy and expressed his concern that such trials "would be unethical," given the lack of confidence that the control group and the experimental group would receive equally efficacious treatment. He also expressed concern that any

such trials "would have substantial methodological limitations," given the need to recruit enough participants and conduct a blind study.  When asked for his opinion regarding the ability of parents and adolescents to adequately understand and give informed consent to the provision of puberty blockers and hormone therapy, Dr. Antommaria answered that those treatments are "comparable to other decisions that parents and their children make in pediatric healthcare on a frequent basis."  He further testified that there are no equally effective alternative medical treatments for adolescents with gender dysphoria and that there is not an ethical basis for distinguishing between minors experiencing precocious puberty[5] and minors experiencing gender dysphoria with respect to the provision of puberty blockers and hormone treatment.

Along with Dr. Antommaria's testimony, the United States presented, among other things, various organizations' medical policy statements and guidelines, some research and news articles, and Dr. Antommaria's declaration and curriculum vitae.  For example, the United States presented the Standards of Care of the World Professional Association for Transgender Health ("WPATH"), which endorse the use of puberty blockers and cross-sex hormone treatment for minors when certain criteria are met.  The United States also offered statements by the Alabama Psychological Association and the American Academy of Pediatrics supporting the use of puberty blockers and cross-sex hormone treatment for minors and opposing the Act.  The full record reveals that at least twenty-

---

[5] Precocious puberty is the premature initiation of puberty.

two professional medical and mental health organizations support the use of such medications.

On cross-examination, Dr. Antommaria acknowledged that "[t]here are risks involved in the treatment course for the treatment of gender dysphoria." He went on to note that, for puberty blockers and cross-sex hormones generally, there is a risk of impaired fertility, and that, for estrogen therapy, there is a risk of change in sexual function. When asked whether he agrees that more research is needed to study the efficacy and the costs and benefits of gender-affirming care, Dr. Antommaria responded that "more research is needed in all areas of health care."

Alabama, for its part, first tendered Dr. James Cantor. Dr. Cantor is a clinical psychologist and neuroscientist who was called as an expert on psychology, human sexuality, research methodology, and the state of research on gender dysphoria. In response to Dr. Antommaria's testimony, Dr. Cantor confirmed that none of the existing studies on puberty blockers and hormone therapies are randomized and opined that there are alternative methodologies that would be more reliable than observational trials, which he described as the lowest quality of evidence. Dr. Cantor also testified that the existing research does not support the conclusion that the use of puberty blockers and hormone therapy is "the only safe and effective treatment for gender dysphoria." In his opinion, gender dysphoria can be treated with a "watchful waiting approach" whereby decisions about medical interventions are withheld, but therapy is continued, until more information becomes available.

According to Dr. Cantor, clinical guidelines suggest that comorbidities, including mental health issues, should be resolved prior to pursuing puberty blockers and cross-sex hormone treatment. He also noted that some cases of gender dysphoria have turned out to be prepubescent children misinterpreting their same-sex attraction and that blocking puberty in such cases prevents those children from understanding their sexuality.

On cross-examination, Dr. Cantor acknowledged that he is not a medical doctor and that he has not provided care to transgender adolescents under the age of sixteen.

Alabama then called Sydney Wright to testify about her personal experience with gender dysphoria. Wright is a biological female who is married to another woman. At the time of her testimony, Wright was twenty-three years old. She testified that she began identifying as transgender and receiving related treatment when she was seventeen years old, which culminated in testosterone therapy for approximately one year when she was nineteen years old. According to Wright, the testosterone treatment put her at a greater risk of heart attack or stroke and caused her to develop tachycardia. She explained that, after a significant discussion with her grandfather, she stopped identifying as transgender and receiving testosterone therapy. She now believes that her doctors mishandled her treatment and that she simply needed counseling during her teenage years. She also reported that her digestive system is "still messed up" and that she may have fertility issues as a result of the testosterone therapy that she received over three-and-a-half

years earlier.  When asked what she would tell a young person struggling with gender dysphoria, Wright stated that she would advise them to take "a lot of time," "love [themselves]," and understand that they can act and dress like the opposite sex without "hav[ing] to transition."

In addition to these two witnesses, Alabama produced, among other things, research papers, foreign countries' medical guidelines, and the declarations of various healthcare professionals and individuals with experience related to gender dysphoria.  For example, in terms of healthcare professionals, Alabama produced a declaration in which Dr. Quentin L. Van Meter[6] states that comparing the use of puberty blockers for precocious puberty with the use of puberty blockers for gender dysphoria is like "comparing apples to oranges," given the evidence that "normal bone density can't be fully reestablished" in the latter case and the lack of long-term data on bone, gonad, and brain health.  Alabama also produced a declaration in which Dr. Patrick Hunter[7] attests that "there is currently no established standard of care for transgender-identified youth" and that "[t]he medical risks of 'gender-affirming' interventions are substantial."  In terms of individuals with personal experience related to gender dysphoria, Alabama produced the

---

[6] Dr. Van Meter is a board-certified pediatrician and pediatric endocrinologist who currently works in private practice.

[7] Dr. Hunter is a board-certified pediatrician with a master's degree in bioethics who currently holds academic positions at the University of Central Florida and Florida State University.

declaration of Corinna Cohn, a biological male who underwent sex reassignment surgery at the age of nineteen—which included the removal of testicles, penectomy, and vaginoplasty—and who, looking back, claims to have been "unprepared to understand the consequences" of seeking such medical interventions as a teenager. Alabama also produced a declaration in which Carol Freitas, a biological female who previously experienced gender dysphoria, claims that "[transitioning] was the biggest mistake [that she] ever made" and that she instead should have been treated for depression and post-traumatic stress disorder related to her "internalized homophobia and childhood abuse." Lastly, in terms of medical opinions from foreign countries, Alabama produced documents showing that public healthcare entities of Sweden, Finland, France, Australia, New Zealand, and the United Kingdom have raised concerns about the risks associated with puberty blockers and cross-sex hormone treatment and supported greater caution and/or more restrictive criteria in connection with such interventions.

On May 13, 2022, the district court granted in part and denied in part the motions for preliminary injunction, enjoining Alabama from enforcing section 4(a)(1)–(3) but allowing the rest of the Act to remain in effect. The ruling was based on, among other things, a determination that Plaintiffs had shown a substantial likelihood of success on the merits as to their substantive due process claim and equal protection claim (Counts I and II), but not as to their other claims. With respect to the substantive due process claim (Count I), the district court recognized a fundamental right of parents to "treat their children with transitioning medications

22-11707                Opinion of the Court                23

subject to medically accepted standards," held that the Act infringes upon that fundamental right and concluded that Alabama had not sufficiently demonstrated that the Act is narrowly tailored to achieve a compelling state interest.  With respect to the equal protection claim (Count II), the district court held that the Act "amounts to a sex-based classification" and concluded that Alabama had not proffered a sufficiently persuasive justification for that classification.

Alabama filed a timely notice of appeal on May 16, 2022.[8]

## II.    STANDARD OF REVIEW

"We review the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Id.* (quoting *United States v. Estrada*, 969 F.3d 1245, 1261 (11th Cir. 2020)).

## III.    ANALYSIS

A district court may grant injunctive relief only if the moving party demonstrates that: "(1) it has a substantial likelihood of

---

[8] The operative pleading—the second amended complaint—was filed on September 19, 2022.  In terms of counts, the second amended complaint contains only the substantive due process claim and the equal protection claim.

success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "In considering these four prerequisites, [courts] must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion" as to these four prerequisites. *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *accord Siegel*, 234 F.3d at 1176.[9]

As previewed, the district court determined that these four prerequisites are met with respect to section 4(a)(1)–(3) and thus enjoined Alabama from enforcing that part of the Act. The district court dedicated the bulk of its analysis in the preliminary injunction order to the first prerequisite and ultimately found that Plaintiffs had established a substantial likelihood of success as to their substantive due process claim and equal protection claim. Because the parties' arguments on appeal similarly focus on the likelihood-of-success prerequisite, we do the same. We begin with the substantive due process claim and then turn to the equal protection claim.

### A. Substantive Due Process

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held that this language guarantees both procedural and substantive rights. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). Those substantive rights include a "great majority" of the rights guaranteed by the first eight Amendments vis-à-vis the federal government, as well as "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id.*; *see also McDonald v. City of Chicago*, 561 U.S. 742, 760–66 (2010) (reviewing the history of the Supreme Court's incorporation of "almost all of the provisions of the Bill of Rights" against the States).

To determine whether a right at issue is one of the substantive rights guaranteed by the Due Process Clause, courts must look to whether the right is "deeply rooted in [our] history and tradition" and "essential to our Nation's 'scheme of ordered liberty.'" *Dobbs*, 142 S. Ct. at 2246 (alteration in original) (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019)). The outcome of this analysis determines the amount of leeway that states have to enact laws that infringe upon the right at issue. "Laws that burden the exercise of a fundamental right require strict scrutiny and are sustained only if narrowly tailored to further a compelling government interest." *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004). Conversely, laws that do not burden the exercise of a fundamental right (and do not discriminate against a suspect class under the Equal Protection Clause) are subject to rational

26                    Opinion of the Court                    22-11707

basis review and need only "be rationally related to a legitimate governmental interest." *Jones v. Governor of Florida*, 950 F.3d 795, 809 (11th Cir. 2020). Although not "toothless," rational basis review is "highly deferential to government action." *Id.* (quoting *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981)).

In other words, every time a court recognizes an asserted right as a fundamental right protected by the Constitution, the court, "to a great extent, place[s] the matter outside the arena of public debate and legislative action." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). For that reason, the Supreme Court has instructed courts addressing substantive due process claims to "engage[] in a careful analysis of the history of the right at issue" and be "'reluctant' to recognize rights that are not mentioned in the Constitution." *Dobbs*, 142 S. Ct. at 2246–47 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)).

In this case, the district court determined that the "right to treat [one's] children with transitioning medications subject to medically accepted standards" is one of the substantive rights guaranteed by the Due Process Clause and that, therefore, section 4(a)(1)–(3) is subject to strict scrutiny. But the use of these medications in general—let alone for children—almost certainly is not "deeply rooted" in our nation's history and tradition. Although there are records of transgender or otherwise gender nonconforming individuals from various points in history,[10] the earliest-

---

[10] *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 822 n.1 (11th Cir. 2022) (Wilson, J. dissenting) (noting that Justinian's Code, from the

recorded uses of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century.[11, 12]  Indeed, the district

_____

early sixth century AD, contains discussion of "hermaphrodites"); Mary Beth Norton, *Founding Mothers & Fathers: Gendered Power and the Forming of American Society* 183–202 (1996) (discussing the case of Thomasine Hall, also known as Thomas Hall, an intersex individual who alternated between identifying as a man and as a woman and who was ordered by a Virginia court in 1629 to wear dual-gendered apparel); Genny Beemyn, *U.S. History, in Trans Bodies, Trans Selves: A Resource for the Transgender Community* 501, 501–53 (Laura Erickson-Schroth ed. 2014) (discussing multiple prominent transgender individuals born between 1882 and 1926, including Lili Elbe, formerly known as Einar Wegener;  Laurence Michael Dillon, formerly known as Laura Maud Dillon; and Christine Jorgensen, formerly known as George William).

[11] Puberty blockers first began being used in the 1980s.  *See* Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars-Sinai Blog (Jan. 16, 2023), https://www.cedars-sinai.org/blog/puberty-blockers-for-precocious-puberty.html; Simona Giordano & Søren Holm, *Is Puberty Delaying Treatment 'Experimental Treatment'?*, 21(2) Int'l. J. Transgend. Health 113 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7430465/.

[12] Estrogen and testosterone were not discovered and characterized until the 1920s and 1930s.  *See* Jamshed R. Tata, *One Hundred Years of Hormones*, 6 EMBO Rep. 490, 491 (2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1369102/pdf/67400444.pdf.  Laurence Michael Dillon, formerly known as Laura Maud Dillon, began receiving testosterone treatment for purposes of treating the discordance between biological sex and sense of gender identity in 1939 and is thought by some to be the first biological female to receive such treatment.  *See* Pagan Kennedy, *The First Man-Made Man: The Story of Two Sex Changes, One Love Affair, and a Twentieth-Century Medical Revolution* (2007).  According to the WPATH Standards of Care offered by both Plaintiffs and the United States, health professionals began using hormone therapy as a

court's order does not feature any discussion of the history of the use of puberty blockers or cross-sex hormone treatment or otherwise explain how that history informs the meaning of the Fourteenth Amendment at the time it was ratified—July 9, 1868.[13]  *See Morrissey v. United States*, 871 F.3d 1260, 1269–70 (11th Cir. 2017) (rejecting the notion that the Constitution protects a right to procreate via in vitro fertilization procedures based on the fact that such procedures are "decidedly modern phenomena" that did not come about until 1978).

Rather than perform any historical inquiry specifically tied to the particular alleged right at issue, the order on appeal instead surmises that the "right to treat [one's] children with transitioning medications subject to medically accepted standards" falls under the broader, recognized fundamental right to "make decisions concerning the care, custody, and control of [one's] children." *E.g., Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Lofton*, 358 F.3d at 812. *But see Morrissey*, 871 F.3d at 1269 (emphasizing that a substantive due process analysis must focus on the specific right asserted, rather than simply rely on a related general right).  However, there is no binding authority that indicates that the general right to "make decisions concerning the care, custody, and control of

---

treatment for gender dysphoria "[i]n the second half of the 20th century." Doc. 78-17 at 14.

[13] *See* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 6–7 (2015) ("[T]he original meaning ('communicative content') of the constitutional text is fixed at the time each provision is framed and ratified.").

[one's] children" includes the right to give one's children puberty blockers and cross-sex hormone treatment.

The fundamental right to "make decisions concerning the care, custody, and control of [one's] children," as it is recognized today, traces back in large part to *Meyer v. Nebraska*, 262 U.S. 390 (1923). There, the Supreme Court held that a Nebraska law restricting the teaching of foreign languages violated the Due Process Clause. *Id.* at 400–03. In doing so, the Court recognized that the "liberty" guaranteed by the Due Process Clause includes the right "to engage in any of the common occupations of life, to acquire useful knowledge, *to marry, establish a home and bring up children*, . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness of free men." *Id.* at 399 (emphasis added).

The Supreme Court elaborated on the fundamental liberty of parents two years later in *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925). That case addressed Oregon's Compulsory Education Act of 1922, which mandated that parents send their school-aged children to public school (as opposed to private school). *Id.* at 530–31. Citing its decision in *Meyer*, the Court concluded that the Oregon law violated the Due Process Clause on the basis that it "unreasonably interferes with the liberty of parents and guardians to *direct the upbringing and education of children under their control.*" *Id.* at 534–35 (emphasis added).

*Meyer* and *Pierce* ushered in a line of Supreme Court decisions that recognized, and further defined the contours of, parents'

30                    Opinion of the Court                    22-11707

liberty interest to control the upbringing of their children.[14] The majority of those cases, however, pertain to issues of education, religion, or custody.  The Supreme Court's most extensive discussion of parents' control over the medical treatment received by their children came in *Parham v. J. R.*, 442 U.S. 584 (1979).

    In *Parham*, a group of minors brought a Due Process challenge to Georgia's procedures for committing children to mental hospitals.  *Id.* at 587–88.  At the time, Georgia law provided for the voluntary admission of children upon application by a parent or

---

[14] *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166–69 (1944) (recognizing that "the custody, care and nurture of [children] reside[s] first in the parents," but nevertheless upholding Massachusetts child labor laws that restricted the ability of children to sell religious literature in accordance with their parents' wishes based on the state's "authority over children's activities" and "the crippling effects of child employment, more especially in public places" (footnote omitted)); *Stanley v. Illinois*, 405 U.S. 645, 646–59 (1972) (holding that Illinois could not automatically designate the children of unwed parents as wards of the state upon the death of the mother because fathers of children born out of wedlock have a "cognizable and substantial" "interest in retaining custody of [their] children" under the Constitution); *Wisconsin v. Yoder*, 406 U.S. 205, 213–234 (1972) (holding that Wisconsin could not compel school attendance beyond the eighth grade because doing so would "grave[ly] interfere[] with important Amish religious tenets" and "the traditional interest of parents with respect to the religious upbringing of their children"); *Troxel*, 530 U.S. at 60–75 (striking down Washington's nonparental visitation statute, which would have permitted any person to petition for visitation rights at any time and courts to grant such rights whenever in the best interest of the child, on the basis that it contravened "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" and "the traditional presumption that a fit parent will act in the best interest of his or her child").

guardian. *Id.* at 590–91. Thus, the question at issue was whether the minors had a *procedural* due process right to greater procedural safeguards, e.g., a judicial hearing, before their parents could commit them. *Id.* at 610. The Supreme Court concluded that "some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied," but that the inquiry could be "informal," e.g., conducted by a staff physician, and did not require an adversarial proceeding with a judicial or administrative officer. *Id.* at 606–10. "[R]equiring a formalized, factfinding hearing," according to the Supreme Court, would "[p]it[] the parents and the child" against each other and represent a "significant intrusion into the parent-child relationship." *Id.* at 610; *see also id.* ("It is one thing to require a neutral physician to make a careful review of the parents' decision in order to make sure it is proper from a medical standpoint; it is a wholly different matter to employ an adversary contest to ascertain whether the parents' motivation is consistent with the child's interests."). In so ruling, the Supreme Court recognized, as a general matter, that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment," *id.* at 603, and that parents retain "plenary authority" as well as "a substantial, if not the dominant, role" in deciding to pursue lawfully available treatment, like institutionalization, for their children, *id.* at 604; *see also id.* at 609 (concerning "treatment that is provided by the state"). *Parham* was concerned about the procedures a state must afford a child prior to institutionalization when the parent believes such treatment—which

32                    Opinion of the Court                    22-11707

is not only lawful but provided by the state itself—is necessary. No-
tably, *Parham* does not at all suggest that parents have a fundamen-
tal right to direct a particular medical treatment for their child that
is prohibited by state law. *Parham* therefore offers no support for
the Parent Plaintiffs' substantive due process claim.

This Court has issued its own series of decisions outlining
the contours of parents' liberty interest to control the upbringing
of their children,[15] with the most relevant decision being *Bendiburg
v. Dempsey*, 909 F.2d 463 (11th Cir. 1990). In that case, the State of
Georgia had obtained temporary custody of a fifteen-year-old boy
who was injured in an automobile accident. As the boy's custodian

---

[15] *See, e.g.*, *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 312–14 (11th
Cir. 1989) (holding that the parent plaintiffs sufficiently alleged a cause of ac-
tion under 42 U.S.C. § 1983 for violation of the fundamental right to direct the
upbringing of one's children against two school officials who allegedly coerced
a minor female into undergoing an abortion), *overruled on other grounds by
Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163
(1993); *Lofton*, 358 F.3d at 811–15 (declining to extend the parental right of con-
trol protected by the Due Process Clause to foster parents); *Robertson v.
Hecksel*, 420 F.3d 1254, 1255–60 (11th Cir. 2005) (declining "to further expand
the substantive protections of the Due Process Clause" by recognizing that a
mother whose son was killed by police during a traffic stop "suffered a depri-
vation of [a] constitutionally-protected liberty interest in a continued relation-
ship with [him]"); *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1281–86 (11th
Cir. 2008) (holding that Florida's Pledge of Allegiance statute, which requires
students to recite the Pledge in the absence of a written request to the contrary
by a parent, is constitutional despite restricting the students' freedom of
speech because it advances the fundamental rights of parents to direct the up-
bringing of their children).

and over the father's wishes,[16] Georgia consented to the use of a Hickman catheter on the boy, which allegedly caused a massive pulmonary embolus and ultimately the boy's death. *Id.* at 466–67. This Court allowed the father's *procedural* due process claims against certain defendants to proceed to trial, noting that "neither the state nor private actors, concerned for the medical needs of a child, can willfully disregard the rights of parents to generally make decisions concerning the treatment to be given to their children" and that "[t]he Due Process Clause prevents government from abusing its power, or employing its power as an instrument of oppression." *Id.* at 470. But, as relevant here, this Court affirmed the determination that the father had no *substantive* due process claim and recognized that "[t]he state has an interest in protecting the health, safety, and welfare of children residing within its borders."[17] *Id.* at 468, 470.

    In sum, none of the binding decisions regarding substantive due process establishes that there is a fundamental right to "treat [one's] children with transitioning medications subject to medically

---

[16] The child's mother had been killed in the same automobile accident. *Bendiburg*, 909 F.2d at 466.

[17] It bears emphasizing that *Bendiburg* dealt with a situation wherein a State interfered with a single parent's ability to *refuse* certain lawful medical treatment for his child. *Id.* at 466–67. To the extent that *Bendiberg* supports the proposition that parents have a substantive due process right relating to the medical treatment that their children receive, its reasoning is not equally applicable to situations involving parents' ability to *affirmatively obtain* certain medical treatment for their children that the State prohibits.

accepted standards." Instead, some of these cases recognize, at a high level of generality, that there is a fundamental right to make decisions concerning the "upbringing" and "care, custody, and control" of one's children. *See Pierce*, 268 U.S. at 534–35; *Troxel*, 530 U.S. at 66. And those decisions applying the fundamental parental right in the context of medical decision-making do not establish that parents have a derivative fundamental right to obtain a particular medical treatment for their children as long as a critical mass of medical professionals approve. Moreover, all of the cases dealing with the fundamental parental right reflect the common thread that states properly may limit the authority of parents where "it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Wisconsin v. Yoder*, 406 U.S. 205, 233–34 (1972); *see also Prince v. Massachusetts*, 321 U.S. 158, 168–69 (1944); *Parham*, 442 U.S. at 604; *Bendiburg*, 909 F.2d at 470. Against this backdrop, and without any historical analysis specifically tied to the medications at issue, Plaintiffs have not shown it to be likely that the Due Process Clause of the Constitution guarantees a fundamental "right to treat [one's] children with transitioning medications subject to medically accepted standards."[18] *See L.W. v. Skrmetti*, 73 F.4th 408, 416–17 (6th Cir. July 8, 2023) (recognizing that parents "have a substantive due process

---

[18] This is consistent with the fact that there has been no showing of any historical recognition of a fundamental right of adults to obtain the medications at issue for themselves. As Alabama points out, it would make little sense for adults to have a *parental* right to obtain these medications for their children but not a *personal* right to obtain the same medications for themselves.

right 'to make decisions concerning the care, custody, and control of their children'" but noting that "[n]o Supreme Court case extends it to a general right to receive new medical or experimental drug treatments" (quoting *Troxel*, 530 U.S. at 66)).

Because the Due Process Clause does not guarantee the described right, state regulation of the use of puberty blockers and cross-sex hormone treatment for minors would be subject only to rational basis review and thus afforded "a 'strong presumption of validity.'" *Dobbs*, 142 S. Ct. at 2284 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). "Under this deferential standard," the question that we ask "is simply whether the challenged legislation is rationally related to a legitimate state interest." *Lofton*, 358 F.3d at 818. Such a relationship may merely "be based on rational speculation" and need not be supported "by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *accord Jones*, 950 F.3d at 809 ("When we review a statute for rationality, generally we ask whether there is *any* rational basis for the law, even if the government's proffered explanation is irrational, and even if it fails to offer any explanation at all.").

We are highly doubtful that section 4(a)(1)–(3) would not survive the lenient standard that is rational basis review. It is well established that states have a compelling interest in "safeguarding the physical and psychological well-being of . . . minor[s]." *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)). In the same vein, states have a compelling interest in protecting children from drugs,

particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects.[19]  Although rational speculation is itself sufficient to survive rational basis review, here Alabama relies on both record evidence and rational speculation to establish that section 4(a)(1)–(3) is rationally related to that compelling state interest.  First, the record evidence is undisputed that the medications at issue present *some* risks.  As the district court recognized, these medications can cause "loss of fertility and sexual function."  The district court also acknowledged testimony that "several European countries have restricted treating minors with transitioning medications due to growing concern about the medications' risks."  Second, there is at least rational speculation that some families will not fully appreciate those risks and that some minors experiencing gender dysphoria ultimately will desist and identify with their biological sex.  Section 4(a)(1)–(3) addresses these risks by prohibiting the prescription and administration of puberty blockers and cross-sex hormone treatment to a patient under the age of nineteen for purposes of treating discordance between biological sex and sense of gender identity so that children will have more time to develop their identities and to consider all of the

---

[19] As Alabama suggests, the opioid epidemic has shown firsthand the need to be skeptical and exercise caution when there is a sudden uptick in prescriptions of powerful, off-label medications, even when some medical and pharmaceutical organizations defend their safety.  *See also Skrmetti*, 73 F.4th at 418 ("[I]t is difficult to maintain that the medical community is of one mind about the use of hormone therapy for gender dysphoria when the FDA is not prepared to put its credibility and careful testing protocols behind the use.").

potential consequences before moving forward with such treatments.  That connection would be sufficient under rational basis review.

In sum, Plaintiffs' assertion that the Constitution protects the right to treat one's children with puberty blockers and cross-sex hormone therapy is precisely the sort of claim that asks courts to "break new ground in [the] field [of Substantive Due Process]" and therefore ought to elicit the "utmost care" from the judiciary. *See Collins*, 503 U.S. at 125.  The district court held that there is a specific right under the Constitution "to treat [one's] children with transitioning medications subject to medically accepted standards," but did so without performing any analysis of whether that specific right is deeply rooted in our nation's history and tradition.  Instead, the district court grounded its ruling in an unprecedented interpretation of parents' fundamental right to make decisions concerning the "upbringing" and "care, custody, and control" of one's children. *See Pierce*, 268 U.S. at 534–35; *Troxel*, 530 U.S. at 66.  That was error.  Neither the record nor any binding authority establishes that the "right to treat [one's] children with transitioning medications subject to medically accepted standards" is a fundamental right protected by the Constitution.  And, assuming it is not, then section 4(a)(1)–(3) is subject only to rational basis review—a lenient standard that the law seems to undoubtedly clear.  Because the district court erroneously reviewed section 4(a)(1)–(3) with heightened scrutiny, its determination regarding the Parent Plaintiffs' likelihood of success does not justify the preliminary injunction.

## B.    Equal Protection

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

"In considering whether state legislation violates the Equal Protection Clause . . . we apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). All statutory classifications must, at a minimum, satisfy rational basis review. *Id.* Classifications based on race or national origin, however, are reviewed under the "most exacting" level of scrutiny: strict scrutiny. *Id.* Between rational basis review and strict scrutiny lies "a level of intermediate scrutiny," which applies to classifications based on sex or illegitimacy. *Id.*

Thus, a government policy that distinguishes on the basis of sex is permissible under the Equal Protection Clause "only if it satisfies intermediate scrutiny." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022). Under that standard, the party seeking to uphold the policy carries the burden of "showing that the [sex-based] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'"

22-11707              Opinion of the Court                    39

*Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980)).

 "For a government objective to be important, it cannot 'rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.'" *Adams*, 57 F.4th at 801 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). And for a policy's means to be substantially related to a government objective, there must be "enough of a fit" between the means and the asserted justification. *Id.* (quoting *Danskine v. Mia. Dade Fire Dep't*, 253 F.3d 1288, 1299 (11th Cir. 2001)). However, "the Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex." *Id.*; *see also Nguyen v. INS*, 533 U.S. 53, 70 (2001) ("None of our gender-based classification equal protection cases have required that the [policy] under consideration must be capable of achieving its ultimate objective in every instance.").

 In this case, the district court first held that section 4(a)(1)–(3) of the Act classifies on the basis of gender nonconformity and therefore classifies on the basis of sex. In determining that section 4(a)(1)–(3) classifies on the basis of gender nonconformity, the district court reasoned that section 4(a)(1)–(3) "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity." And, in holding that a classification on the basis of gender nonconformity necessarily constitutes a classification on the basis of sex, the district court cited the reasoning of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).

After determining that section 4(a)(1)–(3) of the Act amounts to a sex-based classification subject to intermediate scrutiny, the district court then found that Alabama had not offered any exceedingly persuasive justification for the classification and thus concluded that that the Minor Plaintiffs are substantially likely to succeed on their equal protection claim.

On appeal, Alabama maintains that section 4(a)(1)–(3) classifies on the bases of age and procedure, not sex or gender nonconformity, and is therefore not subject to any heightened scrutiny above rational basis review. *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) ("[A]ge is not a suspect classification under the Equal Protection Clause."); *Clark*, 486 U.S. at 461 (listing suspect classifications and making no reference to classifications based on procedures). Alabama further argues that section 4(a)(1)–(3) would survive at any level of scrutiny because it "serves the compelling [state] interest of protecting children from unproven, life-altering medical interventions" and because "no other approach would offer children in Alabama adequate protection."

In response, the Minor Plaintiffs argue that section 4(a)(1)–(3) classifies on the basis of sex both directly, by using sex-based terms, and indirectly, by classifying on the basis of gender nonconformity, and that the district court therefore properly applied intermediate scrutiny. The Minor Plaintiffs also argue that, even if the more lenient rational basis standard applies, section 4(a)(1)–(3) does not pass muster. For its part, the United States makes the argument that section 4(a)(1)–(3) "triggers heightened scrutiny" because it

"discriminates against transgender persons, who constitute at least a quasi-suspect class" by themselves, distinct from sex.

Having carefully considered all of these positions, we agree with Alabama that section 4(a)(1)–(3) is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause. Section 4(a)(1)–(3) is therefore subject only to rational basis review—a standard that it almost undoubtedly satisfies for the reasons discussed. *See supra* Section III.A; *see also Skrmetti*, 73 F.4th at 419 (finding it "highly unlikely" that the plaintiffs could show that Tennessee's substantially similar law "lacks a rational basis"). Because the district court erroneously departed from that standard, its assessment regarding the Minor Plaintiffs' likelihood of success as to their equal protection claim cannot support the preliminary injunction. We reason as follows.

To begin, we reject the view that section 4(a)(1)–(3) amounts to a sex-based classification subject to intermediate scrutiny. As mentioned, one of the Minor Plaintiffs' arguments is that section 4(a)(1)–(3) directly classifies on the basis of sex because it "uses explicitly sex-based terms to criminalize certain treatments based on a minor's 'sex.'" Of course, section 4(a)(1)–(3) discusses sex insofar as it generally addresses treatment for discordance between biological sex and gender identity, and insofar as it identifies the applicable cross-sex hormone(s) for each sex—estrogen for males and testosterone and other androgens for females. We

42                 Opinion of the Court                 22-11707

nonetheless believe the statute does not discriminate based on sex for two reasons.

First, the statute does not establish an unequal regime for males and females. In the Supreme Court's leading precedent on gender-based intermediate scrutiny under the Equal Protection Clause, the Court held that heightened scrutiny applies to "official action that closes a door or denies opportunity to women (or to men)." *Virginia*, 518 U.S. at 532. Alabama's law does not distinguish between men and women in such a way. *Cf. Adams,* 57 F.4th at 800–11. Instead, section 4(a)(1)–(3) establishes a rule that applies equally to both sexes: it restricts the prescription and administration of puberty blockers and cross-sex hormone treatment for purposes of treating discordance between biological sex and sense of gender identity for *all* minors. *See Skrmetti*, 73 F.4th at 419 (explaining that this sort of restriction on puberty blockers and cross-sex hormone treatment "does not prefer one sex to the detriment of the other").

Second, the statute refers to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based. The Act regulates medical interventions to treat an incongruence between one's biological sex and one's perception of one's sex. The cross-sex hormone treatments for gender dysphoria are different for males and for females because of biological differences between males and females—females are given testosterone and males are given estrogen. With regards to puberty blockers, those

medications inhibit and suppress the production of testosterone in males and estrogen in females. For that reason, it is difficult to imagine how a state might regulate the use of puberty blockers and cross-sex hormones for the relevant purposes in specific terms *without* referencing sex in some way. Thus, we do not find the direct sex-classification argument to be persuasive.

The Minor Plaintiffs' other sex-based argument is that section 4(a)(1)–(3) indirectly classifies on the basis of sex by classifying on the basis of gender nonconformity. This is the position that the district court adopted, citing *Bostock* and *Brumby*. Neither of those cases, however, dealt with the Equal Protection Clause as applied to laws regulating medical treatments.

*Bostock* dealt with Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C. § 2000e *et seq.*, in the context of employment discrimination. *See* 140 S. Ct. at 1737–41, 1754 (holding that "[a]n employer who fires an individual merely for being gay or transgender defies [Title VII]"). After noting that "only the words on the page constitute the law adopted by Congress and approved by the President," *id.* at 1738, the Court in *Bostock* relied exclusively on the specific text of Title VII. The Court "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female." *Id.* at 1739. But the Court reasoned that the combined ordinary meaning of the words "because of," *id.*, "otherwise . . . discriminate against," *id.* at 1740, and "individual," *id.*, led to the conclusion that Title VII makes "[a]n

44                    Opinion of the Court                    22-11707

individual's homosexuality or transgender status . . . not relevant to employment decisions," *id.* at 1741.

The Equal Protection Clause contains none of the text that the Court interpreted in *Bostock*. It provides simply that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case. *See Skrmetti*, 73 F.4th at 420 (finding that the reasoning of *Bostock* "applies only to Title VII"); *see also Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc) (expressing skepticism that *Bostock*'s reasoning applies to the Equal Protection Clause of the Fourteenth Amendment because the Fourteenth Amendment "predates Title VII by nearly a century" and contains language that is "not similar in any way" to Title VII's); *see Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring) (noting the different language in Title VI and the Equal Protection Clause and explaining "[t]hat such differently worded provisions should mean the same thing is implausible on its face.")

*Brumby*, on the other hand, did deal with the Equal Protection Clause; but, like *Bostock*, *Brumby* concerned gender stereotyping in the context of employment discrimination. *See* 663 F.3d at 1313–20 (holding that "a government agent violates the Equal Protection Clause's prohibition of sex-based discrimination when he

or she fires a transgender or transsexual employee because of his or her gender non-conformity"). So, while *Brumby* did involve the same law at issue here—the Equal Protection Clause—it discussed that law as applied to a particular factual scenario, i.e., one where an employer fired an employee for failing to adhere to certain expectations and stereotypes associated with the employee's sex. That is not the scenario presented here. Section 4(a)(1)–(3) targets certain medical interventions for minors meant to treat the condition of gender dysphoria; it does not further any particular gender stereotype. Insofar as section 4(a)(1)–(3) involves sex, it simply reflects biological differences between males and females, not stereotypes associated with either sex.

To be sure, section 4(a)(1)–(3) restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive. But just last year, the Supreme Court explained that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (alteration in original) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)); *see also id.* at 2246 (recognizing that "the 'goal of preventing abortion' does not constitute 'invidiously discriminatory animus' against women" (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273–74 (1993))). By the same token, the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation

46                    Opinion of the Court                    22-11707

were a pretext for invidious discrimination against such individu-
als. And the district court did not find that Alabama's law was
based on invidious discrimination.

We similarly reject the United States' view that section
4(a)(1)–(3) is subject to heightened scrutiny because it classifies on
the basis of transgender status, separate from sex. As we recently
explained, "we have grave 'doubt' that transgender persons consti-
tute a quasi-suspect class," distinct from sex, under the Equal Pro-
tection Clause. *Adams*, 57 F.4th at 803 n.5. Even if they did, for the
reasons discussed with respect to gender nonconformity, section
4(a)(1)–(3)'s relationship to transgender status would not trigger
heightened scrutiny. Chiefly, the regulation of a course of treat-
ment that, by the nature of things, only transgender individuals
would want to undergo would not trigger heightened scrutiny un-
less the regulation is a pretext for invidious discrimination against
such individuals, and, here, the district court made no findings of
such a pretext. For these reasons, we conclude that section 4(a)(1)–
(3)'s relationship to transgender status does not warrant height-
ened scrutiny.

Apart from sex, gender nonconformity, and transgender sta-
tus, the Minor Plaintiffs and the United States do not claim any
other suspect classification. All the parties agree that section
4(a)(1)–(3) draws distinctions on the basis of age. However, "age is
not a suspect classification under the Equal Protection Clause."
*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). As a result,
"[s]tates may discriminate on the basis of age without offending the

Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Id.* And "[t]he rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they serve with razorlike precision." *Id.*

Here, it seems abundantly clear that section 4(a)(1)–(3) classifies on the basis of age in a way that is rationally related to a legitimate state interest. As discussed, Alabama has a legitimate interest in "safeguarding the physical and psychological well-being of . . . minor[s]," and notably that interest itself distinguishes minors from adults. *Otto*, 981 F.3d at 868 (quoting *Ferber*, 458 U.S. at 756–57); *see supra* Section III.A. Section 4(a)(1)–(3) furthers that interest by restricting the prescription and administration of puberty blockers and cross-sex hormone treatment to minors for purposes of treating discordance between biological sex and sense of gender identity based on the rational understanding that many minors may not be finished forming their identities and may not fully appreciate the associated risks. Moreover, Alabama's decision to draw the line at the age of nineteen sufficiently approximates the divide between individuals who warrant government protection and individuals who are better able to make decisions for themselves; it is neither too over- nor under-inclusive. For these reasons, it is exceedingly likely that section 4(a)(1)–(3) satisfies rational basis review as a classification on the basis of age.

Section 4(a)(1)–(3) is therefore subject only to rational basis review—a standard that it is exceedingly likely to satisfy for the

48                  Opinion of the Court                  22-11707

reasons discussed. *See supra* Section III.A. The district court erred
as a matter of law by applying heightened scrutiny, and that error
tainted its assessment of Plaintiffs' likelihood of success. Because
that is true with respect to both the due process claim and the equal
protection claim, we vacate the preliminary injunction.

* * * *

This case revolves around an issue that is surely of the ut-
most importance to all of the parties involved: the safety and well-
being of the children of Alabama. But it is complicated by the fact
that there is a strong disagreement between the parties over what
is best for those children. Absent a constitutional mandate to the
contrary, these types of issues are quintessentially the sort that our
system of government reserves to legislative, not judicial, action.

Faced with this difficult and delicate set of circumstances,
the district court granted the "extraordinary and drastic remedy"
that is a preliminary injunction and enjoined Alabama from enforc-
ing part of the law in dispute. *See Callaway*, 489 F.2d at 573. In
doing so, the district court determined that section 4(a)(1)–(3) of
the Act is subject to heightened scrutiny on due process and equal
protection grounds and therefore the parties challenging the law
had a substantial likelihood of success on the merits as to those
claims. That was erroneous. With respect to the Parent Plaintiffs'
substantive due process claim, the district court divined, without
adequate historical support, that the Due Process Clause of the
Fourteenth Amendment protects the right to "treat [one's] children
with transitioning medications subject to medically accepted

standards." And with respect to the Minor Plaintiffs' equal protection claim, the district court determined that the law classifies on the basis of sex, when in reality the law simply reflects real, biological differences between males and females and equally restricts the use of puberty blockers and cross-sex hormone treatment for minors of both sexes. Because the district court reviewed the law under the wrong standard of scrutiny in connection with both claims, the issuance of the preliminary injunction constituted an abuse of discretion. *See Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) ("[A] court abuses its discretion in granting a preliminary injunction if, in determining whether success is likely, it incorrectly or unreasonably applies the law.").

## IV.    CONCLUSION

For these reasons, we vacate the district court's preliminary injunction on the enforcement of section 4(a)(1)–(3) of the Act.

**VACATED.**

22-11707                    BRASHER, J., Concurring                    1

BRASHER, Circuit Judge, concurring:

I concur in the Court's opinion. I write separately to focus on the plaintiffs' equal protection claim.

The resolution of an equal protection claim often turns on the level of scrutiny that we apply—rational basis, intermediate, or strict. The plaintiffs argue that the statute classifies based on sex, which warrants intermediate scrutiny. The Court rejects that argument, and, after much deliberation and research, I agree. Alabama's statute does not treat one sex differently than the other. It does not use sex as a proxy for some more germane classification. And it is not based on a sex stereotype. Instead, I think the law is best read to classify—not based on sex—but as between minors who want puberty blockers and hormones to treat "a discordance between [their] sex and sense of gender identity," Ala. Code § 26-26-2(2), and those minors who want these drugs to treat a different condition.

But even if the statute did discriminate based on sex, I think it is likely to satisfy intermediate scrutiny. If Alabama's statute involves a sex-based classification that triggers heightened scrutiny, it does so because it is otherwise impossible to regulate these drugs differently when they are prescribed as a treatment for gender dysphoria than when they are prescribed for other purposes. As long as the state has a substantial justification for regulating differently the use of puberty blockers and hormones for different purposes, then I think this law satisfies intermediate scrutiny.

## I.

I'll start with the level of scrutiny that applies to this law. We should be cautious when we are asked to extend heightened scrutiny to novel facts like these. As Justice Stevens explained in one of the Court's leading cases on sex discrimination, the text of the Equal Protection Clause does not subject state laws to different levels of judicial scrutiny. *See Craig v. Boren*, 429 U.S. 190, 211–12 (1976) (Stevens, J., concurring). The Clause "requires every State to govern impartially," and it "does not direct the courts to apply one standard of review in some cases and a different standard in other cases." *Id.*; *see also United States v. Virginia*, 518 U.S. 515, 570 (1996) (Scalia, J., dissenting) (calling tiers of scrutiny "made-up tests"); *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 638 (2016) (Thomas, J., dissenting) (calling tiers of scrutiny "increasingly meaningless . . . formalism"). Moreover, some of the Supreme Court's most recent (and significant) equal protection precedents don't apply the tiers of scrutiny. *E.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 672–76 (2015).

Nonetheless, the Supreme Court has established the tiers of scrutiny, and lower courts must apply that doctrine the best we can. In doing so, I think we must appreciate that the tiers of scrutiny are "no more scientific than their names suggest." *Virginia*, 518 U.S. at 567 (Scalia, J., dissenting). They should be "guidelines informing our approach to the case at hand, not tests to be mechanically applied." *Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 457 (2015) (Breyer, J., concurring). To that end, when we are asked to apply heightened

22-11707          Brasher, J., Concurring          3

scrutiny on novel facts, we need to ensure that the purposes of the
doctrine warrant that approach.

In my view, many judges have mechanically applied inter-
mediate scrutiny to laws like Alabama's without considering the
reasons we subject sex classifications to heightened scrutiny. Con-
sider the Eighth Circuit's decision in *Brandt by & through Brandt v.
Rutledge*, 47 F.4th 661 (8th Cir. 2022). There, the court concluded
that Arkansas's comparable law discriminates based on sex be-
cause, referring to cross-sex hormones, it said that "medical proce-
dures that are permitted for a minor of one sex are prohibited for
a minor of another sex." *Id.* at 669. But the court ignored the law's
ban on puberty blockers, which applies the same way to both sexes.
And, more fundamentally, the court did not explain how applying
heightened scrutiny to a law that regulates sex-specific medical in-
terventions is consistent with the reasons the Supreme Court cre-
ated that standard.

Turning back to this case, Alabama's law is replete with sex-
related language. But, even though the statute uses sex-related lan-
guage, I think it is wrong to say that the statute *classifies* based on
sex. The law regulates drugs that "treat a discordance between [an]
individual's sex and sense of gender identity." Ala. Code § 26-26-
2(2). The law defines "sex" as "[t]he biological state of being male
or female, based on the individual's sex organs, chromosomes, and
endogenous hormone profiles." *Id.* § 26-26-2(3). Then the law pro-
hibits various treatments "for the purpose of attempting to alter
the appearance of or affirm the minor's perception of his or her

gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act." *Id.* § 26-26-4(a).

I see the word "sex" in this law. But I don't see a sex *classification*—at least, not as the idea of a sex classification appears in our equal-protection caselaw. Instead, it seems to me that this sex-related language classifies between, on the one hand, those minors who want these drugs to treat "a discordance between [their] sex and sense of gender identity" and, on the other hand, those minors who want these drugs to treat a different condition. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). So the right question under the Equal Protection Clause is whether these two groups—those who want to use these drugs to treat a discordance between their sex and gender identity and those who want to use these drugs to treat other conditions—are similarly situated.

That question isn't one that seems suited to heightened scrutiny. The Equal Protection Clause prohibits "giv[ing] a mandatory preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971). We apply heightened scrutiny to sex classifications because of an intuition that, "[r]ather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women." *City of Cleburne*, 473 U.S. at 441. When we apply heightened scrutiny to a statute that classifies based on sex, the point is to ascertain

22-11707          BRASHER, J., Concurring          5

whether the classification is based on "traditional, often inaccurate, assumptions about the proper roles of men and women." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725–26 (1982). We are also seeking to ensure that sex is not being used as an "inaccurate proxy for other, more germane bases of classification." *Craig*, 429 U.S. at 198.

None of these rationales apply to the line drawn in Alabama's statute. It doesn't distribute benefits or burdens between men and women or arguably use sex as a proxy for other interests. It bans a course of treatment—puberty blockers and hormones—for a particular condition that affects both boys and girls. Another way to think about it: an injunction against the enforcement of Alabama's law under equal-protection principles will not equalize burdens or benefits between girls and boys. It will not require the government to treat boys and girls the same. It will merely force Alabama to *either* ban puberty blockers and hormones for all purposes *or* allow them for all purposes.

For its part, the district court applied heightened scrutiny on the theory that Alabama's statute discriminates based on a sex stereotype because it targets medical interventions for transgender people, i.e., those who feel a "a discordance between [their] sex and sense of gender identity." The district court cited *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011), for this proposition, but I think it misread that precedent.[1] In *Glenn*, we concluded that a public

---

[1] I don't fault the district court for reaching the conclusion that it did. The district court did an admirable job with a difficult case on an expedited

employer engaged in sex discrimination by firing a transgender employee who was born a man because the employee began wearing stereotypical women's clothing. *Id.* at 1314. The employer allowed biological women to wear stereotypical women's clothing, but not biological men. We held that the employer had engaged in sex discrimination under the Equal Protection Clause—not because it fired a transgender employee—but because it fired an employee "on the basis of gender-based behavioral norms." *Id.* at 1316–17. By ruling against that practice under the circumstances of that case, we required the employer to treat men and women equally, no matter their clothing choices.

Unlike the employer's decision in *Glenn*, Alabama's statute does not fit the mold of a sex-based stereotype. The statute isn't based on a socially constructed generalization about the way men or women should behave. It does not reinforce an "assumption[] about the proper roles of men and women" in our society. *Hogan*, 458 U.S. at 725–26. And it doesn't reflect society's "notions of the relative capabilities of men and women." *City of Cleburne*, 473 U.S. at 441. To be sure, the statute's classification reflects the government's recognition that, without medical intervention, a healthy child will mature in accord with his or her biological sex. But the recognition of biological reality is "not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68 (2001).

―――――――――――――

timeframe. One of the benefits of the appellate process is that we have more time and resources to assess a legal question, which sometimes yields a different result.

The district court—viewing this case through the lens of sex stereotyping—did not make any findings on whether the state was justified in treating people differently because they want these drugs to treat a discordance between their sex and gender identity instead of some other condition. But the state has identified many reasons for drawing that line. For example, the record reflects that other countries are regulating the drugs differently for these purposes, and the FDA has not approved them for this purpose although it has for others. I cannot say that those reasons fail the lenient standard of rational basis review. *See Jones v. Gov. of Fla.*, 975 F.3d 1016, 1034–35 (11th Cir. 2020).

## II.

Although I believe rational basis scrutiny likely applies, I also think that, even if Alabama's statute triggered intermediate scrutiny, it would likely survive that heightened scrutiny.

Intermediate scrutiny under the Equal Protection Clause does not require us to ask whether a law is good or bad policy, but whether a government has a good reason for using a sex-based classification in a law. The relevant question is whether "*the classification* serves 'important governmental objectives and that *the discriminatory means* employed' are 'substantially related to the achievement of those objectives.'" *Hogan*, 458 U.S. at 724 (quoting *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 150 (1980)) (emphasis added). As I discuss above, the purpose of this heightened scrutiny is to ensure that laws based on sex classifications aren't using those classifications because of "outmoded notions of the relative

8                    BRASHER, J., Concurring                    22-11707

capabilities of men and women." *City of Cleburne*, 473 U.S. at 441. Instead, the use of sex must reflect that it is a "meaningful consideration[]" on which the law is based. *Id.* And so, under intermediate scrutiny, the government's burden is to establish "an 'exceedingly persuasive justification' *for the classification*." *Hogan*, 458 U.S. at 724 (quoting *Kirchberg v. Feenstra* 450 U.S. 455, 461 (1981)) (emphasis added).

Assuming the classification in this law is subject to intermediate scrutiny, I believe the state probably has an "exceedingly persuasive justification" for regulating these drugs differently when they are used to treat a discordance between an individual's sex and sense of gender identity than when they are used for other purposes. *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531). The record reflects that the use of puberty blockers and hormones for this purpose specifically carries potentially uncertain risks. The record also reflects that there is uncertainty about how to tell which patients need these interventions for this purpose and which don't. Although further fact finding in this litigation will test the plausibility of those concerns, Alabama doesn't have to conclusively prove these things to have an important governmental interest. Intermediate scrutiny permits "the legislature [to] make a predictive judgment" based on competing evidence. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799–800 (2011) (discussing relative burdens of intermediate and strict scrutiny).

Likewise, I think the state's interest is sufficiently related to the sex classification in the law to the extent there is one. Assuming

this statute involves a sex-based classification, it does so because
there is no other way to regulate treatments for "a discordance be-
tween [an] individual's sex and sense of gender identity" without
drawing such a distinction. Alabama would have to use sex-based
language to regulate those treatments even if it wanted to subsidize
them instead of banning them. So, if intermediate scrutiny applied
here, the "sufficiently related" question collapses into the state in-
terest question: it is whether Alabama has an important govern-
mental interest in regulating the use of puberty blockers and hor-
mones for "a discordance between [an] individual's sex and sense
of gender identity" but not for other uses. Because the record re-
flects that the state has that kind of interest, the statute's classifica-
tion likely satisfies intermediate scrutiny.

The plaintiffs argue, in part, that Alabama is not justified in
*banning* these treatments because there are less restrictive alterna-
tives to a ban. But I don't think that is how intermediate scrutiny
works under the Equal Protection Clause. Consider how the Su-
preme Court applied intermediate scrutiny in *Craig v. Boren*, 429
U.S. 190 (1976). There, a state law prohibited sales of alcohol to
men between the ages of eighteen and twenty but not women in
that age range. *Id.* at 191–92. The Court accepted that the goal of
this law—"the enhancement of traffic safety"—is an important in-
terest. *Id.* at 199–200. But it held that the government did not have
sufficient evidence that a "gender-based distinction closely serves
to achieve that objective." *Id.* at 200. The Court in *Craig* never asked
whether the state's decision to *ban* under-21-year-old men from
drinking alcohol was justified as compared to some less restrictive,

but equally sex-based, alternative—such as making men take additional driving classes or the like. Instead, the Court assessed only whether the *sex-based classification* fit closely enough to the purposes of the law. Likewise, here, I think we can resolve the plaintiffs' equal protection claim by assessing whether the state has an interest in classifying based on sex without also asking whether, even if the state were allowed to classify based on sex, the state could achieve its objective with some lesser restriction.

In short, assuming this law is subject to intermediate scrutiny, I think it likely passes. On this record, it seems clear that the state has an interest in regulating these drugs differently when they are prescribed to treat a discordance between sex and gender than when they are prescribed to treat other conditions. And the state cannot do that without drawing the lines it has drawn in this statute.

### III.

Whether rational basis or intermediate scrutiny applies, I believe this appeal comes out the same way: the state will likely prevail on the merits. Future findings of fact in the district court may establish otherwise. But at this stage, the plaintiffs have not carried their burden entitling them to a preliminary injunction. I concur.